1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

   THOMSON REUTERS ENTERPRISE CENTRE
4  GMBH and WEST PUBLISHING CORPORATION,:   CIVIL ACTION
                                         :
5            Plaintiffs,                  :
   v                                     :
6                                        :
   ROSS INTELLIGENCE INC.,               :
7                                        :   NO. 20-613-LPS
            Defendant.
8                              - - -

9                         Wilmington, Delaware
                          Friday, October 30, 2020
10                         *Telephonic Argument*

11                             - - -

12 BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

13 APPEARANCES:                  - - -

14
                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
15              BY:  JACK B. BLUMENFELD, ESQ.

16                  and

17              KIRKLAND & ELLIS LLP
                BY:  DALE M. CENDALI, ESQ., and
18                   JOSHUA L. SIMMONS, ESQ.
                     (New York, New York)
19
                         Counsel for Thomson Reuters
20                       Enterprise Center GmbH and West
                         Publishing Corporation
21

22              POTTER ANDERSON & CORROON LLP
                BY:  DAVID E. MOORE, ESQ., and
23                   STEPHANIE E. O'BYRNE, ESQ.

24                  and

25                       Brian P. Gaffigan
                         Official Court Reporter

1    APPEARANCES:   (Continued)

2

3                    CROWELL & MORING LLP
                     BY:   GABRIEL M. RAMSEY, ESQ.,
                           KAYVAN M. GHAFFARI, ESQ., and
4                          JACOB CANTER, ESQ.
                           (San Francisco, California)

5
                           and
6
                     CROWELL & MORING LLP
7                    BY:   MARK A. KLAPOW, ESQ.
                           JOSHUA M. RYCHLINSKI, ESQ.
8                          (Washington, District of Columbia)

9                              Counsel for ROSS Intelligence Inc

10

11

12

13

14

15

16

17

18

19

20

21

22                               - oOo -

23                       P R O C E E D I N G S

24                    (REPORTER'S NOTE:  The following telephonic

25    argument was held remotely, beginning at 11:04 a.m.)

```
 1              THE COURT:  Good morning, everybody.  This is

 2    Judge Stark.  Who is there for the plaintiff, please?

 3              MR. BLUMENFELD:  Good morning, Your Honor.  It's

 4    Jack Blumenfeld from Morris Nichols for the plaintiffs.

 5    Also on for the plaintiffs are Dale Cendali and Joshua

 6    Simmons from Kirk & Ellis.  And from Thomson Reuters,

 7    Carolyn Blankenship and Jeanpierre Guiliano.  And with Your

 8    Honor's permission, Mr. Cendali and Mr. Simmons are going to

 9    split the argument today.

10              THE COURT:  Okay.  That's fine.

11              Good morning to you all.

12              And who is there for the defendant, please.

13              MS. O'BYRNE:  Good morning, Your Honor.

14    Stephanie O'Byrne along with Dave Moore from Potter Anderson

15    & Corroon for defendant ROSS Intelligence.  I'm joined by

16    co-counsel from Crowell & Moring, Gabe Ramsey, who, with the

17    Court's permission, will be arguing for defendants this

18    morning.  Also in attendance from Crowell & Moring, we have

19    Mark Klapow, Kayvan Ghaffari, Josh Rychlinski, and Jacob

20    Canter.  And from ROSS Intelligence Inc. we have several

21    client representatives of the client as well:  Andrew

22    Arruda, who is the CEO of ROSS, Jimoh Ovbiagele, who is the

23    CTO of ROSS, and Maya Bielinski, who is in-house counsel for

24    ROSS.

25              Thank you, Your Honor.
```

1             THE COURT:  Thank you.  And good morning to all

2      of you as well.

3             I do have a court reporter on the line taking

4      everything down, so I will note for the record that it is

5      our case of Thomson Reuters Enterprise Centre and West

6      Publishing Corp. versus ROSS Intelligence, Inc., our Civil

7      Action No. 20-613-LPS.

8             This is the time we set to hear argument on the

9      defendant's motion to dismiss the complaint.  So we will

10     hear from the defendant first.  And I believe Mr. Ramsey.

11     You may proceed when you are ready.

12            MR. RAMSEY:  Very good.  Thank you, Your Honor;

13     and good day.  I'd like to reserve 10 minutes for rebuttal

14     so I'll attempt to frame our discussion accordingly.

15            THE COURT:  Okay.  I'll let you know when there

16     are 10 minutes left.

17            MR. RAMSEY:  Much appreciated.  Thank you, Your

18     Honor.

19            Your Honor, there is a single overarching

20     problem across the board with the respect to the plaintiffs'

21     claims in its complaint.  There is no direct fact, no

22     plausible inference from any factual alleged material of any

23     copying by either ROSS or third-party LegalEase, and there

24     is no direct fact or any plausible inference from any

25     alleged fact that ROSS had knowledge or intent or any

1    control with respect to any alleged activities of LegalEase.

2    The claims fail to state a claim for these reasons across

3    the board.   In other words, plaintiffs have filed to plead

4    enough facts to state a claim for relief that is plausible

5    on its face as *Twombly* requires.   There is only guesswork,

6    speculation, and unwarranted inference.

7              First, plaintiffs do not allege any plausible

8    fact of any actual material copied by ROSS into any of its

9    material or its system.

10             So just first off the bat, any of the materials

11   returned by ROSS's system, it is undisputed, do not contain

12   the alleged key numbers or headnotes, which it's less even

13   for purposes of arguing assuming that those things are

14   protectable.

15             In fact, in the briefs, it's not -- it appears

16   that plaintiffs are conceding that the actual opinions

17   returned by the system are not at issue.   That is not where

18   the allegations of copying exist, and the Court can take

19   judicial notice of the opinions from the ROSS system

20   attached to the complaint.

21             So then the question is, is there any plausible

22   fact alleged directly -- a factual allegation from which it

23   can be inferred that key numbers and headnotes from the

24   Westlaw system are in ROSS's technology in some way?

25             And the answer is simply no.   There is no place

1    in the complaint where there is a fact alleged or any fact

2    from which it could be inferred that key numbers

3    specifically and headnotes specifically are copied into any

4    ROSS technology.

5         In fact, in paragraph 26 of the complaint,

6    plaintiffs admit that ROSS users are able to search for

7    relevant law, and I quote, "by posing a question in natural

8    language as opposed to boolean terms or keywords."

9         This is the only characterization of plaintiffs

10   of the accused technology in the system in the complaint,

11   and it is clear that the characterization is that the system

12   uses natural language.  In other words, the language of the

13   underlying judicial opinions, not a structured means of

14   organization such as key numbers or headnotes or some other

15   system like boolean constructors.

16        So the facts that are alleged suggest the

17   opposite of copying of key numbers or headnotes or some

18   structure or reading or understanding or searching for the

19   law.

20        But more broadly, in the complaint there is only

21   speculative allegations that somehow ROSS alleges we needed

22   some "descriptions of content or means by which to organize

23   that content.

24        But there is no factual content.  These are just

25   bare conclusory allegations that such a need without any

1    underlying factual content that ROSS actually had such a

2    need or from which it could about entered that ROSS had such

3    a need or that in response to such a need that ROSS actually

4    copied key numbers and headnotes into its technology.   There

5    is no factual content.

6              THE COURT:   Mr. Ramsey, yes, let me ask you a

7    question on that.

8              MR. RAMSEY:   Please.

9              THE COURT:   If it was adequately alleged that

10   ROSS copied the headnotes or key numbers in creating its

11   system, even if it were not alleged that it did that copying

12   on an ongoing basis, i.e., in the search results one might

13   get back when using the ROSS system, would that potentially

14   be a sufficient basis for a copyright infringement claim or

15   are you suggesting they have to allege the latter, that is,

16   on an ongoing basis a user will get back key numbers and

17   headnotes?

18             MR. RAMSEY:   Well, I believe that the -- to

19   answer your question, if the plaintiff alleged facts from

20   which it was directly established or could be reasonably

21   inferred that ROSS had copied on one or more instances the

22   key numbers and the headnotes and used those in the system,

23   in developing the system, that may state a claim.

24             But that is, that is the defendant's point.

25   This complaint does not state such a fact anywhere from

1    which it could even be inferred that the key numbers and the

2    headnotes were somehow used in the engineering process.

3            So let me, for example, perhaps present it this

4    way.  There is nothing that, not even a fact from which it

5    could be inferred that LegalEase downloaded headnotes and

6    key numbers and put them on some medium, handed them off to

7    ROSS and then -- or that there is any feature of ROSS's

8    system from which it could be inferred that, yes, this is

9    this type of architecture, this type of system in the key

10   number system that headnotes somehow drove algorithm

11   development.  It is pure sheer speculation.

12           THE COURT:  Well, do they really need to reach

13   the level of that it drove your system or drove the

14   development of your system?  I mean they do allege that, and

15   I recognize they're just allegations, but you acknowledge

16   have to take them as true if they're not conclusory.

17           They allege that you all induced this third

18   party to reproduce en masse large quantities of materials

19   from Westlaw.  Why is it not reasonable to infer from that

20   that when those materials were accessed en masse, the

21   keynotes and the headnotes were somehow employed?

22           MR. RAMSEY:  So I think the requirements of the

23   case *Frazier v. City of Philadelphia* answers that question.

24   In order to sufficiently plead a copyright claim in the

25   Third Circuit, it's necessary to allege both access and some

1     factual content from which copying can be inferred.

2               Here, all that is alleged as to LegalEase is

3     that LegalEase access, and it's alleged that there was a

4     large volume of the Westlaw system to search.  In other

5     words, that is all we know from the complaint.  That is all

6     that can be reasonably inferred is that LegalEase used the

7     Westlaw system to find law.

8               There is not, in addition, as required by

9     *Frazier* and other cases, any factual content from which

10    it can be reasonably inferred that LegalEase has even

11    downloaded key numbers and headnotes.

12              And by the way, even with respect to the

13    allegation of access, there is no facts in the complaint to

14    attach ROSS to that access.

15              But further, there is no factual content from

16    which it could be inferred that it is actually downloading

17    the headnotes and key numbers.

18              THE COURT:  You say I can take judicial

19    notice --

20              MR. RAMSEY:  Or -- (inaudible, two people

21    talking at once.)

