**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) | C.A. No. 20-613-LPS |
| Plaintiffs, Counterdefendants, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant, Counterclaimant. | ) | |

**DEFENDANT AND COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S
AMENDED PARTIAL ANSWER AND DEFENSES AND AMENDED
COUNTERCLAIMS IN RESPONSE TO PLAINTIFFS' COMPLAINT AND
DEMAND FOR JURY TRIAL**

## AMENDED ANSWER

Defendant ROSS Intelligence, Inc. ("ROSS") hereby partially responds to the Complaint filed by Plaintiffs Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West") (collectively, "Plaintiffs"). Specifically, ROSS responds to Plaintiffs' second claim for tortious interference with contract. Plaintiffs' first claim for copyright infringement, and any allegation purporting to assert copyright protection over any content, is subject to ROSS's pending motion to dismiss pursuant to Federal Rules of Civil Procedure Rule 12(b).

## NATURE OF THE ACTION[1]

1.      ROSS denies it illicitly and surreptitiously used a then-Westlaw licensee to acquire access to and copy Plaintiff's content, and that it is attempting to create a business or

---

[1] The section headings in this Answer are provided solely for ease of reference, tracking those used in the Complaint, and do not constitute any part of ROSS's response to the allegations in the Complaint or any form of admission as to the truth of those allegations.

competing product by taking for itself any features of Westlaw or "Westlaw Content," as defined and alleged by Plaintiffs. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and therefore denies them.

2.      ROSS denies the allegations in paragraph 2.

3.      ROSS admits West denied ROSS's direct access to Westlaw. Except as expressly admitted, ROSS denies the allegations in Paragraph 3.

4.      ROSS denies the allegations in paragraph 4.

5.      ROSS denies the allegations in paragraph 5.

## PARTIES

6.      Paragraph 6 states a legal conclusion as to whether any "Westlaw Content" is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time. Otherwise, ROSS admits the allegations in paragraph 6.

7.      Paragraph 7 states a legal conclusion as to whether there is any copyrightable creation or authorship in any "Westlaw Content," which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time. Otherwise, ROSS admits the allegations in paragraph 7.

8.      ROSS admits the allegations in paragraph 8.

## JURISDICTION AND VENUE

9.      ROSS admits that the Complaint purports to assert claims arising under the copyright laws of the United States, specially, 17 U.S.C. § 101 *et. seq.* ROSS denies that this action arises under Delaware law. ROSS admits that the Complaint purports that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

10.    ROSS admits that the Complaint purports that venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1400(a).

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

I.    **Plaintiffs and the Creativity of Westlaw**

11.    ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

12.    ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

13.    ROSS admits that the "Abandoned and Lost Property" topic contains the Key Numbers "Nature and elements," "evidence and questions for jury," and "operation and effect." ROSS admits that within the "Nature and elements" Key Number are Key Numbers assigned to the legal issues and points of law "In general," "Intent," and "Acts and omissions" topics. ROSS admits that the "In general" Key Number is delineated 1k1.1, and currently contains 603 cases. Except as expressly admitted, ROSS denies the allegations in Paragraph 13.

14.    ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

15.    ROSS admits Westlaw contains case law, state and federal statutes, state and federal regulations, law journals, and treatises.  ROSS admits that West Headnotes describe key concepts of a case.  ROSS admits that the Plaintiffs provide an example of West Headnotes and West Key Numbers from the *Harper & Row* case.  ROSS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and therefore denies them.

16.    ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

17.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

18.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

19.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

## II.     Plaintiffs' Valuable Intellectual Property Rights in Westlaw

20.     Paragraph 20 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

21.     Paragraph 21 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Otherwise, ROSS denies the allegations in paragraph 21.

22.     Paragraph 22 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

23.     Paragraph 23 states a legal conclusion as to whether any "Westlaw Content" is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time. Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

## III.     ROSS Intelligence and Its Infringement of Westlaw

24.     ROSS admits it was founded in 2015 and is engaged in the business providing judicial opinions to the public through legal research services.

25.     ROSS admits it began by offering research services in bankruptcy and intellectual property law and currently offers research services on case law, statutes, and regulations across all practice areas and all 50 states.

26.     ROSS admits that ROSS's users are able to search for relevant law by posing a question in natural language, as opposed to Boolean terms or key words.  ROSS admits that Paragraph 26 reflects results of a natural language search on ROSS.

27.     ROSS denies the allegations in paragraph 27.

28.     ROSS admits it acquired judicial opinions to develop a legal research platform. Except as expressly admitted, ROSS denies the allegations in Paragraph 28.

29.     ROSS admits it contracted with LegalEase, a legal research and writing support services company.  Except as expressly admitted, ROSS denies the allegations in Paragraph 29.

30.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

31.     Paragraph 31 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

32.     Paragraph 32 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

33.     Paragraph 33 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no

response is appropriate at this time.  Paragraph 33 states a legal conclusion as to whether any "Westlaw Content" is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  ROSS admits LegalEase provided ROSS with excerpts from judicial opinions.  Except as expressly admitted, ROSS denies the allegations in Paragraph 33.

34.     Paragraph 34 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Paragraph 34 states a legal conclusion as to whether any "Westlaw Content" is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  ROSS admits it has been working with LegalEase since October 2015.  Except as expressly admitted, ROSS denies the allegations in Paragraph 34.

35.     Paragraph 35 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Paragraph 35 states a legal conclusion as to whether any "Westlaw Content" is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Paragraph 35 states a legal conclusion to the extent it states, characterizes, or refers to ROSS "copied" any purported copyrighted material, to which no response is required.  Otherwise, ROSS denies the allegations in Paragraph 35.

36.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

37.     Paragraph 37 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Paragraph 37 states a legal conclusion as to whether any "Westlaw Content" is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Otherwise, ROSS denies the allegations in Paragraph 37.

38.     Paragraph 38 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Paragraph 38 states a legal conclusion as to whether any content is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Otherwise, ROSS denies the allegations in paragraph 38.

39.     Paragraph 39 states a legal conclusion to the extent it states, characterizes, or refers to any action as infringing, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.  Paragraph 39 states a legal conclusion as to whether any "Westlaw Content" is subject to copyright protection, which is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time. Otherwise, ROSS denies the allegations in Paragraph 39.

## CLAIMS FOR RELIEF

### COUNT I
**Copyright Infringement (17 U.S.C. *et seq.*)**

40.     ROSS incorporates by reference its responses to each and every allegation above as if fully set forth herein.

41.     Paragraph 41 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

42.     Paragraph 42 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

43.     Paragraph 43 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

44.     Paragraph 44 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

45.     Paragraph 45 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

46.     Paragraph 46 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

47.     Paragraph 47 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

48.     Paragraph 48 is subject to ROSS's motion to dismiss, and therefore no response is appropriate at this time.

### COUNT II
### Tortious Interference with Contract

49.     ROSS incorporates by reference its responses to each and every allegation above as if fully set forth herein.

50.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

51.     ROSS denies the allegations in paragraph 51.

52.    ROSS admits Plaintiffs denied ROSS direct access to Westlaw.   Except as expressly admitted, ROSS denies the allegations in Paragraph 52.

53.    ROSS denies the allegations in paragraph 53.

## PRAYER FOR RELIEF

ROSS denies that Plaintiffs are entitled to any relief whatsoever, specifically including the relief specified in its Prayer for Relief.

## JURY DEMAND

ROSS admits that Plaintiffs have demanded a jury trial on all issues triable to a jury.

