## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE                )
CENTRE GMBH and WEST PUBLISHING           )
CORPORATION,                              )          C.A. No. 20-613-LPS
                                          )
      Plaintiffs/Counterdefendants,       )          **JURY TRIAL DEMANDED**
                                          )
  v.                                      )
                                          )
ROSS INTELLIGENCE INC.,                   )
                                          )
      Defendants/Counterclaimant.         )


## DEFENDANT AND COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S
## OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIM

OF COUNSEL:

Gabriel M. Ramsey
Warrington Parker
Kayvan M. Ghaffari
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel:  (415) 986-2800

Mark A. Klapow
Lisa Kimmel
Joshua M. Rychlinski
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 624-2500

Dated:  April 22. 2021

David E. Moore (#3983)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

7175572 / 50241

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDING ................................................... 1

II.   SUMMARY OF ARGUMENT AND INTRODUCTION ................................................ 1

III.  STATEMENT OF FACTS ............................................................... 5

    A.   The Legal Search Products ...................................................... 5

    B.   The Relevant Markets ........................................................... 7

    C.   ROSS's Sales Efforts & Consumer Reactions ...................................... 8

    D.   Westlaw's Conduct Harms Competition by Preventing ROSS and Other Rivals from Entering the Legal Search Platforms Market and by Blocking the Development of Innovative Products and New Business Models that Threaten its Monopoly. ........................................................... 10

IV.   ARGUMENT ....................................................................... 11

    A.   Westlaw Does Not Dispute that the Counterclaim States a Cause of Action Under Section 2 Which Also Preserves the UCL Claim. ................................... 11

    B.   ROSS Alleges an Agreement as Required by Section 1 of the Sherman Act...... 12

    C.   ROSS States a Claim for Anticompetitive Tying. ............................... 13

    D.   The Refusal to Deal Allegations State Another Basis for the Section 2 Claim.......................................................................... 17

    E.   The Counterclaim States a UCL Cause of Action ............................... 19

    F.   The Counterclaim States a Delaware Common Law Cause of Action................ 19

V.    CONCLUSION..................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accenture Glob. Srvs GmbH v. Guidewire Software, Inc.,*
  581 F. Supp. 2d 654 (D. Del. 2008) ..................................................................20

*Allen-Myland, Inc. v. IBM Corp.,*
  33 F.3d 194 (3d Cir. 1994) ...................................................................3, 12, 13, 14

*Agilent Techs., Inc. v. Kirkland,*
  2009 WL 119865 (Del. Ch. Jan. 20, 2009) ......................................................20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) ................................................................................17, 18

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................2, 13

*Broadcom Corp. v. Qualcomm Inc.,*
  501 F.3d 297 (3d Cir. 2007) ..............................................................................11

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
  20 Cal. 4th 163 (1999) .....................................................................................19

*Chavez v. Whirlpool Corp.,*
  113 Cal. Rptr. 2d 175 (Cal. App. 2001) ............................................................19

*Connelly v. Lane Const. Corp.,*
  809 F.3d 780 (3d Cir. 2016) ...........................................................................2, 13

*Diva Limousine, Ltd. v. Uber Technologies, Inc.,*
  392 F. Supp. 3d 1074 (N.D. Cal. 2019) ...........................................................19

*Eastman Kodak Co. v. Image Technical Servs., Inc.,*
  504 U.S. 451 (1992) ...................................................................................3, 14

*EDIX Media Group v. Mahani,*
  2006 WL 3742595 (Del. Ch. Dec. 12, 2006) ....................................................20

*FTC v. AbbVie, Inc.,*
  976 F.3d 327 (3d Cir. 2020) ..............................................................................12

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
  466 U.S. 2 (1984) ...................................................................................3, 14, 16

*Kaufman v. Time Warner,*
  836 F.3d 137 (2d Cir. 2016) .........................................................................16-17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Kenney v. Am. Bd. of Internal Med.*,
   2021 WL 732715 (3d Cir. Feb. 25, 2021)........................................................................16, 17

*Kickflip Inc. v. Facebook, Inc.*,
   999 F. Supp. 3d 677 (D. Del. 2013)..............................................................................4, 17

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F. App'x 554 (9th Cir. 2008) ......................................................................................19

*Ocasio-Hernandez v. Fortuño-Burset*,
   640 F.3d 1 (1st Cir. 2011)................................................................................................2, 13

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
   508 U.S. 49 (1993).................................................................................................................12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)...............................................................................................17

*United States v. Colgate*,
   250 U.S. 300 (1919)..........................................................................................................4, 17

*United States v. Microsoft*,
   253 F.3d 34 (D.C. Cir. 2001) .....................................................................................3, 14, 16

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ...........................................................................................4, 18

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
   342 F.3d 191 (3d Cir. 2003)...............................................................................................19

*In re Wettach*,
   811 F.3d 99 (3d Cir. 2016)...................................................................................................1

*You Map, Inc. v. Snap Inc.*,
   2021 WL 106498 (D. Del. Jan. 12, 2021)...........................................................................20

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012).............................................................................................2, 12

**Statutes & Rules**

15 U.S.C. § 1.................................................................................................................. *passim*

15 U.S.C. § 2.................................................................................................................. *passim*

Cal. Bus. & Prof. § 17200 ...........................................................................................1, 11, 19

Delaware Common Law Unfair Competition....................................................................1, 19, 20

## TABLE OF AUTHORITIES

**Page(s)**

D. Del. LR 7.1.3(c)(2).........................................................................................................................1

## I.     NATURE AND STAGE OF PROCEEDING

West Publishing Corp. and Thomson Reuters Enterprise GmbH (collectively, "Westlaw")
filed a complaint against ROSS Intelligence, Inc. ("ROSS") for copyright infringement and
tortious interference.  D.I. 1.  ROSS filed a motion to dismiss, that this Court denied.  D.I. 12, 31.

