```
 1                      IN THE UNITED STATES DISTRICT COURT

 2                      IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
        THOMSON REUTERS ENTERPRISE CENTRE
 4      GMBH and WEST PUBLISHING CORPORATION,:   CIVIL ACTION
                                              :
 5               Plaintiffs,                   :
        v                                     :
 6                                            :
        ROSS INTELLIGENCE INC.,               :
 7                                            :     NO. 20-613-LPS
                 Defendant.
 8                              - - -

 9                      Wilmington, Delaware
                        Monday, October 4, 2021
10                      Oral Argument Hearing

11                              - - -

12      BEFORE:        HONORABLE LEONARD P. STARK, U.S.D.C.J.

13      APPEARANCES:               - - -

14
                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
15              BY:  MICHAEL J. FLYNN, ESQ.

16                  and

17              KIRKLAND & ELLIS LLP
                BY:  DANIEL E. LAYTIN, P.C.
18                  (Chicago, Illinois)

19                  and

20              KIRKLAND & ELLIS LLP
                BY:  JOSHUA L. SIMMONS, ESQ.
21                  (New York, New York)

22                      Counsel for Thomson Reuters
                        Enterprise Center GmbH and West
23                      Publishing Corporation

24

25                                  Brian P. Gaffigan
                                    Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3                        POTTER ANDERSON & CORROON LLP
                         BY:   STEPHANIE E. O'BYRNE, ESQ.

4                            and

5                        CROWELL & MORING LLP
                         BY:   WARRINGTON PARKER, ESQ.,
6                              GABRIEL M. RAMSEY, ESQ., and
                               KAYVAN M. GHAFFARI, ESQ.
7                              (San Francisco, California)

8                                Counsel for ROSS Intelligence Inc

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                - oOo -

23                        P R O C E E D I N G S

24                    (REPORTER'S NOTE:   The following oral argument

25    hearing was held in open court, beginning at 4:02 p.m.)

1              THE COURT:  Good afternoon, everyone.

2              (The attorneys respond, "Good afternoon, Your

3    Honor.")

4              THE COURT:  On the masks, if you are fully

5    vaccinated and you are comfortable with that, you can take

6    the mask off.  You can, of course, leave the mask on if you

7    want.

8              Let's put the appearances on the record, please.

9              MR. FLYNN:  Good afternoon, Your Honor.  Michael

10   Flynn from Morris Nichols on behalf of the plaintiffs.  I'm

11   joined today by Dan Laytin here at the counsel table.

12             THE COURT:  Good afternoon.

13             MR. FLYNN:  And Josh Simmons from Kirkland &

14   Ellis.  I am also joined by Carolyn Blankenship and

15   Jeanpierre Giuliano, both in-house counsel for plaintiffs.

16             THE COURT:  Okay.  Welcome to all of you.  Thank

17   you.

18             MS. O'BYRNE:  Good afternoon, Your Honor.

19             THE COURT:  Good afternoon.

20             MS. O'BYRNE:  Stephanie O'Byrne with Potter

21   Anderson & Corroon for defendant ROSS Intelligence.  I'm

22   joined by my co-counsel from Crowell & Moring, Mr.

23   Warrington Parker, Mr. Gabriel Ramsey and Mr. Kayvan

24   Ghaffari.  And with the Court's permission, Mr. Parker will

25   be point on the motion today.

1          THE COURT:  Welcome to all of you.

2          MR. PARKER:  Thank you.

3          THE COURT:  I think -- in my mind I'm still

4     thinking of West here as the plaintiffs and ROSS as the

5     defendants, even though I know we're sort of switched for

6     today's purposes.  But if I refer to plaintiffs, I'm

7     probably referring to West.  If I refer to defendant, I'm

8     probably referring to ROSS.  So we are here on plaintiffs'

9     motion with respect to the counterclaims.  We set aside

10    45 minutes a side.

11          Any housekeeping or any questions from you

12    before we get started?

13          MR. LAYTIN:  No, Your Honor.

14          THE COURT:  Any questions?

15          MR. PARKER:  None.  Thank you.

16          THE COURT:  All right.  Then we will hear from

17    Mr. Laytin, I believe it is.

18          MR. LAYTIN:  It's an interesting new setup, a

19    new world.

20          THE COURT:  Yes, it is, as you would imagine.

21    It's our COVID setup for a criminal jury trial.  We have

22    been having a lot of them lately, but not this week.

23          MR. LAYTIN:  Thank you, Your Honor, for

24    scheduling oral argument in person.  My name is Dan Laytin

25    from the law firm of Kirkland & Ellis.  I get confused, too.

1    I am going to refer to the plaintiffs and counter-defendants

2    as Westlaw, and I'm going to refer to the defendant and

3    counter-plaintiff as ROSS.

4            ROSS asserts a bunch of different antitrust

5    theories here, at least three different strains of

6    monopolization claims:  refusal to deal, sham litigation and

7    tying, as well as a conspiracy claim and two related state

8    law claims.

9            And that's not surprising because ROSS is

10   searching for a legal theory to get itself out of the box

11   that it put itself in.

12           ROSS developed a product that depended on

13   Westlaw's product, knowing that Westlaw would not allow ROSS

14   access to its product.

15           So ROSS paid a Westlaw customer to download

16   Westlaw's content, it got caught and now ROSS needs an

17   excuse.  The antitrust law will harbor no excuse here.  And

18   this is an unusual case, Your Honor, where the facts alleged

19   in ROSS's complaint establish no antitrust claim.

20           Let me give a couple examples before moving

21   methodically through their claims.

22           For example, ROSS asserts a refusal to deal

23   claim and that claim would require an allegation that the

24   parties had a historical course of conduct and that

25   historical course of conduct was terminated.

1          But here, ROSS alleges the opposite in an

2     allegation I'll call the 7-UP allegation.  Westlaw never

3     had, it never will.  Westlaw has never licensed its Westlaw

4     content to ROSS or allowed ROSS to obtain it.

5          ROSS asserts a tying claim that Westlaw forces

6     customers to accept its search tools to get its public law

7     database.  A tying claim would require allegations that the

8     tools and databases are separate products.

9          But here again, ROSS alleges the opposite, that

10    consumers aren't interested in buying search tools without a

11    public law database.

12         This is not a Reese's peanut butter cup.  This

13    is not chocolate and peanut butter.

14         As a final example, ROSS alleges that Westlaw

15    has conspired with its customers and that's because the

16    contract at issue prohibits the customer from allowing ROSS

17    to obtain Westlaw content.  The section on conspiracy claim,

18    of course, requires more than unilateral conduct.

19         But again, ROSS alleges the opposite.  Westlaw

20    has always maintained a policy it would not license its

21    content to its competitors and customers are forced in what

22    ROSS calls contracts of adhesion to accept this term to buy

23    Westlaw's product.

24         The bottom line is neither the law, nor the

25    facts alleged by ROSS can state an antitrust claim, now or

1    ever, and the Court should dismiss them.

2               THE COURT:  Let's start with public law,

3    database versus search platforms or search tools.

4               You say that they allege that a tool is no good

5    without a database, but don't they also allege that there is

6    independent consumer demand for each of those two items, so

7    don't I have to take that as true?

8               MR. LAYTIN:  I think they allege the first half

9    of the second sentence but not the second half.  I think

10   that they allege customer enthusiasm about their legal

11   search tools.

12              I don't believe that they allege consumer

13   demand for public law database separate from a search tool,

14   maintaining this fiction as we must that these are separate

15   products.

16              And so look at *Kodak*, Your Honor, where the

17   Supreme Court is deciding whether parts and services are

18   separate markets, and it concludes that because some people

19   may buy parts and not service, if you are a do-it-yourselfer

20   and some require service but no parts, because not every

21   service requires a part.  There, there was separate demands.

22   There was separate demands for each.

23              But the allegations here, so paragraph 79:  For

24   other customers, there is a growing interest in unbundled

25   search products, for other flexible options for digital

1    legal research.  For these customers, legal search tools

2    could be a valuable product as long as the technology exists

3    to allow the consumers to combine the tools with the public

4    law database.

5              To combine.  So long as you can combine.

6              Paragraphs 68 and 69, they allege:  There was

7    widespread support for the company's legal search product.

8              But then customers asked what digital public law

9    collection was connected to this legal search engine?  And

10   this proved -- this is ROSS's own allegation, and this

11   proved to be a serious problem.

12             Paragraph 73:  ROSS's search engine was

13   incredibly valuable.

14             So again, enthusiasm about the search tool.

