# EXHIBIT A

3 Embarcadero Center, 26th Floor, San Francisco, CA  94111 ▪ p415.986.2800 ▪ f415.986.2827



**Kayvan Mason Ghaffari**
**(415) 365-7223**
**KGhaffari@crowell.com**

August 3, 2021

**VIA EMAIL**

Joshua Simmons
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Re:     *Thomson Reuters Enterprise Centre GMBH et al. v. ROSS Intelligence Inc.*, Case No. 20-613-LPS (D. Del.)

Dear Mr. Simmons:

I write regarding deficiencies with Thomson Reuters Enterprise Centre GMBH and West Publishing Corporation (collectively, "Thomson Reuters" or Plaintiffs) discovery responses served July 12, 2021.  We look forward to meeting and conferring with you about the deficiencies raised herein.

**I.     Thomson Reuters' General Objections to ROSS's RFPs**

As a preliminary matter, Thomson Reuters has improperly incorporated vague, general objections into each of its Responses and Objections to ROSS's RFPs, in violation of Federal Rule of Civil Procedure 34. General, boilerplate objections, applied across the board without restrain, are improper. Rule 34(b)(2)(B) explicitly requires that objections to document production "state with specificity the grounds for objecting" to each Request for Production ("RFP").

Rule 34(b)(2)(C) also requires that objections state whether any responsive documents are being withheld on the basis of an objection. Thomson Reuters has failed to do so. Instead, Thomson Reuters has simply included vague statements that its responses are purportedly "subject to" all the general objections. This type of response is not permitted under Rule 34(b)(2)(C), and courts regularly find such responses non-compliant.  *Crozer-Chester Med. Ctr. v. Nat'l Lab. Rels. Bd.*, 976 F.3d 276, 292 (3d Cir. 2020); *see also* 2015 Advisory Committee Notes to Rule 34 (noting Rule 34(b)(2)(C) is intended to "end the confusion that frequently arises when a producing party states several objections and still produces information, leaving the requesting party uncertain whether any relevant and responsive information has been withheld on the basis of the objections" and allowing for "an objection" to state what materials have been withheld).

**Crowell & Moring LLP ▪ www.crowell.com**

Brussels ▪ Chicago ▪ Doha ▪ Indianapolis ▪ London ▪ Los Angeles ▪ New York ▪ Orange County ▪ San Francisco ▪ Shanghai ▪ Washington, DC

Joshua Simmons
August 2, 2021
Page 2

Some of the Thomson Reuters' general objections are also wholly inadequate. For example, Thomson Reuters states ROSS's requests are overly broad and unduly burdensome regarding time frame and geography. These objections are unacceptable. First, Thomson Reuters' own document requests are not limited in time or geography.  Next, Thomson Reuters never states what constitutes a "reasonable time" given the context nor how it will determine what is a "reasonable" time.  Thomson Reuters never states what constitutes "reasonable geography" given that Plaintiff Thomson Reuters Enterprise Centre GmbH – the purported "owner" of the copyrights in and to Westlaw Content (D.I. 1 at ¶ 6) – is based in Switzerland. Further, nowhere under any specific response does Thomson Reuters state what it has determined to be a "reasonable time" or "reasonable geographic scope" for that specific Request—nor whether it is withholding documents based on these objections. To be clear, Thomson Reuters cannot unilaterally determine the scope of ROSS's requests in order to shirk its discovery obligations.  It is Thomson Reuters that is asserting a property right based on conduct and communications that date back nearly a century.  *See* Thomson Reuters' Opposition to ROSS's Motion to Dismiss, D.I. 15 at p. 8 (stating this case is "about Westlaw, its organization, which has been registered by the Copyright Office within the statutory period … [a]ny selection or arrangement within the statutory period is copyrightable").

In addition, Thomson Reuters redefines the terms "Thomson Reuters," "West", "LegalEase," and "LexisNexis", as defined by ROSS in its RFPs, to exclude "its present and former officers, directors, employees, attorneys, agents, representatives, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purported to act on its behalf."  *See e.g.*, Thomson Reuters General Objections Nos. 13-14, 17-18.  For example, Thomson Reuters objects to ROSS's definition of "Thomson Reuters" and construes the term "to mean solely Thomson Reuters Enterprise Centre Gmbh." *See* Thomson Reuters General Objections No. 13.  These objections are improper.  As a preliminary matter, it appears from Thomson Reuters' production that Thomson Reuters Global Resources, *not* Thomson Reuters Enterprise Centre GmbH, is the claimant of certain copyright registrations.  *See* TR-0034509.  Thus, the copyrights on which this whole case is based is registered to a different entity, one Thomson Reuters claims is irrelevant to this case.  This is nonsensical.

Moreover, it is wholly unclear whether and to what extent Thomson Reuters plans to withhold responsive documents on the basis of these objections.  Please confirm whether it is Thomson Reuters' position that Thomson Reuters', West's, LegalEase's, and/or LexisNexis' "present and former officers, directors, employees, attorneys, agents, representatives, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purported to act on its behalf" do not have possess, control, or otherwise have custody of *any* documents relevant to this matter. If not, ROSS demands that Thomson Reuters withdraw

Joshua Simmons
August 2, 2021
Page 3

its baseless objections[1] and produce documents responsive to the full scope of ROSS's defined terms.

Accordingly, by qualifying all of its responses to ROSS's RFPs as "subject to" all its purported general objections, Thomson Reuters' responses are inadequate and must be promptly corrected.

## II.     Thomson Reuters' Specific Responses

***First***, Thomson Reuters objects to twenty-four requests on the basis that those requests are irrelevant and pertain to ROSS's antitrust claims, which are presently not subject to discovery.  *See* Thomson Reuters' Responses & Objections to Requests for Production Nos. ("Responses") 1, 3, 4, 32, 47-55, 57-65, 87, 88.  Thomson Reuters' objections mischaracterizes the nature of ROSS's requests, impermissibly (and unilaterally) limits the scope of discovery, and ignores that the evidentiary standard of "relevance" is not the correct standard for discoverability of information. *See* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable.").

Even assuming "relevance" was a proper objection (it is not), Thomson Reuters misapplies it repeatedly to avoid production of documents that go to central issues in this case. *In re MiMedx Grp. Sec. Litig.,* No. 15-84-RGA, 2015 WL 5445140, at *4 (D. Del. July 17, 2015) ("Courts in this circuit have broadly construed Fed. R. Civ. P. 26(b)(1) to encompass 'any matter that bears on, or that reasonably could bear on, any issue that is or *may be* in [the] case.' Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case. Rather, discovery requests may be deemed relevant if there is *any possibility* that the information may be relevant to the *general subject matter of the action.*") (citations omitted) (emphasis in original).  As representative examples, Thomson Reuters refuses to produce documents responsive to RFP Nos. 1, 3, 48-54, which ask for:

- RFP No. 1: "All settlement agreements between You and LexisNexis."

- RFP No. 3: "All settlement agreements between You and any third-party relating to the Westlaw Content, including without limitation the Key Number System and Headnotes."

---

[1] It is surprising that Thomson Reuters chose to incorporate these objections given that Thomson Reuters' own document requests contain verbatim language regarding the definition of any corporate entity.

Joshua Simmons
August 2, 2021
Page 4

- RFP No. 48: "All documents and communications, including without limitation policies, instructions, and guidelines, reflecting Your decision "not [to] give competitors access to [your] products" as alleged in Complaint ¶ 3."

- RFP No. 49: "Documents and communicating evidencing all instances where You did 'not give competitors access to [Your] products' as alleged in Complaint ¶ 3."

- RFP No. 50: "All documents and communications reflecting Your decision whether to permit third-party access to Westlaw as alleged in Complaint ¶ 17."

- RFP No. 51: "All documents and communications reflecting Your decision to prohibit Westlaw users from 'creat[ing] a competitive product' as alleged in Complaint ¶ 19."

- RFP No. 52: "All documents and communications evidencing all instances where You prohibited Westlaw from 'creat[ing] a competitive product' as alleged in Complaint ¶ 19."

- RFP No. 53: "All templates of licenses, agreements, and contracts relating to the Westlaw content."

- RFP No. 54: "All templates of licenses, agreements, and contracts between You and any third-party relating to the Westlaw product."

To the extent such refusal is premised on Thomson Reuters' view that RFP Nos. 1, 3, 48-54 are irrelevant (again, we cannot determine the basis for the Thomson Reuters' withholding of documents particularly as "relevance" is not a proper objection) or that the requests seek documents relevant to ROSS's antitrust counterclaims, this is improper.  Copyright misuse forbids a copyright holder from "secur[ing] an exclusive right or limited monopoly not granted by the Copyright Office."  *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc*., 342 F.3d 191, 206 (3d Cir. 2003), as amended (Sept. 19, 2003*); Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977-79 (4th Cir. 1990), *quoted in Practice Mgmt. Info. Corp. v. American Med. Ass'n*, 121 F.3d 516, 520 (9th Cir.), *amended* by 133 F.3d 1140 (9th Cir. 1997).  The doctrine extends from the equitable principle that courts "may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest."  *Video Pipeline, Inc.*, 342 F.3d at 204. The doctrine is intended to prevent copyright holders from using engaging in behavior that stifles competition.  *Id.*  Such behavior may include anticompetitive licensing strategies and third-party agreements.  *Lasercomb*, 911 F.2d at 979 (holding that the copyright holder misused its copyright by including in licensing agreements a provision aimed at preventing the creation of competing software); *see also Practice Mgmt. Info. Corp.*, 121 F.3d at 521 (upholding copyright misuse defense where copyright licensor prevented the licensee from using any other competing product).  While copyright misuse is designed to prevent anticompetitive activities, "a defendant

Joshua Simmons
August 2, 2021
Page 5

in a copyright infringement suit *need not* prove an antitrust violation to prevail on a copyright misuse defense." *Id*. at 521.

ROSS's requests are not based on its antitrust counterclaims; instead, ROSS's requests are related to Thomson Reuters' purported copyright and tortious interference claim.[2]  Thomson Reuters alleges it "explicitly" denied ROSS access to Westlaw because ROSS was developing a competing software platform.  Complaint (D.I. 1) at ¶¶ 3, 28.  Thomson Reuters further alleges its licensing agreements include provisions explicitly prohibiting licensee's from creating a competitive product.  *Id*. at ¶¶ 18-19 ("As these restrictions show, although Westlaw subscribers are permitted to use Westlaw in certain ways, they are expressly prohibited from using Westlaw Content to create a competitive product or to sell the Plaintiffs' proprietary content to others.").  Thomson Reuters affirmatively placed its licensing practice squarely at issue in this case by alleging that Thomson Reuters includes in its licensing agreements a provision "aimed at preventing the creation of a competing software [platform]."  *Lasercomb*, 911 F.2d at 979.[3]  ROSS, therefore, is entitled to seek discovery into Thomson Reuters' licensing and settlement practices to adequately defend itself against Thomson Reuters' copyright infringement claim.  Indeed, Thomson Reuters' policies, practices, and guidelines regarding its licensing agreements may shed light on whether Thomson Reuters recognizes legitimate fair uses of Westlaw by third-parties.

Similarly, Thomson Reuters' refuses to produce its settlement agreements with LexisNexis and any third-party regarding the Westlaw Content.  *See* Responses to RFP Nos. 1, 3.  This is unacceptable.  Thomson Reuters has filed a sprawling copyright infringement action against ROSS by which it is enforcing purported copyrights over the "Westlaw Content."  The settlement agreements are directly relevant to the parties' copyright claim and defenses.  Issues relating to Thomson Reuters' understanding as to the scope of its purported copyrights and the enforcement of its copyrights against ROSS and other third parties, including LexisNexis, are at issue.  For example, if Thomson Reuters entered into a settlement agreement whereby it would not enforce its "Westlaw Content" against LexisNexis (or any other third-party), but did enforce the "Westlaw Content" against ROSS, such evidence is relevant and material to ROSS's equitable defenses of unclean hands, waiver, and copyright misuse.  Similarly, if Thomson

---

[2] Thomson Reuters' objections to RFP Nos. 48-54 are particularly troubling in light of Thomson Reuters' allegation that ROSS tortiously interfered with a third-party agreement.  *See infra*.

[3] Discovery would be permitted even if ROSS was not subject to the purported misuse.  "Courts in this jurisdiction have a liberal discovery policy, permitting full disclosure of information except in situations where compelling circumstances warrant protection of the information." *BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 589 (D. Del. 2004); *see also Lasercomb*, 911 F.2d at 979 ("The fact that appellants here were not parties to one of [copyright holder's] standard license agreements is inapposite to their copyright misuse defense.  The question is whether [the copyright holder] is using its copyright in a manner contrary to public policy, which question we have answered in the affirmative.").

Joshua Simmons
August 2, 2021
Page 6

Reuters agreed not to enforce its headnotes against LexisNexis (or any other third party), such evidence may suggest that Thomson Reuters does not perceive its headnotes to be eligible for copyright protection.

In addition, these requests are relevant to Thomson Reuters' tortious interference claim. In order to prove its tortious interference claim, Thomson Reuters must show, among other factors, the existence of an *enforceable* contract and ROSS's knowledge of an enforceable contract. *See Travel Syndication Tech., LLC v. Fuzebox, LLC*, 2012 U.S. Dist. LEXIS 73117, at *17-19 (D. Del. May 25, 2012). At minimum, ROSS is entitled to discovery to test the enforceability of Thomson Reuters' agreements, including without limitation discovery into Thomson Reuters' interpretation and understanding of the provisions contained in the agreements and Thomson Reuters' policies, practices, and guidelines in including and enforcing those provisions. Thomson Reuters alleges certain provisions in certain agreements prohibit searching for and downloading certain purported Westlaw content to provide to a potential competitor. ROSS is entitled to test the veracity of these allegations and understand the basis for these provisions and how Thomson Reuters' actually interprets those provisions beyond self-serving statements in a complaint. For example, ROSS is entitled to learn whether Westlaw interprets those provisions to prohibit a third-party from downloading raw judicial opinions, notwithstanding Thomson Reuters' purported claim that it does not claim a proprietary interest in government edicts. *Compare* D.I.1 at 9 ("Copyright is not claimed as to any part of the original work prepared by a United States Government officer or employee as part of that person's official duties") *with* TR-0013857 (a copy of a copyright deposit certificate listing government edicts as, including Supreme Court decisions, as part of the data submitted for copyright protection).

Thomson Reuters cannot unilaterally determine which counterclaim is applicable to which RFP. Because these requests are directly relevant to ROSS's ability to adequately defend itself against Thomson Reuters' copyright and tortious interference claims, ROSS demands that Thomson Reuters withdraw these improper objections and produce documents responsive to RFP Nos. 1, 3, 4, 32, 47-55, 57-65, 87, and 88.

***Second***, Thomson Reuters has objected to a number of requests "as vague and ambiguous to the extent that the terms 'structure, sequence, and organization and content' are unclear and undefined." *See* RFP Nos. 10, 11, 12, 13, 14. However, in these same responses Thomson Reuters has indicated that it will produce documents sufficient to show "the structure, sequence, and organization of the WKNS and West Headnotes." Please detail what Thomson Reuters finds vague and ambiguous about "structure, sequence, and organization and content," especially in view of Thomson Reuters' representation to the Court that Plaintiffs "also have a copyright in the compilation that [Plaintiffs] created…the entire structure, sequence, and organization that [Plaintiffs] put together to find, analyze, to explain the law." Hearing Tr. at 35:3-8. ROSS demands that Thomson Reuters withdraw these improper objections.

Joshua Simmons
August 2, 2021
Page 7

**Third**, Thomson Reuters objects to a number of requests concerning the WESTLAW DATABASE or the database referenced in Exhibit A of the complaint. *See* Responses to RFP Nos. 10 ("Plaintiffs object to this Request as overly broad and unduly burdensome to the extent that it seeks 'DOCUMENTS sufficient to show the . . . content of the WESTLAW DATABASE.'"), 11, 12, 13, 14, 15. To the extent it was not obvious, Westlaw Database, as used in these requests, is this same database that forms the basis for Thomson Reuters' copyright infringement claim. *See* Compl. ¶ 22-23 ("To protect Westlaw, Thomson Reuters registers the database with the United States Copyright Office every three months…Thomson Reuters is the sole owner and proprietor of all right, title, and interest in and to the copyrights in Westlaw."). There should be nothing unduly burdensome about Thomson Reuters producing the information underlying Thomson Reuters' allegations. ROSS demands that Thomson Reuters withdraw these improper objections.

Additionally, in many of these same responses, Thomson Reuters has indicated it will not produce documents concerning the WESTLAW DATABASE or the database referenced in Exhibit A to the complaint; rather, it will produce documents concerning the WKNS and West Headnotes. *See, e.g.,* Response to RFP No. 10 (referring to the "WKNS and West Headnotes"). Please clarify whether the WESTLAW DATABASE described in your complaint – the database ROSS has allegedly infringed – contains information, data, content, and/or materials that are separate and apart from the WKNS and West Headnotes. If it does, ROSS demands that Thomson Reuters amend its responses and produce the scope of information relating to the WESTLAW DATABASE.

Similarly, RFP Nos. 37, 41, 42, 94, 95, 96, 97, 98 seek certain documents and communications regarding the WESTLAW CONTENT, which has the same meaning as the term "Westlaw content" as used in Complaint ¶ 1. However, Thomson Reuters responds to each of those requests by stating it will produce documents relating to "Plaintiffs' content." *See* Response to RFP Nos. 37, 41, 42, 94, 95, 96, 97, 98. It is unclear whether and to what extent the phrase "Plaintiffs' content" is different than "Westlaw Content," as used in Complaint ¶ 1, and Thomson Reuters' representation to the Court. *See* Hearing at 37:14-17 (representing to the Court that Thomson Reuters is "suing on all of Westlaw, all of our proprietary material which includes our revisions, our compilations, our additions, our analysis, and the hierarchy that we detail at length in our complaint"). Please confirm that those terms are co-extensive and that Thomson Reuters will not withhold documents based on the term "Plaintiffs' content."

**Fourth**, Thomson Reuters objects to a number of requests regarding Thomson Reuters' licensing agreements. *See* Responses to RFP Nos. 48-54. However, Plaintiffs accuse ROSS of tortuously interfering in Plaintiffs' contract with LegalEase – itself a subscriber. As discussed above, Thomson Reuters must show, among other factors, the existence of an *enforceable* contract and ROSS's knowledge of an enforceable contract. *See Travel Syndication Tech., LLC* 2012 U.S. Dist. LEXIS 73117, at *17-19. At minimum, ROSS is entitled to discovery to test the enforceability of Thomson Reuters' agreements, including without limitation discovery into

Joshua Simmons
August 2, 2021
Page 8

Thomson Reuters' interpretation and understanding of the provisions contained in the agreements. For example, Thomson Reuters' understanding as to whether a provision prohibiting the downloading of raw judicial opinions is contrary to established law and public policy, this would tend to show that those prohibitions are unlawful and unenforceable.

Moreover, Plaintiffs allege they have adopted a strategy of withholding access to its products (Compl. ¶3) and that ROSS knew about this very strategy (Compl. ¶52). Plaintiffs' refusal to produce documents related to its decision to adopt this strategy (RFP No. 48, 51), or instances where it enforced this strategy (RFP Nos. 49, 50, 52) is baffling given Plaintiffs' tortious interference with contract claim. ROSS is entitled to inquire about the facts underlying Plaintiffs' allegations regarding Plaintiffs contract drafting decisions as part of its inquiry into the legitimacy of Plaintiffs' tortious interference claim. And for the reasons detailed above, ROSS is further entitled to discovery on Plaintiffs' contract practices as part of ROSS's copyright misuse defense.

Thomson Reuters refuses to produce any templates of licenses, agreements, and contracts relating to WESTLAW CONTENT or the WESTLAW PRODUCT. *See* Response to RFP Nos. 53-54. As discussed above, these documents are relevant to ROSS's copyright misuse defense. In addition, Thomson Reuters opened the door to such discovery by attaching what appears to be a template agreement to its Motion to Dismiss Opposition and represented that it was "a true and correct copy of the Service Agreements [sic] entered into between West and LegalEase" despite the fact that the agreement itself was unexecuted. D.I. 16 at 2 (declaration); D.I. 16-1 (Service Agreement). Thomson Reuters cannot have it both ways: provide a template when convenient for itself but refuse to produce templates in response to ROSS's RFPs. Moreover, Thomson Reuters seeks the same discovery from ROSS. *See* RFP No. 61 ("All DOCUMENTS given to actual or potential customers of the ROSS PLATFORM, including without limitation any and all agreements…"). Please immediately withdraw these objections and produce all templates of licenses, agreements, and contracts relating to WESTLAW CONTENT or the WESTLAW PRODUCT.

Thomson Reuters' response to RFP No. 55 also impermissibly limits the scope of discovery. RFP No. 55 seeks all agreements with LegalEase. Thomson Reuters response that it will only produce the agreement LegalEase allegedly breached as well as the agreement with LegalEase that settled the lawsuit is unacceptable. *See* Response to RFP No. 55. The full scope of RFP No. 55 is directly relevant to the parties' claims and defenses, including Thomson Reuters' tortious interference claim. Please identify the agreements that Thomson Reuters intends to exclude and why Thomson Reuters believes said material are not relevant to the parties' claims or defenses. Otherwise, Thomson Reuters must withdraw its objections and produce all agreements with LegalEase.

**Fifth**, Thomson Reuters has objected to a number of requests regarding Thomson Reuters contracts with judicial entities. *See* Responses to Request Nos. 57-65. As discussed above,

Joshua Simmons
August 2, 2021
Page 9

Thomson Reuters' contracts with third parties are relevant to ROSS's copyright misuse defense. In addition, Thomson Reuters alleges ROSS "needed to acquire vast amounts of legal content" and needed access to Westlaw for that purpose. Compl. ¶28. Westlaw represented to the Court that it is "suing on all of Westlaw, all of our proprietary material which includes our revisions, our compilations, our additions, our analysis, and the hierarchy that we detail at length in our complaint." Hearing Tr. at 37:14-17. And Thomson Reuters has publicly stated judges should "forward all opinions you [the judge] recommend for reporting in all versions (print and Westlaw)…", suggesting Thomson Reuters may have agreements – whether exclusive or not – with the members of the judiciary. *See, e.g.,* https://legal.thomsonreuters.com/en/solutions/government/court-opinion-submission-guidelines; *see also Practice Mgmt. Info. Corp.*, 121 F.3d at 521 (upholding copyright misuse defense where copyright licensor prevented the [government agency licensee] from using any other competing product). In addition, Thomson Reuters is impermissibly claiming a copyright interest in government edicts through its headnotes, which are reproductions or derivative works of government edicts. As a matter of public policy, "the whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all . . . ." *Banks v. Manchester*, 128 U.S. 244, 253 (1888). Accordingly, since Thomson Reuters alleges ROSS infringed the "Westlaw content," which contain and/or are premised on government edicts, ROSS is entitled to review Thomson Reuters' agreements with the judiciary and test Thomson Reuters' copyright claims. Accordingly, please withdraw your objections and produce documents response to RFP Nos. 57-65.

**Sixth**, ROSS is concerned that Thomson Reuters has deliberatively worded its responses in such a way to create needless ambiguities about what it is agreeing to produce and what it is withholding on the basis of its stated objects. As a representative example, RFP No. 94 asks for all documents evidencing *when* Thomson Reuters discovered LegalEase's alleged copying and distribution of the purported Westlaw Content to ROSS. Thomson Reuters responds that it will "produce relevant, non-privileged responsive documents showing LegalEase's copying and distribution of Plaintiffs' content…" *See* Response to RFP No. 94.

Thomson Reuters claims ROSS tortiously interfered with Thomson Reuters' contract with LegalEase. ROSS contends the statute of limitations bars Thomson Reuters' claim. Accordingly, ROSS is entitled to discover the circumstances surrounding Thomson Reuters' discovery of ROSS's purportedly tortious conduct. Accordingly, ROSS demands that Thomson Reuters amends its Response and produce all documents evidencing when YOU discovered LegalEase allegedly copied and distributed WESTLAW CONTENT to ROSS.

