IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>ROSS INTELLIGENCE INC.,<br><br>Defendant. | C.A. No. 20-613-LPS |

Jack B. Blumenfeld and Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Dale M. Cendali, Joshua L. Simmons, and Eric A. Loverro, KIRKLAND & ELLIS LLP, New York, NY

Daniel E. Laytin, Christa C. Cottrell, Alyssa C. Kalisky, and Cameron D. Ginder, KIRKLAND & ELLIS LLP, Chicago, IL

    Attorneys for Plaintiffs


David E. Moore, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Gabriel M. Ramsey, Warrington Parker, and Jacob Canter, CROWELL & MORING LLP, San Francisco, CA

Mark A. Klapow and Lisa Kimmel, CROWELL & MORING LLP, Washington, DC

    Attorneys for Defendant

**MEMORANDUM OPINION**

April 26, 2022
Wilmington, Delaware



**STARK, U.S. Circuit Judge:**

Plaintiffs Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West," and together with Thomson Reuters, "Plaintiffs") sued Defendant ROSS Intelligence Inc. ("ROSS") for copyright infringement and tortious interference with contract. (*See generally* D.I. 1) ("Compl.") ROSS asserts a variety of counterclaims, including violations of the Sherman Act and the unfair competition laws of both California and Delaware. (*See generally* D.I. 36 at 11-46) Plaintiffs move to dismiss the antitrust and unfair competition counterclaims. (D.I. 39) For the reasons explained below, the Court will grant Plaintiffs' motion in part and deny it in part.

## BACKGROUND[1]

### A. Factual Allegations[2]

Plaintiffs Thomson Reuters and West operate and market Westlaw, a legal search platform. (D.I. 36 at 11 ¶ 5) Plaintiffs control "over 80% of the market for legal search platform products," so some consider Westlaw to be the "king" of legal research. (*Id.*) Westlaw has a comprehensive database of "public law," comprising federal and state court decisions, federal and state statutes, and administrative rules and guidance. (*Id.* at 11 ¶ 2; *see also id.* at 17 ¶ 39) Because Westlaw's public law database is so comprehensive, Westlaw "has

---

[1] In a previous Memorandum Opinion, the Court outlined Plaintiffs' allegations against ROSS. *See Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, 529 F. Supp. 3d 303, 307-10 (D. Del. 2021). That background is not repeated here, as the instant Memorandum Opinion focuses on ROSS's allegations against Plaintiffs.

[2] The factual allegations in this section are taken primarily from ROSS's amended counterclaims and the parties' papers. At this stage, the Court must take ROSS's well-pled factual allegations as true.

been the standard . . . since before any practicing lawyer was born," and legal researchers "can feel confident when looking for cases in Westlaw's digital collection." (*Id.* at 18 ¶ 44) Yet Westlaw's vast amount of public law information is not particularly helpful without a way to search within that information. (*See id.* at 26 ¶ 78) ("[I]f the database is not connected to a legal search tool, then it holds no value.") Thus, Westlaw incorporates a search tool that allows researchers to sift through the public law. (*Id.* at 18 ¶ 45) The "backbone" of Westlaw's search tool is the West Key Number System, which "organizes numerous legal topics and then subclassifies them into key numbers based on legal issues and points of law." (D.I. 28 at 4-5) Attorney-editors are constantly reviewing cases to distill crucial points of law into headnotes and to organize the headnotes by key number. (*See id.* at 5)

Despite Westlaw's dominance, ROSS endeavored to develop a new and improved legal search platform using artificial intelligence ("AI"). (D.I. 36 at 14 ¶ 24) ROSS sold access to its legal search platform for "a tiny fraction" of Westlaw's cost. (*Id.* at 15 ¶ 25) Given its low cost and ease of use, ROSS's legal search product garnered significant support from customers, the media, and bar associations. (*See id.* at 24 ¶ 68) But ROSS struggled to build a public law database that was even remotely as comprehensive as Westlaw's. (*See id.* at 15 ¶ 28; *see also id.* at 25 ¶¶ 73-74; *id.* at 12 ¶ 7 ("ROSS never really had a chance.")) ROSS partnered with LegalEase Solutions, LLC ("LegalEase") to improve ROSS's search tool. According to Plaintiffs, however, LegalEase "used a bot . . . to download and store mass quantities of proprietary information," which it then provided to ROSS. (D.I. 28 at 6) Ultimately, ROSS was "forced to suspend business activities." (D.I. 38 at 7)

