# EXHIBIT A

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT B

ONESTOP REPORT
# Thomson Reuters Canada Limited
21-Jul-2022



D&B Hoovers

# Table of Contents

COMPANY SUMMARY
SITE CONTACTS
CORPORATE FAMILY
CORPORATE OVERVIEW
SIGNALS
NEWS
TRIGGERS
CLOSEST INDUSTRY PEERS
CLOSEST COMPANIES

# Thomson Reuters Canada Limited

Toronto, Ontario,  Canada

+1-416-687-7500 · www.thomsonreuters.com · in 🐦 f

Private Subsidiary · Headquarters

---

Marketability: Has limited marketability due to incomplete or invalid data

| | | |
|---|---|---|
| **EMPLOYEES** ⓘ | **SALES** ⓘ | **ADDRESS** |
| 300 (Here) Ⓐ | 177.74M ⊚ | 333 Bay St Suite 400 |
| 800 (Total) Ⓐ | 10.66B (Global Ultimate Total) | Toronto, Ontario, M5H |
| 55,000 (Global Ultimate Total) Ⓐ | ⊚ | 2R2 Canada |



**EMPLOYEES** ⓘ
300 (Here) Ⓐ
800 (Total) Ⓐ
55,000 (Global Ultimate Total) Ⓐ

**PARENT**
Thomson Reuters Corporation

**GLOBAL ULTIMATE**
Thomson Company Inc, The

**CORPORATE LINKAGE**
382 Companies

**INDUSTRY**
Miscellaneous Professional
Services

**SALES** ⓘ
177.74M ⊚
10.66B (Global Ultimate Total)
⊚

**REPORTING CURRENCY**
CAD

**D-U-N-S® NUMBER**
24-666-8032

**ADDRESS**
333 Bay St Suite 400
Toronto, Ontario, M5H
2R2 Canada

(Primary Address)
**Latitude:** 43.65025
**Longitude:** -79.38086

---

# Company Summary

## Business Description

Services, Not Elsewhere Classified.

Source: D&B

---

## Industry

**D&B HOOVERS INDUSTRIES**
Miscellaneous Professional Services

**ANZSIC 2006**
6999 - Other Professional, Scientific and Technical Services
Not Elsewhere Classified

**US 8-DIGIT SIC**
89991002 - Information bureau

**ISIC REV 4**
8299 - Other business support service activities n.e.c.

**NACE REV 2**
7490 - Other professional, scientific and technical activities
n.e.c.

**NAICS 2017**
541990 - All Other Professional, Scientific, and Technical
Services

**UK SIC 2003**
7487 - Other business activities not elsewhere classified

**UK SIC 2007**
9003 - Artistic creation

**US SIC 1987**
8999 - Services, Not Elsewhere Classified

View All

---

## Latest News



**COURT OF APPEAL SUMMARIES (MARCH 7, 2022 – MARCH 11, 2022)**
Lex Blog
13-Mar-2022 • 1,942 Words

View All News Articles

## Company Identifiers

D-U-N-S® NUMBER
246668032
LEI NUMBER
54930009KC7P1XTORR50

## Corporate Highlights

TRADESTYLE
Thomas Healthcare, Thomson Reuters (Financial & Risk)
Canada, a div of, Carswell, div of, Thomson Reuters Labs, a
div

PARENT D-U-N-S® NUMBER
242175776

GLOBAL ULTIMATE D-U-N-S® NUMBER
251100749

DOMESTIC ULTIMATE D-U-N-S® NUMBER
251100749

IMPORT/EXPORT STATUS
Exports

OWNS/RENTS
Rents

YEAR FOUNDED
1990

PRESCREEN SCORE
LOW RISK

## Contacts


**Diedre Stanley**
Vice President


**Bernadette Johnson**
Vice President & Board Member


**David Bienstock**
Director Strategic Partnerships And Development


**William Deslauriers**
Director


**Richard Ganley**
Board Member


**James Springfield**
Board Member

View All 6 Contacts

Back to Table of Contents

## Site Contacts

☐ **Diedre Stanley**
Vice President at Thomson Reuters Canada Limited
Toronto, Ontario, · +1-416-687-7500
Miscellaneous Professional Services

☐ **Bernadette Johnson**
Vice President & Board Member at Thomson Reuters Canada Limited
Toronto, Ontario, · +1-416-687-7500
Miscellaneous Professional Services

☐ **David Bienstock**
Director Strategic Partnerships And Development at Thomson Reuters Canada Limited
Toronto, Ontario, · +1-416-687-7500
Miscellaneous Professional Services

☐ **William Deslauriers**
Director at Thomson Reuters Canada Limited
Toronto, Ontario, · +1-416-687-7500
Miscellaneous Professional Services

☐ **Richard Ganley**
Board Member at Thomson Reuters Canada Limited
Toronto, Ontario, · +1-416-687-7500
Miscellaneous Professional Services

☐ **James Springfield**
Board Member at Thomson Reuters Canada Limited
Toronto, Ontario, · +1-416-687-7500
Miscellaneous Professional Services

▲ Back to Table of Contents

## Corporate Family

- ⊟ ☐ **HQ** **Thomson Company Inc, The**
  65 Queen St W Suite 2400, Toronto, Ontario, M5H 2M8, Canada
  D-U-N-S® Number: 25-110-0749
  Has Not Opted Out of Direct Marketing

  - ⊟ ☐ **HQ** **Woodbridge Company Limited, The**
    65 Queen St W Suite 2400, Toronto, Ontario, M5H 2M8, Canada
    D-U-N-S® Number: 20-944-3514
    Has Not Opted Out of Direct Marketing

    - ⊟ ☐ **HQ** **Thomson Reuters Corporation**
      333 Bay St, Toronto, Ontario, M5H 2R2, Canada
      D-U-N-S® Number: 24-217-5776
      Has Not Opted Out of Direct Marketing

      - ⊞ ☐ **HQ** **West Publishing Corporation**
        610 Opperman Dr, Eagan, Minnesota, 55123-1340, United States
        D-U-N-S® Number: 14-850-8286
        Has Not Opted Out of Direct Marketing

      - ⊞ ☐ **HQ** **Thomson Reuters (legal) Inc.**
        610 Opperman Dr, Eagan, Minnesota, 55123-1340, United States
        D-U-N-S® Number: 00-615-8414
        Has Not Opted Out of Direct Marketing

      - ⊞ ☐ **HQ** **Thomson Reuters U.S. LLC**
        1 Station Pl Ste 6, Stamford, Connecticut, 06902-6893, United States
        D-U-N-S® Number: 87-275-2626
        Has Not Opted Out of Direct Marketing

      - ⊞ ☐ **HQ** **Reuters America LLC**
        3 Times Sq, New York, New York, 10036-6564, United States
        D-U-N-S® Number: 14-783-3446
        Has Not Opted Out of Direct Marketing

      - ☐ **B** **Thomson Reuters Corporation**
        1 New York Plz FL 34, New York, New York, 10004-1964, United States
        D-U-N-S® Number: 82-843-0616
        Has Not Opted Out of Direct Marketing

      - ☐ **B** **Thomson Reuters Corporation**
        717 Ofc Pkwy, Saint Louis, Missouri, 63141, United States
        D-U-N-S® Number: 83-111-0395
        Has Not Opted Out of Direct Marketing

      - ⊟ ☐ **HQ** **Thomson Reuters Canada Limited**
        333 Bay St Suite 400, Toronto, Ontario, M5H 2R2, Canada
        D-U-N-S® Number: 24-666-8032
        Has Not Opted Out of Direct Marketing

        - ⊞ ☐ **HQ** **Éditions Blais, Yvon Inc, Les**
          75 rue Queen bureau 4700, Montréal, Quebec, H3C 2N6, Canada
          D-U-N-S® Number: 24-253-8841
          Has Not Opted Out of Direct Marketing

        - ☐ **B** **Thomson Reuters Canada Limitée**
          75 rue Queen bureau 4700, Montréal, Quebec, H3C 2N6, Canada
          D-U-N-S® Number: 25-623-5581
          Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
120 Bremner Blvd, Toronto, Ontario, M5J 0A8, Canada
D-U-N-S® Number: 20-352-0499
Has Not Opted Out of Direct Marketing

**Thomson Reuters Dt Impét Et Comptabilité Inc**
3333 boul Graham bureau 222, Mont-royal, Quebec, H3R 3L5, Canada
D-U-N-S® Number: 24-394-8614
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
352 East River Rd, New Glasgow, Nova Scotia, B2H 3P7, Canada
D-U-N-S® Number: 24-789-6889
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
100-245 Bartley Dr, North York, Ontario, M4A 2V8, Canada
D-U-N-S® Number: 24-784-6470
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
75 rue Queen bureau 4700, Montréal, Quebec, H3C 2N6, Canada
D-U-N-S® Number: 24-101-1399
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
800 boul René-Lévesque O Bureau 300, Montréal, Quebec, H3B 1X9, Canada
D-U-N-S® Number: 25-612-5329
Has Not Opted Out of Direct Marketing

**Tortoise Press Ltd**
14323 101 Ave Nw, Edmonton, Alberta, T5N 0K7, Canada
D-U-N-S® Number: 24-997-9253
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
1150 Montreal Rd, Cornwall, Ontario, K6H 1E2, Canada
D-U-N-S® Number: 20-043-5287
Has Not Opted Out of Direct Marketing

**Reuters News & Media Inc.**
3 Times Sq Lbby F, New York, New York, 10036-6567, United States
D-U-N-S® Number: 11-659-1184
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
407 2 St Sw Suite 312, Calgary, Alberta, T2P 2Y3, Canada
D-U-N-S® Number: 24-906-2159
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
2075 Kennedy Rd Suite 11, Scarborough, Ontario, M1T 3V4, Canada
D-U-N-S® Number: 20-305-9225
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
500-969 Robson St, Vancouver, British Columbia, V6Z 1X5, Canada
D-U-N-S® Number: 20-352-0515
Has Not Opted Out of Direct Marketing

**The Thomson Canada Ltd**
529 14Th St Nw Ste 1240, Washington, District of Columbia, 20045-2520, United States
D-U-N-S® Number: 78-579-5683
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
165 Sparks St Suite 400, Ottawa, Ontario, K1P 5B9, Canada
D-U-N-S® Number: 25-130-7229
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
355 Ridout St N, London, Ontario, N6A 2N8, Canada
D-U-N-S® Number: 24-998-3081
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
2075 Kennedy Rd Suite 11, Scarborough, Ontario, M1T 3V4, Canada
D-U-N-S® Number: 24-371-7514
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
240 Graham Ave Unit 6, Winnipeg, Manitoba, R3C 0J7, Canada
D-U-N-S® Number: 24-347-4983
Has Not Opted Out of Direct Marketing

**THOMSON REUTERS HOLDINGS S.A.**
Boulevard Royal 26, Luxembourg, , 2449, Luxembourg
D-U-N-S® Number: 40-099-7755
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
11 Cidermill Ave Suite 201, Concord, Ontario, L4K 4B6, Canada
D-U-N-S® Number: 25-969-6412
Has Not Opted Out of Direct Marketing

**Thomson Reuters Canada Limited**
2180 ch Sainte-Foy, Québec, Quebec, G1V 1S4, Canada
D-U-N-S® Number: 24-114-6427
Has Not Opted Out of Direct Marketing

**Manatron, Inc.**
2429 Military Rd Ste 300, Niagara Falls, New York, 14304-1551, United States
D-U-N-S® Number: 07-927-8305
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
1 Station Pl, Stamford, Connecticut, 06902-6800, United States
D-U-N-S® Number: 96-801-5441
Has Not Opted Out of Direct Marketing

**Capital Confirmation Inc.**
214 Centerview Dr Ste 100, Brentwood, Tennessee, 37027-5274, United States
D-U-N-S® Number: 00-558-5315
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
3 Times Sq, New York, New York, 10036-6564, United States
D-U-N-S® Number: 09-075-8129
Has Not Opted Out of Direct Marketing

**Global Securities Information Inc**
1100 13Th St Nw Ste 300, Washington, District of Columbia, 20005-4036, United States
D-U-N-S® Number: 36-151-5026
Opts Out of Direct Marketing

**Dofiscal Editores, S.A. de C.V.**
Blvd. Avila Camacho 36 Piso 19, México, Ciudad De Mexico, 03100, Mexico
D-U-N-S® Number: 81-236-7654
Has Not Opted Out of Direct Marketing

(S) **REUTERS INC IN ENGLAND LTD**
138 West St, Sandown, Gauteng, 2196, South Africa
D-U-N-S® Number: 56-748-1270
Has Not Opted Out of Direct Marketing

(HQ) **Integration Point Holdings, LLC**
2395 Midway Rd, Carrollton, Texas, 75006-2521, United States
D-U-N-S® Number: 07-124-6726
Has Not Opted Out of Direct Marketing

(S) **Thomson Quantitative Analytics Inc**
230 S La Salle St Ste 688, Chicago, Illinois, 60604-1433, United States
D-U-N-S® Number: 06-307-0713
Has Not Opted Out of Direct Marketing

(B) **Thomson Reuters Corporation**
2395 Midway Rd, Carrollton, Texas, 75006-2521, United States
D-U-N-S® Number: 83-190-0076
Has Not Opted Out of Direct Marketing

(B) **Thomson Reuters Corporation**
100 Phoenix Dr, Ann Arbor, Michigan, 48108-2635, United States
D-U-N-S® Number: 82-982-7554
Has Not Opted Out of Direct Marketing

(S) **Turban Health Analytics**
6200 S Syracuse Way Ste 300, Englewood, Colorado, 80111-4740, United States
D-U-N-S® Number: 03-046-0455
Has Not Opted Out of Direct Marketing

(B) **Thomson Reuters Corporation**
2200 Cabot Dr Ste 300, Lisle, Illinois, 60532-0914, United States
D-U-N-S® Number: 93-844-1925
Has Not Opted Out of Direct Marketing

(B) **Thomson Reuters Corporation**
121 River St, Hoboken, New Jersey, 07030-5982, United States
D-U-N-S® Number: 80-728-9017
Has Not Opted Out of Direct Marketing

(B) **Thomson Reuters Corporation**
322 County Road D E, Saint Paul, Minnesota, 55117-1275, United States
D-U-N-S® Number: 01-626-1194
Has Not Opted Out of Direct Marketing

(B) **Thomson Reuters Corporation**
1333 H St Nw Ste 410E, Washington, District of Columbia, 20005-4717, United States
D-U-N-S® Number: 18-566-1626
Has Not Opted Out of Direct Marketing

(S) **Thomson Reuters Costa Rica Servicios SA**
Plaza Roble Edificio Las Terrazas 5° Piso Regus, San Jose, San Jose, , Costa Rica
D-U-N-S® Number: 85-320-1622
Has Not Opted Out of Direct Marketing

(S) **Thoughttrace, Inc.**
33126 Magnolia Cir Ste B, Magnolia, Texas, 77354-1629, United States
D-U-N-S® Number: 85-858-1069
Has Not Opted Out of Direct Marketing

(B) **Thomson Reuters Corporation**
7322 Newman Blvd, Dexter, Michigan, 48130-1557, United States
D-U-N-S® Number: 08-591-8615
Has Not Opted Out of Direct Marketing

**B**  The Thomson Corporation
610 Opperman Dr, Saint Paul, Minnesota, 55123-1340, United States
D-U-N-S® Number: 18-894-7543
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
4100 S Lake Dr, Milwaukee, Wisconsin, 53235-5902, United States
D-U-N-S® Number: 80-619-8615
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
61 Broadway FL 3, New York, New York, 10006-2748, United States
D-U-N-S® Number: 10-293-5041
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
3100 Cumberland Blvd Se Ste 700 # 700, Atlanta, Georgia, 30339-5911, United States
D-U-N-S® Number: 80-155-6259
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
5410 Trinity Rd Ste 102, Raleigh, North Carolina, 27607-6003, United States
D-U-N-S® Number: 01-702-3591
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
4024 Barrett Dr, Raleigh, North Carolina, 27609-6625, United States
D-U-N-S® Number: 03-019-0997
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
430 S Westmoreland Ave, Los Angeles, California, 90020-1508, United States
D-U-N-S® Number: 16-216-0944
Has Not Opted Out of Direct Marketing

**HQ**  Avanon SA
Quai de l'Ile 13, Genève, Genève, 1204, Switzerland
D-U-N-S® Number: 48-077-1133
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
340 Glenn Hill Ave, West Richland, Washington, 99353-7200, United States
D-U-N-S® Number: 06-021-4803
Has Not Opted Out of Direct Marketing

**S**  Taxstream, LLC
95 River St Ste 5C, Hoboken, New Jersey, 07030-5612, United States
D-U-N-S® Number: 02-389-3048
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
807 Las Cimas Pkwy Ste 320, Austin, Texas, 78746-6194, United States
D-U-N-S® Number: 96-549-4672
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
50 S Steele St Ste 430, Denver, Colorado, 80209-2809, United States
D-U-N-S® Number: 07-371-8822
Has Not Opted Out of Direct Marketing

**B**  Thomson Reuters Corporation
990 Main St, East Hartford, Connecticut, 06108-2220, United States
D-U-N-S® Number: 02-990-1883
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
6231 West River Dr Ne, Belmont, Michigan, 49306-9082, United States
D-U-N-S® Number: 05-034-5089
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
5 Crossbar Rd, Hastings On Hudson, New York, 10706-3908, United States
D-U-N-S® Number: 05-298-1606
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
3200 W Pleasant Run Rd Ste 420, Lancaster, Texas, 75146-1088, United States
D-U-N-S® Number: 09-993-5551
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
3801 Connecticut Ave Nw Apt 821, Washington, District of Columbia, 20008-4564, United States
D-U-N-S® Number: 03-934-7874
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
801 Cherry St U 13, Fort Worth, Texas, 76102-6803, United States
D-U-N-S® Number: 05-299-0035
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
200 Stamford Pl Ste 300, Stamford, Connecticut, 06902-6753, United States
D-U-N-S® Number: 14-626-0000
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
5048 Wesley Dr, Tampa, Florida, 33647-3206, United States
D-U-N-S® Number: 12-474-6210
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
381 Foxcroft Dr, Warminster, Pennsylvania, 18974-1649, United States
D-U-N-S® Number: 00-537-1795
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
2386 99Th St E, Inver Grove Heights, Minnesota, 55077-4533, United States
D-U-N-S® Number: 02-117-3320
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
1500 Broadway, New York, New York, 10036-4015, United States
D-U-N-S® Number: 12-986-7222
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
800 Corporate Pointe Ste 150, Culver City, California, 90230-7676, United States
D-U-N-S® Number: 03-760-8481
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
800 W California Ave Ste 100, Sunnyvale, California, 94086-3608, United States
D-U-N-S® Number: 62-499-3874
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
30200 Telegraph Rd, Bingham Farms, Michigan, 48025-4502, United States
D-U-N-S® Number: 09-115-4920
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
135 Garland Way, Waterford, Michigan, 48327-3698, United States
D-U-N-S® Number: 18-790-3203
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
526 Eastbrook Dr, Charlottesville, Virginia, 22901-1135, United States
D-U-N-S® Number: 02-264-7877
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
404 Alameda Padre Serra, Santa Barbara, California, 93103-2108, United States
D-U-N-S® Number: 09-876-8816
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
633 Ashland Ave, River Forest, Illinois, 60305-1826, United States
D-U-N-S® Number: 09-813-3656
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
3280 Motor Ave Ste 200, Los Angeles, California, 90034-3700, United States
D-U-N-S® Number: 02-185-7834
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
26 Thomson Pl, Boston, Massachusetts, 02210-1212, United States
D-U-N-S® Number: 11-708-3474
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
500 Pearl St, New York, New York, 10007-1316, United States
D-U-N-S® Number: 05-218-6484
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
250 Dodge Ave, East Haven, Connecticut, 06512-3360, United States
D-U-N-S® Number: 03-707-6778
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
2429 Military Rd Ste 300, Niagara Falls, New York, 14304-1551, United States
D-U-N-S® Number: 02-595-8475
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
950 Winter St Ste 1900, Waltham, Massachusetts, 02451-1479, United States
D-U-N-S® Number: 04-741-8329
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
9 Dunwoody Park Ste 104, Atlanta, Georgia, 30338-6712, United States
D-U-N-S® Number: 17-759-3980
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
4905 Riverplace Ct, Glen Allen, Virginia, 23059-5655, United States
D-U-N-S® Number: 14-040-3473
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
1 Lethbridge Plz Ste 6, Mahwah, New Jersey, 07430-2113, United States
D-U-N-S® Number: 09-861-3328
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
925 Oak St, Scranton, Pennsylvania, 18515-0901, United States
D-U-N-S® Number: 11-112-4926
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
1 N Dearborn St Ste 1400, Chicago, Illinois, 60602-4336, United States
D-U-N-S® Number: 02-676-5667
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
2600 W Olive Ave Ste 910, Burbank, California, 91505-4568, United States
D-U-N-S® Number: 12-372-8061
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
610 Opperman Dr, Saint Paul, Minnesota, 55123-1340, United States
D-U-N-S® Number: 18-553-4005
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
3 Bethesda Metro Ctr Ste 1400, Bethesda, Maryland, 20814-6300, United States
D-U-N-S® Number: 88-456-7603
Has Not Opted Out of Direct Marketing

**Pondera Solutions Holdings, LLC**
123 Winterstein Dr, Folsom, California, 95630-2324, United States
D-U-N-S® Number: 03-277-1604
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
145 Stillmere Ct, Winston Salem, North Carolina, 27101-2311, United States
D-U-N-S® Number: 80-559-7460
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
1906 Acklen Ave, Nashville, Tennessee, 37212-3700, United States
D-U-N-S® Number: 03-484-2706
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
1331 17Th St, Denver, Colorado, 80202-1566, United States
D-U-N-S® Number: 88-456-7587
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
163 Albert Pl, Costa Mesa, California, 92627-1744, United States
D-U-N-S® Number: 03-752-3670
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
805 Pleasant St, Weymouth, Massachusetts, 02189-2376, United States
D-U-N-S® Number: 87-977-0378
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
8670 Harrison Pkwy, Fishers, Indiana, 46038-4456, United States
D-U-N-S® Number: 09-930-1515
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
2 Gateway Ctr FL 11, Newark, New Jersey, 07102-5006, United States
D-U-N-S® Number: 10-941-8447
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
492 River Rd, Nutley, New Jersey, 07110-3609, United States
D-U-N-S® Number: 07-861-5854
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
18756 Knollwood Cir, Lakeville, Minnesota, 55044-4451, United States
D-U-N-S® Number: 10-233-6631
Has Not Opted Out of Direct Marketing

**S** **Servicios Tecnicos DOF, S.A. de C.V.**
Insurgentes Sur No. 800 Piso 14, México, Ciudad De Mexico, 03100, Mexico
D-U-N-S® Number: 81-501-9930
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
7322 Newman Blvd, Dexter, Michigan, 48130-1557, United States
D-U-N-S® Number: 80-218-2019
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
525 Wescott Rd, Eagan, Minnesota, 55123-1310, United States
D-U-N-S® Number: 07-835-7054
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
75 Wall St FL 18&, New York, New York, 10005-2833, United States
D-U-N-S® Number: 08-529-8557
Has Not Opted Out of Direct Marketing

**S** **Aegisoft, LLC**
14 Penn Plz FL 8, New York, New York, 10122-0049, United States
D-U-N-S® Number: 96-180-3223
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
31 Saint James Ave Ste 820, Boston, Massachusetts, 02116-4101, United States
D-U-N-S® Number: 84-046-4887
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
507 Polk St Ste 410, San Francisco, California, 94102-3396, United States
D-U-N-S® Number: 14-414-9648
Has Not Opted Out of Direct Marketing

**S** **Thomson Reuters Group Pension Plan**
3 Times Sq, New York, New York, 10036-6564, United States
D-U-N-S® Number: 07-884-5987
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
2810 Sharer Rd Ste 28, Tallahassee, Florida, 32312-2107, United States
D-U-N-S® Number: 60-416-7627
Has Not Opted Out of Direct Marketing

**B** **Thomson Reuters Corporation**
1150 18Th St Nw Lowr Ll3, Washington, District of Columbia, 20036-3838, United States
D-U-N-S® Number: 12-083-7141
Has Not Opted Out of Direct Marketing

**HQ** **TR Holdings Limited**
Clarendon House 2 Church Street, Hamilton, , HM 11, Bermuda
D-U-N-S® Number: 81-530-4406
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
4020 E Madison St Ste 321, Seattle, Washington, 98112-3150, United States
D-U-N-S® Number: 16-767-0504
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
30 Knightsbridge Rd, Piscataway, New Jersey, 08854-3948, United States
D-U-N-S® Number: 02-724-1340
Has Not Opted Out of Direct Marketing

**Thomson Reuters Corporation**
5425 Hollister Ave Ste 140, Santa Barbara, California, 93111-3341, United States
D-U-N-S® Number: 87-640-1456
Has Not Opted Out of Direct Marketing

**Thomson Reuters**
17 Rue El Oraibi Jilali Sidi Belyout, Casablanca, Casablanca, , 20100, Morocco
D-U-N-S® Number: 55-929-2528
Has Not Opted Out of Direct Marketing

**Globe And Mail Inc**
351 King St E Suite 1600, Toronto, Ontario, M5A 0N1, Canada
D-U-N-S® Number: 24-760-8263
Has Not Opted Out of Direct Marketing

**The Woodbridge Group**
827 Graham Dr, Fremont, Ohio, 43420-4077, United States
D-U-N-S® Number: 83-326-5994
Has Not Opted Out of Direct Marketing

**Alex Esolutions, Inc.**
807 Las Cimas Pkwy Ste 300, Austin, Texas, 78746-6183, United States
D-U-N-S® Number: 88-415-8374
Has Not Opted Out of Direct Marketing

**Epropertytax, Inc.**
7500 N Dobson Rd Ste 300, Scottsdale, Arizona, 85256-2727, United States
D-U-N-S® Number: 08-138-4419
Has Not Opted Out of Direct Marketing

**REUTERS FINANCE CI LTD**
26 Cornet Street, Guernsey, , , United Kingdom
D-U-N-S® Number: 21-124-2872
Has Not Opted Out of Direct Marketing

**Thomson Company Inc, The**
6030 88 St Nw Suite 227, Edmonton, Alberta, T6E 6G4, Canada
D-U-N-S® Number: 20-513-7153
Has Not Opted Out of Direct Marketing

**Bell Mobility Inc**
1087 Robson St, Vancouver, British Columbia, V6E 1A9, Canada
D-U-N-S® Number: 20-793-3581
Has Not Opted Out of Direct Marketing

**Bell Mts**
365 Osborne St, Winnipeg, Manitoba, R3L 2A2, Canada
D-U-N-S® Number: 24-213-0851
Has Not Opted Out of Direct Marketing

**FRONT PAGE LTD**
Dorey Court, Guernsey, , , United Kingdom
D-U-N-S® Number: 21-124-2874
Has Not Opted Out of Direct Marketing

▲ Back to Table of Contents

# Corporate Overview

Key ID [SM] Number: 107696468

## Key Corporate Relationships

AUDITOR
NA

## Industry Codes

ANZSIC 2006
**6999 - Other Professional, Scientific and Technical Services Not Elsewhere Classified (Primary)**
5412 - Magazine and Other Periodical Publishing
5413 - Book Publishing
5420 - Software Publishing

ISIC REV 4
**8299 - Other business support service activities n.e.c. (Primary)**
1811 - Printing
5811 - Book publishing
5813 - Publishing of newspapers, journals and periodicals
5820 - Software publishing

NACE REV 2
**7490 - Other professional, scientific and technical activities n.e.c. (Primary)**
1812 - Other printing
1814 - Binding and related services
5814 - Publishing of journals and periodicals
5829 - Other software publishing

NAICS 2017
**541990 - All Other Professional, Scientific, and Technical Services (Primary)**
323117 - Books Printing
511120 - Periodical Publishers
511130 - Book Publishers
511210 - Software Publishers

UK SIC 2003
**7487 - Other business activities not elsewhere classified (Primary)**
2211 - Publishing of books
2213 - Publishing of journals and periodicals
2222 - Printing not elsewhere classified
7221 - Publishing of software

UK SIC 2007
### 9003 - Artistic creation (Primary)
18129 - Printing (other than printing of newspapers and printing on labels and tags) n.e.c.
5811 - Book publishing
5814 - Publishing of journals and periodicals
6201 - Computer programming activities

US 8-DIGIT SIC
### 89991002 - Information bureau (Primary)
27210105 - Trade journals: publishing only, not printed on site
27210200 - Periodicals, publishing and printing
27310200 - Books, publishing and printing
27320200 - Books, printing and binding
73720000 - Prepackaged software

US SIC 1987
### 8999 - Services, Not Elsewhere Classified (Primary)
2721 - Periodicals Publishing, or Publishing and Printing
2731 - Books Publishing, or Publishing and Printing
2732 - Book Printing
7372 - Prepackaged Software

## Business Description

Services, Not Elsewhere Classified.

Source: D&B

### Financial Summary

| Financials In | CAD(mil) | 1 Year Growth |
|---|---|---|
| Sales | 230.9 | NA |

© 2022 Dun & Bradstreet, Inc. All rights reserved.

⌃ Back to Table of Contents

# Signals Report



### Mobile Enabled

Signals when a company has corporate web site that supports mobile access or has applications developed for mobile devices.

Has mobile enabled site and apps



### Publishes Video

Signals whether or not any company in the D&B Hoovers database publishes videos on one one or more corporate YouTube channels.

Publishes videos



### Technology Adopter

Signals the likelihood that a company is a strong adopter of technology solutions based on evidence found in news stories, the company website, and other information sources.

Is a technology adopter



### Uses Video on Website

Signals whether or not a company uses video to communicate on their corporate web site for all companies in the D&B Hoovers database where a corporate URL is available.

Uses video on website



### Exporter

Signals the likelihood that a company is an exporter based on evidence found in news stories, the company website, and other information sources.

Is an exporter



### High Bandwidth

Signals the likelihood that a company requires high communication bandwidth based on its aggregate ranking for other relevant signals.

Has high bandwidth needs

▲ Back to Table of Contents

# News



### COURT OF APPEAL SUMMARIES (MARCH 7, 2022 – MARCH 11, 2022)
**Lex Blog**
4 months ago • 13-Mar-2022 • 1,942 Words

Following are our summaries of the civil decisions of the Court of Appeal for Ontario for the week of March 7, 2022. In Ernst & Young Inc. v. Aquino, the court upheld the application judge's decision to grant...

[www.lexblog.com](http://www.lexblog.com) ⓘ

▲ Back to Table of Contents

Case 1:20-cv-00613-SB Document 204-1 Filed 07/29/22 Page 24 of 243 PageID #: 6181

# Triggers

We're sorry, we couldn't find any information at this time

▲ Back to Table of Contents

## Closest Industry Peers



### Plenary Health Hamilton LP

Toronto, Ontario, Canada
Miscellaneous Professional Services
Partnership · Independent
D-U-N-S: 20-414-1535

Employees (Here):    1 Ⓐ
Employees (Total):    1 Ⓐ

0.00 Miles Away



### Family Office Round Table Foundation

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 24-042-2520

Sales USD:              3.50M ⊘
Employees (Here):        8 ⊘
Employees (Total):       8 ⊘

0.00 Miles Away



### Encore Global Events (Canada) ULC

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-434-2158

Employees (Here):    1 Ⓐ
Employees (Total):    1 Ⓐ

0.00 Miles Away



### RubricEm Inc.

Toronto, Ontario, Canada
· +1-416-366-8381
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-419-5767

Employees (Here):    1 Ⓐ
Employees (Total):    1 Ⓐ

0.00 Miles Away



### No Trace Camping Productions Inc

Toronto, Ontario, Canada
· +1-416-929-3020
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 24-326-3988

Sales USD:            113.72K ⊘
Employees (Here):        1 Ⓐ
Employees (Total):       1 Ⓐ

0.00 Miles Away

### The Mint Corp · MIT (TSX Venture Exchange)

Toronto, Ontario, Canada
Miscellaneous Professional Services
Public · Subsidiary · Headquarters
D-U-N-S: 25-361-6932

Sales USD:        12.29M ⌄
Assets:           2.74M
Employees (Total):   18 Ⓐ

0.00 Miles Away

### 2780194 Ontario Inc.

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-421-0343

Employees (Here):    2 ⌄
Employees (Total):   2 ⌄

0.00 Miles Away

### Rowley Arbitration Services Limited

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-833-2117

Sales USD:        0.87M ⌄
Employees (Here):    2 ⌄
Employees (Total):   2 ⌄

0.00 Miles Away

### Cinaport Acquisition Corp. III · CAC.P (TSX Venture Exchange)

Toronto, Ontario, Canada
· +1-416-213-8118
Miscellaneous Professional Services
Public · Independent
D-U-N-S: 20-382-6326

Employees (Here):    4 ⌄
Employees (Total):   4 ⌄

0.00 Miles Away

### Mts Testing Systems Ltd

Toronto, Ontario, Canada
· +1-705-788-9186
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-472-8981

Sales USD:        1.33M ⌄
Employees (Here):    4 ⌄
Employees (Total):   4 ⌄

0.00 Miles Away

## Neil Sheehy Professional Corporation

**Toronto, Ontario, Canada**
· +1-416-597-4229
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 24-326-5062

Employees (Here):    1 Ⓐ
Employees (Total):    1 Ⓐ

**0.00** Miles Away

## Mercer Park Brand Acquisition Corp.

**Toronto, Ontario, Canada**
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-420-6122

Employees (Here):    2 ⌄
Employees (Total):    2 ⌄

**0.00** Miles Away

## Talmine Resources Ltd.

**Toronto, Ontario, Canada**
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-420-4531

Employees (Here):    2 ⌄
Employees (Total):    2 ⌄

**0.00** Miles Away

## The Canadian Family Office Network Ltd.

**Toronto, Ontario, Canada**
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 24-029-8461

Sales USD:    0.87M ⌄
Employees (Here):    2 ⌄
Employees (Total):    2 ⌄

**0.00** Miles Away

## Loram Maintenance of Way Ltd

**Toronto, Ontario, Canada**
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 24-326-8491

Employees (Here):    1 Ⓐ
Employees (Total):    1 Ⓐ

**0.00** Miles Away

Quote · Report · D&B D&B Reuters Leaders Reports · more



## Innovision Design & Project Management Inc.

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-460-7111

Sales USD: 1.33M
Employees (Here): 4
Employees (Total): 4

0.01 Miles Away



## ABCO International Translators and Interpreters

Toronto, Ontario, Canada
· +1-416-359-0873
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 25-820-1425

Sales USD: 1.31M
Employees (Here): 3
Employees (Total): 3

0.01 Miles Away



## Tern Immigration

Toronto, Ontario, Canada
· +1-416-703-0051
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-861-6932

Sales USD: 0.87M
Employees (Here): 2
Employees (Total): 2

0.01 Miles Away



## Transperfect Translations

Toronto, Ontario, Canada
· +1-416-703-0050
Miscellaneous Professional Services
Private · Branch
D-U-N-S: 24-626-0876

0.01 Miles Away

## Scott Burns Planning

Toronto, Ontario, Canada
· +1-416-304-1420
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-980-9776

Sales USD: 300.94K
Employees (Here): 1
Employees (Total): 1

0.01 Miles Away

## Eq Offices Inc.

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-835-6935

| | |
|---|---|
| Sales USD: | 0.87M |
| Employees (Here): | 2 |
| Employees (Total): | 2 |

0.02 Miles Away

## DKS E-Services Limited

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 24-391-6306

| | |
|---|---|
| Sales USD: | 1.33M |
| Employees (Here): | 4 |
| Employees (Total): | 4 |

0.02 Miles Away

## Boska Settlement Corp.

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-122-7639

| | |
|---|---|
| Employees (Here): | 4 |
| Employees (Total): | 4 |

0.02 Miles Away

## Kisoji Biotechnologie Inc / kisoji Biotechnology Inc

Toronto, Ontario, Canada
· +1-514-235-3652
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 24-326-6844

| | |
|---|---|
| Employees (Here): | 1 |
| Employees (Total): | 1 |

0.02 Miles Away

## Canatrade Hospitality Inc

Toronto, Ontario, Canada
Miscellaneous Professional Services
Private · Independent
D-U-N-S: 20-411-1848

| | |
|---|---|
| Employees (Here): | 5 |
| Employees (Total): | 5 |

0.02 Miles Away

Back to Table of Contents

  
---

# Closest Companies



## Seal Storage Technology Inc

**Toronto, Ontario, Canada**
· +1-416-219-3695
Software
Private · Independent
D-U-N-S: 20-433-5413

Sales USD: 1.87M
Employees (Here): 11
Employees (Total): 11

0.00 Miles Away



## Open Effect

**Toronto, Ontario, Canada**
Nonclassifiable Establishments
Private · Independent
D-U-N-S: 20-386-1857

0.00 Miles Away



## Pivot Pharmaceuticals Manufacturing Corp.

**Toronto, Ontario, Canada**
Pharmacies and Personal Care Stores
Private · Independent
D-U-N-S: 24-219-7037

Sales USD: 1.74M
Employees (Here): 7
Employees (Total): 7

0.00 Miles Away



## 6502873 Canada Inc.

**Toronto, Ontario, Canada**
Securities
Private · Independent
D-U-N-S: 20-417-4562

Sales USD: 1.06M
Employees (Here): 4
Employees (Total): 4

0.00 Miles Away



## Clip Money Inc.

**Toronto, Ontario, Canada**
Mortgage and Credit
Private · Independent
D-U-N-S: 20-885-6100

Sales USD: 0.57M
Employees (Here): 4
Employees (Total): 4

0.00 Miles Away

### 11000454 Canada Inc.

Toronto, Ontario, Canada
Securities
Private • Independent
D-U-N-S: 24-039-2297

Sales USD:             1.34M
Employees (Here):        2
Employees (Total):       2

0.00 Miles Away

### La Maison De La Francophonie De Toronto

Toronto, Ontario, Canada
Miscellaneous Information Services
Nonprofit • Independent
D-U-N-S: 25-906-9565

Sales USD:             0.80M
Employees (Here):       10
Employees (Total):      10

0.00 Miles Away

### Relay Ventures

Toronto, Ontario, Canada
• +1-416-367-2440
Investment Services
Private • Independent
D-U-N-S: 24-010-8522

Sales USD:             1.96M
Employees (Here):        5
Employees (Total):       5

0.00 Miles Away

### 9968164 Canada Limited

Toronto, Ontario, Canada
Securities
Private • Independent
D-U-N-S: 20-420-7045

Sales USD:             1.06M
Employees (Here):        4
Employees (Total):       4

0.00 Miles Away

### Cerebral Capital Inc.

Toronto, Ontario, Canada
Nonclassifiable Establishments
Private • Independent
D-U-N-S: 20-531-3785

0.00 Miles Away

Created Report Thomson Reuters

### Investissements Hcn Gp-4

**Toronto, Ontario, Canada**
Nonclassifiable Establishments
Private · Independent
D-U-N-S: 20-867-2561

**0.00** Miles Away

### Spencer Stuart And Associates Ltd

**Toronto, Ontario, Canada**
Employment Services
Private · Independent
D-U-N-S: 24-289-2147

| | |
|---|---|
| Sales USD: | 0.56M |
| Employees (Here): | 5 |
| Employees (Total): | 5 |

**0.00** Miles Away

### 13083764 Canada Inc.

**Toronto, Ontario, Canada**
Miscellaneous Store Retailers
Private · Independent
D-U-N-S: 20-857-3228

| | |
|---|---|
| Sales USD: | 0.64M |
| Employees (Here): | 2 |
| Employees (Total): | 2 |

**0.00** Miles Away

### 10798177 Canada Inc.

**Toronto, Ontario, Canada**
Securities
Private · Independent
D-U-N-S: 20-416-7145

| | |
|---|---|
| Sales USD: | 1.06M |
| Employees (Here): | 4 |
| Employees (Total): | 4 |

**0.00** Miles Away

### Munters Canada Inc.

**Mississauga, Ontario, Canada**
· +1-705-788-9186
Securities
Private · Independent
D-U-N-S: 20-388-7334

| | |
|---|---|
| Sales USD: | 265.88K |
| Employees (Here): | 1 |
| Employees (Total): | 1 |

**0.00** Miles Away



### Morgan Bay Capital Inc

**Toronto, Ontario, Canada**
· +1-416-203-0653
Holding Companies
Private · Independent
D-U-N-S: 20-977-2388

| | |
|---|---|
| Sales USD: | 295.54K ⌄ |
| Employees (Here): | 1 Ⓐ |
| Employees (Total): | 1 Ⓐ |

**0.00** Miles Away

---



### 11457420 Canada Inc

**Toronto, Ontario, Canada**
· +1-343-688-1066
Professional and Commercial Equipment Wholesale
Private · Independent
D-U-N-S: 20-425-2162

| | |
|---|---|
| Sales USD: | 1.47M ⌄ |
| Employees (Here): | 5 Ⓐ |
| Employees (Total): | 5 Ⓐ |

**0.00** Miles Away

---



### Sauga Origins Inc.

**Toronto, Ontario, Canada**
· +1-416-571-6587
Facilities Management
Private · Independent
D-U-N-S: 20-426-9877

| | |
|---|---|
| Sales USD: | 190.69K ⌄ |
| Employees (Here): | 1 Ⓐ |
| Employees (Total): | 1 Ⓐ |

**0.00** Miles Away

---



### Corbec Ontario Inc.

**Toronto, Ontario, Canada**
Metal Products Manufacturing
Private · Independent
D-U-N-S: 20-394-6862

| | |
|---|---|
| Sales USD: | 1.13M ⌄ |
| Employees (Here): | 7 ⌄ |
| Employees (Total): | 7 ⌄ |

**0.00** Miles Away

---



### Meteogroup Weather Services Canada Inc.

**Toronto, Ontario, Canada**
Nonclassifiable Establishments
Private · Independent
D-U-N-S: 20-393-2615

**0.00** Miles Away



### Central Mur (Iii) Equities Inc.

Toronto, Ontario, Canada
Primary and Secondary Education
Private · Independent
D-U-N-S: 20-856-8372

| | |
|---|---|
| Sales USD: | 390.64K |
| Employees (Here): | 5 |
| Employees (Total): | 5 |

0.00 Miles Away



### Gravitas Select Flow Through L P 2016

Toronto, Ontario, Canada
Nonclassifiable Establishments
Private · Independent
D-U-N-S: 20-874-8955

0.00 Miles Away



### Vwk Partners Fund Group Inc

Toronto, Ontario, Canada
Storage and Warehousing
Private · Independent
D-U-N-S: 20-817-9865

| | |
|---|---|
| Sales USD: | 289.23K |
| Employees (Here): | 2 |
| Employees (Total): | 2 |

0.00 Miles Away



### 2444950 Ontario Inc

Toronto, Ontario, Canada
· +1-416-926-2698
Miscellaneous Store Retailers
Private · Independent
D-U-N-S: 20-329-7317

| | |
|---|---|
| Sales USD: | 250.27K |
| Employees (Here): | 1 |
| Employees (Total): | 1 |

0.00 Miles Away



### Troop Impact Inc.

Toronto, Ontario, Canada
Nonclassifiable Establishments
Private · Independent
D-U-N-S: 20-824-7677

0.00 Miles Away

^ Back to Table of Contents

# EXHIBIT C

## ACADEMIC LICENCE AGREEMENT

**THOMSON REUTERS**

TO ALL USERS:  Your access to and use of the online legal research services

i.   WestlawNext Canada ("WLNC"), and

ii.   The West Education Network ("TWEN")

**of Thomson Reuters Canada , are subject to the terms and conditions of this licence agreement ("Agreement"). To complete the registration and gain access to WLNC or TWEN (any reference to WLNC hereafter shall be deemed to include WLNC and TWEN), read the Agreement. If you agree with the terms of the Agreement, click on "I Agree" below and click on "Submit Registration" to complete the registration process. If you do not agree with the terms of the Agreement do not click on "I Agree" and you will not be provided access to WLNC.  By clicking on the "I Agree" button and using WLNC, you agree to be bound by the terms and conditions of the Agreement.**

**"User" under this agreement includes:  i) any person who has completed the registration process hereunder and ii) any person who/which has entered into a Subscriber agreement with the former Carswell, a Division of Thomson Reuters Canada or its successor business entity, Thomson Reuters Canada, and iii) any person who/which accesses and/or uses the Features and/or Data.**

---

### 1. Representations.

User represents that he or she is currently enrolled as a student or a graduating student or is currently enrolled in a law school-authorized class at an authorized Canadian law school ("Student"), or is a full-time or part-time/adjunct faculty, administration or staff or law school career services director or staff ("Personnel") at the law school identified by User on the Password Registration (the "Law School"). If User is a Student, he or she also represents that the expected Law School graduation date indicated on the Password Registration is accurate. User agrees to notify Thomson Reuters Canada immediately (i) if User registered as a Student and (a) User is no longer enrolled as a Student at the Law School, or (b) User's expected graduation date changes, or (ii) if User registered as Personnel and the Law School no longer employs User.

### 2. WLNC  License.

**2.1 Grant. Thomson Reuters Canada grants User a non-exclusive, non-transferable, limited license to access WLNC , which consists of various Thomson Reuters Canada-owned and third party content, services and functions (collectively "Features") that may change from time to time. User is licensed to access and use data made available through WLNC ("Data," which includes "Downloaded Data" as defined in section 2.2 below), through equipment provided by User or the Law School by means of the WLNC  Student or Personnel password ("Password") solely for the following purposes at the Law School (collectively, "Educational Purposes"):**

**i.   if User is registered as a Student, for purposes directly related to User's coursework at the Law School (including pro bono and public service program, unpaid public internships that are part of User's graduation requirements or for which the User receives law school course credit) or for bar preparation purposes; or**

**ii.   if User is registered as Personnel, for scholarly research or for Student placement purposes.**

**Any other use, including any use in connection with User's employment outside of the Law School and any Student internship where the User receives remuneration of any kind, is prohibited. Access to certain Features and databases may be restricted by Thomson Reuters Canada.**

### WLNC License

**2.2** The User acknowledges that all intellectual property, including all copyright, trademarks, patents or rights to trade secrets in the Features and Data belongs to Thomson Reuters Canada  or its suppliers or licensors, as the case may be, and that User's rights do not extend beyond the limited licence expressly granted herein.  Subject to Section 3, the User is permitted, only for Educational Purposes, to:

a.   use the Features and browse and search the Data;

b.   download and temporarily store insubstantial portions of the Data ("Downloaded Data") to a storage device within the User's exclusive control, solely:

i.   to display internally such Downloaded Data; and

ii.   to quote and excerpt from such Downloaded Data (the parts of which are commentary, references and caselaw being appropriately cited and credited) by electronic cutting and pasting or other means in memoranda, facta, client communications and similar work product created by the User in the regular course of its research and work;

c.   print and make photocopies of insubstantial portions of the Data which result from browsing or searching for User's own use and to quote and excerpt from such Downloaded Data (the parts of which are commentary references and caselaw being appropriately cited and credited) in print memoranda, facta, client communications and similar work product created by the User in the regular course of its research and work;

**2.3** Certain Data and Features are or may in future be governed by Terms and Conditions that are different from those set forth in this Agreement ("**Additional Terms**"). The User will be given an opportunity to review Additional Terms by receiving notice of such Additional Terms from Thomson Reuters Canada, which shall be deemed to have been given by Thomson Reuters Canada  upon posting online on WLNC website, or may be given by Thomson Reuters Canada as set out in Section 11. Additional Terms may be created or modified by Thomson Reuters Canada, upon Thomson Reuters Canada

giving the User notice of such new or modified Additional Terms. By using such aforesaid Data and Features governed by Additional Terms, the User agrees to and will be obligated to comply with all such Additional Terms as part of the Terms and Conditions in this Agreement.

### 3. Activities Excluded from Licence

The User shall not, without the written permission of Thomson Reuters Canada:

a.   copy all or part of the Features and/or Data, save and except insubstantial portions, onto a memory storage facility of any computer, and keep on such storage facility, provided that insubstantial portions may be downloaded and temporarily stored in a computer only for so long as the initial project of the User requiring it is continuing. Such temporary storage facility must consist preponderantly of User's work product;

b.   use all or any part of the Features and/or Data in a Document Delivery Service, commercial time sharing, rental network, computer service, research service, service bureau business or interactive cable television arrangement; a "**Document Delivery Service**" herein means the service, whether or not established or conducted for profit, of making a copy of a work and supplying the copy to any individual or entity;

c.   publish, sell, lease, rent, licence, sub-licence, transfer, market, distribute, redistribute or otherwise part with all or part of the Features and/or Data in any manner or in any form;

d.   copy, modify, alter, disassemble, de-compile, translate or convert into human readable form, or reverse engineer, all or any part of the Features and/or Data;

e.   use all or part of the  Features and/or Data to develop any derivative works other than documents for Educational Purposes at the Law School;

f.   share forms downloaded by Users in the Subscriber and/or Law School with any affiliates of Subscriber and/or Law School of any other party.

### 4. Term and Termination.

**4.1 (a)** This Agreement will be effective upon User's first access to WLNC by means of the Password. This Agreement will terminate (i) for Students enrolled as graduating students at the Law School, on

User's graduation ceremony date (ii) for Students who are not graduating students at the Law School but who are enrolled in an authorized class, at the time User completes or otherwise terminates such enrollment; (iii) for Personnel, when User's employment with the Law School terminates.

b. User may terminate this Agreement at any time by giving Thomson Reuters Canada notice by Canadian mail to Thomson Reuters Canada Academic Online Program 2075 Kennedy Road Toronto, Ontario M1T 3V4 and ceasing all use of WLNC, the Password, and/ or westlawnextcanada.com/faculty or students.

**4.2** Thomson Reuters Canada may immediately terminate this Agreement by revoking all passwords if the User breaches or permits any breach of any provision of this Agreement. The User may terminate this Agreement immediately upon giving written notice to Thomson Reuters Canada within 30 days of being deemed to have received notice from Carswell of Additional Terms under Section 2.2.

**4.3** Upon termination of this Agreement:

a. the provisions of Sections 5 and 6 will continue to apply between Thomson Reuters Canada and the User following the termination;

b. all User's rights hereunder shall immediately cease; and

c. the User shall erase any Downloaded Data and/or Features, or portions thereof, improperly copied onto any computer controlled by the User.

**5. LIMITED WARRANTIES AND LIMITATION OF LIABILITY**

**5.1** THOMSON REUTERS CANADA DISCLAIMS ANY REPRESENTATIONS, WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING THOSE OF PERFORMANCE OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE FEATURES AND DATA. THOMSON REUTERS CANADA PROVIDES THE FEATURES, FORMS AND DATA "AS IS", AND DOES NOT WARRANT THAT THE FUNCTIONS OR THAT THE OPERATION OR CONTENT WILL BE:

A. UNINTERRUPTED, OR

B. FREE FROM LIBELOUS CONTENT OR CONTENT WHICH IS AN INVASION OF PRIVACY, OR

C. IDENTICAL TO THE ORIGINAL SOURCE FROM WHICH THE DATA OR FEATURES WERE OBTAINED, OR

D. ACCURATE, OR

E. COMPLETE, OR

F. CURRENT, OR

G. FREE FROM ANY SOFTWARE VIRUS OR OTHER HARMFUL COMPONENT.

**5.2** THOMSON REUTERS CANADA SHALL

NOT BE LIABLE FOR ANY LOSS OR INJURY ARISING OUT OF OR CAUSED, IN WHOLE OR IN PART, BY THOMSON REUTERS CANADA'S NEGLIGENT ACTS OR OMISSIONS IN PROCURING, COMPILING, COLLECTING, INTERPRETING, REPORTING, COMMUNICATING, OR DELIVERING THE DATA.

**5.3** THOMSON REUTERS CANADA SHALL NOT BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF THE USER OR OF ANY THIRD PARTY CLAIMED AGAINST THE USER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS OR REVENUE OR FAILURE TO REALIZE EXPECTED SAVINGS, HOWEVER DERIVED.

**5.4** NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR ANY STATUTE OR RULE OF LAW TO THE CONTRARY, SUBJECT TO SECTION 5.3, THOMSON REUTERS CANADA'S CUMULATIVE LIABILITY FOR ALL CLAIMS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND ANY SCHEDULES ATTACHED HERETO, WHETHER DIRECTLY OR INDIRECTLY, INCLUDING, WITHOUT LIMITATION, FROM OR IN CONNECTION WITH THE LICENCE, USE OR IMPROPER FUNCTIONING OF THE FEATURES AND/ OR DATA SHALL NOT EXCEED ALL FEES PAID TO THOMSON REUTERS CANADA BY THE USER FOR ACCESS TO WESTLAWNEXT CANADA PURSUANT TO THIS AGREEMENT. THE EXPRESSION "**THOMSON REUTERS CANADA**" IN THIS SECTION SHALL BE DEEMED TO INCLUDE ANY LICENSORS OR THIRD-PARTY SUPPLIERS TO THOMSON REUTERS CANADA OF DATA, AND ALL GATEWAY PROVIDERS OF DATA THROUGH THOMSON REUTERS CANADA TO THE USER.

**5.5** IN NO EVENT SHALL THOMSON REUTERS CANADA, ITS AFFILIATES AND/OR CONTRIBUTORS BE LIABLE TO USER FOR ANY CLAIM(S) RELATING IN ANY WAY TO USER'S INABILITY OR FAILURE TO PERFORM LEGAL OR OTHER RESEARCH OR RELATED WORK OR TO PERFORM SUCH LEGAL, TAX OR OTHER RESEARCH OR WORK PROPERLY OR COMPLETELY EVEN IF ASSISTED BY CARWELL, ITS AFFILIATES OR CONTRIBUTORS, OR ANY DECISION MADE OR ACTION TAKEN BY USER IN RELIANCE UPON DATA OR FEATURES.

**5.6** USER ACKNOWEDGES THAT PROVISION OF DATA AND FEATURES ENTAILS THE LIKELIHOOD OF SOME HUMAN AND MACHINE ERRORS, DELAYS, INTERRUPTIONS AND LOSSES, INCLUDING THE INADVERTENT LOSS OF DATA OR DAMAGE TO MEDIA.

**5.7** THE FEATURES AND DATA WERE NOT NECESSARILY PREPARED BY A PERSON LICENSED TO PRACTICE LAW IN A PARTICULAR JURISDICTION. THOMSON REUTERS CANADA IS NOT

ENGAGED IN RENDERING LEGAL OR OTHER PROFESSIONAL ADVICE, AND WESTLAWNEXT CANADA IS NOT A SUBSTITUTE FOR THE ADVICE OF LEGAL COUNSEL.  IF USER REQUIRES LEGAL OR OTHER EXPERT ADVICE, USER SHOULD SEEK THE SERVICES OF COMPETENT LEGAL COUNSEL OR OTHER PROFESSIONAL.

**5.8** THOMSON REUTERS CANADA DOES NOT RATIFY, ENDORSE, WARRANT, CONFIRM OR REPRESENT THE EXPERTISE OR COMPETENCE OF ANY OF THE INDIVIDUALS OR ORGANIZATIONS LISTED IN ANY DIRECTORIES.

**6. Password**

**6.1** If the User's password is lost or stolen, the User will immediately notify Thomson Reuters Canada by telephone and confirm such notice in writing. Upon receipt of notice, Thomson Reuters Canada shall make every effort to cancel the password as soon as is possible under the circumstances. The User shall be responsible for all charges incurred prior to its cancellation by Thomson Reuters Canada. Thomson Reuters Canada reserves the right to change passwords at any time, subject to notice being given to the User.

**6.2** Passwords are issued to the User and cannot be shared with any affiliates of User or any other party.

**7. Release of Information**

**7.1 For Users through Academic Institutions**
The User hereby authorizes the release to Thomson Reuters Canada of information pertinent to this licence including User name, address, email address, status as student, faculty member or librarian, course of study and expected year of graduation. This authorization includes any permission required under any applicable information or privacy legislation anywhere in Canada. Thomson Reuters Canada undertakes to use the information collected under this clause only for purposes directly related to this licence.
This authorization includes any permission required under any applicable information or privacy legislation anywhere in Canada. Thomson Reuters Canada undertakes to use the information collected under this clause only for purposes directly related to this licence.

**8. Governing Law**
This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**9. Effect of Agreement**
This Agreement (which includes all current and future Schedules and Additional Terms) embodies the entire understanding between the parties with respect to the subject matter of this Agreement and supersedes any and all prior understandings and agreements, oral or written, relating to the subject matter. With effect after the expiry of the notice to

the User, Thomson Reuters Canada may amend the Terms and Conditions of this Agreement by giving at least 30 days' prior notice of the Additional Terms to the User in writing or online, subject to the User's termination rights under Section 4. Any other amendment must be in writing and signed by both Thomson Reuters Canada and the User. Should any portion of this Agreement be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions will not be affected thereby. Failure of either party to enforce any provision of this Agreement will not constitute or be construed as a waiver of such provision or of the right to enforce such provision. The headings and captions in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

**10. Force Majeure**

Thomson Reuters Canada's performance under this Agreement is subject to interruption and delay due to causes beyond its reasonable control, such as acts of God, acts of any government or governmental authority, war or other hostility, terrorism, civil disorder, the elements, fire, explosion, power failure, equipment failure, industrial or labour dispute, inability to obtain necessary supplies, inability of any computer system or software to properly calculate dates.

**11. Notices**

Except as otherwise provided herein, all notices must be in writing (including email):

- to Thomson Reuters Canada at One Corporate Plaza (Attn: Customer Relations),
  2075 Kennedy Road, Toronto, Ontario, M1T 3V4 or www.carswell.com/email
- to the User at the most recent address in Carswell's records, or online.

Notice shall be deemed delivered three business days after posting in the Canadian postal system, or one business day after posting online by Thomson Reuters Canada or Thomson Reuters Canada's licensor, or sending by either party by email or by courier.

**12. Arbitration**

12.1 Any claim, dispute or controversy (whether in contract or tort, pursuant to statute or regulation, or otherwise, and whether pre-existing, present or future) arising out of or relating to:

a. this Agreement;

b. the Features or Data;

c. oral or written statements, advertisements or promotions relating to this Agreement or to the Features or Data; or

d. the relationships which result from this Agreement (including relationships with third parties who are not signatories to this Agreement) (collectively the "**Claim**");

will be referred to and determined by arbitration (to the exclusion of the courts).

User agrees to waive any right User may have to commence or participate in any class action against Thomson Reuters Canada related to any Claim and, where applicable, User also agrees to opt out of any class proceedings against Thomson Reuters Canada.

12.2 If User has a Claim, User should give written notice to arbitrate to Thomson Reuters Canada at the address specified in Section 11. If Thomson Reuters Canada has a claim, Thomson Reuters Canada will give User notice to arbitrate at User's address as required by Section 11. Arbitration of Claims will be conducted in such forum and pursuant to such rules as User and Thomson Reuters Canada agree upon, and failing agreement will be conducted by one arbitrator pursuant to the laws and rules relating to commercial arbitration in the Province of Ontario that are in effect on the date of the notice to arbitrate.

**13. Assignability**

a. The User may not assign, sub-license, or otherwise transfer or encumber this Agreement, or any of User's rights or obligations under this Agreement, to any person except with the prior written consent of Thomson Reuters Canada.

b. Thomson Reuters Canada may assign or transfer this Agreement and/or any rights or obligations hereunder to any affiliate of Thomson Reuters Canada's, and Thomson Reuters Canada or such affiliate-assignee may assign or transfer this Agreement and/or any rights or obligations hereunder to any third-party successor to all or substantially all of the business or assets of Thomson Reuters Canada, in each case without the prior consent of User.

**14. Language**

At the request of the parties, the official language of this Agreement and all communications and documents relating hereto is the English language, and the English-language version shall govern all interpretation of the Agreement. À la demande des parties, la langue officielle de la présente convention ainsi que toutes communications et tous documents s'y rapportant est la langue anglaise, et la version anglaise est celle qui régit toute interprétation de la présente convention.

**15. Terms and Conditions Governing TWEN and Law School Exchange Document Viewer Access**

**15. License.**

**15.1 TWEN License**

Thomson Reuters Canada, grants User the right to access and use, at no charge, TWEN data made available on TWEN ("TWEN Data"), exclusive of content accessible through Law School Exchange Document Viewer for which the User has paid an additional fee ("LSE Content"), and data and information provided by TWEN users ("TWEN User Data") by means of the Password. TWEN is made available to User under this

Agreement and may also be made available under an agreement between the Law School and Thomson Reuters Canada ("Law School Agreement"). User may use TWEN solely for Educational Purposes. Any other use, including any use in connection with User's employment outside of the Law School, is strictly prohibited.

**15.2 Law School Exchange Document Viewer License**

User may access LSE Content through links on TWEN including some content only after payment of the applicable fee.  Access to individual LSE Content is limited to 12 months from the date of payment or, for those materials not requiring fee, until links to the content within TWEN has been removed while the User has relevant TWEN access.  West grants User the right to access and use LSE Content consistent with this Agreement, with the additional right to highlight text and add notes. User may use LSE Content solely for Educational Purposes.  Use of LSE Content may be subject to additional terms defined by the underlying rights holder and noted on the content.

**16. User Content.**

**16.1 Right to Use.**

USER RETAINS ALL RIGHTS (INCLUDING COPYRIGHTS) IN THE TWEN USER DATA AND INFORMATION PROVIDED BY USER. Thomson Reuters Canada, may use TWEN User Data for testing, file maintenance and similar purposes in connection with TWEN and related Thomson Reuters Canada, products and services. Other TWEN users can use TWEN User Data only as provided in this Agreement, unless User includes a notice granting greater rights to use User's TWEN User Data.

**16.2 Upload and Posting Restrictions.**

User agrees not to upload or post (i) any data, information, messages or other materials that User does not have the right to distribute or the provision of which violates the proprietary rights of others; (ii) any data, information, messages or other material that is defamatory, violates another person's or entity's privacy, publicity or other rights, or is obscene, harassing, threatening or offensive; or (iii) any data file that contains viruses or other harmful, disruptive or destructive components. Thomson Reuters Canada, reserves the right to trace anonymous postings that violate this section. Thomson Reuters Canada, may release to the Law School the name of a User whose anonymous posting violates this section.

**16.3 TWEN User's Notice:**

Law School professors may monitor usage of TWEN for their courses. For example, professors may access information such as the number of times TWEN is accessed, the content accessed, and postings made to discussion forums from User's account. By using TWEN, User consents to this observation. If User has any questions about

how a professor uses the statistical tools in TWEN, User should talk to that professor.

**17. Use of TWEN.**

**17.1 Use of TWEN Data, TWEN User Data, and Law School Exchange Content.**
User may print out and download insubstantial amounts of TWEN Data, TWEN User Data and LSE Content only for User's own use, such review of certain TWEN Data, TWEN User Data or LSE Content in hard copy form or incorporation of portions of TWEN Data and TWEN User Data in User's work product, appropriately cited and credited.   Use of LSE Content is subject to additional terms identified by the underlying rights holder.

**17.2 Online Notices.**
Certain TWEN Data, TWEN User Data, LSE Content and WLNC Data is subject to different license terms, as identify by online notices. To the extent additional permission is required for use of such data or content, User must send a written request (indicating the content or data in issue and the purposes for which you would like to use such content or data) to Thomson Reuters Canada Copyright Permissions Editor at carswell.copyright@thomsonreuters.com.

**18. No Endorsement.**
Thomson Reuters Canada, does not endorse and is not responsible for (i) TWEN User Data posted by TWEN users; (ii) any third-party products and services made available through TWEN; or (iii) data, information, files and other materials included at any third-party Internet sites to which a link or URL is provided on or through TWEN. Statements and opinions expressed by forum facilitators or other Thomson Reuters Canada employees (except authorized Thomson Reuters Canada , spokespersons) do not necessarily reflect the views of, nor are they endorsed by Thomson Reuters Canada. In addition, such statements and opinions will not constitute or be considered legal advice. User is solely responsible for determining and verifying the accuracy, completeness, reliability and value of Data, information, products and services obtained through TWEN.

**19. General Provisions.**
If any provision(s) of this Agreement is determined by a court to be void, invalid, unenforceable or illegal, the enforceability of the other provisions of the Agreement will not be affected. Failure to enforce any provision of this Agreement will not waive a party's right to enforce such provision. The headings and captions contained in this Agreement are inserted for convenience only and do not constitute a part hereof.

# EXHIBIT D

## ⚠ *Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295*

Canadian Commercial Law Guide

Ontario Superior Court of Justice

Before: Perell J

Decision: February 21, 2012.

Court File No. 10-CV-403667CP

*Canadian Commercial Law Guide   >  Cases  >  2010s  >  2012*

**2012 CCLG para. 25-295**   |   *[2012] O.J. No. 792*   |   *2012 ONSC 1138*

Lorne Waldman Plaintiff v. Thomson Reuters Corporation and Thomson Reuters Canada Limited Defendants

See commentary at *CCLG para. 19-400*.

# Case Summary

**Intellectual property — Copyright — Class actions — Motion for certification of proposed class action for copyright infringement — Defendant copied court documents authored by lawyers and law firms, and reproduced them in electronic database accessible by licensed subscribers — Plaintiff alleged defendant infringed class members' copyright by making those court documents available without permission and for a fee — Motion allowed — Action met criteria for certification — Class adjusted to remove clients, public sector lawyers, in-house lawyers, and self-represented litigants — Canadian Charter of Rights and Freedoms, 1982, RSC 1985, App. II, No. 44, Sch. B, s. 2(b) — Class Proceedings Act, 1992, SO 1992, c. C.6, s. 5, 5(1), 5(1)(a), 5(1)(b), 5(1)(c) — Copyright Act, *RSC 1985, c. C-42, s. 13*, 27(1), 28.2(1), 29, 29.1, 34, 34(1), 38.1, 38.1(1).**

**Facts:** The plaintiff, Lorne Waldman ("Waldman"), brought a motion for certification of a proposed class action for infringement of copyright against the defendant, Thomson Reuters Canada Limited ("Thomson"). Thomson, through its legal publishing branch Carswell, copied court documents authored by lawyers and reproduced them in an electronic database called "Litigator." The database, which was accessible by licensed subscribers, facilitated search and retrieval of the documents. Waldman was a lawyer who had authored court documents that were included in the database.

Waldman alleged that Thomson infringed class members' copyright by making available, without permission and for a fee, copies of court documents authored by lawyers and law firms. Waldman claimed damages of $50 million, plus $1 million in punitive damages for primary and secondary copyright infringement, and infringement of moral rights by Thomson's assertion of its ownership of copyright in the documents. Thomson argued that subscribers to Litigator were subject to terms and conditions that accorded with the *Copyright Act* (the "Act"), that its conduct constituted fair dealing under sections 29 and 29.1 of the Act, that it had consent or an implied licence to copy and sell the documents, and that its conduct was protected by section 2(*b*) of the *Canadian Charter of Rights and Freedoms* (the "Charter"). Thomson opposed the motion on the basis that Waldman sought to limit access to publicly filed documents in a manner that was antithetical to the open court system and to principles promoting access to justice.
HELD: The motion was allowed.

The Ontario Superior Court of Justice certified the action as a class proceeding. On the motion, the Court did not assess the merits of Waldman's claim or opinion about the social utility of the class action. The Court's gatekeeper function and screening function were limited to determining whether the certification criteria were satisfied. Waldman pleaded a cause of action for copyright infringement and for infringement of an author's moral rights. Thomson delivered a statement of defence and did not challenge the legal adequacy of those causes of action. The proposed class was overly inclusive, since clients, public sector lawyers, in-house lawyers, and self-represented litigants had different commercial interests than private sector lawyers. They were therefore excluded from the class definition.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

While there were questions raised by Waldman that were individual and not common in nature, there was a set of questions that, with minor adjustments to address the technical problems, was certifiable and would substantially advance the proceeding. In particular, issues raised by Thomson's defence readily lent themselves to resolution on a class-wide basis. Assuming there was copyright infringement, a class proceeding was the only reasonable means to provide access to justice to class members. Individual actions would not be financially viable. Waldman was a suitable representative plaintiff.

## Counsel

L. Sokolov, J. Goldblatt, and J. Kosa for the plaintiff; W. Matheson and A. Bernstein for the defendants.

REASONS FOR DECISION

**P.M. PERELL J.**

*A. INTRODUCTION*

**1** Lorne Waldman moves for certification of a proposed class action under the *Class Proceedings Act, 1992,* S.O. 1992, c. C.6. Mr. Waldman's action is against Thomson Reuters Canada Limited ("Thomson") and Thomson Reuters Corporation. On consent, the parties ask that leave be granted to dismiss the action as against Thomson Reuters Corporation, a holding company and an indirect parent of Thomson. I grant leave and dismiss the action as against Thomson Reuters Corporation.

**2** This action arises because Thomson, through its legal publishing branch known as Carswell, copies court documents that have been authored by lawyers and reproduces them on an electronic data base and search and retrieval service known as "Litigator." Documents authored by Mr. Waldman, who is a lawyer, were included in Litigator without his express permission. In his proposed class action, Mr. Waldman alleges that Thomson infringes the copyright of the class members by making available, without permission and for a fee, copies of court documents authored by the lawyers and the law firms.

**3** Thomson asks that the certification motion be dismissed. It submits that Mr. Waldman is seeking to limit access to a publicly-filed court documents and that his action is antithetical to the open court system and to access to justice, behaviour modification, and judicial economy, which are the rationales for class proceedings.

**4** Further, Thomson submits that the common issues trial would provide no judicial economy and no meaningful access to justice, and it submits that a class action would be unmanageable and not the preferable procedure because the prosecution of a mass claim of copyright infringement would lead inevitably to complex individual trials about the originality and the authorship of the court documents. Thomson submits that some of the Litigator documents are not copyrightable because they lack originality, which is to say the documents were prepared without the exercise of skill or judgment, and it submits that court documents are rarely, if ever, the creation of a single author and adjudicating the complex individual claims would require claimants to breach solicitor and client privilege and that too, makes the action unmanageable and also offensive to the administration of justice.

**5** Further still, Thomson challenges the commonality of the proposed common issues, and it also submits that Mr. Waldman's proposed action fails to satisfy the identifiable class criterion and the preferable procedure criterion for a class action. It submits that the class members do not, would not, and should not support a class action that advances a claim that is against public policy, in particular, against the policies of an open court system and freedom of expression.

**6** Thomson submits that the court should exercise its gatekeeper function and not certify a class action that has negative social utility and little interest from class members.

**7** However, notwithstanding Thomson's challenges, in my opinion, Mr. Waldman's action does satisfy the criteria for certification, and with some modifications to the class definition and to the common questions, his action should be certified.

**8** As my Reasons will reveal, Thomson's arguments about commonality and about the preferable procedure criteria of certification

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

should be rejected. In the main, Thomson's arguments fail to recognize that certification is a technical and procedural legal phenomenon and the court's gatekeeper's role is limited to ensuring that the technical and procedural elements of the test are satisfied, which, subject to some adjustments, is the situation for the case at bar. Some of Thomson's arguments against certification, while relevant to the determination of the merits of the action and to Thomson's several defences, are not pertinent to whether, as a procedural matter, the action should be certified as a class action.

## B. ORGANIZATION OF REASONS FOR DECISION

**9**  My Reasons for Decision are organized under the following headings:

* Introduction

* Organization of Reasons for Decision

* Evidentiary Background

* Factual Background

    * Carswell, Litigator, and the Court Document Collection Service

    * Mr. Waldman and the Arar Factum

    * Mr. Slaght's Expert Evidence

    * The Proposed Class Action

* Copyright and Copyright Infringement

    * Introduction to Copyright Law

    * Authorship, Copyright Ownership, and Copyright Infringement

    * The Problem of Client Ownership of Copyright in a Lawyer's Work Product and the Privilege Problem

    * Remedies for Copyright Infringement

* The Criteria for Certification

    * Introduction - The Test for Certification

    * The Gatekeeper Argument

    * Disclosure of Cause of Action

    * Identifiable Class

    * Common Issues

    * Preferable Procedure

    * Representative Plaintiff and the Litigation Plan

* Conclusion

## C. EVIDENTIARY BACKGROUND

**10**  The evidence for the certification motion was provided by affidavits from:

* Lorne Waldman, an Ontario lawyer, who is one of Canada's leading practitioners in immigration and refugee law

* Jilean Bell, the Director of the Legal and Regulatory Strategic Market Group at Carswell, who was involved in the services offered by Carswell, including the Litigator service on Westlaw Canada

* Ronald G. Slaght, one of Canada's foremost civil litigation practitioners and a respected leader of the legal community and valued contributor to the administration of justice.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

11  Mr. Waldman and Ms. Bell were cross-examined on their affidavits. Mr. Slaght's evidence was not challenged.

*D. FACTUAL BACKGROUND*

      1.                **Carswell, Litigator, and the Court Document Collection Service**

12  Thomson Reuters Canada Limited operates a legal publishing division known as Carswell that publishes law reports, legal textbooks, loose-leaf services, and annotated statutes. Carswell offers numerous electronic publications and online services for legal research including a database service known as "Litigator."

13  One of the Litigator products is the "Court Document Collection," which offers subscribers the means to examine documents copied from court files from across Canada. The subscriber may download, edit, and print the court documents. The text, or more likely portions of the text, can be incorporated into the subscriber's own court documents.

14  Lawyers and legal scholars and the editors of several of Carswell's case reporting services select the court files, i.e. the actions and applications from which court documents will be extracted for the Litigator service. The documents are from significant cases in the provincial superior and appellate courts, the Federal Court, and the Supreme Court of Canada. The Litigator's court documents include pleadings, notices of motion, affidavits, and factums.

15  There are approximately 100,000 documents that have been selected for inclusion in Litigator. There are approximately 12,000 to 13,000 different lawyers' names on the court documents in Litigator. There are approximately 6,500 different firm names listed.

16  Carswell does not ask the lawyers or the law firms for permission to place the documents on Litigator. It says, however, that it will respond to requests from lawyers and law firms to remove their documents from the database.

17  Carswell obtains copies of the documents from the courts' files from across the country. It scans the document into portable digital format (".pdf"), and then using optical character recognition technology, it creates a document that can be searched on-line and edited off line. The documents are not translated or otherwise modified, but they are redacted to remove personal information such as social insurance numbers, bank account numbers, dates of birth or death, passport numbers, etc. for privacy and to comply with any publication bans.

18  Carswell adds several features to its Litigator data-base; namely: (a) a citation; (b) a hyper-link to other motions and proceedings; (c) a classification by legal issue; (d) highlighting of relevant procedural rules; (e) links to related cases; and (f) hyperlinks to the full text of a decision and secondary sources; (g) the redaction.

19  Litigator is connected to Westlaw Canada's research service, "Law Source," which provides cases, legislation and secondary sources electronically. A lawyer who finds a case of interest on Law Source may find considerable information about that case on Litigator, including the direct history, the case history, citing references, and a *Canadian Abridgement* digest.

20  Carswell has made a substantial investment in Litigator. In addition to the expense of the technology and the expense of the editorial contribution, more than $1 million has been paid to courts across the country for file access fees and photocopying charges. Adding new cases to the service requires a substantial investment each year.

21  Subscribers to Litigator must sign a Licence Agreement. Under the agreement, subscribers are limited to use in "the regular course of legal and other research related work and study." The subscribers may only copy "insubstantial portions" of court documents to "give to a judge or other presiding officer ... in making filings or submissions and filing court documents ... in judicial or quasi-judicial or parliamentary proceedings."

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**22**  The Licence Agreement expressly permits copying but requires the subscriber to acknowledge the intellectual property rights of "Carswell or its suppliers and licensors" In this regard, s. 2.1 of the agreement states:

> 2.1 The Subscriber acknowledges that all intellectual property, including all copyright, trademarks, patents or rights to trade secrets in the Features and Data belongs to Carswell or its suppliers and licensors, as the case may be, and that the Subscriber's rights do not extend beyond the limited license expressly granted herein. Subject to Section 3, the Subscriber is permitted to:
>
> (a)  use the Features and browse and search the Data;
>
> (b)  download and temporarily store insubstantial portions of the Data ("Downloaded Data") to a storage device within the Subscriber's exclusive control, solely:
>
> (i)  to display internally such Downloaded Data; and
>
> (ii)  to quote and excerpt from such Downloaded Data (the parts of which are commentary, references and case law being appropriately cited and credited) by electronically cutting and pasting or other means in memoranda, facta, client communications and similar work product created by the Subscriber in the regular course of its research and work; ...

**23**  When a subscriber uses Litigator, a copyright notice appears from clicking "copyright" from the "What's in Litigator" page, which includes the following language:

> ... Each reproduction (as permitted and/or required by the Licence Agreement for Westlaw Canada) of a portion of Westlaw Canada (specifically other than court documents) must contain notice of copyright as follows:
>
> Copyright (C) CARSWELL, a division of Thomson Reuters Canada Limited, or its licensors. All rights reserved. ...

**24**  Every download of a court document occurs by way of telecommunication over the internet. A subscriber may save a downloaded document onto his or her own computer, or else download the document in Microsoft Word, WordPerfect, HTML, plain text format, .pdf format or rich text format.

**25**  Where documents are downloaded by a subscriber in .pdf format, no enhancements are included. Where documents are downloaded in formats other than .pdf, or are viewed on the Litigator web-site, the enhancements are active.

**26**  There are approximately 1,300 subscribers, including sole practitioners, law firms, in-house law departments, government lawyers, and law schools across Canada. Although Thomson does not have exact numbers, it estimates that over 10,000 lawyers across Canada currently have access to the Litigator service.

**27**  Thomson's marketing material indicates that subscribers may usefully copy portions of the court documents and use them for their own document creation. It praises the skill, experience, and ingenuity of the lawyers and law firms that prepared the court documents.

**28**  Carswell has had only two complaints about its posting court documents on Litigator; i.e., Mr. Waldman's complaint and a complaint from the law firm Sutts, Strosberg in 2007. In response to these complaints, Carswell removed the documents, and it states that it will continue that practice in similar circumstances when it receives a complaint in writing from a lawyer or law firm with the appropriate authority to ask that the document be removed.

**29**  Carswell is not the only source for copies of court documents. The Supreme Court of Canada permits users to download factums filed with the Supreme Court. Legal Aid Ontario provides a collection of primary and secondary legal materials, including court documents. The Legal Aid Ontario service is provided to Ontario lawyers representing clients who have legal aid certificates. The Canadian Bar Association operates the National Class Actions Database. This database provides court documents from class proceedings. Each of these services includes a specific caution against copyright infringement, and in contrast to Litigator, none of these services are for profit.

**30**  Lawyers (and members of the public) are also able to attend at a court office and obtain copies of publicly-filed court documents

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

for a service fee. It is not disputed that for a fee, process servers routinely obtain copies of court documents for lawyers. Mr. Waldman has no objection to these activities.

 

 

2.     **Mr. Waldman and the Arar Factum**

**31**  Mr. Waldman is a well-regarded and well-known lawyer who practices immigration and refugee law in Toronto.

**32**  Mr. Waldman was counsel to Maher Arar, who was an intervenor in a proceeding before the Court of Appeal. Mr. Waldman drafted a factum that was filed with the court in Toronto. To be more precise, the Arar Factum was filed in the court file for *Bouzari v. Islamic Republic of Iran*, which was a claim for damages for acts of torture. *Bouzari* is an important constitutional law case.

**33**  Mr. Waldman registered a claim with the Canadian Intellectual Property Office for the copyright in his factum.

**34**  Without Mr. Waldman's permission, Carswell copied the factum from *Bouzari v. Islamic Republic of Iran* and made it available as part of the Litigator Service.

**35**  Mr. Waldman provided copies of his Arar Factum to lawyers upon request and without restriction on how it might be used.

**36**  Mr. Waldman admitted that once a lawyer has a copy of a court document, however retrieved or copied, the lawyer is free to make extensive use of the document including copying from it verbatim.

 

 

3.     **Mr. Slaght's Expert Evidence**

**37**  In response to the certification motion, Thomson delivered an affidavit from Mr. Slaght, who provided unchallenged expert evidence for the certification motion.

**38**  Mr. Slaght testified about the creation of court documents by lawyers and law firms. He deposed that there may be one or more authors for any legal document, and that the author or authors are not necessarily the lawyers whose names are on the document. The signing of a court document does not necessarily indicate authorship.

**39**  Mr. Slaght deposed that a junior lawyer might prepare a first draft of a factum or other court document. The junior lawyer may be assisted by a research lawyer, particularly in important cases. One or two senior lawyers may review the draft. A senior lawyer might author the court document in whole or in part or not at all. The lawyer who appears in court may not be the author of the court document he or she relies on.

**40**  Mr. Slaght deposed that not all the work in a court document is original because lawyers frequently use precedents, pleadings, evidence (affidavits, exhibits, and transcripts), secondary sources, and reasons for decision in their court documents.

**41**  Mr. Slaght deposed that clients often provide comments and revisions and may make a substantial contribution to the authorship of some documents. In terms of client involvement, Mr. Slaght deposed that affidavits are somewhat different from other court documents because there is a significant role for the affiant, who often will be a client. Affidavits are mostly prepared from information conveyed by the affiant. Affiants may write substantial portions of their own affidavits.

**42**  Based on Mr. Slaght's evidence, Thomson submits that a court document may be a cooperative work of a group of co-authors that might include lawyers from one or more law firms and that clients may be co-authors of some court documents.

**43**  Mr. Slaght also deposed that it is normal for lawyers to request copies of factums about an interesting case directly from one of

the lawyers involved or to obtain copies from other sources, including hiring process servers and paying them to attend at the court office and make a copy of court documents filed by other lawyers.

**44** Mr. Slaght deposed that lawyers commonly provide precedents to their colleagues as a matter of professional courtesy, legal education, and collegiality.

**45** He testified that lawyers typically collect precedents without seeking permission from the lawyer or law firm from which the document originated. It was his opinion that lawyers know that once filed, court documents become part of the administration of justice and anyone can obtain a copy of them and use them.

### 4.     The Proposed Class Action

**46** Mr. Waldman commenced his proposed class action by a Statement of Claim issued on May 25, 2010.

**47** In his Statement of Claim, Mr. Waldman alleges that Carswell has committed primary and secondary copyright infringement as defined by the *Copyright Act*. He also alleges that Carswell has infringed his "moral rights", as well as those of the class as a whole, by asserting that they are the owners of copyright in the works. He pleads that Thomson encourages its subscribers to infringe copyright. He claims $50 million in compensation for the proposed class members and punitive damages of $1 million.

**48** Thomson delivered a Statement of Defence on December 20, 2011. It asserts, among other things, that: (a) the subscribers of Litigator are subject to terms and conditions that accord with the *Copyright Act*; (b) it did not engage in copyright infringement; (c) its conduct constituted "fair-dealing," pursuant to s. 29 and s. 29.1 of the Act; (d) it has the consent and/or an implied licence to copy and sell copies of court documents; and (e) has a right supported by s.2(b) (freedom of expression) of the *Charter of Rights and Freedoms*, to copy and sell the works. Accordingly, it denies any wrongdoing.

**49** Thomson also disputes that Mr. Waldman is the author or the sole author of the Arar Factum. It submits that he knew that once filed with the Court of Appeal, the factum could be accessed and copied for a fee and that he accepted that commercial research services would have the same access to the court system as any member of the public. Thomson pleads that once Mr. Waldman filed the factum, he consented or implicitly licensed the factums reproduction and communication to the public. It submits that he acquiesced in the use of the factum by other lawyers as a precedent. It relies on a limitation period defence, and it submits that Mr. Waldman's claim is statute-barred.

**50** Thomson also raises a public policy defence, and it relies on the public interest in an open court system and the public interest in the availability and dissemination of publically available materials as an exception to copyright under the *Copyright Act*.

## E. COPYRIGHT AND COPYRIGHT INFRINGEMENT

### 1.     Introduction to Copyright Law

**51** In order to understand Thomson's challenges to certification and to evaluate whether Mr. Waldman's action satisfies the test for certification as a class action, it is necessary to understand the nature of copyright and several other associated concepts. And, it is necessary to understand that there are copyright policy and public policy issues associated with copyright and copyright infringement. In particular, because they are central to several of Thomson's major arguments against certification, it is necessary to understand the concepts of authorship and ownership. It is also necessary to address the question of whether clients have a copyright in documents in which they had some role in drafting.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**52**  In this section of my judgment, I will set out the legal framework for Thomson's major arguments against certification, and I will identify and describe some of the policy questions.

**53**  In particular, in this section, I will address the law's approach to copyright infringement, the matter of client authorship of court documents, and the problem of solicitor and client privilege. I will return to these topics later during the discussion of the various criteria for certification. I will, however, in this section, make some findings or conclusions that are material to my decision about the satisfaction of the certification criteria.

2.      <u>Authorship, Copyright Ownership, and Copyright Infringement</u>

**54**  Copyright is a creature of the *Copyright Act*, <u>R.S.C. 1985, c. C-42</u>, and the rights and remedies it provides are exhaustive: *Théberge v. Galerie d'Art du Petit Champlain inc., 2002 SCC 34* at para. 5.

**55**  There is no ownership in ideas, but copyright provides a property interest to the person who puts the idea into written form: *Donoghue v. Allied Newspapers Ltd.* [1938] Ch. 106. The purpose of copyright law is not to protect the ideas or opinions expressed by the creator, but rather it protects the various means and forms by which those ideas are communicated: *Théberge v. Galerie d'Art du Petit Champlain inc., supra,* at para. 115; *CCH Canadian Limited v. Law Society of Upper Canada,* <u>2004 SCC 13</u> at para. 8.

**56**  Copyright law is a matter of public policy. The *Copyright Act* is a balance between, on the one hand, promoting the public interest in the encouragement and dissemination of works of the arts and intellect and, on the other hand, ensuring that the creator of a work obtains a just reward and preventing others from appropriating the creator's just reward: *Théberge v. Galerie d'Art du Petit Champlain inc., supra,* at para. 30.

**57**  The *Copyright Act* balances user's rights with creator's rights and neither right should be interpreted restrictively: *CCH Canadian Limited v. Law Society of Upper Canada, supra,* at paras. 10, 48. In *Théberge,* Justice Binnie stated at paras. 31 and 32:

> 31.  The proper balance among these and other public policy objectives lies not only in recognizing the creator's rights but in giving due weight to their limited nature. In crassly economic terms it would be as inefficient to overcompensate artists and authors for the right of reproduction as it would be self-defeating to undercompensate them. Once an authorized copy of a work is sold to a member of the public, it is generally for the purchaser, not the author, to determine what happens to it.

> 32.  Excessive control by holders of copyrights and other forms of intellectual property may unduly limit the ability of the public domain to incorporate and embellish creative innovation in the long-term interests of society as a whole, or create practical obstacles to proper utilization. This is reflected in the exceptions to copyright infringement enumerated in ss. 29 to 32.2, which seek to protect the public domain in traditional ways such as fair dealing for the purpose of criticism or review and to add new protections to reflect new technology, such as limited computer program reproduction and "ephemeral recordings" in connection with live performances.

**58**  Under s. 27 (1) of the *Copyright Act*, it is an infringement of copyright for anyone to do anything that the Act only permits owners to do, including authorizing the exercise of an owner's rights. The Act also prohibits "secondary" infringement, which includes selling or renting out copies of works that the defendants knew, or should have known, infringed copyright. Section 27 (1) of the Act states:

> 27.  (1) It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

**59**  For the purposes of the case at bar, it is important to note that for a class member to prove copyright infringement, the class member must prove four elements: (1) that copyright exists in the work; (2) that he or she is the owner of the copyright in the work; (3) that Thomson has done a thing that only the owner of the copyright has the right to do; and (4) that the class member did not consent to Thomson's conduct.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**60**  I will address each of these elements in turn beginning with whether copyright exists in the court documents found on Litigator. However, before addressing the four elements, for the purposes of the case at bar, it is also important to note that there are several standard defences to an infringement claim and that Thomson's Statement of Defence engages and relies on these defences.

**61**  The defences to copyright infringement are conveniently summarized by Professor David Vaver in "Copyright in Legal Documents" (1993), 31 Osgoode Hall L.J. 661 at p. 670, where he states:

> Anyone who copies a copyrighted legal document fully or substantially, or publishes, faxes, or translates an unpublished document, infringes copyright in the document, unless he can justify the act. The main defences or justifications occur where the copier:
>
> * has the copyright owner's express or implicit consent;
>
> * can rely on a specific exemption, such as fair dealing;
>
> * wishes to use the idea of the document, but cannot practically avoid taking the expression; or
>
> * can show a business or professional custom, or public policy reason, that allows copying.

**62**  The first element of copyright infringement is that copyright exists in the work. Under the *Copyright Act*, there are different types of work, and the case at bar concerns court documents, which could qualify as literary works.

**63**  Copyright exists in every literary work where the exercise of skill and judgment required to produce the work is not so trivial that it could be characterized as a purely mechanical exercise. In *CCH Canadian Limited v. Law Society of Upper Canada*, *supra* at para. 16, Chief Justice McLachlin stated:

> 16.  For a work to be "original" within the meaning of the *Copyright Act*, it must be more than a mere copy of another work. At the same time, it need not be creative, in the sense of being novel or unique. What is required to attract copyright protection in the expression of an idea is an exercise of skill and judgment. By skill, I mean the use of one's knowledge, developed aptitude or practised ability in producing the work. By judgment, I mean the use of one's capacity for discernment or ability to form an opinion or evaluation by comparing different possible options in producing the work. This exercise of skill and judgment will necessarily involve intellectual effort. The exercise of skill and judgment required to produce the work must not be so trivial that it could be characterized as a purely mechanical exercise.

**64**  Thomson does not dispute that many of the court documents available on Litigator are literary works. Indeed, the steps Carswell takes in providing a copyright notice and in inserting terms of use in its subscription contract recognizes the presence of copyrightable literary works on Litigator. However, Thomson submits that there are some documents on Litigator, for example, orders, judgments, routine notices of motion and case management forms that may not have the requisite originality to attract copyright protection, because they were created with little or no exercise of skill and judgment. These documents, Thomson submits, are not subject to copyright protection.

**65**  Doctrinally, there is substance to Thomson's argument. Authorship of a copyrightable work connotes a creative process and ingenuity; an author is more than a scribe, editor, or amanuensis and expresses ideas in an original or novel form: *New Brunswick Telephone Company, Limited v. John Maryon International Ltd.*, *[1982] N.B.J. No. 387* (N.B.C.A.); *Neugebauer v. Labieniec*, *2009 FC 666*, affd. *2010 FCA 229*.

**66**  Thomson submits that each document in Litigator would have to be proven to be copyrightable and this means that the action is unmanageable as a class action and that all, or at least some, of the proposed common issues lack commonality because of this discrete element of an infringement claim.

**67**  I agree with Thomson that whether a court document found on Litigator is copyrightable, in the sense of it being the product of creativity, will have to be proven to establish copyright infringement, but for reasons to be provided later, I disagree that this circumstance makes the action inappropriate for certification as a class action.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**68**  I turn now to the matter of copyright ownership and the rights of authors and owners. If a literary work is copyrightable, the *Copyright Act*, among other things, confers rights on authors of literary works and on the owners of the copyright in a literary work.

**69**  By operation of statutory law, the owners of copyright are granted the exclusive right to reproduce a work, publish a work, translate a work, or communicate the work to the public by way of telecommunication.

**70**  Authors have certain rights, known as moral rights, which are personal and cannot be assigned. The author of a work is the person who actually created the work or the person who expresses the work in an original form. In the case of a sole author of a legal document, the author is the drafter or compiler. The *Copyright Act* presumes that a person named on a work is the author.

**71**  Having regard to Thomson's arguments, for the case at bar, it is important to note that a literary work may have more than one author. If authors collaborate one with the other and the contribution of each is not distinct from the contribution of the others, the work will have more than one author.

**72**  The constituent elements of joint ownership are: (1) each author makes a substantial although not necessarily equal contribution to the work; and (2) there is a joint labour in carrying out a common purpose or design: *Levy v. Rutley* (1871), 6 L.R. 976 (C.P.); *Neugebauer v. Labieniec*, *supra*. Some courts impose the additional requirement that the authors intend the work to be attributed to them as a joint work: *Neudorf v. Nettwerk Productions Ltd. (1999), 3 C.P.R. (4th) 129* (B.C.S.C.); *Dolmage v. Erskine (2003), 23 C.P.R. (4th) 495* (S.C.J.).

**73**  Under s. 13 of the *Copyright Act*, the author or authors are the first owner(s) of copyright in a work. However, where the author of a work is in the employment of some other person at the time of the creation of the work, the author remains the author of the work, but the employer is the owner of copyright in the work.

**74**  As noted, an author of a work has "moral rights" under the Act that cannot be assigned although they can be waived: *Théberge v. Galerie d'Art du Petit Champlain inc., 2002 SCC 34* at para. 15.

**75**  The author has a moral right to the integrity of the work and a right to be associated with the work as its author by name or a right to keep his or her association anonymous. The integrity of the work is infringed only if the work is modified "to the prejudice of the honour or reputation of the author:" *Théberge v. Galerie d'Art du Petit Champlain inc., supra*, at para. 17. The need for prejudice to the honour or reputation of the author is an essential element of an infringement of the right of integrity; without prejudice, the right of integrity is not infringed: *Prise de parole Inc. v. Guerin Editeur Ltee (1995), 66 C.P.R. (3d) 257* at 265, aff'd *(1996), 73 C.P.R. (3d) 557*; *Harmony Consulting Ltd. v. G.A. Foss Transport Ltd., 2011 FC 340* at para. 290.

**76**  In the case at bar, Mr. Waldman alleges that the author's right to integrity has been infringed by the use of their works in association with Litigator, to the prejudice of their honour and reputation under s. 28.2(1) of the *Act*.

**77**  An author may assign his or her copyright in a literary work, but an author cannot lose his or her moral rights associated with the literary work. An author who is an employee many never have had the copyright in the literary work but will still have moral rights that cannot be assigned.

**78**  I turn to the third element; i.e., whether Thomson has done a thing that only the owner of the copyright has the right to do. I will discuss this factor again later as a part of my discussion of the common issues. I foreshadow here to say that in my opinion, Thomson's conduct and its various defences associated with the use of court documents on Litigator are common issues and justify the certification of Mr. Waldman's action as a class action.

**79**  For the present purposes of understanding the nature of copyright and copyright infringement and recalling the balancing of public policy interests that underlies the *Copyright Act*, the point to note is that the Act accepts that there are some rights of expression or copying that are not exclusive to the owner of the copyright. This point is demonstrated by the Supreme Court of Canada's judgment in *CCH Canadian Limited v. Law Society of Upper Canada, supra*, which plays a large role in my decision to certify Mr. Waldman's action as a class action.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**80**  In *CCH Canadian Limited,* a group of legal publishers (including Thomson) sued the Law Society of Upper Canada, which operates the Great Library at Osgoode Hall. The publishers sued the Law Society for copyright infringement and for authorizing copyright infringement at the Great Library.

**81**  The Great Library provided a service to photocopy legal materials for library users including lawyers and judges. The publishers alleged that the Law Society's Library infringed their copyrights in the published legal materials. The Law Society denied there was any infringement and pleaded that the photocopying service was "fair dealing" under s. 29 of the *Copyright Act*.

**82**  Although arguably there may be distinguishing features, by way of analogy, the Great Library's photocopy service is comparable to Litigator in that legal materials (literary works) authored by lawyers were reproduced by the users of the photocopying service (subscribers) or the legal materials were reproduced by library staff and delivered to the users, who, in turn could use the copies for their own purposes, including incorporating the information into court documents.

**83**  In *CCH Canadian Limited*, the Supreme Court described the nature of fair dealing under the *Copyright Act*. Chief Justice McLachlin explained at paras. 48-53 that the fair dealing exception was properly understood as an integral part of the *Copyright Act* and more than simply a defence.

**84**  Fair dealing was a user's right and in order to maintain the proper balance between the rights of a copyright owner and users' interests, it must not be interpreted restrictively. In order to show that a dealing was fair under s. 29 of the *Copyright Act*, a defendant must prove: (1) that the dealing was for the purpose of either research or private study and (2) that it was fair. "Research" has a large and liberal interpretation in order to ensure that users' rights are not unduly constrained and was not limited to non-commercial or private contexts. Research for the purpose of advising clients, giving opinions, arguing cases, preparing briefs and factums was research.

**85**  What is a "fair" dealing is a question of fact and depends on the facts of each case. There is no standard test for fairness, but the following non-exhaustive factors may be considered to help assess whether a dealing is fair: (1) the purpose of the dealing; (2) the character of the dealing; (3) the amount of the dealing; (4) alternatives to the dealing; (5) the nature of the work; and (6) the effect of the dealing on the work.

**86**  In *CCH Canadian Limited*, the Supreme Court made a detailed analysis of the various factors of fair dealing and concluded that the Law Society's dealings were research-based and fair. In the case at bar, it is a matter for another day whether Thomson's Litigator service is another example of fair dealing. I will return to the issue of whether that other day is at individual issues trials or at a common issues trial below, when I discuss the proposed common issues for the case at bar.

**87**  The fourth element of the class member's infringement claim is that the class member did not consent to Thomson's conduct. Consent is a fundamental part of any copyright infringement case. The class member must establish that he or she is the owner of the copyright in a work, and that the work has been reproduced without consent.

**88**  Consent can be express. It can also be implied, for example, through knowledge and conduct. See *Bishop v. Stevens*, *[1990] 2 S.C.R. 467*. Professor Vaver points out in his article at p. 670 that courts frequently use the device of an implied licence when a copyright owner is trying to exercise its rights too extensively. See *Netupsky v. Dominion Bridge Co.*, *[1972] S.C.R. 368*.

3.        The Problem of Client Ownership of Copyright in a Lawyer's Work Product and the Privilege
          Problem

**89**  Thomson submits that clients may be authors of court documents and thus clients may be co-owners or even the exclusive owner of a court document if the lawyer made no significant contribution to the creation of the court document, which might be the case, for instance, with an affidavit. Thomson submits that the matter of authorship of a literary work is a factual determination

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

of who made a substantial contribution of skill and judgment to the creation of the literary work and one of the contributors may be the client.

**90**  This is an important point for Thomson because it adds to the fuel of a major argument that submits that Mr. Waldman's action should not be certified as a class action because the prospect of client ownership or co-ownership means that Mr. Waldman's proposed class action is unmanageable and, practically speaking, the action is impossible to prosecute, unless the client waives solicitor and client privilege associated with the court document.

**91**  Thomson submits that in order to prosecute the class action, it would be necessary to determine for each of the 200,000 documents on Litigator who participated in the creation of the document, which might include client participants. This means that the client's file would be relevant and that in every case, it would be necessary for the class member to disclose and produce his or her file, which, however, would not be possible, unless the client waives his or her privilege associated with the client file.

**92**  Thomson submits that copyright is entirely a matter of statute, and although, practically speaking, without the cooperation of their clients, lawyers cannot protect against copyright infringement of court documents, if this is a problem for lawyers, the fix must come from Parliament. Thomson submits that until Parliament addresses the problem, a class action would be unmanageable and also unseemly because it is offensive to the ethical responsibilities of lawyers for them to ask their client to waive solicitor and client privilege.

**93**  The copyright in legal documents is not a settled matter. In his very interesting and informative article, Professor David Vaver identifies the uncertainties associated with copyright in legal documents. Professor Vaver's article is not specifically about court documents but about legal documents generally, and he points out several public policy concerns that arise because the extent of copyright in legal documents, if any, would affect the ability of lawyers to serve other clients and would detract from the profession's obligation to serve the public to the best of its ability, would promote needless variety when standardization and consistency in legal expression would be beneficial, and would monopolize legal services and suppress healthy competition. Professor Vaver suggests that it would be unethical and contrary to professional ethics for a lawyer to insist on copyright.

**94**  Thus, there are serious policy questions about how much, if any, protection of legal documents, including court documents, should have. See also: S.F. Birch, Jr., "Copyright Protection for Attorney Work Product: Practical and Ethical Considerations" (2003), 10 J. Intell. Prop. L. 255; L.P. Wang, "The Copyrightability of Legal Complaints" (2004), 45 Boston College Law Rev. 705. D.H. Issacs, "The Highest Form of Flattery? Application of the Fair Use Defence against Copyright Claims for Unauthorized Appropriation of Litigation Documents" (2006), 71 Missouri Law Rev. 391.

**95**  Given these unsettled policy issues which would influence how the *Copyright Act* is interpreted, I do not necessarily agree with Thomson's submission that clients may be authors or co-owners of copyrightable court documents. For present purposes, I make no finding in this regard. I also make no finding whether there is a categorically justification for the infringement of any copyright in court documents based on the open court principle or some other matter of public policy.

**96**  At this juncture of the proposed class action, it is both unnecessary and also inappropriate for me to decide these points. For the purposes of the certification motion, I need and should go no further than to note on the one hand that there is a reasonably strong argument that a client has the legal capability of being an author and or owner based on a fact-based determination that he or she made a substantial contribution to the creation of the court document, and on the other hand, there are reasonably strong arguments that: (a) clients categorically are never authors of court documents; (b) clients categorically have no moral rights with respect court documents; (c) clients categorically waive any moral rights; and (d) clients categorically assign any copyright in court documents to the lawyer of record.

**97**  I foreshadow to say that although it is inappropriate for me to decide these matters, I disagree with Thomson's argument that the presence of these complex and important issues makes a class action unmanageable and not the preferable procedure. I will return to this topic below, but I say here that I do not agree with Thomson that the possibility of client authorship or client copyright ownership makes the class action unmanageable or wanting for common issues. I will explain these conclusions later when I discuss the test for certification and the certification criteria.

**98**  Based on my review of the authorities and the provisions of the *Copyright Act*, I do agree with Thomson that <u>provided that</u>

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

clients are legally capable of being an author of a court document, then clients could be owners or co-owners of the copyright in the court document.

**99**  I also agree with Thomson that it is entitled to require that every class member establish his or her entitlement to the rights of a copyright owner or his or her entitlement to the moral rights of an author, and I agree that this element of proof of copyright infringement means that whether there are co-authors or co-owners is a material issue in Mr. Waldman's proposed class action.

**100**  I further agree with Thomson that if authorship or ownership is in issue, then the class member's solicitor and client file is relevant and should be disclosed and produced. The client file would be relevant even if there was no client contribution since the file could provide evidence of whether the class member was an author or co-author or not an author at all.

**101**  I also agree that the class member cannot produce his or her solicitor and client file, unless the client waives his or her solicitor and client privilege.

**102**  It is not necessary for me to review the law about solicitor and client privilege. See: *Canada (Privacy Commissioner) v. Blood Tribe Department*, 2008 SCC 44; *Blank v. Canada (Minister of Justice)*, 2006 SCC 39; *Maranda v. Richer*, 2003 SCC 67; *Lavallee, Rackel & Heintz v. Canada (Attorney General)*, 2003 SCC 61. It is uncontestable that the lawyer's file for the client will contain communications for the purpose of obtaining legal advice and that those communications will provide source material for the court documents.

**103**  I thus agree that the matter of solicitor and client privilege is a problem that has to be addressed in the prosecution of this class action for copyright infringement.

**104**  I note that Thomson also argues in the alternative that in any event, there is no copyright infringement because the authors of court documents implicitly consent to the copying of their documents by delivering the document to the court file. Thomson also pleads, in any event, that it has public policy, fair dealing, and s. 2 (b) (freedom of expression) defences to the allegation of copyright infringement. I will return to these topics below when I discuss the certification criteria.

### 4.  Remedies for Copyright Infringement

**105**  A variety of remedies are available for copyright infringement. Part IV of the *Copyright Act* specifies the remedies for copyright infringement. Under s. 34 (1) of the Act, the copyright owner is entitled to all remedies, including an injunction, for the infringement of copyright in his or her work.

**106**  In the case at bar, Mr. Waldman claims the following relief on behalf of the class: (a) general damages of $50 million; (b) disgorgement of any profit made by Thomson in infringing copyright; (c) statutory damages; (d) a permanent injunction restraining Thomson from dealing with the class member's court documents; (d) punitive damages of $1 million; (e) pre and post-judgment interest in accordance with the *Courts of Justice Act*, R.S.O. 1990, c. C.43.

## F. THE CRITERIA FOR CERTIFICITION

### 1.  Introduction - The Test for
### Certification

**107**  Pursuant to s. 5(1) of the *Class Proceedings Act, 1992*, the court shall certify a proceeding as a class proceeding if: (a) the pleadings disclose a cause of action; (b) there is an identifiable class; (c) the claims of the class members raise common issues of fact or law; (d) a class proceeding would be the preferable procedure; and (e) there is a representative plaintiff who would adequately represent the interests of the class without conflict of interest and who has produced a workable litigation plan.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**108**   For an action to be certified as a class proceeding, there must be a cause of action, shared by an identifiable class from which common issues arise that can be resolved in a fair, efficient, and manageable way that will advance the proceeding and achieve access to justice, judicial economy, and the modification of behaviour of wrongdoers: *Sauer v. Canada (Attorney General)*, *[2008] O.J. No. 3419* (S.C.J.) at para. 14, leave to appeal to Div. Ct. refused, *[2009] O.J. No. 402* (Div. Ct.).

**109**   On a certification motion, the question is not whether the plaintiff's claims are likely to succeed on the merits but whether the claims can appropriately be prosecuted as a class proceeding: *Hollick v. Toronto (City)*, *[2001] 3 S.C.R. 158* at para. 16.

**110**   The test for certification is to be applied in a purposive and generous manner, to give effect to the important goals of class actions -- providing access to justice for litigants; promoting the efficient use of judicial resources; and sanctioning wrongdoers to encourage behaviour modification: *Western Canadian Shopping Centres Inc. v. Dutton*, *[2001] 2 S.C.R. 534* at paras. 26-29; *Hollick v. Toronto (City)*, *[2001] 3 S.C.R. 158* at paras. 15 and 16.

**111**   The purpose of a certification motion is to determine how the litigation is to proceed and not to address the merits of the plaintiff's claim; there is to be no preliminary review of the merits of the claim: *Hollick v. Toronto (City)*, *[2001] 3 S.C.R. 158* at paras. 28-29.

2.        **The Gatekeeper Argument**

**112**   In *Arabi v. Toronto-Dominion Bank*, *[2006] O.J. No. 2072* (S.C.J.) at para. 9, aff'd *[2007] O.J. No. 5035* (Div. Ct.), Justice E. Macdonald stated that although not a test on the merits, the certification motion is an important screening mechanism for claims that are not appropriate for class actions, and the careful screening process highlights the gatekeeping role of the court on certification motions.

**113**   In *Robertson v. Thomson Corp.* *(1999), 43 O.R. (3d) 161* (Gen. Div.) at p. 391, Justice Sharpe stated that: "the certification motion is intended to screen claims that are not appropriate for class action treatment, at least in part to protect the defendant from being unjustifiably embroiled in complex and costly litigation."

**114**   Thomson relies on these statements to submit that the court has a jurisdiction to deny certification to a proposed class proceeding that is of little social utility or that arguably is socially detrimental. Thomson submits that the class members' copyright infringement claim is inimical to the public interest and indeed to the interest of the class members of the private practice bar. It argues that Litigator advances the open court principle, which is a fundamental principal of democracy and the administration of justice. Thomson submits that Mr. Waldman's copyright claim is detrimental to the advancement of the law, an impediment to the administration of justice, an obstacle to the education of the legal profession, inconsistent with the collegiality and professionalism of the bar and spiteful because Mr. Waldman Wellman is quite willing to share his court documents with other lawyers without monetary consideration and so loses nothing by Thomson's copying and making the factum available to other lawyers.

**115**   Thus, Thomson asks the court to exercise its gatekeeper role and not certify Mr. Waldman's action as a court proceeding. However, Thomson (and for that matter many other defendants contesting certification) misconceives the scope of the court's gatekeeper function.

**116**   The court does have a gatekeeper function, but this role is quite modest and limited because as noted by the Court of Appeal in *Carom v. Bre-X Minerals Ltd.* *(2000), 51 O.R. (3d) 236* (C.A.) at paras. 40-42, the Ontario legislature made a conscious attempt to avoid setting the bar for certification too high. As the case law has developed the courts have respected the directive of the legislature and, if anything, the appellate courts have lowered the bar.

**117**   A review of the case law about the test for certification shows that the certification of a class action is not as difficult as the defendants insist it should be. The case law reveals that the various standards that plaintiffs must vault over are low bars.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**118** For factual issues, for certification, the plaintiff must establish an evidentiary basis for four of the five certification criteria. However, the merits of the plaintiff's claim are not assessed as an aspect of certification, and the plaintiff need only show some basis in fact for these criteria: *Hollick v. Toronto (City)*, *[2001] 3 S.C.R. 158* at para. 25.

**119** The some basis in fact standard sets a very low bar and is far below the evidentiary standard that confronts the defendant: *Lambert v. Guidant Corporation*, *[2009] O.J. No. 1910* (S.C.J.) at paras. 56-74; *Cloud v. Canada (Attorney General)*, *[2004] O.J. No. 4924* (C.A.) at paras. 49 to 52; *LeFrancois v. Guidant Corp.*, *[2009] O.J. 2481* (S.C.J.) at paras. 13-14, leave to appeal ref'd *[2009] O.J. No. 4464* (Div. Ct.). The parties, however, are on a level playing field for the legal issues associated with certification: see *McCracken v. Canadian National Railway Company*, *2010 ONSC 4520*.

**120** For certification, the plaintiff need not present any evidence to satisfy the cause of action requirement. For this criterion, the facts set out in the statement of claim are assumed to be true and provable, and it is well established that the cause of action requirement will prevent certification only where it is "plain and obvious" that the pleadings disclose no cause of action. Since it is very difficult for a defendant to show that it is plain and obvious that no cause of action has been disclosed, it is conversely quite easy for the plaintiff to satisfy the cause of action requirement.

**121** Moreover, provided that the defendant is not prejudiced, the representative plaintiff may recast his or her claim to make it more amenable for a class proceeding: *Markson v. MBNA Canada Bank*, *[2007], 85 O.R. (3d) 321* (C.A.) at para. 39; *L.R. v. British Columbia (sub nom. Rumley v. British Columbia)*, *[2001] 3 S.C.R. 184* at para. 30; *Harrington v. Dow Corning Corp.*, *[2000] B.C.J. No. 2237* (C.A.) at para. 26, leave to appeal to S.C.C. ref'd *[2001] S.C.C.A. No. 21*; *Pearson v. Inco Ltd.* *(2006), 78 O.R. (3d) 641* (C.A.) at para. 62.

**122** In practice, the identifiable class criterion is not difficult to satisfy, and it presents more a technical than a substantive problem. Sometimes the problems are solved by amending the definition and other times the problems are solved by adding or subtracting representative plaintiffs.

**123** A plaintiff has considerable flexibility in defining class membership. The class must not be arbitrarily under-inclusive: *Paramount Pictures (Canada) Inc. v. Dillon*, *[2006] O.J. No. 2368* (S.C.J.); however, the plaintiff is not obliged to sue on behalf of all persons who have the same interest in the common issues: *Dumoulin v. Ontario*, *[2005] O.J. No. 3961* (S.C.J.) at para. 20; *Ragoonanan v. Imperial Tobacco Canada Ltd. (2005), 78 O.R. (3d) 98* (S.C.J.) at para. 12, leave to appeal ref'd *[2008] O.J. No. 1644* (S.C.J.).

**124** The class should not be defined wider than necessary, but where the class could be defined more narrowly, the court may allow certification on condition that the definition of the class be amended: *Hollick v. Toronto (City)*, *[2001] 3 S.C.R. 158* at para. 21; *Febringer v. Sun Media Corp.*, *[2002] O.J. No. 4110* (S.C.J.) at paras. 12-13, aff'd *[2003] O.J. No. 3918* (Div. Ct.). On a motion to certify or on an appeal, the court may modify the definition of the class, if the court is of the view that such modification is required to accord with the Act: *Williams v. Mutual Life Assurance Co.; Zicherman v. Equitable Life Insurance Co. of Canada*, *[2003] O.J. No. 1160* and *[2003] O.J. No. 1161* (C.A.) and *Zicherman v. The Equitable Life Assurance Company of Canada*, *[2000] O.J. No. 5144* (S.C.J.); *Wilkins v. Rogers Communications Inc.*, *[2008] O.J. No. 4381* (S.C.J.).

**125** The common issue criterion also presents a low bar: *Carom v. Bre-X Minerals Ltd. (2000), 51 O.R. (3d) 236* (C.A.) at para. 42; *Cloud v. Canada (Attorney General) (2004), 73 O.R. (3d) 401* (C.A.) at para. 52; *203874 Ontario Ltd. v. Quiznos Canada Restaurant Corp.*, *[2009] O.J. No. 1874* (Div. Ct.), aff'd *[2010] O.J. No. 2683* (C.A.), leave to appeal to S.C.C. ref'd *[2010] S.C.C.A. No. 348*. An issue can be a common issue even if it makes up a very limited aspect of the liability question and even though many individual issues remain to be decided after its resolution; *Cloud v. Canada (Attorney General) supra*, at para. 53.

**126** On a motion to certify or on an appeal, the court may modify the common issues if the court is of the view that such modification is required to accord with the Act: *Williams v. Mutual Life Assurance Co.; Zicherman v. Equitable Life Insurance Co. of Canada*, *[2003] O.J. No. 1160* and *[2003] O.J. No. 1161* (C.A.), aff'g *[2001] O.J. No. 4952* (Div. Ct.), which aff'd *(2000), 51 O.R. (3d) 54* (S.C.J.) and *Zicherman v. The Equitable Life Assurance Company of Canada*, *[2000] O.J. No. 5144* (S.C.J.).

**127** In *Cloud v. Canada (Attorney General) (2004), 73 O.R. (3d) 401* (C.A.) at para. 95, leave to appeal to the S.C.C. ref'd, *[2005] S.C.C.A. No. 50*, rev'g *(2003), 65 O.R. (3d) 492* (Div. Ct.), the motions judge refused to certify the action among other reasons

because the action did not satisfy the common issues criterion, *[2001] O.J. No. 4163*. By the time of the appeal to the Divisional Court, the plaintiffs reworked their list of common issues, and in a dissenting judgment, Justice Cullity held that with some further refashioning, there were common issues sufficient to satisfy s. 5(1)(c). Justice Cullity's decision and approach about the common issues was adopted by the Court of Appeal.

**128** The preferable procedure criterion perhaps sets the highest bar for certification. However, where the court has found that there are appropriate common issues and the individual issues do overwhelm the common issues, the court should not be too quick to find that a class action is not the appropriate procedure: *Dean v. Mister Transmission Ltd.*, *[2008] O.J. No. 4372* (S.C.J.) at paras. 91-95.

**129** There two core elements of the preferable procedure inquiry are manageability and whether a class action would be preferable to other reasonably available means of resolving the class members' claims. Practically speaking, the preferable procedure criterion is often not difficult to satisfy because there will be no reasonable alternative to a class proceeding.

**130** The last criterion, that there is a representative plaintiff who would adequately represent the interests of the class without conflict of interest and who has produced a workable litigation plan, is rarely a difficulty, and challenges to the qualifications of the representative are very rare.

**131** At the certification stage, the litigation plan need only provide a reasonable framework for the issues reasonably expected to arise as the case proceeds: *Wheadon v. Bayer Inc.*, *[2004] N.J. No. 147* (T.D.) at para. 159, leave to appeal ref'd *[2005] N.J. No. 122* (C.A.), leave to appeal ref'd *[2005] S.C.C.A. No. 211*; *Frey v. BCE Inc.*, *[2007] S.J. No. 476* (Q.B.) at paras. 11-13. Litigation plans are a work in progress and may have to be amended during the course of the proceedings: *Cloud v. Canada (Attorney General), supra*, at para. 95.

**132** Section 5 of the *Class Proceedings Act, 1992* uses mandatory language, and the court must certify if the certification criteria are satisfied: *Bendall v. McGhan Medical Corp.* *(1993), 14 O.R. (3d) 734* (Gen. Div.) at para.41, leave to appeal ref'd *[1993] O.J. No 4210* (Gen. Div.); *Banerjee v. Shire Biochem Inc.*, *2010 ONSC 889* at para. 14. See also *Logan v. Dermatech*, *2011 BCSC 1097* at para. 16. On the certification motion, the court does not assess the merits of the plaintiff's claim or opinion about the social utility of the class action; the court's gatekeeper function and screening function is limited to determining whether the certification criteria are satisfied.

**133** I, therefore, reject Thomson's gatekeeper arguments and turn to considering whether the five certification criteria are satisfied in the case at bar.

3.    **Disclosure of Cause of Action**

**134** The first criterion is whether the plaintiff's pleading discloses a cause of action. The "plain and obvious" test for disclosing a cause of action from *Hunt v. Carey Canada, [1990] 2 S.C.R. 959* is used to determine whether a proposed class proceeding discloses a cause of action for the purposes of s. 5 (1)(a) of the *Class Proceedings Act, 1992*: *Anderson v. Wilson* *(1999), 44 O.R. (3rd) 673* (C.A.) at p. 679, leave to appeal to S.C.C. ref'd, *[1999] S.C.C.A. No. 476*; *176560 Ontario Ltd. v. Great Atlantic & Pacific Co. of Canada Ltd. (2002), 62 O.R. (3d) 535* (S.C.J.) at para. 19, leave to appeal granted, *64 O.R. (3d) 42* (S.C.J.), aff'd *(2004), 70 O.R. (3d) 182* (Div. Ct.).

**135** Mr. Waldman has pleaded a cause of action for copyright infringement and for infringement of an author's moral rights. Thomson delivered a statement of defence and did not challenge the legal adequacy of these causes of action.

**136** In the case at bar, the first criterion for certification is satisfied.

4.    **Identifiable Class**

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

137  Mr. Waldman proposes that the class be defined as follows:

> All persons who are the authors of original legal documents, and all persons, law firms, or other legal entities who own copyright in the pleadings, affidavits, facta, notices of motion and other legal documents that the defendants have copied, used or otherwise dealt with in connection with the Litigator service.

138  The definition of an identifiable class serves three purposes: (1) it identifies the persons who have a potential claim against the defendant; (2) it defines the parameters of the lawsuit so as to identify those persons bound by the result of the action; (3) it describes who is entitled to notice: *Bywater v. Toronto Transit Commission, [1998] O.J. No. 4913* (Gen. Div.).

139  Class membership identification is not commensurate with the elements of the cause of action; there simply must be a rational connection between the class member and the common issue(s): *Sauer v. Canada (Attorney General), [2008] O.J. No. 3419* (S.C.J.) at para. 32, leave to appeal to Div. Ct. refused, *[2009] O.J. No. 402* (Div. Ct.).

140  In defining class membership, there must be a rational relationship between the class, the causes of action, and the common issues, and the class must not be unnecessarily broad or over-inclusive: *Pearson v. Inco Ltd. (2006), 78 O.R. (3d) 641* (C.A.) at para. 57, rev'g *[2004] O.J. No. 317* (Div. Ct.), which had aff'd *[2002] O.J. No. 2764* (S.C.J.).

141  Although it is necessary after a common issues trial to be able to determine whether a particular person is a class member and therefore bound with the benefits and burdens of the *res judicata*, and although it is necessary to be able to determine precisely who are the class members in order to administer a settlement, it is not necessary for certification to list each and every member of the class by name and the Act contemplates that it may be difficult to precisely name every member of the class: *Robertson v. Thomson Corp. (1999), 43 O.R. (3d) 161* (Gen. Div.).

142  In my opinion, subject to my comments about over-inclusiveness and under-inclusiveness, the proposed class definition satisfies the technical requirements of a class action, and Thomson did not argue otherwise.

143  Thomson's objections to the class definition are connected to its submissions about the alleged unmanageability of the action as a class action. In part, these objections focus on the possibility that a court document may have multiple co-authors including senior and junior lawyers, lawyers from more than one law firm, and clients as authors. These objections also draw attention to the question of whether the class definition is over or under-inclusive.

144  As presently drafted, the definition for class membership includes lawyers from both the private sector and the public sector. It also includes lawyers from in-house law departments. The current definition for the class also includes self-represented litigants as class members, and the current definition includes clients and affiants as possible class members.

145  During the course of the oral argument, I expressed the view that the inclusion of clients, self-represented litigants, in-house counsel, and public sector lawyers made the class over-inclusive. In response, Mr. Waldman indicated that he had no objection to narrowing the class definition.

146  Mr. Waldman is a member of the private bar, and it is the interests of the private enterprise part of the bar that chiefly motivates Mr. Waldman's action and not the interests, if any, of clients, in-house lawyers, self-represented litigants, and public sector lawyers to have copyright protection for court documents.

147  Although clients, in-house lawyers, self-represented litigants, and public sector lawyers would be proper parties to the class action brought by private sector lawyers for copyright infringement of court documents, they are not necessary parties. In other words, their joinder is justified, not by necessity, but as a matter of avoiding a multiplicity of actions.

148  Clients, in-house lawyers, self-represented litigants, and public sector lawyers are not similarly situated to private sector lawyers because they are unlikely to have a commercial interest in protecting their court documents from copyright infringement. For example, a self-represented litigant does not create court documents as a part of its trade or business but simply because he or she is a litigant. The self-represented litigant has no commercial reason to protect his or court documents from copyright infringement. Under s. 12 of the *Copyright Act* where any work is prepared or published by or under the direction or control of Her Majesty or any government department, the copyright in the work shall, subject to any agreement with the author, belong to Her Majesty. Since

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

there is likely no commercial interest to protect, the assessment of compensation for self-represented litigants, law departments, and public sector lawyers would be different from that of the private sector lawyers.

149   In terms of access to justice and behaviour modification, clients, in-house lawyers, self-represented litigants, and public sector lawyers may be as well served by standing on the sidelines and just watching the outcome of the action by the private sector class members. If Mr. Waldman is successful in obtaining an injunction, then clients, in-house lawyers, self-represented litigants, and public sector lawyers will benefit even though they are standing on the side lines. If Thomson's defences of public policy, implied consent, fair dealing, or freedom of expression are successful, then there will be a precedent that would govern the situation of clients, in-house lawyers, self-represented litigants, and public sector lawyers.

150   For the above reasons, my conclusion is that clients, self-represented litigants, law departments, and public sector lawyers should not be included as class members. This will have the advantage of modestly simplifying the prosecution and defence of the class action.

151   If this conclusion is correct, then the appropriate class definition, with some editorial refinements from the original, is as follows:

> All lawyers and paralegals in private practice and licensed to practice law in Canada, who: (a) are the authors of the original legal documents that Thomson Reuters Canada Limited has copied, used, or otherwise dealt with in connection with its Litigator service, including pleadings, affidavits, facta, notices of motion, and other legal documents, and (b) are the owners of the copyright in the original legal documents that Thomson Reuters Canada Limited has copied, used, or otherwise dealt with in connection with its Litigator service, including pleadings, affidavits, facta, notices of motion, and other legal documents

152   I am satisfied that the second criterion for certification is satisfied in the case at bar.

### 5.    Common Issues

153   For an issue to be a common issue, it must be a substantial ingredient of each class member's claim and its resolution must be necessary to the resolution of each class member's claim: *Hollick v. Toronto (City), [2001] 3 S.C.R. 158* at para. 18.

154   The fundamental aspect of a common issue is that the resolution of the common issue will avoid duplication of fact-finding or legal analysis: *Western Canadian Shopping Centres Inc. v. Dutton, [2001] 2 S.C.R. 534* at para. 39.

155   An issue is not a common issue if its resolution is dependent upon individual findings of fact that would have to be made for each class member: *Fehringer v. Sun Media Corp., [2003] O.J. No. 3918* (Div. Ct.) at paras. 3, 6. Common issues cannot be dependent upon findings which will have to be made at individual trials, nor can they be based on assumptions that circumvent the necessity for individual inquiries: *Nadolny v. Peel (Region), [2009] O.J. No. 4006* (S.C.J.) at paras. 50-52; *Collette v. Great Pacific Management Co., [2003] B.C.J. No. 529* (B.C.S.C.) at para. 51, var'd on other grounds *(2004) 42 B.L.R. (3d) 161* (B.C.C.A.); *McKenna v. Gammon Gold Inc., [2010] O.J. No. 1057* (S.C.J.) at para. 126, leave to appeal granted *[2010] O.J. No. 3183* (Div. Ct.), var'd 2011 ONSC 3882 (Div. Ct.). An issue that has to be decided on an individual basis lacks commonality: *Kafka v. Allstate Insurance Co. of Canada, 2011 ONSC 2305.*

156   While only a minimum evidentiary basis is required, there must be some evidence to show that the issue exists and that the common issues trial judge is capable of assessing it in common; otherwise, the task for the common issues trial judge would not be to determine a common issue, but rather to identify one: *Fresco v. Canadian Imperial Bank of Commerce, [2009] O.J. No. 2531* (S.C.J.) at para. 61, aff'd *2010 ONSC 4724.*

157   An issue can satisfy the common issues requirement even if it makes up a very limited aspect of the liability question and even though many individual issues remain to be decided after its resolution. In determining the commonality of a question, the focus is on the commonality of the question, and it is an error to focus on those aspects of the claim that would require individual

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

determination. The focus is on whether the proposed common issue is a substantial ingredient of the claim and on whether the resolution of the issue would be necessary to resolve each class member's claim. The comparative extent of individual issues is not a consideration in the commonality inquiry although it is a factor in the preferability assessment. See *Cloud v. Canada (Attorney General) (2004), 73 O.R. (3d) 401* (C.A.) at paras. 51-65, leave to appeal to S.C.C. ref'd, *[2005] S.C.C.A. No. 50*.

**158**  Mr. Waldman proposes the following common issues:

1. Copyright in Legal Documents

   (a) Does copyright subsist in legal documents filed in Court, including, but not limited to Statement of Claim, Statements of Defence, facta, notices of motion and affidavits ( the "Works" and each a "Work")?

2. Ownership of Copyright

   (a) Does the defendants' Litigator service contain Works authored by Class Members?

   (b) Does the defendants' Litigator service contain Works whose copyright is owned by Class Members?

   (c) If yes, what rights, if any, do Class Members have over the legal documents they authored?

3. Infringement

   (a) Have the defendants' activities infringed the rights of Class Members by dealing in the Works in a manner that only the author or owner had the right to do, including by way of any of:

       (i) reproducing Works authored or owned by Class Members?

       (ii) publishing Works authored or owned by Class Members?

       (iii) making Works authored or owned by Class Members available to the public by way of telecommunication?

       (iv) selling or renting copies of the Works authored or owned by Class Members?

       (v) translating the Works?

       (vi) authorizing its subscribers to infringe Class Members' copyright?

       (vii) holding itself out as the owner or author of the Works?

       (viii) infringing the moral rights of the authors of the copyrighted documents?

   (b) If so, which rights have been infringed.

4. Defences

   (a) If the answer to 3 is affirmative, do the defendants have a defence under the Copyright Act for these acts of infringement?

5. Relief

   (a) Are Class Members entitled to statutory damages pursuant to section 38.1 of the *Copyright Act* for each act of infringement carried out by the defendants? If the answer to this question is "yes", what is the quantum of the statutory damages to which the Class Members are entitled?

   (b) What other damages or, alternatively, other heads or categories of damages, are Class Members entitled to?

   (c) Is there a reasonable likelihood that damages can be determined (in whole or in part) on an aggregate basis on behalf of the Class?

   (d) If the answer to (c) is "yes", how is a damages award to be calculated and distributed to the Class?

   (e) If the answer to (c) or (d) above is "yes" what is the quantum of those damages?

   (f) Does the defendants' conduct justify an award of aggravated, exemplary, or punitive damages?

   (g) Are the Class Members entitled to injunctive relief against the defendants under section 34(1) of the *Copyright Act*?

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**159**  Thomson submits that the proposed common issues require individual determinations or the questions pre-suppose or are dependent upon individual determinations and that the proposed common issues are not common and that, in any event, the proposed questions do not materially advance the action. Thomson thus submits that Mr. Waldman's action does not satisfy the common issues criterion for a class action.

**160**  Thomson submits that many of the questions are tautological and pre-suppose or beg answers that would not substantially advance the litigation. For example, two of the proposed questions are whether Litigator contains works authored or owned by class members, but if there is copyright in these documents, the answer to these questions will always be "yes" in light of the class definition that describes members who wrote or own copyright in court documents available on Litigator. Similarly, the question about the rights of class members as authors of court documents is tautological; visualize, if class members are authors, which status is what makes them class members, then by definition, they will have the rights of an author under the *Copyright Act*.

**161**  I agree with Thomson that the proposed common questions - as they are currently drafted - pre-suppose the determination of individual issues, except for some defence oriented questions and some questions about Thomson's activities.

**162**  And I also agree that unless Thomson's defences of public policy, consent, fair dealing, and freedom of expression under the *Charter* succeed, there will necessarily have to be individual issues trials to determine: (a) whether a particular document is a literary work; (b) who is the author(s) of the literary work; (c) who is the owner of the copyright; (d) what is the quantification of compensation for infringement; and, (e) if Thomson's conduct qualifies for condemnation, what is the quantification of the punitive damages. Further, if the common issues judge decides that the consent to copying defence was not proven systemically or innately across the class, the issue of whether a Litigator document was reproduced without the consent of the copyright owner also would be an individual issue.

**163**  However, I do not agree that Mr. Waldman's action does not satisfy the common issues criterion for certification as a class action. Although there are questions that are individual and not common in nature and, accordingly, they are not certifiable and although some of the proposed questions have technical problems, in my opinion, Mr. Waldman's action does satisfy the common issues criterion.

**164**  In my opinion based on the analysis of each of the questions that follows, there is a set of questions that with minor adjustments to address the technical problems are certifiable and that would substantially advance the proceeding. Several issues, and particularly the issues raised by Thomson's defence, readily lend themselves to a resolution on a class-wide basis.

**165**  If Thomson succeeds on the defence common issues, the action will be over. If Mr. Waldman succeeds at the common issues trial, then it is true that there will have to be individual trials, but that is not an obstacle to the certification of the action. I borrow what Justice Sharpe stated in *Robertson v. Thomson Corp. (1999), 43 O.R. (3d) 161* (Gen. Div.) at pp. 172-173: "[I]ndividual proceedings ... are plainly contemplated by the *Class Proceedings Act*, 1992 ss. 24, 25, and it is well established that the need to deal with certain aspects of a claim on an individual basis does not mean that there can be no common issues within the meanings of the Act."

**166**  I turn now to an analysis of the proposed common issues.

     **(a)  Copyright in Legal Documents**

**167**  Turning then to the questions, proposed question 1 asks whether copyright subsists in the Litigator documents. A class member needs a "yes" answer to this question, because while a court document is a literary work, copyright only exists in a literary work where the exercise of skill and judgment required to produce the work was not so trivial that it could be characterized as a purely mechanical exercise.

**168**  Thomson submits that some court documents are the product of a purely mechanical exercise, and it points to notices of motion and court orders as examples. Assuming Thomson is correct (and I do not have to decide the point), it is also obvious that some court documents involve the exercise of skill and judgment. Factums are an obvious example.

**169**  I would have thought that the overwhelming majority of documents on Litigator are the product of judgment and skill,

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

especially since Thomson advertised this feature in promoting litigator, but, nevertheless, Thomson is entitled to assert that a particular document is not subject to copyright protection, and it cannot be simply assumed that originality exists in all of the court documents available on Litigator. Thomson's position means that question 1 is not a certifiable question because it lacks commonality.

**(b) Ownership and Infringement of Copyright**

**170** Proposed question 2, which is a group of questions, focuses on authorship and ownership of copyright. Question 2 is essentially a qualification or entitlement question.

**171** I agree with Thomson that ultimately authorship and ownership is an individual issue about what class member has the copyright in a particular court document. If one borrows from the set theory of mathematics, there will be a correspondence between individual members of the set of authors and copyright owners and the set of documents in Litigator, but this correspondence will be an individual correspondence and not a class-wide correspondence. Accordingly, question 2 is not certifiable because again it is not a common issue and its answer requires individual assessments.

**172** Proposed question 3, which is a group of questions, purports to focus on infringement. It asks whether Thomson's activities infringe the copyright and moral rights of class members.

**173** I agree with Thomson that infringement cannot be a common issue across the class because that would ignore that copyright and moral rights are ultimately individual issues of entitlement and that consent to copying may be an individual issue. In particular, the infringement of moral rights is an individual issue depending upon whether a particular author's honour or reputation has been prejudiced by the use of particular court documents.

**174** However, Thomson's conduct, which is the nub of question 3, is a common issue. In other words, although the individual issues of creativity, authorship, ownership, and individual consent, which are issues associated with individual class members and with discrete documents, would remain to be determined, Thomson's conduct, which does apply across the class and with respect to all the documents it selects for Litigator, is an important common element of the claim of copyright infringement. Thomson's conduct in so far as it is an element of the legal wrong of copyright infringement is connected to its common practices with respect to all of the documents on Litigator, and questions about this conduct have commonality.

**175** As a matter of judicial economy and of facilitating access to justice, it would be useful for every class members as he or she prosecutes a claim at an individual issues trial to already have a judgment from the common issues trial that Thomson, reproduced, published, telecommunicated, sold, rented, or translated court documents as part of its Litigator service or authorized those activities by subscribers to Litigator. As a matter of judicial economy and facilitating access to justice, it would be useful to determine before the individual issues trial whether Thomson held itself out as the author or owner of the works on Litigator or whether Thomson's activities could be an infringement of the moral rights of the class member at his or her individual issues trial.

**176** I conclude that within proposed question 3, there are certifiable common issues as follows:

Thomson's Conduct

Did Thomson through its Litigator service reproduce, publish, telecommunicate to the public, sell, rent, translate, or hold itself out as the author or owner of court documents?

Did Thomson through its Litigator service authorize subscribers to reproduce, publish, telecommunicate to the public, sell, rent, translate, or hold themselves out as the author or owner of court documents?

**(c) Defences**

**177** Question 4 asks whether Thomson has a defence under the *Copyright Act* to the allegations of copyright and moral rights infringement. In my opinion, although it wants for precision, this is a very productive common issue.

**178** In my opinion, Thomson's fair dealing, public policy, and implied consent defences can be established by general practice evidence and, therefore, questions about these defences have commonality.

**179** The commonality of questions about the conduct of an alleged mass copyright infringer is demonstrated by *CCH Canadian*

*Limited v. Law Society of Upper Canada, supra,* the facts of which were discussed above. In that case, Chief Justice McLachlin decided that the Law Society's fair dealing defence could be established by general practice evidence. The fair dealing question was a common or generalized issue independent of particular instances of photocopying the publisher's legal texts. The Chief Justice stated at paras. 63-64:

63.   This raises a preliminary question: is it incumbent on the Law Society to adduce evidence that every patron uses the material provided for in a fair dealing manner or can the Law Society rely on its general practice to establish fair dealing? I conclude that the latter suffices. Section 29 of the *Copyright Act* states that "[f]air dealing for the purpose of research or private study does not infringe copyright." The language is general. "Dealing" connotes not individual acts, but a practice or system. This comports with the purpose of the fair dealing exception, which is to ensure that users are not unduly restricted in their ability to use and disseminate copyrighted works. Persons or institutions relying on the s. 29 fair dealing exception need only prove that their own dealings with copyrighted works were for the purpose of research or private study and were fair. They may do this either by showing that their own practices and policies were research-based and fair, or by showing that all individual dealings with the materials were in fact research-based and fair.

64.   The Law Society's custom photocopying service is provided for the purpose of research, review and private study. The Law Society's Access Policy states that "[s]ingle copies of library materials, required for the purposes of research, review, private study and criticism ... may be provided to users of the Great Library." When the Great Library staff make copies of the requested cases, statutes, excerpts from legal texts and legal commentary, they do so for the purpose of research. Although the retrieval and photocopying of legal works are not research in and of themselves, they are necessary conditions of research and thus part of the research process. The reproduction of legal works is for the purpose of research in that it is an essential element of the legal research process. There is no other purpose for the copying; the Law Society does not profit from this service. Put simply, its custom photocopy service helps to ensure that legal professionals in Ontario can access the materials necessary to conduct the research required to carry on the practice of law. In sum, the Law Society's custom photocopy service is an integral part of the legal research process, an allowable purpose under s. 29 of the *Copyright Act.*

**180**   I appreciate that there are differences between Thomson's for profit service and the Law Society's not-for-profit photocopying service, but it will be for the common issues judge to determine whether Thomson's reproduction of legal works was systemically for the purpose of research by subscribers and a fair dealing for Thomson to facilitate the research efforts of the subscribers.

**181**   Similarly, Thomson's public policy defences, which depend upon the court finding a balance between creator's rights and user's rights, has a commonality that does not depend upon any analysis of each document on Litigator but which analysis would apply to all documents. Further, in my opinion, the question of whether client's have a copyright in court documents or for that matter whether anybody has a copyright in court documents is a public policy determination that would apply to the situations of all class members whose court documents are on Litigator.

**182**   I also appreciate and note that if the common issues judge decided that a common consent by class members to the use of the court documents by Thomson was not established, the issue of when a particular class member consented to the copying of the documents would be an individual issue.

**183**   I conclude that within question 4, there are certifiable common issues as follows:

Defences

Did Thomson have the copyright owner's implicit consent to reproduce, publish, telecommunicate to the public, sell, rent, translate, or hold itself out as the author or owner of court documents?

Does Thomson have a public policy defence to copyright infringement or to the violation of moral rights based on (a) fair dealing, (b) the open court principle, (c) freedom of expression, (d) the necessity of using the idea of the court document as it is expressed, or (e) a business or professional custom or public policy reason that would justify reproducing, publishing, telecommunicating to the public, selling, renting, translating, or holding itself out as the author or owner of court documents?

**(d)   Relief**

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**184** Section 38.1 provides the copyright owner with an election to recover damages and profits referred to in subsection 35(1) of the *Copyright Act* or an award of statutory damages for all infringements involved in the proceedings. Section 38.1 (1) states:

> 38.1 (1) Subject to this section, a copyright owner may elect, at any time before final judgment is rendered, to recover, instead of damages and profits referred to in subsection 35(1), an award of statutory damages for all infringements involved in the proceedings, with respect to any one work or other subject-matter, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $500 or more than $20,000 as the court considers just.

**185** I agree with Thomson's argument that Mr. Waldman's series of questions about relief do not satisfy the common issues criterion. As presently drafted, these questions are largely tautological.

**186** In other words, by definition, a class member whose copyright under the *Copyright Act* has been infringed will have a remedy under the Act for the copyright infringement, be it statutory damages or other categories of damages or the remedy of an injunction. If there is a copyright infringement or a violation of moral rights and statutory or another head of damages becomes available to class members. Thus, the proposed questions about relief are not certifiable since they do little to advance the litigation.

**187** Further, I see no basis for an aggregate assessment of the class members' damages or any common issue about the quantification of damages. In this regard, it was conceded during argument that statutory damages are discretionary and would depend upon the circumstances of each individual case.

**188** Subsection 38.1 (1) of the *Copyright Act* is subject to subsections (2) to (4), which allow the court to adjust the minimum award. The minimum statutory award "of not less than $500 or more than $20,000 as the court considers just" is thus not standard and can be reduced depending on the individual circumstances of the copyright infringement, and while the so-called statutory minimum can be increased to the maximum of $20,000, this requires individual determinations.

**189** Thus, the question about aggregate damages is not certifiable and with the exception of a modified version of the question about aggravated, exemplary, or punitive damages and with the exception of the question about injunctive relief, in my opinion there are no certifiable common issues about the class members claims for relief. These matters all need to be determined at individual issues trials.

**190** For the reasons I expressed in *Robinson v. Medtronic Inc.*, *[2009] O.J. No. 4366* (S.C.J.), aff'd *[2010] O.J. No. 3056* (Div. Ct.), a claim for punitive damages will not be suitable for a common issue when the court cannot make a rational assessment about the appropriateness of punitive damages until after individual assessments of the compensatory losses of class members has been completed. However, where the ultimate determination of the entitlement and quantification of punitive damages must be deferred until the conclusion of the individual trials, the question of whether the defendants' conduct was sufficiently reprehensible or high-handed to warrant punishment is capable of being determined as a common issue at the common issues trial: *Chalmers (Litigation guardian of) v. AMO Canada Co.*, *2010 BCCA 560*.

**191** I, therefore, conclude that within proposed question 4, there are certifiable common issues as follows:

> Relief

> Does Thomson's conduct justify an award of aggravated, exemplary, or punitive damages?

> Are Class Members entitled to injunctive relief against Thomson under s. 34 (1) of the *Copyright Act*?

**192** Based on the common issues that are certifiable, I am satisfied that the third criterion for certification is satisfied in the case at bar.

**6.**             **Preferable Procedure**

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

**193**  For a class proceeding to be the preferable procedure for the resolution of the claims of a given class, it must represent a fair, efficient, and manageable procedure that is preferable to any alternative method of resolving the claims: *Cloud v. Canada (Attorney General)* *(2004), 73 O.R. (3d) 401* (C.A.) at paras. 73-75, leave to appeal to S.C.C. ref'd, *[2005] S.C.C.A. No. 50*.

**194**  Preferability captures the ideas of: (a) whether a class proceeding would be an appropriate method of advancing the claim; and (b) whether a class proceeding would be better than other methods such as joinder, test cases, consolidation, and any other means of resolving the dispute: *Markson v. MBNA Canada Bank* *(2007), 85 O.R. (3d) 321* (C.A.) at para. 69, leave to appeal to S.C.C. ref'd, *[2007] S.C.C.A. No. 346*; *Hollick v. Toronto (City)*, *[2001] 3 S.C.R. 158*.

**195**  In considering the preferable procedure criterion, the court should consider: (a) the nature of the proposed common issue(s); (b) the individual issues which would remain after determination of the common issue(s); (c) the factors listed in the Act; (d) the complexity and manageability of the proposed action as a whole; (e) alternative procedures for dealing with the claims asserted; (f) the extent to which certification furthers the objectives underlying the Act; and (g) the rights of the plaintiff(s) and defendant(s): *Chadha v. Bayer Inc.* *(2001), 54 O.R. (3d) 520* (Div. Ct.) at para. 16, aff'd *(2003), 63 O.R. (3d) 22* (C.A.), leave to appeal to S.C.C. ref'd, *[2003] S.C.C.A. No. 106*.

**196**  Whether a class proceeding is the preferable procedure is judged by reference to the purposes of access to justice, behaviour modification, and judicial economy and by taking into account the importance of the common issues to the claims as a whole, including the individual issues: *Markson v. MBNA Canada Bank* *(2007), 85 O.R. (3d) 321* (C.A.) at para. 69, leave to appeal to S.C.C. ref'd, *[2007] S.C.C.A. No. 346*; *Hollick v. Toronto (City)*, *[2001] 3 S.C.R. 158*.

**197**  That the common issues trial may leave significant individual issues to be resolved does not necessarily mean that a class proceeding is not the preferable procedure because it will be common that the common issues trial will not be determinative of the defendant's liability and the *Class Proceedings Act, 1992* provides powerful procedural mechanisms and powerful compensation distribution mechanisms that permits the court to take a variety of approaches to resolving the claims of class members: *Cassano v. Toronto-Dominion Bank*, *2007 ONCA 781* at para. 60.

**198**  In the case at bar, Thomson submits that the preferability requirement is not satisfied because the certification of this action as a class action would accomplish none of the goals of the *Class Proceedings Act, 1992* and would, in light of the individual and privilege issues, be unmanageable. It submits that the action would break down into a long series of discrete trials with multiple parties prosecuting complex factual and legal issues. It submits that there would be little judicial efficiency in a class proceeding.

**199**  Thomson submits that Mr. Waldman's class action is not necessary for access to justice because the class members confront no economic or social barriers to making claims to enforce their legal rights. It submits that the private bar of litigators does not need the assistance of a class action to obtain access to justice.

**200**  Thomson submits that its behaviour does not need to be modified; rather, it submits that in Litigator it provides a useful service that facilitates the open court principle, freedom of expression, the administration of justice, and the professionalism of the legal profession and a service that does not cause any damage to class members who lose nothing by having their court documents shared on Litigator. It submits that its behaviour should be encouraged not condemned or enjoined. Further, Thomson submits that Mr. Waldman's action does not advance judicial economy but rather depletes judicial resources for a common issues trial and for individual lawsuits that are unlikely to be brought forward because publicly-filed court documents are readily and widely available and class members have not suffered any damages. For those few class members who object to their court documents being available on Litigator, there is the simple alternative procedure of asking Thomson to remove the court documents from Litigator. For all these reasons, Thomson submits that Mr. Waldman's proposed class action does not satisfy the preferable procedure criterion.

**201**  My own conclusion, however, is to the contrary. Putting aside the manageability factor, there is a fatal flaw in Thomson's arguments about access to justice, judicial economy, and behaviour modification. Thomson's argument depends upon a premise that cannot be taken as true at this juncture of the proposed class action. A necessary premise of Thomson's argument is that the court will, on the merits, decide that Thomson committed no legal wrong and that its Litigator service is not an infringement of copyright or a violation of individual class members' moral rights. If that premise were true, then it would follow that Mr. Waldman's action would not advance access to justice for class members, would not provide judicial economy, and would not

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

achieve the behaviour modification of a wrongdoer. However, a certification motion is not a merits test, and it remains to be determined whether Thomson is a wrongdoer.

**202** Removing the premise that Thomson is necessarily innocent and analyzing the preferability criterion on the assumption that Thomson may not be innocent, then Mr. Waldman's proposed action satisfies the preferable procedure criterion.

**203** Assuming there was copyright infringement, a class proceeding is the only reasonable means to provide access to justice to class members. That some individual class members may have the financial means and that class members do not confront any social barriers and would not be intimidated in taking on Thomson, does not mean that a class action is unnecessary to provide access to justice. Class actions are suitable for cases where the individual class member's monetary loss, if any, is small, but the defendant has wronged many who as individuals cannot sensibly take on the financial risk of suing the defendant, who simply gets away with its misdeeds.

**204** In the case at bar, for an individual class member, an individual action would not be financially viable. Thomson's offer to remove the court documents from Litigator, at best, stops future injury, but this approach does not compensate or atone for the copyright infringement and the past violation of moral rights. In the case at bar, damages are not a constituent element of the class member's individual claim, but, in any event, a class member is entitled to seek justice for the infringement of his or her rights even if that justice is a non-compensatory remedy enjoining the defendant from its misconduct.

**205** In the case at bar, an individual issues trial, would become viable only if the common issues were determined in favour of the class member, in which case, the court could employ its powerful procedural mechanisms and powerful distribution mechanisms to provide access to justice.

**206** In the case at bar, a class action would provide judicial economy. If the common issues were decided against Thomson, then the court would not have to decide those substantial issues again in the individual issues trial. If the common issues were decided against Thomson, then behaviour modification would be achieved. Thomson's alternative of removing court documents from Litigator is an expediency to avoid acknowledging that its behaviour may be wrongful.

**207** I do not agree that the certification of this action as a class action would result in an unmanageable proceeding. There is no suggestion that the common issues phase would be unmanageable and if any of Thomson's defences carry the day, that will end the litigation altogether. Viewed globally, the class action will not be unmanageable and indeed may not have to be managed much, if Thomson is correct that class members are not interested in pursuing claims. Those that do pursue claims will benefit from the productivity of the common issues trial.

**208** I borrow what Justice Lax stated in *Sauer v. Canada (Attorney General)*, *[2008] O.J. No. 3419* (S.C.J.) at para. 66:

> I consider that the ghostly spectre of unmanageability underlying the arguments presented against certification is unconvincing. As with most ghosts, it will either vanish in the daylight of case management, the direction of the trial judge, or agreement of the parties or it will return in the night to haunt this proceeding, in which case the defendant may move under section 10 of the *CPA* for decertification: *Pearson v. Inco Ltd. (2005), 78 O.R. (3d) 641* (C.A.) at para. 70.

**209** If the action proceeds to individual issues trials and Thomson insists that authorship be proven, the problem of solicitor-client privilege will be a problem for the class members to solve but this problem does not make the action unmanageable.

**210** I agree with Thomson that solicitor and client privilege is a matter that has to be addressed even if it were determined that clients do not have authorship or ownership claims. This factor means that class members will have to obtain a waiver of the privilege from their client after insisting that their client obtain independent legal advice.

**211** If the client waiver is not forthcoming, then the class member will not be able to pursue its individual claim and there will no claim to manage. If the client waives solicitor and client privilege, then determining authorship and ownership will not make the action unmanageable. The class members will have dockets and file memoranda and draft documents that will facilitate the determination of authorship and ownership.

**212** I note that manageability concerns do not arise if Thomson does not contest the authorship or ownership of class members.

Waldman v. Thomson Reuters Corporation, 2012 CCLG para. 25-295

Assuming it is unsuccessful after a common issues trial, then it may not be worthwhile for Thomson to challenge authorship or ownership because some class member will be the author or copyright owner and so Thomson does not benefit much by precisely identifying co-authors and co-owners.

**213** In any event, I am satisfied that a class proceeding is the preferable procedure and that the fourth criterion for certification has been satisfied.

7.        <u>Representative Plaintiff and the Litigation Plan</u>

**214** The representative plaintiff must be a member of the class asserting claims against the defendant, which is to say that the representative plaintiff must have a claim that is a genuine representation of the claims of the members of the class to be represented or that the representative plaintiff must be capable of asserting a claim on behalf of all of the class members as against the defendant: *Drady v. Canada (Minister of Health)*, *[2007] O.J. No. 2812* (S.C.J.) at paras. 36-45; *Attis v. Canada (Minister of Health)*, *[2003] O.J. No. 344* (S.C.J.) at para. 40, aff'd *[2003] O.J. No. 4708* (C.A.).

**215** Provided that the representative plaintiff has his or her own cause of action, the representative plaintiff can assert a cause of action against a defendant on behalf of other class members that he or she does not assert personally, provided that the causes of action all share a common issue of law or of fact: *Boulanger v. Johnson & Johnson Corp.*, *[2002] O.J. No. 1075* (S.C.J.) at para. 22, leave to appeal granted, *[2002] O.J. No. 2135* (S.C.J.), varied *(2003), 64 O.R. (3d) 208* (Div. Ct.) at paras. 41, 48, varied *[2003] O.J. No. 2218* (C.A.); *Matoni v. C.B.S. Interactive Multimedia Inc.*, *[2008] O.J. No. 197* (S.C.J.), at paras. 71-77; *Voutour v. Pfizer Canada Inc.*, *[2008] O.J. No. 3070* (S.C.J.); *LeFrancois v. Guidant Corp.*, *[2008] O.J. No. 1397* (S.C.J.) at para. 55.

**216** Whether the representative plaintiff can provide adequate representation depends on such factors as: his or her motivation to prosecute the claim; his or her ability to bear the costs of the litigation; and the competence of his or her counsel to prosecute the claim: *Western Canadian Shopping Centres Inc. v. Dutton*, *[2001] 2 S.C.R. 534* at para. 41.

**217** It was not contested that Mr. Waldman is a suitable and satisfactory representative plaintiff. I conclude that the fifth criterion for certification is satisfied in the case at bar.

*G. CONCLUSION*

**218** For the above reasons, I am satisfied that all the certification criteria have been satisfied. Therefore, the action must be certified as a class action.

**219** The parties agreed that the successful party on this motion shall be entitled to costs in the cause fixed at $15,000.00, inclusive.

**220** Order to go accordingly.

P.M. PERELL J.

---

End of Document

# EXHIBIT E

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 68 of 243 PageID #: 6225

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

2007 SCC 34

Supreme Court of Canada

Union des consommateurs c. Dell Computer Corp.

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801, [2007] S.C.J. No. 34, 158 A.C.W.S. (3d) 870, 284 D.L.R. (4th) 577, 34 B.L.R. (4th) 155, 366 N.R. 1, 44 C.P.C. (6th) 205

Dell Computer Corporation (Appellant) and Union des consommateurs and Olivier Dumoulin (Respondents) and Canadian Internet Policy and Public Interest Clinic, Public Interest Advocacy Centre, ADR Chambers Inc., ADR Institute of Canada, Inc., and London Court of International Arbitration (Interveners)

McLachlin C.J.C., Bastarache, Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein JJ.

Heard: December 13, 2006
Judgment: July 13, 2007
Docket: 31067

Proceedings: reversed *Union des consommateurs c. Dell Computer Corp.* (2005), 2005 CarswellQue 3270, EYB 2005-91033, [2005] R.J.Q. 1448 ((C.A. Que.))

Counsel: Mahmud Jamal, Anne-Marie Lizotte, Dominic Dupoy for Appellant
Ronald Bourguignon, Yves Lauzon, Careen Hannouche for Respondents
Mistrale Goudreau, Philippa Lawson for Interveners, Canadian Internet Policy and Public Interest Clinic and Public Interest Advocacy Centre
J. Brian Casey, Janet E. Mills, John Pirie for Intervener, ADR Chambers Inc.
Stefan Martin, Margaret Weltrowska for Intervener, ADR Institute of Canada
Pierre Bienvenu, Frédéric Bachand, Azim Hussain for Intervener, London Court of International Arbitration

Subject: Civil Practice and Procedure; Corporate and Commercial; Public; International; Contracts; Property

**Table of Authorities**
**Cases considered by *Deschamps J.*:**

*Banque nationale du Canada c. Premdev Inc.* (1997), 1997 CarswellQue 222 (C.A. Que.) — referred to
*Bisaillon c. Concordia University* (2006), 51 C.C.P.B. 163, *(*sub nom. *Bisaillon v. Concordia University)* 149 L.A.C. (4th) 225, *(*sub nom. *Bisaillon v. Concordia University)* 348 N.R. 201, *(*sub nom. *Concordia v. Bisaillon)* 2006 C.L.L.C. 220-033, 2006 C.E.B. & P.G.R. 8200, 2006 SCC 19, 2006 CarswellQue 3689, 2006 CarswellQue 3690, *(*sub nom. *Bisaillon v. Concordia University)* 266 D.L.R. (4th) 542, [2006] 1 S.C.R. 666 (S.C.C.) — followed
*Blais & Langlois inc. c. Construction de la source inc.* (2006), 2006 CarswellQue 3066, 2006 QCCA 461 (C.A. Que.) — referred to
*C.C.I.C. Consultech International c. Silverman* (1991), [1991] R.D.J. 500, 52 Q.A.C. 111, 1991 CarswellQue 331 (C.A. Que.) — referred to
*Compagnie nationale algérienne de navigation c. Pegasus Lines Ltd. S.A.* (1994), 1994 CarswellQue 1196 (C.A. Que.) — referred to
*Condominiums Mont Ste-Sauveur Inc. c. Constructions Serge Sauvé Ltée* (1990), [1990] R.J.Q. 2783, [1991] R.D.I. 8 (C.A. Que.) — referred to
*Dalimpex Ltd. v. Janicki* (2003), 35 B.L.R. (3d) 41, 64 O.R. (3d) 737, 172 O.A.C. 312, 228 D.L.R. (4th) 179, 2003 CarswellOnt 1998, 35 C.P.C. (5th) 55 (Ont. C.A.) — referred to

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 69 of 243 PageID #: 6226
Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...
2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

*Desputeaux c. Éditions Chouette (1987) inc.* (2003), *(sub nom. Desputeaux v. Éditions Chouette (1987) inc.)* 301 N.R. 220, 223 D.L.R. (4th) 407, 23 C.P.R. (4th) 417, [2003] 1 S.C.R. 178, 2003 SCC 17, 2003 CarswellQue 342, 2003 CarswellQue 343 (S.C.C.) — considered

*Dominion Bridge Corp. c. Knai* (1997), [1998] R.J.Q. 321, 1997 CarswellQue 1181 (C.A. Que.) — followed

*Ford c. Québec (Procureur général)* (1988), 10 C.H.R.R. D/5559, *(sub nom. Ford v. Quebec (Attorney General))* [1988] 2 S.C.R. 712, 90 N.R. 84, 54 D.L.R. (4th) 577, 19 Q.A.C. 69, 36 C.R.R. 1, 1988 CarswellQue 155, 1988 CarswellQue 155F (S.C.C.) — considered

*Gulf Canada Resources Ltd./Ressources Gulf Canada Ltée v. Arochem International Ltd.* (1992), *(sub nom. Gulf Canada Resources Ltd. v. Arochem International Ltd.)* 66 B.C.L.R. (2d) 113, *(sub nom. Gulf Canada Resources Ltd. v. Arochem International Inc.)* 22 W.A.C. 145, *(sub nom. Gulf Canada Resources Ltd. v. Arochem International Inc.)* 11 B.C.A.C. 145, *(sub nom. Gulf Canada Resources Ltd. v. Arochem International Ltd.)* 43 C.P.R. (3d) 390, 1992 CarswellBC 95 (B.C. C.A.) — referred to

*Kingsway Financial Services Inc. c. 118997 Canada inc.* (1999), 1999 CarswellQue 3927 (C.A. Que.) — considered

*Laurentienne-vie, cie d'assurance inc. c. Empire, cie d'assurance-vie* (2000), 2000 CarswellQue 1093, *(sub nom. Laurentienne-vie (La), compagnie d'assurances inc. c. Empire (L'), compagnie d'assurance-vie)* [2000] R.J.Q. 1708, *(sub nom. Larentienne-vie (La), compagnie d'assurances inc. c. Empire (L'), compagnie d'assurance-vie)* [2000] R.R.A. 637 (C.A. Que.) — considered

*Regenair inc. c. Quebecor Printing Memphis Inc.* (2001), 2001 CarswellQue 841, *(sub nom. Quebecor Printing Memphis inc. c. Regenair inc.)* [2001] R.J.Q. 966 (C.A. Que.) — considered

*Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.* (2005), *(sub nom. GreCon Dimter Inc. v. J.R. Normand Inc.)* [2005] 2 S.C.R. 401, *(sub nom. GreCon Dimter Inc. v. J.R. Normand Inc.)* 255 D.L.R. (4th) 257, 2005 SCC 46, 2005 CarswellQue 5110, 2005 CarswellQue 5111, *(sub nom. GreCon Dimter Inc. v. Normand (J.R.) Inc.)* 336 N.R. 347 (S.C.C.) — considered

*Tremblay c. Acier Leroux inc.* (2004), 2004 CarswellQue 449, [2004] R.J.Q. 839 (C.A. Que.) — referred to

**Cases considered by *Bastarache, LeBel JJ.* (dissenting):**

*Athlumney, Re* (1898), [1898] 2 Q.B. 547, 67 L.J.Q.B. 935, [1895-99] All E.R. Rep. 329 (Eng. Q.B.) — considered

*Automobiles Duclos inc. c. Ford du Canada ltée* (2000), [2001] R.J.Q. 173, 2000 CarswellQue 3175 (C.S. Que.) — referred to

*Bisaillon c. Concordia University* (2006), 51 C.C.P.B. 163, *(sub nom. Bisaillon v. Concordia University)* 149 L.A.C. (4th) 225, *(sub nom. Bisaillon v. Concordia University)* 348 N.R. 201, *(sub nom. Concordia v. Bisaillon)* 2006 C.L.L.C. 220-033, 2006 C.E.B. & P.G.R. 8200, 2006 SCC 19, 2006 CarswellQue 3689, 2006 CarswellQue 3690, *(sub nom. Bisaillon v. Concordia University)* 266 D.L.R. (4th) 542, [2006] 1 S.C.R. 666 (S.C.C.) — considered

*Chassé c. Union Canadienne, cie d'assurances* (1999), [1999] R.R.A. 165, 1999 CarswellQue 699 (C.S. Que.) — referred to

*Desputeaux c. Éditions Chouette (1987) inc.* (2003), *(sub nom. Desputeaux v. Éditions Chouette (1987) inc.)* 301 N.R. 220, 223 D.L.R. (4th) 407, 23 C.P.R. (4th) 417, [2003] 1 S.C.R. 178, 2003 SCC 17, 2003 CarswellQue 342, 2003 CarswellQue 343 (S.C.C.) — considered

*Dominion Bridge Corp. c. Knai* (1997), [1998] R.J.Q. 321, 1997 CarswellQue 1181 (C.A. Que.) — considered

*Garcia Transport Ltée c. Cie Trust Royal* (1992), [1992] 2 S.C.R. 499, 139 N.R. 81, *(sub nom. Garcia Transport Ltée v. Royal Trust Co.)* 50 Q.A.C. 1, *(sub nom. Garcia Transport Ltée v. Royal Trust Co.)* [1992] R.D.I. 492, 1992 CarswellQue 116, 1992 CarswellQue 136 (S.C.C.) — considered

*Gustavson Drilling (1964) Ltd. v. Minister of National Revenue* (1975), 1975 CarswellNat 330, [1976] C.T.C. 1, 75 D.T.C. 5451, 66 D.L.R. (3d) 449, 7 N.R. 401, 1975 CarswellNat 376, [1977] 1 S.C.R. 271 (S.C.C.) — referred to

*Kanitz v. Rogers Cable Inc.* (2002), 58 O.R. (3d) 299, 16 C.P.C. (5th) 84, 2002 CarswellOnt 628, 21 B.L.R. (3d) 104 (Ont. S.C.J.) — considered

*Kingsway Financial Services Inc. c. 118997 Canada inc.* (1999), 1999 CarswellQue 3927 (C.A. Que.) — referred to

*La Sarre (Ville) c. Gabriel Aubé inc.* (1991), [1992] R.D.J. 273, 1991 CarswellQue 264, 43 Q.A.C. 226 (C.A. Que.) — referred to

*Lemieux c. 9110-9595 Québec inc.* (2004), 2004 CarswellQue 2252 (C.Q.) — referred to

*Lipohar v. R.* (1999), 200 C.L.R. 485, [1999] H.C.A. 65 (Australia H.C.) — considered

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 70 of 243 PageID #: 6227

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQué...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

*MacMillan Bloedel Ltd. v. Simpson* (1995), [1995] 4 S.C.R. 725, [1996] 2 W.W.R. 1, 14 B.C.L.R. (3d) 122, 44 C.R. (4th) 277, 130 D.L.R. (4th) 385, 103 C.C.C. (3d) 225, 191 N.R. 260, 33 C.R.R. (2d) 123, 68 B.C.A.C. 161, 112 W.A.C. 161, 1995 CarswellBC 974, 1995 CarswellBC 1153 (S.C.C.) — referred to

*Martineau c. Verreault* (June 13, 2001), Doc. C.S. Québec 200-05-014699-016 (C.S. Que.) — referred to

*Masson c. Thompson* (1994), [1994] R.J.Q. 1032, 1994 CarswellQue 769 (C.S. Que.) — referred to

*Morguard Properties Ltd. v. Winnipeg (City)* (1983), [1983] 2 S.C.R. 493, 3 D.L.R. (4th) 1, 50 N.R. 264, [1984] 2 W.W.R. 97, 25 Man. R. (2d) 302, 6 Admin. L.R. 206, 24 M.P.L.R. 219, 1983 CarswellMan 187, 1983 CarswellMan 162 (S.C.C.) — considered

*Normandin Lumber Ltd. v. "Angelic Power" (The)* (1971), [1971] F.C. 263, 1971 CarswellNat 233, 1971 CarswellNat 233F (Fed. T.D.) — considered

*Rees c. Convergia, Convergia Networks Inc.* (2005), 2005 QCCA 353, 2005 CarswellQue 1022 (C.A. Que.) — considered

*Richard-Gagné c. Poiré* (2006), 2006 CarswellQue 8233, 2006 QCCS 4980 (C.S. Que.) — referred to

*Royal Bank v. Concrete Column Clamps (1961) Ltd.* (1971), 19 D.L.R. (3d) 621, 1971 CarswellQue 42, [1971] S.C.R. 1038, 1971 CarswellQue 42F (S.C.C.) — considered

*Rudder v. Microsoft Corp.* (1999), 47 C.C.L.T. (2d) 168, 2 C.P.R. (4th) 474, 1999 CarswellOnt 3195, 40 C.P.C. (4th) 394 (Ont. S.C.J.) — referred to

*Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.* (2005), *(*sub nom. *GreCon Dimter Inc. v. J.R. Normand Inc.)* [2005] 2 S.C.R. 401, *(*sub nom. *GreCon Dimter Inc. v. J.R. Normand Inc.)* 255 D.L.R. (4th) 257, 2005 SCC 46, 2005 CarswellQue 5110, 2005 CarswellQue 5111, *(*sub nom. *GreCon Dimter Inc. v. Normand (J.R.) Inc.)* 336 N.R. 347 (S.C.C.) — considered

*Sia v. Albury Grain Sales Inc.* (2005), 2005 CarswellQue 5537 (C.S. Que.) — referred to

*Simbol Test Systems Inc. v. Gnubi Communications Inc.* (March 6, 2002), P. Isabelle J. (C.S. Que.) — referred to

*Tolofson v. Jensen* (1994), [1995] 1 W.W.R. 609, 22 C.C.L.T. (2d) 173, 100 B.C.L.R. (2d) 1, 32 C.P.C. (3d) 141, 7 M.V.R. (3d) 202, 26 C.C.L.I. (2d) 1, 175 N.R. 161, 120 D.L.R. (4th) 289, *(*sub nom. *Lucas (Litigation Guardian of) v. Gagnon)* [1994] 3 S.C.R. 1022, 77 O.A.C. 81, 51 B.C.A.C. 241, 84 W.A.C. 241, 1994 CarswellBC 1, 1994 CarswellBC 2578 (S.C.C.) — referred to

*World LLC c. Parenteau & Parenteau Int'l* (1998), 1998 CarswellQue 2036 (C.S. Que.) — referred to

*Zodiak International Productions Inc. v. Polish People's Republic* (1983), [1983] 1 S.C.R. 529, [1983] R.D.J. 277, 47 N.R. 321, 1983 CarswellQue 105F, 1983 CarswellQue 105 (S.C.C.) — considered

**Statutes considered by *Deschamps J.*:**

*Cadre juridique des technologies de l'information, Loi concernant le*, L.R.Q., c. C-1.1

    art. 5 — referred to

*Code civil du Bas-Canada*, S. Prov. C. 1865, c. 41

    en général — referred to

*Code civil du Québec*, L.Q. 1991, c. 64

    en général — considered

    livre V — considered

    livre V, Titre II, Chapitre XVIII — considered

    livre X — referred to

    livre X, Titre II — referred to

    livre X, Titre III — considered

    art. 1435 — considered

    art. 1435-1437 — considered

    art. 1436 — referred to

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

art. 1437 — referred to

art. 2638 — considered

art. 2639 — considered

art. 3083-3133 — referred to

art. 3111 — considered

art. 3129 — referred to

art. 3134 — referred to

art. 3141-3147 — referred to

art. 3148 — considered

art. 3148(2) — considered

art. 3148(3) — referred to

art. 3149 — considered

art. 3150 — referred to

art. 3151 — referred to

art. 3152-3154 — referred to

art. 3154(2) — referred to

*Code civil et le code de procédure civile en matière d'arbitrage, Loi modifiant le*, L.Q. 1986, c. 73
   en général — considered

*Code Napoleon*
   en général — referred to

*Code de procédure civile*, Loi no 91-650 du 9 juillet 1991
   art. 1458 — referred to

   art. 1492 — considered

*Code de procédure civile*, L.R.Q., c. C-25
   en général — referred to

   livre VII — referred to

   livre VII, Titre I — considered

   livre VII, Titre II — considered

   livre IX — referred to

   art. 31 — referred to

   art. 940 — considered

   art. 940.1 [ad. 1986, c. 73, art. 2] — referred to

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 72 of 243 PageID #: 6229

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

art. 940.6 [ad. 1986, c. 73, art. 2] — referred to

art. 943 — considered

art. 943.1 [ad. 1986, c. 73, art. 2] — considered

art. 943.2 [ad. 1986, c. 73, art. 2] — referred to

art. 948 al. 2 — considered

art. 948-951.2 — referred to

art. 999(d) "class action" — referred to

art. 1000 — referred to

*Commercial Arbitration Act*, R.S.C. 1985, c. 17 (2nd Supp.)

Generally — referred to

*Federal Arbitration Act*, 9 U.S.C. 1

Generally — referred to

*Protection du consommateur, Loi sur la*, L.R.Q., c. P-40.1

en général — referred to

*Protection du consommateur et la Loi sur le recouvrement de certaines créances, Loi modifiant la Loi sur la*, L.Q. 2006, c. 56

en général — referred to

art. 2 — considered

art. 17 — referred to

art. 18 — considered

**Statutes considered by *Bastarache, LeBel JJ.* (dissenting):**

*Code civil du Bas-Canada*, S. Prov. C. 1865, c. 41

en général — considered

art. 8.1 [ad. 1989, c. 62, art. 1] — considered

art. 27 — considered

art. 85 — considered

*Code civil du Québec*, L.Q. 1991, c. 64

en général — considered

livre X — referred to

livre X, Titre III — considered

livre X, Titre III, Chapitre II, Section II — referred to

art. 1379 — referred to

art. 1435 — considered

art. 1435 al. 2 — referred to

art. 1437 — referred to

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 73 of 243 PageID #: 6230

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

art. 2638-2643 — referred to

art. 2639 — considered

art. 2639 al. 1 — considered

art. 2640 — referred to

art. 2642 — considered

art. 3094 — considered

art. 3111 — considered

art. 3117 — referred to

art. 3118 — referred to

art. 3126 — referred to

art. 3139 — referred to

art. 3148 — considered

art. 3148(1) — referred to

art. 3148(1)-3148(5) — referred to

art. 3148(2) — considered

art. 3149 — considered

art. 3149-3151 — referred to

art. 3151 — considered

*Code de procédure civile*, L.R.Q., c. C-25

en général — considered

livre VII — referred to

livre IX — referred to

art. 21.1 [ad. 1989, c. 62, art. 2] — considered

art. 31 — referred to

art. 33 — referred to

art. 68 — considered

art. 940.1 [ad. 1986, c. 73, art. 2] — considered

art. 940.6 [ad. 1986, c. 73, art. 2] — referred to

art. 943 — referred to

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 74 of 243 PageID #: 6231

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

art. 943.1 [ad. 1986, c. 73, art. 2] — referred to

art. 946.4(2) [ad. 1986, c. 73, art. 2] — considered

art. 951 — referred to

art. 1051 — considered

*Code du travail*, L.R.Q., c. C-27
en général — referred to

*Constitution Act, 1867 (U.K.)*, 30 & 31 Vict., c. 3, reprinted R.S.C. 1985, App. II, No. 5
s. 96 — referred to

*Private International Law Act*, 1987
Article 114 — considered

*Protection du consommateur, Loi sur la*, L.R.Q., c. P-40.1
en général — considered

art. 8 — referred to

art. 271 al. 2 — referred to

art. 271 al. 3 — referred to

*Protection du consommateur et la Loi sur le recouvrement de certaines créances, Loi modifiant la Loi sur la*, L.Q. 2006, c. 56
en général — referred to

art. 2 — considered

art. 18 — referred to

*Statut professionnel des artistes, des arts visuels, des métiers d'art et de la littérature et sur leurs contrats avec les diffuseurs, Loi sur le*, L.R.Q., c. S-32.01
art. 37 — referred to

*Tribunaux judiciaires, Loi sur les*, L.R.Q., c. T-16
art. 10 — referred to

**Treaties considered by *Deschamps J.*:**
*Rome Convention*, 1980
Article 3 — considered

*UNCITRAL Model Law on International Commercial Arbitration, 1985*, 24 I.L.M. 1302
Generally — considered

Article 8 — referred to

Article 8 ¶ 1 — referred to

Article 16 — referred to

*United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958*, 330 U.N.T.S. 3; T.I.A.S. No. 6997
Generally — considered

Article II — considered

Article II ¶ 3 — considered

**Treaties considered by *Bastarache, LeBel JJ.* (dissenting):**
*UNCITRAL Model Law on International Commercial Arbitration, 1985*, 24 I.L.M. 1302

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 75 of 243 PageID #: 6232

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

Generally — referred to

*United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958*, 330 U.N.T.S. 3; T.I.A.S. No. 6997

Generally — referred to

APPEAL by computer equipment retailer against judgment reported at *Union des consommateurs c. Dell Computer Corp.* (2005), 2005 CarswellQue 3270, [2005] R.J.Q. 1448, 2005 QCCA 570 (C.A. Que.), dismissing appeal by retailer against judgment reported at *Union des consommateurs c. Dell Computer Corp.* (2004), 2004 CarswellQue 86 (C.S. Que.), allowing motion by consumer to institute class action against retailer.

POURVOI d'un détaillant de matériel informatique à l'encontre d'une décision publiée à *Union des consommateurs c. Dell Computer Corp.* (2005), 2005 CarswellQue 3270, [2005] R.J.Q. 1448, 2005 QCCA 570 (C.A. Que.), ayant rejeté l'appel interjeté par le détaillant à l'encontre d'une décision publiée à *Union des consommateurs c. Dell Computer Corp.* (2004), 2004 CarswellQue 86 (C.S. Que.), ayant accueilli la requête d'un consommateur en autorisation d'exercer un recours collectif contre le détaillant.

*Deschamps J.*:

1    The expansion of trade is without question spurring the development of rules governing international relations. Alternative dispute resolution mechanisms, including arbitration, are among the means the international community has adopted to increase efficiency in commercial relationships. Concomitantly, in Quebec, recourse to arbitration has increased greatly owing this mechanism's flexibility when compared with the traditional justice system.

2    This appeal relates to the debate over the place of arbitration in Quebec's civil justice system. More specifically, the Court is asked to consider the validity and applicability of an arbitration agreement in the context of a domestic legal dispute under the rules of Quebec law and international law, and to determine whether the arbitrator or a court of law should rule first on these issues.

3    To ensure the internal consistency of the *Civil Code of Québec*, S.Q. 1991, c. 64 ("C.C.Q."), it is necessary to adopt a contextual interpretation that limits the scope of the provisions of the title on the international jurisdiction of Quebec authorities to situations with a relevant foreign element. The prohibition in art. 3149 C.C.Q. against waiving the jurisdiction of Quebec authorities is found in that title and accordingly applies only to situations with a relevant foreign element. Since arbitration is in essence a neutral institution, it does not in itself have any foreign element. An arbitration tribunal has only those connections that the parties to the arbitration agreement intended it to have. The independence and territorial neutrality of arbitration are characteristics that must be promoted and preserved in order to foster the development of this institution. In the case at bar, the arbitration clause was not prohibited by any provision of Quebec legislation at the time it was invoked. Consequently, for the reasons that follow, I would allow the appeal, refer Mr. Dumoulin's claim to arbitration and dismiss the motion for authorization to institute a class action.

### 1. Facts

4    Dell Computer Corporation ("Dell") is a company that sells computer equipment retail over the Internet. It has its Canadian head office in Toronto and a place of business in Montreal. In the late afternoon of Friday, April 4, 2003, the order pages on Dell's English-language Web site indicated a price of $89 rather than $379 for the Axim X5 300-MHz handheld computer and a price of $118 rather than $549 for the Axim X5 400-MHz handheld computer. The pages of the site where the products were advertised listed the correct prices, however. On April 5, on being informed of the errors, Dell blocked access to the erroneous order pages through the usual address, although the pages were not withdrawn from the site. On the morning of April 7, Olivier Dumoulin, a Quebec consumer, was told about the prices by an acquaintance who sent him the detailed links, which the parties described as "deep links". These links made it possible to access the order pages without following the usual route, that is, through the home page and the advertising pages. In short, the deep links made it possible to circumvent the measures taken by Dell. Using a deep link, Mr. Dumoulin ordered a computer at the price of $89. Shortly after Mr. Dumoulin placed his order, Dell corrected the two price errors. That same day, Dell posted a price correction notice and at the same time announced that

it would not process orders for computers at the prices of $89 and $118. At trial, a Dell employee testified that over the course of that weekend, 354 Quebec consumers had placed a total of 509 orders for these Axim computers, whereas on an average weekend, only one to three of them were sold in Quebec.

5     On April 17, Mr. Dumoulin put Dell in default, demanding that it honour his order at the price of $89. When Dell refused, the Union des consommateurs and Mr. Dumoulin ("Union") filed a motion for authorization to institute a class action against Dell. Dell applied for referral of Mr. Dumoulin's claim to arbitration pursuant to an arbitration clause contained in the terms and conditions of sale, and dismissal of the motion for authorization to institute a class action. The Union contended that the arbitration clause was null and that, in any event, it could not be set up against Mr. Dumoulin.

## 2. Judicial History

6     The trial judge noted that according to the arbitration clause, arbitration proceedings were to be governed by the rules of the National Arbitration Forum ("NAF"), which is [TRANSLATION] "located in the United States". This led her to conclude that there was a foreign element for purposes of the rules of Quebec private international law and that the prohibition under art. 3149 C.C.Q., as interpreted in *Dominion Bridge Corp. c. Knai* (1997), [1998] R.J.Q. 321 (C.A. Que.), should apply. In her view, the arbitration clause could not be set up against Mr. Dumoulin. She then considered the criteria for instituting a class action and authorized the action against Dell ([2004] J.Q. No. 155 (C.S. Que.)).

7     The Court of Appeal dismissed Dell's appeal from that decision ([2005] R.J.Q. 1448, 2005 QCCA 570 (C.A. Que.)). It began by expressing its disagreement with the Superior Court's application of the rules of Quebec private international law. According to the Court of Appeal, this was not a situation in which the consumer had waived the jurisdiction of Quebec authorities. It noted that the parties had agreed that the dispute was governed by the laws applicable in Quebec and that the arbitration could take place in Quebec. In its view, the instant case could be distinguished from *Dominion Bridge*, a case in which a foreign element had triggered the application of art. 3149 C.C.Q. However, the Court of Appeal concluded that the arbitration clause was external to the contract. Since Dell had not proven that the clause had been brought to the consumer's attention, the effect of art. 1435 C.C.Q. was that the clause could not be set up against him. The Court of Appeal then briefly discussed whether an issue arising under the *Consumer Protection Act*, R.S.Q., c. P-40.1, could be referred to arbitration and held that the Quebec legislature did not intend to preclude arbitration in such matters. Finally, it discussed, but did not accept, the argument that the class action should take precedence over arbitration, mentioning that the disputes that may not be submitted to arbitration are identified in the *Civil Code of Québec* and certain specific statutes.

8     On November 9, 2006, the Quebec Minister of Justice tabled Bill 48, *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts* (2nd Sess., 37th Leg.) ("Bill 48"), in the National Assembly. One of the Bill's provisions prohibits obliging a consumer to refer a dispute to arbitration. Bill 48, which came into force the day after the hearing of the appeal to this Court, does not include any transitional provisions applicable to this case.

## 3. Positions of the Parties

9     In this Court, the parties have reiterated the arguments raised in the Superior Court and the Court of Appeal. More specifically, Dell submits that the arbitration clause is not prohibited by any provision of Quebec legislation. It therefore is not contrary to public order, is not prohibited by art. 3149 C.C.Q., and is neither external nor abusive. Dell also contends that the courts are limited to conducting a *prima facie* analysis of the validity of an arbitration clause and must leave it to the arbitrator to consider the clause on the merits. According to Dell, this approach, which is based on the "competence-competence" principle, was implicitly adopted by this Court in *Desputeaux c. Éditions Chouette (1987) inc.*, [2003] 1 S.C.R. 178, 2003 SCC 17 (S.C.C.), and the Superior Court should have applied it in the case at bar and referred the matter to an arbitrator to assess the validity of the clause based on the Union's submissions. The Union did not express an opinion on the degree of scrutiny to which the validity of the arbitration clause should be subject but did take a position, contrary to Dell's, on every other issue.

10     After Bill 48 came into force, the Court asked the parties to make written submissions regarding its applicability to the instant case. Dell raised three arguments in support of its position that Bill 48 does not affect the case: that the Bill does not

Case 1:20-cv-00613-SB Document 204-1 Filed 07/29/22 Page 77 of 243 PageID #: 6234

*Union des consommateurs c. Dell Computer Corp.*, 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

have retroactive effect; that the new legislation cannot apply to disputes already before the courts; and that Dell had a vested right to the arbitration procedure provided for in the contract with Mr. Dumoulin. The Union advanced only one argument: that the provision on arbitration clauses merely confirms an existing prohibition.

11    The parties have raised many issues. In my view, the most significant one in the context of this case concerns the application of art. 3149 C.C.Q. This question is not only a potentially decisive one for the parties, but also one that involves the ordering of the rules in the *Civil Code of Québec*; the answer to it will have repercussions on the interpretation of the other provisions of the title in which this article appears and on the interpretation of the Code in general. The analysis of this issue will lead me to consider the influence of international rules on Quebec law. These rules are also relevant to another issue: whether the competence-competence principle applies to the review of the application to refer the dispute to arbitration. The conclusion I will reach is that an arbitrator has jurisdiction to assess the validity and applicability of an arbitration clause and that, although there are exceptions, the decision regarding jurisdiction should initially be left to the arbitrator. However, in light of the state of the case, I will discuss all the issues that have been raised.

### 4. Application of Article 3149 C.C.Q.

12    It will be helpful to reproduce the provision in issue and discuss its context. It reads as follows:

> 3149. A Québec authority also has jurisdiction to hear an action involving a consumer contract or a contract of employment if the consumer or worker has his domicile or residence in Québec; the waiver of such jurisdiction by the consumer or worker may not be set up against him.

This provision appears in Title Three, entitled "International Jurisdiction of Québec Authorities", which is found in Book Ten of the *Civil Code of Québec*, entitled "Private International Law". The Court must decide whether it applies in the case at bar. In my view, it is applicable only where there is a relevant foreign element that justifies resorting to the rules of Quebec private international law. I will explain why.

#### *4.1 Context of Application of the Rules on the International Jurisdiction of Quebec Authorities*

*4.1.1 Purpose and Consequences of the Codification of Private International Law in the Civil Code of Québec*

13    When the Quebec legislature began the reform of the civil law in the mid-twentieth century, it did so in a way that was consistent with the civil law tradition in its purest form. As Professor Crépeau writes:

> [TRANSLATION] The Civil Code is an organic, ordered, structured, harmonious and cohesive whole that contains the substantive subject matters of private law, governing, in the civil law tradition, the legal status of persons and property, relationships between persons, and relationships between persons and property. (P.-A. Crépeau, "Une certaine conception de la recodification", in *Du code civil du Québec: Contribution à l'histoire immédiate d'une recodification réussie* (2005), 23, at p. 40)

14    The codification process therefore entailed a reflection on all the principles and on how to organize them in one central document with a view to simplifying and clarifying the rules, and thus making them more accessible. The organization of rules is an essential feature of codification. Professors Brierley and Macdonald describe the impact of this feature on the mode of presentation and the interpretation of the *Civil Code* as follows:

> A number of assumptions as to form underpin a Civil Code. Their common character is linked to notions of rationality and systematization, nicely captured by Weber's expression — formal rationality. To say that a Civil Code is, and must be understood as, systematic and rationally organized implies that it reflects a consciously chosen, integrated design for presenting the law that has been consistently followed.
>
> . . . . .
>
> The rational and systematic character of the Code also bears on its mode of presentation. One of the central features of the Code is its taxonomic structure. This affects both its organization and its drafting style. Just as the very existence of a Code

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 78 of 243 PageID #: 6235

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...
2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

labelled "Civil Code" presupposes a larger legal universe that can be divided and subdivided — public law, private law; and, within private law, procedure and substance; and, within substantive private law, commercial law and civil law — the same taxonomic approach is carried through into the Code itself. Its primary division is into large books — for example, persons, property, modes of acquisition of property, commercial law — each of which is subdivided into titles. Within these titles the Code is subdivided into chapters that, in turn, are divided into sections and sometimes into subsections. All the concepts relating to a given area of the law are thus logically derived from first principles, meticulously developed, and systematically ordered.

. . . . .

In this architectonic mode of presentation, the inventory of subjects selected for inclusion and the manner of their placement serve to define the range of meaning that each of the subjects so included may have. The initial organizational choices bear directly on the manner in which the Code adapts to changing circumstances...

(J. E. C. Brierley and R. A. Macdonald, *Quebec Civil Law: An Introduction to Quebec Private Law* (1993), at pp. 102-4)

15     In his commentaries on the *Civil Code of Québec*, Quebec's Minister of Justice confirmed that the Code [TRANSLATION] "is a structured and hierarchical statutory scheme": *Commentaires du ministre de la Justice* (1993), vol. I, at p. VII. For this reason, it cannot be assumed that the jurists who took part in the reform placed the provisions of the *Civil Code of Québec* in one title or another indiscriminately or without a concern for coherence. A codification process presupposes an ordering of rules, and the provisions of the title on the international jurisdiction of Quebec authorities reflect this general philosophy of codification.

*4.1.2 Private International Law*

16     Private international law is the branch of a state's domestic law that governs private relationships that [TRANSLATION] "exten[d] beyond the scope of a single national legal system": É. Wyler and A. Papaux, "Extranéité de valeurs et de systèmes en droit international privé et en droit international public", in É. Wyler and A. Papaux (eds.), *L'extranéité ou le dépassement de l'ordre juridique étatique* (1999), 239, at p. 241. Since every state has the power to adopt its own system of rules, the result is a variety of conceptions of private international law. Thus, in some countries, this branch of law is limited to the conflict of laws, whereas in France, private international law has a broader scope, extending also to questions concerning the status of foreign nationals and the nationality of persons. In English private international law, an intermediate approach has been adopted that generally concerns three types of questions: (i) conflict of laws, (ii) conflict of jurisdictions and (iii) the recognition and enforcement of foreign judgments: *Dicey, Morris and Collins on the Conflict of Laws* (14th ed. 2006), vol. 1, at p. 4; P. North and J. J. Fawcett, *Cheshire and North's Private International Law* (13th ed. 1999), at p. 7. What is the situation in Quebec law?

*4.1.3 Legislative History of Quebec Private International Law*

17     The drafters of the original rules of Quebec private international law naturally drew on French law. Like the *Code Napoléon*, the *Civil Code of Lower Canada* contained only a few articles on this subject, and until the *Civil Code of Québec* was enacted in 1991, they and a few provisions of the *Code of Civil Procedure* and from specific statutes constituted the private international law of Quebec.

18      While Quebec's private international law was going through a period of relative stagnation in the nineteenth and early twentieth centuries, a growing number of states had recourse to codification, adopting increasingly comprehensive and systematic rules: B. Audit, *Droit international privé* (4th ed. 2006) at para. 37; A. N. Makarov, "Sources", in International Association of Legal Science, *International Encyclopedia of Comparative Law*, vol. III, *Private International Law* (1972), c. 2, at pp. 4-5. The subsequent project to codify Quebec's private international law was part of that trend; it was included in the mandate for the proposed general reform of the *Civil Code* that was assigned to the Civil Code Revision Office ("Office") in 1965.

19     In 1975, an initial draft codification of the rules of Quebec private international law was submitted to the Office by its private international law committee, which was chaired by Professor J.-G. Castel. The content of this report was amended slightly and was incorporated two years later into Book Nine of the *Draft Civil Code* (Civil Code Revision Office, *Report on*

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 79 of 243 PageID #: 6236

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

*the Québec Civil Code* (1978), vol. I, *Draft Civil Code*, at pp. 593 *et seq.*). The preliminary chapter and Chapter I of Book Nine contained general provisions. Chapter II concerned conflicts of laws, while Chapter III dealt with conflicts of jurisdictions. Chapters IV and V dealt with the recognition and enforcement of foreign decisions and arbitration awards. Finally, Chapter VI codified the immunity from civil jurisdiction and execution enjoyed by foreign states and certain other international actors.

20      The structure of Book Nine attests to the Quebec legislature's adoption of the intermediate approach of English private international law described by Dicey, Morris and Collins and North and Fawcett (mentioned above). The Office's decision was the result of a process that stretched over many years.

21      The Office explained that Chapter III on conflicts of jurisdictions was adopted to make up for a lack of specific rules on private international law that had obliged courts to resort to the *Code of Civil Procedure*'s provisions on the judicial districts in Quebec where proceedings could be instituted:

To remedy this state of affairs and to distinguish between international and domestic jurisdiction, it seemed necessary to provide rules applicable exclusively to situations containing a foreign element. [Emphasis added.]

(Civil Code Revision Office, *Report on the Québec Civil Code* (1978), vol. II, t. 2, *Commentaries*, at p. 965)

22      In the commentaries that accompanied the final text of the *Civil Code of Québec*, the Minister of Justice mentioned a number of times that the various sections of Book Ten of the *Civil Code* apply to legal situations [TRANSLATION] "with a foreign element". He expressly repeated this in the introduction to Title Three on the international jurisdiction of Quebec authorities (*Commentaires du ministre de la Justice*, vol. II, at p. 1998). The Minister also reiterated the Office's comments on the need for a set of jurisdictional rules for private international law distinct from the rules of the *Code of Civil Procedure* upon which the courts had relied until then:

[TRANSLATION] Since there were no rules for determining whether Quebec authorities had jurisdiction over disputes with a foreign element, the courts had extended the domestic law rules of jurisdiction provided for in the *Code of Civil Procedure* to such situations.

The general objective of Title Three is to remedy this deficiency by establishing specific rules for determining the international jurisdiction of Quebec authorities....

(*Commentaires du ministre de la Justice*, at p. 1998)

23      These commentaries shed light on the distinction between rules of jurisdiction governing purely domestic disputes and those that, because of a foreign element, form part of private international law. Where domestic disputes are concerned, the question of adjudicative jurisdiction is governed by the *Code of Civil Procedure*. In the case at bar, arts. 31 and 1000 C.C.P. are the provisions that confer jurisdiction over class actions on the Quebec Superior Court.

24      Given that domestic disputes are governed by the general provisions of Quebec domestic law, there is no reason to apply the rules relating to the international jurisdiction of Quebec authorities to a dispute that involves no foreign element.

### *4.2 Foreign Element Concept*

25      What is this foreign element that is omnipresent in the literature on private international law? Very little has been written about it. Of course, disputes in which rules of private international law are relied on usually have an international aspect and, as a result, the courts have not needed to elaborate on the parameters of the foreign element concept. One reference to this concept can be found in *Regenair inc. c. Quebecor Printing Memphis Inc.*, [2001] R.J.Q. 966 (C.A. Que.), at para. 17, in which Philippon J.A., dissenting on another issue, described the initial step of the analytical approach in private international law:

[TRANSLATION] First, it had to be determined whether the dispute related to an international situation or a transnational event or had a foreign element. [Emphasis deleted.]

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 80 of 243 PageID #: 6237

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

26     This foreign element can be defined, however. It must be "[a] point of contact which is *legally relevant* to a foreign country", which means that the contact must be sufficient to play a role in determining whether a court has jurisdiction: J. A. Talpis and J.-G. Castel, "Interpreting the rules of private international law", in *Reform of the Civil Code* (1993), vol. 5B, at page 38 (emphasis added); J. Walker, *Castel & Walker, Canadian Conflict of Laws* (loose-leaf ed.), vol. 1, at p. 1-1; see also Wyler and Papaux, at p. 256.

27     Since our private international law is based on English law, it will be helpful to review the state of English law on this question. North and Fawcett define private international law as follows:

> Private international law, then, is that part of law which comes into play when the issue before the court affects some <u>fact, event or transaction that is so closely connected with a foreign system of law</u> as to necessitate recourse to that system. [Emphasis added; p. 5.]

This definition is similar to the one adopted by Canadian authors, and it includes a notion common to many systems of private international law: the factor connecting a matter with a particular system. It follows that the foreign element and the connecting factor are overlapping notions. One author describes the connecting factor concept as follows:

> The connecting factor is the element forming one of the facts of the case which is selected in order to attach a question of law to a legal system. The connecting factor determines the applicable law or the jurisdiction of a court. For instance, if the facts of a case present a question of intestate succession to movables, the element among those facts selected for the designation of the applicable law may be the last domicile, the last habitual residence, the nationality of the deceased or the situs of the movables. Likewise, one of these connecting factors may be employed to establish the jurisdiction of the courts to deal with intestate succession to movables. (F. Vischer, "Connecting Factors", in International Association of Legal Science, *International Encyclopedia of Comparative Law*, vol. III, *Private International Law*, 1999, c. 4, at p. 3)

See also Y. Loussouarn, P. Bourel and P. de Vareilles-Sommières, *Droit international privé* (8th ed. 2004), at p. 2. The connecting factor and foreign element concepts are recognized in Quebec private international law, too: Talpis and Castel, at p. 38; C. Emanuelli, *Droit international privé québécois* (2nd ed. 2006), at pp. 11-12.

28     These two concepts can, therefore, overlap. A connecting factor is a tie to either the domestic or a foreign legal system, whereas the foreign element concept refers to a possible tie to a foreign legal system. Thus, in a personal action brought in Quebec, the fact that a defendant is domiciled in Quebec is a connecting factor with respect to the Quebec legal system but not a foreign element, whereas the fact that a defendant is domiciled in England will be considered both a connecting factor with respect to English jurisdiction and a foreign element with respect to the Quebec legal system. Certain of the connecting factors enumerated in Professor Vischer's definition above are common to most systems of private international law (see on this point the enumerations in Loussouarn, Bourel and de Vareilles-Sommières, at p. 2; North and Fawcett, at p. 5).

29     A state is free to determine what connecting factors or foreign elements it considers to be relevant. In Quebec, the legislature adopted a number of factors already found in the main Western private international law systems. In the title of the *Civil Code of Québec* on the conflict of laws, these factors are divided into four main categories, each of which is addressed in a separate chapter: (1) personal factors, with the main one being the place of domicile; (2) property-related factors; (3) factors related to obligations, such as the place where a contract is entered into; and (4) factors related to procedure, which is usually governed by the law of the court hearing the case (arts. 3083 to 3133 C.C.Q.).

30     The legislature also provided for certain connecting factors in respect of the international jurisdiction of Quebec authorities, which is the subject of a separate title. The place where one of the parties is domiciled heads the list of these factors, too. Article 3148 C.C.Q. shows this clearly:

> 3148. In personal actions of a patrimonial nature, a Québec authority has jurisdiction where
>
> > (1) the defendant has his domicile or residence in Québec;

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 81 of 243 PageID #: 6238

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

(2) the defendant is a legal person, is not domiciled in Québec but has an establishment in Québec, and the dispute relates to its activities in Québec;

(3) a fault was committed in Québec, damage was suffered in Québec, an injurious act occurred in Québec or one of the obligations arising from a contract was to be performed in Québec;

(4) the parties have by agreement submitted to it all existing or future disputes between themselves arising out of a specified legal relationship;

(5) the defendant submits to its jurisdiction.

However, a Québec authority has no jurisdiction where the parties, by agreement, have chosen to submit all existing or future disputes between themselves relating to a specified legal relationship to a foreign authority or to an arbitrator, unless the defendant submits to the jurisdiction of the Québec authority.

See also arts. 3134, 3141 to 3147, 3149, 3150, and 3154, para. 2 C.C.Q. Other factors that are considered include the place where damage was suffered or an injurious act occurred (art. 3148(3) C.C.Q.), and the place where the property in dispute is located (arts. 3152 to 3154, para. 1 C.C.Q.).

31      It can be seen that what these traditional factors have in common is a concrete connection with Quebec; if private international law is invoked, it can be assumed that there is an equally concrete foreign element that can serve as a basis for applying a foreign legal system. Despite the developments I have just mentioned, we should question the postulate that the rules of Quebec private international law apply only where there is a foreign element.

32      In the Office's *Draft Civil Code*, it was clear that a foreign element was necessary. In its commentary on the provision on the law applicable to juridical acts, the Office stated the following:

It should be noted that the text applies to juridical acts of an international character. The parties are not free to refer to a law not related to their act unless that act contains a foreign element. (Civil Code Revision Office, *Report on the Québec Civil Code*, vol. II, t. 2, *Commentaries*, at p. 977 (commentary on art. 21 of Book Nine of the *Draft Civil Code*))

In discussing art. 48 of Book Nine of the *Draft Civil Code*, the predecessor of art. 3148 C.C.Q. on the international jurisdiction of Quebec authorities, the Office stated that the jurisdictional rules set out in this article "are intended to apply to situations involving a foreign element" (Civil Code Revision Office, vol. II, t. 2, at p. 988).

33      The 1988 draft bill did not substantively alter the traditional foreign element requirement (*An Act to add the reformed law of evidence and of prescription and the reformed private international law to the Civil Code of Québec*). The wording of art. 3477 of the draft bill on the designation of the applicable law was substantially similar to that of the final version of the provision in the *Civil Code of Québec* (art. 3111). It read as follows:

3477. A juridical act containing a foreign element is governed by the law expressly designated in the instrument or the designation of which may be inferred with certainty from the terms of the act.

A system of law may be expressly designated as applicable to the whole or a part only of a juridical act.

34      The reference in this article to the foreign element led professors Talpis and Goldstein to ask whether such a reference was necessary, since they considered the foreign element requirement to be essential:

[TRANSLATION] It might first be asked whether it was necessary to specify that the parties may choose the applicable law only for a contract "containing a foreign element". It is obvious that the existence of a foreign element is the *sine qua non* of recourse to *all* the rules in Book Ten of the future Civil Code. However, since the Draft Bill does not include a

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 82 of 243 PageID #: 6239

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

specific provision on evasion of the law, this reference may have been intended to indicate that the will of the parties is not sufficient to turn a contract connected entirely with Quebec into an international one. [Emphasis added.]

(J. A. Talpis and G. Goldstein, "Analyse critique de l'avant-projet de loi du Québec en droit international privé" (1988-1989), 91 *R. du N.* 456, at p. 476)

As for art. 3511 of the 1988 draft bill, which concerned the international jurisdiction of Quebec authorities, it already contained all the substantive elements of the future art. 3148 C.C.Q.

35    In Bill 125 of 1990, the *Civil Code of Québec*, however, the foreign element requirement was not retained with respect to the designation of the applicable law. The legislature incorporated a special rule into the provision. The final version of art. 3111 includes an addition to the text that was initially proposed:

> 3111. A juridical act, <u>whether or not it contains any foreign element</u>, is governed by the law expressly designated in the act or the designation of which may be inferred with certainty from the terms of the act.
>
> A juridical act containing no foreign element remains, nevertheless, subject to the mandatory provisions of the law of the country which would apply if none were designated.
>
> The law of a country may be expressly designated as applicable to the whole or a part only of a juridical act.

What this addition brings to the title on the conflict of laws is to make it possible for the parties to provide that a purely domestic juridical act will be governed by the law of a foreign jurisdiction. However, immediately after recognizing the autonomy of the will of the parties where the designation of the applicable law is concerned, the legislature hastened to limit it in the second paragraph of the provision. Thus, in the absence of a foreign element, a juridical act remains subject to the mandatory rules that would apply if no law were designated. As a result, the designation of the law of a foreign jurisdiction in an act that contains no foreign element is a special circumstance that was cautiously introduced into Quebec private international law and is confined to the rules applicable to the conflict of laws.

36    I should add that the wording of art. 3111 C.C.Q. is based on that of art. 3 of the *Convention on the Law Applicable to Contractual Obligations* (Rome Convention of 1980), which authorizes the "[choice of] a foreign law" where there is no foreign element. It is also conceivable that the determination of the law applicable to a juridical act will at times require a more complex analysis than the one to be made where adjudicative jurisdiction is in issue. Thus, a juridical act, such as a giving of security, that appears to have only domestic connections may in reality be part of an international transaction whose ramifications are not in issue in a given dispute. So there are several possible explanations for the exception provided for in Title Two on the conflict of laws.

37    In the title on the international jurisdiction of Quebec authorities, on the other hand, there is no exception to the foreign element requirement, and it is clear that a court asked to apply the rules of private international law must first determine whether the situation involves a foreign element. This position is consistent with the traditional definition of private international law and with the Office's intention. It must now be asked whether, in the case at bar, the choice of arbitration procedure gives rise to a foreign element warranting the application of art. 3149 C.C.Q. To answer this question, it will be necessary to consider how arbitration has been incorporated into Quebec law.

### *4.3 Arbitration in Quebec*

#### *4.3.1 International Sources*

38    International arbitration law is strongly influenced by two texts drafted under the auspices of the United Nations: the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3 ("New York Convention"), and the *UNCITRAL Model Law on International Commercial Arbitration*, U.N. Doc. A/40/17 (1985) ("Model Law").

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 83 of 243 PageID #: 6240
*Union des consommateurs c. Dell Computer Corp.*, 2007 SCC 34, 2007 CarswellQue...
2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

39     The New York Convention entered into force in 1959. Article II of the Convention provides that a court of a contracting state that is seized of an action in a matter covered by an arbitration clause must refer the parties to arbitration. At present, 142 countries are parties to the Convention. The accession of this many countries is evidence of a broad consensus in favour of the institution of arbitration. Lord Mustill wrote the following about the Convention:

> This Convention has been the most successful international instrument in the field of arbitration, and perhaps could lay claim to be the most effective instance of international legislation in the entire history of commercial law. (M. J. Mustill, "Arbitration: History and Background" (1989), 6 *J. Int'l Arb.* 43, at p. 49)

Canada acceded to the New York Convention on May 12, 1986.

40     The Model Law is another fundamental text in the area of international commercial arbitration. It is a model for legislation that the UN recommends that states take into consideration in order to standardize the rules of international commercial arbitration. The Model Law was drafted in a manner that ensured consistency with the New York Convention: F. Bachand, "Does Article 8 of the Model Law Call for Full or Prima Facie Review of the Arbitral Tribunal's Jurisdiction?" (2006), 22 *Arb. Int'l* 463, at p. 470; S. Kierstead, "Referral to Arbitration under Article 8 of the UNCITRAL Model Law: The Canadian Approach" (1999), 31 *Can. Bus. L.J.* 98, at pp. 100-101.

41     The final text of the Model Law was adopted on June 21, 1985 by the United Nations Commission on International Trade Law ("UNCITRAL"). In its explanatory note on the Model Law, the UNCITRAL Secretariat states that it:

> ...reflects a worldwide consensus on the principles and important issues of international arbitration practice. It is acceptable to States of all regions and the different legal or economic systems of the world. (Explanatory Note by the UNCITRAL secretariat on the Model Law on International Commercial Arbitration, at para. 2)

In 1986, Parliament enacted the *Commercial Arbitration Act*, R.S.C. 1985, c. 17 (2nd Supp.), which was based on the Model Law. The Quebec legislature followed suit that same year and incorporated the Model Law into its legislation. Quebec's Minister of Justice at the time, Herbert Marx, reiterated the above-quoted comment by the UNCITRAL Secretariat: National Assembly, *Journal des débats*, 1st Sess., 33rd Leg., June 16, 1986, at p. 2975, and Oct. 30, 1986, at p. 3672.

*4.3.2 Nature and Scope of the 1986 Amendments to the Civil Code of Lower Canada and the Code of Civil Procedure*

42     In 1986, the *Act to amend the Civil Code and the Code of Civil Procedure in respect of arbitration*, S.Q. 1986, c. 73 ("Bill 91"), which established a scheme for promoting arbitration in Quebec, was tabled in the legislature. Bill 91 added a new title on arbitration agreements to the *Civil Code of Lower Canada*. This title consisted of only six provisions setting out a few general principles relating to the validity and applicability of such agreements. The legislature's decision to place arbitration agreements among the nominate contracts in the *Civil Code of Lower Canada* is significant. After that, there was no longer any reason to regard arbitration agreements as being outside the sphere of the general law; on the contrary, they were now an integral part of it: *Condominiums Mont Ste-Sauveur Inc. c. Constructions Serge Sauvé Ltée*, [1990] R.J.Q. 2783 (C.A. Que.), at p. 2785; J. E. C. Brierley, "Arbitration Agreements: Articles 2638-2643", in *Reform of the Civil Code* (1993), vol. 3B, at p. 1. The provisions added by Bill 91 would be restated without any major changes in the chapter of the *Civil Code of Québec* on arbitration agreements.

43     Bill 91 also had a considerable impact on the *Code of Civil Procedure*. Substantial additions were made to Book VII on arbitrations, which was divided into two titles. Title I is a veritable code of arbitral procedure that regulates every step of an arbitration proceeding subject to Quebec law, from the appointment of the arbitrator to the order of the proceeding to the award and homologation. Most of these rules apply only "where the parties have not made stipulations to the contrary" (art. 940 C.C.P.). Title II sets out a system of rules applicable to the recognition and execution of arbitration awards made outside Quebec.

44     Although Bill 91 was the Quebec legislature's response to Canada's accession to the New York Convention and to UNCITRAL's adoption of the Model Law, it is not identical to those two instruments. As the Quebec Minister of Justice

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 84 of 243 PageID #: 6241

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...
2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

noted, Bill 91 was [TRANSLATION] "inspired" by the Model Law and [TRANSLATION] "implement[ed]" the New York Convention: *Journal des débats*, 1st Sess., 33rd Leg., October 30, 1986, at p. 3672. For this reason, it is important to consider the interplay between Quebec's domestic law and private international law before interpreting the provisions of Bill 91.

45     This Court analysed the interplay between the New York Convention and Bill 91 in *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc., [2005] 2 S.C.R. 401, 2005 SCC 46* (S.C.C.), at paras. 39 *et seq.* After noting that there is a recognized presumption of conformity with international law, the Court mentioned that Bill 91 "incorporate[s] the principles of the *New York Convention*" and concluded that the Convention is a formal source for interpreting the provisions of Quebec law governing the enforcement of arbitration agreements: para. 41. This conclusion is confirmed by art. 948, para. 2 C.C.P., which provides that the interpretation of Title II on the recognition and execution of arbitration awards made outside Quebec (arts. 948 to 951.2 C.C.P.) "shall take into account, where applicable, the [New York] Convention".

46     The same is not true of the Model Law. Unlike an instrument of conventional international law, the Model Law is a non-binding document that the United National General Assembly has recommended that states take into consideration. Thus, Canada has made no commitment to the international community to implement the Model Law as it did in the case of the New York Convention. Nevertheless, art. 940.6 C.C.P. attaches considerable interpretive weight to the Model Law in international arbitration cases:

> 940.6. Where matters of extraprovincial or international trade are at issue in an arbitration, <u>the interpretation</u> of this Title, <u>where applicable, shall take into consideration</u>
>
> > (1) the Model Law on International Commercial Arbitration as adopted by the United Nations Commission on International Trade Law on 21 June 1985;
> >
> > (2) the Report of the United Nations Commission on International Trade Law on the work of its eighteenth session held in Vienna from the third to the twenty-first day of June 1985;
> >
> > (3) the Analytical Commentary on the draft text of a model law on international commercial arbitration contained in the report of the Secretary-General to the eighteenth session of the United Nations Commission on International Trade Law.

47     In short, to quote Professor Brierley, Bill 91 opened Quebec arbitration law to "international thinking" in this area; this international thinking "has become a formal source of Quebec positive law": J. E. C. Brierley, "Quebec's New (1986) Arbitration Law" (1987-88), 13 *Can. Bus. L.J.* 58, at pp. 63 and 68-69.

*4.3.3 Status of Arbitration in Quebec Private International Law*

48     Bill 91 established the legal framework applicable to arbitration. Not all arbitration proceedings are subject to the same rules. First, Title I on arbitration proceedings applies only if the parties have not stipulated that they intend to opt out of it. In addition, the facts of the case must call for application of the *Code of Civil Procedure* either because the foreign parties have chosen it in accordance with a provision authorizing them to do so in a law that would otherwise govern this proceeding or because the circumstances of the proceeding necessitate the application of Quebec law. Second, Title II of Book VII of the *Code of Civil Procedure* contains special provisions on the recognition and execution of arbitration awards made outside Quebec. Third, art. 940.6 C.C.P. provides that Title I on arbitration proceedings is to be interpreted in light, where applicable, of the Model Law and certain documents related to it "[w]here matters of extraprovincial or international trade are at issue in an arbitration". As Professor Marquis notes, the words "mettant en cause des intérêts du commerce" in the French version of art. 940.6 have an [TRANSLATION] "unfamiliar sound in Quebec law": L. Marquis, "Le droit français et le droit québécois de l'arbitrage conventionnel", in H. P. Glenn, ed., *Droit québécois et droit français: communauté, autonomie, concordance* (1993), 447, at p. 483. In fact, they were taken straight from the French *Code of Civil Procedure*:

> 1492. Est international l'arbitrage qui met en cause des intérêts du commerce international [Arbitration is international where matters of international trade are at issue].

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 85 of 243 PageID #: 6242

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

Because the same words are used, Quebec authors agree that art. 940.6 C.C.P. has imported the concept of international arbitration from French law: S. Guillemard, *Le droit international privé face au contrat de vente cyberspatial* (2006), at pp. 73-74; S. Thuilleaux, *L'arbitrage commercial au Québec: Droit interne — Droit international privé* (1991), at p. 129; L. Marquis, "La notion d'arbitrage commercial international en droit québécois" (1991-1992), 37 *McGill L.J.* 448, at pp. 465 and 469.

49      The matter of international trade test is different from connecting factors such as the parties' place of residence or the place where the obligations are performed. Thus, a contractual legal situation may have foreign elements without involving any matters of extraprovincial or international trade; in such a case, although the resulting arbitration will not be considered an international arbitration, it will nonetheless be subject to the rules of private international law. Since the case at bar does not involve international commercial arbitration, this explanation is intended merely to highlight the fact that the test under art. 940.6 C.C.P. is clearly distinct from the foreign element requirement. Where the Quebec legislature intended different rules to apply, it has made this clear.

50      The rules on arbitration proceedings set out in Title I of Book VII of the *Code of Civil Procedure* apply, to the extent provided for, to any arbitration proceeding subject to Quebec law. The parties are free to attribute foreign connections to an arbitration process, in which case the rules of private international law may be applicable. However, an arbitration clause is not in itself a foreign element warranting the application of the rules of Quebec private international law. The commentators are unanimous on this point:

> [TRANSLATION] It is clear that if an arbitration process is considered to be purely internal to Quebec, the law of Quebec will be applied to it. The rules of private international law will not be applicable. It is Quebec's *Code of Civil Procedure* (rules on arbitration) that will be applied. (J. Béguin, *L'arbitrage commercial international* (1987), at p. 67)

See also to the same effect, in respect of comparative law, E. Gaillard and J. Savage, *Fouchard, Gaillard, Goldman on International Commercial Arbitration* (1999), at p. 47.

51      The neutrality of arbitration as an institution is one of the fundamental characteristics of this alternative dispute resolution mechanism. Unlike the foreign element, which suggests a possible connection with a foreign state, arbitration is an institution without a forum and without a geographic basis: Guillemard, at p. 77; Thuilleaux, at p. 145. Arbitration is part of no state's judicial system: *Desputeaux*, at para. 41. The arbitrator has no allegiance or connection to any single country: M. Lehmann, "A Plea for a Transnational Approach to Arbitrability in Arbitral Practice" (2003-2004), 42 *Colum. J. Transnat'l L.* 753, at p. 755. In short, arbitration is a creature that owes its existence to the will of the parties alone: *Laurentienne-vie, cie d'assurance inc. c. Empire, cie d'assurance-vie*, [2000] R.J.Q. 1708 (C.A. Que.), at paras. 13 and 16.

52      To say that the choice of arbitration as a dispute resolution mechanism gives rise to a foreign element would be tantamount to saying that arbitration itself establishes a connection to a given territory, and this would be in outright contradiction to the very essence of the institution of arbitration: its neutrality. This institution is territorially neutral; it contains no foreign element. Furthermore, the parties to an arbitration agreement are free, subject to any mandatory provisions by which they are bound, to choose any place, form and procedures they consider appropriate. They can choose cyberspace and establish their own rules. It was open to the parties in the instant case to refer to the *Code of Civil Procedure*, to base their procedure on a Quebec or U.S. arbitration guide or to choose rules drawn up by a recognized organization, such as the International Chamber of Commerce, the Canadian Commercial Arbitration Centre or the NAF. The choice of procedure does not alter the institution of arbitration in any of these cases. The rules become those of the parties, regardless of where they are taken from.

53      I cannot therefore see how the parties' choice of arbitration can in itself create a foreign element. Such an interpretation would empty the foreign element concept of all meaning. An arbitration that contains no foreign element in the true sense of the word is a domestic arbitration. The rules on the international jurisdiction of Quebec authorities will apply only to an arbitration containing a foreign element, such as where a defendant in a case involving a personal claim is domiciled in another country.

54      It must now be determined whether the facts of the present case contain a foreign element.

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 86 of 243 PageID #: 6243

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

### 4.4 Seeking to Identify a Foreign Element in the Facts of the Case at Bar

55     The trial judge saw a foreign element in the fact that [TRANSLATION] "[t]he NAF is located in the United States" (para. 32). The Court of Appeal rejected this conclusion, and the Union has abandoned this argument. Like other organizations, such as the International Chamber of Commerce and the Canadian Commercial Arbitration Centre, the NAF offers arbitration services. The place where decisions concerning arbitration services are made or where the employees of these organizations work has no impact on the disputes in which their rules are used.

56      Thus, the location of the NAF's head office is not a relevant foreign element for purposes of the application of Quebec private international law. Moreover, Dell having conceded that the arbitration proceeding will take place in Quebec should put an end to the debate regarding the place of arbitration.

57      Another potential foreign element is found in the NAF's Code of Procedure (*National Arbitration Forum Code of Procedure*). Rules 5O and 48B of the NAF Code provide that, unless the parties agree otherwise, arbitrations and arbitration procedures are governed by the U.S. *Federal Arbitration Act*. In Quebec, designation of the applicable law is governed by Title Two of Book Ten of the *Civil Code of Québec* on the conflict of laws. The parties' designation of the applicable law under this title is not ordinarily recognized as a foreign element in the subsequent title on the international jurisdiction of Quebec authorities. In any event, since art. 3111 C.C.Q., which I discussed above, refers to designation of the law applicable to a juridical act containing no foreign element, the designation itself does not produce such an element.

58     The Union raised a final element: the language of the proceedings. According to the NAF Code, English is the language used in NAF proceedings, although the parties may choose another language, in which case the NAF or the arbitrator may order the parties to provide any necessary translation and interpretation services at their own cost (rules 11D and 35G of the NAF Code).

59     In my view, the language argument must fail. Although I agree that the use of a language with which the consumer is not familiar may cause difficulties, neither the French nor the English language can be characterized as a foreign element in Canada.

60      My colleagues Bastarache and LeBel JJ. nonetheless consider it logical to accept that an arbitration clause in itself constitutes a foreign element that can result in application of the provisions on the international jurisdiction of Quebec authorities. Their interpretation has consequences for agreements other than consumer contracts. Thus, it would also be impossible to set up against a Quebec worker *any* undertaking to submit to an arbitrator any future disputes with his or her Quebec employer relating to an individual contract of employment. Furthermore, *any* arbitration agreement concerning damage suffered as a result of exposure to raw materials originating in Quebec would be null (see arts. 3151 and 3129 C.C.Q.), even an agreement between a Quebec supplier and a Quebec producer. This interpretation is hard to accept. It implies that the codifiers failed to achieve their objective of ordering the rules in both Book Ten on private international law and Chapter XVIII on arbitration agreements in Book Five. This is an important point, and it is not strictly confined to the foreign element argument. I will therefore consider it separately.

### 4.5 Ordering of the Rules on Arbitration

61     The chapter on arbitration is found in the important Book Five of the *Civil Code of Québec* on obligations. Book Five is divided into two titles, the first of which concerns obligations in general, while the second concerns nominate contracts. Chapter XVIII is the final chapter of the title on nominate contracts. It incorporates the provisions of Bill 91 enacted in 1986, which I have already discussed. It contains a general provision, art. 2638 C.C.Q., which is based on the recognition that an arbitration agreement is valid and can be set up against a party:

> 2638. An arbitration agreement is a contract by which the parties undertake to submit a present or future dispute to the decision of one or more arbitrators, to the exclusion of the courts.

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 87 of 243 PageID #: 6244

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

In his commentary on this provision, the Minister of Justice stated that the essential purpose of the arbitration agreement is [TRANSLATION] "to displace judicial intervention" and that "by conferring jurisdiction on arbitrators, [one] ousts the usual jurisdiction of the judiciary": *Commentaires du ministre de la Justice*, vol. II, at p. 1649.

62     Chapter XVIII also contains a provision that enumerates the cases in which the jurisdiction of the Quebec courts cannot be ousted by the parties. This provision reads as follows:

> 2639. Disputes over the status and capacity of persons, family matters or other matters of public order may not be submitted to arbitration.

> An arbitration agreement may not be opposed on the ground that the rules applicable to settlement of the dispute are in the nature of rules of public order.

63     Thus, the codifiers laid down, for disputes containing no foreign element, specific rules dealing, on the one hand, with the effect of the arbitration agreement and, on the other, with cases in which arbitration is not available under domestic law. They therefore considered what matters should be arbitrable. Where disputes not involving private international law issues are concerned, these matters are set out in the provisions governing arbitration. Article 3148, para. 2 C.C.Q. does not simply restate the text of art. 2638 C.C.Q. Rather, it lays down the same rule as it applies to an arbitration agreement containing a foreign element. To give arts. 3149 and 3151 C.C.Q. general application, it would be necessary to infer that the codifiers were inconsistent in not including, in the chapter on arbitration, the exceptions relating to consumer contracts, contracts of employment and claims regarding exposure to raw materials.

64     Furthermore, to view art. 3149 C.C.Q. as being limited to private international law is consistent with the legislature's objective. This provision is one of the new measures the legislature inserted into the title on the international jurisdiction of Quebec authorities to protect certain more vulnerable groups: *Commentaires du ministre de la Justice*, vol. II, at p. 2011. Article 3149 C.C.Q. refers to two of these groups, Quebec consumers and workers, who cannot waive the jurisdiction of a Quebec authority. I agree with the following comment by Beauregard J.A. of the Quebec Court of Appeal in *Dominion Bridge* with regard to the legislature's general objective in enacting art. 3149 C.C.Q.:

> [TRANSLATION] In my view, it is clear that the legislature intended to ensure that employees could not be required to go abroad to assert rights under a contract of employment. [p. 325]

Thus, the reason why an arbitration clause cannot be set up against a consumer under the title on the international jurisdiction of Quebec authorities is clearly to protect a consumer in a situation with a foreign element.

65     In enacting art. 3149 C.C.Q., the legislature could not have intended to take an obscure approach requiring a decontextualized reading of the title on the international jurisdiction of Quebec authorities. The interpretation of art. 3149 C.C.Q. must be consistent with the legislature's objective of protecting vulnerable groups and must be harmonized not only with the title on the international jurisdiction of Quebec authorities, but also with the entire book of the C.C.Q. on private international law and Chapter XVIII on arbitration (in Title Two of Book Five), and with Book VII of the *Code of Civil Procedure* on arbitration. This brings out the internal consistency of these rules, which interact harmoniously and without redundancy. The general provisions on arbitration are grouped together in the books, titles and chapters of the *Civil Code of Québec* and the *Code of Civil Procedure*, and specific exceptions are set out in these provisions. It would not be appropriate to shatter the consistency of the rules on arbitration and those on the international jurisdiction of Quebec authorities by placing all disputes concerning an arbitrator's jurisdiction within the scope of the rules on the jurisdiction of Quebec authorities regardless of whether there is a foreign element.

### *4.6 Conclusion on the Application of Article 3149 C.C.Q.*

66     The legal experts who worked on the reform of the Civil Code, the Minister of Justice who was in office at the time of the enactment of the *Civil Code of Québec*, and many Canadian and foreign authors recognized that a foreign element was a

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

prerequisite for applying the rules on the international jurisdiction of Quebec authorities. The ordering effected in a codification process and the rule that a provision must be interpreted in light of its context require an interpretation of art. 3149 C.C.Q. that limits it to cases with a foreign element.

67    I will now discuss the other issues before this Court. They concern the degree of scrutiny of an arbitration clause by the Superior Court, and the validity and applicability of the arbitration clause.

### 5. Degree of Scrutiny of an Arbitration Clause by the Superior Court in Considering a Referral Application

68    The objective of this part is to determine whether it is the arbitrator or a court that should rule first on the parties' arguments on the validity or applicability of an arbitration agreement. I will accordingly consider the limits of intervention by the courts in cases involving arbitration agreements.

### *5.1 Competence of Arbitrators to Rule on Their Own Jurisdiction in International Law*

69    There are two opposing schools of thought in the debate over the degree of judicial scrutiny of an arbitrator's jurisdiction under an arbitration agreement. Under one, it is the court that must rule first on the arbitrator's jurisdiction; this view is based on a concern to avoid a duplication of proceedings. Since the court has the power to review the arbitrator's decision regarding his or her jurisdiction, why should the arbitrator be allowed to make an initial ruling on this issue? According to this view, it would be preferable to have the court settle any challenge to the arbitrator's jurisdiction immediately. This first school of thought thus favours an interventionist judicial approach to questions relating to the jurisdiction of arbitrators.

70    The other school of thought gives precedence to the arbitration process. It is concerned with preventing delaying tactics and is associated with the principle commonly known as the "competence-competence" principle. According to it, arbitrators should be allowed to exercise their power to rule first on their own jurisdiction (Gaillard and Savage, at p. 401).

71    The New York Convention does not expressly require the adoption of either of these schools of thought. Article II(3) reads as follows:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, <u>shall</u>, at the request of one of the parties, <u>refer</u> the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

72    According to some authors, this provision means that referral is the general rule: Gaillard and Savage, at pp. 402-4; F. Bachand, *L'intervention du juge canadien avant et durant un arbitrage commercial international* (2005), at pp. 178-79 and 183. Its wording indicates that the court must not rule on the arbitrator's jurisdiction unless the clause is clearly null and void, inoperative or incapable of being performed.

73    The fact that art. II(3) of the New York Convention provides that the court can rule on whether an agreement is null and void, inoperative or incapable of being performed does not mean that it is required to do so before the arbitrator does, however.

74    The Model Law, which, as I mentioned above, was drafted consistently with the New York Convention, is clearer. First of all, the wording of art. 8(1) of the Model Law is almost identical to that of art. II(3) of the New York Convention. What is more, art. 16 of the Model Law expressly recognizes the competence-competence principle. It reads as follows:

### Article 16. Competence of arbitral tribunal to rule on its jurisdiction

> (1) The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail *ispo jure* the invalidity of the arbitration clause.

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 89 of 243 PageID #: 6246

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

(2) A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than the submission of the statement of defence. A party is not precluded from raising such a plea by the fact that he has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

(3) The arbitral tribunal may rule on a plea referred to in paragraph (2) of this article either as a preliminary question or in an award on the merits. If the arbitral tribunal rules as a preliminary question that it has jurisdiction, any party may request, within thirty days after having received notice of that ruling, the court specified in article 6 to decide the matter, which decision shall be subject to no appeal; while such a request is pending, the arbitral tribunal may continue the arbitral proceedings and make an award.

75    Some authors argue that the competence-competence principle requires the court to limit itself to a *prima facie* analysis of the application and to refer the parties to arbitration unless the arbitration agreement is manifestly tainted by a defect rendering it invalid or inapplicable: F. Bachand, "Does Article 8 of the Model Law Call for Full or Prima Facie Review of the Arbitral Tribunal's Jurisdiction?" According to Professor Bachand, this interpretation is confirmed by the legislative history of the Model Law. This approach has also been adopted in a number of countries; France, for example, has formally incorporated the approach in art. 1458 of its Code of Civil Procedure (*Code de procédure civile*). The *prima facie* test has also been adopted in Switzerland by way of judicial interpretation: decision of the 1st Civil Court dated April 29, 1996 in *Fondation M. v. Banque X*, BGE 122 III 139 (1996), cited by Gaillard and Savage, at p. 409.

76    The manifest nullity test is a fairly strict one:

[TRANSLATION] The nullity of an arbitration agreement will be manifest if it is incontestable.... As soon as a serious debate arises about the validity of the arbitration agreement, only the arbitrator can validly conduct the review.... An apparently valid arbitration clause will never be considered to be manifestly null. (É. Loquin, "Compétence arbitrale", in *Juris-classeurs*, *Procédure civile*, fasc. 1034, "Arbitrage" (1994), No. 105)

77    Despite the lack of consensus in the international community, the *prima facie* analysis test is gaining acceptance and has the support of many authors: Gaillard and Savage, at pp. 407-13; Bachand, "Does Article 8 of the Model Law Call for Full or Prima Facie Review of the Arbitral Tribunal's Jurisdiction?" This test is indicative of a deferential approach to the jurisdiction of arbitrators.

78    Having completed this review of international law, I will now consider the state of Quebec law on this issue.

### *5.2 Quebec Test for Judicial Intervention in a Case Involving an Arbitration Agreement*

79    The legal framework governing referral to arbitration is set out in the *Code of Civil Procedure*. The relevant provisions read as follows:

940.1 Where an action is brought regarding a dispute in a matter on which the parties have an arbitration agreement, the court shall refer them to arbitration on the application of either of them unless the case has been inscribed on the roll or it finds the agreement null.

The arbitration proceedings may nevertheless be commenced or pursued and an award made at any time while the case is pending before the court.

943. The arbitrators may decide the matter of their own competence.

943.1 If the arbitrators declare themselves competent during the arbitration proceedings, a party may within thirty days of being notified thereof apply to the court for a decision on that matter.

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 90 of 243 PageID #: 6247

*Union des consommateurs c. Dell Computer Corp.*, 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

While such a case is pending, the arbitrators may pursue the arbitration proceedings and make their award.

943.2 A decision of the court during the arbitration proceedings recognizing the competence of the arbitrators is final and without appeal.

80    It should be noted from the outset that art. 940.1 C.C.P. incorporates the essence of art. II(3) of the New York Convention and of its counterpart in the Model Law, art. 8. Furthermore, art. 943 C.C.P. confers on arbitrators the competence to rule on their own jurisdiction. This article clearly indicates acceptance of the competence-competence principle incorporated into art. 16 of the Model Law.

81    A review of the case law on arbitration reveals that Quebec courts have often accepted or refused to give effect to arbitration clauses without reflecting on the degree of scrutiny required of them: *C.C.I.C. Consultech International c. Silverman*, [1991] R.D.J. 500 (C.A. Que.); *Banque nationale du Canada c. Premdev Inc.*, [1997] A.Q. No. 689 (C.A. Que.); *Tremblay c. Acier Leroux inc.*, [2004] R.J.Q. 839 (C.A. Que.); *Blais & Langlois inc. c. Construction de la source inc.*, 2006 QCCA 461 (C.A. Que.); *Compagnie nationale algérienne de navigation c. Pegasus Lines Ltd. S.A.*, [1994] A.Q. No. 329 (C.A. Que.). However, it can be seen that where the analysis of a clause requires an assessment of contradictory factual evidence, Quebec courts can be reluctant to engage in a review on the merits. For example, in *Kingsway Financial Services Inc. c. 118997 Canada inc.* (C.A. Que.), the buyer sued the seller on the basis of error induced by fraud. The court hearing the case had to decide whether the seller had made false representations to the buyer. The Court of Appeal simply referred the case to arbitration.

82    One author suggests that Quebec courts are more deferential as regards the jurisdiction of arbitrators when hearing cases that simply concern the applicability of an arbitration clause, whereas if it is the validity of the same clause that is an issue, the rule they seem to observe is to dispose of the issue immediately: F. Bachand, *L'intervention du juge canadien avant et durant un arbitrage commercial international* (2005), at pp. 190-91. Although I agree that a distinction can be made between a case concerning validity and one concerning applicability, it cannot be said that the Quebec courts have uniformly used or identified this distinction as a criterion for intervening. Nor has it been adopted in the rest of Canada, where the *prima facie* analysis has also been extended to cases concerning the applicability of an arbitration clause: *Gulf Canada Resources Ltd./Ressources Gulf Canada Ltée v. Arochem International Ltd.* (1992), 66 B.C.L.R. (2d) 113 (B.C. C.A.); *Dalimpex Ltd. v. Janicki* (2003), 228 D.L.R. (4th) 179 (Ont. C.A.). I therefore consider it necessary to pursue the analysis beyond this distinction.

83    Article 940.1 C.C.P. refers only to cases where the arbitration agreement is null. However, since this provision was adopted in the context of the implementation of the New York Convention (the words of which, in art. II(3), are "null and void, inoperative or incapable of being performed"), I do not consider a literal interpretation to be appropriate. It is possible to develop, in a manner consistent with the empirical data from the Quebec case law, a test for reviewing an application to refer a dispute to arbitration that is faithful to art. 943 C.C.P. and to the *prima facie* analysis test that is increasingly gaining acceptance around the world.

84    First of all, I would lay down a general rule that in any case involving an arbitration clause, a challenge to the arbitrator's jurisdiction must be resolved first by the arbitrator. A court should depart from the rule of systematic referral to arbitration only if the challenge to the arbitrator's jurisdiction is based solely on a question of law. This exception is justified by the courts' expertise in resolving such questions, by the fact that the court is the forum to which the parties apply first when requesting referral and by the rule that an arbitrator's decision regarding his or her jurisdiction can be reviewed by a court. It allows a legal argument relating to the arbitrator's jurisdiction to be resolved once and for all, and also allows the parties to avoid duplication of a strictly legal debate. In addition, the danger that a party will obstruct the process by manipulating procedural rules will be reduced, since the court must not, in ruling on the arbitrator's jurisdiction, consider the facts leading to the application of the arbitration clause.

85    If the challenge requires the production and review of factual evidence, the court should normally refer the case to arbitration, as arbitrators have, for this purpose, the same resources and expertise as courts. Where questions of mixed law and fact are concerned, the court hearing the referral application must refer the case to arbitration unless the questions of fact require only superficial consideration of the documentary evidence in the record.

Case 1:20-cv-00613-SB  Document 204-1  Filed 07/29/22  Page 91 of 243 PageID #: 6248

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

86    Before departing from the general rule of referral, the court must be satisfied that the challenge to the arbitrator's jurisdiction is not a delaying tactic and that it will not unduly impair the conduct of the arbitration proceeding. This means that even when considering one of the exceptions, the court might decide that to allow the arbitrator to rule first on his or her competence would be best for the arbitration process.

87    Thus, the general rule of the Quebec test is consistent with the competence-competence principle set out in art. 16 of the Model Law, which has been incorporated into art. 943 C.C.P. As for the exception under which a court may rule first on questions of law relating to the arbitrator's jurisdiction, this power is provided for in art. 940.1 C.C.P., which in fact recognizes that a court can itself find that the agreement is null rather than referring this issue to arbitration.

88    In the case at bar, the parties have raised questions of law relating to the application of the provisions on Quebec private international law and to whether the class action is of public order. There are a number of other arguments, however, that require an analysis of the facts in order to apply the law to this case. This is true of the attempt to identify a foreign element in the circumstances of the case. Likewise, the external nature of the arbitration clause requires not only an interpretation of the law, but also a review of the documentary and testimonial evidence introduced by the parties. According to the test discussed above, the matter should have been referred to arbitration.

89    Considering the status of the case, it would be counterproductive for this Court to refer it to arbitration, thereby exposing the parties to a new round of proceedings. It would therefore be preferable to deal with all the questions here. I have already discussed the application of art. 3149 C.C.Q. and the question of the foreign element. I will now consider the external clause issue.

### 6. External Nature of the Arbitration Clause

90    In 1994, the legislature introduced arts. 1435 to 1437 C.C.Q. — which lay down special rules on the validity of certain clauses typically found in contracts of adhesion or consumer contracts — into the law of contractual obligations. Although all these rules share a general purpose of protecting the weakest and most vulnerable contracting parties, they concern different types of clauses (external, illegible, incomprehensible and abusive) and are accordingly aimed at different types of abuse. For example, whereas the notion of the external clause (art. 1435 C.C.Q.) traditionally concerns contract clauses that are physically separate from the main document, that of the illegible clause (art. 1436 C.C.Q.) concerns clauses that are not separate from the main document but are, owing to their physical presentation, illegible for a reasonable person. Thus, a clause that is [TRANSLATION] "buried among a large number of other clauses" because of its location in the contract is characterized as illegible: D. Lluelles and B. Moore, *Droit des obligations* (2006), at p. 897; B. Lefebvre, "Le contrat d'adhésion" (2003), 105 *R. du N.* 439, at p. 479. An incomprehensible clause (art. 1436 C.C.Q.) is one that is drafted so poorly that its content is unintelligible or excessively ambiguous.

91    In the case at bar, the Union argues that, pursuant to art. 1435 C.C.Q., the arbitration clause is null because it is an external clause and because it has not been proven that Mr. Dumoulin knew of its existence. Article 1435 reads as follows:

> 1435. An external clause referred to in a contract is binding on the parties.

> In a consumer contract or a contract of adhesion, however, an external clause is null if, at the time of formation of the contract, it was not expressly brought to the attention of the consumer or adhering party, unless the other party proves that the consumer or adhering party otherwise knew of it.

92    This provision begins with a recognition that an external clause referred to in a contract is valid. However, its purpose is to remedy abuses resulting from the inclusion by reference of clauses that one of the parties is unaware of: Civil Code Revision Office, vol. II, t. 2, at pp. 601-2; *Commentaires du ministre de la Justice*, vol. I, at pp. 870-71. A party wishing to apply a clause that is external to a consumer contract or a contract of adhesion must prove that it was expressly brought to the attention of the consumer or adhering party, or that the consumer or adhering party otherwise knew of it.

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 92 of 243 PageID #: 6249

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

93     In the absence of a statutory definition, the authors have undertaken to define the external clause concept. An external clause is a contractual stipulation [TRANSLATION] "set out in a document that is separate from the agreement or instrument but that, according to a clause of this agreement, is deemed to be an integral part of it": *Baudouin et Jobin*: *Les obligations* (6th ed. 2005), at p. 267. A clause is external if it is physically separate from the contract: Lluelles and Moore, at p. 748. A clause found on the back of a contract or in a schedule at the end of it is not an external clause, because it is an integral part of the contract; art. 1435 C.C.Q. does not apply to such a clause.

94     The case at bar is the first in which the Quebec Court of Appeal has had to consider whether a contract clause that can be accessed by means of a hyperlink in a contract entered into via the Internet can be considered to be an external clause. Previous disputes concerning the external nature of contractual stipulations have concerned paper documents.

95     Some aspects of electronic documents are covered by the law. In light of the growing number of juridical acts entered into via the Internet, the Quebec legislature has intervened and laid down rules relating to this new environment. Thus, the *Act to establish a legal framework for information technology*, R.S.Q., c. C-1.1, provides that documents have the same legal value whether they are paper or technology-based documents (s. 5). A contract may therefore be entered into using either an electronic medium — by, for example, filling out a form on a Web page - or paper: V. Gautrais, *Know your law: Guide respecting the management of technology-based documents* (2005), at p. 23.

96     Despite the efforts to harmonize the rules via legislation, there are legal rules that are not always easy to apply in the context of the Internet. This is true, for example, in the case of external clauses, since the traditional test of physical separation cannot be transposed without qualification to the context of electronic commerce.

97     A Web page may contain many links, each of which leads in turn to a new Web page that may itself contain many more links, and so on. Obviously, it cannot be argued that all these different but interlinked pages constitute a single document, or that the entire Web, as it scrolls down a user's screen, is just one document. However, it is difficult to accept that the need for a single command by the user would be sufficient for a finding that the provision governing external clauses is applicable. Such an interpretation would be inconsistent with the reality of the Internet environment, where no real distinction is made between scrolling through a document and using a hyperlink. Analogously to paper documents, some Web documents contain several pages that can be accessed only by means of hyperlinks, whereas others can be viewed by scrolling down them on the computer's screen. There is no reason to favour one configuration over the other. To determine whether clauses on the Internet are external clauses, therefore, it is necessary to consider another rule that, although not expressly mentioned in art. 1435 C.C.Q., is implied by it.

98     Thus, a number of authors have stressed that, for an external clause to be binding on the parties, it must be reasonably accessible: Lluelles and Moore, at p. 753; *Baudouin et Jobin: Les obligations*, at p. 268. A contracting party cannot argue that a contract clause is binding unless the other party had a reasonable opportunity to read it. For this, the other party must have had access to it. Where a contract has been negotiated and all its terms and conditions are set out in the contract itself, the problem of accessibility does not arise, since all the clauses are part of a single document. Where the contract refers to an external document, however, accessibility is an implied precondition for setting up the clause against the other party.

99     The implied precondition of accessibility is a useful tool for the analysis of an electronic document. Thus, a clause that requires operations of such complexity that its text is not reasonably accessible cannot be regarded as an integral part of the contract. Likewise, a clause contained in a document on the Internet to which a contract on the Internet refers, but for which no hyperlink is provided, will be an external clause. Access to the clause in electronic format should be no more difficult than access to its equivalent on paper. This proposition flows both from the interpretation of art. 1435 C.C.Q. and from the principle of functional equivalence that underlies the *Act to establish a legal framework for information technology*.

100     The evidence in the record shows that the consumer could access the page of Dell's Web site containing the arbitration clause directly by clicking on the highlighted hyperlink entitled "Terms and Conditions of Sale". This link reappeared on every page the consumer accessed. When the consumer clicked on the link, a page containing the terms and conditions of sale,

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 93 of 243 PageID #: 6250

*Union des consommateurs c. Dell Computer Corp.*, 2007 SCC 34, 2007 CarswellQue...
2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

including the arbitration clause, appeared on the screen. From this point of view, the clause was no more difficult for the consumer to access than would have been the case had he or she been given a paper copy of the entire contract on which the terms and conditions of sale appeared on the back of the first page.

101    In my view, the consumer's access to the arbitration clause was not impeded by the configuration of the clause; to read it, he or she needed only to click once on the hyperlink to the terms and conditions of sale. The clause is therefore not an external one within the meaning of the *Civil Code of Québec*.

102    The Union submits that the NAF Code, too, is an external document and cannot be set up against Mr. Dumoulin, the consumer in the instant case. According to the Union, the hyperlink merely led to the home page of the NAF's Web site, and to access the NAF Code, consumers had to pursue their searches beyond the home page. At first glance, the need to pursue a search beyond the home page seems to me to be insufficient to support a finding that the NAF Code is an external document. Without further evidence regarding access problems, I find that the argument must be rejected. Furthermore, even if the NAF Code were an external document, this argument would not be sufficient to decide the issue of the arbitrator's jurisdiction. If the NAF Code were in fact an external clause and therefore null pursuant to art. 1435 C.C.Q., that would not affect the validity of the arbitration clause. The arbitration procedure would then simply be governed by the C.C.P.

103    In concluding, I would like to point out, relying only on the facts in the record and having heard no specific arguments on the issue of an illegible or incomprehensible arbitration clause, that I would have reached the same conclusion even if the Union had also argued that the clause was illegible or incomprehensible within the meaning of art. 1436 C.C.Q. As was mentioned above, the highlighted hyperlink appeared on every page the consumer accessed, and no evidence was adduced that could lead to the conclusion that the text was difficult to find in the document, or that it was hard to read or to understand.

104    I would also note that in this Court, the Union argued generally that the arbitration clause was abusive. This argument is based on the prohibition under art. 1437 C.C.Q. However, since no submissions were made in support of this allegation, I will simply find that the Union has not demonstrated its merits.

### 7. Availability of the Class Action Where There is an Arbitration Clause

105    As a separate ground in support of the argument that the arbitration clause cannot be set up against Mr. Dumoulin's motion, the Union relies on art. 2639 C.C.Q. and submits that because this is a class action, the dispute is of public order and therefore cannot be submitted to arbitration. Thus, Dell is not entitled to request that the dispute be referred to arbitration, and the class action must be heard on the merits. In my opinion, the Union's argument must be rejected. The class action is a procedure, and its purpose is not to create a new right.

106    The procedural framework for the class action was added to the *Code of Civil Procedure* in 1979. It is accepted that the class action has a social dimension: "Its purpose is to facilitate access to justice for citizens who share common problems and would otherwise have little incentive to apply to the courts on an individual basis to assert their rights" (*Bisaillon c. Concordia University*, [2006] 1 S.C.R. 666, 2006 SCC 19 (S.C.C.), at para. 16) or might lack the financial means to do so. From this perspective, the class action is clearly of public interest. However, the first introductory provision of Book IX of the *Code of Civil Procedure* — Class Action — reminds us that, as important as it may be, the class action is only a legal procedure:

    999. ...

        (d) "class action" means the procedure which enables one member to sue without a mandate on behalf of all the members.

                                    . . . . .

107    This position was already accepted at the time Book IX was enacted:

    [TRANSLATION] The class action is not a right (*jus*); it is a procedure. It is not, in itself, even a means to exercise a right, a remedy in the sense of the maxim *ubi jus, ibi remedium*. It is merely a special mechanism that is applied to an

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 94 of 243 PageID #: 6251

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

existing means to exercise an existing right in order to "collectivize" it. (M. Bouchard, "L'autorisation d'exercer le recours collectif" (1980), 21 *C. de D.* 855, at p. 864)

The notion that the class action procedure does not create new rights has been reiterated on numerous occasions, including recently by this Court in *Bisaillon*, at paras. 17 and 22.

108     In the case at bar, the parties agreed to submit their disputes to binding arbitration. The effect of an arbitration agreement is recognized in Quebec law: art. 2638 C.C.Q. Obviously, if Mr. Dumoulin had brought the same action solely as an individual, the Union's argument based on the class action being of public order could not have been advanced to prevent the court hearing the action from referring the parties to arbitration. Does the mere fact that Mr. Dumoulin instead decided to bring the matter before the courts by instituting a class action affect the admissibility of his action? In light of the reasons of LeBel J., writing for the majority in *Bisaillon*, at para. 17, the answer is no: "[the class action] cannot serve as a basis for legal proceedings if the various claims it covers, taken individually, would not do so".

109     Moreover, the Union's argument that the class action is a matter of public order that may not be submitted to arbitration has lost its force as a result of this Court's decision in *Desputeaux*. In that case, one of the parties had invoked the same provision, art. 2639 C.C.Q., to argue that the dispute over ownership of the copyright in a fictitious character, Caillou, was a question of public order that could not be submitted to arbitration. The Court held that the concept of public order referred to in art. 2639 C.C.Q. must be interpreted narrowly and is limited to matters analogous to those enumerated in that provision: paras. 53-55. In the case at bar, neither Mr. Dumoulin's hypothetical individual action nor the class action is a dispute over the status and capacity of persons, family law matters or analogous matters.

110     Consequently, the Union's argument relating to the public order nature of the class action must fail. I must now rule on the application of Bill 48, which came into force after this appeal was heard.

### 8. Application of the Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts

111     Bill 48 was enacted on December 14, 2006. It introduces a number of measures, only one of which is relevant to the case at bar: the addition to the *Consumer Protection Act* of a provision on arbitration clauses. This provision reads as follows:

> 2. The Act is amended by inserting the following section after section 11:

>> 11.1. Any stipulation that obliges the consumer to refer a dispute to arbitration, that restricts the consumer's right to go before a court, in particular by prohibiting the consumer from bringing a class action, or that deprives the consumer of the right to be a member of a group bringing a class action is prohibited.

>> If a dispute arises after a contract has been entered into, the consumer may then agree to refer the dispute to arbitration.

The question that arises is whether this new provision applies to the facts of the instant case.

112     Pursuant to s. 18 of Bill 48, s. 2 came into force on December 14, 2006. Section 18 reads as follows:

> 18. The provisions of this Act come into force on 14 December 2006, except section 1, which comes into force on 1 April 2007, and sections 3, 5, 9 and 10, which come into force on the date or dates to be set by the Government, but not later than 15 December 2007.

Bill 48 has only one transitional provision, s. 17, which provides that the new ss. 54.8 to 54.16 of the *Consumer Protection Act* do not apply to contracts entered into before the coming into force of the Bill. The instant case is not one in which s. 17 is applicable. However, if ss. 17 and 18 are read together, it would seem at first glance that, aside from the provisions referred to in s. 17, Bill 48 applies to contracts entered into before its coming into force. Is this true? And is Bill 48 applicable in the case at bar?

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 95 of 243 PageID #: 6252

*Union des consommateurs c. Dell Computer Corp.*, 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

113      Professor P.-A. Côté writes in *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 169, that "retroactive operation of a statute is highly exceptional, whereas prospective operation is the rule". He adds that "[a] statute has immediate effect when it applies to a legal situation that is ongoing at the moment of its commencement: the new statute governs the future developments of this situation" (p. 152). A legal situation is ongoing if the facts or effects are occurring at the time the law is being modified (p. 153). A statute of immediate effect can therefore modify the future effects of a fact that occurred before the statute came into force without affecting the prior legal situation of that fact.

114      To make it clear what is meant by an ongoing situation and one whose facts and effects have occurred in their entirety, it will be helpful to consider the example of the obligation to warrant against latent defects cited by professors P.-A. Côté and D. Jutras in *Le droit transitoire civil: Sources annotées* (loose-leaf ed.), at p. 2-36. This obligation comes into existence upon the conclusion of the sale, but the warranty clause does not produce tangible effects unless a problem arises with the property sold. The warranty comes into play either when the vendor is put in default or when a claim is made. Once all the effects of the warranty have occurred, the situation is no longer ongoing and the new legislation will not apply to the situation unless it is retroactive.

115      Can the facts of the case at bar be characterized as those of an ongoing legal situation? If they can, the new legislation applies. If all the effects of the situation have occurred, the new legislation will not apply to the facts.

116      The only condition for application of Dell's arbitration clause is that a claim against Dell, or a dispute or controversy between the customer and Dell, must arise (s. 13(C) of the Terms and Conditions of Sale). All the facts of the legal situation had therefore occurred once Mr. Dumoulin notified Dell of his claim. Thus, all the facts giving rise to the application of the binding arbitration clause had occurred in their entirety before Bill 48 came into force.

117      Since there is nothing in Bill 48 that might lead to the conclusion that it applies retroactively, there is no reason to give it such a scope.

118      Moreover, to interpret Bill 48 as having retroactive effect would be problematic. First, retroactive operation is exceptional: Côté, at pp. 114-15; R. Sullivan, *Sullivan and Driedger on the Construction of Statutes* (4th ed. 2002), at pp. 553-54. Where a law is ambiguous and admits of two possible interpretations, an interpretation according to which it does not have retroactive effect will be preferred: *Ford c. Québec (Procureur général)*, [1988] 2 S.C.R. 712 (S.C.C.), at pp. 742-45.

119      Second, I find it highly unlikely that the legislature intended that s. 2 should apply to *all* arbitration clauses in force before December 14, 2006. For example, neither a consumer who is a party to an arbitration that is under way nor a consumer whose claims have already been rejected by an arbitrator should be able to rely on s. 2 and argue that the arbitration clause binding him or her and the merchant is invalid in order to request a stay of proceedings or to have the unfavourable arbitration award set aside. Failing a clear indication to the contrary, when a dispute is submitted for a decision, the decision maker must apply the law as it stands at the time the facts giving rise to the right occurred.

120      I accordingly conclude that since the facts triggering the application of the arbitration clause had already occurred before s. 2 of Bill 48 came into force, this provision does not apply to the facts of the case at bar.

## 9. Disposition

121      For these reasons, I would allow the appeal, reverse the Court of Appeal's judgment, refer Mr. Dumoulin's claim to arbitration and dismiss the motion for authorization to institute a class action, with costs.

***Bastarache, LeBel JJ.*** **(dissenting):**

## I. Introduction

122      In this appeal, our Court must decide whether an arbitration clause in an Internet consumer contract bars access to a class action procedure in the province of Quebec. For the reasons which follow, we hold that the clause at issue is of no

Case 1:20-cv-00613-SB    Document 204-1    Filed 07/29/22    Page 96 of 243 PageID #: 6253

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

effect and cannot be set up against the consumer who seeks the authorization to initiate a class action. As a result, we would dismiss the appeal.

## II. Background

123     Over the weekend between April 4, 2003 and April 7, 2003, Dell showed some erroneous prices on one page of its website, the "shopping page" for its Axim X5 line of handheld computers. On this specific page, the Axim X5 300 mhz and 400 mhz were announced at a price of $89 and $118 respectively. It appears that the actual pricing should have read $379 and $549 respectively and that the error was due to a technical problem with one of Dell's database systems.

124     The error was discovered by Dell on Saturday, April 5th. Dell immediately tried to correct it by erecting an electronic barrier to block access to the faulty page through the generally publicized homepage *www.Dell.ca*. However, Dell overlooked the fact that it was still possible to access the blocked page through a "deep-link", a direct hyperlink that permits web users to have access to a particular page without having to go through the website's homepage. It appears that many people were able to access the faulty page through this means and that an unusually high number of Axim X5 handheld computers were ordered at the erroneous prices over the weekend. The respondent Dumoulin is one of the persons who placed an order in this way, having ordered, on April 7th, an Axim X5 300 mhz at the erroneous price of $89 after having accessed the shopping page of the Axim X5 handheld computers through its deep-link.

125     On Monday, April 7th, at 9:30 a.m., the technical problem with the shopping page was fixed and access through the homepage was re-established at 2:30 p.m. Later that day, Dell published a correction notice on its website informing customers of the pricing error and of the fact that all orders for the Axim X5 handheld computers with incorrect pricing would not be processed.

126     The following day, Dumoulin received an e-mail informing him of the pricing error and also that his order would not be processed. He answered by putting Dell on notice to honour its advertised sale price. His request having been denied, Union des consommateurs, on behalf of Dumoulin, decided to file a motion in the Superior Court to be authorized to institute a class action.

127     Dell contested the motion by raising a declinatory exception to the Quebec Superior Court's jurisdiction based on the fact that the terms and conditions of the sale contained the following arbitration agreement:

> **Arbitration**. ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE, WHETHER PREEXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, COMMON LAW, INTENTIONAL TORT AND EQUITABLE CLAIMS CAPABLE IN LAW OF BEING SUBMITTED TO BINDING ARBITRATION) AGAINST DELL, its agents, employees, officers, directors, successors, assigns or affiliates (collectively for purposes of this paragraph, "Dell") arising from or relating to this Agreement, its interpretation, or the breach, termination or validity thereof, the relationships between the parties, whether pre-existing, present or future, (including, to the full extent permitted by applicable law, relationships with third parties who are not signatories to this Agreement), Dell's advertising, or any related purchase SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM ("NAF") under its Code of Procedure and any specific procedures for the resolution of small claims and/or consumer disputes then in effect (available via the Internet at http://www.arb-forum.com/, or via telephone at 1-800-474-2371). The arbitration will be limited solely to the dispute or controversy between Customer and Dell. Any award of the arbitrator(s) shall be final and binding on each of the parties, and may be entered as a judgment in any court of competent jurisdiction. Information may be obtained and claims may be filed with the NAF at P.O. Box 50191, Minneapolis, MN 55405, or by e-mail at file@arb-forum.com, or by online filing at http://www.arb-forum.com/. (Appellant's record, vol. III, at p. 384, *Dell's Online Policies*, Terms and Conditions of Sale (Canada), clauses 13(c))

Dell argued that on account of this clause, Dumoulin's dispute had to be submitted to compulsory arbitration.

## III. Judicial History

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

128      The Superior Court dismissed the declinatory exception (J.E. 2004-457, [2004] J.Q. No. 155 (C.S. Que.)). Langlois J. found that the arbitration agreement provided for an arbitration administered by the National Arbitration Forum ("NAF"), a U.S. based institute governed by American law, and that the agreement purported to derogate from art. 3149 of the *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*") which provides that the waiver of the jurisdiction of Quebec authorities cannot be set up against a consumer. In reaching this decision, Langlois J. followed an earlier decision of the Court of Appeal in *Dominion Bridge Corp. c. Knai* (1997), [1998] R.J.Q. 321 (C.A. Que.), where it was held that an agreement to arbitrate an employment dispute in a foreign jurisdiction could not be set up against the worker under art. 3149 *C.C.Q.*

129      The Quebec Court of Appeal dismissed the appeal, but on different grounds ([2005] R.J.Q. 1448, 2005 QCCA 570 (C.A. Que.)). Writing for a unanimous bench, Lemelin J. (*ad hoc*) overturned Langlois J. on the basis that, pursuant to Rule 32A of the *National Arbitration Forum Code of Procedure* ("*NAF Code*"), the seat of the arbitration could have been located in Quebec and that the factual situation was on that basis distinguishable from the one in *Dominion Bridge*. However, Lemelin J. did conclude that the arbitration agreement was null on another basis. Having found that the "Terms and Conditions of Sale" in which the agreement was included was itself an external clause pursuant to art. 1435 *C.C.Q.*, she further found that the arbitration agreement and its rules of procedure were not expressly brought to the attention of Dumoulin and that Dell had not established that the consumer had otherwise gained knowledge of it. She thus concluded that the arbitration agreement was null and that the Superior Court had not lost its jurisdiction over the class action proceedings.

**IV. Analysis**

*A. Introduction*

130      In this case, we are dealing with an arbitration clause inserted into a consumer contract of adhesion. The primary question raised by this appeal can be stated in the following terms: did the courts below err in law by refusing to refer the parties to arbitration? Before analysing this question, however, it is helpful to first discuss the nature of exclusive contractual arbitration clauses, the history of their recognition in Quebec law, and the principles that inform the interpretation of the rules relating to arbitration.

*(1) The Nature of Exclusive Contractual Arbitration Clauses: a Jurisdiction Clause*

131      There are two types of contractual arbitration clauses. A complete undertaking to arbitrate, or an "exclusive arbitration clause", is that by which the parties undertake in advance to submit to arbitration any dispute which may arise regarding their contract, and which specifies that the award made will be final and binding on the parties. This may be contrasted with an arbitration clause that is purely optional (see *Zodiak International Productions Inc. v. Polish People's Republic*, [1983] 1 S.C.R. 529 (S.C.C.), at p. 533.

132      Exclusive arbitration clauses operate to create a "private jurisdiction" that implicates the loss of jurisdiction of state-appointed forums for dispute resolution, such as ordinary courts and administrative tribunals, rendering contractual arbitration both different and exclusive of the later entities (see J. E. C. Brierley, "Arbitration Agreements, Articles 2638-2643" in *Reform of the Civil Code*: Texts written for the Barreau du Québec and the Chambre des notaires du Québec, (1993), at pp. 1, 2-3, 10). Contractual arbitration has also been described as creating a "private justice system" for the parties: [TRANSLATION] "From a theoretical standpoint, arbitration is a private justice system that ordinarily arises out of an agreement. Thus, it has a contractual source and an adjudicative function" (see S. Thuilleaux in *L'arbitrage commercial au Québec : Droit interne - Droit international privé* (1991), at p. 5 (footnotes omitted)).

133      What makes contractual arbitration a "private jurisdiction" or "private justice system" is the degree of freedom the parties have in choosing the manner in which their dispute will be resolved:

   Arbitration is therefore the settling of disputes between parties who agree not to go before the courts, but to accept as final the decision of experts of their choice, in a place of their choice, usually subject to laws agreed upon in advance and usually under rules which avoid much of the formality, niceties, proof and procedure required by the courts.

Case 1:20-cv-00613-SB  Document 204-1  Filed 07/29/22  Page 98 of 243 PageID #: 6255
Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

(W. Tetley, *International Conflict of Laws: Common, Civil and Maritime* (1994), at p. 390)

Parties to contractual arbitration are free to choose the laws governing their agreement to arbitrate, the law of the arbitral proceedings, the law of the subject matter under dispute, as well as the rules of conflict applicable to all of the above. In addition, the above four laws need not be the same and may differ from the law of the place of arbitration. Thus, contractual arbitration proceedings can be seen to be *delocalized* from the jurisdiction where the arbitration is held (see Tetley, at pp. 391-92).

134    One of the major differences between courts and arbitration is that contractual arbitrators are not representatives of the state, but, rather, are privately appointed. On account of this, whether an arbitration is situated in Quebec or not, in order for an arbitral award to be legally enforceable, the laws of Quebec require the decision to first be recognized by Quebec courts. There is no difference here with how judgments from foreign courts must first be recognized before having force of law in the province. This is noted by R. Tremblay in "La nature du différend et la fonction de l'arbitre consensuel" (1988), 91 *R. du N.* 246, at p. 252:

[TRANSLATION] However, care must be taken not to confuse the judicial function with the arbitration function. Judges derive their jurisdiction from a state's foundational institutions. Arbitrators, on the other hand, derive their jurisdiction from the mutual agreement of the parties. The difference is an important one. An arbitrator is chosen and appointed by the parties and is not a representative of the state. Arbitrators may rule on disputes, but their decisions are not enforceable unless they are homologated; unlike a judgment, an arbitrator's decision is not enforceable on its own.

135    Exclusive arbitration and forum selection clauses operate very similarly. The effect of both is to derogate from the jurisdiction of ordinary courts, who would otherwise have jurisdiction to hear the matter. Many authors of conflict of laws' textbooks simply refer to these clauses, without distinguishing between them, as "jurisdiction clauses": see for example J. G. Collier, *Conflict of Laws*, 3rd ed. (2001), at p. 96. In the common law provinces, courts will stay their jurisdiction in the presence of either a valid forum selection or arbitration clause. The power to do so stems from the courts' inherent jurisdiction; however, different statutes provide for certain factors that should be taken into account in determining whether to grant the stay depending on whether the court is faced with a forum selection or a domestic or international arbitration clause. Quebec has also tended to treat exclusive arbitration and forum selection clauses analogously, the history of which we will now turn to.

*2) Recognition of Jurisdiction Clauses in Quebec Law*

136    Prior to the coming into force of the *C.C.Q.*, the rules on jurisdiction of Quebec courts were not codified. Quebec courts relied on art. 27 of the *Civil Code of Lower Canada* ("*C.C.L.C.*") and art. 68 of the Quebec *Code of Civil Procedure*, R.S.Q., c. C-25 ("*C.C.P.*"), to delineate their jurisdiction in cases where it was challenged: see *Masson c. Thompson*, [1994] R.J.Q. 1032 (C.S. Que.). Article 27 *C.C.L.C.* provided that aliens although not resident in Lower Canada could be sued in Quebec courts "for the fulfilment of obligations contracted by them in foreign countries". Article 68 *C.C.P.*, which is still in force today, provides the domestic rules for determining in which judicial district of Quebec a personal action can be started. Relying on the general principles set out in this section, and art. 27 *C.C.L.C.*, Quebec courts have delineated a body of jurisprudential rules deciding when Quebec courts have jurisdiction to hear an action.

137    Prior to its amendment in 1992, the opening phrase of art. 68 *C.C.P.* stated: "Subject to the provisions of articles 70, 71, 74 and 75, *and notwithstanding any agreement to the contrary*, a purely personal action may be instituted...". This was interpreted by Quebec courts to be a prohibition against intentional derogation through contract from the jurisdiction of Quebec courts through forum selection and arbitration clauses: see S. Thuilleaux and D. M. Proctor, "L'application des conventions d'arbitrage au Canada: une difficile coexistence entre les compétences judiciaires et arbitrale" (1992), 37 *McGill L.J.* 470, at pp. 477-78.)

138    Then came the 1983 decision of this Court in *Zodiak International Productions*, where a party to a contract submitted to arbitration in Warsaw, but having lost, commenced a fresh action in the Quebec Superior Court against his co-contractor. Noting the tension between art. 68 *C.C.P.* and contractual arbitration clauses, the Court held that the Quebec legislator had nonetheless clearly intended to permit such clauses by introducing art. 951 *C.C.P.*, which states: "An undertaking to arbitrate must be set out in writing". Faced with this provision, Chouinard J., for the Court, cited with approval the words of Pratte J. in *Normandin Lumber Ltd. v. "Angelic Power" (The)*, [1971] F.C. 263 (Fed. T.D.)", who stated: "I do not see how the Quebec legislator could

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 99 of 243 PageID #: 6256

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

have regulated the form and effect of an agreement whose validity he does not admit" (p. 539). Shortly after this decision, in 1986, the Quebec legislator introduced amendments to the *C.C.L.C.* and the *C.C.P.* providing detailed rules on the validity, form and procedure governing contractual arbitration. (Today, these rules can be found in the specific chapter on arbitration in the Book of Obligations of the *C.C.Q.*, these being arts. 2638 to 2643, and in Book VII (on Arbitration) of the *C.C.P.*)

139    Following these changes, an inconsistency could be noted in the Quebec legislator's approach to forum selection clauses and arbitration clauses. By operation of art. 68 of the *C.C.P.*, the former were still held to be invalid: see Thuilleaux and Proctor, at pp. 477-78. It would seem that this difference was accidental rather than intentional. Draft bills from as early as 1977 assimilated forum selection and arbitration clauses. For example, art. 67 of Book Nine of the *Draft Civil Code of 1977* provided the following situations where Quebec authorities could refuse to recognize foreign decisions:

> 67. On application by the defendant, the jurisdiction of the court of origin is not recognized by the courts of Québec when:

>> 1. the law of Québec, either because of the subject matter or by virtue of an agreement between the parties, gives exclusive juristidction to its courts to hear the claim which gave rise to the foreign decision;

>> 2. the law of Québec, either because of the subject matter or by virtue of an agreement between the parties, recognizes the exclusive of another court; or

>> 3. the law of Québec recognizes an agreement by which exclusive jurisdiction is conferred upon arbitrators.

This oversight was corrected, however, through the introduction of art. 3148 in Book Ten of the new *C.C.Q.* The second paragraph of this provision clarifies the intention of the Quebec legislator to assimilate the effect of forum selection and arbitration clauses. It provides that "a Québec authority has no jurisdiction where the parties, by agreement, have chosen to submit all existing or future disputes between themselves relating to a specific legal relationship to a *foreign authority or to an arbitrator...*". Simultaneously to this provision being passed, the opening phrase of art. 68 *C.C.P.* was amended to remove the prohibition on contractual derogation from the jurisdiction of Quebec courts and to direct matters concerning the international jurisdiction of Quebec authorities to Book Ten of the *C.C.Q.* It now reads: "Subject to the provisions of this Chapter and the provisions of Book Ten of the Civil Code of Québec...".

140    Perhaps owing more to inadvertence than intention, some minor differences remain in the treatment of these two types of jurisdiction clauses in Quebec law. For example, there is no parallel provision to art. 940.1 *C.C.P.* for forum selection clauses, as there is for arbitration clauses, which permits parties to contest the validity of such clauses. This provision was introduced in the 1986 amendments to the *C.C.P.* and it provides that Quebec courts shall refer the parties to arbitration unless the case has been inscribed on the roll or it finds the agreement null, of which more will be said further below. Article 3148, para. 2 alone does not provide for challenging the validity of jurisdiction clauses. This has led to some criticism of the current set up of the rules on jurisdiction in the doctrine. For example, G. Saumier, in "Les objections à la compétence internationale des tribunaux québécois : nature et procédure" (1998), 58 *R. du B.* 145, criticizes the discrepancies between the rules applicable to forum selection clauses and arbitration clauses: [TRANSLATION] "there is no justification, where the parties have agreed in advance on the appropriate forum for settling their disputes, for making a distinction between an arbitral tribunal and a state court" (p. 161). Saumier advocates uniform rules between the two, and in this respect, urges an overhaul of the rules on international competence of Quebec authorities in one comprehensive set of rules:

> [TRANSLATION] The fundamental reform of the rules of private international law brought about by the adoption of the *Civil Code of Québec* did not include a revision of the procedural rules applicable in matters of international jurisdiction. Thus, a party wanting to object to the international jurisdiction of a Quebec court must deal with a multitude of statutory schemes relating to time limits and waiver and with precedents that are not easily reconciled.... It is therefore imperative to adopt rules tailored to the international context that reflect the interests both of the parties and of the state judicial system and the arbitration system. [pp. 164-65]

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 100 of 243 PageID #: 6257

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

See also the 2000 report of the Comité de révision de la procédure civile which similarly advocates the creation of one coherent and comprehensive chapter on private international law to be situated in the *Code of Civil Procedure*, which would include, among other things, the rules on Arbitrations currently located in Book VII of the *C.C.P.* (see Comité de révision de la procédure civile, *La révision de la procédure civile*, Document de consultation (février 2000) at pp. 113-14).

141     This short historical overview demonstrates, in our view, that one should not attach any significance to the structure of the *C.C.Q.* or the *C.C.P.* when interpreting the substantive provisions under review in this appeal. The coherence of the regime is not dependent on the particular Book of the *C.C.P.* that deals with arbitrations, or the particular title and Book of the *C.C.Q.* in which is found art. 3149. The *Civil Code* constitutes itself an *ensemble* which is not meant to be parcelled out into chapters and sections that are not interrelated. The way in which the law is presented in the Code corresponds to a methodology and a logic; it is not meant to insulate one substantive provision from all others. As pointed out by J. E. C. Brierley and R. A. Macdonald in *Quebec Civil Law: An Introduction to Quebec Private Law* (1993), at p. 25, "the codification of the private law of Lower Canada was, primarily, a technical reordering of a complex body of norms that was intended to make this private law more accessible in both its language and substance to legal professionals...". From its very inception, the Code's interpretation depended not on this reordering but on its place in the legal order and its relation to the theory of sources it presupposes (p. 97). Indeed, Brierley and Macdonald write, after having noted the assumptions as to form that underpin the Code: "[t]o assume that codal provisions are non-redundant is to assume that they are to be mutually cross-referenced within the Code and that each article must be read in conjunction with all others, regardless of their placement in the Code" (pp. 102-3). The Code is of course taxonomic; this invites to conceptual characterization, to "identifying the extensions of which a concept is susceptible, all the more so since these headings are themselves part of the enacted law" (p. 104). Moreover, "the best guide to ascertaining the legislative intention will still be the Code itself, read as a whole..." (p. 139). This is why headings will be considered indicators of scope and meaning and other codal articles will help fix the meaning of any given text (p. 139).

*3) The Principle of Primacy of the Autonomy of the Parties*

142     Quebec's acceptance of jurisdiction clauses over the past two decades is rooted in the principle of primacy of the autonomy of the parties. This has recently been confirmed by our Court in *Desputeaux c. Éditions Chouette (1987) inc.*, [2003] 1 S.C.R. 178, 2003 SCC 17 (S.C.C.), with respect to agreements to submit a dispute to an arbitral tribunal, and *Scierie Thomas-Louis Tremblay inc. c. J.R. Normand inc.*, [2005] 2 S.C.R. 401, 2005 SCC 46 (S.C.C.), with respect to agreements to submit it to a foreign authority.

143     In *Desputeaux*, our Court recognized that the limits to the autonomy of the contracting parties to choose to submit a dispute to arbitration had to be given a restrictive interpretation. More specifically, as will be discussed in further detail below, we held that the notion of "public order" at art. 2639, para. 1 *C.C.Q.* had to be given a narrow interpretation. Furthermore, we held that legislation merely identifying the courts which, within the judicial system, will have jurisdiction over a particular subject matter should not be interpreted as excluding the possibility of arbitration, except if it was clearly the legislator's intention to do so. In reaching these conclusions, we notably had regard to the legislative policy that now accepts arbitration as a valid form of dispute resolution and, moreover, seeks to promote its use.

144     Both art. 3148, para. 2 *C.C.Q.* and art. 940.1 *C.C.P.* can be interpreted as giving practical effect to the principle of primacy of the autonomy of the parties that has characterized the development of the law of arbitration in Quebec in the last two decades. The provisions purport most notably to promote legal certainty for the parties by enabling them to provide in advance for the forum to which their disputes will have to be submitted. They are also consistent with the international movement towards harmonizing the rules of jurisdiction.

145     This movement towards harmonization can be explained by the importance of legal certainty for commercial and international transactions. As noted by J. A. Talpis in "Choice of Law and Forum Selection Clauses under the New *Civil Code of Quebec*" (1994), 96 *R. du N.* 183, at pp. 188-89:

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

Th[e] essential goal of predictability was surely on the mind of the drafters of the new *Civil Code of Quebec*, as it reaffirmed and extended the theory of party autonomy, a theory clearly among the foremost general principles of law recognized by civilized nations. It is a principle which makes the express or implied intention of the parties determinative of the legal system by which even the essential validity of a contract should be governed. In Quebec, it has a lengthy history and a great deal of current vitality.

The fact is that considerations of commercial convenience and of conflicts theory weigh heavily in favor of this theory which rests mainly upon the interest of the parties to the contract, but is supported by those of the commercial community and of the courts as well. Consequently, it was considered by the legislature to be in the general social interest to provide a legal system favorable to the predictable resolution of the conflict of laws.

This clear intention of the Quebec legislator was acknowledged by our Court in *GreCon Dimter*, where we concluded that the fact that an action was incidental to a principal action heard by a Quebec court was not sufficient to trump an agreement to submit any claim arising from the contract to a foreign authority. More specifically, we concluded that art. 3148, para. 2 *C.C.Q.* was to be given primacy over art. 3139 *C.C.Q.*

*4) The Limits on the Autonomy of the Parties*

146    Naturally, the primacy of the autonomy of contracting parties permitting them to choose in advance the forum for resolving their disputes is not without limits. The Quebec legislator has restricted it in many different ways.

147    We noted the limits on the expression of the autonomy of the parties to submit their disputes to a foreign authority in *GreCon Dimter*, pursuant to art. 3148, para. 2. First, art. 3151 *C.C.Q.* confers to the Quebec authorities *exclusive* jurisdiction to hear in first instance all actions founded on civil liability for damage suffered as a result of exposure to or the use of raw materials originating in Quebec. Second, art. 3149 *C.C.Q.*, which confers jurisdiction to the Quebec authorities to hear an action involving a consumer contract or an employment contract if the consumer or worker has his domicile or residence in Quebec, states that the waiver of such jurisdiction by the consumer or worker may not be set up against him. The language of both provisions is clear with regard to the intention of the legislature to limit the autonomy of the parties.

148    Given the various location of rules relating to arbitration in the *C.C.Q.*, the definition of the limits on the autonomy of the parties to submit their disputes to an arbitral tribunal gives rise to some uncertainty, as illustrated by this case. The general provision is art. 2639 *C.C.Q.* which states that "[d]isputes over the status and capacity of persons, family matters or other matters of public order may not be submitted to arbitration". While it is the only exception created in the chapter on "Arbitrations", art. 2639 *C.C.Q.* is not the only legislative exception to arbitrability. This was recognized by Brierley when writing on the new chapter on arbitration in the *Civil Code*:

It is possible that an implicit legislative intention to exclude arbitration can be detected, even if it has not been expressly forbidden (for example, when the matter is reserved for resolution to the courts or quasi-judicial state agencies). An imperative attribution of competence in certain areas might in fact contain a rule of public order which excludes arbitration. [Emphasis added] (Brierley, *Reform of the Civil Code*, at p. 4)

Furthermore, in order to be enforceable, an arbitration agreement has to be evidenced in writing under art. 2640 *C.C.Q.* and must otherwise be in compliance with all the conditions of formation of a contract. This latter point is true even when the arbitration agreement is contained in a contract since it is then considered to be a separate agreement pursuant to art. 2642 *C.C.Q.* The comments of the Minister of Justice on this article specifically recognize that an arbitration agreement is subject to the general rules of contract and can be challenged before the courts on the same basis as any other contract (Commentaires du ministre de la Justice (1993), t. II. As well, since arbitration clauses raise primarily a question of jurisdiction, there is the additional problem of which jurisdiction (the arbitrator or Quebec courts) ought to decide whether any of these limits apply in a given case. This brings us back to the primary issue raised by this case.

*B. Issues Raised by this Case*

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 102 of 243 PageID #: 6259

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

149    On the primary question of whether the lower courts erred in refusing to refer the parties to arbitration, it is not contested by the respondents that, if the arbitration agreement is valid and applicable to the dispute, the courts have no discretion and must not refuse to refer the parties to arbitration. On that point, art. 940.1 *C.C.P.* seems clear: if the parties have an agreement to arbitrate on the matter of the dispute, on the application of either of the parties, the court *shall* refer the parties to arbitration, unless the case has been inscribed on the roll or the court finds the agreement to be null. It is well established that, by using the term "shall", the legislator has indicated that the court has no discretion to refuse, on the application of either of the parties, to refer the case to arbitration when the appropriate conditions are met (see *GreCon Dimter*, at para. 44; *La Sarre (Ville) c. Gabriel Aubé inc.* (1991), [1992] R.D.J. 273 (C.A. Que.), at p. 277). On a plain reading of art. 940.1 *C.C.P.*, these conditions appear to be threefold: (i) the parties must have an arbitration agreement on the matter of the dispute; (ii) the case must not have been inscribed on the roll; and (iii) the court must not find the agreement to be null. Regarding the latter condition, it appears obvious to us that the reference to the nullity of the agreement is also meant to cover the situation where the arbitration agreement cannot, without being null, be set up against the applicant.

150    It is also well established that the effect of a valid undertaking to arbitrate is to remove the dispute from the jurisdiction of the ordinary courts of law (per *Zodiak International Productions*, art. 940.1 *C.C.P.* and art. 3148, para. 2 *C.C.Q.*). It is also accepted that jurisdiction over the individual actions that form the basis of a class action is a prerequisite to the exercise of jurisdiction over the proceedings (*Bisaillon c. Concordia University*, [2006] 1 S.C.R. 666, 2006 SCC 19 (S.C.C.). There is consequently no question that, if the arbitration agreement is valid and relates to the dispute, the Superior Court has no jurisdiction to hear the case and must refer the parties to arbitration.

151    In the case at bar, it is not contested by the respondents that the first two conditions for the application of art. 940.1 are met. What is at issue, though, is whether the Court of Appeal erred in law by refusing to refer the parties to arbitration on the basis that the arbitration agreement was null or cannot otherwise be set up against Dumoulin.

152    Many different grounds have been raised in order to demonstrate that the arbitration clause in the case at bar is null or otherwise cannot be set up against Dumoulin. It has notably been argued: (1) that the arbitration agreement cannot be set up against Dumoulin, a consumer, because it constitutes a waiver of the jurisdiction of the Quebec authorities under art. 3149 *C.C.Q.*; and (2) that it is null, (a) because it is over a consumer dispute which is in and of itself a matter of public order under art. 2639 *C.C.Q.*; (b) because it constitutes a waiver of the jurisdiction of the Superior Court over class actions and that such a waiver is contrary to public order under art. 2639 *C.C.Q.*; (c) because Dumoulin did not really consent to it as it was imposed on him through a contract of adhesion; (d) because it is abusive and offends art. 1437 *C.C.Q.*; and (e) because it is found in an external clause that was not expressly brought to the attention of Dumoulin as required under art. 1435 *C.C.Q.* Each of these arguments represents a sub-issue in this case and will be dealt with separately in section D below. But before we turn to the study of these sub-issues of the case, it is necessary to address two preliminary questions.

153    First, we have to decide whether the amendments the Quebec legislator recently brought to the *Consumer Protection Act*, R.S.Q., c. P-40.1 ("*C.P.A.*"), apply to this case. Bill 48, *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts*, 2nd Sess., 37th Leg., (now S.Q. 2006, c. 56), was assented to on December 14, 2006, the day after the hearing of this case before our Court. Section 2 of Bill 48 reads as follow:

> 2. The Act [the *Consumer Protection Act*] is amended by inserting the following section after section 11:
>
>> 11.1. Any stipulation that obliges the consumer to refer a dispute to arbitration, that restricts the consumer's right to go before a court, in particular by prohibiting the consumer from bringing a class action, or that deprives the consumer of the right to be a member of a group bringing a class action is prohibited.
>>
>> If a dispute arises after a contract has been entered into, the consumer may then agree to refer the dispute to arbitration.

It is not disputed that, if this amendment applies to the case at bar, there would be no need to address the other sub-issues as the third condition for the application of art. 940.1 *C.C.P.* would clearly not be met.

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

154    Second, we have to determine the scope of the analysis a court should conduct under art. 940.1 *C.C.P.* in order to "find" whether the arbitration agreement is null. The appellant argues that this analysis should only be *prima facie*; the respondents argue it should be comprehensive. Depending on the answer to be given to this question, it is possible that only *some* of the grounds of nullity invoked by the respondents can be properly raised at the stage of a referral application, whereas the other grounds should be more appropriately left to the arbitrator to decide, subject to subsequent review by the courts.

### C. Preliminary Questions

*1) The Impact of Bill 48 on the Case at Bar*

155    The main provision in Bill 48 relevant to this appeal is s. 2. It amends the *C.P.A.* by prohibiting and voiding any contractual clauses which oblige a consumer to submit a dispute to arbitration. Pursuant to the *C.P.A.* as amended, an arbitration agreement can validly be concluded by a merchant and a consumer only after a dispute has arisen. It is conceded that, if this amendment applies to the case at bar, the appeal should be dismissed as the arbitration agreement on which the appellant's declinatory exception is founded would clearly be of no effect. It should be noted that our interpretation of art. 3149 *C.C.Q.* achieves the same result as Bill 48. It might be argued that the introduction of Bill 48 is an indication that the Legislative Assembly did not share our view of art. 3149. Our response to this is that it is much more likely that the misinterpretation of art. 3149 in *obiter* in *Dominion Bridge*, and in the Court of Appeal in this case, caused the legislator to act swiftly in order to ensure the protection of consumers in the province.

156    Section 18 of Bill 48 provides that its provisions come into force on December 14, 2006, except for certain specific provisions that come into force at later dates (between April 1, 2007 and December 15, 2007). Since s. 2 of Bill 48 is now in force, the question before us is whether it has any effect on the pending case.

157    Under well-established principles of statutory interpretation, in general, new laws affecting *substantive* matters do not apply to pending cases. It is also well recognized that a new law will be applicable to a pending case if it clearly expresses an intent to retroactively modify the substantive rights at issue. Professor P.-A. Côté states the applicable principles in the following manner:

> In general, new statutes affecting substantive matters do not apply to pending cases, even those under appeal. Since the judicial process is generally declaratory of rights, the judge declares the rights of the parties as they existed when the cause of action arose: the day of the tort, of the conclusion of the contract, the commission of the crime, etc. However, a new statute bringing substantive modification is applicable to a pending case if it retroactively modifies the law applicable on the day of the tort, the contract, the crime, etc. A pending case, even under appeal, can therefore be affected by a retroactive statute, and even by one enacted while proceedings are pending in appeal.

> (P.-A. Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 179)

158    The rule is different for new laws affecting *procedural* matters. Such laws have immediate effect and apply to pending cases. As Professor Côté notes, this does not mean that such laws have retroactive effect:

> Because procedural provisions apply to pending cases, the term "retroactivity" has been used by analogy with the effect of statutes affecting substantive rights. But procedural enactments do not govern the law that the judge declares to have existed: they only deal with the procedures used to assert a right, and with the rules for conduct of the hearing. It is normal that a statute dealing with trial procedure will govern the future conduct of all trials carried out under its authority. This is not retroactivity but simply immediate and prospective application. [pp. 179-80]

159    We therefore have to decide whether s. 2 of Bill 48 is a provision affecting substantive or procedural matters. If it affects substantive matters, we will further have to decide whether it has retroactive effects.

160    In our view, s. 2 of Bill 48 is a provision dealing with substantive matters as it affects a contractual right of the parties: the right of a party to have his claim referred to arbitration, to the exclusion of the courts. It is true that, in some respects, this right

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 104 of 243 PageID #: 6261

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 Carswellque...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

resembles a procedural right: it determines how a right will be asserted. That said, it is obviously more than just a procedural right. It affects the jurisdiction of the courts and "it is well established that jurisdiction is not a procedural matter" (*Royal Bank v. Concrete Column Clamps (1961) Ltd.*, [1971] S.C.R. 1038 (S.C.C.), at p. 1040; see also Côté, at p. 183).

161      Furthermore, we are of the view that s. 2 of Bill 48 has no retroactive effect. Unless a statute provides otherwise, expressly or by necessary implication, it is not to be construed as having such effect. Wright J.'s dictum in *Athlumney, Re*, [1898] 2 Q.B. 547 (Eng. Q.B.), at pp. 551-52, still adequately reflects the law on this issue:

> Perhaps no rule of construction is more firmly established than this — that a retrospective operation is not to be given to a statute so as to impair an existing right or obligation, otherwise than as regards matter of procedure, unless that effect cannot be avoided without doing violence to the language of the enactment. If the enactment is expressed in language which is fairly capable of either interpretation, it ought to be construed as prospective only.

> (See also *Gustavson Drilling (1964) Ltd. v. Minister of National Revenue* (1975), [1977] 1 S.C.R. 271 (S.C.C.), at p. 279)

162      Nothing in Bill 48 leads us to think that its s. 2 should be read as having retroactive effect. The transitional provisions do not state it and cannot be interpreted in such a way. Therefore, the general presumption against the retroactivity of the statute has not been rebutted and s. 2 of Bill 48 should not be interpreted as having the effect of rendering null the arbitration agreement at bar as this agreement was concluded before the coming into force of the provision.

*2) The Scope of the Analysis Under Article 940.1 C.C.P.*

163      The appellant relies on the competence-competence principle in arguing that the extent of the review that a court should conduct under art. 940.1 *C.C.P.* should be limited to a *prima facie* investigation. This principle has been described as having two components (see e.g., E. Gaillard and J. Savage (eds.), *Fouchard, Gaillard, Goldman on International Commercial Arbitration* (1999), at p. 401). First, the competence-competence principle stands for the proposition that the arbitrators have the power to rule on their own jurisdiction. This principle is well established in our law and has received legislative recognition in art. 943 *C.C.P.* More importantly for present purposes, it is a rule of chronological priority under which the arbitrators must have the first opportunity to rule on their jurisdiction, subject to subsequent review by the courts. This aspect of the competence-competence principle is still subject to disagreement and gives rise to different applications.

164      In trying to determine the scope of this principle, one has to keep in mind the difference between the types of challenges that can be brought against an arbitrator's jurisdiction. They fall into two main categories. The first category encompasses the challenges regarding the *validity* of the arbitration agreement involving the parties. The second category encompasses the challenges regarding the *applicability* of the arbitration agreement to the specific dispute.

165      It is relatively well accepted that the competence-competence principle applies to the jurisdictional challenges regarding the *applicability* of the arbitration agreement (see e.g., *Kingsway Financial Services Inc. c. 118997 Canada inc.*, [1999] J.Q. No. 5922 (C.A. Que.). In any challenge to arbitral jurisdiction alleging that the dispute does not fall within the scope of the arbitration clause, it has been established that courts ought to send the matter to arbitration and allow the arbitrator to decide the question, unless it is obvious that the dispute is not within the arbitrator's jurisdiction. (See L. Y. Fortier, "Delimiting the Spheres of Judicial and Arbitral Power: 'Beware, My Lord, of Jealousy'(2001), 80 *Can. Bar. Rev.* 143, at p. 146; P. Bienvenu, "The Enforcement of International Arbitration Agreements and Referral Applications in the NAFTA Region" (1999), 59 *R. du B.* 705, at p. 721; J. B. Casey and J. Mills, *Arbitration Law of Canada: Practice and Procedure* (2005), at p. 64; L. Marquis, "La compétence arbitrale : une place au soleil ou à l'ombre du pouvoir judiciaire" (1990), 21 *R.D.U.S.* 303, at pp. 318-9.) However, whether courts ought to generally send the matter to arbitration when the validity of the arbitration agreement itself is challenged, is more controversial.

166      In some cases, the courts have recognized that the arbitrators should be the first to rule on the validity of the arbitration agreement and have referred the parties to arbitration (see e.g., *World LLC c. Parenteau & Parenteau Int'l*, [1998] A.Q. No. 736 (C.S. Que.); *Automobiles Duclos inc. c. Ford du Canada ltée* (2000), [2001] R.J.Q. 173 (C.S. Que.); *Simbol Test Systems Inc. v. Gnubi Communications Inc.*, [2002] J.Q. No. 437 (C.S. Que.); *Sia v. Albury Grain Sales Inc.* (C.S. Que.)). In other cases,

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 105 of 243 PageID #: 6262

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

the courts have undertaken a comprehensive review of the validity of the arbitration clause before referring, or refusing to refer, the case to arbitration (see e.g., *Martineau c. Verreault,* [2001] J.Q. No. 3103 (C.S. Que.); *Chassé c. Union Canadienne, cie d'assurances,* [1999] R.R.A. 165 (C.S. Que.); *Lemieux c. 9110-9595 Québec inc.,* [2004] J.Q. No. 9489 (C.Q.); *Joseph v. Assurances générales des Caisses Desjardins inc.,* SOQUIJ AZ-99036669; *Bureau v. Beauce, Société mutuelle d'assurance générale,* SOQUIJ AZ-96035006 (C.Q.); *Richard-Gagné c. Poiré,* [2006] J.Q. No. 9350, 2006 QCCS 4980 (C.S. Que.)).

167     The difficulties caused by the lack of clarity in the drafting of the *C.C.P.* now confirms the need for a full review of the matter in order to determine the appropriate approach to the exercise of the supervisory power of the Superior Court.

168     The appellant argues for what has been called the "*prima facie* approach" following which a court seized of a referral application should refer the matter to arbitration upon being satisfied on a *prima facie* basis that the action was not commenced in breach of a valid arbitration agreement. The appellant, and the doctrine to which it refers, never gives a precise definition of the expression "*prima facie*" in this context. We interpret its submissions as meaning that the court seized of a referral application would have to decide if the arbitration agreement *appears* to be valid and applicable to the dispute only on the basis of the documents produced to support the motion, presuming that they are true, without hearing any testimonial evidence. The ruling of the court on the issue would not have the authority of a final judgment and the arbitral tribunal could conduct its own comprehensive review of the validity of the arbitration, subject to subsequent review by the courts.

169     On the contrary, the respondents argue for what has been called the "comprehensive approach" following which the objections to the validity of the arbitration agreement should be dealt with comprehensively before the matter is referred (or not) to arbitration. The court seized of a referral application could thus, for example, hear testimonial evidence before ruling on the validity of the arbitration agreement. Furthermore, its ruling would have the authority of a final judgment (*res judicata*) on the matter. As the intervener London Court of International Arbitration notes in its factum, the advocates of both approaches share a common objective, that is to promote the efficiency of the dispute resolution mechanisms. Where they disagree is on how best to achieve this objective.

170     The advocates of a comprehensive judicial review of the validity of the arbitration agreement under art. 940.1 *C.C.P.* rely on an "economy-of-means" rationale. They argue that it is a waste of time and money to refer the question of the validity of an agreement to an arbitral tribunal, whose very jurisdiction is challenged by one of the parties, in order to allow it to first rule on the question, as the parties will almost invariably have to return to the court either for a decision on the validity of the arbitration agreement pursuant to art. 943.1 *C.C.P.* (if the arbitral tribunal has declared itself competent) or to continue the proceedings that were interrupted by the referral application (if the arbitral tribunal has declared itself incompetent). They also argue that, as the jurisdiction of the arbitral tribunal depends entirely on the validity of the arbitration, it is illogical to ask the arbitral tribunal to first rule on the validity of the arbitration agreement.

171     Those who are in favour of limiting the review of the courts to a *prima facie* review focus on the prevention of dilatory tactics. They argue that a comprehensive review of the validity of an agreement, based on testimonial as well as documentary evidence, can take many months to decide, and that allowing such a review at the referral stage would afford a recalcitrant party the opportunity to delay unduly the commencement or progress of the arbitration. They further argue that the validity of the arbitration agreement should be presumed and that limiting its comprehensive review by the court only to the motions brought pursuant to art. 943.1 *C.C.P.* does not entail the same problems as this provision explicitly provides that the arbitral tribunal may pursue the proceedings and make its award while such a motion is pending.

172     It is particularly significant to note that art. 940.1 *C.C.P.* clearly provides that a preliminary question be answered by the court concerning the agreement's validity; the provision does not specify that only a "*prima facie*" review be undertaken. The Quebec Superior Court, as a court designated by s. 96 of the *Constitution Act, 1867,* possesses inherent jurisdiction and has original jurisdiction in any matter unless jurisdiction is taken away by statute, according to arts. 31 and 33 *C.C.P.* (see also T. A. Cromwell in "Aspects of Constitutional Judicial Review in Canada" (1995), 46 *S.C. L. Rev.* 1027, at pp. 1030-31, cited to *MacMillan Bloedel Ltd. v. Simpson,* [1995] 4 S.C.R. 725 (S.C.C.), at para. 32). In matters involving an exclusive arbitration clause, the Quebec legislator has seen fit to divest Quebec courts of their jurisdiction pursuant to art. 3148, para. 2 *C.C.Q.,*

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

subject to those exceptions discussed above, and subject to art. 940.1 *C.C.P.* which, on its face, clearly gives the Superior Court the power to consider the validity of the arbitration agreement.

173     According to contextual argument based on the French version of art. 940.1 *C.C.P.*, the word "constate" effectively means that courts can only undertake a *prima facie* review of the nullity of the arbitration agreement. But then art. 2642 *C.C.Q.* uses the same language with regard to the arbitrator's review of the arbitration clause: "... la constatation de la nullité du contrat par les arbitres ne rend pas nulle pour autant la convention d'arbitrage". Applying the reasoning that "constate" in art. 940.1 *C.C.P.* signifies a *prima facie* review pursuant to art. 2642 *C.C.Q.*, an arbitrator would be limited to a *prima facie* analysis of the validity of the contract containing the arbitration clause and would be unable to conduct any in-depth analysis or hear proof as to the alleged nullity of a contract. Such a result would confirm that the argument is flawed and illogical. Moreover, the verb "constate", in a legal context, does not appear to imply a superficial review. It may just as well indicate a review on the merits of an issue of fact and law. See G. Cornu, *Vocabulaire juridique*, (8th ed., 2000), at p. 208.

174     Furthermore, the Minister of Justice's comments on art. 2642 *C.C.Q.* support the proposition that a full review of nullity can be undertaken by the courts when the validity of the arbitration agreement is challenged. This article provides that an arbitration agreement contained in a contract is a separate agreement from the other clauses of the contract in which it is contained. As a consequence, the arbitration agreement must be subject to all of the general grounds for invalidating a contract at civil law, including those applying specifically to consumer or adhesion contracts. The comment of the Minister of Justice specifically recognizes that an arbitration agreement is subject to the general rules of contract and can be challenged before the courts on the same basis as any other contract:

> [TRANSLATION] This rule [art 2642 C.C.Q.] does not preclude a party from asking the court to rule on the nullity of the arbitration agreement if, for example, he or she did not give free and informed consent or did not have the capacity to contract. The general rules of the law of obligations apply to an arbitration agreement as to any contract. (*Commentaires du ministre de la Justice*, t. II, at p. 1651)

175     An argument was also presented on the basis of the *UNCITRAL Model Law on International Commercial Arbitration* of June 21, 1985 ("*Model Law*"), U.N Doc. A/40/17, Annex I, and the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3, ("*New York Convention*"), international documents the Quebec rules on arbitration are based on and which can be used to interpret the *C.C.P.* rules (see *GreCon Dimter*, at paras. 39-43, and art. 940.6 *C.C.P.*). It was argued that these provisions mandate that only a *prima facie* review of nullity be undertaken by courts. A review of these provisions has convinced us that the drafters of the *Model Law* and the *New York Convention* intended that courts and arbitrators have concurrent jurisdiction over such questions. In our view, the Quebec legislator, basing the Quebec rules on these international documents, adopted the same approach. The Report of the Working Group preparing the *Model Law* specifically states that it opted not to take a "manifestly" null and void approach:

> 77. A suggestion was made that [article 8 of the Model Law] should not be understood as requiring the court to examine in detail the validity of an arbitration agreement and that this idea could be expressed by requiring only a *prima facie* finding or by rephrasing the closing words as follows: "unless it finds that the agreement is *manifestly* null and void". In support of that idea it was pointed out that it would correspond with the principle to let the arbitral tribunal make the first ruling on its competence, subject to later control by a court. However, the prevailing view was that, in the cases envisaged under paragraph (1) where the parties differed on the existence of a valid arbitration agreement, that issue should be settled by the court, without first referring the issue to an arbitral tribunal, which allegedly lacked jurisdiction. The Working Group, after deliberation, decided to retain the text of paragraph (1). (Report of the Working Group on International Contract Practices on the work of its fifth session (New York, 22 February — 4 March 1983) (A/CN.9/233))

The finding is confirmed by P. Binder in *International Commercial Arbitration and Conciliation in UNCITRAL Model Law Jurisdictions* (2nd ed. 2005), at p. 91.

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

176    Endorsing a concurrent jurisdiction approach to questions concerning the validity of the agreement is defendable on an "economy-of-means" rationale and consistent with the general policy favouring the autonomy of the parties. Although art. 940.1 *C.C.P.* is not clear regarding the extent of the analysis the court should undergo, we think that a discretionary approach favouring resort to the arbitrator in most instances would best serve the legislator's clear intention to promote the arbitral process and its efficiency, while preserving the core supervisory jurisdiction of the Superior Court. When seized with a declinatory exception, a court should rule on the validity of the arbitration only if it is possible to do it on the basis of documents and pleadings filed by the parties without having to hear evidence or make findings about its relevance and reliability.

177    This approach appears to be more consistent with the legislative framework which favours an *a posteriori* control of the arbitral process and sentences. As we have noted above, the affirmative ruling of an arbitrator on jurisdiction will always be subject to the comprehensive review of a court seized of the question pursuant to art. 943.1 *C.C.P.* Furthermore, art. 946.4(2) *C.C.P.* expressly provides, *inter alia*, that a court can refuse the homologation of an arbitration award on proof that the arbitration agreement that led to it was invalid. Both these means of exercising *a posteriori* control do not impede the efficiency of the arbitration proceeding since the latter takes place after the arbitral proceeding has been completed and the former does not suspend it.

178    That said, we believe courts may still exercise some discretion when faced with a challenge to the validity of an arbitration agreement regarding the extent of the review they choose to undertake. In some circumstances, particularly in those that truly merit the label "international commercial arbitration", it may be more efficient to submit all questions regarding jurisdiction for the arbitrator to hear at first instance. In other circumstances, such as in the present case where we are faced with the need to interpret provisions of the *Civil Code*, it would seem preferable for the court to fully entertain the challenge to the arbitration agreement's validity. In our view, the courts below were correct to fully consider Dumoulin's challenge to the validity of the arbitration agreement based on the application of art. 3149 *C.C.Q.*

### D. Possible Grounds of Nullity of the Arbitration Agreement

*1) Does the Arbitration Clause Constitute a Waiver of the International Jurisdiction of the Quebec Authorities that Cannot Be Set Up Against Dumoulin?*

179    Here, we are faced with the task of interpreting art. 3149 *C.C.Q.* which is located in Section II, "Personal Actions of a Patrimonial Nature" included in Chapter II, "Special Provisions" of Title three, "International Jurisdiction of Québec Authorities" in Book Ten of the Civil Code, entitled "Private International Law". There are four provisions in Section II. First, there is art. 3148, para. (1) to (5) of which set out the general rules on when a Quebec authority has jurisdiction to hear a dispute. As discussed above, the second paragraph sets out when a Quebec authority loses jurisdiction to hear a dispute it would otherwise be competent to hear. Then arts. 3149 to 3151, as mentioned earlier, appear as legislated limits on the autonomy of the parties.

180    For ease of reference, we set out arts. 3148, para. 2 and 3149 *C.C.Q.*:

> 3148. In personal actions of a patrimonial nature, a Québec authority has jurisdiction where
>
> . . . . .
>
> However, a Québec authority has no jurisdiction where the parties, by agreement, have chosen to submit all existing or future disputes between themselves relating to a specified legal relationship to a foreign authority or to an arbitrator, unless the defendant submits to the jurisdiction of the Québec authority.
>
> 3149. A Québec authority also has jurisdiction to hear an action involving a consumer contract or a contract of employment if the consumer or worker has his domicile or residence in Québec; the waiver of such jurisdiction by the consumer or worker may not be set up against him.

181    The first phrase of art. 3149 confers jurisdiction on a "Québec authority" to hear an action involving a consumer or employment contract so long as the consumer or worker has his or her residence or domicile in Quebec. This phrase must

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 108 of 243 PageID #: 6265

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

be seen as giving additional protection to consumers and workers by conferring jurisdiction to Quebec authorities when these persons act as plaintiffs, since Quebec authorities already have jurisdiction where the consumer or worker is named as the defendant (per art. 3148(1)).

182      The second phrase of art. 3149 provides that the waiver of the jurisdiction of Quebec authorities by the consumer or worker cannot be set up against him or her. A consumer or worker waives the jurisdiction of Quebec authorities precisely through entering the type of agreement contemplated in art. 3148, para. 2, whereby parties "... have chosen to submit all existing or future disputes between themselves ... to a foreign authority or to an arbitrator". The effect of the second phrase is that a defending party cannot, in response to an action brought before a Quebec authority, the Superior Court for example, argue that the court has no jurisdiction to hear the matter by operation of a forum selection or arbitration clause.

183      Here, Dumoulin has his domicile in Quebec and the Superior Court is clearly a Quebec authority. It would seem that, for Dell to maintain that the Superior Court has no jurisdiction in this matter, it would have to argue that the arbitrator presiding over the NAF arbitration proceeding is a Quebec authority. It is only if this is the case that Dumoulin cannot be said to have waived the jurisdiction of a Quebec authority through the arbitration clause.

184      Thus, in determining whether art. 3149 *C.C.Q.* applies, the language invites us to ask whether the jurisdiction chosen in the contract through a forum selection or arbitration clause is a "Québec authority". If that jurisdiction is not a "Québec authority", art. 3149 comes into play to permit the consumer or worker to bring his or her dispute before a "Québec authority". The issue, then, is who is a "Québec authority"?

185      The respondents argue that art. 3149 must be read in light of the distinction made in the second paragraph of art. 3148 between a "Québec authority", a "foreign authority" and "an arbitrator", such that a "Québec authority" in art. 3149 cannot be a "foreign authority" or "an arbitrator". This is challenged by the appellant who argues that if the arbitration is to take place in Quebec, then art. 3149 does not apply at all. The argument being made is that the arbitration is not "international" since it was found that it would take place in Quebec. In such a case, the rules of private international law in Book Ten of the *C.C.Q.* do not come into play. This submission raises a new question that has become a central issue in this case: faced with an exclusive arbitration clause agreed on by the parties, to what extent — if any — must the facts disclose "foreign" elements, or be "international" for the rules of private international law to be engaged? The question calls for a detailed examination.

*a) Must the Arbitration Agreement Contain a "Foreign Element" in Order for Articles 3148, Para. 2 and 3149 — Rules of Private International Law — to Be Engaged?*

186      The introduction to any private international law (or "conflict of laws" as it is more commonly referred to in common law jurisdictions) textbook will state that this area of law comes into play in legal disputes involving foreign elements. But what does this general assertion mean? Is any foreign element sufficient to invoke private international law? In order to answer these questions, it is helpful to first explain the nature, purpose and structure of private international law.

187      Despite what its name might connote, and the existence of international agreements on various aspects of private international law, the latter is not international in the "public international law" sense. It is not "international" or universal norms that determine when such rules apply; rather, these are domestic laws created by the judiciary or the legislature within a given territory. J.-G. Castel, in *Canadian Conflict of Laws* (4th ed. 1997), at pp. 4-5, describes the character of the conflict of laws:

Principles and rules of the conflict of laws are not international, they are essentially national in character. Since they are part of the local law, they are formulated by the legislative bodies of the different legal units or are to be found in the decisions of their courts.

188      At their core, the rules of private international law/conflict of laws are local laws designed to provide answers in legal situations where two or more systems of law are capable of applying. Unfortunately, as discussed by Collier, at pp. 5-6, the names given to this area of law can be misleading with respect to its purpose:

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 109 of 243 PageID #: 6266

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

Two names for the subject ["private international law" and "conflict of laws"] are in common use; however, they are interchangeable. Neither is wholly accurate or properly descriptive. The name 'conflict of laws' is somewhat misleading, since the object of this branch of the law is to eliminate any conflict between two or more systems of law (including domestic law) which have competing claims to govern the issue which is before the court, rather than to provoke such a conflict, as the words may appear to suggest. However, it was the name given to the subject by A. V. Dicey, when he published his treatise, the first coherent account by an English lawyer of its rules and principles, in 1896 and it has been hallowed by use ever since.

Another name is 'private international law', which is in common use in Europe. This is even more misleading than 'conflict of laws', and each of its three words requires comment. 'Private' distinguishes the subject from 'public' international law, or international law *simpliciter*. The latter is the name for the body of rules and principles which governs states and international organisations in their mutual relations. It is administered through the International Court of Justice, other international courts and arbitral tribunals, international organisations and foreign offices, although, as part of a state's municipal or domestic law, it is also applied by that state's courts. Its sources are primarily to be found in international treaties, the practice of states in their relations (or custom) and the general principles of municipal legal systems. Private international law is concerned with the legal relations between private individuals and corporations, though also with the relations between states and governments so far as their relationships with other entities are governed by municipal law, an example being a government which contracts with individuals and corporations by raising a loan from them. Its sources are the same as those of any other branch of municipal law, which is to say that [domestic] private international law is derived from legislation and decisions of [domestic] courts.

'International' is used to indicate that the subject is concerned not only with the application by [domestic] courts of [domestic] law but of rules of foreign law also. The word is inapt, however, in so far as it might suggest that it is in some way concerned with the relations between states (it is even more inapt if it suggests 'nations' rather than states)....

The word 'law' must be understood in a special sense. The application of the rules of [a country's or province's] private international law does not by itself decide a case, as does that of the rules of the law of contract or tort. Private international law is not substantive law in this sense, for, as we have seen, it merely provides a body of rules which determine whether the [domestic] court has jurisdiction to hear and decide a case, and if it has, what system of law, [domestic] or foreign, will be employed to decide it, or whether a judgment of a foreign court will be recognised and enforced by [a domestic] court.

189     As this last paragraph suggests, the rules of private international law specifically involve the three following areas: (1) choice of law; (2) choice of jurisdiction; and (3) recognition of foreign judgments (see also Tetley, at p. 791).

190     "Choice of law" rules attempt to resolve the issue of which law governs a legal dispute when it becomes possible for the laws from more than one legal system to apply. A classic example would be a car accident occurring in Quebec, involving a resident of Ontario and a resident of Quebec. Rules developed to determine whether Ontario or Quebec substantive law should govern the dispute (i.e., the *lex loci delicti* rule adopted in *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.), if Ontario authorities are seized of the question, and art. 3126 of Book Ten of the *C.C.Q.* if Quebec authorities are seized of the question) fall under the 'choice of law' category of private international law.

191     "Choice of jurisdiction" rules attempt to resolve the issue of which jurisdiction can hear a dispute when it becomes possible for more than one jurisdiction to be seized of the matter. The issues raised by this area are logically considered prior to those raised under "choice of law". Consider the example given above. Which choice of law rule will be applied is not the first question to be addressed. A court hearing the dispute must first decide whether it can properly exercise jurisdiction over the dispute. Could the Alberta courts hear the dispute between the Quebec and Ontario motorists? Would the Ontario courts be better situated to hear the dispute? These are the types of questions "choice of jurisdiction" rules help to determine.

192     "Recognition of foreign judgments" rules operate to do just what the name suggests: they provide guidance on when the domestic jurisdiction can recognize and give force of law to foreign judgments.

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 Carswellque...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

193     A word should be said about the general structure of traditional private international law rules. Within each of the three areas discussed, different factors are identified to help resolve the issue at hand. The relevant factors to be considered are called "connecting factors". Connecting factors are defined by Tetley as facts which tend to connect a transaction or occurrence with a particular law or jurisdiction. These can be domicile, residence, nationality or place of incorporation of the parties; the place(s) of conclusion or performance of the contract; the place(s) where the tort or delict was committed or where its harm was felt; the flag or country of registry of the ship; the shipowner's base of operation, etc. (see Tetley, at pp. 41 and 195-96. Since private international law rules are domestic rules, as discussed above, it is the domestic courts or the legislature that determine what the relevant connecting factors will be. As well, the relevant connecting factors can vary depending on the area of private law under scrutiny. For example, in "choice of law" the factors one looks to in order to determine which law should apply in a family dispute may be different from the factors one looks at to determine which laws apply in torts or contracts.

194     The general claim is that the rules of private international law are engaged once a legal dispute presents foreign elements. The above discussion should bring to light the obvious link between this assertion and the connecting factors that will be considered in applying private international law rules. The connecting factors are indicators of the legally relevant foreign elements that can bring private international law rules into operation; they include such factors as different domiciles, residency or nationality of the parties, jurisdiction where legal proceedings were brought as compared to where the tort occurred, or where the contract was concluded, etc. For example, the choice of law rule set out at art. 3094 *C.C.Q.* reads:

> 3094. The obligation of support is governed by the law of the domicile of the creditor. However, where the creditor cannot obtain support from the debtor under that law, the applicable law is that of the domicile of the debtor.

This rule implies that the relevant foreign element would be a difference in domicile between creditor and debtor of support obligations; a wife domiciled in Quebec and a husband domiciled in New Brunswick, for example. That the parties might have been married in a jurisdiction other than Quebec would be an irrelevant foreign element in applying this rule. Thus, not all foreign elements will be relevant. The relevant foreign elements will be those raised by the applicable private international law rule.

195     Must there always be a foreign element to engage the rules of private international law? Since these are domestic laws, it is certainly possible for legislators to craft private international rules that can be engaged absent foreign elements. It is not as if there were any constitutional or international laws prohibiting the legislator from adopting such rules. One example is found in art. 3111 *C.C.Q.*, which acknowledges the capacity of parties to choose the rules that will govern their contractual relationship, whether they be domestic or foreign. The first paragraph of art. 3111 states:

> 3111. A juridical act, underline(whether or not it contains any foreign element), is governed by the law expressly designated in the act or the designation of which may be inferred with certainty from the terms of the act.

The stated purpose of this particular rule of private international law, one that comes into operation absent any foreign element, is to respect the principle primacy of the autonomy of the parties:

> [TRANSLATION] The principle of autonomy of the will of the parties is firmly rooted in Quebec's legal traditions, and the proposed article confirms it.

> ...[T]he parties may choose the law applicable to their contract not only if the contract contains a foreign element, but also if it does not.

> (Project de loi 125 : Code civil du Québec, *Commentaires détaillés sur les dispositions du Projet*, Livre X: Du droit international privé et disposition finale (Art. 3053 à 3144) (1991). Titre deuxième : *Des conflits de lois* (Art. 3059 à 3110). Chapitre troisième : Du statut des obligations (Art. 3085 à 3108), at p. 53)

As discussed earlier, this principle had significant influence in the crafting of the new private international rules in Book Ten of the *C.C.Q.* See Talpis, at p. 189:

Case 1:20-cv-00613-SB  Document 204-1  Filed 07/29/22  Page 111 of 243 PageID #: 6268

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

[T]he New Code adopts a very subjective approach to party autonomy. Going well beyond the Rome Convention on the *Law Applicable to Contractual Relations* of June 19, 1980 and the *Swiss Code of Private International Law* of December 18, 1987, from which many of the rules on contractual obligations were drawn, *party autonomy under the new Code allows for an unrestricted choice of law*, even in the absence of a foreign element (Paragraph 2 of Art. 3111), for the severance of the contract (Paragraph 3 of Art. 3111), extension to succession (Paragraph 2 of Art. 3098), to certain aspects of civil responsibility (Art. 3127), and even to the external relationships of conventional representation (Art. 3116).

196    This brings us to art. 3148, para. 2 *C.C.Q.* which Talpis also argues allows for unrestricted choice (at p. 218). It has been the subject of some debate whether, in order to claim the application of art. 3148, para. 2, a foreign element need be shown to exist. Aside from the presence of an exclusive forum selection clause, or an arbitration clause, no other factor is mentioned in the provision as being necessary for its operation.

197    Two theories have been offered on whether the application of art. 3148, para. 2 requires the presence of a foreign element. The first is that, like in the case of art. 3111 *C.C.Q.*, the legislator intended that no foreign element be present for its operation; this would be consistent with the desire to give primacy to the autonomy of the parties. See S. Rochette, "Commentaire sur la décision *United European Bank and Trust Nassau Ltd. c. Duchesneau*-Le tribunal québécois doit-il examiner le caractère abusif d'une clause d'élection de for incluse dans un contrat d'adhésion?", *Droit civil en ligne, Repères*, Bulletin de droit civil EYB 2006-104816, who, writing on the subject of forum selection clauses, states: [TRANSLATION] "[A]rticles 3111 and 3148, para. 2 C.C.Q. in no way require that a contract contain a foreign element for effect to be given to a forum selection clause in favour of a foreign authority (pp. 3-4)".

198    This would also be consistent with a global trend occurring within the area of private international law with which we are dealing - choice of jurisdiction. In modern times, when it is recognized that respecting parties'jurisdiction clauses promotes commercial certainty, it is generally accepted that the rules and principles which confer jurisdiction in private international law fall within at least two categories: (i) consensual jurisdiction; and (ii) "connected" jurisdiction (some authors also point a potential third area of jurisdiction, "exclusive jurisdiction", on which it is not necessary to elaborate here): see J. Hill in "The Exercise of Jurisdiction in Private International Law", in *Asserting Jurisdiction: International and European Legal Perspectives* (2003), at p. 39; S. Guillemard and A. Prujiner in "La codification internationale du droit international privé : un échec?" (2005), 46 C. de D. 175; and G. Saumier. Consensual jurisdiction rules are those permitting the parties to determine by agreement the jurisdiction to govern their dispute. Hill, at p. 49, describes it as follows:

According to the submission principle, a court is competent-<u>notwithstanding the fact that neither the events giving rise to the dispute nor the parties have any connection with the forum</u>-if parties voluntarily submit to the court's jurisdiction. Such a submission may take the form of a voluntary appearance to defend the claim without challenging the court's jurisdiction or <u>a contractual agreement, typically a jurisdiction clause forming part of a wider agreement</u>. [Emphasis added.]

Under the second category, the "connected" jurisdiction rules employ connecting factors to assist in determining whether the jurisdiction seized can hear the matter. Thus, only the second category of jurisdiction is concerned with an examination of factual links to geographical territories.

199    On the other hand, it has been pointed out that unlike art. 3111, which specifically stipulates that the provision applies even in the absence of a "foreign element", art. 3148, para. 2 makes no such concession and that this silence should not be construed as a mere oversight. See S. Guillemard, "Liberté contractuelle et rattachement juridictionnel : le droit québécois face aux droits français et européen", *E.J.C.L.*, vol. 8.2, June 2004, at pp. 25-26, online:

[TRANSLATION] Must a case be intrinsically international for the designation of a foreign court or tribunal to be permissible, or can the designation of a foreign authority constitute in itself the foreign element required to make a dispute an international one? ...

The *Civil Code of Québec* does not expressly indicate how this question should be answered, but merely allows the parties to agree to a forum "[with respect] to a specified legal relationship". This statement merits special attention, since Quebec's

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 112 of 243 PageID #: 6269

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 Carswellque...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

codifiers were more specific where the normative connection is concerned. Under article 3111 C.C.Q., the parties may designate the law applicable to "[a] juridical act, whether or not it contains any foreign element". How should the silence of the provisions on the jurisdiction of courts be interpreted? Pierre-André Côté, a Quebec expert on statutory interpretation, gives the following warning: "Assuming a statute to be well drafted, an interpretation which adds to the terms ... is suspect". He cites the recommendation of Lord Mersey: "It is a strong thing to read into an Act of Parliament words which are not there, and in the absence of clear necessity it is a wrong thing to do". In other words, if, as the saying goes, the legislature "does not speak gratuitously", it certainly does not remain silent for no reason either. Since a comparison of the two provisions — on choice of law and on choice of forum — is perplexing because of the precision of one and the silence of the other, it must be concluded that selecting a forum is permitted in Quebec law only in a case with a foreign element. [Footnotes omitted.]

The author goes on to theorize, however, that the forum selection clause in itself may be the requisite foreign element since any other conclusion would fail to respect the principle of the primacy of the autonomy of the parties, at pp. 26, 28:

[TRANSLATION] Is it possible that the designation by the parties of a court of a state with no other connection whatsoever to the contract would not in itself constitute a sufficiently significant connection?

. . . . .

In our opinion, to require that one of the elements of the case be "objectively" foreign would be inconsistent with the principle of freedom of contract. This would amount to viewing the jurisdictional connection solely within the framework — if not the straitjacket — of the elements of the contract itself, as is the case with other connecting factors in this area. Moreover, this reasoning is illogical. As we have seen, there is generally no requirement of a connection between the court and a contract otherwise characterized as an international one.

Guillemard similarly recognizes that the same conclusion can be reached in the case of arbitration clauses, at p. 50:

[TRANSLATION] [W]e have observed that where the choice of forum is concerned, in Quebec law at least, the "artificial" internationality that results uniquely from the fact that the authority belongs to another legal system does not appear necessarily to be precluded. It would seem to us to be illogical if the same were not true in the arbitration sphere.

200    In our view, the proposition that forum selection and arbitration clauses constitute on their own the requisite foreign element such that their presence alone brings art. 3148, para. 2 into operation seems quite logical. In the case of forum selection clauses, the *effect* of such clauses will be to divest Quebec authorities of their jurisdiction to hear the matter in order for the dispute to be sent to another country or province to be heard under the laws of that jurisdiction. Similarly, the *effect* of exclusive arbitration clauses is to create a "private jurisdiction" that implicates the loss of jurisdiction of state-appointed authorities for dispute resolution, such as domestic courts and administrative tribunals.

201    We see no principled basis to distinguish between forum selection and arbitration clauses with regard to the question of whether they represent in and of themselves a foreign element. The fact that contractual arbitration may take place within the geographic territory of Quebec is not determinative of anything in that respect. First and foremost, the effect of both is to derogate from the jurisdiction of Quebec authorities and vest jurisdiction in some other entity. It seems to us that the rules in Title three of Book Ten of the *C.C.Q.* are concerned with "jurisdiction" with respect to judicial and quasi-judicial powers, not so much "jurisdiction" in the geographical sense (though the notions can obviously overlap). Jurisdiction can mean a number of things, depending on the context. In *Lipohar v. R.* (1999), 200 C.L.R. 485, [1999] HCA 65 (Australia H.C.), at p. 516, it was said of "jurisdiction": "It is used in a variety of senses, some relating to geography, some to persons and procedures, others to constitutional and judicial structures and powers."

202    The fact that Title three is entitled "*International* jurisdiction of Quebec authorities" does not, in our view, mandate another conclusion. We do not take the reference to "international jurisdiction" to necessarily connote that questions of jurisdiction arise only when faced with geographical extra-territoriality. Private arbitration proceedings, even those located in Quebec, are just as removed from Quebec's judicial and quasi-judicial systems — and hence "international" — as legal proceedings taking place in another province or country. One should avoid placing undue emphasis on the reference to "international" in Title three for the

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 113 of 243 PageID #: 6270
Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 Carswellque...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

same reasons discussed earlier concerning how one should not be mislead by the reference to "international" in the expression "private international law". Indeed, earlier draft versions of Title three used the title "Conflicts of Jurisdiction" (see J. A. Talpis and G. Goldstein, "Analyse critique de l'avant-projet de loi du Québec en droit international privé" (1988), 91 *R. du N.* 606 at p. 608). As well, "International jurisdiction of Quebec authorities" may be somewhat of a misnomer since Quebec authorities must exercise their adjudicative jurisdiction within the territorial limits of the province — hence the holding in *Morguard Properties Ltd. v. Winnipeg (City)*, [1983] 2 S.C.R. 493 (S.C.C.), that to be constitutional, assertions of jurisdiction over a legal dispute must have a real and substantial connection to the province.

203    As a final point, it should be noted that unlike many of the other provinces, Quebec has adopted arbitration rules that make no distinction between domestic and international arbitration. The Book on Arbitration in the *C.C.P.* covers both "domestic" and "international" arbitration; the rules are essentially identical. The purpose of this approach was to show deference to the parties' choice to arbitrate. In the common law provinces, some distinctions are made between "domestic" and "international" arbitrations for the purposes of court intervention and recognition of arbitral awards. The trend appears to be that court intervention is more tightly constrained in "international" arbitration than "domestic" arbitration. Courts are given more freedom to intervene and hear domestic arbitrations. (It would be an odd thing indeed if, in the face of this trend, this Court were to interpret Quebec law to permit greater court intervention in "international" arbitration only.) If Quebec does not make the distinction in the *C.C.P.* rules, it stands to reason that one should not distinguish for the purpose of Book Ten of the *C.C.Q.* This is especially so when it seems that the only reason the word "arbitrator" was included in art. 3148, para. 2 (which substantially duplicates the effects of art. 940.1 *C.C.P.*) was to make available the exceptions to art. 3148, para. 2 at arts. 3149 to 3151.

204    For these reasons, we would conclude that an arbitration clause is itself sufficient to trigger the application of art. 3148, para. 2, and hence the exceptions that apply to it, including art. 3149.

*b) The Quebec Court of Appeal's Decision in Dominion Bridge Corp.*

205    The appellant has relied on the decision in *Dominion Bridge Corp.*, in support of its position. There, the Court of Appeal, *in obiter*, interpreted art. 3149 such that it would permit workers or consumers to be bound to arbitration through an exclusive arbitration clause, so long as the arbitration occurs inside Quebec. Quebec courts have since followed this precedent, including Lemelin J. for the Court of Appeal below, although its wisdom has been questioned: see G. Goldstein and E. Groffier, *Droit international privé*, t. II, *Règles spécifiques* (2003), at p. 640.

206    It is clear that the decision in *Dominion Bridge*, was based on a mistaken belief that the intent of the legislator in enacting art. 3149 was to protect consumers and workers from moving their disputes outside Quebec. Explaining the basis of his conclusion, Beauregard J.A. speculates: [TRANSLATION] "The legislature's main intention was probably to protect a worker's right to sue his or her employer in Quebec" (p. 324). In fact, an examination of the comments made by the Minister of Justice when enacting this legislation reveals that the intent was to preserve consumer and worker access to Quebec courts and other state-appointed dispute resolution forums, not merely to keep them within the geographic territory of Quebec. The comments of the Minister of Justice on art. 3149 are as follows:

[TRANSLATION] This article is new law and is based on Switzerland's 1987 *Loi fédérale sur le droit international privé* and on the third paragraph of article 85 C.C.L.C. It confers jurisdiction over a consumer contract or a contract of employment on a Quebec authority where the consumer or worker is resident or domiciled in Quebec; this jurisdiction is in addition to the jurisdiction based on the criteria set out in article 3148.

The article provides consumers and workers with enhanced protection. [pp. 2010-11]

207    It is instructive to examine the provisions that art. 3149 is purportedly modelled upon. First, there is art. 85 *C.C.L.C.* which provides:

85. When the parties to a deed have for the purpose of such deed, made election of domicile in any other place than their real domicile, all notifications, demands and suits relating thereto may be made at the elected domicile, and before the judge of such domicile.

Case 1:20-cv-00613-SB  Document 204-1  Filed 07/29/22  Page 114 of 243 PageID #: 6271

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

. . . . .

Save in the case of a notarial deed, an election of domicile shall be without effect as regards the jurisdiction of any court, when it is signed by a non-trader within the boundaries of the district in which he resides.

208    Then, there is art. 114 of the Swiss legislation on private international law (*Loi fédérale sur le droit international privé suisse de 1987, RO 1988 1776*), which provides:

[TRANSLATION] **Art. 114** Contracts with consumers

1. Where a consumer brings an action relating to a contract that satisfies the conditions set out in art. 120, para. 1, he may elect to do so <u>in the Swiss court</u>:

a. of his domicile or of his habitual place of residence, or

b. of the supplier's domicile or, in the absence of such domicile, of the supplier's habitual place of residence.

2. A consumer may not waive in advance the forum of his domicile or habitual place of residence.

209    Both provisions specifically maintain the jurisdiction of the courts to hear consumer disputes. As well, it should be noted the Minister of Justice's comments on arts. 3117 and 3118, which are rules that also seek to protect the consumer and worker when it comes to choice of law, end with the following statements, respectively:

[TRANSLATION] It should be noted that the consumer contract is defined in article 1384 and that article 3149 *confers jurisdiction on the Quebec courts* in certain circumstances where consumer contracts are in issue.

. . . . .

It should also be noted here that article 3149 <u>confers jurisdiction on the Quebec courts</u> in certain circumstances where contracts of employment are in issue. [Emphasis added] (Commentaires du ministre de la Justice, at pp. 1987-88)

210    There appears from the above to be an intention on the part of the Quebec legislator to safeguard consumer and worker access to the courts. It is interesting to note that in a more recent decision, *Rees c. Convergia, Convergia Networks Inc.*, [2005] J.Q. No. 3248, 2005 QCCA 353 (C.A. Que.), the Court of Appeal seems to recognize that this was the purpose of art. 3149 *C.C.Q.*: [TRANSLATION] "Evidently, *in the case at bar, the legislature intended, in adopting article 3149 C.C.Q., to confer a separate and full jurisdiction on the Quebec courts* in two areas of economic activity where one of the contracting parties is particularly vulnerable" (para. 37 (emphasis added)).

211    A further problem with the interpretation of art. 3149 in *Dominion Bridge* is that it essentially equates a contractual arbitrator seated in Quebec with a "Québec authority". Applying this notion in most situations demonstrates the flaws in this approach. Assuming that being a decision-maker situated in Quebec is sufficient to make one a "Québec authority", it ignores the issue of whether the arbitrator must be from Québec. In this case, as we read the provisions on appointment of arbitrators in *NAF's Code*, Rules 20-24, there is no guarantee that an arbitrator will be from the complainant's jurisdiction. If the parties do not select an arbitrator on mutually agreeable terms, NAF chooses, permitting the parties to strike out one candidate each from the short list. The only provision that touches on what jurisdiction the arbitrator may be from is Rule 21E. It reads as follows:

E. Unless the Parties agree otherwise, in cases involving citizens of different countries, the Forum may designate an Arbitrator or Arbitrator candidate based, in part, on the nationality and residence of the Arbitrator or Arbitrator candidate, but may not exclude an Arbitrator solely because the person is a citizen of the same country of a Party.

It is nothing short of puzzling how an arbitrator not from Quebec, even though located in Quebec, could be a "Québec authority".

212    This approach also ignores another important issue: where does the arbitrator hold his authority from? Here, the arbitrator and arbitration proceedings under NAF are ultimately subject to U.S. law. We note that in this respect Rule 5O of NAF's *Code* stipulates that "Arbitrations under the Code are governed by the Federal Arbitration Act in accord with Rule 48B." Rule 48B stipulates that: "Unless the Parties agree otherwise, any Arbitration Agreement as described in Rules 1 and 2E and all arbitration

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 115 of 243 PageID #: 6272

*Union des consommateurs c. Dell Computer Corp.*, 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

proceedings, Hearings, Awards, and Orders are to be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16." No arbitrator who is bound by U.S. law could be a "Québec authority". The respondents also rightly raise the fact that Rule 11D provides that all arbitrations will be in English. One would think a "Québec authority" would be required to provide arbitration services in French. Finally, it seems completely incongruous how, in this case, in order to begin the process attributing to the purported "Québec authority" power to hear the dispute, the consumer must first contact an American institution, located in Minneapolis, who is in charge of organizing the arbitration.

213    It should be noted, as well, that assigning the status of "Québec authority" to a contractual arbitrator seated in Quebec would have unwanted consequences when applied to the other exceptions to art. 3148, para. 2, especially art. 3151. It surely could not have been intended that in reserving jurisdiction to "Québec authorities" to hear all "matters of civil liability for damage suffered in or outside Québec as a result of exposure to or the use of raw materials", that private arbitrators could be selected by the parties to hear such disputes before they arise. This is evident from the earlier version of this provision, art. 21.1 *C.C.P.*, assented to June 21, 1989, which reserves the exclusive jurisdiction to hear disputes over raw materials to Quebec courts:

**Civil Code of Lower Canada**

8.1. The application of the rules of this Code is imperative in matters of liability for damage suffered in or outside Québec as a result of exposure to or use of raw materials, whether processed or not, originating in Québec.

**Code of Civil Procedure**

21.1. The courts of Québec have exclusive jurisdiction to hear in first instance all demands or actions founded on liability under article 8.1 of the Civil Code of Lower Canada

In presenting these provisions, the Minister of Justice made the following declarations:

[TRANSLATION] Mr. Speaker, the purpose of the bill is to ensure that Quebec legal rules applicable to certain matters are also mandatory for foreigners.

. . . . .

Since the damage in question is suffered as a result of the use of or exposure to raw materials originating in Quebec, it seemed important that all litigants, be they Quebecers, other Canadians or foreigners, be treated equally and that a single legal scheme governing liability, namely that of Quebec ... should apply to all of them. (Québec, Assemblée nationale, *Journal des débats*, 2nd Sess., 33rd Leg., Vol. 30, No. 126, June 21, 1989, at pp. 6941 and 6970)

It is clear that in introducing these provisions, the National Assembly wanted all litigants in this area to be subject to one single legal system-Quebec's-which of course includes Quebec courts.

*c) Conclusion on the Interpretation of Article 3149*

214    As identified at the outset of this section, the application of art. 3149 hinges on the question "Who is a Quebec authority?" and, in our view, on this question only. It is obvious from the above discussion that a "Québec authority" must mean a decision-maker situated in Quebec holding its authority from Quebec law. This is consistent with the meaning of "Québec authority" discussed in Quebec doctrine. C. Emanuelli, in *Droit international privé québécois* (2nd ed. 2006), defines the terms as encompassing: [TRANSLATION] "Quebec courts and notaries and other Quebec authorities, such as the Director of Youth Protection and the Registrar of Civil Status" (art. 152). H. P. Glenn notes that [TRANSLATION] "[b]y simply referring to 'Québec authorities' without further clarification, Title Three establishes the rules respecting the international jurisdiction *of Quebec judicial and administrative authorities*" ("*Droit international privé*", in *La Réforme du Code civil* 1993, t.3, at p. 743 (emphasis added)). See also G. Goldstein and E. Groffier, who state: [TRANSLATION] "The new Code refers to Quebec or foreign 'authorities' rather than to courts. The intention is to include administrative authorities whose decisions may concern private law matters .... However, (non-state) arbitral tribunals do not appear to be regarded as 'authorities' for purposes of this Code" (*Droit international privé*, at p. 287). This is completely consistent with the distinction made between "Québec authorities", "foreign authorities" and "arbitrators" in art. 3148, para. 2.

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

215    While little has been written on the interpretation of art. 3149 itself, there is academic support for our position. N. W. Vermeys, in "Commentaire sur la décision *Dell Computer Corporation c. Union des consommateurs* - Quand « browsewrap » rime avec « arbitrabilité »" Droit civil en ligne, *Repères*, August 2005, EYB2005REP375, argues:

> [TRANSLATION] "Article 3148 C.C.Q. seems to preclude compulsory arbitration where consumer contracts are concerned.... The effect of this article is that the 'arbitrator' concept is expressly excluded from that of the 'Quebec authority'. Since the Code prevents a consumer from waiving the jurisdiction of Quebec authorities, it would necessarily be impossible to set up an arbitration clause against the consumer".

Vermeys further rejects the argument that an arbitrator could fit within the word "court" in the C.P.A., s. 271, para. 3, in order to qualify as a "Québec authority" for the purposes of arts. 3148 and 3149:

> [TRANSLATION] For this purpose, some may be tempted to argue that the definition of "court" in the CPA includes an arbitrator. However, to interpret the word "courts" this broadly would appear to me to be inconsistent with the current state of the law. As the Court [of Appeal] quite correctly stated, "the [Consumer Protection] Act does not define this term, so it is necessary to turn to article 4 C.C.P.: '"court" means one of the courts of justice enumerated in article 22 or a judge presiding in a courtroom'" (para. 51 of the decision in question).... [B]efore even consulting the *Code of Civil Procedure*, it should be determined whether the legislation is internally consistent. Several provisions of the Act, including sections 142, 143, 267 and 271, seem to imply that only courts within the meaning of the *Code of Civil Procedure* were contemplated by the legislature in drafting the CPA. [Footnote No. 20]

216    All of this leads to the conclusion that a contractual arbitrator cannot be a "Québec authority" for the purposes of art. 3149. Therefore, Dell cannot succeed here in trying to set up the exclusive arbitration against Dumoulin. This interpretation does not affect labour arbitrators, nor other forms of arbitration made available under Quebec statutes, because such arbitrators would qualify as "Québec authorities": see Tremblay, at p. 252: [TRANSLATION] "A distinction must also be made between civil or commercial arbitration and other types of arbitration, such as grievance arbitration in labour law. In grievance arbitration, even though the parties can choose the third party, *arbitration is compulsory by law*" (emphasis added). This explains why this Court's decisions in *Bisaillon*, and *Desputeaux* do not dictate our conclusion here. The former involved an arbitrator whose authority stemmed from Quebec's *Labour Code*, and the latter involved an arbitrator designated by s. 37 of the *Act respecting the professional status of artists*. Nor does our interpretation signify that arbitration clauses in consumer and worker contracts are always invalid. It simply means that the agreement to arbitrate in advance of the dispute, which is the effect of an arbitration clause included in a contract of adhesion, could not be set up against the consumer or worker. The consumer or worker could well decide they want to arbitrate; in that case recourse to art. 3149 is unnecessary. This is explained very well by Goldstein and Groffier, at p. 640:

> [TRANSLATION] All that article 3149 C.C.Q. says is that the party contracting with the weaker party cannot impose such a clause on him or her regardless of what the weaker party intended and perhaps even though ... the weaker party originally opted for arbitration but subsequently changed his or her mind. While it is true that workers or consumers cannot waive the forum of their residence or domicile *in advance*, they can nevertheless waive it if they believe that would be in their interest in the circumstances. To say the contrary would be tantamount to saying that in international situations, nothing relating to a contract of employment or a consumer contract is arbitrable.

217    Our conclusion on art. 3149 *C.C.Q.* is alone sufficient to dismiss the appellant's motion to refer the dispute to arbitration and it is therefore not strictly necessary to study the other possible grounds of nullity of the arbitration agreement. That said, we are of the view that the other questions raised by this appeal are sufficiently important to make it necessary for our Court to state its views on their respective merits.

*2) Is the Arbitration Agreement Null Because a Consumer Dispute Is a Matter of Public Order?*

218    Although the respondents did not specifically argue that a consumer dispute could never be arbitrated because it would constitute an arbitration over a matter of public order, we need to briefly state our position on the subject, as the question was

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

discussed by the Court of Appeal. In our view, the Court of Appeal was correct in concluding that a consumer dispute can be arbitrated. Such a conclusion inevitably flows from the application of the reasoning we have adopted in *Desputeaux*, and is in accordance with the requirements of public policy, subject to the effect of art. 3149 *C.C.Q.*

219   Article 2639 *C.C.Q.* deals with the kind of disputes that cannot be submitted to arbitration. These are the "[d]isputes over the status and capacity of persons, family matters or *other matters of public order*". The question is therefore whether a consumer dispute constitutes such an other matter of public order. We believe that it does not. As we held in *Desputeaux*, the concept of public order in art. 2639, para. 1 *C.C.Q.* must be interpreted restrictively so as to respect the parties'autonomy to choose arbitration, as well as the clear legislative intention to respect such a choice. As there was no compelling reason to consider copyright disputes as analogous to disputes regarding the status and capacity of persons or family matters in *Desputeaux*, there is no such compelling reason regarding consumer disputes in the case at bar.

220   Furthermore, the fact that certain *C.P.A.* rules to be applied by the arbitrator are in the nature of public order does not constitute a bar for the hearing of the case by an arbitral tribunal. The second paragraph of art. 2639 *C.C.Q.* makes this clear. This was also recognized by our Court in *Desputeaux*:

> A broad interpretation of the concept of public order in art. 2639, para. 1 *C.C.Q.* has been expressly rejected by the legislature, which has specified that the fact that the rules applied by an arbitrator are in the nature of rules of public order is not a ground for opposing an arbitration agreement (art. 2639, para. 2 *C.C.Q.*). The purpose of enacting art. 2639, para. 2 *C.C.Q.* was clearly to put an end to an earlier tendency by the courts to exclude any matter relating to public order from arbitral jurisdiction. (See *Condominiums Mont St-Sauveur inc. v. Constructions Serge Sauvé ltée*, [1990] R.J.Q. 2783, at p. 2789, in which the Quebec Court of Appeal in fact stated its disagreement with the earlier decision in *Procon (Great Britain) Ltd. v. Golden Eagle Co.*, [1976] C.A. 565; see also *Mousseau* [*v. Société de gestion Paquin ltée*, [1994] R.J.Q. 2004 (Sup.Ct.)], at p. 2009.) Except in certain fundamental matters, relating, for example, strictly to the status of persons, as was found by the Quebec Superior Court to be the case in *Mousseau, supra*, an arbitrator may dispose of questions relating to rules of public order, since they may be the subject matter of the arbitration agreement. The arbitrator is not compelled to stay his or her proceedings the moment a matter that might be characterized as a rule or principle of public order arises in the course of the arbitration. [para. 53]

221   Finally, the fact that the *C.P.A.* and the *C.C.Q.* are silent as to the arbitrability of a consumer dispute suggests its permissibility. An act should only be interpreted as excluding the possibility of arbitration if it is clear from it that the legislator purported to exclude the possibility of arbitration. No provisions of the *C.P.A.* or the *C.C.Q.* lead us to think that it is the case for consumer disputes. More specifically, we think the Court of Appeal was correct in finding that art. 271, para. 3 *C.P.A.* merely defines the jurisdiction *ratione materiae* of the courts and in concluding that, as we held in *Desputeaux*, such an article should not be interpreted as excluding the possibility of arbitration.

222   The Quebec legislature has never given any clear indications that consumer disputes are not arbitrable. No general rule to that effect can be found anywhere. The legislature adopted another approach. The *C.C.Q.* and the *C.P.A.* contain certain rules which govern the validity, applicability and enforceability of arbitration agreements in respect of consumers.

223   The respondents seem to argue that a consumer dispute can never be arbitrated because arbitration proceedings should be considered *inherently* unfair for the consumer. We are not convinced that this is the case. On the contrary, we think that under certain circumstances, arbitration may actually be an appropriate or preferable forum for the adjudication of consumer disputes.

*3) Is the Arbitration Agreement Void Because It Constitutes a Waiver of the Jurisdiction of the Superior Court Over Class Actions Contrary to Public Order?*

224   The respondents also argue that access to class actions is a matter of public order and therefore cannot be subject to arbitration under art. 2639. This argument must fail, because, as discussed above, art. 2639, para. 1 seeks to insulate only certain types of "matters" or disputes of public order from arbitration. Access to class actions is a procedural right and not a type of "matter" or dispute analogous to status and capacity of persons, or family law disputes.

225     The respondents alternatively argue that this Court should apply its decision in *Garcia Transport Ltée c. Cie Trust Royal*, [1992] 2 S.C.R. 499 (S.C.C.), to find that the rules on class actions are rules of public order, with the consequence that contractual provisions preventing the consumer from accessing class actions are of no effect. In *Garcia Transport*, the Court concluded that a provision in the *C.C.L.C.* was a rule of public order absent an explicit statement within the provision indicating this status. Finding that such status could be implied, the Court identified a number of factors that indicated legislative intent to accord the provision this status. The decision leaves no doubt, however, that it is the Quebec legislature that decides which laws apply as a matter of public order, not the courts. The role of courts in this regard is to determine whether sufficient legislative intent is present to clearly indicate that a law is intended to be one of public order, and this will occur only in those rare cases where the legislator has been less than explicit about its status. The following excerpt from J.-L. Baudouin, *Les obligations* (3rd ed. 1989) at p. 81 (cited in *Garcia Transport* at p. 525) accurately sets out the law:

> [TRANSLATION] Most of the time, the legislature intervenes directly to establish what is a matter of public order. Sometimes there is even an explicit statement in the statutory or regulatory provision that it is of public order; sometimes it indicates that there can be no contractual derogation from the rule, and that any such derogation will be null. Sometimes, on the contrary, the legislature clearly indicates that it is left to the parties themselves to settle the question and that the rule that is set out will apply only to supplement their agreement.... In other cases, finally, the formula used does not directly suggest that the statute is truly imperative. It is then for the courts to determine the legislative intention and to decide whether the provisions should be treated as being of public order, that is, to determine whether they are *imperative* provisions or merely *supplement* the will of the parties. [Emphasis in original]

226     In this case, there is no indication of a legislative intent to give the rules in Book IX on "Class Action" of the *C.C.P.* public order status. While art. 1051 *C.C.P.* states that the provisions of the other books of the *C.C.P.* that are inconsistent with the rules of Book IX do not apply, this rule merely intends to remedy practical difficulties in applying procedures that would be unfeasible in the class action context, such as strictly applying the rules on cross-claims and joinder. It does not elevate the right to institute class actions to the status of a rule of public order that cannot be waived. Furthermore, this Court's recent decision in *Bisaillon*, is clear authority that the class action, while having an important social dimension, is only a "procedural vehicle whose use neither modifies nor creates substantive rights" and can generally be waived (para. 17). It is the legislature, and not the courts, that can create exceptions to this.

*4) Is the Arbitration Agreement Null Because Dumoulin Did Not Consent to It as It Was Imposed on Him Through a Contract of Adhesion?*

227     The respondents also argue that the principle of the autonomy of the parties has no bearing on this case as the arbitration clause is found in a contract of adhesion. In other words, the respondents seem to argue that Dumoulin should not be bound by the arbitration agreement because he did not give a true consent to the contract in which it is contained, this contract being of adhesion. This argument must also fail. It is based on the false assumption that an adhering party does not truly consent to be bound by the obligations contained in a contract of adhesion. The notion of a contract of adhesion is only meant to describe the contract in which the essential stipulations were imposed or drawn up by one of the parties and were not negotiable (see art. 1379 *C.C.Q.*). This does not mean that the adhering party cannot give a true consent to it and be bound by each one of its clauses, subject to the possibility that some might be void or without effect pursuant to some other provisions of the law. As stated by J.-L. Baudouin and P.-G. Jobin:

> [TRANSLATION] Since the adhering party's only choice is between entering into the contract on the terms imposed by the other party and not entering into it, the question that arises is whether this is a true contract, that is, an *agreement of the wills* of the parties. Some authors argue that a contract of adhesion is more akin to a unilateral juridical act, whereas a contract is a bilateral juridical act. However, most authors consider a contract of adhesion to be a true contract even though the role of the will of the adhering party is reduced to a minimum. Support for this position can be found in the variety of mechanisms that have been developed at law to correct the inequities and problems of consent that result from the adhering party's inability to negotiate .... [Emphasis in original] (Les obligations (6th ed. 2005), at p. 79)

228    We agree with the position defended by the majority of the doctrine and think it is therefore not sufficient for the respondents to raise the fact that the arbitration clause is found in a contract of adhesion in order to demonstrate that Dumoulin should not be bound by it. Reliance on some other provisions of the law is necessary.

*5) Is the Arbitration Clause Void Because It Is Abusive?*

229    Article 1437 *C.C.Q.* and s. 8 *C.P.A.* provide the basis for a judicial declaration of the nullity of an abusive clause. However, as was noted above, we are of the view that an arbitration clause cannot be said to be abusive only because it is found in a consumer contract or in a contract of adhesion. The agreement to arbitrate a consumer dispute is not inherently unfair and abusive for the consumer. On the contrary, it may well facilitate the consumer's access to justice. Therefore, the consumer that raises this ground of nullity must prove that, given the particular facts of his case, the arbitration agreement should be considered abusive. Most of the time, such proof will require testimonial evidence. If that is the case, the question will have to be dealt with by the arbitral tribunal, subject to the possibility for the consumer to ask for a revision of the arbitral tribunal's decision under art. 943.1 *C.C.P.* Such would have been the situation in the case at bar if it had not been for our conclusion regarding the applicability of art. 3149 *C.C.Q.*

*6) Is the Arbitration Agreement Null Because It Is an External Clause that Was Not Expressly Brought to the Attention of Dumoulin?*

230    Generally, the question of whether the arbitration agreement is null pursuant to art. 1435, para. 2 *C.C.Q.* will be more appropriately left to the arbitral tribunal to decide. Although it will often be possible for a court to decide on examination of the material supporting the referral application if the arbitration agreement was contained in an external clause, it will generally not be possible to determine, on such a review, if this external clause was expressly brought to the attention of the consumer or adhering party, or if the consumer or adhering party otherwise knew of it. For that reason, a review involving testimonial evidence will often be necessary and this review is better left to the arbitral tribunal. Such would have been the situation in the case at bar if it had not been for our conclusion regarding the applicability of art. 3149 *C.C.Q. in fine.*

231    That said, the finding of the Court of Appeal that the arbitration clause was external because the Terms and Conditions were external is significant, given the growing frequency with which on-line contracts are made and the impact such a finding could have on e-commerce. As the position adopted by the Court of Appeal is not free from doubts, we feel compelled to state our view on the matter.

232    The context of e-commerce requires courts to be sensitive to a number of considerations. First, we are dealing with a different means of doing business than has heretofore been generally considered by the courts, with terminology and concepts that may not easily, though nevertheless must be fit within the existing body of contract law. Second, as e-commerce increasingly gains a greater foothold within our society, courts must be mindful of advancing the goal of commercial certainty (see *Rudder v. Microsoft Corp.* (1999), 2 C.P.R. (4th) 474 (Ont. S.C.J.)). Finally, the context demands that a certain level of computer competence be attributed to those who choose to engage in e-commerce. As noted by the Ontario Superior Court of Justice in *Kanitz v. Rogers Cable Inc.* (2002), 58 O.R. (3d) 299 (Ont. S.C.J.):

> We are here dealing with people who wish to avail themselves of an electronic environment and the electronic services that are available through it. It does not seem unreasonable for persons who are seeking electronic access to all manner of goods, services and products, along with information, communication, entertainment and other resources, to have the legal attributes of their relationship with the very entity that is providing such electronic access, defined and communicated to them through that electronic format. [para. 32]

233    As a preliminary matter, the appellant raised the objection that the Court of Appeal made its own factual findings by reviewing the transcripts and appeal record in order to find that art. 1435 *C.C.Q.* applied. The appellant submits that the Court of Appeal erred by not remitting the case to the court below for the necessary evidentiary findings to be made since the Superior Court made no finding of fact of this issue. This submission must be rejected. The power of the Court of Appeal to make a fresh assessment of facts on the record and offer a substituted verdict can be implied from s. 10 of the *Courts of Justice Act*, R.S.Q.,

Case 1:20-cv-00613-SB   Document 204-1   Filed 07/29/22   Page 120 of 243 PageID #: 6277

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

c. T-16, which provides that the Court's power to hear appeals "shall carry with it all powers necessary to its exercise" (see also R. P. Kerans, *Standards of Review Employed by Appellate Courts* (1994), at p. 201).

234      We turn now to whether art. 1435 *C.C.Q.* applied in this case. Article 1435 *C.C.Q.* provides that external clauses are generally permitted, except in cases involving contracts of adhesion or consumer contracts, where, in order to be found valid, it must be proved that they have been brought to the party's attention or that the consumer or adhering party otherwise knew of it. The first question, then, is whether Dell's Terms and Conditions of Sale, hyperlinked to the bottom of the Configurator Page and containing the arbitration clause, constitute an external document.

235      The meaning of "external" is not defined in the *C.C.Q.*; however, both the doctrine and Quebec jurisprudence provide some insight into its meaning. Baudouin and Jobin provide a definition but they express ambivalence over whether, in general, hyperlinked documents are external within the meaning of art. 1435 *C.C.Q.*:

> [TRANSLATION] [An external clause is] a stipulation set out in a document that is separate from the agreement or instrument but that, according to a clause of this agreement, is deemed to be an integral part of it and thus binding on the parties.... In a contract entered into via the Internet, the contracting party must use one or more hyperlinks to find the external clauses that govern the contract appearing on the screen; it might be asked whether these are in fact external clauses. The external clause concept needs to be clarified somewhat. For instance, a document that is appended to the contract and is immediately submitted to each party, or a stipulation found on the back of the instrument, is not an external clause. [Footnotes omitted; p. 267.]

236      The appellant's submissions were along similar lines, analogizing clicking a hyperlink on a web page to the turning of the page of a contract in paper form. There may be some merit to this argument, but it ignores the fact that a web page can contain several hyperlinks, which can obscure the relevant link containing important information about the consumer's legal rights.

237      S. Parisien provides better insight into when a hyperlinked document may be considered to have been expressly brought to the attention of the consumer at the moment of formation of the contract: [TRANSLATION] "A hyperlink to a document that is incorporated by reference should satisfy this condition if it is functional and clearly visible", in *Guide juridique du commerçant électronique* (2001), at p. 106). This is a reasonable approach to the issue; it is more realistic than a general finding that hyperlink documents are either always or never external. Applied to the facts of this case, the issue would be whether the relevant hyperlink's location and visibility on a web page obscures it to such an extent that it can properly be said to be external.

238      It is true, as noted by the Court of Appeal, that the hyperlink to the Terms and Conditions of Sale was in smaller print, located at the bottom of the Configurator Page. The evidence was that Dell places a hyperlink to its Terms and Conditions of Sale at the bottom of every shopping page on its site. This is consistent with industry standards. In fact, this is the placement that was at the time recommended by Industry Canada's Office of Consumer Affairs (*Your Internet Business: Earning Consumer Trust — A guide to consumer protection for on-line merchants* (1999), at p. 10). It is proper to assume, then, that consumers that were engaging in e-commerce at the time would have expected to find a company's terms and conditions at the bottom of the web page. In light of this, we conclude that the hyperlink to the Terms and Conditions was evident to Dumoulin. Furthermore, the Configurator Page contained a notice that the sale was subject to the Terms and Conditions of Sale, available by hyperlink, thus bringing the Terms and Conditions expressly to Dumoulin's attention.

239      Upon clicking on the hyperlink, the first paragraph states, in block capital letters:

> PLEASE READ THIS DOCUMENT CAREFULLY! IT CONTAINS VERY IMPORTANT INFORMATION ABOUT YOUR RIGHTS AND OBLIGATIONS, AS WELL AS LIMITATIONS AND EXCLUSIONS THAT MAY APPLY TO YOU. THIS DOCUMENT CONTAINS A DISPUTE RESOLUTION CLAUSE.

> This Agreement contains the terms and conditions that apply to your purchase from Dell Computer Corporation, a Canadian Corporation ("Dell", "our" or "we") that will be provided to you ("Customer") on orders for computer systems and/or other products and/or services and support sold in Canada. By accepting delivery of the computer systems, other products and/

Union des consommateurs c. Dell Computer Corp., 2007 SCC 34, 2007 CarswellQue...

2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, [2007] 2 S.C.R. 801...

or services and support described on the invoice, Customer agrees to be bound by and accepts these terms and conditions. (Appellant's record, vol. III, at p. 381)

240     This warning brings the existence of the dispute resolution clause directly to the attention of the reader at the outset, and one has only to scroll down to find clause 13(c), where the arbitration clause is set out to easily access all information needed about the conduct of the arbitration process. For this reason, we would reject the suggestion that the arbitration clause was buried or obscured within the Terms and Conditions of Sale. We adopt the reasoning in *Kanitz v. Rogers Cable Inc.*, at para. 31, regarding a very similar arbitration agreement located in a standard-form contract:

> [The arbitration clause] is displayed just as all of the other clauses of the agreement are displayed. It is not contained within a larger clause dealing with other matters, nor is it in fine print or otherwise tucked away in some obscure place designed to make it discoverable only through dogged determination. The clause is upfront and easily located by anyone who wishes to take the time to scroll through the document for even a cursory review of its contents. The arbitration clause is, therefore, not at all equivalent to the fine print on the back of the rent-a-car contract in the *Tilden* case or on the back of the baseball ticket in the *Blue Jays* case.

241     Lemelin J. concluded that it was significant that the *Code of Civil Procedure* governing the arbitration process could be accessed only through an outside website. However, what is relevant is whether the arbitration agreement itself, and not the *C.C.P.*, was evident and accessible through the Terms and Conditions of Sale.

### V. Disposition

242     For these reasons, we would dismiss the appeal with costs.

***Bastarache J., LeBel J., Fish J.:***

Dissenting.

*Appeal allowed.*

*Pourvoi accueilli.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# EXHIBIT F

 **_T1T2 Limited Partnership et al. v. The Queen in Right of Canada [Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66_**

Ontario Reports

Ontario Court (General Division),

Borins J.

November 10, 1994

Court File No. 94-CQ-55762

23 O.R. (3d) 66    |    _[1994] O.J. No. 2614_

# Case Summary

**Civil procedure — Stay of proceedings — Arbitration — Agreement between parties providing that any dispute or difference "except a dispute or difference involving a question of law" may be referred to arbitration — "Question of law" including questions of mixed fact and law and not restricted to questions of pure law — Motion to stay action for declaration that defendant had breached agreement dismissed.**

The parties had entered into three contracts which together provided for the privatization of Terminals 1 and 2 of Lester B. Pearson International Airport. Each contract contained an arbitration clause which provided that "Any dispute or difference between the parties . . . except a dispute or difference involving a question of law may be referred to an arbitration tribunal". After the government introduced in the House of Commons Bill C-22, an Act purporting to declare that the contracts had not come into effect and had no legal effect, the plaintiffs commenced an action for a declaration that the defendant breached and repudiated the contracts, a declaration that the defendant was to save the plaintiffs harmless from all claims or proceedings brought against the plaintiffs by third parties, and an order directing a reference to an arbitration tribunal to assess the plaintiffs' losses and damages resulting from the defendant's breach. The defendant moved, pursuant to s. 106 of the Courts of Justice Act, _R.S.O. 1990, c. C.43_, for an order staying the action on the ground that the plaintiffs were precluded from bringing the action as they had made a submission in accordance with the arbitration provisions contained in the contracts. In the alternative, the defendant asked the court to exercise its discretion under s. 106 to stay the proceedings.

Held, the motion should be dismissed.

The resolution of the disputes raised by the statement of claim would involve questions of mixed fact and law. The term "question of law" in the arbitration clause of the contracts included questions of mixed fact and law and was not restricted to pure questions of law. As the dispute involved a question of law, the motion to stay the action on the ground that the plaintiffs were prohibited by the arbitration provision from litigating arbitrable disputes had to be dismissed.

The action should not be stayed under s. 106 of the Courts of Justice Act on the ground that it was otherwise just to do so. This was not a case where the disputes would proceed simultaneously before two forums, the court and the arbitration tribunal, as the dispute in respect of damages would not get to arbitration unless, and until, the plaintiffs obtained the declaratory judgments sought in their statement of claim. In any event, art. 8(2) of the Commercial Arbitration Code contemplates simultaneous proceedings before the court and an arbitration tribunal in appropriate cases. To stay the action would effectively deprive the plaintiffs of any forum in which to assert their claims. As there would not be a multiplicity of proceedings, it followed that there would not be a possibility of inconsistent results. As the plaintiffs had moved for summary judgment, there was a risk that they would be deprived of a juridical advantage if a stay was granted because they might be deprived of being able to obtain judgment before Bill C-22 was proclaimed, if it should pass the Senate.

Cases referred to

Boart Sweden AB v. NYA Stromnes AB _(1988), 41 B.L.R. 295_ (Ont. H.C.J.); Canadian National Railway v. Bell Telephone Co., _[1939] S.C.R. 308_, _[1939] 3 D.L.R. 8_, _50 C.R.T.C. 10_; Deluce Holdings Inc. v. Air Canada _(1992), 12 O.R. (3d) 131_, _98 D.L.R. (4th)_

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

*509*, *13 C.P.C. (3d) 72*, *8 B.L.R. (2d) 294* (Gen. Div.); Heyman v. Darwins Ltd., [1942] A.C. 356, [1942] 1 All E.R. 337, 111 L.J.K.B. 241, 166 L.T. 306, 58 T.L.R. 169 (H.L.); Kaverit Steel & Crane Ltd. v. Kone Corp. *(1992), 87 D.L.R. (4th) 129*, *85 Alta. L.R. (2d) 287*, *40 C.P.R. (3d) 161*, *[1992] 3 W.W.R. 716*, *4 C.P.C. (3d) 99* (C.A.), leave to appeal to S.C.C. refused *(1992), 11 C.P.C. (3d) 18*n; Nanisivik Mines Ltd. v. F.C.R.S. Shipping Ltd., *[1994] 2 F.C. 662*, *113 D.L.R. (4th) 536* (C.A.); S.L. Sethia Liners Ltd. v. State Trading Corp. of India, [1986] 1 Lloyd's Rep. 31, [1986] 2 All E.R. 395 (C.A.).

Statutes referred to

Arbitrations Act, 1991, *S.O. 1991, c. 17, s. 7*(1) Commercial Arbitration Act, *R.S.C. 1985, c. 17 (2nd Supp.)* Courts of Justice Act, *R.S.O. 1990, c. C.43, s. 106*

Treaties and conventions referred to

Commercial Arbitration Code, United Nations Commission on International Trade Law, June 21, 1985 (set out in Schedule to Commercial Arbitration Act), arts. 5, 7, 8, 16

Authorities referred to

Casey, International and Domestic Commercial Arbitration (Toronto: Carswell, 1993), pp. 3-5, 3-6 to 3-7 Nolan and Nolan-Haley, Black's Law Dictionary, 6th ed. abridg. (St. Paul: West Publishing Co.), "fact", "law", "question" Words and Phrases, Vol. 22A, Permanent ed. (St. Paul: West Publishing Co., 1958), "involve"

Motion for a stay of proceedings.
Ivan G. Whitehall, Q.C., David Sgayias, Q.C., and Paul Vickery, for moving party (defendant).

Ronald G. Slaght, Q.C., for responding parties (plaintiffs).

**BORINS J.**: — This is a motion brought by the defendant pursuant to s. 106 of the Courts of Justice Act, *R.S.O. 1990, c. C.43*, for an order staying the plaintiffs' action. It is the position of the defendant that the plaintiffs are precluded from bringing this action as they have made a submission in accordance with the arbitration provisions contained in what are described in this action as the Airport Contracts. In the alternative, the court is asked to exercise its discretion under s. 106 of the Act to stay the proceedings on grounds which will be discussed below. Central to the resolution of this motion is the proper interpretation of the arbitration provisions which, for convenience, will be referred to as the "arbitration provision".

There is no dispute between the parties as to the events leading up to this action. The Airport Contracts provide for the privatization of Terminals 1 and 2 of the Lester B. Pearson International Airport. From March through July 1993, the plaintiffs and the defendant negotiated and agreed upon the fundamental terms of the Airport Contracts. In August 1993, the federal Cabinet and the Treasury Board approved these terms. The Airport Contracts were signed by the plaintiffs and the defendant on October 7, 1993, and the transaction closed on that date. Although the Airport Contracts consist of approximately 40 agreements, there are three principal agreements -- the Ground Lease, the Development Agreement and the Management and Operations Agreement. Each of these agreements contain an identical arbitration provision. Comprehensively, the Airport Contracts deal with all aspects of the leasing, redevelopment and operation of Terminals 1 and 2 until 2030, with an option to extend the agreements to 2050.

After October 25, 1993, the Minister of Transport requested that the plaintiffs delay the takeover of Terminals 1 and 2, scheduled for November 1, 1993, and the commencement of the first stage of construction, scheduled for December 1, 1993, in order to permit the defendant, which was then represented by a new government, to review the Airport Contracts. The plaintiffs agreed to this request. On December 3, 1993, the defendant, represented by the Prime Minister, announced that it intended to cancel the Airport Contracts forthwith, notwithstanding the absence of a cancellation provision in the agreements. Subsequent to this announcement, the defendant has not permitted the plaintiffs to occupy Terminals 1 and 2 with the result that the plaintiffs have been unable to perform their obligations under the Airport Contracts.

In April 1994, the government introduced in the House of Commons Bill C-22, which is described as "An Act respecting certain agreements concerning the redevelopment and operation of Terminals 1 and 2 at Lester B. Pearson International Airport". The Act

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

purports to declare that the Airport Contracts had not come into force and to have no legal effect and provides that all existing legal recourse or entitlement to compensation from the Crown is negated, and purports to prohibit the plaintiffs from access to the courts in relation to the Airport Contracts. However, the Act authorizes the Minister of Transport, with the approval of the Governor in Council, to enter into agreements for the payment of amounts in connection with the coming into force of the Act. Some negotiations have taken place with Mr. Robert Wright concerning such payments. Bill C-22 was passed by the House of Commons on June 16, 1994, and was referred to the Senate. The Senate did not pass the Act, and recommended amendments deleting those provisions which deny the plaintiffs access to the courts. Bill C-22 has since been reaffirmed by the House of Commons and is, again, before the Senate.

The plaintiffs commenced their action with the issuance of their statement of claim on September 14, 1994. On September 16, 1994 the plaintiffs obtained an order under rule 20.01(2) of the Rules of Civil Procedure, on the ground of special urgency, granting leave to serve a notice of motion for summary judgment together with their statement of claim. On September 20, 1994 the defendant was served with the statement of claim, a notice of motion for summary judgment returnable November 21, 1994, and supporting motion materials.

The plaintiffs' claim is contained in para. 1 of the statement of claim which reads as follows:

1. The plaintiffs claim:

   (a) a declaration that the defendant committed a breach of the Airport Contracts on or about December 3, 1993, and has repudiated the Airport Contracts;

   (b) a declaration that the defendant shall save the plaintiffs harmless from and against all claims, demands, losses, costs, damages, actions, suits or proceedings brought against the plaintiffs by third parties with whom the plaintiffs contracted or with whom the plaintiffs entered into commitments or arrangements for the purpose of financing, designing, building, developing and operating the Terminals 1 and 2 complex and generally carrying out the duties and obligations of the plaintiffs under the Airport Contracts;

   (c) an order directing a reference to an arbitration tribunal appointed pursuant to the provisions of the Airport Contracts to assess the plaintiffs' losses and damages resulting from the defendant's breach, and judgment for the amount so determined by the arbitration tribunal . . .

Pursuant to the order of Conant J., granted on October 11, 1994, the plaintiffs provided particulars of the claim contained in para. 1(b).

As I understand the plaintiffs' action, the order requested in para. 1(c) referring the assessment of damages to an arbitration tribunal appointed pursuant to the provisions of Airport Contracts is sought because the plaintiffs are required by the arbitration provision to submit the assessment of damages to arbitration. Indeed, as I will explain below, on a proper interpretation of the arbitration provision it is necessary that the court determine whether the defendant has committed a breach of the Airport Contracts and whether the defendant must legally indemnify the plaintiffs for damages which they have incurred to third parties by reason of their inability to perform the Airport Contracts consequent to the defendant's alleged breach. Therefore, the declaratory judgments which the plaintiffs claim in paras. 1(a) and 1(b) are required before they can ask the arbitration tribunal to assess their damages.

Typical of the arbitration provisions in the three principal Airport Contracts is Article 49 in the Ground Lease, which states:

ARTICLE 49

Arbitration

49.1

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

   (a)   Any dispute or difference between the parties hereto arising under this Lease except a dispute or difference involving a question of law may be referred to an arbitration tribunal for an award and determination by written submission signed by either the Landlord or the Tenant.

   (b)   The parties agree that the award and determination of the arbitration tribunal shall be final and binding on the parties hereto.

   (c)   The arbitration tribunal shall be governed by the Commercial Arbitration Code referred to in the Commercial Arbitration Act. (R.S.C. 1985 Chap. c-34.6).

49.2

   (a)   The arbitration tribunal shall consist of three (3) arbitrators, one (1) appointed by the Landlord, one (1) appointed by Tenant and the third appointed by the first two (2) arbitrators.

   (b)   The arbitration tribunal shall decide the dispute or difference in accordance with the laws referred to in Section 1.6. The arbitration tribunal shall not be authorized to decide ex aequo et bono or as amiable compositeur.

49.3

   (a)   The proceedings shall take place in the Province of Ontario, unless the parties hereto agree otherwise.

   (b)   The language to be used in the proceedings is English, unless the parties hereto agree otherwise.

   (c)   The parties hereto, and not the arbitration tribunal, may appoint experts to give evidence in the arbitration proceedings.

49.4 During the progress of arbitration, the parties hereto shall continue to perform their obligations under this Lease.

49.5 If the Landlord should not be subject to the Commercial Arbitration Act (R.S.C. 1985, Chap. c. 34.6), the corresponding arbitration statute of the Province of Ontario shall apply.

   The Commercial Arbitration Code ("Code"), referred to in art. 49.1(c), is a schedule to the Commercial Arbitration Act, _R.S.C. 1985, c. 17 (2nd Supp.)_. It is based on the model law adopted by the United Nations Commission on International Trade Law on June 21, 1985. Counsel for the defendant has placed reliance on the following articles of the Code:

Article 5

Extent of Court Intervention

In matters governed by this Code, no court shall intervene except where so provided in this Code.

. . . . .

Chapter II. Arbitration Agreement

Article 7

Definition and Form of Arbitration Agreement

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

(1) "Arbitration agreement" is an agreement by the parties to submit to arbitration all or certain disputes which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not. An arbitration agreement may be in the form of an arbitration clause in a contract or in the form of a separate agreement.

. . . . .

## Article 8

Arbitration Agreement and Substantive Claim before Court

(1) A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed.
(2) Where an action referred to in paragraph (1) of this article has been brought, arbitral proceedings may nevertheless be commenced or continued, and an award may be made, while the issue is pending before the court.

. . . . .

Chapter IV. Jurisdiction of Arbitral Tribunal

## Article 16

Competence of Arbitral Tribunal to Rule on its Jurisdiction

(1) The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause.

(2) A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than the submission of the statement of defence. A party is not precluded from raising such a plea by the fact that he has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.
(3) The arbitral tribunal may rule on a plea referred to in paragraph (2) of this article either as a preliminary question or in an award on the merits. If the arbitral tribunal rules as a preliminary question that it has jurisdiction, any party may request, within thirty days after having received notice of that ruling, the court specified in article 6 to decide the matter, which decision shall be subject to no appeal; while such a request is pending, the arbitral tribunal may continue the arbitral proceedings and make an award.

It is a well-established and well-recognized principle of law, as Campbell J. pointed out in Boart Sweden AB v. NYA Stromnes AB *(1988), 41 B.L.R. 295* (Ont. H.C.J.) at p. 303, "that where parties have agreed by contract that they will have arbitrators decide their claims, instead of resorting to the courts, the parties should be held to their contract". This principle is reflected in art. 8(1) of the Code and, in Ontario, in s. 7(1) of the Arbitrations Act, 1991, *S.O. 1991, c. 17*. These provisions require the court to stay any action brought in "a matter which is the subject of an arbitration agreement". It is on the basis of this basic principle that the defendant submits the plaintiffs' action must be stayed, it being the position of the defendant that the claims found in para. 1(a) and (b) constitute matters within the scope of the arbitration provision and, in particular, art. 49.1(a). On the other hand, it is the submission of the plaintiffs that their paras. 1(a) and (b) claims come within the exception contained in art. 49.1(a).

Notwithstanding the elaborate submissions of counsel for the defendant, in my view the issue presented by this motion is straightforward. It requires the court to interpret the arbitration provision and then to analyze the plaintiffs' claims. If their claims, on a proper interpretation of the arbitration provision, fall within those disputes and differences which must be decided by the arbitration tribunal, art. 8(1) of the Code applies and the court must stay the plaintiffs' action. On the other hand, if the plaintiffs' claims are not in respect to matters which the parties have agreed to submit to arbitration, they are beyond the scope of art. 8(1). It then remains for the court to decide whether to exercise its discretion, outside of the parameters imposed by art. 8(1), and stay the

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

action on other grounds: see Deluce Holdings Inc. v. Air Canada *(1992), 12 O.R. (3d) 131* at pp. 149-51, *98 D.L.R. (4th) 509* (Gen. Div.), per R.A. Blair J. This proposition is found in the following passage contained in the speech of Lord Macmillan in the leading case of Heyman v. Darwins Ltd., [1942] A.C. 356 at p. 370, [1942] 1 All E.R. 337 (H.L.):

> Where proceedings at law are instituted by one of the parties to a contract containing an arbitration clause and the other party, founding on the clause, applies for a stay, the first thing to be ascertained is the precise nature of the dispute which has arisen. The next question is whether the dispute is one which falls within the terms of the arbitration clause. Then sometimes the question is raised whether the arbitration clause is still effective or whether something has happened to render it no longer operative. Finally, the nature of the dispute being ascertained, it having been held to fall within the terms of the arbitration clause, and the clause having been found to be still effective, there remains for the court the question whether there is any sufficient reason why the matter in dispute should not be referred to arbitration.

It follows that on a motion to stay an action on the ground that the subject matter of the action is precluded by an arbitration provision or agreement, the court of necessity must, and accordingly has the jurisdiction to, interpret the arbitration provision or agreement: Kaverit Steel & Crane Ltd. v. Kone Corp. *(1992), 87 D.L.R. (4th) 129* at p. 134, *85 Alta. L.R. (2d) 287* (C.A.), leave to appeal to the Supreme Court of Canada refused *(1992), 11 C.P.C. (3d) 18*n. This necessarily follows, as well, from the language of art. 8(1) of the Code. In other words, the court first must interpret the arbitration provision for the purpose of determining whether the action, to use the words of art. 8(1), "is brought in a matter which is the subject of an arbitration agreement". This does not, in any way, derogate from the power of the arbitration tribunal to subsequently interpret the arbitration agreement, as contemplated by the jurisdiction vested in the tribunal by art. 16 of the Code, should any dispute or difference be submitted to arbitration. Arts. 8 and 16 are mutually exclusive. It is only after the court has interpreted the arbitration agreement and determined whether the subject matter of the action comes within the scope of the agreement that the court is able to address the issue of a stay: Kaverit Steel, supra, at p. 137; DeLuce Holdings, supra, at p. 150; Nanisivik Mines Ltd. v. F.C.R.S. Shipping Ltd., *[1994] 2 F.C. 662* at pp. 671, 672, 674, *113 D.L.R. (4th) 536* at pp. 541, 542 and 544 (C.A.); Boart Sweden AB, supra, at pp. 303-04.

Ordinary contract law applies to whether there is an arbitration agreement. As stated in Casey, International and Domestic Commercial Arbitration (Toronto: Carswell, 1993) at p. 3-5: "As it is a contract, the arbitration agreement can be drafted as narrowly or as broadly as the parties wish. For example, it can refer all matters of dispute under a certain amount to arbitration, with the balance of disputes going to court." The author continues at pp. 3-6 to 3-7:

> The arbitration agreement can be as broad or as narrow as the parties wish. At its broadest, the arbitration agreement can deal with all differences, disputes, claims or controversies between the parties, whether sounding in contract or tort, and can stipulate that the arbitral tribunal has full power to award damages, interest, costs and all forms of equitable relief including injunction and specific performance. The clause may extend to both contractual and non-contractual matters arising out of the commercial legal relationship. But, as the arbitral tribunal must take its jurisdiction from the arbitration agreement, it is important that the drafters spend time considering how broad or narrow the parties require the agreement. It is possible to have the arbitration agreement only cover certain matters, and to leave the balance of the disputes to the courts. For example, in a long term supply contract, the parties may wish to refer any disputes concerning the quality or suitability of the product to arbitration, but refer other matters dealing with contract interpretation to the courts.

Indeed, art. 7(1) of the Code, in defining an "arbitration agreement" as "an agreement by the parties to submit to arbitration all or certain disputes", recognizes that the contracting parties are free to draft the agreement as broadly or as narrowly as they wish. It is my view that, in doing so, it is to be assumed, as in this case, that they have directed their minds to the purpose to be served by the arbitration provision in the context of the contract in which it is contained.

The Deluce Holdings case, supra, contains an example of an arbitration provision limited in its scope. The provision, contained in a shareholders' agreement, called for arbitration in the event of a dispute over the value of the shares. At p. 150 R.A. Blair J. distinguished this provision from what he characterized as a "general resort to arbitration' clause in the event of any dispute arising in connection with the agreement". An example of a general resort to arbitration clause is to be found in the Heyman case, supra, where the clause read as follows:

> f any dispute shall arise between the parties hereto in respect of this agreement or any of the provisions herein contained or anything arising hereout the same shall be referred for arbitration in accordance with the provisions of the Arbitration Act, 1889, or any then subsisting statutory modification thereof.

(Emphasis added)

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

Counsel for the defendant placed considerable reliance on the statement of principle contained in the speech of Viscount Simon L.C. in the Heyman case, supra, found in the paragraph commencing on p. 366, for his submission that the arbitration provision in art. 49.1(a) requires that the plaintiffs' claims in their entirety must go to arbitration. It is not necessary to reproduce this statement of principle, with which no issue can be taken. However, it is important to recognize that Viscount Simon L.C. confined his views to "the scope of an arbitration clause in a contract where the clause is framed in wide and general terms such as" the clause in the Heyman case.

I come now to consider the arbitration provision contained in art. 49.1(a) which, for convenience, I repeat:

Any dispute or difference between the parties arising under this Lease except a dispute or difference involving a question of law may be referred to an arbitration tribunal for an award and determination by written submission signed by either the Landlord or the Tenant.

(Emphasis added)

But for the exception, this would be a general resort to arbitration clause which would have precluded the plaintiffs' access to the court for the resolution of their claims contained in paras. 1(a) and (b) of the statement of claim. The existence of the exception clearly indicates an agreement reached by the parties that only certain disputes or differences, not all disputes and differences, may be submitted to arbitration. It is necessary, therefore, to determine the meaning of the exception.

I begin by referring to the definitions of several words and terms found in Nolan and Nolan-Haley, Black's Law Dictionary (St. Paul: West Publishing Co., abridged 6th ed., 1991). At p. 410 are found the following definitions:

Fact. A thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence; an actual happening in time or space or an event mental or physical; that which has taken place. A fact is either a state of things, that is, an existence, or a motion, that is, an event. The quality of being actual; actual existence or occurrence.

Fact and law distinguished. "Fact" is very frequently used in opposition or contrast to "law". Thus, questions of fact are for the jury; questions of law for the court. E.g., fraud in fact consists in an actual intention to defraud, carried into effect; while fraud imputed by law raises from the person's conduct in its necessary relations and consequences. A "fact", as distinguished from the "law", may be taken as that out of which the point of law arises, that which is asserted to be or not to be, and is to be presumed or proved to be or not to be for the purpose of applying or refusing to apply a rule of law. Law is a principle; fact is an event. Law is conceived; fact is actual. Law is a rule of duty; fact is that which has been according to or in contravention of the rule.

The following definition of law is at p. 612:

Law. That which is laid down, ordained, or established. A rule or method according to which phenomena or actions co-exist or follow each other. Law, in its generic sense, is a body of rules of action or conduct prescribed by controlling authority, and having binding legal force. That which must be obeyed and followed by citizens subject to sanctions or legal consequences is a law. Law is a solemn expression of the will of the supreme power of the State. Calif. Civil Code, 22.

The "law" of a state is to be found in its statutory and constitutional enactments, as interpreted by its courts, and, in absence of statute law, in rulings of its courts (i.e. case law).

The word may mean or embrace: body of principles, standards and rules promulgated by government constitution or constitutional provision; statute or enactment of legislative body; administrative agency rules and regulations; judicial decisions, judgments or decrees; municipal ordinances; or, long established local custom which has the force of law.

With reference to its origin, "law" is derived either from judicial precedents, from legislation, or from custom.

The following definitions are on p. 866:

Question. A subject or point of investigation, examination or debate; theme of inquiry; problem; matter to be inquired into, as subject matter of civil or criminal discovery. A point on which the parties are not agreed, and which is submitted to the decision of a judge and jury.

Question of fact. An issue involving the resolution of a factual dispute and hence within the province of the jury in contrast to a question of law.

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

Question of law. Question concerning legal effect to be given an undisputed set of facts. An issue which involves the application or interpretation of a law and hence within the province of the judge and not the jury.

In Canadian National Railway v. Bell Telephone Co., *[1939] S.C.R. 308* at pp. 316-17, *[1939] 3 D.L.R. 8* at p. 15, Sir Lyman P. Duff C.J.C. discussed the meaning of the phrase "question of law":

The phrase "question of law" which the Legislature has employed in this enactment is prima facie a technical phrase well understood by lawyers. So construed "question of law" would include (without attempting anything like an exhaustive definition which would be impossible) questions touching the scope, effect or application of a rule of law which the Courts apply in determining the rights of parties; and by long usage, the term "question of law" has come to be applied to questions which, when arising at a trial by a Judge and jury, would fall exclusively to the Judge for determination; for example, questions touching the construction of documents and a great variety of others including questions whether, in respect of a particular issue of fact, there is any evidence upon which a jury could find the issue in favour of the party on whom rests the burden of proof. The determination of such a question seldom depends upon the application of any principle or rule of law, but upon the view of the Judge as to the effect of the evidence adduced. Nevertheless, it falls within the category described by the phrase "question of law".

In Words and Phrases, Vol. 22A, Permanent ed. (St. Paul: West Publishing Co., 1958) at p. 414, the following definitions of "involve" appear:

"Involve" imports the idea of implicate, include, affect. Culver v. Kurn, 193 S.W. 2d 602, 604, 354 Mo. 1158, 166 A.L.R. 644. The word "involve" means "to imply"; "to include"; or "necessitate as a result or legal consequence." Baltimore & O.S.W.R. Co. v. Evans, 82 N.E. 773, 779, 169 Ind. 410, citing Stand. Dict.; 23 Cyc. pp. 352, 353.

At p. 440 the word "involving" is discussed: The word "involving" possesses connotations such as "implying", "including", "relating to", "growing out of", "necessitating as a result or legal consequence". Taub v. Bowles, Em. App., 149 F. 2d. 817, 820.

On analysis, there is a small, but vital, difference in the interpretation which the parties ask the court to place on the exception contained in the arbitration provision. It is common ground that the defendant has repudiated the Airport Contracts. It is also common ground that the resolution of the disputes raised by paras. 1(a) and (b) of the statement of claim requires the court, or the tribunal, resolving them to apply principles of law to either undisputed facts or facts to be determined upon the evidence before the court or tribunal. It follows that the resolution of the disputes will involve both questions of fact and questions of law, i.e., questions of mixed law and fact. On the basis of the above definitions, counsel for the plaintiffs submits that the exception is to be interpreted as applying where the dispute includes a question of law. As the disputes necessarily include questions of law, counsel for the plaintiffs submit that they are precluded from submitting them to arbitration. Counsel for the defendant, however, submits that the exception is to be read as if the word "pure" appears before the phrase "question of law". As the disputes involve questions of mixed fact and law, counsel for the defendant submits that the action must be stayed and the disputes must be referred to arbitration pursuant to art. 8(1) of the Code.

As I understand the submission of the defendant's counsel, the interpretation which he has asked the court to place on the exception follows from a consideration of art. 49 as a whole when read in the context of the Airport Contract in which it is contained. In particular, he submits that this interpretation is compelled by art. 49.2(b) which requires the arbitration tribunal to decide the dispute in accordance with the law of Ontario. He submits that if the meaning of the exception prohibits the arbitration tribunal from deciding disputes involving a question of law, it would not have been necessary to include art. 49.2(b). That is why, he submits, the arbitration provision should be interpreted as permitting the tribunal to decide a dispute involving a question of mixed fact and law, but not to decide a dispute involving a pure question of law. Counsel for the defendant added that if the arbitration tribunal is not permitted to apply legal principles the arbitration provision becomes meaningless because, in his submission, only disputes or differences arising from the contract involving questions of fact can be arbitrated. In this regard, counsel stated that if his interpretation is not accepted, then the dispute in respect to the damages allegedly suffered by the plaintiffs as claimed in para. 1(c) of their statement of claim cannot be referred to arbitration as the assessment of damages raises questions of fact and law. Counsel for the plaintiffs acknowledged that this may be correct. It is my view, however, that this does not represent a question to be answered on this motion.

In my view, it does not follow that because art. 49.2(b) requires the arbitration tribunal to decide disputes or differences in accordance with the law of Ontario that the tribunal can decide disputes involving a question of mixed law and fact, but cannot decide a dispute involving a pure question of law. All that art. 49.2(b) means is that the tribunal in deciding a dispute or difference

T1T2 Limited Partnership et al. v.The Queen in Right of Canada[Indexed as: T1T2 Limited Partnership v. Canada], 23 O.R. (3d) 66

based on disputed facts is required to do so "in accordance with" the law of Ontario. It is my opinion that art. 49.2(b) cannot be used to give the tribunal jurisdiction which the parties, by agreement, declined to give it in art. 49.1(a). In other words, art. 49.2(b) does not extend what, in my view, is the clear meaning and intent of the arbitration clause, which is the meaning advanced by counsel for the plaintiffs.

If it had been the intention of the parties to exclude from arbitration disputes involving pure questions of law, in my view, they would have used appropriate language to achieve their intent. The most obvious approach would have been to insert the word "pure" before "questions of law". Or they might have inserted the word "exclusively" after the word "involving". Or they might have drafted the exception to state "except a dispute or difference about or on a question of law". But they did not do so and, in my view, the court should not add words to, or redraft, what the parties have written.

It follows, therefore, that as the parties have agreed to litigate disputes involving a question of law, and as the disputes raised in paras. 1(a) and (b) of the statement of claim involve a question of law, the defendant's motion to stay the plaintiffs' action on the ground that they are prohibited by the arbitration provision from litigating arbitrable disputes must be dismissed.

It remains to be decided whether it is otherwise just that the court should stay this action under s. 106 of the Courts of Justice Act, supra. As I understand the submission of counsel for the defendant, the court should, nevertheless, exercise its discretion and stay the action because not to do so will result in the disputes proceeding simultaneously before two forums -- the court and the arbitration tribunal. It is submitted that this would result in a situation similar to that which the court disapproved in S.L. Sethia Liners Ltd. v. State Trading Corp. of India, [1986] 1 Lloyd's Rep. 31, [1986] 2 All E.R. 395 (C.A.). I do not agree. This is not a case where the disputes will proceed simultaneously as the dispute in respect to damages will not get to arbitration unless, and until, the plaintiffs obtain a judgment in respect to the claims raised in paras. 1(a) and/or (b) of their statement of claim. For the same reason, this is not a case where permitting the action to continue might interfere with an ongoing arbitration as in the Boart Sweden AB case, supra. This submission ignores the fact that the parties by their agreement have determined that some disputes are to be arbitrated, while others are to be litigated. Indeed, this submission reflects what, in my respectful view, has been the major flaw in the position taken by counsel for the defendant on this motion -- the failure to recognize that art. 49.1(a) does not encompass arbitration of all disputes which may arise under the Airport Contracts. In any event, as I interpret art. 8(2) of the Code, it contemplates simultaneous proceedings before the court and an arbitration tribunal in appropriate cases.

There are several additional points advanced by counsel for the plaintiffs which enter into my decision not to exercise my discretion under s. 106 of the Courts of Justice Act to stay the action. The first point is the inconsistent position taken by the Crown in its motion for particulars and on this motion. On that motion the Crown asserted that it required further particulars to enable it to prepare its statement of defence and for purposes of trial. It now asserts that the plaintiffs are not entitled to a trial. It seems to me that it is difficult for the Crown to have it both ways. One must credit the Crown with a purpose for its motion for particulars.

To stay the action would effectively deprive the plaintiffs of any forum in which to assert their claims. To permit the action to continue will not result in a multiplicity of proceedings because, as I have explained, there will be no arbitration unless the plaintiffs are successful in obtaining a declaratory judgment in respect to the defendant's liability under the Airport Contracts. It follows, as well, that there will not be a possibility of inconsistent results. As the plaintiffs have moved for summary judgment, there is the risk that the plaintiffs will be deprived of a juridical advantage if a stay is granted because it may be deprived of being able to obtain a judgment before Bill C-22 is proclaimed, if it should pass the Senate.

Having decided that a stay is not warranted on the interpretation which I have placed on the arbitration provision, I have not been provided with any ground upon which the court should exercise its discretion under s. 106 of the Courts of Justice Act to stay the plaintiffs' action.

In the result, the motion is dismissed. Counsel may make arrangements to speak to me with respect to costs and, if necessary, in respect to directions in regard to the plaintiffs' motion for summary judgment.

Motion dismissed.

# EXHIBIT G

 **_Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15_**

Supreme Court of Canada Judgments

Supreme Court of Canada

Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.

Heard: May 12, 2010;

Judgment: March 18, 2011.

File No.: 33154.

[2011] S.C.J. No. 15    |    _[2011] A.C.S. no 15_    |    _2011 SCC 15_    |    _[2011] 1 S.C.R. 531_    |    _[2011] 1 R.C.S. 531_    |    _301 B.C.A.C._
_1_    |    _412 N.R. 195_    |    _2011EXP-936_    |    _J.E. 2011-498_    |    _EYB 2011-187826_    |    _329 D.L.R. (4th) 577_    |    _[2011] 6 W.W.R._
_229_    |    _16 B.C.L.R. (5th) 1_    |    _82 B.L.R. (4th) 1_    |    _2011 CarswellBC 553_    |    _1 C.P.C. (7th) 221_    |    _199 A.C.W.S. (3d) 1064_

Michelle Seidel, Appellant; v. TELUS Communications Inc., Respondent, and Barreau du Québec, Canadian Arbitration Congress, and ADR Chambers Inc., Interveners.

(176 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

## Case Summary

**Civil litigation — Civil procedure — Parties — Class or representative actions — Procedure — Disposition without trial
— Stay of action — Appeal by plaintiff from Court's of Appeal's decision to allow defendant's appeal from decision
dismissing its application for a stay of the class action commenced by plaintiff allowed in part — Plaintiff commenced
action despite arbitration clause in contract with defendant — To the extent that plaintiff's claim in Supreme Court
invoked s. 172 remedies in respect of "rights, benefits or protections" conferred by British Columbia Business Practices
and Consumer Protection Act, her court action had to be allowed to proceed notwithstanding mediation/arbitration
clause — As to the other claims, her court action should be stayed pursuant to s. 15 of Commercial Arbitration Act.**

**Alternative dispute resolution — Binding arbitration — Practice and procedure — General principles — Legislation —
Interpretation — Statutes — Appeal by plaintiff from Court's of Appeal's decision to allow defendant's appeal from
decision dismissing its application for a stay of the class action commenced by plaintiff allowed in part — Plaintiff
commenced action despite arbitration clause in contract with defendant — To the extent that plaintiff's claim in
Supreme Court invoked s. 172 remedies in respect of "rights, benefits or protections" conferred by British Columbia
Business Practices and Consumer Protection Act, her court action had to be allowed to proceed notwithstanding
mediation/arbitration clause — As to the other claims, her court action should be stayed pursuant to s. 15 of Commercial
Arbitration Act.**

Appeal by the plaintiff from the Court's of Appeal's decision to allow the defendant's appeal from the decision dismissing its
application for a stay of the class action commenced by the plaintiff. The plaintiff was a customer of the defendant's cellular
telephone services. The contract between the parties provided that any disputes would be referred to private and confidential
mediation and thereafter, if unresolved, to private, confidential and binding arbitration. The plaintiff filed a statement of claim
setting out a variety of complaints, including some that invoked rights, benefits or protections under the British Columbia Business
Practices and Consumer Protection Act ("BPCCA"). She claimed that the defendant falsely represented to her and other consumers
how it calculated air time for billing purposes. She seeks redress against what she contended were deceptive and unconscionable
practices and invoked both s. 171 and s. 172 remedies under the BPCCA. She also sought certification to act on her own behalf and
as representative of a class of allegedly overcharged customers. In the course of the plaintiff's application to have her claim certified

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

as a class action, the defendant applied for a stay on the basis of the arbitration clause pursuant to s. 15 of the Commercial Arbitration Act ("CAA"). The applications judge found that it was premature to determine whether the action should be stayed until the certification application had been dealt with and denied the application. The Court of Appeal held that the plaintiff was bound by the arbitration clause contained in the contract of adhesion in respect of all claims. It also found that it was for the arbitrator to consider whether the arbitration agreement existed in the original contract, and to determine which claims were subject to arbitration and which should go before a court.

HELD: Appeal allowed in part.

The stay was lifted with respect to the s. 172 claims made by the plaintiff. She could in that respect pursue the certification proceedings. However, the stay was upheld in relation to her other claims which could, if she pursued them, go to arbitration. The choice to restrict or not to restrict arbitration clauses in consumer contracts was a matter for the legislature. Absent legislative intervention, the courts generally give effect to the terms of a commercial contract freely entered into, even a contract of adhesion, including an arbitration clause. The BPCPA issue was rightly entertained by the courts below rather than in the first instance by an arbitrator notwithstanding the adoption of the competence-competence principle in British Columbia, because it raised an issue of jurisdiction on undisputed facts on which an authoritative judicial interpretation was appropriate. Section 172 of the BPCPA contained a remedy whereby "a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court" to enforce the statute's consumer protection standards. Under s. 3 of the BPCPA, any agreement between the parties that would waive or release "rights, benefits or protections" conferred by the BPCPA was "void". To the extent that the plaintiff's claim in the Supreme Court invoked s. 172 remedies in respect of "rights, benefits or protections" conferred by the BPCPA, her court action had to be allowed to proceed notwithstanding the mediation/arbitration clause. The clear intention of the legislature was to supplement and multiply the efforts of the Director under the BPCPA to implement province-wide standards of fair consumer practices by enlisting the efforts of a whole host of self-appointed private enforcers. An action in the Supreme Court would generate a measure of notoriety and, where successful, public denunciation, neither of which would be achieved to nearly the same extent by "private, confidential and binding arbitration". Private arbitral justice was necessarily limited. As the BPCPA recognized, some types of relief could only be made available from a superior court. Accordingly, to the extent the plaintiff's complaints sheltered under s. 172 of the BPCPA, they could not be waived by an arbitration clause and her court action could continue. As to the other claims, her court action should be stayed pursuant to s. 15 of the Commercial Arbitration Act.

## Statutes, Regulations and Rules Cited:

Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts, S.Q., 2006, c. 56, s. 2, s. 11.1

Arbitration Act, R.S.B.C. 1979, c. 18,

Business Practices and Consumer Protection Act, *S.B.C. 2004, c. 2, s. 1*(1), s. 1(1), s. 1(1), s. 3, s. 4, s. 4(1)(a), s. 4(1) (b), s. 4(3), s. 5, s. 8, s. 8(1), s. 8(2), s. 8(3), s. 9, s. 10(2), s. 171, s. 171(2), s. 172, s. 172(1)(a), s. 172(1) (b), s. 172(3)(a), s. 173(1), s. 173(2), s. 189, s. 190, s. 192

Civil Code of Lower Canada, art. 13

Civil Code of QuÚbec, R.S.Q., c. C-1991, s. 3149

Class Proceedings Act, *R.S.B.C. 1996, c. 50, s. 4*(1)(d), s. 13, s. 41

Code of Civil Procedure, R.S.Q., c. C-25, s. 94, s. 940.1, s. 943, s. 943.1, s. 943.2

Commercial Arbitration Act, R.S.B.C. 1996, c. 55, s. 15, s. 22, s. 23, s. 29

Commercial Arbitration Act, S.B.C. 1986, c. 3, s. 15

Consumer Protection Act, R.S.Q. c. P-40.1,

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

Consumer Protection Act, 2002, S.O. 2002, c. 30, Sched. A, ss. 7-8, s. 100

Copyright Act, *R.S.C. 1985, c. C-42, s. 37*

Fair Trading Act, R.S.A. 2000, c. F-2, s. 16

International Commercial Arbitration Act, *R.S.B.C. 1996, c. 233,*

Interpretation Act, *R.S.C. 1985, c. I-21, s. 44*(h)

Miscellaneous Statutes Amendment Act (No. 2), 1988, S.B.C. 1988, c. 46,

Provincial Court Act, R.S.B.C., 1996, c. 379,

Small Claims Act, R.S.B.C., 1996, c. 430, s. 3

Solicitors Act, *R.S.O. 1990, c. S.15, s. 23*

Supreme Court Act, *R.S.B.C. 1996, c. 443, s. 15*

Trade Practice Act, R.S.B.C. 1996, c. 457, s. 3, s. 4(3)(b), s. 4(3)(e), s. 18(3)

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Consumer Protection -- Contracts -- Arbitration -- Class actions -- Stay of proceedings -- Cell phone service contract containing private and confidential mediation and arbitration and class action waiver clause -- Customer filing claim in B.C. Supreme Court for declaratory and injunctive relief alleging cell phone service provider engaged in deceptive and unconscionable practices -- Customer seeking relief as individual and as representative of class -- Cell phone company obtaining stay of proceedings under Commercial Arbitration Act -- British Columbia Business Practices and Consumer Protection Act (BPCPA) stating agreements waiving or releasing rights, benefits or protections under the Act are void -- Whether BPCPA renders arbitration clause void such that the stay of the court proceedings should be lifted -- Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2, ss. 3, 171, 172. -- Commercial Arbitration Act, R.S.B.C. 1996, c. 55, s. 15.*

*Arbitration -- Competence-competence principle -- Effect of arbitration clause on jurisdiction of court -- Customer signing contract with mobile phone service provider containing mandatory mediation and arbitration clause -- Customer filing claim in B.C. Supreme Court for declaratory and injunctive relief under the BPCPA -- Whether question of jurisdiction should be determined by court or arbitrator -- Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2, ss. 3, 171, 172 -- Commercial Arbitration Act, R.S.B.C. 1996, c. 55, s. 22.*

**Court Summary:**

TELUS and S entered into a written cellular phone services contract in 2000. The standard form contract included a clause referring disputes to private and confidential mediation and arbitration. It further purported to waive any right to commence or participate in a class action. By statement of claim filed in the Supreme Court of British Columbia, S asserted a variety of claims, including (but not limited to) statutory causes of action under the *BPCPA*, alleging that TELUS falsely represented to her and other consumers how it calculates air time for billing purposes. She sought remedial relief under ss. 171 and 172 of the *BPCPA* in respect of what she contends are deceptive and unconscionable practices, as well as certification to act on her own behalf and as representative of a class of allegedly overcharged customers.

In the course of S's application to have her claim certified as a class action, TELUS applied for a stay of all proceedings on the basis

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

of the arbitration clause, pursuant to s. 15 of the *Commercial Arbitration Act*. The trial judge denied TELUS's application finding it was premature to determine whether the action should be stayed until the certification application had been decided. Applying the competence-competence principle, the Court of Appeal held that S was bound by the arbitration clause contained in the contract of adhesion in respect of all claims. In the result, the Court of Appeal allowed the appeal and entered a stay of S's action in its entirety, holding that it is for the arbitrator to determine which claims are subject to arbitration and which should go before a court.

*Held* (LeBel, Deschamps, Abella and Charron JJ. dissenting): The appeal should be allowed in part, and the stay lifted in relation to the s. 172 claims.

*Per* McLachlin C.J. and **Binnie**, Fish, Rothstein and Cromwell JJ.: The purpose of the *BPCPA* is consumer protection. As such, its terms should be interpreted generously in favour of consumers. Section 172 of the *BPCPA* contains a statutory remedy whereby a person other than a supplier may bring an action in the Supreme Court to enforce the statute's consumer protection standards whether or not the person bringing the action has a special interest or is affected by the consumer transaction that gives rise to the action. Such a plaintiff is properly characterized as a public interest plaintiff. This conclusion is reinforced by s. 3 of the *BPCPA* which provides that any agreement between parties that would waive or release "rights, benefits or protections" conferred by the *BPCPA* is void. To the extent S's claim in the Supreme Court invokes s. 172 remedies in respect of rights, benefits or protections conferred by the *BPCPA*, her court action must be allowed to proceed notwithstanding the mediation/arbitration clause.

The choice to restrict or not restrict arbitration clauses in consumer contracts is a matter for the legislature. Absent legislative intervention, the courts will generally give effect to the terms of a commercial contract freely entered into, even a contract of adhesion, including an arbitration clause. Section 172 is clearly designed to encourage *private* enforcement in the *public* interest. It was open to the legislature to prefer the vindication and denunciation available through a well-publicized court action to promote adherence to consumer standards. The legislature understood that the policy objectives of s. 172, would not be well served by a series of isolated low-profile, private and confidential arbitrations.

A proper interpretation of s. 172 of the *BPCPA* must be approached textually, contextually and purposively. Whether characterized as procedural or substantive, a s. 172 right is indubitably a "right" conferred by the statute and cannot be waived by contract. S therefore possesses a statutory "right" to take her action invoking s. 172 remedies to the Supreme Court.

As to her alternative complaints, however, whether under other sections of the *BPCPA*, the now repealed *Trade Practice Act*, or at common law, the TELUS arbitration clause is valid and enforceable. Accordingly S's court action in these respects should be stayed pursuant to s. 15 of the *Commercial Arbitration Act*.

The class action waiver is not severable from the arbitration clause as a whole. Accordingly, it is also rendered void by s. 3 of the *BPCPA*. If there is any ambiguity in the TELUS clause, it must be resolved in favour of S's right of access to the court by the principles of *contra proferentum*. Accordingly, S is not barred from continuing to seek certification of her s. 172 claims as a class action.

As for the procedural issues raised in this appeal, British Columbia has adopted the competence-competence principle through the combined operation of s. 22 of the *Commercial Arbitration Act* and s. 20(2) of the Rules of the British Columbia International Commercial Arbitration Centre ("BCICAC Rules"). Absent legislated exception, any challenge to an arbitrator's jurisdiction over S's dispute with TELUS should first be determined by the arbitrator, unless the challenge were to involve a pure question of law, or one of mixed fact and law that requires for its disposition "only superficial consideration of the documentary evidence in the record". Whether or not s. 172 of the *BPCPA* has the legal effect claimed for it by S was a question of law to be determined on undisputed facts. This matter was properly entertained by the Supreme Court in the first instance, and the competence-competence principle was not violated.

*Per* **LeBel, Deschamps,** Abella and Charron JJ. (dissenting): Absent a clear statement by the legislature of an intention to the contrary, a consumer claim that could potentially proceed either by way of arbitration or class action must first be submitted to arbitration. The *BPCPA* does not manifest explicit legislative intent to foreclose the use of arbitration as a vehicle for the resolution of disputes under that Act in British Columbia. As such, a clause in a standard form consumer contract for the supply of mobile phone services, which mandates that all disputes with the service provider be resolved by way of arbitration displaces the availability of class proceedings in the province of British Columbia.

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

Canadian courts, both in Quebec and in the common law jurisdictions, have endorsed the use of arbitration as a dispute resolution mechanism and now encourage its use. Lower courts across Canada swiftly followed this Court's lead in accepting and endorsing arbitration as a legitimate dispute resolution mechanism, and this shift in attitude where there is no longer hostility towards arbitration clearly took root. It is now settled that if a legislature intends to exclude arbitration as a vehicle for resolving a particular category of legal disputes, it must do so explicitly. In British Columbia, the current approach to arbitration was adopted with the enactment of the *Commercial Arbitration Act*. British Columbia's modern commercial arbitration legislation was influenced in part by the *UNCITRAL Model Law on International Commercial Arbitration* and the legislature clearly intended to incorporate the competence-competence principle into the province's domestic arbitration legislation. Challenges to the arbitrator's jurisdiction -- namely arguments that an agreement is void, inoperative or incapable of being performed -- should be resolved first by the arbitrator. A court should depart from this general rule only if the challenge is based on a question of law, or on questions of mixed fact and law that require only superficial consideration of the documentary evidence in the record, and is not merely a delaying tactic. This requirement of deference to the arbitrator's jurisdiction is related directly to the role of the court that must, in considering an application for a stay of proceedings, determine whether the agreement is "void, inoperative or incapable of being performed", which must be narrowly construed. Courts should therefore be mindful to avoid an interpretation that makes it possible to sidestep the competence-competence principle and turns the "inoperative" exception into a back door for a party wanting to "escape" the agreement. The British Columbia Court of Appeal recognized that the competence-competence principle is part of the province's law. It did not err in doing so. Therefore, absent a challenge to the arbitrator's jurisdiction based solely on a question of law or on one of mixed fact and law requiring only superficial consideration of the evidence in the record, the existence or validity of an arbitration agreement to which the *Commercial Arbitration Act* applies must be considered first by the arbitrator and the court should grant the stay.

S argues that the effect of the arbitration clause is to deny her the exercise of her rights under the *BPCPA*. The purpose of consumer protection legislation like the *BPCPA* is to protect consumers from losses suffered when they purchase goods and services that do not meet existing standards. Class actions have a significant social and legal role in Canadian law. However, since a class action is only a way to group together a number of individual claims, it concerns the procedure for bringing an action. As this Court has put it, the certification of a class action confers a procedural right. It does not change either the substantive law or the substantive rights of the parties. Where a court would, because of an arbitration agreement, not have jurisdiction over a dispute, that jurisdiction cannot be conferred on it by commencing a class proceeding.

In British Columbia, no explicit legislative direction has been enacted which would remove consumer disputes from the reach of arbitration legislation. S nevertheless argues that an arbitrator lacks the jurisdiction to grant either of the specific remedies contemplated in s. 172 of the *BPCPA*. She submits that these remedies can be granted only by the Supreme Court and, therefore, that s. 172(1) itself creates a substantive right to have a dispute resolved in the public court system. As a result, the agreement to submit this dispute to arbitration constitutes a waiver -- in violation of s. 3 of the *BPCPA* -- of the substantive right to those particular remedies. In light of ss. 171 and 172 and of the powers conferred on arbitrators in British Columbia, it is evident that the legislature has not barred the submission of such claims to arbitration. The remedy sought by a claimant under s. 172 is a declaration or an injunction. Either an arbitrator or a court can adjudicate a monetary claim under s. 171. What is important here is that the adjudicator has jurisdiction to make a declaration or order an injunction, which are the same remedies as are contemplated in s. 172. Arbitrators exercising their jurisdiction under arbitration legislation are generally understood to have jurisdiction to make any award a court could make. But the British Columbia legislation goes further, as it explicitly grants arbitrators broad remedial powers. An arbitrator deriving his or her authority from the *Commercial Arbitration Act*, and by extension from the BCICAC Rules, also has broad remedial powers including injunctions and other equitable remedies and the arbitrator can therefore, unless the parties have agreed otherwise, grant the declaratory and injunctive relief sought by S under ss. 172(1)(a) and (b) of the *BPCPA*.

Access to justice is protected both by the broad powers given to arbitrators and by the representative action provided for in the *BPCPA*. Although third party consumers would not be bound by the arbitrator's order, TELUS would be bound by it. There is no requirement that the arbitral award itself, which would incorporate the remedy S seeks, be private and confidential. Therefore, an arbitrator could order a supplier, in this case TELUS, to advertise the particulars of any order or award granted against it to the public at large. This would fulfill a public purpose. Given their broad remedial powers, arbitrators are authorized to grant this very public remedy.

The reference in s. 172 to the Supreme Court as the forum in which claims *may* be brought does not confer exclusive jurisdiction on

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

that court to adjudicate claims under that section. The purpose of that reference is to clarify that the Supreme Court, not the Provincial Court, may grant declaratory and injunctive relief. Further the use of the word "may" makes it even clearer that the Supreme Court is not intended to be the only forum in which these remedies can be sought. By enacting s. 172, the legislature provided a means not only to have claims dealt with by the director or any person, both of whom seek orders on behalf of consumers, but also to have the arbitration rules apply. In doing so, it provided a way to use the private dispute resolution system to obtain the same declaratory or injunctive relief against a supplier as can be obtained by means of a class action. Access to justice can only be enhanced by this approach.

Any argument based on the view that access to justice requires claims based on s. 172 of the *BPCPA* to be made by way of a class proceeding is without merit. Access to justice is fully preserved by arbitration, and there is no need to resort to a class proceeding to so ensure. The arbitrator can grant the remedies contemplated in s.172 of the *BPCPA* against TELUS. The arbitration agreement between S and TELUS does not therefore constitute an improper waiver of S's rights, benefits or protections for the purposes of s. 3 of that Act. Section 172 of the *BPCPA* merely identifies the procedural forum in which an action with respect to the rights, benefits and protections provided for in s. 172 may be brought in the public court system. It does not explicitly exclude alternate fora, such as an arbitration tribunal from acquiring jurisdiction.

Whether an arbitration clause in a consumer contract is unfair or unconscionable must always be determined on a case-by-case basis in light of the relevant facts. In Canada, the courts have left the question whether arbitration is appropriate for particular categories of disputes to the discretion of the legislatures. The British Columbia legislature remains free to address any unfairness or harshness that might be perceived to be imposed as a result of the inclusion of arbitration clauses in commercial contracts. The legislatures of Quebec, Ontario and Alberta have seen fit to amend their consumer protection legislation to prohibit or limit waivers of class proceedings and arbitration clauses in agreements to which their consumer protection legislation applies. The British Columbia legislature made a choice both by incorporating the provisions of the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards* and the *UNCITRAL Model Law on International Commercial Arbitration* and by refraining from enacting provisions expressly limiting arbitration clauses and waivers of class proceedings in the consumer context. It also made another choice: to confer broad remedial jurisdiction on arbitrators. These choices are ones to which this Court must defer.

# Cases Cited

By Binnie J.

**Referred to:** *Griffin v. Dell Canada Inc.*, 2010 ONCA 29, 98 O.R. (3d) 481; *Dell Computer Corp. v. Union des consommateurs*, 2007 SCC 34, [2007] 2 S.C.R. 801; *Rogers Wireless Inc. v. Muroff*, 2007 SCC 35, [2007] 2 S.C.R. 921; *MacKinnon v. National Money Mart Co.*, 2004 BCCA 473, 50 B.L.R. (3d) 291; *MacKinnon v. National Money Mart Co.*, 2009 BCCA 103, 89 B.C.L.R. (4) 1; *Bisaillon v. Concordia University*, 2006 SCC 19, [2006] 1 S.C.R. 666; *GreCon Dimter inc. v. J.R. Normand inc.*, 2005 SCC 46, [2005] 2 S.C.R. 401; *Desputeaux v. Éditions Chouette (1987) inc.*, 2003 SCC 17, [2003] 1 S.C.R. 178; *Unifund Assurance Co. v. Insurance Corp. of British Columbia*, 2003 SCC 40, [2003] 2 S.C.R. 63; *Smith v. Co-operators General Insurance Co.*, 2002 SCC 30, [2002] 2 S.C.R. 129; *ACS Public Sector Solutions Inc. v. Courthouse Technologies Ltd.*, 2005 BCCA 605, 48 B.C.L.R. (4) 328; *Co-operators Life Insurance Co. v. Gibbens*, 2009 SCC 59, [2009] 3 S.C.R. 605; *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102.

By LeBel and Deschamps JJ. (dissenting)

*MacKinnon v. National Money Mart Co.*, 2004 BCCA 473, 50 B.C.L.R. (3d) 291; *Dell Computer Corp. v. Union des consommateurs*, 2007 SCC 34, [2007] 2 S.C.R. 801; *Rogers Wireless Inc. v. Muroff*, 2007 SCC 35, [2007] 2 S.C.R. 921; *Bisaillon v. Concordia University*, 2006 SCC 19, [2006] 1 S.C.R. 666; *MacKinnon v. National Money Mart Co.*, 2009 BCCA 103, 89 B.C.L.R. (4) 1; *Desputeaux v. Éditions Chouette (1987) inc.*, 2003 SCC 17, [2003] 1 S.C.R. 178; *Horton v. Sayer* (1859), 4 H. & N. 643, 157 E.R. 993; *Lee v. Page* (1861), 30 L.J. Ch. 857; *Edwards v. Aberayon Mutual Ship Insurance Society Ltd.* (1876), 1 Q.B.D. 563; *Doleman & Sons v. Ossett Corp.*, [1912] 3 K.B. 257; *Scott v. Avery* (1856), 5 H.L.C. 811, 10 E.R. 809; *Johnston v. Western Assurance Co.* (1879), 4 O.A.R. 281; *Nolan v. Ocean, Accident and Guarantee Corp.* (1903), 5 O.L.R. 544; *Cayzer, Irvine and Co. v. Board of Trade*, [1927] 1 K.B. 269; *Brand v. National Life Assurance Co.* (1918), 44 D.L.R. 412; *Altwasser v. Home Insurance Co. of New York*, [1933] 2 W.W.R. 46; *Re Rootes Motors (Canada) Ltd. and Wm. Halliday Contracting Co.*, [1952] 4 D.L.R. 300; *Deuterium of Canada Ltd. v. Burns & Roe of Canada Ltd.* (1970), 15 D.L.R. (3d) 568, rev'd (1971), 21 D.L.R. (3d) 568, aff'd [1975] 2 S.C.R. 124; *Procon (Great Britain) Ltd. v. Golden Eagle Co.*, [1976] C.A. 565; *Vancouver v. Brandram-Henderson of B.C. Ltd.* (1959), 18 D.L.R. (2d) 700; *National Gypsum Co. v. Northern Sales Ltd.*, [1964] S.C.R. 144; *Vinette Construction Ltée*

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

*v. Dobrinsky*, [1962] B.R. 62; *Gordon and Gotch (Australasia) Ltd. v. Montreal Australia New Zealand Line Ltd.* (1940), 68 B.R. 428; *Zodiak International Productions Inc. v. Polish People's Republic*, *[1983] 1 S.C.R. 529*; *Ville de Granby v. Désourdy Construction Ltée*, [1973] C.A. 971; *Sport Maska Inc. v. Zittrer*, *[1988] 1 S.C.R. 564*; *GreCon Dimter inc. v. J.R. Normand inc.*, *2005 SCC 46*, *[2005] 2 S.C.R. 401*; *Boart Sweden AB v. NYA Stromes AB* *(1988), 41 B.L.R. 295*; *Automatic Systems Inc. v. Bracknell Corp.* *(1994), 12 B.L.R. (2d) 132*; *BWV Investments Ltd. v. Saskferco Products Inc.* *(1994), 125 Sask. R. 286*; *Quintette Coal Ltd. v. Nippon Steel Corp.*, *[1991] 1 W.W.R. 219*; *Burlington Northern Railroad Co. v. Canadian National Railway Co.* *(1995), 59 B.C.A.C. 97*, rev'd *[1997] 1 S.C.R. 5*; *Condominiums Mont St-Sauveur Inc. v. Constructions Serge Sauvé Ltée*, *[1990] R.J.Q. 2783*; *Gulf Canada Resources Ltd. v. Arochem International Ltd.* *(1992), 66 B.C.L.R. (2d) 113*; *R. v. Collins*, *2000 BCCA 437*, *140 B.C.A.C. 311*; *R. v. St. Lawrence Cement Inc.* *(2002), 60 O. R. (3d) 712*; *British Columbia Government and Service Employees' Union v. British Columbia (Minister of Health Services)*, *2007 BCCA 379*, *245 B.C.A.C. 39*; *Dalimpex Ltd. v. Janicki* *(2003), 64 O.R. (3d) 737*; *Dawson (City) v. TSL Contractors Ltd.*, *2003 YKCA 3*, *180 B.C.A.C. 205*; *Dancap Productions Inc. v. Key Brand Entertainment Inc.*, *2009 ONCA 135*, *246 O.A.C. 226*; *Jean Estate v. Wires Jolley*, *2009 ONCA 339*, *96 O.R. (3d) 171*; *No. 363 Dynamic Endeavours Inc. v. 34718 B.C. Ltd.* *(1993), 81 B.C.L.R. (2d) 359*; *Kaverit Steel and Crane Ltd. v. Kone Corp.* (1992), 87 D.L.R. (4) 129; *Mind Star Toys Inc. v. Samsung Co.* *(1992), 9 O.R. (3d) 374*; *Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974); *Western Canadian Shopping Centres Inc. v. Dutton*, *2001 SCC 46*, [2001] 2 S.C.R. 543; *Hollick v. Toronto (City)*, *2001 SCC 68*, *[2001] 3 S.C.R. 158*; *Marcotte v. Longueuil (City)*, *2009 SCC 43*, *[2009] 3 S.C.R. 65*; *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate* (2005), 2 B.L.R. (4) 151, aff'd *(2006), 80 O.R. (3d) 533*, aff'd *2007 SCC 55*, *[2007] 3 S.C.R. 679*; *Ting v. AT&T*, 319 F.3d 1126 (2003); *Szetela v. Discover Bank*, 118 Cal.Rptr.2d 862 (2002).

## Statutes and Regulations Cited

*Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts*, S.Q., 2006, c. 56, ss. 2, 11.1.

*Arbitration Act*, R.S.B.C. 1979, c. 18.

*Business Practices and Consumer Protection Act*, *S.B.C. 2004, c. 2, ss. 1*(1) "consumer", "consumer transaction", "supplier", 3, 4 "deceptive act or practice", 5, 8, 9, 10(2), 171, 172, 173, 189, 190, 192.

*Civil Code of Lower Canada*, art. 13.

*Civil Code of Québec*, R.S.Q., c. C-1991, s. 3149.

*Class Proceedings Act*, *R.S.B.C. 1996, c. 50, ss. 4*(1)(d), 13, 41.

*Code of Civil Procedure*, R.S.Q., c. C-25, ss. 94, 940.1, 943, 943.1, 943.2.

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55, ss. 15, 22, 23, 29.

*Commercial Arbitration Act*, S.B.C. 1986, c. 3, s. 15.

*Consumer Protection Act*, R.S.Q. c. P-40.1.

*Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A., ss. 7-8, 100.

*Copyright Act*, *R.S.C. 1985, c. C-42, s. 37*.

*Fair Trading Act*, R.S.A. 2000, c. F-2, s. 16.

*International Commercial Arbitration Act*, *R.S.B.C. 1996, c. 233*.

*Interpretation Act*, *R.S.C. 1985, c. I-21, s. 44*(h).

*Miscellaneous Statutes Amendment Act (No. 2), 1988*, S.B.C. 1988, c. 46.

*Provincial Court Act*, R.S.B.C., 1996, c. 379.

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

*Small Claims Act*, R.S.B.C., 1996, c. 430, s. 3.

*Solicitors Act*, R.S.O. 1990, c. S.15. s. 23.

*Supreme Court Act*, R.S.B.C. 1996, c. 443, s. 15.

*Trade Practice Act*, R.S.B.C. 1996, c. 457, ss. 3, 4(3)(b), (e), 18(3).

**Treaties and Other International Instruments**

*Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3.

United Nations. Commission on International Trade Law. *UNCITRAL Model Law on International Commercial Arbitration*, U.N. Doc. A/40/17 (1985), Ann. I, arts. 8, 16.

## Authors Cited

Bachand, Frédéric. "Should No-Class Action Arbitration Clauses Be Enforced?", in Arthur W. Rovine, ed., *Contemporary Issues in International Arbitration and Mediation: The Fordham Papers 2008*. Leiden, The Netherlands: Martinus Nijhoff, 2009, 153.

British Columbia, International Commercial Arbitration Centre. *Domestic Commercial Arbitration Rules of Procedure*. Vancouver: The Centre, 1998.

British Columbia. Law Reform Commission. *Report on Arbitration*. Vancouver: The Commission, 1982.

Bromfield, Heather. "The Denial of Relief: The Enforcement of Class Action Waivers in Arbitration Agreements" (2009), 43 U.C. Davis L. Rev. 315.

Casey, J. Brian, and Janet Mills. *Arbitration Law of Canada: Practice and Procedure*. Huntington, N.Y.: Juris, 2005.

Côté, Pierre-André, avec la collaboration de Stéphane Beaulac et Mathieu Devinat. *Interprétation des lois*, 4e éd. Montréal: Thémis, 2009.

Earle, Wendy J. *Drafting ADR and Arbitration Clauses for Commercial Contracts*. Toronto: Thomson, 2005 (loose-leaf updated 2008, release 2).

Fortier, L. Yves. "Delimiting the Spheres of Judicial and Arbitral Power: 'Beware, My Lord, of Jealousy'" (2001), 80 *Can. Bar Rev.* 143.

Glover, J. Maria. "Beyond Unconscionability: Class Action Waivers and Mandatory Arbitration Agreements" (2006), 59 Vand. L. Rev. 1735.

*Lawyers' Arbitration Letters 1980-1989*. Ardsley-on-Hudson, N.Y.: Transnational Juris, 1990.

Little, Andrew D. "Canadian Arbitration Law After *Dell Computer Corp. v. Union des consommateurs*" (2007), 45 *Can. Bus. L.J.* 356.

McEwan, J. Kenneth, and Ludmila B. Herbst. *Commercial Arbitration in Canada: A Guide to Domestic and International Arbitrations*. Aurora, Ont.: Canada Law Book, 2009.

Mingie, Christine J. *British Columbia Commercial Arbitration -- An Annotated Guide*. Vancouver: Continuing Legal Education Society of British Columbia, 2004.

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

Mustill, Michael J., and Stewart C. Boyd. *The Law and Practice of Commercial Arbitration in England*, 2 ed. London: Butterworths, 1989.

Saumier, Geneviève. "Consumer Arbitration in the Evolving Canadian Landscape" (2008-2009), 113 *Penn. St. L. Rev.* 1203.

Sternlight, Jean R., and Elizabeth J. Jensen. "Using Arbitration to Eliminate Consumer Class Actions: Efficient Business Practice or Unconscionable Abuse?" (2004), 67 *Law & Contemp. Probs.* 75.

Thuilleaux, Sabine. *L'arbitrage commercial au Québec: Droit interne -- Droit international privé*. Cowansville, Qué.: Yvon Blais, 1991.

**History and Disposition:**

APPEAL from a judgment of the British Columbia Court of Appeal (Finch C.J.B.C. and Rowles, Newbury, Tysoe and Neilson JJ.A.), *2009 BCCA 104*, 88 B.C.L.R. (4) 212, *[2009] 5 W.W.R. 466*, 68 C.P.C. (6) 57, *267 B.C.A.C. 266*, 450 W.A.C. 266, 304 D.L.R. (4) 564, *[2009] B.C.J. No. 469* (QL), *2009 CarswellBC 608*, reversing a decision of Masuhara J., *2008 BCSC 933*, 85 B.C.L.R. (4) 372, 295 D.L.R. (4) 511, *[2008] B.C.J. No. 1347* (QL), *2008 CarswellBC 1490*. Appeal allowed in part, LeBel, Deschamps, Abella and Charron dissenting.

# Counsel

*Arthur M. Grant* and *Bruce W. Lemer*, for the appellant.

*Robert S. Anderson, Q.C., Sean Hern* and *Nicholas T. Hooge*, for the respondent.

*Babak Barin, Gaston Gauthier* and *Frédéric Côté*, for the intervener Barreau du Québec.

*Ivan G. Whitehall, Q.C.,* and *Alejandro Manevich*, for the intervener the Canadian Arbitration Congress.

*Barry Leon, Andrew de Lotbinière McDougall* and *Daniel Taylor*, for the intervener ADR Chambers Inc.

[Editor's note: A corrigendum was published by the Court April 27, 2011. The corrections have been incorporated in this document and the text of the corrigendum is appended to the end of the judgment.]

[Editor's note: A corrigendum was published by the Court March 31, 2011. The corrections have been incorporated in this document and the text of the corrigendum is appended to the end of the judgment.]

The judgment of McLachlin C.J. and Binnie, Fish, Rothstein and Cromwell JJ. was delivered by

**BINNIE J.**

**1**   This appeal concerns a dispute between TELUS Communications Inc. ("TELUS") and one of its customers, the appellant Ms. Seidel, arising out of a cell phone contract. The contract, drawn up by TELUS, provided that "[a]ny claim, dispute or controversy" shall be referred to "private and confidential mediation" and thereafter, if unresolved, to "private, confidential and binding arbitration". TELUS says that mediation and arbitration offer a low cost, quick, private and effective means of sorting out disputes according to rules the parties themselves have agreed to. Notwithstanding these provisions, Ms. Seidel filed a statement of claim in the Supreme Court of British Columbia setting out a variety of complaints including some that invoke rights, benefits or protections under the British Columbia *Business Practices and Consumer Protection Act*, S.B.C. 2004, c. 2 ("BPCPA"). This consumer legislation is designed, it is contended, to remedy the mischief described by Sharpe J.A. of the Ontario Court of Appeal:

> The seller's stated preference for arbitration is often nothing more than a guise to avoid liability for widespread low-value wrongs that cannot be litigated individually but when aggregated from the subject of a viable class proceeding.[...] When consumer disputes are in fact arbitrated through bodies such as NAF that sell their services to corporate suppliers, consumers are often disadvantaged by arbitrator bias in favour of the dominant and repeat-player corporate client.

> (*Griffin v. Dell Canada Inc., 2010 ONCA 29, 98 O.R. (3d) 481*, at para. 30)

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

**2**  The choice to restrict or not to restrict arbitration clauses in consumer contracts is a matter for the legislature. Absent legislative intervention, the courts will generally give effect to the terms of a commercial contract freely entered into, even a contract of adhesion, including an arbitration clause. The important question raised by this appeal, however, is whether the *BPCPA* manifests a legislative intent to intervene in the marketplace to relieve consumers of their contractual commitment to "private and confidential" mediation/arbitration and, if so, under what circumstances.

**3**  My colleagues LeBel and Deschamps JJ. attempt to cast the appeal in terms of whether or not arbitrators should be seen as "second-class adjudicators" (at para. 55) and paint those with whom they disagree as exhibiting "an undercurrent of hostility towards arbitration" (at para. 101). Respectfully, I believe the Court's job is neither to promote nor detract from private and confidential arbitration. The Court's job is to give effect to the intent of the legislature as manifested in the provisions of its statutes.

**4**  The *BPCPA* issue was rightly entertained by the courts below rather than in the first instance by an arbitrator notwithstanding the adoption of the competence-competence principle in British Columbia, because it raised an issue of jurisdiction on undisputed facts on which an authoritative judicial interpretation was appropriate (see *Dell Computer Corp. v. Union des consommateurs*, [2007 SCC 34](#), [[2007] 2 S.C.R. 801](#), at paras. 84-86).

**5**  Section 172 of the *BPCPA* contains a remedy whereby "a person other than a supplier, <u>whether or not the person</u> bringing the action has a special interest or <u>any</u> interest under this Act or <u>is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court</u>" to enforce the statute's consumer protection standards. Under s. 3 of the *BPCPA*, any agreement between the parties that would waive or release "rights, benefits or protections" conferred by the *BPCPA* is "void". My opinion is that to the extent Ms. Seidel's claim in the Supreme Court invokes s. 172 remedies in respect of "rights, benefits or protections" conferred by the *BPCPA*, her court action must be allowed to proceed notwithstanding the mediation/arbitration clause. This includes her claims for declaratory and injunctive relief and, if granted, ancillary relief in the form of restoration to consumers of any money acquired by TELUS in contravention of the *BPCPA*.

**6**  The reason for this conclusion is simple. Section 172 provides a mandate for consumer activists or others, whether or not they are personally "affected" in any way by any "consumer transaction". Section 172 contemplates such a person "bringing the action". The action is specified to be brought "in Supreme Court". The clear intention of the legislature is to supplement and multiply the efforts of the Director under the *BPCPA* to implement province-wide standards of fair consumer practices by enlisting the efforts of a whole host of self-appointed private enforcers. In an era of tight government budgets and increasingly sophisticated supplier contracts, this is understandable legislative policy. An action in the Supreme Court will generate a measure of notoriety and, where successful, public denunciation, neither of which would be achieved to nearly the same extent by "private, confidential and binding arbitration".

**7**  Private arbitral justice, because of its contractual origins, is necessarily limited. As the *BPCPA* recognizes, some types of relief can only be made available from a superior court. Accordingly, to the extent Ms. Seidel's complaints shelter under s. 172 of the *BPCPA* (and only to that extent), they cannot be waived by an arbitration clause and her court action may continue, in my opinion. As to her alternative complaints, whether under other sections of the *BPCPA*, the now repealed *Trade Practice Act*, [R.S.B.C. 1996, c. 457](#) ("*TPA*") or at common law, the TELUS arbitration clause is valid and enforceable. As to those claims, her court action should be stayed pursuant to s. 15 of the *Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 ("*CAA*").

**8**  I should flag at the outset two issues that this appeal does *not* decide. Firstly, of course, Ms. Seidel's complaints against TELUS are taken to be capable of proof only for the purposes of this application. We are not assuming the allegations will be proven, let alone deciding that TELUS did in fact engage in the conduct complained of. Secondly, Ms. Seidel's action is framed as a class proceeding, for which she is seeking certification. The present appeal concerns only her individual action. Whether or not the s. 172 claims should be certified as a class action is a matter that will have to be determined by the courts of British Columbia, which have yet to address the issue.

**9**  The British Columbia Court of Appeal stayed all of Ms. Seidel's claims -- both under the *BPCPA* and otherwise. I would therefore partly grant the appeal to allow her claims under s. 172 of the *BPCPA* to go forward as candidates for certification. In other respects, the appeal should be dismissed.

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

I.   Facts

**10**  TELUS and Ms. Seidel entered into a written cellular phone services contract in 2000. By a statement of claim dated January 21, 2005, she claims that TELUS falsely represented to her and other consumers how it calculates air time for billing purposes. She seeks redress against what she contends are deceptive and unconscionable practices contrary to ss. 3, 4(3)(b) and 4(3)(e) of the *TPA* and ss. 4, 5, 8(3)(b) and 9 of the *BPCPA* (statement of claim, at paras. 11-12). She invokes both s. 171 and s. 172 remedies. Further, as stated, she seeks certification to act on her own behalf and as representative of a class of allegedly overcharged customers, pursuant to the *Class Proceedings Act, R.S.B.C. 1996, c. 50* ("*CPA*").

**11**  I leave aside her claims under the *TPA* which are clearly subject to the arbitration agreement, and therefore not before the court. With respect to s. 172 of the *BPCPA*, however, she seeks a declaration that TELUS engaged in deceptive and unconscionable trade acts and practices under s. 172(1)(a). She also seeks an interim and permanent injunction under s. 172(1)(b), prohibiting TELUS from engaging in such acts and practices, and an order under s. 172(3)(a) restoring monies that TELUS acquired, she says, by contravening the *BPCPA*, including a proper accounting.

**12**  In 2007, in the course of Ms. Seidel's application to have her claim certified as a class action, TELUS applied for a stay on the basis of the arbitration clause pursuant to s. 15 of the *CAA*. In doing so, it relied on this Court's decisions in *Dell* and *Rogers Wireless Inc. v. Muroff, 2007 SCC 35, [2007] 2 S.C.R. 921*, in which Quebec class certification proceedings were stayed pending the arbitration of consumer disputes. Ms. Seidel is obliged in the first instance, TELUS says, to have her entire complaint, including the *BPCPA* claims, dealt with by arbitration, as provided for in their service contract. Under the competence-competence principle, the arbitrator will determine what, if anything, is excluded from his or her jurisdiction and can thus be taken to the courts (R.F., at para. 30).

**13**  Unfortunately, the initial 2000 contract containing the original arbitration clause on which TELUS relies cannot be found. However, the 2003 contract is in evidence and contains the following arbitration clause. (An almost identical clause is found in the 2004 renewed contract):

> 15.   ARBITRATION: <u>Any claim, dispute or controversy</u> (whether in contract or tort, pursuant to statute or regulation, or otherwise and whether pre-existing, present or future -- except for the collection from you of any amount by TELUS Mobility) <u>arising out of or relating to: (a) this agreement; (b) a phone or the service; (c) oral or written statements, or advertisements or promotions relating to this agreement or service or (d) the relationships which result from this agreement</u> (including relationships with third parties who are not parties to this agreement), (each, a "Claim") <u>will be</u> referred to and determined by private and confidential mediation before a single mediator chosen by the parties and at their joint cost. Should the parties after mediation in good faith fail to reach a settlement, the issue between them shall then be <u>determined by private, confidential and binding arbitration</u> by the same person originally chosen as mediator. Either party may commence court proceedings to enforce the arbitration result when an arbitration decision shall have been rendered and thirty (30) days have passed from the date of such decision. <u>By so agreeing, you waive any right you may have to commence or participate in any class action against TELUS Mobility related to any Claim and, where applicable, you hereby agree to opt out of any class proceeding against TELUS Mobility otherwise commenced...</u> . [Emphasis added; A.R., at p.83.]

The last four lines of the arbitration clause purport to waive any right Ms. Seidel may have to commence or participate in a class action. It is suggested on behalf of TELUS that those last four lines constitute a separate bargain -- distinct from the arbitration provision that precedes it -- that survives any invalidity of the rest of the clause in relation to s. 172 proceedings. On this alternative submission, Ms. Seidel could still proceed in court with her individual s. 172 action but would be contractually barred from seeking its certification as a class proceeding. As will be seen, I would reject this submission of TELUS as well.

II.   Judicial History

A.   *Supreme Court of British Columbia (2008 BCSC 933, 85 B.C.L.R. (4th) 372; Masuhara J.)*

**14**  The applications judge concluded that *Dell* could not be said to have set out a test of general application. In his view, it rested on provisions specific to Quebec law and should not be taken to have overruled earlier B.C. precedent, including in particular, *MacKinnon v. National Money Mart Co., 2004 BCCA 473, 50 B.L.R. (3d) 291* ("*MacKinnon 2004*"). In *MacKinnon 2004*, the B.C. Court of Appeal had found that an arbitration agreement should be considered "inoperative" within the meaning of s. 15 of the *CAA* only if

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

a class proceeding is certified under the *CPA* because it is the "preferable procedure" (s. 4(1)(d)), and that it is premature to determine whether the action should be stayed until the court has dealt with the certification application. The court therefore remitted the stay application back to the case management judge for reconsideration with the application for certification. Applying the *MacKinnon 2004* reasoning, Masuhara J. denied TELUS's application for a stay of the certification proceedings (at para. 84).

    B.   *British Columbia Court of Appeal* (*2009 BCCA 104*, *88 B.C.L.R. (4th) 212*; Tysoe J.A. (Finch C.J.B.C and Rowles, Newbury and Neilson JJ.A. concurring))

**15**  The Court of Appeal considered *Seidel* with a companion case, *MacKinnon v. National Money Mart Co.*, *2009 BCCA 103*, *89 B.C.L.R. (4th) 1* ("*MacKinnon 2009*"). The appeal in *Seidel* was allowed. The appeal in *MacKinnon 2009* would also have been allowed but for the court's conclusion that issue estoppel applied. The appeal in that case was dismissed accordingly.

**16**  The central issue was whether this Court's decision in *Dell* had effectively overruled the earlier B.C. Court of Appeal decision in *MacKinnon 2004*.

**17**  For this purpose, in *MacKinnon 2009*, the court considered whether the legislative provisions governing arbitration in Quebec could be distinguished from the British Columbia *CAA*. It concluded that, since both pieces of legislation stemmed from the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3 ("New York Convention") and the *UNCITRAL Model Law on International Commercial Arbitration*, U.N. Doc. A/40/17 (1985), Ann. I ("Model Law"), any differences were technical rather than substantive.

**18**  As to the provisions of the *BPCPA* forbidding waivers of "rights, benefits or protections", the court considered that to the extent the arbitration clause is a waiver of anything, it is a waiver of forum, but forum (as such) is not included in the protection offered by s. 3 of the *BPCPA*, which only covers substantive consumer rights. Accordingly, the court applied *Dell* and held that the plaintiff was bound by the arbitration clause contained in the contract of adhesion in respect of all claims (*MacKinnon* 2009, at paras. 69-72).

**19**  In *Seidel*, the Court of Appeal also held, having regard to the competence-competence principle as it is incorporated in B.C. law, that it is for the arbitrator to consider whether the arbitration agreement existed in the original contract, and to determine which claims are subject to arbitration and which should go before a court (*Seidel*, at paras. 28-34).

**20**  In the result, the B.C. Court of Appeal entered a stay of Ms. Seidel's action in its entirety.

    III.  Relevant Legislation

**21**  *Business Practices and Consumer Protection Act, S.B.C. 2004.* c. 2

    [Waiver or release void except as permitted]

    **3**  Any waiver or release by a person of the person's rights, benefits or protections under this Act is void except to the extent that the waiver or release is expressly permitted by this Act.

...

    [Unconscionable acts or practices]

  **8** (1) An unconscionable act or practice by a supplier may occur before, during or after the consumer transaction.

    (2)  In determining whether an act or practice is unconscionable, a court must consider all of the surrounding circumstances of which the supplier knew or ought to have known.

    (3)  Without limiting subsection (2), the circumstances that the court must consider include the following:

        (a)  that the supplier subjected the consumer or guarantor to undue pressure to enter into the consumer transaction;

        (b)  that the supplier took advantage of the consumer or guarantor's inability or incapacity to reasonably protect his or her own interest because of the consumer or guarantor's physical or mental infirmity, ignorance,

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

illiteracy, age or inability to understand the character, nature or language of the consumer transaction, or any other matter related to the transaction;

(c)   that, at the time the consumer transaction was entered into, the total price grossly exceeded the total price at which similar subjects of similar consumer transactions were readily obtainable by similar consumers;

(d)   that, at the time the consumer transaction was entered into, there was no reasonable probability of full payment of the total price by the consumer;

(e)   that the terms or conditions on, or subject to, which the consumer entered into the consumer transaction were so harsh or adverse to the consumer as to be inequitable;

(f)   a prescribed circumstance.

...

[Damages Recoverable]

**171** (1) Subject to subsection (2), if a person, other than a person referred to in paragraphs (a) to (e), has suffered damage or loss due to a contravention of this Act or the regulations, <u>the person who suffered damage or loss may bring an action against a</u>

(a)   supplier,

(b)   reporting agency, as defined in section 106 [*definitions*],

(c)   collector, as defined in section 113 [*definitions*],

(d) bailiff, collection agent or debt pooler, as defined in section 125 [*definitions*], or

(e)   a person required to hold a licence under Part 9 [*Licences*] who engaged in or acquiesced in the contravention that caused the damage or loss.

...

[Court actions respecting consumer transactions]

**172** (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action, <u>may bring an action in Supreme Court</u> for one or both of the following:

(a)   a declaration that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;

(b)   an interim <u>or permanent injunction</u> restraining a supplier from contravening this Act or the regulations.

...

(3) If the court grants relief under subsection (1), the court may order one or more of the following:

(a)   that the <u>supplier restore to any person any money</u> or other property or thing, in which the person has an interest, that may have been acquired because of a contravention of this Act or the regulations;

(b)   if the action is brought by the director, that the supplier pay to the director the actual <u>costs</u>, or a reasonable proportion of the costs, of the inspection of the supplier conducted under this Act;

(c)   that the supplier <u>advertise to the public</u> in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section.

*Commercial Arbitration Act, R.S.B.C. 1996, c. 55*

**15** (1) If a party to an arbitration agreement commences legal proceedings in a court against another party to the agreement in respect of a matter agreed to be submitted to arbitration, a party to the legal proceedings may apply, before or after

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

entering an appearance and before delivery of any pleadings or taking any other step in the proceedings, to that court to stay the legal proceedings.

(2) In an application under subsection (1), the court must make an order staying the legal proceedings unless it determines that the arbitration agreement is void, inoperative or incapable of being performed.

...

**22** (1) Unless the parties to an arbitration otherwise agree, the rules of the British Columbia International Commercial Arbitration Centre for the conduct of domestic commercial arbitrations apply to that arbitration.

(2) If the rules referred to in subsection (1) are inconsistent with or contrary to the provisions in an enactment governing an arbitration to which this Act applies, the provisions of that enactment prevail.

(3) If the rules referred to in subsection (1) are inconsistent with or contrary to this Act, this Act prevails.

*Class Proceedings Act, R.S.B.C. 1996, c. 50*

**4** (1) The court must certify a proceeding as a class proceeding on an application under section 2 or 3 if all of the following requirements are met:

  (a)   the pleadings disclose a cause of action;

  (b)   there is an identifiable class of 2 or more persons;

  (c)   the claims of the class members raise common issues, whether or not those common issues predominate over issues affecting only individual members;

  (d)   a class proceeding would be the preferable procedure for the fair and efficient resolution of the common issues;

  (e)   there is a representative plaintiff who

      (i)    would fairly and adequately represent the interests of the class,

      (ii)   has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and

      (iii)  does not have, on the common issues, an interest that is in conflict with the interests of other class members.

(2) In determining whether a class proceeding would be the preferable procedure for the fair and efficient resolution of the common issues, the court must consider all relevant matters including the following:

  (a)   whether questions of fact or law common to the members of the class predominate over any questions affecting only individual members;

  (b)   whether a significant number of the members of the class have a valid interest in individually controlling the prosecution of separate actions;

  (c)   whether the class proceeding would involve claims that are or have been the subject of any other proceedings;

  (d)   whether other means of resolving the claims are less practical or less efficient;

  (e)   whether the administration of the class proceeding would create greater difficulties than those likely to be experienced if relief were sought by other means.

...

**13** The court may at any time stay any proceeding related to the class proceeding on the terms the court considers appropriate.

British Columbia International Commercial Arbitration *Centre's Domestic Commercial Arbitration Rules, Of Procedure*, as amended June 1, 1998 ("BCICAC Rules")

**20** [Jurisdiction]

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

(1) The arbitration tribunal may rule on its own jurisdiction, including ruling on any objections with respect to the existence or validity of the arbitration agreement

(2) A decision by the arbitration tribunal that the contract is null and void shall not entail the invalidity of the arbitration clause unless specifically found to be so by the arbitration tribunal.

(3) Any objection to the jurisdiction of the arbitration tribunal to consider a claim or counter-claim shall be raised in the statement of defense or statement of defense to counter-claim. The tribunal may consider a late objection if it regards the delay justified.

(4) A party is not precluded from raising a jurisdictional plea by the fact that it has appointed or participated in the appointment of an arbitrator.

IV.  Analysis

22  The underlying issue in this appeal is access to justice. Each of the disputants claims to be its supporter. Mediation and arbitration, TELUS says, reflect the values of freedom of contract and the autonomy of individuals to order their affairs as they see fit. A consumer can press an individual complaint which would not be worthwhile to pursue under the more costly proceedings of a court.

23  The virtues of commercial arbitration have been recognized and indeed welcomed by our Court in a series of recent decisions mainly from Quebec, including not only *Dell* and *Rogers Wireless*, but also *Bisaillon v. Concordia University*, *2006 SCC 19*, *[2006] 1 S.C.R. 666*; *GreCon Dimter inc. v. J.R. Normand inc.*, *2005 SCC 46*, *[2005] 2 S.C.R. 401*; and *Desputeaux v. Éditions Chouette (1987) inc.*, *2003 SCC 17*, *[2003] 1 S.C.R. 178*. See also, S. Thuilleaux, *L'arbitrage commercial au Québec: Droit interne -- Droit international privé* (1991), at p. 5, and F. Bachand, "Should No-Class Action Arbitration Clauses Be Enforced?", in A. W. Rovine, ed., *Contemporary Issues in International Arbitration and Mediation: The Fordham Papers 2008* (2009), 153, at p. 162.

24  Nevertheless, from the perspective of the *BPCPA*, "private, confidential and binding arbitration" will almost certainly inhibit rather than promote wide publicity (and thus deterrence) of deceptive and/or unconscionable commercial conduct. It is clearly open to a legislature to utilize private consumers as effective enforcement partners operating independently of the formal enforcement bureaucracy and to conclude that the most effective form is not a "private and confidential" alternative dispute resolution behind closed doors, but very public and well-publicized proceedings in a court of law.

25  Leaving aside British Columbia for a moment, a number of other provincial legislatures have intervened in the marketplace with greater or lesser limitations on arbitration clauses in consumer contracts. See, e.g.: in Quebec, *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts*, S.Q. 2006, c. 56, s.2; in Ontario, the *Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A, ss. 7-8 and 100; and in Alberta, the *Fair Trading Act*, R.S.A. 2000, c. F-2, which in s. 16 subjects consumer arbitration clauses to ministerial approval.

26  This case requires the Court to determine, in short, whether, as a matter of statutory interpretation, s. 172 of the *BPCPA* contains such a limitation and, if so, its extent and effect on Ms. Seidel's action. In addition, we need to address the procedural issue of whether these questions ought to be decided in the first instance by the court or an arbitrator.

A. *The Principle of Competence-Competence Must Be Respected*

27  It is convenient to deal first with the procedural issue.

28  British Columbia has adopted the competence-competence principle through the combined operation of s. 22 of the *CAA* and s. 20(2) of the BCICAC Rules which in turn reflect the provisions of the New York Convention and Model law. As such, "[t]he jurisdiction to determine jurisdiction is given to the arbitral tribunal by statute, as well as by the rules of arbitration used by most institutions"; see J. B. Casey and J. Mills, *Arbitration Law of Canada: Practice and Procedure* (2005), at p. 147.

29  I agree with my colleagues LeBel and Deschamps JJ. (at para. 114) that in these circumstances, absent legislated exception, any challenge to an arbitrator's jurisdiction over Ms. Seidel's dispute with TELUS should first be determined by the arbitrator, unless the challenge involves a pure question of law, or one of mixed fact and law that requires for its disposition "only superficial

he

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

consideration of the documentary evidence in the record" (*Dell*, at para. 85). See also *Unifund Assurance Co. v. Insurance Corp. of British Columbia*, *2003 SCC 40*, *[2003] 2 S.C.R. 63*, at paras. 37-38.

**30**  Whether or not s. 172 of the *BPCPA* has the legal effect claimed for it by Ms. Seidel was a question of law to be determined on undisputed facts. Accordingly, it was properly entertained by the Supreme Court of British Columbia in the first instance. The competence-competence principle was not violated.

> B.   *The Substantive Issue: Does Section 172 of the BPCPA Override the Mediation/Arbitration Provision in a Consumer Contract?*

**31**  For practical purposes, the answer to this question turns on whether the waiver contained in the TELUS arbitration clause is rendered null and void by s. 3 of the *BPCPA*, which, for convenience, I reproduce again:

> **3** Any waiver or release by a person of the person's rights, benefits or protections under this Act is void except to the extent that the waiver or release is expressly permitted by this Act.

I interpret this clause to mean that to the extent the arbitration clause purports to take away a right, benefit or protection conferred by the *BPCPA*, it will be invalid, and to that extent, Ms. Seidel will retain her individual cause of action under the *BPCPA* in the Supreme Court of British Columbia. If the arbitration clause is thus rendered invalid, the stay provisions of the *CAA* will not assist TELUS. However, the statutory right to bring an action in the Supreme Court of British Columbia appears only in s. 172. As explained earlier, Ms. Seidel's statement of claim contains a variety of different assertions and claims invoking different statutes and causes of action. It is only to the extent that she can bring her case within s. 172 of the *BPCPA* that the legislative override in s. 3 will extricate her from the arbitration clause to which she agreed in the TELUS contract.

> (1)   The "Rights, Benefits or Protections" Conferred by Section 172

**32**  For ease of reference, I reproduce again the language of s. 172. It is headed "Court actions respecting consumer transactions". It is clearly framed to encourage *private* enforcement in the *public* interest:

> [Court actions respecting consumer transactions]

> **172** (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court for one or both of the following:

>> (a)   a declaration that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;

>> (b)   an interim or permanent injunction restraining a supplier from contravening this Act or the regulations.

> ...

> (3)   If the court grants relief under subsection (1), the court may order one or more of the following:

>> (a)   that the supplier restore to any person any money or other property or thing, in which the person has an interest, that may have been acquired because of a contravention of this Act or the regulations;

>> (b)   if the action is brought by the director, that the supplier pay to the director the actual costs, or a reasonable proportion of the costs, of the inspection of the supplier conducted under this Act;

>> (c)   that the supplier advertise to the public in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section.

It will be noted that whereas s. 171 damages may only be sought by "the person who suffered damage", a s. 172 claim may be initiated by virtually anyone ("a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action"). The fact that such persons do not necessarily act in their personal interest (as they don't need to have any) emphasizes the *public* interest nature of the s. 172 remedy. Opening the door to private enforcement in the public interest vastly increases the potential effectiveness of the Act and thereby promotes adherence to the consumer standards set out therein. The legislature clearly intended the Supreme Court to be able to enjoin a supplier guilty of infractions of the *BPCPA* from practising the offending conduct against any consumer (orders which only

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

courts can issue), rather than just in relation to a particular complainant (as in a "private" and "confidential" arbitration created by private contract).

> (2)   A Proper Interpretation of Section 172 of the *BPCPA* Must Be Approached Textually, Contextually and Purposively

**33**  The text of the statute favours Ms. Seidel's interpretation. The operative language of s. 3 ("rights, benefits or protections") is all-encompassing. TELUS argues (and my colleagues LeBel and Deschamps JJ. agree, at para. 136) that the s. 172 right to "bring an action in Supreme Court" is merely procedural. With respect, this characterization is of no assistance to TELUS. Whether procedural or substantive, it is indubitably a "righ[t]" or "benefi[t]" conferred by the statute. If the legislature had intended to draw distinctions between procedural and substantive "rights, benefits or protections" in s. 3 of the *BPCPA*, it could easily have done so, but it chose not to. Ms. Seidel possesses a statutory "right" to take her complaint to the Supreme Court. My colleagues LeBel and Deschamps JJ. read down the expression "rights, benefits or protections" to exclude procedural rights. I can find no justification for modifying the legislation in this way.

**34**  My colleagues then focus on the word "may" appearing in s. 172 where it provides that an individual "may bring an action in Supreme Court". This shows, they say, that "the Supreme Court is not intended to be the only forum in which these remedies can be sought" (para. 154). With respect, the word "may" simply indicates the obvious intention that an individual (particularly one without "any interest" in a consumer transaction) has the option to complain or not to complain. How could it be mandatory? However, the statutory point is that *if* a s. 172 action is taken, it must be taken in the Supreme Court.

**35**  The internal structure of s. 172 also shows that the B.C. legislature was well aware that, in the consumer context, declarations and injunctions are the most efficient remedies in terms of protection of the interest of the broader public of consumers and deterrence of wrongful supplier conduct. Damages are often a less important form of relief considering the small amounts of money at stake. Thus, in s. 172, an order to "restore" money or property is framed as secondary relief that is contingent on the plaintiff first obtaining a declaration or injunction that, unlike an arbitral award, would be broadcast to the marketplace generally with full supporting reasons. On this point, my colleagues argue (at para. 152) that an arbitrator could make an order that "would fulfill the public purpose" of the *BPCPA* provision authorizing a superior court to order the supplier to

> advertise to the public in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section. [s. 172(3)(*c*)]

While the validity of such a hypothetical order is not before us, I think that TELUS would have a legitimate objection. It is true that arbitrators in B.C. have fairly broad remedial powers, but it is equally true that in the exercise of those powers the arbitrator would have to respect the parties' contractual agreement that the arbitration be "private and confidential". (Indeed my colleagues' entire argument is said to be based on respect for the intention of the parties.) I doubt that Ms. Seidel or TELUS would be free to turn a private and confidential arbitration into a public denunciation of the other under the guise of enforcement proceedings. The arbitrator is not a court and the parties are constrained by contract not to treat it like one.

**36**  As to the statutory context, s. 172 stands out as a public interest remedy (i.e. it is available whether or not the self-appointed plaintiff "is affected by a consumer transaction that gives rise to the action") as compared with s. 171 (where the plaintiff must be "the person who suffered damage or loss"). The difference in the personal stake (or lack of it) required of a plaintiff is scarcely accidental. Section 171 confers a private cause of action. Section 172 treats the plaintiff as a public interest plaintiff intended to shine a spotlight on allegations of shabby corporate conduct, and the legislative intent thereby manifested should be respected by the court. This appeal falls to be determined on the meaning of s. 172 of the *BPCPA*, not on general theories of the desirability of commercial arbitration.

**37**  As to statutory purpose, the *BPCPA* is all about consumer protection. As such, its terms should be interpreted generously in favour of consumers: *Smith v. Co-operators General Insurance Co.*, 2002 SCC 30, [2002] 2 S.C.R. 129, and *ACS Public Sector Solutions Inc. v. Courthouse Technologies Ltd.*, 2005 BCCA 605, 48 B.C.L.R. (4th) 328. The policy objectives of s. 172 would not be well served by low-profile, private and confidential arbitrations where consumers of a particular product may have little opportunity to connect with other consumers who may share their experience and complaints and seek vindication through a well-publicized court action.

> (3)   Private Arbitration Is Antithetical to Achievement of the Purposes of Section 172

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

**38** Casting the legislative purpose still more broadly, the usual rationales for private arbitration are quite incompatible with achieving s. 172's objective. At the same time, private arbitration would be of considerable benefit to TELUS, i.e., "[t]here are real advantages to be gleaned from an arbitration agreement which guarantees confidentiality of the proceeding, avoids the dispute getting into the public domain, and ensures that sensitive information or harmful precedents remain confidential" (W. J. Earle, *Drafting ADR and Arbitration Clauses for Commercial Contracts* (loose-leaf), at pp. 2-13 to 2-14). Each one of these objectives -- confidentiality, lack of precedential value and avoiding "the dispute getting into the public domain" -- makes perfect sense from the perspective of TELUS, but equally each of them undermines the effectiveness of s. 172(1) of the *BPCPA*.

(4)   Private Arbitration Cannot Offer the Remedies Set out in Section 172

**39** Rule 29(1)(k) of the BCICAC Rules provides that an arbitrator may order "injunctions and other equitable remedies". On this basis, my colleagues LeBel and Deschamps JJ. conclude that "[t]he arbitrator can therefore ... grant the declaratory and injunctive relief sought by Ms. Seidel under ss. 172(1)(a) and (b) of the *BPCPA*" (para. 148). Yet it can hardly be denied that arbitrators, who derive their jurisdiction by virtue of the parties' contract, cannot order relief that would bind third parties, or that only superior courts have the authority to grant declarations and injunctions enforceable against the whole world. Ms. Seidel does not seek remedies applicable only between her and TELUS but between TELUS and the whole world. Provided TELUS complied with any order in relation to Ms. Seidel, it could carry on as before in relation to TELUS customers who are not parties to the arbitration and are therefore unaffected by its outcome, just as a successful defence by TELUS against Ms. Seidel's complaint would not create in its favour a precedent in future arbitrations raising the same or similar complaints.

**40** In summary, s. 172 offer remedies different in scope and quality from those available from an arbitrator and constitutes a legislative override of the parties' freedom to choose arbitration. Unlike Quebec and Ontario, which have decided to ban arbitration of consumer claims altogether, or Alberta, which subjects consumer arbitration clauses to ministerial approval, the B.C. legislature sought to ensure only that certain claims proceed to the court system, leaving others to be resolved according to the agreement of the parties. It is incumbent on the courts to give effect to that legislative choice, in my view.

C. *This Outcome Is Not in Conflict with the Dell or Rogers Decisions of this Court*

**41** In *Dell* and its companion case *Rogers Wireless*, our Court rejected an attempt by consumers to pursue class actions in Quebec in disputes arising out of product supply contracts in the face of arbitration clauses. The outcome turned on the terms of the Quebec legislation. In *Dell*, Deschamps J. wrote for the majority: "This appeal relates to the debate over the place of arbitration in Quebec's civil justice system" (at para. 2; emphasis added). In particular, the issue was whether arbitration clauses in the consumer contracts were avoided by art. 3149 of the *Civil Code of Québec*, R.S.Q., c. C-1991. The majority concluded that art. 3149 did not assist the consumers because it only applies "where there is a relevant foreign element that justifies resorting to the rules of Quebec private international law" (para. 12). The minority contended that art. 3149 did allow consumers to avoid arbitration because "[p]rivate arbitration proceedings, even those located in Quebec, are just as removed from Quebec's judicial and quasi-judicial systems -- and hence "international" -- as legal proceedings taking place in another province or country" (at para. 202). *Rogers Wireless* (another Quebec case) was disposed of in accordance with *Dell*. The intricacies of the *Civil Code of Québec* are far removed from the issue in British Columbia. The Quebec legislation at the time contained no provision similar to s. 172 of the *BPCPA* directing specific statutory claims to a specific forum.

**42** For present purposes, the relevant teaching of *Dell* and *Rogers Wireless* is simply that whether and to what extent the parties' freedom to arbitrate is limited or curtailed by legislation will depend on a close examination of the law of the forum where the irate consumers have commenced their court case. *Dell* and *Rogers Wireless* stand, as did *Desputeaux*, for the enforcement of arbitration clauses *absent legislative language to the contrary.*

D. *May Ms. Seidel's Section 172 Claims Proceed as a Class Action?*

**43** I have concluded that Ms. Seidel has a statutory right to assert her s. 172 right before the Supreme Court of British Columbia. The next question is whether she can proceed by way of class action, as she would like, or whether she may only proceed on an individual basis. The British Columbia courts did not reach this issue as the TELUS application for a stay was their exclusive focus, whether to deny it (as did the applications judge) or to grant it (as did the Court of Appeal).

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

**44**  The arbitration clause, it will be remembered, speaks not only of having claims "determined by private, confidential and binding arbitration" but goes on to say that "[b]y so agreeing, [the signatories waive] any right [they] may have to commence or participate in any class action against TELUS". An argument was raised that even if the *arbitration* aspect is invalidated by s. 3, the *concurrent waiver* of class action proceedings in the same clause remains valid and enforceable.

**45**  Ms. Seidel argues that class action waivers are unconscionable in any event. Picking up on some U.S. jurisprudence, she notes that "an important number of courts, principally state courts from California and Illinois, as well as the 9th Circuit, consider pre-dispute arbitration agreements to be unconscionable, especially when they are coupled with waiver of class proceeding rights" (A.F., at para. 88). It is not necessary on this appeal to determine whether class action waivers are unconscionable (and I do not purport to do so) because in my view, as a matter of interpretation, the TELUS class action waiver is not severable from the arbitration clause as a whole, and as a whole it is rendered void by s. 3 of the *BPCPA*.

**46**  The TELUS clause is structured internally to make the class action waiver dependent on the arbitration provision. The wording makes it clear that it is only by virtue of their agreement to arbitrate that consumers bar themselves from a class action. The undertakings are linked by the term "[b]y so agreeing". What precedes (the arbitration clause) is the foundation for what follows (the class action waiver). If the arbitration provision is rendered invalid by s. 3 of the *BPCPA*, as I believe to be the case, the dependant class action waiver falls with it. The unitary nature of the clause is reinforced to some extent by its title, which is "Arbitration", not "Arbitration and Class Action Waiver".

**47**  I take this language to be clear. However if there is any ambiguity in the TELUS clause, it is resolved in favour of Ms. Seidel's right of access to the court by the principles of *contra proferentum*. "Whoever holds the pen creates the ambiguity and must live with the consequences": *Co-operators Life Insurance Co. v. Gibbens*, 2009 SCC 59, [2009] 3 S.C.R. 605, at para. 25; see also, *ACS Public Sector Solutions*, *per* Donald J.A., at para. 50. This, the Court said in *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102, "is particularly true where the clause is found in a standard printed form of contract, frequently termed a contract of adhesion, which is presented by one party to the other as the basis of their transaction" (at p. 108).

**48**  Accordingly, Ms. Seidel is not contractually barred from continuing to seek certification of her s. 172 claims as a class action.

**49**  Reference was made to s. 41(a) of the *CPA* which provides that no class action can be instituted where a representative action is available. However, under the *BPCPA*, only the Director may bring a representative action. Ms. Seidel may not do so. While consumer activists may bring actions despite the fact that they have not personally suffered any damage, such actions cannot be brought as representative actions under the *BPCPA*. This is to be contrasted with the situation under the now repealed *TPA*, where s. 18(3) allowed consumer-brought representative actions. Accordingly, s. 41(a) of the *CPA* is not a bar to Ms. Seidel's application for certification.

V.  <u>Disposition</u>

**50**  I would allow the appeal in part and lift the stay as regards the s. 172 claims made by Ms. Seidel. She may in that respect pursue the certification proceedings. On the other hand, I would uphold the stay in relation to her other claims which may, if she pursues them, go to arbitration. This may lead, if the arbitration is proceeded with, to bifurcated proceedings. Such an outcome, however, is consistent with the legislative choice made by British Columbia in drawing the boundaries of s. 172 as narrowly as it did.

**51**  As Ms. Seidel has enjoyed substantial success, she should have her costs in this Court and in the courts below, including costs on the application for leave to appeal to this Court. The stay proceedings raise quite distinct issues unrelated to the merits of her claim. The costs are therefore awarded to her in any event of the ultimate outcome of the litigation.

The reasons of LeBel, Deschamps, Abella and Charron JJ. were delivered by

**LeBEL and DESCHAMPS JJ. (dissenting)**

**52**  In an effort to promote and improve access to justice, and to make more efficient use of scarce judicial resources, legislatures have adopted new procedural vehicles designed to modify or provide alternatives to the traditional court action. These alternatives include class actions and arbitration, both of which have been endorsed by this Court. Consumers in British Columbia, depending on the contractual arrangements they make, already have access to either arbitration or the courts to resolve their disputes. In this

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

case, the consumer's contract provides that in the event of a dispute, the exclusive adjudicative forum is arbitration. This is a forum our courts have long accepted as an efficient and effective access to justice mechanism. Thus, the question in this case is instead whether access to justice means -- and requires -- access to a judge.

**53** This appeal specifically calls upon this Court to determine whether a clause in a standard form consumer contract for the supply of mobile phone services which mandates that all disputes with the service provider be resolved by way of arbitration, displaces the availability of class proceedings in the province of British Columbia. In our view, the British Columbia legislature has, by incorporating the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 330 U.N.T.S. 3 ("New York Convention"), and the *UNCITRAL Model Law on International Commercial Arbitration*, U.N. Doc A/40/17 (1985), Ann. I ("Model Law"), into its domestic arbitration legislation, made a clear choice. Absent a clear statement by the legislature of an intention to the contrary, a consumer claim that could potentially proceed either by way of arbitration or class action must first be submitted to arbitration.

**54** Access to justice in Canada no longer means access just to the public court system. Historically, judges were reluctant to relinquish their grasp on dispute resolution, and they even viewed alternative dispute resolution as antithetical to the parties' interests. This era is gone. It is the role of the legislature, not the courts, to limit access to alternative dispute resolution mechanisms. Unlike several other provinces, British Columbia has not limited the resolution of consumer disputes to a single procedural regime. On the contrary, it has left room for arbitration and allowed arbitrators to exercise broad remedial powers, subject to the agreement of parties to a dispute. Given the current structure of consumer protection legislation in British Columbia, submitting a consumer's dispute with their mobile phone service provider to arbitration is entirely consistent with the important public purposes of protecting consumers, vindicating their rights and promoting access to justice.

**55** Our colleague Binnie J. frames this case somewhat differently than the parties. He focusses first not on whether the arbitration clause agreed to by the parties to this dispute is inoperative -- the issue on which the British Columbia courts focussed their decisions, and on which leave was granted -- but rather on the interpretation of ss. 3 and 172 of the *Business Practices and Consumer Protection Act*, *S.B.C. 2004, c. 2* ("*BPCPA*"). He considers s. 172 to be the result of a legislative decision to confer exclusive jurisdiction on the British Columbia Supreme Court to issue declaratory, injunctive and other equitable orders, the waiver of which is prohibited by s. 3. In our view, this interpretation represents an inexplicable throwback to a time when courts monopolized decision making and arbitrators were treated as second-class adjudicators. This approach completely disregards the modern state of the law in British Columbia, in which arbitrators have expanded powers comparable to those of the courts to hear representative proceedings and to issue equitable orders.

**56** We disagree that the *BPCPA* manifests explicit legislative intent to foreclose the use of arbitration as a vehicle for the resolution of disputes under that Act in British Columbia. We would dismiss the appeal, thereby upholding the stay of court proceedings to allow the arbitration process contractually agreed to by the parties to run its course.

I.   Factual Background

**57** The appellant, Michelle Seidel, became a customer of the respondent TELUS Communications Inc.'s ("TELUS") mobile phone services in 2000. The parties have been unable to locate her original contract with TELUS, if one was in fact signed. Whether the original contract contained an arbitration clause cannot therefore be conclusively determined.

**58** When Ms. Seidel renewed her cell phone service with TELUS in 2003, however, she did sign a contract. It included the following arbitration clause:

> 15.   ARBITRATION: Any claim, dispute or controversy (whether in contract or tort, pursuant to statute or regulation, or otherwise and whether pre-existing, present or future -- except for the collection from you of any amount by TELUS Mobility) arising out of or relating to: (a) this agreement; (b) a phone or the service; (c) oral or written statements, or advertisements or promotions relating to this agreement or to a product or service; or (d) the relationships which result from this agreement (including relationships with third parties who are not parties to this agreement), (each, a "Claim") will be referred to and determined by private and confidential mediation before a single mediator chosen by the parties and at their joint cost. Should the parties after mediation in good faith fail to reach a settlement, the issue between them shall then be determined by private, confidential and binding arbitration by the same person originally chosen as mediator. Either party may commence court proceedings to enforce the arbitration result when an arbitration decision shall have been rendered and thirty (30) days have passed from the date of such decision. By so

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

> agreeing, you waive any right you may have to commence or participate in any class action against TELUS Mobility related to any Claim and, where applicable, you hereby agree to opt out of any class proceeding against TELUS Mobility otherwise commenced. [A.R., at p. 83.]

Ms. Seidel renewed her TELUS service once again in 2004. The renewal form included a notification that the terms of the 2004 renewal supplemented the terms of her existing TELUS service contract, which continued to apply.

**59**  On January 21, 2005, Ms. Seidel commenced a class proceeding against TELUS, alleging breach of contract and deceptive and unconscionable practices contrary to the *BPCPA*. The essence of Ms. Seidel's allegations is that TELUS unlawfully charges its customers for incoming calls based upon when the caller connects to TELUS's network, but before the customer answers the call. This is said to include connection time and ring time. In her view, TELUS can lawfully charge only for "air time", or what is otherwise known as "actual talking time". To date, no certification hearing has taken place.

**60**  Ms. Seidel seeks the following remedies: a declaration that TELUS engaged in deceptive and unconscionable trade acts and practices; damages, including both punitive and exemplary damages; an order restoring the monies acquired by TELUS in contravention of the *BPCPA*; an accounting of amounts due; and both interim and permanent injunctions prohibiting the allegedly deceptive and unconscionable acts and practices. All these remedies are sought pursuant to the *BPCPA*.

    II.   Judicial History

**61**  In order to place the decisions of the courts below in their proper context, it is important to begin by briefly reviewing the legal environment in place when they were rendered. The courts have in fact ruled a number of times on the issue of whether the certification of a class action should take precedence over contractual agreements to arbitrate.

    A.  *MacKinnon v. National Money Mart Co.* ( 2004 BCCA 473, 50 B.C.L.R. (3d) 291) ("*MacKinnon 2004*")

**62**  In *MacKinnon 2004*, a five-member panel of the British Columbia Court of Appeal was asked to decide whether an arbitration clause in a consumer contract is "inoperative" where an action for breach of that contract is brought as an intended class proceeding.

**63**  Levine J.A., writing for a unanimous court, found that an operational conflict exists between the *Class Proceedings Act*, R.S.B.C. 1996, c. 50 ("*CPA*"), and the *Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 ("*CAA*"): under the *CPA*, the court must certify a class proceeding if all the statutory criteria are met, but must also refer a matter to arbitration pursuant to the *CAA* unless the agreement to arbitrate is null or inoperative. In other words, the mandatory terms of the two Acts "mean that arbitration and class proceedings cannot operate at the same time with respect to the same dispute" (para. 53).

**64**  Levine J.A. rejected the sequential approach to interpretation advanced by Money Mart, according to which the stay application under the *CAA* had to be considered before the certification application under the *CPA*. Instead, relying in part on policy concerns associated with standard-form agreements and the use of arbitration to resolve consumer disputes, Levine J.A. crafted an approach that would give meaning to and recognize the importance of both statutory schemes. She concluded that an arbitration agreement becomes inoperative when, upon certification, a class proceeding is considered the "preferable procedure" (s. 4 (1)(d), *CPA*) for resolving the dispute.

    B.  *Dell Computer Corp. v. Union des consommateurs* (2007 SCC 34, [2007] 2 S.C.R. 801)

**65**  In July 2007, this Court released its decisions in *Dell* and *Rogers Wireless Inc. v. Muroff*, 2007 SCC 35, [2007] 2 S.C.R. 921. These decisions dealt with the relationship between arbitration clauses and class actions under the *Civil Code of Québec*, R.S.Q., c. C-1991 ("*CCQ*") and the *Code of Civil Procedure*, R.S.Q., c. C-25 ("*CCP*"). In TELUS's view, *Dell* and *Rogers* cast doubt on the validity of *MacKinnon 2004*. On July 23, 2007, TELUS accordingly applied for a stay under s. 15 of the *CAA*, arguing that the arbitration clause should prevail over the proposed class proceeding. In support of this application, TELUS filed an affidavit of a Quebec lawyer, who stated that there was no substantive difference between Quebec's legislation dealing with arbitration and class proceedings and that of British Columbia.

**66**  Decided against the backdrop of an application to certify a class action, *Dell* addressed the question of who, between the courts or an arbitrator, should first consider the validity and applicability of an arbitration agreement. After canvassing the international

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

and domestic authorities, the majority confirmed the primacy of the "competence-competence" principle and set out the applicable general test:

> First of all, I would lay down a general rule that in any case involving an arbitration clause, a challenge to the arbitrator's jurisdiction must be resolved first by the arbitrator. A court should depart from the rule of systematic referral to arbitration only if the challenge to the arbitrator's jurisdiction is based solely on a question of law. This exception is justified by the courts' expertise in resolving such questions, by the fact that the court is the forum to which the parties apply first when requesting referral and by the rule that an arbitrator's decision regarding his or her jurisdiction can be reviewed by a court. It allows a legal argument relating to the arbitrator's jurisdiction to be resolved once and for all, and also allows the parties to avoid duplication of a strictly legal debate. In addition, the danger that a party will obstruct the process by manipulating procedural rules will be reduced, since the court must not, in ruling on the arbitrator's jurisdiction, consider the facts leading to the application of the arbitration clause.

> If the challenge requires the production and review of factual evidence, the court should normally refer the case to arbitration, as arbitrators have, for this purpose, the same resources and expertise as courts. Where questions of mixed law and fact are concerned, the court hearing the referral application must refer the case to arbitration unless the questions of fact require only superficial consideration of the documentary evidence in the record. [paras. 84-85]

Thus, a challenge to the jurisdiction of the arbitrator will be determined by the court only if it concerns either a question of law or one of mixed fact and law that requires only superficial consideration of the evidence in the record and can be dealt with expeditiously.

**67**  As to the interaction between an arbitration clause and a class action, the majority in *Dell* focussed on the procedural nature of the class action. The possibility of using a particular procedural vehicle cannot alter substantive rights agreed to by the parties to a contract. Therefore, when contracting parties agree to refer to arbitration any dispute arising under their contract, they create a substantive right. Relying on *Bisaillon v. Concordia University*, *2006 SCC 19*, *[2006] 1 S.C.R. 666*, the majority held that the choice to initiate a class action cannot serve as the basis for a court's jurisdiction to hear a dispute if the claims raised in that action, taken individually, would not do so. This is because the parties have, by virtue of their contractual agreement to arbitrate these claims, created a substantive right that ousts a court's jurisdiction.

**68**  Though the judges of the minority dissented in *Dell*, they did so on other grounds. They agreed, in respect of the competence-competence principle, with the "rule of chronological priority under which the arbitrators must have the first opportunity to rule on their jurisdiction" (para. 163). They also agreed "that a discretionary approach favouring resort to the arbitrator in most instances would best serve the legislator's clear intention to promote the arbitral process and its efficiency, while preserving the core supervisory jurisdiction of the Superior Court" (para. 176). Similarly, the minority agreed that a court that lacks jurisdiction over a dispute in the first place -- because the parties have chosen to have disputes resolved through arbitration, for example -- cannot acquire jurisdiction over it as a result of an application for certification of a class action (para. 150).

**69**  In oral argument in the instant case, emphasis was put on the fact that *Dell* was based on the interpretation of the provisions of the *CCQ* and the *CCP* on arbitration and class actions. It was submitted on this basis that the *ratio* of that case does not apply outside Quebec. While it is true that *Dell* involved the interpretation of Quebec legislation, the subject matter of that legislation was domestic commercial arbitration, and the key issue was the relationship between arbitration and individual court actions. Quebec's arbitration legislation is not unique to the civil law tradition, but was based on two international texts relating to arbitration: the Model Law and the New York Convention. The general test adopted in *Dell* for dealing with challenges to an arbitrator's jurisdiction in this context was based on the interpretation of these international documents. The approach in that case to determining the jurisdiction of the arbitrator, and more specifically the application of the competence-competence principle, is not unique to Quebec.

    C.  *British Columbia Supreme Court* (*2008 BCSC 933*, *85 B.C.L.R. (4th) 372*; Masuhara J.)

**70**  Returning to the present appeal, the stay application brought by TELUS was argued before the case management judge, Masuhara J. The key question he had to address was whether the legal tests for certification of a class proceeding and for establishing the jurisdiction of an arbitrator in Quebec are, for all intents and purposes, the same as those in British Columbia. The answer to this question would ultimately determine the reach of both *Dell* and *Rogers* in the province. In Masuhara J.'s opinion, *Dell*

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

requires an arbitrator to determine if the arbitration clause is valid before the court considers whether the class action should be certified. If this *ratio* extended to the common law provinces, he reasoned, it would call *MacKinnon 2004* into question.

**71** Masuhara J. concluded that there was no substantial difference between the two provinces' approaches to class proceedings. However, he observed three main differences between the arbitration regimes that, in his view, precluded a finding that the "Quebec test" (at para. 75) set out in *Dell* applies in British Columbia. First, s. 15(2) of the *CAA* provides for broader exceptions from the automatic referral to arbitration than art. 940.1 of the *CCP* does in Quebec. Second, the *CAA* does not expressly grant arbitrators the authority to decide questions with regard to their own jurisdiction. The plain language of s. 15 of the *CAA* indicates that this jurisdiction resides exclusively with the court. Third, the *CAA* is not based on the New York Convention and the Model Law, and does not contain the provisions found in the Quebec legislation that expressly oust the jurisdiction of the courts.

**72** In the event that he was wrong, and that *Dell* does in fact apply in British Columbia, Masuhara J. went on to consider the effect of that case on TELUS's stay application. He was not convinced that *Dell* had the effect of overturning *MacKinnon 2004*. First, *Dell*'s "Quebec test" had no bearing on the actual issue raised by TELUS's application: whether the court had jurisdiction to grant a stay of proceedings under the *CAA*. Second, two exceptions to the competence-competence principle were identified in *Dell*: where the challenge to the arbitrator's jurisdiction involves a question of law, or questions of mixed fact and law that require only a superficial examination of the evidence. Whether an action ought to be certified as a class proceeding is a question of law that falls within the exclusive jurisdiction of the court. Masuhara J. therefore dismissed TELUS's application for a stay of proceedings.

D.  *British Columbia Court of Appeal*

(i)  *MacKinnon v. National Money Mart Co.* ( *2009 BCCA 103, 89 B.C.L.R. (4th) 1*) ("*MacKinnon2009*")

**73** The Court of Appeal's decision in the case at bar (*2009 BCCA 104*, *88 B.C.L.R. (4th) 212*, *per* Tysoe J.A. (Finch C.J.B.C. and Rowles, Newbury and Neilson JJ.A. concurring)) was released concurrently with *MacKinnon 2009*. Because Tysoe J.A. simply applied the reasoning in *MacKinnon 2009* to the facts of Ms. Seidel's case, we will discuss both sets of reasons.

**74** In *MacKinnon 2009* and in the case at bar, the Court of Appeal again sat as a five-judge panel, because it was being explicitly asked to overturn its decision in *MacKinnon 2004* on the basis that that decision had been overtaken by *Dell*. Newbury J.A., writing for a unanimous court in *MacKinnon 2009*, concluded that the reasoning in *Dell* applied in British Columbia and therefore that *MacKinnon 2004* should no longer be followed. However, she focussed not so much on the alleged conflict of purposes between the statutory scheme for commercial arbitration and the one for class proceedings as on the legal status of class proceedings themselves.

**75** After reviewing this Court's recent jurisprudence on class actions, Newbury J.A. began by observing that the commencement of a class proceeding cannot affect the substantive rights of the parties. A class proceeding is a procedural vehicle only: when contracting parties create a substantive contractual right to have their disputes resolved by way of arbitration, the class proceeding cannot be certified and "the court must generally respect the parties' choice of arbitration instead of judicial determination" (para. 66). The class proceeding cannot therefore be used either to circumvent the exclusive jurisdiction of the arbitrator or to modify the substantive rights of the parties to an arbitration agreement (para. 70).

**76** Newbury J.A. also held that the differences in statutory language identified by Masuhara J. were not material to the question of whether the reasoning in *Dell* extends to British Columbia. The arbitration schemes of both provinces provide essentially the same thing. Moreover, the question raised in the appeal logically paralleled the question considered by this Court in *Dell*:

> [I]f Mr. MacKinnon had brought his action solely as an individual, he could not have prevented the court in either province from staying the action and referring it to arbitration. [para. 69]

**77** Newbury J.A. therefore decided that the approach taken in *Dell* also applies in British Columbia. However, having found no basis for interfering with the case management judge's exercise of discretion in *MacKinnon 2009* in refusing to grant the stay on the basis of issue estoppel, she dismissed the appeal (para. 84). For this reason, the dispute was not referred to arbitration.

(ii)  **Seidel v. TELUS Communications Inc.**

**78** Tysoe J.A., writing for the Court of Appeal in the case at bar, applied the reasoning of his colleague in *MacKinnon 2009* to the issue of whether the stay should be granted on the basis of *Dell*. However, he then went on to consider three residual issues decided neither by Newbury J.A. in *MacKinnon 2009* nor by Masuhara J. that were specific to the case at bar: (1) whether the arbitration

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

agreement was inoperative by virtue of s. 3 of the *BPCPA* (which renders void any waiver or release of rights, benefits or protections under that Act); (2) whether issue estoppel was available; and (3) whether the arbitration clause covered those of Ms. Seidel's claims that arose before February 2003, since no contract between the parties could be located from before that time.

**79**  Tysoe J.A. rejected the argument that the *BPCPA* conferred rights on members of the proposed class and that, by virtue of s. 3, those rights could not be waived. Specifically, s. 10(2) confers rights, benefits or protections applicable only to mortgage loans, and s. 172(1) simply identifies the British Columbia Supreme Court as the court in which the remedies provided for in that section can be sought. Section 172(1) does not explicitly exclude arbitral jurisdiction and cannot therefore render the arbitration agreement between Ms. Seidel and TELUS inoperative.

**80**  Regarding the availability of issue estoppel, Tysoe J.A. noted that there was no evidence that TELUS had ever promised not to apply for a stay of proceedings. Nor had it done anything in the course of the proceedings that would constitute a "step in the proceedings" within the meaning of s. 15(1) of the *CAA* and would accordingly bar it from applying for a stay. Moreover, TELUS applied for a stay only after *Dell* and *Rogers* had cast doubt on the correctness of *MacKinnon 2004*. And it did so promptly after their release.

**81**  Finally, in considering whether the arbitration agreement covered the pre-February 2003 claims, Tysoe J.A. noted that this issue involved the determination of a number of factual matters. As a result, it did not fall within either of the exceptions to the applicability of the competence-competence principle identified in *Dell* and therefore had to be resolved at first instance by the arbitrator. Tysoe J.A. therefore allowed TELUS's appeal and stayed Ms. Seidel's proposed class action in its entirety.

   III.  Analysis

A. *The Issues*

**82**  In the courts below, the parties' arguments were firmly focussed on one main issue, namely:

   (1)  whether the competence-competence principle is incorporated into the law of British Columbia by virtue of the stay provision -- s. 15 of the *CAA* -- and if so, whether judicial proceedings, including class proceedings, should be stayed where the parties have signed an agreement to arbitrate unless the narrow exceptions in *Dell* apply.

A second issue was raised almost incidentally:

   (2)  whether an arbitration clause in an agreement for mobile phone services constitutes an impermissible waiver of rights, benefits and protections provided for in the *BPCPA*.

In this Court, it is this second issue that has come to the forefront. It constitutes a question of law that, pursuant to the exception in *Dell*, should be considered in the first instance by a court rather than the arbitrator. Consequently, it will be necessary to resolve both these issues in these reasons.

B. *Positions of the Parties*

   (i)  The Appellant, Ms. Seidel

**83**  Ms. Seidel argues that the *CAA* was never intended to apply to consumer disputes; rather, its purpose was to regulate domestic commercial relationships between business persons operating at arms length in the province. By contrast, the *CPA* is intended to make class proceedings available in situations in which actions are ordinarily brought only on an individual basis, and its express purpose is to foster access to justice.

**84**  Ms. Seidel argues that the Court of Appeal's approach in *MacKinnon 2004* establishes the proper framework, as it allows both statutes to operate and to achieve their objectives. If the British Columbia legislature had intended to exclude arbitration proceedings from the "preferable procedure" analysis required by s. 4(1)(d) of the *CPA*, it would surely have done so expressly. In comparison with the provinces that have explicitly legislated against the inclusion in consumer agreements of arbitration clauses and clauses prohibiting participation in class proceedings, British Columbia has simply taken a different approach. But the effect of the Court of Appeal's decision in *MacKinnon 2009* was to exclude, from the outset, the possibility of certifying a proceeding as a class

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

proceeding if it concerns a dispute, subject to an arbitration agreement. The Court of Appeal has also disregarded some significant policy arguments which suggest that arbitration is not an effective forum for remedying consumer claims, particularly when there are a large number of claims of low or nominal value.

**85** Furthermore, Ms. Seidel argues, the Court of Appeal's conclusion that *Dell* applies is premised on two false assumptions. The first is that the laws of Quebec and British Columbia respecting arbitration and class proceedings are sufficiently similar. The second is that legislation dealing with procedural rights is subordinate to legislation dealing with substantive rights. Finally, on the issue of the waiver of rights under the *BPCPA*, Ms. Seidel argues that a person's rights under the Act include the substantive right to bring an action in the British Columbia Supreme Court under s. 172 for declarations and for injunctive relief. These are remedies that only a court can grant. An approach pursuant to which a consumer subject to an arbitration agreement would be required to have an arbitrator determine whether the *BPCPA* has been breached before being entitled to proceed to court to obtain declaratory or injunctive relief would strip the *BPCPA* of its legislative force, and achieving its objectives would become impossible.

(ii)    The Respondent, TELUS

**86** TELUS asks this Court to adopt the reasoning in *MacKinnon 2009* as a correct statement of the law in British Columbia. The overarching principle from *Dell*, that a court may rule first on the arbitrator's jurisdiction only if there is a pure legal issue or an issue of mixed fact and law that can be expeditiously decided by the court on a minimal evidentiary record, also applies in British Columbia. The presence of an arbitration agreement precludes a court from considering the certification of the proposed class action and mandates the granting of the stay under s. 15 of the *CAA*, provided that the narrow exception from *Dell* does not apply. Unless this Court were to hold that a standard-form contract cannot establish a substantive right to arbitration or that arbitration clauses are inherently unfair to consumers, an agreement to arbitrate cannot be supplanted by the procedural right to commence a class action. Taking any necessary action and assessing Ms. Seidel's policy concerns with respect to the use of arbitration clauses in consumer agreements are matters best left to the legislature, which is in a better position to balance competing policies and objectives.

**87** TELUS argues that the arbitration clause does not constitute a waiver of rights, benefits or protections under the *BPCPA* and therefore does not offend s. 3 of the *CAA*. The clause simply provides that it is an arbitrator, and not the court, who determines in the first instance whether the *BPCPA* has been breached. Moreover, the arbitrator has the authority to order the same relief as could a court. Ms. Seidel therefore does not lose any of the substantive rights, benefits or protections provided for in the *BPCPA* by having her dispute with TELUS resolved by way of arbitration. If the legislature intends to exclude arbitration as an appropriate forum for dispute resolution in a particular case, it must do so expressly.

**88** Before we deal with this last argument, it will be necessary to resolve the issue that was the primary focus of argument in the courts below: whether the competence-competence principle applies in British Columbia law.

C.    *Evolution of Arbitration in British Columbia and the Competence-Competence Principle*

**89** Canadian courts, both in Quebec and in the common law jurisdictions, have endorsed the use of arbitration as a dispute resolution mechanism and now encourage its use (*Desputeaux v. Éditions Chouette (1987) inc.*, 2003 SCC 17, [2003] 1 S.C.R. 178, at para. 38). This was not always the case, however, as the courts originally displayed overt hostility to arbitration, effectively treating it as a second-class method of dispute resolution. As Casey and Mills observe in *Arbitration Law of Canada: Practice and Procedure*:

> Judicial hostility to "lesser" tribunals, and the lack of a modern legislative framework, inhibited the growth of arbitration in Canada, particularly relative to European countries. Until the 1990's, commercial arbitration in Canada was not regarded as a real substitute for the courts and the provinces were slow to recognize any distinction between domestic arbitration and international arbitration.

> (J. B. Casey and J. Mills, *Arbitration Law of Canada: Practice and Procedure* (2005), at pp. 2-3)

This hostility originated in the English common law (see, e.g., *Horton v. Sayer* (1859), 4 H. & N. 643, 157 E.R. 993; *Lee v. Page* (1861), 30 L.J. Ch. 857; *Edwards v. Aberayon Mutual Ship Insurance Society Ltd.* (1876), 1 Q.B.D. 563; *Doleman & Sons v. Ossett Corp.*, [1912] 3 K.B. 257).

**90** In the early cases on arbitration, the courts displayed a distinct attitude that arbitration agreements, the purported effect of which was to oust the jurisdiction of the courts, were void on grounds of public policy. If, however, the agreement merely stipulated

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

-- in what became known as a *Scott v. Avery* clause -- that arbitration was a condition precedent to bringing a court action, the court's jurisdiction was not ousted and the agreement would be valid (*Scott v. Avery* (1856), 5 H.L.C. 811, 10 E.R. 1121; see also, e.g., *Johnston v. Western Assurance Co. (1879), 4 O.A.R. 281*; *Nolan v. Ocean, Accident and Guarantee Corp. (1903), 5 O.L.R. 544* (Div. Ct.); *Cayzer, Irvine and Co. v. Board of Trade*, [1927] 1 K.B. 269, at p. 293; *Brand v. National Life Assurance Co.* (1918), 44 D.L.R. 412 (Man. K.B.); *Altwasser v. Home Insurance Co. of New York, [1933] 2 W.W.R. 46* (Sask. C.A.); *Re Rootes Motors (Canada) Ltd. and Wm. Halliday Contracting Co. [1952] 4 D.L.R. 300* (Ont. H.C.J.); *Deuterium of Canada Ltd. v. Burns & Roe of Canada Ltd. (1970), 15 D.L.R. (3d) 568* (N.S.S.C.), rev'd *(1971), 21 D.L.R. (3d) 568* (N.S.S.C.A.D.), aff'd *[1975] 2 S.C.R. 124*; *Procon (Great Britain) Ltd. v. Golden Eagle Co., [1976] C.A. 565*, at p. 567).

**91**  The clearest articulation of why the courts considered arbitration agreements to be contrary to public policy is found in the following passage from *Brand*:

> From the earliest times both common law and equity courts have recognized and given effect to the principle that parties cannot, by contract, oust the courts of their jurisdiction, and that a provision to refer any dispute which might arise, not to the ordinary tribunals, but to some forum of their own selection, could not be pleaded in bar to an action upon the contract.

> At one time it was supposed that the principle underlying these decisions was that an agreement to prevent the enforcement of a cause of action through the medium of the ordinary tribunals of the country was void as contrary to public policy, and indeed expressions to that effect may be found in the reports of cases of comparatively recent date.

> ...

> The true ground for holding that the jurisdiction of the courts cannot be ousted by an agreement between parties is that the courts derive their jurisdiction either from the statute or common law, and no mere contract *inter partes* can take away that which the law has conferred. [pp. 414-15]

**92**  This hostility towards arbitration animated the courts' approach in applications to stay proceedings in the face of arbitration agreements:

> While the Courts are guided by the principle that persons who make an agreement for arbitration should be bound by its terms, they do not lose sight of the principle that the jurisdiction of the Courts is not to be ousted by agreement between the parties; and in cases where it is thought better that the matters at issue should be decided by the Courts rather than by arbitration, the action is allowed to proceed and a stay of proceedings is refused. [*Altwasser*, at p. 50]

**93**  Not only were the courts overtly hostile to any mechanism that would oust their jurisdiction to hear and resolve disputes, they were also sceptical that arbitration was really more efficient or effective than a traditional judicial proceeding:

> One cannot but wonder about the efficacy of arbitration as a means of settling disputes of this kind. The present case occupied a great deal of time before the Board and before the two Courts. Costs are bound to be heavy. It would appear that the *Arbitration Act*, R.S.B.C. 1948, c. 16 instead of affording a quick, easy and cheap method of settlement provides one longer, more difficult and more expensive in the elucidation of matters such as these.

> (*Vancouver v. Brandram-Henderson of B.C. Ltd.* (1959), 18 D.L.R. (2d) 700 (B.C.C.A.), at p. 705, *per* Sidney Smith J.A.)

In short, in the early cases on arbitration, the courts were "very jealous of their jurisdiction" and did not look "with favour upon efforts of the parties to oust it by agreement" (*Re Rootes*, at p. 304).

**94**  The best example of this hostility can perhaps be found in this Court's decision in *National Gypsum Co. v. Northern Sales Ltd., [1964] S.C.R. 144*. In an agreement signed in New York, National Gypsum had undertaken that its vessel would travel to Montreal to pick up a load of wheat. The vessel failed to do so, and Northern Sales alleged that, as a result, it was unable to ship wheat it had contracted to deliver. Northern Sales sued for breach of contract. The agreement provided that any disputes were to be resolved by way of arbitration in New York. The issue before the Court was whether the agreement to arbitrate could be enforced under Quebec law.

**95**  The current provisions of the *CCP* were not in force at the time, and the rules regarding the jurisdiction of the courts in arbitration matters had not been codified. In cases in which the jurisdiction of the courts was challenged, that jurisdiction was defined on the basis of art. 13 of the *Civil Code of Lower Canada*, which provided that "[n]o one can by private agreement, contravene

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

the laws of public order and good morals", and what was then art. 94 of the *CCP*, which governed the place where an action to claim a sum of money could be instituted. The Court endorsed the Quebec jurisprudence on this subject, as established in *Vinette Construction Ltée. v. Dobrinsky*, [1962] B.R. 62, and *Gordon and Gotch (Australasia) Ltd. v. Montreal Australia New Zealand Line Ltd.* (1940), 68 B.R. 428, and held that the undertaking to arbitrate was contrary to public policy.

**96**  These decisions reflected the view that only courts were capable of granting remedies for legal disputes and that, as a result, any effort by the parties to a dispute to contract in such a way as to oust the courts' jurisdiction was, in itself, contrary to public policy, regardless of the nature of the substantive legal issues in a given case.

**97**  In *Zodiak International Productions Inc. v. Polish People's Republic*, [1983] 1 S.C.R. 529, the Court, in reasons written by Chouinard J., distanced itself from the approach taken in *National Gypsum* and *Vinette* and, in so doing, advanced a more positive view of arbitration. Rather than viewing arbitration as a potential threat to the administration of justice, and therefore contrary to public order, the Court was starting to see that it could be beneficial to the administration of justice.

**98**  After *National Gypsum*, the Quebec legislature enacted art. 951 of the *CCP*:

> **951.** An undertaking to arbitrate must be set out in writing.
>
> When the dispute contemplated has arisen, the parties must execute a submission. If one of them refuses, and does not appoint an arbitrator, a judge of the court having jurisdiction makes such appointment and states the objects in dispute, unless the agreement itself otherwise provides.

Chouinard J. found in *Zodiak* that the effect of enacting art. 951 had been to overtake *Vinette* and *National Gypsum*:

> The prevailing opinion since the coming into effect of the new *Code of Civil Procedure* is that the adoption of art. 951 in its present form sufficed to render the complete undertaking to arbitrate valid. The old *Code of Procedure* was silent as to the undertaking to arbitrate: it was not mentioned. The present situation is accordingly quite different from that prevailing when *Vinette Construction* (supra) and *National Gypsum* (supra) were rendered, decisions which some have suggested have become obsolete. [p. 538]

Citing with approval Gagnon J.A. in *Ville de Granby v. Désourdy Construction Ltée.*, [1973] C.A. 971, Chouinard J. concluded that the enactment of art. 951 indicated an intention "to make a step forward" and that "it is the legislature, when it takes a position, who is the final arbiter in the matter" (at p. 542).

**99**  Recognizing how harmful the hostility shown by the courts might be to the modern development and maturation of arbitration in Canadian law, this Court stressed the value of commercial arbitration as a dispute resolution mechanism once again in *Sport Maska Inc. v. Zittrer*, [1988] 1 S.C.R. 564:

> This lack of interest by our courts and academic commentators may be explained by the importance at the time of the debate on the validity of the undertaking to arbitrate, a matter settled by this Court in *Zodiak, supra*. This long period of legal uncertainty did nothing to encourage the use of this method of settling disputes. [para. 598]

More recently, the Court again recognized "the existence and legitimacy of the private justice system" of arbitration in *GreCon Dimter inc. v. J.R. Normand inc.*, 2005 SCC 46, [2005] 2 S.C.R. 401, at para. 38.

**100**  Lower courts across Canada swiftly followed this Court's lead in accepting and endorsing arbitration as a legitimate dispute resolution mechanism, and this shift in attitude clearly took root. The following passage from the reasons of Campbell J. in *Boart Sweden AB v. NYA Strommes AB* (1988), 41 B.L.R. 295 (Ont. H.C.J.), is often cited as an example of this shift:

> Public policy carries me to the consideration which I conclude is paramount having regard to the facts of this case, and that is the very strong public policy of this jurisdiction that where parties have agreed by contract that they will have the arbitrators decide their claims, instead of resorting to the Courts, the parties should be held to their contract. [pp. 302-303]

See also, *Automatic Systems Inc. v. Bracknell Corp.* (1994), 12 B.L.R. (2d) 132 (Ont. C.A.), *per* Austin J.A. (international arbitration); *BWV Investments Ltd. v. Saskferco Products Inc.* (1994), 125 Sask. R. 286 (C.A.), *per* Gerwing J.A. (international arbitration); *Quintette Coal Ltd. v. Nippon Steel Corp.*, [1991] 1 W.W.R. 219 (B.C.C.A.), *per* Hutcheon J.A., concurring (international arbitration); *Burlington Northern Railroad Co. v. Canadian National Railway Co.* (1995), 59 B.C.A.C. 97, *per* Cumming J.A., dissenting, whose view was upheld

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

by this Court (*[1997] 1 S.C.R. 5*) (domestic arbitration); *Condominiums Mont St-Sauveur Inc. v. Constructions Serge Sauvé Ltée.*, *[1990] R.J.Q. 2783* (C.A.), *per* Monet J.A. (domestic arbitration).

**101**  In the instant case, our colleague's reasons appear to embrace the pre-*Zodiak* undercurrent of hostility towards arbitration. Though Binnie J. does not take issue with our approach to the competence-competence principle, his reading of the relevant provisions of the *BPCPA* exhibits the same reluctance to fully accept arbitration as a legitimate form of dispute resolution that permeated the older jurisprudence. His hostility towards arbitration is now couched as an exercise in statutory interpretation of the *BPCPA*. Although Chouinard J. pointed out in *Zodiak* that the statutory interpretations adopted in *Vinette* and *National Gypsum* were misguided, our colleague's view appears to revive this outdated approach exemplified by the comment of Casey J.A. of the Quebec Court of Appeal in *Vinette*:

> The right to apply to the Courts for relief is one of the cornerstones of our legal system. Its importance cannot be exaggerated nor can any threat to its existence be tolerated ... . If this be allowed to happen those who accept the clause today will have it imposed on them tomorrow. For this reason its use is contrary to the public interest: and this is why it offends against art. 13 *C.C.* [pp. 68-69]

Respectfully, Binnie J.'s approach to interpreting the *BPCPA* neglects the broader contextual backdrop in which legislatures and courts have progressively come to encourage the use of alternative dispute resolution, including arbitration.

**102**  Since *Zodiak*, there is a consistent trend that leads in one direction only: "Canadian courts have indicated their willingness to stay court proceedings in favour of arbitrations where either the domestic or international Acts apply, and will no longer 'jealously guard its jurisdiction against encroachment by arbitration'" (Casey and Mills, at pp. 228-29). See also the comments of L. Yves Fortier in "Delimiting the Spheres of Judicial and Arbitral Power: 'Beware, My Lord, of Jealousy'" (2001), 80 *Can. Bar Rev.* 143, at pp. 143-45. More importantly, the courts have gone from avoiding arbitration, and seeing it as contrary to public order and the proper administration of justice, to embracing it as a legitimate vehicle for fostering access to justice.

**103**  It is now settled that if a legislature intends to exclude arbitration as a vehicle for resolving a particular category of legal disputes, it must do so explicitly (*Desputeaux*, at para. 42). Arbitration in and of itself is no longer considered contrary to public order, and courts ought not to read in the exclusion of arbitration if the legislature has not clearly provided that it is to be excluded. Yet this is exactly the effect of the approach adopted by Binnie J.

**104**  In British Columbia, the current approach to arbitration was adopted in 1986 with the enactment of the *Commercial Arbitration Act*, S.B.C. 1986, c. 3 ("1986 *CAA*"). The 1986 *CAA* replaced the *Arbitration Act*, R.S.B.C. 1979, c. 18, which had essentially remained unchanged since 1893. The new legislation was modelled primarily on the recommendations of a 1982 Law Reform Commission of British Columbia *Report on Arbitration* ("LRC Report"). In enacting it, British Columbia took a "leadership role" by being the first common law province to modernize its approach to arbitration (J. K. McEwan and L. B. Herbst, *Commercial Arbitration in Canada: A Guide to Domestic and International Arbitrations* (2009), at p. 1-10). However, the 1986 *CAA* stopped short of adopting the New York Convention and Model Law approaches to recognition and enforcement of arbitral awards that had been gaining prominence on the international stage, particularly the enumerated grounds on which a court could refuse to recognize and refuse to enforce arbitral awards.

**105**  The 1986 version of s. 15 of the *CAA*, the stay provision, even incorporated the LRC Report's preference for giving the court broad jurisdiction to refuse to grant a stay. Section 15 provided that court proceedings should continue in place of arbitration if the court was satisfied that there was a "good reason" for doing so. "[G]ood reason" was defined expansively, as the court was authorized to consider: whether the matters in dispute were factually or legally complex; the comparative expense and delay associated with the two proceedings; whether other parties were affected by the dispute; and "any other matter the court considers significant".

**106**  Despite the fact that the LRC Report was based on a broad public consultation, "s. 15 had a rough landing" in British Columbia (C. J. Mingie, *British Columbia Commercial Arbitration -- An Annotated Guide* (2004), at p. 37). Court decisions that addressed the issue of the s. 15 stay were inconsistent either with the Act itself or with each other (p. 37). Although this Court had begun to show support for arbitration legislation, the British Columbia courts did not always take a similar approach in considering the 1986 *CAA*.

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

**107** As a result, just two years after the 1986 *CAA* was first enacted, the legislature amended it to limit the power of the courts to intervene where the parties have agreed that a matter should be submitted to arbitration (*Miscellaneous Statutes Amendment Act (No. 2), 1988*, S.B.C. 1988, c. 46). More specifically, the legislature amended s. 15 to more closely reflect the wording of the New York Convention and art. 8 of the Model Law, and thereby limit the grounds upon which a court could refuse to grant a stay of proceedings (see Mingie, at p. 37; *Gulf Canada Resources Ltd. v. Arochem International Ltd. (1992), 66 B.C.L.R. (2d) 113* (C.A.), *per* Hinkson J.A.).

**108** Masuhara J. in the B.C. Supreme Court below accepted the argument that although the *International Commercial Arbitration Act, R.S.B.C. 1996, c. 233*, was modelled on the New York Convention and the Model Law, the *CAA* was not. And it was partly on this basis that he held that the competence-competence principle, according to which it is the arbitrator who must first consider the existence, validity and scope of the arbitration agreement, does not form part of the domestic arbitration law of British Columbia. The Court of Appeal rejected this argument in *MacKinnon 2009* and in the case at bar, but Ms. Seidel hopes to revive it in this Court.

**109** However, it is clear from a review of the current *CAA* that British Columbia's modern commercial arbitration legislation was in fact "influenced in part by the Model Law" (McEwan and Herbst, at p. 1-7, citing *Lawyers' Arbitration Letters: 1980-1989* (1990), at pp. 218-19). This review shows that the legislature intended to incorporate the competence-competence principle into the province's domestic arbitration legislation.

**110** Section 15 of the *CAA*, as amended in 1996, provides that a court must, if the parties have agreed that a matter should be submitted to arbitration, stay any legal proceeding brought in respect of that matter:

> **15 (1)**   If a party to an arbitration agreement commences legal proceedings in a court against another party to the agreement in respect of a matter agreed to be submitted to arbitration, a party to the legal proceedings may apply, before or after entering an appearance and before delivery of any pleadings or taking any other step in the proceedings, to that court to stay the legal proceedings.
>
> (2)   In an application under subsection (1), the court must make an order staying the legal proceedings <u>unless it determines that the arbitration agreement is void, inoperative or incapable of being performed</u>.

The language used is virtually identical to that of art. 8 of the Model Law:

> 8... .
>
> (1)   A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement <u>is null and void, inoperative or incapable of being performed</u>.
>
> (2)   Where an action referred to in paragraph (1) of this article has been brought, arbitral proceedings may nevertheless be commenced or continued, and an award may be made, while the issue is pending before the court.

We see no meaningful difference between saying that the court must refer the parties to arbitration and saying that it must order a stay of proceedings.

**111** It is true that the *CAA* does not itself include a provision that ousts the jurisdiction of the courts. However, the British Columbia International Commercial Arbitration Centre's *Domestic Commercial Arbitration Rules of Procedure* ("BCICAC Rules") apply, as they have been incorporated by reference (*R. v. Collins, 2000 BCCA 437, 140 B.C.A.C. 311*; *R. v. St. Lawrence Cement Inc. (2002), 60 O.R. (3d) 712* (C.A.); *British Columbia Government and Service Employees' Union v. British Columbia (Minister of Health Services), 2007 BCCA*

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

*379, 245 B.C.A.C. 39*; P.-A. Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at paras. 286 ff; see also s. 44(*h*) of the *Interpretation Act, R.S.C. 1985, c. I-21*). Section 22(1) of the *CAA* reads as follows:

22          (1) Unless the parties to an arbitration otherwise agree, the rules of the British Columbia International Commercial Arbitration Centre for the conduct of domestic commercial arbitrations apply to that arbitration.

Rule 20 of the BCICAC Rules addresses the arbitrator's jurisdiction:

**20.** [Jurisdiction]

(1)   The arbitration tribunal may rule on its own jurisdiction, including ruling on any objections with respect to the existence or validity of the arbitration agreement.

(2)   A decision by the arbitration tribunal that the contract is null and void shall not entail the invalidity of the arbitration clause unless specifically found to be so by the arbitration tribunal.

(3)   Any objection to the jurisdiction of the arbitration tribunal to consider a claim or counter-claim shall be raised in the statement of defense or statement of defense to counter-claim... .

(4)   A party is not precluded from raising a jurisdictional plea by the fact that it has appointed or participated in the appointment of an arbitrator.

**112**  We observe that the language used in Rule 20 is essentially identical to that of arts. 943, 943.1 and 943.2 of the *CCP* -- which were at issue in *Dell* -- and of art. 16 of the Model Law:

Article 16. [Competence of arbitral tribunal to rule on its jurisdiction]

(1)   The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail *ipso jure* the invalidity of the arbitration clause.

(2)   A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than the submission of the statement of defence. A party is not precluded from raising such a plea by the fact that he has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

(3)   The arbitral tribunal may rule on a plea referred to in paragraph (2) of this article either as a preliminary question or in an award on the merits. If the arbitral tribunal rules as a preliminary question that it has jurisdiction, any party may request, within thirty days after having received notice of that ruling, the court specified in article 6 to decide the matter, which decision shall be subject to no appeal; while such a request is pending, the arbitral tribunal may continue the arbitral proceedings and make an award.

**113**  A British Columbia court must grant a stay of proceedings unless it concludes that the arbitration agreement is "void, inoperative or incapable of being performed". However, the fact that a court can rule on its jurisdiction does not mean that it is required to do so. An argument that an arbitration agreement is void, inoperative or incapable of being performed constitutes a direct challenge to the arbitrator's authority to consider and resolve the dispute. In *Dell*, both the majority and the minority had to decide whether the arbitrator or the court should rule first on the validity and applicability of the agreement, and they also discussed, by extension, the type of review the court should conduct to determine whether the agreement is "void, inoperative or incapable of being performed".

**114**  The majority recognized that there were two schools of thought on this point -- one being that the court must rule first on the issue, and the other that the arbitrator should do so -- and that the debate was not conclusively resolved by either the New York Convention or the Model Law. However, a consensus was building in the international community that a court should engage in

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

only a *prima facie* analysis and intervene only if the test of manifest nullity was met (*Dell*, at paras. 75-76). From this, a general rule was identified. Challenges to the arbitrator's jurisdiction -- namely arguments that an agreement is void, inoperative or incapable of being performed -- should be resolved first by the arbitrator. A court should depart from this general rule only if the challenge is based on a question of law, or on questions of mixed fact and law that require only superficial consideration of the documentary evidence in the record, and is not merely a delaying tactic (see *Dell*, at paras. 84-86).

**115**  This general approach is consistent with the one -- developed by the British Columbia Court of Appeal in its 1992 decision in *Gulf Canada* -- that many provincial appellate courts were following across Canada before *Dell*. According to the test from *Gulf Canada*, the court was to grant the stay unless it was "clear" that the dispute fell outside the scope of the agreement. If it was "arguable" that the agreement applied to the dispute, the question was to be left to the arbitrator:

> Considering s. 8(1) in relation to the provisions of s. 16 and the jurisdiction conferred on the arbitral tribunal, in my opinion, it is not for the court on an application for a stay of proceedings to reach any final determination as to the scope of the arbitration agreement or whether a particular party to the legal proceedings is a party to the arbitration agreement because those are matters within the jurisdiction of the arbitral tribunal. Only where it is clear that the dispute is outside the terms of the arbitration agreement or that a party is not a party to the arbitration agreement or that the application is out of time should the court reach any final determination in respect of such matters on an application for a stay of proceedings.

> Where it is arguable that the dispute falls within the terms of the arbitration agreement or where it is arguable that a party to the legal proceedings is a party to the arbitration agreement then, in my view, the stay should be granted and those matters left to be determined by the arbitral tribunal. [paras. 39-40]

**116**  In *Dalimpex Ltd. v. Janicki* *(2003), 64 O.R. (3d) 737*, *per* Charron J.A. (as she then was), the Ontario Court of Appeal endorsed the *Gulf Canada* approach. It concluded that if "it is at least arguable that the disputes ... fall within the scope of the arbitration agreement", the "preferable approach is to leave any definitive pronouncement on the scope of the agreement to be determined by the arbitral tribunal as decision-maker of first instance" (para. 3) (see also, *Dawson (City) v. TSL Contractors Ltd.*, *2003 YKCA 3*, *180 B.C.A.C. 205*, at para. 14). In *Dancap Productions Inc. v. Key Brand Entertainment Inc.*, *2009 ONCA 135*, *246 O.A.C. 226*, *per* Sharpe J.A., the Ontario Court of Appeal held that "[i]t is now well-established in Ontario" that a court should grant a stay of proceedings where it is "arguable" that the dispute falls within the terms of an arbitration agreement" (at para. 32), and that the motion judge had therefore erred in ruling on the scope of the arbitration agreement. See also *Jean Estate v. Wires Jolley*, *2009 ONCA 339*, *96 O.R. (3d) 171*, *per* Weiler J.A.; *No. 363 Dynamic Endeavours Inc. v. 34718 B.C. Ltd.* *(1993), 81 B.C.L.R. (2d) 359* (C.A.), *per* Hollinrake J.A.

**117**  This requirement of deference to the arbitrator's jurisdiction is related directly to the role of the court that must, in considering an application for a stay of proceedings, determine whether the agreement is "void, inoperative or incapable of being performed". Given that the general rule is that arbitrators should be the first to consider challenges to their jurisdiction, the expressions "void", "inoperative" and "incapable of being performed" should be interpreted narrowly. There appears in fact to be a consensus to this effect in the authorities on all three of these criteria. See, e.g., *Kaverit Steel and Crane Ltd. v. Kone Corp.* *(1992), 87 D.L.R. (4th) 129* (Alta. C.A.), *per* Kerans J.A. (in which it was held, at p. 138, that an arbitration agreement is not "inoperative" merely because a reference to arbitration might be "inconvenient"); *Mind Star Toys Inc. v. Samsung Co.* *(1992), 9 O.R. (3d) 374* (Gen. Div.) (in which it was held that an arbitration agreement is not null and void merely because a claim of fundamental breach is made); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974), *per* Stewart J. (in which it was held that if the *forum conveniens* test for jurisdiction were to be considered in determining whether an arbitration agreement was valid, it would almost always result in a finding against arbitration); M. J. Mustill and S. C. Boyd, *The Law and Practice of Commercial Arbitration in England* (2nd ed. 1989), at p. 465) (in which the authors write that "[i]ncapable of being performed" connotes something more than mere difficulty or inconvenience or delay in performing the arbitration); and McEwan and Herbst, at pp. 3-63ff). The British Columbia Court of Appeal even appeared to endorse this view in *MacKinnon 2004* (at para. 36).

**118**  It is clear that the task of the court responsible for considering whether the agreement is "void, inoperative or incapable of being performed" cannot properly be construed so broadly as to authorize it to determine whether a class action would be a "preferable procedure". Not only would such an approach require a degree of judicial scrutiny inconsistent with the competence-competence principle and with the superficial consideration on the basis of which a court can decide whether to grant a stay of proceedings, but the arbitration agreement would as a result be subject to the whim of the party wanting to avoid its application.

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

More specifically, the word "inoperative" cannot be interpreted so broadly that a mere procedural decision of a party seeking to certify a class proceeding would suffice for that party to avoid the operation of the agreement to arbitrate.

**119**  In *Dell*, this Court interpreted an express legislative direction that arbitrators are to consider the scope of their own jurisdiction, coupled with the use of language similar to that of the New York Convention and the Model Law, as amounting to incorporation of the competence-competence principle into Quebec law. As the Court concluded in *Dell*, at para. 83, the actual words of the provision in question were not so important as the conclusion that they were based on those of the New York Convention and the Model Law:

> Article 940.1 C.C.P. refers only to cases where the arbitration agreement is null. However, since this provision was adopted in the context of the implementation of the New York Covention (the words of which, in art. II(3), are "null and void, inoperative or incapable of being performed"), I do not consider a literal interpretation to be appropriate. It is possible to develop, in a manner consistent with the empirical data from the Quebec case law, a test for reviewing an application to refer a dispute to arbitration that is faithful to art. 943 C.C.P. and to the *prima facie* analysis test that is increasingly gaining acceptance around the world.

Courts should therefore be mindful to avoid an interpretation that makes it possible to sidestep the competence-competence principle and turns the Convention's "inoperative" exception into a back door for a party wanting to "escape" the agreement.

**120**  In considering a statutory provision containing the language contemplated by *Dell* and based on that of the New York Convention and the Model Law, the British Columbia Court of Appeal accepted and endorsed the modern approach according to which arbitration is acceptable in commercial matters. It recognized that the competence-competence principle is part of the province's law. It did not err in doing so.

**121**  Therefore, absent a challenge to the arbitrator's jurisdiction based solely on a question of law or on one of mixed fact and law requiring only superficial consideration of the evidence in the record, the existence or validity of an arbitration agreement to which the *CAA* applies must be considered first by the arbitrator. The court should grant the stay.

>        D.   *British Columbia Business Practices and Consumer Protection Act*

**122**  Because Ms. Seidel argues in part that the effect of the arbitration clause is to deny her the ability to exercise her rights under the *BPCPA*, it is important to discuss in some detail the rights and procedures provided for in that Act.

**123**  The purpose of consumer protection legislation like the *BPCPA* is to protect consumers from losses suffered when they purchase goods and services that do not meet existing standards. Thus, the *BPCPA* applies to a "consumer" -- an individual, whether in British Columbia or not -- who participates in a "consumer transaction". The term "consumer transaction" is defined as follows:

>        **1** ...

>> (a)   a supply of goods or services or real property by a supplier to a consumer for purposes that are primarily personal, family or household, or

>> (b)   a solicitation, offer, advertisement or promotion by a supplier with respect to a transaction referred to in paragraph (a).

A "supplier" is "a person, whether in British Columbia or not, who in the course of business participates in a consumer transaction" either by supplying goods or services, or by soliciting, offering, advertising or promoting the supply of goods or services. The definition of "supplier" applies regardless of whether any privity of contract exists between the supplier and the consumer. See, generally, s. 1(1) of the *BPCPA*.

**124**  The provision of mobile phone services for personal use clearly falls within the definition of "consumer transaction", and Ms. Seidel and TELUS clearly fit the statutory definitions of "consumer" and "supplier", respectively.

**125**  Ms. Seidel alleges that TELUS, by unlawfully charging for the time after a cellular phone connects with the TELUS network but before the recipient answers the call, has breached its obligations under the *BPCPA*. More specifically, Ms. Seidel alleges breach of contract, and deceptive and/or unconscionable practices. The *BPCPA* defines a "deceptive act or practice", in the context of a

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

consumer transaction, as "an oral, written, visual, descriptive or other representation by a supplier" (s. 4(1)(a)) or "any conduct by a supplier" "that has the capability, tendency or effect of deceiving or misleading a consumer or guarantor" (s. 4(1)(b)). Subsection 4(3) provides specific examples -- without limiting the generality of s. 4(1) -- of what constitutes a deceptive act or practice, which "may occur before, during or after the consumer transaction" (s. 4(2)).

**126** Section 8 of the *BPCPA* also provides that an "unconscionable act or practice by a supplier may occur before, during or after the consumer transaction" (s. 8(1)), and that in determining whether an act or a practice is unconscionable, a court must consider "all of the surrounding circumstances of which the supplier knew or ought to have known" (s. 8(2)). Section 8(3) contains a list -- again without limiting the generality of s. 8(2) -- of specific circumstances that must be considered in this regard.

**127** In the event that a supplier contravenes the *BPCPA*, a number of avenues of redress are available. First, s. 189 creates an offence, for which any person who contravenes the provisions listed in the section can be prosecuted. An individual convicted under s. 189 is liable to a fine of not more than $10,000, to imprisonment for not more than 12 months, or to both. A corporation convicted under s. 189 is liable to a fine of up to $100,000. See, generally, the penalties provided for in s. 190.

**128** Second, in the event of a contravention, the Act authorizes a consumer to bring an action for compensatory damages:

> [Damages Recoverable]
>
> **171** (1) Subject to subsection (2), if a person, other than a person referred to in paragraphs (a) to (e), has suffered damage or loss due to a contravention of this Act or the regulations, the person who suffered damage or loss may bring an action against a
>
> (a)   supplier,
>
> ...
>
> who engaged in or acquiesced in the contravention that caused the damage or loss.
>
> (2)   A person must not bring an action under this section if an application has been made, on the person's behalf, to the court in respect of the same defendant and transaction under section 192.
>
> (3)   The Provincial Court has jurisdiction for the purposes of this section, even though a contravention of this Act or the regulations may also constitute a libel or slander.

We note, however, that because a person convicted of an offence may already be required to compensate an aggrieved consumer for pecuniary losses pursuant to s. 192, s. 171(2) operates to prevent double recovery.

**129** The *BPCPA* also provides for declaratory and injunctive relief:

> [Court actions respecting consumer transactions]
>
> **172** (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under this Act or is affected by a consumer transaction that gives rise to the action, may bring an action in Supreme Court for one or both of the following:
>
> (a)   a declaration that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;
>
> (b)   an interim or permanent injunction restraining a supplier from contravening this Act or the regulations.
>
> (2) If the director brings an action under subsection (1), the director may sue on the director's own behalf and, at the director's option, on behalf of consumers generally or a designated class of consumers.

We emphasize that the relief available under s. 172(1) is not restricted to consumers directly affected by a particular consumer transaction.

**130** If relief is granted under s. 172(1), s. 172(3) authorizes the following remedial orders:

> (a)   that the supplier restore to any person any money or other property or thing, in which the person has an interest, that may have been acquired because of a contravention of this Act or the regulations;

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

(b)  if the action is brought by the director, that the supplier pay to the director the actual costs, or a reasonable proportion of the costs, of the inspection of the supplier conducted under this Act;

(c)  that the supplier advertise to the public in a manner that will assure prompt and reasonable communication to consumers, and on terms or conditions that the court considers reasonable, particulars of any judgment, declaration, order or injunction granted against the supplier under this section.

**131**  Moreover, by virtue of s. 3, rights under the Act, and remedies for the violation of those rights, cannot be waived, through an arbitration clause or otherwise:

> **3** Any waiver or release by a person of the person's rights, benefits or protections under this Act is void except to the extent that the waiver or release is expressly permitted by this Act.

**132**  The final aspect of the *BPCPA* that we must discuss is the nature of the action provided for in s. 172(1). Subsection 172(1) authorizes the director to bring an action for declaratory or injunctive relief, but it also authorizes any person other than a supplier to do so. In this sense, s. 172(1) creates a representative action. In the case of an action brought by the director, any ambiguity in this respect is removed by s. 172(2). As for an action brought by a person other than the director, the fact that the person need not have been affected by the consumer transaction, together with the potentially representative nature of the available remedies -- declaratory and injunctive relief -- makes his or her representative capacity just as evident.

**133**  The director is entitled to notice -- by service of a copy of the writ of summons or notice of claim -- of any action brought under either s. 171 or s. 172 (s. 173(1)). Upon being served, the director may apply to intervene in the action as a party, on any terms or conditions the court considers just (s. 173(2)). Since the scope of s. 172 and the conditions for applying it were not discussed in the courts below, the record does not reveal whether the director was in fact served with a notice of claim.

**134**  Having outlined the statutory schemes governing arbitration and consumer protection in British Columbia, we will now review the types of proceedings at issue in this appeal.

E. *Nature of the Class Action*

**135**  This Court has endorsed the class action as a means of facilitating access to justice, promoting efficiency in and reducing costs associated with civil litigation, and deterring or modifying dangerous or risky behaviour (see e.g. *Western Canadian Shopping Centres Inc. v. Dutton*, 2001 SCC 46, [2001] 2 S.C.R. 534, at para. 28; *Hollick v. Toronto (City)*, 2001 SCC 68, [2001] 3 S.C.R. 158, at para. 15; *Bisaillon*, at para. 16). The class action therefore has "a significant social and legal role" in Canadian law (*Marcotte v. Longueuil (City)*, 2009 SCC 43, [2009] 3 S.C.R. 65, at para. 43).

**136**  However, since a class action is only a way to group together a number of individual claims, it concerns the procedure for bringing an action. As this Court has put it, the certification of a class action confers a procedural right. It does not change either the substantive law or the substantive rights of the parties. A proposed class action "cannot serve as a basis for legal proceedings if the various claims it covers, taken individually, would not do so" (*Bisaillon*, at para. 17). The majority in *Bisaillon* explained how the procedural nature of a class action affects the jurisdiction of a court:

> In short, the class action procedure cannot have the effect of conferring jurisdiction on the Superior Court over a group of cases that would otherwise fall within the subject-matter jurisdiction of another court or tribunal. Except as provided for by law, this procedure does not alter the jurisdiction of courts and tribunals. Nor does it create new substantive rights. [para. 22]

See also, the reasons of both the majority and the dissenting judges in *Dell* (paras. 105-106, 108 and 224), and of the dissenting judges in *Marcotte*, at para. 125, citing *Bisaillon* and *Dell*.

**137**  It bears repeating that an arbitration clause has always been understood as going to the court's jurisdiction to hear a claim. As we saw in our review of the historical development of arbitration, agreements to arbitrate were once seen to be contrary to public order on the basis that they constituted an improper attempt to oust the jurisdiction of the courts. Arbitration clauses are no longer seen to be contrary to public order, but the fact remains that they constitute a jurisdictional choice made by the parties to the agreement. Indeed, in *Dell*, both the majority and the minority considered an agreement to arbitrate to constitute such a choice. The

minority characterized this choice in favour of arbitration as conveying a substantive contractual right (at para. 160). See also, *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate [2005], 2 B.L.R. (4th) 151* (Ont. S.C.), at para. 9, affirmed both by the Court of Appeal *([2006], 80 O.R. (3d) 533*), and by this Court ( *2007 SCC 55, [2007] 3 S.C.R. 679, per* McLachlin C.J.), although neither commented on this legal principle.

**138**  The dissenting judges in *Dell* emphasized "that jurisdiction over the individual actions that form the basis of a class action is a prerequisite to the exercise of jurisdiction over the proceedings". They added that there is "no question that, if the arbitration agreement is valid and relates to the dispute, the Superior Court has no jurisdiction to hear the case and must refer the parties to arbitration" (para. 150). The substantive right to arbitration created in the agreement effectively ousts the jurisdiction of a superior court to hear the case as a court action. Therefore, merely commencing a class action cannot vest the court with jurisdiction that it would not otherwise have over the individual claims of members of the proposed class.

> F.  *Impact of the CAA on the Procedural Right Being Claimed and on the Validity of the Waiver*

**139**  As we concluded above, the competence-competence principle forms part of the domestic arbitration law of British Columbia. Absent a challenge to the arbitrator's jurisdiction based on a question of law or on a mixed question of law and fact that requires only superficial consideration of the evidence in the record, the arbitrator has jurisdiction to entertain, in the first instance, a challenge to the existence, validity and scope of an arbitration agreement.

**140**  As we also mentioned, where, because of an arbitration agreement, a court would not have jurisdiction over a dispute, that jurisdiction cannot be conferred on it by commencing a class proceeding. This Court has made it clear that arbitration, as a legitimate private dispute resolution mechanism, applies to all kinds of disputes, except where the legislature has expressly provided that it intends to remove the subject matter from the reach of arbitration legislation. In British Columbia, no such explicit legislative direction has been enacted, and consumer disputes may be resolved by way of arbitration.

**141**  Ms. Seidel nevertheless argues that an arbitrator lacks the jurisdiction to grant either of the specific remedies contemplated in s. 172 of the *BPCPA*: a declaration (s. 172(1)(a)), or an interim or permanent injunction (s. 172(1)(b)). She submits that these remedies can be granted only by the British Columbia Supreme Court and, therefore, that s. 172(1) itself creates a substantive right to have a dispute resolved in the public court system. As a result, the agreement to submit this dispute to arbitration constitutes a waiver -- in violation of s. 3 of the *BPCPA* -- of the substantive right to those particular remedies. In effect, Ms. Seidel argues that the prospective arbitrator lacks jurisdiction to grant the remedy being sought and therefore lacks jurisdiction over the subject matter of her claim. (See, e.g., *Bisaillon*, at para. 29.) This argument raises a question of law which, pursuant to the exception in *Dell*, may be considered in the first instance by a court rather than the arbitrator. In light of ss. 171 and 172 and of the powers conferred on arbitrators in British Columbia, we are of the view that the legislature has not barred the submission of such claims to arbitration.

**142**  Ms. Seidel's argument is grounded in s. 3 of the *BPCPA*, which provides that any waiver of rights, benefits or protections under that Act is void. The real question here is whether the identification in s. 172(1) of the Supreme Court as the forum where an action may be brought constitutes a right, benefit or protection that cannot -- by virtue of s. 3 -- be waived. To answer this question, it must be determined, as a matter of law, what rights, benefits and protections are found in s. 172. In other words, when s. 3 operates to prevent a waiver of rights, benefits or protections, does it apply only to the remedy sought by the claimant or does it also encompass the choice of the forum in which the remedy can be obtained? In answering this question of law, we are of the view that means are just a way to attain an end. The remedy is the end, and the same remedies, and perhaps others as well, can be obtained through the arbitration process as they can through the public court system. The remedy sought by a claimant under s. 172 is a declaration or an injunction. Either an arbitrator or a court can adjudicate a monetary claim under s. 171. What is important here is that the adjudicator has jurisdiction to make a declaration or order an injunction, which are the same remedies as are contemplated in s. 172.

**143**  These comments foreshadow our views on the question whether arbitrators lack the specific jurisdiction to grant the declaratory relief and order the interim or permanent injunctions contemplated in ss. 172(1)(a) and (b), and to grant the ancillary remedies provided for in s. 172(3). If they do not have authority to do this, then to the extent that Ms. Seidel's claims include a request for declaratory and injunctive relief, the agreement to arbitrate would constitute a waiver contrary to s. 3 of the *BPCPA*, because recourse to arbitration would result in the loss of a right, benefit or protection within the meaning of s. 3 of the *BPCPA*.

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

**144** In adjudicating disputes that are submitted to them, arbitrators are required to apply the law. Section 23 of the *CAA* provides:

> **23** An arbitrator must adjudicate the matter before the arbitrator by reference to law unless the parties, as a term of an agreement referred to in section 35, agree that the matter in dispute may be decided on equitable grounds, grounds of conscience or some other basis.

Similarly, rule 33 of the BCICAC Rules provides:

> **33.** An arbitration tribunal shall decide the dispute in accordance with the law unless the parties agree in writing in accordance with section 23 of the *Commercial Arbitration Act* that the matter in dispute may be decided on equitable grounds, grounds of conscience or some other basis.

**145** Arbitrators exercising their jurisdiction under arbitration legislation are generally understood, provided that the arbitration agreement is broadly drafted, to have "jurisdiction to make any award a court could make, whether sounding in contract, tort, equity or by statute" (Casey and Mills, at p. 151).

**146** But the British Columbia legislation goes further, as it explicitly grants arbitrators broad remedial powers. As we noted above, s. 22 of the *CAA* provides that, unless the parties agree otherwise, the BCICAC Rules apply to all arbitrations conducted under that Act. Rule 29 of the BCICAC Rules addresses the arbitrator's remedial jurisdiction:

> **29.** [General Powers of the Arbitration Tribunal]
>
> (1)   Without limiting the generality of Rule 19 or any other Rule which confers jurisdiction or powers on the arbitration tribunal, and unless the parties at any time agree otherwise, the tribunal may:
>
> (a)   order an adjournment of the proceedings from time to time;
>
> (b)   make a partial award;
>
> (c)   make an interim order or award on any matter with respect to which it may make a final award, including an order for costs, or any order for the protection or preservation of property that is the subject matter of the dispute;
>
> (d)   order inspection of documents, exhibits or other property, including a view or physical inspection of property;
>
> (e)   order the recording of any oral hearing;
>
> (f)   at any time extend or abridge a period of time fixed or determined by it, or any period of time required in these Rules;
>
> (g)   empower one member of the arbitration tribunal to make interim and other orders, including settling of matters at the pre-hearing meeting, that do not deal with the issues in dispute;
>
> (h)   order any party to provide security for the legal or other costs of any other party by way of a deposit or bank guarantee or in any other manner the arbitration tribunal thinks fit;
>
> (i)   order any party to provide security for all or part of any amount in dispute in the arbitration;
>
> (j)   order that any party or witness shall be examined on oath or affirmation, and may for that purpose administer any necessary oath or take any necessary affirmation;
>
> (k)   <u>make an award ordering specific performance, rectification, injunctions and other equitable remedies.</u>

**147** In *Automatic Systems Inc.* and in *Wires Jolley*, the Ontario Court of Appeal drew a helpful distinction between the designation, at the procedural level, of a particular forum and the substantive protections provided by a particular legislative scheme. So long as the choice of a particular forum does not result in a loss of the substantive right to a remedy provided for in the legislation, the dispute can properly be resolved in the designated forum.

**148** An arbitrator deriving his or her authority from the *CAA*, and by extension from the BCICAC Rules, also has broad remedial powers. Rule 29(1)(k) specifically authorizes the arbitrator to order "injunctions and other equitable remedies". The arbitrator can

therefore, unless the parties have agreed otherwise, grant the declaratory and injunctive relief sought by Ms. Seidel under ss. 172(1)(a) and (b) of the *BPCPA*.

**149**  Our colleague argues that in the consumer context, the principles of access to justice require a public form of relief that is not limited to the parties to the consumer transaction in issue, and also require that the claims themselves be adjudicated in only one public forum: the courts. We would respond to this argument by observing that access to justice is protected both by the broad powers given to arbitrators and by the representative action provided for in the *BPCPA*.

**150**  Although third party consumers benefitting from a declaration or injunction issued by an arbitrator against TELUS would not be bound by the arbitrator's order, TELUS would be bound by it. Since no undertaking is sought from third party consumers, there is no detriment to them in an order that is not binding on them. The arbitrator has the authority to order the relief being sought as it relates to Ms. Seidel's claim against TELUS. Ms. Seidel and TELUS are both parties to the arbitration agreement.

**151**  Our colleague emphasizes the fact that the arbitration proceedings themselves take place in a private and confidential setting. However, what Ms. Seidel seeks is a result. There is no requirement that the arbitral award itself, which would incorporate the remedy she seeks, be private and confidential. First, a party is always free to submit an arbitral award to the court for enforcement pursuant to s. 29 of the *CAA*:

> **29** With leave of the court, an award may be enforced in the same manner as a judgment or order of the court to the same effect, and judgment may be entered in the terms of the award.

The procedure for enforcing an award is provided for in the arbitration clause agreed to by the parties to this dispute, which reads, in part, that "[e]ither party may commence court proceedings to enforce the arbitration result when an arbitration decision shall have been rendered and thirty (30) days have passed from the date of such decision."

**152**  Second, we reiterate that arbitrators who derive their authority from the *CAA* have broad remedial powers at their disposal, including the authority to grant "injunctions and other equitable remedies" (R. 29(1)(k), BCICAC Rules). They also must apply the law (s. 23, *CAA*; R. 33, BCICAC Rules). There is nothing in the record that would suggest that they cannot issue the same kind of injunctive relief as is contemplated in s. 172(1)(b) of the *BPCPA*. Therefore, an arbitrator could order a supplier, in this case TELUS, to advertise the particulars of any order or award granted against it to the public at large (s. 172(3)(c)). An order that the supplier do so would fulfill the public purpose that our colleague considers to be necessary if the broader goals of the *BPCPA* are to be attained. Given their broad remedial powers, arbitrators are authorized to grant this very public remedy.

**153**  This brings us to another aspect of the question: Does the reference in s. 172 to the British Columbia Supreme Court as the forum in which claims *may* be brought show that the legislature intended to confer exclusive jurisdiction on that court to adjudicate claims under the *BPCPA*? In our view, in light of the context, the words of the provision, and the authorities, this question must be answered in the negative.

**154**  Section 171, as we saw above, mainly concerns the recovery of damages. Our colleague Binnie J. agrees that the general rules for jurisdiction apply to such claims and that they can validly be adjudicated in the first instance by an arbitrator. Section 171 is relevant because it refers specifically to the Provincial Court, providing that that court has jurisdiction even though the contravention of the *BPCPA* may also constitute a libel and slander, which is a matter over which it would not otherwise have jurisdiction (see, for the general rules: *Supreme Court Act*, R.S.B.C. 1996, c. 443, s. 15; *Provincial Court Act*, R.S.B.C. 1996, c. 379; *Small Claims Act*, R.S.B.C. 1996, c. 430, s. 3). This can be compared with the reference in s. 172 to the British Columbia Supreme Court. There is no departure from the general rules in s. 172, and its purpose is to clarify that the Supreme Court, not the Provincial Court, may grant declaratory and injunctive relief. This reference does not, on its own, indicate that the Supreme Court's jurisdiction over the remedies provided for in s. 172 is exclusive. The use of the word "may" makes it even clearer that the Supreme Court is not intended to be the only forum in which these remedies can be sought. Here once again is the text of s. 172(1):

> **172** (1) The director or a person other than a supplier, whether or not the person bringing the action has a special interest or any interest under the Act or is affected by a consumer transaction that gives rise to the action, <u>may bring an action in Supreme Court</u> for one or both of the following:
>
> > (a)  a declaration that an act or practice engaged in or about to be engaged in by a supplier in respect of a consumer transaction contravenes this Act or the regulations;

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

>    (b) an interim or permanent injunction restraining a supplier from contravening this Act or the regulations.

**155** Confirmation of this interpretation respecting jurisdiction can be found in cases concerning similar references to superior or statutory courts in the context of arbitration clauses. The argument made by Ms. Seidel was in fact raised in *Desputeaux*. In that case, the Court was asked to determine, *inter alia*, whether an agreement to refer a dispute over copyright to arbitration was enforceable in light of s. 37 of the *Copyright Act*, R.S.C. 1985, c. C-42, which read as follows:

>    37 The Federal Court has concurrent jurisdiction with provincial courts to hear and determine all proceedings, other than the prosecution of offences under section 42 and 43, for the enforcement of a provision of this Act or of the civil remedies provided by this Act.

It was argued that the effect of s. 37 was to prevent disputes under the *Copyright Act* from being heard and resolved in any forum other than a court -- either the Federal Court or the Quebec Superior Court in that case.

**156** This Court disagreed, concluding that the purpose of s. 37 was merely to designate a forum:

>    The purpose of enacting a provision like s. 37 of the *Copyright Act* is to define the jurisdiction *ratione materiae* of the courts over a matter. It is not intended to exclude arbitration. It merely identifies the court which, within the judicial system, will have jurisdiction to hear cases involving a particular subject matter. It cannot be assumed to exclude arbitral jurisdiction unless it expressly so states. Arbitral jurisdiction is now part of the justice system of Quebec, and subject to the arrangements made by Quebec pursuant to its constitutional powers. [para. 42]

**157** The Ontario Court of Appeal applied and elaborated upon *Desputeaux* in *Wires Jolley*, in which the issue was whether s. 23 of the *Solicitors Act*, R.S.O. 1990, c. S.15, conferred exclusive jurisdiction on the Superior Court of Justice. Section 23 provided:

>    23 No action shall be brought upon any such agreement, but every question respecting the validity or effect of it may be examined and determined, and it may be enforced or set aside without action on the application of any person who is a party to the agreement or who is or is alleged to be liable to pay or who is or claims to be entitled to be paid the costs, fees, charges or disbursements, in respect of which the agreement is made, by the court, not being the Small Claims Court, in which the business or any part of it was done or a judge thereof, or, if the business was not done in any court, by the Superior Court of Justice.

Applying *Desputeaux*, the Ontario Court of Appeal concluded that s. 23 was simply a forum designation provision:

>    [S]imply because the *Solicitors Act* refers to a Superior Court judge as having the jurisdiction to protect clients' rights, this does not mean that disputes arising between a solicitor and a client may not be submitted to arbitration. The Act simply identifies the person within the judicial system empowered to make a decision. The right to have an independent decision maker who can interpret the agreement and make a decision respecting a contingency fee dispute is preserved through arbitration and hence the public policy of the Act, the provision of a forum for legitimate dispute resolution, is not undermined. [para. 73]

Satisfied that the statutory rights going to the merits of the dispute would not be affected by the enforcement of the arbitration clause, the court held that the dispute could properly be submitted to arbitration.

**158** This approach to determining whether a dispute can be submitted to arbitration rather than having a court resolve it appears to have existed before *Desputeaux*. For example, in *Automatic Systems*, the issue before the Ontario Court of Appeal was whether a construction lien claim could be resolved by arbitration, as stipulated in an agreement that was subject to legislation respecting international arbitrations. Austin J.A. considered whether the lien claimant would lose any right if the dispute was submitted to arbitration. He concluded that it was not apparent that the party seeking to resist arbitration "will lose any right it presently has" (para. 17).

**159** In the instant case, s. 172(1) of the *BPCPA* designates the British Columbia Supreme Court as a forum in which an action *may* be brought. It is not nearly specific enough to indicate that the legislature intended to exclude arbitration as a mechanism for resolving disputes concerning claims under the *BPCPA*. The conclusion of the Ontario Court of Appeal in *Wires Jolley* with respect to s. 23 of the *Solicitors Act* -- that it identifies the person within the judicial system empowered to make a decision -- also applies here to s. 172(1) of the *BPCPA*. Subsection 172(1) identifies the appropriate forum in the judicial system, but it does not exclude the jurisdiction of other fora, such as an arbitral tribunal.

*Seidel v. TELUS Communications Inc.*, [2011] S.C.J. No. 15

**160**  We endorse the view that a clear statement of legislative intent is necessary for a court to conclude that a particular category of disputes cannot be submitted to arbitration. To hold otherwise would be to revert to the former judicial hostility towards arbitration, and to the pre-*Zodiak* view that there is a right to bring an action in the public court system that cannot be waived. Despite his assertion that "[a]bsent legislative intervention, the courts will generally give effect to the terms of a commercial contract freely entered into, even a contract of adhesion, including an arbitration clause" (at para. 2), we see our colleague Binnie J.'s reasons as an example of such a reversion.

**161**  The facts that the *BPCPA* addresses a public purpose and that it designates the Supreme Court as a forum for declaratory or injunctive relief in pursuit of that purpose are not nearly sufficient for us to conclude that s. 172 "constitutes a legislative override of the parties' freedom to choose arbitration" (reasons of Binnie J., at para. 40). We agree with our colleague that the legislature is free to rely on the initiative of private litigants to achieve the public purpose of remedying breaches of the *BPCPA* and that in these times of budgetary constraints it may not have much choice. By enacting s. 172, the legislature provided a means not only to have claims dealt with by the director or any person, both of whom seek orders on behalf of consumers, but also to have the arbitration rules apply. In doing so, it provided a way to use the private dispute resolution system to obtain the same declaratory or injunctive relief against a supplier as can be obtained by means of a class action. Access to justice can only be enhanced by this approach.

**162**  Finally, we note that our colleague's approach would result in bifurcated proceedings. He concludes that the arbitration clause applies to Ms. Seidel's claim for damages under either the common law or s. 171 of the *BPCPA*, but that her claims for declaratory and injunctive relief under s. 172(1) fall within the jurisdiction of the British Columbia Supreme Court. We question whether the additional time and costs inherent in bifurcated claims -- and particularly claims split between two different fora -- are likely to facilitate access to justice in this context.

**163**  Even if there was any doubt that the arbitration clause ousted the jurisdiction of the British Columbia Supreme Court, an action in which declaratory or injunctive relief is sought under s. 172(1) of the *BPCPA* together with ancillary relief under s. 172(3), could hardly satisfy the "preferable procedure" requirement under s. 4(1)(d) of the *CPA* for certifying the action as a class proceeding. In *Marcotte*, the majority of this Court concluded that to authorize a class action for an action in nullity would serve no purpose, because "[a]n individual action of nullity could have resulted in a declaration in nullity that would have applied in respect of all citizens and ratepayers of the municipality" (para. 27). In other words, a declaration of nullity is an *in rem* remedy. This argument applies with equal force to the effect of declaratory or injunctive relief granted under the *BPCPA*. Since the director or any person can act as a claimant, a class proceeding in which declaratory or injunctive relief is sought could never satisfy the "preferable procedure" requirement under the *CPA*. This is because an individual action for such relief can, in addition to applying to the supplier, have the same effect as an action *in rem* in respect of all consumers in the province who might have the same claim. Moreover, s. 41 of the *CPA* would prevent certification as a class proceeding of a representative action such as this. Therefore, any argument based on the view that access to justice requires claims based on s. 172 of the *BPCPA* to be made by way of a class proceeding is without merit. Access to justice is fully preserved by arbitration, and there is no need to resort to a class proceeding to so preserve that access.

**164**  An arbitrator can grant the remedies contemplated in s. 172 of the *BPCPA* against TELUS. The arbitration agreement between Ms. Seidel and TELUS does not therefore constitute an improper waiver of Ms. Seidel's rights, benefits or protections for the purposes of s. 3 of that Act. Consequently, the *BPCPA*, in its current form, does not provide a court considering a stay application under s. 15 of the *CAA* with a reason for refusing to grant it. Section 3 of the *BPCPA* does not prohibit agreements under which consumer disputes are to be submitted to arbitration or that otherwise limit the possibility of having a proceeding certified as a class proceeding, since s. 172 of the *BPCPA* merely identifies the procedural forum in which an action with respect to the rights, benefits and protections provided for in s. 172 may be brought in the public court system. However, s. 172 does not explicitly exclude alternate fora, such as an arbitration tribunal from acquiring jurisdiction.

**165**  Nevertheless, Ms. Seidel raises a number of policy considerations that, in her opinion, preclude a finding that arbitration agreements can apply to consumer disputes. These include the following: (1) arbitration clauses in consumer contracts are a means of denying consumers access to justice; (2) some courts, mostly American, have concluded that arbitration clauses in consumer agreements are unconscionable, particularly when coupled with a waiver of class proceeding rights; (3) arbitration agreements in consumer contracts have the effect of inhibiting the development of the common law in this area; and (4) arbitration clauses in consumer agreements have the effect of negating the behaviour modification objective of class proceedings (see A.F., at para. 88).

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

**166**  These same concerns have been raised by certain commentators. See, for example, H. Bromfield, "The Denial of Relief: The Enforcement of Class Action Waivers in Arbitration Agreements" (2009), 43 U.C. Davis L. Rev. 315; J. R. Sternlight and E. J. Jensen, "Using Arbitration to Eliminate Consumer Class Actions: Efficient Business Practice or Unconscionable Abuse?" (2004), 67 *Law & Contemp. Probs.* 75; J. M. Glover, "Beyond Unconscionability: Class Action Waivers and Mandatory Arbitration Agreements" (2006), 59 Vand. L. Rev. 1735; G. Saumier, "Consumer Arbitration in the Evolving Canadian Landscape" (2008-2009), 113 *Penn. St. L. Rev.* 1203.

**167**  However, the belief that arbitration clauses in consumer agreements have the effect of preventing or denying access to justice is not unanimous. See, for example, A. D. Little, "Canadian Arbitration Law After *Dell Computer Corp. v. Union des consommateurs*" (2007), 45 *Can. Bus. L.J.* 356, at pp. 378-79. And none of the discussions of jurisdiction have concerned situations in which the arbitrator's powers are as broad as in British Columbia.

**168**  We cannot agree with Ms. Seidel's argument that to have the dispute resolved by arbitration would negate the behaviour modification objective of the class proceeding. As we noted above, the parties have agreed in their contract that any arbitration award, which would include any declaratory or injunctive relief granted by the arbitrator, can be enforced by a court. Section 15 of the *CAA* empowers the court to do so upon granting leave. Moreover, as we mentioned above, the arbitrator would be free to grant the ancillary remedy provided for in s. 172(3)(c): to compel TELUS to advertise the particulars of any order or judgment issued against it to the public at large. Consequently, the potential for modifying TELUS's behaviour would not be negated by having this dispute resolved by arbitration.

**169**  This Court has held that standard-form contracts or contracts of adhesion are valid and enforceable. While we acknowledge that the arbitration clauses applicable to consumer disputes that are included in standard-form contracts may be more problematic from a public policy standpoint, they are not *per se* invalid on the ground that they are contrary to public policy (see, e.g., *Dell*, at para. 228). Nor are they inherently unfair to consumers. To accept this argument, as our colleague Binnie J. implicitly appears to do, would be to return to the former view that arbitration is, in itself, contrary to public policy. Moreover, it would constitute a departure from the *ratio* of *Dell*.

**170**  As we mentioned above, this hostility to arbitration is no longer the norm, and the change in attitude was assisted in large part by legislative action. As the Court stated in *Desputeaux*, for example, the purpose of clarifying the meaning of "public order" in the arbitration context "was clearly to put an end to an earlier tendency by the courts to exclude any matter relating to public order from arbitral jurisdiction" (para. 53).

**171**  The courts have endorsed the view that for the purpose of determining whether a particular category of disputes can be submitted to arbitration, "public policy" does not require recourse to a different forum so long as the arbitration is conducted in accordance with the statutory regime. For example, in *Wires Jolley*, in which the legislature had not expressly excluded arbitration, the Ontario Court of Appeal rejected the application judge's conclusion that the relationship between members of the legal profession -- who have a professional monopoly -- and a vulnerable public must, as a matter of public policy, be resolved by the courts.

**172**  Furthermore, whether an arbitration clause in a consumer contract is unfair or unconscionable must always be determined on a case-by-case basis in light of the relevant facts. This Court has in fact acknowledged that, "under certain circumstances, arbitration may actually be an appropriate or preferable forum for the adjudication of consumer disputes" (*Dell*, at para. 223, *per* Bastarache and LeBel JJ., dissenting, but not on this point). Ms. Seidel nevertheless urges the Court to follow the decisions of a number of American courts, which have held that pre-dispute arbitration agreements, particularly when coupled with a class action waiver, are void by virtue of the unconscionability doctrine in contract law (see, e.g., *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003); *Szetela v. Discover Bank*, 118 Cal.Rptr. 2d 862 (Ct. App. 2002)). In Canada, an approach to this issue based on the unconscionability doctrine has not been adopted, however, and this Court has accepted the reality of standard form contracts in the consumer context. The courts have instead left the question whether arbitration is appropriate for particular categories of disputes to the discretion of the legislatures.

**173**  It is important to bear in mind that the British Columbia legislature remains free to address any unfairness or harshness that might be perceived to be the result of the inclusion of arbitration clauses in consumer contracts. In fact, the Court's decision in *Dell* is no longer relevant in the consumer context in Quebec, as the Quebec legislature had already amended the *Consumer Protection Act,*

Seidel v. TELUS Communications Inc., [2011] S.C.J. No. 15

R.S.Q. c. P-40.1, before *Dell* was even argued (see, e.g., *An Act to amend the Consumer Protection Act and the Act respecting the collection of certain debts*, S.Q. 2006, c. 56, s. 2). Those amendments were about to come into force at the time *Dell* was heard.

**174** Ontario and Alberta have also seen fit to amend their consumer protection legislation to prohibit both waivers of class proceedings and arbitration clauses in agreements to which their consumer protection legislation applies (see, e.g., *Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sch. A, ss. 7(1), 7(5), 8(1) and 8(4); *Fair Trading Act*, R.S.A. 2000, c. F-2, s. 16: which states an action may not be commenced or maintained where the consumer has agreed in writing to submit the dispute to arbitration, and the arbitration agreement has been approved by the Minister). More importantly, these legislative choices too were made well before the Court heard and decided *Dell* and *Rogers*.

**175** Thus, even before *Dell*, there was evidence of a trend in certain provinces to prohibit arbitration and class action waivers in the consumer context. This is a choice for the legislatures, not for the courts. The British Columbia legislature made a choice both by incorporating the provisions of the New York Convention and the Model Law and by refraining from enacting provisions expressly limiting arbitration clauses and waivers of class proceedings in the consumer context. It also made another choice: to confer broad remedial jurisdiction on arbitrators. These choices are ones to which this Court must defer. None of Ms. Seidel's policy concerns suffice to overcome this reality.

    IV.  <u>Disposition</u>

**176** For these reasons, we would dismiss the appeal. The parties should bear their own costs.

    *Appeal allowed in part, with costs throughout,* LeBEL, DESCHAMPS, ABELLA *and* CHARRON JJ. *dissenting.*

\* \* \* \* \*

Corrigendum, released April 27, 2011

    Please note the following changes in **_Seidel v. TELUS Communications_** *Inc.*, *2011 SCC 15*, released March 18, 2011.
        Para.25 - reference to Quebec *Act to Amend the Consumer Protection Act*: "s.11.1" should read "s.2".

        Para.90 - reference to *Scott v. Avery*: "10 E.R. 809" should read "10 E.R. 1121".

Corrigendum, released March 31, 2011

    Please note the following changes in the English version of **_Seidel v. TELUS Communications_** *Inc.*, *2011 SCC 15*, released March 18, 2011:
        Paragraph 23, last sentence: "Ravine should read "Rovine".

**Solicitors:**

*Solicitors for the appellant: Grant Kovacs Norell, Vancouver.*

*Solicitors for the respondent: Farris, Vaughan, Wills & Murphy, Vancouver.*

*Solicitors for the intervener Barreau du Québec: B C F, Montréal.*

*Solicitors for the intervener the Canadian Arbitration Congress: Heenan Blaikie, Ottawa.*

*Solicitors for the intervener ADR Chambers Inc.: Perley-Robertson, Hill & McDougall, Ottawa.*

# EXHIBIT H

Français

## Limitations Act, 2002

S.O. 2002, CHAPTER 24
Schedule B

**Consolidation Period:** From January 1, 2022 to the e-Laws currency date.

Last amendment: 2021, c. 34, Sched. 9, s. 10.

Legislative History: 2002, c. 24, Sched. B, s. 50; 2004, c. 16, Sched. D, Table; 2004, c. 31, Sched. 22; 2006, c. 21, Sched. D; 2006, c. 32, Sched. C, s. 29; 2007, c. 13, s. 44; 2008, c. 19, Sched. L; 2008, c. 19, Sched. V, s. 4; 2009, c. 13, s. 12; 2009, c. 33, Sched. 21, s. 5; 2010, c. 1, Sched. 14; 2010, c. 16, Sched. 4, s. 27; 2015, c. 20, Sched. 39, s. 5; 2016, c. 2, Sched. 2; CTS 18 AU 10 - 1; 2017, c. 2, Sched. 3, s. 6; 2017, c. 2, Sched. 5, s. 14; 2017, c. 2, Sched. 8, s. 5; 2017, c. 10, Sched. 4, s. 7; 2017, c. 24, s. 77; 2017, c. 34, Sched. 12, s. 11; 2019, c. 15, Sched. 22, s. 98; 2019, c. 17, Sched. 2, s. 15; 2020, c. 11, Sched. 16; 2020, c. 36, Sched. 25; 2021, c. 34, Sched. 9, s. 10.

### CONTENTS

DEFINITIONS AND APPLICATION

| | |
|---|---|
| 1. | Definitions |
| 2. | Application |
| 3. | Crown |

BASIC LIMITATION PERIOD

| | |
|---|---|
| 4. | Basic limitation period |
| 5. | Discovery |
| 6. | Minors |
| 7. | Incapable persons |
| 8. | Litigation guardians |
| 9. | Appointment of litigation guardian on application or motion by potential defendant |
| 11. | Attempted resolution |
| 12. | Successors |
| 13. | Acknowledgments |
| 14. | Notice of possible claim |

ULTIMATE LIMITATION PERIODS

| | |
|---|---|
| 15. | Ultimate limitation periods |

NO LIMITATION PERIOD

| | |
|---|---|
| 16. | No limitation period |
| 17. | Undiscovered environmental claims |

GENERAL RULES

| | |
|---|---|
| 18. | Contribution and indemnity |
| 19. | Other Acts, etc. |
| 20. | Statutory variation of time limits |
| 21. | Adding party |
| 22. | Limitation periods apply despite agreements |
| 23. | Conflict of laws |
| 24. | Transition |
| Schedule | (section 19) |

### DEFINITIONS AND APPLICATION

**Definitions**

**1** In this Act,

"adverse effect" has the same meaning as in the *Environmental Protection Act*; ("conséquence préjudiciable")

"assault" includes a battery; ("voies de fait")

"claim" means a claim to remedy an injury, loss or damage that occurred as a result of an act or omission;  ("réclamation")

"contaminant" has the same meaning as in the *Environmental Protection Act*; ("contaminant")

"discharge" has the same meaning as in the *Environmental Protection Act*; ("rejet", "rejeter")

"environmental claim" means a claim based on an act or omission that caused, contributed to, or permitted the discharge of a contaminant into the natural environment that has caused or is likely to cause an adverse effect; ("réclamation relative à l'environnement")

"natural environment" has the same meaning as in the *Environmental Protection Act*. ("environnement naturel") 2002, c. 24, Sched. B, s. 1.

**Application**

**2** (1)  This Act applies to claims pursued in court proceedings other than,

(a)  proceedings to which the *Real Property Limitations Act* applies;

(b)  proceedings in the nature of an appeal, if the time for commencing them is governed by an Act or rule of court;

(c)  proceedings under the *Judicial Review Procedure Act*;

(d)  proceedings to which the *Provincial Offences Act* applies;

(e)  proceedings based on the existing aboriginal and treaty rights of the aboriginal peoples of Canada which are recognized and affirmed in section 35 of the *Constitution Act, 1982*;

(f)  proceedings based on equitable claims by aboriginal peoples against the Crown; and

(g)  proceedings to which the Limitation Convention or the Amended Limitation Convention, as defined in the *International Sales Conventions Act*, applies. 2002, c. 24, Sched. B, s. 2 (1); 2017, c. 2, Sched. 8, s. 5.

**Exception, aboriginal rights**

(2)  Proceedings referred to in clause (1) (e) and (f) are governed by the law that would have been in force with respect to limitation of actions if this Act had not been passed.  2002, c. 24, Sched. B, s. 2 (2).

**Section Amendments with date in force (d/m/y)**

2017, c. 2, Sched. 8, s. 5 - 22/03/2017

**Crown**

**3**  This Act binds the Crown.  2002, c. 24, Sched. B, s. 3.

BASIC LIMITATION PERIOD

**Basic limitation period**

**4**  Unless this Act provides otherwise, a proceeding shall not be commenced in respect of a claim after the second anniversary of the day on which the claim was discovered.  2002, c. 24, Sched. B, s. 4.

**Discovery**

**5** (1)  A claim is discovered on the earlier of,

(a)  the day on which the person with the claim first knew,

(i)  that the injury, loss or damage had occurred,

(ii)  that the injury, loss or damage was caused by or contributed to by an act or omission,

(iii)  that the act or omission was that of the person against whom the claim is made, and

(iv)  that, having regard to the nature of the injury, loss or damage, a proceeding would be an appropriate means to seek to remedy it; and

(b)  the day on which a reasonable person with the abilities and in the circumstances of the person with the claim first ought to have known of the matters referred to in clause (a).  2002, c. 24, Sched. B, s. 5 (1).

**Presumption**

(2)  A person with a claim shall be presumed to have known of the matters referred to in clause (1) (a) on the day the act or omission on which the claim is based took place, unless the contrary is proved.  2002, c. 24, Sched. B, s. 5 (2).

**Demand obligations**

(3) For the purposes of subclause (1) (a) (i), the day on which injury, loss or damage occurs in relation to a demand obligation is the first day on which there is a failure to perform the obligation, once a demand for the performance is made. 2008, c. 19, Sched. L, s. 1.

**Same**

(4) Subsection (3) applies in respect of every demand obligation created on or after January 1, 2004. 2008, c. 19, Sched. L, s. 1.

**Section Amendments with date in force (d/m/y)**

2008, c. 19, Sched. L, s. 1 - 27/11/2008

**Minors**

**6** The limitation period established by section 4 does not run during any time in which the person with the claim,

   (a)  is a minor; and

   (b)  is not represented by a litigation guardian in relation to the claim.  2002, c. 24, Sched. B, s. 6.

**Incapable persons**

**7** (1)  The limitation period established by section 4 does not run during any time in which the person with the claim,

   (a)  is incapable of commencing a proceeding in respect of the claim because of his or her physical, mental or psychological condition; and

   (b)  is not represented by a litigation guardian in relation to the claim.  2002, c. 24, Sched. B, s. 7 (1).

**Presumption**

(2) A person shall be presumed to have been capable of commencing a proceeding in respect of a claim at all times unless the contrary is proved.  2002, c. 24, Sched. B, s. 7 (2).

**Extension**

(3) If the running of a limitation period is postponed or suspended under this section and the period has less than six months to run when the postponement or suspension ends, the period is extended to include the day that is six months after the day on which the postponement or suspension ends.  2002, c. 24, Sched. B, s. 7 (3).

(4) REPEALED: 2016, c. 2, Sched. 2, s. 1.

**Section Amendments with date in force (d/m/y)**

2016, c. 2, Sched. 2, s. 1 - 08/03/2016

**Litigation guardians**

**8** If a person is represented by a litigation guardian in relation to the claim, section 5 applies as if the litigation guardian were the person with the claim.  2002, c. 24, Sched. B, s. 8.

**Appointment of litigation guardian on application or motion by potential defendant**

**Definitions**

**9** (1)  In this section,

"potential defendant" means a person against whom another person may have a claim but against whom the other person has not commenced a proceeding in respect of the claim;  ("défendeur éventuel")

"potential plaintiff" means a person who may have a claim against another person but has not commenced a proceeding against that person in respect of the claim.  ("demandeur éventuel") 2002, c. 24, Sched. B, s. 9 (1).

**Appointment of litigation guardian on application or motion by potential defendant**

(2) If the running of a limitation period in relation to a claim is postponed or suspended under section 6 or 7, a potential defendant may make an application or a motion to have a litigation guardian appointed for a potential plaintiff.  2002, c. 24, Sched. B, s. 9 (2).

**Effect of appointment**

(3) Subject to subsection (4), the appointment of a litigation guardian ends the postponement or suspension of the running of the limitation period if the following conditions are met:

   1.  The appointment is made by a judge on the application or motion of a potential defendant.

    2.  The judge is satisfied that the litigation guardian,

        i.  has been served with the motion,

       ii.  has consented to the appointment in writing, or in person before the judge,

      iii.  in connection with the claim, knows of the matters referred to in clause 5 (1) (a),

      iv.  does not have an interest adverse to that of the potential plaintiff, and

       v.  agrees to attend to the potential plaintiff's interests diligently and to take all necessary steps for their protection, including the commencement of a claim if appropriate.  2002, c. 24, Sched. B, s. 9 (3).

**Non-expiry**

(4)  The limitation period shall be deemed not to expire against the potential plaintiff until the later of,

    (a)  the date that is six months after the potential defendant files, with proof of service on the litigation guardian,

       (i)  a notice that complies with subsection (5), and

      (ii)  a declaration that, on the filing date, the potential defendant is not aware of any proceeding by the litigation guardian against the potential defendant in respect of the claim; and

    (b)  the date on which the limitation period would otherwise expire after it resumes running under subsection (3).  2002, c. 24, Sched. B, s. 9 (4).

**Notice**

(5)  The notice,

    (a)  shall not be served before the first anniversary of the appointment;

    (b)  shall identify the potential plaintiff, the potential defendant and the claim; and

    (c)  shall indicate that the claim could be extinguished if a proceeding is not promptly commenced.  2002, c. 24, Sched. B, s. 9 (5).

**10** REPEALED: 2016, c. 2, Sched. 2, s. 2.

**Section Amendments with date in force (d/m/y)**

2016, c. 2, Sched. 2, s. 2 - 08/03/2016

**Attempted resolution**

**11** (1)  If a person with a claim and a person against whom the claim is made have agreed to have an independent third party resolve the claim or assist them in resolving it, the limitation periods established by sections 4 and 15 do not run from the date the agreement is made until,

    (a)  the date the claim is resolved;

    (b)  the date the attempted resolution process is terminated; or

    (c)  the date a party terminates or withdraws from the agreement.  2002, c. 24, Sched. B, s. 11.

**Same**

(2)  For greater certainty, a person or entity that provides resolution of claims or assistance in resolving claims, on an impartial basis, is an independent third party no matter how it is funded.  2006, c. 21, Sched. D, s. 1.

**Section Amendments with date in force (d/m/y)**

2006, c. 21, Sched. D, s. 1 - 19/10/2006

**Successors**

**12** (1)  For the purpose of clause 5 (1) (a), in the case of a proceeding commenced by a person claiming through a predecessor in right, title or interest, the person shall be deemed to have knowledge of the matters referred to in that clause on the earlier of the following:

    1.  The day the predecessor first knew or ought to have known of those matters.

    2.  The day the person claiming first knew or ought to have known of them.  2002, c. 24, Sched. B, s. 12 (1).

**Principals and agents**

(2) For the purpose of clause 5 (1) (a), in the case of a proceeding commenced by a principal, if the agent had a duty to communicate knowledge of the matters referred to in that clause to the principal, the principal shall be deemed to have knowledge of the matters referred to in that clause on the earlier of the following:

1.  The day the agent first knew or ought to have known of those matters.

2.  The day the principal first knew or ought to have known of them. 2002, c. 24, Sched. B, s. 12 (2).

**Same**

(3) The day on which a predecessor or agent first ought to have known of the matters referred to in clause 5 (1) (a) is the day on which a reasonable person in the predecessor's or agent's circumstances and with the predecessor's or agent's abilities first ought to have known of them. 2002, c. 24, Sched. B, s. 12 (3).

**Acknowledgments**

**13** (1) If a person acknowledges liability in respect of a claim for payment of a liquidated sum, the recovery of personal property, the enforcement of a charge on personal property or relief from enforcement of a charge on personal property, the act or omission on which the claim is based shall be deemed to have taken place on the day on which the acknowledgment was made. 2002, c. 24, Sched. B, s. 13 (1).

**Interest**

(2) An acknowledgment of liability in respect of a claim for interest is an acknowledgment of liability in respect of a claim for the principal and for interest falling due after the acknowledgment is made. 2002, c. 24, Sched. B, s. 13 (2).

**Collateral**

(3) An acknowledgment of liability in respect of a claim to realize on or redeem collateral under a security agreement or to recover money in respect of the collateral is an acknowledgment by any other person who later comes into possession of it. 2002, c. 24, Sched. B, s. 13 (3).

**Realization**

(4) A debtor's performance of an obligation under or in respect of a security agreement is an acknowledgment by the debtor of liability in respect of a claim by the creditor for realization on the collateral under the agreement. 2002, c. 24, Sched. B, s. 13 (4).

**Redemption**

(5) A creditor's acceptance of a debtor's payment or performance of an obligation under or in respect of a security agreement is an acknowledgment by the creditor of liability in respect of a claim by the debtor for redemption of the collateral under the agreement. 2002, c. 24, Sched. B, s. 13 (5).

**Trustees**

(6) An acknowledgment by a trustee is an acknowledgment by any other person who is or who later becomes a trustee of the same trust. 2002, c. 24, Sched. B, s. 13 (6).

**Personal property**

(7) An acknowledgment of liability in respect of a claim to recover or enforce an equitable interest in personal property by a person in possession of it is an acknowledgment by any other person who later comes into possession of it. 2002, c. 24, Sched. B, s. 13 (7).

**Liquidated sum**

(8) Subject to subsections (9) and (10), this section applies to an acknowledgment of liability in respect of a claim for payment of a liquidated sum even though the person making the acknowledgment refuses or does not promise to pay the sum or the balance of the sum still owing. 2002, c. 24, Sched. B, s. 13 (8).

**Restricted application**

(9) This section does not apply unless the acknowledgment is made to the person with the claim, the person's agent or an official receiver or trustee acting under the *Bankruptcy and Insolvency Act* (Canada) before the expiry of the limitation period applicable to the claim. 2002, c. 24, Sched. B, s. 13 (9).

**Same**

(10) Subsections (1), (2), (3), (6) and (7) do not apply unless the acknowledgment is in writing and signed by the person making it or the person's agent. 2002, c. 24, Sched. B, s. 13 (10).

**Same**

(11)  In the case of a claim for payment of a liquidated sum, part payment of the sum by the person against whom the claim is made or by the person's agent has the same effect as the acknowledgment referred to in subsection (10).  2002, c. 24, Sched. B, s. 13 (11).

**Notice of possible claim**

**14** (1)  A person against whom another person may have a claim may serve a notice of possible claim on the other person. 2002, c. 24, Sched. B, s. 14 (1).

**Contents**

(2)  A notice of possible claim shall be in writing and signed by the person issuing it or that person's lawyer, and shall,

    (a)  describe the injury, loss or damage that the issuing person suspects may have occurred;

    (b)  identify the act or omission giving rise to the injury, loss or damage;

    (c)  indicate the extent to which the issuing person suspects that the injury, loss or damage may have been caused by the issuing person;

    (d)  state that any claim that the other person has could be extinguished because of the expiry of a limitation period; and

    (e)  state the issuing person's name and address for service.  2002, c. 24, Sched. B, s. 14 (2).

**Effect**

(3)  The fact that a notice of possible claim has been served on a person may be considered by a court in determining when the limitation period in respect of the person's claim began to run.  2002, c. 24, Sched. B, s. 14 (3).

**Exception**

(4)  Subsection (3) does not apply to a person who is not represented by a litigation guardian in relation to the claim and who, when served with the notice,

    (a)  is a minor; or

    (b)  is incapable of commencing a proceeding because of his or her physical, mental or psychological condition.  2002, c. 24, Sched. B, s. 14 (4).

**Acknowledgment**

(5)  A notice of possible claim is not an acknowledgment for the purpose of section 13.  2002, c. 24, Sched. B, s. 14 (5).

**Admission**

(6)  A notice of possible claim is not an admission of the validity of the claim.  2002, c. 24, Sched. B, s. 14 (6).

ULTIMATE LIMITATION PERIODS

**Ultimate limitation periods**

**15** (1)  Even if the limitation period established by any other section of this Act in respect of a claim has not expired, no proceeding shall be commenced in respect of the claim after the expiry of a limitation period established by this section. 2002, c. 24, Sched. B, s. 15 (1).

**General**

(2)  No proceeding shall be commenced in respect of any claim after the 15th anniversary of the day on which the act or omission on which the claim is based took place.  2002, c. 24, Sched. B, s. 15 (2).

**Exception, purchasers for value**

(3)  Despite subsection (2), no proceeding against a purchaser of personal property for value acting in good faith shall be commenced in respect of conversion of the property after the second anniversary of the day on which the property was converted.  2002, c. 24, Sched. B, s. 15 (3).

**Period not to run**

(4)  The limitation period established by subsection (2) does not run during any time in which,

    (a)  the person with the claim,

        (i)  is incapable of commencing a proceeding in respect of the claim because of his or her physical, mental or psychological condition, and

        (ii)  is not represented by a litigation guardian in relation to the claim;

(b)  the person with the claim is a minor and is not represented by a litigation guardian in relation to the claim; or

(c)  the person against whom the claim is made,

    (i)  wilfully conceals from the person with the claim the fact that injury, loss or damage has occurred, that it was caused by or contributed to by an act or omission or that the act or omission was that of the person against whom the claim is made, or

    (ii)  wilfully misleads the person with the claim as to the appropriateness of a proceeding as a means of remedying the injury, loss or damage.  2002, c. 24, Sched. B, s. 15 (4).

**Burden**

(5)  The burden of proving that subsection (4) applies is on the person with the claim.  2002, c. 24, Sched. B, s. 15 (5); 2016, c. 2, Sched. 2, s. 3.

**Day of occurrence**

(6)  For the purposes of this section, the day an act or omission on which a claim is based takes place is,

(a)  in the case of a continuous act or omission, the day on which the act or omission ceases;

(b)  in the case of a series of acts or omissions in respect of the same obligation, the day on which the last act or omission in the series occurs;

(c)  in the case of an act or omission in respect of a demand obligation, the first day on which there is a failure to perform the obligation, once a demand for the performance is made.  2002, c. 24, Sched. B, s. 15 (6); 2008, c. 19, Sched. L, s. 2 (1).

**Application, demand obligations**

(7)  Clause (6) (c) applies in respect of every demand obligation created on or after January 1, 2004.  2008, c. 19, Sched. L, s. 2 (2).

**Section Amendments with date in force (d/m/y)**

2008, c. 19, Sched. L, s. 2 (1, 2) - 27/11/2008

2016, c. 2, Sched. 2, s. 3 - 08/03/2016

NO LIMITATION PERIOD

**No limitation period**

**16** (1)  There is no limitation period in respect of,

(a)  a proceeding for a declaration if no consequential relief is sought;

(b)  a proceeding to enforce an order of a court, or any other order that may be enforced in the same way as an order of a court;

(c)  a proceeding to obtain support under the *Family Law Act* or to enforce a provision for support or maintenance contained in a contract or agreement that could be filed under section 35 of that Act;

(d)  REVOKED: 2017, c. 2, Sched. 5, s. 14 (1);

(e)  a proceeding under section 8 or 11.2 of the *Civil Remedies Act, 2001*;

(f)  a proceeding by a debtor in possession of collateral to redeem it;

(g)  a proceeding by a creditor in possession of collateral to realize on it;

(h)  a proceeding based on a sexual assault;

(h.1)  a proceeding based on any other misconduct of a sexual nature if, at the time of the misconduct, the person with the claim was a minor or any of the following applied with respect to the relationship between the person with the claim and the person who committed the misconduct:

    (i)  the other person had charge of the person with the claim,

    (ii)  the other person was in a position of trust or authority in relation to the person with the claim,

    (iii)  the person with the claim was financially, emotionally, physically or otherwise dependent on the other person;

(h.2) a proceeding based on an assault if, at the time of the assault, the person with the claim was a minor or any of the following applied with respect to the relationship between the person with the claim and the person who committed the assault:

    (i) they had an intimate relationship,

    (ii) the person with the claim was financially, emotionally, physically or otherwise dependent on the other person;

(i) a proceeding to recover money owing to the Crown in respect of,

    (i) fines, taxes and penalties, or

    (ii) interest that may be added to a tax or penalty under an Act;

(j) a proceeding described in subsection (2) that is brought by,

    (i) the Crown, or

    (ii) a delivery agent under the *Ontario Disability Support Program Act, 1997* or the *Ontario Works Act, 1997*; or

(k) a proceeding to recover money owing in respect of student loans, medical resident loans, awards or grants made under the *Ministry of Training, Colleges and Universities Act*, the *Canada Student Financial Assistance Act* or the *Canada Student Loans Act*.  2002, c. 24, Sched. B, s. 16 (1); 2007, c. 13, s. 44 (1); 2010, c. 1, Sched. 14, s. 1; 2016, c. 2, Sched. 2, s. 4 (1); 2017, c. 2, Sched. 5, s. 14 (1).

**Same**

(1.1) Clauses (1) (h), (h.1) and (h.2) apply to a proceeding whenever the act on which the claim is based occurred and regardless of the expiry of any previously applicable limitation period, subject to subsection (1.2). 2016, c. 2, Sched. 2, s. 4 (2).

**Same**

(1.2) Subsection (1.1) applies to a proceeding that was commenced before March 8, 2016, unless the proceeding,

    (a) was dismissed by a court and no further appeal is available; or

    (b) was settled by the parties and the settlement is legally binding. 2016, c. 2, Sched. 2, s. 4 (2); 2020, c. 11, Sched. 16, s. 1.

**Same**

(1.3) For greater certainty, clauses (1) (h), (h.1) and (h.2) are not limited in any way with respect to the claims that may be made in the proceeding in relation to the applicable act, which may include claims for negligence, for breach of fiduciary or any other duty or for vicarious liability. 2016, c. 2, Sched. 2, s. 4 (2).

**Same**

(2) Clause (1) (j) applies to proceedings in respect of claims relating to,

    (a) the administration of social, health or economic programs; or

    (b) the provision of direct or indirect support to members of the public in connection with social, health or economic policy.  2002, c. 24, Sched. B, s. 16 (2).

**Same**

(3) Without limiting the generality of subsection (2), clause (1) (j) applies to proceedings in respect of claims for,

    (a) the recovery of social assistance payments, student loans, awards, grants, contributions and economic development loans; and

    (b) the reimbursement of money paid in connection with social, health or economic programs or policies as a result of fraud, misrepresentation, error or inadvertence. 2002, c. 24, Sched. B, s. 16 (3).

**Conflict with s. 15**

(4) This section and section 17 prevail over anything in section 15. 2002, c. 24, Sched. B, s. 16 (4).

**Section Amendments with date in force (d/m/y)**

2007, c. 13, s. 44 (1) - 04/06/2007

2010, c. 1, Sched. 14, s. 1 - 18/05/2010

2016, c. 2, Sched. 2, s. 4 (1, 2) - 08/03/2016

2017, c. 2, Sched. 5, s. 14 (1) - 22/03/2017

2020, c. 11, Sched. 16, s. 1 - 08/07/2020

**Undiscovered environmental claims**

**17** There is no limitation period in respect of an environmental claim that has not been discovered.  2002, c. 24, Sched. B, s. 17.

GENERAL RULES

**Contribution and indemnity**

**18** (1)  For the purposes of subsection 5 (2) and section 15, in the case of a claim by one alleged wrongdoer against another for contribution and indemnity, the day on which the first alleged wrongdoer was served with the claim in respect of which contribution and indemnity is sought shall be deemed to be the day the act or omission on which that alleged wrongdoer's claim is based took place.  2002, c. 24, Sched. B, s. 18 (1).

**Application**

(2)  Subsection (1) applies whether the right to contribution and indemnity arises in respect of a tort or otherwise.  2002, c. 24, Sched. B, s. 18 (2).

**Other Acts, etc.**

**19** (1)  A limitation period set out in or under another Act that applies to a claim to which this Act applies is of no effect unless,

(a)  the provision establishing it is listed in the Schedule to this Act; or

(b)  the provision establishing it,

    (i)  is in existence on January 1, 2004, and

    (ii)  incorporates by reference a provision listed in the Schedule to this Act.  2002, c. 24, Sched. B, s. 19 (1); 2008, c. 19, Sched. L, s. 3.

**Act prevails**

(2)  Subsection (1) applies despite any other Act.  2002, c. 24, Sched. B, s. 19 (2).

**Interpretation**

(3)  The fact that a provision is listed in the Schedule shall not be construed as a statement that the limitation period established by the provision would otherwise apply to a claim as defined in this Act.  2002, c. 24, Sched. B, s. 19 (3).

**Same**

(4)  If there is a conflict between a limitation period established by a provision referred to in subsection (1) and one established by any other provision of this Act, the limitation period established by the provision referred to in subsection (1) prevails.  2002, c. 24, Sched. B, s. 19 (4).

**Period not to run**

(5)  Sections 6, 7 and 11 apply, with necessary modifications, to a limitation period established by a provision referred to in subsection (1).  2002, c. 24, Sched. B, s. 19 (5).

**Section Amendments with date in force (d/m/y)**

2008, c. 19, Sched. L, s. 3 - 27/11/2008

**Statutory variation of time limits**

**20** This Act does not affect the extension, suspension or other variation of a limitation period or other time limit by or under another Act.  2002, c. 24, Sched. B, s. 20.

**Adding party**

**21** (1)  If a limitation period in respect of a claim against a person has expired, the claim shall not be pursued by adding the person as a party to any existing proceeding.  2002, c. 24, Sched. B, s. 21 (1).

**Misdescription**

(2)  Subsection (1) does not prevent the correction of a misnaming or misdescription of a party.  2002, c. 24, Sched. B, s. 21 (2).

**Limitation periods apply despite agreements**

**22** (1)  A limitation period under this Act applies despite any agreement to vary or exclude it, subject only to the exceptions in subsections (2) to (6).  2006, c. 21, Sched. D, s. 2.

**Exception**

(2)  A limitation period under this Act may be varied or excluded by an agreement made before January 1, 2004.  2006, c. 21, Sched. D, s. 2.

**Same**

(3)  A limitation period under this Act, other than one established by section 15, may be suspended or extended by an agreement made on or after October 19, 2006.  2006, c. 21, Sched. D, s. 2; 2008, c. 19, Sched. L, s. 4 (1).

**Same**

(4)  A limitation period established by section 15 may be suspended or extended by an agreement made on or after October 19, 2006, but only if the relevant claim has been discovered.  2006, c. 21, Sched. D, s. 2; 2008, c. 19, Sched. L, s. 4 (1).

**Same**

(5)  The following exceptions apply only in respect of business agreements:

   1.  A limitation period under this Act, other than one established by section 15, may be varied or excluded by an agreement made on or after October 19, 2006.

   2.  A limitation period established by section 15 may be varied by an agreement made on or after October 19, 2006, except that it may be suspended or extended only in accordance with subsection (4).  2006, c. 21, Sched. D, s. 2; 2008, c. 19, Sched. L, s. 4 (1).

**Definitions**

(6)  In this section,

"business agreement" means an agreement made by parties none of whom is a consumer as defined in the *Consumer Protection Act, 2002*; ("accord commercial")

"vary" includes extend, shorten and suspend. ("modifier")  2006, c. 21, Sched. D, s. 2; 2008, c. 19, Sched. L, s. 4 (2).

**Section Amendments with date in force (d/m/y)**

2006, c. 21, Sched. D, s. 2 - 19/10/2006

2008, c. 19, Sched. L, s. 4 (1, 2) - 27/11/2008

**Conflict of laws**

**23**  For the purpose of applying the rules regarding conflict of laws, the limitations law of Ontario or any other jurisdiction is substantive law.  2002, c. 24, Sched. B, s. 23.

**Transition**

**Definition**

**24** (1)  In this section,

"former limitation period" means the limitation period that applied in respect of the claim before January 1, 2004.  2002, c. 24, Sched. B, s. 24 (1); 2008, c. 19, Sched. L, s. 5 (1, 2).

**Application**

(2)  Subject to subsection (2.1), this section applies to claims based on acts or omissions that took place before January 1, 2004 and in respect of which no proceeding has been commenced before that date.  2002, c. 24, Sched. B, s. 24 (2); 2008, c. 19, Sched. L, s. 5 (4); 2016, c. 2, Sched. 2, s. 5 (1).

**Exception**

(2.1)  This section does not apply to a claim in respect of which clause 16 (1) (h), (h.1) or (h.2) applies. 2016, c. 2, Sched. 2, s. 5 (2).

**Former limitation period expired**

(3)  If the former limitation period expired before January 1, 2004, no proceeding shall be commenced in respect of the claim.  2002, c. 24, Sched. B, s. 24 (3); 2008, c. 19, Sched. L, s. 5 (3).

**Former limitation period unexpired**

(4) If the former limitation period did not expire before January 1, 2004 and if no limitation period under this Act would apply were the claim based on an act or omission that took place on or after that date, there is no limitation period. 2002, c. 24, Sched. B, s. 24 (4); 2008, c. 19, Sched. L, s. 5 (5).

**Same**

(5) If the former limitation period did not expire before January 1, 2004 and if a limitation period under this Act would apply were the claim based on an act or omission that took place on or after that date, the following rules apply:

1. If the claim was not discovered before January 1, 2004, this Act applies as if the act or omission had taken place on that date.

2. If the claim was discovered before January 1, 2004, the former limitation period applies. 2002, c. 24, Sched. B, s. 24 (5); 2008, c. 19, Sched. L, s. 5 (3, 6, 7).

**No former limitation period**

(6) If there was no former limitation period and if a limitation period under this Act would apply were the claim based on an act or omission that took place on or after January 1, 2004, the following rules apply:

1. If the claim was not discovered before January 1, 2004, this Act applies as if the act or omission had taken place on that date.

2. If the claim was discovered before January 1, 2004, there is no limitation period. 2002, c. 24, Sched. B, s. 24 (6); 2008, c. 19, Sched. L, s. 5 (3, 8).

(7) REPEALED: 2016, c. 2, Sched. 2, s. 5 (3).

**Claims re payments alleged to be *ultra vires***

(7.1) For the purposes of this section, clause 45 (1) (g) of the *Limitations Act*, as it read immediately before its repeal, applies to a claim respecting amounts paid to the Crown or to another public authority for which it is alleged that no valid legal authority existed at the time of payment. 2008, c. 19, Sched. L, s. 5 (9).

**Agreements**

(8) This section is subject to any agreement to vary or exclude a limitation period that was made before January 1, 2004. 2002, c. 24, Sched. B, s. 24 (8); 2008, c. 19, Sched. L, s. 5 (10).

**Section Amendments with date in force (d/m/y)**

2008, c. 19, Sched. L, s. 5 (1-8, 10) - 27/11/2008; 2008, c. 19, Sched. L, s. 5 (9) - 22/10/2008

2016, c. 2, Sched. 2, s. 5 (1-3) - 08/03/2016

**25-49** OMITTED (AMENDS OR REPEALS OTHER ACTS). 2002, c. 24, Sched. B, ss. 25-49.

**50** OMITTED (AMENDS THE SCHEDULE TO THIS ACT). 2002, c. 24, Sched. B, s. 50.

**51** OMITTED (PROVIDES FOR COMING INTO FORCE OF PROVISIONS OF THIS ACT). 2002, c. 24, Sched. B, s. 51.

**52** OMITTED (ENACTS SHORT TITLE OF THIS ACT). 2002, c. 24, Sched. B, s. 52.

SCHEDULE
(SECTION 19)

| Act | Provision |
| --- | --- |
| Arbitration Act, 1991 | subsection 52 (3) |
| Assignments and Preferences Act | subsections 26 (2) and 27 (2) |
| Business Corporations Act | subsections 157 (2), 185 (18) and (19), 188 (9), (13) and (14), and 189 (5) |
| City of Toronto Act, 2006 | subsections 214 (4), 250 (2), 270 (4) and 351 (5) |
| Civil Remedies Act, 2001 | subsections 3 (5) and 13 (7) |
| Commodity Futures Act | section 60.4 |
| Construction Act | subsections 13.18 (2) and 13.20 (2) and sections 31 and 36 |
| Corporations Act | subsection 37 (2) |
| Creditors' Relief Act, 2010 | subsection 12 (1) |
| Drainage Act | section 111 |
| Education Act | subsection 218 (2) and subsection 11 (3) of Schedule 1 |
| Election Act | subsection 99 (4) |
| Electricity Act, 1998 | section 36.1.1 |
| Environmental Bill of Rights, 1993 | section 102 |

11

| Estates Act | subsections 44 (2) and 45 (2) and section 47 |
|---|---|
| Estates Administration Act | subsection 17 (5) |
| Expropriations Act | section 43 |
| Family Law Act | subsection 7 (3) |
| Fines and Forfeitures Act | subsection 6 (2) |
| Forestry Workers Lien for Wages Act | subsections 8 (1) and 26 (1) |
| Fuel Tax Act | subsection 8 (13) |
| Gasoline Tax Act | subsection 5 (13) |
| Income Tax Act | section 38 |
| Insurance Act | section 148, statutory condition 14 and section 259.1 |
| International Commercial Arbitration Act, 2017 | section 10 |
| Libel and Slander Act | section 6 |
| Liquor Licence and Control Act, 2019 | subsection 59 (4) |
| Mortgages Act | subsections 21 (2) and 54 (2) |
| Municipal Act, 2001 | subsections 273 (5), 380 (5) and 415 (2) |
| Municipal Conflict of Interest Act | subsections 8 (2) and (6) |
| Municipal Elections Act, 1996 | subsections 58 (2), 63 (1) and 83 (2) |
| Not-for-Profit Corporations Act, 2010 | subsections 98 (3) and 187 (14) and (15) |
| Ontario Home Ownership Savings Plan Act | section 18 |
| Opioid Damages and Health Care Costs Recovery Act, 2019 | subsection 6 (1) |
| Personal Property Security Act | subsections 44 (13) and (14) |
| Prohibiting Profiting from Recounting Crimes Act, 2002 | subsections 4 (5) and 6 (6) |
| Public Lands Act | subsection 34 (3) |
| Reciprocal Enforcement of Judgments Act | subsection 2 (1) |
| Reciprocal Enforcement of Judgments (U.K.) Act | paragraph 1 of article iii of the Schedule |
| Securities Act | section 129.1, subsection 136 (6) and sections 138 and 138.14 |
| Succession Law Reform Act | section 61 |
| Taxation Act, 2007 | section 139 |
| Tile Drainage Act | subsection 2 (3) |
| Tobacco Damages and Health Care Costs Recovery Act, 2009 | subsection 6 (1) |
| Tobacco Tax Act | subsections 6 (10) and 24 (5) |
| Trustee Act | subsection 38 (3) |

2002, c. 24, Sched. B, Sched.; 2002, c. 24, Sched. B, s. 50; 2004, c. 16, Sched. D, Table; 2004, c. 31, Sched. 22, s. 1; 2006, c. 32, Sched. C, s. 29; 2007, c. 13, s. 44 (2); 2008, c. 19, Sched. V, s. 4; 2009, c. 13, s. 12; 2009, c. 33, Sched. 21, s. 5; 2010, c. 16, Sched. 4, s. 27; 2015, c. 20, Sched. 39, s. 5; 2017, c. 2, Sched. 3, s. 6; 2017, c. 2, Sched. 5, s. 14 (2); 2017, c. 10, Sched. 4, s. 7; 2017, c. 24, s. 77; 2017, c. 34, Sched. 12, s. 11; 2019, c. 15, Sched. 22, s. 98; 2019, c. 17, Sched. 2, s 15; 2020, c. 11, Sched. 16, s. 2; 2020, c. 36, Sched. 25, s. 1; 2021, c. 34, Sched. 9, s. 10.

**Section Amendments with date in force (d/m/y)**

2002, c. 24, Sched. B, s. 50 (1-3) - 01/01/2004

2004, c. 16, Sched. D, Table - 01/01/2004; 2004, c. 31, Sched. 22, s. 1 - 16/12/2004

2006, c. 32, Sched. C, s. 29 - 01/01/2007

2007, c. 13, s. 44 (2) - 04/06/2007

2008, c. 19, Sched. V, s. 4 - 01/01/2009

2009, c. 13, s. 12 - 14/05/2009; 2009, c. 33, Sched. 21, s. 5 - 25/01/2010

2010, c. 16, Sched. 4, s. 27 - 25/10/2010

CTS 18 AU 10 - 1

2015, c. 20, Sched. 39, s. 5 - 04/06/2015

2017, c. 2, Sched. 3, s. 6 - 22/03/2017; 2017, c. 2, Sched. 5, s. 14 (2) - 22/03/2017; 2017, c. 10, Sched. 4, s. 7 - 01/03/2019; 2017, c. 24, s. 77 (1) - 01/07/2018; 2017, c. 24, s. 77 (2) - 01/10/2019; 2017, c. 34, Sched. 12, s. 11 - 14/12/2017

2019, c. 15, Sched. 22, s. 98 - 29/11/2021; 2019, c. 17, Sched. 2, s. 15 - 12/12/2019

2020, c. 11, Sched. 16, s. 2 - 08/07/2020; 2020, c. 36, Sched. 25, s. 1 - 19/10/2021

2021, c. 34, Sched. 9, s. 10 - 01/01/2022

_____

Français

Back to top

# EXHIBIT I

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT J

| From: | Means, Miranda <miranda.means@kirkland.com> |
|---|---|
| Sent: | Friday, May 27, 2022 12:59 PM |
| To: | Steinberg, Joachim |
| Cc: | ROSS Lit Team; #Thomson-Ross; mflynn@morrisnichols.com; jblumenfeld@morrisnichols.com; *dmoore@Potteranderson.com1; *bpalapura@potteranderson.com |
| Subject: | RE: Thomson Reuters v. ROSS - Expert Schedule |

External Email

Dear Joachim,

We can move the rebuttal report deadline, but the November close of expert discovery would not work for us.  So we think it makes sense to make the reply report deadline a week shorter and keep the close of expert discovery November 4.  Does that work for your team?  In terms of the anti-trust schedule, we had proposed pushing things out by six months, rather than the year that ROSS initially proposed.  During the meet and confer, you told us that ROSS would consider nine months, as six months seemed too short, but said ROSS would get back to us on that part of the schedule.  We have been waiting to hear from you on that -- please let us know ROSS's position.

| Event | Plaintiffs' Proposed Deadline | ROSS's Counter Proposal | Plaintiff's New Proposal |
|---|---|---|---|
| Expert Reports | July 18, 2022 | July 18, 2022 | July 18, 2022 |
| Rebuttal Expert Reports | August 30, 2022 | September 6, 2022 | September 6, 2022 |
| Reply Expert Reports | October 10, 2022 | October 17, 2022 | October 10, 2022 |
| Close of Expert Discovery | November 4, 2022 | November 11, 2022 | November 4, 2022 |
| Summary Judgment Briefs | December 22, 2022 | December 22, 2022 | December 22, 2022 |
| Summary Judgment Opposition Briefs | January 30, 2023 | January 30, 2023 | January 30, 2023 |
| Summary Judgment Reply Briefs | March 1, 2023 | March 1, 2023 | March 1, 2023 |

In terms of the stipulation, we still do not think it makes sense and it's not clear what such a stipulation would accomplish.  If either party wants to re-open copyright discovery for good cause, the parties can meet and confer on the specific issue and file a stipulation or motion.  Given that copyright fact discovery is now closed and to re-open it would require permission of the court regardless, dealing with this issue if it arises, rather than in an abstract stipulation, seems like the better approach.  If, however, you think a stipulation achieves a different purpose, can you propose language and let us know how it would vary from the ordinary rules?

With regard to the Westlaw financial data and RFP responses, based on the parties' meet and confers to date, Plaintiffs had understood that ROSS would be sending a letter on that last week, so we were looking out for that.  With respect to the licensing agreement documents, we understood there was some overlap with the forthcoming letter.  We have not received such a letter.  Is ROSS still planning on sending such correspondence?  We are in the process of looking into Mr. Cavalieri's documents, and plan to respond shortly on that issue.  As you saw, Eric has separately scheduled a meet and confer on the source code.

Best regards,
Miranda

**Miranda Means**
She/Her/Hers

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7419
**M** +1 617 320 9248

miranda.means@kirkland.com

---

**From:** Steinberg, Joachim <JSteinberg@crowell.com>
**Sent:** Tuesday, May 24, 2022 5:53 PM
**To:** Means, Miranda <miranda.means@kirkland.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>;
mflynn@morrisnichols.com; jblumenfeld@morrisnichols.com; *dmoore@Potteranderson.com1
<dmoore@Potteranderson.com>; *bpalapura@potteranderson.com <bpalapura@potteranderson.com>
**Subject:** RE: Thomson Reuters v. ROSS - Expert Schedule

Miranda,

We can generally agree with that schedule, but with one modification: could we move the rebuttal deadline and
discovery deadlines back one week, and otherwise keep the schedule intact? In the alternative, we would be open to a
schedule with one less week for reply reports, in order to move the rebuttal report deadline by one week (i.e., Rebuttal
reports would be due September 6, reply reports due October 10). Please let us know if either of those options works for
you.

| Event | Plaintiffs' Proposed Deadline | ROSS's Counter Proposal |
|---|---|---|
| Expert Reports | July 18, 2022 | July 18, 2022 |
| Rebuttal Expert Reports | August 30, 2022 | September 6, 2022 |
| Reply Expert Reports | October 10, 2022 | October 17, 2022 |
| Close of Expert Discovery | November 4, 2022 | November 11, 2022 |
| Summary Judgment Briefs | December 22, 2022 | December 22, 2022 |
| Summary Judgment Opposition Briefs | January 30, 2023 | January 30, 2023 |
| Summary Judgment Reply Briefs | March 1, 2023 | March 1, 2023 |

For the stipulation we requested, I think we may actually be closer to an agreement than your email suggests. We are
not asking for either party to have the unilateral right to re-open copyright discovery, but instead, a stipulation that we
could re-open portions of copyright discovery for good cause. We think that standard would address the concerns you
list below and we are happy to spend some time developing language that encompasses those concerns.

As for a final deadline for meet and confers, if, per your email, there is not "much more left to discuss" on existing
disputes, then please provide some times later this week or early next for final meet and confers on Plaintiffs' licensing
documents; Westlaw Financial Data; Plaintiffs' responses to RFPs Nos. 96-99, 111-115, 128-29, and 131; the Andrew
Cavalieri documents; and Plaintiffs' production of source code.

Please also let us know your proposal for antitrust discovery.

Kind regards,
Joachim

**Joachim B. Steinberg**
Pronouns: he/him/his
Crowell & Moring LLP
jsteinberg@crowell.com
+1.415.365.7461 direct  |  +1.917.575.6244 mobile

---

**From:** Means, Miranda <miranda.means@kirkland.com>
**Sent:** Monday, May 23, 2022 9:32 AM
**To:** Steinberg, Joachim <JSteinberg@crowell.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>;
mflynn@morrisnichols.com; jblumenfeld@morrisnichols.com; *dmoore@Potteranderson.com1
<dmoore@Potteranderson.com>; *bpalapura@potteranderson.com <bpalapura@potteranderson.com>
**Subject:** Thomson Reuters v. ROSS - Expert Schedule

External Email

Dear Joachim,

Plaintiffs have considered ROSS's proposal to set the expert report deadlines starting either in September or the week of July 18.   September does not work for our team and pushes the schedule out too far, but the week of July 18 should work, as outlined below.  In light of James Malackowski's limited availability, for the below schedule to work, we would need to schedule his deposition on November 3 or November 4.  Would that work for your team?

| Event | Plaintiffs' Proposed Deadline |
|---|---|
| Expert Reports | July 18, 2022 |
| Rebuttal Expert Reports | August 30, 2022 |
| Reply Expert Reports | October 10, 2022 |
| Close of Expert Discovery | November 4, 2022 |
| Summary Judgment Briefs | December 22, 2022 |
| Summary Judgment Opposition Briefs | January 30, 2023 |
| Summary Judgment Reply Briefs | March 1, 2023 |

During the meet and confer, ROSS made two other proposals.  *First*, ROSS asked for a stipulation permitting copyright discovery to be reopened.   Plaintiffs cannot agree to such a broad stipulation.  Giving both parties unilateral authority to reopen discovery at any time could cause further delays in this case, and it's unclear what it would mean to "re-open discovery" at a later point (i.e. would it mean unlimited new requests and depositions or more limited, tailored discovery).  Rather, we think it makes more sense to approach this issue on a case-by-case basis.  If either party thinks something it discovers in anti-trust discovery makes it necessary to re-open discovery in the copyright side of the case, then the parties can discuss what specific additional copyright discovery might make sense (e.g. an additional RFP, an additional hour with a witness, etc.).  But we think it makes more sense to cross that bridge if it comes up, rather than agree to such a broad stipulation.

*Second*, ROSS proposed building final meet and confer deadlines into the schedule.  This does not seem necessary.  To the extent ROSS has new issues it wishes to raise related to copyright fact discovery, at this stage we think it would be too late to do so.   With regard to the issues ROSS has already raised, on which the parties have been conferring, we don't envision there being much more left to discuss.

3

Best regards,
Miranda

**Miranda Means**
She/Her/Hers

---

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7419
**M** +1 617 320 9248

---

miranda.means@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT K

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | C.A. No. 20-613-LPS |
|  | ) |  |
| Plaintiffs/Counterdefendants, | ) | **JURY TRIAL DEMANDED** |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ROSS INTELLIGENCE INC., | ) |  |
|  | ) |  |
| Defendants/Counterclaimant. | ) |  |

**INITIAL DISCLOSURES OF DEFENDANT/COUNTERCLAIMANT
ROSS INTELLIGENCE INC. PURSUANT TO FED. R. CIV. P. 26(a)(1)
AND PARAGRAPH 3 OF THE DEFAULT STANDARD**

In accordance with Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendant and Counterclaimant ROSS Intelligence Inc. ("ROSS") makes the following initial disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedure, Paragraph 3 of the Delaware Default Standard for Discovery, and the parties' joint proposed schedule (D.I. 41). ROSS will amend its Initial Disclosure if Plaintiffs' pending Motion to Dismiss is denied.

Discovery in this matter has not begun. These disclosures are based upon information known and reasonably available to ROSS at this time. ROSS's investigation is ongoing. ROSS reserves the right to supplement or modify these disclosures as additional information is obtained, and as required by Fed. R. Civ. P. 26(e)(1).

Nothing in these disclosures is intended as, or should be deemed to be, a waiver of the attorney-client privilege, attorney work product immunity, any other applicable privileges or protections, or any objection to the use or admissibility of the matters disclosed herein. ROSS specifically reserves the right to object on any applicable ground to the use or admission of any information disclosed herein. ROSS does not represent that these disclosures identify each and

every document, tangible thing, or witness that may be relevant to its claims or defenses in this action. Further, ROSS makes these disclosures without any concession, agreement, or admission as to the relevance or admissibility of any information set forth, and without waiver of or prejudice to any objection thereto. In addition, ROSS reserves the right to call any witness and present any exhibit or item at trial not listed herein to the fullest extent permissible under the applicable Federal Rules of Civil Procedure and the Local Rules of this Court.

## I.   INITIAL DISCLOSURES PURSUANT TO RULE 26(A)(1)

### A.   Identification of Individuals Pursuant to Rule 26(a)(1)(A)(i)

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), ROSS believes that the following individuals are likely to have discoverable information that ROSS may use (other than solely for impeachment) to support its claims or defenses in this action. In making these disclosures, ROSS does not waive its right to object, pursuant to the applicable Federal Rules and the Local Rules of this Court, to the testimony of any of the individuals listed below. ROSS reserves the right to identify additional individuals as the case progresses.

| Name | Contact | Subject(s) |
|---|---|---|
| Andrew Arruda, Board Member, and former Chief Executive Officer, at ROSS | May be contacted through ROSS's counsel | The research, design, development, marketing, and sales of ROSS's legal research product |
| Jimoh Ovbiagele, Board Director, and former Chief Technology Officer, at ROSS | May be contacted through ROSS's counsel | The research, design, development, marketing, and sales of ROSS's legal research product |
| Tomas Van Der Heijden, former Vice President, Product, and Head of Legal, at ROSS | May be contacted through ROSS's counsel | The research, design, development, marketing, and sales of ROSS's legal research product |

| Name | Contact | Subject(s) |
|---|---|---|
| Thomas Hamilton, former Vice President, Strategy and Operations, at ROSS | May be contacted through ROSS's counsel | The research, design, development, marketing, and sales of ROSS's legal research product |
| Pargles Dall'Oglio, former Software Engineer at ROSS | May be contacted through ROSS's counsel | The research, design, and development of ROSS's legal research product |
| Elias Jonsson, former machine learning engineer at ROSS | May be contacted through ROSS's counsel | The research, design, and development of ROSS's legal research product |
| Maxim Isakov, former Product Developer at ROSS | May be contacted through ROSS's counsel | The research, design, and development of ROSS's legal research product |
| Sean Shafik, former Vice President, Finance, at ROSS | May be contacted through ROSS's counsel | Marketing and sales of the ROSS legal research product. |
| Maya Bielinski, former Product Developer and in-house counsel at ROSS | Toronto, Canada | The research, design, and development of ROSS's legal research product |
| Charles von Simson, former Legal Subject Matter Expert at ROSS | University of Wisconsin Law School 975 Bascom Mall Madison, WI 53706 608-262-2240 | The research, design, and development of ROSS's legal research product |
| Kathleen Killin, former Marketing & Communications Coordinator at ROSS and current Legal Platform Use Case Lead at Thomson Reuters and/or West Publishing Corporation | 610 Opperman Dr Eagan, MN, 55123-1340 United States (651) 687-7000 | Ms. Killin may have information regarding ROSS's legal research product and Plaintiffs' legal research product and "Westlaw Content" as it is characterized in Plaintiffs' Complaint (D.I. 1) |

| Name | Contact | Subject(s) |
|------|---------|-----------|
| Khalid Al-Kofahi, Vice President of Research at Thomson Reuters and/or West Publishing Corporation | 610 Opperman Dr Eagan, MN, 55123-1340 United States (651) 687-7000 | Mr. Kofahi may have information regarding ROSS's legal research product and Plaintiffs' legal research product, including the Classification and Recommendation Engine, and "Westlaw Content" as it is characterized in Plaintiffs' Complaint (D.I. 1) |
| Stephen L. Haynes, Manager of Westlaw Research | 610 Opperman Dr Eagan, MN, 55123-1340 United States (651) 687-7000 | Mr. Haynes may have information regarding Plaintiffs' legal research product and "Westlaw Content" as it is characterized in Plaintiffs' Complaint (D.I. 1), purported copyrights, and Plaintiffs' enforcement of purported copyrights |
| Ed Walters, Fastcase CEO and co-founder | Unknown | Mr. Walters may have information regarding Plaintiffs' legal research product and copyright misuse |
| Jake Heller, Casetext CEO | Unknown | Mr. Heller may have information regarding Plaintiffs' legal research product and copyright misuse |
| Teri Whitehead, former Vice President of LegalEase Solutions LLC ("Legalease") | Unknown | Ms. Whitehead may have information regarding the work LegalEase performed for ROSS |
| Tariq Hafeez, President of LegalEase | Unknown | Mr. Hafeez may have information regarding the work LegalEase did for ROSS |
| Tariq Akbar, CEO of LegalEase | Unknown | Mr. Akbar may have information regarding the work LegalEase performed for ROSS |

| Name | Contact | Subject(s) |
|------|---------|-----------|
| Gayathri Rajeev, Senior Manager, Delivery and Global Operations at LegalEase | Unknown | Ms. Rajeev may have information regarding the work LegalEase performed for ROSS |
| Sony Merin, LegalEase | Unknown | Mr. Merin may have information regarding the work LegalEase performed for ROSS |

In addition to the individuals identified above, the following categories of individuals may have discoverable information: (1) Plaintiffs' attorney-editors as discussed in Plaintiffs' Complaint (D.I. 1); (2) all individuals identified by Plaintiffs in their disclosures; (3) all individuals necessary for evidentiary foundational purposes; (4) all individuals necessary for impeachment purposes; (6) any other persons involved with the creation of headnotes, the key number system, or any Westlaw content at issue in the Complaint (D.I. 1); (7) any other persons involved with the filing and registering of Westlaw's purported copyrighted materials; (8) all individuals identified in any party's interrogatories or documents responses; and (9) other presently unknown individuals who may have knowledge of one or more matters relevant to this case.

## B.    Identification of Documents Pursuant to Rule 26(a)(1)(A)(ii)

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), and based on its investigations to date, ROSS identifies the following categories of documents, electronically stored information, and tangible things in its possession, custody, or control that ROSS may use to support its claims or defenses in this action, unless solely for impeachment.  Discovery in this case is in the earliest stages. Once discovery progresses, ROSS may become aware of additional or different categories of documents, electronically stored information, or tangible things that ROSS may use to support any of its counterclaims or defenses. In that event, ROSS may supplement or revise these disclosures or,

alternatively, may simply produce additional documents, electronically stored information, or tangible things:

- Documents pertaining to the research, design, development, marketing, and sales of ROSS's legal research product.

ROSS does not concede that the materials listed above are relevant or admissible. ROSS reserves the right to withhold any documents and information that are covered by the attorney-client privilege, work-product immunity, or any other immunity from discovery. Further, on information and belief, some of the documents in the categories listed above are within the possession, custody, or control of Plaintiffs. Some of the documents in the categories listed above are publicly available and others are, on information and belief, in the possession, custody, or control of third parties. Some of the documents in the categories listed above are, or will be, in the possession, custody, or control of ROSS or undersigned counsel; however, the identification of any category of document above does not indicate that any such documents exist or are in ROSS's possession, custody, or control.  As the case progresses, additional categories of documents that ROSS may use to support its defenses may be identified.

### C.   Computation of Damages Pursuant to Rule 26(a)(1)(A)(iii)

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii), ROSS states that it has not made any claim for damages as to the claims at issue at this time.  ROSS reserves the right to seek reimbursement of the attorneys' fees and costs incurred in defending this action to the fullest extent recoverable by law.  ROSS also reserves the right to seek damages from Plaintiffs.

### D.   Marketing and sales of the ROSS legal research product

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iv), ROSS states that it is aware of one insurance agreement under which an insurance business may be liable to satisfy all or part of a possible

judgment in the action or to indemnify or reimburse for payments made to satisfy any such judgment, which will be made available during discovery.

## II.     INITIAL DISCLOSURES PURSUANT TO PARAGRAPH 3 OF THE DISTRICT OF DELAWARE'S DEFAULT SCHEDULE FOR DISCOVERY

### A.     Custodians

Pursuant to Paragraph 3(a) of Delaware's Default Standard for Discovery, ROSS identifies the following custodians it presently believes are most likely to have discoverable information that is relevant to this case. The custodians identified below may only be contacted through ROSS's counsel.

Given the early stage of the case (discovery has not begun), the scope of discovery under Paragraph 2(b)(i) of the Default Standard is as yet undefined. As a result, ROSS's identification of likely custodians is necessarily preliminary and based on ROSS's current understanding, which may change upon further investigation and discovery, and upon the Court's ruling on Plaintiffs' motion to dismiss (D.I. 28) and the Scheduling Order (D.I. 41). ROSS reserves the right to add or remove custodians from this disclosure as discovery progresses. Similarly, ROSS's identification of the subject matter of information for each custodian is based on ROSS's current understanding and is neither a representation that the individuals have any information on the below-described subjects nor intended to be a limitation on the matters concerning which they may provide information. The discoverable information of the individuals identified herein may or may not exceed the scope of the subject matter identified in the entries below. In making these disclosures, ROSS reserves its right to object to the production of any document or tangible thing in the possession of any of these custodians on the basis of privilege, the work-product doctrine, relevance, or any other valid objection.

ROSS has attempted to rank these custodians from most likely to possess discoverable information to least likely, but, given the status of discovery, ROSS is unable to provide a precise ranking of custodians.

| Custodian | Subject Matter of Information |
|---|---|
| Andrew Arruda | The research, design, development, marketing, and sales of ROSS's legal research product |
| Jimoh Ovbiagele | The research, design, development, marketing, and sales of ROSS's legal research product |
| Tomas Van Der Heijden | The research, design, development, marketing, and sales of ROSS's legal research product |
| Thomas Hamilton | The research, design, development, marketing, and sales of ROSS's legal research product |
| Pargles Dall'Oglio | The research, design, and development of ROSS's legal research product |
| Maya Bielinski | The research, design, and development of ROSS's legal research product |
| Elias Jonsson | The research, design, and development of ROSS's legal research product |
| Maxim Isakov | The research, design, and development of ROSS's legal research product |
| Sean Shafik | Marketing and sales of the ROSS legal research product. |

## B.    Paragraph 3(b): Non-custodial data sources

ROSS presently believes that the following non-custodial data sources may contain non-duplicative discoverable information. Identification of a data source below does not indicate that the data source does in fact contain discoverable, non-duplicative information, and ROSS reserves the right to delete from or add to this list as necessary during the process of discovery. ROSS does not waive its right to object to the production of any information from these data

sources on the basis of privilege, work product doctrine, relevance, or any other valid objection. As mandated by Paragraph 3(b), the data sources below are listed based on ROSS's current estimation of their relative importance to the issues likely to arise during this litigation.

- Cloud storage repositories (*e.g.*, Google Drive) for project management documentation
- Cloud storage repository for source code
- Cloud storage repository for government edicts, including without limitation case law, statutes, and regulations

### C.    Electronically Stored Information

Pursuant to Paragraph 3(c)(i) of Delaware's Default Standard for Discovery, ROSS states that it is not aware of any electronically stored information ("ESI") relevant to this lawsuit that is not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(C)(i) beyond those categories of ESI identified in Schedule A of Delaware's Default Standard for Discovery, which is hereby incorporated by reference. ROSS reserves the right to delete from or add to this list as necessary during the process of discovery.

### D.    Third-Party Discovery

ROSS anticipates that there may be a need to subpoena various third parties related to Plaintiffs' legal research product, including its purported copyright claims in the "headnotes," "key number system," and "Westlaw Content". ROSS may also need to subpoena various third parties concerning Plaintiffs' artificial intelligence technology, including its Classification and Recommendation Engine and the inventors of the Document Classification System, Method and Software referenced in U.S. Patent No. 7,065,514.  ROSS may also need to subpoena various third parties concerning Plaintiffs' enforcement of their purported copyrights, including without limitation LegalEase. ROSS's investigation into third-party discovery is ongoing, but ROSS is not presently aware of any issues that need to be address concerning the timing and sequencing of

such discovery. ROSS reserves its right to supplement its disclosures at a later time as discovery continues or after the Court's ruling on Plaintiffs' motion to dismiss (D.I. 28).

### E.      Production of Information Subject to Privacy Protections

Pursuant to Paragraph 3(c)(iii) of the Default Standard, ROSS intends to seek entry of a protective order in this case to maintain the confidentiality of the technical and business information it will produce. In addition, given the early stage of the case, ROSS is not presently aware of any other privacy issues that might arise relating to production of information in this litigation. ROSS reserves the right to amend or supplement these disclosures as necessary during the process of discovery. ROSS reserves the right to amend or supplement its Paragraph 3(c)(iii) disclosures as ROSS learns more about the facts and circumstances of this case.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gabriel M. Ramsey
Warrington Parker
Kayvan M. Ghaffari
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel:  (415) 986-2800

Mark A. Klapow
Lisa Kimmel
Joshua M. Rychlinski
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 624-2500

Dated:  May 13, 2021
7199433 / 50241

By:  */s/ David E. Moore*
       David E. Moore (#3983)
       Stephanie E. O'Byrne (#4446)
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       Wilmington, DE  19801
       Tel:  (302) 984-6000
       dmoore@potteranderson.com
       sobyrne@potteranderson.com

*Attorneys for Defendant/Counterclaimant
ROSS Intelligence, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on May 13, 2021, true and correct copies of the

within document were served on the following counsel of record at the addresses and in the

manner indicated:

## <u>VIA ELECTRONIC MAIL</u>

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@mnat.com
mflynn@mnat.com

Dale Cendali, P.C.
Joshua L. Simmons
Eric Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
eric.loverro@kirkland.com

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
Alyssa C. Kalisky
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
cameron.ginder@kirkland.com
alyssa.kalisky@kirkland.com
s

Megan L. McKeown
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
megan.mckeown@kirkland.com

_/s/ David E. Moore_
David E. Moore

7193230 / 50241

# EXHIBIT L

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT M

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Thursday, July 8, 2021 11:46 AM |
| **To:** | Chow, James |
| **Subject:** | FedEx Shipment 281235370015: This shipment is scheduled to be sent |

External Email



# Hi. This shipment is scheduled to be sent on Thu 7/08/2021.

## Personal Message

PSShip eMail Notification

 The delivery date may be updated when FedEx receives the package.

**Estimated delivery date**

Fri, 07/09/2021
by 10:30am

1



## INITIATED

### MANAGE DELIVERY

| | |
|---:|:---|
| **TRACKING NUMBER** | 281235370015 |
| **FROM** | Crowell & Moring LLP |
| | 1001 Pennsylvania Ave NW |
| | Washington, DC, US, 20004 |
| **TO** | Kirkland and Ellis LLP |
| | Erika Dillion |
| | 601 Lexington Avenue |
| | NEW YORK, NY, US, 10022 |
| **REFERENCE** | 118374.0000002.004840 |
| **SHIPPER REFERENCE** | 118374.0000002.004840 |
| **PACKAGING TYPE** | FedEx Pak |
| **ORIGIN** | Washington, DC, 20004 |
| **DESTINATION** | NEW YORK, NY, US, 10022 |
| **SPECIAL HANDLING** | Deliver Weekday |
| | NSR |
| **STANDARD TRANSIT** | Fri, 07/09/2021 by 10:30am |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 1.00 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



## Download the FedEx® Mobile app

Get the flexibility you need to create shipments and request to customize your deliveries through the app.

**LEARN MORE**

## This tracking update has been requested by:



| | |
|---|---|
| **Company name:** | Crowell & Moring LLP |
| **Name:** | Jay Chatman |
| **Email:** | jchatman@crowell.com |

**FOLLOW FEDEX**

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 10:45 AM CDT 07/08/2021.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2021 Federal Express Corporation. The content of this message is protected by copyright and

trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

Dear Customer,

The following is the proof-of-delivery for tracking number: 281235370015

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | |
| **Signed for by:** | W.WAYNE | **Delivery Location:** | |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday; No Signature Required | | NEW YORK, NY, |
| | | **Delivery date:** | Jul 9, 2021 10:58 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 281235370015 | **Ship Date:** | Jul 8, 2021 |
| | | **Weight:** | |

| **Recipient:** | **Shipper:** |
|---|---|
| NEW YORK, NY, US, | WASHINGTON, DC, US, |

**Reference**      118374.0000002.004840

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

Thank you for choosing FedEx

# EXHIBIT N

| | |
|---|---|
| **From:** | noreply@crowell.com |
| **Sent:** | Wednesday, September 29, 2021 4:59 PM |
| **To:** | thomson-ross@kirkland.com; ckim@morrisnichols.com; jblumenfeld@morrisnichols.com; mflynn@morrisnichols.com |
| **Cc:** | ROSS Lit Team; sobyrne@potteranderson.com; dmoore@potteranderson.com |
| **Subject:** | D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - ROSS Production |

**You are receiving this notification from Crowell & Moring LLP - https://www.crowell.com**

## Secure files ready for download

jchow@crowell.com has sent you files through the Crowell & Moring LLP Secure File Transfer system.

**Message subject:** D.Del. 1:20-cv-00613-LPS Thomson Reuters Enterprise Centre GmbH et al v. ROSS - Service - ROSS Production

**Sent at:** 2021-09-29 20:59 GMT

**Message:**

Eric,

Attached via Crowell's large file transfer system, please find Defendant ROSS Intelligence, Inc.'s second production of documents in response to Plaintiffs' Thomson Reuters Centre GmbH and West Publishing Co.'s Requests for Production of Documents, Set One. I will send the password in a separate cover. This production contains information designated pursuant to and governed by the Stipulated Protective Order entered by the Court on May 13, 2021.

Thanks,
Kayvan

Download your attachments by visiting:

**Click here to download files**

The following files have been sent to you:

- PROD04.zip.001 (8.6 GB)
- PROD04.zip.002 (8.6 GB)
- PROD04.zip.003 (8.6 GB)
- PROD04.zip.004 (8.6 GB)
- PROD04.zip.005 (8.6 GB)
- PROD04.zip.006 (8.6 GB)
- PROD04.zip.007 (8.6 GB)
- PROD04.zip.008 (8.6 GB)
- PROD04.zip.009 (8.6 GB)
- PROD04.zip.010 (8.6 GB)
- PROD04.zip.011 (8.6 GB)
- PROD04.zip.012 (8.6 GB)
- PROD04.zip.013 (8.6 GB)
- PROD04.zip.014 (1.0 GB)

Your data will expire at **2021-10-29 09:00 GMT** and deleted off the system afterwards.

Our Secure File Transfer system can securely transport files of any size. Therefore we would like to ask you to use our system in case you need to send files back to us.

For help and support of any aspect of this notification message please contact jchow@crowell.com.

Kind regards

**Crowell & Moring LLP**

© 2019 Litéra – All rights reserved.

# EXHIBIT O

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) ) | C.A. No. 20-613 (LPS) |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) | |

**PLAINTIFFS THOMSON REUTERS ENTERPRISE CENTRE GMBH AND
WEST PUBLISHING CORPORATION'S SECOND SET OF
<u>REQUESTS FOR PRODUCTION TO DEFENDANT ROSS INTELLIGENCE INC.</u>**

PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure 26 and 34

and the Local Rules of the United States District Court for the District of Delaware (the "Local

Rules" and each a "Local Rule"), Plaintiffs Thomson Reuters Enterprise Centre GmbH

("Thomson Reuters") and West Publishing Corporation ("West") (collectively "Plaintiffs"),

hereby request that Defendant ROSS Intelligence Inc. ("ROSS" or "You") produce for

examination, inspection, and copying by Plaintiffs, their attorneys or others acting on Plaintiffs'

behalf, the documents and things set forth below at the offices of Plaintiffs' attorneys, Kirkland

& Ellis LLP, 601 Lexington Avenue, New York, New York 10022, no later than thirty (30) days

after service of these document requests ("Requests" and each a "Request").

<u>DEFINITIONS</u>

Unless otherwise defined, all words and phrases used herein shall be accorded their usual

meaning and shall be interpreted in their common, ordinary sense.  As used in these Requests,

the words set forth below shall be defined as follows:

1.      The terms "COMMUNICATED" and "COMMUNICATION(S)" should be interpreted in their broadest sense to include without limitation all oral or written communications, including any writings, emails, or other electronically stored information as that term is defined by Federal Rule of Civil Procedure 34(a).

2.      The term "COMPLAINT" means and refers to the Complaint filed by PLAINTIFFS in this LITIGATION on May 6, 2020.

3.      The terms "CONCERNING" and "REFERRING OR RELATING TO" should be construed in the broadest possible sense to mean analyzing, citing, commenting upon, comprising, concerning, consisting of, constituting, containing, dealing with, describing, discussing, embodying, evidencing, identifying, involved with, mentioning, monitoring, referring to, reflecting, responding to, pertaining to, showing, stating, summarizing, or bearing any logical or factual connection with the matter discussed, as these terms are understood in the broadest sense.

4.      The term "CONTRACTOR(S)" means and refers to any third parties that ROSS was, is, or considered working with to provide ROSS with TRAINING DATA, work product, or services in connection with the ROSS PLATFORM, including without limitation LEGALEASE.

5.      The term "DESCRIBE" means to state what is requested to be described, including all facts and opinions known or held by ROSS CONCERNING, relating to, or pertinent to what is requested to be described; and (i) the identity of each person or entity involved or having any knowledge of each fact or opinion that relates to what is so described; (ii) the identity of each document evidencing the answer or response given or relating, referring or pertaining to said subject matter in any way; and (iii) all relevant or material dates and time periods, specifying the way in which said dates or time periods are pertinent to the subject matter described.

6.      The term "DOCUMENT(S)" means any written, printed, typed, recorded, or graphic matter, however produced, reproduced, or stored, including the originals and all non-identical copies, whether different from the originals by reason of any notations made on such copies or otherwise, in the actual or constructive possession, custody, or control of ROSS, including without limitation contracts, letter agreements, records, correspondence, COMMUNICATIONS, electronically stored information, emails, tweets, blog or Internet forum posts or comments, text messages on portable devices, Blackberry Messenger messages, SMS messages, instant messenger messages (e.g. Skype, Slack, etc.), memoranda, handwritten notes, source code, source code comments, source repository logs, server logs, records or summaries of negotiations, records or summaries of interviews or conversations, audio or video recordings, copies of video games, all Internet-based media, photographs, corporate minutes, diaries, telephone logs, instant messaging logs, chat room logs, schedules, drawings, product storyboards, product mockups, statistical statements, work papers, disks, data cards, films, data processing files, charts, graphs, microfiche, microfilm, contracts, notices, reports, recitals, statements, worksheets, abstracts, resumes, summaries, jottings, market data, books, journals, ledgers, audits, maps, diagrams, research documents, newspapers, appointment books, desk calendars, project management charts (e.g., Gantt charts), task management records (e.g., to-do lists), expense reports, computer printout and other computer readable or electronic records, and all drafts or modifications thereof, and all non-identical copies of any such items.  Any such DOCUMENT with any sheet or part thereof bearing any marks, such as initials, stamped indices, comments or notations, or any character or characters, that are not part of the signed text or photographic reproduction thereof is to be considered as a separate DOCUMENT.  Where there

3

is any question about whether a tangible item otherwise described in these requests falls within the definition of "DOCUMENT(S)," such tangible item shall be produced.

7.      The term "LEGALEASE" means and refers to LegalEase Solutions, LLC, and any of its former or current parents, subsidiaries, predecessors, successors, affiliated entities, controlled entities, joint ventures, related entities, agents, attorneys, employees, interns, representatives, assigns, directors, or officers and all other PERSONS acting or purporting to act on their behalf, including without limitation Teri Whitehead.

8.      The term "LITIGATION" means and refers to the lawsuit filed by PLAINTIFFS against ROSS in the United States District Court for the District of Delaware with case number 20-cv-00613.

9.      The term "PERSON(S)" means any natural person, firm, corporation, partnership, group, association, governmental entity, or business entity.

10.      The term "PLAINTIFFS" means and refers to THOMSON REUTERS and WEST.

11.      The terms "ROSS," "YOU," and "YOUR" mean and refer to Defendant ROSS Intelligence Inc., and any of its former or current parents, subsidiaries, predecessors, successors, affiliated entities, controlled entities, joint ventures, related entities, agents, attorneys, employees, interns, representatives, assigns, directors, or officers and all other PERSONS acting or purporting to act on their behalf, including without limitation ROSS Intelligence, Inc., the Canadian entity, Andrew Arruda, and Jimoh Ovbiagele.

12.      The term "ROSS MEMOS" means and refers to any work product created or distributed by a CONTRACTOR for or to ROSS, including without limitation any "Memos" or "Legal Research Questions" as defined by Sections 1.2 and 1.3 of the "STATEMENT OF

WORK II FOR ROSS BULK MEMOS" that was published by ROSS on May 7, 2020, on the website available at https://medium.com/@AndrewArruda/hold-59effcd819b0, attached hereto as **Exhibit A**.

13.    The term "ROSS PLATFORM" means and refers to any and all services and products offered by ROSS, including without limitation the online legal research platform referred to as "ROSS" previously offered through the website available at https://www.rossintelligence.com/.

14.    The term "STATE" means to state all relevant facts discoverable under FRCP 26(b) relating to a particular matter that is known to YOU.

15.    The term "TRAINING DATA" means and refers to any material, data or sets of data used by ROSS to train any artificial intelligence algorithms or systems, including without limitation any ROSS MEMOS and WESTLAW CONTENT.

16.    The term "WEST" means and refers to Plaintiff West Publishing Corporation, and any of their former or current parents, subsidiaries, predecessors, successors, affiliated entities, controlled entities, joint ventures, related entities, agents, attorneys, employees, interns, representatives, assigns, directors, or officers and all other PERSONS acting or purporting to act on their behalf.

17.    The term "WEST HEADNOTES" means and refers to the proprietary text created by WEST's attorney-editors to DESCRIBE and summarize the key concepts, points of law, or facts of judicial opinions found on WESTLAW.

18.    The term "WESTLAW" means and refers to PLAINTIFFS' online legal research product named Westlaw.

19.     The term "WESTLAW CONTENT" means and refers to any and all WESTLAW content owned by PLAINTIFFS, including without limitation the WKNS and WEST HEADNOTES, and expressly excluding any work prepared by a United States Government officer or employee as a part of that person's official duties, including without limitations government edicts, legislative enactments, judicial decisions, or similar types of official legal materials.

20.     The term "WKNS" means and refers to the taxonomy of cases, topics, legal issues, points of law, and WEST HEADNOTES created and maintained by WEST's attorney-editors for WESTLAW.

21.     The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to bring within the scope of a Request any PERSONS, COMMUNICATIONS, or DOCUMENTS which otherwise would not be brought within its scope.

22.     The words "any" and "all" are mutually interchangeable and are meant to encompass each other.

23.     The singular includes the plural and vice versa.

24.     The past tense shall be construed to include the present tense and vice versa.

**<u>GENERAL INSTRUCTIONS</u>**

1.     These Requests are intended to cover all DOCUMENTS in YOUR possession, custody or control, whether located at YOUR offices, home, stored via server, or at any other place.  If any DOCUMENT was, but is no longer, in YOUR possession or subject to YOUR control, or in existence, state whether it (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred, voluntarily or involuntarily, to others (and if so, to whom); or (iv) has been disposed of in some other manner.  IF YOU have reason to believe a responsive DOCUMENT is

in the possession of another PERSON, STATE (i) the basis for this belief; (ii) the PERSON believed to be in possession of the responsive DOCUMENT(s); (iii) where YOU believe the responsive DOCUMENT(s) may be located; and (iv) other information as is sufficient to identify the DOCUMENTS for a subpoena *duces tecum*.

2.      If a DOCUMENT that is responsive to a Request has been lost or destroyed, it should be identified as follows: (i) preparer; (ii) addressor (if different); (iii) addressee; (iv) each recipient and each person to whom distributed or shown; (v) date prepared; (vi) date transmitted (if different); (vii) date received; (viii) description of contents and subject matter; (ix) date of destruction; (x) manner of destruction; (xi) name, title, and address of the person who directed that the DOCUMENT be destroyed and (if different) the person who destroyed the DOCUMENT; (xii) the reason for the DOCUMENT's destruction; (xiii) the names of persons having knowledge of the destruction; and (xiv) a full description of the efforts made to locate the DOCUMENT.

3.      The production should include every DOCUMENT known to YOU and every such DOCUMENT that can be located or discovered by reasonably diligent efforts by YOU.

4.      If any of the requested DOCUMENTS cannot be disclosed or produced in full, produce the DOCUMENTS to the extent possible, and STATE YOUR reasons for YOUR inability to produce the remainder, stating whatever information, knowledge, or belief YOU have CONCERNING the unproduced portions.

5.      If any of the DOCUMENTS requested below are claimed to be privileged or are otherwise withheld, YOU are requested to provide a privilege log which identifies: (i) the date of the DOCUMENT; (ii) the identity of all PERSONS who sent, authored, signed or otherwise prepared the DOCUMENT; (iii) the identity of all PERSONS designated as addressee or

copyees; (iv) a description of the contents of the DOCUMENT that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the DOCUMENT and the basis of the claim or privilege or immunity; (v) the type or nature of the privilege asserted (e.g., attorney-client privilege, work product doctrine, etc.); and (vi) for redacted DOCUMENTS only, the Bates numbers corresponding to the first and last page of any DOCUMENT redacted.  To the extent e-mail is included and described on the privilege log, any e-mail chain (i.e., a series of e-mails linked together by e-mail responses and forwarding) that is withheld or redacted on the grounds of privilege, immunity or any similar claim may be logged as a single entry and identified by the most recent (i.e., top-most) e-mail.  YOU shall not be required to break up an e-mail chain and log each individual e-mail separately.  If, however, e-mail contained within a given chain exists separately, then YOU shall log that material in accordance with this Paragraph.  If an e-mail chain contains one or more privileged e-mails requiring redaction, the e-mail chain may be logged as a single entry and identified by the most recent redacted e-mail.

6.      All DOCUMENTS or other things responsive to a Request shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the Request to which they are responsive.

7.      All electronically stored information responsive to a Request shall be produced in black-and-white, single-page TIFF (300 dpi, Group IV) or color JPEG format.  The file names of the images should correspond to the appropriate Bates number and should be accompanied by an OPT file mapping each Bates number with the associated image file.  All corresponding metadata shall be produced in a DAT file, separated with consistent Concordance delimiters.  All corresponding document text (extracted text or optical character recognition) information should

be provided as document level text files with file names corresponding to the beginning Bates number of the document, and text files should be in plain-text format (not Unicode or UTF). Productions should be compatible with Concordance version 8.26.  All electronically stored audio or audiovisual files shall be produced in their native format as maintained and retained by YOU.  In addition, PLAINTIFFS reserve the right to request particular electronically stored information in another format, including native file format.

8.      All electronically stored information shall be produced with the following corresponding metadata fields: APPLICATION, AUTHOR, BEGBATES, ENDBATES, BEGBATES_ATT, ENDBATES_ATT, CUSTODIAN, FILE_NAME, FILE_PATH, FILE_SIZE, EXTENSION, TEXT_FILE, NATIVEFILE, DATE_CREATED, TIME_CREATED, DATELAST_MOD, TIMELAST_MOD, SUBJECT, FROM, TO, CC, BCC, DATE_SENT, TIME_SENT, DATE_RECD, TIME_RECD, CONFIDENTIALITY, and MD5HASH.

9.      Any DOCUMENT responsive to a Request should be produced in and with a file folder and other DOCUMENT (e.g., envelope, file cabinet marker) in or with which the DOCUMENT was located when this Request was served.

10.      All pages of any DOCUMENT(s) now stapled or fastened together should be produced stapled or fastened together.  Where DOCUMENT(s) are produced electronically, attachments shall be produced with the parent DOCUMENT(s) together as a family.

11.      If it is otherwise not possible to produce any DOCUMENT called for by any Request, or if any part of any Request is objected to, the reasons for the objection should be stated with specificity as to all grounds and, for the convenience of the Court and the parties, each Request should be quoted in full immediately preceding the objection.

12.     These Requests shall be deemed continuing and require further and supplemental production by YOU as and whenever YOU acquire, make, or locate additional DOCUMENTS between the time of the initial production and the time of final judgment in this LITIGATION.

## DOCUMENTS TO BE PRODUCED

**REQUEST FOR PRODUCTION NO. 94:**

All DOCUMENTS CONCERNING COMMUNICATIONS between ROSS and Charles von Simson REFERRING OR RELATING TO WESTLAW, WESTLAW CONTENT, access to WESTLAW, pricing of WESTLAW, PLAINTIFFS, the LITIGATION, or the COMPLAINT.

**REQUEST FOR PRODUCTION NO. 95:**

All DOCUMENTS CONCERNING COMMUNICATIONS between Charles von Simson and PLAINTIFFS, including without limitation COMMUNICATIONS REFERRING OR RELATING TO WESTLAW, access to a WESTLAW account, and/or pricing of WESTLAW.

**REQUEST FOR PRODUCTION NO. 96:**

All DOCUMENTS CONCERNING any comparison test between the ROSS PLATFORM and WESTLAW, including without limitation the test referenced in the document ROSS-003390240-ROSS-003390241.

**REQUEST FOR PRODUCTION NO. 97:**

All DOCUMENTS CONCERNING the "case classifier project" referenced in the document ROSS-003276505, including without limitation all DOCUMENTS CONCERNING COMMUNICATIONS between ROSS and CONTRACTORS (such as LEGALEASE) REFERRING OR RELATING TO the project.

10

**REQUEST FOR PRODUCTION NO. 98**:

All DOCUMENTS CONCERNING the "ROSS Variation" project referenced in the document ROSS-000205329, including without limitation all DOCUMENTS CONCERNING COMMUNICATIONS between ROSS and CONTRACTORS (such as LEGALEASE) REFERRING OR RELATING TO the project.

**REQUEST FOR PRODUCTION NO. 99**:

All DOCUMENTS CONCERNING the "ROSS Nuance" project referenced in the document ROSS-000310188-ROSS-000310189, including without limitation all DOCUMENTS CONCERNING COMMUNICATIONS between ROSS and CONTRACTORS (such as LEGALEASE) REFERRING OR RELATING TO the project.

**REQUEST FOR PRODUCTION NO. 100**:

All DOCUMENTS CONCERNING "ROSS' proprietary application" referenced in the document ROSS-000310188-ROSS-000310189, including without limitation all DOCUMENTS REFERRING OR RELATING TO what the "ROSS' proprietary application" refers to (*i.e.*, whether it is a part of, or separate from, the ROSS PLATFORM), and/or how LEGALEASE was to assign relevant practice areas to cases using "ROSS' proprietary application."

**REQUEST FOR PRODUCTION NO. 101**:

All DOCUMENTS CONCERNING ROSS's "Eva" product, including without limitation the creation and development of the product.

**REQUEST FOR PRODUCTION NO. 102:**

All DOCUMENTS CONCERNING TRAINING DATA that ROSS used or acquired in connection with ROSS's "Eva" product, including without limitation the TRAINING DATA referenced in the document ROSS-003390211-ROSS-003390212.

**REQUEST FOR PRODUCTION NO. 103:**

All DOCUMENTS CONCERNING COMMUNICATIONS between ROSS and David Aloyts, including without limitation COMMUNICATIONS REFERRING OR RELATING TO WESTLAW, WESTLAW CONTENT, or access to WESTLAW.

**REQUEST FOR PRODUCTION NO. 104:**

All DOCUMENTS CONCERNING COMMUNICATIONS between ROSS and Nate Palmer, including without limitation COMMUNICATIONS REFERRING OR RELATING TO WESTLAW, WESTLAW CONTENT, PLAINTIFFS, or access to WESTLAW.

**REQUEST FOR PRODUCTION NO. 105:**

All DOCUMENTS that ROSS made available to its customers that was delivered to ROSS, or authored, by CONTRACTORS (such as LEGALEASE).

**REQUEST FOR PRODUCTION NO. 106:**

All DOCUMENTS CONCERNING any analysis of the proprietary and non-proprietary aspects of WESTLAW (including without limitation the WESTLAW CONTENT), including without limitation all COMMUNICATIONS REFERRING OR RELATING TO any analysis or report performed by ROSS, prepared for ROSS, or sent to ROSS.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and Counterdefendants*
*Thomson Reuters Enterprise Center GmbH*
*and West Publishing Corporation*

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
Alyssa C. Kalisky
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

Megan McKeown
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX  77002
(713) 836-3600

November 30, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2021, copies of the foregoing were caused to be served upon the following in the manner indicated:

David E. Moore, Esquire                                    *VIA ELECTRONIC MAIL*
Stephanie E. O'Byrne, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Defendant and Counterclaimant*

Joshua M. Rychlinski, Esquire                              *VIA ELECTRONIC MAIL*
Mark A. Klapow, Esquire
Lisa Kimmel, Esquire
Crinesha B. Berry, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC  20004
*Attorneys for Defendant and Counterclaimant*

Gabriel M. Ramsey, Esquire                                 *VIA ELECTRONIC MAIL*
Kayvan M. Ghaffari, Esquire
Jacob Canter, Esquire
Warrington Parker, Esquire
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
*Attorneys for Defendant and Counterclaimant*

*/s/ Michael J. Flynn*
_____
Michael J. Flynn (#5333)

# EXHIBIT Q

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT R

| | |
|---|---|
| **From:** | Steinberg, Joachim |
| **Sent:** | Monday, June 13, 2022 3:06 PM |
| **To:** | Means, Miranda |
| **Cc:** | ROSS Lit Team; #Thomson-Ross; mflynn@morrisnichols.com; jblumenfeld@morrisnichols.com; *dmoore@Potteranderson.com1; *bpalapura@potteranderson.com |
| **Subject:** | RE: Thomson Reuters v. ROSS - Amended Complaint |

Miranda,

We have not withheld a meet and confer on this topic. We are, as we said below, willing to meet and confer on the proposed amendments. However, given the delays that have taken place because of Plaintiffs' refusal to engage in the meet and confer process, we think it's reasonable to discuss the other outstanding discovery topics at the same time. For example, we asked Plaintiffs to either produce documents or be willing to meet and confer on the documents mentioned at Mr. Tario's deposition five separate times, beginning in early May. Your email is the first time we have received any substantive response to those questions, and it still asks us to wait for more information. For Mr. Cavalieri's documents, we requested the same six times before receiving a substantive response. On several other occasions, we have had to make multiple requests for meet and confer calls before receiving any response from your team.

We are available to meet and confer regarding the proposed amendments on Friday, June 17, Tuesday, June 21, or Wednesday, June 22, but expect that your team will also be prepared to discuss other discovery issues on those calls. Please let us know a few times on those days that work for you.

Kind regards,
Joachim


**Joachim B. Steinberg**
Pronouns: he/him/his
Crowell & Moring LLP
jsteinberg@crowell.com
+1.415.365.7461 direct  |  +1.917.575.6244 mobile

---

**From:** Means, Miranda <miranda.means@kirkland.com>
**Sent:** Friday, June 10, 2022 5:17 PM
**To:** Steinberg, Joachim <JSteinberg@crowell.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>; mflynn@morrisnichols.com; jblumenfeld@morrisnichols.com; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; *bpalapura@potteranderson.com <bpalapura@potteranderson.com>
**Subject:** RE: Thomson Reuters v. ROSS - Amended Complaint

External Email

Dear Joachim,

First, it is completely improper for you withhold a meet and confer with Plaintiffs on an issue that you admit is ripe for a meet and confer.  You have stated below, without any explanation, that ROSS does not consent to the proposed amendment.  When the parties reached an impasse on other issues, we scheduled meet and confers with your team.  Indeed, we have two in a row scheduled on issues that ROSS wished to discuss next week.  Discovery is a two way

1

street.  Provide your team's availability, or be prepared to explain to the Court why you refused to meet and confer with Plaintiffs on this amendment.

Second, you sent us five different lengthy discovery letters this week.  Two of them were sent in response to a letter we sent you *over a month* ago April 21.  Two of them, which you sent yesterday, were letters sent following a meet and confer three weeks ago.  Some of them raise new issues and arguments that ROSS never mentioned during fact discovery, and our client has every right to address.   For the letters you sent this week that we have not responded to yet, we will respond in due course, but we will not rush because ROSS unilaterally decided to make this week the week it dredges up discovery issues it has conveniently ignored for over a month.

Third, there are a number of issues Plaintiffs have been working diligently to resolve.  With regard to Mr. Cavalieri's documents, we should be able to produce documents early next week (likely Monday).  With regard to the documents from Cameron Tario's deposition, many of the documents you asked for do not exist, but we are still investigating whether there is anything to produce, and hope to know more next week.  On the audit trails, we are expecting to be able to get back to you on that shortly as well.

Best regards,
Miranda

**Miranda Means**
She/Her/Hers

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T**  +1 617 385 7419
**M** +1 617 320 9248

miranda.means@kirkland.com

---

**From:** Steinberg, Joachim <JSteinberg@crowell.com>
**Sent:** Friday, June 10, 2022 3:11 PM
**To:** Means, Miranda <miranda.means@kirkland.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>; mflynn@morrisnichols.com; jblumenfeld@morrisnichols.com; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; *bpalapura@potteranderson.com <bpalapura@potteranderson.com>
**Subject:** RE: Thomson Reuters v. ROSS - Amended Complaint

Miranda,

ROSS does not consent to the proposed amendment to the Complaint. We are willing to meet and confer with you on the amendment, however, as we have repeatedly requested meet and confers on several issues, including but not limited to the Andrew Cavalieri documents, the documents mentioned at the Cameron Tario deposition, and Plaintiffs' proposal regarding audit trails, we believe that the parties should schedule those final meet and confer discussions, as well as any other issues still outstanding, for the same time that we meet and confer on Plaintiffs' proposed amendment.

Kind regards,
Joachim

**Joachim B. Steinberg**
Pronouns: he/him/his
Crowell & Moring LLP
jsteinberg@crowell.com
+1.415.365.7461 direct  |  +1.917.575.6244 mobile

**From:** Means, Miranda <miranda.means@kirkland.com>
**Sent:** Friday, June 3, 2022 4:25 PM
**To:** Steinberg, Joachim <JSteinberg@crowell.com>
**Cc:** ROSS Lit Team <Rosslitteam@crowell.com>; #Thomson-Ross <thomson-ross@kirkland.com>; mflynn@morrisnichols.com; jblumenfeld@morrisnichols.com; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; *bpalapura@potteranderson.com <bpalapura@potteranderson.com>
**Subject:** Thomson Reuters v. ROSS - Amended Complaint

External Email

Dear Joachim,

Based on the new information discovered during the course of fact discovery, including the deposition of Charles von Simson, Plaintiffs intend to amend their complaint.  Attached is a redline of the proposed amended complaint.  Please let us know if ROSS will consent to Plaintiffs' request, or provide a time when you are available to meet and confer.

Best regards,
Miranda

**Miranda Means**
She/Her/Hers

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T**  +1 617 385 7419
**M** +1 617 320 9248

miranda.means@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT S

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | C.A. No. 20-613-SB |
| | ) | |
| Plaintiffs/Counterdefendants, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| ROSS INTELLIGENCE INC., | ) | |
| | ) | |
| Defendants/Counterclaimant. | ) | |

**DECLARATION OF WARRINGTON S. PARKER, III, IN SUPPORT OF ROSS
INTELLIGENCE, INC.'S RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO
FILE AMENDED COMPLAINT**

I, Warrington S. Parker, III, declare as follows:

      1.      I am a partner at Crowell & Moring, LLP, lead counsel of record for ROSS

Intelligence, Inc. I am licensed in the State of California and admitted *pro hac vice* with this

Court. I submit this declaration in support of ROSS's Response to Plaintiffs' Motion for Leave to

File Amended Complaint. The following statements are based on my personal knowledge.

      On July 15, 2022, I visited Westlaw Canada's website at
https://www.westlawcanada.com/DynamicData/AttachedDocs/Academic/Academic_Licence_A
greement_WLNC_2016.pdf and retrieved the Westlaw Canada Academic Licence Agreement,
which is attached to ROSS's Response to Plaintiffs' Motion for Leave to File Amended
Complaint at Exhibit C.

      2.      Exhibit C is unaltered and in the same form as it appeared on July 15, 2022.

      3.      On July 21, 2022, Crowell & Moring's Research Services Department visited

https://learning.dnb.com/courses/db-hoovers-onestop-reports and retrieved the OneStop Report

for Thomson Reuters Canada Limited, which is attached to ROSS's Response to Plaintiffs'

Motion for Leave to File Amended Complaint at Exhibit B.

4.      Exhibits B was retrieved in a downloadable PDF format from the website and is unaltered and in the same form as it appeared on July 21, 2022.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed at Dukes County, Massachussetts, on this 22nd day of July, 2022

*/s/ Warrington S. Parker III*

Warrington S. Parker III