# EXHIBIT 31

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 32



Project Rose – Project Protocol



**Project Rose**

**Project Protocol**

| | |
|---|---|
| **Updated** | 19 November 2017 |
| **Version** | 1.1 Working |
| **Document Classification** | RESTRICTED |
| **Status** | Draft/Working |
| **Author** | Christopher Cahn |

All rights reserved.  No part of this document may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of Morae Global.



**Cahn Exhibit 52**

LEGALEASE-00093076



Project Rose – Project Protocol

**Table of Contents**

**1. INTRODUCTION** ....................................................................................................................**3**

   1.1   Background ................................................................................................................... 3
   1.2   Order of Review ........................................................................................................... 3
   1.3   Question Formation ..................................................................................................... 3
   1.4   Question Responses ...................................................................................................... 3
   1.5   Formatting .................................................................................................................... 5

**2. EXAMPLE MEMO** ...............................................................................................................**87**

LEGALEASE-00093077



Project Rose – Project Protocol

# 1. INTRODUCTION

## 1.1 BACKGROUND

Our client is assisting an artificial intelligence company train its system to identify and distinguish quality legal cases without the need significant intervention from human end users.

We will formulate questions based upon Westlaw headnotes and provide sample responses in a pre-determined format. The questions and responses will subsequently be "processed" by a computer so proper formatting is of critical importance.

## 1.2 ORDER OF REVIEW

Topics will be assigned based upon the Westlaw key system. At the top level will be the Westlaw key topic e.g. 298 Perpetuities. Within each key will be individual keys and within each key will be a list of cases that each have headnotes. We will prepare a memo for every **unique** headnote that appears under a given Westlaw Key.

For example, for topic 298 Perpetuities, Key 2- "What law Governs" there are 42 cases with headnotes so we would prepare 42 memos.

**Never select a resource that is labelled as "Out of Plan".**

## 1.3 QUESTION FORMATION

Initially questions are formulated based upon the Westlaw headnote. For example, the below headnote:

> **Headnote**: The common law rule against perpetuities is in force in Oregon.

Might lead to the question, "Is the common law rule against perpetuities in force?"

Once memo drafting beings, it is permissible to change the question to better suit the cases found but, **each question must be unique**.

Additional requirements for questions:

- Questions must <u>not</u> start with the word, "may"
- Questions must not be state specific (but answers can be state specific)
- Questions should be based upon headnotes but framed to be concise. If the question runs more than 2 lines it is probably too long.

## 1.4 QUESTION RESPONSES

For each question, we will provide quotes that respond to the question. Memos are being used to train a computer system rather than for actual legal research. Negative treatment of a case - whether distinguished or overturned - is not relevant. Overturned cases can still be quoted and the fact that it is overturned need not be mentioned. Please also note that question responses are judged by whether they contain the same keywords as the question. Synonyms for the keywords and responses that answer substantive issue but do not contain the same keywords are not consider acceptable substitutes for the actual keywords.

LEGALEASE-00093078



Project Rose – Project Protocol

Quotes are classified in four ways, great, good, topical and irrelevant.
- Each memo will contain <u>at least</u> one "great" quote.
- Memos will also contain exactly one topical and one irrelevant quote
- Memos must contain 4- 6 quotes in total.
    - Never less than 4 and never more than 6.
    - 5-6 quotes is optimal.
- The entire paragraph should be copied into the memo but the actual quote should not be overly wordy. Try to be surgical; **if your quote is more than two lines it is probably too long**
- Paragraphs should not be overly lengthy. If a paragraph runs more than 10 lines, it is too long and an alternate quote should be found.
- Great, Good and Topical quotes should be substantive rather than factual

> **Comment [MS1]:** The rule of entire para had been revised by the client, and intimated to Clutch on Nov. 14, 2017.

**"Great" quote – Answers every aspect of the question using the same keywords.**
<u>Question</u>: "Are oil and gas leases executory contracts?"

<u>Answer</u>: "Any party to an 'executory contract,' such as a long-term supply contract or an oil and gas operating agreement, may similarly obtain from the debtor full performance plus additional ' assurance' as the quid pro quo for continued dealings." ) King v. Baer, 482 F.2d 552 (10th Cir.1973) (emphasis mine). **[[Other courts have considered an oil and gas lease a transfer of an interest in real property and therefore not an executory contract]]**."

**"Good" quote -** Should answer the most essential element of the question and contain all but one keyword

<u>Question</u>: "Does a person commit forgery by opening an account and signing checks in an assumed name?"

<u>Answer</u>: One cannot conclude that the defendant in this case committed forgery as defined in Susalla. There may have been a litany of offenses committed, but not forgery. The check given by defendant did not purport to be anything other than a personal check drawn by the person who presented it on an account that that person had opened. **[[The misrepresentation of identity to the bank in opening the account did not make the creation of a draft on that account a forgery when presented to pay for the television.]]** *See, Rapp v. State*, 274 So.2d 18 (Fla.App., 1973), *Smith v. State,* 379 S.W.2d 326 (Tex.Cr.App., 1964).

**"Topical" and "Irrelevant" quote.**

In addition to the 2-4 great or good answers (quotes) to each research question, we will need one "topical" quote and one "irrelevant" quote.

**"Topical" quote**
 A topical quote is a quote that hits on limited aspects of the question, but does not answer any essential part of the question. Examples of good topical quotes are a definition of one of the key words or background of the law.

For example:

LEGALEASE-00093079



Project Rose – Project Protocol

<u>Question:</u> 'Are oil and gas leases executory contracts?'

<u>Answer:</u> 'There are no published opinions construing this language. However, by its terms, the paragraph deals with interests of the debtor in 'gaseous hydrocarbons' and not contract rights like the ones involved here. **[[The legislative history of § 541(b)(4) indicates that it was enacted to address questions related to the transfer of rights in oil and gas leases.']]**

The easiest way to find topical cases is to look for cases within the case cited...as they are citing law. This will provide a foundation.  And, by clicking on a case within one of your cited cases, you will save time.

- Touches on the elements of the question
- Does not answer the question
- May contain a limited component of the question
- Not necessary to have a key word of the question

**"Irrelevant" quote:**
An irrelevant quote has some keywords in it from the question but completely missed the mark. An easy way to find irrelevant quotes is to search a keyword, pick any case, and use a quote from the facts or body with the key word. This quote is not at all on topic and will likely only contain one essential word. The easiest way to locate a good irrelevant quote is to pick a key word from the question, search only that word in WestLaw/Lexis, find a case with that word in the facts with little to no other words from the question, bracket and bold the sentence with the word.

For example, if the question is **"[a]re oil and gas leases executory contracts?"** an answer may contain key words like **"olive oil"** or **"residential leases"** but nothing else relevant regarding the question.

The easiest way to locate a good irrelevant quote is to pick a key word from the question, search only that word in WestLaw, find a case with that word in the facts with little to no other words from the question, bracket and bold the sentence with the word.

An Irrelevant quote:
- One or two matching words with the question, but completely unrelated.
- Has key word but not within realm of the issue presented (example question on oil and gas lease, irrelevant quote about olive oil).

**1.5   FORMATTING**

Memos will be machine read which means that formatting is of critical importance. At the most basic level the memos must conform to the below:

- Single Spaced
- Left Justified
- Times New Roman, Font 12
- No italics
- Eliminate Special characters and other formatting issues (eliminate *,¶ , unusual spaces, footnotes, unwanted squiggly lines).
- No underlining

LEGALEASE-00093080



Project Rose – Project Protocol

- Cases Sequentially Numbers (i.e. Case 1, Case 2, Case 3, etc)
- Check if Great, Good, Topical and Irrelevant are in order and properly titled.
- Check if the memo number in the file name is unique and that it matches the number in the body of the memo.

More broadly, the memos will conform to the following:

| Issue | Description |
|---|---|
| 1 | Draft questions following Creative Process.<br>• Questions must not start with the word, "may"<br>• Questions must not be state specific<br>• Questions should be based upon headnotes but framed to be concise. If the question runs more than 2 lines it is probably too long.<br>• Is the question grammatically correct? |
| 2 | Research questions using online resources and accounts.<br>**Only a basic case cite should be provided – No pin point or alternate cites**<br>Kirquel Dev., Ltd. v. Planning Bd. of Town of Cortland, 96 A.D.3d 754. |
| 3 | Memo title and number centered and bold.<br><div align="center">**MEMORANDUM # 23**</div> |
| 4 | Left justify the balance of the memo |
| 5 | Confirm the font and spacing of the memo is appropriate. <u>Nothing</u> should be italicized or underlined. |
| 7 | Does the memo number at the top of the memo match the number in the file name? |
| 8 | The Issue and the quotes must be in bold. No other text should be in bold. |
| 9 | Quotes are to be in double brackets, all punctuation inside of the brackets, and bold font. No highlighting. The end of the quote must include punctuation and cites should not be included in the quote UNLESS it is required in order to have the quote end with punctuation.<br>**[[This would present due process concerns and is clearly not what the Legislature intended.]]** |
| 10 | All quotes must be identical to the one found in the case unless otherwise noted here, no stray words, missing punctuation, or carriage returns.<br>***Westlaw internal page numbers must be eliminated***. |
| 11 | Ensure <u>bracket spacing</u> is correct, before and after brackets, and <u>bold font is limited to the bracketed quote</u>. No highlighting. |
| 12 | Quotes should not all be from the same ruling or case. |
| 13 | Bracketed language must be a <u>full sentence</u>. Not just two words. |
| 14 | Label quotes as great (1-4), good (2-3), topical (1), and irrelevant (1) for a total of 4-6 quotes.<br>Case 4: Winston v. Freshwater Wetlands Appeals Bd., 254 A.D.2d 363.<br>Good Quote 1: text text text |
| 15 | GREAT –The bracketed language must answer question and must contain **all** the essential keywords of the question. Note: Synonyms are not considered the same key word |
| 16 | GOOD – The bracketed language must answer question and must contain **most** of the the essential keywords of the question. |
| 17 | TOPICAL – **foundation** quote, **background** information. |
| 18 | IRRELEVANT– has **no** reference or relevance but includes one key word from the |

**Comment [MS2]:** Identical in the way it appears in WL; do not use identical quotes (where all the quotes of the memo are identical).

LEGALEASE-00093081



Project Rose – Project Protocol

| | |
|---|---|
| | question. |
| 19 | Memo saved in correct format – naming convention (Topic – Memo # - C (for clutch) - associate initials). When saving after review include your initials. Venue – Memo # 23 – C - AA |
| 20 | Tracker Updated |
| 21 | Watch out for 1: Grammar – question, missing period 2: Format – bold, spacing, pagination 3: Great/Good – quote mislabelled 4: Topical – quote should not answer the question but should provide background knowledge 5: Irrelevant – quote is irrelevant |

LEGALEASE-00093082



Project Rose – Project Protocol

## 2. EXAMPLE MEMO

<div align="center">

**MEMORANDUM # 57**

</div>

**1. Question**
Is equitable relief a cause of action?

**2. Reference List**
**Issue: Is equitable relief a cause of action?**

Case 1: Hendrix v. Napolitano, 77 F. Supp. 3d 188.
Great Quote 1: Mr. Hendrix asserts a claim for equitable relief in Count V. **[[Equitable relief, however, is a form of relief and not a cause of action.]]** Since the Court grants the motion for summary judgment as to Count IV, there is no cause of action in this matter upon which it could grant any equitable relief. The Court, therefore, dismisses Count V for failure to state a claim upon which relief can be granted.

Case 2: Eisenberg v. City of Miami Beach, 1 F. Supp. 3d 1327.
Great Quote 1: **[[The equitable relief Plaintiffs seek is a remedy, not a separate cause of action.]]** See Perret v. Wyndham Vacation Resorts, Inc., 889 F.Supp.2d 1333, 1346 (S.D.Fla.2012) (dismissing count pleading injunctive and declaratory relief for failure to state a separate cause of action); Tara Prods., Inc. v. Hollywood Gadgets, Inc., No. 09–CV–61436, 2010 WL 1531489, at (S.D.Fla. Apr. 16, 2010) (dismissing count pleading remedy of equitable lien for failure to state separate cause of action); see also Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1127 (11th Cir.2005) ("[A]ny motion or suit for either a preliminary or permanent injunction must be based upon a cause of action ... There is no such thing as a suit for a traditional injunction in the abstract.") (internal quotation marks and citation omitted). Moreover, "[A] court should not entertain an action for declaratory relief when the issues are properly raised in other counts of the pleadings and are already before the court." Perret, 889 F.Supp.2d at 1346 (citation omitted). Plaintiffs already seek equitable relief in the other counts of the Complaint. Accordingly, Count VII is dismissed.

