# EXHIBIT 104

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE
CENTRE GMBH and WEST PUBLISHING
CORPORATION,

Plaintiffs,

v.

ROSS INTELLIGENCE INC.,
Defendant.

1:20-cv-00613-SB

**CONFIDENTIAL, HIGHLY
CONFIDENTIAL – ATTORNEYS' EYES
ONLY**

**REBUTTAL OF KREIN EXPERT WITNESS REPORT
L. KARL BRANTING, J.D., Ph.D.**

**I.    INTRODUCTION**..........................................................................................................1

**II.   INFORMATION CONSIDERED** .................................................................................1

**III.  SUMMARY OF OPINIONS** ........................................................................................2

**IV.   DETAILED REBUTTAL OF THE KREIN REPORT** ................................................3

## I.    I NTRODUCTION

██    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██    ████████████████████████████████

████████████████████████████████████████

██████████████████████████████

## II.    I NFORMATION C ONSIDERED

██    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

### III.   SUMMARY OF OPINIONS

■ ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

■ ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

■ ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

■ ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

■ ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

■    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

■    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

## IV.    DETAILED REBUTTAL OF THE KREIN REPORT

■    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████ █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

■    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[1] *See generally* Branting Report Ex. 7.



<sup>4</sup> Ovbiagele Deposition at 181:15, 181:22-182:9.

[redacted]

---

[6] *See e.g.*, Branting Report ¶¶ 19, 57.

[7] Krein Report, ¶ 2.

[8] *See* Frederickson-Cross Report ¶ 20 [redacted] *. Id.*

[9] *See e.g.*, Branting Report ¶¶ 50-51.

---

[10] Krein Report, ¶¶ 103-114, 143-149.

[11] Third Supplemental Response to Interrogatory No. 1, pp. 69-71.

_____

[12] *See e.g.*, Branting Report ¶ 19.

[13] *See e.g.*, *id.*

[14] Krein Report ¶ 148.



---

15 Christopher J. C. Burges, *From RankNet to LambdaRank to LambdaMART: An overview*, MSR-TR-2010-82 (June 2010), https://www.microsoft.com/en-us/research/wp-content/uploads/2016/02/MSR-TR-2010-82.pdf

16 Krein Report ¶ 135.



---

[17] Christopher J. C. Burges, *From RankNet to LambdaRank to LambdaMART: An overview*, MSR-TR-2010-82 (June 2010), https://www.microsoft.com/en-us/research/wp-content/uploads/2016/02/MSR-TR-2010-82.pdf.

[18] Krein Report paragraph 113.



<hr />

[19] Krein Report ¶ 146.

[20] Ovbiagele Depo. at 131:8-10, 16-17; 132:5, 13-15; 133:5-6.

[21] *See* Branting Report ¶¶ 27-29.

[22] ROSS-000076307 ██████████████████████

[23] LEGALEASE-00108391 ████████████████████████



---

[24] Ovbiagele Depo. at 131:8-10, 16-17; 132:5, 13-15; 133:5-6.

[25] Krein Report, ¶ 114.

[26] *See e.g.,* Krein Report, p. 1 of Appendix C.

[27] *Id.*

[28] ROSS-000076307 ███████████████████ Obviagele Depo. 132:13-15

[29] Whitehead Depo. 101:1-10, 107:6-108:9.

[30] Krein Report ¶ 103. See also Krein Report ¶ 74

BRANTING REBUTTAL OF THE EXPERT REPORT OF JONATHAN KREIN          CASE 1:20-cv-00613-SB



---

[31] Krein Report ¶ 142.

[32] ██████████████████████████████████████████████████████████████
Moulinier Deposition Transcript, at 62:14; 92:23-24, 86:12-13.

[33] Artificial Intelligence Index Report, 2021, https://aiindex.stanford.edu/wp-content/uploads/2021/03/2021-AI-Index-Report-_Chapter-1.pdf, pg. 4.

[34] Public Access to NSF-Funded Research, https://www.nsf.gov/news/special_reports/public_access/.

[35] https://ai.google/about/.

[36] https://allenai.org/.

[37] https://www.amazon.science/.

[38] The Stanford Law School CodeX Techindex, https://techindex.law.stanford.edu/.



_Luther Karl Branting_
1 September 2022

---

[39] Krein report ¶ 149.

[40] Branting Report ¶ 50.

13

# EXHIBIT 105

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) ) | C.A. No. 20-613-SB |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) ) | |

**REPLY EXPERT REPORT OF DR. JONATHAN L. KREIN**
**HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY**

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**TABLE OF CONTENTS**

1. Introduction ........................................................................................................... 1

2. Background and Expert Qualifications .................................................................. 2

3. Summary of Opinions ........................................................................................... 4

4. ███████████████ ........................................................................... 6

   4.1 ████████████████████████ ...................................... 8

   4.2 ██████████████████████████████ ....................... 15

   4.3 ██████████████████████████████ ....................... 21

5. The Leiter Rebuttal Report .................................................................................. 32

6. The Cox Rebuttal Report ..................................................................................... 35

   6.1 ████████████████████████ ...................................... 36

7. The Frederiksen-Cross Rebuttal Report ............................................................. 40

   7.1 ██████████████████████████████ ...................... 41

      7.1.1 ████████████████████████ ........................... 42

      7.1.2 ████████████████████████████ ................ 47

         7.1.2.1 ██████████████████ .............................. 47

         7.1.2.2 ████████████████ .................................. 50

         7.1.2.3 ████████████████████████ ............... 56

   7.2 ██████████████████████████ ........................... 60

   7.3 ████████████████████████████ ..................... 68

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

7.4 ███████████████████████████████████████ 76

8. Conclusion ................................................................................................87

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

## <u>APPENDICES</u>



Appendix A:    List of Materials Considered

Appendix B:

Appendix C:

Appendix D:

Appendix E:

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[1] Expert Report of Dr. Jonathan L. Krein, August 1, 2022.

[2] Expert Report of Dr. Jonathan L. Krein, September 6, 2022.

[3] Expert Report of L. Karl Branting, J.D., Ph.D., August 1, 2022.

[4] Expert Report of Barbara Frederiksen-Cross, August 1, 2022.

[5] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

[6] Expert Report of Barbara Frederiksen-Cross, September 6, 2022.

[7] Expert Report of Alan J. Cox, Ph.D., September 6, 2022.

[8] Expert Report of Richard Leiter, J.D., September 6, 2022.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[9] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶¶ 4–10.

[10] *Ibid.*

[11] *Id.*, ¶¶ 5–6.

[12] *Id.,* ¶ 7.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[13] *Id.*, ¶ 8.

[14] *Id.*, ¶ 9.

[15] *Id.*, ¶ 10.

[16] *Ibid.*

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[17] *Id.*, ¶ 11.

[18] *Ibid*.

[19] Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶ 37.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

[20] Expert Report of L. Karl Branting, J.D., Ph.D., August 1, 2022, ¶ 51.

[21] A. Arruda Dep. Tr. 275:23–276:12

(objections omitted).

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



[22] *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991)

[23] Expert Report of L. Karl Branting, J.D., Ph.D., September 1, 2022, ¶ 14

(emphasis added).

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

[24] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶ 12.

[25] *Id*., ¶ 13.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

[26] *See* https://medium.com/@AndrewArruda/hold-59effcd819b0.

[27] T. van der Heijden Dep. Tr. 136:15-136:20.

[28] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶ 12.

[29] Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶¶ 129–144.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[33] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶ 14.

[34] *Ibid*.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[35] *Id.*, ¶ 15.

[36] *See generally* Expert Report of Dr. Jonathan L. Krein, September 6, 2022.

[37] Footnote 8 of Dr. Branting's report reads: █████████████████████████

████████████████████████████████████████████████████████████████

*Id.*" Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, fn. 8.

████████████████████████████████████████████████████████████████

[38] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶ 15.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[39] *Id.*, ¶ 17.

[40] *Ibid.*

[41] *See* Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 106.

[42] *See* Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 107; R-LEGALEASE-00189134-R–LEGALEASE-00189139 (█████████████████████████████████
█████████████████████)

[43] *See* Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 113.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



[44] *See* Plaintiffs' Second Supplemental Response to ROSS' Interrogatory No. 1, March 23, 2022, pp. 33–37.

[45] *See also* Expert Report of Dr. Jonathan L. Krein, August 1, 2022, Appendix C.

[46] *See, e.g.*, T. Hafeez Dep. Tr. 66:4–17

[47] Expert Report of Dr. Jonathan L. Krein, September 6, 2022, Section 4.1.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



<hr />

[4]

Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 51.

[49] *See* LEGALEASE-00093066–LEGALEASE-00093074 (                    ); *see also* C. Cahn Dep. Tr. 159:25–160:7

; TR-0073545–TR-0073546

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



---

[50] ROSS-000177723 ▮▮▮▮▮ *see also* T. van der Heijden Dep. Tr. 347:20–22 ▮▮▮▮▮

[51] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶ 18.

[52] *Compare* TR-0179847-TR-0179854 (▮▮▮▮▮), *with*, ROSS-010128683 (▮▮▮▮▮).

[53] ROSS-003419784-ROSS-003419786 (▮▮▮▮▮).

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[54] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶¶ 24–27.

[55] *Id.*, ¶ 25.

[56] *Id.*, ¶ 26.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

[57] *Id*, ¶ 28.

[58] *See* Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 147.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



---

[59] *Id.*, ¶ 148; *see also* ROSS-003487472–ROSS-003487474 (

; ROSS-009558441–ROSS-009558443

; ROSS-009545896–ROSS-009545899

; ROSS-003704423-ROSS-003704439 (

[60] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶¶ 19–20.

[61] *Ibid*.

[62] *See* ROSS-000076307.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

[63] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶ 20.

[64] *See* ROSS-009558441–ROSS-009558443 ████████████████████████

[65] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶¶ 21–22.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

[66] *Id*., ¶ 20.

[67] *Ibid*.

[68] *Id*., ¶ 21.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

54.

---

[69] https://xkcd.com/1007/.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



---

[70] https://online.stat.psu.edu/stat501/lesson/12/12.8.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[71] Expert Report of L. Karl Branting, J.D., Ph.D., September 6, 2022, ¶¶ 20.

[72] *Id.*, ¶ 22.

[73] *Ibid.*

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



[74] *Id.*, ¶ 23

[75] *Ibid.*

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[78] Expert Report of Richard Leiter, J.D., September 6, 2022, ¶¶ 1, 6.

[79] *Id.*, ¶ 6.

[80] Expert Report of Richard Leiter, J.D., September 6, 2022, ¶ 20.

[81] *See* Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶¶ 71–72; *see also* TR-0179838-TR-0179842 (█████████████████████████); TR-0179830- TR-0179837 (████████████████████████ TR-0432528-TR-0432533 (███████████████); TR-0002864–TR-0003137 (███████████████ Plaintiffs' Second Supplemental Response to ROSS's Interrogatory No. 1, March 23, 2022, p. 9; L. Oliver Dep. Tr., pp. 198-211, 340-341.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



---

[82] *Ibid.*

[83] *Ibid.*

[84] *See Broad. Music, Inc. v. Moor-Law, Inc.*, 484 F. Supp. 357, 362–63 (D. Del. 1980); *see also Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 294 (3d Cir. 1991).

[85] C. Cahn Dep. Tr. 161:10-161:23

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[86] Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶¶ 28–32.

[87] Expert Report of Richard Leiter, J.D., September 6, 2022, ¶ 13.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[88] A full list of Bulk Memos with filenames corresponding to the WKNS Digest Topics is attached hereto as Appendix B.

[89] Expert Report of Alan J. Cox, Ph.D., September 6, 2022, ¶ 15.

[90] *Ibid*.

[91] *Ibid*.

[92] *Ibid*.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



---

93 *Ibid*.

94 Expert Reports of James E. Malackowski, August 1, 2022 and September 6, 2022.

95 J. Obviagele Dep. Tr. 171:7–11

96 ROSS-003332311.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

[97] Expert Report of Alan J. Cox, Ph.D., September 6, 2022., ¶ 21.

[98] Expert Report of Alan J. Cox, Ph.D., September 6, 2022., ¶¶ 19–20.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[99] Expert Report of Alan J. Cox, Ph.D., September 6, 2022, ¶ 20.

[100] *See* https://medium.com/@AndrewArruda/hold-59effcd819b0

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

[101] *See* Expert Report of Alan J. Cox, Ph.D., September 6, 2022, ¶¶ 27–35.

[102] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

[103] *Id.*, ¶ 29.

[104] *Id.*, ¶¶ 36–40.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[105] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 9–15.

[106] *Id.*, ¶¶ 9–11.

[107] *Id.*, ¶ 15.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[109] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 25–39.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[110] Expert Report of Dr. Jonathan L. Krein, August 1, 2022, fn. 162.

[111] *Ibid*.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[112] *Ibid.*

[113] *See* Expert Report of Dr. Jonathan L. Krein, August 1, 2022, Section 9.1.4; *see also* Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶¶ 43, 70, 83.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

[114] Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶¶ 76–80.

[115] *Ibid*.

[116] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 36–37.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

[117] *Ibid.*; *see also*, *id.*, ¶ 25.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[118] *Id.*, ¶ 17.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

[119] Expert Report of Barbara Frederiksen-Cross, September 6, 2022.

[120] *Id.*, ¶ 18.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[121] *Ibid.*

[122] *Ibid.*

[123] C. Cahn Dep. Tr. 161:10-161:23

[124] Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶¶ 28–32.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[125] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶ 100.

[126] *Id.*. ¶ 102.

[127] *Id.*, ¶¶ 104–105.

[128] Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 113.

[129] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 106–108.

[130] *Id.*, ¶ 109 (emphasis in original).

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

[131] Expert Report of Dr. Jonathan L. Krein, August 1, 2022, Section 9.1.4.

[132] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 110–116.

[133] *Id.*, ¶ 110.

[134] *Ibid.*

**HIGHLIGHT CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[135] Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 146.

[136] ROSS-003419784-ROSS-003419786

[137] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 112–116

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[138] *Id.*, ¶ 122.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[139] Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 109.

[140] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶ 123.

[141] *Id.*, ¶¶ 124–126.

[142] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 21–24.

[143] *Ibid.*

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**





[144] Id., ¶ 22.

[145] *See* C. Cahn Dep. Tr. 68:3–9



[146] *See* T. Hafeez Dep. Tr. 152:7–21

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[147] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶ 22.

[148] LEGALEASE-00059362.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

[149] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶ 22.

[150] Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶ 109.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[151] Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 112, incl. fn 162.

[152] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 41–42.

[153] *Ibid*.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

---

154 Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶ 109.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[155] LEGALEASE-00140943-LEGALEASE-00140944.

[156] ROSS-003330518-ROSS-003330519.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[157] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 41–54.

[158] *Id.*, ¶ 12.

[159] *Id.*, ¶ 48.

[160] *Id.*, ¶¶ 45–46.

[161] Expert Report of Barbara Frederiksen-Cross, August 1, 2022, ¶¶ 131–132.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

162 Expert Report of Dr. Jonathan L. Krein, August 1, 2022, ¶ 112, incl. fn 162.

163 *See, e.g.*, Expert Report of Barbara Frederiksen-Cross, August 1, 2022, ¶¶ 80–89.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



---

165 Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶¶ 67–97.

166 Id., ¶¶ 93–97.

167 *Ibid*.;



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[168] TR-0541943.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[169] Expert Report of Dr. Jonathan L. Krein, September 6, 2022, ¶ 100.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

[171] Expert Report of Barbara Frederiksen-Cross, September 6, 2022, ¶ 130.

[172] *Id.*, ¶ 132.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[173] *Ibid.*

[174] *Id.*, ¶ 133.

[175] *Id.*, ¶ 134.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[176] *Ibid.*

[177] *Id.*, ¶ 135.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[178] *Ibid.*

[179] *Id.*, ¶ 139.

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



[180] *Id.*, ¶ 15

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



---

[181] ████████████████████████████████████████████

[182] *Id.*, ¶ 15

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**

---

[183] *Ibid.*

[184] *Ibid.*

[185] *Ibid.*

**HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY**



I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 10, 2022

Respectfully submitted,

_____
Dr. Jonathan L. Krein

87

# EXHIBIT 106

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3                C.A. No. 20-613(LPS)

 4

 5   -------------------------------------------

 6   IN RE MATTER OF:

 7   THOMSON REUTERS ENTERPRISE

 8   CENTRE GMBH and WEST PUBLISHING

 9   CORPORATION,

10              Plaintiffs and Counterdefendants

11         -vs-

12   ROSS INTELLIGENCE INC.,

13              Defendant and Counterclaimant.

14   -------------------------------------------

15

16

17

18     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

19      REMOTE TESTIMONY OF RICHARD A. LEITER

20           October 24, 2022 - 11 A.M. CDT

21

22

23

24     JOB NO. 2022-866213
```

26





38



257



258



259



260



261



# EXHIBIT 107

HIGHLY CONFIDENTIAL

1     DEPOSITION OF THOMAS LEIGHTON

2   IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF DELAWARE
3 _____

4

  THOMSON REUTERS ENTERPRISE
5 CENTRE GMBH and WEST
  PUBLISHING CORPORATION,
6
          Plaintiffs and
7         Counterdefendants,

8  vs.                C.A. No.
                20-613 (LPS)
9 ROSS INTELLIGENCE INC.,

10        Defendant and
         Counterclaimant.
11 _____

12 _____

13

14      HIGHLY CONFIDENTIAL
   PURSUANT TO THE PROTECTIVE ORDER
15

16 VIDEOTAPED DEPOSITION OF THOMAS LEIGHTON

17     MINNEAPOLIS, MINNESOTA

18       April 5, 2022

19

20

21

  Reported by:
22

23 KELLY A. HERRICK

24 JOB NO. 208927

25

1              DEPOSITION OF THOMAS LEIGHTON

# EXHIBIT 108

Highly Confidential - Attorneys' Eyes Only Pusuant to Protective Order

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4   THOMSON REUTERS ENTERPRISE          )
    CENTRE GMBH and WEST PUBLISHING     )
5   CORPORATION,                        )
                                        )
6     Plaintiffs/Counterdefendants,     )
                                        ) C.A. No. 20-613-LPS
7              vs.                      )
                                        ) Volume I
8   ROSS INTELLIGENCE, INC.,            )
                                        ) Pages 1 to 343
9       Defendant/Counterclaimant.      )
    _____)

10

11

12

13

14       *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

15              PURSUANT TO THE PROTECTIVE ORDER

16

17      REMOTE VIDEOCONFERENCED VIDEOTAPED DEPOSITION OF

18                    JONATHAN KREIN

19                  Salt Lake City, Utah

20               Saturday, October 22, 2022

21

22

23

24   Reported by:
     ELIZABETH BORRELLI, CSR No. 7844, CCRR, CLR
25   JOB NO. 218478

# EXHIBIT 109

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
THOMSON REUTERS ENTERPRISE    )
CENTRE GMBH and WEST          )
PUBLISHING CORPORATION,       )
                              )
        Plaintiffs and        )
        Counterdefendants,)
                              )
                              )
  vs.                         )    C.A. No. 20-613 (LPS)
                              )
ROSS INTELLIGENCE, INC.,      )
                              )
        Defendant and         )
        Counterplaintiff.     )
                              )
_____)
```

**\*\*HIGHLY CONFIDENTIAL\*\***


VIDEOTAPED 30(b)(6) DEPOSITION OF DEFENDANT,

by and through its corporate designee

TOMAS VAN DER HEIJDEN,

(also in his individual capacity)



London, England, United Kingdom

Thursday, March 17, 2022




Pages: Pages 1 - 443

Reported stenographically by:
LEAH M. WILLERSDORF, RPR-CRR-FBIVR-ACR-QRR2-CLR

284



285



415



# EXHIBIT 110



# West Key Number System®

## Numerical List of Digest Topics

| | | | | | |
|---|---|---|---|---|---|
| 1 | Abandoned and Lost Property | 31 | Appearance | 70 | Carriers |
| 2 | Abatement and Revival | 34 | Armed Services | 71 | Cemeteries |
| 4 | Abortion and Birth Control | 35 | Arrest | 72 | Census |
| 5 | Absentees | 36 | Arson | 73 | Certiorari |
| 6 | Abstracts of Title | 37 | Assault and Battery | 74 | Champerty and Maintenance |
| 7 | Accession | 38 | Assignments | 75 | Charities |
| 8 | Accord and Satisfaction | 40 | Assistance, Writ of | 76 | Chattel Mortgages |
| 9 | Account | 41 | Associations | 76A | Chemical Dependents |
| 10 | Account, Action on | 42 | Assumpsit, Action of | 76D | Child Custody |
| 11 | Account Stated | 43 | Asylums and Assisted Living Facilities | 76E | Child Support |
| 11A | Accountants | 44 | Attachment | 76H | Children Out-of-Wedlock |
| 12 | Acknowledgment | 45 | Attorney and Client | 78 | Civil Rights |
| 13 | Action | 46 | Attorney General | 79 | Clerks of Courts |
| 14 | Action on the Case | 47 | Auctions and Auctioneers | 80 | Clubs |
| 15 | Adjoining Landowners | 48 | Audita Querela | 81 | Colleges and Universities |
| 15A | Administrative Law and Procedure | 48A | Automobiles | 82 | Collision |
| 16 | Admiralty | 48B | Aviation | 83 | Commerce |
| 17 | Adoption | 49 | Bail | 83H | Commodity Futures Trading Regulation |
| 18 | Adulteration | 50 | Bailment | 83T | Common Interest Communities |
| 19 | Adultery | 51 | Bankruptcy | 84 | Common Lands |
| 20 | Adverse Possession | 52 | Banks and Banking | 85 | Common Law |
| 21 | Affidavits | 54 | Beneficial Associations | 89 | Compromise and Settlement |
| 23 | Agriculture | 55 | Bigamy | 90 | Confusion of Goods |
| 24 | Aliens, Immigration, and Citizenship | 56 | Bills and Notes | 91 | Conspiracy |
| 25 | Alteration of Instruments | 58 | Bonds | 92 | Constitutional Law |
| 25T | Alternative Dispute Resolution | 59 | Boundaries | 92B | Consumer Credit |
| 26 | Ambassadors and Consuls | 60 | Bounties | 93 | Contempt |
| 27 | Amicus Curiae | 61 | Breach of Marriage Promise | 95 | Contracts |
| 28 | Animals | 63 | Bribery | 96 | Contribution |
| 29 | Annuities | 64 | Bridges | 96H | Controlled Substances |
| 29T | Antitrust and Trade Regulation | 65 | Brokers | 97C | Conversion and Civil Theft |
| 30 | Appeal and Error | 66 | Building and Loan Associations | 98 | Convicts |
| | | 67 | Burglary | 99 | Copyrights and Intellectual Property |
| | | 69 | Cancellation of Instruments | | |

For assistance using Westlaw Classic , call **1-800-WESTLAW** (1-800-937-8529).

For free reference materials, visit **store.westlaw.com /westlaw/guides**.

**THOMSON REUTERS WESTLAW**

Thomson Reuters Westlaw comprises industry leading online research, print products, software, tools, and services that help legal professionals perform their work faster and more efficiently, every day.



TR-0179847

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 100 | Coroners | 136 | Dower and Curtesy | 178 | Food | 220 | Internal Revenue |
| 101 | Corporations and Business Organizations | 141 | Easements | 179 | Forcible Entry and Detainer | 221 | International Law |
| 102 | Costs | 142 | Ejectment | 180 | Forfeitures | 222 | Interpleader |
| 103 | Counterfeiting | 143 | Election of Remedies | 181 | Forgery | 223 | Intoxicating Liquors |
| 104 | Counties | 144 | Elections | 183 | Franchises | 224 | Joint Adventures |
| 105 | Court Commissioners | 145 | Electricity | 184 | Fraud | 226 | Joint Tenancy |
| 106 | Courts | 146 | Embezzlement | 185 | Frauds, Statute of | 227 | Judges |
| 107 | Covenant, Action of | 148 | Eminent Domain | 186 | Fraudulent Conveyances | 228 | Judgment |
| 108 | Covenants | 149 | Entry, Writ of | | | 229 | Judicial Sales |
| 108A | Credit Reporting Agencies | 149E | Environmental Law | 187 | Game | 230 | Jury |
| | | 149T | Equitable Conversion | 188 | Gaming | 231 | Justices of the Peace |
| 110 | Criminal Law | | | 189 | Garnishment | 231E | Kidnapping |
| 111 | Crops | 150 | Equity | 190 | Gas | 231H | Labor and Employment |
| 113 | Customs and Usages | 151 | Escape | 191 | Gifts | | |
| | | 152 | Escheat | 192 | Good Will | 233 | Landlord and Tenant |
| 114 | Customs Duties | 154 | Estates in Property | 193 | Grand Jury | 234 | Larceny |
| 115 | Damages | 156 | Estoppel | 195 | Guaranty | 237 | Libel and Slander |
| 116 | Dead Bodies | 157 | Evidence | 196 | Guardian and Ward | 238 | Licenses |
| 117 | Death | 158 | Exceptions, Bill of | 197 | Habeas Corpus | 239 | Liens |
| 117G | Debt, Action of | 159 | Exchange of Property | 198 | Hawkers and Peddlers | 240 | Life Estates |
| 117T | Debtor and Creditor | 160 | Exchanges | | | 241 | Limitation of Actions |
| 118A | Declaratory Judgment | 161 | Execution | 198H | Health | 242 | Lis Pendens |
| 119 | Dedication | 162 | Executors and Administrators | 200 | Highways | 245 | Logs and Logging |
| 120 | Deeds | 163 | Exemptions | 201 | Holidays | 246 | Lost Instruments |
| 122A | Deposits and Escrows | 164 | Explosives | 202 | Homestead | 247 | Lotteries |
| | | 165 | Extortion and Threats | 203 | Homicide | 248 | Malicious Mischief |
| 123 | Deposits in Court | 166 | Extradition and Detainers | 205 | Husband and Wife | 249 | Malicious Prosecution |
| 124 | Descent and Distribution | | | 205H | Implied and Constructive Contracts | 250 | Mandamus |
| 125 | Detectives and Security Guards | 167 | Factors | 206 | Improvements | 251 | Manufactures |
| 126 | Detinue | 168 | False Imprisonment | 207 | Incest | 252 | Maritime Liens |
| 129 | Disorderly Conduct | 169 | False Personation | 208 | Indemnity | 253 | Marriage |
| 130 | Disorderly House | 170 | False Pretenses | 209 | Indians | 256 | Mayhem |
| 131 | District and Prosecuting Attorneys | 170A | Federal Civil Procedure | 210 | Indictment and Information | 257 | Mechanics' Liens |
| | | 170B | Federal Courts | | | 257A | Mental Health |
| 132 | District of Columbia | 171 | Fences | 211 | Infants | 258A | Military Justice |
| 133 | Disturbance of Public Assemblage | 172 | Ferries | 212 | Injunction | 259 | Militia |
| | | 174 | Fines | 213 | Innkeepers | 260 | Mines and Minerals |
| 134 | Divorce | 175 | Fires | 216 | Inspection | 265 | Monopolies |
| 135 | Domicile | 176 | Fish | 217 | Insurance | 266 | Mortgages |
| 135H | Double Jeopardy | 177 | Fixtures | 218 | Insurrection and Sedition | 267 | Motions |
| | | | | 219 | Interest | 268 | Municipal Corporations |

TR-0179848

| | | | | | | |
|---|---|---|---|---|---|---|
| 269 | Names | 313 | Process | 344 | Salvage | 379 | Torts |

269 Names
271 Ne Exeat
272 Negligence
273 Neutrality Laws
274 Newspapers
275 New Trial
276 Notaries
277 Notice
278 Novation
279 Nuisance
280 Oath
281 Obscenity
282 Obstructing Justice
283 Officers and Public Employees
284 Pardon and Parole
285 Parent and Child
286 Parliamentary Law
287 Parties
288 Partition
289 Partnership
290 Party Walls
291 Patents
294 Payment
295 Penalties
296 Pensions
297 Perjury
298 Perpetuities
300 Pilots
302 Pleading
303 Pledges
305 Possessory Warrant
306 Postal Service
307 Powers
307A Pretrial Procedure
308 Principal and Agent
309 Principal and Surety
310 Prisons
311 Private Roads
311H Privileged Communications and Confidentiality

313 Process
313A Products Liability
314 Prohibition
315 Property
315H Prostitution
315P Protection of Endangered Persons
315T Public Amusement and Entertainment
316E Public Assistance
316H Public Contracts
317 Public Lands
317A Public Utilities
318 Quieting Title
319 Quo Warranto
319H Racketeer Influenced and Corrupt Organizations
320 Railroads
321 Rape
322 Real Actions
323 Receivers
324 Receiving Stolen Goods
325 Recognizances
326 Records
327 Reference
328 Reformation of Instruments
330 Registers of Deeds
331 Release
332 Religious Societies
333 Remainders
334 Removal of Cases
335 Replevin
336 Reports
337 Rescue
338 Reversions
339 Review
340 Rewards
341 Riot
342 Robbery
343 Sales

344 Salvage
345 Schools
346 Scire Facias
347 Seals
348 Seamen
349 Searches and Seizures
349A Secured Transactions
349B Securities Regulation
350 Seduction
350H Sentencing and Punishment
351 Sequestration
352 Set-Off and Counterclaim
353 Sheriffs and Constables
354 Shipping
355 Signatures
356 Slaves
356A Social Security and Public Welfare
357 Sodomy
358 Specific Performance
359 Spendthrifts
360 States
361 Statutes
362 Steam
363 Stipulations
365 Submission of Controversy
366 Subrogation
367 Subscriptions
368 Suicide
369 Sunday
370 Supersedeas
371 Taxation
372 Telecommunications
373 Tenancy in Common
374 Tender
375 Territories
378 Time

379 Torts
380 Towage
381 Towns
382T Trademarks
384 Treason
385 Treaties
386 Trespass
387 Trespass to Try Title
388 Trial
390 Trusts
391 Turnpikes and Toll Roads
392 Undertakings
392T Unemployment Compensation
393 United States
394 United States Magistrates
395 United States Marshals
396 Unlawful Assembly
396A Urban Railroads
398 Usury
399 Vagrancy
400 Vendor and Purchaser
401 Venue
402 War and National Emergency
403 Warehousemen
404 Waste
405 Water Law
406 Weapons
407 Weights and Measures
408 Wharves
409 Wills
410 Witnesses
411 Woods and Forests
413 Workers' Compensation
414 Zoning and Planning
450 Merit Systems Protection

## Searching by West Topic and Key Number

When you have identified a topic and key number associated with the legal issue you are researching, you can run a Terms and Connectors search using that topic and key number to quickly retrieve cases involving the same legal issue. A topic and key number search does not require a field-restricted format; that is, you do not need to include a field name or abbreviation as part of your search request. For example, to search for cases with headnotes classified under topic 343 (Sales) and key number 255 (Parties; Privity), type **343k255**.

To narrow your search, add search terms. For example, the query **343k255 /p contract** retrieves cases with headnotes classified under topic 343 and key number 255 that also contain the term *contract* in the same digest paragraph.

## Topic field searching

You can also retrieve cases with headnotes classified under a specific West digest topic by using a topic field (to) restriction in your Terms and Connectors search. In addition to the topic name and number, the topic field contains the hierarchical classification information, key number, and text of the related key line. For example, to retrieve cases with headnotes classified under topic 409 (Wills), type **to(409)** or **to(wills)**. The broader search is **to(wills)** because it retrieves cases in which the term *wills* is mentioned in the key line or other levels of the hierarchy, even if the headnotes are not classified under topic 409. To narrow your search, add search terms; for example, type **to(409) /p "condition subsequent"**.

## Using the West Key Number Digest (Custom Digest)

The West Key Number Digest, also called the Custom Digest, contains the complete topic and key number outline used by West attorney-editors to classify headnotes. The West Key Number Digest helps you identify topic and key numbers related to your issue and retrieve cases with headnotes classified under those topic and key numbers.

To access the West Key Number Digest, click **Key Numbers** at the top of any page, then click **West Key Number Digest Outline** under *Browse Key Numbers*. (Alternatively, click **Custom Digest** at a case law database Search page.) To browse the digest, click the plus (**+**) and minus (**−**) symbols.

In addition to browsing the West Key Number Digest for relevant topic and key numbers, you can also search for them using the Search for Key Numbers feature.

To use the Search for Key Numbers feature, complete these steps:

1. Click **Key Numbers** at the top of any page. A page is displayed that contains the *Search for Key Numbers* text box.

2. Type your terms, e.g., **family and medical leave**, in the text box.

3. To change the jurisdiction from which you retrieve case headnotes, click **Change Jurisdiction**, then select the check boxes next to the jurisdictions you want and click **Done**.

4. Click **Search**. A list of topic and key numbers is displayed.

5. Click a topic and key number to view the headnotes classified under that topic and key number. Or select the check boxes next to one or more topic and key numbers and click **Search Selected** to view the headnotes classified under those topic and key numbers.

**TR-0179850**

# Digest Topics by Specialty

**Alternative Dispute Resolution**

| | |
|---|---|
| 25T | Alternative Dispute Resolution |
| 76D | Child Custody |
| 217 | Insurance |
| 231H | Labor and Employment |
| 233 | Landlord and Tenant |
| 289 | Partnership |
| 354 | Shipping |

**Antitrust**

| | |
|---|---|
| 29T | Antitrust and Trade Regulation |

**Bankruptcy**

| | |
|---|---|
| 51 | Bankruptcy |
| 117T | Debtor and Creditor |
| 163 | Exemptions |
| 202 | Homestead |
| 349A | Secured Transactions |

**Business and Other Organizations**

| | |
|---|---|
| 41 | Associations |
| 52 | Banks and Banking |
| 54 | Beneficial Associations |
| 65 | Brokers |
| 66 | Building and Loan Associations |
| 70 | Carriers |
| 71 | Cemeteries |
| 75 | Charities |
| 80 | Clubs |
| 81 | Colleges and Universities |
| 83T | Common Interest Communities |
| 101 | Corporations and Business Organizations |
| 108A | Credit Reporting Agencies |
| 145 | Electricity |
| 167 | Factors |
| 190 | Gas |

| | |
|---|---|
| 213 | Innkeepers |
| 217 | Insurance |
| 224 | Joint Adventures |
| 289 | Partnership |
| 317A | Public Utilities |
| 320 | Railroads |
| 332 | Religious Societies |
| 345 | Schools |
| 372 | Telecommunications |
| 396A | Urban Railroads |

**Civil Procedure–Federal Cases**

| | |
|---|---|
| 2 | Abatement and Revival |
| 13 | Action |
| 25T | Alternative Dispute Resolution |
| 48 | Audita Querela |
| 96 | Contribution |
| 106 | Courts |
| 115 | Damages |
| 118A | Declaratory Judgment |
| 135 | Domicile |
| 143 | Election of Remedies |
| 156 | Estoppel |
| 157 | Evidence |
| 158 | Exceptions, Bill of |
| 170A | Federal Civil Procedure |
| 170B | Federal Courts |
| 197 | Habeas Corpus |
| 212 | Injunction |
| 222 | Interpleader |
| 227 | Judges |
| 228 | Judgment |
| 230 | Jury |
| 241 | Limitation of Actions |
| 250 | Mandamus |
| 311H | Privileged Communications and Confidentiality |
| 314 | Prohibition |

| | |
|---|---|
| 319 | Quo Warranto |
| 334 | Removal of Cases |
| 378 | Time |
| 394 | United States Magistrates |
| 410 | Witnesses |

**Civil Procedure–State Cases**

| | |
|---|---|
| 2 | Abatement and Revival |
| 13 | Action |
| 21 | Affidavits |
| 25T | Alternative Dispute Resolution |
| 30 | Appeal and Error |
| 31 | Appearance |
| 44 | Attachment |
| 48 | Audita Querela |
| 73 | Certiorari |
| 96 | Contribution |
| 105 | Court Commissioners |
| 106 | Courts |
| 115 | Damages |
| 118A | Declaratory Judgment |
| 123 | Deposits in Court |
| 135 | Domicile |
| 143 | Election of Remedies |
| 150 | Equity |
| 156 | Estoppel |
| 157 | Evidence |
| 158 | Exceptions, Bill of |
| 161 | Execution |
| 189 | Garnishment |
| 197 | Habeas Corpus |
| 212 | Injunction |
| 222 | Interpleader |
| 227 | Judges |
| 228 | Judgment |
| 230 | Jury |
| 231 | Justices of the Peace |
| 241 | Limitation of Actions |

| | |
|---|---|
| 242 | Lis Pendens |
| 250 | Mandamus |
| 267 | Motions |
| 271 | Ne Exeat |
| 275 | New Trial |
| 277 | Notice |
| 287 | Parties |
| 302 | Pleading |
| 307A | Pretrial Procedure |
| 311H | Privileged Communications and Confidentiality |
| 313 | Process |
| 314 | Prohibition |
| 319 | Quo Warranto |
| 322 | Real Actions |
| 327 | Reference |
| 334 | Removal of Cases |
| 339 | Review |
| 346 | Scire Facias |
| 351 | Sequestration |
| 352 | Set-Off and Counterclaim |
| 363 | Stipulations |
| 370 | Supersedeas |
| 378 | Time |
| 388 | Trial |
| 401 | Venue |
| 410 | Witnesses |

**Commercial Law**

| | |
|---|---|
| 29T | Antitrust and Trade Regulation |
| 38 | Assignments |
| 51 | Bankruptcy |
| 52 | Banks and Banking |
| 56 | Bills and Notes |
| 70 | Carriers |
| 76 | Chattel Mortgages |
| 92B | Consumer Credit |
| 95 | Contracts |
| 117T | Debtor and Creditor |

TR-0179851

| 186 | Fraudulent Conveyances |
| 219 | Interest |
| 278 | Novation |
| 294 | Payment |
| 303 | Pledges |
| 343 | Sales |
| 349A | Secured Transactions |
| 403 | Warehousemen |

**Communications**

| 92 | Constitutional Law |
| 99 | Copyrights and Intellectual Property |
| 237 | Libel and Slander |
| 306 | Postal Service |
| 311H | Privileged Communications and Confidentiality |
| 372 | Telecommunications |

**Criminal Justice**

| 18 | Adulteration |
| 19 | Adultery |
| 35 | Arrest |
| 36 | Arson |
| 37 | Assault and Battery |
| 55 | Bigamy |
| 63 | Bribery |
| 67 | Burglary |
| 76A | Chemical Dependents |
| 91 | Conspiracy |
| 96H | Controlled Substances |
| 98 | Convicts |
| 103 | Counterfeiting |
| 110 | Criminal Law |
| 129 | Disorderly Conduct |
| 130 | Disorderly House |
| 131 | District and Prosecuting Attorneys |
| 133 | Disturbance of Public Assemblage |
| 135H | Double Jeopardy |
| 146 | Embezzlement |

| 149E | Environmental Law |
| 151 | Escape |
| 164 | Explosives |
| 165 | Extortion and Threats |
| 166 | Extradition and Detainers |
| 168 | False Imprisonment |
| 169 | False Personation |
| 170 | False Pretenses |
| 174 | Fines |
| 175 | Fires |
| 180 | Forfeitures |
| 181 | Forgery |
| 184 | Fraud |
| 193 | Grand Jury |
| 197 | Habeas Corpus |
| 198H | Health |
| 203 | Homicide |
| 207 | Incest |
| 209 | Indians |
| 210 | Indictment and Information |
| 211 | Infants |
| 218 | Insurrection and Sedition |
| 231E | Kidnapping |
| 234 | Larceny |
| 248 | Malicious Mischief |
| 256 | Mayhem |
| 273 | Neutrality Laws |
| 281 | Obscenity |
| 282 | Obstructing Justice |
| 284 | Pardon and Parole |
| 297 | Perjury |
| 310 | Prisons |
| 311H | Privileged Communications and Confidentiality |
| 315H | Prostitution |
| 315P | Protection of Endangered Persons |
| 319H | Racketeer Influenced and Corrupt Organizations |
| 321 | Rape |

| 324 | Receiving Stolen Goods |
| 337 | Rescue |
| 341 | Riot |
| 342 | Robbery |
| 349 | Searches and Seizures |
| 350 | Seduction |
| 350H | Sentencing and Punishment |
| 357 | Sodomy |
| 368 | Suicide |
| 384 | Treason |
| 396 | Unlawful Assembly |
| 399 | Vagrancy |
| 406 | Weapons |
| 410 | Witnesses |

**Education**

| 81 | Colleges and Universities |
| 345 | Schools |

**Employment Law**

| 78 | Civil Rights |
| 81 | Colleges and Universities |
| 104 | Counties |
| 198H | Health |
| 231H | Labor and Employment |
| 268 | Municipal Corporations |
| 283 | Officers and Public Employees |
| 345 | Schools |
| 356A | Social Security and Public Welfare |
| 360 | States |
| 381 | Towns |
| 392T | Unemployment Compensation |
| 393 | United States |
| 413 | Workers' Compensation |

**Energy**

| 145 | Electricity |
| 190 | Gas |
| 260 | Mines and Minerals |

| 317A | Public Utilities |
| 362 | Steam |
| 402 | War and National Emergency |

**Environmental Law**

| 23 | Agriculture |
| 145 | Electricity |
| 149E | Environmental Law |
| 260 | Mines and Minerals |
| 279 | Nuisance |
| 405 | Water Law |
| 414 | Zoning and Planning |

**Estate Planning**

| 17 | Adoption |
| 75 | Charities |
| 76H | Children Out-of-Wedlock |
| 124 | Descent and Distribution |
| 136 | Dower and Curtesy |
| 154 | Estates in Property |
| 162 | Executors and Administrators |
| 191 | Gifts |
| 220 | Internal Revenue |
| 226 | Joint Tenancy |
| 240 | Life Estates |
| 298 | Perpetuities |
| 307 | Powers |
| 333 | Remainders |
| 338 | Reversions |
| 371 | Taxation |
| 373 | Tenancy in Common |
| 390 | Trusts |
| 409 | Wills |

**Family Law**

| 4 | Abortion and Birth Control |
| 17 | Adoption |
| 19 | Adultery |
| 55 | Bigamy |
| 61 | Breach of Marriage Promise |
| 76D | Child Custody |
| 76E | Child Support |

76H    Children Out-of-Wedlock
134    Divorce
136    Dower and Curtesy
196    Guardian and Ward
205    Husband and Wife
207    Incest
211    Infants
253    Marriage
285    Parent and Child
315P    Protection of Endangered Persons
350    Seduction

**Financial Institutions**

52    Banks and Banking
66    Building and Loan Associations
92B    Consumer Credit
108A    Credit Reporting Agencies
217    Insurance

**Government**

64    Bridges
81    Colleges and Universities
104    Counties
132    District of Columbia
200    Highways
268    Municipal Corporations
316E    Public Assistance
316H    Public Contracts
345    Schools
360    States
375    Territories
381    Towns
393    United States
405    Water Law

**Health**

76A    Chemical Dependents
96H    Controlled Substances
198H    Health

257A    Mental Health
315P    Protection of Endangered Persons

**Immigration and Citizenship**

24    Aliens, Immigration, and Citizenship

**Insurance**

217    Insurance
356A    Social Security and Public Welfare
392T    Unemployment Compensation
413    Workers' Compensation

**Intellectual Property**

29T    Antitrust and Trade Regulation
99    Copyrights and Intellectual Property
291    Patents
382T    Trademarks

**International Issues**

24    Aliens, Immigration, and Citizenship
26    Ambassadors and Consuls
114    Customs Duties
221    International Law
385    Treaties
402    War and National Emergency

**Juvenile Justice**

211    Infants

**Legal Services**

12    Acknowledgement
25T    Alternative Dispute Resolution
45    Attorney and Client
46    Attorney General
79    Clerks of Courts
105    Court Commissioners
106    Courts
131    District and Prosecuting Attorneys
227    Judges

231    Justices of the Peace
276    Notaries
327    Reference
394    United States Magistrates

**Maritime Law**

16    Admiralty
82    Collision
172    Ferries
252    Maritime Liens
300    Pilots
344    Salvage
348    Seamen
354    Shipping
405    Water Law
408    Wharves

**Medicaid**

198H    Health

**Medicare**

198H    Health

**Military Law**

34    Armed Services
258A    Military Justice
259    Militia
402    War and National Emergency

**Products Liability**

145    Electricity
164    Explosives
178    Food
190    Gas
313A    Products Liability

**Professional Malpractice**

11A    Accountants
45    Attorney and Client
65    Brokers
198H    Health
211    Infants
257A    Mental Health
272    Negligence
332    Religious Societies
345    Schools

**Real Property**

6    Abstracts of Title
7    Accession
15    Adjoining Landowners
20    Adverse Possession
59    Boundaries
65    Brokers
66    Building and Loan Associations
83T    Common Interest Communities
84    Common Lands
108    Covenants
119    Dedication
120    Deeds
141    Easements
142    Ejectment
148    Eminent Domain
149    Entry, Writ of
149T    Equitable Conversion
154    Estates in Property
171    Fences
177    Fixtures
179    Forcible Entry and Detainer
206    Improvements
233    Landlord and Tenant
238    Licenses
239    Liens
242    Lis Pendens
257    Mechanics' Liens
266    Mortgages
272    Negligence
288    Partition
290    Party Walls
311    Private Roads
315    Property
315T    Public Amusement and Entertainment
317    Public Lands
318    Quieting Title

| 322 | Real Actions |
| 330 | Registers of Deeds |
| 338 | Reversions |
| 358 | Specific Performance |
| 386 | Trespass |
| 387 | Trespass to Try Title |
| 400 | Vendor and Purchaser |
| 405 | Water Law |
| 414 | Zoning and Planning |

**Securities and Commodities Regulations**

| 83H | Commodity Futures Trading Regulation |
| 160 | Exchanges |
| 349B | Securities Regulation |

**Taxation**

| 83 | Commerce |
| 104 | Counties |
| 220 | Internal Revenue |
| 223 | Intoxicating Liquors |

| 238 | Licenses |
| 268 | Municipal Corporations |
| 345 | Schools |
| 371 | Taxation |
| 381 | Towns |

**Torts**

| 37 | Assault and Battery |
| 45 | Attorney and Client |
| 48A | Automobiles |
| 48B | Aviation |
| 52 | Banks and Banking |
| 70 | Carriers |
| 78 | Civil Rights |
| 97C | Conversion and Civil Theft |
| 115 | Damages |
| 117 | Death |
| 145 | Electricity |
| 164 | Explosives |
| 168 | False Imprisonment |

| 178 | Food |
| 179 | Forcible Entry and Detainer |
| 184 | Fraud |
| 190 | Gas |
| 198H | Health |
| 213 | Innkeepers |
| 233 | Landlord and Tenant |
| 237 | Libel and Slander |
| 249 | Malicious Prosecution |
| 272 | Negligence |
| 279 | Nuisance |
| 313A | Products Liability |
| 315T | Public Amusement and Entertainment |
| 320 | Railroads |
| 350 | Seduction |
| 354 | Shipping |
| 379 | Torts |
| 386 | Trespass |
| 404 | Waste |

| 406 | Weapons |

**Transportation**

| 16 | Admiralty |
| 48A | Automobiles |
| 48B | Aviation |
| 64 | Bridges |
| 70 | Carriers |
| 82 | Collision |
| 83 | Commerce |
| 172 | Ferries |
| 200 | Highways |
| 320 | Railroads |
| 348 | Seamen |
| 354 | Shipping |
| 391 | Turnpikes and Toll Roads |
| 396A | Urban Railroads |
| 405 | Water Law |

**Unemployment Compensation**

| 392T | Unemployment Compensation |

© 2012 Thomson Reuters. All rights reserved. Published 8/12. L-352461.
The trademarks used herein are the trademarks of their respective owners.
West trademarks are owned by West Publishing Corporation.



TR-0179854

# EXHIBIT 111





ROSS-010128683.xlsx

# EXHIBIT 112

163 N.C. 356

Supreme Court of North Carolina.

LATHAM

v.

FIELD et al.

Nov. 5, 1913.

**Synopsis**

Appeal from Superior Court, Guilford County; Peebles, Judge.

Action by J. E. Latham against J. E. Field and another. From a judgment for defendants, plaintiff appeals. Reversed and remanded.

West Headnotes (3)

**[1]** **Principal and Agent** 🗝 Representation of Principal

308 Principal and Agent
308III Rights and Liabilities as to Third Persons
308III(A) Powers of Agent
308k91 Representation of Principal
308k92 In General
308k92(1) In General
The acts of an agent performed within the scope of his real or apparent authority are binding on his principal.

7 Cases that cite this headnote

**[2]** **Principal and Agent** 🗝 Agent's Acts in General

308 Principal and Agent
308III Rights and Liabilities as to Third Persons
308III(A) Powers of Agent
308k130 Liabilities Incurred
308k131 Agent's Acts in General
A principal is as liable for damages from acts performed through an agent as if he had done them himself.

1 Cases that cite this headnote

**[3]** **Principal and Agent** 🗝 Questions for Jury

308 Principal and Agent
308III Rights and Liabilities as to Third Persons
308III(F) Actions
308k191 Trial
308k193 Questions for Jury
In an action for breach of a contract for the sale of cotton, made through a third person, evidence on the question of the defendant's liability as principal held sufficient to go to the jury.

1 Cases that cite this headnote

**\*865** This case was before us at Fall term, 1912, and is reported in 160 N. C. 335, 76 S. E. 251. The facts, as they now appear, are somewhat different from those there stated. Plaintiff testified: That W. H. Field, one of the defendants, called at his place of business in April, 1908, and showed him some samples of cotton, stating that J. D. Turner would thereafter represent his firm in that territory as their broker, and he hoped defendants would send them some business through Mr. Turner. That about three weeks after the conversation, plaintiff ordered some cotton from the defendants through Turner, buying 100 bales of strict low middling from defendants through Turner, at 10 1/6 cents per pound. Plaintiff paid for the cotton at that price, although it proved to be of a very low and inferior quality, below any known grade, and what is called in the trade "Junk." The difference in value of the two kinds is 2 cents per pound, and the quantity 46.493 pounds. That he had no further communication with defendants, personally or by letter, after the time of the conversation until the cotton had been shipped and received. He ordered the cotton through Turner, and at first wanted 200 bales, but Turner told him that he could only get 100 bales of the required grade, and that he had secured it from defendants. The cotton was shipped to defendants, Greensboro, N. C., "order notify J. D. Turner," and the bill of lading showed that the cotton was shipped by defendants to their own order, and indorsed by them. J. D. Turner drew the draft for the price, and plaintiff paid it at bank and took up the bill of lading. Draft was signed by Turner and drawn at Greensboro, N. C., and not by Field & Co. at their home in Cartersville, Ga., as if it had originated there. Cotton is very often shipped through the South to the order of a bank cashier or some clerk in a merchant's office. "As to whose name is on a bill of lading, that is a thing we don't look at. It is who is the shipper of the cotton and whose name is indorsed on

CONFIDENTIAL
TR-0802088

the back that makes it negotiable." That he never found out what disposition was made of the proceeds of his payment for the cotton. That he paid the draft, and took the bill of lading to the railway company and got the cotton. He received the following letter confirming the trade:

"Our order No. -. Greensboro, N. C., 5-11-1908. Messrs. J. E. Latham, Greensboro, N. C.-Dear Sirs: We hereby confirm the following sale made you this day: 100 bales cotton, grade, strict low middling, at 10 1/6 c. per lb., landed at Group A, for shipment prompt, for the account of J. E. Field & Son. Remarks: Shipped by J. E. Field & Son, Cartersville, Ga. Yours truly, Jno. D. Turner, Jr.

"N. B. In any case of reference to this order, please give our order number, subject to Carolina mill rules."

On the cross and re-examination, plaintiff testified: "Mr. Latham, in June 19, 1908 you addressed a letter to Field & Co., which I have just shown you, and you told them about this offer you had received from the Riverside Cotton Mills of 10 cents? Answer: Yes, sir." Plaintiff did not address this communication to the defendants for the purpose of connecting them with the original sale, or for the purpose of getting some reply from defendants in order to connect them with the original sale. Plaintiff's reason for so writing the defendant was that cotton is sold in this territory, including Danville and all the territory around Greensboro, under what is known as the Carolina mill rules. These rules provide that when a shipment of cotton is received, if it is below grade as originally contracted for, it may be rejected by the buyer. Our position on this cotton all the time was that Field & Co. had not performed their contract; that they had shipped something we did not buy, and so far as we were concerned, we rejected it. We were holding the cotton, waiting for them to replace the contract with the proper grade of cotton which  *866  we had bought and which we had paid for. When he paid the draft drawn by Turner, for some $4,600, he knew that the draft had been drawn in Greensboro. He knew that a draft drawn by Field & Co. on him would have originated in Cartersville, Ga. In the former trial he testified that the cotton shipped was very difficult to grade, but in his opinion it would average about strict low middling. Cotton that is full of dust and sand is not merchantable, and for that reason is not gradable cotton. When cotton is bought, it is customary to confirm it. In this instance no confirmation was sent to the defendants, for the reason that plaintiff received a confirmation from J. D. Turner. Plaintiff confirmed the purchase to Turner. It is customary in the cotton trade to confirm either to the vendor or his agent. The sample exhibited to witness is a sample

of strict low middling cotton. The sale in controversy was confirmed to plaintiff by J. D. Turner for the account of the defendants. Cotton arrives several days later than drafts, and in this instance the draft was presented and paid by plaintiff probably seven days before the arrival of the cotton. Plaintiff had no opportunity to examine the cotton before he paid the draft. That is the usual custom in the trade. He paid the draft upon the faith of the contract he had with Mr. Turner as broker for J. E. Field & Son, and upon the fact that it was attached to the bill of lading showing J. E. Field & Son, of Cartersville, Ga., were the shippers of the cotton, and that J. E. Field & Son, in order to make the bill of lading negotiable, had indorsed it on the back. He would not have paid the draft unless the bill of lading had been attached. The paper shown him is the confirmation he received at the time he bought the 100 bales of cotton in controversy.

The bill of lading was introduced. It was of the standard form, issued at Cartersville, Ga., by the railroad company to J. E. Field & Son, and contained the following: "Shippers' order notify. Consignee, J. D. Turner, Jr." -and was indorsed by J. E. Field & Son and J. D. Turner, Jr. There was more evidence as to the damages, not necessary to be stated. At the close of the plaintiff's testimony, the judge ordered a nonsuit, upon defendants' motion, and plaintiff appealed.

## Attorneys and Law Firms

Thos. S. Beall and King & Kimball, all of Greensboro, for appellant. Douglass & Douglass, of Raleigh, J. T. Norris, of Cartersville, and R. C. Strudwick, of Greensboro, for appellees.

## Opinion

WALKER, J. (after stating the facts as above).

[1] [2] The nonsuit requires us to consider the evidence in the most favorable view for the plaintiff. Plaintiff contends that he acted upon the representation of W. H. Field that J. D. Turner was the broker of defendants, and therefore fully authorized to make contracts for the sale of cotton in their behalf, and that he was dealing with Turner as agent, and not in his individual capacity, and relied upon the statement of W. H. Field that he could so deal in the future. The rule in regard to agency may be thus stated: A principal is bound by the acts of his agent within the authority he has actually given him, which includes not only the precise act which he expressly authorizes him to do, but also whatever usually belongs to the doing of it, or is necessary to its performance. Beyond that he is liable for the acts of the agent within the appearance of

CONFIDENTIAL   TR-0802089

authority which the principal himself knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. For the acts of his agent, within his express authority, the principal is liable because the act of the agent is the act of the principal. For the acts of the agent, within the scope of his authority he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible because to permit him to dispute the authority of the agent in such cases would be to enable him to commit a fraud upon innocent persons. Bank v. Hay, 143 N. C. 326, 55 S. E. 811; Law v. Stokes, 32 N. J. Law, 249, 90 Am. Dec. 655; Mechem on Agency, § 84. "The principal is bound by all the acts of his agent within the scope of the authority which he holds him out to the world to possess, although he may have given him more limited private instructions, unknown to the persons dealing with him; and this is founded on the doctrine that where one of two persons must suffer by the act of a third person, he who has held that person out as worthy of trust and confidence, and as having authority in the matter, shall be bound by it. Carmichael v. Buck, 10 Rich. (S. C.) 332, 70 Am. Dec. 226; Story on Agency, § 127. "Where a person by words or conduct represents or permits it to be represented that another person is his agent, he will be estopped to deny the agency, as against third persons who have dealt, on the faith of such representation, with the person so held out as agent, even if no agency existed in fact." Trollinger v. Fleer, 157 N. C. 81, 72 S. E. 795; Metzger v. Whitehurst, 147 N. C. 171, 60 S. E. 907. These cases fairly illustrate this doctrine and define its limits. As to the liability of a principal acting through a broker, see 19 Cyc. 292. The court, in this case, when formerly here (160 N. C. 335, 76 S. E. 251), stated the duties of a broker and the nature of his agency.

[3] [4] The case may be considered in two aspects: (1) Was Turner in fact acting as defendant's broker in the transaction? (2) Did defendants, by W. H. Field, induce the plaintiff to believe that Turner had authority to represent them in selling their cotton, and thereby lead him to make the order for the 100 bales, he believing, and having reason to believe, under the circumstances, that *867 they were selling, not to Turner for himself, but through him to the plaintiff? If the jury should find that Turner was really acting as agent or broker for the defendants, they would be liable for the damages sustained by the plaintiffs, for the defendants would, in such case, be the principals, and the acts of Turner, though in his own name, would be imputable to them as much so as if they had acted for themselves, instead of by representation. The form of the transaction is not material. Holt v. Wellons, 79 S. E. 450 at this term. We think there was evidence to support either of

these theories. In the first place, the plaintiff testifies, without qualification, that "he got the cotton from the defendants through Turner," and thus he did precisely what W. H. Field told him to do. It also appears that Turner told the plaintiff that he had succeeded in getting the cotton for them from defendants. In the letter of confirmation it is stated that "the sale was made for the account of J. E. Field & Son," and Turner opens his letter by saying: "We hereby confirm the sale, and request plaintiff, in case of any reference to the order, to give *our* order number." Plaintiff might well argue, and the jury be authorized to find, that Turner, by the use of this language, was not referring merely to himself, but to Field & Co., or to them, and to himself as their agent. Turner knew of the conversation that W. H. Field had with the plaintiff, for he was present, and it might reasonably be inferred by the jury that, as he had not disavowed his agency, or notified plaintiff to the contrary, up to the time of the purchase, he was acting for them in accordance with the understanding at the April meeting. The plaintiff testified that cotton is very often shipped to the order of a bank cashier or some clerk in a merchant's office. The name on the bill of lading is disregarded -they look for the shipper of the cotton and the indorsement on the bill. This was an explanation of the form of the bill of lading, and a reason why the request to notify J. D. Turner of the shipment did not necessarily disprove his agency, or establish the fact that defendants were dealing with him as a principal in the transaction and as a purchaser of the cotton, and its consignee, on his own account. If by the conduct of W. H. Field, or the defendants the plaintiff was reasonably led to believe that Turner was acting as their broker, and by reason thereof he dealt with him as such, relying upon such conduct and believing in good faith that Turner was acting as broker and not for himself, it would be the same as if he was, in fact, the broker of defendants in selling the cotton. The jury may consider whether Turner was in fact defendants' broker, and in the bill of lading they requested that he be notified individually of the shipment, merely for their convenience or in accordance with the custom, or whether they thereby intended to deal with him individually, and not as their broker, or whether they used his name, meaning that he should be their broker, without regard to the fact that he was not addressed as such, and knowing that he had been so represented to the plaintiff. These are merely suggestions as to the different views of the evidence, and must not be taken as an intimation upon the weight or sufficiency of the same to establish either side of the case.

It would serve no practical purpose to further consider the evidence as bearing upon the question of an agency in fact or

CONFIDENTIAL                                                                TR-0802090

*Latham v. Field*, 163 N.C. 356 (1913)

79 S.E. 865

in law. It is sufficient to say that, as the case is now presented to us, there is evidence fit to be submitted to the jury and to warrant a finding thereon in favor of the plaintiff, under proper instructions from the court as to the law.

There was error in granting the nonsuit. It will be set aside, and a new trial is ordered.

New trial.

**All Citations**

163 N.C. 356, 79 S.E. 865

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

CONFIDENTIAL

TR-0802091

# EXHIBIT 113

2017 IL App (2d) 160554
Appellate Court of Illinois, Second District.

IN RE Parentage of J.W., a Minor

(Carol M., Petitioner-Appellant,

v.

Larry W., Respondent-Appellee).

No. 2-16-0554
|
Opinion filed April 28, 2017

**Synopsis**

**Background:** During parentage action, mother filed a third motion seeking interim attorney fees. The Circuit Court of Du Page County, No. 01-F-424, Timothy J. McJoynt, J., dismissed the motion. Mother appealed.

**Holdings:** The Appellate Court, McLaren, J., held that:

[1] mother forfeited her right to a hearing on her first and second motions for interim attorney fees;

[2] the trial court was required to conduct a hearing on mother's motion for attorney fees from father.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (11)

**[1]    Parent and Child** 👈 Attorney fees

    285    Parent and Child
    285II    Proceedings to Determine Parentage
    285II(A)    In General
    285k186    Costs
    285k188    Attorney fees
    Mother forfeited her right to a hearing on her first and second motions for interim attorney fees, in parentage action, where mother never asked the trial court for a hearing date on either her first or second motion for interim attorney fees. 750 Ill. Comp. Stat. Ann. 5/508(a), 501(c)-1).

**[2]    Statutes** 👈 Intent

    361    Statutes
    361III    Construction
    361III(A)    In General
    361k1071    Intent
    361k1072    In general
    The primary rule of statutory construction is to give effect to the intent of the legislature.

**[3]    Statutes** 👈 Language and intent, will, purpose, or policy

    **Statutes** 👈 Plain Language; Plain, Ordinary, or Common Meaning

    361    Statutes
    361III    Construction
    361III(A)    In General
    361k1078    Language
    361k1080    Language and intent, will, purpose, or policy
    361    Statutes
    361III    Construction
    361III(B)    Plain Language; Plain, Ordinary, or Common Meaning
    361k1091    In general
    The most reliable indicator of legislative intent is the statutory language itself, which must be given its plain and ordinary meaning when construing a statute.

**[4]    Appeal and Error** 👈 Statutory or legislative law

    30    Appeal and Error
    30XVI    Review
    30XVI(D)    Scope and Extent of Review
    30XVI(D)2    Particular Subjects of Review in General
    30k3169    Construction, Interpretation, or Application of Law
    30k3173    Statutory or legislative law
        (Formerly 30k893(1))
    The Appellate Court reviews de novo issues of statutory construction.

**[5]    Costs, Fees, and Sanctions** 👈 Waiver and correction of irregularities and errors

    102    Costs, Fees, and Sanctions

CONFIDENTIAL

102III  Awards of Costs and Fees
102III(G)  Proceedings to Award; Taxation
102k898  Waiver and correction of irregularities and errors
  (Formerly 102k208)

While it is true that a party who requests a hearing on attorney fees must be given one, the failure to request such a hearing results in a forfeiture of one's right to the hearing.

---

**[6]**   **Pretrial Procedure**  🔑  **Insufficiency in general**

307A  Pretrial Procedure
307AIII  Dismissal
307AIII(B)  Involuntary Dismissal
307AIII(B)4  Pleading, Defects In, in General
307Ak622  Insufficiency in general

A motion to dismiss challenges only the legal sufficiency of the complaint. 735 Ill. Comp. Stat. Ann. 5/2-615.

---

**[7]**   **Pretrial Procedure**  🔑  **Construction of pleadings**

307A  Pretrial Procedure
307AIII  Dismissal
307AIII(B)  Involuntary Dismissal
307AIII(B)6  Proceedings and Effect
307Ak679  Construction of pleadings

When reviewing a motion to dismiss, the critical inquiry is whether the allegations of the complaint, when considered in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. 735 Ill. Comp. Stat. Ann. 5/2-615.

1 Cases that cite this headnote

---

**[8]**   **Pretrial Procedure**  🔑  **Well-pleaded facts**

   **Pretrial Procedure**  🔑  **Matters not admitted**

307A  Pretrial Procedure
307AIII  Dismissal
307AIII(B)  Involuntary Dismissal
307AIII(B)6  Proceedings and Effect
307Ak686  Matters Deemed Admitted
307Ak687  Well-pleaded facts
307A  Pretrial Procedure
307AIII  Dismissal
307AIII(B)  Involuntary Dismissal

307AIII(B)6  Proceedings and Effect
307Ak689  Matters not admitted

For the purpose of a motion to dismiss, all well-pled facts in the complaint must be taken as true, but conclusions of law will not be taken as true unless supported by specific factual allegations. 735 Ill. Comp. Stat. Ann. 5/2-615.

1 Cases that cite this headnote

---

**[9]**   **Appeal and Error**  🔑  **De novo review**

30  Appeal and Error
30XVI  Review
30XVI(D)  Scope and Extent of Review
30XVI(D)3  Procedural Matters in General
30k3196  Dismissal and Nonsuit in General
30k3200  De novo review
  (Formerly 30k893(1))

The dismissal of a complaint is reviewed de novo. 735 Ill. Comp. Stat. Ann. 5/2-615.

---

**[10]**   **Attorneys and Legal Services**  🔑  **Third parties; non-clients**

   **Parent and Child**  🔑  **Attorney fees**

46H  Attorneys and Legal Services
46HVII  Compensation of Attorney
46HVII(A)  In General
46Hk250  Persons Liable
46Hk252  Third parties; non-clients
  (Formerly 45k133 Attorney and Client)
285  Parent and Child
285II  Proceedings to Determine Parentage
285II(A)  In General
285k186  Costs
285k188  Attorney fees

Statute governing final hearings for attorney fees and costs against an attorney's own client, which required a written fee agreement between attorney and client, did not preclude attorney for mother from seeking attorney fees from father, in parentage action, even though there was no written fee agreement between mother and attorney, where statute only applied to an attorney's action seeking attorney fees from his or her own client, not the opposing party. 750 Ill. Comp. Stat. Ann. 5/508(c).

CONFIDENTIAL                TR-0743444

In re J.W., 2017 IL App (2d) 160554 (2017)
77 N.E.3d 734, 413 Ill.Dec. 129

[11]   Attorneys and Legal Services 🔑 Third
   parties; non-clients

   Parent and Child 🔑 Attorney fees

   46H   Attorneys and Legal Services
   46HVII   Compensation of Attorney
   46HVII(A)   In General
   46Hk250   Persons Liable
   46Hk252   Third parties; non-clients
       (Formerly 45k133 Attorney and Client)
   285   Parent and Child
   285II   Proceedings to Determine Parentage
   285II(A)   In General
   285k186   Costs
   285k188   Attorney fees
   The trial court was required to conduct a hearing
   on mother's motion for attorney fees from father,
   in parentage action, even though there was
   no written fee agreement between mother and
   attorney; attorney for mother had a right to seek
   contribution from father for attorney fees under
   the Parentage Act. 750 Ill. Comp. Stat. Ann.
   5/503(j), 508(a,c).

 *735  Appeal from the Circuit Court of Du Page County, No.
01-F-424, Honorable Timothy J. McJoynt, Judge, Presiding.

**Attorneys and Law Firms**

JerryW. Kinnan, of Jerry Kinnan Ltd., of Addison, for
appellant.

Elizabeth M. Westover and Kerry M. Born, of Westover Born,
P.C., of Chicago, for appellee.

## OPINION

JUSTICE McLAREN delivered the judgment of the court,
with opinion.

**130  ¶ 1 During the proceedings in this parentage action,
originally filed under the Illinois Parentage Act of 1984
(Parentage Act of 1984) (750 ILCS 45/1 et seq. (West
2008)), attorney Jerry Kinnan filed three motions for "Interim
Attorney Fees" on behalf of his client, petitioner Carol
M., seeking fees from respondent Larry W. The trial court
dismissed Carol's third motion for interim attorney fees on

the grounds that she was actually seeking contribution for
final attorney fees and that Carol and Kinnan did not have a
written engagement agreement. Carol appeals the trial court's
dismissal of her third motion for interim attorney fees. Carol
argues that the trial court erred by (1) failing to expeditiously
schedule a hearing on her first two motions for interim
attorney fees, and (2) determining that a written engagement
agreement was required. We reverse and remand for further
proceedings consistent with this opinion.

¶ 2 I. BACKGROUND

¶ 3 In this parentage case, the parties are the parents of J.W.,
born in 2001. Larry signed a voluntary acknowledgment of
paternity two days after J.W.'s birth. After Carol petitioned for
child support in 2002, the trial court ordered Larry to pay child
support. This case has been litigated continuously with the
assistance of many  *736  **131 attorneys throughout the
years. We will concern ourselves with the most recent events.

¶ 4 From the time of J.W.'s birth, J.W. has lived with
Carol. However, in August 2015, J.W. began living with
his godparents after Carol allegedly threatened to kill J.W.
and herself and was taken to a nearby hospital, where she
remained for several days.

¶ 5 In September 2015, Larry filed a "Petition to Modify
Custody, to Remove Child to Maryland, and for other Relief,"
alleging that since the entry of an agreed parenting order there
had been a substantial change in circumstances, arising from
the events of August 2015. On September 21, 2015, Kinnan
filed his appearance on behalf of Carol. On September 28,
2015, the trial court appointed a guardian ad litem (GAL). On
October 19, 2015, Carol filed a response to Larry's petition.
On October 22, 2015, Carol filed a motion to modify child
support.

¶ 6 On November 2, 2015, Carol, by and through Kinnan, filed
her first motion for interim attorney fees, pursuant to sections
501(c-1) and 508 of the Illinois Marriage and Dissolution
of Marriage Act (Marriage Act) (750 ILCS 5/501(c-1), 508
(West 2014)) and section 17 of the Parentage Act of 1984 (750
ILCS 45/17 (West 2014)).

¶ 7 In her motion, Carol alleged that (1) Kinnan had expended
23.5 hours on behalf of Carol since his appearance, (2) Carol
owed Kinnan $7222 for attorney fees and costs, and (3)
Kinnan estimated that there would be an additional $8000

CONFIDENTIAL                                                                    TR-0743445

in attorney fees and costs. Of note, Carol alleged that she and "Counsel have been unable to come to an agreement on the amount of legal fees that [Carol] is willing to pay Counsel. Accordingly, Counsel, as the real party in interest, must therefore, seek legal fees on a *quantum meruit* basis." Both Kinnan and Carol attached affidavits to the motion.

¶ 8 On February 29, 2016, Carol, by and through Kinnan, filed her second motion for interim attorney fees. Kinnan's attached affidavit alleged that Carol owed him $14,464 for legal services rendered, and he sought an additional $5000 for legal services he anticipated Carol would incur. Carol's notice of motion indicated that she would present her motion to the court on March 3, 2016.

¶ 9 On March 3, 2016, at the beginning of the call, the trial court listed all of the open motions, including Larry's motion to modify "custody," now renamed "parental allocation," and his motion for "removal," now renamed "relocation"; the GAL's motion to quash Carol's subpoena of J.W.; Carol's first motion for interim attorney fees; and Carol's second motion for interim attorney fees, which the court stated had been filed that day. The court heard the GAL's motion to quash Carol's subpoena, which it granted, and then proceeded to a hearing on Larry's motion to modify the allocation of parental responsibilities. The record does not contain a transcript of the remainder of the call that day.

¶ 10 On March 8, 2016, Carol, by and through Kinnan, filed her third motion for interim attorney fees. Carol alleged the following. Thus far, Kinnan had expended 71.15 hours in representing Carol and, based on *quantum meruit*, was owed $21,385 for attorney fees and costs. Kinnan estimated an additional $2500 in attorney fees and costs. Carol also alleged that she had previously filed two motions for interim attorney fees, which were presented to the court on December 3, 2015, and March 3, 2016, and remained pending and undetermined.

¶ 11 Kinnan attached his affidavit, wherein he averred, in part, the following:

**\*737   \*\*132** "2. [Carol] \* \* \* engaged my law firm \* \* \* to represent [her] in her ongoing custody dispute with [Larry] on September 19, 2015.

3. [Kinnan] provided valuable legal services to Carol including drafting numerous pleadings, researching legal matters, consulting with [Carol,] and representing [Carol in court on several occasions.]

4. [Carol] and Counsel have been unable to come to a meeting of the minds regarding the hourly rate that [Carol] is to be charged for legal services rendered. I informed [Carol] that my hourly billing rate is $300.00. However, [Carol] has indicated that she is unable to pay Counsel for legal services rendered nor is she able to pay for her court ordered GAL fees.

5. [Carol] has not paid me a retainer fee nor has she paid me any amount towards the accrued and unpaid legal fees.

6. Counsel is not providing [Carol] any legal services on a pro bono basis and Counsel has so informed [Carol] that he is not working pro bono and that he wants to be paid for legal services rendered.

7. Notwithstanding that [Carol] is apparently unable to pay Counsel for services rendered and there has been no meeting of the minds regarding legal fees [Carol] must pay, Counsel is nevertheless entitled to be paid for services rendered on a *quantum meruit* basis. [Citation.]

8. *Quantum meruit* literally mean 'as much as he deserves.' "

¶ 12 In addition, Carol attached her affidavit to her third motion for attorney fees, wherein she averred, in part, the following:

"2. I met with [Kinnan] \* \* \* on September 19, 2015, to discuss with him [Larry's] custody and removal petitions that were pending before the court. I asked Counsel to represent me in the custody disputes.

3. I informed Counsel that I could not pay him a retainer fee, but that I would try to pay him for the legal services that he would render on my behalf. Counsel informed me that he was not going to represent me *pro bono* and that he wanted to be paid for services rendered. Counsel and I have not agreed on an hourly rate that Counsel would charge for services rendered. Counsel informed me that his billing rate is $300.00 per hour.

4. Due to my limited financial resources, I have not paid Counsel a retainer fee or any fees for the services that he has rendered and I do not have the financial resources to pay for Counsel's legal services.

\* \* \*

CONFIDENTIAL

TR-0743446

In re J.W., 2017 IL App (2d) 160554 (2017)
77 N.E.3d 734, 413 Ill.Dec. 129

8. Counsel has sent me an invoice indicating that I currently owe him in excess of $21,000 for the legal services that he has rendered to date.

9. I do not have the financial wherewithal to pay Counsel the legal fees that he is owed."

¶ 13 Carol noticed her third motion for interim attorney fees for presentment to the court on March 11, 2016.

¶ 14 On March 11, 2016, in a written order, the trial court granted Larry's petition to modify the allocation of parental responsibilities, "transferring allocation of parental responsibility from [Carol] to [Larry]." [1] The trial court further granted Larry "sole authority over all parental responsibilities." The trial court also stated that Larry's petition for permanent relocation of J.W. to Maryland was granted "by **738  **133 agreement," and, "[u]nder separate order, the parties will enter into an Agreed Order regarding parenting time * * * to be presented for review [and] entry by this Court on March 21, 2016." Finally, the trial court granted Larry 21 days to respond to Carol's third motion for fees and granted the parties 21 days to respond to the GAL's fee petition. The trial court set a hearing on fees for April 18, 2016.

[1]     The trial court set forth its findings regarding Larry's petition to modify the allocation of parental responsibilities in a separate written "Opinion & Order" dated March 11, 2016.

¶ 15 On March 24, 2016, the trial court entered an "Agreed Final Order" providing for Larry to relocate J.W. to Maryland and for Carol to have parenting time with J.W. On April 12, 2016, the trial court entered an "Agreed Order" setting the case for hearing on May 11, 2016, on "all fee petitions outstanding."

¶ 16 On May 4, 2016, Larry filed a "Motion to Strike and Dismiss [Carol's] Third Motion for Interim Attorneys [sic] Fees" pursuant to section 2-615(b) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615(b) (West 2014)). Larry alleged that Carol's motion was insufficient at law because (1) she cited to "750 ILCS 45/802(a)," which does not exist, and "750 ILCS 5/501(c-1)," which does not apply to parentage cases, and (2) Carol did not sign a retainer agreement with Kinnan; she did not want to "contractually obligate herself to pay any amount of fees to [Kinnan]." Kinnan knew this yet "agreed to file an Appearance on behalf of Carol." There

was no contract between Carol and Kinnan; therefore, their relationship "appears to be a pro bono relationship, as there was no reasonable expectation for payment from [Carol]."

¶ 17 On June 14, 2016, the trial court granted Larry's motion to dismiss Carol's third motion for interim attorney fees. The trial court ruled, under the Illinois Parentage Act of 2015 (Parentage Act of 2015) (Pub. Act 99-85 (eff. Jan. 1, 2016) (adding 750 ILCS 46/101 et seq.)) and In re Minor Child Stella, 353 Ill.App.3d 415, 288 Ill.Dec. 889, 818 N.E.2d 824 (2004), that a "motion for interim fees is certainly allowable in a paternity action. The difficulty, of course comes in the provisions of the Illinois Marriage and Dissolution of Marriage Act, and specifically section 5/508[ (c) ] which requires an agreement, a written engagement agreement as a prerequisite to a final hearing for attorney's fees and court costs. But it's not a prerequisite to interim fees." The trial court also stated that Carol's "Third Motion for Interim Attorney Fees" was actually a motion for contribution for final attorney fees pursuant to section 503(j) of the Marriage Act (750 ILCS 5/503(j)) (West 2014)). The trial court further stated that "without a written agreement in this case between Carol and Mr. Kinnan, I have to grant the motion to dismiss."

¶ 18 On July 8, 2016, Carol filed a notice of appeal.

## ¶ 19 II. ANALYSIS

[1] ¶ 20 Carol argues that the trial court failed to schedule a hearing on her first and second motions for interim attorney fees expeditiously, pursuant to 501(c-1)(1) of the Marriage Act (750 ILCS 5/501(c-1)(1) (West 2014)).

¶ 21 We begin by noting that effective January 1, 2016, the legislature repealed the Illinois Parentage Act of 1984 (750 ILCS 45/1 et seq. (West 2014)) and replaced it with the Parentage Act of 2015 (Pub. Act 99-85 (eff. Jan. 1, 2016) (adding 750 ILCS 46/101 et seq.)).

¶ 22 Carol filed her first motion for interim attorney fees on November 2, 2015, her second motion for interim attorney fees on February 29, 2016, and her third motion for interim attorney fees on March 8, 2016. Therefore, when Carol filed her second and third motions the Parentage **739  **134 Act of 2015 was in effect. However, after reviewing the language of the relevant sections of the Parentage Act of 1984 and the Parentage Act of 2015, we determine that the timing

CONFIDENTIAL     TR-0743447

In re J.W., 2017 IL App (2d) 160554 (2017)
77 N.E.3d 734, 413 Ill.Dec. 129

of the filing of Carol's motions does not affect our decision here.

**[2]** **[3]** **[4]** ¶ 23 The primary rule of statutory construction is to give effect to the intent of the legislature. *Hayashi v. Illinois Department of Financial & Professional Regulation,* 2014 IL 116023, ¶ 16, 388 Ill.Dec. 878, 25 N.E.3d 570. The most reliable indicator of legislative intent is the statutory language itself, which must be given its plain and ordinary meaning. *Id.* We review de novo issues of statutory construction. *Id.*

¶ 24 Section 17 of the Parentage Act of 1984, relating to costs, provided:

"[T]he court may order *reasonable fees of counsel,* experts, and other costs of the action, pre-trial proceedings, post-judgment proceedings to enforce or modify the judgment, and the appeal or the defense of an appeal of the judgment, *to be paid by counsel in accordance with the relevant factors specified in Section 508 of the Illinois Marriage and Dissolution of Marriage Act * * *.*" (Emphases added.) 750 ILCS 45/17 (West 2014).

¶ 25 Similarly, section 809(a) of the Parentage Act of 2015, relating to the right to counsel, provides:

"[T]he court may order, *in accordance with the relevant factors specified in Section 508 of the Illinois Marriage and Dissolution of Marriage Act, reasonable fees of counsel,* experts, and other costs of the action, pre-trial proceedings, post-judgment proceedings to enforce or modify the judgment, and the appeal or the defense of an appeal of the judgment *to be paid by the parties.*" (Emphases added.) 750 ILCS 46/809(a) (West Supp. 2015).

¶ 26 Thus, both section 17 of the Parentage Act of 1984 (750 ILCS 45/17 (West 2014)) and section 809(a) of the Parentage Act of 2015 (750 ILCS 46/809(a) (West Supp. 2015)) provide that, in a parentage action, the court may order reasonable fees of counsel and costs to be paid by the parties "in accordance with the relevant factors specified in *Section 508* of the Illinois Marriage and Dissolution of Marriage Act." (Emphasis added.) Accordingly, both sections are essentially the same for our purposes here. Therefore, the timing of the filing of Carol's motions for interim attorney fees is not relevant to our analysis in this case.

¶ 27 Neither section 17 of the Parentage Act of 1984 nor section 809(a) of the Parentage Act of 2015 uses the

words "interim fees," but the sections refer to payment of "reasonable fees of counsel" for every stage of the proceedings, and then the sections direct the court to the "relevant factors specified in Section 508" of the Marriage Act.

¶ 28 Section 508 of the Act provides:

"(a) The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. Interim attorney's fees and costs *may be awarded from the opposing party, in a pre-judgment dissolution proceeding in accordance with subsection (c-1) of Section 501* [ (750 ILCS 5/501) ] * * *." (Emphasis added.) 750 ILCS 5/508(a) (West 2014).

Thus, section 508 does not specify any relevant factors. Instead, it points to section 501(c-1) for the way "interim attorney's fees and costs may be awarded from the opposing party." *Id.*

¶ 29 Section 501(c-1) provides:

***740** ***135** "(c-1) As used in this subsection (c-1), 'interim attorney's fees and costs' means attorney's fees and costs assessed from time to time while a case is pending, in favor of the petitioning party's current counsel, for reasonable fees and costs either already incurred or to be incurred, and 'interim award' means an award of interim attorney's fees and costs. Interim awards shall be governed by the following:

(1) Except for good cause shown, a proceeding for (or relating to) interim attorney's fees and costs in a pre-judgment dissolution proceeding shall be nonevidentiary and summary in nature. All hearings for or relating to interim attorney's fees and costs under this subsection *shall be scheduled expeditiously by the court.*" (Emphasis added.) 750 ILCS 5/501(c-1) (West 2014).

Then, in subsections (c-1)(1)(A)-(I), it sets forth nine factors for the court to consider when making an award. 750 ILCS 5/501(c-1)(1)(A)-(I) (West 2014).

¶ 30 Carol argues that the trial court abused its discretion by failing to expeditiously schedule hearings on her first and second motions for interim attorney fees. Carol filed her first motion for interim attorney fees on November 2, 2015.

CONFIDENTIAL

TR-0743448

Carol's notice of motion indicated that the motion would be presented to the trial court on December 3, 2015, at a status call. However, Carol's first motion for interim attorney fees was not heard that day; instead, the trial court stated that it would "set [the case] for trial on all open pleadings" the following Tuesday. Carol asserts that the following Tuesday the trial court did not set a hearing date for her first motion for interim attorney fees. Regarding Carol's second motion, filed on February 29, 2016, she argues that the trial court stated on March 3, 2016, that it had not yet scheduled a hearing on her motion.

 **[5]**  ¶ 31 While it is true that a party who requests a hearing on attorney fees must be given one, the failure to request such a hearing results in a forfeiture of one's right to the hearing. See *Cabrera v. First National Bank of Wheaton*, 324 Ill.App.3d 85, 103, 257 Ill.Dec. 512, 753 N.E.2d 1138 (2001) (failure to request a hearing on a motion results in forfeiture).

¶ 32 In this case, Carol does not indicate where in the record she ever asked the trial court for a hearing date on either her first or second motion for interim attorney fees, or where in the record the trial court denied Carol's request for a hearing. In fact, during the hearing on Larry's motion to dismiss Carol's third motion for interim attorney fees, the trial court stated:

> "There has been an argument made that a prior interim fee petition had been filed by Carol and somehow the Court has denied Carol access to the Court system to have those matters resolved in a timely way.
>
>  The Court has no recollection of such denial."

¶ 33 Carol cites nothing in the record that contradicts the trial court's finding. Accordingly, we conclude that Carol forfeited her right to a hearing on her first and second motions for interim attorney fees. See *id.*

¶ 34 Next, Carol argues that the trial court erred by granting Larry's section 2-615 motion to dismiss her third motion for interim attorney fees.

 **[6]**   **[7]**   **[8]**   **[9]**  ¶ 35 A motion to dismiss under section 2-615 of the Code challenges only the legal sufficiency of the complaint. *Bonhomme v. St. James*, 2012 IL 112393, ¶ 34, 361 Ill.Dec. 1, 970 N.E.2d 1. The critical inquiry is whether the allegations of the complaint, when considered in the light **\*741  \*\*136**  most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Id.* All well-pled facts in the complaint must be taken as

true, but conclusions of law will not be taken as true unless supported by specific factual allegations. *Id.* The dismissal of a complaint under section 2-615 of the Code is reviewed *de novo*. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47, 365 Ill.Dec. 517, 978 N.E.2d 1020.

¶ 36 Carol argues that the trial court applied the wrong rule of law in granting Larry's section 2-615 motion to dismiss her third motion for interim attorney fees. Carol argues that the trial court (1) erroneously characterized her motion as for a final fee contribution pursuant to section 503(j) of the Marriage Act (750 ILCS 5/503(j) (West 2014)) and (2) erroneously determined that, without a written agreement between Carol and Kinnan, section 508(c) of the Marriage Act (750 ILCS 5/508(c) (West Supp. 2015)) precluded attorney fees and costs.

 **[10]**  ¶ 37 Because it is dispositive, we discuss Carol's second argument first. Section 508(c) provides, in part:

> "(c) *Final hearings for attorney's fees and costs against an attorney's own client*, pursuant to a Petition for Setting Final Fees and Costs of either a counsel or a client, shall be governed by the following:
>
>  \* \* \*
>
> (2) No final hearing under this subsection (c) is permitted unless: (i) *the counsel and the client had entered into a written engagement agreement* at the time the client retained the counsel (or reasonably soon thereafter) and the agreement meets the requirements of subsection (f); (ii) the written engagement agreement is attached to an affidavit of counsel that is filed with the petition or with the counsel's response to a client's petition; (iii) judgment in any contribution hearing on behalf of the client has been entered or the right to a contribution hearing under subsection (j) of Section 503 has been waived; (iv) the counsel has withdrawn as counsel of record; and (v) the petition seeks adjudication of all unresolved claims for fees and costs between the counsel and the client. Irrespective of a Petition for Setting Final Fees and Costs being heard in conjunction with an original proceeding under this Act, the relief requested under a Petition for Setting Final Fees and Costs constitutes a distinct cause of action. A pending but undetermined Petition for Setting Final Fees and Costs shall not affect appealability or enforceability of any judgment or other adjudication in the original proceeding." (Emphases added.) *Id.*

CONFIDENTIAL

TR-0743449

¶ 38 The plain language of section 508(c) clearly indicates that the legislature intended the requirement of a "written engagement agreement" to apply to "an attorney seeking fees from his or her former client." *In re Parentage of Rocca,* 408 Ill.App.3d 956, 967, 349 Ill.Dec. 507, 946 N.E.2d 1003 (2011). As the issue here involves Carol seeking fees from the opposing party, section 508(c) is inapplicable here. See *id.*

**[11]** ¶ 39 Larry argues that section 508 directs courts to apply certain section 503 factors. Larry notes that section 508(a) provides that "[a]ll provisions for contribution under this subsection shall also be subject to [paragraph (5) of subsection (j) of Section 503]." 750 ILCS 5/508(a) (West 2014). Larry also notes that section 503(j)(5) provides:

"A contribution award (payable to either the petitioning party *or the party's* **\*742 \*\*137** *counsel,* or jointly, as the court determines) may be in the form of either a set dollar amount or a percentage of fees and costs (or a portion of fees and costs) *to be subsequently agreed upon by the petitioning party and counsel or,* alternatively, thereafter determined in a hearing pursuant to subsection (c) of Section 508 or previously or thereafter determined in an independent proceeding under subsection (e) of Section 508." (Emphases added.) 750 ILCS 5/503(j)(5) (West 2014).

Larry contends that, therefore, if a set dollar amount cannot be agreed upon by the petitioning party and counsel, then that amount must be determined in a hearing pursuant to either subsection (c) or (e) of section 508.

¶ 40 Larry concludes that, because the amount of fees Carol owes to Kinnan is uncertain, a determination must be made pursuant to section 508(c) before any amount of contribution from Larry can be assessed; otherwise section 503(j)(5) has no meaning. We disagree with Larry.

¶ 41 The plain language of section 503(j)(5) clearly indicates that the legislature intended that, where counsel has received no payment from his client due to hardship, a court could order a contribution award "to the party's counsel." Section 508(c) applies only if counsel and his client, the "petitioning party," cannot agree on how much each should receive from the contribution award. In this case, Carol has no claim to any contribution amount, because the record indicates that she has paid nothing to Kinnan. Attorney fees, while awarded to the client, actually belong to the attorney. See *Rocca,* 408 Ill.App.3d at 969, 349 Ill.Dec. 507, 946 N.E.2d 1003.

¶ 42 Our interpretation is in concert with the purposes underlying the Parentage Act. In *Stella,* the appellate court, addressing two certified questions, held that interim attorney fees can be awarded in a parentage proceeding under the costs provision of the Parentage Act of 1984 (750 ILCS 45/17 (West 2002)) and sections 501(c-1) and 508 of the Marriage Act (750 ILCS 5/501(c1), 508 (West 2002)). *Stella,* 353 Ill.App.3d at 420-21, 288 Ill.Dec. 889, 818 N.E.2d 824. The appellate court reasoned that a "fundamental reason" for the interim fee system in the Marriage Act was to "prevent a party from using his or her relative wealth as a litigation tool." (Internal quotation marks omitted.) *Id.* at 420, 288 Ill.Dec. 889, 818 N.E.2d 824. Further, the court explained:

"Providing interim attorney fees in Parentage Act and Marriage Act cases well might produce similar public policy benefits that would not have escaped the legislature's attention: avoiding long delays, discouraging the use of superior assets as a litigation tool, encouraging attorneys to undertake parentage actions, and reducing the risk of simply outlasting the disadvantaged party." *Id.* at 420-21, 288 Ill.Dec. 889, 818 N.E.2d 824.

¶ 43 Similarly, in *Rocca,* this court held that the mother's attorney had a right to seek contribution from the father for attorney fees under the Parentage Act of 1984. Our court stated:

" 'The fee-shifting provisions of section 508, coupled with the court's ability to award fees directly to the attorney, provide an incentive for attorneys who might otherwise decline to represent spouses with few financial resources of their own. Thus, the attorney's right to proceed against the other spouse for an award of fees is oftentimes essential to a spouse's ability to procure legal representation.' " *Rocca,* 408 Ill.App.3d at 962, 349 Ill.Dec. 507, 946 N.E.2d 1003 (quoting **\*743 \*\*138** *Lee v. Lee,* 302 Ill.App.3d 607, 612-13, 236 Ill.Dec. 222, 707 N.E.2d 67 (1998)).

¶ 44 Thus, the trial court erroneously determined that, without a written agreement between Carol and Kinnan, section 508(c) of the Marriage Act precluded contribution to attorney fees and costs. Accordingly, the trial court erred by dismissing Carol's motion for attorney fees. The trial court should have held an evidentiary hearing, despite the lack of a written agreement between Kinnan and his client pursuant to section 508(c). The cause is remanded to the trial court for a hearing on Carol's motion seeking contribution to attorney fees and costs pursuant to sections 508(a) and 503(j) of the Marriage Act. See 750 ILCS 5/508(a) (West 2014) ("[C]ontribution to

CONFIDENTIAL

TR-0743450

In re J.W., 2017 IL App (2d) 160554 (2017)

77 N.E.3d 734, 413 Ill.Dec. 129

attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 * * *."); 750 ILCS 5/503(j) (West 2014).

¶ 45 III. CONCLUSION

¶ 46 For the reasons stated, we reverse the trial court's order and remand for further proceedings.

¶ 47 Reversed and remanded.

Justices Zenoff and Burke concurred in the judgment and opinion.

**All Citations**

2017 IL App (2d) 160554, 77 N.E.3d 734, 413 Ill.Dec. 129

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

CONFIDENTIAL

TR-0743451

# EXHIBIT 114

🚩 KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Korean Presbyterian Church of Seattle
Normalization Committee v. Lee, Wash.App. Div. 1, September 26,
1994

723 S.W.2d 544
Missouri Court of Appeals,
Western District.

Harold and Hazel HESTER, Appellants,

v.

Donald R. BARNETT, Respondent.

No. WD 36517.
|
Jan. 20, 1987.

**Synopsis**

Husband and wife brought action against clergyman alleging
defamation, ministerial malpractice, alienation of affections,
intentional infliction of emotional distress, invasion of
privacy, and interference with contract. Minister moved to
dismiss. The Circuit Court, Nodaway County, Montgomery
L. Wilson, J., sustained minister's motion to dismiss as to
each of several counts. Plaintiffs appealed. The Court of
Appeals, Shangler, J., held that: (1) even assuming viability
of clergyman malpractice remedy for negligent counseling,
allegation that minister "acted contrary to ministerial ethics
and against Missouri law * * * and against the standard
of conduct imposed upon ministers of the gospel" did not
allege such cause of action; (2) plaintiffs pleaded cause
of action for spousal alienation of affections; (3) claim of
parent against third person for alienation of affections of
child is not actionable; (4) complaint pleaded justiciable
claim for defamation; (5) complaint sufficiently pleaded tort
of unreasonable intrusion upon seclusion of another; (6)
complaint pleaded cause of action for tortious interference
with contract; and (7) allegations described secular conduct
and hence stated cause of action outside scope of free exercise
clause.

Affirmed in part and reversed in part; reinstatement of counts
II and V ordered.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**West Headnotes (57)**

**[1]    Pretrial Procedure** 🔑 **Well-pleaded facts**

307A   Pretrial Procedure
307AIII   Dismissal
307AIII(B)   Involuntary Dismissal
307AIII(B)6   Proceedings and Effect
307Ak686   Matters Deemed Admitted
307Ak687   Well-pleaded facts

Motion to dismiss concedes truth of all facts well
pleaded, so that in assessment of sufficiency of
petition under such motion, all facts properly
pleaded are assumed as true, averments are given
liberal construction, and petition is given favor of
those inferences fairly deducible from the facts
alleged. V.A.M.R. 55.05.

2 Cases that cite this headnote

**[2]    Pretrial Procedure** 🔑 **Insufficiency in
general**

307A   Pretrial Procedure
307AIII   Dismissal
307AIII(B)   Involuntary Dismissal
307AIII(B)4   Pleading, Defects In, in General
307Ak622   Insufficiency in general

Petition suffices against motion to dismiss if
averments, given every reasonable intendment,
invoke substantive remedy. V.A.M.R. 55.05.

**[3]    Religious Societies** 🔑 **Torts**

332   Religious Societies
332k30   Torts

Cleric is amenable to suit for alienation of
affection albeit guised as religious practice,
assault and battery committed during religious
service, malicious prosecution of parents
informed against by cleric for child abuse,
obstention of donations of money by fraud, and
for other incidences of intentional tort in exercise
of religious duty.

**[4]    Religious Societies** 🔑 **Torts**

332   Religious Societies
332k30   Torts

CONFIDENTIAL                                                                          TR-0562422

Intentional torts of cleric are actionable, even though incidents of religious practice and belief.

1 Cases that cite this headnote

**[5]    Constitutional Law**  🔑  Clergy;  Ministers

92    Constitutional Law
92XIII    Freedom of Religion and Conscience
92XIII(B)    Particular Issues and Applications
92k1327    Religious Organizations in General
92k1340    Clergy;  Ministers
92k1340(1)    In general
    (Formerly 92k84.5(10))

Liability for cleric's intentional torts does not clash with free exercise clause of First Amendment because conduct, albeit promoted by religious belief, is subject to regulation for protection of society. U.S.C.A. Const.Amend. 1.

17 Cases that cite this headnote

**[6]    Religious Societies**  🔑  Torts

332    Religious Societies
332k30    Torts

While statute which renders clergyman incompetent to testify concerning communication made to him in professional character as spiritual advisor no doubt means to encourage effective relationship between spiritual advisor and communicant, enactment has no effect beyond its actual terms and does not impose "minimum standard for the profession." V.A.M.S. § 491.060(4).

1 Cases that cite this headnote

**[7]    Religious Societies**  🔑  Torts

332    Religious Societies
332k30    Torts

Tradition that spiritual advisor not divulge communications received in that capacity, even if tenet of "ministerial ethics," describes moral, not legal duty.

2 Cases that cite this headnote

**[8]    Torts**  🔑  Duty and breach thereof in general

379    Torts
379I    In General

379k109    Duty and breach thereof in general
    (Formerly 379k3)

Breach of moral duty is not sufficient to invest tort liability.

1 Cases that cite this headnote

**[9]    Religious Societies**  🔑  Torts

332    Religious Societies
332k30    Torts

Even assuming viability of clergyman malpractice remedy for negligent counseling, allegation that minister "acted contrary to ministerial ethics and against Missouri law * * * and against the standard of conduct imposed upon ministers of the gospel" did not allege such cause of action.

2 Cases that cite this headnote

**[10]    Marriage and Cohabitation**  🔑  Right of action;  effect of statute

253    Marriage and Cohabitation
253VI    Torts
253VI(B)    Alienation of Affections
253k1102    Right of action;  effect of statute
    (Formerly 205k323.1, 205k323 Husband and Wife)

Tort of alienation of affections of a spouse, albeit discarded as a remedy in many states, remains intact in Missouri.

1 Cases that cite this headnote

**[11]    Marriage and Cohabitation**  🔑  Pleading

253    Marriage and Cohabitation
253VI    Torts
253VI(B)    Alienation of Affections
253k1107    Pleading
    (Formerly 205k332 Husband and Wife)

Complaint sufficiently pleaded cause of action against minister for spousal alienation of affections; pleading alleged that minister had implied that wife's separation from her husband would gain wife friendship of members of community over whom minister claimed to exercise influence and control, and that as direct and proximate result of such tortious conduct,

CONFIDENTIAL    TR-0562423

wife lost love, care, companionship, consortium and trust of her husband.

**[12]    Constitutional Law** 🔑 **Particular Issues and Applications**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1310   In general
(Formerly 92k84.5(1))

Conduct or actions which pose some substantial threat to public safety, peace or order may be subject to governmental regulation, even though prompted by religious beliefs or principles. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[13]    Constitutional Law** 🔑 **Family Law**

**Marriage and Cohabitation** 🔑 **Right of action;  effect of statute**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1404   Family Law
92k1405   In general
(Formerly 92k84.5(1))
253   Marriage and Cohabitation
253VI   Torts
253VI(B)   Alienation of Affections
253k1102   Right of action;  effect of statute
(Formerly 205k323.1, 205k323 Husband and Wife)

Intentional interference with spousal relationship by third person is threat to public welfare and order that law may redress, right of free exercise of religion notwithstanding, and alienation of affections of one spouse from the other disrupts not only personal felicity but also undermines family relationship; where however, interference involves merely preachment of doctrine or advocacy of religious faith without unlawful or improper motive, no paramount state consideration is affected, and alienation is not actionable. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[14]    Parent and Child** 🔑 **Interference with parent-child relationship**

285   Parent and Child
285VI   Rights, Duties, and Liabilities Concerning Relation
285VI(C)   Parent's Claims for Injuries to Child
285k322   Existence, Nature, and Grounds of Action
285k326   Interference with parent-child relationship
(Formerly 285k7(1))

Claim of parent against third person for alienation of affections of child is not actionable.

3 Cases that cite this headnote

**[15]    Libel and Slander** 🔑 **Setting out defamatory matter**

237   Libel and Slander
237IV   Actions
237IV(B)   Parties, Preliminary Proceedings, and Pleading
237k79   Declaration, Complaint, or Petition
237k85   Setting out defamatory matter

Allegations that minister published and republished among church members and community at large, false statements imputing to character defamation plaintiffs crimes of theft, arson and child abuse, dishonesty in business and cruelty to children, stated cause of action for defamation. U.S.C.A. Const.Amend. 1.

**[16]    Libel and Slander** 🔑 **Presumption as to damage;  special damages**

237   Libel and Slander
237I   Words and Acts Actionable, and Liability Therefor
237k31   Injury from Defamation
237k33   Presumption as to damage;  special damages

False utterances which hold one up to hatred, contempt or ridicule, or cause person to be shunned and avoided, or which induce evil opinion of one in minds of right-thinking persons are defamations actionable per se.

1 Cases that cite this headnote

CONFIDENTIAL                                                                                                    TR-0562424

**[17]**  **Libel and Slander**  👉 **Presumption as to damage; special damages**

237  Libel and Slander

237I  Words and Acts Actionable, and Liability Therefor

237k31  Injury from Defamation

237k33  Presumption as to damage; special damages

False imputation of crime is defamatory per se, as is false imputation that person is dishonest in business relation, or, by very definition, imputation that parents cruelly abuse their children.

2 Cases that cite this headnote

**[18]**  **Libel and Slander**  👉 **Setting out defamatory matter**

237  Libel and Slander

237IV  Actions

237IV(B)  Parties, Preliminary Proceedings, and Pleading

237k79  Declaration, Complaint, or Petition

237k85  Setting out defamatory matter

To be sufficient as pleading for libel per se, petition must set forth defamation published in haec verba, or, at very least, paraphrase of what is charged as the libel.

1 Cases that cite this headnote

**[19]**  **Libel and Slander**  👉 **Nature and grounds of privilege in general**

237  Libel and Slander

237II  Privileged Communications, and Malice Therein

237k34  Nature and grounds of privilege in general

It is not time or place of alleged defamation, but occasion which determines whether publication of slander is privileged and whether slander is, under circumstances, absolutely or conditionally or qualifiedly privileged.

**[20]**  **Libel and Slander**  👉 **Form and requisites in general**

237  Libel and Slander

237IV  Actions

237IV(B)  Parties, Preliminary Proceedings, and Pleading

237k79  Declaration, Complaint, or Petition

237k80  Form and requisites in general

Count, in which it was alleged that minister published and republished false statements among church members in sermons from pulpit of church, letters and other written publications, and reports to child abuse hot line, and at convocations of neighbors, sufficiently defined occasions for publications of false statements, for purpose of alleging cause of action for defamation of character. U.S.C.A. Const.Amend. 1.

**[21]**  **Libel and Slander**  👉 **Absolute Privilege**

**Libel and Slander**  👉 **Qualified Privilege**

237  Libel and Slander

237II  Privileged Communications, and Malice Therein

237k35  Absolute Privilege

237k36  In general

237  Libel and Slander

237II  Privileged Communications, and Malice Therein

237k40  Qualified Privilege

237k41  In general

Privilege, absolute or qualified, is complete defense against liability for libel.

1 Cases that cite this headnote

**[22]**  **Libel and Slander**  👉 **Good faith in exercise of privilege or right**

237  Libel and Slander

237II  Privileged Communications, and Malice Therein

237k50  Good faith in exercise of privilege or right

Qualified privilege is conditioned upon good motive and reasonable behavior and is forfeited if abused.

**[23]**  **Libel and Slander**  👉 **Existence and Effect of Malice**

237  Libel and Slander

CONFIDENTIAL

TR-0562425

237II   Privileged Communications, and Malice
Therein
237k51   Existence and Effect of Malice
237k51(1)   In general
Publications uttered with malice forfeit the
immunity of privilege; malice, however, does not
destroy an absolute privilege.

**[24]**   **Libel and Slander**   Absolute Privilege

237   Libel and Slander
237II   Privileged Communications, and Malice
Therein
237k35   Absolute Privilege
237k36   In general
Absolute immunity as to defamatory
publications is confined to the few situations
where there is an obvious policy in favor
of permitting complete freedom of expression,
without any inquiry as to defendant's motives;
occasions for absolute privilege are limited
and extend to judicial, legislative or executive
proceedings, among others, and to occasions
where communication is provided for and
required by law.

4 Cases that cite this headnote

**[25]**   **Libel and Slander**   Absolute Privilege

237   Libel and Slander
237II   Privileged Communications, and Malice
Therein
237k35   Absolute Privilege
237k36   In general
Immunity from liability that statute grants to
reports of child abuse or neglect are not
absolute, but qualified and conditional. V.A.M.S.
§ 210.135.

1 Cases that cite this headnote

**[26]**   **Libel and Slander**   Exceeding privilege or
right

237   Libel and Slander
237II   Privileged Communications, and Malice
Therein
237k50.5   Exceeding privilege or right
(Formerly 237k501/2)

Allegations that minister knew his statements
and publication that defamation character
plaintiffs practiced child abuse were false when
made were not subject to immunity under statute
granting privilege to reports of child abuse or
neglect. V.A.M.S. § 210.135.

2 Cases that cite this headnote

**[27]**   **Constitutional Law**   Freedom of Religion
and Conscience

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(A)   In General
92k1290   In general
(Formerly 92k84.2, 92k84(1))
Only religious freedom to believe is absolute;
freedom to act remains subject to regulation for
protection of society. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[28]**   **Constitutional Law**   Beliefs protected;
inquiry into beliefs

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(A)   In General
92k1292   Beliefs protected; inquiry into beliefs
(Formerly 92k84(2))
Where truth or falsity of religious belief
becomes object of judicial redress, inquiry enters
forbidden domain. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[29]**   **Constitutional Law**   Particular Issues and
Applications

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1310   In general
(Formerly 92k84.5(1))
Court may justly allow vindication of right to
reputation without constitutional infringement,
albeit words and conduct of defamation
were uttered in religious setting. U.S.C.A.
Const.Amend. 1.

CONFIDENTIAL   TR-0562426

Hester v. Barnett, 723 S.W.2d 544 (1987)

**[30]   Constitutional Law 👈 Free Exercise of Religion**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(A)   In General
92k1302   Free Exercise of Religion
92k1303   In general
(Formerly 92k84.1, 92k84(1))

It is only religious belief and practice that free exercise clause protects absolutely against governmental regulation, and not secular belief and practice. U.S.C.A. Const.Amend. 1.

**[31]   Constitutional Law 👈 Particular Issues and Applications**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1310   In general
(Formerly 92k84.5(1))

Claim and proof of defamation may not involve truth or falsity of statements of religious belief or tenet made by minister; however, they could show that, although delivered in milieu of religious practice, beliefs asserted as religious were not held as such in good faith, but were used to cloak secular purpose that is, to injure reputation. U.S.C.A. Const.Amend. 1.

3 Cases that cite this headnote

**[32]   Constitutional Law 👈 Clergy; Ministers**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1327   Religious Organizations in General
92k1340   Clergy; Ministers
92k1340(1)   In general
(Formerly 92k84.5(10))

Minister's alleged statements imputing to defamation of character plaintiffs crimes of theft, arson, child abuse, dishonesty in business and cruelty to children, were not of kind inherently and invariably expressions of religious belief or religious purpose so as to come under absolute protection of free exercise clause against governmental regulation; thus, it was competent for court to inquire whether sermon declarations were expressions of actual creed and practice, held in exercise of good faith, or were merely religious occasions for wholly secular purpose of intentional defamation and injury to reputation of persons not even communicants of church. U.S.C.A. Const.Amend. 1.

5 Cases that cite this headnote

**[33]   Constitutional Law 👈 Particular Issues and Applications**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1310   In general
(Formerly 92k84.5(1))

Free exercise clause forbids court from any evaluation of "correctness" of content of religious sermons as expressions of belief or religious practice. U.S.C.A. Const.Amend. 1.

**[34]   Constitutional Law 👈 Discipline; expulsion**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1327   Religious Organizations in General
92k1336   Membership
92k1336(2)   Discipline; expulsion
(Formerly 92k84.5(7.1), 92k84.5(7))

If defamation of character plaintiffs were members of minister's church and congregation, they presumptively consented to religiously motivated discipline practiced in good faith.

2 Cases that cite this headnote

**[35]   Religious Societies 👈 Membership in general**

332   Religious Societies
332k7   Membership in general

Consent to submit to discipline of church, sect, or congregation is one of contract between member and religious body.

1 Cases that cite this headnote

**[36]   Religious Societies 👈 Membership in general**

332   Religious Societies
332k7   Membership in general

CONFIDENTIAL                                                                                    TR-0562427

Discipline religious body may impose upon those who consent to submit to its discipline must be within terms of that consent.

**[37]    Libel and Slander** 🗝️ **Common membership in church**

237   Libel and Slander
237II   Privileged Communications, and Malice Therein
237k40   Qualified Privilege
237k45   Common Interest in Subject-Matter
237k45(3)   Common membership in church
Minister's statements, from pulpit and other locations, if made to members of minister's church or congregation, were privileged communications enjoined by duty upon minister to church members with corresponding interest or duty. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[38]    Libel and Slander** 🗝️ **Existence and Effect of Malice**

237   Libel and Slander
237II   Privileged Communications, and Malice Therein
237k51   Existence and Effect of Malice
237k51(1)   In general
Privilege granted to expressions of religious practice is qualified and is lost if it is proven that declarant acted with intention to injure reputation, feelings or profession; use of pulpit as pretext for practice of religion, but as occasion for intentional defamation is neither justified by privilege nor protected by free exercise clause. U.S.C.A. Const.Amend. 1.

**[39]    Libel and Slander** 🗝️ **Privilege**

237   Libel and Slander
237IV   Actions
237IV(C)   Evidence
237k101   Presumptions and Burden of Proof
237k101(4)   Privilege
Burden to prove defense of privilege in defamation action rests on person who asserts privilege.

**[40]    Libel and Slander** 🗝️ **Setting out defamatory matter**

237   Libel and Slander
237IV   Actions
237IV(B)   Parties, Preliminary Proceedings, and Pleading
237k79   Declaration, Complaint, or Petition
237k85   Setting out defamatory matter
Allegations attributing false statements delivered by minister, published and republished among church members and community at large, which imputed to defamation of character plaintiffs the crimes of theft, arson and child abuse, dishonesty in business and cruelty to children pleaded justiciable claim for defamation.

1 Cases that cite this headnote

**[41]    Damages** 🗝️ **Nature of conduct**

115   Damages
115III   Grounds and Subjects of Compensatory Damages
115III(A)   Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2   Mental Suffering and Emotional Distress
115k57.19   Intentional or Reckless Infliction of Emotional Distress; Outrage
115k57.22   Nature of conduct
(Formerly 115k50.10)
Gist of "tort of extreme and outrageous conduct" is intentional infliction of emotional distress on another by conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community; it is conduct so extreme as to exceed any reasonable limit of social toleration.

5 Cases that cite this headnote

**[42]    Pleading** 🗝️ **Adoption of allegations in other pleadings**

302   Pleading
302I   Form and Allegations in General
302k15   Adoption of allegations in other pleadings
Adoption by reference technique is designed to avoid repetition and redundancy characteristic

CONFIDENTIAL                                                                                                          TR-0562428

of common-law system of pleading. V.A.M.R.
55.12.

[43]    **Pleading** 🔑 Adoption of allegations in other
pleadings

302   Pleading
302I   Form and Allegations in General
302k15   Adoption of allegations in other pleadings
Adoption by reference procedure for pleading
does not dispel requirement that pleadings,
as enhanced by reference adopted, be simple,
concise, and direct. V.A.M.R. 55.04, 55.05,
55.12; Fed.Rules Civ.Proc.Rule 10(c), 28
U.S.C.A.

2 Cases that cite this headnote

[44]    **Pleading** 🔑 Adoption of allegations in other
pleadings

302   Pleading
302I   Form and Allegations in General
302k15   Adoption of allegations in other pleadings
Reference not sufficiently clear and explicit
to advise adversary of the issue tendered
for trial is not effective as incorporation
of pleading. V.A.M.R. 55.04, 55.05, 55.12;
Fed.Rules Civ.Proc.Rule 10(c), 28 U.S.C.A.

[45]    **Pleading** 🔑 Reference from one count or
paragraph to another

302   Pleading
302II   Declaration, Complaint, Petition, or
Statement
302k54   Reference from one count or paragraph to
another
Attributions of infamous conduct alleged in
first count as defamations would not be
incorporated into second count alleging extreme
and outrageous conduct, as to do so would be to
allow not alternative remedy, but redundant and
duplicate remedy. V.A.M.R. 55.06(a).

1 Cases that cite this headnote

[46]    **Pleading** 🔑 Adoption of allegations in other
pleadings

302   Pleading

302I   Form and Allegations in General
302k15   Adoption of allegations in other pleadings
Attempted incorporation by reference by
allusion, in count alleging extreme and
outrageous conduct, to "those actions described
specifically in other Counts" did not inform
defendant as to nature and extent of
incorporation, and it was thus ineffective as
adoption by reference. V.A.M.R. 55.12.

1 Cases that cite this headnote

[47]    **Torts** 🔑 Intrusion

379   Torts
379IV   Privacy and Publicity
379IV(B)   Privacy
379IV(B)2   Intrusion
379k340   In general
(Formerly 379k8.5(4), 379k5(4))
Unreasonable intrusion upon seclusion of
another tort encompasses three elements:
existence of secret and private subject matter,
right in plaintiffs to keep that subject matter
private, and obtainment by defendant of
information about that subject matter through
unreasonable means.

8 Cases that cite this headnote

[48]    **Torts** 🔑 Intrusion

379   Torts
379IV   Privacy and Publicity
379IV(B)   Privacy
379IV(B)2   Intrusion
379k340   In general
(Formerly 379k8.5(4))
Publicity is not element of tort of unreasonable
intrusion upon seclusion of another.

3 Cases that cite this headnote

[49]    **Torts** 🔑 Particular cases in general

379   Torts
379IV   Privacy and Publicity
379IV(B)   Privacy
379IV(B)1   Privacy in General
379k332   Particular cases in general
(Formerly 379k26(1))
Allegation that minister had intruded upon
solitude and seclusion by entering home

CONFIDENTIAL

Hester v. Barnett, 723 S.W.2d 544 (1987)

under disguise of helping family through family counseling and assistance with children's behavior problems, when minister's true motive was to harm, sufficiently pleaded tort of unreasonable intrusion upon seclusion of another.

3 Cases that cite this headnote

**[50]   Torts 🔑 Pleading**

379   Torts
379IV   Privacy and Publicity
379IV(D)   Actions in General
379k415   Pleading
    (Formerly 379k26(1))
Allegation that minister made public untrue accusations of child abuse with intent and for purpose of disturbing privacy did not suffice either as statement of claim for unreasonable publication of private facts tort, or for false light of invasion of privacy tort.

3 Cases that cite this headnote

**[51]   Torts 🔑 Privacy in General**

379   Torts
379IV   Privacy and Publicity
379IV(B)   Privacy
379IV(B)1   Privacy in General
379k330   In general
    (Formerly 379k8.5(2))
Tort of invasion of privacy is not species of defamation; where claim for recovery on either theory, publication of private facts or false light invasion of privacy, involves untrue statements, appropriate remedy is by defamation.

6 Cases that cite this headnote

**[52]   Constitutional Law 🔑 Clergy; Ministers**

92   Constitutional Law
92XIII   Freedom of Religion and Conscience
92XIII(B)   Particular Issues and Applications
92k1327   Religious Organizations in General
92k1340   Clergy; Ministers
92k1340(1)   In general
    (Formerly 92k84.5(10))
Count pleading injury from course of intentionally tortious action by minister, on

occasion only pretextually religious, but actually entirely secular, was not offensive to free exercise clause. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[53]   Labor and Employment 🔑 Pleading**

231H   Labor and Employment
231HIX   Interference with the Employment Relationship
231Hk915   Actions in General
231Hk917   Pleading
    (Formerly 379k26(1))
Count pleading that minister enticed, harassed, intimidated, and threatened, and caused employees to leave employment, thereby rendering plaintiffs unable to employ and maintain labor to conduct their business, and that minister's actions were intentional and malicious, sufficiently pleaded cause of action for tortious interference with contract.

1 Cases that cite this headnote

**[54]   Torts 🔑 Contracts**

379   Torts
379III   Tortious Interference
379III(B)   Business or Contractual Relations
379III(B)1   In General
379k212   Contracts
    (Formerly 379k26(1))
In order to plead tortious interference with contract, it is enough that petition plead business relationship, present or future, with which defendant has knowingly interfered, without justification, to damage of pleaders.

2 Cases that cite this headnote

**[55]   Torts 🔑 Knowledge and intent; malice**
**Torts 🔑 Absence of justification or privilege**

379   Torts
379III   Tortious Interference
379III(B)   Business or Contractual Relations
379III(B)1   In General
379k215   Knowledge and intent; malice
    (Formerly 379k12)
379   Torts
379III   Tortious Interference

CONFIDENTIAL                                                                    TR-0562430

379III(B)  Business or Contractual Relations

379III(B)1  In General

379k217  Absence of justification or privilege

(Formerly 379k12)

Proof of tortious interference with contract must show intent and primary purpose in actor to interfere and to cause result interference augurs; proof must also show that interference was without justification, that is to say, unprivileged as well as unlawful.

2 Cases that cite this headnote

[56]  **Labor and Employment** 🗝️ Contracts or relationships susceptible or subject to interference

231H  Labor and Employment

231HIX  Interference with the Employment Relationship

231Hk903  Contracts or relationships susceptible or subject to interference

(Formerly 255k341 Master and Servant)

That employment is at will does not justify a third person, without privilege, to induce breach of contract with purpose of doing injury to party to contract.

[57]  **Constitutional Law** 🗝️ Clergy;  Ministers

**Torts** 🗝️ Defenses and Mitigating Circumstances

92  Constitutional Law

92XIII  Freedom of Religion and Conscience

92XIII(B)  Particular Issues and Applications

92k1327  Religious Organizations in General

92k1340  Clergy;  Ministers

92k1340(1)  In general

(Formerly 92k84.5(10))

379  Torts

379I  In General

379k120  Defenses and Mitigating Circumstances

379k121  In general

(Formerly 379k16)

Allegations of minister's unlawful enticements, intimidations and threats to plaintiffs' employees described secular conduct, pretext of religious purpose notwithstanding, and hence stated cause of action outside scope of free exercise clause.

U.S.C.A. Const.Amend. 1.

7 Cases that cite this headnote

**Attorneys and Law Firms**

*549  David T. Greis, Kansas City, for appellants.

Larry Zahnd, Zahnd, Dietrich & Ross, Maryville, for respondent.

Before PRITCHARD, P.J., SHANGLER, J., and MARTIN, Special Judge.

**Opinion**

SHANGLER, Judge.

The action for damages by the plaintiffs Hester, husband and wife, against defendant Barnett, a Baptist clergyman, commenced as a petition in defamation. The motion of the defendant to dismiss that petition was sustained, and the plaintiffs were granted leave to present a more definite and certain statement of the defamation. The petition as amended pleads not only defamation, but also five other separate causes of action denominated: [Count I] Ministerial Malpractice, [Count II] Alienation of Affections, [Count III] Defamation of Character, [Count IV] Intentional Infliction of Emotional Distress, [Count V] Invasion of Privacy, and [Count VI] Interference with Contract. The defendant Barnett moved to dismiss the petition as amended, and the court sustained the motion as to each of the several counts "for failure to state causes of action upon which relief may be granted." The plaintiffs appeal the judgment of dismissal.

[1]  [2]  A motion to dismiss concedes the truth of all facts well pleaded. In the assessment of the sufficiency of a petition under such a motion, therefore, all facts properly pleaded are assumed as true, the averments are given a liberal construction, and the petition is given the favor of those inferences fairly deducible from the facts alleged. *Commercial Bank of St. Louis Co. v. James,* 658 S.W.2d 17, 23[3–10] (Mo. banc 1983). A petition suffices against a motion to dismiss, accordingly, if the averments, given every reasonable intendment, invoke a substantive remedy. *Hyde v. City of Columbia,* 637 S.W.2d 251, 254[1–3] (Mo.App.1982); Rule 55.05. It is within the perspective of these maxims that we review the judgment of dismissal.

CONFIDENTIAL                                                                    TR-0562431

**\*550**   The first amended petition alleges these operative facts:

The plaintiffs Hester, husband and wife, reside in Nodaway County. The wife is the mother of Connie Wymer, Lee Wymer and Don Wymer, and the husband is their stepfather. The defendant Barnett is an ordained minister of the Baptist Church. The principals met when the minister visited the Hester home and presented himself to the family as an ordained Baptist clergyman. He invited them to trust and confide in him and assured them that any communication with him as minister would be kept in strictest confidence and not be divulged to anyone outside the Hester family. The husband and wife then confided in the minister that the three children, Connie, Lee and Don were beset with disciplinary and behavioral problems. The minister offered his family counseling services as the solution. Notwithstanding the prior assurances, the minister divulged to deacons of the church and members of the community the confidential communications from the family, and without their authority. The minister lied to these others about the communications and, in particular, that the Hesters abused the children and used them cruelly. The minister advised and instructed the children to lie to others as to the mode of the discipline so that they would eventually be removed from the home of the mother and stepfather. The minister undertook a course of action, which continues, designed to defame the Hesters in their community by denunciations that they are both irreligious and abusive parents. The minister thereafter apologized to the Hesters for this conduct and prayed for forgiveness in their presence, but nevertheless continues that course of conduct and refuses to retract the statements made to members of the public.

The petition alleges also that the minister intentionally and maliciously "set out to alienate the affections of one from the others," did alienate the children, Connie, Lee and Don, from the mother and stepfather, and attempted to induce the alienation of the wife from the husband.

The petition alleges also, by a catalogue of particulars, that the minister has, since January of 1984, used every opportunity to defame them, and from the pulpit as well as in letters and memoranda, church bulletins and publications, accused them of crimes, of physical and emotional abuse of the children and other relations, has falsely accused them of such conduct over the Hot Line for Child Abuse, and has organized and directed meeting of neighbors to publish the libels and slanders against the Hesters. The petition alleges also that the minister has harassed, intimidated, threatened and caused the Hester employees to leave employment and so interfered with the Hester farming business.

The petition pleads these allegations as a continuous narrative, punctuated into the six designations of causes of action already described: Ministerial Malpractice, Alienation of Affections, Defamation of Character, Intentional Infliction of Emotional Distress, Invasion of Privacy, and Interference with Contract. The judgment dismisses them all. Our review determines whether as to any count the facts pleaded invoke a substantive remedy, and hence entitle the pleaders to a trial.

## COUNT I MINISTERIAL MALPRACTICE

The plaintiffs acknowledge that ministerial malpractice is a tort not known in Missouri law. They argue that the allegations of the petition, that the minister disclosed confidential communications from the Hesters, alienated the affections of the Hester family members, interfered with the business relationship between the Hesters and their farm employees, defamed the Hesters from the pulpit and otherwise in public, invaded their privacy and inflicted intentional emotional distress upon them, all bespeak breaches of a professional standard of care, and hence are suitable for redress by the malpractice remedy.

**[3]**   The term *malpractice* means *professional misconduct.* Black's Law Dictionary, p. 864 [5th ed. 1979]. It means "the failure to use that degree of skill and learning **\*551** ordinarily used under the same or similar circumstances by members of [that] profession." MAI 11.06 [3d ed. 1981]; *see also* Restatement (Second) of Torts § 299A (1965). It means, by very definition, the breach of a professional duty unique to that profession. I Mo. Tort Law [Mo.Bar 1985], § 1.6 [Medical Malpractice]; § 2.1 [Attorneys Malpractice]; § 2.14 [Accountants Malpractice]; § 2.30 [Insurance Agents and Brokers Malpractice]. Malpractice, therefore, is not a theory of ordinary negligence or of intentional tort. The ordinary negligence or intentional tort of any person is already actionable, regardless of its "professional" color. Thus, also, a cleric is amenable to suit for alienation of affections albeit guised as a religious practice, [1] for assault and battery committed during a religious service, for a malicious prosecution of parents informed against by the cleric for child abuse, for the obtention of donations of money by fraud, [2] and for other incidences of intentional tort in the exercise of the religious duty. [3]

CONFIDENTIAL

TR-0562432

[1] *Carrieri v. Bush,* 69 Wash.2d 536, 419 P.2d 132, 137[15, 16] (1966).

[2] The range of decisions on the civil liability of clerics and religious leaders for their intentional torts, as well as the sources for such commentary, are reported in Klee, *Clergy Malpractice: Bad News for the Good Samaritan or a Blessing in Disguise?* 17 Toledo L.Rev. 209, 212, n. 23 (1985); Comment, *Made Out of Whole Cloth? A Constitutional Analysis of the Clergy Malpractice Concept,* 19 Cal.W.L.Rev. 507, 512, n. 31 (1983).

[3] *Christofferson v. Church of Scientology,* 57 Or.App. 203, 644 P.2d 577 (1982) (intentional infliction of emotional distress); *Bear v. Reformed Mennonite Church,* 462 Pa. 330, 341 A.2d 105 (1975) (tortious interference with business relationships).

To avoid a redundant remedy, therefore, any functional theory of clergy malpractice needs address incidents of the clergy-communicant relationship not already actionable.[4] The duties of a clergyman most nearly approximate to an existent professional practice, and hence most accountable to minimum professional standards [preeminent commentators agree], include that of spiritual counseling: the advice a member of the clergy renders to meet the spiritual, emotional, and religious needs of the communicant.[5] These authorities agree also—and that, whether they favor or disfavor the clergy malpractice remedy—that the validity of such a tort cause of action is most typically articulated in terms of the pastoral counseling function. The only reported case in which the petition presented the theory of clergy malpractice in terms of negligent counsel and spiritual advice leaves unresolved the question whether such a petition is justiciable.

[4] The petition of the Hester husband and wife pleads not only clergy malpractice, but separate counts for alienation of affections, defamation, intentional infliction of emotional distress, invasion of privacy and intentional interference with contract—all intentional torts, and so acknowledges a subsistent remedy for each of these grievances without need for resort to a malpractice theory, even though each of the torts as pleaded was an incident of the minister-communicant relationship.

[5] B. Bergman, *Is the Cloth Unraveling? A First Look at Clergy Malpractice,* 9 U. San Fern.V.L.Rev. 47, 57–59 (1981); Ericsson, *Clergyman Malpractice: Ramifications of a New Theory,* 16 Val.L.Rev. 163, 166 (1981).

That case, *Nally v. Grace Community Church of the Valley,* 157 Cal.App.3d 912, 204 Cal.Rptr. 303 (1984), was a claim by parents against a church and its pastors for the wrongful death of a son who committed suicide after counseling by the pastors. The young man, Kenneth Nally, had become depressed after a rift with his girlfriend. Shortly afterward, to the chagrin of his parents, the son converted from Catholicism to Protestantism and became a communicant of the Grace Community Church, a fundamentalist sect. He attended a Bible institute at the church and counseled with the pastor frequently to discuss his problems with the girlfriend and family. His depression deepened, and at the request of his mother, Nally consulted a physician, who placed him on antidepressent medication. Nally attempted suicide, and was hospitalized. Nally stayed at the home of the pastor after release, to avoid the tensions at home. He refused to keep psychiatric appointments since, as he believed, **\*552** psychiatrists were not Christians and would not be able to help him. A few days later, Nally committed suicide.

The petition of the parents pleaded three counts. Count I, designated "CLERGYMAN MALPRACTICE," alleged that the pastor in his role as spiritual counselor actively discouraged the disturbed parishioner from resort to professional psychiatric or psychological care outside the church. Instead, the pastor advised Nally to consult with church counselors, pray, read the Bible, and listen to taped sermons. The parents alleged that by such conduct the pastor negligently failed to exercise the standard of care for a clergyman of his sect and training with the proximate result that Nally committed suicide. Count II, designated "NEGLIGENCE," alleged the church and the pastor were negligent in the failure to require proper psychological training for their lay spiritual counselors. Count III, designated "OUTRAGEOUS CONDUCT," alleged that the defendants church and pastor disparaged, ridiculed and denigrated the Catholic faith professed by the parents, and thereby exacerbated the feelings of guilt, anxiety and depression the son harbored, and that the exercise of undue influence over Nally prevented the son from contact or consultation with persons outside the church. These actions, the count alleged, amounted to outrageous conduct which proximately caused Nally to become further ridden with guilt, depression and anxiety as to drive him to take his life.

CONFIDENTIAL

TR-0562433

Hester v. Barnett, 723 S.W.2d 544 (1987)

The trial court granted summary judgment against the petition. The majority of the court of appeals posed the question for review [204 Cal.Rptr. at 307]:

> We are thus confronted with the question whether a clergyman or church should be immune from liability for intentional infliction of emotional distress caused by the nature or content of counseling simply because the counseling may have a spiritual aspect.

The majority responded [204 Cal.Rptr. at 308 and 309]:

> [R]emedies should exist for harm caused by extreme and outrageous conduct even when such conduct involves the expression of religious beliefs.
>
> ....
>
> Because we have concluded that triable issues of fact remain as to whether Kenneth Nally's suicide was caused by intentional infliction of emotional distress, we need not also decide whether Pastor MacArthur [the defendant pastor] had a duty to refer Kenneth Nally to a psychiatrist or other mental health professional or whether Pastor MacArthur or the church had a duty to adequately train the pastors in methods of psychological counseling.

Thus, the court of appeals majority resolved that a remedy exists for wrongful death caused by *intentional* infliction of emotional distress caused by a cleric, even though an incident of spiritual counseling. The majority left unanswered, however, the question posed by Count I ["Clergyman Malpractice"] of the petition: whether allegations that advice of a spiritual counselor to a parishioner with known suicidal tendency to confer only with church counselors about his state, and not with outside professionals, states a justiciable claim for clergy malpractice negligence.

 [4]    [5]    The *intentional* torts of a cleric are already actionable, however, even though incidents of religious practice and belief. *Bear v. Reformed Mennonite Church,* 462 Pa. 330, 341 A.2d 105 (1975); *Carrieri v. Bush,* 69 Wash.2d 536, 419 P.2d 132 (1966). *See also Radecki v. Schuckardt,* 50 Ohio App.2d 92, 361 N.E.2d 543 (1976). Liability for

such conduct does not clash with the free exercise clause of the First Amendment because conduct albeit promoted by religious belief is subject to regulation for the protection of society. That is the clear sense of *Cantwell v. State of Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) at 303, 60 S.Ct. at 903:

> The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth **\*553** Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship ... On the other hand, it safeguards the free exercise of the chosen form of religion. *Thus, the Amendment embraces two concepts, —freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.* [emphasis added]

*Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) confirmed that whereas "the door of the free exercise clause stands tightly closed against religious *beliefs* as such," overt acts prompted by religious beliefs are not free from governmental regulation where the actions "posed some substantial threat to public safety, peace or order." *Id.* at 402–403, 83 S.Ct. at 1792–1793.

*Nally,* therefore, merely confirms that an *intentional* tort by a cleric may be actionable, albeit the conduct which occasioned the harm [here, pastoral counseling] is related to the exercise of religious belief. *Nally* leaves unresolved the unavoidable and more serious question: whether a theory of clergy malpractice inevitably implicates the *freedom to believe* aspect of the *free exercise clause,* and hence unduly involves courts in matters purely sacerdotal. That is because

CONFIDENTIAL

TR-0562434

Hester v. Barnett, 723 S.W.2d 544 (1987)

a theory of malpractice is defined in terms of the duty to act with that degree of skill and learning ordinarily used in the same or similar circumstances by members of that profession. MAI 11.06 [3d ed. 1981]. It is a theory of tort, therefore, which presupposes that every cleric owes the same duty of care, whatever the religious order which granted ordination, or the cleric serves, or the beliefs espoused. It is a theory of tort, moreover, which inevitably involves the court in a judgment of the competence, training, methods and content of the pastoral function in order to determine whether the cleric breached the duty "to act with that degree of skill and learning ordinarily used in the same or similar circumstances by members of that profession." Thus, the question *Nally* leaves unanswered is whether pastoral counseling is so ineluctably a function of the particular religion that no one definition of its malpractice can evolve into a standard of professional performance, and is otherwise so purely sacerdotal a function, that it is both unfeasible as a theory of tort and not constitutionally permissible. *See,* for the full exposition of positions, *pro* and *contra,* Bergman, *Is the Cloth Unraveling? A First Look at Clergy Malpractice,* 9 San Fern. V.L.Rev. 47, 48 et seq. (1981) and Ericsson, *Clergyman Malpractice: Ramifications of a New Theory,* 16 Val.L.Rev. 163, 169 et seq. (1981).

The authority of *Nally* other than as an exposition of theory, whatever its undoubted impact, is clouded further by the order of the California Supreme Court that the opinion be decertified and be given publication without official status. *Nally v. Grace Community Church of the Valley,* 157 Cal.App.3d 912, 204 Cal.Rptr. 303 [asterisk footnote] (2d Dist.1984). On remand and retrial, the Nally parents proceeded on the theory of clergy malpractice for negligent counseling, and at the close of the presentation of that evidence, the motion of the defendants church and pastors for nonsuit on First Amendment grounds was sustained. The review of the judgment of nonsuit still pends. [6]

[6]     That chronicle of the litigation is as reported by counsel for the Nally parents in Barker, *Clergy Negligence, Are Juries Ready to Sit in Judgment?,* Trial (July, 1986).

The viability of a clergy malpractice remedy for negligent counseling, nevertheless assumed, the petition brought by the Hesters as Count I does not allege the tort. That count pleads the sequence from the outset of the self-introduction by Pastor Barnett to the Hesters as a minister of the Baptist Church, his invitation to them to trust and confide in him,

and his assurances *554 that their confidences would not be divulged outside the family. The count then pleads the disclosure to the pastor of the behavioral problems of the three Wymer children, the invitation by the pastor to counsel the family to relieve the problems, the acceptance by the Hesters, and the breach of that confidence by the divulgence by Pastor Barnett to third persons of the confidences disclosed during counseling. The rest of the averments of Count I assert the state of mind which prompted the disclosures: that Pastor Barnett deliberately misrepresented to others the content of the Hester communications with him—and instructed the Wymer children to lie to others about the nature of the parental discipline "so that the children would eventualy [sic] be removed from plaintiffs' home," and [to that end?] "began a crusade and course of action which is continuing today and which is designed to defame plaintiffs in the community where they live, denouncing them as irreligious and abusive parents." These allegations of intentional disclosure of the confidential communications reposed in him during the family counseling, the animus which prompted them, and the malicious purposes intended, are all iterated as separate counts in terms of established intentional torts: defamation, alienation of affections, invasion of privacy, and the intentional infliction of emotional distress. These torts, however, do not depend for validity upon a standard of professional conduct found, imposed and breached [that is, a malpractice], but upon the duty the law imposes on every person to avoid injury to another.

[6]   [7]   [8]   What remains of the Count I as a pleading of clergy malpractice is the allegation that the defendant Barnett

"acted contrary to ministerial ethics and against Missouri law in particular Section 491.060(H)—[sic, actually § 491.060(4), RSMo Cum.Supp.1987] —and against the standard of conduct imposed upon ministers of the gospel...."

It is the sense of that pleading—the Hesters expound in argument—that § 491.060(4), which renders a clergyman incompetent to testify concerning a communication made to him in the professional character as spiritual advisor, imposes a "minimum standard for the profession," whose nonobservance constitutes both a malpractice and a breach of professional ethics. While the statute no doubt means

CONFIDENTIAL                                                                                          TR-0562435

Hester v. Barnett, 723 S.W.2d 544 (1987)

to encourage an effective relationship between the spiritual advisor and the communicant, the enactment has no effect beyond its actual terms. *State v. Kurtz,* 564 S.W.2d 856, 860[10] (Mo. banc 1978). There is no intimation that § 491.060(4) intends any effect beyond a judicial proceeding —let alone a cause of action for the breach. The privilege, moreover, was not known at the common law, and hence the pleading cannot be understood to invoke any tort principle of that system of law to validate a malpractice action for its breach. *State v. Kurtz,* 564 S.W.2d at 860[10]; C. McCormick, Evidence § 72 (3d ed. 1984). The tradition that a spiritual advisor does not divulge communications received in that capacity, moreover, even if a tenet of "ministerial ethics" as Count I pleads, describes a moral, not a legal duty. In the absence of a legal duty, a breach of a moral duty does not suffice to invest tort liability. T. Cooley, Law of Torts § 3 (4th ed. 1932); J. Dooley, Modern Tort Law § 2.01, at 8 (1982 rev.); Restatement (Second) of Torts, §§ 4 and 5 (1965); *Linville v. Ripley,* 237 Mo.App. 1275, 173 S.W.2d 687, 690[5–8] (1943).

[9]   Count I does not allege a cause of action for clergy malpractice for negligent counseling, and was properly dismissed.


COUNT II ALIENATION OF AFFECTIONS

The next sequence of pleading alleges as a separate count that the Hester husband and wife and the three Wymer children were bound together by love and affection, and that the minister, Barnett, intentionally and maliciously set out to alienate the affections of "one family member from the others." That pleading alleges that the minister advised the wife Hester, "Leave Harold and the doors of Clearmont will be opened to you," so as to imply that separation **\*555** from her husband would gain the wife "the friendship of members of the community over whom the defendant claims to exercise influence and control." The pleading then alleges [albeit disjointedly in the causation and damages "count" of the petition] that as the direct and proximate result of the tortious conduct, "Hazel Hester ... lost the love, care companionship, consortium and trust of her husband."

That pleading also asserts that the minister intentionally and maliciously alienated the affections of the children from the mother and her husband, and from the children, *inter sese:* Lee Wymer declared to them: "Because of what the preacher has said about you, I do not have a brother or sister nor a mother or a father." Connie Wymer [the petition pleads]

"will have nothing to do with her family, not even notifying plaintiffs of the birth of her child ... nor inviting them to visit her child." Don Wymer, first alienated from the Hesters, "has since changed his attitude gradually toward acceptance of the love of plaintiffs for him."

[10]  [11]  [12]  [13]   The tort of alienation of affections of a spouse, albeit discarded as a remedy in many states, remains intact in our jurisdiction. *Kraus v. Kraus,* 693 S.W.2d 869 (Mo.App.1985). The cause of action is delineated in *Gibson v. Frowein,* 400 S.W.2d 418, 421[3] (Mo. banc 1966):

> "Alienation of affections is an intentional tort, and the elements of the cause of action are defendant's wrongful conduct, plaintiff's loss of the affections or consortium of his spouse, and the causal connection between such conduct of defendant and the loss by plaintiff."

Count II sufficiently pleads a cause of action for spousal alienation of affections in terms of that formulation, and the dismissal of that separate count was error. The answer the defendant pleads merely denies the allegations of Count II, but does not assert that the conduct described was privileged or was otherwise religious activity within the protection of the free exercise clause of the First Amendment. Conduct or actions which pose "some substantial threat to public safety, peace or order" may be subject to governmental regulation, even though prompted by religious beliefs or principles. *Sherbert v. Verner,* 374 U.S. at 403, 83 S.Ct. at 1793. The alienation of affections of one spouse from the other disrupts not only personal felicity but also undermines the family relationship. The intentional interference with that relationship by a third person, therefore, is a threat to the public welfare and order the law may redress, the right of the free exercise of religion notwithstanding. *Carrieri v. Bush,* 419 P.2d at 137[15, 16]; *Bear v. Reformed Mennonite Church,* 341 A.2d at 107[3]. Where, however, the interference involves merely the preachment of doctrine or advocacy of religious faith, without unlawful or improper motive, no paramount state concern is affected, and the alienation is not actionable. *Radecki v. Schuckardt,* 50 Ohio App.2d 92, 361 N.E.2d 543, 545[2] (1976); *Baugh v. Thomas,* 56 N.J. 203, 265 A.2d 675, 677[1] (1970). The alienation Count II pleads cannot be fairly understood to rest on exercises of

CONFIDENTIAL

TR-0562436

the defendant minister purely sacerdotal, but rather malicious conduct—doctrine apart—to separate the wife from the husband. Count II stands as a sufficient pleading for the alienation of spousal affection cause of action.

[14]    Count II intermixes with the alienation of spousal affections pleading allegations by the Hesters of the alienation of the affections of the three Wymer children by the intentional and malicious conduct of Pastor Barnett. A *child* has been denied recovery for the alienation of the affections of the father [*Hale v. Buckner,* 615 S.W.2d 97 (Mo.App.1981) ], but the claim of a *parent* against a third person for the alienation of the affections of a child remains unaddressed by our courts. Those courts—save one—presented with such a claim have refused remedy. *See* Annotation, Right of a Child or Parent to Recovery for Alienation of Other's Affections, 60 A.L.R.3d 931 (1974). The refusal rests on concern that such a recovery would render the child a hostage in family disputes.  **556** *Bock v. Lindquist,* 278 N.W.2d 326, 328 (Minn.1979); *Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178, 1181[4, 5] (1984). The analogy of *Hale v. Buckner,* 615 S.W.2d 97 (Mo.App.1981), and the rationales of *Bock* and *Bartanus* suffice to refuse to extend the remedy to the alienated affections of a child. To the extent that Count II undertakes to plead a cause of action by the Hesters for the alienation of the affections of the three children, the order to dismiss Count II is sustained. To the extent the order undertakes to dismiss the Count II as a pleading by husband Hester for the alienation of the affections of wife Hester, it is reversed.


## COUNT III DEFAMATION OF CHARACTER

The petition next pleads a sequence of conduct "[s]ince the first day of January of 1984 ... only discovered by Plaintiffs since the first of this year" whereby the defendant "has undertaken to slander, libel and defame the character of Plaintiffs" and used every opportunity and means to publish and broadcast remarks intentionally and maliciously "designed to harm the character and reputation of Plaintiffs ... remarks ... repeated and republished by defendant time after time even to this day." The recitation then describes the slanders and libels and the occasions of publication; that the pastor

(a) delivered sermons from the pulpit of his church wherein the pastor "wrongfully accused Plaintiffs of crimes, stealing, abuse, physical and emotional cruelty to

their [sic] spouse, her children and his stepchildren, Connie Wymer, Lee Wymer and Don Wymer"

(b) repeated these false remarks "[i]n letters, memos, church bulletins and publications"

(c) made reports to the Missouri Hot Line for Child Abuse of false accusations by the pastor that the plaintiffs abused the children and thereby subjected them to investigation by the Missouri Division of Family Services

(d) repeated these libels and slanders to neighbors of the plaintiffs in meetings the pastor organized and directed for that purpose

(e) uttered the specific untrue and defamatory remarks, among others, that

1. "Harold Hester is a thief who stole tools from a neighbor."

2. "Harold Hester does not pay his employees their earned wages."

3. "Harold Hester is an arsonist who burns down barns and other buildings."

4. "Harold Hester will cheat anyone out of anything."

5. "Harold Hester cheats the Government."

6. "Plaintiffs abuse their children mentally and physically."

7. "Plaintiffs do not love their children but use them to get work done."

8. "Plaintiffs beat their children so badly that they have bruises all over."

9. "Plaintiffs punish their children by forcing them to lie face down on the bed of a pickup truck and then drive it over plowed ground and bumpy roads."

10. "Plaintiffs whip their children in an excessive and abusive manner."

11. "Harold Hester tried to punish Connie Wymer by knocking her into a ditch and then using a bulldozer to cover her with dirt."

[15]    [16]    [17]    [18]    The trial court ruled that these allegations did not state a cause of action for defamation. The court erred. False utterances which hold one up to hatred,

CONFIDENTIAL                                                                          TR-0562437

Hester v. Barnett, 723 S.W.2d 544 (1987)

contempt or ridicule, or cause the person to be shunned and avoided, or which "induce an evil opinion of one in the minds of right-thinking persons," are defamations actionable *per se.* W. Prosser, Law of Torts § 111, p. 739 (4th ed. 1971). A false imputation of crime, by that measure, is defamatory *per se,* as is a false imputation that a person is dishonest in the business relation, or—by very definition—the imputation that parents cruelly abuse their children. *Brown v. Kitterman,* 443 S.W.2d 146, 153[8] (Mo.1969). To be sufficient as a **\*557** pleading for libel *per se* the petition must set out the defamation published *in haec verba*—or, at the very least, a paraphrase of what is charged as the libel. *Lorenz v. Towntalk Pub. Co.,* 261 S.W.2d 952, 953[1–3] (Mo.1953); *Missouri Church of Scientology v. Adams,* 543 S.W.2d 776, 777[3, 4] (Mo. banc 1976); *Bremson v. Kinder-Care Learning Centers,* 651 S.W.2d 159, 160[4] (Mo.App.1983). The pleaded count for defamation attributes false statements delivered by Pastor Barnett, published and republished among the church membership and the community at large, which impute to Harold Hester the crimes of theft, arson and child abuse, dishonesty in business and cruelty to the children —and to Hazel Hester, the crime of child abuse and the practice of wanton cruelty upon the children. These utterances and publications are pleaded in detail and, if not verbatim, then in substantial paraphrase. Count III pleads actionable defamation. Rules 55.05 and 55.20.

 **[19]**   **[20]**   Pastor Barnett contends nevertheless that Count III alleges neither "the time, place [nor] means" of the publications, and hence does not suffice as a libel *per se.* He argues that absent a declaration of these incidents of publication, a defendant is unable to respond whether the utterances the pleading attributes were privileged or not. It is not the time or place, as such, but "[t]he *occasion* which determines whether a publication of slander is privileged and whether the slander is, under the circumstances, absolutely or conditionally or qualifiedly privileged." *Williams v. School District of Springfield R–12,* 447 S.W.2d 256, 267 (Mo.1969). Count III defines the occasions for the publications: sermons from the pulpit of the church, letters and other written publications, reports to the Missouri Hot Line, and at convocations of neighbors the pastor contrived for that purpose. The pleaded response to Count III was, in fact, not only a denial of the allegations, but that the utterances were published "in the performance of his duties as a Minister of the Gospel and as a citizen." The sufficiency of Count III as a pleading for libel assumed, therefore, the question which remains on the propriety of the trial court order to sustain the motion to dismiss that cause of action is whether the pleas

of privilege are as to occasions of utterances which accorded Pastor Barnett absolute immunity of expression—whatever the motives which prompted them. *Id.* at 268[21, 22].

 **[21]**   **[22]**   **[23]**   **[24]**   Privilege, absolute or qualified, is a complete defense against liability for libel. W. Prosser, Law of Torts § 114 (4th ed. 1971). A qualified privilege is conditioned upon good motive. Publications uttered with malice forfeit the immunity of the privilege. Malice, however, does not destroy an absolute privilege. *Laun v. Union Electric Co.,* 350 Mo. 572, 166 S.W.2d 1065, 1068[2, 3] (1942). Absolute immunity as to defamatory publications is confined to the few situations "where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." W. Prosser, Law of Torts § 114, at 777. Absolute privilege ensures the public policy of freedom of speech " 'where it is essential that freedom of speech should exist.' " *Laun v. Union Electric Co.,* 350 Mo. at 578, 166 S.W.2d at 1071 [11]. The occasions for the absolute privilege are limited and extend to judicial, legislative or executive proceedings [among others], and "to occasions where the communication is provided for and required by law." *Pulliam v. Bond,* 406 S.W.2d 635, 640 [1, 2] (Mo.1966). The immunity from the utterance of false speech may also be a matter of constitutional privilege. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

 **[25]**   **[26]**   The responsive pleading of Pastor Barnett invokes privilege for the defamations alleged by Count III on grounds that the utterances were published "in the performance of his duties as a Minister of the Gospel and as a citizen." Reports of child abuse or neglect are protected by privilege under § 210.135, RSMo 1978, the pleading alleges, and hence Count III does **\*558** not state a cause of action for defamation as to those utterances. The immunity from liability that statute grants is not absolute, however, as the pleading implies. It is qualified and conditional. It protects "[a]ny person, official, or institutions complying with the provisions of [the Child Abuse Act] in the making of a report ... [against] any liability, civil or criminal, that otherwise might result by reason of such actions. *Provided, however, any person intentionally filing a false report shall not have immunity, from any liability, civil or criminal.*" § 210.135 [emphasis added]. A qualified privilege "is conditioned upon good motives and reasonable behavior and is forfeited if it is abused." *Williams v. School District of Springfield R–12,* 447 S.W.2d at 268[21, 22]. The statute itself defines the "reasonable behavior" concomitant of the

CONFIDENTIAL   TR-0562438

privilege: that the report of abuse or neglect be free of intentional falsehood. Count III pleads expressly:

> The Defendant, knowing that the reports were false, called the Missouri Hot Line for Child Abuse and reported Plaintiffs falsely accusing them of child abuse [in the particulars separately pleaded] and causing them to be the subject of an investigation by the Missouri Division of Family Services.

Those averments of Count III attribute to Pastor Barnett statements and publications of child abuse practiced by the Hesters on the children, reports known to be false when made, and hence defamatory and beyond the immunity the statute grants.

[27]  [28]  As to the remainder of the statements alleged by Count III against the defendant as defamations, Pastor Barnett invokes, in defense, "the privilege due a Minister of the Gospel in the performance of his duties." He pleads an absolute privilege against liability as to such communications under the First Amendment mandate of separation of church and state. The First Amendment, however,—as *Cantwell v. State of Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, holds—encompasses the freedom to believe and the freedom to act. Only the freedom to believe is absolute. The freedom to act remains subject to regulation for the protection of society. The courts do not hesitate—as our discussion notes—to impose tort liability upon ministers and churches where the religious conduct otherwise protected "posed some substantial threat to public safety, peace or order." *Sherbert v. Verner,* 374 U.S. at 403, 83 S.Ct. at 1793. It is the freedom to believe the law protects absolutely, and not always how the belief is acted out—whatever the injury to others. Thus, where the truth or falsity of religious belief becomes the object of judicial redress, the inquiry "enter[s] a forbidden domain." *United States v. Ballard,* 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). That is because the First Amendment protects religious belief. "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or belief." *Id.* at 86, 64 S.Ct. at 886. A defense based on the Free Exercise Clause, therefore, presents a concern in an action for defamation which does not inhere in the other formulations of tort the petition asserts against

Pastor Barnett. That is because defamation involves the truth or falsity of published speech and published speech is a usual means to propagate religious belief. *Christofferson v. Church of Scientology,* 57 Or.App. at 236, 644 P.2d at 598 [8].

[29]  [30]  [31]  [32]  A defamation injures reputation, and false accusation of crime, of dishonesty in business, and of primitive cruelty to one's children do severe damage to the personality, dignity and sensibility of the one accused. The denial of legal recourse in such cases engenders a sense of unfairness and frustration in the persons injured and, left unrequited, tends to fester into a substantial threat "to public safety, peace or order." A court, as the organ of government to which a citizen turns for redress of wrongs, therefore, may justly allow the vindication of the right to reputation without constitutional infringement—albeit the words and conduct of defamation were uttered in a religious setting. **\*559** *Sherbert v. Verner,* 374 U.S. at 403, 83 S.Ct. at 1793; *Bear v. Reformed Mennonite Church,* 341 A.2d at 107. It is only *religious* belief and practice the free exercise clause protects absolutely against governmental regulation, and not *secular* belief and practice. *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925). The claim and proof of defamation, therefore, may not involve the truth or falsity of statements of religious belief or tenet made by Pastor Barnett. They may show, however, that although delivered in the milieu of religious practice, the beliefs asserted as religious were not held as such in good faith, but were used to cloak a secular purpose: in this case, to injure reputation. *United States v. Ballard,* 322 U.S. at 85–86, 64 S.Ct. at 885–886; *Founding Church of Scientology v. United States,* 409 F.2d 1146, 1162 (D.C.Cir.1969). The statements alleged by Count III are not of the kind inherently and invariably expressions of religious belief or religious purpose so as to come under the absolute protection of the free exercise clause against governmental regulation. They are not of the kind, therefore, as to which judicial remedy constitutes an undue burden on the free exercise of religion.

[33]  Our decision rests on the assumption that the Hesters were not members of the church served by Pastor Barnett. The petition alleges only that Pastor Barnett presented himself to them as the minister of the Baptist Church in Clearmont and invited the Hesters to confide in him. They responded with the confidences about the problems with the children. There is no intimation in the petition or answer that the Hesters were members of the Clearmont Church, or that they subjected themselves to the doctrine, religious practices or discipline

CONFIDENTIAL  TR-0562439

of the church or its congregation. Among the defamations Count III alleges against the pastor were statements made in the course of sermons delivered from the pulpit. The free exercise clause forbids a court from any evaluation of the "correctness" of the content of religious sermons as expressions of belief or religious practice. *Fowler v. State of Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953). The stricture of the free exercise clause is against "any governmental regulation of religious *beliefs* as such." *Sherbert v. Verner,* 374 U.S. at 402, 83 S.Ct. at 1792. It is competent, therefore, for a court to inquire whether the sermon declarations that the Hesters stole, committed arson and abused their children were expressions of actual creed and practice, held and exercised in good faith, or were merely the religious occasion for the wholly secular purpose of intentional defamation and injury to reputation of persons not even communicants of the church.

[34]   [35]   [36]   It may be that the statements from the pulpit, and the several others asserted against Pastor Barnett as defamations, were a form of chastening usual as to wayward members and conformable to the liturgy, discipline and ecclesiastical policy of the church and congregation. If so, and if the Hesters were members of that religious body, they presumptively conformed to religiously motivated discipline practiced in good faith. *Rosicrucian Fellowship v. Rosicrucian Nonsectarian Church,* 39 Cal.2d 121, 245 P.2d 481, 487–488 (banc 1952) states the principle:

" 'It is perfectly clear that, whatever church relationship is maintained in the United States, is not a matter of status. It is based ... on voluntary consent ... It is "one of contract," and is therefore exactly what the parties to it make it and nothing more. A person who joins a church covenants expressly or impliedly that in consideration of the benefits which result from such a union he will submit to its control and be governed by its laws, usages and customs whether they are of an ecclesiastical or temporal character to which laws, usages, and customs he assents as to so many stipulations of a contract.' "

The consent to submit to the discipline of the church, sect, or congregation is one of contract, therefore, between the member and the religious body. The discipline the **\*560** religious body may impose, accordingly, must be within the terms of the consent. Damage incurred within the terms of consent is a nontortious consequence. "It is a fundamental principle of the common law that *volenti non fit injuria*—to one who is willing no wrong is done." W. Prosser, The Law of Torts § 18 (4th ed. 1971); 86 C.J.S. Torts § 12 (1954).

[37]   [38]   The statements from the pulpit, and the others, moreover—if as to members and if as expressions, bona fide, of the religious practice of the church or congregation—are privileged as communications enjoined by duty [upon the pastor] to persons [church members] with a corresponding interest or duty. *Kersting v. White,* 107 Mo.App. 265, 80 S.W. 730, 734 (1904); *Haynes v. Robertson,* 190 Mo.App. 156, 175 S.W. 290, 293[9] (1915); Restatement (Second) of Torts § 596, comment e (1977). The privilege, however, is qualified, and is lost if the plaintiffs prove the defendant acted with the intention to injure the plaintiffs in reputation, feelings or profession. *Kersting v. White,* 80 S.W. at 734; Annotation: Defamation—Religious Activities, 87 A.L.R.2d 453 (1963); C. Zollman, American Civil Church Law at 392 (1917). The use of the pulpit as the pretext for the practice of religion, but as the occasion for intentional defamation, therefore, is neither justified by privilege nor protected by the free exercise clause.

[39]   [40]   We construe Count III, given its best intendments, to plead a cause of action against Pastor Barnett in defamation. The burden to prove the defense of privilege —qualified or absolute—rests on the person who asserts the privilege. *Williams v. School District of Springfield R–12,* 447 S.W.2d at 265[7, 8]. If the evidence shows consent to the defamations, there was no tort proven. The proof may show otherwise that the statements the Hesters claim as defamations were, as a matter of law, expressions of religious belief or so nearly so in practice that they come under the absolute protection of the free exercise clause. If so, the issue of defamation will not be submissible. We hold only that Count III pleads a justiciable claim for defamation.

## COUNT IV INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

[41]   The rubric notwithstanding, Count IV pleads expressly the tort of extreme and outrageous conduct as introduced in *Pretsky v. Southwestern Bell Telephone Company,* 396 S.W.2d 566 (Mo.1965). The gist of the tort is the intentional infliction of emotional distress on another by conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 568, 569; Restatement (Second) of Torts § 46, comment d (1965). It is conduct so extreme as to exceed any reasonable

CONFIDENTIAL

TR-0562440

limit of social toleration. *Frye v. CBS INC,* 671 S.W.2d 316 (Mo.App.1984).

Count IV pleads that:

> 20. Defendant, "with malicious intent to cause plaintiffs emotional distress intentionally did those actions described specifically in other Counts knowing that Plaintiff Hazel Hester was nervous and suffered frequent and severe attacks of depression and knowing Plaintiff Harold Hester suffered from high blood pressure and nervous tension and was subject to heart attacks all with the malicious design to cause emotional distress and aggravate [sic] plaintiffs' known physical ailments all to their damage as hereafter more specifically described."

The allegations do not suffice as a pleading for the extreme and outrageous cause of action. However dismal the motives and however censurable the designs, the conduct pleaded is not extreme and outrageous, and therefore is not tortious—unless the allusion to "those actions described specifically in other Counts" aid the pleaders. *Id.* Those allegations, already recapitulated, recite breach of confidence, incidents of alienation of affections, of defamation, of invasion of privacy, and of interference with contract. These counts are each pleaded as disparate causes of action.

**\*561** **[42]** **[43]** **[44]** Rule 55.12 allows a pleader to adopt by reference statements "in a different part of the same pleading or in another pleading or in any motion." The rule replicates Rule 10(c) of the Federal Rules of Civil Procedure. The adoption by reference technique is designed to avoid the repetition and redundancy characteristic of the common law system of pleading. 2A Moore's Federal Practice § 10.05 (2d ed. 1985). The adoption by reference, however, must subserve the dominant objective of the rules of pleading: that "[e]ach averment of a pleading shall be simple, concise and direct" [Rule 55.04], and that "[a] pleading ... shall contain ... a short and plain statement of the facts ..." [Rule 55.05]. The adoption by reference procedure, therefore, does not dispel the requirement that the pleading—as enhanced by the reference adopted—be "simple, concise and direct." That is because the function of pleadings is to "present, define and isolate controverted issues so as to advise the trial court and the parties of the issues to be tried and to expedite the trial of the cause on the merits." *Pillow v. General American Life Ins. Co.,* 564 S.W.2d 276, 280[2, 3] (Mo.App.1978). A reference not sufficiently clear and explicit to advise the adversary of the issue tendered for trial, therefore, is not effective as

an incorporation or pleading. *Texas Water Supply Corp. v. Reconstruction Finance Corp.,* 204 F.2d 190 (5th Cir.1953).

**[45]** The quandary the adoption by reference Count IV presents the adversary pleader is evident. Count IV attempts the extreme and outrageous conduct cause of action. A glance at the composite petition discloses averments of conduct attributed to Pastor Barnett, indeed extravagant and socially censurable to the extreme: that Pastor Barnett falsely accused the Hesters of crimes: "Harold Hester is a thief who stole tools from a neighbor"; "Harold Hester will cheat anyone out of anything," etc. Also, that Pastor Barnett falsely reported and accused the Hesters on the Missouri Hot Line of child abuse and so caused them to be the subject of investigation. Also, that the Hesters were inhumanly cruel to the children: "Plaintiffs [the Hesters] punish their children by forcing them to lie down on the bed of the pickup truck and then drive it over plowed ground and bumpy roads"; "Harold Hester tried to punish Connie Wymer by knocking her into a ditch and then using a bulldozer to cover her with dirt," etc. These and other like attributions of infamous conduct were alleged against Pastor Barnett in Count III—*as defamations.* That pleading attributes these and the numerous others to Pastor Barnett, as false publications made with the intent to injure reputation, delivered from the pulpit, in church circulations, at meetings convoked for that purpose, and on other occasions. Those statements and publications as alleged in Count III constitute *defamation,* and only defamation. "[A]ny action seeking damages for an untrue statement should be in libel." *Barber v. Time, Inc.,* 348 Mo. 1199, 159 S.W.2d 291 (1942). To allow defamation Count III to be incorporated into extreme and outrageous conduct Count IV would be to allow—not an alternative remedy—but a redundant and duplicate remedy. *Cf.* Rule 55.06(a).

**[46]** The composite pleading, exclusively of Causation and Damages Count VII, consists of a sequence of forty-nine enumerated separate recitations—paragraphs and subparagraphs. These are interspersed among six formulations of tort—negligent and intentional. It would have been simple for the pleader merely to specify by number or letter the enumerated allegations the plaintiffs meant to incorporate. It is not the role of the defendant to define the cause of action for the plaintiffs, and then to defend against it. Nor is it the role of the court on a motion to dismiss to shape extraneous recitations in other counts into a cause of action to match the rubric for remedy the pleader attributes. The attempted incorporation by reference by allusion to "those actions described specifically in other Counts" does

CONFIDENTIAL                                                                  TR-0562441

not inform the defendant as to the nature and extent of the incorporation, and hence is ineffective as an adoption by reference under **\*562** Rule 55.12. *See Heintz & Co. v. Provident Tradesmen's Bank & Trust Co.,* 29 F.R.D. 144, 145[4, 5] (E.D.Pa.1961). Count IV was properly dismissed for failure to state a cause of action.


## COUNT V INVASION OF PRIVACY

The right to privacy as a general doctrine of tort was recognized by our Supreme Court in *Barber v. Time, Inc.,* 348 Mo. 1199, 159 S.W.2d 291 (1942). The general right to privacy, our Supreme Court en banc then held in *Sofka v. Thal,* 662 S.W.2d 502 (Mo. banc 1983), expressed four separate interests, and the invasion of privacy described four different torts, each with distinct elements. *Sofka* [at 510] adopted the Restatement (Second) of Torts § 652B (1977) formulations that the right to privacy is invaded when there is

    (1) unreasonable intrusion upon the seclusion of another

    (2) appropriation of the other's name or likeness

    (3) unreasonable publicity given to the other's private life

    (4) publicity that unreasonably places the other in a false light before the public.

In its delineation of the action for invasion of privacy, *Barber* determined [348 Mo. at 1208, 159 S.W.2d at 296[12–15]] that "truth or untruth is not an issue." "[A]ny action seeking damages for an untrue statement should be in libel." *Sullivan v. Pulitzer Broadcasting Company,* 709 S.W.2d 475 (Mo. banc 1986) adopted the *Barber* rationale that the proper remedy for the publication of *untrue* private facts is defamation, to deny redress to a claim formulated on the false light invasion of privacy theory, but actually "nothing more than the classic defamation action where one party alleges that the other published a false accusation concerning a statement of fact— in this case, a charge of criminal conduct or wrongdoing." *Id.* at 481.

Count V pleads:

  21. Defendant has intruded upon plaintiffs' solitude and seclusion by entering into plaintiffs' home under the disguise [sic] of helping them and their family through family counselling and assistance with the children's behavior problems when defendant's true motive was to harm plaintiffs and for which he would not have

been permitted into their home had plaintiffs known defendant's true motive.

  22. Defendant has made public by reporting to School Authorities, Juvenile Authorities, Law Enforcement Authorities and the Hot Line for Child Abuse certain untrue accusations, more specifically stated in other Counts hereof[7] for the intended purpose of disturbing the privacy of plaintiffs, subjecting them to intrusion by investigators, social workers, psychologists and law enforcement officers intruding upon their solitude and seclusion all to their damage as hereafter more specifically set forth.

    [7]    The adoption by reference into Invasion of Privacy Count V of "certain untrue accusations, more specifically stated in other Counts hereof" can allude only to ¶ 14d which contains those allegations of untrue accusations, and so validly accomplishes the incorporation under Rule 55.12.

**[47]  [48]  [49]** The Hesters say that ¶¶ 21 and 22 plead the essential elements of three invasion of privacy torts: (1) unreasonable intrusion upon the seclusion of another (2) unreasonable publicity given to the other's private life (3) publicity that unreasonably places the other in a false light before the public. Count V pleads two components of facts: ¶ 21 relates to invasion of privacy by conduct, without publicity or publication of words; ¶ 22 relates to an invasion of privacy by public disclosure of private facts. The unreasonable intrusion upon the seclusion of another tort encompasses three elements: (1) the existence of a secret and private subject matter; (2) a right in the plaintiffs to keep that subject matter private; and (3) the obtainment by the defendant of information about that subject matter through unreasonable means. *Corcoran* **\*563** *v. Southwestern Bell Telephone Co.,* 572 S.W.2d 212, 215[6] (Mo.App.1978). Publicity is not an element of that tort. *Sofka v. Thal,* 662 S.W.2d at 510. Count V, ¶ 21, sufficiently pleads the tort. It is the sense of that pleading that Pastor Barnett gained access to the Hester home through the pretense as counselor to assist in the correction of the children's behavior, when the true motive was to harm the Hesters by the disclosure of the information obtained through that guile. These allegations, taken as true, describe a substantial interference with seclusion and of the kind decidedly offensive to reasonable persons. *Corcoran v. Southwestern Bell Telephone Co.,* 572 S.W.2d at 215[7]. *See* Restatement (Second) of Torts § 652B, commend d (1977). It was error for the trial court to dismiss Count V.

CONFIDENTIAL    TR-0562442

[50]   [51]   Count V, ¶ 22, however, suffices neither as a statement of claim for the unreasonable publication of private facts tort,[8] nor for a false light invasion of privacy. The tort of invasion of privacy is not a species of defamation. Where the claim for recovery on either theory—the publication of private facts or a false light invasion of privacy—involves *untrue* statements, the appropriate remedy is by defamation. *Barber v. Time,* 159 S.W.2d at 296; *Sullivan v. Pulitzer Broadcasting Co.,* 709 S.W.2d at 478. The allegations of ¶ 22 are as those before the court in *Sullivan:* "the classic defamation action where one party alleges that the other published a false accusation concerning a statement of fact—in this case, a charge of criminal conduct or wrongdoing." 709 S.W.2d at 478. [The very subject of ¶ 22 was, in fact, one of the pleaded grounds [¶ 14–d] of defamation Count III].

8   *Corcoran v. Southwestern Bell Telephone Co.,* 572 S.W.2d at 214[3] delineates as the elements of the public disclosure of private facts tort: (1) publication (2) absent any waiver of privilege (3) of private matters in which the public has no legitimate concern (4) such as to bring shame or humiliation to a person of ordinary sensibility.

[52]   Count V pleads injury to the Hesters from a course of intentionally tortious action by a minister, on an occasion only pretextually religious, but actually entirely secular, and hence not offensive to the free exercise clause.

Count V is reinstated as a pleading for the intrusion upon seclusion invasion of privacy tort.

COUNT VI TORTIOUS
INTERFERENCE WITH CONTRACT

Count VI pleads:

23.   Defendant has enticed, harassed, intimidated, threatened and caused employees of Plaintiffs to leave their employ thereby rendering Plaintiffs unable to employ and maintain the necessary labor to conduct their farming business, their earth moving and construction business and their business of building and maintaining a lake and airplane landing strip on Plaintiffs' south farm.

24.   Defendant's said actions are continuing today through the harassment, intimidation and threats against plaintiffs' only remaining employee, Mack Ellison.

25.   Defendant's actions are intentional and malicious and calculated by defendant to harm plaintiffs' businesses and in fact harming his businesses by causing their employees to quit their employ and thereby damage plaintiffs as more specifically set forth in the last paragraph hereof.

[53]   [54]   [55]   [56]   The elements of a cause of action for tortious interference with contract or business relations are repeated in *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524, 529[1, 2] (Mo.App.1981):

(1) a contract or valid business relationship or expectancy

(2) knowledge by the defendant of the contract or relationship

*564   (3) intentional interference by defendant which induces the breach of contract or relationship

(4) Absence of justification

(5) resulting damages

Count VI suffices to plead the cause of action, and the dismissal was error. *Eib v. Federal Reserve Bank of Kansas City,* 633 S.W.2d 432, 435[2] (Mo.App.1982). It is enough that the petition plead a business relationship, present or future, with which the defendant has knowingly interfered, without justification, to the damage of the pleaders. *Casterline v. Stuerman,* 588 S.W.2d 86, 88 (Mo.App.1979). The *proof,* of course, must show an intent and primary purpose in the actor to interfere and to cause the result the interference augurs. *Francisco v. Kansas City Star,* 629 S.W.2d at 530[6]. The *proof* of the cause of action must also show that the interference was without justification —that is to say unprivileged as well as unlawful. *Id.* at 533–534[8–11]. The petition pleads that the interference was "intentional, malicious and calculated by defendant to harm plaintiffs' businesses ... by causing their employees to quit their employ and thereby damage plaintiffs." The petition pleads also that the interference was accomplished by enticements, harassments, intimidations and threats so as to cause the employees to leave and hamper the plaintiffs in the conduct of their businesses. Those allegations, conjoined with the others, suffice to plead a prima facie cause of action of the intentional interference with a known contractual and business relationship with the intent to injure and without justification. It is not significant to the cause of action that the employments the defendant disrupted were at will [as we assume from the allegations]. It is the reasonable expectancy

CONFIDENTIAL   TR-0562443

of persons who contract at will that the subsistent relationship will continue into the future unless terminated *inter sese.* That does not justify a third person, without privilege, to induce the breach with the purpose to do injury to a party to the contract. Restatement (Second) of Torts § 766. comment g. *Cook v. MFA Livestock Association,* 700 S.W.2d 526, 528–529 (Mo.App.1985); *Alyeska Pipeline Service v. Aurora Air Service,* 604 P.2d 1090, 1093 (Alaska 1979); Dobbs, *Tortious Interference with Contractual Relationships,* 34 Ark.L.Rev. 335 (1981). In the context of the pleading, those allegations, moreover, were merely part of the design to interfere with business relations and to subvert going enterprises.

 [57]   These allegations of unlawful enticements, intimidations and threats—whatever the actual proof— describe secular conduct, the pretext of religious purpose notwithstanding, and hence state a cause of action outside the scope of the free exercise clause.

The dismissals of Ministerial Malpractice Count I and Extreme and Outrageous Conduct Count IV are affirmed. The dismissals of Alienation of Affections Count II, Defamation Count III, Invasion of Privacy Count V, and Tortious Interference with Contract Count VI are reversed, and those counts are ordered reinstated. Count II is reinstated as a cause of action for alienation of spousal affection, and Count V is reinstated as a cause of action for the invasion of privacy by the unreasonable intrusion upon the seclusion of another. The costs are allocated equally between the plaintiffs and the defendant.

All concur.

**All Citations**

723 S.W.2d 544

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

CONFIDENTIAL

TR-0562444

# EXHIBIT 115





**CONFIDENTIAL**

**TR-0894152**



**CONFIDENTIAL**

**TR-0894153**



**CONFIDENTIAL**



**CONFIDENTIAL**

**TR-0894155**



**CONFIDENTIAL**                                                  **TR-0894156**

PRICING GUIDELINES FOR CORPORATE PLANS **QUICK-REFERENCE GUIDE**



The intelligence, technology
and human expertise you need
to find trusted answers.



© 2017 Thomson Reuters  L-370948/5-17

**CONFIDENTIAL**

**TR-0894157**