Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) | |
| Plaintiffs/Counterdefendants, | ) ) | C.A. No. 20-613-SB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| ROSS INTELLIGENCE INC., | ) ) ) | |
| Defendants/Counterclaimant. | ) | |

**DEFENDANT/COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S FIRST SET OF COUNTERCLAIM REQUESTS FOR PRODUCTION TO PLAINTIFF/COUNTERDEFENDANTS THOMSON REUTERS ENTERPRISE CENTRE GMBH AND WEST PUBLISHING CORPORATION (NOS. 182-233)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Defendant / Counterclaimant ROSS Intelligence Inc. serves the following requests for production on Plaintiffs / Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation.

**DEFINITIONS**

Insofar as any of the terms below are used herein, the following definitions shall apply:

1.      The term "THOMSON REUTERS" as used herein means Plaintiff / Counterdefendant Thomson Reuters Enterprise Centre GmbH, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

2.      The term "WEST" as used herein means Plaintiff / Counterdefendant West Publishing Corporation, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

3.     The terms "YOU," "YOUR," and "PLAINTIFFS" as used herein means THOMSON REUTERS and WEST.

4.     The terms "ROSS," "DEFENDANT," and "COUNTERCLAIMANT," as used herein mean ROSS Intelligence, Inc., and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

5.     The terms "PUBLIC LAW DATABASE" and "PUBLIC LAW DATABASES" as used herein mean a digital collection, or separate digital collections, in any digital form, format, arrangement, or organization whatsoever, that INCLUDES public text documents such as judicial opinions, administrative rulings, or legislative enactments such as statutes, public ordinances, rules, regulations.

6.     The terms "LEGAL SEARCH TOOL" and "LEGAL SEARCH TOOLS" as used herein mean any application, program, method, system, tool, or technology that facilitates, supports, augments, or otherwise contributes to ANY search, exploration, or analysis of a PUBLIC LAW DATABASE. Examples, without limitation, of LEGAL SEARCH TOOLS INCLUDE: West Headnotes, the West Key Number System ("WKNS"), key numbers, WKNS topics, WKNS subtopics WestSearch Plus, Boolean search functionality, any other search functionality on WestlawNext, Westlaw Edge, Westlaw Classic, Westlaw Precision, or any other version of the WESTLAW PLATFORM, and any similar applications, programs, methods, systems, tools, or technologies that other PERSONS have developed or license.

7.     The terms "LEGAL SEARCH PLATFORM" and "LEGAL SEARCH PLATFORMS" as used herein mean any websites or applications where legal research can be performed, whether or not it costs a fee to use the website or application. Examples, without limitation, of LEGAL SEARCH PLATFORMS INCLUDE: the WEST PLATFORM, the ROSS PLATFORM, and the platforms and/or services created and/or licensed by COMPETITORS.

8.     The term "WESTLAW PLATFORM" as used herein means WestlawNext, Westlaw Edge, Westlaw Classic, Westlaw Precision, and any other version of the Westlaw

LEGAL SEARCH TOOL that was, is, or will be accessible to users.  The term "WESTLAW PLATFORM" does not include PeopleMap or Company Investigator.

9.      The term "ROSS PLATFORM" as used herein means all versions of the online legal research platform previously offered on the website https://www.rossintelligence.com/.

10.      The term "LEXISNEXIS" as used herein means the corporation LexisNexis which makes available the website https://www.lexisnexis.com, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

11.      The term "GOOGLE" as used herein means the company Google LLC which makes available the website https://www.google.com, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

12.      The term "FASTCASE" as used herein means the company Fastcase.com, Inc., which makes available the website https://fastcase.com, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

13.      The term "BLOOMBERG" as used herein means the company Bloomberg L.P., which makes available the website https://bloomberglaw.com, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

14.      The term "CASEMAKER" as used herein means the company that was formerly separate from FASTCASE and formerly offered the separate available website https://casemakerx.com, and its former officers, directors, employees, attorneys, agents,

3

representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

15.     The term "CASETEXT" as used herein means the company Casetext which makes available the website https://casetext.com, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

16.     The term "WOLTERS KLUWER" as used herein means the company Wolters Kluwer N.V., which makes available the website https://my.vitallaw.com/, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

17.     The term "JURISEARCH" as used herein means the company Jurisearch, which makes available the website https://www.jurisearch.com, and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

18.     The term "COMPETITORS" includes past and present providers of LEGAL SEARCH PLATFORMS, LEGAL SEARCH TOOLS, or PUBLIC LAW DATABASES, including LEXISNEXIS, GOOGLE, FASTCASE, CASEMAKER, CASETEXT, WOLTERS KLUWER, JURISEARCH, ROSS, and any other entity or person that PLAINTIFFS have or do consider competitors in LEGAL SEARCH PLATFORMS, LEGAL SEARCH TOOLS, or PUBLIC LAW DATABASES.

19.     The terms "DISCOUNT" and "DISCOUNTS" as used herein mean ANY decrease in the amount that a PERSON is required to pay for a license of a product for ANY purpose, including bundled-product agreements or direct deductions from a standard or listed price.

20.     The term "ARTIFICIAL INTELLIGENCE" as used herein means analysis and development in the fields known as artificial intelligence, machine learning, or natural language processing, including processes, designs, products, and systems.

21.     The terms "AGREEMENT" and "AGREEMENTS" as used herein means all formal and informal licenses, contracts, settlements, stipulations, agreements, arrangements, memoranda of understandings, and other types of written or oral communications between at least two PERSONS.

22.     The term "TERMS OF SERVICES" as used herein means a type of AGREEMENT whereby there are terms accepted by a PERSON to license or otherwise use a LEGAL SEARCH PLATFORM, product, or service.

23.     The terms "DOCUMENT" and "DOCUMENTS" as used herein shall be construed in the broadest sense permissible under the Federal Rules of Civil Procedure and shall include, without limitation any written, printed, typed, recorded, or graphic matter, however produced, reproduced, or stored, including the originals and all nonidentical copies, whether different from the originals by reason of any notations made on such copies or otherwise, in the actual or constructive possession, custody, or control of PLAINTIFFS, including without limitation contracts, letter agreements, records, correspondence, COMMUNICATIONS, electronically stored information, emails, tweets, blog or Internet forum posts or comments, text messages on portable devices, Blackberry Messenger messages, SMS messages, instant messenger messages (e.g. Skype, Slack, etc.), memoranda, handwritten notes, source code, object code, binaries and associated files and/or structures, source code comments, source repository logs, server logs, records or summaries of negotiations, records or summaries of interviews or  conversations, audio or video recordings, copies of video games, all Internet-based media, photographs, corporate minutes, diaries, telephone logs, instant messaging logs, chat room logs, schedules, drawings, product storyboards, product mockups, statistical statements, work papers, disks, data cards, films, data processing files, charts, graphs, microfiche, microfilm, contracts, notices, reports, recitals, statements, worksheets, abstracts, resumes, summaries, jottings, market data, books, journals,

ledgers, audits, maps, diagrams, research documents, newspapers, appointment books, desk calendars, project management charts (e.g., Gantt charts), task management records (e.g., to-do lists), expense reports, computer printout and other computer readable or electronic records, and all drafts or modifications thereof, and all non-identical copies of any such items.

24.     The terms "COMMUNICATION" and "COMMUNICATIONS" mean any manner or method in which information is communicated from one human being to another, including, but not limited to, any means of transmission, sending, and/or receipt of information of any kind, such as speech, writing, language, nonverbal signals, computer electronics of any kind, video tape, photographs, graphs, symbols, sound, radio and/or video signal, telephone, teletype, telecommunication, microfilm, microfiche, and/or media of any kind.

25.     The term "ANY" as used herein shall mean any or all and the term "ALL" as used herein shall mean any or all.

26.     The term "IDENTIFY" as used herein means to provide a description sufficient in specificity such that the document or thing can be unambiguously obtained by means of such description in a request for production pursuant to Rule 34 of the Federal Rules of Civil Procedure, which will include, whether applicable, the document's or thing's title, date, author(s) or creator(s), recipient(s), Bates number, and present location.

27.     The terms "INCLUDE," "INCLUDES," and "INCLUDING" as used herein mean not limited to.

28.     The terms "PERSON" and "PERSONS" as used herein mean any individual, corporation, partnership, association, organization, or other entity of any type or nature.

29.     The terms "RELATE TO," "RELATED TO," and "RELATING TO" as used herein mean constituting, pertaining to, in connection with, reflecting, respecting, regarding, concerning, referring to, based upon, stating, showing, evidencing, establishing, supporting, negating, contradicting, describing, recording, noting, embodying, memorializing, containing, mentioning, studying, analyzing, discussing, specifying, identifying or in any manner logically, factually, indirectly or directly, or in any other way connecting to the matter addressed, in whole or in part.

30.     The term "CUSTOMER SEGMENT" as used herein means divisions or tiers of customers, users or subscribers and potential customers, users or subscribers that affects pricing, services, or TERMS OF SERVICES offered to customers, users, or subscribers, which may include government, law firms of various sizes, pro bono access for law firms, in-house legal departments, non-profit legal departments, universities, law schools, university law libraries, law firm law libraries, and students.

## INSTRUCTIONS

1.      PLAINTIFFS shall IDENTIFY, produce, and permit the visual inspection and reproduction of the following DOCUMENTS, electronically stored information, and things which are in its possession, custody, or control, INCLUDING DOCUMENTS, electronically stored information, and things in the actual or constructive possession of PLAINTIFFS, its attorneys, experts, and anyone else acting on its behalf. The production and visual inspection shall take place at Crowell & Moring LLP, 3 Embarcadero Center, 26th Fl., San Francisco CA 94111 (or such other place as may be stipulated by the parties).

2.      These requests are not limited by time unless stated within the request itself.

3.      Unless otherwise stated, the geographic scope covered by these requests is the United States.

4.      If PLAINTIFFS claim that ANY DOCUMENT, tangible object, or other thing responsive to ANY request was once in its possession, custody or control and has since been lost, discarded, destroyed, deleted, relinquished, OR disposed in some other manner, PLAINTIFFS shall IDENTIFY with particularity each such DOCUMENT and set forth: (a) the date the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, or disposed; (b) the circumstances under which the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, or disposed; and (c) the identity of ALL PERSONS who had knowledge of, or were present when,

the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, or disposed, as well as ALL PERSONS who authorized such actions.

5.      In the event that PLAINTIFFS contend that ANY DOCUMENT responsive to ANY discovery request below is privileged or otherwise excludable from discovery, PLAINTIFF shall: (a) IDENTIFY each such DOCUMENT by date, author(s), signer(s), intended recipient(s), and addressee(s); (b) IDENTIFY each PERSON to whom a copy was furnished OR to whom the information OR advice was conveyed; (c) state the general subject matter of the DOCUMENT; and (d) state the ground on which the claim of privilege or immunity from disclosure is based. Failure to do so will constitute a waiver of such a claim.

6.      If PLAINTIFFS claim a privilege or immunity with regard to ANY DOCUMENT responsive to ANY discovery request below, PLAINTIFFS should nevertheless produce ALL portions of such DOCUMENT that contains information not appropriately subject to a claim of privilege or immunity.

7.      The terms "and" and "or" and "between" and "among" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all information that otherwise might be construed to be outside of its scope.

8.      The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun, and vice versa; and the past tense shall include the present tense where the clear meaning is not distorted.

9.      These requests are continuing in nature under Rule 26(e) of the Federal Rules of Civil Procedure. If, at ANY time prior to the completion of the above-captioned matter, PLAINTIFFS obtain or become aware of additional DOCUMENTS, tangible objects, and things responsive to these requests, PLAINTIFFS shall promptly supplement its response to provide such

DOCUMENTS, tangible objects, and things to ROSS.

10.     Any DOCUMENT with any sheet or part thereof bearing any marks, such as initials, stamped indices, comments or notations, or any character or characters, that are not part of the signed text or photographic reproduction thereof is to be considered as a separate DOCUMENT. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "DOCUMENT(S)," such tangible item shall be produced.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 182:**

DOCUMENTS sufficient to show revenue from the sale, distribution, or license of the WESTLAW PLATFORM, separately broken out for revenue attributed to PUBLIC LAW DATABASES and LEGAL SEARCH TOOLS, and by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 183:**

DOCUMENTS sufficient to show financial profits or losses from the sale, distribution, or license of the WESTLAW PLATFORM, separately broken out for profits or losses attributed to PUBLIC LAW DATABASES and LEGAL SEARCH TOOLS, and by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 184:**

DOCUMENTS sufficient to show the costs associated with the WESTLAW PLATFORM, separately broken out for costs attributed to PUBLIC LAW DATABASES and LEGAL SEARCH TOOLS, and by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 185:**

DOCUMENTS sufficient to show YOUR investments in the WESTLAW PLATFORM, separately broken out for each of YOUR LEGAL SEARCH TOOLS and for each ARTIFICIAL INTELLIGENCE tool.

**REQUEST FOR PRODUCTION NO. 186:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO the reasons for making investments in the WESTLAW PLATFORM, separately broken out for each of YOUR LEGAL SEARCH TOOLS and for each ARTIFICIAL INTELLIGENCE tool.

**REQUEST FOR PRODUCTION NO. 187:**

DOCUMENTS sufficient to show the costs associated with offering the WESTLAW PLATFORM to law students and for training lawyers, including the costs of training, representatives, and incentive programs.

**REQUEST FOR PRODUCTION NO. 188:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO pricing the WESTLAW PLATFORM for PERSONS to license, INCLUDING plans, strategies, manuals, policies, analyses, memoranda, price lists, and guides for pricing the WESTLAW PLATFORM, including documents related to pricing by CUSTOMER SEGMENT and documents related to pricing decision-making.

**REQUEST FOR PRODUCTION NO. 189:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO pricing the WESTLAW PLATFORM for PERSONS to license, INCLUDING documents related to pricing by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 190:**

DOCUMENTS RELATED TO how you define or use CUSTOMER SEGMENTS and the number of users and/or seats per CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 191:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO the DISCOUNTS that PERSONS can or do receive when licensing the WESTLAW PLATFORM, including broken out by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 192:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO requests to purchase, license, or access the PUBLIC LAW DATABASES that are available on the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 193:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO requests to purchase, license, or access the LEGAL SEARCH TOOLS that are available on the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 194:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR renewal and churn rate for WESTLAW PLATFORM subscriptions, including broken out by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 195:**

ALL COMMUNICATIONS with customers or potential customers RELATED TO the terms of YOUR AGREEMENTS, including pricing.

**REQUEST FOR PRODUCTION NO. 196:**

DOCUMENTS RELATED TO demand or preferences for LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS, including surveys, market studies or research reports conducted or commissioned or obtained by YOU.

**REQUEST FOR PRODUCTION NO. 197:**

DOCUMENTS RELATED TO demand or preferences for each of YOUR LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS, including surveys, market studies or research reports conducted or commissioned or obtained by YOU.

**REQUEST FOR PRODUCTION NO. 198:**

DOCUMENTS sufficient to show the complete history of the TERMS OF SERVICES RELATING TO the WESTLAW PLATFORM, including how TERMS OF SERVICES have varied by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 199:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO strategies and/or plans for the sale, distribution, or license of the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 200:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO strategies and/or plans for the sale, distribution, or license of the LEGAL SEARCH TOOLS.

**REQUEST FOR PRODUCTION NO. 201:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO strategies and/or plans for the sale, distribution, or license of the PUBLIC LAW DATABASES.

**REQUEST FOR PRODUCTION NO. 202:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO strategies and/or plans for the sale, distribution, or license of the LEGAL SEARCH PLATFORMS.

**REQUEST FOR PRODUCTION NO. 203:**

DOCUMENTS RELATED TO YOUR decision how to and whether to develop, offer or discontinue each of YOUR LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS, including internal DOCUMENTS and COMMUNICATIONS and surveys, market studies or research reports conducted or commissioned by YOU or third parties.

**REQUEST FOR PRODUCTION NO. 204:**

DOCUMENTS RELATED TO YOUR decision how to and whether to develop, offer or discontinue LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS not ultimately offered to the public, including YOUR internal DOCUMENTS and COMMUNICATIONS and surveys, market studies or research reports conducted or commissioned by YOU or third parties.

**REQUEST FOR PRODUCTION NO. 205:**

DOCUMENTS RELATED TO YOUR offering the WESTLAW PLATFORM to law students or for training lawyers, including strategies, manuals, policies, cost-benefit analyses, and memoranda, and COMMUNICATIONS.

**REQUEST FOR PRODUCTION NO. 206:**

ALL DOCUMENTS RELATED TO YOUR share in any market in which any element of the WESTLAW PLATFORM competes, including LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, and LEGAL SEARCH PLATFORMS, including by CUSTOMER SEGMENT.

**REQUEST FOR PRODUCTION NO. 207:**

DOCUMENTS and COMMUNICATIONS sufficient to show the markets in which any elements of the WESTLAW PLATFORM competes.

**REQUEST FOR PRODUCTION NO. 208:**

ALL DOCUMENTS analyzing responses by YOUR customers, including by CUSTOMER SEGMENT, to actual or potential changes in pricing to any element of the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 209:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO competitive intelligence or research that YOU have performed, commissioned, obtained, or otherwise gathered, including RELATED TO LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS, and LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS that are currently or have been operated by COMPETITORS.

**REQUEST FOR PRODUCTION NO. 210:**

ALL AGREEMENTS with COMPETITORS.

**REQUEST FOR PRODUCTION NO. 211:**

DOCUMENTS and COMMUNICATIONS sufficient to IDENTIFY YOUR COMPETITORS, including IDENTIFYING each product offered by that COMPETITOR that competes with the WESTLAW PLATFORM or any element or segment of the WESTLAW PLATFORM, and IDENTIFYING YOUR product that competes with the COMPETITOR'S product.

**REQUEST FOR PRODUCTION NO. 212:**

DOCUMENTS sufficient to identify any COMPETITORS that have licensed the WESTLAW PLATFORM as well as which products the COMPETITORs has licensed.

14

**REQUEST FOR PRODUCTION NO. 213:**

DOCUMENTS sufficient to identify any COMPETITORS that have used the WESTLAW PLATFORM without a license as well as which products each of these COMPETITOR has used.

**REQUEST FOR PRODUCTION NO. 214:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to not license access to the WESTLAW PLATFORM to a COMPETITOR or potential COMPETITOR.

**REQUEST FOR PRODUCTION NO. 215:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to not license access to the WESTLAW PLATFORM, including to ROSS.

**REQUEST FOR PRODUCTION NO. 216:**

ALL COMMUNICATIONS with the U.S. Federal Trade Commission or the U.S. Department of Justice about the WESTLAW PLATFORM, including COMMUNICATIONS about investigations, complaints, and requests for information.

**REQUEST FOR PRODUCTION NO. 217:**

ALL DOCUMENTS RELATED TO COMMUNICATIONS with the U.S. Federal Trade Commission or the U.S. Department of Justice about the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 218:**

ALL DOCUMENTS RELATED TO litigation involving antitrust or unfair competition claims or counterclaims brought against YOU.

**REQUEST FOR PRODUCTION NO. 219:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO acquiring, licensing, or obtaining PUBLIC LAW DATABASES or the content therein, such as judicial opinions, INCLUDING AGREEMENTS and COMMUNICATIONS with the licensors or providers of such content.

**REQUEST FOR PRODUCTION NO. 220:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO acquiring, licensing, or obtaining LEGAL SEARCH TOOLS or LEGAL SEARCH PLATFORMS, including AGREEMENTS.

**REQUEST FOR PRODUCTION NO. 221:**

ALL Library Maintenance Agreements to which YOU are a party.

**REQUEST FOR PRODUCTION NO. 222:**

ALL AGREEMENTS and TERMS OF SERVICES with any judicial, executive, or legislative governmental entities within the United States of America, including federal courts, state, municipal, county, and territorial courts RELATING TO LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS.

**REQUEST FOR PRODUCTION NO. 223:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision to make judicial opinions available online, including competitive intelligence and research.

**REQUEST FOR PRODUCTION NO. 224:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO any decision whether or not to license, sell, or distribute judicial opinions online independent of the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 225:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to continue to license, sell, or distribute judicial opinions in paper-format, including competitive intelligence and research.

**REQUEST FOR PRODUCTION NO. 226:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decisions about what judicial opinions to publish or not publish in paper-format.

**REQUEST FOR PRODUCTION NO. 227:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR "Opinion Submission Guidelines" that are available to be accessed at the following website address: https://legal.thomsonreuters.com/en/solutions/government/court-opinion-submission-guidelines.

**REQUEST FOR PRODUCTION NO. 228:**

A copy of YOUR current organizational charts.

**REQUEST FOR PRODUCTION NO. 229:**

ALL insurance agreements referred to in Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Supplemental Initial Disclosures.

**REQUEST FOR PRODUCTION NO. 230:**

ALL non-privileged DOCUMENTS and COMMUNICATIONS RELATED TO preparing YOUR responses to this set of document requests.

**REQUEST FOR PRODUCTION NO. 231:**

DOCUMENTS RELATED TO each instance in which any entity requested a change to the TERMS OF SERVICES YOU require for access to the WESTLAW PLATFORM, including

all instances in which any entity did not agree to the TERMS OF SERVICES and were not granted access to the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 232:**

All documents that support any admission or denial by Plaintiffs and Counterdefendants to any of Defendants' and Counterplaintiffs requests for admission.

**REQUEST FOR PRODUCTION NO. 233:**

All documents used (including referenced or relied upon) by Plaintiffs and Counterdefendants in responding to any of Defendants' and Counterplaintiffs interrogatories.

OF COUNSEL:

Gabriel M. Ramsey
Warrington Parker
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel:  (415) 986-2800

Mark A. Klapow
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 624-2500

Dated:  September 20, 2022
10346083 / 20516.00001

POTTER ANDERSON & CORROON LLP

By:  */s/ Carson R. Bartlett*
        David E. Moore (#3983)
        Bindu A. Palapura (#5370)
        Carson R. Bartlett (#6750)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE  19801
        Tel:  (302) 984-6000
        dmoore@potteranderson.com
        bpalapura@potteranderson.com
        cbartlett@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

## CERTIFICATE OF SERVICE

I, Carson R. Bartlett, hereby certify that on September 20, 2022, true and correct copies of the within document were served on the following counsel of record at the addresses and in the manner indicated:

## VIA ELECTRONIC MAIL

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@mnat.com
mflynn@mnat.com

Dale Cendali, P.C.
Joshua L. Simmons
Eric Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
thomson-ross@kirkland.com

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
Alyssa C. Kalisky
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
thomson-ross@kirkland.com

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
thomson-ross@kirkland.com

_/s/ Carson R. Bartlett_____
Carson R. Bartlett

7193230 / 50241

Exhibit B

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

|  |  |  |
|---|---|---|
| Cameron Ginder | 300 North LaSalle | |
| To Call Writer Directly: | Chicago, IL 60654 | |
| +1 312 862 3757 | United States | Facsimile: |
| cameron.ginder@kirkland.com | +1 312 862 2000 | +1 312 862 2200 |
| | www.kirkland.com | |

January 10, 2023

**By Email**

Shira Liu
Crowell & Moring LLP
sliu@crowell.com

Re:     *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence, Inc.*,
         Case No. 20-613-SB

Dear Shira:

I write on behalf of Thomson Reuters Enterprise Centre GmbH and West Publishing Corp. (collectively "Thomson Reuters") in response to ROSS's December 29, 2022 letter, which followed ROSS's November 7, 2022 letter; Thomson Reuters' November 22, 2022 letter; the parties' December 1 and 2 meet and confer; and ROSS's December 13, 2022 letter.

## I.    Temporal Scope of Production

ROSS continues to insist, without plausible justification, that Thomson Reuters produce "all documents and communications" in response to over 50 requests—"without a temporal limitation."  12/29 ROSS Ltr. at 2.  Thomson Reuters has agreed to produce documents from January 1, 2015.  As Thomson Reuters explained in its November 22 letter, ROSS's single tying claim "cannot justify the limitless discovery that ROSS seeks" or "justif[y] the production of documents dating back to the 19th Century, as is, apparently, ROSS's position."  11/22 TR Ltr. at 2.  The parties then met and conferred on December 1 and 2.  During our two-hour meet and confer, ROSS did not raise the temporal scope of Thomson Reuters' production.

Nevertheless, ROSS's December 29 letter starts by objecting to the temporal scope of Thomson Reuters' production.  The letter does not explain why ROSS needs all documents dating back over 100 years for each one of its 52 requests or attempt to limit ROSS's requests in any way.  Instead, ROSS doubles down on its demand that Thomson Reuters produce "documents without a temporal limitation" because "ROSS alleges anticompetitive conduct going back decades," citing just two examples.  12/29 ROSS Ltr. at 2.  Neither, however, justifies such an expansive production.

# KIRKLAND & ELLIS LLP

First, you state that Thomson Reuters' "historical practices with regard to its public law database and search products are relevant to the tying claim" because ROSS alleged that Thomson Reuters' "public law database was effectively sold as a standalone product before modern technology allowed [Thomson Reuters] to develop an online legal search tool." *Id.* This focus on the time before the internet existed is misplaced. Thomson Reuters has "never offered a commercial license to a collection of judicial opinions, statutes, and regulations separate from any search functionality." RFA No. 136 Resp. Indeed, ROSS itself alleges that the earliest form of West's case reporters contained the Key Number System. D.I. 225 n.5 ("In 1882, John B. West and his brother established the West Publishing Corporation ... . For almost twenty years, West built his company into the nation's leader in legal publishing, in large part because of the method for classifying cases, called the key number system ... ."). And the Key Number System is, as ROSS has defined it, a "Legal Search Tool." ROSS First Counterclaim RFPs, Definition 6. Notwithstanding our disagreement, Thomson Reuters is willing to produce documents sufficient to show any business plans, products, and licenses related to its public law database separate from any search technology from 1990 to present, to the extent any such documents exist and are reasonably accessible.

Second, you contend that Thomson Reuters' alleged "accumulation of market power over time" is relevant to ROSS's tying claim. Market power in the alleged tying product market is a necessary element of a per se tying claim. But nothing in *Brokerage Concepts*, or any other case you cite, holds that Thomson Reuters' alleged market power "over time" is relevant. Nor could it be relevant here. ROSS, a failed competitor, must prove that the alleged tie caused it anticompetitive harm and resulting antitrust injury. ROSS did not exist until 2015. Whether Thomson Reuters had market power before ROSS existed is thus irrelevant to ROSS's counterclaims: "a discovery request which seeks information prior to the time that the only plaintiff was incorporated is not 'facially relevant.'" *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 WL 950282 at *3 (D. Kan. Mar. 26, 2007).

Subject to this letter, Thomson Reuters intends to produce documents as described in its written RFP responses, from January 1, 2015. Thomson Reuters remains willing to have the parties' first meet and confer on this issue.

## II.   General RFP Responses

ROSS's December 29 letter next raises two alleged "fundamental inadequacies that are common to" Thomson Reuters' RFP responses. While under a separate heading, many of ROSS's objections to specific RFP responses are based solely on these same alleged inadequacies. *See* RFP Nos. 186; 199-202; 203-204; 209; 214-215, 224; 188-189, 191, 195, 208; 196-197; 219-220. Thomson Reuters responds to these objections here.

First, you state that Thomson Reuters' responses "are typically too vague for ROSS to understand precisely what is being offered" and allow Thomson Reuters "to cherry-pick the documents they prefer to produce." 12/29 ROSS Ltr. at 2-3. Not so. The phrase "sufficient to show" "means that [Thomson Reuters] will produce documents that sufficiently reflect that

## KIRKLAND & ELLIS LLP

topic"—just as ROSS explained when defending its use of the exact same phrase in its RFP responses.  12/13 ROSS Ltr. at 1.

Second, you state that Thomson Reuters' "offers wholly exclude communications" and "exclude documents related to how decisions are made, market studies, surveys, and the like." 12/29 ROSS Ltr. at 3.  This is unfounded.  Thomson Reuters stated it would "produce ***documents*** sufficient to show."  ROSS defined the word "document" to include "communications."  ROSS's First Counterclaim RFPs, Definition 23.  As I explained during our meet and confer, Thomson Reuters will produce communications if necessary to produce documents sufficient to show a particular topic.  Further, Thomson Reuters will produce "market studies, surveys, and the like" if responsive and within Thomson Reuters' RFP responses.

Neither of ROSS's stated concerns demonstrates any "fundamental inadequacy" with Thomson Reuters' RFP responses.  Thomson Reuters has agreed to produce arguably relevant, responsive documents proportionate to the needs of the case.  Nothing more is required.

## III.    Specific RFP Responses

Several of the specific responses that you identified in your letter are addressed below.

- RFP Nos. 187 and 205.  Thomson Reuters disagrees with ROSS's assertion that its practice of providing Westlaw access to law students—a practice ROSS itself adopted and implemented—is a barrier to entry.   However, to avoid further dispute, Thomson Reuters is willing to produce documents sufficient to show its practice and the cost of providing Westlaw access to law students.

- RFP No. 222.  Thomson Reuters will produce agreements with "all federal and state governmental agencies, whether part of the judicial, executive, or legislative branch, related to judicial opinions." 12/29 ROSS Ltr. at 11.  It is unclear what you mean by your request to clarify whether Thomson Reuters' offer "excludes agreements related to Westlaw's access to judicial opinions that are placed onto its website." *Id.* at 11-12. Thomson Reuters will produce agreements with the above identified federal and state governmental agencies to publish judicial opinions.  If you mean something different, please clarify ROSS's question so Thomson Reuters can adequately respond.

- RFP No. 210.  Thank you for clarifying and narrowing the scope of this request. Thomson Reuters will produce agreements with competitors related to legal search platforms, legal search tools, and public law databases.

- RFP Nos. 223, 225-226, 227.  Thomson Reuters disagrees with ROSS's suggestion that Thomson Reuters decides what judicial opinions to publish in official case reporters. Thomson Reuters further disagrees with ROSS's suggestion that Thomson Reuters' decision about what judicial opinions to make available online is relevant to this case. Nevertheless, to avoid further dispute, Thomson Reuters is willing to produce documents sufficient to show its process for deciding what opinions to (1) publish in official print

3

## KIRKLAND & ELLIS LLP

reporters and (2) include online.  As a reminder, Thomson Reuters has agreed to produce agreements with federal and state agencies related to the publication of judicial opinions. If Thomson Reuters has "exclusive" or "unique access" to cases, 12/29 ROSS Ltr. at 14, which it does not, it would be reflected in those agreements.

- <u>RFP No. 221</u>.  We have confirmed that Library Maintenance Agreements relate to print publications.  With the exception of academic customers and a few government customers, Westlaw is included on a separate contract from print publications.  The single Library Maintenance Agreement that ROSS found online confirms as much. Exhibit 1 to that agreement demonstrates that the CD-ROMs in question related to specific case reporters, not Westlaw.  Nevertheless, to avoid further dispute, Thomson Reuters will produce documents sufficient to show its licensing policy with respect to print publications through Library Maintenance Agreements.

- <u>RFP No. 231</u>.  Thank you for narrowing RFP No. 231.  Thomson Reuters agrees to produce documents sufficient to show any request to change the Westlaw terms and conditions in a way that would allow the requesting party to use Thomson Reuters' public law database separate from search technology.

- <u>RFP No. 213</u>.  Thomson Reuters agrees to produce "documents sufficient to identify competitors that have accessed [Thomson Reuters'] public law database or its legal search tools," as requested in your letter.  12/29 ROSS Ltr. at 15.

*     *     *

Thomson Reuters does not adopt or agree with any of ROSS's characterizations or arguments in its 17-page, single-spaced letter.  Thomson Reuters reserves all rights and waives none.  We can be available for a meet and confer Friday, January 13 or the week of January 16. Please let us know your availability.

Sincerely,

*/s/ Cameron Ginder*
Cameron Ginder

4

Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THOMSON REUTERS ENTERPRISE           )
CENTRE GMBH and WEST PUBLISHING      )
CORPORATION,                          )
                                      )    C.A. No. 20-613-SB
        Plaintiffs/Counterdefendants,    )
                                      )    **JURY TRIAL DEMANDED**
    v.                              )
                                      )
ROSS INTELLIGENCE INC.,               )
                                      )
        Defendants/Counterclaimant.      )

**DEFENDANT/COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S
SECOND SET OF COUNTERCLAIM REQUESTS FOR PRODUCTION TO
PLAINTIFF/COUNTERDEFENDANTS THOMSON REUTERS ENTERPRISE
<u>CENTRE GMBH AND WEST PUBLISHING CORPORATION (NOS. 234-247)</u>**

      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules

of this Court, Defendant / Counterclaimant ROSS Intelligence, Inc. serves the following requests

for production on Plaintiffs / Counterdefendants Thomson Reuters Enterprise Centre GmbH and

West Publishing Corporation.

<u>**DEFINITIONS**</u>

      Insofar as any of the terms below are used herein, the following definitions shall apply:

      1.     The term "THOMSON REUTERS" as used herein means Plaintiff /

Counterdefendant Thomson Reuters Enterprise Centre GmbH, and its present and former officers,

directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents,

subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its

behalf.

      2.     The term "WEST" as used herein means Plaintiff / Counterdefendant West

Publishing Corporation, and its present and former officers, directors, employees, attorneys,

agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

3.      The terms "YOU," "YOUR," and "PLAINTIFFS" as used herein means THOMSON REUTERS and WEST.

4.      The terms "ROSS," "DEFENDANT," and "COUNTERCLAIMANT," as used herein mean ROSS Intelligence, Inc., and its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf.

5.      The terms "PUBLIC LAW DATABASE" and "PUBLIC LAW DATABASES" as used herein mean a digital collection, or separate digital collections, in any digital form, format, arrangement, or organization whatsoever, that INCLUDES public text documents such as judicial opinions, administrative rulings, or legislative enactments such as statutes, public ordinances, rules, regulations.

6.      The terms "LEGAL SEARCH TOOL" and "LEGAL SEARCH TOOLS" as used herein mean any application, program, method, system, tool, or technology that facilitates, supports, augments, or otherwise contributes to ANY search, exploration, or analysis of a PUBLIC LAW DATABASE. Examples, without limitation, of LEGAL SEARCH TOOLS INCLUDE: West Headnotes, the WEST KEY NUMBER SYSTEM, WEST KEY NUMBER SYSTEM numbers, WEST KEY NUMBER SYSTEM topics, WEST KEY NUMBER SYSTEM subtopics WestSearch Plus, Boolean search functionality, any other search functionality on WestlawNext, Westlaw Edge, Westlaw Classic, Westlaw Precision, or any other version of the WESTLAW PLATFORM, and any similar applications, programs, methods, systems, tools, or technologies that other PERSONS have developed or license.

2

7.      The terms "LEGAL SEARCH PLATFORM" and "LEGAL SEARCH PLATFORMS" as used herein mean any websites or applications where legal research can be performed, whether or not it costs a fee to use the website or application. Examples, without limitation, of LEGAL SEARCH PLATFORMS INCLUDE: the WESTLAW PLATFORM, the ROSS PLATFORM, and the platforms and/or services created and/or licensed by COMPETITORS.

8.      The term "COMPETITORS" includes past and present providers of LEGAL SEARCH PLATFORMS, LEGAL SEARCH TOOLS, or PUBLIC LAW DATABASES, including LEXISNEXIS, GOOGLE, FASTCASE, CASEMAKER, CASETEXT, WOLTERS KLUWER, JURISEARCH, ROSS, and any other entity or person that PLAINTIFFS have or do consider competitors in LEGAL SEARCH PLATFORMS, LEGAL SEARCH TOOLS, or PUBLIC LAW DATABASES.

9.      The term "WESTLAW PLATFORM" as used herein means WestlawNext, Westlaw Edge, Westlaw Classic, Westlaw Precision, and any other version of the Westlaw LEGAL SEARCH TOOL that was, is, or will be accessible to users.  The term "WESTLAW PLATFORM" does not include PeopleMap or Company Investigator.

10.     The terms "AGREEMENT" and "AGREEMENTS" as used herein means all formal and informal licenses, contracts, settlements, stipulations, agreements, arrangements, memoranda of understandings, and other types of written or oral COMMUNICATIONS between at least two PERSONS.

11.     The terms "DOCUMENT" and "DOCUMENTS" as used herein shall be construed in the broadest sense permissible under the Federal Rules of Civil Procedure and shall include, without limitation any written, printed, typed, recorded, or graphic matter, however produced,

3

reproduced, or stored, including the originals and all nonidentical copies, whether different from the originals by reason of any notations made on such copies or otherwise, in the actual or constructive possession, custody, or control of PLAINTIFFS, including without limitation contracts, letter agreements, records, correspondence, COMMUNICATIONS, electronically stored information, emails, tweets, blog or Internet forum posts or comments, text messages on portable devices, Blackberry Messenger messages, SMS messages, instant messenger messages (e.g., Skype, Slack, etc.), memoranda, handwritten notes, source code, object code, binaries and associated files and/or structures, source code comments, source repository logs, server logs, records or summaries of negotiations, records or summaries of interviews or conversations, audio or video recordings, copies of video games, all Internet-based media, photographs, corporate minutes, diaries, telephone logs, instant messaging logs, chat room logs, schedules, drawings, product storyboards, product mockups, statistical statements, work papers, disks, data cards, films, data processing files, charts, graphs, microfiche, microfilm, contracts, notices, reports, recitals, statements, worksheets, abstracts, resumes, summaries, jottings, market data, books, journals, ledgers, audits, maps, diagrams, research documents, newspapers, appointment books, desk calendars, project management charts (e.g., Gantt charts), task management records (e.g., to-do lists), expense reports, computer printout and other computer readable or electronic records, and all drafts or modifications thereof, and all non-identical copies of any such items.

12.     The terms "COMMUNICATION" and "COMMUNICATIONS" mean any manner or method in which information is communicated from one human being to another, including, but not limited to, any means of transmission, sending, and/or receipt of information of any kind, such as speech, writing, language, nonverbal signals, computer electronics of any kind, video tape,

photographs, graphs, symbols, sound, radio and/or video signal, telephone, teletype, telecommunication, microfilm, microfiche, and/or media of any kind.

13.     The term "ANY" as used herein shall mean any or all and the term "ALL" as used herein shall mean any or all.

14.     The term "IDENTIFY" as used herein means to provide a description sufficient in specificity such that the document or thing can be unambiguously obtained by means of such description in a request for production pursuant to Rule 34 of the Federal Rules of Civil Procedure, which will include, whether applicable, the document's or thing's title, date, author(s) or creator(s), recipient(s), Bates number, and present location.

15.     The terms "INCLUDE," "INCLUDES," and "INCLUDING" as used herein mean not limited to.

16.     The terms "PERSON" and "PERSONS" as used herein mean any individual, corporation, partnership, association, organization, or other entity of any type or nature.

17.     The terms "RELATE TO," "RELATED TO," and "RELATING TO" as used herein mean constituting, pertaining to, in connection with, reflecting, respecting, regarding, concerning, referring to, based upon, stating, showing, evidencing, establishing, supporting, negating, contradicting, describing, recording, noting, embodying, memorializing, containing, mentioning, studying, analyzing, discussing, specifying, identifying or in any manner logically, factually, indirectly or directly, or in any other way connecting to the matter addressed, in whole or in part.

18.     The term "COMPLAINT" as used herein means the Complaint that You filed at docket no. 1 in this action on May 6, 2020.

19.     The terms "HEADNOTE" and "HEADNOTES" as used herein mean the materials that YOU refer to in the COMPLAINT as "West Headnotes" at paragraphs 1, 11, 14, 15, and 20.

5

20.     The term "WEST KEY NUMBER SYSTEM" as used herein means the system that is reflected in the document at Bates No. TR-0179847.

21.     The term "ARTIFICIAL INTELLIGENCE" as used herein means analysis and development in the fields known as artificial intelligence, machine learning, or natural language processing, including processes, designs, products, and systems.

22.     The term "PER SEAT" as used herein means pricing at a rate per user that does not vary with the number of searches performed by that user.

23.     The term "PER SEARCH" as used herein means pricing at a rate that varies with the number of searches performed.

24.     The term "MONTHLY GUARANTEE" as used herein means pricing at a set monthly rate, which may be adjusted based on a customer's user count.

25.     The term "PRICING STRUCTURE" as used herein means the formula by which a customer's total price is calculated, including PER SEAT, PER SEARCH, or MONTHLY GUARANTEE pricing.

26.     The term "CUSTOMER SEGMENT" as used herein means divisions or tiers of customers, users or subscribers and potential customers, users or subscribers that affects pricing, services, or TERMS OF SERVICES offered to customers, users, or subscribers, which may include government, law firms of various sizes, pro bono access for law firms, in-house legal departments, non-profit legal departments, universities, law schools, university law libraries, law firm law libraries, and students.

## INSTRUCTIONS

1.       PLAINTIFFS shall IDENTIFY, produce, and permit the visual inspection and reproduction of the following DOCUMENTS, electronically stored information, and things which are in its possession, custody, or control, INCLUDING DOCUMENTS, electronically stored information, and things in the actual or constructive possession of PLAINTIFFS, its attorneys, experts, and anyone else acting on its behalf. The production and visual inspection shall take place at Crowell & Moring LLP, 3 Embarcadero Center, 26th Fl., San Francisco CA 94111 (or such other place as may be stipulated by the parties).

2.       These requests are not limited by time unless stated within the request itself.

3.       Unless otherwise stated, the geographic scope covered by these requests is the United States.

4.       If PLAINTIFFS claim that ANY DOCUMENT, tangible object, or other thing responsive to ANY request was once in its possession, custody or control and has since been lost, discarded, destroyed, deleted, relinquished, OR disposed in some other manner, PLAINTIFFS shall IDENTIFY with particularity each such DOCUMENT and set forth: (a) the date the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, or disposed; (b) the circumstances under which the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, or disposed; and (c) the identity of ALL PERSONS who had knowledge of, or were present when, the DOCUMENT was lost, discarded, destroyed, deleted, relinquished, or disposed, as well as ALL PERSONS who authorized such actions.

5.       In the event that PLAINTIFFS contend that ANY DOCUMENT responsive to ANY discovery request below is privileged or otherwise excludable from discovery, PLAINTIFF shall: (a) IDENTIFY each such DOCUMENT by date, author(s), signer(s), intended recipient(s),

and addressee(s); (b) IDENTIFY each PERSON to whom a copy was furnished OR to whom the information OR advice was conveyed; (c) state the general subject matter of the DOCUMENT; and (d) state the ground on which the claim of privilege or immunity from disclosure is based. Failure to do so will constitute a waiver of such a claim.

6.      If PLAINTIFFS claim a privilege or immunity with regard to ANY DOCUMENT responsive to ANY discovery request below, PLAINTIFFS should nevertheless produce ALL portions of such DOCUMENT that contains information not appropriately subject to a claim of privilege or immunity.

7.      The terms "and" and "or" and "between" and "among" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all information that otherwise might be construed to be outside of its scope.

8.      The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun, and vice versa; and the past tense shall include the present tense where the clear meaning is not distorted.

9.      These requests are continuing in nature under Rule 26(e) of the Federal Rules of Civil Procedure. If, at ANY time prior to the completion of the above-captioned matter, PLAINTIFFS obtain or become aware of additional DOCUMENTS, tangible objects, and things responsive to these requests, PLAINTIFFS shall promptly supplement its response to provide such DOCUMENTS, tangible objects, and things to ROSS.

10.     Any DOCUMENT with any sheet or part thereof bearing any marks, such as initials, stamped indices, comments or notations, or any character or characters, that are not part of the signed text or photographic reproduction thereof is to be considered as a separate DOCUMENT. Where there is any question about whether a tangible item otherwise described in

these requests falls within the definition of "DOCUMENT(S)," such tangible item shall be produced.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 234:**

ALL DOCUMENTS RELATED TO YOUR decision whether or not to offer, including discontinuing offering, and under what circumstances to offer, not offer, or discontinue offering, each element of YOUR LEGAL SEARCH TOOLS and PUBLIC LAW DATABASES online, including the KEY NUMBER SYSTEM and HEADNOTES.

**REQUEST FOR PRODUCTION NO. 235:**

ALL DOCUMENTS RELATED TO YOUR decision whether or not to offer, including discontinuing offering, and under what circumstances to offer, not offer, or discontinue offering, each element of YOUR LEGAL SEARCH TOOLS and PUBLIC LAW DATABASES in paper format, including the KEY NUMBER SYSTEM and HEADNOTES.

**REQUEST FOR PRODUCTION NO. 236:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision whether or not to offer, including discontinuing offering, and under what circumstances to offer, not offer, or discontinue offering, to license any element of YOUR LEGAL SEARCH TOOLS or PUBLIC LAW DATABASES on its own or to require it to be licensed with other elements of YOUR LEGAL SEARCH TOOLS or PUBLIC LAW DATABASES, including offering the KEY NUMBER SYSTEM online without requiring a license including judicial opinions, offering judicial opinions without requiring a license including the KEY NUMBER SYSTEM, offering statutes without requiring a license to the KEY NUMBER SYSTEM, and offering the KEY

9

NUMBER SYSTEM and/or HEADNOTES online without requiring online access to judicial opinions.

**REQUEST FOR PRODUCTION NO. 237:**

ALL AGREEMENTS that limit user access to YOUR paper-format publications, including incentivizing or requiring return or destruction of YOUR paper-format publications.

**REQUEST FOR PRODUCTION NO. 238:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO pricing of YOUR paper format publications, including analyses of the effects of pricing of YOUR paper format publications on customers' licensing of the WESTLAW PLATFORM.

**REQUEST FOR PRODUCTION NO. 239:**

ALL DOCUMENTS, including surveys, market studies or research reports, and COMMUNICATIONS RELATING TO YOUR decision whether or not to introduce a new PRICING STRUCTURE, such as a PER SEAT or MONTHLY GUARANTEE model.

**REQUEST FOR PRODUCTION NO. 240:**

ALL COMMUNICATIONS RELATING TO changes to YOUR PRICING STRUCTURE, including any changes thereto, and whether and how to implement PER SEAT or MONTHLY GUARANTEES, and/or requiring or incentivizing customers to change or adopt a PRICING STRUCTURE.

**REQUEST FOR PRODUCTION NO. 241:**

DOCUMENTS sufficient to show the number of customers by PRICING STRUCTURE, by CUSTOMER SEGMENT, by month.

**REQUEST FOR PRODUCTION NO. 242:**

ALL DOCUMENTS and COMMUNICATIONS RELATING TO setting PER SEAT or MONTHLY GUARANTEE pricing, including internal analyses setting pricing and COMMUNICATIONS with customers reflecting feedback or negotiations on PER SEAT or MONTHLY GUARANTEE pricing.

**REQUEST FOR PRODUCTION NO. 243:**

Documents sufficient to show the number of 1) users and 2) searches per user by CUSTOMER SEGMENT and by PRICING STRUCTURE.

**REQUEST FOR PRODUCTION NO. 244:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO each decision whether or not to invest in ARTIFICIAL INTELLIGENCE technology.

**REQUEST FOR PRODUCTION NO. 245:**

Public comments submitted to the Department of Justice regarding the acquisition of West Publishing Company by The Thomson Corporation.

**REQUEST FOR PRODUCTION NO. 246:**

The source code for YOUR LEGAL SEARCH TOOLS and PUBLIC LAW DATABASES.

**REQUEST FOR PRODUCTION NO. 247:**

ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to offer or cease offering more than one LEGAL SEARCH TOOL, such as Westlaw Classic and Westlaw Next, simultaneously to access YOUR PUBLIC LAW DATABASE.

11

OF COUNSEL:

Gabriel M. Ramsey
Warrington Parker
Joachim B. Steinberg
Jacob Canter
Christopher J. Banks
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel:  (415) 986-2800

Mark A. Klapow
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 624-2500

Dated:  January 13, 2023
10547494 / 20516.00001

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew L. Brown (#6766)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on January 13, 2023, true and correct copies of the

within document were served on the following counsel of record at the addresses and in the

manner indicated:

## VIA ELECTRONIC MAIL

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@mnat.com
mflynn@mnat.com

Dale Cendali, P.C.
Joshua L. Simmons
Eric Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
thomson-ross@kirkland.com

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
Alyssa C. Kalisky
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
thomson-ross@kirkland.com

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
thomson-ross@kirkland.com

_/s/ David E. Moore_
David E. Moore

7193230 / 20516.00001

Exhibit D

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Cameron Ginder
To Call Writer Directly:
+1 312 862 3757
cameron.ginder@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

February 27, 2023

**By Email**

Shira Liu
Crowell & Moring LLP
sliu@crowell.com

Re:     *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence, Inc.*,
        Case No. 20-613-SB

Dear Shira:

I write in response to your February 21, 2023 letter about Thomson Reuters' responses to ROSS's Second Set of Counterclaim Requests for Production.

*First*, as you note, Thomson Reuters has agreed to produce documents responsive to RFPs 234-36, 238-40, 242, 244, and 247. Thomson Reuters is not, however, agreeing to produce "all documents" in response to these requests. To do so would be overly burdensome and disproportionate to the needs of the case. Rather, Thomson Reuters has collected and reviewed documents using search terms and custodians. To that end, the search parameters and data sources previously disclosed by Thomson Reuters, as revised and added to by ROSS, accounted for these RFPs.

*Second*, you agreed to accept Thomson Reuters' response to RFP 237 if "(1) there are no agreements responsive to this RFP other than Terms of Service; and (2) the offer includes documents sufficient to show past agreements relating to hardcopy caselaw reporters." We have confirmed that Thomson Reuters' terms of service govern customers' access to, and use of, hardcopy caselaw reporters. Further, Thomson Reuters' offer includes documents sufficient to show its terms of service for hardcopy caselaw reporters from January 1, 2015 to present.

*Third*, you have asked us to clarify Thomson Reuters' response to RFP 241. Thomson Reuters agreed to produce documents "related to customer pricing." Thomson Reuters has collected and produced documents reflecting Westlaw pricing. Further, several search terms target pricing-related documents. We have produced those documents, too. The phrase "as they are kept in the ordinary course of business" means just that—Thomson Reuters will produce documents related to customer pricing as they are kept in the ordinary course of business.

Austin   Bay Area   Beijing   Boston   Brussels   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Paris   Salt Lake City   Shanghai   Washington, D.C.

## KIRKLAND & ELLIS LLP

Thomson Reuters will not create documents showing the number of customers by pricing structure and customer segment. *See Palmer v. York Cnty., Penn.*, 2022 WL 4473595, at *2 (M.D. Pa. Sept. 26, 2022) ("It is clear, therefore, that the court cannot compel the production of things that do not exist. Nor can the court compel the creation of evidence by parties who attest that they do not possess the materials sought by an adversary in litigation."); *Am. Banana Co. v. Republic Nat'l Bank of New York, N.A.*, 2000 WL 521341, at *3 (S.D.N.Y. May 1, 2000) ("[The] Court cannot compel production of what does not exist."); *Deng v. N.Y. Office of Mental Health*, 2016 WL 11699675, at *3 (S.D.N.Y. Feb. 23, 2016) (denying plaintiff's motion to compel in part because "Rule 34 cannot be used to compel a party to create a 'document' solely for its production") (citation omitted).

*Fourth*, you have asked Thomson Reuters to produce "public comments submitted to the Department of Justice regarding the acquisition of West Publishing Company by the Thomson Reuters Corporation" because ROSS has been unable to locate any such comments after "a reasonable effort." We ask that you explain what ROSS's "reasonable efforts" entailed. As you are no doubt aware, the DOJ filed suit to prevent Thomson Reuters' acquisition of West Publishing. *See United States v. Thomson Corp.*, Case No. 1:96-cv-01415 (United States District Court for the District of Columbia). The docket is available on Westlaw, just as it is on PACER, and includes the option to send a runner to the court to acquire a copy of any docket entry. The suggestion that "the burden of pulling comments ... is not significant" for Thomson Reuters because they "relate[] to a specific government investigation" ignores that Thomson Reuters acquired West Publishing in 1996—nearly thirty years ago. Nevertheless, if ROSS confirms that it cannot acquire the documents it needs from the court, Thomson Reuters will evaluate whether any public comments it made to the DOJ as part of its acquisition of West Publishing are reasonably accessible in its internal files.

*Fifth*, and finally, ROSS continues its years'-long effort to gain access to Thomson Reuters' source code. Thomson Reuters' source code is no more relevant now than it was in the copyright case. Thomson Reuters sells a single product, Westlaw. It does not—and has never—commercially licensed or sold a public law database separate from search technology, and the only way Thomson Reuters' customers can access its collection of primary law is through a Westlaw license. How Thomson Reuters implements Westlaw from a technical perspective is irrelevant to the issues in this case. Nothing in either *Microsoft* or *Assessment Technologies* holds otherwise.

Thomson Reuters reserves all rights and waives none.

Sincerely,

Cameron Ginder

Exhibit E



Shira Liu
sliu@crowell.com
(949) 798-1325 direct

Crowell & Moring LLP
3 Park Plaza
20th Floor
Irvine, CA 92614
+1.949.263.8400 main

February 21, 2023

**VIA E-MAIL**

Cameron Ginder
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
312-862-3757
cameron.ginder@kirkland.com

Re:    *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence, Inc.*, Case No. 20 Civ.
       613 (SB)

Dear Cameron:

      We write on behalf of ROSS Intelligence, Inc. ("ROSS") to respond to your February 13, 2023 Responses to ROSS's Second Set of Counterclaim Requests for Production ("Second Counterclaim RFPs").[1]

## I.    Plaintiffs' Specific Objections to ROSS's RFP Requests

### a.    Request Nos. 234-236, 238-240, 242, 244, and 247

      For Request Nos. 234-236, 238-240, 242, 244, and 247, ROSS sought "ALL DOCUMENTS RELATED TO" the issues propounded. However, Plaintiffs responded with an offer of documents that were not clearly offering ALL documents related to the RFPs. The responses to Request Nos. 234-236, 238-240, 242, 244, and 247 state that Plaintiffs will produce "documents related" to the issue.  It is unclear whether Plaintiffs' are agreeing to produce all documents or if you intend to limit your production, and if so, how.  Please confirm your intention behind these responses.  Or, if you intend to produce via an ESI process, we request to meet and confer on terms and custodians.

---

[1] As you know, the parties have also conferred in regards to ROSS's September 20, 2022, First Set of Counterclaim Requests for Production ("First Counterclaim RFPs").  This included your October 20, 2022, responses to the Counterclaim RFPs ("Counterclaim RFPs Responses"), our November 7, 2022, letter ("Nov. 7 Letter"), your November 22, 2022, response letter ("Nov. 22 Letter"), the December 1 and 2, 2022, videoconference conferral ("Dec. M&C"), our December 29, 2022, letter ("Dec. 29 Letter"), your January 10, 2023, letter ("Jan. 10 Letter") and our February 17, 2023 conferral ("Feb. M&C").  Between the Jan. 10 Letter and the Feb. M&C, the parties also conferred on numerous occasions regarding Plaintiffs' responses to the First Counterclaim RFPs, including a phone conferral on January 19, 2023 ("Jan. 19 Conferral").



**b.      Request No. 237**

For Request No. 237, ROSS requested "ALL AGREEMENTS that limit user access to YOUR paper-format publications, including incentivizing or requiring return or destruction of YOUR paper-format publications."  In response, Plaintiffs' proposed "Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs state that they will produce documents sufficient to show the Terms of Service relating to hardcopy caselaw reporters."

This production is acceptable to ROSS subject to the forgoing facts: (1) there are no AGREEMENTS responsive to this RFP other than Terms of Service; and (2) the offer includes documents sufficient to show past AGREEMENTS relating to hardcopy caselaw reporters. Please confirm your response conforms to these requirements.

**c.      Request No. 241**

For Request No. 241, ROSS requested "DOCUMENTS sufficient to show the number of customers by PRICING STRUCTURE, by CUSTOMER SEGMENT, by month." In response, Plaintiffs' offer to "produce documents related to customer pricing as they are kept in the ordinary course of business." It is unclear to ROSS whether your offer of "documents related to customer pricing" includes DOCUMENTS sufficient to show the number of customers by PRICING STRUCTURE, by CUSTOMER SEGMENT, and by month—to the extent such documents are maintained in the ordinary course of business.  Please confirm your intention behind these responses.

**d.      Request No. 245**

For Request No. 245, ROSS requested "Public comments submitted to the Department of Justice regarding the acquisition of West Publishing Company by The Thomson Corporation." Plaintiffs have refused to produce documents in response to this RFP. Specifically, Plaintiffs claim that this request "seeks documents that are neither relevant to any claim or defense of any party in this Litigation nor proportional to the needs of the case because "[p]ublic comments submitted to the Department of Justice regarding the acquisition of West Publishing Company by The Thomson Corporation" are not relevant to ROSS's counterclaims and any relevance is significantly outweighed by the burden of production"; and "it expressly seeks documents that are publicly available and are therefore equally or less burdensome for ROSS to procure itself."

ROSS has made a reasonable effort to locate and identify these comments.  Please identify where these documents can be found and if they are public. ROSS requests that Plaintiffs produce the public comments which are in Plaintiffs' possession.  Relatedly, ROSS does not understand the burden-of-production objection, as we would anticipate that the burden of pulling comments in Plaintiffs' custody and control related to a specific government investigation is not significant.

In addition, the argument that these public comments are not relevant to ROSS's counterclaims is not persuasive. Previous actions by Plaintiffs, long before the initiation of this litigation, have contributed to the problems that have negatively impacted ROSS and the public. ROSS alleges that West has controlled the market through anticompetitive conduct for decades. (*See, e.g.*, D.I. 36 ¶¶ 5, 8, 39-56, 82-87.) And the DOJ analysis of the merger occurred to determine

2



whether West and Thomson Reuters combining would have anticompetitive market effects. Thus, this request is directly relevant.  Accordingly, ROSS restates its request for documents under Request No. 245. Please produce these documents.

   e.      **Request No. 246**

   For Request No. 246, ROSS requested the "source code for YOUR LEGAL SEARCH TOOLS and PUBLIC LAW DATABASES." Plaintiffs have refused to produce documents in response to this RFP. Specifically, Plaintiffs object to this Request "to the extent that it seeks documents that are neither relevant to any claim or defense of any party in this Litigation nor proportional to the needs of the case," "as vague and ambiguous to the extent that the term 'source code' is unclear and undefined," that "it incorporates disputed factual or legal conclusions," "it implies or assumes their Public Law Databases and Legal Search Tools are separate products or have separate consumer demand," and "that it calls for confidential information, trade secrets, or proprietary business information."

   First, Plaintiffs' boilerplate "confidentiality" objection is immaterial. We have had a protective order in place since May 13, 2021, and both parties have regularly designated material confidential or attorneys' eyes only, so we are confused as to what this objection means or why it is a basis for you to withhold documents. Confidential documents still must be produced under the terms of the agreed-upon protective order. *See New Berry Inc. v. Smith*, 2020 WL 2839904, at *2-3 (W.D. Pa. June 1, 2020) (objecting "to the extent" that requested documents are Confidential, Highly Confidential, or Attorney Eyes Only is contrary to purpose of protective orders). Please withdraw this objection in its entirety.

   Second, source code is defined in the protective order, (*see* D.I. 48 § 2.9,) and the parties negotiated the production of source code during copyright discovery without raising this issue. Please confirm that you do not intend to withhold access to source code on the basis of your vagueness objection.

   Third, ROSS has made clear for nearly two years that source code is relevant to this case. For example, ROSS's RFP Nos. 67-68 (served on May 12, 2021) request source code related to the Westlaw platform and the CaRE system, and RFP Nos. 120-22 (served on November 12, 2021) request source code related to the development and assignment of headnotes and key numbers. Plaintiffs refused to produce source code at that time, but ROSS expressly notified Plaintiffs that it intended to revisit the source code requests if the Court permitted its counterclaims to proceed into discovery. (*See* Exhibit A, J. Steinberg Email E. Loverro, May 6, 2022.)  Also, in a June 10, 2022, letter regarding Plaintiffs' source code, ROSS reiterated that: "Plaintiffs' source code is relevant to the antitrust and unfair competition claims to support ROSS's tying claim—that the search engine and public law database are two separate products. Plaintiffs' source code is also relevant to ROSS's claims that Westlaw's antiquated technology is insulated from competition by anticompetitive practices." (*See* Exhibit B, J. Steinberg Ltr. M Means, June 10, 2022.)

   Third, source code is directly relevant to ROSS's counterclaims.  It is relevant to the tying claims because technical intermingling constitutes tying.  *See U.S. v. Microsoft Corp.*, 253 F.3d 34, 65-66, 85-86 (D.C. Cir. 2001). ROSS cannot know if Plaintiffs technically intermingles its separate products unless it reviews code.  Also, technical intermingling that makes it impossible



to access judicial opinions without accessing Plaintiffs' alleged copyrights may constitute copyright misuse. *See Assessment Techs. of WI, LLC, v. Wiredata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003).

\* \* \*

We look forward to your prompt resolution of these concerns. ROSS preserves all rights and waives none.


Very truly yours,

/s/ Shira Liu

Shira Liu

# EXHIBIT A

| | |
|---|---|
| **From:** | Steinberg, Joachim <JSteinberg@crowell.com> |
| **Sent:** | Friday, May 6, 2022 11:12 AM |
| **To:** | Loverro, Eric; ROSS Lit Team |
| **Cc:** | #Thomson-Ross; Flynn, Michael J.; *dmoore@Potteranderson.com1; |
| | *bpalapura@potteranderson.com |
| **Subject:** | RE: TR v. ROSS - Follow-Up Re Ovbiagele Deposition |

Eric,

The Github repository contains source code and related documentation, as well as some website assets. ROSS has not produced the source code because for the past year your team has repeatedly stated that it was not interested in ROSS's source code. While negotiating the protective order, your colleague twice commented that "Plaintiffs do not intend to produce any source code and do not anticipate needing to see ROSS's source code." *See* Plaintiffs' Counsel's Protective Order Redline, at 4; Email, M. McKeown to. K Gaffari, Apr. 25, 2021 (same). Based on this, ROSS has been operating under the assumption that Plaintiffs did not need and were uninterested in ROSS's source code, as Plaintiffs did not raise this issue again until very recently.

ROSS will nevertheless make the source code available, subject to the protective order, including in particular section 8(c).

Given that the parties are revisiting this issue and the Court's ruling permitting ROSS to proceed on its antitrust claims, ROSS requests that Plaintiffs mutually agree to produce their source code, which is responsive to a number of ROSS's RFPs, including, without limitation, Nos. 67-18 and 120-22.

Best regards,
Joachim

**Joachim B. Steinberg**
Pronouns: he/him/his
Crowell & Moring LLP
jsteinberg@crowell.com
+1.415.365.7461 direct  |  +1.917.575.6244 mobile

**From:** Loverro, Eric <eric.loverro@kirkland.com>
**Sent:** Wednesday, April 27, 2022 7:51 AM
**To:** Steinberg, Joachim <JSteinberg@crowell.com>; ROSS Lit Team <Rosslitteam@crowell.com>
**Cc:** #Thomson-Ross <thomson-ross@kirkland.com>; Flynn, Michael J. <mflynn@morrisnichols.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; *bpalapura@potteranderson.com
<bpalapura@potteranderson.com>
**Subject:** RE: TR v. ROSS - Follow-Up Re Ovbiagele Deposition

External Email

Joachim,

We are in receipt of the hard drive.  With respect to your April 21 letter, however, it is unclear what ROSS's basis is for refusing to produce ROSS's GitHub repository.  Mr. Ovbiagele explicitly testified that the only way Plaintiffs could determine what machine learning models, natural language processes, and signals were used by ROSS in developing the

ROSS Platform would be to review the files in ROSS's GitHub repository.  *See* Ovbiagele Tr. 109:5-13 and 112:25-113:7.  ROSS cannot refuse to produce documents that its 30(b)(6) witness stated under oath were necessary to review if Plaintiffs want to understand how the ROSS Platform was developed—an issue that is at the heart of this litigation.

Moreover, these documents are clearly encompassed by Requests for Production Nos. 2 ("All DOCUMENTS CONCERNING the creation and development of the ROSS PLATFORM"), 3 ("All DOCUMENTS CONCERNING changes to the ROSS PLATFORM from conception of the ROSS PLATFORM to today"), 9 ("All DOCUMENTS CONCERNING the TECHNICAL FUNCTIONING of the ROSS PLATFORM"), 12 ("All technical DOCUMENTS CONCERNING the TECHNICAL FUNCTIONING of the ROSS PLATFORM, including without limitation, technical specifications, TRAINING DATA, algorithm training sets, algorithm training documentation, and user and administrator manuals"), and 39 ("All DOCUMENTS CONCERNING the manner in which the material delivered by CONTRACTORS, including without limitation LEGALEASE, to ROSS was stored, maintained, and used by ROSS), among others.

If there are other documents that ROSS produced that it believes shows the information Mr. Ovbiagele testified only existed in the GitHub repository, please identify them.  If no such documents have been produced, then please either produce the GitHub files immediately or provide ROSS's availability for a final meet and confer on this issue.

Best,
Eric

**Eric Loverro**

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 390 4243
**M** +1 646 884 2971
**F** +1 212 446 4900

eric.loverro@kirkland.com

**From:** Steinberg, Joachim <JSteinberg@crowell.com>
**Sent:** Thursday, April 21, 2022 4:09 PM
**To:** Loverro, Eric <eric.loverro@kirkland.com>; ROSS Lit Team <Rosslitteam@crowell.com>
**Cc:** #Thomson-Ross <thomson-ross@kirkland.com>; Flynn, Michael J. <mflynn@morrisnichols.com>; *dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; *bpalapura@potteranderson.com <bpalapura@potteranderson.com>
**Subject:** RE: TR v. ROSS - Follow-Up Re Ovbiagele Deposition

Eric,

Please see the attached letter.  You should receive today, if you haven't already, a hard drive sent by Federal Express. The password to access the materials on the hard drive referenced in this letter is **6159191**.

Best regards,
Joachim

**Joachim B. Steinberg**
Pronouns: he/him/his
Crowell & Moring LLP
jsteinberg@crowell.com
+1.415.365.7461 direct  |  +1.917.575.6244 mobile

**From:** Loverro, Eric <eric.loverro@kirkland.com>
**Sent:** Wednesday, April 20, 2022 3:00 PM

**To:** ROSS Lit Team <Rosslitteam@crowell.com>
**Cc:** #Thomson-Ross <thomson-ross@kirkland.com>; Flynn, Michael J. <mflynn@morrisnichols.com>;
*dmoore@Potteranderson.com1 <dmoore@Potteranderson.com>; *bpalapura@potteranderson.com
<bpalapura@potteranderson.com>
**Subject:** TR v. ROSS - Follow-Up Re Ovbiagele Deposition

External Email

Counsel,

During Mr. Ovbiagele's deposition on April 12 he testified about the existence of a number of documents that existed on ROSS's databases and other cloud servers, including csv files, "or whatever intermediate form it was in," that contained "augmentations" that ROSS made to the data it received from LegalEase.  In addition, Mr. Ovbiagele mentioned that certain documents were only contained on ROSS's GitHub repository and/or MongoDB database, such as documents reflecting the various signals used in developing the ROSS platform, and documents related to ROSS's "training app."  Mr. Ovbiagele also testified that these databases have been closed, and was not certain whether they had been preserved or destroyed.

Please confirm that all materials discussed during Mr. Ovbiagele's deposition have been produced, including any and all csv/intermediate files created by ROSS to train its AI system, the GitHub repository, and MongoDB database.  If they have not been produced, Plaintiffs request that ROSS do so immediately.  If ROSS is unable to produce these documents because they have been destroyed, please explain why ROSS failed to preserve these documents in accordance with its discovery obligations.

Best,
Eric

**Eric Loverro**

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 390 4243
**M** +1 646 884 2971
**F** +1 212 446 4900

eric.loverro@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT B



**Joachim B. Steinberg**
jsteinberg@crowell.com
(415) 365-7461  direct

Crowell & Moring LLP
3 Embarcadero Center
26th Floor
San Francisco, CA 94111
+1.415.986.2800  main
+1.415.986.2827  fax

June 10, 2022

Miranda Means
Kirkland & Ellis LLP
200 Clarendon Street
Boston, MA 02116
miranda.means@kirkland.com

Re:   *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.,* Case No. 20-613-
      LPS, Plaintiffs' Source Code

Dear Miranda:

       We write on behalf of ROSS Intelligence, Inc. ("ROSS") in regards to ROSS's request for
Plaintiffs Thomson Reuters Enterprise Center GmbH and West Publishing Corporation
(collectively "Plaintiffs") to produce source code.

## I.       Source Code Relevant to Copyright Claim

       Following the parties' June 2, 2022 meet and confer, Plaintiffs asked that ROSS identify
which portions of the source code ROSS believes are relevant to the copyright claim. ROSS
seeks Plaintiffs' search engine and JCaRE source code for the reasons identified below.

       First, ROSS seeks Plaintiffs' search engine code as it relates to headnotes and key
numbers. Plaintiffs have stated that their search engine technology somehow employs or relies
on the headnotes and key numbers. *See, e.g.,* Al-Kofahi Dep. Tr. 21:22-22:18 (describing how
the search engine algorithm incorporates headnotes and key numbers); *id*. 23:12-24:20
(describing how an algorithm that considers key numbers operates); *id*. 38:21-41:19 (describing
how the Westlaw Edge algorithms use headnotes). We are entitled to examine the source code to
test those claims.

       Plaintiffs have placed the search engines at issue throughout this litigation. For example,
Plaintiffs' counsel, Dale Cendali, put the search engines and algorithms at issue when she
claimed that ROSS copied the entire Westlaw database, including the search engines and
algorithms. *See* Mot. Hearing Tr. 39:25-40:7 (Oct. 30, 2020) (Plaintiffs' counsel stating, "Yes,
the search engines and algorithms are part – they're part of the compilation. They're part of the
hierarchy and structure of how Westlaw is created and operates. And that is definitely part of
our, of our copyright claim, and part of our registration."). Then, in Plaintiff's November 19,
2021 Supplemental Response to Interrogatory No. 1, Plaintiffs claimed that ROSS's algorithm
was based on "cases that West's attorney-editors determined are relevant to a given legal topic



and the results provided by Westlaw's own search algorithm when the same question was fed into it." *Id.* at 25. Plaintiffs claim that the memoranda that ROSS used to train its algorithm are based on "Plaintiffs' selection and arrangement of cases, West Headnotes, and portions of the WKNS." *Id.* Plaintiffs cannot argue or imply that headnotes and key numbers are implicated in the types of searches that the ROSS search engine performs without ROSS testing the veracity of those claims. ROSS is therefore entitled to compare what Plaintiffs' search engine does in comparison to ROSS's.

Although the Parties discussed source code earlier here, ROSS had not demanded Plaintiffs' source code because the parties agreed that they would not exchange source code. Plaintiffs stated very clearly that they did not anticipate needing to review ROSS's source code. *See* Plaintiffs' Counsel's Protective Order Redline, at 4 ("Plaintiffs do not intend to produce any source code and do not anticipate needing to see ROSS's source code."); Email, M. McKeown to K. Ghaffari, Apr. 25, 2021 (same). As Plaintiffs have reopened this discussion, ROSS now requests access to Plaintiffs' source code.

Plaintiffs have stated that they decided they would like to view source code because of Jimoh Ovbiagele's deposition testimony, *see* E. Loverro Email, May 10, 2022, while ROSS has not yet demonstrated the same need. But ROSS has not conducted the deposition of Isabelle Moulinier, because Plaintiffs needed to re-schedule that deposition. *See* E. Loverro Email, May 22, 2022. As Ms. Moulinier is designated to testify on similar topics to Mr. Ovbiagele, and because the delay in that deposition is not attributable to ROSS, with the schedule in place, ROSS should be able to view Plaintiffs' source code now.

Second, ROSS seeks Plaintiffs' JCaRE search code. The parties currently dispute whether the JCaRE technology makes classification selections or whether West employees make classification selections. *Compare* May 20, 2022 M. Means Ltr (disagreeing with ROSS' position and stating that "JCare [sic] does not decide what key numbers are assigned to headnotes") *with* Apr. 21, 2022 J. Steinberg Ltr ("[T]he document at Bates no. TR-0036339 states that 70% of the time one of the key numbers assigned to a headnote are based on the top-5 list of key numbers generated by a non-human, JCaRE. *See* TR-0036339 at -39."). The source code for JCaRE is relevant to how JCaRE operates and may reveal whether and how JCaRE functionality matches the computer technology making classification decisions. Accordingly, the JCaRE source code is relevant to determining the copyrightability of portions of the key number system.

## II.    Source Code Relevant to Antitrust Counterclaims

ROSS also intends to request Plaintiffs' source code during antitrust discovery. Plaintiffs' source code is relevant to the antitrust and unfair competition claims to support ROSS's tying claim – that the search engine and public law database are two separate products. Plaintiffs' source code is also relevant to ROSS's claims that Westlaw's antiquated technology is insulated from competition by anticompetitive practices. As a result, producing the source code now avoids burdening the court, and the Parties, with additional discovery disputes on material that will be inevitably produced.



ROSS reserves all rights and waives none.


Very truly yours,

Joachim B. Steinberg

Exhibit F

# KNOWLEDGE ECOLOGY INTERNATIONAL (HTTPS://WWW.KEIONLINE.ORG/)

ATTENDING AND MENDING THE KNOWLEDGE ECOSYSTEM

Search …

SEARCH

Four Years of Struggles to Free the Law (CFP-95 presentation)»Book page»Knowledge Ecology International

ABOUT (/ABOUT)   |   AREAS OF WORK (HTTPS://WWW.KEIONLINE.ORG/OURWORK)   |   CORONAVIRUS (HTTPS://WWW.KEIONLINE.ORG/CORONAVIRUS)   |

XTANDI (HTTPS://WWW.KEIONLINE.ORG/XTANDI2021)   |   LISTSERVES (/LISTSERVES)   |   VIDEOS (HTTP://WWW.YOUTUBE.COM/USER/KEIWASHDC/VIDEOS)   |

PUBLICATIONS (/PUBLICATIONS)   |   DATABASES (HTTP://WWW.DRUGDATABASE.INFO)   |   DONATE (/DONATE)

## Four Years of Struggles to Free the Law (CFP-95 presentation)

```
------------------------------------------------------------
TAP-INFO - An Internet newsletter available from listproc@tap.org
------------------------------------------------------------
```

TAXPAYER ASSETS PROJECT - INFORMATION POLICY NOTE
Crown Jewels - Legal Information
March 23, 1995

                    Four Years of Struggles to Free the Law
                         Background Comments for
                  Conference on Computers, Freedom and Privacy, 1995
                              (CFP-95)
                     Panel on "Who Owns the Law"
                        Friday, March 31, 1995
                     San Francisco Airport Marriott

            James Love, Director, Taxpayer Assets Project
               P.O. Box 19367, Washington, DC  20036
                  202/387-8030; love@tap.org

The title of this panel, "Who Owns the Law," sounds like a
misprint.  Who but the public, after all, could "own" the law?
In fact several private concerns make claim to various parts of
the law, through an array of copyright and other intellectual
property assertions.  Under the federal copyright law, no one can
copyright the work of a federal employee, but states and local
governments are not so constrained.  Some states award exclusive
rights to publish state statutes, and publish court decisions in
copyrighted reporters.  Even at the federal level there are
private claims on the ownership of the law that citizens must
obey.

West Publishing is the only comprehensive publisher of state or
federal court opinions.  While several firms publish court
opinions in selected states, West is the only publisher that
reports decisions from all 50 states in paper formats.  West is
also the only company that reports court decisions from all
federal courts in paper formats.  For more than a century, the
West Publishing Company has acted as a quasi-official arm of the
court system, and the firm has been richly rewarded for doing so.

The West paper bound volumes of court opinions are a staple in
law libraries throughout the United States.  But with the
development of computers and computer networks, the role of West
as the principle source for court information is being called
into question.  There is increasing interest in a public database
of court opinions that would be available for free on the
Internet.  There is also growing activism by new firms that want
to create value added information products that include court
decisions.

The most important barriers to access the court opinions are
copyright claims by West Publishing.  West asserts a copyright to
the "arrangement" of opinions that it publishes.  These claims,
which are controversial on both legal and empirical grounds,
include such items editorial corrections, the editorial
discretion of what cases to publish and the location of page
breaks in the West printed volumes of opinions.  Because of these
copyright assertions, courts have not allowed persons to freely
copy the text of judges opinions from the West paper volumes, or
show the location of the West page breaks in computer databases.

Citations to court cases are typically based upon the West bound
volumes of published decisions.  I say typically, because rules
for citations are highly decentralized, and often informal rather
than formal.  But as the only comprehensive publisher of federal
and state judicial opinions, judges and academic journals usually
expect lawyers to cite the text of court opinions according to
the page in a West paper volume where the text appears.  This is
even true in states that have non-West reporters, when out-of-
jurisdiction cases are involved, including federal cases.
Therefore, more than a century of case law and academic research
is based upon citations to the West page breaks.

citations are being tested in federal courts and there are many other battles over access to legal information.  Here is a brief summary of some of the battles:

1.    In February, 1991, the Administrative Office of the U.S.
      Courts proposed a public domain database of federal court
      opinions (a central repository) and a public domain citation
      system.  This proposal, which was vigorously opposed by West
      Publishing, was first watered down and eventually defeated
      at a September 22-23, 1992 meeting of the federal Judicial
      Conference.  West lobbied judges very aggressively.

2.    In May, 1992, Congress held hearings on legislation that
      would have prevented anyone from having a copyright on
      statutes or citations to court cases.  West vigorously
      opposed this proposal which was never voted upon.

3.    Since 1991, the Taxpayer Assets Projected (TAP) advocated
      that the Department of Justice (DOJ) provide public access
      to the JURIS database.  JURIS was created by DOJ in 1971,
      and since 1979 it was available throughout the government
      via an executive order (12146) issued by Jimmy Carter.
      JURIS was a second generation service, following FLITE, a
      legal computer database created by the Air Force in 1964.
      In 1973, LEXIS began to sell access to court opinions
      online.  WESTLAW began in 1975, using technical staff who
      developed JURIS for DOJ, but the initial product only
      included West headnotes and summaries, and not the full text
      of opinions.  In 1976, the Air Force signed a contract with
      West that gave West the exclusive rights to obtain the FLITE
      database of court opinions.  In 1978, WESTLAW began
      providing access to the full text of court opinions.  In
      1982, DOJ contracted with West to provide the text of
      federal court opinions for JURIS.  That contract was renewed
      in 1988.  When TAP first approached DOJ about access to the
      JURIS database, DOJ claimed that West "owned" the text of
      court opinions in JURIS.  In 1993, the West contract with
      JURIS was being renewed.  TAP pushed for a provision that
      included public access.  In October, 1993, West announced
      that it would end its contract, and demanded that the
      government return all the data that it had provided DOJ over
      the past decade, leaving a huge gap in case law that could
      not be replaced on short notice.  The Department of Justice
      then terminated positions for the 29 JURIS employees, and
      shut down the JURIS program on December 31, 1993.  This also
      ended data collections for other sections of JURIS which
      dealt with administrative law and other items.

5.    In January, 1994, Tax Analysts, a publisher of legal
      information about taxes, sued the Department of Justice for
      access to the JURIS database under the FOIA.  Tax Analysts
      says that the JURIS contract did not prohibit disclosure of
      the court opinions under FOIA.  West has sought to
      supplement the "four corners of the contract" with
      affidavits from DOJ officials saying what the contract is
      supposed to say.  If Tax Analysts is successful, a large
      portion of the historical records for federal case law will
      enter the public domain.

6.    In February, 1994, two firms sued West in the Southern
      District of New York, challenging the West copyright
      assertions.  The firms were Matthew Bender, a Times-Mirror
      company, and Hyperlaw, a small CD-ROM publisher from New
      York City.  (CIV. No. 94-0589).  The case is being heard by
      Judge Loretta Preska.  Over the past several months Judge
      Preska has sealed most of the records in the case which show
      the degree to which the Judges determine which cases West
      includes in its paper bound volumes, and the degree to which
      Judges approve editorial changes and corrections to
      published decisions.  These two areas of cooperation between
      the judiciary and West are key issues in both the copyright
      suit and the broader public debate of the amount of "value"
      that is added by West.  Ironically, this court information
      is also not public.

procurement for computer assisted legal research (CALR) to create a public database of opinions and a public domain citation. One firm, Tax Analysts, told Justice that it could create a database of all new federal opinions for about $.5 million per year, and that it would cost about $6 million to replace the historical case law. Another firm told Justice that it could create a public domain database of circuit court opinions for $36,000 per year. (These opinions are already disseminated electronically without an official citation. One CD-ROM vendor, Hyperlaw, now charges $195 for 20,000+ circuit court opinions sans citations, covering four years.).

Federal agencies spend tens of millions buying case law from very expensive LEXIS and WESTLAW contracts (the only two that can use the West page numbers in an online database of court opinions). Law book purchases are also expensive -- DOJ reported spending more than $8 million one year. Much of this information could be provided to the government for a tiny fraction of the price on CD-ROM and online if the database itself was in the public domain.

When the DOJ procurement was published it was extremely uncompetitive. No firm could bid to provide CALR services to DOJ unless they could provide roughly two hundred years of federal case law, plus a comprehensive collection of state case law, all with "BLUE BOOK" approved citations. Only LEXIS and WESTLAW qualified to bid. Moreover, the contract allowed the bidder to bundle other value added services into a flat rate contract. This had the effect of giving LEXIS or WESTLAW an opportunity to choose partners for other value added products, which would be available to DOJ lawyers at a zero marginal cost, making it next to impossible for other publishers to sell services to DOJ unless they are part of a WESTLAW or LEXIS partnership.

8.  In August, 1994, DOJ began an antitrust investigation of West Publishing. In September the probe was broadened to include the entire CALR industry. The probe still continues.

9.  A TAP study in August, 1994, showed that West, through its company PAC and contributions from associated lawyers, lobbyists and family members, contributed more than $738,000 to members of Congress and the Democratic National Committee over a five year period.

10.  In September, 1994, the Attorney General announced that DOJ would consider the creation of a public domain database of court opinions and a public domain vendor neutral citation system. West told its 6,000 employees that they would lose their jobs if a public database was created, and asked its employees and retirees to write letters to Attorney General Janet Reno and members of Congress, giving copies to their supervisors. Some employees protested, but West was able to generate more than 20,000 letters, many of them written in the company cafeteria using form letters. The Minnesota Congressional delegation also weighed in for West, as did others who received campaign funds or fund raising assistance from West President Vance Opperman. By October 1994, DOJ had more or less abandoned plans to create a public database of court decisions.

11.  In October, 1994, TAP began meetings with legal publishers to see if there might be a consensus on a method of citation. Using an email list and two meetings in Washington (both attended by lawyers for West Publishing), several publishers agreed upon a system that uses paragraph numbers as the pin point citation, rather than the page breaks in the West paper volumes. The paragraph numbering system was endorsed because it is technology neutral, and if issued as part of an opinion, would be available to the public and all publishers the moment the opinion is made public.

TAP offices, by inviting dozens of persons to attend at West's expense and object to the meeting and the agenda. West also took out four large ads in Washington Post to complain about the meeting.  The West activities drew attention to the effort, however, and gave this somewhat obscure issue much more visibility.

12.   The American Association of Law Librarians (AALL) has been working on the public domain citation issue for several years and have formed a task force to recommend a uniform public domain vendor neutral system of citation.  The AALL task force, which includes representatives from LEXIS and WEST, is expected to issue a report on the topic soon.

13.   Several states have recently moved ahead with plans to develop pubic domain citation systems, including Louisiana, Colorado, Wisconsin and Florida.  Last year British Columbia and the U.S. Military Court of Appeals began using paragraph numbering.

14.   In January, 1995, a number of small publishers and software companies created the American Association of Legal Publishers, to push for a public domain citation system.

15.   On Feb 6, 1995, Rep. Clinger (R-PA) introduced a bill (HR 830) with a provision inserted for West Publishing (Sec. 3518(f)) that would have eliminated the Tax Analysts FOIA law suit, vastly enhanced West's claims on ownership of published judicial opinions, and made it illegal for the government to create a public database of opinions that used the West page numbers, without approval from West.  The "West Provision," as it became known, would have also done much more.  For example, it would have eliminated public FOIA rights to all government records created by contractors.  The bill was set for hearing on Feb. 7, subcommittee markup on Feb. 8th, and full committee mark-up at 9 am, Feb. 10.  Within 72 hours the Internet community learned about bill and flooded Congress with faxes and telephone calls.  The provision was removed from bill after a long and contentious debate before 50 members of the House Committee on Reform and Oversight.  The Washington trade press, Business Week and others wrote stories about the provisions's demise, which was widely seen as key demonstration of the growing importance of the Internet.

16.   On March, 5, 1995, the Minneapolis  Star Tribune (MST) published a volumous article detailing West's close ties with judges and lavish trips paid for by West for judges, including seven members of the Supreme Court.  The trips were to resorts and expensive hotels in places such as the Virgin Islands, the Bahamas, Hawaii, Florida, California and New York City  -- justices were often involved in the selection of the location.  The only judge who reported the value of trips said West paid $7,700 for a three day trip to Los Angeles.  The article focused on Devitt award, which includes a $15,000 cash gift to at least one federal judge every year.  The Award is provided by West Publishing.

      TAP had earlier, Nov. 1993, raised questions about Devitt Award, but we had focused on the cash prize rather than expensive trips to resorts for persons who chose the prize "winner."  According to the MST, while accepting trips, the Justices refused to hear appeals from 5 cases involving West, including one case regarding West's claims to copyright of the Texas Statutes and another involving West's claims that it can copyright the page breaks in its bound volumes.

17.   West is also a funder of dozens of events which raise ethical questions.  For example, in February 1995, West solicited nominations for a $5,000 prize to law librarians (given to three each year), funded a conference at Stanford for more than 100 students working at prestigious law reviews (including the students who will write this year's revision of the Blue Book on judicial citations), and

associations with all expense paid trips to Washington, DC
for meetings on covering the judiciary.


What is this battle about?

i.   Can West Publishing retain ownership over the citations used
     for a century of case law, as well as the text of opinions
     that it has published?  Or, will this end up on the
     Internet, available for free from some law school's World
     Wide Web site?

ii   Can the influence gained by the employment of several public
     relations firms and lobbists, various junkets and awards,
     and hundreds of thousands of dollars in campaign
     contributions be offset by an opposition that mainly
     operates by posting messages to Internet discussions lists?

To follow this and other battles over public access to government
information, subscribe to tap-info, a free internet newsletter,
available from listproc@tap.org.

-----------------------------------------------------------------
TAP-INFO is an Internet Distribution List provided by the Taxpayer
Assets Project (TAP).  TAP was founded by Ralph Nader to monitor the
management of government property, including information systems and
data, government funded R&D, spectrum allocation and other government
assets.  TAP-INFO reports on TAP activities relating to federal
information policy.  tap-info is archived at tap.org.

Subscription requests to tap-info to listproc@tap.org with
the message:  subscribe tap-info your name
-----------------------------------------------------------------
Taxpayer Assets Project; P.O. Box 19367, Washington, DC  20036
v. 202/387-8030; f. 202/234-5176; internet:  tap@tap.org
-----------------------------------------------------------------


(/#facebook)      (/#twitter)      (/#reddit)      (/#linkedin)      (/#email)

(https://www.addtoany.com/share#url=https%3A%2F%2Fwww.keionline.org%2Fbook%2Ffouryearsofstrugglestofreethelawcfp95presentation&title=Four
95%20presentation))

## META

Log in (https://www.keionline.org/login)

Entries feed (https://www.keionline.org/feed)

Comments feed (https://www.keionline.org/comments/feed)

WordPress.org (https://wordpress.org/)

## CATEGORIES

[Test] Post (https://www.keionline.org/category/test-post)

About (https://www.keionline.org/category/about)

Access to Knowledge (https://www.keionline.org/category/access-to-knowledge)

Access to Medicine (https://www.keionline.org/category/access-to-medicine)

Competition (https://www.keionline.org/category/competition)

Delinkage (https://www.keionline.org/category/delinkage)

Economics (https://www.keionline.org/category/economics)

Events (https://www.keionline.org/category/events)

Evidence (https://www.keionline.org/category/evidence)

Government Funded research (https://www.keionline.org/category/government-funded-research)

Influence (https://www.keionline.org/category/influence)

Intellectual Property Rights (https://www.keionline.org/category/intellectual-property-rights)

Legislation (https://www.keionline.org/category/congress)

Litigation (https://www.keionline.org/category/litigation)

Lobbying (https://www.keionline.org/category/lobbying)

Marketing (https://www.keionline.org/category/marketing)

Meetings (https://www.keionline.org/category/meetings)

Negotiations (https://www.keionline.org/category/negotiations)

Nuclear Proliferation (https://www.keionline.org/category/nuclear-proliferation)

Orphan Drugs (https://www.keionline.org/category/orphan-drugs)

Presentations (https://www.keionline.org/category/presentations)

Privacy (https://www.keionline.org/category/privacy)

Public Goods (https://www.keionline.org/category/public-goods)

Research and Development (https://www.keionline.org/category/research-and-development)

Timelines (https://www.keionline.org/category/timelines)

Trade (https://www.keionline.org/category/trade)

Transparency (https://www.keionline.org/category/transparency)

WHO (https://www.keionline.org/category/who)

WIPO (https://www.keionline.org/category/wipo)

WTO (https://www.keionline.org/category/wto)

Knowledge Ecology International (https://www.keionline.org)»Book page (https://www.keionline.org)»Four Years of Struggles to Free the Law (CFP-95 presentation) (https://www.keionline.org/book/fouryearsofstrugglestofreethelawcfp95presentation)

© 2023 Knowledge Ecology International. All rights reserved.                    Hiero (https://athemes.com/theme/hiero/) by aThemes

Exhibit G

**ROSS's Temporal Limit Counterproposals for the First Set of Counterclaim Requests**

Plaintiffs' current proposal:
- 2015 for all documents except that Plaintiffs are "willing to produce documents sufficient to show any business plans, products, and licenses related to its public law database separate from any search technology from 1990 to present"

ROSS's counterproposal:
- Documents sufficient to show any business plans, strategies, products, licenses (including unfulfilled requests to purchase, license or access), related to developing, offering, or discontinuing offering your public law database separately from your legal search tools from 1990 to present, including as related to offering material in online or paper format, as well as documents related to your decision to offer or not offer legal search tools separate from public databases from 1990 to present, such as surveys, market research studies, and competitive intelligence of offerings by COMPETITORS.

As well as the following:

| Doc. No. | Document Request | Limit |
|---|---|---|
| No. 185 | DOCUMENTS sufficient to show YOUR investments in the WESTLAW PLATFORM, separately broken out for each of YOUR LEGAL SEARCH TOOLS and for each ARTIFICIAL INTELLIGENCE tool. | 2000 |
| No. 186 | ALL DOCUMENTS and COMMUNICATIONS RELATED TO the reasons for making investments in the WESTLAW PLATFORM, separately broken out for each of YOUR LEGAL SEARCH TOOLS and for each ARTIFICIAL INTELLIGENCE tool. | 2000 |
| No. 187 | DOCUMENTS sufficient to show the costs associated with offering the WESTLAW PLATFORM to law students and for training lawyers, including the costs of training, representatives, and incentive programs. | 2000 |

| No. 191 | ALL DOCUMENTS and COMMUNICATIONS RELATED TO the DISCOUNTS that PERSONS can or do receive when licensing the WESTLAW PLATFORM, including broken out by CUSTOMER SEGMENT. | 2000 for docs re discounts that persons can or do receive which relate specifically to the public law database, 2015 otherwise |
|---|---|---|
| No. 192 | ALL DOCUMENTS and COMMUNICATIONS RELATING TO requests to purchase, license, or access the PUBLIC LAW DATABASES that are available on the WESTLAW PLATFORM. | 2000 |
| No. 193 | ALL DOCUMENTS and COMMUNICATIONS RELATING TO requests to purchase, license, or access the LEGAL SEARCH TOOLS that are available on the WESTLAW PLATFORM. | 2000 |
| No. 196 | DOCUMENTS RELATED TO demand or preferences for LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS, including surveys, market studies or research reports conducted or commissioned or obtained by YOU. | 2000 |
| No. 197 | DOCUMENTS RELATED TO demand or preferences for each of YOUR LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS, including surveys, market studies or research reports conducted or commissioned or obtained by YOU. | 2000 |
| No. 198 | DOCUMENTS sufficient to show the complete history of the TERMS OF SERVICES RELATING TO the WESTLAW PLATFORM, including how TERMS OF SERVICES have varied by CUSTOMER SEGMENT. | No limits |
| No. 205 | DOCUMENTS RELATED TO YOUR offering the WESTLAW PLATFORM to law students or for training lawyers, including strategies, manuals, policies, cost-benefit analyses, and memoranda, and COMMUNICATIONS. | 2000 |

| No. 206 | ALL DOCUMENTS RELATED TO YOUR share in any market in which any element of the WESTLAW PLATFORM competes, including LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, and LEGAL SEARCH PLATFORMS, including by CUSTOMER SEGMENT. | 2000 for docs re any public law database market share, 2015 otherwise |
|---|---|---|
| No. 210 | ALL AGREEMENTS with COMPETITORS. | No limits |
| No. 211 | DOCUMENTS and COMMUNICATIONS sufficient to IDENTIFY YOUR COMPETITORS, including IDENTIFYING each product offered by that COMPETITOR that competes with the WESTLAW PLATFORM or any element or segment of the WESTLAW PLATFORM, and IDENTIFYING YOUR product that competes with the COMPETITOR'S product. | 2000 for identification of public law database competitors, 2015 otherwise |
| No. 212 | DOCUMENTS sufficient to identify any COMPETITORS that have licensed the WESTLAW PLATFORM as well as which products the COMPETITORS has licensed. | No limits |
| No. 213 | DOCUMENTS sufficient to identify any COMPETITORS that have used the WESTLAW PLATFORM without a license as well as which products each of these COMPETITOR has used. | No limits |
| No. 214 | ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to not license access to the WESTLAW PLATFORM to a COMPETITOR or potential COMPETITOR. | 2000 |
| No. 215 | ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to not license access to the WESTLAW PLATFORM, including to ROSS. | No limits |
| No. 216 | ALL COMMUNICATIONS with the U.S. Federal Trade Commission or the U.S. Department of Justice about the WESTLAW PLATFORM, including COMMUNICATIONS about investigations, complaints, and requests for information. | No limits |

| No. 217 | ALL DOCUMENTS RELATED TO COMMUNICATIONS with the U.S. Federal Trade Commission or the U.S. Department of Justice about the WESTLAW PLATFORM. | No limits |
|---------|---|---|
| No. 218 | ALL DOCUMENTS RELATED TO litigation involving antitrust or unfair competition claims or counterclaims brought against YOU. | No limits |
| No. 219 | ALL DOCUMENTS and COMMUNICATIONS RELATING TO acquiring, licensing, or obtaining PUBLIC LAW DATABASES or the content therein, such as judicial opinions, INCLUDING AGREEMENTS and COMMUNICATIONS with the licensors or providers of such content. | No limits |
| No. 220 | ALL DOCUMENTS and COMMUNICATIONS RELATING TO acquiring, licensing, or obtaining LEGAL SEARCH TOOLS or LEGAL SEARCH PLATFORMS, including AGREEMENTS. | 2000 |
| No. 221 | ALL Library Maintenance Agreements to which YOU are a party. | 2000 |
| No. 222 | ALL AGREEMENTS and TERMS OF SERVICES with any judicial, executive, or legislative governmental entities within the United States of America, including federal courts, state, municipal, county, and territorial courts RELATING TO LEGAL SEARCH TOOLS, PUBLIC LAW DATABASES, or LEGAL SEARCH PLATFORMS. | No limits |
| No. 223 | ALL DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision to make judicial opinions available online, including competitive intelligence and research. | 1975 |
| No. 224 | ALL DOCUMENTS and COMMUNICATIONS RELATED TO any decision whether or not to license, sell, or distribute judicial opinions online independent of the WESTLAW PLATFORM. | 2000 |
| No. 225 | ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decision to continue to license, sell, or distribute judicial opinions in paper-format, including competitive intelligence and research. | 2000 |

| No. 226 | ALL DOCUMENTS and COMMUNICATIONS RELATED TO YOUR decisions about what judicial opinions to publish or not publish in paper-format. | 2000 |

Exhibit H



# Our AI timeline

Thomson Reuters has been innovating for its customers from day one - which for some customer segments goes as far back as the 1800's. Initially, technology was used to collect, organize, and enhance information for its customers. Later, it would employ artificial intelligence (AI) to improve the customer's ability to find the information they needed. Today, we use AI to better understand our customers and surface information and insights they need when they need it. Thomson Reuters, through its different businesses, has had a formal applied research and development group since 1992.

Follow our AI @ TR timeline to discover our innovation journey.

## 1970s

### 1975
#### Westlaw

Westlaw was one of the first online legal research services. Attorneys used dumb terminals to dial up to a mainframe. The content was limited (disk space was expensive) and the search language simplistic.

Westlaw marked the beginnings of technology-driven innovation in many ways for legal sector.



In 1986, the Harris County Law Library began offering Westlaw as part of its collection through a terminal named WALT - a.k.a. West Automated Legal Terminal - similar to the one pictured here.

## 1990s

TR-0037669

## 1991

Scientist Spotlight: Howard Turtle

As chief scientist, Howard Turtle helped found one of the first R&D groups at Thomson Reuters. He is a nationally known scholar in search engine technologies, having developed a formal retrieval model based on Bayesian Inference Networks that formed the basis of the University of Massachusetts' INQUERY Retrieval System and of West Publishing's natural language search product, called WIN. Howard led the legal R&D group until 1996. Howard Turtle retired from Syracuse University in 2016.



Howard Turtle

## 1992

WIN (Westlaw is Natural)

Westlaw Is Natural (WIN) was the first commercially available search engine with probabilistic rank retrieval. Howard Turtle led the effort after completing his PhD at UMass. This was an innovation milestone for legal research because prior to that most search engines only supported Boolean term & connectors.



Researching on a Westlaw terminal, with a sign for "WIN: Westlaw Is Natural" that says "Try the only legal research service that lets you search in plain English!" Irvine, 1993.

## 1995

Scientist Spotlight: Peter Jackson

Peter Jackson was one of the founders of research and development (R&D) at Thomson Reuters. Peter joined Lawyers Cooperative Publishing (LCP) and formed the natural language processing (NLP) group in 1995. In 1998, Peter assumed leadership of the legal R&D group. Peter became Chief Research Scientist & Vice-President, Technology in 2005 at Thomson.



Peter Jackson

## 1996

History Assistant

History Assistant was a large scale natural language processing (NLP) system that analyzed case law documents, extracted parties, judges and built the appellate chain for a particular case. The system found history relationships between court decisions by using a combination of information retrieval and machine learning techniques to link each new case to related documents that it may impact.



History Assistant

## 2000s

2000

### 2000

PeopleCite & Profiler

PeopleCite and Profiler extracted entities from American case law documents to create a knowledge base of judges, attorneys, and expert witnesses with links to all their cases and biographies. Machine learning enabled those systems to analyze millions of documents, a scale far beyond what could be done manually. [Info Today]



Jury Verdict and Settlement Document with Hyper Links to Attorneys, Judges, and Expert Witnesses including Arthur Ablin

## 2001

CaRE - Classification and Recommendation Engine

Using an ensemble of machine learning algorithms, CaRE has been used widely across the company to classify legal, tax and finance documents to large taxonomies, e.g., CaRE is used to classify millions of headnotes to a KeyNumber taxonomy with more than 90,000 categories. CaRE later formed the basis of ResultsPlus (2003) - a very successful document recommendation system. It is still in use today (2019).



Headnotes are summaries of the issues in a case. Headnotes in West reporters are written by the editors.

## 2003

ResultsPlus

ResultsPlus was a very popular document recommendation solution in Westlaw. Based in part on CaRE, the system made contextually relevant recommendations of secondary law documents, Key Numbers, briefs and more alongside search results. The system incorporated: natural language generation of summaries for briefs; user behavior analysis to enable personalized recommendations; and dynamic ranking of selections based on data from real-time A/B testing.



ResultsPlus

## 2005

Firm360

Built on the work done for the Profiler project to link attorney and judge names, this system identified law firms and companies, and used semantic parsing and discourse analysis techniques to infer the relationships among judges, attorneys, law firms, their roles, and the companies they represent. The metadata was stored in a data warehouse which in turn fed the Firm360 reports.



Firm360

## 2006

Dexter

Dexter is a machine learning (ML)-based named entity extraction and resolution (NER)system focusing on news and legal content. It is used in many products including Reuters Insider (2011).



Dexter

TR-0037671

## 2007

### Medical Litigator

<u>Westlaw Medical Litigator</u> provided legal researchers with immediate, "one-stop" access to information about medical terms, procedures and devices related to medical malpractice, personal injury, and device liability.  In addition, it provided an understanding of related medical issues, health care professionals and expert witnesses. It included natural language support and disambiguation tagging.



Medical Litigator

## 2008

### Concord

Thomson Reuters provides one of the largest and most diverse set of Public Records in the United States. Concord enables searches where there could be thousands of "John Smith"s, connecting the correct records among hundreds of millions of records, and many more possible connections. It was, perhaps, the first statistics-based record linking and resolution solution of this scope in the public records domain.



In the market intelligence domain, Concord and Dexter were used to extract entities and resolve such mentions to authorities to create the litigation history database behind West's Litigation Monitor.

# 2010s

## 2010

### WestlawNext

Building on all our previous experience, a wide array of AI technologies were leveraged to solve a wide set of challenges. It used machine learning (ML), clustering, classification, usage log analysis, citation network analysis, topic modeling, and natural language generation – the veritable "kitchen sink" of AI. The result was WestSearch. WestlawNext set a new standard for legal research solutions. AI enabled the system to go beyond traditional search.



WestlawNext

## 2011

### Reuters Insider

Reuters Insider used CaRE classification and Dexter entity extraction to connect transcripts of live news shows to video; this enabled searching video-based news.



Reuters Insider

## 2011

TR-0037672

### NewsPlus

NewsPlus is a content recommendation platform used in Westlaw and Eikon. The recommendation algorithms incorporated information from multiple sources to retrieve, filter, and prioritize news given the context of a specific user and application. It analyzes, de-duplicates, and groups/clusters the content. Like its predecessor, ResultsPlus, it used a hybrid approach of content and collaborative filtering.



Screenshot showing how NewsPlus can drive an entire news portal - leveraging recommendation, deduplication, clustering, trending entities, summarization, etc.

## 2013

### Checkpoint - Broadside

Checkpoint Broadside applied many of the technologies and approaches used in WestlawNext to power the new "Intuitive Search" capability in Checkpoint, our market-leading research solution for tax and accounting professionals.



Intuitive Search on Thomson Reuters Checkpoint

## 2013

### Magnet

Magnet analyzed SEC filing for deviation in language that may merit further review. An analysts could then review and provide deeper insights into related plans, initiatives, prospects and challenges; in effect, expanding the news coverage of that company.



Magnet provided an indicator for boilerplate, normal, or abnormal language along 3 dimensions in two key parts of SEC filing documents

## 2015

### Reuters Tracer and Social Data Platform (SDP)

A platform and tool created for Reuters journalists to monitor Twitter for breaking events. Tracer filters out social media noise and identifies potential breaking news events. It utilized natural language processing (NLP), content classification, clustering and machine learning. A special Tracer feed is provided to Eikon as a completely automated real-time news feed.



Separating Real News from Fake in 40 Milliseconds

## 2018

### DPA - Data Privacy Advisor

Data Privacy Advisor incorporates a next-generation question-answering feature built in partnership with the Thomson Reuters and IBM Watson.

How Thomson Reuters and Watson help answer data privacy questions

TR-0037673

## 2018

### Adverse Media

Adverse media capabilities enable our analysts to perform adverse media screening from tens of thousands of news sources. In addition to extracting risk signals, these capabilities also perform concordance from unstructured sources. This capability helps analysts in performing ongoing background checks that support Anti-Money Laundering regulations. In particular, this new capability will perform interactive person name disambiguation and identify text/documents that potentially contain evidence of financial crimes. This service was being done manually by analysts. The solution searches news articles and leverages NewsPlus tagging capabilities. This capability is used in World-Check One: Media Check.



Adverse Media

## 2018

### AutoMuni - Automated Municipal Bond Pricing

The accurate evaluation of approximately a million bonds daily is a big challenge. The muni valuation method is quite manual. Such an approach is not only time consuming and costly, but also only a small portion of bonds can be accurately evaluated due to the restriction of resources. The AutoMuni system helps scale the valuation process by using intelligent, machine learning, algorithms that can price the entire fixed income universe automatically and efficiently.



AutoMuni

## 2018

### Inferno

Inferno is a data ingestion and workflow tool to help analysts refresh content within the World-Check database. This helps to improve the accuracy and reliability of World-Check which is crucial in keeping the competitive advantage. It mines news feeds and then uses various techniques, including machine learning and natural language processing (NLP), to enhance the data ingestion workflow, increasing the speed and accuracy of identifying required updates to World-Check data.



Inferno

## 2018

### Westlaw Edge: WestSearch Plus

WestSearch Plus answers customers' questions posed in natural language. Behind the scenes, it mines the rich analytical material in our headnotes as the source for answers. It uses editorial guidelines to divide Headnotes into frames/intents. Then it classifies both answers and questions (mined from the query logs) to those intents. WestSearch Plus uses search strategies based on questions and intents to assemble a headnote candidate pool and uses natural language processing (NLP) & discourse features in XGBoost model to classify/score answers.



WestSearch Plus on Westlaw Edge

## 2018

### Westlaw Edge: Litigation Analytics

Lawyers now have all the analytics from past cases at their fingertips and can shape their litigation strategy with Westlaw Edge's Litigation Analytics.

Many AI methods were used including deep learning. It extracts information from federal dockets, identifying names and relationships of all parties. It identifies case topics and adds all this information to a knowledge graph. The knowledge graph is continually updated. Customers use natural language to explore this knowledge graph. When returning results, the AI generates text narratives explaining the generated



Litigation Analytics on Westlaw Edge

TR-0037674

visualizations.

## 2018

### Westlaw Edge: KeyCite Overruling Risk

KeyCite is our market leading case citator system. It is important to identify cases that are negatively impacted by an overruling decision, and to flag them as possibly impliedly overruled cases that need further careful examination. The AI-powered solution identifies those cases using machine learning algorithms.

The problem is formulated as a binary classification of candidate cases into those that are negatively impacted (and possibly impliedly overruled) and those that are not (and hence are still safe to be relied on in a legal investigation). Our classifier uses a variety of features, including metadata information about the cases, citation paragraphs in the overruling and affected cases, as well as headnotes in the overruled case.



KeyCite Overruling Risk on Westlaw Edge

## 2019

### Deep Learning Center Launched in Boston

Thomson Reuters launched a deep learning center in the heart of Boston, Massachusetts, very appropriately addressed at 1 Thomson Place. This marked a growing commitment within the organization to expand capabilities across core technology domains. Deep learning methodologies can greatly add to the proficiency of related fields like natural language processing or image processing and analysis. The implications of this field are substantial across operational efficiencies as well as discovering new insights across key industry segments.



Deep Learning at Thomson Reuters

## 2019

### Checkpoint Edge

Checkpoint Edge introduced an entirely new feature called Concept Markers and made further enhancements to the Intuitive Search algorithms that assist and guide the research process. It helps users refine and/or elaborate on their queries to find answers. Natural language processing (NLP) and machine learning (ML) technologies were used to enable these features.

## 2019

### Westlaw Edge : Quick Check

Attorneys perform hours of legal research so that they can provide their clients with the best possible representation. They are under constant pressure to do their best work as efficiently as possible.

Quick Check is a Westlaw Edge feature that, given a legal document, finds additional supporting authority to research. This helps our customers complete their legal research faster and have a higher degree of confidence in their work. It also enables them to do a thorough analysis on their opponent's work and in turn help them be more prepared for their clients.



Westlaw Edge Quick Check™ In the Making

# Today

TR-0037675



## Today

AI @ TR - We're Just Getting Started!

Today, Thomson Reuters is scaling innovation for its customers to new heights. How will AI transform our industries tomorrow? AI @ TR is working on that answer today!

TR-0037676