IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) ) | C.A. No. 20-613 (SB) |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) | |

## CROSS-NOTICE OF DOCUMENT SUBPOENA TO KING & SPALDING LLP

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 45, Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation will serve the attached Subpoena to Produce Documents, Information, or Objects in a Civil Action on King & Spalding LLP, requesting that it produce the specified documents and things for inspection and copying at the time and location noticed in the subpoena or at a time and location as may be agreed upon by counsel.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

OF COUNSEL:

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
Alyssa C. Kalisky
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

April 6, 2023

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and Counterdefendants Thomson Reuters Enterprise Center GmbH and West Publishing Corporation*

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Delaware

| | |
|---|---|
| Thomson Reuters Enterprise Centre GmbH, et al. | ) |
| _Plaintiff_ | ) |
| v. | )    Civil Action No.   20-CV-0613-SB |
| Ross Intelligence Inc. | ) |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
King & Spalding LLP
601 South California Avenue Suite 100 Palo Alto, CA 94304 +16504226700

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: Kirkland & Ellis LLP<br>3330 Hillview Ave<br>Palo Alto, CA 94304 | Date and Time:<br><br>04/12/2023 12:00 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   04/052023

        _CLERK OF COURT_
                                      OR

| | |
|---|---|
| _Signature of Clerk or Deputy Clerk_ | /s/ Cameron Ginder<br>_Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Thomson Reuters Enterprise Centre GmbH, et al. , who issues or requests this subpoena, are:

Cameron Ginder, cameron.ginder@kirkland.com, 312-862-3757, 300 North LaSalle, Chicago, IL 60654.

## Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  20-CV-0613-SB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                               *Server's signature*

                                          _____
                                               *Printed name and title*

                                          _____
                                               *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

## **DEFINITIONS**

Unless otherwise defined, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense. Should You not understand the meaning of any term, it is requested that You immediately seek clarification through Plaintiffs' counsel.  As used in these Requests, the words set forth below shall be defined as follows:

1.     The term "Agreement(s)" means and refers to written and oral agreements and contracts.

2.     The terms "Communicate(d)" and "Communication(s)" should be interpreted in their broadest sense to include without limitation all oral or written communications, including any writings, emails, or other electronically stored information as that term is defined by Federal Rule of Civil Procedure 34(a).

3.     The term "Countercomplaint" means and refers to the Amended Counterclaims filed by ROSS in this litigation on September 14, 2022, attached hereto as Exhibit B.

4.     The terms "Concerning," Referring to," or "Relating to" should be construed in the broadest possible sense to mean analyzing, citing, commenting upon, comprising, concerning, consisting of, constituting, containing, dealing with, describing, discussing, embodying, evidencing, identifying, involved with, mentioning, monitoring, referring to, reflecting, responding to, pertaining to, showing, stating, summarizing, or bearing any logical or factual connection with the matter discussed, as these terms are understood in the broadest sense.

5.     The term "Document(s)" means any written, printed, typed, recorded, or graphic matter, however produced, reproduced, or stored, including the originals and all nonidentical copies, whether different from the originals by reason of any notations made on such copies or otherwise, in Your actual or constructive possession, custody, or control, including without

limitation contracts, letter agreements, records, correspondence, Communications, electronically stored information, emails, tweets, blog or Internet forum posts or comments, text messages on portable devices, Blackberry Messenger messages, SMS messages, instant messenger messages (e.g. Skype, Slack, etc.), memoranda, handwritten notes, source code, source code comments, source repository logs, server logs, records or summaries of negotiations, records or summaries of interviews or conversations, audio or video recordings, copies of video games, all Internet-based media, photographs, corporate minutes, diaries, telephone logs, instant messaging logs, chat room logs, schedules, drawings, product storyboards, product mockups, statistical statements, work papers, disks, data cards, films, data processing files, charts, graphs, microfiche, microfilm, contracts, notices, reports, recitals, statements, worksheets, abstracts, resumes, summaries, jottings, market data, books, journals, ledgers, audits, maps, diagrams, research documents, newspapers, appointment books, desk calendars, project management charts (e.g., Gantt charts), task management records (e.g., to-do lists), expense reports, computer printout and other computer readable or electronic records, and all drafts or modifications thereof, and all non-identical copies of any such items. Any such Document with any sheet or part thereof bearing any marks, such as initials, stamped indices, comments or notations, or any character or characters, that are not part of the signed text or photographic reproduction thereof is to be considered as a separate Document. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "Document(s)," such tangible item shall be produced.

6.     The terms "King & Spalding" "You," or "Your" mean and refer to King & Spalding LLP, and any of its former or current parents, subsidiaries, predecessors, successors, affiliated entities, controlled entities, joint ventures, related entities, agents, attorneys,

employees, interns, representatives, assigns, directors, or officers and all other persons acting or purporting to act on its behalf.

7.      The term "LexisNexis" means and refers to the online legal research product named LexisNexis (now Lexis+).

8.      The term "Plaintiffs" or "Counterdefendants" means and refers to Thomson Reuters and West.

9.      The term "Person(s)" means any natural person, firm, corporation, partnership, group, association, governmental entity, or business entity.

10.     The term "ROSS" means and refers to Defendant and Counterclaimant ROSS Intelligence Inc., and any of its former or current parents, subsidiaries, predecessors, successors, affiliated entities, controlled entities, joint ventures, related entities, agents, attorneys, employees, interns, representatives, assigns, directors, or officers and all other Persons acting or purporting to act on their behalf, including without limitation ROSS Intelligence, Inc., the Canadian entity, Andrew Arruda, and Jimoh Ovbiagele.

11.     The term "ROSS Platform" means and refers to any and all services and products offered by ROSS, including without limitation ROSS's online legal research platform referred to as "ROSS" previously offered through the website available at www.rossintelligence.com/.

12.     The term "Thomson Reuters" means and refers to Plaintiff and Counterdefendants Thomson Reuters Enterprise Centre GmbH, and any of its former or current parents, subsidiaries, predecessors, successors, affiliated entities, controlled entities, joint ventures, related entities, agents, attorneys, employees, interns, representatives, assigns, directors, or officers and all other Persons acting or purporting to act on its behalf.

13.     The term "West" means and refers to Plaintiff and Counterdefendants West Publishing Corporation, and any of its former or current parents, subsidiaries, predecessors, successors, affiliated entities, controlled entities, joint ventures, related entities, agents, attorneys, employees, interns, representatives, assigns, directors, or officers and all other Persons acting or purporting to act on their behalf.

14.     The term "West Headnotes" means and refers to the proprietary text created by West's attorney-editors to describe and summarize the key concepts, points of law, or facts of judicial opinions found on Westlaw.

15.     The term "West Subscriber Agreement" means and refers to the agreement entered into between West and its customers regarding the customer's license to Westlaw, including without limitation any terms and/or conditions referenced and incorporated therein.

16.     The term "Westlaw" means and refers to Plaintiffs' online legal research product named "Westlaw."

17.     The term "Westlaw Content" means and refers to any and all Westlaw content owned by Plaintiffs, including without limitation the WKNS and West Headnotes, and expressly excluding any work prepared by a United States Government officer or employee as a part of that person's official duties, including without limitations government edicts, legislative enactments, judicial decisions, or similar types of official legal materials.

18.     The term "WKNS" means and refers to the taxonomy of cases, topics, legal issues, points of law, and West Headnotes created and maintained by West's attorney-editors for Westlaw.

19.     The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to

bring within the scope of a Request any Persons, Communications, or Documents which otherwise would not be brought within its scope.

20.     The words "any" and "all" are mutually interchangeable and are meant to encompass each other.

21. The singular includes the plural and vice versa.

22. The past tense shall be construed to include the present tense and vice versa.

## GENERAL INSTRUCTIONS

1.     These Requests are intended to cover the Documents in Your possession, custody, or control, whether located at Your offices, home, stored via server, or at any other place. If any Document was, but is no longer, in Your possession or subject to Your control, or in existence, state whether it (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred, voluntarily or involuntarily, to others (and if so, to whom); or (iv) has been disposed of in some other manner.  If You have reason to believe a responsive Document is in the possession of another Person, state (i) the basis for this belief; (ii) the Person believed to be in possession of the responsive Documents(s); (iii) where You believe the responsive Document(s) may be located; and (iv) other information as is sufficient to identify the Documents for a subpoena duces tecum.

2.     If a Document that is responsive to a Request has been lost or destroyed, it should be identified as follows: (i) preparer; (ii) addressor (if different); (iii) addressee; (iv) each recipient and each person to whom distributed or shown; (v) date prepared; (vi) date transmitted (if different); (vii) date received; (viii) description of contents and subject matter; (ix) date of destruction; (x) manner of destruction; (xi) name, title, and address of the person who directed that the Document be destroyed and (if different) the person who destroyed the Document; (xii)

the reason for the Document's destruction; (xiii) the names of persons having knowledge of the destruction; and (xiv) a full description of the efforts made to locate the Document.

3. The production should include every Document known to You and every such Document that can be located or discovered by reasonably diligent efforts by You.

4. If any of the requested Documents cannot be disclosed or produced in full, produce the Documents to the extent possible, and state Your reasons for Your inability to produce the remainder, stating whatever information, knowledge, or belief You have Concerning the unproduced portions.

5. If any of the Documents requested below are claimed to be privileged or are otherwise withheld, You are requested to provide a privilege log which identifies: (i) the date of the Document; (ii) the identity of all Persons who sent, authored, signed or otherwise prepared the Document; (iii) the identity of all Persons designated as addressee or copyees; (iv) a description of the contents of the Document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the Document and the basis of the claim or privilege or immunity; (v) the type or nature of the privilege asserted (e.g., attorney-client privilege, work product doctrine, etc.); and (vi) for redacted Documents only, the Bates numbers corresponding to the first and last page of any Document redacted. To the extent e-mail is included and described on the privilege log, any e-mail chain (i.e., a series of e-mails linked together by e-mail responses and forwarding) that is withheld or redacted on the grounds of privilege, immunity or any similar claim may be logged as a single entry and identified by the most recent (i.e., top-most) e-mail. You shall not be required to break up an e-mail chain and log each individual e-mail separately. If, however, email contained within a given chain exists separately, then You shall log that material in accordance with this Paragraph. If an e-mail chain

contains one or more privileged e-mails requiring redaction, the e-mail chain may be logged as a single entry and identified by the most recent redacted e-mail.

6.      Documents or other things responsive to a Request shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the Request to which they are responsive.

7.      All electronically stored information responsive to a Request shall be produced in black-and-white, single-page TIFF (300 dpi, Group IV) or color JPEG format. The file names of the images should correspond to the appropriate Bates number and should be accompanied by an OPT file mapping each Bates number with the associated image file. All corresponding metadata shall be produced in a DAT file, separated with consistent Concordance delimiters. All corresponding document text (extracted text or optical character recognition) information should be provided as document level text files with file names corresponding to the beginning Bates number of the document, and text files should be in plain-text format (not Unicode or UTF). Productions should be compatible with Concordance version 8.26. All electronically stored audio or audiovisual files shall be produced in their native format as maintained and retained by You. In addition, Plaintiffs reserve the right to request particular electronically stored information in another format, including native file format.

8.      All electronically stored information shall be produced with the following corresponding metadata fields: APPLICATION, AUTHOR, BEGBATES, ENDBATES, BEGBATES_ATT, ENDBATES_ATT, CUSTODIAN, FILE_NAME, FILE_PATH, FILE_SIZE, EXTENSION, TEXT_FILE, NATIVEFILE, DATE_CREATED, TIME_CREATED, DATELAST_MOD, TIMELAST_MOD, SUBJECT, FROM, TO, CC, BCC,

DATE_SENT, TIME_SENT, DATE_RECD, TIME_RECD, CONFIDENTIALITY, and MD5HASH.

9.     Any Documents responsive to a Request should be produced in and with a file folder and other Documents (e.g., envelope, file cabinet marker) in or with which the Document was located when this Request was served.

10.     To the extent a Document is considered confidential in nature, You may designate it in accordance with the Protective Order entered into this case (Exhibit C).

11.     All pages of any Document(s) now stapled or fastened together should be produced stapled or fastened together. Where Document(s) are produced electronically, attachments shall be produced with the parent Document(s) together as a family.

12.     If it is otherwise not possible to produce any Document called for by any Request, or if any part of any Request is objected to, the reasons for the objection should be stated with specificity as to all grounds and, for the convenience of the Court and the parties, each Request should be quoted in full immediately preceding the objection.

13.     These Requests shall be deemed continuing and require further and supplemental production by You as and whenever You acquire, make, or locate additional Documents between the time of the initial production and the time of final judgment in this litigation.

## **DOCUMENTS TO BE PRODUCED**

**REQUEST FOR PRODUCTION No. 1:**

All Documents and Communications Related to ROSS, including Communications with ROSS, feedback about the ROSS Platform, and Your reasons for licensing, choosing not to license, or terminating any Agreement You had with ROSS.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | |
| | ) | C.A. No. 20-613-SB |
| Plaintiffs/Counterdefendants, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant/Counterclaimant. | ) | |

**DEFENDANT AND COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S
SECOND AMENDED ANSWER AND DEFENSES AND AMENDED
COUNTERCLAIMS IN RESPONSE TO PLAINTIFFS' COMPLAINT AND
DEMAND FOR JURY TRIAL**

**AMENDED ANSWER**

Defendant ROSS Intelligence, Inc. ("ROSS") hereby responds to the Complaint filed by

Plaintiffs Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing

Corporation ("West") (collectively, "Plaintiffs").

**NATURE OF THE ACTION[1]**

1.      ROSS denies it illicitly and surreptitiously used a then-Westlaw licensee to acquire

access to and copy Plaintiff's content, and that it is attempting to create a business or competing

product by taking for itself any features of Westlaw or "Westlaw Content," as defined and alleged

by Plaintiffs.  ROSS lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations, and therefore denies them.

2.      ROSS denies the allegations in paragraph 2.

---

[1] The section headings in this Answer are provided solely for ease of reference, tracking those used in the Complaint, and do not constitute any part of ROSS's response to the allegations in the Complaint or any form of admission as to the truth of those allegations.

3.    ROSS admits West denied ROSS's direct access to Westlaw. Except as expressly admitted, ROSS denies the allegations in Paragraph 3.

4.    ROSS denies the allegations in paragraph 4.

5.    ROSS denies the allegations in paragraph 5.

## PARTIES

6.    ROSS denies that "Westlaw Content" is subject to copyright protection. ROSS lacks knowledge or information sufficient to form a belief as to the remaining allegations, and therefore denies them.

7.    ROSS denies that West has any copyrightable creation or authorship in any "Westlaw Content." ROSS lacks knowledge or information sufficient to form a belief as to the remaining allegations, and therefore denies them.

8.    ROSS admits the allegations in paragraph 8.

## JURISDICTION AND VENUE

9.    ROSS admits that the Complaint purports to assert claims arising under the copyright laws of the United States, specially, 17 U.S.C. § 101 *et. seq.* ROSS denies that this action arises under Delaware law. ROSS admits that the Complaint purports that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

10.    ROSS admits that the Complaint purports that venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1400(a).

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**I.    Plaintiffs and the Creativity of Westlaw**

11.    ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

12. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

13. ROSS admits that the "Abandoned and Lost Property" topic contains the Key Numbers "Nature and elements," "evidence and questions for jury," and "operation and effect." ROSS admits that within the "Nature and elements" Key Number are Key Numbers assigned to the legal issues and points of law "In general," "Intent," and "Acts and omissions" topics. ROSS admits that the "In general" Key Number is delineated 1k1.1, and currently contains 603 cases. Except as expressly admitted, ROSS denies the allegations in Paragraph 13.

14. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

15. ROSS admits Westlaw contains case law, state and federal statutes, state and federal regulations, law journals, and treatises. ROSS admits that West Headnotes describe key concepts of a case. ROSS admits that the Plaintiffs provide an example of West Headnotes and West Key Numbers from the *Harper & Row* case. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and therefore denies them.

16. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

17. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

18. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

19. ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

## II.     Plaintiffs' Valuable Intellectual Property Rights in Westlaw

20.     ROSS denies the West Headnotes are creative.  Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

21.     ROSS denies the allegations in paragraph 21.

22.     ROSS admits that Exhibit A purports to contain a list of copyright registrations with the United States Copyright Office, but denies that the material registered is copyrightable subject matter.  Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

23.     ROSS denies that the copyrights in Westlaw are valid, and were valid and subsisting at all times affecting the matters complained of herein.  Otherwise, ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

## III.    ROSS Intelligence and Its Infringement of Westlaw

24.     ROSS admits it was founded in 2015 and is engaged in the business providing judicial opinions to the public through legal research services.

25.     ROSS admits it began by offering research services in bankruptcy and intellectual property law and currently offers research services on case law, statutes, and regulations across all practice areas and all 50 states.

26.     ROSS admits that ROSS's users are able to search for relevant law by posing a question in natural language, as opposed to Boolean terms or key words.  ROSS admits that Paragraph 26 reflects results of a natural language search on ROSS.

27.     ROSS denies the allegations in paragraph 27.

28.     ROSS admits it acquired judicial opinions to develop a legal research platform. Except as expressly admitted, ROSS denies the allegations in Paragraph 28.

29.     ROSS admits it contracted with LegalEase, a legal research and writing support services company.  Except as expressly admitted, ROSS denies the allegations in Paragraph 29.

30.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

31.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

32.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

33.     ROSS admits LegalEase provided legal analysis to ROSS.  Except as expressly admitted, ROSS denies the allegations in Paragraph 33.

34.     ROSS admits it worked with LegalEase for a period starting in October 2015. Except as expressly admitted, ROSS denies the allegations in Paragraph 34.

35.      Paragraph 35 states a legal conclusion to the extent it states, characterizes, or refers to ROSS "copied" any purported copyrighted material, to which no response is required. Otherwise, ROSS denies the allegations in Paragraph 35.

36.     ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

37.     ROSS denies the allegations in Paragraph 37.

38.     ROSS denies the allegations in paragraph 38.

39.     ROSS denies the allegations in Paragraph 39.

## CLAIMS FOR RELIEF

### COUNT I

### Copyright Infringement (17 U.S.C. *et seq.*)

40.  ROSS incorporates by reference its responses to each and every allegation above as if fully set forth herein.

41.  ROSS denies the allegations in Paragraph 41.

42.  ROSS denies the allegations in Paragraph 42.

43.  ROSS denies the allegations in Paragraph 43.

44.  ROSS denies the allegations in Paragraph 44.

45.  ROSS denies the allegations in Paragraph 45.

46.  ROSS denies the allegations in Paragraph 46.

47.  ROSS denies the allegations in Paragraph 47.

48.  ROSS denies the allegations in Paragraph 48.

### COUNT II

### Tortious Interference with Contract

49.  ROSS incorporates by reference its responses to each and every allegation above as if fully set forth herein.

50.  ROSS lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

51.  ROSS denies the allegations in paragraph 51.

52.  ROSS admits Plaintiffs denied ROSS direct access to Westlaw.  Except as expressly admitted, ROSS denies the allegations in Paragraph 52.

53.  ROSS denies the allegations in paragraph 53.

## PRAYER FOR RELIEF

ROSS denies that Plaintiffs are entitled to any relief whatsoever, specifically including the relief specified in its Prayer for Relief.

## JURY DEMAND

ROSS admits that Plaintiffs have demanded a jury trial on all issues triable to a jury.

## DEFENSES

ROSS sets forth its defenses below, and in doing so, ROSS does not allege or admit that it has the burden of proof and/or persuasion with respect to any of these matters, and does not assume the burden of proof and/or persuasion as to any matters to which Plaintiffs bear such a burden. ROSS reserves its right to amend its Answer to assert other defenses as they may become known.

## FIRST DEFENSE
### (Failure to State a Claim for Tortious Interference with Contract)

Plaintiffs' tortious interference with contract claim fails to state a claim upon which relief can be granted.

## SECOND DEFENSE
### (Double Recovery)

Recovery on any alleged tortious interference by ROSS with the contract between LegalEase and Plaintiffs is barred due to the double recovery. Plaintiffs would receive, having already sued and entered in a consent judgment with LegalEase for LegalEase's alleged breach of its contract with Plaintiffs.

## THIRD DEFENSE
### (Statute of Limitations)

Plaintiffs' tortious interference with contract claim is barred under California's two-year statute of limitations.

- 7 -

**FOURTH DEFENSE**
**(Good Faith)**

ROSS's actions were taken in good faith, in reliance upon information provided by LegalEase's representatives, agents, and/or employees, and with a reasonable belief that such actions were legal, appropriate and necessary. The conduct alleged to be in violation of a statute, if any such conduct occurred, was purely unintentional, and occurred, if at all, despite ROSS's reasonable and appropriate efforts to avoid any such violation.

**FIFTH DEFENSE**
**(Equitable Doctrines – Consent, Waiver, Laches and Estoppel)**

Plaintiffs' tortious interference with contract claim is barred, in whole or in part, by equity and the doctrines of consent, waiver, laches, and estoppel.

**SIXTH DEFENSE**
**(Tort of Another)**

Without admitting any liability and without admitting that Plaintiffs have suffered any loss or damage whatsoever, Plaintiffs tortious interference with contract claim is barred, in whole or in part, by the intervening tort of a third-party, for which ROSS is not liable.

**SEVENTH DEFENSE**
**(Equitable Doctrines – No Injunction)**

Plaintiffs are not entitled to injunctive relief because any alleged injury to Plaintiffs is not immediate and irreparable, and Plaintiffs have an adequate remedy at law.

**EIGHTH DEFENSE**
**(Failure to State a Claim for Copyright Infringement)**

Plaintiffs' copyright infringement claim fails to state a claim upon which relief can be granted.

**NINTH DEFENSE**
**(No Copyright Infringement)**

ROSS has not infringed, does not infringe (either directly or indirectly), and is not liable for any valid copyright or copyright rights of Plaintiffs', including without limitation, any copyright rights in the works that are the subject of the asserted copyrights.

**TENTH DEFENSE**
**(Fair Use – Copyright Act)**

ROSS' alleged conduct constitutes fair use pursuant to 17 U.S.C. § 107.

**ELEVENTH DEFENSE**
**(Invalidity or Unenforceability of Copyrights)**

Plaintiffs are not entitled to recover on their purported copyright claim because one or more of Plaintiffs' copyrights are invalid and/or unenforceable, including by reason of lack of originality.

**TWELFTH DEFENSE**
**(Invalidity or Unenforceability of Copyrights)**

Plaintiff's claims are barred since critical part or portions of their alleged protected copyrights are invalid due to consisting of un-protectable idea(s) or processes.

**THIRTEENTH DEFENSE**
**(Invalidity or Unenforceability of Copyrights)**

One or more of Plaintiffs' copyrights have elements taken from the public domain upon which a copyright infringement action cannot be maintained, including under the government edicts doctrine.

**FOURTEENTH DEFENSE**
**(Doctrine of Merger)**

One or more of Plaintiffs' copyrights is barred by the doctrine of Merger.

### FIFTEENTH DEFENSE
### (Doctrine of *Scenes a Faire*)

One or more of Plaintiffs' copyrights is barred by the "scenes-a-faire" doctrine.

### SIXTEENTH DEFENSE
### (Copyright Misuse)

Plaintiffs have engaged in one or more acts that have misused their copyrights including but not limited to having wrongfully attempted to extend the scope of the limited monopoly granted by the Copyright Act. Defendants reserve the right to assert one or more antitrust related claims.

### SEVENTEENTH DEFENSE
### (Innocent Infringement)

Defendant's conduct was innocent, non-infringing, and not a willful infringement of copyright.

### EIGHTEENTH DEFENSE
### (Copyright Section 117 Limitations)

This action is barred by 17 U.S.C. §117 limitations on exclusive rights.

### NINETEENTH DEFENSE
### (Lack of Ownership)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are not the owner of one or more Copyrights at issue.

### TWENTIETH DEFENSE
### (Authorized Use, License, Consent Acquiescence)

Plaintiffs' claims are barred, in whole or in part, by license or the doctrine of implied license because Plaintiffs impliedly or explicitly, directly, or indirectly, authorized, licensed, consented to, or acquiesced to ROSS's allegedly infringing use of Plaintiffs' works.

- 10 -

## TWENTY FIRST DEFENSE
### (First Sale Doctrine)

This action may be barred by the "first sale doctrine" because if lawfully obtained and possessed one or more of Plaintiff's copyrighted works. 17 U.S.C. §109(a).

## TWENTY SECOND DEFENSE
### (First Amendment)

Plaintiffs' copyright claim is barred to the extent the "Westlaw Content" are protected by the First Amendment of the U.S. Constitution.

## TWENTY THIRD DEFENSE
### (Copyright Preemption)

Plaintiffs' tortious interference claims are preempted or otherwise barred by 17 U.S.C. § 301.

## DEFENDANT ROSS INTELLIGENCE INC.'S AMENDED COUNTERCLAIMS

1.      This is a case about the public right of access to the rules of our democracy and Westlaw's anticompetitive tactics to keep "the public law" from most Americans and maintain its monopoly.

2.      "The public law" is the decisions of federal and state courts, the laws enacted, and the administrative guidance.  This is the material we the people reference when saying that ours is a government of laws, not of men.

3.      The right to access to the public law has been well-recognized by courts throughout the nation for hundreds of years.

4.      Nevertheless, as every judge, law clerk, professor, practicing lawyer, paralegal, law student, and other participant in the legal ecosystem knows, when it comes to accessing the public law, Westlaw is king.

5. Counterdefendants market and sell Westlaw, which controls over 80% of the market for legal search platform products. Westlaw's[2] status as king of legal search has been unchallenged for more than a century. Westlaw's control over legal search is not only enduring, it is incredibly lucrative – Counterdefendants reap billions in revenue at supra-competitive prices. As a result, most Americans have no way to credibly search the public law and are forced to rely on others to understand the rules of our democracy.

6. Counterclaimant ROSS Intelligence Inc. ("ROSS") is a nascent competitor in the market. ROSS built a robust and intuitive legal search engine that uses artificial intelligence and other technology with the goal of making the public law accessible to every American. ROSS secured substantial investment to develop and launch its product. The legal technology community uniformly recognized that ROSS's product was poised to reshape the market.

7. Ultimately – despite substantial venture capital investment, disruptive technology, and widespread enthusiasm – ROSS never really had a chance. ROSS brings this antitrust case against Westlaw for engaging in an exclusionary and anticompetitive course of conduct to maintain its monopoly and restrain trade. This conduct both harmed ROSS and injured American consumers by depriving them of access to the public law.

8. ROSS will show that Westlaw does not maintain its exalted status in legal search through innovation or procompetitive business practices. To the contrary, at its essential core, the Westlaw platform has not kept up with technological advances and its search functionality is substantially behind the search functionality offered in other products.

---

[2] Counterdefendants Thomson Reuters Enterprise GmbH and West Publishing Corp. are herein referred to as "Counterdefendants" or "Westlaw."

9.     Instead, Counterdefendants use anticompetitive sales and licensing regimes supported by a web of sham copyrights and intimidation tactics to crush potential rivals like ROSS. As a result, despite massive advances in technology, including the advent of the Internet and artificial intelligence, not a single credible threat to Westlaw dominance has emerged.

10.    To end those anticompetitive practices, bring competition to the market, increase consumer welfare, and make the public law really and truly available to the public, ROSS asserts the following amended counterclaims.

## NATURE OF THE ACTION

11.    ROSS seeks injunctive and monetary relief for Counterdefendants' exclusionary conduct to maintain monopoly control in violation of Section 2 of the Sherman Act.

12.    ROSS seeks injunctive and monetary relief for Counterdefendants' anticompetitive practices and agreements in violation of Section 1 of the Sherman Act.

13.    ROSS also seeks injunctive and monetary relief for Counterdefendants' unfair business practices in violation of the California Unfair Competition Law.

14.    Finally, ROSS seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, preliminary and permanent injunctive relief, and other necessary and proper relief, enjoining Counterdefendants from impeding ROSS's publication of any public law, and from alleging that ROSS has tortiously interfered with any contract.

## PARTIES

15.    ROSS is a corporation organized under the laws of the State of Delaware, having a principal place of business at 650 California Street, San Francisco, California 94108.

16.    Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") is a limited liability company having its principal place of business in Zug, Switzerland.

17.     West Publishing Corp. ("West") is a Minnesota corporation having its principal place of business at 610 Opperman Drive, Eagan, Minnesota 55123.

## JURISDICTION AND VENUE

18.     Based on the allegations in Counterdefendants' complaint filed in this action (herein, the "Complaint"), *see* D.I. 1, there presently exists a justiciable controversy regarding the validity, copyrightability, and ownership of certain content purportedly owned by Counterdefendants.

19.     This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, and 1338(a), and because ROSS's claims arise under the Copyright Act 17 U.S.C. § 101 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*, and the Sherman Act, 15 U.S.C. § 1 *et seq*.

20.     Counterdefendants are subject to personal jurisdiction in this Court because they have submitted to jurisdiction of the Court by filing the Complaint.

21.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and/or 1400 at least because Counterdefendants have filed the Complaint in this District.

22.     Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental subject-matter jurisdiction over ROSS's state-law claim because this claim is so related to the copyright and antitrust claims herein that it forms part of the same case or controversy.

## GENERAL ALLEGATIONS

### ROSS & Counterdefendants' Complaint

23.     ROSS is a modern legal search company that has designed a product to provide consumers with simplified access to the public law at affordable prices.

- 14 -

24. Over years of work, ROSS developed a powerful natural language search engine based on artificial intelligence. Based on natural language search queries, ROSS's search engine can search through a database of public law and identify legal materials responsive to the query from within the database.

25. ROSS sold access to its AI-based legal search product for less than $100 per month, a tiny fraction of what Westlaw charges.

26. Westlaw controls the largest, most comprehensive, and most reliable public law database, but only makes that database available to those who also license its legal search tools through the Westlaw platform.

27. Westlaw denied ROSS access to the Westlaw platform and thus also the public law database. According to Westlaw, then, ROSS had to access the public law through smaller, less comprehensive, and less reliable databases.

28. ROSS looked for alternatives and eventually obtained a degree of access to the public law through small companies called Fastcase and Casemaker. However, unlike Westlaw, Fastcase and Casemaker makes their public law database available to those who choose not to also license their legal search tools in a bundled product, even if the database purchaser is a competitor.[3]

29. Once ROSS's AI search engine is connected to a public law database, it can identify cases from within the database after receiving a natural language search query. ROSS's search engine only searches through the raw public law and not extraneous materials added by other content providers, like Westlaw's key numbers, headnotes, and page numbers. Indeed, ROSS's training process was specifically designed to be incapable of digesting information that was added

---

[3] Fastcase and Casemaker have very recently merged into a single company. The merger in no way impacts Westlaw's monopoly power.

to the public law by third parties like Westlaw, including key numbers, headnotes, and page numbers.

30.     ROSS contracted with legal research companies for assistance in training the AI search algorithm, including a small company called LegalEase.  ROSS directed LegalEase to provide researcher-chosen quotes of case law directly from raw judicial opinions.

31.     ROSS explicitly told LegalEase that it did not want any third-party information beyond the LegalEase researcher-chosen quotes of case law from raw judicial opinions.

32.     According to Westlaw's Complaint, LegalEase used the Westlaw platform to conduct legal research and prepare its responses for ROSS.

33.     According to Westlaw's Complaint, when LegalEase accessed the public law through Westlaw in support of the ROSS contract, LegalEase breached its license agreement with Westlaw and was liable.  Also according to Westlaw, when ROSS received and used LegalEase's work product quoting judicial opinions to train its AI technology, ROSS was liable for copyright infringement and tortious interference.

34.     The Westlaw license agreement is a contract of adhesion that must be and is accepted by licensees, including most major legal service providers.  It prohibits copying and distributing significant portions of materials found on Westlaw, even if none of the material is protected under a valid copyright.  The license also prohibits using any material found on Westlaw to support a competitor.

35.     West sued the much smaller LegalEase in Federal Court in Minnesota and extracted a settlement.  Through the lawsuit, West gained access to information from LegalEase and third-party ROSS under a protective order issued by the Minnesota Court.

36.     Westlaw believes that this information supports its Complaint.

37.     One day after the West-LegalEase action was dismissed, Westlaw sued ROSS, without obtaining relief from the Minnesota protective order.

**The Westlaw Platform**

38.     In paragraph 11 of the Complaint, Westlaw describes its platform as "a comprehensive collection of legal information that is easily searchable."  Based on this description and personal knowledge[4], the Westlaw platform bundles two products: (1) a comprehensive database (or digital collection) of the public law and (2) a legal search technology and functionality product – or, for brevity's sake, legal search tools.

39.     Westlaw has built up its comprehensive collection of public law since the 19th century.  On information and belief, this database is comprehensive because it includes at least every federal and state judicial opinion, statute, and regulation in United States history.

40.     While the opinions are written by judges, the statutes are written by legislatures, and the regulations are written by government agencies, Westlaw asserts a copyright interest in the comprehensive database.

41.     Westlaw asserts that its database is reliable because it is regularly updated with new opinions, legislation, and guidance, and is also regularly audited to confirm its accuracy.

42.     In the 19th Century, and for decades afterwards, Westlaw stored its collection of public law in volumes of hard copy books that could be purchased and updated when new volumes became available.  To the extent possible given physical limitations, Westlaw sought to include all the public law in its voluminous collections.  Today, the public law collection is stored virtually,

---

[4] To the extent that Counterdefendants claim that ROSS's legal team violates the Westlaw license when it uses ROSS's or its own personal knowledge about the Westlaw platform to prepare the Amended Answer, this is, and should be treated as, further evidence that Westlaw is acting in a way that is anticompetitive and violates the public policy goals of the copyright law.

and made available through a subscription to the Westlaw platform that can be accessed through the Internet.   As the physical limitations are now gone, the digital collection is truly comprehensive.

43.     The public law database made available through Westlaw is a highly valuable product because it is comprehensive and reliable, and because it can be accessed virtually and all at once.  On information and belief, some of the public law available in Westlaw's database is not available anywhere else.  For example, on information and belief, Westlaw had at least at one time, and likely still today, exclusive agreements with governmental agencies to retrieve and ultimately use their governmental edicts for licensing purposes.

44.     Just as importantly, consumers can feel confident when looking for cases in Westlaw's digital collection.  The Westlaw database has been the standard for collecting judicial opinions, legislation, and regulations since before any currently practicing lawyer was born.  Not only do users know that Westlaw's digital collection includes all the potentially relevant public law, but they also have (in many cases) years and years of experience knowing that Westlaw's collection of public law is complete and reliable.

45.     The Westlaw platform also incorporates a legal search technology and functionality product (the "legal search tools") that can be used to search the public law.  Westlaw legal search tools purport to help users search through large amounts of public law to find desired material. Just as stock analysts need tools to search through the enormous amount of stock data, lawyers need tools to search through the enormous amount of public law.  According to the Complaint, Westlaw refers to this product as the "Westlaw Content."

46.     According to the Complaint, the "backbone" of the Westlaw legal search tools is the West Key Number System.  The West Key Number System is a "hierarchy" reflecting core

concepts in the public law and used to organize the public law. The Complaint contends that the West Key Number System "is the result of decades of human creativity and choices."

47.     Westlaw purports to maintain copyrights in the West Key Number System, which Westlaw asserts is incredibly valuable.

48.     In reality, the West Key Number System is not copyrightable, irrelevant to most users, and out of sync with how most users perform legal search. In reality, the West Key Number System is a relic of another time. The West key numbers have absolutely no creative value and are not novel. Westlaw did not decide how the law is organized. Westlaw did not determine the elements of legal claims. Westlaw did not come up with the structure and organization of legal principles. These ideas and concepts derive from the common law and the generations of public legal discourse and thought that are the building blocks of our public legal practice. Westlaw has no copyright ownership in this.

49.     According to the Complaint, the Westlaw legal search tools also include the West Headnotes and notes of decision.

50.     Westlaw purports to maintain copyrights in the West Headnotes and notes of decision, which Westlaw also asserts are incredibly valuable. In reality, the West Headnotes and notes of decision are not useful or copyrightable.

51.     In reality, the West Headnotes and notes of decision are hierarchical lists of basic legal concepts that no one owns, ranging in sophistication from verbatim recitations of the public law to simple phrases derived from and closely tracking the verbatim public law.

52.     Westlaw cites its two best examples of allegedly copyrightable headnotes in the Complaint. Neither example, however, includes any creativity, expression, or interpretation. The examples are headnotes 7 and 8 for the Supreme Court decision *Harper & Row Publishers, Inc. v.*

*Nation Enterprises*, 471 U.S. 539 (1985).  *See* D.I. 1 ¶ 15.  Headnote 7 is a condensed restatement of analysis within the opinion.  Headnote 8 is a verbatim quote from the opinion.  There are literally thousands of West Headnotes and notes of decision nearly identical to these two.  Westlaw cannot seriously assert a copyright interest in these quotes, and doing so is a blatant violation of the policy interests behind the federal copyright laws.

53.     Westlaw purported at one time to maintain copyrights in the page numbers it added to the public law.  In reality, the Westlaw page numbers are not copyrightable but Westlaw fought that in court.  The Second Circuit affirmed that Westlaw's so-called "star pagination" notations embedded into judicial opinions are not copyright-eligible.  *See Matthew Bender & Co. v. W. Publ. Co.*, 158 F.3d 693 (2d Cir. 1998).

54.     On the same day, the Second Circuit affirmed the same district court's judgment that "additions of certain factual information to the text of [judicial] opinions, including parallel or alternative citations to cases, attorney information, and data on subsequent procedural history" are also not copyright-eligible.  *See Matthew Bender & Co. v. W. Publ. Co.*, 158 F.3d 674 (2d Cir. 1998); *see id.* at 677 ("All of West's alterations to judicial opinions involve the addition and arrangement of facts, or the rearrangement of data already included in the opinions, and therefore any creativity in these elements of West's case reports lies in West's selection and arrangement of this information.  In light of accepted legal conventions and other external constraining factors, West's choices on selection and arrangement can reasonably be viewed as obvious, typical, and lacking even minimal creativity.").

55.     In other words, despite the above and contrary legal decisions, Westlaw continues to maintain that every aspect of the so-called "Westlaw Content" is copyrightable and protected under the Copyright Act.

56.    Westlaw uses its alleged copyrights to restrict access to the public law, protect its monopoly power, stifle innovation, and charge supra-competitive prices.[5]

**ROSS' Rise & Fall**

57.    ROSS started in 2014 when two computer scientists at the University of Toronto, a world-leading AI research institute, teamed up with a lawyer to invent a legal search product that makes legal research more intuitive, efficient, and accessible.  The company built its prototype without any funding, and soon thereafter began seeking investors to further develop the product and enter the market.

58.    Investors quickly grew curious.  Lawyers in the United States spend $8 billion on legal research software annually, and the demand for innovative legal search tools that are cheap, simple, reliable, and efficient remains very high.

59.    Owing to the expense and perceived inefficiency in legal services, interest in innovative legal technology has reached a fever pitch.  The American Bar Association recommended in 2016 to establish the Center for Legal Innovation "to reshape the delivery of, and

---

[5] Westlaw's abusive business conduct actually goes very far back – to its very first decades as a corporation.  In 1882, John B. West and his brother established the West Publishing Corporation, with laudable ambitions to provide frontier lawyers with a cheap and efficient means to learn about new cases.  For almost twenty years, West built his company into the nation's leader in legal publishing, in large part because of the method for classifying cases, called the key number system, that met lawyers' expectations, joined established modes of thinking about the law and, thus, had utility.  But in 1899, West suddenly left his company.  Though the reasons are not well known, it is known that in 1908 West gave a scathing speech about the state of legal publishing, and in particular derided the West Publishing Corporation's classification system and its abusive use of unofficial case reporters.  West sought to build a better and fairer publishing company after leaving his former corporation, the Keefe-Davidson Law Book Company, but the new business was never able to get off the ground.  ROSS, not Westlaw, is trying to realize West's laudable ambitions and make the public law truly accessible.  Westlaw instead is following the footsteps of its predecessor-in-interest, and pursuing abusive and exclusionary conduct to preserve its market power.  *See* Robert M. Jarvis, John B. West: Founder of the West Publishing Company, 50 A.M. J. Legal Hist. 1 (2008).

access to, legal services for the 21st century."   *See* www.americanbar.org/groups/centers_
commissions/center-for-innovation/AboutUs/.  Since its enactment, the Center has partnered with
lawyers, technologists, and innovators to "[e]ncourage and accelerate innovations that improve the
affordability, effectiveness, efficiency, and accessibility of legal services." *Id.*

60.    The Center has pursued several creative lines for technology development and
remains active.  For example, the "Legal Tech for Change Project" is a project to expand access
to cutting-edge technology for all members of the legal community.  *See* www.americanbar.org/
groups/centers_commissions/center-for-innovation/programs-and-projects/.[6]

61.    Similarly, the state bars for New York, California, Illinois, and Texas all have
committees or subsections that identify and promote new technology that improves access to the
public law.  As just one example, the State Bar of Texas' Computer and Technology Council has
an Emerging Technology working group.  *See* sbot.org/about/committees-and-working-groups/.

62.    Corporate clients and law firms across the country have also jumped with
enthusiasm at the opportunity to identify and ultimately use innovative and powerful legal search
products.  Corporate legal departments have, for example, established The Corporate Legal
Operations Consortium ("CLOC") as a global community of experts focused on redefining the
delivery of legal services and the business of law.  Law firms have also, for example, established
technology committees to identify and evaluate new legal software to use for litigation, corporate,
and regulatory matters.  These are just a few of the many developments that evidence growing
demand for greater choice and innovation in products that support legal research.

---

[6] ROSS was actually a founding member of the Legal Tech for Change Initiative.  The company
has taken a leadership position in expanding the market for legal search platforms to tap into unmet
consumer demand and close the legal representation gap.

63.     Moreover, these initiatives are not just passion projects.  The market for legal services is in desperate demand for better technology.  Since the Great Recession, law firms have been forced to tighten belts and justify costs.  Whereas in 2008 law firms recovered over 80% of legal research costs from clients, in 2020 they recovered less than 30%.  And over the same period of time, the percentage of law firms that have moved to relying on a single legal search product has increased from around 10% to over 50%.  Both trends are expected to continue.

64.     Access to adequate legal representation is also seriously deficient because the cost of the law is so high.  While Americans with the greatest ability to pay for legal services have options, Americans that have less ability to pay are substantially foreclosed from professional legal services.  These Americans have no less of a need for effective legal representation, but cannot pay the high costs.  A more competitive market for legal research tools would help to grow the market for affordable legal services, tap into unmet consumer demand, and significantly close the legal representation gap.

65.     Given the widespread interest in and need for a better, cheaper, and more efficient way to do legal research and ROSS's innovative AI-based approach to legal search, ROSS was offered an opportunity to present to the prestigious start-up incubator, Y Combinator.

66.     After the initial presentation, Y Combinator's leadership was very interested.  They saw how ROSS's product could tap into the substantial demand for greater choice and flexibility in legal research tools – and the opportunity to invest in a product that makes legal research simple and intuitive was hard to ignore.  They also understood that a quality AI-based natural language search engine could overcome the training-based switching costs that protect Westlaw's market dominance. However, while they saw the market potential, they also understood the risk that Westlaw would move to protect its strangle grip on the market.

67.     Y Combinator ultimately invested in ROSS.  They recognized that the concentrated market for legal search products means unmet demand and inefficiencies in the legal services community.  And they believed in the extraordinarily valuable and disruptive potential of ROSS's product.  ROSS primarily used the significant financial investment to develop its AI technology for the legal search engine.

68.     As ROSS approached customers, there was widespread support for the company's innovative, AI-based legal search product, and equally strong recognition that such technology could make legal research easier, cheaper, and more accessible.  ROSS received similar praise from the media and major bar associations across the country as well – many hoping and predicting that ROSS would be on the leading-edge of significant market change for the better.

69.     But then customers asked what digital public law collection was connected to the legal search engine.  And this proved to be a serious problem.  ROSS knew that it could not obtain access to Westlaw's database, despite its significant willingness to pay for that product.  Westlaw has never offered to license its database separate from its search tools and, in any event, Westlaw had denied ROSS access to the platform as well.

70.     Moreover, there was no practical or reliable way for ROSS to obtain a digital collection of public law on its own.  There are no APIs for public law and no downloadable files to obtain large collections of the public law.  And to this day, government agencies do not generally offer their public law in a downloadable format for free or at market cost.  On information and belief, this is due, in part, to Westlaw having exclusive contracts with government agencies to be the exclusive provider of primary law in a digital format.

71.     So, ROSS instead built its public law database through other sources.  It purchased some cases from Casemaker, and other public law from Fastcase, starting only in bankruptcy, but

steadily expanding out to intellectual property law, and labor/employment law as well. The hope was that ROSS could first build interest from subject-matter-specific legal practitioners, and then with the initial wave of users grow its product until it could offer comprehensive access to the public law. Given the widespread interest in better and cheaper legal research options, and ROSS's innovative technology, the company did have some success through this practice. ROSS was able, for example, to secure a license with a large national labor/employment firm.

72.     But ultimately, the spliced-and-put-it-back-together approach to building its public law database just was not adequate. Even after ROSS made a large investment to partner with Fastcase and fill the gaps in its digital collection, customers were still not convinced.

73.     There was no doubt that ROSS's search engine was incredibly valuable. The problem instead was that the database connected to the search engine lacked what the customer needed. For example, some customers voiced concerns that a substitute database might not be sufficiently comprehensive. Without access to Westlaw's database, they might miss an important older case or an unpublished opinion that would give the opposing counsel an advantage. Or there might be a new decision that has not been added to the database yet. Customers also feared relying on a database that was not viewed in the legal community as reliable and the well-known standard.

74.     These customers instead licensed Westlaw's legal search product solely because it includes Westlaw's well-known digital public law collection. They acknowledged that ROSS's search engine is better than Westlaw's legal search tools, and some even indicated that combining ROSS's search engine with Westlaw's database would produce a better platform than anything available in the market. But these customers, ultimately, were reluctantly willing to use Westlaw's ineffective legal search tools if it meant access to the high-quality database.

- 25 -

75.     ROSS faced this problem everywhere – from solo practitioners to full-service big law firms.  To many of these customers, it was not just about the fact that the database connected to ROSS's search engine had less public law, but also the fear of accessing and relying on a newly created digital public law collection.  These customers had confidence that Westlaw's database would have the materials they needed through years of using the database and seeing colleagues and classmates use it as well.  A new digital public law collection, pulled together by smaller and unknown companies, was too great a risk to bear.

76.     And given this concern, customers would always fall back on Westlaw.  They needed to license the Westlaw platform because that is the only way to access Westlaw's database, and they needed to access Westlaw's database.  Even though they did not want to purchase Westlaw's legal search tools as well, they were forced to purchase them, as they had no way to access Westlaw's database without them.  And having already being forced to pay for the Westlaw legal search tools through licensing the Westlaw platform, these customers decided that it just did not make sense to license the ROSS product or any other alternative legal search product as well.  By making customers take the Westlaw legal search with its database, then, Westlaw keeps other legal search options out of the market.

**The Relevant Markets**

77.     There is a relevant market for legal search platform products ("legal search platforms").  A legal search platform combines a legal search functionality product with a database of public law.  The relevant geographic area is the United States.

78.     For some customers, there is currently no substitute for a legal search platform. These customers license legal search products to practice law or for educational purposes.  For these customers, if the database is not connected to a legal search tool, then it holds no value.

There is too much public law to efficiently and effectively identify the relevant material without search functionality.  These customers prefer the convenience and reliability of a bundled platform product.

79.     For other customers, there is a growing interest in unbundled search products, or other flexible options for digital legal research.   This nascent demand includes customers like the ABA, state bars across the country, and major law firms, which have a desire to develop new technologies that can lower costs, improve efficiency, add greater flexibility, and tap into substantial unmet demand.  For these customers, legal search tools could be a valuable product as long as the technology exists to allow the consumer to combine the tools with a public law database.

80.     Consequently, there are relevant markets for public law database products and legal search technologies in the United States.  Customers in these markets include both end-users like law firms, intermediate buyers like bar associations that seek to expand access to the law, and intermediate buyers like ROSS that need access to a database to develop, test and market their platform products.

81.     In the market for legal search platforms, Westlaw and ROSS are competitors.

**Monopoly Power**

82.     Westlaw has both market and monopoly power in the market for legal search platforms.

83.     In a 2020 trade survey, 83% of responding United States law firms reported having a Westlaw license.  Among AmLaw 100 firms, which account for well over 80% of legal revenue in the United States, this license-share rises to 95%.

84.     The extraordinarily strong license-share is also likely to maintain over time.  Only 1% of responding law firms reported that they are "extremely likely" to eliminate their Westlaw license once the contract expires, and only 4% more responded that they are "moderately likely" to do so.  Given that the share of law firms only using one legal search product has increased five-fold in the last decade, and given that this trend is predicted to continue, Westlaw can confidently expect that it will continue to be licensed by nearly every law firm across the country for years to come, even while those firms discard alternative products.

85.     Westlaw also accounts for the majority of legal information spending among U.S. law firms, and well more than double the closest rival.  These ratios have been the same since at least 2018, and also remain stable when law firms project three years into the future.  The survey also reports that Westlaw is considered "essential" by at least 43% of respondents.

86.     A 2020 trade report similarly states that Westlaw is the platform most often used by small, midsize, and big law firms, and that this dominant position has been stable since the earliest date where data is available.  The report also indicates that Westlaw has market dominance within law schools, where students are trained on how to use the platform.

87.     Westlaw's control over licenses and revenue has been stable despite consistently requiring customers to pay significantly higher prices than any of its rivals.  Westlaw charges AmLaw 100 law firms millions of dollars a year.  Each search on the platform for a mid-size or big law firm costs up to $172, which is almost double the cost-per-search for its closest rival.  The price difference quickly expands as the number of lawyers at the firm, and the number of searches each lawyer completes, increases.  Moreover, this Westlaw price represents a 20% increase compared to what Westlaw charged in 2020.  Westlaw has been steadily increasing its prices even while the costs of cloud computing and storage have steadily fallen.

88.     The difference is present amongst small firms as well. Westlaw charges solo practitioners that accept a three-year subscription plan $396 per month, with 5% annual price increases, over twice the amount that the closest rival charges under a similar three-year plan.

89.     Given that the United States legal information market is $8 billion per year, Westlaw is reaping billions in revenue due to their monopoly position.

90.     Westlaw's power in the legal search platform market is protected by substantial barriers to entry and expansion. Importantly, Westlaw's monopoly in legal search is protected by significant lock-in and high switching costs, network effects, and differential pricing practices for separate consumer bases.

91.     Westlaw offers its platform and training support to those entering the legal market like law students for free to "get them hooked." Westlaw also expends significant resources to provide training and other support to licensees. Once users have expended the energy and resources to build the skills to use a specific platform, it is highly unlikely that those users will make the choice to switch to another. Indeed, this is one reason why it's so common to hear a lawyer say "I use Westlaw" and who has almost no experience with another platform. Law schools hold classes where students learn how to use Westlaw because the platform has become a seeming prerequisite for every law job.

92.     Westlaw's dominant market position has also seeped into the judiciary. The Local Rules for many courts (including this one) expressly refer to Westlaw when stating how to cite to cases.

93.     Westlaw's differential pricing for separate consumer bases facilitates the lock-in. Westlaw offers different prices for access to the same or substantially similar material. Most notably, on information and belief, Westlaw licenses the platform to law schools and governments

essentially for free, while Westlaw licenses the platform to large law firms on a very expensive pay-per-search basis.

94.     And network effects amplify the switching costs.  As more people use a particular legal search platform, its value to existing participants rises, incentivizing more to join.  The study and practice of law is collaborative.  Identifying and understanding the right cases or statutes to apply to a particular fact pattern is a complex task.  Often, the best way to figure out a problem is to work with others, which includes providing advice and suggestions on materials to search and how to complete a search.  These collaborative processes are made easier when the team members are using the same platform for research.  For example, it is easier to help a colleague, co-clerk, or classmate find the right case when you know the search terms that work and have experience with the search tools.

95.     Together, these characteristics substantially increase the barriers to entry and expansion for actual and potential rivals in legal search platforms and protect Westlaw's market position.

96.     Westlaw also has significant and durable market and monopoly power in the market for public law database products.

97.     No other available public law database product is as comprehensive as Westlaw's product.  Westlaw can guarantee that its database has every judicial opinion, every statute, and every regulation that has ever been published, unlike anyone else.

98.     In addition, no other available public law database product is as reliable.  Westlaw has effective mechanisms in place that are not available to other competitors to ensure that all new public law is quickly added to its database, and to ensure that mistakes in the database are efficiently identified and corrected.

99. Westlaw's database power is also protected by the Westlaw brand. Consumers know that Westlaw has been building its public law collection for over one hundred years, and that it is comprehensive and reliable. Consumers thus also know that if they pursue a legal research question for long enough – despite the fact that the research is probably taking longer than is needed because the legal search tools are just not that good – they eventually can find the right case. This level of reassurance is unique to Westlaw. In an industry where legal research can be the difference between keeping or losing a client, winning or losing a case, or even being sanctioned for failure to uphold professional responsibilities or not – people feel compelled to go with what everyone has used before (*i.e.*, Westlaw).

100. This level of reassurance is also extraordinarily powerful, and only Westlaw can offer it.

**The Exclusionary Conduct**

101. Westlaw has not maintained its monopoly power in the market for legal search platforms by legitimately building on its historical advantage through product innovation and investment. Instead, Westlaw has engaged in an intentional anticompetitive and exclusionary course of conduct to enhance entry barriers and raise costs to rivals. This course of conduct has reduced consumer choice and competition and stifled innovation – depriving the public of efficient, convenient, and affordable access to the public law.

102. Westlaw uses restrictive licensing conditions to foreclose rivals from access to the relevant markets. Westlaw's exclusionary conduct is grounded in its anticompetitive business model, which only provides customers with access to its valuable database product through the integrated platform. This business model is akin to a tying scheme that raises entry barriers in the relevant markets and allows Westlaw to monopolize the distribution of public law.

- 31 -

103.    This restrictive condition is drafted into section 1(a) of the "Research Subscriber Agreement" (herein, the "Agreement"), which Westlaw states in the Complaint all platform users must follow.[7]  The Agreement is a contract of adhesion, and it defines "Data" to include "all information and representations of information, including but not limited to, graphical representations, and other content made available to [users] through the Product."

104.    Moreover, on information and belief, Westlaw has never provided consumers with an option to only license the public law database, or to only license the legal search tools, and does not plan to ever provide such an option.

105.    Due to this licensing condition, customers that seek access to Westlaw's highly valuable public law database are forced to also license the significantly less valuable Westlaw legal search tools.  It is not possible to only license one and not the other.  Customers that strongly prefer the better legal search tools that competitors offer are forced to buy Westlaw's ineffective legal search tools to get access to Westlaw's database.  Given the significant cost to license Westlaw's platform, these customers are unwilling to spend on yet another product.

106.    These restrictive licensing conditions stifle innovation as well.  But-for Westlaw's refusal to separately license its digital public law collection, new companies would find ways to incorporate Westlaw's database into their products, or build technology that allows their search engines to be compatible with Westlaw's database.  The refusal thus seriously harms consumer welfare both by forcing customers to purchase products they do not want, as well as raising the price and reducing output in the relevant markets for legal search products.

---

[7] Counterdefendants appended the Research Subscriber Agreement to their Brief in Opposition to ROSS's Motion to Dismiss the Complaint.  *See* D.I.s. 16, 16-1.  The Research Subscriber Agreement did not accompany the Complaint.

107.    Westlaw also uses restrictive licensing conditions to exclude rivals from valuable research and development opportunities.  Westlaw blocks rivals from getting anywhere close to its Westlaw platform and the digital collection therein.  Westlaw admits this in paragraph 28 of the Complaint when it remarks that even if ROSS sought to license the Westlaw platform, Westlaw "would not [] grant" ROSS "access to Westlaw" and its "vast amounts of legal content."  This exclusion is also drafted into the Agreement's restrictive terms about how users may use, store, and disseminate material found on the platform.  Westlaw states this succinctly in paragraph 19 of the Complaint, which sums up these terms of the Agreement as together "expressly prohibit[ing] [licensees] from using [the platform] to create a competitive product."

108.    Due to these licensing conditions, rivals are not allowed to license Westlaw, and are also not allowed to contract with Westlaw platform licensees to perform legitimate business activities, including to develop or test their own products.  Westlaw denies rivals any path for access even if those rivals are willing to pay Westlaw's commercial rates for access.  This behavior has no procompetitive justification.  This exclusionary conduct reduces entry from high-quality products, deters legitimate business activities, and depresses the competitive pressure to innovate.  Though we have seen limited entry into the relevant markets from firms like Fastcase, Casemaker, and Casetext, these firms have struggled to gain traction or to constrain Westlaw's monopoly.[8]

109.    The general market impact of these restrictive conditions is just as severe.  Indeed, a licensing agreement that "expressly prohibit[s] [licensees] from using [the platform] to create a competitive product" has the effect of prohibiting huge swaths of competitive activity in the legal business profession.  Practicing lawyers violate the Agreement when they help incorporate,

---

[8] Due to advancements in information digitalization, it is curious – and, indeed, astonishing – that the legal industry is one of the last remaining spaces where consumers need to pay for access to information.

finance, and defend through litigation market competitors; corporate counsel violate the Agreement when they rely on Westlaw to build state-surveys that include information already on the platform; law professors violate the Agreement when they rely on Westlaw to prepare material for an upcoming casebook.

110.    Westlaw's licensing conditions also illegitimately expose rivals to extraordinarily high professional and reputational risk.  The government edicts and public law database are so severely co-mingled with the Westlaw legal search tools that it is impossible for a licensee to use Westlaw materials in legitimate ways without also risking a copyright lawsuit.  The key numbers and headnotes cannot be separated from the government edicts either when viewed on the platform or printed.  When viewing or printing the government edicts, the key numbers and headnotes are only a small part of the overall content and, in that context, are superfluous and not reproduced or used in any manner that would impact demand for key numbers or headnotes.  Yet, nonetheless, Westlaw leverages the key numbers and headnotes to wrongfully and unfairly extend its alleged copyrights in those materials to control the unprotectable government edicts.  Westlaw makes it impossible to separate the public law from Westlaw add-ons, even when the user does not want the add-ons.  And the design and layout of Westlaw creates material confusion and uncertainty about what is a government edict and what is not.  Upon information and belief, this is by design, in order to provide Westlaw practical control over the full content of the public law, despite the fact that the public law is not owned by Westlaw and Westlaw has no right to control it.  Given these licensing and technical conditions, it is not difficult for Westlaw to find a way to sue its rivals for copyright infringement.  And in fact, on information and belief, Westlaw has a long practice of aggressively pursuing such claims.

111.    Importantly, though, Westlaw is not advancing a legitimate interest in intellectual property rights through such filings.  Instead, these lawsuits are a complete sham, brought to police the exclusionary platform access policies.  Westlaw knows that its copyright assertions and claims are objectively baseless, as there is no dispute that government edicts and a comprehensive database are not copyright-eligible.  It pursues these claims to force rivals into unnecessary, expensive legal fights solely to raise entry barriers, particularly to destroy nascent rivals before they can gain a toehold in the relevant markets.

112.    This is exactly what happened to ROSS.   ROSS was beginning to build an enthusiastic user base in 2019 and become a market competitor.  The company had just put a significant investment into building its spliced-and-put-back-together digital public law collection, and was receiving enthusiasm from the media and consumers fed up with Westlaw's high prices and low-quality search tools.

113.    It was only a few months thereafter that Westlaw pounced.  In a sense, Westlaw's anticompetitive course of conduct has been successful.  To its own benefit, but everyone else's loss.

114.    There is no procompetitive justification for any of Westlaw's exclusionary acts. The only justifications for Westlaw's conduct are to maintain its monopoly control and to restrain trade.  As a result, consumer welfare is significantly harmed.  And just as importantly, access to justice is substantially denied.

115.    ROSS was ultimately forced to exit the market, becoming the latest victim of Westlaw's anticompetitive practices.  Its unfortunate experience illustrates how Westlaw uses exclusionary tactics to harm nascent rivals, deter investment and entry, and protect its market position.

## COUNT I
### (Declaratory Judgment of No Valid Copyrights in the Westlaw Content)

116.     ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 115 above.

117.     In its Complaint, Counterdefendants allege, *inter alia*, that ROSS directly and indirectly infringes the "Westlaw Content" by reproducing and creating a creative work based on Counterdefendants' content.

118.     It is well established in American law that judicial opinions and federal and state laws, including administrative rules and regulations, are not copyrightable, and must remain public as a matter of due process. *See Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834); *Banks v. Manchester*, 128 U.S. 244 (1888); *Davidson v. Wheelock*, 27 F. 61 (C.C.D. Minn. 1866) (holding publisher cannot copyright state statutes, even if state purports to give exclusive publishing rights); *Howell v. Miller*, 91 F. 129 (6th Cir. 1898) ("no one can obtain the exclusive right to publish the laws of a state") (Harlan, J., sitting by designation); *Nash v. Lathrop*, 142 Mass. 29, 6 N.E. 559 (Mass. 1886) ("Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes or the decisions and opinions of the justices."). *See generally* L. Ray Patterson & Craig Joyce, Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations, 36 UCLA L. Rev. 719 (1989), and cases cited therein.

119.     Indeed, "[a]s a matter of longstanding public policy, the U.S. Copyright Office will not register a government edict that has been issued by any state, local, or territorial government, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or

similar types of official legal materials." Compendium of U.S. Copyright Office Practices, Third Edition, Sec. 313.6(C)(2).

120.    ROSS is informed and believes, and on that basis alleges, that Counterdefendants have not contributed any original or creative authorship to the "Westlaw Content." 17 U.S.C. § 102(b); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991). The judicial opinions and federal and state laws, including administrative rules and regulations, are written by government officials.

121.    ROSS is informed and believes, and on that basis alleges, that Counterdefendants' key number system is a method of operation. *See* 17 U.S.C. § 102(b); *Baker v. Selden*, 101 U.S. 99, 103 (1879).

122.    In view of the foregoing, Counterdefendants have no legal rights, in copyright or contract, exclusive or otherwise, to restrict access to or publication of the judicial opinions, notes on decisions, headnotes, federal and state laws, including administrative rules and regulations, or any aspect of the Westlaw Content.

123.    Thus, ROSS seeks declaratory judgment that Counterdefendants have no basis from which to prohibit ROSS from copyright, reproducing, or otherwise creating derivative works in the judicial opinions, notes on decisions, headnotes, federal and state laws, including administrative rules and regulations, or any aspect of the Westlaw Content, in its subscription legal research service.

124.    Accordingly, and as evidenced by the Complaint demanding ROSS cease reproduction, publication or any other use of certain content, an actual justiciable controversy exists as to the parties' respective rights in connection with judicial opinions, and with the laws, rules, and regulations of any other State or the Federal Government, and the Westlaw Content, as

to which Counterdefendants now claim or might hereafter claim any exclusive right, including the rights to use, license, publish, and distribute such laws, rules, and regulations.

125. To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that Counterdefendants have no protectable exclusive rights in the judicial opinions, notes on decisions, headnotes, federal and state laws, including administrative rules and regulations, or any aspect of the Westlaw Content, in either contract or copyright.

## COUNT II
### (Declaratory Judgment of Non-Infringement)

126. ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 125 above.

127. ROSS's use of LegalEase researcher-chosen quotes of case law directly from raw judicial opinions does not infringe any copyrights that Counterdefendants claim to have in any "Westlaw Content," including because the judicial opinions and direct excerpts thereof are not entitled to copyright protection under the Copyright Act (17 U.S.C. § 101 *et. seq.*), government edicts doctrine, and the First Amendment of the United States Constitution.

128. There is no basis upon which Counterdefendants can allege copying of copyrighted material in the "Westlaw Content," or any other act of infringement encompassed by the Copyright Act.

129. There is no basis upon which Counterdefendants can allege indirect copyright infringement of copyrighted material in the "Westlaw Content," whether by inducing infringement, contributing to infringement or any other theory of indirect infringement encompassed by the Copyright Act.

130.     As evidenced by the allegations in the Complaint and in these Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between ROSS and Counterdefendants with respect to the alleged infringement of any valid copyrights in the Westlaw Content.

131.     To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that ROSS has not infringed, directly or indirectly, upon any of the Counterdefendants alleged rights in the Westlaw Content.

## COUNT III
### (Declaratory Judgment of Fair Use)

132.     ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 131 above.

133.     ROSS's use of LegalEase researcher-chosen quotes of case law directly from raw judicial opinions constitutes a fair use under 17 U.S.C. § 107.

134.     To the extent Counterdefendants can allege copying of copyrighted material in the "Westlaw Content," or any other act of infringement encompassed by the Copyright Act, such constitutes a fair use under 17 U.S.C. § 107.

135.     There is no basis upon which Counterdefendants can establish that any alleged act of infringement is not barred by the doctrine of fair use pursuant to 17 U.S.C. § 107, in view of the nature of the works asserted by Counterdefendants and covered by the asserted copyrights, the amount (if any) and substantiality of the portions of such works used in relation to the works as a whole, the purpose and character of any use thereof, and the effect, if any, of such use on the potential market for the works.

136.    As evidenced by the allegations in the Complaint and in these Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between ROSS and Counterdefendants with respect to the alleged infringement of any valid copyrights in the Westlaw Content.

137.    To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that any allegedly infringing act by ROSS or LegalEase constitutes fair use and, therefore, does not constitute direct or indirect infringement.

## COUNT IV
### (Declaratory Judgment of Copyright Misuse)

138.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 137 above.

139.    Copyright protection exists "to promote the Progress of Science and the useful Arts."

140.    Copyrights should not be enforced when such enforcement does not fulfill the Constitutional purpose of copyright protection.

141.    Counterdefendants have utilized the Westlaw Content and the asserted copyrights in the Westlaw Content in an anticompetitive, wrongful, unfair and exclusionary manner.

142.    The key numbers and headnotes cannot be separated from the government edicts either when viewed on the platform or printed.  In this way, and through their unfair licensing practices, Counterdefendants leverage the key numbers and headnotes of the Westlaw Content to wrongfully and unfairly extend their alleged copyrights in those materials to control the unprotectable government edicts.

143.     Counterdefendants' use of the Westlaw Content and the asserted copyrights in the Westlaw Content does not comport with the Constitutional purposes of copyright protection.

144.     As evidenced by the allegations in the Complaint and in these Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between ROSS and Counterdefendants with respect to the alleged infringement of any valid copyrights in the Westlaw Content.

145.     To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgment that Counterdefendants' assertion of and practices regarding the Westlaw Content and the asserted copyrights in the Westlaw Content constitute copyright misuse.

146.     As a result of Counterdefendants' misuse of their copyrights, Counterdefendants' copyrights should be invalidated, and ROSS is entitled to appropriate attorneys' fees and costs.

## COUNT V
## (Declaratory Judgment of No Tortious Interference with Contract)

147.     ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 146 above.

148.     As evidenced by the allegations in the Complaint and in these Amended Counterclaims, there is an actual and ongoing controversy between ROSS and Counterdefendants as to whether ROSS tortiously interfered with LegalEase's contract with Counterdefendants.

149.     Counterdefendants' claim requires a showing that LegalEase had a contract with Counterdefendants, that ROSS knew of the existence of this contract, that ROSS intentionally instructed LegalEase to breach the contract without justification, that Counterdefendants were harmed, and that ROSS's conduct was a substantial factor in Counterdefendants' harm.

150.     ROSS did not direct or in any way encourage LegalEase to breach any third-party contract, including without limitation LegalEase's contract with Counterdefendants.  ROSS further did not direct or control LegalEase conduct in connection with researching and obtaining raw judicial opinions.

151.     For these reasons, ROSS maintains that it did not tortiously interfere with any contract between LegalEase and Counterdefendants.

152.     To resolve the uncertainty raised by the Counterdefendants, and to afford ROSS relief from the uncertainty and controversy that the Counterdefendants' assertions have precipitated, ROSS seeks a declaratory judgement that ROSS did not tortiously interfere with Counterdefendants' contract with LegalEase.

### COUNT VI
### (Sherman Act § 2:  Unlawful Monopoly Maintenance in the
### Legal Search Platforms Market)

153.     ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 147 above.

154.     Counterdefendants' conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.

155.     The market for legal search platforms is a valid antitrust market.

156.     Counterdefendants hold monopoly power in this market.

157.     Counterdefendants unlawfully maintain their monopoly power in this market through the exclusionary acts described herein.  These exclusionary acts serve no legitimate or procompetitive purpose that could justify their anticompetitive effects.

158.     Counterdefendants' conduct affects a substantial volume of interstate commerce.

159. Counterdefendants' conduct has substantial anticompetitive effects, including increased prices and costs, lower output, and reduced innovation and quality of product options.

160. As a nascent market competitor, ROSS has been harmed by Counterdefendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. ROSS has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Counterdefendants' anticompetitive conduct issues.

161. To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein, and should award ROSS monetary damages.

### COUNT VII
### (Sherman Act § 1: Unreasonable Restraint of Trade in the Legal Search Platforms Market)

162. ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 161 above.

163. Counterdefendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

164. The market for legal search platforms is a valid antitrust market.

165. Counterdefendants' unlawfully restrain trade in this market through the anticompetitive acts described herein. These anticompetitive acts serve no legitimate or procompetitive purpose that could justify their anticompetitive effects.

166. Counterdefendants' conduct and unlawful contractual restraints affect a substantial volume of interstate commerce.

167. Counterdefendants' conduct has substantial anticompetitive effects, including increased prices and costs, lower output, reduced innovation, and reduced quality of product options.

168.    As a nascent market competitor, ROSS has been harmed by Counterdefendants' unlawful contractual restraints in a manner that the antitrust laws were intended to prevent.  ROSS has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Counterdefendants' anticompetitive restraints issues.

169.    To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein, and should award ROSS monetary damages.

### COUNT VIII
### (California Unfair Competition Law)

170.    ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 169 above.

171.    Counterdefendants and ROSS both pursue substantial volumes of interstate commerce as well as commerce within the State of California.

172.    Counterdefendants' actions described herein constitute unlawful, unfair, or fraudulent acts or practices in the conduct of business, in violation of California's Business and Professions Code Section 17200 et seq., including actions that are forbidden by other laws.

173.    Counterdefendants' conduct is unlawful, unfair, or fraudulent because it is in violation of Sections 1 and 2 of the Sherman Act, and also in violation of the policy or spirit of the Sherman Act.

174.    Counterdefendants' conduct is unlawful, unfair, or fraudulent because it is in violation of the Copyright Act, and also in violation of the policy or spirit of the Copyright Act.

175.    As a result of Defendants' various acts, ROSS has been harmed and has lost money and property in the form of, among other things, costs to defend itself against the Complaint, costs to bring these counterclaims, and costs to survive in the market in spite of the unfair market conditions.

## COUNT IX
### (Delaware Common Law Unfair Competition)

176.     ROSS incorporates by reference each and every allegation contained in Paragraphs 1 through 175 above.

177.     As established by the facts pled *supra*, ROSS had a business expectancy to sell its legal search platform product in the market, having received encouragement in the industry and indications from customers that they would purchase access to the ROSS platform once it was tied to a reliable database.

178.     As discussed *supra*, Westlaw took unfair business actions to prevent ROSS from legitimately earning revenue in the relevant market.  These acts were taken with the intent to cause competitive harm and, in certain cases, disparage ROSS.

179.     But for Westlaw's unfair business actions, ROSS would have made sales of its product in the relevant market.

180.     Counterdefendants' actions described herein constitute unlawful, unfair, or fraudulent acts or practices in the conduct of business, in violation of common law unfair competition laws.

### RELIEF REQUESTED

WHEREFORE, ROSS respectfully requests the following relief:

A.     The entry of judgment on the Complaint in favor of ROSS, and against Counterdefendants, with Counterdefendants not being awarded any relief of any kind;

B.     The entry of judgment declaring that Counterdefendants do not have valid copyrights in the "Westlaw Content";

C.     The entry of judgment declaring that ROSS has not infringed, directly or indirectly, Counterdefendants' copyrights;

D.      The entry of judgment declaring that any alleged use of Counterdefendants' copyrights constitutes fair use;

E.      The entry of judgment declaring that Counterdefendants have engaged in misuse of their copyrights and that Counterdefendants' copyrights are invalidated;

F.      The entry of judgment declaring that ROSS did not tortiously interfere with LegalEase's contract with West; and

G.      Enjoining Counterdefendants' acts in support of its unlawful monopoly maintenance in the market and its unreasonable restraint on trade in the market.

H.      Monetary relief, including all forms of available damages and monetary relief in equity.

I.      The entry of judgment declaring that ROSS is the prevailing party under 17 U.S.C. § 505.

J.      Appropriate attorneys' fees and costs.

K.      Such other and further relief, in law or equity, as this Court deems just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 38.1, ROSS respectfully requests a trial by jury on Plaintiffs' Complaint and on ROSS's Amended Counterclaims for all issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ David E. Moore*
     David E. Moore (#3983)
Gabriel M. Ramsey
     Bindu A. Palapura (#5370)
Warrington Parker
     Carson R. Bartlett (#6750)
Joachim B. Steinberg
     Hercules Plaza, 6th Floor
Jacob Canter
     1313 N. Market Street
CROWELL & MORING LLP
     Wilmington, DE  19801
3 Embarcadero Center, 26th Floor
     Tel:  (302) 984-6000
San Francisco, CA 94111
     dmoore@potteranderson.com
Tel:  (415) 986-2800
     bpalapura@potteranderson.com
     cbartlett@potteranderson.com

Mark A. Klapow
Crinesha B. Berry
*Attorneys for Defendant/Counterclaimant*
CROWELL & MORING LLP
*ROSS Intelligence, Inc.*
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Tel:  (202) 624-2500

Dated:  September 14, 2022
10337976 / 20516.00001

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) | C.A. No. 20-613 (LPS) |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) | |

## [PROPOSED] STIPULATED PROTECTIVE ORDER

Plaintiffs Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West") (collectively, "Plaintiffs") and Defendant Ross Intelligence, Inc. ("ROSS") anticipate that documents, testimony, or information containing or reflecting confidential, proprietary, trade secret, and/or commercially sensitive information are likely to be disclosed or produced during the course of discovery in this case and request that the Court enter this Stipulated Protective Order ("Order") limiting the disclosure and use of such discovered information.

Pursuant to Federal Rule of Civil Procedure 26(c), the Court finds good cause for this Order:

1.  <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted.

1

Accordingly, the parties stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

The parties further acknowledge, as set forth in Section 14.3, below, that this Stipulated Protective Order does not dictate the standards that apply to under seal filings with this Court. The parties understand and agree that D. Del. LR 5.1.3 and this Court's Scheduling Order provides those standards.

2.     DEFINITIONS

2.1     Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2     "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c). "CONFIDENTIAL" Information or Items also includes all information, documents, interrogatory answers, responses to requests for admissions, deposition testimony and transcripts, deposition exhibits, and any other discovery materials, and any copies, notes, abstracts, or summaries of the foregoing, produced by a Producing Party, in connection with this Action, which has not been made public and which concerns or relates to the proprietary information used by the Producing Party in, or pertaining to, its business, which is not generally known, and which the Producing Party would not normally reveal to third parties or would cause third parties to maintain in confidence, including, without limitation, agreements and contracts; current and future business, product, or strategic plans; internal communications; financial information; marketing

2

documents; private personal identifying information; trade secrets; or documents or information that, if released publicly, would cause embarrassment or be damaging to the reputation of the Producing Party.  Any copies or reproductions, excerpts, summaries, or other documents or media that paraphrase, excerpt, or contain Confidential Information or Highly Confidential Information shall be treated as Confidential Information or Highly Confidential Information pursuant to this Order.  Material that is available to the public, such as advertising or promotional materials, is not Confidential Information.

2.3     Counsel (without qualifier): Outside Counsel of Record (as well as their employees and support staff).

2.4     Designated House Counsel: House Counsel (defined below) who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter. Each Party shall designate to the other Party no more than four (4) Designated House Counsel with no more than one of those four attorneys serving as Designated House Counsel for purposes of addressing solely ROSS's antitrust counterclaims, in the event those claims are not dismissed.[1]

2.5     Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".[2]

---

[1] For avoidance of doubt, any counsel designated for purposes of the antitrust counterclaims shall not have any access to documents or information designated "Highly Confidential – Attorneys Eyes Only", regardless of the substance of those documents or information, pending the Court's ruling on Plaintiffs' Motion to Dismiss ROSS's antitrust counterclaims (D.I. 28) and upon satisfaction of the disclosure requirements set forth below.

[2] For the avoidance of doubt, the provisions relating to source code in this Stipulated Protective Order shall not be construed to mean that either Party concedes the relevance of source code in this action.  Such provisions shall not prejudice a Party's ability to argue that source code should not be produced in discovery.

2.6    <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7    <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation, including an expert, consultant, or investigator, who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a current employee of a Party or of a Party's competitor, (3) at the time of retention, is not intending to become an employee of a Party or of a Party's competitor, and (4) does not have a financial interest in or a business or personal relationship with any Party.

2.8    <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>: extremely sensitive "Confidential Information or Items," including but not limited to trade secrets or other competitively sensitive business or financial information, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9    <u>"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>: extremely sensitive "Confidential Information or Items" representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.10    <u>House Counsel</u>: attorneys who serve as in house counsel to a Party. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12    Outside Counsel of Record: attorneys who are not employees of a Party but are retained to represent or advise a Party and have appeared in this action on behalf of that Party or are affiliated with a law firm that has appeared on behalf of that party.

2.13    Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.14    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16    Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," or as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or as "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.17    Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.    SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material.

However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.    DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.  Any invalidity, in whole or in part, of any provision of this Order shall not affect the validity of any other provision of this Order.

5.    DESIGNATING PROTECTED MATERIAL

5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other

portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or done in bad faith (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation.

5.2     <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated at the time the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) <u>for information in documentary form</u> (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains protected material.  If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE) to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may state on the record (before the deposition, hearing, or other proceeding is concluded) that the entire transcript be designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" subject to further review. The Designating Party shall then have thirty (30) days to identify the specific portions of the testimony as to which protection is sought and specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated

for protection within the thirty (30) days shall be covered by the provisions of this Stipulated Protective Order. The thirty (30) day period begins upon notification that the final deposition transcript is available to the Parties (regardless of whether a Party chooses to order the transcript) and ends thirty (30) days after receipt of such notification.

Where possible, Parties shall give the other parties notice if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 30-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE". If only a portion or portions of the information or item

warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3     <u>Inadvertent Failures to Designate</u>. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

## 6.     <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

6.1     <u>Timing of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2     <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge, unless the Challenging Party claims in good faith that the Designating Party has engaged in mass, indiscriminate, or routinized designations. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an

opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner. Such challenge must also be made in accordance with the Court's Scheduling Order. D.I. 41. In particular, the challenge process shall require conferring directly (in voice-to-voice dialogue—other forms of communication are not sufficient) among at least one Delaware counsel and one Lead Counsel for each Party to the dispute.

6.3    <u>Judicial Intervention</u>. If, after meeting and conferring, the Parties are unable to resolve the dispute, the Parties shall first submit to the Court a joint letter in substantially the form outlined in the Court's Discovery Dispute Procedure set forth in the Scheduling Order. D.I. 41. Until the court rules on the challenge, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation.

The burden of persuasion in any such challenge proceeding shall at all times be and remain on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions.

7.    <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

7.1    <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has

been terminated, a Receiving Party must comply with the provisions of section 14 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner[3] that ensures that access is limited to the persons authorized under this Order.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b) House Counsel and Designated House Counsel (1) to whom disclosure is reasonably necessary for this litigation, (2) who has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(1), below, have been followed;

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(2), below, have been followed;

(d) the Court and its personnel;

---

[3] It may be appropriate under certain circumstances to require the Receiving Party to store any electronic Protected Material in password-protected form.

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary after the witness has been provided with a copy of this Stipulated Protective Order, unless otherwise agreed by the Designating Party or ordered by the Court. Once the witness is provided with a copy of the Stipulated Protective Order, the witness is bound by its provisions regardless of whether the witness signs Exhibit A. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.3 **Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items**. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b) Designated House Counsel of the Receiving Party (1) who have no involvement in competitive business decision-making, (2) to whom disclosure is reasonably necessary for this

litigation, (3) who has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (4) as to whom the procedures set forth in paragraph 7.5(a)(1), below, have been followed;[4]

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(2), below, have been followed.

(d) the Court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary after the witness has been provided with a copy of this Stipulated Protective Order, unless otherwise agreed by the Designating Party or ordered by the Court. Once the witness is provided with a copy of the Stipulated Protective Order, the witness is bound by its provisions regardless of whether the witness signs Exhibit A. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

---

[4] This Order contemplates that Designated House Counsel shall not have access to any information or items designated "HIGHLY CONFIDENTIAL – SOURCE CODE."

7.4 <u>Disclosure of "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – SOURCE CODE" only to:

(a) the Receiving Party's Outside Counsel of Record, as well as employees of said Outside Counsel of Record to whom it is necessary to disclose the information for this litigation;

(b) Experts of the Receiving Party (1) to whom disclosure is necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(2), below, have been followed;

(c) the Court and its personnel;

(d) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(e) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.5 <u>Procedures for Approving or Objecting to Disclosure of "CONFIDENTIAL" Information or Items, "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items to Designated House Counsel or Experts and "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items to Experts.</u>

(a)(1) Unless otherwise ordered by the Court or agreed to in writing by the Designating Party, a Party that seeks to disclose to Designated House Counsel any information or item that has been designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to paragraph 7.3(b) first must make a written request to the Designating Party

that (1) sets forth the full name of the Designated House Counsel and the city and state of his or her residence, and (2) describes the Designated House Counsel's current and reasonably foreseeable future primary job duties and responsibilities in sufficient detail to determine if the Designated House Counsel is involved, or may become involved, in any competitive business decision-making.[5]

(a)(2) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert any information or item that has been designated "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" first must make a written request to the Designating Party that (1) sets forth the full name of the Expert and the city and state of his or her primary residence, (2) attaches a copy of the Expert's current resume, (3) identifies the Expert's current employer(s), (4) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years,[6] and (5) identifies (by name and number of the case, filing date, and location

---

[5] It may be appropriate in certain circumstances to require that any Designated House Counsel who receives "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information pursuant to this Order to disclose any relevant changes in job duties or responsibilities prior to final disposition of the litigation to allow the Designating Party to evaluate any later-arising competitive decision-making roles or responsibilities.

[6] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.[7]

(b) A Party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject Protected Material to the identified Designated House Counsel or Expert unless, within fourteen (14) days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection must meet and confer with the Designating Party to try to resolve the matter by agreement within (7) seven days of the written objection. If no agreement is reached, the Parties shall first submit to the Court a joint letter in substantially the form outlined in the Court's "Discovery Matters" Procedures. If the Court requires additional briefing, the Party seeking to make the disclosure to Designated House Counsel or the Expert, may file a motion pursuant to the Court's Discovery Dispute Procedures.

In any such proceeding, the Party opposing disclosure to Designated House Counsel or the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Designated House Counsel or Expert.

8.  SOURCE CODE

(a)  To the extent a Party seeks the production of source code in this case and such source code is produced, a Producing Party may designate source code as "HIGHLY

---

[7] It may be appropriate in certain circumstances to restrict the Expert from undertaking certain limited work prior to the termination of the litigation that could foreseeably result in an improper use of the Designating Party's "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information.

CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code.

(b)     Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information, and may be disclosed only to the individuals set forth in Paragraph 7.4.

(c)     Protected materials designated as "HIGHLY CONFIDENTIAL - SOURCE CODE" shall be made available only for an in-person inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location. The "HIGHLY CONFIDENTIAL - SOURCE CODE" shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the "HIGHLY CONFIDENTIAL - SOURCE CODE" onto any recordable media or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any "HIGHLY CONFIDENTIAL - SOURCE CODE" review, but only to ensure that there is no unauthorized recording, copying, or transmission of the HIGHLY CONFIDENTIAL - SOURCE CODE.[8]

(d)     The Receiving Party may request paper copies of no more than 25 consecutive pages and no more than 250 pages total (unless otherwise agreed in writing or

---

[8] It may be appropriate under certain circumstances to require the Receiving Party to keep a paper log indicating the names of any individuals inspecting the source code and dates and times of inspection, and the names of any individuals to whom paper copies of portions of source code are provided.

approved by the Court) of portions of "HIGHLY CONFIDENTIAL - SOURCE CODE" that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the "HIGHLY CONFIDENTIAL - SOURCE CODE" other than electronically as set forth in paragraph (c) in the first instance. The Producing Party shall provide all such "HIGHLY CONFIDENTIAL - SOURCE CODE" in paper form including bates numbers and the label "HIGHLY CONFIDENTIAL - SOURCE CODE."

(e)     The Receiving Party shall maintain a record of any individual who has inspected any portion of the "HIGHLY CONFIDENTIAL - SOURCE CODE" in electronic or paper form. The Receiving Party shall maintain all paper copies of any printed portions of the "HIGHLY CONFIDENTIAL - SOURCE CODE" in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.[9]

---

[9] The nature of the source code at issue in a particular case may warrant additional protections or restrictions. For example, it may be appropriate under certain circumstances to require the Receiving Party to provide notice to the Producing Party before including "HIGHLY CONFIDENTIAL – SOURCE CODE" information in a court filing, pleading, or expert report.

9.      PROSECUTION BAR

        Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – SOURCE CODE" information shall not be involved in the prosecution of patents or patent applications relating to artificial intelligence software and/or legal research software of any kind. For purposes of this paragraph, "prosecution" includes directly or indirectly drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.  To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination or *inter partes* reexamination). This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL –SOURCE CODE" information is first received by the affected individual and shall end two (2) years after final termination of this action.

10.     PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

        If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" "HIGHLY CONFIDENTIAL – SOURCE CODE" that Party must:

        (a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

        (b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[10]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

11.   <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a)   The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" "HIGHLY CONFIDENTIAL – SOURCE CODE". Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)   In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

---

[10] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

1. promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2. promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3. make the information requested available for inspection by the Non-Party.

(c)      If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court.[11] Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

12.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

---

[11] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

13.  INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

Information that contains privileged matter or attorney work product shall be immediately returned if such information appears on its face to have been inadvertently produced or if notice is provided to the Receiving Party within a reasonable period of time after discovering the inadvertent production.    Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.  Nothing contained within this Paragraph prevents a Party from challenging a designation pursuant to the procedures described in Paragraph 6.

14.  MISCELLANEOUS

14.1    Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

14.2    Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

14.3 Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material.  In accordance with Section G of the Administrative Procedures Governing Filing and Service by Electronic Means, all sealed documents shall be filed electronically in CM/ECF.  A redacted version of the sealed documents

shall be filed electronically within seven (7) days after the filing of the original sealed document. A Party that seeks to file under seal any Protected Material must comply with D. Del. LR 5.1.3 and this Court's Scheduling Order. Any pleading or other paper sought to be filed under seal pursuant to this Paragraph shall also bear the legend "CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER" in the caption. In the event that any Protected Material is used in this action, the Parties agree that it shall not lose its confidential status through such use, and the Parties shall take all reasonable steps to protect its confidentiality. Regardless of any provision in this Order to the contrary, a Party is not required to file a document under seal if the Confidential Information contained or reflected in the document was so designated solely by that Party.

14.4 <u>Other Proceedings.</u>  By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

15. <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected

Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and
Counterdefendants Thomson Reuters
Enterprise Center GmbH and West
Publishing Corporation*

POTTER ANDERSON & CORROON LLP

*/s/ Stephanie E. O'Byrne*

David E. Moore (#3983)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Defendant and
Counterclaimant
ROSS Intelligence, Inc.*

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
Alyssa C. Kalisky
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

Megan McKeown
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX  77002
(713) 836-3600

May 13, 2021

OF COUNSEL:

Gabriel M. Ramsey
Warrington S. Parker
Kayvan M. Ghaffari
CROWELL & MORING LLP
3 Embarcadero Center
26th Floor
San Francisco, CA 94111
(415) 986-2800

Mark A. Klapow
Joshua M. Rychlinski
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED: _____          _____
                                        Leonard P. Stark
                                        United States District Chief Judge

## EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of perjury that I have read

in its entirety and understand the Stipulated Protective Order that was issued by the United States

District Court for the District of Delaware on [date] in the case of _____ *Thomson Reuters*

*Enterprise Centre GMBH and West Publishing Corp. v. Ross Intelligence, Inc.*, C.A. No. 20-613-

LPS. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order

and I understand and acknowledge that failure to so comply could expose me to sanctions and

punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner

any information or item that is subject to this Stipulated Protective Order to any person or entity

except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for

the District of Delaware for the purpose of enforcing the terms of this Stipulated Protective Order,

even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and telephone number]

as my Delaware agent for service of process in connection with this action or any proceedings

related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____
                          [printed name]

Signature: _____
                          [signature]

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2023, I caused the foregoing to be electronically filed

with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on April 6,

2023, upon the following in the manner indicated:

David E. Moore, Esquire                    *VIA ELECTRONIC MAIL*
Bindu Palapura, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Defendant and Counterclaimant*

Mark A. Klapow, Esquire                    *VIA ELECTRONIC MAIL*
Lisa Kimmel, Esquire
Crinesha B. Berry, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC  20004
*Attorneys for Defendant and Counterclaimant*

Gabriel M. Ramsey, Esquire                    *VIA ELECTRONIC MAIL*
Jacob Canter, Esquire
Warrington Parker, Esquire
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
*Attorneys for Defendant and Counterclaimant*


                              */s/ Michael J. Flynn*
                              _____
                              Michael J. Flynn (#5333)