IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE )
CENTRE GMBH and WEST PUBLISHING )
CORPORATION, )
)
          Plaintiffs and )
          Counterdefendants, )
)
   v. )   C.A. No. 20-613 (SB)
)
ROSS INTELLIGENCE INC., )   REDACTED - PUBLIC VERSION
)
          Defendant and )
          Counterclaimant. )

**THOMSON REUTERS' OPENING BRIEF IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ON ROSS'S ANTITRUST
<u>COUNTERCLAIMS (NO. 1) – SEPARATE PRODUCTS</u>**

                                                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                                 Jack B. Blumenfeld (#1014)
                                                 Michael J. Flynn (#5333)
                                                 1201 North Market Street
                                                 P.O. Box 1347
                                                 Wilmington, DE  19899
                                                 (302) 658-9200
OF COUNSEL:                                  jblumenfeld@morrisnichols.com
                                                 mflynn@morrisnichols.com
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Cameron Ginder                                 *Attorneys for Plaintiffs and Counterdefendants*
Max A. Samels                                  *Thomson Reuters Enterprise Center GmbH and West*
KIRKLAND & ELLIS LLP                     *Publishing Corporation*
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

 Original filing date: August 31, 2023
 Redacted filing date: September 14, 2023

<u>TABLE OF CONTENTS</u>

<u>Page</u>

SUMMARY OF ARGUMENT ................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

    A.    Westlaw's Legal Research Platform ................................................................. 2

    B.    ROSS's Legal Research Platform ...................................................................... 5

    C.    ROSS's Tying Claim ......................................................................................... 7

    D.    The Lack of Evidence of Consumer Demand for Separate Products ................... 8

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT .................................................................................................................. 9

I.    ROSS Has No Evidence of Separate Consumer Demand for a Public Law
    Database and Legal Search Tool ....................................................................... 10

    A.    There Is No Record Evidence of Any Consumer Demand—Let Alone the
    Significant Demand That ROSS Must Show ...................................................... 13

    B.    ROSS Cannot Prove <u>Consumer</u> Demand by Showing <u>Competitor</u> Demand ........ 16

    C.    ROSS Has No Other Evidence That Can Satisfy the Consumer-Demand
    Test ..................................................................................................................... 17

CONCLUSION .............................................................................................................. 20

<u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994)..................................................................................9

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
537 F. Supp. 3d 273 (N.D.N.Y. 2021)..........................................................12, 15

*Avaya Inc., RP v. Telecom Labs, Inc.*,
838 F.3d 354 (3d Cir. 2016)........................................................................ *passim*

*Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
2015 WL 1969380 (D.N.J. Apr. 29, 2015) ........................................................12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992).................................................................................. *passim*

*Eastman Kodak. Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
172 F. Supp. 2d 680 (D. Md. 2000).....................................................................13

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)......................................................................................10, 18

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016)...............................................................................11

*Kenney v. Am. Bd. of Internal Med.*,
412 F. Supp. 3d 530 (E.D. Pa. 2019) .................................................................11

*Kenney v. Am. Bd. of Internal Med.*,
847 F. App'x 137 (3d Cir. 2021) ..............................................................2, 10, 20

*LiveUniverse, Inc. v. MySpace, Inc.*,
304 F. App'x 554 (9th Cir. 2008) .......................................................................10

*Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).............................................................................................9

*Multistate Legal Stud., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns,
Inc.*,
63 F.3d 1540 (10th Cir. 1995) ...........................................................................12

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999)..........................................................................12, 14

ii

*SodexoMAGIC, LLC v. Drexel Univ.*,
   24 F.4th 183 (3d Cir. 2022) ...................................................................................................8

*Tricom, Inc. v. Elec. Data Sys., Corp.*,
   1996 WL 224762 (E.D. Mich. Mar. 6, 1996) ........................................................................17

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ..............................................................................11, 15, 18, 20

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*,
   342 F.3d 191 (3d Cir. 2003) .................................................................................................10

## SUMMARY OF ARGUMENT

ROSS's tying claim is an improper attempt to deconstruct Westlaw.  ROSS claims that Westlaw, Thomson Reuters' well-known legal research platform, actually consists of two separate products:  Westlaw's collection of primary law and its legal search technology.  According to ROSS, lawyers would license Westlaw's public law database alone, acquire a legal search tool of their choice (such as ROSS's), and combine them into a legal research platform.  ROSS's problem at summary judgment is that discovery did not bear out the factual allegations on which this Court sustained ROSS's tying claim.  Though Thomson Reuters produced more than 5.8 million documents and ROSS took 17 depositions, ROSS lacks the required evidence of sufficient consumer demand from legal researchers for such a "mix-and-match" legal-research solution.  That's not surprising given that the record contains:

- ***Zero*** evidence of legal researchers licensing public law and legal search tools separately;

- ***Zero*** evidence of legal researchers ever demanding public law separately from a search tool; and

- ***Zero*** evidence of Thomson Reuters, ROSS, Lexis, or anyone else ever offering public law to legal researchers as a separate product.

To sustain its tying claim, ROSS has the burden of proving that Westlaw's integrated legal research platform is, in fact, two products in the eyes of consumers.  Specifically, ROSS must prove that there is "***sufficient consumer demand*** so that it is efficient for" Thomson Reuters to license Westlaw's collection of primary law and legal search tool "separate from" the existing integrated legal research platform.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462–63 (1992) (emphasis added).  ROSS has not met and cannot meet this burden.  As the Third Circuit has explained, "most any product can be deconstructed into component parts that could be sold separately," but not every such product is an unlawful tie.  *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016).  Because ROSS cannot prove that there is sufficient separate

consumer demand for a public law database and legal search tool, the Court should grant summary judgment to Thomson Reuters on Counts VI, VII, and VIII of ROSS's counterclaim Complaint in their entirety.  *See Kenney v. Am. Bd. of Internal Med.*, 847 F. App'x 137, 145–46 (3d Cir. 2021).[1]

## STATEMENT OF FACTS

### A.   Westlaw's Legal Research Platform

Thomson Reuters licenses Westlaw, a "legal research platform used by attorneys and legal professionals."  Ex. 16, Lindberg (Sr. Director Westlaw Product Management Team) Dep. II 24:21–24.[2]  Consumers use Westlaw to conduct legal research and find relevant cases, statutes, briefs, dockets, and other legal content, as well as access Thomson Reuters' proprietary resources.  Ex. 92, TRCC-00437310.  These proprietary resources include the West Key Number System, a granular taxonomy of legal topics; the KeyCite citation network, a sophisticated source document mapping system; Notes of Decisions, which are "brief summaries of the important cases that interpret a [statute] or regulation"; and Headnotes & Synopsis, which synthesize key points of law and secondary sources such as treatises and law review articles.  *Id.* at 310–11; Ex. 90, TRCC-00195791 at 800.  For over 125 years, Thomson Reuters has created and curated these proprietary resources to help lawyers conduct efficient and effective legal research, and ███████████ ████████████████████████████████████████████████  *Id.* Thomson Reuters also offers sophisticated practice tools such as the Practical Law research platform, a set of area-specific practice guides and precedent, and Litigation Analytics, which extracts trends and other information from docket data.  Ex. 102, TRCC-05614007; Ex. 17,

---

[1]   Each argument raised in this and Thomson Reuters' other motions for summary judgment apply equally to Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation and summary judgment on each ground should be granted to both counterdefendants.

[2]   All exhibits are attached to the Declaration of Max Samels, submitted concurrently.

Martens (TR Global Head of Product and Editorial) Dep II 36:12–18 (describing tools).

There are a "myriad [of] ways" for a legal researcher to find information on Westlaw, like navigating within the Key Number system or reviewing cases in the Notes of Decision for a statute of interest. Ex. 19, Olivier (TR U.S. Cases Editorial Manager) Dep. II 42:24–43:15; Ex. 92, TRCC-00437310 at 310. A researcher can also find relevant legal authority by searching. Beginning in 1992, Westlaw offered users the ability to search its content database using a form of artificial intelligence known as natural language searching. Ex. 6, Dahn (TR SVP and Head of Westlaw Product Management) Dep. 22:1–9. Since then, Thomson Reuters has repeatedly updated Westlaw's search offerings with more advanced artificial intelligence technology. Ex. 90, TRCC-00195791 at 809. Westlaw's search technology ██████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 16, Lindberg Dep. II 209:4–5.

Thomson Reuters offers different versions of Westlaw to fit legal researchers' needs and budgets. Westlaw Classic is the most basic version. *Id.* at 25:2–16. Westlaw Edge, launched in 2018, added features like "KeyCite overruling risk warnings" and a "QuickCheck" "document analysis tool." *Id.* ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████ *Id.* at 25:21–26:11, 57:18–58:3, 93:7–16. Finally, Westlaw Precision gives legal researchers access to even more features, including new editorial enhancements and more nuanced overruling risk. *Id.* at 35:20–36:16. Legal researchers can further customize their Westlaw licenses by limiting them to the law relevant to them, such as a Minnesota lawyer licensing a legal research platform that includes only Minnesota state and federal law. Ex. 13, Hoffman (TR Sr. Manager Commercial Strategy and Policy) Dep. II 13:14–14:1. Each of these

iterations is a legal research platform; none separate public law from search.

Thomson Reuters also offers ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  An API is a protocol that allows one online system to

communicate with another.  *See* Ex. 96, TRCC-01734423. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉ *Id.* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *Id.*

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[3] There

is no evidence that any legal researcher has ever licensed, or attempted to license, Westlaw's

electronic database of primary law (referred to as its "public law database") other than as part of

Westlaw's legal research platform.  Nor is there any evidence that Westlaw has ever sold its search

technology to customers outside of the Westlaw platform such that a researcher could use it to run

searches over another collection of public law.  Offering an integrated product allows Thomson

Reuters to license a product that is superior to the sum of its parts.  Ex. 16, Lindberg Dep. II 54:24–

55:4, 190:3–11; 191:22–192:13 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[3]   Ex. 45, Thomson Reuters' Response and Objections to ROSS's Request for Admission
No. 136▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ D.I. 225
¶ 26▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

████████████████████████████████████████████████████████████

███ TR Antitrust MSJ No. 2 – Market Definition and Market Power at 6–7.

**B.      ROSS's Legal Research Platform**

Like  Westlaw,  ROSS's  product  was  a  ██████████████████████

██████████████████████  Ex. 8, D'Angelo (ROSS Head of Growth) Dep. 13:12–22.

ROSS's  legal  research  platform  ████████████████████████████████

█████████████████  *Id.*  Founded in 2014, ROSS prided itself on its supposedly innovative

AI technology, Ex. 62, ROSS-009500822 ████████████████████████████

████████████████████████████████  and  told  investors  that  █████████████

████████████████████████████████  Ex. 3, Bond Dep. 20:13–18, 36:18–21

████████████████████████████████████████████████████████

███████████████████████████████████████████.

Despite  some  initial  success  based  on  advertising  its  AI,  ROSS  struggled  to  retain

customers who  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Ex.  71,  ROSS-010150145.  ████████████████

████████████████████████████████████████████████████████

████████  *See, e.g., id.*; Ex. 80, ROSS-023091588 at 588  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████

████████  Ex. 23, Ratliff Dep. 117:22–118:2 (████████████████████████

████████████████████████████████████████████").  While ROSS obtained some

customers  ████████████████████████████████████████████████████

█████████████████████████████████████ Ex. 71, ROSS-010150145.  ROSS discontinued its legal research platform in January 2021.  Ex. 79, ROSS-023046631.

ROSS obtained its public law database by licensing cases and other legal authority from third parties. ████████████████████████████████████████████ ████████ Ex. 59, ROSS-003504697 █████████████████████, ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████ Ex. 81, ROSS-023101050 ████████████████, Ex. 56, ROSS-003426765 █████████████████.  ROSS advertised to its investors and customers that ████ ████████████████████████████████████████Ex. 70, ROSS-009778735; Ex. 3, Bond Dep. 57:14–58:6.

Like Westlaw, ROSS only ever licensed a legal research platform to its customers.[4]  There is not a single piece of evidence suggesting that a legal researcher ever purchased or asked to purchase a freestanding collection of legal authority or a legal search tool from ROSS.  ROSS's executives █████████████████████ Ex. 8, D'Angelo Dep. 15:10–13 ████████████ ████████████████████████████████████████████; *id.* at 15:18–22 ████████████████████████████████████████████ ████████████████████).  And ROSS's Subscriber Agreement ███████████████████████ ████████████████████████████████████ Ex. 66, ROSS-009701040 at 044–045; Ex. 12, Hamilton (ROSS VP of Strategy and Operations) Dep. II 188:6–189:2.

---

[4]   ROSS's own promotional materials shows ████████████████████████████ ████████████████████████████ Ex. 52 ROSS-003375703 at 717 ████████████████████ ████████████████████████████ Ex. 21 Ovbiagele (ROSS CTO and Co-Founder) Dep. II 83:24–84:18 ████████████████████.

### C.     ROSS's Tying Claim

In 2020, Thomson Reuters sued ROSS for copyright infringement because ROSS developed its AI using Westlaw's copyrighted Headnote content.  D.I. 1.  ROSS thereafter filed these antitrust counterclaims under the Sherman Act and Delaware and California law.  D.I. 21.  ROSS pled three different theories of antitrust liability, that:  (1) Thomson Reuters unlawfully refused to deal with ROSS by not licensing to ROSS its public law database; (2) Thomson Reuters engaged in sham copyright litigation, including by bringing this copyright infringement action against ROSS; and (3) the Westlaw legal research platform constitutes unlawful "tying."  D.I. 38 at 1–4.  ROSS abandoned its refusal-to-deal theory at the motion-to-dismiss hearing, the Court dismissed ROSS's sham-litigation theory and Delaware law claim, and ROSS was permitted to proceed to discovery on its tying theory alone (Counts VI, VII, and VIII of its operative counterclaim Complaint).  D.I. 170 at 6 n.4, 11–12; D.I. 225 ¶¶ 153–75.

As relevant to its surviving tying claim, ROSS alleged that Westlaw has "monopoly power in the market for public law database products," which ROSS has specified to mean ███████ ████████████████████████████████  D.I. 225 ¶ 96; Ex. 33, Ratliff Rpt. ¶ 24.  Thomson Reuters has supposedly leveraged its superior collection of primary law to "force[]" legal researchers to "license [its] ... legal search tools" because it "has never provided consumers with an option to only license the public law database, or to only license the legal search tools."  D.I. 225 ¶¶ 104–05.  ROSS contends that there "is independent demand for ... legal search tools and public law databases" and, if consumers had the choice, some would buy Westlaw's superior public law database, combine it with ROSS's legal search tool, and build their own legal research platform.  D.I. 38 at 5.  Unlike ROSS's refusal-to-deal claim, its tying claim does ***not*** challenge Thomson Reuters' refusal to license its legal research platform or public law database to competitors like ROSS.  *See* Ex. 5, Cox Dep. II 100:6–18 (ROSS's damages expert ████████

███████████████████████████████████████████████████████████████████████.

**D.      The Lack of Evidence of Consumer Demand for Separate Products**

Over the more than two years since this Court's motion-to-dismiss decision, ROSS has had

every opportunity to adduce facts establishing separate consumer demand for a public law database

and legal search tool. Thomson Reuters alone has produced more than *5.8 million pages of*

*documents* in the antitrust case, ROSS has taken more than *17 depositions*, and ROSS introduced

around *1,200 pages of expert opinions from five different experts*. Despite these extensive efforts,

the record is clear that no consumer *ever* licensed or attempted to license a separate public law

database or search tool to conduct legal research from Westlaw,[5] ROSS,[6] or anyone else.[7]

**LEGAL STANDARD**

On a motion for summary judgment, if "the nonmoving party fails to make a showing

sufficient to establish the existence of an element essential to its case, and on which it will bear

the burden of proof at trial, then summary judgment is appropriate for the moving party."

*SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (citation and alterations

---

[5]   Ex. 45, Thomson Reuters' Response and Objections to ROSS's Request for Admission
No. 136 (admitting Thomson Reuters has ████████████████████████████████████████████
██████████████████████████████████████████████████████████ Ex. 6, Dahn
Dep. 81:20–82:2 (testifying Thomson Reuters has ███████████████████████████████████
██████████████████████████████████████████████████ Ex. 22, Post (TR
Sr. Director of Market Research & Competitive Intelligence) Dep. 29:10–24 (testifying that ██████
████████████████████████
██████████████).

[6]   Ex. 8, D'Angelo Dep. 15:10–13 (admitting that █████████████████████████████████
██████████████████████████████████ *id.* at 15:18–22 (admitting that ████████████
██████████████████████████████████████████████████ Ex. 26, van der
Heijden Dep. II 17:12–24 (ROSS's Vice President of Product unable ███████████████████
████████████████).

[7]   Ex. 5, Cox Dep. II 124:12–125:19 (ROSS expert identifying ██████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████).

omitted)).  When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  This summary judgment standard "applies with equal force in antitrust cases," and the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1001 (3d Cir. 1994) (citation omitted).

## <u>ARGUMENT</u>

At the motion-to-dismiss stage, the Court allowed ROSS's tying claim to proceed to discovery because ROSS had sufficiently alleged that "public law databases and legal search tools may be two different products" with "independent markets."  D.I. 170 at 8.  But every allegation that the Court relied on has proven to be legally irrelevant, unsupported by the facts, or both.  ROSS relied on allegations about physical "books," *id.*, but its expert admitted ██████████████ ██████████████████████████████████████████████████" Ex. 33, Ratliff Rpt. ¶ 24 (emphasis added).  ROSS invoked its own purchase of "cases from Casemaker and Fastcase," D.I. 38 at 13, but ROSS has since clarified it is ***only*** suing over a supposed tie that denied ***legal research consumers*** the right to purchase public law and search separately—not competitors like ROSS, and in any event competitor demand is legally irrelevant, Ex. 5, Cox Dep. II 100:6–18; *see infra* at 15–17.  ROSS also promised that it could prove that investors ███████████████████ ████████████████ D.I. 38 at 15–16, but ████████████████████████████████ ██████████████████████ Ex. 3, Bond Dep. 20:13–18, 36:18–21.

Most importantly, ROSS has failed to fulfill its promise to prove that "end-users like law firms" demand public law databases and legal search tools separately.  D.I. 38 at 16.  The Supreme Court's controlling test for whether two components are "separate products" looks to whether there is "sufficient consumer demand."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451,

462 (1992).  While ROSS promised it could meet this test, it has produced *zero* evidence of any consumer demand for a mix-and-match legal research solution, let alone the "sufficient consumer demand" the law requires.  *Id.*  This failure is fatal to ROSS's tying claim under federal law (Counts VI and VII), as well as ROSS's California Unfair Competition Law claim (Count VIII), as ROSS has made no attempt to establish liability under California law on any non-tying basis. *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (explaining that "a finding that the conduct is not an antitrust violation precludes a finding of unfair competition" under California law).[8]

## I.  ROSS Has No Evidence of Separate Consumer Demand for a Public Law Database and Legal Search Tool.

To bring a tying claim, a plaintiff must prove that a "pair of products or services [are] distinct, and therefore capable of being tied together." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 397 (3d Cir. 2016).  Under the Supreme Court's "consumer demand" test, two products are "distinct" only if there is "*sufficient consumer demand* so that it is efficient for a firm to provide service separately from parts." *Eastman Kodak*, 504 U.S. at 462 (emphasis added) *see also Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984).  When a plaintiff cannot show "separate demand" for the supposedly tied products, that failure is "fatal" to all possible tying claims. *Kenney*, 847 F. App'x at 145 (affirming dismissal of per se and rule of reason claims under Section 1 and 2 of the Sherman Act); *LiveUniverse*, 304 F. App'x at 557.

---

[8]   In its motion-to-dismiss order, the Court declined to reach the question of whether ROSS could state a California Unfair Competition Law claim on the basis of "copyright misuse."  D.I. 170 at 15 n.5.  ROSS has made no attempt to prove up a separate "copyright misuse" theory of antitrust liability, making this question irrelevant. Ex. 29, Cox Rpt. ¶¶ 8–13 (ROSS's damages expert not identifying copyright use as "anticompetitive conduct" at issue).  Furthermore, copyright misuse is a "defense" that a defendant can use to try to "preclude [a copyright's] enforcement during [a] period of misuse[s]," not a basis for liability. *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 204 (3d Cir. 2003) (citation omitted).

The "consumer demand test is a rough proxy for whether a tying arrangement may, on balance, be welfare-enhancing." *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001). There is always hypothetical demand for more choice, and "most any product can be deconstructed into component parts that could be sold separately." *Avaya*, 838 F.3d at 398. But "[n]ot all ties are illegal." *Id.* "Only when the efficiencies from bundling are dominated by the benefits to choice for enough consumers ... will we actually observe consumers making independent purchases." *Microsoft*, 253 F.3d at 87. The Supreme Court has eschewed asking courts to make a "difficult, uncertain, and often impossible" direct assessment of whether it is economically efficient to separate two products. Areeda & Hovenkamp, Antitrust Law ¶ 1744b ("Areeda & Hovenkamp"). Instead, it has adopted a "*market test*" that says that without evidence of sufficient customer demand to separate two goods, bundling them is economically efficient and should not be condemned by the antitrust laws. *Id*.

Thus, to determine whether a plaintiff has met its burden under the consumer-demand test, courts look to "the history of the products being, or not being, sold separately or the sale of the products separately in similar markets." *Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530, 544 (E.D. Pa. 2019) (quoting *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016)). For example, in *Eastman Kodak*, the Supreme Court held that summary judgment was not appropriate on the issue of whether printer parts and services were separate products because "[e]vidence in the record indicate[d] that service and parts **have been sold separately in the past and still are sold separately** to self-service equipment owners." 504 U.S. at 462 (emphasis added). When a plaintiff cannot produce evidence that consumers "bought the items separately" or even "requested or wanted the items separated," it has failed to meet its threshold burden under the consumer-demand test. Areeda & Hovenkamp ¶ 1743b.

In determining whether a plaintiff has shown "sufficient consumer demand," courts require a showing of "***significant*** demand for separate components"—a mere one-off sale or request is not enough. *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 15 (1st Cir. 1999) (emphasis added) (holding that there was sufficient evidence of separate consumer demand because the "record [was] pellucid" with evidence that market participants "treated warranty and equipment as separate products") (cited by *Avaya*, 838 F.3d at 402). "That some idiosyncratic buyers sufficiently prefer the items separately to support the extra costs of separate production and distribution does not mean buyers generally prefer the items combined." Areeda & Hovenkamp ¶ 1744d; *Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 2015 WL 1969380, at *4 (D.N.J. Apr. 29, 2015) (holding that allegation that a single school district wanted textbooks and textbook delivery provided by different companies did not adequately allege separate demand). Applying this standard, Areeda and Hovenkamp explain that, "if less than 20 percent of the tying item is sold unbundled in the competitive market analogue, then the items are a single product." Areeda & Hovenkamp ¶ 1744d.

When courts permit an antitrust plaintiff to proceed past summary judgment, they do so because that plaintiff has identified evidence that a great many customers purchased or took steps to purchase the products or services separately. *E.g.*, *SMS Sys.*, 188 F.3d at 15; *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273 (N.D.N.Y. 2021) (denying motion for summary judgment because there was evidence of sale of tied product on its own and customers had inquired about purchasing separately); *Multistate Legal Stud., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d 1540, 1548 (10th Cir. 1995) (holding defendant was not entitled to summary judgment because of widespread evidence of products sold separately in other markets).

A.     **There Is No Record Evidence of Any Consumer Demand—Let Alone the Significant Demand That ROSS Must Show.**

ROSS did not identify significant demand from consumers who want to purchase a public law database and legal search tool separately. *See Eastman Kodak*, 504 U.S. at 462. In fact, it has not identified a single consumer who has ever purchased or attempted to purchase a separate public law database and legal search tool. Quite the opposite, as the record shows that:

- *No consumer has ever purchased a public law database from __any__ company to combine with a legal search tool*: ROSS has not identified a single example of a lawyer, law firm, or other legal researcher purchasing these supposedly separate products and combining them to conduct legal research. Not from Westlaw, ROSS, Lawriter, Fastcase, Lexis, or anyone else.

- *No consumer has ever __sought__ to purchase a separate public law database and legal search tool*: Beyond the complete lack of actual sales, ROSS has not identified a single consumer who took steps to attempt to separately license a public law database and a legal search tool.

- *No company has ever licensed a separate public law database or legal search tool to consumers to combine into a legal research platform*: Unsurprisingly given the absence of consumer demand, ROSS has not identified a single company that has sold primary law and search tools to consumers as separate products. Even ROSS ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 12, Hamilton Dep. II 188:6–189:3.

ROSS's own experts recognized the complete lack of evidence of separate consumer demand. When asked if they could identify a single example of a consumer purchasing a public law database to combine with a legal search tool, *four different* ROSS experts failed to do so:

- **Dr. James Ratliff:** Despite being ROSS's supposed expert on consumer demand, Dr. Ratliff ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 23, Ratliff Dep. 20:14–18. Dr. Ratliff's expert report likewise identifies no such examples of consumer demand.[9]

---

[9]   Thomson Reuters has moved to exclude Dr. Ratliff's opinions on, among other things, separate demand because his opinions are based on no analysis or reliable methodology and rely entirely on his own *ipse dixit* and recitations of irrelevant evidence. *See* Motion to Exclude Dr. James Ratliff and Dr. Gillian Hadfield. Regardless of the outcome of that motion, however, Dr. Ratliff's "naked opinions" cannot save ROSS's tying claims because he identifies no evidence of consumer demand for separate products, let alone the significant demand required by *Eastman Kodak*. *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 700 n.68 (D. Md. 2000) (explaining at summary judgment an opposing party's burden is to "'set forth *specific facts*'

- **Dr. Peter Martin:** Dr. Martin, who has over forty years of experience in legal research, testified that ███████████████████████████████████████████████████ ███████████████████████████████████ Ex. 18, Martin Dep. 60:5–22.

- **Dr. Gillian Hadfield:** Dr. Hadfield testified that she could not identify ███████████████████████████████████████████████████ ███████████████████████████████ Ex. 9, Hadfield Dep. 194:4–14.

- **Dr. Alan Cox:** Dr. Cox identified Fastcase and Casemaker as companies ███████████████████████████████████████████████████ ████████████████████ Ex. 5, Cox. Dep. II 124:12–125:19.

Dr. Cox's admissions illustrate the point. ██████████████████ license collections of primary law to Westlaw competitors, such as ROSS. *See supra* at 6. Though ███████████ ███████████████ offered the supposedly tied product to competitors, ROSS has no evidence that a single *legal researcher* ever licensed or took steps to license a public law database from these companies. This record is inconsistent with ROSS's burden to show "significant" consumer demand for a separate public law database and legal search tool. *SMS Sys.*, 188 F.3d at 15.

In discovery, ROSS has tried and failed to fulfill its promise to show demand from "end users like law firms." D.I. 225 ¶ 80. ROSS's favored examples—legal researchers asking about the quality of a public law database *incorporated into a legal research platform*, and Westlaw customers choosing between *different legal research platforms*—only reinforce the complete absence of customer demand for separate public law and legal search tools.

*First*, ROSS has cited documents in which legal researchers ask where ROSS's legal research platform gets its underlying caselaw. For example, ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

---

establishing the presence of a genuine issue" and "[a]n expert's 'naked opinions' … may not suffice to defeat summary judgment" (citation omitted)).

██████████████████████████████████████████

████████████████). All these inquiries show is that consumers were in the market to acquire a legal research platform like Westlaw or ROSS and unsurprisingly cared about the quality of a component of the platform. ROSS's sole expert on consumer demand agreed that ████████████

██████████████████████████████████████████

█████████████████████████████████ Ex. 23, Ratliff Dep. 166:14–24. Even these consumers who cared about the quality of the public law expressed no interest in the mix-and-match approach that ROSS hypothesizes. *Contrast AngioDynamics*, 537 F. Supp. 3d at 310 (sufficient evidence of separate demand because "many institutions have requested to purchase" the bundled product separately).[10]

*Second*, ROSS has highlighted that consumers license versions of Westlaw with different features and scope of law. Ex. 34, Ratliff Reply Rpt. ¶¶ 240–51 (arguing ████████████

███████████████████. But ROSS cannot dispute that each of these iterations of Westlaw is a legal research platform. The mere fact that consumers may prefer to pay for a broader scope or more features in a legal research platform says nothing about whether that consumer could or would buy public law and search tools separately and combine them themselves. The fact that consumers may care about the type or quality of inputs in an integrated product does not imply that there is any demand to purchase those inputs separately. *Microsoft*, 253 F.3d at 87 (explaining that courts should not infer the existence of separate products unless it can "actually observe" consumers demanding to unbundle the products in question).

---

[10] ROSS claims that ███████████████████████████
████████████ Ex. 44, ROSS Interrogatory Resp. at 7. ROSS has identified no documents showing that these groups are legal researchers or ever attempted to purchase public law and search tools separately. To the contrary, ROSS executives ████████████
████████████ Ex. 8, D'Angelo Dep. 52:2–12.

**B.      ROSS Cannot Prove <u>Consumer</u> Demand by Showing <u>Competitor</u> Demand.**

Instead of consumer demand for a separate public law database, ROSS focuses on demand by competitors (really, itself).  ROSS's experts cite extensively to ROSS's own transactions to acquire caselaw and contend that these transactions ███████████████████████████████ ███████████████████████ Ex. 33, Ratliff Rpt. ¶¶ 46–51; *see supra* at 6 ███████████████ ██████████████████████ This argument cannot save ROSS's claim for two reasons:

*First*, competitor demand is facially irrelevant to ROSS's theory of the case.  ROSS is suing Thomson Reuters because it "has never ***provided consumers*** with an option to only license the public law database, or to only license the legal search tools."  D.I. 225 ¶ 104 (emphasis added). The theory of harm is that Thomson Reuters ███████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 29, Cox Rpt. ¶¶ 55, 69.  This theory depends on the premise that ███████████████████████████████████████████████████████████████████ *id.* at ¶ 63. That ROSS may have sought access to Westlaw's public law database has no bearing on whether a tie existed with respect to consumers.

*Second*, in all events, the antitrust laws do not permit a plaintiff to use competitor demand to prove that two component pieces of a finished product are "separate."  It is common for companies to buy components of their products, and it is just as common for companies to want to buy a competitor's superior component part.  But that does not make it likely that "any such [consumer] buyer" exists for the component part.  Areeda & Hovenkamp ¶ 1748b (explaining that "no one wants to bring their own napkins to restaurants," even if a restaurant wants to buy another's superior napkins).  Thus, absent consumer demand, the bundled good "should be deemed a single finished product" even if it is "common" for ***competitors*** to buy components separately.  *Id.*

Thomson Reuters is not aware of a single decision departing from this rule and allowing a tying plaintiff to meet its burden of proving separate "consumer demand" with evidence of competitor conduct. *Eastman Kodak*, 504 U.S. at 462. This Court should likewise follow the sensible principle that to determine "whether two items are separate products, a court must look at the products through the eyes of a customer." *Tricom*, 1996 WL 224762, at *2, 5 (declining to vacate verdict because "the jury could reasonably have found that [ ] GM was the ultimate customer" and therefore "GM's demand for the products was the only demand to examine to determine if the products were separate").

At bottom, ROSS's invocation of competitor demand shows it continues to conflate its tying claim with it abandoned refusal-to-deal theory. The "effect of imposing tie-in liability" based on competitor demand "would [ ] be to force the defendant to sell [the component] to its rival." Areeda & Hovenkamp ¶ 1748b. In a world where there is competitor demand but not consumer demand for the untied component, the only possible purchaser of the component is the competitor, making any tying remedy a de facto forced dealing between the defendant and its rivals. *Id.* ROSS has explicitly abandoned its refusal-to-deal claim, and its experts ████████████████████
████████████████████████████ Ex. 5, Cox Dep. II 100:6–18. ROSS may still want to force Thomson Reuters to deal with it, but that is not the proper purpose of a tying claim, and thus ROSS cannot use evidence of competitor demand to prove the existence of separate products.

### C.   ROSS Has No Other Evidence That Can Satisfy the Consumer-Demand Test.

Perhaps recognizing its failure to prove consumer demand, ROSS has cited to various other irrelevant evidence, such as the hypothetical technical feasibility of separating these products, West's history of publishing physical books, Thomson Reuters' other APIs, and the supposed quality of ROSS's search technology. This evidence is all irrelevant to showing consumer demand, let alone sufficient consumer demand, to purchase unbundled versions of these products.

17

*Hypothetical Technical Feasibility*:   The Supreme Court has expressly held that the separate-products inquiry does "***not***" turn "on the functional relation between" the components at issue.   *Jefferson Par.*, 466 U.S. at 19 (emphasis added).   Yet ROSS has focused much of its discovery, including an entire expert report, arguing that, ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████   Ex. 28, Branting Rpt. ¶ 17.   But mere technical "separability" does "not actually suffice to prove separate products."   Areeda & Hovenkamp ¶ 1743b; *Avaya*, 838 F.3d at 398 ("Most any product can be deconstructed into component parts that could be sold separately," but "[n]ot all [such] ties are illegal.").

*Printed Books*:   ROSS has abandoned any reliance on printed volumes as relevant evidence of separate demand.   ROSS's experts explicitly defined the supposedly tied product market as

████████████████████████████████████████████████████████████████████

██████████████████████████████   Ex. 33, Ratliff Rpt. ¶ 24; Ex. 5, Cox Dep. II 210:3–7.   Moreover, the nature of consumer demand for these books is uninformative about demand for electronically searchable collections of public law because ██████████████████████████████████████

██████████████████████   Ex. 18, Martin Dep. 67:14–17; *see also Microsoft*, 253 F.3d at 89 (cautioning against applying the consumer-demand test to condemn "new functionality previously provided by standalone products").

*Thomson Reuters' Existing APIs*:   Thomson Reuters' existing APIs likewise cannot make up for ROSS's complete lack of consumer-demand evidence.   *First*, ROSS cannot show that any of these APIs are for products at all similar to the expansive public law database at issue in this lawsuit.   Take, for example, the Practical Law API.   Any economic demand for these succinct practice guides says nothing about whether a law firm would want freestanding access to the entire

collection of primary law available on Westlaw.  *See* Ex. 102, TRCC-05614007 ██████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████.  At minimum,

ROSS  has  failed  to  prove  that  the  demand  for  these  two  types  of  information  would  bear  any

resemblance to one another, and the record evidence indicates the exact opposite.  Ex. 96, TRCC-

01734423 ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████.

     *Second*, ROSS's reliance on APIs is misplaced because they are not separate public law

databases.  Instead, they are just another method that customers use to access Thomson Reuters'

***platforms***.  Returning again to the Practical Law example, the undisputed evidence establishes that

Westlaw's  Practical  Law  API  does  ***not***  provide  any  content  without  a  search  tool.   Rather,  it

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████  *Id*.  Thus, ████████████████████████████

██████████████████  *Id.* (emphasis added).  The Practical Law API is pointedly ***not*** an example of

a legal researcher taking source documents from one company and combining it with search tools

from another.  Rather, it is yet another example reinforcing that consumers demand legal research

platforms and only legal research platforms.

     ***Quality of ROSS's Search Tool***:  Finally, ROSS argues that the ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████  Ex. 44, ROSS Interrogatory Resp. at 6.  But the

*Jefferson Parish* consumer-demand test sought to avoid exactly this type of direct "inquiry into

possible welfare consequences" or "efficiencies" of bundling. *Microsoft*, 253 F.3d at 87. The point of the consumer-demand test is that it permits courts to presume that if a significant number of consumers have not sought to unbundle the products at issue, then the value from separating products must not be great enough to create separate consumer demand. *Id.*; Areeda & Hovenkamp ¶ 1745c ("[N]either *Jefferson Parish* nor *Kodak* inquired directly into the actual costs or quality of offering the items bundled.").

ROSS, like any other competitor bringing a tying claim, protests ███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ *See, e.g.*, Ex. 44, ROSS Interrogatory Resp. at 6; Ex. 29, Cox Rpt. ¶¶ 42–47. ROSS's argument is unsupportable because there is ample evidence that ROSS's search technology did not deliver value to its customers,[11] that the costs of integrating a public law database and search tool vastly exceed any benefits,[12] and that investors chose ROSS because they (incorrectly) believed it could create a legal platform to compete with Westlaw, not a separate legal search tool.[13] But more fundamentally, these assessments of quality are irrelevant to the consumer-demand test as the Supreme Court has applied it. *See Eastman Kodak*, 504 U.S. at 462.

## CONCLUSION

ROSS cannot adduce evidence that a public law database and legal search tool are separate products under the consumer-demand test, as required to prevail on its tying claims. The Court should thus grant summary judgment on Counts VI, VII, and VIII. *Kenney*, 847 F. App'x at 145.

---

[11]  *See supra* at 5–6.

[12]  *See* Ex. 35, Syverson (TR Expert) Rpt. ¶¶ 48–59 (discussing efficiencies).

[13]  Ex. 3, Bond Dep. 20:13–18, 36:18–21 (ROSS investor testifying that he ███████████ █████████████████████████.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and Counterdefendants*
*Thomson Reuters Enterprise Center GmbH and West*
*Publishing Corporation*

OF COUNSEL:

Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Cameron Ginder
Max A. Samels
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

August 31, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, I caused the foregoing to be electronically filed

with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

August 31, 2023, upon the following in the manner indicated:

David E. Moore, Esquire                                  *VIA ELECTRONIC MAIL*
Bindu Palapura, Esquire
Andrew L. Brown, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Defendant and Counterclaimant*

Mark A. Klapow, Esquire                                 *VIA ELECTRONIC MAIL*
Lisa Kimmel, Esquire
Crinesha B. Berry, Esquire
Matthew J. McBurney, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC  20004
*Attorneys for Defendant and Counterclaimant*

Gabriel M. Ramsey, Esquire                              *VIA ELECTRONIC MAIL*
Jacob Canter, Esquire
Warrington Parker, Esquire
Margaux Poueymirou, Esquire
Anna Z. Saber, Esquire
Beatrice B. Nguyen, Esquire
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
*Attorneys for Defendant and Counterclaimant*

Shira Liu, Esquire
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614
*Attorneys for Defendant and Counterclaimant*

*VIA ELECTRONIC MAIL*

*/s/ Michael J. Flynn*

_____

Michael J. Flynn (#5333)