# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE     )
CENTRE GMBH and WEST PUBLISHING    )
CORPORATION,     )
    )   C.A. No. 20-613-SB
      Plaintiffs/Counterdefendants,     )
    )   **JURY TRIAL DEMANDED**
     v.     )
    )   **PUBLIC VERSION**
ROSS INTELLIGENCE INC.,     )
    )
     Defendant/Counterclaimant.     )

## ROSS INTELLIGENCE, INC.'S OPPOSITION TO COUNTERDEFENDANTS' MOTION TO EXCLUDE DR. ALAN COX AND MOTION FOR SUMMARY JUDGMENT ON ROSS'S ANTITRUST COUNTERCLAIMS (NO. 5) – *COMCAST*

OF COUNSEL:

Gabriel M. Ramsey
Warrington S. Parker III
Beatrice B. Nguyen
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Matthew J. McBurney
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant
ROSS Intelligence, Inc.*

Dated: September 28, 2023
Public Version Dated: October 12, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENTS ......................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

    A.    ROSS's Antitrust Counterclaims ............................................................ 3

    B.    Dr. Cox's Damages Analysis ................................................................. 4

    C.    ROSS's Fair Use Defense ...................................................................... 8

ARGUMENT ....................................................................................................................... 9

    A.    Dr. Cox Proffers a Reliable and Relevant Damages Analysis Using Scientifically Sound and Court-Approved Methodologies. .................................. 9

    B.    Dr. Cox's Damages Analysis "Fits" ROSS's Unlawful Tying Claim. ............... 10

    C.    Dr. Cox's Damages Analysis Does Not Mistakenly Fail to Account for Westlaw's Headnotes and Key Number System, Because They Are Unnecessary to Train ROSS's AI Search Technology. ..................................... 14

    D.    Because Dr. Cox Has Presented a Reliable and Relevant Damages Analysis that "Fits" ROSS's Unlawful-Tying Liability Theory, Counterdefendants' Motion for Summary Judgment Necessarily Fails. .............. 16

CONCLUSION ................................................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Actiq Sales & Mktg. Practices Litig.*,
  2014 WL 3572932 (E.D. Pa. July 21, 2014)..........................................................................14

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
  350 F.3d 316 (3d Cir. 2003)..................................................................................................9

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
  2022 WL 2753636 (D. Del. June 30, 2022)..........................................................................17

*Coleman Motor Co. v. Chrysler Corp.*,
  525 F.2d 1338 (3d Cir. 1975)...............................................................................................17

*Comcast v. Behrend*,
  569 U.S. 27 (2013)......................................................................................................... *passim*

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ..............................................................................................17

*In re Flonase Antitrust Litig.*,
  284 F.R.D. 207 (E.D. Pa. 2012)............................................................................................10

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) (en banc)..................................................................................10

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
  708 F.2d 1081 (7th Cir. 1983) ..............................................................................................17

*In re Niaspan Antitrust Litig.*,
  397 F. Supp. 3d 668 (E.D. Pa. 2019) ...............................................................................13, 14

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ...........................................................................12

*Shire Viropharma Inc. v. CSL Behring LLC*,
  2021 WL 1227097 (D. Del. Mar. 31, 2021) .........................................................................17

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020)..................................................................................................13

*Utesch v. Lannett Co.*,
  2021 WL 3560949 (E.D. Pa. Aug. 12, 2021), *aff'd sub nom. Univ. of Puerto
  Rico Ret. Sys. v. Lannett Co.*, 2023 WL 2985120 (3d Cir. Apr. 18, 2023)............................13

*Walker v. Gordon*,
   46 F. App'x 691 (3d Cir. 2002) ...............................................................................................17

**Other Authorities**

Federal Rules of Evidence Rule 702...............................................................................................9

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation (collectively, "Counterdefendants") do not challenge Dr. Alan Cox's credentials as an expert in antitrust cases or the underlying methodologies that he employs to determine Counterclaimant ROSS Intelligence, Inc. ("ROSS")'s antitrust damages in this case.  Nor can they.  Dr. Cox is a respected economist with years of expert experience.[1]  He used trusted methodologies to determine the extent to which ROSS has been harmed by Counterdefendants' anticompetitive conduct: use of their monopoly and substantial market power to perpetuate an unlawful tie of Westlaw's public law database to Westlaw's search tools.  Counterdefendants' own expert agrees that the methodologies used by Dr. Cox are valid and appropriate means to calculate damages; he himself has used these very same methodologies in his own practice.

Unable to attack Dr. Cox's qualifications, experience, or underlying methodologies, Counterdefendants instead resort to: (1) trying to convince this Court to inappropriately expand application of the Supreme Court's decision in *Comcast v. Behrend*, 569 U.S. 27 (2013) to this case; and (2) presenting a false narrative that ROSS needed Westlaw's editorial enhancements—specifically its headnotes and key number system—in order to train its artificial intelligence ("AI")-based legal search tool.  Neither is an appropriate basis to exclude Dr. Cox's opinions or, by extension, to grant summary judgment on ROSS's counterclaims.

*Comcast*, a case addressing the "predominance" requirement for class certification and a situation where a damages analysis based on four separate theories of liability collapsed when the court subsequently rejected three of those theories after the expert report was issued, does not

---

[1] A copy of Dr. Cox's resume is attached to his expert report as Appendix B.  (*See* McBurney Decl., Ex. 1 (Cox Report), App. B.)

apply to the circumstances here, where there is a *single* antitrust plaintiff and a *single* theory of liability at issue.  At most, *Comcast* reiterates the core notion that an antitrust plaintiff's damages analysis must match its theory of liability, and that is precisely what Dr. Cox has done in this case.  He has presented a damages analysis focused on the extent to which ROSS was harmed by the unlawful tie perpetuated by Counterdefendants, the only theory of liability remaining in connection with ROSS's antitrust counterclaims.

And, contrary to Counterdefendants' suggestion, Dr. Cox did not somehow neglect to consider ROSS's alleged need for Westlaw's headnotes and key number system to train its AI search technology.  As explained in the copyright case, ROSS could not use those editorial enhancements to train its technology.  ROSS needed the language of the judicial opinions, not the headnotes.  And ROSS was not organizing the cases by some key number system, so that too was of no use to ROSS.  Finally, as explained in the antitrust case, Dr. Cox does not envision a but-for world (*i.e.*, one free from Counterdefendants' unlawful tie) where the headnotes and key number system would be part of a Westlaw public law database unbundled from Westlaw's legal search tools.

For these reasons and those more fully explained below, ROSS respectfully requests that the Court reject Counterdefendants' Motion to Exclude Dr. Alan Cox and Motion for Summary Judgment on ROSS's Antitrust Counterclaims (No. 5) – *Comcast* (the "Motion") in its entirety.

## STATEMENT OF FACTS

### A.    ROSS's Antitrust Counterclaims

ROSS's pending antitrust counterclaims are premised on a theory of liability that Counterdefendants engaged in an unlawful tie.[2]  Specifically, ROSS alleges harm on account of Counterdefendants' use of their monopoly and/or substantial market power to prohibit consumers (*i.e.*, legal researchers) from licensing Westlaw's comprehensive, current, and citable database of U.S. "public law" without also licensing one of Westlaw's legal search tools.  (D.I. 225 (ROSS's 2d Am. Counterclaims) ¶¶ 101, 102, 107.)  The result is that consumers are foreclosed from being able to freely choose to pair an alternative legal search tool (such as the AI-powered search tool offered by ROSS) to the comprehensive public law database offered by Westlaw.

Specifically, ROSS alleges that Counterdefendants



. (McBurney Decl., Ex. 2 (Ratliff Report) ¶ 16.)  Counterdefendants

(McBurney Decl., Ex. 2 (Ratliff Report) ¶¶ 16, 74; *id.*, Ex. 3 (Hoffman Dep. Tr.) at 15:4–15.)  Counterdefendants also

(McBurney Decl., Ex. 2 (Ratliff Report) ¶ 74; *see also id.*, Ex. 4 (Westlaw Terms and Conditions) § 3.c, https://legal.thomsonreuters.com/content/dam/ewp-

_____

[2] This is the sole antitrust theory of liability at issue in this case, and it is the only one that ROSS is presently pursuing.  ROSS's sham-litigation and refusal-to-deal theories of liability were dismissed previously at the motion-to-dismiss phase of this case.

m/documents/legal/en/pdf/terms-and-agreements/commercial-agreements/general-terms-and-conditions-final.pdf.)

By "tying" Westlaw's public law database to its legal search tools in this manner, Counterdefendants ███████████████████████████████████████████████ ████████████████████████████████████. (McBurney Decl., Ex. 2 (Ratliff Report) ¶¶ 259, 261.)  If not for Counterdefendants' ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████. (*See id.* ¶ 261.)  Counterdefendants would, of course, ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ (*See id.*)  Put another way, Counterdefendants' anticompetitive conduct curbs consumer choice and consumer demand for alternative search technologies, which, in turn, harms innovation.

**B.**    **Dr. Cox's Damages Analysis**

ROSS retained Dr. Cox to evaluate the extent to which ROSS has been harmed by the unlawful tie described above.  To do so, Dr. Cox first ██████████████████████████ ██████████████████████████. (McBurney Decl., Ex. 1 (Cox Report) ¶¶ 37–78, 80–82.)  He determined that, without the anticompetitive conduct at issue, ████████████████████ ████████████████████████████████████████████████████ ████████████ (*Id.* ¶ 15(a).)  Dr. Cox then sought to measure the amount, if any, ROSS was damaged.  (*Id.* ¶¶ 79–105.)



(*Id.* ¶ 80 (internal footnote omitted).)  To calculate ROSS's damages, Dr. Cox employed two

widely used damages methodologies: ███████████████████████████████████

(*See id*. ¶¶ 81, 82.)

Using ██████████████ Dr. Cox measured ROSS's ██████████████

████████████████████. (*See id*. ¶¶ 87–98.)  Specifically, he focused on

companies that, like ROSS, ███████████████████████████████

███████████████████████████████████

████████████████████. (*See id*. ¶¶ 87–89.)  He then ████████████

███████████████████████████████

███████████████████████ (*See id*. ¶¶ 90, 91.)  In

order to account for ██████████████████████████

██████ (*See id*. ¶¶ 92–97.)  He further applied ████████████████

███████████████████████████████████. (*See id*.

¶¶ 83–86, 98.)

Using ██████████████, Dr. Cox also measured ROSS's ████████████

████████████████. (*Id.* ¶¶ 99–104.)  Based on ████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████

██████████████ (*Id.* ¶¶ 32, 100–02.)  Dr. Cox then ████████████



████. (*Id.* ¶¶ 102–04.)

(*Id.* ¶ 105.)  Counterdefendants do not challenge the propriety of using either one of these underlying methodologies to calculate damages.  Their own expert, Mihran Yenikomshian, █████████ (McBurney Decl., Ex. 5 (Yenikomshian Dep. Tr.) at 135:16–138:11.)

Dr. Cox is clear that █████████ and that it is in no way premised on ROSS's previously dismissed sham-litigation or refusal-to-deal antitrust theories of liability:

- █████████ (McBurney Decl., Ex. 1 (Cox Report) ¶ 10.)

- █████████ (*Id.* ¶ 53.)

- █████████ (*Id.* ¶ 60.)

- █████████ (*Id.* § VIII(A) (cleaned up).)

- █████████ (McBurney Decl., Ex. 7 (Cox Reply Report) ¶ 4.)

Dr. Cox also makes clear that █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████:

████████████████████████████████████████████

█████

████████████████████████████████████████

██████████████████████

██████████████████████████████

██████████████████████████

██████████████████████████

(McBurney Decl., Ex. 6 (Cox Dep. Tr.) at 87:21–88:13.)

Finally, Dr. Cox makes █████████████████████████

████████████████████████████████████████████

████   With respect to ███████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

(*See* McBurney Decl., Ex. 7 (Cox Reply Report) ¶ 42 ████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████

Likewise, Counterdefendants' █████████████████████

█████████████████████████████████████████████████████



. (*See* McBurney Decl., Ex. 6 (Cox Dep. Tr.) at 94:4–9 █████████

████████████████████████████████████████████████

███████████████████████████████ 95:1–3 █████████████

████████████████████████████████████████

## C.    **ROSS's Fair Use Defense**

Counterdefendants' copyright lawsuit alleges that a third-party vendor hired by ROSS, LegalEase Solutions, LLC ("LegalEase"), used Westlaw's headnotes and key number system in preparing question and answer memoranda incorporating quotes from judicial opinions that were used to train ROSS's AI legal search technology.  In response, ROSS has asserted a "fair use" defense under the Copyright Act.  (*See* D.I. 272 (ROSS's Opening Br. Mot. Summ. J. Affirmative Defense of Fair Use).)

As explained in that lawsuit, neither the memoranda prepared by LegalEase nor the metadata used in those memoranda included Westlaw key numbers or any tangible representation of the key number system.  (*See* Declaration of Jimoh Ovbiagele in support of ROSS's Motion for Summary Judgment on Its Affirmative Defense of Fair Use, D.I. 278 ("Ovbiagele Decl."), ¶ 22); *see also* McBurney Decl., Ex. 8 (Cahn Dep. Tr.) at 125:7–12; *id.*, Ex. 9 (Frederiksen-Cross Dep. Tr.) at 343:6–21, 345:5–18.)  And ROSS ████████████

███████████████████████████████████████████████████

███████████████████████████████████████ (*See, e.g.*, McBurney Decl., Ex. 10 (Best Practices Guide for ROSS Intelligence) at TR-0045734 (stating ███████

███████████████████████████████████████); *id.*, Ex. 8 (Cahn Dep. Tr.) at 60:8–18, 61:21–62:21 (███████████████████████████████████

-8-



"); *see also id.*, Ex. 11 (Hafeez Dep. Tr.) at 78:1–17.)

This is because ███████████████████████████████████████████ ██████████████████████████████████. (*See* D.I. 278 (Ovbiagele Decl.) ¶ 4 ███████████████████████████████████████████ ████████████████████████████████ In fact, the use of such editorial enhancements would ████████████████████████. (*See id.* ¶ 21 ████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████).)  As ROSS's co-founder, Jimoh Ovbiagele, explained, ROSS ████ ███████████████████████████████████ (*See* McBurney

Decl., Ex. 12 (Ovbiagele Dep. Tr. I) at 82:6–83:1.)

## ARGUMENT

**A.** **Dr. Cox Proffers a Reliable and Relevant Damages Analysis Using Scientifically Sound and Court-Approved Methodologies.**

There are three requirements for the admissibility of expert testimony pursuant to Rule 702 of the Federal Rules of Evidence: "qualification, reliability and fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). "Qualification" requires "that the witness possess specialized expertise." *Id.* "Reliability" requires that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id.* "Fit" requires that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.'" *Id.* Dr. Cox's damages analysis meets all three of these requirements.

Counterdefendants do not challenge Dr. Cox's qualifications.  Nor can they, as Dr. Cox is a seasoned economist with years of expert experience in calculating antitrust damages.  Similarly, Counterdefendants do not challenge the reliability of the underlying methodologies employed by Dr. Cox—███████████████████—to calculate ROSS's damages.  Nor can they, as both are commonly accepted ways of measuring damages in antitrust cases,[3] and both have been used by Counterdefendants' expert, Mihran Yenikomshian, in his own practice.  (*See* McBurney Decl., Ex. 5 (Yenikomshian Dep. Tr.) 135:16–138:11.)

Finally, Dr. Cox's damages analysis addresses a core question at issue in this case: whether and to what extent ROSS was injured by Counterdefendants' unlawful tie.  (*See supra* at 4–8.)  His analysis is, therefore, relevant to the purposes of the case and will undoubtedly assist the jury in determining whether ROSS is able to meet the injury and damages elements of its antitrust counterclaims based on Counterdefendants' unlawful tie.

**B.**     **Dr. Cox's Damages Analysis "Fits" ROSS's Unlawful Tying Claim.**

Unable to challenge Dr. Cox's qualifications and methodologies, Counterdefendants resort to trying to persuade this Court that: (1) Dr. Cox has somehow incorporated ROSS's previously dismissed sham-litigation and refusal-to-deal antitrust theories of liability in his

---

[3] *See generally LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003) (en banc) (In denying defendant's challenge to a jury award, the Third Circuit noted: "Importantly, [the defendant] does not challenge [the plaintiff expert's] basic approach to calculating damages, conceding that 'an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities.'"); *see also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 232 (E.D. Pa. 2012) ("The before-and-after 'yardstick' methodology has been accepted by courts as a means to measuring damages in both indirect and direct purchaser antitrust actions.").

damages analysis, but has failed to account for their effects[4] and (2) as a result, the Court must expand application of the Supreme Court's decision in *Comcast* to this case.

As an initial matter, Dr. Cox does not incorporate the previously dismissed sham-litigation and refusal-to-deal antitrust theories of liability into his analysis.  (*See supra* Statement of Facts.)  Therefore, he could not have failed to account for the effects of those theories of liability.  This itself undermines Counterdefendants' second argument—that *Comcast* applies.  But there are other reasons that *Comcast* has no place here.

First, *Comcast* involved a different procedural posture with a different procedural question that had to be addressed.  The issue was whether the "predominance" requirement for class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure can be satisfied when a damages model that is supposed to demonstrate "commonality of damages" is incapable of distinguishing among different theories of liability, some of which were subsequently deemed to be incapable of class-wide proof.  *See Comcast*, 569 U.S. at 30, 37.  A driving factor in the *Comcast* Court's decision was that different class plaintiffs' damages were premised on different liability theories, and the class expert's damages model was incapable of accounting for those differences.  *See id*. at 37–38.  Unlike in *Comcast*, this case does not ask whether common questions of law or fact predominate among class members.  Rather, it asks whether a single antitrust plaintiff (ROSS) was harmed by a single course of anticompetitive conduct (Counterdefendants' unlawful tie).

---

[4] In their Motion, Counterdefendants seem to oscillate between whether or not Dr. Cox incorporated these theories of liability in his damages analysis.  In one breath, they cite to the portion of his report reciting the general antitrust allegations contained in ROSS's counterclaims and state "[t]o be sure, he identified the copyright litigation as 'anticompetitive conduct.'"  Mot. at 13.  But, in another breath, they state that "Dr. Cox chose not to account for the copyright lawsuit in either of his analyses."  *Id*. at 7.

Second, even if one were to assume that *Comcast* applied outside of the class-certification context, that case involved a very different scenario than the one presented here.[5]  In *Comcast*, the class plaintiffs pursued four different liability theories and submitted an expert model that calculated damages based on all four.  *See id.* at 31–32.  At class certification—and well after the class plaintiffs' damages model had been developed and submitted—the district court rejected three of the four liability theories on the grounds that they were not capable of class-wide proof.  *See id.* at 31.  This resulted in a mismatch between the class plaintiffs' damages model and their sole remaining theory of liability.  (*See id.* at 36–37.)  The Supreme Court concluded that both the district court and Third Circuit improperly granted class certification under the specific circumstances.  *See id.* at 38.

Here, ROSS is pursuing only one theory of liability stemming from Counterdefendants' unlawful tie of Westlaw's public law database to Westlaw's legal search tools.  Dr. Cox's damages analysis, which was submitted well after the Court provided clarity about whether ROSS's sham-litigation and refusal-to-deal theories of liability would move forward, only focuses on the impact of the unlawful tie.  As a result, Dr. Cox's analysis is specifically tailored to ROSS's remaining theory of liability.  This is in stark contrast to the expert report submitted in *Comcast*, which addressed *four divergent theories of liability* (three of which were subsequently

---

[5] The other case on which Counterdefendants heavily rely—*In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017)—also involves a very different situation than the one presented here.  In that case, the class plaintiffs' damages expert openly admitted that he "did not seek to understand the nature of the conspiracies alleged by the [p]laintiffs" and "did not attempt to connect his findings to any particular claim or attempt to attribute what portion of damages he measured to [the plaintiffs'] two theories [of liability]."  *See id.* at *20.  There are no similar allegations that Dr. Cox engaged in such wanton disregard of the liability theory at issue in this case.

rejected) and which was submitted *prior* to a court decision about which claims would remain in the case.

As a result of this difference, Counterdefendants are left claiming that, what is essentially the opposite of what occurred in *Comcast*, should be required here:  That Dr. Cox's damages analysis must affirmatively account for ROSS's previously dismissed liability theories (*i.e.*, its sham-litigation and refusal-to-deal claims) or else be deemed invalid.[6]  In so arguing, Counterdefendants try to side-step the core holding of *Comcast* that "any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'"  *Id*. at 35; *see also In re Niaspan Antitrust Litig.*, 397 F. Supp. 3d 668, 688 (E.D. Pa. 2019) ("*Comcast*'s critical lesson is that the damages model must 'translate the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.'").  As discussed above, that is precisely what Dr. Cox provides in this case—a damages model consistent with ROSS's sole theory of liability.

Courts in the Third Circuit have consistently rejected application of *Comcast* where, as here, there is only one theory of liability at issue.  *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 271 n.11 (3d Cir. 2020) ("This case is unlike *Comcast* because there is only one theory of antitrust injury, and that theory corresponds to a theory of liability."); *Utesch v. Lannett Co.*, 2021 WL 3560949, at *13 (E.D. Pa. Aug. 12, 2021) ("*Comcast* is 'inapposite' here because the numerical mismatch between damages model

---

[6] Counterdefendants also claim that Dr. Cox's damages analysis fails to disaggregate between "unlawful" and "lawful" conduct.  *See* Mot. at 11.  However, as explained at length above, his damages analysis is based only on unlawful conduct; it is not premised on conduct that Counterdefendants allege to be lawful.  In reality, Counterdefendants appear to be raising a causation issue (*i.e.*, whether their unlawful tie or some other factor caused ROSS's damages) under the guise of a "disaggregation" argument, because they know that causation is for the jury to decide and is not proper or appropriate for summary judgment.

(one model) and liability theory (four theories) at issue in that case is not present here."), *aff'd sub nom. Univ. of Puerto Rico Ret. Sys. v. Lannett Co.*, 2023 WL 2985120, at *13 (3d Cir. Apr. 18, 2023) (holding that, because "the numerical mismatch of liability theories to damages theories present in *Comcast* is not present here," "[t]he District Court correctly concluded that *Comcast* did not prevent class certification on that basis"); *see also Niaspan*, 397 F. Supp. 3d at 688–89 (ruling that defendants' reliance on *Comcast* is "unpersuasive," because "the jury will be presented with a single liability theory"); *In re Actiq Sales & Mktg. Practices Litig.*, 2014 WL 3572932, at *17 (E.D. Pa. July 21, 2014) ("Here, unlike in *Comcast*, Plaintiffs assert only one theory of liability and [the plaintiffs' expert's] damages calculation is based solely on that theory . . . .").

For these reasons, the Court should reject Counterdefendants' challenge to Dr. Cox's damages analysis based on *Comcast*.

## C.   Dr. Cox's Damages Analysis Does Not Mistakenly Fail to Account for Westlaw's Headnotes and Key Number System, Because They Are Unnecessary to Train ROSS's AI Search Technology.

Counterdefendants also attempt to undermine Dr. Cox's damages analysis by resorting to a false narrative about ROSS's alleged need for Westlaw's headnotes and key number system to train its AI legal search technology. They claim that this would result in their filing a copyright lawsuit in the but-for world. But Counterdefendants' claim is based on a twisted and misleading recitation of Dr. Cox's deposition testimony in this case.

Specifically, Counterdefendants cobble together Dr. Cox's answers to disparate deposition questions about (1) Counterdefendants' allegations in the copyright case about how ROSS initially trained its AI technology, (2) ROSS's needing to train its AI technology in the but-for world, and (3) Counterdefendants' being likely to continue to try to protect what they view as copyrighted materials in the but-for world. Then, using this cobbled-together patchwork

of disparate answers from Dr. Cox, they make the unsupported leap that it is "undisputed" that Counterdefendants would have brought the copyright case in Dr. Cox's but-for world (Mot. at 1–2) and that, "[a]ccordingly, there was no excuse for Dr. Cox to fail to disaggregate the effect of [Counterdefendants'] copyright suit on ROSS" (*id.* at 2).[7]

However, Dr. Cox has made it explicitly clear why there would be no copyright case in the but-for world: 

(McBurney Decl., Ex. 1 (Cox Report) ¶ 42.)  Indeed, the but-for world envisioned by Dr. Cox does not even anticipate that the headnotes or key number system would be included in the separate Westlaw public law database offered to consumers.  (*See* McBurney Decl., Ex. 6 (Cox Dep. Tr.) at 87:21–88:13 (when asked what the public law database would include, Dr. Cox testified that

).)

Dr. Cox's vision of the but-for world aligns with the facts.

.  (*See* D.I. 278 (Ovbiagele Decl.) ¶¶ 4, 22.)  As ROSS's co-founder and Chief Technology Officer, Jimoh Ovbiagele, testified, the company

.  (*See* McBurney Decl., Ex. 12 (Ovbiagele Dep. Tr. I) at 82:6–83:1; *see also* D.I. 278 (Ovbiagele Decl.)

---

[7] Counterdefendants' claim that Dr. Cox has a "fundamental misunderstanding of the copyright lawsuit" (Mot. at 8) is especially disingenuous in light of the fact that Dr. Cox is also serving as an expert on fair use in that case.

¶ 21.)  This is precisely why ROSS ███████████████████████████████

██████████████████████████████████████████████████████████.

(*See, e.g.*, McBurney Decl., Ex. 10 (Best Practices Guide for ROSS Intelligence) at TR-0045734

(stating ████████████████████████████████████████; *see*

*also id.*, Ex. 8 (Cahn Dep. Tr.) at 60:8–18, 62:21–63:21 (████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████").).)

For these reasons, the Court should reject Counterdefendants' challenge to Dr. Cox's

damages analysis based on their unsupported claim that ROSS needs the Westlaw headnotes and

the key number system to train its AI technology.

**D.**      **Because Dr. Cox Has Presented a Reliable and Relevant Damages Analysis that "Fits" ROSS's Unlawful-Tying Liability Theory, Counterdefendants' Motion for Summary Judgment Necessarily Fails.**

Counterdefendants' request for summary judgment rises or falls on whether their *Daubert*

challenge to Dr. Cox's damages analysis is successful.[8]  As explained above, Dr. Cox's analysis

is based on court-approved and accepted methodologies and corresponds to ROSS's sole theory

of liability in this case—that Counterdefendants have used their monopoly and/or substantial

market power to unlawfully tie access to Westlaw's comprehensive, current, and citable public

law database to the use of one of Westlaw's legal search tools.  As a result, Dr. Cox's analysis is

---

[8] In an effort to try to save their summary judgment motion in the event that the Court rejects their *Daubert* challenge to Dr. Cox's damages analysis, Counterdefendants baldly state—without any support or further explanation—that "whether or not Dr. Cox is formally excluded under *Daubert*, his analysis is incapable of proving antitrust injury (whether ROSS was harmed *at all* by the alleged tie) or damages—and ROSS cannot meet essential elements of its claim." Mot. at 17.  However, if Dr. Cox is permitted to testify about harm and damages incurred by ROSS, then it is hard to imagine how ROSS could be deemed to have failed to present any evidence to the jury on essential elements of its counterclaims, as Counterdefendants assert.

relevant and reliable and goes directly to whether ROSS can satisfy the antitrust injury and damages elements of its counterclaims.  Because Counterdefendants' *Daubert* challenge to Dr. Cox fails, their request for summary judgment necessarily does too.

Additionally, as Counterdefendants' challenge to Dr. Cox's testimony centers on what inputs he did and did not incorporate into his damages analysis, it inherently implicates questions of fact that should be put to the jury.  *See Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 2022 WL 2753636, at *3 (D. Del. June 30, 2022) (ruling that a "'battle of the experts' . . . is not amenable to summary judgment" and denying summary judgment motion as a result (cleaned up)); *see also Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) ("Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury."); *Shire Viropharma Inc. v. CSL Behring LLC*, 2021 WL 1227097, at *8 (D. Del. Mar. 31, 2021) ("[C]onflicting opinions on the propriety of [an expert's] analysis bear not on the reliability of his analysis, but rather on the correctness of his opinion").

Indeed, the Third Circuit case that Counterdefendants highlight as being "instructive" with respect to their summary judgment request—*Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975)—only underlines that this Court should permit Dr. Cox to testify before the jury.  *Coleman* involves a wholistic review of a jury verdict to determine whether it was based on sufficient evidence, <u>not</u> pre-trial summary adjudication of an antitrust claim.[9]  (*Id.* at

---

[9] Likewise, the two cases from outside of the Third Circuit cited by Counterdefendants in a footnote—*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) and *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)—both involved situations were expert testimony was put before a jury.

-17-

1341.)  The issue of damages here should be left to trial, where the parties can present their evidence, and the jury can decide.

<u>**CONCLUSION**</u>

For the foregoing reasons, ROSS respectfully requests that the Court reject Counterdefendants' Motion in its entirety.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  /s/ David E. Moore
    David E. Moore (#3983)

Gabriel M. Ramsey
    Bindu A. Palapura (#5370)
Warrington S. Parker III
    Andrew L. Brown (#6766)
Beatrice B. Nguyen
    Hercules Plaza, 6th Floor
Joachim B. Steinberg
    1313 N. Market Street
Jacob Canter
    Wilmington, DE  19801
CROWELL & MORING LLP
    Tel:  (302) 984-6000
3 Embarcadero Ctr., 26th Floor
    dmoore@potteranderson.com
San Francisco, CA 94111
    bpalapura@potteranderson.com
Tel: (415) 986-2800
    abrown@potteranderson.com

Matthew J. McBurney
Crinesha B. Berry
*Attorneys for Defendant/Counterclaimant*
CROWELL & MORING LLP
*ROSS Intelligence, Inc.*
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated:  September 28, 2023
11078612
Public Version Dated: October 12, 2023

-18-