**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | |
| | ) | C.A. No. 20-613-SB |
| Plaintiffs/Counterdefendants, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| | ) | **PUBLIC VERSION** |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant/Counterclaimant. | ) | |

**ROSS INTELLIGENCE, INC.'S OPPOSITION TO COUNTERDEFENDANTS' MOTION (NO. 6) TO EXCLUDE DR. JAMES RATLIFF AND DR. GILLIAN HADFIELD**

OF COUNSEL:
Gabriel M. Ramsey
Warrington S. Parker III
Beatrice B. Nguyen
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Matthew J. McBurney
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated:  September 28, 2023
Public Version Dated: October 12, 2023

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

## TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENTS ..........................................................1

FACTUAL BACKGROUND .........................................................................................................2

    A.    Dr. Hadfield's Qualifications and Assignment ....................................................2

    B.    Dr. Ratliff's Qualifications and Assignment .......................................................3

ARGUMENT ....................................................................................................................................4

    A.    Drs. Hadfield and Ratliff Have Good Grounds for Their Opinions Relating
        to the "Comprehensiveness" of Westlaw's Public Law Database. .......................4

    B.    Dr. Ratliff's Opinions Relating to Market Power Are Premised on Robust
        Economic Analyses. ..............................................................................................8

    C.    Dr. Ratliff's Opinions Relating to "Consumer Demand" Are Supported by
        a Reliable Economic Methodology. .....................................................................12

    D.    Drs. Hadfield's and Ratliff's Opinions Relating to Westlaw's Search
        Technology "Falling Behind" or "Dawdling" Are Supported by Reliable
        Methodologies Applied to the Facts of This Case. ..............................................15

CONCLUSION ...............................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Regents Univ. of Texas Sys. v. Bos. Sci. Corp., - F. Supp. 3d,*
2022 WL 17584180 (D. Del. Dec. 12, 2022)...........................................................................13

*Bresler v. Wilmington Tr. Co.,*
855 F.3d 178 (4th Cir. 2017) .................................................................................................17

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962).................................................................................................................9

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
350 F.3d 316 (3d Cir. 2003).....................................................................................................4

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)...........................................................................................................4, 17

*Fed. Trade Comm'n v. Abbvie Inc,*
976 F.3d 327 (3d Cir. 2020).....................................................................................................9

*Inline Connection Corp. v. AOL Time Warner Inc.,*
472 F. Supp. 2d 604 (D. Del. 2007).........................................................................................4

*M.A.P. Oil Co., Inc. v. Texaco Inc.,*
691 F. 2d 1303 (9th Cir. 1982) ...........................................................................................9, 10

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
124 F.3d 430 (3d Cir. 1997).....................................................................................................9

*Shire Viropharma Inc. v. CSL Behring LLC,*
2021 WL 1227097 (D. Del. Mar. 31, 2021) ............................................................................4

*United States v. Crews,*
494 F. App'x 240 (3d Cir. 2012) .......................................................................................4, 15

*United States v. Mitchell,*
365 F.3d 215 (3d Cir. 2004)...................................................................................................17

**Other Authorities**

Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law ........................................................13

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Dr. Gillian Hadfield is an established economist with a focus on how law and economics intersect in relation to legal technology and markets.  Dr. James Ratliff is an established economist with a focus on how firms compete within industries.  Applying their relevant training, expertise, and experience to the facts of this case, both have provided expert opinions on behalf of ROSS Intelligence, Inc. ("ROSS") on issues that fall squarely within the purview of their specialized skill sets.  These include opinions relating to: (1) ████████████ ████████████████ (both experts); (2) whether Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation (collectively, "Counterdefendants") possess ████ ████ (Dr. Ratliff only); (3) whether there is ██████████████████ ████ (Dr. Ratliff only); and (4) whether ████████████████████ ████████████████████ (both experts).

Because Counterdefendants are unable to attack Drs. Hadfield's and Ratliff's opinions on legitimate grounds, they have resorted to strawmen and twisted descriptions of the analyses that these experts employed in coming to the challenged opinions.  Counterdefendants want this Court to rule that experts need to follow rigid formulas for reaching conclusions, but the law does not require this.  There is no one-size-fits-all framework for providing an expert opinion, and experts are afforded wide latitude in how they reach their conclusions.  As long as experts base their opinions on reliable methodologies (*i.e.*, they have good grounds for those opinions), courts allow the opinions to be presented to the jury to assist it in reaching its ultimate conclusions.

As discussed in detail below, this is precisely what Drs. Hadfield and Ratliff have done here:  Both have formulated opinions relating to the four issues listed above based on reliable

methodologies that incorporate their expertise and apply it to the unique facts of this case.  As a result, both have good grounds for the conclusions they have reached.

For these reasons and those more fully explained below, ROSS respectfully requests that this Court deny Counterdefendants' Motion (No. 6) to Exclude Dr. James Ratliff and Dr. Gillian Hadfield (the "Motion") in its entirety.

## FACTUAL BACKGROUND

### A.    Dr. Hadfield's Qualifications and Assignment

Dr. Hadfield is an economist with expertise in artificial intelligence ("AI") used in legal technology and the intersection of law and economics as it relates to legal technology and legal markets.[1]  (*See generally* McBurney Decl., Ex. 13 (Hadfield Report) ¶¶ 1–15; *see also* McBurney Decl., Ex. 14 (Hadfield Dep. Tr.) at 16:15–17:1.)  She is the Schwartz Reisman Chair in Technology and Society and Professor of Law at the University of Toronto.  (McBurney Decl., Ex. 13 (Hadfield Report) ¶ 1.)  She also holds a Canadian Institute for Advanced Research ("CIFAR") AI Chair at the Vector Institute for Artificial Intelligence and is a Faculty Affiliate at the University of California Berkley Center for Human Compatible Artificial Intelligence.  (*Id.*)  Since 2018, she has been the Senior Policy Advisor for OpenAI.  (*Id.* ¶ 3.[2])  Additionally, Dr. Hadfield has both formally and informally advised a number of technology startups in the legal and AI spaces.  (*Id.* ¶ 5.)

---

[1] A copy of Dr. Hadfield's resume is attached to her expert report as Exhibit A. (McBurney Decl., Ex. 13 (Hadfield Report), Ex. A.)

[2] Dr. Hadfield also has served in a number of other AI-related roles, such as the Canadian AI Advisory Council, Cooperative AI Foundation, Chair of the Programmatic Steering Board of the Hague Institute for the Innovation of Law, World Economic Forum's Global Agenda Council on Justice, the Global Future Council on Technology, Values and Policy, the Global Future Council on Agile Governance, the Legal Advisory Council for LegalZoom, and the Policy Advisory Board of Responsive Law.  (McBurney Decl., Ex. 13 (Hadfield Report) ¶ 4.)

ROSS retained Dr. Hadfield to opine on "how attorneys use legal research, West's role in publishing of the public law in the United States, and how artificial intelligence has impacted legal technology." (*Id.* ¶ 18.)   In connection with that assignment, she has offered a number of opinions, only two of which are challenged by Counterdefendants: (1) that ████████████████████ ████████████████████████████████████; and (2) that ██████████████ ██████████████████████████

In reaching these opinions, Dr. Hadfield ██████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████

### B.    Dr. Ratliff's Qualifications and Assignment

Dr. Ratliff is a respected economist and antitrust expert specializing in industrial organization, a field in economics that focuses specifically on how firms compete within industries.[3] (McBurney Decl., Ex. 2 (Ratliff Report) ¶ 3.)  He has conducted numerous antitrust analyses for more than two decades, including in many matters involving defining relevant markets, assessing market power, and addressing claims of unlawful ties.  (*Id.* ¶ 6.)

ROSS retained Dr. Ratliff to opine on "market definition, market power, and effects on competition related to Westlaw's licensing practices and their effect on consumers' welfare and abilities to access and search U.S. public law." (*Id.* ¶ 10 (footnote omitted).)  In connection with that assignment, he offered a number of opinions, only four of which are challenged by Counterdefendants: (1) that ████████████████████████████████████ ██████████████████; (2) that Counterdefendants ████████████████ (3) that there is

---

[3] A copy of Dr. Ratliff's resume is attached to his expert report as Attachment A. (McBurney Decl., Ex. 2 (Ratliff Report), Attach. A.)

████████████████████████████████████████████; and (4) that Westlaw's ████████

████████████████████████████████████████████████

In reaching these opinions, Dr. Ratliff applied his knowledge, education, and experience as an economist and specialist in industrial organization and antitrust to industry materials and the record evidence in this case.

## ARGUMENT

Counterdefendants challenge the "reliability" of the methodologies employed by Drs. Hadfield and Ratliff in coming to their opinions. "Reliability" in the *Daubert* context requires that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). In calling for the exclusion of Drs. Hadfield's and Ratliff's testimony, Counterdefendants, however, ignore that "an expert is permitted wide latitude to offer opinions." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993); *see also Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 613 (D. Del. 2007) (same); *Shire Viropharma Inc. v. CSL Behring LLC*, 2021 WL 1227097, at *10 (D. Del. Mar. 31, 2021) (same). Additionally, they disregard that "experts can testify based on background and experience" and that "expert opinion need not be based on objective or scientific data." *United States v. Crews*, 494 F. App'x 240, 247 (3d Cir. 2012). For the reasons explained below, Drs. Hadfield's and Ratliff's opinions are supported by reliable methodologies and, therefore, rest on good grounds.

### A.    Drs. Hadfield and Ratliff Have Good Grounds for Their Opinions Relating to the "Comprehensiveness" of Westlaw's Public Law Database.

Counterdefendants' argument that Drs. Hadfield and Ratliff have "no methodology" for

████████████████████████████████████████████████████████ is based on a false

premise that their opinions are based on the total number of cases contained in that database.
Specifically, Counterdefendants disingenuously chastise Drs. Hadfield and Ratliff for not having:
(1) conducted a one-to-one comparison of the case law collections found on Westlaw and other
legal research databases; (2) identified a case found on the Westlaw database that is not also
publicly available; and (3) disputed a claim made by Lexis that its database contains a greater
number of cases than the Westlaw database.  However, neither Dr. Hadfield nor Dr. Ratliff base

██████████████████████████████ on the number of cases in the Westlaw database.  Rather,
both identify and analyze an amalgamation of factors that lead them to conclude that Westlaw's
public law database should be considered "comprehensive."  Counterdefendants simply ignore
these other factors and, instead, resort to trying to reframe this issue as a pure numbers game.  In
turn, the Court should reject Counterdefendants' request for exclusion.



**Dr. Hadfield**.  As Dr. Hadfield explains, ████████████████████████

████████████████████████████████████████████

█████████████████████████████ (McBurney Decl., Ex. 13 (Hadfield
Report) ¶ 33; *see also id.*, Ex. 14 (Hadfield Dep. Tr.) at 61:15–62:19 (discussing the various
factors that contribute ████████████████ 51:19–52:2 (explaining that ████████████

████████████████████████████████████████████

████).)

In her expert report, Dr. Hadfield goes to great lengths—citing record evidence, industry
background, and testimony—to explain her analysis and conclusions as to why each of these
additional factors make Westlaw's ████████████████████████

- Completeness: ████████████████████████████████
████████████████████████████████████████
████████████████████████

██████████████████████████████████. (McBurney Decl., Ex. 13 (Hadfield Report) ¶¶ 34, 53–55, 62, 63.)

- **Accuracy:** ██████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████ (*Id.* ¶¶ 46, 47, nn.41, 42.)

- **Citability:** ████████████████████████████████████
████████████████████ (*Id.* § IV.F, ¶¶ 38–43.)

- **Timeliness:** ██████████████████████████████████
███████████████████████████ (*Id.* ¶ 45, nn.35, 36.)

Counterdefendants make no mention of these other factors in their Motion, let alone address how

they impact Dr. Hadfield's opinions relating to ████████████████████

██████████

Further, Counterdefendants' claim that ████████████████████

████████████████████████████████████████████████ is

undercut by the fact that she includes an entire section in her report dedicated to explaining the

████████████████████████████████████████

█████████████████████████. Specifically, Dr. Hadfield opines: ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████ (*Id.* § IV.E, ¶¶ 69–77.)  Throughout this section, Dr. Hadfield

relies on both her expertise as an economist, as well as her own publications, to examine these

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████.  (*See id.*)  Again, Counterdefendants make no mention of Dr.

Hadfield's economic analysis in their Motion.

**Dr. Ratliff**.  Contrary to what Counterdefendants claim, Dr. Ratliff never once states that

Westlaw has ██████████████████████████.  Rather, he explains that, █████

█████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████  (McBurney Decl., Ex. 2 (Ratliff Report) § V.C.)  Specifically, Dr. Ratliff opines:

███████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████  (*Id.* ¶ 75.)

Dr. Ratliff's assessment of ████████████████████████████████

████████████████████████  (McBurney Decl., Ex. 15 (Ratliff Dep. Tr.)

at 56:14-57:6.)  Rather, like that of Dr. Hadfield, his opinion is based on a number of factors,

such as ████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████.  (*See* McBurney Decl., Ex. 2, Ratliff Report

¶ 17.)  Indeed, Dr. Ratliff takes steps to analyze each of these factors and explain how they result

in ████████████████████ that contributes to making ██████████████

██████████████████  (*Id.* § V.C.)  Additionally, he explains in detail how

Counterdefendants' █████████████████████████████████████

███████████████████████████████████████████████████ (*See id.* ¶¶ 62, 76, 77, 79, 80,

91, 138.[4])

On account of the above, both Drs. Hadfield's and Ratliff's opinions relating to the

██████████████████████████████████████████ rest on reliable methodologies.

Therefore, the Court should deny Counterdefendants' request for their exclusion.

**B.     Dr. Ratliff's Opinions Relating to Market Power Are Premised on Robust Economic Analyses.**

Counterdefendants' challenge to Dr. Ratliff's opinions relating to ████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

Because Dr. Ratliff's opinions on both of these issues are premised on reliable economic analysis

tailored to the facts of this case, Counterdefendants' requests for exclusion necessarily fail.

**Relevant Market.**  With respect to defining relevant markets, Dr. Ratliff's opinions are

based on ████████████████████████ He concludes that, ██████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

(*See id.* ¶¶ 100, 113–15, 122, 123.[5])  In so concluding, Dr. Ratliff cites to substantial evidence

---

[4] Counterdefendants simply dismiss these documents as mere external ████████████
████████████████████████ (*See, e.g.*, McBurney Decl., Ex. 16 (TRCC-03568132).)
Tellingly, when Counterdefendants make statements about the breadth of their case law
collection, they are mere ██████████████ but when Lexis makes similar statements, they
are ███████████████████████████████████████████████████████████████

[5] Counterdefendants' expert, Dr. Chad Syverson, who was retained to address Dr.
Ratliff's opinions, ██████████████████████████████████████████████████
████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ (*See id.* ¶¶ 61–63, 71–73, 76,

77, 79–86, 134.)

    Counterdefendants make much of the fact that Dr. Ratliff ████████████████

██████████████████████████████████████████████████████

█████████████████████ However, despite what Counterdefendants imply, the case law

makes clear that relevant market determinations can be based <u>either</u> on interchangeability of use

<u>or</u> cross-elasticity of demand:  "The outer boundaries of a product market are determined by the

reasonable interchangeability of use <u>or</u> the cross-elasticity of demand between the product itself

and substitutes for it."  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)

(emphasis added); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.

1997) (same); *see also Fed. Trade Comm'n v. Abbvie Inc*, 976 F.3d 327, 373 (3d Cir. 2020)

(rejecting the defendant's argument that the district court's market definition should be

overturned where the FTC's economist "'presented no cross-elasticity study to support' the

market the Court defined.").  Both analyses are not required, as Counterdefendants suggest.

    As discussed above, Dr. Ratliff ████████████████████████████████

███ ████████████████████████████████████████████████████████

---

[6] The Ninth Circuit provides a good synopsis of the relationship between reasonable interchangeability and cross-elasticity of demand in *M.A.P. Oil Co., Inc. v. Texaco Inc.*, 691 F. 2d 1303 (9th Cir. 1982):

> Market definition can be broadly characterized in terms of the "cross-elasticity of demand" for or "reasonable interchangeability" of a given set of products or services.  "If the product and its substitutes are reasonably interchangeable by consumers for the same purposes, or if they have a high cross-elasticity of demand in the trade, they will be included in the same market."  Reasonable interchangeability emphasizes the economic factors of use and physical characteristics, while cross-elasticity stresses price.

██████████████████████████████.  In particular, to analyze "cross-elasticity of demand" here, one would need to ask to what other products Westlaw customers would switch if Westlaw raised the price of standalone access to its public law collection.  There are two problems with this question.  First, because of Counterdefendants' unlawful tie, an actual price for access to a Westlaw standalone public law collection does not exist to use in this analysis.  Therefore, there can be no data analysis that exploits variations in that price in order to determine cross-price elasticities.  Second, an analysis of cross-elasticity of demand is valid only when the products at issue are sold at competitive prices.  When one provider—like Counterdefendants here—has market power (or monopoly power), the cross-price elasticity with respect to other products may be high, but not because those other products are close substitutes, but rather just because the provider is already exercising market power.

**Market Power.**  Dr. Ratliff also employs a reliable methodology that is grounded in economics to formulate his opinions ████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████.[7]  (McBurney Decl., Ex. 2 (Ratliff Report) ¶¶ 152–74, 193–97.) In coming to his conclusion, Dr. Ratliff also examines other indicia of market power, such as (1) Counterdefendants' ability to ███████████████████████████████ ██████ (2) Counterdefendants' ability ████████████████████████, and (3) the fact that Counterdefendants are ███████████████████████.  (*See id.* ¶¶ 148–51, 198–208.)  Further, Dr. Ratliff goes to great lengths to examine and explain how the

*Id.* at 1306 (internal citations omitted).

[7] Counterdefendants criticize Dr. Ratliff for using the legal research platform market as a proxy, but they ignore the fact that this is the closest—and only—comparison on account of their unlawful tie.



(*id.* ¶¶ 76–147) and how this results in ▇▇▇▇▇▇▇▇▇▇ (*id.* ¶¶ 19, 104, § VI.A).

Additionally, contrary to what Counterdefendants claim, Dr. Ratliff does ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ For example, in Table 1 of his expert report, ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇ (*Id.*, Tbl. 1.[8]) The ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[9] (*See, e.g.*, *id.* ¶¶ 47–49, 86, 112, 219, 220.)

On account of the above, Dr. Ratliff's opinions relating to Counterdefendants' ▇▇▇▇ ▇▇▇ rest on reliable methodologies, and, therefore, the Court should reject Counterdefendants' request for their exclusion.

---

[8] This table is based on a slide produced by Counterdefendants entitled ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ (McBurney Decl., Ex. 17 (TRCC-02670399) at 410.)

[9] Also, as a matter of antitrust-economics logic, product-market definition has nothing to do with who the participants are in that market. Rather, product-market definition focuses on the characteristics of products that are in the relevant market. In fact, it is not even possible to ask the question of who the participants are in the relevant market until the market is actually defined. Identifying the participants comes after the relevant market is defined. That is a necessary first step for computing market shares as a means to assess market power. (*See, e.g.*, McBurney Decl., Ex. 18 (Horizontal Merger Guidelines) § 4 ("[M]arket definition allows the Agencies to identify market participants and measure market shares and market concentration.").)

### C.   Dr. Ratliff's Opinions Relating to "Consumer Demand" Are Supported by a Reliable Economic Methodology.

Counterdefendants' claim that Dr. Ratliff lacks "any methodology whatsoever" to be able to opine on ███████████████ is based on a series of strawmen and ignores the robust analysis that Dr. Ratliff conducted in support of his opinions.  Thus, the Court should reject Counterdefendants' request that these opinions be excluded.

The first strawman employed by Counterdefendants is a claim that, without surveying legal researchers or interviewing law firm personnel, it is not possible for Dr. Ratliff to have a reliable opinion with respect to consumer demand.  However, as Counterdefendants' own experts agree, ████████████████████████████████████████████████ ████████████████████ (*See, e.g.*, McBurney Decl., Ex. 19 (Syverson Dep. Tr.) at 114:8–13; *see also id.*, Ex. 5 (Yenikomshian Dep. Tr.) at 63:24–64:25.)

In fact, one of Counterdefendants' experts, Dr. Chad Syverson, testified that ██████ ███████████████████████████████████████████████████████████ ███████████████████████████ (McBurney Decl., Ex. 19 (Syverson Dep. Tr.) at 68:9–69:3, 70:1–7.)  When asked what expertise and experience allowed him to draw the opinion, he testified:



(*Id.* at 69:9–24.)  Counterdefendants fail to explain why such steps are appropriate for their expert to take in order to provide an opinion on "consumer demand," but not Dr. Ratliff.

The second strawman employed by Counterdefendants is a claim that, unless Dr. Ratliff points to specific instances of legal researchers asking for a public law database separate and apart from a legal search tool in the real world, it is impossible for him to have any opinion on what consumer demand would look like in a but-for world where Counterdefendants' unlawful tie does not exist.  In essence, Counterdefendants ask this Court to create a standard where, if an unlawful tie is so successful that consumers cannot conceive of the tied products being sold separately or believe that they are not permitted to ask for the tied products to be sold separately, then the unlawful tie can never be challenged.  But, such a standard would "perversely immunize the worst-case scenario of a successful tie by which a monopolist successfully leverages a monopoly in the tying product into a monopoly in the tied product."  (*See* McBurney Decl., Ex. 20 (Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (5th ed. 2020)) ¶ 1745d1.)

Counterdefendants present these two strawmen to try to distract attention away from the fact that Dr. Ratliff has good grounds for his opinions relating to consumer demand based on (1) his training as an economist, (2) his expertise in antitrust and industrial organization, and (3) the available information in this case.  *See generally Bd. of Regents Univ. of Texas Sys. v. Bos. Sci. Corp.*, - F. Supp. 3d -, 2022 WL 17584180, at *5 (D. Del. Dec. 12, 2022) ("An expert may offer opinions based on personal experience if the expert also explains how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (cleaned up).)

Specifically, Dr. Ratliff first observes the ███████████████████████████
████████████████████████.  (McBurney Decl., Ex. 2 (Ratliff Report) ¶¶ 36–45).  Dr.
Ratliff then observes that, ████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████



(McBurney Decl., Ex. 21 (Ratliff Reply Report) ¶ 15.)  In this way, Dr. Ratliff ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████  (*Id.* ¶ 239.)

On account of the above, Dr. Ratliff's opinions relating to "consumer demand" rest on
reliable methodologies and, therefore, the Court should deny Counterdefendants' request for
their exclusion.

**D.    Drs. Hadfield's and Ratliff's Opinions Relating to Westlaw's Search Technology "Falling Behind" or "Dawdling" Are Supported by Reliable Methodologies Applied to the Facts of This Case.**

Counterdefendants' claim that neither Dr. Hadfield nor Dr. Ratliff use a reliable

methodology to come to their conclusions that ███████████████████████████

█████████████████████████████████████████████ again ignores the

scope and breadth of the analyses that Drs. Hadfield and Ratliff conducted based on their

relevant expertise.  Therefore, the Court should reject Counterdefendants' request for exclusion.

**Dr. Hadfield.**  In attacking Dr. Hadfield's opinions relating to ████████████

████████████████ Counterdefendants ignore "that experts can testify based on

background and experience and that expert opinion need not be based on objective or scientific

data." *Crews*, 494 F. App'x at 247.  Dr. Hadfield is a renowned expert in AI used in legal

technology.  As such, her experience and knowledge about technologies used in legal research

make her uniquely situated to opine on ████████████████████████████████

████████████████████████████████████████. (*See* McBurney

Decl., Ex. 13 (Hadfield Report) ¶¶ 1–15.)

In her report, Dr. Hadfield discusses in detail the history and development of many of

these technologies, including ███████ (*id.* ¶¶ 96–98), ██████████ (*id.* ¶¶ 103–05),

and █████████ (*id.* ¶¶ 96–98).  This analysis forms the foundation of her opinions

that the ████████████████████████████████████████████

████████████████████████████████████. (*Id.* § V, ¶¶ 95–108.)  As

Dr. Hadfield demonstrates in her report, these opinions are supported by a robust collection of

documents and testimony that speak directly to Counterdefendants' ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ (*Id.* ¶¶ 135, 138, 139, n.219, 141, n.222,

142.)[10]

Contrary to what Counterdefendants claim, Dr. Hadfield also has taken steps to compare

███████████████████████████████████████████ Notably, in her discussion of

██████████████████████████████ Dr. Hadfield discusses the release of ████████████

█████████████████████████████████████████████ (*Id.*

¶¶ 137, 145–48.) This discussion proved to be especially prescient as, subsequent to Dr.

Hadfield's serving her expert report, Counterdefendants acquired Casetext for $650 million in a

direct effort to close their technological gap by "accelerat[ing] and expand[ing] [their] market

potential for [generative AI] offerings."[11]

**Dr. Ratliff.**  Dr. Ratliff's opinion that █████████████████████████████

████████████████ is just one factor in his larger analysis of how Counterdefendants' unlawful

tie insulated Counterdefendants from competitive pressures in the legal search tool market and

how legal researchers were deprived of greater and faster innovation as a result.  (*See* McBurney

Decl., Ex. 2 (Ratliff Report) § VII.) Like Dr. Hadfield, in forming his opinions, Dr. Ratliff relied

on the robust collection of documents and testimony demonstrating that Counterdefendants

---

[10] For example, Dr. Hadfield points to a Counterdefendant document from 2023 stating:
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████ (McBurney Decl., Ex. 22 (TRCC-00195919).)  She also highlights
a Counterdefendant memorandum from 2020 ██████████████████████████████████
████████████████████████████████ (McBurney Decl., Ex. 23
(TRCC-01319339) at 50.)

[11] *See* McBurney Decl., Ex. 24, *Thomson Reuters to Acquire Legal AI Firm Casetext for $650 Million*, Reuters (June 27, 2023, 10:59 AM PDT), https://www.reuters.com/markets/deals/thomson-reuters-acquire-legal-tech-provider-casetext-650-mln-2023-06-27/.

-16-

viewed their own technology as being behind that of others on account of a failure to invest in search modernization. (*Id.* ¶¶ 209–18.)[12] He further analyzed additional record evidence and industry studies evaluating and comparing other search technologies, as well as consumer statements about ███████████████████████████████████ (*Id.* ¶¶ 219–29.)[13] Additionally, Dr. Ratliff took steps to identify and assess █████████ ████████████████████████████████████████████ ██████████████████ (*Id.* ¶¶ 66–68, nn.42–45.)

On account of the above, both Dr. Hadfield's opinion that ████████████████ █████████████████████████████████████████ rest on reliable methodologies and, therefore, Counterdefendants' request for their exclusion is without merit.

## CONCLUSION

For the foregoing reasons, ROSS respectfully requests that the Court deny Counterdefendant's Motion in its entirety.

---

[12] For example, Dr. Ratliff notes a Counterdefendant slide deck from 2022 stating that ████████████████████████████████████████ ████████████████ (McBurney Decl., Ex. 25 (TRCC-01020239) at 240.)

[13] Counterdefendants' claim that the evidence on which Dr. Ratliff has relied is "not even facially related to the quality of Westlaw's search technology" goes to the weight of the evidence. *See United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) ("*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct."); *see also Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) ("'[Q]uestions regarding the factual underpinnings of the [expert witness's] opinion affect the weight and credibility' of the [witness's] assessment, 'not its admissibility.'").

OF COUNSEL:

Gabriel M. Ramsey
Warrington S. Parker III
Beatrice B. Nguyen
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Matthew J. McBurney
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated:  September 28, 2023
11078600
Public Version Dated: October 12, 2023

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*                              
     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Andrew L. Brown (#6766)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com
     abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant
ROSS Intelligence, Inc.*