**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THOMSON REUTERS ENTERPRISE )
CENTRE GMBH and WEST PUBLISHING )
CORPORATION, )
)  C.A. No. 20-613-SB
       Plaintiffs/Counterdefendants, )
)  **JURY TRIAL DEMANDED**
   v. )
)   **PUBLIC VERSION**
ROSS INTELLIGENCE INC., )
)
       Defendant/Counterclaimant. )

**ROSS INTELLIGENCE, INC.'S OPPOSITION TO COUNTERDEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON ROSS'S ANTITRUST
COUNTERCLAIMS (NO. 2) –
<u>MARKET DEFINITION AND MARKET POWER</u>**

OF COUNSEL:

Gabriel M. Ramsey
Warrington S. Parker III
Beatrice B. Nguyen
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Matthew J. McBurney
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant
ROSS Intelligence, Inc.*

Dated:  September 28, 2023
 Public Version Dated: October 12, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENTS ........................................................... 1

ARGUMENT ...................................................................................................................... 3

    I.    Substantial Evidence Supports a Relevant Tying Product Market of Electronically Searchable Collections of U.S. Public Law .................................... 3

        A.    Dr. Ratliff's Tying Product Market of Electronically Searchable Collections of Public Law Is Properly Defined. ......................................... 4

        B.    Counterdefendants' Challenges to Dr. Ratliff's Product Market Definition Are Unavailing. ........................................................................ 7

    II.    Substantial Evidence Demonstrates that Counterdefendants Have Monopoly Power in the Relevant Market. .............................................................. 9

        A.    ROSS Has Direct Evidence of Counterdefendants' Monopoly Power. ....................................................................................................... 10

        B.    ROSS Has Circumstantial Evidence of Counterdefendants' Monopoly Power ...................................................................................... 13

        C.    Counterdefendants' Efforts to Rebuff Their Market Power Fail. ............ 17

    III.    ROSS Has Offered Substantial Evidence of Anticompetitive Effects in the Legal Search Tools Market Under the Rule of Reason. ..................................... 19

CONCLUSION ................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen-Myland, Inc. v. IBM Corp.*,
33 F.3d 194 (3d Cir. 1994)..............................................................3, 4, 13, 14

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)...................................................................................17

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007)...............................................................4, 9, 10, 14

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...............................................................................2, 3, 4, 5

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .................................................................................9

*Fineman v. Armstrong World Indus., Inc.*,
980 F.2d 171 (3d Cir. 1992).................................................................. *passim*

*FTC v. AbbVie Inc*,
976 F.3d 327 (3d Cir. 2020)..................................................................................8

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) ...............................................................................20

*FTC v. Penn State Hersey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016)..................................................................................4

*In re Hypodermic Prods. Antitrust Litig.*,
2007 WL 1959225 (D.N.J. June 27, 2007) .............................................................4

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006)..............................................................................................3

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)................................................................................................3

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
302 F.3d 1207 (11th Cir. 2002) .....................................................................17, 18

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) ...........................................................................20

*New Mexico Oncology v. Presbyterian Healthcare Servs.*,
  418 F. Supp. 3d 826 (D.N.M. 2019) ...................................................................18

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004)..................................................................8

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  562 F. Supp. 2d 392 (E.D.N.Y. 2008) .................................................................13

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  940 F. Supp. 2d 367 (E.D. La. 2013)...................................................................14

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) ...............................................................................12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)...................................................................................4

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
  899 F.2d 951 (10th Cir. 1990) ...............................................................................9

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
  959 F.2d 468 (3d Cir. 1992) (en banc)...................................................3, 4, 19, 20

*Tunis Bros. Co. v. Ford Motor Co.*,
  952 F.2d 715 (3d Cir. 1991)...................................................................................8

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)....................................................................... *passim*

*United States v. Microsoft*,
  253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) ........................................................10

## Other Authorities

Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law  ....................................9, 17

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Counterdefendants, and their legal research platform Westlaw, are long-entrenched hegemons in the relevant product markets for (1) electronically searchable collections of U.S. public law—the tying product in this case—and (2) tools to search and analyze legal data—the tied product.[1]  They dominate these markets to such a substantial degree that, in their employee's own words: ███████████████████████████████ (Declaration of Beatrice B. Nguyen in Support of ROSS Intelligence, Inc.'s Oppositions to Counterdefendants' Motions for Summary Judgment Nos. 1–4 ("Nguyen Decl."), Ex. CCC (TRCC-01052125) at -125.)

Under bedrock principles of antitrust law, this constitutes monopoly power.  As the Third Circuit and others have held, where a firm "sets prices with little concern for its competitors [that is] 'something a firm without monopoly power [is] unable to do.'"  *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005).  Counterdefendants have historically charged ███ ███████████████████████████████████.  (Nguyen Decl., Ex. DDD (TRCC_01506384) at -384.)  And Westlaw's remaining competitors are mostly inconsequential, far-off blips on the radar.

Despite this and other evidence, Counterdefendants move for summary judgment on the basis that ROSS can neither prove a relevant tying product market nor prove that Counterdefendants have market power.  Counterdefendants' effort to remove these issues from the jury fails—on both the facts and the law—for at least the following two reasons.

First, relevant market definition is a "highly factual" question that is "best allocated to the trier of fact."  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992).  And

---

[1] In this brief, the term "Counterdefendants" refers collectively to Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation. The term "ROSS" refers to Defendant and Counterclaimant ROSS Intelligence, Inc.

here it should be.  A relevant market is "determined by the reasonable interchangeability of use *or* the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (emphasis added).  Dr. James Ratliff, ROSS's economics expert, considered whether any products are reasonably interchangeable with a collection of U.S. public law and determined that there are none.  Notably, Counterdefendants do not propose any alternative product of their own.  Rather, they mischaracterize Dr. Ratliff's opinions and incorrectly claim that he was required to also assess cross-elasticity of demand.  But that assertion ignores that Counterdefendants' immense success in restraining the market makes any such analysis impossible and unreliable.

Second, a firm has monopoly power when it has the ability to control prices or exclude competition.  *Dentsply*, 399 F.3d at 187.  Counterdefendants' monopoly power cannot be seriously contested—let alone removed from the jury's hands.  The evidence paints a picture of a firm that prices several times higher than its closest competitors and refuses to price compete because it does not need to.  And that is not because it offers a better product: the evidence shows that Counterdefendants' monopoly power insulated them from having to innovate and improve for more than a decade, even in the face of blunt consumer complaints and demands for improvement.  This is, by definition, direct evidence of monopoly power.

This direct evidence is compelling and determinative.  But, there is also substantial circumstantial evidence proving Counterdefendants' monopoly power.  In particular, despite their supracompetitive pricing practices, █████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████.  This high market share combined with existing structural barriers, and other factors all insulate Counterdefendants from increased competition.

The Court should deny Counterdefendants' Motion for Summary Judgment on ROSS's Antitrust Counterclaims (No. 2) – Market Definition and Power (the "Motion") in its entirety.

## ARGUMENT

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006).  Market power is the ability "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–14 (1984). "[M]arket power exists whenever prices can be raised above the levels that would be charged in a competitive market." *Id.* at 27 n.46.  Put another way, "[m]arket power is defined as the ability 'to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market.'" *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 200 (3d Cir. 1994).  "To determine the existence of market power for purposes of the 'per se' test, then, [courts] must first define the relevant tying product market and inquire into whether [the defendant] has power over price in that market." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3d Cir. 1992) (en banc).

Counterdefendants argue that ROSS has neither defined the relevant tying product market nor established Counterdefendants' power in that market.  They are wrong on both fronts.

## I.  Substantial Evidence Supports a Relevant Tying Product Market of Electronically Searchable Collections of U.S. Public Law.

A relevant market consists of a relevant product market and a relevant geographic market.  *See Brown Shoe*, 370 U.S. at 324.  Counterdefendants do not dispute that the geographic market in this case is the United States.  Instead, they argue that ROSS has failed to define a relevant product market based on mischaracterizations of Dr. Ratliff's expert report.

"[T]he determination of a relevant product market or submarket ('market') is a highly

factual one best allocated to the trier of fact." *Fineman*, 980 F.2d at 199; *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at *10 (D.N.J. June 27, 2007); *FTC v. Penn State Hersey Med. Ctr.*, 838 F.3d 327, 335 (3d Cir. 2016) ("[D]efinition of the relevant market is a factual question 'dependent upon the special characteristics of the industry involved.'").  In defining a product market, core antitrust principles provide: "The outer boundaries of a product market are determined by the reasonable interchangeability of use *or* the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe*, 370 U.S. at 325 (emphasis added); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (same); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  This test—written in the disjunctive—provides two alternatives for determining the relevant market.

With respect to the first alternative—determining "the reasonable interchangeability of use"—the analysis asks whether "the relevant product market 'is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'"  *Allen-Myland*, 33 F.3d at 206.  "'Interchangeability' implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for one over the other, either would work effectively."  *Id.*  Put more simply, "a market . . . includes actual or potential competitors who may take business away from each other."  *Town Sound*, 959 F.2d at 480.

A. **Dr. Ratliff's Tying Product Market of Electronically Searchable Collections of Public Law Is Properly Defined.**

At trial, ROSS will prove a tying market consisting of electronically searchable collections of U.S. public law.  Under Dr. Ratliff's definition, public law includes ███████████

████████████████████████████████████████████████████

████████████████████████████████      (Nguyen Decl., Ex. F (Ratliff Report) ¶ 24.)

Dr. Ratliff's definition is consistent with that provided by Counterdefendants' own current and former employees.  For example, Michael Dahn, Counterdefendants' 30(b)(6) witness, testified: ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ (*Id.*,

Ex. BBB (Dahn 30(b)(6) Dep. Tr.) at 93:1–11.)  Similarly, Andrew Martens, Counterdefendants'

former Senior Vice President and Global Head of Legal Product and Editorial testified: ████████

████████████████████████████████████████████████████

████████████████████████ (*Id.*, Ex. EEE (Martens Dep. Tr.) (May 5,

2023) at 13:24–14:5.)  In fact, neither Counterdefendants' expert, Dr. Chad Syverson, nor

Counterdefendants themselves, dispute Dr. Ratliff's definition.  Instead, Counterdefendants

mischaracterize Dr. Ratliff's report, claiming that ████████████████████.  Mot. at 12.

That is simply untrue.  Dr. Ratliff's opinions are based on his ████████████████████

████ which is one of the methods for proving the relevant market.  *See Brown Shoe*, 370 U.S. at

325.

In conducting his analysis, Dr. Ratliff concluded, based on the record evidence, that,

████████████████████████████████████████████████████████

████████████████████████.  (*See, e.g.*, Nguyen Decl., Ex. F (Ratliff Report) ¶¶ 100

████████████████████████████████████████████████████████

████████████████████████████████████ 113 (citing ROSS

user indicating: ████████████████████████████████████

████████████████████████████ 114 (citing Counterdefendants' document

stating that ████████████████████████████████████████

█████████████ 122 (citing ROSS expert, Dr. Martin: ████████████████

████████████████████████████████████

█████████████████████████ 123 (citing the

U.S. Department of Justice: ██████████████████████

███████████████████████████████████████

█████████████

Dr. Ratliff also considered and relied on evidence that ████████████████

███████████████████████████████████

██████████████ (*See, e.g.*, *id.*, Ex. F (Ratliff Report) ¶¶ 61–63, 76, 77, 79–86

(citing numerous examples of Counterdefendants themselves ██████████████████

████████████████████████████████

████████ ), 71–73 (providing examples of ███████████████████████

████████████████ 134 (citing █████████████████

██████████████████████████████████ ").)

Counterdefendants' documents support Dr. Ratliff's conclusions.  For example, an email

chain among Counterdefendants' employees notes that █████████████████████

██████████████████████████████████████

██████████████████████████████ (*Id.*, Ex. FFF

(TRCC-01887390) at -391 (emphasis added).)  Similarly, in yet another document,

Counterdefendants acknowledge that ██████████████████████████

████████████████████████████████████████

██████████████ (*Id.*, Ex. GG (TRCC_03906219) at -220.)  The above all

constitutes substantial evidence that electronically searchable collections of U.S. public law is a

relevant tying product market.

**B.    Counterdefendants' Challenges to Dr. Ratliff's Product Market Definition Are Unavailing.**

Rather than challenging Dr. Ratliff's market definition, Counterdefendants spin a fiction

that he fails to consider (1) the participants in that market, (2) any product interchangeability,

and (3) cross-elasticity of demand.  Mot. at 12–13.  These mischaracterizations fall flat.

First, Counterdefendants falsely claim that Dr. Ratliff did not include other market

participants, such as Lexis and Casetext, in defining the relevant market.  In their words,

"ROSS's apparent position [is] that Westlaw's public database is a market of one."  *Id.* at 13.

But that is not so.  Indeed, Counterdefendants note that Dr. Ratliff's report cites evidence that

they have ███████████████████████████.  Mot. at 17 (citing Ratliff Report

¶ 150).  Had Dr. Ratliff been advancing a single-brand market, Counterdefendants' revenue share

would, of course, be 100%.  The truth is that Dr. Ratliff ██████████████████ (*see,*

*e.g.*, Nguyen Decl., Ex. F (Ratliff Report) ¶ 164, tbl. 1), and ████████████████

█████████████████████████████████████

█████████████████████████  Additionally, it is proper to define

relevant markets by reference to the *products* at issue—not the producers.[2]

Second, Dr. Ratliff ████████████████████████████████

███████████████████████████████████████████

██████████████████████.  *See supra* Section I.A.  Counterdefendants do

not challenge this conclusion.  Indeed, Counterdefendants' rebuttal expert, Dr. Syverson,

████████████████████████████████████████.  *Id.*

---

[2] (*See* Nguyen Decl., Ex. GGG (U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (Aug. 19, 2010)) at 7 ("[M]arket definition allows the Agencies to identify market participants and measure market shares and market concentration.").)

Finally, Counterdefendants criticize Dr. Ratliff for "not analyz[ing] other public law database's prices or evaluat[ing] cross-elasticity of demand." Mot. at 13. In plain English, cross-elasticity of demand tests whether the rise in price of a good within a product market would create a greater demand for other goods in that market. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). As discussed above, cross-elasticity of demand is merely one method of determining market definition—it is not the *exclusive* method of doing so. *See supra* Section I.A. Moreover, where—as Dr. Ratliff determined here—cross-elasticity of demand cannot be assessed with any accuracy or reliability, conducting such an analysis is futile.

Indeed, the Third Circuit has rejected a challenge to a market definition where an economist "'presented no cross-elasticity study to support' the market the [district court] defined." *FTC v. AbbVie Inc*, 976 F.3d 327, 373 (3d Cir. 2020). Other courts have similarly held that an economist may "define a relevant market without economic study of cross-elasticity of demand, especially when economic analysis of cross-elasticity of demand is infeasible based on pricing data." *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1082 (D. Colo. 2004).

That is the case here. To analyze cross-elasticity of demand, one would need to ask what other products, if any, Counterdefendants' customers would switch to if the price of standalone access to their public law collection was raised. That *cannot* be accomplished here because an actual price for access to Westlaw's standalone public law collection does not exist. Therefore, there can be no data analysis that exploits variations in that price to determine cross-price elasticities.[3] Mandating such an analysis under these circumstances would effectively immunize

---

[3] There is another reason why an analysis of cross-price elasticity is uninformative here: such an analysis is only useful when the products in question are sold at competitive prices. Where one firm "has substantial market power or monopoly power (and has *already* exercised

a highly successful tying arrangement from critique under the antitrust laws, precisely the type of "perverse result" that the leading antitrust law treatise warns against.  (*See* Nguyen Decl., Ex. A (Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (5th ed. 2020)) ¶ 1745d1 (explaining that, in the context of analyzing separate products, difficulty of proof should not be a basis for permitting monopolists to get away with their wrongful conduct).)

In short, Counterdefendants' arguments as to ROSS's relevant market fail, and the Court should deny summary judgment on this basis.

## II.   Substantial Evidence Demonstrates that Counterdefendants Have Monopoly Power in the Relevant Market.

Monopoly power is defined as "the ability 'to control prices or exclude competition.'" *Dentsply*, 399 F.3d at 187 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). ROSS asserts claims under both Section 1 and Section 2 of the Sherman Act; both require market power, although "'[m]onopoly power under § 2 requires something greater than market power under § 1.'"  *Id.* at 186 (cleaned up) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 967 (10th Cir. 1990) ("Market and monopoly power only differ in degree—monopoly power is commonly thought of as 'substantial' market power.  We discuss the two concepts together here, since the same evidence relates to each."  (Internal citation omitted)).[4]

Monopoly power may be proven directly or indirectly.  A plaintiff may establish monopoly power directly through evidence of supracompetitive prices and restricted output.

---

that power to charge a supracompetitive price," as Counterdefendants do here—at least with respect to the sale of the bundled Westlaw legal research platform—determining cross-price elasticity poses problems, and "'alternative indicia of market power should be explored.'"  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 n.7 (9th Cir. 2023).

[4] Because ROSS has evidence of Counterdefendants' monopoly power, it uses that terminology here, unless otherwise noted.  As stated above, however, market power under Section 1 requires a lesser showing.

*Broadcom*, 501 F.3d at 307.  If a firm can profitably raise prices without causing competing

firms to expand output and drive down prices, that firm has monopoly power.  *Id.*  Alternatively,

monopoly power may be proven circumstantially through showing either (1) "a predominant

share of the market" or (2) "a lesser market share combined with other relevant factors."

*Fineman*, 980 F.2d at 201.  ROSS has both direct and circumstantial evidence of

Counterdefendants' monopoly power—more than enough to reach a jury.

### A.      ROSS Has Direct Evidence of Counterdefendants' Monopoly Power.

Counterdefendants' own documents and testimony provide direct evidence of their

monopoly power such that summary judgment on this point should be denied.

Counterdefendants charge a substantial price premium over their competitors.  In their

own words, ██████████████████████████████████████████████

██████████████████████████████████████████ (Nguyen Decl., Ex. DDD

(TRCC-01506384) at -384; *see also id.*, Ex. HHH (TRCC-01327274) at -280 █████████

██████████████████████████████████████████████

It is not just these substantial price premiums that demonstrate Counterdefendants'

monopoly power.  Counterdefendants admit that they "set [these] prices with little concern for

[their] competitors, 'something a firm without a monopoly would have been unable to do.'"  *See*

*Dentsply*, 399 F.3d at 191 (quoting *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001)

(en banc) (per curiam)).  As the D.C. Circuit ruled in *Microsoft*, such proof was "telling" direct

evidence that "Windows is a monopoly product."  253 F.3d at 57–58.

For example, during her deposition, Bridgett You, Counterdefendants' current Vice

President of Revenue Management, repeatedly testified that ██████████████████████

████████████████████████ (Nguyen Decl., Ex. III (You Dep. Tr.) at 46:19–47:7

(emphasis added).)  This view is also reflected in Counterdefendants' documents.  For example,

one email from Ms. You stated: ████████████████████████████

████████████████████████████ (*Id.*, Ex. CCC (TRCC-01052125) at -125.)

When asked about this document, Ms. You did not try to retreat from that plain admission;

rather, she doubled down:



(*Id.*, Ex. III (You Dep. Tr.) at 133:19–134:4.)  This remarkable exchange not only reaffirms

Counterdefendants' unfettered pricing power, but also acknowledges its *durability*—that is, three

years later, Counterdefendants still maintain and exploit that pricing power.  And it was not just

Ms. You who expressed this sentiment.  In negotiations, ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ (*Id.*, Ex. JJJ (TRCC-03726570) at -571.)  In response, ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████ (*Id.* at -570 (emphasis added).))

These are not the only examples of Counterdefendants' admissions that they can "set[]

prices with little concern for [their] competitors."  *Dentsply*, 399 F.3d at 191.  Indeed, Dr. Ratliff

extensively reviewed and summarized this evidence in his report—as well as evidence of

Counterdefendants' substantial price premiums—and concluded that ████████████████

██████████████████████████████████████████████

(Nguyen Decl., Ex. F (Ratliff Report) ¶¶ 20, 148–51, 198–208; *see also, e.g.*, *id.*, Ex. DDD (TRCC-01506384) at -384; *id.*, Ex. HHH (TRCC-01327274) at -280; *id.*, Ex. JJJ (TRCC-03726570) at -570–71; *id.*, Ex. KKK (TRCC-01507658) at -659 (Senior Finance Analyst stating ██████████████████████████████████████

      Nor can Counterdefendants' ability to price at supracompetitive levels be justified by Westlaw's higher quality.  While Counterdefendants may argue this to the jury, there is substantial evidence to the contrary.  For example, ██████████████████████████ ██████████████████████████████████████████████████████████████ ████. (████████████████████████.)" (*Id.*, Ex. LLL (TRCC-01020239) at -240.)  This failure to innovate is yet another sign of Counterdefendants' market power. *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014) (citing the Horizontal Merger Guidelines for the proposition that one dimension of market power is "diminish[ed] innovation").  Because they have not improved their core search algorithms for more than a decade, Counterdefendants concluded that ████████████████████████████ ██████████████████████ (Nguyen Decl., Ex. LLL (TRCC-01020239) at -241.)  This same internal report cited other customers as complaining that, among other things: ████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████ *Id.*  Likewise, Counterdefendants themselves note that ███████████████████████████████████████ Mot. at 18.  In the same vein, Counterdefendants acknowledged that they needed to start ████████████ ████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ (Nguyen Decl., Ex. GG (TRCC-03906219) at -220 (emphasis

added).)  Thus, there is, at best, a question of material fact about whether Counterdefendants'

monopoly prices are an exercise of monopoly power or can be justified by higher quality.

A firm that can durably maintain substantial price premiums without regard for its

competitors' lower prices has monopoly power.  There is substantial evidence indicating that this

is precisely how Counterdefendants operate.  The Court therefore can deny summary judgment

on the issue of monopoly power on this basis alone.

**B.    ROSS Has Circumstantial Evidence of Counterdefendants' Monopoly
        Power.**

In addition to the direct evidence described above, which would alone suffice, there is

also circumstantial evidence supporting the existence of Counterdefendants' monopoly power.

Under Third Circuit law, "[a] predominate share, *or* a lesser market share combined with

other relevant factors, may suffice to demonstrate monopoly power."  *Fineman*, 980 F.2d at 201

(emphasis added).  A "market share, if sufficiently high, may obviate the need to analyze other

pertinent factors," but even absent such a share, this does not end the inquiry.  *Id.*  "A less than

predominant share of the market combined with other relevant factors may suffice to

demonstrate monopoly power."  *Dentsply*, 399 F.3d at 187; *In re Payment Card Interchange Fee*

*& Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008) ("Just as a

defendant's large market share, without more, cannot support a finding of monopoly power, a

low market share by itself cannot necessarily defeat such a finding.").  It is important to note,

however, that:

> Market share, of course, is only one type of evidence that may prove the defendant
> has sufficient market power to impose per se antitrust liability.  "Market share is
> just a way of estimating market power, which is the ultimate consideration.  When
> there are better ways to estimate market power, the court should use them."

*Allen-Myland*, 33 F.3d at 209.

A key "other factor" that can demonstrate monopoly power is the existence of entry barriers, including "regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Broadcom*, 501 F.3d at 307. The Third Circuit has identified even more factors, including: "the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods or services from outside the market, and consumer demand factors." *Fineman*, 980 F.2d at 202. Finally, the share required to prove market power under Section 1 is naturally lower than the share required for proving monopoly power under Section 2. *See In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 397–99 (E.D. La. 2013) (allowing Section 1 claim—but not Section 2 claim—to proceed with allegations of 33% market share).

***Market Share.*** Counterdefendants estimate their ██████████████████████████

████████████████████████████████████████████████████████████████

████ (Nguyen Decl., Ex. HHH (TRCC-01327274) at -280 ████████████████████

████████████).) While, under Third Circuit precedent, this share alone cannot prove monopoly power as a matter of law, it is a relevant and compelling component of the analysis under Section 2 that should be considered by the jury. *See Fineman*, 980 F.2d at 202 (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946), for the proposition that "over two-thirds of the entire domestic field" constituted "a substantial monopoly"). And it is more than enough to establish market power under Section 1. *See Pool Prods.*, 940 F. Supp. 2d at 397.

---

[5] As Dr. Ratliff notes in his report, ████████████████████████████████████

████████████████████████████████████ (Nguyen Decl., Ex. F
(Ratliff Report ¶ 163).)

Westlaw's penetration rate among large- and mid-size law firms is even higher than this. ███████████████████████████████████████████████████████ ████████████ (Nguyen Decl., Ex. MMM (TRCC-01362714) at -714.)  This share has been durable as well—indeed, it has increased: ████████████████████████████████ ███████████████████████████████████████████████ (*Id.*, Ex. NNN (TRCC-01477261) at -261.)  As part of his analysis, Dr. Ratliff reviewed this, and other, evidence to support his conclusion that Counterdefendants maintain market power.  (*Id.*, Ex. F (Ratliff Report) ¶¶ 148–67.)

***Entry Barriers.*** ████████████████████████, other factors indicate the existence of monopoly power—most notably, exceptionally high barriers to entry.  Dr. Ratliff analyzed this market in depth and concluded that ████████████████████████████████████ ██████████████████████████████████.

First, Westlaw's role as the owner and publisher of the National Reporter System—███ ████████████████████████████████████████████████████████—gives Counterdefendants an unmatched advantage in maintaining a comprehensive, timely, citation friendly, and error-corrected body of case law within its public law collection.  (*See id.*, Ex. H (TRCC-00644013) at -014.)  Dr. Ratliff spends a considerable amount of time in his report ███████████████████████████████████████████ (*id.*, Ex. F (Ratliff Report) ¶¶ 87–142), and concludes that ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ (*id.* ¶¶ 177).  Dr. Ratliff also analyzed ████████████████████████████ ███████████████████████████████ (*id.* ¶¶ 179–92), and concluded that ████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ (*id.*

¶ 192).

But even assuming Counterdefendants did not have these structural advantages, Counterdefendants describe how difficult it would be for a nascent competitor to create a competitive electronically searchable collection of U.S. public law.  *See* Mot. at 3–4.  The capital costs required for a nascent competitor to compile centuries' worth of primary law—much of which must be done manually at courthouses across the country—would be insurmountable.  This is particularly true where, as Counterdefendants state, there are roughly 80 million cases going on in the United States at any given time.  *Id.* at 4.

***Other Factors.***  Apart from these extraordinary entry barriers, other characteristics of the industry further support a finding of monopoly power sufficient to withstand summary judgment.  First, as described in Section II.A, pricing trends and practices in the industry—specifically, Counterdefendants' durable ability to charge significant pricing premiums without regard to their competitors' own prices—serve as compelling evidence of market power.  Second, Counterdefendants' nearest competitor, Lexis, is a *distant* second, with all other competitors light years behind that.  To illustrate, Dr. Ratliff ███████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ (Nguyen Decl., Ex. F (Ratliff Report) ¶ 164, tbl. 1.)  Thus, ███████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████.

**C.      Counterdefendants' Efforts to Rebuff Their Market Power Fail.**

The thrust of Counterdefendants' arguments to minimize their market power is that ROSS and Dr. Ratliff lack evidence of market power in the relevant public law database market. Mot. at 15–18.  As discussed above, there is ***no*** way to precisely measure Counterdefendants' market power in the market for a standalone public law collection.  That is because those data do not exist due to Counterdefendants' unlawful conduct.  *See supra* at 8–9.

This does not—and should not—immunize Counterdefendants.  Long ago, the Supreme Court held that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).  That holds true here.  Given that Counterdefendants have exercised monopoly power to morph and restrain the market in the manner of their choosing, the market as it exists today serves as the best proxy—indeed, it contains the product at issue.  (*See* Nguyen Decl., Ex. A (Areeda & Hovenkamp) ¶ 1745d1 (endorsing the view, in the context of analyzing separate products, that courts should look to "comparable markets" when there is no current existence of independent markets).)

Nor do the cases Counterdefendants cite help them.  Unlike here, the inability to identify a market share in those cases was not a consequence of the defendants' unlawful conduct.  In *Maris Distributing Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002), the plaintiff attempted to use the defendant's market share in the "beer market" as a proxy for the "alleged relevant market for the purchase and sale of equity ownership interests in beer distributorships."  *Id.* at 1215.  The Eleventh Circuit did not completely foreclose that possibility, instead noting that the plaintiff would need to show "some 'connection' between the two different markets" to justify doing so.  *Id.* at 1214.  The plaintiff failed, and, to the contrary, there *was* evidence

showing that the defendant's market share in the restrained market was just "one to three

percent." *Id.* at 1217.  Here, there clearly is a "connection" between the relevant tying market

and the "online legal research market" contained in Counterdefendants' documents.  Indeed,

Counterdefendants' documents openly refer to ██████████████████████████

██████ (Nguyen Decl., Ex. GG (TRCC-03906219) at -220.)  And unlike the defendant in

*Maris*, Counterdefendants offer no contrary evidence of their market share in the tying product

market, because they, like ROSS, cannot provide any such calculation.[6]

Counterdefendants' remaining arguments are similarly unpersuasive.  They contend that

███████████████████████████████████████████████████████████████

███████ Mot. at 17.  But that misstates the law.  Not having a *prima facie* showing of monopoly

power via market share is not the end of the analysis.  *See supra* Section II.B.

Counterdefendants also attempt to argue that they lack market power in the tying product

market.  But in support, they simply cite evidence that there are other companies that maintain

public law databases and offer competing legal research platforms—they do not discuss these

companies' relative market power in any way.  Mot. at 18.  ROSS does not dispute that there are

other companies that offer legal research platforms—or even companies that behave in a similar

practice to Counterdefendants; rather, ROSS's challenge is to an entrenched monopolist's

practice of engaging in a tying arrangement that has thwarted competition, raised prices, and

stifled innovation.  As the Third Circuit has written:

> Behavior that otherwise might comply with antitrust law may be impermissibly
> exclusionary when practiced by a monopolist.  As we said in *LePage's Inc. v. 3M*,
> 324 F.3d 141, 151–52 (3d Cir. 2003), "a monopolist is not free to take certain

---

[6] *New Mexico Oncology v. Presbyterian Healthcare Services*, 418 F. Supp. 3d 826 (D.N.M. 2019), is similarly of no help to Counterdefendants.  There, the plaintiff's expert attempted to use market shares for a market that he "acknowledges . . . is not a relevant market."  *Id.* at 856–57.  And, like in *Maris*, there *was* evidence of actual shares in the relevant market.  *Id.* at 856.

actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior."

*Dentsply*, 399 F.3d at 187.

At bottom, Counterdefendants are an extraordinarily successful monopolist with substantial market power.  A jury should hear and weigh ROSS's evidence against Counterdefendants' competing evidence.

### III. ROSS Has Offered Substantial Evidence of Anticompetitive Effects in the Legal Search Tools Market Under the Rule of Reason.

Finally, Counterdefendants briefly argue that ROSS "has no alternative, non-leveraging theory of antitrust harm" should the Court conclude that the *per se* rule does not apply here. Mot. at 19–20.  Although unnecessary because ROSS has offered evidence of a *per se* tie, this argument should also be rejected.  Courts may not "ignore proffered evidence of actual conduct and economic performance in the *tied* product market simply because of a finding on *tying* product market structure."  *Town Sound*, 959 F.2d at 484.[7]  Contrary to Counterdefendants' claim, ROSS has indeed offered such non-leveraging theories through Dr. Ratliff's opinions.

First, based on his review of the record, Dr. Ratliff concluded that ███████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ (Nguyen Decl., Ex. F (Ratliff Report) ¶ 21.)  A sample of that evidence is discussed above.  *See supra* at 12–13.  Dr. Ratliff considered that evidence—and more—in forming his opinions.  (Nguyen Decl., Ex. F (Ratliff Report) ¶ 209–30.)  For example, Counterdefendants' own documents ████ ███████████████████████████████████████████████████████████████

---

[7] Counterdefendants argue that Dr. Ratliff's definition of the tied product market is deficient for the same reasons as it is for the tied product market.  Mot. at 19.  For the reasons discussed at length above, their argument is flawed.

██████████████████████████████████ (*Id.*, Ex. OOO (TRCC-01621492 Database)

Cell E10.)  ROSS's own documents substantiate the inferiority of Counterdefendants' legal

search tools, with users stating, among other things: ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

(*Id*., Ex. PPP (ROSS-010350910) at -912.)  Thus, ROSS has offered evidence of cognizable

harm in the tied product market in the form of reduced innovation.  *See FTC v. Hackensack*

*Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir. 2022) ("Anticompetitive effects can include

price increases and reduced product quality, product variety, service, or innovation."); *McWane,*

*Inc. v. FTC*, 783 F.3d 814, 827 (11th Cir. 2015) (citing slowed innovation as a potential

anticompetitive harm of exclusive dealing).

Second, Dr. Ratliff concluded that ████████████████████████████████

████████████████████████████████████████ (Nguyen Decl., Ex. F

(Ratliff Report) ¶ 22.)  The Third Circuit has held that, "even if a defendant lacks power in the

tying product market, it could conceivably achieve a substantial foreclosure of the tied product

market." *Town Sound*, 959 F.2d at 493.  Dr. Ratliff extensively analyzed the foreclosure in the

legal search tools market created by Counterdefendants' vertical restraints.  (Nguyen Decl., Ex. F

(Ratliff Report) ¶¶ 231–61.)  Because Counterdefendants do not directly acknowledge or attack

this theory in their Motion, ROSS does not address it here beyond acknowledging that, contrary

to Counterdefendants' representations, the theory (1) exists and (2) is a legally cognizable one.

## CONCLUSION

For the reasons above, the Court should deny Counterdefendants' motion for summary

judgment as to relevant market and market power.

OF COUNSEL:

Gabriel M. Ramsey
Warrington S. Parker III
Beatrice B. Nguyen
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Matthew J. McBurney
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated:  September 28, 2023
11079082
Public Version Dated: October 12, 2023

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew L. Brown (#6766)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*