## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE )
CENTRE GMBH and WEST PUBLISHING )
CORPORATION, )
            )   C.A. No. 20-613-SB
       Plaintiffs/Counterdefendants, )
            )   **JURY TRIAL DEMANDED**
    v. )
            )   **PUBLIC VERSION**
ROSS INTELLIGENCE INC., )
            )
       Defendant/Counterclaimant. )

## ROSS INTELLIGENCE, INC.'S OPPOSITION TO COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ROSS'S ANTITRUST COUNTERCLAIMS (NO. 1) – SEPARATE PRODUCTS

OF COUNSEL:

Gabriel M. Ramsey
Warrington S. Parker III
Beatrice B. Nguyen
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Matthew J. McBurney
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated:  September 28, 2023
Public Version Dated: October 12, 2023

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

LEGAL STANDARD.................................................................................................................... 3

ARGUMENT ................................................................................................................................. 3

I.   To Determine Whether Public Law Databases and Legal Search Tools Are Separate Products, Jurors Must Consider Whether There Would Be Demand for Each Product if Offered Separately. .................................................... 3

II.  There Is Ample Support in the Record for Ross's Position That There Would Be Separate Demand for Public Law Databases and Legal Search Tools But For Counterdefendants' Unlawful Restraints. ...................................... 7

    A.   The Allegations That This Court Relied on to Dismiss Counterdefendants' "Separate Products" Motion to Dismiss Have Been Substantiated in Discovery. ............................................................ 7

        1.   A public law database product is technologically distinct from a legal search tool product...................................................... 8

        2.   Counterdefendants effectively sold their public law database as a standalone product in the form of books................. 8

        3.   ROSS's legal search tool received significant attention and praise. ............................................................................................ 9

    B.   Additional Evidence Supports ROSS's Position That There Would Be Separate Demand for Public Law Databases and Legal Search Tools if They Were Offered Separately.................................................... 11

        1.   Consumer interest in unbundling content from search products is apparent. ...................................................................... 11

        2.   Counterdefendants offer much of their content to consumers unbundled from their legal search tools..................... 13

        3.   Counterdefendants offer consumers their legal search tool separately from their public law database..................................... 17

CONCLUSION............................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
   537 F. Supp. 3d 273 (N.D.N.Y. 2021) .....................................................................6, 7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................................3

*In re Data Corp.*,
   490 F. Supp. 1089 (N.D. Cal. 1980) ...........................................................................18

*Downs v. Insight Commc'ns Co., L.P.*,
   2011 WL 1100456 (W.D. Ky. Mar. 22, 2011) ............................................................5

*Eastman Kodak Co. v. Image Tech. Servs.*,
   903 F.2d 612 (9th Cir. 1990) .........................................................................................4

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ..............................................................................................3, 4, 5

*GN Netcom, Inc. v. Plantronics, Inc.*,
   278 F. Supp. 3d 824 (D. Del. 2017) ..............................................................................3

*Jefferson* Par. *Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984), *abrogated in part on other grounds by Ill. Tool Works Inc.*
   *v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ..............................................................3, 4, 17

*In re Processed Egg Prods. Antitrust Litig.*,
   881 F.3d 262 (3d Cir. 2018) ..........................................................................................3

*Siva v. Am. Bd. of Radiology*,
   38 F.4th 569 (7th Cir. 2022) ..........................................................................................6

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*,
   188 F.3d 11 (1st Cir. 1999) ...........................................................................................6

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001), *cert. denied*, 534 U.S. 952 (2001) ..............................5

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) .........................................................................................9

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................3

**Other Authorities**

Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law ................................................. passim

## INTRODUCTION AND SUMMARY OF ARGUMENT

Counterdefendants' Motion for Summary Judgment on ROSS's Antitrust Counterclaims (No. 1) asserts that Westlaw is a single product, which therefore cannot be the subject of a tying claim. To reach that conclusion, Counterdefendants craft a legal standard that is unknown to antitrust law and that is, in fact, antithetical to antitrust legal principles. According to Counterdefendants, ROSS Intelligence, Inc. ("ROSS") is only able to show that public law databases and legal search tools are two separate products, if "a great many customers *purchased or took steps to purchase*" the two separately. D.I. 520 ("Motion") at 12 (emphasis added).

That is not the law. This is not the test. Courts do not demand proof of *actual* separate purchases. Rather, courts ask "whether independent markets *could* exist" but for the restraints in question. (Declaration of Beatrice B. Nguyen in Support of ROSS Intelligence, Inc.'s Oppositions to Counterdefendants' Motions for Summary Judgment Nos. 1–4, Ex. A (Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (5th ed. 2020) ("Areeda & Hovenkamp")) ¶ 1745d1 (emphasis added).) The ABA Model Jury Instructions set the same test, instructing jurors "[t]o determine whether [*product A*] and [*product B*] are separate and distinct products, you should consider whether there *would* be demand for each of them *if* they were offered separately." (Nguyen Decl., Ex. B (ABA Antitrust Section, Model Jury Instructions in Civil Antitrust Cases E-90) at 5 (emphasis added) (Instruction 5: Presence of Two Products).)

Of course, evidence that "some buyers requested or wanted the items separated" can be relevant. It assists in determining demand in this "but for" world. (Nguyen Decl., Ex. C (Areeda & Hovenkamp) ¶ 1743.) Examples from analogous markets—historical, geographical, or for similar products—can also be used. (Nguyen Decl., Ex. D (Areeda & Hovenkamp) ¶ 1744.)

But requiring evidence of *actual* separate purchases is nothing more than

Counterdefendants' strategy to perversely immunize the worst-case scenario of a successful tie. When the tying defendant is a monopolist that never gave buyers an opportunity to buy the two products separately, asking for proof of *actual* separate purchases is an exercise in futility. In this case, it would allow Counterdefendants to continue to leverage their dominance in the public law database market into dominance in the legal search tool market, thereby eliminating the ability of customers (and certainly of "a great many customers") to use alternative search technologies and, as a consequence, stifling innovation in legal search technology.

Counterdefendants know that the law cannot be as they articulate it because this is exactly the analysis undertaken by Circuit Judge Leonard P. Stark when denying Counterdefendants' motion to dismiss on this issue. *See* D.I. 170. Discovery proved the allegations on which Judge Stark relied. As reflected in discovery:



Discovery has provided even more evidence that there are two products at play:



By definition, Counterdefendants' use of the *wrong* legal standard to support their summary judgment motion means that they are not entitled to judgment "as a matter of law."

Applying the *correct* standard, there is clearly a genuine dispute as to whether there *would* be separate demand.  Moreover, as reflected below, given the choice, consumers *would* purchase public law databases and legal search tools separately.  Counterdefendants know this.  Some of the evidence that supports this came from their files.  The Court should therefore deny Counterdefendants' Motion in its entirety.

## LEGAL STANDARD

On summary judgment, Counterdefendants bear the burden of showing that there is "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *GN Netcom, Inc. v. Plantronics, Inc.*, 278 F. Supp. 3d 824, 827 (D. Del. 2017).  Counterdefendants bear "a substantial burden in showing that [they are] entitled to summary judgment."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992) ("*Kodak*").

Because Counterdefendants bring this Motion, "'[t]he evidence of [ROSS] is to be believed, and all justifiable inferences are to be drawn in [ROSS's] favor.'"  *See id.* at 456 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  And the Court must "evaluate the record 'in the light most favorable to [ROSS] and draw all inferences in [ROSS]'s favor.'"  *See In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 268 (3d Cir. 2018) (cleaned up).  ROSS's "version of any disputed issue of fact thus is presumed correct."  *Kodak* at 456.

## ARGUMENT

**I.    To Determine Whether Public Law Databases and Legal Search Tools Are Separate Products, Jurors Must Consider Whether There Would Be Demand for Each Product if Offered Separately.**

The parties agree that a viable tying claim requires that there be "two separate products." *Jefferson* Par. *Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18 (1984), *abrogated in part on other*

*grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ("*Jefferson Parish*").

"[T]he answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the items." *Id.* at 19. Put differently, the issue is not whether the two products are inextricably linked or whether one is more or less useless without the other, but whether the products in question are "distinguishable in the eyes of buyers." *Id.*; *see also Eastman Kodak Co. v. Image Tech. Servs.*, 903 F.2d 612, 615-16 (9th Cir. 1990) ("That products must be used together does not eliminate the possibility that they form distinct markets.").

Turning to the issue of demand, Counterdefendants read *Jefferson Parish* and *Kodak* to equate "demand" with *actual* purchases. They argue that, for ROSS to proceed past summary judgment on the "separate demand" question, it must identify evidence "that a great many customers *purchased or took steps to purchase*" public law databases and legal search tools separately. Mot. at 12 (emphasis added). As Areeda and Hovenkamp explain, Counterdefendants misread these cases and set a standard that immunizes anticompetitive tying arrangements: "read literally," the *Jefferson Parish* statement that "a tying arrangement cannot exist unless two separate-product markets have been linked" and the court's requirement "that two distinguishable product markets be involved," "could perversely immunize the worst-case scenario of a successful tie by which a monopolist successfully leverages a monopoly in the tying product into a monopoly in the tied product."[1] (Nguyen Decl., Ex. A (Areeda and Hovenkamp) ¶ 1745d1 (internal citations omitted).) Indeed, "this is the paradigmatic case

---

[1] Areeda and Hovenkamp provide the following example: "proof that all cans are sold with can-filling machines, so that no independent market exists for them, should not preclude inquiry into a tie between cans and can-filling machines by a monopolist in both. Rather, such proof simply reflects a 100 percent successful tie." (Nguyen Decl., Ex. A (Areeda and Hovenkamp) ¶ 1745d1.)

illustrating the anticompetitive evils that motivate anti-tying doctrine.  Such a perverse result was clearly unintended." (*Id.*)  Dispelling this incorrect reading, the authors turn to outline the applicable "consumer demand" test: "[w]hen actual markets provide no market test, the Court seems to ask whether independent markets *could* exist.  This requires some assessment of what consumer demand would be at the costs and quality that would prevail if the items were separately provided.  The lower courts appear to agree with this interpretation." (*Id.* (internal citations omitted) (emphasis added).)

That is precisely why the ABA Model Jury Instructions in Civil Antitrust Cases ask jurors to consider whether "there *would* be demand for each [product] *if* they were offered separately." (Nguyen Decl., Ex. B (ABA Model Jury Instruction) at 5 (emphasis added).)  And that is why the Supreme Court in *Kodak*, in ruling that "[e]nough doubt [was] cast on Kodak's claim of a unified market that it should be resolved by the trier of fact," relied on *potential—not actual—*demand for the products at issue.  *See* 504 U.S. at 463 ("At least some consumers *would* purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, *would* purchase parts without service." (emphasis added.)).

The D.C. Circuit in *Microsoft*, as well, gave weight to the district court's factual finding that "many consumers, if given the option, would choose their [Internet] browser separately from the [operating system]." *United States v. Microsoft Corp.*, 253 F.3d 34, 88 (D.C. Cir. 2001); *cert. denied*, 534 U.S. 952 (2001); *see also Downs v. Insight Commc'ns Co., L.P.*, 2011 WL 1100456, at *2 (W.D. Ky. Mar. 22, 2011) (finding that cable television service and set-top box for premium digital services could be separate products even though there was currently no independent demand for the boxes and that such a market could emerge if defendant ceased

tying); *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 576 (7th Cir. 2022) (explaining that "looking

at market demand in the post-tie world runs the risk of 'immuniz[ing] the worst-case scenario of

a successful tie by which a monopolist successfully leverages a monopoly in the tying product

into a monopoly in the tied product.'" (citing Areeda & Hovenkamp ¶ 1745d1.)).

Given the clear state of the law, it is not surprising that Counterdefendants' supposed test

for determining separate demand is nowhere to be found even in the (few) lower-court cases they

cite.  Not one of their cases says that proof of *current* separate purchases—or the existence of

*current* independent markets—is the only way of showing separate demand.  At most, these

cases stand for the (unremarkable) statement that evidence of actual separate purchases is a good

indication for separate demand—a position that ROSS's expert Dr. James Ratliff ███████.

(*See* Nguyen Decl., Ex. E (Ratliff Reply Report) ¶¶ 18, 256.)  *See also SMS Sys. Maint. Servs.,*

*Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 15 (1st Cir. 1999) (finding a "separate demand" to be a

disputed issue of fact for purposes of summary judgment based on analogous market practices);

*AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 309 (N.D.N.Y. 2021) (same).[2]

\* \* \*

In sum, the question to be answered is whether there would be consumer demand for each

product if they were sold separately.  And while actual sales can be used, they need not be.

Instead, one can answer this question by looking at analogous historical and geographical

---

[2] Counterdefendants also cite Areeda and Hovenkamp for the proposition that, "if less than 20 percent of the tying item is sold unbundled, . . . then the items are a single product." Mot. at 12 (quoting Areeda and Hovenkamp ¶ 1744d).  But, as a review of the full passage from those authors makes clear, that is only the case when *competitive market analogues* are considered.  (Nguyen Decl., Ex. D (Areeda and Hovenkamp) ¶ 1744d ("We would find a single product for all tying purposes when unbundling is uncommon in *competitive market analogues*." (emphasis added).)  What is more, as the authors admit, "any definition of 'uncommon' is arbitrary."  (*Id.*)  Counterdefendants are silent as to which "competitive market analogues" they rely on for their analysis.

markets, as well as by evaluating sales of similar products.  (Nguyen Decl., Ex. D (Areeda and Hovenkamp) ¶ 1744 *et seq*.)  One can also answer this question with an appropriate expert opinion on the economics of unbundling.  *See AngioDynamics*, 537 F. Supp. 3d at 309 (crediting expert opinion concerning the likely nature of the demand for the product at issue).

Whether or not Counterdefendants agree with this proposition, the cases they cite in their Motion do.  *See, e.g.*, Mot. at 11 (citing *Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530, 544 (E.D. Pa. 2019) ("Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the history of the products being, or not being, sold separately or the sale of the products separately in similar markets.") (quoting *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016).).

Considering these parameters, there is substantial evidence of separate consumer demand for public law databases and legal search tools.

## II.    There Is Ample Support in the Record for Ross's Position That There Would Be Separate Demand for Public Law Databases and Legal Search Tools But For Counterdefendants' Unlawful Restraints.

### A.    The Allegations That This Court Relied on to Dismiss Counterdefendants' "Separate Products" Motion to Dismiss Have Been Substantiated in Discovery.

Counterdefendants acknowledge (as they must) that this Court already has adjudicated the "separate products" issue in ROSS's favor at the motion-to-dismiss phase.  When ruling in ROSS's favor, this Court rejected Counterdefendants' proposed "actual purchases" standard, instead explaining that historical and similar market analogues could be used as proxies to evaluate potential consumer demand.  D.I. 170 at 7–8.  This Court then credited a number of ROSS's allegations, expounding on the distinct nature of public law databases and legal search tools and detailing relevant market analogues.  All of these allegations were borne out in discovery.

1.     **A public law database product is technologically distinct from a legal search tool product.**

Counterdefendants no longer argue that public law databases are technologically

inseparable from legal search tools.  Notably, as ROSS's experts have explained, ███████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (*See* Nguyen

Decl., Ex. F (Ratliff Report) ¶¶ 33–35; *id*., Ex. G (Branting Report) ¶¶ 20–30.)

ROSS's own experience of ███████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████ (*See, e.g.,*

Nguyen Decl., Ex. JJ (ROSS-023101050) (ROSS licensed ███████████████████

████████████████████).)[3]

2.     **Counterdefendants effectively sold their public law database as a standalone product in the form of books.**

Counterdefendants ████████████████████████████████████████

████████████████████████████████.  Mot. at 18.  (*See also* Nguyen Decl.,

Ex. H (TRCC-00644013) at -014 (████████████████████████████████).)  This

Court has relied on this historical market analogue as a relevant factor in its "separate products"

analysis.  D.I. 170 at 8.  Nevertheless, Counterdefendants now claim that "ROSS has abandoned

any reliance on printed volumes as relevant evidence," and that, contrary to this Court's ruling,

---

[3] Counterdefendants, too, ████████████████████████████████████████████

██████████████████████████████████████ (Nguyen Decl., Ex. KK (TRCC-02151854) at

-874–886.)

consumer demand for "these books" is legally irrelevant.  Motion at 9, 18.  Counterdefendants are wrong on both points.

ROSS has not abandoned its reliance on printed volumes as relevant evidence.  Even though the tying market in question is ████████████████████████████████████████ analogous market practices are commonly used to inform the separate demand question. (Nguyen Decl., Ex. D (Areeda and Hovenkamp) ¶ 1744 *et seq.*)  These analogous markets include similar geographical markets, markets for similar products, and *historical* markets.  (*Id.*) The analogous market analysis functions even when the adjacent markets are noncompetitive (as was the case with Counterdefendants' printed public law database), such that "unbundling in a noncompetitive market analogue implies separate products."  (*Id.* ¶ 1744g.)  *See also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 474 (7th Cir. 2020) (citing Areeda and Hovenkamp ¶ 1744g and explaining that bundling in non-competitive markets does not necessarily provide insight into whether a tie is efficient rather than reflective of increased market power exploitation, while unbundling in competitive markets likely reflects efficiencies).

### 3. ROSS's legal search tool received significant attention and praise.

The last set of allegations credited by this Court when denying Counterdefendants' "one product" motion to dismiss argument relates to the quality of ROSS's search tool and the standalone value it represented for its customers.  Counterdefendants disagree with the factual premise of this argument, stating that ROSS "did not deliver value to its customers."  Mot. at 20.

The record begs to differ.  It is replete with examples of customer praise for ROSS's search offering.  For example, ████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████   (*See* Nguyen Decl., Ex. I (Dentons-Thomson_000013) at -014 (emphasis added); *id.*, Ex. J (Dentons-Thomson_000034 (cover email)); *id.*, Ex. K (Dentons-



Thomson_000036 ( ███████████ ████████████████████████████████ ███████████████████████████████████████████ (*id.*, Ex. L (ROSS-003528324) at -324), ████████████████████████ (*id.*, Ex. M (ROSS-003510421) at -421.)

To be clear, ROSS does not claim that all customers offered glowing reviews for its legal search product.  That is precisely why ROSS—an upstart technology developer—solicited feedback in the first place: to learn and improve.  Indeed, even Counterdefendants, the established, longtime market leader, ███████████████████████████████ ███████████████ (*See* Nguyen Decl., Ex. N (TRCC-00069771) at -771 (█████████ ███████████████████████████████████████████ ███████████████ ); *id.*, Ex. O (TRCC-05818362) at -362 (cell R97) (██████████ ███████████████████████████████████████████ ███████████████████████████████████████████ *id.*, Ex. P (TRCC-05818365) at -365 (cells N7457, N8902) (████████████████████████████ ███████████████████████████████████████████ ████████████████ ).)

The point is that, for at least *some* customers, ROSS's search offering represented a new and valuable method of finding the law.  This supports the proposition that, *given the option*, those customers would have liked to purchase and combine ROSS's legal search tool with Westlaw's "must have" public law database—which is precisely the point of the separate demand test.

Indeed, this unavailable "mix and match" *option* is at the heart of ROSS's case.  That is

to say, the central question is not whether Counterdefendants can continue to market a product that integrates their public law database with one of their various search offerings—ROSS does not challenge this practice.  The question is whether customers, who find value in other search tools (such as the AI-based one developed by ROSS), should be allowed to exercise their choice and apply non-Westlaw legal search tools to Westlaw's "must have" content.  This is how the anticompetitive nature of Counterdefendants' restraints manifests.  As ROSS's expert explains: █

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████  (Nguyen Decl., Ex. E (Ratliff Reply Report) ¶ 88-94.)  Counterdefendants' restraints thwart consumers' desires and choices—to the detriment of consumers and innovation. (*Id.*)

> **B.  Additional Evidence Supports ROSS's Position That There Would Be Separate Demand for Public Law Databases and Legal Search Tools if They Were Offered Separately.**

Discovery to date has done more than substantiate the allegations in ROSS's counterclaims; it has added significant supply-side and demand-side evidence supporting ROSS's claim that consumers would opt to purchase public law databases and legal search tools separately, were that option to exist.

> **1.  Consumer interest in unbundling content from search products is apparent.**

Counterdefendants' own documents make clear that a number of their existing clients— and large global law firms in particular—█████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████  (*See* Nguyen Decl., Ex. Q (TRCC-01875817_0001) at 0002.)

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ (*See id.*)

Similarly, █████████████████████████████████████

██████████████████████████████████████████████████

████████████████████. (*See* Nguyen Decl., Ex. R (TRCC-00735652).)

ROSS employees also fielded questions about the possibility of licensing ROSS's search

technology as a standalone product.  In its interrogatory responses, ROSS identified ████████

████████████████████████████████████████████████████

████████ (*See* Nguyen Decl., Ex. S (ROSS's Resp. & Obj. to Pls.' Fifth Set of Interrogs.,

Resp. to Interrog. No. 20) at 6.)  Several of those ██████████████, and all confirmed as

much.  (*See id*., Ex. T (Phan Dep. Tr. (May 11, 2023)) at 100:24–102:15 (testifying that

customers ██████████████████████████████████████████

████████████); *id*., Ex. U (van der Heijden Dep. Tr. (May 9, 2023)) at 14:18–18:2 (stating

that ███████████████████████████████); *id*., Ex. V (Arruda

Dep. Tr. (May 19, 2023)) at 155:5–156:22 (recalling that ████████████████████████

██████████████████████████████████████████████); *id*.,

Ex. W (Hamilton Dep. Tr. (May 4, 2023)) at 269:23–271:11 (testifying about general █████

█████████████████).)

This market trend was not lost on Counterdefendants.  ████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████



(Nguyen Decl., Ex. X (TRCC-00539872) at -873.)

(*Id.*)

(*See* Nguyen Decl., Ex. Y (TRCC-00194341) at -347.)

(*Id.*)

(*Id.*)

. (*Id.*)

(*Id.*; *see also id.*, Ex. F (Ratliff Report) ¶¶ 69, 70.)

**2.   Counterdefendants offer much of their content to consumers unbundled from their legal search tools.**

Counterdefendants condition access to their collection of public law on the acceptance of two vertical restraints: first, Counterdefendants offer access to Westlaw's collection of public law only when bundled with access to one of Westlaw's search tool products; second, Counterdefendants prevent and forbid Westlaw subscribers from using competing legal search

---

[4] . (*See* Nguyen Decl., Ex. Z (Lindberg Dep. Tr. (April 24, 2023)) at 98:23–99:21.)

tools to access Westlaw's collection of public law.  (*Id.*, Ex. F (Ratliff Report) ¶¶ 16, 74).

While preventing independent access to their full U.S. public law database, Counterdefendants offer much of their remaining legal content to consumers through an Application Programming Interface (API) that allows consumers to access that data using their own or third-party software applications for search or analysis.  For example, in 2020, Counterdefendants announced that they were making some of their legal content available via APIs.  (Nguyen Decl., Ex. DD (Thomson Reuters Press Release, dated January 28, 2020).)  This eventually included data from Westlaw Edge Litigation Analytics, Westlaw's Practical Law, U.S. SEC filings, and U.S. dockets, and it also included a portion of Westlaw's *public law data*, namely U.S. legislation and regulations.  (*See id.* (reflecting information about Litigation Analytics API and Practical Law API); *see also id.*, Ex. NN (Thomson Reuters Website, Legal Data APIs) (reflecting information about Westlaw Edge Litigation Analytics API, U.S. SEC Filings API, and Dockets API); *id.*, Ex. OO (Thomson Reuters Website, Westlaw US Legislation API); *id.*, Ex. BB (TRCC-01878637) at -639, -641-42, -644-45.)

The Westlaw US Legislation API provides users with API access



(*Id.*, Ex. BB (TRCC-01878637) at -644.)  The Westlaw U.S. Regulations API provides users with API access

(*Id.* at -645; *see also id.*, Ex. AA (TRCC-01779416) at -433 (

").)

Finally, Counterdefendants even offer access to a full public law database, albeit not from

the United States. ███████████████████████████████████

███████████████████████████ (*See id*., Ex. AA (TRCC-01779416) at -429.)

██████████████████████████████████████ (*id*. at -432) and

████████████████████████████████████████████

█████████████████████ (*See id*., Ex. CC (TRCC-02748376) at -378.)

These Westlaw offerings are proof that there is market demand to access content

independently in the same and in analogous markets. ████████████████████

████████████████████████████████████████████

████████████████████████. (*Id*., Ex. LL (TRCC-

01564207) at -207; *id*. Ex. MM (TRCC-01564211) (████████████████████

████).) ███████████████████████████████████

████████████████████████████████████████████

████████████ (*Id*., Ex. EE (TRCC-01645565) at -570.) ███████████

█████████████████████████████ (*Id*. at -578.)  As a

result, Counterdefendants ███████████████████████████. (*Id*.)

████████████████████████████████████████████

██████████████████████ (*Id*.)

Counterdefendants were ██████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

████ (*Id*., Ex. FF (TRCC-01906000) at -6000.)

That Counterdefendants ██████████████████████████████

settles the question of whether there is consumer demand for legal content independent from the demand for Counterdefendants' legal search tools.  By Counterdefendants' own estimates, █████

██████████████████████████████████████████████████████

██████████████████████████████████████ (Nguyen Decl.,

Ex. EE (TRCC-01645565) at -573; *see also, id.*, Ex. F (Ratliff Report) ¶¶ 52–58.)

Despite this robust consumer demand, Counterdefendants resist offering their U.S. public law database as a standalone product.  As a result, they stifle competition in the market for legal search tools, which they believe will become critical for their business once enough current, citable, and error-free public law becomes "open source."

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████  (Nguyen Decl., Ex. GG (TRCC-03906219) at -220.)  Because of this, ███████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████  (*Id.* (emphasis added).))

The above demonstrates that Counterdefendants are well aware that demand for their search and analytics products is inextricably tied to the ████████████ they possess through ██████████████████ their must-have public law database.  Counterdefendants are also aware

that, once the public law data they now ████████████████████████████████

████████████—becomes *free,* that leverage will disappear and Counterdefendants will need

to, for the first time, build search tools that can compete on the merits of their legal search

technology.  Counterdefendants' insistence on unlawfully tying their current, sub-par search

offerings to their must have ████████ should be understood in this context.

3.    <strong>Counterdefendants offer consumers their legal search tool separately from their public law database.</strong>

Although Counterdefendants refuse to offer consumers their U.S. public law database as

a standalone product, they are willing to offer their legal search tools separately.  ████████



████████ (*See* Nguyen Decl., Ex. HH (TRCC-05235742) at -743 ████████████

████████████████████████████

████████████████████ ████████

████████████████████████ (*Id.*)  Separately, ████████

████████████████████████

████████████████ (*Id.*, Exs. HH, II.)[5]

That Counterdefendants sell their legal search technology (the tied product)

independently means that there is demand for this product separate from their public law

database (the tying product).  It is yet further evidence that the Westlaw "platform" is not a

single product, as Counterdefendants claim.  *See Jefferson Parish* at 21-22 (demand for the

---

[5] Exhibit II to the Nguyen Declaration is a Thomson Reuters website that includes a video where Counterdefendants discuss West KM. The website can be accessed here: https://legal.thomsonreuters.com/en/products/west-km (last viewed September 25, 2023).

purchase of the tied product separate from the tying product is an indication of a distinct product

market in which it is efficient to offer the tied product separately from the tying product); *see*

*also In re Data Corp.*, 490 F. Supp. 1089, 1108 (N.D. Cal. 1980) ("In light of the undisputed fact

that Data General (and other companies such as Ampex) will sell memory boards [the tied

product] separately, it cannot be concluded that memory boards and CPUs are normally sold as a

unit.  If the facts summarized above were to be presented to a jury, the Court would be

compelled to direct a verdict in favor of Ampex on the separate products issue.").

## CONCLUSION

For the foregoing reasons, the Court should deny Counterdefendants' Motion in its

entirety.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gabriel M. Ramsey
Warrington S. Parker III
Beatrice B. Nguyen
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Matthew J. McBurney
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew L. Brown (#6766)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

Dated:  September 28, 2023
11079078
Public Version Dated: October 12, 2023

-18-