# EXHIBIT AAAA

**From:**
**Sent:**
**To:**
**Cc:**
**Subject:**

Confidential

ROSS-023089340



Confidential

ROSS-023089341

# EXHIBIT BBBB

ROSS      Features    Coverage    Pricing    Customers    About Us    Blog                                    Log In

# Simple Pricing. No Hidden Fees.

No credit card required.

14-Day Free Trial



| | Most Popular | |
| --- | --- | --- |
| **$89.00** | **$79.00** | **$69.00** |
| per month, billed monthly | per month, billed quarterly | per month, billed annually |

## All Plans Include



| | |
| --- | --- |
| Question-based Search | Find Similar Language |
| Document Analyzer | Case Treatments |
| Case Summaries | Coverage |

---

ROSS

Twitter

Facebook

LinkedIn

© ROSS Intelligence, Inc. 2014–2020

**Company**
About Us
Careers
Terms of Service
Privacy Policy

**Product**
Features
Coverage
Pricing
Academic Access
Why ROSS
What is AI

**Resources**
Contact Us
FAQ + Support
Blog

# EXHIBIT CCCC

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT DDDD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | |
| | ) | |
| Plaintiffs/Counterdefendants, | ) | C.A. No. 20-613-SB |
| | ) | |
| v. | ) ) | **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| ROSS INTELLIGENCE INC., | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

**PLAINTIFFS/COUNTERDEFENDANTS THOMSON REUTERS ENTERPRISE CENTRE GMBH AND WEST PUBLISHING CORPORATION'S RESPONSES TO DEFENDANT/COUNTERCLAIMANT, ROSS INTELLIGENCE INC.'S FIRST SET OF COUNTERCLAIM INTERROGATORIES (NOS. 22-28)**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Rules of the United States District Court for the District of Delaware (the "Local Rules" and each a "Local Rule"), Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West") (collectively "Plaintiffs"), hereby supplement their responses to Defendant and Counterclaimant ROSS Intelligence Inc.'s ("Defendant") First Set of Counterclaim Interrogatories (Nos. 22-28), served on April 11, 2023 (the "Interrogatories" and each individually, an "Interrogatory") in the above-captioned action ("Action") as follows:

**GENERAL OBJECTIONS**

1.   Plaintiffs object to the Interrogatories to the extent that it purports to impose obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules, or other applicable law.

2.   Plaintiffs object to the Interrogatories to the extent that it seeks proprietary or confidential business information, trade secrets or other sensitive information. To the extent that the response to any Interrogatory requires the disclosure of any non-privileged proprietary or confidential information, trade secrets or other sensitive information, Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case. D.I. 48.

3.   Plaintiffs object to the Interrogatories to the extent that it seeks information that is subject to the attorney-client privilege, the work product privilege, or any other applicable privilege or protection under federal or state law. Plaintiffs do not waive, intend to preserve, and are preserving any such privilege with respect to any information protected by such privilege.

4.   The responses provided to the Interrogatories are based on Plaintiffs' interpretation of the language used in the Interrogatories. Plaintiffs reserve their right to amend or to supplement their responses and objections in the event that Defendant asserts an interpretation that differs from Plaintiffs' interpretation.

5.   Plaintiffs object to the Interrogatories to the extent that it seeks information that is outside of Plaintiffs' possession, custody, or control, including in Instruction No. 7. For the purpose of responding to the Interrogatories, Plaintiffs will provide responses based on the information that is reasonably within their possession, custody, or control.

6.   The responses below shall not be interpreted to concede the truth of any factual assertion or implication contained in the Interrogatories. Plaintiffs' responses to the Interrogatories in no way constitute admissions or acknowledgements by Plaintiffs as to the relevance, materiality, or admissibility of any of the information contained therein, and Plaintiffs expressly reserve their rights to object as such.

7.   Plaintiffs reserve the right to modify or supplement their objections and responses to the Interrogatories to conform to the results of continuing discovery and factual investigation in this matter. These responses also are subject to correction for omissions or errors.

8.   In providing responses to the Interrogatories, Plaintiffs do not in any way waive or intend to waive, but rather are preserving and intend to preserve:

(i)      All objections as to competency, authenticity, relevancy, materiality and admissibility;

(ii)     All rights to object on any grounds to the use in any subsequent proceedings of any of the responses or information contained herein, including but not limited to the right to object at the trial of this or any other action;

(iii)    All objections as to vagueness and ambiguity; and

(iv)    All rights to object on any grounds to any further interrogatories.

9.   Plaintiffs object to the Interrogatories to the extent that any Interrogatory's subparts, including those arising from Defendant's "Definitions" and "Instructions," actually constitute separate interrogatories, thereby exceeding the number of interrogatories permitted under Federal Rule of Civil Procedure 33(a)(1).

10. Plaintiffs object to the Interrogatories as premature to the extent that it asks or requires Plaintiffs to provide information that is the subject of expert disclosures under Federal Rule of Civil Procedure 26(a)(2).

11. Plaintiffs object to the Interrogatories to the extent that it is premature in that it asks or requires Plaintiffs to analyze or formulate contentions on matters for which Plaintiffs' investigation and discovery have not yet been completed. The responses provided below are based

on the investigation conducted to date and are without prejudice to any later supplementation, amendment, or modification.

12. Plaintiffs object to the Interrogatories as overly broad to the extent that it defines the term "THOMSON REUTERS" to include "its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf." For the purpose of responding to the Interrogatories, Plaintiffs will construe this term to mean solely Thomson Reuters Enterprise Centre GmbH, and not any other person or entity.

13. Plaintiff objects to the Interrogatories as overly broad to the extent that it defines the term "WEST" to include "its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf." For the purpose of responding to the Interrogatories, Plaintiffs will construe this term to mean solely West Publishing Corporation, and not any other person or entity.

14. Plaintiffs object to the Interrogatories as overly broad to the extent that it defines the terms "YOU," "YOUR," and "PLAINTIFFS" to incorporate the definitions of the terms "THOMSON REUTERS" and "WEST" and thus are defined to include Thomson Reuters Enterprise Centre GmbH's and West Publishing Corporation's "present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on [their] behalf." For the purpose of responding to the Interrogatories, Plaintiffs will construe the terms "YOU," "YOUR," and "PLAINTIFFS" to mean solely Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation, and not any other person or entity.

15. Plaintiffs object to the Interrogatories as overly broad to the extent that it defines the terms "ROSS," "DEFENDANT," and "COUNTERCLAIMANT" to include "its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf." For the purpose of responding to the Interrogatories, Plaintiffs will construe these terms to mean solely ROSS Intelligence, Inc., and not any other person or entity.

16. Plaintiffs object to the Requests to the extent that they define "PUBLIC LAW DATABASE" and "PUBLIC LAW DATABASES" to incorporate disputed factual and legal conclusions. Plaintiffs do not adopt, concede, or confirm the accuracy of any purported or disputed factual or legal conclusions incorporated into ROSS's definitions of "PUBLIC LAW DATABASE" and "PUBLIC LAW DATABASES."

17. Plaintiffs object to the Requests to the extent that the Requests define "LEGAL SEARCH TOOL" and "LEGAL SEARCH TOOLS" to incorporate disputed factual and legal conclusions. Plaintiffs do not adopt, concede, or confirm the accuracy of any purported or disputed factual or legal conclusions incorporated into ROSS's definitions of "LEGAL SEARCH TOOL" and "LEGAL SEARCH TOOLS."

18. Plaintiffs object to the Requests to the extent that the Requests define "LEGAL SEARCH PLATFORM" and "LEGAL SEARCH PLATFORMS" to incorporate disputed factual and legal conclusions. Plaintiffs do not adopt, concede, or confirm the accuracy of any purported or disputed factual or legal conclusions incorporated into ROSS's definitions of "LEGAL SEARCH PLATFORM" and "LEGAL SEARCH PLATFORMS."

19. Plaintiffs object to the Interrogatories as vague and ambiguous to the extent that it defines the term "DESCRIBE" using the capitalized term "Identifying." It is unclear whether

Defendant intended to incorporate the definition of the defined term "IDENTIFY," in which case the definition of the term "DESCRIBE" is nonsensical, or to give that word a separate definition. For the purpose of responding to the Interrogatories, Plaintiffs will construe the term "Identifying" as used in the definition of the term "DESCRIBE" with its ordinary meaning.

20. Plaintiffs object to Instruction No. 6 to the extent it purports to impose obligations with regard to the production of privilege logs that differ from those required by the Federal Rules and Local Rules. Plaintiffs will log information pursuant to the parties' agreed procedure for preparing and producing a privilege log.

21. Plaintiffs object to Instruction Nos. 7 and 9 as vague and ambiguous to the extent that they use the undefined term "FOUNDATION." For the purpose of responding to the Interrogatories, Plaintiffs will construe that term to mean Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation, and not any other person, entity, or foundation.

22. Plaintiffs object to the Interrogatories as overly broad and unduly burdensome to the extent that its Interrogatories do not specify timeframes and are thus unlimited as to time.

23. Plaintiffs incorporate the foregoing General Objections into each and every one of its responses to the Interrogatories as set forth below.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 22:**

STATE ALL FACTS that support any claim that PLAINTIFFS are not liable under Sections 1 or 2 of the Sherman Act, INCLUDING without limitation the basis for each of PLAINTIFFS' affirmative defenses.

**RESPONSE TO INTERROGATORY NO. 22:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome

to the extent that it asks Plaintiffs to state "all facts" regarding how Plaintiffs are not liable under Sections 1 or 2 of the Sherman Act without limitation. Plaintiffs further object to this Interrogatory to the extent it purports to require them to marshal all evidence and all facts in support of their defense of ROSS's antitrust counterclaims. Plaintiffs will identify, with specific examples, the types of evidence supporting their defense of ROSS's antitrust counterclaims and do not purport to identify every single piece of evidence that supports a particular argument or that Plaintiffs will use in this matter. Further, depositions remain ongoing and are being completed contemporaneously with Plaintiffs' preparation of these responses. Plaintiffs reserve the right to use any and all deposition testimony that supports its arguments in this matter, including those outlined below. Plaintiffs incorporate by reference the deposition exhibits used in Plaintiffs' offensive depositions of ROSS's witnesses and any third parties deposed in this matter. Plaintiffs further state that the development of their factual and legal arguments in defense of ROSS's antitrust counterclaims is ongoing, and they reserve the right to supplement their response to this Interrogatory in light of facts learned during discovery, particularly as this Interrogatory is premature in that it requires or asks Plaintiffs to provide information that is subject to expert disclosures under Federal Rule of Civil Procedure 26(a)(2). Plaintiffs incorporate their experts' forthcoming opinions in this matter, and any reliance material, in their response to this Interrogatory. Finally, Plaintiffs expressly reserve the right to make these, and other, arguments with additional evidence both at summary judgment and at trial based on Plaintiffs' continued development and refinement of the factual and legal arguments underpinning their defense in this case.

Plaintiffs further object to this Interrogatory on the basis that ROSS has the burden of proof on its antitrust counterclaims, and to the extent this Interrogatory seeks a factual basis for defenses

7

to elements of ROSS's claims on which ROSS has the burden, this Interrogatory improperly seeks to shift the burden onto Plaintiffs to disprove ROSS's allegations. By setting forth the factual basis supporting their argument that they are not liable under the Sherman Act, Plaintiffs do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to ROSS. Plaintiffs finally object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:









**INTERROGATORY NO. 23:**

DESCRIBE how YOU obtain judicial content for the PUBLIC LAW DATABASE, IDENTIFY ANY and ALL formal and informal agreements, arrangements, or understandings relating to same.

**RESPONSE TO INTERROGATORY NO. 23:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrases "obtain," "judicial content," "formal and informal agreements," "arrangements, and "understandings" are unclear and undefined. Plaintiffs will respond to this Interrogatory with the understanding that the phrase "judicial content" means judicial opinions. Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:



**INTERROGATORY NO. 24:**

DESCRIBE the differences between WESTLAW CLASSIC, WESTLAW NEXT, WESTLAW EDGE, and WESTLAW PRECISION, INCLUDING the reasons for developing each and the pricing and subscription options for each.

**RESPONSE TO INTERROGATORY NO. 24:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrases "reasons for developing each" and "pricing and subscription options for each" are unclear and undefined. Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome. Plaintiffs object to this Interrogatory to the extent that it seeks information that ROSS equally may otherwise obtain from public sources, including by reviewing the Westlaw website available at https://legal.thomsonreuters.com/en/westlaw.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:





**INTERROGATORY NO. 25:**

IDENTIFY ALL PERSONS with knowledge of PLAINTIFFS' finances, including without limitation gross and net revenue, expenses, and profit, associated with the WESTLAW PRODUCT.

**RESPONSE TO INTERROGATORY NO. 25:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory to the term "all persons" as overbroad, unduly burdensome, and disproportionate to the needs of this case. Plaintiffs will respond with the understanding that this Interrogatory seeks information regarding Persons with direct, material, and non-privileged knowledge. Plaintiffs object to this Interrogatory as vague and ambiguous to the extent that the phrases "knowledge" and "finances" are unclear and undefined. Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.

Subject to, as limited by, and without waiver of the foregoing objections, ███████

███████████████████████████████████████

**INTERROGATORY NO. 26:**

STATE the number of judicial opinions contained on WESTLAW.

**RESPONSE TO INTERROGATORY NO. 26:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrases "judicial opinions" and "contained" are unclear and undefined. Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: █████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

**INTERROGATORY NO. 27:**

IDENTIFY the courts where YOU are unable to obtain judicial opinions for YOUR PUBLIC LAW DATABASE.

**RESPONSE TO INTERROGATORY NO. 27:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrase "judicial opinions" is unclear and undefined. Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: ███████████████████████████████████████████

████████████████████████████████████

## INTERROGATORY NO. 28:

DESCRIBE in detail the meaning of "superior content" identified in TRCC-00000368 as a "WestlawNext Difference," INCLUDING what is the specific content being compared and how the content is specifically superior to Lexis Advance.

## RESPONSE TO INTERROGATORY NO. 28:

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrases "content" and "superior" are unclear and undefined. Plaintiffs object to this Interrogatory to the extent that it seeks information that is neither relevant to any claim or defense of any party in this Litigation. Plaintiffs object to this Interrogatory as the document identified speaks for itself. Plaintiffs further object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: ███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and Counterdefendants*
*Thomson Reuters Enterprise Center GmbH*
*and West Publishing Corporation*

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Daniel E. Laytin
Christa C. Cottrell
Alyssa C. Kalisky
Cameron Ginder
Vanessa Barsanti
Danielle O'Neal
Jonathan Emmanuel
Lexi Wung
Erin Bishop
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

May 11, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2023, copies of the foregoing were caused to be served upon the following in the manner indicated:

David E. Moore, Esquire                                      *VIA ELECTRONIC MAIL*
Bindu Palapura, Esquire
Andrew L. Brown, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Defendant and Counterclaimant*

Mark A. Klapow, Esquire                                      *VIA ELECTRONIC MAIL*
Lisa Kimmel, Esquire
Crinesha B. Berry, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC  20004
*Attorneys for Defendant and Counterclaimant*

Gabriel M. Ramsey, Esquire                                   *VIA ELECTRONIC MAIL*
Jacob Canter, Esquire
Warrington Parker, Esquire
Margaux Poueymirou, Esquire
Anna Z. Saber, Esquire
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
*Attorneys for Defendant and Counterclaimant*

Shira Liu, Esquire                                           *VIA ELECTRONIC MAIL*
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614
*Attorneys for Defendant and Counterclaimant*

*/s/ Michael J. Flynn*

_____
Michael J. Flynn (#5333)

# EXHIBIT EEEE

VitalLaw®



# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, Highlights

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp
Fourth and Fifth Editions, 2023 Cum. Supp.

Click to open document in a browser

**Last Updated: 8/2023**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application

*by Phillip E. Areeda and Herbert Hovenkamp*

**By the same author**

*IP and Antitrust* by Herbert Hovenkamp, Mark D. Janis, Mark A. Lemley, Christopher R. Leslie, and Michael A. Carrier

*Fundamentals of Antitrust Law* by Phillip Areeda and Herbert Hovenkamp

One of the most intellectually challenging areas of the law, antitrust presents such difficult issues as defining markets and analyzing market power and pricing and often implicates complex economic models. *Antitrust Law* gives you the comprehensive overview, including relevant economic and policy concerns, and incisive analysis of all pertinent issues.

Highlights of the 2023 Supplement

The 2023 Supplement brings you up to date on many important developments in the law, including:

- Discussion of the *Ellis* and *Indian River Shores* decisions on the "authorization" requirement for the state action doctrine (see ¶224)
- Discussion of the First Circuit's decision in *Confederación Hípica de Puerto Rico*, which extended the labor antitrust immunity to a collective of jockeys, who were independent contractors (see ¶255d)
- Discussion of the *Celestin* decision in the Second Circuit, limiting the Act of State doctrine (see ¶274b); and also *Blenheim Capital Holdings* in the Fourth Circuit, on whether South Korean military procurement is immune under the Foreign Sovereign Immunities Act (see ¶274d)
- Discussion of the *Hobart-Mayfield*, *BRFHH Shreveport*, and DRAM litigation on antitrust pleading requirements (see ¶307d)
- Discussion of the important *Dealer Management* decision on the relationship between expert testimony and summary judgment (see ¶309)
- Treatment of the *Oakland Raiders* decision on causation and private plaintiff standing (see ¶¶335, 338)
- Discussion of the Ninth Circuit *PLS* decision that real estate board restrictions that excluded some agents did not need to show harm to the final buyers and sellers of homes, but only to the intermediate good (see ¶337)
- Discussion of the district court's *Facebook* decision holding that the FTC had adequately alleged high entry barriers (see ¶421)
- Discussion of direct measurement of market power on two-sided markets (see ¶521)

- Treatment of the *Vasquez* decision on pleading requirements for market power under the hypothetical monopolist test (see ¶531)
- Discussion of the market definition issue in the FTC's *Facebook* case (see ¶521)
- Discussion of the market definition problem in the *United States Sugar* merger case (see ¶562)
- Discussion of the Fifth Circuit's *Chandler* decision on "arising under" jurisdictional choice of court in a *Walker Process* patent/antitrust case (see ¶¶706c, 713)
- Analysis of the Third Circuit's treatment of the merger efficiency defense in the *Hackensack* case (see ¶970d)
- Treatment of the franchise/single-entity issue in the *Arrington/Burger King* litigation (see ¶1462)
- Discussion of the *EpiPen* quasi-exclusive-dealing case (see ¶¶1802, 1807, 1821d2)
- Updated discussion of "anti-poaching" market-division agreements involving labor (see ¶2013b)
- Discussion of the Ninth Circuit's *PLS.Com* decision on unreasonable restraints on real estate brokers participating in a real property listing service (see ¶2203)
- Discussion of *Maui Electric*, concluding that the Hawaii public utility commission's authorization to act in the "public interest" did not authorize it to hear antitrust complaints (see ¶2411)
- Discussion of *StarKist*, holding that the Washington Consumer Protection Act permitted the state to seek restitution for price fixing, and as a public enforcer it need not show causation or traditional damages, but restitution could be measured by unlawful gains (see ¶2412a)

**5/23**

**For questions concerning this product, billing, or other customer service matters, contact our Customer Service Department at customer.service@wolterskluwer.com or 1-800-234-1660.**

**If you are interested in subscribing to this content digitally via our VitalLaw platform, visit *https://law-store.wolterskluwer.com/* or call 1-800-638-8437.**

Copyright © 2023 Vols 1-10 President & Fellows of Harvard College; Vols 11-14 CCH Incorporated; Supplement CCH Incorporated. All Rights Reserved.



## Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, 3F "Standing" of Private Plaintiffs (¶335-¶363)

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp
**Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp**
CHAPTER 3 The Antitrust System of Remedies (¶300-¶399)  ::  3F "Standing" of Private Plaintiffs (¶335-¶363)

Click to open document in a browser

### 3F "Standing" of Private Plaintiffs

---

## Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, 3F-1 General Standing Doctrine (¶335-¶340)

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp
**Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp**
CHAPTER 3 The Antitrust System of Remedies (¶300-¶399)  ::  3F "Standing" of Private Plaintiffs (¶335-¶363)  ::  3F-1 General Standing Doctrine (¶335-¶340)

Click to open document in a browser

### 3F-1 General Standing Doctrine

---

## Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶335. "Standing"

Phillip E. Areeda (late) & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶335. (Fourth and Fifth Editions, 2023 Cum. Supp. 2016-2022)
Fourth and Fifth Editions, 2023 Cum. Supp.

**Last Updated: 8/2023**

*City of Oakland v. Oakland Raiders* , 20 F.4th 441, 452–53 (9th Cir. 2021), *cert. denied* , 143 S. Ct. 84 (2022) (City of Oakland lacked standing to assert claim that football team's exit from its market was pursuant to an unlawful output restriction conspiracy, noting difficulties in establishing causation; for example, instead of permitting the Raiders to move to Las Vegas, the NFL could simply have created an additional team so that both cities would have one), citing this Paragraph in the main text. *Cf. City of Long Beach v. Total Gas & Power N. Am., Inc.* , 2021 WL 5754295 (2d Cir. Dec. 3, 2021) (affirming district court's decision denying city's claim for lack of standing; but facts indicate that in fact the defendant had not violated the antitrust laws because a single firm's manipulation of prices is not an antitrust violation; in that case the court should have dismissed the claim on the antitrust merits rather than denying standing). *See also DYJ Holdings, Inc. v. Intercontinental Exch., Inc.* , 2022 WL 433338 (2d Cir. 2022) (putative intervenor must have standing on same criteria as person in whose stead he is intervening).

© 2023 CCH Incorporated and  ts affi ates and  censors.
A   r ghts reserved.

On constitutional Article III standing, see *EJ MGT LLC v. Group, Inc* ., 2021 WL 5754901, at *2–*3 (3d Cir. Dec. 3, 2021) (plaintiff who could not show any causal effect of defendant's methodology for evaluating property denied Article III standing; thus the motion to dismiss was properly brought under Rule 12(b)(1)).

**335a. Introduction..—**Unlike the United States government, which is authorized to sue anyone who violates the antitrust laws, a private antitrust plaintiff must show "standing" to sue. [1] In addition to proving everything that would entitle the government to relief, the private plaintiff must also show (1) that the acts violating the antitrust laws caused—or, in an equity case, threatened to cause—it injury-in-fact [2] to its "business or property;" [3] (2) that this injury is not too remote or duplicative of the recovery of a more directly injured person; [4] (3) that such injury is "antitrust injury," which is defined as the kind of injury that the antitrust laws were intended to prevent and "flows from that which makes defendants' acts unlawful"; [5] and, in a damage case, (4) that the damages claimed or awarded measure such injury in a reasonably quantifiable way. [6] Antitrust standing therefore requires more than the constitutional minimum for the "case or controversy" that brings jurisdiction to Article III courts. [7]

The limitations on antitrust standing are only hinted at by the simple and apparently broad language of §4 of the Clayton Act, which authorizes private damage suits to enforce the antitrust laws. [8] Section 4 provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws … shall recover threefold the damages by him sustained." Thus, the plaintiff must establish that it actually "sustained" injury-in-fact to "business or property," and the "by reason of" language insists that such injury be caused by the violation. However, the statutory language does not illuminate any "antitrust injury" requirement or tell us how proximate causation must be defined or how precisely damages must be measured.

We summarize the elements of standing in ¶c after pausing briefly in ¶b to mention the similar limitations on standing to obtain equitable relief. In ¶d, we examine Supreme Court doctrine and connect contemporary standing requirements with earlier requirements that the plaintiff's injury be "direct" or within the "target area" of the defendant's conduct. In ¶e, we explain that it does not matter whether the court calls all the elements summarized in ¶c "standing" or defines them with different terminology. Whatever they are called, all must be shown. In ¶f, we offer a simple way to avoid erroneously denying standing when the tribunal really means that no antitrust violation has occurred. Finally, ¶¶g – h state the general arguments for greater or lesser hospitality to private suits and summarize the typical results for various classes of plaintiffs, as the remainder of this subchapter explores in detail.

**335b. Standing doctrine limits equity..—**The plaintiff seeking injunctive relief must generally meet all the requirements that apply to the damage plaintiff, except that the injury itself need only be threatened and damage need not be quantified. Occasionally a party too remote for damages or unable to prove its damages can be granted an injunction. [9]

Clayton Act §16 provides, "Any person … shall be entitled to sue for and have injunctive relief … against threatened loss or damage by a violation of the antitrust laws … under the same conditions and principles … [usually employed by] courts of equity." [10] Unlike §4, this provision does not require any injury to "business or property," although little turns on this language. [11] More important, an injunction is available before any actual loss or damage—speculative, duplicative, or otherwise—occurs; §16 requires only that injury be "threatened." To be sure, the plaintiff must show that this threatened injury would be caused by the alleged antitrust violation and that this threatened injury would constitute "antitrust injury" if it actually occurred.

To satisfy this causation requirement, the plaintiff in equity must connect its prospective injury to the violation in about the same proximate way as the damage plaintiff. However, somewhat greater latitude may be allowed in the equity suit. [12] For example, while plaintiffs claiming duplicative injuries may be denied standing for damage purposes, multiple or duplicative suits are less troublesome in equity where, as the Supreme Court has pointed out, one injunction is as effective as 100. [13] Additional equity plaintiffs have no incentive to sue once

© 2023 CCH Incorporated and ts affi ates and censors.
A r ghts reserved.



the threatening conduct is enjoined. Similarly, the availability of a preferable plaintiff may be less reason to deny standing in equity than in a damage suit. [14]

However, equity courts must resist the impulse to minimize standing limitations. That impulse may seem especially strong late in a suit, when the lack of threatened proximately caused injury (or especially antitrust injury) appears after the court has become convinced that the defendant has violated the antitrust laws. At that point, the litigation burden has already been borne by the court and the parties. Because dismissing that case does not then conserve any trial resources, it might seem best to protect the public by enjoining the violation, regardless of the plaintiff's lack of standing. The court may thus feel tempted either to dispense with standing or to strain to invent it.

That temptation should be resisted. *First* , if the statute requires plausible allegations of threatened antitrust injury proximately caused by a violation to initiate an equity suit, nothing in the legislative language or history distinguishes the end of the suit from the beginning. There is no warrant for progressively diluting the requirement of standing as the suit progresses. *Second* , rulings that invent standing at the close of a suit will not be confined to such cases; they will be taken by other courts to define "standing" early in the suit as well. Indeed, dispensing with or shading standing requirements after the merits are determined might tempt judges to postpone ruling on standing, which may seem unimportant if a violation appears or moot if it does not. *Third* , granting an injunction subjects the defendant to liability for the plaintiff's attorney's fees [15] and to offensive collateral estoppel in suits by other parties. [16] The effect is not only to burden the defendant but to encourage more suits by parties without standing. [17]

### 335c. Basic standing requirements summarized..—In order to maintain an antitrust damage suit, the private plaintiff must show the following:

### 335c1. *Injury to "business or property."*.—Although the language of §4 of the Clayton Act requires such injury, we will see that these limiting words are of little effect today. [18] To be sure, courts denying standing sometimes use those words to express doubt that the alleged injury is of the actionable kind or that any injury was actually suffered, especially by the "nascent" firm that was not yet in operation at all. [19] Such doubts would also deny standing to equity plaintiffs notwithstanding the absence of "business or property" language in §16.

### 335c2. *Injury-in-fact "by reason of" the antitrust violation*..—The private plaintiff must show actual injury that was "caused" by the violation. Given multiple causes for virtually every phenomenon, the courts do not insist that the violation be the only possible cause of the plaintiff's injury. However, it must be a "material" or a "substantial" cause. [20]

### 335c3. *Proximity*..—The private plaintiff must also show that its injury is not unduly remote from the violation. [21] As some of the older decisions put it, the injury must be "direct." The plaintiff's "remoteness" can be relevant in several ways. *First*, undue remoteness may suggest the improbability of actual injury, causation, or even any antitrust violation. *Second*, the intervening causes affecting the plaintiff become more numerous as the plaintiff is more remote from the violation. Tracing causation from the violation and measuring the injuries thus caused may become impracticably complex. *Third*, damages for all "remote" plaintiffs are more than necessary to deter illegal conduct and may overdeter. For example, the Organization of Petroleum Exporting Countries (OPEC) cartel injures not only immediate buyers and their customers and their customers' customers, but also sellers of electric motors and of copper wire, their stockholders and creditors, as well as tax-collecting governmental bodies and thus taxpayers generally. Clearly, not all of them will be allowed to sue under the antitrust laws. If they were, total recoveries would almost certainly be excessive. Beyond the actual customers, most other plaintiffs would be classified as "remote" and denied standing even though they suffered injury-in-fact. *Fourth*, and closely related to the last point, damages for remote plaintiffs can yield "duplicative" recovery—most clearly when the plaintiff's injury would be fully compensated by damages to a more direct victim from whom the plaintiff's injury was derived. [22] For example, an injury to a shareholder [23] or landlord [24] is typically identical to the injury to the corporation or the business tenant who is the more immediate victim of the antitrust violation. *Fifth*, the

© 2023 CCH Incorporated and ts affi ates and censors.
A  r ghts reserved.

# EXHIBIT FFFF


**THOMSON REUTERS®**

---

**AUGUST 17, 2023**

# Thomson Reuters Completes Acquisition of Casetext, Inc.

**TORONTO, August 17, 2023 –** Thomson Reuters Corporation ("Thomson Reuters") (NYSE / TSX: TRI) announced today that it has closed on its previously announced acquisition of Casetext, Inc. ("Casetext"), a provider of technology for legal professionals, for a purchase price of $650 million in cash.

Founded in 2013, Casetext uses advanced AI and machine learning to build technology for legal professionals, creating solutions that help them work more efficiently and provide higher-quality representation to more clients. Casetext's customers include more than 10,000 law firms and corporate legal departments. Its key products include CoCounsel, an AI legal assistant powered by GPT-4 that delivers document review, legal research memos, deposition preparation, and contract analysis in minutes.

The acquisition supports Thomson Reuters 'build, partner and buy' strategy to bring generative AI solutions to its customers and the company's efforts to redefine the future of professionals through applications of generative AI. Other recent developments include Thomson Reuters commitment to invest $100 million-plus annually to integrate AI into its flagship content and technology solutions, as well as its work with Microsoft for a new plugin

---

that leverages Westlaw, Practical Law and Document Intelligence. In July, Thomson Reuters also launched a beta program to pilot new generative AI capabilities in Westlaw with select customers.

"Our company has a successful track record of fueling growth and innovation through acquired businesses, partnerships and organic investments.  We are thrilled to welcome the Casetext team to the Thomson Reuters family," said Steve Hasker, president and CEO of Thomson Reuters. "Together, we will accelerate breakthroughs in generative AI for the benefit of our customers and markets. We believe this will revolutionize the way professionals work, and the work that they do."

"Today marks an exciting day for Casetext employees and customers alike," said Jake Heller, CEO of Casetext. "Joining Thomson Reuters provides us with an unparalleled opportunity to scale the Casetext vision and accelerate breakthroughs for legal professionals. As we look to unlock generative AI's full potential to drive greater productivity, more impactful work and increased access to justice, there could not be a better home for our brand, talent and products."

**About Thomson Reuters**

Thomson Reuters (NYSE / TSX: TRI) informs the way forward by bringing together the trusted content and technology that people and organizations need to make the right decisions. The company serves professionals across legal, tax, accounting, compliance, government, and media. Its products combine highly specialized software and insights to empower professionals with the data, intelligence, and solutions needed to make informed decisions, and to help institutions in their pursuit of justice, truth, and transparency. Reuters, part of

Thomson Reuters, is a world leading provider of trusted journalism and news. For more information, visit tr.com.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS, MATERIAL RISKS AND MATERIAL ASSUMPTIONS

*Certain statements in this news release are forward-looking, including but not limited to statements regarding the expected benefit of the transaction to Thomson Reuters' customers and professionals generally . The words "expect", "believe" and similar expressions identify forward-looking statements. While the company believes that it has a reasonable basis for making forward-looking statements in this news release, they are not a guarantee of future performance or outcomes and there is no assurance that any of the other events described in any forward-looking statement will materialize. Forward-looking statements are subject to a number of risks, uncertainties and assumptions that could cause actual results or events to differ materially from current expectations. Many of these risks, uncertainties and assumptions are beyond our company's control and the effects of them can be difficult to predict. You are cautioned not to place undue reliance on forward-looking statements which reflect expectations only as of the date of this news release. Except as may be required by applicable law, Thomson Reuters disclaims any obligation to update or revise any forward-looking statements.*

## CONTACTS

**MEDIA**
**Andrew Green**
Senior Director, Corporate Affairs
+1 332 219 1511

### INVESTORS

**Gary Bisbee, CFA**

Head of Investor Relations

+1 646 540 3249

gary.bisbee@tr.com

---

**Media contacts**                                                    →

---

**SHARE**

↱

# EXHIBIT GGGG

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY