**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | |
| | ) | C.A. No. 20-613-SB |
| Plaintiffs/Counterdefendants, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant/Counterclaimant. | ) ) | |

**EXHIBIT A TO ROSS INTELLIGENCE'S RESPONSE AND
OBJECTIONS TO PLAINTIFFS' PROPOSED VERDICT FORM**

OF COUNSEL:

Warrington S. Parker III
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated:  August 16, 2024

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant
ROSS Intelligence, Inc.*

# EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           IN AND FOR THE DISTRICT OF DELAWARE

 3
        THOMSON REUTERS ENTERPRISE CENTRE  )
 4      GmbH et al.,                        )
                                            )
 5      --------------------Plaintiffs,     )
                                            ) Case No.
 6      vs.                                 ) 20-CV-613-SB
                                            )
 7      ROSS INTELLIGENCE INC.,             )
                                            )
 8      --------------------Defendant.      )

 9
               TRANSCRIPT OF PRETRIAL CONFERENCE
10

11       PRETRIAL CONFERENCE had before the Honorable

12  Stephanos Bibas, U.S.D.C.J., in Courtroom 2B on the 6th of

13  August, 2024.

14

15                      APPEARANCES

16      MORRIS, NICHOLS, ARSHT & TUNNELL LLP
             BY:  JEREMY TIGAN, ESQ.
17
                       -and-
18
        KIRKLAND & ELLIS LLP
19           BY:  DALE CENDALI, ESQ.
                  JOSHUA SIMMONS, ESQ.
20                MIRANDA MEANS, ESQ.
                  YUNGMOON CHANG, ESQ.
21                ERIC LOVERRO, ESQ.

22                      Counsel for Plaintiffs

23

24

25
```

1    (Appearances continued.)

2

3            POTTER ANDERSON & CORROON LLP
                 BY:  DAVID MOORE, ESQ.
4
                                -and-
5
        CROWELL & MORING LLP
6            BY:  WARRINGTON S. PARKER III, ESQ.
                 KEITH HARRISON, ESQ.
7                JOACHIM STEINBERG, ESQ.

8                           Counsel for Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1          THE COURT:  So we're here in Thomson Reuters
2   Enterprise versus ROSS Intelligence 20613.  Counsel for
3   Plaintiffs, please enter your appearances.
4          MR. TIGAN:  Good afternoon, Your Honor.  Jeremy
5   Tigan with Morris Nichols here in Wilmington for the
6   plaintiffs.  I'm joined by five of my colleagues from
7   Kirkland & Ellis today.  I have Dale Cendali, Joshua
8   Simmons, Miranda Means, Yungmoon Chang, and Eric Loverro
9   with me, and depending on the issue discussed, you may hear
10  from variation combinations of them.
11         THE COURT:  Mr. Tigan, are you going to take the
12  lead on the general admin issues?
13         MR. TIGAN:  Yes, I'm happy to discuss that when
14  Your Honor is ready.
15         THE COURT:  Very good.  Thank you.
16         And for Defendant.
17         MR. MOORE:  Good afternoon, Your Honor.  David
18  Moore from Potter Anderson here in Wilmington joined by my
19  colleagues from Crowell & Moring Warrington Parker, Joachim
20  Steinberg, and Keith Harrison.
21         THE COURT:  Good afternoon to you all.
22         And, Mr. Moore, are you going to be handling
23  the --
24         MR. MOORE:  I'm happy to, but I think Mr. Parker
25  planned to handle that.
```

1           THE COURT:  Mr. Parker.  Okay.  Got it.  Great.

2           We have trial in three weeks, and my

3    understanding is this case is going to trial or we all

4    expect it to.  We're going to -- I want to start by talking

5    about Dr. Braden's replacement.  We'll go on to talk about

6    trial logistics, dates, times, things like that.  We'll go

7    to substantive issues like jury instructions, voir dire,

8    verdict sheet, and some motions in limine, deposition

9    designations, and then we'll loop back around to the

10   antitrust summary judgment oral argument that comes up after

11   this copyright trial.

12          Is there anything else apart from the things

13   I've laid out that the parties want to add to the agenda

14   today?

15          MS. CENDALI:  Nothing I can think of, Your

16   Honor.

17          MR. PARKER:  No.

18          THE COURT:  Very good.  So the most pressing

19   thing here is I want to hear from ROSS about Dr. Braden's

20   replacement.  He's our expert who had an untimely demise a

21   month ago, less.

22          MR. PARKER:  Much less.  Dr. Braden passed away

23   around midnight July 19th East Coat time.  We have obtained

24   an expert.  We retained that expert on Wednesday.  We

25   offered the name of the expert to Plaintiff's counsel on

1  Tuesday, which we're required to do under the protective

2  order.  Plaintiff's counsel responded on Wednesday.  His

3  name is Joe Morris.

4           As I indicated to you when we talked on the

5  Thursday before last, I was able to represent to the Court

6  that I anticipated having an expert.  That expert, through

7  no fault of our own, received the last materials today, this

8  morning.  And talking to him this evening, I will report to

9  the Court and opposing counsel what his views are on getting

10  up to speed.  I literally have no idea.

11           THE COURT:  We're not in a position to know yet

12  whether he adopts Dr. Braden's report and is comfortable

13  doing so.

14           MR. PARKER:  I think he is going to be able to

15  do that.  He read the reports.  He said, "It makes sense to

16  me," but he hasn't had the underlying material to say more

17  than that.

18           THE COURT:  Understood.  Does he have

19  availability through the end of the month?

20           MR. PARKER:  Yes, he does.

21           THE COURT:  Very good.  So is there -- if we

22  could proceed to trial on the current schedule, are there

23  any accommodations that your side needs, anticipates needing

24  with him, or do you need to discuss those after you go

25  through the substantive issues?

1          MR. PARKER:  Step one for me is let me talk to

2     him tonight.  I'm not sure if there's anything that needs to

3     be done.  There are some logistics that we probably need to

4     work out, simple things that I don't think we have a problem

5     with.  You're not Dr. Braden.  You're somebody different and

6     sort of impeach him in that kind of way.

7          Can I just talk to him tonight and I can get a

8     very fulsome report.  My hope is that he can say he's going

9     to go to trial.  I told him, frankly, please don't make a

10    representation until you have all the materials.

11         And let me just -- I want to be clear for

12    everyone.  The last materials he received this morning were

13    the source code.  He was supposed to receive that yesterday

14    and it was Federal Expressed and I don't know.  It was in

15    the Federal Express world until this morning.

16         THE COURT:  Got it.  Understood.  Let's see if

17    we're able to come together by a call or Zoom at the end of

18    the week.  Great.  I have a trial next week, but I will make

19    time around it to talk to you, given the late-breaking

20    nature of this.

21         I also think it would be entirely appropriate if

22    the parties are able to agree now on the language of some

23    instruction I give them explaining it's no fault of ROSS's

24    that this -- the previous expert died and that this is

25    unusual procedure and that, obviously, we'll have some

1    questions about what he knows, et cetera, hasn't done this

2    personally.  So we'll be doing that, but there's no reason

3    that any suspicion should fall on ROSS by the nature of it.

4    And there will be, of necessity, some of what he's able to

5    say about the report based on his review of the materials,

6    et cetera, but he didn't write it himself.

7              MR. PARKER:  So what we'll -- let me just give

8    you the Court my ideas for tomorrow.  Tomorrow, I'm flying

9    from 8:00 this time until 1:00 California time.  It's not

10   going to be a problem.  If he says he's ready, I'm going to

11   ask Mr. Moore to send you a letter and opposing counsel

12   saying he can do this by that date.  If not, I'm going to

13   say -- have another letter saying no, but I would submit an

14   affidavit on his behalf.  I know from the judge's -- from

15   your earlier position on this there may be some headwinds on

16   this, but we'll at least give you, the Court, one way or the

17   other a heads-up.  I don't know which way it will turn, but

18   we'll get it done.

19             THE COURT:  I appreciate your being a good

20   officer of the court and not representing more that you can

21   represent at this point.  And under the circumstances, that

22   seems eminently reasonable to me.  We'll hear from Thomson

23   Reuters, but it doesn't seem like we can expect more of a

24   position until he's had an appropriate time to go through

25   it.

1              So you do your flight tomorrow, spend some time

2    talking with him, and then work with opposing counsel to see

3    if we're in a position to set up a call later in the week,

4    just a status on this.

5              MR. PARKER:  Certainly.  Thank you.

6              THE COURT:  Very good.  So let's -- is there any

7    more that anyone would like to say on that?

8              MS. CENDALI:  No, Your Honor.  This is

9    Ms. Cendali.  Other than to say we're happy to work with

10   them on the type of stipulation you envisioned, and for all

11   the reasons we talked about last time, we're hopeful, as I

12   think everyone in the room is, that we can go to trial.

13             THE COURT:  Very good.  I'm taking you at face

14   value.  We're not going to allow anything that would

15   inadvertently insinuate that there's something improper

16   going on here.  I wouldn't expect it from you.  I'm sure we

17   can agree on mutually agreeable language to sue for the

18   jury.

19             MS. CENDALI:  Unless there's something else

20   going on, which I don't think Mr. Parker is a murderer, I'm

21   confident that this had nothing to do with ROSS and they

22   will not be in any way criticized for that.

23             THE COURT:  I'll take him as representing that

24   he, in fact, had nothing to do with the untimely demise.

25             MR. PARKER:  I'm not going to respond to that.

1             And I've done this for the last three days and

2    I've used every other name for Joe except the right one.

3    His last name is Marks and not Morris, not Martin, and all

4    the other last names I've made for him.

5             THE COURT:  So it's Marks.

6             MR. PARKER:  Marks, M-A-R-K-S.

7             THE COURT:  And just kind of curious.  What's

8    his professional background and training?

9             MR. PARKER:  AI programmer, Carnegie Mellon.

10            THE COURT:  Was he on faculty there?

11            MR. PARKER:  He is.

12            THE COURT:  Very good.

13            Are we ready to move on?

14            Okay.  Let's talk about logistics.  The first

15   thing, I think I had this down for jury selection at

16   10:00 a.m. August 26th.  I'm a little concerned that with

17   the last-minute search, I want to leave us a little bit more

18   room.  Each side has 15 hours plus an hour for opening, and

19   about an hour and a half for closing, I think it is.

20            Would the parties be amenable to our going from

21   jury selection directly into opening statements and using

22   Friday as a full trial day?  Gives us a little more elbow

23   room, and I don't want the jury to feel rushed in its

24   deliberations to try to get out of there for the Labor Day

25   weekend.

```
1                     Would that work for the parties?
2                     MR. PARKER:  As long as we don't split openings,
3     I don't mind.  In other words, if we could do openings all
4     on the Friday.
5                     THE COURT:  I agree.  You don't want to leave
6     the jury over the weekend having heard from only one side.
7     I think I can pick a jury before lunch.  If the opening is
8     right after lunch, we can get into a first witness.
9                     MR. PARKER:  I'm fine.
10                    MS. CENDALI:  As long as, Your Honor, we can
11    just do the opening and not actually start testimony.  I
12    think that would be hard given what we know about witness
13    availability.
14                    THE COURT:  So you think what we should do is do
15    the openings on Friday and not get to the first witness
16    until Monday morning.
17                    MS. CENDALI:  That's my suggestion, Your Honor.
18                    MR. PARKER:  I would really ask the Court not to
19    start witnesses on Friday because we have arranged flights
20    and all of that for ours.
21                    THE COURT:  Let's do that.  Let's do the
22    openings on Friday.  Afterwards, we dismiss the jury and
23    then any more admin things you see that come have up, we can
24    wrap them up on Friday afternoon so we're ready to hit the
25    ground running on Monday morning.  The more that we can do,
```

1    the better.

2            Trial day, I'll check with the jury pool.  I

3    want to be a little flexible.  My hope is that they can get

4    here before 9:00 and then we're ready to go no later than

5    9:00, which means at 8:30 I handle with you any legal issues

6    that have come up.

7            We do one mid morning break, 10, 15 minutes.  We

8    take up lunch about 45 minutes, sometimes around 12:30, but

9    being a little flexible so that we finish up a witness, for

10   example, rather than breaking in the middle of a witness.

11           Ditto for the afternoon.  We take one mid

12   afternoon break, 10, 15 minutes.  We try to wrap around 4:30

13   but, again, it makes more sense to go an extra ten minutes

14   to let a witness finish up rather than spilling over to the

15   next day.

16           And at the end of the day, out of the jury's

17   hearing, it's much more efficient, rather than doing

18   sidebars, to do the issues you anticipate with the witness

19   or scope of the cross, et cetera, when we've broken for

20   lunch or broken for midmorning or afternoon break or broken

21   for the day.

22           I wanted to work through logistics for how this

23   will work.  First of all, AV.  I'm having the deputy run

24   down what courtroom we're going to be in.  Why doesn't each

25   side give me an understanding of what AV you need or want,

1    what you plant to do in terms of bringing in a vendor to set

2    up in the courtroom.  I'll see what we can do in terms of

3    make the courtroom available for your vendors to set up and

4    test stuff out ahead of time.  This sounds to me like the

5    kind of trial where there will be some -- present some

6    complicated information to the jury in a visual format.

7              So why don't we hear from Thomson Reuters about

8    how you'd like to do it.

9              MR. SIMMONS:  So, Your Honor, we're happy to

10   have our trial techs discuss with the courtroom deputy

11   trials in Delaware.  We've done this multiple times where

12   we'll have monitors for the jury to be able to view

13   demonstratives.  There is a setup in the courtroom,

14   obviously, and our trial techs can hook into the system and

15   project.

16             THE COURT:  There will be a screen set up that

17   the jurors can see, there will be a screen that I can see,

18   there will be a screen that the witness can see.

19             MR. SIMMONS:  Correct.  All we'll need to do is

20   work with the trial tech team here the and hook into the

21   system.  Other than that, we don't have a lot of extra

22   needs.  Sometimes the court reporter will provide realtime,

23   which is useful.  One thing I don't know is how you do

24   sidebars, especially if you're doing sidebar up at the desk

25   so it's helpful for others to see it.  If you can set up a

1   time for them to come in, they have done many trials and are

2   happy to work with you.

3              THE COURT:  By tomorrow, we will have a

4   courtroom assigned.  At that point, court staff will be able

5   to tell you what's already wired there.  We'll see if we can

6   block out -- if we're starting -- does the tech need to be

7   set up for the openings?

8              MR. SIMMONS:  Yes.

9              THE COURT:  Then let's try to block out the

10  courtroom Thursday the 22nd so that the vendors can come in,

11  set it up, do some testing, et cetera.  We'll do the jury

12  selection 23rd in the morning.  We'll do the openings in the

13  afternoon.  We'll break before there are any witnesses and

14  then we'll -- it will all be set up before the trial even

15  starts.  Okay.

16              Now, I don't know whether you're going to be

17  using the same tech system that ROSS, I think, is using.

18  Have you two worked together on this?

19              MR. SIMMONS:  We haven't had that conversation

20  yet.  My experience has been that each side would have their

21  own tech set up that gets filtered in the Delaware court

22  system and a switch gets switched.

23              THE COURT:  In terms of screens and things.

24              MR. SIMMONS:  We can coordinate.

25              THE COURT:  We're not going to use duplicates.

1            And in terms of whether you anticipate there

2   will also be hard copy binders, the kind of logistics of

3   providing exhibits to each of us as well the jurors.  This

4   is not a place -- I don't know whether the other courts here

5   do, but I don't think they do have those flip-up viewing

6   screens for each juror.  If you anticipate having some hard

7   copy exhibits, obviously, we'll have some system that works,

8   whether it's a separate binder for each side or a

9   consolidated binder.

10            MR. SIMMONS:  We can certainly do that.  In my

11  experience, we usually provide to the witness and to the

12  Court and opposing counsel when the witness goes up on

13  direct and then when the cross starts and the binder goes

14  out to everybody.  Is that Your Honor's preference?

15            THE COURT:  That's fine.  Very good.  Let me

16  hear from ROSS.

17            MR. PARKER:  I do have just one question.  I've

18  done it this way for long enough.  I want to make sure we're

19  clear.  I have not usually handed up hard copies to the

20  jurors, the 11 or 12.  Usually, we would show it on the

21  video and they would see it and highlight what we wish.

22            THE COURT:  That's fine.  It avoids a lot of

23  papers moving around.  At some point, I'll want them to have

24  a binder once all the stuff has been admitted and stuff.

25  During the direct, it gets clunky.

1          MR. PARKER:  They will definitely have a binder,

2     and we will work together to make sure that they have a

3     coherent binder.  I appreciate that.

4          THE COURT:  Okay.  Great.

5          Let's see.  Is the courthouse set up in terms of

6     rooms for each side's counsel and leaving equipment?  What

7     can you tell me about that?

8          Each side can have an attorney lounge and we can

9     lock the doors for them.  They can leave the AV.  They can

10    leave the electronics and binders and other stuff like that.

11    They don't need to, like, move them aside or anything else.

12         MR. TIGAN:  She beat me to the punch, but I

13    think we've made a reservation, I assume Mr. Moore's firm as

14    well.  The breakout rooms are locked at 4:00, 4:30,

15    something like that, so we can take care of that.

16         THE COURT:  I think this courthouse might have a

17    prohibition on personal electronic devices.  If the sides

18    want a written order from the Court giving the attorneys

19    permission -- now, you're on your honor to turn off the

20    noise and silence them.  I will not be pleased if I hear

21    ringing.  Set everything on vibrate.

22         But on that understanding, if you want to

23    prepare some orders, I can have my staff put the signature

24    on it so ordered.  You can present it when you come to the

25    Court, and you'll be allowed to have things.  Let's do it

1    ahead of trial.  It's not something I need to be signing the

2    morning of trial.

3                  MR. SIMMONS:  Yes, Your Honor.  We'll have that

4    prepared.

5                  THE COURT:  Very good.  Are the counsel for each

6    side planning to provide lunch for the jurors, or should I

7    be telling them to bring their own lunches?

8                  MR. TIGAN:  Maybe I should stay up here.

9                  Yes, typically Delaware counsel coordinate that.

10   We split the cost and we get a menu in to the jurors.  And

11   there's no indication who's paying for it or where it comes

12   from.  We just provide that.

13                 THE COURT:  Absolutely.  It just makes things

14   faster.  No one is running back from some greasy spoon

15   worried about starting.  It saves a lot of time.  That's

16   great.  Much obliged.

17                 In terms of courtroom, we don't need to move

18   things aside.  We'll have to know which courtroom we're in

19   before we figure out witness and location, but since we're

20   going to have some extra time on Friday the 23rd, I think

21   after we dismiss the jurors for the day then we can work out

22   the, okay, where's the lectern going to be and where are

23   people questioning from.  We'll have a better sense of that

24   once we know what courtroom we're in.  So I don't think we

25   can really do much about that now.

1          MR. TIGAN:  I think the lecterns can be moved

2    slightly.  There might be wires under here and the witness

3    box in each courtroom.  There's not much that can be done,

4    but we'll look at that.

5          THE COURT:  Again, Friday 23rd, a little time to

6    check the mics, the angles, those kinds of things.

7          As I said, the fewer sidebars the better.  I

8    tend to be pretty reluctant to do sidebars and I think they

9    just complicate and slow things down.

10          How I do jury selection.  I do it in open court.

11   I give each juror -- we can create a map of the seats in the

12   room, and so we're going to do probably 12 jurors plus two

13   alternates.  Now that we're past the worst of COVID, if it

14   really is going to be a five-day trial, I'll do two

15   alternates.  If people think this might go longer, I can be

16   convinced easily to have a third alternate.

17          But I find it moves so much faster if I ask

18   questions.  I ask in open court anyone who has a yes answer

19   to raise the number card.  I've got a seat map and you've

20   got a seat map and I go to each of them in turn.  Juror

21   Number 2, why did you answer yes to the question?  Juror

22   Number 4, why did you answer yes to that question?  They

23   stand up and tell they answer, then they sit down.  We're

24   jotting down notes as we go going through the whole group.

25          I am not going to ask nearly all the voir dire

1  questions you proposed.  I'm going to narrow it down to ones

2  that go to bias if.  People have worked in the legal field

3  as a lawyer, paralegal, legal secretary, I'm going to ask

4  about that.  If they use -- have some kind of work in AI,

5  I'm going to ask about those kinds of things.  But you all

6  have a lot of questions on your list that go substantially

7  beyond that.  I'm focusing on does someone have personal

8  involvement in these industries themselves relative or close

9  friend, basically.

10         We're going to jot down answers to all of these

11  questions, and I'll tell them if the answer to something is

12  very sensitive, I'm open to doing it at sidebar, but rarely

13  if ever.  This is not a criminal case where there's a lot of

14  sensitive stuff coming up.

15         After that point, each side will exercise its

16  peremptories going back, forth, back, forth, back, forth.

17  We'll do that quietly.  No one will know who's been struck

18  and whether they've struck been struck peremptorily or for

19  cause.

20         First, we'll do the for cause, and you'll come

21  up to me after we question the whole pool.  You'll go over

22  with me, Your Honor, I move to strike that person for cause

23  or that person.  I'll say, yeah, this person has a horrible

24  work conflict or something else.  I'm going to resist the

25  usual excuses that people would rather be down Rehoboth

1   Beach right now then be in a courtroom.  Once I've done that

2   and teased apart the people for whom it's a genuine hardship

3   or I'm real concerned that they're not going to be able to

4   listen and pay attention and judge patiently, you make your

5   motion for cause, we'll make a record.  At that point, we'll

6   go back and forth on peremptories.

7            So the jurors, ultimately, won't know who was

8   struck for cause, who was struck peremptorily, who was

9   struck by one side or the other.  We'll just -- as soon as

10  we question through the pool of excuse for cause and then

11  we've done the peremptories, I'll tell them here are the

12  jurors.  I'll call them up to the box, and the lowest 12

13  numbers will be the 12 on the jury.  And I won't tell them,

14  necessarily, but number 13 and 14 will wind up being the

15  alternates.  And it's better not to tell them upfront so

16  they're all paying attention until when it's time to send

17  them back to deliberate letting them know that the first 12

18  who are left are jurors.  Sometimes someone calls in sick

19  day three and the alternate ends up being one of the jurors.

20            MR. TIGAN:  Your Honor, do you have the

21  alternates join the deliberations?

22            THE COURT:  No, the rules -- I know the criminal

23  rules forbid their joining the deliberations.  I've got to

24  check as to whether it's permissible in the civil, but I

25  haven't done that in the past.  I'm open to considering it.

1          MR. TIGAN:  I don't think we have any view.

2     Mr. Moore can correct me.  I think they typically do in a

3     Delaware civil jury where there's six to eight, but

4     obviously completely up to the Court.

5          THE COURT:  If the parties are amenable.  I've

6     got to check.  The rule is much stricter in criminal than

7     civil cases.

8          MR. TIGAN:  And three peremptories per side, is

9     that what Your Honor --

10         THE COURT:  The standard in Delaware court and

11    civil rules, three per side.  We have that.  As I said, I

12    exercise a kind of prudent middle ground in terms of what I

13    do on for cause and after that, you know.  If Plaintiffs

14    have exercised three strikes -- if we've done the for cause,

15    Plaintiff used three strikes, the defendant in deciding to

16    use the last strike if I strike this person then the next

17    person numerically after that is going to be the one that

18    winds up on the jury.

19         So you can figure out 12 plus 6 is 18.  14 plus

20    6 is 20.  Once we've done for cause, then it's only the

21    lowest 20 numbered people that we're looking at as

22    potentially being on the jury if we wind up having to do

23    follow-up question, but usually it's the basic questions.

24         We'll work out -- those are good last questions

25    we'll work that out by the final time.  But I think the

1    three plus three considering whether or not we're in

2    deliberations, we'll get that rule before the trial.

3              MS. CENDALI:  Your Honor, I just have a

4    question.  Is it possible to have a break after the for

5    cause before the people start exercising their peremptories

6    just to think about it with their team?

7              THE COURT:  I'll give you five minutes or so to

8    huddle.  When I send them off for a break, it winds up being

9    25 minutes.  You guys will have time to huddle.  I won't

10   tell them what exactly is going on, but you'll have a chance

11   to confer about these I see these 20 and here's the 20 I'm

12   concerned about.

13             Exhibits.  So let's talk a little bit.  How much

14   can we get stipulated about -- I presume we'll have all the

15   exhibits premarked.  How much do we have to do in terms of

16   identifying and authenticating and foundation, and how much

17   are we going to be able to resolve by pretrial stipulations?

18   Because it's wasting everyone's time if we're dealing with

19   objections in open court where there isn't a serious

20   authenticity or foundation issue.  Tell me what and how you

21   propose to work these out ahead of time.

22             MS. CHANG:  Good morning, Your Honor.  Yungmoon

23   Chang on plaintiff of Plaintiffs.

24             We've been working with the other side, and the

25   exhibit list that we filed represents the full universe of

1   exhibits that may be used with the full universe of

2   objections that existed at the time those exhibit lists were

3   filed.  As Your Honor can imagine, since then, the

4   objections will narrow pursuant to the pretrial order, which

5   has the provision that says documents that have been

6   produced are presumed to be authentic on their face.  Also,

7   the documents will come in through a sponsoring witness.

8   There may have been foundation exhibits that were preserved

9   because we didn't know how, the parties didn't know how, the

10  exhibits would be coming in.

11          THE COURT:  That's the kind of thing pretrial.

12  Rule 403 type stuff, I get.  You wind up raising it on the

13  fly.  Sometimes it's how the stuff has come in.  But the

14  authentication, the foundation stuff, the hearsay, and

15  whether it's a business record, most of this stuff you can

16  see coming down the pike.

17          MS. CHANG:  Certainly, we're in agreement with

18  Your Honor.  And we'll note that the pretrial order that was

19  entered by this Court, the parties agreed that certain types

20  of exhibits would be joint exhibits to which there will be

21  no objection.  Those are things like the case notes and head

22  notes.  I think there's no objection there.

23          What we would propose is we had a conversation

24  with opposing counsel earlier today in an effort to

25  streamline the disputes for the Court.  Rather than go

1    through the exhibit list in their current condition, what we

2    would propose is following today, following the rulings on

3    the motions in limine, that the sides would work together to

4    identify early objections that are higher priority and more

5    likely to arise and then to raise those to the Court's

6    attention at the Court's convenience.  That would be our

7    proposal.

8              THE COURT:  That makes perfect sense.  And

9    related to that, obviously, getting into with whole

10   filtration issue, we have 1,800 pages of head notes.

11   Everyone understands that it's lunacy to think you can put

12   even a fifth of those to the jury, and I want some proposals

13   in terms of either whether you're going to focus on certain

14   bellwethers or whether there will be clumping classes of

15   things together because the experts are testifying about

16   relevance as a whole, you're going to have to push them on

17   cross.  How can you say this about the evidence as a whole?

18   What is the value added?  Was the value added simply that

19   these were organized or was there more some kind of

20   creativity that went into the system.  But over the next

21   couple of weeks, we're going to have to come to some

22   concrete proposals about which head notes are clustered and

23   head notes and how they're going to be presented.  There's

24   no way to do a one-week trial with hundreds of pages of head

25   notes.

1           MS. CHANG:  Understood, Your Honor.  We'll do

2      that.

3           MR. PARKER:  So I'm going to say something and I

4      don't mean to excite the Court when I say this.  I would be

5      loath to stipulate that exhibits should just be admitted

6      because I think there should be a sponsoring witness.  I

7      would only make a foundation objection if, for example, they

8      show a witness an e-mail, that person's name is not on it,

9      that person says I've never seen it before.  Then I think it

10      would be ripe.

11           We are not going to fight -- like, if it's a

12      business record, I'm not going to.  My God, you should yell

13      at me if I do that.  But I would like to have a sponsoring

14      witness so that lawyers are -- we're constrained into

15      arguing what the document or thing actually is by the

16      witness's testimony.  That's the only thing I would ask, if

17      the Court would indulge me on that.  If I cross the line,

18      take it out on me.

19           THE COURT:  I got it.  Very reasonable.  Strong

20      presumption this stuff is going to come in, but if there's

21      just no witness at all, it's difficult.

22           MR. PARKER:  Thank you.

23           THE COURT:  Let's see.  Let's talk about some of

24      logistics.  I think I talked to you about voir dire.  I

25      think I'm going to try to get you a streamlined voir dire

1    draft ahead of time.  I actually -- if you have a real

2    objection I'm interested in listening.  My understanding is

3    I have very broad latitude what to cover or not, and I

4    intend to cover things that go genuinely to bias.

5                In terms of jury instructions, I'm going to be

6    working over the next couple of weeks to work out the

7    difference in copyright laws and compile jury instructions.

8    My experience, is first of all, juries are commonly baffled

9    by jury instructions.  They're just written in legalese.  I

10   take the substance of the standard instructions and then I

11   try to put them in plain English.  I also, in a short trial

12   that's a week or less, my strong preference is if I've given

13   preliminary jury instructions that say don't use a cell

14   phone to do research, I don't repeat that instruction

15   verbatim a week later when they retire.  If I tell them

16   don't talk to anyone outside, I can simply remind them I

17   said that a week ago.  This is not a two-month trial, so I'm

18   going to do a lot of that and just trying to put stuff in

19   plain English.  That helps.

20               And the other thing I'll do as far as the

21   instructions is if I can format it and indent it and say

22   there are four elements of this claim or three elements of

23   this defense, I will do indenting and bullet points and

24   things like that.

25               Obviously, this is a pretty novel area of law.

1    There are some genuine disputes about what copyright means,

2    how fair use works, how we can do damages.  That stuff I'm

3    going to spend the next couple of weeks on in light of your

4    proposed jury instructions.  I will, of course, have drafts

5    of preliminary jury instructions I'll have to you before

6    trial, but the final jury instructions, we have to see how

7    some of this stuff comes in, but I will have done

8    substantial work on getting to the final set, and we'll have

9    a charging conference before this goes back to the jury.

10               To the extent I can resolve some of these issues

11   at the beginning of trial, I'm talking about the Friday,

12   August 23rd, I will let you know what I can because I

13   understand it will affect how you develop your case.

14               In terms of verdict sheets --

15               Sorry.  You wanted to add something.

16               MR. SIMMONS:  Your Honor, in terms of the

17   formatting, would it be helpful if we provide the Court with

18   Word versions of the submissions.

19               THE COURT:  It would be.

20               MR. SIMMONS:  Second of all, in terms of the

21   charge conference with the final jury instructions, what

22   timing do you anticipate?  Many judges do it Thursday

23   afternoon if we're closing on Friday.  And also when will

24   you be giving the final, before or after the closings?

25               THE COURT:  I defer -- different courthouses

1   have different practice on this.  If the parties both prefer

2   to close before the charge or close after the charge, I'll

3   do what the parties have a joint preference on.  It seems

4   local courthouse culture varies a lot on this.  I don't

5   really care.

6           I will certainly do a charging conference in

7   time for you to prepare the closing.  It's hard to prepare a

8   closing without the charging conference.  And usually, if I

9   can do it the night before, great.  If not, at least it

10   would be before a lunch break or something like that.  We

11   have to see how long it runs.

12           Look, I've tried cases.  I know you need to know

13   these things as you prepare your closing.  If we're just

14   about ready to close Friday morning, then we'll stay late

15   and do the charging conference Thursday night so that you

16   have that evening to write your closings.

17           MR. SIMMONS:  Thank you, Your Honor.  That's

18   helpful.  From the plaintiff's perspective, I think having

19   the charge for the jury before the closing makes it easier

20   for the jury to understand so they have the framework for

21   the evidence.

22           THE COURT:  "The judge just told you" rather

23   than "the judge is about to tell you."

24           MR. SIMMONS:  Which is awkward.  They don't

25   really understand the sequence.

1              THE COURT:  Is ROSS amenable to doing that,

2     having the jury charge and then doing closings?

3              MR. PARKER:  I think so.  Let me think about it.

4              THE COURT:  You're not committed.  You're not

5     locked in.  Think about it.

6              MR. PARKER:  I bet you I will agree, but I want

7     to think.

8              THE COURT:  Sure.  We don't have to do fix this

9     now.

10             In terms of verdict sheet, both of you have

11    special verdict forms.  This is clearly the kind of case

12    that calls for a special verdict form.  ROSS's is a longer.

13    I tend to like ROSS's approach with the caveat that ROSS's

14    then asks the jurors to turn to some appendix of a whole

15    bunch of head notes that were not turned over or at least

16    not submitted to me as one of the exhibits attached to this,

17    at least as I got it.  And again, it can't be 1,800 pages or

18    whatever.  I like the concept.  I want to understand what

19    the execution is actually going to look like.

20             MR. PARKER:  We need to talk about the exhibit

21    that we would attached is 21,000-some-odd head notes, so we

22    thought we don't quite know what you to do with this, and

23    it's Plaintiff's case, and I think the exhibits are going to

24    depend on how this Court wants certain things bundled up.  I

25    think they need to see the copyright at issue.  That's why

1    we did it.

2              THE COURT:  The idea of focusing in on each

3    possible element of defense, whether there's certain things

4    copyrighted or not, a lot of intuitive sense in guiding the

5    jury step by step.  It's figuring out the mechanics how we

6    group and cluster head notes so they can consider them as

7    batches.

8              MR. SIMMONS:  Your Honor, if I may.

9              THE COURT:  Yes.

10             MR. SIMMONS:  I'm happy to reserve argument on

11   the verdict form because, as you can imagine, we don't agree

12   with the approach.  If you want to hear argument on it now,

13   I'm happy to walk through it.

14             THE COURT:  Sure.

15             MR. SIMMONS:  One of the major issues here is it

16   doesn't actually follow the way that the Copyright Act and

17   copyright law works in terms of they talk about the validity

18   of the head note, the validity of a copyrighted head note.

19   That's not the proper test.  The question is, is there

20   validity of the work, which is Westlaw.

21             The way our verdict form works, it starts with

22   that presumption, which is the copyrighted work is Westlaw

23   and then there's infringement of the head notes as the

24   subsidiary question.  There's a concern I have going through

25   this, and I don't think we have time to do it.  We have

1    internal consistency where you're going through and it's

2    unclear what the jury is supposed to do at each turn in the

3    road.  We're happy to work from this form and propose

4    something to the Court.

5              THE COURT:  I think that would be helpful to try

6    to come up with something that is more detailed along ROSS's

7    lines but that makes clear, at this point, our position

8    based on this authority, we should be judging the copyright

9    on the work as a whole.  The response is going to be you're

10   supposed to be filtering these kinds of things out, but

11   you're saying that happens at a the infringement stage.  Got

12   it.

13             So if you can come back to me with a revised

14   proposal, my concern is just step by step.  There's a way to

15   do that consistent with okay your argument is the correct

16   sequence of steps is this.  So take another crack at that.

17             MR. SIMMONS:  Can do.

18             MR. PARKER:  I'll just preview this because I

19   think this will be a fight.  There's no question that when

20   something is registered in a compilation those things that

21   are copyrightable inside of that remain copyrighted.  As an

22   example, if I play something that was in the public domain

23   in a compilation, it doesn't become copyrightable.  And then

24   otherwise, then, the question posed is did a value copyright

25   take it to compilation, for example.  The facts within a

1    compilation can never be copyrighted.

2              THE COURT:  It cannot be.  The question is if

3    there's a certain system of organization that makes the

4    individual facts more usable, better searchable, where you

5    see connections or you synthesize them, it can become a part

6    of the copyright work.

7              MR. PARKER:  I agree.  Let's just be very clear.

8    That's a structure sequence, an organization argument.  I'm

9    going to agree with you a hundred percent.

10             We have something that's a little bit different,

11   and this goes to the filtration.  They have a summary

12   judgment motion that accuses us of violating the words of a

13   head note, of using those words within the head note, and

14   that's not a structure, sequence, and organization argument.

15   Of course, they also argue that the head note sits within a

16   structured sequence of organization, but if we focus just on

17   the words of the head note, that's a different question.

18   That we know it's at issue is they filed a summary judgment

19   on it.  There's a summary judgment order recognized that's

20   what they were doing.

21             THE COURT:  This is one of those unsettled

22   issues because your defense is the way you're using

23   something to crawl over it in AI is not -- maybe they would

24   disagree with this, but arguably might not be extracting a

25   creative art but just underlying, unprotected facts.  I'm

1    not saying -- I'm saying I understand Defendant's position

2    in taking that argument.

3            MR. PARKER:  I'm not asking you to accept it

4    now.  I'm going to hope that you accept it, but that's where

5    just talking about structure, sequence, and organization is

6    not enough because I agree to have that claim -- we have

7    jury instructions about it, but I also agree they're looking

8    at the head note saying this question is, they want to say,

9    substantially similar.  I think it's virtual identity.

10           THE COURT:  Are experts on both sides going to

11   get into what, at a higher level understanding, software is

12   doing when it crawls over and digests all of this raw

13   material and then learns from it?  Because it seems like

14   there's huge unsettled issues of law that I'm going to have

15   to decide here about at what point the copyright kicks in

16   and what point the AI is doing something separate.

17           MR. PARKER:  I believe from our side, Gino

18   Lobiaccole [phonetic] is a lay witness who programmed the

19   IA.  We'll talk about that as a layperson who did it and

20   then my friend Joe Marks whose name I've gotten correct is

21   the expert who will hopefully do that as well.

22           THE COURT:  Anyone from Thomson Reuters want to

23   speak to this?

24           MS. CENDALI:  Let me talk a little bit about the

25   relation between the head notes and structure, sequence, and

1    organization.  We moved for summary judgment just on those

2    head notes because, as Your Honor knows, those are the ones

3    we are saying their own expert admitted were copied and were

4    the same.

5            We're past summary judgment now, so where are

6    we?  Your Honor mentioned *Feist*.  *Feist* is key to this case

7    because in addition to saying, "The compilation author

8    typically chooses which facts to include and what order to

9    place them and how to arrange the collated data so that they

10   may be used effectively by readers, these choices as to

11   selection and arrangement, as long as they're made

12   independently by the compiler involving minimal degree of

13   creativity, are copyrightable."

14           And the Court goes on to say, "Even a directory

15   that contains absolutely no protectable written

16   expression" -- which is not the case here -- "only facts

17   meets the constitutional minimum for copyright protection if

18   it features an original selection and arrangement."

19           What I'm concerned about is that there's become

20   confusion as to the significance of the head notes and how

21   similar they are or not to the --

22           THE COURT:  That has a lot of power to the

23   copyright laws.  And we think there's a formative use or

24   theory.  You're right.  At different stages, we need to

25   focus on different things and this is at the first stage.

1              MS. CENDALI:  That's right, but, Your Honor, a

2    key thing, if I may, is that it's not just that they copied

3    the head notes.  Remember, they had the cases.  They already

4    had the cases.  Our position is they copied the head notes

5    in order to get the pairs with the case text that they go

6    to.  They copied the selection of the head note and the

7    arrangement of that head note to the text to the case

8    because that's what they needed to train the AI.  They

9    needed and copied the selection of the head note, its

10   arrangement with the case.  That was copied.  This isn't a

11   case about matching language.  We tried to explain that in

12   our response to their submission, but it's a fundamental

13   thing that goes to the heart of the copyright issues, and I

14   wanted to respond.

15              MR. PARKER:  I will say this then.  Dr. Krine

16   has no business testifying at all.  All he does is tell us

17   questions and head notes match each other, the words of the

18   head note.  This is a structure, sequence, and organization

19   case, then you can throw out the head notes and words and

20   all the questions.  This is purely structure, sequence, and

21   organization.  We'll try that case.

22              But we can't have it both ways saying the words

23   of the head notes are creative; therefore, if you make a

24   question out of the head note, that's a copyright violation.

25   There's 21,000 of these things and there are questions next

1    to each one and they had an expert who testified they were

2    like each other.  They brought a summary judgment motion on

3    the words saying the words of the head note are creative.

4    Your order said -- recognized that was the argument made.

5    Their interrogatory responses -- I think it's Docket 281 at

6    page 3 says it's the words of the head notes that we

7    infringed as well as other things.

8                    So if this is the place they want to be, then

9    the words of the head notes don't make a difference.  But

10   what I think they're doing is actually hiding and saying

11   both things.  They're saying the words of the head note

12   matter because we picked up words from the text of the

13   opinion.  That's an idea, that we want to pick up the words

14   from an opinion that lawyers will care about.  It's actually

15   the expression contained in the head note that is relevant

16   for copyright.  Otherwise, they're turning the structure,

17   sequence, and organization argument into an idea argument

18   and, therefore, getting copyright protection for it.  That's

19   what I'm concerned about.

20                   Again, the idea is we have a bunch of people

21   picking the best words out of the case.  That's an idea.  I

22   could say that's what I want to do as well.  It's how you

23   execute.  It's the particularized expression of that that is

24   at issue here, if it is any longer at issue.

25                   THE COURT:  Ms. Cendali.

1           MS. CENDALI:  Thank you, Your Honor.

2           Just to be clear, our compilation copyright,

3    which has been frequently issued and issued by the Copyright

4    Office, is rich and deep.  By that, it means we are

5    absolutely saying that we wrote synopses, we wrote the west

6    key system, we classified the cases with the head notes, and

7    we wrote our own head notes.  Some of them, as we all know,

8    are closer to some of language of the judicial opinions.

9    Some of them aren't closer, but we have a copyright in all

10   of that expression, how it's used together in selection and

11   arrangement and individually.

12          Again, the confusion stems from -- maybe it's

13   our fault in moving for summary judgment on what we thought

14   was low-hanging fruit because they had admitted a lot of the

15   head notes were the same, so we said, all right, let's get

16   those out of the case.  But that is nothing to say, as we

17   pled in this case, that they copied our -- the copyrightable

18   and copyrighted content, which includes the language of the

19   head notes, the synopses, the way it relates to the key

20   number system, the classification, and the language itself.

21   And all of that will be presented to the jury.

22          THE COURT:  Very good.  Let's move on.

23          One last admin request, if I could make a

24   request for each side.  If you could have the paralegals

25   pull together the head shot for each of you and have your

1   name and law firm next to it.  I like to learn who you all

2   the people are and keep Plaintiff's counsel and Defendant's

3   counsel separate at the top of the sheet.  Here's Plaintiff

4   for Thomson Reuters and different counsel list for

5   Defendants.  You can get that to me by the first day of

6   trial.

7              MS. CENDALI:  Happy to do that.

8              THE COURT:  Great.

9              Let's move on to the motions in limine.  We have

10  three motions from each side.  Are the parties willing to

11  stipulate on any of these items?

12             MS. CENDALI:  I'm sorry, Your Honor.  I couldn't

13  hear.

14             THE COURT:  I think Thomson Reuters made three

15  motions in limine and ROSS made three motions in limine.  Is

16  either side willing to drop or stipulate to any of the

17  issues before we go on to arguing?

18             MS. CENDALI:  No, Your Honor, other than the

19  fact that one of our motions in limine, the BFC surrebuttal

20  one, was effectively disposed of by Your Honor's Daubert

21  ruling with regard to Dr. Frederickson -- I'm bad at names

22  too -- and issues with regard to that will be addressed in

23  one of ROSS's motions in limine.

24             MR. SIMMONS:  It's Barbara Frederickson-Cross.

25  There was a Daubert of Dr. Frederickson-Cross that had been

1     pending.  It was addressed in the Dr. Krine motion in

2     limine.  We had tied them together.

3             THE COURT:  That's already done with respect to

4     her?

5             MR. SIMMONS:  Right.

6             There is -- I do have one -- I don't know if

7     there will be a stipulation on the generative AI motion in

8     limine that we brought.  It seems like the parties are in

9     agreement that no one plans to talk about generative AI

10    because ROSS didn't create that, and everyone seems to agree

11    ROSS can talk about the benefits and talk about the

12    implications of the technology they created.  I think that's

13    agreed.  I don't know if there's a stipulation.

14           THE COURT:  I read it the same way, which is I

15    can deny the motion on the understanding that ROSS is only

16    going to be talking about things that it can clearly connect

17    and compare with any other examples it uses.  If you're

18    going to talk about AI technology that's more advanced than

19    what you use, you've got to say it's more advanced, say why

20    it's related, and not just general benefits or other stuff

21    that doesn't relate to what you're doing.  I don't see

22    daylight between the sides.

23           MR. STEINBERG:  We agree with that.  I think

24    that's our position.  Our problem was lack of a definition,

25    but with the understanding, I'm --

1           THE COURT:  I'm happy to deny on that

2    understanding and I'll hold you to no rank speculation about

3    how good other AI is.  It's got to be tied to your product

4    as we talk about benefits because benefits do get connected

5    up.

6           Let's see.  I think Thomson Reuters also had a

7    motion to exclude references to antitrust.  I think, again,

8    I don't think there's much daylight here.  As I understand

9    it, all ROSS is going to try to do is introduce some

10   evidence that might also come into the trial only on the

11   issues of fair use or damages but not for antitrust per se.

12           MS. CENDALI:  May I speak to that, Your Honor?

13           THE COURT:  Yes.

14           MS. CENDALI:  So the thrust of our motion is

15   that we don't want to bring the antitrust case into this

16   case.  And what we've seen recently is that, first, as you

17   saw in our reply brief, Mr. Ruda is tweeting frequently

18   about issues regarding owning the law and antitrust issues.

19   I don't even know if that's testimony.  That should not be

20   something that anyone for other reasons should be able to

21   talk about, anyway.  But whatever his mandate is on that, it

22   doesn't belong in this case.  I don't know if it belongs in

23   the other case, either.

24           The other thing is, in looking at their exhibit

25   list, we see they have among their exhibits the

1    United States government's antitrust guidelines; a big,

2    thick law review article about antitrust.  I don't know how

3    they're planning on using these things, but it seemed to

4    make sense to get some guidelines from you for the fact that

5    we're not going to be getting into these types of documents

6    or those types of arguments in this case.

7            THE COURT:  I'm inclined to grant it in part.

8    How is the antitrust enforcement guidelines, antitrust

9    articles going to be relevant to this part of the case?

10            MR. STEINBERG:  Your Honor, I think this is

11   fundamentally similar to the generative AI issue in that we

12   haven't been provided with a definition of what "antitrust"

13   means in this context, so while we don't intend to introduce

14   antitrust evidence, there's evidence about, say, market

15   position or about activities in the market that are

16   plausibly relevant to both, and we don't think a per se rule

17   of exclusion is appropriate.  We think the appropriate

18   response is to deny this motion and then grant objections as

19   appropriate in the course of the trial.

20            THE COURT:  I'm going to grant it in part.  I

21   think I will allow you to put on evidence about their

22   marking control to the extent you can tie it to fair use.

23   Anything that is not tied to fair use or damages that's just

24   straight antitrust, market share, et cetera will be kept

25   out.

1          MR. STEINBERG:  Understand, Your Honor.  Thank

2     you.

3          MS. CENDALI:  May I ask one clarification, Your

4     Honor?

5          THE COURT:  Yes.

6          MS. CENDALI:  This is something that came out in

7     the briefing that we alluded to.  They said we think it

8     could be relevant to factor four in fair use.  And as we

9     explain, that's confusion because they kept saying,

10    effectively, that we interpreted their brief as saying

11    Thomson Reuters is big so we can't hurt them.  And

12    therefore, we can make those kinds of arguments, but that's

13    actually not what factor four is about.

14          As Campbell says, quoting section 1074 of the

15    Copyright Statute is the effect of the use on the potential

16    market or the value of the copyrighted work.  It's not the

17    harm to the company, in that we mean every big company would

18    lose the case.  It's the value of the copyrighted work which

19    is a fundamental issues because we don't want to have

20    sidebars, nor you, Your Honor, on saying, Your Honor, it

21    doesn't matter that we're big.  That plays into the David

22    and Goliath.  What matters is the effect of the market --

23          THE COURT:  That is black letter copyright law.

24    Absolutely.  So how much does this affect the value of

25    Westlaw, the going concern?  Is it charging the subscribers,

1    is it undercutting its sales to people?  Market share is

2    going to be part of it.  If there's evidence that sales

3    dipped or didn't dip, et cetera, they may be able to draw

4    inferences about we were reaching new consumers rather than

5    old ones, and only to that extent can it be used.

6          MS. CENDALI:  Also, Your Honor, it's fairly

7    important, certainly to us, and it's also black letter law

8    that the test is if the use becomes widespread, and there's

9    been in the literature and academics, professors write about

10   sometimes it's clear that it's not a damages analysis.  In

11   other words, it's -- if everyone and his brother were doing

12   this, would that hurt?  If everyone and his brother did what

13   they did, which is go to us, we want to replace Westlaw,

14   which is what they did, would that hurt us?  That's what

15   this is about.  We don't want to confuse the jury.

16         THE COURT:  This is not, you know, 2 Live Crew

17   using another person's music where the people who are going

18   to buy country style Pretty Woman are different than the

19   people who are going to buy Parrot.  This is selling to the

20   same market and the same people, so you've got a strong

21   position that this is going to undercut the value of your

22   copyright for that market.  Absolutely.

23         That is the correct analysis, but I think that

24   there are ways, limited ways in which some of this goes to

25   do we see marginal effects that suggest that the work isn't

1    being undermined or not because AI in some ways might be

2    transformative, but that's where the battle is going to be.

3              MS. CENDALI:  I'll just say, though, because I

4    believe -- I think the law is that you can't just encamp AI

5    and have it be a magical thing that is transformative.  I

6    think the Copyright Act is really clear and the cases are

7    clear.  It's very fact-intensive and you look at each case.

8              In a case like this, where someone has used your

9    own work to come up with a product that they marketed as a

10   substitute and a replacement for your work, is different

11   fundamentally from other types of cases like generative AI

12   cases where the results might be different and the amount of

13   competition might be different.

14             THE COURT:  Ultimately, it's going to come down

15   to a battle of how the jury understands from the experts

16   different -- whether they play a different role with

17   consumers, is there a substitution effect here versus a

18   complimentary effect.  There's a lot of stuff that's well

19   above my pay grade, which is partly why this is a jury

20   question.  I absolutely get the argument.

21             MS. CENDALI:  Thank you, Your Honor.

22             MR. PARKER:  I want to put a fine point on it.

23   The reason we oppose the motion is just now you heard the

24   concept that they can't just say this company is big.  "This

25   company is big" is not an antitrust concept.  And that's

1    what we were concerned about, is the concepts that may apply

2    in antitrust will be precluded under the copyright because

3    they're concepts that are in antitrust.

4              THE COURT:  If it relates to a

5    copyright-specific analysis, it comes in.

6              MR. PARKER:  That's all I wanted to hear.  Thank

7    you.

8              THE COURT:  All right.  Third motion in limine.

9    Motion to exclude testimony referencing ROSS shutting down.

10   ROSS says it doesn't plan to mention the shut down, but if

11   Thomson Reuters argues it failed because its technology was

12   bad, it might be in rebuttal.  That's a basic

13   opening-the-door analysis that if you don't open the door,

14   I'll grant the motion on that.

15             MS. MEANS:  Yes, Your Honor.  Miranda Means for

16   Plaintiff.  I was going to say the parties are relatively

17   close on this.  There's not much daylight Thomson Reuters

18   doesn't intend to offer testimony or evidence as to why,

19   specifically, ROSS shut down.

20             Now, I think where there was some disagreement

21   was how far does that extend.  Does it extend to all

22   financials?  Obviously, Thomson Reuters intends to put in

23   information about ROSS's financials.  It's relevant to

24   damages.  We're not going to go the step further and go down

25   the road of what happened after we filed this lawsuit.  Did

1   ROSS specifically shut down for this reason, or did it shut

2   down for other reasons?

3                THE COURT:  I'm curious if -- you've got to

4   figure out -- I guess the jury won't know or hear about it,

5   but it is a puzzling thing, Thomson Reuters, the stakes of

6   going after a failed competitor here.  Perhaps you're trying

7   to deter other people out there, but that's absolutely --

8   the jury shouldn't be paying attention to this.

9                Now, we have three motions from ROSS.  So

10  excluding mention of the market for AI training data, but

11  the plaintiffs weren't in the market and didn't express

12  interest in joining it.  It does seem to me like existence

13  or cost of training AI data and the market for that, why

14  wouldn't that matter for damages calculations here?

15               Who from ROSS wants to speak to this.

16               MR. STEINBERG:  I'll speak to it, Your Honor.  I

17  think our point was more about fair -- specifically about

18  fair use analysis, where under factor four, what needs to be

19  compared is what ROSS was putting onto the market as opposed

20  to the Westlaw product that Thomson Reuters puts out.  I

21  think if there's a way in which it's relevant for damages,

22  that would, in this case, need to be appropriate and

23  bifurcated because ROSS was never in the business of selling

24  trading data.  ROSS didn't put out a product that relied on

25  selling trading data.  It was not displace the market for

1  selling trading data, but I'm also not sure how it would be

2  relevant for damages given that ROSS was not in that

3  position.

4  MS. CHANG:  Your Honor, with respect to the

5  question of fair use, the inquiry is not whether a defendant

6  has a competing product on the market.  It's certainly not

7  limited to that.  If we go back to the language of the

8  Copyright Statute itself, I'm referencing 17 U.S.C. Section

9  107, which lists factor four as the effect of the use upon

10  the potential market or the value of the copyrighted work.

11  So the appropriate inquiry here is whether there's a

12  potential market for AI training data.  There's certainly

13  evidence of that on record.  There's testimony from

14  witnesses from ROSS who say we don't want anyone else using

15  memos we purchased from Legalese to be able to use the AI

16  training data that we bought to create a competing legal

17  research platform.

18  The question here of damages, it's quite frankly

19  already been addressed by this Court.  It was addressed in

20  the Daubert motions of Dr. Krine, Mr. Malikowski.  And

21  specifically Mr. Malikowski offered the damages opinion on

22  behalf of Plaintiffs that because the plaintiffs were losing

23  the exclusive right to license the AI training data or enter

24  the market that there was harm to Plaintiffs.  Dr. Krine

25  further opined that there is this market for potentially

1    licensing AI training data.  He identified 17 companies.

2    Your Honor found that both of those opinions were admissible

3    and also denied the parties' cross-motions for summary

4    judgment.

5              THE COURT:  I'm going to deny.  I think

6    Malikowski and Krine are ones the jury is entitled to

7    consider.

8              Let's move on to the next motion, motion to

9    exclude the evidence or testimony about Charles Simpson.  He

10   joined ROSS after the bulk memo project.  As long as he's

11   testifying about the events he took part in after he joined,

12   this seems like it's quite relevant.  I mean, it's fair

13   enough to not let him speculate about things that happened

14   beforehand or imply he knows about the whole course of

15   things, but what's the argument for keeping it out if he's

16   just going to talk about -- if we make it clear he joined

17   after the bulk memo and he's only testifying about things he

18   took part in?

19             MR. STEINBERG:  To clarify, Your Honor, we do

20   not intend to call Charles Von Simpson.  If I recall

21   correctly, he's not on the plaintiff's exhibit list either.

22   I think they were intending to introduce evidence related to

23   him.

24             We think there's two issues with testimony about

25   Charles Von Simpson.  One, there is no relevance.  He

1    certainly could testify to events that happened afterwards

2    if it were relevant to any copyright use, but, in fact, his

3    testimony is pretty clear.  He may have accessed Westlaw to

4    benchmark a product.  There's no copyright use.  It's not

5    relevant to copyright use.  In fact, Plaintiffs a brought in

6    a motion to amend their complaint to include Mr. Von Simpson

7    and withdrew that motion to amend.

8            We also think it's potentially confusing because

9    there are allegations of access to Westlaw but they come

10   after the bulk memo project, have nothing to do with

11   copyright infringement allegations, and simply are

12   temporally removed from anything that could be possible

13   copyright infringement.  We don't see relevance.  We do see

14   a potential for prejudice.

15           THE COURT:  Okay.

16           MR. LOVERRO:  Good afternoon, Your Honor.  Eric

17   Loverro on behalf of Plaintiffs.

18           To address the first point about relevance,

19   Mr. Von Simpson is relevant because the evidence concerning

20   him establishes ROSS's institutional knowledge.  It's

21   important for tortious interference specifically, that can

22   be proved through circumstantial evidence.  And there's

23   something that's -- ROSS is kind of overlooking in the

24   evidence related to Mr. Von Simpson which is when Mr. Von

25   Simpson was accessing Westlaw and getting an agreement from

1   Westlaw in his own Gmail account, not using ROSS's account,

2   and talking to ROSS's executives about what is or not

3   permissible and ROSS's executives are responding to him, no

4   one is saying this is new information for the first time

5   that they're hearing.  That is strong circumstantial

6   evidence that Plaintiffs should be entitled to pair with

7   other contemporaneous evidence both before the bulk memo and

8   during the bulk memo project was happening such that ROSS

9   was there at all times from the moment that Plaintiffs

10  denied it access in 2015 to when Mr. Von Simpson was

11  attempting to get access in 2018 and '19 that ROSS knew

12  about the terms of service of Westlaw and knew exactly what

13  Mr. Von Simpson would have to do to get access and knew that

14  it couldn't identify itself as a competitor.  All of that is

15  related to Defendant's tortious interference.

16          THE COURT:  I'm going deny the motion in limine.

17  I'm going to allow evidence of testimony of Charles Von

18  Simpson.  I'm going to allow for the purposes that Plaintiff

19  set out if it goes to tortious interference and goes to the

20  awareness and the like but, again, it's not --

21          MR. STEINBERG:  Can I make one more point on

22  this?

23          THE COURT:  Yes.

24          MR. STEINBERG:  The tortious interference

25  allegations have been limited now to password sharing and

1   the use of a bot to scrape data.  There's no allegation that

2   Charles Von Simpson knew anything about that or had anything

3   to do with it.  We're not sure how they could acknowledge of

4   how the activities were unlawful tortiously interfering or

5   anything like that, given that it's not anything to do with

6   anything Charles Von Simpson ever did.

7             THE COURT:  How would you connect it up?

8             MR. LOVERRO:  Two points, Your Honor, and I will

9   go slowly this time.  Sorry about that.

10            The first is that evidence related to Mr. Von

11  Simpson is also relevant to secondary liability, but there

12  are also documents, evidence where Mr. Von Simpson is

13  discussing both whether ROSS is able to scrape Westlaw's

14  content and the content -- this is in context of some

15  project that they were doing deciding whether they would be

16  able to scrape websites that were hosted by Westlaw, and

17  also whether they could password share because, as ROSS is

18  well aware, Mr. Von Simpson got access to Westlaw and was

19  sharing the password credentials all throughout ROSS.  He

20  acknowledges -- this is also in his deposition

21  testimony where he acknowledges that's a violation of the

22  terms of service and he was telling other people at ROSS

23  that much as well.  Again, this all plays back to what I was

24  talking about before as well as tortious interference as

25  well as secondary liability and the other issues numerated

1    in our response.

2              THE COURT:  I'll deny the motion.

3              All right.  The last motion I had down is some

4    of the Krine's -- he didn't disclose in his expert report.

5    I let Barbara Frederickson's evidence in even though I

6    assume it was untimely.  I think what's good for the goose

7    is good for the gander.  Krine hadn't had a chance to opine

8    on this because Barbara Frederickson-Cross, that her --

9    didn't have a chance to speak to it before.  Seems like I

10   should be evenhanded in letting both sides speak to this.

11             MR. STEINBERG:  Your Honor, I think the key

12   difference is Dr. Krine had Ms. Frederickson-Cross's report.

13   He refused to read it.  He refused to answer questions about

14   it at his deposition.  They can't now introduce opinions he

15   might have given, depriving us any chance to challenge the

16   opinions when they had full access to the report and the

17   opportunity to read it.

18             THE COURT:  Is that how we got here?

19             MR. SIMMONS:  So, Your Honor, the timeline of

20   events was that there's a scheduling order in this case that

21   permitted opening and rebuttal reports.  Barbara

22   Frederickson-Cross and Jonathan Krine both provided opening

23   and rebuttal reports.  After those deadlines, Barbara

24   Frederickson-Cross produced a supplemental report she calls

25   a surrebuttal and acknowledged contained new opinions that

1  had never been put in the two reports that were permitted

2  under the scheduling order.

3         As Your Honor's Daubert opinion recognizes, that

4  was untimely.  The Court has already ruled she's allowed to

5  put those opinions in for the reasons provided in the

6  Daubert.  We agree, however, that Jonathan Krine should be

7  permitted to respond them.  The lateness of her report

8  prejudiced our ability to prepare and his ability to review

9  a voluminous report in preparation for his deposition.

10         Two, the fairness issue is they're going to get

11  to put in this evidence.  He certainly should be allowed to

12  respond to her new theories that she only put in in terms of

13  surrebuttal.  In terms of prejudice, we would be willing to

14  prepare a short supplemental report if they want to have

15  disclosure of the new opinions in advance of trial, just so

16  we're all playing from the same bucket.

17         THE COURT:  I think I'll allow both but given

18  the report and --

19         MR. PARKER:  Then we would request a deposition.

20  We were deprived of it.  We literally don't know what he's

21  going to say or what he was given.

22         The order is Ms. Cross did not receive the

23  disclosure of the head notes at issue until after her first

24  opinion.  That's what drove all of this.  What drove all of

25  this is the plaintiffs, after the Court ordered the

1   disclosure, the plaintiffs did and issued an opinion related

2   to that.  There's absolutely no question that Dr. Krine in

3   deposition was asked whether he read Barbara

4   Frederickson-Cross's report, and he said no.  It was not one

5   of those issues where it was given to him the day before.

6           And so we have never been able to ask him any

7   questions.  We've never even begun to say there's something

8   else out there until these motions in limine.  So I

9   understand they had an opportunity, full and fair, to

10  question Barbara Frederickson-Cross.  We have not.  Now

11  they're coming up with they want to rebut something that

12  they had every opportunity to rebut and didn't.

13          And finally, and the reason it's very important

14  to us --

15          THE COURT:  They want to rebut her belated

16  surrebuttal.

17          MR. PARKER:  I push back on the late.  That's

18  fine.  I'm not going to fight that with the Court.

19          That's what -- now we're having this knock-on

20  effect because the issues in that report, we should be able

21  to ask him questions about it.  They definitely had the full

22  opportunity, however late that cross report was.

23          MR. SIMMONS:  Your Honor, two points on that.

24          Number one, Dr. Frederickson-Cross's surrebuttal

25  was not the subject of her deposition, as her Daubert order

1    acknowledged.  From our perspective it was untimely, not

2    permitted by the scheduling order, she wasn't asked

3    questions about it.  I think both experts filled in that

4    with deposition.

5           Fundamentally, an expert report is intended to

6    be the disclosure of opinions.  The way the federal rules

7    are designed, this is more information than you normally

8    would get at trial.  The expert report will tell you exactly

9    what he's going to say.  As Your Honor acknowledged, he

10   should be able to respond.  I'm offering to give them more

11   than they otherwise would get.

12          THE COURT:  Yeah, I think this gives enough, and

13   I think it's important that the jury hear more rather than

14   less.  I realize this is one of these no-win situations.

15   Whichever ruling I make, someone is going to feel aggrieved.

16   I think the best thing for the jury is to hear both sides

17   and if the defendants feel like they've been aggrieved and

18   there's something surprising, which I don't think should be

19   the case by the nature of the surrebuttal, if some kind of

20   continuance or recalling the witness later is necessary, I'm

21   amenable to some flexibility on how we handle this witness

22   on the stand, but I'm going to allow it.

23          MR. SIMMONS:  Thank you, Your Honor.

24          THE COURT:  All right.  We have long lists of

25   deposition designations and trial exhibits.  Now, you've

1    already talked to me about how you're going to deal with

2    trial exhibit lists and objections.  In terms of the

3    deposition designations, does any of this need to be

4    resolved by the Court?  You already mentioned you're working

5    toward resolution together.  I see Mr. Parker shaking his

6    head.

7              Ms. Chang, what would you like to say?

8              MS. CHANG:  I think that Mr. Parker and I may be

9    agreement, which is that there's nothing for the Court to

10   address at this time.  The parties, again, spoke about the

11   deposition designations at the same time as the exhibits.

12   We certainly plan to cull down the deposition designations.

13   We're mindful of the time.  We don't intent to play all of

14   this.

15             THE COURT:  Let me make a couple of suggestions.

16             First of all, you all know that the best way to

17   get through a case like this is to put on the video deps of

18   the uncontested stuff.

19             Second, you clip them down.

20             Third, you come in with a sense how long they

21   are and then we can play them when we have a block of time

22   at the end of the afternoon.

23             Fourth, I find playing these things at one time

24   speed is extremely boring for everyone involved.  I would

25   ask you to consider either 1.25 or 1.5 times depending on

1    how fast they were, but you want to have some list of how

2    long it takes and the speed you're going to play them at.

3    Maybe it's the generation.  I'm certainly listening to all

4    my podcasts at one and a half speed now.  Perhaps some older

5    jurors wouldn't be used to that, but I trust that you're

6    going to work this out.

7            I ask you to come into court with a sense --

8    I'll defer to however the parties want to put this on, the

9    speed, what it needs to be clipped.  I ask that you be

10   mindful and ask the paralegals in the next couple of weeks

11   to come in with lists at the speed you end intend to play

12   it, how long each of them will wind up taking so if you have

13   25 minutes until, say, breaking for the day at 4:30 we can

14   think about which of these pieces we can slot in to best use

15   that time.

16           MS. CHANG:  We'll certainly do that, Your Honor

17   if I may make one suggestion, once we have the designations

18   and we have the testimony and it's in writing, may I suggest

19   that the parties jointly submit that transcript to the Court

20   to be included in the trial record so that the deposition

21   testimony need not be transcribed while played live here in

22   court.

23           THE COURT:  That makes perfect sense.  The

24   grateful court reporter thanks you.

25           Let's talk about filtration.  I am going deny

1    filtration for a couple of reasons.

2              The first one is I think Ms. Cendali argues with

3    some force, but they have a live argument, that this is not

4    just about the individual pieces but a system or

5    arrangement.

6              Second of all, even if I were inclined to filter

7    things out, from an analogy, it seems a fair fact to settle

8    on.  What ROSS has given us, there are -- there may be some

9    there are verbatim but there are many that are just altered

10   just enough that a reasonable jury could find that there was

11   some creativity in the individual way that a question was

12   turned into a statement or introductory words were changed

13   or very often something was omitted but there are points of

14   ellipsis.  So I don't know if I was a juror I would find

15   personally that involved creativity, but I think a

16   reasonable juror on so many of the things that were proposed

17   could potentially find it.

18             Both because of that reason and because of

19   Ms. Cendali's argument, I'm going to send it all to the jury

20   unless something in my understanding of arguments in the

21   copyright law changes, and the parties have work to do here

22   to talk about what their proposals are about how you're

23   going to present this massive number of head notes to the

24   jury.

25             Do you have a suggestion about when you want to

1    come back to me about that with further detail?

2             MS. CENDALI:  Not at this time, Your Honor.

3             THE COURT:  Okay.  We have a couple more weeks.

4             Antitrust counterclaims.  Just a reminder, on

5    September 18th from 3:00 to 4:00 p.m. I'm scheduled for oral

6    argument by Zoom for the summary judgment motion on -- this

7    is ROSS's antitrust counterclaims and on Thomson Reuters's

8    motions in limine about ROSS's experts on antitrust

9    counterclaims.  I think Thomson Reuters originally also

10   asked to make an oral argument on some associated motions in

11   limine.

12            But, ROSS, is there any real need for oral

13   argument on this motion in limine against Chad Seiberson's

14   motions and opinions?  I don't know who's handling that on

15   the antitrust piece of this case.

16            MR. SIMMONS:  Your Honor, and also on the

17   Thomson Reuters side, our antitrust attorneys didn't come to

18   the preference because our understanding is it was not this

19   case.

20            THE COURT:  We'll raise this again later.  It's

21   a different team that's doing that.

22            MR. SIMMONS:  Yes, Your Honor.

23            THE COURT:  Got it.

24            MR. SIMMONS:  As much as we'd like to come and

25   argue with you on the antitrust issues as well, we have

1   antitrust lawyers coming to do that.

2           MS. CENDALI:  We're pretty confident our

3   antitrust lawyers would not like us to argue.

4           THE COURT:  I want to thank the parties for the

5   professional and efficient way you managed to keep this

6   moving ahead.  I'm grateful that we've got agreement on a

7   number of things.  We're working towards agreement on the

8   rest.  I will await Mr. Parker's update about is it

9   Dr. Marks, not Dr. Morris, and hopefully we'll learn some

10  more and hoping for some good news later this week.

11          MR. PARKER:  Understood.  Thank you.

12          THE COURT:  Wonderful.  This Court stands

13  adjourned.

14

15                    **C E R T I F I C A T E**

16      I, Deanna L. Warner, a Registered Professional

17  Reporter, do hereby certify that as such Registered

18  Professional Reporter, I was present at and reported in

19  Stenotype shorthand the above and foregoing proceedings.

20

21  _____

22  Deanna L. Warner, RPR, CSR
    Official Court Reporter
23  U.S. District Court

24

25

**'**

**'19** [1] - 49:11

---

**1**

**1,800** [2] - 23:10, 28:17
**1.25** [1] - 55:25
**1.5** [1] - 55:25
**10** [2] - 11:7, 11:12
**107** [1] - 46:9
**1074** [1] - 41:14
**10:00** [1] - 9:16
**11** [1] - 14:20
**12** [6] - 14:20, 17:12, 19:12, 19:13, 19:17, 20:19
**12:30** [1] - 11:8
**13** [1] - 19:14
**14** [2] - 19:14, 20:19
**15** [3] - 9:18, 11:7, 11:12
**17** [2] - 46:8, 47:1
**18** [1] - 20:19
**18th** [1] - 58:5
**19th** [1] - 4:23
**1:00** [1] - 7:9

---

**2**

**2** [2] - 17:21, 42:16
**20** [4] - 20:20, 20:21, 21:11
**20-CV-613-SB** [1] - 1:6
**2015** [1] - 49:10
**2018** [1] - 49:11
**2024** [1] - 1:13
**20613** [1] - 3:2
**21,000** [1] - 34:25
**21,000-some-odd** [1] - 28:21
**22nd** [1] - 13:10
**23rd** [4] - 13:12, 16:20, 17:5, 26:12
**25** [2] - 21:9, 56:13
**26th** [1] - 9:16
**281** [1] - 35:5
**2B** [1] - 1:12

---

**3**

**3** [1] - 35:6
**3:00** [1] - 58:5

---

**4**

**4** [1] - 17:22
**403** [1] - 22:12
**45** [1] - 11:8
**4:00** [2] - 15:14, 58:5
**4:30** [3] - 11:12, 15:14, 56:13

---

**6**

**6** [2] - 20:19, 20:20
**6th** [1] - 1:12

---

**8**

**8:00** [1] - 7:9
**8:30** [1] - 11:5

---

**9**

**9:00** [2] - 11:4, 11:5

---

**A**

**a.m** [1] - 9:16
**ability** [2] - 52:8
**able** [17] - 5:5, 5:14, 6:17, 6:22, 7:4, 12:12, 13:4, 19:3, 21:17, 39:20, 42:3, 46:15, 50:13, 50:16, 53:6, 53:20, 54:10
**absolutely** [8] - 16:13, 33:15, 36:5, 41:24, 42:22, 43:20, 45:7, 53:2
**academics** [1] - 42:9
**accept** [2] - 32:3, 32:4
**access** [6] - 48:9, 49:10, 49:11, 49:13, 50:18, 51:16
**accessed** [1] - 48:3
**accessing** [1] - 48:25
**accommodations** [1] - 5:23
**account** [2] - 49:1
**accuses** [1] - 31:12
**acknowledge** [1] - 50:3
**acknowledged** [3] - 51:25, 54:1, 54:9
**acknowledges** [2] - 50:20, 50:21
**act** [2] - 29:16, 43:6
**activities** [2] - 40:15,

50:4
**add** [2] - 4:13, 26:15
**added** [2] - 23:18
**addition** [1] - 33:7
**address** [2] - 48:18, 55:10
**addressed** [4] - 37:22, 38:1, 46:19
**adjourned** [1] - 59:13
**admin** [3] - 3:12, 10:23, 36:23
**admissible** [1] - 47:2
**admitted** [4] - 14:24, 24:5, 33:3, 36:14
**adopts** [1] - 5:12
**advance** [1] - 52:15
**advanced** [2] - 38:18, 38:19
**affect** [2] - 26:13, 41:24
**affidavit** [1] - 7:14
**afternoon** [11] - 3:4, 3:17, 3:21, 10:24, 11:11, 11:12, 11:20, 13:13, 26:23, 48:16, 55:22
**afterwards** [2] - 10:22, 48:1
**agenda** [1] - 4:13
**aggrieved** [2] - 54:15, 54:17
**ago** [2] - 4:21, 25:17
**agree** [12] - 6:22, 8:17, 10:5, 28:6, 29:11, 31:7, 31:9, 32:6, 32:7, 38:10, 38:23, 52:6
**agreeable** [1] - 8:17
**agreed** [2] - 22:19, 38:13
**agreement** [6] - 22:17, 38:9, 48:25, 55:9, 59:6, 59:7
**ahead** [5] - 12:4, 16:1, 21:21, 25:1, 59:6
**AI** [19] - 9:9, 18:4, 31:23, 32:16, 34:8, 38:7, 38:9, 38:18, 39:3, 40:11, 43:1, 43:4, 43:11, 45:10, 45:13, 46:12, 46:15, 46:23, 47:1
**al** [1] - 1:4
**allegation** [1] - 50:1
**allegations** [3] - 48:9, 48:11, 49:25
**allow** [6] - 8:14, 40:21, 49:17, 49:18, 52:17, 54:22
**allowed** [3] - 15:25,

52:4, 52:11
**alluded** [1] - 41:7
**altered** [1] - 57:9
**alternate** [2] - 17:16, 19:19
**alternates** [4] - 17:13, 17:15, 19:15, 19:21
**amenable** [4] - 9:20, 20:5, 28:1, 54:21
**amend** [2] - 48:6, 48:7
**amount** [1] - 43:12
**analogy** [1] - 57:7
**analysis** [5] - 42:10, 42:23, 44:5, 44:13, 45:18
**AND** [1] - 1:2
**Anderson** [1] - 3:18
**ANDERSON** [1] - 2:3
**angles** [1] - 17:6
**answer** [6] - 17:18, 17:21, 17:22, 17:23, 18:11, 51:13
**answers** [1] - 18:10
**anticipate** [4] - 11:18, 14:1, 14:6, 26:22
**anticipated** [1] - 5:6
**anticipates** [1] - 5:23
**antitrust** [23] - 4:10, 39:7, 39:11, 39:15, 39:18, 40:1, 40:2, 40:8, 40:12, 40:14, 40:24, 43:25, 44:2, 44:3, 58:4, 58:7, 58:8, 58:15, 58:17, 58:25, 59:1, 59:3
**anyway** [1] - 39:21
**apart** [2] - 4:12, 19:2
**appearances** [1] - 3:3
**APPEARANCES** [1] - 1:15
**Appearances** [1] - 2:1
**appendix** [1] - 28:14
**apply** [1] - 44:1
**appreciate** [2] - 7:19, 15:3
**approach** [2] - 28:13, 29:12
**appropriate** [7] - 6:21, 7:24, 40:17, 40:19, 45:22, 46:11
**area** [1] - 25:25
**arguably** [1] - 31:24
**argue** [3] - 31:15, 58:25, 59:3
**argues** [2] - 44:11, 57:2
**arguing** [2] - 24:15, 37:17
**argument** [17] - 4:10, 29:10, 29:12, 30:15,

52:4, 52:11
**add** [2] - 4:13, 26:15
31:8, 31:14, 32:2, 35:4, 35:17, 43:20, 47:15, 57:3, 57:19, 58:6, 58:10, 58:13
**arguments** [3] - 40:6, 41:12, 57:20
**arise** [1] - 23:5
**arrange** [1] - 33:9
**arranged** [1] - 10:19
**arrangement** [6] - 33:11, 33:18, 34:7, 34:10, 36:11, 57:5
**ARSHT** [1] - 1:16
**art** [1] - 31:25
**article** [1] - 40:2
**articles** [1] - 40:9
**aside** [2] - 15:11, 16:18
**assigned** [1] - 13:4
**associated** [1] - 58:10
**assume** [2] - 15:13, 51:6
**attached** [2] - 28:16, 28:21
**attempting** [1] - 49:11
**attention** [4] - 19:4, 19:16, 23:6, 45:8
**attorney** [1] - 15:8
**attorneys** [2] - 15:18, 58:17
**August** [3] - 1:13, 9:16, 26:12
**authentic** [1] - 22:6
**authenticating** [1] - 21:16
**authentication** [1] - 22:14
**authenticity** [1] - 21:20
**author** [1] - 33:7
**authority** [1] - 30:8
**AV** [3] - 11:23, 11:25, 15:9
**availability** [2] - 5:19, 10:13
**available** [1] - 12:3
**avoids** [1] - 14:22
**await** [1] - 59:8
**aware** [1] - 50:18
**awareness** [1] - 49:20
**awkward** [1] - 27:24

---

**B**

**background** [1] - 9:8
**bad** [2] - 37:21, 44:12
**baffled** [1] - 25:8
**Barbara** [7] - 37:24, 51:5, 51:8, 51:21,

51:23, 53:3, 53:10
**based** [2] - 7:5, 30:8
**basic** [2] - 20:23, 44:12
**batches** [1] - 29:7
**battle** [2] - 43:2, 43:15
**Beach** [1] - 19:1
**beat** [1] - 15:12
**become** [3] - 30:23, 31:5, 33:19
**becomes** [1] - 42:8
**beforehand** [1] - 47:14
**beginning** [1] - 26:11
**begun** [1] - 53:7
**behalf** [3] - 7:14, 46:22, 48:17
**belated** [1] - 53:15
**bellwethers** [1] - 23:14
**belong** [1] - 39:22
**belongs** [1] - 39:22
**benchmark** [1] - 48:4
**benefits** [4] - 38:11, 38:20, 39:4
**best** [4] - 35:21, 54:16, 55:16, 56:14
**bet** [1] - 28:6
**better** [5] - 11:1, 16:23, 17:7, 19:15, 31:4
**between** [2] - 32:25, 38:22
**beyond** [1] - 18:7
**BFC** [1] - 37:19
**bias** [2] - 18:2, 25:4
**Bibas** [1] - 1:12
**bifurcated** [1] - 45:23
**big** [6] - 40:1, 41:11, 41:17, 41:21, 43:24, 43:25
**binder** [6] - 14:8, 14:9, 14:13, 14:24, 15:1, 15:3
**binders** [2] - 14:2, 15:10
**bit** [4] - 9:17, 21:13, 31:10, 32:24
**black** [2] - 41:23, 42:7
**block** [3] - 13:6, 13:9, 55:21
**boring** [1] - 55:24
**bot** [1] - 50:1
**bought** [1] - 46:16
**box** [2] - 17:3, 19:12
**Braden** [2] - 4:22, 6:5
**Braden's** [3] - 4:5, 4:19, 5:12
**break** [7] - 11:7, 11:12, 11:20, 13:13,

21:4, 21:8, 27:10
**breaking** [3] - 6:19, 11:10, 56:13
**breakout** [1] - 15:14
**brief** [2] - 39:17, 41:10
**briefing** [1] - 41:7
**bring** [2] - 16:7, 39:15
**bringing** [1] - 12:1
**broad** [1] - 25:3
**broken** [3] - 11:19, 11:20
**brother** [2] - 42:11, 42:12
**brought** [3] - 35:2, 38:8, 48:5
**bucket** [1] - 52:16
**bulk** [5] - 47:10, 47:17, 48:10, 49:7, 49:8
**bullet** [1] - 25:23
**bunch** [2] - 28:15, 35:20
**bundled** [1] - 28:24
**business** [4] - 22:15, 24:12, 34:16, 45:23
**buy** [2] - 42:18, 42:19
**BY** [1] - 1:16

## C

**calculations** [1] - 45:14
**California** [1] - 7:9
**Campbell** [1] - 41:14
**cannot** [1] - 31:2
**card** [1] - 17:19
**care** [3] - 15:15, 27:5, 35:14
**Carnegie** [1] - 9:9
**case** [32] - 4:3, 18:13, 22:21, 26:13, 28:11, 28:23, 33:6, 33:16, 34:5, 34:7, 34:10, 34:11, 34:19, 34:21, 35:21, 36:16, 36:17, 39:15, 39:16, 39:22, 39:23, 40:6, 40:9, 41:18, 43:7, 43:8, 45:22, 51:20, 54:19, 55:17, 58:15, 58:19
**Case** [1] - 1:5
**cases** [20] - 20:7, 27:12, 34:3, 34:4, 36:6, 43:6, 43:11, 43:12
**caveat** [1] - 28:13
**cell** [1] - 25:13
**Cendali** [4] - 3:7, 8:9, 35:25, 57:2
**CENDALI** [22] - 1:19,

4:15, 8:8, 8:19, 10:10, 10:17, 21:3, 32:24, 34:1, 36:1, 37:7, 37:12, 37:18, 39:12, 39:14, 41:3, 41:6, 42:6, 43:3, 43:21, 58:2, 59:2
**Cendali's** [1] - 57:19
**CENTRE** [1] - 1:3
**certain** [5] - 22:19, 23:13, 28:24, 29:3, 31:3
**certainly** [12] - 8:5, 14:10, 22:17, 27:6, 42:7, 46:6, 46:12, 48:1, 52:11, 55:12, 56:3, 56:16
**certify** [1] - 59:17
**cetera** [6] - 7:1, 7:6, 11:19, 13:11, 40:24, 42:3
**Chad** [1] - 58:13
**challenge** [1] - 51:15
**chance** [4] - 21:10, 51:7, 51:9, 51:15
**Chang** [3] - 3:8, 21:23, 55:7
**CHANG** [7] - 1:20, 21:22, 22:17, 24:1, 46:4, 55:8, 56:16
**changed** [1] - 57:12
**changes** [1] - 57:21
**charge** [3] - 26:21, 27:2, 27:19, 28:2
**charging** [5] - 26:9, 27:6, 27:8, 27:15, 41:25
**Charles** [6] - 47:9, 47:20, 47:25, 49:17, 50:2, 50:6
**check** [4] - 11:2, 17:6, 19:24, 20:6
**choices** [1] - 33:10
**chooses** [1] - 33:8
**circumstances** [1] - 7:21
**circumstantial** [2] - 48:22, 49:5
**civil** [4] - 19:24, 20:3, 20:7, 20:11
**claim** [2] - 25:22, 32:6
**clarification** [1] - 41:3
**clarify** [1] - 47:19
**classes** [1] - 23:14
**classification** [1] - 36:20
**classified** [1] - 36:6
**clear** [10] - 6:11, 14:19, 30:7, 31:7, 36:2, 42:10, 43:6,

43:7, 47:16, 48:3
**clearly** [2] - 28:11, 38:16
**clip** [1] - 55:19
**clipped** [1] - 56:9
**close** [5] - 18:8, 27:2, 27:14, 44:17
**closer** [2] - 36:8, 36:9
**closing** [6] - 9:19, 26:3, 27:7, 27:8, 27:13, 27:19
**closings** [3] - 26:24, 27:16, 28:2
**clumping** [1] - 23:14
**clunky** [1] - 14:25
**cluster** [1] - 29:6
**clustered** [1] - 23:22
**Coat** [1] - 4:23
**code** [1] - 6:13
**coherent** [1] - 15:3
**collated** [1] - 33:9
**colleagues** [2] - 3:6, 3:19
**combinations** [1] - 3:10
**comfortable** [1] - 5:12
**coming** [5] - 18:14, 22:10, 22:16, 53:11, 59:1
**committed** [1] - 28:4
**commonly** [1] - 25:8
**companies** [1] - 47:1
**company** [4] - 41:17, 43:24, 43:25
**compare** [1] - 38:17
**compared** [1] - 45:19
**competing** [2] - 46:6, 46:16
**competition** [1] - 43:13
**competitor** [2] - 45:6, 49:14
**compilation** [6] - 30:20, 30:23, 30:25, 31:1, 33:7, 36:2
**compile** [1] - 25:7
**compiler** [1] - 33:12
**complaint** [1] - 48:6
**completely** [1] - 20:4
**complicate** [1] - 17:9
**complicated** [1] - 12:6
**complimentary** [1] - 43:18
**concept** [3] - 28:18, 43:24, 43:25
**concepts** [2] - 44:1, 44:3
**concern** [3] - 29:24, 30:14, 41:25
**concerned** [6] - 9:16,

43:7, 47:16, 48:3
**clearly** [2] - 28:11, 38:16
**clip** [1] - 55:19
**clipped** [1] - 56:9
**close** [5] - 18:8, 27:2, 27:14, 44:17
**closer** [2] - 36:8, 36:9
**closing** [6] - 9:19, 26:3, 27:7, 27:8, 27:13, 27:19
**closings** [3] - 26:24, 27:16, 28:2
**clumping** [1] - 23:14
**clunky** [1] - 14:25
**cluster** [1] - 29:6
**clustered** [1] - 23:22
**Coat** [1] - 4:23
**code** [1] - 6:13
**coherent** [1] - 15:3
**collated** [1] - 33:9
**colleagues** [2] - 3:6, 3:19
**combinations** [1] - 3:10
**comfortable** [1] - 5:12
**coming** [5] - 18:14, 22:10, 22:16, 53:11, 59:1
**committed** [1] - 28:4
**commonly** [1] - 25:8
**companies** [1] - 47:1
**company** [4] - 41:17, 43:24, 43:25
**compare** [1] - 38:17
**compared** [1] - 45:19
**competing** [2] - 46:6, 46:16
**competition** [1] - 43:13
**competitor** [2] - 45:6, 49:14
**compilation** [6] - 30:20, 30:23, 30:25, 31:1, 33:7, 36:2
**compile** [1] - 25:7
**compiler** [1] - 33:12
**complaint** [1] - 48:6
**completely** [1] - 20:4
**complicate** [1] - 17:9
**complicated** [1] - 12:6
**complimentary** [1] - 43:18
**concept** [3] - 28:18, 43:24, 43:25
**concepts** [2] - 44:1, 44:3
**concern** [3] - 29:24, 30:14, 41:25
**concerned** [6] - 9:16,

19:3, 21:12, 33:19, 35:19, 44:1
**concerning** [1] - 48:19
**concrete** [1] - 23:22
**condition** [1] - 23:1
**confer** [1] - 21:11
**CONFERENCE** [2] - 1:9, 1:11
**conference** [5] - 26:9, 26:21, 27:6, 27:8, 27:15
**confident** [2] - 8:21, 59:2
**conflict** [1] - 18:24
**confuse** [1] - 42:15
**confusing** [1] - 48:8
**confusion** [3] - 33:20, 36:12, 41:9
**connect** [2] - 38:16, 50:7
**connected** [1] - 39:4
**connections** [1] - 31:5
**consider** [3] - 29:6, 47:7, 55:25
**considering** [2] - 19:25, 21:1
**consistency** [1] - 30:1
**consistent** [1] - 30:15
**consolidated** [1] - 14:9
**constitutional** [1] - 33:17
**constrained** [1] - 24:14
**consumers** [2] - 42:4, 43:17
**contained** [2] - 35:15, 51:25
**contains** [1] - 33:15
**contemporaneous** [1] - 49:7
**content** [3] - 36:18, 50:14
**context** [2] - 40:13, 50:14
**continuance** [1] - 54:20
**continued** [1] - 2:1
**control** [1] - 40:22
**convenience** [1] - 23:6
**conversation** [2] - 13:19, 22:23
**convinced** [1] - 17:16
**coordinate** [2] - 13:24, 16:9
**copied** [7] - 33:3, 34:2, 34:4, 34:6, 34:9, 34:10, 36:17
**copies** [1] - 14:19

**copy** [2] - 14:2, 14:7
**copyright** [31] - 4:11, 25:7, 26:1, 28:25, 29:16, 29:17, 30:8, 30:24, 31:6, 32:15, 33:17, 33:23, 34:13, 34:24, 35:16, 35:18, 36:2, 36:9, 41:15, 41:23, 42:22, 43:6, 44:2, 44:5, 46:8, 48:2, 48:4, 48:5, 48:11, 48:13, 57:21
**Copyright** [1] - 36:3
**copyright-specific** [1] - 44:5
**copyrightable** [4] - 30:21, 30:23, 33:13, 36:17
**copyrighted** [9] - 29:4, 29:18, 29:22, 30:21, 31:1, 36:18, 41:16, 41:18, 46:10
**correct** [2] - 12:19, 20:2, 30:15, 32:20, 42:23
**correctly** [1] - 47:21
**CORROON** [1] - 2:3
**cost** [2] - 16:10, 45:13
**counsel** [15] - 1:22, 3:2, 4:25, 5:2, 5:9, 7:11, 8:2, 14:12, 15:6, 16:5, 16:9, 22:24, 37:2, 37:3, 37:4
**Counsel** [1] - 2:8
**counterclaims** [3] - 58:4, 58:7, 58:9
**country** [1] - 42:18
**couple** [7] - 23:21, 25:6, 26:3, 55:15, 56:10, 57:1, 58:3
**course** [4] - 26:4, 31:15, 40:19, 47:14
**court** [12] - 7:20, 12:22, 13:4, 13:21, 17:10, 17:18, 20:10, 21:19, 22:19, 56:7, 56:22, 56:24
**COURT** [92] - 1:1, 3:1, 3:11, 3:15, 3:21, 4:1, 4:18, 5:11, 5:18, 5:21, 6:16, 7:19, 8:6, 8:13, 8:23, 9:5, 9:7, 9:10, 9:12, 10:5, 10:14, 10:21, 12:16, 13:3, 13:9, 13:23, 13:25, 14:15, 14:22, 15:4, 15:16, 16:5, 16:13, 17:5, 19:22, 20:5, 20:10, 21:7,

22:11, 23:8, 24:19, 24:23, 26:19, 26:25, 27:22, 28:1, 28:4, 28:8, 29:2, 29:9, 29:14, 30:5, 31:2, 31:21, 32:10, 32:22, 33:22, 35:25, 36:22, 37:8, 37:14, 38:3, 38:14, 39:1, 39:13, 40:7, 40:20, 41:5, 41:23, 42:16, 43:14, 44:4, 44:8, 45:3, 47:5, 48:15, 49:16, 49:23, 50:7, 51:2, 51:18, 52:17, 53:15, 54:12, 54:24, 55:15, 56:23, 58:3, 58:20, 58:23, 59:4, 59:12
**Court** [26] - 5:5, 5:9, 7:8, 7:16, 10:18, 14:12, 15:18, 15:25, 20:4, 22:25, 24:4, 24:17, 26:17, 28:24, 30:4, 33:14, 46:19, 52:4, 52:25, 53:18, 55:4, 55:9, 56:19, 59:12, 59:22, 59:22
**Court's** [2] - 23:5, 23:6
**courthouse** [3] - 15:5, 15:16, 27:4
**courthouses** [1] - 26:25
**courtroom** [12] - 11:24, 12:2, 12:3, 12:10, 12:13, 13:4, 13:10, 16:17, 16:18, 16:24, 17:3, 19:1
**Courtroom** [1] - 1:12
**courts** [1] - 14:4
**cover** [2] - 25:3, 25:4
**COVID** [1] - 17:13
**crack** [1] - 30:16
**crawl** [1] - 31:23
**crawls** [1] - 32:12
**create** [3] - 17:11, 38:10, 46:16
**created** [1] - 38:12
**creative** [3] - 31:25, 34:23, 35:3
**creativity** [4] - 23:20, 33:13, 57:11, 57:15
**credentials** [1] - 50:19
**crew** [1] - 42:16
**criminal** [3] - 18:13, 19:22, 20:6
**criticized** [1] - 8:22
**cross** [5] - 11:19, 14:13, 23:17, 24:17, 37:24, 47:3, 51:24, 52:22, 53:22

**Cross** [4] - 37:25, 51:8, 51:22, 53:10
**Cross's** [3] - 51:12, 53:4, 53:24
**cross-motions** [1] - 47:3
**CROWELL** [1] - 2:5
**Crowell** [1] - 3:19
**CSR** [1] - 59:21
**cull** [1] - 55:12
**culture** [1] - 27:4
**curious** [2] - 9:7, 45:3
**current** [2] - 5:22, 23:1

## D

**DALE** [1] - 1:19
**Dale** [1] - 3:7
**damages** [10] - 26:2, 39:11, 40:23, 42:10, 44:24, 45:14, 45:21, 46:2, 46:18, 46:21
**data** [11] - 33:9, 45:10, 45:13, 45:24, 45:25, 46:1, 46:12, 46:16, 46:23, 47:1, 50:1
**date** [1] - 7:12
**dates** [1] - 4:6
**Daubert** [6] - 37:20, 37:25, 46:20, 52:3, 52:6, 53:25
**DAVID** [1] - 2:3
**David** [2] - 3:17, 41:21
**daylight** [3] - 38:22, 39:8, 44:17
**days** [1] - 9:1
**deadlines** [1] - 51:23
**deal** [1] - 55:1
**dealing** [1] - 21:18
**Deanna** [2] - 59:16, 59:21
**decide** [1] - 32:15
**deciding** [2] - 20:15, 50:15
**deep** [1] - 36:4
**defendant** [3] - 3:16, 20:15, 46:5
**Defendant** [2] - 1:8, 2:8
**defendant's** [2] - 32:1, 37:2
**Defendant's** [1] - 49:15
**defendants** [2] - 37:5, 54:17
**defense** [3] - 25:23, 29:3, 31:22
**defer** [2] - 26:25, 56:8
**definitely** [2] - 15:1,

53:21
**definition** [2] - 38:24, 40:12
**degree** [1] - 33:12
**DELAWARE** [1] - 1:2
**Delaware** [5] - 12:11, 13:21, 16:9, 20:3, 20:10
**deliberate** [1] - 19:17
**deliberations** [4] - 9:24, 19:21, 19:23, 21:2
**demise** [2] - 4:20, 8:24
**demonstratives** [1] - 12:13
**denied** [2] - 47:3, 49:10
**deny** [7] - 38:15, 39:1, 40:18, 47:5, 49:16, 51:2, 56:25
**deposition** [3] - 4:8, 50:20, 51:14, 52:9, 52:19, 53:3, 53:25, 54:4, 54:25, 55:3, 55:11, 55:12, 56:20
**deprived** [1] - 52:20
**depriving** [1] - 51:15
**deps** [1] - 55:17
**deputy** [2] - 11:23, 12:10
**designations** [6] - 4:9, 54:25, 55:3, 55:11, 55:12, 56:17
**designed** [1] - 54:7
**desk** [1] - 12:24
**detail** [1] - 58:1
**detailed** [1] - 30:6
**deter** [1] - 45:7
**develop** [1] - 26:13
**devices** [1] - 15:17
**died** [1] - 6:24
**difference** [3] - 25:7, 35:9, 51:12
**different** [15] - 6:5, 26:25, 27:1, 31:10, 31:17, 33:24, 33:25, 37:4, 42:18, 43:10, 43:12, 43:13, 43:16, 58:21
**difficult** [1] - 24:21
**digests** [1] - 32:12
**dip** [1] - 42:3
**dipped** [1] - 42:3
**dire** [4] - 4:7, 17:25, 24:24, 24:25
**direct** [2] - 14:13, 14:25
**directly** [1] - 9:21
**directory** [1] - 33:14
**disagree** [1] - 31:24

**disagreement** [1] - 44:20
**disclose** [1] - 51:4
**disclosure** [4] - 52:15, 52:23, 53:1, 54:6
**discuss** [3] - 3:13, 5:24, 12:10
**discussed** [1] - 3:9
**discussing** [1] - 50:13
**dismiss** [2] - 10:22, 16:21
**displace** [1] - 45:25
**disposed** [1] - 37:20
**disputes** [2] - 22:25, 26:1
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 59:22
**ditto** [1] - 11:11
**docket** [1] - 35:5
**document** [1] - 24:15
**documents** [4] - 22:5, 22:7, 40:5, 50:12
**domain** [1] - 30:22
**done** [15] - 6:3, 7:1, 7:18, 9:1, 12:11, 13:1, 14:18, 17:3, 19:1, 19:11, 19:25, 20:14, 20:20, 26:7, 38:3
**door** [2] - 44:13
**doors** [1] - 15:9
**down** [19] - 9:15, 11:24, 17:9, 17:23, 17:24, 18:1, 18:10, 18:25, 22:16, 43:14, 44:9, 44:10, 44:19, 44:24, 45:1, 45:2, 51:3, 55:12, 55:19
**Dr** [16] - 4:5, 4:19, 4:22, 5:12, 6:5, 34:15, 37:21, 37:25, 38:1, 46:20, 46:24, 51:12, 53:2, 53:24, 59:9
**draft** [1] - 25:1
**drafts** [1] - 26:4
**draw** [1] - 42:3
**drop** [1] - 37:16
**drove** [2] - 52:24
**duplicates** [1] - 13:25
**during** [2] - 14:25, 49:8

## E

**e-mail** [1] - 24:8
**early** [1] - 23:4
**easier** [1] - 27:19
**easily** [1] - 17:16

**East** [1] - 4:23
**effect** [6] - 41:15, 41:22, 43:17, 43:18, 46:9, 53:20
**effectively** [3] - 33:10, 37:20, 41:10
**effects** [1] - 42:25
**efficient** [2] - 11:17, 59:5
**effort** [1] - 22:24
**eight** [1] - 20:3
**either** [5] - 23:13, 37:16, 39:23, 47:21, 55:25
**elbow** [1] - 9:22
**electronic** [1] - 15:17
**electronics** [1] - 15:10
**element** [1] - 29:3
**elements** [2] - 25:22
**ellipsis** [1] - 57:14
**Ellis** [1] - 3:7
**ELLIS** [1] - 1:18
**eminently** [1] - 7:22
**encamp** [1] - 43:4
**end** [5] - 5:19, 6:17, 11:16, 55:22, 56:11
**ends** [1] - 19:19
**enforcement** [1] - 40:8
**English** [2] - 25:11, 25:19
**enter** [2] - 3:3, 46:23
**entered** [1] - 22:19
**ENTERPRISE** [1] - 1:3
**Enterprise** [1] - 3:2
**entirely** [1] - 6:21
**entitled** [2] - 47:6, 49:6
**envisioned** [1] - 8:10
**equipment** [1] - 15:6
**ERIC** [1] - 1:21
**Eric** [2] - 3:8, 48:16
**especially** [1] - 12:24
**ESQ** [10] - 1:16, 1:19, 1:19, 1:20, 1:20, 1:21, 2:3, 2:6, 2:6, 2:7
**establishes** [1] - 48:20
**et** [7] - 1:4, 7:1, 7:6, 11:19, 13:11, 40:24, 42:3
**evenhanded** [1] - 51:10
**evening** [2] - 5:8, 27:16
**events** [3] - 47:11, 48:1, 51:20
**evidence** [21] - 23:17, 27:21, 39:10, 40:14, 40:21, 42:2, 44:18,

46:13, 47:9, 47:22, 48:19, 48:22, 48:24, 49:6, 49:7, 49:17, 50:10, 50:12, 51:5, 52:11
**exactly** [3] - 21:10, 49:12, 54:8
**example** [4] - 11:10, 24:7, 30:22, 30:25
**examples** [1] - 38:17
**except** [1] - 9:2
**excite** [1] - 24:4
**exclude** [3] - 39:7, 44:9, 47:9
**excluding** [1] - 45:10
**exclusion** [1] - 40:17
**exclusive** [1] - 46:23
**excuse** [1] - 19:10
**excuses** [1] - 18:25
**execute** [1] - 35:23
**execution** [1] - 28:19
**executives** [2] - 49:2, 49:3
**exercise** [2] - 18:15, 20:12
**exercised** [1] - 20:14
**exercising** [1] - 21:5
**exhibit** [7] - 21:25, 22:2, 23:1, 28:20, 39:24, 47:21, 55:2
**exhibits** [15] - 14:3, 14:7, 21:13, 21:15, 22:1, 22:8, 22:10, 22:20, 24:5, 28:16, 28:23, 39:25, 54:25, 55:11
**existed** [1] - 22:2
**existence** [1] - 45:12
**expect** [3] - 4:4, 7:23, 8:16
**experience** [3] - 13:20, 14:11, 25:8
**expert** [12] - 4:20, 4:24, 4:25, 5:6, 6:24, 32:21, 33:3, 35:1, 51:4, 54:5, 54:8
**experts** [5] - 23:15, 32:10, 43:15, 54:3, 58:8
**explain** [2] - 34:11, 41:9
**explaining** [1] - 6:23
**express** [2] - 6:15, 45:11
**expressed** [1] - 6:14
**expression** [4] - 33:16, 35:15, 35:23, 36:10
**extend** [2] - 44:21
**extent** [3] - 26:10,

40:22, 42:5
**extra** [3] - 11:13, 12:21, 16:20
**extracting** [1] - 31:24
**extremely** [1] - 55:24

## F

**face** [2] - 8:13, 22:6
**fact** [7] - 8:24, 37:19, 40:4, 43:7, 48:2, 48:5, 57:7
**fact-intensive** [1] - 43:7
**factor** [4] - 41:8, 41:13, 45:18, 46:9
**facts** [5] - 30:25, 31:4, 31:25, 33:8, 33:16
**faculty** [1] - 9:10
**failed** [2] - 44:11, 45:6
**fair** [11] - 26:2, 39:11, 40:22, 40:23, 41:8, 45:17, 45:18, 46:5, 47:12, 53:9, 57:7
**fairly** [1] - 42:6
**fairness** [1] - 52:10
**fall** [1] - 7:3
**far** [2] - 25:20, 44:21
**fast** [1] - 56:1
**faster** [2] - 16:14, 17:17
**fault** [3] - 5:7, 6:23, 36:13
**features** [1] - 33:18
**federal** [3] - 6:14, 6:15, 54:6
**Feist** [1] - 33:6
**fewer** [1] - 17:7
**field** [1] - 18:2
**fifth** [1] - 23:12
**fight** [3] - 24:11, 30:19, 53:18
**figure** [3] - 16:19, 20:19, 45:4
**figuring** [1] - 29:5
**filed** [4] - 21:25, 22:3, 31:18, 44:25
**filled** [1] - 54:3
**filter** [1] - 57:6
**filtered** [1] - 13:21
**filtering** [1] - 30:10
**filtration** [4] - 23:10, 31:11, 56:25, 57:1
**final** [5] - 20:25, 26:6, 26:8, 26:21, 26:24
**finally** [1] - 53:13
**financials** [2] - 44:22, 44:23
**fine** [5] - 10:9, 14:15,

14:22, 43:22, 53:18
**finish** [2] - 11:9, 11:14
**firm** [2] - 15:13, 37:1
**first** [16] - 9:14, 10:8, 10:15, 11:23, 18:20, 19:17, 25:8, 33:25, 37:5, 39:16, 48:18, 49:4, 50:10, 52:23, 55:16, 57:2
**five** [3] - 3:6, 17:14, 21:7
**five-day** [1] - 17:14
**fix** [1] - 28:8
**flexibility** [1] - 54:21
**flexible** [2] - 11:3, 11:9
**flight** [1] - 8:1
**flights** [1] - 10:19
**flip** [1] - 14:5
**flip-up** [1] - 14:5
**fly** [1] - 22:13
**flying** [1] - 7:8
**focus** [3] - 23:13, 31:16, 33:25
**focusing** [2] - 18:7, 29:2
**follow** [2] - 20:23, 29:16
**follow-up** [1] - 20:23
**following** [1] - 23:2
**FOR** [1] - 1:2
**forbid** [1] - 19:23
**force** [1] - 57:3
**foregoing** [1] - 59:19
**form** [4] - 28:12, 29:11, 29:21, 30:3
**format** [2] - 12:6, 25:21
**formative** [1] - 33:23
**formatting** [1] - 26:17
**forms** [1] - 28:11
**forth** [4] - 18:16, 19:6
**foundation** [5] - 21:16, 21:20, 22:8, 22:14, 24:7
**four** [5] - 25:22, 41:8, 41:13, 45:18, 46:9
**fourth** [1] - 55:23
**framework** [1] - 27:20
**frankly** [2] - 6:9, 46:18
**Frederickson** [10] - 37:21, 37:24, 37:25, 51:8, 51:12, 51:22, 51:24, 53:4, 53:10, 53:24
**Frederickson's** [1] - 51:5
**Frederickson-cross** [6] - 37:24, 37:25, 51:8, 51:22, 51:24, 53:10

**Frederickson-Cross's** [3] - 51:12, 53:4, 53:24
**frequently** [2] - 36:3, 39:17
**Friday** [11] - 9:22, 10:4, 10:15, 10:19, 10:22, 10:24, 16:20, 17:5, 26:11, 26:23, 27:14
**friend** [2] - 18:9, 32:20
**fruit** [1] - 36:14
**full** [6] - 9:22, 21:25, 22:1, 51:16, 53:9, 53:21
**fulsome** [1] - 6:8
**fundamental** [2] - 34:12, 41:19
**fundamentally** [1] - 40:11, 43:11, 54:5

## G

**gander** [1] - 51:7
**general** [2] - 3:12, 38:20
**generation** [1] - 56:3
**generative** [4] - 38:7, 38:9, 40:11, 43:11
**genuine** [2] - 19:2, 26:1
**genuinely** [1] - 25:4
**Gino** [1] - 32:17
**given** [10] - 6:19, 10:12, 25:12, 46:2, 50:5, 51:15, 52:17, 52:21, 53:5, 57:8
**Gmail** [1] - 49:1
**GmbH** [1] - 1:4
**God** [1] - 24:12
**Goliath** [1] - 41:22
**goose** [1] - 51:6
**government's** [1] - 40:1
**grade** [1] - 43:19
**grant** [4] - 40:7, 40:18, 40:20, 44:14
**grateful** [2] - 56:24, 59:6
**greasy** [1] - 16:14
**great** [6] - 4:1, 6:18, 15:4, 16:16, 27:9, 37:8
**ground** [2] - 10:25, 20:12
**group** [2] - 17:24, 29:6
**guess** [1] - 45:4
**guidelines** [3] - 40:1, 40:4, 40:8

**guiding** [1] - 29:4
**guys** [1] - 21:9

# H

**half** [2] - 9:19, 56:4
**handed** [1] - 14:19
**handle** [3] - 3:25, 11:5, 54:21
**handling** [2] - 3:22, 58:14
**hanging** [1] - 36:14
**happy** [10] - 3:13, 3:24, 8:9, 12:9, 13:2, 29:10, 29:13, 30:3, 37:7, 39:1
**hard** [5] - 10:12, 14:2, 14:6, 14:19, 27:7
**hardship** [1] - 19:2
**harm** [2] - 41:17, 46:24
**Harrison** [1] - 3:20
**HARRISON** [1] - 2:6
**head** [42] - 22:21, 23:10, 23:22, 23:23, 23:24, 28:15, 28:21, 29:6, 29:18, 29:23, 31:13, 31:15, 31:17, 32:8, 32:25, 33:2, 33:20, 34:3, 34:4, 34:6, 34:7, 34:9, 34:17, 34:18, 34:19, 34:23, 34:24, 35:3, 35:6, 35:9, 35:11, 35:15, 36:6, 36:7, 36:15, 36:19, 36:25, 52:23, 55:6, 57:23
**heads** [1] - 7:17
**heads-up** [1] - 7:17
**headwinds** [1] - 7:15
**hear** [12] - 3:9, 4:19, 7:22, 12:7, 14:16, 15:20, 29:12, 37:13, 44:6, 45:4, 54:13, 54:16
**heard** [2] - 10:6, 43:23
**hearing** [2] - 11:17, 49:5
**hearsay** [1] - 22:14
**heart** [1] - 34:13
**helpful** [4] - 12:25, 26:17, 27:18, 30:5
**helps** [1] - 25:19
**hereby** [1] - 59:17
**hiding** [1] - 35:10
**higher** [2] - 23:4, 32:11
**highlight** [1] - 14:21
**himself** [1] - 7:6

**hit** [1] - 10:24
**hold** [1] - 39:2
**honor** [1] - 15:19
**Honor** [50] - 3:4, 3:14, 3:17, 4:16, 8:8, 10:10, 10:17, 12:9, 16:3, 18:22, 19:20, 20:9, 21:3, 21:22, 22:3, 22:18, 24:1, 26:16, 27:17, 29:8, 33:2, 33:6, 34:1, 36:1, 37:12, 37:18, 39:12, 40:10, 41:1, 41:4, 41:20, 42:6, 43:21, 44:15, 45:16, 46:4, 47:2, 47:19, 48:16, 50:8, 51:11, 51:19, 53:23, 54:9, 54:23, 56:16, 58:2, 58:16, 58:22
**Honor's** [3] - 14:14, 37:20, 52:3
**Honorable** [1] - 1:11
**hook** [2] - 12:14, 12:20
**hope** [3] - 6:8, 11:3, 32:4
**hopeful** [1] - 8:11
**hopefully** [2] - 32:21, 59:9
**hoping** [1] - 59:10
**horrible** [1] - 18:23
**hosted** [1] - 50:16
**hour** [2] - 9:18, 9:19
**hours** [1] - 9:18
**huddle** [2] - 21:8, 21:9
**huge** [1] - 32:14
**hundred** [1] - 31:9
**hundreds** [1] - 23:24
**hurt** [3] - 41:11, 42:12, 42:14

# I

**IA** [1] - 32:19
**idea** [6] - 5:10, 29:2, 35:13, 35:17, 35:20, 35:21
**ideas** [1] - 7:8
**identified** [1] - 47:1
**identify** [2] - 23:4, 49:14
**identifying** [1] - 21:16
**identity** [1] - 32:9
**III** [1] - 2:6
**imagine** [2] - 22:3, 29:11
**impeach** [1] - 6:6
**implications** [1] -

38:12
**imply** [1] - 47:14
**important** [4] - 42:7, 48:21, 53:13, 54:13
**improper** [1] - 8:15
**IN** [2] - 1:1, 1:2
**inadvertently** [1] - 8:15
**INC** [1] - 1:7
**inclined** [2] - 40:7, 57:6
**include** [2] - 33:8, 48:6
**included** [1] - 56:20
**includes** [1] - 36:18
**indent** [1] - 25:21
**indenting** [1] - 25:23
**independently** [1] - 33:12
**indicated** [1] - 5:4
**indication** [1] - 16:11
**individual** [3] - 31:4, 57:4, 57:11
**individually** [1] - 36:11
**indulge** [1] - 24:17
**industries** [1] - 18:8
**inferences** [1] - 42:4
**information** [4] - 12:6, 44:23, 49:4, 54:7
**infringed** [1] - 35:7
**infringement** [4] - 29:23, 30:11, 48:11, 48:13
**inquiry** [2] - 46:5, 46:11
**inside** [1] - 30:21
**insinuate** [1] - 8:15
**institutional** [1] - 48:20
**instruction** [2] - 6:23, 25:14
**instructions** [12] - 4:7, 25:5, 25:7, 25:9, 25:10, 25:13, 25:21, 26:4, 26:5, 26:6, 26:21, 32:7
**INTELLIGENCE** [1] - 1:7
**intelligence** [1] - 3:2
**intend** [5] - 25:4, 40:13, 44:18, 47:20, 56:11
**intended** [1] - 54:5
**intending** [1] - 47:22
**intends** [1] - 44:22
**intensive** [1] - 43:7
**intent** [1] - 55:13
**interest** [1] - 45:12
**interested** [1] - 25:2

**interference** [5] - 48:21, 49:15, 49:19, 49:24, 50:24
**interfering** [1] - 50:4
**internal** [1] - 30:1
**interpreted** [1] - 41:10
**interrogatory** [1] - 35:5
**introduce** [4] - 39:9, 40:13, 47:22, 51:14
**introductory** [1] - 57:12
**intuitive** [1] - 29:4
**involved** [2] - 55:24, 57:15
**involvement** [1] - 18:8
**involving** [1] - 33:12
**issue** [12] - 3:9, 21:20, 23:10, 28:25, 31:18, 35:24, 40:11, 52:10, 52:23
**issued** [3] - 36:3, 53:1
**issues** [21] - 3:12, 4:7, 5:25, 11:5, 11:18, 26:10, 29:15, 31:22, 32:14, 34:13, 37:17, 37:22, 39:11, 39:18, 41:19, 47:24, 50:25, 53:5, 53:20, 58:25
**items** [1] - 37:11
**itself** [3] - 36:20, 46:8, 49:14

# J

**JEREMY** [1] - 1:16
**Jeremy** [1] - 3:4
**Joachim** [1] - 3:19
**JOACHIM** [1] - 2:7
**Joe** [3] - 5:3, 9:2, 32:20
**join** [1] - 19:21
**joined** [5] - 3:6, 3:18, 47:10, 47:11, 47:16
**joining** [2] - 19:23, 45:12
**joint** [2] - 22:20, 27:3
**jointly** [1] - 56:19
**Jonathan** [2] - 51:22, 52:6
**JOSHUA** [1] - 1:19
**Joshua** [1] - 3:7
**jot** [1] - 18:10
**jotting** [1] - 17:24
**judge** [3] - 19:4, 27:22, 27:23
**judge's** [1] - 7:14
**judges** [1] - 26:22
**judging** [1] - 30:8

**judgment** [10] - 4:10, 31:12, 31:18, 31:19, 33:1, 33:5, 35:2, 36:13, 47:4, 58:6
**judicial** [1] - 36:8
**July** [1] - 4:23
**juries** [1] - 25:8
**juror** [6] - 14:6, 17:11, 17:20, 17:21, 57:14, 57:16
**jurors** [13] - 12:17, 14:3, 14:20, 16:6, 16:10, 16:21, 17:12, 19:7, 19:12, 19:18, 19:19, 28:14, 56:5
**jury** [45] - 4:7, 8:18, 9:15, 9:21, 9:23, 10:6, 10:7, 10:22, 11:2, 12:6, 12:12, 13:11, 17:10, 19:13, 20:3, 20:18, 20:22, 23:12, 25:5, 25:7, 25:9, 25:13, 26:4, 26:5, 26:6, 26:9, 26:21, 27:19, 27:20, 28:2, 29:5, 30:2, 32:7, 36:21, 42:15, 43:15, 43:19, 45:4, 45:8, 47:6, 54:13, 54:16, 57:10, 57:19, 57:24
**jury's** [1] - 11:16

# K

**keep** [2] - 37:2, 59:5
**keeping** [1] - 47:15
**Keith** [1] - 3:20
**KEITH** [1] - 2:6
**kept** [2] - 40:24, 41:9
**key** [5] - 33:6, 34:2, 36:6, 36:19, 51:11
**kicks** [1] - 32:15
**kind** [11] - 6:6, 9:7, 12:5, 14:2, 18:4, 20:12, 22:11, 23:19, 28:11, 48:23, 54:19
**kinds** [4] - 17:6, 18:5, 30:10, 41:12
**Kirkland** [1] - 3:7
**KIRKLAND** [1] - 1:18
**knock** [1] - 53:19
**knock-on** [1] - 53:19
**knowledge** [1] - 48:20
**knows** [3] - 7:1, 33:2, 47:14
**Krine** [10] - 34:15, 38:1, 46:20, 46:24, 47:6, 51:7, 51:12,

51:22, 52:6, 53:2
**Krine's** [1] - 51:4

## L

**labor** [1] - 9:24
**lack** [1] - 38:24
**laid** [1] - 4:13
**language** [7] - 6:22, 8:17, 34:11, 36:8, 36:18, 36:20, 46:7
**last** [12] - 5:5, 5:7, 6:12, 8:11, 9:1, 9:3, 9:4, 9:17, 20:16, 20:24, 36:23, 51:3
**last-minute** [1] - 9:17
**late** [4] - 6:19, 27:14, 53:17, 53:22
**late-breaking** [1] - 6:19
**lateness** [1] - 52:7
**latitude** [1] - 25:3
**law** [10] - 25:25, 29:17, 32:14, 37:1, 39:18, 40:2, 41:23, 42:7, 43:4, 57:21
**laws** [2] - 25:7, 33:23
**lawsuit** [1] - 44:25
**lawyer** [1] - 18:3
**lawyers** [4] - 24:14, 35:14, 59:1, 59:3
**lay** [1] - 32:18
**layperson** [1] - 32:19
**lead** [1] - 3:12
**learn** [2] - 37:1, 59:9
**learns** [1] - 32:13
**least** [4] - 7:16, 27:9, 28:15, 28:17
**leave** [4] - 9:17, 10:5, 15:9, 15:10
**leaving** [1] - 15:6
**lectern** [1] - 16:22
**lecterns** [1] - 17:1
**left** [1] - 19:18
**legal** [4] - 11:5, 18:2, 18:3, 46:16
**legalese** [1] - 25:9
**Legalese** [1] - 46:15
**less** [4] - 4:21, 4:22, 25:12, 54:14
**letter** [4] - 7:11, 7:13, 41:23, 42:7
**letting** [2] - 19:17, 51:10
**level** [1] - 32:11
**liability** [2] - 50:11, 50:25
**license** [1] - 46:23
**licensing** [1] - 47:1

**light** [1] - 26:3
**likely** [1] - 23:5
**limine** [15] - 4:8, 23:3, 37:9, 37:15, 37:19, 37:23, 38:2, 38:8, 44:8, 49:16, 53:8, 58:8, 58:11, 58:13
**limited** [3] - 42:24, 46:7, 49:25
**line** [1] - 24:17
**lines** [1] - 30:7
**list** [7] - 18:6, 21:25, 23:1, 37:4, 39:25, 47:21, 56:1
**listen** [1] - 19:4
**listening** [2] - 25:2, 56:3
**lists** [5] - 22:2, 46:9, 54:24, 55:2, 56:11
**literally** [2] - 5:10, 52:20
**literature** [1] - 42:9
**live** [3] - 42:16, 56:21, 57:3
**LLP** [4] - 1:16, 1:18, 2:3, 2:5
**loath** [1] - 24:5
**Lobiaccole** [1] - 32:18
**local** [1] - 27:4
**location** [1] - 16:19
**lock** [1] - 15:9
**locked** [2] - 15:14, 28:5
**logistics** [6] - 4:6, 6:3, 9:14, 11:22, 14:2, 24:24
**look** [4] - 17:4, 27:12, 28:19, 43:7
**looking** [3] - 20:21, 32:7, 39:24
**loop** [1] - 4:9
**lose** [1] - 41:18
**losing** [1] - 46:22
**lounge** [1] - 15:8
**LOVERRO** [3] - 1:21, 48:16, 50:8
**Loverro** [2] - 3:8, 48:17
**low** [1] - 36:14
**low-hanging** [1] - 36:14
**lowest** [2] - 19:12, 20:21
**lunacy** [1] - 23:11
**lunch** [6] - 10:7, 10:8, 11:8, 11:20, 16:6, 27:10
**lunches** [1] - 16:7

## M

**M-A-R-K-S** [1] - 9:6
**magical** [1] - 43:5
**mail** [1] - 24:8
**major** [1] - 29:15
**Malikowski** [3] - 46:20, 46:21, 47:6
**managed** [1] - 59:5
**mandate** [1] - 39:21
**map** [3] - 17:11, 17:19, 17:20
**marginal** [1] - 42:25
**market** [18] - 40:14, 40:15, 40:24, 41:16, 41:22, 42:1, 42:20, 42:22, 45:10, 45:11, 45:13, 45:19, 45:25, 46:6, 46:10, 46:12, 46:24, 46:25
**marketed** [1] - 43:9
**marking** [1] - 40:22
**Marks** [1] - 59:9
**marks** [4] - 9:3, 9:5, 9:6, 32:20
**martin** [1] - 9:3
**massive** [1] - 57:23
**match** [1] - 34:17
**matching** [1] - 34:11
**material** [2] - 5:16, 32:13
**materials** [4] - 5:7, 6:10, 6:12, 7:5
**matter** [3] - 35:12, 41:21, 45:14
**matters** [1] - 41:22
**mean** [3] - 24:4, 41:17, 47:12
**MEANS** [2] - 1:20, 44:15
**means** [4] - 11:5, 26:1, 36:4, 40:13
**Means** [2] - 3:8, 44:15
**mechanics** [1] - 29:5
**meets** [1] - 33:17
**Mellon** [1] - 9:9
**memo** [5] - 47:10, 47:17, 48:10, 49:7, 49:8
**memos** [1] - 46:15
**mention** [2] - 44:10, 45:10
**mentioned** [2] - 33:6, 55:4
**menu** [1] - 16:10
**mics** [1] - 17:6
**mid** [2] - 11:7, 11:11
**middle** [2] - 11:10, 20:12

**midmorning** [1] - 11:20
**midnight** [1] - 4:23
**might** [10] - 15:16, 17:2, 17:15, 31:24, 39:10, 43:1, 43:12, 43:13, 44:12, 51:15
**mind** [1] - 10:3
**mindful** [2] - 55:13, 56:10
**minimal** [1] - 33:12
**minimum** [1] - 33:17
**minute** [1] - 9:17
**minutes** [11] - 11:7, 11:8, 11:12, 11:13, 21:7, 21:9, 56:4
**MIRANDA** [1] - 1:20
**Miranda** [2] - 3:8, 44:15
**moment** [1] - 49:9
**Monday** [2] - 10:16, 10:25
**monitors** [1] - 12:12
**month** [3] - 4:21, 5:19, 25:17
**MOORE** [3] - 2:3, 3:17, 3:24
**Moore** [4] - 3:18, 3:22, 7:11, 20:2
**Moore's** [1] - 15:13
**MORING** [1] - 2:5
**Moring** [1] - 3:19
**morning** [10] - 5:8, 6:12, 6:15, 10:16, 10:25, 11:7, 13:12, 16:2, 21:22, 27:14
**MORRIS** [1] - 1:16
**Morris** [4] - 3:5, 5:3, 9:3, 59:9
**most** [2] - 4:18, 22:15
**motion** [22] - 19:5, 31:12, 35:2, 38:1, 38:7, 38:15, 39:7, 39:14, 40:18, 43:23, 44:8, 44:9, 44:14, 47:8, 48:6, 48:7, 49:16, 51:2, 51:3, 58:6, 58:13
**motions** [15] - 4:8, 23:3, 37:9, 37:10, 37:15, 37:19, 37:23, 45:9, 46:20, 47:3, 53:8, 58:8, 58:10, 58:14
**move** [7] - 9:13, 15:11, 16:17, 18:22, 36:22, 37:9, 47:8
**moved** [2] - 17:1, 33:1
**moves** [1] - 17:17
**moving** [3] - 14:23,

36:13, 59:6
**MR** [74] - 3:4, 3:13, 3:17, 3:24, 4:17, 4:22, 5:14, 5:20, 6:1, 7:7, 8:5, 8:25, 9:6, 9:9, 9:11, 10:2, 10:9, 10:18, 12:9, 12:19, 13:8, 13:19, 13:24, 14:10, 14:17, 15:1, 15:12, 16:3, 16:8, 17:1, 19:20, 20:1, 20:8, 24:3, 24:22, 26:16, 26:20, 27:17, 27:24, 28:3, 28:6, 28:20, 29:8, 29:10, 29:15, 30:17, 30:18, 31:7, 32:3, 32:17, 34:15, 37:24, 38:5, 38:23, 40:10, 41:1, 43:22, 44:6, 45:16, 47:19, 48:16, 49:21, 49:24, 50:8, 51:11, 51:19, 52:19, 53:17, 53:23, 54:23, 58:16, 58:22, 58:24, 59:11
**MS** [28] - 4:15, 8:8, 8:19, 10:10, 10:17, 21:3, 21:22, 22:17, 24:1, 32:24, 34:1, 36:1, 37:7, 37:12, 37:18, 39:12, 39:14, 41:3, 41:6, 42:6, 43:3, 43:21, 44:15, 46:4, 55:8, 56:16, 58:2, 59:2
**multiple** [1] - 12:11
**murderer** [1] - 8:20
**music** [1] - 42:17
**mutually** [1] - 8:17

## N

**name** [7] - 4:25, 5:3, 9:2, 9:3, 24:8, 32:20, 37:1
**names** [2] - 9:4, 37:21
**narrow** [2] - 18:1, 22:4
**nature** [3] - 6:20, 7:3, 54:19
**nearly** [1] - 17:25
**necessarily** [1] - 19:14
**necessary** [1] - 54:20
**necessity** [1] - 7:4
**need** [16] - 5:24, 6:3, 11:25, 12:19, 13:6, 15:11, 16:1, 16:17, 27:12, 28:20, 28:25, 33:24, 45:22, 55:3, 56:21, 58:12
**needed** [2] - 34:8,

34:9
**needing** [1] - 5:23
**needs** [5] - 5:23, 6:2, 12:22, 45:18, 56:9
**never** [6] - 24:9, 31:1, 45:23, 52:1, 53:6, 53:7
**new** [5] - 42:4, 49:4, 51:25, 52:12, 52:15
**news** [1] - 59:10
**next** [10] - 6:18, 11:15, 20:16, 23:20, 25:6, 26:3, 34:25, 37:1, 47:8, 56:10
**Nichols** [1] - 3:5
**NICHOLS** [1] - 1:16
**night** [2] - 27:9, 27:15
**no-win** [1] - 54:14
**noise** [1] - 15:20
**normally** [1] - 54:7
**note** [16] - 22:18, 29:18, 31:13, 31:15, 31:17, 32:8, 34:6, 34:7, 34:9, 34:18, 34:24, 35:3, 35:11, 35:15
**notes** [27] - 17:24, 22:21, 22:22, 23:10, 23:22, 23:23, 23:25, 28:15, 28:21, 29:6, 29:23, 32:25, 33:2, 33:20, 34:3, 34:4, 34:17, 34:19, 34:23, 35:6, 35:9, 36:6, 36:7, 36:15, 36:19, 52:23, 57:23
**nothing** [6] - 4:15, 8:21, 8:24, 36:16, 48:10, 55:9
**novel** [1] - 25:25
**number** [8] - 17:19, 17:21, 17:22, 19:14, 36:20, 53:24, 57:23, 59:7
**numbered** [1] - 20:21
**numbers** [1] - 19:13
**numerated** [1] - 50:25
**numerically** [1] - 20:17

## O

**objection** [4] - 22:21, 22:22, 24:7, 25:2
**objections** [6] - 21:19, 22:2, 22:4, 23:4, 40:18, 55:2
**obliged** [1] - 16:16
**obtained** [1] - 4:23

22:24
**oral** [4] - 4:10, 58:5, 58:10, 58:12
**order** [13] - 5:2, 15:18, 22:4, 22:18, 31:19, 33:8, 34:5, 35:4, 51:20, 52:2, 52:22, 53:25, 54:2
**ordered** [2] - 15:24, 52:25
**orders** [1] - 15:23
**organization** [9] - 31:3, 31:8, 31:14, 31:16, 32:5, 33:1, 34:18, 34:21, 35:17
**organized** [1] - 23:19
**original** [1] - 33:18
**originally** [1] - 58:9
**otherwise** [3] - 30:24, 35:16, 54:11
**outside** [1] - 15:23
**overlooking** [1] - 48:23
**own** [7] - 5:7, 13:21, 16:7, 33:3, 36:7, 43:9, 49:1
**owning** [1] - 39:18

## P

**p.m** [1] - 58:5
**page** [1] - 35:6
**pages** [3] - 23:10, 23:24, 28:17
**pair** [1] - 49:6
**pairs** [1] - 34:5
**papers** [1] - 14:23
**paralegal** [1] - 18:3
**paralegals** [2] - 36:24, 56:10
**Parker** [6] - 3:19, 3:24, 4:1, 8:20, 55:5, 55:8
**PARKER** [32] - 2:6, 4:17, 4:22, 5:14, 5:20, 6:1, 7:7, 8:5, 8:25, 9:6, 9:9, 9:11, 10:2, 10:9, 10:18, 14:17, 15:1, 24:3, 24:22, 28:3, 28:6, 28:20, 30:18, 31:7, 32:3, 32:17, 34:15, 43:22, 44:6, 52:19, 53:17, 59:11
**Parker's** [1] - 59:8
**Parrot** [1] - 42:19
**part** [7] - 31:5, 40:7, 40:9, 40:20, 42:2, 47:11, 47:18
**particularized** [1] -

35:23
**parties** [17] - 4:13, 6:22, 9:20, 10:1, 20:5, 22:9, 22:19, 27:1, 27:3, 37:10, 38:8, 44:16, 55:10, 56:8, 56:19, 57:21, 59:4
**parties'** [1] - 47:3
**partly** [1] - 43:19
**passed** [1] - 4:22
**password** [3] - 49:25, 50:17, 50:19
**past** [3] - 17:13, 19:25, 33:5
**patiently** [1] - 19:4
**pay** [2] - 19:4, 43:19
**paying** [3] - 16:11, 19:16, 45:8
**pending** [1] - 38:1
**people** [15] - 16:23, 17:15, 18:2, 18:25, 19:2, 20:21, 21:5, 35:20, 37:2, 42:1, 42:17, 42:19, 42:20, 45:7, 50:22
**per** [4] - 20:8, 20:11, 39:11, 40:16
**percent** [1] - 31:9
**peremptories** [5] - 18:16, 19:6, 19:11, 20:8, 21:5
**peremptorily** [2] - 18:18, 19:8
**perfect** [2] - 23:8, 56:23
**perhaps** [2] - 45:6, 56:4
**permissible** [2] - 19:24, 49:3
**permission** [1] - 15:19
**permitted** [4] - 51:21, 52:1, 52:7, 54:2
**person** [6] - 18:22, 18:23, 20:16, 20:17, 24:9
**person's** [2] - 24:8, 42:17
**personal** [2] - 15:17, 18:7
**personally** [2] - 7:2, 57:15
**perspective** [2] - 27:18, 54:1
**phone** [1] - 25:14
**phonetic** [1] - 32:18
**pick** [2] - 10:7, 35:13
**picked** [1] - 35:12
**picking** [1] - 35:21
**piece** [1] - 58:15

**pieces** [2] - 56:14, 57:4
**pike** [1] - 22:16
**place** [3] - 14:4, 33:9, 35:8
**plain** [2] - 25:11, 25:19
**plaintiff** [5] - 20:15, 21:23, 37:3, 44:16, 49:18
**plaintiff's** [6] - 4:25, 5:2, 27:18, 28:23, 37:2, 47:21
**Plaintiffs** [3] - 1:5, 1:22, 49:9
**plaintiffs** [13] - 3:3, 3:6, 20:13, 21:23, 45:11, 46:22, 46:24, 48:5, 48:17, 49:6, 52:25, 53:1
**plan** [2] - 44:10, 55:12
**planned** [1] - 3:25
**planning** [2] - 16:6, 40:3
**plans** [1] - 38:9
**plant** [1] - 12:1
**platform** [1] - 46:17
**plausibly** [1] - 40:16
**play** [6] - 30:22, 43:16, 55:13, 55:21, 56:2, 56:11
**played** [1] - 56:21
**playing** [2] - 52:16, 55:23
**plays** [2] - 41:21, 50:23
**pleased** [1] - 15:20
**pled** [1] - 36:17
**plus** [5] - 9:18, 17:12, 20:19, 21:1
**podcasts** [1] - 56:4
**point** [12] - 7:21, 13:4, 14:23, 18:15, 19:5, 30:7, 32:15, 32:16, 43:22, 45:17, 48:18, 49:21
**points** [4] - 25:23, 50:8, 53:23, 57:13
**pool** [3] - 11:2, 18:21, 19:10
**posed** [1] - 30:24
**position** [11] - 5:11, 7:15, 7:24, 8:3, 30:7, 32:1, 34:4, 38:24, 40:15, 42:21, 46:3
**possible** [3] - 21:4, 29:3, 48:12
**potential** [4] - 41:15, 46:10, 46:12, 48:14
**potentially** [4] - 20:22, 46:25, 48:8, 57:17

**obviously** [7] - 6:25, 12:14, 14:7, 20:4, 23:9, 25:25, 44:22
**OF** [2] - 1:2, 1:9
**offer** [1] - 44:18
**offered** [2] - 4:25, 46:21
**offering** [1] - 54:10
**office** [1] - 36:4
**officer** [1] - 7:20
**Official** [1] - 59:22
**often** [1] - 57:13
**old** [1] - 42:5
**older** [1] - 56:4
**omitted** [1] - 57:13
**once** [5] - 14:24, 16:24, 19:1, 20:20, 56:17
**one** [35] - 6:1, 7:16, 9:2, 10:6, 11:7, 11:11, 12:23, 14:17, 16:14, 18:17, 19:9, 19:19, 20:17, 23:24, 28:16, 29:15, 31:21, 35:1, 36:23, 37:19, 37:20, 37:23, 38:6, 38:9, 41:3, 47:25, 49:4, 49:21, 53:4, 53:24, 54:14, 55:23, 56:4, 56:17, 57:2
**one-week** [1] - 23:24
**ones** [4] - 18:1, 33:2, 42:5, 47:6
**open** [6] - 17:10, 17:18, 18:12, 19:25, 21:19, 44:13
**opening** [7] - 9:18, 9:21, 10:7, 10:11, 44:13, 51:21, 51:22
**opening-the-door** [1] - 44:13
**openings** [6] - 10:2, 10:3, 10:15, 10:22, 13:7, 13:12
**opine** [1] - 51:7
**opined** [1] - 46:25
**opinion** [6] - 35:13, 35:14, 46:21, 52:3, 52:24, 53:1
**opinions** [9] - 36:8, 47:2, 51:14, 51:16, 51:25, 52:5, 52:15, 54:6, 58:14
**opportunity** [4] - 51:17, 53:9, 53:12, 53:22
**oppose** [1] - 43:23
**opposed** [1] - 45:19
**opposing** [5] - 5:9, 7:11, 8:2, 14:12,

**Potter** [1] - 3:18
**POTTER** [1] - 2:3
**power** [1] - 33:22
**practice** [1] - 27:1
**precluded** [1] - 44:2
**prefer** [1] - 27:1
**preference** [4] - 14:14,
25:12, 27:3, 58:18
**prejudice** [2] - 48:14,
52:13
**prejudiced** [1] - 52:8
**preliminary** [2] -
25:13, 26:5
**premarked** [1] - 21:15
**preparation** [1] - 52:9
**prepare** [5] - 15:23,
27:7, 27:13, 52:8,
52:14
**prepared** [1] - 16:4
**present** [4] - 12:5,
15:24, 57:23, 59:18
**presented** [2] - 23:23,
36:21
**preserved** [1] - 22:8
**pressing** [1] - 4:18
**presume** [1] - 21:14
**presumed** [1] - 22:6
**presumption** [2] -
24:20, 29:22
**pretrial** [4] - 21:17,
22:4, 22:11, 22:18
**PRETRIAL** [2] - 1:9,
1:11
**pretty** [5] - 17:8,
25:25, 42:18, 48:3,
59:2
**preview** [1] - 30:18
**previous** [1] - 6:24
**priority** [1] - 23:4
**problem** [3] - 6:4,
7:10, 38:24
**procedure** [1] - 6:25
**proceed** [1] - 5:22
**proceedings** [1] -
59:19
**produced** [2] - 22:6,
51:24
**product** [6] - 39:3,
43:9, 45:20, 45:24,
46:6, 48:4
**professional** [2] - 9:8,
59:5
**Professional** [2] -
59:16, 59:18
**professors** [1] - 42:9
**programmed** [1] -
32:18
**programmer** [1] - 9:9
**prohibition** [1] - 15:17
**project** [5] - 12:15,

47:10, 48:10, 49:8,
50:15
**proper** [1] - 29:19
**proposal** [2] - 23:7,
30:14
**proposals** [3] - 23:12,
23:22, 57:22
**propose** [4] - 21:21,
22:23, 23:2, 30:3
**proposed** [3] - 18:1,
26:4, 57:16
**protectable** [1] - 33:15
**protection** [2] - 33:17,
35:18
**protective** [1] - 5:1
**proved** [1] - 48:22
**provide** [5] - 12:22,
14:11, 16:6, 16:12,
26:17
**provided** [3] - 40:12,
51:22, 52:5
**providing** [1] - 14:3
**provision** [1] - 22:5
**prudent** [1] - 20:12
**public** [1] - 30:22
**pull** [1] - 36:25
**punch** [1] - 15:12
**purchased** [1] - 46:15
**purely** [1] - 34:20
**purposes** [1] - 49:18
**pursuant** [1] - 22:4
**push** [2] - 23:16,
53:17
**put** [14] - 15:23, 23:11,
25:11, 25:18, 40:21,
43:22, 44:22, 45:24,
52:1, 52:5, 52:11,
52:12, 55:17, 56:8
**puts** [1] - 45:20
**putting** [1] - 45:19
**puzzling** [1] - 45:5

**Q**

**questioning** [1] -
16:23
**questions** [14] - 7:1,
17:18, 18:1, 18:6,
18:11, 20:23, 20:24,
34:17, 34:20, 34:25,
51:13, 53:7, 53:21,
54:3
**quietly** [1] - 18:17
**quite** [3] - 28:22,
46:18, 47:12
**quoting** [1] - 41:14

**R**

**raise** [3] - 17:19, 23:5,
58:20
**raising** [1] - 22:12
**rank** [1] - 39:2
**rarely** [1] - 18:12
**rather** [8] - 11:10,
11:14, 11:17, 18:25,
22:25, 27:22, 42:4,
54:13
**raw** [1] - 32:12
**reaching** [1] - 42:4
**read** [5] - 5:15, 38:14,
51:13, 51:17, 53:3
**readers** [1] - 33:10
**ready** [6] - 3:14, 7:10,
9:13, 10:24, 11:4,
27:14
**real** [3] - 19:3, 25:1,
58:12
**realize** [1] - 54:14
**really** [6] - 10:18,
16:25, 17:14, 27:5,
27:25, 43:6
**realtime** [1] - 12:22
**reason** [5] - 7:2,
43:23, 45:1, 53:13,
57:18
**reasonable** [4] - 7:22,
24:19, 57:10, 57:16
**reasons** [5] - 8:11,
39:20, 45:2, 52:5,
57:1
**rebut** [3] - 53:11,
53:12, 53:15
**rebuttal** [3] - 44:12,
51:21, 51:23
**recalling** [1] - 54:20
**receive** [2] - 6:13,
52:22
**received** [2] - 5:7, 6:12
**recently** [1] - 39:16
**recognized** [2] -
31:19, 35:4
**recognizes** [1] - 52:3
**record** [5] - 19:5,
22:15, 24:12, 46:13,
56:20
**references** [1] - 39:7
**referencing** [2] - 44:9,
46:8
**refused** [1] - 51:13
**regard** [2] - 37:21,
37:22
**regarding** [1] - 39:18
**Registered** [2] -
59:16, 59:17
**registered** [1] - 30:20

**Rehoboth** [1] - 18:25
**relate** [1] - 38:21
**related** [7] - 23:9,
38:20, 47:22, 48:24,
49:15, 50:10, 53:1
**relates** [2] - 36:19,
44:4
**relation** [1] - 32:25
**relative** [1] - 18:8
**relatively** [1] - 44:16
**relevance** [4] - 23:16,
47:25, 48:13, 48:18
**relevant** [12] - 35:15,
40:9, 40:16, 41:8,
44:23, 45:21, 46:2,
47:12, 48:2, 48:5,
48:19, 50:11
**relied** [1] - 45:24
**reluctant** [1] - 17:8
**remain** [1] - 30:21
**remember** [1] - 44:17
**remind** [1] - 25:16
**reminder** [1] - 58:4
**removed** [1] - 48:12
**repeat** [1] - 25:14
**replace** [1] - 42:13
**replacement** [3] - 4:5,
4:20, 43:10
**reply** [1] - 39:17
**report** [17] - 5:8, 5:12,
6:8, 7:5, 51:4, 51:12,
51:16, 51:24, 52:7,
52:9, 52:14, 52:18,
53:4, 53:20, 53:22,
54:5, 54:8
**reported** [1] - 59:18
**reporter** [2] - 12:22,
56:24
**Reporter** [3] - 59:17,
59:18, 59:22
**reports** [4] - 5:15,
51:21, 51:23, 52:1
**represent** [2] - 5:5,
7:21
**representation** [1] -
6:10
**representing** [2] -
7:20, 8:23
**represents** [1] - 21:25
**request** [3] - 36:23,
36:24, 52:19
**required** [1] - 5:1
**research** [2] - 25:14,
46:17
**reservation** [1] - 15:13
**reserve** [1] - 29:10
**resist** [1] - 18:24
**resolution** [1] - 55:5
**resolve** [2] - 21:17,
26:10

**resolved** [1] - 55:4
**respect** [2] - 38:3,
46:4
**respond** [5] - 8:25,
34:14, 52:7, 52:12,
54:10
**responded** [1] - 5:2
**responding** [1] - 49:3
**response** [4] - 30:9,
34:12, 40:18, 51:1
**responses** [1] - 35:5
**rest** [1] - 59:8
**results** [1] - 43:12
**retained** [1] - 4:24
**retire** [1] - 25:15
**REUTERS** [1] - 1:3
**Reuters** [15] - 3:1,
7:23, 12:7, 32:22,
37:4, 37:14, 39:6,
41:11, 44:11, 44:17,
44:22, 45:5, 45:20,
58:9, 58:17
**Reuters's** [1] - 58:7
**review** [3] - 7:5, 40:2,
52:8
**revised** [1] - 30:13
**rich** [1] - 36:4
**ringing** [1] - 15:21
**ripe** [1] - 24:10
**road** [2] - 30:3, 44:25
**role** [1] - 43:16
**room** [4] - 8:12, 9:18,
9:23, 17:12
**rooms** [2] - 15:6,
15:14
**ROSS** [34] - 1:7, 3:2,
4:19, 7:3, 8:21,
13:17, 14:16, 28:1,
37:15, 38:10, 38:11,
38:15, 39:9, 44:9,
44:10, 44:19, 45:1,
45:9, 45:15, 45:19,
45:23, 45:24, 46:2,
46:14, 47:10, 48:23,
49:8, 49:11, 50:13,
50:17, 50:19, 50:22,
57:8, 58:12
**ROSS's** [13] - 6:23,
28:12, 28:13, 30:6,
37:23, 44:23, 48:20,
49:1, 49:2, 49:3,
58:7, 58:8
**RPR** [1] - 59:21
**Ruda** [1] - 39:17
**rule** [3] - 20:6, 21:2,
40:16
**Rule** [1] - 22:12
**ruled** [1] - 52:4
**rules** [4] - 19:22,
19:23, 20:11, 54:6

**ruling** [2] - 37:21, 54:15
**rulings** [1] - 23:2
**run** [1] - 11:23
**running** [2] - 10:25, 16:14
**runs** [1] - 27:11
**rushed** [1] - 9:23

**S**

**sales** [2] - 42:1, 42:2
**saves** [1] - 16:15
**saw** [1] - 39:17
**schedule** [1] - 5:22
**scheduled** [1] - 58:5
**scheduling** [3] - 51:20, 52:2, 54:2
**scope** [1] - 11:19
**scrape** [3] - 50:1, 50:13, 50:16
**screen** [2] - 12:16, 12:17, 12:18
**screens** [2] - 13:23, 14:6
**se** [2] - 39:11, 40:16
**search** [1] - 9:17
**searchable** [1] - 31:4
**seat** [2] - 17:19, 17:20
**seats** [1] - 17:11
**Second** [1] - 57:6
**second** [2] - 26:20, 55:19
**secondary** [2] - 50:11, 50:25
**secretary** [1] - 18:3
**section** [2] - 41:14, 46:8
**see** [25] - 6:16, 8:2, 10:23, 12:2, 12:17, 12:18, 12:25, 13:5, 14:21, 15:5, 21:11, 22:16, 24:23, 26:6, 27:11, 28:25, 31:5, 38:21, 39:6, 39:25, 42:25, 48:13, 55:5
**seem** [2] - 7:23, 45:12
**Seiberson's** [1] - 58:13
**selection** [9] - 9:15, 9:21, 13:12, 17:10, 33:11, 33:18, 34:6, 34:9, 36:10
**selling** [4] - 42:19, 45:23, 45:25, 46:1
**send** [4] - 7:11, 19:16, 21:8, 57:19
**sense** [9] - 5:15, 11:13, 16:23, 23:8,

29:4, 40:4, 55:20, 56:7, 56:23
**sensitive** [2] - 18:12, 18:14
**separate** [3] - 14:8, 32:16, 37:3
**September** [1] - 58:5
**sequence** [10] - 27:25, 30:16, 31:8, 31:14, 31:16, 32:5, 32:25, 34:18, 34:20, 35:17
**serious** [1] - 21:19
**service** [2] - 49:12, 50:22
**set** [13] - 8:3, 12:1, 12:3, 12:16, 12:25, 13:7, 13:11, 13:14, 13:21, 15:5, 15:21, 26:8, 49:19
**settle** [1] - 57:7
**setup** [1] - 12:13
**shaking** [1] - 55:5
**share** [3] - 40:24, 42:1, 50:17
**sharing** [2] - 49:25, 50:19
**sheet** [3] - 4:8, 28:10, 37:3
**sheets** [1] - 26:14
**short** [2] - 25:11, 52:14
**shorthand** [1] - 59:19
**shot** [1] - 36:25
**show** [2] - 14:20, 24:8
**shut** [4] - 44:10, 44:19, 45:1
**shutting** [1] - 44:9
**sick** [1] - 19:18
**side** [18] - 5:23, 9:18, 10:6, 11:25, 13:20, 14:8, 15:8, 16:6, 18:15, 19:9, 20:8, 20:11, 21:24, 32:17, 36:24, 37:10, 37:16, 58:17
**side's** [1] - 15:6
**sidebar** [2] - 12:24, 18:12
**sidebars** [5] - 11:18, 12:24, 17:7, 17:8, 41:20
**sides** [6] - 15:17, 23:3, 32:10, 38:22, 51:10, 54:16
**signature** [1] - 15:23
**significance** [1] - 33:20
**signing** [1] - 16:1
**silence** [1] - 15:20
**similar** [3] - 32:9,

33:21, 40:11
**Simmons** [3] - 3:8
**SIMMONS** [24] - 1:19, 12:9, 12:19, 13:8, 13:19, 13:24, 14:10, 16:3, 26:16, 26:20, 27:17, 27:24, 29:8, 29:10, 29:15, 30:17, 37:24, 38:5, 51:19, 53:23, 54:23, 58:16, 58:22, 58:24
**simple** [1] - 6:4
**simply** [3] - 23:18, 25:16, 48:11
**Simpson** [15] - 47:9, 47:20, 47:25, 48:6, 48:19, 48:24, 48:25, 49:10, 49:13, 49:18, 50:2, 50:6, 50:11, 50:12, 50:18
**sit** [1] - 17:23
**sits** [1] - 31:15
**situations** [1] - 54:14
**six** [1] - 20:3
**slightly** [1] - 17:2
**slot** [1] - 56:14
**slow** [1] - 17:9
**slowly** [1] - 50:9
**software** [1] - 32:11
**someone** [4] - 18:7, 19:18, 43:8, 54:15
**sometimes** [5] - 11:8, 12:22, 19:18, 22:13, 42:10
**soon** [1] - 19:9
**sorry** [3] - 26:15, 37:12, 50:9
**sort** [1] - 6:6
**sounds** [1] - 12:4
**source** [1] - 6:13
**special** [2] - 28:11, 28:12
**specific** [1] - 44:5
**specifically** [5] - 44:19, 45:1, 45:17, 46:21, 48:21
**speculate** [1] - 47:13
**speculation** [1] - 39:2
**speed** [6] - 5:10, 55:24, 56:2, 56:4, 56:9, 56:11
**spend** [2] - 8:1, 26:3
**spilling** [1] - 11:14
**split** [2] - 10:2, 16:10
**sponsoring** [3] - 22:7, 24:6, 24:13
**spoon** [1] - 16:14
**staff** [2] - 13:4, 15:23
**stage** [2] - 30:11, 33:25

**stages** [1] - 33:24
**stakes** [1] - 45:5
**stand** [2] - 17:23, 54:22
**standard** [2] - 20:10, 25:10
**stands** [1] - 59:12
**start** [4] - 4:4, 10:11, 10:19, 21:5
**starting** [2] - 13:6, 16:15
**starts** [3] - 13:15, 14:13, 29:21
**statement** [1] - 57:12
**statements** [1] - 9:21
**States** [1] - 40:1
**STATES** [1] - 1:1
**status** [1] - 8:4
**statute** [2] - 41:15, 46:8
**stay** [2] - 16:8, 27:14
**STEINBERG** [9] - 2:7, 38:23, 40:10, 41:1, 45:16, 47:19, 49:21, 49:24, 51:11
**Steinberg** [1] - 3:20
**stems** [1] - 36:12
**Stenotype** [1] - 59:19
**step** [6] - 6:1, 29:5, 30:14, 44:24
**Stephanos** [1] - 1:12
**steps** [2] - 30:16
**stipulate** [3] - 24:5, 37:11, 37:16
**stipulated** [1] - 21:14
**stipulation** [3] - 8:10, 38:7, 38:13
**stipulations** [1] - 21:17
**straight** [1] - 40:24
**streamline** [1] - 22:25
**streamlined** [1] - 24:25
**stricter** [1] - 20:6
**strike** [3] - 18:22, 20:16
**strikes** [2] - 20:14, 20:15
**strong** [4] - 24:19, 25:12, 42:20, 49:5
**struck** [6] - 18:17, 18:18, 19:8, 19:9
**structure** [7] - 31:8, 31:14, 32:5, 32:25, 34:18, 34:20, 35:16
**structured** [1] - 31:16
**stuff** [16] - 12:4, 14:24, 15:10, 18:14, 22:12, 22:13, 22:14, 22:15, 24:20, 25:18, 26:2,

26:7, 38:20, 43:18, 55:18
**style** [1] - 42:18
**subject** [1] - 53:25
**submission** [1] - 34:12
**submissions** [1] - 26:18
**submit** [2] - 7:13, 56:19
**submitted** [1] - 28:16
**subscribers** [1] - 41:25
**subsidiary** [1] - 29:24
**substance** [1] - 25:10
**substantial** [1] - 26:8
**substantially** [2] - 18:6, 32:9
**substantive** [2] - 4:7, 5:25
**substitute** [1] - 43:10
**substitution** [1] - 43:17
**sue** [1] - 8:17
**suggest** [2] - 42:25, 56:18
**suggestion** [3] - 10:17, 56:17, 57:25
**suggestions** [1] - 55:15
**summary** [10] - 4:10, 31:11, 31:18, 31:19, 33:1, 33:5, 35:2, 36:13, 47:3, 58:6
**supplemental** [2] - 51:24, 52:14
**supposed** [3] - 6:13, 30:2, 30:10
**surprising** [1] - 54:18
**surrebuttal** [6] - 37:19, 51:25, 52:13, 53:16, 53:24, 54:19
**suspicion** [1] - 7:3
**switch** [1] - 13:22
**switched** [1] - 13:22
**synopses** [2] - 36:5, 36:19
**synthesize** [1] - 31:5
**system** [10] - 12:14, 12:21, 13:17, 13:22, 14:7, 23:20, 31:3, 36:6, 36:20, 57:4

**T**

**team** [3] - 12:20, 21:6, 58:21
**teased** [1] - 19:2
**tech** [4] - 12:20, 13:6,

13:17, 13:21
**technology** [3] -
38:12, 38:18, 44:11
**techs** [2] - 12:10,
12:14
**temporally** [1] - 48:12
**ten** [1] - 11:13
**tend** [2] - 17:8, 28:13
**terms** [20] - 12:1, 12:2,
13:23, 14:1, 15:5,
16:17, 20:12, 21:15,
23:13, 25:5, 26:14,
26:16, 26:20, 28:10,
29:17, 49:12, 50:22,
52:12, 52:13, 55:2
**test** [3] - 12:4, 29:19,
42:8
**testified** [1] - 35:1
**testify** [1] - 48:1
**testifying** [4] - 23:15,
34:16, 47:11, 44:17
**testimony** [13] - 10:11,
24:16, 39:19, 44:9,
44:18, 46:13, 47:9,
47:24, 48:3, 49:17,
50:21, 56:18, 56:21
**testing** [1] - 13:11
**text** [3] - 34:5, 34:7,
35:12
**THE** [93] - 1:1, 1:2,
3:1, 3:11, 3:15, 3:21,
4:1, 4:18, 5:11, 5:18,
5:21, 6:16, 7:19, 8:6,
8:13, 8:23, 9:5, 9:7,
9:10, 9:12, 10:5,
10:14, 10:21, 12:16,
13:3, 13:9, 13:23,
13:25, 14:15, 14:22,
15:4, 15:16, 16:5,
16:13, 17:5, 19:22,
20:5, 20:10, 21:7,
22:11, 23:8, 24:19,
24:23, 26:19, 26:25,
27:22, 28:1, 28:4,
28:8, 29:2, 29:9,
29:14, 30:5, 31:2,
31:21, 32:10, 32:22,
33:22, 35:25, 36:22,
37:8, 37:14, 38:3,
38:14, 39:1, 39:13,
40:7, 40:20, 41:5,
41:23, 42:16, 43:14,
44:4, 44:8, 45:3,
47:5, 48:15, 49:16,
49:23, 50:7, 51:2,
51:18, 52:17, 53:15,
54:12, 54:24, 55:15,
56:23, 58:3, 58:20,
58:23, 59:4, 59:12
**themselves** [1] - 18:8

**theories** [1] - 52:12
**theory** [1] - 33:24
**therefore** [3] - 34:23,
35:18, 41:12
**they've** [2] - 18:18,
54:17
**thick** [1] - 40:2
**third** [3] - 17:16, 44:8,
55:20
**THOMSON** [1] - 1:3
**Thomson** [16] - 3:1,
7:22, 12:7, 32:22,
37:4, 37:14, 39:6,
41:11, 44:11, 44:17,
44:22, 45:5, 45:20,
58:7, 58:9, 58:17
**three** [14] - 4:2, 9:1,
19:19, 20:8, 20:11,
20:14, 20:15, 21:1,
25:22, 37:10, 37:14,
37:15, 45:9
**throughout** [1] - 50:19
**throw** [1] - 34:19
**thrust** [1] - 39:14
**Thursday** [4] - 5:5,
13:10, 26:22, 27:15
**tie** [1] - 40:22
**tied** [3] - 38:2, 39:3,
40:23
**Tigan** [2] - 3:5, 3:11
**TIGAN** [9] - 1:16, 3:4,
3:13, 15:12, 16:8,
17:1, 19:20, 20:1,
20:8
**timeline** [1] - 51:19
**timing** [1] - 26:22
**today** [5] - 3:7, 4:14,
5:7, 22:24, 23:2
**together** [9] - 6:17,
13:18, 15:2, 23:3,
23:15, 36:10, 36:25,
38:2, 55:5
**tomorrow** [4] - 7:8,
8:1, 13:3
**tonight** [2] - 6:2, 6:7
**took** [2] - 47:11, 47:18
**top** [1] - 37:3
**tortious** [5] - 48:21,
49:15, 49:19, 49:24,
50:24
**tortiously** [1] - 50:4
**toward** [1] - 55:5
**towards** [1] - 59:7
**trading** [3] - 45:24,
45:25, 46:1
**train** [1] - 34:8
**training** [7] - 9:8,
45:10, 45:13, 46:12,
46:16, 46:23, 47:1
**transcribed** [1] - 56:21

**TRANSCRIPT** [1] - 1:9
**transcript** [1] - 56:19
**transformative** [2] -
43:2, 43:5
**trial** [32] - 4:2, 4:3, 4:6,
4:11, 5:22, 6:9, 6:18,
8:12, 9:22, 11:2,
12:5, 12:10, 12:14,
12:20, 13:14, 16:1,
16:2, 17:14, 21:2,
23:24, 25:11, 25:17,
26:6, 26:11, 37:6,
39:10, 40:19, 52:15,
54:8, 54:25, 55:2,
56:20
**trials** [2] - 12:11, 13:1
**tried** [2] - 27:12, 34:11
**trust** [1] - 56:5
**try** [8] - 9:24, 11:12,
13:9, 24:25, 25:11,
30:5, 34:21, 39:9
**trying** [2] - 25:18, 45:6
**Tuesday** [1] - 5:1
**TUNNELL** [1] - 1:16
**turn** [5] - 7:17, 15:19,
17:20, 28:14, 30:2
**turned** [2] - 28:15,
57:12
**turning** [1] - 35:16
**tweeting** [1] - 39:17
**two** [9] - 13:18, 17:12,
17:14, 25:17, 47:24,
50:8, 52:1, 52:10,
53:23
**two-month** [1] - 25:17
**type** [2] - 8:10, 22:12
**types** [4] - 22:19, 40:5,
40:6, 43:11
**typically** [3] - 16:9,
20:2, 33:8

**U**

**U.S** [1] - 59:22
**U.S.C** [1] - 46:8
**U.S.D.C.J** [1] - 1:12
**ultimately** [2] - 19:7,
43:14
**unclear** [1] - 30:2
**uncontested** [1] -
55:18
**under** [6] - 5:1, 7:21,
17:2, 44:2, 45:18,
52:2
**undercut** [1] - 42:21
**undercutting** [1] -
42:1
**underlying** [2] - 5:16,
31:25

**undermined** [1] - 43:1
**understood** [4] - 5:18,
6:16, 24:1, 59:11
**United** [1] - 40:1
**UNITED** [1] - 1:1
**universe** [2] - 21:25,
22:1
**unlawful** [1] - 50:4
**unless** [2] - 8:19,
57:20
**unprotected** [1] -
31:25
**unsettled** [2] - 31:21,
32:14
**untimely** [5] - 4:20,
8:24, 51:6, 52:4,
54:1
**unusual** [1] - 6:25
**up** [45] - 4:10, 5:10,
7:17, 8:3, 10:23,
10:24, 11:6, 11:8,
11:9, 11:14, 12:2,
12:3, 12:16, 12:24,
12:25, 13:7, 13:11,
13:14, 13:21, 14:5,
14:12, 14:19, 15:5,
16:8, 17:23, 18:14,
18:21, 19:12, 19:14,
19:19, 20:4, 20:18,
20:22, 20:23, 21:8,
22:12, 28:24, 30:6,
35:12, 35:13, 39:5,
43:9, 50:7, 53:11,
56:12
**update** [1] - 59:8
**upfront** [1] - 19:15
**usable** [1] - 31:4
**useful** [1] - 12:23
**uses** [1] - 38:17
**usual** [1] - 18:25

**V**

**validity** [3] - 29:17,
29:18, 29:20
**value** [9] - 8:14, 23:18,
30:24, 41:16, 41:18,
41:24, 42:21, 46:10
**variation** [1] - 3:10
**varies** [1] - 27:4
**vendor** [1] - 12:1
**vendors** [2] - 12:3,
13:10
**verbatim** [2] - 25:15,
57:9
**verdict** [7] - 4:8,
26:14, 28:10, 28:11,
28:12, 29:11, 29:21
**versions** [1] - 26:18

**versus** [2] - 3:2, 43:17
**vibrate** [1] - 15:21
**video** [2] - 14:21,
55:17
**view** [2] - 12:12, 20:1
**viewing** [1] - 14:5
**views** [1] - 5:9
**violating** [1] - 31:12
**violation** [2] - 34:24,
50:21
**virtual** [1] - 32:9
**visual** [1] - 12:6
**voir** [4] - 4:7, 17:25,
24:24, 24:25
**voluminous** [1] - 52:9
**Von** [14] - 47:20,
47:25, 48:6, 48:19,
48:24, 49:10, 49:13,
49:17, 50:2, 50:6,
50:10, 50:12, 50:18
**vs** [1] - 1:6

**W**

**walk** [1] - 29:13
**wants** [2] - 28:24,
45:15
**warner** [1] - 59:16
**Warner** [1] - 59:21
**WARRINGTON** [1] -
2:6
**Warrington** [1] - 3:19
**wasting** [1] - 21:18
**ways** [4] - 34:22,
42:24, 43:1
**websites** [1] - 50:16
**Wednesday** [2] - 4:24,
5:2
**week** [8] - 6:18, 8:3,
23:24, 25:12, 25:15,
25:17, 59:10
**weekend** [2] - 9:25,
10:6
**weeks** [6] - 4:2, 23:21,
25:6, 26:3, 56:10,
58:3
**west** [1] - 36:5
**Westlaw** [12] - 29:20,
29:22, 41:25, 42:13,
45:20, 48:3, 48:9,
48:25, 49:1, 49:12,
50:16, 50:18
**Westlaw's** [1] - 50:13
**whichever** [1] - 54:15
**whole** [8] - 17:24,
18:21, 23:9, 23:16,
23:17, 28:14, 30:9,
47:14
**widespread** [1] - 42:8

**willing** [3] - 37:10, 37:16, 52:13
**Wilmington** [2] - 3:5, 3:18
**win** [1] - 54:14
**wind** [4] - 19:14, 20:22, 22:12, 56:12
**winds** [2] - 20:18, 21:8
**wired** [1] - 13:5
**wires** [1] - 17:2
**wish** [1] - 14:21
**withdrew** [1] - 48:7
**witness** [20] - 10:8, 10:12, 10:15, 11:9, 11:10, 11:14, 11:18, 12:18, 14:11, 14:12, 16:19, 17:2, 22:7, 24:6, 24:8, 24:14, 24:21, 32:18, 54:20, 54:21
**witness's** [1] - 24:16
**witnesses** [3] - 10:19, 13:13, 46:14
**woman** [1] - 42:18
**wonderful** [1] - 59:12
**Word** [1] - 26:18
**words** [17] - 10:3, 31:12, 31:13, 31:17, 34:17, 34:19, 34:22, 35:3, 35:6, 35:9, 35:11, 35:12, 35:13, 35:21, 42:11, 57:12
**works** [4] - 14:7, 26:2, 29:17, 29:21
**world** [1] - 6:15
**worried** [1] - 16:15
**worst** [1] - 17:13
**wrap** [2] - 10:24, 11:12
**write** [3] - 7:6, 27:16, 42:9
**writing** [1] - 56:18
**written** [3] - 15:18, 25:9, 33:15
**wrote** [3] - 36:5, 36:7

## Y

**yell** [1] - 24:12
**yesterday** [1] - 6:13
**YUNGMOON** [1] - 1:20
**yungmoon** [1] - 21:22
**Yungmoon** [1] - 3:8

## Z

**zoom** [2] - 6:17, 58:6