# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) ) | C.A. No. 20-613 (SB) |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) | |

## PLAINTIFFS AND COUNTERDEFENDANTS THOMSON REUTERS ENTERPRISE CENTRE GMBH AND WEST PUBLISHING CORPORATION'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT AND COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S INTERROGATORY NO. 1

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Rules of the United States District Court for the District of Delaware (the "Local Rules" and each a "Local Rule"), Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West") (collectively "Plaintiffs"), hereby supplement their responses to Defendant and Counterclaimant ROSS Intelligence Inc.'s ("Defendant") Interrogatories, served on May 12, 2021 (the "First Set of Interrogatories" and each individually, an "Interrogatory") in the above-captioned action ("Action") as follows:

## GENERAL OBJECTIONS

1.      Plaintiffs object to the First Set of Interrogatories to the extent that it purports to impose obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules, or other applicable law.

2.      Plaintiffs object to the First Set of Interrogatories to the extent that it seeks proprietary or confidential business information, trade secrets or other sensitive information.  To the extent that the response to any Interrogatory requires the disclosure of any non-privileged proprietary or confidential information, trade secrets or other sensitive information, Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

3.      Plaintiffs object to the First Set of Interrogatories to the extent that it seeks information that is subject to the attorney-client privilege, the work product privilege, or any other applicable privilege or protection under federal or state law.  Plaintiffs do not waive, intend to preserve, and are preserving any such privilege with respect to any information protected by such privilege.

4.      The responses provided to the First Set of Interrogatories are based on Plaintiffs' interpretation of the language used in the First Set of Interrogatories.  Plaintiffs reserve their right to amend or to supplement their responses and objections in the event that Defendant asserts an interpretation that differs from Plaintiffs' interpretation.

5.      Plaintiffs object to the First Set of Interrogatories to the extent that it seeks information that is outside of Plaintiffs' possession, custody, or control, including in Instruction No. 7.  For the purpose of responding to the First Set of Interrogatories, Plaintiffs will provide responses based on the information that is reasonably within their possession, custody, or control.

6.     The responses below shall not be interpreted to concede the truth of any factual assertion or implication contained in the First Set of Interrogatories.  Plaintiffs' responses to the First Set of Interrogatories in no way constitute admissions or acknowledgements by Plaintiffs as to the relevance, materiality, or admissibility of any of the information contained therein, and Plaintiffs expressly reserve their rights to object as such.

7.     Plaintiffs reserve the right to modify or supplement their objections and responses to the First Set of Interrogatories to conform to the results of continuing discovery.  These responses also are subject to correction for omissions or errors.

8.     In providing responses to the First Set of Interrogatories, Plaintiffs do not in any way waive or intend to waive, but rather are preserving and intend to preserve:

(i)     All objections as to competency, authenticity, relevancy, materiality and admissibility;

(ii)     All rights to object on any grounds to the use in any subsequent proceedings of any of the responses or information contained herein, including but not limited to the right to object at the trial of this or any other action;

(iii)     All objections as to vagueness and ambiguity; and

(iv)     All rights to object on any grounds to any further interrogatories.

9.     Plaintiffs object to the First Set of Interrogatories to the extent that any Interrogatory's subparts, including those arising from Defendant's "Definitions" and "Instructions," actually constitute separate interrogatories, thereby exceeding the number of interrogatories permitted under Federal Rule of Civil Procedure 33(a)(1).

10.      Plaintiffs object to the First Set of Interrogatories as premature to the extent that it asks or requires Plaintiffs to provide information that is the subject of expert disclosures under Federal Rule of Civil Procedure 26(a)(2).

11.      Plaintiffs object to the First Set of Interrogatories to the extent that it is premature in that it asks or requires Plaintiffs to analyze or formulate contentions on matters for which Plaintiffs' investigation and discovery have not yet been completed.  The responses provided below are based on the investigation conducted to date and are without prejudice to any later supplementation, amendment, or modification.

12.      Plaintiffs objects to the First Set of Interrogatories as overly broad to the extent that it defines the term "THOMSON REUTERS" to include "its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf."  For the purpose of responding to the First Set of Interrogatories, Plaintiffs will construe this term to mean solely Thomson Reuters Enterprise Centre GmbH, and not any other person or entity.

13.      Plaintiffs objects to the First Set of Interrogatories as overly broad to the extent that it defines the term "WEST" to include "its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf."  For the purpose of responding to the First Set of Interrogatories, Plaintiffs will construe this term to mean solely West Publishing Corporation, and not any other person or entity.

14.      Plaintiffs objects to the First Set of Interrogatories as overly broad to the extent that it defines the terms "YOU," "YOUR," and "PLAINTIFFS" to incorporate the definitions of the

terms "THOMSON REUTERS" and "WEST" and thus are defined to include Thomson Reuters Enterprise Centre GmbH's and West Publishing Corporation's "present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on [their] behalf." For the purpose of responding to the First Set of Interrogatories, Plaintiffs will construe the terms "YOU," "YOUR," and "PLAINTIFFS" to mean solely Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation, and not any other person or entity.

15. Plaintiffs objects to the First Set of Interrogatories as overly broad to the extent that it defines the terms "ROSS," "DEFENDANT," and "COUNTERCLAIMANT" to include "its present and former officers, directors, employees, attorneys, agents, representatives, successors, predecessors, owners, parents, subsidiaries, affiliated companies, or any other person or entity acting or purporting to act on its behalf." For the purpose of responding to the First Set of Interrogatories, Plaintiffs will construe these terms to mean solely ROSS Intelligence, Inc., and not any other person or entity.

16. Plaintiffs object to the First Set of Interrogatories as vague and ambiguous to the extent that it defines the term "DESCRIBE" using the capitalized term "Identifying." It is unclear whether Defendant intended to incorporate the definition of the defined term "IDENTIFY," in which case the definition of the term "DESCRIBE" is nonsensical, or to give that word a separate definition. For the purpose of responding to the First Set of Interrogatories, Plaintiffs will construe the term "Identifying" as used in the definition of the term "DESCRIBE" with its ordinary meaning.

17.    Plaintiffs object to Instruction No. 6 to the extent it purports to impose obligations with regard to the production of privilege logs that differ from those required by the Federal Rules and Local Rules.  Plaintiffs will log information pursuant to the Protective Order.

18.    Plaintiffs object to Instruction Nos. 7 and 9 as vague and ambiguous to the extent that they use the undefined term "FOUNDATION."  For the purpose of responding to the First Set of Interrogatories, Plaintiffs will construe that term to mean Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation, and not any other person, entity, or foundation.

19.    Plaintiffs object to the First Set of Interrogatories as overly broad and unduly burdensome to the extent that its Interrogatories do not specify timeframes and are thus unlimited as to time.

20.    Plaintiffs incorporate the foregoing General Objections into each and every one of its responses to the First Set of Interrogatories as set forth below.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1:

IDENTIFY the specific portions of the WESTLAW CONTENT that you claim is subject to copyright that ROSS INFRINGES.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrases "specific portions" and "you claim is subject to copyright" are unclear and undefined.  Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and premature to the extent that it asks Plaintiffs to identify any and all WESTLAW CONTENT owned by Plaintiffs that ROSS has infringed and continues to infringe, without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:  Thomson Reuters owns copyrights in the content that is part of Westlaw that was created by Plaintiffs' attorney-editors through a rigorous editorial process.  As alleged in Plaintiffs'

Complaint, this content includes original Westlaw headnotes and the West Key Number System ("WKNS").

With regard to judicial opinions, the editorial process begins with newly published opinions being divided into different categories that are assigned a priority level by Plaintiffs' attorney-editors. Priority cases include opinions from the United States Supreme Court, the federal courts of appeals, and the States' highest courts, along with some jurisdictions Plaintiffs have designated. Beginning with the highest priority cases, Plaintiffs' attorney-editors carefully review the opinion to identify concepts discussed by the court that they select to call out as points of law. Each point of law is reflected in a headnote, and each headnote will, ordinarily, contain a single point of law. In some cases, however, multiple points of law may be included in a single headnote to compare and contrast, or to show how they operate in conjunction with each other—this is a decision left to the attorney-editors' discretion.

Many creative choices are made by Plaintiffs' attorney-editors when they create headnotes. For example, headnotes are written to be understood standing alone—*i.e.*, no reference to the opinion or any other headnote should be necessary for it to be understood. Thus, Plaintiffs' attorney-editors write the headnotes so that they summarize only certain, selected facts, and explain in clear language the holding of the court or contentions of the parties. Plaintiffs' attorney-editors will also make the editorial judgment of recommending Key Number topics to assign to headnotes to integrate the new opinion into the West Key Number System. Although Plaintiffs have created tools to assist their attorney-editors in this effort, such as the tool discussed in Plaintiffs' response to Interrogatory No. 12, which Plaintiffs incorporate hereto by reference, it is ultimately Plaintiffs' attorney-editors that arrange the headnotes in the WKNS. Pursuant to Rule 33(d), Plaintiffs incorporate by reference the editorial manual used by Plaintiffs' attorney-editors

for creating headnotes and assigning Key Number topics during the editorial process, which was produced in this Litigation at TR-0002864–TR-0003137.

Plaintiffs' attorney-editors will also create headnotes for the various legal standards, factual holdings, and legal conclusions made by the court, create original synopses and holdings to be included at the beginning of the opinion in Westlaw, and determine which legal topics covered in the opinion and what search terms should be associated with the opinion so it may be integrated into the database of opinions on Westlaw and the WKNS.

After Plaintiffs' attorney-editors have created the headnotes and made initial recommendations of where they might be placed in the WKNS, the opinion is assigned to one or more "classifiers"—attorney-editors who are responsible for classifying headnotes in the WKNS—who actually assign Key Numbers to the headnote (including reassigning the suggested Key Number topics of the headnote writers), and/or send the case back to the original attorney-editor for further review.  Senior classifiers also will reorganize parts of the WKNS from time to time.  There is nothing that dictates how the WKNS is organized or what keywords are used to express it.

As indicated in the certificates of registration for Westlaw, Thomson Reuters does not claim copyrights in material prepared by a United States Government officer or employee as a part of that person's official duties, including without limitations government edicts, legislative enactments, judicial decisions, or similar types of official legal materials.  Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs incorporate by reference those certificates, which were produced as Exhibit A to Plaintiffs' Complaint.  Plaintiffs also incorporate the deposit copies for those certificates, which were produced in this Litigation at TR-0003138–TR-0033981.

With regard to ROSS's infringement of Plaintiffs' content, ROSS and LegalEase Solutions, LLC ("LegalEase") have agreed to produce in this Litigation documents responsive to Plaintiffs' discovery requests, but Plaintiffs have yet to receive any such documents. Nevertheless, it is Plaintiffs' understanding that, at ROSS's request and with its knowledge and participation, LegalEase created "Memos" using Westlaw. As explained in Section 1.3 of the "Statement of Work II for ROSS Bulk Memos" that was published on May 7, 2020 by ROSS on the website available at https://medium.com/@AndrewArruda/hold-59effcd819b0, each Memo was to contain (1) a "Legal Research Question" created by LegalEase, which the SOW defines as "a question grounded in legal principles," (2) a "Reference List," which the SOW defines as "the list of Case Law included in the Memo," and (3) "a target of at least four (4) and no more than six (6) Quotes," which are defined as "an independent paragraph excerpt from Case Law." It is Plaintiffs' understanding that the questions were based on headnotes from Westlaw that were written by Plaintiffs' attorney-editors. In addition to paraphrasing the headnotes, the Memos' list of cases were selected by Plaintiffs' attorney-editors for that headnote and arranged in Plaintiffs' WKNS hierarchy. It is further Plaintiffs' understanding, based on Mr. Arruda's blog post, that ROSS used the Memos to create the ROSS platform. Pursuant to Federal Rule 33(d), the SOW is incorporated by reference herein as are the memoranda produced by ROSS in this Litigation at ROSS-000000001–ROSS-000175081.

Plaintiffs' discovery efforts in this case are ongoing, and they reserve the right to further supplement this response in light of facts learned during discovery. In particular, once they have the opportunity to review fully the memoranda ROSS recently produced, Plaintiffs will provide a supplemental response to this Interrogatory.

**\* BEGIN HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY DESIGNATION \***

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 (NOVEMBER 19, 2021):**

Plaintiffs incorporate by reference the above-stated General and Specific Objections as if fully set forth herein.  Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:

As discussed above, ROSS infringed Plaintiffs' Westlaw Content in three ways.  ***First***, ROSS is contributorily and vicariously liable for LegalEase's direct infringement of Plaintiffs' Westlaw Content.  ROSS's desire to gain access to Westlaw for purposes of acquiring training data can be traced back as early as February 17, 2015, when Jimoh Ovbiagele, one of ROSS's founding members, suggested to Andrew Arruda "for legal memos…why don't we just get a westlaw subscription?"  *See* ROSS-003391075, incorporated herein by reference pursuant to Rule 33(d).  The next day, Mr. Ovbiagele shared a task with Mr. Arruda to sign up for a Westlaw account by posing as a student.  *See* ROSS-003391076, incorporated herein by reference.  Later that year, in September 2015, Thomas Hamilton, the Head of Legal Research at ROSS, reached out to West to acquire a license for Westlaw, but was explicitly denied and told that West "do[es] not sell [its] legal research products to direct competitors."  *See* ROSS-003390563-ROSS-003390565, incorporated herein by reference.  At the same time, ROSS reached out to LegalEase to inquire about creating "memos" for ROSS—explicitly saying that LegalEase was to use Westlaw to create the "memos."  *See* ROSS-003277880-ROSS-003277881.  On October 15, 2015, ROSS entered into a "Master Service Agreement" with LegalEase under which LegalEase began providing "memos" to ROSS containing Westlaw Content.  ROSS did so fully aware that it explicitly told LegalEase to use Westlaw to fulfill its obligations to ROSS and that doing so violated the terms of LegalEase's access to Westlaw.  *See* ROSS-000056386-ROSS-000056387, incorporated by reference.

Thus, at ROSS's direction, LegalEase violated the terms of its license agreement and began reproducing and distributing the Westlaw Content to ROSS.  To be clear, LegalEase's license was conditioned on LegalEase not taking any of the following actions: "sell, sublicense, distribute, display, store or transfer [West's] products or any data in [its] products in bulk or in any way that could be used to replace or substitute for [its] products in whole or in part or as a component of any material offered for sale, license or distribution to third parties."  Further, although LegalEase was permitted to "store, on a matter-by-matter basis, insubstantial portions of [Westlaw content] . . . in connection with an active matter being handled by [LegalEase] in its regular course of business," the agreement was clear that the amount stored must "(a) have no independent value other than as part of [LegalEase's] work product; and (b) c[an] not be used in any way in whole or in part as a substitute for any service or product provided by West." LegalEase was also not permitted to "copy, download, scrape, store, publish, post, transmit, retransmit, transfer, distribute, disseminate, broadcast, circulate, sell, resell, license, sublicense or otherwise use [Westlaw content], or any portion of [Westlaw content], in any form or by any means except as expressly permitted by [the License Grant], or as otherwise expressly permitted in writing by West."  Thus, at least as early as October 15, 2015, LegalEase materially breached the foregoing conditions of its license with West while acting as ROSS's agent, at ROSS's direction, and with ROSS's knowledge.  As a result, each time LegalEase accessed Westlaw without such a license, LegalEase directly infringed Thomson Reuters' copyrights in Westlaw. Plaintiffs incorporate by reference documents showing the terms of LegalEase's license agreement with West, which can be identified within TR-0000001-TR0002830.

ROSS and LegalEase also entered into another agreement on September 15, 2017, referred to as the "Bulk Memo Project," by which LegalEase was to provide ROSS with

"memos" following a different format than the previous memos—these memos were to follow an extremely specific format set by ROSS.  *See* TR-0000568-TR-0000581 ("Statement of Work II For ROSS Bulk Memos"), incorporated herein by reference.  As explained in Section 1.3 of the "Statement of Work II for ROSS Bulk Memos," each memo was to contain (1) a "Legal Research Question" created by LegalEase, which the SOW defines as "a question grounded in legal principles," (2) a "Reference List," which the SOW defines as "the list of Case Law included in the Memo," and (3) "a target of at least four (4) and no more than six (6) Quotes," which are defined as "an independent paragraph excerpt from Case Law."

Although ROSS now claims that the memos produced by LegalEase under this agreement were nothing more than "legal research" and that it only needed "raw judicial opinions," its own documents and testimony make clear that is not the case.  Indeed, ROSS claims in the Statement of Work itself that the memos constitute "Confidential Information," which is at odds with ROSS's position in this case that the memos merely contain unprotectable government edicts. *Id*.  Moreover, Andrew Arruda readily admitted on May 7, 2020, the day after Plaintiffs filed the Complaint, that ROSS worked with LegalEase "to build datasets to train [ROSS's] artificial intelligence (AI) systems."  *See* TR-0000587-TR-0000590, incorporated herein by reference. Further, during the previous litigation between West and LegalEase, counsel for ROSS represented to counsel for LegalEase that "Ross designed the memos as training data the company uses for its algorithms that are structured in a very specific way and serve as a key competitive advantage for Ross vis-à-vis Westlaw."  *See* ROSS-003276415-ROSS-003276420, incorporated by reference.  Thus, it is clear that, contrary to what ROSS now claims, the purpose of this agreement was not for LegalEase to provide ROSS with "legal research," but rather to provide ROSS with training data that it could use to build its competing legal research platform.

Furthermore, the documents produced in this case, as well as deposition transcripts and discovery responses from the litigation between West and LegalEase, unambiguously show that, because ROSS directed LegalEase to create unique questions for each memo and required the memos cover different areas of the law, to create the "memos" and fulfill its obligations to ROSS, LegalEase (1) used a bot to scrape Westlaw Content from Westlaw in violation of the terms of its license, and (2) copied Plaintiffs' selection and arrangement of West Headnotes, cases, and portions of the WKNS.  As a result, each time LegalEase accessed Westlaw without such a license, LegalEase directly infringed Thomson Reuters' copyrights in Westlaw, for which ROSS was contributorily and vicariously liable.  Pursuant to Rule 33(d), Plaintiffs incorporate by reference (1) documents showing the terms of LegalEase's license agreement with West, which can be identified within TR-0000001-TR0002830, (2) documents showing various instances of LegalEase's unlicensed Westlaw activity, including the activity of LegalEase's "bot," which can be identified within TR-0038110-TR-0038826, and (3) deposition transcripts and discovery responses from the litigation between West and LegalEase in which LegalEase admits to (a) using an automated tool to access Westlaw and download Westlaw Content, and (b) copying the WKNS and West Headnotes to create and distribute derivative works to ROSS for purposes of training its algorithms, which were produced in this Litigation at TR-0038833-TR-0040226. Plaintiffs are also in the process of producing additional documents showing LegalEase's unlicensed Westlaw activity, and hereby incorporate them by reference herein.

According to LegalEase's documents and testimony, it created the bulk memos by taking the following steps: *First*, LegalEase copied portions of the WKNS to assign topics (*i.e.* Key Numbers) to be covered in each memo.  *Second*, to create questions for the memos, LegalEase would navigate to the assigned Key Number, reproduce the West Headnotes listed therein, and

frame them as questions. *Finally*, because ROSS required the memos to identify passages of cases that were responsive to the question, LegalEase would identify the passage of the case that was linked to the West Headnote copied to create the question. LegalEase would then use Westlaw to identify other cases that cite the copied West Headnote or are referenced in the passage linked to the copied West Headnote, as well as run a search for the question on Westlaw to identify the "good," "topical," and "irrelevant" cases.

In addition, because ROSS required LegalEase to produce significantly more memos than it previously had on a significantly shorter timeframe, LegalEase utilized a bot to scrape Westlaw Content from Westlaw *en masse*. LegalEase's use of the bot worked as follows:

- Questions that were created by copying West Headnotes were submitted to the bot, which would log into Westlaw using the ID "LegalEase8," run a search for the question, scrape the results of that search (*i.e.*, reproduce the results from Westlaw), and store them in a LegalEase database.

- The content that the bot reproduced included not just the text of judicial opinions, but all of the West Headnotes and Key Numbers, annotations, case reference links, and related case reference links therein.

- LegalEase employees could then access the results through the tool and create "memos" for ROSS following the same steps outlined above, though the foregoing documents also show that LegalEase employees contemporaneously accessed Westlaw and performed these steps manually.

LegalEase's use of this bot is a clear instance of LegalEase materially breaching the terms of its license and reproducing copious amounts of Westlaw Content as an intermediate step of creating the memos for ROSS.

For its part, ROSS cannot deny that it had both knowledge and control over LegalEase's infringing activity.  Indeed, putting the fact that ROSS explicitly asked LegalEase to use Westlaw back in 2015 aside, the documents produced in this litigation unambiguously show that ROSS was aware LegalEase was using Westlaw to create the bulk memos and had complete control over LegalEase's infringing activity.  LegalEase readily admits that "[it] was hired by Ross to create legal research memos in a very specific format and template – *as meticulously directed by Ross*."  *See* LEGALEASE-00171828-LEGALEASE-00171831 (emphasis added), incorporated herein by reference.  LegalEase also asserts that it "followed [ROSS's] instructions to a tee on how the research memos are to be constructed, what content is required to be in the memos (case law consisting of 'good quotes', 'great quotes', 'irrelevant quotes,' 'topical quotes') how the memos are to be formatted precisely, what topics the memos should cover and more."  *Id.*  Finally, LegalEase acknowledges that, "[p]er [ROSS and LegalEase's] agreements, while LegalEase was to research and draft memos, [ROSS] reserved the right to make changes, deletions, or additions to the memos as deemed necessary."  *Id.*

It is also clear that ROSS did in fact exercise its rights to control how LegalEase created the memos.  For instance, in one email LegalEase asked ROSS how it should handle "lengthy paragraphs" in Westlaw when creating the memos.  *See* ROSS-000204366-ROSS-000204367, incorporated herein by reference.  After providing two examples and noting that "[t]he paragraph as it appears in Westlaw is lengthy" and "the lengthy paragraphs are actually as they appear in Westlaw[,]" LegalEase asked "[w]hat would work best for training ROSS: (1) cutting the paragraphs to 8-10 sentences or (2) using the entire paragraph?"  *Id*.  ROSS responded "Option 1, cutting the paragraph down[,]" never commenting that LegalEase should not be using Westlaw.  *Id*.

Similarly, ROSS has produced over 10,000 cases in this litigation that were clearly downloaded from Westlaw—more than 2,000 contain West Headnotes and Key Numbers, and all of them prominently include Thomson Reuters' copyright notice on the bottom alongside the WESTLAW logo.  *See, e.g.*, ROSS-000176819-ROSS-003390385, incorporated herein by reference.  Although ROSS's claim that it told LegalEase to stop sending it Westlaw Content, that claim rings hollow as (1) that comment was made with respect to the "ROSS Classifier II" project, not the "Bulk Memo Project"; (2) that comment was made on December 22, 2017, three months after the Bulk Memo Project had been well-underway and two weeks before LegalEase's access to Westlaw was cut off; and (3) ROSS still never told LegalEase to stop using Westlaw.  *See* LEGALEASE-00100520-LEGALEASE-00100521, incorporated herein by reference.  To the contrary, what this comment shows is that (1) ROSS was aware of LegalEase's infringing use of Westlaw; (2) ROSS had the ability to control LegalEase's infringing use of Westlaw; (3) ROSS benefitted from and contributed to LegalEase's infringing use of Westlaw; and (4) ROSS did nothing to end LegalEase's infringing use of Westlaw.  Thus, it is clear that ROSS is contributorily and vicariously liable for LegalEase's direct infringement.

**Second**, ROSS is directly liable for copying Plaintiffs' selection and arrangement of the West Headnotes, cases, and portions of the WKNS contained within the "memos" LegalEase provided it to build its competing legal research platform.  As detailed in Plaintiffs' answer to Interrogatory No. 1, West Headnotes and the WKNS are the result of decades of creative choices by Plaintiffs' dedicated attorney-editors.  Judicial opinions are not published with headnotes covering the key issues discussed therein, nor are they published with a list of the legal topics to which the opinion is relevant.  Rather, Plaintiffs' attorney-editors make creative choices as to which points of law should be made into a West Headnote, what that West Headnote should say,

what legal topics that West Headnote covers, and how that legal topic should be expressed—all so

the opinion and West Headnotes can be integrated into the West Key Number System.  Moreover,

even if a West Headnote is made using a verbatim portion of the judicial opinion, the choice by

Plaintiffs' attorney-editors to create that headnote is unequivocally creative and protectable.  Thus,

the WKNS reflects Plaintiffs' selection and arrangement of West Headnotes and cases, as well as

Plaintiffs' original and unique hierarchy for organizing the law.

As discussed above, it is clear from the documents produced in this litigation, as well as

discovery responses and testimony produced in the prior litigation between West and LegalEase,

that LegalEase created the memos by copying Plaintiffs' selection and arrangement of West

Headnotes, cases, and the WKNS—thus rendering the memos derivative works (*i.e.*, works

based on Westlaw).  Pursuant to Rule 33(d), Plaintiffs also incorporate by reference the "Project

Rose Project Protocol," which details how LegalEase and its subcontractor created the memos

using the WKNS and West Headnotes, produced in this Litigation at LEGALEASE-00093066-

LEGALEASE-00093074.  This document states that, as mentioned above, the legal topics to be

covered by each memo were "assigned based upon the Westlaw key system."  *Id.*  The document

explains that (a) "[w]ithin each [top-level Key Number] will be individual [Key Numbers] and

within each [Key Number] will be a list of cases that each have headnotes"; and (b) LegalEase

created a memo "for every unique headnote that appear[ed] under a given Westlaw Key" by

turning the headnote into a question and identifying the case it came from as highly responsive.

*Id*.  In other words, this document shows the memos were created by systematically walking

through the WKNS and copying Plaintiffs' selection and arrangement, as doing so ensured the

memos provided to ROSS (1) covered unique legal topics and (2) had unique questions that

mapped to cases that were certain to be responsive.  The document also clearly shows

18

LegalEase's understanding that the "[m]emos [were] being used to train a computer system rather than for actual legal research," further evidencing that LegalEase exceeded the scope of its license and that the memos were not "legal research" as ROSS claims.  *Id.*

Plaintiffs also incorporate by reference the documents produce by LegalEase in this Litigation that show systematic copying of Plaintiffs' selection and arrangement.  For example, the document produced at R-LEGALEASE-00189134-R-LEGALEASE-00189139 explains how LegalEase determined the "number of possible memos from any single Westlaw Key Number." The document contains screenshots of the WKNS, specifically Key Number "181 Forgery," Plaintiffs' selection and arrangement of subtopics therein, as well as Plaintiffs' selection and arrangement of cases and corresponding West Headnotes within the subtopics.  *Id.*





-Second, when you click on each Topic you'll get a number of unique headnotes under each Topic. In the example below, when clicking on "Nature of Offense In General" you get 293 unique headnotes. Each of these 293 can be used to create a memo, so total of 293 memos from this Topic alone.

-Third, you can also expand certain Topics to get Subtopics. For example see the Topic "Elements of Offenses" It has a plus sign next to it which indicates additional subtopics. In this example, there are 11 additional subtopics under "Elements

As shown above, the document explains that "when clicking on 'Nature of Offense In General' you get 293 unique headnotes" and that "[e]ach of these 293 [headnotes] can be used to create a memo, so total of 293 memos from this Topic alone." *Id.*

Similarly, LegalEase's "Best Practices Guide for ROSS Intelligence," produced in this Litigation at LEGALEASE-00078065-LEGALEASE-00078083 and incorporated herein by reference, includes screenshots of Westlaw, along with step-by-step instructions, showing how LegalEase copied Plaintiffs' selection and arrangement:

**1. West Law**

1)  Headnote Search  - Click on the Key Numbers. You will be assigned a number which is available under the Key Numbers.

20



Here, the Key Number assigned is 1 and the topic is Abandoned and Lost Property.



2)  Click on a key number topic. The best practice is to begin from the top (sub topic number 1) and follow the pattern.



3)  Clicked on #4 Evidence and questions for jury.



4)  Got this...



5) Clicked on Cheffins case.



6) Which pulls up the exact headnote on point. As well as ton of others...

6)  Which pulls up the exact headnote on point. As well as ton of others...



7)  From that headnote, make the statement a question.

So – headnote 12  -  "Under Nevada law, abandonment of property may be inferred from acts done."
Convert to a question, "May abandonment of property under Nevada Law be inferred from acts done?"

Plaintiffs are in the process of producing the cases, West Headnotes, and portions of the WKNS that LegalEase copied to create the memos for ROSS, and hereby incorporate them by reference herein.  Plaintiffs incorporate by reference the over 67,000 memos produced by LegalEase in this Litigation, which can be identified within LEGALEASE-00000001-LEGALEASE-00167379 and R-LEGALEASE-00000001-R-LEGALEASE-00170166, and the over 23,000 memos produced by ROSS in this Litigation, which can be identified within ROSS-000000001-ROSS-003332229.

Once ROSS had the memos, it used them as training data to build its competing legal research platform, which makes it directly liable for copying Plaintiffs' selection and arrangement.  As mentioned above, ROSS's documents, as well as statements ROSS made to the

public and LegalEase's counsel, unambiguously show that ROSS understood the "memo" to be training data and that ROSS used them to build ROSS's competing legal research platform. Moreover, it is abundantly clear that the memos, by virtue of how they were created, reflect Plaintiffs' selection and arrangement of the West Headnotes, cases, and portions of the WKNS contained within and that ROSS copied that selection and arrangement when it used the memos as training data to build its competing legal research platform.  Indeed, as ROSS states in its response to Plaintiffs' Interrogatory No. 1, incorporated herein by reference, the memos were fed into ROSS's algorithm, which "analyzed the answers…in view of the questions…to categorize an answer's relevance."  In other words, ROSS's algorithm learned how to identify a relevant answer based on the cases that West's attorney-editors determined are relevant to a given legal topic and the results provided by Westlaw's own search algorithm when the same question was fed into it.  Contrary to ROSS's assertion that "memoranda that contained anything other than the raw public judicial text were not useable," *id.*, it is only *because* the memos contained Plaintiffs' selection and arrangement of cases, West Headnotes, and portions of the WKNS that they were useful to ROSS as training data.

*Third*, ROSS is directly liable for copying the West Headnotes that LegalEase copied to create the memos.  As explained above, nothing dictates which points of law in an opinion will become West Headnotes, what Key Numbers will be assigned to those West Headnotes, or how an opinion will ultimately fit into the WKNS.  Rather, Plaintiffs' attorney-editors make creative and original choices as to what points of law become West Headnotes, which Key Numbers are assigned to those West Headnotes, and how an opinion ultimately fits into the WKNS.  Such choices are undoubtedly protectable.  Moreover, in addition to all of the West Headnotes that ROSS copied being protectable as part of Plaintiffs' original selection and arrangement,

25

certain West Headnotes are also independently protectable because Plaintiffs' attorney-editors

write their own, original interpretation of key points of law—examples of which that Plaintiffs

have identified to date are shown below:

| __Judicial Opinion__ | __Westlaw Headnote__ | __Question in ROSS Memo__ | __Bates Number__ |
|---|---|---|---|
| *Republic of Philippines v. Marcos*, 818 F.2d 1473 (9th Cir. 1987). | HN27 - Embarrassment of United States' relations with foreign government is not the sole concern underlying act of state doctrine. | Is the embarrassment of the United States' relations with foreign government the sole concern underlying act of state doctrine? | LEGALEASE-00123981-LEGALEASE-00123982 |
| *Reinoso v. Fuentes*, 932 So. 2d 536 (Fla. Dist. Ct. App. 2006) | HN1 - Plaintiffs' failure to obtain leave of court prior to making claim for punitive damages in their negligence complaint mandated dismissal of the claim, even though hearing was held on defendant's motion to dismiss the claim in which the plaintiffs were permitted to proffer evidence in support of punitive damages claim, given that governing statute required that leave of court be obtained before making a punitive damages claim. West's F.S.A. § 768.72(1). | If a plaintiff fails to obtain leave from the trial court to amend prior to asserting a claim for punitive damages, should the complaint be dismissed? | LEGALEASE-00166082-LEGALEASE-00166083 |
| *Whetstone v. Chadduck*, 316 Ark. | HN1 - Plaintiff had absolute right to voluntary nonsuit of | Is the right to nonsuit absolute? | LEGALEASE-00139081- |

| | | | |
|---|---|---|---|
| 330, 871 S.W.2d 583 (1994) | his claim without prejudice | | LEGALEASE-00139082 |
| *Smith v. Tennessee Furniture Indus., Inc.*, 212 Tenn. 291, 369 S.W.2d 721 (1963) | HN3 - Workmen's Compensation Law is not a social welfare statute. T.C.A. § 50-901 et seq. | Is Workmen's compensation law a social welfare statute? | LEGALEASE-00132970-LEGALEASE-00132971 |
| *Mut. Life Ins. Co. of N.Y. v. Tailored Woman,* 91 N.Y.S.2d 140 (Sup. Ct.), rev'd, 276 A.D. 144, 93 N.Y.S.2d 241 (App. Div. 1949) | HN1 - Defendant's right to examine corporate plaintiff before trial may not be thwarted by plaintiff's purpose to withhold its proof until trial, regardless of motivation thereof. | Are examinations of defendants by plaintiffs prior to trial favored by the courts and are not to be thwarted on technicalities? | LEGALEASE-00139169-LEGALEASE-00139170 |
| *Overland v. Le Roy Foods, Inc.,* 113 N.Y.S.2d 124 (Sup. Ct.), aff'd sub nom. Overland v. Le Roy Foods, 279 A.D. 1085, 114 N.Y.S.2d 262 (App. Div. 1952) | HN11 - In an action at law, plaintiff may recover only for claims existing at commencement of action, whereas in equity court renders judgment as of date of trial. | In an action at law, can a plaintiff recover only for claims existing at the commencement of the action? | LEGALEASE-00018036-LEGALEASE-00018037 |
| *Allstate Prop. v. Ploutis*, 290 Va. 226, 776 S.E.2d 793 (2015) | HN1 - An action filed in relation to a nonsuit is a new action that stands independently of any prior nonsuited action. | Is an action filed in relation to a nonsuit a new action that stands independently of any prior nonsuited action? | LEGALEASE-00132781-LEGALEASE-00132782 |
| *United States v. Perdiz,* 256 F. Supp. 805 (S.D.N.Y. 1966) | HN3 - Arresting officers' failure to advise accused of his rights to counsel and to remain silent did not render accused immune from prosecution for attempt to bribe arresting officers after arrest. | Does arresting officers' failure to advise accused of his rights to counsel and to remain silent render accused immune from prosecution for attempt to bribe arresting officers after arrest? | LEGALEASE-00030617-LEGALEASE-00030618 |

| *Green v. Wilmot Mountain, Inc.,* 92 Ill. App. 3d 176, 415 N.E.2d 1076 (1980) | HN5 - Dismissal of an action for want of prosecution is distinct from a dismissal for lack of diligence in obtaining service prior to expiration of applicable statute of limitations. Supreme Court Rules, Rule 103(b), S.H.A. ch. 110A, § 103(b). | Is dismissal of an action for want of prosecution distinct from a dismissal for lack of diligence in obtaining service prior to expiration of applicable statute of limitations? | LEGALEASE-00043224-LEGALEASE-00043225 |

Plaintiffs' discovery efforts in this case are ongoing, and they reserve the right to further supplement this response in light of facts learned during discovery. In particular, once they have the opportunity to review fully the memoranda ROSS produced in this Litigation, including the over 20,000 that ROSS produced on October 1, Plaintiffs will provide another supplemental response to this Interrogatory.

### SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 (MARCH 23, 2022):

Plaintiffs incorporate by reference the above-stated General and Specific Objections, July 12, 2021 response, and November 19, 2021 supplemental response (the "First Supplemental Response"), as if fully set forth herein. Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:

As discussed at length in Plaintiffs' First Supplemental Response, as well as in numerous meet and confers and letters, ROSS is contributorily and vicariously liable for LegalEase's direct infringement of Plaintiffs' Westlaw Content, as well as directly liable for copying (1) the selection and arrangement of Plaintiffs' Westlaw Content contained within the memos LegalEase provided it, which ROSS used as training data to build its competing legal research platform, and (2) certain West Headnotes that LegalEase copied to create the memos. Plaintiffs' First Supplemental

Response identified LegalEase's direct infringement to be its Westlaw activity after losing the benefit of its license, which included using Westlaw to create the bulk memos for ROSS and to assist ROSS with its "classifier" project.  With respect to the latter, Plaintiffs explained that LegalEase downloaded and distributed a number of cases to ROSS that contained Plaintiffs' copyrighted content, such as West Headnotes, Key Numbers, original case synopses, and other editorial enhancements.  Plaintiffs also explained how LegalEase lost the benefit of its Westlaw license—particularly because LegalEase (1) accessed and used Westlaw on ROSS's behalf for purposes of creating a competing legal research platform, and (2) copied and distributed to ROSS Plaintiffs' copyrighted content, including West Headnotes, portions of the WKNS, Plaintiffs' original selection and arrangement, and other editorial enhancements.  Finally, Plaintiffs explained their legal theories for why these actions constituted direct infringement by LegalEase, as well as why ROSS was (1) contributorily and vicariously liable for LegalEase's direct infringement, and (2) directly liable for using Plaintiffs copyrighted content to develop its legal research product. With respect to ROSS's liability, Plaintiffs explained and cited to numerous documents showing (1) ROSS's knowledge of Westlaw's terms of service, (2) ROSS's inducement of LegalEase's breach of Westlaw's terms of service, (3) ROSS's direction, control, and knowledge of LegalEase's use of Westlaw and copying of Plaintiffs' copyrighted content, (4) the benefits ROSS derived from LegalEase's infringing use of Westlaw and copying of Plaintiffs' copyrighted content, and (5) ROSS's copying of that same content in developing its legal research product.

Since Plaintiffs' last supplemental response to this interrogatory, additional information has been revealed through discovery that further shows that ROSS is directly, as well as contributorily and vicariously, liable for copyright infringement.  That said, Plaintiffs are still reviewing the documents that ROSS recently identified as being relevant among the over 13

29

million documents ROSS belatedly produced after the deadline for substantial completion of document production, and therefore reserve all rights to further supplement this response.

**ROSS'S DIRECT LIABILITY**

As discussed in Plaintiffs' First Supplemental Response, ROSS is directly liable for (1) copying the original selection and arrangement reflected in the memos LegalEase and Morae Global created by using Westlaw and copying Westlaw Content, (2) copying certain West Headnotes listed in the chart in Plaintiffs' First Supplemental Response, and (3) copying certain Westlaw Content ROSS received from LegalEase, including a number of cases containing West's editorial enhancements, such as case synopses, West Headnotes, Key Numbers and portions of the WKNS, and original selection and arrangement.

A. **ROSS's Copying of Plaintiffs' Original Selection and Arrangement**

The headnotes created by West's attorney-editors are protectable by Plaintiffs' copyrights because they are the result of numerous creative choices. For each headnote, Plaintiffs had to choose:

- Which parts of the case are important?

- What points of law or facts should be selected to be a headnote?

- What exactly should that headnote say?

- Should an important point of law or fact be made into one longer headnote, or multiple smaller headnotes?

- Where should that headnote be linked to in the opinion?

Once a headnote is created, Plaintiffs make additional creative choices regarding how it and the case should be arranged in the WKNS:

- What topics, sub-topics, and Key Numbers should be associated with that headnote?

30

- Does that headnote fit with the other headnotes that share those topics, sub-topics, and Key Numbers?

- Can this headnote be connected to other cases or headnotes through Plaintiffs' KeyCite feature?

- Do any additional topics, sub-topics, or Key Numbers need to be added to accommodate that headnote?

- Should any topics, sub-topics, or Key Numbers be renamed, or rearranged within the WKNS, to better accommodate that headnote?

Collectively, these creative choices are protectable as Plaintiffs' original selection and arrangement.  Plaintiffs' created an original taxonomy of the law, selected what parts of which cases are important and should be represented as headnotes, mapped those headnotes to specific portions of those cases, and arranged all of this under Plaintiffs' original taxonomy.  Put differently, Plaintiffs' original selection and arrangement is the connective tissue of the West Key Number System, and is what ROSS is directly liable for copying.

Specifically, ROSS is directly liable for copying Plaintiffs' original selection and arrangement because its agents, rather than merely looking at judicial opinions and randomly selecting ones they believed were relevant to a question that they came up with, copied Plaintiffs' headnotes, their associated cases, and the connections Plaintiffs created for their headnotes, into the ROSS Memos.  As a result, Plaintiffs' original selection and arrangement was copied into the memos.  ROSS then copied Plaintiffs' original selection and arrangement when it stored the memos on its servers, reproduced and distributed the memos within ROSS to develop its competing legal research product, copied their contents to train its algorithm, and reproduced and distributed the memos externally to Cobra Legal.  *See, e.g.,* ROSS-003419784-ROSS-003419786 (created over 25,000 datapoints using LegalEase memos, and then used those datapoints to create over 150,000 labels for additional training data), incorporated herein by

reference pursuant to Rule 33(d)[1]; *see also* ROSS-003276371-ROSS-003276375   As discussed in Plaintiffs' First Supplemental Response, it is clear from the documents produced in this litigation, as well as discovery responses and testimony produced in the prior litigation between West and LegalEase, that LegalEase and its subcontractor, Morae Global, created training data for ROSS by using Westlaw and copying Westlaw Content to create memos.[2]

Documents and testimony from LegalEase and Morae Global shows that the bulk memos were created by first copying portions of the WKNS to assign topics (*i.e.* topics and Key Numbers) to be covered in each memo.  LegalEase and Morae Global would then navigate to the assigned Key Number, reproduce the West Headnotes listed therein, and paraphrase them to be questions for the memos.  Numerous documents produced in this litigation and cited in Plaintiffs' First Supplemental Response show this.  For example, spreadsheets produced by Morae Global and LegalEase show thousands of headnotes being reproduced *en masse,* along with the associated topics and Key Numbers, and then being paraphrased into questions for the memos.  *See, e.g.,* MORAE_00024103, MORAE_00002386, MORAE_00003801, MORAE_00013863, MORAE_00029239, MORAE_00045427, MORAE_00092628, MORAE_00092629, MORAE_00005079, MORAE_00043660, MORAE_00015344, MORAE_00014068, MORAE_00030512; LEGALEASE-00115007.  Comparing the questions

---

[1]   All documents cited by bates number in this response are incorporated by reference pursuant to Rule 33(d).

[2]   As an initial matter, it is worth noting that a total of over 122,000 memos have been produced by ROSS, LegalEase, and Morae Global in this litigation.  Upon further investigation into the over 122,000 memos produced in this litigation, it appears that there are approximately 25,000 unique memos, which is consistent with the number of memos that ROSS claims to have received from LegalEase.  *See* ROSS's Supplemental Response to Plaintiffs' Interrogatory No. 11, pg. 63.  Plaintiffs will supplemental their response to ROSS's Interrogatory No. 21 to reflect that Plaintiffs are entitled to recover statutory damages of $3,750,000,000 based on ROSS's willful infringement of the at least 25,000 judicial opinions with West's editorial enhancements used to create the memos and copied by LegalEase without a license.  This number actually is under inclusive as the number of judicial opinions with West's editorial enhancement that LegalEase copied exceeds 25,000.

and memo titles from the LegalEase and Morae Global documents to the various documents that ROSS has produced in this litigation shows that ROSS received memos containing these paraphrased headnotes.  *See, e.g*, ROSS-000054844; ROSS-000155730.  In addition, an examination of the titles of the memos that ROSS produced shows that the "practice areas" LegalEase provided ROSS for each memo simply copy the topic of the WKNS under which the copied West Headnote was organized.  *Id*.  A document produced by LegalEase shows this is the case:

From: Merin Sony
Sent: Wednesday, August 23, 6:55 AM
Subject: Naming convention
To: Teri Whitehead
Cc: Gayathri Rajeev

Hi Teri,

The naming conventions we followed for the banked memos are : "WL Key Number - Sub topic Number - Memo #" (draft has initials and date; and final do not have them), and "Area of Law - Memo #" (for memos drafted using Lexis).

I understand that Tomas wants to know the topics covered in the memos. So, should we use another method to name the memos - something like "Administrative Law - Memo 1", "Easements - Memo 2" (without mentioning the key numbers)? For internal tracking, we will continue to enter the numbers in the SS.

Kindly let me know your thoughts.

Thanks,
Merin Sony

*See* LEGALEASE-00068628-LEGALEASE-00068630; *see also* MORAE_00012592-MORAE_00012594.

By way of example, below is an excerpt from the "Taxation" tab in MORAE_00045427, which contains approximately 531 rows like what is shown below.  As shown below, the Taxation tab lists a number of headnotes that are associated with the "Key Number" 371 and "Sub-Topic Key Number" 3602.  As discussed later on in this response, 371 is associated with the "Taxation" topic in the WKNS.  Nomenclature aside, the below shows the first step LegalEase and Morae Global took to create the memos for ROSS—navigate to the WKNS, copy

the West Headnotes arranged under certain topics and Key Numbers, and paraphrase them to be

questions for the memos.

| Key Number | Sub-topic Key Number | Sub-Topic Title | Case Name | Head Note | Question |
|---|---|---|---|---|---|
| 371 | 3602 | Nature of Taxes In General | Allstate Insurance Company v. Hegar | Sales tax is, fundamentally, a tax on the transaction, namely, on each sale of a taxable item. | What is a sales tax? |
| 371 | 3602 | Nature of Taxes In General | Travelocity.com, L.P. v. Director of Taxation | The General Excise Tax is a privilege tax assessed based on the privilege or activity of doing business within the state, and not on the fact of domicile. HRS Â§ 237-13. | What is a General Excise Tax? |
| 371 | 3602 | Nature of Taxes In General | Travelocity.com, L.P. v. Director of Taxation | General Excise Tax is assessed when the taxpayer avails itself of the protection, opportunities, and benefits afforded by the State of Hawai"i. HRS Â§ 237-13. | When is a General Excise Tax assessed? |
| 371 | 3602 | Nature of Taxes In General | S & H Transport, Inc. v. City of York | The business-privilege tax differs from a "transaction tax," which is imposed on the receipts from the designated transactions, the measure of which is the value of the transaction. | How is the business-privilege tax different from a "transaction tax"? |
| 371 | 3602 | Nature of Taxes In General | Loeffler v. Target Corp. | The central principle of the sales tax is that retail sellers are subject to a tax on their "gross receipts" derived from retail "sale" of tangible personal property. | What is the central principle of the sales tax? |

| | | | | West's Ann.Cal.Rev. & T.Code § 6051. | |
|---|---|---|---|---|---|
| | | | | | |

Other documents showing that each memo was created by copying West Headnotes can easily be found throughout the documents produced by LegalEase and Morae Global.  For example, below are instructions LegalEase created and provided to Morae Global describing how the memos would be created using Westlaw and copying Westlaw Content:



See MORAE_00011129.  With respect to copying Plaintiffs' original selection and arrangement, other documents, such as the one shown below, explain how at least one "great" quote in each

memo was identified by navigating to passage of the case where the headnote is linked to in

Westlaw:

| | A | B |
|---|---|---|
| 1 | | Legal Ease - another LPO - end client Ross International - leverages IBM etc. congnitive process - for no need to leverage a law firm or LPO to be engaged - to train the system to this kind of work. |
| 2 | | very basic level of LR |
| 3 | | putting it in memorandum format |
| 4 | | font/ spaces  etc - refer protocol / blue book formating is followed |
| 5 | | |
| 6 | | case note - not full proof (prepared by the editor of TR)- refer it |
| 7 | | |
| 8 | Head note | convert the head note in a question retaining all points in head note. |
| 9 | | go to the para where the head note is taken from |
| 10 | | copy para - put citation - bold the line refered in Head note - put [[]] around it too and bold it. |
| 11 | | Great Label at the beginning of para with : |
| 12 | Format:<br>Great quote | Put case on on the top ex -<br><br>Q: Is Writ manadaums an extraordinary remedy?<br><br>Case 1: Waymo LLC v. Uber Techs, Inc., 2017 WL 401806<br>Great label: Para ...<br><br>Case 2:Gulfstream Aerospace<br>Great Quote |
| 13 | Format topical quote: | Search - "mandamus" and "extraordinary"<br><br>those cases which are not directly answering should be copied- as the topical quote must not answer the question directly. |
| 14 | | Topical |
| 15 | | |
| 16 | Irrelevant Quote | Will have terms of the question but dosent answer the question. |

See MORAE_00013373.  Plaintiffs further refer ROSS to the first row in the "Taxation" tab

references above and reproduced below.  See MORAE_00045427.

| Key Number | Sub-topic Key Number | Sub-Topic Title | Case Name | Head Note | Question |
|---|---|---|---|---|---|
| 371 | 3602 | Nature of Taxes In General | Allstate Insurance Company v. Hegar | Sales tax is, fundamentally, a tax on the transaction, namely, on each sale of a taxable item. | What is a sales tax? |

A quick search for the question—"What is a sales tax?"—among the documents that

ROSS has produced in this litigation immediately reveals a memo titled "Taxation - Memo 1066

- C - KI_64706.docx," shown below:

**MEMORANDUM # 1066**

**1. Question**
What is a sales tax?

**2. Reference List**
**Issue: What is a sales tax?**

Case 1: Allstate Ins. Co. v. Hegar, 484 S.W.3d 611.
Great Quote 1: Our reasoning begins with the nature of the sales tax to which Section 151.057(2)'s exclusion is addressed. **[[As Allstate observes, the sales tax is, fundamentally, a "tax on the transaction," namely, on "each sale of a taxable item."]]** Here, the parties agree, the taxable item at issue would be a type of taxable service—"insurance claims adjustment or claims processing"—although they differ as to which actions of Pilot this would refer. The Tax Code provides that the "sale" or "purchase" of a taxable service means, as applicable here, "the performance of a taxable service" "when done or performed for consideration."

*See* ROSS-003282142-ROSS-003282143.  Opening Westlaw and navigating to *Allstate Ins. Co. v. Hegar*, 484 S.W.3d 611, ROSS can see the copied West Headnote, as well as see that it is categorized under "Taxation" and links to the exact same passage included in the above memo:





Plaintiffs also produced a copy of this case showing the exact same information, as well as copies of all the other cases that LegalEase copied headnotes from, to ROSS, so using Westlaw is not necessary.  *See* TR-0586032-TR-0586051.

**B.  ROSS's Copying of Additional Westlaw Content Provided by Its Agents**

ROSS also is directly liable for copying Westlaw Content sent to it by LegalEase as a part of the "case classifier" project.[3]  As discussed in ROSS-003658597–ROSS-003658604, ROSS determined that the training data it had been using at the time to construct its case classifier rendered the classifier "unuseable - or at the very least critically flawed."  *Id.*  The document shows that ROSS held a meeting to discuss options for remedying this issue, one of which was to "collect new data even though it's very expensive[.]"  *Id.*  Notably, one of the "[t]akeaways" from this meeting was that ROSS had concerns regarding "[its] ability to test the quality of any system [it] design[ed] due to lack of data[,]" as well as "concerns about testing a model with data containing the same bias as the data it was trained on."  *Id.*  During the meeting, ROSS determined that it had "an untapped source of training data in the form of [its] new QA

---

3    ROSS is also contributorily and vicariously liable for LegalEase's direct infringement, as discussed further below.

data that links questions with practice area tags to cases in our database"—referring to the training data that LegalEase and Morae Global created for ROSS using Westlaw.  *Id.*

It appears that after this meeting, ROSS did in fact use the training data LegalEase and Morae Global created using Westlaw to train its case classifier, noting in a separate document that it used "25,539 Q&A pairs from which [it] extracted 151,695 labels for cases mapped to a practice area."  *See* ROSS-003419784-ROSS-003419786.[4]  ROSS, however, was only able to extract over 150,000 labels to be used as training data for its case classifier—therefore saving itself the time and cost of having to acquire or generate the same amount of training data itself— because LegalEase and Morae Global used Westlaw and copied Plaintiffs original selection and arrangement to create the memos.  Indeed, LegalEase and Morae Global *needed* to copy Plaintiffs' original selection and arrangement because, as ROSS itself noted on multiple occasions, their own work product was lacking.  *See, e.g.*, ROSS-009558474-ROSS-009558475 (noting ROSS "can never trust LegalEase 100%" and therefore included a 15% penalty provision for any bulk memos that ROSS identified as "not being up to standard"); ROSS-003389628- ROSS-003389629 (remarking that "[t]he downsides of having LegalEase prepare full memos" included "potential quality issues[,]" and noting that "[i]n terms of quality, [ROSS] would need to determine how [it would] tackle this, knowing that LegalEase requires quality control oversight from time to time."); ROSS-009637399-ROSS-009637400 (discussing bulk memo project and stating that "We know from experience, particularly with LegalEase, that quality can clip from time and time and we need to keep a close eye on what they're doing."); ROSS- 003464647-ROSS-003464651 (remarking that, in the context of drafting memos, "LegalEase =

---

[4]     Although this document suggests that LegalEase created more than 25,000 memos for ROSS, Plaintiffs are being conservative and using 25,000 for purposes of ROSS's infringement as discussed above in footnote 1.

not as good quality as the other LPO [Cobra Legal] + less analysis + we pay less"); "ROSS-000061913 (Cobra Legal's memos were more comprehensive than LegalEase's).

As a result of LegalEase and Morae Global copying Plaintiffs' original selection and arrangement, ROSS received Plaintiffs' high-quality content— question and answer pairs with accurately labeled practice areas (*i.e.*, a copied West Headnote mapped to a case passage identified using the WKNS and/or Westlaw that used Plaintiffs' topics and Key Numbers)—and used it as training data.  This was something ROSS unquestionably cared about receiving.  *See, e.g.*, ROSS-009558441-ROSS-009558443 ("We constantly need to ensure the training data remains of **high quality** (e.g. that the quotes actually answer the questions)." (emphasis added)); ROSS-003487472-ROSS-003487474 (remarking to an investor a year after receiving training data from LegalEase that "[t]here's also a scarcity of companies who have the requisite datasets to take advantage of deep neural networks.  **You don't just need a lot of data. You need high-quality data.** This and the reason above are why you see a lot of enterprise AI initiatives failing. We have one of the largest question answering data sets in existence, which we specifically collected for our application." (emphasis added)); ROSS-009545896-ROSS-009545899 ("[W]e will want to continuously revise and improve a product which provides us with **high quality training data** (our protective moat – part of why its so important we properly ensure that we can 'honeypot' to get training data) which also *simultaneously helps us kill our only real competition to date*[.]" (bold emphasis added, italics/underlining in original)); ROSS-003704423-ROSS-003704439 (presentation titled "ROSS Project & Technology & Vision & Strategy," stating that, in the context of training data, ROSS plans to "[i]nvest in **high-quality hand-labelled data.**" (emphasis added)); *see also* ROSS-000204857-ROSS-000204860 (remarking to LegalEase that "[ROSS] care[s] about the quality of the quotes, not the full cases.").

While developing its case classifier, ROSS produced a list of all the "practice areas" that LegalEase provided it (which, as discussed above, it did by naming the memos things like Taxation - Memo 1066 - C - KI_64706.docx").  Unsurprisingly, of the 91 practice areas that LegalEase provided to ROSS, all of them are literal copies of topics of the WKNS[5], as shown below:

| West Key Number System Digest Topic as shown in TR-0179847-TR-0179854* | "LPO classification" as shown in ROSS-010128683 |
|---|---|
| 2 - Abatement and Revival | ABATEMENT AND REVIVAL |
| 9 - Account | ACCOUNT |
| 13 - Action | ACTION |
| 15A - Administrative Law and Procedure | ADMINISTRATIVE LAW |
| 16 - Admiralty | ADMIRALTY |
| 18 - Adulteration | ADULTERATION |
| 20 - Adverse Possession | ADVERSE POSSESSION |
| 21 - Affidavits | AFFIDAVIT |
| 23 - Agriculture | AGRICULTURE |
| 24 - Aliens, Immigration, and Citizenship | ALIENS IMMIGRATION AND CITIZENSHIP |
| 25T - Alternative Dispute Resolution | ALTERNATIVE DISPUTE RESOLUTION |
| 26 - Ambassadors and Consuls | AMBASSADORS AND CONSULS |
| 27 - Amicus Curiae | AMICUS CURIAE |
| 30 - Appeal and Error | APPEAL AND ERROR |
| 34 - Armed Services | ARMED FORCES |
| 36 - Arson | ARSON |
| 38 - Assignments | ASSIGNMENTS |
| 50 - Bailment | BAILMENT |
| 52 - Banks and Banking | BANKS AND BANKING |
| 56 - Bills and Notes | BILLS AND NOTES |
| 63 - Bribery | BRIBERY |

---

[5]   Although a few "practice areas" are listed differently in ROSS's list, LegalEase still provided memos labeled by the corresponding topics of the WKNS to ROSS for those "practice areas."  Specifically, those "practice areas" include: ARMED FORCES (*see, e.g.*, ROSS-003280407-ROSS-003280408 (memo titled "Armed Services - Memo 344 - RK_66865.docx")), CUSTOMS USAGE (*see, e.g.*, ROSS-003284576-ROSS-003284577 (memo titled "Customs & Usage - Memo 16 - JS.docx")); SEX OFFENCE (*see, e.g.,* ROSS-003280067-ROSS-003280068 (memo titled "Sex Offenses - Memo 137 - RK_66940.docx")); THREATS (see, e.g., ROSS-003280375-ROSS-003280376 (memo titled "Threats, Stalking, and Harassment - Memo #8 - C - LB_58581.docx")).

| | |
|---|---|
| 67 - Burglary | BURGLARY |
| 75 - Charities | CHARITIES |
| 76D - Child Custody | CHILD CUSTODY |
| 79 - Clerks of Court | CLERKS OF COURT |
| 83H - Commodity Futures Trading Regulation | COMMODITY FUTURES TRADING REGULATION |
| 92B - Consumer Credit | CONSUMER CREDIT |
| 98 - Convicts | CONVICTS |
| 108H - Creditors Remedies* | CREDITORS REMEDIES |
| 113 - Customs and Usage | CUSTOMS USAGE |
| 129 - Disorderly Conduct | DISORDERLY CONDUCT |
| 135 - Domicile | DOMICILE |
| 135H - Double Jeopardy | DOUBLE JEOPARDY |
| 141E - Education* | EDUCATION |
| 145 - Electricity | ELECTRICITY |
| 146 - Embezzlement | EMBEZZLEMENT |
| 148 - Eminent Domain | EMINENT DOMAIN |
| 149E - Environmental Law | ENVIRONMENTAL LAW |
| 156 - Estoppel | ESTOPPEL |
| 159 - Exchange of Property | EXCHANGE OF PROPERTY |
| 164T - Extortion* | EXTORTION |
| 174 - Fines | FINES |
| 181 - Forgery | FORGERY |
| 183 - Franchises | FRANCHISES |
| 192 - Good Will | GOODWILL |
| 195 - Guaranty | GUARANTY |
| 200 - Highways | HIGHWAY |
| 203 - Homicide | HOMICIDE |
| 207 - Incest | INCEST |
| 209 - Indians | INDIANS |
| 212 - Injunction | INJUNCTION |
| 216 - Inspection | INSPECTION |
| 217 - Insurance | INSURANCE |
| 221 - International Law | INTERNATIONAL LAW |
| 231E - Kidnapping | KIDNAPPING |
| 231H - Labor and Employment | LABOR AND EMPLOYMENT |
| 233 - Landlord and Tenant | LANDLORD AND TENANT |
| 237 - Libel and Slander | LIBEL AND SLANDER |
| 240 - Life Estate | LIFE ESTATE |
| 249 - Malicious Prosecution | MALICIOUS PROSECUTION |

| 253 - Marriage and Cohabitation* | MARRIAGE AND COHABITATION |
| 260 - Mines and Minerals | MINES AND MINERALS |
| 265 - Monopolies | MONOPOLY |
| 272 - Negligence | NEGLIGENCE |
| 273 - Neutrality Laws | NEUTRALITY LAWS |
| 277 - Notice | NOTICE |
| 278 - Novation | NOVATION |
| 284 - Pardon and Parole | PARDON AND PAROLE |
| 289 - Partnership | PARTNERSHIP |
| 296 - Pension | PENSION |
| 302 - Pleading | PLEADING |
| 307A - Pretrial Procedure | PRE TRIAL PROCEDURE |
| 308 - Principal and Agent | PRINCIPAL AND AGENT |
| 311H - Privileged Communications and Confidentiality | PRIVILEGED COMMUNICATIONS AND CONFIDENTIALITY |
| 313A - Products Liability | PRODUCTS LIABILITY |
| 315 - Property | PROPERTY |
| 317A - Public Utilities | PUBLIC UTILITIES |
| 349A - Secured Transactions | SECURED TRANSACTIONS |
| 352H - Sex Offenses* | SEX OFFENCE |
| 366 - Subrogation | SUBROGATION |
| 368 - Suicide | SUICIDE |
| 371 - Taxation | TAXATION |
| 377E - Threats, Stalking, and Harassment* | THREATS |
| 384 - Treason | TREASON |
| 386 - Trespass | TRESPASS |
| 399 - Vagrancy | VAGRANCY |
| 401 - Venue | VENUE |
| 407 - Weights and Measures | WEIGHTS AND MEASURES |
| 411 - Woods and Forests | WOODS AND FORESTS |
| 413 - Workers' Compensation | WORKERS COMPENSATION |
| 414 - Zoning and Planning | ZONING AND PLANNING |

\* - These topics are not listed in TR-0179847-TR-0179854, but are part of the WKNS. Plaintiffs refer ROSS to the WKNS page available on Westlaw.

In addition to using Westlaw and copying Westlaw Content to create the memos for

ROSS, LegalEase also used Westlaw for another part of the classifier project. Specifically,

LegalEase accessed Westlaw and downloaded and distributed a large number of cases to ROSS,

including cases containing West Headnotes, Key Numbers, and Plaintiffs' other original editorial enhancements. *See, e.g.*, ROSS-000177723 (attaching four zip files of cases containing Westlaw Content). As Plaintiffs noted in their First Supplemental Response, ROSS has produced over 2,000 cases in this litigation that were clearly downloaded from Westlaw and contain Westlaw Content. These cases represent specific instances in which ROSS actually infringed Plaintiffs' copyrights. These cases were sent to ROSS by LegalEase, at ROSS's direction and for ROSS's benefit, on December 22, 2017, as a part of the "classifier" project. *See* ROSS-003362818-ROSS-003362819. Upon further review of the documents ROSS has produced, it appears to have produced approximately 8,500 cases, of which approximately 2,700 contain West Headnotes and Key Numbers. That said, it appears that ROSS produced a number of cases multiple times. Based on the number of cases produced from the custodian of Maxim Isakov, who received a forward of LegalEase's email from Mr. van der Heijden, it appears LegalEase provided ROSS with approximately 500 cases containing West's editorial enhancements. *See* ROSS-009691365-ROSS-009691366.[6]

---

[6]    These cases can be found at the following Bates numbers: ROSS-009691813-ROSS-009691815, ROSS-009692108-ROSS-009692114, ROSS-009693003-ROSS-009693008, ROSS-009693472-ROSS-009693474, ROSS-009692914-ROSS-009692919, ROSS-009692363-ROSS-009692370, ROSS-009693806-ROSS-009693812, ROSS-009693984-ROSS-009693991, ROSS-009692807-ROSS-009692815, ROSS-009693813-ROSS-009693820, ROSS-009691963-ROSS-009691968, ROSS-009691604-ROSS-009691606, ROSS-009691939-ROSS-009691945, ROSS-009691928-ROSS-009691934, ROSS-009691977-ROSS-009691984, ROSS-009691501-ROSS-009691503, ROSS-009692454-ROSS-009692462, ROSS-009693222-ROSS-009693236, ROSS-009691718-ROSS-009691727, ROSS-009692731-ROSS-009692754, ROSS-009691748-ROSS-009691756, ROSS-009693157-ROSS-009693159, ROSS-009693750-ROSS-009693763, ROSS-009692391-ROSS-009692400, ROSS-009692635-ROSS-009692641, ROSS-009692625-ROSS-009692627, ROSS-009691870-ROSS-009691876, ROSS-009693064-ROSS-009693077, ROSS-009692835-ROSS-009692859, ROSS-009692794-ROSS-009692796, ROSS-009691457-ROSS-009691463, ROSS-009692986-ROSS-009692990, ROSS-009691496-ROSS-009691500, ROSS-009693318-ROSS-009693327, ROSS-009692699-ROSS-009692725, ROSS-009691989-ROSS-009691994, ROSS-009692953-ROSS-009692979, ROSS-009691973-ROSS-009691976, ROSS-009692564-ROSS-009692576, ROSS-009693025-ROSS-009693036, ROSS-009692060-ROSS-009692065, ROSS-009691367-ROSS-009691383, ROSS-009691562-ROSS-009691590, ROSS-009691405-ROSS-009691411, ROSS-009692249-ROSS-009692260, ROSS-009692923-ROSS-009692930, ROSS-009691420-ROSS-009691433, ROSS-009693237-ROSS-009693244, ROSS-009691854-ROSS-009691864, ROSS-009692140-ROSS-009692150, ROSS-009691740-ROSS-009691747, ROSS-009691682-ROSS-009691692, ROSS-009692401-ROSS-009692453, ROSS-009693060-ROSS-009693063, ROSS-009692129-ROSS-009692134, ROSS-009692802-ROSS-009692806, ROSS-

009693821-ROSS-009693827, ROSS-009693057-ROSS-009693059, ROSS-009693400-ROSS-009693410, ROSS-009692729-ROSS-009692730, ROSS-009693511-ROSS-009693516, ROSS-009693555-ROSS-009693564, ROSS-009692083-ROSS-009692087, ROSS-009692161-ROSS-009692174, ROSS-009692095-ROSS-009692104, ROSS-009692463-ROSS-009692472, ROSS-009692797-ROSS-009692801, ROSS-009692371-ROSS-009692380, ROSS-009691447-ROSS-009691451, ROSS-009691903-ROSS-009691913, ROSS-009693938-ROSS-009693951, ROSS-009693614-ROSS-009693622, ROSS-009691476-ROSS-009691485, ROSS-009692327-ROSS-009692343, ROSS-009693175-ROSS-009693190, ROSS-009693125-ROSS-009693153, ROSS-009693784-ROSS-009693798, ROSS-009692822-ROSS-009692828, ROSS-009691384-ROSS-009691404, ROSS-009693339-ROSS-009693347, ROSS-009692880-ROSS-009692896, ROSS-009693862-ROSS-009693891, ROSS-009691693-ROSS-009691699, ROSS-009693245-ROSS-009693254, ROSS-009691757-ROSS-009691788, ROSS-009693952-ROSS-009693961, ROSS-009692545-ROSS-009692554, ROSS-009691946-ROSS-009691958, ROSS-009692935-ROSS-009692944, ROSS-009691533-ROSS-009691539, ROSS-009692031-ROSS-009692035, ROSS-009693718-ROSS-009693728, ROSS-009693902-ROSS-009693908, ROSS-009693837-ROSS-009693839, ROSS-009691789-ROSS-009691795, ROSS-009693469-ROSS-009693471, ROSS-009693857-ROSS-009693861, ROSS-009693191-ROSS-009693193, ROSS-009691611-ROSS-009691618, ROSS-009692277-ROSS-009692284, ROSS-009692005-ROSS-009692014, ROSS-009692075-ROSS-009692082, ROSS-009691877-ROSS-009691885, ROSS-009692920-ROSS-009692922, ROSS-009693374-ROSS-009693378, ROSS-009693391-ROSS-009693394, ROSS-009692980-ROSS-009692982, ROSS-009693828-ROSS-009693829, ROSS-009692261-ROSS-009692276, ROSS-009692381-ROSS-009692390, ROSS-009692105-ROSS-009692107, ROSS-009691486-ROSS-009691492, ROSS-009693565-ROSS-009693593, ROSS-009692897-ROSS-009692913, ROSS-009694001-ROSS-009694004, ROSS-009691969-ROSS-009691972, ROSS-009693275-ROSS-009693291, ROSS-009691823-ROSS-009691828, ROSS-009693535-ROSS-009693540, ROSS-009692002-ROSS-009692004, ROSS-009693499-ROSS-009693510, ROSS-009691596-ROSS-009691600, ROSS-009692036-ROSS-009692046, ROSS-009693737-ROSS-009693749, ROSS-009692945-ROSS-009692952, ROSS-009691412-ROSS-009691414, ROSS-009693160-ROSS-009693162, ROSS-009691914-ROSS-009691927, ROSS-009692655-ROSS-009692668, ROSS-009692860-ROSS-009692871, ROSS-009692991-ROSS-009692993, ROSS-009692755-ROSS-009692758, ROSS-009692577-ROSS-009692590, ROSS-009693154-ROSS-009693156, ROSS-009693712-ROSS-009693717, ROSS-009691591-ROSS-009691595, ROSS-009693395-ROSS-009693399, ROSS-009693194-ROSS-009693199, ROSS-009693933-ROSS-009693937, ROSS-009692057-ROSS-009692059, ROSS-009692642-ROSS-009692654, ROSS-009691816-ROSS-009691819, ROSS-009693962-ROSS-009693968, ROSS-009691607-ROSS-009691610, ROSS-009693623-ROSS-009693656, ROSS-009693200-ROSS-009693206, ROSS-009693329-ROSS-009693338, ROSS-009693475-ROSS-009693487, ROSS-009691796-ROSS-009691812, ROSS-009692285-ROSS-009692326, ROSS-009692151-ROSS-009692160, ROSS-009691540-ROSS-009691545, ROSS-009693292-ROSS-009693308, ROSS-009691546-ROSS-009691561, ROSS-009692816-ROSS-009692821, ROSS-009691835-ROSS-009691839, ROSS-009691464-ROSS-009691475, ROSS-009693348-ROSS-009693359, ROSS-009693207-ROSS-009693221, ROSS-009691625-ROSS-009691635, ROSS-009692674-ROSS-009692690, ROSS-009691995-ROSS-009692001, ROSS-009692224-ROSS-009692238, ROSS-009693078-ROSS-009693086, ROSS-009691415-ROSS-009691419, ROSS-009693594-ROSS-009693603, ROSS-009693119-ROSS-009693124, ROSS-009692027-ROSS-009692030, ROSS-009692872-ROSS-009692879, ROSS-009691504-ROSS-009691510, ROSS-009692617-ROSS-009692624, ROSS-009693662-ROSS-009693711, ROSS-009691829-ROSS-009691834, ROSS-009694010-ROSS-009694022, ROSS-009693094-ROSS-009693105, ROSS-009692983-ROSS-009692985, ROSS-009691452-ROSS-009691456, ROSS-009693541-ROSS-009693554, ROSS-009693009-ROSS-009693012, ROSS-009694005-ROSS-009694009, ROSS-009693492-ROSS-009693498, ROSS-009692239-ROSS-009692248, ROSS-009693013-ROSS-009693024, ROSS-009693087-ROSS-009693093, ROSS-009693488-ROSS-009693491, ROSS-009693771-ROSS-009693778, ROSS-009692669-ROSS-009692673, ROSS-009693270-ROSS-009693274, ROSS-009692628-ROSS-009692634, ROSS-009691523-ROSS-009691529, ROSS-009691840-ROSS-009691853, ROSS-009692193-ROSS-009692223, ROSS-009693517-ROSS-009693520, ROSS-009693521-ROSS-009693524, ROSS-009693463-ROSS-009693468, ROSS-009693255-ROSS-009693269, ROSS-009693309-ROSS-009693317, ROSS-009692499-ROSS-009692519, ROSS-009693830-ROSS-009693836, ROSS-009693841-ROSS-009693856, ROSS-009692047-ROSS-009692056, ROSS-009692536-ROSS-009692544, ROSS-009693379-ROSS-009693390, ROSS-009691511-ROSS-009691516, ROSS-009692931-ROSS-009692934, ROSS-009692066-ROSS-009692074, ROSS-009693360-ROSS-009693373, ROSS-009692609-

45

ROSS-009692616, ROSS-009693779-ROSS-009693783, ROSS-009693037-ROSS-009693056, ROSS-009691493-ROSS-009691495, ROSS-009694023-ROSS-009694034, ROSS-009691601-ROSS-009691603, ROSS-009691935-ROSS-009691938, ROSS-009692726-ROSS-009692728, ROSS-009691865-ROSS-009691869, ROSS-009693328, ROSS-009691985-ROSS-009691988, ROSS-009691434-ROSS-009691440, ROSS-009692484-ROSS-009692498, ROSS-009691665-ROSS-009691672, ROSS-009693525-ROSS-009693534, ROSS-009692175-ROSS-009692192, ROSS-009692015-ROSS-009692026, ROSS-009692691-ROSS-009692698, ROSS-009692115-ROSS-009692128, ROSS-009693729-ROSS-009693736, ROSS-009691530-ROSS-009691532, ROSS-009691636-ROSS-009691657, ROSS-009691820-ROSS-009691822, ROSS-009691728-ROSS-009691739, ROSS-009692555-ROSS-009692563, ROSS-009693163-ROSS-009693174, ROSS-009691886-ROSS-009691891, ROSS-009693411-ROSS-009693419, ROSS-009691517-ROSS-009691522, ROSS-009692473-ROSS-009692483, ROSS-009692597-ROSS-009692608, ROSS-009693799-ROSS-009693805, ROSS-009692520-ROSS-009692535, ROSS-009692591-ROSS-009692596, ROSS-009692088-ROSS-009692094, ROSS-009693764-ROSS-009693770, ROSS-009693604-ROSS-009693613, ROSS-009693106-ROSS-009693118, ROSS-009691658-ROSS-009691664, ROSS-009693982-ROSS-009693983, ROSS-009692344-ROSS-009692362, ROSS-009692994-ROSS-009693002, ROSS-009691619-ROSS-009691624, ROSS-009693442-ROSS-009693462, ROSS-009692759-ROSS-009692793, ROSS-009691441-ROSS-009691446, ROSS-009693992-ROSS-009694000, ROSS-009693918-ROSS-009693932, ROSS-009692829-ROSS-009692834, ROSS-009693420-ROSS-009693441, ROSS-009691892-ROSS-009691902, ROSS-010293230-ROSS-010293237, ROSS-010293242-ROSS-010293245, ROSS-010294361-ROSS-010294364, ROSS-010293374-ROSS-010293383, ROSS-010295579-ROSS-010295581, ROSS-010293356-ROSS-010293358, ROSS-010294832-ROSS-010294848, ROSS-010294092-ROSS-010294102, ROSS-010294202-ROSS-010294209, ROSS-010295200-ROSS-010295203, ROSS-010295568-ROSS-010295578, ROSS-010293606-ROSS-010293607, ROSS-010294249-ROSS-010294255, ROSS-010293351-ROSS-010293355, ROSS-010293807-ROSS-010293813, ROSS-010293498-ROSS-010293506, ROSS-010293369-ROSS-010293373, ROSS-010294056-ROSS-010294067, ROSS-010295025-ROSS-010295028, ROSS-010295040-ROSS-010295049, ROSS-010293531-ROSS-010293539, ROSS-010293453-ROSS-010293456, ROSS-010293659-ROSS-010293664, ROSS-010293246-ROSS-010293248, ROSS-010295326-ROSS-010295332, ROSS-010293316-ROSS-010293321, ROSS-010293423-ROSS-010293426, ROSS-010293514-ROSS-010293530, ROSS-010295366-ROSS-010295372, ROSS-010295029-ROSS-010295039, ROSS-010293547-ROSS-010293562, ROSS-010293619-ROSS-010293625, ROSS-010293347-ROSS-010293350, ROSS-010295361-ROSS-010295365, ROSS-010293928-ROSS-010293941, ROSS-010294608-ROSS-010294611, ROSS-010295131-ROSS-010295134, ROSS-010294855-ROSS-010294898, ROSS-010293855-ROSS-010293861, ROSS-010294103-ROSS-010294114, ROSS-010293874-ROSS-010293881, ROSS-010293457-ROSS-010293461, ROSS-010294676-ROSS-010294688, ROSS-010293540-ROSS-010293546, ROSS-010295204-ROSS-010295210, ROSS-010294324-ROSS-010294342, ROSS-010294708-ROSS-010294723, ROSS-010294830-ROSS-010294831, ROSS-010295115-ROSS-010295116, ROSS-010293249-ROSS-010293264, ROSS-010293696-ROSS-010293701, ROSS-010293446-ROSS-010293452, ROSS-010293739-ROSS-010293742, ROSS-010294934-ROSS-010294942, ROSS-010293608-ROSS-010293613, ROSS-010294800-ROSS-010294805, ROSS-010295058-ROSS-010295066, ROSS-010293462-ROSS-010293475, ROSS-010294352-ROSS-010294360, ROSS-010294811-ROSS-010294818, ROSS-010294021-ROSS-010294035, ROSS-010295298-ROSS-010295306, ROSS-010294272-ROSS-010294277, ROSS-010294573-ROSS-010294607, ROSS-010294970-ROSS-010294974, ROSS-010295458-ROSS-010295468, ROSS-010293265-ROSS-010293272, ROSS-010293966-ROSS-010293977, ROSS-010294256-ROSS-010294271, ROSS-010293882-ROSS-010293897, ROSS-010293309-ROSS-010293315, ROSS-010295214-ROSS-010295271, ROSS-010295378-ROSS-010295387, ROSS-010294422-ROSS-010294540, ROSS-010294307-ROSS-010294317, ROSS-010294779-ROSS-010294783, ROSS-010293329-ROSS-010293336, ROSS-010293749-ROSS-010293763, ROSS-010294210-ROSS-010294213, ROSS-010294620-ROSS-010294627, ROSS-010295616-ROSS-010295620, ROSS-010295414-ROSS-010295420, ROSS-010293238-ROSS-010293241, ROSS-010294235-ROSS-010294240, ROSS-010295316-ROSS-010295321, ROSS-010294278-ROSS-010294280, ROSS-010293273-ROSS-010293279, ROSS-010294241-ROSS-010294248, ROSS-010294612-ROSS-010294616, ROSS-010293728-ROSS-010293735, ROSS-010293717-ROSS-010293727, ROSS-010294910-ROSS-010294917, ROSS-010293563-ROSS-010293571, ROSS-010295016-ROSS-010295024, ROSS-010294918-ROSS-010294923, ROSS-010295553-ROSS-010295561, ROSS-010294784-ROSS-010294790, ROSS-010293592-ROSS-010293597, ROSS-010295502-ROSS-010295507, ROSS-010294751-ROSS-010294778, ROSS-010295546-ROSS-010295552, ROSS-

Finally, ROSS is also directly liable for copying the West Headnotes listed in the chart in

Plaintiffs' First Supplemental Response, as well as any other additional West Headnotes, Key

---

010294343-ROSS-010294351, ROSS-010293384-ROSS-010293389, ROSS-010294849-ROSS-010294854, ROSS-010293712-ROSS-010293716, ROSS-010295443-ROSS-010295457, ROSS-010294226-ROSS-010294234, ROSS-010294997-ROSS-010295015, ROSS-010295593-ROSS-010295615, ROSS-010294791-ROSS-010294799, ROSS-010295347-ROSS-010295360, ROSS-010293691-ROSS-010293695, ROSS-010294735-ROSS-010294740, ROSS-010293862-ROSS-010293864, ROSS-010295469-ROSS-010295481, ROSS-010293978-ROSS-010293989, ROSS-010295582-ROSS-010295592, ROSS-010294375-ROSS-010294394, ROSS-010295399-ROSS-010295409, ROSS-010293769-ROSS-010293770, ROSS-010294724-ROSS-010294734, ROSS-010295153-ROSS-010295158, ROSS-010295279-ROSS-010295281, ROSS-010294318-ROSS-010294323, ROSS-010293796-ROSS-010293800, ROSS-010293301-ROSS-010293308, ROSS-010293839-ROSS-010293841, ROSS-010294281-ROSS-010294290, ROSS-010293359-ROSS-010293363, ROSS-010293776-ROSS-010293781, ROSS-010293400-ROSS-010293418, ROSS-010295388-ROSS-010295398, ROSS-010294994-ROSS-010294996, ROSS-010294115-ROSS-010294141, ROSS-010294541-ROSS-010294551, ROSS-010293865-ROSS-010293873, ROSS-010294365-ROSS-010294374, ROSS-010294819-ROSS-010294829, ROSS-010293801-ROSS-010293806, ROSS-010295421-ROSS-010295428, ROSS-010295272-ROSS-010295278, ROSS-010293398-ROSS-010293399, ROSS-010295117-ROSS-010295130, ROSS-010294222-ROSS-010294225, ROSS-010293814-ROSS-010293817, ROSS-010295514-ROSS-010295529, ROSS-010294899-ROSS-010294909, ROSS-010294395-ROSS-010294402, ROSS-010293942-ROSS-010293965, ROSS-010294160-ROSS-010294201, ROSS-010295211-ROSS-010295213, ROSS-010293419-ROSS-010293422, ROSS-010295410-ROSS-010295413, ROSS-010293911-ROSS-010293922, ROSS-010293390-ROSS-010293397, ROSS-010295322-ROSS-010295325, ROSS-010295150-ROSS-010295152, ROSS-010294142-ROSS-010294159, ROSS-010293923-ROSS-010293927, ROSS-010295333-ROSS-010295343, ROSS-010295495-ROSS-010295501, ROSS-010294655-ROSS-010294661, ROSS-010295489-ROSS-010295494, ROSS-010294291-ROSS-010294306, ROSS-010294689-ROSS-010294707, ROSS-010294068-ROSS-010294081, ROSS-010294214-ROSS-010294221, ROSS-010295067-ROSS-010295074, ROSS-010294566-ROSS-010294572, ROSS-010294403-ROSS-010294421, ROSS-010293476-ROSS-010293483, ROSS-010293427-ROSS-010293435, ROSS-010294963-ROSS-010294969, ROSS-010293578-ROSS-010293587, ROSS-010295429-ROSS-010295436, ROSS-010293835-ROSS-010293838, ROSS-010293771-ROSS-010293775, ROSS-010293572-ROSS-010293577, ROSS-010293507-ROSS-010293513, ROSS-010294617-ROSS-010294619, ROSS-010295104-ROSS-010295114, ROSS-010295172-ROSS-010295175, ROSS-010293702-ROSS-010293711, ROSS-010294662-ROSS-010294675, ROSS-010294628-ROSS-010294640, ROSS-010293898-ROSS-010293910, ROSS-010293280-ROSS-010293300, ROSS-010293337-ROSS-010293340, ROSS-010293677-ROSS-010293690, ROSS-010294556-ROSS-010294565, ROSS-010294954-ROSS-010294962, ROSS-010294641-ROSS-010294654, ROSS-010293743-ROSS-010293748, ROSS-010295099-ROSS-010295103, ROSS-010295621-ROSS-010295626, ROSS-010295135-ROSS-010295138, ROSS-010293736-ROSS-010293738, ROSS-010294981-ROSS-010294993, ROSS-010293341-ROSS-010293346, ROSS-010293668-ROSS-010293670, ROSS-010293782-ROSS-010293783, ROSS-010294552-ROSS-010294555, ROSS-010295530-ROSS-010295545, ROSS-010294741-ROSS-010294750, ROSS-010295050-ROSS-010295057, ROSS-010294048-ROSS-010294055, ROSS-010293665-ROSS-010293667, ROSS-010294082-ROSS-010294091, ROSS-010293842-ROSS-010293854, ROSS-010293829-ROSS-010293834, ROSS-010294806-ROSS-010294810, ROSS-010294924-ROSS-010294933, ROSS-010294943-ROSS-010294953, ROSS-010295139-ROSS-010295146, ROSS-010295282-ROSS-010295292, ROSS-010295373-ROSS-010295377, ROSS-010295437-ROSS-010295442, ROSS-010295176-ROSS-010295199, ROSS-010293784-ROSS-010293788, ROSS-010293364-ROSS-010293368, ROSS-010293789-ROSS-010293795, ROSS-010294036-ROSS-010294047, ROSS-010293484-ROSS-010293497, ROSS-010295159-ROSS-010295171, ROSS-010293997-ROSS-010294020, ROSS-010295075-ROSS-010295098, ROSS-010293671-ROSS-010293676, ROSS-010293818-ROSS-010293828, ROSS-010293764-ROSS-010293768, ROSS-010293614-ROSS-010293618, ROSS-010293322-ROSS-010293328, ROSS-010293436-ROSS-010293445, ROSS-010293990-ROSS-010293996, ROSS-010294975-ROSS-010294980, ROSS-010293598-ROSS-010293605.

Numbers, and/or other original editorial enhancements that Plaintiffs may identify as they complete review of the documents ROSS belatedly produced.

**C.** **ROSS's Copying of Additional Westlaw Content Provided by Its Employees**

In addition to the foregoing, discovery has revealed that Charles Von Simson, Rohit Jayawardhan, and Ashley Stenning also copied Westlaw Content as ROSS employees.[7]

**1.    Charles Von Simson**

As discussed above, there are a number of documents showing that, at ROSS's direction and for ROSS's benefit, Mr. von Simson surreptitiously accessed Westlaw and interacted with West on ROSS's behalf, all while both parties were fully aware that doing so violated Westlaw's terms of service.  *See* ROSS-010373855-ROSS-010373856 (sending Westlaw Agreement to another ROSS employee saying "[h]ere's a quote I got from [West] under the false representation that I was a solo practitioner in Buffalo.  Another issue is that our use of WL for competitive purposes is a violation of their T&C.").  It also appears that ROSS and Mr. von Simson were actively discussing purchasing a subscription for Westlaw Edge in addition to the subscription for Westlaw Classic that Mr. von Simson already surreptitiously used on ROSS's behalf.  *See* ROSS-010252343-ROSS-010252345 ("I'm told the WL / Lexis license issue will be presented to the board today.  Don't take no for an answer.").

In another instance, after lying to West about being a solo practitioner and requesting a demo of Westlaw Edge, Mr. von Simson made an unauthorized recording of said demo at ROSS's request and widely distributed it within ROSS for competitive purposes.  See ROSS-009727510-ROSS-009727512.  Rather than reprimanding Mr. von Simson for flagrantly

---

[7]    In addition to ROSS's direct infringement for the activities of its employees, it is contributorily and vicariously liable for their direct infringement.

committing copyright infringement by reproducing and distributing West's copyrighted materials without West's knowledge or permission, Mr. Arruda joined with others in applauding Mr. Von Simson for how thorough he was in his questioning and making the unknowing Westlaw representative fully explain Westlaw Edge's capabilities for ROSS's development team:

**Thomas Hamilton**

2018-09-19 14:09:54 -07:00

> <@charles> - can't stress enough how magnificent you were on that call with the Westlaw folks zeroing in on the specifics of filtering your search

---

**Andrew Arruda**

2018-09-19 14:44:15 -07:00

> Really great -- what is interesting is now AI really hasn't played a part of Westlaw Edge as much as analytics has, Lexis might be really reeling from this release from Westlaw.

---

*Id*.

In addition to Mr. von Simson's infringement as described above, and Plaintiffs will be producing his infringing Westlaw activity as requested by ROSS

### 2.    Ashley Stenning and Rohit Jayawardhan

Discovery has also revealed that ROSS induced Ashley Stenning and Rohit Jayawardhan to access Westlaw on ROSS's behalf as part of ROSS's development of its competing legal research platform, thereby violating the terms of their Westlaw licenses.  It is Plaintiffs understanding that Ashley Stenning and Rohit Jayawardhan were law students who were employed by ROSS and had access to Westlaw through their respective law schools.  Documents show that they used these credentials at ROSS's inducement and for ROSS's benefit.  For example, Mr. Jayawardhan sent Mr. van der Heijden a google spreadsheet titled "Legal Research Website Practice Are Organization."  *See* ROSS-009599271-ROSS-009599272.  Mr. van der Heijden asked if there was a reason "why the Westlaw list does not line up" with a list available

on Plaintiffs' website, to which Mr. Jayawardhan responded "I copied the list from my westlaw

account." *Id.* Similarly, with Ms. Stenning, Mr. van der Heijden sent her an email with the

subject line "WestLaw Coverage," saying her to do competitive research:

On Mon, Nov 20, 2017 at 4:07 PM, Tomas van der Heijden <tomas@rossintelligence.com> wrote:

> I'm trying to find something like this from them: https://www.fastcase.com/coverage/
> Specifically, I'm trying to find out how far back their Federal case law coverage goes (Supreme Court,
> Circuit Courts, District Courts, Bankruptcy courts) and how deep their State law coverage goes (e.g.
> you'll see that the Fastcase State coverage is 1950 - current for most States and includes the Supreme +
> Appellate Courts for each State but nothing lower down).
>
> I'm having difficulty finding anything granular for Westlaw online beyond what you found, e.g. "we are the
> most comprehensive."

On Mon, Nov 20, 2017 at 7:01 PM, Ashley Stenning <ashley@rossintelligence.com> wrote:

> I have access to Westlaw. I want to make sure I find what you're actually looking for since I can't find
> anything they specifically advertise for their scope of coverage for case law besides saying they are the
> most comprehensive. Do you want to know what databases they have for case law? or are you looking
> more for jurisdictions or numbers? I'm also happy to call them and discretely ask for information.

On Mon, Nov 20, 2017 at 3:35 PM, Tomas van der Heijden <tomas@rossintelligence.com> wrote:

> Ashley - you have access to WestLaw right? Would you be able to send me what they are currently
> advertising as the scope of coverage for Federal and State case law?
> Would you be able to send this to me by tomorrow?

*See* ROSS-009599477-ROSS-009599480.  Another email exchange shows that Ms. Stenning

accessed Westlaw on ROSS's behalf to prepare a market analysis, specifically looking into the

following topics:

On Thu, Feb 15, 2018 at 8:32 AM, Tomas van der Heijden <tomas@rossintelligence.com> wrote:

Hi Ashley,
We'd like to do some deeper analysis into the relative size of practice areas as we scope out our strategy of which practice areas we want to expand into next. Here is the doc that outlines all the practice areas: https://docs.google.com/document/d/15rd-heTpIF-hqBkkgYTJZPSoURj7tApSiamA2Ma7ICk/edit

Could you do a bit of research into this, specifically focusing on the following questions?

**1. Proportion of cases per practice area**

We know that there are between 12 and 14 million cases in the United States. We don't know though what the proportionate size of each practice area is. Would you be able to find rough estimates? One way this may be done is by looking at how many cases are included in each practice area bucket in WL/LN, but I'm not really sure.

**2. Number of lawyers**

How many lawyers practice in each practice area?

**3. Estimated revenue per practice area**

How much money do lawyers generate in each practice area? For example, I imagine that Securities Law generates much higher billables than Family Law. I don't need exact numbers, just relative estimates.

**4. Average size of law firm in practice area**
Again as an example, I imagine that Securities Law is primarily practiced by large firms while Family Law is primarily practice by small firms/solo-pracs.

*See* ROSS-009600614-ROSS-009600616.  Mr. van der Heijden forwarded Ms. Stenning's

market analysis along to Mr. Ovbiagele, noting that it "[w]ill help in our 20/80 analysis."  *Id.*

\* \* \*

As Charles von Simson, Ashley Stenning, and Rohit Jayawardhan took these actions as ROSS

employees, and at ROSS's direction, ROSS is liable for their activities.

## **ROSS'S CONTRIBUTORY AND VICARIOUS LIABILITY**

As discussed above and in Plaintiffs' First Supplemental Response, ROSS is

contributorily and vicariously liable for LegalEase's, and by extension Morae Global's, direct

infringement of Plaintiffs' Westlaw Content.  In addition to LegalEase's direct infringement,

however, discovery has revealed that ROSS is contributorily and vicariously liable for the direct

infringement of Charles Von Simson, Rohit Jayawardhan, and Ashley Stenning.  The documents

and the testimony of ROSS's 30(b)(6) witness show that ROSS directed these third parties to use

Westlaw, knew they were doing so, knew that they were doing so for purposes of developing

ROSS's competing platform, knew that they were violating Westlaw's terms of service, and had the right and ability to control their infringing use.  Accordingly, for the reasons discussed in Plaintiffs' First Supplemental Response, as well as above and below in this response, ROSS is contributorily and vicariously liable.

### A. **ROSS's Liability for LegalEase's Direct Infringement**

At least as early as October 15, 2015, and certainly no later than September 15, 2017, LegalEase materially breached its contract with West and lost its license to Westlaw and Westlaw Content.  The documents show that ROSS was well aware of LegalEase's use of Westlaw, and that using Westlaw for purposes of building a competing legal research platform violated Westlaw's terms of service.  Likewise, as Mr. van der Heijden acknowledged in another document, the act of accessing Westlaw and scraping the data contained therein is also a violation of Westlaw's terms of service.  *See* ROSS-009731365-ROSS-009731369 ("[I]t's not that simple. We don't receive the WL or LEXIS citations through the metadata we receive from our publisher. To get them, we'd have to gain direct access to those platforms and scrape the data, which I think would also run us afoul of the WL/LEXIS terms and conditions. This is not a unique problem to us - every other legal research provider other than WL and LEXIS face the same issue."); *see also* ROSS-010208998-ROSS-010209003 (concerns whether ROSS can legally scrape Westlaw content).  In other words, LegalEase accessed Westlaw having lost the benefit of its license.  When it did so, it displayed West's editorial enhancements, creating copies of them on its computers in the process.  As a result, every time that LegalEase viewed a judicial opinion, copied portions out of a judicial opinion, or used a judicial opinion to create a memo, it was creating an unauthorized copy of West's copyrighted content associated therewith in its browser and on its network.

As discussed below, LegalEase did so while acting as ROSS's agent, at ROSS's direction, for ROSS's benefit, and with ROSS's knowledge and control. As a result, each time LegalEase accessed Westlaw after losing the benefit of its license, LegalEase directly infringed Plaintiffs' copyrights in Westlaw, for which ROSS is contributorily and vicariously liable. Plaintiffs produced several documents showing LegalEase's unlicensed Westlaw activity, but specifically direct ROSS to TR-0038825, TR-0518367, TR-0038036, TR-0038826, TR-0494988, TR-0836004, and TR-0465998.

### 3.    ROSS's Knowledge of and Contribution to LegalEase's Direct Infringement

As stated in Plaintiffs' First Supplemental Response, it is clear that ROSS was aware of Westlaw's terms of service prior to entering into its first contract with LegalEase in October 2015, for which ROSS expressly requested that LegalEase use Westlaw. ROSS's desire to gain access to Westlaw for purposes of acquiring training data can be traced back as early as February 17, 2015, when Jimoh Ovbiagele, one of ROSS's founding members, suggested to Andrew Arruda "for legal memos…why don't we just get a westlaw subscription?" *See* ROSS-003391075. The next day, Mr. Ovbiagele shared a task[8] with Mr. Arruda to sign up for a Westlaw account by posing as a student. *See* ROSS-003391076.

Then, on July 21, 2015, ROSS received a copy of Westlaw's terms of service from Dentons, one of ROSS's investors and a Westlaw license, with "relevant points highlighted in the PDF." *See* ROSS-003390881-ROSS-003390884; *see also* March 17, 2022 30(b)(6) Deposition of Tomas van der Heijden ("van der Heijden Tr.") at 87:14-89:5 (admitting ROSS by July 21, 2015, ROSS had received a copy of Westlaw's terms of service). On August 4, 2015, ROSS asked

---

[8]    In this context, a task refers to an item on a digital "to-do" list that Mr. Ovbiagele created and shared with Mr. Arruda.

Dentons to provide ROSS with access to Westlaw for "product research purposes." *See* ROSS-003390773-ROSS-003390774. When Dentons declined and said that it can't give ROSS Westlaw credentials, ROSS assured Dentons that it "completely [understood] that [Dentons] [wasn't] comfortable providing login/password rights." ROSS-003390233. ROSS, however, still asked Dentons to provide it with a list of the secondary bankruptcy materials that Dentons has access to through Westlaw. *Id*. Additionally, it appears that ROSS nevertheless acquired access from Dentons only a few days later on August 22, 2015. *See* ROSS-003390772 (Andrew Arruda stating that "Westlaw and Lexis need not know anything :).").

A month later, in September 2015, ROSS attempted to get its own Westlaw license, but was explicitly denied and told that West "do[es] not sell [its] legal research products to direct competitors." *See* ROSS-003389728-ROSS-003389730. This email was forwarded to Mr. Arruda and Mr. Ovbiagele on September 25, 2015. *Id*. But even though ROSS knew that it could not have access to Westlaw, ROSS nevertheless continued to seek access to Westlaw through a variety of means. *See* van der Heijden Tr. at 142:4–13. ROSS also clearly understood and appreciated what West's denial meant for ROSS because on September 29, 2015, four days after West expressly denied ROSS access to Westlaw because it was competitor, ROSS reached out to Dentons once again saying that ROSS was ready "a paid account with Lexis, and have been sent the terms and conditions of their Subscription Agreement." *See* ROSS-010164415-ROSS-010164417. Tellingly, ROSS told Dentons that it reviewed Lexis's Subscription Agreement and came across two provisions that concerned it. *Id*. As shown below, ROSS explained that it was "especially curious about the potential implications of 1.3" and underlined a portion of provision.

The two provisions in question are 1.3 and 1.5 (posted below). I'm especially curious about the potential implications of 1.3.

*1.3 Except as specifically provided in Sections 1.1 and 1.2, you and your Authorized Users are prohibited from downloading, emailing, faxing, storing, reproducing, transmitting, displaying, copying, distributing, or using Materials retrieved from the Online Services. You may not exploit the goodwill of LN, including its trademarks, service marks, or logos without the express written consent of LN. Additionally, <u>offer any part of the Online Services or Materials for commercial resale or commercial redistribution in any medium or use the Online Services or the Materials to compete with the business of LN.</u>*

*1.5 Neither you nor your Authorized Users may use the Online Services or Materials in any fashion that infringes the intellectual property rights or proprietary interests of LN or any third party. Your use of the Online Services and Materials must comply with all applicable laws, rules or regulations.*

*Id*. Dentons responded to ROSS saying that it believed Section 1.3 was a concern because there was "a good argument that [ROSS's] proposed use [was] competitive." Mr. Arruda then instructed Mr. Hamilton, ROSS's then-Head of Legal Research, to "plan a quick call with [Dentons] here. something like, understood. can we jump on a quick call today at all? or something like that." *Id*.

Westlaw's terms of service includes similar language: specifically, Westlaw's terms of service state: "(d) You may not sell, sublicense, distribute, display, store or transfer [West's] products or any data in [its] products in bulk or in any way that could be used to replace or substitute for [its] products in whole or in part or as a component of any material offered for sale, license or distribution to third parties." *See, e.g.*, TR-0002842-TR-0002843. Moreover, ROSS incorporated similar language into its own terms of service as of April 28, 2020, just days before the filing of the Complaint in this litigation on May 6, 2020:

**6.9** Modify, adapt, translate or create derivative works based upon the Service;

**6.10** Reverse engineer, decompile, disassemble or otherwise attempt to discover the source code of the Service, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation;

**6.11** Rent, lease, loan, resell, sublicense, distribute or otherwise transfer the Service to any third party; provide time sharing or similar services for any third party; or use the Service for any purpose other than your own internal business use;

**6.12** Remove, circumvent, disable, damage or otherwise interfere with security-related features of the Service, features that prevent or restrict use or copying of any content accessible through the Service or Service, or features that enforce limitations on use of the Service or Service;

**6.13** Access the Service if you are a direct competitor of Company, except with Company's prior written consent, or for any other competitive purposes; or

**6.14** Collect or harvest any Personal Information or other type of personally identifiable information, including account names, from the Service.

**6.15** Misrepresent the source, identity, or content of Personal Information.

*See* TR-0001142-TR-0001153; van der Heijden Tr. at 80:19-81:12.  Shortly after this litigation commenced, however, ROSS updated its terms of service yet again, this time to remove Section 6.13, which restricted direct competitors from accessing the ROSS platform and using the ROSS platform for competitive purposes, was removed, as shown below:

**6.9** Modify, adapt, translate or create derivative works based upon the Service;

**6.10** Reverse engineer, decompile, disassemble or otherwise attempt to discover the source code of the Service, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation;

**6.11** Rent, lease, loan, resell, sublicense, distribute or otherwise transfer the Service to any third party; provide time sharing or similar services for any third party; or use the Service for any purpose other than your own internal business use;

**6.12** Remove, circumvent, disable, damage or otherwise interfere with security-related features of the Service, features that prevent or restrict use or copying of any content accessible through the Service or Service, or features that enforce limitations on use of the Service or Service;

**6.13** Collect or harvest any Personal Information or other type of personally identifiable information, including account names, from the Service; or

**6.14** Misrepresent the source, identity, or content of Personal Information.

TR-0001154-TR-0001165 (ROSS's Terms of Service as of June 15, 2020).  Whether ROSS claims this change was made for reasons entirely separate from this litigation is immaterial—the fact remains that even a cursory glance at ROSS's terms of service will reveal that it contains extremely similar language to Westlaw's and Lexis's terms of service.  This is not by coincidence, but rather by design.  On June 29, 2017, Mr. van der Heijden, ROSS's then-Head of Legal Research, sent another ROSS employee ROSS's latest Subscriber Agreement asking the employee to compare it to the latest versions of Westlaw's and Lexis's terms of service.  *See* ROSS-010361787-ROSS-010361789.  Mr. van der Heijden noted that the "[l]ast time [he] checked [ROSS's Subscriber Agreement against Westlaw's and Lexis's terms of service] was about a year ago, but could use a refresher."  *Id*.  In other words, ROSS's own Head of Legal Research, who was also the one at ROSS most involved with LegalEase on a daily basis, *personally* reviewed Westlaw's and Lexis's terms of service and modeled ROSS's own terms of service after them.  *See also* van der Heijden Tr. at 158:9–12 (Q. "So you had reviewed the Westlaw terms and conditions in approximately the middle of 2016?", A. "I must have, yeah").

Fittingly, the version of ROSS's Subscriber Agreement that Mr. van der Heijden sent along,

which based on the timing would have been in place for ROSS subscribers when LegalEase

began work on the "Bulk Memo" project for ROSS using Westlaw, includes the same provisions

that Plaintiffs allege ROSS induced LegalEase to violate, as shown below:

2.7.    **License Restrictions**. The Subscriber and its Authorized Users shall not, without the written permission of ROSS:

(a)    use all or any part of the Service and/or Materials in a Document Delivery Service, commercial time sharing, rental network, computer service, research service, service bureau business or interactive cable television arrangement;

(b)    publish, sell, resell, lease, rent, license, sub-license, transfer, market, distribute, redistribute or otherwise commercially make available all or part of the Service and/or Materials in any manner or in any form;

(c)    copy, modify, alter, disassemble, de-compile, translate or convert into human readable form, or reverse engineer, all or any part of the Service and/or Materials;

(d)    use all or part of the Service and/or Materials to develop (i) any derivative works other than court documents and other documents prepared on behalf of a specific represented party or in connection with Subscriber's preparation for presentations, memoranda, facta, client communications, and similar work product created by the Subscriber in the regular course of Subscriber's research and work, (ii) any functionally compatible or competitive software, or (iii) a directory or database prepared for commercial sale;

(e)    use the Service via mechanical, programmatic, robotic, scripted or any other automated means; or

(f)    remove or obscure the copyright notice or other notices contained in Materials; or

(g)    use the Service or Materials or make them available for the benefit of anyone other than you and your Authorized Users.

*See* ROSS-010361790-ROSS-010361804; van der Heijden Tr. at 76:24-80:17.  It is also worth

noting that ROSS's Subscriber Agreement defines "Materials" as "the content, data, and other

materials made available to subscribers through the [ROSS Platform]" and states that if someone

accesses and uses ROSS's "Materials without authorization," then "[their] access and use [of

said Materials] will be governed by [the] Agreement and [they] will be liable to ROSS for any

breach of [the] Agreement as well as for unauthorized access and payment for use at the then-

current rates." *Id*. (Section 3.3 - "Users other than Authorized Users").  In other words, if

LegalEase had used ROSS's platform to do the exact same work that ROSS purportedly asked it

to do, ROSS's Subscriber Agreement would give rise to the same kind of claims that Plaintiffs

are bringing against ROSS.

      It is also clear that ROSS fully understood and appreciated that it, as well as a third party

acting on its behalf, accessing Westlaw for purposes of acquiring training data to build a

competitive legal research platform violated Westlaw's terms of service.  For example,

documents produced from various ROSS employees discuss a project to creating training data

for the ROSS Platform.  *See, e.g.,* ROSS-003447138-ROSS-003447139 ("The purpose of this

exercise is to assist the machine intelligence engineers in developing the capability to allow

ROSS to identify and return relevant facts in response to a research query.").  The document

cautions ROSS's employees to do searches in ROSS because "it may be a violation of the

Westlaw and Lexis terms of service to use those platforms for this purposes." *Id*.  Thus, ROSS

clearly understood using Westlaw for competitive purposes violated Westlaw's terms of service.

      Other examples abound.  On May 24, 2018, Mr. van der Heijden asked Mr. von Simson

whether ROSS would be "running afoul of the WEXIS [Westlaw and Lexis] terms of service" by

having a librarian from the University of Toronto Law School "do a demonstration of Lexis and

Westlaw stats and regs."  *See* ROSS-010203134-ROSS-010203135; van der Heijden Tr. at

175:02-12.  Mr. von Simson replied that "[t]here may be issues with it[.]"  *Id*.  In another

document titled "Product Brief - Publicly Available Law in Headpin," ROSS employees are

discussing scraping websites hosted by Westlaw for statutes and regulations.  *See* ROSS-

010208998-ROSS-010209003.  The document reads, "Notes for legal: Are we confident that we

can legally scrape sources hosted by Westlaw? To inform discussion: the Westlaw sources do not

include annotations. But can a claim for copyright or other right subsist in how the material is presented?" *Id*.  In addition to showing ROSS's awareness of Westlaw's terms of service, this document also shows that ROSS fully understood that Plaintiffs claim copyright in the annotations they make to content on Westlaw.

Further, as shown in numerous documents, Mr. von Simson, ROSS's Lead Subject Matter Expert, provided ROSS with Westlaw's terms of service and expressed how ROSS's use of Westlaw violated them.  *See, e.g.,* ROSS-009547818-ROSS-009547823 (Mr. von Simson lying about being a solo practitioner and inquiring about subscriptions and payment plans for Westlaw Edge using his personal email, which he then passed along to Mr. Arruda and the rest of the ROSS team); ROSS-023018635 (same with respect to Lexis).  For example, as shown below, one ROSS employee, Julian D'Angelo, and Mr. Ovbiagele are discussing an upcoming Above The Law article that was intended to function as a puff piece showcasing ROSS's search capabilities:

**Julian D'Angelo**

2019-05-17 11:34:44 -07:00

Also, we should definitely confirm that this question doesn't get us relevant cases on Westlaw

---

**Julian D'Angelo**

2019-05-17 11:35:06 -07:00

if it does, we'd be leaving ourselves open

---

**Jimoh Ovbiagele**

2019-05-17 11:35:22 -07:00

yup - we should definitely do that

---

**Jimoh Ovbiagele**

2019-05-17 11:35:36 -07:00

we should confirm a uniquely relevant case that West or Lex don't find

---

**Julian D'Angelo**

2019-05-17 11:36:06 -07:00

ok - this was helpful. I will make some additions to call this out + confirm WL can't do this question

*See* ROSS-003718400-ROSS-003718406.  Minutes after Mr. D'Angelo states he will confirm Westlaw "can't do this question," he sends a search query to Mr. von Simson to search on Westlaw, which Mr. von Simson does immediately, as shown below.  *See* ROSS-010373855-ROSS-010373856.  After Mr. von Simson states he doesn't know what the search results would be like on Westlaw Edge because he doesn't have access to that platform (only Westlaw Classic), Mr. D'Angelo says he is asking whether ROSS can buy Westlaw Edge to compare search results.  Mr. von Simson then shares the abovementioned Westlaw Edge Subscriber

61

Agreement with Mr. D'Angelo stating, "Here's a quote I got from [West] under the false

representation that I was a solo practitioner in Buffalo.  Another issue is that our use of WL for

competitive purposes is a violation of their T&C.":

**Julian D'Angelo**

2019-05-17 11:41:30 -07:00

What is the distinction between independent contractors and employees under
the New York "economic reality test since" 2016? motion for summary
judgment and motion to dismiss; facts: car drivers and exclusion: delivery
services. FSL from the Saleem case: "courts have endeavored to distinguish
between employees and independent contractors based on factors crafted to
shed light on the underlying economic reality of the relationship."

**Charles von Simson**

2019-05-17 11:43:38 -07:00

The results aren't very good on regular WL but I don't know what would
happen on WL Edge

**Julian D'Angelo**

2019-05-17 11:50:35 -07:00

ok. Asking if we can buy WL edge

**charles**

2019-05-17 11:53:11 -07:00

Here's a quote I got from them under the false representation that I was a solo
practitioner in Buffalo. Another issue is that our use of WL for competitive
purposes is a violation of their T&C.

⬚ Westlaw Edge Agreement.pdf | PDF

*Id*.  Ultimately, ROSS used the search that Mr. von Simson cleared on Westlaw for ROSS's

advertisement with Above The Law later that month:

**What Sets ROSS Apart? Relevant And Comprehensive Results**

We tested ROSS's ability to identify cases that distinguish contractors from employees in New York.

We entered the following question: *What is the distinction between independent contractors and employees under the New York "economic reality test" since 2016?* Then, we made our question even more focused by specifying the motions we were thinking of filing and some terms related to the particular facts of our case.



In a few seconds, ROSS's AI found leading and relevant cases and presented them in an accurately ranked list.

*See* https://abovethelaw.com/2019/05/ross-intelligence-offers-a-new-take-on-legal-research/.

ROSS also clearly knew that LegalEase was using Westlaw, or at least was willfully blind to the fact. First, ROSS expressly asked LegalEase to use Westlaw. *See* ROSS-010164290-ROSS-010164291. LegalEase also expressly *told* ROSS that it was using Westlaw to create the memos. *See, e.g.,* ROSS-000204366-ROSS-000204367 (asking ROSS how it should handle "lengthy paragraphs" in Westlaw). Further, ROSS received countless memos from LegalEase containing cases cited by their respective citation on Westlaw and/or passages of cases linking to other cases and materials by Westlaw citation. *See, e.g.*, ROSS-003297293-ROSS-003297295 (cases 2 through 5 cited using Westlaw citation ("WL") and case 1 containing a Westlaw citation in the cited passage); *see also* ROSS-000136374-ROSS-000136379 (earlier

memo including Westlaw citation).  Moreover, in addition to all of the earlier instances in which LegalEase made it abundantly clear to ROSS that LegalEase was using Westlaw and how, when ROSS received the cases from LegalEase containing West Headnotes, Key Numbers, and Plaintiffs' other editorial enhancements, ROSS unquestionably knew that LegalEase was using Westlaw to assist ROSS build its competing legal research platform.

And contrary to what ROSS may claim publicly, it is well aware that it did not contract LegalEase to acquire "legal research" or judicial opinions.  Nor is that what LegalEase provided to ROSS.  ROSS contracted with LegalEase for training data to build the ROSS platform, specifically high-quality training data in the form of unique legal questions mapped to passages from cases that were labeled according to how responsive they were to the question.  In addition, ROSS needed LegalEase to provide training data that identify which portions of the passages were responsive to the question, as well as which area of the law each question and answers could be classified under.  That is why ROSS wanted access to Westlaw, and directed LegalEase to use Westlaw once it was denied.  ROSS didn't need judicial opinions—it had those already.  ROSS needed training data that would allow it to build an alternative to Westlaw, and by using training data that was created by using Westlaw and copying Plaintiffs' original selection and arrangement, ROSS would be able to do just that.

Thus, although the documents clearly show that ROSS did know of LegalEase's infringing use, to the extent ROSS claims otherwise is because ROSS was willfully blind to LegalEase's infringement and purposefully avoided inquiring further.  As discussed above, ROSS requested that LegalEase create unique legal questions for the memos and categorized all of the memos it provided ROSS by "practice area."  *See, e.g.,* ROSS-003419784-ROSS-003419786 (ROSS requested LegalEase to categorize memos by "practice area"); ROSS-

003658597-ROSS-003658604 (same); ROSS-009783300 (same); *see also* ROSS-000054844 (showing ROSS tracked the memos by practice area). By using Westlaw, specifically the West Headnotes, to create the questions, LegalEase and Morae Global were able to create unique legal questions for each memo, and because each West Headnote was the result of Plaintiffs numerous creative choices and reflected Plaintiffs' original selection and arrangement, LegalEase and Morae Global could be sure they always had a "great" quote and "practice area" for the memo. Given that LegalEase was producing memos at a rate they had never done before—*i.e.*, thousands a week up from approximately 75 a week—and were being tasked with creating questions and unique practice areas for the memos, it was highly likely that it was using Westlaw and copying Westlaw Content. Indeed, the fact that ROSS received 25,000 memos across more than 100 practice areas should have tipped ROSS off that something was amiss. Additionally, given how much of ROSS's capital was being paid to LegalEase for these memos, and because these memos would significantly impact the functionality of ROSS's platform, it is unlikely that ROSS never asked LegalEase at least *once* how it was creating the questions, or identifying the passages, or determining the practice areas, or even where it came up with such oddly specific practice area names like "Aliens, Immigration, and Citizenship" (*see, e.g.,* ROSS-003296151-ROSS-003296152), "Ambassadors and Consuls" (*see, e.g.,* ROSS-003284907-ROSS-003284908), or "Threats, Stalking, and Harassment" (*see, e.g.*, ROSS-003295356-ROSS-003295357). Even if one was to believe that LegalEase did everything on its own without ROSS's knowledge, which is clearly not the case, LegalEase only did so because ROSS wanted them to do and ROSS purposefully avoided asking.

### 4. ROSS's Right and Ability to Control LegalEase's Direct Infringement

As discussed above and in Plaintiffs' First Supplemental Response, ROSS clearly had the right and ability to control LegalEase's infringement. LegalEase readily admits that "[it] was

hired by Ross to create legal research memos in a very specific format and template – *as meticulously directed by Ross*." *See* LEGALEASE-00171828-LEGALEASE-00171831 (emphasis added); *see also* van der Heijden Tr. at 291:03-15 (Q.   "And ROSS dictated how the answers to be submitted, isn't that right?" A. "Correct." Q. "And it actually provided an answer file format that had to be used, correct?" A. "Correct." Q. "Why did ROSS insist on specific file format?" A.   "Because I -- not a hundred percent sure on the full scope of the reason, but I believe that it was easier for the engineers to process the data if it was in a consistent format."); 301:10-17 (Q. "Why did ROSS want to dictate how the memos were created?" A."Because we needed the memos to be of a certain structure and certain quality in order for them to be effective for the training of our algorithms.").  LegalEase also asserts that it "followed [ROSS's] instructions to a tee on how the research memos are to be constructed, what content is required to be in the memos (case law consisting of 'good quotes', 'great quotes', 'irrelevant quotes,' 'topical quotes') how the memos are to be formatted precisely, what topics the memos should cover and more." *Id.*  Finally, LegalEase acknowledges that, "[p]er [ROSS and LegalEase's] agreements, while LegalEase was to research and draft memos, [ROSS] reserved the right to make changes, deletions, or additions to the memos as deemed necessary." *Id.*

It is also clear that ROSS did in fact exercise its rights to control how LegalEase created the memos.  *See, e.g.,* ROSS-000204366-ROSS-000204367 (instructing LegalEase how to handle "lengthy paragraphs" in Westlaw when creating memos).  Indeed, although ROSS champions the fact that it instructed LegalEase to stop sending it cases with Westlaw Content for the discrete case classifier project, this only shows ROSS's right and ability to control LegalEase's conduct.  ROSS never instructed LegalEase to stop using Westlaw—for this project or any other projects it was working on for ROSS at the same time (*i.e.*, the bulk memo

project)—once it learned LegalEase was doing so, but if it *had*, LegalEase clearly would have stopped. In reality, all ROSS's instruction to LegalEase shows is that ROSS had an opportunity to put an end to LegalEase's infringing activity, but ultimately did not care if LegalEase was using Westlaw in violation of the terms of its license so long as ROSS received the materials it needed. Put another way, all ROSS's instruction amounted to was an instruction for LegalEase to stop *distributing* copyrighted content for this single project. ROSS did not tell LegalEase to stop using Westlaw, meaning LegalEase continued to use Westlaw after losing the benefit of its license and reproduced Plaintiffs' copyrighted content every time it accessed Westlaw to download a case for ROSS without West Headnotes and Key Numbers, or create a memo for the bulk memo project. All while ROSS was fully aware and had full control over LegalEase.

### 5. ROSS's Financial Benefit from LegalEase's Direct Infringement

Finally, as discuss above, ROSS clearly benefitted from LegalEase's and Morae Global's copying when it used the memos as training data to build its competing legal research platform. Although the details of how ROSS benefitted will be covered by Plaintiffs' experts, one does not need to be an expert in machine learning to understand why it would benefit ROSS if its algorithm and Westlaw thought the same cases and passages were relevant, particularly if ROSS marketed itself as an alternative, or replacement, for Westlaw—which it did. *See, e.g.,* ROSS-009779537-ROSS-009779540. ROSS used memos that reflected Plaintiffs' original selection and arrangement to develop a competing legal research platform, and it is precisely that original selection and arrangement that made the memos valuable to ROSS. *See* van der Heijden Tr. at 265:10-267:22 (Q. "Is there value to having just the judicial text without knowing what questions it answers?" A. "Is there a value to the machine-learning training data set?" Q. "With the questions, yes." A. "No."); *see also* ROSS-00960334 (stating to one of ROSS's investors that the training data provided by LegalEase cost $1,190,797); ROSS-003658597–ROSS-003658604

(ROSS determined that the training data it had been using at the time to construct its case classifier rendered the classifier "unuseable - or at the very least critically flawed" and that one solution was to "collect new data even though it's very expensive[.]")

Plaintiffs' discovery efforts in this case are ongoing, and they reserve the right to further supplement this response in light of facts learned during discovery.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 (AUGUST 22, 2022):

Plaintiffs incorporate by reference the above-stated General and Specific Objections, July 12, 2021 response, November 19, 2021 supplemental response (the "First Supplemental Response"), and March 23, 2022 supplemental response (the "Second Supplemental Response"), as if fully set forth herein.  Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:

As explained in Plaintiffs' First and Second Supplemental Responses, ROSS is contributorily and vicariously liable for LegalEase's direct infringement of Plaintiffs' Westlaw Content, as well as directly liable for copying (1) the selection and arrangement of Plaintiffs' Westlaw Content contained within the memos LegalEase provided it, which ROSS used as training data to build its competing legal research platform, (2) certain West Headnotes that LegalEase copied to create the memos, and (3) Plaintiffs' copyrighted content contained within the cases reproduced and distributed to ROSS by LegalEase as part of the "classifier project."

Plaintiffs' First and Second Supplemental Responses identified LegalEase's direct infringement to be its Westlaw activity after losing the benefit of its license, which included using Westlaw to (1) create the bulk memos for ROSS, and (2) to assist ROSS with its "classifier" project.  With respect to the latter, Plaintiffs explained that LegalEase downloaded and distributed a number of cases to ROSS that contained Plaintiffs' copyrighted content, such as West Headnotes,

Key Numbers, original case synopses, and other editorial enhancements. With respect to ROSS's direct liability, Plaintiffs explained and cited to numerous documents showing (1) ROSS's knowledge of Westlaw's terms of service, (2) ROSS's inducement of LegalEase's breach of Westlaw's terms of service, (3) ROSS's direction, control, and knowledge of LegalEase's use of Westlaw and copying of Plaintiffs' copyrighted content, (4) the benefits ROSS derived from LegalEase's infringing use of Westlaw and copying of Plaintiffs' copyrighted content, and (5) ROSS's copying of that same content in developing its legal research product.

Pursuant to the Court's July 25, 2022 Order (D.I. 201), Plaintiffs provide the following additional explanation of the foregoing bases for ROSS's liability:

As detailed above in Plaintiffs' Second Supplemental Response and the expert report of Dr. Jonathan Krein, as well as in the documents and testimony produced by LegalEase and Morae Global in this litigation, to create each Bulk Memo, the following steps were taken: (1) To begin, LegalEase and Morae Global copied portions of the WKNS to assign topics (*i.e.* topics and Key Numbers) to be covered in each memo, (2) LegalEase and Morae Global then navigated to the assigned Key Number on Westlaw, (3) once at the assigned Key Number, LegalEase and Morae Global reproduced the West Headnotes listed therein and paraphrased them to be used as questions for the Bulk Memos, (5) once the memo question was created, LegalEase and Morae Global followed the hyperlink associated with the copied West Headnote—both of which were created by West's attorney-editors—and used the case and hyperlinked case passage associated with the copied West Headnote as a "great" quote in the Bulk Memo, (6) LegalEase and Morae Global then used Westlaw, the WKNS, and the copied West Headnote in order to find the rest of the quotes needed for the Bulk Memo, and (7) once the Bulk Memo was drafted, LegalEase and Morae Global

would name the file according to the Digest Topic (*i.e.*, the highest level portion of the WKNS) the assigned Key Number and copied West Headnote were organized under.

In creating the Bulk Memos using this process, ROSS is liable for copying the following Westlaw Content.  **First**, ROSS is liable for the copied West Headnotes that were used to create the questions for the Bulk Memos.  Attached hereto as **Exhibit A** is a document that identifies the West Headnotes that Plaintiffs allege were copied to create questions for the Bulk Memos.[9]  *See also*  MORAE_00024103,  MORAE_00002386,  MORAE_00003801,  MORAE_00013863, MORAE_00029239,     MORAE_00045427,     MORAE_00092628,     MORAE_00092629, MORAE_00005079,     MORAE_00043660,     MORAE_00015344,     MORAE_00014068, MORAE_00030512; LEGALEASE-00115007.  **Second**, ROSS is liable for the copied selection and arrangement of the copied West Headnotes and corresponding case passages, which are hyperlinked together on Westlaw by West's attorney-editors, which LegalEase and Morae Global identified in the Bulk Memos as "great quotes."  **Third**, ROSS copied the selection and arrangement of the copied West Headnote, case, and case passage under the WKNS, including the WKNS Digest Topic provided to ROSS in the file name of each Bulk Memo.  Exhibit A contains the portions of the WKNS under which the copied West Headnotes, cases, and case passages were organized.[10]

ROSS is also liable for copying Plaintiffs' copyrighted content contained within the cases that LegalEase and Morae Global reproduced during the Bulk Memo Project.  Specifically, for each case that LegalEase and Morae Global reproduced while using Westlaw without the benefit

---

[9]   These West Headnotes also were identified in Appendix C to Dr. Krein's August 1, 2022 opening report.

[10]   These portions of the WKNS are also identified in the table on pages 41-43 in Plaintiffs' Second Supplemental Response.

of a license from Plaintiffs, ROSS is liable for copying the West Headnotes, Key Numbers, original case synopses, and selection and arrangement of West Headnotes, Key Numbers, and case passages under the portions of the WKNS contained therein.  Attached hereto as **Exhibit B** is a chart identifying these cases.  *See also* TR-0465998 (usage log showing LegalEase's and Morae Global's unlicensed Westlaw activity); TR-0464988 (same); TR-0396715 (same); TR-0038826 (same); Exhibit A (identifying relevant bulk memos by Bates number); Krein Report at Appendix C (same). [11]

Finally, ROSS is liable for copying Plaintiffs' copyrighted content contained within the cases reproduced and distributed to ROSS by LegalEase as part of the "classifier project," which are identified above in Plaintiffs' Second Supplemental Response in footnote 6.  *See also* ROSS-000177723; ROSS-009691365-ROSS-009691366.

**<u>*END OF HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY DESIGNATION*</u>**

**<u>INTERROGATORY NO. 2</u>:**

IDENTIFY the specific HEADNOTES that you claim is subject to copyright that ROSS INFRINGES.

**<u>RESPONSE TO INTERROGATORY NO. 2</u>:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrase "you claim is subject to copyright" is unclear and undefined.  Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and premature to the extent that it asks Plaintiffs to identify "specific HEADNOTES" owned by Plaintiffs that ROSS has infringed and

---

[11]   In addition to this list, additional content accessed by LegalEase on Westlaw during the course of the Bulk Memos Project was identified in the LegalEase usage spreadsheet and described in the expert report of James Malackowski.

continues to infringe, without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case. Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15. Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome. Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information. Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case. D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 3:**

IDENTIFY the specific portions of the KEY NUMBER SYSTEM that you claim is subject to copyright that ROSS INFRINGES.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrases "specific portions" and "you claim is subject to copyright" are unclear and undefined. Plaintiffs further object to this Interrogatory as overly broad, unduly burdensome, and premature to the extent that it asks Plaintiffs to identify "specific portions of the KEY NUMBER SYSTEM" owned by Plaintiffs that ROSS has infringed and continues to infringe, without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case. Plaintiffs object to this Interrogatory

as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:  Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 4:**

State all facts describing how ROSS infringes Plaintiffs' asserted copyrights in WESTLAW CONTENT.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as vague and ambiguous to the extent that the phrase "Plaintiffs' asserted copyrights" is unclear and undefined.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that it asks Plaintiffs to state "all facts" regarding how ROSS infringes Plaintiffs' copyrights in WESTLAW CONTENT without limitation.  Plaintiffs further object to this Interrogatory as premature to the extent that it asks Plaintiffs to state "all facts" regarding how ROSS infringes Plaintiffs' copyrights in WESTLAW CONTENT without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case. Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the

First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

## INTERROGATORY NO. 5:

State all facts describing how ROSS infringes Plaintiffs' asserted copyrights in the specific structure, sequence and organization of specific elements of the KEY NUMBER SYSTEM.

## RESPONSE TO INTERROGATORY NO. 5:

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome to the extent that it asks Plaintiffs to state "all facts" regarding how ROSS infringes Plaintiffs' copyrights in the "specific structure, sequence and organization of specific elements of the KEY NUMBER SYSTEM" without limitation.  Plaintiffs object to this Interrogatory as vague and ambiguous to the extent the phrases "Plaintiffs' asserted copyrights," "specific structure, sequence and organization" and "specific elements" are unclear and undefined.  Plaintiffs further object to this Interrogatory as premature to the extent that it asks Plaintiffs to state "all facts" regarding how ROSS infringes Plaintiffs' copyrights in the "specific structure, sequence and organization of specific elements of the KEY NUMBER SYSTEM" without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content

actually at issue in this case.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 6:**

DESCRIBE how the ROSS product allegedly infringes the WESTLAW CONTENT that you claim is subject to copyright.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome to the extent that it asks Plaintiffs to describe how the ROSS product infringes Plaintiffs' copyrights in WESTLAW CONTENT without limitation.  Plaintiffs object to this Interrogatory as vague and ambiguous to the extent the phrases "ROSS product" and "you claim is subject to copyright" are unclear and undefined.  Plaintiffs further object to this Interrogatory as premature to the extent that it asks Plaintiffs to describe how the ROSS product infringes Plaintiffs' copyrights in WESTLAW CONTENT without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at

issue in this case.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 7:**

For each WESTLAW CONTENT identified in Interrogatory No. 1, STATE ALL FACTS describing how ROSS allegedly infringes the WESTLAW CONTENT that you claim is subject to copyright.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome to the extent that it asks Plaintiffs to state "all facts" regarding how ROSS infringes Plaintiffs' copyrights in WESTLAW CONTENT without limitation.  Plaintiffs object to this Interrogatory as vague and ambiguous to the extent the phrase "you claim is subject to copyright" is unclear and undefined. Plaintiffs further object to this Interrogatory as premature to the extent that it asks Plaintiffs to state "all facts" regarding how ROSS infringes Plaintiffs' copyrights in WESTLAW CONTENT without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case.  Plaintiffs

object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set

of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No.

15.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in

the possession of ROSS by referring to documents, taking depositions, or any other means of

obtaining discovery in this Litigation that is more convenient, efficient, practical, and less

burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential

information, trade secrets, or proprietary business information.  Plaintiffs will provide such

information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.  Plaintiffs

object to this Interrogatory to the extent that it is duplicative of other Interrogatories, including

Interrogatory No. 1.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond

as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 8:**

For each WESTLAW CONTENT identified in Interrogatory No. 1, STATE ALL FACTS
that support YOUR contention that the WESTLAW CONTENT that you claim is subject to
copyright is original and creative.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth

herein.  Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome

to the extent that it asks Plaintiffs to state "all facts" regarding how each WESTLAW CONTENT

identified in Interrogatory No. 1 is original and creative without limitation.  Plaintiffs object to this

Interrogatory as vague and ambiguous to the extent that the phrases "you claim is subject to

copyright," "original," and "creative," are unclear and undefined.  Plaintiffs further object to this

Interrogatory as premature to the extent that it asks Plaintiffs to state "all facts" regarding how

each WESTLAW CONTENT identified in Interrogatory No. 1 is original and creative without

ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "YOUR" overly broadly as indicated in General Objection No. 14.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 9:**

For each HEADNOTE identified in Interrogatory No. 2, STATE ALL FACTS that support YOUR contention that the HEADNOTE that you claim is subject to copyright is original and creative.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome to the extent that it asks Plaintiffs to state "all facts" regarding how each HEADNOTE identified in Interrogatory No. 2 is original and creative without limitation.  Plaintiffs object to this Interrogatory as vague and ambiguous to the extent that the phrases "you claim is subject to copyright," "original," and "creative" are unclear and undefined.  Plaintiffs further object to this

78

Interrogatory as premature to the extent that it asks Plaintiffs to state "all facts" regarding how each HEADNOTE identified in Interrogatory No. 2 is original and creative without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case. Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "YOUR" overly broadly as indicated in General Objection No. 14. Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15. Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome. Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information. Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case. D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 10:**

For each specific element of the KEY NUMBER SYSTEM identified in Interrogatory No. 3, STATE ALL FACTS that support YOUR contention that the specific element of the KEY NUMBER SYSTEM that you claim is subject to copyright is original and creative.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein. Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome to the extent that it asks Plaintiffs to state "all facts" regarding how each specific element of the KEY NUMBER SYSTEM identified in Interrogatory No. 3 is original and creative without

limitation.  Plaintiffs further object to this Interrogatory as premature to the extent that it asks Plaintiffs to state "all facts" regarding how each specific element of the KEY NUMBER SYSTEM identified in Interrogatory No. 3 is original and creative without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "YOUR" overly broadly as indicated in General Objection No. 14.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory as vague and ambiguous to the extent that the phrases "specific element," "you claim is subject to copyright," "original," and "creative" are unclear and undefined.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows:  Plaintiffs incorporate by reference their response to Interrogatory No. 1.

**INTERROGATORY NO. 11:**

For the specific structure, sequence and organization of the specific elements of the KEY NUMBER SYSTEM identified in Interrogatory No. 3, STATE ALL FACTS that support YOUR contention that such structure, sequence and organization of the KEY NUMBER SYSTEM that you claim is subject to copyright is original and creative.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth herein.  Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome to the extent that it asks Plaintiffs to state "all facts" regarding how the specific structure, sequence and organization of the specific elements of the KEY NUMBER SYSTEM identified in Interrogatory No. 3 is original and creative without limitation.  Plaintiffs further object to this Interrogatory as premature to the extent that it asks Plaintiffs to state "all facts" regarding how the specific structure, sequence and organization of the specific elements of the KEY NUMBER SYSTEM identified in Interrogatory No. 3 is original and creative without ROSS first responding to Plaintiffs' discovery requests, which will narrow the focus of the parties' discovery efforts to the content actually at issue in this case.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "YOUR" overly broadly as indicated in General Objection No. 14.  Plaintiffs object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set of Interrogatories define the term "ROSS" overly broadly as indicated in General Objection No. 15.  Plaintiffs object to this Interrogatory as vague and ambiguous to the extent that the phrases "specific structure, sequence and organization," "specific elements," "you claim is subject to copyright," "original," and "creative" are unclear and undefined.  Plaintiffs object to this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS by referring to documents, taking depositions, or any other means of obtaining discovery in this Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to this Interrogatory to the extent that it calls for confidential information, trade secrets, or proprietary business information.  Plaintiffs will

provide such information subject to the Protective Order so ordered by the Court in this case.  D.I.

48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond

as follows: Plaintiffs incorporate by reference their response to Interrogatory No. 1.

## INTERROGATORY NO. 12:

DESCRIBE how YOUR algorithmically generated key number categorization system, known as the Classification and Recommendation Engine (CaRE) system, classifies "millions of headnotes to a Key Number taxonomy with more than 90,000 categories," stated on the website https://web.archive.org/web/20210507051753/https://www.thomsonreuters.com/en/artificialintelligence/ai-timeline.html, attached hereto as Exhibit A.

## RESPONSE TO INTERROGATORY NO. 12:

Plaintiffs incorporate by reference the above-stated General Objections as if fully set forth

herein.  Plaintiffs specifically object to this Interrogatory as overly broad and unduly burdensome

to the extent that it asks Plaintiffs to describe how the Classification and Recommendation Engine

(CaRE) system classifies HEADNOTES to a Key Number taxonomy without limitation.  Plaintiffs

object to this Interrogatory as overly broad and unduly burdensome to the extent that the First Set

of Interrogatories define the term "YOUR" overly broadly as indicated in General Objection No.

14.  Plaintiffs object to this Interrogatory to the extent that it is neither relevant to any claim or

defense of any party in this Litigation nor proportional to the needs of the case. Plaintiffs object to

this Interrogatory to the extent that it seeks information that is or will be in the possession of ROSS

by referring to documents, taking depositions, or any other means of obtaining discovery in this

Litigation that is more convenient, efficient, practical, and less burdensome.  Plaintiffs object to

this Interrogatory to the extent that it seeks information that is publicly available and therefore is

equally or less burdensome for ROSS to procure itself.  Plaintiffs object to this Interrogatory to

the extent that it calls for confidential information, trade secrets, or proprietary business

information.  Plaintiffs will provide such information subject to the Protective Order so ordered by the Court in this case.  D.I. 48.

Subject to, as limited by, and without waiver of the foregoing objections, Plaintiffs respond as follows: The Classification and Recommendation Engine (CaRE) is a tool used by West's attorney-editors during the editorial process to assist "classifiers"—attorney-editors who are responsible for classifying headnotes in the West Key Number System ("WKNS").  Once a headnote is written by an attorney-editor, it is submitted to one or more classifiers along with the highest-level topic to which the attorney-editor believes the headnote belongs.  Then, one or more classifiers assign more granular Key Numbers to the headnote and/or reassigned the headnote to a new highest-level topic.  To assist the classifier in doing so, the CaRE tool identifies five or more possible Key Numbers to which the headnote could be classified.  The tool does not select which Key Number(s) are assigned to the headnote.  Instead, Plaintiffs' attorney-editors review the options and decide whether to classify the headnote under any of the suggested Key Numbers.  Thus, the CaRE tool is not an automated tool for the finalized classification of headnotes in the WKNS, but rather a tool used to assist Plaintiffs' attorney-editors in making their own editorial decision as to which of the numerous options will be selected for each headnote.

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Daniel E. Laytin
Christa C. Cottrell
Cameron Ginder
Alyssa C. Kalisky
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

Miranda Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7419

August 22, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and*
*Counterdefendants Thomson Reuters*
*Enterprise Center GmbH and West Publishing*
*Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2022, copies of the foregoing were caused to be served upon the following in the manner indicated:

David E. Moore, Esquire                                          *VIA ELECTRONIC MAIL*
Stephanie E. O'Byrne, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Defendant and Counterclaimant*

Joshua M. Rychlinski, Esquire                             *VIA ELECTRONIC MAIL*
Mark A. Klapow, Esquire
Lisa Kimmel, Esquire
Crinesha B. Berry, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC  20004
*Attorneys for Defendant and Counterclaimant*

Gabriel M. Ramsey, Esquire                                 *VIA ELECTRONIC MAIL*
Kayvan M. Ghaffari, Esquire
Jacob Canter, Esquire
Warrington Parker, Esquire
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
*Attorneys for Defendant and Counterclaimant*


*/s/ Michael J. Flynn*
_____
Michael J. Flynn (#5333)

EXHIBIT 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE )
CENTRE GMBH and WEST PUBLISHING )
CORPORATION, )
                         )
            Plaintiffs and )    C.A. No. 20-613-SB
            Counterdefendants, )
                         )
    v. )
                         )
ROSS INTELLIGENCE INC., )
                         )
           Defendant and )
            Counterclaimant. )

## SUPPLEMENTAL EXPERT REPORT OF DR. JONATHAN L. KREIN
## HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

## **TABLE OF CONTENTS**

I.  Introduction ........................................................................................................ 3

II.  Summary of Opinions ........................................................................................ 4

III.  Ms. Frederiksen-Cross's Surrebuttal Ignores the Facts of this Case ................................ 6

IV.  Ms. Frederiksen-Cross's Surrebuttal Analysis is Flawed ................................................. 10

V.  Conclusion ........................................................................................................ 21

VI.  Appendix A: Materials Considered ................................................................. 23

VII.  Appendix B: Categorized Chart of Copied West Headnotes ........................................... 24

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

## I.   <u>INTRODUCTION</u>

1.      My name is Dr. Jonathan L. Krein. I have been retained as an expert in connection with the matter of *Thomson Reuters Enterprise Centre GmbH & West Publishing Corp. v. ROSS Intelligence Inc.* (United States District Court, District of Delaware, C.A. No. 20-613-SB). In this report, I refer to Plaintiffs/Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation as "TREC" and "West," respectively, and collectively as "Thomson Reuters"; I refer to Defendant/Counterclaimant ROSS Intelligence Inc. as "ROSS Intelligence" or "ROSS."

2.      I have been retained by Thomson Reuters to provide opinions concerning ROSS's development of its legal research platform and Thomson Reuters' allegations of copyright infringement and tortious interference. I previously submitted three expert reports—my opening report,[1] my rebuttal report,[2] and my reply report,[3] which I incorporate here by reference—summarizing my findings regarding these topics and the bases and reasons for those findings, as well as my analysis and rebuttal to the opening expert reports of Dr. L. Karl Branting and Ms. Barbara Frederiksen-Cross (the "Branting Opening Report"[4] and the "Frederiksen-Cross Opening Report,"[5] respectively), and the rebuttal expert reports of Dr. Branting, Ms. Frederiksen-Cross, Dr. Alan Cox, and Mr. Richard Leiter (the "Branting Rebuttal Report,"[6] the

---

[1]    Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022.

[2]    Rebuttal Expert Report of Dr. Jonathan L. Krein, September 6, 2022.

[3]    Reply Expert Report of Dr. Jonathan L. Krein, October 10, 2022.

[4]    Report of Defendants' Expert L. Karl Branting, J.D., Ph.D., July 28, 2022.

[5]    Expert Report of Barbara Frederiksen-Cross, August 1, 2022.

[6]    Rebuttal of Krein Expert Witness Report L. Karl Branting, J.D., Ph.D., September 1, 2022.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

"Frederiksen-Cross Rebuttal Report,"[7] the "Cox Rebuttal Report,"[8] and the "Leiter Rebuttal Report,"[9] respectively).

3. Since submitting my reply report, I have been asked by counsel for Thomson Reuters to review and respond to the surrebuttal report of Ms. Frederiksen-Cross (the "Frederiksen-Cross Surrebuttal Report"[10]).

4. A detailed description of my background, qualifications, and compensation is provided in my opening report. I have no financial interest that is contingent or dependent on my testimony, on the content of this report, or on the outcome of this case in any way. The opinions set forth in this report are my own and are based upon my education and professional experience in computer science, systems engineering, software engineering, software development, statistics, and other relevant areas of knowledge and professional experience, as well as on my review of the materials cited in this report. A list of the materials I have considered in the course of preparing this report is attached as **Appendix A**.

## II.   <u>SUMMARY OF OPINIONS</u>

5. Based on my review of the Frederiksen-Cross Surrebuttal report, among other things, I have formed the following opinions, which I discuss in detail throughout this supplemental report:

6. *First*, my prior opinions, which are summarized in my opening, rebuttal, and reply reports, remain supported by the data and testimony of record—and are not altered in response to

---

[7]   Rebuttal Report of Barbara Frederiksen-Cross, September 6, 2022.

[8]   Expert Rebuttal Report of Alan J. Cox, Ph.D., September 6, 2022.

[9]   Rebuttal Report to the Report of Plaintiffs' Expert Dr. Jonathan L. Krein by Defendant's Expert Professor Richard Leiter, J.D., September 6, 2022.

[10]   Surrebuttal Report of Barbara Frederiksen-Cross, October 10, 2022.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

anything put forward by ROSS's expert witnesses in their opening, rebuttal, and reply reports, as explained in my rebuttal and reply reports and in this report. I base my conclusions on sound, industry-standard methods, backed by careful theoretical consideration and internal validation. Conversely, as I explained in my rebuttal and reply reports, the opinions recited by ROSS's expert witnesses rest on false assumptions, inadequate consideration of the data, unsupported and mismatched methods, a lack of traceability and/or clear theoretical underpinnings, numerous errors and oversights, and false conclusions based on misleading summary statistics.

7.    **Second**, Ms. Frederiksen-Cross's opinions and analysis in her Surrebuttal Report are inaccurate, unreliable, and inconsistent with the record. As discussed below, the analysis that Ms. Frederiksen-Cross performs in her Surrebuttal Report suffers from the same flaws as her opening and rebuttal reports, namely that it is inconsistent with the factual record and unsound. The overwhelming evidence in the record shows that LegalEase and Morae Global systematically copied from Westlaw, copying its headnotes, West Key Numbers, the relationships between them, and other editorial contents from the judicial opinions that appear in the Westlaw database. Likewise, the evidence shows that ROSS needed high-quality training data in the form of legal questions mapped to relevant case passages across (and categorized by) a range of legal topics to train the artificial intelligence model that ran its platform, and it wanted (and used) the West Key Numbers and West Headnotes as that training data.

8.    **Third**, Ms. Frederiksen-Cross's analyses fail to account for the creative choices made by Thomson Reuters' attorney-editors in creating the West Headnotes, including the fact that they select which judicial opinions to annotate, which key concepts discussed therein to be made into West Headnotes, which portions of the judicial opinion should be linked to the West Headnotes, and what "classification" number or numbers should be assigned to each West

5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Headnote to link them to the West Key Number System, among other choices discussed further below. As detailed below, the analysis in Ms. Frederiksen-Cross's Surrebuttal Report overstates the similarity between the West Headnotes and the text of the judicial opinions, and there is no support for the methodology she used in performing her filtration analysis.

9.     **Fourth**, the analysis I performed comparing the West Headnotes and Judicial Opinion Text (*i.e.*, Great Quotes) shows that all of the West Headnotes that LegalEase and ROSS copied reflect original and creative choices of one form or another made by Thomson Reuters' attorney-editors.

### III.    MS. FREDERIKSEN-CROSS'S SURREBUTTAL IGNORES THE FACTS OF THIS CASE

10.    In her Surrebuttal Report, Ms. Frederiksen-Cross asserts that I "ignore[] relevant evidence that was necessary to adequately analyze whether there was copying."[11] That is not the case. Rather, it is Ms. Frederiksen-Cross that continues to ignore relevant evidence.

11.    For example, Ms. Frederiksen-Cross opines that "in the vast majority of cases, West Headnotes are created by taking the text of judicial opinions and only slightly adjusting the wording, if at all."[12] Yet, Ms. Frederiksen-Cross's analysis and conclusion fail to properly account for the overwhelming and clear evidence in the record that reflects the manner in which West Headnotes are created and the creative choices that are made by Thomson Reuters' attorney-editors.

12.    As I explained in my opening report, the record shows that Thomson Reuters' attorney-editors carefully select and review judicial opinions to identify what they believe to be

---

[11]    Frederiksen-Cross Surrebuttal Report at ¶ 20.

[12]    Frederiksen-Cross Surrebuttal Report at ¶ 15.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

the key concepts discussed therein, which they then select to call out as points of law.[13] For each

point of law selected, the attorney-editors create West Headnotes that summarize facts and/or

explain in clear language key concepts of law, the holding of the court, or contentions of the

parties.[14] These West Headnotes are then included at the top of the Westlaw opinion along with

hyperlinks, created by the attorney-editors, to the passages of the case that the attorney-editors

believe are most relevant to the point of law reflected in each of the headnotes.[15] Attorney-

editors then decide what "classification" number or numbers should be assigned to each West

Headnote to link them to the West Key Number System.[16]

13.    Contrary to Ms. Frederiksen-Cross's assertion, the creation of a West Headnote

involves multiple decision-making steps, from whether a case should be editorially enhanced at

all, to whether there should be headnotes at all and, if so, how many, how to write each headnote

---

[13]   L. Oliver Dep. Tr. at 26:19–27:4 ("Q. When you talk about creating editorial enhancements, what sort of -- you mentioned headnotes, synopses, and other features for cases, right? A. Right. Q. What is your understanding of a headnote? A. A headnote is a representation of a point of law made in a court opinion.")

[14]   L. Oliver Dep. Tr. at 27:16-24 ("Q. So what's the difference between an abstract and a concrete headnote? A. An abstract headnote is a more general statement of the law, one that could be applied in probably multiple cases. A concrete headnote is, more typically, about the facts of the individual case and, really, not something that would apply in other cases."), 30:7-13 ("Q. And so what is a concrete headnote? A. A concrete headnote is a representation of a holding in the case that is particular to the case and the facts within the case.).

[15]   A. Martens Dep. Tr. at 142:7-20 ("Q. And when you say 'points of law,' do you -- are you including -- what is included in the definition, your definition of 'points of law'? A. Headnotes and notes of decisions classified to the key number system. And again, those headnotes and notes of decisions are keys to unlocking the complexity that exists in case law. You'll remember I talked about jump sites once, so I find the headnote that I'm interested in, directly link you to the section of the case that that was drawn from, so that's another way that we stitch the information together.")

[16]   L. Oliver Dep. Tr. at 227:16-228:23 ("Q. What is the relationship between headnotes and key numbers? A. The key number represents the issue for which the headnote stands and its placement within the larger key number system. Q. How do you guys go about determining or assigning a key number to a headnote? That is a process that requires a fair amount of training. Our classification editors do that task of reading the headnote, determining first probably which high level topic it goes into, and then drilling down from there, also determining whether a headnote might classify to more than one key number, which does happen sometimes. Q. And so when a classifier gets a headnote, they read the headnote, and then they determine, based on the content of that headnote, how it should be assigned in the key number system, correct? A. They start with the text of the headnote. Sometimes they might not find everything they need there about the context of the case. They may need to look at the case. They may look at the notes that we talked about before and, ultimately, decide where in the key number system to classify that headnote.").

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

(including how long it should be), what part of the judicial opinion to link to the headnote, and how the headnote should fit into the West Key Number System.[17] None of these are prescribed by the text of the judicial opinion. Moreover, not only do Thomson Reuters' attorney-editors select the points of law or facts that should be made into West Headnotes, but they also arrange those West Headnotes within Thomson Reuters' own original taxonomy—the West Key Number System. They perform this arrangement by assigning Key Numbers to each West Headnote as it is created, thereby integrating it, along with the opinion for which it was created, into the West Key Number System.[18]

14.    Ms. Frederiksen-Cross also opines that my opinions are flawed because of the "unsupported assumption that all of the ROSS Bulk Memo questions were only created by copying West headnotes."[19] According to her, "[t]his assertion ignores voluminous testimony and evidence that LegalEase and its subcontractors did not copy headnotes."[20] In support of her opinion, Ms. Frederiksen-Cross cites the LegalEase Best Practices Guide and points to a portion where it instructs LegalEase and Morae Global employees not to copy West Headnotes.[21]

---

[17]    *See generally* TR-0002864-TR-0003137 (Editorial Manual, Policies and Guidelines for Headnoting); TR-0040273-TR-0040566 (Summarization Manual: Judicial Editorial).

[18]    L. Oliver Dep. Tr. at 227:16-228:23 ("Q. What is the relationship between headnotes and key numbers? A. The key number represents the issue for which the headnote stands and its placement within the larger key number system. Q. How do you guys go about determining or assigning a key number to a headnote? That is a process that requires a fair amount of training. Our classification editors do that task of reading the headnote, determining first probably which high level topic it goes into, and then drilling down from there, also determining whether a headnote might classify to more than one key number, which does happen sometimes. Q. And so when a classifier gets a headnote, they read the headnote, and then they determine, based on the content of that headnote, how it should be assigned in the key number system, correct? A. They start with the text of the headnote. Sometimes they might not find everything they need there about the context of the case. They may need to look at the case. They may look at the notes that we talked about before and, ultimately, decide where in the key number system to classify that headnote.").

[19]    Frederiksen-Cross Surrebuttal Report at ¶ 20.

[20]    Frederiksen-Cross Surrebuttal Report at ¶ 20.

[21]    Frederiksen-Cross Surrebuttal Report at ¶ 20.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

15.     However, Ms. Frederiksen-Cross's cherry-picked evidence does nothing to address the overwhelming evidence that shows LegalEase and Morae Global did, in fact, create the Bulk Memos by using Westlaw and copying West Headnotes to create the questions.[22] As I explained in my opening report, the evidence shows LegalEase created a Bulk Memo "for every unique headnote that appear[ed] under a given Westlaw Key" by turning the West Headnote into a question and identifying the case it came from as highly responsive.[23] Moreover, the "Best Practices Guide" specifically advises that the West Headnote should be used to create the question.[24]

16.     Ms. Frederiksen-Cross's opinions also fail to properly reflect the purpose for which ROSS needed the Bulk Memos—*i.e.*, as training data to train the algorithms supporting its competing legal research platform. Indeed, as I have previously explained, at the time it commissioned LegalEase to create the Bulk Memos, ROSS already had its own repository of cases and, thus, to the extent it only needed questions mapped to text from judicial opinions, it could have created that training data set on its own without the need to access Westlaw. But that

---

[22]     *See, e.g.,* Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, at § 9.1.4.

[23]     LEGALEASE-00093066-LEGALEASE-00093074 (Project Proposal).

[24]     LEGALEASE-00078065-LEGALEASE-00078083 (Best Practices Guide for ROSS Intelligence); *see also* MORAE_00011129 (Bulk Memo Process - Clutch). As explained in my opening report, although the "Best Practices Guide" provides guidance for using LexisNexis to create the memos, Westlaw was used to create most, if not all, of the Bulk Memos. Morae Global, which created over 20,000 Bulk Memos, did so exclusively using Westlaw. *See* C. Cahn Dep. Tr. at 68:3-9 ("Q. And if you turn the page, which is page 360, there are instructions for Lexis, correct? Do you see that? A. I do. Q. And as I understand it -- as I understand it, Morae did not use Lexis, correct? A. Correct."), 194:19-195:5 ("Q. Okay. So fair to say at a minimum the numbers that are in the second column are I believe you said the floor of the amount of memos that Morae created for LegalEase; is that fair? A. That is correct, yeah. Q. Okay. And I'll represent to you if you add up those numbers you get about 20,151."). Similarly, during the time of the Bulk Memo Project, I understand LegalEase had "at least 50" Westlaw credentials and only "two or three" LexisNexis credentials, the latter of which Mr. Hafeez testified were being used by another cohort at LegalEase on other matters. *See* T. Hafeez Dep. Tr. at 152:7-21 ("Q. Why would you get trial IDs? A. I think the accounts we already had were being used by other members of our team, supporting other clients. So we just -- we needed to get -- I'm guessing here. I would -- I with have to go back and look at our Lexis contract and agreements, when -- when they were in place and when they were not in place. But my conjecture, my guess, is that we had Lexis. It had been used by another cohort of our company on other matters, and for the ROSS project we would need -- we needed to get additional licenses.").

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

is not what ROSS actually needed, nor what it did. Rather, ROSS wanted to create a product that could compete with Westlaw—therefore, ROSS needed high-quality training data. Accordingly, ROSS wanted West Headnotes and the corresponding case passages that Thomson Reuters' attorney-editors had manually selected because such data provided the high-quality question-answer pairs that ROSS needed to train its algorithms sufficient to compete with Westlaw.

### IV.   MS. FREDERIKSEN-CROSS'S SURREBUTTAL ANALYSIS IS FLAWED

17.   In her Surrebuttal Report, Ms. Frederiksen-Cross states that, based upon the similarity analysis she performed, at least 57% of the West headnotes are verbatim or near-verbatim copies of passages from the applicable judicial opinions.[25] She further states that, based on her filtration analysis, "90% of the rows in Krein's Appendix C are likely to have been either paraphrased from the underlying judicial opinion passages or were paraphrased from Lexis or State Headnotes."[26] In my opinion, Ms. Frederiksen-Cross's opinions are inaccurate and unreliable.

18.   In particular, Ms. Frederiksen-Cross's surrebuttal analysis, like her other analyses, appears to be designed to find higher levels of similarity while ignoring the facts of this case and what I understand to be the nature of Thomson Reuters' copyright rights.[27] Rather than consider the creative choices made by Thomson Reuters' attorney editors in creating the West Headnotes, or the overwhelming evidence in the record showing how LegalEase and Morae Global used Westlaw to create the Bulk Memos, Ms. Frederiksen-Cross attempts to find similarity wherever

---

[25]   Frederiksen-Cross Surrebuttal Report at ¶ 17.

[26]   Frederiksen-Cross Surrebuttal Report at ¶ 17.

[27]   As explained in my opening report, I am not an expert in the law, and I have not been asked to provide legal opinions. That said, I have considered the U.S. statute on copyright and have been informed by counsel for Thomson Reuters of certain basic principles of law relevant to my technical expert opinions, which are set forth in my opening report. *See, e.g.,* Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, at § 6.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

she can, including by using unsupported metrics to determine whether something is "nearly identical," as well as by comparing West Headnotes and Bulk Memo Questions to text for which there is no support in the record to show why it is relevant.

19.   For example, Exhibit C to her Surrebuttal Report details the comparison she performed using the modified Postgres "similarity" metric from my rebuttal report.[28] As I explained in my rebuttal report, my purpose in applying the modified Postgres "similarity" metric was to correct for length disparities between compared texts in order to represent the proportion of the Bulk Memo Question that has been copied from the West Headnote, rather than the degree to which the question wholly matches the headnote.[29]

20.   Ms. Frederiksen-Cross, however, misapplies this metric in her comparison of West Headnotes, Bulk Memo Questions, and Judicial Opinion Text. Specifically, after performing her analysis, she concludes that "there are 19,366 West headnotes identified as 'nearly identical' to the corresponding Great Quote when the score is above [a] threshold of 0.8. In contrast," she further notes, "21,845 questions (out of 23,668 rows) are nearly identical to the corresponding Great Quote when using First Comparison Function and the same 0.8 threshold."[30]

21.   Ms. Frederiksen-Cross's conclusion here is flawed, as it ignores the various choices made by Thomson Reuters' attorney editors in creating the West Headnotes and overstates the similarity between the Bulk Memo Question and the Judicial Opinion Text. For example, the below pairing comes from row 6 of Ms. Frederiksen-Cross's Exhibit C. According to Ms. Frederiksen-Cross, each comparison (West Headnote to Bulk Memo Question, West Headnote to

---

[28]   Frederiksen-Cross Surrebuttal Report at ¶¶ 46–50, Ex. C.

[29]   The latter approach fails to identify obvious and verbatim copying in cases where Bulk Memo Questions don't copy entire headnotes. *See* Rebuttal Expert Report of Dr. Jonathan L. Krein, September 6, 2022, at ¶ 102.

[30]   Frederiksen-Cross Surrebuttal Report at ¶ 51.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Judicial Opinion Text, and Bulk Memo Question to Judicial Opinion Text) has a score of 1, which Ms. Frederiksen-Cross characterizes in her results as the three being "nearly identical."[31] A visual inspection of the three texts, however, makes clear that this is not the case. Indeed, it is true that the Bulk Memo Question was clearly derived from the West Headnote—that is consistent with the facts of this case and the overwhelming evidence detailing the process by which LegalEase and Morae Global created the Bulk Memo Questions. It does not follow, however, that the West Headnote is nearly identical to the Judicial Opinion Text. Rather, a simple visual comparison of the two texts makes clear that Thomson Reuters' attorney-editors both condensed and augmented the text of the judicial opinion in creating the West Headnote.

---

[31]   Frederiksen-Cross Surrebuttal Report at Ex. C.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| West Headnote | Bulk Memo Question | Judicial Opinion Text (*i.e.*, Great Quote) |
|---|---|---|
| estoppels are generally classified as one of three kinds estoppel by record as for instance where a party files pleadings in a suit he may be thereafter estoped to assert a contrary position where opposing litigant has relied on such pleadings to his detriment estoppel by deed as for instance where a vendor warrants full title to vendee the vendor is estoped to thereafter assert an interest contrary to his warranty and estoppel in pais or equitable estoppel is a term applied to a situation where because of some conduct on his part a person is denied the right to assert or prove a certain fact as for instance where a person has done or said something with intent to influence the other and the other has acted upon faith of it to his detriment the former is estopped to change his position | Is estoppel generally classified as one of three kinds, estoppel by record, estoppel by deed, and estoppel in pais? | Actually, we are unable to rationalize how the actions or conduct of Pierre Boudoin, in attempting to sell the one-half interest of the six heirs, or the acceptance of his succession by Leon, created what in legal terms can be classified as an â€˜estoppelâ€™. Generally speaking, it may be said that estoppel is a bar which precludes a person and his privies from denying or asserting anything to the contrary of that which has, in contemplation of law, been established as the truth, either by the acts of judicial or legislative offices, or by his execution of a deed or his representations or conduct, express or implied. See 19 Am.Jur. 601, Verbo Estoppel, Sec. 2. The general purpose of estoppels is to require honesty, fair dealing and good faith by preventing a person from making contrary representations. 19 Am.Jur. 602, Verbo Estoppel, Sec. 4. [[Estoppels are generally classified as one of three kinds: (1) Estoppel by record, as for instance where a party files pleadings in a suit, he may be thereafter estopped to assert a contrary position, where the opposing litigant has relied on such pleadings to his detriment. See Staunton v. Vintrella, 223 La. 958, 67 So.2d 550. (2) Estoppel by deed, as for instance where a vendor warrants full title to the vendee, the vendor is estopped to thereafter assert an interest contrary to his warranty. See Gaines v. Crichton, 187 La. 345, 174 So. 666. (3) Estoppel â€˜in pais' or equitable estoppel is a term applied to a situation where, because of some conduct on his part, a person is denied the right to assert or prove a certain fact, as for instance where a person has done or said something with the intent to influence the other, and the other has acted upon the faith of it to his detriment, the former is estopped to change his position.]] See Brock v. Black, Rogers & Co., 201 La. 1017, 10 So.2d 790. |

22.    In order to rebut Ms. Frederiksen-Cross's analysis and conclusions, counsel for Thomson Reuters' asked me to perform an additional analysis that properly accounts for the creative choices made by Thomson Reuters' attorney-editors. Specifically, I was asked to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

compare the text of the West Headnotes that were copied to create the Bulk Memo Questions to the corresponding Judicial Opinion Text in the Bulk Memos and categorize each West Headnote based on the creative choices reflected therein.

23.   As a first step, I added an additional column titled "Judicial Opinion Text" to Appendix D from my reply report and inserted the Great Quotes that I previously extracted from the Bulk Memos. As I explained in my opening report, the Great Quotes (*i.e.*, Judicial Opinion Text) listed in the Bulk Memos are the passages of the judicial opinions identified in column B from which Thomson Reuters created the corresponding West Headnotes identified therein, and which LegalEase copied.

24.   Owing to the magnitude of the data, I performed this analysis with the help of associates, coupled with automation where possible (such as to identify instances where the West Headnotes are shorter or longer than the associated Judicial Opinion Text, or where the order of the text differs in the West Headnote and Judicial Opinion Text). I determined the following categories for the West Headnotes based on the types of changes I understand from counsel to be meaningful from a copyright standpoint, coupled with my own review of the data and my understanding to date of the types of changes Thomson Reuters' attorney-editors routinely made when creating the West Headnotes.

25.   **Order** – I analyzed the West Headnotes paired with the Judicial Opinion Text and noted the pairings for which Thomson Reuters changed the order of portions of the Judicial Opinion Text for the corresponding West Headnote. Below are some examples of this.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Appx. D Row | West Headnote | Judicial Opinion Text (*i.e.*, Great Quote) |
|---|---|---|
| 1845 | The trial court's role when ruling, under the prima facie standard, on a motion to dismiss for lack of personal jurisdiction, and the appellate court's role in its de novo review, is not as a factfinder, but as a data collector; thus, the court must accept the plaintiff's properly documented proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing. | Under the prima facie standard, the inquiry is whether the plaintiff (here, the State) "has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." Phillips v. Prairie Eye Center, 530 F.3d 22, 26 (1st Cir.2008), cert. denied, """ U.S. """", 129 S.Ct. 999, 173 L.Ed.2d 298 (2009). To make a prima facie showing, the plaintiff "ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts." Foster"Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir.1995); see Thomas v. Telegraph Publ'g Co., 151 N.H. 435, 437, 859 A.2d 1166 (2004). The trial court's role, and our role in our de novo review, is "not as a factfinder, but as a data collector. That is to say, the court ... must accept the plaintiff's (properly documented) proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Foster"Miller, 46 F.3d at 145 (citation omitted). Additionally, the court must construe the plaintiff's evidentiary proffers "in the light most congenial to the plaintiff's jurisdictional claim." Phillips, 530 F.3d at 26 (quotation omitted). Facts put forward by the defendant may be considered only if they are uncontradicted by the plaintiff's submissions. Mass. School of Law at Andover v. American Bar, 142 F.3d 26, 34 (1st Cir.1998). |
| 15832 | Counterclaims against plaintiff may be adjudicated after plaintiff's action against defendant is dismissed on merits. | However, the Supreme Court improperly denied the plaintiff's cross motion as moot. CPLR 3019(d) provides, in pertinent part, that "[a] cause of action contained in a counterclaim shall be treated, as far as practicable, as if it were contained in a complaint". Thus, in cases where the plaintiff's action against a defendant is dismissed on the merits, the court may still adjudicate counterclaims against the plaintiff (see, 3 Weinstein"Korn"Miller, NY Civ Prac 3019.32; Siegel, Practice Commentary, McKinney's Cons.Laws of N.Y., Book 7B, CPLR C3019:20, at 230; cf., Brennan v. Mead, 73 A.D.2d 926, 423 N.Y.S.2d 678). Since a common carrier's liability for the value of goods destroyed or lost prior to delivery is distinct from the shipper's liability for freight charges (see, Alcoa Steamship Co. v. United States, 338 U.S. 421, 422, 70 S.Ct. 190, 191, 94 L.Ed. 225; Texaco Export v. Overseas Tankship Corp., 2nd Cir., 573 F.2d 717; National Trailer Convoy v. United States, Fed.Cir., 345 F.2d 573, 170 Ct.Cl. 823), the plaintiff's cross motion was improperly denied as moot. Consequently, the matter is remitted to the Supreme Court for a consideration of the merits of the plaintiff's cross motion insofar as it seeks to dismiss Mayflower's counterclaim. |

15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

26.   **Substantive additions or substitutions** – Other passages include significant text added or substituted by Thomson Reuters' attorney-editors. In my analysis, I identified the West Headnotes that contain significant added or substituted material that does not appear in the corresponding Judicial Opinion Text. Below are some examples of this.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Appx. D Row | West Headnote | Judicial Opinion Text (*i.e.*, Great Quote) |
|---|---|---|
| 3551 | In determining whether to dismiss as sanction for failure to prosecute or to comply with superior court order, inquiry should include whether conduct calling for sanctions was willful and whether other party was prejudiced by it and sanction imposed should, wherever possible, be tailored to offense. | As a general matter, dismissal under Rule 41(b) lies within the exercise of the trial court's discretion, which this court will not disturb absent clear evidence of abuse. See Frazier v. Center Motors, 418 A.2d 1018, 1020 (D.C.1980). Given the severity of dismissal as a sanction, however, and the oft-stated preference for trial on the merits, this discretion must be exercised carefully and in accordance with standards identified in our cases. Brown v. Cohen, 505 A.2d 77, 78 (D.C.1986); LaPrade v. Lehman, supra note 10, 490 A.2d at 1155; Shimer v. Edwards, 482 A.2d 399, 400"01 (D.C.1984); Frazier, supra, 418 A.2d at 1020; Pollock v. Brown, 395 A.2d 50, 52 (D.C.1978); Garces v. Bradley, 299 A.2d 142, 144 (D.C.1973). Thus, dismissal should be adopted as a remedy only in extreme circumstances and only after the trial court has considered lesser sanctions. Granville v. Hunt, 566 A.2d 65, 66 (D.C.1989); LaPrade v. Lehman, supra, 490 A.2d at 1155; see also District of Columbia v. Greene, 539 A.2d 1082, 1084 (D.C.1988); National Voter Contact, Inc. v. Versace, 511 A.2d 393 (D.C.1986); Vernell v. Gould, 495 A.2d 306, 311 (D.C.1985); Braxton v. McNamara, 429 A.2d 183, 184 (D.C.1981). The inquiry should include whether the conduct calling for sanctions was willful and whether the other party was prejudiced by it, Vernell, supra; Brown v. Cohen, supra, 505 A.2d at 78"79; Garces, supra, 299 A.2d at 144"45; and the sanction imposed should, wherever possible, be tailored to the offense. Pollock v. Brown, supra, 395 A.2d at 52; see also Peek v. District of Columbia, 567 A.2d 50, 54 (D.C.1989); Vernell, supra (trial court abuses its discretion where the sanction is too strict or unnecessary under the circumstances). These factors serve as a basis for determining whether or not the trial court has abused its discretion. |
| 5961 | To serve function of expediting trial by narrowing range of factual issues, rule governing requests for admissions accords conclusiveness to admissions so that party may rely on fact that admission binds party addressed, unless court permits withdrawal or amendment of admission. V.A.M.R. 59.01. | Rule 59.01(c), in pertinent part, states that "[a]ny matter admitted under this [rule] is conclusively established unless the court on motion permits withdrawal or amendment of the admission." "A request for admissions, as authorized by Rule 59.01(a), is designed to remove an issue from trial or to determine which pleaded matters present genuine issues for trial." N.R. v. A.D., 655 S.W.2d 733, 735 (Mo.App.1983) (citing Linde v. Kilbourne, 543 S.W.2d 543 (Mo.App.1976)). The purpose of the rule " "... is to expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial." " N.R., 655 S.W.2d at 735 (analogy between Federal Rules of Civil Procedure 36 and Rule 59.01) (citations omitted). To serve this function, the rule accords conclusiveness to admissions so that a party may rely on the fact that the admission binds the party addressed, unless the court permits withdrawal or amendment of the admission. N.R., 655 S.W.2d at 735; Killian Const. Co. v. Tri"City Const. Co., 693 S.W.2d 819, 827 (Mo.App.1985) (citations omitted). A party need not produce any further proof regarding facts admitted. Killian Const. Co., 693 S.W.2d at 827. |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

27. **Condensed** – Many passages have been significantly condensed by Thomson Reuters' attorney-editors. My analysis revealed significant textual reductions, which is consistent with my understanding of the choices Thomson Reuters' attorney-editors make in creating the West Headnotes. Below are some examples of this.

| Appx. D Row | West Headnote | Judicial Opinion Text (*i.e.*, Great Quote) |
|---|---|---|
| 4563 | While pretrial order should be liberally construed to permit any issues at trial that are embraced within its language, theory or issue must be at least implicitly included in the pretrial order. | Nentwig correctly points out that failure to raise an issue in the pretrial order may result in a waiver. Har"Win, Inc. v. Consolidated Grain & Barge Co. (5th Cir.1986), 794 F.2d 985; Miles v. Tennessee River Pulp & Paper Co. (11th Cir.1989), 862 F.2d 1525. The purpose of the pretrial order is to prevent surprise, simplify the issues, and permit the parties to prepare for trial. Bache v. Gilden (1992), 252 Mont. 178, 181"82, 827 P.2d 817, 819. However, this Court said in Bell v. Richards (1987), 228 Mont. 215, 217, 741 P.2d 788, 790, that the pretrial order "should be liberally construed to permit any issues at trial that are "embraced within its language." " (Quoting Miller v. Safeco Title Ins. Co. (9th Cir.1985), 758 F.2d 364, 368.) But the theory or issue must be at least implicitly included in the pretrial order. United States v. First Nat'l Bank of Circle (9th Cir.1981), 652 F.2d 882, 886; ACORN v. City of Phoenix (9th Cir.1986), 798 F.2d 1260, 1272. |
| 4750 | Owner of mineral estate has such rights of ingress, egress, exploration, and surface usage as are reasonably necessary to successful exploitation of his interest but he has no right to destroy surface. | The owner of a mineral estate has rights of ingress, egress, exploration, and surface usage as are reasonably necessary to the successful exploitation of his interest. Jilek et al. v. Chicago, Wilimington & Franklin Coal Co., 382 Ill. 241, 47 N.E.2d 96, 146 A.L.R. 871; Miller v. Ridgley, 2 Ill.2d 223, 117 N.E.2d 759. These rights were recognized by the trial court in its decree. However, such an owner has no right to destroy the surface. Barker v. Mintz, 73 Colo. 262, 215 P. 534. |

28. **Selection and arrangement** – I have identified the passages that Thomson Reuters' attorney-editors selected for association with a West Headnote. All headnotes at issue in this litigation qualify for this category.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

29.   I also included a column in Appendix B titled "Multiple Differences," which, based on the comparison I performed, identifies the West Headnotes that fall into more than one of the above categories.

30.   The below table summarizes the results of my analysis, which is attached to this report as **Appendix B**.

| Categories of Thomson Reuters' Creative Choices | Number of West Headnotes in Each Category |
|---|---|
| Order | 839 |
| Substantive Additions | 14,873 |
| Condensed | 15,344 |
| Selection and Arrangement | 21,876 |
| Multiple Differences | 9,029 |

31.   As the above table shows, Ms. Frederiksen-Cross's conclusions overstate the similarity between the West Headnotes and Judicial Opinion Text, as well as between the Bulk Memo Questions and Judicial Opinion Text. Rather than properly accounting for the facts of this case, Ms. Frederiksen-Cross's surrebuttal analysis—much like the analyses in her other reports—simply seeks to find higher levels of similarity in what she is comparing.

32.   This same issue is prevalent in Ms. Frederiksen-Cross's "filtration" analysis, which compares West Headnotes and Bulk Memo Questions to "Lexis Headnotes, Lexis Headnote references, and State Headnotes."[32] For this analysis, Ms. Frederiksen-Cross's methodology for filtering is summarized in the second column of the below table:

---

[32]   Frederiksen-Cross Surrebuttal Report at ¶¶ 35–44.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Filter # | Filter Removes Rows from Appendix C When… | Input Rows Count | Rows Removed Count | Count of Output Rows After Filter Runs | % Rows Remaining |
|---|---|---|---|---|---|
| 0 | Some Bulk Memo associated with an Appendix C row may identify a Question with a better matching score to a Great Quote than the Question to the West Headnote's score. **(when there exists a Q-GQ K102 score > Q-WHN K102 score)** | 23,668 | 15,982 | 7,686 | 32% |
| 1 | The West Headnote is a close match to a Great Quote in the corresponding Bulk Memo. **(when there exists a WHN-GQ K102score >= 0.8)**[17] | 7,686 | 968 | 6,718 | 28% |
| 2 | The Question-to-Lexis Headnote score shows a closer match than the Question-West Headnote score. **(Q-LHN K102 score >= Q-WHN's K102 score)** | 6,718 | 228 | 6,490 | 27% |
| 3 | Similar to Filter 2, but for State Headnotes. **(Q-SHN K102 score >= Q-WHN's K102 score)** | 6,490 | 26 | 6,464 | 27% |
| 4 | Question is not a good match to its corresponding West Headnote. **(Q-WHN k102 score < 0.6)** (set to < 0.8) | 6,464 | 109 | 6,355 | 27% |
| 5 | Question is a close match to a Lexis Headnote, and the Lexis Headnote is a close match to the West Headnote. **(when there exists a Q-LHN k102 score > 0.8 and LHN-WHN k102 score > 0.8)** | 6,355 | 3,908 | 2,447 | 10% |
| 6 | State Headnote is a close match to the West Headnote. **(when there exists a SHN-WHN k102 score > 0.8)** | 2,447 | 66 | 2,381 | 10% |

33. Ms. Frederiksen-Cross's process for filtering out rows from Appendix C in my opening report makes little sense and, in any event, is flawed as she fails to separate out the processes of determining similarity and filtration. For instance, she filters out 15,982 rows in the first step if a Bulk Memo Question has a better matching score to the Judicial Opinion Text than to a West Headnote. This ignores the overwhelming evidence in the record that clearly shows LegalEase and Morae Global created questions for the Bulk Memos by copying West Headnotes. For the same reasons, Ms. Frederiksen-Cross's filtering at steps 1, 2, 3, and 5 are completely unfounded. As I explained in my reply report, the record clearly shows that, although LegalEase may have contemplated using LexisNexis for the Bulk Memo Project, it did not do so and

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

instead used Westlaw to create the Bulk Memos.[33] Likewise, there is no evidence in the record whatsoever that suggests LegalEase or Morae Global created questions for the Bulk Memos using state court headnotes. Rather, any similarity that the Bulk Memo Questions might have to the Judicial Opinion Text, Lexis headnotes, or to state court headnotes is coincidental only, as I explained in my reply report[34] and demonstrated in my rebuttal report with the additional data analysis I performed on the results set forth in Ms. Frederiksen-Cross's opening report.[35]

34.    Accordingly, Ms. Frederiksen-Cross's conclusion—*i.e.*, that 90% of the rows in Appendix C to my opening report are likely to have been either paraphrased from the underlying judicial opinion passages or were paraphrased from Lexis or state court headnotes—is unfounded and, thus, unreliable.

## V.    <u>CONCLUSION</u>

35.    I have formulated my opinions in this report to at least a reasonable degree of professional certainty. I expressly reserve the right to modify or supplement this report based upon any additional information produced or presented to me in this case.

***

---

[33]    Reply Expert Report of Dr. Jonathan L. Krein, October 10, 2022, at ¶¶ 116-117.

[34]    Reply Expert Report of Dr. Jonathan L. Krein, October 10, 2022, at ¶¶ 116-117.

[35]    Rebuttal Expert Report of Dr. Jonathan L. Krein, September 6, 2022, at ¶ 109.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 11, 2024

Respectfully submitted,

_____

Dr. Jonathan L. Krein

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

## VI.   <u>APPENDIX A: MATERIALS CONSIDERED</u>

36.   In addition to the materials cited within and attached to my foregoing report and in my Opening Report, Rebuttal Report, and Reply Report, I was provided with the below materials for review:

- Surrebuttal Report of Barbara Frederiksen-Cross, October 10, 2022.

23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

## VII.   APPENDIX B: CATEGORIZED CHART OF COPIED WEST HEADNOTES

37.   Attached.