# EXHIBIT 50

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
2

   THOMSON REUTERS ENTERPRISE CENTRE    §
3  GMBH and WEST PUBLISHING             §
   CORPORATION,                         §
4                                       §   C.A. No. 20-613-SB
         Plaintiffs/Counterdefendants,  §
5                                       §
   vs.                                  §
6                                       §
   ROSS INTELLIGENCE, INC.,             §
7                                       §
         Defendant/Counterclaimant,     §
8

9

10                  HIGHLY CONFIDENTIAL

11           PURSUANT TO PROTECTIVE ORDER

12

13          VIDEO-RECORDED ORAL DEPOSITION OF

14                  CHRISTOPHER CAHN

15          AS CORPORATE REPRESENTATIVE OF

16              MORAE GLOBAL CORPORATION

17                   Houston, Texas

18                Thursday, May 12, 2022

19                (REPORTED REMOTELY)

20

21

22

23      REPORTED BY:

24      Linda Russell, CSR

25      JOB NO:  210749

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    CAHN - MORAE GLOBAL

2

3

4              May 12, 2022

5              9:06 a.m.

6

7

8         DEPOSITION OF CHRISTOPHER CAHN, conducted

9    via Zoom, taken before Linda Russell, Certified

10   Court Reporter No. 2965, pursuant to the Federal

11   Rules of Civil Procedure for the United States

12   District Court pertaining to the taking of

13   depositions, in the City of Houston, Texas,

14   commencing at 9:06 a.m. Central Time, on

15   May 12, 2022.

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    CAHN - MORAE GLOBAL

2    A P P E A R A N C E S

3    (All parties appearing remotely)

4

5    ON BEHALF OF PLAINTIFFS/COUNTERDEFENDANTS:
         ERIC LOVERRO, ESQ.
6        MIRANDA MEANS, ESQ.
         Kirkland & Ellis
7        601 Lexington Avenue
         New York, New York 10022
8

9

     ON BEHALF OF DEFENDANT/COUNTERCLAIMANT:
10       WARRINGTON PARKER, ESQ.
         JACOB CANTER, ESQ.
11       GABRIEL RAMSEY, ESQ.
         Crowell & Moring
12       3 Embarcadero Center
         San Francisco, California 94111
13

14

15   ON BEHALF OF THE WITNESS:
         MONIKA DZIEMIANCZUK, ESQ.
16       Locke Lord
         2800 JPMorgan Chase Tower
17       600 Travis
         Houston, Texas 77002
18

19

     ALSO PRESENT:
20       Darryl Russell, Videographer
         Bill Thomas, Exhibit Operator
21

22

23

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 4

1                            I N D E X

2                                                    Page
   CHRISTOPHER CAHN
3        BY MR. PARKER                                10
         BY MR. LOVERRO                              127
4        BY MR. PARKER                               219
         BY MR. LOVERRO                              229
5  CERTIFICATE                                       232
   ERRATA SHEET                                      234
6


7
                        EXHIBITS MARKED
8
      No.            Description                     Page
9

      Exhibit 1      Defendant ROSS Intelligence,     12
10                   Inc.'s Notice of Deposition
                     Subpoena to Morae Global
11                   Corporation

12    Exhibit 2      Statement of Work II for Bulk    24
                     Memos Project - MORAE_00012755
13

      Exhibit 3      Email - MORAE_00003043           33
14

      Exhibit 4      Email - MORAE_00032863           36
15

      Exhibit 5      Email - MORAE_00025712           40
16

      Exhibit 6      Email - MORAE_00025351           43
17

      Exhibit 7      ROSS Bulk Instructions &         44
18                   Checklist - Bulk Memos - 6
                     quotes.  MORAE_00025374
19

      Exhibit 8      Quality Control Guide for ROSS   52
20                   Intelligence, Quality Control
                     Procedures in Drafting
21                   Questions, and Preparing
                     Responsive Memorandum -
22                   MORAE_0045723


23    Exhibit 9      Best Practices Guide for ROSS    59
                     Intelligence, Drafting
24                   Questions, Preparing Responsive
                     Memorandum, and Quality Control
25                   Procedures - MORAE_00025353

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 8

 1              CAHN - MORAE GLOBAL

 2              P-R-O-C-E-E-D-I-N-G-S

 3              THE VIDEOGRAPHER:  My name is Darryl

 4    Russell, I am the legal videographer in

 5    association with TSG Reporting, Incorporated.

 6              Due to the severity of COVID-19, and

 7    following the practice of social distancing, I

 8    will not be in the same room with the witness,

 9    instead I will record this videotaped deposition

10    remotely.  The reporter, Linda Russell, also will

11    not be in the same room and will swear the

12    witness remotely.

13              Do all parties stipulate to the

14    validity of this video-recording and remote

15    swearing and that it will be admissible in the

16    courtroom as if it had been taken following

17    Rule 30 of the Federal Rules of Civil Procedures

18    and in the State's rules where this case is

19    pending?

20              Counsel, please state your name for

21    the record, whom you represent, and that you

22    agree.

23              MR. PARKER:  Warrington Parker on

24    behalf of ROSS Intelligence.  So stipulated.

25              MR. LOVERRO:  Eric Loverro on behalf

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    CAHN - MORAE GLOBAL

2   of Plaintiffs.  So stipulated.

3                    THE VIDEOGRAPHER:  Thank you.

4                    This is the start of media labeled

5   Number 1 of the video-recorded 30(b)(6)

6   deposition of Christopher Cahn in the matter of

7   Thomson Reuters Enterprise Centre GmbH, et al.

8   versus ROSS Intelligence, Incorporated, in the

9   United States District Court, District of

10  Delaware, Number 20-613.

11                   This deposition is being held

12  remotely on May 12th, 2022.  The time is

13  approximately 9:06 a.m.  My name is Darryl

14  Russell, I am the legal video specialist with

15  TSG Reporting, Incorporated, New York.  The court

16  reporter is Linda Russell, in association with

17  TSG Reporting.  The exhibit operator is Bill

18  Thomas, also with TSG Reporting.

19                   Will the court reporter please swear

20  in the witness.

21                   CHRISTOPHER CAHN,

22   having sworn or affirmed to tell the

23   truth, the whole truth and nothing but the

24   truth was examined and testified as

25   follows:

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 25

1          CAHN - MORAE GLOBAL

2          Q.  Okay.  I'm putting in front of you

3     what is marked -- what we're marking for this

4     deposition as Exhibit 2, which is Statement of

5     Work II for Bulk Memo Project.

6               Take a look at it.  And my first

7     question to you will be have you seen this

8     before?

9          A.  I have.

10         Q.  All right.  And this is a -- it's

11    true this is an agreement between LegalEase and

12    Morae, correct?

13         A.  That's correct.

14         Q.  And it was supposed to -- it was

15    relating to work for a project called the Bulk

16    Memo Project, correct?

17         A.  That's correct.

18         Q.  And the Bulk Memo Project was to

19    create memos for use by ROSS Intelligence,

20    correct?

21         A.  That is my understanding, correct.

22         Q.  And as you -- at least as reflected

23    in this document on the last page, this was an

24    agreement entered into between LegalEase and

25    Morae on October 5, 2017, correct?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1                    CAHN - MORAE GLOBAL

2          A.   Correct.

3          Q.   Now, as I understand it, correct me

4    if I'm wrong, Morae did work, according to the

5    terms of this agreement, for LegalEase, correct?

6          A.   Correct.

7          Q.   And when I say "Morae," do I need to

8    separate out Clutch Group from Morae?

9          A.   No.

10         Q.   Okay.  So when I say Morae did work

11   under this agreement for LegalEase, the same

12   would be true of Clutch Group did work under this

13   agreement for LegalEase as well, correct?

14         A.   Correct.

15         Q.   And internally does Morae make a

16   distinction between Clutch Group and the entity

17   called Morae?

18         A.   No.

19         Q.   Okay.  And is it common for Morae to

20   refer to Clutch Group and Morae by simply using

21   the term "Morae"?

22         A.   Yes.

23         Q.   Now, in connection with the work done

24   by Morae with regard to the Bulk Memo Project,

25   was there ever a time where anyone from Morae

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1             CAHN - MORAE GLOBAL

2    communicated directly with anyone from ROSS

3    Intelligence?

4          A.  Not that I'm aware of.

5          Q.  And the communications regarding the

6    Bulk Memo Project and the work, those were

7    communications between LegalEase and Morae,

8    correct?

9          A.  Correct.

10          Q.  And is it fair to say that LegalEase

11    dictated what work was to be done?

12          A.  It is, yes.

13             MR. LOVERRO:  Objection.  Vague.

14    BY MR. PARKER:

15          Q.  Is it fair to say that LegalEase

16    dictated how the work should be done?

17          A.  It is, yes.

18          Q.  And the -- is it fair to say that

19    LegalEase set forth the particular contents and

20    form of the memos?

21             MR. LOVERRO:  Objection.  Form.

22    Vague.

23    BY MR. PARKER:

24          Q.  I didn't hear your answer.  I

25    apologize.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                CAHN - MORAE GLOBAL

 2          A.  Yes.

 3          Q.  Okay.  And on page 1 of this

 4   document, Exhibit 2 -- well, let me keep going.

 5   I'm sorry, under, "Description," do you see 3.1,

 6   it says, "Legal" -- "Subcontractor" --

 7   "Subcontractor agrees to provide LegalEase with

 8   Memos for Client, as topically assigned by

 9   LegalEase."  Do you see that?

10          A.  I do.

11          Q.  And did you understand that, if you

12   read the rest of 3.1 -- so I don't need to read

13   it my -- read it to yourself.  My question is

14   does 3.1 accurately describe the work that Morae

15   was to do for LegalEase?

16          A.  It does.

17          Q.  And if you'd turn to paragraph 8,

18   it's Bates stamp number -- well, there are two.

19   One is Morae, and I'll use the Morae number.

20   MORAE_00012757.

21          You understood that Morae was to be

22   paid by LegalEase for providing the memos that

23   were contracted for under this Agreement,

24   correct?

25          MR. LOVERRO:  Objection.  Form.
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 54

1                    CAHN - MORAE GLOBAL

2                    And if you could go to the page that

3       has at the last three numbers under the Morae

4       Bates stamp, 378.

5              A.  I see that.

6              Q.  And it -- it says, "Explanation and

7       examples for Great, Good, Topical, and Irrelevant

8       cases."  Do you see that?

9              A.  I do.

10             Q.  And it says, '"Great' case," and then

11      there's a question:  "Are oil and gas leases

12      executory contracts?"  And then the answer.  Do

13      you see that?

14             A.  I do.

15             Q.  And what -- what did you understand

16      was to be the contents of the Bulk Memos?

17                    MR. LOVERRO:  Objection.  Form.

18      Vague.

19             A.  The Bulk Memos were expected to

20      contain no less than four and no more than six

21      quotes, with I believe it was two to -- two to

22      four "Good" or "Great" quotes, and then one

23      "Topical" and one "Irrelevant."

24      BY MR. PARKER:

25             Q.  And when you use the word "quotes,"

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                  CAHN - MORAE GLOBAL

 2   what are you referencing?

 3        A.   Portions of a paragraph, typically a

 4   sentence or a phrase that would be responsive to

 5   the question that the memo is supposed to be

 6   answering.

 7        Q.   And what -- where would you get the

 8   sentence or the phrase?

 9             MR. LOVERRO:  Objection.  Form.

10        A.   From -- from the case -- from the

11   particular case that was being looked at.

12   BY MR. PARKER:

13        Q.   When you say "case," you mean

14   judicial opinions?

15        A.   That's correct.

16        Q.   And was there any effort when you

17   were providing the quotes or the phrases or the

18   sentences to paraphrase from judicial opinions?

19             MR. LOVERRO:  Objection.  Form.

20   Vague.  Speculation.

21        A.   No.

22   BY MR. PARKER:

23        Q.   Did -- were the quotes required to be

24   verbatim?

25        A.   Yes.
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 62

1                     CAHN - MORAE GLOBAL

2     begins at 356.  And it says, "Framing Questions.

3     You may be assigned a Westlaw/Lexis topic to

4     frame questions."  Do you see that?

5          A.  I do.

6          Q.  And it says, "An easy way of framing

7     questions is to rely on the headnotes," correct?

8          A.  Yes, I see that.

9          Q.  Great.

10              And it's true, if you look under --

11     under "1. Westlaw," what LegalEase would assign

12     were topics under the Key Numbers system,

13     correct?

14          A.  Correct.

15          Q.  And then once you -- once a topic was

16     assigned, Morae would then look for headnotes

17     under subtopics falling under those topics,

18     correct?

19          A.  Correct.

20          Q.  Great.

21              And if you look at the first

22     paragraph it says, "However, note that the

23     headnotes are proprietary and you should not

24     copy/paste them in the question."  Do you see

25     that?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    CAHN - MORAE GLOBAL

2          A.   I do.

3          Q.   What did you understand that to mean?

4               MR. LOVERRO:   Objection.   Form.

5    Vague.   Foundation.

6          A.   Not to -- not to just, you know,

7    blindly copy verbatim any of the headnotes.

8    BY MR. PARKER:

9          Q.   And to your knowledge, did Morae ever

10   copy verbatim any of the headnotes?

11              MR. LOVERRO:   Objection.   Form.

12   Foundation.

13         A.   Not that I'm aware of.

14   BY MR. PARKER:

15         Q.   And what were Morae -- the people who

16   were doing the Bulk Memos, were they -- were they

17   also instructed not to copy the headnotes

18   verbatim?

19              MR. LOVERRO:   Objection.   Form.

20   Mischaracterizes the witness' testimony.

21         A.   I believe so.

22   BY MR. PARKER:

23         Q.   Okay.   And is it fair to say that the

24   Morae employees who were doing the Bulk Memo

25   Project would have received what is Exhibit 9?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                   CAHN - MORAE GLOBAL

 2               MR. LOVERRO:  Objection.  Form.

 3    Foundation.  Speculation.

 4         A.  Not all of them.

 5    BY MR. PARKER:

 6         Q.  All right.  And if we keep going

 7    through this document, it starts (1), under

 8    "Westlaw," under 356, it would say, "Headnote

 9    Search," and then there's a screenshot that says,

10    "Click on the Key Numbers.  You will be assigned

11    a number which is available under the Key

12    Numbers."  Do you see that?

13         A.  Sorry, which --

14         Q.  At 356.  There you go.

15         A.  Okay.

16         Q.  Do you see that?

17         A.  I do.

18         Q.  And it says, "Here, the Key Number

19    assigned is 1 and topic is Abandoned and Lost

20    Property."  Do you see that?

21         A.  I do.

22         Q.  Okay.  By the way, how is it that you

23    have an understanding that the Morae team that

24    worked on the Bulk Memo Project were not -- were

25    instructed or did not copy headnotes verbatim?
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 65

1      CAHN - MORAE GLOBAL

2           MR. LOVERRO:  Objection.  Form.

3   Vague.  Mischaracterizes the witness' testimony.

4           A.  Because the headnotes are generally

5   not in the form that was expected for the

6   questions.

7   BY MR. PARKER:

8           Q.  And when you say that, you mean

9   the -- literally the questions were different

10  from the verbatim headnotes, correct?

11          MR. LOVERRO:  Objection.  Form.

12  Mischaracterizes the witness's testimony.

13          A.  That's my expectation, yes.

14  BY MR. PARKER:

15          Q.  Okay.  So now here it says, "Here,

16  the Key Number assigned is 1 and the topic is

17  Abandoned and Lost Property."  Do you see that?

18          A.  I do.

19          Q.  And it's true that at least Morae

20  would receive from LegalEase a topic such as, and

21  this is an example, Abandoned and Lost Property,

22  correct?

23          A.  Yes.

24          Q.  And then it says two, on the page, it

25  says, "Click on a key number topic.  The best

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          CAHN - MORAE GLOBAL

2    says, "Great Case," it says, "Good" -- you see it

3    has two "Great" cases, it has a "Good" case, in

4    the sample memo, it has a "Good" case, it has a

5    "Topical" case and it has an "Irrelevant" case.

6    Do you see that?

7          A.  I do.

8          Q.  Once a question was formulated, do

9    you have any understanding of how these cases

10   would be found?

11          MR. LOVERRO:  Objection.  Foundation.

12   Form.  Speculation.

13          A.  I think there were -- were two main

14   ways.  The first was following the headnotes, the

15   second was actually running searches.

16   BY MR. PARKER:

17          Q.  Right.  Well, one -- let me -- let me

18   provide you -- let me -- if you look at just a

19   sample memo, it says, "Reference List.

20   Issue: What is implied actual notice?"  Do you

21   see that?

22          A.  Yes.

23          Q.  And it says, "Great Case 1."  And it

24   says, "Symons Corp. v Tartan-Lavers Delray Beach,

25   Inc."  Do you see that?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    CAHN - MORAE GLOBAL

2          A.  I do.

3          Q.  And then it says, "Quote 1."  And do

4    you see that?  "Notice is of two kinds, actual

5    and constructive."  Do you see that?

6          A.  I'm sorry.  In Great Case 1?

7          Q.  Yes, under Quote 1.

8          A.  Oh, okay.  Yeah, I see that.

9          Q.  And then it cites to Sapp versus

10   Warner, correct?

11         A.  Right, correct.

12         Q.  And if we go to "Great Case 2," Great

13   Case 2 is Sapp versus Warner.  Do you see that?

14         A.  Yes.

15         Q.  And then also if you look at Great

16   Case 1, it cites to, in the bold, Reinhart versus

17   Phelps.  Do you see that?

18         A.  Yes.

19         Q.  And if you look at Great Case -- Good

20   Case 3 at the bottom, it -- although kind of

21   misspelled, it says, "Rinehart versus Phelps,"

22   correct?

23         A.  Correct.

24         Q.  And so there were instances in which

25   once one located a case, one could then go from

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          CAHN - MORAE GLOBAL

2    one case cited in the case to another case in

3    order to fill out the Bulk Memo, correct?

4          A.  Correct.

5          Q.  And so it wouldn't be unusual, in

6    your mind, if I look at one quote and I saw a

7    case cite, that that case cite would then supply

8    another quote that would appear in the Bulk Memo,

9    correct?

10          MR. LOVERRO:  Objection.  Form.

11   Vague.  Foundation.

12          A.  Unusual?  No.  How common it was, I

13   couldn't say, because obviously some were more

14   challenging than others.

15          MR. PARKER:  Let me direct your

16   attention to Tab 10, which we'll mark as

17   Exhibit 10.  I apologize.  Tab 11, which we'll

18   call Exhibit 10.

19          (Exhibit 10 marked for identification.)

20   BY MR. PARKER:

21          Q.  And Exhibit 10 is a document with --

22   from Saloni, and that's a name that I'm not going

23   to try to pronounce.  It's dated September 19th,

24   2017, and it's to Teri Whitehead with cc's.  And

25   the subject is, "ROSS Bulk Project - LPO."  Do

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 125

```
 1                   CAHN - MORAE GLOBAL
 2    Law -- 221 International Law, and then the
 3    subtopic key number 10.9, those are Key Numbers,
 4    correct?
 5         A.  I -- that -- that appears to be the
 6    case, yes.
 7         Q.  And the memos that went to LegalEase
 8    did not contain Key Numbers, correct?
 9              MR. LOVERRO:  Objection.  Form.
10    Vague.  Calls for speculation.
11         A.  Correct, the memos did not contain
12    the Key Numbers.
13              MR. PARKER:  Let me show you what
14    we'll mark as Exhibit 47, which is Tab 35.
15         (Exhibit 47 marked for identification.)
16    BY MR. PARKER:
17         Q.  And Tab 35 is an email from Saloni to
18    Christopher Cahn, cc to others.  Subject,
19    "Project Rose - Status Update," with a variety of
20    attachments.
21              MR. PARKER:  Tab 35, please.  It's
22    Exhibit 47.
23              EXHIBIT OPERATOR:  Sorry.  You --
24    okay.  35?
25    BY MR. PARKER:
```

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          CAHN - MORAE GLOBAL

2  point list under, "Notes from the call," do you

3  see that the second one says, "Quality control

4  needs to be really high"?  Do you see that?

5      A.  I do.

6      Q.  What's your understanding for why

7  quality control needed to be really high for the

8  Bulk Memo Project?

9      A.  Because the memos were being

10  processed into a technology platform, everything

11  needed to be very precise both from a formatting

12  perspective as well as a content to ensure it

13  loaded appropriately and was interpreted

14  appropriately.

15      Q.  So let me just understand the latter

16  part of your answer.  When you say content to

17  ensure it was loaded properly and was interpreted

18  properly, do you mean the -- how the content

19  looked or the actual content itself?

20      A.  Both.

21      Q.  So was it important that the Memos --

22  strike that.

23          Was it important that the answers,

24  the quotes in the Memo, were accurately labeled,

25  for example?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                     CAHN - MORAE GLOBAL

2          A.  Yes, that was our understanding.

3          Q.  And was that something that LegalEase

4    and Morae were both concerned about in terms of

5    making sure "Great" cases were really "Great"

6    quotes to answer the question and so on?

7          A.  Yes.

8          Q.  And was LegalEase the one that set

9    the standard for that in terms of, you know, what

10   made something a "Great" answer versus what made

11   something a "Good" answer?

12         A.  LegalEase is the company or the

13   entity that communicated that expectation to

14   Morae.

15         Q.  And they communicated that

16   expectation, but where did that expectation come

17   from?

18         A.  My understanding is from ROSS.

19         Q.  So going down to the sixth bullet

20   point, the one that's under the break in what

21   looks like different fonts.  It says, "Resources

22   assigned must have experience in Westlaw and

23   drafting in Westlaw."  Do you see that?

24         A.  I do.

25         Q.  So was any other legal research

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    CERTIFICATE

2

STATE OF TEXAS    )
3                 )
COUNTY OF HARRIS  )

4

5        I, LINDA RUSSELL, a Certified Court

6   Reporter within and for the State of Texas, do

7   hereby certify:

8        That CHRISTOPHER CAHN, the witness whose

9   deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of the testimony given by such witness.

12        I certify that review of the transcript by

13   the deponent was not requested.

14        I certify that the amount of time used by

15   each party at the deposition is as follows:

16        MR. PARKER    -    02:53:47

17        MR. LOVERRO    -    01:44:53

18        I further certify that I am not related to

19   any of the parties to this action by blood or

20   marriage; and that I am in no way interested in

21   the outcome of this matter.

22            (Signature on following page)

23

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 233

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand this 24th day of May, 2022.

3

4     _____
      LINDA RUSSELL, Texas CSR #2965
5     Expiration Date:  4/30/2023

6     TSG Reporting, Inc.
      Firm Registration No. 615
7     228 E. 45th Street, Suite 810
      New York, New York 10017
8     (212) 702-9580

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 51

**In the Matter Of:**

*Thomson Reuters vs*

*Ross Intelligence*

---

*TARIQ HAFEEZ*

*May 26, 2022*

---



1

HIGHLY CONFIDENTIAL

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2

3

4    IN RE MATTER OF:           )
                                )
5    THOMSON REUTERS            )   C.A. No. 20-613(LPS)
     ENTERPRISE CENTRE GMBH     )
6    and WEST PUBLISHING        )
     CORPORATION,               )
7                               )
        Plaintiffs and          )
8       Counterdefendants,      )
                                )
9    VS.                        )
                                )
10   ROSS INTELLIGENCE,         )
     INC.,                      )
11                              )
        Defendant and           )
12      Counterclaimant.        )
                                )
13

14

15          ORAL AND VIDEOTAPED DEPOSITION
                        OF
16                 TARIQ HAFEEZ
                  MAY 26, 2022
17

18

19

20

21

22

23

24

25

2

3            ORAL AND VIDEOTAPED DEPOSITION OF

4    TARIQ HAFEEZ, produced as a witness at the

5    instance of the Plaintiff and

6    Counterdefendants and duly sworn, was taken in

7    the above-styled and numbered cause on

8    May 26, 2022, from 9:07 a.m. to 4:11 p.m.,

9    before KATERI A. FLOT-DAVIS, CSR, CCR, in and

10   for the State of Texas, reported by machine

11   shorthand, pursuant to the Federal Rules of

12   Civil Procedure and the provisions stated on

13   the record herein.

3

```
1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    JOSHUA SIMMONS, ESQ
     ERIC LOVERRO, ESQ.
5    Kirkland & Ellis LLP
     601 Lexington Avenue
6    New York, New York 10077
     joshua.simmons@kirkland.com
7    eric.loverro@kirkland.com

8

9    FOR THE DEFENDANT:

10   WARRINGTON PARKER, ESQ.
     CRINISHA BERRY, ESQ.
11   GABRIEL RAMSEY, ESQ.
     Crowell & Moring LLP
12   3 Embarcadero Center
     26th Floor
13   San Francisco, California 94111
     wparker@crowell.com
14   cberry@crowell.com
     gramsey@crowell.com
15

16
     FOR THE WITNESS TARIQ HAFEEZ:
17
     TARIK D. TURFE, ESQ.
18   Hammoud Dakhlallah & Associates
     6050 Greenfield
19   Ste. 201
     Dearborn, Michigan 48126
20   tt@hdalawgroup.com

21

22
     Also Present:
23   Kimberly Villalobos, Videographer

24

25
```

4

```
 1                    INDEX

 2
                                                      PAGE
 3

 4

 5     Appearances........................        3

 6

 7

 8     TARIQ HAFEEZ

 9

10        Examination by Mr. Simmons..........    20

11        Examination by Mr. Parker...........   181

12        Examination by Mr. Simmons..........   322

13        Examination by Mr. Parker...........   353

14        Examination by Mr. Simmons..........   357

15

16

17

       Signature and Changes...................   359
18
       Reporter's Certificate..................   361
19

20

21

22

23

24

25
```

19

```
 1        P R O C E E D I N G S

 2

 3        THE VIDEOGRAPHER:  We are on the

 4   record on May 26th, 2022, at 9:07 a.m.,

 5   Eastern Time, for the remote video

 6   deposition of Mr. Tariq Hafeez, in the

 7   matter of Thomson Reuters Enterprise

 8   Centre GMBH, et al., versus ROSS

 9   Intelligence, Incorporated.

10        My name is Kimberly Villalobos and

11   I am the videographer and document tech.

12        All present will be noted on the

13   stenographic record.

14        Will the court reporter please

15   swear in the witness.

16        (Witness sworn.)

17        MR. SIMMONS:  So let's start by

18   getting appearances on the record.

19        I'm Joshua Simmons from Kirkland &

20   Ellis.  I represent the plaintiffs.

21        And along with me is Eric Loverro

22   from our offices, as well.

23        MR. PARKER:  Warrington Parker,

24   representing ROSS Intelligence.

25        With me is Crinisha Berry.
```

50

```
 1    do research in different practice areas.  I

 2    don't recall specifically if we were asked to

 3    label them in -- in practice areas.  I would

 4    take a look at the document to refresh my

 5    memory on that.

 6              MR. SIMMONS:  Let's look at what's

 7         Tab 12, which I think is going to be

 8         just 12 underscore.

 9              So this document is Bates Numbered

10         LEGALEASE-00078065.

11              Would you let me know, Mr. Hafeez,

12         when you have that in front of you?

13              THE WITNESS:  I have it now.

14         Q.   (BY MR. SIMMONS)  This is a

15    document that LegalEase produced in this

16    litigation; is that right?

17         A.   Yes.

18         Q.   Are you familiar with it?

19         A.   I've seen -- I've seen the document

20    before, yes.

21         Q.   And it's titled, "Best Practices

22    Guide for ROSS Intelligence," correct?

23         A.   Yes.

24         Q.   Now, this explains how ROSS wanted

25    the bulk memos created, right?
```

63

1    but, yeah, it provided -- provided -- it was

2    the playbook.  It -- it gave our attorneys an

3    understanding of what the project was and --

4    and how it was to be conducted and how we were

5    supposed to draft these memos.

6         Q.    Would you turn to Page 4?

7               And go to the section labeled,

8    "Part II," "Framing Questions," please.

9         A.    Yep.  I'm there.

10        Q.    Now, LegalEase's lawyers would be

11   assigned a Westlaw or Lexis topic to frame

12   questions; is that right?

13        A.    Yes.

14        Q.    And an easy way of framing

15   questions was to rely on headnotes; isn't that

16   right?

17        A.    Yes.

18        Q.    But LegalEase understood that

19   headnotes are proprietary, didn't it?

20             MR. PARKER:  Vague and ambiguous.

21             THE WITNESS:  I mean, the language

22        speaks for itself, that we did -- we did

23        dictate such, that headnotes were

24        proprietary and they should not copy and

25        paste the question.

78

1          Q.    So as early as July 2017, LegalEase

2    was planning to copy Westlaw's headnotes to

3    create the research questions for the Bulk

4    Memo Project, right?

5               MR. PARKER:  Vague and ambiguous.

6          Misstates --

7               (Simultaneous speaking.)

8               THE WITNESS:  Well --

9               MR. PARKER:  -- the testimony --

10              THE WITNESS:  -- I wouldn't --

11              MR. PARKER:  -- (inaudible) --

12              THE WITNESS:  -- characterize it as

13         copying.

14              We were using -- we were using the

15         headnotes as a way to make topics to --

16         to provide the research and analysis

17         that we were asked to provide.

18              MR. SIMMONS:  Okay.

19         Q.    (BY MR. SIMMONS)  So as early as

20   July 2017, LegalEase was using Westlaw

21   headnotes to create the research questions for

22   ROSS, right?

23         A.    Yes.

24         Q.    And as early as July 2017,

25   LegalEase was using the West key number system

84

```
 1        Q.    Okay.

 2              So she's reporting on a

 3   conversation where she was discussing "Good"

 4   and "Great" quotes, right?

 5        A.    Let's see here.

 6              "Thank you for your question on the

 7   call this morning."

 8              Yes.  I mean, the subject was "Good

 9   and Great Quotes" (as read), yes.

10        Q.    And in the second paragraph of her

11   email she indicates that the LegalEase

12   creative drafting process requires the first

13   headnote to provide the great quote as the

14   question.

15              And --

16              (Simultaneous speaking.)

17        A.    Yes.

18              MR. PARKER:  Objection.  Misstates

19        the document.

20        Q.    (BY MR. SIMMONS)  And you

21   understand that the question was drafted

22   directly from the headnote, right?

23              MR. PARKER:  Objection.  Misstates

24        the document.

25              THE WITNESS:  Sorry.
```

85

```
 1              Are you asking -- sorry.

 2              Can you repeat the question?

 3              MR. SIMMONS:  Sure.

 4         Q.   (BY MR. SIMMONS)  So you understand

 5     that the question was drafted directly from

 6     the headnotes, right?

 7              MR. PARKER:  Misstates --

 8              (Simultaneous speaking.)

 9              THE WITNESS:  No --

10              MR. PARKER:  -- the document.

11              THE WITNESS:  Yeah, not from this

12         email but, yes, we talked earlier about

13         how the process -- the process involved

14         framing a question from the -- from the

15         headnotes.

16              MR. SIMMONS:  Okay.

17              Let's take that break.

18              MR. PARKER:  Okay.

19              THE VIDEOGRAPHER:  The time is

20         10:14 a.m. and we are going off the

21         record.

22              (Brief Recess Taken.)

23              THE VIDEOGRAPHER:  The time is

24         10:29 a.m. and we are back on the

25         record.
```

88

```
 1          Q.    Now, you -- before the break we
 2    were talking about Morae Global.
 3                Do you remember that?
 4          A.    Yes.
 5          Q.    And did Morae Global formally go by
 6    the name Clutch Group?
 7          A.    They were -- I believe they bought
 8    Clutch Group at some point.  So they may have
 9    been under the Morae Global umbrella.
10          Q.    Okay.
11          A.    Yeah.  That name does sound
12    familiar.
13          Q.    So did LegalEase hire Clutch Group
14    to help with the Bulk Memo Project?
15          A.    We -- we contracted with -- with
16    Morae or Clutch -- I don't recall which entity
17    was -- who the contract was with -- to provide
18    lawyers in India to help us with the project.
19          Q.    And for the project Morae Global
20    used Westlaw credentials that LegalEase
21    provided; is that right?
22          A.    I believe so, yes.
23          Q.    So LegalEase hired Morae Global to
24    accomplish the Bulk Memo Project.
25          A.    What was --
```

225

1    is a mention of Lexis, correct?

2         A.    Yes.

3         Q.    And the purpose of the discussion

4    about Lexis is how to use Lexis headnotes to

5    frame questions, correct?

6         A.    Correct.

7              MR. PARKER:  And then if we go to

8         Tab 61, which we'll mark as Exhibit 33.

9              (Exhibit No. 33 Marked.)

10             THE WITNESS:  Is that being shared

11        or was that previously shared?

12             Sorry.

13             MR. PARKER:  It should be shared.

14        It was not previously shared.

15             THE WITNESS:  I'm not seeing

16        anything on my Chat.

17             THE VIDEOGRAPHER:  Can you repeat

18        the number?

19             MR. PARKER:  Tab 61.

20             And Tab 61 is an email from Merin

21        Sony to Rejitha and others, "Subject:

22        ROSS -- ROSS bulk memo - July 21, 2017."

23             It's Bates Stamped LEGALEASE --

24        R-LEGALEASE-00050673.

25             THE WITNESS:  I have that pulled

226

```
 1        up.

 2                MR. PARKER:  Great.

 3        Q.   (BY MR. PARKER)  And Merin Sony,

 4   you've already testified, was someone who

 5   worked at LegalEase.

 6                Correct?

 7        A.   Correct.

 8        Q.   And the people that she addressed

 9   this email to were people who were also

10   working for LegalEase, correct?

11        A.   Right.

12        Q.   And it says, "Please continue with

13   the topic assigned you on Monday."

14                Do you see that?

15        A.   I do.

16        Q.   And it says, below that:  "Sandesh:

17   Please take up Banking law from Lexis."

18                Do you see that?

19        A.   Yes.

20        Q.   Who determined what topics should

21   be assigned for the Bulk Memo Project?

22        A.    We had a project manager who was

23   managing this project, to make sure that we

24   were not duplicating memos and making sure

25   that everything that we were providing to ROSS
```

227

```
 1    was unique.

 2              I believe there were a few people

 3    Merin was chiefly responsible for assigning

 4    the topics, but -- but it seems like she

 5    delegated some of that to others below her,

 6    because it was a large -- a large team working

 7    on this.

 8         Q.   Great.

 9              And LegalEase wasn't taking

10    direction from ROSS as to what topics to

11    assign, correct?

12         A.   Correct.

13         Q.   And then it says, "Sandesh:  Please

14    take up Banking law from Lexis."

15              Do you see that?

16         A.   Uh-huh.

17         Q.   And so banking law was a topic,

18    correct?

19         A.   It looks like it was a topic, yes.

20    Yep.

21         Q.   And you understood Merin to be

22    directing Sandesh to use Lexis to create the

23    bulk memos, correct?

24              MR. SIMMONS:  Objection.  The

25         document speaks for itself.  Calls for
```

228

```
 1              speculation.

 2                   THE WITNESS:  Yeah.  It appears

 3              that Sandesh is ask- -- is ask- -- I'm

 4              sorry -- Merin is asking Sandesh to use

 5              Lexis for the -- for that particular

 6              topic area.

 7                   MR. PARKER:  Okay.

 8              Q.   (BY MR. PARKER)  And then it says,

 9    next paragraph:  "Make" -- "Make sure to

10    follow the pattern we discussed last day - not

11    to stick to headnotes to frame questions,

12    rather use them as a stepping stone, and tweak

13    questions."

14                   Do you see that?

15              A.   I do.

16              Q.   And was that the instruction given

17    to those who were using headnotes to formulate

18    questions?

19                   MR. SIMMONS:  Objection.

20              Foundation.  Calls for speculation.

21                   THE WITNESS:  It appears to be.  It

22              appears to be providing some guidance on

23              how to -- on how to frame a question

24              using the headnotes.

25                   MR. PARKER:  Great.
```

321

```
 1        understood that to be a number that they

 2        were going to seek against us.

 3        Q.   (BY MR. PARKER)  Do you know how

 4   that number, 27.5 million worth of content was

 5   calculated?

 6             MR. SIMMONS:  Objection.  Calls for

 7        speculation.

 8             THE WITNESS:  I think they may

 9        have -- they may just have looked at the

10        total number of users and the number of

11        clicks, and -- and what the rack rate

12        for those clicks or those downloads

13        would be in the aggregate, if there was

14        no subscription.

15             Obviously, from a subscription

16        standpoint, the number that we paid was

17        much less than that amount.  But we did

18        pay, you know, monthly, the thousands of

19        dollars to Westlaw.

20             MR. PARKER:  Okay.

21             No further questions at this time.

22             MR. SIMMONS:  All right.

23             Could I have the videographer just

24        read on the current time?

25             Because Mr. Parker and I will want
```

361

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
 2


 3


 4   IN RE MATTER OF:          )
                               )
 5   THOMSON REUTERS           )   C.A. No. 20-613(LPS)
     ENTERPRISE CENTRE GMBH    )
 6   and WEST PUBLISHING       )
     CORPORATION,              )
 7                             )
         Plaintiffs and        )
 8       Counterdefendants,    )
                               )
 9   VS.                       )
                               )
10   ROSS INTELLIGENCE,        )
     INC.,                     )
11                             )
         Defendant and         )
12       Counterclaimant.      )
                               )
13


14
                      REPORTER'S CERTIFICATION
15                         DEPOSITION
                              OF
16                        TARIQ HAFEEZ
                          MAY 24, 2022
17


18


19              I, Kateri A. Flot-Davis, Certified

20      Shorthand Reporter in and for the State of

21      Texas, hereby certify to the following:

22          That the witness, TARIQ HAFEEZ, was duly

23      sworn by the officer and that the transcript

24      of the oral deposition is a true record of the

25      testimony given by the witness;
```

362

```
 1      There was a request for examination and

 2   signature of the witness to the deposition

 3   transcript.  The original transcript was sent

 4   for review on _____ to the

 5   witness or to the attorney for the witness for

 6   examination, signature and return to me by

 7   _____;

 8      I further certify that I am neither counsel

 9   for, related to, nor employed by any of the

10   parties or attorneys in the action in which

11   this proceeding was taken, and further that I

12   am not financially or otherwise interested in

13   the outcome of the action.

14      Certified to by me this ____ of _____

15   ,_____.

16

17   _____

18   Kateri A. Flot-Davis
     Texas CSR No. 8462
19   Expiration Date: 12-31-22

20

21

22

23

24

25
```

# EXHIBIT 52

Exhibit 5

## STATEMENT OF WORK II
## FOR BULK MEMOS PROJECT

This Statement of Work is made pursuant to the Strategic Partnership Agreement by and between LegalEase Solutions, LLC, a Michigan limited liability company ("LEGALEASE") and Morae Global Corporation, a Delaware corporation ("Subcontractor").

### RECITALS

WHEREAS, LEGALEASE and Subcontractor are parties to a Strategic Partnership Agreement dated in August 2017 which governs the relationship between the parties;

WHEREAS, LEGALEASE has been engaged by Client ("Client") to provide certain memo drafting services as outlined below ("Client Engagement");

WHEREAS, LEGALEASE desires to subcontract some of the Client Engagement work to SUBCONTRACTOR;

WHEREAS, SUBCONTRACTOR agrees to accept the Client Engagement work under the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual promises contained and set out in this Agreement, the parties agree as follows:

1. <u>Definitions</u>:  Terms and expressions not expressly defined in this Statement of Work, shall have the following meanings:

   1.1. "Case Law" means judicial decisions originating from a judicial or administrative body in the United States of America, or as otherwise prescribed in writing by LEGALEASE and sent to SUBCONTRACTOR.
   1.2. "Legal Research Question" means a question grounded in legal principles.
   1.3. "Memorandum or Memo" means a memorandum of law that answers a Legal Research Question.
   1.4. "Quote" means an independent paragraph excerpt from Case Law.
   1.5. "Reference List" means the list of Case Law included in the Memo.
   1.6. "Deficiency" means a reference quote that does not directly answer the LEGALEASE question.

2. <u>Currency</u>: Unless stated otherwise, all dollar figures in this Statement of Work are in United States dollars.

3. <u>Description of Service</u>:

3.1. SUBCONTRACTOR agrees to provide LEGALEASE with Memos for Client, as topically assigned by LEGALEASE. SUBCONTRACTOR agrees to meet the expectations for performance as set forth in this Statement of Work. SUBCONTRACTOR will research topics and Legal Research Questions from any Federal or State jurisdiction in the United States, without regard to any legal decisions, draft Memos, and compile the Memos in the format approved by LEGALEASE. Unpublished cases are acceptable.

3.2. LEGALEASE and SUBCONTRACTOR agree that SUBCONTRACTOR will not be expected or required to engage in the practice of law during the provision of any of the services under this Statement of Work. To the extent SUBCONTRACTOR is providing services to LEGALEASE under this Statement of Work that are related to legal matters, LEGALEASE on behalf of itself and its responsible attorney, agrees and acknowledges that such services shall be solely in support of LEGALEASE's responsible attorney and that



EXHIBIT
5
605541

SUBCONTRACTOR is not providing legal advice or opinions to LEGALEASE's, responsible attorney, or any other third party regarding any project.

3.3. LEGALEASE will provide SUBCONTRACTOR with Best Practices Guide for SUBCONTRACTOR to determine minimum number of memos to be delivered for each topic assigned. SUBCONTRACTOR will confirm with LEGALEASE the number of memos per topic assigned within 24 business hours of assignment.

3.4. Each Memo shall include a Legal Research Question and a Reference list with a target of at least five (5) and no more than six (6) Quotes.

3.5. Three (3) to four (4) Quotes in each Memo shall contain either a "great" or "good" independent answer to the Legal Research Question. A "great" Quote is one that contains an answer to all essential elements of the Legal Research Question while a "good" Quote is one that contains an answer to most essential elements of the Legal Research Question. SUBCONTRACTOR shall strive for four (4) "good" or "great" Quotes per question, of any quantity. SUBCONTRACTOR shall strive to have more "great" than "good" Quotes.

3.6. SUBCONTRACTOR shall rank the "great" and "good" Quotes in order of relevance, with the first-ranked Quote in a Memo being the best answer to the Memo question.

3.7. One (1) Quote in each Memo shall contain a "topical" independent response to the Legal Research Question. A "topical" response is a response that answers and/or references limited components of a Legal Research Question but does not answer the essential elements of such Legal Research Question.

3.8. One (1) Quote in each Memo shall contain an "irrelevant" independent response to the Legal Research Question. An "irrelevant" response is a response that contains one or more keywords from the Legal Research Question but does answer and/or reference any elements of the Legal Research Question, either limited or essential.

3.9. SUBCONTRACTOR shall label whether a Quote contains a response that is "great", "good", "topical" or "irrelevant" and double bracket and bold the specific component of each such Quote that is "great", "good", "topical" or "irrelevant." SUBCONTRACTOR shall also label which legal practice area each Quote falls under.

4. <u>Changes</u>: LEGALEASE reserves the right to request changes, deletions, or additions as deemed necessary by LEGALEASE. LEGALEASE' proposed changes shall become effective only by written agreement of SUBCONTRACTOR.

5. <u>Production/Delivery Schedule</u>: SUBCONTRACTOR agrees to draft LEGALEASE questions and Memos pursuant to the schedule below. In the Production Run of Memos, SUBCONTRACTOR shall commence providing deliverables on October 6, 2017 and as outlined below. There shall be no duplicate questions and memos submitted. SUBCONTRACTOR may produce more questions and memos in the Production.

Confidential

Production:
First stage: Minimum of 2000 Memos completed by October 20, 2017 and will make all effort to deliver by October 18, 2017.
Daily deliverables shall be a minimum of 200 memos per day starting October 16, 2017.

Second stage: Minimum of 8000 Memos completed by November 15, 2017
Daily deliverables shall be a minimum of 400 memos per day.

6. Option for additional Memos: It is anticipated that LEGALEASE will contract for additional memos from SUBCONTRACTOR. LEGALEASE will notify SUBCONTRACTOR no later than 5 days prior for the commencement date for additional Memos. In the event that LEGALEASE contracts with SUBCONTRACTOR for subsequent production runs, the production schedule will be mutually agreed upon prior to commencing such future production runs. LEGALEASE is in no way obligated to SUBCONTRACTOR for these Anticipated Production, absent agreement.

Anticipated Production:
Third stage: Minimum of 11,000 memos completed by December 30, 2017
CONTRACTORs commitment on delivery of number of memos and due date for the third stage is dependent on receiving assignment from LEGALEASE by no later than October 23, 2017.

Fourth stage: Minimum of 7,000 memos completed by January 13, 2017
CONTRACTORs commitment on delivery of number of memos and due date for the fourth stage is dependent on receiving assignment from LEGALEASE by no later than November 27, 2017.

7. General Terms: This Agreement is subject to and conditioned upon the underlying engagement between Client and LEGALEASE. Should client terminate or revise its engagement with LEGALEASE, LEGALEASE will notify SUBCONTRACTOR immediately.   In the event that client terminates the agreement, LEGALEASE shall be responsible for payment of only for those memos which have been accepted by the client.

8. Fee: LEGALEASE shall pay SUBCONTRACTOR pursuant to the schedule below:

| Reference Quotes | Price per Memo, Westlaw provided LEGALEASE |
|---|---|
| 4 Quotes + 1 topical and 1 irrelevant Quote | $11.34 |
| 3 Quotes + 1 topical and 1 irrelevant Quote | $10.34 |

Confidential

9. Volume Discount: SUBCONTRACTOR will provide a 5% discount for any Memo purchase over 15,000 and a 10% volume discount for any total order over 30,000 Memos.

10. Payment: SUBCONTRACTOR shall invoice LEGALEASE at the end of the month for the total number of Memos completed during that month. LEGALEASE shall pay within 30 days of receipt of invoice. Payments made by LEGALEASE to SUBCONTRACTOR are subject to the provisions of Quality Assurance Section 12 of this Agreement.

11. Delivery: SUBCONTRACTOR shall deliver daily batched Memos on the box site as provided by LEGALEASE or in any other manner by LEGALEASE in equal increments per production.

12. Quality Assurance: SUBCONTRACTOR shall ensure the Memos submitted follow the Quality Control Checklist ("QCC") provided in Schedule A to this Statement of Work. If any of the Memos, in any batch submitted does not meet the parameters prescribed in the QCC, SUBCONTRACTOR shall not bill for that Memo, nor resubmit that Memo or Memo question. LEGALEASE will provide the rejection reason in compliance with the QCC. SUBCONTRACTOR shall achieve the minimum memos per assigned topic area.

13. Any inquiries and question from LEGALEASE AND SUBCONTRACTOR shall be immediately addressed within 24 hours. LEGALEASE will allow SUBCONTRACTOR for the first 50 memos an opportunity, upon rejection, the opportunity to resubmit those memos.

14. Reporting: SUBCONTRACTOR shall email daily reports to LEGALEASE which include the production totals, QCC results, and other requested information from LEGALEASE. SUBCONTRACTOR shall also provide daily updates on tracking google docs sheet or other mechanism as provided by LEGALEASE.

15. Destruction of Memos: SUBCONTRACTOR acknowledges that the Memos constitute Confidential Information and are the property of LegalEase and shall remove and destroy all Memos and copies of Memos in its possession within sixty (60) days of each Production Run and LEGALEASE shall seek confirmation that such removal and destruction has occurred.

16. License Grant: LEGALEASE hereby grants to SUBCONTRACTOR and SUBCONTRACTOR'S affiliates and subsidiaries license to use of the Westlaw, pursuant to the terms of Westlaw's agreement, in all ways necessary to perform the services described in this Statement of Work for the term of this Statement of Work.

17. LegalEase Representations and Warranties; Indemnification: LEGALEASE represents and warrants that: (i) it has obtained any and all necessary authority, permissions and licenses from the relevant third-party software vendor to grant a license in the same terms as set out in Section 16 above; and (ii) it has reviewed the Westlaw Privacy Policy and confirmed that the Privacy Policy is sufficient to protect the intellectual property rights in the deliverables created under this Statement of Work.

LEGALEASE shall indemnify SUBCONTRACTOR (including its affiliates and subsidiaries) for any losses, liability, costs and expenses incurred by SUBCONTRACTOR or SUBCONTRACTOR'S affiliates or subsidiaries in the event of a third-party claim against SUBCONTRACTOR or a SUBCONTRACTOR affiliate or subsidiary arising out of, or resulting from: (i) LEGALEASE'S breach of the representations and warranties in this Section 17. For clarity, the indemnification obligation set forth in this Section 17 will not be subject to the disclaimer of damages or limitation of liability in Section VII of the Strategic Partnership Agreement.

Date: October 5, 2017

LEGALEASE SOLUTIONS LLC

By: _____

Name: Tariq Hafeez
Title:  President

MORAE GLOBAL CORPORATION

By: _____

Name: Joy Saphla
Title:  President, eLEXir

Confidential

MORAE_00012759

TR-0039947

# EXHIBIT 53

# In The Matter Of:

*West Publishing Corp. vs.*
*Legalease Solutions, LLC*

---

*Tariq Hafeez*
*Vol. I*
*December 18, 2018*

---



**DORIS O. WONG ASSOCIATES, INC.**

C O U R T   R E P O R T E R S

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File Hafeez_Tariq.txt*
*Min-U-Script® with Word Index*

TR-0039043

1

Volume 1
Pages 1 to 265
Exhibits 1 to 29


UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA


WEST PUBLISHING

CORPORATION                    Civ No. 18-CV-01445 (DSD/ECW)

        Plaintiff/Counterclaim

        Defendant,


    -vs-


LEGALEASE SOLUTIONS, LLC,

        Defendant/Counterclaim-Plaintiff.

                                    /


    The Deposition of TARIK HAFEEZ,

    Taken at 500 Woodward,

    Detroit, Michigan,

    Commencing at 9:00 a.m.,

    Tuesday, December 18, 2018,

    Before Shacara V. Mapp, CSR-9305.


D o r i s  O . W o n g  A s s o c i a t e s , I n c .

APPEARANCES:

      MR. SCOTT T. LASHWAY

      Holland & Knight

      10 St. James Avenue

      Boston, MA 02116

      (617) 305-2119

      scott.lashway@hklaw.com

         Appearing on behalf of the

      Plaintiff/Counterclaim-Defendant.


      MR. KASSEM M. DAKHLALLAH

      Hammoud & Dakhlallah

      6050 Greenfield Road

      Suite 201

      Dearborn, Michigan 48126

      (313) 551-3038

      kd@hdalawgroup.com

         Appearing on behalf of the

      Defendant/Counterclaim-Plaintiff.


ALSO PRESENT:

      - Videographer:  Neal Rogers

      - Erik Lindberg

      - Jeanpierre Juliano

TR-0039045

3

```
1                          TABLE OF CONTENTS
2    Witness                                        Page
3    TARIK HAFEEZ
4
5         EXAMINATION BY MR. LASHWAY:              8
6         EXAMINATION BY MR. DAKHLALLAH:           259
7
8                          INDEX TO EXHIBITS
9         Exhibit                                  Page
10
11        HAFEEZ EXHIBIT 1                         7
12        Notice of Rule 30(b)(6) Deposition of
13        LegalEase, LLC
14        HAFEEZ EXHIBIT 2                         7
15        Michigan Dept. Of Consumer & Industry
16        Services Fax Sheet
17        HAFEEZ EXHIBIT 3                         7
18        LARA Corporations LegalEase Filing
19        HAFEEZ EXHIBIT 4                         57
20        Intelligence is the Ability to
21        Adapt to Change Packet
22        HAFEEZ EXHIBIT 5                         72
23        Thomas Reuters Order Form
24        Order ID: Q-00105954
25
```

TR-0039046

1                    INDEX TO EXHIBITS, Continued

2          Exhibit                                 Page

3

4          HAFEEZ EXHIBIT 6                        76

5          Master Service Agreement

6          HAFEEZ EXHIBIT 7                        76

7          Statement of Work

8          HAFEEZ EXHIBIT 8                        76

9          Statement OF Work II for Ross Bulk Memos

10         HAFEEZ EXHIBIT 9                        77

11         Master Service Agreement from 8/10/17

12         HAFEEZ EXHIBIT 10                       77

13         Defendant/Counterclaim-Plaintiff Responses

14         to Plaintiff's First Set of Requests for

15         Admissions

16         HAFEEZ EXHIBIT 11                       77

17         First Amendment to Statement of Work

18         HAFEEZ EXHIBIT 12                       126

19         9/28/17 E-mail Subject: Minutes of Meeting

20         ROSS Bulk Project and ROSS Original

21         HAFEEZ EXHIBIT 13                       144

22         7/31/17 E-mail Subject: New West Law

23         Passwords-July 2017

24

25

1                        INDEX TO EXHIBITS, Continued

2              Exhibit                                  Page

3

4              HAFEEZ EXHIBIT 14                        149

5              7/26/17 E-mail Subject: ROSS-TC

6              Tomas 7 26 17

7              HAFEEZ EXHIBIT 15                        157

8              Statement of Work II LegalEase

9              Process Automation

10             HAFEEZ EXHIBIT 16                        183

11             Master Service Agreement Effective 8/10/17

12             HAFEEZ EXHIBIT 17                        205

13             8/18/17 E-mail Subject: WL Registration

14             Keys

15             HAFEEZ EXHIBIT 18                        207

16             9/5/17 E-mail Subject: Ross Portal

17             HAFEEZ EXHIBIT 19                        213

18             9/15/17 E-mail Subject: Ross Bulk Project

19             - LPO

20             HAFEEZ EXHIBIT 20                        216

21             9/15/17 E-mail Subject: Ross Bulk Project

22             - LPO

23             HAFEEZ EXHIBIT 21                        221

24             9/18/17 E-mail Subject: LegalEase Bulk

25             Memo Project Request

6

```
 1                     INDEX TO EXHIBITS, Continued

 2        Exhibit                                    Page

 3        HAFEEZ EXHIBIT 22                          225

 4        9/19/17 E-mail Subject: Ross Bulk

 5        Project-LPO

 6        HAFEEZ EXHIBIT 23                          233

 7        10/10/17 E-mail Subject: Permanent ID's

 8        Still

 9        Not Established

10        HAFEEZ EXHIBIT 25                          239

11        12/4/17 E-mail Subject: Ancillary Block

12        HAFEEZ EXHIBIT 26                          243

13        Thomas Reuter Research Subscriber

14        Agreement

15        HAFEEZ EXHIBIT 27                          243

16        Thomson Reuters General Terms and

17        Conditions

18        HAFEEZ EXHIBIT 28                          244

19        Thomson Reuters Schedule A

20        HAFEEZ EXHIBIT 29                          245

21        Westlaw Schedule A

22

23

24

25
```

TR-0039049

7

1   Detroit, Michigan

2   Tuesday, December 18, 2018

3   About 9:06 a.m.

4

5                    *                    *                    *

6           HAFEEZ EXHIBIT 1

7           Notice of Rule 30(b)(6) Deposition of

8           LegalEase, LLC;

9           HAFEEZ EXHIBIT 2

10          Michigan Dept. Of Consumer & Industry

11          Services Fax Sheet;

12          and HAFEEZ EXHIBIT 3

13          LARA Corporations LegalEase Filing

14          WAS MARKED BY THE REPORTER

15          FOR IDENTIFICATION

16              THE VIDEOGRAPHER:  We are on the record.

17      This is the video recorded deposition of Tariq Hafeez

18      being taken in Detroit, Michigan.  Today is December

19      18, 2018 and the time is 9:06 a.m.  Will the attorneys

20      please identify themselves and the court reporter

21      please swear in the witness?

22              MR. LASHWAY:  Scott Lashway on behalf of the

23      Plaintiff and counterclaim Defendant, West Publishing

24      Corporation.

25              MR. JULIANO:  John Pierre Juliano from

1          Thomson Reuters on behalf of West Publishing

2          Corporation.

3                    MR. LINDENBERG:  Erik Lindenberg, Thomson

4          Reuters on behalf of West Publishing Corporation.

5                    MR. DAKHLALLAH:  Kassem Dakhlallah on behalf

6          of the witness, the 30(b)(6) witness in this case,

7          Tariq Hafeez.

8                         TARIK HAFEEZ,

9          having first been duly sworn, was examined and

10          testified on his oath as follows:

11  EXAMINATION BY MR. LASHWAY:

12  Q.    Mr. Hafeez, it's nice to meet you.  As I just

13          mentioned, I represent the Plaintiff and -- I'm sorry,

14          the Plaintiff and Counterclaim Defendant, West

15          Publishing Corp.

16                    And, Mr. Dakhlallah represents you for

17          purposes of today's deposition?

18  A.    Yes, that's correct.

19  Q.    And does he represent LegalEase Solutions, LLC, the

20          named Defendant and Counterclaim-Plaintiff as well?

21  A.    Yes, he does.

22  Q.    Okay.

23                    MR. LASHWAY:  Kassem, just to go over some

24          quick stipulations, are you -- since this is our first

25          deposition in the case, are you okay with preserving

**Tariq Hafeez - Vol. I - December 18, 2018**

124

```
 1   A.   They did, yes.
 2   Q.   And then it says, for any subsequent production run,
 3        the advance payment shall be 420,000.  Do you see that?
 4   A.   Yes.
 5   Q.   Is that because the subsequent production runs were
 6        anticipated to be 20,000 production memos a month?
 7   A.   Yes.
 8   Q.   Did you provide any subsequent production runs?
 9   A.   No.
10   Q.   So in total, you provided to Ross, 25,000 memos?
11   A.   Yes.
12   Q.   Anything else?
13   A.   Not for this.
14   Q.   But the original project was still ongoing?
15   A.   Yes.
16   Q.   Were you still producing 75 memos a week on the
17        original?
18   A.   I believe we did.  I believe we started because we
19        needed to reallocate the bulk.  We weren't doing 75,
20        but we were doing enough to keep Ross happy.
21   Q.   How did you pay the individuals who were doing the
22        manual work?
23   A.   So some were paid -- so maybe we can break it down into
24        the different types for individuals.
25   Q.   Sure.
```

TR-0039167

1    CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN      )

4                           )  SS

5    COUNTY OF MACOMB       )

6              I, Shacara V. Mapp, Certified Shorthand

7         Reporter, a Notary Public in and for the above county

8         and state, do hereby certify that the above deposition

9         was taken before me at the time and place hereinbefore

10        set forth; that the witness was by me first duly sworn

11        to testify to the truth, and nothing but the truth;

12        that the foregoing questions asked and answers made by

13        the witness were duly recorded by me stenographically

14        and reduced to computer transcription; that this is a

15        true, full and correct transcript of my stenographic

16        notes so taken; and that I am not related to, nor of

17        counsel to either party, nor interested in the event of

18        this cause.

19

20        _____

21        Shacara V. Mapp, CSR-9305

22        Notary Public,

23        Macomb County, Michigan

24        My Commission expires:  07-25-2024

25

TR-0039308

# EXHIBIT 54

**In the Matter Of:**

*THOMSON REUTERS ENTERPRISE vs*

*ROSS INTELLIGENCE*

---

*TOMAS VAN DER HEIJDEN*

*March 17, 2022*

---



1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

THOMSON REUTERS ENTERPRISE    )
4  CENTRE GMBH and WEST         )
   PUBLISHING CORPORATION,      )
5                               )
          Plaintiffs and    )
6          Counterdefendants,)
                               )
7                               )
   vs.                     )    C.A. No. 20-613 (LPS)
8                               )
   ROSS INTELLIGENCE, INC.,     )
9                               )
          Defendant and    )
10          Counterplaintiff. )
                               )
11  _____)

12

13          **HIGHLY CONFIDENTIAL**

14

15       VIDEOTAPED 30(b)(6) DEPOSITION OF DEFENDANT,

16       by and through its corporate designee

17              TOMAS VAN DER HEIJDEN,

18          (also in his individual capacity)

19

20          London, England, United Kingdom

21              Thursday, March 17, 2022

22

23

   Pages: Pages 1 - 443
24

   Reported stenographically by:
25  LEAH M. WILLERSDORF, RPR-CRR-FBIVR-ACR-QRR2-CLR

2

1

2

3

4                    Thursday, March 17, 2022

5

                               09:29 a.m.
6                        (Greenwich Mean Time)

7

8

9         Videotaped 30(b)(6) deposition of Defendant, by

10   and through its corporate representative Tomas van der

11   Heijden, as well as in his individual capacity, held

12   at the offices of Kirkland & Ellis International LLP,

13   30 St. Mary Axe, London EC3A 8AF, England, United

14   Kingdom, before Leah Willersdorf, Registered

15   Professional Reporter and Certified Realtime Reporter

16   with the US National Court Reporters Association,

17   and Accredited Court Reporter, Qualified Realtime

18   Reporter (Level 2) and Fellow of the British Institute

19   of Verbatim Reporters, and Certified LiveNote

20   Reporter.

21

22

23

24

25

THOMSON REUTERS ENTERPRISE vs                    Tomas van der Heijden
ROSS INTELLIGENCE            30(b)(6), Highly Confidential       March 17, 2022

3

```
 1                    A P P E A R A N C E S

 2

 3    On behalf of Plaintiffs and Counterdefendants:

 4          KIRKLAND & ELLIS, LLP

 5              601 Lexington Avenue
                New York, New York 10022
 6              (212) 446 4800

 7          BY:  JOSHUA L. SIMMONS, ESQ.
                 JENNIFER GIBBINS, ESQ.
 8               joshua.simmons@kirkland.com
                 jennifer.gibbins@kirkland.com
 9


10

     On behalf of Defendant and Counterplaintiff:
11
          CROWELL & MORING, LLP
12
                3 Embarcadero Center
13              26th Floor
                San Francisco, CA 94111
14              (415) 986 2800

15          BY:  KAYVAN M. GHAFFARI, ESQ.
                 kghaffari@crowell.com
16


17
     ALSO PRESENT:
18

19          Linda Fleet   -   Videographer

20

21

22

23

24

25
```

4

```
 1                    WITNESS INDEX

 2   Witness:                              Page

 3   TOMAS VAN DER HEIJDEN

 4       Examination by Mr. Simmons              15

 5       Examination by Mr. Ghaffari            387

 6       Further Examination by Mr. Simmons     420

 7

 8

 9

10

11

12
                     REQUEST FOR PRODUCTION
13
                                  Line      Page
14
         Document request            19        104
15

16

17

18

19

20

21

22

23

24

25
```

THOMSON REUTERS ENTERPRISE vs                           Tomas van der Heijden
ROSS INTELLIGENCE            30(b)(6), Highly Confidential              March 17, 2022

14

1            (On the record at 9:29 a.m.)

2            THE VIDEOGRAPHER:  We are now on the

3    record.  My name is Linda Fleet.  I am a videographer

4    retained by Philadelphia.

5            This is a video deposition for the United

6    States District Court for the District of Delaware.

7            Today's date is March 17, 2022, and the

8    video time is 9:30 a.m.

9            This deposition is being held at Kirkland

10   & Ellis, 30 St. Mary Axe, London EC3A 8AF, United

11   Kingdom, in the matter of Thomson Reuters Enterprise

12   Centre GmbH, versus ROSS Intelligence, Inc.

13           The deponent is Tomas van der Heijden.

14           Would all counsel please voice-identify

15   themselves.

16           MR. SIMMONS:  This is Joshua Simmons from

17   Kirkland & Ellis.  With me is Jennifer Gibbins who is

18   also from Kirkland & Ellis.  We are here on behalf of

19   the plaintiffs.

20           MR. GHAFFARI:  My name is Kayvan Ghaffari

21   of Crowell & Moring, LLP, here on behalf of the

22   witness and defendant/counterplaintiff ROSS

23   Intelligence, Inc.

24           THE VIDEOGRAPHER:  The court reporter is

25   Leah Willersdorf and will now swear in the witness.

15

```
 1                    TOMAS VAN DER HEIJDEN,

 2                   having been duly sworn,

 3           was examined and testified as follows:

 4                 EXAMINATION ON BEHALF OF

 5                 PLAINTIFFS/COUNTERDEFENDANTS

 6   BY MR. SIMMONS:

 7         Q.    Would you please state your name for the

 8   record.

 9         A.    It's Tomas van der Heijden.

10         Q.    And what's your address?

11         A.    37 Fehrbelliner Strasse, Berlin, Germany.

12         Q.    Are you currently employed?

13         A.    I am, yeah.

14         Q.    By what company?

15         A.    It's called Briink Intelligence.

16         Q.    And what do they do?

17         A.    Produce sustainable finance reporting.

18         Q.    What's your role at Briink Intelligence?

19         A.    I'm the CEO and cofounder.

20         Q.    What's your relationship to ROSS

21   Intelligence, the defendant in this case?

22         A.    I'm a former employee.

23         Q.    What was your role as an employee when you

24   left the company?

25         A.    I was the VP Product and Legal.
```

133

```
 1              MR. GHAFFARI:  Objection as to form.
 2              THE WITNESS:  I would want to clarify that
 3    you're using the term "documents," but we didn't use
 4    the term "documents" internally.  We used the term
 5    "passages."
 6    BY MR. SIMMONS:
 7         Q.   Okay.
 8         A.   We were interested in passages from case
 9    law.
10         Q.   But LegalEase provided you with documents,
11    right?
12              MR. GHAFFARI:  Objection as to form.
13              THE WITNESS:  They mostly provided us with
14    either Word documents or they provided us with
15    passages.
16    BY MR. SIMMONS:
17         Q.   So LegalEase provided you with Word
18    documents and passages, right?
19         A.   Yes.
20         Q.   Did ROSS ever investigate whether the
21    material contained in those Word documents or passages
22    was copyrightable?
23              MR. GHAFFARI:  Objection as to form.
24              THE WITNESS:  We didn't really need to.
25    ///
```

135

```
 1          A.   It had a few.

 2          Q.   Okay.  So it trained artificial

 3   intelligence using materials that were provided by

 4   LegalEase, right?

 5               MR. GHAFFARI:  Objection as to form.

 6               THE WITNESS:  Yes.

 7   BY MR. SIMMONS:

 8          Q.   And when it did that, the materials

 9   LegalEase provided had content beyond quotations from

10   judicial opinions, right?

11               MR. GHAFFARI:  Objection as to form.

12               THE WITNESS:  So, again, could you clarify

13   which project you're talking about because I think

14   you're convoluting a number of different projects.

15   It's hard for me to answer those questions without

16   knowing what you're referring to.

17   BY MR. SIMMONS:

18          Q.   Why is that?

19          A.   Because the different -- the extent to

20   which I knew that there was data beyond case law

21   passages and the data that was provided by LegalEase

22   depends on the project you're talking about.

23          Q.   Okay.  Which projects did you know had

24   material beyond quotations from judicial opinions?

25          A.   The ROSS Classifier project.
```

1        Q.    Okay.  And in that project, what material

2    beyond judicial opinions was LegalEase providing?

3        A.    If my memory serves, there were some

4    headnotes in some of the material that was provided

5    to ROSS from LegalEase for the ROSS Classifier

6    project.

7        Q.    Material from Westlaw?

8        A.    Yes.

9        Q.    Westlaw headnotes?

10        A.    That is what my engineers informed me of,

11    yeah.

12        Q.    Did that concern you?

13        A.    Yes, that did concern me.

14        Q.    Why?

15        A.    Again, because the ability for us to train

16    our algorithms effectively meant that we needed to

17    have passages from case law because it needed to map

18    to passages from case law we had in our system.  If

19    there was no mapping, it was bad data, it was

20    irrelevant.  And, worse so, it was noisy, because it

21    became a resource-intensive exercise for our team to

22    be able to then have to take out stuff that was

23    irrelevant from the data set.

24        Q.    Did you know at the time that LegalEase

25    gave you Westlaw material, including headnotes, that

321

1           MR. GHAFFARI:  Objection as to form.

2           THE WITNESS:  This is just one component

3    of the platform, a small component of it.  The rest of

4    the platform was powered by machine learning, the core

5    platform.

6    BY MR. SIMMONS:

7           Q.   Mmm-hmm.  There came a time that ROSS

8    hired LegalEase to perform a Bulk Memos project,

9    right?

10          A.   Right.

11          Q.   Why was it called the Bulk Memos project?

12          A.   A lot of these names came from LegalEase.

13   They had interesting ways of coming up with names for

14   things.

15          Q.   Do you know why LegalEase called it the

16   Bulk Memo project?

17          A.   Likely because it was a large amount of

18   memos.  "Bulk" is typically used for characterizing

19   large.

20          Q.   When you say "typically," you mean in the

21   legal services industry or in some other context?

22          A.   In the English language.

23          Q.   Okay.  And what was the Bulk Memos

24   project?

25          A.   The Bulk Memos project was a project

322

 1    whereby we wanted to generate a large data set of

 2    legal research question and case law answers to train

 3    our machine-learning algorithms.

 4         Q.   And to do that, you worked with LegalEase

 5    to put together quality-controlled guidelines,

 6    correct?

 7         A.   Correct.

 8         Q.   And those were jointly written by ROSS and

 9    LegalEase?

10         A.   Those were primarily written by ROSS.

11         Q.   Okay.  Why did ROSS want to dictate how

12    the memos were created?

13         A.   Because we needed the memos to be of a

14    certain structure and certain quality in order for

15    them to be effective for the training of our

16    algorithms.

17         Q.   And that's because the memos were used to

18    teach your artificial intelligence?

19         A.   The memos were used to train our language

20    models, yes.

21         Q.   And the language models were how the

22    platform operated, right?

23         A.   The language models were what taught the

24    platform how to identify relevance in -- with respect

25    to a legal research question.

415

```
 1    for speculation, foundation.

 2              THE WITNESS:  Yes.

 3    BY MR. GHAFFARI:

 4         Q.   Now, if we go to Exhibit 46, this is an

 5    email that plaintiffs' counsel provided to you earlier

 6    today.  Do you recall seeing this email?

 7         A.   Yes.

 8         Q.   And this email was sent -- this email

 9    chain was sent on December 22, 2017; is that correct?

10         A.   Correct.

11         Q.   And the Subject line is "Classifier Part

12    II."  Correct?

13         A.   Correct.

14         Q.   What is the Classifier project?

15         A.   The Classifier project was an experiment

16    that we ran at ROSS.  We were under the hypothesis

17    that we needed to classify our case law into smaller

18    chunks because we did not think that the search

19    platform would function as quickly as it could if we

20    had it search over the entire database of case law.

21    There was a latency issue.

22         Q.   Was the Classifier project used to train

23    the artificial intelligence search engine that's known

24    as ROSS?

25              MR. SIMMONS:  Objection; leading.
```

THOMSON REUTERS ENTERPRISE vs                                    Tomas van der Heijden
ROSS INTELLIGENCE              30(b)(6), Highly Confidential           March 17, 2022

416

```
 1              THE WITNESS:  The Classifier project was

 2    never used for anything that went into production on

 3    the platform.

 4    BY MR. GHAFFARI:

 5         Q.   And why not?

 6              MR. SIMMONS:  Same objection.

 7              THE WITNESS:  We learned that our

 8    hypotheses around why we needed to classify case law

 9    were -- those hypotheses were proven false during the

10    experimentation that we ran.

11    BY MR. GHAFFARI:

12         Q.   Can you -- how were they proven false?

13         A.   So there was two reasons why -- there was

14    two sort of hypotheses that were running in parallel.

15    One was we need to classify the cases into smaller

16    chunks so that if a user, for example, asked

17    a copyright law question, we would only search

18    copyright law.  That was for purposes of ensuring that

19    the best search results appeared at the top, right.

20    We had a hypothesis that if we had a copyright

21    question search over all 11 million cases, that it

22    would not do as effective a job.

23              The second hypothesis was that there were

24    latency issues on the platform.  At the time, it took

25    quite a long time for us to run a search and get
```

THOMSON REUTERS ENTERPRISE vs                                    Tomas van der Heijden
ROSS INTELLIGENCE              30(b)(6), Highly Confidential            March 17, 2022

445

```
 1                    REPORTER CERTIFICATE

 2

 3   I, LEAH M. WILLERSDORF, Registered Professional

 4   Reporter, Certified Realtime Reporter, Fellow of the

 5   British Institute of Verbatim Reporters, Qualified

 6   Realtime Reporter Level 2, and Certified LiveNote

 7   Reporter, do hereby certify that:

 8            TOMAS VAN DER HEIJDEN appeared before me on

 9   Thursday, March 17, 2022, was sworn by me, and was

10   thereupon examined by counsel; that the testimony of

11   said witness was taken and reduced to stenotype

12   writing before me; that the foregoing is a true and

13   accurate record to the best of my knowledge, skill and

14   ability; that I am neither a relative nor employee of

15   any party to the action in which this deposition was

16   taken; nor am I a relative nor employee of any

17   attorney or counsel employed by any party thereto;

18   and, further, I am not financially or otherwise

19   interested in the outcome of the action.

20        IN WITNESS WHEREOF I have hereunto set my hand

21   this 28th of March 2022.

22

23

24   _____

25            LEAH M. WILLERSDORF
             RPR-CRR-FBIVR-ACR-QRR2-CLR
```

**Signature and Errata Sheet**
**March 17, 2022 Deposition of Tomas van der Heijden**
***Thomson Reuters Enterprise Centre GMBH and West Publishing Corporation v. ROSS***
***Intelligence Inc.***

    I, Tomas van der Heijden, have reviewed the attached transcript of my March 17, 2022 deposition testimony and certify, pursuant 28 U.S.C. § 1746 that the attached transcript is my true and correct testimony during that deposition, subject to the corrections shown below.

| Page/Line | Now Reads | Correction | Reason |
|---|---|---|---|
| 14:4 | Philadelphia | Lexitas | Transcription error |
| 161:12 | spoke | spoken | Transcription error |
| 182:16 | they were | then we were | Transcription error |
| 183:16 | is we | is why | Transcription error |
| 339:19 | experts, didn't | experts, you didn't | Transcription error |
| 384:10 | dispersement | disbursement | Transcription error |
| 428:19 | using for | using it for | Transcription error |
| | | | |
| | | | |

Executed on April 28, 2022, at Berlin, Germany.

_____

# EXHIBIT 55

Highly Confidential

```
 1          IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF DELAWARE

 3

 4   THOMSON REUTERS ENTERPRISE

 5   CENTRE GMBH and WEST PUBLISHING

 6   CORPORATION,

 7             Plaintiffs/Counterdefendants,

 8

 9      vs.          C.A. No.  20-613-LPS

10

11   ROSS INTELLIGENCE, INC.,

12             Defendant/Counterclaimant.

13   _____

14

15             HIGHLY CONFIDENTIAL

16          PURSUANT TO PROTECTIVE ORDER

17

18          VIDEOTAPED AND VIDEOCONFERENCE

19          DEPOSITION OF TERI WHITEHEAD

20

21             Monday, April 18, 2022

22

23   Reported by:

24   Denise M. Kizy, RPR, CRR, CSR-2466

25   JOB NO. 208941
```

Highly Confidential

1

2

3

4            April 18, 2022

5            9:04 a.m.

6

7

8       Deposition of TERI WHITEHEAD, held

9   via videoconference, before Denise M. Kizy,

10   RPR, CRR, CSR-2466, a Notary Public of the

11   State of Michigan.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

1    APPEARANCES:

2

3         Kirkland & Ellis LLP

4         Attorneys for Plaintiffs/Counterdefendants

5              601 Lexington Avenue

6              New York, New York 10022

7         BY:   JOSHUA SIMMONS, ESQ.

8              JENNIFER GIBBINS, ESQ.

9

10        Crowell & Moring LLP

11        Attorneys for Defendant/Counterclaimant

12             3 Embarcadero Center

13             San Francisco, California 94111

14        BY:   WARRINGTON PARKER, ESQ.

15             CRINESHA BERRY, ESQ.

16

17

18

19

20

21

22   ALSO PRESENT:

23   Brandon Vosburgh - Video Technician

24   Alexandra Teves - Exhibit Operator

25

```
 1                    TABLE OF CONTENTS

 2   WITNESS                              PAGE

 3   TERI WHITEHEAD

 4

 5   EXAMINATION

 6   BY MR. PARKER                        11

 7   EXAMINATION

 8   BY MR. SIMMONS                       179

 9

10                      EXHIBITS

11   EXHIBIT                              PAGE

12   EXHIBIT 1    Defendant and Counterclaimant   12

13                ROSS Intelligence Inc.'s

14                Amended Notice of Deposition

15                Subpoena to Teri Whitehead

16   EXHIBIT 2    Master Services Agreement   30

17   EXHIBIT 3    Statement of Work           32

18   EXHIBIT 4    First Amendment to Statement  35

19                of Work

20   EXHIBIT 5    [Proposed] Stipulated        35

21                Protective Order

22   EXHIBIT 6    E-mail chain                 39

23   EXHIBIT 7    E-mail chain                 43

24   EXHIBIT 8    E-mail chain                 45

25   EXHIBIT 9    E-mail                       47
```

Highly Confidential

```
 1                TERI WHITEHEAD

 2        VIDEO TECHNICIAN:  Good morning.  My

 3   name is Brandon Vosburgh.  I'm the legal

 4   videographer in association with TSG

 5   Reporting, Incorporated.

 6        Due to the severity of COVID-19 and

 7   following the practice of social

 8   distancing, I will not be in the same room

 9   with the witness; instead, I will record

10   this deposition remotely.

11        Our certified court stenographer,

12   Denise Kizy, will also be in a separate

13   room and will swear in the witness

14   remotely.

15        Do all the parties stipulate to the

16   validity of this video recording and remote

17   swearing, and that it will be admissible in

18   the courtroom as if it had been taken

19   following Rule 30 of the Federal Rules of

20   Civil Procedures and the state's rules

21   where this case is pending?

22        Your answers, please.

23        MR. PARKER:  Yes.

24        MR. SIMMONS:  It's okay from the

25   plaintiff's perspective as well.
```

Highly Confidential

```
 1              TERI WHITEHEAD

 2         VIDEO TECHNICIAN:  Thank you for

 3   your answers.

 4         Today is Monday, April 18, 2022, and

 5   the time is 9:05 a.m. Eastern Standard

 6   Time.

 7         This is media unit number one of the

 8   video-recorded deposition of Teri Whitehead

 9   in the matter of Thomson Reuters Enterprise

10   Centre GmbH, et al. versus ROSS

11   Intelligence, Incorporated.

12         Will counsel please identify

13   yourselves for the record and then we'll

14   have our court stenographer swear in the

15   witness.

16         THE COURT REPORTER:  Counsel, please

17   identify yourselves.

18         MR. PARKER:  This is Warrington

19   Parker appearing on behalf of ROSS

20   Intelligence, defendants in the case.  With

21   me is Crinesha Berry.

22         MR. SIMMONS:  My name is Joshua

23   Simmons.  With me is Jennifer Gibbins.

24   We're from Kirkland & Ellis representing

25   the plaintiffs.
```

Highly Confidential

1              TERI WHITEHEAD

2              MR. PARKER:  Good morning, Ms.

3       Whitehead.  How are you?

4              THE COURT REPORTER:  Excuse me,

5       excuse me.

6              Ms. Whitehead, would you raise your

7       right hand, please.

8              TERI WHITEHEAD

9       was thereupon called as a witness herein,

10      and after having been first duly sworn to

11      testify to the truth, the whole truth and

12      nothing but the truth, was examined and

13      testified as follows:

14              EXAMINATION

15   BY MR. PARKER:

16      Q.    Well, good morning.  Now you're

17   placed under oath and you can really say good

18   morning I reckon.  How are you?

19      A.    Good.  Thanks.

20      Q.    Good.  I apologize.  I'm in San

21   Francisco.  The back lighting is poor and it's

22   still dark, but it will get lighter as the day

23   goes on, so I won't look quite as mysterious.

24              You understand you've been placed

25   under oath; yes?

Highly Confidential

1                    TERI WHITEHEAD

2        Q.    Do you know whether or not anyone at

3   ROSS directed LegalEase to use either Westlaw

4   or Lexis?

5        A.    No, I don't believe so.

6        Q.    Let me turn -- direct your attention

7   to what we'll mark as Tab 20 -- I'm sorry.

8             EXHIBIT OPERATOR:  I'm sorry, you

9        said Tab 20?

10            MR. PARKER:  No, I'm stuck.  It's

11       going to be marked as Exhibit 7 and it's

12       going to be Tab 22.

13            MARKED FOR IDENTIFICATION:

14            EXHIBIT 7

15            10:10 a.m.

16  BY MR. PARKER:

17       Q.    And while you're reviewing that,

18  Ms. Whitehead, Tab -- I'm sorry, Exhibit 7 is a

19  document.  At the top it says, "Re:  ROSS

20  Intelligence," from Thomas Hamilton to Teri

21  Whitehead, March 9, 2016.  It's Bates stamped

22  on the first page ROSS-000199634.

23       A.    Okay.  I've briefly reviewed this.

24       Q.    Great.  And if you go to the e-mail

25  which begins on Wednesday, March 9, 2016, at

Highly Confidential

1                    TERI WHITEHEAD

2  refreshes your recollection?

3      A.    It seems as though I was -- okay.

4  Well, here.

5           So it appears as though I attached

6  this memo -- or this case because it appears

7  like I might have had a dispute with ROSS or

8  Tomas on confirming that the quote referenced

9  is complete.

10     Q.    And did you during the time period

11  where ROSS was providing questions and

12  LegalEase was providing memos answering those

13  questions, did you direct the people creating

14  the memos to use Westlaw or Lexis; did you have

15  a preference?

16     A.    I don't think -- I don't know if I

17  had a necessarily preference.  I think that's

18  what LegalEase used and they also used Lexis as

19  well, so...

20     Q.    And my question is -- let me be more

21  specific.

22           Did you ever direct the persons

23  preparing the memos who worked at LegalEase to

24  use West versus Lexis or any other legal

25  research tool?

Highly Confidential

1          TERI WHITEHEAD

2       Q.    And do you know whether or not --

3   well, did ROSS ever direct you as to what

4   topics should be addressed in a Bulk Memo

5   Project?

6       A.    No, I do not think they did.  I

7   believe we had a tracking sheet, perhaps a

8   Google tracking sheet, that would have been

9   created that might address these headnotes and

10  the subtopics.

11      Q.    All right.  And when you say there

12  was a Google Sheet that addresses headnotes and

13  topics, what do you mean?

14      A.    And I'm saying Google Sheet because

15  that's what I believed we used, so I could be

16  wrong, maybe it was another format, but I

17  thought we had Google Sheets that we were using

18  to track topics, or as it says here to assign

19  topics to attorneys and to different teams and

20  companies.

21      Q.    And with whom was that Google Sheet

22  shared?

23      A.    Everybody within LegalEase.  Not --

24  I don't think we assigned it to ROSS.  I think

25  the Google Sheet was given -- I'm not sure what

Highly Confidential

1          TERI WHITEHEAD

2     Q.    And if you could go to the last page

3  of this, Exhibit 29, which is TR-0001913.

4     A.    Please, I'm there.

5     Q.    Okay.  It says:

6          "Thank you for following up on the WL

7     registration numbers.  I have a big ask of

8     you - could you please provide an Excel

9     spreadsheet today of the Westlaw Key

10    Numbers, Sub Key Numbers, Sub Key Numbers

11    with topics assigned?  Please feel free to

12    call me directly with questions."

13         Do you see that?

14    A.    I do.  Thank you.

15    Q.    Did you write this -- did you send

16  this e-mail?

17    A.    We sent this e-mail, yes.

18    Q.    Okay.  And do you recall why you

19  were asking for an Excel spreadsheet with the

20  West Key Numbers, Sub Key Numbers, Sub Key

21  Numbers with topics assigned?

22    A.    If I can go back, I think it must

23  have to do with -- I thought there was some

24  other e-mail that we read.

25         I believe that it was probably for

1                    TERI WHITEHEAD

2     our internal use so that we could assign out

3     topics with the teams of attorneys, so I think

4     it goes back to an e-mail that you showed

5     earlier on assignment of topics to different

6     teams of attorneys.

7          Q.    Did anyone from ROSS ask you to make

8     this request?

9          A.    No, no.

10               MR. SIMMONS:  Objection; foundation,

11          calls for speculation.

12               MR. PARKER:  Can we go off the

13          record for a moment?  Are we off the

14          record?

15               VIDEO TECHNICIAN:  This marks the

16          end of media unit number 3.  We are off the

17          record at 12:07 p.m.

18               (Recess taken at 12:07 p.m.)

19               (Back on the record at 12:29 p.m.)

20               VIDEO TECHNICIAN:  This marks the

21          beginning of media unit number 4.  The time

22          is 12:29 p.m.  We are back on the record.

23     BY MR. PARKER:

24          Q.    Ms. Whitehead, I'd like to show you

25     what we'll mark as Exhibit 30, and it's Tab

Highly Confidential

1                    TERI WHITEHEAD

2    questions.  So I guess Westlaw and Lexis, they

3    both have topical areas like family law,

4    employment law.

5        Q.    And it says:

6              "However, note that the headnotes are

7         proprietary and you should not copy or paste

8         them in the question."

9              Do you see that?

10       A.    I do.

11       Q.    What was the expectation?  What use

12   as you understood it were headnotes to be used

13   for?

14             MR. SIMMONS:  Objection to the form

15        of the question.

16             THE WITNESS:  My understanding is to

17        assist in the process of creating

18        questions.

19   BY MR. PARKER:

20       Q.    And then it says under "1.  West

21   Law," it says:

22             "1) Headnote search - Click on the Key

23        Numbers.  You will be assigned a number

24        which is available under the Key Numbers."

25             Do you see that?

1                    TERI WHITEHEAD

2                      CERTIFICATE

3

4    STATE OF MICHIGAN)

5                    ) ss.

6    COUNTY OF OAKLAND)

7

8           I, Denise M. Kizy, a Notary Public

9        within and for the State of Michigan, do

10       hereby certify:

11          That TERI WHITEHEAD, the deponent

12       whose deposition is hereinbefore set forth,

13       was duly sworn by me and that such

14       deposition is a true record of the

15       testimony given by such witness.

16          I further certify that I am not

17       related to any of the parties to this

18       action by blood or marriage; and that I am

19       in no way interested in the outcome of this

20       matter.

21          IN WITNESS WHEREOF, I have hereunto

22       set my hand April 28, 2022.

23                    _Denise M. Kizy_

24       _____

25          Denise M. Kizy, RPR, CRR, CSR-2466

# EXHIBIT 56

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4   THOMSON REUTERS ENTERPRISE      )
    CENTRE GMBH and WEST            )
5   PUBLISHING CORPORATION,         )
                                    )
6          Plaintiffs,              )
                                    )
7      vs.                          ) No. 1:20-cv-00613-UNA
                                    )
8   ROSS INTELLIGENCE INC.,         )
                                    )
9          Defendant.               )
    _____ )

10

11

12

13

14   VIDEO-RECORDED DEPOSITION OF

15   BARBARA FREDERIKSEN-CROSS, at Regus Center,

16   1050 SW Sixth Avenue, Suite 1100, Portland,

17   Oregon, commencing at 9:21 a.m. PST, on

18   Friday, November 11, 2022, before

19   Marla Sharp, RPR, CLR, CCRR, CA CSR 11924,

20   OR CSR 17-0446, WA CSR 3408.

21

22

23

24

25

2

```
 1  APPEARANCES OF COUNSEL:

 2  FOR THE PLAINTIFFS

 3          KIRKLAND & ELLIS LLP
            BY:  JOSHUA L. SIMMONS, ESQ.
 4               ERIC LOVERRO, ESQ.
            601 Lexington Avenue
 5          New York, New York 10022
            212-226-4800
 6          joshua.simmons@kirkland.com
            eric.loverro@kirkland.com
 7

 8  FOR THE DEFENDANT

 9          CROWELL & MORING LLP
            BY:  GABRIEL M. RAMSEY, ESQ.
10          3 Embarcadero Center, 26th Floor
            San Francisco, California 94111
11          415-986-2800
            gramsey@crowell.com
12
            BY:  CRINESHA B. BERRY, ESQ.
13          1001 Pennsylvania Ave NW
            Washington, DC 20004
14          202-624-2500
            cberry@crowell.com
15

16  ALSO PRESENT:

17          Rick Majewski, videographer

18

19

20

21

22

23

24

25
```

THOMSON REUTERS ENTERPRISE CENTRE GMBH v
ROSS INTELLIGENCE INC.

Barbara Frederiksen-Cross
November 11, 2022

3

```
 1                    I N D E X

 2   EXAMINATION                                 PAGE

 3   BARBARA FREDERIKSEN-CROSS

 4        BY MR. SIMMONS                            7

 5        (afternoon session)                     191

 6

 7                 DEPOSITION EXHIBITS

 8   EXHIBIT            DESCRIPTION               PAGE

 9   Exhibit 1   Curriculum vitae (19 pages, not   49
                 Bates stamped)
10
     Exhibit 2   Exhibit to Frederiksen-Cross     109
11               Surrebuttal Report: Case Citations
                 Containing Lexis References
12               (18 pages, not Bates stamped,
                 highly confidential, attorneys'
13               eyes only)

14   Exhibit 3   7-20-17 e-mail to Rejitha R and  129
                 others from Merin Sony (1 page,
15               Bates No. R-LEGALEASE-00050673,
                 confidential)
16
     Exhibit 4   7-21-17 e-mail to Teri Whitehead 131
17               and others from Merin Sony (1 page,
                 Bates Nos. LEGALEASE-00059362)
18
     Exhibit 5   Best Practices Guide for ROSS    143
19               Intelligence (19 pages, Bates No.
                 LEGALEASE-00078065)
20
     Exhibit 6   Westlaw citation, Chetfins v.    153
21               Stewart, 825 F.3d 588 (2016)
                 (14 pages, not Bates stamped)
22
     Exhibit 7   Excerpt from deposition of       157
23               Christopher Cahn (5 pages, not
                 Bates stamped)
24

25
```

6

| | |
|---|---|
| 1 | PORTLAND, OREGON |
| 2 | FRIDAY, NOVEMBER 11, 2022 |
| 3 | 9:21 A.M. PST |
| 4 | - - - |

5       THE VIDEOGRAPHER:  We are now on the

6  record.  My name is Rick Majewski, and I'm the

7  videographer retained by Lexitas for this video

8  deposition for the United States District Court for

9  the District of Delaware, Case

10  No. 1:20-cv-00613-UNA.

11       Today's date is November 11th, 2022, and

12  the time is 9:21 a.m.  This deposition is being held

13  at 1050 Southwest Sixth Ave, Suite 1100, Portland,

14  Oregon 97204, in the matter of Thomas [sic] Reuters

15  Enterprise Center GmbH, et al., versus ROSS

16  Intelligence Inc.  The deponent is Barbara

17  Frederiksen-Cross.

18       All counsels will be noted on the

19  stenographic record.

20       Would all counsels please identify

21  themselves.

22       MR. SIMMONS:  My name is Joshua Simmons.

23  With me is Eric Loverro.  We are from the law firm

24  of Kirkland & Ellis.  And we represent the

25  plaintiffs.

7

```
 1            MR. RAMSEY:  This is Gabe Ramsey with

 2    Crinesha Berry for Crowell & Moring for ROSS

 3    Intelligence.

 4            THE VIDEOGRAPHER:  The court reporter is

 5    Marla Sharp and will now swear in the witness.

 6                BARBARA FREDERIKSEN-CROSS,

 7              having been first duly sworn,

 8          was examined and testified as follows:

 9                      EXAMINATION

10    BY MR. SIMMONS:

11       Q    Would you please state your name for the

12    record.

13       A    Certainly.  It's Barbara Frederiksen-Cross.

14    And that's B-a-r-b-a-r-a, last name

15    F-r-e-d-e-r-i-k-s-e-n hyphen C-r-o-s-s.

16       Q    Are you currently employed?

17       A    Yes.

18       Q    By whom?

19       A    JurisLogic LLC.

20       Q    And what is your current title?

21       A    I am the director of forensic services for

22    JurisLogic.

23       Q    What are forensic services?

24       A    That's a very broad topic.  With respect to

25    the forensic services JurisLogic provides, we
```

343

1    of the bulk memo project, ROSS requested that

2    LegalEASE label each bulk memo by practice area?

3        A    Yeah.  It doesn't really specify how they

4    do it, but it does appear that that was a

5    requirement.

6        Q    And you understand that LegalEASE did, in

7    fact, label each bulk memo by practice area,

8    correct?

9             MR. RAMSEY:  Objection.  Calls for

10   speculation.

11            THE WITNESS:  In the memos that I examined,

12   those identified in Dr. Krein's report, based on the

13   metadata that was available to him and to me, I

14   wouldn't say that each one actually got labeled in

15   that fashion.  Some were labeled only with numeric

16   values and others were labeled, as he and I, I

17   think, both comment on, with respect to a legal

18   practice area being a part of the memo file name.

19            But it -- whether that was the intent, it

20   appears that some memos were just labeled with sort

21   of a generic number.

22   BY MR. SIMMONS:

23       Q    Other memos were labeled with a file name

24   containing a topic, correct?

25       A    Some definitely were, yes, based on the

352

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2         I, Marla Sharp, certified shorthand

3    reporter in the State of Oregon, hereby certify:

4         That the foregoing video-recorded

5    deposition of BARBARA FREDERIKSEN-CROSS was taken

6    before me on November 11, 2022, at the time set

7    forth therein, at which time the witness was duly

8    sworn by me;

9         That the testimony of the witness and all

10   colloquy and objections made at the time of the

11   deposition were recorded stenographically by me and

12   thereafter transcribed, said transcript being a true

13   copy of my shorthand notes thereof;

14        That review of the transcript was neither

15   requested nor waived before completion of the

16   deposition; ( ) that the witness has failed or

17   refused to approve the transcript.

18        I further certify I am neither financially

19   interested in the action nor a relative or employee

20   of any attorney of any of the parties.

21        In witness whereof, I have subscribed my

22   name and signature this date, November 14, 2022.

23        *Marla Sharp*
     _____
24        Marla Sharp
          RPR, CLR, CCRR, CA CSR 11924,
25        OR CSR 17-0446, WA CSR 3408

**Signature and Errata Sheet**
**November 11, 2022 Deposition of Barbara Frederiksen-Cross**
***Thomson Reuters Enterprise Centre GMBH and West Publishing Corporation v. ROSS Intelligence Inc.***

     I, Barbara Frederiksen-Cross, have reviewed the attached transcript of my November 11, 2022 deposition testimony and certify, pursuant 28 U.S.C. § 1746 that the attached transcript is my true and correct testimony during that deposition, subject to the corrections shown below.

| Page/Line | Now Reads | Correction | Reason |
|---|---|---|---|
| 8:2 | litigation contexts for | litigation contexts, for | Clarity |
| 43:12 | LegalEASE | LegalEase | Grammatical error |
| 43:18 | LegalEASE | LegalEase | Grammatical error |
| 48:7 | LegalEASE | LegalEase | Grammatical error |
| 48:11 | LegalEASE | LegalEase | Grammatical error |
| 49:4 | Ross | ROSS | Grammatical error |
| 49:4 | LegalEASE | LegalEase | Grammatical error |
| 49:8 | Exhibit C.  I think it was Exhibit C. | Appendix C. I think it was Appendix C. | I misspoke |
| 69:8 | Wilford | Wilfred | Spelling |
| 95:3 | note | | Clarity/repetitive |
| 104:21 | LegalEASE | LegalEase | Grammatical error |
| 105:3 | LegalEASE | LegalEase | Grammatical error |
| 105:15 | LegalEASE | LegalEase | Grammatical error |
| 105:23 | LegalEASE | LegalEase | Grammatical error |
| 105:24 | LegalEASE | LegalEase | Grammatical error |
| 112:4 | LegalEASE | LegalEase | Grammatical error |
| 112:5 | LegalEASE | LegalEase | Grammatical error |
| 112:8 | LegalEASE | LegalEase | Grammatical error |

| 113:15 | LegalEASE | LegalEase | Grammatical error |
|--------|-----------|-----------|-------------------|
| 113:21 | compare | comparison | Transcription error |
| 114:6 | acrost | across | Spelling |
| 116:12 | LegalEASE | LegalEase | Grammatical error |
| 116:24 | LegalEASE | LegalEase | Grammatical error |
| 124:4 | originated | original | Transcription error |
| 124:17 | LegalEASE | LegalEase | Grammatical error |
| 129:14 | LegalEASE | LegalEase | Grammatical error |
| 130:14 | LegalEASE | LegalEase | Grammatical error |
| 130:17 | LegalEASE | LegalEase | Grammatical error |
| 133:19 | LegalEASE | LegalEase | Grammatical error |
| 134:12 | LegalEASE | LegalEase | Grammatical error |
| 134:17 | LegalEASE | LegalEase | Grammatical error |
| 134:22 | LegalEASE | LegalEase | Grammatical error |
| 135:2 | LegalEASE | LegalEase | Grammatical error |
| 136:4 | LegalEASE | LegalEase | Grammatical error |
| 136:12 | LegalEASE | LegalEase | Grammatical error |
| 136:21 | LegalEASE | LegalEase | Grammatical error |
| 136:21 | LegalEASE | LegalEase | Grammatical error |
| 137:4 | LegalEASE | LegalEase | Grammatical error |
| 137:17 | LegalEASE | LegalEase | Grammatical error |
| 137:25 | LegalEASE | LegalEase | Grammatical error |
| 139:18 | LegalEASE | LegalEase | Grammatical error |
| 140:25 | LegalEASE | LegalEase | Grammatical error |

| 141:23 | LegalEASE | LegalEase | Grammatical error |
|--------|-----------|-----------|-------------------|
| 142:5 | LegalEASE | LegalEase | Grammatical error |
| 143:24 | LegalEASE | LegalEase | Grammatical error |
| 147:21 | LegalEASE | LegalEase | Grammatical error |
| 150:20 | LegalEASE | LegalEase | Grammatical error |
| 159:7 | LegalEASE | LegalEase | Grammatical error |
| 159:16 | LegalEASE | LegalEase | Grammatical error |
| 160:2 | LegalEASE | LegalEase | Grammatical error |
| 160:18 | LegalEASE | LegalEase | Grammatical error |
| 160:22 | LegalEASE | LegalEase | Grammatical error |
| 174:9 | Ross | ROSS | Grammatical error |
| 177:18 | LegalEASE | LegalEase | Grammatical error |
| 184:2 | LegalEASE | LegalEase | Grammatical error |
| 187:24 | LegalEASE | LegalEase | Grammatical error |
| 192:23 | LegalEASE | LegalEase | Grammatical error |
| 193:1 | LegalEASE | LegalEase | Grammatical error |
| 193:7 | LegalEASE | LegalEase | Grammatical error |
| 193:19 | LegalEASE | LegalEase | Grammatical error |
| 193:24 | LegalEASE | LegalEase | Grammatical error |
| 194:1 | LegalEASE | LegalEase | Grammatical error |
| 194:9 | LegalEASE | LegalEase | Grammatical error |
| 195:24 | LegalEASE | LegalEase | Grammatical error |
| 196:18 | LegalEASE | LegalEase | Grammatical error |
| 197:2 | LegalEASE | LegalEase | Grammatical error |

| 197:18 | LegalEASE | LegalEase | Grammatical error |
|---|---|---|---|
| 197:23 | LegalEASE | LegalEase | Grammatical error |
| 198:4 | LegalEASE | LegalEase | Grammatical error |
| 198:9 | LegalEASE | LegalEase | Grammatical error |
| 198:15 | LegalEASE | LegalEase | Grammatical error |
| 199:1 | LegalEASE | LegalEase | Grammatical error |
| 202:20 | LegalEASE | LegalEase | Grammatical error |
| 203:7 | LegalEASE | LegalEase | Grammatical error |
| 203:10 | LegalEASE | LegalEase | Grammatical error |
| 203:11 | LegalEASE | LegalEase | Grammatical error |
| 203:17 | LegalEASE | LegalEase | Grammatical error |
| 204:6 | LegalEASE | LegalEase | Grammatical error |
| 204:17 | Ross | ROSS | Grammatical error |
| 206:8 | LegalEASE | LegalEase | Grammatical error |
| 207:14 | Ross | ROSS | Grammatical error |
| 207:25 | LegalEASE | LegalEase | Grammatical error |
| 213:8 | Clear Case | Fastcase | Transcription error/misspoke |
| 213:21 | in | and | Transcription error |
| 226:15 | sys | system | Clarify term of art |
| 226:15 | admin | administrator | Clarify term of art |
| 245:18 | to the comparant | in the comparison | Transcription error |
| 270:24 | LegalEASE | LegalEase | Grammatical error |
| 273:20 | LegalEASE | LegalEase | Grammatical error |

| 293:17 | verbatim in | verbatim and | Transcription error |
|---|---|---|---|
| 326:10 | LegalEASE | LegalEase | Grammatical error |
| 326:10 | LegalEASE | LegalEase | Grammatical error |
| 326:25 | LegalEASE | LegalEase | Grammatical error |
| 334:20 | dispatch of evidence | dispatch of packets | Transcription error |
| 340:24 | LegalEASE | LegalEase | Grammatical error |
| 341:4 | LegalEASE | LegalEase | Grammatical error |
| 341:7 | LegalEASE | LegalEase | Grammatical error |
| 341:10 | LegalEASE | LegalEase | Grammatical error |
| 342:21 | LegalEASE | LegalEase | Grammatical error |
| 343:2 | LegalEASE | LegalEase | Grammatical error |
| 343:6 | LegalEASE | LegalEase | Grammatical error |
| 345:6 | LegalEASE | LegalEase | Grammatical error |
| 345:22 | LegalEASE | LegalEase | Grammatical error |

Executed on December 22, 2022, at Hubbard, Oregon

Barbara A. Frederiksen-Cross

# EXHIBIT 57

**THOMSON REUTERS**™

# Research Subscriber Agreement

RESEARCH SUBSCRIBER AGREEMENT ("Subscriber Agreement") entered into between **"Subscriber"** and **WEST PUBLISHING CORPORATION, a Thomson Reuters business ("West")** regarding certain West research services, as follows:

**1.   License Grant.**   West grants Subscriber a non-exclusive, non-transferable, worldwide, limited license to access and use, in accordance with the provisions expressly set forth herein, the Data (as defined below), features, services, remotely-accessed gateways, and other components of the products named and described in the Agreement (as defined below) (collectively, the "Product") which may change from time to time.   Access to certain Data may be restricted.

**a.   Usage.**   Subject to the restrictions set forth in paragraph 2 (License Restrictions) below, Subscriber may use the Product(s), including Data (as defined below) in the regular course of Subscriber's business, legal, and other research and related work subject to the limitations contained herein. "Data" means all information and representations of information, including, but not limited to, graphical representations, and other content made available to Subscriber through the Product.   Subscriber may: (i) display Data internally; (ii) quote and excerpt from Data (appropriately cited and credited) by electronic cutting and pasting or other means in memoranda, briefs, reports, and similar work product created by Subscriber in the regular course of Subscriber's research and work; and (iii) to the extent not expressly prohibited by the terms of the Agreement, use Data as permitted under the fair use provision of the Copyright Act (17 U.S.C.A. § 107).

**b.   Storage.**   Subscriber may store, on a matter-by-matter basis, insubstantial portions of Data in Subscriber's database, maintained in connection with an active matter being handled by Subscriber in its regular course of business ("Project Database").   Such database must consist preponderantly of Subscriber's work product, with access to Data limited to internal users who have a need to know such information.   Subscriber may maintain Data in the Project Database until the file or case becomes inactive or until any termination of the Agreement, whichever occurs first.   Subscriber may also store insubstantial portions of Data in accordance with Subscriber's records retention policies, provided that such policies are in keeping with prevailing industry standards.   For purposes of the Agreement, the term "insubstantial portions" means amounts of Data that (a) have no independent value other than as part of Subscriber's work product; and (b) could not be used in any way in whole or in part as a substitute for any service or product provided by West, any affiliate of West, or any third-party that licenses, contributes, or otherwise provides Data, features, or other materials to West for inclusion in the Product ("Contributor").

**c.   Print Outs**.   Provided that all printouts and other reproductions of Data retain, unaltered, all proprietary notices appearing on such reproductions, Subscriber may print, or otherwise reproduce, in hard copy form, insubstantial portions of Data in   Subscriber's regular course of business and share such printouts: (i) with Subscriber's clients in relation to specific, ascertainable matters; and/or (ii) as required or reasonably necessary, to regulatory agencies, court officials, or parties to legal actions in which Subscriber is directly involved.

**d.   Electronic Distribution**.   Subscriber may, on an occasional basis and via Product functionality, direct West to transmit individual documents in electronic format to individual internal user(s), and to individual third parties in connection with actual, ascertainable matters being handled by Subscriber.   Subscriber may also include downloaded Data in briefs prepared for a specific cause of action for a specific court in an electronic format. Distribution or dissemination of such downloaded Data in connection with, or as part of a brief must be limited to the court before which the cause of action is to be heard, the parties to the cause of action, or their representatives. All other direct transmission of electronic copies by Subscriber is prohibited.

**2.   License Restrictions.**

**a.   Usage Restrictions.**   Subscriber may not copy, download, scrape, store, publish, post, transmit, retransmit, transfer, distribute, disseminate, broadcast, circulate, sell, resell, or otherwise use the Data, or any portion of the Data, in any form or by any means except as expressly permitted by paragraph 1 (License Grant) above, or as otherwise expressly permitted in writing by West.   Subscriber shall not reverse engineer, decompile, disassemble, or otherwise attempt to discern the source code of the Products, their components, or any avenue by which Products are accessed.

**b.   Compliance with Applicable Law.**   Subscriber shall not use any Data and shall not distribute any Data to a third party for use in a manner contrary to or in violation of any applicable federal, state, or local law, rule or regulation.

**c.   Copyright Notices.**   Subscriber shall not remove or alter any copyright notices from any saved, downloaded, or otherwise reproduced Data.   Subscriber shall indicate that use of, distribution, and dissemination of Data is with the permission of West.

**3.   Regulated Data.**   Certain Data available through the Products is subject to heightened regulatory scrutiny under state and federal law ("Regulated Data").

**a.   Regulated Data Restrictions**

i.   Subscriber acknowledges that West provides Regulated Data to support Subscriber's own processes and decisions, and Subscriber should not deny any service or access based solely on Regulated Data provided through the Product or results provided by West.   Subscriber is responsible for any denial of services or access and Subscriber will not deny such services or access without first conducting its own appropriate internal review in conjunction with its decision-making process.

ii.   West is not a consumer reporting agency, and Subscriber certifies that it will not use any Data as a factor in establishing a consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes, for employment purposes, or for any other purpose authorized under section 1681b of the Fair Credit Reporting Act (15 U.S.C.A. § 1681b).

iii.   Subscriber acknowledges that access to Regulated Data, available through the Product, including but not limited to credit header Data, motor vehicle Data, driver license Data, and voter registration Data is regulated by state or federal laws, such as the Gramm Leach Bliley Act ("GLBA"), the Driver's Privacy Protection Act ("DPPA"), or other state or federal laws and regulations, or is subject to Contributor restrictions.

HIGHLY CONFIDENTIAL

WPC-0001449

**TR-0002808**

iv. If Subscriber is permitted to purchase motor vehicle records ("MVR Data") from West, without in any way limiting Subscriber's obligations to comply with all state and federal laws governing use of MVR Data, the following specific restrictions apply and are subject to change:

- Subscriber shall not use any MVR Data provided by West, or portions of information contained therein, to create or update a file to the end that Subscriber develops its own source of driving history information.
- As requested by West, Subscriber shall complete any state forms that West is legally or contractually obligated to obtain from Subscriber before serving Subscriber with state MVR Data.

v. Subscriber agrees not to access Regulated Data for any purpose that is not allowed by the GLBA, by the DPPA, by any other applicable state or federal laws or regulations, or that is contrary to any Additional Terms, as defined in paragraph 5 (Additional Terms) below.

vi. Subscriber represents and warrants that it is the end user of Regulated Data and shall limit use and dissemination of Regulated Data solely to the permissible uses stated by Subscriber in the application and online (Subscriber's "Permissible Use"). Subscriber agrees to keep confidential and shall not disclose any Regulated Data except to Subscriber employees in the United States of America whose duties reasonably require access to such Regulated Data to carry out Subscriber's Permissible Use.

**b.    Regulated Data Usage Compliance.**  West retains the right to temporarily or permanently block access to certain Data if West, in its sole discretion, reasonably believes that the Data may be or has been used for an improper purpose or otherwise in violation of the terms of the Agreement, or as otherwise required by a Contributor.  By accessing Data, Subscriber acknowledges that from time to time, West and its Contributors and/or various government entities will require Subscriber to identify a permissible use (if applicable) and may inquire as to Subscriber's compliance with applicable laws or the Agreement.  Subscriber agrees to reasonably cooperate with any inquiry, subject to any attorney-client confidentiality. Subscriber shall immediately report to West any misuse, abuse, or compromise of Data of which Subscriber becomes aware.

**c.    Regulated Data Subscriber Credentials**.  West's provision of access to Regulated Data is contingent on West's verification of Subscriber's credentials in accordance with West's internal credentialing procedures. Subscriber shall notify West immediately of any changes to the information on Subscriber's application for Services and, if at any time Subscriber no longer meets such credentialing requirements, West may terminate Subscriber's access to Regulated Data.

**d.    Subscriber Responsibility for Use of Regulated Data**. Subscriber recognizes that its access to and use of Regulated Data is contingent upon complying with its contractual obligations.  Except as otherwise prohibited by law and without waiving any defenses to which it may be entitled, Subscriber is responsible for all damages due to (i) the misuse of Regulated Data by Subscriber (or any other party receiving such Regulated Data from or through Subscriber); and (ii) Subscriber's breach of any representation, or warranty, or other provision of this Subscriber Agreement relating to its use of or purpose in using Regulated Data. This provision shall not be interpreted as allowing Subscriber to assume liability for the actions of West.

**4.    Rights in Data.**  Except for the license granted in this Subscriber Agreement, all rights, title, and interest in the Product, including Data, in all languages, formats, and media throughout the world, including all copyrights, are and will continue to be the exclusive property of West and its Contributors.

**5.    Additional Terms.**  Certain Data, products and features are governed by specific terms and conditions ("Additional Terms") which are supplemental to and may be different from those set forth either in this Subscriber Agreement or elsewhere in the Agreement.  All applicable Additional Terms are available for review at the following locations: **http://legalsolutions.com/westlaw-additional-terms** and **http://legalsolutions.com/clear-additional-terms**. In the event of a conflict between any Additional Terms and terms set forth elsewhere in the Agreement, the Additional Terms will control.

**6.    Protection of Personal Information**.    West and Subscriber acknowledge that both parties may be required to comply with various privacy and security requirements, including but not limited to those set forth in paragraph 3.a. (Regulated Data Restrictions) above, the European Union Directive on Data Protection (95/46), and all other applicable legal directives and applicable industry standards (collectively "Privacy Laws") pursuant to which each party wishes to obtain certain undertakings from the other with regard to the use and protection of the Personal Information of either party. For purposes of this Subscriber Agreement, "Personal Information" shall refer to, without limitation, the following types of information:  name, address, e-mail address, age, date of birth, telephone number, fax, social security number or equivalent or similar government identification numbers, credit/debit card information, bank account information, logins, passwords, or medical or health records of an identifiable human being.    Each party shall be responsible for any collection, access, use, and disclosure of Personal Information subject to this Subscriber Agreement.  Without limiting the foregoing, each party shall employ appropriate administrative, physical, and technical safeguards in order to sufficiently protect the Personal Information and any information assets and resources in question.  Each party shall promptly notify the other of any event that may result in the unauthorized collection, access, use, or disclosure of Personal Information subject to this Subscriber Agreement ("Information Protection Incident").  The parties shall make reasonable efforts to assist one another in relation to the investigation and remedy of any such Information Protection Incident claim, allegation, action, suit, proceeding, or litigation with respect to the unauthorized access, use, or disclosure of Personal Information.  Furthermore, any access to or use of Personal Information must be in accordance with all applicable law. No individual shall access records that require a permissible purpose unless such a purpose exists for such individual.  For purposes of its obligations hereunder, any acts or omissions by the personnel of each party shall also be deemed to be the acts or omissions of that respective party.

**7.    Charges and Modification of Charges.**    Charges payable by Subscriber for access to Products ("Service Charges") will commence on the date West processes Subscriber's order.  Service Charges will be as stated in an applicable Special Offer Amendment, or Order Form/Order Notification to this Subscriber Agreement, the Schedule A Price Plan, or as otherwise agreed upon in writing by the parties.  Schedule A rates may be modified upon at least 30 days prior notice to Subscriber in writing or online or pursuant to the terms stated on an applicable Order Form/Order Notification. Modification of any Service Charges pursuant to this paragraph 7 shall not be considered as an amendment to this Subscriber Agreement that permits termination pursuant to paragraph 13(ii) herein.  Service Charges are exclusive of applicable sales, use, value added tax (VAT) or equivalent, ad valorem, personal property and other taxes, which are the responsibility of Subscriber.  Subscriber will pay all invoices in full within 30 days from date of invoice.  If full payment is not made, Subscriber may be charged interest on any unpaid balance, not to exceed 1% per month.

HIGHLY CONFIDENTIAL

**8.   Product Software and Internet Based Services.**

**a.   Product Software.**  West may make available to Subscriber, on a subscription basis, software for use in connection with the Product. Such software, including new versions and the accompanying user documentation, may be referred to collectively as "Software."  All Software will be licensed to Subscriber under a license agreement which will accompany the Software. By using the Software and taking such other action as may be referenced in the license agreement as constituting acceptance, Subscriber agrees to be bound by the terms and conditions of the accompanying license agreement. If Subscriber does not so agree, Subscriber must return any tangible copies of the Software in its possession or control.

**b.   Internet Based Services.**  Certain Products may be accessed via the Internet. Subscriber may use Data cached in Subscriber's local disk drive solely in support of its use of the Product via the Internet ("Internet Based Services").  Certain software used by Subscriber may not be capable of supporting Internet Based Services.  The performance of Internet Based Services varies with the manufacturers' equipment with which it is used.

**9.   Disclaimer of Warranties. EXCEPT AS SPECIFICALLY PROVIDED IN THIS SUBSCRIBER AGREEMENT, ANY SCHEDULE, OR LICENSE AGREEMENT, ALL PRODUCTS, DATA, SOFTWARE, AND INTERNET-BASED SERVICES ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, OMISSIONS, COMPLETENESS, CURRENTNESS, AND DELAYS.**

**10.  Limitation of Liability. SUBSCRIBER'S EXCLUSIVE REMEDY AND WEST'S, ITS AFFILIATES, AND/OR CONTRIBUTORS' ENTIRE LIABILITY UNDER THE AGREEMENT, IF ANY, FOR ANY CLAIM(S) FOR DAMAGES RELATING TO PRODUCTS, DATA, SOFTWARE, OR INTERNET BASED SERVICES WHICH ARE MADE AGAINST THEM, INDIVIDUALLY OR JOINTLY, WHETHER BASED IN CONTRACT OR NEGLIGENCE, SHALL BE LIMITED TO THE AGGREGATE AMOUNT OF SERVICE OR SOFTWARE CHARGES PAID BY SUBSCRIBER FOR THE INDIVIDUAL PRODUCT TO WHICH SUCH LIABILITY APPLIES DURING THE 12 MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.   IN NO EVENT SHALL WEST, ITS AFFILIATES, AND/OR CONTRIBUTORS BE LIABLE TO SUBSCRIBER FOR ANY CLAIM(S) RELATING IN ANY WAY TO (i) SUBSCRIBER'S INABILITY TO USE PRODUCTS, DATA, SOFTWARE, OR INTERNET BASED SERVICES, OR ITS INABILITY OR FAILURE TO PERFORM LEGAL OR OTHER RESEARCH OR RELATED WORK OR TO PERFORM SUCH LEGAL OR OTHER RESEARCH OR WORK PROPERLY OR COMPLETELY, EVEN IF ASSISTED BY WEST, ITS AFFILIATES, OR CONTRIBUTORS, OR ANY DECISION MADE OR ACTION TAKEN BY SUBSCRIBER IN RELIANCE UPON DATA; OR (ii) THE PROCURING, COMPILING, INTERPRETING, EDITING, WRITING, REPORTING, OR DELIVERING DATA.   IN NO EVENT SHALL WEST, ITS AFFILIATES AND/OR CONTRIBUTORS BE LIABLE TO SUBSCRIBER FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, INDIRECT, OR SPECIAL DAMAGES RELATING IN WHOLE OR IN PART TO SUBSCRIBER'S RIGHTS UNDER THE AGREEMENT EVEN IF WEST, ITS AFFILIATES AND/OR CONTRIBUTORS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  FURTHER, WEST SHALL HAVE NO LIABILITY WHATSOEVER TO SUBSCRIBER FOR ANY CLAIM(S) RELATING IN ANY WAY TO ANY THIRD PARTY FEATURE.  NEITHER WEST NOR CONTRIBUTORS MAKE ANY WARRANTY THAT ACCESS TO PRODUCTS AND DATA WILL BE UNINTERRUPTED, SECURE, COMPLETE, OR ERROR FREE.   NOR DOES WEST MAKE ANY WARRANTY AS TO THE LIFE OF ANY URL OR THIRD PARTY WEB SERVICE.   SUBSCRIBER ACKNOWLEDGES THAT PROVISION OF PRODUCTS AND DATA ENTAILS THE LIKELIHOOD OF SOME HUMAN AND MACHINE ERRORS, DELAYS, INTERRUPTIONS, AND LOSSES, INCLUDING THE INADVERTENT LOSS OF DATA.  THE DISCLAIMERS OF WARRANTY AND LIMITATIONS OF LIABILITY SET FORTH IN THIS SUBSCRIBER AGREEMENT WERE MATERIAL FACTORS IN THE DETERMINATION OF SERVICE CHARGES.**

**11.  Responsibility for Certain Matters.**  Subscriber shall provide to West the office location and address associated with Subscriber's passwords issued under the Agreement.  Subscriber's personnel may also access Products via home computers, laptops, or other wireless devices. Subscriber is responsible for promptly notifying West in writing of persons to whom passwords are to be issued or from whom passwords are to be revoked.   Subscriber is solely responsible for maintaining security of passwords.  Subscriber is also responsible for all access to and use of all Products, Data, Software, and Internet Based Services through Subscriber's account, login credentials, and/or systems, whether or not Subscriber has knowledge of or authorizes such access and use. Sharing of passwords that have been issued to individual users of Subscriber is strictly prohibited.

**12.  Limitation of Claims.**  Except for claims relating to Service Charges or improper use of Products, Data, Software, or Internet Based Services, no claim, regardless of form, which in any way arises out of the Agreement, may be made, nor such claim brought, under the Agreement more than one year after the basis for the claim becomes known to the party desiring to assert it.

**13.  Term and Termination.**  This Subscriber Agreement will become effective upon approval and acceptance by West in St. Paul, Minnesota, and will continue in force for the term set forth in an amendment or applicable Order Form/Order Notification to this Subscriber Agreement. Notwithstanding the foregoing, (i) West may terminate this Subscriber Agreement immediately upon giving written notice of termination to Subscriber if West reasonably believes that Subscriber's use of Data violates any applicable law or regulation or this Subscriber Agreement, or may result in a risk to public safety, including but not limited to the safety of private individuals; (ii) Subscriber may terminate the Agreement immediately upon giving written notice of termination to West after receiving notice of an amendment (as permitted under paragraphs 5 (Additional Terms) and 14 (Effect of Agreement)) which contains new terms that materially alter the terms of this Subscriber Agreement and are unacceptable to Subscriber; (iii) either party may terminate the Agreement immediately upon giving written notice of termination to the other party if the other party commits a material breach of this Subscriber Agreement; or (iv) West may terminate the Agreement immediately upon giving written notice of termination to Subscriber if Subscriber commits a material breach of any obligation to West under any other agreement between the parties.   Upon any termination of this Subscriber Agreement, the Product Software licenses shall also terminate.

**14.  Effect of Agreement.**  This Subscriber Agreement along with all applicable current and future Schedules, Additional Terms, license agreements, Special Offer Amendment to this Subscriber Agreement or applicable Order Form/Order Notification (if any), and the like (collectively, "Agreement") embodies the entire understanding between the parties with respect to the subject matter of the Agreement and supersedes any and all prior understandings and agreements, oral or written, relating to the subject matter.  Except as otherwise provided in the Agreement, West may amend the terms and conditions of this Subscriber Agreement by giving Subscriber at least 30 days prior written notice.  Within 30 days of the receipt of such amendment, Subscriber may, at its option, request that the parties enter into good faith negotiations regarding the new amended terms and conditions.  In the event the parties are not able to reach an agreement resulting in mutually

HIGHLY CONFIDENTIAL

agreeable alternative language for the amended terms and conditions within 30 days after the start of the negotiations, Subscriber may terminate this Subscriber Agreement as set forth in paragraph 13(ii) herein.  Except as expressly set forth herein, any other amendment to the Agreement must be in writing and signed by both parties.

**15. Force Majeure.**  Each party's performance under the Agreement is subject to interruption and delay due to causes beyond its reasonable control, such as acts of God, acts of any government, war or other hostility, civil disorder, the elements, fire, explosion, power failure, equipment failure, industrial or labor dispute, inability to obtain necessary supplies, and the like.

**16. Notices.**  Except as otherwise provided herein, all notices must be in writing to West at 610 Opperman Drive, P.O. Box 64833, St. Paul, Minnesota 55164-1803, Attention: Customer Service, and to Subscriber at the address set forth in the applicable Special Offer Amendment or Order Form/Order Notification.

**17.  Choice of Law and Jurisdiction.**

    **a.   For Non-Government Subscribers Only.**  The Agreement will be governed by and construed under the law of the state of Minnesota, U.S.A. without regard to conflicts of law provisions.  The parties agree that the state and federal courts sitting in Minnesota will have exclusive jurisdiction over any claim arising out of the Agreement and each party consents to the exclusive jurisdiction of such courts.

    **b.   For Government Subscribers Only.**  The Agreement will be governed by and construed under the law of Subscriber's state.  The state and federal courts sitting in Subscriber's state will have exclusive jurisdiction over any claim arising from or related to the Agreement and each party consents to the exclusive jurisdiction of such courts.

**18.  General Provisions.**  Neither the Agreement nor any part or portion may be assigned, sublicensed, or otherwise transferred by Subscriber without West's prior written consent.  Should any provision of the Agreement be held to be void, invalid, unenforceable, or illegal by a court, the validity and enforceability of the other provisions will not be affected thereby.  Failure of any party to enforce any provision of the Agreement will not constitute or be construed as a waiver of such provision or of the right to enforce such provision.   The headings and captions contained in the Agreement are inserted for convenience only and do not constitute a part of the Agreement.  West, as used herein, also applies to West Services Inc.

**19. Feedback.** Any and all Feedback that Subscriber provides to West shall become the exclusive property of West without any payment, accounting, remuneration, or attribution to Subscriber.  "Feedback" means information provided, in any manner, by or on behalf of Subscriber with respect to any feature, West product or service, or their enhancement, customization, configuration, installation, or implementation, including but not limited to ideas, concepts, suggestions, materials, functions, methods, processes, and rules.

HIGHLY CONFIDENTIAL

WPC-0001452

**TR-0002811**

# EXHIBIT 58

# Best Practices Guide for ROSS Intelligence

Drafting Questions, Preparing Responsive Memorandum, and Quality Control Procedures

Last revised on September 18, 2017.

EXHIBIT

3

LEGALEASE-00078065



Document ID   : ROSS Bulk
Date of Issue   : 08.07.17
Periodic Review   : 09.14.2017
Revision No   : 4

| | |
|---|---|
| **Document ID** | **: ROSS Bulk** |
| **Date of Issue** | **: 08.07.17** |
| **Periodic Review** | **: 09.18.2017** |
| **Revision No** | **: 5** |

# Contents

Part I ................................................................................................................................................ 3

Overview......................................................................................................................................... 3

Introduction.................................................................................................................................... 3

Audience......................................................................................................................................... 3

Objectives ....................................................................................................................................... 3

Legal Disclaimer.............................................................................................................................. 4

Part II ............................................................................................................................................... 4

Framing Questions ......................................................................................................................... 4

1.   West Law ............................................................................................................................. 4

2.   Lexis: .................................................................................................................................... 9

Part III ............................................................................................................................................ 13

I.   Standards & Best Practices for ROSS Memos Drafting................................................... 13

Attorney - ROSS Intelligence Checklist ........................................................................................ 15

Sample Memo ............................................................................................................................... 16

II.   Standards & Best Practices for ROSS Memos Review .................................................... 18

Review Attorney - ROSS Intelligence Checklist............................................................................ 18

III.   Standards & Best Practices for ROSS Portal Upload..................... **Error! Bookmark not defined.**

Portal Upload - ROSS Intelligence Checklist ........................................ **Error! Bookmark not defined.**

2

## Part I

### Overview

The LegalEase Solutions Best Practices Guide aims to set out the quality assurance process followed by the LegalEase team to ensure delivery of memos that meet the standards and requirements of ROSS Intelligence.

### Introduction

The LegalEase Solutions Best Practices Guide is the primary quality assurance resource and playbook for our attorneys.  This Practice Guide provides all the tools and resources needed for the drafting and delivery of ROSS Intelligence memos.

### Audience

The intended audience for this guide is our full‑time, part-time, and subcontracted attorneys who prepare Ross memos. Additionally, this guide may be utilized by ROSS to review our internal process.

### Objectives

This guide:

- Identifies clear guidelines for attorneys to follow when designing, developing, researching, drafting, and delivering ROSS memos.
- Promotes uniformity of the process to be followed by the team.
- Lay out checklists to ensure quality assurance of the memos at different stages.
- Describes best practices and standards for ROSS memos.

3



BOSS Bulk
Date of Issue        : 08.07.17
Periodic Review    : 09.14.2017
Revision No          : 4

**Legal Disclaimer**

This Best Practices Guide includes proprietary, confidential, and/or trade secret information. LegalEase considers this information to be a trade secret not subject to disclosure.

**Part II**

**Framing Questions**

You may be assigned a West Law (WL)/Lexis topic to frame questions. An easy way of framing questions is to rely on the head notes. However, note that the head notes are proprietary and you should not copy paste them in the question.
Given below are screenshots to frame questions using WL and Lexis:

1. **West Law**

1) Headnote Search   - Click on the Key Numbers. You will be assigned a number which is available under the Key Numbers.

LEGALEASE-00078068



Here, the Key Number assigned is 1 and the topic is Abandoned and Lost Property.



5

LEGALEASE-00078069


Date of Issue        : 08.07.17
Periodic Review      : 09.14.2017
Revision No          : 4

2) Click on a key number topic. The best practice is to begin from the top (sub topic number 1) and follow the pattern.



3) Clicked on #4 Evidence and questions for jury.



4) Got this…

LEGALEASE-00078070



BOSS Bulk
Date of Issue          : 08.07.17
Periodic Review        : 09.14.2017
Revision No            : 4

---

👉 **4 Evidence and questions for jury (78)**   ⭐ Add to Favorites

**Jurisdiction:** All Federal   Change

| 1 - 78 | Sort by: | Topic then Date ▾ |
|---|---|---|

☐ Select all items  |  No items selected

> 1 ABANDONED AND LOST PROPERTY 415
> └─ 1I Abandonment 290
>    └──────── 1👉4 Evidence and questions for jury 78

---

☐ **1.  Cheffins v. Stewart**

United States Court of Appeals, Ninth Circuit.  |  June 8, 2016  |  825 F.3d 588

**Headnote:** Under Nevada law, abandonment of property may be inferred from acts done.

> **Document Preview:** COPYRIGHTS - Art and Architecture. Mobile replica of 16th-century Spanish galleon was not protected b

---

☐ **2.  Recovery Ltd. Partnership v. Wrecked and Abandoned Vessel, S.S. CENTRAL AMERICA**

United States District Court, E.D. Virginia, Norfolk Division.  |  August 11, 2015  |  120 F.Supp.3d 500

**Headnote:** In order for the law of finds to be applied to property lost at sea, the treasure-hunter must establish abandonment of t
bar to proving such abandonment is high.

> **Document Preview:** MARITIME LAW - Salvage. Law of salvage applied to artifacts recovered from historic shipwreck.

---

5)  Clicked on Cheffins case.

7

LEGALEASE-00078071



1 ABANDONED AND LOST PROPERTY 415
     1I Abandonment 290
     1◆4 Evidence and questions for jury 78

☐  **1. Cheffins v. Stewart**
United States Court of Appeals, Ninth Circuit.   |   June 8, 2016   |   825 F.3d 588

Headnote: Under Nevada law, abandonment of property may be inferred from acts done.

Document Preview: COPYRIGHTS - Art and Architecture. Mobile replica of 16th-century Spanish galleon was not pr

☐  **2. Recovery Ltd. Partnership v. Wrecked and Abandoned Vessel, S.S. CENTRAL AM**
United States District Court, E.D. Virginia, Norfolk Division.   |   August 11, 2015   |   120 F.Supp.3d 500

Headnote: In order for the law of finds to be applied to property lost at sea, the treasure-hunter must establish abandor

6) Which pulls up the exact headnote on point. As well as ton of others...

**12   Abandoned and Lost Property**
Under Nevada law, abandonment of property may be inferred from acts done.

**13   Federal Courts**
Any error was harmless as to district court's failure to give jury instructions
lost profits and punitive damages, which failure was based on district cour
determination that such damages were unduly speculative, in action for
conversion under Nevada law, relating to destruction of mobile replica of
16th-century Spanish galleon, built from used school bus, where jury foun
favor of defendant on the conversion claim brought by mobile replica's
creators, so that there were no damages to be awarded.

7) From that headnote, make the statement a question.

So – headnote 12  - "Under Nevada law, abandonment of property may be inferred from
acts done."
Convert to a question, "May abandonment of property under Nevada Law be inferred
from acts done?"

8

LEGALEASE-00078072



Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : 4

2. **Lexis:**

1)   Log on to your account and go to the main screen.



2)   Select Search By Topic or Headnote.

9



Lexis®

| My Lexis™ | Search ▾ | Get a Document ▾ | Shepard's® ▾ | More ▾ |

◄ | All | By Topic or Headnote | Minnesota | Legal | ► | ✚ Add/Edit Subtabs

**All Topics**

| Look for a Legal Topic | Help |

Option 1: Find a Legal Topic

[                                        ] **Find**

Find in: ⦿ Administrative Law        ✕ Rectangular Snip
        ○ All Topics

Option 2: Explore Legal Topics

ⓘ **Administrative Law**
   ⓘ General Overview
   ☐ ⓘ Agency Adjudication
      ⓘ General Overview
      ⓘ Alternative Dispute Resolution (Related Topics...)
     ✚ ⓘ Decisions
     ✚ ⓘ Hearings
     ✚ ⓘ Impartiality
      ⓘ Prehearing Activity
     ✚ ⓘ Presiding Officers
      ⓘ Review of Initial Decisions
   ✚ ⓘ Agency Investigations
   ✚ ⓘ Agency Rulemaking
   ✚ ⓘ Governmental Information
     ⓘ Informal Agency Actions
   ✚ ⓘ Judicial Review (Related Topics...)
   ✚ ⓘ Separation of Powers
     ⓘ Sovereign Immunity

10

LEGALEASE-00078074



Date of Issue      : 08.07.17
Periodic Review  : 09.14.2017
Revision No      : 4

3) Select Option 2 – Search by Headnote.



4) Select the Jurisdiction and date from the drop-down. Try searching for "Previous 10 years" in the drop down.



11

LEGALEASE-00078075




Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : 4

5)  When the cases are displayed, select "Show Headnotes Only" option.



6)  We may be able to find more cases by clicking "More Like This HeadNote"



12



ROSS Bulk
Date of Issue        : 08.07.17
Periodic Review    : 09.14.2017
Revision No          : 4

**Part III**

**I.        Standards & Best Practices for ROSS Memos Drafting**

1.    The whole memo is drafted in Times New Roman, with font size 12 and single spaced.

2.    File name convention: "Topic No. – sub topic no.  - Memo # – [associate initials] - [date].

3.    Building and formatting the memo.

a.    Opening the ROSS template, use the save as option and rename the template following the naming convention mentioned above.

b.    Begin by researching the question from head notes.

c.    There should be no jurisdictional filtering for the questions. This means the questions should not be state specific.

d.    Enter the questions framed from the assigned topic in the Smartsheet (SS).

e.    Each Memo shall include a Question and a Reference list (RL) with a target of at least 2 and no more than 6 cases.

f.    The most relevant paragraph of the case would be entered in the memo as Quote 1. Do not add more than 1 quote from a case.

g.    Copy paste the entire paragraph of the case that answers the question.

h.    When using WL Next to "Copy with reference" BE SURE the format it copies with is "Standard."  That should automatically give you a good cite when you paste it.

i.    The first 2- 4 cases of the memo must provide an independent answer to the legal research question.

j.    These quotes shall be labelled "Great" or "Good" depending on the relevancy of the quote to the question.

k.    When the excerpts hit on all essential elements of the question, they will be labelled "great." If they hit on most essential elements of the question they will be labelled "good."

l.

13

LEGALEASE-00078077




m. Associate shall strive for 4 great/good quotes per question. However, if the Associate is only able to find 1, 2 or 3 cases, they shall only provide 1, 2 or 3 cases.

n. Associate shall aim for more number of great quotes (maximum 4) for each memo.

o. In addition to the 2-4 cases/quotes to each research question, we will draft one 'topical' quote and one 'irrelevant' quote.

p. A topical quote is a case with a quote that hits on aspect of the question, but does not answer any part of the question. For example: <u>Question</u>: 'Are oil and gas leases executory contracts?'

<u>Answer:</u> 'There are no published opinions construing this language. However, by its terms, the paragraph deals with interests of the debtor in 'gaseous hydrocarbons' and not contract rights like the ones involved here. (The legislative history of § 541(b)(4) indicates that it was enacted to address questions related to the transfer of rights in **[[oil and gas leases]]**.'

q. An irrelevant quote has some keywords in it from the question but completely missed the mark. For example, if the question is '[a]re oil and gas leases executory contracts?' a bad answer may contain key words like 'olive oil" or "residential leases' but nothing else relevant about the question.

r. Associate shall rank the cases in order of relevance, with the first-ranked case in a Memo being the best answer to the Memo question and the last-ranked case being the worst answer to the Memo question.

s. Associate shall also bold the relevant parts of each Quote that answer the relevant Memo question and put them in double brackets. The topical and irrelevant quotes must also have the required portion in bold and double brackets.

t. A bracketed excerpt can be up to the length of one paragraph, provided there isn't too much unnecessary filler. If need be, you can double bracket separate sentences/sections of the same paragraph/quote if that leads to a fuller answer to the question.

u. Associate shall label the quotes as great, good, topical, and irrelevant.

v. Note that pinpoint citation is not used in ROSS memo. For e.g. *In re Story*, 536 B.R. 279, 283 (Bankr. E.D. Mo. 2015) will be entered as In re Story, 536 B.R. 279.

LEGALEASE-00078078



w.  In the RL section, while the quotes are copy-pasted, make sure the page numbers and footnotes in the judgment are deleted.

x.  Check over the entire memo to make sure that there are no stray lines or odd spaces.

y.  Complete all Smartsheet fields. This include entering the associate initials, question drafted, date, number of quotes, date of QC, initials of QC associate, Notes, and saved file name.

**Attorney - ROSS Intelligence Checklist**

| Description | Completed |
|---|---|
| 1.  Draft ROSS questions following LegalEase Creative Process. | |
| 2.  Research questions using online resources and accounts. | |
| 3.  Label the quotes as great, good, topical, and irrelevant. | |
| 4.  Confirm that great, and good quotes answer the question directly. | |
| 5.  Add topical and irrelevant quotes. | |
| 6.  Confirm that the topical and irrelevant cases meet the criteria. | |
| 7.  Confirm grammar correct throughout memo. | |
| 8.  Confirm the font and space of the memo. | |
| 9.  Follow file name convention. | |

LEGALEASE-00078079



B9SO Bulk
Date of Issue       : 08.07.17
Periodic Review     : 09.14.2017
Revision No         : 4

**Sample Memo**

## MEMORANDUM #

### 1. Question

What is implied actual notice?

### 2. Reference List
**Issue: What is implied actual notice?**

Case 1: Symons Corp. v. Tartan-Lavers Delray Beach, Inc., 456 So. 2d 1254.
Great Quote 1: Notice is of two kinds, actual and constructive. Sapp v. Warner, 105 Fla. 245, 141 So. 124, aff'd, 143 So. 648 (1932). Actual notice is itself comprised of two types: (1) express, based on direct information; and (2) implied, which includes notice inferred from the fact that a person had the means of knowledge, which it was his duty to use. Id. **[[Implied actual notice is an inference of fact. Id.; see also, Reinhart v. Phelps, 150 Fla. 382, 7 So.2d 783 (1942). Implied actual notice, being an inference of fact, may be drawn by the court as a matter of law when warranted by the circumstances of the particular case calling for its application in order to grant equitable relief.]]** Sapp v. Warner, supra. United Contractors, Inc. v. United Constr. Corp., 187 So.2d 695 (Fla. 2d DCA 1966).

Case 2: Sapp v. Warner, 105 Fla. 245.
Great Quote 1: Notice is of two kinds, actual and constructive. 'Constructive notice' has been defined as notice imputed to a person not having actual notice; for example, such as would be imputed under the recording statutes to persons dealing with property subject to those statutes. **[['Actual notice' is also said to be of two kinds: (1) Express, which includes what might be called direct information; and (2) implied, which is said to include notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not use, or, as it is sometimes called, 'implied actual notice.']]** Cooper v. Flesner, 24 Okl. 47, 103 P. 1016, 23 L. R. A. (N. S.) 1180, 20 Ann. Cas. 29; Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 12 S. Ct. 239, 35 L. Ed. 1063; Hoy v. Bramhall, 19 N. J. Eq. 563, 97 Am. Dec. 687; Acer v. Westcott, 46 N. Y. 384, 7 Am. Rep. 355. **[[Constructive notice is a legal inference, while implied actual notice is an inference of fact]],** but the same facts may sometimes be such as to prove both constructive and implied actual notice. Knapp v. Bailey, 79 Me. 195, 9 A. 122, 1 Am. St. Rep. 295.

Case 3: Rinehart v. Phelps, 150 Fla. 382.
Good Quote 1: **[[Constructive notice is a legal inference, while implied actual notice is an inference of fact, but the same facts may sometimes be such as to prove both constructive and implied actual notice]].** Knapp v. Bailey, 79 Me. 195, 9 A. 122, 1 Am.St. Rep. 295; 105 Fla. 245, 141 So. page 127.

Case 4: Knapp v. Bailey, 79 Me. 195.

16

LEGALEASE-00078080



Date of Issue      : 08.07.17
Periodic Review  : 09.14.2017
Revision No        : 4

Good Quote 1: There is a conflict in the cases and among writers as to what is actual notice. Much of the difference is said to be verbal only,— more apparent than real. Certain propositions, however, are quite well agreed upon by a majority of the authorities. Notice does not mean knowledge; actual knowledge is not required. Mr. Wade describes the modes of proving actual notice as of two kinds. One he denominates express notice, and the other implied. [["*Implied,* **which imputes knowledge to the party because he is shown to be anxious of having the means of knowledge, though he does not use them; in other words, where he chooses to remain voluntarily ignorant of the fact, or is grossly negligent in not following up the inquiry which the known facts suggest." Wade, Notice, (2d Ed.) § 5. Some writers use the word "implied" as meaning constructive, and would regard what is here described to be implied actual notice as constructive notice merely]].** As applicable to actual notice, such as is required by the sections of the statute under consideration, we think the classification of the author whom we quote is satisfactory. The author further explains the distinction by adding that "notice by implication differs from constructive notice, with which it is frequently confounded, and which it greatly resembles, with respect to the character of the inference upon which it rests; constructive notice being the creature of positive law, or resting upon strictly legal inference, while **[[implied notice arises from inference of fact." It amounts substantially to this: that actual notice may be proved by direct evidence, or it may be inferred or implied (that is, proved) as a fact from indirect evidence,—by circumstantial evidence]].** A man may have notice or its legal equivalent. He may be so situated as to be estopped to deny that he had actual notice. We are speaking of the statutory notice required under the conveyances act. A higher grade of evidence may be necessary to prove actual notice appertaining to commercial paper. Kellogg v. Curtis*, 69 Me. 212. The same facts may sometimes be such as to prove both constructive and actual notice; that is, a court might infer constructive notice, and a jury infer actual notice, from the facts. There may be cases where the facts show actual, when they do not warrant the inference of constructive, notice; as where a deed is not regularly recorded, and not giving constructive notice, but a second purchaser sees it on the records, thereby receiving actual notice. Hastings v. Cutler*, 24 N. H. 481.

Case 5: Hagan v. Sabal Palms, Inc., 186 So. 2d 302.
Topical Quote 1: **[[The principle applied in cases of alleged implied actual notice is that a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice]]**; that it will not suffice the law to remain willfully ignorant of a thing readily ascertainable by whatever party puts him on inquiry, when the means of knowledge is at hand. (cases cited).' (Emphasis supplied).

Case 6: Hopkins v. McCarthy, 121 Me. 27.
Irrelevant Quote 1: Inquiry was not necessary, because the plaintiff saw the defendant in possession. **[[Possession alone is not implied notice**.]] *Hanly v. Morse*, 32 Me. 287. But inquiry became highly important when he had found out that the man was in possession under a contract of lease. Then a prudent man would have inquired, and, inquiring, would have learned. Then, to excerpt from *Birdsall v. Russell*, 29 N. Y. 220, there was "such a connection between the fact discovered and the further facts to be discovered as to furnish a clue–a reasonable and natural clue–to the latter." Notice of a lease will be notice of its contents (Story's Eq. Jur. § 400), which is but another way of saying that notice may become the equivalent of knowledge, and that he who is put upon inquiry must exercise good faith, proper diligence, and reasonable care in following up the inquiry. The underlying and ruling principle is that of common prudence, or, better still, that of

LEGALEASE-00078081



common honesty. "Whatever puts a party upon inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding," is a commendable syllabus condensed into small space. Lodge v. Simonton, 2 Pen. & W (Pa.) 439, 23 Am. Dec. 36. Mr. Justice Strong says:
"Wherever inquiry is a duty, the party bound to make it is affected with knowledge of all that which he would have discovered had he performed the duty." Cordova v. Hood, 17 Wall. 1, 21 L. Ed. 587.

## II.      Standards & Best Practices for ROSS Memos Review

a.  Check the question for grammatical errors using https://www.grammarly.com/i?breadcrumbs=true&page=install or https://www.grammarly.com/office-addin/windows

b.  Validate the cites quoted in the case.

c.  Validate if the highlighted portions answer the question correctly.

d.  Make sure that the Memo has 4 independent quotes. If it lacks 4 quotes, note the concern in the SS.

e.  Validate the formatting, and alignment.

f.   If the memo requires substantial rework return to the associate.

g.  Once finalized, save the final eliminating associate's initials and date.

h.  Tab time for review of each memo.


### Review Attorney - ROSS Intelligence Checklist

|  | Description | QC 1 | QC 2 |
|---|---|---|---|
|  | Question should not be state specific. |  |  |
|  | Grammar check of question. |  |  |
|  | Quotes to be labeled correctly. GREAT – must contain **all** essential elements of the question. GOOD – contains **most** of the essential elements of the question. TOPICAL – foundation quote, background information. |  |  |

18

LEGALEASE-00078082



| | | | |
|---|---|---|---|
| | IRRELEVANT– has no reference or relevance. | | |
| | Should label as Great Quote 1, Great Quote 2, Topical Quote 1, and Irrelevant Quote 1. | | |
| | Bracketed language **must** answer question.<br><br>Bracketed language may be up to a paragraph.<br><br>If necessary, you can double bracket separate sentences.<br><br>Bracketed language must be a sentence. Not just two words. | | |
| | Double Brackets, and Content in Bold. | | |
| | No red squiggly line. | | |
| | Confirm reference quote.  Ensure Topical quote and Irrelevant quotes are added. | | |
| | Smartsheet updates. | | |
| | Double check the Form - Double Brackets for Quotes.  No highlights. | | |
| | Memo number. | | |
| | Memo saved in correct format – naming convention. | | |

LEGALEASE-00078083

# EXHIBIT 59

**From:** Merin Sony <merin.sony@legaleasesolutions.com>
**Sent:** Thursday, July 20, 2017 11:36 PM EDT
**To:** Rejitha R <rejitha@legaleasesolutions.com>; Reshma Mathew <reshma.mathew@legaleasesolutions.com>; Anjusha Puthanpurayil <anjusha.puthanpurayil@legaleasesolutions.com>; Aparna Remesh <aparna.remesh@legaleasesolutions.com>; Sandesh Soman <sandesh.soman@legaleasesolutions.com>; Priyada R Menon <priyada.menon@legaleasesolutions.com>
**CC:** Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Anitha NG <anitha.ng@legaleasesolutions.com>; Savitha Shenoy <savitha.shenoy@legaleasesolutions.com>
**Subject:** ROSS bulk memo - July 21, 2017

Rejitha, Reshma, Anjusha, Aparna, Priyada,

Please continue with the topic assigned you on Monday. Kindly tab time for each question, and update the same along with the question EOD.

Sandesh: please take up Banking law from Lexis.

Make sure to follow the pattern we discussed last day - not to stick to headnotes to frame questions, rather use them as stepping stone, and tweak questions. That will help us to be more efficient and frame more questions. Also, please share with the team any other ways that you find would make this process more efficient.

Thanks,

**Merin Sony Thampy**
Associate
**Tel:** +91 4842803684/85 | **Mob:** +91 9446025807
**Email:** merin.sony@legaleasesolutions.com

logo

**LegalEase Solutions LLC**
*The future of law*
**Website** | **Lawstore**

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

# EXHIBIT 60

| Message | |
|---|---|
| **To**: | Steven Babb [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=130c1dae44c146418234024addc5cbd9-steven.babb]; Suryad Pai [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ba832f782d6142928d718f0936e1b211-suryad.pai]; Eric Schramm [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c5cb8b9660ab44eda37462185ec2572f-Eric.Schram] |
| **CC**: | Jyothi Prasad Bislehalli [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b084de6a39b54c4889a7fb1bce0df289-prasad.bisl]; Priti Parekh [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6e699571f00c454e968d7f9619e9af7b-Priti.Parek]; Joy Saphla [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e7e4f5e01dab4995ab831eba5d9fde6c-joy.saphla] |
| **Subject**: | WestLaw logins |

+Joy

Hi All,

Please find below a summary of our conversation:

We don't believe that there will be any legal issues with the Ross project for the following reasons:
1.      We've spoken to LegalEase and they will be providing Westlaw accounts to all of our team members under their own names.
2.      Also, there will be no copy/paste of WestLaw proprietary information.  We will be copy/pasting directly from court cases that are available to the public only.

Joy, Priti, Jyothi, and I have a call at 7am CST to discuss what approach we would like to take in regards to the WestLaw logins.  They've asked whether we'd prefer to procure logins on our own or if they should.  The catch with Westlaw is that they are looking for a minimum one year subscription.

Joy, could you please send across a copy of the SOW to this group today?  Eric is going on leave shortly and should see it to provide his thoughts.

Regards,

Chad
Bangalore, India

---

**From:** Steven Babb
**Sent:** Thursday, September 28, 2017 2:29 PM
**To:** Suryad Pai <suryad.pai@clutchgroup.com>; Chad Fennell <chad.fennell@clutchgroup.com>; Eric Schramm <Eric.Schramm@clutchgroup.com>
**Cc:** Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Subject:** RE: FW: Sales Pitch

+ Eric

I`ll get to this later today and will then ask Eric to cast his eye over it from a legal perspective.

So just to be clear, we are confident that we are not in breach of the Westlaw conditions of service?  Whilst LegalEase are providing us with user id`s in our own names, we are still a separate legal entity.  Eric, I`d appreciate your perspective on this point also.

Regards, Steven

**Steven Babb** / Global Director of Information Security
steven.babb@clutchgroup.com / O: +44 203 744 7560 / C: +44 7977 995321



www.clutchgroup.com | www.moraeglobal.com

---

**From:** Suryad Pai
**Sent:** 28 September 2017 07:29
**To:** Chad Fennell <chad.fennell@clutchgroup.com>
**Cc:** Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>; Steven Babb <steven.babb@clutchgroup.com>
**Subject:** RE: FW: Sales Pitch

+ Steven

Apologies, forgot to loop Steven in my earlier response. I think Steven is best placed to respond to this, since it seems like there has been a further development in terms agreed with LeagalEase.

Steven, I can also drop a line to Eric to confirm this.

Regards,

**Suryad Pai** / Manager – InfoSec & QMS
suryad.pai@clutchgroup.com
O: +91 (80) 3040 4425 / C: +91 7760 72 72 62



www.clutchgroup.com | www.moraeglobal.com

---

**From:** Chad Fennell
**Sent:** Thursday, September 28, 2017 10:48 AM
**To:** Suryad Pai <suryad.pai@clutchgroup.com>
**Cc:** Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Subject:** RE: FW: Sales Pitch

+Looping in Priti

Hi Suryad,

MORAE_00033850
TR-0047927

There shouldn't be any pending legal issues.

We've spoken to LegalEase and they will be providing Westlaw accounts to all of our team members under their own names.

Also, there will be no copy/paste of WestLaw proprietary information.  We will be copy/pasting directly from court cases that are available to the public only.

Regards,

Chad
Bangalore, India

MORAE_00033851

TR-0047928