# EXHIBIT 65

1           IN THE UNITED STATES DISTRICT COURT

2         IN AND FOR THE DISTRICT OF DELAWARE

3

4      THOMSON REUTERS ENTERPRISE CENTRE  )
       GmbH et al.,                  )
                                     )

5      --------------------Plaintiffs,  )
                                 ) Case No.

6      vs.                      ) 20-CV-613-SB
                                 )

7      ROSS INTELLIGENCE INC.,         )
                                 )

8      --------------------Defendant.   )

9

              TRANSCRIPT OF PRETRIAL CONFERENCE

10

11     PRETRIAL CONFERENCE had before the Honorable

12  Stephanos Bibas, U.S.D.C.J., in Courtroom 2B on the 6th of

13  August, 2024.

14

15                  APPEARANCES

16      MORRIS, NICHOLS, ARSHT & TUNNELL LLP
             BY:  JEREMY TIGAN, ESQ.

17
                     -and-

18
      KIRKLAND & ELLIS LLP

19            BY:  DALE CENDALI, ESQ.
                JOSHUA SIMMONS, ESQ.

20                MIRANDA MEANS, ESQ.
                YUNGMOON CHANG, ESQ.

21                ERIC LOVERRO, ESQ.

22                  Counsel for Plaintiffs

23

24

25

1   (Appearances continued.)

2

3        POTTER ANDERSON & CORROON LLP
            BY:  DAVID MOORE, ESQ.

4                          -and-

5

        CROWELL & MORING LLP
6            BY:  WARRINGTON S. PARKER III, ESQ.
                 KEITH HARRISON, ESQ.
7                JOACHIM STEINBERG, ESQ.

8                          Counsel for Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1           THE COURT:  So we're here in Thomson Reuters
2    Enterprise versus ROSS Intelligence 20613.  Counsel for
3    Plaintiffs, please enter your appearances.
4           MR. TIGAN:  Good afternoon, Your Honor.  Jeremy
5    Tigan with Morris Nichols here in Wilmington for the
6    plaintiffs.  I'm joined by five of my colleagues from
7    Kirkland & Ellis today.  I have Dale Cendali, Joshua
8    Simmons, Miranda Means, Yungmoon Chang, and Eric Loverro
9    with me, and depending on the issue discussed, you may hear
10   from variation combinations of them.
11          THE COURT:  Mr. Tigan, are you going to take the
12   lead on the general admin issues?
13          MR. TIGAN:  Yes, I'm happy to discuss that when
14   Your Honor is ready.
15          THE COURT:  Very good.  Thank you.
16          And for Defendant.
17          MR. MOORE:  Good afternoon, Your Honor.  David
18   Moore from Potter Anderson here in Wilmington joined by my
19   colleagues from Crowell & Moring Warrington Parker, Joachim
20   Steinberg, and Keith Harrison.
21          THE COURT:  Good afternoon to you all.
22          And, Mr. Moore, are you going to be handling
23   the --
24          MR. MOORE:  I'm happy to, but I think Mr. Parker
25   planned to handle that.
```

1    we did it.

2              THE COURT:  The idea of focusing in on each

3    possible element of defense, whether there's certain things

4    copyrighted or not, a lot of intuitive sense in guiding the

5    jury step by step.  It's figuring out the mechanics how we

6    group and cluster head notes so they can consider them as

7    batches.

8              MR. SIMMONS:  Your Honor, if I may.

9              THE COURT:  Yes.

10             MR. SIMMONS:  I'm happy to reserve argument on

11   the verdict form because, as you can imagine, we don't agree

12   with the approach.  If you want to hear argument on it now,

13   I'm happy to walk through it.

14             THE COURT:  Sure.

15             MR. SIMMONS:  One of the major issues here is it

16   doesn't actually follow the way that the Copyright Act and

17   copyright law works in terms of they talk about the validity

18   of the head note, the validity of a copyrighted head note.

19   That's not the proper test.  The question is, is there

20   validity of the work, which is Westlaw.

21             The way our verdict form works, it starts with

22   that presumption, which is the copyrighted work is Westlaw

23   and then there's infringement of the head notes as the

24   subsidiary question.  There's a concern I have going through

25   this, and I don't think we have time to do it.  We have

1   antitrust lawyers coming to do that.

2           MS. CENDALI:  We're pretty confident our

3   antitrust lawyers would not like us to argue.

4           THE COURT:  I want to thank the parties for the

5   professional and efficient way you managed to keep this

6   moving ahead.  I'm grateful that we've got agreement on a

7   number of things.  We're working towards agreement on the

8   rest.  I will await Mr. Parker's update about is it

9   Dr. Marks, not Dr. Morris, and hopefully we'll learn some

10  more and hoping for some good news later this week.

11          MR. PARKER:  Understood.  Thank you.

12          THE COURT:  Wonderful.  This Court stands

13  adjourned.

14

15                  **C E R T I F I C A T E**

16      I, Deanna L. Warner, a Registered Professional

17  Reporter, do hereby certify that as such Registered

18  Professional Reporter, I was present at and reported in

19  Stenotype shorthand the above and foregoing proceedings.

20

21  _____

22  Deanna L. Warner, RPR, CSR
    Official Court Reporter
23  U.S. District Court

24

25

# EXHIBIT 66



THOMSON REUTERS ENTERPRISE CENTRE GMBH AND WEST PUBLISHING CORPORATION

V.

ROSS INTELLIGENCE INC.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Civil Action No. 1:20-cv-00613-SB

REBUTTAL EXPERT REPORT OF JAMES E. MALACKOWSKI

September 6, 2022

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Ocean Tomo, J.S. Held and their affiliates and subsidiaries are not a certified public accounting firm(s) and do not provide audit, attest, or any other public accounting services.  Ocean Tomo and J.S. Held are not law firms and do not provide legal advice.  All rights reserved.

 INTELLECTUAL CAPITAL EQUITY

1   Assignment ........................................................................................................................... 1

2   Summary of Opinions ......................................................................................................... 2

   2.1   Summary of Rebuttal Opinions ................................................................................... 2

   2.2   Bases for Opinions and Analyses ................................................................................ 4

3   Fair Use ............................................................................................................................... 5

4   Summary of the Fair Use Opinions of Dr. Cox ................................................................ 7

5   Use of Westlaw Content by ROSS and By Plaintiffs ....................................................... 9

   5.1   ROSS's Use of Westlaw Content for Training Data ................................................... 9

   5.2   Plaintiffs' Use of Westlaw Content for Training Data .............................................. 12

   5.3   Comparison of Plaintiffs' and ROSS's Use of Westlaw Content for Training Data .......... 14

   5.4   Extent of Use of Westlaw Content by ROSS ........................................................... 15

6   ROSS's Platform Created as Substitute for Westlaw ...................................................... 17

   6.1   ROSS Platform Developed Using the Bulk Memos to Compete with Other Platforms ......... 17

   6.2   West Headnotes and WKNS Facilitate, Not Limit, Legal Research ............................ 18

   6.3   ROSS Users Not Shown to be Uninterested in Westlaw ........................................... 19

7   ROSS's Copying Does Not Benefit Plaintiffs or the Public ........................................... 20

   7.1   Assertions of Benefits to Plaintiffs of ROSS's Alleged Copying ............................. 20

   7.2   Assertions of Benefits to the Public of ROSS's Alleged Copying ............................ 21

8   Potential Market for Westlaw Content ............................................................................ 23

   8.1   Dr. Cox's Inaccurate Analysis of the Market or Potential Market for Westlaw Content ..... 23

   8.2   Opinion Regarding the Potential Market for the Copyrights at Issue ........................ 24

9   Signature ............................................................................................................................ 27

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**


INTELLECTUAL CAPITAL EQUITY

## 1   ASSIGNMENT

This report is designated as containing Highly Confidential - Attorneys' Eyes Only information under the Protective Order stipulated in this matter, as specified in the footer on each page.[1]  This report is to be used only for the purpose of this litigation.  No part of this report may be published or used for any other purpose without written consent.

Ocean Tomo, LLC ("Ocean Tomo") was retained by counsel for Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West") (collectively, "Plaintiffs").  On August 1, 2022, the Expert Report of James E. Malackowski[2] (the "Malackowski Report") was issued regarding the amount and form of compensation related to the allegations made by Plaintiffs of copyright infringement of its West Key Number System ("WKNS") and its West Headnotes (collectively, "Westlaw Content"), as well as the allegations of tortious interference with contract, by ROSS Intelligence Inc. ("ROSS").  My opinions in this rebuttal report supplement the opinions expressed in the Malackowski Report and attached schedules regarding the appropriate form and amount of compensation to Plaintiffs assuming there is a finding of liability on the part of ROSS.

On August 1, 2022, the Expert Report of Alan J. Cox, Ph.D.[3] was issued.  This report addressed the four factors of fair use of a copyrighted work,[4] with particular focus on the fourth fair use factor.  I have been asked to respond to Dr. Cox's opinions and analysis in this rebuttal report.  As discussed in detail in this report, Dr. Cox mischaracterizes the facts regarding the use of Plaintiffs' copyrighted materials by Plaintiffs and as allegedly infringed by ROSS.  As a result, it is my opinion that the opinions expressed by Dr. Cox in his August 1, 2022 report are not a reliable basis for analyzing the fourth fair use factor, or other of the fair use factors.  In contrast to the opinions of Dr. Cox, it is my opinion that the benefits and value to Plaintiffs of exclusive rights to Westlaw Content would be impaired if competing legal research platforms could freely copy Westlaw Content to train their legal research platforms without paying appropriate compensation to Plaintiffs.

My qualifications, experience, compensation and curriculum vitae were provided in the Malackowski Report and have not been duplicated in this rebuttal report.  A listing of documents considered by Ocean Tomo in connection with this litigation are presented in Appendix B - Rebuttal attached to this rebuttal report.  In addition to the documents listed on Appendix B - Rebuttal, I interviewed Dr. Jonathan Krein.  As stated in the Malackowski Report, no part of Ocean Tomo's compensation depends on the outcome of this litigation.

---

[1] Stipulated Protective Order, May 13, 2021.
[2] Expert Report of James E. Malackowski, August 1, 2022.
[3] Expert Report of Alan J. Cox, Ph.D., August 1, 2022.
[4] 17 U.S.C. § 107.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



INTELLECTUAL CAPITAL EQUITY

## 2 SUMMARY OF OPINIONS

My opinions and analyses in the Malackowski Report are provided for use by the Court in determining the appropriate compensation, if any, to Plaintiffs assuming there is a finding of liability on the part of ROSS under the copyright infringement claim and/or the tortious interference with contract claim asserted by Plaintiffs against ROSS. My opinions on the appropriate compensation to Plaintiffs in this matter has not changed since the issuance of the Malackowski Report.

This rebuttal report provides my assessment of and response to the opinions of Dr. Cox as expressed in his August 1, 2022 regarding the "fourth [fair use of copyrighted material] factor, [which evaluates] the impact of the alleged copying of Westlaw Content by ROSS upon the market for the copyrighted work,"[5] and the other fair use factors as addressed in Dr. Cox's report.

### 2.1 Summary of Rebuttal Opinions

As summarized in this section, and presented in detail in the following sections of this rebuttal report, it is my opinion that Dr. Cox's opinions as stated in his August 1, 2022 report are not founded in the facts of this case and, as a result, are not a reliable basis for analyzing the fourth fair use factor, or the other fair use factors. My critiques of Dr. Cox's analyses and opinions focus on four topics, encompassing Dr. Cox's 14 opinions, as stated in his August 1, 2022 report.

#### 2.1.1 ROSS's Purpose for Westlaw Content Use is the Same as Plaintiffs' Purpose

Dr. Cox's report does not acknowledge the full extent of Plaintiffs' use of Westlaw Content as AI training data for Westlaw Next and Westlaw Edge, instead focusing only on Plaintiffs' use of Westlaw Content as AI training data for the natural language search function in Westlaw Edge called WestSearch Plus. Dr. Cox attempts to incorrectly distinguish ROSS's use of Westlaw Content as AI training data for its legal research platform from Plaintiffs' use of Westlaw Content for the same purpose. Both Plaintiffs and ROSS used Westlaw Content for the purpose of developing training data for their respective AI-driven legal research platforms.

Dr. Cox focuses on the use of Westlaw Content by West subscribers for conducting legal research instead of Plaintiffs' use of Westlaw Content for training the search algorithms of its legal research platforms. Benefits of Westlaw Content facilitating legal research by West subscribers does not alter the fact that West subscribers also benefit from Plaintiffs' use of Westlaw Content in developing quality search functionality for its legal research platforms.

Section 5 of this report provides details on ROSS's and Plaintiffs' use of Westlaw Content to develop AI training data and compares the use for this purpose by ROSS and Plaintiffs. Section 5 also provides details regarding the extent of ROSS's use of Westlaw Content.

---

[5] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 19.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

### 2.1.2    ROSS's Legal Research Platform Created as Substitute for Westlaw

Dr. Cox attempts to show that ROSS's legal research platform is based on a different approach than Plaintiff's platform, and as a result would attract a different type of subscriber than those interested in Plaintiffs' legal research platforms.  Dr. Cox fails to acknowledge that ROSS's legal research platform was developed to be a substitute for Westlaw and it was ROSS's goal to take subscribers from Westlaw and other competitors such as LexisNexis.

Section 6 presents facts regarding ROSS's use of the Bulk Memos to develop training data that allowed ROSS to compete with Plaintiffs' legal research platforms, and those of others.  Section 6 also discusses other critiques of Dr. Cox's opinions regarding the differences between the legal research platforms of ROSS and Plaintiffs that Dr. Cox suggests indicate that the legal research platforms of ROSS and Plaintiffs did not compete.  For example, although Dr. Cox claims that ROSS's legal research platform is superior to that of Plaintiffs, he does not provide examples of points of law that the ROSS legal research platform provides to legal researchers that are missed in, or are substantially different from, the points of law on Plaintiffs' legal research platform.

### 2.1.3    ROSS's Alleged Copying Does Not Benefit Plaintiffs or the Public

Dr. Cox opines that ROSS's use of Westlaw Content may have increased the value of Westlaw Content, benefiting Plaintiffs.  In addition, according to Dr. Cox, the legal research platform developed by ROSS using AI training data developed with Westlaw Content provides a public benefit by lowering the cost of legal research.  Section 7 of this report discusses the lack of support for these opinions offered by Dr. Cox.

### 2.1.4    Potential Market for Westlaw Content

I understand that Dr. Cox relies on an inaccurate representation of the fourth fair use factor as being a requirement for the copyright owner to actually use or intend to use its allegedly infringed copyrighted materials in establishing a market reflecting the alleged use of the copyrighted materials by the defendant.  Section 8 of this report discusses reasons that Dr. Cox's opinions regarding the lack of a market for the copyrights at issue are not supportable.

As discussed in Section 8, an accurate analysis the potential market for Westlaw Content supports my conclusion in the Malackowski Report that there is a potential market for the Plaintiffs' copyrighted information for developing AI training data sets, if Plaintiffs were to elect to license Westlaw Content as training data for legal research platforms.  It is my opinion that if unauthorized free use of Westlaw Content is allowed, the value of a license to Westlaw Content would be substantially impaired, as would the benefits and value to Plaintiffs of exclusive rights to Westlaw Content as AI training data for its own legal research platform.  Plaintiffs would be forced to compete with legal research platforms trained with free access to Westlaw Content while Plaintiffs continue to invest in developing and improving Westlaw Content.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

 **INTELLECTUAL CAPITAL EQUITY**

## 2.2    Bases for Opinions and Analyses

The bases for my opinions and analyses are discussed within the body of my report.  The opinions and analyses discussed throughout this report are based on my current understanding of the facts and circumstances surrounding this matter, my review of the produced documentation, testimony, and third-party information available to date and my experience and training.  The opinions and analyses described in my report are subject to change based upon additional discovery or other developments.  If additional information becomes available in this matter, I plan to review the information and prepare a supplemental report, if appropriate and allowed by the Court.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

INTELLECTUAL CAPITAL EQUITY

## 3   FAIR USE

For my analysis, I have considered the U.S. statute on fair use of a copyrighted work, as well as federal case law on fair use.

As stated in 17 U.S.C. § 107 – Limitations on Exclusive Rights: Fair Use:[6]

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include -
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

It is my understanding that in assessing the fourth fair use factor, courts consider the effect of the infringing use on the market for or value of the original work, as well as "harm to the market for derivative works."[7]  Courts have found that "as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work" and that "the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."[8]  Courts specifically look at the impact on revenues for "traditional, reasonable, or **likely to be developed markets**." (emphasis added)[9]  As a result, while it is my opinion that Plaintiffs incurred actual damages as a result of ROSS's use of the Westlaw Content, as discussed in the Malackowski Report, I also understand that "[a]ctual present harm need not be shown" in the fair use analysis, as long as

---

[6] 17 U.S.C. § 107.
[7] Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994); Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 844 (11th Cir. 1990).
[8] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 (2d Cir. 1994).
[9] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



there is an effect on the potential market for the work.[10]  For example, a court found a defendant's assertion of fair use should not be upheld, even where a plaintiff did not itself license the copyrighted work and had no present intention to do so.[11]  In addition, I understand that in assessing the fourth fair use factor, courts look not just at the particular actions of the specific infringers in a case, but also to "whether unrestricted and widespread conduct of the sort engaged in by the defendant…would result in a substantially adverse impact on the potential market for the original."[12]

---

[10] Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 450-51 (1984); Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1119 (9th Cir. 2000); Ringgold v. Black Ent. Television, Inc., 126 F.3d 70, 81 (2d Cir. 1997); Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 136, 145-46 (2d Cir. 1998).

[11] *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012).

[12] *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2002).

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

INTELLECTUAL CAPITAL EQUITY

## 4    SUMMARY OF THE FAIR USE OPINIONS OF DR. COX

Dr. Cox states that his August 1, 2022 report is "directed to the fourth [fair use of copyrighted material] factor, the impact of the alleged copying of Westlaw Content by ROSS upon the market for the copyrighted work.  Put another way, [Dr. Cox has] been asked to determine whether the LegalEase Memos,[13] and ROSS's use of the LegalEase Memos, had an impact on the potential markets for or value of the Westlaw Content."[14]  Dr. Cox also addresses the other fair use factors in his report, but states that he does "not offer[] an opinion about the extent to which these other factors weigh in favor of a finding of fair use."[15]

Dr. Cox summarizes his opinions in 14 bullet points.[16]  Dr. Cox's opinions generally relate to five topics:

▪ Dr. Cox opines that "Westlaw Content is used in very different ways by Plaintiffs compared to ROSS."[17]  Dr. Cox focuses on the use of West Headnotes and WKNS by Plaintiffs' customers in performing legal research, a feature Dr. Cox states is not used by subscribers of the ROSS legal research platform.[18]  He contrasts this "interactive use" of Westlaw Content by Plaintiffs' subscribers to ROSS's use of "Westlaw Content as a particular component of its training material for an Artificial Intelligence Program."[19]

▪ Dr. Cox opines that "ROSS's use of the Westlaw Content did not have a negative impact on the value of Westlaw Content to persons who attach importance to the Interactive use of Westlaw Content."[20]  He attempts to draw distinctions between how the two platforms function and minimize the similarities between them.

▪ Dr. Cox opines that ROSS expanded the legal research platform market by providing an alternative at "a much lower cost than Plaintiffs."[21]  This opinion ignores that the ROSS legal research platform is alleged to have been developed through infringement of Plaintiffs' copyrighted materials, in which Plaintiffs have made a considerable investment, as discussed in the Malackowski Report.[22]

▪ Dr. Cox opines that the use of West Headnotes "could not have had an impact on the market for or value of the Answer Components use of headnotes" because there is no actual or

---

[13] The Rebuttal Report refers to the memos that LegalEase prepared in the Bulk Memo Project for ROSS as Bulk Memos, consistent with the Malackowski Report.
[14] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 19.
[15] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 19.
[16] Rebuttal Schedule 1.0.
[17] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 5.
[18] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 36.
[19] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 5.
[20] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 6.
[21] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 8.
[22] Expert Report of James E. Malackowski, August 1, 2022, pp. 34-35, 39.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

**INTELLECTUAL CAPITAL EQUITY**

intended market for West Headnotes "as Answer Components in particular or for AI-training related applications."[23]

- Dr. Cox opines that there is no market for the copyrighted materials at issue, including West Headnotes and WKNS, for the purpose of developing AI training data for legal research platforms.  Dr. Cox opines that there is no market for West Headnotes as answers in question-answer pairs because there is no evidence that Plaintiffs market, license, or sell the West Headnotes for this purpose.[24]  In addition, Dr. Cox opines that the WKNS were not copied by ROSS, and therefore ROSS did not have an impact on their value or the market for them.[25]

In my opinion, Dr. Cox's opinions are not founded in the facts of this case and, as a result, are not a reliable basis for analyzing the fourth fair use factor, or the other fair use factors.  Sections 5 through 8 provide discuss the basis of my opinions and my critiques of the opinions of Dr. Cox.

---

[23] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 7.
[24] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 7.
[25] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 8.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



## 5    USE OF WESTLAW CONTENT BY ROSS AND BY PLAINTIFFS

Dr. Cox opines that "Westlaw Content is used in very different ways by Plaintiffs compared to ROSS, to the extent that such content could be considered to be used by ROSS."[26]  In his efforts to support this opinion, Dr. Cox mischaracterizes the purpose and use of Westlaw Content by Plaintiffs and ROSS.  It is my understanding that one of the most important assessments for evaluating fair use factors one, three and four is whether the copyrighted material is being used for the same purpose by both the infringer and the copyright holder.  As discussed in this section, in contrast to the opinion of Dr. Cox, both Plaintiffs and ROSS used Westlaw Content for the same purpose of developing training data for their respective AI-driven legal research platforms.

Dr. Cox attempts to support his opinion regarding Plaintiffs and ROSS using Westlaw Content in different ways by contrasting the use of Westlaw Content by subscribers to the Westlaw legal research platform, called "interactive use" of Westlaw Content by Dr. Cox, to the alleged use of Westlaw Content by ROSS to develop training data.[27]  This comparison ignores the fact that both Plaintiffs and ROSS used Westlaw Content to develop training data for their competing legal research platforms, as discussed in Sections 5.1 and 5.2.  Both ROSS and Plaintiffs developed search functionality using Westlaw Content as a training data input that was important to obtaining subscriber satisfaction with their respective platforms, contributing to the value of each platform.  Dr. Cox also incorrectly minimizes the extent of ROSS's alleged copying, and attempts to draw distinctions between the ways ROSS and Plaintiffs used Westlaw Content as training data that are not consistent with the facts.

### 5.1    ROSS's Use of Westlaw Content for Training Data

ROSS's initial legal research platform was "powered by IBM's Watson ("Watson"), which is an off-the-shelf question-answering search algorithm that allows companies like ROSS to integrate Watson into their own products."[28]  ROSS's training data for the Watson system was a spreadsheet of "legal question[s], passage(s) that answer [the] legal question[s], and relevance label(s)" created from memos prepared by LPOs,[29] such as LegalEase.  ROSS requested that LegalEase prepare these memos using "LexisNexis/Westlaw and other reliable sources for your research."[30]

---

[26] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 5.
[27] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 5.
[28] Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, p. 37.
[29] Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' Set of Interrogatories (Supplemental Response to Interrogatory No. 11 Only), February 22, 2022, Supplemental Answer to Interrogatory No. 2, pp. 10-12.
[30] Email chain between Akash Venkat, Tariq Hafeez, Thomas Hamilton, Andrew Arruda, and Jimoh Ovbiagele, Subject: Legal Research Inquiry, September 20-21, 2015, ROSS-003277880-ROSS-003277881 at ROSS-003277881.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

By mid-2017, ROSS determined that it needed to transition from the Watson technology to a legal research platform based on its own design.[31] To develop the new ROSS legal research platform, ROSS needed a larger collection of judicial opinions as it expanded into other areas of law and a larger set of high-quality training data "in the form of legal memoranda."[32] As discussed in the Malackowski Report[33] and in the Opening Report of Dr. Jonathan Krein (the "Krein Report"),[34] ROSS, through LegalEase and Morae Global Corporation ("Morae Global"), used Westlaw Content to create this required training data.

On June 12, 2017, Mr. van der Heijden contacted LegalEase with a "ROSS Scale-Up Query" regarding ROSS's interest in acquiring large batches of memo, starting with "between 25,000 to 100,000 memos in the ROSS format by end of summer."[35] The memos that LegalEase was to create could relate to any legal practice area but would be in the same format as LegalEase was preparing at that time for ROSS.[36] ROSS reviewed the initial memos, gave edits and provided feedback before LegalEase went forward, scaling up the production.[37] ROSS understood that LegalEase would create the Bulk Memos by generating legal questions "in accordance with what [ROSS] wanted those questions to look like," and would then "find case law passages in response" to the questions.[38]

The Bulk Memos were created for ROSS between July 2017 and mid-January 2018,[39] a short timeframe for the number of memos required by ROSS as indicated by LegalEase's need to use subcontractors to create the Bulk Memos. LegalEase found that using Westlaw Content made the creation of the Bulk Memos for ROSS more efficient.[40] The LegalEase process for creating the Bulk Memos included the use of both WKNS and Westlaw Headnotes. LegalEase used the WKNS to organize its memo process because the use of WKNS "was a helpful tool for [LegalEase to use] to

---

[31] Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' Set of Interrogatories (Supplemental Response to Interrogatory No. 11 Only), February 22, 2022, Supplemental Answer to Interrogatory No. 2, p. 12.

[32] Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' Set of Interrogatories (Supplemental Response to Interrogatory No. 11 Only), February 22, 2022, Supplemental Answer to Interrogatory No. 2, pp. 12-13; Andrew Arruda, Deposition March 30, 2022, pp. 275, 277.

[33] Expert Report of James E. Malackowski, August 1, 2022, pp. 30-34.

[34] Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, pp. 46-61.

[35] Email chain between Teri Whitehead and Tomas van der Heijden, Subject: ROSS Scale-Up Query, June 12-13, 2017, ROSS-000197671-ROSS-000197673 at ROSS-000197672.

[36] Email chain between Teri Whitehead and Tomas van der Heijden, Subject: ROSS Scale-Up Query, June 12-13, 2017, ROSS-000197671-ROSS-000197673 at ROSS-000197672.

[37] Tomas van der Heijden, 30(b)(6) Deposition March 17, 2022, pp. 325-326.

[38] Tomas van der Heijden, 30(b)(6) Deposition March 17, 2022, p. 327.

[39] Tariq Hafeez, 30(b)(6) Deposition May 26, 2022, pp. 78-79; Letter from Thomson Reuters to LegalEase providing notice of termination of access to Westlaw, January 4, 2018, TR-0002723; Email chain between Thomson Reuters Corporation and LegalEase and between LegalEase and Codematrix, Subject: Westlaw Termination, December 26, 2017-January 17, 2018, R-LEGALEASE-00101636-R-LEGALEASE-00101642 at R-LEGALEASE-00101637; Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, pp. 181-183, 186.

[40] Tariq Hafeez, 30(b)(6) Deposition May 26, 2022, p. 80.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

 **INTELLECTUAL CAPITAL EQUITY**

find topics and ensure that [LegalEase was] not duplicating topics."[41]  LegalEase used Westlaw Headnotes to create the research questions for the ROSS Bulk Memos.[42]  Morae Global, a subcontractor to LegalEase for the Bulk Memo Project, also used Westlaw Headnotes to create questions in preparing Bulk Memos for ROSS, because it was guided by LegalEase that use of Westlaw Headnotes "was the most efficient path" of providing the information ROSS required for the Bulk Memos.[43]

With its use of Westlaw Content, LegalEase was able to create a large number of Bulk Memos for ROSS.  ROSS acknowledges obtaining approximately 25,000 Bulk Memos from LegalEase.[44]  According to Mr. Ovbiagele, because of "the number of variations to [the Bulk Memo questions]," derived from Westlaw Headnotes, and "the number of quotes" ROSS had from the Bulk Memos, ROSS created over 750,000 question-answer pairs from the Bulk Memo Project that could be used to train its legal research platform.[45]  ROSS claims that with these question-answer pairs, ROSS had "one of the largest training data sets in the tech industry, not limited to legal tech."[46]  Mr. Ovbiagele said that, "In speaking to leading scientists in the field about the size of our question/answer data set, they were also impressed by the size.  In fact, it led many scientists to want to work for [ROSS]."[47]

A June 28, 2018 ROSS Board presentation states that ROSS had "[b]uilt [a] proprietary Q&A system from [the] ground up and [was] completely off of IBM Watson."[48]  ROSS acknowledged that "[b]y the Fall of 2018, ROSS  was no longer running on any Watson servers."[49]  That proprietary ROSS Q&A system was trained using the data from the Bulk Memo Project and the resulting approximately 25,000 memoranda prepared by LegalEase and its subcontractors that are alleged by Plaintiffs to infringe Plaintiffs' copyrights.

According to Mr. Ovbiagele, the ROSS model, which "aggregates the ranking variables and signals and weights them," was fed training data from the Bulk Memo Project and the raw text from judicial

[41] Tariq Hafeez, 30(b)(6) Deposition May 26, 2022, p. 79.
[42] Tariq Hafeez, 30(b)(6) Deposition May 26, 2022, p. 78.
[43] Christopher Cahn, 30(b)(6) Deposition May 12, 2022, pp. 194-198.
[44] Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' Set of Interrogatories (Supplemental Response to Interrogatory No. 11 Only), February 22, 2022, Supplemental Answer to Interrogatory No. 11, p. 63.
[45] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, pp. 186-188.
[46] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, p. 187.
[47] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, p. 188.
[48] ROSS Board Discussion Materials, June 28, 2018, ROSS-009722263-ROSS-009722299 at ROSS-009722264.
[49] Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' Set of Interrogatories (Supplemental Response to Interrogatory No. 11 Only), February 22, 2022, Supplemental Answer to Interrogatory No. 2, p. 12.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

INTELLECTUAL CAPITAL EQUITY

opinions obtained from Casemaker.[50]  These were the only sources of training data used for the ROSS model.[51]

These facts confirm the use and importance of the use of Westlaw Content to ROSS in the development of its legal research platform.  ROSS obtained the large amount of training data that was needed by ROSS to create its own legal research platform, ending its reliance on Watson.  This large amount of training data was obtained within a short timeframe, benefiting from LegalEase's determination that it was efficient to create the Bulk Memos using West Headnotes.  This training data was of high quality and, as Dr. Krein explains, without this high-quality training data, ROSS's search functionality would have been of a lower quality.[52]  That is, high quality training data developed using Westlaw Headnotes improved the search functionality of ROSS legal research platform.  This high-quality training data was available for ROSS to use in improving its search functionality because LegalEase used WKNS to organize its creation of the Bulk Memos for ROSS and both LegalEase and Morae Global used West Headnotes to create the Bulk Memos because that was the most efficient method to create Bulk Memos that met ROSS's requirements.

### 5.2    Plaintiffs' Use of Westlaw Content for Training Data

As discussed in the Malackowski Report[53] and in the Krein Report,[54] but not fully acknowledged by Dr. Cox in his expert report, Plaintiffs use Westlaw Content for training the algorithms that power their AI-driven legal research platform.  Thomson Reuters Corporation introduced the concept of machine learning, a form of AI, to search in the 2006 to 2007 timeframe, and applied this in its development of Westlaw Next and WestSearch, the search algorithm for Westlaw Next.[55]  Question-answer pair training data was used in developing WestSearch.  The millions of daily queries in Westlaw were clustered to identify the questions to use in the training data.[56]  Attorney editors ranked the headnotes that answered the identified questions as A, B, C, D or F.[57]  These results were compared, with the relative ranking assigning a "cost" to the selection of a lower ranking headnote over a higher-ranking headnote.  Hundreds of thousands of these example pairs and their relative ranking "costs" were used to train WestSearch the search algorithm for Westlaw Next.[58]  While WKNS was not training data for WestSearch, WKNS was used beneficially in search algorithms in

---

[50] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, pp. 184-185.
[51] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, pp. 186-187.
[52] Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, p. 65.
[53] Expert Report of James E. Malackowski, August 1, 2022, pp. 26-27.
[54] Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, pp. 34-37.
[55] Khalid Al-Kofahi, Deposition April 8, 2022, pp. 16-17, 19.
[56] Khalid Al-Kofahi, Deposition April 8, 2022, p. 144.
[57] Khalid Al-Kofahi, Deposition April 8, 2022, pp. 52-53, 132-133.
[58] Khalid Al-Kofahi, Deposition April 8, 2022, pp. 97-98.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

WestSearch to map versions of the same question by different users, identifying questions that were expressed differently but were addressing the same legal question.[59]

The application of machine learning to search was enhanced in Westlaw Edge.[60]  Khalid Al-Kofahi, Thomson Reuters Corporation's former Vice President of Research and Development, explained that Westlaw Edge can "understand the question, and understand the answer, and determine algorithmically that the answer is responsive to that question" using an "ensemble of algorithms."[61] Westlaw Edge's search engine considered both headnotes and key numbers in determining an answer to a user's question.[62]  Mr. Al-Kofahi clarified:

> [I]f a legal issue is attorney-client privileges, … one of the algorithms would find key numbers that relate to attorney-client privileges, and if there is such a thing as extension of that privilege from one party to another … That would be one algorithm.
>
> Another algorithm would … run the Q&A text against headnotes or cases or identical articles as well as structured records ... [Y]ou will run … a number of algorithms against different data sets, and then you combined the results, and the way you combined the results is through training data.[63]

Isabelle Moulinier, Thomson Reuters Corporation's VP, Research and Data Science, explained that in addition to its general search engine, Westlaw Edge has a specific search functionality called WestSearch Plus.[64]  While general searches in Westlaw Edge provide a full and complete list of search results, WestSearch Plus identifies a "handful" of search results that provide "very specific portions of documents that can be characterized as an answer."[65]  "Machine learning, natural language processing, citation networks, the Thomson Reuters taxonomy of law, the key number system, and the West archive of twenty-seven million headnotes work together to optimize search results" with WestSearch Plus.[66]  Thomson Reuters Corporation's website explains that in Westlaw Edge and WestSearch Plus:

> WestSearch Plus answers customers' questions posed in natural language.  Behind the scenes, it mines the rich analytical material in our headnotes as the source for answers.  It uses editorial guidelines to divide Headnotes into frames/intents.  Then it classifies both answers and questions (mined from the query logs) to those intents. WestSearch Plus uses search strategies based on questions and intents to assemble a

[59] Khalid Al-Kofahi, Deposition April 8, 2022, pp. 23-24.
[60] Khalid Al-Kofahi, Deposition April 8, 2022, p. 20.
[61] Khalid Al-Kofahi, Deposition April 8, 2022, pp. 20-21.
[62] Khalid Al-Kofahi, Deposition April 8, 2022, pp. 23-24.
[63] Khalid Al-Kofahi, Deposition April 8, 2022, p. 22.
[64] Isabelle Moulinier, 30(b)(6) Deposition July 1, 2022, pp. 12-13.
[65] Isabelle Moulinier, 30(b)(6) Deposition July 1, 2022, pp. 13-14.
[66] Major Thomson Reuters Launch: Westlaw Edge, West Search Plus, Analytics, Enhances Citator and More, Jean O'Grady, July 12, 2018, Dewey B Strategic, https://www.deweybstrategic.com/2018/07/6838.html.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**

INTELLECTUAL CAPITAL EQUITY

headnote candidate pool and uses natural language processing (NLP) & discourse features in XGBoost model to classify/score answers.[67]

A team of approximately 20 Thomson Reuters Corporation scientists worked for 18 to 20 months to develop the ranking algorithms in Westlaw Edge.[68]  To train these algorithms, Thomson Reuters Corporation used its own content and data from Westlaw.  Specifically, West Key Numbers were used to train Westlaw Edge's general functionality with "key numbers for training the search specific to key numbers as an output as well as underlying information for training case search."[69]  West Headnotes were used as the answers in question-answer pairs used to train WestSearch Plus.[70]

### 5.3    Comparison of Plaintiffs' and ROSS's Use of Westlaw Content for Training Data

Both Plaintiffs and ROSS made extensive use of Westlaw Content in developing training data for building and improving search functionality for their legal research platforms.  As discussed in Sections 5.1 and 5.2, both Plaintiffs and ROSS used West Headnotes as inputs for training data consisting of question-answer pairs.  WKNS was also used by both Plaintiffs and ROSS to structure and refine the development of that training data.

Dr. Cox's report includes minimal recognition of Plaintiffs' use of Westlaw Content as training data, acknowledging only its use "as a particular component of Plaintiffs' training material for a very specific portion of their Artificial Intelligence program, WestSearch Plus."[71]  Instead, his report focuses on Westlaw Content as a "structure that guides the [legal] research undertaken by Plaintiffs' customer-licensees."[72]  This use of Westlaw Content in structuring the research undertaken by legal researchers on Westlaw is in addition to Plaintiffs' use of Westlaw Content in creating training data for its AI system discussed in Section 5.2.[73]  Subscribers using Westlaw Content for legal research benefit from the use of Westlaw Content in training data because Plaintiffs' search algorithm provides improved search results attributable, at least in part, to training on high-quality data.[74]

When Dr. Cox acknowledges that Westlaw Content was "used internally by Plaintiffs as a particular component of Plaintiffs' training material," he limits this consideration to Plaintiffs' "Artificial Intelligence program, WestSearch Plus,"[75] ignoring the long-term and varied use of Westlaw Content for AI training data by Plaintiffs' as explained in Section 5.2.  With regard to WestSearch Plus, Dr.

---

[67] Our AI Timeline, TR-0037669-TR-0037676 at TR-0037674.
[68] Khalid Al-Kofahi, Deposition April 8, 2022, p. 60.
[69] Isabelle Moulinier, 30(b)(6) Deposition July 1, 2022, p. 143; Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, pp. 36-37.
[70] Isabelle Moulinier, 30(b)(6) Deposition July 1, 2022, pp. 77-78.
[71] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 6.
[72] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 5.
[73] Free vs. Westlaw: Why you need the West Key Number System, Thomson Reuters, https://legal.thomsonreuters.com/en/insights/articles/using-the-west-key-number-system.
[74] Interview of Jonathan Krein, Ph.D.
[75] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 6.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



INTELLECTUAL CAPITAL EQUITY

Cox asserts that, "Plaintiffs used the headnotes as the <u>answers</u> in the question-answer pairs that were used as part of the training material for Plaintiffs' Artificial Intelligence software, software that was designed to identify only headnotes in response to natural language legal questions." (emphasis in original)[76]  Dr. Cox contrasts this with his understanding of ROSS's use of West Headnotes "as a component of its training material for its Artificial Intelligence program" in which "the headnotes were used by ROSS as the starting point to generate _questions_ in question-answer pairs that make up ROSS's Artificial Intelligence training material, _not_ answers.  Also, ROSS's program returned only the text from judicial opinions," not West Headnotes or other Westlaw Content.[77]

I understand from Dr. Krein that the contrast Dr. Cox attempts to create between the use of West Headnotes by Plaintiffs and the use by ROSS with their AI programs is not accurate.[78]  Dr. Krein explained that the purpose of the use of West Headnotes by ROSS was the same as the purpose of the use of West Headnotes by Plaintiffs for WestSearch Plus: both ROSS and Plaintiffs used West Headnotes as input in the form of training data used to teach an AI system to provide relevant portions of judicial opinions in response to a natural language question.  The fact that WestSearch Plus provides subscribers a list of West Headnotes linked to judicial opinions in response to natural language questions instead of the judicial opinions themselves is not materially different from the judicial case excerpts provided to users of the ROSS legal research platform in response to natural language questions.  The West Headnotes in Westlaw are drawn from and are linked to judicial opinions, providing a convenient means for West subscribers to identify the section of the judicial opinion most relevant to the question posed by the subscriber.[79]

### 5.4    Extent of Use of Westlaw Content by ROSS

As part of his analysis of "the use made of Westlaw Content by ROSS," Dr. Cox incorrectly minimizes the extent of use of West Headnotes by ROSS and LegalEase, proposing that 0.086 percent of the total number of West Headnotes on Westlaw were copied.[80]  Dr. Cox concludes this from a comparison of the number of Bulk Memos to the total number of unique West Headnotes. ROSS acknowledges obtaining approximately 25,000 legal memoranda from LegalEase.[81]  In addition, ROSS obtained over 750,000 question-answer pairs from the Bulk Memo Project with LegalEase, which according to Mr. Ovbiagele, was an impressive size "to leading scientists in the

---

[76] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 6.
[77] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, pp. 6-7.
[78] Interview of Jonathan Krein, Ph.D.
[79] Interview of Jonathan Krein, Ph.D.
[80] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, pp. 29-30.
[81] Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' Set of Interrogatories (Supplemental Response to Interrogatory No. 11 Only), February 22, 2022, Supplemental Answer to Interrogatory No. 11, p. 63.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

INTELLECTUAL CAPITAL EQUITY

field."[82]  This indicates that, considering the purpose for which ROSS was copying the Westlaw Content, it was taking a substantial amount.

Similarly, LegalEase's copying, which Plaintiffs contend ROSS is liable for, was also substantial.  As I explained in the Malackowski Report:[83]

> Plaintiffs have determined that to create those 25,000 memos, LegalEase and its subcontractors "copied at least 45,016 editorially-enhanced judicial opinions, representing the cases cited in the memos from which LegalEase derived a 'good' or 'great' quote."[84]  To identify these 45,000 plus editorially-enhanced judicial opinions for the Bulk Memo Project, LegalEase and its subcontractors accessed approximately 443,700 state and federal cases, including cases accessed on a transaction basis and cases accessed on a time basis.[85]  Plaintiffs state that, "Each time LegalEase clicked on a case on Westlaw, it copied a myriad of protectable content without the benefit of a license to that content.  This included West Headnotes, Key Numbers, original synopses, and other editorial enhancements, *verbatim*."[86]

The number of question-answer pairs prepared by ROSS from the Bulk Memos and the number of cases accessed by LegalEase in creating the Bulk Memos, with each instance copying Plaintiffs' protected content, indicates that ROSS's benefits from its alleged infringement of Westlaw Content was larger in comparison to the number of West Headnotes than proposed by Dr. Cox.

---

[82] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, pp. 186-188.
[83] Expert Report of James E. Malackowski, August 1, 2022, p. 59.
[84] Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Second Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Interrogatory No. 21, June 9, 2022, First Supplemental Response to Interrogatory No. 21, p. 22.
[85] Expert Report of James E. Malackowski, August 1, 2022, Schedule 1.2
[86] Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Second Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Interrogatory No. 21, June 9, 2022, First Supplemental Response to Interrogatory No. 21, p. 22.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



## 6   ROSS'S PLATFORM CREATED AS SUBSTITUTE FOR WESTLAW

Dr. Cox minimizes the importance of ROSS's use of Westlaw Content in its efforts to create a legal research platform to compete with Westlaw, among other legal research platforms.  The Malackowski Report summarizes information about some of the legal research platform providers competing in the U.S., among other geographies, including Thomson Reuters Corporation, LexisNexis, Bloomberg, Fastcase, Casemaker and Casetext.[87]  In contrast to the competition between legal research platforms described in the Malackowski Report, Dr. Cox describes the ROSS platform and Westlaw as different products facilitating different types of research.[88]  Dr. Cox even claims that Westlaw Content limits legal researchers, contrary to available evidence discussed in this section.  Dr. Cox also asserts, without support, that users of ROSS's legal research platform would not have subscribed to Westlaw if ROSS's platform were not available.

### 6.1   ROSS Platform Developed Using the Bulk Memos to Compete with Other Platforms

ROSS has acknowledged that ROSS offered a legal research platform that competed with Westlaw.[89]  ROSS's documents identified Westlaw as a competitor.[90]  Mr. Arruda agreed that ROSS competed with Plaintiffs' Westlaw and that both companies "target lawyers as customers."[91]  In the first quarter of 2019, one of ROSS's top level product goals was to "Take market share from Westlaw and Lexis."[92]  Success in achieving this goal would be measured by "20 solo-practitioners or small law firms in our Headpin market switch over completely or indicate their intent to switch over completely from WEXIS once their subscriptions with WEXIS expire."[93]  According to ROSS, it "brought on some of the world's top law firms as customers," identifying Kobre & Kim, Kilpatrick Townsend, Clark Hill, Dickinson Wright, Carlton Fields, Dentons and Jackson Lewis.[94]  Plaintiffs also determined that the legal research platform being develop by ROSS would result in ROSS and Plaintiffs being competitors.[95]

---

[87] Expert Report of James E. Malackowski, August 1, 2022, pp. 13-17.
[88] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 28.
[89] Andrew Arruda, Deposition March 30, 2022, pp. 39, 103, 114; Powered by IBM Watson Application Executive Summary, ROSS-003705907-ROSS-003705908 at ROSS-003705907; Declaration of Andrew Arruda, *West Publishing Corporation v. LegalEase Solutions, LLC,* Case No. 0:18-cv-01445, October 1, 2019, p. 2; Tomas van der Heijden, 30(b)(6) Deposition March 17, 2022, p. 55.
[90] Powered by IBM Watson Application Executive Summary, ROSS-003705907-ROSS-003705908 at ROSS-003705907.
[91] Andrew Arruda, Deposition March 30, 2022, pp. 39, 112, 114.
[92] ROSS's Top 3 Product Goals for Q1 2019, ROSS-009501052-ROSS-009501053 at ROSS-009501052.
[93] ROSS's Top 3 Product Goals for Q1 2019, ROSS-009501052-ROSS-009501053 at ROSS-009501052.
[94] Slide Notes, ROSS-010114898-ROSS-010114899.
[95] Email chain between Melissa Pritchard, Tara Levin, Kelly Phillipson and Charles Mikesell and Thomas Hamilton, Subject: Ross Intelligence – Demo Practice Point, September 21, 2015 and September 25, 2015, ROSS-003389728-ROSS-0003389730 at ROSS-003389728.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



To develop its legal research platform that competes with Westlaw, among other platforms, ROSS is accused of infringing Plaintiffs' copyrighted Westlaw Content with the Bulk Memos that were used by ROSS as training data.[96]  Dr. Cox bases his determination of "whether ROSS's alleged copyright infringement had an effect on the market for and value of Westlaw Content" on purported differences in use of the copyrighted materials by Plaintiffs and by ROSS.[97]  For example, Dr. Cox states that, "ROSS did not provide [Plaintiffs'] copyrighted material to its customer-licensees.  Indeed the allegedly infringing Memos would have been useless to ROSS's customer-licensees."[98]  This statement by Dr. Cox ignores the fact that the Bulk Memos were critical to training the ROSS legal research platform to be capable of responding to the queries of ROSS's customer-licensees.  Without the use of this training data, the ROSS legal research platform would be "useless" to its customer-licensees.[99]

### 6.2   West Headnotes and WKNS Facilitate, Not Limit, Legal Research

Dr. Cox points to superficial distinctions between the ROSS platform and Westlaw that do not change the fact of the importance of the Bulk Memos to ROSS.  For example, he asserts that because the West Headnotes and judicial opinions are organized under WKNS, search results will necessarily "be aggregated in a manner that reflects the patterns and limits imposed by this classification system," and suggests that this is a limitation on the Westlaw platform that ROSS's platform does not have.[100]  Instead, Westlaw Content is a feature, not a limitation.  Dr. Cox's report even discusses various uses and benefits of Westlaw Content by West subscribers in performing legal research.[101]  Dr. Cox acknowledges that WKNS and West Headnotes "organize[] a large portion of the law and thus allows researchers to feel confident that their interactive research [using Westlaw] will include the opportunity to identify a significant amount of relevant material."[102]  Dr. Cox also acknowledges that Westlaw's structure including WKNS and West Headnotes has been "built up over decades" with updating by human reviewers or Attorney Editors to reflect "where things are changing in the law."[103]

In contrast to the limitations perceived by Dr. Cox, the Thomson Reuters Corporation website explains how a legal researcher, who would generally be expected to be conducting legal research focused on one topic at a time for a particular research effort, can use West Headnotes and WKNS to efficiently identify judicial opinions relevant to the research topic.  For example, searching by WKNS and topics "helps to find specific Key Numbers that use the language [that is the basis of the

---

[96] Complaint, May 6, 2020, pp. 11-14.
[97] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 19.
[98] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 20.
[99] Interview of Jonathan Krein, Ph.D.
[100] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, pp. 24-25.
[101] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, pp. 21-25.
[102] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 24.
[103] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 24.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



researcher's query], whereas the search in headnotes provides a broader option to find helpful headnotes or related Key Numbers."[104]  With this search approach, "[f]inding one case on point will directly lead [the researcher] to others through Key Numbers.  *Headnotes are summaries of specific points of law addressed in a particular case, drafted by Westlaw Attorney Editors to ensure that topics include relevant cases even where those cases may use atypical language.*"[105]  This website also notes the alternative provided by Plaintiffs for natural language search, stating, "WestSearch Plus on Westlaw Edge provides superior research suggestions right from the search box, then provides the most relevant text for [the researcher's] legal query without the need to dive into a result list" by returning West Headnotes linked to judicial opinions.[106]

### 6.3    ROSS Users Not Shown to be Uninterested in Westlaw

Dr. Cox attempts to show that ROSS's legal research platform is based on a different approach than Plaintiff's platform, suggesting that ROSS used an "alternative approach[] … utilizing newly emergent technologies."[107]  According to Dr. Cox, "[n]atural language search methodologies such as ROSS's tend to be untethered from the sort of classification imposed by West, and this freedom from an imposed structure is an attribute that different legal researchers may prefer and which may extract, uncover and disclose points of law that the [WKNS] structure may miss."[108]  Dr. Cox does not provide examples of points of law that the ROSS legal research platform provides to legal researchers that are missed in, or are substantially different from, the points of law on Plaintiffs' legal research platform.  Dr. Cox fails to acknowledge that ROSS's natural language legal research platform provides responses to questions after AI training using training data developed from the Bulk Memos alleged to infringe Plaintiffs' copyrighted materials.  In addition, Dr. Cox fails to show how, if at all, the ROSS natural language approach is so different from the product offered by Plaintiffs with WestSearch Plus in Westlaw Edge that ROSS was attracting different customers due to its natural language approach.  Dr. Cox acknowledges that it "is not relevant to the Factor Four consideration in this case," but still decides to include in his report his conclusion, without citing evidence, that "[i]t seems unlikely that West lost any customers directly as a result of ROSS's use of Westlaw Content, in particular the use of headnotes to train an algorithm."[109]  Instead, as discussed earlier in this section, ROSS's legal research platform competed with Westlaw, among others, and had a goal to "[t]ake market share from Westlaw and Lexis."[110]

---

[104] Free vs. Westlaw: Why you need the West Key Number System, Thomson Reuters, https://legal.thomsonreuters.com/en/insights/articles/using-the-west-key-numbers-system.
[105] Emphasis in original.  Free vs. Westlaw: Why you need the West Key Number System, Thomson Reuters, https://legal.thomsonreuters.com/en/insights/articles/using-the-west-key-numbers-system.
[106] Free vs. Westlaw: Why you need the West Key Number System, Thomson Reuters, https://legal.thomsonreuters.com/en/insights/articles/using-the-west-key-numbers-system.
[107] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 25.
[108] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 25.
[109] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 34.
[110] ROSS's Top 3 Product Goals for Q1 2019, ROSS-009501052-ROSS-009501053 at ROSS-009501052.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**


INTELLECTUAL CAPITAL EQUITY

## 7    ROSS'S COPYING DOES NOT BENEFIT PLAINTIFFS OR THE PUBLIC

Dr. Cox's report presents opinions that both Plaintiffs and the public have benefited from ROSS's alleged copying of Westlaw Content and using it as training data to develop ROSS's legal research platform.  As discussed in this section, these opinions are not consistent with the facts of this case. There is no factual support for Dr. Cox's contention that the value of Westlaw Content would increase due to ROSS's copying.  Nor is there evidence of public benefit from ROSS's copying as proposed by Dr. Cox, such as meeting the needs of legal researchers who cannot access any legal research platform other than ROSS's.  Instead, ROSS's copying, if allowed without cost to ROSS, would harm the public by discouraging investment in legal research platforms, such as Westlaw, which have provided a trusted resource to lawyers and other legal researchers.

### 7.1    Assertions of Benefits to Plaintiffs of ROSS's Alleged Copying

Dr. Cox opines that, "ROSS's use of Westlaw Content may increase the value of Westlaw Content" by increasing the size of the market for legal research by "[l]owering average costs" which he expects to result in "increased utilization and consumption of legal services and the number of users of these legal research tools."[111]  Dr. Cox provides no explanation as to why ROSS's legal research platform would be more likely to expand the "base of potential consumers with fewer financial resources and less ability to pay West prices"[112] than other price competitive legal research platforms that are not accused of infringing Plaintiffs' copyrights, such as the availability of Fastcase through "the bar associations of all 50 states, the District of Columbia, the U.S. Virgin Islands, and four-dozen metropolitan, county and specialty bar associations."[113]  Dr. Cox has not shown that the number of these subscribers would increase nor that the use and consumption of legal services would increase if ROSS entered the competition for lower cost legal research platforms.

Nor does Dr. Cox provide any explanation as to how, even if it were possible that ROSS's platform could expand the size of the market for legal research platforms to include consumers that are less able to pay West prices, the result would include an increase in the value of Westlaw Content. Proposing that "West could charge higher prices to its loyal customers who prefer[] the Westlaw Content as provided by West"[114] ignores the competitive nature of the market for legal research platforms, as discussed in the Malackowski Report.[115]  Dr. Cox provides no evidence that competition with an additional legal research platform, such as ROSS's, would alter the price Plaintiffs' subscribers would be willing to pay for the benefits of using Westlaw.

---

[111] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 37.
[112] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 38, footnote 153.
[113] Longtime Competitors Fastcase and Casemaker Merge, Reshaping the Legal Research Landscape, Bob Ambrogi, LawSites, January 5, 2021, https://www.lawnext.com/2021/01/longtime-competitors-fastcase-and-casemaker-merge-reshaping-the-legal-research-landscape.html.
[114] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 37.
[115] Expert Report of James E. Malackowski, August 1, 2022, pp. 13-17.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



### 7.2 Assertions of Benefits to the Public of ROSS's Alleged Copying

Dr. Cox asserts that ROSS provided a public benefit by lowering the cost of legal research, offering access beyond "consumers with any interest in legal research services, an ability to pay West's high prices, and an ability to commit to West's long-term licenses."[116]  Not only does Dr. Cox fail to identify any of these consumers he claims would benefit, he fails to consider the public harm from discouraging investment in the high quality editorial content in which Plaintiffs represent to have "invested vast resources, including creativity, talent, time, effort, and money."[117]

Dr. Cox fails to identify members of the "base of potential consumers with fewer financial resources and less ability to pay West prices,"[118] whose needs are not met by the current legal research ecosystem.  In order for ROSS to create more demand for legal research services, as expected by Dr. Cox, there would have to be potential legal research consumers who are not currently subscribing to legal research platforms available at lower prices than Westlaw, such as Fastcase.  Dr. Cox does not provide evidence of these potential legal researcher with unmet needs.  Because alternative legal research platforms are currently made available without copying Plaintiffs' copyrighted materials, there does not appear to be support for Dr. Cox's contention that, "Access to the law at a low cost for more people, who could not otherwise afford it, using effective AI tools [allegedly developed by infringing Plaintiffs' copyrights] serves the public interest."[119]

The range of legal research platforms currently competing with a variety of features and prices without copying Plaintiffs' copyrighted materials indicates that instead of a public benefit, ROSS's copying, without appropriate compensation, results in harm by impairing the value of that content and discouraging continuing investment in proprietary editorial content.  To launch Bloomberg Law, Bloomberg "added some 250 full-time attorneys to sort through cases on top of teams of support and sales people to set up shop at top law schools and knock on firms' doors," over a period of five years before launching its legal research platform.[120]  Plaintiffs assert that they have "invested vast resources, including creativity, talent, time, effort, and money, to create Westlaw Content" including the creation of "West Headnotes summarizing key points of law, and organizing those cases and West Headnotes in the WKNS," noting that WKNS "is the result of decades of human creativity and choices."[121]  Plaintiffs, and others currently providing legal research platforms without copying Plaintiffs' proprietary content for commercial gain, provide trusted legal research services, assisting lawyers and others to efficiently research the law.  If Plaintiffs' West Headnotes and WKNS could

---

[116] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 38, footnote 153.
[117] Complaint, May 6, 2020, p. 8.
[118] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 38, footnote 153.
[119] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 38, footnote 153.
[120] Bloomberg Hangs New Shingle, The Wall Street Journal, July 8, 2010, https://www.wsj.com/articles/SB10001424052748704545004575353143750422612.
[121] Complaint, May 6, 2020, p. 8.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



INTELLECTUAL CAPITAL EQUITY

be freely used to develop competing legal research platforms, investment in this type of editorial content would be discouraged.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



## 8    POTENTIAL MARKET FOR WESTLAW CONTENT

Dr. Cox focuses his analysis on the lack of marketing, licensing or selling of Plaintiffs' West Headnotes for the training of AI, stating that "there is no evidence that West licenses to software researchers the headnotes allegedly used by ROSS in the process of training its ranking algorithm. Thus, ROSS has not supplanted any market for the use of Westlaw Content in training of AI."[122] Instead Dr. Cox focuses on Plaintiffs' licensing subscribers, providing access to Westlaw Content for legal research purposes.[123]  Dr. Cox fails to consider the potential market for Westlaw Content as AI training data, as discussed in the Malackowski Report, as well as in this section of my rebuttal report.  Dr. Cox also fails to consider whether ROSS's conduct, if it were widespread, would impair the value of the Westlaw Content.  As discussed in this section, I concluded that it would.

### 8.1    Dr. Cox's Inaccurate Analysis of the Market or Potential Market for Westlaw Content

Dr. Cox relies on what I understand to be an inaccurate representation of the fourth fair use factor as being a requirement for the copyright owner to actually use or intend to use its allegedly infringed copyrighted materials in establishing a market reflecting the alleged use of those copyrighted materials by the defendant.[124]  As discussed in Section 2, it is my understanding that courts consider "likely to be developed markets"[125] and "[a]ctual present harm need not be shown."[126]  Courts have ruled against a fair use defense even where a plaintiff did not itself license the copyrighted work and had no present intention to do so.[127]  More broadly than the specific conduct of the alleged infringers, courts consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market for the original."[128]

Dr. Cox incorrectly relies on a purported admission by West "that there is no licensing market for the Westlaw Content at issue" because he limits his consideration to the lack of "evidence that West licenses to software researchers the headnotes allegedly used by ROSS in the process of training its ranking algorithms."[129]  Dr. Cox is incorrectly limiting his consideration to whether Plaintiffs themselves are currently licensing the content for the alleged infringing use of Westlaw Content as AI training data for legal research platforms, rather than the approach suggested by courts of whether such a market is "traditional, reasonable, or likely to be developed."[130]  In other words, even

---

[122] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 35.
[123] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 35.
[124] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, pp. 7, 35-40.
[125] Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F 3d 73, 91 (2nd Cir. 2014).
[126] Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 450-51 (1984).
[127] Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1191-1192 (9th Cir. 2012).
[128] Kelly v. Arriba Soft Corp., 336 F.3d 811, 821 (9th Cir. 2002).
[129] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 35.
[130] Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 930 (2d Cir. 1994).

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

INTELLECTUAL CAPITAL EQUITY

if West has no present intent of entering a market offering Westlaw Content as AI training data for legal research platforms, that does not mean that such a market could not develop or that potential copiers can be the first to "pull the trigger"[131] by using the copied content in that market without a license.

Dr. Cox attempts to support his incorrect opinion on the lack of a market for West Headnotes for use in training algorithms for legal research platforms with assertions that because ROSS did not provide Westlaw Headnotes on its legal research platform that its copying did not impair the value of Westlaw Content.[132] In addition, Dr. Cox opines that ROSS's legal research platform would not have attracted as customers those West subscribers who have a preference for performing legal research enjoying the benefits of Westlaw Content. According to Dr. Cox, the "[l]egal researchers who did switch to ROSS would have been those that were indifferent to or rejected the structure of Westlaw Content and did not want to license the uses of the Westlaw Content provided by West."[133] Dr. Cox ignores the fact that ROSS used Westlaw Content as training data to develop its legal research platform to compete with Westlaw and other legal research platforms, as discussed in Section 6, and the existence of the alternative legal research platforms meant that a researcher who "did not want to license the uses of the Westlaw Content provided by West" could subscribe to a different non-accused legal research platform that existed prior to ROSS developing a competing platform.

### 8.2    Opinion Regarding the Potential Market for the Copyrights at Issue

Section 11.1 of the Malackowski Report presents my analysis and opinions regarding the potential market for Westlaw Content as AI training data for developing legal research platforms. My opinion on this issue has not changed since the issuance of the Malackowski Report.

Specifically, ROSS engaged LegalEase to prepare the Bulk Memos that served as training data for ROSS after searching for alternatives, including attempting to obtain a license to Westlaw.[134] ROSS could not train its legal research platform using only raw judicial opinions without editorial enhancements. Rather, ROSS needed data like Westlaw Content to create its questions and answers

---

[131] *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1183-1184 (9th Cir. 2012).
[132] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 36.
[133] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, p. 36.
[134] Email chain between Andrew Arruda, Thomas Hamilton, Jimoh Ovbiagele, and Akash Venkat, July 29, 2015, ROSS-003334354; Master Services Agreement between ROSS Intelligence, Inc. and LegalEase Solutions LLC, effective October 15, 2015, TR-0038909-TR-0038920; Email chain between Tomas van der Heijden and Teri Whitehead, Subject: Final SOW, September 15, 2017, with attachment Statement of Work II for ROSS Bulk Memos between ROSS Intelligence, Inc. and LegalEase Solutions, LLC, September 15, 2017, ROSS-000304769-ROSS-000304784 at ROSS-000304771-ROSS-000304774; Email chain between Melissa Pritchard, Tara Levin, Kelly Phillipson and Charles Mikesell and Thomas Hamilton, Subject: Ross Intelligence – Demo Practice Point, September 21, 2015 and September 25, 2015, ROSS-003389728-ROSS-0003389730 at ROSS-003389728.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**

that were used to train its legal research platform, confirming demand for a potential market for the copyrights at issue.[135]

An alternative to infringing Plaintiffs' copyrights was for ROSS to create its own data comparable to that in the Westlaw Content for its AI training data, but the cost of doing so would have been very high.[136]  As Mr. Ovbiagele acknowledged, ROSS did not retrain is models without using the Bulk Memos because "[t]he creation of a new data set of sufficient size and quality would have been too expensive."[137]  The high cost of alternatives confirms demand for a potential market for the copyrights at issue for the purpose of AI training data.

ROSS required LegalEase to destroy all of the copies of the Bulk Memos developed for use by ROSS as training data because ROSS did not want LegalEase to sell the training data to another entity, since acquiring that training data would allow a competing entity to "create a machine learning model that is comparable to ours."[138]  This demonstrates that ROSS was aware that other potential developers of legal research platforms would also create demand for the potential market for Plaintiffs' copyrighted materials for the purpose of creating AI training data.

Demand is also demonstrated by Plaintiffs' own use of WKNS and West Headnotes as training data for its AI models.[139]  Aspects of Westlaw Content were used by Plaintiffs in developing and training WestSearch, the search algorithm for Westlaw Next, the general search function of Westlaw Edge as well as the natural language search functionality for Westlaw Edge, WestSearch Plus.[140]

Plaintiffs' use of Westlaw Content and the unauthorized use of Westlaw Content by ROSS to develop AI training data for legal research platforms confirm the demand for and potential for a market for Westlaw Content for this purpose, if Plaintiffs were to elect to license the Westlaw Content as AI training data for legal research platforms.  As discussed in the Malackowski Report, other companies offering legal research platforms promote their use of AI, further indicating demand for training data and the potential for a market for Westlaw Content as AI training data for legal research platforms.[141]  In addition, both the Malackowski Report[142] and the Krein Report[143] identify a number of sellers of data that can be used for training data for the purposes of AI, confirming that other markets for this type of data exist and it would be reasonable for it a market

---

[135] Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, pp. 75, 89.
[136] Interview of Jonathan Krein, Ph.D.
[137] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, p. 227.
[138] Jimoh Ovbiagele, 30(b)(6) Deposition April 12, 2022, pp. 167-168.
[139] Isabelle Moulinier, 30(b)(6) Deposition July 1, 2022, p. 143.
[140] Khalid Al-Kofahi, Deposition April 8, 2022, pp. 16-17, 20; Isabelle Moulinier, 30(b)(6) Deposition July 1, 2022, pp. 12-13; Major Thomson Reuters Launch: Westlaw Edge, West Search Plus, Analytics, Enhances Citator and More, Jean O'Grady, July 12, 2018, Dewey B Strategic, https://www.deweybstrategic.com/2018/07/6838.html.
[141] Expert Report of James E. Malackowski, August 1, 2022, pp. 46-48.
[142] Expert Report of James E. Malackowski, August 1, 2022, pp. 46-48.
[143] Opening Expert Report of Dr. Jonathan L. Krein, August 1, 2022, pp. 79-88.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



for the copyrights at issue for the purpose of AI training data to develop, if Plaintiffs were willing to offer its Westlaw Content for this purpose.

If unauthorized free use of Westlaw Content is allowed, the value of a license to Westlaw Content would be minimal, since others would also assume that they should have free access to Westlaw Content for use as AI training data for legal research platforms.  The benefits and value to Plaintiffs of exclusive rights to Westlaw Content as AI training data for its own legal research platform would be impaired due to forced competition with legal research platforms trained with free access to Westlaw Content while Plaintiffs continue to invest in developing and improving Westlaw Content.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

INTELLECTUAL CAPITAL EQUITY

## 9   SIGNATURE

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Respectfully submitted,

_____          September 6, 2022_____
James E. Malackowski                               Date

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



INTELLECTUAL CAPITAL EQUITY



200 West Madison
Suite 1020
Chicago, IL 60606
(312) 327-4400 Ph
www.oceantomo.com

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

# Appendix B - Rebuttal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal

### Thomson Reuters and Westlaw Produced Documents

| | | |
|---|---|---|
| TR-0000030 | TR-0037211 - TR-0037214 | TR-0179887 - TR-0179890 |
| TR-0000568 - TR-0000581 | TR-0037669 - TR-0037680 | TR-0179889 |
| TR-0000587 - TR-0000590 | TR-0037703 - TR-0037706 | TR-0358927 - TR-0358948 |
| TR-0000695 - TR-0000696 | TR-0037860 - TR-0037861 | TR-0358967 - TR-0358988 |
| TR-0001119 - TR-0001122 | TR-0038909 - TR-0038922 | TR-0359181 - TR-0359186 |
| TR-0001142 - TR-0001165 | TR-0039860 - TR-0039885 | TR-0359202 - TR-0359204 |
| TR-0001253 | TR-0039933 - TR-0039942 | TR-0359401 - TR-0359443 |
| TR-0001733 - TR-0001735 | TR-0040273 - TR-0040566 | TR-0359503 - TR-0359560 |
| TR-0001965 - TR-0001971 | TR-0044730 | TR-0359564 - TR-0359954 |
| TR-0002635 - TR-0002636 | TR-0048605 - TR-0048606 | TR-0359959 - TR-0360216 |
| TR-0002705 - TR-0002710 | TR-0048620 | TR-0361194 - TR-0361207 |
| TR-0002723 | TR-0048725 - TR-0048732 | TR-0433738 - TR-0433741 |
| TR-0002758 - TR-0002772 | TR-0049195 - TR-0049200 | TR-0521595 |
| TR-0002775 | TR-0073545 - TR-0073546 | TR-0526552 - TR-0528261 |
| TR-0002779 - TR-0002783 | TR-0091408 - TR-0091411 | TR-0532236 - TR-0532373 |
| TR-0002812 - TR-0002814 | TR-0098206 - TR-0098209 | TR-0532427 |
| TR-0002837 - TR-0002839 | TR-0135110 - TR-0135116 | TR-0532475 - TR-0532476 |
| TR-0002844 - TR-0002849 | TR-0178604 - TR-0178612 | TR-0532519 - TR-0532520 |
| TR-0002864 - TR-0003137 | TR-0179830 - TR-0179845 | TR-0549927 - TR-0549958 |
| TR-0033982 - TR-0033985 | TR-0179838 - TR-0179847 | TR-0734270 - TR-0734276 |
| TR-0033999 - TR-0034002 | TR-0179838 - TR-0179850 | TR-0836004 |
| TR-0034152 - TR-0034155 | TR-0179863 - TR-0179870 | TR-0894151 - TR-0894157 |
| TR-0034357 - TR-0034359 | TR-0179863 - TR-0179872 | TR-0908413 - TR-0908442 |
| TR-0034509 - TR-0034512 | TR-0179876 - TR-0179877 | TR-0908447 |
| TR-0034557 - TR-0034560 | TR-0179876 - TR-0179878 | TR-0908678 - TR-0908680 |
| TR-0035897 - TR-0035908 | TR-0179877 | TR-0908939 - TR-0908942 |
| TR-0035922 - TR-0035925 | TR-0179884 - TR-0179886 | TR-0909025 - TR-0909029 |
| TR-0036336 - TR-0036340 | TR-0179885 | WPC-0001475 - WPC-0001476 |

### ROSS Produced Documents

| | | |
|---|---|---|
| ROSS_0103232888 | ROSS-000176146 - ROSS-000176148 | ROSS-000197791 - ROSS-000197794 |
| ROSS-000000001 - ROSS-000000002 | ROSS-000176758 - ROSS-000176780 | ROSS-000197949 - ROSS-000197951 |
| ROSS-000061913 - ROSS-000061932 | ROSS-000176798 - ROSS-000176803 | ROSS-000198151 - ROSS-000198152 |
| ROSS-000175054 - ROSS-000175067 | ROSS-000197671 - ROSS-000197673 | ROSS-000201544 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal

| | | |
|---|---|---|
| ROSS-000201630 - ROSS-000201632 | ROSS-003390101 - ROSS-003390105 | ROSS-009603341 |
| ROSS-000203449 - ROSS-000203467 | ROSS-003390233 - ROSS-003390236 | ROSS-009621324 - ROSS-009621325 |
| ROSS-000204216 - ROSS-000204218 | ROSS-003390563 - ROSS-003390565 | ROSS-009637399 - ROSS-009637400 |
| ROSS-000204366 - ROSS-000204367 | ROSS-003390586 - ROSS-003390587 | ROSS-009637509 |
| ROSS-000235965 - ROSS-000235969 | ROSS-003390869 - ROSS-003390871 | ROSS-009659108 |
| ROSS-000241438 - ROSS-000241439 | ROSS-003390881 - ROSS-003390884 | ROSS-009659301 |
| ROSS-000247118 - ROSS-000247120 | ROSS-003391075 | ROSS-009659437 |
| ROSS-000251670 - ROSS-000251671 | ROSS-003391127 - ROSS-003391130 | ROSS-009659609 |
| ROSS-000271277 - ROSS-000271302 | ROSS-003413719 | ROSS-009660296 |
| ROSS-000304769 - ROSS-000304784 | ROSS-003414996 | ROSS-009660815 |
| ROSS-000304847 - ROSS-000304856 | ROSS-003415357 - ROSS-003415367 | ROSS-009660832 - ROSS-009660841 |
| ROSS-001782470 - ROSS-001782489 | ROSS-003419039 - ROSS-003419044 | ROSS-009661179 |
| ROSS-003268059 | ROSS-003483172 - ROSS-003483173 | ROSS-009664862 |
| ROSS-003276744 - ROSS-003276745 | ROSS-003487472 - ROSS-003487474 | ROSS-009664862 - ROSS-009664867 |
| ROSS-003277880 - ROSS-003277881 | ROSS-003496253 | ROSS-009666105 |
| ROSS-003278045 | ROSS-003522469 - ROSS-003522470 | ROSS-009667571 |
| ROSS-003278256 - ROSS-003278258 | ROSS-003537612 - ROSS-003537613 | ROSS-009667620 |
| ROSS-003278267 | ROSS-003540523 | ROSS-009668638 - ROSS-009668640 |
| ROSS-003334354 | ROSS-003610162 - ROSS-003610165 | ROSS-009668688 |
| ROSS-003343202 - ROSS-003343207 | ROSS-003610547 | ROSS-009668796 |
| ROSS-003382387 - ROSS-003382389 | ROSS-003695819 - ROSS-003695827 | ROSS-009675875 |
| ROSS-003383658 | ROSS-003705907 - ROSS-003705911 | ROSS-009676232 - ROSS-009676233 |
| ROSS-003384058 - ROSS-003384059 | ROSS-003715393 - ROSS-003715406 | ROSS-009676258 |
| ROSS-003385440 - ROSS-003385442 | ROSS-003715671 | ROSS-009676260 |
| ROSS-003386171 - ROSS-003386173 | ROSS-003718400 - ROSS-003718407 | ROSS-009676660 |
| ROSS-003386670 - ROSS-003386686 | ROSS-009494331 | ROSS-009677267 |
| ROSS-003389607 | ROSS-009501052 - ROSS-009501053 | ROSS-009688516 |
| ROSS-003389615 - ROSS-003389616 | ROSS-009503144 | ROSS-009688583 |
| ROSS-003389728 - ROSS-003389732 | ROSS-009547818 - ROSS-009547823 | ROSS-009690393 - ROSS-009690399 |
| ROSS-003389778 - ROSS-003389779 | ROSS-009556219 - ROSS-009556220 | ROSS-009690394 |
| ROSS-003389911 | ROSS-009558474 - ROSS-009558475 | ROSS-009698876 |
| ROSS-003389928 - ROSS-003389938 | ROSS-009559997 - ROSS-009559998 | ROSS-009705518 |
| ROSS-003389945 - ROSS-003389946 | ROSS-009583583 | ROSS-009705710 |
| ROSS-003389960 - ROSS-003389961 | ROSS-009584733 - ROSS-009584735 | ROSS-009706035 |
| ROSS-003390024 - ROSS-003390025 | ROSS-009585472 | ROSS-009720945 - ROSS-009720946 |
| ROSS-003390050 - ROSS-003390052 | ROSS-009599508 - ROSS-009599509 | ROSS-009720946 - ROSS-009720954 |
| ROSS-003390062 - ROSS-003390065 | ROSS-009601555 | ROSS-009720977 |
| ROSS-003390071 - ROSS-003390075 | ROSS-009601588 - ROSS-009601589 | ROSS-009721062 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal

| | | |
|---|---|---|
| ROSS-009721062 - ROSS-009721064 | ROSS-010099622 - ROSS-010099623 | ROSS-010318431 |
| ROSS-009721138 - ROSS-009721139 | ROSS-010106819 - ROSS-010106840 | ROSS-010318435 |
| ROSS-009721521 - ROSS-009721522 | ROSS-010114898 - ROSS-010114899 | ROSS-010318437 |
| ROSS-009721525 | ROSS-010151565 - ROSS-010151570 | ROSS-010318448 |
| ROSS-009721539 | ROSS-010157007 - ROSS-010157008 | ROSS-010318459 |
| ROSS-009722028 | ROSS-010164415 - ROSS-010164417 | ROSS-010318684 |
| ROSS-009722034 | ROSS-010164415 - ROSS-010164418 | ROSS-010318686 |
| ROSS-009722081 - ROSS-009722083 | ROSS-010186032 - ROSS-010186033 | ROSS-010319517 |
| ROSS-009722263 - ROSS-009722299 | ROSS-010209030 - ROSS-010209035 | ROSS-010319520 |
| ROSS-009722349 | ROSS-010221959 - ROSS-010221960 | ROSS-010319595 - ROSS-010319596 |
| ROSS-009722606 | ROSS-010224509 | ROSS-010319771 |
| ROSS-009722699 | ROSS-010241185 - ROSS-010241191 | ROSS-010319914 |
| ROSS-009722781 | ROSS-010262269 | ROSS-010319997 |
| ROSS-009722810 | ROSS-010262295 | ROSS-010320005 |
| ROSS-009722867 | ROSS-010264083 | ROSS-010320024 |
| ROSS-009723167 | ROSS-010264450 | ROSS-010320092 |
| ROSS-009723181 | ROSS-010265185 | ROSS-010320219 |
| ROSS-009723190 | ROSS-010268031 | ROSS-010320363 |
| ROSS-009723321 | ROSS-010268840 | ROSS-010320544 |
| ROSS-009723513 | ROSS-010270585 | ROSS-010320665 |
| ROSS-009724001 - ROSS-009724002 | ROSS-010270844 | ROSS-010320773 |
| ROSS-009724273 | ROSS-010271649 | ROSS-010320775 - ROSS-010320776 |
| ROSS-009724328 | ROSS-010271696 | ROSS-010320798 - ROSS-010320799 |
| ROSS-009724635 | ROSS-010271701 - ROSS-010271702 | ROSS-010321010 |
| ROSS-009724653 | ROSS-010272041 - ROSS-010272046 | ROSS-010321321 - ROSS-010321322 |
| ROSS-009724983 | ROSS-010278634 | ROSS-010321551 - ROSS-010321552 |
| ROSS-009725036 | ROSS-010279547 | ROSS-010321554 |
| ROSS-009725466 | ROSS-010279751 | ROSS-010321557 |
| ROSS-009725472 | ROSS-010290089 | ROSS-010321701 |
| ROSS-009725534 | ROSS-010291541 | ROSS-010321970 |
| ROSS-009725538 | ROSS-010291961 - ROSS-010291962 | ROSS-010322226 |
| ROSS-009725605 | ROSS-010292064 | ROSS-010322390 |
| ROSS-009725612 | ROSS-010292067 | ROSS-010322423 |
| ROSS-009725675 | ROSS-010300414 - ROSS-010300416 | ROSS-010322513 |
| ROSS-009725677 | ROSS-010300433 | ROSS-010322551 |
| ROSS-009725864 | ROSS-010306683 | ROSS-010322631 |
| ROSS-009725908 | ROSS-010306690 | ROSS-010322787 |
| ROSS-009731365 - ROSS-009731369 | ROSS-010316865 - ROSS-010316866 | ROSS-010322870 - ROSS-010322872 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal

| | | |
|---|---|---|
| ROSS-010322919 - ROSS-010322920 | ROSS-010323324 | ROSS-023018279 - ROSS-023018281 |
| ROSS-010322928 | ROSS-010361787 - ROSS-010361789 | ROSS-023018635 |
| ROSS-010323018 | ROSS-010364506 - ROSS-010364509 | ROSS-023018710 - ROSS-023018739 |
| ROSS-010323194 | ROSS-023018166 - ROSS-023018167 | ROSS-023018772 |
| ROSS-010323272 | ROSS-023018180 - ROSS-023018183 | |
| ROSS-010323288 - ROSS-010323319 | ROSS-023018233 - ROSS-023018236 | |

**LegalEase Produced Documents**

| | | |
|---|---|---|
| LEGALEASE-00018036 - LEGALEASE-00018037 | LEGALEASE-00166082 - LEGALEASE-00166083 | R-LEGALEASE-00049652 - R-LEGALEASE-00049664 |
| LEGALEASE-00030617 - LEGALEASE-00030618 | LEGALEASE-00171823 | R-LEGALEASE-00050673 |
| LEGALEASE-00067320 - LEGALEASE-00067323 | LEGALEASE-00171828 - LEGALEASE-00171831 | R-LEGALEASE-00050718 - R-LEGALEASE-00050721 |
| LEGALEASE-00069484 - LEGALEASE-00069487 | LEGALEASE-00043224 - LEGALEASE-00043225 | R-LEGALEASE-00067404 |
| LEGALEASE-00078065 - LEGALEASE-00078083 | R-LEGALEASE-00028693 - R-LEGALEASE-00028694 | R-LEGALEASE-00067463 - R-LEGALEASE-00067465 |
| LEGALEASE-00108391 - LEGALEASE-00108392 | R-LEGALEASE-00029691 - R-LEGALEASE-00029693 | R-LEGALEASE-00067492 - R-LEGALEASE-00067493 |
| LEGALEASE-00123981 - LEGALEASE-00123982 | R-LEGALEASE-00048728 - R-LEGALEASE-00048737 | R-LEGALEASE-00067565 - R-LEGALEASE-00067569 |
| LEGALEASE-00132781 - LEGALEASE-00132782 | R-LEGALEASE-00048772 - R-LEGALEASE-00048776 | R-LEGALEASE-00101636 - R-LEGALEASE-00101642 |
| LEGALEASE-00132970 - LEGALEASE-00132971 | R-LEGALEASE-00048928 - R-LEGALEASE-00048932 | R-LEGALEASE-00140064 - R-LEGALEASE-00140078 |
| LEGALEASE-00139081 - LEGALEASE-00139082 | R-LEGALEASE-00049260 | R-LEGALEASE-00154874 - R-LEGALEASE-00154886 |
| LEGALEASE-00139169 - LEGALEASE-00139170 | R-LEGALEASE-00049399 | |

**Fastcase and Casemaker Produced Documents**

| | | |
|---|---|---|
| CASEMAKER_029770 - CASEMAKER_029776 | FASTCASE_085024 - FASTCASE_085027 | FASTCASE_090401 - FASTCASE_090403 |
| CASEMAKER_032406 | FASTCASE_085445 - FASTCASE_085448 | FASTCASE_090429 |
| FASTCASE_083411 - FASTCASE_083412 | FASTCASE_090007 - FASTCASE_090011 | FASTCASE_090487 - FASTCASE_090490 |
| FASTCASE_084268 - FASTCASE_084270 | FASTCASE_090065 - FASTCASE_090068 | FASTCASE_098063 - FASTCASE_098067 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal

---

### Depositions

Deposition of Khalid Al-Kofahi, April 8, 2022
Deposition of Andrew Arruda, March 30, 2022 with exhibits
30(b)(6) Deposition of Christopher Cahn, May 12, 2022
30(b)(6) Deposition of Tariq Hafeez, May 26, 2022 with exhibits
Deposition of Mark Hoffman, March 16, 2022 with exhibits
30(b)(6) Deposition of Erik Lindberg, March 22, 2022 with exhibits
30(b)(6) Deposition of Andrew Martens, March 25, 2022 with exhibits
30(b)(6) Deposition of Isabelle Moulinier, July 1, 2022 with exhibits
30(b)(6) Deposition of Jimoh Ovbiagele, April 12, 2022 with exhibits
30(b)(6) Deposition of Sean Shafik, April 22, 2022 with exhibits
30(b)(6) Deposition of Tomas van der Heijden, March 17, 2022 with exhibits
30(b)(6) Deposition of Edward Walters,  March 1, 2022 with exhibits
Deposition of Teri Whitehead, April 18, 2022 with exhibits

---

### Expert Reports

Report of Defendants' Expert L. Karl Branting, J.D., Ph.D., July 28, 2022
Expert Report of Alan J. Cox, Ph.D., August 1, 2022
Opening Expert Report of Dr. Jonathan Krein, August 1, 2022

---

### Legal Filings

Complaint, May 6, 2020
Defendant and Counterclaimant ROSS Intelligence Inc.'s Partial Answer and Defenses in Response to Plaintiffs Complaint and Demand For Jury Trial, December 13, 2020
Plaintiffs / Counter-Defendants' Answer to Defendant / Counterclaimant's Counterclaims, January 4, 2021
Defendant and Counterclaimant ROSS Intelligence Inc.'s Amended Partial Answer and Defenses and Amended Counterclaims in Response to Plaintiffs' Complaint and Demand for Jury Trial, January 25, 2021
Defendant and Counterclaimant ROSS Intelligence Inc.'s Amended Answer and Defenses and Amended Counterclaims in Response to Plaintiffs' Complaint and Demand for Jury Trial, April 12, 2021
Plaintiffs Thomson Reuters Enterprise Centre GmbH and  West Publishing Corporation's First Set of  Interrogatories to Defendant ROSS Intelligence Inc., May 3, 2021
Defendant/Counterclaimant ROSS Intelligence, Inc.'s  First Set of Interrogatories (Nos. 1-8), May 12, 2021
Stipulated Protective Order, May 13, 2021
Defendant and Counterclaimant ROSS Intelligence Inc.'s Response to Plaintiffs' First Set of Interrogatories, July 2, 2021
Plaintiffs and Counterdefendants Thomson Reuters  Enterprise Centre GmbH and West Publishing Corporation's Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s First Set of Interrogatories (1–12), July 12, 2021
Plaintiffs and Counterdefendants Thomson Reuters  Enterprise Centre GmbH and West Publishing Corporation's First Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s  First Set of Interrogatories, November 19, 2021
Plaintiffs Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Second Set of Interrogatories to Defendant ROSS Intelligence Inc., November 30, 2021
Defendant / Counterclaimant ROSS Intelligence, Inc.'s Second Set of Interrogatories (No. 13), January 7, 2022
Defendant and Counterclaimant ROSS Intelligence Inc.'s Response and Objection to Plaintiffs' Second Set of Interrogatories, January 11, 2022
Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, January 11, 2022
Defendant / Counterclaimant ROSS Intelligence, Inc.'s  Third Set of Interrogatories (Nos. 14-21), January 25, 2022

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal

Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Third Set of Interrogatories to Defendant and Counterclaimant ROSS Intelligence Inc., February 4, 2022

Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Third Set of Interrogatories (Nos. 14-21), February 4, 2022

Plaintiffs and Counterdefendants Thomson Reuters  Enterprise Centre GmbH and West Publishing Corporation's Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Second Set of Interrogatories (No. 13), February 7, 2022

Defendant and Counterclaimant ROSS Intelligence Inc.'s Supplemental Responses and Objections to Plaintiffs' Set of Interrogatories (Supplemental Response to Interrogatory No. 11 Only), February 22, 2022

Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Third Set of Interrogatories (Nos. 14–21), February 24, 2022

Defendant and Counterclaimant ROSS Intelligence, Inc.'s Responses and Objections to Plaintiffs'  Third Set of Interrogatories, March 7, 2022

Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Fourth Set of Interrogatories to Defendant and Counterclaimant ROSS Intelligence Inc., March 22, 2022

Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Second Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Interrogatory No. 1, March 23, 2022

Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s First Set of Requests for Admission (Nos. 1-129), April 6, 2022

Defendant and Counterclaimant ROSS Intelligence Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories, April 21, 2022

Plaintiffs and Counterdefendants Thomson Reuters  Enterprise Centre GmbH and West Publishing Corporation's  First Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Interrogatory No. 21, April 21, 2022

Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Second Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Interrogatory No. 21, June 9, 2022

---

***West Publishing Corporation v. LegalEase Solutions, LLC*, Case No. 0:18-cv-01445**

Declaration of Andrew Arruda, October 1, 2019
Consent Judgment and Stipulated Permanent Injunction, May 5, 2020

---

**Public Documents**

---

"Data Science and Analytics," https://www.lexisnexis.com/en-us/professional/connect/daas/data-science.page?utm_source=google&utm_medium=cpc&utm_term=machine%20learning%20data&utm_campaign=BR-M-NEX-US-DAAS-PPC-BMM-2020&utm_content=&gclid=Cj0KCQjw2_OWBhDqARIsAAUNTTFfpb40XXJNBLhBRC-Kq4Roa3KpOH91Bz8LvUeGwNMmE0FfW2hftZ8aApbzEALw_wcB.

"Getty Images Launches Industry-First Model Release Supporting Data Privacy in Artificial Intelligence and Machine Learning," March 22, 2022, http://press.gettyimages.com/getty-images-launches-industry-first-model-release-supporting-data-privacy-in-artificial-intelligence-and-machine-learning/.

About Bloomberg Law, Bloomberg Law, https://pro.bloomberglaw.com/about-bloomberg-law/.

About Fastcase, Fastcase, https://www.fastcase.com/team/.

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).

Bloomberg Hangs New Shingle, The Wall Street Journal, July 8, 2010, https://www.wsj.com/articles/SB10001424052748704545004575353143750422612.

Bloomberg Industry Group Terms of Service: Subscription Products, Updated November 2019, https://www.bloombergindustry.com/terms-of-service-subscription-products/.

Buy Clean Datasets For Machine Learning, DataStock, https://datastock.shop/buy-clean-datasets/.

*Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829 (11th Cir. 1990).

*Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569 (1994)

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal

Can Bloomberg Law Compete With Westlaw and LexisNexis, The Wall Street Journal, July 8, 2010, https://www.wsj.com/articles/BL-LB-31032.

Casemaker Offers Its Members Access to Vincent, AI Tool from vLex, LawSites, March 12, 2019, https://www.lawnext.com/2019/03/casemaker-offers-its-members-access-to-vincent-ai-tool-from-vlex.html.

Casetext develops technology for attorneys who take pride in doing their best work efficiently, Casetext, https://casetext.com/about/.

Casetext Terms of Service, Updated July 6, 2022, https://casetext.com/terms/.

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998).

Categorize your data set for optimal search results with our superior taxonomy offering, LexisNexis, https://internationalsales.lexisnexis.com/partners/taxonomy.

Comparing 3 Legal Research Software Products, Capterra, Casetext vs Fastcase vs Lexis, https://www.capterra.com/legal-research-software/compare/196820-168929-196819/CARA-vs-Fastcase-vs-Lexis-Advance.

Cost-Effective Electronic Legal Research: Casemaker, Franklin County Law Library, https://fclawlib.libguides.com/costeffectivelegalresearch/casemaker.

Data Privacy Day at Apple: Improving transparency and empowering users, Apple, January 27, 2021, https://www.apple.com/newsroom/2021/01/data-privacy-day-at-apple-improving-transparency-and-empowering-users/.

Defined.AI Home Page, https://www.defined.ai/.

Editorial Enhancements, https://legal.thomsonreuters.com/en/products/westlaw/editorial-enhancements.

Elsevier Terms and Conditions, https://www.elsevier.com/legal/elsevier-website-terms-and-conditions.

Fastcase AI Sandbox, Fastcase, https://www.fastcase.com/sandbox/.

Fastcase Terms of Service, https://www.fastcase.com/terms/.

Free vs. Westlaw: Why you need the West Key Number System, Thomson Reuters, https://legal.thomsonreuters.com/en/insights/articles/using-the-west-key-numbers-system.

*Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, No. 3718-VCP, 2010 WL 338219 (Del. Ch. Jan. 29, 2010).

How Bloomberg Law (BLAW) Uses AI and Machine Learning to Prove its Case, Bloomberg, June 7, 2019, https://www.bloomberg.com/company/stories/bloomberg-law-blaw-uses-ai-machine-learning-prove-case/.

Huge "foundation models" are turbo-charging AI progress," The Economist, June 11, 2022, https://www.economist.com/interactive/briefing/2022/06/11/huge-foundational-models-are-turbo-charging -AI-progress.

JSTOR Terms and Conditions, https://about.jstor.org/terms/#content-use.

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2002).

Law Firm Per Search Pricing, LexisNexis, September 1, 2019, https://www.lexisnexis.com/en-us/terms/21/pricing.page.

Legal Analytics and Artificial Intelligence for Research & Law Practice: Tools, Features & Functionality," www.duq.edu/assets/Documents/law/legal-research/_pdf/Baginski,%20Lexis.pdf

Legal Products, https://legal.thomsonreuters.com/en/products?.

Longtime Competitors Fastcase and Casemaker Merge, Reshaping the Legal Research Landscape, Bob Ambrogi, LawSites, January 5, 2021, https://www.lawnext.com/2021/01/longtime-competitors-fastcase-and-casemaker-merge-reshaping-the-legal-research-landscape.html.

Low-Cost Legal Databases, Georgetown Law Library, https://guides.ll.georgetown.edu/freelowcost/low-cost.

Major Thomson Reuters Launch: Westlaw Edge, West Search Plus, Analytics, Enhances Citator and More, Jean O'Grady, July 12, 2018, Dewey B Strategic, https://www.deweybstrategic.com/2018/07/6838.html.

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012).

New Leadership at Legal Research Company Casemaker, Bob Ambrogi, June 5, 2018, LawSites, https://www.lawnext.com/2018/06/new-leadership-legal-research-company-casemaker.html.

One subscription, unlimited benefits, Bloomberg Law, https://pro.bloomberglaw.com/the-complete-legal-research-resource/.

RELX Group 2021 Annual Report

Restatement (Second) Torts § 766.

*Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70 (2d Cir. 1997)

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2nd Cir. 2014).

Terms and Conditions of use for the LexisNexis Services, Terms and Conditions for use of the Online Services, October 21, 2021, https://www.lexisnexis.com/en-us/terms/general/default.page.

The world's most valuable resource is no longer oil, but data, The Economist, May 6, 2017, https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DOCUMENTS CONSIDERED**
Appendix B - Rebuttal


Thomson Reuters Corporation 2021 Annual Report
Welcome to Fastcase, Fastcase, https://www.fastcase.com/.
What is Casemaker?, Lawyerist, https://lawyerist.com/reviews/online-legal-research-tools/casemaker/.
*Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# Appendix C - Rebuttal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DR. COX'S OPINIONS ON FAIR USE**
Rebuttal Schedule 1.0

| | Dr. Cox's Opinions |
|---|---|
| 1 | Westlaw Content is used in very different ways by Plaintiffs compared to ROSS, to the extent that such content could be considered to be used by ROSS. |
| 2 | Westlaw Content is licensed by Plaintiffs to its customer-licensees to actually undertake legal research through manual interaction and engagement with Westlaw Content.  I call this the "Interactive" use of Westlaw Content. |
| 3 | In contrast, ROSS used Westlaw Content as a particular component of its training material for an Artificial Intelligence program that enables users to enter natural language search queries and returns solely the text of public domain judicial opinions.  It is the Artificial Intelligence program that is used by ROSS customer-licensees to undertake legal research. |
| 4 | As a result, Westlaw Content is properly seen as being used by ROSS in a market that is higher up in the supply chain from the provision of legal research services.  ROSS does not use Westlaw Content as a substitute for Plaintiffs' customer-licensees' Interactive use of Westlaw Content. |
| 5 | For Plaintiffs, Westlaw Content provides a structure to their corpus of law and it is that human-generated structure that guides the research undertaken by Plaintiffs' customer-licensees.  In contrast, on ROSS's legal research platform the search is controlled by an Artificial Intelligence program that is not mediated and guided by any preestablished, human-generated structure of the law. |
| 6 | A further indication of the large difference between ROSS's use of the Westlaw Content and the Interactive use of Westlaw Content is that Plaintiffs are only accusing ROSS of infringing less than 0.1% of all headnotes.  Westlaw Content is intentionally built to be extensive so that it provides a structure and direction over a significant part of the corpus of law.  In contrast, ROSS's system is designed to be able to address the corpus of law without the mediation of such a structure. It is possible that legal research undertaken on an AI-based platform such as that of ROSS will differ from those of West. |
| 7 | ROSS's use of the Westlaw Content did not have a negative impact on the value of Westlaw Content to persons who attach importance to the Interactive use of Westlaw Content.  Even if ROSS had been able to stay in business and maintain its growth, it is probable that Plaintiffs would have retained customers who attach importance to the structure and to the Interactive use of Westlaw Content.  Customers with this preference for Interactive use would, consequently, tend to be less price sensitive such that Plaintiffs would be able to increase the price of access to Westlaw Content and still preserve this segment of its customer base.  Without opining on the number of such relatively price-inelastic customers, it is possible that, as a significant portion of customers who do not attach importance to the Interactive use of Westlaw Content switch away from West, it could still earn higher profits on its loyal customers. |
| 8 | Headnotes, part of Westlaw Content, were also used internally by Plaintiffs as a particular component of Plaintiffs' training material for a very specific portion of their Artificial Intelligence program, Westsearch Plus.  That specific portion of the program is designed to return *only* headnotes (and does *not* return relevant portions of judicial opinions.)  Specifically, Plaintiffs used the headnotes as the <u>answers</u> in the question-answer pairs that were used as part of the training material for Plaintiffs' Artificial Intelligence software, software that was designed to identify only headnotes in response to natural language legal questions.  I call this the "Answer Components" use of headnotes. |
| 9 | As noted, ROSS also used headnotes as a component of its training material for its Artificial Intelligence program.  But in contrast to Plaintiffs' use, the headnotes were used by ROSS as the starting point to generate <u>*questions*</u> in question-answer pairs that make up ROSS's Artificial Intelligence training material, *not* answers.  Also, ROSS's program returned only the text from judicial opinions.  ROSS's program did not return more limited, structured and constrained content such as headnotes, key numbers, the WKNS or any other Westlaw Content. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation v. ROSS Intelligence, Inc.*
**DR. COX'S OPINIONS ON FAIR USE**
Rebuttal Schedule 1.0

<div align="center">

**Dr. Cox's Opinions**

</div>

| | |
|---|---|
| 10 | Thus, ROSS's use of headnotes is very different than Plaintiffs' Answer Components use of headnotes. ROSS's use of headnotes is not a substitute for the Answer Components use of headnotes. And ROSS's use of headnotes does not have an impact the value of headnotes for persons who attach importance to the Answer Components use of headnotes. Again, the segment of persons who do attach importance to the Answer Components use of headnotes—whatever its size—would not be affected by ROSS's Answer Components use of headnotes and would be price insensitive even in the face of new options in the market, such as ROSS's use of headnotes. |
| 11 | Moreover—and perhaps most significantly—I have seen no evidence in the record that Plaintiffs actually intended to—or ever did—market, license, or sell their headnotes to be used as answers in question-answer pairs.  I also did not see evidence in the record that Plaintiffs actually intended to—or ever did—market, license, or sell their headnotes to be used as questions in question-answer pairs.  Plaintiffs' discovery responses in the case discussed only uses of the headnotes for Manual Research and no other purpose. Plaintiffs' corporate witness, Isabelle Moulinier, responsible for AI research, testified that she was unaware of any licensing market for headnotes in training AI programs.  Indeed, I understand that Plaintiffs nowadays only permit electronic access to their headnotes for those who seek to use the headnotes for Manual Research (i.e., via the online platform.) |
| 12 | ROSS's use of headnotes thus definitionally could not have had an impact on the market for or value of the Answer Components use of headnotes, because Plaintiffs did not put— and never intended to put—headnotes into the market as Answer Components in particular or for AI-training related applications at all.  Further, ROSS's use of headnotes does not in any way prevent, preclude or impair Plaintiffs' internal use of headnotes for any purpose and thus do not have any impact on such internal use. |
| 13 | ROSS did not use individual West key numbers or the WKNS in any way, including in training Artificial Intelligence.  The questions that ROSS used to train its Artificial Intelligence program were selected randomly, and thus did not reflect any organization of the WKNS.  Given this, ROSS did not have and could not have had an impact on any market for or value of key numbers or the WKNS. |
| 14 | By providing an Artificial Intelligence software alternative to the search of the public domain of judicial opinions and enriching the range of possible results all at a much lower cost than Plaintiffs, ROSS increased the market for access to that material for that portion of the public not able or willing to pay the cost imposed by Plaintiffs for such access.  In this way, ROSS expanded the analysis of judicial opinions beyond what Plaintiffs would be able to achieve and that expansion did not likely have a negative impact on the value of the asserted Westlaw Content. |

**Notes and Sources:**
[1] Expert Report of Alan J. Cox, Ph.D., August 1, 2022, pp. 5-8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 67



# Thomson Reuters:
# Artificial Intelligence & Westlaw Discussion

Erik Lindberg, Westlaw Product Development
May 2022



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992673



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992674



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992675

# Succeeding with AI



## In this world of open source [AI technology], the scarce resources are:

**Data**   Among leading AI teams, many can likely replicate others' software in, at most, 1–2 years. But it is exceedingly difficult to get access to someone else's data. Thus **data, rather than software, is the defensible barrier for many businesses**.

**Talent**   Simply **downloading and "applying" open-source software to your data won't work**. AI needs to be customized to your business context and data. This is why there is currently a war for the scarce AI talent that can do this work.

**Andrew Ng**
Former Chief Scientist at Baidu,
Founder of Google Brain project,
Adjunct Professor at Stanford

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Succeeding with AI

## Attorney Editors

- 700+ attorney editors
- Many years of professional experience
- Expertise in 40+ practice areas

## Data

- 100+ years of editorial enhancements
- Leading legal taxonomy (Key Number System)
- Leading legal and tax secondary sources
- Sophisticated citation mapping with KeyCite

## Research Scientists

- 80+ at Thomson Reuters Labs
- Specialties in AI, involving Machine Learning & Deep Learning, Natural Language Processing, Information Retrieval, and Computational Linguistics
- Deep experience with legal and tax content, taxonomies, and citation networks

At Thomson Reuters, we have both the c o n t e n t and the e x p e r t i s e to produce groundbreaking AI-driven capabilities in Westlaw Edge

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Editorial quality matters for AI performance



Thomson Reuters attorney editors concisely describe the essence of the matter and add important terms for better recall and understanding

Not only do Westlaw's headnotes improve legal research, but they are also a critical component in our unique AI

# Editorial quality matters for AI performance



Similarly, Westlaw's unmatched classification of the law, the West Key Number System, both makes legal research more effective and is an important building block for the AI leveraged in Westlaw Edge

- Precise and evolving topical categorization of the law
- Leads you right to highly-relevant cases
- Complete your research and respond to your client faster

TRCC-00992679

# For artificial intelligence: Data quality matters

High resolution    Low resolution

# Low resolution legal data

*Briseno v. Con Agra Foods*
844 F.3d 1121 (9th Cir. 2017)

**Text**

**Links to Cases**

- All legal content inherently has some patterns that AI can pick up upon
- The case text, with links to cited and citing cases provides just the blurriest glimpse into what's really going on with this case

TRCC-00992681

# High resolution legal data







TRCC-00992684

# AI in Thomson Reuters Products

**Thomson Reuters has a** long history of integrating AI **algorithms into products**

Westlaw Is Natural (WIN) search is one of the first commercial implementations of statistical ranking in 1992

WestSearch in WestlawNext uses machine learning for learning to rank in 2010

Checkpoint Catalyst uses machine learning for ranking in 2013

WestSearch Plus adds deep learning to represent words and documents in 2018

TR Labs conducts early experiments with BERT models on question answering in 2018

Westlaw Edge introduces Quick Check, a document analysis tool using ML components in 2019

Checkpoint Edge introduces a BERT-based approach for ranking into a Thomson Reuters product in 2020

WestSearch Plus incorporates BERT-based models to expand coverage and quality of question answering in 2022

TR Labs continues to adapt AI and deep learning tools in support of internal editorial teams and future product features

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992685





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992687



TRCC-00992688



# WestSearch Plus on Westlaw Edge

A system containing several machine-learned models incorporating NLP that was trained on hundreds of thousands of Question-Answer pairs graded by Thomson Reuters attorney-editors.

This allows Westlaw Edge to suggest commonly asked legal research questions and provide concise responsive answers.

Q : Is a settlement agreement enforceable if it is not signed by all parties?

A : A written settlement agreement is not enforceable unless it is signed by all the parties to the agreement, not merely the parties against whom the agreement is sought to be enforced

Q : Can a court intervene if administrative agency conduct is unreasonable?

A : Considerable latitude must be afforded administrative agencies to perform functions delegated to them under the law, and courts should not intervene unless the agency's conduct is clearly unreasonable and arbitrary

Q : Does the attorney client relationship between a corporation and attorney extend to shareholders?

A : In cases of closely-held corporations, a law firm's representation of a corporation does not create an attorney-client relationship between the law firm and any of the corporation's shareholders

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# WestSearch Plus on Westlaw Edge

**WestSearch Plus uses ML & NLP to** understand the researcher's question and to find the right answers

| Keywords, Stemming, Phrases |
| Synonyms & Equivalencies |
| Lexical Semantics / Dictionary Definitions / POS (parts of speech) |
| Named Legal Entity & Concept Recognition |

**Distributional Semantics & Word Sense Disambiguation**
- What other terms statistically appear with a term?
- A large language model, RoBERTa (Deep Learning), is fine-tuned on legal question-answer pairs

**Discourse Features: Intent**
- Determining the type of answer required based on the type & structure of the question asked

> **What is the burden of proof on [PARTY] to establish [CLAIM]?**
>
> **Burden is on [PARTY] to establish [CLAIM] by [STANDARD]**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



TRCC-00992692



TRCC-00992693



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992694



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992695





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992697

## To find the right cases to apply the warning, we used machine learning and natural language processing, training the system iteratively



Westlaw Attorney Editors analyzed over 13,000 citations to 1,809 overruled cases, covering multiple legal issues, jurisdictions, popularity, and date ranges.

System relies on dozens features including KeyCite, Key Numbers, headnotes and text. Derived features include semantic similarities based on terms of art associated with citation patterns.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Only with KeyCite Overruling Risk:

**Only KeyCite Overruling Risk warns you of invalidated law within a case based upon the way the law is stated,** not merely relying on an overruled case



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992699

# Westlaw Edge warns of more bad law than anyone else

In the past 12 months:

## 16 %

of the Michigan Supreme Court **briefs** on Westlaw cite to cases with a KeyCite Overruling Risk warning



Confirmed May 2022

# KeyCite Overruling Risk

> " This tool literally would save hours and made me realize that
> I have been doing this kind of research wrong this whole time.
>
> – Sr. Associate, Am Law 25

> " This would be invaluable.
> Every attorney's greatest fear is to cite law that is no longer good.
>
> – Associate, Am Law 50

- **Prevent reliance on invalidated law, even in situations where the case has not cited to overruled authority**
- **Save hours of research time**
- **Minimize risk of inaccurate court filings**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# "You're always wondering, was there something better out there that I missed?"*

"The Court is quite troubled by Defendant's utter failure to cite to *Cunningham*, which plainly controls the disposition of this motion."

Defendant expressed "regret[ ] that it missed controlling precedent on punitive damages in federal court"

The Court is also troubled by the fact that defendants did not cite *Okuarume* until the reply… [if] defendants were aware of *Okuarume* at the time they filed this motion, withholding it for reply would be unfair and improper.

The plaintiff's delay in seeking amendment was…due to a failure to research and therefore a lack of diligence.…[a]ccordingly, the plaintiff's first argument fails.

More troubling to the Court is that Plaintiff's brief fails to cite recent, controlling Eighth Circuit caselaw which rejects this claim.

"Defendant is presenting…newly discovered cases…the Court now believes that, if these cases had been presented at the appropriate time, the Court might have reached a different conclusion in this matter."

"Google also has not shown why diligent legal research would not have revealed this issue sooner. Google's motion for leave 'to provide further elaboration' of its Section 101 invalidity contentions is DENIED."

"Defendant was earlier represented in this Court by one of the largest and most able law firms in this state. As such, Defendant… could have presented the appropriate caselaw in the due course of research."

In their briefing,…the parties overlook controlling Nevada precedent that is dispositive of this appeal…[the] offer of judgment [is] invalid as a matter of law"

"We remind counsel of their ethical obligation to know the legal precedent of this Court and to base their legal arguments on that precedent. Where counsel fails to do so…we will not hesitate to impose sanctions…[and] this appeal comes mighty close to that point"

"It is troubling that neither Plaintiffs nor Defendants cite to any of these authorities. The Court reminds Counsel that failure to cite obviously controlling authority is sanctionable conduct."

We…strongly admonish defendant for failing to cite *Cisneros* in its opening brief…by failing to do so, defendant eschewed its obligation of fairness and candor to the court."

"We do not imply that either counsel acted knowingly or intended to mislead when they failed to cite *Yang*. We nevertheless remind counsel of their obligation."

*Source: Thomson Reuters survey of 192 Attorneys (2018)



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992704









HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992708

# Quick Check integration with Case Center



TRCC-00992709

# Thomson Reuters Case Center



### Courts

Ensures timely access to justice with a single accessible source of exhibits and evidence for all parties and the judge

### Administrative hearing agencies

Transforms agency hearings with a common platform for hearing officers, case parties, and agency staff

### Prosecutors

Case Center for prosecutors provides a unique set of tools to organize, prepare, share, review, and present

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



TRCC-00992711

# HighQ from Thomson Reuters



### Improve collaboration and engagement

An integrated platform for collaborative work and engagement on projects



### Automate tasks and legal processes

Workflow engine automates time-consuming, manual tasks and connects the content across the platform



### Manage complex projects

Task and event management, document collaboration, data visualisation, document analysis and document automation

## Work Smarter. Faster. Simpler.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Sophisticated document analysis at ANY stage of litigation



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Quick Check for analyzing opponent's work



**Quickly understand your opponent's document and how to counter it:**

- Contrary Authority Identification to locate and analyze cases that rebut your opponent's argued positions

- Relevant cases opposing counsel omitted from their arguments

- Case details, including motion type, instantly identify stage of litigation

- Relevant text from your opponent's document to understand context for the recommended case

**Also valuable for your own brief:**

Discover and distinguish cases contrary to your position before your opposition or judge does



- Manage risk and maintain credibility
- Spot inaccuracies in opponents' arguments



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992716



## Quick Check Judicial: Uncover relevant case law missed by parties

**Issue:** What is necessary for website "terms of use" to be enforceable?

An **A m L a w 2 5 firm (A p p e l l a n t)** sought to reverse a decision ruling that a "browsewrap" agreement was unenforceable

**APPELLANT'S BRIEF ARGUES:** Y E S
(T e r m s  E n f o r c e a b l e)

- Consumer's assent to the "Terms of Use" was manifested by visiting website with the hyperlinked terms prominently placed on it
- Law does not require the consumer to click on the "Terms of Use" to be bound by them
- "Terms of Use" hyperlink was visible to the consumer within the checkout flow on the website, and did not require scrolling
- "Terms of Use" hyperlink was displayed in close proximity to fields the consumer was required to click on to continue checkout
- The parties formed a binding agreement to arbitrate

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





| Parties' Briefs | | Quick Check Recommendations | |
|---|---|---|---|
| **Bookstore Chain** | | **Advertising Broker** | **Dating Service** |
| Retailer's website had "Terms of Use," with the hyperlinked terms, prominently placed on it | Prominent placement of "Terms of Use" | "Merchant Agreement" at issue was readily visible on website without needing to scroll or change screens | "Terms and Conditions of Service" at issue was readily visible on website without needing to scroll or change screens away from registration screen |
| "Terms of Use" hyperlink was visible in close proximity to fields consumer was required to click within checkout flow | Proximity of terms to fields party was required to click on | "Merchant Agreement" appeared adjacent to activation button that party was required to click to create account | "Terms and Conditions of Service" appeared right above a button that user was required to click to move forward in registration |
| Retailer did not require the consumer to click to agree to the terms, nor did the consumer do so; and there was no warning that by clicking elsewhere, the consumer agreed to terms | No requirement to click on terms to continue transaction — NO Warning to User / YES Warning to User | No requirement that one click the agreement, but there was a warning near activation button stating that "By clicking . . . To Activate, you agree to the terms and conditions" | No requirement that one click the agreement, but there was a warning stating "I . . . have read and agreed to" the terms, with a checkbox users needed to click |
| **Legal Question:** Was proximity/conspicuousness of the terms alone enough to put consumer on constructive notice so that he could agree to and be bound by them? | Question as to whether party was bound to terms | **Court found:** Party was put on constructive notice of the terms and agreed to them by clicking; party was, therefore, bound to those terms | **Court found:** Party was put on constructive notice of the terms and agreed to them by clicking; party was, therefore, bound to those terms |

November 2020

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**The 9th Circuit Court relied on** both cases that Quick Check Judicial recommended **to support its decision affirming the district court's holding that the agreement was not enforceable, basing their ruling on distinction that both of those cases involved "warnings",** whereas this case did not

But the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice, and Barnes & Noble directs us to no case law that supports this proposition.[1]

1.   Indeed, in cases where courts have relied on the proximity of the hyperlink to enforce a browsewrap agreement, the websites at issue have also included something more to capture the user's attention and secure her assent. *See, e.g., 5381 Partners LLC v. Shareasale.com, Inc.,* No. 12-CV-4263 JFB AKT, 2013 WL 5328324, at *7 (E.D.N.Y. Sept. 23, 2013) (in addition to hyperlink that appeared adjacent to the activation button users had to click on, website also contained a text warning near the button that stated "By clicking and making a request to Activate, you agree to the terms and conditions in the [agreement]"); *Zaltz,* 952 F.Supp.2d at 451–52 (users required to check box confirming that they had reviewed and agreed to website's Terms and Conditions, even though hyperlink to Terms and Conditions was located on the same screen as the button users had to click on to complete registration).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992720

# Praise for Quick Check Judicial

### Justice Randy Holland
#### Delaware Supreme Court (Retired)



"From a judge's point of view, you want to be confident that you understand each party's position and you want to be confident that you understand the state of the law. Quick Check Judicial allows you to do that efficiently and accurately."

"Attorneys only argue before the court so often, and even though the judge might hear the same cases a lot, attorneys aren't arguing them every day. No matter how good a lawyer is, it's hard to stay up to date with everything, but ==with Quick Check Judicial, you can go into court with confidence.=="

### Justice Eric Magnuson
#### Minnesota Supreme Court (Retired)



"Most judges don't have the time to explore every little detail of what's put in front of them. ==They want big-picture, and they want core stuff, which Quick Check Judicial can help with.=="

"As an appellate lawyer, it would be really nice to take all the filings from the parties, as well as the lower court opinion, and run them all through Quick Check Judicial and see which cases everybody agrees are important, and which cases were missed.  That's how I would use this now, and it would be really valuable."



TechnoLawyer®
Top Product

**Quick Check Judicial**

Award
Winner
2021

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00992722