IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) ) | C.A. No. 20-613 (SB) |
| | ) | **REDACTED - PUBLIC VERSION** |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RENEWED MOTION
FOR PARTIAL SUMMARY JUDGMENT ON FAIR USE**

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
Jeremy King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Yungmoon Chang
Allyn Belusko
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(310) 552-4200

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs Thomson Reuters
Enterprise Center GmbH and West Publishing
Corporation*

Original filing date: October 1, 2024
Redacted filing date: October 8, 2024

## <u>TABLE OF CONTENTS</u>

**SUMMARY OF THE ARGUMENT** ................................................................................ 1

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS** ..................... 6

**STATEMENT OF FACTS** ........................................................................................... 7

    A.   The Westlaw Content ..................................................................................... 7

    B.   ROSS's Copying of Westlaw Content ............................................................... 8

**ARGUMENT** ......................................................................................................... 11

**I.**    **ROSS's Copying Is Not Fair Use As a Matter Of Law** ................................... 12

    A.   Factor Four – It Is Undisputed That ROSS Affected the Market for and
          Value of the Westlaw Content ....................................................................... 12

        1.   ROSS Created a Substitute for Westlaw ..................................................... 13

        2.   ROSS Appropriated Plaintiffs' Exclusive Use of the Westlaw
             Content as Training Content ................................................................. 16

        3.   ROSS Inhibited the Licensing Markets for Westlaw Content ................... 17

        4.   If ROSS's Use Were Widespread, It Would Harm the Market for
             and Value of Westlaw ......................................................................... 20

        5.   ROSS's Use Harms the Public ............................................................... 21

    B.   Factor One – ROSS Undisputedly Copied to Create a Commercial
          Substitute .................................................................................................. 23

        1.   ROSS's Use Was Commercial ............................................................... 23

        2.   ROSS's Use Was in Bad Faith .............................................................. 24

        3.   ROSS's Purpose Was Not Transformative ............................................. 25

    C.   Factor Two – It Is Undisputed That the Westlaw Content Is Creative ............... 32

    D.   Factor Three – It Is Undisputed That ROSS Took the Heart of Westlaw .......... 36

**CONCLUSION** ....................................................................................................... **40**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994)................................................................26, 30

*Am. Geophysical Union v. Texaco Inc.*,
802 F. Supp. 1 (S.D.N.Y. 1992)........................................................22, 30

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021) ................................................................13, 16

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)........................................................................ *passim*

*Associated Press v. Meltwater*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013)....................................................39

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)..................................................23, 26, 38

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)....................................................................17

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)........................................................................ *passim*

*Capitol Recs., LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018)....................................................................13

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998)....................................................12, 20, 37

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................11, 19, 20

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ........................................11, 13, 16, 17

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)...............................................................................2, 21

*FameFlynet, Inc. v. Jasmine Enters., Inc.*,
344 F. Supp. 3d 906 (N.D. Ill. 2018) ....................................................16

ii

*FMC Corp. v. Control Sols., Inc.*,
    369 F. Supp. 2d 539 (E.D. Pa. 2005) ...................................................................33

*Fox News Network, LLC v. TVEyes, Inc.*,
    883 F.3d 169 (2d Cir. 2018)......................................................................... *passim*

*Google LLC v. Oracle, Inc.*,
    141 S.Ct. 1183 (2021)...........................................................................26, 37, 38

*Hachette Book Grp., Inc. v. Internet Archive*,
    -- F. 4th --, 2024 WL 4031751 (2d Cir. 2024)...................................17, 18, 27, 33

*Harper & Row, Publ'rs, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)..................................................................................... *passim*

*Hustler Mag. Inc. v. Moral Majority Inc.*,
    796 F.2d 1148 (9th Cir. 1986) .............................................................................33

*Infinity Broadcast Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998)................................................................................16

*L.A. News Service v. KCAL-TV Channel 9*,
    108 F.3d 1119 (9th Cir. 1997) .............................................................................24

*Love v. Kwitny*,
    706 F. Supp. 1123 (S.D.N.Y. 1989).....................................................................33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................11

*MCA, Inc. v. Wilson*,
    677 F.2d 180 (2d Cir. 1981)................................................................................36

*Monge v. Maya Mags., Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ................................................................20, 21, 27

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011)....................................................................2, 12, 13, 24

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004)................................................................................25

*Oasis Publ'g. Co. v. West Publ'g. Co.*
    924 F. Supp. 918 (D. Minn. 1996).......................................................................27

*On Davis v. The Gap, Inc*,
    246 F.3d 152 (2d Cir. 2001)..........................................................................18, 20

*Pac. & S. Co. Inc. v. Duncan*,
    744 F.2d 1490 (11th Cir. 1984) ........................................................24

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
    99 F.3d 1381 (6th Cir. 1996) .......................................................2, 22

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992)......................................................23, 26

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).............................................................17

*Sega Enters. Ltd. v. Accolade, Inc*,
    977 F.2d 1510 (9th Cir. 1992) ..............................................29, 30, 31

*Seymour v. Richardson*,
    194 Va. 709 (1953) ..................................................................34, 35

*Shihab v. Source Digital, Inc.*,
    No. 23 Civ. 7266, 2024 WL 3461351 (S.D.N.Y. Jul. 18, 2024) ............20

*Soc'y of Holy Transfig. Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012).................................................29, 32, 39

*Soitec, S.A. v. Silicon Genesis Corp.*,
    81 Fed. Appx. 734 (Fed. Cir. 2003) .................................................30

*Sony Comput. Ent. Inc. v. Connectix Corp*,
    203 F.3d 596 (9th Cir. 2000) ....................................................30, 31

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019)......................................................11, 12

*TD Bank, N.A. v. Hill*,
    No. 12 Civ. 7188, 2015 WL 4523570 (D.N.J. July 27, 2014) ...............33

*Video Pipeline, Inc. v. Buena Vista Home Ent.*,
    342 F.3d 191 (3d Cir. 2003).................................................11, 12, 27

*Walker v. Univ.*,
    602 F.2d 859 (9th Cir. 1979) ....................................................29, 30

*Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*,
    447 F.3d 769 (9th Cir. 2006) ................................................. *passim*

*Warner Bros. Ent. Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008)...........................................27, 38

*Weissmann v. Freeman,*
    868 F.2d 1313 (2d Cir. 1989)..........................................................26, 37

*West Pub. Co. v. Mead Data Cent., Inc.,*
    616 F. Supp. 1571 (D. Minn. 1985)...........................................................24

*Worldwide Church of God v. Phila. Church of God, Inc.,*
    227 F.3d 1110 (9th Cir. 2000) ..........................................12, 26, 30

**Statutes**

17 U.S.C. § 106(2) ..........................................................................................32

17 U.S.C. § 107(1) ............................................................................................3

17 U.S.C. § 107(2) ......................................................................................4, 33

17 U.S.C. § 107(3) ......................................................................................5, 37

17 U.S.C. § 107(4) ......................................................................................2, 12

Copyright Act...........................................................................21, 29, 30, 33

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................11

Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corp. ("West") (together "Plaintiffs") respectfully submit this brief in support of their renewed motion for summary judgment on ROSS Intelligence, Inc.'s ("ROSS") fair use defense.

## SUMMARY OF THE ARGUMENT

For decades, Plaintiffs' Westlaw platform has been the gold standard for lawyers and judges conducting legal research, providing highly valuable content that helps researchers find and understand the law. Thanks to innovative features on Westlaw, legal research once akin to finding a needle in a haystack is made easier and quicker. This took the sustained creative investment of Plaintiffs' attorney-editors in writing one of Westlaw's key features: editorial content (the "Westlaw Content"). This content includes the West Headnotes, which Plaintiffs' attorney-editors create by identifying, synthesizing, and summarizing key legal concepts in judicial opinions, and connecting them to relevant portions of often long, dense caselaw. It also includes the West Key Number System ("WKNS"), an original and ever-evolving organization of hundreds of topics and myriad sub-topics into which the West Headnotes and cases are arranged. And it also includes case synopses, which attorney-editors create by analyzing and summarizing judicial opinions. Researchers can read and benefit from the Westlaw Content by researching on Westlaw. The Westlaw Content also plays a key role powering Plaintiffs' artificial intelligence ("AI") search algorithms that help researchers find relevant cases. Such technological progress, including Plaintiffs' AI search algorithms, was only made possible by Plaintiffs' significant investment in human creativity, like that of Plaintiffs' attorney-editors.

Instead of making similar creative investments, ROSS's legal research platform freerode on Plaintiffs' investment. ROSS copied Plaintiffs' copyrighted Westlaw Content in bulk because the careful legal analysis of Plaintiffs' attorney-editors served as an excellent synthesis and organization of the law that ROSS wanted to train its AI algorithm how to find relevant case law.

1

The copying enabled ROSS to develop its own legal research platform, admittedly to compete with and replace Westlaw.  Thus, by using Westlaw Content to train its AI algorithm, ROSS did what Plaintiffs themselves had *already* done for years, *without* having to make the same investment in human innovation.  Copyright law "*celebrates* the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge."  *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18, 219 (2003).  Allowing free copying and exploitation by a competitor, particularly where the current market already encourages the creation and dissemination of new legal research platforms and content like Westlaw, is contrary to this Constitutional incentive structure.

Accordingly, *none* of the four fair use factors favors fair use in this case.  Although the Court previously found factual disputes precluded summary judgment on fair use, D.I. 547 (the "Opinion" or "Op."), the additional facts and law discussed herein show that, as a matter of law, ROSS cannot meet its burden of proving fair use.  Specifically:

- **Factor four** concerns "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).[1]  This factor weighs strongly against fair use for multiple reasons.  *First*, ROSS created a competing substitute for Westlaw.  Although the Court recognized that ROSS and Plaintiffs compete, it questioned whether ROSS introduced into the market a true substitute.  Op.  24–25.  But as explained below, extensive undisputed

---

[1] Courts regularly find that any factor may be considered first, particularly when it is most important.  *See, e.g.*, *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1383 (6th Cir. 1996) (assessing the fourth factor first); *see also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011) (assessing the fourth factor second).  Here, starting with factor four makes sense for two reasons.  First, it "is undoubtedly the single most important element of fair use."  *Harper & Row, Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985).  Second, it is particularly significant in this case where ROSS's copying affects the market for Westlaw in multiple ways.  *Infra* 12–20.

evidence in the record confirms ROSS's platform was substitutive, including because customers actually replaced their Westlaw subscriptions with subscriptions to ROSS. ***Second***, ROSS deprived Plaintiffs of exclusive use of the Westlaw Content as AI training content. ***Third***, ROSS did not pay Plaintiffs the typical fee paid for the use of content to train AI. The Court did not previously address the latter two reasons, which ***alone*** militate against fair use. And all three market effects would be even more harmful if conduct like ROSS's became widespread.

- **<u>Factor one</u>** concerns "the purpose and character of the use, including whether such use is of a commercial or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This Court already found that ROSS copied the Westlaw Content for commercial gain. Op. 16–17. The sole question then is whether any transformativeness outweighs that commercialism and ROSS's bad faith.[2] There, however, is no transformative purpose to counterbalance the commercialism and bad faith here. A purpose is transformative if it is dissimilar from the author's purpose. Here, ROSS copied the Westlaw Content to create an avowed substitute to Westlaw—a legal research platform that serves the same purpose as Westlaw. And both Plaintiffs and ROSS specifically used the Westlaw Content for the same specific purpose: to train their respective AI algorithms to help researchers find relevant case law in response to user queries. Moreover, although the Court previously found there were factual issues as to whether ROSS's copying was an "intermediate" step in training its AI algorithm, Op. 19, the law is clear that

---

[2] Although the Court previously found insufficient grounds to find bad faith, noting that being denied permission to use a work is not sufficient to weigh against fair use, Op. 20, this case goes far beyond being denied permission, as ROSS engaged in various bad faith conduct, including hiring a third party to illicitly access content it knew would violate Westlaw's terms of service. As described below, this qualifies as bad faith and should weigh against fair use.

transformativeness does not turn on whether the copying was "intermediate."  Instead, the cases on which ROSS relies involved copying to create novel or compatible products.  Here, by contrast, ROSS used the content the way it was already being used, deliberately mimicking Plaintiffs' preexisting product rather than creating a novel or compatible one.  This is not transformative and weighs against fair use as a matter of law.

- **<u>Factor two</u>** concerns "the nature of the copyrighted work."  17 U.S.C. § 107(2).  Here, the Westlaw Content is creative, which weighs against fair use.  On this factor, the Court recognized Plaintiffs' editors make some creative choices in creating the Westlaw Content, but found there were factual issues on the level of creativity, and noted that the Westlaw Content was more informational than other types of works, likening the Westlaw Content to news reporting.  Op. 21.  The law recognizes, however, that even informational works, such as a work of non-fiction or news reporting, can be creative and weigh this factor against fair use.  Moreover, although the Court originally concluded that the jury would need to decide how closely content like the West Headnotes reflected the language of judicial opinions, Op. 21, the Court has since recognized that even West Headnotes containing the language of judicial opinions can be creative in their selection and arrangement.  In particular, attorney editors had to make choices about (1) which cases should be headnoted in the first place; (2) what headnotes to create out of many possible choices; (3) which concepts should be included in the headnote and which should be left out; (4) which portion of the case a given headnote should be linked to; and (5) how to word a headnote.  The WKNS—which is comprised of hundreds of different topics and multiple levels of subtopics—is similarly creative, requiring decisions as to which topics to include, how to arrange them, how to write them, and how to organize the headnotes and cases within them.  Moreover, it took substantial labor and investment to

create the Westlaw Content, a subfactor that many courts have held is relevant to factor two, and which further weighs this factor against fair use.

- **Factor three** concerns "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). ROSS's copying was both qualitatively and quantitatively substantial. As an initial matter, to get the content that ROSS needed to train its AI algorithm, ROSS hired LegalEase Solutions, LLC ("LegalEase") to copy verbatim *hundreds of thousands* of editorially enhanced judicial opinions by clicking through them on the Westlaw platform outside the scope of its license. In building the algorithm, ROSS also directly copied thousands of West Headnotes and the selection and arrangement of those headnotes and case passages within the WKNS. These editorial enhancements are the "heart" of Westlaw and what makes it unique; obtaining them was not merely incidental to ROSS's project, it was the entire goal. On this factor, the Court previously found that ROSS "must show that the scale of the copying" was "practically necessary and furthered its transformative goals." Op. 23. The Court found there were factual issues on this point, but as described above, the law on transformativeness makes clear that ROSS cannot show it had a valid transformative purpose here, so there is nothing to justify the amount copied. Regardless, the use was not "practically necessary," as ROSS's AI expert acknowledged that ROSS did *not need* to copy the Westlaw Content to train its algorithm. It could have created this content itself, as competitors like Lexis did. Accordingly, this factor also strongly weighs against fair use.

Ultimately, the word "AI" does not, once incanted, give a secondary user *carte blanche* to copy human-created works with impunity under the doctrine of fair use. Instead, fair use is and remains a highly fact-specific doctrine, the applicability of which depends entirely on the particular

use at hand and should be tailored to encourage the creation of works, like the Westlaw Content. And the particular use of Westlaw before this Court is nowhere near an edge case—it is simply not a fair use under binding precedent concerning every single fair use factor. Nor should it be. To permit this kind of copying would be highly disruptive of a functioning market that already adequately incentivizes the creation of new works. Accordingly, ROSS cannot meet its burden of proving fair use and the Court should grant summary judgment to Plaintiffs.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On May 6, 2020, Plaintiffs commenced this lawsuit asserting copyright infringement and tortious interference with contract. D.I. 1 ("Compl."). ROSS filed its Second Amended Answer to Plaintiffs' Complaint asserting twenty-three defenses. D.I. 225 ("SAA") 7–11. On December 22, 2022, the Parties moved for summary judgment. Plaintiffs moved for summary judgment on three issues: (1) copyright infringement (D.I. 250); (2) tortious interference with contract (D.I. 252); and (3) fair use and other defenses (D.I. 254). ROSS moved for summary judgment on two issues: (1) tortious interference with contract (D.I. 270) and (2) fair use (D.I. 272).

On September 25, 2023, the Court issued an opinion on the Parties' competing summary judgment motions. Op. Therein, the Court granted in part and denied in part Plaintiffs' motion for summary judgment on copyright infringement by granting the motion with respect to actual copying. *Id.* In finding actual copying, the Court found specifically that "LegalEase admitted to copying at least portions of the headnotes directly," it "had access to Westlaw, which included access to the headnotes," and that "no reasonable jury could say that the similarities" between ROSS's and Plaintiffs' works are "not at least probative of some copying." Op. 8–9. The Court also granted Plaintiffs' motion for summary judgment on ROSS's miscellaneous defenses. *Id.* 33–34. The Court denied both Parties' motions for summary judgment on fair use, finding that there were factual issues. *Id.* 15–26. On August 22, 2024, the Court held a videoconference at which it

6

held that Plaintiffs would be permitted to renew their summary judgment motions on certain issues, including fair use.  D.I. 663; Ex. 33.

## STATEMENT OF FACTS

### A.    The Westlaw Content

As explained by Thomson Reuters' manager of its United States attorney-editor team, Laurie Oliver, Plaintiffs' legal research platform, Westlaw, offers subscribers access to a collection of editorially enhanced judicial opinions arranged within an original classification system, the WKNS.  D.I. 256 (Declaration of Laurie Oliver, dated December 21, 2022, "Oliver Decl.") ¶¶ 3, 8–11.  West's attorney-editors create editorial enhancements, including synopses of cases and West Headnotes, which identify and synthesize key issues and holdings.  *Id.* ¶ 4–6; Second Declaration of Laurie Oliver, dated September 30, 2024, ("2d Oliver Decl.") ¶¶ 3–5.  West's attorney-editors draft the specific wording of the West Headnotes, decide which concepts and key points of law to include, make choices about which judicial opinions to annotate with West Headnotes, how many West Headnotes to create for a given judicial opinion, and which case passages should be linked to which West Headnotes, among other choices.  *Id.*  As discussed by Erik Lindberg, Thomson Reuters' Senior Director, Westlaw Product Management, West's attorney-editors also decide which "Key Numbers"—*i.e.*, more granular legal topics—are assigned to West Headnotes for purposes of integrating the West Headnotes and related judicial opinions into Plaintiffs' classification system, the WKNS.  Ex. 8[3] (Lindberg Tr.) 74:9–22, 75:21–76:9, 116:14–119:6; 2d Oliver Decl. ¶¶ 9–10.  After West's attorney-editors make initial recommendations of where a headnote might be placed in the WKNS, it is assigned to one or more

---

[3] All exhibits are attached to the concurrently filed Declaration of Miranda D. Means, dated October 1, 2024.

"classifiers," attorney-editors who officially assign Key Numbers. Oliver Decl. ¶ 10.   Once assigned, the West Headnote and judicial opinion are added to the WKNS under that Key Number. *Id.* ¶ 8.

Because new judicial opinions are issued every day, and the law is constantly evolving, West's attorney-editors regularly create, revise, and update the Westlaw Content.  Oliver Decl. ¶ 7.  The Westlaw Content thus reflects decades of creative choices about how to explain, organize, classify, structure, and synthesize the law.  *Id.* ¶¶ 9, 12. ████████████████████ ████████ there are many ways to organize the law and other competitors, such as LexisNexis, do so differently. ██████████████████████   The Westlaw Content is valuable for a variety of reasons, including because (1) the content makes researching case law more efficient and effective for Plaintiffs' customers and (2) since at least in or around 2010, Plaintiffs used this content to train Westlaw's artificial intelligence.  Oliver Decl. ¶¶ 12–13; ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

### B.    ROSS's Copying of Westlaw Content

ROSS created the ROSS platform in 2014.  Ex. 2 (Arruda Tr.) 11:18–12:4.  It marketed the platform as using AI to allow researchers to search for legal content by posing questions in natural language.  Ex. 94 (https://blog.rossintelligence.com/post/how-natural-language-search-changing-face-of-legal-research). ████████████████████████   ROSS is a competitor of Plaintiffs. ██████████████████   ROSS created the ROSS platform as a replacement for Westlaw. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████ In particular, ████████████████████████████

███████ ROSS hoped law firms would stop using Westlaw and start using ROSS. ████████

████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

To create the ROSS platform, ROSS wanted a large set of content to teach its AI model how to answer legal questions.  Exs. 13 (Ovbiagele 30(b)(6) Tr.) 48:23–50:9; 73 (ROSS-010271831) at 831.  ROSS already had a large set of *judicial opinions* ████████████ ███████████████████████████████████████████████████ But ROSS wanted *legal analysis*—"legal memos" containing legal questions mapped to relevant passages from judicial opinions that answered the essential elements of the query.  Ex. 2 (Arruda Tr.) 275:23–276:12.  Instead of creating this content itself, ROSS decided to use Westlaw to get this legal analysis. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ ██████ ██████████████████████████

████████████████████████████████████████████████████████





Accordingly, this Court already found that ROSS actually copied Westlaw Content.  Op. 8–9.

## ARGUMENT

Summary judgment is proper where there is "no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant informs the court "of the basis for its motion" and the matter "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the non-moving party must present evidence establishing disputed issues as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

As fair use is "an affirmative defense," ROSS "bears the burden of proof."  *See Video Pipeline, Inc. v. Buena Vista Home Ent.*, 342 F.3d 191, 197 (3d Cir. 2003); *see also Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) (same).  Courts routinely decide summary judgment in favor of the copyright holder where a defendant cannot meet this burden as a matter of law.  *See, e.g.*, *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (commercial use of work that hurt market for the original was not fair use as a matter of law); *Wall Data Inc. v.*

*L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 782 (9th Cir. 2006) (finding no fair use as a matter of law); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) (same); *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 146 (2d Cir. 1998) (same); *Murphy*, 650 F.3d at 308 (overturning district court's finding of summary judgment for defendant and finding all four fair use factors favored plaintiff); *Video Pipeline*, 342 F.3d at 198 (granting preliminary injunction where three factors favored fair use).  As detailed below, ROSS cannot meet its burden because each factor weighs against finding fair use as a matter of law.  *See*, *e.g.*, *TD Bank*, 928 F.3d at 278 (finding no fair use where commercial use hurt market for the original).

## I.      ROSS'S COPYING IS NOT FAIR USE AS A MATTER OF LAW

Fair use law draws a line between new technologies that substitute for the content that they copy, and those that do not.  Here, ROSS copied the Westlaw Content, not to train an algorithm in a different field or for a novel application different from how Plaintiffs already used that content, but to develop a commercial legal research platform that its own executives admit was designed to and in fact ***did*** substitute for Westlaw.  Like so many copyists before it, ROSS copied the Westlaw Content to avoid the "drudgery" of creating its own creative content.  That is not fair use and, when each factor is considered, that unescapable conclusion is clear.

### A.      Factor Four – It Is Undisputed That ROSS Affected the Market for and Value of the Westlaw Content

This factor considers "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4); *Harper*, 471 U.S. at 566.  As the Supreme Court recognized and this Court noted, relevant to this analysis is not only the effect on the ***actual*** or potential markets for the original, but also the effect on the market for ***potential*** derivatives, including "those that creators of original works" would "license others to develop."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994) (emphasis added); Op. 23 (finding inquiry "must

take account not only of harm to the original but also of harm to the market for derivative works" (internal citations omitted)).  Although not previously analyzed by this Court, in considering this factor, courts also assess "whether unrestricted and widespread conduct of the sort engaged in by the defendant" would affect the potential market for the original.  *Id.* at 590. *Murphy*, 650 F.3d at 308; *see also Harper*, 571 U.S. at 568 (emphasis added).  Ultimately, the "burden of proving that the secondary use does not compete in the relevant market is . . . born by the party asserting the defense." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol I*"), 11 F.4th 26, 49 (2d Cir. 2021); *Seuss*, 983 F.3d 443 at 459.  The undisputed facts show that ROSS's use of the Westlaw Content affected the market for and value of the Westlaw Content in multiple ways.

### 1.    ROSS Created a Substitute for Westlaw

ROSS's copying from Westlaw affected the market for the Westlaw Content by creating a competing substitute: the ROSS platform.  "When a secondary use competes in the rightsholder's market as an effective substitute for the original, it impedes the purpose of copyright to incentivize new creative works by enabling their creators to profit from them." *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018) (focusing on whether the copy "brings to the marketplace a competing substitute for the original"); *see also Harper*, 471 U.S. at 550.  For example, in *Seuss*, the Ninth Circuit found the fact that defendants "intentionally targeted and aimed to capitalize on the same" market as the plaintiff was evidence of market harm.  983 F.3d at, 460 (considering evidence of intent to market derivative to similar audiences as original in weighing the fourth factor against fair use).

On this factor, this Court already recognized that ROSS and Thomson Reuters compete in the market for legal research platforms.  Op. 24.  Although it found that competition alone did not show substitution, *id.* at 24–25, extensive undisputed facts show that ROSS engaged in more than general competition; it created a market substitute for Westlaw.  Both ROSS and Plaintiffs offer

the same basic service of helping customers identify relevant law by searching through judicial opinions—the two platforms even look similar.  *Compare* Exs. 19 (Cox Ex. 2); 20 (Cox Ex. 1).  In response to legal queries, both platforms give researchers a list of relevant cases, along with relevant case passages therefrom.  *Id.*; ███████████████████████████

███████████████████████████████████████  ████████████████

████████████████████  ROSS and Plaintiffs targeted the same customers.   Ex. 2

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████  ████████████████████████

████████████████████████████████████████  ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████  ██████████████████████

████████████████████  ████████████████████████████

████████████████████████  ██████████████████████████

███████████████████████████████████████████████

██████████████████████████

Consistent with these aims, ROSS touted its product as an alternative to Westlaw and promised that ROSS would bring the "death" of Westlaw contracts  ████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ 78 (TR-0001119) (ROSS Facebook advertisement asking, "ROSS or Westlaw?"); ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ ███████████████████

████████████████████████ ████████████████████████

████████████████████████████████

Moreover, ROSS's actions resulted in ***undisputed*** substitution. ███████████ law firms stopped using Westlaw and started using the ROSS platform instead. ███████████

████████████████████████████████████████████████

█████████████████████████████████ ███████████████

████████████ various customers cancelled their Westlaw subscriptions in favor of ROSS. ██████

████████████████████████████████████████████████

██████████████████████████████████████████ █

██ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Documents further demonstrate these lost opportunities ████████

████████████████████████████████████████████████

████████████████████████████ Thus, ROSS cannot meet its burden under this factor of showing that its use did not usurp the market for Westlaw. *Warhol I*, 11 F.4th at 49 (*citing Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) ("As always, [the secondary user] bears the burden of showing that his use does not" usurp the market for the primary work)).

15

2.    ROSS Appropriated Plaintiffs' Exclusive Use of the Westlaw Content as Training Content

In addition to market substitution, ROSS deprived Plaintiffs' of the exclusivity in their use of the Westlaw Content to train AI.  Copyright law recognizes that exclusivity can contribute to the value of a copyrighted work, and that depriving an author of that exclusivity can decrease the value of a work.  *See Harper*, 471 U.S. at 543 (exclusivity factored into the licensing fee for the work); *FameFlynet, Inc. v. Jasmine Enters., Inc.*, 344 F. Supp. 3d 906, 913 (N.D. Ill. 2018) (loss of ability to control a photographs exclusivity diminished its value).  In *Seuss*, for example, the Ninth Circuit recognized the author's decision "not to saturate those markets with variations of their original," by holding back on certain uses.  983 F.3d at 461.

As explained by Thomson Reuters' now-retired Vice President of Applied AI Research, Isabelle Moulinier, Plaintiffs themselves used the Westlaw Content to train their search algorithms *before* ROSS did. ████████████████████████████████████ ████████████████████████████████████  And part of what makes the Westlaw Content valuable is the fact that, although Plaintiffs use it internally to develop their proprietary algorithms, it was *not* available for competitors to create comparable algorithms at the time ROSS used it.  *See* Oliver Decl. ¶ 13; Ex. 9 (Malackowski Tr.) 42:3–24.

ROSS itself recognized the competitive advantage afforded by exclusive use of the Westlaw Content to train AI, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████. Plaintiffs similarly wanted to retain the benefits both from having an unmatched algorithm trained on Plaintiffs' own content *and* from being able to enter the derivative market at a strategically advantageous time and under suitable terms.  Thus, the market effect here is similar to that in *Seuss*, where ComicMix harmed the market for the plaintiff's content by pushing out content "hop[ing] to get to one of the potential markets for Seuss's derivative works before Seuss." 983 F.3d at 460; *see Salinger v. Colting*, 607 F.3d 68, 74, 83 (2d Cir. 2010) (fourth factor favored plaintiff in suit over unauthorized sequel even where plaintiff had publicly disclaimed *any* intent to author or authorize a sequel).  ROSS similarly jumped the gun here—by impermissibly copying the Westlaw Content to create training content, ROSS harmed the value of the Westlaw Content

███████████████████████████████████████

████████████████████

### 3.    ROSS Inhibited the Licensing Markets for Westlaw Content

ROSS also copied the Westlaw Content without paying Plaintiffs, impeding their ability to license the Westlaw Content and its derivatives into existing and potential licensing markets therefor.  The "impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Hachette Book Grp., Inc. v. Internet Archive*, -- F. 4th --, 2024 WL 4031751, at *17 (2d Cir. 2024) (*quoting Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)).  Using a work without paying the customary licensing fee constitutes market harm.  *Id.*

Here, there are multiple licensing markets impacted by ROSS's copying.  ***First***, there is an **existing** market for and clearly defined value to the Westlaw legal research platform, which includes the Westlaw Content. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████  ROSS's infringing use

directly deprived Plaintiffs of licensing revenues in this traditional market because it did not pay

the customary price for the content.  *See Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169,

180 (2d Cir. 2018) (by using content without payment, TVEyes deprived Fox News of "licensing

revenues from TVEyes").  There is no dispute that by using the Westlaw Content without payment,

ROSS impaired Plaintiffs' ability, if they so choose, to charge others for that same content, which

thus harms the market therefor.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████  *see On Davis v. The Gap, Inc*, 246 F.3d

152, 167-168, 175–76 (2d Cir. 2001) (freely taking a copyrighted work allowed defendant to avoid

"paying the customary price," that plaintiff "was entitled to charge" for use of work, and that, as a

result, plaintiff "suffered market harm through his loss of the royalty revenue to which he was

reasonably entitled in the circumstances, as well as through the diminution of his opportunity to

license to others").[4]

There also is extensive evidence in the record of a **_potential_** licensing market for Westlaw

Content and derivatives thereof as AI training content.  The undisputed evidence shows there was

demand for Westlaw Content to train AI.  ████████████████████████████

████████████████████████████████████████████████

---

[4] ROSS has not presented evidence that could legally satisfy its burden on factor four. ████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

ROSS focuses entirely on the traditional market for the Westlaw Content and ignores the harm to
the potential market.  Thus, ROSS cannot meet its burden under *Celotex*.  Ultimately, if the Court
believes that there is a material dispute, the jury should decide it.

██████████████████████████████████████████████████████

██████████████████████  ███████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████   As in *Fox News*, where the court found that the fact that the defendant's customers were willing to pay for the infringing use showed there was a "plausibly exploitable market," ROSS's payment for the ███████████ is evidence of a market here. 883 F.3d at 180 (since the ability to use the content was "clearly of value" to the defendant it "should be willing to pay"). Moreover, Plaintiffs' use of the Westlaw Content to train their AI algorithm confirms its usefulness for this purpose. *Supra* 16. And there are potential customers for this content; other legal research companies use AI on their own platforms, indicating, as Mr. Malackowski explains, potential demand for legal research content to train these algorithms. Ex. 28 (Malackowski Op. Rpt.) at 45–48; *see also* 5 (Cox Tr.) 26:20–27:3. ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████   In addition, the undisputed evidence shows that markets for other content to train AI already exist. ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████   ROSS has presented no evidence to dispute this under *Celotex*.[5]

---

[5]The Court excluded ROSS's expert, Dr. Alan Cox's, speculative opinion that there is no potential market for the Westlaw Content as AI training content, as it was based on a flawed methodology and unsupported assumptions. D.I. 549 at 7–8. To the extent the Court does not find the above evidence to be sufficient to establish the existence of a potential market as a matter of law, it is ***at least*** sufficient to show that this factor does not weigh in ROSS's favor as a matter of law either.

Thus, as in the existing licensing market, ROSS's failure to pay for use of the Westlaw Content to train AI deprives Plaintiffs of licensing revenues in this burgeoning potential market. *See Davis*, 246 F.3d at 175–76 (describing harm through failure to pay licensing fee).  Whether Plaintiffs actually participated in this market is not legally relevant—they could reasonably decide to participate, and ROSS should not be permitted to cut them off at the pass.  *See Shihab v. Source Digital, Inc.*, No. 23 Civ. 7266, 2024 WL 3461351, at *7 (S.D.N.Y. Jul. 18, 2024) (unlicensed copying harmed the market "even though there [was] no evidence [the plaintiff] ever attempted to license [the work]"); *see Castle Rock*, 150 F.3d at 145–46 (plaintiff's decision not to enter derivative market occupied by defendant did not change fair use analysis); *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012).

### 4.   If ROSS's Use Were Widespread, It Would Harm the Market for and Value of Westlaw

This Court did not previously address a central aspect of market harm set out in *Campbell*—"whether unrestricted and widespread conduct of the sort engaged in" by ROSS would undermine the potential market for the copyrighted work.  510 U.S. at 590.  As the Supreme Court found in *Harper*, a use is not fair where "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright."  471 U.S. at 569. Here, if similar uses were to become widespread, anyone could use the Westlaw Content to develop competing legal research platforms without Plaintiffs' permission, which would make a "major inroad on the copyright" by diminishing Plaintiffs' ability to command a price.  Ex. 29 (Malackowski Rbt. Rpt.) at 24–25. As to the potential market for Westlaw Content as training content, widespread copying here would ***destroy*** a potentially lucrative licensing market for Westlaw Content to train AI, as none of the potential customers (other legal research companies) would pay for this use if they could use Westlaw Content for free.  *Monge*, 688 F.3d at 1182 (Ninth

Circuit found that widespread use would result in "the bottom literally dropp[ing] out of the market"). Widespread use would also extinguish the value of exclusivity—anyone could use the Westlaw Content to create a comparable AI search algorithm.

        5.    <u>ROSS's Use Harms the Public</u>

In assessing factor four, courts also must look at the impact on the public. The Supreme Court has admonished courts that "gave insufficient deference to the scheme established by the Copyright Act for fostering the [creation of] original works," *Harper*, 471 U.S. at 545–46, 560, as the Framers intended copyright to promote "free expression" by "establishing a marketable right." *Eldred*, 537 U.S. at 219. By doing so, copyright protection "supplies the economic incentive to create and disseminate ideas." *Harper*, 471 U.S. at 558. Copyright law thus "*celebrates* the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge" *Eldred*, 537 U.S. at 212 fn. 18. Where "there is a fully functioning market that encourages the creation and dissemination" of a work, "permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit." *Harper*, 471 U.S. at 568 n.9; *see also Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1391 (6th Cir. 1996) (finding no fair use where copying would "have a deleterious effect upon the incentive" to publish the copyrighted work).

As described above, multiple existing and potential markets for the Westlaw Content and its derivatives would be needlessly disrupted by a finding of fair use here. Westlaw plays a significant role in helping lawyers and judges find and understand the law, and benefits clients by increasing the efficiency and accuracy of legal research. *Supra* 8; Exs. 97–98. This innovation required a significant investment in the creation of Westlaw Content—by decreasing the value of this content in the existing and potential markets, ROSS's use undercuts monetary incentives to

create helpful platforms like Westlaw.  *See Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 27 (S.D.N.Y. 1992) (recognizing that through its ability to profit from its exclusive rights, the plaintiff "expanded [the] range" of journal articles available, and that the publication of such articles requires a "large investment" that is incentivized through copyright protection and would be harmed by widespread copying).  Plaintiffs' creativity powers its advanced search algorithms, but Plaintiffs' incentive to invest in creativity would be diminished if competitors could simply use original content for free.  *Supra* 8, 16; Ex. 29 (Malackowski Rbt. Rpt.) 20–22.  Allowing uses like ROSS's disrupts the fully functioning market that already encourages the creation of new legal research platforms; companies like Lexis, Bloomberg, and Fastcase, offer legal research tools without copying Westlaw.

As to any public benefits from the ROSS Platform, the Court expressed concern about being put in an "uncomfortable position" on the "hotly debated question: Is it in the public benefit to allow AI to be trained on copyrighted material?"  Op. 25.  But this case is not about AI in general.  Fair use is fact dependent, and different facts could lead to different results.  As the Court advised, the value of any given AI is likely reflected in the traditional factors: "How transformative is it?  Can the public use it for free?  Does it discourage other creators by swallowing up their markets?"  Op. 25–26.  The answers to these questions support a finding that ROSS cannot prove its fair use defense as a matter of law.  As explained below, the use is not transformative, as ROSS used the Westlaw Content for the exact same purpose as Plaintiffs: as syntheses of the law connected to relevant case passages used to develop a legal research platform that helps researchers find relevant case law.  *Infra* 26–33.  The public cannot use the ROSS Platform for free because ROSS charged for access to its platform.  Ex. 16 (van der Heijden 30(b)(6) Tr.) 90:4–6.  And allowing this use, particularly if widespread, would hurt the existing market for Westlaw Content,

and swallow up and destroy the potential market therefor as AI training content.  Accordingly, factor four weighs strongly against fair use.

### B.   <u>Factor One</u> – ROSS Undisputedly Copied to Create a Commercial Substitute

This "factor [] focuses on whether an allegedly infringing use has a further purpose or different character" from the original.  *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol II*"), 598 U.S. 508, 525 (2023).  In assessing this factor, courts consider whether the use was (1) **commercial**, (2) in **bad faith**, and (3) **transformative**.  Op. 16 (*citing Authors Guild v. Google, Inc.*, 804 F.3d 202, 214, 218–19 (2d Cir. 2015)).  Here, all three subfactors weigh against a finding of fair use.

#### 1.   <u>ROSS's Use Was Commercial</u>

In its initial opinion, this Court found that ROSS's use was "undoubtedly commercial," Op. 16, which weighs against a finding of fair use as a matter of law.  *Harper,* 471 U.S. at 562 (considering whether the user stands to profit from the exploitation of copyrighted material "without paying the customary price"); *Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992) (defendant's "substantial profit" and "intentionally exploitive" use weighed against fair use).  ROSS's commercial use of the Westlaw Content thus militates "strongly against a finding of fair use."  *See Pac. & S. Co. Inc. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) ("unabashedly commercial" use was not fair use, noting that the defendant could not "hide the fact that profit is its primary motive."); *see also Murphy,* 650 F.3d at 308 (finding commerciality weighed against a finding of fair use); *West Pub. Co. v. Mead Data Cent., Inc.*, 616 F. Supp. 1571, 1580 (D. Minn. 1985) (finding use of proprietary West content to "enhance [the defendant's] position in the marketplace" was not fair use).

2.      ROSS's Use Was in Bad Faith

The Supreme Court has held that "the propriety of the defendant's conduct" is part of factor

one.  *See Harper*, 471 U.S. at 562 ("Fair use presupposes 'good faith' and 'fair dealing'" (internal

citations omitted)).  Although merely being denied permission to use a work is not sufficient to

show bad faith, Op. 20, the Supreme Court in *Campbell* did not confront a defendant who, after

being denied permission to use the work at issue, enlisted a third party to illicitly access content

and engaged in other underhanded conduct to gain access to the content, as was the case here.

Indeed, in a far more similar case, *L.A. News Service v. KCAL-TV Channel 9*, the Ninth Circuit

found bad faith where the defendant requested a license, was refused one, and ***then*** obtained a

copy from a third party rather than paying the requisite fee.  108 F.3d 1119, 1122 (9th Cir. 1997).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████

Moreover, acquiring a copyrighted work in violation of the law weighs against fair use.

*See Harper*, 471 U.S. at 563; *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 475, 478 (2d Cir. 2004)

(holding that it is bad faith to use a work knowing access was unauthorized or was "derived from

24

a violation of law or breach of duty" and only finding fair use due to defendant's critical analysis of quoted material). ROSS knew from the Terms of Service that Westlaw "do[es] not sell [its] legal research products to direct competitors." Exs. 51 (ROSS-003390563) at 563; 31 (ROSS's Supp. Resps. Pls.' 1st Interrogs.) No. 11. Yet, ***after*** learning this, ROSS contacted LegalEase about creating the training content ROSS needed. ████████████████████████████

████████████████████████████ ████████████████████. And ROSS's later efforts to access Westlaw show that its actions were in bad faith, as it knew of Plaintiffs' Terms of Service. ████████████████████████

████████████████████████████████████████

██████████ ████████████████████████████████

████████████████████████████████████████

██████████████████████████ In short, ROSS's actions exceed lack of permission—ROSS took extensive measures to access Westlaw illicitly, in violation of Westlaw's Terms of Service. Fair use should not be twisted to encourage such behavior, and ROSS's bad faith, commercial purpose thus weighs against fair use. *See also Rogers*, 960 F.2d at 310 (copying "done in bad faith, primarily for profit-making motives" was not a fair use).

### 3.   ROSS's Purpose Was Not Transformative

Given that ROSS copied the Westlaw Content commercially and in bad faith, for this factor, ROSS would need to show it so transformed the Westlaw Content that it counterbalances those other considerations. *See Warhol II*, 598 U.S. at 525. As it used the Westlaw Content for

---

█ ████████████████████████████████
████████████████████████████████
████████████████████████

the same purpose as the original, it cannot do so.  *Id.* at 551; [7] *see also Worldwide Church*, 227 F.3d at 1117 (where the use in question "is for the same intrinsic purpose as" the copyright holder's purpose, that fact "seriously weakens a claimed fair use" and undermines transformativeness) (*quoting Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)); *Am. Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 923 (2d Cir. 1994) (contrasting "untransformed duplication," which is "likely to be used simply for the same intrinsic purpose as the original," with transformative use). Although the Supreme Court has noted that "[m]ost copying has some further purpose" and "[m]any secondary works add something new," this "alone does not render such uses fair." *Warhol II*, 598 U.S. at 528-29.  Rather, courts should consider "whether *and to what extent*" the use at issue has a purpose or character different from the original.  *Id.* (internal quotations omitted) (emphasis in the original).  For example, in *Warhol II*, the Supreme Court found the parties' respective purposes were not sufficiently different to weigh against fair use because both illustrated stories about the musician Prince.  *Id.* at 545–46.  Similarly, in *Wall Data,* the court found no fair use where the defendant copied the plaintiff's software and "put those copies to the identical purpose as the original software."  447 F.3d at 778.  Thus, the two parties' purposes need to be compared, and whether the defendant's use has a different or further purpose from the plaintiff's "is a matter of degree" that is weighed against the other factor one considerations.  *Warhol II*, 598 U.S. at 525.

---

[7] The Court previously found that this case was more similar to *Google v. Oracle* than to *Warhol II* because it is in a "technological context."  Op. 17.  But ROSS's invocation of AI does not change the fact that this case concerns copying a literary work, not a functional piece of source code. Further, this case does not involve software compatibility nor lock-in risks, which were the central focus of *Google*.  593 U.S. at 34, 39 (focusing on purpose of copying for compatibility to "permit programmers to make use of their knowledge and experience using the Sun Java API when they wrote new programs for smartphones with the Android platform" and expressing concern that enforcement created a "lock" that would interfere with future creativity).  This makes *Warhol II*, the most recent Supreme Court case on transformativeness, more apt.

Here, the parties' purposes were the same, and thus ROSS's use was not transformative.[8]
**First**, ROSS's overall purpose in copying the Westlaw Content in the Bulk Memos was to create
an avowed substitute for Westlaw. *Supra* 13–16. Copying for purposes of creating a competing
substitute is a classic example of a non-transformative use. *See, e.g.*, *Video Pipeline*, 342 F.3d at
199 (finding clips likely to serve as substitutes for original were not transformative); *Oasis Publ'g.
Co. v. West Publ'g. Co.*, 924 F. Supp. 918, 927 (D. Minn. 1996) (finding no fair use where business
plans showed "directly competitive" nature of infringing products with West products). For
instance, in *Hachette*, the court found that a use that competed directly with the original was not
transformative, noting that the use "serve[s] the same exact purpose as the originals: making
authors' works available to read." 2024 WL 4031751, at *7 (finding factor one weighed against
fair use even where the use was ***not*** commercial). Although there were some differences in *how*
the works were made available, the overall purpose of the respective uses in *Hachette* was the
same, and thus the use was not transformative. *Id.*

The same is true here. The ROSS platform helped legal researchers find relevant cases that
answered their legal questions, which is precisely what Westlaw does. *Supra* 14. ROSS has
claimed that its platform is different from Westlaw because Westlaw offers "human intermediated"
content on its platform, Op. 17, but this makes no sense for multiple reasons. As an initial matter,
both platforms help researchers find law, and indeed, this is part of the purpose served by the
Westlaw Content; the West Headnotes link directly to relevant legal case passages. Ex. 8

---

[8] Consistent with *Warhol II*, courts treat transformativeness not as a binary, but a matter of degree.
Even if modestly transformative, which it is not, that would not be sufficient to tip the scales. *See
Fox News*, 883 F.3d at 178 (finding no fair use where transformative nature of the use was
"modest"); *Monge*, 688 F.3d at 1176 (finding no fair use where use was "minimally
transformative"); *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 542 (S.D.N.Y. 2008)
(finding no fair use where work was "slightly transformative").

(Lindberg Tr.) 129:1–8.  Moreover, researchers can use Westlaw *without* interacting with so-called "human intermediated" content, such as by simply typing a question into the search bar and clicking on a relevant case from a list provided by Plaintiffs' algorithm.  And ROSS *built* its own platform on "human intermediated" content—content created by ***Plaintiffs'*** human editors.  *Supra* 8–10.  Thus, its claim that it does not use human intermediated content is nonsensical.  Although ROSS has tried in this case to create create artificial distinctions between the ROSS platform and Westlaw, that ROSS marketed and sold its platform as a replacement for Westlaw speaks for itself.  *Supra* 13–16.

 ***Second***, both Plaintiffs and ROSS used the Westlaw Content as summations and syntheses of factual and legal issues, selected and arranged in coherent categories, chosen and honed by Plaintiffs, within Plaintiffs' original West Key Number System, **to train the Parties' respective search algorithms**.  *Supra* 8–10, 16.  Plaintiffs used the Westlaw Content for the specific purpose of training their AI to provide relevant law in response to user queries, as ROSS's own AI expert, Dr. Branting, admitted.  ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████.  Likewise, ROSS specifically used the Westlaw Content to train its search algorithm to find relevant answers to legal research questions.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

ROSS's use of Plaintiff's original content for the "same purpose and benefit" as Plaintiffs is not transformative. *See Soc'y of Holy Transfig. Monastery, Inc. v. Gregory*, 689 F.3d 29, 60 (1st Cir. 2012) (finding use of translations for religious practice and education, the same purpose as the monastery holding the copyrights, was not fair).

Faced with the entirely overlapping purposes described above, which sufficiently establishes that the use is not transformative under *Warhol II* and defeats its defense, ROSS has asserted that its copying is nonetheless transformative because the copying was merely an "intermediate" step necessary to gain access to underlying judicial opinions. D.I. 272 at 14–15. This argument is legally and factually incorrect. It is legally incorrect because there is no "intermediate copying" doctrine. In *Sega Enters. Ltd. v. Accolade, Inc.*, one of the two Ninth Circuit cases that has been overread in an attempt to create such a doctrine, the Ninth Circuit specifically held that "the Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent." 977 F.2d 1510, 1518 (9th Cir. 1992). It pointed to its prior decision in *Walker v. Univ.*, in which it held "the fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement." 602 F.2d 859, 864 (9th Cir. 1979). The *Sega* court agreed with the *Walker* court's reasoning, explaining it was based on the plain language of the Copyright Act, and that on its face, the statutory language "unambiguously encompasses and proscribes 'intermediate copying.'" *Id.* at 1518.

Instead, courts confronted with "intermediate copying" consider whether the copying was for the same purpose as the original.[9]  For example, in *Am. Geophysical*, the Second Circuit found that photocopying scientific articles to facilitate research that might have led to the development of new products or technologies was not transformative.  60 F.3d at 922.  Likewise, in *Wall Data*, the Ninth Circuit found that a sheriff's department copying of plaintiff's software for the same purpose as the original to "save the expense of purchasing authorized copies," was not a fair use even where the sheriff's department was not selling those copies or competing with the plaintiff.  447 F.3d at 780.  Similarly, in *Worldwide Church of God*, the Ninth Circuit found factor one weighed against fair use "even if the copies are not offered for sale," noting that "the purpose for which [defendant] uses the [works] is the same."  227 F.3d at 1118.  Tellingly, in cases involving intermediate copying where the courts did find fair use, there were other facts that made the use transformative.  In *Sega*, the court found that the copying was transformative because it was for purposes of achieving *compatibility* with a new product.  *Id.* 1520–28 (copying to create game cartridges compatible with the plaintiff's console was fair use).  The same *compatibility* purpose was central to the Ninth Circuit's decision in *Sony Comput. Ent. Inc. v. Connectix Corp.*, which found that the use of code to create compatible games was transformative.  203 F.3d 596, 606 (9th Cir. 2000) ("Connectix reverse-engineered the Sony BIOS to produce a product that would be *compatible* with games designed for the Sony PlayStation. We have recognized *this* purpose as a legitimate one under the first factor of the fair use analysis.") (emphasis added).  By contrast, ROSS copied the Westlaw Content in the Bulk Memos (to avoid creating such content from

---

[9] This is consistent with how courts approach other types of intellectual property, such as patent infringement, which applies the same test for infringement "regardless of whether the [ ] activity took place at the research and development stage" or later.  *See Soitec, S.A. v. Silicon Genesis Corp.*, 81 Fed. Appx. 734, 737 (Fed. Cir. 2003).

scratch) to train its AI algorithm; the copying was not merely incidental to ROSS studying some functionality or creating a compatible product.  And here, ROSS copied for the same purpose as Plaintiffs, *i.e.*, to create a legal research platform to help researchers find relevant law and specifically, to train a legal search algorithm to power that platform, *supra* 8–10, 16, whereas neither *Sony* nor *Sega* involved such a shared purpose.

ROSS's intermediate copying theory—that it needed to copy the Westlaw Content to access the underlying case law—is also factually wrong.  ROSS **already had** a bank of judicial opinions in its possession.  Ex. 16 (van der Heijden 30(b)(6) Tr.) 239:17–19.  What ROSS wanted was **legal analysis**: questions across a range of topics, corresponding to a selection of relevant passages from judicial opinions.  ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████  Unlike in *Sega*, where there was "no evidence in the record that Accolade sought to avoid performing its own [ ] work," 977 F.2d at 1522, ROSS's own expert admitted that it did not **need** to copy the Westlaw Content; it could have gone to the judicial opinions it already had and **created** this material from scratch.  Ex. 3 (Branting Tr.) 276:5–10.  But it wanted to avoid the expense.  Ex. 13 (Ovbiagele 30(b)(6) Tr.) 227:2–22.  Plaintiffs had already spent years developing such material in the form of carefully selected West Headnotes linked to relevant case passages and arranged within a wide variety of topics—so ROSS took a shortcut and illicitly copied that to avoid doing its own work.  *Supra* 7–10.  Part of what makes the Westlaw Content original is precisely this selection and arrangement of what Plaintiffs' attorney-editors decided were key legal concepts matched to legal passages, and, as in *Warhol II* where the purposes were the same, ROSS exploited that for the same purpose as Plaintiffs.  That is not transformative.

This Court initially found that there was a dispute as to how ROSS's AI worked—whether it merely converted the Bulk Memos into numerical data similar to translation,[10] or whether it used the Westlaw Content to "analyze language patterns."  Op. 19. ████████████████████

████████████████████████████████████████████████

██████████████████████████  ████████████████████████

██████████████  ██████████████████████████████████

████████████████████████████████████████████████

██████████████  ROSS was thus not just concerned with learning language generally, it was concerned with legal analysis—the **connection** between the language of the West Headnote (question) and relevant case passage (answer), which is precisely what is created and selected by Plaintiffs' attorney editors. ████████████████████████████████

████████████████████████████████████████████████  ROSS

paid ████████████████  third-party LegalEase for not just any questions and answers but legal questions paired with selected case passages.  Exs. 16 (van der Heijden 30(b)(6) Tr.) 322:11–16, 284:6–285:5; 27 (Krein Rpl. Rpt.) ¶¶ 24–30.  Regardless, focusing on technical details in the training process ignores the fundamentals: ROSS used the Westlaw Content for **exactly** the same purpose as Plaintiffs, which weighs this factor against fair use.

### C.    Factor Two – It Is Undisputed That the Westlaw Content Is Creative

This factor focuses on the nature of the copyrighted work.  17 U.S.C. § 107(2).  In assessing this factor, courts consider "whether the work [was] creative, imaginative, and original."  Op. 20

---

[10] Repackaging, reformatting, and translating is not transformative.  *See*, *e.g.*, *Soc'y of Holy Transfig.,* 689 F.3d at 29; 17 U.S.C. § 106(2) (translations are derivative works).

(*citing Hustler Mag. Inc. v. Moral Majority Inc.,* 796 F.2d 1148, 1153–54 (9th Cir. 1986)).  On this factor, this Court recognized Plaintiffs' editors make some creative choices in creating the Westlaw Content, but it found there were factual issues on the level of creativity, noting that the Westlaw Content was more informational than other types of works.  Op. 21.  Factor two, however, may weigh against fair use ***even*** for factual or informational works, where such works are creative.  *See TD Bank, N.A. v. Hill*, No. 12 Civ. 7188, 2015 WL 4523570, at *18 (D.N.J. July 27, 2014) (second factor cut for plaintiff even where work was factual in nature); *FMC Corp. v. Control Sols., Inc.*, 369 F. Supp. 2d 539, 579 (E.D. Pa. 2005) ("[C]ourts do not hesitate to deny the fair use defense even when the work is 'nonfiction.'") (internal quotations and citations omitted); *Fox News*, 883 F.3d at 178 (rejecting argument that because facts are not copyrightable, the factual nature of creative compilations weighed against a finding of fair use); *Love v. Kwitny*, 706 F. Supp. 1123, 1134 (S.D.N.Y. 1989) (finding fair use defense inappropriate in a fact-based work where author extensively quoted the copyrighted work).  For example, in *Hachette*, the Second Circuit found that even ***nonfiction*** works "contain original expression 'close[] to the core of intended copyright,'" noting that while the Copyright Act does not protect facts it "*does* protect that author's manner of expressing those facts and ideas," and that it would be an "oversimplification" to find nonfiction nature of the works weighed against fair use.  2024 WL 4031751, at *13 (emphasis in the original) (internal quotations omitted).  Moreover, while not analyzed by the Court previously, courts consider whether plaintiff made a "substantial investment of time and labor" in creating the work "in anticipation of a financial return."  *Wall Data,* 447 F.3d at 780.

Westlaw is not just a collection of factual content—the Westlaw Content is legal analysis that involved immense creativity and effort.  For West Headnotes, Plaintiffs' attorney editors decide which cases to annotate, how many headnotes to create from which concepts in the case,

which case passages to link, and how to word the headnotes.  *Supra* 3; Oliver Decl. ¶ 6; 2d Oliver Decl. ¶ 4–5; Ex. 7 (Leiter Tr.) 70:12-20.  As ROSS's own library expert admitted, an attorney editor might add or subtract language to clarify a particular issue, or change the language to clarify a point of law.



The attorney editor might also choose to skip or combine different points from throughout a passage to achieve a coherent headnote.

Take, for example, the following West Headnote from *Seymour v. Richardson*, 194 Va. 709 (1953), which was copied into the Bulk Memos and which reads:

> A 'cause of action' accrues to a person when that person first comes to a right to bring action and consists of act or omission constituting violation of duty but differs from a "right of action" which is the right to bring suit.

Ex. 95 (*Seymour,* 194 Va. at 713).  Plaintiffs chose to annotate this case; they also decided which West Headnotes to write out of many possible options, how to write the above headnote to synthesize a long, dense paragraph of legal text and then what key concepts from the paragraph to include in the West Headnote, combining multiple legal concepts across the paragraph to form a coherent whole.  *Id.*  Compare the above headnote to the dense legal opinion below:

> The *Anderson* case, however, was dealing with the effect of the statutes of limitation on the right of action. It is frequently the case that more or less confusion arises from a failure to distinguish between the cause and the right of action. 'A cause of action is said to accrue to any person when that person first comes to a right to bring an action. There is, however, an obvious distinction between a cause of action and a right, though a cause of action generally confers a right. * * *' 'Lewis' Adm'r v. Glenn, Trustee, 84 Va. 947, 979 (1888). Mercer v. Richmond, **80 152 Va. 736, 744 (1929). In the latter case the question was whether the sixty-

> day notice of injury required by city ordinance to be given before a suit could be maintained related to the date of the injury or to the qualification of the personal representative of the injured person whose death resulted from the injury. The court said that it agreed with the principle stated in the *Anderson* case, and other cases cited, that the *right of action* which accrued to the administrator upon the death of his intestate was entirely different from the right of action which accrued to the injured party, but that the right of action referred to in those cases 'is entirely different from the cause of action.'

Ex. 95 (Seymour, 194 Va. at 713).  While this Court initially believed this factor required the jury to decide similarity between the West Headnotes and judicial opinions, Op. 21, it has since recognized that West Headnotes with language from judicial opinions still require creativity.  As this Court described during the hearing on August 22, 2024, the process of creating West Headnotes is like the sculptor chipping away at a piece of stone—even where quoting language from the underlying case, the attorney-editor cuts away extraneous or unnecessary information, concepts, and phrases, resulting in the final West Headnote.  Because this is a creative process, minds can differ as to what to include in a headnote; ██████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████.

Plaintiffs' attorney-editors also needed to decide how to organize the cases and West Headnotes within the West Key Number System, which also involved creative decisions.  2d Oliver Decl. ¶¶ 9–10; ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████  Moreover, the WKNS itself is creative.  ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  The WKNS, which is comprised of

hundreds of topics and nested subtopics, is not the only choice available for organizing the law.

*Id.* at 254:18–24.  Indeed, Lexis organizes the law differently from Westlaw.  *Id.* at 38:8–12.

Additionally, Plaintiffs have invested significant time and resources in developing the

Westlaw Content, which both the Ninth Circuit and the Second Circuit have recognized are part

of factor two.  *Wall Data*, 447 F.3d at 780 (finding fair use and *citing MCA, Inc. v. Wilson*, 677

F.2d 180, 182 (2d Cir. 1981)).  Plaintiffs paid and trained a large team of attorney-editors to create

the Westlaw Content.  Oliver Decl. ¶¶ 9–12.  Indeed, Ms. Oliver testified that Plaintiffs have a

team of around ████ attorney-editors on its editorial team and ████ additional attorney-editors who

classify headnotes.  Ex. 12 (Oliver Tr.) 34:25–4.  There is a comprehensive training process for

these attorneys to teach them how to create the Westlaw Content.  ████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████  Thus, although, as this Court recognized, this factor "has rarely played a significant

role in the determination of a fair use dispute," *Fox News*, 883 F.3d at 178; Op. 21, it nonetheless

weighs against fair use here.  *See Harper*, 471 U.S. at 556–57 (finding second factor weighed

against fair use where work was creative); *Weissmann*, 868 F.2d at 1325 (holding that scientific

nature of original work did not weigh this factor in favor of fair use).

**D.**     <u>**Factor Three**</u> **– It Is Undisputed That ROSS Took the Heart of Westlaw**

The third statutory fair use factor considers "the amount and substantiality of the portion

used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  This inquiry "must

focus upon whether '[t]he extent of [the] copying' is consistent with or more than necessary to

further 'the purpose and character of the use.'" *Castle Rock*, 150 F.3d at 144.  For example, in *Castle Rock*, the secondary use involved the creation of 643 trivia questions based on different episodes of the television program *Seinfeld*—although the entirety of the television series was not copied, the Second Circuit found that the third factor weighed against fair use because the defendant used more than necessary to serve its claimed transformative purpose of "commentary," indicating its true purpose was not in fact transformative.  *Id.*  Factor three also requires a qualitative analysis of the content copied, considering whether the copier took "the heart" of the work.  *Harper*, 471 U.S. at 544; Op. 22 (*citing Campbell*, 510 U.S. at 589).  "[E]ven a small amount to copying may fall outside the scope of fair use where the excerpt copied consists of the heart of the original works creative expression."  Op. 22 (*quoting Google LLC v. Oracle, Inc.*, 141 S.Ct. 1183, 1205 (2021)).

Several subfactors weigh factor three against fair use.  **First**, the Court previously held that a key question on this factor is whether the copying was "tethered to a valid, and transformative, purpose."  Op. 22 (*quoting Google*, 141 S. Ct. at 1205); *see also Warner Bros.*, 575 F. Supp. 2d at 548.  Here, it was not.  As described above, ROSS's purpose was not transformative under *Warhol II* because it copied for the same purpose as Plaintiffs.  *Supra* 27–28.  Moreover, this Court held that ROSS "must show that the scale of the copying" was "practically necessary."  Op. 23.  ROSS cannot show this. ███████████████████  ROSS did not need to copy the Westlaw Content to achieve its purpose: ███████████████  ROSS could have used the Casemaker judicial opinions to make its own ████████████████████████

███████████████████████  ███████████████████████

██████████████████████████████████

██████████████████████████████████

37

█████████████████████  Thus, unlike in cases like *Google*, for example, where using the specific code at issue was necessary and tethered to its compatibility purpose of "permit[tig] programmers to make use of their knowledge and experience using the Sun Java API," 141 S.Ct. at 1205, the copying here is not tied to a valid transformative purpose.

**Second**, this Court previously held that because "what output" ROSS's AI produces is disputed, this factor must go to the jury, Op. 23, but unlike a generative AI case where there is an "output" generated by the algorithm that is often at issue, this case does not involve generative AI or allegations of copying in some generated output.  Rather, the infringing copies were created for and during the *training* of ROSS's search algorithm to enable it to do exactly what Westlaw does; the amount of content used is indisputably large.  *Supra* 11.  At ROSS's direction, LegalEase copied ████████████████ editorially enhanced cases into the Bulk Memos, and ROSS directly copied ████████ of West Headnotes and other Westlaw Content in the Bulk Memos during the training process.  *Supra* 11.  This Court did not address LegalEase's copying in its Opinion, but that copying was ██ extensive ████████████████████████████████ ████████████████████████████████  ████████████████████ ████████████████████████████████████████████████████ ████████████████████████  All this copying resulted in a large dataset ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

   ***Third***, ROSS took the "heart" of Westlaw—Plaintiffs' editorial enhancements embodied in their unique synthetization and organization of the law in the WKNS and the West Headnotes—which further weighs this factor against fair use.  *See Soc'y of Holy Transfig.*, 689 F.3d at 63 (copying of part of greater works, but "which alone may be qualitatively significant" was not fair use).  For example, in *Associated Press v. Meltwater*, while the defendant only copied a small percentage of the articles at issue, it copied the introductory sentence thereof, which takes "significant journalistic skill to craft" and represented the heart of the work.  931 F. Supp. 2d 537, 558 (S.D.N.Y. 2013) ("relatively small takings may be significant if the portions taken are qualitatively important").  As in *Meltwater*, the Westlaw Content—*headnotes*, *key numbers*, and *synopses*—are the part of Westlaw that take significant editorial skill to craft.  And the Westlaw Content is critically important for two reasons: (1) it powers Plaintiffs' AI search algorithms, *supra* 16, and (2) it differentiates Westlaw from competitors and helps researchers find legal content more quickly, efficiently, and effectively.  *See* Ex. 97 (https://www.youtube.com/watch?v=NiOXTn4iDT4) ("The value that headnotes create for our customers is that it allows them to research cases more quickly and efficiently."); 96 (https://legal.thomsonreuters.com/en/products/westlaw/editorial-enhancements).  Accordingly, Plaintiffs tout the Westlaw Content in marketing materials.  Ex. 98 ("[W]e have humans looking at every single one of these headnotes and deciding where the best place to put it into the key number system[.] [O]ne of the great things about having a group of humans doing the classification

---

[11] The precise number of West Headnotes copied is not material to deciding fair use, as ROSS copied the heart of what makes Westlaw special—the editorial content—without a valid transformative purpose.

work in the key number system is that they are constantly looking at the outlines and they are seeing where things are changing in the law[,] where the outline doesn't quite work as well any longer and [we] change them."). The heart of the work is **both** the text of the West Headnote **and** its connection to the underlying judicial opinion—ROSS copied **both** without permission or renumeration to create a product it expressly marketed as a Westlaw replacement. Taken together, this factor weighs against fair use.

## CONCLUSION

Although this case involves AI, the nature of ROSS's infringement is nothing new. ROSS copied the Westlaw Content to "avoid the drudgery in working up something fresh," *Campbell*, 510 U.S. 580, exploiting the creativity of a competitor to bring to market a competing substitute. Copying a competitor's original content to develop a competing commercial product, in the name of AI or otherwise, is not fair use. As ROSS's copying was not fair use as a matter of law, this Court should grant Plaintiffs summary judgment on ROSS's defense.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and Counterdefendants*
*Thomson Reuters Enterprise Center GmbH and*
*West Publishing Corporation*

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
Jeremy King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Yungmoon Chang
Allyn Belusko
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(213) 680-8400

October 1, 2024

41

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 1, 2024, upon the following in the manner indicated:

| | |
|---|---|
| David E. Moore, Esquire<br>Bindu Palapura, Esquire<br>Andrew L. Brown, Esquire<br>POTTER ANDERSON & CORROON LLP<br>Hercules Plaza, 6th Floor<br>1313 North Market Street<br>Wilmington, DE  19801<br>*Attorneys for Defendant and Counterclaimant* | *VIA ELECTRONIC MAIL* |
| Mark A. Klapow, Esquire<br>Lisa Kimmel, Esquire<br>Crinesha B. Berry, Esquire<br>Matthew J. McBurney, Esquire<br>Keith J. Harrison, Esquire<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue NW<br>Washington, DC  20004<br>*Attorneys for Defendant and Counterclaimant* | *VIA ELECTRONIC MAIL* |
| Jacob Canter, Esquire<br>Warrington Parker, Esquire<br>Anna Z. Saber, Esquire<br>Beatrice B. Nguyen, Esquire<br>CROWELL & MORING LLP<br>3 Embarcadero Center, 26th Floor<br>San Francisco, CA  94111<br>*Attorneys for Defendant and Counterclaimant* | *VIA ELECTRONIC MAIL* |

Emily T. Kuwahara, Esquire                         *VIA ELECTRONIC MAIL*
Jordan Ludwig, Esquire
CROWELL & MORING LLP
515 South Flower Street, 41st Floor
Los Angeles, CA 90071
*Attorneys for Defendant and Counterclaimant*

Ryan Henry Seewald, Esquire                        *VIA ELECTRONIC MAIL*
CROWELL & MORING LLP
1601 Wewatta Street, Suite 815
Denver, CO 80202
*Attorneys for Defendant and Counterclaimant*


                                    */s/ Michael J. Flynn*
                                    _____
                                    Michael J. Flynn (#5333)