# EXHIBITS 1-18

## Redacted in their Entirety

# EXHIBIT 19

THOMSON REUTERS
WESTLAW EDGE ○

23575-003    History    Folders    My links    Notifications                    Sign out

All content    In New York, what is secondary liability with respect to    All Federal                    Search Tips
                                                                                                            Advanced



### Cases (76)

WestSearch includes documents with concepts related to your terms for more thorough research.
To modify these results to just documents that include your precise terms, **click here** .

1 - 20                    Relevance

☐ Select all items    No items selected                                        Related documents

☐    1.    **Arista Records LLC v. Lime Group LLC**
           United States District Court, S.D. New York.   •   May 02, 2011   •   784 F.Supp.2d 398
           2011 WL 1742029

           E-COMMERCE - Intellectual Property. Business distributing file-sharing software
           induced **copyright** infringement of sound recordings.
           **Show synopsis**

           ☐    1 - 3 of 390 snippets   ☐

           ...Holdings:  The District Court, Kimba M. Wood, J., held that: (1)   record
           companies' collaboration with statistical expert did not render inadmissible
           expert's opinions regarding what percentage of shared files were not authorized
           for free distribution; (2)   under **New York** law, entire declaration of businesses's
           employee to record companies' counsel would not be stricken as arising out of
           improper ex parte communication; (3)   e-mail chains and Internet forum
           postings written in whole or part by business's employees were admissions by
           opponent constituting admissible non-hearsay; (4)   business induced
           **copyright**...

           ...Plaintiffs raise the following claims against LW, Lime Group, and Gorton:  (1)
           inducement of **copyright infringement**; (2) contributory **copyright**
           **infringement**; (3) vicarious **copyright infringement**;  and (4) state common law
           **copyright infringement**...

           ...General principles that persons and corporations who participate in, exercise
           control over, or benefit from **copyright infringement** are jointly and severally
           **liable** as **copyright infringers** and that individuals with ability to supervise
           **infringing** activity or who personally participate in the activity are personally
           **liable** for **infringement**...

☐    2.    **Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.**
           Supreme Court of the United States   •   June 27, 2005   •   545 U.S. 913   •   125 S.Ct. 2764

           COPYRIGHTS - Software. Distributors of peer-to-peer file sharing software may be
           **liable** for users' **copyright infringement**
           **Show synopsis**

           ☐    1 - 3 of 282 snippets   ☐

           ...Although **secondary liability** for **copyright infringement** may not be imposed
           by presuming or imputing intent to cause **infringement** solely from the design or



COX
EXHIBIT 1

#### Content types sidebar

| Content types | Filters | ○ |
| --- | --- | --- |

Set default

| | |
| --- | --- |
| Overview | 15 |
| **Cases** | **76** |
| Trial Court Orders | 20 |
| Statutes & Court Rules | 38 |
| Secondary Sources | 96 |
| Practical Law | 896 |
| Regulations | 38 |
| Public Records | |
| Administrative Decisions & Guidance | 10,000 |
| Arbitration Materials | 9,812 |
| Briefs | 86 |
| Expert Materials | 3,076 |
| Forms | 0 |
| Jury Verdicts & Settlements | 1,346 |
| Key Numbers | 10 |
| Proposed & Adopted Regulations | 1,148 |
| Proposed & Enacted Legislation | 672 |
| Trial Court Documents | 95 |
| All results | 27,399 |

distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for **infringement**, this bar does not mean that a producer can never be held contributorily **liable**...

...Inducement **liability** for **copyright infringement** goes beyond encouraging a particular consumer to **infringe** a **copyright**, and the distribution of a product can itself give rise to **liability** where evidence shows that the distributor intended and encouraged the product to be used to **infringe**; in such a case, the culpable act is not merely the encouragement of **infringement**...

...Mere knowledge of **infringing** potential or of actual **infringing** uses would not be enough to subject to **copyright infringement liability** a distributor of a product capable of **infringing** uses, nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support **liability** in themselves; instead, **liability**...

---

☐  3.  **A&M Records, Inc. v. Napster, Inc.**
United States Court of Appeals, Ninth Circuit.  •  February 12, 2001  •  239 F.3d 1004  •  2001 WL 115033

INTELLECTUAL PROPERTY - Computers and Online Services. Transmission of digital audio files over Internet was not fair use of **copyrighted** musical works.

**Show synopsis**

1 - 3 of 246 snippets

...  Accordingly, we next address whether Napster is **secondarily liable** for the direct **infringement** under two doctrines of **copyright** law:  contributory **copyright infringement** and vicarious **copyright infringement**....

...Traditionally, one who, with knowledge of the **infringing** activity, induces, causes, or materially contributes to the **infringing** conduct of another, may be held **liable** as a contributory **copyright infringer**; **liability** exists if the defendant engages in personal conduct that encourages or assists the **infringement**....

...  See S. Rep. 105–190, at 40 (1998) ( "The limitations in subsections (a) through (d) protect qualifying service providers from **liability** for all monetary relief for direct, vicarious, and contributory **infringement**."), reprinted in Melville B. Nimmer & David Nimmer, Nimmer on **Copyright**:  Congressional Committee Reports on the Digital Millennium **Copyright** Act and Concurrent Amendments (2000);  see also Charles S. Wright, Actual Versus Legal Control:  Reading Vicarious **Liability**...

---

☐  4.  **Arista Records LLC v. Usenet.com, Inc.**
United States District Court, S.D. New York.  •  June 30, 2009  •  633 F.Supp.2d 124  •  2009 WL 1873589

E-COMMERCE - Computers and Online Services. Operators of file distribution service engaged in conduct which allowed direct **infringement** of music **copyrights**.

**Show synopsis**

1 - 3 of 267 snippets

...Background:  Recording companies brought action against operators of file distribution service that made music available for download, alleging direct **infringement** of exclusive right of distribution, inducement of **copyright**

infringement, contributory **copyright** infringement, and vicarious **copyright** infringement...

...Holdings:  The District Court, Harold Baer, Jr., J., held that: (1)  imposition of sanction precluding operators from asserting affirmative defense of protection under Digital Millennium **Copyright** Act's (DMCA) safe harbor provision was warranted for discovery abuse; (2)  operators actively engaged in conduct which allowed direct **infringement** of recording companies' **copyrights**; (3)  operators intended to induce or foster **copyright infringement** by its users on its services, as required for inducement of **infringement**...

...  Specifically, Plaintiffs brought this action alleging (1) direct **infringement** of the Plaintiffs' exclusive right of distribution under 17 U.S.C. §  106(3); 2  (2) inducement of **copyright infringement**; (3) contributory **copyright** infringement;  and (4) vicarious **copyright infringement**...

☐  5.  **Perfect 10, Inc. v. Amazon.com, Inc.**
United States Court of Appeals, Ninth Circuit.  •  December 03, 2007  •  508 F.3d 1146  • 2007 WL 4225819

E-COMMERCE - Computers and Online Services. Search engine's display of thumbnail images of **copyrighted** photographs on third-party websites was fair use.

Show synopsis

┌─────────────────────────────────────────────────┐
│ ☐    1 - 3 of 322 snippets    ☐ │
└─────────────────────────────────────────────────┘

...Although the lines between direct **copyright infringement**, contributory **infringement**, and vicarious **liability** are not clearly drawn, in general, contributory **liability** is based on the defendant's failure to stop its own actions which facilitate third-party **infringement**, while vicarious **liability** is based on the defendant's failure to cause a third party to stop its directly **infringing**...

...Within the general rule that one **infringes** a **copyright** contributorily by intentionally inducing or encouraging direct **infringement**, there are two categories of contributory **liability**:  **liability** may be predicated on actively encouraging or inducing **infringement** through specific acts or on distributing a product distributees use to **infringe copyrights**...

...Operator of Internet search engine that indexed and organized third-party webpages substantially assisted third-party websites in distributing their **infringing** copies of **copyrighted** photographs to a worldwide market and assisted worldwide audience of users to access **infringing** materials, for purpose of **copyright** owner's contributory **infringement** claim, even if operator did not undertake any substantial promotional or advertising efforts to encourage visits to **infringing**...

☐  6.  **Wolk v. Kodak Imaging Network, Inc.**
United States District Court, S.D. New York.  •  January 03, 2012  •  840 F.Supp.2d 724  •  2012 WL 11270

COPYRIGHTS - Internet. Internet service provider was shielded from **liability** under Digital Millennium **Copyright** Act (DMCA) safe harbor provision.

Show synopsis

┌─────────────────────────────────────────────────┐
│ ☐    1 - 3 of 236 snippets    ☐ │
└─────────────────────────────────────────────────┘

...To **establish** a claim of **copyright infringement** violative of **Copyright** Act, a plaintiff must **establish**: (1) ownership of a valid **copyright**, and (2) unauthorized copying or a violation of one of the other exclusive rights afforded **copyright** owners pursuant to the **Copyright** Act.   17 U.S.C.A. § 101 et seq....

... While "[t]he **Copyright** Act does not expressly render anyone **liable** for **infringement** committed by another," it "does not preclude the imposition of **liability** for **copyright infringements** on certain parties who have not themselves engaged in the **infringing** activity."  ...

...There are five counts in the Complaint applicable to Photobucket:  Count I requesting a declaratory judgment that Photobucket has **infringed** on Wolk's **copyrights**, Count II requesting a permanent injunction preventing Photobucket from continuing to **infringe**, Count III alleging contributory **copyright infringement**, Count IV alleging vicarious **copyright infringement**...

☐  7.  **VHT, Inc. v. Zillow Group, Inc.**
United States Court of Appeals, Ninth Circuit.  •  March 15, 2019  •  918 F.3d 723  •  2019 WL 1216206

**COPYRIGHTS** — Online Services. Owner of real estate marketplace website did not directly **infringe copyrighted** photos that were displayed after property had sold.

**Show synopsis**

☐  1 - 3 of 272 snippets  ☐

...Holdings:  The Court of Appeals, McKeown, Circuit Judge, held that: (1) owner did not directly **infringe** photos that were displayed on its real property listing platform; (2)   owner did not directly **infringe** photos that were not displayed on its home design webpages; (3)   owner did not directly **infringe** non-searchable photos that were displayed on its home design webpages; (4) searchable functionality that was added to **copyrighted** photos displayed on home design webpages did not constitute fair use; (5)   owner was not **liable**...

...Owner of real estate marketplace website was not **liable** for **secondary copyright infringement** based on induced **infringement** with **respect** to photos displayed on its home design webpages, since website's generally applicable tools and messages for users to save more photos from its listing platform to home design webpages did not promote use of home design webpages specifically to **infringe**...

...Owner of real estate marketplace website was not **liable** for **secondary copyright infringement** based on vicarious **liability** theory with **respect** to photos displayed on its home design webpages, since owner did not have technical ability to screen out or identify allegedly **infringing** photos among many photos that users saved or uploaded daily to home design webpages....

☐  8.  **Capitol Records, LLC v. ReDigi Inc.**
United States District Court, S.D. New York.  •  March 30, 2013  •  934 F.Supp.2d 640  •  2013 WL 1286134

**COPYRIGHTS** - Music. First sale doctrine did not protect website operator's distribution of record company's **copyrighted** works.

**Show synopsis**

☐  1 - 3 of 212 snippets  ☐

...In its Complaint, Capitol alleges multiple violations of the **Copyright** Act, 17 U.S.C. § 101, et seq., including direct **copyright infringement**, inducement of **copyright infringement**, contributory and vicarious **copyright infringement**, and common law **copyright**...

...Holdings: The District Court, Richard J. Sullivan, J., held that: (1) operator's unauthorized transfer of digital music files over internet was reproduction within meaning of **Copyright** Act; (2) operator's use of company's **copyrighted** music was fell outside fair use defense to **infringement**; (3) first sale doctrine did not protect operator's distribution of company's **copyrighted** works; (4) operator directly **infringed** company's distribution and reproduction rights;...

...To be **liable** for direct **copyright infringement**, a defendant must have engaged in some volitional conduct sufficient to show that it actively violated one of the plaintiff's exclusive rights; in other words, to **establish** direct **liability** under the **Copyright** Act, something more must be shown than mere ownership of a machine used by others to make illegal copies, and there must be actual **infringing**...

☐    9.    **Capitol Records, Inc. v. MP3tunes, LLC**
United States District Court, S.D. New York.  •  October 25, 2011  •  821 F.Supp.2d 627  •  2011 WL 5104616

**COPYRIGHTS** - Music. Online music service provider satisfied threshold requirements to qualify for safe harbor under DMCA.
**Show synopsis**

1 - 3 of 282 snippets

...A party is contributorily **liable** for **copyright infringement** only if it (1) knew or had reason to know of the **infringement** and (2) materially contributed to the **infringement**....

...Digital Millennium **Copyright** Act (DMCA) seeks to balance the interests of **copyright** owners and online service providers by promoting cooperation, minimizing **copyright infringement**, and providing a higher degree of certainty to service providers on the question of **copyright infringement**.    17 U.S.C.A. § 512....

...To **establish** direct **copyright infringement**, a plaintiff must prove (1) ownership of a valid **copyright** and (2) unauthorized copying by a third party; additionally, a plaintiff must demonstrate compliance with provision of **Copyright** Act requiring preregistration or registration for United States **copyrights** as a prerequisite for suit.    17 U.S.C.A. § 411(a)....

☐    10.    **Capitol Records, LLC v. Escape Media Group, Inc.**
United States District Court, S.D. New York.  •  March 25, 2015  •  Not Reported in F.Supp.3d  •  2015 WL 1402049

Before the Court is the report and recommendation ("Report" or "R & R") of Magistrate Judge Sarah Netburn dated May 28, 2014, Dkt. No. 90, regarding Plaintiff EMI Music North America ("EMI")'s motion for summary judgment. EMI moved for summary judgment as to its First and Sixth Claims for federal and common law **copyright infringement**. By...

1 - 3 of 425 snippets

…" **Secondary liability** for **copyright infringement** may be imposed on a party that has not directly **infringed** a **copyright**, but has played a significant role in direct **infringement** committed by others, for example by providing direct **infringers** with a product that enables **infringement**…

…Specifically, the Court recommends finding that Escape, as a matter of law, is not entitled to an affirmative defense under the Digital Millennium **Copyright** Act, and that summary judgment should be granted in favor of EMI on its claims for direct **infringement** of the right of performance under federal law, **secondary infringement** under federal law for both contributory and vicarious **infringement**, and direct and **secondary infringement**…

…While the elements of contributory and vicarious **copyright infringement** under **New York** common law are not explicitly delineated, the case law indicates that theories of **secondary liability** generally mirror federal law….

☐   11.   **UMG Recordings, Inc. v. Shelter Capital Partners LLC**
United States Court of Appeals, Ninth Circuit.  •  March 14, 2013  •  718 F.3d 1006  •  2013 WL 1092793

**COPYRIGHTS** - Music. Operator of a video-sharing website was entitled to safe harbor protection under the Digital Millennium **Copyright** Act.
Show synopsis

☐ 1 - 3 of 240 snippets ☐

…Operator of publicly accessible website that enabled users to share videos with other users did not have necessary right and ability to control **infringing** activity, and thus remained eligible for safe harbor protection from **copyright infringement** claims under Digital Millennium **Copyright** Act; although parties agreed that at times there was **infringing** material available on website, website operator promptly removed **infringing** material when it became aware of specific instances of **infringement**…

…13   Congress made a considered policy determination that the "DMCA notification procedures [would] place the burden of policing **copyright infringement** —identifying the potentially **infringing** material and adequately documenting **infringement** —squarely on the owners of the **copyright**." …

…General knowledge of operator of publicly accessible website that enabled users to share videos with other users, that it hosted **copyrightable** material and that its services could be used for **infringement**, was insufficient to constitute a red flag providing actual notice of **infringing** activity, as required for website operator's safe harbor protection under Digital Millennium **Copyright** Act from recording company's **copyright infringement**…

☐   12.   **Krisko v. Marvel Entertainment, LLC**
United States District Court, S.D. New York.  •  July 21, 2020  •  473 F.Supp.3d 288  •  2020 WL 4194940
Show synopsis

> ## Did complaint sufficiently allege that there was any injury in the forum to support specific personal jurisdiction? **No**
>
> **Legal issue:** Personal Jurisdiction > Relates to or A…   [More cases on this issue](#)

**Material Facts**                                                    Headnote 15

- Television theme was distributed all over world, including New York

- Copyright owner lived in Florida and did not allege non-speculative and direct New York-based injury to his intellectual property rights other than pure economic losses

**Causes of Action**
Copyright Infringement

**Motion Type**
Motion to Transfer or Change Venue > **Denied**  •  Motion to Dismiss for Lack of Personal Jurisdiction > **Granted**  •  Motion to Dismiss for Failure to State a Claim > …

---

1 - 3 of 156 snippets

…Holdings:  The District Court, Gregory H. Woods, J., held that: (1)   theme composer did not "transact business" in **New York** within meaning of **New York** long-arm statute; (2)   composer was never physically present in **New York**, and companies which distributed his theme through the airing of the show in **New**...

…**Copyright** owner, who alleged that composer of television show's theme music plagiarized his **copyright**, failed to allege that any **infringement** caused injury to person or property within **New York**, for purposes of **New York** long-arm statute; although television theme was distributed all over world, including **New**...

…Composer of television show's musical theme was never physically present in **New York**, and **New York** media companies which distributed his theme through the airing of the show in **New York** did not act as composer's agent, for purposes of **New York** long-arm statute, where composer's work was sold by his employer to **New**...

---

13.   **Sony Corp. of America v. Universal City Studios, Inc.**
Supreme Court of the United States   •   January 17, 1984   •   464 U.S. 417   •   104 S.Ct. 774

Owners of **copyrights** on television programs brought **copyright infringement** action against manufacturers of home videotape recorders.   The United States District Court for the Central District of California, 480 F.Supp. 429, denied all relief sought by **copyright** owners and entered judgment for manufacturers, and owners appealed.   The...

Show synopsis

---

1 - 3 of 493 snippets

…Anyone who trespasses into **copyright** owner's exclusive domain by using or authorizing use of the **copyrighted** work in one of the five ways set forth in the statute is an **infringer** of the **copyright**;  conversely, anyone who is authorized by **copyright** owner to use the **copyrighted** work in a way specified in the statute or who makes a fair use of the work is not an **infringer**...

…Decision in Kalem Co. v. Harper Brothers, which held that producer of an unauthorized film dramatization of a **copyrighted** book was **liable** for his sale of the motion picture to jobbers who in turn arranged for the commercial exhibition of the film did not **establish** a basis upon which to hold manufacturers of home videotape recorders **liable** to owners of **copyrights** on television programs for **copyright infringement**...

…Respondents argue that Kalem stands for the proposition that supplying the "means" to accomplish an **infringing** activity and encouraging that activity

through advertisement are sufficient to **establish liability** for copyright **infringement**....

Missing: ~~secondary liability~~ | Must include: secondary liability

☐    14.    **Gershwin Pub. Corp. v. Columbia Artists Management, Inc.**

United States Court of Appeals, Second Circuit.   •   May 24, 1971   •   443 F.2d 1159   •   14 A.L.R. Fed. 819

Appeal from an order of the United States District Court for the Southern District of **New** York, Gus J. Solomon, J., 312 F.Supp. 581, granting summary judgment for the plaintiff and enjoining defendant from any future **infringement** of plaintiff's **copyright** in the musical composition 'Bess, You Is My Woman Now.' The Court of Appeals,...

Show synopsis

┌─────────────────────────────────────────────────────────────────┐
│  ☐  1 - 3 of 45 snippets  ☐                                       │
│                                                                   │
│  ...One who, with knowledge of **copyright infringing** activity, induces, causes or │
│  materially contributes to **infringing** conduct of another may be held **liable** as a │
│  "contributory" **infringer**.   17 U.S.C.A. §§ 1(e), 101....     │
│                                                                   │
│  ...[1][2][3] Section 1(e) of the **Copyright** Act bestows upon the **copyright** │
│  proprietor 'the exclusive right * * * to perform the **copyrighted** work publicly for │
│  profit,' an interest which is protected by § 101 of the Act which holds accountable │
│  'any person (who) shall **infringe** the **copyright**.'...      │
│                                                                   │
│  ...Even in absence of employer-employee relationship one may be vicariously │
│  **liable** for **copyright infringement** if he has right and ability to supervise │
│  **infringing** activity and also has direct financial interest in such activities.   17 │
│  U.S.C.A. §§ 1(e), 101....                                        │
└─────────────────────────────────────────────────────────────────┘

Missing: ~~respect~~ , ~~established~~ and ~~secondary liability~~ | Must include: respect, established, secondary liability, or all search terms

☐    15.    **Arista Records LLC v. Lime Group LLC**

United States District Court, S.D. New York.   •   May 25, 2010   •   715 F.Supp.2d 481   •   2010 WL 2291485

E-COMMERCE - Intellectual Property. Business distributing file-sharing software induced **copyright infringement** of sound recordings.

Show synopsis

┌─────────────────────────────────────────────────────────────────┐
│  ☐  1 - 3 of 293 snippets  ☐                                      │
│                                                                   │
│  ...Holdings:   The District Court, Kimba M. Wood, J., held that: (1)   record │
│  companies' collaboration with statistical expert did not render inadmissible │
│  expert's opinions regarding what percentage of shared files were not authorized │
│  for free distribution; (2)   under **New York** law, entire declaration of businesses's │
│  employee to record companies' counsel would not be stricken as arising out of │
│  improper ex parte communication; (3)   e-mail chains and Internet forum │
│  postings written in whole or part by business's employees were admissions by │
│  opponent constituting admissible non-hearsay; (4)   business induced │
│  **copyright**...                                                 │
│                                                                   │
│  ...Plaintiffs raise the following claims against LW, Lime Group, and Gorton (1) │
│  inducement of **copyright infringement**;  (2) contributory **copyright** │
└─────────────────────────────────────────────────────────────────┘

infringement; (3) vicarious **copyright infringement**; and (4) state common law **copyright infringement**...

...For the reasons stated below, the Court: (1) DENIES Defendants' motions to exclude evidence; 4 (2) GRANTS Plaintiffs' motion for summary judgment on the claim against LW of inducement of **copyright infringement**, and DENIES LW's motion for summary judgment on the claim; (3) DENIES the parties' cross-motions for summary judgment on the claim against LW of contributory **copyright infringement**; (4) DENIES LW's motion for summary judgment on the claim of vicarious **copyright**...

☐   16.   **Warner Records Inc. v. Charter Communications, Inc.**

United States District Court, D. Colorado.   •   April 15, 2020   •   454 F.Supp.3d 1069   •   2020 WL 1872387

**COPYRIGHTS —** Online Services. **Copyright** owners stated claim against ISP for vicarious **liability** for **copyright infringement**.

**Show synopsis**

> 1 - 3 of 192 snippets
>
> ...Financial benefit, as element of claim for vicarious **liability** for **copyright infringement**, may be **established** by showing that users of **copyrighted** materials are attracted to a defendant's product because it enables **infringement**, and that use of the product for **infringement** financially benefits defendant; it exists when the availability of **infringing**...
>
> ...Record companies and music publishers that produced and distributed **copyrighted** commercial sound recordings and musical compositions sufficiently alleged Internet service provider's (ISP) direct financial interest in its customers' **infringing** activities, as required to state claim for vicarious **liability** for **copyright infringement**; allegations included that ISP drew **infringers** to its service by touting specific features of its service that were attractive to **copyright**...
>
> ...Record companies and music publishers that produced and distributed **copyrighted** commercial sound recordings and musical compositions sufficiently alleged Internet service provider (ISP) had both a legal right to stop or limit directly **infringing** conduct, as well as the practical ability to do so, as required to state claim for vicarious **liability** for **copyright infringement**; allegations included that ISP's own terms of service and policies expressly prohibited users from engaging in **copyright**...

☐   17.   **Sony Music Entertainment v. Cox Communications, Inc.**

United States District Court, E.D. Virginia, Alexandria Division.   •   June 02, 2020   •   464 F.Supp.3d 795   •   2020 WL 3121306

**COPYRIGHTS —** Music. Jury's award of statutory damages of $99,830.29 for each work **infringed** was not miscarriage of justice in record companies' **copyright infringement** action against ISP.

**Show synopsis**

> 1 - 3 of 497 snippets
>
> ...Holdings:  The District Court, Liam O'Grady, Senior District Judge, held that: (1) evidence of operators' direct **infringement liability** from distribution under **Copyright** Act presented question for jury; (2)  evidence of operators' direct **infringement liability** from reproduction presented question for jury; (3)

evidence of operators' right and ability to supervise **infringing** activity presented question for jury on claim of vicarious **liability**...

...The number of awards of statutory damages that a plaintiff may recover in any given **copyright infringement** action against a single defendant depends on the number of works that are **infringed**, not the number of **infringements**, and the number of individually **liable infringers** and is unaffected by the number of **infringements** of those works.    17 U.S.C.A. § 504(c)(1)....

...[39] Then, to solidify the idea that the number of **infringers** is also measured by the work **infringed**, Congress specifies that the " **infringer** is **liable** individually, or [ ] any two or more **infringers** are **liable** jointly and severally." § 504(c)(1)....

---

☐    18.    **Ellison v. Robertson**
United States Court of Appeals, Ninth Circuit.    •    February 10, 2004    •    357 F.3d 1072    •    2004 WL 235466

**COPYRIGHTS -** Internet. Fact issue existed as to whether ISP was eligible for **Copyright** Act's safe-harbor provisions.

**Show synopsis**

> 1 - 3 of 128 snippets
>
> ...The court found that:  (1) the evidence failed to **establish** Ellison's claims of direct and vicarious **copyright infringement**; (2) whether AOL was **liable** for contributory **copyright infringement** presented a triable issue of fact; (3) the evidence showed that AOL met the threshold eligibility requirements of 17 U.S.C. §  512(i) for the safe harbor limitations from **liability**...
>
> ...One who, with actual or implied knowledge of **copyright infringing** activity, induces, causes, or materially contributes to **infringing** conduct of another may be **liable** as contributory **infringer**....
>
> ...  A defendant is vicariously **liable** for **copyright infringement** if he enjoys a direct financial benefit from another's **infringing** activity and "has the right and ability to supervise" the **infringing** activity....

Missing: ~~New York,~~ | Must include: New York,

---

☐    19.    **Perfect 10, Inc. v. Visa Intern. Service Ass'n**
United States Court of Appeals, Ninth Circuit.    •    July 03, 2007    •    494 F.3d 788    •    2007 WL 1892885

**COPYRIGHTS -** Internet. Payment processing by credit card companies did not constitute material contribution to **infringement**.

**Show synopsis**

> 1 - 3 of 400 snippets
>
> ...Holdings:  The Court of Appeals, Milan D. Smith, Jr., Circuit Judge, held that: (1)   payment processing by credit card companies did not constitute material contribution to **infringement** by competing Internet websites that stemmed from failure to obtain license to distribute; (2)   payment processing by credit card companies did not induce competing Internet websites to **infringe copyrights**; (3)   credit card companies had not vicariously **infringed copyrights**...

...[12][13]   To be **liable** for contributory trademark **infringement**, a defendant must have (1) "intentionally induced" the primary **infringer** to **infringe**, or (2) continued to supply an **infringing** product to an **infringer** with knowledge that the **infringer** is mislabeling the particular product supplied....

...To be **liable** for contributory trademark **infringement** under Lanham Act, a defendant must have (1) intentionally induced the primary **infringer** to **infringe**, or (2) continued to supply an **infringing** product to an **infringer** with knowledge that the **infringer** is mislabeling the particular product supplied.   Lanham Act, §  32(1)(a), 15 U.S.C.A. §  1114(1)(a)....

Missing: ~~New York,~~ | Must include: New York,

20.   **Levine v. Landy**
United States District Court, N.D. New York.   •   December 30, 2011   •   832 F.Supp.2d 176   •   2011 WL 6845886

**COPYRIGHTS -** Art and Architecture. Allegations by photographer stated contributory **copyright infringement** claim against defendant-publisher.

**Show synopsis**

1 - 3 of 173 snippets

...Holdings:  The District Court, David N. Hurd, J., held that: (1)   allegations stated claim for violation of the **Copyright** Act; (2)   photographer was prohibited from claiming statutory damages and attorney fees in connection with certain **infringement** claims under the **Copyright** Act; (3)   allegations stated contributory **copyright infringement** claim against publisher; (4)   unjust enrichment claim was preempted by **Copyright**...

...Although the **Copyright** Act does not expressly render anyone **liable** for **infringement** committed by another, the doctrines of **secondary liability** emerged from common law principles and are well **established** in **copyright infringement** law.   17 U.S.C.A. §  106....

...Photographer's claim for an accounting against publisher, under **New York** law, was preempted by the **Copyright** Act, with **respect** to photographs that were allegedly **copyrighted** and **infringed** by publisher, as claim was premised primarily on **copyright infringement**.   17 U.S.C.A. §  301(a)...

1 2 3 4

20 per page

## Documents related to your search

Secondary Sources     Briefs     Trial Court Documents

**Liability as "vicarious" or "contributory" infringer under Federal Copyright Act**

American Law Reports ALR Federal

...A person **infringes** on **copyright** contributorily by inducing or encouraging direct **infringement**, and **infringes** vicariously by profiting from direct **infringement** while declining to exercise a right to stop or limit it; without a showing of a direct **copyright infringement**, **secondary liability**...

### 4.11[5][B]Individual Liability for the Conduct of Business Entities (Including the Potential Liability of Investors, Venture Capitalists, Officers, Directors and Owners)

E-Commerce and Internet Law

...54] The court further rejected Robertson's argument that he could not be held **secondarily liable** for MP3Tunes' **secondary liability**, noting other cases where individuals were held **secondarily liable** for their companies' **secondary liability**...

### 4.11[4][C]Right and Ability to Control and the Potential Applicability of the Sony Safe Harbor

E-Commerce and Internet Law

...Similarly, in UMG Recording, Inc. v. Escape Media Group, Inc.,[ 23] Judge Thomas Griesa of the Southern District of **New York** granted summary judgment for the record company plaintiffs in that case, holding that the entity that owned the online music service Grooveshark, whose employees had uploaded over 4,000 **infringing** sound recordings, had the ability to control its employees' **infringing** activity where internal emails **established** that senior executives directed employees to upload music files to "seed" the Grooveshark service and various employees testified that they were directed to and did upload **infringing**...

Contact us   •   Live chat   •   Training and support   •   Improve Westlaw Edge/Report an error   •   Transfer My Data   •   Pricing guide   •   Sign out

1-800-REF-ATTY (1-800-733-2889)



Westlaw Edge. © 2022 Thomson Reuters     Accessibility  •  Privacy  •  Supplier terms          *Thomson Reuters is not providing professional advice*

# EXHIBIT 20



COX
EXHIBIT 2

# EXHIBITS 21-39

## Redacted in their Entirety

# EXHIBIT 40

STATEMENT OF WORK II
FOR ROSS BULK MEMOS

This Statement of Work II incorporates and is made pursuant to the October 15, 2015 Master Services Agreement ("MSA") by and between ROSS Intelligence, Inc. ("ROSS"), a Delaware corporation and LegalEase Solutions, LLC ("Contractor") a Michigan limited liability company.

1. Definitions: Terms and expressions not expressly defined in this Statement of Work, shall have the following meanings:

    1.1. "Case Law" means judicial decisions originating from a judicial or administrative body in the United States of America, or as otherwise prescribed in writing by ROSS and sent to Contractor.
    1.2. "Legal Research Question" means a question grounded in legal principles.
    1.3. "Memorandum or Memo" means a memorandum of law that answers a Legal Research Question.
    1.4. "Quote" means an independent paragraph excerpt from Case Law.
    1.5. "Reference List" means the list of Case Law included in the Memo.
    1.6. "Deficiency" means a reference quote that does not directly answer the ROSS question.

2. Additional Terms and Expressions: Additional capitalized terms and expressions have the meanings ascribed to them in the MSA.

3. Currency: Unless stated otherwise, all dollar figures in this Statement of Work are in United States dollars.

4. Term: Subject to the termination provisions of this Agreement, the term of this Statement of Work shall be for a period of three months commencing on September 19, 2017 and expiring on December 19, 2017 ("Initial Term"). Upon the expiration of the Initial Term, this Statement of Work shall renew with the prior written mutual consent of ROSS for successive three month periods ("Renewal Terms"), unless terminated pursuant to the terms of the Agreement. The terms Initial and Renewal Terms shall be collectively referred to as the "Term".

5. Description of Service:

5.1. Contractor agrees to provide ROSS with bulk Memos. Contractor agrees to meet the expectations for performance as set forth in this Statement of Work. Contractor's attorneys will research topics and Legal Research Questions from any Federal or State jurisdiction in the United States, without regard to any legal decisions, draft Memos, and compile the Memos in the format approved by ROSS.

5.2. Each Memo shall include a Legal Research Question and a Reference list with a target of at least four (4) and no more than six (6) Quotes.

5.3. Two (2) to four (4) Quotes in each Memo shall contain either a "great" or "good" independent answer to the Legal Research Question. A "great" Quote is one that contains an answer to all essential elements of the Legal Research Question while a "good" Quote is one that contains an answer to most essential elements of the Legal Research Question. The Contractor shall strive for four (4) "good" or "great" Quotes per question. However, if

ROSS-000175054

Contractor is only able to find 2 or 3 "good" or "great" Quotes, they shall only provide 2 or 3 "good" or "great" Quotes. Contractor shall strive to have more "great" than "good" Quotes.

5.4. One (1) Quote in each Memo shall contain a "topical" independent response to the Legal Research Question. A "topical" response is a response that answers and/or references limited components of a Legal Research Question but does not answer the essential elements of such Legal Research Question.

5.5. One (1) Quote in each Memo shall contain an "irrelevant" independent response to the Legal Research Question. An "irrelevant" response is a response that contains one or more keywords from the Legal Research Question but does answer and/or reference any elements of the Legal Research Question, either limited or essential.

5.6. Contractor shall label whether a Quote contains a response that is "great", "good", "topical" or "irrelevant" and double bracket and bold the specific component(s) of each such Quote that is "great", "good", "topical" or "irrelevant." Contractor shall also label which legal practice area each Quote falls under.

6.  Changes: ROSS reserves the right to request changes, deletions, or additions as deemed necessary by ROSS and Contractor. ROSS' proposed changes shall become effective only by written agreement of Contractor.

7.  Production/Delivery Schedule: Contractor agrees to draft ROSS questions and Memos pursuant to the Production Run schedule below. In the First Production Run of Memos, Contractor shall commence providing deliverables on October 19, 2017 and conclude on December 19, 2017, as outlined below. For the Subsequent Production Runs of Memos, Contractor shall provide 20,000 Memos in subsequent months to ROSS.

First Production Run

| Delivery Date | Amount of Memos |
|---|---|
| October 19, 2017 | 5,000 |
| November 19, 2017 | 10,000 |
| December 19, 2017 | 10,000 |

Subsequent Production Run

| Delivery Date | Amount of Memos |
|---|---|
| Month 1 | 20,000 |
| Month 2 | 20,000 |
| Month 3 | 20,000 |
| Month 4 | 15,000 |

8.  Fee: ROSS shall pay Contractor pursuant to the schedule below:

| Reference Quotes | Price per Memo |
|---|---|

| | |
|---|---|
| 4 Quotes + 1 topical and 1 irrelevant Quote | $26.17 |
| 3 Quotes + 1 topical and 1 irrelevant Quote | $24.55 |
| 2 Quotes + 1 topical and 1 irrelevant Quote | $21.00 |

Contractor shall provide a 5% volume discount to ROSS for any Memo purchase over 25,000 and a 15% volume discount for a total order of 100,000 Memos.

9. Payment: ROSS shall pay Contractor in advance at the beginning of each month for the following 30 days of expected output at a minimum $21.00 price per Memo (each, an "Advance Payment"). For clarity, the Advance Payment for the (i) first 5,000 Memos of the First Production Run due October 19, 2017 shall be $105,000 and shall be made on September 19, 2017; (ii) subsequent 10,000 Memos of the First Production Run due November 19, 2017 shall be $210,000 and shall be made on October 19, 2017 and (iii) final 10,000 Memos of the First Production Run due December 19, 2017 shall be $210,000 and shall be made on November 20, 2017. For any Subsequent Production Run, the Advance Payment shall be $420,000. If there is a difference between an Advance Payment amount and aggregate Memo cost during a Production Run pursuant to the Section 8 Fee schedule (the "Cost Difference"), Contractor shall provide ROSS a detailed accounting of such Cost Difference in a timely manner and ROSS shall pay such Cost Difference within seven (7) days receipt of such detailed accounting.

10. Delivery: Contractor shall deliver batched Memos via e-mail or FTP to ross@rossintelligence.com and via the ROSS Memo upload portal (the "Portal"). The Portal shall meet necessary specifications of speed and capacity to process daily batched Memo uploads.

11. Quality Assurance: Contractor shall ensure the Memos submitted follow the (i) quality control processes detailed in the LegalEase Solutions Quality Control Guide ("QCG") provided in Schedule A to this Statement of Work and the (ii) Quality Control Checklist provided in Schedule B to this Statement of Work. Contractor shall follow a staged quality control process. There will be 100% quality control for the first 2000 Memos, 75% for the next 10,000 Memos and 25% for the remaining Memos. If any of the Memos submitted do not meet the parameters prescribed in the QCG, ROSS shall inform Contractor of such Deficiencies within 14 days of receipt of the applicable Memos. If no such notice is received within the prescribed 14 days, the applicable Memos shall be deemed fully accepted by ROSS. A 15% penalty shall be charged to any Memo and/or batch of Memos that fail to meet the QCG requirements.

12. Reporting: Contractor shall email daily reports to ROSS which include the production totals, QCG results, and other requested information from ROSS.

13. Destruction of Memos: Contractor acknowledges that the Memos constitute Confidential Information and shall remove and destroy all Memos and copies of Memos in its

ROSS-000175056

possession within sixty (60) days of each Production Run and shall concurrently confirm to ROSS that such removal and destruction has occurred.

14. <u>Existing Agreements</u>: This Statement of Work is anciliary to existing agreements, including, but not limited to the MSA and prior Statements of Work.

Date: September  15 , 2017

ROSS INTELLIGENCE, INC.

By: _____

Name: Andrew Arruda
Title: Chief Executive Officer

LEGALEASE LLC

By: _____

Name: Tariq Hafeez
Title: President

ROSS-000175057

Schedule A

# Quality Control Guide for ROSS Intelligence

Drafting Questions, Preparing Responsive Memorandum, and Quality Control Procedures

LegalEase Solutions LLC

ROSS-000175058



## TABLE OF CONTENTS

Overview ......................................................................................................... 2
    Introduction ............................................................................................. 2
    Audience ................................................................................................... 2
    Objectives ................................................................................................ 2
Legal Disclaimer ............................................................................................. 3
The LegalEase Ross Team and Process ........................................................ 4
    Attorneys ................................................................................................. 4
    Quality Control Attorneys ....................................................................... 4
    Staged Quality Control Process ............................................................. 4
    Production Expeditors ............................................................................. 5
    India and US Project Managers ............................................................. 5
    ROSS Operations .................................................................................... 5
The LegalEase ROSS Process Flowchart ...................................................... 6

ROSS-000175059



## Overview

### Introduction

The LegalEase Solutions Quality Control Guide ("QCG") is the primary quality assurance resource and playbook for our attorneys. This QCG provides all the tools and resources needed for the drafting and delivery of ROSS Intelligence memos.

### Audience

The intended audience for this guide is our attorneys who prepare Ross memos. Additionally, this guide may be utilized by ROSS to review our internal process.

### Objectives

This guide:

- Identifies clear guidelines for attorneys to follow when designing, developing, and researching, drafting, and delivering ROSS memos.
- Describes quality control standards for ROSS memos.
- Describes quality control procedures and processes set in place for ROSS memo production.

ROSS-000175060

**LEGAL**EASE
SOLUTIONS LLC

**Legal Disclaimer**

This Quality Control Guide includes proprietary, confidential, and/or trade secret information. LegalEase considers this information to be a trade secret not subject to disclosure.

ROSS-000175061



**The LegalEase ROSS Team and Process**

We have organized a comprehensive team for this project. Leading the team for ROSS operations are Teri Whitehead, VP of Global Strategy and Gayathri Rajeev, Director of Operations in India. Teri and Gayathri will oversee operations and are available anytime to address and resolve any potential concerns.

**Attorneys.** Our team of attorneys will research topics and questions, draft the memos, and compile the memos in the ROSS approved format. We will ensure that our attorneys follow this QCG for drafting memos and utilize our internal associate work product checklists. The steps include:

    i.    Using our LegalEase's creative process, to produce ROSS questions.
    ii.   Research answers to questions.
    iii.  Draft ROSS memorandum.

**Quality Control Attorneys.** We have allocated a minimum of 5 separate QC attorneys to independently review memos, ensuring that ROSS standards are met. These attorneys have a minimum of 3 years' experience in these positions. The QC team will be expanded as needed per the scope and requirements of this project. The QC team will follow the QC checklist setting out the steps to be followed in completing the process. These steps include:

    i.    Review and confirm the grammar, question format, and citations.
    ii.   Confirm and review short answer and legal analysis.
    iii.  Review reference quotes for relevancy.
    iv.  Confirm case law.
    v.   Advise associates of errors and design action plan to avoid future errors.

**Staged Quality Control Process.** Our QC attorneys will follow LegalEase's staged quality control process. We have used this process with success on other large accounts with over 50,000 documents.

    First Stage:
        100% QC of 2000 Memos. Our QC attorneys will QC 100% of the first 2000 memos.
    Second Stage:
        75% for the next 10,000 memos. Our QC attorneys will QC 75% of the next 10,000 memos.
    Third Stage:
        25% for the remaining memos. Our QC attorneys will QC 25% or more of the remaining memos.

Private and Confidential - Page 4 of 6

ROSS-000175062



**Production Expeditors.** Our dedicated ROSS production expeditors will comply and follow ROSS' process on delivery, including the portal upload, data tracking, and logistics. These steps include:

    i.      Validate question originality.
    ii.     Upload memorandum to ROSS dedicated portal.
    iii.    Update internal LE production tracking sheet.
    iv.    Email production totals of attorneys and QC attorneys to Project Managers.
    v.     Update internal exception error tracking sheet.
    vi.    Update ROSS' completion tracking sheet.

**India and US Project Managers.** We have assigned to ROSS, three project managers. Our project managers will guarantee and ensure ROSS quality and processes. Having project managers in different time zones will provide round the clock attention and access.

The role of the PM's include:

    i.      Review production of attorneys, QC attorneys, production expeditors.
    ii.     Daily review protocol and process for efficiencies following LE model theory of constraints.
    iii.    Address any concerns.
    iv.    Email daily reports to LegalEase Operations detailing production, legal topics addressed, upload process production, improved efficiencies, and QC results.

**Ross Operations.** Teri Whitehead and Gayathri Rajeev will oversee all aspects of this project. Teri and Gayathri's role includes the following:

    i.      Address any concerns.
    ii.     Email daily reports to the ROSS team providing production totals, QC results, and other requested information.
    iii.    Host daily conference status calls with the ROSS Production team.

ROSS-000175063



The LegalEase ROSS Process Flowchart



| Attorneys - Research, Review, Compile |
| --- |
| 50+ attorneys |

| Quality Control Attorneys |
| --- |
| 5 |

| Production Expeditors |
| --- |
| 3 |

| India Project Manager |
| --- |
| Merin Sony |

| US Project Managers |
| --- |
| Chris Schmidt and Moon Thompson |

| ROSS Operations |
| --- |
| Gayathri Rajeev and Teri Whitehead |

ROSS-000175064

Schedule 8

Document ID       : ROSS Bulk QCC
Date of Issue     : 07.08.2017
Periodic Review   : 09.15.2017
Revision No       :

# Quality Control Checklist for ROSS Intelligence

## LegalEase Solutions LLC

1

ROSS-000175065

Schedule 8

| | |
|---|---|
| Document ID | : ROSS Bulk QCC |
| Date of Issue | : 07.08.2017 |
| Periodic Review | : 09.15.2017 |
| Revision No | : |

## QUALITY CONTROL CHECKLIST FOR ROSS BULK MEMOS

### Attorney - ROSS Intelligence Checklist

| Description | Completed |
|---|---|
| 1. Draft ROSS questions following LegalEase Creative Process. | |
| 2. Research questions using online resources and accounts. | |
| 3. Label cases as great, good, topical, and irrelevant. | |
| 4. Confirm that great, and good quotes answer the question directly. | |
| 5. Add topical and irrelevant cases. | |
| 6. Confirm that the topical and irrelevant cases meet the criteria. | |
| 7. Confirm grammar correct throughout memo. | |
| 8. Confirm the font and space of the memo. | |
| 9. Follow file name convention. | |

### Review Attorney - ROSS Intelligence Checklist

| Description | QC 1 | QC 2 |
|---|---|---|
| Question should not be state specific. | | |
| Grammar check of question. | | |
| Quotes to be labeled correctly. GREAT — must contain all essential elements of the question. GOOD — contains most of the essential elements of the question. | | |

2

ROSS-000175066

Schedule B

| | |
|---|---|
| Document ID | : ROSS Bulk QCC |
| Date of Issue | : 07.08.2017 |
| Periodic Review | : 09.15.2017 |
| Revision No | : |

| | | |
|---|---|---|
| TOPICAL – foundation quote, background information. IRRELEVANT– has no reference or relevance. | | |
| Should label as Great Case 1, Great Case 2, and not Great Quote. | | |
| Bracketed language **must** answer question. Bracketed language may be up to a paragraph. If necessary, you can double bracket separate sentences. Bracketed language must be a sentence. Not just two words. | | |
| Double Brackets, and Content in Bold. | | |
| No red squiggly line. | | |
| Confirm reference quote. Ensure Topical quote and Irrelevant quotes are added. | | |
| Smartsheet updates. | | |
| Double check the Form - Double Brackets for Quotes. No highlights. | | |
| Memo number. | | |
| Memo saved in correct format – naming convention. | | |

3

ROSS-000175067

# EXHIBITS 41-42

## Redacted in their Entirety

# EXHIBIT 43

61 P.3d 1141

148 Wash.2d 451
Supreme Court of Washington,
En Banc.

HJS DEVELOPMENT, INC., Respondent,
v.
PIERCE COUNTY, acting through its
DEPARTMENT OF PLANNING AND LAND
SERVICES, Appellant.

No. 71430–4.
|
Argued Oct. 15, 2002.
|
Decided Jan. 23, 2003.

Subdivision developer sought review of county hearing examiner's decision to revoke site plan and preliminary plat approval. The Superior Court, Thurston County, Daniel J. Berschauer, J., reversed. County sought review. The Supreme Court, Smith, J. Pro Tem., held that: (1) preliminary subdivision plat is a "use" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any permit, use, or activity; (2) statute which states that the process for dividing land is a matter of state concern and should be administered in a uniform manner by cities, towns, and counties throughout the state did not preempt the ordinance; (3) the ordinance did not conflict with statute requiring developer to submit final plat for approval within five years of the preliminary plat approval; and (4) revocation of plat was the only proper remedy for removal of trees and vegetation in violation of conditions of preliminary plat approval.

So ordered.

Madsen, J., dissented and filed opinion in which Sanders, J., joined.

West Headnotes (30)

[1]   **Zoning and Planning**
      Record

      A petition for review by the superior court constitutes appellate review on the administrative record before the local jurisdiction's body or officer with the highest level of authority to make the final land use determination. West's RCWA 36.70C.020(1), 36.70C.130(1).

      23 Cases that cite this headnote

[2]   **Zoning and Planning**
      Review of local authority or lower court

      When reviewing a superior court's decision on a land use petition, the appellate court stands in the shoes of the superior court and reviews the administrative decision on the record of the administrative tribunal, not of the superior court.

      31 Cases that cite this headnote

[3]   **Zoning and Planning**
      De novo review

      On appeal of superior court decision overturning county hearing examiner's revocation of preliminary plat, the Supreme Court would review the record before the hearing examiner and review questions of law de novo to determine whether the land use decision was supported by fact and law.

      42 Cases that cite this headnote

[4]   **Constitutional Law**
      Resolution of non-constitutional questions before constitutional questions

      If a case can be decided on nonconstitutional grounds, an appellate court should decline to consider the constitutional issues.

      8 Cases that cite this headnote

Confidential    ROSS-000179468

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

[5]    **Zoning and Planning**
&#9758;&#9758;Tentative or preliminary approval

A preliminary subdivision plat was not a "site plan" or "permit" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any site plan approval or permit; thus, the ordinance did not grant the hearing officer authority to revoke a preliminary plat.

Cases that cite this headnote

[6]    **Zoning and Planning**
&#9758;&#9758;Nature of power

An administrative tribunal, such as a county hearing examiner for subdivision plat applications, has only the authority granted it by statute or ordinance.

Cases that cite this headnote

[7]    **Municipal Corporations**
&#9758;&#9758;Construction and operation

Interpretation of local ordinances is governed by the same rules of construction as state statutes.

1 Cases that cite this headnote

[8]    **Statutes**
&#9758;&#9758;Construing together; harmony

In considering an undefined term, the court considers the statute as a whole to give meaning to the term in harmony with other statutory provisions.

1 Cases that cite this headnote

[9]    **Municipal Corporations**
&#9758;&#9758;Construction and operation
**Statutes**
&#9758;&#9758;Absence of Ambiguity;  Application of Clear or Unambiguous Statute or Language

Rules of construction do not apply when the language of a statute or ordinance is clear and explicit.

3 Cases that cite this headnote

[10]    **Municipal Corporations**
&#9758;&#9758;Construction and operation
**Statutes**
&#9758;&#9758;Defined terms; definitional provisions

Definitions contained within a statute or ordinance control the meaning of words used in that act.

3 Cases that cite this headnote

[11]    **Municipal Corporations**
&#9758;&#9758;Construction and operation

Courts must reasonably construe ordinances with reference to their purpose.

1 Cases that cite this headnote

[12]    **Zoning and Planning**
&#9758;&#9758;Maps, plats, or plans;  subdivisions

Preliminary subdivision plat is a not a "permit" or "activity" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any permit, use, or activity granted pursuant to the county zoning code; a preliminary plat does not impact the land.

Confidential

ROSS-000179469

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

Cases that cite this headnote

[13] **Statutes**
　Conjunctive and disjunctive words

Ordinarily, the word "or" does not mean "and" unless there is clear legislative intent to the contrary.

6 Cases that cite this headnote

[14] **Statutes**
　Conjunctive and disjunctive words

Statutory phrases separated by the word "and" generally should be construed in the conjunctive.

1 Cases that cite this headnote

[15] **Zoning and Planning**
　Maps, plats, or plans; subdivisions

Preliminary subdivision plat is a "use" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any permit, use, or activity granted pursuant to the county zoning code; although the right to subdivide land arises from final plat approval, approval of a preliminary plat begins the plat subdivision process, and without a preliminary plat, final plat approval may never be achieved.

2 Cases that cite this headnote

[16] **Counties**
　Legislative control of acts, rights, and liabilities

Counties have plenary police power to enact ordinances, but the power ceases when in conflict with general state law or when the legislature intended state law to be exclusive, unless there is room for concurrent jurisdiction. West's RCWA Const. Art. 11, § 11.

Cases that cite this headnote

[17] **Counties**
　Legislative control of acts, rights, and liabilities

Whether there is room for county to exercise concurrent jurisdiction with state depends on legislative intent which is derived from analysis of the statute.

Cases that cite this headnote

[18] **Counties**
　Legislative control of acts, rights, and liabilities

Preemption of a county ordinance arises when the legislature has expressed its intent to preempt the field or that intent is manifest from necessary implication.

3 Cases that cite this headnote

[19] **Counties**
　Legislative control of acts, rights, and liabilities

If the legislature is silent on its intent to occupy a given field, courts ruling on preemption of a county ordinance may refer to the purposes of the particular legislative enactment and to facts and circumstances upon which the statute was intended to operate.

3 Cases that cite this headnote

Confidential    ROSS-000179470

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)
61 P.3d 1141

[20]    **Municipal Corporations**
        ⟜Presumptions and burden of proof

A heavy burden rests upon the party challenging the constitutionality of an ordinance.

2 Cases that cite this headnote

[21]    **Municipal Corporations**
        ⟜Presumptions and burden of proof

Every presumption is in favor of constitutionality of an ordinance.

2 Cases that cite this headnote

[22]    **Zoning and Planning**
        ⟜Maps, plats, or plans; subdivisions

Statute which states that the process for dividing land is a matter of state concern and should be administered in a uniform manner by cities, towns, and counties throughout the state did not preempt former county ordinance permitting hearing examiner to revoke a preliminary subdivision plat; state platting laws are silent on revocation of a preliminary plat, the statute serves only as a guide to the intended effect of the operative sections, and local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or condition such approvals to mitigate problems caused by a development. West's RCWA 58.17.010, 58.17.100.

1 Cases that cite this headnote

[23]    **Zoning and Planning**
        ⟜Maps, plats, or plans; subdivisions

Former county ordinance permitting hearing examiner to revoke subdivision plat does not conflict with statute requiring developer to submit final plat for approval within five years of the preliminary plat approval. West's RCWA 58.17.140.

Cases that cite this headnote

[24]    **Municipal Corporations**
        ⟜Concurrent and Conflicting Exercise of Power by State and Municipality

Local jurisdictions may enact ordinances upon subjects already covered by state legislation if their enactment does not conflict with state legislation.

4 Cases that cite this headnote

[25]    **Municipal Corporations**
        ⟜Conformity to constitutional and statutory provisions in general

An ordinance is constitutionally invalid on grounds of conflict with state law if the ordinance directly and irreconcilably conflicts with the statute. West's RCWA Const. Art. 11, § 11.

3 Cases that cite this headnote

[26]    **Municipal Corporations**
        ⟜Conformity to constitutional and statutory provisions in general

If a local ordinance and statute can be harmonized, no conflict will be found with state law.

3 Cases that cite this headnote

Confidential    ROSS-000179471

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

[27]    **Municipal Corporations**
     Concurrent and Conflicting Exercise of Power by State and Municipality
     **Municipal Corporations**
     Ordinances permitting acts which state law prohibits

Unconstitutional conflict occurs when an ordinance permits what is forbidden by state law or prohibits what state law permits. West's RCWA Const. Art. 11, § 11.

3 Cases that cite this headnote

[28]    **Zoning and Planning**
     Tentative or preliminary approval

Statute requiring developer to submit final plat for approval within five years of the preliminary plat approval does not grant an unqualified right to develop property without limitation for five years after preliminary plat approval, but sets a time limit for preliminary plats and still requires full compliance with conditions and requirements of preliminary plat approval before a final plat can be submitted for review and approval. West's RCWA 58.17.140.

2 Cases that cite this headnote

[29]    **Zoning and Planning**
     Tentative or preliminary approval

A county ordinance revoking a preliminary subdivision plat may be reconciled with state platting laws in circumstances under which revocation is necessary to protect the public health, safety and welfare; revocation of a preliminary plat is appropriate in those cases in which it is impossible to satisfy the conditions of approval because of knowing and deliberate violations of conditions.

1 Cases that cite this headnote

[30]    **Zoning and Planning**
     Tentative or preliminary approval

Revocation of preliminary subdivision plat was the only proper remedy for removal of trees and vegetation in violation of conditions of preliminary plat approval; the conditions imposed contemplated the public safety and welfare, the violation could not be remedied, and the developer could never comply with the conditions.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*1143 \*456** Bertha Fitzer, Jill Guernsey, Tacoma, Hillis Clark Martin & Peterson, George Kresovich, Seattle, for Appellant.

Davis, Wright, Tremaine, Stephen Rummage, Jessica Goldman, Seattle, James Kelly, Fox Island, for Respondent.

**Opinion**

SMITH, J.*

Appellant Pierce County seeks direct review of a Thurston County Superior Court **\*\*1144** judgment in favor of Respondent HJS Development, Inc., overturning a decision **\*457** of a Pierce County hearing examiner which revoked a preliminary plat under a local ordinance, former Pierce County Code 18.50.970 and 18.50.975. The Superior Court reasoned that the hearing examiner did not have authority to revoke Respondent's preliminary plat approval because state platting laws, chapter 58.17 RCW, preempt revocation powers of local jurisdictions on preliminary plat approvals.

*QUESTIONS PRESENTED*

The questions presented in this case are (1) whether the

Confidential

ROSS-000179472

61 P.3d 1141

Pierce County hearing examiner had the authority to revoke a preliminary plat approval under former Pierce County Code 18.50.970 and 18.50.975; (2) whether state laws, chapter 58.17 RCW—establishing procedures for approving subdivision plats—preempt local ordinances which permit a hearing examiner to revoke a preliminary plat approval; (3) whether revocation powers under the Pierce County Code conflict with RCW 58.17.140, which provides that a final plat meeting all requirements shall be submitted for approval within five years of preliminary plat approval; and (4) whether the decision by the Pierce County hearing examiner was clearly erroneous because he did not consider less harsh sanctions in enforcing conditions of the preliminary plat approval.

### STATEMENT OF FACTS

On December 30, 1994 Respondent Fox Ridge Investments[1] filed a complete application[2] for approval of preliminary plat and site plan for a 71–acre parcel on Fox Island in *458 unincorporated Pierce County.[3] In its proposal, Respondent requested permission to divide the parcel into a subdivision of 63 single-family residential lots to be served by private roads, on-site septic, and public water. Division I consisted of 42 lots. Division II consisted of 21 lots.[4] The plat is bisected by a road, Island Boulevard, and a substantial portion of Division I contains steep slopes, a mixture of coniferous and deciduous vegetation, and forests containing protected trees. Single-family residential homes are located below a portion of the steep slopes and near the proposed development site.[5]

At the time the plat application was filed on December 30, 1994 and prior to the effective date of the County's Comprehensive Plan, the local zoning laws, Rural–Residential Environment,[6] permitted one dwelling unit per acre.[7] On January 1, 1995 the property was rezoned R–10, which allowed a maximum residential density of .25 dwelling unit per acre.[8] Also in existence at the time of filing were local regulations, Gig Harbor Peninsula Development Regulations 18.50.970 and 18.50.990 which granted the hearing examiner the power to *revoke or modify any permit, use or activity granted pursuant to the Pierce County Code or allowed pursuant to the Underlying Zone ....*[9]

**1145 In the review process for the proposal, Respondent was required to submit a geotechnical report to the Development *459 Engineering Section.[10] In June 1997 Respondent submitted a report prepared by David Evans and Associates, Inc., which included a description

of the topography in Division I.[11] The report indicated the property contained steep slopes, with the steepest slopes occurring across the southern boundary with grades ranging from 30 percent to 87 percent, approximately 100 to 150 feet in height.[12] The geotechnical report also indicated that landslide and erosion hazards were moderate to severe where slopes exceeded 30 percent.[13] It therefore recommended a 50–foot setback and buffers from the top of the slopes and only allowing selective clearing.[14]

On December 3, 1997 the Pierce County environmental official, Charles F. Kleeberg, issued a mitigated determination of nonsignificance (MDNS).[15] No appeal was filed. In its findings of fact, the responsible official found that the project came within a landslide and erosion hazard area, as defined and regulated by Pierce County Code, chapter 21.14, "Geologically Hazardous Areas," and that relevant local ordinances[16] allowed approval of the proposal subject to conditions in order to mitigate any probable significant *460 adverse environmental impacts.[17] The responsible official concluded that Respondent's "proposal [did] not have a probable significant impact on the environment, and an Environmental Impact Statement (EIS) [was] not required under RCW 43.21C.030(2)(c), *only if the following conditions [were] met.*" [18] Of the 12 conditions specified in the MDNS, the following conditions are relevant to this appeal:

Condition (1) stated in part:[19]

The [Oregon White Oak Preservation] plan shall cause the preservation of not less than 80% of the Oregon White Oaks....
  Condition (6)(a) stated:[20]

The proposal shall comply with all recommendations contained with the June 1997 geotechnical report prepared for the development with the following modification:

  a. Clearing within the building setback area shall be limited to removal of dead and dangerous trees and reasonable topping, clearing, and limbing for the purposes of creating view areas. Clearing below the top of the steep slope located on Lots 3 through 29 shall be prohibited, except that the applicant may selectively top, limb, or remove trees within this area to enhance view. Prior to the removal of any vegetation within this area, the applicant shall submit a clearing plan for the area to the Resource Management Development Engineering Sections of the Pierce County

Confidential     ROSS-000179473

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

Planning and Land Services Department for review **1146 and approval. The purpose of the review shall be to ensure that vegetation removal in this area is strictly limited to only that reasonably necessary to provide for view areas within the lots and the removal of hazardous trees. Vegetation removal beyond this shall be prohibited.

....

*461 Condition (4) stated:[21]

The edge of the Oregon White Oak Preservation Area shall be clearly staked and flagged prior to and through the completion of site development and construction. Prior to final plat approval, signage denoting the Oak Preservation Area shall be erected along the boundary of the area. The type of spacing of the signage shall be determined by the Pierce County Planning and Land Services Department.

....

Condition (8) stated:[22]

The steep slope and building setback area shall be clearly shown and labeled on the face of the preliminary and final plat as "Slope Protection Area Easement."

Condition (9) stated:[23]

The following shall be placed on the face of the final plat:

"The Slope Protection Area Easement appearing on this plat shall remain in its natural state. The intent of this area is to protect slope stability and prevent erosion. There shall be no clearing, grading, filling, or construction of any kind within this area, except as shown on plans or documents approved by the Director of Pierce County Planning and Land Services, and contained in the official files for this project. Removal of dead or dangerous trees may be permitted upon receiving written approval from the Pierce County Planning and Land Services Department."

....

Condition (11) stated in part:

In order to minimize erosion, changes in surface water runoff characteristics, and minimize impacts to aesthetics and the rural character of the site, vegetation removal from the site during site development phase of the proposal, shall be limited to those areas necessary for the construction of roads and utilities, creation of building pads, and view shed creation approved by the Pierce County Planning and Land Services Department. Except for the clearing discussed above, all lots *462 shall remain in their natural, vegetated state until the time of building permit issuance.

....

The Peninsula Advisory Commission (PAC) considered the proposed preliminary plat and heard public testimony at its January 14, 1998 meeting.[24] It recommended denial, citing concerns of storm water control, slope stability, and an incomplete application. However, it proposed two conditions in the event the hearing examiner approved the proposal.[25] The first condition required the applicant to conduct a study for frontage road improvements along Island Boulevard. The second required a 25–foot–wide perimeter buffer along the lot lines to act as a barrier to visibility, airborne particles, glare and noise impacts.

On February 5, 1998 a public hearing was held before Hearing Examiner Stephen K. Causseaux, Jr.[26] Fox Island residents raised concern about landslides in the area and submitted a geological report prepared by James P. Brazil, engineering geologist, on October 21, 1981, recommending against further tree or vegetation removal. The Pierce County Planning and Land Services Department (PALS), Hugh Taylor, presented a staff report on the proposed preliminary plat.[27] He described the proposal and discussed its restrictions on clearing, testifying that "the **1147 slopes, themselves are intended to stay in a natural, undisturbed state," and barring limbing for view enhancement and removing dangerous and dead trees, "the slope is off limits for development."[28] He further noted that the Oregon white oaks within the development area were protected under the county critical areas ordinance, and detailed the *463 plans for preservation of those trees.[29] In response, Joseph Quinn, attorney for Respondent, testified that clearing would stay within the limits and clearing and development would be done in accordance with the county's regulations and under the county's supervision.[30] He acknowledged the restrictions on development, stating that the developer would act responsibly and comply with conditions.[31]

On September 2, 1998 the hearing examiner issued a

Confidential                                                                                ROSS-000179474

61 P.3d 1141

report and decision approving the preliminary plat, subject to specified conditions, including those recommended by the PAC and Planning Staff and all those required by the MDNS.[32]

Respondent applied for a site development permit for clearing in preparation for road construction in Division I on March 24, 1999.[33] On May 20, 1999 Pierce County approved the site development permit consistent with the conditions announced by the hearing examiner. The plan noted that the Oregon White Oak Preservation Area would be flagged and clearing would proceed in the designated areas. A provision in the site development plan required Respondent to notify the county 48 hours prior to beginning any construction at the site and prior to initiation of clearing.[34] Respondent and a county inspector conducted a preconstruction meeting reviewing requirements of the site development permit.

On April 18, 2000, Ray Clark, a county inspector, conducted an unscheduled site inspection.[35] He discovered that significant clearing had occurred. He believed the clearing did not comply with the limitations specified in the site *464 development plans.[36] He reported that many of the clearing limits had been disregarded, as evidenced by removal of trees from the steep slopes, buffer areas, and the oak protection areas. He testified that an estimated 150 trees were logged outside the approved plan, and stumps on the slopes measured from 18 inches to 2 ½ feet in diameter.[37] A subsequent investigation substantiated the report of violations, revealing that more than 200 stumps had been cut from the steep slope areas, many stumps had been burned and removed, and there were not sufficient erosion control methods.[38] With these reported violations, the PALS posted a stop work order and contacted the Department of Natural Resources (DNR).[39]

The DNR inspected the site and ultimately concluded that a forest practices permit was required for the west slope, but not for the other areas outside of this slope. Based upon this, the DNR issued a stop work order on May 8, 2000.[40] Pursuant to local development regulations and state law, PALS imposed a six-year Forest Practices Act of 1974 development moratorium.[41]

On May 17, 2000 PALS notified Respondent it would take action to revoke the preliminary plat because of the violations of site development regulations and the preliminary plat conditions.[42] On May 26, 2000 Respondent **1148 filed a request to the hearing examiner to lift the moratorium. A public hearing on the revocation action and moratorium rescission was held on October 4, 2000.[43]

*465 At the hearing, County Planner Taylor and County Inspector Clark presented exhibits and photographs detailing the extent of the violations of conditions.[44] Mr. Taylor noted that the original conditions allowed some limbing and tree removal, but did not allow a clear-cut of the buffer or slope.[45] He concluded that approximately seven acres were removed from the top of the slopes. Respondent's attorney, Mr. Quinn, conceded in testimony that trees within the White Oak Preservation Area and trees on the steep slope were cut, but he disputed the extent and exact number of trees cut.[46] He asserted that, despite the fact that prohibited cutting occurred, removal of the trees did not violate the conditions because the approvals allowed for selective cutting and removal which did not negatively impact the stability of the present slope.

On November 13, 2000 the hearing examiner revoked the site plan and preliminary plat approvals and denied the request to rescind the moratorium.[47] In his decision, the hearing examiner concluded that[48]

> [t]he clearing of the 50–foot landslide and erosion hazard area buffer and the removal of numerous significant trees on the steep slopes below the top of the bank constitute intentional and flagrant violations of conditions of approval and mitigating measures set froth in the Mitigated Determination of Nonsignificance issued pursuant to SEPA [State Environmental Policy Act of 1971, chapter 43.21C RCW] review.... *These violations are especially egregious because the most significant issues associated with site plan and preliminary plat approval were concerned with protection of the steep slopes, the proper handling of storm water runoff, and the protection of homes below the slopes near the shoreline. The environmental official also imposed a number of mitigating measures addressing the preservation of vegetation on the slope and establishing an Oregon White Oak Preservation Area, all of which were agreed to by the applicant to avoid issuance of a Determination of *466 Significance and preparation of an Environmental Impact Statement.* (Emphasis added.)

Respondent filed a timely request for reconsideration on November 22, 2000.[49] In addition, Respondent requested that the hearing examiner reopen the proceedings or allow a rehearing pursuant to a local law and rule.[50] The hearing examiner denied the request on January 4, 2001.[51]

On January 24, 2001 Respondent filed an appeal in the Thurston County Superior Court under the Land Use Petition Act (LUPA), chapter 36.70C RCW, challenging the revocation and the moratorium.[52] Its appeal reiterated

Confidential

ROSS-000179475

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

the same arguments considered in the administrative hearing, and raised a new argument contending the hearing examiner exceeded his authority in revoking the preliminary plat.[53]

The Thurston County Superior Court, the Honorable Daniel J. Berschauer, granted the LUPA petition and presided over the bench trial on June 7, 2001.[54] He decided in favor of Respondent HJS Development, Inc., reversing the hearing examiner's decision revoking **1149 the preliminary plat.[55] The court reasoned that state statutes governing plats and subdivision of land preempted the local revocation ordinance under which Hearing Examiner Taylor proceeded in revoking Respondent's preliminary plat.[56] The *467 court invalidated the ordinance, ruling that it conflicts with state law, reasoning that if the Legislature intended to allow revocation of a preliminary plat, it would have expressly done so.[57] The court ruled, in the alternative, that the hearing examiner's decision was clearly erroneous because he did not consider other viable and less harsh legal options to enforce the conditions and require compliance.[58]

Appellant filed a notice of direct appeal with this court on August 7, 2001.[59] Review was granted on July 1, 2002.[60]

## DISCUSSION

### STANDARD OF REVIEW

[1] Judicial review of a land use decision proceeds under the Land Use Petition Act (LUPA).[61] A petition for review by the superior court constitutes appellate review on the administrative record before the local jurisdiction's body or officer with the highest level of authority to make the final determination.[62] Relief may be granted when the following standards set forth in LUPA are met:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

....

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

*468 d) The land use decision is a clearly erroneous

application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates constitutional rights of the party seeking relief.[63]

[2] [3] "When reviewing a superior court's decision on a land use petition, the appellate court stands in the shoes of the superior court."[64] "An appellate court reviews administrative decisions on the record of the administrative tribunal, not of the superior court."[65] We therefore review the record before the Pierce County hearing examiner and review questions of law de novo to determine whether the land use decision was supported by fact and law.[66]

### STATE AND LOCAL PLATTING AND SUBDIVISION PROCESSES

Development of real property in this state implicates both state statutes and local ordinances that impose subdivision and platting controls. The state statute, chapter 58.17 **1150 RCW, provides a general statutory scheme for regulating subdivision of land to ensure the orderly development of new areas for which new streets, sewers, drainage, and utilities will be needed.[67] The owner or developer initiates the subdivision process by filing a preliminary plat and a complete application for approval by the legislative *469 body of the city, town, or county.[68] A preliminary plat is a "neat and approximate drawing of a proposed subdivision showing the general layout of streets and alleys, lots, blocks, and other elements of a subdivision consistent with the requirements of [chapter 58.17 RCW]."[69] The local planning agency or designated official then considers whether the proposed plat complies with the local comprehensive plan and adopted specifications and standards, and makes recommendations to the local legislative body.[70]

Upon receipt of the recommendation, the legislative body conducts a public hearing on the plat application. In Pierce County the legislative body by ordinance has delegated to the hearing examiner the authority to review and decide plat applications.[71] Approval of a preliminary plat may be subject to conditions imposed by the hearing examiner.[72] Once approved, the owner or developer may begin development to prepare the final plat in compliance with the preliminary plat.[73]

Confidential

ROSS-000179476

61 P.3d 1141

### AUTHORITY TO REVOKE GRANTED BY LOCAL ORDINANCES

[4] [5] Respondent contends the dispositive issue in this case is whether the hearing examiner possessed the power to revoke the preliminary plat.[74] It argues that the local revocation ordinances under which the hearing examiner proceeded, former PCC 18.50.970 and .975, did not grant him authority to revoke the preliminary plat. Respondent asserts that the local ordinances, former PCC 18.50.970 stating that "[t]he Examiner may revoke or modify any *site* **470** *plan approval or permit,* and former PCC 18.50.975 providing that [t]he Examiner may revoke or modify any *permit, use or activity* granted pursuant to the Pierce County Zoning Code .... " do not include preliminary plats within their purview.[75]

Although the distinction between *site plan approval* and *preliminary plat approval* has been blurred with at least one Court of Appeals decision using the two terms interchangeably,[76] Respondent correctly notes **1151** that the county code treats the two as distinctly separate processes.

Former PCC 18.50.960 read in part: "*Plats are exempt from all procedural requirements of the site plan review process;* however, a plat when being reviewed during the preliminary plat review and approval process, shall be reviewed for consistency with the Gig Harbor Development Plan.... *A plat is exempt from [the] site plan approval process* .... "[77] This distinction is further supported by two proceedings: one in which the county hearing examiner in the revocation proceedings revoked "Division I of the Fox **471** Ridge site plan approval and preliminary plat,"[78] and the other in which the Court of Appeals, Division Two, vacated and voided rezone ordinances, site plan approval, and plat approval adopted by the City of Tacoma....[79] RCW 58.17.070 also treats the two terms distinctly, allowing processing of a preliminary plat application simultaneously with site plan applications.

[6] An administrative tribunal, such as the hearing examiner in this case, has only the authority granted it by statute or ordinance.[80] Based upon distinct treatment of the two processes, a site plan or permit is not a preliminary plat.[81] In this case, the local ordinance allowing revocation of site plans and permits did not grant the hearing officer authority to revoke a preliminary plat. Without more, the purported revocation of the preliminary plat would not be valid under former PCC 18.50.970.

[7] [8] [9] [10] [11] Interpretation of local ordinances is governed by the same rules of construction as state statutes.[82] In considering an undefined term, the court

considers the statute as a whole to give meaning to the term in harmony with other statutory provisions.[83] Rules of construction do **472** not apply when the language is clear and explicit.[84] In interpreting statutes and ordinances, definitions contained within the act control the meaning of words used in that act.[85] Courts must reasonably construe ordinances with reference to their purpose.[86]

[12] Former PCC 18.50.975 provided for revocation of any *permit, use or activity* granted under the Pierce County Zoning Code. However, it did not expressly include preliminary plats as one of the three revocable categories. Respondent distinguishes preliminary plats from the three categories by reference to the definitions and derived meanings contained in former chapter 18.50 PCC.

In interpreting the three categories (permit, use or activity) listed in former PCC **1152** 18.50.975, this court examines the definitions and meanings of those terms contained in the regulations.[87] The definition of "preliminary plat" (a representation of the proposed general layout) is not included in the meaning of "permit or activity." "Activity" is defined as any use conducted on a lot, tract or parcel of land,[88] and from the local development regulations, "permit[s]" take effect during the developmental phase of the property where some physical activity is involved.[89] In the context of zoning, "activity" has been used to characterize the types of **473** conduct or business occurring on the land,[90] while "permit[s]" under the county code relate to a governmentally approved activity such as a nonconforming use permit or a building permit.[91] A preliminary plat (a tentative representation of the details of a project) thus does not come within the meaning of an "activity" or "permit."

Former chapter 18.50 PCC defined "use" as follows:
> "Use" of property is the purpose or activity for which the land, or building thereon, is designed, arranged or intended, or for which it is occupied or maintained and shall include any manner of performance of such activity with respect to the performance standards of this Regulation. The word "use" also means the word "development."[92]

[13] [14] Under the first definition, a broad reading of "use" includes the definition of a preliminary plat. Construed broadly, "use" can be read to mean "the purpose ... for which the land, ... is designed, arranged, or intended.... "[93]

Confidential

ROSS-000179477

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)
61 P.3d 1141

A rough sketch of the proposed alleys, blocks, and streets would fit within such a reading. However, a further reading of the same sentence following the disjunctive clauses with the conjunctive "and" indicates that the definition of "use" "shall include any manner of performance of such activity with respect to the performance standards of this Regulation."[94] This last element of the definition contemplates involvement of some type of "activity" impacting the land. A preliminary plat does not impact *474 the land in a similar manner as does "use" under the regulations.

The Pierce County Code further clarifies the meaning of the word by providing a second definition of "use."[95] Under the county code "development" or "use" shall mean:

A. Any activity, other than normal agricultural activity which materially affect the existing condition of land or improvements, such as:

1. Clear cutting of trees ...

2. Substantial excavation of deposits of earth ...

3. Construction, reconstruction or alteration of any improvement ...

4. Dumping or parking of any objects ...

**1153 5. Commencement of any primary or substantial use of land and every change in its type of intensity.

B. Any change in the legal relationship of persons to land which materially affects development, such as: the division of land into two or more parcels or units to facilitate separate transfer of title to each parcel unit.[96]

Under this definition, an activity materially affecting the condition of land is one that physically impacts it. Examples of "uses" listed in the definition—*cutting, excavation, construction, dumping,* and *parking*—represent physical actions occurring on the land. A preliminary plat, which is merely a drawing, does not physically impact the land in a similar manner as does a specific land use applied in this context.[97] This definition restricts the term "activity" to a physical activity to or upon the land. Part (B), however, departs from this limitation and expands the meaning of "use" to include conduct which is not physical.

[15] *475 Part (B) of the definition becomes operative when a change in the legal relationship of persons to land

materially affects development, such as division of land. Respondent argues there was no such change in this case. A preliminary plat, it asserts, does not affect the division of land.[98] Subdivision of land occurs upon final plat approval, which is not guaranteed by approval of a preliminary plat.[99] It contends a preliminary plat has no effect on the legal relationship of developer to land which materially affects development. It asserts that preliminary plat approval is not a "use."

This argument is somewhat shortsighted in that it assumes preliminary plat approval and final plat approval are separate and distinct processes. The initial and essential step in obtaining final plat approval is receiving preliminary plat approval.[100] A preliminary plat application notifies the local government of the applicant's intention to follow plat subdivision procedures to gain final plat approval. Once receiving preliminary plat approval, an owner or developer may proceed to prepare detailed engineering drawings, construct improvements, and prepare the final plat in compliance with the terms and conditions of the approved preliminary plat.[101] Approval (with terms and conditions) of that application by the local government acknowledges the developer's reliance on that approval in undertaking the plat subdivision process. This approval creates a change in the legal relationship of the owner or developer to the land which materially affects development.[102] Although the right to subdivide land arises from final plat approval, approval of a preliminary plat begins the plat subdivision process. The right to subdivide land arises out of preliminary plat approval. Without a preliminary *476 plat, final plat approval may never be achieved.[103] As indicated in the definition section of the ordinance, a preliminary plat approval for a subdivision is a "use."

This conclusion is consistent with the revocation ordinance. Former PCC 18.50.975 permits revocation of a *use,* but only when *granted pursuant to the Pierce County Zoning Code or Underlying Zoning.*[104] In this case, the applicable local zoning law was the Rural–Residential Environment, which specified the particular developments and uses permitted.[105] The zoning code divided permitted **1154 developments and uses into three categories.[106] Like the statutory definition, Category (C)(1) expressly considered a subdivision a permitted "use" under the zoning code.[107]

We conclude that a preliminary plat is within the definition of a "use" and that the revocation ordinance granted the hearing examiner authority to revoke a preliminary plat. The Pierce County hearing examiner had the authority to revoke Appellant's preliminary plat.

Confidential    ROSS-000179478

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

### PREEMPTION

[16] [17] Our state constitution, article **XI**, section 11, allows a county, city or town to "make and enforce within its limits all such local police, sanitary, and other regulations **\*477** as are not in conflict with general laws."[108] Within this authority counties have plenary police power to enact ordinances, which ceases when in conflict with general state law or when the Legislature intended state law to be exclusive, unless there is room for concurrent jurisdiction.[109] Whether there is room for exercise of concurrent jurisdiction depends on legislative intent which is derived from analysis of the statute.[110]

[18] [19] Preemption arises when the Legislature has expressed its intent to preempt the field or that intent is manifest from necessary implication.[111] If the Legislature is silent on its intent to occupy a given field, we may refer to the purposes of the particular legislative enactment and to facts and circumstances upon which the statute was intended to operate.[112]

[20] [21] [22] In establishing the constitutional invalidity of an ordinance, a heavy burden rests upon the party challenging its constitutionality.[113] "Every presumption will be in favor of constitutionality."[114] This appeal places at issue the constitutional validity of a local ordinance, former PCC 18.50.975, which granted the Pierce County hearing examiner authority to revoke an approved preliminary plat. Former PCC 18.50.975 allowed revocation of permits, uses, and activities.[115] Respondent contends that grant of such authority impinges upon and violates the state platting laws, chapter 58.17 RCW, which call for land to be divided **\*478** in a uniform manner. The Thurston County Superior Court, Judge Berschauer, agreed, finding that RCW 58.17.010 expressly evidenced the Legislature's intent to preempt local jurisdictions from enacting conflicting legislation.[116] In support of a preemption conclusion, both Judge Berschauer and Respondent cited the following language in RCW 58.17.010 which sets out the purpose of the chapter: "The legislature finds the process by which land is divided is a matter of state concern and should be administered in a *uniform manner* **\*\*1155** by cities, towns, and counties throughout the state."[117]

Similar uniformity language was discussed in *City of Seattle v. Williams,* a case challenging a local traffic law. *Williams* provides some guidance in interpreting the word "uniform" in the preemption context and applied the concept of uniformity to a given field.[118] The question in *Williams* was whether two general statutes requiring uniformity of traffic laws preempted a city ordinance criminalizing driving under the influence (DUI) at a blood alcohol concentration (BAC) of .08 grams.[119] RCW 46.08.020 stated:

> The provisions of this title [Title 46 Motor Vehicles] relating to vehicles *shall be applicable and uniform* throughout this state and in all incorporated cities and towns and all political subdivisions therein and no local authority shall enact or enforce any law, ordinance, rule or regulation in conflict with the provisions of this title except and unless expressly authorized by law to do so and any laws, ordinances, rules or regulations in conflict with the provisions of this title are hereby declared to be invalid and of no effect. Local authorities may, however, adopt additional vehicle and traffic regulations which are not in conflict with the provisions of this title.
> (Emphasis added.)

**\*479** RCW 46.08.030 provided:

> The provisions of this title relating to the operation of vehicles *shall be applicable and uniform* upon all persons operating vehicles upon the public highways of this state, except as otherwise specifically provided.

(Emphasis added.)

Without a statutory definition of "uniform," in interpreting the statutes we employed the dictionary definition of the word, defining it to mean "marked by lack of variation, diversity, and marked by complete conformity to a rule or pattern or by similarity in salient detail or practice."[120] Incorporating this definition, we concluded the statutory scheme relating to motor vehicles must "lack variation," and that the Legislature intended the provisions of Title 46 to be uniformly applied throughout the state.[121] We additionally considered how the challenged ordinance establishing the offense at 0.08 grams of alcohol disrupted the uniform statewide application of state DUI laws which criminalized DUI at the 0.10 percent BAC level. We found that the ordinance, varying in salient detail from the state law on DUI, significantly undermined the uniformity requirement of both RCW 46.08.020 and RCW 46.08.030.

In *Williams* we concluded that the "uniform" language found in the statutes evidenced the Legislature's intent to create a statutory scheme with the same standards consistently applicable throughout the state. In this

Confidential

ROSS-000179479

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

respect, the uniformity requirement preempted local legislative bodies from enacting ordinances inconsistent with the standards set out in state traffic laws. Because the challenged ordinance departed from the state DUI standard of .10 percent BAC, we concluded that the ordinance violated the statutory uniformity requirement, but we were "not saying that a municipality may never enact traffic laws for which there **480** is a statutory provision on the same subject,"[122] rejecting Respondent Williams' argument that the uniformity requirement of the state statutes preempts all ordinances directed against DUI.

Although *Williams* provides some guidance on the preemption issue in this case, it is, however, distinguishable. Unlike *Williams*, this case does not involve an ordinance that varied in detail from standards established by state laws. Relying on *Williams*, Respondent argues that state platting laws, specifically RCW 58.17.100, requiring only approval or disapproval of a **1156** preliminary plat,[123] preempts the revocation ordinance because it departs from the statutory scheme. Reliance on *Williams* for this proposition is misplaced.[124] In this case, the revocation ordinance does not depart from the state statutory scheme of uniformity. State platting laws are silent on revocation of a preliminary plat.

Located in the purpose section and having no operative force, the "uniform" language in RCW 58.17.010 serves only as a guide to the intended effect of the operative sections.[125] This means the process of dividing land in one county should "not vary" from another in which all local governments must follow the procedures specified in chapter 58.17 RCW. Because RCW 58.17.010 does not contain the "exclusivity" language identified in the *Williams* case, no meaning of "uniform" can be ascertained to preempt the entire field of dividing property. This court "will not interpret a statute to deprive a municipality of the power to legislate on a particular subject unless that clearly is the legislative intent." We do not interpret the purpose section of chapter 58.17 RCW to deprive a county of the power to revoke a preliminary plat because it is not clear under the **481** statute whether the Legislature intended such deprivation.[126]

Respondent's uniformity requirement argument is also undercut by the fact that local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or condition such approvals to mitigate problems caused by a development.[127] This court in *Isla Verde International Holdings v. City of Camas* and the Court of Appeals in *Norco Construction v. King County* have acknowledged the authority of local

governments to supplement state platting laws for the public health, safety, and welfare.[128] Under this authority, the challenged ordinance in this case was appropriately enacted to allow revocation of an approved "use" when that use is exercised against the public health, safety or general welfare.[129] The statutory scheme of chapter 58.17 RCW is designed to protect the public health, safety and general welfare. In recognition of this, the Legislature has left room for concurrent jurisdiction in matters relating to these interests.[130] Former PCC 18.50.975 providing for revocation of a preliminary plat was not preempted by RCW 58.17.010.

## CONFLICT

[23] [24] [25] [26] [27] We must decide whether there is a conflict between former PCC 18.50.975, allowing revocation of a preliminary plat, and RCW 58.17.140, providing that a final plat meeting all requirements of the chapter shall be submitted for approval within five years of the preliminary **482** plat approval. Local jurisdictions may enact ordinances upon subjects already covered by state legislation if their enactment does not conflict with state legislation.[131] This court will consider an ordinance to be constitutionally invalid on grounds of conflict if the ordinance "directly and irreconcilably conflicts with the statute."[132] If, however, the ordinance and statute can be harmonized, no conflict will be found.[133] Unconstitutional conflict occurs **1157** when an ordinance permits what is forbidden by state law or prohibits what state law permits.[134]

[28] Respondent interprets RCW 58.17.140 to unconditionally allow it five years following preliminary plat approval to comply with conditions and requirements. It asserts the Legislature chose this policy to bring preliminary plats within the arena of vested rights to instill certainty of the rules governing land development. Its vested right, Respondent contends, may only be extinguished upon a finding that the final plat as submitted does not conform to preliminary plat conditions or operative development regulations, and that revocation of the preliminary plat before five years has expired violates its vested right.[135]

Respondent misconstrues RCW 58.17.140. Its contention assumes that the provision grants it an unqualified right to develop its property without limitation for five years after preliminary plat approval. RCW 58.17.140 does not support such an assumption. The provision sets a time limit for preliminary plats.[136] It still requires full compliance with conditions and requirements of

Confidential

ROSS-000179480

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

preliminary plat approval before a final plat can be submitted for review and *483 approval.[137]

Respondent also misunderstands the concept of vested rights in the preliminary plat review and approval context. Its argument assumes that the doctrine confers without limitations or conditions a right to develop the land for five years after preliminary plat approval. The vesting doctrine has generally been applied in the preliminary plat context merely to confer the right to have an application for preliminary plat considered under ordinances and laws in effect at the time a completed application is filed.[138] Chapter 58.17 RCW is silent on revocation.

[29] Subdivision of land is both a local and statewide concern. State platting laws expressly charge local governments with the duty to ensure that the public interest is best served by approval of preliminary plats and final plats.[139] The Legislature has provided that local governments may adopt regulations for the public health, safety, and general welfare[140] in considering plat approval. When conditions of approval of a preliminary plat cannot be satisfied or are deliberately violated, remedial action, such as revocation, may be the only remedy. A revocation ordinance may be reconciled with state platting laws in circumstances under which revocation is necessary to protect the public health, safety and welfare. Revocation of a preliminary plat is appropriate in those cases in which it is impossible to satisfy the conditions of approval because of knowing and deliberate violations of conditions.

### DECISION BY HEARING EXAMINER

When reviewing a superior court's decision on a land use petition, we review the record of the administrative tribunal *484 and not the record of the superior court.[141] In this case we review the record before the Pierce County hearing examiner de novo to determine whether there was evidence to support the land use decision.[142]

[30] Respondent contends the hearing examiner's decision was erroneous because he did not consider whether Respondent could satisfy the requirements for final plat approval within the statutory time period of five years, and that less drastic remedial **1158 methods than revocation were available to enforce the violated or unfulfilled conditions. It argues that despite its removal of trees in the preservation area and on the steep slopes, the hearing examiner committed error by not determining whether removal of those trees jeopardized the public interest by negatively impacting the stability of the

slope.[143]

Respondent, however, cannot satisfy the requirements for final plat approval because it cannot meet the conditions of preliminary plat approval which specifically prohibited removal of trees and vegetation in specified areas. The conditions imposed contemplated the public safety and welfare. It is clear from the record that Respondent knowingly and deliberately violated conditions of preliminary plat approval which cannot be remedied. Respondent can never comply with the specified conditions of the plat approval because, among other reasons, the removed white oak trees cannot be restored to their original state. Monetary fines and remediation methods cannot correct the violations committed by Respondent. Revocation was the only proper remedy.

### *485 SUMMARY AND CONCLUSIONS

At issue in this case is the revocation of a preliminary plat under former Pierce County Code (PCC) 18.50.970 and 18.50.975. Respondent contends the Pierce County hearing examiner exceeded his authority in revoking its preliminary plat because the local revocation ordinance, allowing revocation of any *site plan permit or approval, permit, use,* or *activity,* did not include preliminary plats.

Site plans, permits, and activities do not come within the definition of a preliminary plat (a drawing of the proposed subdivision showing the general layout of streets and alleys, lots, and blocks). The definition of *use* under the ordinance, however, includes subdivisions. Because preliminary plat approval initiates the subdivision process, approval of a preliminary plat for a subdivision is a "use." The ordinance therefore granted the hearing examiner authority to revoke a preliminary plat.

Respondent contends that state platting laws, chapter 58.17 RCW, preempted enactment of any ordinance allowing revocation of preliminary plats. It erroneously relies on *City of Seattle v. Williams* to support its argument that the language in RCW 58.17.010, calling for land to be divided in a uniform manner, evidences the intent of the Legislature to preempt the field. *Williams* is distinguishable. Legislative intent is clear from the provisions at issue in that case, but not clear from the provision at issue in this case.

Respondent's uniformity requirement argument is also undercut by the fact that local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or conditions for those

Confidential

ROSS-000179481

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

approvals. This court in *Isla Verde International Holdings v. City of Camas* and the Court of Appeals in *Norco Construction v. King County* have acknowledged the authority of local governments to supplement state platting laws for the public health, safety, and welfare. Under this authority the revocation ordinance, **\*486** former PCC 18.50.975, was properly enacted and not preempted by state platting laws.

Respondent claims there is a conflict between the revocation ordinance and RCW 58.17.140, which provides that a final plat meeting all requirements of the chapter shall be submitted for approval within five years of preliminary plat approval. Respondent misinterprets this provision as granting it an unqualified right to develop its property without limitation for five years after preliminary plat approval. The provision does nothing more than set a time limit for preliminary plats. No direct conflict exists because RCW 58.17.140 is silent on revocation.

The hearing examiner correctly decided revocation was the only remedy in this case because Respondent can never satisfy the conditions for final plat approval and conditions of preliminary plat approval. Respondent knowingly and deliberately violated conditions of preliminary plat approval which **\*\*1159** cannot be remedied. This particularly involved violation of prohibitions against removal of irreplaceable trees and vegetation in specified areas. Monetary fines and remediation methods cannot correct the violations committed by Respondent because the trees removed from the Oregon White Oak Preservation Area can never be restored to their original state.

We determine that the Pierce County Hearing Examiner had authority to revoke Respondent's preliminary plat under former PCC 18.50.975; that state platting laws do not preempt Pierce County from enacting the challenged revocation ordinance; that the revocation ordinance did not conflict with state platting laws; and that the hearing examiner correctly decided revocation was the only remedy.

ALEXANDER, C.J., IRELAND, OWENS, CHAMBERS, JJ., and BECKER J. Pro Tem., concur.

MADSEN, J. (dissenting).

The majority concludes that former Pierce County Code (PCC) 18.50.975 authorized revocation of HJS Development's preliminary plat approval **\*487** on the grounds that the developer failed to comply with conditions of preliminary plat approval. However, the county's former land use regulations applicable to this case contain no such authority, and therefore I respectfully dissent.

The majority first concludes, and I agree, that former PCC 18.50.970, concerning revocation of "any site plan approval or permit" did not apply to preliminary plats because under the county code neither of these terms encompasses preliminary plat approval.

Former PCC 18.50.975 provided for revocation or modification of "any permit, use or activity granted pursuant to the Pierce County Zoning Code or allowed pursuant to the Underlying Zoning which shall include, but not necessarily be limited to, site plans related to special zones or unclassified use permits." The majority says, and again I agree, that former PCC 18.50.975, insofar as it concerns revocation of any "permit" or any "activity," did not apply to preliminary plats. Majority at 1151. The majority then reasons, however, that the term "use" in former PCC 18.50.975 did encompass preliminary plat approval. Majority at 1152. The majority notes that former PCC 18.50.145U.1 defined " 'use' " as meaning " 'development,' " among other things. *Id.* at 1152. "Development," in turn, was defined in part as "[a]ny change in the legal relationship of persons to land which materially affects development, such as: the division of land into two or more parcels or units to facilitate separate transfer of title to each parcel or unit." Former PCC 18.50.145D.3(B). The majority says that preliminary plat approval creates a change in the legal relationship of the owner or developer to the land that materially affects development, and thus preliminary plat approval is a "use" within the meaning of former PCC 18.50.975. Majority at 1153. I disagree.

Until a final plat is approved and filed, it is illegal to transfer or sell, or advertise for transfer or sale, any lot, tract, or parcel. RCW 58.17.200 (providing that prosecuting attorney "shall commence an action to restrain and enjoin **\*488** further subdivisions or sales, or transfers, or offers of sale or transfer and compel compliance with all provisions of" chapter 58.17 RCW).[1] The majority itself acknowledges that the right to subdivide arises from final plat approval. Majority at 1153; *see* RCW 58.17.170 ("[w]hen the legislative body of the city, town or county finds that the subdivision proposed for final plat approval conforms to all terms of the preliminary plat approval, ... other applicable state

Confidential

ROSS-000179482

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

laws, and any [applicable] local ordinances," then it shall given final written approval "on the face of the plat"). And, "[f]inal approval *cannot* be granted if [the conditions to preliminary plat approval] are not met." *Friends of the Law v. King County,* 123 Wash.2d 518, 528, 869 P.2d 1056 (1994); *see also, e.g.,* 18 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 5.4, at 271 (1995) (an applicant's inability or unwillingness to meet conditions for dedications or public improvements appear to be causes for denial of plat approval).

**\*\*1160** Preliminary plat approval does not authorize subdivision of land. As the majority says, "approval of a preliminary plat *begins* the plat subdivision process." Majority at 1153 (emphasis added). The majority also says that "the right to subdivide land arises from *final plat approval.*" *Id.* (emphasis added). Thus, although preliminary plat approval is a significant stage in plat approval, in that it involves the actual decisions as to the terms and conditions of final plat approval, the majority itself necessarily recognizes that preliminary plat approval does not authorize subdivision.

Since there is no right to subdivide land merely upon preliminary plat approval, preliminary plat approval does not, and cannot, change the legal relationship of the owner or the developer to the land that materially affects development. Therefore, while preliminary plat approval is an important part of the approval process, it does not come **\*489** within the definition of "development" in former PCC 18.50.145D.3(B), and thus it not within the meaning of "use" in former PCC 18.50.145U.1. Preliminary plat approval therefore does not fall within the revocation authority stated in former PCC 18.50.975.

The majority's statement that its conclusion is consistent with former PCC § 18.50.975's limitation on revocation, i.e., that a use may be revoked only when granted pursuant to the county zoning code or underlying zoning, is also unfounded. The majority refers to the applicable zoning law specifying developments and uses permitted, noting that former PCC 18.50.185 divided them into three

categories. Majority at 1153. The majority then says that former PCC 18.50.185(C)(1)[2] expressly considered a subdivision a permitted use under the zoning code, "[l]ike the statutory definition." Majority at 1153–1154.

However, while a subdivision may be a permitted use under the zoning code, the majority's equation of preliminary plat approval to a subdivision as the term is used in former PCC 18.50.185 suffers from the same flaw as its main analysis. That is, while a subdivision can involve land that has been divided into parcels for the transfer of title to each parcel, as the statutory definition of "development" in former PCC 18.50.145(D).3(B) contemplates, a preliminary plat cannot. Therefore, I do not find persuasive the majority's attempt to reinforce its conclusion by equating the zoning code to the ordinance's definition of "development."

Finally, I note that Pierce County maintains, in an argument directed at whether state law preempts any local ordinances respecting revocation, that the authority to revoke is implied in state law. It is not necessary to reach **\*490** the question of preemption, since the local ordinances did not, in any event, purport to authorize revocation of preliminary plat approval.

In contrast to the majority, I would hold that none of the express revocation provisions in Pierce County's former land use regulations applies to authorize revocation of HJS Development's preliminary plat approval. Accordingly, the superior court's decision should be affirmed.

SANDERS, J., concurs.

**All Citations**

148 Wash.2d 451, 61 P.3d 1141

Footnotes

\*      Judge Charles Z. Smith is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a).

1      Fox Ridge Investments filed the preliminary plat and site plan application. Respondent HJS Development, Inc., is the property owner. Both entities are the same party Respondent on this appeal.

2      Under RCW 58.17.033(2), [t]he requirements for a fully completed application shall be defined by local ordinance. Appellant acknowledges Respondent filed a complete application for plat approval.

3      Clerk's Papers at 37. The Gig Harbor Peninsula Development Regulations, which regulated development of all

Confidential    ROSS-000179483

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

     property on the Gig Harbor Peninsula in unincorporated Pierce County, former chapter 18.50 of the Pierce County Code, required proposed plats to be processed with a site plan in the Rural–Residential Environment.

4     *Id.*

5     Clerk's Papers at 181.

6     In 1989 the Pierce County Council amended the comprehensive plan and the Gig Harbor Peninsula Development Regulations and adopted the Rural–Residential Environment of the Gig Harbor Peninsula Comprehensive Plan which included essentially all of Fox Island.

7     The Pierce County Comprehensive Plan became effective on January 1, 1995.

8     Clerk's Papers at 37.

9     *Id.* at 249–50 (emphasis added).

10     *Id.* at 140, 198. Former PCC 21.14.030(c)(2), "Geologically Hazardous Areas" Ordinance states: "The development proposal may be approved, approved with conditions or denied based [upon] the Department's evaluation of the ability of the proposed mitigation measures to reduce risks associated with the erosion and landslide hazard area."

11     *Id.* (citing Administrative Record at 819).

12     *Id.*

13     *Id.* (citing Administrative Record at 822–23).

14     *Id.* (citing Administrative Record at 826–28). Appellant's brief cites the report in stating "Selective clearing is considered to be acceptable with the 50 foot BSBL [building setback and buffer line] for the purpose of creating lawns and landscaped areas. Selective clearing is defined herein to mean the removal of small trees, bushes and other low-lying vegetation and the removal of dead, diseased or dangerous trees. No trees greater than 36 inches in diameter at breast height (dbh) occurring within the BSBL or upon adjacent steep slopes shall be removed with the exception of dead, diseased or dangerous trees."

15     Clerk's Papers at 198.

16     *See id.* (noting former § PCC 21.14.030(c)(2)) "Geologically Hazardous Areas" and former PCC 21.20.080.D "Critical Areas and Natural Resource Land Authority and Purpose."

17     *Id.*

18     *Id.* at 201.

19     *Id.*

20     *Id.* at 202 (emphasis added).

21     *Id.*

22     *Id.*

Confidential

ROSS-000179484

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

23    *Id.* at 203–04.

24    *Id.* at 175.

25    *Id.* at 175–76.

26    *Id.* at 174–95.

27    Verbatim Report of Proceedings (VRP) of Recorded Hearing Before Hearing Examiner Stephen K. Causseaux, Jr. (Feb. 5, 1998) at 3–8.

28    VRP at 5.

29    *Id.*

30    *Id.* at 9–18.

31    *Id.*

32    Clerk's Papers at 174–95. The hearing examiner's decision adopted all of the MDNS mitigated measures as conditions of approval.

33    VRP (Oct. 4, 2000) at 6.

34    *Id.;* Clerk's Papers at 208.

35    Clerk's Papers at 208.

36    VRP (Oct. 4, 2000) at 6.

37    *Id.* at 128.

38    *Id.* at 18, App. C.

39    Clerk's Papers at 208.

40    *Id.*

41    *See* Title 18(h) PCC and chapter 76.09 RCW.

42    Clerk's Papers at 208. Two Fox Island residents also filed a petition for revocation of the preliminary plat.

43    *See* VRP (Oct. 4, 2000).

44    Clerk's Papers at 209.

45    *Id.*

Confidential    ROSS-000179485

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

46    Clerk's Papers at 212.

47    *Id.* at 231.

48    *Id.*

49    *Id.* at 64.

50    PCC 1.22.130 authorizes the examiner to "take such further action as is deemed proper"; Rule 1.11 of the Rules of Procedure for Hearings authorizes reopening of a hearing "for good cause shown" or in the "interest of justice."

51    Clerk's Papers at 70.

52    *Id.* at 4.

53    *Id.* at 79–124.

54    VRP (June 7, 2001).

55    The court did not address the moratorium issue. VRP (June 7, 2001) at 25–28.

56    VRP (June 7, 2001) at 104–06.

57    *Id.* at 106.

58    *Id.* at 109.

59    Notice of Appeal to Washington State Supreme Court, Number 71430–4 (Aug. 2, 2001).

60    Order Granting Review (July 1, 2002).

61    *See* RCW 36.70C.030 which provides specific exceptions; *Chelan County v. Nykreim,* 146 Wash.2d 904, 916–17, 52 P.3d 1 (2002).

62    *See Citizens to Preserve Pioneer Park v. City of Mercer Island,* 106 Wash.App. 461, 470, 24 P.3d 1079 (2001); RCW 36.70C.130(1), .020(1).

63    RCW 36.70C.130(1).

64    *Citizens,* 106 Wash.App. at 470, 24 P.3d 1079.

65    *King County v. Boundary Review Bd.,* 122 Wash.2d 648, 672, 860 P.2d 1024 (1993) (citing *Sherman v. Moloney,* 106 Wash.2d 873, 881, 725 P.2d 966 (1986); *Farm Supply Distribs., Inc. v. Wash. Utils. & Transp. Comm'n,* 83 Wash.2d 446, 448, 518 P.2d 1237 (1974); *Schmitt v. Cape George Sewer Dist. 1,* 61 Wash.App. 1, 4, 809 P.2d 217 (1991)).

66    *See City of Univ. Place v. McGuire,* 144 Wash.2d 640, 647, 30 P.3d 453 (2001); *Girton v. City of Seattle,* 97 Wash.App. 360, 363, 983 P.2d 1135 (1999) (citing *Boundary Review Bd.,* 122 Wash.2d at 672, 860 P.2d 1024; *Hilltop Terrace Homeowner's Ass'n v. Island County,* 126 Wash.2d 22, 29, 891 P.2d 29 (1995)).

Confidential

ROSS-000179486

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

67   *See* RCW 58.17.010; *Norco Const. Inc. v. King County,* 29 Wash.App. 179, 180, 627 P.2d 988 (1981).

68   *See* RCW 58.17.030, .070.

69   RCW 58.17.020(4).

70   RCW 58.17.100; *Norco Const. Inc.,* 29 Wash.App. at 180, 627 P.2d 988.

71   *See* RCW 58.17.100; PCC 16.08.020.

72   PCC 16.08.020.

73   *Norco Const. Inc.,* 29 Wash.App. at 181, 627 P.2d 988.

74   It is well established that if a case can be decided on nonconstitutional grounds, an appellate court should decline to consider the constitutional issues. *See Isla Verde Int'l Holdings, Inc. v. City of Camas,* 146 Wash.2d 740, 49 P.3d 867, 874 (2002); *State v. Speaks,* 119 Wash.2d 204, 207, 829 P.2d 1096 (1992).

75   Former PCC 18.50.970 and 18.50.975 (emphasis added). Standards for revocation established in the ordinance, former PCC 18.50.995, stated in part:
   Such revocation or modification shall be made on any one or more of the following grounds:
   ....
      D. That the permit or variance granted is being, or recently has been, exercised contrary to the terms or conditions of such approval, or in violation of any Statute, Resolution, Cod, Law or Regulation;
      E. That the use for which the approval was granted was so exercised as to be detrimental to the public health or safety, or so as to constitute a nuisance.

76   *See Burley Lagoon Improvement Ass'n v. Pierce County,* 38 Wash.App. 534, 540, 686 P.2d 503 (1984). In the city of Seattle, site plan plans are master use permits (MUPs) employed to streamline the regulatory review process. MUPs include a number or regulatory components such as environmental impact review, comprehensive plan review, and other use inquires. *See, e.g., Erickson & Assocs., Inc. v. McLerran,* 123 Wash.2d 864, 872 P.2d 1090 (1994). In the revocation hearing, the Pierce County Planning and Land Services Department requested the hearing examiner to consider revocation of the site plan for violations of the plat's conditions of approval. Clerk's Papers at 36.

77   Br. of Resp't (citing former PCC 18.50.960) (emphasis added).

78   Clerk's Papers at 231.

79   *Brister v. Council of Tacoma,* 27 Wash.App. 474, 476, 619 P.2d 982 (1980) (treating site plan and plat approval as separate processes). Although neither party defines site plan, it is unlikely to be confused with binding site plan. As defined by statute, a binding site plan is an alternative method in dividing land and exempted from the platting requirements of chapter 58.17 RCW. It is similar to a preliminary plat in that it requires a drawing to scale to subdivide land, but it is only applicable in three types of land uses: (1) commercially or industrially zoned property; (2) mobile home or travel trailer sites; and (3) condominium development. This case, involving single-family dwellings in a rural-residential zone, does not come within this definition.

80   *Lejeune v. Clallam County,* 64 Wash.App. 257, 270, 823 P.2d 1144 (1992).

81   *See McTavish v. City of Bellevue,* 89 Wash.App. 561, 565, 949 P.2d 837 (1998); *Brister,* 27 Wash.App. at 476, 619 P.2d 982.

82   *World Wide Video, Inc. v. City of Tukwila,* 117 Wash.2d 382, 392, 816 P.2d 18 (1991), *cert. denied,* 503 U.S. 986, 112 S.Ct. 1672, 118 L.Ed.2d 391 (1992).

Confidential                                                                                              ROSS-000179487

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

83    *Heinsma v. City of Vancouver,* 144 Wash.2d 556, 563, 29 P.3d 709 (2001).

84    *State v. Villarreal,* 97 Wash.App. 636, 641, 642, 984 P.2d 1064 (1999); *McTavish v. City of Bellevue,* 89 Wash.App. 561, 565, 949 P.2d 837 (1998).

85    *Burley Lagoon Improvement Ass'n,* 38 Wash.App. at 536, 686 P.2d 503 (citing *N. Pac. Coast Freight Bureau v. State,* 12 Wash.2d 563, 122 P.2d 467 (1942)).

86    *Burley Lagoon Improvement Ass'n,* 38 Wash.App. at 537, 686 P.2d 503 (citing *State ex rel. Spokane United Rys. v. Dep't of Pub. Serv.,* 191 Wash. 595, 71 P.2d 661 (1937)).

87    *Burley Lagoon Improvement Ass'n,* 38 Wash.App. at 538, 686 P.2d 503.

88    Former PCC 18.50.145A.2.

89    Respondent contends "permits" under the code does not refer to or make mention of preliminary plats. Instead the code specifies "use permits" for "conditional use," "unclassified use," and "nonconforming use" of the property and "building permits" and "site development permits" for development of the property, citing former PCC 18.203.050, 18.10.221.010, 18.10.610(I, N), .630(C, D), .680(B), .700(A)(1), .145U.2; PCC 17A.10.070).

90    *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.,* 142 Wash.2d 543, 554, 14 P.3d 133 (2000) ("preventing interference with agricultural activities by nearby non-agricultural land uses.").

91    *See* former PCC 18.203.050, 18.10.221.010, 18.10.610(I, N), .630(C, D), .680(B), .700(A)(1), .145U.2; PCC 17A.10.070.

92    Former PCC 18.50.145U.1, .145D.3.

93    *See id.*

94    Ordinarily, the word "or" does not mean "and" unless there is clear legislative intent to the contrary. *See State v. Tiffany,* 44 Wash. 602, 87 P. 932 (1906). Statutory phrases separated by the word "and" generally should be construed in the conjunctive. *See* 1A Norman J. Singer, *Statutes and Statutory Construction* § 21:14, at 179–81 (6th ed.2002).

95    Former PCC 18.50.145D.3.

96    *See id.*

97    *See, e.g., King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.,* 142 Wash.2d 543, 550, 14 P.3d 133 (2000); *Citizens for Mount Vernon v. City of Mount Vernon,* 133 Wash.2d 861, 947 P.2d 1208 (1997); *Christianson v. Snohomish Health Dist.,* 133 Wash.2d 647, 946 P.2d 768 (1997).

98    Br. of Resp't at 24.

99    *See* RCW 58.17.140, .150, .160, .170.

100    *See* RCW 58.17.170.

101    6 WASH. STATE BAR ASS'N, REAL PROPERTY DESKBOOK § 89.5(2) (1996).

102    *See Loveless v. Yantis,* 82 Wash.2d 754, 763, 513 P.2d 1023 (1973) (a preliminary plat approval constitutes a major action significantly affecting the environment, necessitating an environmental impact statement).

Confidential                                                                                                    ROSS-000179488

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

103    *See* RCW 58.17.170.

104    Former PCC 18.50.975 (emphasis added).

105    Clerk's Papers at 36; former PCC 18.50.180, .185.

106    "(A) Developments or uses permitted outright; (B) Development or uses permitted after administrative review and approval of a site plan by the Planning Department; and (C) Development or uses permitted after review and approval of a site plan by the Examiner after at least one public hearing." Former PCC 18.50.185.

107    Former PCC 18.50.185(C)(1) stated in part:
       1. Any use or activity which requires a public hearing or public meeting.... In the event any use or activity requires approval over and beyond the requirements of this Regulation and the Examiner has the authority to review the matter under the other Regulations or Code, the Examiner may consider the separate applications concurrently.... This Section shall be applicable, but not necessarily limited to, subdivisions....

108    CONST. art. XI, § 11.

109    *See Rabon v. City of Seattle,* 135 Wash.2d 278, 287, 957 P.2d 621 (1998); *Brown v. City of Yakima,* 116 Wash.2d 556, 559, 807 P.2d 353 (1991).

110    *Lenci v. City of Seattle,* 63 Wash.2d 664, 667–68, 388 P.2d 926 (1964) (citing *In re Iverson,* 199 Cal. 582, 250 P. 681 (1926)).

111    *Rabon,* 135 Wash.2d at 289, 957 P.2d 621; *Brown,* 116 Wash.2d at 560, 807 P.2d 353.

112    *Brown,* 116 Wash.2d at 560, 807 P.2d 353; *Lenci,* 63 Wash.2d at 669–70, 388 P.2d 926.

113    *Lenci,* 63 Wash.2d at 667–68, 388 P.2d 926 (citing *Letterman v. City of Tacoma,* 53 Wash.2d 294, 333 P.2d 650 (1958)).

114    *Id.* (citing *Winkenwerder v. City of Yakima,* 52 Wash.2d 617, 328 P.2d 873 (1958)).

115    Former PCC 18.50.975.

116    *See* VRP at 104 (June 7, 2001).

117    RCW 58.17.010 (emphasis added).

118    *City of Seattle v. Williams,* 128 Wash.2d 341, 359–60, 908 P.2d 359 (1995).

119    *Id.* at 347–48, 908 P.2d 359.

120    *Id.* at 349–50, 908 P.2d 359.

121    *Id.* at 363, 908 P.2d 359.

122    *Id.* at 353, 908 P.2d 359.

123    *See* RCW 58.17.100.

Confidential    ROSS-000179489

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

124    Br. of Resp't at 27.

125    *See Oliver v. Harborview Med. Ctr.,* 94 Wash.2d 559, 565, 618 P.2d 76 (1980).

126    *Trimen Dev. Co. v. King County,* 124 Wash.2d 261, 270, 877 P.2d 187 (1994); *Rabon v. City of Seattle,* 135 Wash.2d 278, 291, 957 P.2d 621 (1998).

127    *See* RCW 58.17.100, .110. *See also Isla Verde Int'l Holdings v. City of Camas,* 146 Wash.2d 740, 49 P.3d 867, 880 (2002) ( " [L]ocal governments have the authority to adopt regulations or to withhold plat approval if appropriate provisions have not been made ... "); *Norco Constr.,* 29 Wash.App. at 180, 627 P.2d 988.

128    *Id.*

129    Former PCC 18.50.995.

130    *See* RCW 58.17.100, .110 (allowing enactment of regulations for the public health, safety, and general welfare).

131    *Lenci,* 63 Wash.2d at 670, 388 P.2d 926.

132    *Heinsma,* 144 Wash.2d at 565, 29 P.3d 709 (citing *Brown,* 116 Wash.2d at 561, 807 P.2d 353).

133    *Heinsma,* 144 Wash.2d at 565, 29 P.3d 709.

134    *Rabon,* 135 Wash.2d at 292, 957 P.2d 621 (citing *Trimen Dev. Co.,* 124 Wash.2d at 269, 877 P.2d 187; *City of Bellingham v. Schampera,* 57 Wash.2d 106, 110–111, 356 P.2d 292 (1960)).

135    Br. of Resp't at 31, 32.

136    *See* RCW 58.17.140.

137    *Id.*

138    *Friends of the Law,* 123 Wash.2d at 522, 869 P.2d 1056; RCW 58.17.030.

139    *See* RCW 58.17.100, .110.

140    *See* RCW 58.17.110.

141    *Boundary Review Bd.,* 122 Wash.2d at 672, 860 P.2d 1024.

142    *See McGuire,* 144 Wash.2d at 647, 30 P.3d 453; *Girton,* 97 Wash.App. at 363, 983 P.2d 1135 (citing *Boundary Review Bd.,* 122 Wash.2d at 672, 860 P.2d 1024; *Hilltop Terrace Homeowner's Ass'n,* 126 Wash.2d at 29, 891 P.2d 29).

143    Clerk's Papers at 212–13.

1    Under RCW 58.17.205, an offer or agreement to sell, lease, or transfer a lot, tract, or parcel of land that is expressly conditioned on recording of the final plat is not subject to RCW 58.17.200's injunctive action.

Confidential    ROSS-000179490

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

2    That code provision states in relevant part:
    "Developments or uses permitted after review and approval of a site plan by the Examiner after at least one public hearing are as follows:
    "1. Any use ... which requires a public hearing or public meeting according to any other law, ordinance, regulation, or Code.... This Section shall be applicable, but not necessarily limited to ... subdivisions...."
    Former PCC 18.50.185(C)(1).

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Confidential                                                                                ROSS-000179491

# EXHIBITS 44-76

## Redacted in their Entirety

# EXHIBIT 77

# Westlaw is Suing Us. Our Response:

 **Andrew Arruda**  [Follow]
May 7 · 5 min read

Yesterday, Westlaw filed a suit alleging that ROSS stole its proprietary data to fast-track our technology development. These allegations are false. We did nothing wrong. Below, we release internal communications, agreements, and work product related to Westlaw's claims. It saddens us to be writing this piece, taking away our focus from delivering useful features to our customers.

In 2017, we started work with a contractor called LegalEase to build datasets to train our artificial intelligence (AI) systems. We needed legal questions mapped directly to passages from case law that answer those questions. It was crucial that the passages mapped directly to case law in our database because we wanted to teach our system to give on-point answers directly from primary law.

In 2018, Westlaw filed a suit against LegalEase claiming that LegalEase gave us proprietary data in the form of headnotes, case summaries, and other editorial content. We never asked for or used proprietary data from Westlaw. Not only could we not map this proprietary data to the case law in our database, our technology does not attempt to generate editorialized answers; instead, it aims to recognize and extract answers directly from case law using machine learning. In fact, anyone that accesses our platform (which is freely accessible through our website) can readily see that we have no editorialized content. It has always been our view that the editorialized content approach, in addition to being fallible and difficult to quality-check, produces work that is stale the moment it is published. That is the old legal research playbook. We chose a new way.

In fact, when LegalEase did once send us unsolicited Westlaw content, we immediately told them to not include such proprietary information. You can see this in the emails provided below. The first email is from one of our engineers who discovered the data, alerting the project lead. He said, "…they [LegalEase] include a lot of what seems to be Westlaw headnotes, footnotes, and other stuff. If it's possible for them to send us cases without that it would be much better as that is added noise…". The second email is from our project lead to our primary contact at LegalEase about the unwanted data. We were very clear: "if you can send us cases without that extra info, that would be great. Thanks."



TR-0000587



As a part of its suit against LegalEase, Westlaw subpoenaed us for all communications, agreements, and work product related to the claim. Westlaw and their attorneys were unable to find any evidence that we used or benefited from Westlaw's data. Below you can read a complete copy of the statement of work related to this matter. No matter; we had to spend over a hundred thousand dollars to comply with this subpoena. As a young company, this was a financial blow, which we are sure was not lost on Westlaw's executive team.



TR-0000588

SEE FULL AGREEMENT HERE.

Fast forward to earlier this week: we received notification that Westlaw had settled with LegalEase. We thought this costly distraction was behind us, but today we are back to square one. We opened Law.com to learn that Westlaw had filed a suit against us. That Westlaw notified the press before us is disappointing.

Since the founding of ROSS Intelligence, we have had one mission: to democratize the law through better legal technology. We recognize that for decades the legal research market has been dominated by Westlaw — with its bloated, expensive, and unintuitive products that provide bad results. We knew there was a better, and more affordable, way. Over the last five years, we have made tremendous progress. We've spent over a million dollars building our database of primary law from data partners such as Casemaker and Fastcase. We've innovated new tools and better ways of searching. We've signed up thousands of lawyers and law firms. And we've partnered with companies like Clio and Bar Associations across the United States. By filing this lawsuit despite its lack of merit, Westlaw is interfering with our chances of securing more funding or merging with other companies, which we need to do in order to innovate and compete with Westlaw. This is not the first time Westlaw has used litigation as a weapon.

We were one of the first donors to the ABA's Center for Innovation because their mission deeply resonated with ours. They believed that the intersection of law and technology affords the profession a tremendous opportunity to reshape both the delivery of and access to legal services for the 21st century. We are asking our friends and supporters in the legal community to help us fight this unfair attack and allow us to continue building products lawyers love. We believe that better legal technology can enable better access to justice at its core.

So, here we are. A small company versus a juggernaut. David versus Goliath. This litigation epitomizes everything that is wrong with Westlaw's business practices. Having done nothing wrong, unless case law is copyrightable… Of course, it is well established that primary law is not copyrightable in the United States. As has long been held and as the Supreme Court reminded us last week, "no one can own the law" (Georgia v. Public.Resource.Org, Inc., №18–1150, 590 U.S. ___ (2020)). Individuals must have free

TR-0000589

access to the law if American democracy is to survive. We will continue to fight for free access to the law and look forward to showing the world Westlaw's true colors.

**If you want to get involved in this fight, email us directly at thelawisfree@rossintelligence.com.**

Thank you for reading.

Andrew and Jimoh



TR-0000590

# EXHIBIT 78





facebook Sign Up
Email or Phone
Password
Log In
Forgot account?

**ROSS Intelligence**
June 18 at 12:47 PM ·

Westlaw:

🚫 Stuck in years-long contracts
🚫 Dozens of complicated plans and extra charges
🚫 Thousands of cases returned that require filtering
🚫 Bad search experience
🚫 Clunky, complicated, and outdated design

ROSS:

✅ Month-to-month contract, cancel anytime
✅ Full access to all features for as low as $69/month
✅ Relevant cases returned first
✅ Understands legal questions in plain language (Boolean optional)
✅ Beautifully designed interface made for 2020

Don't take our word for it. Try it free for 14 days.

ROSSINTELLIGENCE.COM
**Don't take our word for it. Try ROSS free for 14 days.**
No credit card required.
Learn More

56 54 Comments 14 Shares

Share

All Comments

**Adam Millican** She looks like she's making a very tough decision. It looks super stressful.
5
1w

**Stacey Jackson Roberts** Adam Millican anguishing...
1
1d

**Crystal McDonough** Does it come with state specific secondary sources such as Colorado practice manuals? Lexis provides these in our subscription. Would love to switch as our contract period is almost completed but we need these sources.
1
6d

Author
**ROSS Intelligence** Hi Crystal, we do not have secondary sources in our system at this time. I've shared your comment with the team so we can improve our product. Thank you!
1
1d

**Michael Payne** Oooh
1

**Related Pages**

- **Lyft** — Internet Company
- **The Young Turks** — TV Show
- **SAINt JHN** — Artist
- **Beastcoast** — Gaming Video Creator
- **Simba Chips** — Food & Beverage
- **Mercury** — Product/Service
- **University of Notre Dame** — College & University
- **Genesis** — Energy Company
- **Bloomberg Industry Group** — Publisher
- **Donotpay** — Product/Service
- **L3Harris Technologies** — Defense Company
- **Sprout Social** — Product/Service

**Pages Liked by This Page**

- **Lee County Bar - Solo and Small...**
- **Fastcase**

**Recent Post by Page**

1w

**Tim White** Does it has Internal Revenue Code, Treasury regulations, and IRS Rev. Rulings, Rev. Procs, and Tax Court Opinions?

26m

**Adam Robert Waldstein** Does it have overviews of foreign regulatory regimes like MiFID and the AIFMD?

1w

Author
**ROSS Intelligence** Hi Adam, at this time we do not have any documents outside of US case law and legislation (statutes and regulations).
Thanks for your question!

1d

**Marvin S. Robinson II** BOTH

1w

**Young Kim** I wish Ross took up Casetext AI challenge. Similar products, but the question remains? Who has the better product?

1w

**Hunter Tucker** What is it? lol

1w

**Daniel Anthony** Notice how no one's talking about Lexis.

1

5d

**Larry Bell** I know Business and not law

5d

**Oscar Argüello** She is like.... but my firm uses west law.... should I... should I not.... should I..... I'm just.... why the hell not!

1

5d · Edited

**Heather Bastine Kinser** The main thing we use Lexis for is the public records feature- Skip tracing basically. Does this have a similar feature? Also Lexis has sample forms, we don't get them with our subscription but I think they would be helpful. Have those?

3d

Author
**ROSS Intelligence** Hi Heather, at this time we do not have skip tracing or sample forms on ROSS. I've shared your comment with the team so we can improve our product.
Thank you!

1d

**Jake Petersen** Any actual users use this before?

1w

Author
**ROSS Intelligence** Here are some folks who've used ROSS!
https://www.rossintelligence.com/case-studies

1w

**Carly Nuttall Gibson** Joe Gibson

2d

**Scott Phillips** I tried Ross. Not a fan. It was hard to get useable results. The search engine has a hard time with boolean search strings and their natural language inquiries suck.

1d

**Scott Phillips** ROSS Intelligence - See my email to Alex Abid, Thursday, June 25, 2020 on or about 12:10 PM.
That was just relating to nonsensical problems importing and analyzing a garden variety pleading. We didn't even get to the search operator issues.

**ROSS Intelligence**
June 11 at 8:33 AM

ROSS is excited to be a launch partner with OpenAI on their first commercial product: an API. https://bit.ly/30wNter

15 2 Comments 2 Shares

Share

**ROSS Intelligence**
May 26 at 9:53 AM

Looking forward to joining LegalFuel and the Florida Bar at 2pm today to offer a free CLE on Legal Research and Profitability!

5 3 Comments

Share

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2020



1d

Author
**ROSS Intelligence** Scott sorry you had a tough time with ROSS - I wasn't able to find your outreach. I'll certainly speak with my colleagues to see if we can understand your bad experience. Also more than happy to offer an extension of your free trial and a 1-1 demo to run through your specific research queries.
1d

**Scott Phillips** ROSS Intelligence - Already have. My trial is over and I decided I'm not paying $60 monthly to beta test y'alls software.
1d

Author
**ROSS Intelligence** Hi Scott, thanks for your comments. We'd love to get your feedback and understand how you were using ROSS to get these poor results. Please email us at support@rossintelligence.com if you're willing to chat!
1d · Edited

**Cathy Troester Seidenberg** It's interesting how you went after Westlaw in this ad, since Thomson Reuters is suing you for copyright infringement for allegedly stealing Westlaw data. US District Court for the District of Delaware, 1:20cv613. Of course, I'm not saying that ROSS has done what is alleged, just that it's interesting that you've drawn attention to it when you could have just used LexisNexis instead.
5
4d

Author
**ROSS Intelligence** Hi Cathy, ROSS invites comparison with any other platforms. That's why we offer a 14-day free trial so that anyone can use our software and decide for themselves if our low price, comprehensive coverage, and accurate plain language search is right for them.

You may also read our response to the Westlaw allegations here: https://blog.rossintelligence.com/.../westlaw-copyright...

BLOG.ROSSINTELLIGENCE.COM
ROSS Intelligence Says Allegations of Copyright Theft Are False,…
1d

**Kyle Howard** Cathy Troester Seidenberg Even the Lexis rep here agrees that is wrong. Lol
2
2d

**Michael J. Burley** Lexis Nexis !!!!!!!!
1
1w

**Dave Brezina** https://news.bloomberglaw.com/.../thomson-reuters-sues...

NEWS.BLOOMBERGLAW.COM
Thomson Reuters Sues Ross Intel for Infringing Westlaw Copyright
22h

**Andrew Pfeiffer** What about comparing to Lexis? I know westlaw is crappy to use even if it's okay functional. Which is better than Bloomberg if you want anything besides the barest bones.
1
1w

Author
**ROSS Intelligence** Thanks for the kind words Bryce! Andrew if you'd like to try ROSS free, you can sign up and gain full access here: https://app.rossintelligence.com/signup



Westlaw! 🕘 Stuck in years-long... - ROSS Intelligence | Facebook

APP.ROSSINTELLIGENCE.COM
ROSS
2
1d

**Andrew Pfeiffer** Bryce Murray thanks for the feedback, I'll have to look into it! Lexis does know how to charge.
1
5d

**Bryce Murray** Andrew Pfeiffer for about 1/3 of the price of our lexis subscription we've found it as an adequate replacement. We miss certain little features of lexis but Ross' document review (reviews your memo/brief case law if you upload the brief) is pretty impressive.
3
5d

# EXHIBITS 79-80

## Redacted in their Entirety

# EXHIBIT 81

*LIBRARY OF CONGRESS*

*Copyright Office*
*of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that on April 8, 1981 a claim to copyright a work identified as **WESTLAW (BASIC DATA BASE FILE)** was registered under number **TXu 65-600.** This work was registered in accordance with provisions of the United States Copyright Law (Title 17 United States Code).

**THIS IS TO CERTIFY FURTHER**, that the attached is an additional certificate of this work.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on August 22, 2020.

Maria Strong
Acting United States Register of Copyrights and Director

By:    Jarletta Walls
Section Head
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. Copyright law 17 U.S.C. 101 et seq.

TR-0033982

# Additional Certificate of Registration of a Claim to Copyright

This is to certify that the statements set forth in the attached have been made a part of the records of the Copyright Office with claim of copyright registered under number

In testimony whereof, the seal of this office is affixed hereto on

**TXu 65-600**

**August 22, 2020**



Acting United States Register of Copyrights and Director

c-731 · 01/2020

TR-0033983

# FORM TX

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

TXu

65-600

TX    (TXU)

EFFECTIVE DATE OF REGISTRATION

APR 8 1981

(Month)    (Day)    (Year)

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE CONTINUATION SHEET (FORM TX/CON)**

**(1) Title**

**TITLE OF THIS WORK:**

WESTLAW (Basic Data Base File)

**PREVIOUS OR ALTERNATIVE TITLES:**

If a periodical or serial give: Vol...... No .... Issue Date ....................

**PUBLICATION AS A CONTRIBUTION:** (If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.)

Title of Collective Work: ............................... Vol..... No.... Date .............. Pages.............

**(2) Author(s)**

**IMPORTANT:** Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). If any part of this work was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates blank.

**1**

**NAME OF AUTHOR:**

West Publishing Co.

Was this author's contribution to the work a "work made for hire"? Yes X.... No ....

**DATES OF BIRTH AND DEATH:**

Born .......... Died ..........
(Year)    (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of U. S. A. ........ } or { Domiciled in ..................
(Name of Country)    (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**

Anonymous?    Yes ..... No X....
Pseudonymous?    Yes ..... No X....

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

Compilation, revisions, additions, etc.

**2**

**NAME OF AUTHOR:**

Was this author's contribution to the work a "work made for hire"? Yes...... No..

**DATES OF BIRTH AND DEATH:**

Born .......... Died ..........
(Year)    (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of ................ } or { Domiciled in ..................
(Name of Country)    (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**

Anonymous?    Yes ...... No .....
Pseudonymous?    Yes ...... No .....

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

**3**

**NAME OF AUTHOR:**

Was this author's contribution to the work a "work made for hire"? Yes .... No..

**DATES OF BIRTH AND DEATH:**

Born .......... Died ..........
(Year)    (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of ................ } or { Domiciled in ..................
(Name of Country)    (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**

Anonymous?    Yes ..... No .....
Pseudonymous?    Yes ..... No .....

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

**(3) Creation and Publication**

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED:**

Year 1981

(This information must be given in all cases.)

**DATE AND NATION OF FIRST PUBLICATION:**

Date .................
(Month)    (Day)    (Year)

Nation .................
(Name of Country)

(Complete this block ONLY if this work has been published.)

**(4) Claimant(s)**

**NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S):**

West Publishing Co.
P. O. Box 3526
50 W. Kellogg Boulevard
St. Paul, Minnesota 55165

**TRANSFER:** (If the copyright claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.)

---

• Complete all applicable spaces (numbers 5-11) on the reverse side of this page
• Follow detailed instructions attached    • Sign the form at line 10

DO NOT WRITE HERE

Page 1 of .... pages

TR-0033984

| EXAMINED BY: DL | APPLICATION RECEIVED: APR 8 1981 | FOR COPYRIGHT OFFICE USE ONLY |
|---|---|---|
| CHECKED BY: | | |
| CORRESPONDENCE: ☑ Yes | DEPOSIT RECEIVED: APR 8 1981 | |
| DEPOSIT ACCOUNT FUNDS USED: ☑ | REMITTANCE NUMBER AND DATE: | |

**TXu  65-600**

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM TX/CON)**

**PREVIOUS REGISTRATION:**

- Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?   Yes   No X
- If your answer is "Yes," why is another registration being sought? (Check appropriate box)
  - ☐ This is the first published edition of a work previously registered in unpublished form.
  - ☐ This is the first application submitted by this author as copyright claimant.
  - ☐ This is a changed version of the work, as shown by line 6 of this application.
- If your answer is "Yes," give: Previous Registration Number .............   Year of Registration .............

**⑤ Previous Registration**

**COMPILATION OR DERIVATIVE WORK:** (See instructions)

PREEXISTING MATERIAL: (Identify any preexisting work or works that this work is based on or incorporates.)
Copyright is not claimed as to any part of the original work prepared by a United States Government officer or employee as part of that person's official duties.

MATERIAL ADDED TO THIS WORK: (Give a brief, general statement of the material that has been added to this work and in which copyright is claimed.)
Compilation of previously published case reports including but not limited to opinions, synopses, syllabi or case law paragraphs, key number class, tables & index digest with revisions & additions. Also included is training and descriptive information and annotated citations.

**⑥ Compilation or Derivative Work**

**MANUFACTURERS AND LOCATIONS:** (If this is a published work consisting preponderantly of nondramatic literary material in English, the law may require that the copies be manufactured in the United States or Canada for full protection. If so, the names of the manufacturers who performed certain processes, and the places where these processes were performed must be given. See instructions for details.)

| NAMES OF MANUFACTURERS | PLACES OF MANUFACTURE |
|---|---|
| West Publishing Co. | P.O. Box Box 3526, 50 W. Kellogg Blvd. St. Paul, Minnesota 55165 |

**⑦ Manufacturing**

**REPRODUCTION FOR USE OF BLIND OR PHYSICALLY-HANDICAPPED PERSONS:** (See instructions)

- Signature of this form at space 10, and a check in one of the boxes here in space 8, constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols); or (2) phonorecords embodying a fixation of a reading of that work; or (3) both.

  a ☐ Copies and phonorecords        b ☐ Copies Only        c ☐ Phonorecords Only

**⑧ License For Handicapped**

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)
Name: West Publishing Co.
Account Number: DA 021970

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)
Name: West Publishing Co.
Address: PO Box 3526, 50 W. Kellogg Blvd. (Apt.)
St. Paul, Minnesota 55165 (ZIP)
(City) (State)

**⑨ Fee and Correspondence**

**CERTIFICATION:** ✱ I, the undersigned, hereby certify that I am the: (Check one)
☐ author ☐ other copyright claimant ☐ owner of exclusive right(s) ☑ authorized agent of   West Publishing Co.
(Name of author or other copyright claimant or owner of exclusive right(s))
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature (X)   _Rufus K. Griscom_

Typed or printed name   Rufus K. Griscom        Date   1 April 1981

**⑩ Certification (Application must be signed)**

| MAIL CERTIFICATE TO | West Publishing Co. (Name) |
|---|---|
| | P. O. Box 3526, 50 W. Kellogg Blvd. (Number, Street and Apartment Number) |
| | St. Paul, Minnesota 55165 (City) (State) (ZIP code) |

(Certificate will be mailed in window envelope)

**⑪ Address For Return of Certificate**

✱ 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

● U.S. GOVERNMENT PRINTING OFFICE: 1979-281-421/4        Mar. 1979-200,000

TR-0033985



# EXHIBIT 82

*LIBRARY OF CONGRESS*

*Copyright Office of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that on August 8, 2019 a claim to copyright a work identified as **GROUP REGISTRATION FOR AUTOMATED DATABASE TITLED "WESTLAWNEXT"; UNPUBLISHED UPDATES APRIL 1, 2019 THROUGH JUNE 30, 2019; REPRESENTATIVE CREATION DATE: JUNE 5, 2019; UPDATED DAILY** was registered under number **TXu 2-178-620.** This work was registered in accordance with provisions of the United States Copyright Law (Title 17 United States Code).

**THIS IS TO CERTIFY FURTHER**, that the attached is an additional certificate of this work.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on August 22, 2020.

Maria Strong
Acting United States Register of Copyrights and Director

By:    *Jarletta Walls*
Jarletta Walls
Section Head
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. Copyright law 17 U.S.C. 101 et seq.

TR-0034557

Additional Certificate (17 U.S.C. 706)

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## TXu 2-178-620

**Effective Date of Registration:**
August 08, 2019
**Registration Decision Date:**
February 04, 2020

## Title

**Title of Work:** Group Registration for automated database titled "WestlawNext", unpublished updates from April 1, 2019 through June 30, 2019; representative creation date: June 5, 2019; updated daily.

## Completion/Publication

**Year of Completion:** 2019

## Author

| | |
|---|---|
| **Author:** | West Publishing Corporation |
| **Author Created:** | original and revised text and compilation of legal material |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |
| **Anonymous:** | No |
| **Pseudonymous:** | No |

## Copyright Claimant

**Copyright Claimant:** Thomson Reuters Global Resources
Neuhofstrasse 1, 6340 Baar, Switzerland
**Transfer statement:** By assignment

## Limitation of copyright claim

**Material excluded from this claim:** previously registered unpublished database
**Previously registered:** Yes
**Basis of current registration:** This is a changed version of the work.

**New material included in claim:** daily updates of original and revised text and compilation of legal material

## Certification

**Name:** Rebecca Matzek

**Date**:    August 05, 2019

**Copyright Office notes:**    Regarding limitation of claim: Registration does not extend to U.S. government works or government edicts that have been issued by any state, local, or territorial government, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or similar types of official legal materials that have the force of law. 17 U.S.C. 105; Compendium 313.6(C)(2).

Regarding previous registration: Information added by CO from information provided by applicant.

TR-0034559

**Registration #:**  TXu002178620
**Service Request #:**  1-7993872098

Thomson Reuters
Rebecca Matzek
610 Opperman Drive
St. Paul, MN 55164 0526

TR-0034560