# EXHIBIT 83

EXHIBIT 57
WIT: —
DATE: 10.10.19
LORI A. BALDWIN CSR, RPR, CRR

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| WEST PUBLISHING CORPORATION,<br><br>Plaintiff / Counterclaim-Defendant,<br><br>v.<br><br>LEGALEASE SOLUTIONS, LLC,<br><br>Defendant / Counterclaim-Plaintiff. | : | Civ No. 18-CV-01445 (DSD/ECW) |

## AMENDED NOTICE OF DEPOSITION

TO: LegalEase Solutions, LLC
c/o Amanda Cefalu, Esq.
Kutak Rock LLP
60 South Sixth Street, Suite 3400
Minneapolis, MN 55402

**PLEASE TAKE NOTICE** that on **October 9, 2019**, at **9:00 a.m.,** at the offices of Kerr, Russell and Weber, PLC, 500 Woodward Avenue, Suite 2500, Detroit, MI 48226, Plaintiff and Counterclaim-Defendant West Publishing Corporation, by its attorneys, will take the deposition upon oral examination of Teri Whitehead. The deposition will be recorded by stenographer, will be conducted before a person authorized to administer oaths in accordance with Rule 28 of the Federal Rules of Civil Procedure, and will continue day to day until completed or otherwise adjourned or continued by agreement of counsel. The deposition may be also be recorded by a videographer. The deposition is being taken for purposes of discovery, use at trial, and such purposes as are permitted under the Federal Rules of Civil Procedure.

You are invited to attend and cross-examine.

Dated: September 25, 2019

Lora Mitchell Friedemann (#0259615)
Fredrikson & Byron, P.A.
200 South Sixth Street
Suite 4000
Minneapolis, MN 55402
(612) 492-7185
*lfriedemann@fredlaw.com*

Scott T. Lashway (*pro hac vice*)
Mara A. O'Malley (*pro hac vice*)
Manatt, Phelps & Phillips, LLP
177 Huntington Avenue
Boston, Massachusetts 02115
(617) 646-1401
*SLashway@manatt.com*
*MOMalley@manatt.com*

***Attorneys for West Publishing Corporation***

**CERTIFICATE OF SERVICE**

I, Mara A. O'Malley, hereby certify that a true copy of West Publishing Corporation's Notice of Deposition was served on September 25, 2019, by U.S. Mail and electronic mail upon counsel of record for LegalEase Solutions, LLC: Amanda Cefalu, Kutak Rock LLP, 60 South Sixth Street, Suite 3400, Minneapolis, MN 55402-4018, *amanda.cefalu@kutakrock.com*; and Kassem Dakhlallah, Hammoud, Daklallah & Associates PLLC, 6050 Greenfield Road, Suite 201, Dearborn, MI 48126, *kd@hdalawgroup.com*.

Mara A. O'Malley

EXHIBIT 67
WIT: —
DATE: 10·10·19
LORI A. BALDWIN CSR, RPR, CRR

Volume 1

Pages 1 to 265

Exhibits 1 to 29

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

WEST PUBLISHING
CORPORATION                Civ No. 18-CV-01445 (DSD/ECW)

Plaintiff/Counterclaim
Defendant,

-vs-

LEGALEASE SOLUTIONS, LLC,

Defendant/Counterclaim-Plaintiff.
/

The Deposition of TARIK HAFEEZ,
Taken at 500 Woodward,
Detroit, Michigan,
Commencing at 9:00 a.m.,
Tuesday, December 18, 2018,
Before Shacara V. Mapp, CSR-9305.

APPEARANCES:

MR. SCOTT T. LASHWAY
Holland & Knight
10 St. James Avenue
Boston, MA 02116
(617) 305-2119
scott.lashway@hklaw.com
Appearing on behalf of the Plaintiff/Counterclaim-Defendant.

MR. KASSEM M. DAKHLALLAH
Hammoud & Dakhlallah
6050 Greenfield Road
Suite 201
Dearborn, Michigan 48126
(313) 551-3038
kd@hdalawgroup.com
Appearing on behalf of the Defendant/Counterclaim-Plaintiff.

ALSO PRESENT:

- Videographer: Neal Rogers
- Erik Lindberg
- Jeanpierre Juliano

TABLE OF CONTENTS


| Witness | Page |
|---|---|
| TARIK HAFEEZ | |
| EXAMINATION BY MR. LASHWAY: | 8 |
| EXAMINATION BY MR. DAKHLALLAH: | 259 |


INDEX TO EXHIBITS


| Exhibit | Page |
|---|---|
| HAFEEZ EXHIBIT 1<br>Notice of Rule 30(b)(6) Deposition of LegalEase, LLC | 7 |
| HAFEEZ EXHIBIT 2<br>Michigan Dept. Of Consumer & Industry Services Fax Sheet | 7 |
| HAFEEZ EXHIBIT 3<br>LARA Corporations LegalEase Filing | 7 |
| HAFEEZ EXHIBIT 4<br>Intelligence is the Ability to Adapt to Change Packet | 57 |
| HAFEEZ EXHIBIT 5<br>Thomas Reuters Order Form<br>Order ID: Q-00105954 | 72 |


2016
RULE → LEGAL RESEARCH WRITING WORK,
PARTNERSHIP,
CORPORATE COUNSEL
2016 EMAIL

INDEX TO EXHIBITS, Continued


| Exhibit | Page |
|---|---|
| HAFEEZ EXHIBIT 6<br>Master Service Agreement | 76 |
| HAFEEZ EXHIBIT 7<br>Statement of Work | 76 |
| HAFEEZ EXHIBIT 8<br>Statement OF Work II for Ross Bulk Memos | 76 |
| HAFEEZ EXHIBIT 9<br>Master Service Agreement from 8/10/17 | 77 |
| HAFEEZ EXHIBIT 10<br>Defendant/Counterclaim-Plaintiff Responses to Plaintiff's First Set of Requests for Admissions | 77 |
| HAFEEZ EXHIBIT 11<br>First Amendment to Statement of Work | 77 |
| HAFEEZ EXHIBIT 12<br>9/28/17 E-mail Subject: Minutes of Meeting ROSS Bulk Project and ROSS Original | 126 |
| HAFEEZ EXHIBIT 13<br>7/31/17 E-mail Subject: New West Law Passwords-July 2017 | 144 |

INDEX TO EXHIBITS, Continued


| Exhibit | Page |
| --- | --- |
| HAFEEZ EXHIBIT 14<br>7/26/17 E-mail Subject: ROSS-TC<br>Tomas 7 26 17 | 149 |
| HAFEEZ EXHIBIT 15<br>Statement of Work II LegalEase<br>Process Automation | 157 |
| HAFEEZ EXHIBIT 16<br>Master Service Agreement Effective 8/10/17 | 183 |
| HAFEEZ EXHIBIT 17<br>8/18/17 E-mail Subject: WL Registration<br>Keys | 205 |
| HAFEEZ EXHIBIT 18<br>9/5/17 E-mail Subject: Ross Portal | 207 |
| HAFEEZ EXHIBIT 19<br>9/15/17 E-mail Subject: Ross Bulk Project<br>- LPO | 213 |
| HAFEEZ EXHIBIT 20<br>9/15/17 E-mail Subject: Ross Bulk Project<br>- LPO | 216 |
| HAFEEZ EXHIBIT 21<br>9/18/17 E-mail Subject: LegalEase Bulk<br>Memo Project Request | 221 |

INDEX TO EXHIBITS, Continued


| Exhibit | Page |
|---|---|
| HAFEEZ EXHIBIT 22<br>9/19/17 E-mail Subject: Ross Bulk Project-LPO | 225 |
| HAFEEZ EXHIBIT 23<br>10/10/17 E-mail Subject: Permanent ID's Still Not Established | 233 |
| HAFEEZ EXHIBIT 25<br>12/4/17 E-mail Subject: Ancillary Block | 239 |
| HAFEEZ EXHIBIT 26<br>Thomas Reuter Research Subscriber Agreement | 243 |
| HAFEEZ EXHIBIT 27<br>Thomson Reuters General Terms and Conditions | 243 |
| HAFEEZ EXHIBIT 28<br>Thomson Reuters Schedule A | 244 |
| HAFEEZ EXHIBIT 29<br>Westlaw Schedule A | 245 |

Detroit, Michigan
Tuesday, December 18, 2018
About 9:06 a.m.

* * *

HAFEEZ EXHIBIT 1
Notice of Rule 30(b)(6) Deposition of
LegalEase, LLC;
HAFEEZ EXHIBIT 2
Michigan Dept. Of Consumer & Industry
Services Fax Sheet;
and HAFEEZ EXHIBIT 3
LARA Corporations LegalEase Filing
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

THE VIDEOGRAPHER: We are on the record. This is the video recorded deposition of Tariq Hafeez being taken in Detroit, Michigan. Today is December 18, 2018 and the time is 9:06 a.m. Will the attorneys please identify themselves and the court reporter please swear in the witness?

MR. LASHWAY: Scott Lashway on behalf of the Plaintiff and counterclaim Defendant, West Publishing Corporation.

MR. JULIANO: John Pierre Juliano from

Thomson Reuters on behalf of West Publishing Corporation.

MR. LINDENBERG: Erik Lindenberg, Thomson Reuters on behalf of West Publishing Corporation.

MR. DAKHLALLAH: Kassem Dakhlallah on behalf of the witness, the 30(b)(6) witness in this case, Tariq Hafeez.

TARIK HAFEEZ,

having first been duly sworn, was examined and testified on his oath as follows:

EXAMINATION BY MR. LASHWAY:

Q. Mr. Hafeez, it's nice to meet you. As I just mentioned, I represent the Plaintiff and -- I'm sorry, the Plaintiff and Counterclaim Defendant, West Publishing Corp.

And, Mr. Dakhlallah represents you for purposes of today's deposition?

A. Yes, that's correct. — NO.

Q. And does he represent LegalEase Solutions, LLC, the named Defendant and Counterclaim-Plaintiff as well?

A. Yes, he does. — NO.

Q. Okay.

MR. LASHWAY: Kassem, just to go over some quick stipulations, are you -- since this is our first deposition in the case, are you okay with preserving

all objections except to privilege and form until trial, and motions to strike reserved?

MR. DAKHLALLAH: Sure.

BY MR. LASHWAY:

Q. And Mr. Hafeez, we're going to request that you review the deposition transcript to ensure it's accurate, and review and sign the transcript. Is that okay with you?

A. Yes.

Q. Have you ever been deposed before?

A. No, I don't think so.

Q. All right. So let me go through a couple of ground rules for you, then, for today's purposes.

First, so far so good. If you wait for me to finish my questions for you to answer, and then I will do my best to do the same so that the court reporter can accurately record what is being said.

In addition, you'll have to answer verbally.

A. Yes.

Q. So nods of the head or uh-huhs or uhn-uhns don't necessarily work. If you don't understand a question of mine, I want you to ask me to clarify it. If you answer a question, I'm going to understand that you understood the question. Is that okay?

A. Yes.

Q. And if you need to take a break at all, please let me

know. The only thing I'll ask you to do unless your counsel instructs you otherwise, is to answer the question if there's one pending.
A. Yes.
MR. LASHWAY: One thing we're going to cover today, Kassem, is that the documents we received from you all in your production are not Bates numbered. We've applied a code to them just to try to keep them straight on our side. If you have any objections to that, just let us know. Obviously, you'll get a copy of all the exhibits.
Mr. Hafeez, can you spell your name for the record, please?
A. Sure. Tariq, T-A-R-I-Q. Last name, Hafeez, H-A, F like Frank, E-E-Z.
Q. And what is your current residential address?
A. 7577 Embassy Drive, Canton Michigan, 48187.
Q. And what is the current address for LegalEase Solutions, LLC?
A. 2373 South Main, Suite 150, Ann Arbor, Michigan, 48104.
Q. Is there any reason today, that would impact your ability to provide truthful answers?
A. No.
Q. You're not taking any medications?
A. No.

Q. Not under the influence of any drugs or alcohol?
A. No.
Q. Are you an employee of LegalEase Solutions, LLC?
A. Yes.

NO. LAID OFF OCT. 4.

Q. So I'm going to ask you at some point, about another LegalEase entity. Are you okay if I use LegalEase to refer to LegalEase Solutions, LLC and then I'll differentiate if I need to?
A. Yes.
Q. What is your title at LegalEase? — VP GLOBAL STRATEGY.
A. I'm the president and cofounder.
Q. And, has that been your title since you first became employed?
A. I have also had the title of general counsel.
Q. And do you have that title today?
A. On occasion.

→ WORK WITH CORPORATE CLIENTS ON DELIVERY

Q. What does that mean?
A. So I represent myself as general counsel when it comes to legal matters of the company. And, I also go by president and cofounder.
Q. So when you need legal advice, you also assume the title of general counsel?
A. Yes.
Q. And do you make the decision when you're going to carry the title, general counsel?

A. Yes.
Q. Have -- has there ever been another president or chief executive officer of LegalEase?
A. Yes. So Tariq Akbar is the CEO of LegalEase Solutions and also a cofounder.
Q. Are there any other cofounders?
A. No.
Q. Okay. Did you attend college?
A. Yes.
Q. Where? Where did you obtain your degree?
A. I got my bachelor's at the University of Michigan, Ann Arbor. And I also got my BA degree in political science from Michigan as well.
Q. What year did you graduate from college?
A. I graduated 1999 from undergrad and 2002 from law school.
Q. Do you have any other degrees?
A. I do not.
Q. Any other professional certifications?
A. No.
Q. What was your degree in undergrad?
A. Political science. And, there was a major called APTIS, Arabic, Persian, Turkish, Islamic Studies.
Q. Did you, or have you ever taken any classes or formal instruction in coding or technology focused

CWRU
YES
1994-2000 LAW SCHOOL
NO
COMMUNICATIONS
NO

engineering, computer science, anything like that?
A. No.
Q. Do you view yourself as a technologist? / NO
A. No.
Q. All right. So do you currently hold an active bar license in Michigan? YES
A. I do.
Q. In any other jurisdictions?
A. Nope, only in Michigan.
Q. And are you currently practicing in Michigan? YES
A. Yes.
Q. Are you affiliated with a law firm? YES - WLC.
A. Yes.
Q. What is the name of that law firm?
A. It's called Fauson Bohn.
Q. Can you --
A. Spell it out for you? ~~2000~~ 2001
Q. Can you spell it for me? Thanks.
A. F-A-U-S-O-N B-O-H-N.
Q. How long have you worked at Fauson?
A. I would say between eight to nine years.
Q. So that would take us back to around 2010?
A. Yes. Maybe 2000 -- yeah, it was either 2010 or 2011. Yes
Q. So let's start in 2002. So did you take the bar exam in 2002?

A. I did, yeah.

Q. And you passed?

A. I did.

Q. And where was your first position after law school?

A. It was actually in this building at the Law Firm of Dickinson Wright.

Q. And what were you doing there?

A. I was an associate in the commercial lending and corporate department.

Q. And how long did you work at that firm?

A. About two years.

Q. And was your responsibilities there the same during the two-year tenure?

A. Yes.

Q. And then, where did you go after you left Dickinson Wright?

A. I joined the Michigan Attorney General's Office in, I believe, April of 2004.

Q. And what was your title; and what were your responsibilities at the AG's office?

A. Sure. So my title was Assistant Attorney General and I was in the Child Support Enforcement Division.

Q. What were your responsibilities in that position?

A. It was a -- we were prosecuting individuals who had not paid child support. So it was a felony prosecution

KIRK PATRICK & ASSOCIATES

ASSOCIATE

6 MONTHS TO A YEAR

WLC

that I went around the state charging and prosecuting people who did not pay child support.

Q. How long were you at the AG's office for?

A. I was there until June of 2005.

Q. So --

A. So barely over a year.

Q. Okay. And where did you go next?

A. Then, I started LegalEase. Well, actually, I -- I started working at LegalEase full time. The LegalEase company was started a few months earlier, as far as the corporation goes.

Q. And, you mentioned earlier, that you're the cofounder of LegalEase. So was the company founded before your arrival?

A. So both Tariq Akbar and I cofounded a company. Came up with the idea at the end of 2014 and we incorporated it in February of '15. But we still had our day jobs until June.

MR. DAKHLALLAH: Tariq, you got your decades wrong.

THE WITNESS: I'm sorry, I'm saying 2015. I apologize.

We came up with the idea at the end of 2004. And then, I -- we both left our jobs in June of 2005 to work at LegalEase or work on LegalEase full time.

WLC UNTIL 2010

2014/2015 I BELIEVE

BY MR. LASHWAY:

Q. Okay. And where -- and how long were you at LegalEase exclusively before you returned to practicing at a law firm or in a similar capacity?

A. So I believe in November of 2006, I got a position at the University of Michigan Law School as a, essentially, a career counselor for the lawyers or for JDs, or for law students, I should say.

And, I took that position. I believe I joined around Thanksgiving of 2006, in that rough time frame. And, I was there until April or maybe March of 2008.

Q. Okay. And were you still at LegalEase during that time period?

A. Yes. So we still had the business, but I just wasn't working at it full time.

Q. And then, in 2008, did you take on any additional employment?

A. No. So I was working full time as a career counselor at U of M. And around April of '08, I resigned from that position to go back into LegalEase full time.

Q. Okay. And how long were you full time or exclusive at LegalEase before taking another position?

A. So in April of '08, I started LegalEase full time again. And I joined Fauson Bohn, which was the next

WILLIAMS ACOSTA 2010-2014/2015

position I took. If you just give me a second, I've got to think about the dates here.

Q. Take your time.

A. I'm skipping decades here. I don't want to do that.

I believe it was January of 2010 that I started working at Fauson Bohn. But it may have been 2011. I -- I would need to look at something to confirm that.

Q. During that time period in between University of Michigan and Fauson Bohn, you were exclusively working at LegalEase?

A. So, no. Actually, I was working at LegalEase, but I had also started a side law practice as well, under the name Hafeez Law, PLLC. And it was that practice that I folded into Fauson Bohn when I started with them.

Q. Okay. And what was Hafeez Law focused on? What was your practice there?

A. For the most part, whatever I could get. It was some estate planning, commercial litigation, landlord and tenant, some corporate.

Q. Was this the first time in your practice that you had litigated?

A. Other than commer -- other than the criminal litigation I had done at Fauson Bohn and some projects I had worked on at Dickinson.

STARTED WITH A PROJECT PAID FLAT FEE THEN OFFERED A POSITION

Q. Fair enough.
And then, either in January of '10 or January of 2011, you joined Fauson?
A. I did, yes.
Q. And since joining Fauson, have you had any other positions other than LegalEase?
A. No.
Q. And would you -- when you were working at Fauson, are you full time at LegalEase? How does that work? How did you juggle that?
A. Sure. So Fauson Bohn was a client of LegalEase, so they know about our business and continued to use our services. So they -- basically, we approach each other, I guess, and we said hey, I got this law practice, but I also have the business. I would like to keep one foot in the law but still run my business as well.
So we picked an arrangement where, initially, I think for the first maybe six to eight months, I was working there full time. And I was expected to be there, you know, 40 hours a week, and I was getting paid a salary.
And then, after about a six-month period, my LegalEase business started getting busy again where I wanted to get -- focus more time on the business. And

TEACHING
NOT THAT I CAN RECALL
1) OCC
2) MEDIATOR 48TH DISTRICT COURT

essentially, I was -- I was treated as a, sort of, you know, eat what you kill.

So basically whatever I brought in, we had an arrangement where I would split the revenue with the firm. And there were no expectations of me other than that, you know, I'll continue to keep my license active and whatever work I get from a legal perspective will be done through the firm.

So it transitioned from being a full-time position in six months to being that scenario or situation which is how it's been ever since then.

Q. And are you paid a salary from LegalEase?

SALARY $95K

A. I am, yes.

Q. What's that salary based on? Is it a sentimental?

A. Yes. Currently, it's an actual salary. And it's -- that amount has fluctuated over the years.

Q. Okay. I'm going to hand to you, Mr. Hafeez, a document that has been marked already, as Exhibit 1.

Have you seen this document before?

A. I have, yes.

Q. When was the first time you saw it?

A. Whenever counsel forwarded it to me. I think back in November.

Q. And do you understand that this document is requesting a deposition of LegalEase, LLC as a 30(b)(6) witness?

A. Yes.
Q. Do you understand what that means?
A. Yes.
Q. Have you gone through the topics listed at schedule A?
A. I have.
Q. And are you the person most knowledgeable to speak about each of those topics on behalf of LegalEase?
A. Yes.
Q. Is there anyone else at LegalEase or elsewhere, outside of the company, that would be knowledgeable about any of these particular topics?
A. There definitely are certain people that would be knowledgeable about the particular topics, but I believe I would be a good representative for these topics.
Q. So at some point today, we'll start talking about names. But did you speak with any of those folks in preparation for today?
A. I spoke to at least one -- one individual.
Q. Who is that?
A. Her name is Gayathri Rajeev.
Q. Can you spell that for me?
A. Sure. It's G-A-Y-A-T-H-R-I. Her last name is R-A-J-I-V [sic].
Q. Where is Ms. Rajeev?

A. She is based out of Cochin, India.
Q. Does she spend time here in Michigan, in connection with LegalEase?
A. Not in Michigan, no.
Q. What is her role at LegalEase?
A. She is the director of operations in India.
Q. Is she an employee of LegalEase?
A. She's an employee of the India entity.
Q. What entity is that?
A. It is called LegalEase India Private -- LegalEase Solutions India Private Limited.
Q. And are you a cofounder of that entity?
A. No.
Q. Okay. Did you speak with anyone else to prepare for your testimony today, other than your counsel?
A. No.
Q. Did you review any documents in preparation for today?
A. Yes.
Q. Do you know if all those documents have been produced in this matter?
A. Yes.
Q. Did you do anything else to prepare for today's testimony?
A. No.
Q. Have you spoken with anyone other than your counsel and

LE Attorneys TH

Ms. Rajeev about this deposition?
A. In what -- I mean, I'm sorry, just in what sense?
Q. In any sense.
A. Yeah. So I -- my wife knows I'm here, my kids know, my parents know. My employees know.
Q. Employees at LegalEase?
A. Right.
Q. Is that it?
A. I think so.
Q. Does Mr. Akbar know you're here?
A. Yes.
Q. Have you reviewed the pleadings, the complaint and the answer in this matter?
A. Yes, I have.
Q. Were you involved in collecting documents for purposes of discovery in the litigation?
A. Yes.
Q. Were you the person who is responsible for doing that?
A. Yes.
Q. Is there anyone else involved?
A. Yes.
Q. Who is that?
A. So we had a -- our -- his title is Lead Technology. He's sort of our IT guy in India. His name is Hasan Faiz. I'll spell that for you.

Q. Thank you.
A. H -- yeah, we're going to have a lot of Indian names, so.
Q. I appreciate that.
A. H-A-S-A-N, Hasan. And his last name is Faiz, F-A-I-Z. He was the one who helped apply the search strings against our e-mail server and our Box server which is where we keep all of our documents.
Q. Okay.
A. As far as the setup of our E-discovery platform, which is Logical, we had another of our technology employees in India help with that. His name is Aditya, A-D-I-T-Y-A. I can't think of how to spell his last name --
Q. Okay.
A. -- because we just call him Adi. And, as far as review and tagging of the documents on the platform, it was primarily done by me. But I also had one of my attorneys in India do some initial review. And her name is Anitha, A-N-I-T-H-A. And her last name actually is just two letters, N-G.
Q. And is that how you say it, NG?
A. I've never called her by her last name.
Q. Okay.
A. So I don't know. I think it may actually be a longer

last name, but they customarily shortened it.
Q. They shortened it?
A. Yeah.
Q. Okay. So I'll go through the list here. Are Mr. Faiz, Adi and Ms. -- I'm sorry?
A. Anitha.
Q. Yeah, Anitha. Are they all employees of LegalEase?
A. Yeah, they're all employees of India entity.
Q. So you mentioned that you search strings. But do you remember what the search strings was, what the search words were?
A. I wrote it down on a notebook. Would you like me to take a look and give you the exact search strings or would you like me to give it to memory? Either way.
Q. If you have it with you, great. I'd love to hear what they are.
A. Okay.
Q. How long is the search string? Why don't you get it out and we'll take a look at it.
A. Yeah.
MR. DAKHLALLAH: Can we go off the record for one second?
MR. LASHWAY: Sure.
THE VIDEOGRAPHER: We are going off the record. The time is 9:29 a.m.

(Off the record at about 9:29 a.m.)

(On the record at about 9:33 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 9:33 a.m.

BY MR. LASHWAY:

Q. Mr. Hafeez, you had an opportunity to get a notepad out of your bag?

A. I did, yes.

Q. So can you explain to us what the search strings were that you used to search e-mail and the Box, again?

A. Sure. So the search strings we used were the words West Law, or Thomson Reuters, or Ross -- sorry, Ross Bulk Project, or Ross Intelligence, or Lexis, or Fraz Essa, F-R-A-Z-E-S-S-A, or Carolyn Rudberg, C-A-R-O-L-Y-N, R-U-D-B-E-R-G, or Cameron Tario, C-A-M-E-R-O-N, T-A-R-I-O. That was it.

Q. Anything else?

A. No.

Q. Was it limited by time?

A. Yes, it was.

Q. What was the time period?

A. The date range we used was June 2017 through February 2018.

Q. And why did you use that time period?

A. That was the relevant time period for the Ross Bulk

Project, which is what is at issue here.
Q. You mentioned e-mail. What kind of e-mail program or technology do you use, like G-mail?
A. We use Microsoft Exchange.
Q. Do you have your own Exchange server, or are you using the cloud version?
A. We -- I believe we are using the cloud version.
Q. Is that Microsoft Azure? Does that ring a bell?
A. Azure does not ring a bell in context of my understanding of our e-mail system, but what I do know is all of our employees in U.S. and India, LegalEase India, share a Microsoft Outlook Exchange platform. It seems to be cloud based.
Q. Okay. And do you have one e-mail address on that?
A. Me, personally?
Q. Yeah.
A. Myself?
Q. Yes.
A. Yes.
Q. Do the other employees and folks with LegalEase e-mail addresses have one e-mail address or multiple?
A. Each one has one e-mail address.
Q. How did you decide whose e-mail to search?
A. We -- we ran those search terms against the entire e-mail. The entire universe of e-mails on our Exchange

is what I understand.
Q. So you didn't limit it to any custodians?
A. We did not.
Q. Do you know roughly how many people have LegalEase e-mail addresses, or how many e-mail accounts have existed on the cloud server?
A. During what time range?
Q. During this time period.
A. This time frame?
Q. Yeah, that you have mentioned.
A. Probably around close to, maybe 70 to 100 accounts during that time frame.
Q. How many employees did LegalEase have during that same time period?
A. So the LegalEase -- again, we're referring to LegalEase as the LLC, correct?
Q. Yes. The LegalEase that is based here in Michigan.
A. Sure. So at that time period, we roughly had about five employees. And then, we had a number of U.S. based independent contractors as well.
Q. And how many employees did the India company have during the same time period?
A. During that time period, India had probably, 30 to 40 employees. And it also had a number of independent contractors.

Discovery



Q. Do you know how many independent contractors the LegalEase Solutions, U.S., and the LegalEase Solutions, India had, respectively?
A. I don't have the exact number.

No ?

Q. You don't?
A. I can give you an approximate if that would be helpful.
Q. That would be great.
A. Okay. I think at the height when we had the most people, we had maybe about ten independent contractors in the U.S. But that number was brought down to maybe a handful, five or six through the time period we're talking about. I take that back. Maybe about fifteen in the U.S. all together, and brought it down to about five, five or six in the U.S.
Q. So the high-water mark was fifteen?
A. Yes.
Q. And then, how about in India?
A. In India, we had -- we had some independent contractors that worked out of our office and I believe that number may have been ten or fifteen.
Q. Okay. And your search would have collected e-mails from all of those folks?
A. It should have, yes.
Q. Is there any reason to think that it didn't?
A. No. Not -- I mean, not without looking at it closely,

no.
Q. And the Box account, is that one shared account across the LegalEase entity here in the U.S. and the LegalEase entity in India?
A. Yes.
Q. What kind of information is stored on the Box account?
A. Pretty much everything that we use to run our business as far as documents and information. So everything from client contracts to sales materials and pitches, to actual work product that we create for our clients.
Q. And for purposes of the work product, do you segregate the material by client or customer?
A. We do, yes.
Q. Okay. Is there like a folder that would be called Ross, for example?
A. Yes.
Q. And what did you do to search the Box account for responsive information?
A. Again, my understanding, we applied the search strings against the Box account and pulled relevant documents from the Box.
Q. So going back to your search string, is it your understanding that if someone just used the word Ross, it would not have been triggered because you only picked up Ross Bulk Project or Ross Intelligence?

A. That's probably correct, yes.
Q. Did -- you mentioned a couple people that helped you perform this. Is there anyone else?
A. There may have been one additional person now that I think about it. The gentleman's name is Muhammad, M-U-H-A-M-M-A-D. Last name is Ansad, A-N-S-A-D. He's with a company called Code Matrix. He -- he may have had some involvement in compiling the documents, but my recollection and understanding is the previous gentleman I mentioned, Hasan Faiz was the primary person in charge of that.
Q. Is Mr. Ansad one of the independent contractors you mentioned, that has a LegalEase e-mail address?
A. I don't believe at that time, he had a LegalEase e-mail address. He was brought in as an outside vendor, to help us develop the automation tool. I don't think he had a LegalEase e-mail address at that time.
Q. How many automation tools are there?
A. So, we do have one for Ross. We also developed one for another of our corporate clients. Very different work, but the basic idea that we can automate some of our work load to make it more efficient. Those are the two primary ones that I can think of.
Q. And is that other customer that you just mentioned, are they involved in this litigation at all?

ANSAD TECH PERSON ALONG W/ TA

A. No, not at all.
Q. They're not related to any of the allegations we've asserted?
A. No.
Q. And you said we -- you've developed one for Ross; is that right?

Russell FCA

A. I did say we developed one, but I'm thinking we developed -- I mean, we may have developed two for Ross. And the reason there's two, there's two different types of work we were doing for Ross. So there may have been two tools.
Q. Okay. So since -- I want to go backwards here for a minute.
So LegalEase Solutions, LLC in the U.S. was founded sometime in 2005; is that right?
A. Yeah, I believe it was incorporated in 2005.
Q. Okay. I'm going to hand to you a document that's been marked as Exhibit 2. Have you seen this document before?
A. I have.
Q. And is this the filing that LegalEase Solutions, LLC did and stamped February 8, 2005?
A. Yes.
Q. And is that your signature at the bottom of it?
A. It is, yes.

Q. All right. So when you testified earlier that you were cofounder, is this document related to the founding of LegalEase Solutions, LLC?
A. Yes. This is the articles organization that Tariq and I, Tariq Akbar and I, drafted to file the company.
Q. Okay.
A. But it only has my signature since I was the incorporator.
Q. Yeah. And Tariq Akbar is not identified on this page, right?
A. No, he is not.
Q. Did you know -- do you recall if there's any additional filings that you did with the Bureau of Commercial Services, or is this just the one page?
A. As far as the articles go, I believe this is just the one page. We would have filed annual statements.
Q. Okay. Do you see in the middle where it says article two?
A. Mm-hmm.
Q. And there's something that's scribbled out?
A. Mm-hmm.
Q. So I'll represent this to you that we just took this off of the internet. Off of the portal for the Michigan Department of Consumer and Energy Services.
Do you know who black lined over that text?

NMSDC Minority Fdng

A. It was a long time ago, but my recollection is, when you file this initially with the state, the state can get very finicky about what type of purpose they'll accept if you're filing for a non-professional organization.

So my understanding was, the first time we filed it, they rejected it and they told us to remove certain language so that it wouldn't appear that we were providing professional legal services. What that language was that was removed, I don't know, but --

Q. That's my next question.

A. Yeah.

Q. Is, if you're able to see any of it? I see something about limited liability company, but I can't make out the rest of it.

Is there anything that refreshes your memory?

A. It does not.

Q. Okay.

A. But I'm pretty clear about the narrative I just mentioned which is, this was really just to get the articles filed so that LARA, or at the time, it was called Bureau of Commercial Services, would accept it.

Q. So it says that the company will provide legal support services to licensed attorneys. Do you see that?

A. Yes.

CONSULTANT
NOV. FEB. 2016
LEAD, LE PREFEED PARTNER PROGRAM
MARCH ~~FEB~~ - 2016
LEGAL RESERVE PARTNERSHIP
CORPORATE WORK.

55K SALARY
+ PLAN BONUSES
95K

Q. What does that mean?

A. So, we're not a law firm. We're a -- and really, when we started the business, we were sort of a new type of legal services entity, sometimes referred to as LPO, legal process outsourcing. But essentially, at this point, when we filed those articles, our goal for the business was to provide outsourcing support to lawyers about legal departments and law firms. As an outsource supporting their staff, not as professional legal counsel.

Q. And would the customer define the scope of those support services that you were going to provide, or did you have, at this point in time, in 2005, an understanding of what that work would involve?

A. Again, I think we were primarily targeting law firms and in-house legal departments.

Q. For what kind of work?

A. The type of work that I think we would have back then, which was legal research and document review, deposition summaries. Things that paralegals or, perhaps, younger associates would perform.

Q. And the next sentence says this company will not engage in the practice or performance of professional services as defined in MCL 450. Do you see that?

A. Yes.

Q. Is that getting to the point that you weren't going to be practicing law?
A. That's correct.
Q. All right. Is LegalEase Solutions, LLC registered in any other jurisdictions in the United States?
A. No, it's not.
Q. And is the principal place of business for LegalEase the address you provided earlier?
A. Yes.
Q. At one point in time, the address listed was your home address; is that right?
A. That's correct.
Q. Why did that change?
A. Well, we started the business out of my basement. Can't say it got much bigger than that, but we -- over the years, we moved to office space. And up until about July, we were in an office space in Ann Arbor, which is a different address than the one I gave you. Because in July, we moved from that space to another unit or another space in Ann Arbor, which was more in line with what we needed at that time.
Q. Okay. I'm just going to quickly show you Exhibit 3.
So, this is another document I'll represent to you that we pulled offline. Is this the same address that you provided to me earlier?

Office Rent A Suite.

A. I may have misstated the street. I may have said South Main Street and it's South State Street. I apologize.
Q. And who are the members of the LLC?
A. There's two members, myself and Tariq Akbar.
Q. Is Mr. Akbar here in the United States?
A. He is currently in India. He spends his time between India and the U.S.
Q. And do you know what his address is here in the United States?
A. I know what his legal address is, I believe. I mean, yeah, I do know it.
Q. What is it?
A. 300 Apple River Drive, Naperville, Illinois. I believe it's 60564. But I may be wrong on the ZIP Code there.
Q. And is that a residential address or a business address?
A. It's his sister's home, so that's where he stays when he comes to the U.S.
Q. Okay. So you and Mr. Akbar are the only members of the LLC?
A. That's correct.
Q. Is there a manager of the LLC?
A. I believe we have it as a member of manage, so the two of us manage the business.
Q. How did you initially capitalize LegalEase Solutions,

LLC?

A. Can you repeat the question?

Q. Yeah, I'm sorry. I'll rephrase it, too.

I was wondering how you initially capitalized LegalEase Solutions, LLC. Did you borrow money? Did you put your own money in? Did you not need money?

MR. DAKHLALLAH: I'm going to object. That goes beyond the scope of this 30(b)(6) deposition, and really beyond the scope of discovery in this case.

I mean, I guess I'll allow it for now, but we're getting really far afield of what we're here to do today.

THE WITNESS: When you say capitalized, I thought you meant how we actually spelled the name because the E is capitalized. But as far as capitalization goes, it was family and friends. Really family. My parents gave me some money. Tariq had some money that he broke out of his 401K. That's how it started.

BY MR. LASHWAY:

Q. And are you the cofounder of the LegalEase India --

A. I'm not.

Q. -- entity?

A. No.

Q. You're not?

A. No.
Q. Is that just Mr. Akbar?
A. It's not owned by either one of us.
Q. Who owns that?
A. It was owned by a now deceased, Mr. -- Mr. Wadood, W-A-D-O-O-D, and his wife, Fahti Mahl-Wadood, who are the sole shareholders of the India entity.
Q. All right. So the reason I was asking about capitalization is because I'm trying to understand the relationship between the two organizations, and I don't have an agreement between the two for any shared services or anything. So can you help me understand the relationship between the two?
A. The LegalEase Michigan, the Legalese you're referring to essentially would contract with LegalEase India for attorneys and would be invoiced for services provided.
Q. So LegalEase Solutions, LLC, Michigan, would be invoiced by LegalEase Solutions India for services that India provides to Michigan?
A. That's correct.
Q. And you said that there will be a contract. Is there a written? Is it formal? And how is this -- how is it documented?
A. I didn't say there was a contract. I think I just said invoice.

But there was no contract. And I believe there is no contract between the two entities.

Q. There is no contract? I just want to understand.

A. I don't -- I don't believe so. Yeah, I don't believe there's any written agreement or service contracts between the two entities.

Q. All right. So with respect to the Ross Bulk Project, do you know what I'm referring to when I use that?

A. Yes, I am. I mean yes, I do.

Q. As I read the documents, LegalEase Solutions India was involved in whatever that project was; is that correct?

A. That's correct.

Q. And how is it that LegalEase Solutions India provided services in connection with that project, from a contractual perspective?

A. So the agreement with all of our clients, we'll talk about Ross, the contractual agreement is between the client and LegalEase Michigan, LLC. And then, we staff the work either with our U.S. -- either with LegalEase U.S. based employees or independent contractors, or with the employees or contractors of LegalEase India.

Q. And in connection with that, LegalEase India would charge LegalEase Michigan for use of LegalEase India services or employees or contractors?

A. Right.

Q. And LegalEase Michigan would make payment to India?
A. That's correct.
Q. And would those payments be reflected in your Quick Books?
A. That's correct.
Q. Okay. And so, is Mr. Akbar the CEO of LegalEase India?
A. I think he represents himself to be CEO of both entities.
Q. How did it come that the two entities have similar names?
A. So when we started LegalEase Michigan, maybe a year later, Tariq Akbar's family incorporated the business in India and they stayed as the shareholders of the business. So although they are separate entities, we certainly have common management -- management.
Q. And I'm going to -- I'm not going to do well with this name, is it Mahmood? The owners of LegalEase India?
A. No, it's Wadood.
Q. Wadood?
A. Yeah.
Q. Thank you. And Ms. Wadood, is she related to Tariq Akbar?
A. She is.
Q. Okay. And how are they related?
A. She's his mother.

Q. Is that Ross?
A. Yes. Well, yeah, I guess Ross is both in California and Toronto so I'm not sure where they're incorporated.
Q. You work mostly with the Pelawatte based personnel, though?
A. They've switched back and forth, so I don't know where they spend most of their time. So yeah, we work with both. We work with Ross. We have -- or I should correct that. We worked with personnel both in Pelawatte and U.S.
Q. Does anyone report directly to you?
A. Yes.
Q. Who are those people?
A. Our VP for business development, Teri Whitehead. She also goes by title of Global Strategy. We also have -- we've had staff attorneys in the past. We currently have one part-time staff attorney in the U.S. She reports to me, as well.
Q. How about during this time period in late 2017, during the Ross project?
A. Yeah, we had one more staff attorney named Chris Schmidt, based out of Ann Arbor. He reported to me. I believe the others were independent contractors. So we have Teri and Chris.
Q. So what are Teri's responsibilities, or Ms. Whitehead's

responsibilities, and how do they differ from what you do? Or, is there some overlap?
A. There's some overlap. She's very focused on business development. And once we get a client, she's very. focused on bringing that client on board and being their account executive is really what she does.
Q. Was she the person that was the principal point of contact for the Ross project?
A. She was, yes.
Q. Both with Ross and with LegalEase India?
A. Yes.
Q. Is she an attorney?
A. Yes, she is.
Q. Do you know if she's licensed here in Michigan?
A. Yes, she is.
Q. Does she practice law?
A. No, not that I know of.
Q. Is she -- is she an employee?
A. She is.
Q. W-2 employee?
A. Yes.
Q. Okay. And who is Merin Sony?
A. Merin is one of our attorneys in LegalEase India.
Q. Does Merin spend time here in the U.S.?
A. No.

BD ATTORNEY SALES

Q. So is she an employee of LegalEase Michigan or LegalEase India?

A. LegalEase India.

Q. Does she report to you?

A. I guess -- well, let me put it this way. I guess as a -- as the president of LegalEase Michigan, I sort of have a responsibility for our employees here, and also -- no, I don't have direct reports or responsibilities in India, but they would at least see me as a figurehead, that I am someone, I'm a top executive in the organization.

But she would not directly report to me. That would be Gayathri Rajeev, who would be the director of operations in India. All the employees reported to her.

Q. Got it. So Ms. Sony would report to her in connection with that?

A. Yes.

Q. And in terms of LegalEase Michigan, do you and Mr. Akbar each own 50 percent?

A. Yes, we do.

Q. So what does Mr. Akbar do as the CEO of LegalEase India? What are his responsibilities is what I'm trying to get at?

A. Sure. So Mr. Akbar is involved with sort of overseeing

recruitment, overseeing financial, both for the U.S. entity as well as the India entity, budgeting, forecasting, making sure there are pricing for projects and work is appropriate, looking at profitability. He also plays a role in business development as well, for LegalEase Michigan.

And ultimately, Gayathri would report to Tariq Akbar.

Q. Got it. Does he earn income from LegalEase Michigan?
A. He does. He's an employee of LegalEase Michigan.
Q. So he gets a W-2 as well?
A. Yes.
Q. And who is Jessica Sharp?
A. Jessica is an attorney that we had as part of our team. She was an independent contractor.
Q. What were her responsibilities?
A. During this particular time period, she was in charge of quality control for the Ross project. So she was doing a lot of reviewing of the Word product, making sure that it fit the standards. She was also training people on the work.
Q. Does that include quality control of the memos that were generated by the two --
A. Yeah.
Q. -- automated tools?

A. That's primarily what she was doing, was quality control of the memos and also training other attorneys to do the work.
Q. So her job involved reviewing the memos, making sure they were formatted correctly?
A. More than formatted. I mean, formatting was one issue. The other issue was making sure that the substance of the memos, that the delineation of the cases were good, or topical or relevant or appropriate.
Q. And did you need an attorney to do that work?
A. I believe so, yeah.
Q. There was judgment involved?
A. Yes.
Q. Is she still working with LegalEase, either Michigan or India?
A. She's a -- she's still an independent contractor.
Q. Is she here in Michigan?
A. Yes, she is.
Q. And you mentioned earlier, Muhammad Ansad?
A. Mm-hmm, yes.
Q. Is he at Code Matrix?
A. Yes.
Q. Is he here in the United States?
A. No.
Q. He's only in -- or he works in Kerala, India; is that

KWV

right?

A. I believe he has two offices, one in Kerala and one in another city.

Q. Is that Bengaluru?

A. Yes.

Q. And what is the association of Mr. Ansad with, let's start with LegalEase Michigan?

A. I don't believe Mr. Ansad has any direct relationship with Legalese Michigan.

Q. Does he have a direct relationship with LegalEase India?

A. Yes. He was hired as a vendor. And there is an agreement that LegalEase India entered in with Code Matrix.

NOT SURE OF HIS EMPLOYMENT STATUS.

Q. Yeah. We're going to look at that in a little bit.

A. Sure.

Q. Now, is he an independent contractor of LegalEase India?

A. So for the -- for the time period involved, anything involved in the Ross project, he was brought in just as a vendor. So he was brought in to provide services specific to a date.

More recently, he has taken on some other roles within the company in terms of IT support, which he may be -- which he may be paid as an independent

contractor for.

But during this relevant time period, he was just a vendor. We didn't know him. We only got to know him back in June or July of 2017.

Q. You didn't get to work with him previously?

A. No.

Q. Has LegalEase India worked with him previously?

A. No.

Q. You mentioned earlier, the way you produced documents was using a portal. Is that right? I forget the name of it, but you mentioned that name earlier.

A. During the deposition?

Q. Yeah.

A. I don't recall mentioning that. But yes, we refer to different things as portals or tools. So we may need to --

Q. Is that something that you all built?

A. I'm sorry, I did mention the portal, yes. We contracted with outside vendors to build our platforms and portals.

Q. Is it -- what I'm trying to understand is, do you own any discovery platform?

A. Oh, no. Is that what you're talking about?

Q. I could tell we were talking past each other.

A. Logic Colt is a based -- cloud-based discovery platform

TA TAREQ AKBAR INTRODUCED HIM

that we subscribe to.

Q. Okay. And Mr. Ansad was involved in building the automated tools for the Ross project, right?

A. Yes.

Q. Shopna Harris, does that name ring a bell?

A. Yes.

Q. Who is Ms. Harris?

A. She's another attorney at LegalEase India.

SALES PERSON RESP FOR ROSS

Q. Okay. Was she part of the QC process?

A. Yes, she was.

NO, THAT DON'T THINK THEY GAVE US DIRECTION

Q. Was she a W-2 employee? I guess they don't have W-2 employees.

A. She's an employee of LegalEase India.

Q. But not of LegalEase Michigan?

A. That's right.

Q. I'm not asking you here in your -- I'm not asking for a legal opinion here, but I want to understand the difference between an employee that we were talking about and independent contractor, for purposes of the Ross project, from an operational perspective.

A. Can you clarify that question?

Q. Yeah. So what I'm trying to understand is, what is the difference between an independent contractor for purposes of the Ross project, and an employee from a perspective of roles, responsibilities, functionality?

Not the difference that the law would --
A. Sure.
Q. -- draw between the two.
A. On a very basic level, during this time period, we had a -- the largest project we ever had. So we needed staff for the project. But we knew this project wouldn't last forever, so instead of hiring employees, we went the route of hiring independent contractors which we look at as sort of temporary help.

So both on the U.S. side and India, we had independent contractors that were specific for this project. And when this project was completed, we would -- we would terminate them.
Q. And how did you decide to hire for this project between LegalEase Michigan and LegalEase India?
A. It was essentially, where we could get adequate resources for the project. We initially hired some independent contractors through Kelly Services in Michigan. And to our surprise, those folks were not doing the work well enough. The quality was not where we needed it to be. So we started hiring more people in India. We felt the quality was better there.
Q. And was the quality not satisfactory from your perspective or did Ross complain about it?
A. It may have been both, primarily from our perspective.

Kelly Focus- I believe our operation team

So we had our QC team reviewing the work done by our contractors. If they found major errors in judgment in terms of how these cases were classified, for example, or repeat errors on formatting, then that would raise a red flag.

Q. Do you know when you first started to anticipate the need to scale your team for the Ross project?

A. I believe it was June of 2017. We got a communication e-mail from Ross Intelligence that they were looking to roll out this big project and that we were being considered for it.

Q. Did you review that e-mail in preparation for today?

A. I did not.

Q. Do you know if this was connection with any type of RFP process?

A. I'm just trying to think about that, how the project came to us. I don't believe there was a formal RFP. But what we were told was, they were looking at a few different vendors and they would like us to pitch the work or the project, submit a proposal for how we would handle a project of this size, for which we did that. And I believe it was in that time range, June or July 2017.

Q. You had been doing work for Ross previously, correct?

A. We have, yes.

• COBRA COMPETITOR / ASSIST W/ PROPOSAL

Q. And was it of a similar nature in terms of Ross asking questions and LegalEase providing research?
A. Yes. So they were research memos that we were creating for them, that were similar. They were similar, yes.
Q. And were the -- have the memos been -- sorry.
Ross pays particular attention to the format of the memos that you provide to them, correct?
A. Yes, that's correct.
Q. And has the format of those memos ever changed since you began working with Ross?
A. Yes.
Q. Do you know when?
A. So it may be helpful to delineate between the work that we had for Ross, going up to the bulk project. Just so we can talk -- we know we're talking about the same thing.
We call the work that we had been doing at a steady state for Ross, we called that the Ross Original work.
Q. Yeah.
A. That original work had a particular format which it may have changed since they started working with us back in 2015. But that format is distinct from the Ross Bulk memo format which is -- which also, we started the project with a format and it had some slight variations

ROLE -

- REEGAGE CUSTOMERS
- ~~BUILD~~ MIDDLEMAN ~~MIDDLEMAN~~ BTWN OPERATIONS/DELIVERY & CUSTOMER
- ~~[illegible]~~. OVERSAW TO MAKE SURE DELIVERY

through the project.
Q. Based on Ross -- Ross's directive to you?
A. Based on Ross's directive to us, yeah.
Q. And how did they communicate generally with you, was it by e-mail? This is Ross. How did Ross communicate, generally, with you?
A. Ross was e-mail, but also phone calls. Called myself or Teri and talked to us.
Q. LegalEase is still providing services to other customers, correct?
A. That's correct.
Q. And do you have contracts for those services?
A. Yes.
Q. I've seen reference in some of your documents, referring to Spotify Associates. Does that ring a bell at all?
A. Spotify Associates?
Q. Yes.
A. We did do a project completely unrelated to Ross or this litigation for a company whose end client was Spotify.
Q. Was that also providing research memos with West Law data?
A. No, not at all. It was completely contract tagging, document review project.

VP. GLOBAL STRATEGY
→ PROMOTE SALES
→ OVERSAW.
→ WORKING OPERATIONS &
DELIVERY

---

→ LE
- BLAME ANSA
- BLAME ME

→ IT WASNT MY DECISION

→ SALES → FINAL DECISION

---

DID YOU OVERSEE
THE ROSS PROJECT
→ TO WHAT DEGREE

---

Q. Did anyone ever tell West about West -- sorry.
Did anyone ever tell West about LegalEase India?
A. That's kind of a broad question. I don't know, I guess. Are you talking about the sales reps that we were dealing with?
Q. Anybody.
A. Yeah, I don't know if they ever told the sales reps. We have had in the past, LegalEase India contract directly with Lexis. And I don't know if we ever had with West Law. It may have come in our direct contracts.
We have had in the past, LegalEase India contract with Lexis directly, for example. So it's possible we have contracted directly with West Law, but I don't recall.
Q. Do you not recall because you don't know, or you just don't remember sitting here today?
A. I don't remember. I looked at the West Law contracts for the past few years and they were all with the Michigan entity. But I don't in the last ten years, if we had any contracts with West Law and India.
Q. So -- so part of your website talks about legal intelligence. Does that ring a bell?
A. Yes. So our website, just so you know, went through a

NOT THAT I AM AWARE

~~NOT~~ I DO NOT RECALL THE AGREEMENT DOESN'T SEEM THEM

major remodel.
Q. I saw that.
A. Just about a month ago. So that terminology is new terminology. It's not how we necessarily represented our services in the past.
Q. Yeah. And why did it change?
A. We're just trying to better market our services. We find that there is a need out there for either legal research services or content development that we have sort of labeled as legal intelligence, from a marketing standpoint.
Q. All right. So, but what is -- it's going to my point. What is legal intelligence for purposes of LegalEase Michigan?
A. Legal research, content development.
So, for example, we have, in the past, developed contracts or instructions for contracts, for some of the leading online legal -- online legal contract companies.
We've developed legal content for law firm's websites. We've developed multi-jurisdictional research memos for clients. So we thought that would all be encompassed under legal intelligence.
Q. So in that last example, how did you go about doing that?

A. The multi state?
Q. Yeah. How would you go about doing that?
A. If a client had an initiative they're looking at in different states, we would have one of our attorneys go into West Law or Lexis and search case law or statutes for that particular question.
Q. And prepare a 50-state survey?
A. And prepare a memo or survey, yes.
Q. One of the -- there's a couple different features or descriptions on your website. One is contextualized databases. Does that ring a bell?
A. Again, it's a new website, so it rings a bell. But I would have to see it to remember it. Literally, it's about a month old.
Q. It's not a great print out.
A. Okay.
MR. LASHWAY: Can I just mark that quickly and let him see?

HAFEEZ EXHIBIT 4
Intelligence is the Ability to
Adapt to Change Packet
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:
Q. All right. I'm going to hand to you what's been marked

as Exhibit 4, which is our attempt to print part of your website, at least the text of it. Understanding the format looks a little bit different.
A. Okay.
Q. Does this look like part of your website?
A. Yeah, it does.
Q. Okay. So if you turn to the second page, the back of the first where it gives you kind of five buckets.
A. Mm-hmm.
Q. See, there's contextualized databases. Do you know what that's referring to?
A. I think what it refers to broadly is, we think we found a niche in the legal space. We think we found a niche in the legal space where there's technology companies, legal -- legal tech companies like Ross that are looking for information or content that will help drive their technology. So Ross is one example of that, where we produced research memos for them, that they would use to drive their technology.

We've had another client that is in a whole different space. It's -- they're a contract analytics company, where they analyze contracts using artificial intelligence. But there's still a piece of that that needs to be done by smart human beings. So we've been able to help them develop their tool.

TARIQ HAFEEZ
OVERSEES
EVERYTHING
-EMAILS
-CONTRACTS

So we look at that as part of our legal intelligence abilities, capabilities. The actual term, database, I don't know if it really fits what we do. We don't create databases. I mean, we use Excel. We have maybe internal databases that we use to manage our information, but we've never created a database for our client.

So really, I think what you're seeing here is sort of marketing finesse or whatever the term is, to make it look like nicer than normal or intricate or sophisticated of what we do.

Q. But this could be what your customers are doing, right? So for Ross, for example, they're working or they have built a database; isn't that right?

A. They built a research tool, yeah. I'm sure it's powered by a database, yeah.

But like I said, again, we've never gone into building of databases. We just feed them whatever content or information they need.

Another example on the database maybe, is we have a company that is an analytics firm and they compile data on qui tam lawsuits around the country.

So every time there is a news article about a qui tam case, we will summarize that article for them. They're building a database now for their platform that

they believe will be valuable to their further -- to further their ends. But all we're doing is literally summarizing articles. It's high volume. It's good work, but we're no -- no way -- we're not in any way helping them build a database. We're just giving them the content for that database.

Q. And is that -- is that part of both, you know, the contextualized database but also the case summaries, digest and alerts, the example you just provided?

A. Well, the example I provided, yeah. That could fall within both. Could fall within both, yeah.

Q. Would the Ross project, both the original and the bulk fall into each of these categories? So work flow automation, database creation and curation, data training, case summaries, digest alerts, and contextualized databases?

A. I don't think Ross would fall within work flow automation just because the automation was for us, the internal team to get the work done faster. It was not something that was given to Ross. The only thing they were given was the actual work product.

Database creation and curation, again, I think this is marketing speak. We've never done database creation, but we've done curation. You know, so what we did for Ross, we considered curating

NOT THAT I AM AWARE

content. What we did for the contract analyst company, we considered curating content.

Data training, I think it's marketing speak. We've never -- we don't have data scientists. You know, we don't really have a real functional technologist in the company. I certainly am not one. Tariq Akbar is more interested in that role and he does have an engineering background, but we don't do any data training. Something we would like to do, perhaps.

TA → Technology Guru

Case summaries, digest, alerts; yes, we did that for other companies. We have other corporate clients where we do case summaries or digest. I guess what we did for Ross, could also fall within that.

And we just talked about contextualized databases. We've never created databases for any of our clients. I think it's really just an aspirational category for us.

Q. Did you -- who drafted the website?
A. One of our -- well, we have a team. Tariq Akbar led the website revolt initiative, but there are a few other people, internal, that drafted it.
Q. Do you see the bottom left where it says success story?
A. Mm-hmm.
Q. Leading AI company, 500 gigabytes of research curated and produced?

A. Mm-hmm.
Q. And if you flip to the next page. That's here, sorry, page three. It goes on and says 90 days, training data, AI platform. Is that Ross?
A. This is probably referring to Ross because of the 90 days is a very short project.
Q. Are you performing some of these services today? So you mentioned the qui tam articles, but how about the legal research services?
A. We provide legal research today, to law firms. Research memorandum on particular, as a law, that's one of our main stays for our law firm business, or the business that we provide. The services that we provide to law firms, a lot of it is legal research.
We also do have a handful of corporate clients that may request legal research on a particular issue from time to time.
Q. How are you doing that legal research today?
A. Today, we're using a Lexis platform.
Q. Any other platforms?
A. No, I believe it's all Lexis, currently.
Q. Are you using Google at all?
A. Yes, we're currently using Google.
Q. Find law?
A. Sorry?

Q. Find law?
A. No. We pretty much have a 50-state good Lexis subscription which meets our needs. And then, Google as needed.
Q. Do you have access to West Law today?
A. No.
Q. Does anyone affiliated with LegalEase Michigan or LegalEase India have access to West Law?
A. Not that I know of, no.
Q. Would you know if they did?
A. I -- yeah. I mean, affiliated is a big -- is a --
So we do not use West Law whatsoever, either here or in India. We, meaning LegalEase India or LegalEase Michigan. We don't use West Law at all since we were terminated.
Q. Is Code Matrix or Mr. Ansan -- Ansad, does he have access to --
A. I don't believe so, no.
Q. -- to West Law?
Do you know when LegalEase first came a customer of West?
A. I don't have the exact date, but I know it's been about a decade.
Q. Was that in 2008?
A. Yep.

Q. Were you involved in the initial contracting?
A. I probably was.
Q. Do you remember being involved?
A. I mean, vaguely, yeah. I remember anytime we had a research tool, that would be more in my domain than Tariq Akbar's domain. So I would do that.
Q. And when you first contracted with West to get access to West Law, do you remember why you needed access to West Law? Was this in connection with a particular project, or in connection with a business plan that you had envisioned?
A. I think kind of sort of the bread and butter of LegalEase has always been providing legal research to law firms and to corporate counsel. I believe we started off with Lexis when we first started the business.

And we probably looked at West Law just from a pricing standpoint, which was more competitive. And certain attorneys have preferences for West Law or Lexis. So that could have possibly been a reason for why we would have looked at West Law in '08.
Q. Did there become a preference for using West Law in connection with the Ross Original Project or the Ross Bulk Project?
A. I know for the Ross Bulk, it was a preference to use

WESTLAW ACCOUNT TARIQ'S DECISION

West Law. I don't know for Ross Original, if there was a real preference one way or the other.
Q. Do you know why there was a preference to use West Law for the Ross Bulk Project?
A. Yes.
Q. Why?
A. For the Ross Bulk Project, in contrast to what we did for Ross in the original, where they would give us questions and we would answer them. In Ross Bulk, they basically wanted us to write the questions and answer them. We would brainstorm how we would do that in doing 20,000 of these memos. And we realized that, or we thought that using the headnotes as the foundation for our questions would be helpful.
Now, we also did the same thing with Lexis. But I think quite frankly, the pricing we got from West Law is much better. So we said if we need to expand our licenses, let's go with West. We're getting a good price for it, and we can use the headnotes as a foundation for coming up with the questions.
Q. Do you know what the pricing was from Lexis that you got when you initially asked to expand the licenses in mid-2017?
A. I don't remember the pricing. I just know that we found West Law to be more competitive.

USING HEADNOTES AS A BASIS FOR QUESTIONS

Q. Was there also a preference to use West Law because the quality of the headnotes?

A. So, like I said before, definitely the headnotes were key in our strategy of how we come up with questions and answers. Lexis has a similar service.

So I don't know, to be honest, whether we said substantively, West Law's headnotes were better than Lexis' equivalent of that. It came down to, I think, pricing.

And we also had a preference for West Law next. You know, a lot of our staff attorneys in the recent years, they preferred working at West Law over Lexis. So that may have also factored into it, but I think primarily, it was a cost thing. We got a better price on West Law.

Q. Were you involved in requesting the additional 20 licenses for West Law, in August of 2017?

A. I was involved in terms of, I remember having discussions about it, but I believe the first contract we had to up the number of licenses with West Law was signed by Teri Whitehead because I was out of town at that time.

SIGNED ON HIS APPROVAL

Q. And is that dated August 1, 2017?

A. If I can take a look at the contract.

Q. Sure.

A. I don't know the exact date.
Q. While I'm looking and pulling it out, do you -- did you review the order form granting the additional 20 licenses in August of 2017?
A. I would have looked at it, yeah.
Q. And would you have signed off on Ms. Whitehead in executing it?
A. Yes. I would have given her the go ahead to sign it.
Q. What were those additional 20 licenses needed for?
A. So as of August of 2017, we had not received confirmation that we got the project from Ross, for the bulk project, but we were anticipating we would be getting it. So the idea was, let's start training people and let's do some sample memos and make sure that our team understands the process.
And I believe, and I may be wrong, but I believe the August one was actually for ten additional licenses. And then, we brought it up to 25. But I may be wrong. But I did take a look at it yesterday and I thought it was ten additional licenses.
Q. And so, were the additional licenses in the first instance requested for purposes of training in advance of the Ross Bulk Project?
A. Yes.
Q. And was the intention for purposes of the Ross Bulk

SIGNED UPON HIS APPROVAL

UNDER HIS DIRECTION

Project to do that work manually as you had done the Ross Original Project?

A. Yes.

Q. And at some point in time, that plan changed; is that right?

A. Yes.

Q. Why is that?

A. So I believe in about -- so, let me back up a little bit.

One of the -- one of the hurdles in accomplishing this project in three months as we were provided the time frame, was not just the creation of the memos, but we also needed to submit the memos to Ross. And Ross had, what we call the Ross portal in our e-mails. But essentially, I believe it was like an FTP site or a site where we had to actually upload the final memos.

And, we had been uploading memos for Ross for the original project, so we knew how long it took to upload, you know, one or two, or ten or twenty memos. And when we were talking about the volume that we would need to be uploading on a daily basis for the bulk project would be 20,000 memos in three months. You know, that's roughly 7,000 memos a month.

We calculated that we would need something

like five or six people just to sit there and upload every night. And that seemed like it was a bigger pill to swallow. On top of hiring more attorneys, we also need people to be uploading.

At that time, our head of HR in India was a woman named Keerthi, K-E-E-R-T-H-I. Keerthi was tasked with finding these, we called them production support or something like that, they needed to essentially upload memos to Ross. Upload the final product to Ross. And she knew of a company called Code Matrix, and she knew Muhammad Ansad. And she said, you know, what, I know this guy, he's a technology whiz, he may have some ideas for us on how we can automate the process of uploading the final memos to Ross' portal.

And that's how Ansad -- refer to him as Ansad even though his name is Muhammad Ansad. That's how Ansad and Code Matrix was introduced to us. It was how do we upload the final memos to the Ross site in an efficient manner?

Q. But it grew into something else, isn't that right?

A. It grew into something else, yeah.

Q. Up until this point, the LegalEase Original, were you producing about five to six memos a week for the Ross project?

A. May have been a little bit more than that. I'm

thinking it may have been like -- it may have been a couple hundred a month. Five or six a week sounds low, on the low end. I think it was a little higher than that.

Q. And, do you remember in August of 2017, there was an issue raised about excessive use of West Law?

A. I mean, if you could refresh me the e-mail, I could take a look at it. I do know that there was -- there were instances where Carolyn Rudberg or one of our account reps we call it, would mention that the usage is high. So we were notified in that respect.

Q. Do you remember anything about those conversations from Ms. Rudberg as to what she meant by the usage was high?

A. I recall a conversation I had with her. And the reason I recall it is because I e-mailed -- I put this in an e-mail. Something to the effect of --

I don't remember if this was the August 2017, but it was a conversation I had with Carolyn Rudberg. She said your usage is very high. You're one of the top users of West Law that we have, nationally. Which, obviously, was a big -- came as a big surprise to me.

Q. Why were you surprised?

A. Because I had -- I was generally surprised we had, you know, at most, maybe 50, 60 people working on this project. How could that usage have been higher than

large multinational corporations you guys probably service?

So I was surprised by her assertion that the volume of our usage was in the top three or five, whatever she had mentioned.

Q. And what was your reaction to that conversation or those conversations from the perspective of West Law licenses?

A. I think one reaction was -- we had been working with Carolyn for at least a couple years, so we thought maybe she was trying to pressure us into -- well, not in a bad way, in a salesy [sic] way, pressure us to getting more licenses or do something more West Law. So we thought it may have been sort of that type of a statement.

But I don't recall at that time, doing anything proactive in terms of saying, what the heck is going on, why is the usage so high. I -- you know, because it came out in a conversation with Carolyn, I really wasn't documenting exactly what she meant by it. We sort of let it go. I thought it was sort of a sales speech by her or sales talk by her.

Q. And at some point, in the fall of 2017, you increased the licenses for West Law to 50; is that correct?

A. Yes. And my understanding is -- and this is what I

DONT RECALL CONVERSATIONS WITH CAROLYN

think we also provided in our answers. We had an original contract for either 13 or 16 licenses, and that we added an additional 50 in the fall of '17, for a total of either 63 or 66 licenses was my understanding.

HAFEEZ EXHIBIT 5
Thomas Reuters Order Form
Order ID: Q-00105954
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. So, I'm handing you Mr. Hafeez, a document that's been marked as Exhibit 5. Have you seen this document before?

A. I have, yes.

Q. And was this the order form that you signed? Or, I'm sorry. Yeah, that you signed with respect to an additional 50 licenses to West Law --

A. Yes.

Q. -- on October 4th of 2017?

A. Yes.

Q. Did you review this document before you signed it?

A. Yes.

Q. All right. So if you turn to the page that we've stamped 1427, do you see where it gets to quantity 50?

In the middle of the page, I'll just point to it.
A. Yeah. Yes, I do.
Q. All right. Why did you need 50 West Law licenses as of October 4, 2017?
A. So, this would have been -- this would have been in preparation for the bulk project. So we must have been notified by Ross that this project was a go and we did some projections on staffing and how many people we would need to be able to pull off this project for 20,000 memos. And we were getting licenses to support the additional people we would need to do the actual work.

20,000 MEMOS

Q. So if you turn to the next page, 1428, there's a list of names. Do you see that, in the center column?
A. Yeah.
Q. It says SAP number in the left column. Do you see that?
A. Yes.
Q. Is this a document that you produced or a document that West produced?
A. I don't know who produced it, but -- I don't know who produced it.
Q. When I use the word produced, I meant generated. Is this a West document or is this a LegalEase document?
A. I would think it's a West document because of I don't

recognize what SAP number --
Q. That's what I was going to ask you about.
A. Yeah.
Q. So, is LegalEase India using Quick Books as well, or do you know if they're using SAP?
A. They're using a bookkeeping software. I don't know if it's SAP.
Q. Do you know who those names are in the center columns under first name, last name, and then there's an e-mail address?
A. Yes. Some of these are our actual employees. Some of these are independent contractors. And some of these are subcontractors of us, as well, of LegalEase India or LegalEase Michigan.
Q. But almost all of them have at LegalEase Solutions dot com e-mail addresses; is that correct?
A. That's correct.
Q. So did you provide subcontractors or independent contractors with an at LegalEase Solutions --
A. We did.
Q. -- dot com e-mail address?
A. We did, yes.
Q. And why did you do that?
A. It's always been our practice. Whenever we have independent contractor or subcontractors work on a

project for LegalEase, that we would provide them with an e-mail address.

Q. And you see there are two names on here that have at Vakil Search dot com?

A. Yes.

Q. V-A-K-I-L search dot com?

A. Yes.

Q. Who is or what is Vakil Search?

A. Vakil Search is one of our subcontractors. They had a number of people or a number of contractors that helped us with this project.

Q. But there are only two of those e-mail addresses on here; is that correct?

A. Yeah. It's possible at this time they had transitioned into the project at, I believe -- for example, Kavya at Vakil Search dot com, she was one of the account leads for bringing people onto our project. So she may have been given this password to kind of get familiar with it. But at some point, she would have brought in some people and they would have been given LegalEase Solutions e-mail addresses, too.

Q. And would they have been given access to West Law?

A. Yes.

Q. Through this order form?

A. Yes, or -- yeah.

Q. But through an order form with LegalEase Solutions, LLC, correct?
A. Yes.
Q. And if you go back to the first page, this is an order form with LegalEase Solutions; is that right?
A. That's right.
Q. And that's the Michigan entity?
A. That's right.
Q. It doesn't identify the India entity?
A. That's correct.
MR. LASHWAY: You guys want to take a break for just a minute? I'm just going to switch gears, or do you want to just keep going?
THE WITNESS: Can I take a restroom break?
MR. LASHWAY: Sure.
THE VIDEOGRAPHER: We are going off the record. The time is 10:49 a.m.
(Off the record at about 10:49 a.m.)
HAFEEZ EXHIBIT 6
Master Service Agreement;
HAFEEZ EXHIBIT 7
Statement of Work;
HAFEEZ EXHIBIT 8
Statement OF Work II for Ross Bulk Memos;

HAFEEZ EXHIBIT exhibit 18
Master Service Agreement from 8/10/17;
HAFEEZ EXHIBIT 10;
Defendant/Counterclaim-Plaintiff Responses to
Plaintiff's First Set of Requests for Admissions;
and
HAFEEZ EXHIBIT 11
First Amendment to Statement of Work
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

(On the record at about 11:02 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:02 a.m.

BY MR. LASHWAY:

Q. Mr. Hafeez, do you remember when you first contracted with Ross Intelligence?

A. I believe it was October 2015.

Q. I'm going to hand you a series of exhibits that been marked as Exhibit 6, 7 -- I'm missing one. I'm going to hand you a series of exhibits that been marked 6, 7, 11 and 8.

MR. LASHWAY: And Kassem, I'll get those to you. That's 6. I believe that's 7.

BY MR. LASHWAY:

Q. Can you take a look at those for a minute? Have you

had a chance to look at those Mr. Hafeez?

MR. LASHWAY: This is 11. And this is -- let me take a look here.

THE WITNESS: 8.

MR. LASHWAY: 8. This is 8.

BY MR. LASHWAY:

Q. Okay. Are these all of the agreements that LegalEase Michigan has signed with Ross?

A. Yes, I believe so.

Q. There are no others?

A. So pertaining to the bulk project, these are the only agreements of the original project. We did have smaller projects that may have been documented in other memos with Ross that are not included in this set.

Q. Did they utilize West Law, those other projects?

A. I don't believe so.

Q. Did you look?

A. I -- I did not look. I'm speaking from my recollection here.

Q. Do you recall any of those projects, generally or specifically?

A. There's one -- there was one that was called Ross Variations, or we called it Ross Variations. And it was a variation of the bulk. It was a variation of, take a subset of the bulk work and do some rephrasing.

I would have to take a look at the SOW for that, to get more particulars. But my understanding, or my recollection is that it was not involving West Law. It was sort of involving our attorneys to rephrase certain --
Q. Would that be rephrase -- I'm sorry, didn't mean to cut you off.
A. Yeah. You know what, I think I would say I need to look at the SOW. It was a small side project that was not reflected. I need to take a look at what the scope of the project was.
Q. And in terms of rephrasing, would it be rephrasing what you referred to as the memos?
A. It was not the whole memo. It was maybe one particular line item in the memo that we had to rephrase. But again, I think I would feel more comfortable if I can take a look at the SOW. And I honestly don't remember what the scope of that project was.
Q. Do you remember if the rephrasing was because Ross asked you to do that?
A. Yeah. Yeah.
The project was definitely at the request of Ross.
Q. Any other projects that you have with Ross that didn't fall under these agreements or the Ross Variations'

project?

A. I don't think so.

Q. And the Ross Variations' project, do you remember, specifically what Ross wanted rephrased?

A. I don't.

Q. And where would that information -- where would the answer to that question be found?

A. It would probably be in a proposal we submitted to Ross or in a project.

Q. Okay. So if you look at Exhibit 6, this is an October 15, 2015 agreement between Ross Intelligence, a Delaware Corporation, and what we've been referring to as LegalEase Michigan, is that correct?

A. That's correct.

Q. And if you open it up, it seems to say that the scope of the work would be set forth in a statement of work that would be appended?

Am I generally understanding?

A. Right.

Q. And the fees for the work would be set forth in that statement of work; is that correct?

A. Correct.

Q. So if you turn to Exhibit 7, which is dated the same, October 15, 2015, is this the original statement of work that was appended to the master services agreement

that we just looked at?
A. Yes.
Q. Okay. And, if you go down to paragraph 7, it says services. Do you see that?
A. Yes.
Q. Contractor will provide answers to each question received from the company by consulting case law, legislation and/or secondary sources. Do you see that?
A. Yes.
Q. Now, some of those words in that paragraph have capitalized terms; is that right?
A. Yes.
Q. And they refer to the definitions set forth up above?
A. Yes.
Q. If you look at case law, what was your intention in agreeing to the statement of work for purposes of identifying case law as it's defined there? In other words, how were you going to do that?
A. We were going to find case law that would answer the questions that they were submitting to us, using West Law or Lexis.
Q. Were there any other means that you contemplated in terms of identifying case law for purposes of the services in paragraph 7?
A. No.

Q. And have you thought about polling judicial decisions directly from court houses?
A. No.
Q. And the same with respect to legislation and secondary sources. Were you intending to rely on Lexis and West Law for purposes of providing those services?
A. Yes.
Q. And you see that legislation and secondary sources are --
A. Capitalized terms? Yes.
Q. -- capitalized terms?
A. Yes.
Q. Now here, question means a written question to be answered by the contractor, right? But answer means a written response by contractor to a question. Do you see that?
A. Question means -- yes.
Q. Who was posing the questions to Legalese?
A. So under this statement, the questions were coming from Ross.
Q. Do you have any recollection as to what those questions were?
A. I do. They were primarily involving bankruptcy law. So they were questions related to the various chapters in bankruptcy and everything in between?

Q. And do you recall, or can you provide me with an example of the type of question or the form of question that Ross was posing under the statement of work?

A. I can say generally, they were one or two-sentence questions. So they were not long paragraphs with questions. They were questions, for example, can a chapter 11 trustee do X, Y, and Z? Or, what are the debtors' rights with respect to a certain type of bankruptcy involving a certain issue?

So they were, for the most part, short questions that required us to then look at the bankruptcy code and case law to answer.

TH - PRIMARY CONTACT W/ WESTLAW

Q. And that would include using your West Law licenses?

A. Correct.

Q. And at this point in time, do you recall, generally, how many West Law licenses you were using?

A. We were probably within the licenses we had at that point, which may have been somewhere in the range of 16 is what I recall.

Q. Okay. And were all of those 16 licenses assigned to people here in the United States, in 2015?

A. They were assigned between the U.S. and India.

Q. Yeah, LegalEase India?

A. I'm sorry, yes.

Q. Do you see in paragraph 8, it says that each answer

file must be delivered to the following e-mail addresses, answers at Ross Intelligence dot com?
A. Mm-hmm, yes.
Q. Is that what you did with the answers, the answer file?
A. We -- I think we initially were e-mailing it to this address. And then, at some point, Ross developed a portal where they wanted us to upload the documents to. So we -- we moved to that method at some point. I don't remember when, exactly.
Q. Did you identify when you were collecting documents, any of the answer files that had been submitted in accordance with the statement of work?
A. Can you repeat the question?
Q. Yeah. Did you identify, when you were collecting documents, any of the answer files that you submitted in accordance with this statement of work?
MR. DAKHLALLAH: Do you mean in discovery?
MR. LASHWAY: Yeah.
THE WITNESS: Oh.
BY MR. LASHWAY:
Q. When you were collecting documents for purposes of this case?
A. No, we did not.
Q. Did you look for them?
A. We did not.

Q. Is answer file as it's defined here, used synonymously with memos that we read about later on, that we read about later on in e-mails?
A. Yes.
Q. One in the same?
A. Yes.
Q. And at paragraph 10, it says contractor shall return five to six completed answers to company each day.
A. Okay.
Q. You see that?
A. Yeah.
Q. So does that --
A. I think the volume may have increased. Sorry. I should have let you finish the question. Sorry.
Q. No, go ahead.
A. You had asked me how many were we doing per week.
Q. Yeah.
A. I think I mentioned five to six. I think that volume increased over time to maybe double that.
Q. Okay. And at this point in time, do you believe you were doing roughly, five to six per day.
A. At this point in time when we first entered the agreement, yes.
Q. At some point in time, did Ross come back to you and ask you for more?

A. I believe the volume that they were expecting per day did increase from when we first started the project in October of 2015.
Q. Do you remember when?
A. I don't. It was -- to my recollection, it was a gradual increase, nothing like the bulk project where suddenly, I have this huge number of documents that may have been increased over period of time.
Q. And you mentioned earlier, that at least when it started, you were focused on bankruptcy --
A. Correct.
Q. -- bankruptcy topic, correct?
Did you remain focused on bankruptcy until 2017?
A. Ross had talked to us about possibly giving us other areas of law. At this time, they were giving us questions and we were answering them.
Q. Correct.
A. So I believe we may have dabbled in labor employment questions. We may have dabbled in immigration, but the vast majority was bankruptcy related.
Q. Did you do any work in intellectual property?
A. Yes, we did.
Q. And that was prior to the bulk project beginning?
A. Yes, that's correct.

Q. Was intellectual property also one of your focuses from Ross, in addition to bankruptcy?
A. It was a focus area, but I don't think we got too much into it in terms of, I think we did a lot more in bankruptcy than we did in intellectual property. But it was a focus area that they had given us, yes.
Q. And do you know why Ross had you focus on bankruptcy and then intellectual property?
A. I don't know for certainty. They never really disclosed their business to us. They never told us what they were using it for. They never explained to us how they were using our data. A lot of it was assumptions and assumptions on our part.
But at this time, we saw that they were marketing Ross to certain bankruptcy law firms. And I think they had mentioned that, perhaps, they had a bankruptcy law firm as a client, so we thought they were building up this area of law for the customer.
Q. Do you know who that customer was?
A. I don't.
Q. Do you remember if they disclosed it to you?
A. They -- they would not have disclosed it to us. It would have been something we would have seen online or on the website. They kept -- they kept their clients very close in terms of telling us anything about the

N

NO. THEY DIDN'T

ROSS DIDN'T EXPLAIN THEIR USE OR HOW.

NO

NO. I DON'T RECALL.

business.
Q. You referenced to assumptions a minute ago as to what Ross was doing with the answer files. What were those?

I DON'T RECALL.

A. Again, I'm not a technical person, as we established earlier. But my understanding was how machine learning works. We knew Ross was working in the machine learning AI space. And that was, again, I don't know if that came directly from Ross, but on their website, they do a lot of marketing. So clearly, that's the space they were in.

I AM NOT A TECHNOLOGIST

Our assumption was, they are using IBM Watson's platform again. This is all publicly available information to be able to answer legal questions in a simplistic manner. And they need to train that platform on how a human being would answer a question, and we were the trainers. We were essentially, giving them human responses to questions that would help the IBM Watson program be able to respond like a human being would respond.

NO. I DON'T KNOW ROSS' TECHNOLOGY

Q. Ross was also focused on the content of the answer files; is that correct?

I BELIEVE SO

A. Can you explain what you mean by that?
Q. The substantive answers to the questions posed. They were focused on that as well, correct?
A. I don't know what they -- I mean, I don't know what

I DON'T KNOW WHAT THEIR FOCUS. SPECULATION ON HOW OR WHY ROSS USED MEMOS

their focus was. I know what they required us to do, which was answer the question, but also provide the citation.

So they did want to make sure the case law citation was provided, was accurate and it was, you know, relevant to the question answered.

Q. And at this point in the Ross Original Project, is that what we're talking about here?

A. Yeah.

Q. For the Ross Original Project, were we -- were you and your team using West Law material to prepare the answer files?

YES

A. We were searching case law and statutes and preparing answers, memos based on our research with that content, yeah.

Q. And the memos included quotes from cases that were accessed using West Law, correct?

YES

A. Yes.

Q. And the answer was rated either great or good for purposes of the answer file for Ross to use; is that correct?

YES

A. I believe that was for bulk. I don't think we had that rating for original.

Q. How long were these memos, typically, for this period where you were focused on the Ross Original Project?

I DON'T KNOW

A. How long were the actual memos? I DONT RECALL.

Q. Yes.

A. The Ross Original memos were probably one to two pages. They were a little longer than the Ross Bulk memos. They comprised of the question that was being provided by the client. And then, we do a short answer and then we do a long answer. And then, we do what they call the reference list. And the reference list would -- was formatted in a particular way of how they wanted it formatted.

But the reference list was essentially, cite the case law we used in preparing the short and long answer. Cite meaning actually provide the pinpoint citation for that case law. And the reference list may have also had us identify the exact quote that we used from the case to come up with our answer. So the holding of the case or whatever relevant paragraph we saw in that case, we were then to provide that in the reference list.

Q. Okay. So there is a short and a long answer in each answer file; is that correct?

A. For the original Ross memo, yes.

Q. And then, you mention a reference list. What is the reference list?

A. So again, the reference list was something that was

very specific to their requirements. There's a very particular way to format it, indent it. But essentially, it was listing the cases that we relied upon, or the statutes we relied upon, to answer the question, and provide the exact language from the case that we felt answered the question.

Q. And the reference list would be prepared using West Law?

A. Yes.

Q. And would it simply be Smith versus Jones with the West Law citation, or would it have additional information in it?

A. The reference, from my understanding would be the name of the case, the citation, whatever recorder we were citing to, and a quote, a language, a piece of language directly taken from the case.

Q. Would it include information taken from the headnotes?

A. No.

Q. Did Ross Original Project rely on the headnotes at all?

A. No. It's possible our research would have used the headnotes to find the cases to answer the question, but it was not used as a starting point.

Q. And at the time when you were doing this Ross Original Project, did you understand that Ross Intelligence was building a legal research platform to be used by law

firms?

A. Yeah.

MR. DAKHLALLAH: Object.

THE WITNESS: Sorry.

MR. DAKHLALLAH: Objection as to form and foundation. Go ahead.

THE WITNESS: I mean, we -- we, again, like I said, we never were told much about Ross's business from Ross, but Ross was, and I believe, still is very public about what their trying to do. And that's how we got that information.

BY MR. LASHWAY:

Q. I'm going to try this again. When you were performing the Ross Original Project, did you understand that Ross Intelligence was building the legal research platform to be used by law firms?

A. Again, my answer is, we knew what we saw out there, that they were publicly talking about. We didn't have any information other than what we found on their website or in their marketing pieces or PR pieces.

NOT THAT I CAN RECALL.

Q. And what did you know at that point in time, that they were publicly talking about?

A. At the time, they were talking about, essentially building an AI powered research tool that would answer complex legal questions in a simple manner similar to

I DON'T RECALL

what an associate or paralegal could do for you at your office.

Q. At a law firm?

A. Yeah.

I DON'T KNOW

Q. Is that any different than what Thomson Reuters or West Publishing corporation provides to the market?

A. I don't know. I know West Law has AI powered products. I don't know if they're similar, different, the same.

Q. Is your understanding about what Ross is offering to the market, at the time of the Ross Original Project to be different from Thomson Reuters' projects, simply the technology that supports finding relevant law or statutes or other jurisprudence? I'm trying to understand what the difference is between the two, based on your understanding.

I WOULD HAVE TO SEE WHAT ROSS OFFERED IS ACCURATE

A. My understanding was they were doing something different. That's why they're getting all this buzz and raising money and they're being written up. So they're doing something unique and innovative that is distinct from what West was doing at the time, is my understanding.

I DON'T KNOW.

Again, all that is just my understanding from being somebody who reads articles and websites. Nothing that I knew from this project.

Q. So Mr. Arruda, the Chief executive officer of Ross

Intelligence didn't disclose to you what they were
using the --
A. No.
Q. -- answer files for?
A. No. Mr. Arruda was always guarded about what they were doing as far as work.
Q. Was Mr. Arruda the principal point of contact in the LegalEase dealings for Ross?
A. No.
Q. Who was?
A. There were two Thomases. We called one Little Thomas and Big Thomas. I don't know why.
Q. Was one little and one big?
A. Probably not.
Q. I couldn't help but ask.
A. I was leading you to that question.
Initially, with the Ross Original, we had a Thomas [sic], T-O-M-A-S, Tomas. I don't remember his last name, but I'm sure I could refresh my memory at some point.
Q. Sure.
A. When we transitioned to the bulk project, there was another Thomas, vendor, something.
Q. He has a long name, correct?
A. Yes.

Q. Long last name?
A. Yes.
Q. Mr. Arruda was the one who signed the original statement of work in the master services agreement, correct?
A. That's correct.
Q. Was Mr. Arruda involved in defining the scope of services that Ross was acting LegalEase to perform?
A. Our primary conversations were with Thomas or Tomas. I don't think Mr. Arruda had much -- much to do with defining or explaining to us what they wanted us to do.
Q. And at this point in time -- well, let me ask you first, is Tomas, T-O-M-A-S, Little or Big Thomas?
A. I apologize, I don't remember.
Q. Yeah.
A. Just, you know, there were two Thomases. We thought it was funny.
Q. Sure.
A. But I don't remember which one is big or little.
Q. And the Ross Original Project, that went on from 2015 and ended in early January of 2018?
A. It ended in early 2018.
Q. Is it still going?
A. No. It ended in early 2018. Like early January, February, 2018. It ended.

I WOULD HAVE TO SEE TO CONFIRM

I CANNOT SPEAK FOR HOW THE AGMT WAS DRAFTED

2015, 2018 STARTED IN 2020

Q. And did it end by pursuant to the terms of the agreements that you had with Ross? I BELIEVE SO

A. Yeah. I mean, it ended because they no longer needed the service. The SOW provided for them, the terms of service. They no longer needed it.

Q. Do you have any recollection as to when Ross informed you that they were terminating the agreement with you? NO.

A. For the original? I don't. I don't remember if -- I don't remember if it was like February or March. It was earlier in the year, probably the first quarter of the year.

Q. Would that be in an e-mail somewhere? — PERHAPS

A. It probably would be, yeah.

Q. And, do you remember that Ross terminated the agreement because they no longer needed the services you were providing? I BELIEVE SO

A. I mean, there's probably more defined language of why they terminated it, but it was not a quality issue. It was not a relationship issue. They just said we don't need this work, we're going to pause it for now. NOT THAT I CAN RECALL

Q. Did you inform Ross of West's termination of your access to West Law?

A. I don't believe we -- no, we did not. Not at that time. We did not -- sorry. We did not inform Ross of that termination in January. We just kept working,

using Lexis.

Q. While the Ross Original Project continued, were you also using Lexis in addition to West Law?

A. I believe we still -- we did use Lexis in addition to West Law.

Q. And Lexis was sufficient for purposes of that project? YES I BELIEVE SO

A. Yes.

Q. And is it -- I think you testified earlier, but at some point, there was a preference you all showed to using West Law, correct? IBS

A. Yeah. In general, we found that our staff attorneys on the U.S. side liked using West Law. But that was not necessarily related to the Ross work. It was just a preference that we saw come up more often than not.

Q. How did -- how did Ross first come into contact with LegalEase? I DON'T RECALL

A. They actually found us online and they submitted a request on an online contact form. And that's how we first got in touch with them.

Q. Do you know if Ross was working with anyone else? Did you have competition for providing the services to them? I BELIEVE SO.

A. I recall there being phone calls mentioned that they had other providers, or that they might have other providers or they might use other providers. In other

words, they had other avenues to get the work done.

So yes, there was talk about there being other providers, but we had, again, no clear -- we had no visibility to who they were using, to that extent.

Q. No one ever mentioned who else you were competing against for purposes of this work?

I DON'T RECALL

A. No, not that I can recall.

Q. Is there anyone at LegalEase that might know that answer?

A. Honestly, I don't think so. Like I said, they were very closely guarded on how they ran their business.

Q. Can you go back to Exhibit 6, which may be flipped over here?

A. Sure.

Q. Can you turn to page 7 at the top? Do you see where the agreement requires LegalEase to represent and warrant that according to Roman numeral double I, all deliverables and any developments are free and clear of any plagiarism or appropriation?

YES

A. Yes.

Q. Did you think about that in consideration of your use of West Law when signing this agreement?

TH SIGNED THIS AGMT. I DON'T KNOW HIS INTENTIONS

A. I can't recall what I thought about that then. But when I look at it now, it doesn't raise a red flag for me.

Q. Sitting here today, it doesn't?
A. No.
Q. Why is that?
A. Because it's routine practice in legal research that you cite case law. We've done it for the last ten years.
Q. Is what you were doing with respect to preparing the answer files for machine learning client a typical practice for providing legal services, in your review?

I DON'T ~~UNDERST~~ KNOW.

A. The task we were asked to do which was a research memo, was routine. The formatting and the reference list and how they wanted that was different than what we had seen with our other clients, but the actual substance of the work was very similar to what we had done.
Q. So, just so I understand your answer; so the formatting was new to you all, but the project itself, fell within the scope of services you provide to others?
A. Yes.

WITH RESPECT TO LEGAL RESEARCH I BELIEVE SO

Q. And what was the scope of services that Ross asked you to provide here, that you described as being routine?
A. Posing a legal question for which the allotted answer analysis and citations took place in case law issues was very similar to what we had done for other clients.

WOULD HAVE TO ASK TH- HE IS G.C. THAT SIGNS OFF ON AGMTS

Q. And did you have other clients asking you to do this in five or six memos a day?

NOT THAT I AM AWARE

FOR MY TIME AT LEGALEASE, YES

A. No.
Q. So was that new?
A. The volume was new, yes.
Q. And were you paid for these services at the rate, per 80 dollars per answer?
A. I'm sorry, may I -- can I add to my previous answer?
Q. Absolutely.
A. Because we have had in the history of our businesses, certain clients that gave us high-volume work. And with small businesses, that's always been a good problem to have.

So we did have a client at one point that asked us to do legal articles. They weren't called legal memos, they were called legal articles, that they were going to publish on their website, about hundreds of different issues. They were trying to build up their SCO traffic on their website. So we had done projects similar to this, not like the bulk.

The bulk, for sure was made up from Heaven. But for the regular original project, we had had similar volumes for other projects. So it didn't really strike us as odd because we had done it similar for other peoples.
Q. The volume was --
A. The volume wasn't odd.

Q. It was similar to other projects?
A. Yes.
Q. Was that project using West Law?
A. It's possible. I don't recall. It's back in 2009 or '10.

NOT THAT I CAN RECALL

Q. And you mentioned that that other client was trying to drive some traffic to their website?
A. Yes, their website.
Q. What kind of traffic were they trying to drive?
A. They were trying to drive consumers who were looking for legal forms online.
Q. Why do you believe Ross cared so much about the word -- the formatting of the answer files for the original project?
A. Again, from a layperson's perspective, I'm envisioning that they're working off of a platform, IBM Watson. And for IBM Watson to be able to recognize or read our research, it has to be formatted in a certain way. That was my understanding, I think, and my team's understanding.
Q. And what was the, in your understanding, of the end result of why Ross needed this content loaded into their systems?
MR. DAKHLALLAH: Objection, asked and answered. Calls for speculation. Go ahead.

THE WITNESS: Yeah. I mean, again, we were never privy to how they were using the answers. But we -- our understanding was we were helping them. We were helping them train their platform.

BY MR. LASHWAY:

Q. And training of the platform was using information and data taken from West Law; is that right?

A. Training platform was answering legal questions like a human being would answer them by researching case law and statutes, presenting answers. We never were giving content to West Law. It was all to mimic -- not mimic. It was all to --

Again, our understanding was, they wanted to see how a human being would answer these questions.

Q. Did you ever have access to Ross's product?

A. No.

Q. So, at some point in time -- if you flip to Exhibit 11, there's an amendment to the original statement of work. Do you see that?

A. Mm-hmm, yes, I do.

Q. It's first amendment to statement of work. It's dated February 29, 2016?

A. Yes.

Q. What was the reason for this amendment?

A. So this is where the volume picked up. I was -- I had

I DON'T KNOW HOW ROSS USED OUR MEMOS

miscalculated. Seventy-five answers a week. So we're looking at what, maybe 250, 300 per month.

So it's a reflection of additional volume and also a change in our payment terms. We wanted to be paid in advance of the work being done.

Q. Why is that?

A. Cash flow.

Q. Is that cash flow to help you manage the payment of the independent contractors and people that were performing some of the work?

A. Yes.

Q. And do you know, did Ross share with you, or do you know why Ross increased the answers from roughly 25 to 30, to 75 per week?

A. No, they never shared with us. We were just happy to have the work.

Q. Did you ask?

A. No, I don't think so.

Q. Were you still being paid 80 dollars per answer?

A. I believe so.

Q. At this point in time, did you ask for additional licenses from West Law?

A. I don't know.

Q. Do you remember how you were getting this additional work completed?

A. Again, we were staffing it between the U.S. and India. And I don't know at this point, specifically, whether we needed -- we felt we needed to increase the number of licenses we had.

Q. Were you limited to 75 answers per week, or were you able to get as much done as they would give you?

A. I think we were -- I believe it was a soft limit. And I think at some times, we would try to do more if we could make more revenue until they decided hey, that's enough. So it wasn't hard as far as I remember.

Q. So the more you did, the more you got paid?

A. Right.

Q. And Ross would provide you with as many questions as they could, and you would get that work done as quickly as you could?

A. Right.

Q. So, can you turn to what's been marked as Exhibit 8, now? Now, this document was produced this morning, to us. And, it's called Statement of Work, Roman numeral 2 for Ross Bulk memos, do you see that?

A. Yes.

Q. Now, does this relate to the Ross Bulk Project?

A. It does.

Q. Why is it dated October 15, 2015?

A. It must have been a typo.

MR. DAKHLALLAH: Hold on. Objection. That actually mischaracterizes the document. If you read the first sentence, it says it incorporates and is made pursuant to the October 2015 Master Service Agreement.

BY MR. LASHWAY:

Q. And did you find this document recently?

A. I did.

Q. Where did you find it?

A. I found it in my e-mail.

Q. How come it hadn't been found previously?

A. I was confused by that. It's a document that I would have expected to have come in using my search terms.

Q. All right. And is this the statement of work that governs the contractual relationship with Ross for purposes of the bulk project that we've been talking about?

A. Yes.

Q. All right. And if you flip to page 4, in accordance with your counsel's objection, is it dated September 25, 2015?

A. Yes.

Q. And Mr. Arruda signed this again, correct?

A. Yes.

Q. So he was still involved with respect to, at least the contractual aspect of it, is that right?

A. Yes.
Q. How did this project come about?
A. I think in -- so, I think in June of 2017, we had a call from, I believe it was Thomas, and he mentioned that they were looking to do this big project over the summer and that it was a very tight timeline. It was -- they were looking at very high volumes of work and would we be interested in bidding for it.

And, again, you know, this log of business, we were like, of course we will be interested. Of course we'll bid for it. At that point, we had no idea how we would actually do the work, but we started making some project plans on how we could actually do high volume.

Although, I don't think the actual numbers were finalized. There was always the potential of doing anywhere from 25,000 to 100,000 memos. So, you know, we thought we could probably handle doing 25,000. But if they wanted a 100,000 in three months, there was no way we were going to be able to do that, so.

But yeah, it was really a phone call. They said this is a project they have for the summer and are we interested in it and we said yes.
Q. Was Thomas the one who had raised the idea of doing anywhere from 25,000 to 100,000 memos?

I WOULD GUESS FROM ROSS REACHING OUT

I DONT RECALL

A. I believe it was Thomas that mentioned that this could be a much larger project because of the variable range they're looking to get done.
Q. And did Thomas identify for you whether these memos were going to be focused on bankruptcy law, intellectual property law, or something else?
A. Again, I don't know if I was on that phone call. But at some point, as we began discussing this project, it became clear that they were looking at multiple areas. That there was no restriction on which area we could look at.
Q. But at some point, Ross was going to be providing you with the answers -- sorry, the questions to be answered and that would dictate what area of the law would be covered?
A. For the bulk project, I believe. But if my recollection serves me correct, that we had a good understanding -- we had a good idea from the beginning that we would be writing our own questions and we could look at different areas of law. Like, they weren't saying they needed these to be in bankruptcy or intellectual property.
You know, come up with the questions and answer them in any area of law was the understanding we arrived at. I don't know if it was on the first phone

TANGO WAS INVOLVED SMALL COMPANY I DON'T RECALL

call or the second phone call but it's where we were heading towards.

Q. And were these initial phone calls all done by phone?

A. Yes.

Q. There was no e-mails?

A. I don't believe there were e-mails. I mean, there may be. There may have been, but I didn't come across any e-mails that laid out the scope of the project. I believe it was phone calls.

Q. And you said this was in June of 2017?

A. That's when I got the initial phone call, yeah.

Q. And was there a response deadline for you to provide a proposal to Ross for this -- for this new project?

A. There probably was. They wanted -- I mean, it was going to be a summer project. At least at that point, they were saying we want to get this done by the summer. So I'm assuming it was a very tight deadline that we needed to respond by. And I don't remember what date that was.

Q. Did you provide a written response to Ross?

A. I believe we sent them a proposal.

Q. What did it look like? Was it a formal response that identified how you could be of assistance to them?

A. It probably was a formal proposal response, yeah.

Q. Did you find that document in searching for materials

in response to discovery here?
A. I did not see anything like that when I was going through our logical discovery platform, but I would assume it exists. I assume we responded to the request in written format. And -- yeah, there must have been a proposal, but I haven't seen it recently.
Q. Do you know, roughly, when you responded to Tomas and Ross with respect to their -- those initial conversations with the proposal?
A. It probably would have been like end of June, early July.
Q. Do you know when Ross first decided to hire you all?
A. I think they gave us a verbal commitment sometime in August, that we were going to be engaged, which is why we started adding people, start adding licenses and sort of staffing up for the project. But yeah, as you can see, the actual contract wasn't signed until September.
Q. And at that point in time, in the verb -- when you got the verbal commitment, were you being retained to produce, roughly 10,000 memos a month?
A. At that time, our understanding was they wanted us to do -- provide 25,000 memos within a three-month time span.
Q. So roughly 7500 memos a month?

No

No

I would have to see emails to remember

A. Right.

MR. DAKHLALLAH: 8300.

MR. LASHWAY: Thanks.

BY MR. LASHWAY:

Q. And, would -- was your plan to do that through the additional West Law licenses that .you had discussed with West at that point in time, in August?

A. Yes.

Q. And, can you walk me through your thinking as to how additional West Law licenses were going to be able to generate the answer files that much more quickly, based on your two-year practice at that point?

A. So I think we probably worked backwards, you know. How many of these memos can a person do per day divided by the number of memos we need per month? That gave us a number. And then, we had to then, factor in West Law licenses to be able to equip our attorneys to do the research.

Q. And how many -- at that point in time, how many answer files were being prepared a day, by the contractors?

A. At which point in time?

Q. In August of 2017?

A. In August, as far as I remember, the project was -- it was green lit, but we didn't have a contract to actually start producing. But we did start producing

THAT WAS OPERATIONS / TARIQ HAFEEZ DECISION

I DONT UNDERS

some memos to train our team to make sure we know what we're doing and make sure we figure out the logistics of it.

And we have created several hundred memos in August to prepare us for the actual start date in September.

Q. Okay. So let me go backwards from that.

The Ross Original Project, how many on average of client -- I'm sorry.

How many answer files on average did a contractor prepare, per day?

I DON'T REMEMBER

6X

A. I don't -- I don't remember, but I could guess. It would be, you know, maybe we would be expecting four or five, or five or six of the Ross Original memos per day.

6

Q. So prior to the bulk project, according to the statement of work amendment, you were to produce 75 answer files a week, correct?

I DON'T KNOW.

OPERATIONS.

A. Mm-hmm.

Q. And you were producing roughly 75 answer files a week or more, correct?

A. Correct.

Q. How many people did you have preparing those, with respect to the original project?

A. It was not a very big team. Maybe half a dozen people

working on the Ross Original. And then, once bulk started, we probably started doing less original work so we could meet our deadlines for Ross Bulk.

Q. And were those, approximately, 12 individuals based here in the U.S., or were there contractors with? LegalEase India that was doing that work as well?

A. So there were -- sorry. There was half a dozen, more like six that were doing Ross Original, and probably five or six of them were in India. I think Jessica Sharp may have been doing QC on those, but the work was being done in India.

Q. Okay. So for the Ross Original product, in order to produce 75 memos a week, how many persons were doing that work, to accomplish that rate of production?

A. Like I said, I believe it was a team of five or six people.

Q. Okay.

A. Yeah.

Q. And so I'm clear, were those individuals here in the U.S., or were they in India?

A. They were in India.

Q. All of them?

A. There may have been a U.S. independent contractor, I don't remember. But the majority of them were in India.

I THINK INDIAN CONTRACT

Q. And were you doing any of the work to prepare the answer files?
A. Was I doing any of the work?
Q. Yes.
A. No.
Q. Was Teri --
A. I'm sorry, I didn't mean to interrupt you. Not that I recall.
Q. Was Teri Whitehead?
A. Not from a daily production standpoint, no.
Q. Okay. And so, when you get the verbal commitment from Ross to produce the, roughly, 25,000 memos over the span of three months, that was in August of 2017, right? At that point in time, what was your plan to increase the rate of generation of the answer files significantly, to get that project completed?
A. So, the Ross Bulk work as we begin to understand it, was not the same as Ross Original. The -- first of all, when you're writing your own questions, it's easier to answer them. So we knew that the actual research would not be as time consuming. I think that was established fairly -- fairly early on that they would not be assigning us questions. They would be looking at us to come up with questions and the answers for those questions.

I DON'T RECALL DIRECTLY DOING THE WORK

CLIENT RELATIVE

MORE PEOPLE

And the actual format of the memo was less burdensome. It was a shorter memo project. So we estimated that our production would be higher for the Ross Bulk because it was a shorter memo to produce.

Q. And in August of 2017, when you were building the team to support the Ross Bulk Project, were those individuals based in India, or in the U.S.?

/ I BELIEVE SO YES.

A. In August, I believe all the people we had lined up for the bulk memo project, as far as the actual doers, not talking about management or quality control, they were primarily in India.

I believe we had one or two independent contractors that were also producing bulk memos in the U.S., But the majority were in India.

Q. And was the bulk -- I'm sorry, was the Ross Original Project on going?

YES. I BELIEVE SO

A. At that time, it was, yeah. So we still had our team solely focused on original, and then we had to build this new team to focus on the Ross Bulk.

Q. And did Ross tell you why they needed such dramatic increase in the volume of answer files?

NOT THAT I RECALL

A. They did not.

Q. Did you ask? / I DON'T RECALL

A. We might have asked, sort of as casual, like, you know, but we were never told. Again, we were never told what

they were, exactly doing with what we were creating for them.

You know, as I'm thinking about it, they may have said something to the effect that our tool is starting to gain traction and we want to, you know, take advantage of that. So there was something mentioned on some phone call, perhaps, that the tool was starting to gain traction and they were using this opportunity to -- to take it, you know, that much further, but that was never communicated to us in writing or we had no real insight knowledge of that. It was just something that was said in casual conversation.

Q. And, at this point in time when you contract through the statement of work 2, there was also anticipation that the 25,000 memos was just the first production run, correct? There was going to be a subsequent production run?

I BELIEVE SO

A. Right.

Q. And those subsequent production runs you had contemplated with Ross, providing 25,000 memos per month?

I BELIEVE SO

A. Yes.

Q. And you were paid by quote in each of the memos, correct? I'm looking at pages -- well, paragraph 8.

I DON'T RECALL

A. Yes.

Q. So the more West Law material you included, the more you were paid?

A. If one would look at it, the more relevant quotes we were able to provide, the more we were paid.

Q. And we spoke about this earlier, but for the Ross Bulk Project, the scope of each memo was turned from a logistical perspective in that you were able to phrase your own questions?

A. That's correct.

Q. And so, give me an example if you remember, how a particular individual would be assigned work on any given day. Where did they begin?

A. Sure. So, as part of our thinking on how to -- how to come up with 20,000 questions and answers, we gravitated towards the idea of using West Law headnotes as the basic starting point for categories of topics that we could address.

So, for example, we go to, you know, starting with A, abandonment or something like that. And then, we would look at the subtopics under abandonment and then the sub-subtopics. And then, we would say okay, well, let's create as many questions as we can around abandonment.

And some of these headnotes had very few

I DONT RECALL WORDS HAVE TO SEE

I BELIEVE SO

I DONT RECALL

subtopics, some had a lot of subtopics. So the more subtopics there were, the more potential questions that we could phrase using the headnotes.

So, essentially, we were assigning attorneys topics and subtopics to go to and then create questions and answers on the topics and subtopics.

Q. And, they would navigate in providing those answers using the headnote hyperlinks; is that right?

A. Can you rephrase the question?

Q. So they would use the headnote to frame the question for the answer file; is that right?

AS I RECALL

A. They would use the headnote as a starting point to phrase a question for the memo.

Q. And then, would they use the hyperlink that the headnote provided to the material in the case and to the cases and statutes cited under that headnote --

A. Right.

Q. -- for purposes of answering the question framed?

I BELIEVE SO

A. That would be the starting point, yes. They would start out there and click on the hyperlink to come up with cases. And then, they would review those cases to see if those cases were appropriate to use in the memo.

Q. And -- I'm sorry, were you finished?

A. Yeah.

Q. And was one of the points to capture which cases and

I DON'T RECALL

statutes were associated with which headnotes?

A. No. We don't -- we -- no. We never had any use for the headnotes other than it was a convenient way for us to come up with topics and answers.

Q. And was one of the points to capture which cases and statutes were associated with the question that was framed?

A. I don't -- I don't understand that question.

Q. One of the pieces of information you sought to capture in the answer files was which cases and statutes were associated with the headnote used for framing the question; is that correct?

A. No. I mean, again, the purpose was to frame questions to which we could provide answers for which we could provide great quotes, good quotes. We didn't -- we didn't have to go through all the headnotes. In fact, we were never instructed by anyone to use headnotes. It was our own way of being able to piece this project together.

So we -- it was irrelevant to us how many headnotes we, for example, touched. If you could get 25,000 questions using five topics, we would be fine with that. So there was no intrinsic value to headnotes other than it was a starting point for us to frame questions and help our attorneys find case law

that was relevant to those questions to answer them.

Q. How would the attorneys find case law that was relevant to answering the questions?

A. So they would click on a headnote, go to a specific headnote and that headnote would have a legal axiom or legal prohibition of law or whatever you want to call that, a statement of law. And if that headnote was something they could then answer the question.

So, let's say if the headnote was the finder of abandonment property has prima facia right to the property. Just making one up. The researcher might say well, we can frame that question, does the finder of abandonment of property have a prima facia right to that property.

Now, that's the question. Now, the researcher could say yes, they do have prima facia right or no, they don't have prima facia right.

That's how you do research. So you might find good case law under the headnotes, or you might go to one case under the headnotes and that case leads you to another case or other cases. So ultimately, the researcher has to find case law to answer the question that he or she just drafted. And then, not only find those case law, but then find quotes within those cases that, according to Ross' instructions, we would deem as

great quotes or good quotes or topical quotes or relevant quotes.

Q. And to find those great quotes, good quotes, topical quotes, they would use the hyperlinks that allowed them to navigate into the case associated with that headnote?

A. Yes.

I BELIEVE SO

Q. And, the great quotes, good quotes, and topical quotes, those are categories that Ross instructed you to use?

I BELIEVE

A. Yes. Yes.

Q. Qualifying the answer file; is that right?

A. I mean, you keep calling it answer file. We called it a memo. Each memo had distinct portions to it. It had a question, and then it had quotes from different cases, not the same case that, again, would answer that question greatly, goodly, topically, or irrelevant.

So the researcher would have to find different cases for each of those quotes and have to make a judgment on whether those quotes fall within one of those categories.

TH WAS MY BOSS

Q. And, the earlier statements of work refer to those as answer files.

A. Okay.

Q. That's why I'm using that language.

A. All right. We call them memos. Bulk memos and

6.15 - 6.3



original memos.

Q. Okay. So for the bulk memos, they also included a reference list, correct? I'll have you take a look here at page one.

I BELIEVE SO

A. Okay.

Q. So it's definition 1.5.

A. Okay. Yeah.

Q. And so, that reference list here would be the case law that was referenced or used in the bulk memo; is that right?

A. I would have to take a look at a sample bulk memo which I know we provided. Do you have one handy that I can take a look at? I just don't recall -- with the originals, I know we had an actual reference list. I don't recall with the bulk memo, that we had an actual reference list separate from the quotes.

I WOULD HAVE TO SEE

Q. Okay. So let's hold that. We can come to it after I show you one.

A. Okay.

Q. Why were they called bulk memos? Is that something that Ross used, or is that a LegalEase moniker?

I DON'T RECALL.

A. I don't recall where that term came from. I don't know if it was something that LegalEase said hey, this is your bulk memo project. I think it may have come from the client. But the idea was, it was a significant

large project.

Q. And do you see in section 5.2 where it says that each memo shall include a legal research question and a reference list with a target of at least 4, no more than 6 quotes?

A. Yes.

Q. If you get to number paragraph 10, so earlier, we had talked about Ross creating a portal, do you remember that?

I would see.

A. Yes.

Q. And so, there's an e-mail address listed here, Ross at Ross Intelligence dot com?

A. Mm-hmm.

Q. Is that the portal you used to provide the bulk memos?

I believe so

A. We -- the reason I'm pausing is, I know we used the e-mail at various times but they also had a portal where we uploaded the finished memos. What I don't remember is like if we did bulk, like we sent them via e-mail and also by the portal or was the portal good enough. But those are the two ways we would deliver the final memo to Ross.

Q. So the first run was due on October 19th of 2017, of 10,000 memos. Do you know if you met that requirement?

I believe so

A. It was actually 5,000 memos. And yeah, we did. So we broke it up, five; ten and ten. So we did meet that

timeline.
Q. Okay. So I'm reading the wrong language, then. If you go to paragraph nine, can you help me understand? So you were paid in advance; is that right?
A. Yes.
Q. And so you were paid for the first 5,000 memos that you just referenced?
A. Yes.
Q. And those were due on October 19th, but you were paid a month in advance?
A. Yes.
Q. Is that right?
A. Yes.
Q. And then, the second run was -- was it 10,000 memos that were due on November 19th and you were paid a month in advance?
A. Yes.
Q. And then, the third launch was 10,000 memos due on December 19th and payment made on November 20th; is this right?
A. Yes.
Q. Okay. Did you meet all of those requirements in terms of the number of memos you provided?
A. Yes, we did.
Q. And did Ross pay you the amount due?

I WOULD HAVE TO SEE CONTRACT

I BELIEVE SO

A. They did, yes.
Q. And then it says, for any subsequent production run, the advance payment shall be 420,000. Do you see that?
A. Yes.
Q. Is that because the subsequent production runs were anticipated to be 20,000 production memos a month?
A. Yes.
Q. Did you provide any subsequent production runs?
A. No.
Q. So in total, you provided to Ross, 25,000 memos?
A. Yes.
Q. Anything else?
A. Not for this.
Q. But the original project was still ongoing?
A. Yes.
Q. Were you still producing 75 memos a week on the original?
A. I believe we did. I believe we started because we needed to reallocate the bulk. We weren't doing 75, but we were doing enough to keep Ross happy.
Q. How did you pay the individuals who were doing the manual work?
A. So some were paid -- so maybe we can break it down into the different types for individuals.
Q. Sure.

A. The U.S. employees were paid as part of the W-2 compensation. The India employees were paid as part of their salary because they're salaried employees in India. In the U.S., we also had subcontracted with, I mentioned, Kelly Services.
Q. Mm-hmm.
A. So Kelly Services would take care of paying their employees or their however they classified them, and we would pay Kelly's invoice at the end of each month. In the U.S., we also had 1099 contractors that didn't come from Kelly. So they were paid -- it would be a payroll, but it was a 1099 payment. So that's the U.S.
And then, in India, like I mentioned, the salaried employees were paid. Independent contractors were also paid -- they're equivalent of 1099 payments, but they're paid once a month for the work they did that month.
And then, also in India, we had Kelly, like subcontractors that would be paid based on their invoice to us.
Q. And --
A. I'm sorry, I left out one other piece. I'm sorry.
In the U.S., we did also have -- so we had our employees. We had our independent contractors. We had our Kelly Services' contractors. And that's right.

That's all. Yeah, I thought I missed one.
Q. Okay. So that was how you paid them. What did you pay them?
A. For maybe -- by category? How do you want me to classify that because there's different categories?
Q. I just want to understand what your costs was for paying people to do this work?
A. Sure. For our independent contractors in the U.S., we paid an hourly rate of, I think 25 an hour. For our subcontractors in India, I believe we were able to negotiate a per memo flat rate. So I don't know. I don't recall the exact rate, but it was obviously less than what we were being paid, maybe half or less than half. But we tried to manage our costs by paying on a flat rate where we could. In the U.S., that wouldn't fly because Kelly wouldn't accept that. But in India, I believe we were able to establish flat rates with our contractors.
Q. Do you know what those flat rates were?
A. Not off the top of my head. But I do believe I saw SOWs with some of the contractors in India and production that would have had those prices laid out, or those rates laid out.

HAFEEZ EXHIBIT 12
9/28/17 E-mail Subject: Minutes of Meeting

ROSS Bulk Project and ROSS Original
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing to you what has been marked as Exhibit 12. Have you seen this e-mail before?

A. I probably -- I mean, yes. I don't know if this is the exact e-mail, but I've seen an e-mail like this before.

Q. So this is dated September 28, 2017; is that right?

A. Yes.

Q. And this is the minutes of a meeting that involved the Ross Bulk Project and Ross Original Project?

A. Yes.

Q. Was this an internal meeting or was this a meeting with Ross?

A. No, this looks like it's all just LegalEase.

Q. Okay. And, there is reference in here, to delivering 150 answers. Do you see that where it says 150-billable target on the original project?

A. Yes.

Q. And then, it references that of 132 because you were short 18. There was 41 that needs review?

A. Yes.

Q. What does it mean when it says there's 28 questions in the bank that are reviewed and ready for drafting?

A. My understanding, you know, we had -- when we had extra capacity, we would draft more memos and bank them. So then, if we had a particular week or time period where we couldn't meet those targets, we would be able to pull those out of the bank. But some of those memos in the bank may not have been quality controlled or QC'd, so we needed to review them before we used them as an actual product.

Q. And for this project, these are the questions that Ross posed?

A. For the original questions, yes, Ross posed those.

Q. How would Ross share those questions with you?

A. How would they share with us? I believe there -- gosh.

I don't think it was something like e-mail. I think it was under -- I guess it was either by e-mail or it was uploaded.

That's right, I'm sorry. We had a Google sheet. So Ross had a Google sheet where they would upload the questions for us. We would go to that Google sheet and then retrieve those questions from there.

Q. Did you locate that Google sheet for purposes of discovery in this case?

A. I did not.

Q. Do you still have access to it?

SMM

& Don't know

A. I probably do, yes.
Q. It's in a Google -- Google docs?
A. Google docs, yep.
Q. So there's conversation in here about a proposal to increase the production on the Ross Bulk Project. Do you see that?
A. Are you talking about number two? No.
Q. The heading two right before 1, 2, 3. It says proposal to increase the production on the Ross Bulk Project. Do you see that?
A. Oh, yes.
Q. And number two says tests the drafting tool to see if we can increase production.
A. Mm-hmm.
Q. What was the drafting tool that's being referenced there?
A. So this is the, what we've called automation tool or the, I guess, it's also been referred to the drafting tool. It was a tool that -- so let's go back to Mr. Ansad in Code Matrix.
When we first approached Code Matrix, it was a way for us to develop and upload and finalize memos to Ross's portal without using manpower or limiting the amount of manpower. As he got brought on to the project, he learned more about the actual process that

was involved and he had some ideas around how he thought he could help us make our research more efficient and that's what was referred to as the drafting tool.

Q. And would that include automating part of the research process?

A. So the basic idea there was, instead of having an attorney go to a headnote and click on the head -- click on the topics, then subtopics. That tool would, essentially do some of that clicking for them. So they would have -- they would have cases relating to a certain topic as a starting point, as if somebody had gone in there before them and done that for them, if that makes any sense.

Q. I didn't follow you. Maybe you could give me another explanation.

A. Sure.

Q. So you said they would have cases relating to certain topics as a starting point, as if someone had gone in there before them?

A. Yeah. So again, I'll take my stupid abandonment property example. If I were assigned abandonment and I were to go first, so before I even started drafting the memo, I go on to headnotes and I click on abandonment and then I scroll down to a topic within -- a subtopic

I AM NOT EXACTLY SURE HOW IT WORKED

within that topic. And I think hey, this is a good one for me to phrase a question with.

Sorry?

Q. Go ahead.

A. I thought you were looking at me.

Q. No. No.

A. Okay. So this is a good question for me to phrase -- this is a good headnote for me to phrase a question from. That requires multiple clicks and time where the attorney has to go log into West Law, click on the headnote, click on the topics, click on the subtopics.

What Ansad had proposed to us was, what if your associate could be armed with or have available to him or her, cases relating to a certain topic or subtopic that they could start working on immediately as opposed to having to go through that clicking.

So if my topic was abandonment of the vehicle, instead of me having to start from abandonment and click all the way through and find those cases relating to abandonment of the vehicle, the idea behind this tool was, I could log into the tool and I would have a list of cases relating to abandonment of the vehicle that I could start my research from.

Now, the tool did more than that. The tool helped generate the memos. So once I found the cases

that I felt were appropriate, I could frame the question in the tool. I could answer the question in the tool, manually. It had like a little space for me to enter the question, enter the answer. It had -- I could click on which case that the tool had pulled into, that the tool had, which case I wanted to include in the memo and I could select if that was a good quote or a bad -- or, you know, a great, good, relevant, topical.

Demo

And then, once I finished submitting those inputs on the tool, it would generate a word document that was in the exact format that Ross wanted in terms of the indentation and the highlighting. So that's how the tool was, sort of, more from being just an upload tool. And you might see references to it being called the upload tool because that's how we first started it, to a what we call a tool automation. It takes out some of the steps the attorney has to do manually to arrive at the final project.

Q. And some of those steps involve interacting with West Law?

A. Yes.

Q. All right. So this is one of two tools that was built by Code Matrix; is that right?

A. Related to Ross, because we mentioned another tool?

WE HAS

Q. Related to Ross.
A. Related to Ross. I believe they had a version of this for the original project and one for the bulk project.
Q. So the tool you just described, was that used for the original project?
A. It was worked on -- it was used on the original project for a period of time.

I DON'T [illegible]

Q. Was it also used in the bulk project?
A. Yes.
Q. And, would a human being have to log in to West Law using credentials provided by West Law?
A. Yes.
Q. And, where -- let me rephrase that.
Was the tool a form of software that Code Matrix had built?

I BELIEVE

A. The tool was comprised of code. So yes, I believe it was software.
Q. Was there an application interface for the user?

I DON'T

A. Was there an application interface meaning what? A way someone could log into the tool?
Q. Meaning, if they were going to do research in West Law, were they using the tool or were they using West Law? What was the user interacting with?
A. This is where it gets a little bit -- I don't know if the word complicated is correct, but the tool would

I AM NOT SURE.

provide an attorney with cases that were pulled from West Law, okay? Like we talked about. So cases relating to abandonment of a motor vehicle. The tool -- those cases would be hyperlinked.

So the attorney, when they would start working that day for their project, they would log into West Law using their own credentials. They would have these cases that were pulled by the tool to use as a starting point, but they would inevitably, have to go back on to West Law to finish their research unless the tool just happened to capture the right amount of cases and the perfect case law that fit for the memo that they were drafting.

Q. Okay.

A. And the tool was really not used for the purpose of drafting Ross Bulk memos. To a large extent, it was used in a different way. I can elaborate on that whenever you want, whenever you would like.

I Don't know.

Q. No, go ahead.

A. Okay. So the tool was something that was developed for our own employees in India, LegalEase employees in India, the LegalEase employees in the U.S. I think we also gave access to our independent contractors, of the tool. But we never gave access of the tool to any of our subcontracted attorneys like Kelly attorneys or in

India, there's a few different providers that we use. They were not given access to the tool. The vast majority of those 25,000 memos were drafted by those subcontracted entities that did not have the tool. We were using the tool for quality control and upload to the Ross portal

So the tool was -- although it was architected in a way that you could use it as a drafting tool for Ross Bulk, it was primarily being used by our QC team to QC the memos and then, to upload the final memos to -- to Ross.

Q. So if I understand you correctly, you said that the vast majority of the 25,000 memos that you produced for Ross were drafted by the subcontracted entities that didn't have access to the tool?

A. Yes.

Q. So what were those -- how were those subcontracted entities preparing the bulk memos?

A. So they were -- they were all given access to West Law. They were all given their own licenses attached to their LegalEase e-mail and they were doing the research directly from West Law.

And then, to sort of take the narrative all the way through, these various subcontractors would send us a batch of memos at the end of each day. We

had, essentially, all of our U.S. and India employees that were working on the Ross Bulk Project, active QC, they would take these Word documents which is how we got them as Word documents and they would ingest them into the tool. The tool would be able to automatically flag formatting issues. It would also be able to flag if you only had three quotes when you actually needed to have a minimum of four quotes.

So it was very helpful in our QC team rejecting bad memos from the get-go, having the subcontractors do some re-work on those memos, re-submit it and then we would re-ingest it into the automation tool. And, our QC team would finalize it on the automation tool and then it would be sent over to -- to Ross.

Q. All right. So I want to go backwards for a minute, so I understand this.

So there was a group of people that had access to the Code Matrix tool; is that right?

A. Right. A limited group of people.

Q. And this is the tool that you described as helping to drive efficiencies --

A. That's correct.

Q. -- and eliminating having to click on all the tools?

A. That's correct.

Q. So when they accessed West Law, when the human being accessed West Law using the West Law license --
A. Yes.
Q. -- where would the tool reside from an operational perspective? Would it be sitting on that human being's computer?
A. It was a cloud-based tool that you could log into.
Q. Okay. So you would log into West Law and then you would log into the cloud-based tool?
A. That's correct.
Q. And what hosted -- what was the service that hosted the cloud-based tool? Was it Amazon web services or something else?
A. I don't know the -- we have -- I mean, we do use Amazon. We use a few other cloud-based servers. I don't know exactly where that would be hosted on.
Q. So an individual would again, log into West Law, log into the tool?
A. That's correct.
Q. And if they wanted to use your example of abandonment which was an example that's used in some of your materials, would they first navigate to a headnote?
A. So the idea was they would first go to the tool, which would give them a number of cases relating to the abandonment of vehicles. That would serve as their

starting point. So instead of having to go into West Law directly, they could look at these cases that were sort of curated for them and then only go into West Law as they needed to.

Q. Okay.

A. So they have ten cases, but they read the one case and then it cites another case they're more interested in, they click on there and it takes them to West Law.

Q. How would the tool have collected those initial cases to allow the human to navigate there first?

A. So my understanding is the tool was associated with a particular LegalEase license or West Law license. And, in fact, I verified in the last couple days, that tool was using LegalEase 8 which is referenced in your complaint. And Legalese 8 would then go in and find cases relating to a particular headnote and pull them into our automation tool.

Q. And how would the tool know which headnote the human being wanted it to navigate to in the first instance?

A. That, I don't know. I think it was -- there was probably somebody on our team saying look, we need cases relating to these different headnotes and that the tool would then go in and get those cases from West Law using LegalEase 8.

Q. And then, would those -- would the results of the

initial work from the tool populate in the tool?
A. The cases would populate in the tool, yes.
Q. All right. And, the individual would frame the question using the tool?
A. The tool had a static thought to them entering into the question based on the cases they're looking at.
Q. And someone would have to type the question in?
A. Right.
Q. But the headnote would be in front of them?
A. The case would be in front of them, yeah. The cases related to the headnote would be in front of them.
Q. And the headnote as well, right?
A. The headnote probably would have been, yeah.
Q. Otherwise, you wouldn't know which question to answer.
A. Yeah.
Q. So they would use that information, type in the question, and then there was another box or another field to then identify the cases?
A. So visually, I think they would have on the one side of the screen, boxes for them to manually input the question and to be able to categorize the quotes from those cases as being, you know, from those four different topics or categories.

But, and then on the other side of the screen, it would actually have the cases listed. I

believe they had to copy and paste the appropriate sentences or quotations from the case on the right side of the screen and fit it into the box on the left side of the screen.

So it's making everything accessible to them, but they still had to discern if the case, A, answered the question that they had just framed. If it didn't, then they would go out to West Law and look for other cases. The case was perfect and on point, they still had to cut and paste the -- the appropriate sentence holding from the right-hand side to the left-hand side and then do the additional step of categorizing it as great, good, so on and so forth.

Q. Now, I think I've asked you this, but I just want to be -- I just want to make sure I understood your answer. Would the tool using LegalEase 8 go into West Law and pull this information down so that when the user logged in to the tool, there was information available to them?

A. That's correct.

Q. So the user didn't have to deploy the tool, the tool was used with Legalese 8?

A. That's correct.

Q. Okay. And so, the individuals who were doing the work to generate these 25,000 memos could, in effect, use

the tool, but would have to go to West Law if they needed any additional information?

A. Correct.

Q. Okay.

A. However, the sort of -- the irony of the tool was, that work flow we just talked about was barely used because we did not give the tool to our subcontractors. So when they were drafting the memos, they were drafting them as if the tool didn't exist. They were just going on to West Law and going through headnotes and framing the questions and drafting the memos.

And then, the tool would only be deployed by our team to do the Q run -- run a QC process through and then deliver it, the final memo uploaded to Ross.

Q. And where are the 25,000 memos?

A. We -- I'm sure we have copies of them. They were not -- they were not on the Box holder, so they didn't -- I believe they're on an internal server in India, where the actual memos were done, for QC to finalize. And each of the 25,000 memos were also sent to Ross. So Ross has a copy of each memo and I believe we have a copy somewhere

Q. Of each memo?

A. Of each memo.

Q. They haven't been produced in this case, right?

A. We did not produce them, no.
Q. Is there a reason why?
A. We felt the actual memos -- we produced sample memos, but we didn't -- we didn't think that the actual 25,000 memos were relevant to the production requests.
Q. Were they -- were they not relevant or they weren't responsive?
A. Sorry, not responsive.
Q. No, I wasn't trying to pick.
A. I think that's the word I used, yeah. I think the sample set was responsive but not the entire set.
Q. Do you have access to those 25,000 memos?
A. I believe we do.
Q. Would those memos show who prepared each one?
A. I'm sure there is metadata which you could find who authored those memos, yes.
Q. So we would see that the memos were prepared by the contractors not using the tool?
A. Yes.
Q. Do you know which contractors had access to the tool and which didn't?
A. I could -- I mean, we could provide a list. But I can tell you generally speaking, the vast majority of our memos were produced by subcontractors associated with a company called Clutch Group. And Clutch Group did not

have access to them.

Similarly, Vakil produced maybe 5- or 6,000 memos. They also did not have access to the tool. Kelly Services, their contractors produced, maybe 2,000 memos. They did not have access to the tool.

The only ones having access to the tool were our LegalEase, either U.S. employees or India employees or our designated QC team which, we would have a list of those people.

Q. Clutch Group and Kelly had access to LegalEase Solutions dot com e-mail addresses; is that right?

A. Yes.

Q. And they had access to West Law licenses that had been provided to LegalEase Solutions, LLC?

A. Yes.

Q. Did anyone else have access to LegalEase 8 other than the tool?

A. It was also associated with one of our attorneys, Merin Sony, who you referenced earlier.

Q. She was the project manager for this?

A. Yes.

Q. Did she do any research for this herself, using West Law?

A. She probably did, but more in the role of QC, project manager.

Q. Was she responsible for the operation of the tool?
A. She wasn't responsible for the oversight of the tool, but the actual operation was sort of being managed by other people on the team.
Q. Okay.

HAFEEZ EXHIBIT 13
7/31/17 E-mail Subject: New West Law Passwords-July 2017
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:
Q. I'm going to hand to you, Mr. Hafeez, what's been marked as Exhibit 13. I saw you check your watch, so we can take a break here, shortly.
A. Yeah, I need a restroom break.
Q. Okay. Have you seen this e-mail before?
A. Yes, I have seen this e-mail before.
Q. Okay. So do you see in the top e-mail -- and this is an e-mail from, is it Ms. Rajeev to you, Ms. Whitehead and Chris Schmidt?
A. Yes.
Q. Who is Chris Schmidt?
A. He was one of our employees at the time.
Q. Is he based here in the U.S.?
A. Yes.

Q. He was one of the --
A. Staff attorneys.
Q. -- staff attorneys you mentioned earlier, right?
A. Yes.
Q. So I asked you earlier about the Spotify associates and this is the document you referred to?
A. Yes.
Q. Is that a separate project?
A. Yes.
Q. Did you need West Law passwords for the Spotify --
A. Nope.
Q. -- project?
A. Nope.
Q. And so, why is it that Ms. Rajeev was mentioning that none of the Spotify associates has West Law access?
A. The best of my recollection, we were transitioning these Aparma, Priyada, Anjusha, Sandesh, to bulk, the Spotify finished. So she's saying they don't have West Law access, they'll need West Law access to transition to this team, to the West Law team.
Q. Okay. And there's reference to Rohit. Do you see that?
A. Yes.
Q. Started working on the Ross pilot?
A. Mm-hmm.

Q. So by this point in time, had you received the go from Ross to engage in the bulk project?
A. It could have been, I think I mentioned earlier, August, but it could have been late July that at least indication enough that we were ready to start investing some resource to figure it out.
Q. So that paragraph goes on and says we need seven accounts immediately if we are to work efficiently.
Do you see that.
A. Yes.
Q. Who are the seven accounts for at that time?
A. It seems like at least for now, Aparma, Priyada, Anjusha, Sandesh, and maybe Rinie and Visakh.
Q. Okay.
A. That's six accounts.
Q. And are they the Spotify associates identified in the first paragraph, or are they all contractors of LegalEase India?
A. They are either contractors, direct independent contractors or employees of India, LegalEase India.
Q. Okay. So the next paragraph says that Ansad -- and is that referring to Mr. Ansad from Code Matrix?
A. Yes.
Q. -- is trying to automate the WL activity trying to help us to reduce WL log ins. WL log ins, do you see that?

A. Yes.
Q. And WL is West Law?
A. Yes.
Q. Was he doing that in connection with the proposal to produce 25,000 memos in three months?
A. Yes.
Q. And why -- why was a focus to reduce West Law log ins?
A. Again, I think we were trying to plan this whole project, how many people do we have, how many West Law log ins do we need. So it was part of our planning process.
Q. Was it also to reduce the amount of spend using West Law?
A. Could have been, yes.
Q. Did anyone look at the contractual terms between Legalese and West Law to see if you could automate the process for using West Law?
A. We --
Q. And I'll ask you not to divulge in any privileged information, of course.
A. I do know that Gayathri Rajeev who sent this e-mail, she did look at the contract and that was something that was a concern for her, to make sure that we were doing everything according to the contract.
Q. Did you ever consider whether automating West Law

activity was permitted or not permitted?
A. We did, yes.
Q. Did you propose the SOW to Ross, or did they propose it to you?
A. Good question. May I take a look at it? I -- it's one of the exhibits here, right?
Q. Yeah. So this would be, I think, Exhibit 11, which would be here.
A. I believe we took it upon ourselves to draft the SOW and it went to Ross to comment and edit and then it was finalized. So we did the first draft of the Ross based on what we had been told in our previous conversations on what they were looking for.
Q. And is that in consideration in your ability to automate the West Law activity?
A. No.
Q. It wasn't?
A. Well, I guess what -- well, is what in consideration?
So Ross never knew that we were using an automation tool on the back end. Ross had no part and play in that. They just logged in their memos within the time frame. I guess our time frame in how we could hit these targets and the pricing, I'm sure took into consideration that the Ross tool would help us save time on at least the upload portion that I had

mentioned and also the QC.

So yes, I think our pricing took into account, that the tool would be helpful.

Q. But you never explained to them how you were going to get all this work done?

A. No.

Q. They never asked?

A. They never asked, and we felt like that was our secret.

HAFEEZ EXHIBIT 14
7/26/17 E-mail Subject: ROSS -TC
Tomas 7 26 17
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you what's been marked as Exhibit 14. Is this -- have you seen this e-mail before?

A. Yes.

Q. And does this reflect Ms. Whitehead's notes from a telephone conference with Tomas at Ross as of, I guess, on July 26, 2017?

A. Yes.

Q. So in the first bullet, it reads, Ross is waiting for two things to quote on quote, close. Do you see that?

A. Mm-hmm, yes.

Q. Does that give you any better understanding as to when

you had proposed the statement of work to Ross?

A. Well, so this e-mail was dated end of July and it seems from the e-mail, and now that I think about it, yes, we -- Ross hadn't given us the green light yet.

As of this date, they were waiting for a couple things to close. And my understanding at this time, don't know where I got it from, it was a financing thing. They were looking for some financing to close on this project, so we had not been given the green light at the time of this e-mail, so we would not have probably drafted the SOW at this point.

Q. So are you picking up on the fact that that bullet is, I take it, a financial close?

A. Yes.

Q. So you believe that Ross was waiting for finances on their end?

A. Right.

Q. In order to provide you the verbal commitment?

A. Right.

Q. And what is that? What does she mean, or do you recall anything in the conversation where she writes confidential?

A. That was very much in tune with what -- or that was very much the pattern of Ross. They -- they didn't want to tell us much. You know, confidential was

something that they used quite a bit.

So obviously, we had to deal with the fact they didn't want to tell us exactly what was stopping them from giving us the green light. But Teri's take on it was some kind of financial issue.

Q. Did Tomas ever tell you not to inform West Law on the Ross project?

A. No.

Q. Did they ever tell anyone at LegalEase not to inform West Law of the project?

A. No.

Q. In the third bullet, it reads no other issues that they have, dot, dot, dot, portal process and it goes on. Do you see that sentence?

A. Yes.

Q. What does she mean when she wrote problem on those two things closing?

A. It seems like they're talking about some kind of Ross portal on their end, that they needed to -- again, speculation. I don't know what they meant. I don't know what Teri means, but it doesn't have to do, I know, with our automation tool or our portal. It's something on their end.

Q. The last bullet says ideally execute SOW in a few weeks. Do you see that?

A. Yes.
Q. So wouldn't that suggest that the SOW had already been shared?
A. It's possible. Teri is -- like I said earlier in the conversation, she talked about development and she has -- when we get interest from a client on a project, one of the things we started doing more frequently following her lead is hey, if we can draft the SOW to get this project green lighted, so it's possible she had drafted or we had drafted an SOW based on the conversation we had up until then.
I don't know if it was drafted at this point or drafted later, but that was very much Teri's style, to say hey, look, let's give the client everything they need so we can hit the ground running.
Q. So I'm going to have you jump back to Exhibit 13 now, which is an e-mail from generally that same period of time. What was the concern with using Lexis, that's raised in this e-mail, the top e-mail?
A. Yep. I don't know other than we seem to have a consensus that West Law was more user friendly than Lexis.
Q. Is it because the automation tool that was being built by Code Matrix would work in West Law but not Lexis?
A. I don't know from that e-mail.

Q. Do you know --
A. I don't know.
Q. -- otherwise?
A. I don't know otherwise, either.
Q. Did you ever use the automation tool?
A. I have seen it, I don't think I've ever used it for creation of a memo.
Q. Did you ever see it access West Law?
A. I never personally saw it access West Law.
Q. Was that done out of India?
A. Was what done?
Q. Using the tool to access West Law?
A. Primarily, yes. The associates were drafting memos from our side, were primarily India.
Q. Do you know how many times the automated tool that you've described, was used to access West Law?
A. No, I don't.
Q. Would Ms. Sony be the person that would know?
A. I mean, the access point to the -- to West Law was through her log in so the information is probably there. I don't think she would know herself.
Q. Was she the person that ran the automated tool?
A. I don't believe she ran the tool. I believe Ansad ran the tool.
Q. Ansad who is at Code Matrix?

A. Yes.
Q. Does he have -- did -- all right. So let me go backwards.
So I had asked you before where the tool resided from a code-based perspective. Is Ansad the person that's responsible for that?
A. Yes.
Q. And does he control the tool?
A. Yes.
Q. And is the tool property of Code Matrix or LegalEase Michigan, or LegalEase India?
A. So per the SOW with Code Matrix, the tool is property of LegalEase India, but Ansad was hired to create and implement the tool as well.
Q. Was the Ross Bulk Project -- did it begin on or around September 19th?
A. That's probably correct.
Q. Do you remember at that time, approximately how many people you had working on the bulk project?
A. I don't remember the number of people, no.
Q. Can you guess, estimate?
A. I could guess, maybe between our subcontract -- I think in September, we had maybe around nine or ten from Kelly. But those numbers were also brought down when we weren't happy with their work. And then, we had --

I think we had about 40 to 50 people working.
Q. Between Michigan and India?
A. Yeah.
Q. And do you remember looking at the payment terms earlier, Ross was advancing payment to you all; is that right?
A. Yes.
Q. Why were they advancing payment for that project but not for the original project?
A. So, I mean, we always ask for advance payments from any of our clients. And sometimes you get it, sometimes you don't. So it was not out of the ordinary for us to ask for advance payments.
I don't know if Ross Original was ever paid on advance or not. From the SOW, it seems like maybe not. So we always ask for advance payments. We've had other clients in the past give us advanced payments. And we still have clients give us advance payments. That was something we asked for and they agreed to it. Now, obviously from a cash flow standpoint, it was very helpful to have advance payments, but it was something we asked for and received.
Q. Okay. So, I'm going to hand you a document that's called Master Services Agreement that's been marked as Exhibit exhibit 18. Have you seen this document before?

A. I have, yes.
Q. Do you know if this is the final version of the agreement with Code Matrix?
A. I don't know if it's the one I've seen. I've seen this draft, but I've also seen the signed one. So I don't know if there's any changes between those two.
Q. Do you know if you produced the signed version in this case?
A. Yeah, we did. I was able to get it yesterday on the platform.
Q. Was there ever concern at LegalEase about referencing Ross in this agreement?
A. There may have been. I don't -- I don't know. There may have been because in general, with our subcontractors and vendors, we didn't want them to know the client name.
Q. Why is that?
A. For a variety of reasons. One, we felt we had a confidentiality obligation to the client. One, we didn't want our subcontractors or vendors to go directly to Ross.
Q. Could they have done that here, you think?
A. They could have, yes.
Q. Do you see down below, in the scope of work in this draft that says research on West Law and Lexis?

A. Can you point to what page you're talking about?
Q. I'm sorry, page one. You know what, you have a different version of what I'm looking at. Hold on a second.
A. Oh, you're looking at the statement?
Q. Yeah. I'll give you that, too. Put them all together. We can take a lunch break here in just a minute.
HAFEEZ EXHIBIT 15
Statement of Work II LegalEase
Process Automation
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION
MR. DAKHLALLAH: Which exhibit is this?
MR. LASHWAY: I believe we're up to 17. Oh, 15.
BY MR. LASHWAY:
Q. So there's the statement of work.
A. Okay.
Q. Is this the document you were referencing when you mentioned that you've seen other documents or is there something else? This one is not signed.
A. No, I seen a signed one.
Q. Okay. Do you see at the bottom on scope of work, it says research on West Law and Lexis?
A. Mm-hmm, yes.

Q. So it was the intention at least of August 7th to have Code Matrix perform research on West Law?
A. Let me take a look at what's meant here by research.
I -- again, my understanding of this and this is not the version I looked at is, we're asking them to understand, not actually conduct research on West Law and Lexis for purposes of producing memos, but find out more about West Law and Lexis to see how they can -- how automation could help with either of those platforms.
Q. And when it references design and develop a web portal, is that the web portal to the tool?
A. Yes.
Q. And then it's -- it speaks to, I think something you were just mentioning, activity automation engine to gather data from West Law?
A. Mm-hmm.
Q. Does that accurately reflect what the tool ultimately did?
A. Yes.
Q. And then, there was a document processing engine. Is that processing material that was taken from West Law?
A. No. I believe that process engine is the tool would then, based on the inputs provided by the attorney, would generate a Word document that would be formatted

according to Ross specifications.

Q. According to the input into the automation tool?

A. Right.

Q. And then, the next one is activity automation for LegalEase's client's portal. Do you see that?

A. Yeah, I see that. I don't know what that means.

Q. Could that be referenced to automating the process to upload --

A. Could be.

Q. -- to the Ross portal which is referenced up top in paragraph one?

A. Could be, yes. Because like I said before, there was no tool that we made, provided to Ross or provided Ross access to.

Q. And the final bullet is integration of functionality into existing LE portal. Do you see that on the bottom of page one there?

A. Yes.

Q. I think that's referring to the LegalEase portal.

A. So, I think something important for me to clarify here, we use the word portal interchangeably. You have the automation tool, right? -- that we talked about, which had different uses, some for doing the actual work, some for QC, some for uploading. All that was -- all that is included in the automation tool.

There was a separate LE LegalEase portal that we were discussing with Ansad to develop, which was just a dashboard for the client to be able to see the status of the project. Like at any given time, how many memos have we uploaded.

So I believe that LE portal may just be researching the information dashboard that we wanted Ansad to develop for the client, so the client would have access to an information dashboard to know what the progress on the project was, which was completely distinct from the automation tool.

Q. And was the client in that answer, Ross?

A. Right. Yes.

Q. So Ross could go into this dashboard and see where you are with respect to the project objective of 25,000 memos?

A. Yes.

Q. Okay. I think we're going to run out of tape, so why don't we just take a break now?

THE VIDEOGRAPHER: We are going off the record. The time is 1:00 p.m.

(Off the record at about 1:00 p.m.)

(On the record at about 1:42 p.m.)

THE VIDEOGRAPHER: We are back on the record, the time is 1:42 p.m.

BY MR. LASHWAY:

Q. Mr. Hafeez, I stapled the exhibits so that they were --

A. Thank you.

Q. Yeah, sorry about that.

So if you could go back to Exhibit 15, it should be somewhere by the bottom. I organized them for you.

So just prior to lunch, we were talking about a dashboard that Code Matrix had built for Ross to view the project objective?

A. That's correct, yes.

Q. And did they, in fact, build that?

A. I believe so, yes.

Q. In addition to the status of where LegalEase was with respect to meeting the 25,000-memo target, what other information was shared with Ross?

A. My recollection is really, it was just a fancy dashboard for them to know where we stood with the timeline for the memos, or how close we were to completing the project.

To my recollection, there was no other information. It was really just a timetable for them to see progress on the project.

Q. So why would you need a dashboard as opposed to just an

e-mail to say we've produced X number of the 25,000?
A. As part of just more of a marketing thing. We just wanted to impress them, that we -- we had something that they could track their progress as opposed to just giving them an e-mail spreadsheet.
Q. And would they have to log into the dashboard? Ross, would Ross have to log into the dashboard?
A. Yeah, I don't know if it was a log in or just a link that they could just pop up, but they had access. They were given access to that, to the dashboard.
Q. How often did you report on your results or your status of the project to Ross?
A. I believe Teri had regular scheduled calls with Thomas, so she would update him on progress probably on a weekly basis. I don't recall any kind of a project report or, you know, something that we would send over to Ross. And then, the dashboard was another tool we communicated progress.
Q. Who is the person most knowledgeable about the dashboard and what it conveyed? Is that you? Is it Teri? Someone else?
A. Probably Ansad who developed it. Teri might know some more about it as well.
Q. Was Ansad responsible for maintaining the dashboard?
A. Yes.

Q. Is Code Matrix based in the U.S.?
A. Not that I know of.
Q. Do you know if they have any representatives in the United States?
A. Not that I know of. I don't think they do.
Q. Does Mr. Ansad or any Code Matrix employees spend time in the United States?
A. Not that I know of.
Q. Did you ever meet anyone from Code Matrix here in the United States?
A. No.
Q. Have you ever met Mr. Ansad?
A. I met him, I believe, one time.
Q. Where was that?
A. In India.
Q. Was that for purposes of this project?
A. No. Actually, I met him just a couple months ago. Not related to this project at all.
Q. Does Mr. Ansad know about this litigation?
A. He does.
Q. Did you tell him about it?
A. Yes.
Q. Does Code Matrix have any affiliation or association with Ross?
A. No, not that I know of.

Q. Do you know if they know about one another?
A. I'm pretty sure Ross does not know about Code Matrix. Code Matrix may know about Ross.
Q. And if you look at Exhibit 15, there's a reference to Ross in the project scope, isn't that right? On page one.
A. On page one?
Q. I'm sorry. Page one, scope of services. There's a reference to Ross.
A. Oh, okay. Yes.
So Code Matrix does know about Ross, but Ross does not know about Code Matrix as far as I know.
Q. All right. So, can you turn to page two, which is paragraph five which is the solution, proposed solution. Do you see that paragraph?
A. Yes.
Q. So it says in the first paragraph, that to achieve what they described just above will be developing different components. Do you see that?
A. Yes.
Q. And this is, the wheel would be Code Matrix developing different components for LegalEase?
A. Yes. I see it there.
Q. All right. So this agreement, though, is with LegalEase Solutions Michigan; is that right?

A. Yeah, it looks like it is.
Q. Why -- why is this with the Michigan LegalEase and not the India LegalEase?
A. I don't know. But I don't think this agreement was ever executed. The one that I've seen is between LegalEase India and Code Matrix.
Q. So if you go back to paragraph five on page two, it identifies two types of searches performed by the activity automation engine. Do you see that?
A. Yes.
Q. And so, the first one, as I understand it, is a type of search that will be based on legal questions provided by Ross; is that right?
A. That's correct.
Q. And it explains that the activity automation engine will run a search on West Law and will list out the search results to be pulled up on a platform to be developed by Code Matrix.
Now, I inserted some language into what I was reading there, but does that accurately describe what --
A. Yeah. Yes, I believe so.
Q. And was that ultimately done? What -- did Code Matrix build such a tool?
A. Yes, they did.

Q. Okay. And that tool was used to run a search in West Law; is that right?
A. Right.
Q. Would that have used LegalEase 8 West Law account?
A. Yes. Yes, that's my understanding, yeah.
Q. And it would provide the search results from West Law in a platform for a human person to review; is that right?
A. Right, the automation tool.
Q. How would that tool know what search to run?
A. So, for the question-based queries, it would be using natural based on the question and it would also be using -- I can't remember what's called natural language and, what's the other type of search?
Q. Boolean? Boolean?
A. Boolean, yes.
The fact that the SOW that we do have executed has a flow chart which shows that -- which search strings will be used based on the actual questions being provided by that client. But it was natural language and Boolean.
Q. And would it use KeyCite numbers?
A. KeyCite numbers meaning headnote numbers or no?
Q. So, do you know if there's a difference between a headnote and a KeyCite number?

A. I know cases are characterized by headnotes, and I am familiar with KeyCites. I don't recall how they are connected but I don't -- yeah. I know they're there, I'm not sure how they're interrelated to KeyCites and headnotes.
Q. Okay. So my question was, would the search that was run by this activity automation engine use KeyCite numbers?
A. I don't know. My understanding is there was two types of searches that this automation engine ran.
Q. Right.
A. One was -- there was two questions. One was the question provided and it would run a natural language search and Boolean with that question language.
However, when there's a topic assigned, it's possible it was using either the headnote number or the key -- or for purposes of this conversation, I'm not sure what a KeyCite is, but it might have been using a headnote or a KeyCite similar to run that search.
Q. Okay. So the second part of the answer was related to the second type of search, right?
A. Yeah.
Q. So focusing on the first type of search --
A. Yeah.
Q. -- would that activity automation utilize KeyCite

numbers?
A. Not really. I think it would be using the actual question with natural language and Boolean.
Q. And so, who would take the question posed by Ross and input it into the automation? I'm sorry, the activity automation engine?
A. That would be Ansad, I would imagine.
Q. So he would physically load the tool each time they needed to run a search in West Law?
A. I don't know how he did it.
Q. And so, we don't know if he used KeyCite numbers?
A. We don't.
Q. And what about same question, but did he use headnotes? So for purposes of running for the first search --
A. Yeah.
Q. -- the activity automation engine, did he use headnotes?
A. If I could look at the flow chart and the executed SOW, I could see that it's mentioned in there, but I don't have any knowledge in terms of what's in the SOW.
Q. Okay. And who would know that?
A. Ansad would.
Q. Anybody at LegalEase?
A. It's possible -- it's possible Gayathri might know. I don't -- but Ansad is the one really running the tool.

Q. Would Teri Whitehead know that?
A. I don't know that she would know.
Q. For this first search that we're focused on, where would the results be generated for Ansad? Physically, where did the results reside?
A. So, my understanding is we had a local machine server, like a physical server which wherein the results would reside.
Q. And that local server was sitting --
A. In India, in the office in Cochin.
Q. And would that be the LegalEase India office or the Code Matrix office?
A. I believe -- I believe it was in the LegalEase India office.
Q. So would Ansad be sitting in the LegalEase India office to -- when he was using the activity automation engine?
A. I know he had come to the office at intervals, but I don't know that he needed to be there physically. I don't know that the physical machine was connected. The internet cloud to his machine, don't know how that was connected. But Ansad didn't work out of our office, he -- he came as needed.
Q. And he was also based out of, is it Kerala?
A. So he's based in Cochin.
Q. Cochin.

A. Which is a city in Kerala. And he's also got an office in Bengaluru.
Q. Is his office in Cochin, near the office, the LegalEase India office?
A. I don't know.
Q. So, I'm just trying to understand the process here. So I don't mean to belabor this, but Ross would pose, in August of -- well, let's say September of 2017, Ross would pose questions for purposes of this first form of search, correct?
A. Right.
Q. And you testified earlier, that some of those questions were focused on bankruptcy. Some were focused on intellectual property?
A. Right.
Q. And do you know where Ross -- how Ross generated those questions?
A. We don't.
Q. How did -- and Ross -- Ross conveyed those questions to LegalEase using some sort of legal -- I'm sorry, some sort of Google doc?
A. Right, that's correct.
Q. And how would the automated -- the activity automation engine then be used to transform those questions into a search to be performed at West Law?

A. I don't know. I mean, it's possible Ansad was given access to the Google sheet to get questions from there. I don't know for sure.
Q. Okay. And after the activity automation engine was used to search West Law and it would list out the search results reading from here, what was the next step for purposes of advancing the memos?
A. Are we talking about the original or the bulk?
Q. This is the search here that's described as number one under paragraph five.
A. Number one. So the question you're asking is what would happen after this piece of it is done by Code Matrix or by the tool?
Q. Yeah. Code Matrix or the tool, yeah.
A. I think I had mentioned earlier that the cases would be on one side of the screen and then there would be boxes for the attorney to read the cases and then fill in the question that they're deriving from the questions in the case. The answer -- sorry, not the answer. The questions, and then to select the actual quotes that they felt like answered the question.
Q. Okay.
A. So that would be done by the associate as they're looking at those cases.
Q. And that would be using the platform that's described

here, developed by Code Matrix that would have the search results in it?
A. Right.
Q. Okay. Then, there's a second activity automation engine functionality; is that right? That's the one that's identified in paragraph two?
A. Yes.
Q. Okay. And is this -- and paragraph two relates to the bulk, the Ross Bulk Project?
A. Let me just read this real quick.
Q. Okay. Great.
A. Yes. So this looks like it's talking about the automation -- sorry, the Ross Bulk Project.
Q. Okay. And, the purpose of this was to list the contents under a particular topic provided in West Law; is that right?
A. Right.
Q. And is that particular topic a KeyCite number?
A. Again, I thought of it in my mind as topics and subtopics under headnotes. I don't know if that's the same as a KeyCite. But I don't know.
Q. You don't know what that's referencing when it reads under a particular topic, provided in West Law?
A. Yeah. I -- my thought was that's a topic or subtopic under a headnote. That would be used to compile cases

from that particular topic or subtopic.
Q. But you don't know if it references, or if that's relating to a KeyCite number or headnote?
A. I don't know.
Q. Who would know that?
A. Ansad would. Besides him, Gayathri might know. And another attorney named Leo, who was testing out the tools to see if it was functional or not, so he might know.
Q. Okay. How would LegalEase or Code Matrix identify the question to be answered using the process described in number two?
MR. DAKHLALLAH: Objection, that's a compound question.
THE WITNESS: Or maybe you need to rephrase the question.
BY MR. LASHWAY:
Q. How would Legalese identify the question to be answered using the process described in number two?
A. So I recall that with the bulk memos, there was no question being answered. The question was -- the question was being developed by the associate along with the answer. So if the associate had case law or cases related to a certain topic that was being pulled from this tool, they would then either use that --

either use the case law, or as we had spoken about earlier, pulled up an actual headnote or subtopic of a headnote, they would use that primarily as a way to formulate a question.
Q. Would they use the text of the headnote to formulate a question?
A. They would use that to start to formulate a question.
Q. And would they use the KeyCite number in the topic associated with that, to help formulate the question?
A. Again, I don't recall what a KeyCite is in the context that we're talking about today. If you want to show me what a KeyCite looks like, it might be a very quick fix. And I'm not trying to be evasive, I just don't know what a KeyCite is related to headnotes as we're doing this deposition.
But they would create questions based on the data that was pulled, which may have included more than the cases. It may have included the topic or subtopic, that the cases were organized under there.
Q. And during this course of the bulk project, did Ross ever provide any instructions as to the questions that they wanted answered?
A. No.
Q. So -- so you could generate 25,000 memos on whatever topics you were so inclined, from West Law?

A. Yes. The only thing that they specifically said don't -- not to do is they did not want state specific questions and answers. So they wanted questions and answers that were not state specific.
Q. So they didn't want anything related -- they didn't want anything that was identifying the jurisdiction for the answer, they wanted something more holistic?
A. Right. And they specifically said state. So, yeah. So they didn't want under Michigan law such and such applicable. They just wanted, you know, if it was such and such applicable under something else.
Q. Do you know why?
A. I have no idea.
Q. They didn't explain it?
A. No.
Q. Did they care about the difference between state and federal courts?
A. No. They were fine with us using case law from either.
Q. And they didn't want you to differentiate between when answering between a state court answer and a federal court answer?
A. No.
Q. How about with respect to answers that involve statutes? Did they want you to identify a state statute versus a federal statute?

A. No.
Q. Okay. So, you were asking me a question earlier about KeyCite numbers. And what I'm trying to understand is why in this draft agreement, there is reference to a particular topic provided in West Law. And I'm trying to understand, what is the topic that's provided in West Law that this is talking about?
A. So again, in my understanding and, you know, going back to the example of where you have a headnote for abandoned property, within that, you may have ten other subtopics or maybe a hundred subtopics under abandoned property. One of those subtopics or either a sub-subtopic would serve as a potential topic to create a question and answer from.
Q. So, if I was to try and describe the difference between the two, so what you had just described I think relates to KeyCite numbers.
A. Okay.
Q. Headnotes is what's generated at the top of a case to summarize a case that a --
A. Oh, oh.
Q. -- that associates that text to the KeyCite number system.
A. Oh, okay.
Q. Does that make sense?

A. So is the headnote more of the editorial from somebody at West that's summarizing a case --
Q. Correct.
A. -- and linking it to a KeyCite?
Q. Correct.
So if I'm correct, does that help answer what this is referring to as a particular topic provided in West Law?
A. I don't --
Q. Hold on. You think I should know this stuff.
So let me rephrase. When I was using the word KeyCite, I should be using the phrase key number system.
A. Okay.
Q. So a key number system would say admiralty law and then there would be subtopics underneath that.
A. Yes. Yes.
Q. Does this ring a bell?
A. Yes.
Q. Okay. And then, the headnote is exactly what you described, I think the editorial.
A. Yes.
Q. Okay. So what is this referring to? Is this referring to a key number or a --
A. It's referring -- so now that we've clarified what key

number is, I believe it's referring to finding topics using key numbers.
Q. Okay.
A. Yeah.
Q. And so, as I'm reading this, it says after the question is added to the proposed portal, do you see that? This is the next paragraph down under activity automation engine to fetch data from.
A. Number two? We're talking about number two, right?
Q. Yeah, number two. The second paragraph in number two.
A. Oh, okay. Sorry.
Q. That's all right.
So I was asking, it reads, after the question is added to the proposed portal; do you see that?
A. Mm-hmm, yes.
Q. Who -- who adds the question to the proposed portal?
A. So maybe if we back up a little bit, it'll help answer the question. We were using key numbers as a way to help come up with questions and answers for these memos and as a way to help make sure that we weren't having people answer the same question or provide the same, you know, memo multiple times.
So it was a good way for us to organize a project for our internal purposes. So we had somebody tracking here's how many memos we need done this month

and let's make sure we create memos based on these key numbers. And some of these memos can be drafted by Team A. Some of these memos can be drafted by Team B. So, it was a way for us to organize the project and make sure that we were not, you know, duplicating the work, the products.

So there was a project plan or there was an evolving project plan of who or which teams would be assigned to which key number to create questions and answers. I'm sorry, to create memos. And I believe that person would have been Merin Sony, primarily. Now, how that went to Ansad to run through the automation tool? I don't know. Perhaps she had a spread sheet that he was using, but the key numbers were being used to help organize a project.

Q. And so, would one person be assigned admiralty law for example?

A. Right.

Q. One would be assigned bankruptcy law?

A. Right.

Q. Where is that project plan?

A. I haven't -- I did not see it in the initial discovery that we produced. I don't know if it was an actual project plan like, you know, it may have been a series of e-mails or spread sheets, but it's something that

I'm sure I could -- we could find it.
Q. And -- and the key numbers were also used to pull down the data, right; that would be used to generate the memos for the team to review?
A. The key numbers would be used to produce -- you mean the case law, the cases that would come under those key numbers?
Q. Yes.
A. Yes. I believe that's part of how the automation tool worked.
Q. And, as I'm reading this in paragraph two, so once the case law was pulled down from the key numbers, they would send the data to the team for review; is that right?
A. Yeah. So the way this was -- the way it was supposed to work was, the attorney who was responsible for a certain topic like admiralty law or a certain subtopic under admiralty law would have cases in that portal that they could use to generate the memos.
Q. Well, wouldn't the -- wouldn't the team -- wouldn't the activity automation engine automatically generate the memos for their review?
A. No. Pulling the cases was only one piece of it. Then, reading the cases and pulling the language that answers the question. Or, actually, first of all, coming up

with a question, then answering the question and then categorizing the answer, all that was done manually. The tool wasn't that smart.
Q. So this says once they review, they can send this information to Ross portal with minimal human effort. Do you see that?
A. Right. But again, this is an unexecuted statement of work that looks like it was drafted by Code Matrix. So I don't know.
Q. Is that not correct, then?
A. No. The idea was to increase efficiency, but when an outline was involved in creating these memos, it takes human decision making on what particular sentences in the case best answer the question. And going one step beyond to actually determining whether or not that answer is great, or good, or topical. And then, you always need to find an irrelevant quote as well. So all that takes judgment by the attorney doing the work. That part could not be automated.
Q. But the part that was automated according to your testimony, I believe, is the tool pull down West Law data --
A. Yes.
Q. -- into a tool?
A. Yes.

Q. That didn't require human interaction?
A. That's correct.
Q. You touched on this before, but the LegalEase ultimately owned the copyright on the application and service that was developed by Code Matrix; is that right?
A. Yes.
Q. And does LegalEase have a copy of the application, and the code base?
A. We -- we had a copy of the code to which we provided to you, but the application is no longer alive. It's no longer being hosted anywhere.
Q. And the code that you provided to me, does that cover both search functionality one and search functionality two as described in this draft agreement that we've been looking at?
A. We had asked -- we had asked for the code for the bill to be provided and that's where -- I didn't review the code myself, so I can't answer yes or no. But the intent was to provide you with the code for the application.
Q. Did you get that code from Code Matrix?
A. Yes.
Q. And, you paid in Indian currency for this project; is that right?

A. That's correct.
Q. And was the approximate payment to Code Matrix about 2500 dollars, U.S. dollars; understanding there's an exchange rate that's involved?
A. Again, these -- these numbers seem to reflect one -- the numbers that I saw on the executed copy. It was around 150 or 160 rupee, 160,000 in rupees, which would translate to about 25- to maybe 3,000 bucks, U.S. dollars.
Q. What -- who, just because I'm confused a little bit here. Who prepared the actual memo? Was it a human was it a tool?
A. Human being.
Q. Okay.

HAFEEZ EXHIBIT 16
Master Service Agreement Effective 8/10/17
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:
Q. So I'm handing you what's been marked as Exhibit 16. And you'll see on the bottom, what I would call scratch on a contract. Do you see that?
A. Yes.
Q. Is -- do you know if this is the executed version of the agreement?

A. I believe this is the executed agreement, yes.
Q. And is that Mr. Ansad's scratch at the bottom?
A. Or actually --
Q. Or is that Ms. Rajeev's?
A. I thought I had seen one. I do remember seeing this signature on each page. But I thought I had seen one with Ansad having signed it as well.
Q. Okay. And do you know if the scratch on the bottom of the page is Ms. Rajeev's? I'll just represent to you, it looks similar --
A. Yeah.
Q. -- based on page 11.
A. Yeah. I don't know her signature independently, but compared to what's signed on page 11 or page --
Q. Page 19.
A. Yeah, looks like it might be.
Q. Yeah. Now, the date on the back page is December 8th of 2017. Do you see that?
A. Yeah. Yeah.
Or actually, in India they write it the other way around.
Q. Or is that August 12, 2017?
A. It could be that it's August.
Q. That's actually what I was going to ask you.
A. Okay.

Q. So, do you believe this was signed in August of 2017?
A. That would make sense. It would be signed at that time.
Q. Now, this is now with LegalEase Michigan, right?
A. That's correct.
Q. Do you know why, between the draft that we were looking at and the execution of this document, there was a change in who was signing it?
A. No, not at all.
Q. Okay. And is this addressed for LegalEase Solutions India Private Limited at 47 College Road in -- is it Chennai?
A. Mm-hmm, Chennai.
Q. India? Is that their address?
A. That's the corporate address.
Q. Okay.
A. But it's not where the office is.
Q. Where is the office?
A. Cochin.
Q. Okay. Do you know the address there?
A. Not off the top of my head.
Q. Can you spell Cochin for us?
A. Yes, so it's C-O-C-H-I-N.
Q. And do you see that there is -- if you go down, it says ground floor AC prime rose near regional passport

office. Is that Cochin?
A. That's how Cochin is spelled, yeah.
Q. Okay. Who made the decision to share LegalEase 8 with Code Matrix?
A. I don't know, but I would imagine it was -- it probably would have been Gayathri.
Q. Were you aware of that decision?
A. I don't think I was.
Q. Okay. At what point in time did you become aware of it?
A. Actually, the -- as far as the specifics about LegalEase 8 being assigned to Merin and then being assigned to Code Matrix, I only became aware of that yesterday as I was preparing for this deposition because I wanted to understand better, the story behind LegalEase 8. So yeah, I just learned about it recently.
Q. And LegalEase 8 was identified in our complaint, right?
A. Yes.
Q. If you go to page 13, this is a statement of work. Do you see that?
A. Yes.
Q. And it says that it's pursuant to a master services agreement dated August 10th?
A. Mm-hmm.

Q. I assume that is relating back to page one which has the 10th of August date and a signature line?
A. Yes.
Q. Okay.
A. That's my understanding.
Q. If you turn to page -- or, to the next page, page two, I guess, which is Bates stamped 8939.
A. Mm-hmm.
Q. So it says phase one. And it says the first phase will start with a pilot using the Lexis Nexus platform. Do you see that?
A. Yes.
Q. Once successful and there are no untoward consequences, it will be replicated in West Law. Do you see that?
A. Yes.
Q. What would be an untoward LexisNexis consequence?
A. I don't know what that means? It could be the platform wasn't able to pull cases from LexisNexis or there was some kind of a -- if LexisNexis doesn't do that anymore, that would be some kind of untoward consequence. But I didn't write this contract so I'm not sure what's meant there actually.
Q. Did LegalEase ask LexisNexis to test the activity automation tool on its platform?
A. No, I don't think they were ever -- ever formally asked

them, no.

Q. How about informally?

A. We did have some conversations with LexisNexis reps on -- they had some kind of a -- they had some kind of a database that was provided to tech providers if they wanted to do something kind of out of the ordinary that's not within the usual parameters of their LexisNexis research tool. So there was some conversations with Lexis around that, but it didn't seem feasible, so we didn't pursue that angle any further.

Q. Why was it then -- why was it to be tested in Lexis, but then replicated in West Law?

A. I think that -- I think the idea was we wanted to be able to use both platforms for the automation tool. But I think at this time, we may have already realized that West Law licenses were more competitive, so we wanted to go with West Law as opposed to Lexis.

Q. Do you see the second paragraph of paragraph two on page 8939 which begins with service provider?

A. Yeah, sorry.

Q. And is the service provider under the statement of work, Code Matrix?

A. Yes.

Q. So it reads that Code Matrix shall ensure that the

activity automation developed for the process is not in violation of the usage policies of the legal databases used in no untoward consequences arise as a result of the same. Did I read that correctly?

A. Yes.

Q. And legal database is a defining term, right?

A. Right.

Q. And is it defined as the online legal research platform such as West Law and Lexis?

A. Yes.

Q. Why is it that LegalEase was requiring Code Matrix to ensure that the activity automation would not violate West Law's usage policies?

A. Well, because it was a concern of ours. Again, we had reached out to Code Matrix for a completely different thing which was uploading memos to the portal, Ross portal. And Code Matrix pitched us this idea that we could develop a tool to help automate the process and make it more efficient. But in the back of our minds, we always realized that we had to be careful that we were not doing anything to violate our terms and agreements with West Law or Lexis.

So as much as Ansad wanted to sell us this product, we were also cautious about it as well. And didn't want something that he could produce that would

get us in trouble.
Q. Did anyone ask West Law about whether the activity automation would violate its usage policies?
A. We did not seek that opinion from West Law, no.
Q. Why not?
A. We didn't really have a route to do that. The only communication interface we had with West Law was customer service reps. I guess we could have asked the customer service reps to escalate it, but we didn't.
Q. If you go down to the next section, which is talking about the two types of searches, do you see that?
A. Mm-hmm.
Q. So this first search is based on legal question assigned, right?
A. Mm-hmm, yes.
Q. If you look at bullet four, doesn't that say that the activity automation engine will generate the document in the desired format, not the human being?
A. I mean, it says after LegalEase team approves search results. Which doesn't -- it doesn't detail what that actual process is, but like I said before, this is by no means an automated process. The attorneys still have to isolate the appropriate sentences and then categorize them and provide an irrelevant code and the topical code. So there's no way the tool would do all

that in one go.
Q. But then, the generation of the memo or the answer file would be automated, right?
A. It would, yeah, based on the input from the attorney, it would spit out a document that was formatted per Ross's requirements.
Q. Okay. So if you go to the next page, page 16, this is talking about --
A. It's page 16 or 15?
Q. Yes, page 16. Thank you, sorry.
Now page two there, search based on topic assigned, that's focused on the Ross Bulk Project; is that correct?
A. That's correct.
Q. All right. Can you read those six bullets there?
A. Sure. The activity automation -- sorry.
Q. Oh, you don't have to read them out loud. You can read them to yourself.
A. I thought you wanted me to read them out loud. Okay.
Q. All right. So, did you read that?
A. I did.
Q. Okay. So in the heading for -- or the introduction of paragraph two, it says search based on topic assigned. Do you see that? And topic assigned is a defined term?
A. Yes.

Q. All right. So can you go back to the definitions at the beginning of statement of work? And can you actually read this one out loud?
A. Sure.
Q. 1.6, the definition of topic assigned.
A. Topic assigned means a main topic of West's key number system which is assigned by LegalEase.
Q. Okay. So if you go through those six bullets you just read, and starting with number one, the activity automation engine pulled all of the case law from West Law available under the topic assigned; is that right?
A. Yeah. According to this, yes, that's right.
Q. And then, the case law -- I'm sorry, the results will include case law from the subtopics under the main topic assigned; is that right?
A. Yes.
Q. So then, the third bullet talks about the LegalEase team approving of the search results.
A. Right. Again, I think that's the same language where it's using approval as a very broad definition, you know. But like I mentioned before, there was absolutely human manual work involved at this point. There was no such thing as just saying ooh, the automation engine got everything right and let's submit it. This was a process.

Q. Do you know how many cases are -- fall under any key number?

A. I think when you're -- do I know? No, I don't know. But I think on West Law, when you click on key numbers, you do get a drop down that shows how many cases there are.

Q. Associated with that key number?

A. Right.

Q. And, is it your testimony that the LegalEase team, human beings, would approve of the search results or the case law that was assigned to the key number topic?

A. No. There was no such thing as approval of the results that the engine pulled. The LegalEase team was simply using those cases and starting point to drop the memos.

Q. But this says that the activity automation engine will send this information to document generation engine and the document will be created based on the desired format. Do you see that?

A. Right. But that's after the team has done their manual work. Like I mentioned, once -- once the codes were pulled out and characterized and the topical, relevant and irrelevant quote were identified, then that would be submitted, and the tool would generate a Word document in the format that Ross wanted.

Q. So is -- you had testified earlier that it would be

helpful to see a flow chart that was in the signed agreement?
A. Yes.
Q. Is this the flow chart that you wanted to see?
A. Yeah. Yes.
Q. Where does it say that a human being prepares the memo?
A. So I wasn't testifying to that particular -- I said the flow chart would be helpful to look at the process.
But again, I go back to what I've said over and over again here which is the team approves being broadly -- this is a broad statement. There was a lot that went under LegalEase's team approval. And it's been sort of characterized the same way throughout this document and also in the flow chart.
But again, my testimony is very clear that in no way, shape or form, did LegalEase just take what the tool developed and generate a memo out of it. It required actual human, legal judgment on every single memo.
Q. All right. So I appreciate that, and you've testified to that. But my question was a little different, which was, where in this process does it speak to a human being preparing the memo?
A. So my con -- my response would be when the process talks about LegalEase team approves the search results,

it's actually talking about all those steps I outlined.
Q. And then, it doesn't say a human would send the information to the document generation engine, it says the activity automation would, right?
A. Right. Once the document was created and approved by an attorney, they would hit a button like submit and the engine would then spit out a memo and a Word document.
Q. Is this -- do you know if this is the contract that governed the relationship with Code Matrix, the one we were just looking at?
A. I recall seeing one that was signed by Ansad as well. I can't be a hundred percent sure, but this looks very similar to one I looked at as well, in preparation for the deposition.
Q. And this is the one signed by LegalEase India, right?
A. Yeah.
Q. Did Ross pay LegalEase Michigan?
A. Yes.
Q. And who paid Code Matrix?
A. I don't know if that was paid through LegalEase Michigan or LegalEase India. But it probably was paid by LegalEase Michigan.
Q. Did Code Matrix provide monthly and weekly reports as to the progress of performing their services?

A. Code Matrix was -- was providing some sort of updates by e-mail or otherwise. I would imagine that they were being provided, yes.
Q. Were they -- were they shared with you?
A. I may have been on -- I may have been on the e-mails, but I don't -- I don't recall any specific e-mail or document, but it would make sense that we would be getting some kind of report from them.
Q. Okay. Can you go back to page 13 of Exhibit 15? Sixteen, I'm sorry. Exhibit 16. This is the statement of work with Code Matrix.
A. Okay.
Q. Do you see in the definition of activity -- activity automation engine, it speaks to a software program?
A. Yes.
Q. That will strictly adhere to the activities performed by humans and mimic human patterns. Do you see that?
A. Yes.
Q. And it goes on to say including the time taken to upload or download data, it will not allow for any upscale or rapid copying or usage of data from any third-party databases or sites?
A. Yes.
Q. Who drafted that?
A. I believe the statement of work was drafted by Gayathri

Rajeev.

Q. That's a LegalEase India --

A. Yes.

Q. -- person?

And why was it important for the activities to mimic human patterns?

A. I think that the essence of automation, the way we understood it was doing what a human being could do, just doing it more efficiently. So it wasn't -- it wasn't going outside of the scope, how the information was supposed to be used or retrieved. It was just doing it in a more efficient manner.

And I believe that definition was something that Ansad had, I guess, educated us on. Automation is separate from other terms you might hear out there like a bot or scraping. This is something that was done purely to make human effort more efficient.

Q. Okay. So my question was a little bit different. My question was, why was it important for the activity, the automated activity, to mimic human patterns? And it goes on right to say including the time taken to upload or download data.

A. I don't know, but it could be that they wanted to make sure that it wasn't raising any flags.

Q. Raising flags at West Law?

A. Right.

Q. Raising flags as to whether or not an automated program was being used to access West Law?

A. Could be, yeah.

Q. And, or raising any flags as to whether an automated program was downloading data from West Law?

A. Yes. That could be part of that concern expressed here.

Q. Do you know if it was?

A. I don't know because I didn't draft this.

Q. And you didn't sign it, right?

A. I didn't sign it.

Q. Did you authorize the signing of this?

A. No. This particular document, I didn't author or review this as far as I can remember.

Q. Did LegalEase Michigan authorize the use of the Code Matrix automated tools that are described in definition 1.1?

A. Yes, by using it. I mean, we did use it, so.

Q. Used it in connection with West Law licenses granted to LegalEase Michigan, right?

A. Yes. Yes.

Q. And so, for those purposes, was that one of the reasons why we -- Code Matrix and LegalEase wanted to mimic human patterns with respect to -- yeah, I'm going to

start again.

Was the use of LegalEase 8 by Code Matrix one of the reasons why LegalEase and Code Matrix wanted the automated engine to mimic human patterns?

A. Like I testified before, I don't know for sure because I didn't draft this, but that would seem to be a good conjecture as to why that was there.

Q. You -- you were assigned LegalEase 8, correct?

A. Sorry. I was assigned LegalEase 8?

Q. LegalEase Michigan was assigned a license called LegalEase 8; is that right?

A. I thought it was -- I -- what I was told by Gayathri was LegalEase 8 was assigned to Merin, that Merin was using and that was also used by Code Matrix.

Q. Let me rephrase this. So LegalEase Michigan had a license to use West Law that it called LegalEase 8, correct?

A. Amongst other licenses? I mean, you're focusing on LegalEase 8. We had multiple licenses.

So you're saying did we have LegalEase 8 along with other licenses? Yes.

Q. One of them was LegalEase 8?

A. One of them was LegalEase 8, yes.

Q. Yeah.

A. You made it sound like we were specifically assigning

LegalEase 8 to LegalEase Michigan, which was not the case.
Q. And LegalEase 8 was assigned by West Law to Merin Sony; is that correct?
A. That's -- that's what I was told, yes.
Q. And Merin Sony provided the credentials to use the license to West Law called LegalEase 8 to Code Matrix?
A. It was either Merin or somebody provided that from our team in India too. I don't know if it was actually Merin.
Q. And the activity automation that's defined in this statement of work used LegalEase 8; is that correct?
A. Yes.
Q. What does it mean, if you go to page 17 of the statement of work, that at the top of page 17 in that first box on the flow chart, do you see that?
A. On page 17, the first box?
Q. Yeah, the first box?
A. Okay.
Q. What does it mean when it says the managing associate to assign them to individual associates?
A. So again, we had multiple group of people working on the projects. So I read that as different associates were being assigned to different topics.
Q. Based on the search engine pulling out the cases under

the assigned topic, right? Which would be step two on the flow chart?
A. Yeah. From this flow chart, it seems like once the case is related to a topic or subtopic were pulled, then they would he be assigned to an associate by the managing associate.
Q. And then, the next is, this box four is this box that introduces the word approved that we've talked about?
A. That's right.
Q. Okay. That would be the step that would follow step three in the actual process used at LegalEase?
A. Yes.
Q. The automated tool -- I'm sorry. The activity automation engine was then used to upload the resulting memo or answer file into the Ross portal; is that right?
A. Right.
Q. How would you access the Ross portal?
A. I don't know. I don't know if it was through the e-mail address that was provided earlier by Ross, or there was some way, we may have an FTP upload. I believe it was an FTP upload site. So instead of having someone manually uploading memos to the FTP site, this tool was able to just upload them directly from the platform.

Q. And do you know if that would happen simultaneous with a completion of the memo or is this something that would run overnight?
A. I think it was -- I think it was not simultaneous. You know, it was memos completed and then there was a process to upload them on to the Ross portal at the end of each day.
Q. At the end of each day?
A. Yeah.
Q. Were you involved in preparing a document that became known as the Best Practices Guide for Ross Intelligence?
A. Not -- not really. That was not something that I -- I may have reviewed it at some point, but I was not involved in drafting it, no.
Q. Are you aware of whether or not the contract that you had with West strictly prohibited the sharing of passwords?
A. I am aware that the contract had terminology or language prohibiting the sharing of passwords, yes.
Q. Just wanting to understand your answer. So you focused on the terminology in the contract. Do you know if West strictly prohibiting the sharing of passwords?
A. Yes. Based on my reading of the contract, I understand that West prohibits the sharing of passwords.

Q. And is it your position in this case that you were granted permission to share passwords?

A. So I think there is an ambiguity on what's meant by sharing the passwords because this is something that came out, even in the termination letter from West. We've always -- we've taken the position and we feel that it's the right position, that there is nothing prohibiting us from assigning licenses to our team whether it was comprised of employees, independent contractors or subcontractors as long as they were working for us, on a project, we had the right to assign -- we have the right to get licenses on their behalf.

So if that's what you call sharing passwords, we do have a difference of opinion on that issue. If you're talking about passwords being shared as in Tariq Hafeez has LegalEase 12, and then I give it to Tariq Akbar to use because we don't have enough passwords, enough licenses, that type of sharing, password sharing, I understand is not allowed.

Does that make sense? I mean, there -- I'm not being evasive here. Like, I really feel like that term password sharing was conflated to mean two different things. The former, I feel we are entitled to. The latter, I agree we're not entitled to based on

the terms and conditions.

Q. What about LegalEase 8 being assigned to Merin Sony but being used by Code Matrix? Would that be permitted in your view, or would that be prohibited?

A. So, I mean, without getting into what LegalEase 8 did in terms of how -- you know, the data it was getting from West Law or any of that, just a simple act of saying Merin's password -- Merin's user name or password can be used by a different user. That was something that we were allowed to do. And we, in fact, went to our customer and said hey, I need to assign the customer license to somebody else for whatever reason, somebody left the team and we have a new team member or this team member is no longer working on the project.

So the ability to transfer licenses between people, if we had 20 licenses and 20 people, we could transfer them as required. So that simple act of transferring a license from one to the other, I don't believe was violating the contract.

Q. But the licenses were assigned to credentials, right; which were assigned to LegalEase user names?

A. Right.

Q. So why not just go back to West Law and say we need to reassign this --

A. Right.

Q. -- license to this user name?
A. I don't -- I don't know why that wasn't done, to be honest. Because we had done that in other cases where we had requested of Cameron or Fraz to reassign licenses to other people on the team. I don't know why we didn't do the same with Merin.
Q. Do you ever -- do you remember being notified by West at some point in time that there was simultaneous usage on an account?
A. I remember the issue being raised at some point, yes.

HAFEEZ EXHIBIT 17
8/18/17 E-mail Subject: WL Registration Keys
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:
Q. I'm handing you what's been marked as Exhibit 17, Mr. Hafeez. Have you seen this e-mail before?
A. I don't think I've seen this exact e-mail because I wasn't included on it. And I didn't review it when I -- but yeah, I haven't seen it.
Q. And --
A. I have not seen it, but I do see it now, I guess.
Q. And you didn't review it --
A. No.
Q. -- in preparation for today?

A. No.
Q. Do you see at the top where Mr. Tario from Thomson Reuters writes to Ms. Merin? I'm sorry, Ms. Sony that he received a notification about simultaneous usage on the account?
A. Yes.
Q. And then, he instructs her, please make sure only each assigned user receives their assigned registration key?
A. Yes.
Q. And he reminds her that password sharing is not allowed under the terms of your contract, right?
A. Yes.
Q. Did Ms. Sony alert anyone, or you? Let me rephrase this.
Did Ms. Sony alert you as to this concern raised by Mr. Tario?
A. I don't think she raised it directly to me, but I do recall Gayathri, at some point raising the concern that password sharing was something that we needed to be careful about, ongoing.
Q. Do you know why Ms. Sony, after receiving this notification allowed the West Law license assigned to her to be used by Code Matrix?
A. I don't know why.

HAFEEZ EXHIBIT 18
9/5/17 E-mail Subject: Ross Portal
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. Handing you what's been marked as Exhibit 18, Mr. Hafeez. And this is the top e-mail from Teri Whitehead to Mr. Ansad dated September 5, 2017. Do you see that?
A. Yes.
Q. Do you recall this e-mail exchange?
A. Yes, I've reviewed this e-mail before.
Q. Did you review it in preparation for today?
A. Yes.
Q. Do you see in the second e-mail down, dated [sic] at 5:36 p.m., that Mr. Ansad writes, I don't think they will be able to track our usage as I'm not creating a boat software?
A. Yes. We had a laugh about that yesterday, too.
Q. Did he mean bot software?
A. He meant a bot software, I think.
Q. And when he says I don't think they will be able to track our usage, is he referring to West Law?
A. Actually, I think he means -- I think he's referring to Ross because the e-mail before, Teri was very concerned that Ross would find out that we're using an automation

tool. Not that we weren't allowed to but Tony just -- Teri just did not want Ross to know we were using an automation tool to get the work done faster.
Q. Do you know why?
A. She never gave us any real reason. I mean, the next -- the second sentence of that e-mail, she says Ross is temperamental, nervous and constantly thinking someone will steal their business. That alone is a reason for them to run.
I mean we -- we wanted to keep this client on long term. We were hoping to get, you know, additional launches of the project. We don't want to do anything that might rock the boat.
I think Teri wanted us to know if Ross thought we were using an automation tool, they might not be happy about that or would be concerned about that.
Q. And do you know if Ross was concerned about them stealing the business of West?
A. Not -- no. I have no reason to indicate that that was a concern of theirs at all.
Q. If the bulk project was loading data on a nightly basis through an FTP, why would we be concerned about Ross tracking IP addresses?
A. Could you repeat the question?

Q. Yes. So I think you testified earlier that you thought the results of the bulk project were being loaded nightly through an FTP?
A. Mm-hmm.
Q. Is that right?
A. Right.
Q. Why is it that LegalEase is concerned that Ross is tracking user IP addresses?
A. I don't -- I don't know how the two are related together. I mean, again, we were not concerned about Ross as far as uploading memos to their -- to their portal. That's what we were being paid to do, is to create work product and deliver to them.
My read of this e-mail was, perhaps Teri was concerned that Ross would somehow pick up on the fact that we were using some kind of automation engine for which she didn't want them to know about because it wasn't relevant to them and she -- that's how I read this e-mail. Had nothing to do with the fact that we were FTP completing the work product to Ross.
Q. But how would Ross know or be concerned about user IP addresses in connection with your reading of the e-mail?
A. I really don't know, but to be honest, Teri doesn't know anything about IP addresses. So I don't know what

she meant by this.

But my read, and knowing Teri, she was concerned that Ross would know that we're using an automation tool. She didn't want them to know.

Q. Who is Keerthi as referenced in the first sentence of her e-mail address?

A. Keerthi was our -- she was the HR head in India. She was the one originally had been tasked with hiring people to upload the finished memos on to the Ross portal. And she was the one who knew Muhammad Ansad at Code Matrix and said let me get him in and see if we can help us with this.

Q. Do you know what problem Ms. Whitehead is referring to when she said Keerthi has not had a problem in the past night?

A. I don't, but she was involved in making sure the finished memos are uploaded to the Ross portal. So probably referring to that.

Q. Keerthi was doing that work?

A. She was overseeing that work.

Q. Was one of the concerns that Ross would be aware that you were using individuals not affiliated with LegalEase Michigan, in performing their work?

A. Oh, that could be true. That could be it. We didn't want Ross to know that we were subcontracting the work

out.
Q. Why is that?
A. Well, if they knew that we didn't have the manpower ourselves to do it and if we were subcontracting it out, they may have gone directly to one of those companies, so we want to keep the business.
Q. So is it possible that that's what Ms. Whitehead is referring to --
A. Yeah.
Q. -- when she's concerned about --
A. It's possible.
Q. -- Ross tracking user IP addresses and seeing India IP addresses pop you?
A. Yeah, that could be it, too.
Q. Where is Keerthi's IP address?
A. She's based out of our Cochin -- she was based out of our Cochin office.
Q. And who is it -- it's not available here. Do you know who is it that should be -- or can -- I'm sorry.
Ms. Whitehead writes, if you could shadow Keerthi's IP address, that would be on. Do you know who she wants shadowing Keerthi's IP address? Do you understand my question?
A. I think you're asking me who does Teri want to shadow Keerthi's IP address.

Q. Yeah.
A. And it looks like from the e-mail exchange she's having a conversation with Ansad.
Q. So she wants Code Matrix shadowing Keerthi's IP address for purposes of uploading to the Ross portal?
A. That's what it -- I mean, that could be it, yes.
Q. Do you know if that's it?
A. I don't know for sure.
Q. Is there any other reading that you can think of, to that statement?
A. I mean, I really don't know. I mean, I don't even know if this e-mail is to Ansad, but it seems like it is from the chain. But it sounds like here, Teri is telling Ansad to shadow Keerthi's IP address so that Ross doesn't get nervous about something.
Q. Yeah, if you look on the back, there's another e-mail from Ansad to Teri talking about deploying tomorrow. Does that give you any additional context as to that statement?
A. Again, nothing more than Teri is nervous about Ross, and -- no. I really don't know what you're getting at to be honest. Like I said, we were nervous about Ross. And we wanted to keep the client. This had, to my knowledge, nothing to do with the work product. It just has something to do with Ross finding out that,

maybe Ansad was in the picture. Maybe they didn't want -- maybe she didn't want Ross to know Ansad was working with us and they wanted Keerthi to be the person who is always uploading memos. I don't know.

Q. Was Ross aware of LegalEase India?

A. Ross was aware that we have people working outside of the U.S. on the project.

Q. Were they aware of LegalEase India?

A. I don't know.

Q. Do you know if they --

A. I mean, they were aware of the fact that we have an India office and people in India, but I don't know if they knew LegalEase India was called LegalEase India Private because we didn't have any contract between the two. But they were aware of the India outfit, yes.

Q. Okay. Do you know how many consultants you ended up retaining through -- is it -- I'm going to get it wrong again, Vakil Search?

A. I don't know the number. I don't know the number.

Q. Was it more than two?

A. Yes.

HAFEEZ EXHIBIT 19
9/15/17 E-mail Subject: Ross Bulk Project -LPO
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm going to hand to you, a document that's been marked as Exhibit 19, Mr. Hafeez. I'm going to start with the same question.

Do you recall seeing this e-mail before?

A. I think I've seen this e-mail or a copy of something similar to this e-mail.

Q. And I'll reference to you that there's a number of attachments to it, that I've excluded for purposes of this deposition to save down on some paper.

A. Okay.

Q. I'll ask you about some credentials. So do you know if Vakil Search used these two LegalEase 32 and LegalEase 33 West Law credentials to access West Law.

A. My understanding what can I -- sorry. What I remember is that yes, when we were first on boarding Vakil, this e-mail was sent to the two account managers, Kavya and I can't pronounce the other name, but the two account managers. And this was for -- this was us sort of getting them acquainted with the project.

When they came on to the project, they actually had their own West Law accounts that they had -- that they had separately contracted for. So they may have used these two accounts just to play around with the project, but they didn't use it long term.

Q. They had their own West Law licenses to use?
A. I agree -- I believe so, yeah.
Q. And did they use them for the Ross projects?
A. Yes.
Q. And was Vakil Search involved in the Ross Original?
A. No, they were just provided for the Ross Bulk.
Q. Okay. And I think I asked you this, but you don't -- do you recall how many contractors came in to assist --
A. From Vakil?
Q. -- on the Ross project from Vakil?
A. I don't.
Q. All right. So Teri, Ms. Whitehead, writes that Vakil can only use these credentials on Saturday and Sunday. And if on weekends they have to do so before 9:00 a.m. IST and after 6:00 p.m. IST. Do you see that?
A. Yes.
Q. What is IST?
A. India Standard Time.
Q. And, is that because these credentials were used -- being used by other people during the other periods of time?
A. That's what it seems, yeah. That seems to be the case.
Q. Would that be password sharing that was restricted under the contract?
A. Yes.

HAFEEZ EXHIBIT 20
9/15/17 E-mail Subject: Ross Bulk Project - LPO
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you what's been marked as Hafeez 20. Have you seen this e-mail exchange before?

A. Yes.

Q. Did you review this e-mail in connection with today's deposition?

A. Not in connection with today's deposition but I've seen this before.

Q. And who is Clutch Group?

A. Clutch Group is another entity that we subcontracted the memo drafting to.

Q. Where is Clutch Group based?

A. Well, they are based, primarily, out of India. I don't recall if the contracting entity was in the U.S. or India, but the people that were staffed through the Clutch Group were all in India.

Q. Did you contract with them through the United States, do you remember?

A. We had an SOW with them. I don't know if it was through LegalEase India or LegalEase Michigan, but they were definitely a core component of ours through labor

on this project.
Q. Okay. Do you remember how many contractors Clutch Group offered you in connection with the Ross project?
A. I think we had upwards of 30 or plus people from Clutch Group on the project.
Q. Is that total or is that at any given time?
A. At any given time, I'd say.
Q. And did Clutch Group have its own West Law licenses?
A. No.
Q. So they were only using your West Law license?
A. Right.
Q. So in this, similar to the last e-mail, I'll have you kind of look half way down, half way down the page.
A. Mm-hmm.
Q. So Ms. Whitehead writes similarly that they can use the following two credentials to West Law on Saturday and Sunday, and if on weekdays, please let --
A. Mm-hmm, yes.
Q. -- LegalEase know before 9:00 and 6:00. And that's LegalEase 8. Do you see that?
A. Yes.
Q. And that's also the license that was being used by Code Matrix, correct?
A. Correct.
Q. Who is Munsula?

A. She is another one of our U.S. employees.
Q. Is she employed through LegalEase Michigan?
A. Yes.
Q. Is she a W-2 employee?
A. Yes.
Q. Is she still employed?
A. No. In fact, I may have missed mentioning her when we were talking about employees beforehand, but she was an administrative assistant at LegalEase.
Q. Was she a lawyer?
A. She is not a lawyer.
Q. But yet, she was assigned a West Law license at some point?
A. Yes.
Q. And did she ever do any research on -- using West Law?
A. I don't think she did research, no.
Q. And, is the reason why Clutch Group could use these two West Law licenses during these restricted periods of time because they -- because the West Law licenses were being used by others during those periods of time?
A. Yes.
Q. And is this an example of password sharing that you believe would violate the terms of the contract?
A. Yes.
Q. Did anyone from West ever authorize either this

password sharing or the prior version that we looked at in Exhibit 19?
A. No.
Q. Was this same activity in terms of sharing passwords being used with Lexis?
A. I don't know.
Q. There's a reference in an e-mail from around the same time, the same day to an LPO, with capitals. Do you know what LPO stands for?
A. Yes.
Q. What is that?
A. Legal -- legal process outsourcing. Sorry. I'm feeling kind of faint over here.
Q. No, that's okay. Do you want to take a break?
A. Maybe -- maybe I can get after this question if you don't mind.
Q. Yeah. So LPO stands for, legal processing --
A. Processing outsourcing.
Q. Outsourcing. Okay.
And does that describe Clutch Group?
A. Yes.
Q. Does it describe Vakil Search?
A. Yes.
Q. Does it describe -- let me get their name, Morae Global Corporation?

A. Yes. So Clutch Group was actually -- Morae Global owns the Clutch Group.
Q. Got it.
A. So the agreement with Morae may have included the Clutch Group.
Q. Okay. And so, Morae Global was a Delaware corporation, and that agreement was signed with LegalEase Michigan?
A. That's -- yeah, that's correct.
Q. Yeah. Okay.
Are there any other legal process outsourcers?
A. That we used on this project?
Q. Yeah.
A. So we have the Clutch Group.
No. As far as I can recall it, those are the main -- those are the only ones.
Q. So, at any given time, do you recall specifically or generally, how many contractors were working on the Ross project that had access to West Law?
A. So at any given time, we had upwards of -- let me put it this way. During the bulk project, for those three months, we probably had at least 70 plus people working on Ross at any given time. And sometimes, it would fluctuate up and down, but 70 -- 60 to 70 is probably the right number of people who were working on the

project.
Q. And do you know what the high water mark was?
A. I don't.
Q. Do you remember at one point in time in mid-September, having a conversation with Tariq Akbar about where Ross's payment should be directed?
A. It's ringing a bell, but I'd have to see the e-mail about that.
Q. Actually, do you want to take a break because you said that you were feeling --
A. Yeah, can I take a two-minute break?
Q. That's great. We can take a break while I find this document.

THE VIDEOGRAPHER: We're going off the record. The time is 3:13 p.m.

(Off the record at about 3:13 p.m.)

HAFEEZ EXHIBIT 21
9/18/17 E-mail Subject: LegalEase Bulk
Memo Project Request
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

(On the record at about 3:28 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:28 p.m.

MR. LASHWAY: Did you get the document I left

on your keyboard?
MR. DAKHLALLAH: This one?
MR. LASHWAY: Yeah.
BY MR. LASHWAY:
Q. So this is an e-mail -- I'm sorry, Exhibit 21 Mr. Hafeez. It's an e-mail between you and -- an e-mail exchange between you and Mr. Akbar; is that right? September 18th of 2017?
A. Mm-hmm, yes.
Q. So I was asking you right before break, if you recalled having a conversation about where Ross was going to direct payment. And, does this e-mail refresh your memory as to where Ross was to direct payment with respect to the bulk project?
A. Is there something on the other side, too, or no?
Q. I'm sorry?
A. Is there something on the other side as well?
Q. Well, yeah, it's a two-page e-mail. There's -- well, let's just start at the bottom. You write to a Tomas van der Heijden. Do you see that, with a copy to Mr. Akbar?
A. Mm-hmm.
Q. And you directed Ross to make payments in connection with the Ross Bulk, to a Chase account?
A. Mm-hmm, yes.

Q. Okay. Now, is that a different account than what was used for the Ross Original Project?
A. No.
Q. It was the same account?
A. Oh, let me check.
Q. Yeah, the second paragraph of that e-mail is what I want you to focus on.
A. Okay. Yeah.
So we have two accounts at Chase. And we were asking to get paid to the account that was different than the account that was taking the payments for Ross Original.
Q. Was there any reason for that?
A. The only thing I can recall is -- I think Tariq Akbar had some sensitivity to Neha, who was working on our finance team knowing how large the payment was for this particular piece. Neha, N-E-H-A.
But it really didn't matter because everything was accounted for. So I'm not sure, but I remember having this exchange with Tariq Akbar. So it had something to do with not having our -- some of our staff know the amount of payment for this project.
Q. Sorry for that interruption. Do you want to finish your answer?
A. Yeah, just to elaborate. We had two business accounts

for LegalEase, with Chase. There was some sensitivity to Neha, who was one of our finance associates, knowing the numbers coming in. But as you can see from my e-mail to Tariq Akbar, I said she's going to see the Quick Books entries anyhow, so really, what's the point?

Q. Okay.

A. But, yeah.

Q. So that's -- that's what this e-mail exchange is about?

A. Yes. Nothing more.

Q. Are these Chase accounts here in the U.S.?

A. Yes.

Q. Are those your operating accounts for LegalEase Michigan?

A. Yes. And I think in this past summer, we had some fraudulent activity on one of the accounts, so we shut one account down and now we only have one account.

Q. And do you know if it's this account that you shut down?

A. I don't know.

Q. Did someone gain access to the account without authorization?

A. Yeah. We had some charges on our debit cards and bank cards that weren't adding up.

Q. Do you know if you signed an agreement with Clutch

Group, or the Morae Global Communications?
A. I would imagine we had. I don't know. It would probably have been me, but it could have been somebody else, probably Tariq Akbar or Teri.
Q. Okay. But do you recall signing an agreement with them?
A. I don't personally recall, no.

HAFEEZ EXHIBIT 22
9/19/17 E-mail Subject: Ross Bulk Project-LPO
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:
Q. I'm handing you what's been marked as Exhibit 22. Have you seen this e-mail exchange before?
A. Yes, I've seen this before.
Q. At the top on page 2, which we've put a stamp on, 7297 in that top e-mail from September 19th of 2017. Do you see that there's a reference to an NDA?
A. Yes.
Q. A non-disclosure agreement. Do you know if that's a separate agreement that LegalEase had with Ross?
A. I believe this NDA is in reference to -- we had an NDA with Morae. So I believe the NDA is referring to the Morae NDA.
Q. Okay. And was that a separate agreement with Morae?

A. Yes.
Q. And do you know why Mr. Akbar was concerned that LegalEase doesn't use the Ross name more than required with the LPOs?
A. Yeah, the same reason I mentioned before. We didn't want our subcontractor to go out there and try to get business for themselves with Ross. We also felt that we had a confidentiality agreement with Ross and that we didn't want to expose information about them to our clients, to our -- to our subs.
Q. This is -- the way you wrote this is, it was a concern that related to using of the Ross name as opposed to the scope of the project or anything like that. So was there a concern related to using the Ross name in connection with the LPOs, in particular?
A. Again, like I said, we don't want -- we don't want Clutch Group to go directly to Ross.
Q. Did Clutch Group know about Ross at this point in time?
A. I don't think so.
Q. Do you know if Ross is referenced in the Morae slash Clutch Group statement of work?
A. I don't think it is, but don't know for sure.
Q. And I'm sorry, I just asked you this, but I'll ask again. Did you ultimately sign an agreement with Morae slash Clutch Group, to perform services in connection

with the Ross Bulk Project?
A. Yes. Well, I don't know if it was me, personally, but someone did from LegalEase.
Q. And have you seen that document recently?
A. No.
Q. Did you look for it in connection with the requests for documents?
A. I don't recall looking for it. I don't know if it's in there or not.
Q. Would you be surprised if I represented to you that there was at least a draft of a statement of work produced by LegalEase in this matter with Morae Global that was called statement of work two for Ross Intelligence Bulk Memos?
A. I thought we had kept Ross' name out from the SOWs, but it sounds like we kept it in.
Q. So, and I can show you the document, but I'm just trying to speed this along.
A. Mm-hmm, sure.
Q. But if my representation is correct in terms of that draft document, does that change your memory at all, with respect to Mr. Akbar's concern about using the Ross name, that is set forth in that September 19th e-mail?
A. I mean, again, I think TA -- we refer to him as TA,

Tariq Akbar did not want us to use the name Ross more than we needed to. That's really all I can think of right now.

Q. All right. And then, the next e-mail, later that same day, there was a comment from Ms. Whitehead in response to your e-mail saying that some of the documents have Ross all over them. Do you see that?

A. On the e-mail?

Q. I'm sorry, so this is the e-mail on page 1 of Exhibit 22. The bottom e-mail, she wrote, also need to assign revisions to BPG and other documents sent, period, which have Ross all over them, period. Do you see that?

A. Mm-hmm, yes.

Q. What's BPG?

A. I believe that's the Best Practices Guide.

Q. And, is that a guide that references Ross and Ross Intelligence in the project?

A. It's a guide that provides instructions on how the project is to be done. And, I don't recall if Ross is specifically mentioned in there or not. I think, perhaps it was initially and then we took it out later, subsequently.

But the basic idea was, we didn't want more people than needed to know, that Ross was our client.

We did a bad job of that, but that was the basic extent of it.
Q. Was one of the concerns that you didn't want Ross to know that you had these third parties working on the Ross Bulk Project?
A. I don't know.
Q. You don't know if that's one of the reasons for Mr. Akbar's concerns?
A. I don't know his reasons.
Q. Would Mr. Akbar be the only person that can speak to that?
A. Yes.
Q. The next paragraph in that same e-mail references memos in a zip file that, is it Rajesh sent? Do you see that?
A. Yes.
Q. Who is -- is it Rajesh? Did I pronounce that right?
A. Mm-hmm, yes.
Q. Who is Rajesh?
A. He's one of the attorneys at LegalEase India.
Q. And Ms. Whitehead mentioned she can't open either and she asked someone, or she asked you to convert the RAR file to a zip file. Do you see that?
A. Yes.
Q. Is a RAR file a way of packaging and compressing data?

A. Yes.
Q. And, do you know why Rajesh is using a RAR file instead of a zip file?
A. I don't know. I don't -- really don't know what this e-mail is talking about in terms of any particular information.
Q. Are you familiar with RAR files versus zip files?
A. Yeah. I know RAR files are specifically for larger productions or are larger in a sense.
Q. So would it suggest that that file was of some significant size for purposes of needing to be compressed versus using a zip file?
A. Yes.
Q. Do you have a copy of that RAR file, still?
A. I really have no idea.
Q. Did you look?
A. No. I mean, I didn't specifically look. If it was in our -- if it was tagged by our extraction our system, then it would be there. But I didn't look for it.
Q. Did anyone view the Box account manually to see if there are any documents responsive to the discovery in this matter?
A. No, we just did it using the key word search.
Q. Do you know how Morae slash Clutch Group provided memos to LegalEase, in connection with the Ross Bulk Project?

A. I don't recall if they were e-mailed to us or -- yeah, I don't recall how they were delivered.

Q. If they were e-mailed to you, would you still have those e-mails?

A. We should have those e-mails, yes.

Q. Does LegalEase Michigan or LegalEase India have any document retention policy?

A. I don't know for LegalEase India. And for LegalEase Michigan, I don't recall if we have one or not, or if we ever had one.

Q. Do you know if any of the information that would be otherwise called for in discovery in this matter has been deleted between June of 2017 and today?

A. I don't believe anything was deleted.

Q. Do you know if Code Matrix or LegalEase still has the data that was resulted from the automated activity tool when it was deployed in West Law?

A. The actual case itself? I don't know the status of that.

Q. Who would -- I'm sorry, did I cut you off?

A. No.

Q. Who would know whether that information still exists?

A. I think Ansad would be the best person. Ansad at Code Matrix.

Q. Code Matrix.

And is Ansad the cofounder of Code Matrix?
A. I don't know.
Q. I'll represent to you that his signature block says CEO and cofounder.
A. Okay. I don't know.
Q. But you don't know otherwise?
A. I don't know.
Q. Is he related to anyone at LegalEase India?
A. Not that I know of.
Q. And, are there any other family members of Mr. Akbar that are working for LegalEase India?
A. There is recently a business development person that was hired in India, back in May or June of 2018. She's a relative of Mr. Akbar, but apart from that, no.
Q. The HR manager is not related to Mr. Akbar?
A. Keerthi?
Q. Yeah, Keerthi.
A. No.
Q. What was the process that LegalEase used to assign West Law licenses to users?
A. I believe we had one or two individuals who were responsible for that task. I know Gayathri Rajeev was involved in that. She may have had -- she may have had somebody else working with her on that, but they maintained a spread sheet, I believe.

Q. When West Law licenses were assigned by West Law, were they assigned according to the information LegalEase provided to them?

A. I would believe so. Yes, for the most part.

HAFEEZ EXHIBIT 23
10/10/17 E-mail Subject: Permanent ID's Still Not Established
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you Mr. Hafeez, what's been marked as Exhibit 23. And I'm going to ask -- start again with, have you seen this e-mail exchange before?

A. Yes, I've seen these before.

Q. Okay. So in the back, I'm a couple pages in, the page that's marked 3079 at the bottom, do you see that?

A. Mm-hmm.

Q. So, if I'm reading this right, you're writing to Fraz Essa and Cam Tario at Thomson Reuters, to explain that Cameron sent you temp IDs earlier today, but they were sent for the wrong individuals. Do you see that? This is the October exhibit 18, 2017 e-mail.

A. Yeah.

Q. Why did -- or do you know why Cameron got the assignment for these new West Law licenses wrong?

A. I think they're talking about two different things here. I think we had purchased ten new IDs, it looks like from the e-mail, for the people that were going to be using those IDs, those IDs were not active. For some reason, they hadn't come through, so Cameron gave us temporary IDs, is how I'm reading it.
Q. Okay.
A. I don't know why the temporary IDs don't match the people that we needed the licenses for.
Q. But the list you're providing here, which is different from the list on the next page?
A. It looks like it's different, yes.
Q. Yeah. And are you correcting in the 6:52 p.m. e-mail, are you correcting Cameron and saying no, these are the people who need the additional ten West Law licenses?
A. It looks like that's what I'm doing, yeah.
Q. Okay. And Christopher Chan who is the second one in your list, do you see that, C-A-H-N?
A. Mm-hmm.
Q. He's actually an employee of Clutch Group, right?
A. Yes.
Q. And were you ultimately given licenses for your list of ten?
A. From what the e-mail string looks like, I wrote to Chris on October 10th at 10:07 a.m., that all permanent

IDs were set up and the team should have received the e-mails from West Law. So from what I can tell here, it was.

Q. Okay. And I'm confused by this e-mail string, too. So that's -- that's why I brought it up.

So if you jump forward to page 3075, 3-0-7-5, at the bottom, do you see an e-mail from you to Chris Chan and Ms. Whitehead with a copy to others at 11:50 p.m.?

A. Yes.

Q. And you see where you wrote, don't worry that the names don't match your users, this list was created by our West Law rep and you are authorized to use these temporary accounts?

A. Yes.

Q. Now, that list is the initial list from Cam Tario to you, that's a few pages prior, correct?

A. Yeah, it looks like he sent us a list on Monday, October 9th.

Q. All right. Does this ultimately get resolved with Cam Tario correctly assigning the West Law licenses to the individuals in your 6:52 p.m. e-mail that we looked at a minute ago? In other words, does he update the list as you so desire?

A. It seems like in the e-mail chain, yes. I think that

would have been the case.
Q. Who is Scarborough Law. Does that ring a bell?
A. Yes.
Q. And, do you know who that is?
A. Yes. Scarborough was one additional LPO we had reached out to, to see if they could help us out with a project but ultimately, we did not end up using them. They're also based out of India.
Q. Any reason why you didn't use them?
A. I think it was just they didn't have the right people, the quality wasn't good.
Q. And who is -- I think you mentioned these folks, but Kelly Services? Do you know who they are?
A. Yes.
Q. And is Kelly Services another LPO?
A. No.
Q. Who is Kelly Services?
A. Kelly Services is a, I believe, a publicly traded staffing company. They do -- they place attorneys and paralegals, as part of what they do, to law firms and corporations. And we contacted them to help us place some JDs for help on a project.
Q. And this is the bulk project?
A. Yes.
Q. And did you ever retain Kelly Services in connection

with the Ross Bulk Project?
A. We did.
Q. And were they here in the U.S.?
A. Yes.
Q. And, where were those particular consultants based?
A. They were, I believe, in the Detroit area. They were working -- they were allowed to work from home. And, yeah, they were Metro Detroit based as far as I can recall.
Q. And -- I'm sorry.
A. As far as I can recall.
Q. And did they use West Law licenses provided by LegalEase, or did they have their own?
A. I believe we also -- we also obtained licenses on their behalf.
Q. So they would have used licenses that were assigned to LegalEase?
A. Right.
Q. Okay. Would each of the folks staffed in this matter have a LegalEase e-mail address?
A. They would have, yes.
Q. And would the West Law license be assigned to that LegalEase e-mail address?
A. It should have been, yeah.
Q. Do you remember at some point in time, you had raised

questions as to ancillary charges that were charged by West to LegalEase?

A. Yes.

Q. And you explained that some of the users went out of plan?

A. Yes.

Q. Were you surprised to learn that?

A. Yes.

Q. Why?

A. Because we had provided instructions and training on only -- only accessing resources that were available to our subscription and not going outside of the plan.

Q. In connection with that, were you provided detailed information explaining where you went out of plan and where the costs were generated?

A. We were, yes.

Q. And did you ever pay that amount due?

A. It went to a collection agency. And then, we did pay that collection agency. We resolved the matter.

Q. You have paid that now?

A. Yes.

Q. Do you know, in total, how much money you had been paid by Ross in connection with the Ross Original Project?

A. I don't have a number on me, no.

Q. Can you estimate for me?

A. Not really.
Q. Is it more than a hundred thousand dollars?
A. Yes.
Q. Is it more than a million dollars?
A. No, I don't think so.
Q. How about in connection with the Ross Bulk Project, do you know how much Ross has paid LegalEase in connection with that work?
A. Yeah. That's easier because it's laid out in the SOW. I believe it came out to about a half -- half a million dollars.
Q. And are you performing any services for Ross today?
A. No.
Q. At some point in time, do you recall Mr. Tario raising an issue with you as to needing clarification on usage issues before any new passwords could be granted?
A. I don't.

HAFEEZ EXHIBIT 24
11/28/17 E-mail Subject: Ancillary Block
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

MR. LASHWAY: You've got to staple it. I'm sorry about that.

BY MR. LASHWAY:
Q. I'm handing you what has been marked as Exhibit 24.

Have you seen that before?
A. Yes, I do recall this e-mail now.
Q. And, does this refresh your memory as to whether Mr. Tario had alerted you to usage e-mails with respect to using West Law?
A. Yeah. I mean, I guess now, it's clear he brought it -- brought that up. I don't recall having a conversation with him on that, or for any e-mails, but it's possible.
Q. So you don't recall having any conversations with Mr. Tario about usage issues at the end of November of 2017?
A. No. I do recall having a conversation with him after it was determined in the contract and me trying to figure out what happened and he had brought up the usage issues, but I don't recall this particular instance of it.
Q. Okay. And is this in connection, this e-mail exchange, is this in connection with your request for a discount because two of the licenses weren't working? Or let me rephrase that.
Is this e-mail exchange in connection with your request for a discount because two pop-up warnings related to ancillary charges in your opinion, didn't notify the user that they were going out of plan?

A. Yeah, I think we had a discussion about why we had overage charges and why there was no warning -- warning for the accounts that they were going out of plan. So that's the context of this e-mail exchange.

Q. Okay. And you don't have any memory as to the first e-mail where Mr. Tario writes, regarding the rest, I need your help to clarify a couple of things with respect to the usage issues?

A. No, I don't.

Q. Okay.

HAFEEZ EXHIBIT 25
12/4/17 E-mail Subject: Ancillary Block
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you what's been marked as Exhibit 25, Mr. Hafeez. Do you recall seeing this e-mail before?

A. Yes, I do. I mean, I don't recall this e-mail, but I know it's mine because it's from me. But yes, I -- can see this is an e-mail exchange between me and Mr. Tario.

Q. And do you recall a back and forth as to questions about Clutch Group having access to LegalEase's West Law licenses?

A. From the e-mail, it seems like we had a conversation

about -- or an e-mail exchange around that, yes.
Q. And do you recall what Mr. Tario shared with you in connection with that conversation?
A. Again, I don't have any recollection, but just based on the e-mail, it looks like we were kind of addressing a few different issues at the same time; trying to address the issue about the ancillary block issue and then he's bringing up the usage issues again. And then, he's independently asking about the Clutch Group, who is the Clutch Group? And I responded to that.
Q. Is there any reason why the Best Practices Guide for Ross Intelligence would have been updated in February of 2018?
A. It shouldn't have been.
Q. At that point in time, had your work seized?
A. The bulk project completed in December. We had no other bulk work.
Q. Actually, hold on one second.
So if there -- if there was a memo created -- I'm sorry, a Best Practices Guide for Ross Intelligence created after December of 2017, would it have been applicable to the Ross Bulk Project?
A. It would not have. The only thing I can think -- I mean, it's possible someone on our team decided to update it in case we got further, for the launches of

it based on the learning we had from the project. That's a possibility. But there's no active work going on after December.

HAFEEZ EXHIBIT 26
Thomas Reuter Research Subscriber Agreement
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. What I'm handing you, Mr. Hafeez, is a document that's been marked Exhibit 26. It's called the Research Subscriber Agreement. And it's a document that's we produced in this matter. Have you seen this document before?

A. I don't think I have. This doesn't look familiar. I've seen the terms and conditions, general terms and conditions, but I don't think I've seen this.

HAFEEZ EXHIBIT 27
Thomson Reuters General Terms and Conditions
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you what's been marked as Exhibit 27 now, Mr. Hafeez. Are these the terms and conditions that you were just referencing?

A. Yes.

Q. And you've seen those -- this document before?
A. Yes.
Q. Okay. Do you know if Exhibit 26 and Exhibit 27 are a part of the contract terms that are referred to in the complaint in this matter, between LegalEase Michigan and West?
A. I was familiar with the recent general terms and conditions, don't know if I knew that the research subscription agreement was part of the other form as well.
Q. But you are familiar that the general terms and conditions in Exhibit 27 is part of the contractual terms between West and LegalEase?
A. Yeah, if these are the same ones I remember from the other form, yes.

HAFEEZ EXHIBIT 28
Thomson Reuters Schedule A
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:
Q. Handing you what's been marked as Exhibit 28. Have you seen this document before? It's Bates stamped WPC 1489?
A. I don't think I have.
Q. This is called the West Law schedule A. Do you see

that?

A. Mm-hmm.

Q. And it shows prices for use of West Law?

A. Okay.

Q. You've never seen it before?

A. I can't say I've never seen it before, but it's not ringing a bell right now.

Q. Okay.

HAFEEZ EXHIBIT 29
Westlaw Schedule A
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you a document that's marked as Exhibit Hafeez 29. Have you seen this document before?

A. Is this the same thing you provided me earlier?

Q. It might be different, I don't know.

A. It looks exactly the same. But no, again, I don't recall seeing this.

Q. Are you familiar with the functionality at West Law that allows a user to download data from West Law?

A. I don't understand the question.

Q. Are you aware that West Law offers a feature that allows you to download West Law content from West Law, using that feature? It's a download function.

A. Yes.
Q. And you're aware of that?
A. Yes.
Q. Why didn't the automated tool utilize that functionality?
A. I don't know.
Q. I'm going to hand to you what's been marked as Exhibit 10.
MR. LASHWAY: Oh, I'm missing a page here.
BY MR. LASHWAY:
Q. Have you seen this document before?
A. Yes.
Q. And are these LegalEase's responses to West's written discovery requests?
A. They appear to be, yes.
Q. Were you involved in responding to the discovery requests?
A. Yes.
Q. And, I'll have you turn to page 12.
A. The last page?
Q. Yeah.
A. Okay.
Q. And, is that your signature block? I'm sorry, is that your signature --
A. Yes.

Q. Electronically?
A. Yes.
Q. As to the answers?
A. Yes.
Q. And your counsel as to the objections?
A. Yes.
Q. And so, you're certifying that these requests are true and accurate?
A. Yes.
Q. Did you do so under the penalties of pain and perjury?
A. I don't know. I mean, that's in the court rules.
Q. Well, let me just have you look at paragraph -- I'm sorry, page 12 just above your signature. It just says I hereby certify that the discovery requests are true and accurate. Do you see that?
A. Yes, I signed the document. Yes. It doesn't say pain and perjury. Yes, I did sign it and that's my name.
Q. If you go to page 10 and 11, do you see in response to interrogatory number 8, there is a chart that starts out on 10 and expands on to 11?
A. Mm-hmm.
Q. What is the column titled Associate, mean?
A. It appears that the associate is the name of the account holder.
Q. Okay. And are those persons affiliated with LegalEase

Michigan or LegalEase India?
A. So some are -- some are LegalEase India, some are LegalEase U.S., some are independent contractors, some are subcontractors.
Q. Okay. On page 11, there is a subheading that says independent contractors.
A. Mm-hmm.
Q. It actually is repeated twice. What's the difference between those individuals listed in the associate column and the associates listed above?
A. I believe the independent contractors refer to the Clutch Group and Vakil individuals.
Q. Okay. So is the second group of people the Clutch Group? This starts with LegalEase 34 and ends with LegalEase 37.
A. I can't -- I can't say for sure if that's just the Clutch Group or some -- or also anybody else.
Q. I'm trying to understand the organization of the chart.
A. Mm-hmm.
Q. So, I'm not trying to catch you or anything here. But is there a difference between the first set of people where there's a right-hand column identified as assigned to, and then what I -- as I'm reading it, the two additional groups of people that are set forth on page 11 under independent contractors?

A. What I can tell is the -- for the most part, it seems like the top column, the associate before you hit the independent contractors, on page 11, those are all either LegalEase employees or people we had working in our office, sort of independent contractors. And then, the names that come below independent contractors seem to be Clutch, as far as I can tell.
Q. And then, the final group of independent contractors, would that be --
A. They look like they're also Clutch because there's -- like in that final, if you look at LegalEase 20 on page 12, Christopher Cahn, he is Clutch. Saloni, I believe is Clutch as well. So I can't differentiate whether these are just Clutch or Clutch and Vakil. It seems like it may be both.
Q. Do you have any further understanding of that, or is that --
A. Yeah, I mean, it looks like everything above independent contractors were LegalEase India employees or people working as contractors onsite. And the names underneath that seem to me to be Clutch and/or Vakil.
Q. Do you remember providing an interview in July of 2015 where you referenced machine learning and artificial intelligence customer of LegalEase?
A. Are you talking about the infamous podcast?

Q. Yes.
A. Yes.
Q. Why is it infamous?
A. Because it was a bad podcast, too.
Q. Were you referencing -- were those comments that are cited to in the complaint, referencing Ross Intelligence?
A. They were.
Q. And when you said in the podcast that they were feeding this client with data, was that referencing West Law data?
A. No, it was referencing the memos.
Q. That contained West Law information?
A. Yes.
Q. In connection with the two Ross projects, did you use any other third party's West Law licenses?
A. Sorry, can you repeat the question?
Q. Yeah. In connection with performing work for the Ross Original and the Ross Bulk Projects, did you utilize any West Law licenses that were granted to other third parties?
A. My understanding was Vakil had their own West Law accounts that they used for the project. So they used them to create the memos that we used for our client, yes. But we didn't have direct access to those

accounts. Vakil had those accounts.
Q. Were there any other third parties that had their own West Law accounts they used for the project?
A. Not that I can think of, no.
Q. Do you recall asserting in this litigation that a West Law representative provided approval for the practice of sharing West Law passwords to third-party contractors?
A. Yes.
Q. Who is that West Law representative?
A. That was Fraz Essa.
Q. Do you know when Fraz Essa provided the approval that you referenced?
A. May I look in my notebook?
Q. Sure.
A. There's an e-mail dated September 25th.
Q. Of 2017?
A. Yes.
Q. Is there any other basis for that allegation?
A. The -- the order form also provides for use by the brad, the product, by employees and also the category of contractors.
Q. This is the order form with West Law?
A. Yes.
Q. Are you claiming any damages through your counterclaims

brought against West in this matter?
A. Yes.
Q. What are those damages?
A. There were damages involved with having to switch to Lexis and not being able to use West Law at the completion or at the end of the project.
I think more significantly, we lost any future work with Ross because of this litigation. It's a business loss.
Q. So the first category, having to use Lexis and not being able to use West Law, I understood your testimony earlier that the Ross Bulk Project ended in December of 2017; is that right?
A. Right.
Q. And termination of your West Law access occurred in mid-January of 2018?
A. Right.
Q. So how did termination of West Law access result in harmed connection with that theory of damages?
A. We had other -- I mean, we were using West Law for -- we were using it as a tool for other legal research projects after -- after the bulk was completed. We had our law firm clients and other clients.
Q. Have you produced documents in connection with those projects if you're seeking damages in connection with

them?
A. We have not, no.
Q. Are you going to seek damages in this matter in connection with those other projects?
A. We may. But the damages are -- for those particular damages, is the cost of having to find other suitable research tools like Lexis. The business loss is the more significant damage.
Q. If you're able to use Lexis, why would you lose business if you didn't have access to West Law?
MR. DAKHLALLAH: Objection, it mischaracterizes his testimony.
THE WITNESS: So on the -- on the first issue, there was a time period where we had to scramble to find other -- to get other research tools activated, so we lost some business as a result of having suddenly lost our access to West Law.
BY MR. LASHWAY:
Q. Did you have an agreement with Lexis in January of 2018?
A. I believe we had an ongoing contract with Lexis, but we needed additional users for Lexis because of the West Law termination.
Q. And so, in terms of quantifying your damages, would it be the amount of those additional Lexis subscriptions?

A. That would be part of it, yes.
Q. Is there -- what else is there?
A. There could be business loss from the projects we weren't able to take because we didn't have -- there was a business loss from projects we weren't able to take because there was a gap between us having access to research tools and then getting new Lexis accounts.
Q. All right. So I -- I'm trying to get granular here, so I understand what your claim is.
But if you have access to Lexis at the time and prior to West Law terminates access, why is there a gap that would cause harm to LegalEase?
A. Because the accounts we already had with Lexis were already being used on other projects. So we had new projects coming in and we didn't have enough licenses for those projects, so we had to get additional licenses to be able to take on those projects.
Q. So would that -- were there any projects that you weren't able to secure Lexis licenses for, that you lost?
A. There may have been, I don't know. I don't know, specifically, which projects and how many there were.
Q. What kind of work would be -- I'm sorry, let me start this again.
What work would LegalEase be focused on that

was dependent on its access to West Law?
A. We do brief fighting for attorneys. We do research memos for attorneys. We do research memos for corporate clients. For all those types of projects, we would need access to West Law or Lexis.
Q. And you had access to Lexis in -- on January 1st of 2018?
A. I believe we did, yes.
Q. And did you have access to Lexis on January 19th of 2018?
A. We should have, yes.
Q. Okay. So the second category as I understood it was that, you loss future work with Ross because of litigation; is that right?
A. Yes.
Q. And why is that?
A. Well, when we received our notification that we were being sued by West Law or West Publishing, we did inform Ross that we were under a lawsuit and that they could take a look at the lawsuit, it's available online. And subsequent to that, they made a decision not to continue business with us.
Q. Did you speak with someone at Ross in connection with notifying them of the lawsuit?
A. We had a conversation with Andrew Arruda about the

lawsuit.
Q. I'm sorry, with whom?
A. Andrew Arruda, it's the CEO of Ross Intelligence.
Q. Was anybody else on the phone?
A. On their end or my end?
Q. Either.
A. I believe it was myself, Tariq Akbar, and Teri. And I believe it was just Andrew on their side.
Q. Ross didn't have any of their lawyers involved?
A. No, not at that time.
Q. Did you speak with -- have you spoke with Ross subsequent to that conversation?
A. No.
Q. At that point in time, the Ross contract had been terminated already, correct?
A. At that point in time, the Ross Original work had been terminated, but there was still the Ross Bulk work that we were hoping to get second or third launch for. We were hoping to get additional Ross bulk work. We had not been told that that work would not continue forward until the lawsuit.
Q. Had you been told previously that the work wasn't going to continue forward?
A. We were never told. We were never told that we would not get more work of the bulk project eventually. We

just -- we didn't know about the timing. So we were under the impression that there would be an opportunity to have a second or third bite at the apple.

Q. Have you had any communications with anyone else concerning this litigation?

A. We have not discussed litigation with any of our other clients.

Q. And in connection with the Ross conversation, is there any of those in writing?

A. The post-lawsuit conversations?

Q. Yeah.

A. I don't think so. I don't believe so. But if there were, there would be e-mails, but I believe it was just the phone call with Andrew. And soon thereafter, they hired their own counsel.

Q. Have you spoken with that counsel?

A. I believe our counsel at Kutak Rock has had conversation with -- with them, and perhaps Kassem has. I don't know.

Q. Do you know who's representing Ross?

A. I don't remember the firm name.

Q. Do you know if it's someone in Toronto or California?

A. I don't remember.

MR. LASHWAY: Why don't we just go off the record here? I'm just going to go through things

quickly and we can be almost done. I want to talk to my client for a moment.

MR. DAKHLALLAH: Sure.

THE VIDEOGRAPHER: We're going off the record. The time is 4:33 p.m.

(Off the record at about 4:33 p.m.)

(On the record at about 4:38 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:38 p.m.

BY MR. LASHWAY:

Q. Now, Mr. Hafeez, you've referenced your handwritten notes a couple of times. Did you prepare those notes?

A. I prepared them, yes.

Q. They weren't prepared by your counsel in anyway?

A. No.

Q. Do they reflect your review of the documents in preparation for today?

A. They just reflect some points and some notes I wanted to make sure I remembered.

Q. Okay. So, those notes along with, I would say a significant amount of additional documents have been, I believe, are called for for production in the case. We're going to continue the deposition understanding that we have some time remaining, and I'll ask the videographer to disclose that here, pending our

conversations with your counsel as to the production of that information, all of which we've talked about today. We'll follow up with a letter asking for the production of that material, and then we'll have a conversation with your counsel as to how to try to complete the deposition.

Otherwise, I don't have any additional documents or questions for today.

MR. DAKHLALLAH: All right. I have some re-direct.

EXAMINATION BY MR. DAKHLALLAH:

Q. Mr. Hafeez, do you recall testifying --

MR. LASHWAY: So just before you start, can we just have a time stamp on that?

THE VIDEOGRAPHER: Yeah, you've been on the record for 6:14.

MR. LASHWAY: Thank you. Sorry to interrupt.

MR. DAKHLALLAH: All right.

BY MR. DAKHLALLAH:

Q. Mr. Hafeez, do you recall testifying earlier about some texts from an e-mail that you guess was a red flag of some kind?

A. Yes.

Q. Do you remember that?

A. Yes.

Q. Okay. You actually don't know why anyone would have written anything in an e-mail, correct?
A. Correct.
Q. You were just guessing?
A. Right, I was guessing.
Q. And so, whenever you testified in this deposition about what somebody might have been thinking or what somebody might have meant about something they put in an e-mail, that's just a guess?
A. That's correct.
Q. All right. Now, you had been asked several times during this deposition about West Law data or West Law material appearing in memos. Do you remember that?
A. Yes.
Q. That was actually asked several times.
A. Yes.
Q. Okay. Do you believe that West Law owns the actual text of court decisions?
A. No, I don't.
Q. Would that -- would it be fair to say that that's a determination for the court to make in this case?
A. That would be a fair statement.
Q. Now, as -- as an attorney, do you actually have any reason to agree with the premise that West Law owns the text of anything that you put in any memo that you

produced, that is a subject matter of this case?

MR. LASHWAY: Objection.

THE WITNESS: No.

BY MR. DAKHLALLAH:

Q. Now, there was discussion related to KeyCites in this case. Do you remember that line of questioning?

A. Yes.

Q. Now, KeyCites were never given to Ross at any point in anything that you gave them as a deliverable, correct?

A. No.

Q. And they were, in fact, never given to anyone by you in anyway, correct?

A. Correct.

Q. And, the KeyCites themselves, never ended up in any draft of any memo whether in the course of preparing the work product or in a final version of any memo that you were creating for Ross, correct?

A. Correct. The KeyCites were not used verbatim in any of the memos.

Q. And neither were the headnotes?

A. Correct.

Q. And, in fact, the only thing that ever found its way into a memo that was delivered as part of your deliverables to anyone in this case was the actual text of the court decisions themselves, right?

A. Correct.
Q. And there was never any treatises that were produced by anybody for or on behalf of West Law that found its way into any of your memos, correct?
A. Correct. It was case law and statutes.
Q. All right. Thank you.
MR. LASHWAY: All right. So subject to my earlier recitation, we'll continue the deposition and we'll follow up with your counsel by letter.
THE WITNESS: Okay.
MR. LASHWAY: Thank you, very much.
THE VIDEOGRAPHER: This concludes today's deposition. We are off the record at 4:44 p.m.
(The videotaped deposition was concluded at 4:44 p.m.)

C E R T I F I C A T E

I, Tariq Hafeez, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at __________, this ____ day of ________, 2019.

______________________

SUGGESTED CORRECTIONS

RE: West Publishing Corporation vs. LegalLease Solutions, LLC

WITNESS: Tarik Hafeez, Vol. I

The above-named witness wishes to make the following changes to the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|---|---|---|---|
| | | | |

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF MACOMB )

I, Shacara V. Mapp, Certified Shorthand Reporter, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party, nor interested in the event of this cause.

____________________________

Shacara V. Mapp, CSR-9305
Notary Public,
Macomb County, Michigan
My Commission expires: 07-25-2024

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel. Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality. To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

EXHIBIT 73
WIT: 
DATE: 10-10-19
LORI A. BALDWIN CSR, RPR, CRR

| | |
|---|---|
| **From:** | Aditya Lokanandi |
| **Sent:** | Thursday, July 20, 2017 7:15 AM EDT |
| **To:** | Teri Whitehead; Tariq Akbar; Tariq Hafeez; Gayathri Rajeev; Merin Sony |
| **Subject:** | RE: Ross Bulk Memo Production Metrics - Update - July 19 |
| **Attachments:** | Sample Tracking Sheet.xlsx, Ross Project Flowchart August.pdf, Ross Project Flowchart September.pdf, Ross Project Flowchart October.pdf |

Hi,

Each headnote within an sub-topic in WESTLAW is unique. As we would be working based on the headnotes, Project Manager can assign each attorney an headnote( on a weekly bases). We can create these ID's using a simple Excel (I have included one such sheet for sample) we can replicate the sheet to a Smartsheet. Using this unique ID I have tried to build a process.

I have designed the process for all the three months as the numbers vary from month to month. Please find attached the process flow for the ROSS Project based on the number shared in the earlier emails.

Below is the basic principle in which I feel we can carry out the process.

**For the month of August:**

15 memos* 16 associates = 240 headnotes per day as a team

| AUGUST | |
|---|---|
| PER DAY | 240 Headnotes |
| PER WEEK | 1200 Headnotes (240 * 5 days per week) |
| Merin has to Assign | 10 topics every week to ensure we have a minimum of 1200 headnotes |
| | the first 10 topics in WESTLAW have 1110 headnotes |

**By the above math we will complete: 15*16*21days= 5040 memos**

**For the month of September:**

23 memos* 24 associates = 552 headnotes per day as a team

| SEPTEMBER | |
|---|---|
| PER DAY | 550 Headnotes |
| PER WEEK | 2760 Headnotes (550 * 5 days per week) |
| Merin has to Assign | 25-30 topics per week to ensure we have a minimum of 2760 headnotes for the associates to work on |
| | This would cover about 100-130 topics |

**By the above math we will complete: 23*24*19 days= 10,488 memos**

**For the month of October:**

23 memos* 21 associates = 472 headnotes per day as a team

| OCTOBER | |
|---|---|
| PER DAY | 472 Headnotes |
| PER WEEK | 2360 Headnotes |
| Merin has to Assign | 21-25 topics per week to ensure we have a minimum of 2360 headnotes for the associates to work on |
| | This would cover about 80-100 topics |

**By the above math we will complete: 23*21*21 days= 10,143 memos**

The crux of this calculation is tracking of the topic and headnote shouldn't be duplicated.

Aditya Lokanandi
Product Manager
Tel: +91 4428361098 | Mob: +91 8939302877
Email: aditya.lokanandi@legaleasesolutions.com

LEGALEASE SOLUTIONS LLC

LegalEase Solutions LLC
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Gayathri Rajeev
**Sent:** Thursday, July 20, 2017 8:09 AM
**To:** Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Teri Whitehead <teri.whitehead@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Cc:** Merin Sony <merin.sony@legaleasesolutions.com>; Aditya Lokanandi <aditya.lokanandi@legaleasesolutions.com>
**Subject:** Re: Ross Bulk Memo Production Metrics - Update - July 19

Thanks, TH.

Please see my answers to your comments. Would like inputs from all as our current plan is to roll out the project on August 1st.

Thanks,

Gayathri Rajeev
Manager Operations (India)

Tel: +91 0484 2803684/85 Mob: +91 9446479265
Email: gayathri.rajeev@legaleasesolutions.com

LEGALEASE
SOLUTIONS LLC

LegalEase Solutions LLC
*The future of law*

Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system.

NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

---

**From:** Tariq Hafeez
**Sent:** Thursday, July 20, 2017 4:51:35 AM
**To:** Gayathri Rajeev; Teri Whitehead; Tariq Akbar
**Cc:** Merin Sony; Aditya Lokanandi
**Subject:** Re: Ross Bulk Memo Production Metrics - Update - July 19

Gayathri,

Thanks for sharing this. It's very very helpful.

I have some comments and notes--please review and let me know your thoughts (and other team members feel free to do the same).

Thanks

Tariq Hafeez, Esq.
Co-founder/President

Tel: 734-274-2005 | Fax: 734-468-0102
Email: tariq.hafeez@lgles.com

LEGALEASE SOLUTIONS LLC

LegalEase Solutions LLC
*The future of law*

Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If received in error, please promptly notify the sender and delete the original and all copies from your system.

LegalEase Solutions LLC provides legal support services exclusively to licensed United States attorneys. All services provided by LegalEase Solutions LLC are restricted to licensed US attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase Solutions LLC ("LegalEase"), you ("Client") represent the following: that you are a licensed United States attorney, qualified and fit to practice law in one of the 50 states of the United States; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

---

**From:** Gayathri Rajeev
**Sent:** Wednesday, July 19, 2017 12:51 PM
**To:** Teri Whitehead; Tariq Hafeez; Tariq Akbar
**Cc:** Merin Sony; Aditya Lokanandi; Gayathri Rajeev
**Subject:** Ross Bulk Memo Production Metrics - Update - July 19

Teri, TH, Sir, Aditya, Merin,

Attached is the revised/ updated production metrics.

Immediate requirements/concerns [August]

1. We require 19 Attorneys – Available 16 – Need 3 more
2. QC Attorneys – We need 11, 4 to start with. This cannot be freshers. We still have not decided who can be pulled from the other teams. Needs to be determined ASAP.
3. Production Expeditors – Immediate requirement 9 – We have 2-3 ready; on the lookout for 7 [ Can Chennai help?]
4. Infrastructure: Immediate requirement for 10 laptops; 4-10 tables and Chairs
5. Search Engines: Should be able to manage with the 10 extra WL and the 3 Lexis accounts which allow multiple access.
6. Broadband: Have initiated the process of increasing the speed to 10 Mbps.
7. Once we get started in August, will start planning for September. Higher numbers in September.

Thanks,

Gayathri Rajeev
Manager Operations (India)

Tel: +91 0484 2803684/85 | Mob: +91 9446479265
Email: gayathri.rajeev@legaleasesolutions.com

LEGALEASE SOLUTIONS LLC

LegalEase Solutions LLC
*The future of law*

Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system.

NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and

territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

EXHIBIT 716
WIT: —
DATE: 10.10.19
LORI A. BALDWIN CSR, RPR, CRR

| | |
|---|---|
| **From:** | Teri Whitehead |
| **Sent:** | Tuesday, September 19, 2017 1:02 PM EDT |
| **To:** | Tariq Hafeez |
| **Subject:** | Re: ROSS BULK PROJECT - LPO |

Yes. This an old email chain that was prior to the chain.

Also, need to assign revisions to BPG and other documents sent. Which have ROSS all over them.

Can you please look at the memos and zip file that Rajesh sent, that is urgent. I cannot open either. If you can convert the RAR file to a zip file, I will also review. Thank you.
Teri

Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530 | Fax: 734 488 0102
Email: teri.whitehead@legaleasesolutions.com

LEGALEASE SOLUTIONS LLC

LegalEase Solutions LLC
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Tariq Hafeez
**Sent:** Tuesday, September 19, 2017 12:51:16 PM
**To:** Teri Whitehead
**Subject:** Re: ROSS BULK PROJECT - LPO

Teri,

Can we remove the Ross Bulk Project name from the Subject line of the emails with our LPO contacts. TA expressed concern that we don't use the Ross name more than required with our LPOs, notwithstanding the NDA in place.

Thanks

Tariq Hafeez, Esq.
Co-founder/President
Tel: 734-274-2005 | Fax: 734-468-0102
Email: tariq.hafeez@lgles.com

LEGALEASE SOLUTIONS LLC

LegalEase Solutions LLC
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If received in error, please promptly notify the sender and delete the original and all copies from your system.

LegalEase Solutions LLC provides legal support services exclusively to licensed United States attorneys. All services provided by LegalEase Solutions LLC are restricted to licensed US attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase Solutions LLC ("LegalEase"), you ("Client") represent the following: that you are a licensed United States attorney, qualified and fit to practice law in one of the 50 states of the United States; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Teri Whitehead
**Sent:** Tuesday, September 19, 2017 12:46 PM
**To:** Saloni Agara Dwarakanath
**Cc:** Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar; Ross Leads
**Subject:** Re: ROSS BULK PROJECT - LPO

Excellent.

I will circle back with our team lead to confirm her availability.

Thank you,
Teri

Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530 | Fax: 734 468 0102

LEGALEASE SOLUTIONS LLC

Email: teri.whitehead@legaleasesolutions.com

LegalEase Solutions LLC
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>
**Sent:** Tuesday, September 19, 2017 12:41:55 PM
**To:** Teri Whitehead
**Cc:** Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar; Ross Leads
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri,

Thank you for sending across the credentials for Thomson Reuters Westlaw; the team is now comfortable with the user interface.

It would be great if you could set up a training call to validate our understanding. We also had a couple of questions based on the training materials that were sent across earlier.

We will be available until 6 PM IST (8:30 AM EST) on Wednesday and any time that would work for you on Thursday and Friday this week.

Looking forward to your response.

Thanks,

**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328
ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL
Read press release

**From:** Saloni Agara Dwarakanath
**Sent:** Tuesday, September 19, 2017 12:44 PM
**To:** 'Teri Whitehead' <teri.whitehead@legaleasesolutions.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Chad Fennell <chad.fennell@clutchgroup.com>; 'Merin Sony' <merin.sony@legaleasesolutions.com>; 'Gayathri Rajeev' <gayathri.rajeev@legaleasesolutions.com>; 'Tariq Hafeez' <tariq.hafeez@legaleasesolutions.com>; 'Tariq Akbar' <tariq.akbar@legaleasesolutions.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri,

Please find the below group email for future correspondence –

Ross.Leads@clutchgroup.com

Thanks,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328
ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL

**From:** Saloni Agara Dwarakanath
**Sent:** Monday, September 18, 2017 8:26 PM
**To:** 'Teri Whitehead' <teri.whitehead@legaleasesolutions.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Chad Fennell <chad.fennell@clutchgroup.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Of course, Teri. We will get the group email done first thing tomorrow morning and communicate the email address to you.

Thanks,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328

ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com
CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL
Read press release

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Monday, September 18, 2017 8:23 PM
**To:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Chad Fennell <chad.fennell@clutchgroup.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** Re: ROSS BULK PROJECT - LPO

Saloni, thank you.

Joythi, requested that I copy your entire team on this project. One more ask, can you create a group email account for us to correspond? It will be easier for us to use that email, rather than risk excluding anyone from your team by emails. Thank you.

Teri

Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530 | Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

**LegalEase Solutions LLC**
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO

ATTORNEY-CLIENT PRIVILEGE – LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

---

**From:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>
**Sent:** Monday, September 18, 2017 9:10 AM
**To:** Teri Whitehead; Jyothi Prasad Bislehalli; Priti Parekh
**Cc:** Joy Saphla; Chad Fennell; Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar
**Subject:** RE: ROSS BULK PROJECT - LPO

Sure, Teri. I will be the point of contact for any correspondence.

Resending the response as I received an email delivery failure notification. Apologies if this was already received.

Thanks,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328
ClutchGroup
**A MORAE GLOBAL BUSINESS**
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL
Read press release

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Monday, September 18, 2017 6:09 PM
**To:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>; Chad Fennell <chad.fennell@clutchgroup.com>
**Subject:** Re: ROSS BULK PROJECT - LPO

Excellent. Question. Is there one point person that our team could correspond?

Teri Whitehead
Vice President of Global Strategy

Tel: 248 925 0530 · Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

**LegalEase Solutions LLC**
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively, that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

---

**From:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>
**Sent:** Monday, September 18, 2017 8:32:37 AM
**To:** Jyothi Prasad Bislehalli; Teri Whitehead; Priti Parekh
**Cc:** Joy Saphla; Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar; Chad Fennell
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri,

Thank you for sending across the training materials to us. Looking forward to working with you and your team.

Regards,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328
ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com
CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL
Read press release

**From:** Jyothi Prasad Bislehalli
**Sent:** Monday, September 18, 2017 5:53 PM
**To:** Teri Whitehead <teri.whitehead@legaleasesolutions.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>

**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>; Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>; Chad Fennell <chad.fennell@clutchgroup.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri:

Hope you had a nice weekend.

I would like to introduce Saloni to this group who is our Lead on this project. And, Chad Fennell (whom you all know from Project 99a) - is a US licensed attorney, will be the SME for our team. Request you to keep them copied on all communication for this project.

We will be using WL credentials today and tomorrow after 6:00PM IST to train our team. We will be ready for project training this Wednesday (09/20/2017). Please let me know the date and time that works best for your team and I will circulate the invite along with Go To Meeting details for screen-share.

Many thanks,
Jyothi

**Jyothi Prasad** / Associate Director – Legal Services
prasad.bislehalli@clutchgroup.com / C: 91 99866 38314
ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Sunday, September 17, 2017 6:48 PM
**To:** Priti Parekh <Priti.Parekh@clutchgroup.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Excellent.
This week we will provide proposed time and dates for ROSS specific training.
Prior to that, please confirm when your team has become (or will become) comfortable and familiar with Westlaw and have had an opportunity to study our materials.
Thank you.

Teri

---

**From:** Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>
**Sent:** Saturday, September 16, 2017 3:12:10 AM
**To:** Teri Whitehead; Priti Parekh
**Cc:** Joy Saphla; Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar
**Subject:** RE: ROSS BULK PROJECT - LPO

Thank you, Teri.

Merin, great to connect with you via email. We look forward to working with you on this assignment.

Guidance documents looks very good and we will let you know, if there are any questions as we start to review them. As requested, just wanted to let you know that we will be using the below WL credentials on weekdays but will be sure to use them within the stipulated time.

Many thanks,
Jyothi

**Jyothi Prasad** / Associate Director – Legal Services
prasad.bislehalli@clutchgroup.com / C: 91 99866 38314
ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL
Read press release

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Saturday, September 16, 2017 2:37 AM
**To:** Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** ROSS BULK PROJECT - LPO

Greetings!
This email is in furtherance of the discussions we had with you on the ROSS Bulk memo project.

Allow me first to introduce you to our ROSS team lead, Merin Sony. She leads our entire process including quality control. She has also organized this correspondence and attachments.

Please find attached the Best Practices Guide (BPG), Quality Control Guide (QCG), Checklist and instructions, sample memo, and template.

**Best Practices Guide (BPG)** provides the step by step process of drafting and reviewing the memos.
**Quality Control Guide (QCG)** provides instructions on reviewing the memos.
**Checklist and instructions** is a handy doc setting out the checklists and instructions provided in the BPG and QCG for quick reference.

You may use the following West Law (WL) credentials. Kindly note that you may use the credentials on Saturday and Sunday, and if you wish to use on weekdays, please let us you will need to do so before 9 AM IST and after 6 PM IST.

1. Username: LegalEase8
Password: Lgles$#2017

2. Username: MoonSaleh
Password: Legalease2017

3.

The following are a few links to West Law videos that would help you to get an understanding of the required WL process:
Introduction to Thomson Reuters Westlaw
Using the Key Number System & Headnotes on Westlaw
Using KeyCite on Westlaw

We look forward to working with you.

Teri

Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530 | Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

LegalEase Solutions LLC
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER:** This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, "**Morae Global**") is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

**CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER:** This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, "**Morae Global**") is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

**CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER:** This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, "**Morae Global**") is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

**CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER:** This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, "**Morae Global**") is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

EXHIBIT 79
WIT:
DATE: 10·10·19
LORI A. BALDWIN CSR, RPR, CRR

| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

# Best Practices Guide for ROSS Intelligence

Drafting Questions and responsive memos for ROSS Original

**LegalEase Solutions LLC**

# Contents

**Part I** .......... **3**
Overview .......... 3
Introduction .......... 3
Audience .......... 3
Objectives .......... 3
Legal Disclaimer .......... 3
**Part II** .......... **4**
Framing Questions .......... 4
**Westlaw** .......... **4**
**LEXIS** .......... **8**
**Part III** .......... **10**

## Part I

### Overview

The LegalEase Solutions Best Practices Guide aims to set out the framing of questions and responsive memos that meet the standards and requirements of ROSS Intelligence.

### Introduction

The LegalEase Solutions Best Practices Guide is the primary resource and playbook for our attorneys. This Practice Guide provides all the tools and resources needed for the drafting and delivery of ROSS Intelligence memos.

### Audience

The intended audience for this guide is our full-time, part-time, and subcontracted attorneys who prepare Ross memos. Additionally, this guide may be utilized by ROSS to review our internal process.

### Objectives

This guide:

- Identifies clear guidelines for attorneys to follow when designing, developing, researching, drafting, and delivering ROSS memos.
- Promotes uniformity of the process to be followed by the team.
- Lay out checklists to ensure quality assurance of the memos at different stages.
- Describes best practices and standards for ROSS memos.

### Legal Disclaimer

This Best Practices Guide includes proprietary, confidential, and/or trade secret information. LegalEase considers this information to be a trade secret not subject to disclosure.

**Part II**

**Framing Questions**

You may be assigned a West Law (WL)/Lexis topic to frame questions. An easy way of framing questions is to rely on the head notes. However, note that the head notes are proprietary and you should not copy paste them in the question.

Westlaw

Given below are screenshots to frame questions using Westlaw:

1) Headnote Search - Click on the assigned Key Numbers.




Here, the topic assigned is Abandoned and lost property.

Home

# West Key Number System

Add to Favorites

Search for Key Numbers relevant to your issue

Enter terms e.g. landlord duty of care to trespassers

**Jurisdiction selected:** All Federal Change Jurisdiction

| | | | |
|---|---|---|---|
| 1 | ABANDONED AND LOST PROPERTY | 141 | EASEMENTS |
| 2 | ABATEMENT AND REVIVAL | 141E | EDUCATION |
| 4 | ABORTION AND BIRTH CONTROL | 142 | EJECTMENT |
| 5 | ABSENTEES | 142T | ELECTION LAW |
| 6 | ABSTRACTS OF TITLE | 143 | ELECTION OF RE |
| 7 | ACCESSION | 145 | ELECTRICITY |

2) Click on a key number topic.

Home > West Key Number System

# 1 ABANDONED AND LOST PROPERTY

- I. ABANDONMENT, k1-k9
  - + 1 Nature and elements
  - 4 Evidence and questions for jury
  - 5 Operation and effect
- II. FINDING LOST GOODS, k10-k13
  - 10 In general; loss of property
  - 11 Rights and liabilities of finder as to owner
  - 12 Title and rights of finder as to third persons
  - 13 Title and rights of finders inter se

3) Clicked on #4 Evidence and questions for jury.

- I. ABANDONMENT, k1-k9
  - + 1 Nature and elements
  - 4 Evidence and questions for jury
  - 5 Operation and effect
- II. FINDING LOST GOODS, k10-k13
  - 10 In general; loss of property
  - 11 Rights and liabilities of finder as to owner

4) Got this...

4 Evidence and questions for jury (78) Add to Favorites

**Jurisdiction:** All Federal Change

1 - 78 Sort by: Topic then Date

Select all items No items selected

1 ABANDONED AND LOST PROPERTY 415
— 1I Abandonment 290
— 1k4 Evidence and questions for jury 78

1. Cheffins v. Stewart
United States Court of Appeals, Ninth Circuit. June 8, 2016 825 F.3d 588

**Headnote:** Under Nevada law, abandonment of property may be inferred from acts done

**Document Preview:** COPYRIGHTS - Art and Architecture. Mobile replica of 16th-century Spanish galleon was not protected b

2. Recovery Ltd. Partnership v. Wrecked and Abandoned Vessel, S.S. CENTRAL AMERICA
United States District Court, E.D. Virginia, Norfolk Division. August 11, 2015 120 F.Supp.3d 500

**Headnote:** In order for the law of finds to be applied to property lost at sea, the treasure-hunter must establish abandonment of t bar to proving such abandonment is high.

**Document Preview:** MARITIME LAW - Salvage. Law of salvage applied to artifacts recovered from historic shipwreck.

5) Clicked on Cheffins case.

ect 7 ABANDONED AND LOST PROPERTY 415
— 1I Abandonment 290
— 1-4 Evidence and questions for jury 78

78

1. **Cheffins v. Stewart**
United States Court of Appeals, Ninth Circuit. June 8, 2016 825 F.3d 588

**Headnote:** Under Nevada law, abandonment of property may be inferred from acts done.

**Document Preview:** COPYRIGHTS - Art and Architecture. Mobile replica of 16th-century Spanish galleon was not pr

2. **Recovery Ltd. Partnership v. Wrecked and Abandoned Vessel, S.S. CENTRAL AM**
United States District Court, E.D. Virginia, Norfolk Division. August 11, 2015 120 F.Supp.3d 500

**Headnote:** In order for the law of finds to be applied to property lost at sea, the treasure-hunter must establish abandor

6) Which pulls up the exact headnote on point. As well as ton of others…

12 **Abandoned and Lost Property**
Under Nevada law, abandonment of property may be inferred from acts done.

13 **Federal Courts**
Any error was harmless as to district court's failure to give jury instructions lost profits and punitive damages, which failure was based on district cour determination that such damages were unduly speculative, in action for conversion under Nevada law, relating to destruction of mobile replica of 16th-century Spanish galleon, built from used school bus, where jury foun favor of defendant on the conversion claim brought by mobile replica's creators, so that there were no damages to be awarded.

7) From that headnote, I am going to make the statement a question.

So – headnote 12 - "Under Nevada law, abandonment of property may be inferred from acts done."
Convert to a question, "May abandonment of property under Nevada Law be inferred from acts done?"

LEXIS

Given below are screenshots to frame questions using Lexis:

1) Log on to your account and go to the main screen.

[redacted]




(3) Select the assigned Key Topic

[redacted]

Part III

**Drafting Memorandum**

1. ROSS is an artificially intelligent attorney to help attorneys power through legal research. LegalEase is helping ROSS by answering legal issues through memorandum ("Memo") and thus contributing to their databank.

2. As of now, the focus is on Labor and Employment cases.

3. ROSS Smart Sheet (SS) shows the question number, the associate that question is assigned to, and 3 "date" fields: 1st draft, 1st review; 2nd draft, 2nd review, 3rd draft, 3rd review. The reviewer enters the notes in the review column. Never enter a date in review column. It is exclusively for the reviewer.

4. The SS has a column titled Notes where you can enter the concerns encountered while drafting. The reviewer shall look into the concerns and enter the revisions/suggestions in the column.

5. When you complete the work, please be sure to update the 1st Drafts column with the date of completion. Whenever you are asked to revise the draft remember to enter the date in 2nd draft/3rd draft.

6. Use the LE tool to draft memos. Each associate is provided a separate log in credential to access the tool. Once you complete drafting, assign the memo for review.

7. Enter the time taken for the memos in Zoho.

8. The allocated time to draft a memo is 40 minutes, and the target is 10 memos per day which would be revisited based on the team's progress with drafting.

9. The main difference of ROSS memo with LRW memo is that in ROSS Memos, after the Memo section, there is a Reference List Section ("RL Section") that references the footnotes provides in the memo. This section is equally important.

10. The format of RL section is revised from the client sample. There will be mention of an Issue, Cases referring to that issue with docket number and the relevant quotes relied to draft. The RL section, sample format looks like:

**Issue:**
Case 1:
Quote 1:

11. Earlier the whole memo was drafted in Times New Roman, with font size 12 and single spaced. For footnotes use the Word automatic pre-sets. It will be:
    Font: Calibri 10pts
    Alignment: left
    Outline level: body
    Indents left/right: 0". Special: none
    "Spacing" 0pts before, 10pts after. Line spacing: Multiple at 1.15.

12. With the use of automation tool, the requirement for font and space specifications are no longer followed after confirming with the client.

13. File name convention: "[Zoho id] - ROSS Memo – [Question #]

14. Building and formatting the memo.

a. Begin by researching the question. When using WL Next to "Copy with reference" BE SURE the format it copies with is "Standard." That should automatically give you a good cite when you paste it. Use "copy Advanced" when using Lexis.

b. Log in to the LE tool and choose "Create" and "Original."




c. Enter Memo number, Timesheet id (Zoho id that remains same for a given month is entered in place of timesheet id), and the Question. Assign the question to the person drafting the memo.



d. After entering all the required fields, including Practise Area, submit the question to the person drafting the memo.




e. Once the question is assigned the same gets displayed on the dash board. Use "Prepare" to draft the memo.




f. Insert foot notes for each sentence.




g. Build Reference List (RL) using "New" tab.



h. For adding different Quotes from the same case, add "A."




i. Once you complete drafting the memo, submit it for review.

j. If the memo "question" asks a yes or no question, make sure the "short answer" answers it – Yes. No.

k. The short answer and conclusion should directly answer the question, and should not include phraseology such as 'may'. Make sure to spell out directly the inconsistencies in the law and/or different viewpoints (e.g. majority view/ minority view). E.g. "The majority view of the federal courts is that there is no private right of action for damages based on a violation of the discharge injunction".

l. **The long answer should include analysis**, and connect the question to the relevant case law found. **Do not copy paste passages** from the reference list provided into the Long Answer.

m. Each quote in the reference list should directly and independently answer the question. Foundational or conclusion quotes that do not answer the question directly should be avoided.

n. If a quote is included in the reference list the assumption is that it is a case on point. So, there is no need to include the phrase "case on point" in the memo body.

o. As you build a rough RL section, move the quotes around and take notes until it is in a logical order that will answer the question.

p. Cite the quotes, and authority of cases. Unlike the usual memo format that uses in-text citations, here footnotes are inserted for referencing the citations.

q. Use Bluebook to resolve any citation issues.

r. Note that pinpoint citation is no longer used in ROSS memo. For e.g. *In re Story*, 536 B.R. 279, 283 (Bankr. E.D. Mo. 2015) will be entered as *In re Story*, 536 B.R. 279.

s. Do not over-state the law or unnecessarily repeat it.

t. **NEVER cite an unpublished case that cites to a published case.** Especially when all or substantially all of the quoted language comes from the published case the lower court is quoting itself. **Instead, just cite the published case**.

u. As you create issue statements, use those in the memo and RL sections in the same order.

v. Ensure that every footnote in the Long Answer is reflected in the Reference List.

w. If there are multiple quotes from one case related to the same issue in the Reference List, please include all of them under your entry for that case.

x. Each case, which is mentioned in the Long and Short Answer, must be included in the Reference List. This means that there will be no cases mentioned in the Long and Short Answer sections of the memo, which are not also listed at least once in the Reference List.

y. Each issue, which is listed in the Reference List, must have listed below it every case related to it, with the accompanying docket number and quote. A new entry into the Reference List would now look like this:

Issue: Can a chapter 11 bankruptcy petition be summarily dismissed for absence of debtor's good faith?
Case 1:
Quote 1:

Quote 2:

Quote 3:

Case 2:
Quote 1:

Case 3:
Quote 1:

Quote 2:

z. Ensure that where the long answer cites case X, which is directly citing case Y, 2 entries are made into the Reference List. For example:

For example:
The sentence in the Long Answer is:

*The court observed that generally, a lien secures an underlying obligation, and "a lien on a homestead is a division of property."*

And the quote is footnoted to Bakken v. Helgeson, but in fact Bakken v. Helgeson was just repeating that quote as it was found in Charlson v. Charlson, 374 N.W.2d 473, 476 (Minn.App.1985).
Then in the Reference List you would actually have two entries for this one footnote. They would look like this:

**Issue: Under Minnesota law, how is a marital lien perceived?**
Case 1: Bakken v. Helgeson, 785 N.W.2d 791.
Quote 1: But marital liens, such as appellant's, are not judgment liens; they are a method of distributing property in a dissolution proceeding. "A lien on a homestead is a division of property." Charlson v. Charlson, 374 N.W.2d 473, 476 (Minn.App.1985). A lien is "an encumbrance on property as security for the payment of debt." Minn.Stat. § 514.99, subd. 1(b) (2008). A marital lien is personal property, though it is not an estate or an interest in the parcel of real property itself. Granse & Assocs. v. Kimm, 529 N.W.2d 6, 8 (Minn.App.1995), review denied (Minn. Apr. 27, 1995). A district court's use of a marital lien to divide property must have "an acceptable basis in fact and principle." Rohling v. Rohling, 379 N.W.2d 519, 522-23 (Minn.1986) (approving marital lien that did not mature for 15 years)"

Case 2: Charlson v. Charlson, 374 N.W.2d 473.
Quote 2: "A lien on a homestead is a division of property."

aa. When you quote the same case, same paragraph more than once in the memo, the RL need only have the paragraph appears once in each issue section it applies to.

bb. IF you cite Case A (cite is in the footnotes) AND Case A has directly quoted Case B in the quote we are using, THEN the footnote must cite Case A (citing Case B), AND the RL in the relevant section must have the full entry and paragraph of Case A and full entry and paragraph of Case B. Eg, the direct quote we use from Case A has quotes within it from Case B.
IF Case A paraphrases or references Case B BUT does not directly quote Case B, THEN only cite Case A in the footnotes and RL.

cc. In RL section, while the quotes are copy-pasted, make sure the page numbers and footnotes in the judgment are deleted.

dd. Check over the entire memo to make sure that there are no stray lines or odd spaces.

ee. Confirm that the Reference List starts on a new page. Insert page break if necessary.

ff. Complete all Smart sheet fields.

gg. Attorney Checklist

| Description | Completed |
|---|---|
| 1. Draft ROSS questions following LegalEase Creative Process | |
| 2. Research questions using online resources and accounts. | |
| 3. Confirm that the cases cited are good law. | |
| 4. Insert relevant reference quotes. | |
| 5. Confirm that each reference quote answers the question. | |
| 6. Draft legal analysis using LegalEase legal analysis method. | |
| 7. Confirm grammar correct throughout memo. | |
| 8. Confirm the font and space of the memo. | |

15. Quality Control

a. The associate shall do a quick Quality Control (QC) of the memo before submitting for review. The self QC involves checking spelling, grammar, alignment, and formatting.

b. QC team will take up the memo from the tool and complete the review.

c. QC associate must cross check the question in SS with the question in the memo.

d. QC associate must review the grammar and style of the question to make sure that it corresponds to ROSS format.

e. The cases and quotes used in the RL must be cross checked for precision.

f. The citations must be reviewed to make sure that they correspond to the ROSS requirements.

g. The Question and Short Answer (SA) must be compared to make sure that the SA follows the language of the question per ROSS requirement.

h. The memo must be reviewed to make sure that the question and answer corresponds to the law provided in RL.

i. The RL numbering must be reviewed to avoid oversights.

j. The QC team must get back to the associate with the errors encountered to make sure that the same errors are not repeated.

**Review Attorney's Checklist**

| Description | Completed |
|---|---|
| 1. Validate ROSS questions following LegalEase Creative Process | |
| 2. Confirm that the cases cited are good law. | |
| 3. Confirm relevant reference quotes. | |
| 4. Confirm that each reference quote answers the question. | |
| 5. Validate legal analysis using LegalEase legal analysis method. | |
| 6. Confirm grammar correct throughout memo. | |

16. Uploading Memos

a. The final memo will be uploaded to ROSS portal by the reviewer.

b. The reviewer must update the Smart sheet with his/her initials and date of upload.

c. Once uploaded the memo cannot be retrieved. So, he reviewer must double check the memo before uploading.

EXHIBIT 80
WIT: —
DATE: 10-10-19
LORI A. BALDWIN CSR, RPR, CRR

# Best Practices Guide for ROSS Intelligence

Drafting Memorandum, Quality Control, and Portal Upload

LegalEase Solutions LLC

**Best Practices on Drafting Memorandums for ROSS Intelligence**

1. ROSS is an artificially intelligent attorney to help attorneys power through legal research. LegalEase is helping ROSS by answering legal issues through memorandum ("Memo") and thus contributing to their databank.
2. As of now, the focus is on Bankruptcy law and cases.
3. The questions will be assigned in the Smartsheet (SS).
4. ROSS SS shows the question number, the associate that question is assigned to, and then has 3 "date" fields: 1st draft, 1st review; 2nd draft, 2nd review, 3rd draft, 3rd review. The reviewer enters the notes in the review column. Never enter a date in review column. It is exclusively for the reviewer.
5. The SS has a column titled Notes where you can enter the concerns encountered while drafting. The reviewer shall look into the concerns and enter the revisions/suggestions in the column.
6. When you complete the work, and email the drafts to the US team, please be sure to update the 1st Drafts column with the date you did the draft. Whenever you are asked to revise the draft remember to enter the date in 2nd draft/3rd draft.
7. Also, upload the drafts in the "ROSS Intelligence" folder in Box with the date you did the work. We keep monthly folders for the work.
8. Assign the project to your name in the bill4time. The project name will be the question number provided by the client. For Example: ROSS Memo 1, 2, 3 etc.
9. Billable time. Note that each draft has been allocated 2 billable hours. For most of you, this means 3-4 labor hours.
10. The main difference with the usual memos is that in ROSS Memos, after the Memo section, there is a Reference List Section ("RL Section") that references the footnotes provides in the memo. This section is equally important.

11. The format of RL section is revised from the client sample. There will be mention of an Issue, Cases referring to that issue with docket number and the relevant quotes relied to draft. The RL section, sample format looks like:

**Issue:**
Case 1:
Docket Number:
Quote 1:

12. The whole memo is drafted in Times New Roman, with font size 12 and single spaced. For footnotes use the Word automatic pre-sets. It will be:

Font: Calibri 10pts
Alignment: left
Outline level: body
Indents left/right: 0". Special: none
"Spacing" 0pts before, 10pts after. Line spacing: Multiple at 1.15.

13. File name convention: "[bill4time id] ROSS Memo – [Question #] [date][associate initials].

14. Building and formatting the memo.

a. Opening the ROSS template, use the save as option and rename the template following the naming convention mentioned above.

b. Begin by researching the question. When using WL Next to "Copy with reference" BE SURE the format it copies with is "Standard." That should automatically give you a good cite when you paste it.

c. If the memo "question" asks a yes or no question, make sure the "short answer" answers it – Yes. No.

d. The short answer and conclusion should directly answer the question, and should not include phraseology such as 'may'. Make sure to spell out directly the inconsistencies in the law and/or different viewpoints (e.g. majority view/ minority view). E.g. "The majority view of the federal courts is that there is no private right of action for damages based on a violation of the discharge injunction".

e. **The long answer should include analysis**, and connect the question to the relevant case law found. **Do not copy paste passages** from the reference list provided in the Long Answer.

f. Each quote in the reference list should directly and independently answer the question. Foundational or conclusory quotes that do not answer the question directly should be avoided.

g. If a quote is included in the reference list the assumption is that it is a case on point. So, there is no need to include the phrase "case on point" in the memo body.

h. As you build a rough RL section, move the quotes around and take notes until it is in a logical order that will answer the question.

i. Cite the quotes, authority of cases and statutes. Unlike the usual memo format that uses in-text citations, here footnotes are inserted for referencing the citations.

j. Use Bluebook to resolve any citation issues.

k. Note that pinpoint citation is no longer used in ROSS memo. For e.g. *In re Story*, 536 B.R. 279, 283 (Bankr. E.D. Mo. 2015) will be entered as *In re Story*, 536 B.R. 279.

l. Do not over-state the law or unnecessarily repeat it. This helps in minimizing the work in RL section.

m. Refresh your knowledge regarding the hierarchy of authorities. Bankruptcy is a federal statute. Therefore, federal law will generally control. District courts in the federal system are trial courts. Then the courts of appeal (circuit courts), and in the apex, the Supreme Court.

n. **NEVER cite an unpublished case that cites to a published case.** Especially when all or substantially all of the quoted language comes from the published case the lower court is quoting itself. **Instead, just cite the published case**.

o. As you create issue statements, use those in the memo and RL sections in the same order.

p. Ensure that every footnote in the Long Answer is reflected in the Reference List.

q. If there are multiple quotes from one case related to the same issue in the Reference List, please include all of them under your entry for that case.

r. Each case, which is mentioned in the Long and Short Answer, must be included in the Reference List. This means that there will be no cases mentioned in the Long and Short Answer sections of the memo, which are not also listed at least once in the Reference List.

s. Each issue, which is listed in the Reference List, must have listed below it every case related to it, with the accompanying docket number and quote. A new entry into the Reference List would now look like this:

Issue: Can a chapter 11 bankruptcy petition be summarily dismissed for absence of debtor's good faith?
Case 1:
Docket Number:
Quote 1:

Quote 2:

Quote 3:

Case 2:
Docket Number:
Quote 1:

Case 3:
Docket Number:
Quote 1:

Quote 2:

t. Ensure that where the long answer cites case X, which is directly citing case Y, 2 entries are made into the Reference List. For example:

For example:
The sentence in the Long Answer is:

*Generally, a lien secures an underlying obligation, and "a lien on a homestead is a division of property."*

And the quote is footnoted to *Bakken v. Helgeson*, but in fact *Bakken v. Helgeson* was just repeating that quote as it was found in *Charlson v. Charlson*, 374 N.W.2d 473, 476

(Minn.App.1985).
Then in the Reference List you would actually have two entries for this one footnote. They would look like this:

**Issue: Under Minnesota law, how is a marital lien perceived?**
Case 1: *Bakken v. Helgeson*, 785 N.W.2d 791, 794-95 (Minn. Ct. App. 2010)
Docket Number: xyz

Quote 1: But marital liens, such as appellant's, are not judgment liens; they are a method of distributing property in a dissolution proceeding. "A lien on a homestead is a division of property." *Charlson v. Charlson*, 374 N.W.2d 473, 476 (Minn.App.1985). A lien is "an encumbrance on property as security for the payment of debt." Minn.Stat. § 514.99, subd. 1(b) (2008). A marital lien is personal property, though it is not an estate or an interest in the parcel of real property itself. *Granse & Assocs. v. Kimm*, 529 N.W.2d 6, 8 (Minn.App.1995), *review denied* (Minn. Apr. 27, 1995). A district court's use of a marital lien to divide property must have "an acceptable basis in fact and principle." *Rohling v. Rohling*, 379 N.W.2d 519, 522-23 (Minn.1986) (approving marital lien that did not mature for 15 years)"

Case 2: *Charlson v. Charlson*, 374 N.W.2d 473, 476 (Minn.App.1985).
Docket Number: xyz

Quote 2: "A lien on a homestead is a division of property."

u. When you quote the same case, same paragraph more than once in the memo, the RL need only have the paragraph appears once in each issue section it applies to.

v. IF you cite Case A (cite is in the footnotes) AND Case A has directly quoted Case B in the quote we are using, THEN the footnote must cite Case A (citing Case B), AND the RL in the relevant section must have the full entry and paragraph of Case A and full entry and paragraph of Case B. Eg, the direct quote we use from Case A has quotes within it from Case B.
IF Case A paraphrases or references Case B BUT does not directly quote Case B, THEN only cite Case A in the footnotes and RL.

w. In RL section, while the quotes are copy-pasted, please make sure the page numbers and footnotes in the judgment are deleted.

x. Confirm that all quotes over 15 words are indented .5 on both the right and left margins, i.e. block indent.

y. Check over the entire memo to make sure that there are no stray lines or odd spaces.

z. Confirm that the Reference List starts on a new page. Insert page break if necessary.

aa. Complete all Smartsheet fields

15. ROSS Portal Upload

a. Associate entrusted with the upload is assigned a username and password to access ROSS Portal.

b. Make sure to login to the portal midday and check the Assigned Questions.

c. Find the corresponding question in SS; you can use "Ctrl f ctrl v" function in SS. Also, try to break down the question to a few words if the initial search with all words is not giving any result.

d. Confirm if the draft is finalized. Final draft will have "gtg" along with other comments in SS.

e. Check the box with memo number and see if the final doc is present. Final doc will have only Memo number, and no initials (for e.g. 22501-ROSS-Memo 2319).

f. Download and save the final to your desktop.

g. Take up the assigned question and select upload.

h. Copy paste the Short Answer, Long Answer, and Conclusion in the respective boxes.

i. Upload the memo.

j. Select Answer (Reference List) Tab.

k. Select "Add Answer".

l. Copy paste Case name, Docket number, citation, and Quote in the boxes that appear and submit.

m. Click "Add Answer" again to enter next quote.

n. If a case has more than one quote in RL make sure to select "Add Answer" and enter the case name, citation, docket number, and quote again. Note that only one quote of the case will be entered at a given time, and the process needs to be repeated to enter all the quotes. For e.g. if a case has three quotes, select "Add Answer" and enter the case name, citation, docket number, and first quote. Then, repeat the

process by selecting "Add Answer" and entering the case name, citation, docket number, and second quote, and again repeat the process for entering the third quote.

o. After entering all cases, and all quotes in RL, submit the page to ROSS' Brain. Once submitted, the question disappears from the dashboard, so make sure to thoroughly check that all entries are correct and they reflect the entries in the final doc.

16. Following the above practice tips will surely make your work more efficient and less time consuming.

****

EXHIBIT 85
WIT: —
DATE: 10-10-19
LORI A. BALDWIN CSR, RPR, CRR



**From:** Tomas van der Heijden <tomas@rossintelligence.com>
**Sent:** Thursday, December 14, 2017 10:22 AM EST
**To:** Teri Whitehead <teri.whitehead@legaleasesolutions.com>
**Subject:** Re: ROSS Classifier Update

Max tells me the bug has been fixed in the app so those practice areas that you said were "exhausted" should now be showing up again. Give it about 20 minutes though for the fix to go into effect.

Also, what are you basing the 65,000 number on? We have a target of 1,500-2,000 "positive" cases per practice area. But the total number that have been uploaded into the app is closer to 140,000 (as many will be negatives).

Tomas

On Thu, Dec 14, 2017 at 10:07 AM, Teri Whitehead<teri.whitehead@legaleasesolutions.com> wrote:

> Not as painful as keeping track of all cases reviewed. :-(
>
> Our Cochin team always goes way way above and beyond...
>
> Thank you for the update. I will share.
>
> ---
>
> **From:** Tomas van der Heijden <tomas@rossintelligence.com>
> **Sent:** Thursday, December 14, 2017 10:04:44 AM
> **To:** Teri Whitehead
> **Subject:** Re: ROSS Classifier Update
>
> Sounds painful. I think I let you know before that Max can pull those analytics easily for you via computer script on a daily basis. These are the stats as of this morning:
>
> **Total cases reviewed: 10365**
>
> administrative -> 504
> admiralty -> 911
> antitrust -> 581
> banking-and-finance -> 601
> business-and-corporate -> 161
> civil-rights -> 385
> civil-procedure -> 1324
> commercial -> 0
> communication -> 956
> constitutional -> 51
> construction -> 50
> employee-benefits-and-executive-compensation -> 49
> energy -> 51
> entertainment-and-sports -> 20
> environment -> 20
> estate-planning -> 642
> family -> 50
> government -> 51
> health -> 34
> immigration -> 30
> insurance -> 371
> medical -> 141
> municipal -> 897
> native-american -> 843
> pension-and-retirement -> 708
> privacy-and-data-security -> 717
> product-liability -> 144
> real-property -> 23
> securities -> 0
> technology -> 30
> transportation -> 20
>
> **Total number of positively labelled cases: 6140**
>
> administrative -> 404
> admiralty -> 628
> antitrust -> 377
> banking-and-finance -> 441
> business-and-corporate -> 20

civil-rights -> 315
civil-procedure -> 549
commercial -> 0
communication -> 755
constitutional -> 41
construction -> 23
employee-benefits-and-executive-compensation -> 14
energy -> 36
entertainment-and-sports -> 7
environment -> 17
estate-planning -> 372
family -> 48
government -> 15
health -> 14
immigration -> 17
insurance -> 245
medical -> 61
municipal -> 261
native-american -> 544
pension-and-retirement -> 247
privacy-and-data-security -> 518
product-liability -> 133
real-property -> 6
securities -> 0
technology -> 19
transportation -> 13

Max is looking into the "exhausted cases" issue you highlighted. Looks like a front-end bug.

On Thu, Dec 14, 2017 at 9:59 AM, Teri Whitehead<teri.whitehead@legaleasesolutions.com> wrote:
By hand... Yes.

I need to understand our efficiency. In order to review 65,000 cases, we have to have daily targets. Their individual count may be off a few. But, general number this gives me insight on our progress to report.

From: Tomas van der Heijden
Sent: Thursday, December 14, 9:56 AM
Subject: Re: ROSS Classifier Update
To: Teri Whitehead

Hi Teri - thanks, Max will look into this. I don't understand though. how are you tracking this, manually? The app doesn't have tracking capabilities.

On Thu, Dec 14, 2017 at 9:52 AM, Teri Whitehead <teri.whitehead@legaleasesolutions.com> wrote:

Hi Tomas,

Our ROSS team has the prepared the following update. We have exhausted the number of available cases in a few fields, as noted.

Total ROSS Classifier cases reviewed: 7024.

Civil Procedure - 1250
Native American - 700
Communication - 650
Municipal - 515
Privacy and Data security - 504
Pension and Retirement - 500
Estate Planning - 500
Admiralty - 520
Administrative - 500
Civil Rights - 385
Business and corporate - 156
Insurance - 197 (no cases available now)
Antitrust - 49 (no cases available now)
Banking and finance - 598 (no cases available now)

Please let me know if you have any questions.

Thank you,
Teri

--
Best,
**Tomas van der Heijden**
**Head of Legal Research**
ROSS
+1 416 809 4176
tomas@ROSSIntelligence.com
Website | LinkedIn | Twitter | Blog

--
Best,
**Tomas van der Heijden**
**Head of Legal Research**
ROSS
+1 416 809 4176
tomas@ROSSIntelligence.com
Website | LinkedIn | Twitter | Blog

--
Best,
**Tomas van der Heijden**
**Head of Legal Research**
ROSS
+1 416 809 4176
tomas@ROSSIntelligence.com
Website | LinkedIn | Twitter | Blog

EXHIBIT 86
WIT:
DATE: 10-10-19
LORI A. BALDWIN CSR, RPR, CRR

**From:** Teri Whitehead <teri.whitehead@legaleasesolutions.com>
**Sent:** Monday, January 15, 2018 11:12 AM EST
**To:** Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Merin Sony <merin.sony@legaleasesolutions.com>
**CC:** Sales <sales@legaleasesolutions.com>; Marketing <marketing@legaleasesolutions.com>
**Subject:** ROSS New Project - February 5th

Hi,

Call with Tomas.

- ROSS would like us to test out their platform*and* compare it with other providers, i.e. Westlaw and Lexis. (See also emails on Westlaw). I advised that we may be transitioning from Westlaw as they are more costly and do NOT have the breadth of cases that Lexis. We have found on many many occasions missing case law. Tomas agreed.
- Start of the first weekof February. This was supposed to start January 17th... but, the ROSS engineers are behind.
- Once our test of the platform (which I presume is a product ROSS sells) is complete, we would do quarterly updates.

Thank you,
Teri

**Teri Whitehead**
**Vice President of Global Strategy**
Tel: 248 925 0530 | Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

logo

**LegalEase Solutions LLC**
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support services exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

# EXHIBITS 84-86

## Redacted in their Entirety

# EXHIBIT 87

| | |
|---|---|
| | Legal Ease - another LPO - end client Ross International - leverages IBM etc. congnitive process - for no need to leverage a law firm or LPO to be engaged - to train the system to this kind of work.<br>very basic level of LR<br>putting it in memorandum format<br>font/ spaces etc - refer protocol / blue book formating is followed |
| | case note - not full proof (prepared by the editor of TR)- refer it |
| Head note | convert the head note in a question retaining all points in head note.<br>go to the para where the head note is taken from<br>copy para - put citation - bold the line refered in Head note - put **[[]]** around it too and bold it.<br>Great Label at the beginning of para with :<br>Put case on on the top ex - |
| | Q: Is Writ manadaums an extraordinary remedy? |
| Format:<br>Great quote | Case 1: Waymo LLC v. Uber Techs, Inc., 2017 WL 401806<br>Great label: Para ... |
| | Case 2:Gulftream Aerospace<br>Great Quote |
| Format topical quote: | Search - "mandamus" and "extraordinary"<br><br>those cases which are not directly answering should be copied- as the topical quote must not answer the question directly.<br>Topical |
| Irrelevant Quote | Will have terms of the question but dosent answer the question. |
| General | Do not discuss a particular state statue whether in the question or the Quote. |

# EXHIBIT 88

THOMSON REUTERS
**WESTLAW™**

**WESTLAW® CLASSIC**
**QUICK REFERENCE GUIDE**

# West Key Number System®

## Numerical List of Digest Topics

| | |
|---|---|
| 1 | Abandoned and Lost Property |
| 2 | Abatement and Revival |
| 4 | Abortion and Birth Control |
| 5 | Absentees |
| 6 | Abstracts of Title |
| 7 | Accession |
| 8 | Accord and Satisfaction |
| 9 | Account |
| 10 | Account, Action on |
| 11 | Account Stated |
| 11A | Accountants |
| 12 | Acknowledgment |
| 13 | Action |
| 14 | Action on the Case |
| 15 | Adjoining Landowners |
| 15A | Administrative Law and Procedure |
| 16 | Admiralty |
| 17 | Adoption |
| 18 | Adulteration |
| 19 | Adultery |
| 20 | Adverse Possession |
| 21 | Affidavits |
| 23 | Agriculture |
| 24 | Aliens, Immigration, and Citizenship |
| 25 | Alteration of Instruments |
| 25T | Alternative Dispute Resolution |
| 26 | Ambassadors and Consuls |
| 27 | Amicus Curiae |
| 28 | Animals |
| 29 | Annuities |
| 29T | Antitrust and Trade Regulation |
| 30 | Appeal and Error |
| 31 | Appearance |
| 34 | Armed Services |
| 35 | Arrest |
| 36 | Arson |
| 37 | Assault and Battery |
| 38 | Assignments |
| 40 | Assistance, Writ of |
| 41 | Associations |
| 42 | Assumpsit, Action of |
| 43 | Asylums and Assisted Living Facilities |
| 44 | Attachment |
| 45 | Attorney and Client |
| 46 | Attorney General |
| 47 | Auctions and Auctioneers |
| 48 | Audita Querela |
| 48A | Automobiles |
| 48B | Aviation |
| 49 | Bail |
| 50 | Bailment |
| 51 | Bankruptcy |
| 52 | Banks and Banking |
| 54 | Beneficial Associations |
| 55 | Bigamy |
| 56 | Bills and Notes |
| 58 | Bonds |
| 59 | Boundaries |
| 60 | Bounties |
| 61 | Breach of Marriage Promise |
| 63 | Bribery |
| 64 | Bridges |
| 65 | Brokers |
| 66 | Building and Loan Associations |
| 67 | Burglary |
| 69 | Cancellation of Instruments |
| 70 | Carriers |
| 71 | Cemeteries |
| 72 | Census |
| 73 | Certiorari |
| 74 | Champerty and Maintenance |
| 75 | Charities |
| 76 | Chattel Mortgages |
| 76A | Chemical Dependents |
| 76D | Child Custody |
| 76E | Child Support |
| 76H | Children Out-of-Wedlock |
| 78 | Civil Rights |
| 79 | Clerks of Courts |
| 80 | Clubs |
| 81 | Colleges and Universities |
| 82 | Collision |
| 83 | Commerce |
| 83H | Commodity Futures Trading Regulation |
| 83T | Common Interest Communities |
| 84 | Common Lands |
| 85 | Common Law |
| 89 | Compromise and Settlement |
| 90 | Confusion of Goods |
| 91 | Conspiracy |
| 92 | Constitutional Law |
| 92B | Consumer Credit |
| 93 | Contempt |
| 95 | Contracts |
| 96 | Contribution |
| 96H | Controlled Substances |
| 97C | Conversion and Civil Theft |
| 98 | Convicts |
| 99 | Copyrights and Intellectual Property |

For assistance using Westlaw Classic , call **1-800-WESTLAW** (1-800-937-8529).

For free reference materials, visit **store.westlaw.com /westlaw/guides**.

**THOMSON REUTERS WESTLAW**

Thomson Reuters Westlaw comprises industry leading online research, print products, software, tools, and services that help legal professionals perform their work faster and more efficiently, every day.

THOMSON REUTERS™

| | |
|---|---|
| 100 | Coroners |
| 101 | Corporations and Business Organizations |
| 102 | Costs |
| 103 | Counterfeiting |
| 104 | Counties |
| 105 | Court Commissioners |
| 106 | Courts |
| 107 | Covenant, Action of |
| 108 | Covenants |
| 108A | Credit Reporting Agencies |
| 110 | Criminal Law |
| 111 | Crops |
| 113 | Customs and Usages |
| 114 | Customs Duties |
| 115 | Damages |
| 116 | Dead Bodies |
| 117 | Death |
| 117G | Debt, Action of |
| 117T | Debtor and Creditor |
| 118A | Declaratory Judgment |
| 119 | Dedication |
| 120 | Deeds |
| 122A | Deposits and Escrows |
| 123 | Deposits in Court |
| 124 | Descent and Distribution |
| 125 | Detectives and Security Guards |
| 126 | Detinue |
| 129 | Disorderly Conduct |
| 130 | Disorderly House |
| 131 | District and Prosecuting Attorneys |
| 132 | District of Columbia |
| 133 | Disturbance of Public Assemblage |
| 134 | Divorce |
| 135 | Domicile |
| 135H | Double Jeopardy |
| 136 | Dower and Curtesy |
| 141 | Easements |
| 142 | Ejectment |
| 143 | Election of Remedies |
| 144 | Elections |
| 145 | Electricity |
| 146 | Embezzlement |
| 148 | Eminent Domain |
| 149 | Entry, Writ of |
| 149E | Environmental Law |
| 149T | Equitable Conversion |
| 150 | Equity |
| 151 | Escape |
| 152 | Escheat |
| 154 | Estates in Property |
| 156 | Estoppel |
| 157 | Evidence |
| 158 | Exceptions, Bill of |
| 159 | Exchange of Property |
| 160 | Exchanges |
| 161 | Execution |
| 162 | Executors and Administrators |
| 163 | Exemptions |
| 164 | Explosives |
| 165 | Extortion and Threats |
| 166 | Extradition and Detainers |
| 167 | Factors |
| 168 | False Imprisonment |
| 169 | False Personation |
| 170 | False Pretenses |
| 170A | Federal Civil Procedure |
| 170B | Federal Courts |
| 171 | Fences |
| 172 | Ferries |
| 174 | Fines |
| 175 | Fires |
| 176 | Fish |
| 177 | Fixtures |
| 178 | Food |
| 179 | Forcible Entry and Detainer |
| 180 | Forfeitures |
| 181 | Forgery |
| 183 | Franchises |
| 184 | Fraud |
| 185 | Frauds, Statute of |
| 186 | Fraudulent Conveyances |
| 187 | Game |
| 188 | Gaming |
| 189 | Garnishment |
| 190 | Gas |
| 191 | Gifts |
| 192 | Good Will |
| 193 | Grand Jury |
| 195 | Guaranty |
| 196 | Guardian and Ward |
| 197 | Habeas Corpus |
| 198 | Hawkers and Peddlers |
| 198H | Health |
| 200 | Highways |
| 201 | Holidays |
| 202 | Homestead |
| 203 | Homicide |
| 205 | Husband and Wife |
| 205H | Implied and Constructive Contracts |
| 206 | Improvements |
| 207 | Incest |
| 208 | Indemnity |
| 209 | Indians |
| 210 | Indictment and Information |
| 211 | Infants |
| 212 | Injunction |
| 213 | Innkeepers |
| 216 | Inspection |
| 217 | Insurance |
| 218 | Insurrection and Sedition |
| 219 | Interest |
| 220 | Internal Revenue |
| 221 | International Law |
| 222 | Interpleader |
| 223 | Intoxicating Liquors |
| 224 | Joint Adventures |
| 226 | Joint Tenancy |
| 227 | Judges |
| 228 | Judgment |
| 229 | Judicial Sales |
| 230 | Jury |
| 231 | Justices of the Peace |
| 231E | Kidnapping |
| 231H | Labor and Employment |
| 233 | Landlord and Tenant |
| 234 | Larceny |
| 237 | Libel and Slander |
| 238 | Licenses |
| 239 | Liens |
| 240 | Life Estates |
| 241 | Limitation of Actions |
| 242 | Lis Pendens |
| 245 | Logs and Logging |
| 246 | Lost Instruments |
| 247 | Lotteries |
| 248 | Malicious Mischief |
| 249 | Malicious Prosecution |
| 250 | Mandamus |
| 251 | Manufactures |
| 252 | Maritime Liens |
| 253 | Marriage |
| 256 | Mayhem |
| 257 | Mechanics' Liens |
| 257A | Mental Health |
| 258A | Military Justice |
| 259 | Militia |
| 260 | Mines and Minerals |
| 265 | Monopolies |
| 266 | Mortgages |
| 267 | Motions |
| 268 | Municipal Corporations |

269 Names
271 Ne Exeat
272 Negligence
273 Neutrality Laws
274 Newspapers
275 New Trial
276 Notaries
277 Notice
278 Novation
279 Nuisance
280 Oath
281 Obscenity
282 Obstructing Justice
283 Officers and Public Employees
284 Pardon and Parole
285 Parent and Child
286 Parliamentary Law
287 Parties
288 Partition
289 Partnership
290 Party Walls
291 Patents
294 Payment
295 Penalties
296 Pensions
297 Perjury
298 Perpetuities
300 Pilots
302 Pleading
303 Pledges
305 Possessory Warrant
306 Postal Service
307 Powers
307A Pretrial Procedure
308 Principal and Agent
309 Principal and Surety
310 Prisons
311 Private Roads
311H Privileged Communications and Confidentiality
313 Process
313A Products Liability
314 Prohibition
315 Property
315H Prostitution
315P Protection of Endangered Persons
315T Public Amusement and Entertainment
316E Public Assistance
316H Public Contracts
317 Public Lands
317A Public Utilities
318 Quieting Title
319 Quo Warranto
319H Racketeer Influenced and Corrupt Organizations
320 Railroads
321 Rape
322 Real Actions
323 Receivers
324 Receiving Stolen Goods
325 Recognizances
326 Records
327 Reference
328 Reformation of Instruments
330 Registers of Deeds
331 Release
332 Religious Societies
333 Remainders
334 Removal of Cases
335 Replevin
336 Reports
337 Rescue
338 Reversions
339 Review
340 Rewards
341 Riot
342 Robbery
343 Sales
344 Salvage
345 Schools
346 Scire Facias
347 Seals
348 Seamen
349 Searches and Seizures
349A Secured Transactions
349B Securities Regulation
350 Seduction
350H Sentencing and Punishment
351 Sequestration
352 Set-Off and Counterclaim
353 Sheriffs and Constables
354 Shipping
355 Signatures
356 Slaves
356A Social Security and Public Welfare
357 Sodomy
358 Specific Performance
359 Spendthrifts
360 States
361 Statutes
362 Steam
363 Stipulations
365 Submission of Controversy
366 Subrogation
367 Subscriptions
368 Suicide
369 Sunday
370 Supersedeas
371 Taxation
372 Telecommunications
373 Tenancy in Common
374 Tender
375 Territories
378 Time
379 Torts
380 Towage
381 Towns
382T Trademarks
384 Treason
385 Treaties
386 Trespass
387 Trespass to Try Title
388 Trial
390 Trusts
391 Turnpikes and Toll Roads
392 Undertakings
392T Unemployment Compensation
393 United States
394 United States Magistrates
395 United States Marshals
396 Unlawful Assembly
396A Urban Railroads
398 Usury
399 Vagrancy
400 Vendor and Purchaser
401 Venue
402 War and National Emergency
403 Warehousemen
404 Waste
405 Water Law
406 Weapons
407 Weights and Measures
408 Wharves
409 Wills
410 Witnesses
411 Woods and Forests
413 Workers' Compensation
414 Zoning and Planning
450 Merit Systems Protection

## Searching by West Topic and Key Number

When you have identified a topic and key number associated with the legal issue you are researching, you can run a Terms and Connectors search using that topic and key number to quickly retrieve cases involving the same legal issue. A topic and key number search does not require a field-restricted format; that is, you do not need to include a field name or abbreviation as part of your search request. For example, to search for cases with headnotes classified under topic 343 (Sales) and key number 255 (Parties; Privity), type **343k255**.

To narrow your search, add search terms. For example, the query **343k255 /p contract** retrieves cases with headnotes classified under topic 343 and key number 255 that also contain the term *contract* in the same digest paragraph.

## Topic field searching

You can also retrieve cases with headnotes classified under a specific West digest topic by using a topic field (to) restriction in your Terms and Connectors search. In addition to the topic name and number, the topic field contains the hierarchical classification information, key number, and text of the related key line. For example, to retrieve cases with headnotes classified under topic 409 (Wills), type **to(409)** or **to(wills)**. The broader search is **to(wills)** because it retrieves cases in which the term *wills* is mentioned in the key line or other levels of the hierarchy, even if the headnotes are not classified under topic 409. To narrow your search, add search terms; for example, type **to(409) /p "condition subsequent"**.

## Using the West Key Number Digest (Custom Digest)

The West Key Number Digest, also called the Custom Digest, contains the complete topic and key number outline used by West attorney-editors to classify headnotes. The West Key Number Digest helps you identify topic and key numbers related to your issue and retrieve cases with headnotes classified under those topic and key numbers.

To access the West Key Number Digest, click **Key Numbers** at the top of any page, then click **West Key Number Digest Outline** under *Browse Key Numbers*. (Alternatively, click **Custom Digest** at a case law database Search page.) To browse the digest, click the plus (**+**) and minus (**–**) symbols.

In addition to browsing the West Key Number Digest for relevant topic and key numbers, you can also search for them using the Search for Key Numbers feature.

To use the Search for Key Numbers feature, complete these steps:

1. Click **Key Numbers** at the top of any page. A page is displayed that contains the *Search for Key Numbers* text box.
2. Type your terms, e.g., **family and medical leave**, in the text box.
3. To change the jurisdiction from which you retrieve case headnotes, click **Change Jurisdiction**, then select the check boxes next to the jurisdictions you want and click **Done**.
4. Click **Search**. A list of topic and key numbers is displayed.
5. Click a topic and key number to view the headnotes classified under that topic and key number. Or select the check boxes next to one or more topic and key numbers and click **Search Selected** to view the headnotes classified under those topic and key numbers.

# Digest Topics by Specialty

### Alternative Dispute Resolution

- 25T Alternative Dispute Resolution
- 76D Child Custody
- 217 Insurance
- 231H Labor and Employment
- 233 Landlord and Tenant
- 289 Partnership
- 354 Shipping

### Antitrust

- 29T Antitrust and Trade Regulation

### Bankruptcy

- 51 Bankruptcy
- 117T Debtor and Creditor
- 163 Exemptions
- 202 Homestead
- 349A Secured Transactions

### Business and Other Organizations

- 41 Associations
- 52 Banks and Banking
- 54 Beneficial Associations
- 65 Brokers
- 66 Building and Loan Associations
- 70 Carriers
- 71 Cemeteries
- 75 Charities
- 80 Clubs
- 81 Colleges and Universities
- 83T Common Interest Communities
- 101 Corporations and Business Organizations
- 108A Credit Reporting Agencies
- 145 Electricity
- 167 Factors
- 190 Gas
- 213 Innkeepers
- 217 Insurance
- 224 Joint Adventures
- 289 Partnership
- 317A Public Utilities
- 320 Railroads
- 332 Religious Societies
- 345 Schools
- 372 Telecommunications
- 396A Urban Railroads

### Civil Procedure–Federal Cases

- 2 Abatement and Revival
- 13 Action
- 25T Alternative Dispute Resolution
- 48 Audita Querela
- 96 Contribution
- 106 Courts
- 115 Damages
- 118A Declaratory Judgment
- 135 Domicile
- 143 Election of Remedies
- 156 Estoppel
- 157 Evidence
- 158 Exceptions, Bill of
- 170A Federal Civil Procedure
- 170B Federal Courts
- 197 Habeas Corpus
- 212 Injunction
- 222 Interpleader
- 227 Judges
- 228 Judgment
- 230 Jury
- 241 Limitation of Actions
- 250 Mandamus
- 311H Privileged Communications and Confidentiality
- 314 Prohibition
- 319 Quo Warranto
- 334 Removal of Cases
- 378 Time
- 394 United States Magistrates
- 410 Witnesses

### Civil Procedure–State Cases

- 2 Abatement and Revival
- 13 Action
- 21 Affidavits
- 25T Alternative Dispute Resolution
- 30 Appeal and Error
- 31 Appearance
- 44 Attachment
- 48 Audita Querela
- 73 Certiorari
- 96 Contribution
- 105 Court Commissioners
- 106 Courts
- 115 Damages
- 118A Declaratory Judgment
- 123 Deposits in Court
- 135 Domicile
- 143 Election of Remedies
- 150 Equity
- 156 Estoppel
- 157 Evidence
- 158 Exceptions, Bill of
- 161 Execution
- 189 Garnishment
- 197 Habeas Corpus
- 212 Injunction
- 222 Interpleader
- 227 Judges
- 228 Judgment
- 230 Jury
- 231 Justices of the Peace
- 241 Limitation of Actions
- 242 Lis Pendens
- 250 Mandamus
- 267 Motions
- 271 Ne Exeat
- 275 New Trial
- 277 Notice
- 287 Parties
- 302 Pleading
- 307A Pretrial Procedure
- 311H Privileged Communications and Confidentiality
- 313 Process
- 314 Prohibition
- 319 Quo Warranto
- 322 Real Actions
- 327 Reference
- 334 Removal of Cases
- 339 Review
- 346 Scire Facias
- 351 Sequestration
- 352 Set-Off and Counterclaim
- 363 Stipulations
- 370 Supersedeas
- 378 Time
- 388 Trial
- 401 Venue
- 410 Witnesses

### Commercial Law

- 29T Antitrust and Trade Regulation
- 38 Assignments
- 51 Bankruptcy
- 52 Banks and Banking
- 56 Bills and Notes
- 70 Carriers
- 76 Chattel Mortgages
- 92B Consumer Credit
- 95 Contracts
- 117T Debtor and Creditor

186 Fraudulent Conveyances
219 Interest
278 Novation
294 Payment
303 Pledges
343 Sales
349A Secured Transactions
403 Warehousemen

## Communications

92 Constitutional Law
99 Copyrights and Intellectual Property
237 Libel and Slander
306 Postal Service
311H Privileged Communications and Confidentiality
372 Telecommunications

## Criminal Justice

18 Adulteration
19 Adultery
35 Arrest
36 Arson
37 Assault and Battery
55 Bigamy
63 Bribery
67 Burglary
76A Chemical Dependents
91 Conspiracy
96H Controlled Substances
98 Convicts
103 Counterfeiting
110 Criminal Law
129 Disorderly Conduct
130 Disorderly House
131 District and Prosecuting Attorneys
133 Disturbance of Public Assemblage
135H Double Jeopardy
146 Embezzlement
149E Environmental Law
151 Escape
164 Explosives
165 Extortion and Threats
166 Extradition and Detainers
168 False Imprisonment
169 False Personation
170 False Pretenses
174 Fines
175 Fires
180 Forfeitures
181 Forgery
184 Fraud
193 Grand Jury
197 Habeas Corpus
198H Health
203 Homicide
207 Incest
209 Indians
210 Indictment and Information
211 Infants
218 Insurrection and Sedition
231E Kidnapping
234 Larceny
248 Malicious Mischief
256 Mayhem
273 Neutrality Laws
281 Obscenity
282 Obstructing Justice
284 Pardon and Parole
297 Perjury
310 Prisons
311H Privileged Communications and Confidentiality
315H Prostitution
315P Protection of Endangered Persons
319H Racketeer Influenced and Corrupt Organizations
321 Rape
324 Receiving Stolen Goods
337 Rescue
341 Riot
342 Robbery
349 Searches and Seizures
350 Seduction
350H Sentencing and Punishment
357 Sodomy
368 Suicide
384 Treason
396 Unlawful Assembly
399 Vagrancy
406 Weapons
410 Witnesses

## Education

81 Colleges and Universities
345 Schools

## Employment Law

78 Civil Rights
81 Colleges and Universities
104 Counties
198H Health
231H Labor and Employment
268 Municipal Corporations
283 Officers and Public Employees
345 Schools
356A Social Security and Public Welfare
360 States
381 Towns
392T Unemployment Compensation
393 United States
413 Workers' Compensation

## Energy

145 Electricity
190 Gas
260 Mines and Minerals
317A Public Utilities
362 Steam
402 War and National Emergency

## Environmental Law

23 Agriculture
145 Electricity
149E Environmental Law
260 Mines and Minerals
279 Nuisance
405 Water Law
414 Zoning and Planning

## Estate Planning

17 Adoption
75 Charities
76H Children Out-of-Wedlock
124 Descent and Distribution
136 Dower and Curtesy
154 Estates in Property
162 Executors and Administrators
191 Gifts
220 Internal Revenue
226 Joint Tenancy
240 Life Estates
298 Perpetuities
307 Powers
333 Remainders
338 Reversions
371 Taxation
373 Tenancy in Common
390 Trusts
409 Wills

## Family Law

4 Abortion and Birth Control
17 Adoption
19 Adultery
55 Bigamy
61 Breach of Marriage Promise
76D Child Custody
76E Child Support

76H Children Out-of-Wedlock

134 Divorce

136 Dower and Curtesy

196 Guardian and Ward

205 Husband and Wife

207 Incest

211 Infants

253 Marriage

285 Parent and Child

315P Protection of Endangered Persons

350 Seduction

### Financial Institutions

52 Banks and Banking

66 Building and Loan Associations

92B Consumer Credit

108A Credit Reporting Agencies

217 Insurance

### Government

64 Bridges

81 Colleges and Universities

104 Counties

132 District of Columbia

200 Highways

268 Municipal Corporations

316E Public Assistance

316H Public Contracts

345 Schools

360 States

375 Territories

381 Towns

393 United States

405 Water Law

### Health

76A Chemical Dependents

96H Controlled Substances

198H Health

257A Mental Health

315P Protection of Endangered Persons

### Immigration and Citizenship

24 Aliens, Immigration, and Citizenship

### Insurance

217 Insurance

356A Social Security and Public Welfare

392T Unemployment Compensation

413 Workers' Compensation

### Intellectual Property

29T Antitrust and Trade Regulation

99 Copyrights and Intellectual Property

291 Patents

382T Trademarks

### International Issues

24 Aliens, Immigration, and Citizenship

26 Ambassadors and Consuls

114 Customs Duties

221 International Law

385 Treaties

402 War and National Emergency

### Juvenile Justice

211 Infants

### Legal Services

12 Acknowledgement

25T Alternative Dispute Resolution

45 Attorney and Client

46 Attorney General

79 Clerks of Courts

105 Court Commissioners

106 Courts

131 District and Prosecuting Attorneys

227 Judges

231 Justices of the Peace

276 Notaries

327 Reference

394 United States Magistrates

### Maritime Law

16 Admiralty

82 Collision

172 Ferries

252 Maritime Liens

300 Pilots

344 Salvage

348 Seamen

354 Shipping

405 Water Law

408 Wharves

### Medicaid

198H Health

### Medicare

198H Health

### Military Law

34 Armed Services

258A Military Justice

259 Militia

402 War and National Emergency

### Products Liability

145 Electricity

164 Explosives

178 Food

190 Gas

313A Products Liability

### Professional Malpractice

11A Accountants

45 Attorney and Client

65 Brokers

198H Health

211 Infants

257A Mental Health

272 Negligence

332 Religious Societies

345 Schools

### Real Property

6 Abstracts of Title

7 Accession

15 Adjoining Landowners

20 Adverse Possession

59 Boundaries

65 Brokers

66 Building and Loan Associations

83T Common Interest Communities

84 Common Lands

108 Covenants

119 Dedication

120 Deeds

141 Easements

142 Ejectment

148 Eminent Domain

149 Entry, Writ of

149T Equitable Conversion

154 Estates in Property

171 Fences

177 Fixtures

179 Forcible Entry and Detainer

206 Improvements

233 Landlord and Tenant

238 Licenses

239 Liens

242 Lis Pendens

257 Mechanics' Liens

266 Mortgages

272 Negligence

288 Partition

290 Party Walls

311 Private Roads

315 Property

315T Public Amusement and Entertainment

317 Public Lands

318 Quieting Title

322 Real Actions
330 Registers of Deeds
338 Reversions
358 Specific Performance
386 Trespass
387 Trespass to Try Title
400 Vendor and Purchaser
405 Water Law
414 Zoning and Planning

**Securities and Commodities Regulations**

83H Commodity Futures Trading Regulation
160 Exchanges
349B Securities Regulation

**Taxation**

83 Commerce
104 Counties
220 Internal Revenue
223 Intoxicating Liquors
238 Licenses
268 Municipal Corporations
345 Schools
371 Taxation
381 Towns

**Torts**

37 Assault and Battery
45 Attorney and Client
48A Automobiles
48B Aviation
52 Banks and Banking
70 Carriers
78 Civil Rights
97C Conversion and Civil Theft
115 Damages
117 Death
145 Electricity
164 Explosives
168 False Imprisonment
178 Food
179 Forcible Entry and Detainer
184 Fraud
190 Gas
198H Health
213 Innkeepers
233 Landlord and Tenant
237 Libel and Slander
249 Malicious Prosecution
272 Negligence
279 Nuisance
313A Products Liability
315T Public Amusement and Entertainment
320 Railroads
350 Seduction
354 Shipping
379 Torts
386 Trespass
404 Waste
406 Weapons

**Transportation**

16 Admiralty
48A Automobiles
48B Aviation
64 Bridges
70 Carriers
82 Collision
83 Commerce
172 Ferries
200 Highways
320 Railroads
348 Seamen
354 Shipping
391 Turnpikes and Toll Roads
396A Urban Railroads
405 Water Law

**Unemployment Compensation**

392T Unemployment Compensation

© 2012 Thomson Reuters. All rights reserved. Published 8/12. L-352461.

The trademarks used herein are the trademarks of their respective owners.
West trademarks are owned by West Publishing Corporation.

THOMSON REUTERS™

# EXHIBITS 89-93

## Redacted in their Entirety

# EXHIBIT 94

# How is Natural Language Search Changing The Face of Legal Research?

**By Stergios Anastasiadis - April 8, 2019 - Legal Research**

In order to understand how ROSS's A.I. is changing legal research, it's important to understand machine learning, natural language processing, and other A.I. basics. From that basis, we can more meaningfully discuss how those systems are being deployed to improve legal research. In this post, we're going to discuss the fundamentals of natural language search and how it improves legal queries and legal search results in ROSS.

ROSS's natural language processing (NLP) allows lawyers to phrase their research queries the way they would phrase a question to a colleague. Having a system that understands and can leverage the semantic and syntactic context of your query will improve your legal research questions and search results.

A query optimized with the help of NLP will surface the most accurate and relevant decisions because the system was assessed with the prior queries that yielded the best legal search results. Since the system has analyzed all relevant case law, assistance from optimized queries will deliver high recall (the percentage of relevant decisions returned ) and high precision (the percentage of total decisions returned that are relevant).

The four areas that drive NLP are speech recognition, understanding, generation, and speech synthesis.

- Natural language understanding (NLU) is narrower in purpose than NLP, focusing primarily on machine reading comprehension: getting the computer to comprehend what a body of text really means. After all, if a machine cannot comprehend the content, it cannot process it.
- Natural language generation (NLG) is another subset of NLP. NLG turns data into narratives and reports expressed in easy-to-read language.
- Speech Recognition (SR) understands or transcribes spoken language
- and Speech Synthesis (SS) into easy-to-read narratives and reports.

The system allows NLP queries to be typed into a search engine, spoken aloud with voice search or posed as a question to a digital assistant. The goal is to make interactions feel exactly like interactions among humans.

A great overview can be found in this Medium article, "Chapter 9: Natural Language Processing" by Madhu Sanjeevi. The article provides a good understanding of the moving parts without getting bogged down in technical details.

Now let's dig into how ROSS makes this happen.

The complex world of Language, Linguistics, Terms, Expansions and Simplifications is outlined nicely by Jocelyn D'Souza in a great 3

minute read: "A dive into Natural Language Processing".

The lawyer enters a query to find relevant cases. The NLP system interprets the query and "matches" it with legal text.

As you type, your query is processed instantly on three levels:

- Syntax – understanding the grammar of the text
- Semantics – understanding the meaning of the text
- Pragmatics – understanding the context of the text

In milliseconds, the system undertakes the three-level processing and it assesses:

1. **Language representations**: representing the meaning of words at the word, phrase, sentence, and passage level. This potentially makes matching a lot easier.
2. **Linguistic features**: alternatives are used to help with query complexity. A "major" category is noun vs. verb, but also person and number, plurality, tense.
3. **Term suggestions**: legal term suggestions specifically help users write better queries that incorporate legal context.
4. **Expansions**: query expansion provides alternate queries to users based on a global analysis, using some form of thesaurus. This can be combined with legal term suggestions.
5. and **Simplifications**: gives users feedback on their queries that attempt to eliminate complexity.

ROSS is including 1,2,4 and 5 with "Term suggestions" coming soon. "Expansion" will be treated using the same model as with "Term suggestions" but automated on behalf of the user.

A simple overview of the way Google applies this thinking to its search can be found in the "Google Inside Search" blog.

Before you hit **"Ask the Question?"** button it's also helpful to understand how data is stored and retrieved.

The system contains millions of legal decisions and hundreds of millions of passages that have already been processed by machine learning algorithms. The ingestion of legal data happens daily. The algorithms are trained against a corpus of queries and legal decisions. Once the algorithms meet acceptable statistical thresholds, they are then let loose to perform searches against the millions of decisions and hundreds of millions of passages.

These algorithms are usually referred to as ranking and retrieval algorithms. In the example below all the lightly colored boxes assemble the graph used to narrow down from your query to nodes displayed in the answer cards at the bottom of the illustration. They are fast, accurate and reliable algorithms.

As the tree is traversed, the query is used on each node to create a score, making its way down to the leaf nodes. Each leaf node gets a final score, thus completing the ranking process. The system then returns the top leaf nodes based on their final score. This is called retrieval.

Now hit the **"Ask the Question?"** button. The query is submitted and voila, the ranking and retrieval algorithms do their magic by analyzing decisions and other data in milliseconds.

It's an enormous win when lawyers can use their familiar speaking or writing muscles to retrieve authoritative decisions quickly, comprehensively, and accurately. When NLP is done right, it's a powerful tool for legal research.

**Stergios Anastasiadis**

Stergios is the Head of Engineering at ROSS. 25 years in the tech industry, angel investor and wants to make the tech startup community a continued success.

## Popular Articles

ROSS

ROSS



ROSS NEWS

**Enough.**

ROSS NEWS

**Announcement**



AI AND THE LAW

**ROSS partners with OpenAI for the launch of its API**

ROSS is working with OpenAI to refine their first commercial product. What does that mean for AI and legal tech?

ROSS

Twitter

Facebook

LinkedIn

© ROSS Intelligence, Inc. 2014–2020

**Company**

About Us

Careers

Terms of Service

Privacy Policy

**Product**

Features

Coverage

Pricing

Academic Access

Why ROSS

What is AI

**Resources**

Contact Us

FAQ + Support

Blog

Made in Webflow

# EXHIBIT 95

194 Va. 709
*Supreme Court of Appeals of Virginia*

RALPH SEYMOUR AND
BURFORD BUICK CORPORATION
v.
LUCILLE S. RICHARDSON, ADMINISTRATRIX
OF THE ESTATE OF HENRY
CLOPTON RICHARDSON, DECEASED.

Record No. 4044.
|
March 9, 1953.

***709** Present, All the Justices.

**Synopsis**
Action for personal injuries, revived after death of plaintiff in name of his administratrix. The Circuit Court, Elizabeth City County, entered judgment for plaintiff. Defendants brought error. The Supreme Court of Appeals, Buchanan, J., held that in injuries action brought in name of administratrix after injured person's death no recovery could be had for mental anguish, pain or suffering of such person.

Reversed and remanded for new trial on damages.

West Headnotes (10)

**[1]** **Abatement and Revival** Actions for personal injuries

2 Abatement and Revival
2V Death of Party and Revival of Action
2V(A) Abatement or Survival of Action
2k58 Actions and Proceedings Which Abate
2k58(1) Actions for personal injuries

Statute giving right of revival of personal injury action where injured plaintiff dies pending action, grants such right irrespective of cause of injured person's death. Code 1950, § 8–640.

4 Cases that cite this headnote

**[2]** **Abatement and Revival** Proceedings after continuance or revival

**Death** Suffering of deceased

2 Abatement and Revival
2V Death of Party and Revival of Action
2V(B) Continuance or Revival of Action
2k77 Proceedings after continuance or revival
117 Death
117III Actions for Causing Death
117III(H) Damages or Compensation
117k80 Elements of Compensation
117k82 Suffering of deceased

If plaintiff in personal injury action dies pending such action as result of such injuries, pleadings upon revival must be amended and case proceeded with as if brought under wrongful death statutes and in such event there can be no recovery for mental anguish, pain or suffering of decedent. Code 1950, §§ 8–633, 8–634, 8–640.

3 Cases that cite this headnote

**[3]** **Action** Nature and elements of cause of action and suspension of remedies

**Action** Accrual of cause of action

13 Action
13I Grounds and Conditions Precedent
13k1 Nature and elements of cause of action and suspension of remedies
13 Action
13IV Commencement, Prosecution, and Termination
13k61 Accrual of cause of action

A "cause of action" accrues to a person when that person first comes to a right to bring action and consists of act or omission constituting violation of duty but differs from a "right of action" which is the right to bring suit.

6 Cases that cite this headnote

**[4]** **Death** Constitutional and statutory provisions

117 Death
117III Actions for Causing Death
117III(A) Right of Action and Defenses
117k9 Constitutional and statutory provisions
(Formerly 361k212.1)

It must be presumed that legislature had in mind a distinction between cause of action and right of action when it enacted statute providing that no recovery can be had for mental anguish, pain

or suffering in prosecution of cause of action for personal injuries after death of injured person. Code 1950, § 8–628.1.

3 Cases that cite this headnote

[5] **Death** Constitutional and statutory provisions

117 Death
117III Actions for Causing Death
117III(A) Right of Action and Defenses
117k9 Constitutional and statutory provisions
(Formerly 361k212.1)

It must be presumed that legislature knew when it enacted provision excluding recovery for mental anguish, pain or suffering in prosecution of action for personal injuries after death of injured person, that provisions existed for revival of actions brought by plaintiff who later died and if that death resulted from wrongful act, no recovery could be had in revived action for mental anguish, pain and suffering of decedent. Code 1950, §§ 8–628.1, 8–640.

8 Cases that cite this headnote

[6] **Abatement and Revival** Actions for personal injuries

**Death** Suffering of deceased

2 Abatement and Revival
2V Death of Party and Revival of Action
2V(A) Abatement or Survival of Action
2k58 Actions and Proceedings Which Abate
2k58(1) Actions for personal injuries
117 Death
117III Actions for Causing Death
117III(H) Damages or Compensation
117k80 Elements of Compensation
117k82 Suffering of deceased

Statute providing for survival of injuries action but excluding recovery for mental anguish, pain or suffering of injured person, applies to right of revival of actions for injuries whether begun by injured person or by his personal representative. Code 1950, §§ 8–628.1, 8–640.

2 Cases that cite this headnote

[7] **Statutes** Construing together; harmony

**Statutes** Conflict

361 Statutes
361III Construction
361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
361k1155 Construing together; harmony
(Formerly 361k207)
361 Statutes
361III Construction
361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
361k1157 Conflict
(Formerly 361k207)

Where inconsistent and irreconcilable provisions are found in statutes, they must be construed so as to give effect to latest expression of legislative intent.

[8] **Death** Suffering of deceased

117 Death
117III Actions for Causing Death
117III(H) Damages or Compensation
117k80 Elements of Compensation
117k82 Suffering of deceased

Where passenger injured in automobile collision brought action for injuries but died pending trial and action was revived in name of administratrix, there could be no recovery for mental anguish, pain and suffering of passenger. Code 1950, § 8–628.1.

[9] **Appeal and Error** Evidence

30 Appeal and Error
30XVIII Determination and Disposition of Cause
30XVIII(J) Course and Conduct of Further Proceedings in Lower Court
30k4832 New Trial
30k4837 Evidence
(Formerly 30k1214)

Where case was remanded for new trial on question of damages only, evidence as to odor of alcohol on breath of tort-feasor would be irrelevant on such trial.

[10] **Trial** Statements as to Facts, Comments, and Arguments

388 Trial

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

388V Arguments and Conduct of Counsel
388k113 Statements as to Facts, Comments, and Arguments
388k114 In general

In personal injury action revived in name of injured administratrix, statement of administratrix' counsel to jury that administratrix asks application of golden rule was improper, for function of jury is to decide according to evidence rather than how its members might wish to be treated.

6 Cases that cite this headnote

VIRGINIA REPORTS SYNOPSIS

Error to a judgment of the Circuit Court of Elizabeth City county. Hon. Frank A. Kearney, judge presiding.

*Reversed and remanded.*

The opinion states the case.

VIRGINIA REPORTS HEADNOTES AND CLASSIFICATION

(1) Damages — Revived Action for Personal Injuries — Recovery for Pain and Suffering of Decedent Prohibited.
1. Where decedent brought an action for personal injuries but died prior to trial from a cause unrelated to the injuries, and the action was revived, recovery for mental anguish, pain and suffering was prohibited by Code 1950, section 8-628.1. That section removes this element of the cause of action. It applies whether the action is begun by the injured person in his lifetime and revived (as has been long allowed by section 8-640), or is begun by his personal representative after his death.
(2) Argument of Counsel — Improper to Ask Jury to Apply Golden Rule.
2. It is improper for counsel in closing argument to ask the jury to apply the Golden Rule. The function of a jury is to decide according to the evidence, not according to how its members might wish to be treated.
END OF VIRGINIA REPORTS HEADNOTES AND CLASSIFICATION

**Attorneys and Law Firms**

****77** *James, Richardson and James,* for plaintiffs in error.

****78** *Hall and Martin,* for defendant in error.

**Opinion**

JUDGE: BUCHANAN

BUCHANAN, J., delivered the opinion of the court.

On November 25, 1950, Henry C. Richardson was injured in a collision between an automobile in which he was riding and one driven by Ralph Seymour and owned by Burford Buick Corporation. On April 11, 1951, Richardson brought an action ***710** for damages against Seymour and the corporation. On November 9, 1951, before the case was tried, Richardson died of a heart attack, not related to the injuries received in the accident. On January 26, 1952, the action was revived in the name of Richardson's administratrix and thereafter was tried by a jury which returned a verdict for the plaintiff for $10,000, on which the court entered the judgment to which this writ of error was granted.

It is not disputed that the evidence was sufficient to establish that the accident was due to the negligence of Seymour, and the liability of the defendants is not now at issue. The main question on this appeal is whether the mental anguish, pain and suffering of the decedent, Richardson, were proper elements of damage. Over the objection of the defendants the court admitted evidence of those elements, instructed the jury that it was proper to take them into consideration and refused an instruction offered by the defendants that they were not proper elements of damage.

The defendants contend that recovery for mental anguish, pain and suffering is expressly prohibited by section 8-628.1 of the Code, as follows:

'No cause of action for injuries to person or property shall be lost because of the death of the person liable for the injury. No cause of action for injuries to person or property shall be lost because of the death of the person in whose favor the cause of action existed, provided, however, in such action no recovery can be had for mental anguish, pain or suffering, * * *.'

This section was added to the Code by Acts 1950, chapter 481, page 948, entitled 'AN ACT *to amend the Code of 1950 by adding a section numbered 8-628.1 to provide for the survival*

*of certain actions.'* By Acts 1952, chapter 378, page 671, a proviso was added limiting the time for bringing action. Code, Section 8-628.1, 1952 Cum. Supp.

The trial court held that section 8-628.1 does not apply where an injured person brings suit and thereafter, prior to trial, dies from a cause not connected with his injuries, as was the case here; but that it applies only where the person injured dies from a cause unrelated to his injuries without having brought suit therefor. The court was of opinion that section 8-640, applied to the situation in this case, where the action was commenced by Richardson himself.

***711** Section 8-640 of the Code provides that 'the right of action' under sections 8-633 and 8-634 (which are the statutes giving a right of action for death by wrongful act, neglect or default), shall not abate by the death of the defendant; and that when an action for damages is brought by a person injured by another's wrongful act, neglect or default, and the injured person dies pending the action, the action shall not abate but may be revived in the name of his personal representative.

Section 8-640 is the present form of section 2906 of the Code of 1887, as amended. The original section 2906 provided that if a person injured by the wrongful act, neglect or default of another bring suit and then die pending the action, 'and his death is caused by such wrongful act, neglect or default, ' his action might be revived in the name of his personal representative, and the pleadings should thereupon be amended to conform to an action under the wrongful death statutes. By an amendment made in 1894, Acts 1893-94, chapter 88, page 83, the quoted words and the provision for amending the pleadings were omitted from the statute, and in *Birmingham v. Chesapeake &c. R. Co.,* 98 Va. 548, 37 S.E. 17, decided in 1900, it was held that the object of the amendment was not to make all actions for personal injuries revivable, but to give a right of revival in cases where the person ****79** injured died pending the action 'without regard to the cause of death,' which right of revival did not exist before the amendment 'except in those cases where the plaintiff died as a result of the injuries.'

Section 2906 of the 1887 Code, as amended by the 1894 act, and as revised, became section 5790 of the Code of 1919. The Revisors' Note to that section explained that it was not intended by the revision to change the holding in the *Birmingham* case, and the legislature was requested to make the needed changes. This was done by Acts 1920, chapter 26, page 27, amending section 5790 to make it read as section 8-640 does now, except for the final sentence of the act, with which we are not presently concerned. [1]

1 Section 5790 was again amended by Acts 1928, chapter 446, page 1141, by adding a sentence in practically the same language (except that it contained the words 'not resulting in death') as the second sentence inserted in section 5786 by Acts 1926, chapter 507, page 858, now the second sentence of section 8-633.

The Revisors also added this note to section 5790: 'For a personal injury not resulting in death, for which no action is ***712** brought by the injured party in his lifetime, no provision is now, or has ever been made, and it simply dies as at common law.' See also *Anderson v. Hygeia Hotel Co.,* 92 Va. 687, 24 S.E. 269; 1 Am. Jur., Abatement and Revival, § 133, p. 92.

**[1]** **[2]** Section 8-640, as noted above, gives a right of revival in cases where the plaintiff dies pending the action, without regard to the cause of death. *Birmingham v. Chesapeake &c. R. Co., supra.* In such case if death resulted from the injury, the pleadings are required to be amended, and the case proceeded with as if brought under the death by wrongful act statutes. In that event there could be no recovery for the mental anguish, pain or suffering of the decedent. *Virginia Iron &c. Co. v. Odle's Adm'r,* 128 Va. 280, 309, 105 S.E. 107, 116; 5 Mich. Jur., Death by Wrongful Act, § 16, p. 629.

But the plaintiff argues that since her decedent's death did not result from the injury and since the action brought by him was revived in her name as his personal representative, she prosecutes his action and is entitled to recover the same damages as he would have been entitled to recover, which would have included his pain and suffering. See *Norfolk &c. Ry. Co. v. Marpole,* 97 Va. 594, 600, 34 S.E. 462, 464; 5 Mich. Jur., Damages, § 30, p. 519. In support of her contention she cites *Anderson v. Hygeia Hotel Co., supra.*

In that case an injured plaintiff claimed that the revival provision in what was then section 2906 of the 1887 Code (now § 8-640) caused the limitation of his action to be five years under section 2927 of the 1887 Code (now § 8-24). In holding that a one-year limitation applied, the court said that the legislature in enacting the death by wrongful act statutes 'plainly did not intend to continue or cause to survive his [plaintiff's] right of action for the injury, but to substitute

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

for it and confer upon his personal representative a new and original right of action.‘ 92 Va. at p. 691, 24 S.E. at p. 271. It was further said that if the effect of the statute was to cause the ‘right of action‘ of the injured person to survive, the suit by his personal representative would be to recover damages for the injury the deceased had sustained and the detriment caused to his estate; that there would be the same elements of damage for the consideration of the jury, and the evidence ‘would mainly relate to and the damages be for the physical and mental suffering ***713** of the deceased and the injury and loss generally sustained by him and his estate. * * *.‘ 92 Va. at p. 693, 24 S.E. at p. 271.

**[3]** The *Anderson* case, however, was dealing with the effect of the statutes of limitation on the *right* of action. ‘It is frequently the case that more or less confusion arises from a failure to distinguish between the cause and the right of action. 'A cause of action is said to accrue to any person when that person first comes to a right to bring an action. There is, however, an obvious distinction between a cause of action and a right, though a cause of action generally confers a right. * * *.'‘ *Lewis' Adm'r v. Glenn, Trustee,* 84 Va. 947, 979, 6 S.E. 866, 882. *Mercer v. Richmond,* ****80** 152 Va. 736, 744, 148 S.E. 803, 805. In the latter case the question was whether the sixty-day notice of injury required by city ordinance to be given before a suit could be maintained related to the date of the injury or to the qualification of the personal representative of the injured person whose death resulted from the injury. The court said that it agreed with the principle stated in the *Anderson* case, and other cases cited, that the *right of action* which accrued to the administrator upon the death of his intestate was entirely different from the right of action which accrued to the injured party, but that the right of action referred to in those cases ‘is entirely different from the cause of action.‘

‘A right of action is the right to bring suit in a case and may be taken away by the running of the Statute of Limitations, through an estoppel, or by other circumstances which do not affect the cause of action.‘ 1 Am. Jur., Actions, § 3, p. 405.

‘The cause of action means the act or omission constituting the violation of duty complained of.‘ *State v. Jarrett,* 90 W.Va. 180, 110 S.E. 568, 569. Black's Law Dict., De Luxe Ed., p. 293.

‘The cause of action contemplated by our statute is not the death itself, but the tort which produces the death, and this is the same cause of action for decedent's injuries, and, as such, subject to its infirmities as an actionable cause.‘ *Street v. Consumers Min. Corp.,* 185 Va. 561, 572, 39 S.E.2d 271, 275.

In *Hoffman v. Stuart,* 188 Va. 785, 791, 51 S.E.2d 239, 242, after referring to the holding in *Anderson v. Hygeia Hotel Co., supra,* we said:

‘It is made plain in the later cases of *Brammer v. Norfolk &c. R. Co.,* 107 Va. 206, 57 S.E. 593; *Virginia Elec., &c. Co. v.* ***714** *Decatur,* 173 Va. 153, 3 S.E.2d 172 (dissenting opinion 4 S.E.2d 294); and *Street v. Consumers Mining Corp.,* 185 Va. 561, 39 S.E.2d 271, 167 A.L.R. 886, that it is the *cause* of action of the injured person that the personal representative prosecutes.‘

**[4]** It must be presumed that the legislature had these distinctions in mind when it enacted section 8-628.1 of the Code and in it provided that ‘No cause of action for injuries to person or property shall be lost because of the death of the person in whose favor the cause of action existed, provided, however, in such action no recovery can be had for mental anguish, pain or suffering, * * *.‘

**[5]** It must also be presumed that the legislature knew that in section 8-640 provision had already been made for revival of the action brought by a plaintiff who afterwards died, and that if death resulted from the wrongful act, no recovery could be had in the revived action for the mental anguish, pain or suffering of the decedent.

**[6]** **[7]** We can find no warrant, therefore, for the view that into the comprehensive language of section 8-628.1 there must be read an exception making it inapplicable to actions brought by the injured person and applicable only to cases where the injured person had brought no action. That section provides in effect that ‘no cause of action‘ for injury shall be lost (as it would have been at common law) because of the death of the person injured, but in an action for damages for the injury there shall be no recovery for mental anguish, pain or suffering. If it had been the legislative purpose to exclude from the rule thus laid down, actions that had been brought during the life of the deceased and revived in the name of his personal representative under section 8-640, it would have been easy to provide for that. On the contrary, the statute as written deals with the *cause of action* and takes away an element of the cause of action whether the action therefor is begun by the injured person in his lifetime or by his personal representative after his death, as a condition of allowing the right of action for that cause to survive.

Section 8-640, permitting the revival of an action for personal injuries brought by the injured person in his lifetime, does not deal with elements of damage belonging to the revived action. Section 8-628.1 does ****81** deal with those elements to the extent of excluding mental anguish, pain and suffering therefrom. ***715** The latter, which is also the later, section must, we think, be given the scope covered by its broad language and be held to apply to the right of revival of actions for injuries, whether begun by the injured person or by his personal representative. Where inconsistent and irreconcilable provisions are found in statutes they must be construed so as 'to give effect to the latest expression of the legislative intent. ' *Williamson v. Wellman,* 156 Va. 417, 430, 158 S.E. 777, 781.

**[8]** To give the language of section 8-628.1 its natural effect makes uniform the rule as to mental anguish, pain or suffering in suits prosecuted by personal representatives, whether under the death by wrongful act statutes or for injuries which did not cause the death; and avoids the illogic of allowing damages for those elements in an action brought by the injured person and revived in the name of his personal representative, but not in an action for the same cause if brought originally by his personal representative.

**[9]** Our conclusion is that the case should be remanded for a new trial only on the question of damages, which makes it unnecessary to discuss the assignment of error relating to the amount of the judgment. On such trial evidence as to an odor of alcohol on the breath of Seymour, the driver, which is the subject of defendants' assignment of error No. 2, would be irrelevant.

**[10]** However, that part of the closing argument of plaintiff's counsel which is the basis for assignment of error No. 6, was improper and should not be repeated. This was the argument objected to:

'All Mrs. Richardson asks you gentlemen to do when you retire to your jury room is to apply the Golden Rule. 'Do unto her as you wish that you would be done.''

The important rule so attempted to be invoked was designed to regulate the conduct of men among themselves before they bring their controversy to a jury. The function of the jury is to decide according to the evidence, not according to how its members might wish to be treated. *Lorillard Co. v. Clay,* 127 Va. 734, 752, 104 S.E. 384, 390.

The judgment below is reversed and the case remanded for a new trial on the question of damages to be determined consistently with this opinion.

*Reversed and remanded.*

**All Citations**

194 Va. 709, 75 S.E.2d 77

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 96

LEGAL RESEARCH

# Editorial Enhancements

Find the legal information you need quickly and confidently

Back to Westlaw Edge overview →

Feedback

Key Number System KeyCite Headnotes Notes on Decisions Indexes Free trial

## Find the information you need faster

Westlaw attorney editors analyze, categorize, and summarize the law, creating editorial enhancements to help you research more efficiently – and with greater accuracy. For more than 100 years, Thomson Reuters Westlaw has provided these proprietary editorial processes that continue to evolve and incorporate the latest technology.




## Zero in on your legal issue with the **Key Number System**

The Key Number System is the master classification system of U.S. law. For over 100 years, West Topic and Key Numbers have offered attorneys a convenient way to zero-in on a particular legal issue and quickly find on-point cases. Attorney editors identify, summarize, and assign a Topic and Key Number from the Key Number System to each legal issue in a published opinion so you can easily hone in on a specific point of law.

- Easily find relevant cases that address a specific point of law in any jurisdiction
- Find cases stating or applying a legal concept, even if those search terms aren't in the opinion
- Search by Key Number to retrieve cases or use a Key Number found in a relevant case to find cases discussing the same issue




The Key Number system is the master classification system of U.S. las and widely regarded as the cornerstone of effective legal research.

## Mitigate risk with **KeyCite**

Instantly see whether your case, statute, regulation, or administrative decision is still good law with KeyCite, which indicates negative treatment directly on the face of the document and on a result list. And now with KeyCite Overruling Risk on Westlaw Edge, you can see when a point of law in your case has been implicitly undermined based on its reliance on an overruled or otherwise invalid prior decision.

- Quickly access citing references, negative treatment and other information related to your selected document
- Monitor the status of your document and get automatic updates when KeyCite information changes
- Know immediately when a case has an appeal pending in federal court with KeyCite's exclusive Federal Notice of Appeal KeyCite flag



KeyCite flags rulings that have been overruled.

## Save time with **Headnotes**

With Headnotes you can quickly identify and understand what a case stands for and whether it's relevant to your legal issue. Attorney editors identify the important issues of law in a case and then write a short description summarizing the facts, holding, and reasoning being applied so you can determine the case's relevance. Rather than reading through every case in your results list to determine whether it's applicable to your specific issue, you can easily pinpoint the cases that match your facts and desired outcome to build the strongest argument.

- Ensure you haven't missed any relevant authority
- Quickly jump to the parts of the opinion you're most interested in
- Understand the application of law to facts



Use the headnotes for more detail and insights on a case or ruling.

## Better understand the law with **Notes of Decisions**

Notes of Decisions connect brief summaries of important cases to the statute or regulation they interpret so you can quickly understand the most current interpretation of the law. Notes of Decisions are curated, summarized, and classified by attorney editors so that you can feel confident you understand how cases have interpreted or applied a statute or regulation for a precise issue.



- Quickly understand the most current interpretation of the law as well as historic interpretations
- Avoid the need to manually search caselaw for references to a statute or regulation
- Understand the current legal standard and interpretation of your statute or regulation



Westlaw Edge Editorial Enhancements Notes on Decisions give an experts insight into decisions.

## Quickly find the most relevant statute using the **Indexes**

Westlaw is also the only online provider of alphabetical Indexes for statutes in all 50 states and the District of Columbia, USCA, and the CFR. With 20 million references categorized by topic, our online Indexes allow researchers to quickly find the most relevant statutes and regulations without running a search.

For more than 125 years, we provide the best Indexes by standardizing popular names, terms, and concepts across all jurisdictions. We gather related references under a single topic and apply terms of art and terms of general application, in conjunction with local terms and colloquial phrases. We even add terms that don't appear at all in the text of a statute. Because of this extensive process, you can quickly find what you are looking for, regardless of your familiarity with the law in any jurisdiction.



Find all the federal regulations or for any state using indexes.

## Featured articles and insights



ARTICLE

**The expertise behind your legal research**

Read more →



ARTICLE

**Using the West Key Number System**

Read more →



ARTICLE

**Why you need KeyCite**

Read more →

## Experience **Westlaw Edge**

Take the next step today

Free trial

**PRODUCTS**

Westlaw
Practical Law
CLEAR
All products

**RESOURCES**

About us
Our purpose
Press releases
Insights
Events

**SUPPORT**

Support center
Reference attorneys
Legal notices
Contact us
Account management
Product logins

**CONNECT WITH US**

Facebook
Twitter
LinkedIn
YouTube

Thomson Reuters

Cookie policy | Cookies Settings | Terms of use | Privacy statement | Copyright | Accessibility

Do not sell or share my personal information and limit the use of my sensitive personal information

# EXHIBIT 97

YouTube Search Sign in




Transcript

0:01 [Music]
0:04 the value that headnotes create for our
0:06 customers is that it allows them to
0:09 research cases more quickly and
0:10 efficiently headnotes are very important
0:13 because they give legal researchers a
0:16 quick little summary of the point of law
0:18 that the judge is decided in the case
0:20 the real benefit of west's law is that
0:25 you have attorneys already looking at
0:27 the cases before you even have an

English (auto-generated)

## Thomson Reuters Westlaw | Headnotes

Unlisted

Thomson Reuters Legal
7.61K subscribers

Subscribe

5 Share Save

1,083 views May 14, 2018
Thomson Reuters Westlaw headnotes are written by attorney editors. Summarizing court decisions can be tricky and cause researchers to miss essential cases. Our attorney editors are able to provide headnotes with the needed information and terms that will let legal researchers find the right cases more efficiently, with results you can trust.

To learn more about Westlaw headnotes, visit https://legalsolutions.thomsonreuters...

### Key moments

View all



0:04
What are headnotes in Westlaw?

### Transcript

Follow along using the transcript.

Show transcript

Thomson Reuters Legal
7.61K subscribers

Videos About

Show less

0 Comments Sort by

Add a comment...




Brene Brown Leaves the Audience SPEECHLESS | One ...
Let's Achieve Success
2.6M views • 1 year ago



Healing music for the heart Energy For Heart And Soul,...
Gentle Music Melodies
893 watching
LIVE



Autumn Morning by the Lake with Coffee and Bossa Nova...
Cozy Jazz Music
705 watching
LIVE




Understanding Ketamine: Addressing Concerns in Light ...
MaxWell Clinic
8 views • 1 hour ago
New




Katharine Hepburn FINALLY Reveals Her Thoughts On Awa...
Celebs Up Close
48 views • 1 hour ago
New



lofi hip hop radio beats to relax/study to
Lofi Girl
37K watching
LIVE




Live Sea Otter Cam - Monterey Bay Aquarium
Monterey Bay Aquarium
321 watching
LIVE Fundraiser




The Best Celtic Mystique Music for Deep Relaxation by E. F....
Mind & Spirit Relaxation with M...
11M views • 2 years ago




Interview: Power of Adaptability and Our Values with Dr. Spenc...
Jim Peacock
24 views • 1 day ago
New



Cozy Autumn Outdoor Coffee Shop Ambience: Smooth Jazz...
Jazz Cafe BGM
1.7K watching
LIVE



Relaxing Music to Relieve Stress, Anxiety and Depressio...
Soothing Soul
2.6K watching
LIVE



Autumn Cozy Vibes in a Jazz Café: Bossa Nova Jazz with a...
Cozy Jazz Music
1.1K watching




Best classical music. Music for the soul: Beethoven, Mozart,...
Largo Classics
8M views • Streamed 10 months ago




Why the 20 Hour Fast Works for Menopausal Women
Dy Ann - Mindset Coach for Women ...
193 views • 2 hours ago
New




Live Birds In 4K! Cornell Lab FeederWatch Cam at Sapsuck...
Cornell Lab Bird Cams
1K watching
LIVE




Not The Science Type
YouTube Movies & TV
Documentary • 2021
Free with ads TV-PG




Crackling Fireplace & Smooth Jazz Instrumental 🍂 Warm...
Relax Jazz Cafe
5.5K watching
LIVE




Address Manager Essentials: Roads Advanced Functionality
Esri Canada
8 views • 2 hours ago
New




Enchanting Autumn Forests with Beautiful Piano Music 🍁...
Enchanting Peaceful
3.6K watching
LIVE




Muscle Shoals
YouTube Movies & TV
Documentary • 2013
Free with ads PG




La visita de Milei a Nueva York llegó a la portada de The Wall...
DESPABILATE con TITI
17 views • 1 hour ago
New




September Jazz: Sweet Jazz & Elegant Bossa Nova to relax,...
Cozy Jazz Music
1.4K watching
LIVE




The Best of Vivaldi - The Four Seasons
Greatest Classical Music
236K views • 2 weeks ago




The Best of Debussy - Solo Piano | Debussy's Most...
Classical Oasis
2.2M views • 1 year ago



Relaxing Bossa Nova Jazz by the Lake: Autumn Terrace with...
Cozy Jazz Music
557 watching
LIVE




Joni Mitchell - Blue (Full Album) [Official Video]
Joni Mitchell
1.9M views • 2 years ago

# EXHIBIT 98

YouTube
Search
Sign in




**Transcript**

0:53 system and that's because the law is
0:56 complex but we have humans looking at
0:59 every single one of these headnotes
1:01 and deciding where the best place is to
1:04 put it in the key number system one of
1:06 the great things about having a group of
1:08 humans doing the classification work in
1:10 the key number system is that they are
1:13 constantly looking at the outlines and
1:16 they are seeing where things are
1:18 changing in the law where the outline
1:21 doesn't quite work as well any longer
1:24 and then you change them
1:28 [Music]

English (auto-generated)

## Thomson Reuters Westlaw | Key Number System

Unlisted

Thomson Reuters Legal
7.61K subscribers
Subscribe

3 Share Save

867 views May 14, 2018
Westlaw Key Number System is the best way to find the right case law for which you are looking. Created over a century ago, it was the first of its kind and continues to be the standard for case law research providing the industry's largest, and well-organized database. Thomson Reuters classification attorney editors make sure every headnote is placed in the correct key number category. Using human editors allows us to consistently make changes to the categorization of the ever-changing legal landscape.

For more information visit https://legalsolutions.thomsonreuters...

**Key moments** View all



0:04
What is a key number in Westlaw?

**Transcript**

Follow along using the transcript.

Show transcript

Thomson Reuters Legal
7.61K subscribers

Videos About

Show less

**0 Comments** Sort by

Add a comment...



Try the App's New Features Today
Embed Amplitude reports in your HubSpot dashboard with the Amplitude app for HubSpot.
Sponsored · HubSpot
Learn more


4K Anime Purple Evening Sky - Relaxing Live Wallpaper - 1...
ALEXIY
3M views · 2 years ago


| Idea 22 - Best Part (looped) | ° slowed + reverb °
Bella Isa
1M views · 3 months ago



Why LOOKING POOR Is Important
Vincent Chan
432K views · 2 months ago


The Ending Of Interstellar Finally Explained
Looper
12M views · 4 years ago



Miles Morales Being A Comedian For 6 Minutes
Scarlet Reilly
1M views · 11 months ago



Disney hits
innbo_ · Playlist



Simon Sinek & Trevor Noah on Friendship, Loneliness,...
Simon Sinek
1.2M views · 2 weeks ago


playlist for cozy autumn nights
Aeternys
449K views · 4 days ago
New



I Trained an AI for 2 Years on Trackmania. It's Breaking...
Linesight
1.2M views · 4 months ago


funny try not to laugh impossible memes
Mr. Memes
8.3M views · 6 months ago


lofi hip hop radio beats to relax/study to
Lofi Girl
22K watching
LIVE



Canadian Seniors Alert: OAS Benefit Decrease Starts...
Canada Seniors Budget
2.1K views · 23 hours ago
New


The Entire Winnie the Pooh saga
freddyroland
2.1M views · 11 months ago


Cats with zero brain activity
vapingcat
4.3M views · 7 months ago







2h Psychedelic Colorful Neon Background | No Sound 4K
4K VISION BACKGROUND
138K views • 2 months ago




" I am the idiot with the painted face ". ~ a mitski...
- claudia.claws ...
131K views • 2 weeks ago




How To Ride A Motorcycle In 15 Minutes
SoCal Rider B
4.3M views • 2 years ago




Rachmaninoff - Piano Concerto #2 in C Minor, Op. 18 - HD
hellsan631
10M views • 12 years ago




If AMONG US Had A SPY
Shiloh & Bros
68M views • 3 years ago




running away | dreamcore playlist •°
Nephilist
4M views • 1 year ago




Best Stock Market Strategy to Invest During Rate Cuts
ClearValue Tax
50K views • 6 hours ago
New




Bank Cracks Down on Meat Eaters
I Allegedly
29K views • 8 hours ago
New




5 Uncomfortable Truths I've Learned About Money
Rachel Cruze
6.2K views • 10 hours ago
New




MH Marshall Islands - President Addresses United Nations...
United Nations
72 views • 55 minutes ago
New




Labor's Housing Bill Rejected, Consumer Spending at an All...
It's Simple Finance
625 views • 16 hours ago
New




Bitcoin Holders URGENT: 99% WILL LOSE IN THIS TRAP!!!!
Crypto Bratan
1.3K views • 13 hours ago
New

# EXHIBITS 99-100

## Redacted in their Entirety

# EXHIBIT 101

LAW LIBRARY JOURNAL Vol. 109:4 [2017-27]

# Surprising Differences: An Empirical Analysis of LexisNexis and West Headnotes in the Written Opinions of the 2009 Supreme Court Term*

Peter A. Hook** and Kurt R. Mattson***

*The number of headnotes assigned by LexisNexis and West are empirically examined for opinions of the 2009 Supreme Court Term. Additionally,* Citizens United *is examined in detail to determine the overlap of headnote-worthy language. Discrepancies in the number of headnotes assigned and disagreement as to headnote-worthy language call into question the rigor with which headnotes are created.*

Introduction . . . . . 558
What Are Headnotes? . . . . . 559
  What to Call These Systems? . . . . . 560
Historical Background . . . . . 562
  West's National Reporter System . . . . . 562
  Key Number System . . . . . 563
  The Advent of LexisNexis and Computerized Legal Search . . . . . 563
Related Literature . . . . . 564
  Vendor Claims as to Their Headnote Process . . . . . 564
    West . . . . . 564
    LexisNexis . . . . . 565
  Commentators' Thoughts as to What the Systems Are Designed to Do . . . . . 566
  Holdings Versus Dicta . . . . . 568
Case Corpus . . . . . 569
Number of Headnotes . . . . . 570
  Headnotes per Case . . . . . 570
  Headnotes per Page . . . . . 570
  Headnotes per Line . . . . . 572
  Regression Analysis Results . . . . . 572
Greatest Differences . . . . . 576

---

* © Peter A. Hook and Kurt R. Mattson, 2017.

** Assistant Professor, School of Information Sciences, Wayne State University, Detroit, Michigan. Trained as an attorney, Peter was an academic law librarian for ten years. Peter was a LexisNexis Student Associate while in law school at the University of Kansas from August 1995 until May 1997.

*** President of Union Legal Research, Phoenix, Arizona. Trained as an attorney, Kurt is a former law firm librarian. Kurt worked for Pike & Fischer, Inc., a subsidiary of BNA (now Bloomberg BNA) as a legal editor from 1989 to 1990 and for Thomson West (formerly West Publishing) from 1990 until 2008 in product development, sales, and marketing. He has been an employee of LexisNexis from 2009 to the present as an author, editorial, and marketing consultant with the A.S. Pratt & Sons imprint.

Idiosyncratic Differences . . . . . . . . . . 577
*Corcoran v. Levenhagen* . . . . . . . . . . 578
*United States v. Juvenile Male* . . . . . . . . . . 579
LexisNexis Compared with Lawyers' Edition . . . . . . . . . . 581
Agreement in Headnote-Worthy Opinion Language . . . . . . . . . . 581
Conclusions and Future Work . . . . . . . . . . 585
Appendixes . . . . . . . . . . 611

## Introduction

¶1 Headnotes are important.[1] They continue to be one of the main ways[2] that legal researchers engage with the massive body of case law[3] in the United States to marshal arguments for legal advocacy, advising, and scholarship. As one publisher-supplied component of the rule of law in the United States, they contribute to the stability, social justice, and economic growth[4] of the country by making case law usable. Headnotes are vendor-described, atomistic statements of discrete concepts[5] of law found in judicial opinions. They are supplied by two competing legal publishers (and vendors of their online legal platforms)—LexisNexis and Thomson Reuters (formally Thomson/West, formally West Publishing, and hereinafter West). They are not primary source content but important finding aids to the primary source content that are judicial opinions. However, the two publishers show surprising differences in how they assign headnotes, as illustrated by an empirical review of the headnotes assigned to the written opinions of the 2009 Term of the United States Supreme Court. The differences between the two vendors are found in (1) the number of headnotes assigned to each case, and (2) the identification of opinion language that merits a headnote.

1. *See* John O. McGinnis & Steven Wasick, *Law's Algorithm*, 66 FLA. L. REV. 991, 1003 (2014) ("[T]echnology that makes precedent broadly available improves performance" of a distributed approach to legal ordering such as the common law, case-based system.).

2. See the amount of room their explanation continues to occupy in legal research textbooks, hornbooks, and nutshells: J.D.S. ARMSTRONG & CHRISTOPHER A. KNOTT, WHERE THE LAW IS: AN INTRODUCTION TO ADVANCED LEGAL RESEARCH 107–14 (4th ed. 2013); STEPHEN M. BARKAN ET AL., FUNDAMENTALS OF LEGAL RESEARCH 38, 78–104 (9th ed. 2009); MORRIS L. COHEN & KENT C. OLSON, LEGAL RESEARCH IN A NUTSHELL 60, 83–88 (12th ed. 2016); KENT C. OLSON, PRINCIPLES OF LEGAL RESEARCH 250–64 (2d ed. 2015); AMY E. SLOAN, BASIC LEGAL RESEARCH: TOOLS AND STRATEGIES 96–122 (5th ed. 2012).

3. As of June 2012, both LexisNexis and Westlaw databases contained eleven million cases. Susan Nevelow Mart, *The Case for Curation: The Relevance of Digest and Citator Results in Westlaw and Lexis,* 32 LEGAL REFERENCE SERVS. Q. 13, 14 (2013) [hereinafter Mart, *Case for Curation*]. In March 2009, Westlaw contained "approximately nine million cases." In March 2010, LexisNexis contained an estimated 9.7 million cases. Susan Nevelow Mart, *Relevance of Results Generated by Human Indexing and Computer Algorithms: A Study of West's Headnotes and Key Numbers and LexisNexis's Headnotes and Topics*, 102 LAW LIBR. J. 221, 223, 2010 LAW LIBR. J. 13, ¶ 4 [hereinafter Mart, *Relevance*].

4. *Shrink Wrap: Why the History of Economic Growth Should Be All About Recessions*, ECONOMIST (Apr. 8, 2017), http://www.economist.com/news/finance-and-economics/21720311-faster-growth-not-due-bigger-booms-less-shrinking-history [https://perma.cc/Q5KJ-5TAX] ("Before the modern era, elites would fight between themselves for the spoils of growth and send the economy back to square one through wars, corruption and the like. Respect for courts to resolve disputes prevents this from happening."); *see also Order in the Jungle*, ECONOMIST (Mar. 13, 2008), http://www.economist.com/node/10849115 [https://perma.cc/6QCD-G8JZ].

5. They are decidedly not only for "holdings" as was originally written. See *infra* ¶¶ 26–28 below on holdings and dicta.

## What Are Headnotes?

¶2 To critically analyze and evaluate the assignment of headnotes by LexisNexis and West, it is important to articulate with specificity what they are and include. "Headnotes, or syllabi, are brief summaries of the points of law, usually accompanied by relevant facts bearing on that point of law. . . . Each headnote represents a point of law extracted from the case, and the number of headnotes varies from case to case."[6] Headnotes serve three main purposes: (1) They allow "the reader to grasp relatively quickly the legal issues discussed within the opinion"[7] (overview function). (2) They help the reader to quickly locate the issues described in the headnote paragraphs by including bracketed numbers ("[1]") that specify where in the opinion a particular headnote derives the basis for its summary[8] (intra-case location function). (3) And finally, headnotes allow a researcher to identify topically similar cases that have also been marked-up, assigned headnotes, and integrated within the larger categorization scheme[9] (digest function). This is why we refer to them as headnote systems.

¶3 Prior to computer-assisted legal research, a researcher typically started by referencing a multivolume printed digest. Digests contain all of the cases assigned headnotes with particular topics for a particular jurisdiction; they are organized alphabetically by top-level controlled vocabulary topics. Sometimes digests are regional. Sometimes they cover a particular level of the federal judiciary or, in the case of the General and Decennial digests, all West-headnoted U.S. case law. These digests reproduce the headnote summaries from the indexed cases.[10] In this manner, a user obtains topical access to what is otherwise only a chronological and jurisdictional organization of case law.[11] Prior to the introduction of the LexisNexis categorization system, most legal researchers used West's Key Number System.

¶4 The Key Number System is an alphanumeric categorization system that contains more than 400 top-level topics. These top-level topics are also assigned topic numbers[12] such as "92 Constitutional Law." Beyond the top-level topic, West assigns key numbers that drill down numerous levels of the hierarchy and contain a large amount of specificity. The end result are key numbers that look like 92k1018.[13] This key number represents six levels of the hierarchy in West's taxonomy: (1) 92 Constitutional Law, (2) VI Enforcement of Constitutional Provisions, (3) C Determination of Constitutional Questions, (4) 3 Presumptions and

---

6. Barkan et al., *supra* note 2, at 38.

7. *Id.*

8. *Id.*

9. *Id.*

10. *See id.* at 78, 95.

11. *See* Christopher G. Wren & Jill Robinson Wren, The Legal Research Manual: A Game Plan for Legal Research and Analysis 6 (2d ed. 1986); Paul Callister, *Thinking Like a Research Expert: Schemata for Teaching Complex Problem-Solving Skills*, 28 Legal Reference Servs. Q. 31, 40 tbl.4 (2009) [hereinafter Callister, *Thinking*]; Paul D. Callister, *Time to Blossom: An Inquiry into Bloom's Taxonomy as a Hierarchy and Means for Teaching Legal Research Skills*, 102 Law Libr. J. 191, 203 tbl. 3, 210 fig. 6, 2010 Law Libr. J. 12 [hereinafter Callister, *Time to Blossom*]; Christopher G. Wren & Jill Robinson Wren, *The Teaching of Legal Research,* 80 Law Libr. J. 7, 35 matrix A (1988).

12. In cases of expansion or renumbering, sometimes topic numbers are followed by letters: 231H Labor and Employment. A pure numerical organization lacks the ability to change (hospitality) and still keep topics in alphabetical order without resorting to decimals.

13. *See, e.g.,* Citizens United v. Fed. Election Comm'n, 130 S. Ct. 876, 878 (2010).

Case 1:20-cv-00613-SB Document 695-2 Filed 10/08/24 Page 358 of 431 PageID #: 153183



Construction as to Constitutionality, (5) 1006 Particular Issues and Applications, and (6) 1018 Freedom of speech, expression, and press.[14] At its inception in 1908, the Key Number System had 77,000 unique topics.[15] There has been relatively little change in the overall number of unique topics since. In 2007, the Key Number System had "109,183 lines, of which 90,429 are postable [capable of receiving headnote content], and the remaining 18,754 are structural lines in the hierarchy."[16]

¶5 Use of the headnote systems has changed dramatically since the introduction of online, hypertext legal search platforms. In 1999,[17] LexisNexis was able to retrospectively introduce a headnote categorization system for its body of online case law to compete with the West Key Number System.[18] It remains available exclusively online with no analog to print digests or headnote paragraphs in printed case reporters. Currently, LexisNexis includes approximately 16,000 topics in its categorization system.[19] Some commentators assert that these topics are assigned, in part, by automated, patented, and algorithmic systems rather than exclusively by human editors and human decision making.[20]

¶6 Today's online research environment offers several distinct advantages in the use of headnote systems. The first is the easy display of all levels of the nested hierarchy that accompanies each topic assigned to a headnote.[21] The online world also allows for easy and comprehensive updating of topics that have been renumbered or reorganized.[22] Finally, the online world allows for hyperlinked access to all other cases assigned similar headnotes with further customizable refinements such as jurisdictional restraints or the inclusion of additional key words.

## What to Call These Systems?

¶7 In the literature, the topical organizations of headnote content are often called classifications.[23] It is worth referencing definitions from the information science community to add clarity as to how these systems should be discussed. "Cat-

---

14. *Id.* (viewed on Westlaw). This is an example of the hierarchical richness and specificity of the West Key Number System.

15. William W. Marvin, West Publishing Co.: Origin, Growth, Leadership 80 (1969).

16. Daniel P. Dabney, *The Universe of Thinkable Thoughts: Literary Warrant and West's Key Number System*, 99 Law Libr. J. 229, 236, 2007 Law Libr. J. 14, ¶ 33 (referencing a "nonpublic database maintained by West for the purpose of managing the Key Number System").

17. Mart, *Case for Curation, supra* note 3, at 14. Prior to 1999, LexisNexis published few cases in print.

18. During the time that Peter Hook was a LexisNexis student associate in law school (August 1995 until May 1997), he would quietly recommend to close friends that they print their cases from Westlaw. This was due to the competitive advantage that West enjoyed at the time in being the only main legal database company that provided headnotes. For law students printing cases for studying and research, Westlaw's headnotes conferred the advantages of the overview and intra-case location functions discussed above.

19. Mart, *Relevance*, *supra* note 3, at 224, ¶ 6.

20. *Id.* at 224–25, ¶ 7; Mart, *Case for Curation, supra* note 3, at 20–21.

21. Barkan et al., *supra* note 2, at 93; Patrick Charles, *West Topic and Key Numbers: Focusing on the Basic Structure*, 18 Perspectives: Teaching Legal Res. & Writing 130 (2010).

22. Charles, *supra* note 21, at 132.

23. *See* West's Analysis of American Law: With Key Number Classifications (2011) ("In the practice of the department, only classification inside the literary warrant is called "classification." West editors refer to classification outside the literary warrant as providing "library references."); Dabney, *supra* note 16, at 244, ¶ 70; F. Allan Hanson, *From Key Words to Key Numbers: How Automation Has Transformed the Law*, 94 Law Libr. J. 563, 570, 2002 Law Libr. J. 36, ¶ 20.

egorization is the process of dividing the world into groups of entities whose members are in some way similar to each other."[24] In contrast, "[c]lassification . . . involves the orderly and systematic assignment of each entity to one and only one class within a system of mutually exclusive and nonoverlapping classes."[25] The Library of Congress Classification System, used to put call numbers on the spines of books, is a true classification system. Books on a shelf are placed in one, and only one, location.[26] The fact that both LexisNexis and West frequently assign headnote paragraphs to more than one topic, by definition makes these categorization systems rather than classification systems.

¶8 It is also worthwhile to identify whether the two competing categorization systems are controlled vocabularies, taxonomies, and thesauri. A controlled vocabulary is "an authoritative list of terms to be used in indexing (human or automated)."[27] Both systems are controlled vocabularies. Otherwise, they would not be as effective at gathering related case law and would be mere indexes of every word used in judicial opinions. However, they are not static. For example, the West Key Number System has evolved over time to incorporate changes in legal terminology and usage. For instance, in 2003, the controlled vocabulary topic of Master and Servant[28] was updated and merged with Labor Relations to form the new controlled vocabulary topic of Labor and Employment.[29]

¶9 A taxonomy is "a controlled vocabulary with a hierarchical structure."[30] As evidenced by the multipart, hierarchical topical organization displayed with each headnote (in the online world), both categorization systems are taxonomies. Furthermore, a thesaurus is a taxonomy that contains syndetic structure reflecting relationships between terms: broader terms and narrower terms (hierarchical relationships), *see also* references (associative relationships), and *use/used for* statements (equivalency relationships).[31] The latter sometimes are called an entry vocabulary pointing the user to the preferred term. Additionally, terms in a thesaurus often carry scope notes ("brief explanations of how the term should be used in indexing") and term history notes.[32] It is unknown whether the LexisNexis categorization system is a thesaurus. While it is likely that LexisNexis has thesaurus content that it uses in-house, it is not available to the end user. West, on the other hand, makes available its thesaurus in the semi-annual book, *West's Analysis of American Law: With Key Number Classifications*.[33] The 1994 edition of this work includes scope notes at the outset of each of the top-level topic categories ("Subjects Included") as well as *see also* references ("Subjects Excluded and Covered by Other

---

24. Elin K. Jacob, *Classification and Categorization: A Difference that Makes a Difference*, 52 Libr. Trends 515, 518 (2004).

25. *Id.* at 522.

26. This assumes that multiple copies of the book are not classed in different locations. The multiple assignment of call numbers to one work is possible in online, virtual call number browsing systems and may be useful to the user.

27. *About Taxonomies & Controlled Vocabularies*, Taxonomies & Controlled Vocabularies SIG, http://www.taxonomies-sig.org/about.htm [https://perma.cc/R64S-CUQG].

28. Dabney, *supra* note 16, at 240, ¶ 51.

29. *See* 1 Eleventh Decennial Digest pt. 1, V–VII (2005); *id.* pt. 2, IV–VI.

30. *About Taxonomies & Controlled Vocabularies*, *supra* note 27.

31. *Id.*

32. *Id.*

33. West's Analysis of American Law: With Key Number Classifications, *supra* note 23.

Topics").[34] There are also scope notes and *see also* references for some specific key numbers.[35]

## Historical Background

¶10 To empirically analyze the two competing headnote systems, it is important to understand how they evolved historically and in response to what stimuli. This, coupled with commentators' observations about the two systems, has informed the focus of the empirical study and the methodologies used herein.

### West's National Reporter System

¶11 When the number of cases increases dramatically and becomes overwhelming to use and navigate, this leads to new technologies for "abridgement and synthesis."[36] In the late nineteenth to early twentieth centuries, the technological response to the burgeoning amount of case law was the National Reporter System and the Key Number System.[37] Around 1870, and around the age of eighteen, John B. West began selling office supplies and medical and legal publications out of St. Paul, Minnesota, for the D.D. Merrill Book Store.[38] In 1872, he struck out on his own and became a full-time seller of law-related books.[39] In 1876, joined by his brother Horatio, John B. West & Co. launched a weekly legal newspaper named the *Syllabi*. This publication planted the seed that became the National Reporter System.[40]

¶12 The *Syllabi* provided excerpts, and soon full text, of Minnesota court decisions long before they were available in the official state reports.[41] The *Syllabi* was expanded to include cases from Wisconsin, and subsequently other states in the region, and became the *North Western Reporter*.[42] Nationwide subscriptions to and interest in the *North Western Reporter* allowed West Publishing Company to create and publish the *Federal Reporter* in 1880 (covering federal circuit and district court opinions), and the *U.S. Supreme Court Reporter* in 1882.[43] "These three Reporters were all edited under a *uniform* plan of headnotes and indexing which added greatly to the convenience of the user and which was not to be found in the separate State Reports."[44] Soon after, in 1888, case law from all jurisdictions within the United States was collected, indexed, headnoted, and included in a series of reporters that cumulatively became known as the National Reporter System.[45]

---

34. West's Analysis of American Law: With Key Number Classifications (1994).

35. *Id.* at 730 (Injunction "138.54. Schools; colleges and universities. *Excludes school desegregation, see Schools 13(20), and interscholastic and intercollegiate associations, see Schools 183 and Colleges and Universities 15.*").

36. McGinnis & Wasick, *supra* note 1, at 1002.

37. *Id.* at 1003–06.

38. Marvin, *supra* note 15, at 25–26; *see also* Robert M. Jarvis, *John B. West: Founder of the West Publishing Company*, 50 Am. J. Legal Hist. 1 (2010).

39. Marvin, *supra* note 15, at 27.

40. *Id.* at 30–32.

41. *Id.* at 30–35.

42. *Id.* at 36–38.

43. *Id.* at 39, 61.

44. *Id.* at 39.

45. *Id.* at 39, 42–49.

### Key Number System

¶13 Digests were soon created to allow topical exploration of this chronological collection of case law. This process began as West's *Monthly Index* in 1886, which became the *American Digest* in 1887.[46] Aided by the purchase of competing digests that were at a comparative economic disadvantage with West because West already had case law content used to produce its reporters,[47] West created the *Century Digest* in 1897,[48] followed by the first *Decennial Digest* in 1908. The Key Number System was developed by John A. Mallory and introduced in 1908[49] in the first *Decennial Digest*.[50] "This was the critical innovation from West . . . . It gave lawyers the ability to identify a discrete topic that was relevant to their case and then pull up a heretofore unavailable amount of case law on that topic."[51]

### The Advent of LexisNexis and Computerized Legal Search

¶14 The process of using computerized information retrieval systems to research the law began in the late 1950s[52] when a computer was used to produce an index to the Pennsylvania health statutes to find and replace the outdated term "retarded child."[53] The genesis of LexisNexis was a 1964 working group of the Ohio Bar Association that was formed to adopt a computerized legal information system.[54] It commissioned the creation of a system that would eventually become LexisNexis.[55] As LexisNexis originally did not have any editorial value-added material such as abstracts to allow users to quickly ascertain the relevance of a returned document, it pioneered in 1970 the "keyword-in-context (KWIC) format, where the search term was highlighted and displayed with leading and following lines (much like the snippets giving the results of a current search engine)."[56] Initially, LexisNexis dedicated computer terminals were seen as a finding aid to cases that would then be read or photocopied out of traditional law books.[57] To compete, West introduced its own computerized search platform in 1975.[58] Until 1978, the Westlaw platform was limited to searching only West's editorial headnotes of cases and, unlike LexisNexis, did not include the full text of legal documents.[59] In 1999, when

---

46. *Id.* at 47–48; James H. Wyman, *Freeing the Law: Case Reporter Copyright and the Universal Citation System*, 24 Fla. St. U. L. Rev. 217, 229 (1996).

47. Marvin, *supra* note 15, at 68–70.

48. *Id.* at 73.

49. Dabney, *supra* note 16, at 245, ¶ 81.

50. Marvin, *supra* note 15, at 28.

51. McGinnis & Wasick, *supra* note 1, at 1005.

52. Jon Bing, *Let There Be LITE: A Brief History of Legal Information Retrieval*, 1 Eur. J.L. & Info. Tech. (2010) [hereinafter Bing, *Let There Be LITE*], http://ejlt.org/article/view/15/20; Jon Bing, *Performance of Legal Text Retrieval Systems: The Curse of Boole*, 79 Law Libr. J. 187 (1987); K. Tamsin Maxwell & Burkhard Schafer, *Concept and Context in Legal Information Retrieval*, *in* Jurix: The Twenty-First Annual Conference 63, 63–72 (2008); William G. Harrington, *A Brief History of Computer-Assisted Legal Research*, 77 Law Libr. J. 543 (1985).

53. Bing, *Let There Be LITE, supra* note 52.

54. *Id.*; Wyman, *supra* note 46, at 230–32.

55. Bing, *Let There Be LITE, supra* note 52; Harrington, *supra* note 52, at 545.

56. Bing, *Let There Be LITE, supra* note 52.

57. *Id.*

58. *Id.*

59. *Id.*

LexisNexis began to retrospectively introduce headnotes, both LexisNexis and Westlaw offered full text, headnotes, and a related categorization scheme.[60]

## Related Literature

¶15 The literature that informs this empirical study falls into three categories: (1) the publishers' own claims as to their headnote practices; (2) other literature empirically evaluating LexisNexis and West products and commentary as to the headnote systems; and (3) a discussion of "holding" versus "dicta," which applies to the subsequent analysis as to what content is given headnote treatment.

### Vendor Claims as to Their Headnote Process

¶16 To analyze and critique the assignment of headnotes by both major publishers of case law, it is useful to survey what the publishers themselves claim about their headnotes. It is legitimate to analyze whether each publisher is living up to its stated aims and intent with its headnoting.

#### *West*

¶17 In its marketing materials, West promotes its long history as being the primary digest system for U.S. case law.[61] West also claims that "[t]he Key Number System makes legal research easier, more accurate, and more relevant."[62] "Easier" is appropriate as one needs a digest system for topical access into what is otherwise only a chronological ordering of case law per a given jurisdiction.[63] "More accurate" and "more relevant" are much greater claims and appear similar to two information retrieval terms of art, "precision" and "recall." While "more accurate" and "more relevant" are not explicitly proven in the marketing assertion, context supplies some understanding of the claim. From the language immediately following the claim, one may infer that accuracy and relevance stem from the digest function of the West headnote system and the ability to view the full outline of West's hierarchical controlled subjects to discover the applicable divisions and elements of particular areas of the law. "The Key Number System is both an index you use to find opinions relevant to whatever legal problem you are working on and an outline of issues important in the law. This means that it will not only help you find the cases you want, but it will also help you identify the issues you need to consider in the first place!"[64]

¶18 West enumerates the steps used in creating its headnote system:

- A court issues an opinion in a case.
- A copy of the case is obtained by West, where . . . trained attorney editors read the case and pick out the points of law addressed in the case.

---

60. Mart, *Case for Curation, supra* note 3, at 14.

61. "The logical organization of legal materials is essential to the maintenance of a legal system based on precedent. For more than 100 years, the legal community has relied on the Topic and Key Number System's organization of case law to locate that precedent." Thomson Reuters Westlaw, [*Topic and Key Number Overview*], https://lawschool.westlaw.com/marketing/display/RE/24 [https://perma.cc/8MBP-JFLR].

62. *Id.*

63. *See* Wren & Wren, *supra* note 11, at 6; Callister, *Thinking*, *supra* note 11, at 40 tbl.4; Callister, *Time to Blossom, supra* note 11, at 203 tbl.3, 210 fig.6; Wren & Wren, *supra* note 11, 35 matrix A.

64. Thomson Reuters Westlaw, *supra* note 61.

- Written as a short, concise paragraph, these are called headnotes. . . .
- The headnotes are then passed along to attorney editors who are experts in figuring out where points of law belong in the huge Key Number System "outline."
- These "Classifiers" find the correct location on the outline, and assign at least one Key Number to the headnote. . . .
- Then the West Digests take over. Digests are arranged alphabetically by Topic and then numerically by Key Number. There are regional, federal, state, chronological and topical digests. All cases dealing with a legal concept in the jurisdiction, time period, or topical area covered by a Digest are grouped together. . . . On Westlaw, all Key Numbers are hyperlinked to cases addressing the same issue in any jurisdiction. All you have to do is know which Key Number describes the problem or point of law on which you would like to find cases. The rest has all been done for you![65]

¶19 By its own admission, West glosses "points of law" for inclusion in its headnotes and not necessarily only holdings. West also has long emphasized its frequent use of alternative terms in its headnotes,[66] to standardize topics and keywords and make them more findable. For example, the headnote to *Ravell v. United States* uses "spectator" to refer to a woman attending an air show, even though the opinion never uses this word.[67] One commentator notes that "editors take the legal concepts from a case [and] summarize the concept in the editor's own language[.]"[68] Sometimes, the editor's own language is the "exact language of the court."[69]

### *LexisNexis*

¶20 LexisNexis asserts in its promotional and marketing literature that its headnotes "reflect the language of the court."[70] "We never editorialize headnotes, which could lead to a misinterpretation of points of law."[71] LexisNexis goes on to encourage its users to "[g]et the vital information you need from attorney-editors who write headnotes in the language of the court, ensuring reliable information and no misinterpretation."[72] This fidelity to the actual language of the court also appears as a selling point in LexisNexis's instructional materials geared toward law students: "Lexis headnotes provide a more detailed overview of the legal issues discussed. You'll understand the court's assessment of each issue, as actual case language is used in each headnote."[73] LexisNexis also promotes the overview and intra-case

---

65. *Id.*; *see also How a Slip Opinion Becomes a Reported Case*, 15 Password: Newsl. Power Westlaw User 7, 7–9 (1995) (bullets added).

66. *How a Slip Opinion Becomes a Reported Case*, *supra* note 65, at 7–9.

67. Ravell v. United States, 855 F. Supp. 300, 300 (C.D. Cal. 1992). For a similar example of a trademark case about matchbook covers, but never using "matchbook" or "match covers" in the language of the case, see Kenneth H. Ryesky, *From Pens to Pixels: Text-Media Issues in Promulgating, Archiving, and Using Judicial Opinions Accessing the Law*, 4 J. App. Prac. & Process 353, 382–83 (2002).

68. Mart, *Relevance*, *supra* note 3, at 223, ¶ 5.

69. *Id.* at 223 n.13.

70. LexisNexis, *LexisNexis Case Law*, https://www.lexisnexis.com/en-us/products/caselaw.page [https://perma.cc/UYU9-9AQC].

71. *Id.*

72. *Id.*

73. LexisNexis, Preparing to Succeed in Class (2011), http://www.lexisnexis.com/documents/lawschooltutorials/20110728015017_large.pdf [https://perma.cc/KK62-TN3G]; LexisNexis, LexisNexis Headnotes: How to Use the *More Like This Headnote* and *Retrieve All Headnotes* Features (2005), http://www.lexisnexis.com/documents/LawSchoolTutorials/20070430111658_small.pdf [https://perma.cc/84AG-42WC] ("LexisNexis Headnotes show the key legal points of a case. Each LexisNexis Headnote is written by a LexisNexis legal editor, *drawing directly from the language of the court*.").

location functions of its headnotes by stating that they allow a researcher to "[d]etermine if a case merits deeper analysis by quickly accessing the key legal issues and points of law material to a case."[74] Furthermore, LexisNexis promotes the digest function of its headnote system when it states that its headnotes allow a user to "[f]ind other relevant authority with headnotes that help direct you to other important cases related to your legal question."[75]

¶21 LexisNexis's emphasis on how its fidelity to the court's language avoids creating misleading headnotes obliquely implies that West's headnotes may suffer from this problem. We are not aware of any empirical research that demonstrates this is indeed a problem. If such research existed, it would probably be featured in LexisNexis promotional materials. LexisNexis also emphasizes the role of the attorney-editor in the creation of its headnotes. In an online brochure that features the twenty-nine steps of the LexisNexis editorial process, steps 20 through 25 ("Case Enhancements") are:

> 20. Headnote attorney-editors read both published and unpublished cases for identification and analysis of legal issues.
> 21. Attorney-editors craft a case-law summary for each case, which includes a concise synopsis, an overview of relevant legal facts and pertinent authorities, and a statement of the case outcome.
> 22. Attorney-editors identify the issues or points of law that are material to the resolution of the case and create stand-alone headnotes for each statement of authority.
> 23. Every headnote is assigned the most on-point classifications from our legal topic digest. Classifications provide instructive headings for the material rules of law and are a powerful research tool for relevant subject matter.
> 24. Case summaries, headnotes and classifications are quickly updated in the database.
> 25. Work is sampled and audited for quality review. Results are monitored.[76]

Steps 22 and 23 provide the language with which LexisNexis headnotes may be evaluated based on the corporation's own claims. To what extent do their headnotes gloss the "issues or points of law that are material to the resolution of the case" and contain each statement of authority?

### Commentators' Thoughts as to What the Systems Are Designed to Do

¶22 Support is found for both sides of the issue as to whether headnotes should use the actual language of the court opinion:

---

74. *LexisNexis Case Law*, *supra* note 70.

75. *Id.*

76. LexisNexis, Case Law & Shepard's Editorial Process (2013), http://www.lexisnexis.com/pdf/LexisNexis_Case_Law_Shepards_29_Step_Editorial_Process.pdf [https://perma.cc/3GQJ-F6W9]; *see also* Shawn Nevers, *LexisNexis Headnotes*, Hunter's Query (Sept. 18, 2009), http://huntersquery.byu.edu/wordpress/index.php/2009/09/lexisnexis_headnotes/ [https://perma.cc/7LJZ-DZ7P]:

> "[T]he editor reads the case and manually chooses the classifications. He or she has a tool much like an index that has all of the classifications listed there (topics and subtopics). For each point of law in the case that the editor chooses to include as a headnote, he or she then selects the most relevant subtopic/topic. Often they are given more than one as obviously they can not be hammered into only one subtopic. If the language does not fit any current topics, then the editor can request a new one created and a committee of editors makes that decision, but that is very rare. Once the editor has chosen the language and matched the topics, the secondary editors then check that to make sure it is correct." (quoting e-mail from Michael Morton, LexisNexis Regional Account Manager, to Shawn Nevers).

> Because the headnotes are not the actual judicial opinions, and because by design they abbreviate the information set forth in full by the opinion, and because they reflect the style of the digestor and not that of the person writing the opinion, vital data from the opinion can be omitted from its headnotes; or worse yet, the headnote can inaccurately represent the gist of the opinion.[77]

This provides some support to LexisNexis's marketing claims for incorporating the actual language of the court opinion. However, the same commentator also supports West's practice of using its own language to gloss headnotes to use more common key words and phrases: "[a] skilled professional case digestor who writes headnotes can enhance the utility of his or her employer's publication by helping the researcher find the information sought."[78]

¶23 There is an interesting discussion as to what extent these headnote categorization schemes influence the law itself: more specifically, whether they limit the ability to research the law and to even develop new rationales and arguments outside the bounds of traditional topic categories.[79]

> [T]he Key Number system, while detailed, could never actually cover every possible topic created by legal events. As a result, lawyers trained to use (rather than critically examine) the West Key Number System would feel pressure to wedge the facts from their case into arguments that could be developed from within the Key Topic system.[80]

"The essence of a classification scheme is to be a closed list of the salient ideas in the literature it serves, and when the system, by omitting an idea, implies that the idea is not sufficiently salient to be included, it can be an obstacle to considering the idea."[81] Dabney references the inability to use the Topic and Key Number System to research concepts related to feminist jurisprudence as one area of the law hampered by the language of the categorization system.[82]

¶24 Only a little empirical work has compared the two categorization systems. Mart did an empirical analysis as to the return of relevant results between the two vendors' platforms using both the digest and citator tools available on each platform. She started with a dataset of headnotes from ten marquee cases that significantly developed the law.[83] Subsequently, she repeated her study on a larger corpus of ninety important federal and state cases and obtained the following results:

> For digests, Key Number results had a higher percentage of relevant results than either digest function available on Lexis . . . . For citators, . . . Lexis's Shepard's algorithm produced slightly more relevant results than Westlaw's KeyCite algorithm, but the overlap in cases between the two systems is still very small. The differences in the result sets for digest and citator systems illustrate the fact that no one system or type of resource returns comprehensive results.[84]

¶25 We are not aware of any study that directly compares the number of headnotes and their qualities assigned by LexisNexis and West for the same body of cases. Presumably, however, each company has performed such an analysis to gain competitive intelligence on its competitor.

---

77. Ryesky, *supra* note 67, at 382.
78. *Id.* at 382.
79. Dabney, *supra* note 16, at 236–39, ¶¶ 31–44.
80. McGinnis & Wasick, *supra* note 1, at 1006.
81. Dabney, *supra* note 16, at 236, ¶ 31.
82. *Id.* at 239, ¶ 46.
83. Mart, *Relevance*, *supra* note 3, at 240–47, ¶¶ 35–48.
84. Mart, *Case for Curation, supra* note 3, at 15.

## Holdings Versus Dicta

¶26 Relevant to our inquiry is an exploration of holding and dicta, what their conflation might mean for the practice of law in the United States, and how their conflation might be abetted by the headnoting process. Stinson notes two general groupings of definitions of the "holding" of a case: (1) (the more limited) "a holding is limited to the facts plus outcome"; and (2) (the more expansive) "a holding includes the rationale or reasoning a court employs to reach a particular result."[85] Dicta is then defined as everything else in a case that is not a holding. As only holdings are obligated to be followed by lower courts in a multitiered, common-law system, Stinson surveys the problems that result when dicta is mistakenly elevated to a holding and vice versa. This includes a lessening of (1) the accuracy of opinions (whether they are actually correct), (2) judicial authority, and (3) legitimacy of the common-law system.[86] As relates to the U.S. Supreme Court, with its abundance of law clerks and small numbers of written opinions issued each year, the Court "sets broad policy, which invites espousing dicta that would be unnecessary if the Court's sole function were to narrowly resolve litigant's disputes."[87] The problem is exacerbated by the typical length of a Supreme Court written opinion.[88]

¶27 One of the three reasons Stinson gives for the conflation of holdings and dicta is the increasing reliance on "the *words* found in judicial opinions rather than the underlying components of those judicial decisions—facts, issues, holdings, and outcomes."[89] The distillation of holding from dicta can be difficult, and it is often easier to quote language from an opinion rather than succinctly summarize the holding. An additional reason that Stinson gives for preference for quotations from an opinion rather than a careful untangling of holding and dicta is that "electronic legal research encourages a focus on individual screens and snippets of text rather than documents as a whole; this devalues the significance of legal principles in favor of facts and rules taken out of context."[90]

¶28 LexisNexis, with its professed fidelity to the language of the court used for its headnote content, might be complicit with this trend of relying on quoted language rather than a careful parsing of holding from dicta. Stinson cites Doyle in noting that the development of full-text retrieval "minimized the assistance to be gained from editorial judgment."[91] This editorial judgment might support the West approach of more careful editorialized headnotes that summarize concepts rather than merely giving applicable language from the court opinion. Alternatively, advocates in our adversarial legal system want quick access to applicable snippets of language from opinions to marshal arguments most favorable for their clients. In other words, attorneys might welcome a certain degree of muddling of holding and dicta to advance the interests of their clients. Of course, this might be a structural flaw in our common law, adversarial process.

---

85. Judith M. Stinson, *Why Dicta Becomes Holding and Why It Matters*, 76 Brook. L. Rev. 219, 223–24 (2010).

86. *Id.* at 223–33.

87. *Id.* at 221.

88. *Id.* at 222.

89. *Id.* at 246.

90. *Id.* at 253.

91. *Id.* at 254 (quoting John Doyle, *WESTLAW and the American Digest Classification Scheme*, 84 Law Libr. J. 229, 229–30 (1992)).

## Case Corpus

¶29 Opinions at the U.S. Supreme Court level were chosen for our study because it is assumed that they garner the most careful and thorough editorial treatment from each of the publishers. For the sake of completeness, we decided to examine the entire output of the written opinions of one term of the Court. The 2009 Term was chosen (October 5, 2009, through October 3, 2010) because this was the most recent term in which all of the opinions appeared in their bound form in the *United States Reports* when we began work on this article in January 2016. The bound and presumed final version of the *United States Reports* was important because it was the neutral source of line numbering for comparisons of the two publishers' versions of the cases and the location of their headnote placement within each case. The fact that over five years had elapsed since the final written opinion was issued also gave the two publishers plenty of time to make changes and otherwise correct errors (if any) in their editorial enhancements of the cases. This assured that the analysis was conducted on more or less final products.

¶30 The authoritative listing of written opinions come from two sources. The first is the list of slip opinions hosted on the Supreme Court's website ("2009 Term Opinions of the Court"). However, it appears that these lists are not maintained on the Court's website once the relevant opinions are published in the bound volumes of the *United States Reports*. Because of this, we obtained the listing using the Internet Archive's Wayback Machine for the appearance of the Court's website on August 28, 2010.[92] This listing was confirmed using the data contained in the *Supreme Court Database.*[93] Consequently, the relevant corpus for this analysis was eighty-seven written case opinions[94] that have been given headnote treatment by at least

92. *Way Back Machine*, INTERNET ARCHIVE, https://web.archive.org/web/20100828092509/http://www.supremecourt.gov/opinions/slipopinions.aspx (U.S. Supreme Court's website captured on Aug. 28, 2010).

93. *The Supreme Court Database,* WASHINGTON UNIV. LAW, http://supremecourtdatabase.org/ (last visited Nov. 10, 2017). As to the list of "2009 Term Opinions of the Court" and the *Supreme Court Database*, there were two discrepancies. The *Supreme Court Database* included with its listing of written opinions one case that was a sentence-long dismissal pursuant to Rule 46 rather than a written opinion, Pottawattamie Cty. v. McGhee, 558 U.S. 1103 (2010). Conversely, the "2009 Term Opinions of the Court" included one case not included in the *Supreme Court Database* for the 2009 Term, Weyhrauch v. United States, 561 U.S. 476 (2010) ("R-" number: 87): "R: Sequential number assigned by the Reporter of Decisions after the particular case was issued." *Column Header Definitions,* SUP. CT. OF THE U.S., http://www.supremecourt.gov/opinions/definitions.aspx [https://perma.cc/GE7L-T9SG]. This was a one-paragraph per curiam decision that did not garner any headnote treatment from either publisher because it merely vacated the lower court ruling consistent with a companion case in the same 2009 Term, Skilling v. United States, 561 U.S. 358 (2010). The *Supreme Court Database* had two other errors: the citations given for two cases were to subsequent treatments of the cases and not the original opinions in the 2009 Term that merited headnote treatment from at least one of the publishers: Thaler v. Haynes, 559 U.S. 43 (2010) ("R-" number: 23), *reh'g den.*, 559 U.S. 1088 (*Supreme Court Database* citations were to the "rehearing denied" memorandum decision). *United States v. Juvenile Male*, 560 U.S. 558 (2010) ("R-" number: 67), contained a certified question to the Montana State Supreme Court necessary to address a potential issue of mootness related to a juvenile sex offender. The case was subsequently resolved by *United States v. Juvenile Male*, 564 U.S. 932 (2011). The *Supreme Court Database* citations were to the subsequent and final opinion.

94. Several other listed opinions were memorandum decisions with no substantive treatment by the court and no headnotes assigned by the publishers: Briscoe v. Virginia, 559 U.S. 32 (2010) ("R-" number: 21), one-sentence order vacating and remanding for "further proceedings not inconsistent with the opinion, Melendez-Diaz v. Massachusetts, 557 U. S. 305 (2009)"; Kiyemba v. Obama, 559 U.S. 131 (2010) ("R-" number: 27), dismissed because change of circumstances surrounding prisoners at

one of the two publishers. These eighty-seven opinions were downloaded from Lexis Advance and Westlaw in Microsoft Word format. For Westlaw, the option to display the topic and key numbers with the expanded hierarchy was chosen.

### Number of Headnotes

¶31 The metric collected for each written opinion was the total number of headnotes assigned to each case by each publisher. Thus, the unit of analysis for comparison was the entire written opinion. One author populated a spreadsheet with the count numbers for each publisher for each of the written cases of the 2009 Term. (See appendix A.) This was made relatively easy as the headnotes are numbered in each publisher's version of the opinions and the total was obtained by looking at the last numbered headnote. The spreadsheet entries of the numbers per case were then confirmed by the other author. Data was collected for the total number of headnotes assigned by West and LexisNexis, as well as the *Lawyers' Edition*, which is a different categorization scheme also owned and maintained by LexisNexis and given with the LexisNexis case opinions. The total number of headnotes given by both publishers to the eighty-seven cases is surprisingly close given the variances discussed below—1063 for LexisNexis, 1063 for *Lawyers' Edition*, and 929 for Westlaw. (See table 1.)

#### Headnotes per Case

¶32 The total number of headnotes assigned, divided by the eighty-seven cases, resulted in a per case average (arithmetic mean) for LexisNexis of 12.22 headnotes per case and West, 10.68. The similarity of these two averages belies vast differences between the two publishers, as discussed below. The range of the number of headnotes assigned by LexisNexis was 0 to 51. The range of the number of headnotes assigned by West was 1 to 36. In terms of statistical central tendency, some of these differences were captured by the median and mode number of headnotes assigned to the eighty-seven cases by the two publishers. (See table 1.) The median number of headnotes assigned per case by LexisNexis was eleven and nine for West. This means, by definition, half of the LexisNexis cases had fewer than eleven headnotes, and half had more. For West, half of the cases had fewer than nine headnotes, and half had more. The mode number, the most frequently occurring number of headnotes assigned per case, for LexisNexis was two and eleven (tie with six instances each) and eight for West (nine instances).

#### Headnotes per Page

¶33 Opinion page counts were calculated to evaluate how well the number of headnotes correlated with the number of opinion pages. The impetus for the analysis was to see whether a correlation suggested that either publisher used page length as an algorithmic prompt for a target number of headnotes. Page counts excluded the syllabus and started from the language that announced which Justice authored the opinion: "Justice ______ delivered the opinion of the Court" or, when applicable,

---

Guantanamo Bay resulted in no lower court having addressed the new legal issues; Sullivan v. Florida, 560 U.S. 181 (2010) ("R-" number: 51), dismissed as improvidently granted; Robertson v. United States *ex rel.* Watson, 560 U.S. 272 (2010) ("R-" number: 57), dismissed as improvidently granted.

**Table 1**

Headnote Count Comparisons

| | LexisNexis | Lawyers' Edition | West |
|---|---|---|---|
| Total Headnotes | 1063 | 1063 | 929 |
| Average (Mean) Number of Assigned Headnotes per Case | 12.22 | 12.22 | 10.68 |
| Median Number of Assigned Headnotes per Case | 11 | 11 | 9 |
| Mode Amount of Assigned Headnotes per Case | 2 (6 instances)<br>11 (6 instances) | 6 (6 instances)<br>11 (6 instances) | 8 (9 instances) |
| Range | 0–51 | 0–51 | 1–36 |
| *Citizens United v. Fed. Election Comm'n* (Case with Most LexisNexis Headnotes) | 51 | 51 | 24 |
| *Skilling v. United States* (Case with Most West Headnotes) | 41 | 41 | 36 |
| *McDonald v. City of Chicago* (Case with Greatest Disparity in the Number of Headnotes) | 18 | 18 | 1 |
| Number of Cases Each Publisher Assigned the Greater Number of Headnotes. (Note: Three cases had an equal number of headnotes.) | 47 of 87 cases | n/a | 37 of 87 cases |

"Per Curiam." The last page of the opinion contained the line "*It is so ordered*" or "*Affirmed*." The math to determine the overall number of opinion pages was conducted automatically using a populated Excel spreadsheet: ("U.S. Reports Opinion Ends Page" minus U.S. "Reports Opinion Begins Page") + 1. (The plus one was used to avoid one-page opinions registering as having zero page lengths.) The number of pages per opinion in the corpus is given in appendix B.

¶34 Lexis averaged 0.70 headnotes per page (1063 headnotes/1521 total pages). West averaged 0.61 headnotes per page (929 headnotes/1521 total pages). Linear regression analysis was conducted using Microsoft Excel for each of the vendors relative to the total page counts for each of the eighty-seven cases in the corpus.[95] The independent variable or predictor variable ($x$)[96] was the number of pages, and the dependent variable or predicted variable ($y$)[97] was the number of headnotes assigned by each vendor. The results are discussed in the Regression Analysis Results section below.

---

95. *See generally* Conrad Carlberg, Regression Analysis: Microsoft Excel (2016). For an additional tutorial on how to conduct such an analysis, see Janice H. Hammond, *Quantitative Methods Online Course: Regression Section* (2010), Harvard Bus. Publ'g for Educators, https://cb.hbsp.harvard.edu/cbmp/product/6012-HTM-ENG [https://perma.cc/DQK2-HV8U].

96. Carlberg, *supra* note 95, at 130.

97. *Id.*

## Headnotes per Lines

¶35 Line counts per opinion were calculated to evaluate how well the number of headnotes supplied by each publisher correlated with the number of lines in the Court's opinions. The impetus for the analysis was to see whether a correlation suggested that either publisher used the number of lines in an opinion as an algorithmic prompt for a target number of headnotes. The applicable volumes of the *United States Reports* were downloaded from the Supreme Court's website. The entire volumes were opened in the original PDF format and saved as Microsoft Word files. Additionally, continuous line numbering was enabled so each line within the volume had a distinct line number. Opinions of the Court excluded the syllabus and started from the language that announces which Justice authored the opinion: "Justice _______ delivered the opinion of the Court" or, when applicable, "Per Curiam." The last line of the opinion was the line "*It is so ordered*" or "*Affirmed.*" The math to determine the overall number of lines of the opinion was conducted automatically in a populated Excel spreadsheet: ("U.S. Reports Opinion of the Court Line Number Ends" minus "U.S. Reports Opinion of the Court Line Number Begins") + 1. The number of lines per opinion in the corpus is given in appendix B.

¶36 Lexis averaged 0.016 headnotes per line (1063 headnotes/64,950 total lines). West averaged 0.014 headnotes per line (929 headnotes/64,950 total lines). Correlation analysis (linear regression) was conducted using Microsoft Excel for each of the vendors relative to the total number of lines for each of the eighty-seven cases. The independent variable ($x$) was the total number of lines per opinion, and the dependent variable ($y$) was the number of headnotes assigned by each vendor per opinion. The results are discussed in the Regression Analysis Results section below.

## Regression Analysis Results

¶37 In addition to number of pages per opinion and total number of lines per opinion, two other variables were captured in the linear regression analysis: the number of majority votes and the date the opinion was released. We speculated that one or both vendors might use the voting counts as an algorithmic prompt for a target number of headnotes. Less divisive opinions with a larger number of majority votes were hypothesized to receive fewer headnotes. In the regression analysis, the number of majority votes (ranging from 5 to 9) was the independent variable ($x$), and the number of headnotes was the dependent variable ($y$). Additionally, as more controversial cases are often released later in the year, this might be another algorithmic prompt as to a target number of headnotes used by one or both publishers. It was speculated that the later an opinion was released, the greater number of headnotes it would have. In the linear regression analysis, the date was the independent variable ($x$), and the number of assigned headnotes was the dependent variable ($y$). These additional variables are also set out in appendix B.

¶38 Table 2 shows the results of the linear regression analysis conducted using Microsoft Excel for each of the variables discussed above. As to the correlation coefficient, values range between −1 and 1.[98] Perfectly correlated items have a value of either 1 or −1. Completely uncorrelated items have a value of zero.[99] With LexisNexis, there is a strong, positive correlation between number of headnotes per opinion and

98. *Id.* at 30–32.
99. *Id.*

**Figure 1**

Number of LexisNexis Headnotes per Number of Opinion Pages




number of pages per opinion. As the number of opinion pages goes up, so does the number of headnotes assigned. (See figure 1.) There is also a moderate correlation between the number of West headnotes assigned and the number of opinion pages. (See figure 2.) In this instance, the two are more correlated than not correlated. However, the greater correlation coefficient strength as to LexisNexis (0.708) than West (0.527) for this phenomenon makes it more likely that LexisNexis uses an algorithmically suggested number of headnotes based on the length of an opinion (total number of opinion pages) than does West. Alternatively, this might be a result of LexisNexis using more of the exact language of the Court—more language (longer opinions) equating to more headnotes. The results are similar as to the number of headnotes assigned per number of lines in the opinion. As might be expected, the correlation improves marginally (a few decimal places for LexisNexis [0.708 to 0.714]), which is probably due to the increased specificity that the count of lines represents over the count of pages. However, the results are (or are almost) the exact same for both publishers when compared to the correlations for number of opinion pages.

¶39 As to the remaining variables analyzed, the correlation coefficients are very weak and, in the case of the number of Justices signing the opinion, statistically unreliable.[100] As pertains to the 2009 Supreme Court Term, there is almost no correlation

100. *See* T-test results in table 2.

**Table 2**

Correlation Analysis Results

| | Headnotes per Number of Opinion Pages | | Headnotes per Number of Opinion Lines | | Headnotes per Number of Majority Votes | | Headnotes per Date of the Opinion | |
|---|---|---|---|---|---|---|---|---|
| | LexisNexis | West | LexisNexis | West | LexisNexis | West | LexisNexis | West |
| Correlation Coefficient[a] | 0.708 | 0.527 | 0.714 | 0.527 | -0.100 | -0.082 | 0.349 | 0.210 |
| Slope of the Regression Line[b] | 0.717 | 0.425 | 0.016 | 0.009 | -0.553 | -0.361 | 0.043 | 0.021 |
| Standard Error of the Slope of the Regression Line[c] | 0.078 | 0.074 | 0.002 | 0.002 | 0.595 | 0.474 | 0.0127 | 0.011 |
| t-ratio (slope of the regression line/ standard error of the slope of the regression line)[d] | 9.192 | 5.724 | 9.406 | 5.719 | -0.930 | -0.761 | 3.434 | 1.979 |
| Degrees of Freedom[e] | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| T-test (probability of sample slope of the regression line when actual population slope of the regression line equals zero)[f] | 1.101 | 7.63 | 4.07 | 7.788 | 0.823 | 0.776 | 0.000461 | 0.026 |
| y-Intercept of the Regression Line[g] | -0.309 | 3.247 | 0.246 | 3.642 | 16.283 | 13.331 | -1737.69 | -827.093 |
| Standard Error of the y-Intercept[h] | 1.512 | 1.449 | 1.436 | 1.388 | 4.470 | 3.565 | 509.596 | 423.305 |
| R[i] | 0.501 | 0.278 | 0.510 | 0.278 | 0.010 | 0.007 | 0.122 | 0.044 |
| Standard Error of Estimate[j] | 6.259 | 5.994 | 6.203 | 5.995 | 8.817 | 7.031 | 8.304 | 6.898 |
| F-Ratio[k] | 85.409 | 32.766 | 88.471 | 32.711 | 0.865 | 0.580 | 11.792 | 3.917 |
| Sum of Squares for the Regression[l] | 3345.438 | 1177.187 | 3404.209 | 1175.757 | 67.264 | 28.661 | 813.177 | 186.382 |
| Sum of Squares for the Residual[m] | 3329.413 | 3053.802 | 3270.642 | 3055.231 | 6607.587 | 4202.327 | 5861.674 | 4044.607 |
| Observations | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 |

a. Carlberg, *supra* note 95, at 29–57.
b. *Id.* at 107; *see also LINEST Function*, Microsoft Corp., https://support.office.com/en-us/article/LINEST-function-84d7d0d9-6e50-4101-977a-fa7abf772b6d [https://perma.cc/78XT-379F].
c. Carlberg, *supra* note 95, at 109–14.
d. *Id.* at 112.
e. *Id.* at 13, 112.
f. *Id.* at 109–14.
g. *Id.* at 107.
h. *Id.* at 109–14.
i. *Id.* at 117–19.
j. *Id.* at 120–21.
k. *Id.* at 129–48.
l. *Id.* at 125–29.
m. *Id.*

**Figure 2**




(for either publisher) between the number of headnotes assigned and the number of Justices that join the majority opinion. Even though the regression line slopes in the anticipated negative direction—more headnotes assigned when fewer Justices join the majority—the extremely low correlation coefficient rejects the hypothesis that more headnotes would be assigned when more Justices are dissenting (an indication of controversial opinions). Though a dataset of eighty-seven cases is not too small from which to draw statistical inferences,[101] conducting the same analysis on ten or twenty years of Supreme Court cases would be more dispositive. Additionally, there is a weak correlation, for both publishers, as to the number of headnotes assigned and when in the Term opinions are released. The higher correlation coefficient for LexisNexis (0.349) than for West (0.210) indicates that LexisNexis is more likely to use the timing of an opinion release (later in the Term cases being viewed as more significant and thus more headnote worthy) to suggest that more headnotes are merited. (However, opinions released later in the Term are longer, which is the reason they garner more headnote treatment from LexisNexis.) Again, conducting the same analysis over a larger dataset might be more informative. As to the 2009 Term, results might have been skewed by the very controversial case of *Citizens United v.*

---

101. Charles Wheelan, Naked Statistics: Stripping the Dread from the Data 135 (2013) ("As a rule of thumb, the sample size must be at least 30 for the central limit theorem to hold true.").

*Federal Election Commission*,[102] which was released comparatively early in the term (Jan. 21, 2010). Chronologically, it was the nineteenth of the eighty-seven opinions released that year. (See appendix B. See appendix C for an example of the rich topical and procedural information supplied for each case in the Supreme Court database.)

## Greatest Differences

¶40 Ideally, one publisher would consistently assign more headnotes than the other. This would mean that each publisher consistently identified headnote-worthy language, and one of them consistently found more headnote-worthy language in each of the cases based on its own criteria. The differing numbers could then be nicely attributed to different philosophies of headnoting. However, this is not the case. Each publisher assigned more headnotes per case than the other almost an equal number of times: forty-seven times LexisNexis assigned more headnotes than West, and thirty-seven times West assigned more headnotes than LexisNexis. Only in three cases did each publisher assign an equal number of headnotes.[103] If headnote assignment was a science rather than an art, there should be many more instances in which each publisher assigned the same number of headnotes or that one publisher consistently assigned the same ratio of a greater number than the other publisher. In other words, if "issues or points of law that are material to the resolution of the case"[104] (LexisNexis) and "points of law"[105] (West) could be consistently and accurately identified each time, there would not be the disparities seen in the data. It is important to note that LexisNexis also claims to give headnote treatment to each statement of authority.[106] A priori, this suggests that LexisNexis would consistently assign more headnotes than West. It does not. Tables 3 through 6 reveal the greatest disparities in the number of headnotes assigned and the resulting ratios for each publisher. The fact that in numerous instances one publisher assigned multiples of headnotes compared to the other (frequently five or six times as many) further indicates that headnote assignment is an art and not a science.

¶41 *McDonald v. Chicago*[107] offers the starkest contrast, with eighteen LexisNexis headnotes and only one West headnote (a ratio of 1:18, as displayed in tables 3 and 4). In this one instance, West headnotes only the holding of the case—merely enunciating the overarching legal principle on which the case stands in one headnote. Given the significant constitutional issues addressed in *McDonald*, West's choice is puzzling. Surely the *McDonald* opinion states more than one *point of law* worthy of a headnote assignment that would interest West's users. All three functions of headnotes (overview, intra-case location, and digest) might be improved by more than one headnote being assigned. In contrast, LexisNexis offers eighteen "issues or points of law that are material to the resolution of the case" or statements

102. Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).

103. United States v. Marcus, 560 U.S. 258 (2010) (seven headnotes assigned by both LexisNexis and West); Holland v. Florida, 560 U.S. 631 (2010) (fourteen headnotes assigned by both LexisNexis and West); Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89 (2010) (seventeen headnotes assigned by both LexisNexis and West).

104. LexisNexis, *supra* note 76.

105. Thomson Reuters Westlaw, *supra* note 61.

106. LexisNexis, *supra* note 76.

107. 561 U.S. 742 (2010).

**Table 3**

Greatest Total Differences in Headnote Numbers: LexisNexis Greater Than West

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | *Citizens United v. Fed. Election Comm'n* | 558 U.S. 310 | 130 S. Ct. 876 | 175 L. Ed. 2d 753 | 51 | 24 | 27 | 1:2.13 |
| 2 | *Holder v. Humanitarian Law Project* | 561 U.S. 1 | 130 S. Ct. 2705 | 177 L. Ed. 2d 355 | 29 | 11 | 18 | 1:2.64 |
| 3 | *McDonald v. City of Chicago* | 561 U.S. 742 | 130 S. Ct. 3020 | 177 L. Ed. 2d 894 | 18 | 1 | 17 | 1:18 |
| 3 | *Carachuri-Rosendo v. Holder* | 560 U.S. 563 | 130 S. Ct. 2577 | 177 L. Ed. 2d 68 | 25 | 8 | 17 | 1:3.13 |
| 3 | *Carr v. United States* | 560 U.S. 438 | 130 S. Ct. 2229 | 176 L. Ed. 2d 1152 | 20 | 3 | 17 | 1:6.67 |
| 3 | *Abbott v. Abbott* | 560 U.S. 1 | 130 S. Ct. 1983 | 176 L. Ed. 2d 789 | 26 | 9 | 17 | 1:2.89 |
| 7 | *Astrue v. Ratliff* | 560 U.S. 586 | 130 S. Ct. 2521 | 177 L. Ed. 2d 91 | 16 | 3 | 13 | 1:5.33 |
| 7 | *Samantar v. Yousuf* | 560 U.S. 305 | 130 S. Ct. 2278 | 176 L. Ed. 2d 1047 | 29 | 16 | 13 | 1:1.81 |
| 7 | *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.* | 559 U.S. 175 | 130 S. Ct. 1251 | 176 L. Ed. 2d 36 | 18 | 5 | 13 | 1:3.6 |
| 10 | *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez* | 561 U.S. 661 | 130 S. Ct. 2971 | 177 L. Ed. 2d 838 | 25 | 13 | 12 | 1:1.92 |
| 10 | *Dillon v. United States* | 560 U.S. 817 | 130 S. Ct. 2683 | 177 L. Ed. 2d 271 | 18 | 6 | 12 | 1:3 |

of authority for its users to use and discover in reading *McDonald*.[108] In this instance, the LexisNexis headnotes offer more of the component building blocks that went into the holding. Presumably, these building blocks greatly interest advocates who might want to marshal them as legal arguments in their own briefs.

## Idiosyncratic Differences

¶42 A few noteworthy idiosyncratic differences appear in the way headnotes were assigned. This includes the two instances in which West assigned headnotes and LexisNexis did not, as well as the two instances in which the number of LexisNexis headnotes did not equal the number of Lawyers' Edition headnotes.

108. LEXISNEXIS, *supra* note 76.

**Table 4**

Greatest Ratio Differences in Headnote Numbers: LexisNexis Greater Than West

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | *McDonald v. City of Chicago* | 561 U.S. 742 | 130 S. Ct. 3020 | 177 L. Ed. 2d 894 | 18 | 1 | 17 | 1:18 |
| 2 | *Carr v. United States* | 560 U.S. 438 | 130 S. Ct. 2229 | 176 L. Ed. 2d 1152 | 20 | 3 | 17 | 1:6.67 |
| 3 | *New Process Steel, L.P. v. NLRB* | 560 U.S. 674 | 130 S. Ct. 2635 | 177 L. Ed. 2d 162 | 13 | 2 | 11 | 1:6.5 |
| 4 | *Astrue v. Ratliff* | 560 U.S. 586 | 130 S. Ct. 2521 | 177 L. Ed. 2d 91 | 16 | 3 | 13 | 1:5.33 |
| 5 | *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n* | 558 U.S. 165 | 130 S. Ct. 693 | 175 L. Ed. 2d 642 | 10 | 2 | 8 | 1:5 |
| 6 | *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA* | 559 U.S. 573 | 130 S. Ct. 1605 | 176 L. Ed. 2d 519 | 9 | 2 | 7 | 1:4.5 |
| 7 | *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.* | 559 U.S. 175 | 130 S. Ct. 1251 | 176 L. Ed. 2d 36 | 18 | 5 | 13 | 1:3.6 |
| 8 | *Kucana v. Holder* | 558 U.S. 233 | 130 S. Ct. 827 | 175 L. Ed. 2d 694 | 14 | 4 | 10 | 1:3.5 |
| 9 | *Carachuri-Rosendo v. Holder* | 560 U.S. 563 | 130 S. Ct. 2577 | 177 L. Ed. 2d 68 | 25 | 8 | 17 | 1:3.13 |
| 10 | *Dillon v. United States* | 560 U.S. 817 | 130 S. Ct. 2683 | 177 L. Ed. 2d 271 | 18 | 6 | 12 | 1:3 |

## *Corcoran v. Levenhagen*

¶43 In only two instances, one publisher assigned headnotes in a case in which the other did not. *Corcoran v. Levenhagen*,[109] the first opinion of the Term, is a per curiam decision that corrects appellate error. A convicted murderer appealed his state conviction on five separate grounds for federal habeas relief. The federal district judge granted relief on one of those grounds without hearing the other four. The court of appeals reversed without analyzing the other four grounds of the original habeas petition. The Supreme Court reversed, stating that the case should have either been remanded to the district court for consideration of the four other grounds in the original habeas petition or the court of appeals should have explained why such a remand was unnecessary. West created one headnote (unitary for the whole opinion without a bracketed indicator designating a specific part of the opinion) encompassing the holding of this two-page opinion. LexisNexis offered no headnote treatment,

109. 558 U.S. 1 (2010) ("R-" number: 1).

**Table 5**

Greatest Total Differences in Headnote Numbers: West Greater Than LexisNexis

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | *Alabama v. North Carolina* | 560 U.S. 330 | 130 S. Ct. 2295 | 176 L. Ed. 2d 1070 | 4 | 21 | 17 | 1:5.25 |
| 2 | *Graham v. Florida* | 560 U.S. 48 | 130 S. Ct. 2011 | 176 L. Ed. 2d 825 | 12 | 25 | 13 | 1:2.08 |
| 3 | *Renico v. Lett* | 559 U.S. 766 | 130 S. Ct. 1855 | 176 L. Ed. 2d 678 | 9 | 21 | 12 | 1:2.33 |
| 4 | *Perdue v. Kenny A.* | 559 U.S. 542 | 130 S. Ct. 1662 | 176 L. Ed. 2d 494 | 15 | 25 | 10 | 1:1.67 |
| 5 | *Salazar v. Buono* | 559 U.S. 700 | 130 S. Ct. 1803 | 176 L. Ed. 2d 634 | 11 | 20 | 9 | 1:1.82 |
| 6 | *Berghuis v. Smith* | 559 U.S. 314 | 130 S. Ct. 1382 | 176 L. Ed. 2d 249 | 6 | 13 | 7 | 1:2.17 |
| 6 | *Milavetz, Gallop & Milavetz, P.A. v. United States* | 559 U.S. 229 | 130 S. Ct. 1324 | 176 L. Ed. 2d 79 | 10 | 17 | 7 | 1:1.7 |
| 6 | *South Carolina v. North Carolina* | 558 U.S. 256 | 130 S. Ct. 854 | 175 L. Ed. 2d 713 | 6 | 13 | 7 | 1:2.17 |
| 6 | *McDaniel v. Brown* | 558 U.S. 120 | 130 S. Ct. 665 | 175 L. Ed. 2d 582 | 2 | 9 | 7 | 1:4.5 |
| 10 | *Granite Rock Co. v. Teamsters* | 561 U.S. 287 | 130 S. Ct. 2847 | 177 L. Ed. 2d 567 | 8 | 14 | 6 | 1:1.75 |
| 10 | *Conkright v. Frommert* | 559 U.S. 506 | 130 S. Ct. 1640 | 176 L. Ed. 2d 469 | 2 | 8 | 6 | 1:4 |
| 10 | *Maryland v. Shatzer* | 559 U.S. 98 | 130 S. Ct. 1213 | 175 L. Ed. 2d 1045 | 12 | 18 | 6 | 1:1.5 |
| 10 | *Hollingsworth v. Perry* | 558 U.S. 183 | 130 S. Ct. 705 | 175 L. Ed. 2d 657 | 4 | 10 | 6 | 1:2.5 |

which presumably was an oversight. Perhaps the need for headnote treatment could not easily be machine spotted or generated. Regardless, practitioners who might otherwise rely on *Corcoran*'s holding to combat similar errors in the appellate courts receive no help from LexisNexis in finding it.

### *United States v. Juvenile Male*

¶44 *United States v. Juvenile Male*[110] is a short, per curiam decision that certifies a question to the Montana Supreme Court necessary to address a potential issue of mootness related to a juvenile sex offender case. The case was resolved in a subsequent

110. 560 U.S. 558 (2010) ("R-" number: 67).

**Table 6**

Greatest Ratio Differences in Headnote Numbers: West Greater Than LexisNexis

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | *United States v. Juvenile Male* | 560 U.S. 558 | 130 S. Ct. 2518 | 177 L. Ed. 2d 64 | 0 | 1 | 1 | 1:Infinite |
| 1 | *Corcoran v. Levenhagen* | 558 U.S. 1 | 130 S. Ct. 8 | 175 L. Ed. 2d 1 | 0 | 1 | 1 | 1:Infinite |
| 3 | *Alabama v. North Carolina* | 560 U.S. 330 | 130 S. Ct. 2295 | 176 L. Ed. 2d 1070 | 4 | 21 | 17 | 1:5.25 |
| 4 | *McDaniel v. Brown* | 558 U.S. 120 | 130 S. Ct. 665 | 175 L. Ed. 2d 582 | 2 | 9 | 7 | 1:4.5 |
| 5 | *Conkright v. Frommert* | 559 U.S. 506 | 130 S. Ct. 1640 | 176 L. Ed. 2d 469 | 2 | 8 | 6 | 1:4 |
| 6 | *Bobby v. Van Hook* | 558 U.S. 4 | 130 S. Ct. 13 | 175 L. Ed. 2d 255 | 2 | 7 | 5 | 1:3.5 |
| 7 | *Hollingsworth v. Perry* | 558 U.S. 183 | 130 S. Ct. 705 | 175 L. Ed. 2d 657 | 4 | 10 | 6 | 1:2.5 |
| 7 | *Thaler v. Haynes* | 559 U.S. 43 | 130 S. Ct. 1171 | 175 L. Ed. 2d 1003 | 2 | 5 | 3 | 1:2.5 |
| 7 | *Wellons v. Hall* | 558 U.S. 220 | 130 S. Ct. 727 | 175 L. Ed. 2d 684 | 2 | 5 | 3 | 1:2.5 |
| 10 | *Renico v. Lett* | 559 U.S. 766 | 130 S. Ct. 1855 | 176 L. Ed. 2d 678 | 9 | 21 | 12 | 1:2.33 |
| 10 | *Wilkins v. Gaddy* | 559 U.S. 34 | 130 S. Ct. 1175 | 175 L. Ed. 2d 995 | 3 | 7 | 4 | 1:2.33 |
| 10 | *Michigan v. Fisher* | 558 U.S. 45 | 130 S. Ct. 546 | 175 L. Ed. 2d 410 | 3 | 7 | 4 | 1:2.33 |
| 10 | *Wong v. Belmontes* | 558 U.S. 15 | 130 S. Ct. 383 | 175 L. Ed. 2d 328 | 3 | 7 | 4 | 1:2.33 |

Supreme Court Term.[111] The one West headnote (assigned without specific reference in the text of the opinion) is a long, complicated, procedural headnote. The scenario in the case, while unusual, might usefully guide future litigation involving when a federal court may appropriately certify a question to a state supreme court. Ideally, these types of cases are adequately collected under Topic and Key Number 170bk30117, "Federal Courts, particular questions." As LexisNexis did not assign this case a headnote, only a search using Boolean terms or natural language (either by the user or behind the scenes by LexisNexis) will uncover this case. Perhaps the lack of a

111. United States v. Juvenile Male, 564 U.S. 932 (2011).

traditional paper digest frees LexisNexis from the mindset of giving headnotes to small, mostly procedural cases like this one. However, it might be better practice to err on the side of assigning headnotes to all Supreme Court written opinions.

### Lexis Advance Compared with *Lawyers' Edition*

¶45 Except for two cases,[112] Lexis assigned the same number of headnotes to both its Lexis Advance and *Lawyers' Edition* versions. In fact, the headnote paragraph language is usually identical for both versions, and they both gloss the exact same language from the opinion. Thus, their headnote indicators are almost always side by side in the text of the opinion. However, each version of LexisNexis headnote treatment has different topic assignments as each draws from a unique taxonomy. In *Bobby v. Van Hook*, *Lawyers' Edition* has one headnote prior to the start of the Lexis Advance headnotes. However, the remaining two headnotes in both editions use the same language and gloss the same points. Similarly, in *Ontario v. Quon*, Lexis Advance headnotes one and two are combined in *Lawyers' Edition* headnote one. The remaining headnotes use identical headnote language and gloss the same language from the opinion. We have no explanation for why two of the eighty-seven cases vary in this way.

## Agreement in Headnote-Worthy Opinion Language

¶46 As revealed by a case study of *Citizens United*, there are significant differences in the opinion language that garners headnote treatment from each publisher; and, in some cases, there is a surprising lack of overlap in the opinion language that is assigned headnotes by each publisher. To evaluate this, we used line numbers to map each publisher's headnotes to the exact portion of the opinion language glossed by each headnote.[113] We began by parsing the opinion into its outline form (I,II,III; A,B,C; 1,2,3; etc.) and correlating these segments with the line numbering. Neutral line numbering from the *United States Reports* facilitated the ability to determine with precision where each publisher's headnotes began and ended and to compare them. (See tables 7–9.)

¶47 The operative assumption was that a headnote began where indicated in the text and ended where either the next headnote began or the specific section or subsection in the opinion ended. These are identified in table 9 as the columns "Headnote Line Number Start" and "Headnote Line Number End." A more specific, discerning, and limited line number range was also associated with each headnote based on the language of the opinion as well as the language of the headnote paragraph. This range derived from a smaller section of the opinion as reflected in the two columns in table 9 labeled "Headnote Line Number Specific Start" and "Headnote Line Number Specific End." Both line number parsings,

---

112. *Bobby v. Van Hook*, 558 U.S. 4, (2009), has two Lexis Advance and three *Lawyers' Edition* headnotes; *Ontario v. Quon*, 560 U.S. 746 (2010), has seven Lexis Advance and six *Lawyers' Edition* headnotes.

113. The opinion was downloaded as a PDF file from the online version of the bound volumes of the *United States Reports*, https://www.supremecourt.gov/opinions/boundvolumes.aspx (last visited Nov. 10, 2017). Pages that did not contain the actual opinion of the Court were deleted. This included syllabus and heading information, and all concurring and dissenting opinions that were not the opinion of the Court in any part. Next, the PDF file was converted to a Microsoft Word document, and the continuous line numbering feature was enabled.

general and more specific, were manually completed for each of the seventy-five combined headnotes assigned to *Citizens United.*

¶48 This intensive headnote study involving *Citizens United* provides an illustrative case study of the differences and vagaries of headnote assignments by LexisNexis and West. The simplest explanation would have been if all twenty-four West headnotes glossed the same portions of opinion language as twenty-four of the fifty-one LexisNexis headnotes and the remaining twenty-seven LexisNexis headnotes covered portions of the opinion not covered by West. Unfortunately, the correspondence mapping is not so simple. (See table 7.)

¶49 In thirty-two instances, LexisNexis deems portions of opinion language headnote worthy and West does not. In six instances, West deems portions of the opinion language headnote worthy and LexisNexis does not. In fourteen instances, both LexisNexis and West deem opinion language headnote worthy (thus, twenty-eight implicated headnotes—fourteen from each publisher). This agreement is encouraging as it suggests that both publishers interpret the same the legal propositions objectively as headnote worthy. However, the differences suggest a certain amount of arbitrariness that is difficult to explain. Also, on three different instances, the correlation between headnotes was 2:1, not 1:1. In other words, the opinion language covered by two West headnotes was glossed by one LexisNexis headnote and vice versa. This suggests a divergence in the size of the headnote-able unit. It should also be noted that headnote equivalency used in this study is based on overlap in the opinion language glossed. Generally, equivalency based on similar content meaning has not been examined. However, if substantially similar headnotes can be drawn from diverse sections of an opinion, this reduces the efficacy of (or at least muddles) the intra-case location function for headnotes.

¶50 Table 8 shows the variance of headnote assignments broken down by opinion section per the outline format. LexisNexis assigns headnotes to six subsections (0, IB, IID, IIIB2, IVC, and V) that West does not. The same is not true in reverse: West assigns no headnotes to sections that LexisNexis likewise does not. Section 0, or the introductory section, provides a brief overview of the case and a concise holding of the opinion. Arguably, the language providing the concise holding of the opinion is headnote worthy: “The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether.” LexisNexis glosses this exact language with a headnote. While not headnoting this specific language, West does cover these points of law in two separate and lengthier headnotes from language much later in the opinion (headnotes 21 and 23). It is assumed that most discrete sections should have some headnote-worthy language, or else why do they exist? On the other hand, when sections merely refute portions of a party’s argument that are dispositively made moot in another section, maybe those sections do not produce any headnote-worthy language (see subsection IID).

**Table 7**

Headnote Equivalency Between LexisNexis and West in *Citizens United*

| Opinion Part (0 indicates introductory section) | LexisNexis Headnote Number | West Headnote Number | Notes About the Equivalency | Number of LexisNexis Headnotes Without West Equivalents | Number of West Headnotes Without LexisNexis Equivalents | Number of Incidences When Publishers' Headnotes Are Equivalent | Number of Implicated Headnotes That Do Not Map 1 to 1 |
|---|---|---|---|---|---|---|---|
| 0 | 1 | No equivalency | | 1 | | | |
| I.B | 2 | No equivalency | | 1 | | | |
| II.A | No equivalency | 1 - 2 | | | 2 | | |
| | 3 | 3 | | | | 1 | |
| II.B | 4 | 5 | | | | 1 | |
| | No equivalency | 4 | | | 1 | | |
| II.C | 5 | No equivalency | | 1 | | | |
| | 6 | 6 | | | | 1 | |
| II.D | 7 | No equivalency | | 1 | | | |
| II.E | 8 | No equivalency | | 1 | | | |
| | No equivalency | 7 | | | 1 | | |
| | 9 | 8 | | | | 1 | |
| | 10 | 9 | | | | 1 | |
| | 11 | 10 | | | | 1 | |
| | 12–14 | No equivalency | | 3 | | | |
| III | 15 | No equivalency | | 1 | | | |
| | 16 | 11 | | | | 1 | |
| | 17 | 12 | LexisNexis headnote 17 is broader than West headnote 12 and incorporates what arguably should be a separate distinct headnote. | | | 1 | |
| | 18 | 13 | | | | 1 | |
| | 19– 21 | No equivalency | | 3 | | | |
| III.A.1 | 22 | No equivalency | | 1 | | | |
| | 23 | 14 | | | | 1 | |
| III.B.1 | 24–32 | No equivalency | | 9 | | | |
| | 33 | 15 | | | | 1 | |
| | 34 | No equivalency | | 1 | | | |
| III.B.2 | 35 | No equivalency | | 1 | | | |

| Opinion Part (0 indicates introductory section) | LexisNexis Headnote Number | West Headnote Number | Notes About the Equivalency | Number of LexisNexis Headnotes Without West Equivalents | Number of West Headnotes Without LexisNexis Equivalents | Number of Incidences When Publishers' Headnotes Are Equivalent | Number of Implicated Headnotes That Do Not Map 1 to 1 |
|---|---|---|---|---|---|---|---|
| III.C | 36 | 16, 17 | LexisNexis headnote 36 incorporates the same opinion language as two separate West headnotes, 16 & 17, plus an additional legal proposition. | | | | 3 |
| | 37 | No equivalency | | 1 | | | |
| | 38 | 18 | Exact same headnote paragraph text both taken verbatim from the opinion language. | | | 1 | |
| | 39 | 19 | Exact same headnote paragraph text both taken verbatim from the opinion language. | | | 1 | |
| | No equivalency | 20 | | | 1 | | |
| | 40 | 21 | | | | 1 | |
| III.D | 41, 42 | 22 | West headnote 22 incorporates the same opinion language as two separate Lexis headnotes, 41 & 42. | | | | 3 |
| IV.A | 43, 44 | 23 | West headnote 23 incorporates the same opinion language as two separate Lexis headnotes, 43 & 44. | | | | 3 |
| | 45–47 | No equivalency | Lexis headnotes the supporting rationales. | 3 | | | |
| IV.B | 48–49 | No equivalency | | 2 | | | |
| | No equivalency | 24 | | | 1 | | |
| IV.C | 50 | No equivalency | | 1 | | | |
| V | 51 | No equivalency | | 1 | | | |
| | | | **Total:** | **32** | **6** | **14** | **9** |

Case 1:20-cv-00613-SB Document 695-2 Filed 10/08/24 Page 383 of 431 PageID #: 153208


## Conclusions and Future Work

¶51 The data make clear that headnote assignments are far from scientific. In fact, they appear somewhat arbitrary, at least based on the discrepancies described in this article. Further study is warranted. Perhaps we will next examine cases from lower federal courts and state appellate courts to see whether the differences are even starker. We hypothesize that the lesser amount of editorial scrutiny given these cases is likely to create even more differences between LexisNexis's and West's headnote assignments. We also would like to compare (1) the average word count of each publisher's headnote statements; (2) the number of hierarchical levels in each publisher's categorization system; (3) the extent to which headnote language is taken from the court opinion itself; and (4) the number of multiple categories assigned to each headnote.

**Table 8**

Section-by-Section Assignment of Headnotes in *Citizens United*

| **Opinion Part** (o indicates introductory section) | ***U.S Reports* Page Number Section Starts** | **Line Number Section Starts** | **Headnote Number or Range of Headnote Numbers (LexisNexis)** | **Headnote Number or Range of Headnote Numbers (West)** | **Number of LexisNexis Headnotes** | **Number of West Headnotes** | **Notes About the Section** |
|---|---|---|---|---|---|---|---|
| o | 318 | 1 | 1 | n/a | 1 | o | High-level summary of the case and a concise statement of the holding. |
| I | 319 | 66 | n/a | n/a | o | o | No content. Just outline section designator. |
| I.A | 319 | 67 | n/a | n/a | o | o | Factual background section. No headnote treatment expected. |
| I.B | 320 | 107 | 2 | n/a | 1 | o | Statement of the applicable statutory and regulatory law. |
| I.C | 321 | 142 | n/a | n/a | o | o | Procedural background section. No headnote treatment expected. |
| II | 322 | 185 | n/a | n/a | o | o | One-sentence statement as to what Section II is about. |
| II.A | 322 | 190 | 3 | 1 - 3 | 1 | 3 | Statutory interpretation as to whether the applicable *Hillary* video was an "electioneering communication." |
| II.B | 324 | 254 | 4 | 4–5 | 1 | 2 | Analysis as to whether *Hillary* video is the functional equivalent of express advocacy. |
| II.C | 326 | 311 | 5–6 | 6 | 2 | 1 | Rejecting the argument that video-on-demand should be treated differently from other forms of advocacy. |
| II.D | 327 | 353 | 7 | n/a | 1 | o | Addressing winning party's argument to create an exception for nonprofit organizations. Rendered moot by more expansive, ultimate holding. |
| II.E | 329 | 434 | 8–14 | 7–10 | 7 | 4 | Analysis as to whether it is appropriate to revisit free speech precedents. |

| **Opinion Part** (0 indicates introductory section) | ***U.S Reports* Page Number Section Starts** | **Line Number Section Starts** | **Headnote Number or Range of Headnote Numbers (LexisNexis)** | **Headnote Number or Range of Headnote Numbers (West)** | **Number of LexisNexis Headnotes** | **Number of West Headnotes** | **Notes About the Section** |
|---|---|---|---|---|---|---|---|
| III | 336 | 707 | 15–21 | 11–13 | 7 | 3 | Section explains how the applicable law burdens the free speech of commercial entities. |
| III.A | 342 | 901 | n/a | n/a | 0 | 0 | No content. Just outline section designator. |
| III.A.1 | 342 | 902 | 22–23 | 14 | 2 | 1 | Analysis of past cases addressing the constitutionality of restrictions on corporate and union political speech. |
| III.A.2 | 345 | 1019 | n/a | n/a | 0 | 0 | Lengthy section discussing past Supreme Court precedent, *Buckley* and *Bellotti*. |
| III.A.3 | 347 | 1115 | n/a | n/a | 0 | 0 | Stating applicable portions of the past Supreme Court case, *Austin*. |
| III.B | 348 | 1137 | n/a | n/a | 0 | 0 | Noting conflicting lines of precedent and the past rationales used for upholding corporate spending limits that will be addressed in subsequent sections. |
| III.B.1 | 349 | 1168 | 24–34 | 15 | 11 | 1 | Analysis and rejection of *Austin*'s anti-distortion rationale. |
| III.B.2 | 356 | 1440 | 35 | n/a | 1 | 0 | Rejecting the anticorruption or appearance of corruption argument. |
| III.B.3 | 361 | 1632 | n/a | n/a | 0 | 0 | Rejecting the shareholder-protection rationale argued by the government. |
| III.B.4 | 362 | 1667 | n/a | n/a | 0 | 0 | Dismissing the need to address the issue of foreign corporations having undue influence in the national political process. |
| III.C | 362 | 1681 | 36–40 | 16–21 | 5 | 6 | Application of stare decisis and overturning *Austin*. |
| III.D | 365 | 1784 | 41–42 | 22 | 2 | 1 | Overruling *McConnell*. |
| IV | 366 | 1805 | n/a | n/a | 0 | 0 | No content. Just outline section designator. |
| IV.A | 366 | 1806 | 43–47 | 23 | 5 | 1 | Upholding BCRA's disclaimer and disclosure provisions. |
| IV.B | 367 | 1862 | 48–49 | 24 | 2 | 1 | Upholding disclaimer and disclosure provisions as to broadcast advertisements. |
| IV.C | 371 | 1990 | 50 | n/a | 1 | 0 | Simple one-paragraph section explaining that BCRA's disclaimer and disclosure requirements are constitutional based on the rationales given in the previous two subsections. |
| V | 371 | 1999 | 51 | n/a | 1 | 0 | Policy argument about not chilling new forms of speech and new forums. |
| | | | | **Totals:** | **51** | **24** | |

**Table 9**

Headnotes Paragraph Language from Both Vendors in Citizens United

(LexisNexis headnote language reprinted with the permission of LexisNexis; West headnote language used with permission of Thomson Reuters.)

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| 0 | L | 1 | 61 | 61 | 64 | 64 | The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether. | Major holding of the opinion. |
| I.B | L | 2 | 121 | 121 | 133 | 141 | An electioneering communication is defined as any broadcast, cable, or satellite communication that refers to a clearly identified candidate for federal office and is made within 30 days of a primary or 60 days of a general election. 2 U.S.C.S. § 434(f)(3)(A). The Federal Election Commission's regulations further define an electioneering communication as a communication that is "publicly distributed." 11 C.F.R. § 100.29(a)(2) (2009). In the case of a candidate for nomination for President, publicly distributed means that the communication can be received by 50,000 or more persons in a state where a primary election is being held within 30 days. 11 C.F.R. § 100.29(b)(3)(ii). | Mere statement of the applicable statutory and regulatory law. |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| II.A | W | 1 | 191 | 191 | 197 | 234 | Supreme Court would consider contention of nonprofit corporation that its film, regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, did not qualify as an "electioneering communication" under federal statute prohibiting corporations from using their general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office, though nonprofit corporation raised the contention for the first time before the Supreme Court, where the district court had addressed it in its decision granting summary judgment to Federal Election Commission (FEC) with respect to nonprofit corporation's claims for declaratory and injunctive relief. Federal Election Campaign Act of 1971, §§ 304(f)(3)(A)(i), 316(b)(2), 2 U.S.C.A. §§ 434(f)(3)(A)(i), 441b(b)(2); 11 C.F.R. § 100.29(a)(2), (b)(3)(ii). | Significant contextualizing language added. |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| II.A | W | 2 | 191 | 199 | 220 | 234 | Nonprofit corporation's film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, which the nonprofit corporation wished to distribute on cable television through video-on-demand, was an "electioneering communication," for purposes of federal statute prohibiting corporations from using their general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office; the film was a cable communication that referred to a clearly identified candidate for federal office, and distribution through video-on-demand could allow the communication to be received by 50,000 persons or more. Federal Election Campaign Act of 1971, §§ 304(f)(3)(A)(i), 316(b)(2), 2 U.S.C.A. §§ 434(f)(3)(A)(i), 441b(b)(2); 11 C.F.R. § 100.29(a)(2), (b)(3)(ii), (b)(7)(i)(G), (b)(7)(ii). | Significant contextualizing language added. |
| II.A | W | 3 | 235 | 245 | 249 | 253 | Prolix laws chill speech, for First Amendment purposes, for the same reason that vague laws chill speech, i.e., people of common intelligence must necessarily guess at the law's meaning and differ as to its application. U.S.C.A. Const. Amend. 1. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| II.A | L | 3 | 241 | 241 | 251 | 253 | The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill speech: people of common intelligence must necessarily guess at the law's meaning and differ as to its application. The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation. | |
| II.B | L | 4 | 266 | 266 | 271 | 309 | The functional-equivalent test for an "electioneering communication" is objective: a court should find that a communication is the functional equivalent of express advocacy only if it is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| II.B | W | 5 | 256 | 266 | 271 | 309 | The test for determining whether a communication is functionally equivalent to express advocacy for the election or defeat of a candidate, for purposes of federal statute barring corporations from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections, is an objective test, under which a court should find that a communication is the functional equivalent of express advocacy only if it is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate. Federal Election Campaign Act of 1971, § 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added. |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| II.B | W | 4 | 256 | 273 | 280 | 309 | Nonprofit corporation's film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, which the nonprofit corporation wished to distribute on cable television through video-on-demand, was functionally equivalent to express advocacy for or against a specific candidate, for purposes of federal statute barring corporations from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections; the film was, in essence, a feature-length negative advertisement that urged viewers to vote against the candidate, and in light of its historical footage, interviews with persons critical of candidate, and voiceover narration, the film would be understood by most viewers as an extended criticism of the candidate's character and her fitness for the office of the Presidency. Federal Election Campaign Act of 1971, § 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added. |
| II.C | L | 5 | 336 | 336 | 339 | 351 | Courts are bound by the First Amendment. A court must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker. | |
| II.C | W | 6 | 336 | 347 | 349 | 351 | First Amendment standards must give the benefit of any doubt to protecting rather than stifling speech. U.S.C.A. Const. Amend. 1. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| II.C | L | 6 | 347 | 347 | 349 | 351 | First Amendment standards must give the benefit of any doubt to protecting rather than stifling speech. | |
| II.D | L | 7 | 425 | 425 | 426 | 432 | First Amendment freedoms need breathing space to survive. | |
| II.E | L | 8 | 437 | 437 | 439 | 460 | Political speech is speech that is central to the meaning and purpose of the First Amendment. | |
| II.E | W | 7 | 448 | 448 | 455 | 455 | Nonprofit corporation did not waive, for purposes of direct review by Supreme Court of decision of three-judge district court panel granting summary judgment to Federal Election Commission (FEC) in nonprofit corporation's action for declaratory and injunctive relief, its facial constitutional challenge, on grounds of violation of First Amendment protection of political speech, to federal statute prohibiting corporations from using their general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office, though in the district court the corporation had stipulated to the dismissal of the count in its complaint asserting the facial challenge and had proceeded on another count asserting an as-applied constitutional challenge, where the district court panel had addressed the facial challenge by noting that nonprofit corporation could prevail in the facial challenge only if the Supreme Court overruled controlling precedent. U.S.C.A. Const. Amend. 1; Federal Election Campaign Act of 1971, 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added. |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| II.E | W | 8 | 457 | 460 | 462 | 488 | The Supreme Court's practice permits review of an issue not pressed below, so long as it has been passed upon. | |
| II.E | L | 9 | 457 | 460 | 462 | 488 | United States Supreme Court practice permits review of an issue not pressed below so long as it has been passed upon. | |
| II.E | W | 9 | 489 | 492 | 496 | 503 | Once a federal claim is properly presented on appeal, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. | |
| II.E | L | 10 | 492 | 492 | 496 | 504 | For purposes of United States Supreme Court review, once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. | |
| II.E | W | 10 | 504 | 504 | 510 | 705 | The distinction between facial constitutional challenges and as-applied constitutional challenges goes to the breadth of the remedy employed by the court, not what must be pleaded in a complaint. | |

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.E | L | 11 | 504 | 504 | 515 | 522 | The distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by a court, not what must be pleaded in a complaint. The parties cannot enter into a stipulation that prevents the court from considering certain remedies if those remedies are necessary to resolve a claim that has been preserved. | |
| II.E | L | 12 | 522 | 522 | 524 | 683 | Once a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly "as-applied" cases. | |
| II.E | L | 13 | 683 | 683 | 686 | 701 | First Amendment standards must eschew the open-ended rough-and-tumble of factors, which invites complex argument in a trial court and a virtually inevitable appeal. | |
| II.E | L | 14 | 701 | 701 | 703 | 705 | A statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated. | |
| III | L | 15 | 709 | 709 | 710 | 824 | See U.S. Const. amend. I. | This headnote merely indicates that the First Amendment right to free speech has been quoted. |
| III | W | 11 | 817 | 824 | 826 | 833 | First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office. U.S.C.A. Const. Amend. 1. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III | L | 16 | 824 | 824 | 833 | 833 | The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by the United States Constitution. | |
| III | L | 17 | 834 | 834 | 839 | 846 | Political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. | This headnote combines two different propositions and probably should be two separate headnotes. |
| III | W | 12 | 834 | 836 | 839 | 846 | Laws that burden political speech are subject to strict scrutiny for a violation of the First Amendment, which level of scrutiny requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. U.S.C.A. Const. Amend. 1. | |
| III | W | 13 | 847 | 847 | 853 | 899 | Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints, and prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. U.S.C.A. Const. Amend. 1. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III | L | 18 | 847 | 847 | 853 | 857 | Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. | |
| III | L | 19 | 858 | 858 | 869 | 888 | Quite apart from the purpose or effect of regulating content, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each. | This headnote replicates an entire paragraph from the opinion. It contains multiple propositions and probably should be divided into two or more headnotes. This represents particularly sloppy headnoting. |
| III | L | 20 | 888 | 888 | 893 | 895 | There are certain governmental functions that cannot operate without some restrictions on particular kinds of speech. By contrast, it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes. | |
| III | L | 21 | 896 | 896 | 898 | 899 | There is no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.A.1 | L | 22 | 904 | 904 | 905 | 931 | First Amendment protection extends to corporations. | |
| III.A.1 | W | 14 | 928 | 931 | 933 | 1017 | Political speech does not lose First Amendment protection simply because its source is a corporation. U.S.C.A. Const. Amend. 1. | |
| III.A.1 | L | 23 | 931 | 931 | 945 | 1017 | Political speech does not lose First Amendment protection simply because its source is a corporation. The identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster. The United States Supreme Court has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not "natural persons." | Lengthy headnote that could be unpacked into several different headnotes or stated more succinctly. |
| III.B.1 | L | 24 | 1174 | 1174 | 1176 | 1193 | If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.B.1 | L | 25 | 1194 | 1194 | 1204 | 1212 | Political speech is indispensable to decision-making in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The worth of speech does not depend upon the identity of its source, whether a corporation, an association, a union, or an individual. The concept that Government may restrict the speech of some elements of United States society in order to enhance the relative voice of others is wholly foreign to the First Amendment. | Lengthy headnote that could be unpacked into several different headnotes or stated more succinctly. |
| III.B.1 | L | 26 | 1212 | 1212 | 1220 | 1232 | The premise has been rejected that the Government has an interest in equalizing the relative ability of individuals and groups to influence the outcome of elections. The skyrocketing cost of political campaigns cannot sustain a governmental prohibition. The First Amendment's protections do not depend on the speaker's financial ability to engage in public discussion. | |
| III.B.1 | L | 27 | 1232 | 1232 | 1236 | 1241 | The rule that political speech cannot be limited based on a speaker's wealth is a necessary consequence of the premise that the First Amendment generally prohibits the suppression of political speech based on the speaker's identity. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.B.1 | L | 28 | 1241 | 1241 | 1247 | 1248 | State law grants corporations special advantages—such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets. This does not suffice, however, to allow laws prohibiting speech. It is rudimentary that a state cannot exact as the price of those special advantages the forfeiture of First Amendment rights. | |
| III.B.1 | L | 29 | 1249 | 1249 | 1257 | 1285 | It is irrelevant for purposes of the First Amendment that corporate funds may have little or no correlation to the public's support for the corporation's political ideas. All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech. The First Amendment protects the resulting speech, even if it was enabled by economic transactions with persons or entities who disagree with the speaker's ideas. | |
| III.B.1 | L | 30 | 1285 | 1285 | 1287 | 1346 | The United States Supreme Court has consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers. | |
| III.B.1 | L | 31 | 1346 | 1346 | 1352 | 1356 | The Framers may have been unaware of certain types of speakers or forms of communication, but that does not mean that those speakers and media are entitled to less First Amendment protection than those types of speakers and media that provided the means of communicating political ideas when the Bill of Rights was adopted. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.B.1 | L | 32 | 1356 | 1356 | 1357 | 1396 | Ideas may compete in the marketplace without Government interference. | |
| III.B.1 | W | 15 | 1393 | 1397 | 1398 | 1439 | First Amendment protects the right of corporations to petition legislative and administrative bodies. U.S.C.A. Const. Amend. 1. | |
| III.B.1 | L | 33 | 1397 | 1397 | 1398 | 1433 | The First Amendment protects the right of corporations to petition legislative and administrative bodies. | |
| III.B.1 | L | 34 | 1434 | 1434 | 1439 | 1439 | When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves. | |

Case 1:20-cv-00613-SB Document 695-2 Filed 10/08/24 Page 400 of 431 PageID #: 153225



| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.B.2 | L | 35 | 1616 | 1616 | 1628 | 1630 | When Congress finds that a problem exists, a court must give that finding due deference, but Congress may not choose an unconstitutional remedy. If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. A court must give weight to attempts by Congress to seek to dispel either the appearance or the reality of these influences. The remedies enacted by law, however, must comply with the First Amendment; and, it is United States law and tradition that more speech, not less, is the governing rule. An outright ban on corporate political speech during the critical pre-election period is not a permissible remedy. | Lengthy headnote that could be unpacked into several different headnotes or stated more succinctly. |
| III.C | W | 16 | 1683 | 1683 | 1685 | 1695 | Supreme Court precedent is to be respected by the Court unless the most convincing of reasons demonstrates that adherence to it puts the Court on a course that is sure error. | |
| III.C | W | 17 | 1683 | 1685 | 1690 | 1695 | Beyond workability, the relevant factors in deciding whether to adhere to the principle of stare decisis include the antiquity of the precedent, the reliance interests at stake, and whether the decision was well reasoned. | |

| Opinion Part | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.C | L | 36 | 1683 | 1683 | 1693 | 1698 | United States Supreme Court precedent is to be respected unless the most convincing of reasons demonstrates that adherence to it puts the Court on a course that is sure error. Beyond workability, the relevant factors in deciding whether to adhere to the principle of stare decisis include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned. The Court has also examined whether experience has pointed up the precedent's shortcomings. | This headnote incorporates the same opinion language as the two separate proceeding West headnotes, plus an additional proposition. |
| III.C | L | 37 | 1698 | 1698 | 1699 | 1700 | The United States Supreme Court has not hesitated to overrule decisions offensive to the First Amendment. | |
| III.C | W | 18 | 1696 | 1700 | 1702 | 1703 | Stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision. | |
| III.C | L | 38 | 1700 | 1700 | 1702 | 1709 | Stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision. | |
| III.C | W | 19 | 1704 | 1709 | 1711 | 1760 | When neither party defends the reasoning of a precedent, the principle of adhering to that precedent through stare decisis is diminished. | |
| III.C | L | 39 | 1709 | 1709 | 1711 | 1776 | When neither party defends the reasoning of a precedent, the principle of adhering to that precedent through stare decisis is diminished. | |

Case 1:20-cv-00613-SB Document 695-2 Filed 10/08/24 Page 402 of 431 PageID #: 153227



| Opinion Part | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.C | W | 20 | 1762 | 1763 | 1766 | 1775 | With respect to stare decisis, reliance interests are important considerations in property and contract cases, where parties may have acted in conformance with existing legal rules in order to conduct transactions. | |
| III.C | W | 21 | 1776 | 1779 | 1780 | 1782 | Government may not, under the First Amendment, suppress political speech on the basis of the speaker's corporate identity; overruling *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652. U.S.C.A. Const. Amend. 1. | |
| III.C | L | 40 | 1776 | 1776 | 1782 | 1782 | *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), is overruled. The United States Supreme Court returns to the principle that the Government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.D | W | 22 | 1786 | 1786 | 1804 | 1804 | Federal statute barring corporations from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections, and, as amended by Bipartisan Campaign Reform Act of 2002 (BCRA), barring corporations from using general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office, violated First Amendment political speech rights of nonprofit corporation that wished to distribute on cable television, through video-on-demand, a film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election; overruling *McConnell v. Federal Election Com'n*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491. U.S.C.A. Const. Amend. 1; Federal Election Campaign Act of 1971, § 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added with very little actual language of the Court. |
| III.D | L | 41 | 1788 | 1788 | 1793 | 1795 | Overruling *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), effectively invalidates not only § 203 of the Bipartisan Campaign Reform Act of 2002, but also 2 U.S.C.S. § 441b's prohibition on the use of corporate treasury funds for express advocacy. Section 441b's restrictions on corporate independent expenditures are therefore invalid. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| III.D | L | 42 | 1795 | 1795 | 1797 | 1804 | The United States Supreme Court overrules the part of *McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003), that upheld the extension under § 203 of the Bipartisan Campaign Reform Act of 2002 of 2 U.S.C.S. § 441b's restrictions on corporate independent expenditures. | |
| IV.A | W | 23 | 1807 | 1807 | 1826 | 1860 | Provisions of Bipartisan Campaign Reform Act of 2002 (BCRA) requiring televised electioneering communications funded by anyone other than a candidate to include a disclaimer identifying the person or entity responsible for the content of the advertising, and requiring any person spending more than $10,000 on electioneering communications within a calendar year to file a disclosure statement with the Federal Election Commission (FEC), did not violate First Amendment protection of political speech, as applied to a nonprofit corporation that wished to distribute on cable television, through video-on-demand, a film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, and that wished to run three advertisements for the film. U.S.C.A. Const. Amend. 1; Federal Election Campaign Act of 1971, §§ 304(f)(1, 2), 318(a)(3), (d)(2), 2 U.S.C.A. §§ 434(f)(1, 2), 441d(a)(3), (d)(2). | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| IV.A | L | 43 | 1809 | 1809 | 1819 | 1819 | Under § 311 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. § 441d, televised electioneering communications funded by anyone other than a candidate must include a disclaimer that "_______ is responsible for the content of this advertising." 2 U.S.C.S. § 441d(d)(2). The required statement must be made in a clearly spoken manner, and displayed on the screen in a clearly readable manner for at least four seconds. 2 U.S.C.S. § 441d(d)(2). It must state that the communication is not authorized by any candidate or candidate's committee; it must also display the name and address (or Web site address) of the person or group that funded the advertisement. 2 U.S.C.S. § 441d(a)(3). | |
| IV.A | L | 44 | 1819 | 1819 | 1826 | 1826 | Under § 201 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. § 434, any person who spends more than $10,000 on electioneering communications within a calendar year must file a disclosure statement with the Federal Election Commission. 2 U.S.C.S. § 434(f)(1). That statement must identify the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors. 2 U.S.C.S. § 434(f)(2). | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| IV.A | L | 45 | 1827 | 1827 | 1836 | 1838 | Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities and do not prevent anyone from speaking. These requirements are subjected to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest. | |
| IV.A | L | 46 | 1838 | 1838 | 1843 | 1853 | Disclosure can be justified based on a governmental interest in providing the electorate with information about the sources of election-related spending. This interest has been applied in rejecting facial challenges to §§ 201 and 311 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. §§ 434 and 441d. | |
| IV.A | L | 47 | 1853 | 1853 | 1857 | 1860 | As-applied challenges to 2 U.S.C.S. §§ 434 and 441d are be available if a group can show a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. | |
| IV.B | L | 48 | 1869 | 1869 | 1872 | 1888 | Federal Election Commission regulations do not exempt communications that propose a commercial transaction from the disclaimer and disclosure requirements in §§ 201 and 311 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. §§ 434 and 441d. 72 Fed. Reg. 72901 (2007). | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| IV.B | W | 24 | 1874 | 1879 | 1882 | 1988 | Three advertisements for non-profit corporation's film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, which film the nonprofit corporation wished to distribute on cable television through video-on-demand shortly before primary election, were "electioneering communications," for purposes of provisions of Bipartisan Campaign Reform Act of 2002 (BCRA) requiring televised electioneering communications funded by anyone other than a candidate to include a disclaimer identifying the person or entity responsible for the content of the advertising; the advertisements referred to the candidate by name and contained pejorative references to her candidacy. Federal Election Campaign Act of 1971, § 318(a)(3), (d)(2), 2 U.S.C.A. § 441d(a)(3), (d)(2); 11 C.F.R. § 100.29. | Significant contextualizing language added with very little actual language of the Court. |
| IV.B | L | 49 | 1888 | 1888 | 1891 | 1988 | Identification of the source of campaign advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected. | Underlying rationale for the constitutionality of the disclaimer provision of BCRA. |
| IV.C | L | 50 | 1993 | 1993 | 1995 | 1997 | No constitutional impediment is found to the application of the disclaimer and disclosure requirements of the Bipartisan Campaign Reform Act of 2002 to a movie broadcast via video-on-demand. | |

| **Opinion Part** | **Headnote Company** (LexisNexis (L) or Westlaw (W)) | **Company's Headnote Number** | **Headnote Line Number Start** (Explicit from bracket indicator.) | **Headnote Line Number Specific Start** (Inference from opinion language). | **Headnote Line Number Specific End** (Inference from opinion language). | **Headnote Line Number End** (Explicit from end of section or sub-section or start of next bracketed headnote section.) | **Headnote Paragraph** | **Comments** |
|---|---|---|---|---|---|---|---|---|
| V | L | 51 | 2039 | 2039 | 2044 | 2051 | The First Amendment underwrites the freedom to experiment and to create in the realm of thought and speech. Citizens must be free to use new forms, and new forums, for the expression of ideas. The civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it. | Concluding rhetorical flourish as to the high-level rationale for the holding in the opinion. |

## Appendix A

Headnote Counts for the 2009 Term

| R- | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 92 | *Sears v. Upton* | 561 U.S. 945 | 130 S. Ct. 3259 | 177 L. Ed. 2d 1025 | 8 | 6 | 2 | 1:1.33 |
| 91 | *McDonald v. Chicago* | 561 U.S. 742 | 130 S. Ct. 3020 | 177 L. Ed. 2d 894 | 18 | 1 | 17 | 1:18 |
| 90 | *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez* | 561 U.S. 661 | 130 S. Ct. 2971 | 177 L. Ed. 2d 838 | 25 | 13 | 12 | 1:1.92 |
| 89 | *Bilski v. Kappos* | 561 U.S. 593 | 130 S. Ct. 3218 | 177 L. Ed. 2d 792 | 15 | 16 | 1 | 1:1.07 |
| 88 | *Free Enter. Fund v. Public Co. Accounting Oversight Bd.* | 561 U.S. 477 | 130 S. Ct. 3138 | 177 L. Ed. 2d 706 | 25 | 21 | 4 | 1:1.19 |
| 86 | *Black v. United States* | 561 U.S. 465 | 130 S. Ct. 2963 | 177 L. Ed. 2d 695 | 6 | 3 | 3 | 1:2 |
| 85 | *Skilling v. United States* | 561 U.S. 358 | 130 S. Ct. 2896 | 177 L. Ed. 2d 619 | 41 | 36 | 5 | 1:1.14 |
| 84 | *Magwood v. Patterson* | 561 U.S. 320 | 130 S. Ct. 2788 | 177 L. Ed. 2d 592 | 6 | 3 | 3 | 1:2 |
| 83 | *Granite Rock Co. v. Teamsters* | 561 U.S. 287 | 130 S. Ct. 2847 | 177 L. Ed. 2d 567 | 8 | 14 | 6 | 1:1.75 |
| 82 | *Morrison v. Nat'l Austl. Bank Ltd.* | 561 U.S. 247 | 130 S. Ct. 2869 | 177 L. Ed. 2d 535 | 27 | 22 | 5 | 1:1.23 |
| 81 | *Doe v. Reed* | 561 U.S. 186 | 130 S. Ct. 2811 | 177 L. Ed. 2d 493 | 12 | 8 | 4 | 1:1.5 |
| 80 | *Monsanto Co. v. Geertson Seed Farms* | 561 U.S. 139 | 130 S. Ct. 2743 | 177 L. Ed. 2d 461 | 11 | 10 | 1 | 1:1.1 |
| 79 | *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.* | 561 U.S. 89 | 130 S. Ct. 2433 | 177 L. Ed. 2d 424 | 17 | 17 | 0 | 1:1 |
| 78 | *Rent-A-Center, W., Inc. v. Jackson* | 561 U.S. 63 | 130 S. Ct. 2772 | 177 L. Ed. 2d 403 | 11 | 6 | 5 | 1:1.83 |
| 77 | *Holder v. Humanitarian Law Project* | 561 U.S. 1 | 130 S. Ct. 2705 | 177 L. Ed. 2d 355 | 29 | 11 | 18 | 1:2.64 |
| 76 | *Dillon v. United States* | 560 U.S. 817 | 130 S. Ct. 2683 | 177 L. Ed. 2d 271 | 18 | 6 | 12 | 1:3 |
| 75 | *Schwab v. Reilly* | 560 U.S. 770 | 130 S. Ct. 2652 | 177 L. Ed. 2d 234 | 18 | 13 | 5 | 1:1.38 |
| 74 | *Ontario v. Quon* | 560 U.S. 746 | 130 S. Ct. 2619 | 177 L. Ed. 2d 216 | 7 | 11 | 4 | 1:1.57 |
| 73 | *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection* | 560 U.S. 702 | 130 S. Ct. 2592 | 177 L. Ed. 2d 184 | 14 | 18 | 4 | 1:1.29 |

Case 1:20-cv-00613-SB Document 695-2 Filed 10/08/24 Page 410 of 431 PageID #: 153235



| R- | Case Name | *United States Reports* Citation | *Supreme Court Reporter* Citation | *United States Supreme Court Reports—Lawyers' Edition* Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 72 | *New Process Steel, L. P. v. NLRB* | 560 U.S. 674 | 130 S. Ct. 2635 | 177 L. Ed. 2d 162 | 13 | 2 | 11 | 1:6.5 |
| 71 | *Holland v. Florida* | 560 U.S. 631 | 130 S. Ct. 2549 | 177 L. Ed. 2d 130 | 14 | 14 | 0 | 1:1 |
| 70 | *Dolan v. United States* | 560 U.S. 605 | 130 S. Ct. 2533 | 177 L. Ed. 2d 108 | 17 | 8 | 9 | 1:2.13 |
| 69 | *Astrue v. Ratliff* | 560 U.S. 586 | 130 S. Ct. 2521 | 177 L. Ed. 2d 91 | 16 | 3 | 13 | 1:5.33 |
| 68 | *Carachuri-Rosendo v. Holder* | 560 U.S. 563 | 130 S. Ct. 2577 | 177 L. Ed. 2d 68 | 25 | 8 | 17 | 1:3.13 |
| 67 | *United States v. Juvenile Male* | 560 U.S. 558 | 130 S. Ct. 2518 | 177 L. Ed. 2d 64 | 0 | 1 | 1 | 1:Infinite |
| 66 | *Krupski v. Costa Crociere S. p. A.* | 560 U.S. 538 | 130 S. Ct. 2485 | 177 L. Ed. 2d 48 | 5 | 8 | 3 | 1:1.6 |
| 65 | *Hamilton v. Lanning* | 560 U.S. 505 | 130 S. Ct. 2464 | 177 L. Ed. 2d 23 | 16 | 12 | 4 | 1:1.33 |
| 64 | *Barber v. Thomas* | 560 U.S. 474 | 130 S. Ct. 2499 | 177 L. Ed. 2d 1 | 4 | 6 | 2 | 1:1.5 |
| 63 | *Carr v. United States* | 560 U.S. 438 | 130 S. Ct. 2229 | 176 L. Ed. 2d 1152 | 20 | 3 | 17 | 1:6.67 |
| 62 | *Levin v. Commerce Energy, Inc.* | 560 U.S. 413 | 130 S. Ct. 2323 | 176 L. Ed. 2d 1131 | 15 | 12 | 3 | 1:1.25 |
| 61 | *Berghuis v. Thompkins* | 560 U.S. 370 | 130 S. Ct. 2250 | 176 L. Ed. 2d 1098 | 16 | 18 | 2 | 1:1.13 |
| 60 | *Alabama v. North Carolina* | 560 U.S. 330 | 130 S. Ct. 2295 | 176 L. Ed. 2d 1070 | 4 | 21 | 17 | 1:5.25 |
| 59 | *Samantar v. Yousuf* | 560 U.S. 305 | 130 S. Ct. 2278 | 176 L. Ed. 2d 1047 | 29 | 16 | 13 | 1:1.81 |
| 58 | *Jefferson v. Upton* | 560 U.S. 284 | 130 S. Ct. 2217 | 176 L. Ed. 2d 1032 | 2 | 1 | 1 | 1:2 |
| 56 | *United States v. Marcus* | 560 U.S. 258 | 130 S. Ct. 2159 | 176 L. Ed. 2d 1012 | 7 | 7 | 0 | 1:1 |
| 55 | *Hardt v. Reliance Standard Life Ins. Co.* | 560 U.S. 242 | 130 S. Ct. 2149 | 176 L. Ed. 2d 998 | 11 | 6 | 5 | 1:1.83 |
| 54 | *United States v. O'Brien* | 560 U.S. 218 | 130 S. Ct. 2169 | 176 L. Ed. 2d 979 | 8 | 6 | 2 | 1:1.33 |
| 53 | *Lewis v. City of Chicago* | 560 U.S. 205 | 130 S. Ct. 2191 | 176 L. Ed. 2d 967 | 10 | 12 | 2 | 1:1.2 |
| 52 | *American Needle, Inc. v. Nat'l Football League* | 560 U.S. 183 | 130 S. Ct. 2201 | 176 L. Ed. 2d 947 | 17 | 16 | 1 | 1:1.06 |
| 50 | *United States v. Comstock* | 560 U.S. 126 | 130 S. Ct. 1949 | 176 L. Ed. 2d 878 | 21 | 16 | 5 | 1:1.31 |
| 49 | *Graham v. Florida* | 560 U.S. 48 | 130 S. Ct. 2011 | 176 L. Ed. 2d 825 | 12 | 25 | 13 | 1:2.08 |

| R- | Case Name | *United States Reports* Citation | *Supreme Court Reporter* Citation | *United States Supreme Court Reports—Lawyers' Edition* Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 48 | *Abbott v. Abbott* | 560 U.S. 1 | 130 S. Ct. 1983 | 176 L. Ed. 2d 789 | 26 | 9 | 17 | 1:2.89 |
| 47 | *Hui v. Castaneda* | 559 U.S. 799 | 130 S. Ct. 1845 | 176 L. Ed. 2d 703 | 13 | 7 | 6 | 1:1.86 |
| 46 | *Renico v. Lett* | 559 U.S. 766 | 130 S. Ct. 1855 | 176 L. Ed. 2d 678 | 9 | 21 | 12 | 1:2.33 |
| 45 | *Salazar v. Buono* | 559 U.S. 700 | 130 S. Ct. 1803 | 176 L. Ed. 2d 634 | 11 | 20 | 9 | 1:1.82 |
| 44 | *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.* | 559 U.S. 662 | 130 S. Ct. 1758 | 176 L. Ed. 2d 605 | 19 | 24 | 5 | 1:1.26 |
| 43 | *Merck & Co. v. Reynolds* | 559 U.S. 633 | 130 S. Ct. 1784 | 176 L. Ed. 2d 582 | 17 | 16 | 1 | 1:1.06 |
| 42 | *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA* | 559 U.S. 573 | 130 S. Ct. 1605 | 176 L. Ed. 2d 519 | 9 | 2 | 7 | 1:4.5 |
| 41 | *Perdue v. Kenny A.* | 559 U.S. 542 | 130 S. Ct. 1662 | 176 L. Ed. 2d 494 | 15 | 25 | 10 | 1:1.67 |
| 40 | *Conkright v. Frommert* | 559 U.S. 506 | 130 S. Ct. 1640 | 176 L. Ed. 2d 469 | 2 | 8 | 6 | 1:4 |
| 39 | *United States v. Stevens* | 559 U.S. 460 | 130 S. Ct. 1577 | 176 L. Ed. 2d 435 | 9 | 14 | 5 | 1:1.56 |
| 38 | *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.* | 559 U.S. 393 | 130 S. Ct. 1431 | 176 L. Ed. 2d 311 | 5 | 9 | 4 | 1:1.8 |
| 37 | *Padilla v. Kentucky* | 559 U.S. 356 | 130 S. Ct. 1473 | 176 L. Ed. 2d 284 | 14 | 13 | 1 | 1:1.08 |
| 36 | *Jones v. Harris Assocs. L.P.* | 559 U.S. 335 | 130 S. Ct. 1418 | 176 L. Ed. 2d 265 | 16 | 10 | 6 | 1:1.6 |
| 35 | *Berghuis v. Smith* | 559 U.S. 314 | 130 S. Ct. 1382 | 176 L. Ed. 2d 249 | 6 | 13 | 7 | 1:2.17 |
| 34 | *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson* | 559 U.S. 280 | 130 S. Ct. 1396 | 176 L. Ed. 2d 225 | 9 | 8 | 1 | 1:1.13 |
| 33 | *United Student Aid Funds, Inc. v. Espinosa* | 559 U.S. 260 | 130 S. Ct. 1367 | 176 L. Ed. 2d 158 | 22 | 26 | 4 | 1:1.18 |
| 32 | *Milavetz, Gallop & Milavetz, P.A. v. United States* | 559 U.S. 229 | 130 S. Ct. 1324 | 176 L. Ed. 2d 79 | 10 | 17 | 7 | 1:1.7 |
| 31 | *Bloate v. United States* | 559 U.S. 196 | 130 S. Ct. 1345 | 176 L. Ed. 2d 54 | 11 | 5 | 6 | 1:2.2 |
| 30 | *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.* | 559 U.S. 175 | 130 S. Ct. 1251 | 176 L. Ed. 2d 36 | 18 | 5 | 13 | 1:3.6 |
| 29 | *Reed Elsevier, Inc. v. Muchnick* | 559 U.S. 154 | 130 S. Ct. 1237 | 176 L. Ed. 2d 18 | 15 | 9 | 6 | 1:1.67 |

| R- | Case Name | *United States Reports* Citation | *Supreme Court Reporter* Citation | *United States Supreme Court Reports—Lawyers' Edition* Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 28 | *Johnson v. United States* | 559 U.S. 133 | 130 S. Ct. 1265 | 176 L. Ed. 2d 1 | 10 | 8 | 2 | 1:1.25 |
| 26 | *Maryland v. Shatzer* | 559 U.S. 98 | 130 S. Ct. 1213 | 175 L. Ed. 2d 1045 | 12 | 18 | 6 | 1:1.5 |
| 25 | *Hertz Corp. v. Friend* | 559 U.S. 77 | 130 S. Ct. 1181 | 175 L. Ed. 2d 1029 | 8 | 10 | 2 | 1:1.25 |
| 24 | *Florida v. Powell* | 559 U.S. 50 | 130 S. Ct. 1195 | 175 L. Ed. 2d 1009 | 7 | 9 | 2 | 1:1.29 |
| 23 | *Thaler v. Haynes* | 559 U.S. 43 | 130 S. Ct. 1171 | 175 L. Ed. 2d 1003 | 2 | 5 | 3 | 1:2.5 |
| 22 | *Wilkins v. Gaddy* | 559 U.S. 34 | 130 S. Ct. 1175 | 175 L. Ed. 2d 995 | 3 | 7 | 4 | 1:2.33 |
| 20 | *Hemi Grp., LLC v. City of N.Y.* | 559 U.S. 1 | 130 S. Ct. 983 | 175 L. Ed. 2d 943 | 7 | 4 | 3 | 1:1.75 |
| 19 | *Citizens United v. Fed. Election Comm'n* | 558 U.S. 310 | 130 S. Ct. 876 | 175 L. Ed. 2d 753 | 51 | 24 | 27 | 1:2.13 |
| 18 | *Wood v. Allen* | 558 U.S. 290 | 130 S. Ct. 841 | 175 L. Ed. 2d 738 | 4 | 3 | 1 | 1:1.33 |
| 17 | *South Carolina v. North Carolina* | 558 U.S. 256 | 130 S. Ct. 854 | 175 L. Ed. 2d 713 | 6 | 13 | 7 | 1:2.17 |
| 16 | *Kucana v. Holder* | 558 U.S. 233 | 130 S. Ct. 827 | 175 L. Ed. 2d 694 | 14 | 4 | 10 | 1:3.5 |
| 15 | *Wellons v. Hall* | 558 U.S. 220 | 130 S. Ct. 727 | 175 L. Ed. 2d 684 | 2 | 5 | 3 | 1:2.5 |
| 14 | *Presley v. Georgia* | 558 U.S. 209 | 130 S. Ct. 721 | 175 L. Ed. 2d 675 | 6 | 9 | 3 | 1:1.5 |
| 13 | *Hollingsworth v. Perry* | 558 U.S. 183 | 130 S. Ct. 705 | 175 L. Ed. 2d 657 | 4 | 10 | 6 | 1:2.5 |
| 12 | *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n* | 558 U.S. 165 | 130 S. Ct. 693 | 175 L. Ed. 2d 642 | 10 | 2 | 8 | 1:5 |
| 11 | *Smith v. Spisak* | 558 U.S. 139 | 130 S. Ct. 676 | 175 L. Ed. 2d 595 | 5 | 8 | 3 | 1:1.6 |
| 10 | *McDaniel v. Brown* | 558 U.S. 120 | 130 S. Ct. 665 | 175 L. Ed. 2d 582 | 2 | 9 | 7 | 1:4.5 |
| 9 | *Mohawk Indus., Inc. v. Carpenter* | 558 U.S. 100 | 130 S. Ct. 599 | 175 L. Ed. 2d 458 | 11 | 8 | 3 | 1:1.38 |
| 8 | *Alvarez v. Smith* | 558 U.S. 87 | 130 S. Ct. 576 | 175 L. Ed. 2d 447 | 4 | 6 | 2 | 1:1.5 |
| 7 | *Union Pac. R. Co. v. Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region* | 558 U.S. 67 | 130 S. Ct. 584 | 175 L. Ed. 2d 428 | 21 | 20 | 1 | 1:1.05 |
| 6 | *Beard v. Kindler* | 558 U.S. 53 | 130 S. Ct. 612 | 175 L. Ed. 2d 417 | 5 | 4 | 1 | 1:1.25 |

| R- | Case Name | *United States Reports* Citation | *Supreme Court Reporter* Citation | *United States Supreme Court Reports—Lawyers' Edition* Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 5 | *Michigan v. Fisher* | 558 U.S. 45 | 130 S. Ct. 546 | 175 L. Ed. 2d 410 | 3 | 7 | 4 | 1:2.33 |
| 4 | *Porter v. McCollum* | 558 U.S. 30 | 130 S. Ct. 447 | 175 L. Ed. 2d 398 | 7 | 4 | 3 | 1:1.75 |
| 3 | *Wong v. Belmontes* | 558 U.S. 15 | 130 S. Ct. 383 | 175 L. Ed. 2d 328 | 3 | 7 | 4 | 1:2.33 |
| 2 | *Bobby v. Van Hook* | 558 U.S. 4 | 130 S. Ct. 13 | 175 L. Ed. 2d 255 | 2 | 7 | 5 | 1:3.5 |
| 1 | *Corcoran v. Leven-hagen* | 558 U.S. 1 | 130 S. Ct. 8 | 175 L. Ed. 2d 1 | 0 | 1 | 1 | 1:Infinite |

## Appendix B

Additional Information for the 2009 Term

| R- | Case Name | *United States Reports* Citation | Date Decided | Start Page (Opinion of the Court) *United States Reports* | End Page (Opinion of the Court) *United States Reports* | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 92 | *Sears v. Upton* | 561 U.S. 945 | 6/29/2010 | 945 | 956 | 12 | 493 | 5-2 |
| 91 | *McDonald v. City of Chicago* | 561 U.S. 742 | 6/28/2010 | 748 | 791 | 44 | 1966 | 5-4 |
| 90 | *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez* | 561 U.S. 661 | 6/28/2010 | 667 | 698 | 32 | 1448 | 5-4 |
| 89 | *Bilski v. Kappos* | 561 U.S. 593 | 6/28/2010 | 597 | 613 | 17 | 716 | 9-0 |
| 88 | *Free Enter. Fund v. Public Co. Accounting Oversight Bd.* | 561 U.S. 477 | 6/28/2010 | 483 | 514 | 32 | 1413 | 5-4 |
| 86 | *Black v. United States* | 561 U.S. 465 | 6/24/2010 | 467 | 474 | 8 | 337 | 9-0 |
| 85 | *Skilling v. United States* | 561 U.S. 358 | 6/24/2010 | 367 | 415 | 49 | 2170 | 9-0 |
| 84 | *Magwood v. Patterson* | 561 U.S. 320 | 6/24/2010 | 323 | 343 | 21 | 903 | 5-4 |
| 83 | *Granite Rock Co. v. Teamsters* | 561 U.S. 287 | 6/24/2010 | 291 | 314 | 24 | 1011 | 7-2 |
| 82 | *Morrison v. National Austr. Bank Ltd.* | 561 U.S. 247 | 6/24/2010 | 250 | 273 | 24 | 1047 | 8-0 |
| 81 | *Doe v. Reed* | 561 U.S. 186 | 6/24/2010 | 190 | 202 | 13 | 543 | 8-1 |
| 80 | *Monsanto Co. v. Geertson Seed Farms* | 561 U.S. 139 | 6/21/2010 | 144 | 166 | 23 | 984 | 7-1 |
| 79 | *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.* | 561 U.S. 89 | 6/21/2010 | 93 | 112 | 20 | 849 | 6-3 |
| 78 | *Rent-A-Center, W., Inc. v. Jackson* | 561 U.S. 63 | 6/21/2010 | 65 | 76 | 12 | 494 | 5-4 |
| 77 | *Holder v. Humanitarian Law Project* | 561 U.S. 1 | 6/21/2010 | 7 | 40 | 34 | 1466 | 6-3 |
| 76 | *Dillon v. United States* | 560 U.S. 817 | 6/17/2010 | 819 | 831 | 13 | 565 | 7-1 |
| 75 | *Schwab v. Reilly* | 560 U.S. 770 | 6/17/2010 | 774 | 795 | 22 | 975 | 6-3 |
| 74 | *Ontario v. Quon* | 560 U.S. 746 | 6/17/2010 | 750 | 765 | 16 | 694 | 9-0 |
| 73 | *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection* | 560 U.S. 702 | 6/17/2010 | 707 | 733 | 27 | 1212 | 8-0 |
| 72 | *New Process Steel, L.P. v. NLRB* | 560 U.S. 674 | 6/17/2010 | 676 | 688 | 13 | 570 | 5-4 |

| R- | Case Name | *United States Reports* Citation | Date Decided | Start Page (Opinion of the Court) *United States Reports* | End Page (Opinion of the Court) *United States Reports* | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 71 | *Holland v. Florida* | 560 U.S. 631 | 6/14/2010 | 634 | 654 | 21 | 906 | 7-2 |
| 70 | *Dolan v. United States* | 560 U.S. 605 | 6/14/2010 | 607 | 621 | 15 | 615 | 5-4 |
| 69 | *Astrue v. Ratliff* | 560 U.S. 586 | 6/14/2010 | 588 | 598 | 11 | 462 | 9-0 |
| 68 | *Carachuri-Rosendo v. Holder* | 560 U.S. 563 | 6/14/2010 | 566 | 582 | 17 | 755 | 9-0 |
| 67 | *United States v. Juvenile Male* | 560 U.S. 558 | 6/7/2010 | 559 | 562 | 4 | 132 | 9-0 |
| 66 | *Krupski v. Costa Crociere S. p. A.* | 560 U.S. 538 | 6/7/2010 | 541 | 557 | 17 | 723 | 9-0 |
| 65 | *Hamilton v. Lanning* | 560 U.S. 505 | 6/7/2010 | 508 | 524 | 17 | 732 | 8-1 |
| 64 | *Barber v. Thomas* | 560 U.S. 474 | 6/7/2010 | 476 | 492 | 17 | 712 | 6-3 |
| 63 | *Carr v. United States* | 560 U.S. 438 | 6/1/2010 | 441 | 458 | 18 | 789 | 6-3 |
| 62 | *Levin v. Commerce Energy, Inc.* | 560 U.S. 413 | 6/1/2010 | 417 | 433 | 17 | 745 | 9-0 |
| 61 | *Berghuis v. Thomp-kins* | 560 U.S. 370 | 6/1/2010 | 373 | 391 | 19 | 793 | 5-4 |
| 60 | *Alabama v. North Carolina* | 560 U.S. 330 | 6/1/2010 | 334 | 358 | 25 | 1090 | 6-3 |
| 59 | *Samantar v. Yousuf* | 560 U.S. 305 | 6/1/2010 | 308 | 326 | 19 | 843 | 9-0 |
| 58 | *Jefferson v. Upton* | 560 U.S. 284 | 5/24/2010 | 284 | 295 | 12 | 463 | 7-2 |
| 56 | *United States v. Marcus* | 560 U.S. 258 | 5/24/2010 | 260 | 267 | 8 | 313 | 7-1 |
| 55 | *Hardt v. Reliance Standard Life Ins. Co.* | 560 U.S. 242 | 5/24/2010 | 244 | 256 | 13 | 564 | 9-0 |
| 54 | *United States v. O'Brien* | 560 U.S. 218 | 5/24/2010 | 221 | 235 | 15 | 633 | 9-0 |
| 53 | *Lewis v. City of Chi-cago* | 560 U.S. 205 | 5/24/2010 | 208 | 217 | 10 | 441 | 9-0 |
| 52 | *Am. Needle, Inc. v. Nat'l Football League* | 560 U.S. 183 | 5/24/2010 | 186 | 204 | 19 | 851 | 9-0 |
| 50 | *United States v. Comstock* | 560 U.S. 126 | 5/17/2010 | 129 | 150 | 22 | 936 | 7-2 |
| 49 | *Graham v. Florida* | 560 U.S. 48 | 5/17/2010 | 52 | 82 | 31 | 1323 | 6-3 |
| 48 | *Abbott v. Abbott* | 560 U.S. 1 | 5/17/2010 | 5 | 22 | 18 | 767 | 6-3 |
| 47 | *Hui v. Castaneda* | 559 U.S. 799 | 5/3/2010 | 801 | 813 | 13 | 520 | 9-0 |
| 46 | *Renico v. Lett* | 559 U.S. 766 | 5/3/2010 | 769 | 779 | 11 | 469 | 6-3 |
| 45 | *Salazar v. Buono* | 559 U.S. 700 | 4/28/2010 | 705 | 722 | 18 | 774 | 5-4 |
| 44 | *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.* | 559 U.S. 662 | 4/27/2010 | 666 | 687 | 22 | 986 | 5-3 |

| R- | Case Name | United States Reports Citation | Date Decided | Start Page (Opinion of the Court) *United States Reports* | End Page (Opinion of the Court) *United States Reports* | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 43 | *Merck & Co. v. Reynolds* | 559 U.S. 633 | 4/27/2010 | 637 | 654 | 18 | 772 | 9-0 |
| 42 | *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA* | 559 U.S. 573 | 4/21/2010 | 576 | 605 | 30 | 1344 | 7-2 |
| 41 | *Perdue v. Kenny A.* | 559 U.S. 542 | 4/21/2010 | 546 | 560 | 15 | 634 | 5-4 |
| 40 | *Conkright v. Frommert* | 559 U.S. 506 | 4/21/2010 | 509 | 522 | 14 | 591 | 5-3 |
| 39 | *United States v. Stevens* | 559 U.S. 460 | 4/20/2010 | 464 | 482 | 19 | 809 | 8-1 |
| 38 | *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.* | 559 U.S. 393 | 3/31/2010 | 395 | 416 | 22 | 962 | 5-4 |
| 37 | *Padilla v. Kentucky* | 559 U.S. 356 | 3/31/2010 | 359 | 375 | 17 | 724 | 7-2 |
| 36 | *Jones v. Harris Assocs. L.P.* | 559 U.S. 335 | 3/30/2010 | 338 | 353 | 16 | 712 | 9-0 |
| 35 | *Berghuis v. Smith* | 559 U.S. 314 | 3/30/2010 | 319 | 333 | 15 | 633 | 9-0 |
| 34 | *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson* | 559 U.S. 280 | 3/30/2010 | 283 | 302 | 20 | 896 | 7-2 |
| 33 | *United Student Aid Funds, Inc. v. Espinosa* | 559 U.S. 260 | 3/23/2010 | 263 | 279 | 17 | 729 | 9-0 |
| 32 | *Milavetz, Gallop & Milavetz, P.A. v. United States* | 559 U.S. 229 | 3/8/2010 | 231 | 253 | 23 | 976 | 9-0 |
| 31 | *Bloate v. United States* | 559 U.S. 196 | 3/8/2010 | 198 | 215 | 18 | 769 | 7-2 |
| 30 | *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.* | 559 U.S. 175 | 3/2/2010 | 177 | 195 | 19 | 820 | 9-0 |
| 29 | *Reed Elsevier, Inc. v. Muchnick* | 559 U.S. 154 | 3/2/2010 | 157 | 171 | 15 | 642 | 8-0 |
| 28 | *Johnson v. United States* | 559 U.S. 133 | 3/2/2010 | 135 | 145 | 11 | 449 | 7-2 |
| 26 | *Maryland v. Shatzer* | 559 U.S. 98 | 2/24/2010 | 100 | 117 | 18 | 759 | 9-0 |
| 25 | *Hertz Corp. v. Friend* | 559 U.S. 77 | 2/23/2010 | 80 | 97 | 18 | 753 | 9-0 |
| 24 | *Florida v. Powell* | 559 U.S. 50 | 2/23/2010 | 53 | 64 | 12 | 517 | 7-2 |
| 23 | *Thaler v. Haynes* | 559 U.S. 43 | 2/22/2010 | 44 | 49 | 6 | 256 | 9-0 |
| 22 | *Wilkins v. Gaddy* | 559 U.S. 34 | 2/22/2010 | 34 | 40 | 7 | 265 | 9-0 |
| 20 | *Hemi Grp., LLC v. City of N.Y.* | 559 U.S. 1 | 1/25/2010 | 4 | 18 | 15 | 616 | 5-3 |

| R- | Case Name | *United States Reports* Citation | Date Decided | Start Page (Opinion of the Court) *United States Reports* | End Page (Opinion of the Court) *United States Reports* | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 19 | *Citizens United v. Fed. Election Comm'n* | 558 U.S. 310 | 1/21/2010 | 318 | 372 | 55 | 2376 | 5-4 |
| 18 | *Wood v. Allen* | 558 U.S. 290 | 1/20/2010 | 293 | 305 | 13 | 535 | 7-2 |
| 17 | *South Carolina v. North Carolina* | 558 U.S. 256 | 1/20/2010 | 259 | 276 | 18 | 743 | 5-4 |
| 16 | *Kucana v. Holder* | 558 U.S. 233 | 1/20/2010 | 236 | 253 | 18 | 752 | 9-0 |
| 15 | *Wellons v. Hall* | 558 U.S. 220 | 1/19/2010 | 220 | 226 | 7 | 271 | 5-4 |
| 14 | *Presley v. Georgia* | 558 U.S. 209 | 1/19/2010 | 209 | 216 | 8 | 294 | 7-2 |
| 13 | *Hollingsworth v. Perry* | 558 U.S. 183 | 1/13/2010 | 184 | 199 | 16 | 655 | 5-4 |
| 12 | *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n* | 558 U.S. 165 | 1/13/2010 | 167 | 177 | 11 | 452 | 8-1 |
| 11 | *Smith v. Spisak* | 558 U.S. 139 | 1/12/2010 | 141 | 156 | 16 | 654 | 9-0 |
| 10 | *McDaniel v. Brown* | 558 U.S. 120 | 1/11/2010 | 121 | 136 | 16 | 667 | 9-0 |
| 9 | *Mohawk Indus., Inc. v. Carpenter* | 558 U.S. 100 | 12/8/2009 | 103 | 114 | 12 | 506 | 9-0 |
| 8 | *Alvarez v. Smith* | 558 U.S. 87 | 12/8/2009 | 89 | 97 | 9 | 370 | 8-1 |
| 7 | *Union Pac. R. Co. v. Locomotive Eng'rs & Trainmen Gen. Comm. of Adjust-ment, Cent. Region* | 558 U.S. 67 | 12/8/2009 | 71 | 86 | 16 | 686 | 9-0 |
| 6 | *Beard v. Kindler* | 558 U.S. 53 | 12/8/2009 | 55 | 63 | 9 | 360 | 8-0 |
| 5 | *Michigan v. Fisher* | 558 U.S. 45 | 12/7/2009 | 45 | 50 | 6 | 199 | 7-2 |
| 4 | *Porter v. McCollum* | 558 U.S. 30 | 11/30/2009 | 30 | 44 | 15 | 612 | 9-0 |
| 3 | *Wong v. Belmontes* | 558 U.S. 15 | 11/16/2009 | 15 | 28 | 14 | 545 | 9-0 |
| 2 | *Bobby v. Van Hook* | 558 U.S. 4 | 11/9/2009 | 4 | 13 | 10 | 396 | 9-0 |
| 1 | *Corcoran v. Leven-hagen* | 558 U.S. 1 | 10/20/2009 | 2 | 3 | 2 | 56 | 9-0 |

## Appendix C

Subject Information from Supreme Court Database

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 92 | *Sears v. Upton* | Criminal Procedure | right to counsel | judicial review (state level); federal common law | constitutional amendment | Sixth Amendment (right to counsel) |
| 91 | *McDonald v. City of Chicago* | Criminal Procedure | miscellaneous criminal procedure | judicial review (state level) | constitutional amendment | Second Amendment |
| 90 | *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez* | First Amendment | free exercise of religion | judicial review (state level) | constitutional amendment | First Amendment (free exercise of religion) |
| 89 | *Bilski v. Kappos* | Economic Activity | patents and copyrights: patentability of computer processes | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 88 | *Free Enter. Fund v. Public Co. Accounting Oversight Bd.* | Miscellaneous | executive authority vis-a-vis Congress or the states | judicial review (national level); statutory construction | Constitution | Art. II, § 1 (executive power) |
| 86 | *Black v. United States* | Criminal Procedure | extra-legal jury influences: jury instructions (not necessarily in criminal cases) | federal common law | no legal provision | no legal provision |
| 85 | *Skilling v. United States* | Criminal Procedure | statutory construction of criminal laws: fraud | statutory construction; judicial review (national level) | infrequently litigated statutes | infrequently litigated statutes |
| 84 | *Magwood v. Patterson* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241-2255 (habeas corpus) |
| 83 | *Granite Rock Co. v. Teamsters* | Unions | arbitration (in the context of labor-management or employer-employee relations) | statutory construction | federal statute | Labor-Management Relations Act |
| 82 | *Morrison v. Nat'l Austr. Bank Ltd.* | Economic Activity | federal or state regulation of securities | statutory construction; federal common law | federal statute | Securities Act of 1933, the Securities and Exchange Act of 1934, or the Williams Act |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 81 | *Doe v. Reed* | Privacy | Freedom of Information Act and related federal or state statutes or regulations | judicial review (state level) | constitutional amendment | First Amendment (speech, press, and assembly) |
| 80 | *Monsanto Co. v. Geertson Seed Farms* | Economic Activity | natural resources - environmental protection | statutory construction | federal statute | National Environmental Policy Act |
| 79 | *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.* | Economic Activity | liability, other than as in sufficiency of evidence, election of remedies, punitive damages | statutory construction | federal statute | Interstate Commerce, as amended |
| 78 | *Rent-A-Center, W., Inc. v. Jackson* | Unions | arbitration (in the context of labor-management or employer-employee relations) | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 77 | *Holder v. Humanitarian Law Project* | First Amendment | federal or state internal security legislation: Smith, Internal Security, and related federal statutes | statutory construction; judicial review (national level) | infrequently litigated statutes | infrequently litigated statutes |
| 76 | *Dillon v. United States* | Criminal Procedure | statutory construction of criminal laws: sentencing guidelines | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 75 | *Schwab v. Reilly* | Economic Activity | bankruptcy (except in the context of priority of federal fiscal claims) | statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 74 | *Ontario v. Quon* | Criminal Procedure | search and seizure (other than as pertains to vehicles or Crime Control Act) | judicial review (state level) | constitutional amendment | Fourth Amendment |
| 73 | *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection* | Due Process | due process: Takings Clause, or other non-constitutional governmental taking of property | judicial review (state level) | constitutional amendment | Fifth Amendment (Takings Clause) |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 72 | *New Process Steel, L.P. v. NLRB* | Judicial Power | judicial review of administrative agency's or administrative official's actions and procedures | statutory construction | federal statute | National Labor Relations Act, as amended |
| 71 | *Holland v. Florida* | Civil Rights | indigents: inadequate representation by counsel | statutory construction | federal statute | 28 U.S.C. §§ 2241-2255 (habeas corpus) |
| 70 | *Dolan v. United States* | Judicial Power | judicial administration: jurisdiction or authority of federal district courts or territorial courts | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 69 | *Astrue v. Ratliff* | Attorneys | attorneys' and governmental employees' or officials' fees or compensation or licenses | statutory construction | federal statute | Equal Access to Justice Act |
| 68 | *Carachuri-Rosendo v. Holder* | Civil Rights | deportation | statutory construction | federal statute | Immigration and Naturalization, Immigration, Nationality, or Illegal Immigration Reform and Immigrant Responsibility Acts, as amended |
| 67 | *United States v. Juvenile Male* | Civil Rights | juveniles | Supreme Court supervision of lower federal or state courts or original jurisdiction | infrequently litigated statutes | infrequently litigated statutes |
| 66 | *Krupski v. Costa Crociere S. p. A.* | Judicial Power | judicial administration: untimely filing | statutory construction | court rules | Federal Rules of Civil Procedure, including Appellate Procedure, or relevant rules of a circuit court Judicial Code, and admiralty rules |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 65 | *Hamilton v. Lanning* | Economic Activity | bankruptcy (except in the context of priority of federal fiscal claims) | statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 64 | *Barber v. Thomas* | Criminal Procedure | statutory construction of criminal laws: sentencing guidelines | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 63 | *Carr v. United States* | Criminal Procedure | statutory construction of criminal laws: miscellaneous | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 62 | *Levin v. Commerce Energy, Inc.* | Federalism | federal preemption of state court jurisdiction | federal common law; statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 61 | *Berghuis v. Thompkins* | Criminal Procedure | Miranda warnings | judicial review (state level) | constitutional amendment | Fifth Amendment (Miranda warnings) |
| 60 | *Alabama v. North Carolina* | Economic Activity | natural resources - environmental protection | statutory construction | other | interstate compact |
| 59 | *Samantar v. Yousuf* | Economic Activity | liability, other than as in sufficiency of evidence, election of remedies, punitive damages | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 58 | *Jefferson v. Upton* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 56 | *United States v. Marcus* | Criminal Procedure | Federal Rules of Criminal Procedure | statutory construction; federal common law | court rules | Federal Rules of Criminal Procedure, or relevant rules of a circuit court |
| 55 | *Hardt v. Reliance Standard Life Ins. Co.* | Attorneys | attorneys' and governmental employees' or officials' fees or compensation or licenses | statutory construction; federal common law | federal statute | Employee Retirement Income Security Act, as amended |
| 54 | *United States v. O'Brien* | Criminal Procedure | statutory construction of criminal laws: firearms | statutory construction | infrequently litigated statutes | infrequently litigated statutes |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 53 | *Lewis v. City of Chicago* | Civil Rights | employment discrimination: on basis of race, age, religion, illegitimacy, national origin, or working conditions. | statutory construction | federal statute | Civil Rights Act of 1964 (Title VII) |
| 52 | *American Needle, Inc. v. Nat'l Football League* | Economic Activity | antitrust (except in the context of mergers and union antitrust) | statutory construction | federal statute | Sherman Act |
| 50 | *United States v. Comstock* | Federalism | national supremacy: miscellaneous | judicial review (national level) | Constitution | Art. I, § 8, ¶ 18 (Necessary and Proper Clause) |
| 49 | *Graham v. Florida* | Criminal Procedure | cruel and unusual punishment, non-death penalty | judicial review (state level) | constitutional amendment | Eighth Amendment (cruel and unusual punishment) |
| 48 | *Abbott v. Abbott* | Civil Rights | juveniles | statutory construction | other | treaty |
| 47 | *Hui v. Castaneda* | Economic Activity | liability, governmental: tort or contract actions by or against government or governmental officials other than defense of criminal actions brought under a civil rights action. | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 46 | *Renico v. Lett* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 45 | *Salazar v. Buono* | First Amendment | establishment of religion (other than as pertains to Parochiaid:) | judicial review (national level) | constitutional amendment | First Amendment (establishment of religion) |
| 44 | *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.* | Economic Activity | arbitration (other than as pertains to labor-management or employer-employee relations | statutory construction | infrequently litigated statutes | infrequently litigated statutes |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 43 | *Merck & Co. v. Reynolds* | Economic Activity | federal or state regulation of securities | statutory construction | federal statute | Securities Act of 1933, the Securities and Exchange Act of 1934, or the Williams Act |
| 42 | *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA* | Civil Rights | debtors' rights | statutory construction; federal common law | infrequently litigated statutes | infrequently litigated statutes |
| 41 | *Perdue v. Kenny A.* | Attorneys | attorneys' and governmental employees' or officials' fees or compensation or licenses | statutory construction | federal statute | Civil Rights Attorney's Fees Awards |
| 40 | *Conkright v. Frommert* | Economic Activity | Employee Retirement Income Security Act | statutory construction | federal statute | Employee Retirement Income Security Act, as amended |
| 39 | *United States v. Stevens* | First Amendment | First Amendment, miscellaneous | judicial review (national level) | infrequently litigated statutes | infrequently litigated statutes |
| 38 | *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.* | Judicial Power | Federal Rules of Civil Procedure including Supreme Court Rules, application of the Federal Rules of Evidence, Federal Rules of Appellate Procedure in civil litigation, Circuit Court Rules, and state rules and admiralty rules | statutory construction | court rules | Federal Rules of Civil Procedure, including Appellate Procedure, or relevant rules of a circuit court Judicial Code, and admiralty rules |
| 37 | *Padilla v. Kentucky* | Criminal Procedure | right to counsel | judicial review (state level) | constitutional amendment | Sixth Amendment (right to counsel) |
| 36 | *Jones v. Harris Assocs. L.P.* | Economic Activity | federal or state regulation of securities | statutory construction; federal common law | infrequently litigated statutes | infrequently litigated statutes |
| 35 | *Berghuis v. Smith* | Criminal Procedure | extra-legal jury influences: voir dire (not necessarily a criminal case) | judicial review (state level) | constitutional amendment | Sixth Amendment (other provisions) |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 34 | *Graham Cty. Soil & Water Conservation Dist. v. United States* ex rel. *Wilson* | Economic Activity | liability, governmental: tort or contract actions by or against government or governmental officials other than defense of criminal actions brought under a civil rights action. | statutory construction; statutory construction | federal statute | Federal False Claims Act |
| 33 | *United Student Aid Funds, Inc. v. Espinosa* | Economic Activity | bankruptcy (except in the context of priority of federal fiscal claims) | statutory construction; statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 32 | *Milavetz, Gallop & Milavetz, P. A. v. United States* | Attorneys | commercial speech, attorneys | statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 31 | *Bloate v. United States* | Criminal Procedure | speedy trial | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 30 | *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.* | Economic Activity | antitrust (except in the context of mergers and union antitrust) | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 29 | *Reed Elsevier, Inc. v. Muchnick* | Economic Activity | patents and copyrights: copyright | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 28 | *Johnson v. United States* | Criminal Procedure | statutory construction of criminal laws: assault | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 26 | *Maryland v. Shatzer* | Criminal Procedure | Miranda warnings | judicial review (state level) | constitutional amendment | Fifth Amendment (Miranda warnings) |
| 25 | *Hertz Corp. v. Friend* | Judicial Power | miscellaneous judicial power, especially diversity jurisdiction | statutory construction; statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 24 | *Florida v. Powell* | Criminal Procedure | Miranda warnings | judicial review (state level) | constitutional amendment | Fifth Amendment (Miranda warnings) |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 23 | *Thaler v. Haynes* | Criminal Procedure | extra-legal jury influences: voir dire (not necessarily a criminal case) | federal common law | no legal provision | no legal provision |
| 22 | *Wilkins v. Gaddy* | Civil Rights | liability, civil rights acts | statutory construction | federal statute | Reconstruction Civil Rights Acts (42 U.S.C. § 1983) |
| 20 | *Hemi Grp., LLC v. City of N.Y.* | Economic Activity | federal or state consumer protection: typically under the Truth in Lending; Food, Drug and Cosmetic; and Consumer Protection Credit Acts | statutory construction; federal common law | federal statute | Racketeer Influenced and Corrupt Organizations Act |
| 19 | *Citizens United v. Fed'l Election Comm'n* | First Amendment | campaign spending | judicial review (national level) | constitutional amendment | First Amendment (speech, press, and assembly) |
| 18 | *Wood v. Allen* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 17 | *South Carolina v. North Carolina* | Interstate Relations | non-real property dispute between states | federal common law | no legal provision | no legal provision |
| 16 | *Kucana v. Holder* | Civil Rights | deportation | statutory construction | federal statute | Immigration and Naturalization, Immigration, Nationality, or Illegal Immigration Reform and Immigrant Responsibility Acts, as amended |
| 15 | *Wellons v. Hall* | Criminal Procedure | discovery and inspection (in the context of criminal litigation only, otherwise Freedom of Information Act and related federal or state statutes or regulations) | federal common law | no legal provision | no legal provision |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 14 | *Presley v. Georgia* | Criminal Procedure | extra-legal jury influences: voir dire (not necessarily a criminal case) | judicial review (state level) | constitutional amendment | Sixth Amendment (other provisions) |
| 13 | *Hollingsworth v. Perry* | Judicial Power | judicial administration: jurisdiction or authority of federal district courts or territorial courts | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 12 | *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n* | Economic Activity | federal and some few state regulation of public utilities regulation: electric power | statutory construction; federal common law | federal statute | federal power |
| 11 | *Smith v. Spisak* | Criminal Procedure | cruel and unusual punishment, death penalty | judicial review (state level); federal common law | constitutional amendment | Eighth Amendment (cruel and unusual punishment) |
| 10 | *McDaniel v. Brown* | Criminal Procedure | habeas corpus | federal common law | no legal provision | no legal provision |
| 9 | *Mohawk Indus., Inc. v. Carpenter* | Judicial Power | judicial administration: untimely filing | federal common law | infrequently litigated statutes | infrequently litigated statutes |
| 8 | *Alvarez v. Smith* | Judicial Power | mootness | judicial review (state level); federal common law | Constitution | Art. III, § 2, ¶ 1 (case or controversy requirement) |
| 7 | *Union Pac. R. Co. v. Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region* | Unions | labor-management disputes: employee discharge | statutory construction | federal statute | Railway Labor |
| 6 | *Beard v. Kindler* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 5 | *Michigan v. Fisher* | Criminal Procedure | search and seizure (other than as pertains to vehicles or Crime Control Act) | judicial review (state level); federal common law | constitutional amendment | Fourth Amendment |
| 4 | *Porter v. McCollum* | Criminal Procedure | habeas corpus | federal common law | no legal provision | no legal provision |
| 3 | *Wong v. Belmontes* | Civil Rights | indigents: inadequate representation by counsel | judicial review (state level) | constitutional amendment | Sixth Amendment (right to counsel) |

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 2 | *Bobby v. Van Hook* | Civil Rights | indigents: inadequate representation by counsel | judicial review (state level) | Constitution | Art. VI, § 2 (Supremacy Clause) |
| 1 | *Corcoran v. Levenhagen* | Judicial Power | judicial administration: Supreme Court jurisdiction or authority on appeal or writ of error, from federal district courts or courts of appeals | Supreme Court supervision of lower federal or state courts or original jurisdiction | no legal provision | no legal provision |

# EXHIBIT 102

THOMSON REUTERS WESTLAW PRECISION

47891-0001 History Folders My links Notifications Sign out

141E EDUCATION Search West Key Number Headnotes All Federal Search Tips

Home > West Key Number System

# 141E EDUCATION

Add to Favorites Copy link

Select all content • No items selected • Clear Selection Collapse All Specify Content to Search


I. IN GENERAL, k1-k9
- 1 In general
- 2 Right to education in general
- 3 What law governs

II. PUBLIC PRIMARY AND SECONDARY SCHOOLS, k10-k909
- (A) ESTABLISHMENT, OPERATION, AND REGULATION IN GENERAL, k10-k389
- (B) TAXPAYERS' SUITS AND OTHER REMEDIES, k390-k409
- (C) OFFICERS AND EMPLOYEES, k410-k439
- (D) TEACHERS AND EDUCATION PROFESSIONALS, k440-k649
- (E) PUPILS OR STUDENTS, k650-k829
- (F) RACIAL SEGREGATION AND DESEGREGATION, k830-k859
- (G) CHILDREN WITH DISABILITIES; SPECIAL EDUCATION, k860-k909

III. PRIVATE PRIMARY AND SECONDARY SCHOOLS, k910-k959
- 910 In general
- 911 Constitutional and statutory provisions
- 916 Establishment and status in general
- 917 Incorporation and organization
- 918 Regulation and supervision
- 922 Governing boards
- 923 Officers and employees
- 924 Property
- 925 Contracts
- 930 Liabilities
- 940 Fiscal matters; funds
- 941 Public aid
- 944 Teachers and other instructors
- 950 Pupils or students

IV. INTERSCHOLASTIC ASSOCIATIONS, k960-k969
- 960 In general
- 961 Constitutional and statutory provisions
- 962 Rules and regulations
- 968 Judicial intervention

V. POSTSECONDARY PROPRIETARY SCHOOLS; VOCATIONAL AND OTHER PARTICULARIZED TRAINING, k970-k989
- 970 In general
- 971 Constitutional and statutory provisions
- 972 Driving schools
- 973 Subject of license
- 974 Exemptions
- 975 Regulations in general
- 976 License fees and taxes
- 977 Revocation or suspension
- 978 Rights and remedies of unlicensed persons and of persons dealing with them
- 979 Penalties and fines
- 980 Regulation of recruitment
- 981 Educational malpractice

VI. COLLEGES AND UNIVERSITIES, k990-k1229
- (A) ESTABLISHMENT AND REGULATION IN GENERAL, k990-k1009
- (B) GOVERNANCE AND BOARDS, k1010-k1019
- (C) PROPERTY, k1020-k1029
- (D) CONTRACTS, k1030-k1050
- (E) LIABILITIES, k1051-k1059
- (F) FISCAL MATTERS, k1060-k1079
- (G) CLAIMS, k1080-k1089
- (H) ACTIONS, k1090-k1109
- (I) OFFICERS AND EMPLOYEES, k1110-k1129
- (J) FACULTY AND EDUCATION PROFESSIONALS, k1130-k1159
- (K) STUDENTS, k1160-k1219
- (L) INTERCOLLEGIATE ASSOCIATIONS, k1220-k1229

VII. STUDENT FINANCIAL AID, k1230-k1243
- 1230 In general
- 1231 Constitutional and statutory provisions


Tools & Resources

West Key Number System Updates

1231 Constitutional and statutory provisions
1232 Aid to indigent children
1233 Scholarships
1238 Loans

Contact us • Live chat • Training and support • Improve Westlaw Precision/Report an error • Transfer My Data • Pricing guide • Sign out
1-800-REF-ATTY (1-800-733-2889)
THOMSON REUTERS
Westlaw Precision. © 2024 Thomson Reuters Accessibility • Privacy • Supplier terms
Thomson Reuters is not providing professional advice

# EXHIBIT 103

## Redacted in their Entirety