# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, <br><br> Plaintiffs/Counterdefendants, <br><br> v. <br><br> ROSS INTELLIGENCE INC., <br><br> Defendant/Counterclaimant. | C.A. No. 20-613-SB <br><br> **JURY TRIAL DEMANDED** <br><br> **PUBLIC VERSION** |

### DECLARATION OF ALAN COX IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF FAIR USE

OF COUNSEL:

Warrington S. Parker III
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Keith J. Harrison
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant ROSS Intelligence, Inc.*

Dated: October 1, 2024
Public Version Dated: October 9, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, <br><br> Plaintiffs/Counterdefendants, <br><br> v. <br><br> ROSS INTELLIGENCE INC., <br><br> Defendant/Counterclaimant. | C.A. No. 20-613-SB <br><br> **PUBLIC VERSION** |

**DECLARATION OF ALAN COX IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF FAIR USE**

I, Alan Cox, declare as follows:

1. I submit this Declaration in Support of Defendant/Counterclaimant ROSS Intelligence Inc.'s ("ROSS") Motion for Summary Judgment on Its Affirmative Defense of Fair Use. I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently to the below.

2. I am a self-employed independent economist and an Affiliate at NERA Economic Research Associates ("NERA"). NERA provides expert economic and financial analysis to firm and government bodies on a variety of issues.

3. I received a B.Sc. in Environmental Science from York University in Toronto in 1976 and an M.A. in Economics from the University of British Columbia in 1978. From 1978 to 1981, I served as a Visiting Economist at the Energy Laboratory at the Massachusetts Institute of Technology in Cambridge, MA. In 1989, I received a Ph.D. in Economic Analysis and Policy from the Graduate School of Business Administration at the University of California at Berkeley. My coursework and research there concentrated on the statistical analysis of demand, competition and

regulatory issues. I also worked as a researcher in the Department of Economics and at various University of California research institutes. From 1988 to 1994, I was a Senior Economist, Vice President, and Senior Vice President at Law and Economics Consulting Group, Inc. Since 1994, I have been a Senior Consultant, and then a Vice President, a Senior Vice President, and a Managing Director at NERA. From 2016 to 2018 I was Chair of NERA's Global Intellectual Property Practice and a member of the firm's Board of Directors. My curriculum vitae is attached as **Exhibit A**.

4. My opinions and the facts and data that support them are set forth fully in my Opening Expert Report, attached as **Exhibit B**, Rebuttal Report to Expert Krein, attached as **Exhibit C**, Rebuttal Report to Expert Malackowski, attached as **Exhibit D**, and Reply Report to Expert Malackowski, attached as **Exhibit E**.

I. **My Opinions are Based on the Following Facts**

5. ROSS carried out research and made very particular decisions about what approach to use and features to utilize in developing its natural language search technology. See Ex. B, Opening Report ¶ 41. ROSS chose to use a particular two-stage process for determining the most relevant answers to natural language search questions. See Ex. B, Opening Report ¶ 41; Branting Report, ¶¶ 39-43.

6. ROSS chose to use ▌▌▌▌▌▌▌▌▌▌ to rank and return candidate answers in response to natural language search questions. See Ex. B, Opening Report ¶ 41; Branting Report, ¶¶ 44-46.

7. ROSS did not incorporate Plaintiffs' copyrighted material into its legal search product. See Ex. B, Opening Report ¶ 45. ROSS did not provide Plaintiffs' copyrighted material to its customers. See Ex. B, Opening Report ¶ 41; Branting Report, ¶ 20.

8.  The purpose of what Plaintiffs call the "Westlaw Content" is to assist lawyers in finding judicial opinions for legal research. *See* Ex. B, Opening Report ¶¶ 46, 49-50, 61.

9.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* Ex. B, Opening Report ¶ 47. ROSS did not use headnotes as answers to questions. *Id*.

10. According to Westlaw, a key characteristic of headnotes and the key number system is that they are developed, augmented, and modified by humans. *See* Ex. B, Opening Report ¶ 56; (TR-0036336) █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"). This structure has been built up over decades. *See* Ex. B, Opening Report ¶ 56, Ex. 16 at 277-79.

11. I know of no evidence indicating that Plaintiffs attempted to ever sell or license their Westlaw Content as training data for artificial intelligence development. *See* Ex. B, Opening Report ¶ 18 (p. 7), 49-50, 61.

12. There is evidence in the record that suggests the opposite. Plaintiffs have stated that they will not ever sell their copyrighted content to competitors—i.e., to companies that develop legal search services. *See* (Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Second Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Interrogatory No. 21 at 18) ("[█████████████████████████████████████████

3

██████████████████████████████████████████); *see also* (Martens Deposition 102:3-7, 230:2-4; ROSS-003390563).

13. Additionally, there is no evidence that ROSS ever sold or licensed the memos that it received from LegalEase, or ever attempted to do so either. ROSS did not ever sell or license the memos, and never attempted to do so. *See* Ex. E, Reply Report to Expert Malackowski, ¶ 12, Ex. C, Rebuttal Report to Expert Krein, ¶¶ 32-35..

## II. Opinions

14. ROSS does not offer customers the ability to use Westlaw Content, i.e., those items in which Plaintiffs claim a copyright. *See* Ex. B, Opening Report ¶ 45. If a legal researcher wishes to use Westlaw Content, the only source for that content is Plaintiffs. *See* Ex. B, Opening Report, ¶¶73-79.

15. ROSS's activities did not prevent Plaintiffs from using headnotes or any Westlaw Content for AI training. *See* Ex. B, Opening Report ¶ 46. I have not seen a count of the number headnotes that Plaintiffs are alleging were infringed by ROSS. Plaintiffs have, however, indicated that "ROSS created 25,000 memos." *See* Ex. B, Opening Report ¶ 71; Branting Report, ¶¶ 39-65; (Second Supplemental Response to Interrogatory No. 21 at 21). Since each memo contains a question and assuming that each of those questions were created by infringing a headnote, that means that ROSS assumedly infringed 25,000 headnotes representing 0.00086807062 or .086% (that is, 0.086 of one percent, or 8.6/10,000) of the total number of ██████████████. *See* Ex. B, Opening Report ¶ 71; (Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s First Set of Requests for Admission (Nos. 1-129) at 33,

4

34 (admitting, in responses to RFA Nos. 48 and 49, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

16. ROSS has not supplanted any market for the use of Westlaw Content in training of AI. Plaintiffs have never identified any such market. *See* Ex. B, Opening Report ¶ 85; (Second Supplemental Response to Interrogatory No. 1). Plaintiffs' corporate witness, responsible for AI research, testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. B, Opening Report ¶ 85; (Moulinier Dep. Tr. 103:5-104:20).

17. ROSS's use of Westlaw Content may increase the value of Westlaw Content. *See* Ex. B, Opening Report ¶ 90. The development of legal research tools based upon extensive use of AI is likely to increase the size of the market for legal research while reducing the cost of completing research. *See* Ex. B, Opening Report ¶ 90, Ex. 16. AI, in other words, could expand the market just as the conversion of hardcopy indexes and law reporters to digital versions of opinions and statutes stored on centralized servers has increased the speed of access to the law and, consequently, reduced the labor and other variable costs with which legal research can be completed. *See* Ex. B, Opening Report ¶ 90, Ex. 16 at 282. Lowering average costs will generally result in increased utilization and consumption of legal services and the number of users of these legal research tools, all else equal. Trends in legal research-related industries appear to be consistent with these predictions. See Ex. B, Opening Report ¶ 90, Ex. 23. These trends would, on balance, increase the potential to license Westlaw Content in the manner that Plaintiffs provided it, to those who wanted to use the content for the Interactive use (that is, use in legal research) and Answer Component use (use in AI training), and also to increase the potential for ROSS as well. See Ex. B, Opening Report ¶ 90; (TR-0000030; TR-0000695; TR-0836004).

18. There is no single product market for "AI training data." *See* Ex. C, Rebuttal Report to Krein ¶ 20; Krein Report ¶ 50-52. Customers seeking to purchase AI training data require data specific to the model being trained, and thus most training data sets will not be substitutable for each other. *Id*. As ███████████████████████████████████████████

███████████████████████████████████████████ *See* Ex. C, Rebuttal Report to Krein ¶ 20; Krein Report ¶ 155. Similarly, the Westlaw Content could not serve as a substitute for buyers of the other types of AI training data described by Dr. Krein, as the Westlaw Content would not be relevant to the AI models those buyers are training. *Id*.

19. Plaintiffs have ruled out the possibility of licensing the Westlaw Content to potential or actual competitors, stating "█████████████████████████████████

███████████████████████████████████████████

████████████ (Plaintiffs and Counterdefendants Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation's Second Supplemental Responses and Objections to Defendant and Counterclaimant ROSS Intelligence Inc.'s Interrogatory No. 21 at 18); see also (Martens Deposition 102:3-7, 230:2-4; ROSS-003390563).

20. Plaintiffs have not identified any use for the Westlaw Content as AI training data beyond creating what they see as a competitor to West. They have not identified any potential customers for Westlaw Content as AI training data that are not potential competitors. See Ex. C, Rebuttal Report to Krein ¶ 39. Such a failure is an indication that Plaintiffs are not current participants in this market and have no intention to enter it. A company actively refusing to sell a product enter a market does not provide evidence of an actual or potential market for that product. *See* Ex. C, Rebuttal Report to Krein ¶ 40.

21. When a company states definitively that it will not enter a market, it is reasonable to believe the company's statement that it has no intention of doing so. This is particularly the case when, as here, the only reasonable purchasers of Westlaw Content as AI training data are those companies that would use the Westlaw Content to develop legal research platforms, and Plaintiffs have stated that they will not license their Westlaw Content to these companies. *See* Ex. C, Rebuttal Report to Krein ¶¶ 38-40.

22. There is no evidence that Plaintiffs lost customers or sales as a result of ROSS's alleged use of Westlaw Content, and Plaintiffs have not been deprived of any use that it wishes to make of the Westlaw Content. *See* Ex. B, Opening Report ¶ 83.

23. ROSS's service was offered at a lower price than Westlaw, offered innovative AI search capabilities not available on any other legal research platform, and was winning customers and growing. See (ROSS-009664862; ROSS-009690394; ROSS-009721062). Customers had many reasons they preferred ROSS. See, e.g., (TR-0000512-514 at 512 ("Legal research was intimidating and time consuming, and it required a lot of forethought before even getting started. With ROSS, it's a simple, intuitive process that allows me to use plain language in searches and pinpoint what I'm looking for."); TR-0000519-521 at 519 ("… ROSS would return answers that were clearer than anything he returned by using traditional legal research methods."); TR-0000522-524 at 522 ("[S]omething that used to take me three hours in Westlaw I might be able to do in an hour and a half with ROSS."); TR-0000525-527 at 525 ("ROSS is better than other platforms at getting me closer, faster."); TR-0000531-532 at 531 ("Researching a new area of law, the relevant cases were all within the first page of results of my first search on ROSS. ROSS found the cases instantly rather than the hours it took on Westlaw."); TR0000533-535 at 533 ("On efficiency and completeness, ROSS is leaps and bounds ahead of everyone else."); TR- 0000536-

537 at 536 ("ROSS saves me at least 40% of the time I used to spend on legal research."); TR-0000538-540 at 540 ("ROSS is much better priced than Westlaw, and has provided me with cases I could not find there."); TR-0000541-543 at 541 ("I was looking for some leverage and my ROSS search results led me into a line of cases I hadn't considered before – that the other side hadn't even thought of – and I saw a way to press a settlement."); TR0000544-545 at 544 ("There have been several situations where if I hadn't used ROSS it would have taken me an hour to an hour and a half to find the answer, so that's a significant cost savings to my clients based on my hourly rate.")).

24. In 2020 the cost of ROSS was $89 per month. (TR-0000030). LegalEase, when they licensed access to Westlaw, had to pay over $2,260 per month. (TR-0836004). ROSS did not require long term contracts from its consumer-licensees. (TR-0000695). ROSS provided a product that was accessible to a base of potential consumers with fewer financial resources and less ability to pay Plaintiffs' prices.

25. ROSS's use of the Westlaw Content did not have an impact on the market for or the value of that content for AI training. See Ex. B, Opening Report ¶¶ 85-95, Ex. 23; (Second Supplemental Response to Interrogatory No. 21 at 18).

26. The introduction of a low-cost, innovative product to a market benefits consumers, and ROSS's entry into the legal research market would have been no exception. See Ex. E, Reply Report to Malackowski ¶ 31; (Barnett, Thomas O., "Maximizing Welfare Through Technological Innovation," Presentation to the George Mason University Law Review 11th Annual Symposium on Antitrust, Washington, DC (2017) at 2; Council of Economic Advisors, "Benefits of competition and indicators of market power," Council of Economic Advisors Issue Brief, (Updated May 2016); Kovacic, William E. & Shapiro, Carl, "Antitrust policy: A century of economic and

legal thinking," Journal of Economic Perspectives 14(1) (2000) at 43-60). Restricting the ability of ROSS to develop an alternative to West's legal research platform could have a serious impact on public well-being and economic welfare. See Ex. B, Opening Report ¶ 96; Branting Report ¶ 65.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in  Lafayette, CA  on  September 30, 2024.

Alan Cox