IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE )
CENTRE GMBH and WEST PUBLISHING )
CORPORATION, )
 )
Plaintiffs and )
Counterdefendants, )    C.A. No. 20-613 (SB)
 )
v. )    **REDACTED - PUBLIC VERSION**
 )
ROSS INTELLIGENCE INC., )
 )
Defendant and )
Counterclaimant. )

**PLAINTIFFS' OPPOSITION TO ROSS INTELLIGENCE INC.'S
RENEWED MOTION FOR SUMMARY JUDGMENT ON
ROSS'S AFFIRMATIVE DEFENSE OF FAIR USE**

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
Jeremy King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Yungmoon Chang
Allyn Belusko
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(213) 680-8400

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and
Counterdefendants Thomson Reuters
Enterprise Center GmbH and West Publishing
Corporation*

Original filing date: October 30, 2024
Redacted filing date: November 6, 2024

## TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ................................................................. 1

RESPONSE TO ROSS'S STATEMENT OF THE FACTS ................................ 5

    A.    The Westlaw Content .................................................................. 5

        1.    The West Headnotes ...................................................... 6

        2.    The West Key Number System......................................... 6

        3.    WestSearch and WestSearch Plus .................................... 7

    B.    ROSS's Infringing Use of the Westlaw Content ...................... 9

        1.    ROSS's Use of the Westlaw Content Contained in Bulk Memo............. 12

ARGUMENT .................................................................................................. 15

I.    ROSS CANNOT MEET ITS BURDEN OF ESTABLISHING FAIR USE ................... 15

    A.    Factor 4 – ROSS Affected the Market for and Value of the Westlaw Content........................................................... 15

        1.    ROSS Used the Westlaw Content to Create a Substitute for Westlaw.......................................... 16

        2.    ROSS Diminished the Value Plaintiffs Derived from Exclusivity ........... 18

        3.    ROSS Inhibited the Licensing Markets for Westlaw Content................. 19

        4.    ROSS's Use Harms the Public................................. 24

    B.    Factor 1 – ROSS's Purpose Was Commercial, in Bad Faith, and Non-Transformative ....................................... 25

        1.    ROSS's Use Was Commercial................................. 26

        2.    ROSS's Use Was in Bad Faith ................................ 26

        3.    ROSS's Use Was Not Transformative....................... 27

    C.    Factor 2 – The Westlaw Content Is Highly Creative ............ 34

    D.    Factor 3 – ROSS Took the Heart of Westlaw...................... 38

CONCLUSION................................................................................................ 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
  46 F.4th 489 (6th Cir. 2022) ...................................................................................33

*Am. Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913 (2d Cir. 1994)................................................................................22, 32

*Am. Geophysical Union v. Texaco Inc.*,
  802 F. Supp. 1 (S.D.N.Y. 1992).............................................................................25

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol II*"),
  11 F.4th 26 (2d Cir. 2021) ...............................................................................16, 29

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol II*"),
  598 U.S. 508 (2023).......................................................................................... *passim*

*Apple Barrel Prods., Inc. v. Beard*,
  730 F.2d 384 (5th Cir. 1984) .................................................................................37

*Authors Guild Inc. v. Hathitrust*,
  755 F.3d 87 (2d Cir. 2014).....................................................................................29

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)..............................................................................25, 29

*Baker v. Selden*,
  101 U.S. 99 (1879)..................................................................................................33

*Balsley v. LFP, Inc.*,
  691 F.3d 747 (6th Cir.) ...........................................................................................23

*BellSouth Advert. & Pub. Corp. v. Donnelley Info. Pub., Inc.*,
  999 F.2d 1436 (11th Cir. 1993) .............................................................................37

*Bikram's Yoga Coll. Of India v. Evolation Yoga, Ltd. Liability Co.*,
  803 F.3d 1032 (9th Cir. 2014) ...............................................................................33

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006).........................................................................20, 28, 29

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)...................................................................................29

*Brown v. Netflix,*
    462 F. Supp. 3d 453 (S.D.N.Y. 2020)................................................................17

*Cambridge Univ. Press v. Patton,*
    769 F.3d 1232 (11th Cir. 2014) .......................................................................23

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)...........................................................................16, 22, 38

*Capitol Recs., LLC v. ReDigi Inc.,*
    910 F.3d 649 (2d Cir. 2018)..............................................................................16

*Cariou v. Prince,*
    714 F. 3d 694 (2d Cir. 2013).............................................................................29

*Castle Rock Ent., Inc. v. Carol Publ'g Grp.,*
    150 F.3d 132 (2d Cir. 1998)....................................................................23, 38, 39

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..................................................................................15, 40

*Craft Smith, LLC v. EC Design, LLC,*
    969 F.3d 1092 (10th Cir. 2020) .......................................................................37

*Dr. Seuss Enters., L.P. v. ComicMix LLC,*
    983 F.3d 443 (9th Cir. 2020) ...........................................................................15

*Dunn & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.,*
    307 F.3d 197 (3d Cir. 2002)..............................................................................35

*Educ. Testing Serv. v. Katzman,*
    793 F.2d 533 (3d Cir. 1986)..............................................................................37

*Eldred v. Ashcroft,*
    537 U.S. 186 (2003)...........................................................................................24

*Eliahu v. Mediaite, LLC,*
    No. 23 Civ. 11015, 2024 WL 4266323 (S.D.N.Y. Sept. 23, 2024).....................25

*Experian Info. Sols. Inc. v. Nationwide Mktg. Servs., Inc.,*
    893 F.3d 1176 (9th Cir. 2018) .....................................................................37, 39

*Facebook, Inc. v. Power Ventures, Inc.,*
    No. 08 Civ. 5780, 2009 WL 1299698 (N.D. Cal. May 11, 2009) .........................32

*FameFlynet, Inc. v. Jasmine Enters., Inc.,*
    344 F. Supp. 3d 906 (N.D. Ill. 2018) .................................................................18

*FMC Corp. v. Control Sols., Inc.*,
   369 F. Supp. 2d 539 (E.D. Pa. 2005) ....................................................35

*Fox News Network, LLC v. TVEyes, Inc.*,
   883 F.3d 169 (2d Cir. 2018)...............................................20, 34, 35, 36

*Georgia v. Public.Resource.org, Inc.*,
   590 U.S. 255 (2020)............................................................................25

*Google LLC v. Oracle Am., Inc.*,
   593 U.S. 1 (2021)...............................................................36, 38, 40

*Hachette Book Grp., Inc. v. Internet Archive*,
   115 F. 4th 163 (2d Cir. 2024) ...............................................20, 21, 27, 36

*Harper & Row Publishers v. Nation Enters.*,
   471 U.S. 539 (1985).............................................................. *passim*

*Hustler Mag. Inc. v. Moral Majority Inc.*,
   796 F.2d 1148 (9th Cir. 1986) ...............................................................34

*Idearc Media Corp. v. Nw. Directories, Inc.*,
   623 F. Supp. 2d 1223 (D. Or. 2008) .......................................................37

*Infinity Broadcast Corp. v. Kirkwood*,
   150 F.3d 104 (2d Cir. 1998)..................................................................16

*Keck v. Mix Creative Learning Ctr.*,
   116 F.4th 448 (5th Cir. 2024) ................................................................21

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2004) .................................................................29

*Kienitz v. Sconnie Nation LLC*,
   766 F.3d 756 (7th Cir. 2014) .................................................................29

*L.A. News Service v. KCAL-TV Channel 9*,
   108 F.3d 1119 (9th Cir. 1997) ...............................................................26

*Love v. Kwitny*,
   706 F. Supp. 1123 (S.D.N.Y. 1989)........................................................35

*Lowry's Reports, Inc. v. Legg Mason*,
   271 F. Supp. 2d 737 (Jul. 10, 2003)........................................................32

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..............................................................................15

*Matthew Bender & Co. v. West Publ'g Co.*,
    94 Civ. 589, 1997 WL 266972 (S.D.N.Y. May 19, 1997)......................................40

*Matthew Bender & Co. v. West Publishing Co.*,
    158 F.3d 693 (2d Cir. 1998)........................................................................35, 40

*MCA, Inc. v. Wilson*,
    677 F.2d 180 (2d Cir. 1981)................................................................................37

*Miller v. Universal City Studios, Inc.*,
    650 F.2d 1365 (5th Cir. 1981) ...........................................................................37

*Mittel, Inc. v. Iqtel, Inc.*
    124 F.3d 1366 (10th Cir. 1997) .........................................................................35

*Monge v. Maya Mags., Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ...............................................................21, 23, 39

*Monsarrat v. Newman*,
    28 F.4th 314 (1st Cir. 2022)................................................................................36

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011)........................................................................2, 21, 26

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
    904 F.2d 152 (2d Cir. 1990)..........................................................................18, 39

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004)................................................................................26

*Oasis Publ'g. Co. v. West Publ'g. Co.*,
    924 F. Supp. 918 (D. Minn. 1996) ....................................................................28

*On Davis v. Gap, Inc*,
    246 F.3d 152 (2d Cir. 2001)..........................................................................20, 22

*Pac. & S. Co., Inc. v. Duncan*,
    744 F.2d 1490 (11th Cir. 1984) .....................................................................23, 26

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
    99 F.3d 1381 (6th Cir. 1996) .............................................................................24

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992)..........................................................................26, 27

*S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*,
    946 F.3d 780 (5th Cir. 2020) .............................................................................37

*Salinger v. Random House,*
    811 F.2d 90 (2d Cir. 1987)............................................................................22

*Sega Enters. Ltd. v. Accolade, Inc.,*
    977 F.2d 1510 (9th Cir. 1993) ................................................... *passim*

*Seltzer v. Green Day, Inc.,*
    725 F.3d 1170 (9th Cir. 2013) ............................................................29

*Shihab v. Source Digital, Inc.,*
    No. 23 Civ. 7266, 2024 WL 3461351 (S.D.N.Y. Jul. 18, 2024) ......................22

*Soc'y of Holy Transfiguration Monestary, Inc. v. Gregory,*
    689 F.3d 29 (1st Cir. 2012)............................................................39

*SOFA Ent., Inc. v. Dodger Prods., Inc.,*
    709 F.3d 1273 (9th Cir. 2013) ............................................................36

*Sony Comput. Ent., Inc. v. Connectix Corp.,*
    203 F.3d 596 (9th Cir. 1999) ................................................... *passim*

*Swatch Group Mgmt. Servs. Ltd. V. Bloomberg L.P,*
    756 F.3d 73 (2d Cir. 2014)............................................................23

*Taylor v. Comm'r of Internal Revenue,*
    51 F.2d 915 (3d Cir. 1931)............................................................33

*TCA Corp. v. McCollum,*
    839 F.3d 168 (2d Cir. 2016)............................................................21

*TD Bank, N.A. v. Hill,*
    No. 12 Civ. 7188, 2015 WL 4523570 (D.N.J. July 27, 2014) ..............................34

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009) ............................................................25, 26

*Video Pipeline, Inc. v. Buena Vista Home Ent.,*
    342 F.3d 191 (3d Cir. 2003)............................................................15, 28

*Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't,*
    447 F.3d 769 (9th Cir. 2006) ............................................................27, 32, 36, 37

*Warner Bros. Ent. v. RDR Books,*
    575 F. Supp. 2d 513 (S.D.N.Y. 2008)............................................................38

*Weissmann v. Freeman,*
    868 F.2d 1313 (2d Cir. 1989)............................................................28

*West Publ'g Co. v. Mead Data Cent., Inc.*,
    616 F. Supp. 1571 (D. Minn. 1985) .................................................................26, 35

*White v. West Publ'g Corp.*,
    29 F. Supp. 3d 396 (S.D.N.Y. 2014) ..........................................................................29

*Worldwide Church of God v. Phila. Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ............................................................................23, 28

**Statutes**

17 U.S.C. § 107 ...............................................................................................16, 34, 38

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................15

Thomson Reuters Enterprise Centre GmbH and West Publishing Corp. (together "Plaintiffs") respectfully submit this brief in opposition to ROSS Intelligence, Inc.'s ("ROSS") renewed motion for summary judgment on fair use ("Motion" or "Mot.") (D.I. 677).[1]

## SUMMARY OF THE ARGUMENT

In an effort to justify its large-scale appropriation of Plaintiffs' editorial content, ROSS paints itself as a legal research crusader whose goal was to bring an affordable new technology to a needy public. But that narrative belies the undisputed reality laid out in the emails and admissions of ROSS's executives. ROSS is not a charity, but a for-profit competitor, whose goal was to convert paying Westlaw customers into paying ROSS customers. ROSS's technology, moreover, was far from new. Both Lexis and Westlaw offered natural language search years before ROSS entered the market. Plaintiffs themselves were already using the Westlaw Content to train their AI algorithms to provide relevant law in response to user queries on Westlaw. And when ROSS launched, there were already plenty of affordable or free ways to access the law, as well as a fully functioning market that adequately incentivized innovation. ROSS could have entered this market by developing a product built on its *own* legal analysis; it already had a trove of judicial opinions in its possession. Instead, it copied the Westlaw Content so that it could benefit from Plaintiffs' careful legal analysis without having to make a similar investment itself. ROSS cannot hide behind "accessibility" or "affordability" to excuse copying from a competitor for purposes of creating a replacement product. Permitting this type of copying would seriously undermine the incentives that drive innovation and creativity in the legal research market.

Binding Third Circuit and Supreme Court precedent confirm that ROSS's copying is not a fair use. In *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol II*"), the Supreme

---

[1] Exhibits are attached to the Declaration of Miranda Means (D.I. 678) unless otherwise noted.

Court instructed that use of a work for one of the same purposes as the original does not support a finding of fair use particularly where the use is commercial, as is the case here. 598 U.S. 508, 525 (2023). In *Harper & Row Publishers v. Nation Enterprises*, the Supreme Court clarified that fairness "presupposes good faith," such that illicit conduct (like ROSS's) is not fair. 471 U.S. 539 (1985). And in *Murphy v. Millennium Radio Grp. LLC*, the Third Circuit found commerciality, like ROSS's, strongly weighed against fair use. 650 F.3d 295, 308 (3d Cir. 2011). Accordingly, ROSS cannot meet its burden on any fair use factor:

- **Factor Four (Effect on the Market and Value):** The undisputed facts show multiple types of market effects, including because ROSS: (i) competed in the market for the original work by actively replacing customers' Westlaw subscriptions; (ii) diminished the value Plaintiffs obtained from their own exclusive use of the Westlaw Content as training material; and (iii) impeded Plaintiffs' ability to license the Westlaw Content and its derivatives in the current market and in the potential market for Westlaw Content as training material. As to creating a Westlaw replacement, ROSS tries to distance its copying from the substitutive harm created by its legal research platform. But the two cannot be disentangled. A Westlaw replacement was not some incidental result of ROSS's copying: it was ROSS's singular goal. ROSS claimed its product, built on the Westlaw Content, would bring the "death" of Westlaw contracts; it advertised ROSS in comparison to Westlaw; and it actually succeeded in converting Plaintiffs' customers to ROSS customers. As to diminishing the value of the Westlaw Content, ROSS does not even address it. As to impeding Plaintiffs' licensing market, ROSS contends that the Court should ignore the market for Westlaw Content as AI training material because ROSS did not intend to "sell" the Westlaw Content as such. Mot. 3. But ROSS ***used*** the Westlaw Content without payment in a market that Plaintiffs could reasonably

choose to exploit, and black-letter copyright law requires the Court to consider *that* market effect. Moreover, if conduct like ROSS's were to become widespread, it would be hard for Plaintiffs to continue to sell the Westlaw Content at all, and all of the foregoing effects on the Westlaw Content would be substantial indeed. Thus, allowing ROSS's copying disincentivizes the creation of similar content and search tools that benefit the public, and disrupts an already thriving market, which weighs against fair use.

- **<u>Factor One</u> (Purpose and Character):** ROSS illicitly copied the Westlaw Content to create a legal research product that would compete with and ultimately replace Westlaw. Additionally, just like Plaintiffs, ROSS specifically used the Westlaw Content to train its legal research platform to respond to user queries. Such commercial, bad faith, substitutive use alone is enough to deny ROSS's Motion. ROSS argues that it "transformed" the Westlaw Content into mathematical equations, but that was just a means of implementing the copying and is true of virtually anything copied on a computer. Moreover, the argument obscures the true relationship between the training material and the algorithm. The algorithm learns from *characteristics* of the training material. What were those characteristics? ROSS's AI expert Dr. Karl Branting admitted that the "mathematical relationship" on which ROSS's model is trained is the relationship "███████████████████████████████████████████ ██████████████████████████████████████" Ex. 23 (Branting Rbt. Rpt.) ¶ 11. In other words, the "characteristics" that ROSS used to train its algorithm are the creative choices made by Plaintiffs' attorney-editors. ROSS claims that its copying was merely "intermediate" because the copying occurred during the development of its product rather than in the final product itself, but there is no blanket "intermediate copying" exception to infringement. Mot. 1. Rather, courts look at the purpose of the use. Accordingly, in the two

Ninth Circuit software cases that ROSS cites for the principle of "intermediate copying," the court focused on the fact that the defendants had a different purpose from the original, namely, to achieve compatibility with a new product. ROSS did not have a compatibility purpose here. Instead, ROSS used the Westlaw Content for the ***same*** purpose as Plaintiffs, which weighs this factor against fair use.

- **Factor Two (Nature of the Work):** Despite their underlying legal subject matter, the Westlaw Content is creative. ROSS's claim that the Westlaw Content is highly constrained by the law is undermined by its own experts, including its legal expert, who testified that different legal research companies write different headnotes and organize the law differently, and its technical expert, who opined that thousands of copied West Headnotes were ***not*** similar to their underlying judicial opinions. Moreover, ROSS's claim that the Westlaw Content is entitled to thin protection because it is a compilation misunderstands the law and Plaintiffs' claims, incorrectly assuming that Plaintiffs are asserting rights in a compilation of *facts*. Plaintiffs are not asserting protection in a compilation of facts, but a compilation of legal analysis, including the selection and arrangement of headnotes connected with case passages, as well as the wording of the headnotes. This factor too weighs against fair use.

- **Factor Three (Amount and Substantiality):** ROSS's copying was both qualitatively and quantitatively substantial. It indirectly copied hundreds of thousands of editorially enhanced judicial opinions and directly copied thousands of West Headnotes and the selection and arrangement of those headnotes and case passages within the West Key Number System ("WKNS"). These editorial enhancements are the "heart" of Westlaw and what makes it unique, and obtaining them was not merely incidental to ROSS's project, it was the entire goal. Moreover, ROSS copied more than it needed to accomplish its purpose, which is a key part of

the inquiry on factor three.  Because of that undisputed fact, ROSS cannot meet its burden on this factor either.

Taken together, ROSS has not shown it is entitled to summary judgment, and indeed ROSS's use was not fair as a matter of law.

### RESPONSE TO ROSS'S STATEMENT OF THE FACTS

Plaintiffs incorporate by reference the Statement of Facts from the opening brief, D.I. 673 ("Pls.' Br.") at 7–11.  As an initial matter, ROSS includes in its Statement of Facts a summary of Plaintiff's allegations that omits key portions thereof.  For example, ROSS omits portions of Plaintiffs' interrogatories that relate to the creativity of the West Headnotes and Key Numbers and their development over time.  Ex. 114 (Supplemental Rog Response to ROG 1) at 30–31; Oliver Decl. ¶ 9.  ROSS omits that ██████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████  *See, e.g.*, Exs. 36 (LEGALEASE-00078065); 37 (LEGALEASE-00093066); 25 (Krein Op. Rpt.) ¶¶ 103–14; 85 (TR-0055362); 6 (Hafeez Tr.) 66:4–17.  And ROSS leaves out the fact that LegalEase accessed without authorization a total of ██████ cases containing Plaintiffs' copyrighted content.  Exs. 28 (Malackowski Op. Rpt.) at 53; 35 (TR-0836004); Second Declaration of Miranda D. Means, dated October 30, 2021 (Means Decl.) Ex. 112 (Malackowski Op. Rpt. Schedule 3.1).  In addition, Plaintiffs clarify the following mischaracterizations and omissions by ROSS.

A.    **The Westlaw Content**

Plaintiffs' legal research platform, Westlaw, offers subscribers access to a collection of editorially enhanced judicial opinions arranged within an original classification system, the WKNS.  D.I. 256 ("Oliver Decl.") ¶¶ 3, 8–11.  West's attorney-editors create editorial enhancements, including synopses of cases and West Headnotes, which identify and synthesize

key issues and holdings. *Id.* ¶¶ 4–6; D.I. 679 ("2d Oliver Decl.") ¶¶ 3–5. With respect to the West Headnotes, West's attorney-editors make choices about which judicial opinions to annotate with West Headnotes and how many West Headnotes to create for a given judicial opinion, which concepts and key points of law to include, the specific wording to be drafted, and which case passages should be linked to which West Headnotes, among other choices. *Id.* West's classifiers then assign those West Headnotes and corresponding judicial opinions to a West Key Number, integrating both into the organization of the WKNS. Oliver Decl. ¶¶ 9–10. The Westlaw Content helps researchers find and understand the law. 2d Oliver Decl. ¶¶ 4–5. The Westlaw Content also serves a research and development purpose because it is used as training material for Plaintiffs' AI algorithms, as discussed in more detail below. *Infra* 7–10.

       1.    <u>The West Headnotes</u>



    The West Headnotes "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" so "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" Oliver Decl. ¶ 6; Ex. 8 (Lindberg Dep. Tr.) 117:2–9. The West Headnotes often differ from the language of the underlying judicial opinion.[2] ROSS's putative expert Dr. Frederiksen-Cross admitted that ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. Ex. 24 (Frederiksen-Cross Op. Rpt.) ¶¶140–145; Ex. 21 (Ex. 21 to Frederiksen-Cross Deposition).

       2.    <u>The West Key Number System</u>

    The WKNS reflects Plaintiffs' creative choices about how to organize, classify, structure,

---

[2] ROSS cites a PowerPoint on tips for improving headnotes to imply headnotes are copied from judicial opinions, but it omits the portion that says some headnotes "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" which makes clear that attorney-editors may combine concepts from across a passage into a single West Headnote. Means Decl. Ex. 133 (TRCC-00686613) at -627.

and synthesize the law.  Oliver Decl. ¶¶ 9, 12. Although the WKNS uses legal language, exactly *what* language to use and *how* to organize and adapt topics to the changing technological and legal landscape can be done in numerous ways and requires creativity and judgment.  ROSS's library expert, Richard Leiter, admitted that a ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████.

Means Decl. Ex. 107 (Leiter Tr.) 240:2–7, 254:18–256:19.  He further agreed that ███████████ ██████████████████████████████████████████████████████████████████████████ ███████. *Id.* at 38:8–39:16, 97:6–14, 255:15–21, 256:6–13. Mr. Leiter also admitted that ████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████. *Id.* at 132:3–7, 186:15–19, 209:2–12.[3]

   3. <u>WestSearch and WestSearch Plus</u>

  Four years before ROSS's founding, Westlaw offered a product, WestSearch, ████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████.  Means Decl. Ex. 135 (TR-0433738).  Natural language searching became available across the entire Westlaw platform in 2010, allowing researchers to use their own words to find relevant case law. Means Decl. Ex. 116 at 3–4 (https://legal.thomsonreuters.com/en/insights/white-papers/helping-the-legal-researcher-feel-confident-they-have-done-enough).  In 2018, Plaintiffs created WestSearch Plus, which allowed

---

[3] Although not material to fair use, ROSS misleadingly states that ██████████████████████████ ██████████████████████████████. *Mot.* 11. ██████████████████████████████████ this statement is misleading.  Dr. Leiter admitted during his deposition that ████████████████████████████████████████████████████ █████████.  Means Decl. Ex. 107 (Leiter Tr.) 146:1–5, 147:13–16, 186:22–24.  For example, a significant number of topics were discontinued from 1976 to 1986. *Id.* at 200:4–7.

either natural search language or Boolean searches.  Means Decl. Ex. 109 (Moulinier Tr.) 15:6–11.  Lexis offered natural language search at least as early as 2010.  Means Decl. Ex. 115 (Lexis Quick Reference Guide).[4]

Since in or around 2010, Plaintiffs have used the Westlaw Content to train Westlaw's AI.  Oliver Decl. ¶¶ 12–13; Exs. 11 (Moulinier Tr.) 72:13–74:13, 104:18–20, 108:19–24, 143:6–11; 25 (Krein Op. Rpt.) ¶¶ 75–80; 92 (TR-0884952) ("███████████████████");  Means Decl. 104 (Al-Kofahi Tr.) 11:13–17:5, 37:20–41:15, 44:3–45:15.  ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████    ██████████

████████████████████████████████████████

████████████████████████████████████

WestSearch Plus likewise was trained on Westlaw Content, ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████ ).  ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[4] ROSS erroneously asserts that its platform is different from Westlaw because it returned case passages in response to user queries.  Mot. 26–27.  But it is undisputed that WestSearch Plus returns West Headnotes that are connected to **specific case passages**, as well as a list of cases below the West Headnotes.  Means Decl. Ex. 113 (Krein Rbt. Rpt.) ¶ 44 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████")

██████████████████████████████████████ ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████[5]

## B.  ROSS's Infringing Use of the Westlaw Content

ROSS created the ROSS platform in 2014.  Ex. 2 (Arruda Tr.) 11:18–12:4.  It marketed the platform as using AI to allow researchers to search for legal content by posing questions in natural language.  Ex. 94 (https://blog.rossintelligence.com/post/how-natural-language-search-changing-face-of-legal-research).  As ROSS's CEO Andrew Arruda admits, ████████████████████ ██████.  Ex. 2 (Arruda Tr.) 39:1–3.  There is no dispute that ROSS created the ROSS platform as a replacement for Westlaw.  Exs. 64 (ROSS-009501052) at -052 ("███████████████████ ████████████████████████").  2 (Arruda Tr.) 11:18–12:4, 114:25–115:11; 16 (van der Heijden 30(b)(6) Tr.) 55:21–56:20 (Q: ██████████████████████████████████ ██████████████████ A: █████████████████████).  Indeed, Mr. Arruda readily admits that ██████████████████████████████████████████████████ ████  Ex. 2 (Arruda Tr.) 114:25–115:2–11.  Accordingly, ROSS designed promotional material that specifically targeted Westlaw's customers in an attempt to persuade those customers to switch over to ROSS.  For example, one article posted on ROSS's website stated "███████████████████ ████████████████████████████████████████████"  Ex. 70 (ROSS-

---

[5] ████████████████████████████████████████████████████ █████████████████████.  Dr. Krein explained, "█████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████" Means Decl. Ex. 113 (Krein Rbt. Rpt.) ¶ 45.

010099622) at -623; *see also* Ex. 57 (ROSS-003395895) (█████████████████████████

████████████████).[6]  In another advertisement, ROSS directly identifies supposed negative

aspects of Westlaw and states why ROSS, in comparison, is better.  Ex. 78 (TR-0001119).

To create the ROSS platform, ROSS wanted training material to teach its AI model how to

answer legal questions.  Exs. 13 (Ovbiagele 30(b)(6) Tr.) 48:23–50:9; 73 (ROSS-010271831) at -

831.  ROSS already had a large set of ***judicial opinions*** ███████████████████████.  Exs.

16 (van der Heijden 30(b)(6) Tr.) 239:17–19; 25 (Krein Op. Rpt.) ¶ 149.  But ROSS wanted ***legal***

***analysis***—"legal memos" mapping legal questions to relevant passages from judicial opinions.

Ex. 2 (Arruda Tr.) 275:23–276:12.  ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████    ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

For that content, rather than do the work and analysis itself, ROSS capitalized on the

judgment, choice, and skill of Plaintiffs' attorney-editors to copy Westlaw.[7]  ██████████████

---

[6] ROSS claims its goal was to lower the cost of legal research, but low-cost or free legal research
products were already on the market ***before ROSS's founding***, such as Fastcase, Casemaker, and
Casetext.  Ex. 28 (Malackowski Op. Rpt.) at 16-17. Moreover, ████████████████████████
████████████████████████████████████████████████████████████

*See* Means Decl. Ex. 105 (Arruda Tr. 56:3–57:14).
[7]
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ █ █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ There is simply no dispute that ROSS and LegalEase copied Westlaw Content.

    1.    <u>ROSS's Use of the Westlaw Content Contained in Bulk Memo</u>

ROSS mischaracterizes how the Westlaw Content contained within the Bulk Memos was copied during the training process for its machine learning model. ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ Under normal circumstances, ROSS would have had to buy or create new training material on its own. Instead, ROSS decided it had "████████████████████████████████████████████████

---

[8] *See, e.g.*, Means Decl. Exs. 127 (MORAE_00024103) (██████████████); 126 (MORAE_00002386) (████████████████████████); 118 (MORAE_00003801) (████████████████); 120 MORAE_00013863 (████████████████████); 123 (MORAE_00029239) (████████████████); 125 (MORAE_00045427) (████████); 129 (MORAE_00092628) (████████████); 130 (MORAE_00092629) (████████████); 119 (MORAE_00005079) (████████████████); 124 (MORAE_00043660) ████████████████ 122 (MORAE_00015344) (██████████████); 121 (MORAE_00014068) ██████████████ 26 (MORAE_00030512) (████████████████); 117 (LEGALEASE-00115007) (████████████████████).

████████████████████████████████████████████████████████████████

████████████████████████████. ███████████████████████ ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Thus, ROSS

unquestionably benefited from and utilized the copied Westlaw Content in developing its Case

Classifier.[9]

        Similarly, ROSS states that ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████. ROSS omits, however, the undisputed fact that the Bulk Memos

*themselves* contain the copied elements of Plaintiffs' original selection and arrangement—*i.e.*,

Plaintiffs' original West Headnotes, selection of case passages and arrangement under the WKNS,

among other things.    Moreover, as ROSS admits, ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.* at 17. ████████████████████████████████

██████████████████████████████████████████

        ROSS mischaracterizes the extent to which its AI model was trained on the text of the

copied Westlaw Content by pointing to the mathematical values generated by its ██ features.  Mot.

25–26.  Featurization—the process by which different mathematical values are generated from

---

[9] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████.

training material—is a mechanism for copying and embedding key *characteristics* of the input data (*i.e.*, the Westlaw Content contained within the Bulk Memos) within certain parameters (*i.e.*, ROSS's ▮ features) such that answers for new, previously unseen inputs can be estimated from the information that was copied out of the training material. Ex. 113 (Krein. Rbt. Rpt.) ¶¶ 37–39 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

Here, the "characteristics" used to create ROSS's features are distillations of creative aspects of Plaintiffs' expression. *See* Ex. 23 (Branting Rbt. Rpt.) ¶ 11. To claim, as ROSS does, its model was not trained on the text of the copied Westlaw Content is simply contrary to well-established computer science principles and the undisputed record evidence. As an initial matter, ROSS had the characteristics it needed for featurization *because* it copied Westlaw and the creative expression of Plaintiffs' attorney-editors. ROSS admits the ▮ features it used "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Mot. 24. This reflects the creative choice Plaintiffs made in choosing a given passage of a judicial opinion, creating a West Headnote that summarizes that passage, and linking that West Headnote to that passage. Ex. 113 (Krein Rbt. Rpt.) ¶¶ 36–37. Moreover, the features that generated numbers based on characteristics of the answers did so using quotes that were selected by Plaintiffs' attorney-editors who made creative choices as to how many words and sentences, and which words and sentences to quote, and so on. *Id.* ¶ 37. The same is true of features that analyzed the relationship or words or expressions contained within the questions, as those questions are copies of the West Headnotes created by Plaintiffs' attorney editors. *Id.*

14

As Dr. Krein explained, ROSS's features "

███████████████████████████████████████████████" because "████████████████████████████

█████████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████████

███████" *Id.* ¶ 38 (emphasis added).  Put differently, if ROSS's model was not using the text and

characteristics of the text contained within the Bulk Memos—which reflect creative aspects of

Plaintiffs' expression—there would have been no reason for ROSS to contract with LegalEase for

the Bulk Memo Project; no reason for ROSS to instruct LegalEase to use Westlaw; no reason why

ROSS needed "legal questions" a lawyer would ask and relevant passages of judicial opinions; no

reason ROSS needed a "representative sample" of great, good, and bad questions and answers

across different practice areas. None of it would have mattered, as ROSS could have used any text.

*Id.*  ¶¶ 35–40.  But the undisputed record shows each of those things emphatically mattered, and

ROSS absolutely needed to train its model on the high-quality Westlaw Content.

## ARGUMENT

To be entitled to summary judgment, the movant must show that there is "no genuine

dispute as to any material fact" and the movant "is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  As fair use is "an affirmative defense,"

ROSS "bears the burden of proof."  *See Video Pipeline, Inc. v. Buena Vista Home Ent.*, 342 F.3d

191, 197 (3d Cir. 2003); *see also Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th

Cir. 2020) (same).  As detailed below, ROSS cannot meet its burden because each factor weighs

against finding fair use as a matter of law.

## I.    ROSS CANNOT MEET ITS BURDEN OF ESTABLISHING FAIR USE

### A.    <u>Factor 4</u> – ROSS Affected the Market for and Value of the Westlaw Content

This factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4); *Harper*, 471 U.S. at 566. Relevant to this analysis is not only the effect on the actual or potential markets for the original, but also the effect on the market for potential derivatives, including "those that creators of original works" would "license others to develop." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994); D.I. 547 Memorandum Opinion ("Op.") 23. Moreover, a key part of the analysis, which ROSS generally ignores, is "whether unrestricted and widespread conduct of the sort engaged in" by ROSS would undermine the potential market for the copyrighted work. *Campbell,* 510 U.S. at 590. As the Supreme Court found in *Harper*, a use is not fair where "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright." 471 U.S. at 569. Ultimately, the "burden of proving that the secondary use does not compete in the relevant market is . . . born by the party asserting the defense." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol I*"), 11 F.4th 26, 49 (2d Cir. 2021) (*citing Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) ("As always, [the secondary user] bears the burden of showing that his use does not" usurp the market for the primary work)). ROSS cannot meet its burden because the undisputed facts show that its use had **multiple** effects on the market for Westlaw Content and its derivatives.[10]

1.  <u>ROSS Used the Westlaw Content to Create a Substitute for Westlaw</u>

This factor focuses on whether the copier "brings to the marketplace a competing substitute for the original." *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018) *see also*

---

[10] ROSS relies on *Sony* and *Sega* to argue that its transformative use cannot cause market harm. Mot. 39. But ROSS's use is not transformative, *infra* 27–28, and if transformativeness were sufficient on factor 4, that would collapse it into factor one, which is inconsistent with the Supreme Court's treatment of factor 4 as the "most important." *Harper*, 471 U.S. at 566; *see also Campbell*, 510 U.S. at 578 (finding factors are to be explored and weighed together).

*Harper*, 471 U.S. at 550.  That is precisely what ROSS did here.  The creation of a replacement to Westlaw was not some indirect or unexpected consequence, it was the overt goal and direct effect. ROSS advertised its product by comparison ***to*** Westlaw.  Ex. 70 (ROSS-010099622) at -623; 59 (ROSS-003428727) at -730; 78 (TR-0001119) (ROSS Facebook advertisement asking, "ROSS or Westlaw?"); 2 (Arruda Tr.) 115:16–121:1. [11]  ROSS's executives have admitted that its express goal was to create a replacement for Westlaw.  Ex. 16 (van der Heijden 30(b)(6) Tr.) 55:21–56:20 (Q: ███████████████████████████████████████████  A: ███████████████████ ███████████████████████") (Q: ██████████████████████████ A: ███████); 17 (von Simson Tr.) 93:17–20; 14 (Ovbiagele Antitrust Tr.) 29:3–13; Ex. 5 (Cox Tr.) 108:8–14.  And ROSS succeeded in that goal.  ROSS's co-founder Andrew Arruda admitted that ████████████████████████████████████████████████████████████.  Ex. 2 (Arruda Tr.) 115:9–11; 114:21–115:2; 116:23–117:11.[12]  Mr. van der Heijden confirmed that ████████████████████████████████████████████████████.  Ex. 16 (van der Heijden 30(b)(6) Tr.) 364:16–365:18; *see also* Exs. 90 (TR-0521595); 63 (ROSS-003695819) at - 822.

Although ROSS acknowledges that this factor should focus on "substitutionary" market effects, Mot. 36, it advances a series of arguments as to why its copying was non-substitutive, none of which have merit.  ***First***, ROSS argues that lawyers and legal researchers who prefer using headnotes and key numbers will still go to Westlaw because that content is not available on

---

[11] ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████.  Exs. 57 (ROSS-003395895); 46 (ROSS-003227570) at -575 (███████████).
[12] ROSS cites *Brown v. Netflix* for the proposition that factor four weighs in favor of fair use where the infringer targets a different audience from plaintiff—but here by Mr. Arruda's own admission, the Parties target the ***same*** audience.  462 F. Supp. 3d 453, 463 (S.D.N.Y. 2020).

ROSS's platform.  Mot. 37.  But researchers who wish to benefit from the legal analysis of Plaintiffs' attorney-editors can get that benefit from *either* platform—indeed, both platforms offer search engines that are powered by content created by ***Plaintiffs'*** attorney-editors because ROSS was built on Plaintiffs' backs.  *Supra* 7–10.  Training on high quality content (here, the Westlaw Content) was critical to the development of ROSS's competing platform and a key selling point for the ROSS platform.  *Supra* 10.  Accordingly, ROSS's attempt to disconnect its copying of the Westlaw Content from its competition with Westlaw does not hold water.

***Second***, ROSS argues that *Sony* and *Sega* stand for the proposition that the introduction of "competition" into the marketplace is a "virtue under the copyright law."  Mot. 37.  But neither *Sony* nor *Sega* involved a similar scenario where two competitors were selling direct replacements powered by one competitor's copyrighted content.  Rather, *Sony* and *Sega* involved incidental copying necessary to achieve ***compatibility*** with new products and environments (such as Sony games in a ***new*** environment or ***new*** games on a Sega console).  *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 606 (9th Cir. 1999); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527 (9th Cir. 1993).  ROSS did not expand the market by creating a compatible product— it created a ***replacement*** in an already thriving market that already incentivizes competition and creation.  This is precisely what the Copyright Act is designed to prevent.  *See Harper*, 471 U.S. at 568 n.9 (Where "there is a fully functioning market that encourages the creation and dissemination" of a work, "permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit.").

### 2.    ROSS Diminished the Value Plaintiffs Derived from Exclusivity

Copyright law recognizes that exclusivity can contribute to the value of a copyrighted work, and that depriving an author of that exclusivity can decrease the value thereof.  *See Harper*, 471 U.S. at 543 (exclusivity factored into the licensing fee for the work); *FameFlynet, Inc. v.*

*Jasmine Enters., Inc.*, 344 F. Supp. 3d 906, 913 (N.D. Ill. 2018) (loss of ability to control a photograph's exclusivity diminished its value). Here, part of the value of the Westlaw Content is that Plaintiffs used it to train their search algorithms and had ***not*** licensed it to competitors. Exs. 11 (Moulinier Tr.) 72:4–11 ███████████████████████████████), 143:1–11; 5 (Cox Tr.) 123:21–124:13; Oliver Decl. ¶ 13; Ex. 9 (Malackowski Tr.) 42:3–24. ROSS destroyed that value by depriving Plaintiffs of the "████████████████████████████████████" Ex. 9 (Malackowski Tr.) 76:5–77:22. Widespread use would completely extinguish the value of exclusivity—anyone could use the Westlaw Content to create a comparable AI search algorithm. This strongly weighs this factor against fair use.

ROSS does not directly address this market effect beyond generally claiming that because it "used the Westlaw Content to develop its training data," its use was "intermediary" and could not substitute for Plaintiff's use. Mot. 37. The flaws in ROSS's "intermediary" copying defense are detailed below. *Infra* 31–33. But the fact that ROSS used the Westlaw Content for this supposedly "intermediary" purpose as training material is part of what makes the market effect so significant for Plaintiffs—because Plaintiffs were deriving value from doing the same thing.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

"█████████████████████████████████████████" Ex. 13 (Ovbiagele 30(b)(6) Tr.) 167:24–170:19 (emphasis added). Denying that value now is Janus-faced. Plaintiffs were entitled to retain the benefits both from having an unmatched algorithm trained on Plaintiffs' content ***and*** from being able to enter the derivative market at a strategically advantageous time and under suitable terms. ROSS supplanted that use and thus deprived Plaintiffs of that value.

3.    <u>ROSS Inhibited the Licensing Markets for Westlaw Content</u>

ROSS also cannot escape the impact its copying has on the licensing market for the

Westlaw Content.  It is black letter law that the "impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F. 4th 163, 192 (2d Cir. 2024) (*quoting Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)).  Here, there are multiple licensing markets impacted by ROSS's copying.  ROSS cannot dispute that there is an ***existing*** market for and clearly defined value to the Westlaw legal research platform, which includes the Westlaw Content.  Ex. 5 (Cox Tr.) 55:3–56:11.  There is also a reasonable ***potential*** licensing market for derivatives of the Westlaw Content to train AI algorithms.  Numerous companies ***currently*** license large portfolios of content for AI training purposes.  Ex. 25 (Krein Op. Rpt.) ¶ 153.[13]  ROSS's own market expert, Dr. Alan Cox, admitted that ███████████████████████████████████ ██████████ Ex. 5 (Cox Tr.) 172:5–12, 175:8–18.  Indeed, ████████████████████ ████████████████████████████████.  Exs. 15 (Shafik Tr.) 122:1–25; 47 (ROSS-003382388) (data spend); 29 (Malackowski Rbt. Rpt.) at 23–26.  And there are other potential buyers: other legal research companies use AI on their own platforms, indicating potential demand for legal research content to train these algorithms.  Ex. 28 (Malackowski Op. Rpt.) at 45–48; *see also* 5 (Cox Tr.) 26:20–27:3.  ROSS recognized the existence of potential buyers when it took steps to █████████████████████████.  Ex. 13 (Ovbiagele 30(b)(6) Tr.) 167:2–168:20.

By using the Westlaw Content without payment, ROSS impaired Plaintiffs' ability to charge others for that same content in the existing and potential markets, which thus harms the market therefor.  Ex. 9 (Malackowski Tr.) 76:5–77:22; *see On Davis v. Gap, Inc*, 246 F.3d 152,

---

[13] Plaintiffs contend this evidence of an existing and potential market is sufficient to weigh this factor against fair use as ROSS cannot present evidence to rebut it.  At best, the issue should go to the jury, not resolved in ROSS's favor.

167–68, 175–76 (2d Cir. 2001)*; see also Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (by using content without payment, TVEyes deprived Fox News of "licensing revenues from TVEyes"). If anyone could use the Westlaw Content to develop competing legal research platforms without Plaintiffs' permission, it would make a major inroad on the copyright and hurt Plaintiffs' ability to charge for access to Westlaw. Ex. 29 (Malackowski Rbt. Rpt.) at 24–25. And widespread copying would **destroy** a potentially lucrative licensing market for Westlaw Content to train AI, as none of the potential customers (other legal research companies) would pay if they could use Westlaw Content for free. *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012) (widespread use would result in "the bottom literally dropp[ing] out of the market").

ROSS's arguments that its copying did not affect the licensing market for the Westlaw Content are meritless. **First**, ROSS argues that there is no market effect because it did not **sell** the Westlaw Content to others. Mot. 3.[14] Not so. It is black-letter copyright law that **using** a work without paying the customary licensing fee causes market harm under factor four, including in this Circuit, and that is what ROSS did. *See, e.g., Murphy*, 650 F.3d at 308 (finding ability to reproduce photographer's work without paying traditional license fee would adversely impact "ability to license his photograph," making it "likely that cognizable market harm" would occur); *Hachette*, 115 F.4th at 192 (Internet archive appropriated the works "without payment of [the] customary

---

[14] In support of this argument, ROSS cites *Keck v. Mix Creative Learning Center*, but that case involved using an artist's work for educational purposes that, if anything, "increases [the artist's] name recognition and commercial value" and thus did not cause market harm. 116 F.4th 448, 455 (5th Cir. 2024). ROSS also cites *TCA Corp. v. McCollum* for the same proposition, but in that case the Second Circuit found on a 12(b)(6) motion that the allegations in the complaint that the unlicensed use of a work affected plaintiff's ability to license it weighed factor four **against** fair use, not the other way around. 839 F.3d 168, 186–87 (2d Cir. 2016). Neither case holds that the only way to harm the licensing market for a work is by reselling the work, and ROSS cites no other authority for such a claim.

licensing fee" and thus "usurped a market that properly belongs to the copyright holder."); *On Davis*, 246 F.3d at 176 (finding "market harm through his loss of the royalty revenue . . . , as well as through the diminution of his opportunity to license to others . . . .").

**Second**, ROSS claims that this well-accepted approach invites the vice of "circular" reasoning, citing Nimmer on Copyright. Mot. 39. The law, however, already accounts for and "guards against this vice" by limiting consideration to the impact of the use on "potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 930–31 (2d Cir. 1994) (*citing Campbell*, 510 U.S. at 591–92). That is precisely the market that Plaintiffs assert was affected by ROSS's failure to pay for its use: a reasonable potential licensing market. Indeed, the existence of that **potential** market for Plaintiffs' content is confirmed by the **existing** market for other companies' comparable content. *Supra* 20.

**Third**, ROSS argues there is no market effect because Plaintiffs have no present intent to sell Westlaw Content as training material. Mot. 38. But courts have time and again rejected that sort of argument. In *Salinger v. Random House*, the author disavowed any intention to publish certain letters, but the Second Circuit nonetheless found that unauthorized publication thereof harmed the potential licensing market, reasoning that "Salinger **has the right to change his mind**" and that he was "entitled to protect his **opportunity** to sell his letters." 811 F.2d 90, 99 (2d Cir. 1987) (emphasis added); *see also Shihab v. Source Digital, Inc.*, No. 23 Civ. 7266, 2024 WL 3461351, at *7 (S.D.N.Y. Jul. 18, 2024). Here, Plaintiffs are actually using the Westlaw Content as AI training material, and have not even disavowed their desire to sell it as such in the future; their ability to do that should be protected. Indeed, the Second Circuit recognized that "[i]t would [] not serve the ends of the Copyright Act—*i.e.*, to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic

decision not to saturate the markets with variations of the original." *Castle Rock Ent., Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145–46 (2d Cir. 1998) (finding that even where the copyright holder has "evidenced little if any interest in exploiting [a] market for derivative works ..., the copyright law must respect that creative and economic choice."). The Ninth, Sixth, and Eleventh Circuits are all in accord. *See*, *e.g.*, *Monge*, 688 F.3d 1164, 1181 (9th Cir. 2012) (finding plaintiff had right to control delayed future markets even where he disavowed intent to enter them); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000) (same); *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir.) (finding adverse market effects even where plaintiffs "have no present intention of exploiting the market"); *Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) ("Copyrights protect owners who immediately market a work no more stringently than owners who delay before entering the market."). There is no reason to believe the Third Circuit would not follow this sound approach, and ROSS cites none.[15]

**Finally**, lacking any evidence to counter the overwhelming, undisputed evidence showing that a market for Westlaw Content as AI training data is likely to develop, ROSS insists that "AI training data should not be the focus" of the Court's factor four analysis. Mot. 39. In particular, ROSS claims that the Court should not look at the "intermediary step" in the process of the alleged infringement to determine market harm, claiming that in *Sony* and *Sega* the Second Circuit looked at the effect on the market for video games, not software development. Mot. 39. This makes no

---

[15] ROSS cites two cases that are inapposite. First, it cites *Cambridge University Press v. Patton*, where the Eleventh Circuit, "**absent evidence to the contrary**" inferred from the fact that the plaintiff had not licensed the work at issue that it did not think there would be enough of such use to make a license available for that use. 769 F.3d 1232, 1277 (11th Cir. 2014) (emphasis added). Here, by contrast, Plaintiffs do not license the Westlaw Content as AI training material because there is economic value in its current exclusivity, not lack of demand or value. *Supra* 18–19. Likewise, in *Swatch Group Management Services Ltd. V. Bloomberg L.P.*, there was no evidence of an existing or potential licensing market (as here) and therefore nothing suggested any possible market effect at all. 756 F.3d 73 (2d Cir. 2014).

23

sense for multiple reasons.  First, copying of the Westlaw Content as AI training material was not a "step" in the process of the alleged infringement, it *was* the infringement.  Second, in *Sony* and *Sega*, the plaintiffs did not argue or present evidence of harm to the licensing market for derivatives, only harm to the market for the end-product; here there is evidence of *both*.  *Supra* 17–19.  Third, as this Court already found, citing Supreme Court precedent, factor four "*must* take account not only of harm to the original but also of harm to the market for derivative works." Op. 23 (emphasis added) (*citing Harper*, 471 U.S. at 568.)  The market for derivatives of Westlaw Content as training material thus cannot be blithely ignored.

### 4.    ROSS's Use Harms the Public

In assessing factor 4, as ROSS admits, Mot. 39–40, courts also must look at the impact on the public.  The Supreme Court has admonished courts that "gave insufficient deference to the scheme established by the Copyright Act for fostering the [creation of] original works," *Harper*, 471 U.S. at 545–46, 560, as the Framers intended copyright to promote "free expression" by "establishing a marketable right." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003).  By doing so, copyright protection "supplies the economic incentive to create and disseminate ideas." *Harper*, 471 U.S. at 558. Thus, where "there is a fully functioning market that encourages the creation and dissemination" of a work, "permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit."  *Harper*, 471 U.S. at 568 n.9; *see also Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1391 (6th Cir. 1996).

ROSS admits that "making legal opinions easier to find would increase access to legal services" and benefit the public, Mot. 39–40, but it overlooks the fact that its use actually disrupts the fully functioning market that *already* incentivizes the creation of products, like Westlaw, that

provide those benefits.[16]   Westlaw plays a significant role in helping researchers find and understand the law, and benefits clients by increasing the efficiency and accuracy of legal research. *See* Exs. 97–98.   This innovation required a significant investment in the creation of Westlaw Content and the use thereof to train Plaintiffs' algorithms—by decreasing the value of this content in the existing and potential markets, ROSS's use ***undercuts*** monetary incentives to create helpful products and algorithms that help researchers find law.   It would make little sense to invest in creativity if competitors could free-ride thereupon.   *See Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 27 (S.D.N.Y. 1992) (recognizing that through its ability to profit from its rights, the plaintiff "expanded [the] range" of journal articles available, and that publication of such articles requires a "large investment" that is incentivized through copyright protection and would be harmed by widespread copying); *Eliahu v. Mediaite, LLC*, No. 23 Civ. 11015, 2024 WL 4266323, at *8 (S.D.N.Y. Sept. 23, 2024) (finding if use became widespread, "economic incentive to create these important works in the first place would disappear").

## B.   <u>Factor 1</u> – **ROSS's Purpose Was Commercial, in Bad Faith, and Non-Transformative**

This "factor [] focuses on whether an allegedly infringing use has a further purpose or different character" from the original.   *Warhol II*, 598 U.S. at 525.   In assessing this factor, according to *Authors Guild v. Google*, on which ROSS relies, courts consider whether the use was (1) ***commercial***, (2) in ***bad faith***, and (3) ***transformative***.   804 F.3d 202, 214, 218–19 (2d Cir. 2015).   ROSS tellingly does not address the first and second.[17]   The third, transformativeness, is a

---

[16] Moreover, ROSS was admittedly a for-profit company selling its product for a price, not a non-profit organization providing free access to the law, as in *Georgia v. Public.Resource.org, Inc.*, on which ROSS relies for its claim that its copying benefits the public.   590 U.S. 255, 261–62 (2020).   There are many free and low-cost ways to access judicial opinions, and unlike in *Georgia*, Plaintiffs are not claiming copyrights therein or attempting to restrict access thereto.

[17] For example, ROSS cites *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) for the standard on transformativeness.   Mot. 33.   There, however, the court considered

matter of degree to be weighed against the other considerations. *Warhol II*, 598 U.S. at 525.

### 1.    ROSS's Use Was Commercial

ROSS does not address what this Court already found: that ROSS's use was "undoubtedly commercial." Op. 16.  ROSS's unquestionably commercial use of the Westlaw Content was directly substitutive and competitive with Westlaw, motivated purely by profit, which militates "strongly against a finding of fair use." *See Pac. & S. Co.*, 744 F.2d at 1496 ("unabashedly commercial" use was not fair use, noting that the defendant could not "hide the fact that profit is its primary motive."); *Harper,* 471 U.S. at 562 (commerciality weighed against fair use); *Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992) (same); *Murphy,* 650 F.3d at 308 (same); *West Publ'g Co. v. Mead Data Cent., Inc.*, 616 F. Supp. 1571, 1580 (D. Minn. 1985) (same).

### 2.    ROSS's Use Was in Bad Faith

Although ROSS does not address it, the Supreme Court has held that "the propriety of the defendant's conduct" is part of factor one.  *See Harper,* 471 U.S. at 562 ("Fair use presupposes 'good faith' and 'fair dealing'" (internal citations omitted)).  Such bad faith conduct includes where the defendant requested a license, was refused one, and then obtained a copy from a third party rather than paying the requisite fee.  *L.A. News Service v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997).  It also includes acquiring a copyrighted work in violation of the law weighs against fair use.  *See Harper*, 471 U.S. at 563; *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 475, 478 (2d Cir. 2004).  Here, ROSS repeatedly attempted to get access to Westlaw through third parties

---

commerciality, noting that a commercial purpose "tends to weigh against fair use," and noted that it "***must be weighed*** along with [the] other factors." *A.V.* at 638–39 (internal quotations omitted, emphasis added).  That case did not involve a competitor using content to create a directly competing commercial product, and so the commerciality considerations were not as strong.  And there was a more transformative purpose, as the plaintiffs in *A.V.* did ***not*** use the content for the same archival purpose as the defendant.  *Id.* 638–640.  By contrast, ROSS was a direct commercial competitor, creating a direct replacement for Plaintiffs' product.

██████████████████████. Exs. 76 (ROSS-023032254) (███████████████

█████); 54 (ROSS-003390881) at -884 (███████████████████████████);

16 (van der Heijden 30(b)(6) Tr.) 87:14–89:4, 101:19–103:5 (admitting █████████████

██████████████████████); 52 (ROSS-003390772).  ROSS knew from the

█████████████████████████████████████████████████████

Exs. 51 (ROSS-003390563) at -563; 31 (ROSS's Supp. Resps. Pls.' 1st Interrogs.) No. 11.  Yet

ROSS still contacted LegalEase about creating the training content ROSS needed, stating that it

wanted LegalEase "██████████████████████████" to do so.  Ex. 71

(ROSS-010164290).[18]  The bad faith nature of ROSS's conduct weighs factor one against fair use.

*See also Rogers*, 960 F.2d at 310.

### 3.    ROSS's Use Was Not Transformative

In addition, ROSS cannot meet its burden of showing that its use of the Westlaw Content

was transformative, let alone transformative enough to outweigh the commerciality and bad faith

nature of the use.  The proper focus of this inquiry is not on whether the copier has created a

"transformative work" in general; in fact, "the same copying may be fair when used for one

purpose but not another."  *Warhol II*, 598 U.S. at 533.  Rather, the focus is on whether the use at

hand "shares the purpose or character of the original work."  *Id.* at 528.  Use of a work for the

same purpose as any of the "multiple ways" in which plaintiff uses the original work is not

transformative.  *Id.* at 551 (finding factor one weighed against fair use where copying was for the

"same purpose" as the oirignal); *see also Hachette*, 115 F.4th at 180–81 (use for "same purpose as

the originals" was not transformative); *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769,

---

[18] ROSS's later efforts to access Westlaw, ████████████████████████
████████████are further evidence of bad faith, as they show that it knew it could not
access the Westlaw Content legally.  Ex. 74 (ROSS-010373855) at -855.

778 (9th Cir. 2006); *Worldwide Church*, 227 F.3d at 1117 (where the use in question "is for the same intrinsic purpose as" the copyright holder's purpose, that fact "seriously weakens a claimed fair use" and undermines transformativeness) (*quoting Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)).

ROSS tellingly does not directly compare the Parties' respective purposes, which makes sense because the purposes are the same. ROSS copied Westlaw to develop a competing substitute: a legal research platform to help users find relevant law. Pls.' Mot. 13–15. ROSS's stated purpose of "adapting artificial intelligence ("AI") technology to legal search engines," Mot. 1, is precisely what Plaintiffs were *already* doing with the Westlaw Content, and thus is not transformative. *See, e.g.*, *Video Pipeline*, 342 F.3d at 199; *Oasis Publ'g Co. v. West Publ'g. Co.*, 924 F. Supp. 918, 927 (D. Minn. 1996) (finding no fair use where business plans showed "directly competitive" nature of infringing products with West products). Moreover, ROSS specifically copied the Westlaw Content to train its AI search algorithm. Pls.' Mot. 8–10. Plaintiffs used the Westlaw Content for that same purpose; it trained a research platform to find relevant law. *Supra* 7–9. The use is not transformative under the binding precedent set by *Warhol II*. 598 U.S. at 523–24.

Each of ROSS's arguments on transformativeness is unavailing. *First*, ROSS claims it "did more" to the Westlaw Content than in other cases finding transformativeness. For example, ROSS claims it "did more than collect images of posters for inclusion in a historical work," as the plaintiff did in *Bill Graham Archives*, 448 F. 3d at 612–613. But ROSS misses the point of *Bill Graham Archives* and cases like it—there, the Second Circuit found that the use was transformative not because of how much the defendant did but because the defendant's *purpose* in using the posters to convey an actual historical occurrence was different from the plaintiff's

*purpose* of using the posters to advertise concerts. *Id.* at 609–611. ROSS had the same purpose as Plaintiffs here (to create a legal research platform), making *Bill Graham Archives* inapplicable.[19] ROSS also relies on a series of Second Circuit cases in which courts have found collages and montages transformative—these cases have virtually nothing to do with this one, which does not involve a collage or montage created using the Westlaw Content. *See Blanch v. Koons*, 467 F.3d 244, 253 (2006) (collage); *Cariou v. Prince*, 714 F. 3d 694, 710 (2d Cir. 2013) (same);[20] *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176–77 (9th Cir. 2013) (video montage). And they predate *Warhol II*, in which the Court clarified that the focus should be on the *purpose* of the infringing use, rather than how much was added. Finally, ROSS tries to equate its use of Westlaw Content to the use in *White v. West Publishing Corp.*, Mot. 33, but that case only further demonstrates Plaintiffs' point. 29 F. Supp. 3d 396 (S.D.N.Y. 2014). There, the two parties' purposes were *different*: one was to secure a specific legal outcome, the other was to create "an interactive legal research tool." *Id.* at 399. Here, *both* Parties' purpose was to create a legal research tool.

    *Second*, ROSS claims it "transformed" the words in the Bulk Memos into "mathematical relationships" and therefore its use is not "copyright use." Mot. 34. Anything done on a computer

---

[19] Likewise, ROSS's reliance on search cases like *HathiTrust*, *Authors Guild*, and *Kelly* is misplaced—in *Authors Guild Inc. v. Hathitrust*, there was no evidence that the authors' purpose included full-text search functionality, and thus by enabling this new feature, the defendant created something new with a different purpose. 755 F.3d 87, 97 (2d Cir. 2014). The Court emphasized that this functionality would help people find books, not just substitute for them. The same was true in *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2004), both of which involved parties with highly different purposes. But that is not true here. Here, Westlaw already had the functionality that ROSS used the Westlaw Content to develop, and in fact Plaintiffs used the Westlaw Content to power that functionality already. The purposes here are far more deeply intertwined than in either of these cases.

[20] *Cariou* is controversial and has been widely criticized, including by the Seventh Circuit in *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756 (7th Cir. 2014). In fact, the Second Circuit in *Warhol I* clarified that *Cariou* should be limited in its application, cautioning against stretching "the decision too far." 11 F. 4th at 38.

involves breaking things down into math; compressing a JPEG image, for instance, relies on transform coding to mathematically represent it with less information. Ex. 138 ("What is Image Compression?"). But copying an image in a JPEG is no more transformative than copying it on paper. Moreover, "████████████████████████████████████████ ████████████████████████████████████████████████████████████" Ex. 26 (Krein Rpl. Rpt.) ¶ 26. What were the characteristics ROSS's model learned from? Dr. Branting admitted that the "████████████████████" on which ROSS's model is trained is in fact the relationship "████████████████████████████████ ████████████████████████████████████████" Ex. 23 (Branting Rbt. Rpt.) ¶ 11. Dr. Branting further explained that ROSS wanted "████████████████████████████████ ████████████████████" which could be achieved by "████████████████████████████" Ex. 23 (Branting Rbt. Rpt.) ¶ 14. The phrasings of the queries in the Bulk Memos were copied from Plaintiffs' attorney-editors' phrasings in the West Headnotes, and the answers were copied from the passages in judicial opinions to which Plaintiffs' attorney-editors connected those West Headnotes. *Supra* 10–12. Use of the WKNS ensured that ROSS obtained questions for a diverse range of cases. Ex. 25 (Krein Op. Rpt.) ¶¶ 104–109. ROSS thus trained on precisely the editorial content that was infringed.

ROSS's invokes math to distance itself from the substance of the Bulk Memos,[21] but there

---

[21] In its Statement of Facts, ROSS further downplays the importance of its copying to ROSS's end goal—*i.e.*, creating a competing legal research product—by characterizing the Bulk Memo questions as "legal questions that a lawyer would ask" and the answers as "quotes precisely as they appear in legal opinions." Mot. at 17. That characterization ignores that LegalEase and Morae Global were only able to create such questions and identify relevant answers by copying the creative choices made by Plaintiffs' attorney-editors. As Dr. Krein explained, ████████████ ████████████████████████████████████████████████████████████████████████████████████████

is no disentangling the substance here; ROSS obtained the characteristics it used to train its AI algorithm by copying the Westlaw Content. By its own account, ROSS "needed **legal questions** mapped directly to passages from case law that **answer those questions**. It was crucial that the passages mapped directly to case law in our database because we wanted to teach our system to give on-point answers directly from primary law." Ex. 77 (Article) (emphasis added). Because ROSS needed not just **any** content, but legal analysis, ROSS heavily controlled and supervised the creation of the Bulk Memos because it cared about the quality of those memos. Ex. 13 (Ovbiagele Tr.) 75:12–77:5; Ex. 38 (LEGALEASE-00171828). Mr. van der Heijden admitted that ██████

████████████████████████████████████████████████████████████████████

████████████████████████████. Means Decl. Ex. 110 (van der Heijden Tr.) 323:1–

17 (Q: ████████████████████████████████████████████████████████████

A: ██████████████████████████████████████████"); Ex. 13 (Obviagele Tr.)

83:12–18. Using the Westlaw Content accomplished that goal. [22]

    **Third**, although ROSS copied the Bulk Memos (containing the Westlaw Content) multiple times during the multi-step training process (not just in the form of "mathematical equations" but also **verbatim**), ROSS claims that this copying was merely "intermediate" because its final product "contains no headnotes, key numbers, synopses, or other infringing material." Mot. 36. In *Sega*, the Ninth Circuit specifically held that "the Copyright Act does not distinguish between

 In other words, the Bulk Memos link Plaintiffs' copyrighted elements together just as Plaintiffs do on Westlaw, which is why it was valuable to ROSS as high-quality training data. *Id.*

[22] Whether ROSS ultimately converted certain content into mathematical equations is irrelevant given that what matters here was ROSS's **purpose**, which was to train its AI algorithm and create a replacement to Westlaw. However, even if the Court does find this issue material, this evidence is sufficient to find for Plaintiffs (or at the very least, send the question to the jury); ROSS has not met its burden of showing transformativeness as a matter of law.

unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent." 977 F.2d at 1518. Accordingly, so-called "intermediate" copying may constitute copyright infringement, as courts look to the purpose to determine transformativeness, not the stage of the copying. *Id.* For example, in *Facebook, Inc. v. Power Ventures, Inc.*, the court found that copying Facebook pages so that defendant's software could extract the user information may violate Facebook's copyrights "if [defendants] first have to make a copy of a user's entire Facebook profile page in order to collect the user content." No. 08 Civ. 5780, 2009 WL 1299698, at *4 (N.D. Cal. May 11, 2009). And in *Lowry's Reports, Inc. v. Legg Mason*, the defendant used ***internally*** copies of the plaintiffs' works "to advance the business of Legg Mason without due payment," weighing factor one against fair use as a matter of law. 271 F. Supp. 2d 737, 748–49 (Jul. 10, 2003) (finding no fair use even where the copyrighted works were "works of nonfiction" that were "replete with uncopyrightable facts"). *Wall Data* likewise involved internal use of a software program without paying the license fee, which the Ninth Circuit found was not transformative. 447 F.3d at 780. Similarly, in *American Geophysical Union v. Texaco*, the defendant used copies of medical journal articles for internal company research. 60 F.3d at 914. That is precisely what occurred here; ROSS repeatedly copied the Bulk Memos during the training process, without paying a license, in order to create a competing substitute.

Likewise, in both *Sony* and *Sega*, the Ninth Circuit focused on the purpose of the copying, not just the stage. In *Sega*, the court found that the copying was transformative where defendant disassembled object code "in order to understand the functional requirements" and achieve compatibility with a new product. 977 F.2d at 1520–28. Accordingly, the Ninth Circuit found that "where disassembly is the ***only way*** to gain access to the ideas and functional elements embodied in a copyrighted computer program ***and*** where there is a legitimate reason for seeking

such access, disassembly is fair use." *Id.* at 1527.  None of these facts are present here.  This case does not involve disassembly of computer programs, or computer code at all for that matter.  Nor was copying the only way to gain access to ideas and functional elements of the Westlaw Content—ROSS already had the judicial opinions in its possession.  Exs. 16 (van der Heijden 30(b)(6) Tr.) 239:17–19; 25 (Krein Op. Rpt.) ¶ 149.  And ROSS could have created the legal analysis it needed to train its algorithm, rather than copying the Westlaw Content.  Ex. 3 (Branting Tr.) 276:5–10. [23]  The same compatibility purpose was central to the Ninth Circuit's decision in *Sony*, which found that the use of Sony's code during reverse engineering to create a compatible platform was transformative.  203 F.3d at 606.  And in *Sony*, the defendant was using the code to create a wholly new environment (computers vs. game consoles) on which users could play games.  That is not what ROSS did—it copied to replace Plaintiffs' product in the exact same environment.

---

[23] ROSS claims that LegalEase did not infringe the WKNS because it merely used Westlaw as "intended." Mot. 35 n.22.  But LegalEase not only used the WKNS, it ***copied*** it.



Accordingly, ROSS's case citations are inapplicable.  In *Taylor v. Commissioner of Internal Revenue*, there was no copying, the issue was whether the plaintiff could stop others from making use of his idea. 51 F.2d 915 (3d Cir. 1931). Likewise, in *Baker v. Selden*, the author tried to assert that employing a system of ruled-lines and bookkeeping (not copying expression) was infringement. 101 U.S. 99, 101 (1879). *Bikram's Yoga College Of India v. Evolation Yoga, Ltd. Liability Co.* is completely irrelevant, as that case involved the question of whether the work at issue was protectable choreography, which has a very specific definition under the Copyright Act. 803 F.3d 1032 (9th Cir. 2014).  *ACT, Inc. v. Worldwide Interactive Network, Inc.*, involved the arrangement of skill levels for assessment, and there the court found that the testing company ***had*** established it was likely to succeed on its infringement claims. 46 F.4th 489 (6th Cir. 2022).

And unlike *Sony* nor *Sega*, which involved copiers that had a different purpose, ROSS copied for the same purpose as Plaintiffs, i.e., to create a legal research platform ***and*** to train a legal search algorithm to power that platform. *Supra* 28–29.

C.    <u>**Factor 2 – The Westlaw Content Is Highly Creative**</u>

This factor focuses on the nature of the copyrighted work. 17 U.S.C. § 107(2). In assessing this factor, courts consider "whether the work was creative, imaginative, and original." Op. 20 (*citing Hustler Mag. Inc. v. Moral Majority Inc.,* 796 F.2d 1148, 1153–54 (9th Cir. 1986)). Although ROSS addresses this factor first, factor two is far from the most important—in fact, it "'has rarely played a significant role in the determination of a fair use dispute.'" *Fox News*, 883 F.3d at 178. Nonetheless, the undisputed facts show it weighs against fair use here.

The Westlaw Content is highly creative, implicating choices about which cases to annotate, how many headnotes to create from which concepts in the case, which case passages to link, and how to word the headnotes. *Supra* 5–7; Oliver Decl. ¶ 6; 2d Oliver Decl. ¶¶ 4–5; Ex. 7 (Leiter Tr.) 70:12–20. An attorney-editor might add or subtract language to clarify a particular issue or point of law. Ex. 8 (Lindberg Tr.) 117:16–119:6. There are also many ways to organize the law, and the hundreds of topics and subtopics decided upon by Plaintiffs are not a given—they reflect Plaintiffs' creative choices. *See* Ex. 7 (Leiter Tr.) at 239:12–15, 240:2–7 (███████████ ██████████████████████████████████████████████████). This weighs factor two against fair use as a matter of law.

ROSS's arguments on this factor are unavailing. ***First***, ROSS argues that the Westlaw Content is factual and thus "the copyright protection [] is thin." Mot. 28–29. But simply because the Westlaw Content concerns legal subject matter does not mean it can be copied with impunity. Courts regularly find no fair use for factual works where such works are creative. *See TD Bank, N.A. v. Hill*, No. 12 Civ. 7188, 2015 WL 4523570, at \*18 (D.N.J. July 27, 2014) (second factor

cut for plaintiff even where work was factual in nature); *FMC Corp. v. Control Sols., Inc.*, 369 F. Supp. 2d 539, 579 (E.D. Pa. 2005) ("[C]ourts do not hesitate to deny the fair use defense even when the work is 'nonfiction.'") (internal quotations and citations omitted); *Fox News*, 883 F.3d at 178 (rejecting argument the factual nature of creative compilations weighed against fair use); *Love v. Kwitny*, 706 F. Supp. 1123, 1134 (S.D.N.Y. 1989) (finding fair use inappropriate in a fact-based work where author extensively quoted the copyrighted work). In *Harper*, the work was a biography, which necessarily includes facts of the author's life, yet the Supreme Court found that because the defendant took more than necessary to convey facts, the nature of the work weighed against fair use. 471 U.S. at 564. Here, the content that ROSS copied was not facts but rather analysis. ROSS thus took more than just the law (it already **had** the judicial opinions)—it took the attorney-editors' creative decision-making.[24]

**Second**, ROSS tries to minimize the creative decision-making that goes into headnote-writing by arguing that "every point of law receives a headnote," Mot. 29—but ███████████ ███████████████████████████████████████████████████████████████. Not every line of a case is headnoted (nor are all cases chosen for headnoting), and deciding what **counts** as a point of law and how to synthesize and summarize it requires judgment and creativity. Oliver

---

[24] ROSS cites *Mittel, Inc. v. Iqtel, Inc.* 124 F.3d 1366 (10th Cir. 1997) and *Dunn & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197 (3d Cir. 2002) in support of its claim that factor two should weigh in favor of fair use, but neither case involved fair use. *Mittel* involved command codes, which witnesses testified were "arbitrary and largely sequential." 124 F.3d at 1374. The editorial content at issue is not arbitrary and sequential—a large team of highly trained attorneys use legal judgment and writing know-how to sift through legal opinions and create the Westlaw Content. 2d Oliver Decl. 3–5, 9–10. *Dunn & Bradstreet* involved the choices available to computer programmers in drafting code, and applies a definition of *scènes-à-faire* that is specific to source code cases. 307 F.3d at 214–215. ROSS also cites *Matthew Bender & Co. v. West Publishing Co.*, but that case is also distinguishable because it did not involve creative editorial content like that at it issue here. 158 F.3d 693, 707 (2d Cir. 1998). In fact, the "original arrangement of opinions," "headnotes," and "statements of fact," have all been found to be copyrightable. *Mead Data*, 799 F.2d at 1244.

Decl. ¶ 6; 2d Oliver Decl. ¶¶ 4–5; Ex. 7 (Leiter Tr.) 70:12–20.  Attorney-editors must also often combine concepts or different parts of the case.  *Id.*; Ex. 8 (Lindberg Tr.) 117:16–119:6. Accordingly, the editors are attorneys, and their training is extensive.  Ex. 12 (Oliver Tr.) 48:12– 49:21. And Dr. Leiter testified ████████████████████████████████████████

████████████████████████████████████████ *Supra* 7. [25]

**Third**, ROSS argues that the Westlaw Content is "functional," citing *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 29 (2021).  Mot. 29.  But *Google* involved compatibility concerns related to computer programs, which serve a functional purpose because they contain a sequence of instructions that tells the computer to perform a particular task.  *Id.*  Putting aside the fact that the nature of a particular computer programs may nonetheless weigh against fair use despite that intrinsic functionality, *see*, *e.g.*, *Wall Data*, 447 F.3d at 780, the Westlaw Content is far from functional in that sense.  The Westlaw Content is certainly helpful in that it reflects the attorney-editors' analysis of a key point in the case, connected to the relevant law, and thus assists the researcher in finding and better understanding relevant law, but much well-protected copyrighted content is helpful in this way, including non-fictional works like news articles and textbooks.  *See, e.g.*, *Hachette*, 115 F.4th at 187–88 (emphasis in the original); *Fox News*, 883 F.3d at 178 ("Those who report the news undoubtedly create factual works. It cannot seriously be argued that, for that reason, others may freely copy and re-disseminate news reports.").

**Fourth**, ROSS argues that West Headnotes and West Key Numbers are part of a compilation, which makes copyright protection thin.  Mot. 30.  But ROSS is referring to the

---

[25] ROSS cites to cases involving much less creative content.  For example, *Monsarrat v. Newman* involved a blog post that simply quoted a website's privacy policy and did not contain any of the same thoughtful selection and arrangement at issue here.  28 F.4th 314 (1st Cir. 2022).  Likewise, *SOFA Entertainment, Inc. v. Dodger Productions, Inc.*, involved a seven-second clip announcing a musical performance, not analysis. 709 F.3d 1273, 1279 (9th Cir. 2013).

standard for compilations of *facts*, pre-existing material, and unprotectable ideas. *See Experian Info. Sols. Inc. v. Nationwide Mktg. Servs., Inc.*, 893 F.3d 1176, 1184 (9th Cir. 2018) (compilation of consumer data); *BellSouth Advert. & Pub. Corp. v. Donnelley Info. Pub., Inc*., 999 F.2d 1436, 1445 (11th Cir. 1993) (compilation of telephone numbers); *Craft Smith, LLC v. EC Design, LLC*, 969 F.3d 1092, 1103–04 (10th Cir. 2020) (idea of arranging colorful organizer was not protectable); *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 387 (5th Cir. 1984) (compilation of unoriginal material); *S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 783 (5th Cir. 2020) (compilation of facts and blank forms); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1368–69, 1372 (5th Cir. 1981) (describing compilations of preexisting material or data). Plaintiffs' copyrights extend not just to the selection and arrangement of unprotectable facts, but to other original material and analysis contributed by Plaintiffs. *See, e.g.*, *Educ. Testing Serv. v. Katzman,* 793 F.2d 533, 538–39 (3d Cir. 1986); *Idearc Media Corp. v. Nw. Directories, Inc*., 623 F. Supp. 2d 1223, 1230 (D. Or. 2008). Here, Plaintiffs contend the Westlaw Content is original ***both*** in its selection and arrangement of headnotes and cases, ***and*** the original West Headnotes analyzing cases. [26]

   ***Finally***, regardless whether the Westlaw Content is entitled to "thin" copyright protection, which Plaintiffs contest, ROSS ignores another key consideration in the factor two analysis: whether the copyrighted work represents "substantial investment of time and labor ... in anticipation of a financial return." *Wall Data*, 447 F.3d at 780 (finding that the nature of computer software program weighed against fair use even where the computer program was "not purely creative") (*citing MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981)). Plaintiffs made a

---

[26] ROSS says it is "not clear" whether Plaintiffs are asserting that the headnotes were infringed outside of their place in a compilation. Mot. 30 n.16. ROSS's feigned ignorance of the claims is, at this stage of the litigation, baffling. Plaintiffs have consistently asserted protection in ***both*** the headnotes and their selection and arrangement throughout this litigation.

substantial investment in developing the Westlaw Content; they have a team of 70 attorney-editors to write Headnotes and 24 attorney-editors to classify them. Oliver Decl. ¶¶ 9–12; Means Decl. Ex. 111 (Oliver Tr.) 34:25–35:6, 48:12–49:21.

###### D.      Factor 3 – ROSS Took the Heart of Westlaw

Factor three considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This inquiry "must focus upon whether '[t]he extent of [the] copying' is consistent with or more than necessary to further 'the purpose and character of the use.'" *Castle Rock*, 150 F.3d at 144. Factor three also requires a qualitative analysis of the content copied, considering whether the copier took "the heart" of the work. *Harper*, 471 U.S. at 544; Op. 22 (*citing Campbell*, 510 U.S. at 589). "[E]ven a small amount of copying may fall outside of the scope of fair use where the excerpt copied consists of the heart of the original work's creative expression." Op. 22 (*quoting Google LLC v. Oracle, Inc.*, 593 U.S. 1, 33–35 (2021)). ROSS cannot prove this factor weighs in favor of fair use.

As an initial matter, although it recognizes this standard, Mot. 31–32, ROSS does not directly address what this Court previously held was the key question on this factor: whether the amount copied was "tethered to a valid, and transformative, purpose." Op. 22 (*quoting Google*, 593 U.S. at 33–35); *see also Warner Bros. Ent. v. RDR Books*, 575 F. Supp. 2d 513, 548 (S.D.N.Y. 2008). It was not. ROSS's purpose was not transformative because it used the Westlaw Content for the same purpose as Plaintiffs, and regardless, ROSS took more than it needed to serve its purpose. ██████████████████████████████████████████████████████

██████████████████████████████████████████ Mot. 31. The copying was so

abnormal that ███████████████████████████████████████████████████ Ex. 8

(Lindberg Tr.) 70:19–71:2. ████████████████████████

██  Exs. 35 (TR-0836004); 83 (TR-0039539) at -808; 6 (Hafeez Tr.) 88:13–89:20, 93:9–94:4.

Yet ROSS's own expert, Dr. Branting, admitted ██████████████████████████

██████████████████████████████████████████████████████████

████ Ex. 3 (Branting Tr.) 278:18–279:1.  Dr. Cox similarly testified he understood that the Bulk

Memo questions "████████████████████████████████████████████

████████████████████" Ex. 5 (Cox Tr.) 179:5–24.  Not only did ROSS use more

than necessary, ROSS took the "heart" of Westlaw—the unique synthetization and organization

of the law in the WKNS and the West Headnotes.  This weighs against fair use.  *See Soc'y of Holy*

*Transfiguration Monestary, Inc. v. Gregory*, 689 F.3d 29, 63 (1st Cir. 2012); *Harper*, 471 U.S. at

544.[27]

ROSS's arguments on factor three are meritless.  ***First***, ROSS argues that it only copied a

small portion of all of Westlaw as a whole compilation.  Mot. 31.  Even where a defendant only

copies a portion of a single compilation, however, the copying may be substantial where the

compilation is made up of individually protectable works that were copied, as is the case here.  *See*

*Monge*, 688 F.3d at 1180 (finding that collection of photographs was not a compilation because

they were not selected and arranged, but even if they were, copying of 5 photographs out of 400

total was not only substantial but "total"); *see also Castle Rock*, 150 F.3d at 144 (no fair use where

643 trivia questions were based on *Seinfeld*, even where whole show was not copied); *Gregory*,

689 F.3d at 63 (copying part of works "alone may be qualitatively significant").[28]

Moreover, ROSS focuses solely on ██████ that LegalEase sent to ROSS, plus the ██████

West Headnotes and ██████ subtopics copied in the Bulk Memos.  While this alone is substantial,

---

[27] *New Era Publications International, ApS v. Carol Publishing Group*, on which ROSS relies, is inapplicable as the court found defendant did not copy the "heart" of the work and only as necessary for a transformative purpose.  904 F.2d 152, 158 (2d Cir. 1990). Not so here.
[28] ROSS relies on *Experian Information Solutions, Inc. v. Nationwide Marketing Services*, for the conclusion that copying of 80% of a database is permissible, but that decision was not about fair use and did not analyze factor three.  893 F.3d 1176, 1186–88 (9th Cir. 2018).

ROSS ignores the indirect copying (through LegalEase's copying of the Westlaw Content outside the scope of its license), which was even more substantial and involved verbatim copying of ██████████████████████████████████████████████. *Supra* 5, 10–12. ROSS complains that Plaintiffs have not tallied the precise number of key numbers, West Headnotes, or other content that LegalEase copied in these ███████ ██████████████, Mot. 31 n.17, but it is ***ROSS's*** burden to prove that factor three favors fair use, not Plaintiffs' burden to show that the copying was substantial. ROSS puts forth no evidence to the supposed insubstantial scale of this copying, let alone any evidence to show that the copying was necessary, and has not met its burden under *Celotex*.

***Second***, ROSS claims that it copied a "minute percentage" of "factual, utilitarian, or functional information," citing *Matthew Bender & Co. v. West Publ'g Co.*, but that was not a fair use case and did not involve copying of similar ***editorial*** content., 94 Civ. 589, 1997 WL 266972, at *2 (S.D.N.Y. May 19, 1997) ("West's compilation copyright protects its arrangement of cases, its indices, its headnotes and its selection of cases for publication, but these are not what Hyperlaw is copying."). There, the court did not reach the question of whether copying thousands of editorial enhancements would have been a fair use. And ROSS improperly collapses factor two and factor three here, but as explained above, the Westlaw Content is creative and the fact that it concerns factual subject matter does not mean that ROSS can copy it with impunity. *Supra* 34. ROSS cites *Google* for the finding that copying .4% of a work could be fair use, but there the Court found that the copying was tethered to the transformative purpose, whereas here it is not. *Supra* 27–33. Thus, factor three weighs against fair use.

## CONCLUSION

ROSS failed to meet its burden of showing fair use. Plaintiffs request that the Court deny ROSS's motion, and grant them summary judgment on fair use.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and Counterdefendants*
*Thomson Reuters Enterprise Center GmbH and*
*West Publishing Corporation*

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
Jeremy King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Yungmoon Chang
Allyn Belusko
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(213) 680-8400

October 30, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October, upon the following in the manner indicated:

David E. Moore, Esquire                               *VIA ELECTRONIC MAIL*
Bindu Palapura, Esquire
Andrew L. Brown, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
*Attorneys for Defendant and Counterclaimant*

Mark A. Klapow, Esquire                               *VIA ELECTRONIC MAIL*
Lisa Kimmel, Esquire
Crinesha B. Berry, Esquire
Matthew J. McBurney, Esquire
Keith J. Harrison, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
*Attorneys for Defendant and Counterclaimant*

Jacob Canter, Esquire                                 *VIA ELECTRONIC MAIL*
Warrington Parker, Esquire
Anna Z. Saber, Esquire
Beatrice B. Nguyen, Esquire
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
*Attorneys for Defendant and Counterclaimant*

Emily T. Kuwahara, Esquire                              *VIA ELECTRONIC MAIL*
Jordan Ludwig, Esquire
CROWELL & MORING LLP
515 South Flower Street, 41st Floor
Los Angeles, CA 90071
*Attorneys for Defendant and Counterclaimant*

Ryan Henry Seewald, Esquire                             *VIA ELECTRONIC MAIL*
CROWELL & MORING LLP
1601 Wewatta Street, Suite 815
Denver, CO 80202
*Attorneys for Defendant and Counterclaimant*


                                        */s/ Michael J. Flynn*
                                        _____
                                        Michael J. Flynn (#5333)