IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) | C.A. No. 20-613 (SB) |
| v. | ) ) ) | **REDACTED - PUBLIC VERSION** **Original filing date: November 13, 2024** |
| ROSS INTELLIGENCE INC., | ) ) | **Redacted filing date: November 18, 2024** |
| Defendant and Counterclaimant. | ) ) ) | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
RENEWED MOTION FOR PARTIAL SUMMARY
JUDGMENT ON FAIR USE**

<div style="margin-left:40%">

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mflynn@morrisnichols.com
*Attorneys for Plaintiffs*

</div>

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Alyssa C. Kalisky
Cameron Ginder
Vanessa Barsanti
Danielle O'Neal
Jonathan Emmanuel
Lexi Wung
Max Samels
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

November 13, 2024

## <u>TABLE OF CONTENTS</u>

ARGUMENT ........................................................................................................... 3

I.      FACTOR 4: ROSS AFFECTED THE WESTLAW CONTENT MARKET ..... 4

II.     FACTOR 1: ROSS'S COMMERCIAL, SUBSTITUTIVE, AND
        BAD FAITH USE ........................................................................................... 11

III.    FACTOR 2: THE WESTLAW CONTENT IS CREATIVE ........................... 22

IV.     FACTOR 3: ROSS'S COPYING WAS SUBSTANTIAL ............................... 25

CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Broad. Co. v. Aereo, Inc.*,
573 U.S. 431 (2014)........................................................................................................2

*Am. Geophysical Union v. Texaco*,
60 F.3d 913 (1994)...................................................................................................19, 27

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021) ..........................................................................................3, 4

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)................................................................................................ *passim*

*Applied Innovations, Inc. v. Regents of the Univ. of Minn.*,
876 F.2d 626 (8th Cir. 1989) ........................................................................................7

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (9th Cir. 1992) ...................................................................................4, 5

*Authors Guild, Inc. v. Google Inc.*,
954 F. Supp. 2d 282 (S.D.N.Y. 2013).........................................................................6

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)..........................................................................................17

*Authors Guild v. Google*,
804 F.3d 202 (2d Cir. 2015)................................................................................. *passim*

*Balsley v. LFP, Inc.*,
691 F.3d 747 (6th Cir.) .................................................................................................8

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
758 F. Supp. 1522 (S.D.N.Y. 1991)..........................................................................26

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)..........................................................................................7

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006).........................................................................................17

*Campbell v. Acuff-Rose Music*,
510 U.S. 569 (1994)..........................................................................................1, 3, 6, 16

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013) ................................................................17

*Castle Rock Ent., Inc. v. Carol Publ'g Grp.*,
    150 F.3d 132 (2d Cir. 1998) ..........................................................8, 25

*Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) ................................................................9

*Dermansky v. Hayride Media, LLC*,
    2023 WL 6160864 (E.D. La. Sept. 21, 2023) ....................................16

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
    983 F.3d 443 (9th Cir. 2020) .........................................................3, 11

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) .....................................................................24, 25

*Fox News Network, LLC v. TVEyes, Inc.*,
    883 F.3d 169 (2d Cir. 2018) ..........................................9, 11, 23, 24

*Golan v. Gonzales*,
    501 F.3d 1179 (10th Cir. 2007) ..........................................................6

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021) ................................................................... *passim*

*Hachette Book Grp., Inc. v. Internet Archive*,
    115 F. 4th 163 (2d Cir. 2024) .....................................................7, 9, 23

*Harper & Row Publ'rs v. Nation Enters.*,
    471 U.S. 539 (1985) ............................................................... *passim*

*Hi-Tech Video Prods., Inc. v. Cap. Cities/ABC, Inc.*,
    804 F. Supp. 950 (W.D. Mich. 1992) ................................................26

*Kaucher v. Cnty. of Bucks*,
    455 F.3d 418 (3d Cir. 2006) .................................................................3

*Kienitz v. Sconnie Nation LLC*,
    766 F.3d 756 (7th Cir. 2014) ................................................................3

*LA Times v Free Republic*,
    2000 WL 565200 (C.D. Cal. Apr. 4, 2000) ......................................24

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
    780 F. Supp. 1283 (N.D. Cal. 1991) ...................................................5

*Matthew Bender & Co. v. West Publ'g Co.*,
    158 F.3d 693 (2d Cir. 1998)..........................................................................22

*Matthew Bender & Co. v. West Publ'g Co.*,
    1997 WL 266972 (S.D.N.Y. May 19, 1997) .......................................................22

*MCA, Inc. v. Wilson*,
    677 F.2d 180 (2d Cir. 1981)..........................................................................25

*Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op. Prods., Inc.*,
    479 F. Supp. 351 (N.D. Ga. 1979) ..................................................................16

*Monge v. Maya Mags., Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ....................................................................8, 25

*Murphy, v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011).....................................................................5, 9, 11

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999)............................................................................29

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004).....................................................................13, 27

*Oasis Publ'g. Co. v. West Publ'g. Co.*,
    924 F. Supp. 918 (D. Minn. 1996)..................................................................13

*Pac. & S. Co., Inc. v. Duncan*,
    744 F.2d 1490 (11th Cir. 1984) .................................................................9, 12

*Paramount Pictures Corp. v. Carol Publ'g. Grp.*,
    11 F. Supp. 2d 329 (S.D.N.Y. 1998)...........................................................1, 16

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*,
    533 F.3d 1287 (11th Cir. 2008) ...........................................................1, 16, 26

*Princeton Univ. Press v. Mich. Document Servs.*,
    99 F.3d 1381 (6th Cir. 1996) .......................................................................26

*Salinger v. Random House*,
    811 F.2d 90 (2d Cir. 1987)............................................................................8

*Satava v. Lowry*,
    323 F.3d 805 (9th Cir. 2003) .........................................................................6

*Sega Enters. Ltd. v. Accolade, Inc*,
    977 F.2d 1510 (1992).......................................................................... *passim*

*Shihab v. Source Digital, Inc.*,
  2024 WL 3461351 (S.D.N.Y. July 18, 2024) ........................................................8

*Soc'y of Holy Transfiguration Monastery, Inc., v. Gregory*,
  689 F.3d 29 (1st Cir. 2012) ...............................................................................25

*Sony Comp. Ent., Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) ........................................................................20, 21

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ................................................................................. *passim*

*Sundeman v. Seajay Society, Inc.*,
  142 F.3d 194 (4th Cir. 1998) ...............................................................................5

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P*,
  756 F.3d 73 (2d Cir. 2014) .............................................................................22, 23

*Twentieth Century Music Corp. v. Aiken*,
  422 U.S. 151 (1975) .............................................................................................6

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*,
  342 F.3d 191 (3d Cir. 2003) .......................................................................3, 11, 13

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
  447 F.3d 769 (9th Cir. 2006) .....................................................................19, 24, 25

*West Publ'g. Co. v. Mead Data Cent., Inc.*,
  616 F. Supp. 1571 (D. Minn. 1985) ...................................................................12

*WNET, Thirteen v. Aero, Inc.*,
  722 F.3d 500 (2d Cir. 2013) ................................................................................2

*Worldwide Church of God v. Phila. Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) .............................................................................8

*Worth v. Selchow & Righter Co.*,
  827 F.2d 569 (9th Cir. 1987) .............................................................................25

**Statutes**

17 U.S.C. § 106 ......................................................................................................3

17 U.S.C. § 107 ....................................................................................3, 7, 10, 28

**Other Authorities**

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ..........................3, 7, 26

The core questions for deciding fair use as a matter of law—*why* ROSS used the Westlaw Content and *what* was the effect of that use—are undisputed: ROSS copied from Westlaw to create a legal research platform that would compete with and replace it and, in doing so, ROSS necessarily affected the market for and value of the Westlaw Content it copied.[1]  Indeed, it cannot be disputed that ROSS lured customers away from Westlaw and over to ROSS by building its platform on the backs of Plaintiffs' attorney-editors and their careful legal analysis.

Instead of disputing the only issues material to fair use, ROSS focuses on *how* it copied the Westlaw Content.  That, however, addresses neither its use's purpose nor its effect.  Nor is it consistent with any of the cases discussed by the parties.  The Supreme Court in *Warhol II* did not decide transformativeness based on how Warhol's paint was applied to a silkscreen.  *Google* did not turn on the technical details of how the API declarations were reimplemented.  *Campbell* did not turn on how the music sample at issue was recorded or edited.  And the lower court opinions on which ROSS relies are similar.  *Authors Guild* did not turn on how the books were ingested or the process by which they were digitized.  And *Sony* and *Sega* similarly focused on the ultimate purpose of creating compatible technologies.  Accordingly, to decide fair use this Court should similarly focus on ROSS's purpose.  *See*, *e.g.*, *Paramount Pictures Corp. v. Carol Publ'g. Grp.*, 11 F. Supp. 2d 329, 335 (S.D.N.Y. 1998) (considering book's "overall purpose" in assessing factor one); *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1311 (11th Cir. 2008) (same).

In addition to focusing on the wrong issues, ROSS misdescribes its process.  It was not

---

[1] All exhibits herein numbered 1–103 are attached to the Declaration of Miranda D. Means filed at D.I. 695.  Exhibits numbered 104–138 are attached to the Declaration of Miranda D. Means filed at D.I. 718.  Exhibit 139 is attached to the contemporaneously filed Declaration of Miranda D. Means date November 13, 2024.

trying to find out how words relate to each other mathematically—ROSS already had judicial opinions from which it could create mathematical equations, and ROSS was no mere language researcher. What ROSS wanted were the particular ways in which Plaintiffs' attorney-editors selected and wrote the West Headnotes and connected those West Headnotes to relevant legal passages, which it could use as question/answer pairs to train its algorithm how to answer legal questions. To the extent ROSS is attempting to use its creation of mathematical equations as a loophole to excuse its copying, courts routinely reject defenses based on such technological contrivances. In *WNET, Thirteen v. Aero, Inc.*, for example, the defendant created a "Rube Goldberg-like" television broadcasting technology designed around the Copyright Act's definition of public performance. 722 F.3d 500, 512 (2d Cir. 2013). The Supreme Court found that the provider of this technology nonetheless publicly performed the copyrighted works. *Am. Broad. Co. v. Aereo, Inc.*, 573 U.S. 431, 450–51 (2014).

Not only is ROSS's position unmoored from the law of fair use, but the limitations of ROSS's arguments are obvious. Adopting ROSS's view would mean finding that training an algorithm on human-created content is transformative no matter what, regardless of what that algorithm is for or its effect on the market for the original, because "transforming" the underlying training material into mathematical equations that the computer can understand and learn from is always part of the training process. Such a position opens the floodgates on widescale copying of human-created works to train commercial products of all stripes. As explained in Plaintiffs' opening brief ("Pls.' Br.") and opposition to ROSS's summary judgment motion ("Pls.' Opp."), the Court does not need to paint with ROSS's broad brush. The Court does not need to decide the status of ***all*** AI training material in this one case. Rather, the ***specific*** facts here—including the substitutive purpose ROSS had for copying the Westlaw Content, the extensive effects to the

2

existing and potential markets for the Westlaw Content, the bad faith, the commerciality, and the harm to the public caused by the copying— prevent ROSS from meeting its burden on fair use, and the Court should thus dismiss this defense as matter of law.

## ARGUMENT

Although ROSS tries to downplay it, it should not be overlooked that ROSS "bears the burden of proof" on all four fair use factors. *See Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 197 (3d Cir. 2003); *see also Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) (same). This means, for example, that ROSS bears the "burden of proving that the secondary use does not compete in the relevant market." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol I*"), 11 F.4th 26, 49 (2d Cir. 2021). Plaintiffs are entitled to summary judgment because ROSS's "evidence is insufficient to carry that burden." *See Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (stating standard on summary judgment where the non-moving party bears the burden of persuasion at trial).

ROSS's singular focus on transformativeness certainly cannot carry that burden. The Supreme Court in *Campbell v. Acuff-Rose Music* held that **all** four of the factors should be explored and weighed together. 510 U.S. 569, 578 (1994); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, ("*Warhol II*"), 598 U.S. 508, 513 (2023); *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014) ("[A]sking exclusively whether something is 'transformative' not only replaces the list in § 107 but also could override 17 U.S.C. § 106(2), which protects derivative works."); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][1][b] (noting that many courts' applications of the transformative use test "are conclusory – they appear to label a use 'not transformative' as a shorthand for 'not fair,' and correlatively 'transformative' for 'fair' "). Putting dispositive weight on transformativeness to miminize evidence of market harm would also not

align with the Supreme Court's guidance that the fourth factor is "undoubtedly the single most important element of fair use." *Harper & Row Publ'rs v. Nation Enters.*, 471 U.S. 539, 566 (1985). Here, all four fair use factors weigh against fair use as a matter of law.

## I.    FACTOR 4: ROSS AFFECTED THE WESTLAW CONTENT MARKET

ROSS cannot meet its burden of proving that its use does not affect the market for the Westlaw Content. *See Warhol I*, 11 F. 4th at 49. Plaintiffs have presented evidence of three different market effects that each independently preclude a finding for ROSS on fair use: (i) ROSS competed in the market for the original work by actively replacing customers' Westlaw subscriptions; (ii) ROSS diminished the value Plaintiffs obtained from their own exclusive use of the Westlaw Content as training material for their legal search algorithms; and (iii) ROSS impeded Plaintiffs' ability to license the Westlaw Content and its derivatives in the current market and in the potential market for Westlaw Content as training material. Pls.' Br. 13–21; Pls.' Opp. 16–25. These effects would be particularly significant if conduct like ROSS's were to become widespread. Pls.' Br. 20–21. And ROSS's copying also harms the public by disincentivizing human-created works. *Id.* 21–23. Despite bearing the burden on fair use, ROSS has not countered with evidence sufficient to create a dispute as to any of these effects, and thus fails to meet its burden under *Celotex*. In fact, ROSS does not even address the second of these effects and the harm to the public, and thus concedes both points. That alone is sufficient to weigh this factor against fair use, but ROSS's arguments as to the first and third effects are also fundamentally flawed.

**With regard to market substitution**, ROSS raises a series of arguments that are without merit. ***First***, ROSS argues that only market effects created by substitution are cognizable, and that a use cannot be substitutive where it is transformative. D.I. 270 ("Def.'s Opp.") 36–37. This is circular and risks collapsing factor four into factor one. *Supra* 3. And ROSS's use ***was*** substitutive. ROSS used Westlaw to create a competing work that did the same thing as Westlaw,

which is precisely what the Ninth Circuit said was not permitted in *Arica Institute, Inc. v. Palmer*,

to which ROSS cites.  970 F.2d 1067, 1078 (9th Cir. 1992) ("The copyright statute simply

constrains [the copier] from using plaintiff's original expression [to create a competing work]").[2]

ROSS relies on *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc*., where the court found there

was no market harm because Nintendo "does not contend that families will buy fewer new games

because they are using" the infringing game console.  780 F. Supp. 1283, 1294 (N.D. Cal. 1991).

Here, by contrast, Plaintiffs put forward extensive evidence that ROSS's platform was being

marketed as a replacement for Westlaw and ***actually caused*** customers to switch, a fact that ROSS

did not rebut in its Opposition.  Pls.' Opp. 16–18.  There are also other types of substitution at play

here.  LegalEase's sale of the Bulk Memos substituted for derivatives of the Westlaw Content in

the market for training material.  ROSS's failure to pay a licensing fee for its use thereof in a

traditional and reasonably likely to develop market for derivatives of the Westlaw Content is

substitutive—this is recognized as a "cognizable market harm" in the Third Circuit.  *Murphy*, v.

*Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011).

**Second**, by the same token, ROSS claims that the market for Westlaw is "not protected by

factor four" and that its competition with Westlaw does not "usurp any relevant copyright."  Def.'s

Opp. 36–38.  The Westlaw Content is licensed through subscriptions to Westlaw.  Ex. 139

(Lindberg Tr.) 29:13–18.  ROSS used the Westlaw Content to create a platform that affects

---

[2] Moreover, *Arica* was different because there the copying was only a small part of the overall
infringing work as a whole, so the copying was not as directly connected to the competition as it
is here.  970 F.2d at 1078.  Here, by contrast, the ROSS platform was built on the Westlaw
Content—there is no equivalent way to parse out the copying and it was what directly enabled
ROSS to create its competing platform.  ROSS's other cases are also irrelevant.  *Sundeman v.
Seajay Society, Inc.* is irrelevant because it did not involve the creation of a competing product—
in fact, there was no evidence of an effect on the market, let alone the multiple types of effects
described here.  142 F.3d 194, 207 (4th Cir. 1998).

Plaintiffs' ability to license the Westlaw Content through Westlaw and actually deprived Plaintiffs of licensees. It is difficult to see how that market, the original market for Westlaw Content, can simply be ignored.[3] ROSS's attempts to liken its copying to use of a parody or a snippet are not apt. Def.'s Opp. 37–38. *Campbell* held that parodies may in fact be market substitutes, and plainly ROSS did not engage in parody here. 510 U.S. at 591. A snippet is non-substitutive because it helps customers find the original (and potentially even go on to buy it), rather than drawing them away from and eliminating the need for the original as occurred here. *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 293 (S.D.N.Y. 2013) (finding Google's service can drive plaintiff's book sales and increased attention to books). ROSS did not drive users to visit Westlaw; it did the opposite. ROSS argues that a customer who wants Westlaw Content would still go to Westlaw to get it, Def.'s Opp. 38, but both ROSS and Westlaw are legal research platforms built on Westlaw Content—if customers want that, they can purchase either one. Pls.' Opp. 17–18.

    ***Third***, ROSS claims that Plaintiffs are trying to undermine the goals of the Copyright Act and monopolize the law. Def.'s Opp. 38–39. As to the first point, ROSS cites to *Satava v. Lowry* for the proposition that the goal of copyright is to "stimulate artistic creativity for the general public good." 323 F.3d 805, 807 n.1 (9th Cir. 2003). Plaintiffs agree that is a goal of copyright. The Constitutional purpose of copyright is also to incentivize the dissemination of new works. *Harper*, 471 U.S. at 558. If commercial enterprises like ROSS were able to exploit human-created content

---

[3] ROSS says its platform substitutes for Westlaw the way a Beatles album substitutes for a Rolling Stones album, but if the Rolling Stones *copied* from the Beatles to create that album, it would constitute market substitution. ROSS cites to *Twentieth Century Music Corp. v. Aiken*, but that was not a fair use case, it involved the Copyright Act of 1909 and the question of whether radio reception constituted a "performance" of the copyrighted works, and nowhere does it support ROSS's claim that consumer choice excuses substitutive copying. 422 U.S. 151, 157–161 (1975). *Golan v. Gonzales* involves the Copyright Term Extension Act, and whether works that had fallen into the public domain already could be restored protections, neither of which is relevant here. 501 F.3d 1179 (10th Cir. 2007).

to develop a competitive product that attracts customers away from that human-created content and thus disincentive such creation, that does ***nothing*** to advance these goals. It undermines them. As to the second point, Plaintiffs are not seeking to monopolize judicial opinions—ROSS already had the judicial opinions before it even copied from Westlaw and what ROSS is accused of infringing is not those judicial opinions, but Plaintiffs' editorial content. Ex. 16 (van der Heijden 30(b)(6) Tr.) 239:17–19. ROSS could have developed its legal research platform independently, without copying from Westlaw, like the other legal research platforms on the market. Ex. 3 (Branting Tr.) 276:5–10. But ROSS did not do that. Plaintiffs are not trying to stop ROSS from offering a legal research platform; they are trying to stop ROSS from offering one that was built on the backs of Plaintiffs' attorney-editors.[4]

**With regard to licensing for AI training purposes**, ROSS's arguments are meritless. ***First***, ROSS argues that factor four "is not an invitation to speculate about future loss." Def.'s Opp. 39. But Plaintiffs' argument is not based on speculation. The fair use statute and *Nimmer*, on which ROSS relies, are clear that the Court needs to consider the impact of the copying on existing and ***potential*** markets. 17 U.S.C. § 107(4); 4 *Nimmer on Copyright* § 13F.08 (2024) (considering effect on "any potential market [the plaintiff] might plausibly enter"); *Hachette Book Grp., Inc. v. Internet Archive*, 115 F. 4th 163, 192 (2d Cir. 2024) (*quoting Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)). There is extensive record evidence, not just speculation, showing that there is a potential market for the Westlaw Content as training material. This includes evidence that ███████████████████████████████

---

[4] ROSS cites to *Applied Innovations, Inc. v. Regents of the Univ. of Minn.*, but that was not a fair use case and there the court found that certain testing data *was* protectable because the authors made adjustments to certain uncopyrighted material based on their expertise and experience. 876 F.2d 626, 636 (8th Cir. 1989).

████████████████████████████████████████████

████████████ ████████████████ ████████████████

████████████████████████████  Pls.' Br. 19; Pls.' Opp. 19–20.

**Second**, ROSS claims that Plaintiffs have "done nothing to license their copyrights" for AI training purposes.  Def.'s Opp. 39.  But this does not mean ROSS is free to copy instead of licensing the content for this purpose.  Rather, Plaintiffs should still be able to have the opportunity to decide whether to license their works.  They should also be able to choose the timing too, as they are currently exploiting the Westlaw Content for this purpose themselves.  In *Salinger v. Random House*, the author disavowed any intention to publish certain letters, but the Second Circuit nonetheless found that unauthorized publication thereof harmed the potential licensing market, reasoning that "Salinger has the right to change his mind" and that he was "entitled to protect his opportunity to sell his letters."  811 F.2d 90, 99 (2d Cir. 1987) (emphasis added); *see also Shihab v. Source Digital, Inc.*, 2024 WL 3461351, at *7 (S.D.N.Y. July 18, 2024).  The Second Circuit recognized that "[i]t would [] not serve the ends of the Copyright Act—*i.e.*, to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of the original."  *Castle Rock Ent., Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145–46 (2d Cir. 1998) (finding that even where the copyright holder has "***evidenced little if any interest*** in exploiting [a] market for derivative works ..., the copyright law must respect that creative and economic choice.") (emphasis added).  The Ninth, Sixth, and Eleventh Circuits are all in accord.  *See*, *e.g.*, *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012) (finding plaintiff had right to control delayed future markets where he disavowed intent to enter them); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000) (same); *Balsley v. LFP, Inc.*, 691

8

F.3d 747, 761 (6th Cir.) (finding adverse market effects where plaintiffs "have no present intention of exploiting the market"); *Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984).

   ***Third***, ROSS argues that it did nothing to inhibit the market for AI training material because it did not sell the Bulk Memos to others and that customers still need to go to Westlaw if they want to use the Westlaw Content as training material. Def.'s Opp. 40. This argument makes no sense. Using a Westlaw subscription to copy Westlaw Content to create commercial training material for a competitor is ***not*** permitted, but nevertheless, LegalEase ***sold*** the Westlaw Content at ROSS's instigation as AI training material to ROSS. In light of LegalEase's copying (for which Plaintiffs assert ROSS is secondarily liable),[5] it is simply not true that there was no participation in the market as a seller here. And putting that aside, it is black-letter copyright law that ***using*** a work without paying the customary licensing fee in an existing or potential market also causes market harm under factor four, including in this Circuit, and that is what ROSS did here. *See, e.g.*, *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (by using content without payment, TVEyes deprived Fox News of "licensing revenues from TVEyes"); *Murphy*, 650 F.3d at 308 (finding ability to reproduce photographer's work without paying traditional license fee would adversely impact "ability to license his photograph," making it "likely that cognizable market harm" would occur); *Hachette*, 115 F.4th at 192 (Internet archive appropriated the works "'without payment of [the] customary licensing fee'" and thus "usurped a market that properly belongs to the copyright holder."); *Davis v. The Gap, Inc.*, 246 F.3d 152, 176 (2d Cir. 2001) (finding "market harm through his loss of the royalty revenue . . . , as well as through the

---

[5] ROSS claims it did not direct LegalEase to use Westlaw, Def.'s Opp. 4-5, but this goes to liability, not fair use. In any case, ROSS is wrong—it directed LegalEase ████████████████████████████████████████ (Ex. 71 (ROSS-010164290)), ████████████████████████████████████████████ ████████ *See, e.g.,* ROSS-000204366-ROSS-000204367.

diminution of his opportunity to license to others"). This case involves even stronger evidence of market harm, as ROSS not only had an overt desire to replace Westlaw, it actually accomplished that goal. ROSS has not cited any cases finding no market harm on similar facts.

To be clear, neither ROSS nor LegalEase paid a license fee to Plaintiffs for the use at issue here. Accordingly, LegalEase was able to get Westlaw Content *outside* of a Westlaw subscription at subscription prices in violation of its license, and thus not only infringed the Westlaw Content but failed to compensate Plaintiffs for the use (subscription prices are not available for competitive purposes like LegalEase's). ROSS, for its part, paid LegalEase for the Bulk Memos *instead* of paying Plaintiffs. If all of Plaintiffs' competitors were allowed to copy the Westlaw Content to train their legal research platforms without compensating Plaintiffs, why on earth would anyone pay Plaintiffs for it? This burgeoning licensing market would be destroyed.

*Finally*, ROSS argues that the Court should look only at the "end result" of the copying in assessing factor four. Def.'s Opp. 40. ROSS does not cite a *single case* stating the so-called "end result" of the copying should be the sole focus of factor four. Rather, the statute provides that this factor should consider "the effect of *the use*." 17 U.S.C. § 107. ROSS *used* the Westlaw Content as AI training material to create a competing legal research platform and an algorithm built on content that Plaintiffs themselves trained on. That *use* hurt the market for the Westlaw Content in various ways.[6] But even if the court looks at the "end-result," ROSS fares no better—the "end-

---

[6] ROSS claims that *Google* would come out differently under this rule, but in *Google*, the Supreme Court expressly considered the licensing market for the API declarations at issue, and found that there was not sufficient evidence of a potential market, in part because it was "difficult for Sun to enter the smartphone market." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 38 (2021). Moreover, while there was evidence Google sought a license for Java code, that proposed license included far more than the API declaring code at issue in *Google*. There were also other factors at play in the market harm analysis, such as significant public compatibility benefits from copying code to allow programmers to use old knowledge in new environments, factors that are not present here. *Id.* at 39–40.

result" of ROSS's copying was its competing legal research platform. ROSS was able to offer a platform that returned results in response to legal questions because it copied the work of Plaintiffs' attorney-editors to train its platform how to do that.[7] That platform had significant impacts on the market for Westlaw Content and actually deprived Plaintiffs of licensing revenues in the original market therefor. Pls.' Br. 13–21.

## II.    <u>FACTOR 1</u>: ROSS'S COMMERCIAL, SUBSTITUTIVE, AND BAD FAITH USE

In assessing this factor, according to *Authors Guild v. Google*, on which ROSS relies, courts consider whether the use was (1) commercial, (2) in bad faith, and (3) transformative. 804 F.3d 202, 214, 218–19 (2d Cir. 2015). All three subfactors weigh against fair use here. Pls.' Br. 23–32; Pls.' Opp. 25–34.

**<u>Commerciality</u>**. ROSS does not dispute what this Court already found: that its use was "undoubtedly commercial." D.I 547 ("Op.") 16; Def.'s Opp. 29–30. Instead, citing *Google*, ROSS tries to minimize commerciality by arguing that although non-commercial use weighs in favor of fair use, "the inverse is not true." Def.'s Opp. 29. ROSS is legally wrong and misquotes *Google*.[8] The Third Circuit has held that commerciality weighs ***against*** fair use. *See, e.g., Murphy*, 650 F.3d at 308 (finding commerciality weighed against fair use); *Video Pipeline,* 342 F.3d at 198 ("If a new work is used commercially rather than for a nonprofit purpose, its use will less likely qualify as fair."); *see also Dr. Seuss,* 983 F.3d at 451 (same); *Fox News Network,* 883 F.3d at 178 (same).

---

[7] ROSS claims it did not need legal analysis, it needed legal questions mapped to case passages that answer those questions, Def.'s Opp. 11, but what ROSS misses is that this ***was*** the legal analysis—the questions come from the headnotes and the answers are the relevant passages to which Plaintiffs' attorney-editors chose to connect those headnotes. Pls.' Opp. 9–15.

[8] The Supreme Court actually said that the "inverse is not ***necessarily*** true." 593 U.S. at 32 (emphasis added). While some commercial uses, like commentary or criticism, may nonetheless be fair use, ROSS did not have such a purpose here; its purpose was to directly compete with and replace Westlaw by introducing a commercial replacement into the marketplace. Pls.' Br. 14–16. So, while commerciality does not ***always*** weigh against fair use, it certainly can and does here.

11

Likewise, in *Warhol II*, which post-dates *Google*, the Supreme Court held that the commercial character of the use "counsel[s] ***against*** fair use here." 598 U.S. at 510 (emphasis added). Commerciality weighs particularly strongly where the use is less transformative. *Id.*

Here, commerciality looms particularly large. ROSS was not just a commercial enterprise; it was an enterprise ***specifically offering a commercial substitute*** with the unrebutted goal of taking ███████████████████████████████████████████. Pls.' Br. 8–10. This weighs strongly against fair use. *See Pac. & S.*, 744 F.2d at 1496 ("unabashedly commercial" use was not fair use where commercial use was "primary motive"); *West Publ'g. Co. v. Mead Data Cent., Inc.*, 616 F. Supp. 1571, 1580 (D. Minn. 1985) (finding use of proprietary West content to "enhance [the defendant's] position in the marketplace" was not fair use).

**Bad Faith**. ROSS asserts that bad faith "has little to no relevance" to factor one,[9] Def.'s Opp. 30, but the Supreme Court held that "the propriety of the defendant's conduct" is part of this factor. *See Harper*, 471 U.S. at 562. ROSS claims that it did not act in bad faith because it did not direct or know that LegalEase was using Westlaw to create the Bulk Memos. Def.'s Opp. 30. But that is not what the evidence shows. ROSS expressly discussed getting a Westlaw subscription to create the Bulk Memos. *See, e.g.*, Exs. 55 (ROSS-003391075) █████████████████████ ███████████████████████); 13 (Ovbiagele 30(b)(6) Tr.) 204:3–7 (████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████); 56 (ROSS-003391076).[10] ███████████████████████████████████████████

---

[9] ROSS cites *Google* for this point, but in *Google*, the Supreme Court decided not to address bad faith given the weight of the other factors. 593 U.S. at 32–33. And there, the only bad faith conduct the Court addressed was that Google had asked for and been denied a license, not that Google illicitly, repeatedly accessed and copied content in violation of a contract, as occurred here.

[10] ROSS claims that its efforts in 2015 are irrelevant because they were not related to the Bulk

. Ex. 71 (ROSS-010164290).  ROSS did this despite knowing, ███████ that using Westlaw for competitive purposes was a violation of Plaintiffs' Terms of Service.  Pls.' Opp. 27; Ex. 52 (ROSS-003390772) (███████

███████)  ███████

███████

███████.  Pls.' Br. 24–26.  These violations go far beyond merely asking for and being denied a license, and such conduct constitutes bad faith.  *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 475, 478 (2d Cir. 2004).

**Transformativeness**.  As Plaintiffs have detailed in prior briefs, ROSS's use of the Westlaw Content is also not transformative under Supreme Court and Third Circuit law.  Copying for purposes of creating a competing substitute is a classic example of a non-transformative use.  *See, e.g., Video Pipeline,* 342 F.3d at 199 (finding clips likely to serve as substitutes for original were not transformative); *Oasis Publ'g. Co. v. West Publ'g. Co.*, 924 F. Supp. 918, 927 (D. Minn. 1996) (finding no fair use where business plans showed "directly competitive" nature of infringing products with West products).  ROSS copied from Westlaw not because it wanted to do math equations in the abstract—it copied the editorial decisions of Plaintiffs' attorney-editors to create a competing legal research platform that would substitute for Westlaw.  Pls.' Br. 27–28.  ROSS does not raise any material dispute on this point in its Opposition Brief, nor can it; the evidence that ROSS used the Bulk Memos to develop a Westlaw substitute is overwhelming and dispositive.

---

Memo project, but ROSS's own executive said ███████ ███████ (Ex. 13 (Ovbiagele 30(b)(6) Tr.) 204:3–7), which is precisely what it needed for the Bulk Memo project.  Regardless, there is ample evidence that ROSS knew that LegalEase was using Westlaw, which was a violation of the Terms of Service.  Exs. 76 (ROSS-023032254); 54 (ROSS-003390881); 16 (van der Heijden 30(b)(6) Tr.) 101:19–103:5; Ex. 51 (ROSS-003390563).

*Id.*; *compare* Ex. 19 (Westlaw) *with* Ex. 20 (ROSS).[11]  ROSS claims that the creation of a competitive product cannot foreclose fair use because otherwise *Google* would come out differently, Def.'s Opp. 26–27, but the use in *Google* was found ***not*** to be directly competitive. Rather, the Supreme Court discussed evidence that Oracle's primary market for Java was laptops and desktops and that "Google's Android platform was part of a distinct (and more advanced) market than Java software."  593 U.S. at 37.[12]  The fact that the competitiveness of the products was something the Supreme Court grappled with in *Google* confirms its relevance to fair use—it cannot be blithely ignored and ROSS cannot meet its burden here.

ROSS also tries to run away from the fact that, unlike the cases on which it relies, its purpose was the same as Plaintiffs'.  Yet, the comparison of the copier's purpose to the plaintiff's purpose is the crux of transformativeness: the more similar the purposes, the less transformative the use.  *Warhol II*, 598 U.S. at 545–46.  In *Google v. Oracle*, for example, the Supreme Court applied the same standard as in *Warhol II*, considering the ***purpose*** of the copying and comparing it to the ***purpose*** of the original to determine fair use.  593 U.S. at 30.  This standard helps ensure that fair use remains a flexible and fact-specific doctrine.  The same copying—the exact same

---

[11] ROSS claims its platform lowered costs by enabling researchers to use natural language search, Def.'s Opp. 4, but natural language search was ***already*** available long before ROSS entered the scene, as were low-cost platforms.  Pls.' Opp. 7–9, 10 n. 6.  ROSS also asserts that its platform was "free of human intermediated content."  Def.'s Opp. 3–4.  This is an oft repeated catch-phrase that lacks clear meaning or relevance.  ROSS trained on human-created content, so in that sense ROSS' product is most certainly "human intermediated."  If ROSS means that it created a platform where users do not have to go through human-created content to find the results they need, that does not actually distinguish ROSS's product from Plaintiffs—Plaintiffs' users can search on Westlaw and click directly on cases without using the headnotes if they so choose, including by using natural language search.  Pls.' Br. 28.

[12] *Sega* and *Sega* involved copying for purposes of compatibility, which is not at issue here, and a far less direct commercial purpose.  Here, ROSS paid ▮▮▮▮▮▮▮▮▮▮▮ for the Bulk Memos specifically (they were not incidentally created, ROSS went out of its way to create them), it copied editorial content in the Bulk Memos numerous times, unnecessarily, and specifically to develop its competing product to do the same thing as Plaintiffs.

Warhol silkscreen, for instance—may be transformative for one purpose (hanging on a museum wall) and not transformative for another purpose (illustrating the cover of a magazine). *Warhol II* at 533. Copying content as AI training material likewise may be transformative for one purpose, such as scientific research, but not for another purpose, such as the creation of a competitive commercial product. As a result, deciding this case does not require resolving all or nothing questions about the use of copyrighted material in the AI training context. ROSS's insistence that the Court ignore this standard from *Warhol II* and *Google* leaves no room for fact-specificity and is contrary to the law of fair use, which is fact-dependent.

ROSS used the Westlaw Content for the exact ***same*** purpose as Plaintiffs. Pls.' Br. 27–30.[13] ROSS argues that any similarities in the parties' "overall" purposes do not defeat fair use. Def.'s Opp. 27. But there are multiple problems with this argument. As an initial matter, no matter how broadly or narrowly ROSS's purpose is parsed (whether the Court considers the "overall" purpose of creating a competing legal research platform, the somewhat more specific purpose of obtaining a synthesis of the law matched to relevant legal passages, or the even more specific purpose of training an AI algorithm to power a legal research platform) the purposes here were the same. Pls.' Br. 27–30. Indeed, ROSS chides Plaintiffs for articulating the Parties' purposes too broadly, but itself asserts that its purpose was supposedly to "translate[] the words… into

---

[13] ROSS argues that Plaintiffs were not using the headnotes to train until after ROSS entered the market. Def.'s Opp. 14–16. But ROSS's misappropriation is not limited to headnotes, and includes the WKNS ███████████████████████████████. Ex. 109 (Moulinier Tr.) 127:22–128:6; Ex. 104 (Al-Kofahi Tr.) 23:12–24:13; Ex. 11 (Moulinier Tr.) 143:8–11. Regardless, the fact that Plaintiffs have trained ███████████████ show that this is one of the purposes of the content. *See Warhol II*, 598 U.S. at 515 (considering whether use was "generally" done, not whether the plaintiff got there first). ROSS does not cite a single case finding transformativeness merely because a copier started exploiting the content in a derivative market first. ROSS tries to parse minute differences in how its training process differed from Plaintiffs' or how its platform differs, Opp. 17, but none of this changes the purpose of the use.

mathematical relationships," Def.'s Opp. 1, which is an even higher level of abstraction than any of the more specific purposes Plaintiffs identify.  And of course, Plaintiffs used the Westlaw Content to translate words into mathematical equations too.  That's how one trains an algorithm. If that purpose were truly the only relevant one, then ROSS fares no better.

ROSS's argument is also legally wrong—ROSS's overall purpose ***does*** matter to the fair use analysis.  *See*, *e.g.*, *Paramount Pictures*, 11 F. Supp. 2d at 335 (considering book's "overall purpose" in assessing factor one); *Peter Letterese*, 533 F.3d at 1311 (considering "overall purpose and function of the [work]" on factor one); *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op. Prods., Inc.*, 479 F. Supp. 351, 361 (N.D. Ga. 1979) (considering the "overall function" of the works were both to "entertain"); *Dermansky v. Hayride Media, LLC*, 2023 WL 6160864, at *8 (E.D. La. Sept. 21, 2023) (considering ultimate purpose of use).  ROSS cites a number of cases where courts purportedly found fair use even where the parties had the same overall purpose, but none actually support ROSS's position.  Def.'s Opp. 27.  In *Sony Corp. of America v. Universal City Studios, Inc.*, factor one turned on the ***non-commercial*** nature of the use, with the Supreme Court holding that "[i]f Betamax were used to make copies for a commercial or profit-making purpose, such use would ***presumptively be unfair***."[14] 464 U.S. 417, 449 (1984).  If ROSS is correct that the parties in *Universal* had the same overall purpose, that suggests that when such a similar purpose is combined with commerciality (as is the case here), it weighs against fair use.  ROSS also cites *Google*, but there the overall purposes were different—Google's purpose was to expand the use and usefulness of Android-based smartphones by using Java API declarations (which programmers were familiar with) for a product outside of Oracle's market.  Google thus did not

---

[14] To be clear, ROSS's reliance on *Universal* is also misplaced because its scheme of shifting the presumption based on commerciality (presuming fair use where use is noncommercial and vice versa) was rejected in *Campbell*.  510 U.S. at 584.

run away from its ultimate purpose of creating Android but embraced it. *Id.* at 30.

The same principle is demonstrated by ROSS's other case citations. In *HathiTrust* and *Authors Guild*, the overall purpose of searching and finding parts of books was different from the author's purpose in writing and selling full length books; neither case involved two competing search tools. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014); *Authors Guild*, 804 F.3d 202. *Sony* and *Sega* likewise involved a different overall purpose from the original: compatibility. *Infra* 21. *Cariou v. Prince* was a fine art case where the court found that the defendant's work was transformative because it employed "new aesthetics with creative and communicative results distinct from Cariou's." 714 F.3d 694, 708 (2d Cir. 2013). ROSS did nothing of the kind. In *Blanch v. Koons*, the copier asserted that his work had a different meaning from the original. 467 F.3d 244, 252 (2d Cir. 2006) (discussing the respective parties' descriptions of the meaning and message of their works). Again, ROSS did nothing of the kind.[15]

Unable to meet its burden of proving transformativeness (let alone a ***high*** degree of transformativeness, as would be necessary here for ROSS to overcome the commercial, bad faith nature of the use under *Warhol II*) under the accepted test, ROSS cherry-picks non-analogous computer programming cases to advance a series of arguments that are not legally or factually supported. ***First***, ROSS claims that its use was transformative because it either "did not use Plaintiffs['] protected expression" at all or because it "removed any expression, meaning, or message from the Westlaw Content through the training process." Def.'s Opp. 8, 20–21. That is wrong. ROSS did not copy the Westlaw Content incidentally—the Westlaw Content was not some

---

[15] Both *Cariou* and *Blanch* were decided before *Warhol II*, which rejected their approach and found that "new meaning or message" was not sufficient to find transformativeness and was only "relevant to whether the new use served a purpose distinct from the original." 598 U.S. at 542. They are thus of limited usefulness in understanding how transformativeness should be applied, particularly in this context (which involves no allegations of new aesthetics, meaning, or message).

useless or necessary byproduct of an unrelated endeavor. It directly contributed to the development of ROSS's platform. ***According to ROSS***, it "needed a large and diverse body of legal questions and answers" to train its AI. Def.'s Opp. 4. ***According to ROSS***, LegalEase used Westlaw for purposes of preparing those question/answer sets. *Id.* at 5.[16] ***According to ROSS***, this training process relied on the relationships between the questions and case passages provided in the Bulk Memos. D.I. 677 ("Def.'s Br.") 24 (███████████████████████████████ ██████████████████████████████████████████████); *id.* at 17 (██████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████). Indeed, ***according to ROSS's expert***, ROSS's AI algorithm learned from the "████████████████████████████████████████ ████████████████████████████████████████████" Ex. 23 (Branting Rbt. Rpt.) ¶ 11. This is precisely the expression that Plaintiffs are asserting was infringing.[17] Pls.' Opp. 29–30. The Westlaw Content was integral to training process and cannot be separated out from ROSS's purpose of creating a competing legal research platform.

ROSS's claim that it did not use protected expression also improperly collapses fair use, an affirmative defense on which ROSS bears the burden, into copyright infringement, of which copying of protected expression is an element of the claim. It is both factually wrong[18] and legally

---

[16] Much of the copying for which Plaintiffs claim that ROSS is liable occurred at this stage: LegalEase copied ███████████████████ cases containing Westlaw Content ***verbatim*** when it clicked through them on Westlaw outside the scope of its license for **one undisputed purpose**: to prepare AI training material to sell to a Westlaw competitor. ROSS claims that LegalEase accessed this content "pursuant to a license," Def.'s Opp. 5, but this is irrelevant because LegalEase violated that license and accessed this content outside of its license, which is copyright infringement.

[17] ROSS also wanted "███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████" Ex. 23 (Branting Rbt. Rpt.) ¶ 14, which it accomplished by copying the West Key Number System.

[18] ROSS similarly claims that the Bulk Memos "do not contain any Westlaw Content." Def.'s Opp. 6. Again, ROSS mixes questions of liability with questions of fair use, but as explained in

immaterial, as the fair use inquiry *presupposes* copying of expression.  Moreover, whether the Westlaw Content is visible in the final product is besides the point—the ROSS platform was *built and trained* on this content and copying at any stage of the process may constitute infringement. Pls.' Opp. 31–34.  ROSS tries to distinguish Plaintiffs' cases by arguing that in each of them, a consumer of the infringing product "could directly access the copyright holder's expressive content."  Def.'s Opp. 23–24.  That is simply not true—many of these cases involved internal copying rather than the sale of a work to a consumer.  In *Am. Geophysical Union v. Texaco*, for example, the defendant used copies of journal articles for internal company research, not in an end-product.  60 F.3d 913, 914 (1994).  In *Wall Data Inc. v. Los Angeles County Sheriff's Department*, the defendant internally used a software program without paying a license fee, not in an end-product.  447 F.3d 769, 780 (9th Cir. 2006).[19]  Ultimately, this Court already found copying; the question on fair use is not whether ROSS copied, but *why*.  And the answer to that question, as explained above, is undisputed.  *Supra* 17–18.

    *Second*, ROSS claims that copying to "learn or access underlying materials" and as an

---

Plaintiffs' opening brief on copyright infringement, ROSS is responsible for LegalEase's copying of the Westlaw Content to create the Bulk Memos, and ROSS directly copied the Westlaw Content, repeatedly, by copying the Bulk Memos verbatim during the training process. Op. 8–9, *see also* Exs. 24 (Frederiksen-Cross Op. Rpt.) ¶¶ 25–27; 22 (Branting Op. Rpt.) ¶¶ 31–36, 38; 62 (ROSS-003658597); 58 (ROSS-003419784); 42 (ROSS-000177723) (███████████████████████); 43 (ROSS-000179468) (███████████████); 16 (van der Heijden 30(b)(6) Tr.) 347:13–22; 41 (ROSS-000176438).  The Bulk Memos contained Plaintiff's original editorial decisions, such as the selection and arrangement of West Headnotes and relevant case passages, the wording of West Headnotes, and were named based on the topics into which the West attorney-editors sorted these headnotes and case.  Those memos included Plaintiff's original editorial decisions, such as the selection and arrangement of West Headnotes and relevant case passages, the wording of West Headnotes, and the original topics into which the West attorney-editors sorted these headnotes and case.

[19] If what ROSS means is that the *infringer* had to have access to the expressive content, of course it did—that is another element of infringement presupposed by the fair use analysis.  ROSS clearly had that access here; the Court already found actual copying, and there is overwhelming evidence in support thereof.  *Supra* n.9.

"intermediate" step towards the creation of a new product is transformative, citing *Sega* and *Sony*. Def.'s Opp. 22.  This is unsupported by both the facts and the law.  In terms of the facts, ROSS claims it was copying to access the underlying judicial opinions, Def.'s Opp. 21. ██████████████ ███████████████████████████████████████ and those cases are publicly available— it did not ***need*** to copy from Westlaw to get them or learn their language. Exs. 16 (van der Heijden 30(b)(6) Tr.) 239:17–19; 25 (Krein Op. Rpt.) ¶ 149.  And this argument is undermined by ROSS's own admissions, including its own briefing, that it copied to get legal question/answer pairings. Pls.' Opp. 10.  ROSS was not copying to learn unprotected characteristics; the "characteristics" that ROSS's model learned from were admittedly derived from the Westlaw Content.  Ex. 23 (Branting Rbt. Rpt.) ¶ 11.  And ROSS was not creating a wholly new environment, the undisputed facts show that it was creating a substitute for Westlaw.  *Id.* 9–10.

In terms of the law, *Sega* and *Sony* were both highly specific in application.  In *Sega Enterprises Ltd. v. Accolade, Inc.*, the Ninth Circuit held that "where disassembly is the ***only way*** to gain access to the ideas and functional elements embodied in a copyrighted computer program ***and*** where there is a legitimate reason for seeking such access," namely, to make the platform "compatible," then "disassembly is [] fair use." 977 F.2d 1510, 1527-28, 1520 (1992) (finding fair use "because Accolade has a legitimate interest in gaining such access (***in order to determine how to make its cartridges compatible with the Genesis console***)") (emphasis added).  Accolade was not copying to provide the same games as Sega, its purpose was to makes its new games compatible with Sega's system.  Likewise, *Sony* involved reverse engineering of software to create a compatible product.  In *Sony Computer Entertainment, Inc. v. Connectix Corp.*, the Ninth Circuit found that the purpose was to "produce a product that would be ***compatible*** with games designed for the Sony PlayStation," which "[w]e have recognized…as a legitimate one under the first factor

of the fair use analysis," citing *Sega*. 203 F.3d 596, 599, 607 (9th Cir. 2000). Thus, in both of these cases, the Ninth Circuit was grappling with and trying to solve a specific concern that does not exist here: as a result of the functionality of computer programs, "[s]oftware engineers designing a product that must be compatible with a copyrighted product frequently must 'reverse engineer' the copyrighted product to gain access to the functional elements of the copyrighted product." *Id.* ROSS's claim that the Ninth Circuit found fair use "despite compatibility" Def.'s Opp. 28, is therefore just wrong—it found fair use because of compatibility.

This is not a code disassembly case, or even a computer program case. Copying the Westlaw Content was not necessary to access some functional element of a computer program, let alone make a new product compatible. Def.'s Opp. 28. Instead, ROSS copied Plaintiffs' editorial decisions to teach its algorithm how to make these kinds of decisions so that it could compete with and take customers away from Plaintiffs. None of the key facts that guided the Ninth Circuit in *Sega* or *Sony* are present here. In short, ROSS's gloss on these cases as standing for the proposition that it is transformative merely to "learn" or create a "new product" is ***not*** what they hold, and would radically expand a relatively narrow computer program doctrine. ROSS's insistence that the Court ignore the ultimate or overall purpose of ROSS's copying and end the inquiry with looking at whether there was visible copying in the end-product would make ***any*** conceivable exploitation of human-created content in the training process transformative.[20] It would render all sorts of piracy automatically transformative—why bother paying for a book, a movie, a song, or a television show, even for blatantly commercial purposes, if exploitation is permitted? This is not

---

[20] *Google* did not "recognize intermediate copying is fair use" full stop, as ROSS suggests without actually quoting from *Google* Def.'s Opp. 25—in fact, *Google* did not involve intermediate copying at all, it involved ***compatibility***, which was at play in both *Sony* and *Sega*, but is not present here. *Google*, 593 U.S. at 34 (describing Google's "Java-compatibility" objective and familiarity of programmers with the Java declarations).

how fair use works and makes no sense given the Constitutional intent behind copyright law.

## III.    FACTOR 2: THE WESTLAW CONTENT IS CREATIVE

As detailed in Plaintiffs' other briefing, the Westlaw Content is highly creative and thus factor two weighs against fair use. Pls.' Br. 33–36. ROSS argues that this factor weighs in favor of fair use are meritless.

*First*, ROSS re-raises an argument that this Court has already rejected: that the Westlaw Content is entitled only to "thin" protection as a compilation of facts. Op. 7, Def.'s Opp. 31. ROSS relies on *Matthew Bender & Co. v. West Publ'g Co.* for this claim, but that case did not discuss fair use, and instead found "thin" copyright protection only for Westlaw's ***star pagination system***, where West did not allege infringement of any other elements of Westlaw. 158 F.3d 693, 707 (2d Cir. 1998). The trial court there presciently distinguished itself from the case at bar, observing that "West's compilation copyright protects its arrangement of cases, its indices, its headnotes and its selection of cases for publication, but these are not what [plaintiff] is copying." *Matthew Bender & Co. v. West Publ'g Co.*, 1997 WL 266972, at *2 (S.D.N.Y. May 19, 1997). Ultimately, Plaintiffs are not asserting protection in merely a compilation of facts, they are asserting protection in legal analysis, including the phrasings of West Headnotes, and selection and arrangement of those West Headnotes within the overall WKNS. Pls.' Opp. 37.[21]

*Second*, ROSS claims that the Westlaw Content is functional, citing to the dissent in *Google*. Def.'s Opp. 31. *Google* involved computer programs, which serve a functional purpose because they contain a sequence of instructions that tells the computer to perform a particular task. *Id.* at 29. *Google* did not involve editorial works like the Westlaw Content. ROSS's other case, *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.* is likewise distinguishable. 756 F.3d 73, 78 (2d

---

[21] And this is precisely what ROSS copied: the question/answer pairs are the West Headnotes and relevant judicial passage to which they correspond.

Cir. 2014).  There, the plaintiff sought to protect a sound recording of an investor call in which executives conveyed the analysis contained in a publicly filed, non-copyrightable earnings report. *Id.*  The defendant acquired and posted the recording and transcript to its subscribers without editing or adding any content.  *Id.*  The court assumed, without deciding, that there was sufficient copyrightable material in the "executives' tone, cadence, accents, and particular choice of words," but noted that the purpose of the recording was the public domain facts contained therein.  *Id.* at 89.  But here it is Plaintiffs' analysis, *inter alia*, West Headnotes selected and combined with relevant case law and the WKNS, that is at issue, which this Court has already found "likely represent the 'heart' of Westlaw's expression."  Op. 22.  *Swatch* is an inapt comparison.

ROSS misdescribes and minimizes some of the purposes of the Westlaw Content in its bid to frame this content as "functional."  The Westlaw Content does not merely serve the purpose of helping attorneys ***find*** cases (itself a purpose that requires attorney-editor judgment) it also helps them ***understand*** those cases.  D.I. 679 ("2d Oliver Decl.") ¶¶ 3–5.  Moreover, the Westlaw Content goes well beyond merely "factually report[ing] the holdings of [] case[s]," (Def.'s Opp. 31), as the West Headnotes "████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████" D.I. 256 ("Oliver Decl.") ¶ 6 (emphasis added); Ex. 8 (Lindberg Tr.) 117:2–9.  Often this involves synthesizing and combining multiple concepts.  Pls. Br. 1, 34.

***Third***, the fact that the Westlaw Content concerns factual information does not make it any less creative.  *Hatchette*, 115 F.4th at 187-88; *Fox News*, 883 F.3d at 178 ("Those who report the news undoubtedly create factual works. It cannot seriously be argued that, for that reason, others may freely copy and re-disseminate news reports.").  ROSS attempts to counter this well-

established principle through a misreading of *LA Times v Free Republic*, in which the defendant operated a website on which users posted news articles for the purpose of criticizing and commenting on those articles.[22] 2000 WL 565200, at *15 (C.D. Cal. Apr. 4, 2000). Not only does the passage ROSS cites explicitly specify that the court's analysis is limited to newspaper articles—not all creative works based on factual matter in general—but it also confirms Plaintiffs' creativity is deserving of protection, stating "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality."[23] *Id.* (quoting *Harper,* 471 U.S. at 547). And *LA Times* contradicts other, more recent case law, finding that news reporting should not be freely copied merely because it is factual. *Fox News*, 883 F.3d at 178.

***Finally***, an independent, additional reason factor two weighs against fair use is that the Westlaw Content represents a "substantial investment of time and labor . . . in anticipation of a financial return." *Wall Data*, 447 F.3d at 780. ROSS does not dispute Plaintiffs' heavy investment in the creation of the Westlaw Content. Oliver Decl. ¶¶ 9–12; Ex. 111 (Oliver Tr.) 34:25–35:6, 48:12–49:21. Instead, borrowing a concept from copyrightability, ROSS argues that Plaintiffs are impermissibly relying on a "sweat of the brow" theory of copyright. Def.'s Opp. 32 *(*citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359-60 (1991)). But *Feist* is not a fair use case, and while investment of time and labor certainly does not factor into questions of originality, it does play a role in fair use given the need to protect the interests of the creator. Accordingly, the

---

[22] Without support, ROSS makes the conclusory argument that "[n]ewspaper articles . . . are certainly more creative than headnotes." Def.'s Opp. 31. In addition to being legally irrelevant as both news reporting and other forms of nonfiction receive copyright protection, this mischaracterizes the Westlaw Content, ignoring the creative decisions described above.

[23] The full quotation ROSS references (Def.'s Opp. 31) is: "[n]ewspaper articles to a large extent gather and report facts. Nonetheless, a news reporter must determine which facts are significant and recount them in an interesting and appealing manner. *See Harper*, 471 U.S. at 547 ("[c]reation of a nonfiction work, even a compilation of pure fact, entails originality")." *L.A. Times*, 2000 WL 565200, at *15.

court in *Wall Data* found that it did matter in the fair use context, ***fifteen years after Feist was decided***. 447 F.3d. at 769.[24]  ROSS has not met its burden on factor two.

## IV.    FACTOR 3: ROSS'S COPYING WAS SUBSTANTIAL

As explained in Plaintiffs' prior briefing, the amount copied was both quantitatively and qualitatively substantial, which weighs this factor against fair use.  Pls.' Br. 37–40.  ROSS's arguments in opposition do not hold water.

**Quantitative Amount**.  With respect to the quantitative amount copied, ***first***, ROSS argues that it only copied a tiny portion of the entire Westlaw database.  Def.'s Opp. 33.  But copying a large portion of an even larger compilation may nonetheless be quantitatively substantial where the compilation is made up of individually protectable works that were copied, as is the case here. Pls.' Opp. 39; *See Monge*, 688 F.3d at 1180 (finding that collection of photographs was not a compilation because they were not selected and arranged, but even if they were, copying of 5 photographs out of 400 total was not only substantial but "total"); *see also Castle Rock*, 150 F.3d at 144 (no fair use where 643 trivia questions were based on Seinfeld, even where whole show was not copied); *Soc'y of Holy Transfiguration Monastery, Inc., v. Gregory*, 689 F.3d 29, 63 (1st Cir. 2012) (copying part of works "alone may be qualitatively significant").  ROSS tries to paint its copying as fractional, but ROSS is responsible for LegalEase's copying of hundreds of thousands of editorially enhanced cases verbatim (those works were thus copied ***in their entirety***, and contain content such as West Headnotes, key numbers ***and*** synopses, longer case summaries). Pls. Br. 31; Pls.' Opp. 38–39.  The 500 annotated cases that LegalEase downloaded and sent to ROSS are thus

---

[24] ROSS claims that *Wall Data* is bad law because it relied on *MCA*, which was decided before *Feist* repudiated sweatofthebrow. Def.'s Opp. 32–33 (*MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981)). Outside of the copyrightability context, however, *MCA*'s holding was untouched by *Feist*. *Feist*, 499 U.S. at 360. ROSS also contradicts itself by claiming that the controlling case in the Ninth Circuit is not *Wall Data* but *Worth*, which itself was decided ***before*** *Feist*. Def.'s Opp. 32–33 (citing *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 573 (9th Cir. 1987).

only the tip of the iceberg.  Not to mention the ▮▮▮ question/answer pairs comprised of West Headnotes and selected cases and the ▮▮▮ subtopics copied in the Bulk Memos.

*Second*,  ROSS claims that there is a percentage threshold of the copyrighted work below which is presumptively fair use.  Def.'s Opp. at 34.  There is no percentage set by the Copyright Act, and the percentages courts have found to be substantial vary case by case.  *Peter Letterese*, 533 F.3d at 1314-15 (factor three favored plaintiffs, despite quantitatively small taking, because "the inherent value of [the work] comes…particularly from the way they were selected, coordinated, or arranged," explaining that "[l]ike the preceding factors, this factor is intertwined with the fourth factor and partly functions as a heuristic to determine the impact on the market for the original."); 4 Nimmer on Copyright § 13F.07 (2024) ("no bright line rule establishes a set percentage of copying as fair or unfair").  Moreover, as detailed above, ROSS copied *thousands* of West Headnotes and synopses verbatim—which constitutes 100% copying of each of those pieces of content.  ROSS's use of the subtopics in the WKNS, which it acknowledges is ▮▮▮%, is also substantially above the amount copied in *Google* and in line with amounts other courts have said are substantial. *See Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (5% "not insubstantial" for textbooks); *Hi-Tech Video Prods., Inc. v. Cap. Cities/ABC, Inc.*, 804 F. Supp. 950 (W.D. Mich. 1992), *rev'd*, 58 F.3d 1093, 1099 (6th Cir. 1995) (3.5% of video held substantial); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1533 (S.D.N.Y. 1991) (5% substantial for textbooks).

**<u>Qualitative Amount.</u>**  This Court has already found that "headnotes likely represent the 'heart' of Westlaw's expression."  Op. 22.  Likewise, ROSS defines the "'heart' of a copyrighted work" as "what is distinctive and valuable about [Plaintiffs'] expression," Def.'s Opp. 34, which squarely fits the Westlaw Content—the Westlaw Content is the analysis and editorial content that

Plaintiffs' attorney-editors *add* to case law that is otherwise free and publicly available. Pls.' Br. 39; *see* Exs. 96–98. Plaintiffs make a significant investment in the Westlaw Content and it is highly valuable not just to Plaintiffs' customers as a way to understand and find the law, but to Plaintiffs as a way to better improve their legal search tools.

ROSS's arguments that the Westlaw Content is nonetheless not the heart of Westlaw are fundamentally flawed. *First*, ROSS *does not dispute* Plaintiffs' explanation of why the Westlaw Content constitutes the "heart" of Westlaw's expression. Instead, relying on *NXIVM*, ROSS argues that Westlaw has no "heart," because "the value of the copyright is in its unitary work, consisting of many parts."[25] Def.'s Opp. 35 (citing *NXIVM*, 364 F.3d 471 at 481). This is incorrect. *NXIVM* involved copying of a single course manual—the plaintiff tried to assert that each module in the course manual should be treated separately for purposes of determining quantitative infringement, but the court rejected that notion and likened them to chapters of a single overall book. *Id*. at 480-81.[26] The *NXIVM* court *contrasted* the manual to a magazine comprised of individual articles, which may be treated separately. *Id.*; *Am. Geophysical Union*, 60 F.3d at 925 (treating individual articles as separate works). The Westlaw Content is more like the latter than the former. The West Headnotes stand alone as individual works— they are written in a way that they can be understood in isolation. Oliver Decl. ¶ 6; Ex. 8 (Lindberg Dep. Tr.) 117:2–9. Moreover, in *NXIVM*, the plaintiff

---

[25] It is unclear what support ROSS means to provide for this contention, citing without specificity to "Statement of Facts VIII." The only portion of that section that seems to relate to this argument is testimony from Andrew Martens that he could not state the value of a single headnote. But that does not mean they stand as a unitary whole— unlike chapters of the book, the headnotes are not written to be understood all together, and in fact it is unclear what that would even mean here.

[26] ROSS then argues, without authority, that "its unitary work, consisting of many parts . . . can only be substantially taken by a significant quantitative taking, because it has no 'heart' within the meaning of this factor." Def.'s Opp. 35. Only in a footnote does ROSS argue that this baseless statement "coheres with" the compilation-only line of cases that this Court explicitly rejected as inapplicable. *Id.* at 35, n. 8; Op. 5–7. ROSS's attempt to yet again circumvent this Court's ruling fails.

did not identify protectable expression that was at the "heart" of the course manual—here Plaintiffs *have* identified that protectable expression here.

**Second**, ROSS again claims it did not "use" Plaintiffs' expression, citing to its Statement of Facts for ROSS's claim it only "extracted factual information" from Plaintiffs' works. Def.'s Opp. 34. As described above, fair use presupposes copying of protectable expression, as that is an element of infringement and fair use is an affirmative defense. *Supra* 18. Moreover, as explained above, ROSS's claim that it did not use Plaintiffs' expression is not supported by the facts. The undisputed facts show that LegalEase copied the Westlaw Content verbatim by accessing hundreds of thousands of cases and downloading and sharing with ROSS hundreds of cases outside of the scope of its subscription—it did not merely "extract" factual information. Pls.' Br. 10–11. Nor was ROSS "extracting" factual information (like when the case was decided or who the judge was). If that was what it wanted, ROSS could have obtained it from the judicial opinions it already had—instead ROSS paid around ████████ for the Bulk Memos and insisted that ████ ████████████████████████ because it wanted something more. Pls.' Br. 9–10. What its executives admit that it wanted ████████████████████████████ ████████████████████—those question/answer pairs copied the Westlaw Content. Pls.' Opp. 10. This material was not copied just to be discarded—ROSS's AI algorithm learned from the Westlaw Content based on the admissions of ROSS's own expert. *Supra* 17–18.

ROSS also fundamentally misstates factor three's qualitative inquiry by conflating *use* with *visibility* to the end-user—it argues that it could not have "taken" the heart of the work because the Westlaw Content does not "appear" on ROSS. Def.'s Opp. 35. This is legally wrong. Factor three concerns "the amount and substantiality of the portion **used** in relation to the copyrighted work as a whole," not the amount visible. 17 U.S.C. § 107(3). ROSS's citation confirms this,

stating "what is relevant is the amount and substantiality of the copyrighted *expression* **that has been used**[.]" *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 73 (2d Cir. 1999) (italics original). Thus, there is no requirement that the copied portions appear *visibly* in the finished product, only that the portion of the copyrighted work used in the second work allows it to "usefully serve as a competing substitute for the original." *Authors Guild*, 804 F.3d at 222. And it did. ROSS *used* the Westlaw Content to develop a competing legal research platform that would substitute for Westlaw. It used not just factual information about the Westlaw Content, but the editorial judgment itself: the phrasings of the West Headnotes and the selection and arrangement of the West Headnotes paired with relevant case passages. Op. 8–9. ROSS's own briefing and expert admit ███████████████████████████. *Supra* 17–18.

 ***Third***, ROSS asserts that, unlike cases where a substantial taking reduced the likelihood a consumer would purchase the original work, it did not do so here. Def.'s Opp. 35 (citing *Harper*, 471 U.S. at 564-65); *see* Ex. 70 (ROSS-010099622) at -623. In particular, ROSS argues this case is more similar to *Authors Guild*, where a small amount of the copyrighted work was made available to the public, as opposed to *Harper*, where the passage taken gave the consumer no reason to buy the original. 471 U.S. at 564-65 and *Authors Guild v Google*, 804 F.3d at 222. But ROSS's comparison of *Harper* and *Authors Guild* creates a false binary—in both cases the courts actually found factor three weighed against fair use, coming to their holdings based on whether the infringing works were market substitutes for the original works.[27] *Harper* involved a book excerpt that was "scooped" and published in a magazine first, causing market harm. *Harper*, 471 U.S. at 564-65. *Authors Guild* involved a search tool for literature that required copying whole

---

[27] In *Harper*, the court found a quantitatively small, but qualitatively substantial use, whereas in *Authors Guild* the court found a quantitatively large use. 471 U.S. at 564-65; 804 F.3d at 222.

books for the search functionality to work properly. 804 F. 3d at 221. This did not substitute for the books, but helped researchers find and search them. *Id.* ROSS presents *Authors Guild* as if it were decided based on how little of the work was displayed to the public. Def.'s Opp. 35. But the court's factor three determination hinged not on whether the public was able to see what works that were copied, but whether what the public could see made Google's product capable of serving as a market substitute for these books. *Authors Guild*, 804 F.3d at 222 (holding that Google's "snippet view" could not "usefully serve as a competing substitute for the original.").

A visibility requirement of the kind ROSS is proposing makes no sense—source code, for example, is not visible to users of a computer program. It is almost ***never*** visible to the public at all. But ROSS cannot seriously be suggesting that means it can never be infringed, or that factor three favors fair use in any case involving source code. Ultimately ROSS's substantial taking reduced the likelihood that consumers would buy Westlaw ***regardless*** of visibility. Both parties sell legal research platforms based on the same analysis of West's attorney-editors. If ROSS's search functionality worked as well as Westlaw's ***by virtue of being trained on Westlaw Content***, that would encourage consumers to purchase a ROSS subscription instead of a Westlaw subscription, regardless of whether the consumers ***saw*** the Westlaw Content on which ROSS was trained. Factor three thus strongly weighs against fair use as a matter of law.

## CONCLUSION

Copying a competitor's original content to develop a competing commercial product, in the name of AI or otherwise, is not fair use. As ROSS's copying was not fair use as a matter of law, this Court should grant Plaintiffs summary judgment on ROSS's defense.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Alyssa C. Kalisky
Cameron Ginder
Vanessa Barsanti
Danielle O'Neal
Jonathan Emmanuel
Lexi Wung
Max Samels
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

November 13, 2024

Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and*
*Counterdefendants Thomson Reuters*
*Enterprise Center GmbH and West Publishing*
*Corporation*

31

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 13, 2024, upon the following in the manner indicated:

David E. Moore, Esquire                                          *VIA ELECTRONIC MAIL*
Bindu Palapura, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Defendant and Counterclaimant*

Mark A. Klapow, Esquire                                          *VIA ELECTRONIC MAIL*
Lisa Kimmel, Esquire
Crinesha B. Berry, Esquire
Matthew J. McBurney, Esquire
Keith J. Harrison, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC  20004
*Attorneys for Defendant and Counterclaimant*

Jacob Canter, Esquire                                            *VIA ELECTRONIC MAIL*
Warrington Parker, Esquire
Anna Z. Saber, Esquire
Beatrice B. Nguyen, Esquire
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
*Attorneys for Defendant and Counterclaimant*

Emily T. Kuwahara, Esquire                                       *VIA ELECTRONIC MAIL*
Jordan Ludwig, Esquire
CROWELL & MORING LLP
515 South Flower Street, 41st Floor
Los Angeles, CA 90071
*Attorneys for Defendant and Counterclaimant*

Ryan Henry Seewald, Esquire                              *VIA ELECTRONIC MAIL*
CROWELL & MORING LLP
1601 Wewatta Street, Suite 815
Denver, CO 80202
*Attorneys for Defendant and Counterclaimant*


                                        */s/ Michael J. Flynn*
                                        _____
                                        Michael J. Flynn (#5333)