22              THE COURT:  Right.  You say I can say judicial

23    notice of how ROSS opinions appear when accessed.  Can I

24    take judicial notice of how Westlaw opinions appear when I

25    download them or look at them?

1          MR. RAMSEY:  I have no objection on behalf of

2    ROSS, and would submit that these are very different, these

3    are very different materials of Westlaw opinions.  When one

4    reviews it, has headnotes and key numbers.

5          THE COURT:  Right.  Well, I don't want to --

6          MR. RAMSEY:  And ROSS will continue to --

7          THE COURT:  I don't want to supply factual

8    content.  It happens to be, of course, I'm familiar with

9    Westlaw, as I'm sure we all are.  So this is a technology I

10   have some familiarity with.  That generally I would think

11   would be irrelevant to the analysis, but if I could take

12   judicial notice, when I look at a Westlaw opinion, it has

13   headnotes and it has, you know, the key numbering system

14   on it.  I don't know how to not have that.

15          So why isn't it at least a plausible allegation,

16   a reasonable inference that is LegalEase copied large en

17   masse portions of the Westlaw database that at least on

18   occasion say copied with it headnotes and key numbering and,

19   therefore, you know, this element of the claim is adequately

20   stated for this early stage of this case?

21          MR. RAMSEY:  Well, I would again return to the

22   complaint.  There is no factual allegation that actually

23   allows such an inference.  All that is alleged is that

24   LegalEase carried out "tons and tons of legal research."  In

25   other words, accessed the system.  There is no plausible

1   fact that suggests any downloading of any key number or

2   headnote in passing that to ROSS.

3           That's the point.  There needs to be some

4   factual content to suggest that there was actually some

5   downloading of that material.  And in this case, the chain

6   of inferences breaks even farther beyond that.  There

7   would have to be a direct factual allegation or reasonable

8   inference, in fact, that downloading of these particular

9   pieces of content happened.  They were handed to ROSS.  That

10  ROSS somehow, there is some reason to believe that is more

11  than just the broad level, broad recitation of copyright

12  infringement that those particular features were in ROSS's

13  system.

14          And it's important to note, ROSS's system is

15  publicly available.  This is not the kind of case where the

16  product couldn't be reverse engineered.  There is no term

17  of a contract that has been pointed to that would stop the

18  plaintiffs from doing reverse engineering and investigating,

19  looking into what goes into ROSS's system, looking at what

20  comes out; how is conducting a real investigation, that

21  would supply facts from which it could be inferred that,

22  that headnotes and key numbers were in fact in the system;

23  there is none of that.

24          You know, this is not a patent case, but I will

25  note, many patent cases that come before this court, as Your

1    Honor knows, it is quite common to require claim charts and,

2    you know, not every detail, of course, needs to be alleged.

3    You don't have to prove your case up front.  But there must,

4    under the *Twombly* and *Iqbal* standards, must be some factual

5    content to show that the intellectual property right was

6    infringed, something to suggest that some specificity of

7    an element of a claim is met in a patent case, for example.

8                And the same is true in a copyright case.  There

9    must be something about the ROSS's system other than the

10   fact that it is a generally similar legal research system to

11   Westlaw, something more specific than that to suggest that

12   key numbers and headnotes are used in the architecture,

13   which is just not so as it turns out.  But there is nothing

14   to suggest that in the complaint.

15               THE COURT:  I thought you already told me,

16   though, that even if it's not in the architecture, if

17   it's not in the user interface, but the keynotes and head

18   numbers were used in the development of the ROSS system,

19   that could potentially state a claim for copyright

20   infringement.  Didn't we already agree on that?

21               MR. RAMSEY:  We did, but there is no -- the

22   point is there is no facts directly alleged or any fact from

23   which it could be reasonably inferred.

24               THE COURT:  And won't you agree that in the

25   process, that development process, that is not public.  That

1      is not something that the plaintiffs can know at this point

2      on anything other than information and belief; right?

3                  MR. RAMSEY:  Ah.  I disagree with that,

4      respectfully, Your Honor.  That is the point about reverse

5      engineering.

6                  If plaintiff is doing something more than -- we

7      know this from the law.  Plaintiff must plead something more

8      specific than their product is like our product in terms of

9      software, and that is all that is alleged here.

10                 In order to get to the point where there is a

11     reasonable inference that the key numbers and the headnotes

12     are used in the product architecture, there must be some

13     reverse engineering.  This is a case where the plaintiff,

14     again, could and should have investigated the way that the

15     system worked, observed its features and come up with some

16     feature and factual aspect of the ROSS system that would

17     allow an inference that it is structured and operates in a

18     way using key numbers or headnotes.

19                 This is the kind of thing that not every piece

20     could be, of course, known but something could be known

21     about the way that the ROSS's system worked if plaintiff

22     had a theory that was grounded in plausible factual

23     allegations and not just conjecture.

24                 That's the point, that if plaintiff wants to

25     plead a plausible case that there is copying and use of

1    headnotes and key numbers in the architecture of ROSS's

2    system, there is plenty of material, and they could have and

3    should have analyzed, reverse engineered, investigated that

4    system to come up with a plausible inference.

5            And the fact that they have been engaged with

6    ROSS for many years and went through a whole litigation with

7    LegalEase, the system is widely and publicly available,

8    and there is absolutely no detail to suggest that, such a

9    copying in the infrastructure, no investigation, the claim

10   fails.

11          And so, again, there is no plausible fact

12   directly or facts from which it could be inferred that

13   this material was copied into ROSS's system or even that

14   LegalEase downloaded any such material and handed it to

15   ROSS.  There needs to be more than broad generalities.

16          The case, *Levey v Brown Investment Group* makes

17   it clear unsupported conclusion, unwarranted inferences are

18   just not sufficient.  And that is all that is alleged here

19   on information and belief.

20          I'll note that the *Network Managing Solutions*

21   case does make the point that where a product can be reverse

22   engineered, that is a requirement to get to the kind of

23   facts that you would need to allege infringement.

24          And that's the case here, yet plaintiffs allege

25   nothing of the sort.  It's just, just a bare conclusory

1     assertion that the materials must be in there some way

2     because the product functions in the same general technical

3     space as Westlaw.

4             I'm going to move on to indirect infringement,

5     Your Honor.

6             So beyond ROSS's content and products, there

7     is also no plausibly alleged facts to support indirect

8     infringement.

9             Nowhere in the complaint the plaintiff set

10    forth any factual allegations at all that ROSS had any

11    knowledge or intent to cause any reproduction, distribution

12    or derivative works by LegalEase or that ROSS had any

13    knowledge of any contract between LegalEase and West or

14    knowledge that there was any exceeding the scope of such

15    an agreement.

16            There is no factual allegations that ROSS knew

17    of the terms of such an agreement between LegalEase and

18    ROSS.  All that is alleged is that ROSS at some point asked

19    to use Westlaw, West said no, and that ROSS at some point in

20    time hired LegalEase to carry out legal research.  That is

21    all that is alleged.

22            From such bare facts, it is simply not possible

23    to infer that ROSS actually knew about specific terms of

24    LegalEase's agreement with West or even that Westlaw use

25    had anything to do with the relationship between ROSS and

1    LegalEase.

2              It simply can't be inferred from the fact that

3    ROSS was not able -- not permitted to use Westlaw at some

4    point in time and that at another point in time engaged

5    LegalEase to carry out legal research.  And, again, that

6    is all the plaintiffs allege with respect to ROSS's

7    relationship with LegalEase.  That ROSS engaged in legal

8    research, nothing further than that.

9              From that fact alone, it cannot be inferred,

10   and it is certainly not directly alleged factually, that

11   ROSS caused LegalEase to use Westlaw in the first place in

12   general, that ROSS knew of the contract between LegalEase

13   and Westlaw.

14             During the briefing, a very general contract

15   was attached, I believe that should be disregarded, but

16   nonetheless, even that contract, there is no way to know if

17   that has any bearing on ROSS or LegalEase.  They simply have

18   not established there is a particular LegalEase contract

19   with terms that were violated, much less that ROSS knew

20   about that.  So, again, it's a similar sort of failing as to

21   the direct infringement claims.

22             THE COURT:  It is further alleged that the basis

23   on which ROSS was denied access to Westlaw was that West

24   does not give competitors access to its products.  I think

25   it's at least a reasonable inference that LegalEase is not a

competitor of Westlaw.  And why doesn't it follow from all
of that that it's reasonable to infer that ROSS understood
they would have to go through some sort of third party, some
sort of subterfuge in order to get the Westlaw materials
that they knew they could not get directly?

MR. RAMSEY:  Well, there is no -- again, back to
the pleadings standards, there is no facts alleged that ROSS
did anything except in general hired LegalEase to carry out
legal research.  There is nothing wrongful about, you know,
negative that can be inferred from hiring a party to carry
out legal research, whether one is a competitor or not.

There is no facts even alleged that ROSS even
knew LegalEase was going to use Westlaw as opposed to the
Google search or Lexis or PACER or PacerPro or any of the
other tools that are readily available in the world to find
the law.  That's the failing.

And there is also no allegation that ROSS
actually knew of any provision in LegalEase's contract, one
way or the other.  All that is alleged is that ROSS went to
a third-party legal research provider and asked for legal
research.  And that, that is simply not enough to get to
the inference that ROSS, and both -- this covers the
terrain both for indirect and copyright infringement and
for tortious interference.  That ROSS knew of the terms of
a contract, intended to induce its breach for purposes of

1    tortious interference or for purposes of indirect copyright,

2    infringement knew that whatever LegalEase was doing exceeded

3    the scope of any license or violated terms.

4              There is just no -- ROSS simply didn't know

5    about the contract, didn't know what LegalEase was doing.

6    This was from the face of the complaint.  The complaint is

7    silent about those things.

8              So it simply can't be inferred that ROSS

9    intended or knew or induced or contributed to copying any

10   particular material or use of Westlaw even in general.

11             So, again, it's the same failing that -- it's

12   a huge chain of leaps between the simple fact that ROSS is

13   alleged to have engaged LegalEase to carry out legal

14   research and many, many steps beyond that where the chain

15   of inferences breaks both for purposes of copyright

16   infringement and for purposes of tortious interference.

17             So further complicating matters, to complete a

18   plausible copyright claim, it's not just enough to allege

19   that copying happened, there has to be some allegation that

20   copying of copyrightable elements were undertaken by the

21   defendant.

22             Here, there is simply none of that.  Again, it's

23   just a general allegation that ROSS engaged LegalEase to

24   carry out legal research and that somehow, not stated and no

25   facts in any sort of reasonable chain from which it could be

1    inferred, that protectable, protectable material was

2    actually copied into ROSS's system or the protectable

3    material was downloaded by LegalEase.

4              Also note from the face of the complaint, the

5    key number system and the headnotes themselves are not

6    copyrightable.

7              We don't need to decide everything related to

8    copyrightability of headnotes or key number systems or

9    discussion related to the law or material related to the

10   law, we just need to look at the pleadings.

11             So very briefly, the headnotes are just

12   recitation of legal rules and legal concepts taken from

13   judicial preponderances.

14             One of the examples given is a direct quote from

15   two Supreme Court cases.  That can't be protectable.  It is

16   a judicial edict.

17             The second example of headnote states in

18   plaintiff's own assertions the key concepts.  Those are

19   plaintiff's words in the case.

20             That is not a creative -- stating the key

21   concepts in a case is not a creative, expressive gesture.

22             And for those reasons, the offered headnotes are

23   not copyrightable.

24             The key number system is just an alphabetically

25   ordered list of legal topics.

1          The examples provided in the complaint -- these

2    are plaintiff's examples -- are discussion of a legal topic

3    in general.  The nature and the elements, intent, acts and

4    omission, these are basic building blocks of the law, these

5    are not creative expressions; and therefore the key number

6    itself is, as alleged in the complaint, is not creative in

7    nature because they're just the general ideas of law that

8    any lawyer would pick up and talk about.

9          Talk about the topic of law in general, talk

10   about the topic of law and its nature and elements.  That is

11   a requirement of legal rules.  Intent, this is mens rea.

12   Acts and omissions act as reas.  Basic legal building blocks

13   that do not express anything in terms of communicating to an

14   audience in which the copyright law anticipates.

15         And to provide a copyright on articulation that

16   there is an ordered alphabetical list of legal topics and

17   claiming a monopoly on identifying those, those topics in

18   general, their nature and elements, their intent, the acts

19   and omissions required would provide an monopoly under the

20   law, and that is a dangerous proposition.

21         So with that, I will move on to --

22         THE COURT:  Well, before you move on.  The

23   arguments about whether there is any plausible allegation

24   of something protectable by copyright, why are those not

25   viewed as affirmative defenses and therefore a premature

1    basis for me to grant dismissal?

2              MR. RAMSEY:  Well, so under the pleadings

3    standard, it's clear that plaintiff -- again, plaintiff has

4    to allege copying of copyrightable material.  So we're not

5    asking to rule on, pass on the entirety of the defense.

6              But at the same time, under the pleading rule,

7    so a good case is *Riordan vs. H.G. Heinz* in the Western

8    District of Pennsylvania.  In that case, the plaintiff posed

9    material in the complaint that the Court found on its face

10   was an unprotectable idea.

11             So we're asking that the Court pass in the same

12   way here.  To look at the material in the complaint, the

13   ordered alphabetical list of legal topics, the particular

14   list of elements that are alleged to constitute this key

15   number system, which, by the way, is an unprotectable system,

16   plaintiffs even call it that, and the two headnote examples,

17   and simply pass on the face of the pleadings; much like in

18   the *Riordan* case, that the material posed and alleged is, on

19   the face of the complaint, not protectable.

20             So this was part of the pleading standard that

21   if what is put forward by a plaintiff in a copyright case

22   is not facially protectable is an appropriate, appropriate

23   question for the Court to pass on on a Rule 12(b)(6) motion.

24             THE COURT:  How do I factor into all of that

25   the allegations about the registration with the copyright

```
 1    office?
 2              MR. RAMSEY:  Again, this ties back to the
 3    pleadings standards under Rule 12(b)(6).  It is true that a
 4    very large number and massive body of materials are claimed
 5    in the voluminous copyright registrations that are attached.
 6    And the cases that were cited in the defendant's brief make
 7    clear that a plaintiff can't just point to a massive body of
 8    material across many, many registrations and assert there is
 9    copying of some protectable material out of this massive
10    body of material, and that is what is happening here.
11              And so then when one -- and the Court must
12    pass and look at the complaint and know exactly what is
13    alleged.  And when we do that here, we see, of the material
14    that may or may not be protectable under these very broad
15    registrations, that which is in the complaint is simply not
16    on its face.  And we don't -- this stage, you know, will
17    pass further than that.
18              But the case, this is the reason for the
19    pleadings standard that requires that a plaintiff not just
20    plead copying in a very general way but copying protectable
21    elements.  Copyright registrations may cover broad swaths
22    of material such as here, that includes some protectable,
23    some unprotectable material.  And hence, it's all the more
24    important that the plaintiffs specify something that is
25    actually protectable and something that is protectable that
```

1    was actually copied.

2              Back to the initial conversation.  Here, there

3    is no suggestion that the key numbers or the headnotes

4    themselves are in any ROSS system.  There is no fact that

5    those allegedly protectable material, even assuming they

6    were, were copied.

7              So it's, again, just a large chain of inference

8    from an active LegalEase to download material which it's not

9    even, it's not even shown any material was downloaded, much

10   less something that is protectable.  That such protectable

11   material was -- there is nothing to infer it was handed to

12   ROSS at all.  The complaint is absolutely silent that such

13   material was then put into the hands of engineers at ROSS,

14   and there is some rational reason from the facts to infer

15   that material drove a particular architecture in a ROSS

16   product.

17             The entire chain of inference breaks down.  And

18   it is both in terms of copying in general and in terms of

19   copying protectable elements.

20             THE COURT:  Doesn't the registration create at

21   least a presumption that there is something protectable

22   within Westlaw?

23             MR. RAMSEY:  I concede that in general that is

24   true.  But that broad -- again, we're not litigating the

25   entire case here.  I agree and concede that in general that

1     is a proposition of law about copyright registrations.

2              But, again, under the pleadings rules, the

3     Court must look at the complaint itself and say what of

4     that material was plaintiff actually alleging.  That is

5     what we're passing under Rule 12(b)(6) and nothing more.

6              The defendant submitted in this case the two

7     examples of headnotes and the system, the system under

8     102(b) of the Copyright Act that is not protectable, and its

9     constituent elements.  This alphabetical list of topics and

10    the most fundamental "key concepts" of each of those topics.

11             This is the way plaintiff chose to plead their

12    complaint.  Plaintiff unfortunately, from defendant's

13    position, have chosen material out of whatever might be

14    copyrightable in a copyright, within a copyright registration.

15    Plaintiffs have chosen material in the complaint that doesn't

16    meet that bar.

17             THE COURT:  They suggest at least in their

18    briefing that they think they have something protectable

19    in what they call the compilation, at which I think they

20    mean the entirety of Westlaw and how they put it together

21    in total.

22             Might that be a further plausible allegation

23    here?

24             MR. RAMSEY:  Well, first of all, that is not

25    alleged in the complaint.  What is alleged in the complaint

1    is only two, two headnotes.  In other words, what is

2    alleged is representative of the material that is allegedly

3    copyrighted.  Two headnotes and an alphabetical list of

4    legal topics and key concepts ordered within those legal

5    topics that are very, very basic fundamental principles of

6    law, the ways of lawyers thinking about the law.

7            So there is no allegation of a compilation

8    that was -- and certainly not one that was copied by ROSS.

9    Again, back to the failure of alleging copying.

10           There is nothing to even get to copying of a

11   single headnote by ROSS or a single portion of this key

12   number system by ROSS, much less something that could be

13   characterized as a compilation.

14           THE COURT:  Do you oppose me giving them leave

15   to file an amended complaint?

16           MR. RAMSEY:  Well, I'll put it this way, Your

17   Honor.  At this point, given that plaintiffs have had access

18   to ROSS's system to investigate -- it's freely available.

19   They could look at what comes in, look at what comes out,

20   conduct a reasonable investigation, and given the long

21   multiple year history and thousands of documents and

22   engagement with ROSS, we believe it would be futile, but if

23   the Court sees it differently, there would be no opposition,

24   of course.

25           THE COURT:  All right.  Did you want to talk a

1    little bit about statute of limitations?

2              MR. RAMSEY:  So unless Your Honor has questions,

3    I think I will just -- I only have got about five minutes

4    here -- rest on the papers for purposes of statute of

5    limitations just in the interest of time, and instead spend

6    time focused on the failure to plausibly allege tortious

7    interference.

8              I point Your Honor to a couple of cases under

9    the *Travel Syndications Technology* case in Delaware and

10   *Pacific Gas & Electric vs. Bear Stearns* case in California.

11             Regardless of which law applies, it's clear to

12   plead tortious interference it's necessary to plausibly

13   plead both knowledge of the contract and an intention to

14   bring about its breach.  Those are the two requirements.

15             And it's, I think it is encapsulated in the

16   indirect infringement that the concepts are very related and

17   the failures are very related.

18             Here, the plaintiffs allege no, no fact from

19   which it can be inferred or directly established that ROSS

20   knew anything about LegalEase's contract, only that

21   LegalEase was a legal research company.  So plaintiffs

22   failed to allege the knowledge of the contract and they

23   alleged no act by ROSS to carry out, to bring about any

24   breach of such contract or any particular term.

25             Again, the complaint, as to ROSS's relationship

1   with LegalEase, the only facts in the complaint are that

2   ROSS hired LegalEase to carry out tons and tons of Federal

3   Defender legal research.  Carrying out legal research in

4   the United States is not a suggestion of any, any untoward

5   conduct.  It's simply not enough to get to the elements of

6   any of the claims in the complaint.

7                    And I believe I'm at my time.

8                    THE COURT:  We've got you at 12 minutes left,

9   so I don't know if you have more you wanted to say at this

10  point.

11                    MR. RAMSEY:  Well, I think that covers it in

12  terms of tortious interference.  Since I've got a couple of

13  minutes by your watch, I will note that under the statute of

14  limitations issue, the only salient factual material alleged

15  in the complaint is that ROSS is in California and that

16  the alleged acts were carried out by ROSS which is in

17  California, and this is quite important in determining which

18  law applies.

19                    Under the barring statute, since all of the

20  actors are foreign plaintiffs, the statute of limitations

21  where the claim arose is a question.  Here, the claim arose

22  in California, and the question is which state has the most

23  significant relationship of the dispute, and that is under

24  Section 145 of the Restatement of Conflicts of Law.  Here,

25  it's in California where the activity happened.  It's where

1    ROSS is domiciled.  It is where the injury took place.  That

2    is a really important one.

3            Really, plaintiffs only response to substantial

4    relationship is to mention that West Publishing is located

5    in Minnesota.  Really no more elaboration than that.  It

6    fails to mention the other plaintiff is based in Switzerland.

7            And it's clear in the *Ubiquitel* case, that where

8    the injury could have occurred is in multiple ways.  "The

9    particular weight" -- those are the words of the case --

10   "should be placed on the place causing the alleged injury."

11   Here, allegedly ROSS's activities in California.  So the

12   California statute applies.

13           And as to the substance, the statute has run,

14   because under California law, the statute of limitation runs

15   no later, accrues no later than the breach itself, the

16   underlying breach itself.

17           And here the complaint, the plaintiffs allege

18   that as of July 2017, as early as that, there was awareness

19   that LegalEase was working with this machine learning

20   company.  It's clear from the complaint it can be inferred

21   an investigation was ongoing for years because by January

22   2018, LegalEase's contract was terminated, and we know there

23   was inquiry as to ROSS in that case.  Plaintiffs simply knew

24   and waited too long.

25           THE COURT:  How could I resolve a discovery rule

1    issue under California law on this motion to dismiss against

2    the plaintiffs?  Aren't they entitled to the reasonable

3    inferences there?

4              MR. RAMSEY:  Well, again, the only allegation

5    in the complaint as to when they knew is an assertion that

6    in July 2017, there was awareness that this legal research

7    company was carrying out acts on behalf of -- they were

8    carrying out acts -- apologies, LegalEase was carrying out

9    acts in July of 2017 on behalf of this legal research

10   company.  And it can also be inferred from the allegations

11   in the complaint there was inquiry and attention to that

12   issue, and by January 2018, plaintiffs knew.

13             So based on the complaint --

14             THE COURT:  Sure.  Sure.  Yes.  If plaintiff

15   wants to say it's reasonable to infer that that machine

16   learning company was known to be ROSS and we knew that by

17   January 2018, that seems like a reasonable inference I would

18   have to credit, but at the same time if the plaintiff wants

19   to say that it is also reasonable to infer we did not know

20   the identity of ROSS until within two years of when we filed

21   this complaint, that seems like a reasonable inference at

22   this stage of the case and further seems like something --

23   I'm not sure if you have cited any California cases that

24   says I should go ahead and decide that issue against the

25   plaintiff at this stage.

1          Why isn't the answer to all of this even if you

2    are right about California law, at best for you I have to

3    defer deciding the statute of limitations issue?

4          MR. RAMSEY:  Right.  Well, I have not cited such

5    a case, but I will point out the plaintiffs never actually

6    state when they discovered the alleged tortious interference.

7    So --

8          THE COURT:  Right, but have you cited a case --

9    sorry.  Have you cited a case because they have to do that

10   in order to survive a motion to dismiss?

11         MR. RAMSEY:  We have not, Your Honor.  We have

12   not.  But, although I think that *Endo-Surgery* says -- this

13   is 35 Cal.4th 797 -- that "plaintiff's attempt to hide

14   behind California's discovery rule is unavailing because

15   that rule applies that requires that plaintiffs specifically

16   plead the time and manner of discovery and the inability to

17   have made earlier discovery despite reasonable due

18   diligence."

19         So there is some obligation under California

20   in this *Endo-Surgery*, 35 Cal.4th 797.  There is California

21   law that there needs to be some allegation in the complaint

22   about when plaintiffs discovered or not discovered the

23   alleged tortious conduct for breach.

24         THE COURT:  All right.

25         MR. RAMSEY:  And again, that silence matters.

1    But again, the Court need not pause only on the statute of

2    limitations.  The claim is insufficiently plead in general

3    as discussed.

4                 THE COURT:  Okay.  Let's save the rest of your

5    time for rebuttal, and we'll turn it off to plaintiff.

6                 MS. CENDALI:  Thank you, Your Honor.  This is

7    Dale Cendali from Kirkland on behalf of the plaintiffs.

8                 ROSS's argument and briefs fundamentally

9    misunderstand the applicable pleading requirements, the

10   nature of this case, and key facts.

11                Starting with a pleading requirements.  I think

12   Your Honor summed them up well in the *CAE vs. Gulfstream*

13   case which stated that, "A motion to dismiss may only be

14   granted if, after accepting all well-pleaded allegations

15   in the complaint as true and viewing them in the light

16   most favorable to plaintiff, plaintiff is not entitled to

17   relief."

18                In fact, this Court elaborated, citing Third

19   Circuit law in *Wilkerson*, that, "The complaint must state

20   enough facts to raise a reasonable expectation that

21   discovery will reveal evidence of each necessary element of

22   each plaintiff's claim."

23                This standard has been more than met by the

24   detailed complaint before the Court.

25                Now, the second issue, moving beyond the

1    misapprehension about the pleading requirements or at least

2    the threshold one, is the nature of the case.  As I think

3    Your Honor's request made clear, we're not -- this complaint

4    is about accusing ROSS of surreptitiously, when they were

5    rejected by themselves to do it, getting LegalEase to obtain

6    Westlaw content and use that to create a competing platform.

7              That is right in their paragraph 35.  "Upon

8    information and belief, after LegalEase copied the Westlaw

9    content, it distributed that content to ROSS.  ROSS then

10   copied that content and used it to create its platform."

11             That is replete throughout the entire complaint.

12             Yes, it may be that what ROSS is actually also

13   making available to its consumers after the creation might

14   also infringe, but what this complaint is focusing on now is

15   what it did to create the platform to begin with.  And that

16   is clear in the complaint.

17             It's also clear, as I think again Your Honor

18   apprehends from its, the Court's questions that we're not in

19   a position to be sitting there with ROSS's engineers and to

20   know exactly what they did once they succeeded in their goal

21   of obtaining the content that it paid LegalEase to provide

22   it.  That is why that was pled on information and belief.

23   That material is not publicly available.

24             But we have more than set forth, you know,

25   plausible facts that said that they came, after being turned

1    down by West, they ran to LegalEase, that they knew that the

2    contract that LegalEase had with us said that they were not

3    entitled to give material to a competitor.

4              And, again, this is right in paragraph 3 of the

5    complaint.  "Upon information and belief, ROSS intentionally

6    and knowingly induced a third party called LegalEase to

7    breach its contract with West by engaging in unlawful

8    reproduction of plaintiffs' uncopyrighted content and

9    distributed that content en masse to ROSS.  ROSS did so

10   after asking for, and being explicitly being denied,

11   access to Westlaw by West on the basis West does not give

12   competitors access to its products.  Thus, ROSS induced

13   West -- LegalEase to engage in this unlawful activity

14   knowing that it violated the terms of LegalEase's contract

15   with West."

16             So at various times in my friend's argument,

17   they argued that, well, there is nothing in there that, that

18   is alleging that ROSS knew what LegalEase was doing or

19   knowing that it had this contract or knowing what it meant.

20   What we -- we pled exactly the opposite.

21             The other thing that I think is important is not

22   only is it not publicly available, what ROSS's engineers

23   did with the material it received en masse from LegalEase

24   pursuant to its asking them to give it to them, but what is

25   also not publicly available is what their actual interfaced

1    consumers look like.

2            At various time in counsel's argument, he

3    said that, well, you know, the ROSS platform is publicly

4    available.  We should have somehow, you know, looked at it

5    and reverse engineered it or something to that effect.

6            Leaving aside that there is zero requirement

7    in copyright law to try to reverse, reverse engineer some

8    public thing to try to figure out what was taken from you

9    to create it, it's also important to note that prior to

10   us filing this complaint, ROSS's terms of service had a

11   provision explicitly prohibiting competitors from using its

12   product.

13           Only after that we filed the complaint would

14   that provision was tellingly removed.  I don't think it

15   really matters because the nature of this complaint, as I

16   said earlier, isn't about the interface or at least at this

17   point isn't about the interface because we haven't had

18   access to what they're giving people.

19           What this complaint is about that they used

20   Westlaw's copyrighted material to create a competing

21   platform.  To be able to get that fast development time and

22   rush out a competing platform.

23           And to be clear, counsel also repeatedly kept

24   talking about this case as if it were just about the Westlaw

25   key numbering system or the headnotes.

1              No doubt those are material that or it's part of

2    our copyright.  But our copyright also is our registrations,

3    1-1, pages 2 and 3 of our complaint indicate.  And paragraph

4    2 of our complaint also specifies, is that we also have a

5    copyright in the compilation that we created.  It's not just

6    these, you know, standing on its own, headnotes but it's

7    the entire structure, sequence, and organization that we put

8    together to find, analyze, to explain the law.

9              And the complaint details all the myriad

10   creative choices that went into creating that content.  And

11   we have not just one, not just two, but 161 copyright

12   registrations attached to our complaint that all of which

13   under Third Circuit law are entitled to a presumption not

14   just of validity but also a presumption of originality.

15   And that is more than enough to plead a claim of copyright

16   infringement, which we have done.

17              Now this --

18              THE COURT:  Ms. Cendali, let me ask you.  So

19   when you refer to compilation in the answering brief as

20   something you are going to argue is protectable under

21   copyright, that allegation is found in paragraph 2 when you

22   refer to plaintiff's copyrighted content and organization?

23   Is that what I should understand?

24              MS. CENDALI:  That's right.  That's the first

25   time that it is mentioned.  But throughout the complaint,

1    Your Honor, we also talk about, I think it starts in, it

2    starts in paragraph 11 and it goes from there.  It's also

3    talked about in paragraph 12 which talks about plaintiff's

4    numerous creative choices about how to organize cases, which

5    cases to place in the classification, require substantial

6    investments of time, technological resources, and money over

7    the course of decades.

8              And then we go on.  Paragraph 13 talks about

9    plaintiffs' complex hierarchy, and what is done to make

10   choices as to -- and when we all know that even Your Honor's

11   decision in this case could be probably sliced and diced 100

12   different ways or maybe not sliced and diced.  Maybe it will

13   only be sliced and diced in 60 ways or 200 ways and all

14   sorts of keynotes and headnotes can be created.

15             And as we plead in the complaint in detail, we

16   took the time to talk about this is all part of our

17   creativity.  Paragraph 15 as well talks about how Westlaw

18   includes access to volumes of proprietary material,

19   including such as West headnotes, case summaries, and other

20   Westlaw created content, databases, compilations of case

21   law, et cetera.  All of that was pled in our complaint.

22             And they copied it en masse.  This isn't just

23   about the headnotes.  That's not what we, what we pled, and

24   that is not what our copyright registrations are limited to.

25             In fact, as I was, I was saying, you know, if

1    Your Honor looks at the copyright registrations annexed to

2    the complaint, such as Docket 1-1, page 2, it's the author

3    of compilation, revisions, addition, et cetera.

4              And that is also true with regard to 1-1, page

5    3, compilation of previously published case reports,

6    including, but not limited to, opinions and also syllabi in

7    Westlaw paragraphs.

8              Westlaw is much more than the headnotes and

9    keynotes, and it is certainly much more than the one or two

10   headnotes or keynotes that we put in the complaint, just to

11   give Your Honor an idea of the story.

12             We certainly were not saying that is the only

13   thing that we are suing on, and I don't think that is a fair

14   reading of the complaint.  Rather, we're suing on all of

15   Westlaw, all of our proprietary material which includes our

16   revisions, our compilations, our additions, our analysis,

17   and the hierarchy that we detail at length in our complaint.

18   And that is more than enough.

19             THE COURT:  All right.  But what you do in the

20   complaint also at paragraph 1 is create a defined term,

21   "Westlaw content."  And I think by your own concession, but

22   I want to make sure I got this correctly, Westlaw content

23   is a term that also encompasses things that you do not

24   contend you have a copyright on.  For instance, judicial

25   opinions and statutes.

1          So I think some of the confusion here and

2     some of the argument that you are facing is you don't say

3     compilation as a defined term in the complaint, although

4     you suggested it in your belief.  And you don't really make

5     clear in your complaint your acknowledgment that some of

6     what you are defining as Westlaw content is actually not

7     protectable.  So help me with that.

8          MS. CENDALI:  I'm happy to, Your Honor.  What we

9     intended to do and said in paragraph 1 of the complaint is

10    that, "Plaintiffs created and nurtured their well-known

11    Westlaw products since inception, including, without

12    limitation, its unique West key number system and West

13    headnotes."

14          And to be clear, the West key number system (A),

15    it's without limitation, as I point out in the definition of

16    Westlaw content.  But the West key number system, which we

17    explained at length in those paragraphs that I referred Your

18    Honor to a few minutes ago with regard to the hierarchy,

19    that is all of the compilation, the creative structure, and

20    organization of Westlaw.

21          We talk about and repeated paragraphs in this

22    complaint about how they took our structure, sequence, and

23    organization.  For example, we say on paragraph 11, "Westlaw

24    makes legal research seamless through its well designed

25    structure, sequence, and organization."

```
 1              And our point is, well, we don't know, since
 2     we're not inside their company, exactly what they took but
 3     they took all of our content.  And to make it also clear, I
 4     realize I didn't completely answer your question, we did
 5     not define and did not intend to define Westlaw content as
 6     relating to unprotected materials.
 7              The copyright registrations in fact are clear
 8     on that.  The copyright registrations state on their face,
 9     and this is annexed to the complaint in Docket 1-1, page 3
10     as well, that copyright is not claimed as to any part of the
11     original work prepared by United States Government officer
12     or employee as part of that person's official duties.
13              That material would not be included in the
14     definition of Westlaw content.  It couldn't be because it's
15     not part of our copyright registrations.  Rather --
16              THE COURT:  Yes.  Where does your complaint make
17     that clear and give the defendant notice of that?
18              MS. CENDALI:  Well, I think it makes it clear
19     by defining Westlaw content for, for what it is, which is
20     its unique West key number system and the West headnotes,
21     without limitation.  And I think it also makes it clear
22     because we attached 161 copyright registrations to the
23     complaint that disclaimed that material.  We are not
24     claiming copyright on that.
25              THE COURT:  How about the search engines and
```

1    algorithms?  Are you claiming copyright protection on those?

2         MS. CENDALI:  Yes, the search engines and

3    algorithms are part -- they're part of the compilation.

4    They're part of the hierarchy and the structure of how

5    Westlaw is created and operates.  And that is definitely

6    part of our, of our copyright claim, and part of our

7    registration.

8         THE COURT:  And how does your complaint give

9    reasonable and adequate notice to the defendants that that

10   is part of what they are alleged and have to defend against?

11        MS. CENDALI:  Well, if Your Honor doesn't think

12   it gives reasonable notice, then, you know, we submit we

13   would be happy to amend to say that.  But I think that we

14   did our best.  I hope we succeeded, but we did our best to

15   say that, such as on paragraph 11, editorial enhancements

16   such as West proprietary headnotes, notes of decisions,

17   and the WKNS are just a few examples of the creative and

18   original material authored by West.

19        And then we spent a lot of time talking

20   especially in paragraph 13, about the different hierarchy

21   and structure that was created.  And we annexed the

22   copyright registration that was clear that it covers

23   revisions, compilations and does not cover material created

24   by people like yourself.  That's what the registrations

25   reflect, and that is what we thought we did in the

1    complaint.

2              But moving on, Your Honor to, if you permit, to

3    so far we've just been talking about the claims of direct

4    copyright infringement.  Counsel also, in oral argument,

5    talked about our secondary liability indirect claims.

6              And there, I think it's important to make a

7    threshold point, which is that they have waived argument

8    with regard to their secondary liability claim.

9              As Your Honor recently found on, just recently

10   on October 8th of this year, in the *Align Tech* case,

11   where you wrote that you would not evaluate the merits of

12   something that wasn't raised in the opening brief, nowhere

13   in their opening brief did they allege that they would be

14   making arguments about the sufficiency of our indirect

15   infringement claims.

16             Moving from there, counsel also talked about

17   some argument with regard to copying of the constituents

18   elements and the like.  And I think it is important to

19   remember that there is not any kind of requirement as they

20   seem to suggest that we have to somehow parse through all

21   of Westlaw to identify in detail issues with regard to it

22   as they seem to want to do.  Well, I don't know.  You should

23   be specific as to whether this is, this headnote you think

24   is protectable or that headnote, you know, may be not be as

25   good or something to that, to that effect.

1           Again, our copyright registrations are clear

2     that the revisions, the compilation are ours and that the

3     government works are not.

4           But I think that the *Micro Focus* case decided

5     by Judge Andrews a few years ago is a very good case for

6     today's discussion.  Because there, the defendants, too, try

7     to argue that, well, the plaintiff, in a software case, you

8     know, failed to identify -- to break down and identify in

9     their copyrighted software what original elements they

10    believe were worthy of copyright protection.

11          And Judge Andrews dismissed this argument.  He

12    said, "The defendant's original element theory is not the

13    correct standard.  For purposes of Rule 12(b)(6), a

14    complaint only needs to allege specific original works are

15    the subject of a copyright claim.  In the present case,

16    plaintiffs identified the software as the original work in

17    question, and this is sufficient to withstand a motion to

18    dismiss."

19          Plaintiff also tried to tackle on this motion to

20    dismiss the idea that the headnotes of the West key

21    numbering system is somehow not protected by, by copyright.

22          Well, the first point is that is something that

23    they can be free to address in discovery but isn't proper

24    for a motion to dismiss because we have a presumption of

25    validity and a presumption of originality.  We have 161 of

them, and therefore it's an affirmative defense, as the *Masimo* case talked about, that Your Honor alluded to, for them to try to rebut that presumption.

And as the cases cited in our brief also state, that there is no pleading requirement to plead around an affirmative defense.  There is no obligation to do that.

Moreover, I'll also say that the Eighth Circuit in the *West Publishing* case already found that there was a copyright in Westlaw's original expression in the compilation of its, of its material.

And I'll also point out that the Supreme Court recently in the *Georgia vs. Public Resources* case, specifically distinguished between materials that are created by officials empowered to speak with the force of law -- which sadly means, Your Honor, that your writings are not protectable by copyright, at least in your official capacity -- with works that are protectable that are created by private parties.

That distinction was in the majority opinion authored by Justice Roberts.  And then Justice Ginsberg, in her dissent, before going into other areas, said, "all agree that headnotes in syllabi for judicial opinions -- both a kind of annotation -- are copyrightable when created by a reporter of decisions."

The bottom line, Your Honor, is that we did our

1   best.  You know, it's hard to put your entire case in a

2   complaint.  That is not what Rule 8 is about.  But we

3   tried our best to explain why plaintiffs did what they did,

4   what their scheme was, how they were trying to get around

5   the refusal by us to let them use Westlaw, to create a

6   competitive platform.  How they knew of that requirement,

7   that limitation.  That they went to LegalEase anyway to get

8   it indirectly what they couldn't get directly.  And that

9   they used it to rush to market with a competing platform.

10          And that is what this case is about.  We also

11   believe that we plead that they took both directly and

12   indirectly Westlaw content, which we intended to indicate,

13   without limitation, was broad.  And we attached the

14   copyright registrations that reflected that which included

15   the fact that related to the compilation, as we also said

16   in paragraph 2, and that it did not relate, as the base of

17   the registrations also say, to government works.

18          We did our best.  We think that we more than

19   satisfied the pleading requirements in Rule 8.  And we

20   respectfully request, Your Honor, that it's time now to

21   start discovery so that both sides, we can further develop

22   our affirmative claims, and ROSS is entitled to develop its

23   defenses.

24          With that, unless there are more questions on

25   the copyright aspect of it, I'd like to hand it over to

1    my partner, Josh Simmons, to talk about the tortious

2    interference claims.

3              THE COURT:  All right.  Let me ask you a few

4    more questions, and then we will turn it over to him.

5              If, just for the sake of argument, if I don't

6    dismiss the case and I don't require you to amend, you have

7    referenced in discovery what would you envision as the

8    mechanism and how early might it be that you would give

9    greater specificity to the defendant as to what you are

10   contending is protectable under copyright within the subset

11   of Westlaw content?  And what it is you are alleging that

12   they copied from that protectable content?  How soon would

13   they get more specific understandings of what this case is

14   about there your perspective.

15             MS. CENDALI:  Okay.  Let me take it from two

16   respects.

17             First, in terms of the protectable content, how

18   it would -- was that I think your second question -- how

19   would, more detail about what they took?  I believe that is

20   what you were asking, Your Honor.

21             THE COURT:  It is really both sides of it.  They

22   have arguments that I need to evaluate that have you not

23   been specific enough about what you contend is protectable

24   content and, further, what you contend that they copied.

25             So they're telling me I should dismiss the case

1    or, at worse, make you replead.  If I don't go with either

2    of those options but I have concerns that they don't really

3    have enough notice as to what you are alleging, how would

4    you propose in a post-motion to dismiss world that you help

5    alleviate those concerns?

6              MS. CENDALI:  Okay.  First, Your Honor, in terms

7    of what they copied, they know better than we do as to what

8    they copied.  They know what they sent to LegalEase, they

9    know what they asked LegalEase to get them.  They know what

10   they did with the materials they got from LegalEase.

11             At this stage, without discovery, we can't

12   look behind the curtain and see what it was that they did,

13   but they know better than we do as to what they took from

14   Legal -- from LegalEase, what they copied to create the

15   system.

16             But what happened is in discovery, we would

17   no doubt be able to find out through discovery as to what

18   communications with LegalEase, what they did with the

19   materials that they got, and how their engineers used that

20   material to create the system.  That is something that we

21   plead, and I don't know of a case that says we need to plead

22   more than that.

23             We certainly don't need to replead, as Judge

24   Andrews' opinion in *Micro Focus* has said, we don't need to

25   parse through our 161 Westlaw registrations to further

1    identify what is protectable and what isn't because the

2    fact of the matter is, everything that we registered has a

3    presumption of validity.  And what we registered was a

4    compilation, the revisions, the headnotes, and we did not

5    register and have a carveout for the government works, the

6    cases themselves.  That is already in there.

7             I don't know of a case that says you are

8    supposed to do more than that.  I know of cases such as

9    *LegalEase* that says -- excuse me, such as the *Micro Focus*

10   case that says that.  Otherwise, similarly, Your Honor, in

11   the *Vianix vs. Nuance Communications* case in the District of

12   Delaware, the Court found that simply naming the technology

13   that and providing the registrations relating to that is

14   enough to satisfy the pleadings standard of Rule 8.

15            Now, as a practical matter, what will happen in

16   discovery is they will know doubt attempt to try to argue,

17   well, you have already heard some of that.  Well, you know,

18   we think that some of the things that your compilation or

19   your, your headnote, you know, we don't like this headnote,

20   we don't like that headnote.  We're going to try to argue

21   that some of those things aren't protectable.

22            That is part of their affirmative defense and

23   part of their burden to rebut our presumption of validity

24   that the Third Circuit, for example, in the *Ford Motor* case

25   has made clear belongs to us.

1                    And they're free to do that.  They're free to

2       have 30(b)(6) depositions of our people.  They're free to,

3       you know, to try to rake us over the coals as to, well, I

4       don't know about this headnote, I don't know about that

5       headnote.

6                    Presumably, some of that will be less important

7       depending on what they actually took.  What we'll end up

8       doing is no doubt focusing on the material that they

9       ingested and how they used it as opposed to everything at

10      Westlaw.  There is not a lot of need to go over everything.

11      Most likely, both sides will be focusing on what they

12      actually used, and that will be a lot of the focus of the

13      analysis.

14                    But the point is right now, we've plead

15      detailed -- we have, we have satisfied the two part test of

16      *Feist*.  We plead ownership of a valid copyright and 161

17      registrations with their validity and presumption.  They are

18      free to rebut pit.  And we also pled copying by them, both

19      direct and, not challenged until their reply brief, indirect

20      liability.

21                    And we alleged that with specific facts.  And

22      counsel is just not correct in saying that we didn't have

23      allegations in there that are specific as to their knowledge

24      and as to their use.  We did, and I think the complaint sets

25      it out.

1             THE COURT:  I do want to follow-up a little bit

2    on that.  Part of it, what they copied, why shouldn't I

3    understand what you are telling me to be, hey, we're just

4    completely speculating here that the defendant actually used

5    some of our protected material.  We really don't know, we

6    just suspect they could not have developed their product

7    so quickly if they didn't.  But, you know, let us get to

8    discovery and then we'll find out if our suspicions are

9    correct.

10             Have you alleged anything more than that?

11             MS. CENDALI:  Well, I think they have, Your

12   Honor.  I mean we alleged everything that we can since we

13   can't, we can't go behind the scenes and look at exactly

14   what their engineers are doing.  That is why as Your Honor

15   noted, information and belief is, is entirely appropriate

16   in here because of their own conduct.

17             But I think, as you were suggesting, it is a

18   more than plausible inference if you were denied access, as

19   we pled, to Westlaw and then they hired LegalEase to copy

20   our content, which we pled, and provided to them en masse, I

21   think it's a reasonable, plausible inference that you should

22   go our way that they used it.  I mean why would they go

23   through all this if they didn't use it?

24             I don't know what more I could even say on this,

25   because they're the ones who have all that material.  But

1    it's certainly a very plausible inference.  And this

2    happens.  Again, I look at the *Vianix* case and other cases

3    that we cited in the briefs, if someone took the material

4    and you alleged plausibly, and they don't deny that they

5    contracted with LegalEase to do this, of course, but they

6    took the material from LegalEase.  They may have LegalEase

7    give them enormous material of material, which we pled.

8              It's reasonable to think that they did that for

9    a reason and that they copied it.  And there is nothing more

10   I can know now because I have no access to their system.

11             THE COURT:  All right.  Thank you.  You

12   mentioned Judge Andrews' *Micro Focus* decision.

13             There, I think he sets out basically a four-part

14   test to apply when there is a motion to dismiss in an

15   infringement claim like this.  Do you agree that that is a

16   reasonable framework for me to follow?

17             MS. CENDALI:  I actually think that that goes

18   beyond the two-part test of the Supreme Court in *Feist*.  So

19   I'm not sure if the Supreme Court, to be honest with you,

20   Your Honor, would necessarily agree with that.

21             That being said, the actual application of that

22   test would fit this case because as I'm looking at Judge

23   Andrews' decision -- and I note, by the way, that Judge

24   Andrews' decision also cites, pardon the expression, the *Dam*

25   *Things From Denmark vs. Russ Berrie* case, the Third

1    Circuit case that says that complaint has to assert two

2    essential elements, ownership of copyright and copying by

3    the defendant, done.

4            But then Judge Andrews goes beyond to say which

5    specific original works of the subject of the copyright

6    claim?

7            Well, here, the 161 Westlaw works.

8            Two, ownership of the copyrights of those works.

9            Well, that is owned by Thomson Reuters.  We put

10   that in there.

11           Three, registration of the works in question

12   with the copyright office.

13           Check, also done.

14           And four, by what acts the defendant infringed

15   the copyright.

16           And that, we also allege.  We allege it on

17   information and belief that they copied the material that

18   they illicitly obtained from LegalEase to create their

19   competing platform.

20           More than that, we would not be privy to at

21   this point.  But we detailed the volume of what was passed

22   over.  We detailed and discussed how, the information about

23   the algorithms, and we think that that is enough at the

24   pleadings stage to get us into discovery, which I circle

25   back to where we started, Your Honor, which is, you know,

1    your point that the complaint must state enough facts to

2    state a reasonable expectation that discovery will reveal

3    elements of each necessary element of a plaintiffs claim.

4            THE COURT:  Okay.  Thank you.  You have answered

5    my questions.

6            There is about 10 minutes left for plaintiffs;

7    and you can pass it off to your partner, if you wish.

8            MS. CENDALI:  Thank you, Your Honor.

9            MR. SIMMONS:  Good afternoon, Your Honor.

10   This is Joshua Simmons.  I'm going address the tortious

11   interference claim.

12           To kind of a start where Mr. Cendali left off.

13   Contrary to Mr. Ramsey's description, plaintiffs have

14   alleged each element of their tortious interference claim.

15           As to the existence of a contract, no one

16   disputes that LegalEase is alleged to have entered into a

17   subscription agreement with West.  And that is at paragraph

18   29.

19           As to ROSS's knowledge of its subscriber

20   agreement, plaintiffs allege that after ROSS requested and

21   was denied access to Westlaw, as Your Honor then noted in

22   your questions, ROSS hired LegalEase to acquire access to

23   and copy plaintiffs' valuable content.  That is paragraph 1.

24           And it did so because it "knew that LegalEase

25   had a valid contract with West."  That is paragraph 51.

1          As to intentionality, the whole complaint

2     frankly is about ROSS's intent and the scheme between these

3     two companies, but specifically ROSS is alleged to have

4     instigated its scheme knowing that it violated the terms

5     of LegalEase's contract with West.  That is paragraph 3.

6          And thus when ROSS caused LegalEase reproduction

7     and distribution, it's alleged to have done so knowing of

8     the subscription agreement and that doing so would breach

9     those terms.  That is paragraph 3, also 28 through 29, 51

10    through 52.

11         In fact, paragraph 51 specifically alleges that

12    ROSS intentionally instructed LegalEase to act in breach of

13    the contract.

14         As to the remaining claims, I don't think those

15    are in dispute.  Elements, I don't think they're in dispute

16    at this point, you know, as to acting without justification.

17    As we point out, the *Telluride* case makes clear, that is

18    actually ROSS's burden and they can't show it was justified

19    on a motion to dismiss, but in any case, we alleged that it

20    was not justified in paragraphs 3, 30, 31 and 51.  And that

21    the damages, ROSS does not dispute paragraph 53 of the

22    complaint and otherwise we discuss are harmed.

23         Under *Travel Syndication*, which was mentioned

24    earlier, no more than an allegation that ROSS participated

25    in the breach is required.  And we have done far more than

1    that.

2         Moreover, under *Twombly*, our allegations are

3    taken as true and viewed in the light most favorable to us;

4    so, you know, it's simply wrong to suggest that we were

5    required to do more at this stage given all of that, of that

6    pleading.

7         THE COURT:  Let me stop you there.  Going back

8    to, I think you cited paragraph 1.  What was the portion

9    of paragraph 1 that you think supports, if you were saying

10   this, the allegation that ROSS knew LegalEase had a contract

11   with West?

12        MR. SIMMONS:  I think for that, I was citing

13   paragraphs 1, 3, and 51.  I think the best, I think the best

14   of those quotations is on paragraph 51 which is where we

15   write, "Upon information and belief, ROSS knew that

16   LegalEase had a valid contract with West."

17        THE COURT:  Do you see something helpful to you

18   in paragraph 1 on this point?

19        MR. SIMMONS:  Well, yes, I do in the sense

20   that, you know, we also allege that ROSS explicitly and

21   surreptitiously, after being denied permission, used

22   essentially what is LegalEase to enact and obtain illegal

23   content, and it did so to create the competing platform.

24        So in terms of knowledge of the contract, it

25   knew that it was denied access.  As Your Honor pointed out,

1    it was denied specifically because it was a competitor.

2    Turned around and hired another company.

3            And then when one would assume the reason they

4    did that is they knew that they needed someone else to sort

5    of use some subterfuge to get access to the material.

6            THE COURT:  Okay.  But where in that is there an

7    allegation that ROSS knew that LegalEase had a contract and

8    that what ROSS was asking LegalEase to do would be a breach

9    of its contract with Westlaw?  Where is that alleged in this

10   complaint?

11           MR. SIMMONS:  Sure.  So, Your Honor, we alleged

12   that in a couple different places.

13           Paragraph 3 I think is particularly helpful

14   on this where it says, "ROSS intentionally and knowingly

15   induced a third party called LegalEase to breach its

16   contract with West by engaging in the unlawful reproduction

17   of our copyrighted content and distribution of that content

18   en masse to ROSS."

19           THE COURT:  Well, why is that not just

20   conclusory and parroting the elements of the tortious

21   interference claim?

22           MR. SIMMONS:  So I don't, I don't think it is

23   conclusory because you have to -- because it would be --

24   that is a statement that would be read in conjunction with

25   the specific allegations of what LegalEase did the breaching

1    on, which is paragraphs 18 and 19.

2              And so the point here is that they knew --

3    you know, there is multiple allegations of knowing of the

4    contract.  We talk about what those terms were and what

5    LegalEase did and say they, you know, intended that

6    LegalEase would breach them.

7              And under the, under the *Travel Syndications*

8    case, that is what you need to plead at the motion to

9    dismiss stage, particularly when all of the inferences have

10   to be taken in favor of us.

11             THE COURT:  All right.  Did you want to talk

12   about the statute of limitations?

13             MR. SIMMONS:  Sure, Your Honor.  In terms of

14   statute of limitations --

15             MS. CENDALI:  Just to, just to -- not to double

16   team, Your Honor, but I will also point out paragraph 3

17   specifically said that, "ROSS induced LegalEase to engage in

18   this unlawful activity knowing it violated the terms of

19   LegalEase's contract with West."

20             THE COURT:  Thank you.

21             MR. SIMMONS:  Turning to statute of

22   limitations, the Third Circuit explained in Methel vs. Gendy

23   Co. (phonetic), which is cited in the *Travel Syndication*

24   case I was mentioning.  That because statute of limitations

25   affirmative defense, under the law of this Circuit, you

```
 1    know, you can only raise it on a Rule 12(b)(6) motion if
 2    it is apparent on the face of the complaint that it should
 3    apply.  Otherwise, as in various cases, including Your
 4    Honor's, the defense is best left to a later stage of the
 5    pleading -- of the proceedings.
 6              I think that is the better course here because
 7    there are two different issues that come up with plaintiffs'
 8    argument.
 9              The first is the choice of law issue that we
10    didn't hear a lot about this morning, but essentially, you
11    know, because the statute of limitations, the tortious
12    interference claim, rather, is found in Minnesota law, it
13    doesn't, we don't even get into what people knew or when
14    or the rest of it.
15              When you look at all of the factors, it's
16    clear that Minnesota law applies, and that would mean that
17    Delaware's three-year statute of limitations applies.
18              That is true when you look at the place where
19    the injury occurred.  Your Honor held in *Grynberg vs. Total*
20    that a corporation sustains injuries where it incorporated
21    or where it had offices.  That's a tortious interference
22    case.  And that is West.
23              Now, plaintiff said, oh, maybe it was Thomson
24    Reuters but the subscriber agreement is with West, so the
25    only party who they were tortiously interfering with was
```

1    the West subscriber agreement, and so the harm is all in

2    Minnesota.

3            That is all that is necessary there.  And

4    because of that, a great weight is placed on where the harm

5    is placed as opposed to in other cases where there might be

6    a harm in multiple locations.

7            As to the place where the conduct occurred,

8    you know, when it's in only one -- when the harm is only in

9    one state, in other words, because the harm is only in

10   Minnesota, we don't actually give that much weight to where

11   the conduct causing it was created.  That is the *Eureka vs.*

12   *Range* which we cited in our brief.

13           And so ROSS raises sort of not out of the

14   complaint but just sort of raises, oh, well, the conduct

15   must have occurred in their California office, but that is

16   not in the complaint so that is not an allegation you can

17   decide that on.

18           Certainly, all inferences have to go our way,

19   but what the complaint does allege is there was an illicit

20   scheme between ROSS and LegalEase, and LegalEase is

21   incorporated in Michigan.  So on this factor, *Twombly* would

22   suggest that it is not decidable at this stage, so we can

23   just look to other factors, but in any case it would get

24   little weight.

25           On the third factor, where the parties are

```
 1    located, yes, ROSS and West are in California and Minnesota,

 2    but they're also incorporated in Minnesota and Delaware.

 3    And so based on their location of incorporation, that would

 4    mean we would apply the Delaware three-year statute of

 5    limitations.  Just because ROSS is based in California

 6    doesn't mean that factor wouldn't go our way.

 7              THE COURT:  Right.  Let me interrupt you.  You

 8    have got two minutes left.  I have two more questions for

 9    you.

10              MR. SIMMONS:  Okay.

11              THE COURT:  So about Minnesota, is anything

12    alleged by Minnesota in the complaint other than that is

13    where West has its principal place of business.  That is,

14    is there anything about the subscriber agreement?  Is there

15    anything about what law governs that?  Is any of that in

16    the complaint?

17              MR. SIMMONS:  So the subscriber -- so we do

18    reference that West is in Minnesota and then discuss, you

19    know, West in part of the complaint claim.  The subscriber

20    agreement was not attached to the complaint, but it is

21    incorporated by reference because it discussed -- its terms

22    are specifically discussed, and the *Runnion* case we cited

23    in our papers makes clear that when you are discussing a

24    document, you can consider it in deciding whether a claim

25    is improperly pleaded.
```

1          So from our perspective, that document which

2     we attached to our answering brief at 16-1 can come in.  It

3     says it's a West subscriber agreement and that it is based,

4     the law is based in Minnesota.

5          But Your Honor doesn't need to decide that

6     based on the subscriber agreement alone because there is no

7     question that for tortious interference claim, the harm is

8     sought where West is located.  And that is in the complaint

9     at paragraph 7.

10          THE COURT:  All right.  And if alternatively I

11     were to decide that California law applied, Mr. Ramsey was

12     citing to I think it was *Endo* decision at end of his earlier

13     argument.

14          Can I decide the discovery rule issue at this

15     stage consistent with California law?  What is your view on

16     that?

17          MR. SIMMONS:  No, you can't, Your Honor.  And

18     this at least two reasons, I guess maybe even three reasons

19     for that.

20          First, Mr. Ramsey cited to a California state

21     court case, and under *Erie*, the pleading rules are actually

22     determined by the federal court of law.  And so Your Honor's

23     decision in *TL of Florida vs. Terex* is a better place to

24     look for what needs to be pleaded.  And Your Honor

25     specifically noted that you frequently can't decide these

 1    issues on this motion to dismiss and they're not really

 2    amenable to that.

 3           I would also point Your Honor to as *Ausikaitis*

 4    *vs. Kiani* which says, "a plaintiff is not required to plead

 5    sufficient facts so as to avoid affirmative defense based on

 6    the statutes of limitations."

 7           So we didn't need to sort of anticipate that

 8    they would bring this claim, certainly not that they would

 9    bring it based on California law.  And so Your Honor need

10    not reach that issue at all on a motion to dismiss, but the

11    additional reason to not raise it, deal with it now is they

12    didn't raise the discovery rule issue in their opening

13    brief.  They just sort of raised the statute of limitations,

14    but they didn't actually discuss the issue of when we

15    discovered this until we got to reply.

16           And their complaint does not, in any case, say

17    when we discovered it.  At best, there were inferences that

18    would be we didn't know about it until we -- right before we

19    sued, certainly within the two-year statute of limitations

20    window.

21           So I think the better course is either to find

22    that Minnesota law applies, which Your Honor can certainly

23    do, and then this is a moot point or, as Your Honor did in

24    your prior decision in *TL of Florida*, hold off on a statute

25    of limitations claim until ROSS can develop whatever

1    discovery it thinks it will be able to develop on a statute

2    of limitations affirmative defense.

3                THE COURT:  Okay.  Thank you.  Plaintiffs' time

4    is up.

5                We'll turn it back to Mr. Ramsey for his

6    rebuttal.  Go ahead, please.

7                MR. RAMSEY:  Thank you, Your Honor.  Just a few

8    final points here.

9                No less than three times, plaintiffs relied on

10   the *Micro Focus* case in terms of the pleadings standard for

11   copyright.  One of the requirements there is to allege by

12   what acts the defendants infringed.

13               Back to my initial comments that there is simply

14   no allegation of any acts of copying by ROSS or LegalEase of

15   any of the protectable material.

16               Through plaintiffs' discussion just now, we

17   heard about key numbers, we heard about headnotes.  Those

18   are defined terms.  Now we're hearing about algorithms.  I

19   believe I heard the word "database" involved.  We heard now

20   for the first time a compilation.

21               This is the point.  There is a lot of material

22   on the table even through the exposition of argument today

23   that there is simply no notice in any factual allegation,

24   direct or from which it can be inferred that any of this

25   material was actually copied into a ROSS product or by ROSS

1      in general or by LegalEase.

2              In other words, under the language of *Micro*

3      *Focus*, there is simply no alleged acts that constituted the

4      infringement.  And there is just no notice to the defendant.

5              It's a very large body of material that is

6      alleged, broader still after today's argument.  The point

7      is plaintiffs needed to specify, to the extent that they

8      can, and certainly more than they have, what it is that

9      is the acts by defendants where one may reasonably infer.

10     Based on some factual allegation, not just boilerplate

11     recitation of a copyright claim, where that material exists.

12             It is just a fishing expedition with this wide

13     open conclusory assumption that some material must be in

14     there somewhere.  But that puts the discovery cart before

15     the pleading horse, and, you know, the complaint frames the

16     scope of the case.

17             So I think defendants could have done a better

18     job and should have done a better job at the pleading

19     standard to allege what acts are alleged to infringe by

20     defendant and what material could be reasonably referred to

21     have been copied, and that fails completely here.

22             As to -- you know, and again, plaintiffs cannot

23     take shelter under the information and belief.  I refer the

24     court to the "network managing solutions vs. AT&T" case.

25     Only where there is not, and I quote, "some public product

1    that can be reverse engineered is information and belief

2    appropriate."

3            Plaintiffs could have done more, should have

4    done more to come up with a specific fact-based theory

5    directly or upon inference and simply have not done so.

6            Second.  On indirect infringement, there is no

7    way.  I'm going to take up than point real briefly.

8            In the opening brief, at page 7, the defendant

9    alleges that all of the indirect infringement allegations in

10   the complaint, that is paragraphs 24 through 29, 32 through

11   35, and 39 -- pardon, 38 through 39 fail because they're

12   alleged purely on information and belief.  No factual content

13   underlying those allegations that there was knowledge, intent,

14   an act to induce or contribute to infringement.  It's the same

15   feeling as the direct infringement claim.

16           And in general in the opening brief, for the

17   same reasons, the defendant alleges and sets forth argument

18   how there is no -- there is not a factual content to

19   establish that ROSS actually copied anything, certainly, the

20   defined material in the complaint, or that LegalEase did.

21   For those two reasons.  Those are the modes in which

22   defendant took on the indirect infringement claim, filled it

23   out with some law, but no way was persuaded.

24           There was a question posed in Ms. Cendali's

25   argument, why would ROSS works with LegalEase if not to

1    infringe?  That was a quote that I believe I heard or

2    something close to that.

3            This is about what you can infer from the

4    complaint.  That is a fair question.

5            Unfortunately for the plaintiffs, in this case

6    the answer is the only facts in the complaint at all that

7    characterize or have any, any specificity to fill out ROSS's

8    product, what is in it, what may or may not have been copied

9    is the characterization that the product is a "natural

10   language search."  So if we're asking the question why would

11   ROSS work with LegalEase if not to infringe, well, the

12   only thing we can infer from the complaint in that sole

13   characterization is that ROSS is working with LegalEase to

14   understand "the natural language of judicial opinions."

15           If we're talking about reasonable inferences,

16   that is all we have on this pleading.  And for that reason,

17   there can be no reasonable inference of copying by ROSS or

18   LegalEase alike.

19           Finally, I got two minutes left here.  I will

20   turn to tortious interference.

21           In sum, the only way the tortious interference

22   claim is framed in the complaint, and we heard about three

23   paragraphs today.  I noted them.  Paragraphs 1, 3, and 51.

24   Those are the materials that allegedly form the basis of the

25   tortious interference claim.

1          In every single one of those, it is simply a

2     boilerplate recitation of the elements of a tortious

3     interference claim.  That there was a contract that ROSS

4     knew, that ROSS took some act to interfere with that

5     contract.  Just stating a rule of law again.

6          But again, the pleading standard, as we know

7     under *Twombly* and *Iqbal* and the more particular cases

8     dealing with tortious interference requires something more

9     than that.  It has to be -- a claim can't just be a

10    broad-based hunch and theory and speculation that, gosh,

11    ROSS might have been in some universe motivated to interfere

12    with the contract between LegalEase and West.  There has to

13    be some factual material.

14         It may not prove the whole case.  That is not

15    what I'm saying.  We're not dealing with strawmen or women

16    today.  It's just some factual material that is beyond just

17    a recitation of the tortious interference elements, and

18    unfortunately that is all the plaintiffs have alleged.

19         And for these reasons, plaintiff claims simply,

20    simply are not sufficient to meet the pleading standard in

21    this iteration of the complaint for sure.

22         THE COURT:  All right.  Let me ask you just a

23    few more questions.

24         We've all talked about Judge Andrews' *Micro*

25    *Focus* test.  Do the defendants have a view on whether I can

1     or should follow his four-part recitation of what it takes

2     for a claim to survive a motion to dismiss?

3              MR. RAMSEY:  I believe it is a fine formulation,

4     and defendant will accept that formulation.

5              And in particular, candidly, focusing on

6     defendant's best argument today, to make it clear and not

7     hide the proverbial ball, Item 4 is the copyright pleading

8     piece that is really important:  By what acts the defendant

9     infringed the copyright.  Here, there is nothing in this

10    complaint, and that is a requirement, and we're satisfied

11    adopting that test.

12             THE COURT:  All right.  With your respect to

13    your challenge to the indirect infringement allegations,

14    do you contend that in your opening brief you make some

15    argument about the sufficiency of the indirect claim

16    that you did not also make with respect to the direct

17    infringement claim?

18             MR. RAMSEY:  Right.  At page 7 of the opening

19    brief, the defendant asserts that all of the allegations

20    in the complaint, paragraphs 24 through 29, 32 through 35,

21    and 38 through 39 fail for failure -- for pleading them on

22    information and belief without a factual underpinning.

23             Those paragraphs are the bald assertion that

24    ROSS allegedly knew and intended and induced infringement.

25    And we stand on our argument.  It is a species of the

1    more general genus of argument that pervades the entire

2    complaint.   There is no factual underpinnings for any of the

3    elements of either copying by ROSS or copying by LegalEase

4    or knowledge, intent, or control for purposes of indirect

5    infringement or for tortious interference.   Across the

6    board, that is the flaw, and it was argued in the opening

7    brief.

8              THE COURT:   If I were to require them to file an

9    amended complaint, what is your position on whether they can

10   make use of whatever they seem to have learned in the action

11   against LegalEase?   Are you okay with them doing so?

12             MR. RAMSEY:   I think that -- well, I'm not

13   going to concede to that, no.   I think that that is not

14   necessary.

15             The point is they, through that proceeding, they

16   had awareness of the product.   They have known about it for

17   years.   And it's available.

18             So I'm not willing to top the door to, you know,

19   free-ranging discovery, but I am open to inquiry into the

20   product that, you know, to be sure there is a link in the

21   briefs from which anybody can access the service, and

22   investigate it, test its inputs, its outputs, its features

23   and functionality, the way that it presents information, the

24   way it functions.   And if there is some piece of that that

25   could support a claim, then so be it.

1           But it's incumbent to meet the pleadings

2     standard, in other words, to meet Factor 4 of Judge Andrews'

3     test, it's incumbent upon the plaintiffs to do that.  And

4     they have just not done so now.

5           THE COURT:  If the allegation as I think they

6     have made very clear at least now is that it was at the

7     development stage of your client's product that they're

8     alleging there was copying of their protected content that

9     is not public.  It is not discernible through use of the

10    product.

11          So how else could they plead about that or, you

12    know, get information about it without information and

13    belief allegations followed by discovery?

14          MR. RAMSEY:  I submit it is knowable, at least

15    inferentially from the reverse engineering.  Just like in

16    the patent cases.  I don't mean to keep referring to patent

17    cases, but in a technical case like this, it's no different.

18    It's true in every patent case, much like the copyright case

19    here, that the plaintiff can't know everything about a

20    product, but in the words of *Network Managing Solution*,

21    where there is "some public product that can be reverse

22    engineered" to shore up at least inferentially some more

23    specific features than, hey, this is a search product, it

24    must be in there somewhere.  Well, the same is true here.

25    And we're only asking you to apply in an evenhanded way the

1   rules on pleading information and belief and the rules about

2   alleging specific acts.

3           There has to be -- we're not saying prove the

4   whole case.  We're realistic.  What we're saying, there must

5   be something to put the defendants on notice.  This is not

6   just about meeting the pleading standard because it is

7   stated in a case someplace.  It is about allowing the

8   defendant to say, ah, we now understand more specific ways

9   of parameters of the theory in the claim.  We can formulate

10  a defense, admit or deny, and we'll frame the scope of

11  discovery.

12          So, more is possible without sitting in the lab

13  at ROSS through the investigation of the product just like

14  other IP cases, and something more is required here.  They

15  can do more.

16          THE COURT:  All right.  Just one more question.

17  I'm not in any way offended by your reference to patent

18  cases.  My question actually relates to that.

19          In patent cases, we usually have infringement

20  contentions at a fairly early stage in the discovery

21  process.  Isn't that part of the answer here?  They will

22  be required, if they survive this motion to dismiss, to, in

23  a fairly expeditious manner that we would build into the

24  schedule, serve something like infringement contentions on

25  you that make clear, here is what we contend is protectable

1  about, you know, our intellectual property, and here is what

2  we contend you copied.

3             What would be inadequate from your perspective

4  with that approach?

5             MR. RAMSEY:  Well, broadly, there is nothing

6  offensive about such an approach and that sort of mechanism

7  is useful, of course, in any sort of litigation.

8             But my point is we're not quite there yet, Your

9  Honor.  We're still at the pleadings stage.  The pleadings

10  rules do require some level of specificity to open the doors

11  of discovery at all.

12             And plaintiffs have plenty of resources to avail

13  themselves to set the framing of this case beyond we have

14  databases and algorithms and headnotes and key numbers and

15  compilations and something in some way, somehow must be in

16  their product, but we're not, we're not going to frame it in

17  any sort of even, in any inferential way that is useful to

18  frame our case.

19             There is more work to be done in the complaint,

20  I would submit, Your Honor, before we get to the kind of

21  case management details like that.  We're not at that point

22  yet, and the pleadings standards exist for a reason, I would

23  submit.

24             THE COURT:  Okay.  Thank you very much.  I want

25  to thank all three of you for the very helpful argument.

1          I'm going to take the motion under advisement.

2    If I need anything further from you, I will let you know.  I

3    hope everybody enjoys the weekend.  Happy Halloween, I

4    suppose, and stay safe.

5          Thank you again.  We will be in recess.

6          (The attorneys respond, "Thank you, Your Honor.")

7          (Telephonic argument ends at 12:48 p.m.)

8

9        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

10

11                              /s/ Brian P. Gaffigan
                            Official Court Reporter
12                           U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25