## DEFENSES

ROSS sets forth its defenses below, and in doing so, ROSS does not allege or admit that it has the burden of proof and/or persuasion with respect to any of these matters, and does not assume the burden of proof and/or persuasion as to any matters to which Plaintiffs bear such a burden.  ROSS reserves its right to amend its Answer to assert other defenses as they may become known.

## FIRST DEFENSE
### (Failure to State a Claim for Tortious Interference with Contract)

Plaintiffs' tortious interference with contract claim fails to state a claim upon which relief can be granted.

## SECOND DEFENSE
### (Double Recovery)

Recovery on any alleged tortious interference by ROSS with the contract between LegalEase and Plaintiffs is barred due to the double recovery. Plaintiffs would receive, having already sued and entered in a consent judgment with LegalEase for LegalEase's alleged breach of its contract with Plaintiffs.

**THIRD DEFENSE**
**(Statute of Limitations)**

Plaintiffs' tortious interference with contract claim is barred under California's two-year statute of limitations.

**FOURTH DEFENSE**
**(Good Faith)**

ROSS's actions were taken in good faith, in reliance upon information provided by LegalEase's representatives, agents, and/or employees, and with a reasonable belief that such actions were legal, appropriate and necessary.  The conduct alleged to be in violation of a statute, if any such conduct occurred, was purely unintentional, and occurred, if at all, despite ROSS's reasonable and appropriate efforts to avoid any such violation.

**FIFTH DEFENSE**
**(Equitable Doctrines – Consent, Waiver, Laches and Estoppel)**

Plaintiffs' tortious interference with contract claim is barred, in whole or in part, by equity and the doctrines of consent, waiver, laches, and estoppel.

**SIXTH DEFENSE**
**(Tort of Another)**

Without admitting any liability and without admitting that Plaintiffs have suffered any loss or damage whatsoever, Plaintiffs tortious interference with contract claim is barred, in whole or in part, by the intervening tort of a third-party, for which ROSS is not liable.

**SEVENTH DEFENSE**
**(Equitable Doctrines – No Injunction)**

Plaintiffs are not entitled to injunctive relief because any alleged injury to Plaintiffs is not immediate and irreparable, and Plaintiffs have an adequate remedy at law.

## DEFENDANT ROSS INTELLIGENCE INC.'S AMENDED COUNTERCLAIMS

1.      This is a case about the public right of access to the rules of our democracy and Westlaw's anticompetitive tactics to keep "the public law" from most Americans and maintain its monopoly.

2.      "The public law" is the decisions of federal and state courts, the laws enacted, and the administrative guidance.  This is the material we the people reference when saying that ours is a government of laws, not of men.

3.      The right to access to the public law has been well-recognized by courts throughout the nation for hundreds of years.

4.      Nevertheless, as every judge, law clerk, professor, practicing lawyer, paralegal, law student, and other participant in the legal ecosystem knows, when it comes to accessing the public law, Westlaw is king.

5.      Counterdefendants market and sell Westlaw, which controls over 80% of the market for legal search platform products.  Westlaw's[2] status as king of legal search has been unchallenged for more than a century.  Westlaw's control over legal search is not only enduring, it is incredibly lucrative – Counterdefendants reap billions in revenue at supra-competitive prices.  As a result, most Americans have no way to credibly search the public law and are forced to rely on others to understand the rules of our democracy.

6.      Counterclaimant ROSS Intelligence Inc. ("ROSS") is a nascent competitor in the market.  ROSS built a robust and intuitive legal search engine that uses artificial intelligence and other technology with the goal of making the public law accessible to every American.  ROSS

---

[2] Counterdefendants Thomson Reuters Enterprise GmbH and West Publishing Corp. are herein referred to as "Counterdefendants" or "Westlaw."

secured substantial investment to develop and launch its product. The legal technology community uniformly recognized that ROSS's product was poised to reshape the market.

7.      Ultimately – despite substantial venture capital investment, disruptive technology, and widespread enthusiasm – ROSS never really had a chance.  ROSS brings this antitrust case against Westlaw for engaging in an exclusionary and anticompetitive course of conduct to maintain its monopoly and restrain trade. This conduct both harmed ROSS and injured American consumers by depriving them of access to the public law.

8.      ROSS will show that Westlaw does not maintain its exalted status in legal search through innovation or procompetitive business practices.  To the contrary, at its essential core, the Westlaw platform has not kept up with technological advances and its search functionality is substantially behind the search functionality offered in other products.

9.      Instead, Counterdefendants use anticompetitive sales and licensing regimes supported by a web of sham copyrights and intimidation tactics to crush potential rivals like ROSS.  As a result, despite massive advances in technology, including the advent of the Internet and artificial intelligence, not a single credible threat to Westlaw dominance has emerged.

10.     To end those anticompetitive practices, bring competition to the market, increase consumer welfare, and make the public law really and truly available to the public, ROSS asserts the following amended counterclaims.

## NATURE OF THE ACTION

11.     ROSS seeks injunctive and monetary relief for Counterdefendants' exclusionary conduct to maintain monopoly control in violation of Section 2 of the Sherman Act.

12.     ROSS seeks injunctive and monetary relief for Counterdefendants' anticompetitive practices and agreements in violation of Section 1 of the Sherman Act.

13.     ROSS also seeks injunctive and monetary relief for Counterdefendants' unfair business practices in violation of the California Unfair Competition Law.

14.     Finally, ROSS seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, preliminary and permanent injunctive relief, and other necessary and proper relief, enjoining Counterdefendants from impeding ROSS's publication of any public law, and from alleging that ROSS has tortiously interfered with any contract.

## PARTIES

15.     ROSS is a corporation organized under the laws of the State of Delaware, having a principal place of business at 650 California Street, San Francisco, California 94108.

16.     Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") is a limited liability company having its principal place of business in Zug, Switzerland.

17.     West Publishing Corp. ("West") is a Minnesota corporation having its principal place of business at 610 Opperman Drive, Eagan, Minnesota 55123.

## JURISDICTION AND VENUE

18.     Based on the allegations in Counterdefendants' complaint filed in this action (herein, the "Complaint"), *see* D.I. 1, there presently exists a justiciable controversy regarding the validity, copyrightability, and ownership of certain content purportedly owned by Counterdefendants.

19.     This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, and 1338(a), and because ROSS's claims arise under the Copyright Act 17 U.S.C. § 101 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*, and the Sherman Act, 15 U.S.C. § 1 *et seq*.

20.     Counterdefendants are subject to personal jurisdiction in this Court because they have submitted to jurisdiction of the Court by filing the Complaint.

21.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and/or 1400 at least because Counterdefendants have filed the Complaint in this District.

22.     Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental subject-matter jurisdiction over ROSS's state-law claim because this claim is so related to the copyright and antitrust claims herein that it forms part of the same case or controversy.

## GENERAL ALLEGATIONS

### ROSS & Counterdefendants' Complaint

23.     ROSS is a modern legal search company that has designed a product to provide consumers with simplified access to the public law at affordable prices.

24.     Over years of work, ROSS developed a powerful natural language search engine based on artificial intelligence.  Based on natural language search queries, ROSS's search engine can search through a database of public law and identify legal materials responsive to the query from within the database.

25.     ROSS sold access to its AI-based legal search product for less than $100 per month, a tiny fraction of what Westlaw charges.

26.     Westlaw controls the largest, most comprehensive, and most reliable public law database, but only makes that database available to those who also license its legal search tools through the Westlaw platform.

27.     Westlaw denied ROSS access to the Westlaw platform and thus also the public law database.  According to Westlaw, then, ROSS had to access the public law through smaller, less comprehensive, and less reliable databases.

28.     ROSS looked for alternatives and eventually obtained a degree of access to the public law through small companies called Fastcase and Casemaker.  However, unlike Westlaw, Fastcase and Casemaker makes their public law database available to those who choose not to also license their legal search tools in a bundled product, even if the database purchaser is a competitor.[3]

29.     Once ROSS's AI search engine is connected to a public law database, it can identify cases from within the database after receiving a natural language search query.  ROSS's search engine only searches through the raw public law and not extraneous materials added by other content providers, like Westlaw's key numbers, headnotes, and page numbers.  Indeed, ROSS's training process was specifically designed to be incapable of digesting information that was added to the public law by third parties like Westlaw, including key numbers, headnotes, and page numbers.

30.     ROSS contracted with legal research companies for assistance in training the AI search algorithm, including a small company called LegalEase.  ROSS directed LegalEase to provide researcher-chosen quotes of case law directly from raw judicial opinions.

31.     ROSS explicitly told LegalEase that it did not want any third-party information beyond the LegalEase researcher-chosen quotes of case law from raw judicial opinions.

32.     According to Westlaw's Complaint, LegalEase used the Westlaw platform to conduct legal research and prepare its responses for ROSS.

33.     According to Westlaw's Complaint, when LegalEase accessed the public law through Westlaw in support of the ROSS contract, LegalEase breached its license agreement with Westlaw and was liable.  Also according to Westlaw, when ROSS received and used

---

[3] Fastcase and Casemaker have very recently merged into a single company.  The merger in no way impacts Westlaw's monopoly power.

LegalEase's work product quoting judicial opinions to train its AI technology, ROSS was liable for copyright infringement and tortious interference.

34.     The Westlaw license agreement is a contract of adhesion that must be and is accepted by licensees, including most major legal service providers.  It prohibits copying and distributing significant portions of materials found on Westlaw, even if none of the material is protected under a valid copyright.  The license also prohibits using any material found on Westlaw to support a competitor.

35.     West sued the much smaller LegalEase in Federal Court in Minnesota and extracted a settlement.  Through the lawsuit, West gained access to information from LegalEase and third-party ROSS under a protective order issued by the Minnesota Court.

36.     Westlaw believes that this information supports its Complaint.

37.     One day after the West-LegalEase action was dismissed, Westlaw sued ROSS, without obtaining relief from the Minnesota protective order.

**The Westlaw Platform**

38.     In paragraph 11 of the Complaint, Westlaw describes its platform as "a comprehensive collection of legal information that is easily searchable."   Based on this description and personal knowledge[4], the Westlaw platform bundles two products: (1) a comprehensive database (or digital collection) of the public law and (2) a legal search technology and functionality product – or, for brevity's sake, legal search tools.

---

[4] To the extent that Counterdefendants claim that ROSS's legal team violates the Westlaw license when it uses ROSS's or its own personal knowledge about the Westlaw platform to prepare the Amended Answer, this is, and should be treated as, further evidence that Westlaw is acting in a way that is anticompetitive and violates the public policy goals of the copyright law.

39.     Westlaw has built up its comprehensive collection of public law since the 19th century.  On information and belief, this database is comprehensive because it includes at least every federal and state judicial opinion, statute, and regulation in United States history.

40.     While the opinions are written by judges, the statutes are written by legislatures, and the regulations are written by government agencies, Westlaw asserts a copyright interest in the comprehensive database.

41.     Westlaw asserts that its database is reliable because it is regularly updated with new opinions, legislation, and guidance, and is also regularly audited to confirm its accuracy.

42.     In the 19th Century, and for decades afterwards, Westlaw stored its collection of public law in volumes of hard copy books that could be purchased and updated when new volumes became available.  To the extent possible given physical limitations, Westlaw sought to include all the public law in its voluminous collections.  Today, the public law collection is stored virtually, and made available through a subscription to the Westlaw platform that can be accessed through the Internet.  As the physical limitations are now gone, the digital collection is truly comprehensive.

43.     The public law database made available through Westlaw is a highly valuable product because it is comprehensive and reliable, and because it can be accessed virtually and all at once.  On information and belief, some of the public law available in Westlaw's database is not available anywhere else.  For example, on information and belief, Westlaw had at least at one time, and likely still today, exclusive agreements with governmental agencies to retrieve and ultimately use their governmental edicts for licensing purposes.

44.     Just as importantly, consumers can feel confident when looking for cases in Westlaw's digital collection.  The Westlaw database has been the standard for collecting judicial

opinions, legislation, and regulations since before any currently practicing lawyer was born.  Not only do users know that Westlaw's digital collection includes all the potentially relevant public law, but they also have (in many cases) years and years of experience knowing that Westlaw's collection of public law is complete and reliable.

45.    The Westlaw platform also incorporates a legal search technology and functionality product (the "legal search tools") that can be used to search the public law. Westlaw legal search tools purport to help users search through large amounts of public law to find desired material.  Just as stock analysts need tools to search through the enormous amount of stock data, lawyers need tools to search through the enormous amount of public law. According to the Complaint, Westlaw refers to this product as the "Westlaw Content."

46.    According to the Complaint, the "backbone" of the Westlaw legal search tools is the West Key Number System.  The West Key Number System is a "hierarchy" reflecting core concepts in the public law and used to organize the public law.  The Complaint contends that the West Key Number System "is the result of decades of human creativity and choices."

47.    Westlaw purports to maintain copyrights in the West Key Number System, which Westlaw asserts is incredibly valuable.

48.    In reality, the West Key Number System is not copyrightable, irrelevant to most users, and out of sync with how most users perform legal search.  In reality, the West Key Number System is a relic of another time.  The West key numbers have absolutely no creative value and are not novel.  Westlaw did not decide how the law is organized.  Westlaw did not determine the elements of legal claims.  Westlaw did not come up with the structure and organization of legal principles.  These ideas and concepts derive from the common law and the

generations of public legal discourse and thought that are the building blocks of our public legal practice.  Westlaw has no copyright ownership in this.

49.      According to the Complaint, the Westlaw legal search tools also include the West Headnotes and notes of decision.

50.      Westlaw purports to maintain copyrights in the West Headnotes and notes of decision, which Westlaw also asserts are incredibly valuable.  In reality, the West Headnotes and notes of decision are not useful or copyrightable.

51.      In reality, the West Headnotes and notes of decision are hierarchical lists of basic legal concepts that no one owns, ranging in sophistication from verbatim recitations of the public law to simple phrases derived from and closely tracking the verbatim public law.

52.      Westlaw cites its two best examples of allegedly copyrightable headnotes in the Complaint.  Neither example, however, includes any creativity, expression, or interpretation. The examples are headnotes 7 and 8 for the Supreme Court decision *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985).  *See* D.I. 1 ¶ 15.  Headnote 7 is a condensed restatement of analysis within the opinion.  Headnote 8 is a verbatim quote from the opinion. There are literally thousands of West Headnotes and notes of decision nearly identical to these two.  Westlaw cannot seriously assert a copyright interest in these quotes, and doing so is a blatant violation of the policy interests behind the federal copyright laws.

53.      Westlaw purported at one time to maintain copyrights in the page numbers it added to the public law.  In reality, the Westlaw page numbers are not copyrightable but Westlaw fought that in court.  The Second Circuit affirmed that Westlaw's so-called "star pagination" notations embedded into judicial opinions are not copyright-eligible.  *See Matthew Bender & Co. v. W. Publ. Co.*, 158 F.3d 693 (2d Cir. 1998).

54.     On the same day, the Second Circuit affirmed the same district court's judgment that "additions of certain factual information to the text of [judicial] opinions, including parallel or alternative citations to cases, attorney information, and data on subsequent procedural history" are also not copyright-eligible.  *See Matthew Bender & Co. v. W. Publ. Co.*, 158 F.3d 674 (2d Cir. 1998); *see id.* at 677 ("All of West's alterations to judicial opinions involve the addition and arrangement of facts, or the rearrangement of data already included in the opinions, and therefore any creativity in these elements of West's case reports lies in West's selection and arrangement of this information.  In light of accepted legal conventions and other external constraining factors, West's choices on selection and arrangement can reasonably be viewed as obvious, typical, and lacking even minimal creativity.").

55.     In other words, despite the above and contrary legal decisions, Westlaw continues to maintain that every aspect of the so-called "Westlaw Content" is copyrightable and protected under the Copyright Act.

56.     Westlaw uses its alleged copyrights to restrict access to the public law, protect its monopoly power, stifle innovation, and charge supra-competitive prices.[5]

---

[5] Westlaw's abusive business conduct actually goes very far back – to its very first decades as a corporation.  In 1882, John B. West and his brother established the West Publishing Corporation, with laudable ambitions to provide frontier lawyers with a cheap and efficient means to learn about new cases.  For almost twenty years, West built his company into the nation's leader in legal publishing, in large part because of the method for classifying cases, called the key number system, that met lawyers' expectations, joined established modes of thinking about the law and, thus, had utility.  But in 1899, West suddenly left his company.  Though the reasons are not well known, it is known that in 1908 West gave a scathing speech about the state of legal publishing, and in particular derided the West Publishing Corporation's classification system and its abusive use of unofficial case reporters.  West sought to build a better and fairer publishing company after leaving his former corporation, the Keefe-Davidson Law Book Company, but the new business was never able to get off the ground.  ROSS, not Westlaw, is trying to realize West's laudable ambitions and make the public law truly accessible.  Westlaw instead is following the footsteps of its predecessor-in-interest, and pursuing abusive and exclusionary conduct to

- 20 -

**ROSS' Rise & Fall**

57.     ROSS started in 2014 when two computer scientists at the University of Toronto, a world-leading AI research institute, teamed up with a lawyer to invent a legal search product that makes legal research more intuitive, efficient, and accessible.  The company built its prototype without any funding, and soon thereafter began seeking investors to further develop the product and enter the market.

58.     Investors quickly grew curious.  Lawyers in the United States spend $8 billion on legal research software annually, and the demand for innovative legal search tools that are cheap, simple, reliable, and efficient remains very high.

59.     Owing to the expense and perceived inefficiency in legal services, interest in innovative legal technology has reached a fever pitch.  The American Bar Association recommended in 2016 to establish the Center for Legal Innovation "to reshape the delivery of, and access to, legal services for the 21st century."  *See* www.americanbar.org/groups/centers_ commissions/center-for-innovation/AboutUs/.   Since its enactment, the Center has partnered with lawyers, technologists, and innovators to "[e]ncourage and accelerate innovations that improve the affordability, effectiveness, efficiency, and accessibility of legal services."  *Id*.

60.     The Center has pursued several creative lines for technology development and remains active.  For example, the "Legal Tech for Change Project" is a project to expand access to cutting-edge technology for all members of the legal community.  *See* www.americanbar.org/ groups/centers_commissions/center-for-innovation/programs-and-projects/.[6]

---

preserve its market power.  *See* Robert M. Jarvis, John B. West: Founder of the West Publishing Company, 50 A.M. J. Legal Hist. 1 (2008).
[6] ROSS was actually a founding member of the Legal Tech for Change Initiative.  The company has taken a leadership position in expanding the market for legal search platforms to tap into unmet consumer demand and close the legal representation gap.

61.     Similarly, the state bars for New York, California, Illinois, and Texas all have committees or subsections that identify and promote new technology that improves access to the public law.  As just one example, the State Bar of Texas' Computer and Technology Council has an Emerging Technology working group.  *See* sbot.org/about/committees-and-working-groups/.

62.     Corporate clients and law firms across the country have also jumped with enthusiasm at the opportunity to identify and ultimately use innovative and powerful legal search products.  Corporate legal departments have, for example, established The Corporate Legal Operations Consortium ("CLOC") as a global community of experts focused on redefining the delivery of legal services and the business of law.  Law firms have also, for example, established technology committees to identify and evaluate new legal software to use for litigation, corporate, and regulatory matters.  These are just a few of the many developments that evidence growing demand for greater choice and innovation in products that support legal research.

63.     Moreover, these initiatives are not just passion projects.  The market for legal services is in desperate demand for better technology.  Since the Great Recession, law firms have been forced to tighten belts and justify costs.  Whereas in 2008 law firms recovered over 80% of legal research costs from clients, in 2020 they recovered less than 30%.  And over the same period of time, the percentage of law firms that have moved to relying on a single legal search product has increased from around 10% to over 50%.  Both trends are expected to continue.

64.     Access to adequate legal representation is also seriously deficient because the cost of the law is so high.  While Americans with the greatest ability to pay for legal services have options, Americans that have less ability to pay are substantially foreclosed from professional legal services.  These Americans have no less of a need for effective legal representation, but cannot pay the high costs.  A more competitive market for legal research tools would help to

grow the market for affordable legal services, tap into unmet consumer demand, and significantly close the legal representation gap.

65.     Given the widespread interest in and need for a better, cheaper, and more efficient way to do legal research and ROSS's innovative AI-based approach to legal search, ROSS was offered an opportunity to present to the prestigious start-up incubator, Y Combinator.

66.     After the initial presentation, Y Combinator's leadership was very interested. They saw how ROSS's product could tap into the substantial demand for greater choice and flexibility in legal research tools – and the opportunity to invest in a product that makes legal research simple and intuitive was hard to ignore.  They also understood that a quality AI-based natural language search engine could overcome the training-based switching costs that protect Westlaw's market dominance. However, while they saw the market potential, they also understood the risk that Westlaw would move to protect its strangle grip on the market.

67.     Y Combinator ultimately invested in ROSS.   They recognized that the concentrated market for legal search products means unmet demand and inefficiencies in the legal services community.   And they believed in the extraordinarily valuable and disruptive potential of ROSS's product.   ROSS primarily used the significant financial investment to develop its AI technology for the legal search engine.

68.     As ROSS approached customers, there was widespread support for the company's innovative, AI-based legal search product, and equally strong recognition that such technology could make legal research easier, cheaper, and more accessible.  ROSS received similar praise from the media and major bar associations across the country as well – many hoping and predicting that ROSS would be on the leading-edge of significant market change for the better.

69.     But then customers asked what digital public law collection was connected to the legal search engine.  And this proved to be a serious problem.  ROSS knew that it could not obtain access to Westlaw's database, despite its significant willingness to pay for that product. Westlaw has never offered to license its database separate from its search tools and, in any event, Westlaw had denied ROSS access to the platform as well.

70.     Moreover, there was no practical or reliable way for ROSS to obtain a digital collection of public law on its own.  There are no APIs for public law and no downloadable files to obtain large collections of the public law.  And to this day, government agencies do not generally offer their public law in a downloadable format for free or at market cost.  On information and belief, this is due, in part, to Westlaw having exclusive contracts with government agencies to be the exclusive provider of primary law in a digital format.

71.     So, ROSS instead built its public law database through other sources.   It purchased some cases from Casemaker, and other public law from Fastcase, starting only in bankruptcy, but steadily expanding out to intellectual property law, and labor/employment law as well.  The hope was that ROSS could first build interest from subject-matter-specific legal practitioners, and then with the initial wave of users grow its product until it could offer comprehensive access to the public law.  Given the widespread interest in better and cheaper legal research options, and ROSS's innovative technology, the company did have some success through this practice.  ROSS was able, for example, to secure a license with a large national labor/employment firm.

72.     But ultimately, the spliced-and-put-it-back-together approach to building its public law database just was not adequate.  Even after ROSS made a large investment to partner with Fastcase and fill the gaps in its digital collection, customers were still not convinced.

73.     There was no doubt that ROSS's search engine was incredibly valuable.  The problem instead was that the database connected to the search engine lacked what the customer needed.  For example, some customers voiced concerns that a substitute database might not be sufficiently comprehensive.   Without access to Westlaw's database, they might miss an important older case or an unpublished opinion that would give the opposing counsel an advantage.   Or there might be a new decision that has not been added to the database yet. Customers also feared relying on a database that was not viewed in the legal community as reliable and the well-known standard.

74.     These customers instead licensed Westlaw's legal search product solely because it includes Westlaw's well-known digital public law collection.  They acknowledged that ROSS's search engine is better than Westlaw's legal search tools, and some even indicated that combining ROSS's search engine with Westlaw's database would produce a better platform than anything available in the market.  But these customers, ultimately, were reluctantly willing to use Westlaw's ineffective legal search tools if it meant access to the high-quality database.

75.     ROSS faced this problem everywhere – from solo practitioners to full-service big law firms.  To many of these customers, it was not just about the fact that the database connected to ROSS's search engine had less public law, but also the fear of accessing and relying on a newly created digital public law collection.  These customers had confidence that Westlaw's database would have the materials they needed through years of using the database and seeing colleagues and classmates use it as well.  A new digital public law collection, pulled together by smaller and unknown companies, was too great a risk to bear.

76.     And given this concern, customers would always fall back on Westlaw.  They needed to license the Westlaw platform because that is the only way to access Westlaw's

database, and they needed to access Westlaw's database.  Even though they did not want to purchase Westlaw's legal search tools as well, they were forced to purchase them, as they had no way to access Westlaw's database without them.  And having already being forced to pay for the Westlaw legal search tools through licensing the Westlaw platform, these customers decided that it just did not make sense to license the ROSS product or any other alternative legal search product as well.  By making customers take the Westlaw legal search with its database, then, Westlaw keeps other legal search options out of the market.

**The Relevant Markets**

77.    There is a relevant market for legal search platform products ("legal search platforms").  A legal search platform combines a legal search functionality product with a database of public law.  The relevant geographic area is the United States.

78.    For some customers, there is currently no substitute for a legal search platform. These customers license legal search products to practice law or for educational purposes.  For these customers, if the database is not connected to a legal search tool, then it holds no value. There is too much public law to efficiently and effectively identify the relevant material without search functionality.   These customers prefer the convenience and reliability of a bundled platform product.

79.    For other customers, there is a growing interest in unbundled search products, or other flexible options for digital legal research.   This nascent demand includes customers like the ABA, state bars across the country, and major law firms, which have a desire to develop new technologies that can lower costs, improve efficiency, add greater flexibility, and tap into substantial unmet demand.  For these customers, legal search tools could be a valuable product

as long as the technology exists to allow the consumer to combine the tools with a public law database.

80.     Consequently, there are relevant markets for public law database products and legal search technologies in the United States.  Customers in these markets include both end-users like law firms, intermediate buyers like bar associations that seek to expand access to the law, and intermediate buyers like ROSS that need access to a database to develop, test and market their platform products.

81.     In the market for legal search platforms, Westlaw and ROSS are competitors.

**Monopoly Power**

82.     Westlaw has both market and monopoly power in the market for legal search platforms.

83.     In a 2020 trade survey, 83% of responding United States law firms reported having a Westlaw license.  Among AmLaw 100 firms, which account for well over 80% of legal revenue in the United States, this license-share rises to 95%.

84.     The extraordinarily strong license-share is also likely to maintain over time.  Only 1% of responding law firms reported that they are "extremely likely" to eliminate their Westlaw license once the contract expires, and only 4% more responded that they are "moderately likely" to do so.  Given that the share of law firms only using one legal search product has increased five-fold in the last decade, and given that this trend is predicted to continue, Westlaw can confidently expect that it will continue to be licensed by nearly every law firm across the country for years to come, even while those firms discard alternative products.

85.     Westlaw also accounts for the majority of legal information spending among U.S. law firms, and well more than double the closest rival.  These ratios have been the same since at

least 2018, and also remain stable when law firms project three years into the future.  The survey also reports that Westlaw is considered "essential" by at least 43% of respondents.

86.    A 2020 trade report similarly states that Westlaw is the platform most often used by small, midsize, and big law firms, and that this dominant position has been stable since the earliest date where data is available.  The report also indicates that Westlaw has market dominance within law schools, where students are trained on how to use the platform.

87.    Westlaw's control over licenses and revenue has been stable despite consistently requiring customers to pay significantly higher prices than any of its rivals.  Westlaw charges AmLaw 100 law firms millions of dollars a year.  Each search on the platform for a mid-size or big law firm costs up to $172, which is almost double the cost-per-search for its closest rival. The price difference quickly expands as the number of lawyers at the firm, and the number of searches each lawyer completes, increases.  Moreover, this Westlaw price represents a 20% increase compared to what Westlaw charged in 2020.  Westlaw has been steadily increasing its prices even while the costs of cloud computing and storage have steadily fallen.

88.    The difference is present amongst small firms as well. Westlaw charges solo practitioners that accept a three-year subscription plan $396 per month, with 5% annual price increases, over twice the amount that the closest rival charges under a similar three-year plan.

89.    Given that the United States legal information market is $8 billion per year, Westlaw is reaping billions in revenue due to their monopoly position.

90.    Westlaw's power in the legal search platform market is protected by substantial barriers to entry and expansion.  Importantly, Westlaw's monopoly in legal search is protected by significant lock-in and high switching costs, network effects, and differential pricing practices for separate consumer bases.

91.     Westlaw offers its platform and training support to those entering the legal market like law students for free to "get them hooked."  Westlaw also expends significant resources to provide training and other support to licensees.  Once users have expended the energy and resources to build the skills to use a specific platform, it is highly unlikely that those users will make the choice to switch to another.  Indeed, this is one reason why it's so common to hear a lawyer say "I use Westlaw" and who has almost no experience with another platform.  Law schools hold classes where students learn how to use Westlaw because the platform has become a seeming prerequisite for every law job.

92.     Westlaw's dominant market position has also seeped into the judiciary.  The Local Rules for many courts (including this one) expressly refer to Westlaw when stating how to cite to cases.

93.     Westlaw's differential pricing for separate consumer bases facilitates the lock-in. Westlaw offers different prices for access to the same or substantially similar material.  Most notably, on information and belief, Westlaw licenses the platform to law schools and governments essentially for free, while Westlaw licenses the platform to large law firms on a very expensive pay-per-search basis.

94.     And network effects amplify the switching costs.  As more people use a particular legal search platform, its value to existing participants rises, incentivizing more to join.  The study and practice of law is collaborative.  Identifying and understanding the right cases or statutes to apply to a particular fact pattern is a complex task.  Often, the best way to figure out a problem is to work with others, which includes providing advice and suggestions on materials to search and how to complete a search.  These collaborative processes are made easier when the team members are using the same platform for research.  For example, it is easier to help a

colleague, co-clerk, or classmate find the right case when you know the search terms that work and have experience with the search tools.

95.     Together, these characteristics substantially increase the barriers to entry and expansion for actual and potential rivals in legal search platforms and protect Westlaw's market position.

96.     Westlaw also has significant and durable market and monopoly power in the market for public law database products.

97.     No other available public law database product is as comprehensive as Westlaw's product.  Westlaw can guarantee that its database has every judicial opinion, every statute, and every regulation that has ever been published, unlike anyone else.

98.     In addition, no other available public law database product is as reliable.  Westlaw has effective mechanisms in place that are not available to other competitors to ensure that all new public law is quickly added to its database, and to ensure that mistakes in the database are efficiently identified and corrected.

99.     Westlaw's database power is also protected by the Westlaw brand.  Consumers know that Westlaw has been building its public law collection for over one hundred years, and that it is comprehensive and reliable.  Consumers thus also know that if they pursue a legal research question for long enough – despite the fact that the research is probably taking longer than is needed because the legal search tools are just not that good – they eventually can find the right case.  This level of reassurance is unique to Westlaw.  In an industry where legal research can be the difference between keeping or losing a client, winning or losing a case, or even being sanctioned for failure to uphold professional responsibilities or not – people feel compelled to go with what everyone has used before (*i.e.*, Westlaw).

100.    This level of reassurance is also extraordinarily powerful, and only Westlaw can offer it.

**The Exclusionary Conduct**

101.    Westlaw has not maintained its monopoly power in the market for legal search platforms by legitimately building on its historical advantage through product innovation and investment.  Instead, Westlaw has engaged in an intentional anticompetitive and exclusionary course of conduct to enhance entry barriers and raise costs to rivals.  This course of conduct has reduced consumer choice and competition and stifled innovation – depriving the public of efficient, convenient, and affordable access to the public law.

102.    Westlaw uses restrictive licensing conditions to foreclose rivals from access to the relevant markets.  Westlaw's exclusionary conduct is grounded in its anticompetitive business model, which only provides customers with access to its valuable database product through the integrated platform. This business model is akin to a tying scheme that raises entry barriers in the relevant markets and allows Westlaw to monopolize the distribution of public law.

103.    This restrictive condition is drafted into section 1(a) of the "Research Subscriber Agreement" (herein, the "Agreement"), which Westlaw states in the Complaint all platform users must follow.[7]  The Agreement is a contract of adhesion, and it defines "Data" to include "all information and representations of information, including but not limited to, graphical representations, and other content made available to [users] through the Product."

---

[7] Counterdefendants appended the Research Subscriber Agreement to their Brief in Opposition to ROSS's Motion to Dismiss the Complaint.  *See* D.I.s. 16, 16-1.  The Research Subscriber Agreement did not accompany the Complaint.

104.    Moreover, on information and belief, Westlaw has never provided consumers with an option to only license the public law database, or to only license the legal search tools, and does not plan to ever provide such an option.

105.    Due to this licensing condition, customers that seek access to Westlaw's highly valuable public law database are forced to also license the significantly less valuable Westlaw legal search tools.  It is not possible to only license one and not the other.  Customers that strongly prefer the better legal search tools that competitors offer are forced to buy Westlaw's ineffective legal search tools to get access to Westlaw's database.  Given the significant cost to license Westlaw's platform, these customers are unwilling to spend on yet another product.

106.    These restrictive licensing conditions stifle innovation as well.  But-for Westlaw's refusal to separately license its digital public law collection, new companies would find ways to incorporate Westlaw's database into their products, or build technology that allows their search engines to be compatible with Westlaw's database.  The refusal thus seriously harms consumer welfare both by forcing customers to purchase products they do not want, as well as raising the price and reducing output in the relevant markets for legal search products.

107.    Westlaw also uses restrictive licensing conditions to exclude rivals from valuable research and development opportunities.  Westlaw blocks rivals from getting anywhere close to its Westlaw platform and the digital collection therein.  Westlaw admits this in paragraph 28 of the Complaint when it remarks that even if ROSS sought to license the Westlaw platform, Westlaw "would not [] grant" ROSS "access to Westlaw" and its "vast amounts of legal content."  This exclusion is also drafted into the Agreement's restrictive terms about how users may use, store, and disseminate material found on the platform.  Westlaw states this succinctly in

paragraph 19 of the Complaint, which sums up these terms of the Agreement as together "expressly prohibit[ing] [licensees] from using [the platform] to create a competitive product."

108.    Due to these licensing conditions, rivals are not allowed to license Westlaw, and are also not allowed to contract with Westlaw platform licensees to perform legitimate business activities, including to develop or test their own products.  Westlaw denies rivals any path for access even if those rivals are willing to pay Westlaw's commercial rates for access.  This behavior has no procompetitive justification.  This exclusionary conduct reduces entry from high-quality products, deters legitimate business activities, and depresses the competitive pressure to innovate.  Though we have seen limited entry into the relevant markets from firms like Fastcase, Casemaker, and Casetext, these firms have struggled to gain traction or to constrain Westlaw's monopoly.[8]

109.    The general market impact of these restrictive conditions is just as severe. Indeed, a licensing agreement that "expressly prohibit[s] [licensees] from using [the platform] to create a competitive product" has the effect of prohibiting huge swaths of competitive activity in the legal business profession.  Practicing lawyers violate the Agreement when they help incorporate, finance, and defend through litigation market competitors; corporate counsel violate the Agreement when they rely on Westlaw to build state-surveys that include information already on the platform; law professors violate the Agreement when they rely on Westlaw to prepare material for an upcoming casebook.

110.    Westlaw's licensing conditions also illegitimately expose rivals to extraordinarily high professional and reputational risk.  The government edicts and public law database are so

---

[8] Due to advancements in information digitalization, it is curious – and, indeed, astonishing – that the legal industry is one of the last remaining spaces where consumers need to pay for access to information.

severely co-mingled with the Westlaw legal search tools that it is impossible for a licensee to use Westlaw materials in legitimate ways without also risking a copyright lawsuit.  The key numbers and headnotes cannot be separated from the government edicts either when viewed on the platform or printed.  When viewing or printing the government edicts, the key numbers and headnotes are only a small part of the overall content and, in that context, are superfluous and not reproduced or used in any manner that would impact demand for key numbers or headnotes.  Yet, nonetheless, Westlaw leverages the key numbers and headnotes to wrongfully and unfairly extend its alleged copyrights in those materials to control the unprotectable government edicts.  Westlaw makes it impossible to separate the public law from Westlaw add-ons, even when the user does not want the add-ons.  And the design and layout of Westlaw creates material confusion and uncertainty about what is a government edict and what is not.  Upon information and belief, this is by design, in order to provide Westlaw practical control over the full content of the public law, despite the fact that the public law is not owned by Westlaw and Westlaw has no right to control it.  Given these licensing and technical conditions, it is not difficult for Westlaw to find a way to sue its rivals for copyright infringement.  And in fact, on information and belief, Westlaw has a long practice of aggressively pursuing such claims.

111.    Importantly, though, Westlaw is not advancing a legitimate interest in intellectual property rights through such filings.  Instead, these lawsuits are a complete sham, brought to police the exclusionary platform access policies.  Westlaw knows that its copyright assertions and claims are objectively baseless, as there is no dispute that government edicts and a comprehensive database are not copyright-eligible.  It pursues these claims to force rivals into unnecessary, expensive legal fights solely to raise entry barriers, particularly to destroy nascent rivals before they can gain a toehold in the relevant markets.

112.    This is exactly what happened to ROSS.    ROSS was beginning to build an enthusiastic user base in 2019 and become a market competitor.  The company had just put a significant investment into building its spliced-and-put-back-together digital public law collection, and was receiving enthusiasm from the media and consumers fed up with Westlaw's high prices and low-quality search tools.

113.    It was only a few months thereafter that Westlaw pounced.  In a sense, Westlaw's anticompetitive course of conduct has been successful.  To its own benefit, but everyone else's loss.

114.    There is no procompetitive justification for any of Westlaw's exclusionary acts. The only justifications for Westlaw's conduct are to maintain its monopoly control and to restrain trade.  As a result, consumer welfare is significantly harmed.  And just as importantly, access to justice is substantially denied.

115.    ROSS was ultimately forced to exit the market, becoming the latest victim of Westlaw's anticompetitive practices.  Its unfortunate experience illustrates how Westlaw uses exclusionary tactics to harm nascent rivals, deter investment and entry, and protect its market position.

## COUNT I
### (Declaratory Judgment of No Valid Copyrights in the Westlaw Content)

116.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 115 above.

117.    In its Complaint, Counterdefendants allege, *inter alia*, that ROSS directly and indirectly infringes the "Westlaw Content" by reproducing and creating a creative work based on Counterdefendants' content.

118.    It is well established in American law that judicial opinions and federal and state laws, including administrative rules and regulations, are not copyrightable, and must remain public as a matter of due process. *See Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834); *Banks v. Manchester*, 128 U.S. 244 (1888); *Davidson v. Wheelock*, 27 F. 61 (C.C.D. Minn. 1866) (holding publisher cannot copyright state statutes, even if state purports to give exclusive publishing rights); *Howell v. Miller*, 91 F. 129 (6th Cir. 1898) ("no one can obtain the exclusive right to publish the laws of a state") (Harlan, J., sitting by designation); *Nash v. Lathrop*, 142 Mass. 29, 6 N.E. 559 (Mass. 1886) ("Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes or the decisions and opinions of the justices."). *See generally* L. Ray Patterson & Craig Joyce, Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations, 36 UCLA L. Rev. 719 (1989), and cases cited therein.

119.    Indeed, "[a]s a matter of longstanding public policy, the U.S. Copyright Office will not register a government edict that has been issued by any state, local, or territorial government, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or similar types of official legal materials." Compendium of U.S. Copyright Office Practices, Third Edition, Sec. 313.6(C)(2).

120.    ROSS is informed and believes, and on that basis alleges, that Counterdefendants have not contributed any original or creative authorship to the "Westlaw Content." 17 U.S.C. § 102(b); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).  The judicial opinions

and federal and state laws, including administrative rules and regulations, are written by government officials.

121.   ROSS is informed and believes, and on that basis alleges, that Counterdefendants' key number system is a method of operation. *See* 17 U.S.C. § 102(b); *Baker v. Selden*, 101 U.S. 99, 103 (1879).

122.   In view of the foregoing, Counterdefendants have no legal rights, in copyright or contract, exclusive or otherwise, to restrict access to or publication of the judicial opinions, notes on decisions, headnotes, federal and state laws, including administrative rules and regulations, or any aspect of the Westlaw Content.

123.   Thus, ROSS seeks declaratory judgment that Counterdefendants have no basis from which to prohibit ROSS from copyright, reproducing, or otherwise creating derivative works in the judicial opinions, notes on decisions, headnotes, federal and state laws, including administrative rules and regulations, or any aspect of the Westlaw Content, in its subscription legal research service.

124.   Accordingly, and as evidenced by the Complaint demanding ROSS cease reproduction, publication or any other use of certain content, an actual justiciable controversy exists as to the parties' respective rights in connection with judicial opinions, and with the laws, rules, and regulations of any other State or the Federal Government, and the Westlaw Content, as to which Counterdefendants now claim or might hereafter claim any exclusive right, including the rights to use, license, publish, and distribute such laws, rules, and regulations.

125.   To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that Counterdefendants have no protectable

exclusive rights in the judicial opinions, notes on decisions, headnotes, federal and state laws, including administrative rules and regulations, or any aspect of the Westlaw Content, in either contract or copyright.

## COUNT II
### (Declaratory Judgment of Non-Infringement)

126.   ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 125 above.

127.   ROSS's use of LegalEase researcher-chosen quotes of case law directly from raw judicial opinions does not infringe any copyrights that Counterdefendants claim to have in any "Westlaw Content," including because the judicial opinions and direct excerpts thereof are not entitled to copyright protection under the Copyright Act (17 U.S.C. § 101 *et. seq.*), government edicts doctrine, and the First Amendment of the United States Constitution.

128.   There is no basis upon which Counterdefendants can allege copying of copyrighted material in the "Westlaw Content," or any other act of infringement encompassed by the Copyright Act.

129.   There is no basis upon which Counterdefendants can allege indirect copyright infringement of copyrighted material in the "Westlaw Content," whether by inducing infringement, contributing to infringement or any other theory of indirect infringement encompassed by the Copyright Act.

130.   As evidenced by the allegations in the Complaint and in these Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between ROSS and Counterdefendants with respect to the alleged infringement of any valid copyrights in the Westlaw Content.

131.    To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that ROSS has not infringed, directly or indirectly, upon any of the Counterdefendants alleged rights in the Westlaw Content.

## COUNT III
### (Declaratory Judgment of Fair Use)

132.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 131 above.

133.    ROSS's use of LegalEase researcher-chosen quotes of case law directly from raw judicial opinions constitutes a fair use under 17 U.S.C. § 107.

134.    To the extent Counterdefendants can allege copying of copyrighted material in the "Westlaw Content," or any other act of infringement encompassed by the Copyright Act, such constitutes a fair use under 17 U.S.C. § 107.

135.    There is no basis upon which Counterdefendants can establish that any alleged act of infringement is not barred by the doctrine of fair use pursuant to 17 U.S.C. § 107, in view of the nature of the works asserted by Counterdefendants and covered by the asserted copyrights, the amount (if any) and substantiality of the portions of such works used in relation to the works as a whole, the purpose and character of any use thereof, and the effect, if any, of such use on the potential market for the works.

136.    As evidenced by the allegations in the Complaint and in these Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between ROSS and Counterdefendants with respect to the alleged infringement of any valid copyrights in the Westlaw Content.

137.    To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that any allegedly infringing act by ROSS or LegalEase constitutes fair use and, therefore, does not constitute direct or indirect infringement.

## COUNT IV
### (Declaratory Judgment of Copyright Misuse)

138.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 137 above.

139.    Copyright protection exists "to promote the Progress of Science and the useful Arts."

140.    Copyrights should not be enforced when such enforcement does not fulfill the Constitutional purpose of copyright protection.

141.    Counterdefendants have utilized the Westlaw Content and the asserted copyrights in the Westlaw Content in an anticompetitive, wrongful, unfair and exclusionary manner.

142.    The key numbers and headnotes cannot be separated from the government edicts either when viewed on the platform or printed.  In this way, and through their unfair licensing practices, Counterdefendants leverage the key numbers and headnotes of the Westlaw Content to wrongfully and unfairly extend their alleged copyrights in those materials to control the unprotectable government edicts.

143.    Counterdefendants' use of the Westlaw Content and the asserted copyrights in the Westlaw Content does not comport with the Constitutional purposes of copyright protection.

144.    As evidenced by the allegations in the Complaint and in these Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between ROSS and

Counterdefendants with respect to the alleged infringement of any valid copyrights in the Westlaw Content.

145.    To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that Counterdefendants' assertion of and practices regarding the Westlaw Content and the asserted copyrights in the Westlaw Content constitute copyright misuse.

146.    As a result of Counterdefendants' misuse of their copyrights, Counterdefendants' copyrights should be invalidated, and ROSS is entitled to appropriate attorneys' fees and costs.

## COUNT V
### (Declaratory Judgment of No Tortious Interference with Contract)

147.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 146 above.

148.    As evidenced by the allegations in the Complaint and in these Amended Counterclaims, there is an actual and ongoing controversy between ROSS and Counterdefendants as to whether ROSS tortiously interfered with LegalEase's contract with Counterdefendants.

149.    Counterdefendants' claim requires a showing that LegalEase had a contract with Counterdefendants, that ROSS knew of the existence of this contract, that ROSS intentionally instructed LegalEase to breach the contract without justification, that Counterdefendants were harmed, and that ROSS's conduct was a substantial factor in Counterdefendants' harm.

150.    ROSS did not direct or in any way encourage LegalEase to breach any third-party contract, including without limitation LegalEase's contract with Counterdefendants.   ROSS

further did not direct or control LegalEase conduct in connection with researching and obtaining raw judicial opinions.

151.    For these reasons, ROSS maintains that it did not tortiously interfere with any contract between LegalEase and Counterdefendants.

152.    To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgement that ROSS did not tortiously interfere with Counterdefendants' contract with LegalEase.

## COUNT VI
### (Sherman Act § 2:  Unlawful Monopoly Maintenance in the Legal Search Platforms Market)

153.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 147 above.

154.    Counterdefendants' conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.

155.    The market for legal search platforms is a valid antitrust market.

156.    Counterdefendants hold monopoly power in this market.

157.    Counterdefendants unlawfully maintain their monopoly power in this market through the exclusionary acts described herein.  These exclusionary acts serve no legitimate or procompetitive purpose that could justify their anticompetitive effects.

158.    Counterdefendants' conduct affects a substantial volume of interstate commerce.

159.    Counterdefendants' conduct has substantial anticompetitive effects, including increased prices and costs, lower output, and reduced innovation and quality of product options.

160.    As a nascent market competitor, ROSS has been harmed by Counterdefendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  ROSS has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Counterdefendants' anticompetitive conduct issues.

161.    To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein, and should award ROSS monetary damages.

### COUNT VII
### (Sherman Act § 1:  Unreasonable Restraint of Trade in the
### Legal Search Platforms Market)

162.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 161 above.

163.    Counterdefendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.

164.    The market for legal search platforms is a valid antitrust market.

165.    Counterdefendants' unlawfully restrain trade in this market through the anticompetitive acts described herein.  These anticompetitive acts serve no legitimate or procompetitive purpose that could justify their anticompetitive effects.

166.    Counterdefendants' conduct and unlawful contractual restraints affect a substantial volume of interstate commerce.

167.    Counterdefendants' conduct has substantial anticompetitive effects, including increased prices and costs, lower output, reduced innovation, and reduced quality of product options.

168.    As a nascent market competitor, ROSS has been harmed by Counterdefendants' unlawful contractual restraints in a manner that the antitrust laws were intended to prevent.

ROSS has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Counterdefendants' anticompetitive restraints issues.

169.    To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein, and should award ROSS monetary damages.

<u>**COUNT VIII**</u>
<u>**(California Unfair Competition Law)**</u>

170.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 169 above.

171.    Counterdefendants and ROSS both pursue substantial volumes of interstate commerce as well as commerce within the State of California.

172.    Counterdefendants' actions described herein constitute unlawful, unfair, or fraudulent acts or practices in the conduct of business, in violation of California's Business and Professions Code Section 17200 et seq., including actions that are forbidden by other laws.

173.    Counterdefendants' conduct is unlawful, unfair, or fraudulent because it is in violation of Sections 1 and 2 of the Sherman Act, and also in violation of the policy or spirit of the Sherman Act.

174.    Counterdefendants' conduct is unlawful, unfair, or fraudulent because it is in violation of the Copyright Act, and also in violation of the policy or spirit of the Copyright Act.

175.    As a result of Defendants' various acts, ROSS has been harmed and has lost money and property in the form of, among other things, costs to defend itself against the Complaint, costs to bring these counterclaims, and costs to survive in the market in spite of the unfair market conditions.

## COUNT IX
### (Delaware Common Law Unfair Competition)

176.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 175 above.

177.    As established by the facts pled *supra*, ROSS had a business expectancy to sell its legal search platform product in the market, having received encouragement in the industry and indications from customers that they would purchase access to the ROSS platform once it was tied to a reliable database.

178.    As discussed *supra*, Westlaw took unfair business actions to prevent ROSS from legitimately earning revenue in the relevant market.  These acts were taken with the intent to cause competitive harm and, in certain cases, disparage ROSS.

179.    But for Westlaw's unfair business actions, ROSS would have made sales of its product in the relevant market.

180.    Counterdefendants' actions described herein constitute unlawful, unfair, or fraudulent acts or practices in the conduct of business, in violation of common law unfair competition laws.

## RELIEF REQUESTED

WHEREFORE, ROSS respectfully requests the following relief:

A.    The entry of judgment on the Complaint in favor of ROSS, and against Counterdefendants, with Counterdefendants not being awarded any relief of any kind;

B.    The entry of judgment declaring that Counterdefendants do not have valid copyrights in the "Westlaw Content";

C.    The entry of judgment declaring that ROSS has not infringed, directly or indirectly, Counterdefendants' copyrights;

D.      The entry of judgment declaring that any alleged use of Counterdefendants' copyrights constitutes fair use;

E.      The entry of judgment declaring that Counterdefendants have engaged in misuse of their copyrights and that Counterdefendants' copyrights are invalidated;

F.      The entry of judgment declaring that ROSS did not tortiously interfere with LegalEase's contract with West; and

G.      Enjoining Counterdefendants' acts in support of its unlawful monopoly maintenance in the market and its unreasonable restraint on trade in the market.

H.      Monetary relief, including all forms of available damages and monetary relief in equity.

I.      The entry of judgment declaring that ROSS is the prevailing party under 17 U.S.C. § 505.

J.      Appropriate attorneys' fees and costs.

K.      Such other and further relief, in law or equity, as this Court deems just and proper under the circumstances.

## **<u>JURY DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 38.1, ROSS respectfully requests a trial by jury on Plaintiffs' Complaint and on ROSS's Amended Counterclaims for all issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gabriel M. Ramsey
Kayvan M. Ghaffari
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel:  (415) 986-2800

Mark A. Klapow
Joshua M. Rychlinski
Lisa Kimmel
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 624-2500

Dated:  January 25, 2021
7013450 / 50241

By:  */s/ Stephanie E. O'Byrne*
    David E. Moore (#3983)
    Stephanie E. O'Byrne (#4446)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    sobyrne@potteranderson.com

*Attorneys for Defendant ROSS Intelligence, Inc.*

- 47 -