ROSS filed an answer, defenses, and counterclaims, D.I. 21, and then filed an amended
answer, defenses, and counterclaims, D.I. 24 ("Counterclaim").  The Counterclaim includes
counts for violations of the Sherman Act §§ 1 and 2, the California Unfair Competition Law
(Cal. Bus. & Prof. § 17200 *et seq*., and herein "UCL"), and Delaware common law unfair
competition, and also seeks a declaratory judgment of copyright misuse.  *Id.* ¶¶ 138-146, 153-
180.  Westlaw filed a motion to dismiss that addresses some but not all the bases for the Sherman
Act and unfair competition claims.  Westlaw does not seek to dismiss the copyright misuse
claim.  D.I. 28 ("Motion").  This is ROSS's opposition.

## II.     SUMMARY OF ARGUMENT AND INTRODUCTION

Westlaw's motion to dismiss does not dispute that the Counterclaim sufficiently pleads
that (1) ROSS has antitrust standing, (2) Westlaw has market and monopoly power in the legal
search platforms market, (3) Westlaw engages in objectively and subjectively baseless sham
litigation, and (4) ROSS suffered an injury due to Westlaw's conduct.  Based on this alone,
ROSS's Sherman Act Section 2 (Count VI) and UCL (Count VIII) claims cannot be dismissed.
*See also* Motion at 17 (acknowledging that the UCL claim survives if any of the antitrust claims
survive).  Westlaw cannot raise new arguments on reply.  D. Del. LR 7.1.3(c)(2); *In re Wettach*,
811 F.3d 99, 115 (3d Cir. 2016) (arguments not raised in an opening brief are "forfeited").

Westlaw does raise four arguments against the antitrust claims.  Two are irrelevant and
the other two are without merit:

*First,* Westlaw claims that ROSS "hints" that its "'public law database' is an 'essential facility,' such that ROSS is entitled to access it to compete with Plaintiffs."  D.I. 28 at 11-13. ROSS makes no such allegation and does not rely on the essential facilities doctrine.

*Second*, Westlaw asserts that ROSS's Section 1 claim alleges unilateral action by West or an agreement in restraint of trade between West and its corporate parent Thomson Reuters. Westlaw argues that neither unilateral action nor an agreement between West and its parent is actionable under Section 1.  D.I. 28 at 15-16.  Again, ROSS makes no such allegations.  Rather, ROSS alleges that Westlaw's licensing agreements *with customers* constitute unlawful restraints of trade that violate Sections 1 and 2 of the Sherman Act.  D.I. 24 ¶¶ 102-106; *see e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 265-66 (3d Cir. 2012).  Westlaw does not move to dismiss on this basis.

*Third*, Westlaw calls ROSS's allegations implausible and asserts that as a matter of "common sense" a public law database cannot be a separate product from a legal search tool. Westlaw also appeals to "common sense" to argue that ROSS has failed to allege plausible relevant markets for unbundled legal search tools and public law databases.  D.I. 28 at 14.

Plausibility and common sense can justify dismissal when a complaint contains formulaic recitations of elements or assertions of legal conclusions.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  However, the allegations in the Counterclaim do not suffer this infirmity. As such, they must be accepted as true, and the Counterclaim cannot be dismissed on either basis.  *See e.g.*, *Connelly v. Lane Const. Corp*., 809 F.3d 780, 786-89 (3d Cir. 2016); *Ocasio-Hernandez v. Fortuño-Burset,* 640 F.3d 1, 12-13 (1st Cir. 2011).

ROSS's Counterclaim presents chapter and verse on how and why there is independent demand for public law databases and legal search tools.  D.I. 24 ¶¶ 58-65, 68, 70, 73-76, 79, 95-

100.  Similarly, ROSS alleges that a growing number of large institutional consumers of legal research view the bundled platform option as a poor substitute for new legal search tools and demand a more flexible and cost-effective approach to legal research.  *Id.* ¶¶ 59-64, 68-69, 74. These allegations are sufficient to allege separate products as well as the boundaries of distinct relevant markets for legal search tool products and public law database products at the pleading stage.  *United States v. Microsoft,* 253 F.3d 34, 95-96 (D.C. Cir. 2001).

Nor is there merit to the claim that ROSS's Counterclaim alleges that a legal search tool and public law database have no value as independent products.  The Counterclaim alleges in great detail why customers found "ROSS's search engine incredibly valuable."  D.I. 24 ¶ 73. And it also alleges in detail why customers find Westlaw's public law database valuable.  *Id.* ¶¶ 43-44, 96-100.  The fact that some customers may prefer to purchase the products as a bundle from the same seller does not undermine the allegations that there also exists independent demand for a legal search tool and a public law database.  *See e.g., Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 463 (1992) (rejecting a claim that there are not separate product markets for services and parts and noting "[b]y this logic, we would be forced to conclude that there can never be separate markets . . . for camera and film, computers and software, or automobiles and tires").

Moreover, Westlaw's argument misapprehends the law.  "[T]he mere fact that two items are complements, that one is useless without the other, does not make them a single 'product' for purposes of tying law."  *Microsoft,* 253 F.3d at 86 (citations and marks omitted).  Instead, the inquiry is whether there is a demand for each product separately.  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984); *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 211 (3d Cir. 1994).  The Counterclaim alleges that there is.  D.I. 24 ¶¶ 58-65, 68, 70-76, 79, 95-100.

**Fourth**, Westlaw argues that an antitrust violation cannot be based on its refusal to deal with competitors. That is not an accurate statement of the law. Westlaw cites *United States v. Colgate*, D.I. 28 at 2, 9, but ignores its caveat: that a monopolist may not refuse to deal with others for the "*purpose to create or maintain a monopoly*." 250 U.S. 300, 307 (1919) (emphasis added); *accord Kickflip Inc. v. Facebook, Inc*., 999 F. Supp. 3d 677, 685 (D. Del. 2013). Thus, a monopolist's right to refuse to deal is not unlimited. *See Viamedia, Inc. v. Comcast Corp*., 951 F.3d 429, 456-57 (7th Cir. 2020). And ROSS has alleged that Westlaw's refusal to deal is for the purpose to maintain its monopoly. D.I. 24 ¶¶ 39-42, 101, 107-109, 114. In any event, ROSS offers other bases for its Section 2 claim to survive beyond refusal to deal as well: sham litigation (which the Motion does not challenge), and tying.

In sum, Westlaw cannot ignore the well-pleaded allegations: ROSS built an innovative product that can change how Americans search for and engage with the public law and can make legal research cheaper and easier. *Id*. ¶¶ 23-25, 57-65. Westlaw knows that innovations like this product, if allowed to gain traction, threaten its monopoly in the legal search platforms market. *Id*. ¶¶ 79, 101. This is because such innovations offer a cheaper and more efficient option for legal research, and also let consumers choose alternative products and business models to meet their legal search needs (like unbundled legal search tools that can be mixed-and-matched with a public law database). *Id*. ¶¶ 24, 58, 65-68, 73-74. So, Westlaw has taken intentional steps to block innovation and competition from new technologies and business models. *Id*. ¶¶ 101-115. These anticompetitive steps allow Westlaw to preserve its monopoly in the legal search platforms market and restrain trade in both the platforms market and the legal search tools market. *Id*. This has been great for Westlaw, which has been able to reap billions in revenue at

supra-competitive prices.  *Id.* ¶ 89.  But it has severely harmed innovation, competition, and ultimately, consumers.  ROSS's case to restore competition should proceed.

## III.    STATEMENT OF FACTS

### A.    The Legal Search Products

A legal search platform combines two products: "a legal search functionality product [and] a database of public law."  *Id.* ¶¶ 77.  The "public law" is "the decisions of federal and state courts, the laws enacted, and the administrative guidance."  *Id.* ¶ 2.  A legal search functionality product, or a legal search tool, helps users "efficiently and effectively identify the relevant material."  *Id.*  There is independent demand for these two products—legal search tools and public law databases—that constitute the key constituent parts of an integrated legal search platform.  *Id.* ¶¶ 58-65, 68, 70-76, 79, 95-100.

The consumer demand for separate legal search tools and public law databases comes from at least three sources.  First, legal search platforms, and especially Westlaw's platform, are extremely expensive, so there is demand for cheaper options for completing legal research that are just-as-good or better.  *Id.* ¶¶ 87-88.  Second, law firms can no longer recover legal research costs from clients, and thus need to find other ways to preserve and increase margins.  *Id.* ¶ 63.  Third, "Americans [with] less ability to pay" for professional legal services represent "substantial unmet demand," and technology that lowers the overall cost of legal representation can allow law firms to tap into this customer base which has "no less a need for legal representation."  *Id.* ¶¶ 64, 79.

The demand for innovative and cheap products includes a demand to mix-and-match products to fit particular needs.  *Id.* ¶ 79.  "[E]nd-users like law firms [and] intermediate buyers like bar associations that seek to expand access to the law" are not satisfied with being forced to purchase a public law database and legal search tool bundled into a single platform product.  *Id.*

5

¶ 80.  These consumers instead demand the opportunity to decide on their own how to mix-and-match products based on particular preferences and needs.  *Id*. ¶¶ 79-80.

Importantly, this demand is evident within major institutions in the American legal system.  *Id*. ¶¶ 59-62.  The ABA has "establish[ed] the Center for Legal Innovation 'to reshape the delivery of, and access to, legal services for the 21st century'" and to "'[e]ncourage and accelerate innovations that improve the affordability, effectiveness, efficiency, and accessibility of legal services.'"  *Id*. ¶ 59 (quoting ABA website).  The Center has also initiated a "Legal Tech for Change Project" to "expand access to cutting-edge technology for all members of the legal community."  *Id*. ¶ 60.  "[T]he state bars for New York, California, Illinois, and Texas all have committees or subsections that identify and promote new technology that improves access to the public law."  *Id*. ¶ 61.  Corporate legal departments have established "[t]he Corporate Legal Operations Consortium ("CLOC") as a global community of experts focused on redefining the delivery of legal services and the business of law."  *Id*. ¶ 62.  Law firms across the country have "[e]stablished technology committees to identify and evaluate new legal software to use for litigation, corporate, and regulatory matters."  *Id*.  Each of these entities is putting money and time into identifying, developing, and supplying the new unbundled legal search tools and public law databases that are now in demand.

Westlaw's legal search tools, which it calls the Westlaw Content, include the West Key Number System, the West headnotes, and the notes of decision.  *Id*. ¶¶ 45-52.  Westlaw purports to maintain copyrights in the Westlaw Content.  *Id*. ¶¶ 45-56.  But in reality, none of the Westlaw Content is copyright-eligible.  *Id*.  Moreover, the Westlaw Content is outdated and inefficient.  *Id*.  Yet Westlaw's monopoly in the legal search platforms market persists, seemingly immunized from technology and innovation.

ROSS's legal search tool is entirely different than the Westlaw Content and significantly more innovative. *Id*. ¶¶ 6, 24, 29, 57. ROSS's legal search tool is "a powerful natural language search engine based on artificial intelligence." *Id*. ¶ 24. Investors, consumers, and the media have stated that, compared to other legal search tools like the Westlaw Content, ROSS's search engine is the "better, cheaper, and more efficient way to do legal research." *Id*. ¶ 65; *see also id*. ¶¶ 58, 66-68, 71, 73-74, 76. Before ROSS was forced to suspend business activities, *id*. ¶¶ 112-115, there was significant consumer demand to license ROSS's legal search tool as an independent product, *id*. ¶¶ 68, 73-74.

## B.      The Relevant Markets

As set forth in the Counterclaim, there are three relevant markets. There is a market for legal search platforms. *Id*. ¶ 77. The market for legal search platforms is very active and well known. *Id*. ¶¶ 4-5, 77-78, 89. It is nationwide, worth around $8 billion, and has a consumer base that includes practicing lawyers and law firms, law students, academics, and law schools, and state and federal governments. *Id*.

"Westlaw has both market and monopoly power in the market for legal search platforms." *Id*. ¶ 82; *see also id*. ¶¶ 77-78, 83-95. Westlaw does not challenge these allegations.

There is a separate relevant market for public law database products. *Id*. ¶ 80. Westlaw has "significant and durable market and monopoly power in the market for public law database products." *Id*. ¶ 96. This is because Westlaw's prized database product is widely recognized by consumers as the most comprehensive, reliable, and trusted available. *Id*. ¶¶ 39-44, 97-100.

Westlaw has competed in the nationwide public law database market since the 19th Century, when it started collecting the materials for its public law database and selling its collection in hard-copy. *Id*. ¶¶ 39-42. At some point, Westlaw converted these books into an online database, and started licensing the database product as part of an integrated platform with

7

its legal search tools.  *Id*.  Despite Westlaw's history of selling its public law collections in hard copy, Westlaw has never licensed its online database product on its own, and never plans to.  *Id*. ¶¶ 26, 104.  Along with Westlaw, Fastcase and Casemaker (which recently merged) are in this market.  *Id*. ¶ 28.

There is also a relevant market for legal search tools.  *Id*. ¶ 80.  ROSS and Westlaw have both developed legal search tools.  The nationwide legal search tools market has formed due to growing recognition that the legal search platforms market is broken and the concomitant "demand for legal search tools that are cheap, simple, reliable, and efficient."  *Id*. ¶¶ 58; *see also id*. ¶¶ 59-67.  With the support of significant venture capital investment, ROSS entered this market hoping to tap into the substantial consumer demand for a better alternative to legal research than the legal search platforms market offers.  *Id*. ¶¶ 65-67.

### C.    ROSS's Sales Efforts & Consumer Reactions

ROSS received significant venture capital investment to enter the legal search tools market and tap into the consumer base dissatisfied with the product options in the platforms market.  *Id*. ¶¶ 6, 58, 65-67.  The media and major bar associations across the country recognized the need for alternative and cheaper ways to complete legal research and profiled ROSS as offering an innovative and industry-changing product.  *Id*. ¶ 68.  And there was significant interest from consumers to license ROSS's legal search tool as an independent product as well. *Id*. ¶¶ 68, 73-74.  "As ROSS approached customers, there was widespread support for the company's innovative, AI-based legal search product, and equally strong recognition that such technology could make legal research easier, cheaper, and more accessible."  *Id*. ¶ 68. Customers that ROSS contacted also described the ROSS legal search tool as "incredibly valuable" and as "better than Westlaw's legal search tools."  *Id*. ¶¶ 73-74.  And some of these customers stated that they would prefer to mix-and-match the ROSS legal search tool with a

better database, that "combining ROSS's search engine with Westlaw's database would produce a better platform than anything available in the market." *Id.* ¶ 74.

ROSS also competed in the legal search platforms market. *Id.* ¶¶ 69-76. However, as a new entrant into this market, ROSS did not have its own comprehensive public law database, and had "no practical or reliable way . . . to obtain a digital collection of public law." *Id.* ¶ 70. So, ROSS sought to license a database. *Id.* ¶¶ 69-71. "ROSS knew that it could not obtain access to Westlaw's database," as "Westlaw has never offered to license its database separate from its search tools." *Id.* ¶ 69. ROSS thus took a "spliced-and-put-it-back-together approach to building its database," relying on less well-known or trusted materials. *Id.* ¶ 72; *see also id.* ¶ 71.

ROSS had some commercial success in the platforms market with customers that did not require for business purposes a comprehensive public law database. *Id.* ¶ 71. But overall, ROSS struggled to find customers in this market. *Id.* ¶¶ 72-76.

Customers in the platforms market instead licensed the Westlaw platform because the "database connected to [ROSS's] search engine lacked what the customer needed." *Id.* ¶ 73. "ROSS faced this problem everywhere – from solo practitioners to full-service big law firms." *Id.* ¶ 75. These customers saw no other viable choice. "Even though [these customers] did not want to purchase the bundled database and legal search tools from Westlaw, they were forced to purchase" both through the Westlaw platform product. *Id.* ¶ 76. Westlaw provided no alternative because Westlaw refused – and has always refused, and continues to refuse – to license its online database product separately from its Westlaw Content. *Id.* ¶¶ 28, 104-105.

**D.     Westlaw's Conduct Harms Competition by Preventing ROSS and Other Rivals from Entering the Legal Search Platforms Market and by Blocking the Development of Innovative Products and New Business Models that Threaten its Monopoly.**

"Ultimately – despite substantial venture capital investment, disruptive technology, and widespread enthusiasm – ROSS never really had a chance." *Id*. ¶ 7.  This is because Westlaw has "engaged in an intentional anticompetitive and exclusionary course of conduct to enhance entry barriers and raise costs to rivals." *Id*. ¶ 101.  "This course of conduct has reduced consumer choice and competition and stifled innovation – depriving the public of efficient, convenient, and affordable access to the public law." *Id*.

First, "Westlaw uses restrictive licensing conditions to foreclose rivals from access to relevant markets." *Id*. ¶¶ 102; *see also id*. ¶¶ 103-109.  Westlaw's licensing agreement, a contract of adhesion, states the restrictive condition in section 1(a), which "defines 'Data' to include 'all information and representations of information, including but not limited to, graphical representations, and other content made available to [users] through'" the platform.  *Id*. ¶ 103 (quoting the agreement).  This condition is essential to Westlaw's "anticompetitive business model, which only provides customers with access to its valuable database product through the integrated platform." *Id*. ¶ 102.  "This business model is akin to a tying scheme that raises entry barriers in the relevant markets and allows Westlaw to monopolize the distribution of the public law." *Id*.  "Due to this licensing condition, customers that seek access to Westlaw's highly valuable public law database are forced to also license the significantly less valuable Westlaw legal search tools.  It is not possible to only license one and not the other." *Id*. ¶ 105.

Second, Westlaw has built its platform so that the platform intentionally intermingles Westlaw's claimed copyrighted materials with, for example, court opinions for which there is no copyright.  *Id*. ¶ 110.  Westlaw makes it so that the Westlaw Content "cannot be separated from

the government edicts either when viewed on the platform or printed" and "the design and layout of [the platform] creates material confusion and uncertainty about what is a government edict and what is not."  *Id*.  Westlaw has built its platform this way so that it has "practical control over the full content of the public law, despite the fact that the public law is not owned by Westlaw and Westlaw has no right to control it."  *Id*.

Third, "Westlaw has a long practice of aggressively pursuing" copyright infringement claims against rivals, *id*. ¶ 110, even while "not advancing a legitimate interest in intellectual property rights through such filings," *id*. ¶ 111.  "Instead, these lawsuits are a complete sham, brought to police the exclusionary platform access policies.  Westlaw knows that its copyright assertions and claims are objectively baseless, as there is no dispute that government edicts and a comprehensive database are not copyright-eligible."  *Id*.  Westlaw "pursues these claims to force rivals into unnecessary, expensive legal fights solely to raise entry barriers, particularly to destroy nascent rivals before they can gain a toehold in the relevant markets."  *Id*.  Westlaw does not even acknowledge these allegations in its Motion.

Fourth, Westlaw refuses to license its public law database to rivals in order to maintain its monopoly power in the legal search platforms market.  *Id*. ¶¶ 101-102, 104, 106-107.  This refusal goes back to when Westlaw first moved its public law database product onto a single integrated platform with the Westlaw Content.  *Id*. ¶¶ 28, 42, 104.

## IV.   ARGUMENT

### A.   Westlaw Does Not Dispute that the Counterclaim States a Cause of Action Under Section 2 Which Also Preserves the UCL Claim.

Westlaw's attack on the Sherman Act is narrow and leaves intact ROSS's Sherman Act Section 2 claim.  Specifically, Westlaw does not dispute that the Counterclaim properly alleges antitrust standing and injury.  *Id*. ¶¶ 72-76, 112-115.  Nor does Westlaw dispute that ROSS

alleges a relevant market for legal search platform products and Westlaw's monopoly power in that market. *Id.* ¶¶ 77-78, 82-95. Finally, Westlaw does not challenge the allegations that it maintains monopoly power in this market through sham litigation. *Id.* ¶¶ 110-111. These allegations state a Section 2 claim. *See e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) ("Liability under [15 U.S.C.] § 2 requires (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."); *FTC v. AbbVie, Inc.*, 976 F.3d 327, 346 (3d Cir. 2020) (sham litigation can be anticompetitive for Section 2 purposes); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993) (same).

## B.  ROSS Alleges an Agreement as Required by Section 1 of the Sherman Act

Westlaw posits that ROSS's Section 1 claim is not viable because it either alleges unilateral acts by Westlaw or, if not that, it alleges that West and Thompson Reuters conspired, which is not viable given their corporate relationship. D.I. 28 at 15-16. Actually, ROSS makes neither allegation.

ROSS alleges that Westlaw's agreements with its customers represent the "contract" that satisfies 15 U.S.C. § 1. D.I. 24 ¶¶ 102-106 (alleging that Westlaw's restrictive agreements with its customers restrain trade). Section 1(a) of Westlaw's customer contract requires customers to license both Westlaw's legal search tools product and its public law database product as part of the same integrated platform, and does not permit customers to unbundle the two products. *Id.* ¶ 103 (definition of "Data" encompasses both products). This is enough to allege an agreement under Section 1, and Westlaw does not argue otherwise. *See ZF Meritor, LLC*, 696 F.3d at 265-66 (describing the agreement which a monopolist entered into with customers that formed the basis for the contract in restraint of trade); *Allen-Myland, Inc.*, 33 F.3d at 198-200 (describing

12

customer contracts as a "net pricing structure" which tied upgrade installation services to the parts needed to perform the upgrade).

### C.     ROSS States a Claim for Anticompetitive Tying.

ROSS alleges that consumers have independent demand for legal search tool products and public law database products, but that Westlaw sells these products solely as a package to block entry from new technologies and business models that threaten its monopoly position in the legal search platforms market.  ROSS additionally alleges separate markets for legal search tools and public law databases, and a tying arrangement that forecloses competition in the separate market for legal search tools.[1]

Despite these allegations, Westlaw urges the dismissal of ROSS' tying claims because Westlaw asserts that it is implausible that consumers view legal search tools and public law databases as separate products and that it is implausible that these products compete in separate relevant markets.  Westlaw cites no case law.  It cites no facts.  Rather, Westlaw's argument is a combination of *ipse dixit* and a false construction of ROSS's Counterclaim.  D.I. 28 at 13-15.

*First*, ROSS's claims cannot be dismissed based on implausibility or lack of common sense.  ROSS has alleged in detail the facts that support its allegations that a public law database and a legal search tool are separate products.  D.I. 24 ¶¶ 58-65, 68, 70-76, 79, 95-100.  ROSS has also plausibly alleged that these products compete in separate markets.  *Id.* ¶¶ 79-80.  These allegations do not resemble the formulaic recitation of elements or assertion of legal conclusions found wanting in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Indeed, such allegations must be construed as true.  *Connelly*, 809 F.3d at 786-89; *Ocasio-Hernandez*, 640 F.3d at 12-13.

---

[1] "In a tying arrangement, the seller sells one item, known as the tying product, on the condition that the buyer also purchases another item, known as the tied product."  *Allen-Myland, Inc.*, 33 F.3d at 200.

**Second**, the Counterclaim does not allege that a legal search tool and a public law database have no separate value.  The Counterclaim alleges that customers very much valued ROSS's legal search tool as an independent product, calling it "incredibly valuable" and "better than Westlaw's legal search tools," D.I. 24 ¶¶ 73-74, and stating that it "could make legal research easier, cheaper, and more accessible," *id.* ¶ 68.  Customers valued ROSS's legal search tool so highly, the Counterclaim alleges, because it is built with innovative AI-based technology, and thus is better at finding sought after public law than other legal search tools, like the Westlaw Content.  *Id.* ¶¶ 24, 58, 68 73-74.  ROSS also alleges that customers very much valued Westlaw's public law database because it is comprehensive, reliable, and trusted.  *Id.* ¶¶ 97-100.

**Third**, Westlaw's argument is premised on a misapprehension of the law.  That one product's usefulness depends on another is legally irrelevant.  "[T]he mere fact that two items are complements, that one is useless without the other, does not make them a single 'product' for purposes of tying law."  *Microsoft*, 253 F.3d at 86 (citations and marks omitted); *accord Eastman Kodak*, 504 U.S. at 463.

**Fourth**, the allegations more than satisfy the separate products test.  This test asks whether there is a demand for each product.  *Jefferson Parish*, 466 U.S. at 19-22; *see also Allen-Myland Inc.*, 33 F.3d at 211 (the test asks whether "there is sufficient demand for the purchase of the tied product separate from the purchase of the tying product so as to identify a market structure in which it is efficient to offer the tied product separately from the tying product").  Sufficient demand is present where, "given a choice, consumers purchase the tied good . . . from other firms" than the tying good maker.  *Microsoft*, 253 F.3d at 86; *see also Allen-Myland Inc.*, 33 F.3d at 311-13 (vacating a bench trial decision that third-party hardware installations and the hardware are not separate products, in part because there was sufficient evidence that consumers

14

would purchase the hardware installations at a higher price than the hardware on its own).  Both direct evidence of consumer behavior and indirect evidence of consumer behavior via market activities can establish that a consumer would, given the choice, purchase the tied good from another firm than the monopolist.  *See Microsoft*, 253 F.3d at 86.

ROSS alleges that there is significant demand from consumers to purchase legal search tools from firms other than Westlaw.  For direct evidence of consumer behavior, the Counterclaim alleges that consumers thought ROSS's legal search tool was "incredible valuable" and "better than Westlaw's legal search tool."  D.I. 24 ¶¶ 73-74.  It alleges that "there was widespread support [from consumers] for [ROSS's] innovative, AI-based legal search product, and equally strong recognition that such technology could make legal research easier, cheaper, and more accessible."  *Id*. ¶ 68.  It alleges that "some [customers] indicated that combining ROSS's search engine with Westlaw's database would produce a better platform than anything available on the market."  *Id*. ¶ 74.  And it alleges that "[e]ven though [customers who purchased Westlaw's platform] did not want to purchase Westlaw's legal search tools as well, they were forced to purchase them, as they had no way to access Westlaw's database without them."  *Id*. ¶ 76.  The Counterclaim thus expressly alleges that a group of consumers had significant and present demand to purchase a legal search tool from a firm other than Westlaw and that the tying arrangement both restricted competition in the market for legal search tools and also allowed Westlaw to preserve its monopoly power in the legal search platforms market.  *Id*. ¶ 102.

The allegations regarding indirect evidence of consumer behavior are similarly strong.  The Counterclaim alleges that venture capitalists were willing to invest in companies like ROSS (and did in fact invest in ROSS), suggesting that the venture capital community believed that there was demand for legal search tools and also that the legal search tools market could pull

15

customers away from the legal search platforms market. *Id.* ¶¶ 6, 58, 65-67.  It identifies three demand-side factors that have caused "end-users like law firms [and] intermediate buyers like bar associations," *id.* ¶ 80, to demand innovative alternative ways to do legal research, *id.* ¶¶ 63-64, 87-88.  And it alleges that the ABA, state bars across the country, corporate legal teams, and major U.S. law firms are all spending time and resources to identify, develop, and supply the legal search tools to the population that demands them now.  *Id.* ¶¶ 59-62.  This more than satisfies the separate products test.  *Jefferson Parish,* 466 U.S. at 19-22; *see also Microsoft*, 253 F.3d at 54 (The Sherman Act does not "limit[] its prohibition to actions taken against threats that are already well-developed").  Westlaw does not even try to argue that the ROSS fails this test.

*Fifth*, Westlaw conflates the issues of separate products with the question of relevant markets.  ROSS alleges that Westlaw ties its legal search tools to its public law database to block entry of a new business model that would threaten its core monopoly in the legal search platforms market.  D.I. 24 ¶¶ 101-106.  If this Court agrees that ROSS has sufficiently alleged separate products, that alone is sufficient to state a claim for monopoly maintenance and restraint of trade in the legal search platforms market under the fact-specific analysis of competitive effects required under Section 1 rule of reason and Section 2 monopolization.  *Microsoft*, 253 F.3d at 95-96.[2]

*Finally*, the cases that Westlaw cites do not change anything.  *See* D.I. 28 at 13.  In *Kaufman v. Time Warner*, the plaintiffs did not allege that there was a consumer demand for

---

[2] As noted above, Westlaw does not dispute that the Counterclaim alleges that it has monopoly power in the legal search platforms market.  D.I. 24 ¶¶ 77-78, 82-95.  Tying the separate products together allows Westlaw to preserve its monopoly in this market (in violation of Section 2) and to harm competition and innovation in this market (in violation of Section 1).  Antitrust markets for the separate products are not required to state these particular Section 1 and 2 claims. *Microsoft,* 253 F.3d at 95-96.  The separate market for legal search tools is only needed to assert that Westlaw unnecessary restrains trade in the legal search tools market through this tying arrangement.  Westlaw does not properly distinguish between these theories in its Motion.

16

cable boxes separate from the demand for premium cable services.  836 F.3d 137, 144-45 (2d Cir. 2016).  ROSS's allegations do not suffer this infirmity, as noted immediately above.

In *Kenney v. Am. Bd. of Internal Med.*, the complaint failed to allege that consumer-doctors had separate demand for initial-certifications and continuing-competency certifications. 2021 WL 732715, at *3-6 (3d Cir. Feb. 25, 2021).  According to the Court, the allegations established that some consumers had no demand for continuing-competency certifications, not that there was separate demand for the two certifications.  *Id*. at *4-5.  At best, the allegations established that the certifications were sold at separate times, not that the demand for the certifications was separate.  *Id*. at *5-6.

And *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, is inapposite to the claims here.  That case did not even address the issue of whether the plaintiff had properly alleged separate products sufficient to support the tying claims.  Instead, the Court affirmed the grant of a motion to dismiss because plaintiff's relevant market allegations were based on aftermarkets defined by franchise agreements, not consumer demand and substitution. 124 F.3d 430, 437-38 (3d Cir. 1997).  The relevant markets allegations here do not suffer from that legal defect.

### D.    The Refusal to Deal Allegations State Another Basis for the Section 2 Claim

Westlaw claims that it may refuse to license its product to ROSS as a matter of law.  D.I. 28 at 9-11, 14-15.  Westlaw relies on *United States v. Colgate,* 250 U.S. 300 (1919), for this proposition.  *Id*. at 2, 9.  Yet, Westlaw ignores the *Colgate* caveat: a monopolist may only deal with whomever it chooses "in the absence of any purpose to create or maintain a monopoly." 250 U.S. at 307; *accord Kickflip*, 999 F. Supp. 3d at 685 (noting that the defendant's argument elided this caveat).

While failing to articulate the *Colgate* caveat, Westlaw anticipates ROSS's response by wrongly claiming that the only way to bring a refusal to deal claim is through the narrow factual

circumstances that were present in *Aspen Skiing*, where the Supreme Court first articulated the historical dealing exception.  *See* D.I. 28 at 9-10 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)).

But the historical dealing exception is broader than Westlaw suggests.  Just last year, the Seventh Circuit explained that the Supreme Court never intended to cabin the historical dealing exception to the *Aspen Skiing* facts.  *See Viamedia, Inc*., 951 F.3d at 455.  Instead, the *Aspen Skiing* Court identified three "primary factors" that lower courts should consider when determining whether a monopolist's refusal to deal is anticompetitive conduct under the Sherman Act.  *Id*. at 456-57.  The factors are whether a monopolist (1) elects to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years; (2) pursues conduct in the market where it holds monopoly power differently than in comparable markets where it does not possess monopoly power; and (3) foregoes profitable transactions.  *Id*. (distilling the three factors from *Aspen Skiing*).

The Counterclaim does more than enough to meet the primary factors such that the refusal to deal theory survives dismissal.  The Counterclaim alleges that Westlaw originally offered its public law collection in hard-copy and as a separate product, D.I. 24 ¶¶ 39-42, 45-52, and now refuses to offer its public law database product individually, and instead only offers it as part of bundled platform with the legal search tools, *id*. ¶¶ 28, 104-105.  Westlaw thus made an important change in how it distributed its collection of public law – previously offering it on its own but now refusing to do so.  The Counterclaim also alleges that Westlaw foregoes profitable transactions when it refuses to license directly with rivals, and when it prohibits licensees from using its product to enter into legitimate business arrangements with rivals.  *Id*. ¶¶ 104, 107-109.

18

And, most critically, the Counterclaim alleges that Westlaw intentionally pursues these activities to preserve its monopoly position.  *Id*. ¶¶ 101, 114.

### E.      The Counterclaim States a UCL Cause of Action

Westlaw agrees that the UCL claim, brought under Cal. Bus. & Prof. § 17200 *et seq*., survives as long as the Counterclaim alleges a Sherman Act claim.  D.I. 28 at 17-18.  Thus, the UCL claim must survive because the Section 1 and 2 claims survive dismissal.

But the UCL claim does not depend solely on the viability of the Sherman Act claims, as Westlaw suggests.  Copyright misuse, alleged in Count IV, is a form of anti-competitive behavior.  *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc*., 342 F.3d 191, 204 (3d Cir. 2003).  And the California Supreme Court has stated that a UCL claim is well-pleaded when the alleged conduct "violates the policy or spirit of one of [the antitrust laws] because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999); *see also Diva Limousine, Ltd. v. Uber Technologies, Inc*., 392 F. Supp. 3d 1074, 1090-91 (N.D. Cal. 2019) (denying a motion to dismiss a UCL claim because the policy of misclassifying drivers as independent contractors rather than employees violated "the policy or spirit" of the antitrust laws).[3]  This counterclaim accordingly should not be dismissed.

### F.      The Counterclaim States a Delaware Common Law Cause of Action

Westlaw finally argues that the Delaware common law unfair competition claim fails because ROSS fails to allege that Westlaw wrongfully interfered with ROSS entering into a business relationship with a specific party.  D.I. 28 at 18-19.

---

[3] The cases that Westlaw cite stand for the proposition that a failure to allege any exclusionary conduct amounts to a failure to allege a violation of the policy or spirit of the Sherman Act.  *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008); *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d 175, 184 (Cal. App. 2001).  These cases do not, as Westlaw states, stand for the proposition that a UCL claim rises and falls with the Sherman Act.

First, Delaware's common law unfair competition claim is not violated only in those circumstances when a party has wrongfully interfered with a relationship with a specific party. Instead, it is violated when "an unfair action on the part of defendant . . . prevents plaintiff from legitimately earning revenue." *EDIX Media Group v. Mahani*, 2006 WL 3742595, at *11 (Del. Ch. Dec. 12, 2006); *see also Accenture Glob. Srvs GmbH v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654, 665 (D. Del. 2008). The sham litigation (which Westlaw does not dispute), D.I. 24 ¶¶ 110-111, tying, *id.* ¶¶ 102-106, and refusal to deal, *id.* ¶¶ 107-109, allegations all meet this requirement.

Second, ROSS's common law claim survives even under Westlaw's more restrictive definition. ROSS has alleged that potential customers informed it that but-for Westlaw's illegal tying arrangement, they would have purchased ROSS's legal search tool product. *Id.* ¶¶ 72-76. The Counterclaim also alleges that Westlaw pursued this, and all of the other, anticompetitive and exclusionary acts intentionally. *Id.* ¶¶ 101, 114. That is enough.

At the pleading stage, ROSS "need not name specific parties." *You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *9 (D. Del. Jan. 12, 2021), *report and recommendation adopted*, 2021 WL 327388 (D. Del. Feb. 1, 2021). ROSS "plead[s] facts to allow the court to 'reasonably infer that specific parties were involved.'" *Id.* (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)).

## V.    CONCLUSION

For the reasons stated here, the Court should deny Westlaw's motion to dismiss. If the Court grants any part of the motion to dismiss, ROSS respectfully requests a chance to replead.

OF COUNSEL:

Gabriel M. Ramsey
Warrington Parker
Kayvan M. Ghaffari
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel:  (415) 986-2800

Mark A. Klapow
Lisa Kimmel
Joshua M. Rychlinski
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 624-2500

Dated:  April 22, 2021
7175572 / 50241

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ Stephanie E. O'Byrne*
    David E. Moore (#3983)
    Stephanie E. O'Byrne (#4446)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    sobyrne@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

21