15             The problem instead, from their own allegation,

16   the problem instead was that the database connected to the

17   search engine lacked what the customer needed.

18             So no, I do not believe that ROSS has alleged

19   separate demand for an underlying public law database which

20   we all know to be true because we don't want a book full of

21   cases.  This is not like *Kodak*, where there was separate

22   demand for parts but not service, service but not parts.

23   These two, under their own allegations, only go together.

24             THE COURT:  I'm not sure that that is the only

25   fair reading of what they have alleged.

1          Why aren't they -- and granted I know you deny

2     all these things, but we're here on their allegations just

3     as we are here on your allegations at an earlier stage of

4     the case.

5          Why isn't it plausible and a reasonable reading

6     of the allegation here that what the market wants or at

7     least some segment of the market is a set of public law

8     databases and a set of search tools or search engines and

9     that some significant segment of the market would like to

10    able to pick and choose between column A and column B and

11    they want to operate in column B with the search engine, and

12    that there is, they're separate products, separate product

13    markets with separate demand.  Why is that not a reasonable

14    reading of what they're alleging?

15          MR. LAYTIN:  The first reason is I don't believe

16    there is an allegation in the complaint that alleges a fact

17    that consumers, a law firm, a university, a someone else, a

18    consumer, this is looking to consumer demand, has any

19    independent demand for a public law database.  I don't

20    believe that there is any allegation in the complaint like

21    that at all.

22          I believe the allegations in the complaint are

23    there is consumer enthusiasm, which I would quibble with

24    whether that is adequate demand, which I can talk about, but

25    there's enthusiasm by consumers for a whiz bang search tool

1    engine, search tool, legal search tool but only -- and it's

2    these paragraphs -- but only, we only want that thing if

3    it's bolted onto this public law database.

4           And that's not separate.  That would read the

5    word "separate" out of *Kodak* and really *Jefferson Parish*,

6    because *Jefferson Parish* says you have to have a finding

7    that two separate product markets exist.  That's the first

8    reason, because I don't believe there is any allegation of a

9    separate consumer demand for public law database.

10          The second is that the premise here -- and I

11   understand I have to, we have to take the allegations as

12   true.  But the premise here that there is a product market

13   for a public law database is legally, is legally incorrect

14   because there has never been a public law database by

15   Westlaw or they don't allege by others that has ever been

16   marketed to anyone outside in the world.

17          So -- and this isn't, this isn't me coming up

18   with a test.  This is courts like the Second Circuit in

19   *Kaufman* or the Third Circuit in *Allen-Myland*, the case that

20   ROSS really relies on for their tying claim.  These courts

21   are looking in the past to see whether these two so-called

22   products have ever been sold independently to determine if

23   they're separate customers -- sorry -- if they're separate

24   products.

25          And we know here that the complaint establishes

1    the opposite.  This is paragraph 69:  Westlaw has never

2    offered to license its database separate from its search

3    tools.

4              Paragraph 104:  Westlaw has never provided

5    consumers with an option to only license the public law

6    database or to license the legal search tools and does not

7    plan to ever provide such an option.

8              In the *Allen-Myland* case, there, the Court

9    concluded that there was separate demand for the upgraded

10   installation services, and the parts needed to perform the

11   upgrade because before IBM tied them together, AMI existed

12   and was able to sell the products separately.

13             In the *Kenney* case which relates to certifications

14   for doctors, there was an initial certification, a maintenance

15   certification that passed.  The judge did not -- granted

16   the motion to dismiss because even though they were sold

17   separately in the past, that was a long time ago so it was

18   entitled to a little weight.

19             I'm not aware of any case in which there has

20   been a tying claim where the product has never been

21   available at retail.  And it sort of goes back to -- I know

22   it's a refusal to deal case, but it sort of goes back to the

23   *Trinko* idea.  That in *Trinko,* there was a wholesale product

24   that was required because it was regularly required to be

25   given or sold to your competitors.  But for that, the

1    Supreme Court said that is a product that exists only in the

2    bowels of Verizon.

3           Well, this is a -- this isn't a product that

4    is only in the bowels of Westlaw.  There is no production

5    line at Westlaw that stops the production process when --

6    at the completion of the public law database.  It has

7    never been offered to market that way.  And that's their own

8    allegation, that is not me putting my factual spin on it.

9           So to say where there has never been a retail

10   sale, retail license, where they allege that the only way

11   we want the whiz bang search tool is with a public law

12   database, we submit, Your Honor, that concluding that the

13   complaint fairly states a claim for separate products would

14   be -- it would be a new, that would be a new -- that would

15   not be consistent with the case law as it relates to tying.

16           THE COURT:  They write in their brief, it's

17   page 16, but they say if I do agree that they have sufficiently

18   alleged separate products, that alone is sufficient to state a

19   claim for monopoly maintenance and restraint of trade in the

20   legal search platform market under the facts specific analysis

21   of competitive effects required under both Section 1 and

22   Section 2.

23           I know you don't think they have adequately

24   alleged separate products, but if I disagree, is that the

25   end of the analysis for Section 1 and Section 2?

1            MR. LAYTIN:  I don't understand -- I don't

2    believe it is with respect to Section 1.  I don't think it

3    is -- you know, a tying claim is a Section 2 claim.  It

4    alleges that we, the owner of the two things, are illegally

5    tying it.  I don't think there is any basis to sustain a

6    Section 1 claim.

7            The primary basis, Your Honor, than we do

8    move to dismiss the tying claim is on the basis of failure

9    to allege separate markets which we think would be

10   unprecedented given the complaint allegations in this case.

11           THE COURT:  Okay.  You can move on to wherever

12   you want to.

13           MR. LAYTIN:  Okay.  Well, that is what I had to

14   say on tying.  So maybe we could move to refusal to deal.

15           THE COURT:  Okay.

16           MR. LAYTIN:  So with respect to plaintiffs'

17   monopolization claim with refusal to deal, it is agreed by

18   the parties that ROSS's refusal to deal claim must come

19   within *Aspen Skiing*.  And that is because the general rule

20   as promulgated by *Colgate* and others for a hundred-plus

21   years, that is there is no general duty to do it with a

22   competitor, and *Aspen Skiing* is the narrow exception to

23   that rule.  And it is of course at the outer bound, outer

24   boundary of Section 2 liability.

25           The primary reason that ROSS cannot avail itself

1    of *Aspen Skiing* is that they can't allege, given their

2    affirmative allegations, that Westlaw has terminated a prior

3    course of dealing with ROSS in which Westlaw allowed ROSS to

4    access its product.

5            In *Aspen Skiing* itself, the Supreme Court allowed

6    only the inference of predation of the anticompetitive act

7    because the ski code there had terminated the previous

8    long-standing voluntary course of conduct.

9            And the *Trinko* court applied *Aspen Skiing*'s

10   conclusion to distinguish *Trinko* from *Aspen Skiing* because in

11   *Trinko*, the complaint like here did not allege that Verizon

12   voluntarily engaged in a course of dealing with its rivals or

13   ever would have done so absent statutory compulsion.

14           And so in the cases that followed *Aspen Skiing*

15   and *Trinko*, courts including this one have consistently

16   required allegations of the termination of a long-standing,

17   and not just existing but long-standing course of dealing

18   to even invoke *Aspen Skiing*.

19           And this Court's opinion in *Blix* is a good

20   example.  There, Apple had a course of dealing with Blix.

21   It allowed -- Apple allowed Blix's BlueMail to be in the app

22   store for a month.  Following that month, Apple terminated

23   it, but that termination could not form the basis of an

24   *Aspen Skiing* refusal to deal case.  Because of this, the

25   Court concluded the presumption and profitability emerges

1    only from evidence of a long-term business relationship, and

2    even though there was a business relationship in *Blix*, it

3    was a month, it was contrasted with *Aspen Skiing* which

4    persisted for several years.  And accordingly, this Court

5    dismissed the *Blix* refusal to deal claim.

6              And the similar case, similar cases in the

7    Invisalign series of cases before Judge Hall, in some

8    examples you, were similar.  There, there was an

9    interoperability agreement between Align and the other

10   entity, but -- and 3Shape?  And both 3Shape and a class

11   action of dentists sued alleging the termination of the

12   interoperability agreement, stating a refusal to deal.

13             As in *Blix*, there was an existing business

14   relationship.  In fact, it was longer than in *Blix*, but

15   that was insufficient to allege a refusal to deal claim.

16             What I find most interesting about the *Align*

17   cases is that there was the refusal to deal claim that arose

18   out of the termination of the interoperability agreement

19   between Align and 3Shape.  But there is also a second refusal

20   to deal claim that arose out of Align's design of its scanner,

21   which the plaintiff 3Shape alleged Align designed so as not to

22   easily connect with Align's competitors.

23             And the difference there is there was no course

24   of dealing, obviously.

25             And there, as Judge Hall stated, because Align

1     ever had to deal with its rivals in the aligner market,

2     governing the terms and conditions, it could use them.

3     There was no refusal to deal with case.

4           The bottom line is no, no termination of a

5     long-standing course of conduct, no claim refusal to deal.

6           ROSS relies exclusively on that Seventh

7     Circuit's recent opinion in *Viamedia* to say *Aspen Skiing* is

8     broader.

9           First of all, that, of course, was an eight or

10    nine-year course of dealing *Viamedia* and agreed with Comcast

11    intercontact access in 2011 -- sorry, 2003 and wasn't cut

12    off until 2011 or 2012.

13          In addition, the *Viamedia* complaint had specific

14    allegations of short-term profits that Comcast sacrificed

15    in order to cut off *Viamedia*.  They allege they lost $11

16    million in profits just in the first six months.  It is not

17    surprising under those facts, *Viamedia* sustained the refusal

18    to deal claim.  But it didn't write out the termination of

19    historical dealing, not in an *Aspen Skiing* claim.

20          The *Viamedia* court noted the same basis that

21    *Trinko* used to distinguish *Aspen Skiing*.  If there is a

22    defendant who never would have voluntarily engaged in a

23    course of dealing absent statutory compulsion, that is the

24    basis of the claim.

25          ROSS seizes on language in *Viamedia* that it's

1    enough under *Aspen Skiing* to have a change in your

2    distribution channel, the same as the refusal to deal claim.

3            We disagree.

4            First, the *Viamedia* discussion of the change in

5    distribution was -- the change in distribution we're talking

6    about was the termination of the interconnect agreement.

7    It's not like there was some broader change in distribution.

8            Second, ROSS doesn't allege and can't allege

9    that Westlaw has moved from books to online anything to do

10   with ROSS.  Nor can they allege that the move from books to

11   online had anything to do with Westlaw, somehow during that

12   intervening time, obtaining monopoly power like was true in

13   *Aspen Skiing* where in the intervening time, the Ski Co.

14   rolled up their hills.

15           THE COURT:  Is it your contention that the

16   lateral requirements are requirements under the law, that

17   it is not sufficient just to point to some change in

18   distribution at some time in the history of the company,

19   there needs to be something related to the claims somehow?

20           MR. LAYTIN:  I would put it much more strongly

21   than that, but at a minimum, yes.

22           I'm not aware of any case that has relied on a

23   change in distribution that was not the termination of a

24   long standing historical course of conduct.  So that's the

25   first point.

1           The second point is even if we're going to go

2   into sort of theoretical speculation mode, it has to be a

3   much more than just there was a change to the distribution

4   channel.  It's a Section 2 claim.  You are looking at what

5   the Supreme Court is doing in *Aspen Skiing* is inferring true

6   predation.  The forsaking of short term profits on the idea

7   you are going to get long-term monopoly profits down the

8   road.

9           The fact that as a company at some point you

10  went through a distribution change, especially going from

11  books to online like the rest of the world has done in the

12  course of 20 years, is nowhere close, and it's all ROSS has.

13          So it's not necessary for this Court to decide,

14  but there has been no opinion to sustain the type of

15  allegation that ROSS makes here.

16          Here, again, back to paragraph 69 of the

17  complaint, ROSS actually alleges the opposite that Westlaw

18  has never offered to license its database separate from its

19  search tools.  And in any event, in paragraph 104, Westlaw

20  has never provided consumers with an option to license the

21  database or to only license the legal search tools and does

22  not plan to ever provide such an option.

23          There is no course of conduct.  There is no

24  termination.  There is not even a change in distribution

25  that is all related.

1          THE COURT:  If all the data alleged is a refusal

2     to deal, that you refuse to deal with them for purposes of

3     maintaining or obtaining monopoly power, if that's all that

4     I think that they plausibly alleged, is that enough or is

5     that not enough?

6          MR. LAYTIN:  Let me understand your question.

7     You are saying if they allege the actual anticompetitive --

8     if they allege the actual refusal.  Sorry.

9          THE COURT:  Yes, they're alleging -- they're not

10    alleging a historical course of dealing with them.  They're

11    not alleging a change in distribution that is related to the

12    claim, but they are saying, look, they refuse to deal with

13    us, and here is the only reason they refuse to deal with us,

14    because either they want to maintain the monopoly power or

15    they want to gain monopoly power.  Could that be a

16    sufficient basis for applying under the law?

17         MR. LAYTIN:  Absolutely not.  Then you are back

18    in *Colgate* land.  *If Colgate* is the general rule here, I can

19    deal with whoever I want, for whatever I want to deal, for

20    whatever reason I want.  And the only exception to that, the

21    narrow exception to that, the outer boundary of Section 2 is

22    *Aspen Skiing.*

23         And ROSS's only argument here is on this point

24    is that *Viamedia* reads *Aspen Skiing* more broadly than the

25    termination of historical conduct, which is not true, and

1    the facts of *Viamedia* are very far afield.

2         I think as Your Honor said, I think it was one

3    of the *Align* opinions that the course of conduct, you know,

4    that you were looking at there was much shorter than in

5    *Viamedia*, but at least there was one.  Here, there is

6    nothing.

7         THE COURT:  Thank you.

8         MR. LAYTIN:  Some of these refusal to deal cases

9    talk about an unwillingness of the owner to provide the good

10   to the requester at retail.  This of course is really the

11   second reason why the Supreme Court concluded that there was

12   sufficient evidence of predation in *Aspen Skiing*, because

13   when denied the Ski Co. pass, Highlands said, all right,

14   we'll pay you full price for it and Ski Co. said no.

15        Here, that allegation doesn't really make sense.

16   And this goes back to the *Trinko* point I was making earlier.

17        The wholesale product in *Trinko.*  There, the

18   court explained the services were not otherwise marketed or

19   available to the public, it only exist in the bowels of

20   Verizon.  And so the *Trinko* court said that that aspect of

21   the case makes this case different from *Aspen Skiing* in a

22   more fundamental way.

23        And that's true here.  Because Westlaw again has

24   never sold the public law database at retail.  And so there

25   is no way that ROSS can allege that we didn't agree to sell

1    it or license it at a retail price because the whole idea of

2    a retail price makes no sense here.

3                And that's why they don't really allege that --

4    they are very cagey on this point in paragraphs 59 and 108.

5    They allege that they had a significant willingness to pay.

6    They allege that they were willing to pay a commercial rate,

7    but they can't allege a retail price.  And that's because a

8    retail price has never been offered.

9                And it shows why the refusal to deal claim or

10   even a tying claim really makes no practical sense here

11   because without any precedent for the product ever being

12   sold at retail, the court can't fashion a remedy because

13   that would require estimation of the free market forces.

14   And that is what the *Trinko* court said in page 80, note 3.

15   It says that if you don't sell the product at retail, then

16   this theory doesn't really make a lot of sense.

17                And it's why there is not a separate product for

18   purposes of a tie.  It's why there is not a refusal to deal

19   for purposes of an *Aspen Skiing* claim.

20                At bottom, because they don't allege historical

21   course of conduct, it's been terminated.  Because they can't

22   allege any retail sale ever by Westlaw of the public law

23   database, there is no refusal to deal.

24                The last Section 2 claim is sham litigation.

25                First, a moment on waiver.

1          We moved to dismiss the Section 2 claim.  That

2     was the issue we raised.  They, in response, cited to two

3     sentence fragments in two prior asks in their complaint

4     which they assert alleges a sham litigation claim.

5          That is not true, and for reasons that we can

6     discuss, but there is nothing in the local rule that ROSS

7     points to or the case law they point to that suggests any

8     waiver.

9          In *Wettach*, the case that they've referenced,

10    there was waiver because the issue was not raised.  The

11    local rule, of course, only says you can't reserve material

12    for reply.

13         That is not what happened, like in the *F'Real*

14    *Foods* case that we cite.  Our response was merely, our reply

15    was merely responding to their argument.

16         So on the merits, they point to paragraphs 110

17    and 111 to say that they have alleged sufficiently a

18    monopolization claim based on sham litigation, copyright

19    enforcement.

20         Two reasons this fails:

21         The first is neither paragraph identifies any

22    actual sham litigation.  Paragraphs 110 and 111 refer to

23    such claims and such filings.  There is no indication as to,

24    as to what those claims are.  That fails notice pleading.

25    It certainly can't be the case that is already in front of

1    Your Honor because the motion to dismiss has already been

2    denied.  Nor can it be the *LegalEase* case because that was

3    not a copyright enforcement action.

4           Secondly, on the merits of the elements of the

5    claim, in those two sentence fragments, not surprisingly,

6    ROSS does not allege that the claims are objectively

7    baseless.  In fact, in paragraph 110, they come close to the

8    opposite, if not the actual opposite, by saying given the

9    licensing and technical conditions of our content, it is not

10   difficult for us to find a way to sue our rivals.

11          Under *Professional Real Estate Investors,* absent

12   such allegations, the claim fails and should be dismissed.

13          Unless you have other questions on Section 2,

14   I'm happy to turn to Section 1.

15          THE COURT:  I guess just they, they say that you

16   don't challenge antitrust standing or antitrust injury for

17   purposes of the motion; is that correct?

18          MR. LAYTIN:  Yes.

19          THE COURT:  And I guess you have already

20   addressed this, but they say you don't challenge sham

21   litigation.  But you are challenging their allegations of

22   sham litigation.

23          MR. LAYTIN:  That's right.  And -- that's right.

24          THE COURT:  How about they say you don't allege

25   or you don't challenge you have monopoly power in some named

1 market for purposes of the motion?

2     MR. LAYTIN:  I disagree with that.  I think that

3 the problem between the two separate markets demonstrates

4 that under *Jefferson Parish*, there aren't relevant product

5 markets that are -- the product markets that are relevant

6 to the Section 2 claims are not properly defined.

7     So I disagree with that statement.  I don't

8 believe that they have alleged -- in fact, the relevant

9 market that they purport to define legal search platforms

10 actually is not used in any relevant way in their complaint.

11 It all boils down to the relevancy of legal search tools

12 and the public law databases that has product markets and,

13 in fact, as separate product markets.

14     THE COURT:  Okay.  Thank you.  You can move on.

15     MR. LAYTIN:  Okay.  So Section 1, they allege

16 that our agreements with our customers are a conspiracy

17 under the antitrust laws.

18     The problem with this argument is it is directly

19 contradicted by their Section 2 theory.  And that is

20 demonstrated by their actual complaint allegations.

21     So ROSS actually alleges that the contracts that

22 Westlaw customers sign are contracts of adhesion.  And I'll

23 point Your Honor to paragraphs 34 and 103 that say it in

24 exactly those words, "the agreement is a contract of

25 adhesion."

1             The premise of the Section 2 claim is that

2    Westlaw has always and will always refuse to license its

3    product to competitors.

4             And again, that is paragraphs 69 and 104 of

5    their complaint.

6             So at bottom, ROSS alleges that Westlaw has

7    unilaterally decided how it is going to go to market, and

8    Westlaw has contracts that are consistent with that and

9    Westlaw, and Westlaw presents those contracts to its

10   customers and they sign them.

11            In *Colgate* and its progeny, like the appellate

12   cases that we cite in the brief, *Roland Machinery* among

13   them, holds that a manufacturer only dealing with those that

14   accept its terms doesn't state a Section 1 claim.

15            And so you don't -- they don't have allegations

16   of an agreement.  And this is similar to the *Talley* case that

17   Judge Burke decided in 2017, which was a doctor termination

18   case.  The doctor alleged that she was terminated, her

19   privileges were terminated due to a conspiracy.  But when you

20   actually looked at her complaint, she alleged that one doctor

21   in particular acted in a unilateral fashion when he fired her.

22            And Judge Burke reasoned if the doctor acted

23   unilaterally, then plaintiff's injury was assuredly not the

24   result of any contract.

25            Similar is the *Lenovo* case that Your Honor

1    decided earlier in this case where Lenovo alleged a

2    conspiracy between InterDigital and TSI in standard setting,

3    but Lenovo's allegations focused on a unilateral breach, and

4    purely unilateral conduct is not actionable under Section 1.

5                    That is all that is happening here.

6                    The case that ROSS cites in support of its

7    Section 1 theory is Judge Robinson's -- I see her here --

8    *ZF Meritor* case, and that case was very different.  There,

9    there were actual allegations, and it was tried to a jury,

10   and they agreed there was an agreement between Eaton and the

11   OEMs to exclude ZF from the transmission market.

12                   It wasn't just a contract.  There were allegations

13   of rebates going back to the OEMs.  There was actual conduct

14   by the OEMs, including removing ZF transmissions from their

15   data books, imposing penalties, precluding marketing, et

16   cetera.  In sum, there was a joint and common purpose of

17   excluding defendant Eaton's competitor.

18                   Here, there is no such allegation.  The

19   allegations in paragraphs 69 and 104 are to the contrary.

20                   Absent questions on Section 1, I'm happy to turn

21   briefly to the state law claims.

22                   THE COURT:  That is fine.  You can move on.

23                   MR. LAYTIN:  So two state law claims.

24                   The first is the California Unfair Competition

25   Act.  This rises or falls on the antitrust claim because

1    they don't allege any violation of the copyright act.

2              ROSS alleges, argues only that they allege

3    conduct that violates the spirit of the act.  Putting how

4    to figure that out or determine it aside, the *LiveUniverse*

5    and *Chavez* case explains where the conduct alleged is

6    conduct that otherwise if it were actionable would violate

7    the antitrust laws, then you can't invoke the spirit.  Then

8    the California Unfair Competition Act claim fails.

9              So given that they cannot state an antitrust

10   claim and they don't purport to state a Copyright Act claim,

11   that California claim fails.

12             The Delaware unfair competition claim is actually

13   not an antitrust claim, of course.  It's a different claim.

14   It's essentially a tortious interference claim.

15             The problem for ROSS is very similar to its

16   sham litigation claim.  There is no actual allegation of a

17   customer, any particular customer with whom it had a

18   legitimate business expectancy or that there is any wrongful

19   interference directed toward that, toward that business

20   expectancy.

21             All that they allege, then, is that the

22   customers, the separate product allegations I was talking

23   about before, all they allege is that customers prefer,

24   because of liability and comprehensiveness, to now move from

25   Westlaw.  That is not unfair conduct that would violate the

1   Delaware Unfair Competition Act.  That is competition.  That

2   is customers choosing to license a product that makes sense

3   for them and their business needs.

4           In the end of the day, this is a shotgun

5   antitrust complaint.  They allege many and any type of claim

6   that they perceive to be even potentially actionable.

7           We do not believe that there is any precedent

8   to refusal to deal claim because there is no longstanding

9   course of conduct that has been terminated because there

10  is -- or a tying claim because there are no retail sales or

11  actually any sales of the intermediate product and therefore

12  there is not separate demand, or sham litigation.

13          (The Court sneezes.)

14          MR. LAYTIN:  Bless you, Your Honor.

15          THE COURT:  Thank you.

16          MR. LAYTIN:  Accordingly, we ask that you grant

17  the motion to dismiss because they have -- their complaint,

18  at this point their amended complaint rests on affirmative

19  allegations that they cannot escape that compel the

20  conclusion that these claims cannot stand.  We ask this

21  dismissal be with prejudice.

22          THE COURT:  Why couldn't the contracts,

23  contracts of adhesion with the customers not be the alleged

24  wrongful interference for purposes of Delaware common law

25  claim?  Or maybe that is just not alleged.

```
 1              MR. LAYTIN:  It's not alleged.  That is a

 2    tortious interference with prospective business

 3    relationship, which is typically an alternative to a breach

 4    of contract claim.  So they don't allege it.  It's not

 5    consistent with the theory.

 6              THE COURT:  Okay.  If I were -- they have

 7    multiple counterclaims.  I think you are not challenging,

 8    but I want to make clear, the declaratory judgment one,

 9    basically if I grant your motion, what is left of their

10    counterclaims?

11              MR. LAYTIN:  Yes.  It's everything other than

12    the antitrust claims.  So we have moved to dismiss.

13              THE COURT:  So declaratory judgment of no valid

14    copyrights would still be in; right?

15              MR. LAYTIN:  One -- I can list them.  Do you

16    want me to?

17              THE COURT:  Sure.  That would be great.

18              MR. LAYTIN:  1, 2, 3.  First is declaratory

19    judgment of no valid copyright.

20              Second is declaratory judgment of

21    noninfringement.

22              Third is fair use.

23              Fourth is declaratory judgment of copyright

24    misuse.

25              And then the fifth is declaratory judgment of no
```

1    tortious interference of contract.

2              They are essentially mirror image claims to

3    Westlaw's affirmative claims.

4              THE COURT:  So you are seeking to dismiss 6

5    through 9; is that correct?

6              MR. LAYTIN:  That would have been a much easier

7    way to put it.

8              THE COURT:  Now, sometimes maybe it's typical

9    in a patent case when there is antitrust counterclaims, we

10    often just stay the antitrust and we get to it years later

11    after the patent case is over.  You have not asked for that,

12    but is that the kind of relief I should be considering?

13              MR. LAYTIN:  We don't think so, Your Honor.  We

14    think this is right based on the pleadings.  And because

15    they -- it's clear they can't allege it and there are

16    certainly some overlaps, but given the distinct nature of

17    these antitrust claims we ask you to rule on them now.

18              THE COURT:  Okay.  We'll save your remaining

19    nine minutes for rebuttal.  And I should probably note for

20    the record when you said "hi" to Judge Robinson, you were

21    referring to the portrait of her on the wall; right?

22              MR. LAYTIN:  That is -- speaking of the spirit

23    of the law, that is true.

24              THE COURT:  Right.  All right.  Thank you.

25              We'll hear from ROSS and Mr. Parker, I believe

1     it is.

2                    MR. PARKER:  Yes, sir.

3                    THE COURT:  Good afternoon.

4                    MR. PARKER:  Good afternoon.  How are you?

5                    THE COURT:  I'm good.  How are you?

6                    MR. PARKER:  Good.  I'm going to take this

7     moment.  It's been 18 months since I have been in a

8     courtroom.

9                    THE COURT:  Has it really?

10                    MR. PARKER:  It's a pleasure.  Oh, my God.

11                    THE COURT:  It still feels somewhat new to me as

12     well.  So welcome back.

13                    MR. PARKER:  I'm going to start essentially with

14     the tying claim.

15                    THE COURT:  Okay.

16                    MR. PARKER:  Now, of course, the standard is

17     plausibility.  And I'm not arguing that because it's a low

18     floor.  I just want to frame out what is plausible given the

19     allegations of the complaint.

20                    In the 19th century, West began to sell case

21     law separate from any digest that could be used to search.

22     Until the mid-19th -- 20th century, people would consult

23     case law.  In fact, if I get an opinion from this court, I

24     don't look for search engines, I don't look for key cites,

25     I look for a case.  That is what I am looking for.

1          And in paragraph 28 of the complaint, we allege

2     that Casemaker and Fast Track actually, to this day, still

3     continue to provide a public law database that they have

4     gathered, separate and apart from the legal search engine.

5     That's plausible.

6          ROSS also showed that there was an interest in

7     those two things.  Now, I think it is very important to be

8     careful, do not conflate the words "market" with "consumer

9     demand."  Because as the Court says in *Eastman Kodak*, two

10    products may be completely unusable, one without the other,

11    but that doesn't mean they're separate products.

12          *Jefferson Parish*, the very notion was no one can

13    use this anesthesiologist without a hospital and yet the

14    court still found there was two separate products.  Why?

15    Because at some point, there was some evidence that at least

16    some people who were undergoing surgery asked for an

17    anesthesiologist.

18          *United States v Microsoft* does not require that

19    you find that there be a market to find instead that there

20    are two separate products.

21          In fact, one of the issues in *United States v*

22    *Microsoft* is that Microsoft had so closed off the market to

23    competitors that there was a concern that there was a

24    market that could not be created.  And the Court spent

25    pages talking about how that there is some tension in the

1    *Jefferson Parish* analysis.  But nonetheless, one would never

2    deny a tying claim under Section 1, mind you, under

3    Section 1, because you couldn't find a robust market.

4              But in any case, we have met the standard.

5    Paragraph 28, if nothing else, tells you that we have met

6    that standard.

7              THE COURT:  Is it at all relevant that you

8    allege that West has never sold access to the public

9    database separately?

10             MR. PARKER:  For the tying claim, yes and no.

11   Right?  For the tying claim, we're saying that it's relevant

12   in the sense that they have a monopoly, they have market

13   share that they don't challenge, so they are preventing the

14   market from access to that, that database.

15             And they do that -- just so we're clear, they do

16   that in order to prop up the legal search engine market so

17   that they don't have competition in the legal search engine

18   market.

19             So it is relevant to that extent.  I don't want

20   to confuse it with refusal to deal.  I want to set that

21   aside.

22             THE COURT:  So they --

23             MR. PARKER:  This is not the same thing at all.

24             THE COURT:  Okay.  But the history and the lack

25   of; in fact, you plead that there is no history of West, at

least, separately selling the database.  You are going to

acknowledge that may be relevant to refusal to deal but

your contention is it's not legally relevant to tying.

MR. PARKER:  It really isn't.  It's relevant to

the extent the Court has any question about why they tie,

which is they want to maintain the monopoly.

It is not relevant to a Section 2 -- Section 1

tying clause.

Under the Section 1 tying claim, and I think

there was some notion that the Section 1 tying claim -- I'm

sorry, that the tying claim only applied in Section 2.

That's not so.

*Eastman Kodak* is a Section 1 and Section 2 tying

claim.

*Jefferson Parish* is a Section 1 tying claim.

*Allen-Myland* is a Section 1 tying claim.

*United States v Microsoft* is a Section 1 and 2

tying claim.

And therefore the fact, which it was an argument

made, it was sort of in the middle of the refusal to deal,

talking about retail markets, the fact that you don't have a

retail market necessarily isn't what is dispositive of the

Section 1 or 2 tying claim.  But in any case, again,

paragraph 29 really does just hammer that down.  It is

alleged with no uncertain terms that Casemaker and Fast

1    Track sell the public law database separate and apart from

2    the legal search engine that they possess.

3                    Okay.  Where do I want to go from there?

4                    So let me be clear, the Section 1 tying claim

5    is this:  that Westlaw uses its market power, the database

6    market, in order to protect its legal search engine model,

7    and that's tied together.

8                    The tied product is, of course, the public

9    database.  The tie is the legal search engine.

10                   The Section 2 tying claim, which is -- and you

11   can look at *Microsoft* for that, is they use their market

12   power and the database to tie in the legal search engine to

13   maintain their monopoly in the legal platforms market.

14                   And remember there was some, some -- there was

15   an argument here that we didn't do much with the legal

16   platforms market.

17                   I want to pause just for a moment and get a

18   glass of water, if you don't mind.

19                   THE COURT:  Sure.

20                   MR. PARKER:  In paragraph 77, we alleged what

21   the relevant market was.  That did not -- that was

22   unchallenged in the motions to dismiss.  It really was.  And

23   I think, I think that, and perhaps I'm wrong, but I believe

24   when West said there is some issue they have with that legal

25   platform market, I think we're going back to whether or not

1    there is two different thoughts.

2              Because if you also look at paragraph, I believe

3    it's 101, we do -- 101, 102, we do tie together and we

4    expressly use the term "legal platform market" and explain

5    how it is that West is using its market power in ways we've

6    alleged to maintain its monopoly in the legal platform

7    market.  So it's not that the legal platform market was

8    mentioned once and became useless.  It's not an appendix of,

9    literally the appendix of this complaint.  It is an integral

10   part of the complaint.

11             THE COURT:  So let me understand.  Are you

12   alleging there are three relevant markets or two?

13             MR. PARKER:  There is one overarching relevant

14   market.  There is the legal platform market, and then it is

15   comprised of the legal search engine and it is comprised of

16   a database.

17             THE COURT:  So how should I do that?  As one,

18   two, or three alleged markets?

19             MR. PARKER:  For the purposes of the tying

20   claim, it would be -- the two markets that would be relevant

21   are the legal database market and the legal search engine

22   market.

23             THE COURT:  And you are starting -- and that is

24   for tying --

25             MR. PARKER:  Section 1.

```
1              THE COURT:  -- Section 1.
2              MR. PARKER:  Section 2 is they maintain a
3   monopoly as a legal platform market using the same tying
4   arrangement, but the tying arrangement is that they have a
5   monopoly in the legal platform.
6              THE COURT:  For tying under Section 2, it's the
7   same two relevant markets:  the legal search engine and the
8   legal database; is that right?
9              MR. PARKER:  Correct.  But the purpose is to
10  maintain their monopoly power in the legal platform market.
11             THE COURT:  Section 1, what -- don't you need to
12  allege an agreement with somebody for Section 1?
13             MR. PARKER:  And we do in this, in the following
14  sense.  We do it in the same way it was done in Jefferson
15  Parish, in the same way it is done in United States v
16  Microsoft, and that is through license agreements.
17             THE COURT:  So there, it was just alleged to be
18  a unilateral action and the Court said that was sufficient?
19             MR. PARKER:  Yes.  I wouldn't say it was
20  unilateral.  There was an acceptance.  But in section -- in
21  United States v Microsoft, Microsoft entered into agreements
22  with people who were installing their software and said you
23  cannot do the following things.
24             THE COURT:  And was this issue litigated,
25  whether that was a sufficient agreement, whether it was
```

 1   unilateral action?

 2            MR. PARKER:  For the Section 1 claim, it wasn't

 3   even an issue at all.

 4            THE COURT:  Well, that's what I'm wondering.

 5            MR. PARKER:  Yes.

 6            THE COURT:  Was it litigated and resolved in

 7   your favor?

 8            MR. PARKER:  It's not, it's not whether it is

 9   litigated or not litigated.  I think that we have to, for

10   Section 1 and a tying claim, those agreements are

11   sufficient.  That is not challenged.  It wasn't challenged

12   in *Eastman Kodak.*  It wasn't challenged in *Jefferson Parish*.

13            THE COURT:  You are not, you are not suggesting

14   it is not challenged here, are you?

15            MR. PARKER:  I'm saying it is challenged here

16   in a completely different issue.  In other words, West is

17   saying that you have to have contracts of adhesion or

18   exclusivity contracts.  We're not depending on exclusivity

19   contracts.  We're not depending on contracts of adhesion nor

20   are these cases.

21            If you read the cases which are cited by West on

22   contracts of adhesion, one is literally an employment case

23   where somebody can't come back into the hospital.  That's

24   not what we have here.  Another is frequent flyer miles.

25   American Airlines.

```
1              None of those cases even come close to bearing

2      close on this case.  This is not much different than the

3      case that you have in Kickflip versus Invisalign.

4              Invisalign is a case where we just don't want to

5      deal with you any more, and this Court agreed, that's fine,

6      they don't have to.

7              Kickflip was a little bit different.  Kickflip

8      was in order to sign on to the platform, if you're social

9      media, you want to be on Facebook social media, one must

10     also agree to accept Facebook's crypto or virtual currency.

11             That is different.  You won't find the same kind

12     of analysis in any other cases cited by Westlaw at all.

13     It's a different mode.  It's a different way of thinking

14     through the case law entirely.

15             THE COURT:  So then point me to where, where are

16     the flaws in what I understand to be Westlaw's logic for

17     Section 2 purposes.  You say Westlaw acted unilaterally.

18     But for Section 1 purposes, you want me to find an agreement

19     with their customers.

20             MR. PARKER:  No, no, no.  I'm sorry.  No, thank

21     you for backing me up.

22             It is both, both of them are existing in the

23     licensing agreement that Westlaw entered into.

24             So in this case, for example, they entered into

25     it with LegalEase.  It's already part of the record as
```

 1    Exhibit 1 to the motion to, to the opposition to ROSS's

 2    motion to dismiss.

 3              Now, if it represents the agreement whereby West

 4    is tying the products together and it is with anyone with

 5    whom West does business, in fact, with anybody who West

 6    does business, that means that ROSS is precluded also from

 7    obtaining the services, and it happened here.  We were the

 8    third party to that agreement.  We couldn't obtain access

 9    according to West's definitions, to the public law database.

10              Whether you call it exclusive, contract of

11    adhesion or not, that was the agreement by which West and

12    its -- by which West precludes access to the public law

13    database.

14              THE COURT:  I think I must just be missing

15    something.

16              MR. PARKER:  And what do you think --

17              THE COURT:  They say as a matter of logic it

18    can't both be true that they act unilaterally and they act

19    in a conspiracy with their customers.

20              MR. PARKER:  We're not.

21              THE COURT:  Yet you are alleging both, I

22    believe.

23              MR. PARKER:  We're not alleging conspiracy at

24    all.  The Section 1 claim doesn't depend on conspiracy.

25              THE COURT:  So any agreement, even one that a

1    customer doesn't want, can be a sufficient basis under

2    Section 1.

3                    MR. PARKER:  Yes.

4                    THE COURT:  And for that, I go to *Microsoft*.

5                    MR. PARKER:  Go to *Microsoft*.  Look at

6    *Microsoft*.  Let me tell you where *LegalEase* stands in

7    *Microsoft*.

8                    In *Microsoft*, it was agreements with OEMs, so

9    whoever was installing the Microsoft software on the

10   computers, they were not allowed to install any other

11   browsers on those computers; therefore, when the customer

12   purchased, they got just one thing.

13                   So here, *LegalEase* is required to sign an

14   agreement where they are required, according to Westlaw, to

15   maintain what in the agreement is called data.

16                   And we know that what *LegalEase* got was both a

17   legal search engine and access to a public law database.

18                   According to West, they cannot provide to ROSS

19   access to that public law database except under the most

20   restrictive terms, and that is set forth in the agreements.

21                   So the agreements are enough.  Am I saying

22   they're acting unilaterally?  In a sense, we're talking

23   about agreements, so I'm not -- this is not a -- so let me

24   talk about refusal to deal because I want to clear this out

25   of the weeds.

1          I know that this Court knows, based upon

2  *Invisalign* and based upon *Facebook* cases that there is a

3  difference between tying and refusal to deal.

4          In the *Invisalign* case, when West says we don't

5  want to deal with you, there is an area of the world where

6  they can say that.  All right?  And I don't want the Court

7  to get hung up on the refusal to deal issue at all.

8          What we said is it's a little broader than *Aspen*

9  *Skiing.*  We relied on *Viamedia*.  As this Court knows from

10 *Kickflip*, because it's cited, in *Kickflip*, *Eastman Kodak*, it

11 says you don't take a series of legal presumptions and then

12 just decide antitrust law.  Antitrust law is decided on a

13 case-by-case basis.

14         But that said, we understand there is not

15 historical dealing with ROSS.  We understand that unlike

16 *Aspen* and *Trinko*, ROSS was not the only customer.  It wasn't

17 pointed at, directly at ROSS.  It was to the whole market.

18         So in that way, in some ways the market -- the

19 attempt to keep the market is broader than in *Aspen* and

20 *Trinko*.

21         And if that is why we don't make a refusal to

22 deal claim, that's fine.  But that doesn't make us wrong

23 under the tying claim, Section 1 or Section 2.

24         THE COURT:  Are you trying to press a refusal to

25 deal claim or are you withdrawing that?

```
 1              MR. PARKER:  I'm just going to withdraw the
 2   refusal to deal claim.
 3              THE COURT:  Okay.
 4              MR. PARKER:  Okay?  So that we're clear, the
 5   agreement at issue here is the agreement with all the people
 6   who want to use Westlaw were not using a unilateral refusal
 7   to deal.
 8              THE COURT:  Okay.
 9              MR. PARKER:  Okay?  And then again, I don't know
10   if I need to go further, but there are other paragraphs that
11   talk about the database as -- the importance of a database
12   as a separate product.  I think I have gotten to that.
13              THE COURT:  Well, I think, but --
14              MR. PARKER:  Okay.
15              THE COURT:  But we heard a lot about nobody
16   wants just the database without a search engine and maybe
17   vice versa, nobody wants a search engine without a database.
18   Do you allege something to the contrary?
19              MR. PARKER:  We do, actually.  I mean, I think
20   in the context of everything, so you start with paragraph 28
21   and you keep going.
22              I think the point of that is in order to be
23   maximally -- in order to be able to maximize competition
24   in the marketplace, you do need access to the public law
25   database.  Not that the search engine is useless in and of
```

```
 1    itself.

 2                 As I said, there are companies out there that

 3    sell them separately.  That's all.  I think it's more of

 4    an -- I don't think we admit that there is no value to the

 5    public law database, separate and apart.  And again --

 6                 THE COURT:  You may not admit, but at least the

 7    plaintiffs here are arguing that you don't allege that there

 8    is any demand for the public law database.

 9                 MR. PARKER:  And that's why I take you back to

10    paragraph, I say 28.

11                 THE COURT:  Paragraph 28 being where you say

12    there are these other companies that have tried to create

13    their own database.

14                 MR. PARKER:  They have them.  They don't have --

15    it's not as full and complete as Westlaw's database.

16                 THE COURT:  And from that, it's a reasonable

17    inference that there is demand for a database.  Is that what

18    you are saying?

19                 MR. PARKER:  Correct.  And further, we allege

20    that we were trying to use a database as well.  But we're

21    saying in their market -- in the public law database, West

22    inhibits our ability to enter the market fully and fairly,

23    not that it's completely worthless.  To say it a different

24    way, there is consumer demand.  And whether you put -- and

25    that is enough.  There is a desire for it.
```

1              There was some notion that maybe these things

2    can't be marketed separately; therefore, they have no retail

3    value.  And therefore, there could never be a remedy.  And

4    I would suggest there is actually in the marketplace, again

5    paragraph 28, people who are providing access to a legal

6    search engine.  So it's not that there is no value, but

7    again, to put value or not at this point is we've met our

8    pleading obligations.  If there is a remedy issue that we

9    can deal with, it's that.

10             THE COURT:  Well, I do, I recognize it's wildly

11   premature to talk about remedies, but it is nonetheless in

12   my mind.  Is what ROSS is seeking an order that Westlaw have

13   to market its public law database separately or is it that

14   they must license it to you or is it something else?

15             MR. PARKER:  I think because this is an

16   antitrust, it would be the West has to provide at reasonable

17   rates so West can obtain what their -- some value, but they

18   would have to make it accessible, yes.

19             THE COURT:  And yet it all seems -- I recognize

20   I don't have a refusal to deal issue in front of me anymore,

21   but isn't the law pretty clear that they can refuse to deal

22   except for the limited exceptions under *Aspen Skiing*?  So

23   how can I begin to think that I'm going to be able to, if

24   you win and prove everything, craft a remedy where I tell

25   them here is how they must deal with the market, including

1    their competitor?

2              MR. PARKER:  In *United States* -- again, I'll go

3    back to *United States*.  That is exactly what *United States v*

4    *Microsoft* had to deal with, and it wasn't a refusal to deal

5    claim.

6              That is precisely what the Court was confronting

7    in terms of -- and they did make it so that Westlaw -- I

8    mean so that Microsoft did have to allow the browsers,

9    additional browsers to be used, so it's not unheard of at

10   all.

11             THE COURT:  Okay.  Thank you.

12             MR. PARKER:  Sham litigation, I think I want

13   to ... The claim is that there was no fulsome argument, no

14   fulsome allegations in the complaint.

15             I'm going to take issue with that, but I want

16   you to understand why I want to take issue with that.

17   Because at least one of the arguments made here today was

18   because West survived the motion to dismiss, there can't be

19   sham litigation.

20             Now, that is not an argument made -- that was

21   not an argument made in opening brief or actually in reply

22   brief.  And so if the Court will indulge me, there are at

23   least three cases that say survival of a motion to dismiss

24   does not end a sham litigation case.

25             And I can provide them.  I'll provide it to

1   counsel.  I'll read them but I will also provide them to

2   counsel the cites in written form so it will be easier to

3   see.

4                   The first is 2020 U.S. Dist. Lexis 108233,

5   District Court of Delaware (June 19, 2020).

6                   The next is 777 F.Supp.2d 1102, Seventh District

7   of Ohio (2001).

8                   And the last is 795 F.Supp.2d 300, Eastern

9   District of Pennsylvania (2011).

10                  And essentially the cases say that whether or

11  not something is a sham litigation is a factual matter, a

12  factual matter for the Court.

13                  THE COURT:  But where are your allegations that

14  they have pressed a sham litigation?

15                  MR. PARKER:  Yes, sure.  So let's start with, so

16  they appear in the following places:

17                  Paragraphs 51 to 55.

18                  Paragraphs 110 to 111.

19                  Paragraphs 112 to 113.

20                  So -- and if I may, even paragraph 110 is an

21  entire, almost an entire page that concerns sham litigation.

22  It's not a sentence fragment.  It's not two sentences.

23                  Paragraph 111 summarizes completely the sham

24  litigation arguments.

25                  Paragraph 112 and 113 assert that this case is

1    part of the sham litigation and that's proper.  If the Court

2    looks at *Professional Real Estate Investors v Columbia*, it's

3    a U.S. Supreme Court case in which an issue was whether or

4    not the case at bar was sham litigation for the purposes of

5    antitrust violation.

6              THE COURT:  So are you alleging a violation of

7    the Copyright Act?

8              MR. PARKER:  And then that goes to that.  We are

9    alleging copyright misuse, which is cause of action No. 4,

10   which does not -- is not challenged in this motion to

11   dismiss.

12             THE COURT:  And there is a suggestion, I think,

13   in the briefing that that would be preempted by federal law.

14             MR. PARKER:  I don't think that has been fairly

15   and fully briefed.  It is a Third Circuit case that says

16   that that is actually proper.

17             And under California unfair competition law, it

18   is considered anticompetitive.  The Third Circuit announces

19   it's an anticompetitive conduct.

20             We have an *Uber* case that says something does

21   not have to actually violate antitrust law.  It's enough it

22   violates the spirit of those laws.

23             And in the case with which we cited, you just

24   have to find it was an independent contractor in order to

25   gain a competitive advantage.

```
 1                      And then the Delaware law, again, it would be
 2      the course of conduct, it would be the sham litigation.  It
 3      did cause us to lose customers as a result.
 4                      THE COURT:  Where -- do you allege with any
 5      specificity or plausibility that you have lost a specific
 6      customer?
 7                      MR. PARKER:  We do not allege a specific
 8      customer.  We did allege, I believe it's paragraphs 72 to
 9      75, 112 to 115, that we did lose the business opportunities,
10      and I think we did so in a plausible manner.
11                      THE COURT:  What is the interference you allege
12      that Westlaw engaged in?
13                      MR. PARKER:  This, the sham litigation.
14                      THE COURT:  So it all -- is it fair to say the
15      state law claims all goes back to the slam litigation
16      allegation?
17                      MR. PARKER:  No, they do not.  Copyright is
18      independent.  The California unfair competition claim does
19      not depend upon sham litigation.  It depends on copyright
20      misuse.
21                      THE COURT:  All right.  So does the California
22      claim depend only on the copyright misuse?  That is, if I
23      say you haven't alleged adequately copyright misuse, does
24      that mean that the California claim is gone?
25                      MR. PARKER:  If you also dismiss our antitrust
```

1    claims, then yes.

2              THE COURT:  And but for Delaware, if I say you

3    haven't adequately alleged sham litigation, then the

4    Delaware claim goes away?

5              MR. PARKER:  Yes.

6              THE COURT:  All right.  You have answered my

7    questions, but you have time left if you want to use it.

8              MR. PARKER:  Let me check my notes.

9              THE COURT:  Sure.  Of course.

10             (Counsel confer.)

11             MR. PARKER:  Okay.  If I have a chance for

12   rebuttal, if I can.

13             THE COURT:  Sure.  That's fine.  We'll give you

14   a chance for that, but we'll turn it back to Westlaw.

15             Whenever you are ready.

16             MR. LAYTIN:  Thank you, Your Honor.  I'd like

17   to start with the tying claim and make four points while

18   recognizing one has two parts.

19             The first is there can be no mistake that it is

20   ROSS's burden to define the public law database and the

21   search tools as relevant product markets in every meaning of

22   that word.  It's *Jefferson Parish*.  And in the Circuit, it's

23   the *Allen-Myland* case, 33 F.3d at 200 to 201:  Any Section 1

24   tying claim requires a finding that two separate product

25   markets exist.

1          And again, citing *Allen-Myland*, the *Queen City*

2     *Pizza* case, the Third Circuit in 1997 requires a finding

3     that two separate product markets exist and a determination

4     precisely what the markets are.

5          So they must define the markets.

6          Now, the only paragraph that they point to is

7     paragraph 28.

8          Paragraph 28, ROSS looked for alternatives and

9     eventually obtained a degree of access to the public law

10    through small companies called Fastcase and Casemaker.

11         However, unlike Westlaw, Fastcase and Casemaker

12    make their public law database available to those who choose

13    not to also license their single search tool in a bundled

14    product.

15         So a degree of access through small companies

16    like Fastcase and Casemaker, there has been no case ever

17    that has ever sustained a relevant product market allegation

18    based on, based on an allegation like that.

19         My learned friend said a few minutes ago that

20    Casemaker -- and I'm going to get their names wrong -- but

21    the two small companies were not as full or complete, and

22    they were not reasonably -- and, therefore, they are not

23    reasonably interchangeable.

24         It is reasonable interchangeability that is the

25    touchstone of defining a relevant market and we know that is

1    the case because the whole premise here is that law firms

2    would not trust ROSS plus these two small -- these two small

3    companies.  They are not reasonably interchangeable.

4              If anything, paragraph 28 and the premise of

5    the complaint establishes that the public law database that

6    these two companies have is not a relevant market and is not

7    reasonably interchangeable.

8              They don't also assert that they're even viable

9    in the marketplace.  There is nothing in this complaint,

10   paragraph 28 or otherwise, that establishes a relevant

11   product market under *Queen City Pizza* for either of these

12   two markets.

13             In addition, I have to come back to something

14   that my friend didn't mention and that is the separateness

15   of these markets.

16             There is no allegation that ROSS pointed to in

17   its presentation that these relevant product markets are

18   tied.  That was Points 2A and 2B.

19             The third point is Section 1.  *Microsoft* is a

20   Section 1 case because it's an exclusive dealing case.  In

21   an exclusive dealing case, both sides of the contract get

22   stuff they want.  In exchange for the exclusive dealing, the

23   OEMs got lower prices.  That's good for the OEMs.

24             This is not an exclusive dealing case.  This

25   is -- there is no -- this is the difference between the

1    *Colgate* example and the *ZF* example.  This is a Section 2

2    case because they allege it's a contract of adhesion, so the

3    customers isn't getting anything from it.

4              And in an exclusive dealing case like in

5    *Microsoft*, that can be an actionable agreement because there

6    is a meeting of the minds on.  It's exclusive dealing but

7    we're going to exclude this rival, and from the OEMs'

8    perspective, because I'm getting this thing, because I'm

9    getting lower prices.

10             And the fourth point on tying goes to this

11   remedy idea.

12             Oh, I should also say that the Section 1 claim,

13   any Section 1 tying claim would fail for the same reasons

14   that a Section 2 tying claim would fail for the products.

15   And that is *Allen-Myland*, 33 F.3d at 211, applying *Jefferson

16   Parish*.

17             THE COURT:  So it may fail for the same reasons

18   as a Section 2, but I'm being told that when I go back to

19   look again at *Microsoft and Jefferson Parish*, Section 1

20   doesn't fall apart based on contract of adhesion, that no

21   cases talk about that or have any trouble with it at all.

22             Is that what I'm going to find?

23             MR. LAYTIN:  No, Your Honor.  A Section 1 case

24   requires a meeting of the minds and conscious commitment to

25   the law pursued.  And contract adhesion is the classic take

1    it or leave it *Colgate* example.  That is, here is my policy;

2    if you want it, take it; if not, don't.  That is not a

3    meeting of the minds to do anything unlawful.

4              THE COURT:  Are there cases that say that?

5              MR. LAYTIN:  The *Roland Machinery.*  I would cite

6    the three appellate cases in our opinion, in our brief.  I

7    know one is *Roland Machinery* because it's a Seventh Circuit

8    case.  They all follow on from *Colgate*.

9              THE COURT:  Okay.

10             MR. LAYTIN:  So the fourth point on tying is

11   this reasonable rate idea.

12             And ROSS has essentially just admitted it, that

13   this court at the end of the day would have to fashion a

14   reasonable rate for a product that has never been sold at

15   retail.  We are unaware of any refusal to deal, tying claim,

16   Section 2 claim that has allowed such a claim to proceed

17   to -- in this case.  This is like *Trinko*.  It is a wholesale

18   product, a wholesale not finished good that is in the bowels

19   of Westlaw, just as Trinko was in the bowels of Verizon, and

20   the *Trinko* court said:  We think Professor Arita -- at page

21   883 of the opinion, we think Professor Arita got it exactly

22   right.  No court should impose a duty to deal that it cannot

23   explain or adequately and reasonably supervise.

24             The remedy, by the way, for this tying claim of

25   a reasonable price makes no sense.  The remedy in the tying

```
 1    claim is thou shall stop tying.  It is not thou shall stop
 2    tying and thou shall sell at X price that I -- that the
 3    Judge is going to determine.
 4              The tying claim doesn't make sense when you look
 5    at what remedy ROSS wants here.  It is not actually the
 6    unbundling, it is the forced dealing, which is a refusal to
 7    deal claim that they have withdrawn today.
 8              A moment on the sham litigation.
 9              Paragraphs 110-111, 51 to 55 and 112-113 of this
10    counterclaim.  We don't believe it can be read to establish
11    that the sham litigation is in fact the underlying case.  It
12    was more a rhetorical flourish by Westlaw that they don't
13    allege any sham litigation, and certainly this one can't
14    qualify.
15              The cases, like I said, I haven't looked them
16    up and I don't have access to my client's database at the
17    moment, much less a whiz bang search tool, but I do know
18    that FTC v AbbVie, the Third Circuit in 2020, an opinion
19    that we cited in our brief essentially goes the opposite.
20              The sham litigation test actually stems from the
21    common law tort of -- it's a malicious prosecution.  It's
22    actually a probable cause standard, which is a standard I
23    never thought I would ever be arguing as an antitrust
24    lawyer.  But it basically says if there is any reasonable
25    basis that there's a chance the claim may be upheld, then
```

1    it's not sham litigation.

2            Passing a motion to dismiss I believe as a

3    matter of law establishes a reasonable basis that there is a

4    sham.  It states a claim that is basically the same words.

5            With respect to the state law claims, I don't

6    think we have anything further to say on them.  It sounds

7    like the Delaware claim is limited to sham litigation which

8    is not alleged.  There is no case that Westlaw allegedly

9    brought, alleged to be objectively and subjectively baseless

10   under PRE that could pass muster.

11           And as for the spirit of the California act,

12   they do not allege a violation of the Copyright Act, which

13   is different than the copyright misuse.  And because the

14   conduct at issue in the antitrust claims is the same as the

15   conduct at issue in the California state claim, they rise or

16   fall together.

17           Thank you, Your Honor.

18           THE COURT:  Thank you very much.

19           Mr. Parker, you can come back.

20           MR. PARKER:  On the Section 1 tying claim, at

21   pages 8 to 9 of the reply brief, West's reply brief they

22   cite the case that says it has to be some type of contract

23   of adhesion.  Not one of those cases is a Section 1 tying

24   claim at all.  They are far afield from them.

25           And again, I will point this Court to *Jefferson*

| | |
|---|---|
| 1 | *Parish*, *United States v Microsoft* which are Section 1 tying |
| 2 | claims. |
| 3 | THE COURT:  Are they exclusive dealing cases? |
| 4 | MR. PARKER:  They are, I don't know what that |
| 5 | term exactly means, but all cases in which the party |
| 6 | receiving the good was prohibited from doing an additional |
| 7 | thing.  And so -- |
| 8 | THE COURT:  Was it alleged in those cases that |
| 9 | there was some benefit to that deal to the customer? |
| 10 | MR. PARKER:  It was -- there was -- well, that's |
| 11 | two different things.  There could be a benefit to the deal, |
| 12 | which is when you get into a rule of reason analysis, but it |
| 13 | was harm to the competition as well. |
| 14 | So one does not -- harm to the -- I mean benefit |
| 15 | to a consumer does not forestall the analysis that there is |
| 16 | an antitrust violation. |
| 17 | THE COURT:  Right.  But I understand your |
| 18 | allegations here to be nobody benefits from this scheme |
| 19 | except for Westlaw.  That is, LegalEase or the parties who |
| 20 | are in a license agreement with Westlaw, they're losers just |
| 21 | as you're losing; right? |
| 22 | MR. PARKER:  So I guess I'm not quite sure.  I |
| 23 | think, I'm not quite sure where the thrust of it is.  People |
| 24 | use Westlaw all the time.  We have cases and we provide them |
| 25 | to the court.  You can't say there is no benefit at all to |

1   this arrangement.

2           The harm, though, is to customers -- I mean to

3   competitors, and the harm is, as we allege, to consumers

4   who would want a better search engine than they have.  And

5   they're precluded from doing so through antitrust tying

6   arrangements under Section 1 and Section 2.

7           So I'm not -- that would be a grotesque

8   statement to say there is no one in the world that benefits

9   from this arrangement that West has, but that is -- whether

10  or not these tying arrangements work or not may be a rule of

11  reason versus a per se analysis, and that's not now though.

12          THE COURT:  Well, I'm asking, I think, because

13  one of the distinctions that I am hearing to your cases is

14  that the OEMs, for instance, in *Microsoft* were found to have

15  received a benefit, making it plausible --

16          MR. PARKER:  That was --

17          THE COURT:  Let me just get --

18          MR. PARKER:  I apologize.  No, you are right.

19  You are right.

20          THE COURT:  Making it plausible to believe that

21  maybe there was a meeting of minds.  Sure, they would have

22  liked to have had a chance to put other browsers on, but

23  they were getting a better price, so they went along with

24  this, and they were complicit in some way.

25          I'm being told that that type of allegation is

1    missing here, and that that is legally meaningful.  So I

2    just want to make sure I understand.

3              MR. PARKER:  I understand.  I understand what

4    your saying.  I don't read *United States v Microsoft* to

5    require, except perhaps implicitly, what we would have, that

6    there has to be a benefit conferred on the OEM.  I don't

7    read it that way.

8              We could argue that if we want.  And I should

9    say now, if you are inclined at all, I do hope you provide

10   us an opportunity to amend our complaint because I as

11   understand it, we amended once with the antitrust, so we

12   have not had a second bite at the apple.  I don't want you

13   to do that unless you have to do that, but I want you to do

14   it if you think you need to do it.

15             But again, people here, if you want that type of

16   analysis, that mode of thought, those who contract with

17   Westlaw receive access.  Westlaw owns 83 percent of the

18   market among law firms.  They have a very large percentage

19   of the market.  They have the largest public law database.

20   So yes, necessarily, there is a benefit conferred when, for

21   example, a company like LegalEase, which is hired to do

22   legal research for others, they need access to Westlaw

23   because it would be the most complete.

24             And that's what I'm -- so the analysis, it works

25   a little bit, but it is not the mode of analysis engaged in

1    by the *United States v Microsoft*, but I believe it is one

2    reasons why you don't have an overanalysis of these

3    agreements with their tying arrangements and they involved

4    third parties who the claimed bad actor is constrained in

5    their behavior.

6              THE COURT:  Okay.  Thank you.

7              MR. PARKER:  There was one other point that I

8    really, really wanted to make.  Do you mind if I just look?

9              THE COURT:  I don't mind at all.

10             MR. PARKER:  I'll look at my notes.

11             I'll come back to it.

12             I think it's -- we're having some argument a

13    little bit here about whether *Queen Pizza* and interchange --

14    interoperability, interchangeability in the marketplace is

15    important for a consumer for two separate products.

16             So this way -- and I keep pointing to paragraph

17    28 because I say there is actually a marketplace, and with

18    the idea that there may be better and there may worse

19    public law databases, but there is a market for the good

20    ones, there is a market for the bad ones.  And so they are

21    interchangeable.

22             I don't think that because -- I don't think that

23    one can ignore simply by saying it's implausible that there

24    is two companies -- that the fact that two companies provide

25    a database to which they don't have the biggest database,

1    that somehow renders it without a market.  I don't think

2    that is true.

3                THE COURT:  But -- and maybe you are saying

4    the same thing in different ways here, but maybe they are

5    different things.  Are they really alleged to be

6    interchangeable?  I mean, isn't this very case about the

7    fact that there is nothing interchangeable for Westlaw?

8                MR. PARKER:  No, I don't, I don't think that is

9    what, quite what we're saying.  Just as there are good

10   hospitals or bad hospitals.  Because I have a preference to

11   go to the good hospital doesn't mean the bad one is not a

12   hospital.

13               And so here, it doesn't to be have to be a

14   perfect overlap interchangeability.  It is necessarily one

15   or the other.

16               In fact, I think *Allen-Myland*, I think it is

17   *Allen-Myland*, I mean there is a discussion about how much

18   customers may or may not pay for this other service, and the

19   Court said:  But they are going to pay.  I mean I'm reducing

20   it down to a very fine, thin line, but they are going to pay

21   for it.  And we don't have to get into quite as far, I don't

22   believe, to survive the plausibility, which is all we're

23   doing.

24               Is it plausible that we have alleged two

25   different products?  And I think we have.

1          And this court may, when we get into discovery

2     say, you know what?  Casemaker and Fast Track, that's

3     terrible.  They don't offer the same thing in any way, shape

4     or form, but right now, all you have is it's not the best.

5     There is something better that is hidden behind those walls,

6     these anticompetitive walls.

7          And I think that is enough to survive a motion

8     to dismiss.

9          THE COURT:  Was that the point or was there

10    another one?

11         MR. PARKER:  I think that was the point.

12         THE COURT:  That was the point.  Okay.

13         MR. PARKER:  But you know what?  Tonight I will

14    wake up and there will be a third but it will be too late.

15         THE COURT:  That happens to all of us.

16         Okay.  Thank you.

17         Any last words you want to add?

18         MR. LAYTIN:  Just to reinforce the point you

19    made.  If it were, if Westlaw public law database were

20    reasonably interchangeable with those third parties

21    identified in paragraph 28, then their market foreclosure

22    injury part of the case would be incorrect.  It is only

23    because they alleged that customers would not accept those,

24    those paragraph 28 alternatives to Westlaw public law

25    database that resolves this claim.

1          Thank you, Your Honor.  It is also wonderful to

2    be here in person.

3          THE COURT:  I was going to say the same.

4          Did you want to add something?

5          MR. PARKER:  No, I'm not going to argue again.

6    How would you like us to provide the cases I read off?  I'll

7    make sure the plaintiffs have it.

8          THE COURT:  I think you gave us the citations to

9    all of them, so we will look them up, one way or another.

10          MR. PARKER:  Very good.  Thank you.

11          THE COURT:  Thank you.  Thank you both for the

12    argument.  Thank you all for being here.  It is nice to be

13    in court with all of you.

14          Everybody, stay safe.  I'm taking the motion

15    under advisement.  Travel safely.  We will be in recess.

16          (Oral argument hearing ends at 5:26 p.m.)

17

18       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

19

20                    /s/ Brian P. Gaffigan
                    Official Court Reporter
21                    U.S. District Court

22

23

24

25