Thomson Reuters repeats this potentially concerning sleight of hand throughout its responses. As another example, Request No. 32 seeks documents "relating to ROSS, including communications with LEXISNEXIS and any third party." Thomson Reuters responds, however, that it would produce documents relating to "Defendant's alleged copying and relationship with West and LegalEase." *See* Response to RFP No. 32. This response improperly narrows the

Joshua Simmons
August 2, 2021
Page 10

scope of the request without any basis.  Documents relating to ROSS, beyond the purported
copying, are relevant to the parties' claims and defenses.  For starters, Thomson Reuters sued
ROSS for copyright infringement and tortious interference.  ROSS is entitled to obtain discovery
into Thomson Reuters' documents and communications regarding ROSS.  For example,
documents and communications relating to ROSS's business are directly relevant to the
allegations in the Complaint, including without limitation evaluating the circumstances under
which Thomson Reuters determined ROSS was a competitor (Complaint ¶¶ 28, 38) and thus
explicitly "denied [ROSS] access to Westlaw."  Complaint ¶ 3.  In addition, documents relating
to ROSS beyond the purported copyright infringement and ROSS's relationships with West and
LegalEase are directly relevant to ROSS's affirmative defenses, including waiver, laches,
estoppel and copyright misuse.  Thomson Reuters cannot have it both ways and limit its
production in the manner it intends.  It cannot sue ROSS, but then categorically withhold
documents relating to ROSS that may enable ROSS to appropriately defend itself and/or test the
assertions in Thomson Reuters' complaint. Please (1) identify all documents and
communications that Thomson Reuters intends to exclude and explain why Thomson Reuters
believes said material are not relevant to the parties' claims and defenses or (2) amend your
response and produce all documents responsive to RFP No. 32 as originally written.

**Finally,** Thomson Reuters objects to RFP Nos. 81 and 82 as calling for documents that
are available through the United States Patent and Trademark Office (USPTO) database.  While
the USPTO contains certain documents response to these requests, that is an improper objection
to resist discovery.  This is particularly true given many documents responsive to RFP Nos. 81-
82 may not be available from the USPTO and are solely within the possession, custody, and
control of Thomson Reuters.  *Sciele Pharma, Inc. v. Lupin, Ltd.*, No. CV 09-37 (RBK/JS), 2013
WL 12161442, at *3 , (D. Del. Jan. 31, 2013) ("The fact that a partially redacted copy of the
agreement is publicly available counsels for, not against, its discovery. If part of the agreement is
already in the public domain there is no good reason to withhold the rest of the agreement."); *see
also Eon Corp. IP Holdings v. FLO TV Inc.*, 2013 WL 5882005 (D. Del. July 18, 2013) (holding
the defendants must produce public documents even where they may be equally available to both
parties).  For example, patents Thomson Reuters owns or holds for which assignment
information has not been updated or filed would not be with the USPTO.  Similarly, patents
which Thomson Reuters has an interest in, such as via license, would not appear with the
USPTO.  Please remove these objections and agree to produce all responsive documents. To the
extent Thomson Reuters refuses to do so, please confirm whether or not it is withholding
documents on the basis of these objections.

### III.     Thomson Reuters' Conferral Request to Several RFPs

In response to RFP Nos. 11, 14, 17, 20, 23, 30, 56, and 67, Thomson Reuters stated it is
willing to meet and confer to discuss the scope of the request. ROSS welcomes the opportunity
to confer regarding those requests, in addition to the remaining issues raised herein.

Joshua Simmons
August 2, 2021
Page 11

## IV.     Thomson Reuters' Interrogatory Responses

Regarding your Response to Interrogatory No. 1, as you have now had access to the memoranda produced by LegalEase for ROSS – the only access point you have identified for any sort of WESTLAW CONTENT to get to ROSS – since as least July 12 (since you identified documents produced by ROSS pursuant to Rule 33(d) despite not having the password to access the production until July 15), we look forward to your supplementation by no later than August 6.  We expect, especially in view of Judge Stark's analogy to patent infringement contentions at the Motion to Dismiss hearing, that you will identify your copyright, and, for each copyright, the material you claim ROSS created (or that you claim LegalEase purportedly created on behalf of ROSS) which purportedly infringes that same copyright, in chart form.

*     *     *

Please confirm Thomson Reuters will amend its responses to the above.  Nothing in this letter should be taken as a waiver of any of ROSS's rights or privileges, all of which are expressly reserved, particularly as the deficiencies in Thomson Reuters July 12 responses are too numerous to be set forth in detail in a single letter.  We look forward to hearing from you and hope that we can resolve the above items.

Sincerely,

*Kayvan M. Ghaffari*

Kayvan M. Ghaffari

SFACTIVE-906183683.3

# EXHIBIT B

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

|  | 609 Main Street | |
|---|---|---|
| Megan L. McKeown | Houston, TX 77002 | |
| To Call Writer Directly: | United States | Facsimile: |
| +1 713 836 3499 | +1 713 836 3600 | +1 713 836 3601 |
| megan.mckeown@kirkland.com | | |
|  | www.kirkland.com | |

August 25, 2021

**Via Email**

Kayvan M. Ghaffari
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
(415) 365-7223
kghaffari@crowell.com

Re:     *Thomson Reuters Enterprise Centre GMBH v. Ross Intelligence Inc.*,
         C.A. No. 1:20-cv-00613-LPS

Dear Kayvan,

We write in response to your August 3, 2021 letter ("ROSS's Letter") regarding Thomson Reuters Enterprise Centre GMBH ("Thomson Reuters") and West Publishing Corporation's ("West") (collectively, "Plaintiffs") responses to Defendant ROSS Intelligence Inc.'s ("ROSS") First Set of Requests for Production ("ROSS's RFPs, and each, an "RFP") and First Set of Interrogatories ("ROSS's Interrogatories," and each, an "Interrogatory") (collectively, "Plaintiffs' Responses").

## I.     PLAINTIFFS' OBJECTIONS TO ROSS'S RFPS ARE PROPER

ROSS first asserts that Plaintiffs' Responses to ROSS's RFPs incorporate "vague, general objections into each of its Responses and Objections."  *See* ROSS's Letter, at 1.  Tellingly, ROSS does not identify which objections or category of objections it believes are "boilerplate" and "improper."  *Id.*  Regardless, the objections in Plaintiffs' Responses are not boilerplate; they are specific.  Plaintiffs' Responses specifically explain, for example, why certain of ROSS's RFPs are not relevant or proportional, or are overbroad, and/or duplicative of other RFPs.  *See, e.g.*, Plaintiffs' Response to RFP No. 1 (objecting to the RFP as seeking documents that are neither relevant to any claim or defense of any party nor proportional "***because any settlement agreements that may exist may not have any connection to any issues in this case***," as overbroad to the extent it seeks "***[a]ll settlement agreements*** between YOU and LEXISNEXIS," and as duplicative of "Request No. 3" (emphasis added)).

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 2

ROSS next contends that Plaintiffs have "failed" to state whether any responsive documents are being withheld on the basis of an objection. *See* ROSS's Letter, at 1. As an initial matter, ROSS's position is undermined by its own failure to state whether ROSS is withholding documents responsive to Plaintiffs' First Set of Requests for Production ("Plaintiffs' RFPs"), as we explained in our July 20, 2021 deficiency letter to Joshua M. Rchylinski. Nor can ROSS complain that Plaintiffs' Responses are "subject to" their objections, as ROSS's responses similarly indicate that ROSS's production of documents are "***Subject to*** and without waiving the foregoing General and Specific Objections." *See generally* ROSS's Responses to Plaintiffs' RFPs ("ROSS's Responses") (emphasis added). In contrast to ROSS's Responses, however, Plaintiffs specifically stated in response to each RFP the scope of documents that it was agreeing to produce, and if there was no scope to which Plaintiffs could agree based on their understanding of ROSS's RFP, then Plaintiffs expressly stated that they "will not produce" responsive documents. *Compare* Plaintiffs' Responses *with* ROSS's Responses. This approach satisfies Plaintiffs' discovery obligations. Fed. R. Civ. P. 34(b)(2)(C).[1]

ROSS next asserts that Plaintiffs' objections as to the unlimited time frame and geography of ROSS' Requests are "unacceptable" because Plaintiffs never state what constitutes a "reasonable time" or "reasonable geography." ROSS's Letter, at 2. Since these are ROSS's RFPs, however, ROSS should propose a reasonable time period for Plaintiffs' consideration (*e.g.*, 2015 to the present).

ROSS next contends that Plaintiffs improperly excluded "present and former officers, directors, employees, attorneys, agents, representatives, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purported to act on its behalf" from the definitions of "Thomson Reuters," "West," "LegalEase," and "LexisNexis." ROSS's definitions of these terms, however, are overbroad. *See, e.g.*, *Cywee Grp. Ltd. v. Huawei Device Co.*, No. 2:17 Civ. 495, 2018 WL 4100763, at *2 (E.D. Tex. July 13, 2018) (document requests defining a party to include "its current and former officers, directors, employees, counsel, agents, consultants, representatives, affiliates, parents, . . . predecessors and successors in interest, [and] any other persons acting on behalf of any of the foregoing . . ." were "extremely broad"; denying motion to serve document requests). Nor does ROSS propose

---

[1]   ROSS's case, *Crozer-Chester Medical Center v. National Labor Relations Board*, is inapposite. There, the appellant withheld an entire asset purchase agreement that was relevant to the case, rather than producing relevant parts of it with an explanation of what portions of the agreement it was withholding. 976 F.3d 276, 292 (3d Cir. 2020).

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 3

narrower definitions.  If ROSS has a proposal to narrow its overbroad definitions for these terms, Plaintiffs are willing to consider it.[2]

## II.   PLAINTIFFS' SPECIFIC RESPONSES TO ROSS'S RFPS

### A.   Objections to RFP Nos. 1, 3, 4, 32, 47–55, 57–65, 87, 88 (Settlement Agreements, Access to Westlaw, Templates of Licenses, Agreements, and Contracts Related to Westlaw)

ROSS makes the unsupported claim that Plaintiffs' relevance objections to RFP Nos. 1, 3, 4, 32, 47–55, 57–65, 87, and 88 are improper because "relevance" is "not the correct standard for discoverability of information."  ROSS's Letter, at 3.  In Delaware, however, once a party objects to discovery requests, "the burden falls on the party seeking discovery to show the relevance of the information requested."  *See Invensas Corp. v. Renesas Elecs. Corp.*, No. 11 Civ. 448, 2013 WL 12146531, at *2 (D. Del. May 8, 2013).  Thus, it is entirely appropriate for Plaintiffs to object on relevance grounds (among others, which Plaintiffs hereby expressly reserve), placing the burden on ROSS to demonstrate that its discovery requests seek relevant information.  *Id.*

ROSS asserts that a large swath of material is relevant to its copyright misuse defense to justify a fishing expedition into Plaintiffs' settlement agreements, license agreements, and other contracts related to Westlaw.  ROSS's Letter, at 5–6.  This is wrong for several reasons.

***First***, copyright misuse is a defense that applies "only in narrow circumstances" that do not exist here.  *See, e.g.*, *Ass'n of Am. Med. Colleges v. Princeton Rev., Inc*., 332 F. Supp. 2d 11, 19 (D.D.C. 2004).  The defense requires ROSS to show "that there has been an illegal extension of monopoly or other violation of the public policy underlying copyright law."  *Id.*  An example case where the narrow defense applied (which ROSS cites) is *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990).  There, a license agreement included sweeping language prohibiting the creation of a competing product, ***with or without the licensor's copyrighted content***.  *Id.* at 979 (license agreement prohibited licensee from "writ[ing], develop[ing],

---

[2]   Thomson Reuters Global Resources was the original claimant of certain of Plaintiffs' copyright registrations before Thomson Reuters Enterprise Centre GmbH was formed.  As reflected on the Certificate of Registration ROSS identified, TR-0034509, the registration was assigned.  It was assigned to Thomson Reuters Enterprise Centre GmbH, one of the two Plaintiffs in this lawsuit.  Thus, limiting ROSS's definition of "Thomson Reuters" to Thomson Reuters Enterprise Centre GmbH was entirely appropriate.  Nevertheless, if ROSS believes that a different entity is appropriate, it should say so and explain the basis for its belief that that entity should also be searched.

# KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 4

produc[ing] or sell[ing]" competing software or assisting others in "the writing, developing, producing, or selling" of such software without regard to whether licensor's copyrighted software was used to create such competing software).

Plaintiffs' license agreements are clearly not like the one in *Lasercomb*. Plaintiffs' General Terms and Conditions, which Plaintiffs **already produced**, provides that a subscriber "may not sell, sublicense, distribute, display, store or transfer [West's] products or any data in [its] products in bulk or in any way that could be used to replace or substitute for [its] products in whole or in part or as a component of any material offered for sale, license or distribution to third parties." TR-0002812, at para. 1(d); *see also* Dkt. 1 ¶ 18. Plaintiffs' Research Subscriber Agreement, which Plaintiffs also **already produced**, similarly provides that although a subscriber may "store, on a matter-by-matter basis, *insubstantial portions* of [Westlaw content]… in connection with an active matter being handled by Subscriber in its regular course of business," the amount stored must "(a) have no independent value other than as part of Subscriber's work product; and (b) c[an] not be used in any way in whole or in part as a substitute for any service or product provided by West." TR-0002827; *see also* Dkt. 1 ¶ 18. In other words, the subscriber agreements Plaintiffs rely on and **already produced** prohibit **the use of its copyrighted content** to create a competing product. It does not prohibit the creation of a competing product in general.[3]

**Second**, Plaintiffs' prohibition in its subscriber agreements against the use of its copyrighted content to create a competing product does not constitute copyright misuse. As the Supreme Court has held, "a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work." *Stewart v. Abend*, 495 U.S. 207, 229 (1990); *see also Ass'n of Am. Med. Colleges*, 332 F. Supp. 2d at 20 (discussing this language in dismissing copyright misuse claim). In other words, Plaintiffs have the right to refuse to license Westlaw to parties who would exploit their copyrighted content for purposes Plaintiffs have not authorized, including the purpose of creating a competing product. This makes sense from a public policy standpoint because if copyright holders could not refuse to license their works for use in competing products, they might choose not to license the product at all.

For example, in *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, which ROSS also cites, the Third Circuit found that Video Pipeline was unlikely to succeed on the merits of its

---

[3]   Plaintiffs' subscriber agreements also are not like the license agreement at issue in *Practice Management Information Corp. v. American Medical Association* for similar reasons. 121 F.3d 516, 520 (9th Cir. 1997) (copyright misuse defense established where licensing agreement required use of the licensor's copyrighted coding system and prohibited use of any other without regard to whether licensor's copyrighted software was used in the competing program), *amended*, 133 F.3d 1140 (9th Cir. 1998).

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 5

copyright misuse defense where Disney's licensing agreements "restrict[ed] expression by licensing the Disney trailers for use on the internet only so long as the web sites on which the trailers will appear do not derogate Disney," because "[t]he licensing agreements do not, for instance, interfere with the licensee's opportunity to express such criticism on other web sites or elsewhere." 342 F.3d 191, 206 (3d Cir. 2003), *as amended* (Sept. 19, 2003). As the court appreciated, "the misuse doctrine . . . should not be interpreted to require Disney, if it licenses its trailers for display on any web sites but its own, to do so willy-nilly regardless of the content displayed with its copyrighted works" because "such an application of the misuse doctrine would likely decrease the public's access to Disney's works because it might as a result refuse to license at all online display of its works." *Id.* Similarly, here, Plaintiffs have not interfered with its subscribers' ability to create a competing product in general. It has only prohibited the use of its copyrighted content to create a competing product. The misuse doctrine thus will not be applied in a way that requires Plaintiffs to allow the use of its content to create a competing product, as such an application would decrease the public's access to Plaintiffs' works.

Perhaps this is why ROSS did not allege in its Amended Answer that these provisions of Plaintiffs' subscriber agreements formed the basis of its copyright misuse counterclaim. Dkt. 24, Am. Answ., ¶¶ 138–146. Instead, ROSS's alleged basis for its misuse claim is that "[t]he key numbers and headnotes cannot be separated from the government edicts either when viewed on the platform or printed." *Id.* ¶ 142. But ROSS's mere speculation that additional documents (including "[a]ll settlement agreements" and "[a]ll templates of licenses, agreements, and contracts" related to Westlaw) might reveal some variance to the provisions of the subscriber agreements that Plaintiffs already produced cannot justify the sweeping, overbroad discovery that ROSS seeks. *See, e.g.*, *Brit. Telecommunications PLC v. IAC/Interactivecorp*, No. CV 18-366-WCB, 2020 WL 1043974, at *7 (D. Del. Mar. 4, 2020) ("Speculation that there is more will not suffice; if the theoretical possibility that more documents exist sufficed to justify additional discovery, discovery would never end. Instead of chasing the theoretical possibility that additional documents exist, courts have insisted that the documents that have been produced permit a reasonable deduction that other documents may exist or did exist and have been destroyed."); *see also* FED. R. CIV. P. 26(b)(1) (discovery must be relevant and proportional to the needs of the case). If ROSS believes there is a basis for its copyright misuse defense under the theory it articulated in its Amended Answer, it should say so so that Plaintiffs can determine the contours of proportional discovery.

Failing to justify the relevance and proportionality of its requests for its defense to Plaintiffs' copyright infringement claim, ROSS next claims that RFP Nos. 1, 3, 4, 32, 47–55, 57–65, 87, and 88 are relevant to Plaintiffs' tortious interference claim, because that claim requires "the existence of an enforceable contract" and ROSS "is entitled to discovery to test the enforceability of Thomson Reuters' interpretation and understanding of the provisions contained in the agreements and Thomson Reuters' policies, practices, and guidelines in including and

# KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 6

enforcing those provisions." ROSS's Letter, at 6; *see also id.* at 7–8. But, as noted above, Plaintiffs already produced the relevant subscriber agreements, and ROSS cites no authority for the idea that Plaintiffs' interpretation and understanding of its own agreements are relevant to showing the "existence of an enforceable contract and ROSS's knowledge of an enforceable contract." *Id.* To the contrary, it is contract law 101 that the meaning of a contract is understood by examining the four corners of the document itself. *See, e.g.*, *Ace Cap. v. Varadam Found.*, 392 F. Supp. 2d 671, 674 (D. Del. 2005) ("According to the well-settled rules of contract construction, 'the language of a contract is to be given its plain and ordinary meaning. Accordingly, where the provisions of a contract are plain and unambiguous, 'evidence outside the four corners of the document as to what was actually intended is generally inadmissible.'"). As those agreements are clear, Plaintiffs' "understanding" of the meaning of those terms is thus irrelevant as are wholly different contracts that are not at issue in this lawsuit. *See, e.g.*, *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 38 (D.D.C. 2012) (denying motion to compel production of contracts with third parties as "[Defendant] has not explained how the contracts are sufficiently similar to make the . . . interpretation of one binding on the other"); *see also Sun Pac. Mktg. Co-op., Inc. v. DiMare Fresh, Inc.*, No. 06 Civ. 1404, 2009 WL 4673900, at *11 (E.D. Cal. Dec. 4, 2009) (denying motion to compel production of third-party contracts as irrelevant where plaintiff argued that the contracts defendant had with third parties "may be relevant to the issue of [defendant's] interpretation of" a particular provision); *Freeman v. Witco Corp.*, No. 97 Civ. 1448, 1999 WL 389892, at *1 (E.D. La. June 11, 1999) (noting that "other contracts are irrelevant to this issue as it is the contract between GSS and Witco which controls here, not what GSS's habitual practice is. Further, interpretation of the contract is usually limited to the document itself. . . The court finds no relevance and the request is denied"). Nevertheless, if ROSS is willing to narrow the scope of RFP Nos. 1, 3, 4, 32, 47–55, 57–65, 87, and 88, Plaintiffs are willing to consider ROSS's proposal.

## B.    Vague and Ambiguous Objections to RFP Nos. 10–14

ROSS next contends that Plaintiffs' objection to the terms "structure, sequence, and organization and content" in RFP Nos. 10–14 as vague and ambiguous is improper. ROSS's Letter, at 6. ROSS demands an explanation for what Plaintiffs find vague and ambiguous about those terms and demands that Plaintiffs withdraw the objection. *Id.* To be clear, copyright protection can extend beyond literal elements of a work to the "structure, sequence, and organization" of those elements. *See Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222, 1248 (3d Cir. 1986). ROSS's RFPs Nos. 10–14 are vague and ambiguous because they speak of "structure, sequence, and organization *and content*," and Plaintiffs are unsure how ROSS intended "content" to relate back to the phrase "structure, sequence, and organization," which is a legal term of art in copyright law.

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 7

### C.     Objections to Producing the Entirety of the Westlaw Database in Response to RFP Nos. 10–15

ROSS next asserts that Plaintiffs objection to RFP Nos. 10–15 are improper because Plaintiffs have objected that those requests are overly broad and unduly burdensome to the extent they seek the "content" of the "WESTLAW DATABASE" but the "Westlaw Database, as used in these requests, is the same database that forms the basis for Thomson Reuters' copyright infringement claim."  ROSS's Letter, at 7 (citing Compl. ¶¶ 22–23).  Although it is true that Thomson Reuters "registers the database with the United States Copyright Office every three months," Compl. ¶ 22, Plaintiffs' infringement claim against ROSS does not cover the *entire* database but rather the "Westlaw Content" that Plaintiffs allege ROSS copied, which is defined as Plaintiffs' "West Key Number System ('WKNS') and West Headnotes."  Compl. ¶¶ 1, 34–35.  In other words, the Westlaw database is broader than the WKNS and West Headnotes that Plaintiffs allege ROSS copied.  That is why Plaintiffs agreed to produce "documents sufficient to show the structure, sequence, and organization of the WKNS and West Headnotes that were copied by Defendant," *see* Plaintiffs' Responses to RFP Nos. 10, 11, 13, 14, as well as "documents sufficient to show the purpose of Westlaw's structure and organization," Plaintiffs' Responses to RFP Nos. 12, 15, rather than agreeing to produce the entire database, which is overbroad and not proportional to the needs of the case in light of the scope of Plaintiffs' copyright claim.  In any case, we trust that your law firm has access to the Westlaw database and, thus, does not need Plaintiffs to produce it to you.

### D.     The Meaning of "Plaintiffs' content" in Plaintiffs' Responses to RFP Nos. 37, 41, 42, 94, 95, 96, 97, 98

ROSS next seeks clarification as to whether Plaintiffs agreement to produce documents showing "Plaintiffs' content," that ROSS and LegalEase copied as stated in Plaintiffs' Responses to RFP Nos. 37, 41, 42, 94, 95, 96, 97, and 98, is different from the "Westlaw Content" that Plaintiffs allege in the Complaint was copied.  ROSS's Letter, at 6.  Plaintiffs confirm that "Plaintiffs' content" as that term is used in Plaintiffs' Responses to RFP Nos. 37, 41, 42, 94, 95, 96, 97, and 98 includes the "Westlaw Content" that Plaintiffs allege in the Complaint was copied.  Plaintiffs are not withholding responsive documents based on the term "Plaintiffs' content."

### E.     Objections to RFP Nos. 48–54 (Licensing Agreements)

ROSS repeats its argument that Plaintiffs should produce their licensing agreements in response to RFP Nos. 48–54 because "Thomson Reuters must show . . . the existence of an enforceable contract and ROSS's knowledge of an enforceable contract."  ROSS's Letter, at 7.  As discussed above, Plaintiffs already produced the relevant agreements, which, for purposes of

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 8

analyzing Plaintiffs' tortious interference claim, will be understood by reference to the terms of the agreements themselves.  *See supra.*

ROSS further claims that "Thomson Reuters opened the door" to discovery into "any templates of licenses, agreements, and contracts relating to WESTLAW CONTENT or the WESTLAW PRODUCT" because Plaintiffs attached "what appears to be a template agreement to its Motion to Dismiss Opposition and represented that it was 'a true and correct copy of the Service Agreements [sic] entered into between West and LegalEase" despite the fact that the agreement itself was unexecuted.  ROSS's Letter, at 8 (citing Dkt. 16-1).  Again, Plaintiffs already produced the relevant agreements, including the one Plaintiffs attached to their Motion to Dismiss Opposition that ROSS is mischaracterizing as a "template." *Compare* Dkt. 16-1 (Research Subscriber Agreement from 12/1/2014) *with* TR-0002827 (same).  ROSS also incorrectly characterizes the agreement as "unexecuted."  Plaintiffs produced LegalEase's signed Order Forms for Westlaw, which expressly incorporates Plaintiffs' Subscriber Agreement by reference.  *See, e.g.*, TR-0002712; TR-0002724.  Plaintiffs are thus unsure what more ROSS could be looking for.

### F.      RFP No. 55 (Contracts with LegalEase)

ROSS's RFP No. 55 requested "All licenses, agreements, and contracts between YOU and LEGALEASE."  ROSS contends that Plaintiffs' Response to RFP No. 55 is impermissibly limited because Plaintiffs only agreed to produce "the contract with West that LegalEase breached and the agreement between West and LegalEase that settled the lawsuit between the them."  ROSS's Letter, at 8; *see also* Plaintiffs' Response to RFP No. 55.  Citing no authority, ROSS claims "[t]he full scope of RFP No. 55 is directly relevant to the parties' claims and defenses, including Thomson Reuters' tortious interference claim."

As an initial matter, it makes no sense why agreements that do not form the basis of Plaintiffs' tortious interference claim would be relevant to that claim.  And as repeatedly noted above, Plaintiffs already have produced the relevant agreements.  Nevertheless, and to eliminate any doubt, Plaintiffs confirm that they are not knowingly withholding any agreements between Plaintiffs and LegalEase and have produced the agreements with LegalEase within their possession, custody, or control that were located after a reasonably diligent search.

### G.      RFP Nos. 57–65 (Contracts with Judicial Entities, Federal Agencies)

ROSS asserts that Plaintiffs objected to RFP Nos. 57–65 "regarding Thomson Reuters contracts with judicial entities."  ROSS's Letter, at 8–9.  ROSS then points to a website that encourages judges to forward opinions the judges "recommend for reporting" on Westlaw as evidence that "Thomson Reuters may have agreements . . . with members of the judiciary," which ROSS claims "are relevant to ROSS's copyright misuse defense."  *Id.*

# KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 9

Without conceding whether any such "agreements" with judicial entities actually exist, as noted above, even if they did exist, the cases ROSS cites to show the relevance of any such agreements do not support its position because those cases (discussed *supra*) involved licenses that did not connect the prohibition on the creation or use of a competing product to the ***use*** of the copyright holder's copyrighted content (which is entirely appropriate).  If ROSS believes that the provisions of the agreements Plaintiffs already produced somehow constitute copyright misuse (which they do not), ROSS is free to try to make that argument.  But ROSS's mere hunch that additional contracts (including purported contracts with judicial entities) are likely to reveal some broader prohibition on the creation or use of a competing product in general (without reference to the use of Plaintiffs' copyrighted Westlaw Content) cannot justify the sweeping discovery that ROSS seeks, particularly when ROSS has not even alleged that its copyright misuse counterclaim is based on the provisions of any of Plaintiffs' agreement but rather on the idea that "[t]he key numbers and headnotes cannot be separated from the government edicts either when viewed on the platform or printed."  *See* Dkt. 24, Am. Answ., ¶¶ 138–146; *see also Brit. Telecommunications PLC*, 2020 WL 1043974, at *7.  Although ROSS claims that Plaintiffs' headnotes are mere "reproductions or derivative works of government edicts," ROSS's Letter, at 9, ROSS has not explained how purported agreements with judicial entities might show this theory to be true.

## H.    RFP Nos. 94 and 32 (When Plaintiffs Discovered Copying; Documents re ROSS)

ROSS's RFP No. 94 requested "All DOCUMENTS and COMMUNICATIONS evidencing when YOU discovered LEGALEASE allegedly copied and distributed WESTLAW CONTENT to ROSS" and Plaintiffs agreed in response to produce "documents showing LegalEase's copying and distribution of Plaintiffs' content."  *See* Plaintiffs' Response to RFP No. 94.

ROSS indicates a concern that Thomson Reuters "deliberately worded its responses in such a way to create needless ambiguities about what it is agreeing to produce and what it is withholding on the basis of its stated object[ion]."  ROSS's Letter, at 9.  To be clear, Plaintiffs are not attempting to create needless ambiguities.  Plaintiffs' documents showing LegalEase's copying and distribution of Plaintiffs' content that Plaintiffs have agreed to produce will also reveal when Plaintiffs' discovered LegalEase copied and distributed Plaintiffs' content.

ROSS also points to RFP No. 32, which requests documents relating "ROSS, including communications with LEXISNEXIS and any third party" and Plaintiffs agreed to produce "documents relating to Defendant's alleged copying and relationship with West and LegalEase that are located after a reasonably diligent search, if any."  Requests for all documents and

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 10

communications mentioning a particular party or company like ROSS's RFP No. 32 are overbroad. *See, e.g., Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649–650 (10th Cir. 2008) (affirming district court's finding that a "kitchen sink request" for "all documents . . . that refer to, mention or relate in any way to Plaintiff, Whitlock, or the litigation or the allegations, facts and circumstances concerning the litigation" was "overly broad"); *Kobelco Metal Powder of Am., Inc. v. The Energy Co-op., Inc.*, 01 Civ. 0051, 2001 WL 1397311, at *4 (S.D. Ind. Oct. 30, 2001) (denying motion to compel request for "all documents" that "relate to . . .The Energy Cooperative II, Inc. or any other corporation, association, company, or entity of any sort that uses the words 'Energy Cooperative' in its moniker," which was "overly broad"). Plaintiffs are willing to meet and confer on the scope of this request.

I.      **RFP Nos. 81 and 82 (Patents re Westlaw)**

RFP Nos. 81 and 82 requested "All Patents," including the "prosecution history of any such patent" that Plaintiffs hold relating to the "WESTLAW CONTENT" and "WESTLAW PRODUCT." Plaintiffs objected on several grounds, including without limitation on the ground that these requests "seek[] documents that are publicly available or to which ROSS has equal access, and therefore are equally or less burdensome for ROSS to procure for itself." Plaintiffs' Responses to RFP Nos. 81, 82. Plaintiffs thus responded that "Plaintiffs will not produce documents responsive to [RFP Nos. 81 and 82] as they are available through the Patent and Trademark Office." *Id.* ROSS claims that this objection is not proper as "many documents responsive to RFP Nos. 81–82 may not be available from the USPTO and are solely within the possession, custody, and control of Thomson Reuters." ROSS's Letter, at 10.

As an initial matter, ROSS has not explained why documents relating to patents on Westlaw (public or non-public) are relevant to Plaintiffs' copyright infringement and tortious interference claims, or any of ROSS's defenses. It is ROSS's burden to do so, as Plaintiffs also objected on relevance grounds. *See Invensas Corp.*, 2013 WL 12146531, at *2; Plaintiffs' Responses to RFP Nos. 81, 82. In any case, courts will not require a party to produce public documents that are equally available to the other party. *See, e.g., BYLT, LLC v. B.Y.L.T. Performance, LLC*, No. 8:18 Civ. 02194, 2019 WL 6330695, at *2 (C.D. Cal. Aug. 12, 2019) ("Defendant does not need to print and produce public documents on file with the Patent and Trademark Office."); *Am. Needle, Inc. v. New Orleans*, No. 04 C 7806, 2012 WL 4327395, at *8 (N.D. Ill. Aug. 17, 2012) ("Defendants need not produce documents that are a matter of public record.").[4]

---

4    *Eon Corp. IP Holdings v. FLO TV Inc.* is inapposite. There, the Defendant objected to producing documents related to third-party patent applications that "it did not develop" and which were "publicly available documents which are equally available to both parties" as well as documents related to the accused applications, which Defendant objected to on

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 11

Plaintiffs hold or have held numerous patents related to Westlaw that cover functionality and features that have nothing to do with the copyrighted content at issue in this lawsuit. And indeed, many of Plaintiffs' patents are now expired. The non-public documents related to Plaintiffs' patents are going to be privileged. If ROSS believes there are patents on Westlaw features that implicate the issues in this lawsuit (and ROSS believes the documents related to those patents are not public), ROSS should identify the patents and features it believes are relevant for Plaintiffs' consideration.

## III.   REQUEST FOR A MEET AND CONFER ON ROSS'S RFPS

ROSS indicates that "[i]n response to RFP Nos. 11, 14, 17, 20, 23, 30, 56, and 67, Thomson Reuters stated it is willing to meet and confer to discuss the scope of the request" and that ROSS "welcomes the opportunity to confer" on these RFPs and the other issues ROSS's Letter raises. ROSS's Letter, at 10. Plaintiffs are willing to discuss RFP Nos. 11, 14, 17, 20, 23, 30, 56, and 67, along with any other issues unresolved by this letter.

## IV.   PLAINTIFFS' RESPONSES TO ROSS'S INTERROGATORIES

ROSS's Interrogatory No. 1 asked Plaintiffs to "IDENTIFY the specific portions of the WESTLAW CONTENT that [Plaintiffs] claim is subject to copyright that ROSS INFRINGES." To answer this Interrogatory, Plaintiffs needed ROSS and LegalEase to produce the memoranda that LegalEase created using Westlaw. ROSS unilaterally demanded that Plaintiffs supplement their response to Interrogatory No. 1 by August 6, 2021. As an initial matter, the Scheduling Order entered by Judge Stark indicates that "Defendant may serve an [infringement] interrogatory—which Plaintiffs may supplement pursuant to Rule 26(e) as additional information becomes available." Dkt. 41, at 2. That is exactly what Plaintiffs are doing, and no deadline was set for Plaintiffs' supplement. *Id.* Moreover, as your letter concedes, ROSS did not provide password access to open ROSS's production until July 15, 2021. Given the large size of ROSS's first three production volumes, which apparently included more than 230,000 documents, it took several days for ROSS's data to be ingested into Plaintiffs' discovery database by its discovery vendor. Plaintiffs could not begin reviewing the memoranda ROSS produced until the data ingestion process was completed.

---

different grounds. No. 10-812 (RGA), 2013 WL 5882005, at *2 (D. Del. July 18, 2013), *R&R adopted,* No. CV 10-812-RGA, 2013 WL 5883759 (D. Del. Oct. 30, 2013). The court did not order Defendant to produce documents related to the third party applications and only compelled Defendant to produce documents related to the accused applications, but Defendant did not raise a publicly available objection as to those documents. *Id.* at *4.

## KIRKLAND & ELLIS LLP

Kayvan M. Ghaffari
August 25, 2021
Page 12

Of the 232,484 documents that ROSS produced, it appears that approximately 20,000 of those are memoranda that ROSS received from LegalEase.  It also appears that roughly 7,000 of those 20,000 memos are *outside* of the bates range ROSS specifically identified in its response to Plaintiffs' Interrogatory No. 2 (ROSS-000000001-ROSS-000175081) as "the legal memoranda received from LegalEase."  Separately, LegalEase has produced its own set of memoranda to Plaintiffs in response to Plaintiffs' subpoena.[5]  Between ROSS and LegalEase, there appear to be more than 47,000 memos for Plaintiffs to review, and Plaintiffs are not sure to what extent, if any, the memoranda LegalEase produced overlap with ROSS's productions.  Plaintiffs have been working diligently to confirm the universe of memoranda across both ROSS's and LegalEase's productions, and to de-dupe accordingly, so that Plaintiffs can prioritize and review those documents first before the roughly 212,000 documents that remain for review in ROSS's productions.

Plaintiffs intend to supplement their response to Interrogatory No. 1 as soon as possible upon completion of the review of the memoranda, but this process will take longer than the arbitrary August 6, 2021 deadline that ROSS has set.

\*     \*     \*

The foregoing is not intended to be a full and complete recitation of Plaintiffs' position with respect to any discovery issues.  Plaintiffs hereby expressly reserve, and do not waive, all of its rights and remedies in connection with these issues.

Sincerely,

*Megan L. McKeown*

Megan L. McKeown

---

[5]   Plaintiffs produced LegalEase's documents to ROSS on August 6, 2021 as LEGALEASE-00000001 through LEGALEASE-00171816.  ROSS should promptly produce to Plaintiffs any documents it has received from LegalEase in response to its own subpoena.  *See* Fed. R. Civ. P. 45, Committee Notes on Rules – 2013 Amendment ("Parties desiring access to information produced in response to the subpoena will need to follow up with the party serving it . . . to obtain such access. . . The party serving the subpoena should in any event make reasonable provision for prompt access.").

# EXHIBIT C

3 Embarcadero Center, 26th Floor, San Francisco, CA  94111 ▫ p415 986-2800 ▫ f415 986-2827



Kayvan Mason Ghaffari
(415) 365-7223
KGhaffari@crowell.com

October 4, 2021

*VIA ELECTRONIC MAIL*

Megan L. McKeown
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
megan.mckeown@kirkland.com

Re:     ***Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence, Inc.***, Case No. 20
        **Civ. 613 (LPS)**

Ms. McKeown:

I write on behalf of ROSS Intelligence, Inc. ("ROSS") in response to your August 25, 2021,
letter on behalf of Plaintiffs Thomson Reuters Enterprise Centre GmbH and West Publishing
Corporation (collectively, "Thomson Reuters" or "Plaintiffs"), regarding Plaintiffs' deficient
discovery responses to ROSS's First Set of Requests for Production ("RFP") and First Set of
Interrogatories.

## I.      Plaintiffs' Objections to ROSS's RFPS

Plaintiffs claim that their general objections are proper and that ROSS failed to identify
which objections or category of objections are "'boilerplate' and 'improper.'" *See* 2021.08.25 M.
McKeown Ltr. at 1. ROSS did not specifically identify each objection or category of objections
that are boilerplate because ROSS's letter was clear that Plaintiffs' general objections as it relates
to *each* RFP are improper.  *See* 2021.08.03 K. Ghaffari Ltr. at 1. More specifically, Plaintiffs'
responses to individual RFPs impermissibly incorporates the General Objections but fail to
identify which of those General Objections Plaintiffs rely upon in responding to a specific request.
This is improper. *See* Fed. R. Civ. P. 34(b)(2)(B); *see also Illinois Nat'l Ins. Co. v. Cornett*, No.
1:20-CV-00008, 2021 WL 1376570, at *3 (D.V.I. Apr. 12, 2021) ("The amended provisions make
clear that boilerplate objections, that is, objections 'that merely state the legal grounds for objection
without specifying how the discovery request is deficient,' *Michigan Auto. Ins. Placement Facility
v. New Grace Rehabilitation Ctr.*, PPC, No. 4:17-CV-11007-TGB-DRG, 2109 WL 355654, at *2
(E.D. Mich. Jan. 29, 2019), if they were, are no longer allowed. *Id.* ('Rule 34(b)(2)(B) of the
Federal Rules of Civil Procedure plainly disallows boilerplate objections to discovery requests and

Megan McKeown
October 4, 2021
Page 2

requires parties to 'state with *specificity* the grounds for objecting to the request, including the reasons.'")).

As just one example of many, in RFP No. 1, Plaintiffs state that "Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein." Plaintiffs then identify a separate set of objections as a basis for its improper withholding of relevant information. *See* 2021.08.25 M. McKeown Ltr. at 1. Similarly, Plaintiffs do the same for other requests.  Plaintiffs appear to agree to produce at least some documents in response to a request, but then incorporate objections so that it is unclear whether Plaintiffs are withholding documents that are otherwise responsive. This is improper.

At the least, ROSS will consider not pushing further on this issue if Plaintiffs expressly state that if an objection is not specifically identified, then Plaintiffs are not relying on such objection as a basis for withholding documents.

Next, Plaintiffs assert that ROSS should propose a "reasonable period of time for Plaintiffs' consideration (*e.g.*, 2015 to present)." *See* 2021.08.25 M. McKeown Ltr. at 2. For starters, Plaintiffs cannot ignore that their requests pose the same purported problems. In any event, ROSS cannot propose a reasonable period of time or geography for several reasons. First, Plaintiffs' purported copyrights extend or nearly a century in time. Second, Plaintiffs have developed the West Headnote and West Key Number System ("WKNS") during that same period. *See e.g.*, D.I. 1, ¶ 15 ("Westlaw incorporates decades of search and editorial intelligence with the latest technological innovations to bring its subscribers the most comprehensive legal research platform on the market."). Third, Plaintiff Thomson Reuters Enterprise Centre Gmbh is based in Switzerland, and Thomson Reuters Global Resources, a copyright claimant for many copyrights, appears to be based in Switzerland. *See e.g.*, TR-0012744. The registrant for certain copyrights is based in Ireland. In short, the allegations of Plaintiffs' complaint describe and set the temporal and geographical limitations. ROSS is asking for no more in terms of temporal or geographic scope than Plaintiffs placed at issue.

Finally, Plaintiffs claim that "present and former officers, directors, employees, attorneys, agents, representatives, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purported to act on its behalf," which is included in ROSS's definitions for "Thomson Reuters," "West," "LegalEase," and "LexisNexis" are over broad. *See* 2021.08.25 M. McKeown Ltr. at 2.  Plaintiffs suggest ROSS offer a narrow definition for its consideration. ROSS reasonably expects that these entities may have changed ownership, affiliation, or the like over the course of Plaintiffs' alleged copyrights. Indeed, Plaintiffs have produced documents showing a separate entity, Thomson Reuters Global Resources, is the copyright claimant for many copyrights. *See e.g.*, TR-0018733; TR-0020504.[1] If there is some

---

[1] Plaintiffs further argue that ROSS's definition of "Thomson Reuters" is overbroad because Thomson Reuters Global Research purportedly assigned at least one copyright registration to

Megan McKeown
October 4, 2021
Page 3

specific issue that concerns Plaintiffs, ROSS welcomes a discussion to avoid some specific issue. Otherwise, ROSS will not unilaterally propose a different definition unknowing of its potential consequences.  Finally, ROSS's position is well-taken given that Plaintiffs have used the same framing in their document requests and interrogatories. There must be some specific reason Plaintiffs ask for dispensation from a definition they used. Please tell us why, and we will consider in light of the facts provided.

Further, *Cywee Grp. Ltd. v.Huawei Device Co.*, No. 2:17 Civ. 495, 2018 WL 4100763, at *2 (E.D. Tex. July 13, 2018), is unhelpful.  The district court in that matter was carefully weighing the scope of those requests against the need for foreign discovery. That "particularized analysis" is neither relevant nor needed here.

## II.  Plaintiffs' Specific Responses to ROSS's RFPs

### a.  Objections to RFP Nos. 1, 3, 4, 32, 47-55, 57-65, 87, and 88 (Settlement Agreements, Access to Westlaw, Templates of Licenses, Agreements, and Contracts Related to Westlaw)

Plaintiffs claim that ROSS's position that the RFPs identified above are relevant to ROSS's copyright misuse defense is a fishing expedition and that the use of copyright misuse is limited in scope that does not apply here. *See* 2021.08.25 M. McKeown Ltr. at 3-6. Though these documents are relevant to copyright misuse, they are also relevant to Plaintiffs' copyright infringement. Therefore, Plaintiffs' basis for withholding documents is improper.

First, Plaintiffs conflate its burden to show a lack of relevance with a motion to dismiss standard. *See In re MiMedx Grp. Sec. Litig.*, No. 15-84-RGA, 2015 WL 5445140, at *4 (D. Del. July 17, 2015) ("Courts in this circuit have broadly construed Fed. R. Civ. P. 26(b)(1) to encompass 'any matter that bears on, or that reasonably could bear on, any issue that is or *may be* in [the] case.' Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case. Rather, discovery requests may be deemed relevant if there is *any possibility* that the information may be relevant to the *general subject matter of the action*.") (citations omitted) (emphasis in original). Therefore, Plaintiffs'

---

Plaintiff Thomson Reuters Enterprise Centre GmbH. *See* M. McKeown Ltr. at 3, n.2. However, nothing contained in TR-0034509 indicates that copyright registration was specifically assigned to Plaintiff Thomson Reuters Enterprise Centre GmbH, which is a company based in Switzerland. Moreover, ROSS is unable to test the veracity of Plaintiffs' self-serving statements in a conferral letter – especially as it relates to all copyright registrations listing Thomson Reuters Global Resources as the claimant – without the actual written assignment documentation. Even so, given that Thomson Reuters Global Resources was the original copyright claimant, discovery into Thomson Reuters Global Resources is appropriate.

Megan McKeown
October 4, 2021
Page 4

belief that ROSS does not have a valid copyright misuse defense is not a ground to withhold otherwise relevant documents.

Moreover, ROSS has extensively addressed the relevance of these RFPs as it relates to both the copyright claim and copyright misuse defense. *See* 2021.08.03 K. Ghaffari Ltr. at 3-4. Plaintiffs seem to forget that copyright misuse can be shown with anticompetitive conduct and that is the matter in which ROSS seeks to prove its claim. Plaintiffs cannot control that by trying to limit discovery because of the pending motion to dismiss on ROSS's counterclaims. However, in the spirit of resolving this dispute and focusing on the merits of the case, ROSS does so again. With the exception of the RFPs listed immediately below, the remaining RFPs are addressed later in this letter. Plaintiffs take issue with the following RFPs:

- RFP No. 1: "All settlement agreements between You and LexisNexis."
- RFP No. 3: "All settlement agreements between You and any third-party relating to the Westlaw Content, including without limitation the Key Number System and Headnotes."
- RFP No. 4: "All settlement agreements between you and any third-party relating to any aspect of the Westlaw Product you contend or have contended is protected by copyright."
- RFP No. 47: "All documents and communications relating to your allegation that 'ROSS needed to acquire vast amounts of legal content, descriptions of that content, and a means by which to organize that legal content' as alleged in Complaint ¶ 22."
- RFP No. 87: "All documents and communications, including without limitation board meeting minutes, describing your strategy to license the Westlaw Product to any third party."
- RFP No. 88: "All documents and communications, including without limitation board meeting minutes, describing your strategy to license the Westlaw Content to any third party."

The settlements agreements requested in RFP Nos. 1, 3-4 are relevant to both the copyright claim *and* copyright misuse defense. As to the copyright claim, those documents are relevant to show Plaintiffs' understanding of the scope of their alleged copyright. *See* 2021.08.03 K. Ghaffari Ltr. at 5. Additionally, ROSS has consistently stated that Plaintiffs' conduct impermissibly extends their alleged copyright over government edicts. These documents are also relevant to show how Plaintiffs settled disputes with third-parties as it relates to Westlaw Content and the enforcement of the same, including language either permitting, prohibiting or limiting those parties from using Westlaw Content in a particular way. *See id.* at 5.

Likewise, any board meeting minutes (RFP Nos. 87-88) that describe, for example, the strategy to register certain works for copyright protection or to license products to any third party, are relevant to Plaintiffs' copyright claims and are relevant to copyright misuse for the reasons explained above.

Megan McKeown
October 4, 2021
Page 5

Further, RFP No. 47 requests documents and communications based on Plaintiffs' specific allegations in the Complaint. So, it is unclear why Plaintiffs refuse to produce these documents based on a relevance objection. Plaintiffs claim that "ROSS needed to acquire vast amount of legal content, descriptions of that content, and a means by which to organize that legal content." *See* D.I., 1 at ¶ 22. That statement goes directly to Plaintiffs' alleged claim of copyright infringement against ROSS and is certainly relevant. Therefore, Plaintiffs' objection is baseless, and ROSS is entitled to the documents and communications supporting Plaintiffs' claim of infringement in ¶ 22 of the Complaint.

Therefore, these requests are all directly related to either or both the copyright infringement or copyright misuse defense.

### b. Vague and Ambiguous Objections to RFP Nos. 10–14

Plaintiffs claim that they are unsure how "content" relates back to "structure, sequence, and organization" in the phrase "structure, sequence, and organization and content." *See* 2021.08.25 M. McKeown Ltr. at 6. Plaintiffs' position assumes "content" relates to the phrase "structure, sequence, and organization." "Content" as used in RFP Nos. 10-14 means simply the content of the Westlaw Database. ROSS assumes there is "content" that supports Plaintiffs' copyright claims, including its theories as to the "structure, sequence, and organization" of the Westlaw Database. While "structure, sequence, and organization" is a legal term of art, that term is meaningless without any content supporting the existence of a purported "structure, sequence, and organization." Hearing Tr. at 35:3-8 (Oct. 30, 2020) (stating that Plaintiff "also have a copyright in the compilation that [Plaintiffs] ***created***…the entire structure, sequence, and organization that ***[Plaintiffs] put together to find, analyze, to explain the law***.") (emphasis added). Moreover, because ROSS does not know the universe of Plaintiffs' claimed copyrighted material, it is unable to specifically identify what Plaintiffs are alleging is protected by copyrights. Given this clarity, ROSS expects Plaintiffs to withdraw their objection and file supplemental responses to RFP Nos. 10-14.

### c. Objections to Producing the Entirety of the Westlaw Database in Response to RFP Nos. 10–15

ROSS appreciates Plaintiffs confirming that their copyright infringement claim is limited only to West Headnotes and the WKNS, and that Plaintiffs do not allege ROSS infringed any information, data, content, and/or materials outside of the Headnotes and WKNS that may be contained in the Westlaw Database. *See* 2021.08.25 M. McKeown Ltr. at 7. However, ROSS remains concerned that Plaintiffs are only producing documents "sufficient" to show the Westlaw Content that ROSS allegedly copied. *Id*. That is insufficient. ROSS is entitled to understand the full scope of the allegations against it and to test the veracity of those allegations. There is no other means by which ROSS can appropriately defend itself against Plaintiffs' copyright infringement claims.

Megan McKeown
October 4, 2021
Page 6

Your letter does suggest that Plaintiffs do not know what portions of the "Westlaw Content" ROSS purportedly infringed. *See* 2021.08.25 M. McKeown Ltr. at 11 ("To answer this Interrogatory, Plaintiffs needed ROSS and LegalEase to produce the memoranda that LegalEase created using Westlaw."). Whatever imperfect knowledge may exist at this stage, Plaintiffs must produce all they presently know, including what it knew of ROSS's purported infringement prior to the filing of the Complaint and not merely documents sufficient to show what is a central claim of the case. Moreover, given that Plaintiffs have an obligation to update its interrogatory responses over time, we are confident that Plaintiffs will provide the full basis for its claim that ROSS is liable for copyright infringement.

      **d.**      **The Meaning of "Plaintiffs' content" in Plaintiffs' Responses to RFP Nos. 37, 41, 42, 94, 95, 96, 97, 98**

Plaintiffs confirmed that "Plaintiffs' content" as used in Plaintiffs' responses to RFP Nos. 37, 41, 42, 94, 95, 96, 97, and 98 includes "Westlaw Content," as alleged in the Complaint. See 2021.08.25 M. McKeown Ltr. at 7. Therefore, ROSS considers this issue resolved at present, but ROSS reserves its right to seek the full scope of discovery under the RFPs at a later date should it be warranted.

      **e.**      **Objections to RFP Nos. 48–54 (Licensing Agreements)**

Plaintiffs claim that they have already produced the relevant agreements and that for purposes of the tortious interference claim, whether those agreements are enforceable will be clear from the agreements themselves. *See* 2021.08.25 M. McKeown Ltr. at 8. First, Plaintiffs cannot limit ROSS's entitlement to these agreements to Plaintiffs' claim for tortious interference. In addition to ROSS's antitrust counterclaims, which discovery is currently stayed, ROSS also has defenses, including one for copyright misuse. By Plaintiffs' own admissions, the licensing agreements include language prohibiting a licensee from creating a competitive product. *See* D.I. 1, at ¶¶ 18-19 ("As these restrictions show, although Westlaw subscribers are permitted to use Westlaw in certain ways, they are expressly prohibited from using Westlaw Content to create a competitive product or to sell the Plaintiffs' proprietary content to others."). Therefore, ROSS is entitled to the licensing agreements.

Additionally, ROSS is entitled to documents showing how Plaintiffs interpret the terms of their licensing agreements, and specifically those terms limiting subscribers' use of Westlaw Content, prohibiting the ability to make a competing product and refusing to permit access to competitors. Plaintiffs' claim that the agreements themselves are enough is insufficient. The standard is relevance not admissibility. *See e.g.* Fed. R. Civ. Pro. R. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."). Therefore, discovery is not limited to the agreements themselves – ROSS is entitled to any extrinsic evidence showing how Plaintiffs interpret the restrictive terms within their licensing agreements. *See Ferro v. Atl. City Showboat, Inc.*, No. CV 08-375 (JBS/JS), 2009 WL

Megan McKeown
October 4, 2021
Page 7

10690439, at *2 (D.N.J. July 13, 2009) ("[I]t is inappropriate to deny discovery of parol evidence simply because it may be inadmissible at trial.") (collecting cases); *see also Foster Poultry Farms v. AISLIC*, No. 1:04CV5930 REC DLB, 2005 WL 8176421, at *2 (E.D. Cal. Aug. 22, 2005) (permitting discovery into parol evidence because it was relevant to understanding the meaning of the terms). Accordingly, any extrinsic evidence showing how Plaintiffs interpreted the terms within the agreements are both discoverable and relevant.

### f.       RFP No. 55 (Contracts with LegalEase)

Plaintiffs confirmed that they "are not knowingly withholding any agreements between Plaintiffs and LegalEase and have produced the agreements with LegalEase within their possession, custody, or control that were located after a reasonably diligent search." See 2021.08.25 M. McKeown Ltr. at 8. Therefore, ROSS considers this issue resolved at present, but ROSS reserves its right to seek the full scope of discovery under this RFP at a later date should it be warranted.

### g.       RFP Nos. 57–65 (Contracts with Judicial Entities, Federal Agencies)

Plaintiffs' basis for not producing responsive documents to RFP Nos. 57-65 is because ROSS cannot show the relevance of the documents and that its copyright misuse claim is based on the idea that "[t]he key numbers and headnotes cannot be separated from the government edicts either when viewed on the platform or printed." *See* 2021.08.25 M. McKeown Ltr. at 9. Plaintiffs have brought a copyright infringement case against ROSS. ROSS is entitled to these documents because they are relevant and necessary to show what Plaintiffs receive prior to Plaintiffs' adding any Key Numbers and Headnotes to the judicial opinions. Also, ROSS is aware that some courts provide its own headnotes. ROSS is entitled to those raw judicial opinions that Plaintiffs receive from judicial entities and federal agencies.

Further, ROSS is entitled to these agreements to assess if they contain anticompetitive language. *See Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990). The fact that ROSS's counterclaim does not specifically allege that Plaintiffs' Subscriber Agreements contained anticompetitive language does not prohibit ROSS from obtaining discovery. *See Preferred Carolinas Realty, Inc. v. Am. Home Realty Network, Inc*., No. 1:13CV181, 2014 WL 1320133, at *3 (M.D.N.C. Mar. 28, 2014) (citing Fed.R.Civ.P. 26 advisory committee's notes, 2000 Amendment, Subdivision (b)(1)) ("[T]he commentary to the Rules indicates that '[a] variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.'").

Additionally, ROSS is not required to take Plaintiffs' word that the agreements with the judiciary and federal agencies do not constitute copyright misuse. ROSS is entitled to examine and assess documents to make its own determination of how the documents may support a claim or defense. Because those agreements are relevant to ROSS's copyright misuse defense, they are

Megan McKeown
October 4, 2021
Page 8

discoverable and should be produced. *See In re MiMedx Grp. Sec. Litig.*, 2015 WL 5445140, at
*4. Accordingly, ROSS requests that Plaintiffs withdraw their objections and supplement these
responses.

> **h.     RFP Nos. 94 and 32 (When Plaintiffs Discovered Copying; Documents
> re ROSS)**

With respect to RFP No. 94, Plaintiffs state that "Plaintiffs' documents showing
LegalEase's copying and distribution of Plaintiffs' content that Plaintiffs have agreed to produce
will also reveal when Plaintiffs' discovered LegalEase copied and distributed Plaintiffs'
content." *See* 2021.08.25 M. McKeown Ltr. at 9. Therefore, ROSS considers this issue resolved
at present, but ROSS reserves its right to seek the full scope of discovery under this RFP at a
later date should it be warranted.

Plaintiffs, however, continue to refuse to produce documents as it relates to RFP No. 32
but offered to meet on the scope of this request. ROSS invites a meet and confer on RFP No. 32.

> **i.     RFP Nos. 81 and 82 (Patents re Westlaw)**

Plaintiffs state that they will not produce responsive documents because they are
available through the Patent and Trademark Office. *See* 2021.08.25 M. McKeown Ltr. at 10.
Plaintiffs further claim that ROSS has not articulated the relevance of these documents to
Plaintiffs' claims or ROSS's defenses. *Id.* First, as Plaintiffs rightfully note, "Plaintiffs hold or
have held numerous patents related to Westlaw that cover functionality and features." *Id.* at 11.
There are millions of patents publicly available at the Patent and Trademark Office. However,
ROSS does not know which patents Plaintiffs have that relate to "Westlaw functionality and
features" such as WKNS and Headnotes. It would more burdensome for ROSS to search through
Plaintiffs' "numerous" patents to discover which are relevant to Westlaw Content. Plaintiffs are
in a position to provide that information much faster and efficiently.

Further, any patents and prosecution history relating to the Westlaw Content – WKNS
and Headnotes – are relevant to this lawsuit because those patents would bear on Plaintiffs'
alleged originality and creativity. ROSS is entitled to know what, if any, patents exist that have
any connection or relation, however small, to the Westlaw Content ROSS is accused of
infringing.

**III.     Plaintiffs' Responses to ROSS's Interrogatories**

In response to Interrogatory No. 1, Plaintiffs claim they do not know the universe of
ROSS's alleged infringement. *See* 2021.08.25 M. McKeown Ltr. at 11.  Plaintiffs' response is
inexcusable for a few reasons.

Megan McKeown
October 4, 2021
Page 9

Whether true or not, ROSS is entitled to know all that Plaintiffs know at this stage. Plaintiffs have an obligation to supplement their responses, and ROSS assumes that Plaintiffs will fulfill that obligation.  ROSS need not await some level of perfect knowledge to obtain a response.

Also, this is not the first time Plaintiffs have reviewed ROSS's documents.  See West Publishing Corp. v. LegalEase Solutions, LLC, Case No. 18-cv-01445-DSD (D. Minn. May 25, 2018) (the "LegalEase Case"). In that case, prior to West moving to compel ROSS to produce documents concerning ROSS and LegalEase's relationship, ROSS produced nearly 40,000 documents relating to the development of its legal research algorithms and platforms. See LegalEase Case, D.I. 62 & D.I. 74 at 2. Plaintiffs' characterization that they just gained access to the necessary documents is not valid in light of this. Plaintiffs have had access to ROSS's documents for over a year. Plaintiffs further must have had a factual basis prior to filing their Complaint. ROSS is entitled to discovery of such basis.

*   *   *

ROSS is willing to meet and confer on the issues raised herein the week of October 11. ROSS reserves all rights and waives none.

Sincerely,

*Kayvan M. Ghaffari*

Kayvan M. Ghaffari

# EXHIBIT D

**Berry, Crinesha**

| | |
|---|---|
| **From:** | Berry, Crinesha |
| **Sent:** | Wednesday, December 22, 2021 2:29 PM |
| **To:** | McKeown, Megan L. |
| **Cc:** | ROSS Lit Team; *sobyrne@potteranderson.com; *dmoore@Potteranderson.com1; Ghaffari, Kayvan; #Thomson-Ross; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com |
| **Subject:** | RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence |
| **Attachments:** | 2021.12.22 Joint Letter.docx |

Megan,

ROSS disagrees with Plaintiffs' arguments herein. Further, ROSS notes that throughout the conferral process, ROSS has provided several reasons supporting its request for the settlement agreements in addition to the reason discussed on our telephonic conferral last week. Those arguments are clearly laid out in the parties' back-and-forth.

As to the joint letter, we've accepted all changes and will file today.

Thanks,
Crinesha

---

**From:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Sent:** Wednesday, December 22, 2021 8:07 AM
**To:** Berry, Crinesha <CBerry@crowell.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; Ghaffari, Kayvan <KGhaffari@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

External Email

Dear Crinesha,

We write further to our meet and confer last Thursday.  We understand from our conversation and your December 16 email that ROSS believes Plaintiffs' settlement agreements are relevant because ROSS has doubts about Plaintiffs' ownership of the copyrights and believes those agreements would show which entity has been asserting ownership of the copyrights in Westlaw content in other cases.  This makes no sense, because, regardless of what may have been listed about copyright ownership in settlement agreements in the past, as we explained on the call, the copyrights have all been assigned to Thomson Reuters Enterprise Centre GmBh ("TREC") and we've already produced the relevant agreements showing those transfers.  In any case, that other entities (e.g. West Publishing) may have asserted ownership of the copyrights at one point in the past is irrelevant because settlement agreements with other parties do not prove ownership by anyone (whether Thomson Reuters, West Publishing, or some other entity); at best they show the settlement agreement's parties' rights against each other.  They do not show the copyright holder's rights against the world and have no effect on non-parties to those agreements (like ROSS).  As Warrington confirmed on our call that the agreements we produced have been reviewed, can ROSS please explain why, having reviewed those agreements, it still believes that TREC is not the copyright owner?

Regarding the scope of Plaintiffs' copyrights, we reviewed the portions of the October 30, 2020 motion to dismiss hearing transcript that you flagged for our attention.  The transcript is consistent with the plain reading of Plaintiffs' copyright registrations, as well as how Plaintiffs have articulated the scope of the registrations with the Court and ROSS throughout this case.  Plaintiffs' copyright registrations cover the original and revised text and compilation of legal material authored by West, and explicitly do not cover any government edicts, such as legislative enactments, judicial decisions, etc.

Nothing Ms. Cendali said was inconsistent with this.  Indeed, Plaintiffs sued on all of the protectable material in Westlaw that is covered by Plaintiffs' registrations because, as Ms. Cendali stated at the hearing, "without discovery, we [couldn't] look behind the curtain and see what it was that [ROSS] did."  Tr. 46:11-15.  Now that discovery has begun and we've reviewed ROSS's documents, we recently served a supplemental interrogatory response to Interrogatory No. 1 that describes in detail what Plaintiffs claim is subject to copyright that Plaintiffs are aware of that ROSS infringed.  We thus respectfully refer ROSS to Plaintiffs' supplemental interrogatory response as it is the latest articulation of Plaintiffs' copyright claim.  In case it's helpful, we confirm that we are not knowingly withholding information in response to that interrogatory regarding the scope of Plaintiffs' copyright claim and ROSS's infringement.

Regarding the briefing schedule, the dates ROSS proposes for the initial and responsive letter briefs are workable to us (which I've pasted below), but we disagree that ROSS should have the opportunity to reply.  Judge Stark's standard practice and the Scheduling Order to which the parties agreed does not include a reply for discovery dispute letters.   *See* Dkt. 41, at 10.  Instead, Judge Stark will order further briefing should he find "further briefing necessary." *See id.*  We've thus removed the reply date from the below schedule and the attached joint letter that you circulated.  With these edits incorporated, you have our permission to file the joint letter.

- Initial Letter Brief  (ROSS) – 01/05/22
- Responsive Letter Brief (Plaintiffs) - 01/10/22

We will respond separately regarding the remaining issues in your email below.

Thank you,

Megan

**Megan L. McKeown**
_____
**KIRKLAND & ELLIS LLP**
609 Main St, Houston, TX 77002
**T** +1 713 836 3499
**F** +1 713 836 3601
_____

megan.mckeown@kirkland.com

**From:** Berry, Crinesha <CBerry@crowell.com>
**Sent:** Tuesday, December 21, 2021 6:38 PM
**To:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; Ghaffari, Kayvan <KGhaffari@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

Hi Megan –

Please find attached a joint letter we intend to file with Judge Stark tomorrow. As discussed during our telephonic conferral last Thursday, ROSS will move to compel on Plaintiffs' responses and objections to RFP Nos. 1, 3-4, 48-54,

57-65, as well as Plaintiffs' objections on the basis of time. Please let us know if we have your permission to sign on your behalf.

During our call, Plaintiffs mentioned that any issues as to RFP Nos. 47 and 55 had been resolved. While Plaintiffs have agreed to produce documents responsive to both requests, please confirm that Plaintiffs are not withholding any non-privileged documents on the basis of its stated objections. If Plaintiffs are withholding documents subject to those objections, ROSS asks Plaintiffs identify the specific objections so the parties may properly confer as to those RFPs.

In addition, Plaintiffs mentioned they are continuing to investigate whether there are documents responsive to RFP Nos. 10-15 and 87-88. Specifically, Plaintiffs stated they have identified several stakeholders with information regarding those RFPs, but Plaintiffs would not be in a position to sufficiently respond to ROSS's concerns until the new year. While ROSS appreciates a reasonable delay due to the intervening holidays, ROSS asks that Plaintiffs provide a response no later than January 7, 2022.

Please let us know if you have any questions or concerns.

Best,
Crinesha

---

**From:** Berry, Crinesha
**Sent:** Thursday, December 16, 2021 5:12 PM
**To:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; Ghaffari, Kayvan <KGhaffari@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

Hi Megan –

We're following up to memorialize what we discussed on today's meet and confer. Please let us know if something is inaccurate.

- **RFP Nos. 1, 3-4 (Settlement agreements with third parties)**
  - We discussed that among our concerns is the assignment of copyrights and who has the ability to enforce them. You indicated that you will get back to us on this issue by Tuesday Dec. 21. We will reserve moving on those RFPs until that time.

- **RFP Nos. 47-55 (license agreements and Plaintiffs' interpretation of their license agreements, related to Westlaw)**
  - We agreed to follow up re RFP Nos. 47 and 55, which you believed were resolved, by Tuesday Dec. 21.

- **RFP Nos. 87-88 (licensing strategies, such as board minutes and other business documents)**
  - You indicated that you've identified someone who will know whether responsive documents exist but will not be able to follow up until the New Year. We'll reserve moving on these until after the New Year.

- **RFP Nos. 10-15 (entirety of Westlaw database)**
  - You indicated that you have identified a new person who may be able to export headnotes but will not be able to follow up until the New Year. We'll reserve moving on these until after the New Year.

- **RFP Nos. 57-65 (contracts with judicial entities)**
  - At an impasse

- **Plaintiffs' objections as to time**
  - At an impasse as to the RFPs in dispute. However, we agreed that the temporal scope will be assessed as to all other RFPs on an ongoing basis.

- **Plaintiffs' objections as to the definitions of "LexisNexis" and "LegalEase"**
  - We will follow up by Tuesday Dec. 21.

Otherwise, after we exchange follow-ups on Tuesday, we intend to prepare the joint letter to Judge Stark and move on all outstanding RFPs, except 10-15 and 87-88.  We propose the following briefing schedule:

- Initial Letter Brief  (ROSS) – 01/05/22
- Responsive Letter Brief - 01/10/22
- Reply Letter Brief – 01/13/22

Finally, below are the excerpts (Tr. 37:8-18;  39:18-40:7) we raised on the meet and confer re statements during the motion to dismiss hearing.  Please confirm the scope of Plaintiffs' copyrights by Tuesday Dec. 21, if possible.  We attach the entire transcript for convenience.

> Westlaw is much more than the headnotes and keynotes, and it is certainly much more than the one or two headnotes or keynotes that we put in the complaint, just to give Your Honor an idea of the story.
>
> We certainly were not saying that is the only thing that we are suing on, and I don't think that is a fair reading of the complaint.  Rather, we're suing on all of Westlaw, all of our proprietary material which includes our revisions, our compilations, our additions, our analysis, and the hierarchy that we detail at length in our complaint.  And that is more than enough.

```
18          MS. CENDALI:  Well, I think it makes it clear
19     by defining Westlaw content for, for what it is, which is
20     its unique West key number system and the West headnotes,
21     without limitation.  And I think it also makes it clear
22     because we attached 161 copyright registrations to the
23     complaint that disclaimed that material.  We are not
24     claiming copyright on that.
25          THE COURT:  How about the search engines and
```

```
                                                    40
 1     algorithms?  Are you claiming copyright protection on those?
 2          MS. CENDALI:  Yes, the search engines and
 3     algorithms are part -- they're part of the compilation.
 4     They're part of the hierarchy and the structure of how
 5     Westlaw is created and operates.  And that is definitely
 6     part of our, of our copyright claim, and part of our
 7     registration.
```

Thanks,

Crinesha

---

**From:** Ghaffari, Kayvan
**Sent:** Friday, December 10, 2021 10:08 AM
**To:** McKeown, Megan L. <megan.mckeown@kirkland.com>; #Thomson-Ross <thomson-ross@kirkland.com>;
jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service -
Correspondence

Megan,

We are available next Thursday from 3:30-4:30 pm ET. We will circulate a calendar invite. As for your
question, I believe the parties remain at an impasse on the following issues:

- RFP Nos. 1, 3-4 (Settlement agreements with third parties)
- RFP Nos. 47-55 (license agreements and Plaintiffs' interpretation of their license agreements,
  related to Westlaw)
- RFP Nos. 57-65 (contracts with judicial entities)
- Plaintiffs' objections as to time

We remain concerned by Plaintiffs' objections as to the definitions of "LexisNexis" and "LegalEase," but
ROSS is willing to further discuss those issues at the conferral.

In addition, we would like an update at the conferral on Plaintiffs' continued investigation as to RFP Nos.
10-15 and 87-88.

Best,
KG

---

**From:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Sent:** Thursday, December 9, 2021 9:44 PM
**To:** Ghaffari, Kayvan <KGhaffari@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>;
jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service -
Correspondence

External Email

Hi Kayvan,

We have conflicts with the dates you've proposed.  We (including Delaware counsel) have the following availability to
meet and confer:

- **Wednesday, December 15**
  - 3:00 pm-4:30 pm ET
- **Thursday, December 16**
  - 2:30 pm-5:00 pm ET

If the above times do not work on your end, let us know your availability for Friday, December 17th.

Finally, please let us know which issues ROSS believes there is an impasse so that we can be prepared to discuss them.

Thank you,

Megan

**Megan L. McKeown**

**KIRKLAND & ELLIS LLP**
609 Main St, Houston, TX 77002
**T** +1 713 836 3499
**F** +1 713 836 3601

megan.mckeown@kirkland.com

**From:** Ghaffari, Kayvan <KGhaffari@crowell.com>
**Sent:** Thursday, December 9, 2021 12:03 PM
**To:** McKeown, Megan L. <megan.mckeown@kirkland.com>; #Thomson-Ross <thomson-ross@kirkland.com>;
jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service -
Correspondence

Megan,

It appears the parties are at an impasse on a number of requests below. ROSS will file a motion to compel on those issues consistent with Section 4(g) in the Court's Scheduling Order. Please let us know Plaintiffs' availability, including local counsel, to have a final telephonic conferral on the issues raised below. We are available December 10, 13, or 14.

Best,
KG

**From:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Sent:** Monday, November 29, 2021 4:42 PM
**To:** Ghaffari, Kayvan <KGhaffari@crowell.com>
**Cc:** #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com; ROSS
Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; *dmoore@Potteranderson.com1
<dmoore@Potteranderson.com>
**Subject:** D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

External Email

Dear Kayvan,

We've provided responses and various updates regarding the issues raised in your email in **purple** below.

Regards,

Megan

**Megan L. McKeown**

**KIRKLAND & ELLIS LLP**
609 Main St, Houston, TX 77002
**T** +1 713 836 3499
**F** +1 713 836 3601

megan.mckeown@kirkland.com

---

**From:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Sent:** Tuesday, November 9, 2021 8:51 AM
**To:** Ghaffari, Kayvan <KGhaffari@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>;
jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service -
Correspondence

Dear Kayvan,

Regarding the schedule, my prior email indicated that Plaintiffs agree to a **February 4, 2022** deadline for the substantial completion of document production (not January 14, 2022), but we are amenable to ROSS's April 21, 2022 fact discovery cutoff deadline so long as ROSS can make Mr. Arruda and ROSS's 30(b)(6) witness(es) available for deposition on or before April 1, 2022.  We've thus revised the attached draft stipulation to reflect this accordingly as we appear to have agreement.  You'll also see that we adjusted each of the remaining deadlines in the schedule to be spaced 4 weeks apart after the close of fact discovery and added language to the effect that ROSS will endeavor to make Andrew Arruda and its 30(b)(6) witness(es) available for deposition or or before April 1, 2022 as you mention below.  Plaintiffs cannot agree at this stage to allow depositions to occur after the close of fact discovery when the parties will be in the midst of expert discovery.  If, however, a scheduling conflict arises later, the parties can address how to handle that at the appropriate time.

We are reviewing the balance of your responses below and will respond in due course.

Best,

Megan

**Megan L. McKeown**

**KIRKLAND & ELLIS LLP**
609 Main St, Houston, TX 77002
**T** +1 713 836 3499
**F** +1 713 836 3601

megan.mckeown@kirkland.com

---

**From:** Ghaffari, Kayvan <KGhaffari@crowell.com>
**Sent:** Monday, November 1, 2021 9:50 PM
**To:** McKeown, Megan L. <megan.mckeown@kirkland.com>; #Thomson-Ross <thomson-ross@kirkland.com>;
jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service -
Correspondence

Megan,

Thank you for the email and agreeing to the ROSS's counterproposals. ROSS will make every effort to make Mr. Arruda and its 30(b)(6) witness(es) available before April 1, 2022. However, we are not in a position to make a guarantee at this time. First, ROSS has not seen the 30(b)(6) topics and therefore are lacking information to identify the appropriate designee(s) or confirm their schedule(s). There likely will be a layer of added complication because many of ROSS's witnesses are located abroad. Second, Mr. Arruda is expecting his first child in January and at this time is expecting he may be on parental leave through March. Subject to these questions, ROSS will make every effort to make those depositions occur before April 1, 2022. ROSS will circulate a draft stipulation shortly.

In addition, in anticipation of potential scheduling conflicts, ROSS suggests the parties agree that party depositions may be scheduled after the close of fact discovery so long as those party depositions were noticed prior to April 1, 2022 (Plaintiffs' initial proposed date for extending the close of fact discovery).

I respond to the balance of your email below and added dates associated with each ROSS response for ease of reference.

Best,
KG

---

**From:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Sent:** Tuesday, October 26, 2021 7:32 PM
**To:** Ghaffari, Kayvan <KGhaffari@crowell.com>
**Cc:** #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com; ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

External Email

Dear Kayvan,

Thank you for your responses.  Regarding the schedule, we are amenable to extending the close of fact discovery to April 21, 2022 (as ROSS proposes) with a substantial completion deadline of February 4, 2022, so long as ROSS can agree to make Andrew Arruda and its 30(b)(6) witness available for deposition by April 1, 2022.  Please confirm if this is acceptable to ROSS.

Regarding your other responses, please see Plaintiffs' responses in **purple** below.

Best,

Megan

**Megan L. McKeown**

**KIRKLAND & ELLIS LLP**
609 Main St, Houston, TX 77002
**T** +1 713 836 3499
**F** +1 713 836 3601

megan.mckeown@kirkland.com

**From:** Ghaffari, Kayvan <KGhaffari@crowell.com>
**Sent:** Monday, October 25, 2021 6:26 PM
**To:** #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

Megan,

Thank you for the email. ROSS's preliminary responses to your email are below in redline. Please let me know if you have any questions or concerns.

Best,
KG

---

**From:** McKeown, Megan L. <megan.mckeown@kirkland.com>
**Sent:** Monday, October 25, 2021 10:08 AM
**To:** Ghaffari, Kayvan <KGhaffari@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

External Email

Dear Kayvan,

We are writing to memorialize our conversation with you on the meet and confer held on 10/22/2021.

**I. Scheduling**

- Plaintiffs agree that some extension of fact discovery makes sense but believe that ROSS's five-month extension proposal is too long. We are amenable to the schedule below, which we previewed for you on the call. Our client has now approved it, so let us know your thoughts. ROSS provided a counterproposal of January 14, 2022 for the substantial completion of document productions and a deadline of April 21, 2022 for the close of fact discovery. After checking with the team, ROSS's dates do not work for us. Let us know your thoughts on TR's proposal. If TR's proposal works for you, we will circulate a draft stipulation this week.

| Event | Current Deadline | TR's Proposed Deadline | ROSS's Counterproposal |
|---|---|---|---|
| Substantial Completion of Document Productions | December 17, 2021 | February 4, 2022 | January 14, 2022 |
| End of fact discovery | January 21, 2022 | April 1, 2022 | April 21, 2022 (ROSS maintains this request, especially if the deadline for substantial completion remains February 4, 2022. ROSS, however, is amenable to a modest extension by a week or two to accommodate Plaintiffs' schedule. We believe this will be necessary for coordinating deposition scheduling due to |

|  |  |  | the various locations of witnesses.) |
|---|---|---|---|
| Opening Expert Reports | February 18, 2022 | April 29, 2022 | May 27, 2022 |
| Rebuttal Expert Reports | March 16, 2022 | May 27, 2022 | June 24, 2022 |
| Reply Expert Reports | April 20, 2022 | July 8, 2022 | August 5, 2022 |
| Close of expert discovery | May 20, 2022 | August 5, 2022 | September 2, 2022 |
| Opening Summary Judgment Briefs | June 10, 2022 | September 2, 2022 | October 7, 2022 |
| Summary Judgment Opposition Briefs | July 11, 2022 | September 30, 2022 | November 4, 2022 |
| Reply in Support of any Motion for Summary Judgment | August 10, 2022 | October 28, 2022 | December 2, 2022 |

## II. ROSS's Interrogatory No. 1

- We explained that we have already identified what ROSS copied and that, contrary to your suggestion in your email below, we were not able to use ROSS's documents from the *LegalEase* litigation to prepare the interrogatory response before they were produced in this case.  And as we noted on the call, as recently as October 1, ROSS produced more than 23,000 additional memos for Plaintiffs to review.

ROSS Oct. 25 Response: Megan, on our call on Friday, ROSS reiterated its request that Plaintiffs identify the "Westlaw Content" that formed the basis of Plaintiffs' Complaint. Plaintiffs' factual investigation forming the basis of their Complaint is not – and should not be – based on ROSS's document productions. Accordingly, ROSS requests that Plaintiffs specifically identify in response to Interrogatory No. 1 the purported copyrights that ROSS allegedly infringed and to which formed the basis of Plaintiffs' Complaint.

- You confirmed that you believe ROSS has now produced all of the memos but could not confirm one way or another whether they all have been produced.  You represented that ROSS has at least produced substantially all of them.  Please double check your files and confirm that ROSS has now produced all of the memos.
- We confirmed that, in light of ROSS's representation that it has produced substantially all of the memos, we intend to provide a supplement of our response to ROSS's Interrogatory No. 1 within the next two weeks or so.

ROSS Oct. 25 Response: Megan, on our call on Friday, Plaintiffs mentioned they would supplement its response to Interrogatory No. 1 "within the next two weeks." Given that ROSS can confirm it substantially completed its production of LegalEase memoranda, ROSS expects Plaintiffs to comply with their commitment to supplement *within* the next two weeks. (emphasis added.)

**Plaintiffs' Oct. 26 Response:** Plaintiffs' supplemental interrogatory response is in progress.  Please double check your files and confirm that ROSS has now produced all of the memos as we requested.

ROSS Oct. 29 Response: ROSS reiterates its position that Plaintiffs' supplementation of Interrogatory No. 1 should not be dependent on ROSS's production because Plaintiffs have previously noted it has the right to supplement. Thus, ROSS expects Plaintiffs to supplement their interrogatory within the next two weeks regardless of ROSS's follow-up on this point.

**Plaintiffs' Nov. 29 Response:** We served our supplemental response to Interrogatory No. 1 on November 19, 2021.  ROSS, however, still has not confirmed whether it has now produced all of the memos.  Please double check your files and let us know.

## III. Number of Documents in Plaintiffs' Productions

- We disagree with your characterization of Plaintiffs' productions.  As we explained, the fact that Plaintiffs produced fewer documents than ROSS does not mean that they are not complying with their discovery

obligations.  We also explained that it should come as no surprise that the majority of Plaintiffs production thus far includes documents from the *LegalEase* case because there is a lot of overlap between the two cases and ROSS's copying vis a vis LegalEase.  Plaintiffs have been and continue to produce documents on a rolling basis as they are located.  Plaintiffs are not intending to withhold documents from ROSS merely because there is a substantial completion deadline.

ROSS Oct. 25 Response: Consistent with Plaintiffs' representations on Friday, ROSS expects Plaintiffs to supplement their production this week.

**Plaintiffs' Oct. 26 Response:** We will be producing additional documents this week.  As we've explained, Plaintiffs will continue to produce documents on a rolling basis.

### IV. Documents from the LegalEase Matter

- You confirmed that ROSS's production of the 386 documents that ROSS produced in the *LegalEase* case that it failed to produce in this case by the date the parties agreed on is in queue and that you expect to produce those documents early next week.  You represented that those 386 documents were not previously produced because they were in a different folder than the other documents and that, because of that, ROSS's vendor didn't pick them up.  You, however, had no explanation for the email that ROSS randomly produced with its insurance agreement (that also was produced in the *LegalEase* litigation) and could not explain why ROSS produced it separately or without a bates number from the *LegalEase* case.
- You further confirmed that ROSS will be producing the ROSS transcript and exhibits and that it is working on locating the exhibits to the other transcripts from the *LegalEase* case.
- You asked us whether we have produced all of the documents we produced in the *LegalEase* case.  We confirmed that, after checking Plaintiffs' files, two additional documents from the *LegalEase* case were identified that inadvertently were not produce due to them having a different Bates prefix than the remaining documents West produced in that case and thus were not caught in Plaintiffs' production sweep.  We will be producing those two remaining documents this week.

### V. Redacted Documents in Plaintiffs' Productions

- We confirmed that the basis for the redacted documents in our productions (including TR-0038135) is attorney-client privilege and/or work product.  We so far have not redacted documents for reasons other than attorney-client privilege and/or work product.  If that changes for some reason, we will let you know.  Please confirm that ROSS will do the same.

ROSS Oct. 25 Response: ROSS appreciates Plaintiffs' representation.

### VII. Specific RFP Issues

- **Agreements with third-parties, such as LexisNexis, the judiciary, and other government agencies, including templates of those agreements (RFP Nos. 1, 3-4, 53-54)**
  - **Settlement Agreements with Third Parties (Including LexisNexis) (RFP Nos. 1, 3-4)** -- Plaintiffs understand that ROSS is requesting all settlement agreements related to Westlaw, which we explained is overbroad and not proportionate to the needs of the case as such settlement agreements could involve claims that are tangentially related to Westlaw but that have nothing to do with this case or the issues in this case.  You agreed to provide a written list of the types of settlement agreements related to Westlaw that ROSS believes are relevant to Plaintiffs' copyright claim and ROSS's copyright misuse defense for Plaintiff's consideration.  Although Plaintiffs dispute the relevance of such agreements to any claim or defense in this case, and specifically dispute how those agreements will shed light on Plaintiffs' copyright claims against ROSS, we agreed to discuss the list of types of settlement agreements that you are interested in with our client (once ROSS identifies them) so that we can determine whether we can avoid a dispute.

ROSS Oct. 25 Response: Contrary to your characterization of ROSS's RFPs, those RFPs are narrowly tailored as they are limited to any settlement agreements *relating to* "Westlaw Content." (emphasis added.) For example, this request would not include any settlement agreements relating to any employee harassment claim. Nevertheless, and in the spirit of compromise and without waiving any rights as to the full scope of discovery, ROSS is discussing Plaintiffs' request and may provide specific examples shortly. However, please note that ROSS did not agree to revisit RFP No. 1, which relates to Plaintiffs' settlement agreements with LexisNexis.

**Plaintiffs' Oct. 26 Response:** We understand your position regarding LexisNexis.  We will await your response as to the other settlement agreements.

ROSS Oct. 29 Response: ROSS maintains its position that the requests are sufficiently tailored as written and would exclude settlement agreements relating to any employee harassment claims. Nevertheless, in the spirit of compromise and without waiving any rights to revisit the full scope of RFP Nos. 3-4 at a later date, ROSS is interested in settlement agreements relating to any alleged direct or indirect infringement of Plaintiffs' purported intellectual property in Westlaw Content, including without limitation the Headnotes and Key Number System.

**Plaintiffs' Nov. 29 Response:** After consideration, our client cannot agree to produce settlement agreements with third parties (beyond LegalEase, which already has been produced) related to infringement of Plaintiffs' intellectual property in Westlaw Content as it continues to believe that such settlement agreements are irrelevant to the claims in this case against ROSS and would create mini trials about the circumstances and issues of other cases and situations.

- o **License Agreements Related to Westlaw (RFP Nos. 47-55)** -- Plaintiffs understand that it's ROSS's position that it wants all of Plaintiffs' license agreements with every single subscriber it has ever had, including templates like the one attached to the Cendali Declaration at Dkt. 16-01.  We explained that Plaintiffs' Research Subscriber Agreement is not a "template," but rather an agreement that is incorporated and/or attached to the Order Forms that subscribers sign and that is the reason why there is no signature on the one attached to the Cendali Declaration that ROSS mischaracterized as a "template."  ROSS thus clarified that it wants all of the Order Forms, including any Research Subscriber Agreements attached thereto, for all subscribers, so that it can see whether any terms have changed over time.  We explained that that request is overbroad and not proportionate to the needs of the case and asked ROSS to consider whether what it was really interested in is a representative sample of Order Forms (and accompanying attachments) at different time periods, and if that is what ROSS really wants, then we can ask our client whether it could agree to search for and produce a representative sample to avoid a dispute (despite our continued objections to relevance).  You indicated that you would take that back to your team for consideration.

ROSS Oct. 25 Response: As discussed on Friday, ROSS is entitled to discovery of all license agreements relating to Westlaw Content with any third-party. Nevertheless, and in the spirit of compromise and without waiving any rights as to the full scope of discovery, ROSS is discussing Plaintiffs' request and will follow-up shortly.

**Plaintiffs' Oct. 26 Response:** We will await your response.

ROSS Oct. 29 Response: ROSS reiterates its position that it is entitled to discovery of all license agreements relating to Westlaw Content with any third party. Nevertheless, in the spirit of compromise and without waiving any rights to revisit the full scope of RFP Nos. 47-55 at a later date, ROSS will agree to discovery of representative samples of all variations of Order Forms (and accompanying attachments) from the past twenty years containing different contractual provisions governing access to Westlaw and use of any content contained within Westlaw.

**Plaintiffs' Nov. 29 Response:** The past twenty years is not a reasonable time period, particularly as ROSS's copying did not occur 20 years ago. In the interest of compromise, and to avoid a dispute, Plaintiffs' can agree to search for and produce examples of the Order Forms and General Terms and Conditions that have existed from 2015 to the present (i.e. the past 6 years).

ROSS Oct. 25 Response: In addition, ROSS reiterates its request for any document or communication discussing, referencing, or opining on Plaintiffs' interpretation of their license agreements. As discussed in my letter dated October 4, 2021, ROSS is entitled to any extrinsic evidence showing how Plaintiffs interpret the restrictive terms within their licensing agreements. *See Ferro v. Atl. City Showboat, Inc.,* No. CV 08-375 (JBS/JS), 2009 WL 10690439, at *2 (D.N.J. July 13, 2009) ("[I]t is inappropriate to deny discovery of parol evidence simply because it may be inadmissible at trial.") (collecting cases); *see also Foster Poultry Farms v. AISLIC,* No. 1:04CV5930 REC DLB, 2005 WL 8176421, at *2 (E.D. Cal. Aug. 22, 2005) (permitting discovery into parol evidence because it was relevant to understanding the meaning of the terms). Accordingly, any extrinsic evidence showing how Plaintiffs interpreted the terms within the agreements are both discoverable and relevant.

**Plaintiffs' Oct. 26 Response:** We disagree that Plaintiffs' interpretation of its licensing agreements is relevant to any claim or defense in this litigation, as ROSS already has the license agreements at issue. The cases you cite regarding the parol evidence rule do not show why Plaintiffs' interpretation of its licensing agreement is relevant to ROSS's copyright misuse defense. Nevertheless, based on the information available to us, responsive documents would be privileged.

ROSS Oct. 29 Response: There can be no dispute that Plaintiffs' interpretation of its licensing agreements are relevant to the tortious interference claim. Indeed, Plaintiffs have already produced at least one document on this topic, further supporting the need for additional discovery. For example, Plaintiffs sued LegalEase for breach of contract. Plaintiffs' own documents show there was internal confusion concerning the interpretation of certain provisions in the research agreement. *See* TR-0037754 ███████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████. Plaintiffs' interpretation, therefore, goes directly to the question of tortious interference and whether ROSS engaged in intentional and unjustified conduct to induce LegalEase to breach its contract with West Publishing. Thus, unless Plaintiffs agree to produce the order forms and research agreements with third parties, the parties appear to be at an impasse.

**Plaintiffs' Nov. 29 Response:** Plaintiffs' interpretation of its licensing agreements with respect to parties other than LegalEase is not relevant to Plaintiffs' tortious interference claim. *See, e.g., Freeman v. Witco Corp.,* No. CIV. A. 97-1448, 1999 WL 389892, at *1 (E.D. La. June 11, 1999) (denying motion to compel documents related to contract negotiations with other parties as "other contracts are irrelevant . . . as it is the contract between GSS and Witco which controls here" and "interpretation of the contract is usually limited to the document itself"). We've already produced the documents that we have with respect to LegalEase. In the spirit of compromise, however, and to avoid a dispute, Plaintiffs are willing to search for and produce examples of the Order Forms and General Terms and Conditions that have existed from 2015 to the present, as noted above.

  o **Contracts with Judicial Entities** (RFP Nos. 57-65) -- We understand that it is ROSS's position that contracts/licenses with Judicial entities and government agencies is relevant to show how Plaintiffs obtain law and what Plaintiffs receive prior to Plaintiffs' adding any Key Numbers and Headnotes to the judicial opinions. Although we continue to dispute relevance, we asked whether producing the content of the raw judicial opinions that are cited in the memos would be a compromise to avoid a dispute, and you rejected this proposed compromise. We agreed to check with our client to see whether we are at an impasse.

ROSS Oct. 25 Response: As discussed on Friday, ROSS explained these requests are relevant to whether Plaintiffs' contracts with judicial entities contain provisions concerning the public's access to raw judicial opinion and/or whether these contracts allow or prohibit Plaintiffs from adding any content to the raw judicial opinions. For example, if Plaintiffs' contracts with judicial entities prohibit Plaintiffs from

providing the public access to raw judicial opinion, that would be relevant to ROSS's affirmative defenses and copyright counterclaims. Nevertheless, and in the spirit of compromise and without waiving nay rights as to the full scope of discovery, ROSS is discussing Plaintiffs' request and will follow-up shortly.

**Plaintiffs' Oct. 26 Response:** We will await your response.

ROSS Oct. 29 Response: ROSS cannot agree to Plaintiffs' counterproposal to produce raw judicial opinions cited in the memos. These opinions are not contracts between Plaintiffs and judicial entities or government agencies. These opinions do not shed light on whether and under what circumstances the judicial or government entity provides preferential access to its edicts or restricts in any way Plaintiffs' use of the judicial opinion. Moreover, ROSS understands that many states provide judicial opinions with headnotes. *See* https://lexisnexis.custhelp.com/app/answers/answer_view/a_id/1075428/~/states-with-court-provided-headnotes%2C-official-headnotes%2C-and-syllabi. ROSS is entitled to understand how state cases are provided to Plaintiffs and whether there are any contractual provisions governing Plaintiffs' use of those headnotes. Thus, unless Plaintiffs agree to produce the *contracts/licenses* with judicial entities and government agencies relating to acquiring the raw judicial opinions, the parties appear to be at an impasse.

**Plaintiffs' Nov. 29 Response:** We are not sure which claim or defense ROSS believes that showing "whether and under what circumstances the judicial or government entity provides preferential access to its edicts or restricts in any way Plaintiffs' use of the judicial opinions" is relevant to. ROSS's October 25 response vaguely alludes to "ROSS's affirmative defenses and copyright counterclaims." Which affirmative defenses and counterclaims? ROSS's October 29 response points out that "many states provide judicial opinions with headnotes" and thus that "ROSS is entitled to understand how state cases are provided to Plaintiffs and whether there are any contractual provisions governing Plaintiffs' use of those headnotes." But the headnotes that are the subject of Plaintiffs' copyright claim is based on Plaintiffs' original headnotes, not headnotes that were written by states. Thus, the contracts with these entities will not shed any light on Plaintiffs' claims against ROSS.

- **Content of the Westlaw Database (RFP Nos. 10-15)**
  - You confirmed that what ROSS is interested in is a copy of every single Headnote that appears on Westlaw and all of the key numbers. We explained that we already produced the hierarchy of West's Key Number System and that we aren't sure whether there is a way for Plaintiffs to pull all of the headnotes from its database, but that we will check with our client to see whether that is even possible. If it turns out that there is no way for the client to export the headnotes, we explained that we will at least agree to produce the cases containing the headnotes in the LegalEase memos that ROSS copied.

ROSS Oct. 25 Response: ROSS disagrees with Plaintiffs' characterization of the parties discussion on RFP Nos. 10-15. For example, ROSS did not agree it would be sufficient if Plaintiffs' only provided the Headnotes contained in the LegalEase memoranda. Instead, ROSS reiterated its position that it is entitled to discovery of all Headnotes and West Key Numbers. Plaintiffs put their Westlaw Content at issue by filing a copyright infringement claim against ROSS. ROSS is entitled to test the various assertions in the complaint, including whether Plaintiff is entitled to copyright protection in its Headnotes and Key Number System.

**Plaintiffs' Oct. 26 Response:** As noted above, we already produced the hierarchy of West's Key Number System. We are not sure whether there is a way for Plaintiffs to pull all of the headnotes from its database. We are checking with our client.

ROSS Oct. 29 Response: We look forward to Plaintiffs' response.

**Plaintiffs' Nov. 29 Response:** Our client has so far been unable to identify a feasible way to export the headnotes from its database, but it is continuing to investigate. We will follow up when we have an update.

- **Relating to Stephen L. Haynes' statement re privately-published judicial decisions (RFP No. 56)**
  - We asked ROSS to identify who Stephen L. Haynes is and where the quote from him stating "the American system of privately-published judicial decisions is the best in the world" came from.  You explained that Stephen L. Haynes was a manager of Westlaw Research in the 1990s and that his email address is [shaynes@research.westlaw.com](mailto:shaynes@research.westlaw.com).  You further confirmed that you would provide a link to where that quote appears so that we can consider whether we are able to search for and produce responsive documents.  We made clear, however, that given the passage of time, there is no guarantee that the client will still have responsive documents from Mr. Haynes.
  - We also asked you to clarify why ROSS is interested in this.  You indicated that ROSS is interested in these documents because ROSS wants to understand whether Westlaw had an understanding in the 1990s that it was privatizing judicial opinions.

ROSS Oct. 25 Response: ROSS is deliberating on this request and will respond shortly.

**Plaintiffs' Oct. 26 Response:** We look forward to ROSS's response.

ROSS Oct. 29 Response: In light of the parties' conferral and in the spirit of compromise, ROSS is willing to table this request and reserve its rights to revisit it at a later time.

- **Patents relating to the Westlaw content and platform (RFP Nos. 67, 81-82)**
  - We explained that Plaintiffs have patents on a variety of features related to Westlaw that cover multiple products and do a variety of different things.  We further explained that there's not a repository of all of the Westlaw patents where we can go in and grab all of the patents.  We explained that if ROSS can identify the patent numbers or the features it's interested in, then we can consider those and ask our client to search for them.  We also asked you whether you were aware of any patents other than the CaRE tool that relate to the content of Westlaw, including the creation of headnotes and key numbers.  You indicated that ROSS will provide further information for Plaintiffs' consideration.

ROSS Oct. 25 Response: ROSS is deliberating on this request and will respond shortly.

**Plaintiffs' Oct. 26 Response:** We look forward to ROSS's response.

ROSS Oct. 29 Response: Unfortunately, ROSS is not in the best position to identify all patents within Plaintiffs' portfolio. Nevertheless, in the spirit of compromise and without waiving any rights to revisit the full scope of RFPs 67, 81-82, ROSS is interested in any patent that involves the Westlaw Content, including without limitation, any patent relating to the process of creating Headnotes, assigning Headnotes to a particular case, assigning Key Numbers to the Headnotes and/or a case, or any other feature relating to the Westlaw Content.

**Plaintiffs' Nov. 29 Response:**  We've talked to the people at our client who are responsible for Westlaw patents, and as far as they can tell/recall, there are no patents involving Westlaw content beyond the patent on the CaRE tool, which we've already produced.  If ROSS can identify other patents that it believes relate to Westlaw content, it can let us know.

- **Licensing strategies, such as board minutes (RFP Nos. 87-88)**
  - We understand that it is ROSS's position that documents related to its strategy for licensing Westlaw to third parties is relevant to Plaintiffs' enforcement and understanding of the scope of its intellectual property.  Although we continue to dispute the relevance of Plaintiffs' licensing strategy, we asked ROSS whether searching for board meeting minutes discussing its strategy for licensing Westlaw would resolve this dispute.  ROSS clarified that it doesn't just want board meeting minutes, it also wants guidelines, policies, and non-privileged communications about business decisions concerning the

strategy for licensing Westlaw.  In light of this clarification, we will speak with our client about whether it can agree to search for any categories of these documents to avoid a dispute.

ROSS Oct. 25 Response: ROSS appreciate that Plaintiffs are reconsidering their position as to RFP Nos. 87-88.

**Plaintiffs' Nov. 29 Response:** We are investigating with our client to ascertain whether responsive documents exist, and if so, whether those documents are privileged.  We will revert once we have an update for you.

In addition, ROSS remains concerned about Plaintiffs' response to RFP No. 32, which requests "all DOCUMENTS and COMMUNICATIONS RELATING TO ROSS, including communications with LEXISNEXIS and any third party." Plaintiffs unilaterally and without basis limited the scope of the request to documents relating to "Defendant's alleged copying and relationship with West and LegalEase that are located after a reasonably diligent search, if any." Plaintiffs allege requests for "all communications" is overbroad. *See* Aug. 25, 2021 M. McKeown Ltr. to K. Ghaffari. However, Plaintiffs have not explain how the request is overbroad.

Plaintiffs sued ROSS, a six year old company at the time of the lawsuit, for copyright infringement and tortious interference. ROSS is entitled to discover all communications between Plaintiffs and any third-party relating to ROSS, its technology, and/or whether ROSS is allegedly infringing Plaintiffs' intellectual property. Given the limited time period, please confirm that Plaintiffs will withdraw its objections and produce all documents relating to ROSS.

**Plaintiffs' Oct. 26 Response:** This issue was not discussed in our meet and confer.  Nevertheless, ROSS's assertion that Plaintiffs "unilaterally and without basis limited the scope of the request" is interesting given that ROSS similarly objected to Plaintiffs' RFP No. 34, which asked ROSS for "All DOCUMENTS CONCERNING PLAINTIFFS, including without limitation WESTLAW and WESTLAW CONTENT" and ROSS only agreed to produce documents "related to the allegations of the Complaint."  Plaintiffs continue to believe that ROSS's RFP No. 32 is overbroad because ROSS has come up in contexts that are wholly unrelated to the issues in this lawsuit (e.g. ROSS and West attending similar conferences, etc.).  In the spirit of compromise, Plaintiffs can agree to produce documents that are related to the allegations of the Complaint, which is the same scope that ROSS agreed to in response to Plaintiffs' RFP No. 34.

## VIII.  Definition of Thomson Reuters
- ROSS asked us to withdraw our objection as to the scope of the definition of Thomson Reuters.  We explained that TREC (plaintiff in this lawsuit) is the assignee of the copyrights at issue in this dispute, that we will be producing agreements showing its ownership, and thus we don't see how other entities are relevant to this dispute.  You clarified that you do not believe that West Publishing is the only entity that created the headnotes that we are claiming copyrights in.
- We thus agreed to check with our client as to whether any employees outside of West are responsible for the content of headnotes.

ROSS Oct. 25 Response: ROSS appreciates your agreement to confirm whether any employees outside of West are responsible for the development – either in part or whole – of any content appearing on Westlaw, including without limitation the Headnotes and West Key Number System. Nevertheless, Plaintiffs cannot unilaterally propose a different definition based on Plaintiffs' self-serving statement that "TREC (plaintiff is this lawsuit) is the assignee of the copyrights at issue in this dispute" and therefore "[Plaintiffs] don't see how other entities are relevant to this dispute." This is particularly true given TREC did not create any of the content at issue and that Thomson Reuters Global Research was a claimant of certain copyrights produced by Plaintiffs. This fact alone supports ROSS's definition, the same definition Plaintiffs use to frame their discovery requests. For example, ROSS is entitled to discovery of any communications with any past or present claimant/assignee of the copyrights as they are relevant to, among other topics, understanding Plaintiffs' internal beliefs as to the scope of intellectual property protection on content appearing on Westlaw and any enforcement of the intellectual property.

Accordingly, ROSS is entitled to discovery under its definition of "Thomson Reuters," "West," "LegalEase," and "LexisNexis".

**Plaintiffs' Oct. 26 Response:** If ROSS has specific categories of information that it believes reside with an entity other then TREC, please identify the entity, the information, and the RFP for Plaintiffs' consideration.  Thomson Reuters Global Resources transferred its business to TREC (plaintiff in this lawsuit).  We thus are not sure what documents ROSS believes resides elsewhere.

We did not discuss the remaining definitions on the meet and confer.

ROSS Oct. 29 Response: ROSS is not required to speculate as what documents relating to this litigation *may* reside with other entities. It is incumbent on the party receiving a document request to conduct a reasonable search as to whether responsive documents exist. Plaintiffs' self-serving statement about TREC does not change that reality. For example, Thomson Reuters Global Research still may have documents concerning the *creation* of TREC's purported copyrights that are still within the possession, custody, or control of Thomson Reuters Global Resources. Moreover, Eric represented on Friday that TREC is the assignee of all purported copyrighted, but that West Publishing somehow has standing in this matter because West "created" the underlying content. For example, Mr. Loverro claims West maintains an "economic interest" in the purported copyrights, but ROSS is entitled to understand the circumstances surrounding that "economic interest" to West and to any other related entity that may have been involved in any way in the creation, development, registration, and assignment of any purported copyright. Thus, Plaintiffs recognize and understand that entities other than TREC may possess documents that are relevant to this matter. It is also worth noting that Plaintiffs are speaking out of both sides of their mouth: on the one hand, Plaintiffs claim the requests are overbroad, but on the other hand, Plaintiffs claim other entities do not have anything responsive. Plaintiffs cannot have it both ways. Unless Plaintiffs are willing to reconsider their position, it appears the parties are at an impasse as to the definition of "West Publishing" and "Thomson Reuters" and ROSS will move to compel on this issue. It does not appear Plaintiffs are willing to reconsider their objection to the definitions of "LegalEase" or "LexisNexis." To the extent ROSS's understanding is incorrect, ROSS is willing to further confer. Otherwise, ROSS intends to move to compel on that issue too.

**Plaintiffs' Nov. 29 Response:**  Regarding the definition of "Thomson Reuters" and "West," we checked with our client and believe this is a non-issue.  As it turns out, there is overlap between Plaintiffs' entities and their employees.  Plaintiffs are not knowingly withholding responsive documents on the basis that they reside with any particular entity.  Instead, where our reasonable search reveals that responsive documents exist with another entity, we are checking with that entity, including TRGR, and producing documents accordingly.

Regarding the definitions of LexisNexis and LegalEase, Plaintiffs do not know who LexisNexis's and LegalEase's "present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act" on their behalf are.  Thus, unless ROSS can let us know who the persons and entities are that fall within those definitions, we cannot consider ROSS's definitions.

### IX. Objections as to Time

- ROSS indicated that it would not agree to limit discovery to a reasonable time period because the WKNS dates back to the early 1900s, and thus ROSS believes documents dating back that far are relevant.  We explained that Thomson Reuters is over 100 years old and that it's unreasonable and unduly burdensome to expect us to search back that far for each one of ROSS's RFPs.  We further explained that a conversation about a reasonable time period is more productive in the context of discussing specific RFPs.  We thus asked ROSS to identify the RFPs and categories of documents that it is interested in for older time periods.  You confirmed that you will speak with your team to see if you can specifically identify the RFPs where ROSS would like Plaintiffs to search back as far as it can.

- You indicated that ROSS would like an understanding of how far back Plaintiffs' documents go.  We will check with our client on this.

ROSS Oct. 25 Response: ROSS is deliberating on this request and will respond shortly.

**Plaintiffs' Oct. 26 Response:** We look forward to ROSS's response.

ROSS Oct. 29 Response: ROSS is not able to limit discovery to a specific time period without understanding which Headnotes and Key Numbers are at issue. Plaintiffs allege ROSS infringed Plaintiffs purported copyrights in Headnotes and the Key Number System. Plaintiffs admit both sets of content date back to the late 19th century. Thus, by Plaintiffs' own allegations, discovery cannot be limited by time as to the Westlaw Content or any RFP relating to the Westlaw Content, including any licensing or settlement agreements. This is particularly true where a Headnote purportedly at issue may no longer be eligible for copyright protection if it was created prior to 1926. Regardless of which Headnotes or Key Numbers are at issue, documents spanning back to the creation of West Publishing remain relevant to ROSS's affirmative defenses and copyright counterclaims. As one example, ROSS understands that Plaintiffs have in their possession, custody, and control records dating back to John West, the initial development of the Key Number System, and John West's ousting from West Publishing. Specifically, ROSS understands these physical documents reside at West Publishing's headquarters in Eagen, Minnesota. These documents are highly relevant to the issue of copyrightability of the Key Number System or Headnotes. Similarly, documents and/or training materials from the early 20th century concerning the creation, development, and overall organization of Headnotes and/or Key Number System are highly relevant to copyrightability, copyright misuse, and other affirmative defenses (*e.g.*, unclean hands). It is further worth noting that certain RFPs are inherently restricted by date. For example, any communication regarding ROSS Intelligence is limited in time from ROSS's founding to present. Similarly, any communications with LegalEase are restricted in time from LegalEase's creation to present. Thus, it's inaccurate to claim all of ROSS's RFPs are objectionable as to time. Unless Plaintiffs are willing to withdraw their objections as to time, it appears the parties are at an impasse.

**Plaintiffs' Nov. 29 Response:**  As we noted previously, it is entirely unreasonable and unduly burdensome to expect that Plaintiffs search back over a century for each one of ROSS's RFPs, particularly when ROSS's copying started occurring around the 2017 time period.   You identify general high level categories of documents that you are interested in that you believe are likely to exist in physical form in Eagen, Minnesota, but you do not indicate whether searching back as far as possible for those documents would even satisfy ROSS to avoid a dispute.  If ROSS cannot propose a reasonable time period for Plaintiffs' consideration, or at least identify which types of older documents it is interested in to avoid a dispute, then we agree the parties are at an impasse.

Regards,

Megan

**Megan L. McKeown**

**KIRKLAND & ELLIS LLP**
609 Main St, Houston, TX 77002
**T** +1 713 836 3499
**F** +1 713 836 3601

megan.mckeown@kirkland.com

**From:** Ghaffari, Kayvan <KGhaffari@crowell.com>
**Sent:** Tuesday, October 19, 2021 6:40 PM
**To:** #Thomson-Ross <thomson-ross@kirkland.com>; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>;

*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

Megan,

We write to meet and confer on a number of outstanding discovery issues and request a telephonic conference Friday as ROSS anticipates filing a motion to compel on these issues.

**First**, we haven't received a response to our correspondence on October 4, 2021 regarding Plaintiffs' deficient discovery responses. As a reminder, ROSS is concerned with Plaintiffs' responses to ROSS's Requests for Production, Set One. Specifically, Plaintiffs categorically, and without proper basis, refuse to produce the following documents:

- agreements with third-parties, such as LexisNexis, the judiciary, and other government agencies, including templates of those agreements (RFP Nos. 1, 3-4, 53-54)
- competitor's accessing Westlaw and users creating competing products (RFP Nos. 48-52)
- relating to Stephen L. Haynes' statement re privately-published judicial decisions (RFP No. 56)
- how Plaintiffs obtain judicial opinions, legislation, and other data contained on its Westlaw platform (RFP Nos. 57-65)
- patents relating to the Westlaw content and platform (RFP Nos. 67, 81-82)
- licensing strategies, such as board minutes (RFP Nos. 87-88)

These documents are relevant to Plaintiffs' copyright infringement and tortious interference claims and ROSS's affirmative defenses and copyright counterclaims, for the reasons discussed at length in our August 3, 2021 and October 4, 2021 conferral letters.

**Second**, Plaintiffs' response to Interrogatory No. 1 is deficient. ROSS is entitled to know what Plaintiffs claim ROSS infringed. Plaintiffs filed this action seventeen (17) months ago. Since then, Plaintiffs have not identified a single alleged copyrighted material that ROSS infringed or a single instance of ROSS's purported infringement. This is notwithstanding that Plaintiffs claims to have had some factual bases for bringing this lawsuit. Additionally, at this point, ROSS has produced approximately 500,000 documents responsive to Plaintiffs' RFPs, including the materials that ROSS obtained from LegalEase. ROSS is entitled to understand what "Westlaw Content" it allegedly infringed.

**Third,** we have analyzed Plaintiffs' productions to date of fewer than 1,700 documents. Plaintiffs production to date can be summarized in totality as following:

- Roughly 700 documents (or 40% of Plaintiffs' total productions to date) involve copyright deposits or public statements regarding ROSS;
- Roughly 840 documents (or 50% of Plaintiffs' total productions to date) are documents West Publishing previously produced in the LegalEase matter. Please confirm whether this represents the complete set of documents West Publishing produced in the LegalEase matter. If not, ROSS demands Plaintiffs produce the complete set and explain why it has not produced the remaining documents.
- Approximately a dozen documents concern Plaintiffs' development of the Headnotes or Key Number System.

In addition, it appears Plaintiffs have redacted certain information within the production. *See, e.g.*, TR-0038135. Please explain the basis for these redactions, considering there does not appear to be any attorneys on those documents.

19

In light of the following, it is abundantly clear that Plaintiffs' production is incomplete and, as mentioned before, ROSS is concerned that Plaintiffs are impermissibly withholding responsive documents until close to December 17. Plaintiffs filed this lawsuit seventeen (17) months ago and were engaged in a related litigation for several years before. Nevertheless, Plaintiffs have only produced approximately 1,700 documents. Not one of those documents identifies any basis for Plaintiffs' lawsuit against ROSS – *e.g.*, Plaintiffs have not produced a single document identifying any purported infringement by ROSS of Plaintiffs' purported copyrights. Given the dearth of documents produced, ROSS demands Plaintiffs immediately supplement its production or ROSS will be forced to move to compel compliance with its document requests.

**_Finally_**, we propose pushing the fact discovery deadline by five months. We believe this extension is necessary to afford sufficient time for the parties to complete their document production(s) and notice and take depositions. Because Judge Stark has not set a trial date, we do not believe this extension would materially impact the course of litigation and any impact is outweighed by the parties' need for additional time to conduct depositions and further discovery. Please let us know by Friday, October 22, 2021, whether Plaintiffs would agree to a mutual extension of time.

We look forward to speaking with you regarding Plaintiffs' discovery responses this week.

Best,
KG

---

**From:** Ghaffari, Kayvan
**Sent:** Monday, October 4, 2021 3:30 PM
**To:** Patel, Karina <karina.patel@kirkland.com>; #Thomson-Ross <thomson-ross@kirkland.com>; ckim@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; OByrne, Stephanie E. <sobyrne@potteranderson.com>; Moore, David E. <dmoore@potteranderson.com>
**Subject:** RE: D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

Megan,

Please see attached correspondence.

Best,
KG

---

**From:** Patel, Karina <karina.patel@kirkland.com>
**Sent:** Wednesday, August 25, 2021 10:50 PM
**To:** Berry, Crinesha <CBerry@crowell.com>; Ramsey, Gabriel <GRamsey@crowell.com>; Canter, Jacob <JCanter@crowell.com>; Rychlinski, Joshua <JRychlinski@crowell.com>; Ghaffari, Kayvan <KGhaffari@crowell.com>; Romo, Carol <CRomo@crowell.com>; Kimmel, Lisa <LKimmel@crowell.com>; Klapow, Mark <MKlapow@crowell.com>; *sobyrne@potteranderson.com <sobyrne@potteranderson.com>; Parker, Warrington <WParker@crowell.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>
**Cc:** #Thomson-Ross <thomson-ross@kirkland.com>; ckim@morrisnichols.com; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Subject:** D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - Correspondence

External Email

Counsel,

Please see the attached.

Thank you,
Karina

**Karina Patel**
Paralegal I

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 390 4141
**F** +1 212 446 4900

karina.patel@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) | C.A. No. 20-613-LPS |
| Plaintiffs/Counterdefendants, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendants/Counterclaimant. | ) | |

**DEFENDANT/COUNTERCLAIMANT ROSS INTELLIGENCE, INC.'S**
**FIRST SET OF REQUESTS FOR PRODUCTION (NOS. 1-103)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Defendant / Counterclaimant ROSS Intelligence, Inc. ("ROSS") serves the following requests for production on Plaintiffs / Counterdefendants Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West").

**DEFINITIONS**

Insofar as any of the terms below are used herein, the following definitions shall apply:

1. The term "THOMSON REUTERS" as used herein means Plaintiff / Counterdefendant Thomson Reuters Enterprise Centre GMBH, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

2. The term "WEST" as used herein means Plaintiff / Counterdefendant West Publishing Corporation and its present and former officers, directors, employees, attorneys,

agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

3. The terms "YOU," "YOUR," and "PLAINTIFFS" are used herein to mean THOMSON REUTERS and WEST.

4. "WESTLAW" means the product that YOU license as discussed in YOUR COMPLAINT.

5. "WESTLAW PRODUCT" has the same meaning as the term "Westlaw product" used in the COMPLAINT ¶ 1.

6. "WESTLAW CONTENT" has the same meaning as the term "Westlaw content" as used in the COMPLAINT ¶ 1.

7. "WKNS" or "KEY NUMBER SYSTEM" means the Westlaw Key Number System as discussed in YOUR COMPLAINT.

8. "HEADNOTES" means the West Headnotes as discussed in YOUR COMPLAINT.

9. "WESTLAW DATABASE" has the same meaning as "database" referenced in the COMPLAINT ¶ 15.

10. The terms "ROSS," "DEFENDANT," and "COUNTERCLAIMANT," as used herein means ROSS Intelligence, Inc., and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

11. "COMPLAINT" means the Complaint filed by PLAINTIFFS in this litigation in the United Stated District Court for the District of Delaware on May 6, 2020 (D.I. 1).

12.     "LEGALEASE" as used herein means LegalEase Solutions, LLC, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

13.     "LEGALEASE MATTER" means the litigation filed in the United States District Court for the District of Minnesota, docketed at 18 Civ. 1445, and bearing the caption *West Publishing Corp. v. LegalEase Solutions, LLC.*

14.     "LEXISNEXIS" as used herein means LEXISNEXIS Group, Inc., and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf, including without limitation RELX Group plc and Matthew Bender & Company Inc.

15.     The terms "DOCUMENT" or "DOCUMENTS" is used in the broadest sense permissible under the Federal Rules of Civil Procedure and shall include, without limitation any written, printed, typed, recorded, or graphic matter, however produced, reproduced, or stored, including the originals and all nonidentical copies, whether different from the originals by reason of any notations made on such copies or otherwise, in the actual or constructive possession, custody, or control of PLAINTIFFS, including without limitation contracts, letter agreements, records, correspondence, COMMUNICATIONS, electronically stored information, emails, tweets, blog or Internet forum posts or comments, text messages on portable devices, Blackberry Messenger messages, SMS messages, instant messenger messages (e.g. Skype, Slack, etc.), memoranda, handwritten notes, source code, object code, binaries and associated files and/or structures, source code comments, source repository logs, server logs, records or summaries of

negotiations, records or summaries of interviews or conversations, audio or video recordings, copies of video games, all Internet-based media, photographs, corporate minutes, diaries, telephone logs, instant messaging logs, chat room logs, schedules, drawings, product storyboards, product mockups, statistical statements, work papers, disks, data cards, films, data processing files, charts, graphs, microfiche, microfilm, contracts, notices, reports, recitals, statements, worksheets, abstracts, resumes, summaries, jottings, market data, books, journals, ledgers, audits, maps, diagrams, research documents, newspapers, appointment books, desk calendars, project management charts (e.g., Gantt charts), task management records (e.g., to-do lists), expense reports, computer printout and other computer readable or electronic records, and all drafts or modifications thereof, and all non-identical copies of any such items. Any such DOCUMENT with any sheet or part thereof bearing any marks, such as initials, stamped indices, comments or notations, or any character or characters, that are not part of the signed text or photographic reproduction thereof is to be considered as a separate DOCUMENT. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "DOCUMENT(S)," such tangible item shall be produced.

16. The terms "COMMUNICATION" or "COMMUNICATIONS" mean any manner or method in which information is communicated from one human being to another, including, but not limited to, any means of transmission, sending, and/or receipt of information of any kind, such as speech, writing, language, nonverbal signals, computer electronics of any kind, magnetic tape, video tape, photographs, graphs, symbols, magnetic disks, sound, radio and/or video signal, telephone, teletype, telecommunication, telegram, microfilm, microfiche, photographic film of any type, and/or media of any kind.

17.     "AND" and "OR" and "BETWEEN" and "AMONG" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all information that otherwise might be construed to be outside of its scope.

18.     "ANY" shall mean any or all and the term "ALL" shall mean any or all.

19.     "IDENTIFY" means to provide a description sufficient in specificity such that the document or thing can be unambiguously obtained by means of such description in a request for production pursuant to Rule 34 of the Federal Rules of Civil Procedure, which will include, whether applicable, the document's or thing's title, date, author(s) or creator(s), recipient(s), Bates number, and present location.

20.     "INCLUDING" means not limited to.

21.     The terms "PERSON" and "PERSONS" means any individual, corporation, partnership, association, organization, or other entity of any type or nature.

22.     The terms "RELATE TO," "RELATED TO," AND "RELATING TO" mean constituting, pertaining to, in connection with, reflecting, respecting, regarding, concerning, referring to, based upon, stating, showing, evidencing, establishing, supporting, negating, contradicting, describing, recording, noting, embodying, memorializing, containing, mentioning, studying, analyzing, discussing, specifying, identifying or in any manner logically, factually, indirectly or directly, or in any other way connecting to the matter addressed, in whole or in part.

23.     The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun, and vice versa; and the past tense shall include the present tense where the clear meaning is not distorted. The term "or" shall mean "and" and vice-versa, as necessary to bring within the scope of the following requests all information or DOCUMENTS that would be excluded absent this definition.

## INSTRUCTIONS

1.    PLAINTIFFS shall IDENTIFY, produce, AND permit the visual inspection AND reproduction of the following DOCUMENTS, electronically stored information, AND things which are in its possession, custody, or control, INCLUDING DOCUMENTS, electronically stored information, AND things in the actual OR constructive possession of PLAINTIFFS, its attorneys, experts, AND anyone else acting on its behalf.  The production and visual inspection shall take place at Crowell & Moring LLP, 3 Embarcadero Center, 26th Fl., San Francisco CA 94111 (or such other place as may be stipulated by the parties).

2.    These requests are not limited by time unless stated within the request itself.

3.    Unless otherwise stated, the geographic scope covered by these requests is worldwide.

4.    If PLAINTIFFS claim that ANY DOCUMENT, tangible object, OR other thing responsive to ANY request was once in its possession, custody OR control AND has since been lost, discarded, destroyed, deleted, relinquished, OR disposed in some other manner, PLAINTIFFS shall IDENTIFY with particularity each such DOCUMENT AND set forth:

(a) The date the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, OR disposed;

(b) The circumstances under which the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, OR disposed; AND

(c) The identity of ALL PERSONS who had knowledge of, OR were present when, the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, OR disposed, as well as ALL PERSONS who authorized such actions.

5.      In the event that PLAINTIFFS contend that ANY DOCUMENT responsive to ANY discovery request below is privileged or otherwise excludable from discovery, PLAINTIFF shall:

(a) IDENTIFY each such DOCUMENT by date, author(s), signer(s), intended recipient(s), AND addressee(s);

(b), IDENTIFY each PERSON to whom a copy was furnished OR to whom the information OR advice was conveyed;

(c) state the general subject matter of the DOCUMENT; AND

(d) state the ground on which the claim of privilege OR immunity from disclosure is based.

Failure to do so will constitute a waiver of such a claim.

6.      If PLAINTIFFS claim a privilege OR immunity with regard to ANY DOCUMENT responsive to ANY discovery request below, PLAINTIFFS should nevertheless produce ALL portions of such DOCUMENT that contains information not appropriately subject to a claim of privilege OR immunity.

7.      These requests are continuing in nature under Rule 26(e) of the Federal Rules of Civil Procedure.  If, at ANY time prior to the completion of the above-captioned matter, PLAINTIFFS obtain OR become aware of additional DOCUMENTS, tangible objects, AND things responsive to these requests, PLAINTIFFS shall promptly supplement its response to provide such DOCUMENTS, tangible objects, AND things to ROSS.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1.:

All settlement agreements between YOU and LEXISNEXIS.

**REQUEST FOR PRODUCTION NO. 2.:**

All settlement agreements between YOU and LEGALEASE.

**REQUEST FOR PRODUCTION NO. 3.:**

All settlement agreements between YOU and any third-party RELATING TO the WESTLAW CONTENT, including without limitation the KEY NUMBER SYSTEM and HEADNOTES.

**REQUEST FOR PRODUCTION NO. 4.:**

All settlement agreements between YOU and any third-party RELATING TO any aspect of the WESTLAW PRODUCT YOU contend or have contended is protected by copyright.

**REQUEST FOR PRODUCTION NO. 5.:**

All current and past copyright registrations for any materials YOU claim are subject to copyright protections and YOU allege ROSS copied or caused to be copied.

**REQUEST FOR PRODUCTION NO. 6.:**

All current and past copyright registrations for any materials YOU claim are subject to copyright protections and YOU allege ROSS used as alleged in COMPLAINT ¶¶ 35, 37.

**REQUEST FOR PRODUCTION NO. 7.:**

All current and past copyright registrations for the KEY NUMBER SYSTEM.

**REQUEST FOR PRODUCTION NO. 8.:**

All current and past copyright registrations for the HEADNOTES.

**REQUEST FOR PRODUCTION NO. 9.:**

All current and past copyright registrations for the WESTLAW DATABASE.

8

**REQUEST FOR PRODUCTION NO. 10.:**

DOCUMENTS sufficient to show the structure, sequence and organization and content of the WESTLAW DATABASE.

**REQUEST FOR PRODUCTION NO. 11.:**

DOCUMENTS sufficient to show any changes to the structure, sequence and organization and content of the WESTLAW DATABASE since its inception and reason(s) for any such changes.

**REQUEST FOR PRODUCTION NO. 12.:**

DOCUMENTS RELATING TO the reasons for and purpose of the structure, sequence and organization and content of WESTLAW DATABASE.

**REQUEST FOR PRODUCTION NO. 13.:**

DOCUMENTS sufficient to show the structure, sequence and organization and content of the database referenced in Exhibit A of the COMPLAINT.

**REQUEST FOR PRODUCTION NO. 14.:**

DOCUMENTS sufficient to show any changes to the structure, sequence and organization and content of the database referenced in Exhibit A of the COMPLAINT since its inception and reason(s) for any such changes.

**REQUEST FOR PRODUCTION NO. 15.:**

DOCUMENTS reflecting any reasons for and/or purpose of the structure, sequence and organization and content of the database referenced in Exhibit A of the COMPLAINT.

**REQUEST FOR PRODUCTION NO. 16.:**

DOCUMENTS sufficient to show the structure, sequence and organization and content of the compilation referenced in Exhibit A of the COMPLAINT.

**REQUEST FOR PRODUCTION NO. 17.:**

DOCUMENTS sufficient to show any changes to the structure, sequence and organization and content of the compilation referenced in Exhibit A of the COMPLAINT since its inception and reason(s) for any such changes.

**REQUEST FOR PRODUCTION NO. 18.:**

DOCUMENTS RELATING TO the reasons for and purpose of the structure, sequence and organization and content of the compilation referenced in Exhibit A of the COMPLAINT.

**REQUEST FOR PRODUCTION NO. 19.:**

DOCUMENTS sufficient to show the structure, sequence and organization and content of the "comprehensive collection of legal information" referenced in COMPLAINT ¶ 11.

**REQUEST FOR PRODUCTION NO. 20.:**

DOCUMENTS sufficient to show any changes to the structure, sequence and organization and content of the "comprehensive collection of legal information" referenced in COMPLAINT ¶ 11 and reason(s) for any such changes.

**REQUEST FOR PRODUCTION NO. 21.:**

DOCUMENTS reflecting the reasons for and/or purpose of the structure, sequence and organization and content of the "comprehensive collection of legal information" referenced in COMPLAINT ¶ 11.

**REQUEST FOR PRODUCTION NO. 22.:**

DOCUMENTS sufficient to show the structure, sequence and organization of the "compilations of case law, state and federal statutes, state and federal regulations" referenced in COMPLAINT ¶ 15.

**REQUEST FOR PRODUCTION NO. 23.:**

DOCUMENTS sufficient to show any changes to the structure, sequence and organization of the "compilations of case law, state and federal statutes, state and federal regulations" referenced in COMPLAINT ¶ 15 since its inception and reason(s) for any such changes.

**REQUEST FOR PRODUCTION NO. 24.:**

DOCUMENTS reflecting the reasons for and/or purpose of the structure, sequence and organization and content of the "compilations of case law, state and federal statutes, state and federal regulations" referenced in COMPLAINT ¶ 15.

**REQUEST FOR PRODUCTION NO. 25.:**

DOCUMENTS sufficient to show the "editorial enhancements" that are "creative and original" referenced in COMPLAINT ¶ 11.

**REQUEST FOR PRODUCTION NO. 26.:**

DOCUMENTS sufficient to show the creativity and originality of the "editorial enhancements" referenced in COMPLAINT ¶ 11.

**REQUEST FOR PRODUCTION NO. 27.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO the "West's attorney-editors" and how they "review and create original West Headnotes to describe the key concepts" of a case as stated in COMPLAINT ¶ 14, including without limitation any aids, guidance, training, rules, suggestions, directions or roadmaps.

**REQUEST FOR PRODUCTION NO. 28.:**

All DOCUMENTS and COMMUNICATIONS describing the "West's attorney-editors" and how they "regularly edit and revise the West Headnotes and the West Key Numbers of

previously integrated cases so that subscribers can trust the accuracy and timeliness of the information that is offered" as stated in COMPLAINT ¶ 14, including without limitation any aids, guidance, training, rules, suggestions, directions or roadmaps.

**REQUEST FOR PRODUCTION NO. 29.:**

DOCUMENTS sufficient to show the structure, sequence and organization and content of the "comprehensive collection of legal information" referenced in COMPLAINT ¶ 11.

**REQUEST FOR PRODUCTION NO. 30.:**

DOCUMENTS sufficient to show any changes to the structure, sequence and organization and content of the "comprehensive collection of legal information" referenced in COMPLAINT ¶ 11 since its inception and reason(s) for any such changes.

**REQUEST FOR PRODUCTION NO. 31.:**

DOCUMENTS reflecting the reasons for and/or purpose of the structure, sequence and organization and content of the "comprehensive collection of legal information" referenced in COMPLAINT ¶ 11.

**REQUEST FOR PRODUCTION NO. 32.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS, including communications with LEXISNEXIS and any third party.

**REQUEST FOR PRODUCTION NO. 33.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's alleged request to access Westlaw as alleged in COMPLAINT ¶ 3.

**REQUEST FOR PRODUCTION NO. 34.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision to deny ROSS access to Westlaw.

**REQUEST FOR PRODUCTION NO. 35.:**

All DOCUMENTS and COMMUNICATIONS, RELATING TO ROSS's alleged copying of the KEY NUMBER SYSTEM.

**REQUEST FOR PRODUCTION NO. 36.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's alleged copying of HEADNOTES.

**REQUEST FOR PRODUCTION NO. 37.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's alleged copying of WESTLAW CONTENT.

**REQUEST FOR PRODUCTION NO. 38.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's alleged copying of WESTLAW PRODUCT.

**REQUEST FOR PRODUCTION NO. 39.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO LEGALEASE's alleged copying of the KEY NUMBER SYSTEM for, at the direction, or on behalf of ROSS.

**REQUEST FOR PRODUCTION NO. 40.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO LEGALEASE's alleged copying of HEADNOTES for, at the direction, or on behalf of ROSS.

**REQUEST FOR PRODUCTION NO. 41.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO LEGALEASE's alleged copying of WESTLAW CONTENT for, at the direction, or on behalf of ROSS.

**REQUEST FOR PRODUCTION NO. 42.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO LEGALEASE's alleged copying of WESTLAW PRODUCT for, at the direction, or on behalf of ROSS.

**REQUEST FOR PRODUCTION NO. 43.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR allegation that ROSS "intentionally and knowingly induced" LEGALEASE to "breach its contract with West" as alleged in COMPLAINT ¶ 3.

**REQUEST FOR PRODUCTION NO. 44.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO the WESTLAW CONTENT that LEGALEASE copied and distributed to ROSS as alleged in COMPLAINT ¶ 35.

**REQUEST FOR PRODUCTION NO. 45.:**

All DOCUMENTS and COMMUNICATIONS that reflect or evidence or show LEGALEASE'S breach of contract as alleged in COMPLAINT ¶ 3.

**REQUEST FOR PRODUCTION NO. 46.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's "blatant and willful infringement" as alleged in COMPLAINT ¶ 5.

**REQUEST FOR PRODUCTION NO. 47.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR allegation that "ROSS needed to acquire vast amounts of legal content, descriptions of that content, and a means by which to organize that legal content" as alleged in COMPLAINT ¶ 22.

14

**REQUEST FOR PRODUCTION NO. 48.:**

All DOCUMENTS and COMMUNICATIONS, including without limitation policies, instructions, and guidelines, reflecting YOUR decision "not [to] give competitors access to its products" as alleged in COMPLAINT ¶ 3.

**REQUEST FOR PRODUCTION NO. 49.:**

DOCUMENTS and COMMUNICATIONS evidencing all instances where YOU did "not give competitors access to [YOUR] products" as alleged in COMPLAINT ¶ 3.

**REQUEST FOR PRODUCTION NO. 50.:**

All DOCUMENTS and COMMUNICATIONS reflecting YOUR decision whether to permit third-party access to Westlaw as alleged in COMPLAINT ¶ 17.

**REQUEST FOR PRODUCTION NO. 51.:**

All DOCUMENTS and COMMUNICATIONS reflecting YOUR decision to prohibit Westlaw users from "creat[ing] a competitive product" as alleged in COMPLAINT ¶ 19.

**REQUEST FOR PRODUCTION NO. 52.:**

All DOCUMENTS and COMMUNICATIONS evidencing all instances where YOU prohibited Westlaw users from "creat[ing] a competitive product" as alleged in COMPLAINT ¶ 19.

**REQUEST FOR PRODUCTION NO. 53.:**

All templates of licenses, agreements, and contracts RELATING TO the WESTLAW CONTENT.

**REQUEST FOR PRODUCTION NO. 54.:**

All templates of licenses, agreements, and contracts between YOU and any third-party RELATING TO the WESTLAW PRODUCT.

**REQUEST FOR PRODUCTION NO. 55.:**

All licenses, agreements, and contracts between YOU and LEGALEASE.

**REQUEST FOR PRODUCTION NO. 56.:**

All DOCUMENTS and COMMUNICATIONS from Stephen L. Haynes, Manager, Westlaw Research, stating "the American system of privately-published judicial decisions is the best in the world."

**REQUEST FOR PRODUCTION NO. 57.:**

All DOCUMENTS and COMMUNICATIONS sufficient to show how YOU obtain judicial court decisions.

**REQUEST FOR PRODUCTION NO. 58.:**

All licenses, contracts, and agreements between YOU and any state or federal agency, including without limitation state or federal courts, RELATING TO YOU obtaining judicial court decisions.

**REQUEST FOR PRODUCTION NO. 59.:**

All COMMUNICATIONS RELATING TO any license, contract, and agreement between YOU and any state or federal agency, including without limitation state or federal courts, RELATING TO how YOU obtain judicial court decisions.

**REQUEST FOR PRODUCTION NO. 60.:**

All DOCUMENTS and COMMUNICATIONS sufficient to show how YOU obtain legislation, regulations, ordinances, and statutes from any law or rule making organization INCLUDING municipalities, states, and the federal government.

**REQUEST FOR PRODUCTION NO. 61.:**

All licenses, contracts, and agreements between YOU and any law or rule making organization, INCLUDING municipalities, states, and the federal government, RELATING TO YOUR obtaining of local, state, and federal legislation, regulations, ordinances, and statutes.

**REQUEST FOR PRODUCTION NO. 62.:**

All COMMUNICATIONS RELATING TO any license, contract, and agreement between YOU and law or rule making organization, INCLUDING municipalities, states, and the federal government, RELATING TO YOUR obtaining local, state, and federal legislation, regulations, ordinances, and statutes.

**REQUEST FOR PRODUCTION NO. 63.:**

All licenses, contracts, and agreements between YOU and the United States Military, including without limitation any of its services branches, RELATING TO the WESTLAW PRODUCT.

**REQUEST FOR PRODUCTION NO. 64.:**

All licenses, contracts, and agreements between YOU and the United States Military, including without limitation any of its services branches, RELATING TO the WESTLAW CONTENT.

**REQUEST FOR PRODUCTION NO. 65.:**

All DOCUMENTS and COMMUNICATIONS sufficient to show how YOU obtain materials from any governmental entity that appear, can be accessed, or are contained on or in YOUR WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 66.:**

All DOCUMENTS and COMMUNICATIONS, including without limitation any manuals, policies, procedures, instructions, guidelines, notes, reports, and white papers, explaining YOUR process for reviewing court decisions.

**REQUEST FOR PRODUCTION NO. 67.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision to implement the Document Classification System, Method and Software referenced in U.S. Patent No. 7,065,514 into the WESTLAW PLATFORM, and YOUR integration of this system into the WESTLAW PLATFORM, including but not limited to internal and external announcements or instructions, technical materials, and source code upgrades.

**REQUEST FOR PRODUCTION NO. 68.:**

All DOCUMENTS, including without limitation source code, object code, binaries and associated files and/or structures, RELATING TO PLAINTIFFS' algorithmically generated key number categorization system, known as the Classification and Recommendation Engine (CaRE) system, identified on the website

https://web.archive.org/web/20210507051753/https://www.thomsonreuters.com/en/artificial-intelligence/ai-timeline.html, attached hereto as **Exhibit A**.

**REQUEST FOR PRODUCTION NO. 69.:**

All COMMUNICATIONS RELATING TO PLAINTIFFS' algorithmically generated key number categorization system, known as the Classification and Recommendation Engine (CaRE) system, identified on the website

https://web.archive.org/web/20210507051753/https://www.thomsonreuters.com/en/artificial-intelligence/ai-timeline.html, attached hereto as **Exhibit A**.

**REQUEST FOR PRODUCTION NO. 70.:**

All DOCUMENTS evidencing the roles and responsibilities of YOUR "attorney-editors" or any other of YOUR employees who YOU contend author WESTLAW CONTENT.

**REQUEST FOR PRODUCTION NO. 71.:**

DOCUMENTS sufficient to show the "decades of human creativity and choices" that have resulted in "the structure, sequence, and organization of the WKNS" as alleged in COMPLAINT ¶ 21.

**REQUEST FOR PRODUCTION NO. 72.:**

DOCUMENTS sufficient to show the "rigorous editorial process" as alleged in COMPLAINT ¶ 11.

**REQUEST FOR PRODUCTION NO. 73.:**

DOCUMENTS sufficient to show first KEY NUMBER SYSTEM YOU developed, including without limitation the author of the KEY NUMBER SYSTEM and date of its creation.

**REQUEST FOR PRODUCTION NO. 74.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision to develop the KEY NUMBER SYSTEM.

**REQUEST FOR PRODUCTION NO. 75.:**

All DOCUMENTS and COMMUNICATIONS sufficient to show the development of the KEY NUMBER SYSTEM, including without limitation COMMUNICATIONS from John West RELATING TO the KEY NUMBER SYSTEM.

**REQUEST FOR PRODUCTION NO. 76.:**

All DOCUMENTS, including without limitation any manuals, policies, procedures, instructions, guidelines, notes, reports, and white papers RELATING TO how the KEY NUMBER SYSTEM "organizes" U.S. law as alleged in COMPLAINT ¶ 12.

**REQUEST FOR PRODUCTION NO. 77.:**

DOCUMENTS sufficient to describe the KEY NUMBER SYSTEM'S "hierarchy" as defined in COMPLAINT ¶ 13.

**REQUEST FOR PRODUCTION NO. 78.:**

All DOCUMENTS describing the process where YOU "take [the Headnotes] and select where in the WKNS they should be categorized" as stated in YOUR Answering Brief in Opposition to ROSS's Motion to Dismiss, D.I. 15.

**REQUEST FOR PRODUCTION NO. 79.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO the arrangement and ordering of the Key Number "topics."

**REQUEST FOR PRODUCTION NO. 80.:**

All DOCUMENTS RELATING TO the development of the KEY NUMBER SYSTEM, including without limitation any manuals, policies, procedures, instructions, guidelines, notes, reports, and white papers.

**REQUEST FOR PRODUCTION NO. 81.:**

All Patents YOU own, hold, or otherwise have an interest in RELATING TO the WESTLAW CONTENT, including the prosecution history of any such patent.

**REQUEST FOR PRODUCTION NO. 82.:**

All Patents YOU own, hold, or otherwise have an interest in RELATING TO the WESTLAW PRODUCT or which you have previously or currently contend cover the WESTLAW PRODUCT, including the prosecution history of any such patent.

**REQUEST FOR PRODUCTION NO. 83.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR development of the HEADNOTES, since WEST'S inception to present.

**REQUEST FOR PRODUCTION NO. 84.:**

All DOCUMENTS, including without limitation any manuals, policies, procedures, instructions, guidelines, notes, reports, and white papers, provided by YOU to YOUR "attorney-editors" RELATING TO the generation of HEADNOTES.

**REQUEST FOR PRODUCTION NO. 85.:**

All DOCUMENTS, including without limitation organizational charts, reflecting YOUR personnel with operational control and development of the WESTLAW CONTENT.

**REQUEST FOR PRODUCTION NO. 86.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO KEY NUMBER SYSTEM's "immeasurable value" that "helped position Westlaw as the leading research service" as alleged in COMPLAINT ¶ 16.

**REQUEST FOR PRODUCTION NO. 87.:**

All DOCUMENTS and COMMUNICATIONS, including without limitation board meeting minutes, describing YOUR strategy to license the WESTLAW PRODUCT to any third party.

**REQUEST FOR PRODUCTION NO. 88.:**

All DOCUMENTS and COMMUNICATIONS, including without limitation board meeting minutes, describing YOUR strategy to license the WESTLAW CONTENT to any third party.

**REQUEST FOR PRODUCTION NO. 89.:**

All DOCUMENTS and COMMUNICATIONS, including board meeting minutes, evidencing the "vast resources" YOU invested to develop the WESTLAW CONTENT as alleged in COMPLAINT ¶ 20.

**REQUEST FOR PRODUCTION NO. 90.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO LEGALEASE'S usage of Westlaw beginning in July 2017 as alleged in COMPLAINT ¶¶ 30-33.

**REQUEST FOR PRODUCTION NO. 91.:**

All DOCUMENTS and COMMUNICATIONS, including board meeting minutes, RELATING TO YOUR termination of LEGALEASE'S Service Agreement on January 4, 2018.

**REQUEST FOR PRODUCTION NO. 92.:**

All DOCUMENTS describing the "derivative works" LEGALEASE purportedly produced as alleged in YOUR ANSWER TO COUNTERCLAIMS ¶¶ 11-15.

**REQUEST FOR PRODUCTION NO. 93.:**

All DOCUMENTS evidencing ROSS's alleged instruction to LEGALEASE "to breach its Service Agreement with West" as alleged in COMPLAINT ¶ 34.

**REQUEST FOR PRODUCTION NO. 94.:**

All DOCUMENTS and COMMUNICATIONS evidencing when YOU discovered LEGALEASE allegedly copied and distributed WESTLAW CONTENT to ROSS.

22

**REQUEST FOR PRODUCTION NO. 95.:**

All WESTLAW CONTENT ROSS purportedly obtained as alleged in COMPLAINT ¶¶ 28-29, 35.

**REQUEST FOR PRODUCTION NO. 96.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's use of WESTLAW CONTENT as alleged in COMPLAINT ¶¶ 35, 37.

**REQUEST FOR PRODUCTION NO. 97.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's use of WESTLAW PRODUCT.

**REQUEST FOR PRODUCTION NO. 98.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's use of the HEADNOTES.

**REQUEST FOR PRODUCTION NO. 99.:**

All DOCUMENTS and COMMUNICATIONS RELATING TO ROSS's use of the KEY NUMBER SYSTEM.

**REQUEST FOR PRODUCTION NO. 100.:**

All DOCUMENTS and COMMUNICATIONS which mention, discuss, or refer to any damages, injuries, or harms YOU claim to have suffered as a result of ROSS's alleged copyright infringement alleged in YOUR COMPLAINT, or that support the damages or other relief YOU seek in YOUR copyright infringement claim.

**REQUEST FOR PRODUCTION NO. 101.:**

All DOCUMENTS and COMMUNICATIONS which mention, discuss, or refer to any damages, injuries, or harms YOU claim to have suffered as a result of ROSS's alleged tortious

interference alleged in YOUR COMPLAINT, or that support the damages or other relief YOU

seek in YOUR tortious interference claim.

## REQUEST FOR PRODUCTION NO. 102.:

All DOCUMENTS and COMMUNICATIONS that RELATE TO YOUR claims,

including but not limited to all DOCUMENTS and COMMUNICATIONS that YOU will rely on

in support of any of YOUR claims and defenses in this action.

## REQUEST FOR PRODUCTION NO. 103.:

DOCUMENTS sufficient to show YOUR document retention practices or policies in

force on an annual basis, including the retention of emails or other electronic Documents and

Communications.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  */s/ Stephanie E. O'Byrne*_____

David E. Moore (#3983)

Gabriel M. Ramsey

Stephanie E. O'Byrne (#4446)

Warrington Parker

Hercules Plaza, 6th Floor

Kayvan M. Ghaffari

1313 N. Market Street

Jacob Canter

Wilmington, DE  19801

CROWELL & MORING LLP

Tel:  (302) 984-6000

3 Embarcadero Center, 26th Floor

dmoore@potteranderson.com

San Francisco, CA 94111

sobyrne@potteranderson.com

Tel:  (415) 986-2800

*Attorneys for Defendant/Counterclaimant*

Mark A. Klapow

*ROSS Intelligence, Inc.*

Lisa Kimmel

Joshua M. Rychlinski

CROWELL & MORING LLP

1001 Pennsylvania Avenue, NW

Washington, DC  20004

Tel:  (202) 624-2500

Dated:  May 12, 2021

7198450 / 50241

# EXHIBIT A

Directory                                                        Logins  Support  Contact



# Our AI timeline

| 2000s ⌄ | More on AI @ TR |

Thomson Reuters has been innovating for its customers from day one - which for some customer segments goes as far back as the 1800's. Initially, technology was used to collect, organize, and enhance information for its customers. Later, it would employ artificial intelligence (AI) to improve the customer's ability to find the information they needed. Today, we use AI to better understand our customers and surface information and insights they need when they need it. Thomson Reuters, through its different businesses, has had a formal applied research and development group since 1992.

Follow our AI @ TR timeline to discover our innovation journey.

# 1970s

## 1975

Westlaw



In 1986, the Harris County Law Library began offering Westlaw as part of its collection through a terminal named WALT - a.k.a. West Automated Legal Terminal - similar to the one pictured here.

Westlaw was one of the first online legal research services. Attorneys used dumb terminals to dial up to a mainframe. The content was limited (disk space was expensive) and the search language simplistic.

Westlaw marked the beginnings of technology-driven innovation in many ways for legal sector.

# 1990s

# 1991

Scientist Spotlight: Howard Turtle



Howard Turtle

As chief scientist, Howard Turtle helped found one of the first R&D groups at Thomson Reuters. He is a nationally known scholar in search engine technologies, having developed a formal retrieval model based on Bayesian Inference Networks that formed the basis of the University of Massachusetts' INQUERY Retrieval System and of West Publishing's natural language search product, called WIN. Howard led the legal R&D group until 1996. Howard Turtle retired from Syracuse University in 2016.

# 1992

WIN (Westlaw is Natural)



Researching on a Westlaw terminal, with a sign for "WIN: Westlaw Is Natural" that says "Try the only legal research service that lets you search in plain English!" Irvine, 1993.

Westlaw Is Natural (WIN) was the first commercially available search engine with probabilistic rank retrieval. Howard Turtle led the effort after completing his PhD at UMass. This was an innovation milestone for legal research because prior to that most search engines only supported Boolean term & connectors.

# 1995

Scientist Spotlight: Peter Jackson



Peter Jackson

Peter Jackson was one of the founders of research and development (R&D) at Thomson Reuters. Peter joined Lawyers Cooperative Publishing (LCP) and formed the natural language processing (NLP) group in 1995. In 1998, Peter assumed leadership of the legal R&D group. Peter became Chief Research Scientist & Vice-President, Technology in 2005 at Thomson.

# 1996

## History Assistant



History Assistant

History Assistant was a large scale natural language processing (NLP) system that analyzed case law documents, extracted parties, judges and built the appellate chain for a particular case. The system found history relationships between court decisions by using a combination of information retrieval and machine learning techniques to link each new case to related documents that it may impact.

# 2000s

# 2000

## PeopleCite & Profiler



Jury Verdict and Settlement Document with Hyper Links to Attorneys, Judges, and Expert Witnesses including Arthur Ablin

PeopleCite and Profiler extracted entities from American case law documents to create a knowledge base of judges, attorneys, and expert witnesses with links to all their cases and biographies. Machine learning enabled those systems to analyze millions of documents, a scale far beyond what could be done manually. [Info Today]

# 2001

## CaRE - Classification and Recommendation Engine



Headnotes are summaries of the issues in a case. Headnotes in West reporters are written by the editors.

Using an ensemble of machine learning algorithms, CaRE has been used widely across the company to classify legal, tax and finance documents to large taxonomies, e.g., CaRE is used to classify millions of headnotes to a KeyNumber taxonomy with more than 90,000 categories. CaRE later formed the basis of ResultsPlus (2003) - a very successful document recommendation system. It is still in use today (2019).

# 2003

## ResultsPlus



ResultsPlus

ResultsPlus was a very popular document recommendation solution in Westlaw. Based in part on CaRE, the system made contextually relevant recommendations of secondary law documents, Key Numbers, briefs and more alongside search results. The system incorporated: natural language generation of summaries for briefs; user behavior analysis to enable personalized recommendations; and dynamic ranking of selections based on data from real-time A/B testing.

# 2005

## Firm360



Firm360

Built on the work done for the Profiler project to link attorney and judge names, this system identified law firms and companies, and used semantic parsing and discourse analysis techniques to infer the relationships among judges, attorneys, law firms, their roles, and the companies they represent. The metadata was stored in a data warehouse which in turn fed the Firm360 reports.

# 2006

Dexter

Dexter

Dexter is a machine learning (ML)-based named entity extraction and resolution (NER)system focusing on news and legal content. It is used in many products including Reuters Insider (2011).

# 2007

## Medical Litigator



Medical Litigator

[Westlaw Medical Litigator](#) provided legal researchers with immediate, "one-stop" access to information about medical terms, procedures and devices related to medical malpractice, personal injury, and device liability.  In addition, it provided an understanding of related medical issues, health care professionals and expert witnesses. It included natural language support and disambiguation tagging.

# 2008

## Concord



In the market intelligence domain, Concord and Dexter were used to extract entities and resolve such mentions to authorities to create the litigation history database behind West's Litigation Monitor.

Thomson Reuters provides one of the largest and most diverse set of Public Records in the United States. Concord enables searches where there could be thousands of "John Smith"s, connecting the correct records among hundreds of millions of records, and many more possible connections. It was, perhaps, the first statistics-based record linking and resolution solution of this scope in the public records domain.

# 2010s

# 2010

## WestlawNext



WestlawNext

Building on all our previous experience, a wide array of AI technologies were leveraged to solve a wide set of challenges. It used machine learning (ML), clustering, classification, usage log analysis, citation network analysis, topic modeling, and natural language generation – the veritable "kitchen sink" of AI. The result was WestSearch. WestlawNext set a new standard for legal research solutions. AI enabled the system to go beyond traditional search.

# 2011

## Reuters Insider



Reuters Insider

Reuters Insider used CaRE classification and Dexter entity extraction to connect transcripts of live news shows to video; this enabled searching video-based news.

# 2011

## NewsPlus







Screenshot showing how NewsPlus can drive an entire news portal - leveraging recommendation, deduplication, clustering, trending entities, summarization, etc.

NewsPlus is a content recommendation platform used in Westlaw and Eikon. The recommendation algorithms incorporated information from multiple sources to retrieve, filter, and prioritize news given the context of a specific user and application. It analyzes, de-duplicates, and groups/clusters the content. Like its predecessor, ResultsPlus, it used a hybrid approach of content and collaborative filtering.

# 2013

Checkpoint - Broadside



02:36

Intuitive Search on Thomson Reuters Checkpoint

Checkpoint Broadside applied many of the technologies and approaches used in WestlawNext to power the new "Intuitive Search" capability in Checkpoint, our market-leading research solution for tax and accounting professionals.

# 2013

## Magnet



Magnet provided an indicator for boilerplate, normal, or abnormal language along 3 dimensions in two key parts of SEC filing documents

Magnet analyzed SEC filing for deviation in language that may merit further review. An analysts could then review and provide deeper insights into related plans, initiatives, prospects and challenges; in effect, expanding the news coverage of that company.

## 2015

### Reuters Tracer and Social Data Platform (SDP)



Separating Real News from Fake in 40 Milliseconds

A platform and tool created for Reuters journalists to monitor Twitter for breaking events. Tracer filters out social media noise and identifies potential breaking news events. It utilized natural language processing (NLP), content classification, clustering and machine learning. A special Tracer feed is provided to Eikon as a completely automated real-time news feed.

## 2018

### DPA - Data Privacy Advisor



How Thomson Reuters and Watson help answer data privacy questions

Data Privacy Advisor incorporates a next-generation question-answering feature built in partnership with the Thomson Reuters and IBM Watson.

## 2018

Adverse Media



Adverse Media

Adverse media capabilities enable our analysts to perform adverse media screening from tens of thousands of news sources. In addition to extracting risk signals, these capabilities also perform concordance from unstructured sources. This capability helps analysts in performing ongoing background checks that support Anti-Money Laundering regulations. In particular, this new capability will perform interactive person name disambiguation and identify text/documents that potentially contain evidence of financial crimes. This service was being done manually by analysts. The solution searches news articles and leverages NewsPlus tagging capabilities. This capability is used in World-Check One: Media Check.

# 2018

## AutoMuni - Automated Municipal Bond Pricing



AutoMuni

The accurate evaluation of approximately a million bonds daily is a big challenge. The muni valuation method is quite manual. Such an approach is not only time consuming and costly, but also only a small portion of bonds can be accurately evaluated due to the restriction of resources. The AutoMuni system helps scale the valuation process by using intelligent, machine learning, algorithms that can price the entire fixed income universe automatically and efficiently.

# 2018

Inferno



Inferno

Inferno is a data ingestion and workflow tool to help analysts refresh content within the World-Check database. This helps to improve the accuracy and reliability of World-Check which is crucial in keeping the competitive advantage. It mines news feeds and then uses various techniques, including machine learning and natural language processing (NLP), to enhance the data ingestion workflow, increasing the speed and accuracy of identifying required updates to World-Check data.

# 2018

## Westlaw Edge: WestSearch Plus



00:42

WestSearch Plus on Westlaw Edge

WestSearch Plus answers customers' questions posed in natural language. Behind the scenes, it mines the rich analytical material in our headnotes as the source for answers. It uses editorial guidelines to divide Headnotes into frames/intents. Then it classifies both answers and questions (mined from the query logs) to those intents. WestSearch Plus uses search strategies based on questions and intents to assemble a headnote candidate pool and uses natural language processing (NLP) & discourse features in XGBoost model to classify/score answers.

# 2018

## Westlaw Edge: Litigation Analytics



01:18

Litigation Analytics on Westlaw Edge

Lawyers now have all the analytics from past cases at their fingertips and can shape their litigation strategy with Westlaw Edge's Litigation Analytics.

Many AI methods were used including deep learning. It extracts information from federal dockets, identifying names and relationships of all parties. It identifies case topics and adds all this information to a knowledge graph. The knowledge graph is continually updated. Customers use natural language to explore this knowledge graph. When returning results, the AI generates text narratives explaining the generated visualizations.

# 2018

Westlaw Edge: KeyCite Overruling Risk



KeyCite Overruling Risk on Westlaw Edge

KeyCite is our market leading case citator system. It is important to identify cases that are negatively impacted by an overruling decision, and to flag them as possibly impliedly overruled cases that need further careful examination. The AI-powered solution identifies those cases using machine learning algorithms.

The problem is formulated as a binary classification of candidate cases into those that are negatively impacted (and possibly impliedly overruled) and those that are not (and hence are still safe to be relied on in a legal investigation).  Our classifier uses a variety of features, including metadata information about the cases, citation paragraphs in the overruling and affected cases, as well as headnotes in the overruled case.

# 2019

Deep Learning Center Launched in Boston



Deep Learning at Thomson Reuters

Thomson Reuters launched a deep learning center in the heart of Boston, Massachusetts, very appropriately addressed at 1 Thomson Place. This marked a growing commitment within the organization to expand capabilities across core technology domains. Deep learning methodologies can greatly add to the proficiency of related fields like natural language processing or image processing and analysis. The implications of this field are substantial across operational efficiencies as well as discovering new insights across key industry segments.

# 2019

## Checkpoint Edge

Checkpoint Edge introduced an entirely new feature called Concept Markers and made further enhancements to the Intuitive Search algorithms that assist and guide the research process. It helps users refine and/or elaborate on their queries to find answers. Natural language processing (NLP) and machine learning (ML) technologies were used to enable these features.

# 2019

## Westlaw Edge : Quick Check




Director of Westlaw Product Management

02:01

Westlaw Edge Quick Check™ In the Making

Attorneys perform hours of legal research so that they can provide their clients with the best possible representation. They are under constant pressure to do their best work as efficiently as possible.

Quick Check is a Westlaw Edge feature that, given a legal document, finds additional supporting authority to research. This helps our customers complete their legal

research faster and have a higher degree of confidence in their work. It also enables them to do a thorough analysis on their opponent's work and in turn help them be more prepared for their clients.

# Today

## Today

AI @ TR - We're Just Getting Started!

Today, Thomson Reuters is scaling innovation for its customers to new heights. How will AI transform our industries tomorrow? AI @ TR is working on that answer today!

Search

ABOUT THOMSON REUTERS

PRODUCTS & SERVICES

LEARN MORE

CONTACTS

**CONNECT WITH US**

## <u>CERTIFICATE OF SERVICE</u>

I, Stephanie E. O'Byrne, hereby certify that on May 12, 2021, true and correct copies of the within document were served on the following counsel of record at the addresses and in the manner indicated:

### <u>VIA ELECTRONIC MAIL</u>

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@mnat.com
mflynn@mnat.com

Dale Cendali, P.C.
Joshua L. Simmons
Eric Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
eric.loverro@kirkland.com

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
cameron.ginder@kirkland.com

Megan L. McKeown
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
megan.mckeown@kirkland.com

*/s/ Stephanie E. O'Byrne*
Stephanie E. O'Byrne

7193230 / 50241

# EXHIBIT F

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT G

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT H

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT I

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT J

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
        THOMSON REUTERS ENTERPRISE CENTRE
 4      GMBH and WEST PUBLISHING CORPORATION,:    CIVIL ACTION
                                           :
 5              Plaintiffs,                 :
        v                                  :
 6                                         :
        ROSS INTELLIGENCE INC.,            :
 7                                         :    NO. 20-613-LPS
                Defendant.
 8                              - - -

 9                         Wilmington, Delaware
                           Friday, October 30, 2020
10                          Telephonic Argument

11                              - - -

12      BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge

13      APPEARANCES:             - - -

14
                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
15                  BY:  JACK B. BLUMENFELD, ESQ.

16                      and

17                  KIRKLAND & ELLIS LLP
                    BY:  DALE M. CENDALI, ESQ., and
18                       JOSHUA L. SIMMONS, ESQ.
                         (New York, New York)
19
                            Counsel for Thomson Reuters
20                          Enterprise Center GmbH and West
                            Publishing Corporation
21

22                  POTTER ANDERSON & CORROON LLP
                    BY:  DAVID E. MOORE, ESQ., and
23                       STEPHANIE E. O'BYRNE, ESQ.

24                      and

25                          Brian P. Gaffigan
                            Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3                CROWELL & MORING LLP
                 BY:  GABRIEL M. RAMSEY, ESQ.,
                      KAYVAN M. GHAFFARI, ESQ., and
4                     JACOB CANTER, ESQ.
                      (San Francisco, California)

5

6                     and

7                CROWELL & MORING LLP
                 BY:  MARK A. KLAPOW, ESQ.
                      JOSHUA M. RYCHLINSKI, ESQ.
8                     (Washington, District of Columbia)

9                          Counsel for ROSS Intelligence Inc

10

11

12

13

14

15

16

17

18

19

20

21

22                          - oOo -

23                     P R O C E E D I N G S

24                (REPORTER'S NOTE:  The following telephonic

25    argument was held remotely, beginning at 11:04 a.m.)

1    down by West, they ran to LegalEase, that they knew that the

2    contract that LegalEase had with us said that they were not

3    entitled to give material to a competitor.

4              And, again, this is right in paragraph 3 of the

5    complaint.  "Upon information and belief, ROSS intentionally

6    and knowingly induced a third party called LegalEase to

7    breach its contract with West by engaging in unlawful

8    reproduction of plaintiffs' uncopyrighted content and

9    distributed that content en masse to ROSS.  ROSS did so

10   after asking for, and being explicitly being denied,

11   access to Westlaw by West on the basis West does not give

12   competitors access to its products.  Thus, ROSS induced

13   West -- LegalEase to engage in this unlawful activity

14   knowing that it violated the terms of LegalEase's contract

15   with West."

16             So at various times in my friend's argument,

17   they argued that, well, there is nothing in there that, that

18   is alleging that ROSS knew what LegalEase was doing or

19   knowing that it had this contract or knowing what it meant.

20   What we -- we pled exactly the opposite.

21             The other thing that I think is important is not

22   only is it not publicly available, what ROSS's engineers

23   did with the material it received en masse from LegalEase

24   pursuant to its asking them to give it to them, but what is

25   also not publicly available is what their actual interfaced

1    consumers look like.

2            At various time in counsel's argument, he

3    said that, well, you know, the ROSS platform is publicly

4    available.  We should have somehow, you know, looked at it

5    and reverse engineered it or something to that effect.

6            Leaving aside that there is zero requirement

7    in copyright law to try to reverse, reverse engineer some

8    public thing to try to figure out what was taken from you

9    to create it, it's also important to note that prior to

10   us filing this complaint, ROSS's terms of service had a

11   provision explicitly prohibiting competitors from using its

12   product.

13           Only after that we filed the complaint would

14   that provision was tellingly removed.  I don't think it

15   really matters because the nature of this complaint, as I

16   said earlier, isn't about the interface or at least at this

17   point isn't about the interface because we haven't had

18   access to what they're giving people.

19           What this complaint is about that they used

20   Westlaw's copyrighted material to create a competing

21   platform.  To be able to get that fast development time and

22   rush out a competing platform.

23           And to be clear, counsel also repeatedly kept

24   talking about this case as if it were just about the Westlaw

25   key numbering system or the headnotes.

1          No doubt those are material that or it's part of

2     our copyright.  But our copyright also is our registrations,

3     1-1, pages 2 and 3 of our complaint indicate.  And paragraph

4     2 of our complaint also specifies, is that we also have a

5     copyright in the compilation that we created.  It's not just

6     these, you know, standing on its own, headnotes but it's

7     the entire structure, sequence, and organization that we put

8     together to find, analyze, to explain the law.

9          And the complaint details all the myriad

10    creative choices that went into creating that content.  And

11    we have not just one, not just two, but 161 copyright

12    registrations attached to our complaint that all of which

13    under Third Circuit law are entitled to a presumption not

14    just of validity but also a presumption of originality.

15    And that is more than enough to plead a claim of copyright

16    infringement, which we have done.

17          Now this --

18          THE COURT:  Ms. Cendali, let me ask you.  So

19    when you refer to compilation in the answering brief as

20    something you are going to argue is protectable under

21    copyright, that allegation is found in paragraph 2 when you

22    refer to plaintiff's copyrighted content and organization?

23    Is that what I should understand?

24          MS. CENDALI:  That's right.  That's the first

25    time that it is mentioned.  But throughout the complaint,

1    Your Honor, we also talk about, I think it starts in, it

2    starts in paragraph 11 and it goes from there.  It's also

3    talked about in paragraph 12 which talks about plaintiff's

4    numerous creative choices about how to organize cases, which

5    cases to place in the classification, require substantial

6    investments of time, technological resources, and money over

7    the course of decades.

8            And then we go on.  Paragraph 13 talks about

9    plaintiffs' complex hierarchy, and what is done to make

10   choices as to -- and when we all know that even Your Honor's

11   decision in this case could be probably sliced and diced 100

12   different ways or maybe not sliced and diced.  Maybe it will

13   only be sliced and diced in 60 ways or 200 ways and all

14   sorts of keynotes and headnotes can be created.

15           And as we plead in the complaint in detail, we

16   took the time to talk about this is all part of our

17   creativity.  Paragraph 15 as well talks about how Westlaw

18   includes access to volumes of proprietary material,

19   including such as West headnotes, case summaries, and other

20   Westlaw created content, databases, compilations of case

21   law, et cetera.  All of that was pled in our complaint.

22           And they copied it en masse.  This isn't just

23   about the headnotes.  That's not what we, what we pled, and

24   that is not what our copyright registrations are limited to.

25           In fact, as I was, I was saying, you know, if

1    Your Honor looks at the copyright registrations annexed to

2    the complaint, such as Docket 1-1, page 2, it's the author

3    of compilation, revisions, addition, et cetera.

4            And that is also true with regard to 1-1, page

5    3, compilation of previously published case reports,

6    including, but not limited to, opinions and also syllabi in

7    Westlaw paragraphs.

8            Westlaw is much more than the headnotes and

9    keynotes, and it is certainly much more than the one or two

10   headnotes or keynotes that we put in the complaint, just to

11   give Your Honor an idea of the story.

12           We certainly were not saying that is the only

13   thing that we are suing on, and I don't think that is a fair

14   reading of the complaint.  Rather, we're suing on all of

15   Westlaw, all of our proprietary material which includes our

16   revisions, our compilations, our additions, our analysis,

17   and the hierarchy that we detail at length in our complaint.

18   And that is more than enough.

19           THE COURT:  All right.  But what you do in the

20   complaint also at paragraph 1 is create a defined term,

21   "Westlaw content."  And I think by your own concession, but

22   I want to make sure I got this correctly, Westlaw content

23   is a term that also encompasses things that you do not

24   contend you have a copyright on.  For instance, judicial

25   opinions and statutes.

1          So I think some of the confusion here and

2     some of the argument that you are facing is you don't say

3     compilation as a defined term in the complaint, although

4     you suggested it in your belief.  And you don't really make

5     clear in your complaint your acknowledgment that some of

6     what you are defining as Westlaw content is actually not

7     protectable.  So help me with that.

8          MS. CENDALI:  I'm happy to, Your Honor.  What we

9     intended to do and said in paragraph 1 of the complaint is

10    that, "Plaintiffs created and nurtured their well-known

11    Westlaw products since inception, including, without

12    limitation, its unique West key number system and West

13    headnotes."

14         And to be clear, the West key number system (A),

15    it's without limitation, as I point out in the definition of

16    Westlaw content.  But the West key number system, which we

17    explained at length in those paragraphs that I referred Your

18    Honor to a few minutes ago with regard to the hierarchy,

19    that is all of the compilation, the creative structure, and

20    organization of Westlaw.

21         We talk about and repeated paragraphs in this

22    complaint about how they took our structure, sequence, and

23    organization.  For example, we say on paragraph 11, "Westlaw

24    makes legal research seamless through its well designed

25    structure, sequence, and organization."

1                    And our point is, well, we don't know, since

2      we're not inside their company, exactly what they took but

3      they took all of our content.  And to make it also clear, I

4      realize I didn't completely answer your question, we did

5      not define and did not intend to define Westlaw content as

6      relating to unprotected materials.

7                    The copyright registrations in fact are clear

8      on that.  The copyright registrations state on their face,

9      and this is annexed to the complaint in Docket 1-1, page 3

10     as well, that copyright is not claimed as to any part of the

11     original work prepared by United States Government officer

12     or employee as part of that person's official duties.

13                   That material would not be included in the

14     definition of Westlaw content.  It couldn't be because it's

15     not part of our copyright registrations.  Rather --

16                   THE COURT:  Yes.  Where does your complaint make

17     that clear and give the defendant notice of that?

18                   MS. CENDALI:  Well, I think it makes it clear

19     by defining Westlaw content for, for what it is, which is

20     its unique West key number system and the West headnotes,

21     without limitation.  And I think it also makes it clear

22     because we attached 161 copyright registrations to the

23     complaint that disclaimed that material.  We are not

24     claiming copyright on that.

25                   THE COURT:  How about the search engines and

1     algorithms?  Are you claiming copyright protection on those?

2               MS. CENDALI:  Yes, the search engines and

3     algorithms are part -- they're part of the compilation.

4     They're part of the hierarchy and the structure of how

5     Westlaw is created and operates.  And that is definitely

6     part of our, of our copyright claim, and part of our

7     registration.

8               THE COURT:  And how does your complaint give

9     reasonable and adequate notice to the defendants that that

10    is part of what they are alleged and have to defend against?

11              MS. CENDALI:  Well, if Your Honor doesn't think

12    it gives reasonable notice, then, you know, we submit we

13    would be happy to amend to say that.  But I think that we

14    did our best.  I hope we succeeded, but we did our best to

15    say that, such as on paragraph 11, editorial enhancements

16    such as West proprietary headnotes, notes of decisions,

17    and the WKNS are just a few examples of the creative and

18    original material authored by West.

19              And then we spent a lot of time talking

20    especially in paragraph 13, about the different hierarchy

21    and structure that was created.  And we annexed the

22    copyright registration that was clear that it covers

23    revisions, compilations and does not cover material created

24    by people like yourself.  That's what the registrations

25    reflect, and that is what we thought we did in the

1    complaint.

2         But moving on, Your Honor to, if you permit, to

3    so far we've just been talking about the claims of direct

4    copyright infringement.  Counsel also, in oral argument,

5    talked about our secondary liability indirect claims.

6         And there, I think it's important to make a

7    threshold point, which is that they have waived argument

8    with regard to their secondary liability claim.

9         As Your Honor recently found on, just recently

10   on October 8th of this year, in the *Align Tech* case,

11   where you wrote that you would not evaluate the merits of

12   something that wasn't raised in the opening brief, nowhere

13   in their opening brief did they allege that they would be

14   making arguments about the sufficiency of our indirect

15   infringement claims.

16        Moving from there, counsel also talked about

17   some argument with regard to copying of the constituents

18   elements and the like.  And I think it is important to

19   remember that there is not any kind of requirement as they

20   seem to suggest that we have to somehow parse through all

21   of Westlaw to identify in detail issues with regard to it

22   as they seem to want to do.  Well, I don't know.  You should

23   be specific as to whether this is, this headnote you think

24   is protectable or that headnote, you know, may be not be as

25   good or something to that, to that effect.

1              Again, our copyright registrations are clear

2    that the revisions, the compilation are ours and that the

3    government works are not.

4              But I think that the *Micro Focus* case decided

5    by Judge Andrews a few years ago is a very good case for

6    today's discussion.  Because there, the defendants, too, try

7    to argue that, well, the plaintiff, in a software case, you

8    know, failed to identify -- to break down and identify in

9    their copyrighted software what original elements they

10   believe were worthy of copyright protection.

11             And Judge Andrews dismissed this argument.  He

12   said, "The defendant's original element theory is not the

13   correct standard.  For purposes of Rule 12(b)(6), a

14   complaint only needs to allege specific original works are

15   the subject of a copyright claim.  In the present case,

16   plaintiffs identified the software as the original work in

17   question, and this is sufficient to withstand a motion to

18   dismiss."

19             Plaintiff also tried to tackle on this motion to

20   dismiss the idea that the headnotes of the West key

21   numbering system is somehow not protected by, by copyright.

22             Well, the first point is that is something that

23   they can be free to address in discovery but isn't proper

24   for a motion to dismiss because we have a presumption of

25   validity and a presumption of originality.  We have 161 of

72

1               I'm going to take the motion under advisement.

2    If I need anything further from you, I will let you know.   I

3    hope everybody enjoys the weekend.   Happy Halloween, I

4    suppose, and stay safe.

5               Thank you again.   We will be in recess.

6               (The attorneys respond, "Thank you, Your Honor.")

7               (Telephonic argument ends at 12:48 p.m.)

8

9        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

10

11                          /s/ Brian P. Gaffigan
                          Official Court Reporter
12                          U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25