ROSS is pursuing antitrust and unfair competition counterclaims against Plaintiffs, seeking to stop them from "engaging in an exclusionary and anticompetitive course of conduct to maintain [their] monopoly and restrain trade." (D.I. 36 at 12 ¶ 7) Several allegations regarding the competitive landscape are central to ROSS's counterclaims. First, Plaintiffs have "never provided consumers with an option to only license the public law database, or to only license the legal search tools, and do[] not plan to ever provide such an option." (*Id.* at 32 ¶ 104) That is true even though, according to ROSS, there are three separate but related markets for (i) public law database products, (ii) legal search tool products, and (iii) legal search platforms. (D.I. 38 at 7-8) ROSS further alleges there is "independent demand" by consumers for public law databases and legal search tools, to permit legal researchers to "mix-and-match products based on particular preferences and needs." (*Id.* at 5-6) Moreover, Plaintiffs allegedly require their customers to sign "contract[s] of adhesion" (D.I. 36 at 32 ¶ 103) containing "restrictive licensing conditions" that prevent competitors from gaining access to Plaintiffs' proprietary information (*id.* at 33 ¶¶ 107-08). Finally, Plaintiffs allegedly intermingle copyrighted material with uncopyrightable government edicts, rendering it "not difficult" for Plaintiffs to "find a way" to sue their rivals for copyright infringement, even though such lawsuits are "a complete sham." (*Id.* at 34-35 ¶¶ 110-11)

### B. Procedural History

In May 2020, Plaintiffs sued ROSS for copyright infringement and tortious interference with a contract between West and LegalEase. (*See* Compl. ¶¶ 40-53) The Court denied ROSS's motion to dismiss the complaint for failure to state a claim. *See Thomson Reuters*, 529 F. Supp. 3d at 315.

In December 2020, ROSS partially answered the complaint and asserted counterclaims against Plaintiffs, seeking declaratory judgment of copyright invalidity, copyright noninfringement, and no tortious interference with contract. (*See generally* D.I. 21 ¶¶ 17-37) Plaintiffs answered the counterclaims. (*See generally* D.I. 23) ROSS subsequently amended its answer and added the following counterclaims: (a) declaratory judgment of fair use, (b) declaratory judgment of copyright misuse, (c) violation of the Sherman Act § 2, (d) violation of the Sherman Act § 1, (e) violation of California's unfair competition law, and (f) violation of Delaware common law on unfair competition. (*See generally* D.I. 24 ¶¶ 116-80)

Plaintiffs moved to dismiss the counterclaims involving the alleged violations of federal antitrust law and state unfair competition law (Counts VI-IX). (*See generally* D.I. 27, 28) In light of the Court's intervening denial of ROSS's motion to dismiss Plaintiffs' copyright infringement and tortious interference claims, ROSS again filed amended counterclaims with the same nine counts. (*See generally* D.I. 36)

Plaintiffs filed a second motion to dismiss Counts VI-IX. (D.I. 39)[3] The Court has carefully considered all arguments raised in the parties' briefs (*see generally* D.I. 28, 38, 45), as well as arguments made by counsel during an in-person hearing on the pending motion (*see* D.I. 69) ("Tr.").

## LEGAL STANDARDS

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material factual allegations in the complaint. *See Spruill v. Gillis*, 372

---

[3] The Court denied the first motion to dismiss as moot, in light of subsequent filings. (*See generally* D.I. 160)

4

F.3d 218, 223 (3d Cir. 2004). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Therefore, the Court may grant such a motion to dismiss "only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Ultimately, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept "bald assertions" as true. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted). Nor is it obligated to credit "unsupported conclusions and unwarranted inferences." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997). The Court may likewise reject allegations that are "self-evidently false." *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## DISCUSSION

### I. Antitrust Counterclaims

#### A. Sherman Act § 2

A violation of § 2 of the Sherman Act, 15 U.S.C. § 2, "requires '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).[4]

##### 1. Tying

ROSS's first theory for its claim under § 2 of the Sherman Act alleges that Plaintiffs unlawfully tie their legal search tool to their public law database to maintain their dominance in the overall market for legal search platforms. (*See* Tr. at 35) "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) (internal quotation marks omitted). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase

---

[4] The Court will address the two theories ROSS is pressing in connection with its § 2 claim. ROSS clarified in its briefing that it is not relying on the "essential facilities doctrine" (D.I. 38 at 2), and at the hearing, ROSS withdrew its "refusal to deal" claim (Tr. at 43). ROSS had been pursuing a claim based on Plaintiffs' refusal to deal with ROSS. (*See* D.I. 38 at 17-19) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). The Court will dismiss that claim in light of ROSS's withdrawal of it.

6

elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). In a tying arrangement, there must be "two separate products." *Id.* at 18. "[W]hether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Id.* at 19; *see also Eastman Kodak*, 504 U.S. at 462 ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts.").

Plaintiffs' basis for seeking to dismiss the § 2 tying claim is that ROSS has not sufficiently alleged two different products or two different product markets. (D.I. 28 at 13; Tr. at 13) ROSS responds that public law databases and legal search tools are separate products, citing as support its own experience of developing a legal search tool while separately "buil[ding] its public law database" by "purchas[ing] some cases from Casemaker" and "other public law from Fastcase." (D.I. 36 at 24 ¶ 71) ROSS further alleges that its legal search tool product was "incredibly valuable." (*Id.* at 25 ¶ 73) As ROSS puts it, "[c]ustomers valued ROSS's legal search tool so highly . . . because it is built with innovative AI-based technology." (D.I. 38 at 14) ROSS's experience suggests that building a public law database product is distinct from developing a legal search tool product.

In arguing that public law databases and legal search tools are just one product (i.e., a legal search platform), Plaintiffs emphasize that ***their*** legal search tool has never been sold separately from ***their*** public law database. (*See, e.g.*, Tr. at 11; *see also* D.I. 36 at 24 ¶ 69 (ROSS admitting that Plaintiffs have "never offered to license [their] database separate from [their] search tools")) Plaintiffs are correct that if two products have never been sold separately, this suggests that they are really one product. *See generally Eastman Kodak*, 504 U.S. at 462

7

(noting that products were previously sold separately); *see also* D.I. 45 at 5 (citing additional cases). As ROSS points out, however, Plaintiffs' public law database was effectively sold as a stand-alone product in the form of books for decades before modern technology allowed Plaintiffs to develop an online legal search tool. (*See* Tr. at 31) ("In the 19th century, West began to sell case law separate from any digest that could be used to search.") Moreover, some third parties have allegedly sold public law databases as discrete products. (*See* D.I. 36 at 24-25 ¶ 71) (describing how ROSS purchased cases from Casemaker and Fastcase)

Plaintiffs argue that ***their*** legal search tool is effectively useless without a public law database attached to it. (D.I. 28 at 14) But the Supreme Court has "often found arrangements involving functionally linked products[,] at least one of which is useless without the other[,] to be prohibited tying devices." *Jefferson Par.*, 466 U.S. at 19 n.30; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001) (en banc) ("[T]he mere fact that two items are complements . . . does not make them a single 'product' for purposes of tying law.").

Taking ROSS's allegations as true, and drawing all reasonable inferences in ROSS's favor, ROSS has sufficiently alleged that public law databases and legal search tools may be two different products instead of one.

ROSS has also plausibly alleged that there are independent markets for both products. The amended counterclaims allege "a growing interest in unbundled search products, or other flexible options for digital legal research." (D.I. 36 at 27 ¶ 79) ROSS further alleges that "there are relevant markets for public law database products and legal search technologies in the United States." (*Id.* at 27 ¶ 80) The customers in those markets include "end-users like law firms, intermediate buyers like bar associations that seek to expand access to the law, and

8

intermediate buyers like ROSS that need access to the database to develop, test and market their platform products." (*Id.*) Indeed, ROSS alleges that its legal search tool received significant attention and praise from those types of customers. (*See, e.g., id.* at 24 ¶ 68; *id.* at 25 ¶ 74) Moreover, investors put money into ROSS, "suggesting that the venture capital community believed that there was demand for legal search tools." (D.I. 38 at 15) (citing D.I. 36 at 23-24 ¶¶ 65-67)

In the Court's view, ROSS has adequately and plausibly alleged separate product markets for public law databases and legal search tools. *See generally Eastman Kodak*, 504 U.S. at 486 (acknowledging that Kodak might be able to prove that parts, service, and equipment all compose one market, but declining to reach that conclusion as matter of law on summary judgment); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.").

Thus, the Court will deny Plaintiffs' motion to dismiss ROSS's § 2 tying claim.

### 2. Sham Litigation

ROSS's second theory for its § 2 Sherman Act claim is that Plaintiffs have engaged in anticompetitive conduct by pursuing sham litigation. (D.I. 38 at 12) To prove "sham litigation," ROSS will have to show (i) a lawsuit that is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (ii) Plaintiffs brought the lawsuit with a subjective motivation to weaponize the litigation process for an anticompetitive purpose. *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 60-61 (1993). "The existence of probable cause to institute legal proceedings precludes a

9

finding that an antitrust defendant has engaged in sham litigation." *Id.* at 62. "A litigant has probable cause to initiate a suit if the litigant has 'a reasonable belief that there is a chance that a claim may be held valid upon adjudication.'" *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 148 (3d Cir. 2017) (quoting *PRE*, 508 U.S. at 62-63). Accordingly, ROSS "faces an uphill battle" by "claiming that a lawsuit is, by its very existence, anticompetitive and unlawful." *Id.* at 147.

As a preliminary matter, ROSS argues that Plaintiffs forfeited their challenge to the sham litigation claim by failing to raise it in their opening brief. (D.I. 38 at 1) The Court disagrees. As Plaintiffs persuasively explain, they "moved to dismiss ROSS's § 2 claim for failure to identify any actionable exclusionary conduct," and "there is no separate 'sham litigation' Count in the Counterclaims." (D.I. 45 at 6-7) (emphasis and internal quotation marks omitted) The Court does not fault Plaintiffs for failing to foresee every possible argument ROSS would make after Plaintiffs made it clear they were seeking to dismiss the federal antitrust claims in their entirety.

ROSS has failed to plausibly allege that Plaintiffs have engaged in sham litigation. Notably, the amended counterclaims do not identify any specific litigation that was or is purportedly a sham. At the hearing, ROSS indicated that its sham litigation claim is supported by paragraphs 51-55 and 110-113 of the amended counterclaims. (Tr. at 47) Paragraphs 51-55 allege that Plaintiffs at one point asserted copyrights in Westlaw page numbers and have also asserted copyrights in Westlaw headnotes. (D.I. 36 at 19-20 ¶¶ 51-55) Paragraphs 53 and 54 cite a decision in which the Second Circuit held that certain information regarding cases published on Westlaw is not copyrightable. (*Id.* at 20 ¶¶ 53-54) (citing *Matthew Bender & Co.*

10

*v. W. Publ. Co.*, 158 F.3d 674 (2d Cir. 1998)) Those paragraphs do not allege that the litigation was a sham. ROSS does not allege that the suit was "objectively baseless" or that West had an improper intent in pursuing it.

Paragraphs 110-113 of the amended counterclaims are similarly deficient. Paragraph 110 primarily alleges that uncopyrightable government edicts are intermingled with Plaintiffs' proprietary information on Westlaw. (D.I. 36 at 34 ¶ 110) The paragraph concludes with the vague suggestion that "it is not difficult for [Plaintiffs] to find a way to sue [their] rivals," and "on information and belief," Plaintiffs have "a long practice of aggressively pursuing such claims." (*Id.*) Paragraph 110 does not list even one example that supposedly fits within this "long practice." Paragraph 111 goes on to state that these unspecified litigations are "objectively baseless" and brought "to force rivals into unnecessary expensive legal fights solely to raise entry barriers." (*Id.* at 35 ¶ 111) While these allegations track the legal requirements for sham litigation, *see PRE*, 508 U.S. at 60-61, they are conclusory and deficient, *see Schuylkill Energy Res.*, 113 F.3d at 417.

Finally, ROSS insinuates that the instant litigation is a sham. (*See* D.I. 36 at 35 ¶¶ 112-13) The parties dispute whether the Court's earlier denial of ROSS's motion to dismiss Plaintiffs' copyright and tortious interference claims means that, as a matter of law, this litigation is not a sham. (*See* Tr. at 46-47) Regardless, ROSS has not made any specific allegations about how the instant case is a sham. Instead, after outlining its vague and conclusory allegations about Plaintiffs' "long history" of sham litigation, ROSS simply states that "[t]his is exactly what happened to ROSS." (D.I. 36 at 35 ¶ 112)

11

ROSS has not plausibly alleged that Plaintiffs have engaged in sham litigation. Accordingly, the Court will grant Plaintiffs' motion with respect to ROSS's sham litigation claim. *See, e.g., 3Shape Trios A/S v. Align Tech., Inc.*, 2019 WL 3824209, at *5-6 (D. Del. Aug. 15, 2019) (recommending that motion to dismiss be granted because plaintiff "fail[ed] to plausibly allege sham litigation"), *report and recommendation adopted*, 2019 WL 4686614 (D. Del. Sept. 26, 2019).

### B.  Sherman Act § 1

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "every contract . . . or conspiracy, in restraint of trade or commerce." To state a claim under § 1 of the Sherman Act, one must allege (i) an agreement, contract, combination, or conspiracy, (ii) imposing an unreasonable restraint of trade within a relevant market, and (iii) an accompanying antitrust injury. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314-15, 315 n.9 (3d Cir. 2010).

Like ROSS's § 2 claim, ROSS's § 1 claim is based on a tying theory. A tying arrangement "violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak*, 504 U.S. at 462 (internal quotation marks omitted).

Here, ROSS alleges that Plaintiffs use their market power for public law databases to protect their legal search engine model. (Tr. at 35) Given the similarities between the § 1 claim and the § 2 claim, Plaintiffs principally argue that ROSS's § 1 claim fails for the same reasons that its § 2 claim fails. (D.I. 45 at 6 n.1; Tr. at 53) This argument fails, for all the reasons it failed in connection with the § 2 tying claim, as discussed above.

Plaintiffs advance another reason why the § 1 tying claim should be dismissed: in Plaintiffs' view, ROSS has not alleged any agreement, contract, or conspiracy between one of the Plaintiffs and another party, as is required for a § 1 claim. (D.I. 28 at 15-16; D.I. 45 at 8-9) ROSS points to Plaintiffs' agreements with their customers as the relevant contracts. (D.I. 38 at 12) ROSS alleges that Plaintiffs use "restrictive licensing conditions to foreclose rivals from access to the relevant markets." (D.I. 36 at 31 ¶ 102) For instance, subsection 1(a) of the "Research Subscriber Agreement" between Plaintiffs and their customers defines "Data" to include "all information and representations of information, including but not limited to, graphical representations, and other content made available to [users] through the Product." (*Id.* at 32 ¶ 103) According to ROSS, this contract term "does not permit customers to unbundle [Plaintiffs'] two products." (D.I. 38 at 12) In other words, by entering into the customer agreements, Plaintiffs protect their content from being shared with competitors such as ROSS. (*See* Tr. at 40)

Plaintiffs argue that the customer agreements really involve unilateral action, as evidenced by the fact that ROSS refers to those agreements as "contracts of adhesion." (D.I. 45 at 8-9) This is not dispositive. In *Microsoft*, 253 F.3d at 47, the United States and individual states sued Microsoft for violations of the Sherman Act due to "anticompetitive terms in its licensing and software developer agreements." One of the claims was a § 1 tying claim based on the bundling of the Internet Explorer web browser with the Windows operating system. *Id.* In stating the elements of a per se tying violation, the D.C. Circuit did not mention the existence of an agreement or conspiracy. *Id.* at 85. Even if such an agreement or conspiracy is a

13

necessary element, the D.C. Circuit appears to have assumed that the licensing and software developer agreements were sufficient.

Plaintiffs attempt to brush *Microsoft* aside by casting it as an "exclusive dealing" case. (*See* Tr. at 52) According to Plaintiffs, an exclusive dealing case is different because "both sides of the contract get stuff they want." (*Id.*) Plaintiffs' contention ignores that their customers "get stuff they want" by entering into Research Subscriber Agreements – specifically, they get access to Plaintiffs' comprehensive public law database and valuable legal search tool. (*See id.* at 57-58) Accordingly, the Court agrees with ROSS that *Microsoft* provides some support for its § 1 tying theory.

To further support its § 1 tying claim, ROSS also relies on *Allen-Myland, Inc. v. International Business Machines Corp.*, 33 F.3d 194 (3d Cir. 1994). (*See* D.I. 38 at 12-13) Plaintiffs attempt to distinguish that case in a footnote with one sentence: "*Allen-Myland* is a § 1 tying case; ROSS's tying theory fails for the reasons stated previously." (D.I. 45 at 9 n.4) Given the Court's decision that ROSS's § 2 tying theory does not fail as a matter of law, Plaintiffs' distinction is unpersuasive. Indeed, the facts of *Allen-Myland* (as with those of *Microsoft*) lend some support to ROSS's § 1 tying claim. In *Allen-Myland*, 33 F.3d at 199, the plaintiff challenged IBM's "net pricing" policy, under which "IBM installation labor was bundled in with the price of the parts" for upgrading IBM mainframe computers. The plaintiff brought a § 1 tying claim based on the bundling of the labor and parts. After a bench trial, the district court ruled in the plaintiff's favor. *See id.* at 199-200. In reviewing § 1 tying law, the Third Circuit implied that some kind of "contractual arrangement" is necessary. *See id.* at 201. There appears to have been no dispute, however, that IBM's agreements implementing the "net

14

pricing" policy met any such requirement. ROSS alleges that Plaintiffs and their customers enter into Research Subscriber Agreements, which appear to be similar to the agreements in *Allen-Myland*.

Accordingly, the Court will deny Plaintiffs' motion to dismiss ROSS's § 1 tying claim.

## II. State Law Counterclaims

### A. California Unfair Competition Law

ROSS's counterclaim under California unfair competition law depends in part on federal antitrust law. (D.I. 36 at 44 ¶ 173) ("[Plaintiffs'] conduct is unlawful, unfair, or fraudulent because it is in violation of Sections 1 and 2 of the Sherman Act, and also in violation of the policy or spirit of the Sherman Act.") Plaintiffs admit that ROSS's California claim "rises or falls" with the federal antitrust claims. (Tr. at 26-27) Because ROSS will be permitted to pursue its § 1 and § 2 claims, as discussed above, the Court will deny Plaintiffs' motion with respect to the California claim.[5]

### B. Delaware Common Law On Unfair Competition

The final count in the amended counterclaims alleges that Plaintiffs have violated Delaware common law on unfair competition. (D.I. 36 at 45 ¶¶ 176-80) Under Delaware law, "the elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes [it] harm." *Accenture Glob. Servs. GmbH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 656-66 (D. Del. 2008) (internal

---

[5] The Court need not and does not reach the issue of whether ROSS's allegations of copyright misuse would be sufficient to prevent the dismissal of Count VIII if the Court were to dismiss the federal antitrust claims. (*See* D.I. 38 at 19)

15

quotation marks omitted); *see also Rypac Packaging Mach. Inc. v. Coakley*, 2000 WL 567895, at *8 (Del. Ch. May 1, 2000).

ROSS alleges that it "had a business expectancy to sell its legal search platform product in the market, having received . . . indications from customers that they would purchase access to the ROSS platform once it was tied to a reliable database." (D.I. 36 at 45 ¶ 177) ROSS does not identify or even allude to any specific party with whom it reasonably expected to enter into a valid business relationship. (*See* Tr. at 49) (ROSS admitting that it did "not allege [loss of] a specific customer," just loss of "business opportunities") Although identifying a specific party by name is not necessary, ROSS still must "plead facts to allow the court to 'reasonably infer that specific parties were involved.'" *You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *9 (D. Del. Jan. 12, 2021) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)), *report and recommendation adopted*, 2021 WL 327388 (D. Del. Feb. 1, 2021). ROSS has not pled any facts that allow the Court to draw such an inference.

ROSS initially pointed to allegations regarding multiple antitrust theories as support for its Delaware law claim. (*See* D.I. 38 at 20) At the hearing, however, ROSS clarified that its allegations of sham litigation are the sole support for this claim. (*See* Tr. at 49) In fact, ROSS conceded that dismissal of the sham litigation claim under § 2 of the Sherman Act would warrant dismissal of the claim under Delaware unfair competition law. (*Id.* at 50) Because the Court will dismiss ROSS's sham litigation claim, the Court will also dismiss Count IX.

### III. Amendment

ROSS asks for an opportunity to amend in order to correct any deficiencies identified in the Court's decision on Plaintiffs' motion to dismiss. (D.I. 38 at 20; Tr. at 59) At this point, the

Court lacks a record from which it could conclude that amendment would be futile or otherwise improper. *See generally* Fed. R. Civ. P. 15(a). Accordingly, ROSS may file amended counterclaims, provided that it does so no later than May 20, 2022. The Court's grant of leave to amend is without prejudice to Plaintiffs' having an opportunity to move to dismiss any amended counterclaims.

## CONCLUSION

For the foregoing reasons, Plaintiffs' renewed motion to dismiss ROSS's antitrust and unfair competition counterclaims (D.I. 39) will be granted in part and denied in part. An appropriate order follows.

17