Case 3: Crown Const. Co. v. Huddleston, 961 S.W.2d 552.
Topical Quote 1: In this case, the evidence, other than whether the notice was taped to Huddleston's door on June 2, 1996, is undisputed. Crown acknowledges that it was aware, prior to June 2, 1996, that the option expired on that date. It also acknowledges that after it allegedly taped the notice to Huddleston's office door, it did not attempt to contact Huddleston again until June 12, 1996. Then, on June 12, 1996, Crown delivered notice in writing to Huddleston's agent. Crown never confirmed receipt of the June 2 notice. **[[In the face of undisputed facts, the propriety of equitable relief is a question of law for the court, subject to an abuse of discretion standard of review on appeal. Fontenot, 919 S.W.2d at 715.]]** Because the facts surrounding Crown's equitable argument are undisputed, Crown's third point of error alleging that a fact issue exists regarding whether equity should be applied in this case is overruled. We must now consider, whether the trial court erred in finding that Crown was not entitled to equitable relief as a matter of law.

Case 4: Beard v. Glickman, 189 F. Supp. 2d 994.
Irrelevant Quote 1: In their Reply, the Beards argue that if we accept Defendant's interpretation, the Agency can completely undermine an appellant's right to appeal a denial of equitable relief by simply failing to recommend such relief to the Administrator. We disagree.
**[[There can only be a denial of equitable relief if the party in question has the authority to**

LEGALEASE-00093083



Project Rose – Project Protocol

**actually grant equitable relief.]]** Under the construction of the relevant statutes and regulations, only certain Administrators within the FSA (the head Administrator, Associate Administrator and Deputy Administrator) and the Director of the NAD, as well as, of course, the Secretary of Agriculture, have the authority to grant equitable relief. Thus there could be no denial of equitable relief appealed to the NAD Director in cases where, as here, the appellants chose to bypass the intermediate options of Agency review before appealing directly to the NAD. Therefore, accepting Defendant's interpretation does not undermine an appellant's right to appeal a denial of equitable relief.

**-- End of Document --**

LEGALEASE-00093084

# EXHIBIT 33

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 34

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

EXHIBIT 35

# Best Practices Guide for ROSS Intelligence

Drafting Questions, Preparing Responsive Memorandum, and Quality Control Procedures

Last revised on September 18, 2017.

EXHIBIT

3

LEGALEASE-00078065



**Document ID** : ROSS Bulk
**Date of Issue** : 08.07.17
**Periodic Review** : 09.14.2017
**Revision No** : 4

**Document ID** : ROSS Bulk
**Date of Issue** : 08.07.17
**Periodic Review** : 09.18.2017
**Revision No** : 5

# Contents

Part I ......................................................................................................................................... 3

    Overview.................................................................................................................................... 3

    Introduction............................................................................................................................... 3

    Audience.................................................................................................................................... 3

    Objectives .................................................................................................................................. 3

    Legal Disclaimer........................................................................................................................ 4

Part II ........................................................................................................................................ 4

    Framing Questions .................................................................................................................... 4

        1.   West Law ......................................................................................................................... 4

        2.   Lexis: .............................................................................................................................. 9

Part III ..................................................................................................................................... 13

    I.    Standards & Best Practices for ROSS Memos Drafting................................................... 13

        Attorney - ROSS Intelligence Checklist ................................................................................ 15

        Sample Memo ....................................................................................................................... 16

    II.   Standards & Best Practices for ROSS Memos Review ................................................... 18

        Review Attorney - ROSS Intelligence Checklist................................................................... 18

    III.   Standards & Best Practices for ROSS Portal Upload..................... **Error! Bookmark not defined.**

        Portal Upload - ROSS Intelligence Checklist .......................................... **Error! Bookmark not defined.**

**LEGALEASE-00078066**

Document ID        : ROSS Bulk
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : 4

## Part I

### Overview

The LegalEase Solutions Best Practices Guide aims to set out the quality assurance process followed by the LegalEase team to ensure delivery of memos that meet the standards and requirements of ROSS Intelligence.

### Introduction

The LegalEase Solutions Best Practices Guide is the primary quality assurance resource and playbook for our attorneys.  This Practice Guide provides all the tools and resources needed for the drafting and delivery of ROSS Intelligence memos.

### Audience

The intended audience for this guide is our full-time, part-time, and subcontracted attorneys who prepare Ross memos. Additionally, this guide may be utilized by ROSS to review our internal process.

### Objectives

This guide:
- Identifies clear guidelines for attorneys to follow when designing, developing, researching, drafting, and delivering ROSS memos.
- Promotes uniformity of the process to be followed by the team.
- Lay out checklists to ensure quality assurance of the memos at different stages.
- Describes best practices and standards for ROSS memos.

3

LEGALEASE-00078067



Document ID          : BPGSOP#4
Date of Issue        : 08.07.17
Periodic Review      : 09.14.2017
Revision No          : 4

**Legal Disclaimer**

This Best Practices Guide includes proprietary, confidential, and/or trade secret information. LegalEase considers this information to be a trade secret not subject to disclosure.

**Part II**

**Framing Questions**

You may be assigned a West Law (WL)/Lexis topic to frame questions. An easy way of framing questions is to rely on the head notes. However, note that the head notes are proprietary and you should not copy paste them in the question.
Given below are screenshots to frame questions using WL and Lexis:

1. **West Law**

   1) Headnote Search   - Click on the Key Numbers. You will be assigned a number which is available under the Key Numbers.

4

LEGALEASE-00078068

Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : 4



Here, the Key Number assigned is 1 and the topic is Abandoned and Lost Property.

LEGALEASE-00078069



Date of Issue        : 08.07.17
Periodic Review      : 09.14.2017
Revision No          : 4

2) Click on a key number topic. The best practice is to begin from the top (sub topic number 1) and follow the pattern.



3) Clicked on #4 Evidence and questions for jury.



4) Got this...

LEGALEASE-00078070

Date of Issue    : 08.07.17
Periodic Review    : 09.14.2017
Revision No    : 4



5) Clicked on Cheffins case.

LEGALEASE-00078071

Date of Issue        : 08.07.17
Periodic Review    : 09.14.2017
Revision No          : 4



1 ABANDONED AND LOST PROPERTY 415
└── 1I Abandonment 290
└── 1●4 Evidence and questions for jury 78

☐ **1.  Cheffins v. Stewart**
United States Court of Appeals, Ninth Circuit.  │  June 8, 2016  │  825 F.3d 588

**Headnote:** Under Nevada law, abandonment of property may be inferred from acts done.

Document Preview: COPYRIGHTS - Art and Architecture. Mobile replica of 16th-century Spanish galleon was not pr

☐ **2.  Recovery Ltd. Partnership v. Wrecked and Abandoned Vessel, S.S. CENTRAL AM**
United States District Court, E.D. Virginia, Norfolk Division.  │  August 11, 2015  │  120 F.Supp.3d 500

**Headnote:** In order for the law of finds to be applied to property lost at sea, the treasure-hunter must establish abandon

6)   Which pulls up the exact headnote on point. As well as ton of others…

**12  Abandoned and Lost Property**
Under Nevada law, abandonment of property may be inferred from acts done.

**13  Federal Courts**
Any error was harmless as to district court's failure to give jury instructions lost profits and punitive damages, which failure was based on district cour determination that such damages were unduly speculative, in action for conversion under Nevada law, relating to destruction of mobile replica of 16th-century Spanish galleon, built from used school bus, where jury foun favor of defendant on the conversion claim brought by mobile replica's creators, so that there were no damages to be awarded.

7)   From that headnote, make the statement a question.

So – headnote 12  - "Under Nevada law, abandonment of property may be inferred from acts done."
Convert to a question, "May abandonment of property under Nevada Law be inferred from acts done?"

8

LEGALEASE-00078072



**Date of Issue** : 08.07.17
**Periodic Review** : 09.14.2017
**Revision No** : 4

2. **Lexis:**

1) Log on to your account and go to the main screen.



2) Select Search By Topic or Headnote.

9



Lexis®
My Lexis™
Search
Get a Document
Shepard's®
More
All
By Topic or Headnote
Minnesota
Legal
Add/Edit Subtabs
All Topics
Look for a Legal Topic
Help
Option 1: Find a Legal Topic
Find
Find in: Administrative Law
All Topics
Option 2: Explore Legal Topics
Administrative Law
General Overview
Agency Adjudication
General Overview
Alternative Dispute Resolution (Related Topics...)
Decisions
Hearings
Impartiality
Prehearing Activity
Presiding Officers
Review of Initial Decisions
Agency Investigations
Agency Rulemaking
Governmental Information
Informal Agency Actions
Judicial Review (Related Topics...)
Separation of Powers
Sovereign Immunity



**Date of Issue** : 08.07.17
**Periodic Review** : 09.14.2017
**Revision No** : 4

3) Select Option 2 – Search by Headnote.



4) Select the Jurisdiction and date from the drop-down. Try searching for "Previous 10 years" in the drop down.



11

LEGALEASE-00078075



**Date of Issue** : 08.07.17
**Periodic Review** : 09.14.2017
**Revision No** : 4

5)  When the cases are displayed, select "Show Headnotes Only" option.



6)  We may be able to find more cases by clicking "More Like This HeadNote"



12

LEGALEASE-00078076

**Part III**

**I.        Standards & Best Practices for ROSS Memos Drafting**

1.  The whole memo is drafted in Times New Roman, with font size 12 and single spaced.

2.  File name convention: "Topic No. – sub topic no.  - Memo # – [associate initials] - [date].

3.  Building and formatting the memo.

a.  Opening the ROSS template, use the save as option and rename the template following the naming convention mentioned above.

b.  Begin by researching the question from head notes.

c.  There should be no jurisdictional filtering for the questions. This means the questions should not be state specific.

d.  Enter the questions framed from the assigned topic in the Smartsheet (SS).

e.  Each Memo shall include a Question and a Reference list (RL) with a target of at least 2 and no more than 6 cases.

f.  The most relevant paragraph of the case would be entered in the memo as Quote 1. Do not add more than 1 quote from a case.

g.  Copy paste the entire paragraph of the case that answers the question.

h.  When using WL Next to "Copy with reference" BE SURE the format it copies with is "Standard."  That should automatically give you a good cite when you paste it.

i.  The first 2- 4 cases of the memo must provide an independent answer to the legal research question.

j.  These quotes shall be labelled "Great" or "Good" depending on the relevancy of the quote to the question.

k.  When the excerpts hit on all essential elements of the question, they will be labelled "great." If they hit on most essential elements of the question they will be labelled "good."

l.

13

LEGALEASE-00078077



**Document ID**      : **ROSS069#4**
Date of Issue      : 08.07.17
Periodic Review   : 09.14.2017
Revision No        : 4

m. Associate shall strive for 4 great/good quotes per question. However, if the Associate is only able to find 1, 2 or 3 cases, they shall only provide 1, 2 or 3 cases.

n. Associate shall aim for more number of great quotes (maximum 4) for each memo.

o. In addition to the 2-4 cases/quotes to each research question, we will draft one 'topical' quote and one 'irrelevant' quote.

p. A topical quote is a case with a quote that hits on aspect of the question, but does not answer any part of the question. For example: <u>Question</u>: 'Are oil and gas leases executory contracts?'

<u>Answer:</u> 'There are no published opinions construing this language. However, by its terms, the paragraph deals with interests of the debtor in 'gaseous hydrocarbons' and not contract rights like the ones involved here. (The legislative history of § 541(b)(4) indicates that it was enacted to address questions related to the transfer of rights in **[[oil and gas leases]]**.'

q. An irrelevant quote has some keywords in it from the question but completely missed the mark. For example, if the question is '[a]re oil and gas leases executory contracts?' a bad answer may contain key words like 'olive oil" or "residential leases' but nothing else relevant about the question.

r. Associate shall rank the cases in order of relevance, with the first-ranked case in a Memo being the best answer to the Memo question and the last-ranked case being the worst answer to the Memo question.

s. Associate shall also bold the relevant parts of each Quote that answer the relevant Memo question and put them in double brackets. The topical and irrelevant quotes must also have the required portion in bold and double brackets.

t. A bracketed excerpt can be up to the length of one paragraph, provided there isn't too much unnecessary filler. If need be, you can double bracket separate sentences/sections of the same paragraph/quote if that leads to a fuller answer to the question.

u. Associate shall label the quotes as great, good, topical, and irrelevant.

v. Note that pinpoint citation is not used in ROSS memo. For e.g. *In re Story*, 536 B.R. 279, 283 (Bankr. E.D. Mo. 2015) will be entered as In re Story, 536 B.R. 279.

14

LEGALEASE-00078078



Document ID      : ROSS09_#
Date of Issue    : 08.07.17
Periodic Review  : 09.14.2017
Revision No      : 4

w.  In the RL section, while the quotes are copy-pasted, make sure the page numbers and footnotes in the judgment are deleted.

x.  Check over the entire memo to make sure that there are no stray lines or odd spaces.

y.  Complete all Smartsheet fields. This include entering the associate initials, question drafted, date, number of quotes, date of QC, initials of QC associate, Notes, and saved file name.

**Attorney - ROSS Intelligence Checklist**

| Description | Completed |
|---|---|
| 1.  Draft ROSS questions following LegalEase Creative Process. | |
| 2.  Research questions using online resources and accounts. | |
| 3.  Label the quotes as great, good, topical, and irrelevant. | |
| 4.  Confirm that great, and good quotes answer the question directly. | |
| 5.  Add topical and irrelevant quotes. | |
| 6.  Confirm that the topical and irrelevant cases meet the criteria. | |
| 7.  Confirm grammar correct throughout memo. | |
| 8.  Confirm the font and space of the memo. | |
| 9.  Follow file name convention. | |

LEGALEASE-00078079



Document ID                : BOS5ppu#
Date of Issue          : 08.07.17
Periodic Review      : 09.14.2017
Revision No            : 4

**Sample Memo**

## MEMORANDUM #

### 1. Question

What is implied actual notice?

### 2. Reference List
**Issue: What is implied actual notice?**

Case 1: *Symons Corp. v. Tartan-Lavers Delray Beach, Inc.,* 456 So. 2d 1254.
Great Quote 1: Notice is of two kinds, actual and constructive. *Sapp v. Warner,* 105 Fla. 245, 141 So. 124, aff'd, 143 So. 648 (1932). Actual notice is itself comprised of two types: (1) express, based on direct information; and (2) implied, which includes notice inferred from the fact that a person had the means of knowledge, which it was his duty to use. Id. **[[Implied actual notice is an inference of fact. Id.; see also, Reinhart v. Phelps, 150 Fla. 382, 7 So.2d 783 (1942). Implied actual notice, being an inference of fact, may be drawn by the court as a matter of law when warranted by the circumstances of the particular case calling for its application in order to grant equitable relief.]]** *Sapp v. Warner,* supra. *United Contractors, Inc. v. United Constr. Corp.,* 187 So.2d 695 (Fla. 2d DCA 1966).

Case 2: *Sapp v. Warner,* 105 Fla. 245.
Great Quote 1: Notice is of two kinds, actual and constructive. 'Constructive notice' has been defined as notice imputed to a person not having actual notice; for example, such as would be imputed under the recording statutes to persons dealing with property subject to those statutes. **[['Actual notice' is also said to be of two kinds: (1) Express, which includes what might be called direct information; and (2) implied, which is said to include notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not use, or, as it is sometimes called, 'implied actual notice.']]** *Cooper v. Flesner,* 24 Okl. 47, 103 P. 1016, 23 L. R. A. (N. S.) 1180, 20 Ann. Cas. 29; *Simmons Creek Coal Co. v. Doran,* 142 U. S. 417, 12 S. Ct. 239, 35 L. Ed. 1063; *Hoy v. Bramhall,* 19 N. J. Eq. 563, 97 Am. Dec. 687; *Acer v. Westcott,* 46 N. Y. 384, 7 Am. Rep. 355**. [[Constructive notice is a legal inference, while implied actual notice is an inference of fact]],** but the same facts may sometimes be such as to prove both constructive and implied actual notice. *Knapp v. Bailey,* 79 Me. 195, 9 A. 122, 1 Am. St. Rep. 295.

Case 3: *Rinehart v. Phelps,* 150 Fla. 382.
Good Quote 1: **[[Constructive notice is a legal inference, while implied actual notice is an inference of fact, but the same facts may sometimes be such as to prove both constructive and implied actual notice]].** *Knapp v. Bailey,* 79 Me. 195, 9 A. 122, 1 Am.St. Rep. 295; 105 Fla. 245, 141 So. page 127.

Case 4: *Knapp v. Bailey,* 79 Me. 195.

16

LEGALEASE-00078080

Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : 4



Good Quote 1: There is a conflict in the cases and among writers as to what is actual notice. Much of the difference is said to be verbal only,— more apparent than real. Certain propositions, however, are quite well agreed upon by a majority of the authorities. Notice does not mean knowledge; actual knowledge is not required. Mr. Wade describes the modes of proving actual notice as of two kinds. One he denominates express notice, and the other implied. **[[**"***Implied***, which imputes knowledge to the party because he is shown to be anxious of having the means of knowledge, though he does not use them; in other words, where he chooses to remain voluntarily ignorant of the fact, or is grossly negligent in not following up the inquiry which the known facts suggest." Wade, Notice, (2d Ed.) § 5. Some writers use the word "implied" as meaning constructive, and would regard what is here described to be implied actual notice as constructive notice merely]].** As applicable to actual notice, such as is required by the sections of the statute under consideration, we think the classification of the author whom we quote is satisfactory. The author further explains the distinction by adding that "notice by implication differs from constructive notice, with which it is frequently confounded, and which it greatly resembles, with respect to the character of the inference upon which it rests; constructive notice being the creature of positive law, or resting upon strictly legal inference, while **[[implied notice arises from inference of fact." It amounts substantially to this: that actual notice may be proved by direct evidence, or it may be inferred or implied (that is, proved) as a fact from indirect evidence,—by circumstantial evidence]].** A man may have notice or its legal equivalent. He may be so situated as to be estopped to deny that he had actual notice. We are speaking of the statutory notice required under the conveyances act. A higher grade of evidence may be necessary to prove actual notice appertaining to commercial paper. *Kellogg v. Curtis*, 69 Me. 212. The same facts may sometimes be such as to prove both constructive and actual notice; that is, a court might infer constructive notice, and a jury infer actual notice, from the facts. There may be cases where the facts show actual, when they do not warrant the inference of constructive, notice; as where a deed is not regularly recorded, and not giving constructive notice, but a second purchaser sees it on the records, thereby receiving actual notice. *Hastings v. Cutler*, 24 N. H. 481.

Case 5: Hagan v. Sabal Palms, Inc., 186 So. 302.
Topical Quote 1: **[[The principle applied in cases of alleged implied actual notice is that a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice]]**; that it will not suffice the law to remain willfully ignorant of a thing readily ascertainable by whatever party puts him on inquiry, when the means of knowledge is at hand. (cases cited).' (Emphasis supplied).

Case 6: Hopkins v. McCarthy, 121 Me. 27.
Irrelevant Quote 1: Inquiry was not necessary, because the plaintiff saw the defendant in possession. **[[Possession alone is not implied notice.]]** *Hanly v. Morse*, 32 Me. 287. But inquiry became highly important when he had found out that the man was in possession under a contract of lease. Then a prudent man would have inquired, and, inquiring, would have learned. Then, to excerpt from *Birdsall v. Russell*, 29 N. Y. 220, there was "such a connection between the fact discovered and the further facts to be discovered as to furnish a clue–a reasonable and natural clue–to the latter." Notice of a lease will be notice of its contents (Story's Eq. Jur. § 400), which is but another way of saying that notice may become the equivalent of knowledge, and that he who is put upon inquiry must exercise good faith, proper diligence, and reasonable care in following up the inquiry. The underlying and ruling principle is that of common prudence, or, better still, that of

17

LEGALEASE-00078081



Document ID      : ROSSDocll
Date of Issue    : 08.07.17
Periodic Review  : 09.14.2017
Revision No      : 4

common honesty. "Whatever puts a party upon inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding," is a commendable syllabus condensed into small space. Lodge v. Simonton, 2 Pen. & W (Pa.) 439, 23 Am. Dec. 36. Mr. Justice Strong says: "Wherever inquiry is a duty, the party bound to make it is affected with knowledge of all that which he would have discovered had he performed the duty." Cordova v. Hood, 17 Wall. 1, 21 L. Ed. 587.

## II.     Standards & Best Practices for ROSS Memos Review

a. Check the question for grammatical errors using https://www.grammarly.com/i?breadcrumbs=true&page=install or https://www.grammarly.com/office-addin/windows

b. Validate the cites quoted in the case.

c. Validate if the highlighted portions answer the question correctly.

d. Make sure that the Memo has 4 independent quotes. If it lacks 4 quotes, note the concern in the SS.

e. Validate the formatting, and alignment.

f. If the memo requires substantial rework return to the associate.

g. Once finalized, save the final eliminating associate's initials and date.

h. Tab time for review of each memo.

### Review Attorney - ROSS Intelligence Checklist

| | Description | QC 1 | QC 2 |
|---|---|---|---|
| | Question should not be state specific. | | |
| | Grammar check of question. | | |
| | Quotes to be labeled correctly.<br><br>GREAT – must contain **all** essential elements of the question.<br><br>GOOD – contains **most** of the essential elements of the question.<br><br>TOPICAL – foundation quote, background information. | | |

18

LEGALEASE-00078082

Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : 4

| | | | |
|---|---|---|---|
| | IRRELEVANT– has no reference or relevance. | | |
| | Should label as Great Quote 1, Great Quote 2, Topical Quote 1, and Irrelevant Quote 1. | | |
| | Bracketed language **must** answer question.<br><br>Bracketed language may be up to a paragraph.<br><br>If necessary, you can double bracket separate sentences.<br><br>Bracketed language must be a sentence. Not just two words. | | |
| | Double Brackets, and Content in Bold. | | |
| | No red squiggly line. | | |
| | Confirm reference quote.  Ensure Topical quote and Irrelevant quotes are added. | | |
| | Smartsheet updates. | | |
| | Double check the Form - Double Brackets for Quotes.  No highlights. | | |
| | Memo number. | | |
| | Memo saved in correct format – naming convention. | | |

19

LEGALEASE-00078083

# EXHIBIT 36

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

EXHIBIT 37

# In The Matter Of:

*West Publishing Corp. vs.*
*Legalease Solutions, LLC*

---

*Tariq Hafeez*
*Vol. I*
*December 18, 2018*

---



**DORIS O. WONG**
**ASSOCIATES, INC.**
C O U R T   R E P O R T E R S

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File Hafeez_Tariq.txt*
*Min-U-Script® with Word Index*

TR-0039043

1

Volume 1
Pages 1 to 265
Exhibits 1 to 29


UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA


WEST PUBLISHING

CORPORATION                    Civ No. 18-CV-01445 (DSD/ECW)

        Plaintiff/Counterclaim

        Defendant,


        -vs-


LEGALEASE SOLUTIONS, LLC,

        Defendant/Counterclaim-Plaintiff.

                                        /



        The Deposition of TARIK HAFEEZ,

        Taken at 500 Woodward,

        Detroit, Michigan,

        Commencing at 9:00 a.m.,

        Tuesday, December 18, 2018,

        Before Shacara V. Mapp, CSR-9305.

D o r i s  O . W o n g  A s s o c i a t e s , I n c .

APPEARANCES:

     MR. SCOTT T. LASHWAY

     Holland & Knight

     10 St. James Avenue

     Boston, MA 02116

     (617) 305-2119

     scott.lashway@hklaw.com

       Appearing on behalf of the

     Plaintiff/Counterclaim-Defendant.


     MR. KASSEM M. DAKHLALLAH

     Hammoud & Dakhlallah

     6050 Greenfield Road

     Suite 201

     Dearborn, Michigan 48126

     (313) 551-3038

     kd@hdalawgroup.com

       Appearing on behalf of the

     Defendant/Counterclaim-Plaintiff.


ALSO PRESENT:

     - Videographer:  Neal Rogers

     - Erik Lindberg

     - Jeanpierre Juliano

TR-0039045

3

```
 1                         TABLE OF CONTENTS
 2      Witness                                     Page
 3      TARIK HAFEEZ
 4
 5          EXAMINATION BY MR. LASHWAY:             8
 6          EXAMINATION BY MR. DAKHLALLAH:          259
 7
 8                        INDEX TO EXHIBITS
 9          Exhibit                                 Page
10
11          HAFEEZ EXHIBIT 1                        7
12          Notice of Rule 30(b)(6) Deposition of
13          LegalEase, LLC
14          HAFEEZ EXHIBIT 2                        7
15          Michigan Dept. Of Consumer & Industry
16          Services Fax Sheet
17          HAFEEZ EXHIBIT 3                        7
18          LARA Corporations LegalEase Filing
19          HAFEEZ EXHIBIT 4                        57
20          Intelligence is the Ability to
21          Adapt to Change Packet
22          HAFEEZ EXHIBIT 5                        72
23          Thomas Reuters Order Form
24          Order ID: Q-00105954
25
```

1                     INDEX TO EXHIBITS, Continued

2          Exhibit                                    Page

3

4          HAFEEZ EXHIBIT 6                           76

5          Master Service Agreement

6          HAFEEZ EXHIBIT 7                           76

7          Statement of Work

8          HAFEEZ EXHIBIT 8                           76

9          Statement OF Work II for Ross Bulk Memos

10         HAFEEZ EXHIBIT 9                           77

11         Master Service Agreement from 8/10/17

12         HAFEEZ EXHIBIT 10                          77

13         Defendant/Counterclaim-Plaintiff Responses

14         to Plaintiff's First Set of Requests for

15         Admissions

16         HAFEEZ EXHIBIT 11                          77

17         First Amendment to Statement of Work

18         HAFEEZ EXHIBIT 12                          126

19         9/28/17 E-mail Subject: Minutes of Meeting

20         ROSS Bulk Project and ROSS Original

21         HAFEEZ EXHIBIT 13                          144

22         7/31/17 E-mail Subject: New West Law

23         Passwords-July 2017

24

25

5

1                      INDEX TO EXHIBITS, Continued

2          Exhibit                                   Page

3

4          HAFEEZ EXHIBIT 14                         149

5          7/26/17 E-mail Subject: ROSS-TC

6          Tomas 7 26 17

7          HAFEEZ EXHIBIT 15                         157

8          Statement of Work II LegalEase

9          Process Automation

10         HAFEEZ EXHIBIT 16                         183

11         Master Service Agreement Effective 8/10/17

12         HAFEEZ EXHIBIT 17                         205

13         8/18/17 E-mail Subject: WL Registration

14         Keys

15         HAFEEZ EXHIBIT 18                         207

16         9/5/17 E-mail Subject: Ross Portal

17         HAFEEZ EXHIBIT 19                         213

18         9/15/17 E-mail Subject: Ross Bulk Project

19         - LPO

20         HAFEEZ EXHIBIT 20                         216

21         9/15/17 E-mail Subject: Ross Bulk Project

22         - LPO

23         HAFEEZ EXHIBIT 21                         221

24         9/18/17 E-mail Subject: LegalEase Bulk

25         Memo Project Request

6

1                    INDEX TO EXHIBITS, Continued

2          Exhibit                                    Page

3          HAFEEZ EXHIBIT 22                           225

4          9/19/17 E-mail Subject: Ross Bulk

5          Project-LPO

6          HAFEEZ EXHIBIT 23                           233

7          10/10/17 E-mail Subject: Permanent ID's

8          Still

9          Not Established

10         HAFEEZ EXHIBIT 25                           239

11         12/4/17 E-mail Subject: Ancillary Block

12         HAFEEZ EXHIBIT 26                           243

13         Thomas Reuter Research Subscriber

14         Agreement

15         HAFEEZ EXHIBIT 27                           243

16         Thomson Reuters General Terms and

17         Conditions

18         HAFEEZ EXHIBIT 28                           244

19         Thomson Reuters Schedule A

20         HAFEEZ EXHIBIT 29                           245

21         Westlaw Schedule A

22

23

24

25

7

1    Detroit, Michigan

2    Tuesday, December 18, 2018

3    About 9:06 a.m.

4

5                    *              *              *

6            HAFEEZ EXHIBIT 1

7            Notice of Rule 30(b)(6) Deposition of

8            LegalEase, LLC;

9            HAFEEZ EXHIBIT 2

10           Michigan Dept. Of Consumer & Industry

11           Services Fax Sheet;

12           and HAFEEZ EXHIBIT 3

13           LARA Corporations LegalEase Filing

14           WAS MARKED BY THE REPORTER

15           FOR IDENTIFICATION

16                    THE VIDEOGRAPHER:  We are on the record.

17       This is the video recorded deposition of Tariq Hafeez

18       being taken in Detroit, Michigan.  Today is December

19       18, 2018 and the time is 9:06 a.m.  Will the attorneys

20       please identify themselves and the court reporter

21       please swear in the witness?

22                    MR. LASHWAY:  Scott Lashway on behalf of the

23       Plaintiff and counterclaim Defendant, West Publishing

24       Corporation.

25                    MR. JULIANO:  John Pierre Juliano from

**Tariq Hafeez – Vol. I – December 18, 2018**

116

1   A.   Yes.

2   Q.   So the more West Law material you included, the more

3        you were paid?

4   A.   If one would look at it, the more relevant quotes we

5        were able to provide, the more we were paid.

6   Q.   And we spoke about this earlier, but for the Ross Bulk

7        Project, the scope of each memo was turned from a

8        logistical perspective in that you were able to phrase

9        your own questions?

10  A.   That's correct.

11  Q.   And so, give me an example if you remember, how a

12       particular individual would be assigned work on any

13       given day.  Where did they begin?

14  A.   Sure.  So, as part of our thinking on how to -- how to

15       come up with 20,000 questions and answers, we

16       gravitated towards the idea of using West Law headnotes

17       as the basic starting point for categories of topics

18       that we could address.

19            So, for example, we go to, you know, starting

20       with A, abandonment or something like that.  And then,

21       we would look at the subtopics under abandonment and

22       then the sub-subtopics.  And then, we would say okay,

23       well, let's create as many questions as we can around

24       abandonment.

25            And some of these headnotes had very few

TR-0039159

1      subtopics, some had a lot of subtopics.  So the more

2      subtopics there were, the more potential questions that

3      we could phrase using the headnotes.

4              So, essentially, we were assigning attorneys

5      topics and subtopics to go to and then create questions

6      and answers on the topics and subtopics.

7   Q.  And, they would navigate in providing those answers

8       using the headnote hyperlinks; is that right?

9   A.  Can you rephrase the question?

10  Q.  So they would use the headnote to frame the question

11      for the answer file; is that right?

12  A.  They would use the headnote as a starting point to

13      phrase a question for the memo.

14  Q.  And then, would they use the hyperlink that the

15      headnote provided to the material in the case and to

16      the cases and statutes cited under that headnote --

17  A.  Right.

18  Q.  -- for purposes of answering the question framed?

19  A.  That would be the starting point, yes.  They would

20      start out there and click on the hyperlink to come up

21      with cases.  And then, they would review those cases to

22      see if those cases were appropriate to use in the memo.

23  Q.  And -- I'm sorry, were you finished?

24  A.  Yeah.

25  Q.  And was one of the points to capture which cases and

1   A.    I probably do, yes.

2   Q.    It's in a Google -- Google docs?

3   A.    Google docs, yep.

4   Q.    So there's conversation in here about a proposal to

5         increase the production on the Ross Bulk Project.  Do

6         you see that?

7   A.    Are you talking about number two?  No.

8   Q.    The heading two right before 1, 2, 3.  It says proposal

9         to increase the production on the Ross Bulk Project.

10        Do you see that?

11  A.    Oh, yes.

12  Q.    And number two says tests the drafting tool to see if

13        we can increase production.

14  A.    Mm-hmm.

15  Q.    What was the drafting tool that's being referenced

16        there?

17  A.    So this is the, what we've called automation tool or

18        the, I guess, it's also been referred to the drafting

19        tool.  It was a tool that -- so let's go back to Mr.

20        Ansad in Code Matrix.

21              When we first approached Code Matrix, it was

22        a way for us to develop and upload and finalize memos

23        to Ross's portal without using manpower or limiting the

24        amount of manpower.  As he got brought on to the

25        project, he learned more about the actual process that

Tariq Hafeez – Vol. I – December 18, 2018

130

1          was involved and he had some ideas around how he

2          thought he could help us make our research more

3          efficient and that's what was referred to as the

4          drafting tool.

5     Q.   And would that include automating part of the research

6          process?

7     A.   So the basic idea there was, instead of having an

8          attorney go to a headnote and click on the head --

9          click on the topics, then subtopics.  That tool would,

10         essentially do some of that clicking for them.  So they

11         would have -- they would have cases relating to a

12         certain topic as a starting point, as if somebody had

13         gone in there before them and done that for them, if

14         that makes any sense.

15    Q.   I didn't follow you.  Maybe you could give me another

16         explanation.

17    A.   Sure.

18    Q.   So you said they would have cases relating to certain

19         topics as a starting point, as if someone had gone in

20         there before them?

21    A.   Yeah.  So again, I'll take my stupid abandonment

22         property example.  If I were assigned abandonment and I

23         were to go first, so before I even started drafting the

24         memo, I go on to headnotes and I click on abandonment

25         and then I scroll down to a topic within -- a subtopic

TR-0039173

**Tariq Hafeez – Vol. I – December 18, 2018**

131

1        within that topic.  And I think hey, this is a good one

2        for me to phrase a question with.

3                Sorry?

4    Q.   Go ahead.

5    A.   I thought you were looking at me.

6    Q.   No.  No.

7    A.   Okay.  So this is a good question for me to phrase --

8        this is a good headnote for me to phrase a question

9        from.  That requires multiple clicks and time where the

10       attorney has to go log into West Law, click on the

11       headnote, click on the topics, click on the subtopics.

12               What Ansad had proposed to us was, what if

13       your associate could be armed with or have available to

14       him or her, cases relating to a certain topic or

15       subtopic that they could start working on immediately

16       as opposed to having to go through that clicking.

17               So if my topic was abandonment of the

18       vehicle, instead of me having to start from abandonment

19       and click all the way through and find those cases

20       relating to abandonment of the vehicle, the idea behind

21       this tool was, I could log into the tool and I would

22       have a list of cases relating to abandonment of the

23       vehicle that I could start my research from.

24               Now, the tool did more than that.  The tool

25       helped generate the memos.  So once I found the cases

**Tariq Hafeez – Vol. I – December 18, 2018**

132

1   that I felt were appropriate, I could frame the

2   question in the tool.  I could answer the question in

3   the tool, manually.  It had like a little space for me

4   to enter the question, enter the answer.  It had -- I

5   could click on which case that the tool had pulled

6   into, that the tool had, which case I wanted to include

7   in the memo and I could select if that was a good quote

8   or a bad -- or, you know, a great, good, relevant,

9   topical.

10          And then, once I finished submitting those

11  inputs on the tool, it would generate a word document

12  that was in the exact format that Ross wanted in terms

13  of the indentation and the highlighting.  So that's how

14  the tool was, sort of, more from being just an upload

15  tool.  And you might see references to it being called

16  the upload tool because that's how we first started it,

17  to a what we call a tool automation.  It takes out some

18  of the steps the attorney has to do manually to arrive

19  at the final project.

20  Q.  And some of those steps involve interacting with West

21      Law?

22  A.  Yes.

23  Q.  All right.  So this is one of two tools that was built

24      by Code Matrix; is that right?

25  A.  Related to Ross, because we mentioned another tool?

133

| | |
|---|---|
| 1 | Q. Related to Ross. |
| 2 | A. Related to Ross.  I believe they had a version of this |
| 3 | for the original project and one for the bulk project. |
| 4 | Q. So the tool you just described, was that used for the |
| 5 | original project? |
| 6 | A. It was worked on -- it was used on the original project |
| 7 | for a period of time. |
| 8 | Q. Was it also used in the bulk project? |
| 9 | A. Yes. |
| 10 | Q. And, would a human being have to log in to West Law |
| 11 | using credentials provided by West Law? |
| 12 | A. Yes. |
| 13 | Q. And, where -- let me rephrase that. |
| 14 | Was the tool a form of software that Code |
| 15 | Matrix had built? |
| 16 | A. The tool was comprised of code.  So yes, I believe it |
| 17 | was software. |
| 18 | Q. Was there an application interface for the user? |
| 19 | A. Was there an application interface meaning what?  A way |
| 20 | someone could log into the tool? |
| 21 | Q. Meaning, if they were going to do research in West Law, |
| 22 | were they using the tool or were they using West Law? |
| 23 | What was the user interacting with? |
| 24 | A. This is where it gets a little bit -- I don't know if |
| 25 | the word complicated is correct, but the tool would |

TR-0039176

134

1    provide an attorney with cases that were pulled from
2    West Law, okay?  Like we talked about.  So cases
3    relating to abandonment of a motor vehicle.  The tool
4    -- those cases would be hyperlinked.
5                    So the attorney, when they would start
6    working that day for their project, they would log into
7    West Law using their own credentials.  They would have
8    these cases that were pulled by the tool to use as a
9    starting point, but they would inevitably, have to go
10   back on to West Law to finish their research unless the
11   tool just happened to capture the right amount of cases
12   and the perfect case law that fit for the memo that
13   they were drafting.
14   Q.   Okay.
15   A.   And the tool was really not used for the purpose of
16   drafting Ross Bulk memos.  To a large extent, it was
17   used in a different way.  I can elaborate on that
18   whenever you want, whenever you would like.
19   Q.   No, go ahead.
20   A.   Okay.  So the tool was something that was developed for
21   our own employees in India, LegalEase employees in
22   India, the LegalEase employees in the U.S.  I think we
23   also gave access to our independent contractors, of the
24   tool.  But we never gave access of the tool to any of
25   our subcontracted attorneys like Kelly attorneys or in

TR-0039177

**Tariq Hafeez – Vol. I – December 18, 2018**

135

```
 1            India, there's a few different providers that we use.
 2            They were not given access to the tool.
 3            The vast majority of those 25,000 memos were drafted by
 4            those subcontracted entities that did not have the
 5            tool.  We were using the tool for quality control and
 6            upload to the Ross portal
 7                    So the tool was -- although it was
 8            architected in a way that you could use it as a
 9            drafting tool for Ross Bulk, it was primarily being
10            used by our QC team to QC the memos and then, to upload
11            the final memos to -- to Ross.
12    Q.      So if I understand you correctly, you said that the
13            vast majority of the 25,000 memos that you produced for
14            Ross were drafted by the subcontracted entities that
15            didn't have access to the tool?
16    A.      Yes.
17    Q.      So what were those -- how were those subcontracted
18            entities preparing the bulk memos?
19    A.      So they were -- they were all given access to West Law.
20            They were all given their own licenses attached to
21            their LegalEase e-mail and they were doing the research
22            directly from West Law.
23                    And then, to sort of take the narrative all
24            the way through, these various subcontractors would
25            send us a batch of memos at the end of each day.  We
```

```
 1          had, essentially, all of our U.S. and India employees

 2          that were working on the Ross Bulk Project, active QC,

 3          they would take these Word documents which is how we

 4          got them as Word documents and they would ingest them

 5          into the tool.  The tool would be able to automatically

 6          flag formatting issues.  It would also be able to flag

 7          if you only had three quotes when you actually needed

 8          to have a minimum of four quotes.

 9                  So it was very helpful in our QC team

10          rejecting bad memos from the get-go, having the

11          subcontractors do some re-work on those memos,

12          re-submit it and then we would re-ingest it into the

13          automation tool.  And, our QC team would finalize it on

14          the automation tool and then it would be sent over to

15          -- to Ross.

16   Q.     All right.  So I want to go backwards for a minute, so

17          I understand this.

18                  So there was a group of people that had

19          access to the Code Matrix tool; is that right?

20   A.     Right.  A limited group of people.

21   Q.     And this is the tool that you described as helping to

22          drive efficiencies --

23   A.     That's correct.

24   Q.     -- and eliminating having to click on all the tools?

25   A.     That's correct.
```

1          initial work from the tool populate in the tool?

2     A.   The cases would populate in the tool, yes.

3     Q.   All right.  And, the individual would frame the

4          question using the tool?

5     A.   The tool had a static thought to them entering into the

6          question based on the cases they're looking at.

7     Q.   And someone would have to type the question in?

8     A.   Right.

9     Q.   But the headnote would be in front of them?

10    A.   The case would be in front of them, yeah.  The cases

11         related to the headnote would be in front of them.

12    Q.   And the headnote as well, right?

13    A.   The headnote probably would have been, yeah.

14    Q.   Otherwise, you wouldn't know which question to answer.

15    A.   Yeah.

16    Q.   So they would use that information, type in the

17         question, and then there was another box or another

18         field to then identify the cases?

19    A.   So visually, I think they would have on the one side of

20         the screen, boxes for them to manually input the

21         question and to be able to categorize the quotes from

22         those cases as being, you know, from those four

23         different topics or categories.

24              But, and then on the other side of the

25         screen, it would actually have the cases listed.  I

1          believe they had to copy and paste the appropriate

2          sentences or quotations from the case on the right side

3          of the screen and fit it into the box on the left side

4          of the screen.

5                    So it's making everything accessible to them,

6          but they still had to discern if the case, A, answered

7          the question that they had just framed.  If it didn't,

8          then they would go out to West Law and look for other

9          cases.  The case was perfect and on point, they still

10         had to cut and paste the -- the appropriate sentence

11         holding from the right-hand side to the left-hand side

12         and then do the additional step of categorizing it as

13         great, good, so on and so forth.

14    Q.   Now, I think I've asked you this, but I just want to be

15         -- I just want to make sure I understood your answer.

16         Would the tool using LegalEase 8 go into West Law and

17         pull this information down so that when the user logged

18         in to the tool, there was information available to

19         them?

20    A.   That's correct.

21    Q.   So the user didn't have to deploy the tool, the tool

22         was used with Legalese 8?

23    A.   That's correct.

24    Q.   Okay.  And so, the individuals who were doing the work

25         to generate these 25,000 memos could, in effect, use

1          produced, that is a subject matter of this case?

2                      MR. LASHWAY:  Objection.

3                      THE WITNESS:  No.

4     BY MR. DAKHLALLAH:

5     Q.   Now, there was discussion related to KeyCites in this

6          case.  Do you remember that line of questioning?

7     A.   Yes.

8     Q.   Now, KeyCites were never given to Ross at any point in

9          anything that you gave them as a deliverable, correct?

10    A.   No.

11    Q.   And they were, in fact, never given to anyone by you in

12         anyway, correct?

13    A.   Correct.

14    Q.   And, the KeyCites themselves, never ended up in any

15         draft of any memo whether in the course of preparing

16         the work product or in a final version of any memo that

17         you were creating for Ross, correct?

18    A.   Correct.  The KeyCites were not used verbatim in any of

19         the memos.

20    Q.   And neither were the headnotes?

21    A.   Correct.

22    Q.   And, in fact, the only thing that ever found its way

23         into a memo that was delivered as part of your

24         deliverables to anyone in this case was the actual text

25         of the court decisions themselves, right?

TR-0039304

Tariq Hafeez – Vol. I – December 18, 2018

265

```
 1    CERTIFICATE OF NOTARY

 2

 3    STATE OF MICHIGAN      )

 4                          )   SS

 5    COUNTY OF MACOMB       )

 6                I, Shacara V. Mapp, Certified Shorthand

 7          Reporter, a Notary Public in and for the above county

 8          and state, do hereby certify that the above deposition

 9          was taken before me at the time and place hereinbefore

10          set forth; that the witness was by me first duly sworn

11          to testify to the truth, and nothing but the truth;

12          that the foregoing questions asked and answers made by

13          the witness were duly recorded by me stenographically

14          and reduced to computer transcription; that this is a

15          true, full and correct transcript of my stenographic

16          notes so taken; and that I am not related to, nor of

17          counsel to either party, nor interested in the event of

18          this cause.

19

20          _____

21          Shacara V. Mapp, CSR-9305

22          Notary Public,

23          Macomb County, Michigan

24          My Commission expires:  07-25-2024

25
```

Doris O. Wong Associates, Inc.

# EXHIBIT 38

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 39

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 40

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WESTPUBLISHING CORPORATION,    )
    )
                Plaintiff,    )
    )
                  v.    )    Case File No. _____
    )
LEGALEASE SOLUTIONS, LLC,    )
    )
              Defendant.    )

## COMPLAINT

Plaintiff West Publishing Corporation ("West"), by and through its attorneys, asserts the following cause of action against LegalEase Solutions, LLC ("LegalEase"). In support of its claims, West alleges the following:

1.      West provides industry-leading legal technology solutions, proprietary information, and legal online research platforms to a broad array of subscribers, including companies and law firms. Among the products offered by West is Westlaw®, a legal research platform, which is available via a paid subscription.

2.      Upon information and belief, LegalEase offers legal research and writing support services to attorneys and law firms. For example, LegalEase advertises its ability to provide attorneys with court pleadings and motions, discovery documents, draft contracts and agreements, legal research memoranda, claims research analysis and demand letters, and appeal briefs.

3. In 2008, LegalEase entered into a contract with West (a Thomson Reuters business) to access Westlaw®. At all relevant times, LegalEase paid West a subscription fee that was less than $5,000 per month for its subscription to Westlaw®.

4. In January, 2018, West provided notice of termination of LegalEase's access to all Westlaw® products. West informed LegalEase that its sharing of Westlaw® passwords with employees of a separate company violated the terms of their contract.

5. From 2013 until July, 2017, LegalEase's use of Westlaw® was about 6,000 transactions per month, which, upon information and belief, is consistent with LegalEase's stated use of the product, namely to assist it in preparing legal writing for law firms, in-house counsel, and other attorneys.

6. According to LegalEase, in July, 2017 it was working with a machine learning and artificial intelligence firm to create a new legal research product. As part of this undertaking, LegalEase "fed" the "machine" with "tons and tons of legal research."[1] In a July, 2017 interview, LegalEase stated the following with respect to LegalEase's business:

> One of our clients is a machine learning legal research firm that's using artificial intelligence to create a much stronger legal research product. We're feeding this machine <u>tons and tons of legal research</u> that we're doing manually, to help train that machine to do this automatically. And we are already seeing the power of this type of technology.[2]

---

[1] *See http://www.reinventingprofessionals.com/tag/tariq-hafeez/* beginning at 12:55 (last accessed on May 25, 2018).

[2] *Id.*

2

Upon information and belief, LegalEase obtained this "legal research" from Westlaw®.

7.      Beginning in about July, 2017, LegalEase's use of Westlaw® spiked, eventually reaching approximately 236,000 transactions[3] per month, which is a twenty-fold increase over LegalEase's historical usage pattern and represents a usage rate greater than the average monthly usage of the "AmLaw 100" law firms.[4]

8.      Upon information and belief, LegalEase was only able to obtain the "tons and tons of legal research" from Westlaw® between, at least, July, 2017 and January 17, 2018, by breaching its Subscription Agreement (as defined herein) with West.  Upon information and belief, LegalEase, among other things, deployed computer programs, automated processes, or "bots" to capture and store Westlaw® information, and shared Westlaw® passwords with multiple individuals (including, upon information and belief, non-LegalEase employees) in violation of the Subscription Agreement.

9.      Upon information and belief, LegalEase stored and conveyed Westlaw® information obtained during this period to its "machine learning" customer, thereby further violating LegalEase's agreement with West and other of West's legal rights.

---

[3]      For the purposes of this complaint, a "transaction" refers to any executed search, as well as any viewing, printing, downloading, or emailing of a specific document.

[4]      The "AmLaw 100" is a list generated by The American Lawyer that ranks the largest 100 law firms in the country by revenue.  *See* https://www.law.com/americanlawyer/almID/1202784597030/ (last accessed on May 25, 2018).

10.     West's termination of LegalEase's Westlaw® subscription was effective on January 17, 2018.  Nonetheless, LegalEase still proclaims to this day, that: "[u]sing powerful legal research tools including . . . Westlaw, combined with our years of experience researching a vast array of legal issues for corporate customers and law firms, the LegalEase team is well equipped to research a diverse array of legal issues."[5]

11.     During the period July, 2017 to January 17, 2018, LegalEase accessed Westlaw® information valued in the millions.  LegalEase was able to access this volume of information in such a short period of time by engaging in conduct that is expressly prohibited in its Subscription Agreement with West.

## PARTIES

12.     West Publishing Corporation is a citizen of Minnesota, is a Minnesota corporation, and has its principal place of business at 610 Opperman Drive, Eagan, Minnesota 55123.  West is a wholly-owned subsidiary of Thomson Reuters (Legal) Inc., a Minnesota corporation.

13.     Defendant LegalEase Solutions, LLC is a citizen of Michigan, is a Michigan limited liability company, and has its principal place of business at 2301 Platt Road, Suite 20, Ann Arbor, Michigan 48104.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper under 28 U.S.C. §§ 1332(a) and (c) because there is complete diversity of citizenship between West and LegalEase and the amount in controversy exceeds $75,000.

---

[5]     *See https://legalresearch.uslegal.com/LegalEase/* (last accessed on May 25, 2018).

15.     This Court has personal jurisdiction over LegalEase, as LegalEase has significant contacts with, derives value from, and transacts and does business in the District.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because West resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

17.     Venue is also proper in this District because the express terms of the parties' Subscription Agreement at issue state that any claim "may be brought in the state or federal courts in Minnesota."

## FACTUAL BACKGROUND

### West's Westlaw® Products and Services

18.     Westlaw® is an online legal research platform offered to subscribers by West, which is a subsidiary of Thomson Reuters (Legal) Inc.

19.     Westlaw® offers to subscribers access to a comprehensive collection of legal information, backed by a rigorous editorial process; editorial enhancements such as proprietary headnotes, notes of decisions, and the West Key Number System; technological innovation from its WestSearch® and Research Recommendations tools that provide subscribers with cutting-edge technology and a competitive edge; dedicated attorney-editors, who are bar-admitted, to track legal changes every day, so that its subscribers can trust the accuracy and timeliness of the information that is offered; access to on-demand legal research support to help subscribers; and the KeyCite® citation

service to ensure that subscribers cite good law with the industry's most accurate, up-to-the-minute citation service.

20.     Westlaw®'s platform includes access to volumes of proprietary material, databases, and compilations of case law, state and federal statutes, state and federal regulations, law journals, treatises, and other resources. Westlaw® incorporates decades of search and editorial intelligence with the latest technological innovations.

21.     Integral to the Westlaw® platform is the proprietary organizational system referred to as the "West Key Number System".

22.     West has created the West Key Number System, beginning over 100 years ago. Initially developed in printed digest format, the West Key Number System has been continually updated and digitally transformed onto the online Westlaw® research platform. The development of the West Key Number System, both in print and digital formats, has been and continues to be the result of a substantial investment of time, resources, and editorial choices made by West over decades.

23.     The West Key Number System works as a master classification system through which West's attorney-editors organize cases by corresponding legal issues and topics.

24.     The West Key Number System adds significant value to the Westlaw® product. It has also helped position West as a leader in the legal research sector.

25.     West's original and revised text and compilation of legal material made available through Westlaw®, including the West Key Number System and

headnote system, has independent economic value. West has invested hundreds of millions of dollars in Westlaw® and takes measures, such as those limitations set forth in the parties' agreements, to protect the proprietary nature of Westlaw® information, including its West Key Number System and headnote system.

<div align="center">Relationship Between West and LegalEase</div>

26.     Upon information and belief, LegalEase provides legal research and writing services to law firms and corporate counsel across the United States, and this work involves drafting research memorandums for customers on various legal topics.

27.     LegalEase historically used Westlaw® to carry out its services on behalf of its customers.

28.     LegalEase first contracted with West to obtain a limited license to Westlaw® in 2008.

29.     LegalEase, acting through its President and Co-Founder Tariq Hafeez, renewed its Subscription Agreement for Westlaw® most recently on October 4, 2017.

30.     The terms of LegalEase's agreement with West are set forth in a product Order Form, which expressly incorporates the Thomson Reuters Legal Products and Professional Services General Terms and Conditions (the "Terms and Conditions"). Collectively, the Order Form and the Terms and Conditions (and the earlier iterations of the order forms and terms and conditions, which previously were titled Research Subscriber Agreements) establish the contract terms between LegalEase and West, which is referred to herein as LegalEase's "Subscription Agreement."

<div align="center">7</div>

31.     At all times during LegalEase's relationship with West, LegalEase had a Subscription Agreement in place that governed the terms of the limited license granted by West.  The various iterations of the Subscription Agreement were substantively consistent during the time periods relevant to West's claims.

32.     The Order Forms set forth the specific product or product bundles licensed by LegalEase, including any additional or custom products; the minimum term of the order; the monthly charges; and the individual users who are authorized to access the Westlaw® research platform.

33.     Under the Subscription Agreement, LegalEase was granted a limited license to access Westlaw®'s information, including editorially enhanced case law, statutes, and regulations, and major secondary publications, in exchange for paying a monthly fee of less than $5,000.  LegalEase accepted this Order Form and was charged its monthly subscription fee until January 4, 2018, at which time West terminated LegalEase's access to Westlaw®.

34.     The Terms and Conditions govern LegalEase's use of Westlaw®. Throughout the entirety of the parties' relationship, West granted to LegalEase "a non-exclusive, non-transferable, limited license to [LegalEase] to use the product in [their] ordering document in the regular course of [LegalEase's] business."  West expressly "maintain[s] all rights of ownership to [its] products."

35.     LegalEase's use of Westlaw® was expressly restricted in a number of ways, including by the following terms of the Subscription Agreement:

> Section 1(d). You may not sell, sublicense, distributed,
> display, store or transfer our product or any data in our

8

products in bulk or in any way that could be used to replace or substitute for our products in whole or in part or as a component of any material offered for sale, license or distribution to the third parties. You may not use any means to discern the source code of our products.

Section 1(e). Your access to certain products is password protected. You are responsible for assigning the passwords and maintaining password security. Sharing passwords is strictly prohibited.

Section 1(f). You may not run or install any computer software or hardware on our products or network or introduce any spyware, malware, viruses, Trojan horses, backdoors or other software exploits.

36.     The Subscription Agreement maintained the confidentiality and proprietary nature of Westlaw® by including a:

a.  Strict prohibition from sharing Westlaw® passwords;

b.  Strict prohibition from selling, sublicensing, distributing, displaying, storing or transferring West information in bulk or in any way that could be used to replace or substitute West products in whole or in part or as a component of any material offered for sale, license or distribution to third parties; and

c.  Strict prohibition from running or installing any computer software or hardware on West products or networks or introducing any other software or technical exploits.

37.     Section 12 of the Terms and Conditions provides that LegalEase "may not assign the agreement to anyone else without our prior written consent."

9

38.     Section 10 of the Terms and Conditions grants West the discretion to suspend or limit LegalEase's access to Westlaw® in the event LegalEase materially breaches its obligations under the Subscription Agreement.  Pursuant to the express terms of Section 10(f) of the Terms and Conditions, all licenses granted by West to LegalEase ended immediately upon West's termination of the Subscription Agreement.

39.     By letter dated January 4, 2018, West terminated LegalEase's Subscription Agreement due to material breach and violation of the Subscription Agreement.  The effective date of West's termination was January 17, 2018.  As such, LegalEase's limited license to Westlaw® terminated on January 17, 2018.

<u>LegalEase Materially Violated the Subscription Agreement</u>

40.     During most of LegalEase's approximately nine-year license agreement with West, LegalEase maintained a generally consistent number of monthly Westlaw® transactions.  On average, during the period January, 2013 to June, 2017, LegalEase conducted approximately 6,000 Westlaw® transactions per month.

41.     During the period January, 2017 to January, 2018, LegalEase was charged approximately $60,000 pursuant to the Subscription Agreement, which includes its monthly charge as well as fees in connection with LegalEase's access to Westlaw® information that was not included in LegalEase's limited license.

42.     Beginning in July, 2017, LegalEase's Westlaw® usage increased dramatically.  LegalEase's monthly transactions peaked in November, 2017 at 236,000 transactions within a single month.  In comparison, the average "AmLaw 100" law firm averages 52,000 Westlaw® transactions per month.  See Figure A.

Figure A - LegalEase's Westlaw® Usage



43.     This inexplicable and sudden increase in monthly transactions prompted West to examine LegalEase's Westlaw® usage in greater detail.

44.     Between 2008 and 2015, LegalEase had licensed between two and eight Westlaw® passwords pursuant to the Subscription Agreement.  In August, 2017, LegalEase expanded its limited license to 20 Westlaw® passwords.  In September, 2017, LegalEase expanded its limited license to 40 Westlaw® passwords.  In October, 2017, LegalEase expanded its limited license to 50 Westlaw® passwords.

45.     Despite this increase in the number of passwords, LegalEase engaged in sharing Westlaw® passwords in violation of the Subscription Agreement. Although West had warned LegalEase about this prohibited activity, LegalEase did not stop this improper practice of password sharing.

46.     Certain LegalEase passwords were used in October, November, and December of 2017 to access large amounts of Westlaw® information, and, at times, certain users accessed Westlaw® information for longer than 24 hours in a single session. Exemplary information is below in Figure B.

11

Figure B – LegalEase's Westlaw® Usage for Particular Users

| User | Month | Avg. Hours per Business Day | Longest Access Hrs/Day |
|------|-------|------------------------------|------------------------|
| User A | 10/2017 | 9.97 | 19.34 |
| User B | 10/2017 | 9.49 | 22.85 |
| User C | 10/2017 | 11.67 | 23.87 |
| User D | 11/2017 | 17.23 | 22.47 |
| User E | 11/2017 | 15.32 | 21.97 |
| User F | 11/2017 | 18.48 | 33.87 |
| User G | 12/1-15/2017 | 17.63 | 27.95 |
| User H | 12/1-15/2017 | 16.08 | 23.66 |
| User I | 12/1-15/2017 | 18.17 | 23.22 |

Upon information and belief, Westlaw® usage for certain days by, at least, Users A–I (above), was possible only through the sharing of passwords between individuals or concurrent usage by an automated process, machine, software, or "bot." Through these Westlaw® sessions alone, LegalEase accessed substantially more than $75,000 of Westlaw® information.

47.     Upon information and belief, LegalEase's usage patterns from July, 2017 through January 4, 2018 are also indicative of the use of computer software or a "bot" to access Westlaw® information, in violation of the Subscription Agreement. Further, upon information and belief, this Westlaw® information was bulk "scraped" by LegalEase, in violation of the Subscription Agreement.

48.     For example, between October 1, 2017 and November 21, 2017, the user named "LegalEase8" accessed more than 8,200 Westlaw® documents. "LegalEase8's" access to each document lasted for less than 30 seconds; no document

12

was accessed using Westlaw®'s Search feature; no documents were printed, downloaded, or e-mailed using Westlaw®'s features for doing so.

49.    Upon information and belief, "LegalEase8's" activity cannot be performed by a single human password holder and indicates that computer software, an automated process or machine, or a "bot" was utilized to access protected and proprietary Westlaw® information.  For example, for six of "LegalEase8's" Westlaw® sessions:

      a.    Each Westlaw® session lasted between two and a half hours and approximately four hours;

      b.    Each Westlaw® session involved the viewing of approximately 1,000 documents, with the fewest number of views being 916 documents and the highest number of views being 1,490 documents;

      c.    During each Westlaw® session, each document was accessed for only approximately 10 seconds at a time; and

      d.    None of its Westlaw® sessions resulted in the printing or downloading of a single document.

See Figure C.

Figure C – "LegalEase8" Sessions

| Details | 10/30/17 | 11/2/17 | 11/3/17 (1) | 11/3/17 (2) | 11/5/17 | 11/15/17 |
|---|---|---|---|---|---|---|
| Duration (hrs:min) | 2:50 | 3:15 | 3:12 | 4:01 | 2:47 | 4:16 |
| # of Doc Views | 1,042 | 1,150 | 1,150 | 1,490 | 916 | 1,352 |
| Average Doc View Length | ~10 secs | ~10 secs | ~10 secs | ~10 secs | ~10 secs | ~10 secs |
| Downloads | 0 | 0 | 0 | 0 | 0 | 0 |
| Prints | 0 | 0 | 0 | 0 | 0 | 0 |

Exact same document view sequence in both sessions

50.     The activity in each of these six sessions followed an identical or a consistent pattern. Specifically, in these sessions, "LegalEase8" first browsed to Westlaw®'s West Key Numbers. Next, "LegalEase8" selected a Key Number of interest. "LegalEase8" then selected a West Key Number sub-section of interest. Finally, "LegalEase8" would run a search for all cases in that West Key Number sub-section without using any search terms.

51.     LegalEase8" would then view the West Key Number search results in an identical pattern, including viewing a case in the results list, then viewing each document cited in the paragraph of the case associated with the searched key number sub-section, the list of cases citing the headnote associated with the searched key number sub-section, and the first twenty cases in that list of cases. "LegalEase8" would then repeat the process for the next case in the results list.

52.     Upon information and belief, based on the characteristics of these exemplary sessions identified in Figures B and C -- including, the length of the sessions, with some being longer than 24 hours at a time, the high number of documents viewed, the limited viewing time of each document, the same pattern of usage, and the failure to download or print a single document -- LegalEase employed computer software, a "bot," or some other automated electronic method or browser plug-in to rapidly access Westlaw®'s information, and simultaneously scrape, copy, or otherwise store the Westlaw® information accessed.

53.     LegalEase's password sharing directly and materially violated the Subscription Agreement, including, but not limited to, Section 1 of the Terms and Conditions.

54.     As a result of LegalEase's actions, West sent LegalEase's President and Co-Founder Tariq Hafeez a letter on January 4, 2018 terminating the Subscription Agreement, which was effective on January 17, 2018.

55.     LegalEase has not denied materially breaching the Subscription Agreement.

56.     Upon information and belief, LegalEase was copying, storing, and then transferring and/or selling West's information, which had been accessed and acquired in violation of the Subscription Agreement, to its machine learning customer for use in developing another legal research product.  The Subscription Agreement expressly restricts LegalEase from selling, sublicensing, distributing, displaying, storing, or transferring Westlaw® material.

57.     Upon information and belief, LegalEase and its machine-learning customer continue to possess and store Westlaw® information that LegalEase acquired in violation of the Subscription Agreement.

## COUNT I
(Breach of Contract)

58.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 57 as though fully set forth herein.

59.     The Subscription Agreement, consisting of the West ProFlex Order Form and the Terms and Conditions (and all prior iterations of said order forms and terms and conditions), which are incorporated by reference therein, is a valid and binding contract.

60.     West fully performed its obligations under the Subscription Agreement.

61.     LegalEase breached the Subscription Agreement by, at least:

a.  sharing passwords with unauthorized users; and

b.  utilizing an automated method or browser plug-in to scrape Westlaw® information, including in bulk.

62.     LegalEase continues to possess, store, and otherwise have access to Westlaw® material that it acquired in violation of the Subscription Agreement.

63.     As a direct and proximate cause of LegalEase's breach, West has suffered, and will continue to suffer, damages in an amount to be determined at trial, including, but not limited to, LegalEase's violative access of Westlaw® and Westlaw® information valued in the millions.

16

64.     As a result of LegalEase's breach, West is entitled to injunctive relief enjoining LegalEase from accessing, using, storing, selling, or transferring any information that it acquired from Westlaw® in violation of the Subscription Agreement.

65.     West is further entitled to specific performance of the Subscription Agreement.

## JURY DEMAND

West requests a jury on all claims triable by jury.


WHEREFORE, Plaintiff respectfully requests that this Court:

i.      Enter judgment in favor of West and against LegalEase on West's claims;

ii.     Award damages to West in an amount to be determined at trial against LegalEase;

iii.    Permanently enjoin LegalEase from accessing, using, selling, or transferring any information that it acquired from Westlaw® in violation of the Subscription Agreement;

iv.     Award West reasonable attorneys' fees and costs against LegalEase; and

v.      Award such other relief as the Court deems just and proper.

Dated:  May 25, 2018                    Respectfully submitted,


                                        s/Lora Mitchell Friedemann
                                        Lora Mitchell Friedemann (#0259615)
Scott T. Lashway (pro hac vice          Fredrikson & Byron, P.A.
   application to be filed)              200 South Sixth Street, Ste. 4000
Benjamin A. Stern (pro hac vice         Minneapolis, MN 55402
   application to be filed)              (612) 492-7185
Holland & Knight LLP                    lfriedemann@fredlaw.com
10 Saint James Avenue
Boston, MA 02116
(617) 523-2700
Scott.Lashway@hklaw.com                 Attorneys for West Publishing
Benjamin.Stern@hklaw.com                Corporation


64072363.1

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
WEST PUBLISHING CORPORATION

### DEFENDANTS
LEGALEASE SOLUTIONS, LLC

**(b)** County of Residence of First Listed Plaintiff    Dakota
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Washtenaw County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lora M. Friedemann (259615)
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                            *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury  - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332(a) and (c)
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $   In excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
05/25/2018

SIGNATURE OF ATTORNEY OF RECORD
s/Lora M. Friedemann

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use
 **(b)**  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the
 **(c)**  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting
in this section "(see attachment)".

**II.**  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X"
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the
citizenship of the different parties must be checked**.  (See Section III below**; **NOTE: federal question actions take precedence over diversity
cases.**)

**III.**  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this
section for each principal party.

**IV.**  **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code
that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or
multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to
changes in statue.

**VI.**  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional
statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket
numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

EXHIBIT 41

**In the Matter Of:**

*West Publishing Corporation vs.*

*LegalEase Solutions, LLC*

---

*Volume I*

# Christopher Cahn

*February 18, 2020*

---



DORIS O. WONG
ASSOCIATES, INC.

COURT REPORTERS

50 Franklin St. Boston, MA 02110
Phone (617) 426-2432

**West Publishing Corporation vs.**
**LegalEase Solutions, LLC**

**Christopher Cahn**
**February 18, 2020**

---

**Page 1**

Volume I

Pages 1 to 142

Exhibits 1 to 11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - -x

WEST PUBLISHING CORPORATION, :

    Plaintiff/      :

    Counterclaim-Defendant,:

v.            : CIVIL ACTION No.

LEGALEASE SOLUTIONS, LLC,  : 18-CV-01445 (DSD/ECW)

    Defendant/      :

    Counterclaim-Plaintiff.:

- - - - - - - - - - - - - - -x

Deposition of CHRISTOPHER CAHN

Washington, D.C.

Tuesday, February 18, 2020

11:06 a.m.

Reported by: Cassandra E. Ellis, RPR

---

**Page 2**

Deposition of CHRISTOPHER CAHN, held at the

offices of Manatt Phelps & Phillips, LLP, 1050

Connecticut Avenue, Northwest, Washington, D.C.

20036, pursuant to agreement, before Cassandra E.

Ellis, Certified Court Reporter - Virginia,

Certified Court Reporter - Washington, Certified

Shorthand Reporter - Hawaii, Registered Professional

Reporter, and Notary Public of The District of

Columbia.

---

**Page 3**

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

    CHRISTOPHER A. LISY, ESQUIRE

    MANATT, PHELPS & PHILLIPS, LLP

    177 Huntington Avenue

    Boston, Massachusetts  02115

    (617) 646-1408

    Clisy@manatt.com

    KAYLEE COX BANKSTON, ESQUIRE

    1050 Connecticut Avenue, Northwest

    Suite 600

    Washington, D.C.  20036

    (202) 585-6521

    Kbankston@manatt.com

ON BEHALF OF DEFENDANT:

    AMANDA CEFALU, ESQUIRE

    KUTAK ROCK

    60 South Sixth Street, Suite 3400

    Minneapolis, Minnesota 55402

    (612) 334-5026

    Amanda.cefalu@kutakrock.com

---

**Page 4**

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF THE DEPONENT:

    TEJ R. PARANJPE, ESQUIRE

    PARANJPE, MAHADASS & RUEMKE, LLP

    3701 Kirby, Suite 530

    Houston, Texas  77098

    (832) 667-7700

    Tparanjpe@pandmllp.com

ALSO PRESENT:  AVANI GOSSAI, Morae Global

---

Doris O. Wong Associates, Inc.
www.doriswong.com   (617) 426-2432

TR-0039949

**West Publishing Corporation vs.**
**LegalEase Solutions, LLC**

**Christopher Cahn**
**February 18, 2020**

Page 5

1        C O N T E N T S
2   EXAMINATION OF CHRISTOPHER CAHN          PAGE
3      By Mr. Lisy                              7
4
5
6
7        E X H I B I T S
8        (Attached to the Transcript)

9   CHRISTOPHER CAHN Deposition Exhibit      PAGE
10  Exhibit 1   Subpoena to Testify at a       15
11     Deposition in a Civil Action To: Morae
12     Global Corporation
13  Exhibit 2   September 8, 2017 E-mail Bates  24
14     Stamped MORAE_00003043-054
15  Exhibit 3   November 2, 2017 E-mail Bates   33
16     Stamped MORAE_00012752-759
17  Exhibit 4   October 12, 2017 E-mail Bates   80
18     Stamped MORAE_00027348
19  Exhibit 5   October 22, 2017 E-mail Bates   82
20     Stamped MORAE_00030402-403
21  Exhibit 6   December 6, 2017 E-mail Bates   88
22     Stamped MORAE_00024156-157
23  Exhibit 7   January 3, 2018 E-mail Bates    91
24     Stamped MORAE_00024140

Page 6

1        E X H I B I T S
2        (Attached to the Transcript)

3   CHRISTOPHER CAHN Deposition Exhibit      PAGE
4   Exhibit 8   December 6, 2017 E-mail Bates   96
5      Stamped MORAE_00011684-718
6   Exhibit 9   October 17, 2017 E-mail Bates  108
7      Stamped MORAE_00024599-609
8   Exhibit 10  December 6, 2017 E-mail Bates  118
9      Stamped MORAE_00002677-681
10  Exhibit 11  April 9, 2018 E-mail Bates     124
11     Stamped MORAE_00024117-119
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1        P R O C E E D I N G S
2            CHRISTOPHER CAHN
3   having been first duly sworn, testified as follows:
4            EXAMINATION
5   BY MR. LISY:
6      Q.   Good morning, sir.
7      **A.   Good morning.**
8      Q.   My name is Christopher Lisy, I represent
9   the plaintiff, West Publishing Company, in this
10  action.
11          Are you ready to proceed this morning?
12     **A.   I am.**
13     Q.   Would you please state your name, hometown
14  address and business address, for the record,
15  please?
16     **A.   Christopher Cahn, 1421 Cutter Mill Court,**
17  **Herndon, Virginia  20170.  I have to look up the**
18  **business address.  Business address, 901 North**
19  **Stuart Street, Suite 404, Arlington, Virginia**
20  **22203.**
21     Q.   Who do you work for?
22     **A.   Morae Global.**
23     Q.   And what's your position with Morae Global?
24     **A.   Managing director, currently.**

Page 8

1      Q.   Are you familiar with the underlying
2   lawsuit that you're here to testify in connection
3   with?
4      **A.   Yes.**
5      Q.   What's your understanding of that lawsuit,
6   generally?
7      **A.   That Westlaw is seeking to recover damages**
8   **from LegalEase for inappropriate use of Westlaw.**
9      Q.   Have you read any court filings in the
10  underlying lawsuit?
11     **A.   The request for production.**
12     Q.   Have you read the complaint or the answer?
13     **A.   I don't believe so.**
14     Q.   Have you had any conversations, either
15  written or oral, with anyone at LegalEase about the
16  lawsuit?
17     **A.   No.**
18     Q.   Other than your counsel -- and we'll get to
19  that in a minute -- have you had any conversations
20  with anyone else about the lawsuit?
21     **A.   Perhaps -- well, not -- not that I recall.**
22     Q.   And when I'm using the word "conversations"
23  in my question I'm meaning it as broadly as
24  possible, either written communications or oral

TR-0039950

**Page 49**

1    Q.   At a high level it describes what LegalEase
2    expected the deliverables to contain and, generally
3    speaking, how they ought to be formatted; right?
4        **A.   Not the -- not necessarily the formatting,**
5    **but the content, yes.**
6        Q.   Okay.  Fair enough.
7             We can go through these one at a time,
8    and -- and we probably will, but before we do that,
9    could you walk me through the process, in your
10   words, about how one of these memos would be
11   prepared --
12       **A.   Sure.**
13       Q.   -- by Morae workers for LegalEase?
14       **A.   Yes.  LegalEase would assign Morae certain**
15   **key site topics, and then Morae would be expected to**
16   **go through the head notes from each key site, that**
17   **the team would log into Westlaw, they would**
18   **formulate a question based on the head note, convert**
19   **that and enter that into Microsoft Word, and then**
20   **find paragraphs from cases that would answer the**
21   **question in accordance with the -- the directives**
22   **that you have there that you've referred to within**
23   **the SOW.  And then those would be formatted**
24   **according to LegalEase instruction.**

**Page 50**

1    Q.   So the memo, correct me if I get any of
2    this wrong, the memo that Morae was providing
3    contained a question setting forth a legal issue;
4    right?
5        **A.   Yes.**
6        Q.   And -- and there were, at least under this
7    project, roughly 28,000 questions that were
8    answered?
9        **A.   Roughly.**
10       Q.   All right.  And the question could be in a
11   variety of different legal subject areas; right?
12       **A.   That's correct.**
13       Q.   I don't want to take an attempt at making a
14   question up, but it might be something like what --
15   what's the maximum penalty for assault and battery
16   or something like that?
17       **A.   It could be.**
18       Q.   Is that a fair approximation of what a
19   question would be?
20       **A.   Yes.**
21       Q.   And I think I saw on some of the materials
22   that another question would be:  Are oil and gas
23   leases a certain kind of contract; right?  Is that
24   generally the sort of question that was being

**Page 51**

1    addressed in these legal memos?
2        **A.   Could be.**
3        Q.   Okay.  So there is a legal question, and
4    who provides the question, LegalEase, Morae or
5    somebody else?
6        **A.   Morae would -- would craft them.**
7        Q.   Okay.  What would Morae use to craft the
8    questions?
9        **A.   The head notes in Westlaw.**
10       Q.   Was there any guidance provided by
11   LegalEase as to what the questions ought to be?
12       **A.   Yes.**
13       Q.   And what guidance was that?
14       **A.   We received a document on best practices**
15   **for the engagement.**
16       Q.   And we'll talk about that in a little bit.
17            Did LegalEase provide any substantive --
18   let me withdraw that.
19            Did LegalEase provide any guidance about
20   what the substantive areas of law should be that the
21   questions related to?
22       **A.   Yes.**
23       Q.   And generally, what were those?
24       **A.   I don't recall, specifically.**

**Page 52**

1    Q.   Was it a range of legal topics?
2        **A.   Yes.**
3        Q.   Again, sort of making this up, but it might
4    be admiralty law, environmental law, criminal law,
5    appellate procedure, things like that?
6        **A.   That's correct.**
7        Q.   Roughly?
8             Subject to the guidance that LegalEase
9    provided, did the Morae team have discretion to
10   generate the questions for the memos?
11       **A.   Yes.**
12       Q.   And you mentioned that the memo questions
13   were generated using the West head notes; is that
14   right?
15       **A.   Correct.**
16       Q.   And how would that be done?
17       **A.   Someone would read the head note and then**
18   **think of a question that a human might ask in**
19   **natural language.**
20       Q.   Sticking with my perhaps imperfect example
21   from earlier, if the head note were to read:  The
22   maximum sentence for assault and battery is 20 years
23   in prison, someone on the Morae team might look at
24   that head note and formulate it into a natural

Page 53

1  language question along the lines of:  What is the
2  maximum sentence for assault and battery?
3      A.   That's correct.
4      Q.   Is that a fair approximation of how it
5  would work?
6      A.   Yes.
7      Q.   You also mentioned earlier in your answer,
8  the Morae team using the West key site feature; is
9  that right?
10     A.   That is -- that's correct.
11     Q.   How -- how would that work?
12     A.   That's how the topics were assigned to us
13  by LegalEase.
14     Q.   Sticking with my example from before,
15  maritime, environmental, criminal, LegalEase would
16  say:  Somebody from Morae is assigned maritime, and
17  then someone at Morae would look at all of the
18  maritime head notes and generate the questions that
19  we're talking about?
20     A.   That's correct.
21     Q.   Once the question was generated, what
22  happened next, what did the Morae team do next?
23     A.   Then quotes would be inserted underneath
24  the question providing examples from cases answering

Page 54

1  the question.
2      Q.   How would those cases be located by the
3  Morae team?
4      A.   They would go through Westlaw.
5      Q.   Go through the head note feature of
6  Westlaw?
7      A.   The head note or the related cases.
8      Q.   So sticking with my example, we've now got
9  the question of what's the maximum sentence for
10  assault and battery, someone on the Morae team who
11  was assigned to that question or assigned to that
12  memo would go through the head note feature or
13  related case feature on Westlaw and identify cases
14  that answer that question; right?
15     A.   Yes.
16     Q.   And if a case answered that question saying
17  the maximum sentence for assault and battery is 20
18  years that case might be a candidate for a quote in
19  the memo that was being prepared to answer that
20  question; right?
21     A.   It could be.
22     Q.   And if we look here, back on page 12756,
23  this -- these provisions walk us through how cases
24  might be used to answer that question; right?  It's

Page 55

1  a -- let me just try to formulate the question here.
2         Take a look at 3.5, that refers to three or
3  four quotes in each memo shall contain either a good
4  or great independent answer to the legal research
5  question; do you see that?
6      A.   I do.
7      Q.   That sets out the content of the memo and
8  the quality of cases that would be used to answer
9  the legal question; right?
10     A.   In part.
11     Q.   In part, right.  And the rest of the part
12  is set forth in the successive paragraphs that talk
13  about in addition to good or great quotes topical
14  and irrelevant responses, as well; right?
15     A.   That's correct.
16     Q.   And what was the point of having questions
17  answered by good or great cases but also answered by
18  irrelevant responses?  Why would you include an
19  irrelevant response in a memo asking a legal
20  question?
21     A.   I don't know for certain.
22     Q.   Do you know generally?
23     A.   It was being provided to Ross, so generally
24  I would assume they had a use for it.

Page 56

1      Q.   And -- and the use was that Ross was using
2  it to train its artificial intelligence to sift good
3  responses from bad response; right?
4      A.   I think that's fair.
5      Q.   And so in order to improve the quality of
6  the Ross legal research you would want the computer
7  to know what someone thought was a good answer and
8  what someone thought was a bad answer and what
9  somebody thought was an irrelevant answer; right?
10     A.   Potentially.
11     Q.   Is that your understanding?
12     A.   Yes.
13     Q.   Let's look to paragraph five here, that --
14  that says:  Production delivery schedule; do you see
15  that?
16     A.   I do.
17     Q.   This refers to the subcontractor, which is
18  Morae, will begin providing deliverables on October
19  6th, 2017; do you see that?
20     A.   I do.
21     Q.   And that was the day after the execution of
22  this contract; right?  Correct?
23     A.   That's correct.
24     Q.   And did Morae, in fact, begin providing

Page 61

1    Q.   Who had those discussions?
2    A.   I believe it was -- it -- that varied over
3    time.  Initially, it would have been Joy Saphla,
4    Chad Fennel and myself, from Morae.  And on the
5    LegalEase side, Teri Whitehead and Tariq, and you'll
6    have to forgive me, I don't remember if it was Tariq
7    Hafeez or Tariq Akbar.
8    Q.   When the table title says price per memo
9    Westlaw provided LegalEase, does it -- is what it's
10   trying to say there, maybe a little more clearly,
11   price per memo, when the Westlaw license is provided
12   by LegalEase?
13   A.   Yes.
14   Q.   Okay.  And so there was a discussion
15   between LegalEase and Morae about who was going to
16   procure the Westlaw credentials, and it was
17   ultimately decided that LegalEase was going to
18   provide the Westlaw credentials to Morae; correct?
19   A.   That's -- that's correct.
20   Q.   And Morae undertook to explore whether it
21   could obtain its own Westlaw credentials; right?
22   A.   We did.
23   Q.   And ultimately it was decided at Morae not
24   to do that; right?

Page 62

1    A.   That's correct.
2    Q.   And what was the reason that that decision
3    was made?
4    A.   I believe it was because the -- the term of
5    the LegalEase -- of the Westlaw license was too
6    long.
7    Q.   The duration of the Westlaw license was too
8    long?
9    A.   Yes.
10   Q.   Westlaw wanted the license to be for a year
11   and LegalEase -- excuse me -- Morae wanted it to be
12   for some duration less than a year?
13   A.   That's correct.
14   Q.   And let's assume that Morae had procured
15   Westlaw credentials on its own, would the price per
16   memo that LegalEase paid to Morae have been higher
17   or lower?
18   A.   It would have been higher.
19   Q.   Okay.  And that would have been to cover
20   the cost that Morae would have had to pay for its
21   Westlaw credentials?
22   A.   That's correct.
23   Q.   Instead, what happened was that LegalEase
24   provided Westlaw credentials and, thus, Morae didn't

Page 63

1    have to go out and get its own?
2    A.   Correct.
3    Q.   I think earlier you told me that there were
4    roughly 28,000 memos that Morae provided to
5    LegalEase; is that right?
6    A.   Yes.
7    Q.   And my rudimentary math tells me that
8    that -- using an average price of 11 or -- 10 or 11
9    dollars a contract -- or memo, excuse me.  Let me
10   start that over.
11        Is the total value of this contract with
12   28,000 memos roughly 250 to 300 thousand dollars,
13   somewhere in that general ballpark?
14   A.   At maximum value.
15   Q.   Was it somewhat less than that that Morae
16   collected?
17   A.   Yes.
18   Q.   And that's the outstanding fee dispute that
19   we talked about earlier today?
20   A.   In part.
21   Q.   Okay.  Why in part?
22   A.   Because there was -- there were also
23   certain memos that LegalEase did not -- basically
24   put on hold, for quality reasons, that was deducted

Page 64

1    from that total.
2    Q.   And so if the memos that Morae provided
3    didn't meet LegalEase's quality standards there was
4    some lesser amount or perhaps no amount of payment
5    for those memos?
6    A.   Correct.
7    Q.   Was there also a volume discount that Morae
8    was going to provide?
9    A.   Correct.
10   Q.   Do you recall where the break point was for
11   that volume discount?
12   A.   On page Morae 00012758, sub 9, 5 percent
13   for any memo purchased over 15,000 and 10 percent
14   for any total order over 30,000.
15   Q.   And the 28,000 memos falls in between that,
16   so there would have been a roughly five percent
17   discount off of the prices on the preceding page?
18   A.   Yes, that's my understanding.
19   Q.   Did Morae calculate what its profit would
20   be under this contract?
21   A.   I'm sure we did.
22   Q.   Do you know what that profit was?
23   A.   I don't recall.
24   Q.   Or the profit margin?

TR-0039964

West Publishing Corporation vs.
LegalEase Solutions, LLC

Christopher Cahn
February 18, 2020

Page 65

1    A.   I don't recall.
2    Q.   Let's look ahead on the next page, to
3    paragraph or provision number 11, which is titled:
4    Delivery.  And that provision reads:
5    Subcontractor -- which is Morae -- shall deliver
6    daily batched memos on the Box site as provided by
7    LegalEase or in any other manner by LegalEase in
8    equal increments per production; do you see that
9    text?
10   A.   I do.
11   Q.   And this provision is meant to address how
12   Morae would provide the deliverable memos to
13   LegalEase; right?
14   A.   That's correct.
15   Q.   Did it happen in practice that Morae loaded
16   the memos onto a Box site such that LegalEase could
17   access them?
18   A.   Yes.
19   Q.   Do you recall what Box site, in particular?
20   A.   LegalEase's Box site.
21   Q.   LegalEase made a site available for Morae
22   to upload the memos?
23   A.   That's correct.
24   Q.   And what was the physical process by which

Page 66

1    the memos made their way onto the LegalEase Box
2    site, was it manual, was it automated, how did that
3    happen?
4    A.   It was manual.
5    Q.   And who was responsible for uploading those
6    memos?
7    A.   I think, usually, I did it, but there may
8    have been others.
9    Q.   Where were the documents or the memos
10   stored at Morae, such that you would access them and
11   load them up onto the LegalEase Box site?
12   A.   Immediately prior to the transfer they
13   would have been on my hard drive.
14   Q.   How did they get to your hard drive?
15   A.   Through a share point, a share point site,
16   and I downloaded them.
17   Q.   Who was responsible at Morae for collecting
18   or aggregating the memos as they were completed by
19   the Morae workers?
20   A.   The individual -- the project manager in
21   the individual location, and then I was the final --
22   final point of aggregation.
23   Q.   Well, with what frequency did you upload
24   the completed memos to the LegalEase Box site?

Page 67

1    A.   Typically, daily.
2    Q.   And roughly what volume of memos were you
3    uploading daily?
4    A.   That varied dramatically over time.
5    Q.   What was the low and what was the high
6    point?
7    A.   The high -- the low was probably five, the
8    high several hundred.
9    Q.   Where do those memos reside now at Morae,
10   if anywhere?
11   A.   On our relativity instance, still in my
12   hard drive, and I believe still on the share point
13   site.
14   Q.   Relativity is a document review and
15   document management platform?
16   A.   It is.
17   Q.   And you think the memos exist there, on
18   your hard drive, and on a share point site?
19   A.   Yes.
20   Q.   Have all of those memos been produced
21   pursuant to the subpoena that was issued to Morae?
22   A.   To the best of my knowledge.
23   Q.   Did -- what role did you have, if any, in
24   producing documents in connection with the subpoena?

Page 68

1    A.   Providing the documents that were in my
2    possession.
3    Q.   Did you physically or manually collect
4    those documents that were on your hard drive?
5    A.   Yes.
6    Q.   And you provided those to counsel?
7    A.   I did.
8    Q.   To the best of your knowledge, you captured
9    all of the memos that were on your hard drive?
10   A.   Yes.
11   Q.   Did you look at the relativity site or at
12   the share point site to see if there were any memos
13   there that weren't on your hard drive?
14   A.   No, I did not do that.
15   Q.   Do you know if anybody did that?
16   A.   No.
17   Q.   Nobody did that or you don't know if anyone
18   did?
19   A.   I don't know if anyone did that.
20   Q.   Can you think of anywhere else, other than
21   those three locations, that memos might exist at
22   Morae?
23   A.   They could have -- they could have existed
24   on hard drives of other team members.

TR-0039965

**Page 141**

```
 1           SUGGESTED CORRECTIONS
 2  RE:  West Publishing Corporation vs. LegalEase Solutions, LLC.
 3  WITNESS:  Christopher Cahn, Vol. I
 4  The above-named witness wishes to make the following
    changes to the testimony as originally given:
 5
 6  PAGE  LINE      SHOULD READ            REASON
 7  ____  ____  _____  _____
 8  ____  ____  _____  _____
 9  ____  ____  _____  _____
10  ____  ____  _____  _____
11  ____  ____  _____  _____
12  ____  ____  _____  _____
13  ____  ____  _____  _____
14  ____  ____  _____  _____
15  ____  ____  _____  _____
16  ____  ____  _____  _____
17  ____  ____  _____  _____
18  ____  ____  _____  _____
19  ____  ____  _____  _____
20  ____  ____  _____  _____
21  ____  ____  _____  _____
22  ____  ____  _____  _____
23  ____  ____  _____  _____
24  ____  ____  _____  _____
```

DISCLAIMER

This transcript in any format is a confidential

communication between Doris O. Wong Associates,

Inc., a professional court reporting firm, and the

parties to this matter and their counsel.  Any

reproduction or distribution of this transcript

without the express permission of the parties is a

violation of this confidentiality.  To fulfill any

request to the court reporter for an additional copy

or copies from persons or entities without standing

in this matter will require the consent of the

parties and/or counsel and/or a court order for such

delivery.

**Page 142**

```
 1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2      I, Cassandra E. Ellis, Registered Professional
 3  Reporter and Notary Public, the officer before whom
 4  the foregoing proceedings were taken, do hereby
 5  certify that the foregoing transcript is a true and
 6  correct record of the proceedings; that said
 7  proceedings were taken by me stenographically and
 8  thereafter reduced to typewriting under my
 9  supervision; and that I am neither counsel for,
10  related to, nor employed by any of the parties to
11  this case and have no interest, financial or
12  otherwise, in its outcome.
13      IN WITNESS WHEREOF, I have hereunto set my hand
14  and affixed my signature this 2nd day of March 2020.
15  My commission expires:
16  December 14, 2023
17
18    Cassandra E. Ellis, CSR
19
20  _____
21  CASSANDRA E. ELLIS, CSR-HI, CSR-VA, CCR-WA, CLR, RPR
22  REALTIME SYSTEMS ADMINISTRATOR
23  NOTARY PUBLIC IN AND FOR THE DISTRICT OF COLUMBIA
24
```

# EXHIBIT 42

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 43

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY