```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2                        -  -  -

 3    THOMSON REUTERS ENTERPRISE CENTRE  :  CIVIL ACTION NO.
      GMBH and WEST PUBLISHING           :  20-613
 4    CORPORATION                        :
                   Plaintiffs and        :  HEARING
 5                 Counterdefendants      :
                                         :
 6          v.                           :
                                         :
 7    ROSS INTELLIGENCE INC.             :
                   Defendant and         :
 8                    Counterclaimant.   :

 9    ------------------------------------------------------------

10                              James A. Byrne U.S. Courthouse
                                601 Market Street
11                              Philadelphia, PA 19106
                                December 5, 2024
12                              Commencing at 10:00

13    ------------------------------------------------------------

14                BEFORE THE HONORABLE STEPHANOS BIBAS
      ------------------------------------------------------------

15
      APPEARANCES:
16
      FOR THE               MORRIS, NICHOLS, ARSHT & TUNNELL,
17    PLAINTIFF and         LLP
      COUNTERDEFENDANTS      BY:  MICHAEL J. FLYNN, ESQUIRE
18                          BY:  JACK B. BLUMENFELD, ESQUIRE
                            1201 NORTH MARKET STREET
19                          P.O. BOX 1347
                            WILMINGTON, DE 19899
20

21                              -  -  -

22                    Kim L. Haley, CRR, RPR
                       Official Court Reporter
23                    Kim_Haley@paed.uscourts.gov

24
      Proceedings taken stenographically and prepared
25    utilizing computer-aided transcription
```

1    APPEARANCES CONTINUED:

2

3    FOR THE              KIRKLAND & ELLIS
     PLAINTIFF and        BY:  DALE M. CENDALI, ESQUIRE
     COUNTERDEFENDANTS:   BY:  JOSHUA L. SIMMONS, ESQUIRE
4                         BY:  ERIC A. LOVERRO, ESQUIRE
                          BY:  JEREMY KING, SQUIRE
5                         601 Lexington Avenue
                          New York, New York 10022

6

7                         BY:  MIRANDA D. MEANS, ESQUIRE
                          200 CLARENDON STREET
                          BOSTON, MA  02116
8

9                         BY:  YUNGMOON CHANG, ESQUIRE
                          BY:  ALLYN BELUSKO, ESQUIRE
                          2049 CENTURY PARK EAST
10                        LOS ANGELES, CA 90067

11

12

13   FOR THE              POTTER ANDERSON & CORROON LLP
     DEFENDANT            BY:  DAVID E. MOORE, ESQUIRE
14   COUNTERCLAIMANT:     BY:  BINDU A. PALAPURA, ESQUIRE
                          HERCULES PLAZA, 6th FLOOR
15                        1313 N. MARKET STREET
                          WILMINGTON, DE 19801
16

17

18   FOR THE              CROWELL & MORING LLP
     DEFENDANT            BY:  WARRINGTON S. PARKER III
19   COUNTERCLAIMANT:     BY: JOACHIM B. STEINBERG, ESQUIRE
                          BY: JACOB CANTER, ESQUIRE
20                        3 EMBARCADERO CTR, 26TH FLOOR
                          SAN FRANCISCO, CA 94111
21

22                        BY: KEITH J. HARRISON, ESQUIRE
                          BY: CRINESHA B. BERRY, ESQUIRE
                          1001 PENNSYLVANIA AVENUE NW
23                        WASHINGTON DC, 20004

24

25                              -  -  -

```
 1              (THE DEPUTY CLERK OPENS COURT)

 2              THE COURT:  Good morning.  Please sit

 3    down.  All right.  Madam Court Reporter, everything

 4    visible, working?  Most important person in the room.

 5              This is Judge Stephanos Bibas, and my

 6    designation in the District of Delaware, Civil Case

 7    20-cv-613, Thomson Reuters Enterprise Centre GMBh,

 8    et al. vs. Ross Intelligence, Inc.

 9              Counsel for plaintiffs, please enter your

10    appearances.

11              MR. FLYNN:  Good morning, Your Honor.

12    Michael Flynn for Morris, Nichols on behalf of

13    plaintiffs.

14              At counsel table we have Dale Cendali,

15    Miranda Means, and Josh Simmons from Kirkland & Ellis.

16    Behind them is Yungmoon Chang.

17              We also have two representatives from

18    Thomson Reuters:  Katharine Larson and Jeanpierre

19    Giuliano.

20              THE COURT:  Good morning to all of you.

21              And will plaintiffs be splitting this up

22    by issue or will Ms. Cendali be taking the lead on all

23    of them?

24              MS. CENDALI:  Good question, Your Honor.

25    Ms. Cendali will start with the various questions, and
```

10:04:28 (line 5)
10:04:45 (line 10)
10:04:58 (line 15)
10:05:09 (line 20)
10:05:19 (line 25)

```
 1    my partner, Joshua Simmons, will handle your other

 2    questions.

 3                    THE COURT:  Okay.  So that the

 4    infringement, et cetera.  Okay.

 5                    And for defendant.

 6                    MR. MOORE:  Good morning, Your Honor.

 7    David Moore from Potter Anderson on behalf of defendant.

 8    Joined by my colleagues Warrington Parker, Joachim

 9    Steinberg, Keith Harrison, and Crinessa Berry.

10                    And as far as the division of labor, I

11    will let Mr. Parker speak to that.

12                    THE COURT:  Mr. Parker, how do you --

13                    MR. PARKER:  I will be taking all

14    questions except for Number 6.  Mr. Harrison will be

15    taking Number 6.

16                    THE COURT:  Number 6 being...

17                    MR. PARKER:  Undisputed facts.

18                    THE COURT:  Undisputed facts.  So

19    Mr. Harrison, undisputed facts.  Okay.  Got it.

20                    Thank you.  All right.  Let's start with

21    some logistics and scheduling.  If there is a potential

22    trial next year, we have -- we're holding the week of

23    May 12th, but I'm wondering whether it is possible to do

24    this earlier.

25                    The Court is available for a number of
```

10:05:35
10:05:52
10:06:02
10:06:14
10:06:35

1   weeks and can shuffle some things around, and I would

2   like to know what the barriers are on the parties'

3   schedules.

4           So, first of all, the last week in

10:06:48   5   January, do parties have any conflicts that can't be

6   moved from, say, Tuesday the 28th through Tuesday,

7   February 4th?

8           MS. CENDALI:  Yes, Your Honor.  We have a

9   big symposium that we organize for all our clients

10:07:11   10   throughout that week, which the invitations have gone

11   out.  And it's also the week right after a Ninth Circuit

12   argument, which we would need trial prep time.

13           THE COURT:  All right.  Let's set that

14   aside.  How about the second week of March, March 11th

10:07:32   15   through the 14th or 17th?

16           MS. CENDALI:  At least with regard to

17   plaintiffs, Your Honor, we're -- maybe a path forward is

18   for us to meet and confer about schedules and report

19   back, because right now we have a three-week jury trial

10:07:53   20   in Florida in March, but, like anything else, sometimes

21   the things, move, change, things can happen.  But right

22   now we would have a conflict.

23           THE COURT:  Okay.  You have a conflict

24   through March.  When would that likely end?

10:08:07   25           MS. CENDALI:  It's supposed to end on the

1    21st, but you never know when the jury comes back.

2              THE COURT:  Of course.  Of course.

3              The week of April -- maybe 8th through

4    the 15th?  No, there's -- I don't remember -- I can't

10:08:28    5    remember when Passover starts this year.  I don't know

6    if that conflicts with that.

7              MR. PARKER:  I understand it's

8    April 12th.

9              THE COURT:  Passover is April 12th.  So I

10:08:37    10    don't want to put anyone in that situation.

11              We're holding the week of May 12th.  Does

12    the prior week, May -- the week of May 5th work for

13    counsel?

14              MS. CENDALI:  One of the issues with that

10:08:56    15    for us, Your Honor, is at least one of our experts is

16    out of the country and could not be there.

17              THE COURT:  When does that expert return?

18              MS. CENDALI:  Not until the 9th.

19              THE COURT:  And what is that expert an

10:09:11    20    expert on?

21              MS. CENDALI:  Damages.

22              THE COURT:  Damages expert.  Okay.  But

23    that person would be back the 9th, so would be available

24    for trial the week of the 12th.

10:09:20    25              MS. CENDALI:  Yes.  Yes, Your Honor.

1          THE COURT:  All right.  So let's revisit

2     this later.  It does sound like we're going to have some

3     real difficulty making this happen before May 12th, but

4     schedules are subject to change.  If the March trial

10:09:40  5     goes away, perhaps counsel could, you know, notify, talk

6     with one another if that is a possibility.  I don't know

7     if that's -- there's an issue on Mr. Parker's calendar

8     for -- during March.

9          MR. PARKER:  The only dates in March

10:09:56  10     currently at issue would be March 24th to March 29th.

11          THE COURT:  Okay.  So those second and

12     third weeks in March would work if -- if plaintiff's

13     counsel trial winds up going away.  So let's just

14     revisit this.  Obviously as things go closer, sometimes

10:10:21  15     these cases settle or dismiss or go to summary judgment,

16     but the possibility of a trial beginning March 11th or

17     March 17th could work if the trial winds up going away.

18     At the moment, we will hold the week of May 12th.

19          MS. CENDALI:  Thank you, Your Honor.

10:10:41  20          THE COURT:  Very good.

21          Other logistical issues.  I ask counsel,

22     both sides, split the cost of providing a transcript of

23     this hearing to the Court.

24          I am just going to remind you of the

10:10:53  25     hearing format we've set out.  Each side prepared three

minutes of material on each of seven topics.  We're

going to go topic by topic, back and forth.

On each of them, Thomson Reuters will go

first and ROSS will be some follow-up.  I'll ask

10:11:06  questions as needed.

I also ask, when you're giving me -- you

know, there are a number of issues you briefed.  You've

briefed them well, but they'll still help to go over

some of them orally.  It doesn't mean I haven't read

10:11:20  papers.  It will help the Court to the extent you can

provide citations and D.I. numbers rather than

Declaration X and Exhibit Y to Declaration X, just in

terms of there is a large record here, and the more

precisely I can find things, the easier it will be.  And

10:11:34  as we get to each of these, I will -- I will try to ask

for some more specifics on where I can find things.  And

if I can't find them, it will help direct me to them.

Our court reporter needs a couple of

minutes.  The most important person in the room.

(Discussion off the record.)

THE COURT:  Let's take a five-minute

adjournment.

(Brief recess taken.)

THE DEPUTY CLERK:  All rise.

10:17:27  THE COURT:  So we're starting with

          1    Topic 1, the first fair use factor, the purpose and

          2    character.

          3                    Ms. Cendali.

          4                    MS. CENDALI:  Thank you, Your Honor.

10:17:50  5                    Just as another housekeeping thought, I

          6    see that there's some folks in the courtroom.  We're

          7    going to do -- I am going to do my best to navigate

          8    confidentiality issues and sometimes speak generally and

          9    not name any specific person's names.

10:18:07  10                    It's kind of hard because we need to be

          11    useful to you; that can't be too general.  But I'm also

          12    mindful of those other issues.

          13                    THE COURT:  I understand.  If I say I

          14    need follow-up and you want a sidebar, we can talk about

10:18:21  15    that.  I don't like sidebars generally, but that's a

          16    legitimate reason for one.

          17                    Likewise, if I have a question for you

          18    guys at some point, which is when you have, you know,

          19    sealed stipulations of agreed material facts and things

10:18:33  20    like that, things I may need to use, want to rely on, we

          21    are going to have to come to some agreed-upon way that I

          22    can reference these things.

          23                    And I think it's important that opinions

          24    generally be accessible to the public, but if there's a

10:18:52  25    need for specific redactions or crazy things at a higher

1    level of generality, I want a balance between showing

2    the public, you know, and showing Court of Appeals what

3    it's going to need too.

4              MS. CENDALI:  Right.  If your opinion is

10:19:00   5    to be useful and understandable, you obviously need to

6    cite some things.

7              THE COURT:  Right.

8              MS. CENDALI:  And however the Court wants

9    to deal with that, we would.

10:19:09  10              And then I guess in related housekeeping,

11   I'm going to try -- to the extent that Your Honor asks

12   about specific records, I may offer it, but for

13   Your Honor's potential savings is a cheat sheet in light

14   of your comment about the docket.  The first means

10:19:27  15   declaration, which many of our exhibits are to, is for

16   Docket 678.  The second means declaration is Docket 718.

17   And the Oliver declaration is Docket 679.

18              THE COURT:  Okay.  Means Number 1, 678;

19   Means Number 2, 718; and Oliver declaration, 679.

10:19:54  20   That's helpful.

21              MS. CENDALI:  Thank you, Your Honor.  May

22   I begin?

23              THE COURT:  Yes.

24              MS. CENDALI:  Turning to Your Honor's

10:19:57  25   first question, the first fair use factor, under Harper

1    and Row and its prodigy, Factor 1 requires consideration

2    of three subfactors:  commerciality, bad faith, and

3    transformativeness.

4              The degree of transformativeness, if any,

10:20:12    5    needs to be weighed against commerciality and bad faith.

6    Here all three subfactors weigh against fair use.

7              On commerciality there is simply no

8    dispute that this use was commercial.  This Court has

9    already found in Docket 547 that ROSS's uses were

10:20:32    10   undoubtedly commercial, and one of its goals was to

11   compete with Westlaw.

12             THE COURT:  Then ROSS didn't dispute

13   commerciality.

14             MS. CENDALI:  Absolutely not.  But this

10:20:40    15   is important, Your Honor, though, under Warhol at 530

16   and 31, because the Court there re-emphasizes the

17   importance of commerciality, stating that when

18   commentary has no critical bearing on the substance or

19   style of the original, the claim and true fairness in

10:20:56    20   borrowing from another's work diminishes accordingly.

21             If it does not vanish and other factors,

22   like the extent of commerciality, loom larger.  And

23   that's this case.

24             As to bad faith, ROSS' undisputed contact

10:21:10    25   constitutes bad faith.  The Supreme Court held in

1    Harper & Row the propriety of the conduct as part of

2    Factor One is fair use presupposes good faith and fair

3    dealing.

4             In Harper, the Supreme Court found the

10:21:27    5    defendant knowingly exploited manuscript and ignored the

6    other side's rights for its own benefits.

7             This case is like Harper.  This isn't a

8    case where the defendant merely reached out for a

9    license and was denied; rather, ROSS expressly was told

10:21:40   10    that accessing Westlaw for competitive purposes violated

11    Westlaw's terms of service, yet it was undeterred.

12             And, in fact, this case has a very

13    unusual record filled with deceit in which ROSS in

14    general here -- not naming names -- tried to get access

10:21:57   15    to Westlaw by having its executives pretend to be law

16    students, by convincing its law firm to share

17    credentials, by having an employee get access pretending

18    to be a solo practitioner; and, of course, by hiring

19    LegalEase to do indirectly what ROSS could not do

10:22:15   20    directly.

21             The law, we submit, should not condone or

22    encourage such behavior as the Second Circuit stated in

23    Rogers v. Koons, copying in bad faith primarily for

24    profit-making motives is not fair use.  This Court

10:22:32   25    should find, respectfully, the bad faith subfactor based

1    against fair use.

2    And to the final subfactor,

3    transformativeness, ROSS cannot meet its burden of

4    showing its use was transformative, let alone

10:22:47    5    transformative enough to offset the significant

6    commerciality and bad faith here.

7    ROSS used the Westlaw content for the

8    same purpose as plaintiffs, which under Warhol weighs

9    against fair use.  As Warhol said at 531 and 532, the

10:23:05    10    more similar the parties' purposes, the less

11    transformative the use, because they're more likely to

12    be substituted.

13    Here the purposes are identical.  First,

14    ROSS' overall purpose in copying the Westlaw content for

10:23:19    15    the bulk memos was to create an admitted substitute, a

16    replacement for Westlaw.  It's hard to find a more

17    clear-cut case of substitution than the facts of this

18    case.

19    ROSS was not just doing an artwork that

10:23:34    20    might have had some remote impact on someone else.  It

21    was creating a product specifically designed to be a

22    commercial substitute for Westlaw, and it was marketed

23    that way to take market share from Westlaw, to bring

24    about the death of Westlaw contract, marketing ads that

10:23:52    25    said "ROSS or Westlaw"?

ROSS' purpose was to market a platform to answer legal researchers' questions, which is plaintiff's purpose too, one to one.

The Second Circuit held in ReDigi in an opinion by Judge Leval that found no fair use; that when a secondary use competes in the rights holders' market is an effective substitute for the original, it impedes the purpose of copyright to incentivize new creative works by enabling their creators to profit from them.

Check, same way. The Court found that that it used the competed directly with the original, was not transformative.

Second, both ROSS and Thomson Reuters had the purpose of using the Westlaw content as summations and syntheses of factual legal issues selected and arranged in comparing in categories, which you'll hear more about.

Third, both ROSS and Thomson Reuters used the Westlaw content for the purpose of training the parties' respective AI search algorithm. Years before ROSS was even founded, let alone commenced its steam, plaintiff used its own Westlaw content for the specific purpose of training its AI algorithms and to help to learn how to find relevant law.

And ROSS also used the Westlaw content to

train its AI.  It cannot be overemphasized, Your Honor,

that ROSS already had the pieces from another vendor.

What it lacked was the legal analysis of those cases,

the pairs of what's important and what goes with what,

10:25:30  that that's what it needed.  And it admittedly

repeatedly in its depositions to find the relevant law

in answer to questions, the same way with the same kind

of analysis that ROSS's -- that Westlaw's attorney

editors did it.

10:25:47            It got that analysis from copying the

editorial judgment of Westlaw's attorney editors, as

reflected in part by copying the more than 20,000

question-and-answer headnote pairs ROSS used for

training.  ROSS's whole platform was built on the facts

10:26:07  of Westlaw's attorney editors.  It's set up to compete

with and substitute for Westlaw.  It admitted it did, in

fact, take people from Westlaw.  This is not a

transformative use as a matter of law.

            THE COURT:  All right.  Thank you,

10:26:30  Ms. Cendali.  A few questions for you.

            When I'm considering transformativeness,

what do I focus on?  Do I focus on the intermediate

step, what ROSS did directly with the material, which

was using it to train AI; or do I focus on the end, the

10:26:46  overall output of the project, the legal research tool?

1              And whichever answer you give me, why,

2       and on what authority?

3              MS. CENDALI:  Well, you can look at it in

4       any way, most of the cases look at the overall purpose.

10:27:00   5  Most of the cases, like Warhol, look at what was the

6       ultimate purpose, what it's going to be used for, it

7       going to be used to illustrate a magazine, that was the

8       purpose.

9              There could be other purposes as well:  I

10:27:13  10  want to create artwork, I want to do other things.  And

11      those could be looked at; but, here, whether you look at

12      the highest level of purpose or a more narrow purpose

13      like just for training AI, either way, it's substituted,

14      and, therefore, not transformative.

10:28:46  15            (Pause in proceedings.)

16            THE COURT:  All right.

17            MS. CENDALI:  Just may I interrupt to

18      answer -- page 16 of our moving brief has a long

19      paragraph citing cases such as Paramount, Peter

10:28:59  20  Letterese, MGM, et cetera.  It all stated that the

21      overall purpose does matter in the analysis.  Our point,

22      though, is whether you look at it as the overall

23      purpose, whether you look at it as the slightly more

24      narrow purpose of -- to get answers to legal questions,

10:29:15  25  or whether you look at it as training data, either way,

1    all those purposes align.

2                THE COURT:  Okay.  Now, your framework

3    for arguing this is relying on the Second Circuit's

4    decision in Authors Guild vs. Google.  Three factors:

10:29:34    5    commerciality, bad faith, transformativeness.

6                But I want to understand how I should

7    read that after the Supreme Court's -- that's 2015 --

8    how should I read that after the Supreme Court's 2021

9    decision in Google vs. Oracle.  They didn't decide good

10:29:57    10    faith, yes or no, but there was some skepticism about

11    whether it plays a role.  So how should I feel about

12    relying on the bad faith consideration and how much, if

13    any, weight should I give it post-Google?

14                MS. CENDALI:  Well, two answers.  One, as

10:30:09    15    Your Honor noted, the Court, in Google, just said, I'm

16    skeptical about this, but the Court did not take the

17    opportunity to overrule or change Harper, which remains

18    the law of the land and the law that the district courts

19    and the courts of appeals throughout the country have

10:30:27    20    followed.

21                Moreover, when you look closely, as I'm

22    sure Your Honor has, that opinion, the Court cited, in

23    particular, Campbell on that.  And the concerning

24    Campbell there was about, Gee, I don't want to

10:30:42    25    discourage people from reaching out and asking for a

1    license because maybe that could moot a big expensive

2    case for a small license.  So I am not going to hold

3    that against people if they reach our for a license and

4    were denied.

10:30:56    5         And that's why in my remarks I was trying

6    to distinguish that type of use where bad faith may not

7    matter as much from the type of bad faith here.  In

8    Google, Google was not hiding what it was doing --

9              THE COURT:  Right.

10:31:09    10         MS. CENDALI:  -- unlike ROSS.  So let's

11   point out that we only found out it was ROSS -- think

12   about it, Your Honor.  There was all this advertising,

13   We're better than them, and ROSS versus Westlaw, come to

14   us, we're better -- not disclosing at all to the world,

10:31:22    15   to consumers, that it was actually built on all of our

16   judgments.  And we only found it was them long

17   afterwards.  Not so in Google and these other cases.

18             And that's why I say that I understand

19   that the Court made that comment, but I think you have

10:31:37    20   to look at it in context of --

21             THE COURT:  All right.  So context,

22   Campbell is the 2 Live Crew "Pretty Woman" parody.

23             MS. CENDALI:  Yes.

24             THE COURT:  In a parody case, like, we

10:31:48    25   are not really talking about good faith, bad faith,

1    like, the person being parodied, the whole idea -- well,

2    that's different -- Google is a commercial case, but

3    it's a commercial case where they're not hiding anything

4    and they're producing something different.  And this is

10:32:04    5    a case where it is a commercial case but it's a

6    commercial case where undertelling, they're hiding it,

7    they got turned down for permission, et cetera.

8            So that goes beyond the factual context

9    that Google itself was confronting, and no reason to

10:32:17    10    think that having to reserve the issue would necessarily

11    foreclose considering it here.  That is your argument,

12    right?

13            MS. CENDALI:  That's exactly right.  And

14    to be clear, though, Your Honor, I think the law of the

10:32:28    15    land is to assess each one of those points, but to be

16    clear, even if Your Honor said, I am going to give no

17    weight to that factor, we would still win because it is

18    incredibly commercial, as Warhol gave new life to, and,

19    you know, the days of transformatives being, you know --

10:32:50    20    the Litmus test is gone.  And that was really clear.

21            THE COURT:  How objective is good faith?

22    How amenable to summary judgment either as an objective

23    inquiry or as -- based on facts that are undisputed or

24    conceived here?

10:33:06    25            MS. CENDALI:  Good question; but, here,

the facts of what occurred are not in dispute.  There's

the actual e-mails, all of which were cited to, where

someone said, you know, specifically, I'm going to get

access on the false representation that I was a -- a law

10:33:27    student, you know, things like that.  So when the facts

aren't disputed, there is no historical facts for a jury

to decide.  It's really the legal interpretation of the

facts, which Your Honor can do.

            But, again, if you wanted to write an

10:33:41    opinion that said, This is what I think, I think bad

faith, in my view, should apply here.  It still exists.

But even if I chose not to because of the commerciality

and the lack of transformativeness, it would be the same

result.

10:33:56    THE COURT:  What are your best record

citations for bad faith -- undisputed, undisputable

evidence that you say should be read as bad faith?

            Now, Mr. Parker may read it differently,

but you're making arguments about what I should infer

10:34:13    from them.

            MS. CENDALI:  Exactly.  And that evidence

would be -- forgive me.

            It would be the first Means Declaration

678, at Exhibit 51.  This is about their law firm

10:34:31    telling them that they couldn't get access.

                    THE COURT:  Their law firm, ROSS's or

     LegalEase's?

                    MS. CENDALI:  ROSS's law firm, whose name

     I will not mention, told them that they couldn't get

10:34:43   access.  You will see also in our brief the very telling

     thing from one of ROSS's executives saying, "Hey, come

     on, they're not going to know about it."  That's an

     example of bad faith.

                    The other things:  Trying to sign up law

10:35:01   students is first Means declaration, Exhibit 56, trying

     to get access from the -- more about the law firm is

     Means declaration, Exhibit 54, Exhibit 16, and receiving

     a copy of the terms of service meaning brief at 9 to 10.

     The thing I just mentioned that said, "My man, no

10:35:29   worries on it.  Just keeping it under the hat for now.

     Westlaw and Nexus need not know about it," that's in our

     moving brief at 10, 24, and 25.

                    The posing as a solo practitioner is

     first Means declaration, Exhibit 74 at 855, about

10:35:49   sharing a Westlaw Edge agreement and saying, "Here is a

     quote I got from them under the false representation

     that I was a solely practitioner in Buffalo."

                    I could go on, but the -- there they are,

     a lot of them, in our moving brief at 12.

10:36:11                    THE COURT:  Okay, very good.  Thank you.

1           And I think I will hear from Mr. Parker.

2           MR. PARKER:  I am going to start with a

3      quote that was in Sony v. Connectix.  It's quoting

4      Campbell vs. Acuff.

10:36:39    5           THE COURT:  Uh-huh.

6           MR. PARKER:  It says, "The question is

7      whether the new work supercedes the object of the

8      original creation or instead offers something new with a

9      further purpose or different character.  Altering the

10:36:52   10      first with new expression, meaning, or message, it

11      masks, in other words, whether and to what extent the

12      new work is transformative."

13           To put all of this into context, because

14      there are big words used.  There are words used like

10:37:08   15      "ROSS wanted all of the legal analysis."  There are

16      words used that "it was built on the back of their

17      choice of what should be headnoted or not."

18           There were 25,000 memos.  Of those 25,000

19      memos we've only been talking about the -- what I'll

10:37:28   20      call the "great" quotes.  There are those 25,000.  There

21      are 4 to 6 quotes in all of those memos.  That's -- if

22      you want to take 5 as the average, that's 150,000

23      judicial quotes that are not tied to any headnote.

24           ROSS needed a full range -- and you will

10:37:49   25      find this in the Jimoh Ovbiagele declaration.

1          THE COURT:  What do you mean "not tied to

2     any headnote"?

3          MR. PARKER:  There is no allegation that

4     there was any headnote used to with locate any topical

10:38:02    5     quote, any good quote, any irrelevant quote.  This case

6     has only been discussing headnotes as a small fraction,

7     one-fifth, of all the quotes used to train.  The purpose

8     could not have been, and it's statistically impossible,

9     to have taken all of their work or nearly -- even a

10:38:27   10     fraction of the work.  And we keep -- that is missing

11     out of this.

12          This was not an attempt to map headnotes

13     to quotes.  It couldn't have been.  Only one-fifth, at

14     most, of any quote would have been mapped to a headnote.

10:38:44   15     I am using their term of "mapped."

16          THE COURT:  So let's say that's right.

17     What does that have to do with the first factor?

18          MR. PARKER:  Because what we were doing

19     is, which is without dispute, featurizing these quotes,

10:38:59   20     the end questions matching the words.  Without dispute,

21     we removed anything that would be mapping because it's

22     all a bunch of numbers.  And we provided -- and I am

23     going to have to give you the record cites after because

24     I don't have them in D.I.

10:39:15   25          We have provided to this Court an example

of exactly what that looks like.  We have in the

declaration of Mr. Marks that you can't reverse

engineer -- he tried -- Dr. Branting tried, Dr. Marks

accepts that as true -- and you can't get back to

10:39:32  anything close to the original expression.

We completely transformed it, in other

words, from an expression of any kind to how words, one

relate to the other, across 27 different things, without

dispute.  Their expert, Dr. Krein, says, oh, you can

10:39:51  find it there, but he made no attempt to find it there.

He makes no attempt to show that in the final search

engine there is a key number, a headnote, or any

expression at all.

They suggested maybe there, but

10:40:07  Dr. Krein, this is at paragraphs 129 and 130 of his

opening report, had two days of access to our source

code.  He could have located it and provided

specifically what he was talking about.

Let's go to the next step.  When this

10:40:28  original was adjusted, the memos were adjusted, it went

into a training data aspect.  Once ROSS arrived at those

numbers, those features, the training data -- just as

with Westlaw -- was moved to a side.  It did not touch

the source code.  The source code is a bunch of numbers.

10:40:47  We provided examples of what those numbers look like.

1          The purpose was to remove any human

2    intermediated content to make legal research cheaper.

3    Is that transformative?  Oh, my goodness.

4          It's more transformative than what

10:41:09    5    happened in Sega.  In Sega, they created new games

6    looking at someone's source code.  In Sega, Sega still

7    had to tolerate new games being played on the game

8    system where they were competing by selling games as

9    well.  And the Court found it was still fair use and bad

10:41:28   10    faith.

11          In Sega, they were negotiating a license

12    and they didn't like the terms, so they just went ahead

13    and did it anyway.  And I don't see that bad faith; it

14    is different in degree but not in common.

10:41:45   15          And in Google, I cannot read Google to

16    say that Google was acting openly.  Google 2 was

17    negotiating a contract with Oracle, and certainly Oracle

18    did not think they were acting in good faith, which is:

19    You were negotiating with us, you didn't like the terms,

10:42:05   20    and you decided to use it anyway.

21          THE COURT:  There is no -- I don't recall

22    Google discussing anything about concealment.

23          MR. PARKER:  I don't either, but they

24    made the bad faith argument, so I don't think it was

10:42:19   25    just open and notorious conduct that somehow then

1    elicited bad faith argument.  There was a bad faith

2    argument made.

3                    In Sony, which we were more

4    transformative, Sony had to tolerate connectors using

10:42:35    5    their games on a PC.

6                    We don't make Westlaw tolerate our use of

7    their system.  We don't make Westlaw tolerate our use of

8    their materials.  We don't have those things.

9                    Ooh, I just lost my train of thought.

10:42:56    10    Give me a second.  But at that rate -- oh, I know where

11    I'm going.

12                    So that begins to answer the same

13    purpose.  And you asked about the intermediate and the

14    end.  Let me tell you why we make that argument.

10:43:14    15                    What their argument is, essentially, we

16    make use of this copyrighted material; we have a right

17    to control that copyrighted material.  That is the

18    beginning of a fair use argument because in Sony, they

19    had the right to use that the copyright material, Sega,

10:43:35    20    Google had the right to use --

21                    THE COURT:  You want to make this case

22    looks like Sony, Sega, and Google, because there is the

23    intermediate use of the API or interface required to

24    make this work with a DNE system or something else, but

10:43:50    25    they're arguing, well, the ultimate problem still

1    competing in our space, which goes back some in terms of

2    market, and I think irresponsibly well, maybe these

3    games are competing with the Sony and Sega games.

4                    MR. PARKER:  I am saying two different

10:44:07    5    things here.  So just say with the Factor Four because

6    that's where -- that's where that really comes in.

7                    The question isn't whether or not we are

8    competing against Westlaw at all.  The question is --

9    and I would like to give the quote for you, but I'd like

10:44:20    10    to wait and save my thunder.

11                    The question is whether or not the

12    copyrighted materials are at risk under the Factor Four

13    analysis.  Not with the Westlaw platform written large

14    is somehow under assault.

10:44:33    15                    So let me go back.  In all the cases when

16    you talk about -- when they talk about, We could have

17    used this and we could have done that, of course they

18    could have.  That's why there is a copyright

19    infringement claim.  That's why we have to, for fair

10:44:45    20    use, acknowledge there is some kind of infringement.

21                    All right.  And that's why I'm saying

22    Sega and Sony and Google, all of those cases are

23    companies that said, We actually use our source code to

24    make games, right?  And so now there are cases -- and so

10:45:00    25    that's why looking at it at that step, where you're

1    actually using the copyrighted material, is not -- is

2    just the beginning for fair use.  Because -- and the

3    reason you look at the end result.

4           THE COURT:  So you agree we need to look

10:45:15   5    at the end result, though you think we need to start

6    with the immediate use.

7           MR. PARKER:  Yes.  Because all of their

8    cases -- and this includes their cases on page 16 of the

9    reply brief -- are cases that actually go to analysis,

10:45:29  10    Like you took the copyrighted materials and you made a

11    thing.  This is what happened in Warhol.

12           And then the Court concludes, Well,

13    that's just derivative of the copyrighted material.  And

14    that's where the word "derivative" comes in.  That's

10:45:44  15    where the courts are saying, You have the right to

16    control your derivative materials.  It is the conclusion

17    of a failed fair use argument.

18           In Warhol it was the same photo.  It was

19    a copyright violation; it could not be fair use.  And so

10:45:59  20    that's why I say to the Court, Let's ask how do you use

21    the copyrighted material?  What ended up -- what was the

22    final result?  And is that final result transformative?

23           And that's why Sony and Sega and Google

24    actually do apply.  And let me just say Google is

10:46:20  25    transformative in that Google still contained the actual

1    copyrighted material.  We don't have that either.

2                    So, now, all of those cases, if you look

3    at page 16 of their brief.

4                    THE COURT:  Reply brief.

10:46:37    5                    MR. PARKER:  Of their reply brief, yeah.

6                    So Paramount is -- tells a story of "Star

7    Trek."  It's a book about the "Star Trek."  Okay?  Peter

8    Letterese is materials developed from a book.  So the

9    end result is -- but that's not -- that's just

10:46:59   10    copyright.  It's not the same purpose.

11                    MGM is a play about "Gone With the Wind."

12    They're going to say that's not transformative.

13                    Warhol is about a Warhol photo that just

14    had different colors.  It has no different meaning, and

10:47:16   15    so that's not transformative.

16                    And Wall versus Data, we could go through

17    all the Third cases where they cite it is just a

18    question that they are not transformative; they're

19    derivative.  Wall Data is software programming.

10:47:31   20                    And Worldwide is about the book "Mystery

21    of Ages."  It's just reprinted.

22                    They have another case about scientific

23    papers, where the guy just changes the author and adds a

24    couple of words.

10:47:48   25                    That's why I'm saying for transformative,

```
 1    you don't ask yourself, well, could the holder of the

 2    copyright have done the same thing?  That is never the

 3    question because it presupposes you have the right to do

 4    the same thing.  But fair use allows someone else to

 5    come along and use it to transform, and that's what I

 6    mean by "end result."

 7              THE COURT:  Okay.  Couple of follow-up

 8    questions.

 9              How did ROSS input the memos into the AI?

10    What can you tell me about that?

11              MR. PARKER:  It was converted -- so I

12    will tell you at page -- let me quickly look at the

13    page -- but it didn't -- the question is not a true

14    question, so let me -- it didn't input it into the AI,

15    so...  It took from memos and loaded them into a --

16    called CSV -- CSV, possibly.

17              THE COURT:  Right.

18              MR. PARKER:  It took about 80 percent at

19    a random level.

20              THE COURT:  It sampled 80 percent of a

21    hundred?

22              MR. PARKER:  Correct.  20 percent it set

23    aside because they were used for validation training.  I

24    will give you the page cites.

25              THE COURT:  Okay.
```

10:48:04  (line 5)
10:48:20  (line 10)
10:48:35  (line 15)
10:48:48  (line 20)
10:48:59  (line 25)

1           MR. PARKER:  It then began to run -- it

2    liminized it, which is removing certain -- so instead of

3    stopping, it would become stopped.  It removed like

4    gerunds, past tense, and so on.

10:49:12    5           It then began to featurize across 47

6    features.  How many words separate this noun from this

7    verb?  How long is an answer?  How long is a word?  How

8    many long words are in the answer?  And so on.  All of

9    these 37 features all described in Dr. Mark's deposition

10:49:38   10   evaluation.

11           THE COURT:  Remind of where to find that

12   declaration.

13           MR. PARKER:  I will, but I can't do it

14   right now.  But if you don't mind --

10:49:45   15           THE COURT:  Sure.  Go ahead.

16           MR. PARKER:  It then resulted in a series

17   of numbers.  Those numbers are taken and then used to

18   train the source code.  So there is no touch -- the

19   source code used for the legal search engine, there is

10:50:06   20   no touch between that source code and the actual memos

21   themselves, the words in the memos.

22           The training data, the memos, are pushed

23   to the side, because all they want is the series of

24   numbers stripped of expression, stripped of which

10:50:25   25   question came with which answer, because, of course,

1    part of the reason you want all of the different type of

2    answers is so that the AI can actually know how the

3    words relate to each other, so it can help figure out

4    what aspects mathematically make something less good or

10:50:43    5    more good.

6                    And so the results are not the results

7    that you get from ROSS.  There is no dispute.  Is the

8    question that someone types in, which is not a question

9    in one of the memos; they wouldn't even know what the

10:51:02    10    memos were -- the question typed in in ten judicial

11    quotes.  That's it.

12                    THE COURT:  So maybe that is the answer

13    to this next question, but say someone types in a search

14    using "ROSS."  What precisely does it spit back?  Just

10:51:22    15    ten judicial quotations ranked in order of

16    responsiveness --

17                    MR. PARKER:  Yes.

18                    THE COURT:  -- based on these 29

19    parameters?

10:51:29    20                    MR. PARKER:  27 parameters exactly.

21                    THE COURT:  So -- and those parameters,

22    are they semantic, syntactic, kind of a mix, or both?

23                    MR. PARKER:  Let me find something for

24    you.  Let me just...

10:51:58    25                    So these things are mentioned in

1 Mr. Ovbiagele's declaration, Mr. Marks' declaration.

2 One of them is a feature called QER.  It measured the

3 number of words shared between the question and the

4 answer.

10:52:14 5     Another is called Word2 -- the number

6 2 -- VEC, all one word.  It generated a set of numbers

7 that represented the words of the question and answers

8 as real numbers in a vector space.  I cannot tell you

9 what a vector space is.  That is either closer or

10:52:32 10 further away from each other, based on the possibility

11 that the word would occur in proximity with another word

12 in the natural language.

13     Other features generate a number that

14 reflected something about just the question or answer

10:52:45 15 and not both; for example, the lexical generated a

16 number that represented the number of words in the

17 answer, the average word length of each word in the

18 answer, the number of sentences in the answer, and the

19 average sentence length in the answer.

10:53:00 20     And do you see how even that one has no

21 relation to the question and it has no relation to a

22 mapping, and it's doing this for all of the quotes, even

23 that are terrible, which don't come from Westlaw, and

24 they make no claim that any of the other four or five

10:53:19 25 quotes were taken and are subject to infringement,

1    because this case is not about wholesale taking legal

2    analysis from Westlaw, and they don't have the evidence

3    to show it.  They try to make that argument, but as we

4    note in our fair use opposition brief, what they do,

10:53:39    5    they cite to things that are just widely out of bounds

6    in terms of that.

7                So the evidence is -- for purposes of

8    fair use, I know where we are.  You're assuming in

9    Franklin for fair use.  I don't think we have to assume

10:53:57    10    the scope of the infringement.  They claim, I think, but

11    what the actual facts of that infringement are, at most,

12    a discrete number of headnotes, a very discrete number

13    of key numbers 5,000 or so at most, 500 judicial

14    opinions that our guys, undisputed, say, We don't want

10:54:19    15    this.

16                And that's evidence of -- when you talk

17    about bad faith, that alone, undisputed, when they

18    received an actual thing with all of the headnotes and

19    synopses saying, We don't want this stuff.  This is not

10:54:33    20    useful to us.

21                THE COURT:  What e-mail are you referring

22    to right now?

23                MR. PARKER:  Hold on.  I'll tell you that

24    just in a moment.

10:55:04    25                I might be able to find it faster for

              1    you.

              2                    MS. CENDALI:  Page?

              3                    MR. PARKER:  Page 21 of ROSS's fair use

              4    brief.  It is Exhibit 63 to the declaration of

10:55:22      5    Ovbiagele.  And the quote is ROSS said it was bad data

              6    and they wanted to -- they wanted that stuff taken out,

              7    that it was irrelevant from the data center.

              8                    THE COURT:  This is e-mail from whom to

              9    whom on what date?

10:55:36     10                    MR. PARKER:  It is -- that, now, I'm

             11    going to need to do a little bit more work.

             12                    Do you have it?

             13                    MS. BERRY:  It's from Thomas Van Der

             14    Heijden to Terry Whitehead, who is an employee from

10:55:56     15    LegalEase.

             16                    THE COURT:  How do you spell the last

             17    name of the sender?

             18                    MS. BERRY:  It's V-A-N, space, E-R,

             19    lowercase, capital H-E-I-J-D-E-N.

10:56:02     20                    MR. PARKER:  And what date is it?

             21                    MS. BERRY:  I don't have the date yet.

             22                    MR. PARKER:  Okay.  Terry Whitehead was

             23    the principal at LegalEase to whom -- with whom ROSS was

             24    interacting.

10:56:16     25                    And then one final point on bad faith.

1    Exhibit 71 to the Means declaration.  And, again, I will

2    get you the D.I. cite.  It is an e-mail to LegalEase,

3    asking LegalEase to use Westlaw, lacks a source -- other

4    reputable source to create the legal memos.

10:56:42    5         The undisputed evidence is that ROSS did

6    not direct LegalEase to use Westlaw.  The undisputed

7    evidence is that LegalEase was deposed by both sides.

8    The principal at LegalEase, the CEO, was -- said --

9    testified, without dispute, nothing contradicting it,

10:57:02    10    ROSS did not direct them to use Westlaw.

11         Terry Whitehead, again, the principal at

12    LegalEase, said, "I wasn't directed to use Westlaw, and,

13    in fact, we used LEXIS and Google."

14         So I think, again, that also finally

10:57:17    15    bears on what is or is not bad faith.

16         THE COURT:  Thank you.

17         Unless there's any brief -- if you have a

18    brief, pointed response to anything specific you

19    disagree with in there, I'll listen to it briefly before

10:57:33    20    we move on to Factor Two [sic].

21         MS. CENDALI:  Let me -- let me try

22    briefly.

23         MR. PARKER:  I -- I --

24         THE COURT:  Sorry.  Mr. Parker.

10:57:39    25         MR. PARKER:  We have the burden on fair

1    use, so, you know, I -- it is a little bit more than

2    following the rules of order, but...

3              THE COURT:  That's a fair point.  I just

4    want any factual rebuttal, like what Mr. Parker just

10:57:52    5    said is incorrect.  And if you say that he misquoted

6    something or is taking something out of context, I will

7    let him respond.

8              MS. CENDALI:  Thank you, Your Honor.

9    Just briefly, they're trying to use the trees and the

10:58:10    10    technology that mask the purpose, which is what we're

11    all in the case and care about, purpose.  Not the how in

12    copying it.  At one point, photocopying was the new

13    clever thing, but the law is clear that however you call

14    it -- and Arroyo is a really good example of that.  We

10:58:24    15    cited that case.

16              You can do your own Rube Goldberg type

17    thing, but if it walks like a duck, it talks like a

18    duck, it is a duck.  And, here, they train their content

19    -- and I'm saying -- the quote is on page 29 of our

10:58:41    20    brief -- because they needed legal questions mapped

21    directly to case passages that answer those questions.

22    Moving Brief 31:  "We needed question-and-answer pairs."

23              And their own AI expert, Dr. Branting, at

24    first Means declaration 23, said that ROSS's algorithm

10:58:59    25    learned from the relationship between the pairs.  And

```
 1    that's how it answered the questions.  That's this whole

 2    point, because the whole way it worked was because our

 3    editors did the analysis of saying, this is how you

 4    answer a question, when you ask a question, you got that

 5    answer.

 6                    There is really nothing more to it.

 7                    And I'm more than happy to explain why

 8    this has nothing to do with -- first off, intermediate

 9    copying is not a "get out of jail free" card.  Sega

10    actually stands for that proposition.  It can be

11    actionable.

12                    This is not a case about code.  This is

13    not a case about reverse engineering.  It's not a case

14    about needing to do anything.  Those cases are just not

15    applicable here, but I will stop.

16                    THE COURT:  All right.  I will let

17    Mr. Parker respond limited to the points that were just

18    raised by Ms. Cendali, and then -- he'll have the last

19    word and we'll move on to Topic 2.

20                    MR. PARKER:  I am just going to respond

21    to the factual matter.

22                    There is not a shred of evidence that the

23    only thing that ROSS returned was the quotes that

24    corresponded to a headnote.  There is not a shred of

25    evidence that would be what, at most, 25,000 cases that
```

1  would be returned.  There is not a shred of evidence

2  that it was so limited, that that's what they were

3  looking to do.

4       And, moreover, there is not a shred of

5  evidence that discarding 20 percent, randomly picking

6  which ones you're going to put in would ever obtain the

7  result that you were trying to copy the results that

8  Westlaw returned.

9       THE COURT:  I am satisfied and thankful

10  for both of those presentations.

11       Now we'll go to Ms. Cendali on Topic 2,

12  the fourth fair use factor:  The effect of the use on

13  the potential market for or value of copyrighted work.

14  I realize there is some connections to the previous one.

15       Please proceed.

16       MS. CENDALI:  Thank you, Your Honor.

17       In Harper & Row vs. The Nation, the

18  Supreme Court stated that Factor Four is undoubtedly the

19  single most important element of fair use, and with good

20  reason, because Factor Four has the greatest potential

21  to impact the incentives that the Constitution was

22  intended to promote.

23       ROSS bears the burden of proving that the

24  secondary use does not compete with the relevant market.

25  Warhol at 49.  Ross cannot meet its burden.  Instead,

1    this is an odd case where plaintiffs submitted

2    overwhelming evidence that ROSS caused three primary

3    types of market harm or effect.

4              The first type of market harm is that

11:01:43    5    ROSS substituted for the original Westlaw work by

6    actively marketing Westlaw subscribers to switch to

7    ROSS.  This wasn't just an incidental, it was -- the

8    whole purpose was to get them to switch.  And, again,

9    market -- first Means Declaration 78 adds -- ROSS or

11:02:04    10    Westlaw adds touting the debt of Westlaw.  First Means

11    Declaration 70.

12              ROSS developed a marketing plan to offer

13    discounts to customers who unsubscribed to Westlaw.

14    Means Declaration Exhibit 57.

11:02:20    15              ROSS's witnesses and experts testified

16    that ROSS not only intended to replace Westlaw, but

17    admitted that the ROSS platform actually did do this.

18    For example, one of ROSS's cofounders admitted that law

19    firms substituted ROSS or Westlaw.  He was asked, "Did

11:02:39    20    you hope that law firms would stop using Westlaw and use

21    ROSS instead?"  He answered, "Yes, and eventually they

22    did."  First Means Declaration Exhibit 2, moving brief

23    at 9 and 15.

24              ROSS's 30(b)(6) witnesses also said the

11:03:00    25    intent was to create a replacement, and were users

1    indicating that they would replace Westlaw with ROSS?

2    Yes.  Moving brief at 8 and 4 -- 14.

3              The second type of market harm presented

4    here is that ROSS diminished the value that plaintiffs

11:03:21    5    obtained by their own exclusive use of the Westlaw

6    content as training data for their legal research

7    algorithms.  This isn't a post-comp kind of legal

8    argument.  This is based on the facts.  Plaintiffs

9    trained, using their own content, their own AI search

11:03:41    10    algorithms long before these folks came on the scene in

11    2010.  Moving brief at 28 to 29.

12              We specifically trained it on the

13    question-and-answer pairs.  They did the same thing, and

14    they deprived us as -- of our exclusivity.  And a loss

11:03:58    15    of exclusivity -- is noted about the exclusivity about

16    the book -- about the part in Nixon and Nation -- is a

17    form of harm recognized in Harper.

18              Moreover, worse, talk about the facts, is

19    ROSS not only knew that exclusivity was important, but

11:04:14    20    it admitted it.  And it admitted it because one of its

21    cofounders testified that he told -- ROSS told LegalEase

22    to destroy the bulk memos because ROSS did not want

23    somebody else to get the training data that was based on

24    our stuff so that they could, quote, create a machine

11:04:35    25    learning model that's comparable to if ROSS's.

1          Goose and gander is the legal principle

2     here.  This is first Means Declaration Exhibit 13,

3     moving brief 16.

4          Ross can't now claim there is no value in

11:04:48    5     the training data when they themselves recognize the

6     value of it.

7          The third market harm is that ROSS

8     impeded plaintiffs' ability to license the Westlaw

9     content and its derivatives in the current market or in

11:05:02   10     the potential market for Westlaw content and its

11     training data.  This kind of market harm is recognizable

12     in the Third Circuit in Murphy vs. Millennium.

13          Ross created a substitute legal research

14     platform, as they have admitted.  This is the same kind

11:05:17   15     of harm in Davis vs. The Gap, in which the Second

16     Circuit held that by taking it for free they avoided

17     paying the customary price and caused a loss of royalty

18     and revenue and diminution of the opportunity to

19     license.

11:05:34   20          Same concept in Fox News Network,

21     which -- Mr. Simmons and I -- cases where the Court

22     said, Look, clearly, someone was willing to pay for this

23     and there's clearly a market effect here.

24          And, here, ROSS was willing to pay a lot

11:05:52   25     of money -- I won't say how much -- to get the training

1    data.  It shows the value.  None of that money went to

2    us had we wanted to do it.

3                  I learned long ago, you don't make money

4    on losing money on every sale and making it up on

5    volume.

6                  ROSS's copying, thus, more than, alone,

7    constitutes market harm.  And ROSS can't meet its

8    burden.  But the correct legal standard is not just to

9    look at ROSS, but to look at and examine whether the use

10   became widespread.

11                 Campbell and Harper explained that it's

12   not fair when isolated instances of minor infringements

13   were multiplied many times become an aggregate, a major

14   inroad on copyright.  Harper 569, Campbell 590.

15                 Through decades of investment and

16   creativity, West and Westlaw have became the gold

17   standard in legal research.  This has provided a huge

18   benefit for everyone using the legal system; lawyers,

19   clients, judges.  You know longer need to look for a

20   teeny needle in a giant haystack to find relevant case

21   law.  Yet, if the abuse became so widespread that

22   everyone were free to copy the Westlaw content to create

23   their own competing platforms, it would radically

24   undermine plaintiffs' constitutional incentive to keep

25   creating.

|     |     |
| --- | --- |
|            | 1 |
|            | 2 |
|            | 3 |
|            | 4 |
| 11:07:36   | 5 |
|            | 6 |
|            | 7 |
|            | 8 |
|            | 9 |
| 11:07:51   | 10 |

1    Why would plaintiffs continue to hire and

2    train attorney editors for generations if their work

3    could be copied by others and support other people's

4    businesses to come in and maybe charge less because they

5    don't the R&D expense?  It makes no sense.  And that's

6    why Harper was so create in finding Factor Four so

7    important.

8    If ever there was a case where Factor

9    Four -- and Factor One, Two, and Three -- made a

10    difference is this:  ROSS simply cannot meet its burden.

11    THE COURT:  So just one question to you,

12    and I am going to ask the same question to Mr. Parker.

13    So I see two possible markets here.  One

14    is the market for legal research tools, the other is the

15    market for AI training materials.

16    As I said in, you know, my opinion

17    granting summary judgment on the antitrust

18    counterclaims, I don't view the markets here as well

19    defined.  Does that -- that mattered for the end

20    opinion.  Does it matter here in the fair use analysis?

21    MS. CENDALI:  I don't think that this --

22    antitrust is so focused on market definition.  That is a

23    different world than fair use.  And Courts frequently --

24    and I, again, commend to the Court the decision in the

25    RTVI Fox News case, because it's typical in fair use

1       cases that you have multiple markets that are assessed.

2              You have the primary market, you have the

3       derivative markets, you have potential markets, all of

4       which are assessed because any one of them could be

5       relevant.

6              And that's the case here.  You have such

7       an unusual situation, Your Honor, where there is an

8       overt use, choose us and not them.  I don't think you

9       need to do more, and then lots of subsidiary things

10      about choose us and not them.

11             And then you also have the admitted

12      concept that there is a market for training data.  We

13      use it ourselves.  It's, you know, the experts admit

14      there is a market for this.  And remember -- and forgive

15      me; of course you remember -- but the statute just says

16      "potential market," and so that's another way it's

17      different from antitrust.  There hasn't have to be an

18      existing market.  It just has to be a reasonably

19      anticipated, reasonable market that one could develop.

20             In every way you slice it, this was

21      harmful to us and caused market harm.  And I don't want

22      to be corny, but I really do believe in this principle

23      of killing the golden goose.  Like, it's great to have

24      derivative rights in society, and that's important, and

25      that's part of the purpose of fair use law.  We get

1      that.  But when the use is so overtly, expressly, and

2      intended to be competitive in this particular way on so

3      many levels, there is the danger of killing the golden

4      goose.  And that's why Factor Four exists.

11:10:29    5                     THE COURT:  Thank you.

6                     Mr. Parker.

7                     MR. PARKER:  So when the Court goes back

8      to read plaintiff's Factor Four analysis, I would like

9      the Court to focus on the fact that what they do is they

11:10:50   10      talk about the Westlaw platform.

11                     This is a copyright issue, and I am going

12      to read a quote from Google versus Oracle, because the

13      question is not harm to the platform in all its aspects;

14      the question is what is the harm to their copyrights.

11:11:08   15                     And that's the fourth statutory factor:

16      "Focuses upon the effect of a copy in the market for or

17      value of the copyrighted work."  That's at page 35.

18                     It then continues:  "But a potential loss

19      of revenue is not the whole story.  We must hear, must

11:11:33   20      consider not just the amount, but also the source of the

21      loss.  A parody may kill demand for the original, but

22      this kind of harm, even if directly translated into

23      forgoing dollars, is not cognizable under the copyright

24      factor.

11:11:52   25                     THE COURT:  Right.  Hustler versus

1    Falwell, Campbell, we get that.  What does that have to

2    do with this case?

3                   MR. PARKER:  Because they have never told

4    you in all this litany what is the harm to their

11:12:02    5    copyrights.  They tell you what happens to their search

6    engine, but not what happens to their copyrights.  If

7    people want headnotes, synopses, all their copyright

8    materials, there's still only one source for it.

9                   If they come to us, we don't have them.

11:12:26    10    To say that we harmed them because they have an

11    exclusive right to training data is nothing more than

12    what I said before, which is all copyright holders have

13    an exclusive right to use their copyrights as they wish;

14    and, unless your use is transformative, you're stuck

11:12:43    15    with a copyright violation.

16                   But in every case, someone says, I could

17    have used that copyright that you used.  I could have

18    used it too.  But fair use recognizes that Google is

19    like, We could have come out with a phone using the same

11:13:02    20    APIs.

21                   The Court said, Yeah, but that is the

22    fair use analysis.  It's not whether or not they could

23    have put the same copyrights that are at issue that are

24    being fought over for fair use to the same use or not.

11:13:17    25                   And understand, again, to go back to what

1    I said -- what I said previously, their cases are cases

2    where the conclusion is this is a transformative.

3    You're just using the same copyright.  It works.

4              That's what Murphy is about that was

11:13:32    5    cited by Ms. Cendali.  It's the same -- it's just

6    copying over; and, of course, you're not going to

7    satisfy Factor Four if you're copying over the same

8    thing without transformation.

9              Their potential market for AI training

11:13:48    10    data, there is not a shred of evidence that that has

11    been impacted.  I'm setting aside that they never

12    planned to enter the market, and that's -- but there is

13    not a shred of evidence that it's been impacted.  We

14    weren't in the market.  There is literally nothing.

11:14:06    15    There is literally nothing.  Conceivably, at most, they

16    have conceivably it could be impacted, but they don't

17    have anything that says it is impacted.  They don't have

18    any dollar figures around how this would have somehow

19    usurped a market when we weren't even in the market.

11:14:25    20              THE COURT:  Who bears that burden?  You

21    guys approach Westlaw, they didn't want to sell it.  You

22    took it anyway.  I mean, why isn't that enough?

23              MR. PARKER:  We are saying to the Court

24    there is nothing here.  And I don't know how you can

11:14:44    25    bear burden when you say there is just literally nothing

 1    here.  The other side says, well, no, there is

 2    potential, and they don't say anything more than that.

 3              I think we have met our burden.  There is

 4    zero evidence.  And so I don't know how you could prove

 5    the negative where they say, No, but there is a

 6    potential harm someplace.

 7              THE COURT:  Your argument seems to be

 8    there is not an effect on the market, but they're not

 9    denying that there is a market for AI training materials

10    for legal reasons.

11              MR. PARKER:  I am forced to make that

12    acknowledgment because our expert actually said

13    something different than that --

14              THE COURT:  Okay.

15              MR. PARKER:  -- but this Court excluded

16    that opinion.

17              So I have to -- I have to assume right

18    now that there is a market for AI training data for

19    legal data.  There is apparently no one in the market.

20    There is no evidence that there is anyone in the market.

21    There is no evidence that the market has been impacted

22    if there were a market.  So I'm actually saying to the

23    Court, when we say, There is nothing here, we have

24    satisfied our burden.

25              It would be different if they said, There

1    is a huge market, and there was some evidence there was

2    market, and I said to you, Listen, there's evidence.

3    I've got nothing here on this.

4                    THE COURT:  As I asked Ms. Cendali, does

11:16:02  5    it matter that neither the market for AI training

6    materials or the market for research training tools is

7    well thought?  That is something I talked about into my

8    antitrust.

9                    MR. PARKER:  I think it is -- there is a

11:16:15  10    problem at some point, because we are sitting here

11    telling you there is no evidence of there being a

12    market.  I don't know what it would be.  And you're

13    asking me, What is your burden here?

14                    And I'm saying, However the way in which

11:16:29  15    these markets are mentioned by plaintiffs, my response

16    is there is no evidence.

17                    And so, yes, their definition of what

18    these could possibly be would have made a difference,

19    perhaps, when you say, Have you carried your burden?

11:16:46  20    With what they said is their harm, as their injury, it

21    would be helpful to know.

22                    And, also, let me begin.  I am going to

23    go to Sega/Sony, because this is -- in Sega, the game

24    manufacturer literally had to tolerate people playing

11:17:01  25    games on their Game Station, even though they were in

1    the same business of video games.

2                 You see, it's not just as you compete in

3    some general sense.  They all look at what the copyright

4    issues are.  Does the copyright survive.

11:17:16    5                 And I'm saying here does the copyright

6    survive as AI training data?  It does.  They can

7    continue to sell it.  We could not go out in the market,

8    and that's why I say we couldn't have impacted the

9    market.  We are one person in the market that used,

11:17:31    10    except they couldn't derive income from us for that, but

11    that's true of all fair use cases.

12                 Google refused to license.  Sega refused

13    to license.  And then when they say we used it for

14    ourselves, of course.  So did Google, so did Sony, and

11:17:50    15    they started Oracle D.C. to say, We use this for the

16    same reason, I agree that's what they -- Sega used their

17    source code for the same purpose, which was to create

18    games.  That's why that falls short.

19                 THE COURT:  All right.  Here is a

11:18:06    20    follow-up question.

21                 MR. PARKER:  Yes, sir.

22                 THE COURT:  Your argument is, Look, I

23    distinguished all those cases on page 16 of the reply

24    brief because those were all non-transformative laws.

11:18:20    25    It sounds to me like you are taking what was a

1   Four-Factor balancing test and turning it into a test in

2   which Factor One is a threshold issue.  And that

3   explains kicking all the others out, and then neatly you

4   can say this is different.

11:18:34    5            MR. PARKER:  I am actually saying

6   something slightly different than that.

7            Factor Four does wrap around into Factor

8   One, and courts will say the more transformative it is,

9   the less you have a Factor Four analysis.

11:18:46    10           And so I don't mean to conflate them

11   purposely.  I'm saying to you they are related to each

12   other.  You start at Factor One, and by the time you get

13   to Factor Four and this happened is --

14           THE COURT:  Has our Court linked them in

11:19:00    15   that way?

16           MR. PARKER:  I am not saying they link.

17   I think courts have said -- and I am going to have to

18   get you a cite for that.

19           THE COURT:  Is this Supreme Court or the

11:19:08    20   Third Circuit taking that approach?

21           MR. PARKER:  I am not sure what approach

22   you're talking about.

23           THE COURT:  Of making Factor Four, in

24   part, dependent on the transformative, this factor.

11:19:19    25           MR. PARKER:  Hold on.  I am going to ask

1    her a question.

2                        (Discussion off the record.)

3                        MR. PARKER:  I do not.

4                        So, no, I do not -- I believe Sega and

11:20:18    5    Sony both do that.

6                        THE COURT:  That's my understanding.

7    Okay.  Ninth Circuit opinions.  They don't bind them.

8    Why should they persuade me?

9                        MR. PARKER:  I believe the logic is this:

11:20:30    10    The more transformative, the less likely it will compete

11    in the market against the copyrighted materials that

12    were used.  That's the logic because, again, it's not

13    about whether you compete in the marketplace, so it's --

14                        THE COURT:  For the court reporter.

11:20:51    15                        MR. PARKER:  I'm sorry.

16                        The theory, I believe, is the more

17    transformative, the less likely that any competition in

18    the market will harm when Factor Four protects, which is

19    the copyrighted works, the original copyrighted works.

11:21:07    20    I think that is the theory.

21                        THE COURT:  All right.  Very good.

22                        Let me hear from Ms. Cendali.  I think

23    there is some points you made that I would like to give

24    views on, and I will give you the last word.

11:21:22    25                        MS. CENDALI:  Thank you, Your Honor.

                    Three quick topics.  First, it's

appropriate to look at the harm for the Westlaw platform

because the Westlaw platform contains the Westlaw

content, and that is the -- where we license that

11:21:37    content.

                    Second, there are two ways to obtain a

legal research platform based on those decisions and

judgments of the attorney editors.  You can license

Westlaw or, unbeknownst to us until recently, you can go

11:21:56    to ROSS, and that's the problem.

                    Second point I want to make is with

regard to markets and licensing and the like.  I am

quoting Dr. Seuss versus ComicMix at 489:  "Fair use is

an affirmative defense, thus requiring the defendant to

11:22:17    bring forward favorable inference about relevant

markets."

                    All the evidence that exists here goes

our way, but even if we had done nothing, ROSS still

could not win unless it came forward.

11:22:33            THE COURT:  That's Dr. Seuss on the

burden of proof, but cite me -- you said, All the

evidence goes our way.  What are your best handful

pieces of evidence on the market?

                    MS. CENDALI:  Well, I mean, two things.

11:22:47    First let me deal with it legally and then I'll go back

 1    to it.

 2              THE COURT:  Sure.

 3              MS. CENDALI:  On pages 18 and 19 of our

 4    moving brief, we explain the law in detail with regard

11:23:00    5    to potential markets, particularly for AI training,

 6    which counsel admitted exists as a new market.

 7              And there's no legal requirement, as they

 8    seek -- my friend on the other side seek to emphasize,

 9    Well, you're not currently selling it.  There is no

11:23:17    10    requirement to currently selling it.  It's on Judy

 11    Caldwell.

 12              THE COURT:  It's a potential market will

 13    suffice.

 14              MS. CENDALI:  That's right.  And the harm

11:23:24    15    is that it's impaired by anyone like them that accesses

 16    it without paying the customary price with regard to

 17    data.

 18              And then with regard to market harm,

 19    again, among the evidence to cite for this -- and we go

11:23:41    20    through it in the brief -- is that moving brief at 19,

 21    part of the Malinowski report, ROSS paid LegalEase X

 22    amount of money to obtain this training data.

 23              And under Fox News versus TBIs, the fact

 24    that ROSS was willing to pay for it shows a plausibly

11:24:03    25    exploitable market, 883 F3d at 180.

1          Other research companies also use their

2     AI on their own platform.  This is in Malinowski, which

3     indicates:  "Demand first means declaration" -- at

4     Exhibit 28 -- "of the fact that ROSS required LegalEase

5     to destroy its copies of the bulk memos to prevent them

6     from selling them and licensing them to others" shows

7     and evidences the value of that Means declaration, first

8     Exhibit 13, the 30(b)(6) deposition transcript at 167:2

9     to 168:20, enumerated 16, that numerous other companies

10     currently license large portfolios of content for AI

11     training purposes, versus Means declaration; Exhibit 25,

12     Krein opposition report at 79 to 88.

13          It's like you asked me my best evidence,

14     and I'm like, Which child do I like the best?  There's

15     so much evidence here, and the problem is we did our

16     best to present it to provide a complete picture, but it

17     isn't our burden.

18          THE COURT:  All right.  Now, let me go to

19     this issue I asked Mr. Parker about, which is, why

20     should I be persuaded that transformativeness matters

21     here?

22          If I turn it around, I say, Okay, look at

23     the parody cases.  Look at Campbell versus Acuff-Rose.

24     Like, you could wind up tarnishing the market for the

25     song "Pretty Woman," by, you know -- belittling and

1    making fun of it -- it's syrupy, it's sappy, etcetera --

2    but that doesn't seem to be enough to prevent a parody

3    from being fair use.  Does that meaning more general

4    principle is right, that transformativeness should

11:25:51    5    not -- either isn't relevant or should not loom large

6    under Factor Four?

7        MS. CENDALI:  Well, there's a lot of

8    discussion about this, if you want to listen to the oral

9    argument in the Warhol case, and the Court chided the

11:26:07    10    friends arguing that case because they kept asking them,

11    Warhol is supposed to just be that Factor One, and what

12    they actually presented was transformativeness, but they

13    kept -- you know, counsel for Warhol kept bringing up

14    Factor Four, and the Supreme Court to was getting, I

11:26:22    15    think, very impatient, saying, This isn't about Factor

16    Four, this is about Factor One.  And the opinion in

17    Warhol is all about Factor One.  There's nothing --

18        THE COURT:  I get that, but I think

19    Mr. Parker's point is Factor Four is downstream of

11:26:37    20    Factor One.  Factor Four's influence, which is not

21    logically inconsistent with if we're arguing Factor One,

22    stick with Factor One.

23        MS. CENDALI:  Well, just -- there's --

24    the factors are not in order.  It says:  "The Court

11:26:49    25    shall examine these factors, including other factors."

```
 1    It's a nonexclusive list; often public policy is one of

 2    them.

 3                 But as we know from Google v. Oracle, you

 4    could start with Factor Two, you could start with -- you

 5    know, ours restarted with Factor Four because it seems

 6    so outcome determinative.  So it's not really

 7    downstream.  They're independent considerations, all of

 8    which, as I understand it, the Court should look at each

 9    of the factors and then another factor, and then weigh

10    them and decide as a matter of law whether it's fair

11    use.

12                 THE COURT:  If I were Mr. Parker, I would

13    stand up and say, hey, you know, there are going to be

14    transformative uses that affect the market and you can't

15    use that to offer some genuinely new things.

16                 MS. CENDALI:  Two important points,

17    Your Honor.  And I realize I wasn't giving you the most

18    clear answer to your question.  Because as I was

19    alluding to earlier, there had been a thing in the law

20    Terau -- the case -- maybe that Seltzer case in the

21    Ninth Circuit, where some people argued that

22    transformativeness became a litmus test; that if it was

23    transformative, then that would be a domino effect and

24    all the factors would be like.

25                 As we cited in our brief, Nimmer says
```

1    under Warhol that was Kahn.  And the Warhol case was

2    very clear that each factor needs to be considered and

3    weighed.  And the other key thing that Warhol said is

4    that transformativeness is one of degree.  Like in some

11:28:28    5    of our cases, including the Fox News case and our

6    victory in the Harry Potter Lexicon case finding no fair

7    use, the Court said, well, maybe it was a little bit

8    transformative, but it doesn't matter because the market

9    harm so outweighed that.

11:28:46    10    Now, there is a difference in kind here.

11    This is not a parody case.  They're not arguing that.

12    And the premise why parody is different is that no one

13    has the right to stop speech about critical things you

14    may not want.  In fact, Thomson Reuters would be hard

11:29:02    15    put as a news organization to say that you shouldn't

16    stop criticism.  But this isn't about criticism --

17    THE COURT:  The First Amendment

18    considerations that call for leaving plenty of breathing

19    room for parody in a way that don't call for a more

11:29:19    20    classic IP evaluation.

21    MS. CENDALI:  That's right.  This is pure

22    substitution, and none of either sides' experts raised,

23    oh, there's some First Amendment issue here or anything

24    like that.  This is licensing, not licensing, marketing,

11:29:31    25    head to head for competitive business, unbeknownst to us

1    based on our content.

2              THE COURT:  I don't know if it's a

3    defective lecture, but you seem to have some issues with

4    the notebook up there.  Do we need another lectures or

11:29:47    5    something to keep it in place?

6              MS. CENDALI:  I have often had some

7    lectern issues, as my team would know.

8              But I apologize.  This lectern slides

9    back.  A lot of lecterns are flat.  It's my fault for

11:29:58    10    putting too much on it.  I hereby move things to the

11    second flat shelf and promise to do better.

12              THE COURT:  I will ask my courtroom

13    deputy that maybe at the break we can look to see if

14    there's a flat lectern or flatter one or a surface area

11:30:11    15    or a second one we could move next to it to give her

16    some more options.

17              MS. CENDALI:  Thank you, Your Honor.

18              THE COURT:  Mr. Parker, the last word.

19              MR. PARKER:  Thank you, Your Honor.

11:30:27    20              So I guess I want to start here.  We have

21    to be careful when we talk about things like the Fox

22    News case and all these cases because in Fox News,

23    again, that's not -- they were just taking clips and

24    it's not transformative.  And you sort of get to that

11:30:47    25    end result, you can look back and say, well, of course

1    everything else sort of follows from that because you're

2    in the same market, it's the same material and so on.

3                THE COURT:  We have a spectrum of

4    transformativeness.  And you're arguing this is pretty

11:31:01    5    far along; I think the counter argument would be this

6    isn't genuine AI, this is AI being used as a search tool

7    that's looking at things like word distances and word

8    lengths and a whole bunch of stuff that is not at all

9    intuitive.  But you're right, this is not a cut and

11:31:18    10    place or a simple spitting back.

11                MR. PARKER:  Right.  But I also want to

12    say the market that was just discussed is entirely not

13    what fair use cares about.  Fair use does not say you

14    look at the copyrighted materials used and determine

11:31:36    15    whether the copyrighted materials used had a particular

16    market.  It doesn't.  Because there is no fair use case

17    that could actually work.

18                Like in Google, Oracle had use for the

19    API.  They even tried to license it.  It did not have

11:31:56    20    value.  In sake of the source code used, it did have

21    value.  They tried to license it.  They almost got it

22    licensed.  So that we use the copyrighted materials,

23    that -- paid for or not, that we used it and that there

24    was another -- that West and plaintiffs could have used

11:32:19    25    it for the same purpose and made money on it, fair use

1    doesn't ask that question because fair use assumes that

2    copyrighted materials have value because they are

3    exclusive.

4              What Factor Four says is now having used

11:32:34    5    those copyrighted materials, does what resulted compete

6    in the market to injure the original copyrighted works?

7    And again, there's not a shred of evidence that there

8    was any impact on the market, that they could not go

9    out, if they decided to change their mind, and sell as

11:32:58    10   much as they want because ROSS was never in that

11   business at all.  In fact, the affirmative evidence that

12   was just cited to you, that ROSS wanted everything

13   destroyed.  So there was no possibility that ROSS was

14   going to enter that market.

11:33:12    15             THE COURT:  Just a moment.

16             (Brief pause.)

17             THE COURT:  All right.  Let's move on to

18   topic 3, question 3, the type of copyright compilation

19   derivative created that Thomson Reuters' holds needs

11:33:36    20   disputed part of Westlaw of headnotes number system and

21   any implications for the strength of copyright

22   protection.

23             Now, this is mainly Mr. Simmons, but I am

24   going to flag for Ms. Cendali, I am going to circle back

11:33:51    25   to linking this up to factor 2 and fair use or whether

         1    you would want to chime in on this.  But let's go with

         2    Mr. Simmons first.

         3                MR. SIMMONS:  I will always welcome Ms.

         4    Cendali's commentary on fair use.

11:34:03  5                Your Honor, let me give you the punch

         6    line on your question.  Westlaw is an original creative

         7    work that is protected as a compilation of copyrighted

         8    constituent material and it's headnotes, the West Key

         9    Number System, and other choices are all entitled to

11:34:19 10    ordinary copyrighted protection.

        11                Now, Your Honor's textonomy in the

        12    question, the creative derivative compilation matches

        13    footnote 3 from the Eleventh Circuit's decision,

        14    Intervest Construction versus Canterbury.  And two

11:34:33 15    things struck me in rereading that opinion.

        16                First, the court's statement that, "When

        17    crucial question in the dispute involving compilations

        18    is substantial similarity at the level of protectable

        19    expression, it is often more reliably and accurately

11:34:49 20    resolved in a summary judgment proceeding."

        21                Second, it's not clear to me that the

        22    Eleventh Circuit's factor categories are mutually

        23    exclusive because you could have a compilation that's

        24    based on something else, that's also creative --

11:35:02 25                THE COURT:  And when I read your

1    briefing, I want to pin down your position.  It seems to

2    me that you are arguing both that the key number system

3    as a whole is a compilation and the compendium as a

4    whole, the headnotes is a compilation.  But you also

11:35:17    5    want to claim that the headnotes themselves are, I

6    believe, derivative works.  It's hard to argue that

7    these are original creative works, but they're

8    derivative even though you don't claim a headnote that

9    -- a copyright of the original judicial opinion.

11:35:31    10    MR. SIMMONS:  So to answer the first

11    question, yes, we do claim they're multiple copyrights.

12    And in fact, the Eleventh Circuit is the only circuit

13    that I'm aware of that actually does this categorization

14    separating out to this or this or this.  Most courts are

11:35:43    15    looking for what's the original expression.  So it's

16    either in the text or it's in a compilation through

17    selection and arrangement, and it could be both, as

18    Your Honor recognized in your first opinion.

19    I will circle back to the derivative work

11:35:56    20    question because there is a very clear answer on that,

21    but I want to start with the compilation because I think

22    the Eleventh Circuit's opinion was a little unclear in

23    that when it was talking about compilations, it meant

24    factual compilations, and the law is extremely clear

11:36:10    25    that factual compilations are a completely separate

1    thing than other kinds of compilations.

2              THE COURT:  This is not Feist.  I get

3    this is not Feist.

4              MR. SIMMONS:  Okay.  So, you know, your

11:36:23    5    opinion before made that clear.  And so from our

6    perspective, this isn't Feist, we're not in a thin

7    compilation world.  We are in a rich copyright within a

8    copyright world, and you can find copyright protection

9    at multiple levels.  So that distinguishes us from all

11:36:39   10    the cases that ROSS is citing with regard to

11    compilations.

12              THE COURT:  Now, that's as to the

13    headnotes.

14              How about as to the key numbers?

11:36:50   15              MR. SIMMONS:  So the key numbers also

16    protected by levels.  The terms that are used in the

17    West Key Number System are not fact.  It's not like

18    there's some thing that you can discover in nature that

19    says, ah, this is the marine cases or this is whatever.

11:37:06   20    And Dr. Lighter, which was ROSS's expert, who came in

21    trying to say this is somehow required, actually

22    testified in his deposition -- and I have the citation

23    later in my outline -- that you could have done this any

24    different way, that a legal research platform doesn't

11:37:22   25    need to have a key number system, you could organize it

1      different way.  And in fact, Westlaw has done it

2      different ways.  Every year they go back and they go

3      through the key number system and they say, oh, actually

4      we think it should be this way or that way, maybe this

11:37:32    5      will be more understandable to people.

6                     So it's not a thin copyright in the key

7      number system either, and you know that because it's not

8      -- again, it's not a factual compilation.  So you can

9      use the Eleventh Circuit reasoning.  You have to go

11:37:49   10      through and say, it's not a factual compilation, is it a

11      derivative?  If not, we are back to original copyright

12      principles.  Which, by the way, it's the only way the

13      Third Circuit has ever looked at anything.  They don't

14      -- this whole concept, I can't find much in the Third

11:38:03   15      Circuit's law.

16                     THE COURT:  So your position is neither

17      the Supreme Court nor the Third Circuit tells me to do

18      this boxing and I shouldn't or don't need to go through

19      that.

11:38:12   20                     MR. SIMMONS:  Exactly.

21                     THE COURT:  We will hear from Mr. Parker

22      about that.

23                     MR. SIMMONS:  Sure.  Let me address the

24      derivative-work question, because there's actually a

11:38:20   25      case that gives us a very clear answer on how to deal

1    with that, which is a case that ROSS cited for a

2    different proposition, but we are repeating for the

3    argument, it's Ets-Hokin versus Skyy Spirits, which is a

4    Ninth Circuit case, and that court explained that for

11:38:33    5    work to be categorized as a derivative work, it --

6    quote, "The work from which it derives must itself be

7    within the ambit of copyright."  That's 225 F.3d 1068 at

8    1079.

9            So -- and that was based on the court's

11:38:50    10    reading of the text of the copyright act, which keeps

11    talking about copyrightable works in the derivative

12    context and looking at the legislative history.

13            So the Ninth Circuit says that's -- you

14    just don't go there.  And in this case, where -- what

11:39:02    15    they are saying that headnotes are based on judicial

16    opinions that, under Georgia versus Public Resource,

17    aren't copyrightable.  We just can't be in the

18    derivative work world; we're in creative world.  And so

19    that sort of answers the question on derivative works.

11:39:17    20            THE COURT:  So derivative is useful when

21    you are thinking about, all right, you need a license

22    from the original author, and you need a license from

23    the person who derived it.  It's a useful concept of

24    those topics.  In this context, no.  I mean, we -- but

11:39:34    25    that doesn't get rid of the whole arguments.

1          They're saying this is -- this is, you

2     know, thickness and thinness is a spectrum.  Feist is at

3     one extreme end of the spectrum.  I agree with you, this

4     case is further along than Feist, but this is not a

11:39:50    5     novel either.  This is not someone just came up with

6     characters in a plot out of whole cloth, right.

7          So how does the thinness or thickness

8     along this spectrum matter or play into it, and where

9     along the spectrum should I put both the headnotes and

11:40:06   10     the key numbering system?

11          MR. SIMMONS:  I don't think that -- once

12     you get out of the thin protection that talks about --

13          THE COURT:  Okay.

14          MR. SIMMONS:  -- I don't think it really

11:40:14   15     matters for the purposes of this case.  Because once

16     you're out of factual compilation and your out of

17     derivative work in that categorization, you're in

18     creative.  So now we go to just, is it original?  And

19     you just do the analysis that your Court -- the Court

11:40:27   20     already talked about in its opinion.  As Your Honor

21     knows, Feist standards are extremely low, ^teeth I have.

22          Ms. Cendali, at the pretrial conference,

23     and Your Honor had a conversation about Feist, and the

24     quote was, "Even a directory that contains absolutely no

11:40:45   25     protectable written expression meets the constitutional

1    minimum for ^ protection if it features an original

2    selection and arrangement."  That's Feist at 348.

3                    Likewise, the Third Circuit in Kay Berry

4    versus Taylor Gifts noted that, quote, "All creative

11:41:05    5    works draw on the common well spring that is the public

6    domain," and so when an author combines those elements

7    and adds his or her imaginative spark and the

8    imaginative spark occurs, the author is entitled to

9    protection and the result.

11:41:22    10                    And so when Your Honor wrote your prior

11    opinion, you cited to L. Batlin & Sons for the

12    proposition that all the author needs to contribute is

13    something more than merely trivial variation, something

14    reasonably his own.

11:41:35    15                    So when you look at this case, you think

16    about all the things that Westlaw did, you can read

17    Thomson Reuters's cases editorial manager, Lori Oliver's

18    declaration, that's D.I. 679, that Ms. Cendali gave you

19    at the start of the argument.

11:41:51    20                    And she gave us all kinds of judgment and

21    creativity that go into not just the West headnotes, the

22    key number system, including the head of text itself,

23    the choice to make something even a headnote, where in

24    the opinion to make something a headnote, that sort of

11:42:03    25    linking concept, and those are all clearly original

1    choices that are entitled to protection.

2             And it's not just me saying that.  The

3    Eight Circuit in West Publishing versus New Data Central

4    said that explicitly.  It discussed the judgment and

11:42:17    5    creativity of West editorial process at 799 F.2d 1219 at

6    1226, where it goes through and says this is

7    protectable.

8             Indeed, headnotes are the classic example

9    in all on the Government cases of what is the

11:42:33    10    protectable thing in all the materials that people work

11    on.

12             And I will note that although that prior

13    opinion is before Feist, it's remarkably consistent with

14    the law after Feist.

11:42:44    15             The Second Circuit in CCC

16    Information Services versus Maclean held that even

17    evaluations of vehicles are protectable, and the reason

18    was the professional judgment and expertise involved.

19    That's 44 F.3d 61 at 67.

11:43:02    20             And so there is no question that Westlaw

21    and the copyright material in this case are entitled to

22    protection for all on the original material that was

23    added.  There's is just no reason that we need to get

24    into a debate about how thin or thick we are.  It's, was

11:43:14    25    it trickily different?  If so, protectable, we move on

1   to the next step in the analysis.

2                   THE COURT:  So you say it doesn't matter

3   for the copyright infringement question.  Does it matter

4   for ^firm Factor 2, the nature of the copyrighted work?

11:43:29   5                   And if you want to consult with

6   Ms. Cendali, that's fine, or she may answer.

7                   MR. SIMMONS:  Yeah, she -- I will cede

8   the podium to Ms. Cendali on that, but I'll say to you

9   the punch line there is also no.  It's still protected

11:43:42  10  because the nature of the work is also on the spectrum,

11  and so where you have something that's original like

12  this, you're not in that limited ^fair use.  But let me

13  cede the podium to Ms. Cendali.

14                   MS. CENDALI:  The answer is, it doesn't

11:43:59  15  matter because the Westlaw Content is kindly created as

16  Mr. Simmons indicated, and their own expert, as we

17  detail and agree, not only says that we do it

18  differently, but competitors such as LEXIS.  They didn't

19  have headnotes at first.  Then they decided to have

11:44:21  20  headnotes.  And then they had -- they made headnoted --

21  a different of headnotes per cases, and they will write

22  them differently.  That is their own expert saying that.

23                   So there is ample creativity there, and

24  not only that, there is another element in Factor 2 that

11:44:36  25  hasn't gotten as much light, which is that we also

invested substantial labor and time to create the

Westlaw content with the expectation of financial

return.

And in the Hustler Magazine case, Ninth

11:44:55   Circuit, 796 F.2d 1148 to 1153, ^and well data, in

assessing this factor, courts considered both whether it

was ^created imaginative and original, and whether the

copyright holder invested substantial labor and time.

THE COURT:  All right.  So your answer

11:45:09   is, legally, you agree with what Mr. Simmons said, that

yes, there is a spectrum.  But fact- -- your answer is

fundamentally a factual one in that we are on the right

hand, could have strongly protected end of that

spectrum.

11:45:23   MS. CENDALI:  Yeah.  I think the facts

are undisputed as to what these things are, what the

headnotes are and what West ^ waybills.  No one says

that it was a black of marble that you found on the

beach.  This required judgment and thought, much more so

11:45:42   than in the car-kind-of-case assessments that were

indicated.

And law is hard, and anyone could recode

or reprocess one of your own opinions, probably, in

different ways.  You yourself might do it differently

11:45:57   than the West editors do, and they change it over time.

So the point is that in looking at factor 2, it is -- it is creative, and therefore, it should be entitled to protection.

Let me put it this way, simplify:  There is no way Factor 2 should favor them.  That's the bottom line.

THE COURT:  All right.  Your answer is clear.

Mr. Parker.

MR. PARKER:  I don't want to pander to the Court, but I'm going to pick up sculptures.

Sculptures you find marble, they're hard to do.  It is a skill; it's not done in one day.  And I make the most beautiful octopus sculpture in the world, but I spent 10 years doing it.

That sculpture is construed in this subject to the thinner copyright protection than the book that my 5-year-old writes in 15 minutes.

All that work that you do, it may be creative, but all that work you do, the amount of energy, does not translate into the thin or thickness of copyright protection.  And they don't have a case that said it because the only case that really gets at it is Feist, and its sweat of the brow is not a factor.

And if you read their briefs, and they

```
 1    tell you how many people work for so long to make the

 2    most careful selection of headnotes, it still doesn't

 3    answer what copyright protection should apply.  They

 4    give you no case that says a compilation, however well

 5    done, should somehow get anything more than thin

 6    protection.  There is not a single case they cite.

 7              THE COURT:  But, Mr. Simmons, those make

 8    the argument that, you know, this is -- I should be in

 9    the Eleventh Circuit's boxes here.

10              MR. PARKER:  But there are only three

11    boxes.  It's creative, compilation or derivative.

12              THE COURT:  He's arguing that that's --

13    if I were the Eleventh Circuit, I would have to follow

14    that, but saying I'm here --

15              MR. PARKER:  There's -- every case we

16    cite -- we are not just talking about Eleventh Circuit

17    cases.  We cited a bunch of cases from a bunch of

18    different places that said compilations received thin

19    protection --

20              THE COURT:  Why is this --

21              MR. PARKER:  -- nothing.

22              THE COURT:  Why is this in -- but this

23    isn't Feist.  There's more originality than Feist.

24              MR. PARKER:  That depends on what we're

25    talking about.  Because we keep going between headnotes
```

11:47:54

11:48:10

11:48:21

11:48:33

11:48:43

 1    as words and headnotes as something else.

 2                    The key numbers are a way of stacking and

 3    racking and organizing.  Of course there are multiple

 4    ways to do that because that's true of Feist too.

11:49:03     5    That's true of any compilation case; that's what makes

 6    one compilation creative and original.

 7                    If there was only way to do it, it

 8    wouldn't be creative nor would it be original.  We would

 9    just move on; there would be no protection.

11:49:16    10                    So when we're talking about headnotes as

11    they relate to key numbers, and key numbers as they then

12    stack and rack cases, that is a compilation.  And it

13    does not matter, it does not change whether it's thin or

14    thick.  There are other ways to do it.

11:49:33    15                    Because again, if there were no other way

16    to do it, there would be no copyright.

17                    THE COURT:  Sure.  But their argument is

18    that the protection is not exclusively compilation.  In

19    Feist, it is a bunch of names and the phone numbers that

11:49:47    20    themselves aren't protected.  Each individual headnote

21    is protectable as well.

22                    MR. PARKER:  Now, then -- that's -- then

23    we are not talking about headnotes as part of a

24    compilation.  And that's where, I think, we're -- we're

11:49:59    25    saying you can't just muddy it up and just say, this is

1    this.  We're saying, compilation thin.  If you want to

2    go and look at the individual works within a

3    compilation, then let's talk about those individual

4    works.  But you can't just mash it up and say, the

11:50:18    5    combination of the two is somehow different, and no case

6    says that.

7            They could say they don't want to be in

8    the Eleventh Circuit box, but they certainly don't tell

9    this court that there is any other case that is accepted

11:50:33    10    or viewed, that if it's all the same, you just mix it

11    all up and you go from there.  And that's not what the

12    law is.

13            Now, let's talk about headnotes

14    separately now.  Okay.  There are two different issues,

11:50:44    15    but let me address Issue Number 1.

16            In page 22 of our opposition on fair use,

17    it's other places.  We cite two cases.

18            Alfred Bell & Company, which is the

19    reproductions of public domain paintings were derivative

11:51:05    20    quotes.

21            We have Allen Greene, which they don't

22    cite.  It's a 1944 Eastern District of Pennsylvania case

23    that was affirmed in the Third Circuit that say, Art

24    objects depicting public domain religious shrines were

11:51:22    25    derivative works.  So in other words, the underlying

1    thing, at least in the law of this circuit right now,

2    does not need to be copyrighted.  They are derivative,

3    and therefore, they're subject to protection.

4              Secondly --

11:51:38    5              THE COURT:  So, wait.  What third --

6              MR. PARKER:  Yes, it is --

7              THE COURT:  What in the Third Circuit

8    says I have to understand derivative copyright as

9    applying irrespective of whether the underlying document

11:51:52    10   was in the ^Public domain or not.

11             MR. PARKER:  Correct.  And again, that is

12   at page 22 of our opposition at the bottom after the

13   page.

14             THE COURT:  So you're not disputing that

11:52:02    15   a single work can both be individually detectable and

16   part of a compilation?

17             MR. PARKER:  Correct.  When we discuss

18   this part of a compilation, we are not talking about the

19   words -- it's just how it helps organize.

11:52:13    20             THE COURT:  Right.  And then when you

21   kept referring to earlier arguments in structure

22   sequence organization, there's like, well, there's

23   possible additional creativity involved in the structure

24   sequence organization that is not exclusive of the

11:52:26    25   creativity of each underlying headnote.

1              MR. PARKER:  Each underlying work, so --

2       yes.

3              THE COURT:  Yes.

4              Do you view the key number is as merely

11:52:38    5    protected compilation?

6              MR. PARKER:  They have to be because they

7       can't be protected under copyright.  They are just

8       single words.  They don't do more than that.  The don't

9       do anything.

11:52:51    10    The only -- as standing alone, a key

11      number that says "labor and employment" is not a

12      copyrightable thing.  It's not subject to -- it's --

13      works -- it becomes copyrighted in a way that you

14      organize cases underneath that; that is a compilation.

11:53:11    15    THE COURT:  I sometimes look in the front

16      of a West book, and I see a list of key numbers that

17      almost serves as a table of contents or on index.  So we

18      are not talking about two words in isolation; we are

19      talking about a whole list of them that is a taxonomy

11:53:33    20    for the law.

21             MR. PARKER:  Which is a compilation, yes.

22             So -- again, loss my train of thought,

23      but I'm going to get there again.  Oh, here we go.

24             The next step, and what is not mentioned

11:53:54    25    here, is however much effort the thought process goes

1        in, there are constraints that they impose.  Not us;

2        they impose.  And we cite to Lori Oliver, and we cite to

3        their desire.  The desire -- and their request is that

4        headnotes follow the words of the judicial opinion.

11:54:20  5               The desire and need is for lawyers to be

6        able to locate cases using headnotes.  They have

7        constrained it, and it's separate and apart of whether

8        or not it's derivative.  They constrained the expression

9        in such a way that it can't be subject to extreme

11:54:40  10       copyright protection.

11               And again, however creative it is however

12       much effort it takes, copyright doesn't look at the

13       effort.  It just says, what is the expression?  And is

14       this expression original?  And does it have a minimum

11:54:59  15       level of creativity.

16               THE COURT:  Anyone who has taught

17       students knows the difference between the students who

18       think they deserve an A for effort and the students

19       being evaluated on the fruit of their work.

11:55:10  20               MR. PARKER:  So independently of whether

21       it's derivative, independently of whether it's a

22       compilation, they have so constrained it that it can't

23       be subject to broad copyright protections.  And if it

24       were -- so you're going to hear more about this probably

11:55:29  25       infringement, but when they literally quote the language

1    of a Court and put in the headnote and someone says, ah,

2    that language is good, but it's literally the language

3    of the judge, they can't claim the copyright over that.

4    They just can't.  Otherwise, their headnote just could

11:55:50    5    be filled with quotes from the Court.

6                    And the fact that they decided to, they

7    think, pick the best parts, that is a great idea, right?

8    But we're not here -- you've never heard us litigate,

9    and copyright law doesn't ask the question, is it true

11:56:07    10    that it was really good or really bad; or you did a good

11    job of what you were trying to do.  Copyright looks at

12    the expression itself, not whether it's the best

13    selection, the worst selection.  That's not even a

14    debate we're having.

11:56:25    15                    Now, you ask about factor 2.  First of

16    all, as the Court knows, this factor does not weigh that

17    heavily at all on these things.  Second of all, there

18    are cases -- they actually don't -- their cases are

19    apposite to this.  Harper & Row is about an unpublished

11:56:45    20    manuscript, and I can tell you now, courts crunch pearls

21    if you produce an unpublished manuscript.  That means

22    that factor 2 analysis is much, much different.  That is

23    the Love vs. Kwitny.

24                    The rest of the cases, like Fox, again,

11:57:01    25    we are at places where the courts are saying, hey,

1    listen, this looks exactly like the original work or

2    this is not different than the original work.  Those are

3    the cases.

4              So in sum, there are different modes of

11:57:19   5    analysis, but first you could just look at constraints

6    itself.  In the MGA -- the Mattel vs. MGA case is one

7    case.  You could look at what I call the trivial pursuit

8    case, which is a cite, Sintalva (sp.) is another

9    constrained case.  You can look at the newspaper case,

11:57:40  10    and we cited one, where those are constrained.  And then

11    you can leave behind, if you wish, which bucket any of

12    this stuff falls into.  But I think we're right, a

13    desire to tell this Court I don't want to be in any

14    particular bucket is not useful if there is literally

11:57:56  15    not a single case that allows someone to just say I

16    don't want to be in a particular bucket.

17              THE COURT:  Just one moment.

18              (Brief pause.)

19              THE COURT:  Please proceed.

11:58:31  20              MR. SIMMONS:  Okay.  Third Circuit case

21    compilation, not thin.  Educational Testing Services vs.

22    Katzman, that Your Honor cited in your prior opinion,

23    that was a case where there was a compilation as to the

24    whole set of questions and then each individual question

11:58:46  25    was also protected.

1          THE COURT:  Is this the ETS does SAT, I

2     think --

3          MR. SIMMONS:  Correct.  It's the test

4     questions case.  And so Your Honor relied on that in

11:58:57     5     saying that even when you have a compilation copyright,

6     you could also have a copyright for the things that make

7     it up.  So that's the Third Circuit's law.  The way they

8     analyzed that case is the way they analyze all the cases

9     in the Third Circuit.  Is it trivially different from

11:59:10     10     whatever came before or is it just something creative?

11     It's the same test.  So that doesn't do anything in

12     terms of those cases.

13          In terms of -- I promised you the Lighter

14     citation to their expert.  That's 678-7.  That's the

11:59:27     15     deposition transcript where he discusses his opinions

16     and essentially concedes that there's lots of different

17     ways that these things can be done.

18          In terms of the issue of we constrained

19     it, but the idea that we had made a determination this

11:59:44     20     is how it's going to be.  Yes, that's called creativity.

21     That is our originality.  We told our attorney editors

22     the way we want to do this is this particular way.  You

23     can't come back later on and say, oh, once you made that

24     choice to do it this way, now you lose protection.

12:00:00     25          THE COURT:  Just a moment.

1          Mr. Deputy, could you turn down the

2     volume.  I think he's a little louder than Ms. Cendali.

3               (Brief pause.)

4          MR. SIMMONS:  And I can give you a couple

12:00:18   5     of cases.  The one that I like because -- we argued,

6     that is Oracle v. Google at the federal circuit on

7     copyrightability, which was not reversed by the Supreme

8     Court.  That's 750 F.3d 1339, 1360.  And what the

9     federal circuit did there is collet a variety of cases,

12:00:36  10     all which stand for the proposition that it's the

11     copyright owner that gets to decide and you can't then

12     say, oh, it's constrained later and you lose protection.

13               Another one, if you want to, is Apple

14     versus Formula.  That's 725 F.2d 521, 524.  That's the

12:00:54  15     Ninth Circuit saying the same thing.  So that doesn't

16     get them out of the box either.

17               In terms of the key number system, it's

18     not just single words.  As Your Honor noted, it's

19     textonomy.  And in any case, they are our words.  If you

12:01:06  20     started talking about things as, oh, if you just look at

21     the words in isolation, then I do the same thing to

22     sentences in a book, you can't say that because each

23     word in a sentence is a word, suddenly you lose

24     protection in the combination.

12:01:19  25               The point we're making is, when you put

1    all the things that we are adding together, you look at

2    what we did, and that's what's protectable and that's

3    what they copied.  And you know that it was valuable

4    because they took it.  If they had wanted to just use

12:01:35    5    the judicial opinion text, they had that.  It is

6    conceded fact.  They didn't need judicial opinion text.

7    What they wanted was someone who wrote it differently.

8              And that's because the way that the

9    artificial intelligence operates is if you gave it just

12:01:54   10    the judicial text and said here's the judicial text, it

11    wouldn't know what to do when someone comes up with a

12    new question.  The value of the headnotes and the reason

13    that they went to the headnotes is that they are

14    different; that when a human person then comes along and

12:02:06   15    says the same thing that's in the headnote, out pops the

16    judicial opinion that our attorney editors identified.

17    That is the reason that headnotes are valuable.

18              THE COURT:  Now, Mr. Parker placed some

19    great stress on there being only 25,000 headnotes here,

12:02:23   20    whereas there were 25,000 memos and a whole bunch of

21    other quotations in them that weren't being challenged.

22    What do I do with that?

23              MR. SIMMONS:  Thank you so much for

24    asking.  The 25,000 memos had one question copied

12:02:36   25    directly from a headnote, I'm going to talk about that

1    later, but there is a best practices guide that

2    LegalEase produced that said here is how you create a

3    question:  Go to the headnote of each --  go to the key

4    number, but each headnote, convert that into a question,

12:02:49    5    and that's the question.  And there is a guide that I

6    have citation for at the desk that is actually the

7    step-to-step directions to do that.

8              The answers are selected in a -- are

9    labeled with different types of things.  Great quote is

12:03:06    10    the top one, and then it goes down from there.  The

11    great quote is what the AI is trying to learn to

12    produce, and the great quote was always the case that

13    was connected to the headnote.  So --

14              THE COURT:  So the number one answer was

12:03:21    15    the infringing answer.

16              MR. SIMMONS:  Correct.

17              THE COURT:  And the others were

18    deliberately designed to be worst ones.  So the training

19    value was in picking the preferred one and you wouldn't

12:03:34    20    want the lesser answers to be the ones that were taken.

21              MR. SIMMONS:  Correct.

22              THE COURT:  Got it.

23              MR. SIMMONS:  So number one, our stuff.

24    And then all the ones that are bad and listed as being

12:03:47    25    worse and worse and worse are not.

1    So that's the whole -- and then the AI

2    learns that that's what the attorney editors thought.

3    And that's why, again, the value comes from us, that

4    comes from our work, and that's what they're copying.

12:04:01    5    Let me end by talking a little bit about

6    fair use.  So Mr. Parker, we were up to this question of

7    labor.  So just to be clear, Wall Data is a post Feist

8    case.  The case that Ms. Cendali was quoting, 447 F.3d

9    769, is after Feist.  And what the Ninth Circuit held is

12:04:22    10    that even after Feist, when you talk about nature of the

11    work, you can look at more than just creativity, that

12    you're not restricted.  Because the point there is, what

13    is it -- you know, what do we want from the copyright

14    system?  And maybe there is a work that, from the

12:04:36    15    copyrightability point of view, has less creativity to

16    it, but if it was really labor intensive to create, as a

17    system we still want to have that protection.

18    So Wall Data is one case on that subject.

19    It cites to others that are pre-Feist, MCA versus

12:04:52    20    Wilson.  And what's interesting about MCA v. Wilson is

21    that case is favorably cited by the Supreme Court in

22    Google v. Oracle.  So continuing vitality of that

23    concept --

24    THE COURT:  Right.  But there is no

12:05:09    25    dispute that sweat of the brow alone is not enough.

1          MR. SIMMONS:  For copyright.

2          THE COURT:  For copyright, right, yes.

3          MR SIMMONS:  For nature of the work and

4     fair use, it is relevant.

12:05:15    5          THE COURT:  Got it.

6          MR. SIMMONS:  And so that is really

7     important in -- not so much in this case because I think

8     it's all creative, but in cases where you're trying to

9     cite, should I allow someone to start pilfering the

12:05:28    10    golden goose's eggs, to take Ms. Cendali's example, if

11    it's really labor intensive, perhaps you should not do

12    so.  And that's what Wall Data is saying.

13          THE COURT:  I have this image of geese

14    going into labor that I don't --

12:05:41    15          (Laughter.)

16          MR. SIMMONS:  At least it's gold eggs,

17    though.  That distinguishes it.

18          The last thing I'll say is on bad faith.

19    The bad faith cases are not restricted to pilfering.  In

12:05:52    20    LA News v KCAL, which is a Ninth Circuit case shortly

21    after Campbell, the Court actually does find bad faith.

22    And it is based on the idea that, yes, you can ask for a

23    license and be rejected, but when you know you need one,

24    when the facts are clear that that is something that is

12:06:06    25    required, that could be bad faith.  So  it is not just

                    this secret thing being stolen.  But even if it was,

                    let's be clear, Westlaw is behind a password-protected

                    website.  It's something that you actually have to do a

                    direct contract with West to get access to.  So it's not

12:06:22            so far afield as other cases involving bad faith.

                             THE COURT:  Thank you.  The last word to

                    Mr. Parker.

                             MR. SIMMONS:  I think I get the last

                    word.  It's our burden.  But I will let Mr. Parker.

12:06:36            MR. PARKER:  The Best Practices Guide.

                    So --

                             THE COURT:  This is the guide --

                             MR. PARKER:  Let me start at a different

                    place, and then I will introduce it.

12:06:48            THE COURT:  Okay.

                             MR. PARKER:  There was an argument --

                    there was an argument that the search results returned

                    the best quotes, and not a shred of evidence of that,

                    nothing.  Not in their expert reports at all.

12:07:08            The evidence is that when we trained, you

                    actually break apart the questions and answers

                    completely, so you would not have a relationship between

                    a question and answer at all because, again --

                             THE COURT:  Where would I look in the

12:07:27            record for that?

```
 1              MR. PARKER:  Let's see.  Let me find -- I

 2       am going to give page cites.

 3                   The first place that it would appear is

 4       pages 13 to 14.

 5                   THE COURT:  Of?

 6              MR. PARKER:  Of our opposition to their

 7       fair use brief.  Let me find our fair use brief.

 8                   It is at page 21, 22, 23, 24, 25, 26.

 9       There was a reference to how the Best Practices Guide

10       directed -- Best Practices Guide was a guide that was

11       created by LegalEase to govern how they would prepare

12       memos.

13                   THE COURT:  By the way, I don't know

14       whether either side can tell me where the Best Practices

15       Guide is.

16              MR. PARKER:  Yes, I can.  And we are

17       going to give you the D.I. number, but it's Parker

18       Declaration Exhibit 28.  And all of this is referenced

19       at page 8 of our opposition to the fair use brief, so we

20       will give you the cites that will help you out with

21       that.

22                   The Best Practices Guide was a fit

23       document created by LegalEase that governed how it would

24       prepare memos.

25                   The Best Practices Guide, quote, "The
```

12:08:12 (line 5)
12:08:52 (line 10)
12:09:09 (line 15)
12:09:24 (line 20)
12:09:35 (line 25)

1    headnotes are proprietary, and you should not copy,

2    paste them in the question."

3              The contract attorneys were instructed

4    not to copy headnotes into questions, and so quite

12:09:55    5    contrary to what was just represented, the instructions

6    were not to create -- make headnotes in the questions.

7    Just, it's not supported by the record.  The record says

8    something quite different than that.

9              And so when we're talking -- the Court

12:10:11    10    said there were 25,000 headnotes.  There are not.  There

11    are 25,000 memos.  They accuse us on 21,000 headnotes.

12              The only headnotes that they are accusing

13    us relate to the great question, and what is -- when

14    they provide the idea that there is a motive to

12:10:32    15    essentially copy those things and make it into, it is

16    relevant to know that one-fifth of the materials used

17    were unrelated to any of the accused headnotes, that the

18    great quotes -- the 21,000 headnotes represent less than

19    1 percent of all the 28 million headnotes.

12:10:55    20              I mean, it is a vanishingly small.  There

21    is no -- there is no explanation how the vanishingly

22    small amount could somehow then become the entirety of

23    Westlaw.  And again, they have no evidence of any --

24    they don't have -- we have declarations, and output is

12:11:19    25    nothing related to Westlaw.  There is nothing here like

1    that.  And they don't have anything to contradict that

2    at all.

3              Now, a few other things.  I think that it

4    is a very difficult argument to support that the author

12:11:35    5    gets to determine the level of protection for the

6    copyrights.  I think it's just tough, right, because

7    that wouldn't make sense.  A sculpture who scopes an

8    octopus would spend more time than a 5-year-old writing

9    a 10-page novel, and the 5-year-old would get greater

12:11:55    10   protection without even thinking.

11              I -- it is not the author's prerogative.

12   It is a legal conclusion of what type of protection is

13   afforded regardless of what the author may think.

14   Otherwise, there is no way to regulate the law because

12:12:09    15   --

16              THE COURT:  It would seem like the

17   reasonable position to ^meld, too, is it's the evident

18   amount of manifest effort in the works.  Someone

19   couldn't just run up a thousand hours on something that

12:12:28    20   was trivial.

21              But it's the kind of thing that takes a

22   long time to make that would seem to weigh in favor of a

23   factor two finding.

24              MR. PARKER:  But I think it's not so.  It

12:12:40    25   can't be so.  Because if I created a compilation that

1    listed every human being in the world --

2                    THE COURT:  Right.  Right --

3                    MR. PARKER:  -- it would still be a

4    compilation.

12:12:54    5                    THE COURT:  It's still compilation

6    because the question is the amount of effort required

7    for the creative contribution in there and the simply

8    the compile, compile, compile, compile is not a creative

9    addition.

12:13:10   10                    MR. PARKER:  Then I could decide over

11   that 20-year period that there are many different ways

12   that I can put this together, many, many different ways.

13   And I do it in a certain way.  I do it by hair color; I

14   do it by height.  I actually cross-reference height,

12:13:27   15   hair color and so on; that still doesn't make it

16   anything but a compilation.

17                    THE COURT:  That's a fair point.

18                    MR. PARKER:  And the danger is, and if

19   you start doing this, there are things that are very

12:13:41   20   creative that don't take long at all.  Right.  People

21   write novels in a week; other people write novels over a

22   lifetime.  Ralph Ellison wrote Invisible Man over one

23   period of time.  Right.

24                    THE COURT:  There is the flash of

12:13:59   25   insight.  Samuel Taylor Coleridge wrote, you know, *From*

1    *the Ancient Mariner* having just come out of drug-induced

2    haze.  It just all flowed out.

3                    MR. PARKER:  Correct.  And there it is,

4    subject to the greatest copyright protections ever.

12:14:14    5                    Also, what are the metrics for it?  It's

6    very difficult to have a metric for that creative

7    effort.  Is it a dollar amount?  Which is what they are

8    suggesting.  Is it the number of hours?  Which they

9    don't tell you.  They just tell you people work really

12:14:29    10   hard at it.

11                   And I am not taking that away, but there

12   is no way to measure in an author saying, I worked

13   really hard on this, and therefore, thick protection.

14   And another saying, I can't prove to you how hard I

12:14:44    15   worked, but -- yeah this is -- you list this again,

16   right, subject to, and that's the problem.

17                   THE COURT:  Okay.

18                   MR. PARKER:  All right.

19                   THE COURT:  All right.  I think both

12:14:53    20   sides -- I think this is a good time for a lunch recess.

21   Let's adjourn and reconvene the one o'clock sharp.

22                   (Lunch recess.)

23                   THE COURT:  Good afternoon.  All right.

24   I want to thank the parties for being well-organized.

13:01:10    25   We've made good progress through Questions 1, 2 and 3.

1    Let's move on to Question 4, whether each headnote must

2    be evaluated individually.  Whether findings about

3    individual or groups of headnotes can be extrapolated.

4              Mr. Simmons.

13:01:31    5              MR. SIMMONS:  Your Honor, because you had

6    asked for some citations.  The best practices guide that

7    we discussed before the break is at 678-36, that is the

8    D.I. citation.  And I will command the Court to page 4

9    where it talks about using best practices guide to frame

13:01:52    10    questions; page 8 where they actually show a headnote

11    being converted into a question; and page 13 where it

12    discussions using the connected case as the quote.

13              Turning to Question 4, "This case is

14    well-suited to extrapolate findings about the headnotes

13:02:11    15    because the parties do not dispute what the headnotes

16    are, just whether they are legally protectable.

17              As Your Honor and Ms. Cendali discussed

18    at the pretrial conference, all of the headnotes are

19    protectable under Feist both because of Thomson ^Reuters

13:02:24    20    in selection and arrangement and the judgment of its

21    attorney editors about what should constitute a

22    headnote, and that could decide the issue completely.

23    But if Your Honor wanted to look at protectability other

24    ways, there is other ways to look at it.

13:02:38    25              Another way to decide protectability is

1    to use the groups of headnotes that are categorized in

2    Dr. Kron supplemental report, Appendix B.  That's 690 --

3    it D.I. 690-6, -7, -8, -9, -10 and -11.

4                THE COURT:  This is attachments -6 -7 -8,

13:02:58    5    -9, -10, and -11.  So six attachments for a single

6    spreadsheet.

7                MR. SIMMONS:  What the spreadsheet does

8    is it gives you all the headnotes in the case, all the

9    questions that were created from them, and the judicial

13:03:10    10    opinions that are associated.

11                And then in the right-hand column, it

12    categorizes every single judicial opinion to headnote

13    based on five different categories:  One is where there

14    is a changed order of judicial text; two is where there

13:03:29    15    was substantive addiction to or substraction from the

16    judicial text; three is where the judicial text was

17    condensed; four is where it reflects Thomson ^Reuters as

18    attorney editor, selection and arrangement; five is

19    where multiple of those are at issue.

13:03:46    20                So the categories, what actually happened

21    between judicial opinion and headnote, there is no

22    testimony disputing that that's the correct

23    organization.  And even if there was, the headnotes

24    themselves would supersede and control contrary

13:04:02    25    descriptions of them.  That's ^P Eric Guido Architecture

1    versus Simone Development in the Second Circuit, 602

2    F.3rd 5764.

3              So the only question you have to look at

4    if you want to extrapolate is, what kinds of evidence am

13:04:17    5    I talking about, and do I think that reordering, making

6    substantive changes, condensing, selection and

7    arrangement, are sufficient -- or more than trivial

8    variations from the judicial opinions.  If Your Honor

9    decides that act is more than trivial, then that whole

13:04:36    10   category is protectable and comes out.  So that is a

11   second way that you can slice the protectability.

12             The third way to do it would be to use

13   ROSS's own submissions, and there's three of them we can

14   talk about.

13:04:49    15             Before I do, though, I know Your Honor is

16   familiar with engineering dynamics versus structural

17   software.  The district court in that case at 785 F.7,

18   576 at 583, said what you had said to us at one of the

19   pretrial conferences, that even if you copy a small

13:05:14    20   amount of material, you're still liable, there's still a

21   judgment in your favor, quote, "The extent of copying

22   would just be relevant to a determination of damages."

23             But, just looking a ROSS's own

24   submissions, we can slice this -- if we get three

13:05:28    25   additional ways.

1          One is Your Honor asked ROSS, quote, to
2    "submit a list of all headnotes it believes are verbatim
3    quotations or vary trivially from verbatim quotations of
4    judicial opinions.  That was your order at 612.

13:05:42    5          Out of all the headnotes that are issued
6    in this case, ROSS submitted a subset and left 5,367
7    headnotes out of the submission in response to your
8    order.  That submission is D.I. 617, and all of the
9    headnotes that didn't put in are at 678-27.

13:06:03   10          By excluding those roughly 5,000
11    headnotes from a request you made saying tell me what
12    the ones that are verbatim or just trivial, that should
13    be taken as an omission that the other 5,000 are
14    indisputably more than that because it is their burden
13:06:19   15    to say what the unprotectable elements of the headnotes
16    are.

17          We also look at this from the perspective
18    of ROSS's software expert, Ms. Frederiksen-Cross.  I
19    deposed Ms. Frederiksen-Cross on her analysis.  I walked
13:06:32   20    her through how she was comparing judicial opinions to
21    headnotes to questions, and we produced what is now
22    678-21, which is a document using her spreadsheet
23    filtered to just the headnotes that are different from
24    judicial opinions and similar to questions under her
13:06:54   25    analysis, and that gives you 2,830 headnotes.  So you

1    could use that subset.

2              Finally, you could use the attorney

3    declaration that ROSS submitted in opposition to this

4    round of briefing in the Kanter declaration.

13:07:11    5              Now, as we noted in our reply brief, that

6    declaration is wholly inappropriate.  You cannot, as an

7    attorney, put in expert testimony explaining why you

8    think something is protectable or not.  That's just not

9    how it works.  You have to have an expert do that,

13:07:21    10   disclosed, deposed.

11              I am going to accept, for the purposes of

12   this, that Your Honor considers that declaration and

13   doesn't strike it.  In that analysis, what they did was

14   they took the two sets of headnotes that I just

13:07:37    15   discussed, they deduped them because there is some

16   duplication, and they came up with 5,695 headnotes.

17              Now, they then subtracted out things that

18   they think are unprotectable from that, which is only

19   slightly over a thousand.

13:07:53    20              So even using the attorney declaration at

21   the end of summary judgment with all the benefits of

22   everything in the case, their declaration still left

23   4,534 headnotes on the table.  So whether you do this

24   from all of them are protectable, whether you do it from

13:08:12    25   the perspective of using Dr. Krein's filtration and just

1    deciding it's a legal matter if those categories are

2    protectable or not, or you use one of the many

3    submissions that ROSS made, all of that can be used to

4    extrapolate up to what the protectable headnotes are,

13:08:25    5    and it is wholly appropriate for the Court to do so.

6                    THE COURT:  One question for you.  So in

7    your briefs, you say, "I can find direct infringement of

8    the headnotes in the key number system based on a subset

9    of the headnotes on the period of more than de minimus

13:08:41    10   copying."

11                   Now, I can understand what infringing

12   some headnotes could be enough to show infringement of

13   compilation as a whole under a compilation period.  But

14   I don't understand how is it that infringement of some

13:08:53    15   headnotes could be enough to show infringement of other

16   headnotes on an individual copyright theory?

17                   I mean, maybe, at most, you can get a

18   jury to infer such things, but that would be a fact

19   question at trial; certainly not a summary judgment

13:09:06    20   amenable question.

21                   Does this mean the way you pitched your

22   briefing, that you are only seeking damages under the

23   compilation theory?

24                   MR. SIMMONS:  No.  No to both of those.

13:09:17    25                   So what our point was is at summary

1    judgement, the question was:  Can we report into a

2    judgment under Rule 54, which requires us to meet the

3    elements of our claim, ownership of available copyright

4    and copying of the constituent elements that are the

13:09:30    5    original?

6              If we show more than de minimus copying,

7    then judgment should be to us.

8              The engineering dynamics case that I

9    discussed earlier says we can then deal with that in

13:09:40    10    damages, which the jury is going to have to wade

11    through.  But from a summary judgement, let's not make

12    the jury have to make that determination.  That's all

13    Your Honor has to do.  That's why you the can slice it

14    and dice it in multiple ways.  If you find there is some

13:09:52    15    protectable headnotes and those headnotes have been

16    copied, we win on summary judgment.

17              THE COURT:  Except for damages, the jury

18    is still going to have to go through all the headnotes

19    you're trying to find.

13:10:03    20              MR. SIMMONS:  Well, the jury will have to

21    determine damages.

22              Now, the damages model we are using -- we

23    have a couple different damages model, and if you want

24    get into details, ^Ms. Means is much more capable on

13:10:12    25    that.

1　　　　　　　The damages model is based on the use of

2　Westlaw.  So the way that we calculate damages doesn't

3　have to be based on how the specific headnotes work,

4　because the point is actual damages are if they did not

13:10:27　5　have this service, then we would have made other sales.

6　That's one damages model.  And the other is, if we were

7　going to license someone to do this, they would have had

8　to pay us for each of the cases that they used, and

9　that's another way.

13:10:42　10　　　　　　　So the damages model doesn't have to be,

11　oh, now we have to go back to the headnotes because

12　where the numbers are coming from is LegalEase's use in

13　producing the bulk memos, which we have spreadsheets on

14　from a financial perspective.

13:11:01　15　　　　　　　THE COURT:  Right.  Except on the direct

16　infringement theory, not -- at the moment, we're not

17　talking about precarious infringement, you know, is it

18　enough that you can say that certain headnotes are

19　infringed because your second model, at least, depends

13:11:15　20　on the number of them that was infringed.

21　　　　　　　MR. SIMMONS:  So if our -- so what I

22　would say about that is, from a damages perspective, you

23　can look at actual damages or disgorgement of profits.

24　Disgorgement of profits doesn't -- sorry, actual damages

13:11:31　25　does not turn on how many headnotes are specifically

1    copied.  We don't have to get into that detail.

2                    But even if you thought we did, then we

3    would just present that to the jury to see the burden

4    and insufficiency of having to decide whether there was

5    direct copying or not.  They could focus on the damages

6    question, what do you think the value of the copied

7    material is?

8                    THE COURT:  All right.  Well, we may have

9    to come back around to that.  I mean, as a statutory

10   damages model, that would go -- it would depend on the

11   number of copyrighted -- copyrighted individual works I

12   find infringed, but --

13                   MR. SIMMONS:  Which we have as well.

14                   THE COURT:  -- I suspect that Mr. Parker

15   is going to have some concerns about this.

16                   MR. SIMMONS:  Well, I guess to allay

17   those concerns, Your Honor, the only -- no one has moved

18   on damages.  So there is no summary judgment motion

19   pending that says we are limited in some way, no Daubert

20   motion on that.

21                   So, from where we stand, the motion is,

22   did they directly infringe?  The answer is clearly yes.

23   That's the question that's presented by the briefs.  If

24   you reach that question, there could subsequent

25   discussion of, okay, now we're in damages land, what do

1    we need to do?

2              But none of that was briefed; no one

3    discussed damages, models, or any of that in the

4    briefing.  So it would be inappropriate to deny us

13:12:47    5    what's clearly direct infringement on the basis that,

6    yes, down the line there might be more questions for us.

7              THE COURT:  You are quite right, these

8    are separate questions, and that is a question for

9    possible trial, but the Court is also trying to think

13:13:03   10    through what that trial would look like.  That is not --

11    I am not going to reason backwards from that to what the

12    summary judgment looks like, but it is something

13    certainly on our radar.  Thank you.

14              Mr. Parker.

13:13:28   15              MR. PARKER:  If we are going to continue

16    with this, a compilation.  Again, these are a little bit

17    like quantum physics, like, these pendulums are both a

18    wave and a particle.

19              But if we're talking about compilations,

13:13:43   20    then these numbers don't work because there is no

21    question -- there is no case that -- I'm sorry, let me

22    say it this way.  There's -- every case you have to take

23    a super majority of a compilation in order to be

24    considered to have infringed, and that makes sense in

13:14:00   25    the compilation world.

1          THE COURT:  Part of the work?  Part of

2     the super majority?

3          MR. PARKER:  There is no particular heart

4     -- first, as Patri says, compilations really don't have

13:14:14    5     a heart of the work.  And I don't know what the heart of

6     the work is.  Each -- as I understand it, each headnote

7     has -- is carefully manicured to a particular case,

8     creative.  And so if I remove a -- remove a case and

9     look at the headnote, it doesn't give me insight into

13:14:34   10     all the other headnotes that they have.

11          If I take a portion of their key number

12     system, the whole value of the key number system is how

13     it works all together as a way of organizing.  So if I

14     took some of criminal law, some of civil procedure, some

13:14:54   15     of aviation, I don't see how that is part of the case --

16     part of the matter either.

17          I just -- you know, part of the matter,

18     you can go to Harper & Row where they took the words --

19     I think that is the Gerald Ford case.  And they took the

13:15:12   20     words of Gerald Ford, and that was sort of the book.

21     That makes sense.

22          But a compilation where you are taking

23     bits and pieces, I just don't -- I know they make the

24     argument, but I don't think they tell you where the

13:15:24   25     heart is.  And in a compilation world, I think, as we

1    argue, as we note, the fact that you have to take so

2    much of a compilation actually tells you that you don't

3    really get a heart of a compilation until you get to a

4    very large number, and we just don't have that.

13:15:42   5    THE COURT:  By the way, I do want to hear

6    at some point -- you can take it in your order, but

7    somewhere, I want to hear what you think about

8    Dr. Krein's effort to batch these things from the

9    various layers of this spreadsheet.  Go whatever way you

13:15:53  10    want.

11    MR. PARKER:  Let's start a couple

12    different ways.  First of all, I'm going to start here.

13    There is not a single case that allows you to

14    extrapolate at all.  The Third Circuit case requires a

13:16:07  15    side-by-side comparison.  That's it.

16    And all of the cases that they cite --

17    and the cases are Association of American Medical,

18    page 25 of their motion, is a side-by-side comparison;

19    Texas Holding, LLC, cited on the their reply brief,

13:16:30  20    page 13, side-by-side comparison; plaintiff's reply at

21    14; Peter Pan Fabrics, you will hear about it again when

22    I talk about the next question, side-by-side comparison.

23    And that makes sense.

24    So I will talk about Krein first.  We

13:16:52  25    have never had an opportunity to respond to how Krein

1    batches things at all.  They didn't move on those Krein

2    numbers at all.  So this is the first time we're told,

3    you can just decide how you want to batch it.

4              But those things that Krein responded to

13:17:09    5    or our statements that those headnotes are virtually

6    identical or identical to the words of judicial

7    opinions.  And we say, with triviality, you can't just

8    change small things or remove small things.  And there

9    has been no analysis done at all about what he considers

13:17:32    10    some addition or some subtractions, that that makes that

11    headnote continue to be copyrightable.

12              THE COURT:  Now, Mr. Simmons points out

13    there are 5,000 that you did not claim were trivial.

14              MR. PARKER:  I will give you an example:

13:17:49    15    86 of those 5,000, of the cases, don't have headnotes at

16    all.

17              THE COURT:  All right.  86 of them don't

18    exist.  You have a small batch that were pre-1927.

19    Let's filter those out.

13:18:06    20              MR. PARKER:  Because then -- I guess,

21    here is what I'm going to do, I'm going to jump to the

22    best example, it's in their brief, where they give a

23    headnote, a judicial text of a memo question.

24              The headnote text is:  "A cause of action

13:18:17    25    accrues to a person when that person comes to a right to

1    bring action," and then it continues.

2                    The judicial text is:  "A cause of action

3    is said to accrue to any person when that person first

4    comes to a right to bring an action."

13:18:33    5                    The memo question is:  "Does a cause of

6    action accrue to a person when that person first comes

7    to a right to bring action?"

8                    We did not submit that as virtually

9    identical because the headnote continues on past what I

13:18:48    10   read to you, but the portion that is -- appears in the

11   memo, the question raised is, what they have to prove,

12   is, did someone copy from the text of the judicial

13   opinion or the headnote?  Because they are almost

14   identical.

13:19:10    15                    So that's why those type of things

16   weren't submitted to the Court because that is an

17   analysis, if you do it side-by-side, but it wasn't a

18   virtual identical.

19                    Do you see what I'm saying?

13:19:24    20                    THE COURT:  I do.

21                    MR. PARKER:  And so there was no

22   admission on our part; we just weren't overly aggressive

23   in submitting to this Court -- we submitted to the Court

24   the things that we could say it is.  So word for word is

13:19:36    25   where the headnote is -- conforms to the judicial text.

1    We did that.

2              There are times when the headnote, which

3    we did not bring to -- sorry.  There are times we did

4    not bring to this Court's attention where the question

13:19:53    5    actually has nothing to do with either the headnote or

6    the judicial opinion.  The words aren't the same.  And

7    so we didn't submit that to the Court because that was

8    not the order given to us.

9              That's why you can't just go through the

13:20:10    10    5,000 and then extrapolate, because they came in all

11    different variables, and, as I said, it's -- we are

12    providing you examples, but their obligation is to show

13    copying, and in this instance, there is one example.  I

14    don't think that they can show copying, at least that

13:20:27    15    they need to tell the jury that this is copying, and

16    that LegalEase or whomever did not formulate this from

17    the actual words of the judicial opinion.

18              It is their burden to show material

19    misappropriation, and they haven't done it.  They're

13:20:46    20    just asking this Court to take 5,000 things and you do

21    the work.  That's a jury question.

22              And when we get to the next case, when we

23    talk about 5, those summary judgement cases, what we

24    will call substantial similarity, although you know that

13:21:07    25    we want -- we think it should be virtual identify, but

1    those cases are where the judge is actually doing the

2    side-by-side comparison, and in a fabric case saying,

3    these are identical, or at a Tetris case saying, I'm

4    looking at these two games, and I can't see any

13:21:22    5    difference between the two games.

6                THE COURT:  So let me ask the question

7    for you and maybe your ^friends on the other side.  I'd

8    like to have -- you know, is there somewhere in the

9    record where I can find the 2,830 headnotes in one

13:21:39    10    column and memo question in the other column, or where I

11    can find the 5,367 that, you know, you didn't claim as

12    ^claim as varying trivially, one column and the other,

13    because I agree with you, the Court ought to review

14    these things individually, and I have not found such a

13:22:03    15    chart, but before granting summary judgement, I would

16    want to go through such a chart.

17                MR. PARKER:  I don't mind giving the

18    Court such a chart.  For the 16,000 or so with the

19    filtration, we did that work for the Court.  Right.

13:22:16    20    Because -- and again, we were conservative.

21                And so it wasn't an admission on our part

22    that there was actual copy.  It wasn't an admission --

23    so what is an admission was actual copying because,

24    again, we have instances where headnotes run very long.

13:22:31    25    The judicial opinion has a portion of that headnote, and

                    the question reflects the words of the judicial opinion

                    and not everything.

                              Two, it has to still be protectable

                    elements that are taken.  So material misappropriation,

13:22:46            that's on them.  I am happy to put together a chart as

                    to every single one of these, but that is what's

                    required.

                              You can't just say because you got one,

                    maybe, maybe.  No side-by-side comparison at all; none.

13:23:03            None.

                              THE COURT:  It's a fair point.

                    Responsibility of the Court is to do -- if I take it

                    away from a jury, it requires the Court to do the

                    side-by-side comparison.

13:23:12                      MR. PARKER:  And then, finally, you know,

                    a lot of work, we talk about Barb Frederiksen-Cross.

                    That work was done before we knew exactly what headnotes

                    were involved in this case.  It was an algorithmic and

                    mechanical comparison.

13:23:26                      But anyway, you can't rely on Krein's

                    view of what he thinks is substantially similar at all.

                    It's not his province.

                              You can't rely on Barb, which he may or

                    may not think -- it's not their province.  That is a

13:23:41            factfinders province in the rare instances where it is

1    -- copyright infringement is granted on summary

2    judgement.  It is still a judge looking at it, making

3    these determinations, not some expert that is outside

4    the bounds.  And we cite the cases that say that in our

13:24:03    5    opposition -- oh, and damages.

6                    So I'm not familiar with that engineering

7    case, 785 F.7.  I just read it.  I don't see how it gets

8    you to you can find one and then what we are going to do

9    for the damages is run through and say -- and

13:24:24    10    extrapolate out.

11                    As these cases indicate, used compare

12    side by side, the works that are claimed to be

13    infringed, you don't find -- not horseshoes and hand

14    grenades.

13:24:38    15                    THE COURT:  I get the theory that if they

16    can show a large enough number that would cause a drop

17    in subscriptions.  Subscription revenue could be

18    independent -- not a linear relationship with the

19    headnotes.  It's like a threshold.  I also get the

13:24:55    20    disgorgement of profits theory.

21                    My issue was, well, what if it's not one

22    of those two?  If I look at some other things and those

23    other models seem to have some kind of correlation where

24    there is a certain value for headnote -- maybe I have to

13:25:10    25    do a median or an aggregate or something, but you still

1    would need to know the number of headnotes infringed.

2              MR. PARKER:  Right.  The of it is the

3    crate to actually establish or challenge

4    non-infringement.  Because we sit there at a jury trial,

13:25:23    5    you say I found one --

6              THE COURT:  Well, no.  If they were going

7    to do that, you would have a right to challenge

8    infringement on the other headnotes.  That, I get.  Now,

9    if they have a volume independent theory of the damages

13:25:36    10    that is a disgorgement theory or is a here is how many

11    subscribers you lose once there is a -- you hit some

12    threshold of you've got to use -- you know, you no

13    longer have to use Westlaw, so subscribers switch.  You

14    could, in theory, come up with damages models that don't

13:25:55    15    have a linear relationship.

16              MR. PARKER:  Their damages aren't

17    tailored that way.  They depend on everything that they

18    establish has been infringed.

19              So if you found five headnotes, their

13:26:07    20    damages model does not allow you to modify it down.

21    They do not have any model that says X number

22    infringements equals this diminution in customers.  They

23    don't have that.

24              THE COURT:  How about the disgorgement

13:26:31    25    that Mr. Simmons referred to?

         1              MR. PARKER:  Well, the disgorgement is

         2      entirely.  So for example, if you said five headnotes

         3      out of the 21,000 -- let's just posit that -- no key

         4      numbers compilation, none of that five headnotes.  Right

13:26:45 5      now they are asking us to disgorge everything.  Right?

         6      Their damages model is not dependent - is not formulated

         7      to say if it's X number of headnotes, then Y.  It's,

         8      again, premised on all of them are infringed.  But

         9      that's what it is.

13:27:07 10             In any case, we --

         11             THE COURT:  It wouldn't be a barrier for

         12     summary judgement.  It would just mean a trial that

         13     would not just be pure damages but require liability

         14     findings on a whole bunch of other headnotes.

13:27:25 15             MR. PARKER:  No, it would require trial

         16     on every other piece of their copyright, that's what it

         17     would require.  It would not be a damage -- I mean,

         18     granting summary judgement on what they've given you to

         19     do, you can't.  But it would not be a trial on damages,

13:27:43 20     it would be an infringement trial.

         21             Granting summary judgement on the five

         22     doesn't save anybody any work and they haven't done what

         23     they need to do to get the Court to that place.  Now, if

         24     the Court orders us to create a chart, put it together,

13:27:58 25     happy to.  But that's -- that is what needs to be done.

             1    Not this and not telling me that Dr. Krein, who got to

             2    do a late report, which we don't get to respond to, is

             3    now in play, so that we're now talking about 21,000

             4    headnotes.  I mean, I thought we were just talking about

13:28:16     5    5,000.  And again, 1,000 of those headnotes were never

             6    accused in this case.

             7                THE COURT:  All right.  You have a

             8    procedural objection on that.  What if I gave you notice

             9    and opportunity to be heard and the Court brings those

13:28:29    10    up sua sponte?  Like, I will give with you another

            11    14 days if you want to --

            12                MR. PARKER:  I am actually saying

            13    something a little bit more than that.  One,

            14    procedurally, it's done.  But two, you still need a

13:28:43    15    side-by-side -- to give me 14 days on those doesn't

            16    answer any of the questions I've posed as to the entire

            17    lot.

            18                THE COURT:  Right.  Fair enough.

            19                MR. PARKER:  Thank you.

13:28:53    20                THE COURT:  I will give Mr. Simmons a

            21    chance to respond.

            22                MR. SIMMONS:  Your Honor, the answer is

            23    no, no, no, no no.  That is a completely backwards way

            24    of looking at what happened here.

13:29:30    25                So first, let me start with the

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 13:29:50 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 13:29:58 | 10 |

1    side-by-side comparison.  Because I have those, they are

2    in the record, and they are available to everybody who

3    wants them.  The 5,000 headnotes are D.I. 678-27.

4              THE COURT:  That's the 5,367?

5              MR. SIMMONS:  Yes.

6              THE COURT:  678-27.

7              MR. SIMMONS:  The 2,830 are D.I. 67821.

8              THE COURT:  21.  That's the 2,830 that

9    Barbara Frederiksen-Cross --

10             MR. SIMMONS:  Correct.

11             THE COURT:  I was told algorithmically

12   could not say or could not deny were at least as close

13   or almost identical to the headnotes that weren't

14   verbatim --

15             MR. SIMMONS:  That's right.  She had a

16   methodology by which she was determining what was too

17   close to an opinion and too close to a question.

18             THE COURT:  Are these two column charts

19   side-by-side?

20             MR. SIMMONS:  I believe that they are,

21   but I'd have to go back and check.

22             THE COURT:  The other thing that would be

23   helpful is I don't know whether it would be necessary to

24   also look at the opinion as a whole.  Is the name of the

25   opinion in there, hyperlinked, anything like that?

                    MR. SIMMONS:  I know some of the charts

          do have that.  I can't remember if those two do.

                    The last chart I'd give you is also one I

          mentioned earlier at 690, 6 to 11.  That is the Krein

13:30:48   Appendix B, which is the most robust.  It has every

          single thing you could possibly want in it.  But I do

          know that in Krein, Appendix D, from his rebuttal

          report, which I do not have the D.I. number for but I

          can find, that does have the judicial opinions,

13:30:59   everything you need to find that.  So that's in the

          record, I just don't have the D.I. in front of me.

                    THE COURT:  All right.  But there is one

          that has the side-by-side for headnote question and

          entire opinion.

13:31:14            MR. SIMMONS:  At least the quoted

          judicial opinion text.

                    THE COURT:  The passage?

                    MR. SIMMONS:  The passage.  And that is

          Appendix B to Krein's supplemental report.

13:31:23            THE COURT:  Appendix --

                    MR. SIMMONS:  B.

                    THE COURT:  I thought B was 690, 6

          through 11.

                    MR. SIMMONS:  Yes, that's B.  And that

13:31:29   one has everything at the most robust.  All I was saying

1    is that Appendix D to his rebuttal, which I don't have

2    the D.I. for, has I know the specific cases cited, if

3    you want to to go back to the judicial opinion and --

4                    THE COURT:  I see.  Put B and D together.

5                    MR. SIMMONS:  No, you could do it all

6    with B.  I'm just saying there's another one out there

7    if you wanted to go all the way back to judicial

8    opinion.

9                    THE COURT:  Okay.  Got it.

10                   MR. SIMMONS:  I don't think you need to

11   do that.

12                   Number two, they got the chance to

13   respond to Appendix B.  The Canter declaration that I

14   just discussed at 717 is specifically their response to

15   that.  It is not a situation where they didn't get an

16   opportunity to respond.

17                   And by the way, they shouldn't get a

18   chance to redo it now.  Procedurally, that would be a

19   prejudice to us because we've now gone through all of

20   summary judgement, we've gone -- we actually almost went

21   to trial on the basis of them being ordered to tell you

22   what was quoting from a judicial opinion or varying from

23   it.  They got their shot.  They got another shot in the

24   Canter declaration, and even then there's 4,000

25   headnotes in there.

1          So we should not go back, that would be

2     itself a procedural prejudice on us.  We are entitled at

3     this point to say the record is closed, they didn't do

4     what they had to do.

13:32:41   5          THE COURT:  Where is this 4,000 number

6     coming from?

7          MR. SIMMONS:  So the Canter declaration,

8     which again is 717, takes the 5,000 number that we were

9     discussing -- and it's in Jonathan Krein's Appendix B,

13:32:54   10    which is what's cited in the declaration, and then says,

11    oh, there is a thousand other things that we think

12    should come out for one reason or another.  You subtract

13    1,000 from 5,000, you get the 4,000.

14         THE COURT:  Does that take out the ones

13:33:08   15    they say headnotes that don't exist, headnotes that are

16    pre 1927 and copyrightable opinion, et cetera?

17         MR. SIMMONS:  Yes.  So it says, do not

18    exist in judicial opinion, predates, verbatim copies,

19    near verbatim, no copying, minimum questions with

13:33:23   20    minimum overlap, no previously identified -- the whole

21    list, you know, we can disagree with that, but for

22    summary judgement -- like, you know, giving them the

23    benefit of the doubt of the attorney declaration they

24    put in, that only gets you 1,161.  That leaves me 4,000

13:33:41   25    headnotes that we seem to all agree, and having had the

1    benefit of putting in an attorney declaration explaining

2    why, they couldn't say we're not protectable.

3                    THE COURT:  Okay.  And is there a

4    side-by-side chart for those or it's just a subset of

13:33:53  5    5,367?

6                    MR. SIMMONS:  That has charts in it as

7    well.

8                    THE COURT:  Okay.  But Canter

9    declaration, 717?

13:33:57  10                   MR. SIMMONS:  Yeah.  What I don't recall

11   is whether the ones -- that has the ones that they are

12   saying are out, referring back to Appendix B, so you

13   would have to cross-list.  But the point is, they only

14   remove that 1,000, there's 4,000 left.

13:34:11  15                   THE COURT:  Even if we go through the

16   5,367 and strike out the 1,161 that Canter --

17                   MR. SIMMONS:  Correct.

18                   THE COURT:  Got it.

19                   MR. SIMMONS:  Next I want to point out --

13:34:19  20   and I was wondering whether this would come up -- it is

21   the burden question on substantial similarity.  It is

22   not our burden, it is their burden.  We, as the

23   copyright owner, said, here is what we think was copied

24   and we gave you a chart.  That then turns to them to say

13:34:36  25   why they think it's not protectable, which the

1    filtration briefing was a good way of doing -- turned

2    out to be a good way of doing that.  But I could give

3    you citations for that.  First --

4              THE COURT:  But I think their point is

13:34:45    5    because the copying -- it's clear that there was copying

6    to the deletes, but the evidence of actual copying here

7    is that this is so close, so you've got to show that

8    this was copied.

9              MR. SIMMONS:  So two things there.

13:35:10    10              Actual copying, under Skidmore versus

11    Led Zeppelin, which is a Ninth Circuit opinion, says

12    that:  "Actual copy with probative similarity" -- are

13    you looking at it there? -- "is protectable and

14    unprotectable elements."

13:35:25    15              It doesn't matter for purposes of actual

16    copying any of the filtration.  They don't get to do any

17    of that at the actual copying step.  It's irrelevant.

18              And when we get to six, I will tell you

19    that again, because that is a key way of making it easy

13:35:39    20    for the Court on actual copying.

21              We all agree that there is a lot of

22    similarity there.  We are done on actual copying.  The

23    only place filtration comes in is at substantive

24    similarity after the fact, and that is their burden.

13:35:51    25              We have that burden because of the

1    statute 17 U.S.C. 410(c).  We get a presumption of

2    validity; they have to come back and say why it's not

3    valid.  The legislative history says the same.

4              And then there are cases in every circuit

13:36:05    5    I could find.  The one I liked the best is Compulife

6    Software versus Newman.  That's 959 F.3d 1288 at 1305 to

7    1306.  That is the Eleventh Circuit, where it says:

8    "Copyright owner says what was copied.  The defendant

9    says here's why it's unprotectable," and then it shifts

13:36:25   10    back.

11              So here we said it was copied, they put

12    full in a filtration brief or whatever, and that's it.

13    If they don't say something is unprotectable, we move

14    past protection and we just say it's infringement.

13:36:37   15              Other cases, should you want them,

16    invoicing the bank, that's Boissin v. Banion; that's

17    273 F.3d 262 at 269, Second Circuit.  Same thing:  The

18    Court says, You have a certificate.  It gives you a

19    presumption of validity, so the defendant's burden is to

13:36:52   20    come forward.

21              Brocade versus A10 at 2011 Westlaw

22    7563043 at 2.

23              Society of Holy Transfiguration Monastery

24    versus Gregory.  That is the First Circuit, 689 F.3d 29

13:37:04   25    at 52.

1    So it's not our burden once we get

2    substantial similarity.  So just -- I want to make sure

3    we are all working from the same legal test.

4    In terms of the quote from the brief that

13:37:22    5    my friend on the other side was quoting from, remember,

6    in our reply we showed that actually they had truncated

7    the judicial opinion and that, in fact, the West

8    headnote is different than what they say.

9    Again, the headnotes themselves supersede

13:37:35    10    all of this because there is not any testimony that

11    changes them.  All of this is just looking at them.  So

12    the Court can look at Appendix B to the Krein

13    declaration and say, Yeah, this is similar, this is not

14    similar, and decide it.  There is not any factual

13:37:50    15    dispute.  It's just do you agree that legally

16    truncating, reversing order, is protectable, and that

17    decides the issue.

18    THE COURT:  But ultimately you're not

19    taking issue with Mr. Parker's point that the Court

13:38:06    20    needs to go through each of these notes.

21    MR. SIMMONS:  Well, I think the Court can

22    use -- we said this -- the Krein declaration.  He is not

23    opining on substantial similarity; he's categorizing the

24    differences between them.

13:38:18    25    So you can go and pull those out.  But

1    our point is no one has debated the categories.  Even in

2    the Canter declaration, Dr. Krein's supplemental report,

3    they don't say he miscategorized things.  They just say

4    here are some other things we want to pull out.  So if

13:38:36    5    you take the categories, again, it's fine to

6    extrapolate.

7            The last thing I want to talk about is

8    the damages model again.  I would recommend to the Court

9    that it should not reach it because that's not what the

13:38:48    10    parties briefed, but in looking ahead, a couple things.

11    On discouragement, our only burden under the statute,

12    504(b), is to prove their revenues, then they do

13    expenses and apportionments.  So that is not my burden

14    to do any of that work.  That does not turn this into an

13:39:04    15    infringement case.

16            Two, on actual damages, as I mentioned

17    and was confirmed for me at the break, the actual

18    damages model does not turn on which headnotes are not

19    taken.  The actual damages model is based on the harm

13:39:20    20    and loss to profits Westlaw suffered from the ROSS bulk

21    memo project.  That is an actual damages calculation

22    based on fees that weren't paid to Westlaw.  That is

23    something that would be proved up at trial.

24            THE COURT:  But the threshold then is

13:39:35    25    just more than de minimus?

1    MR. SIMMONS:  Yes.  They copied.  They

2    created a bulk memo project and infringing -- we argue

3    an infringing platform.  And the question is, what are

4    the damages that resulted from that?  And our damages

13:39:50   5    expert and technical estimates would say, yeah, once you

6    didn't pay us the fees that you normally would pay, we

7    should have gotten that money.  And yeah, there would be

8    a trial and the jury would have to reach a conclusion

9    about that for sure, but that doesn't change this into a

13:40:07   10    mini trial on infringement.

11    You would come in and say to the jurors,

12    I found that there was infringement.  You can even say,

13    you know, it's not all of Westlaw, but there was

14    infringement here.  And then our burden is to prove

13:40:18   15    actual damages; their burden is to prove deductions on

16    disgorgement or we could just seek statutory damages,

17    and then the jury decides.

18    It doesn't have to be -- you know, there

19    are burdens there, we will have to prove things, but we

13:40:31   20    can make easier for them by taking the direct

21    infringement question off the table and then just having

22    the experts go at it.

23    THE COURT:  Talk a little more about how

24    I am supposed to figure out what is more than de minimus

13:40:44   25    here.

                    MR. SIMMONS:  We are talking about

thousands of headnotes that are long sentences.  In

Harper & Row, which my friend on the other side

mentioned, it was like 300 words, so I think we're well

13:40:55   past that threshold.  So I don't think it requires a

significant debate about what de minimus would be.

                    If we were talking about a sentence,

which is where that line often is, like if you just took

a sentence out of a book, maybe there is a debate of is

13:41:14   that di minimus copying.  Thousands of sentences has

never been de minimus and no one has ever suggested

that.

                    THE COURT:  So if I thought that the way

in which I find that something is more than de minimus

13:41:30   has an influence on a damages model, right, that -- a

model of reduced subscriber revenue would involve taking

enough stuff that people feel like they can migrate to a

header, that might -- is that something I would need to

make a finding of at this stage?

13:41:50                    MR. SIMMONS:  No.  First of all, you

wouldn't make a finding because it wasn't raised in the

briefing.

                    Second of all, damages is one of those

areas that is quintessentially fact bound and you don't

13:42:00   always give them to the jury.  So Your Honor should

1    instruct the jury that to prove actual damages, we are

2    required to show the but-for world that causes the

3    damages model, and then the jury decides whether they

4    think that's right or not.

13:42:13    5    My friends on the other side will say,

6    no, that couldn't possibly be.  We will say yes.  And

7    that is a quintessential jury question.  Then the debate

8    between the two experts on damages, that happens in

9    every IP case and I don't think it's particularly

13:42:29    10    burdensome for the jury to listen to them and decide

11    based on cross-examination and credibility, whether they

12    think it's credible or not.

13    THE COURT:  Just a moment.

14    (Brief pause.)

13:42:36    15    MR. SIMMONS:  I suspect we're talking

16    about the same thing.  We found Appendix D.  It's D.I.

17    678-27.  So that's the other spreadsheet with all the

18    case numbers.

19    THE COURT:  Right.  Okay.  So I looked at

13:44:05    20    678-21, the 2830 that we were just looking at.  That

21    looks satisfactory.

22    Let me just pull up 678-27 and just

23    confirm whether that has, you know, enough.  If it has

24    the same columns and the same information, that will be

13:44:19    25    sufficient for the Court.

                        (Brief pause.)

1                        THE COURT:  At the moment -- I mean, it's

2        -- look at the charts.  If the Court wants some further

3        charts or adding additional columns of the charts,

4        I'll...

13:46:16    5

6                        MR. SIMMONS:  Thank you, Your Honor.

7        Would you like us to proceed to Question 5?

8                        THE COURT:  No.  I wanted to give Mr.

9        Parker the last word.

13:46:24   10            MR. SIMMONS:  Okay.

11                       MR. PARKER:  A few different things.

12                       First of all, Krein exhibit, Appendix B,

13       we have not had an opportunity to respond to that.  That

14       was submitted in response to the filtration hearing.  It

13:46:43   15       is not moved for -- the next Krein, Exhibit D, does not

16       have anything about judicial opinions in there at all

17       and we would need that opportunity to add those.  They

18       have the burden of showing that we copied from the

19       headnotes.  They can't just say the headnote in the

13:47:00   20       question looks similar.  We've shown you an example of

21       where the judicial opinion itself uses the words.

22                       THE COURT:  Right.  This is the thing

23       that I noticed just now in reviewing them.  D.I.  678-21

24       is the 2830 and that does have headnote, memo question,

13:47:19   25       section of payment.  And you're saying that if I were to

1    use Appendix D, 678-27, you would also want to have the

2    column in that - an additional column with a citation to

3    an opinion, but it should have the actual passage from

4    the opinion that allows me to see how each of those two

13:47:36    5    selections relates to the piece of text.

6                    MR. PARKER:  Yes.

7                    THE COURT:  Yes, I understand.

8                    MR. PARKER:  Oh, I know.  One last thing.

9    De minimus copying.  Citing to Harper & Row does not

13:47:48    10    help you.  Harper & Row is the heart of the matter case.

11    So you can't say 33 -- the amount that was copied in

12    Harper & Row somehow could inform this decision.  There

13    are 28 million headnotes.  28 million.  To say that

14    5,000 is the heart of the matter --

13:48:10    15                    THE COURT:  Well -- okay.

16                    MR. PARKER:  There is not a case that

17    they cite that gives you guidance as to what is enough

18    in a context like this where a headnote from -- one

19    headnote from a case, that wouldn't apply to another

13:48:27    20    case, is somehow enough if we're talking about the

21    words.

22                    If we're talking about headnotes, how

23    they fit in the compilation because they're connected,

24    that is a compilation.  We know you have to get a lot

13:48:40    25    more than some one percent of all the headnotes in that

1    sense.

2              So I am just cautioning the Court.  Like,

3    Harper & Row is a book where they quoted the best thing

4    out of the book, right?  And in the book it's different,

5    but it's the best thing out of the book.  And it was an

6    unpublished manuscript.  But the best thing, they're

7    like, who is going to want to read that now?  They just

8    don't have that where because there are 5,000 headnotes,

9    suddenly no one wants to use Westlaw.  They just don't

10   have that at all.

11             THE COURT:  Okay.  Very good.

12             Question 5:  The circumstances under

13   which it is appropriate for the judge to resolve

14   substantial similarity at summary judgement rather than

15   leave it to a jury, and I wanted specific citations to

16   case law.

17             MR. SIMMONS:  Your Honor, courts

18   routinely find that two works are substantially similar

19   without requiring a jury.  Just the level set.  As with

20   other issues that are presented for summary judgement,

21   the question is whether there are genuine disputes as to

22   material facts.  When the facts are not disputed, just

23   the legal interpretations of them, summary judgement is

24   appropriate.

25             So for example, in TD Bank vs. Hill, the

```
 1        Third Circuit held that the district court correctly

 2        granted summary judgement on copyright infringement.

 3        That's 928 F.3d 259, 277.  Neither the Third Circuit nor

 4        the district court that affirmed applied special

 5        standard.  Instead, the courts considered the

 6        defendant's arguments that --

 7                    (Court reporter interruption.)

 8                    MR. SIMMONS:  I'm sorry.

 9                    The Court considered the defendant's

10        arguments that the material they copied was

11        unprotectable under the merger or set of fair doctrines.

12        And because there were numerous ways to express the life

13        story and business philosophy at issue, they did not

14        apply.  Thus, the copied material was protectable and

15        summary judgement was appropriate.  That's at 278.

16                    The same thing happened in a case Ms.

17        Cendali and I had in the District of New Jersey.  That

18        is in Tetris versus Xio Interactive.  The Court

19        considered the defendant's arguments for holding that

20        the copy material from Tetris, the video game, was

21        unprotectable under the idea, merger, Santa Fer, game

22        mechanics doctrines.  It filtered out the unprotectable

23        material and then compared what remained.  And as they

24        were substantially similar, the Court granted summary

25        judgment.  That's 863 F. Supp. 2d 394, starting at 408.
```

```
1    And that's true cross the country.

2                        In the First Circuit, courts affirmed

3    grants of summary judgement in Society of The Holy

4    Transfiguration Monastery vs. Rayon(sic), that's 689

13:51:28    5    F.3d 29; TMTV vs. Mass Productions, 645 F.3d 464; and

6    Segrets vs. Gillman Knitwear, 207 F.3d 56, in all of

7    those cases rejecting the defendant's unprotectability

8    arguments and finding that works had differences that

9    would be overlooked were not significant.

13:51:51    10                       In the Second Circuit, summary judgement

11    was affirmed in Castle Rock Entertainment vs. Carol

12    Publishing Group.

13                        (Court reporter interruption.)

14                        MR. SIMMONS:  I'm sorry.

13:52:03    15                       That's 150 F.3d 132; Lipton vs. Nature,

16    71 F.3d 464; and Twin Peaks vs. Nations

17    Publication(Sic), 996 F.2d 1366.

18                        In the Seventh Circuit, it's GCW(Sic)

19    Investments vs. Novelty, that's 482 F.3d 910.

13:52:25    20                       And in the Ninth Circuit, it's Unicolors

21    vs. Urban Outfitters, 853 F.3d 980.  Those are just

22    appellate decisions.  There are, of course, numerous

23    district courts that view the same way.

24                        Here, Thomson Reuters moved for summary

13:52:41    25    judgement, and ROSS has not established that there was a
```

1    genuine dispute about its defenses because of the

2    unrebutted testimony of Thomson Reuters' attorney

3    editors on the various points of judgment and creativity

4    involved in creating the copied material -- that is in

13:52:55    5    Oliver declaration that we keep discussing -- or the

6    unlimited choices availability to them, as ROSS's own

7    expert, Dr. Lighter, we discussed earlier, admitted in

8    his deposition.  And it's discussed in our opening brief

9    at pages 22 to 24.

13:53:15    10    And what he pointed out specifically was

11    that many different legal research platforms have no

12    headnotes, their own headnotes, a different number,

13    different wording of them.  And given that the Court

14    need only apply the law to the undisputed facts, there

13:53:33    15    is another -- this is another case where summary

16    judgement is appropriate given the close relationship

17    between the headnotes and the memo questions that copied

18    them.

19    THE COURT:  A few questions.  So ROSS's

13:53:45    20    position in its opening brief was expert testimony is

21    irrelevant to decide a substantial similarity.  You, in

22    your opening brief, disagreed.

23    What's the correct interplay of the

24    opinion of experts and those of lay observers like

13:54:00    25    jurors.

MR. SIMMONS:  So I will give you the

expert and lay -- I'd also like to include the Court in

that because all three of them can be involved.

So at the actual copying stage, everyone

agrees experts are involved.  At substantial similarity,

there are cases where courts have said this is complex,

we want to have experts involved.  The classic example

is computer programs, but there is no reason to believe

that's restricted to them because of the nature of the

computer program, it's because the judge or the lay

observer would need help collecting all the material

together.

To be clear, as I said before, our

experts are not doing the substantial similarity

analyst.  What they're doing is showing here is what all

the things are in these categories factually what's

going on, and then it's for the fact finder to decide.

What the jury or judge can then do is

say, are these substantially similar?  Basically you as

Your Honor could do, like all these other cases, is say,

okay, ROSS's burden was to say what was unprotectable,

they didn't do that for these; or I disagree with their

position on merger or summary fares as a legal matter,

the rest is in; and look at them, they look similar

enough, direct infringement.

1          THE COURT:  So a lot of cases like

2    Tanksley say substantial similarity, it's usually an

3    extremely close question of fact, that's why summary

4    judgement has been traditionally disfavored in the

13:55:32   5    copyright.

6              Why isn't there a close factual question

7    here?

8              MR. SIMMONS:  So that's interesting.  So

9    that quote comes from I think -- the earliest case I

13:55:41  10    remember is Arnold versus Porter from the 1940s.  I

11    actually think the courts have moved quite a pace from

12    that understanding.  They don't just deal with

13    substantial similarity at summary judgement.  They're

14    not doing it motions to dismiss stage where courts will

13:55:55  15    actually say the works are in front of me, I can decide

16    that and I will make a determination.  The Peter F.

17    Geiger case I mentioned earlier from the Second Circuit

18    was sort of a big decision in that area where they said

19    I can do this, I can do substantial similarity without

13:56:10  20    any discovery, without any facts.

21              Here, the reason you can do it is we

22    don't have the kind of testimony of the curettage in

23    dispute.  So for example, you can imagine a case where

24    whether or not something is a common trope of a book of

13:56:25  25    fiction -- and I'm saying that that was copied -- is

1    debated.  But there is two experts or two people saying,

2    no, it is a trope; no, it's not a trope.  That is not

3    ROSS's argument.

4                    ROSS's argument here is these are too

5    close to the judicial opinions.  But we have the

6    judicial opinions, we have the headnotes, and we have

7    the quotes.  There is no disputed issue of fact on that,

8    so the Court can easily look at them and decide for

9    itself.

10                    THE COURT:  Okay.  Walk me through

11    substantial similarity for the key number system.

12                    MR. SIMMONS:  The key number system works

13    the same way as the other parts of the analysis work.

14    The question is, what was original to us?  Here, our

15    point is it's the whole thing, it is a textonomy, but

16    it's also made up of all of these parts.

17                    They, in creating their bulk memos, named

18    every single bulk memo after the key number system.  So

19    like, everyone would have our numerical thresholds in

20    them.  And then, of course, as the headnotes were

21    created, what they were doing was marching through that

22    process.  There is no question that that was copying

23    there.  I think the headnotes are the easier thing to

24    sort of seek through text, but it's clear the key number

25    system was copied as well.

1    THE COURT:  So ROSS says procedurally you

2    didn't raise 1,623 of the 2,830 from Frederiksen-Cross.

3    What is your response?

4    MR. SIMMONS:  We did.  But also,

13:57:56    5    remember, we had a lot more submissions since the

6    original raising of this, so there were -- a filtration

7    hearing, there was supplemental Krein declaration.  So

8    again, I go back to what I think what the Court should

9    do is look at Appendix B to the supplemental Krein

13:58:13    10    declaration where it has the judicial opinion text, the

11    headnote, the question.  That's all Your Honor needs to

12    do.  They tried to filter that out of the Canter

13    declaration, they didn't filter it all out, we win.

14    THE COURT:  So take the 2,830 in Krein

13:58:33    15    Appendix B, which I guess is 678-21.  At most, filter

16    out the 1,161 from the Canter declaration.  And what's

17    left, there is infringement at least as to that.

18    MR. SIMMONS:  As we discussed earlier, I

19    have a thousand of headnotes in every single way we

13:58:49    20    cross this bridge because there's so much copying.  I

21    don't think Your Honor needs to go through every single

22    thing to get there, you just have to say that there's

23    more than de minimus copying and let's move on to the

24    other parts of the case.

13:59:01    25    THE COURT:  Okay.

1          MR. PARKER:  At the heart, this isn't

2    really an argument about whether you can grant summary

3    judgement or not.  Right?  Unicolor tells you that

4    granting summary judgement for infringement in favor of

5    a plaintiff is the exceptional circumstance.  Nimmer

6    tells you at Section 12.10 that if the resemblance is

7    overwhelming, you should grant summary judgement.  In

8    footnote 76, notes that it rarely happens in favor of

9    plaintiff and usually on substantial similarity it's

10   been in favor of the defendant.

11          And in each of the cases that were cited,

12   the correlation was obvious.  So TD Bank copied 16

13   percent, side-by-side comparison in Unicolors.  So

14   overwhelmingly identical fabric designs.  Range Rd.

15   Music, the entire song was played.  It wasn't a matter

16   of parsing anything.  Association of American Medical, a

17   side-by-side comparison was done by the court.  The

18   original aspects of the MCAT had been improperly

19   appropriated.  Side-by-side comparison, the court said

20   there was no difference.  So we are not at that stage.

21          We are at a stage, though, where --

22   again, I will say it again, we would like to respond to

23   the Krein supplemental.  But moreover, this case also

24   raises the issue of copying, and that's the example we

25   talked about last time.

1          It's not merely whether some aspect of a

2     headnote is created.  The headnotes are, based on

3     judicial opinions.

4          I want to make sure I didn't hear

14:01:09    5     something wrong.  There are some memos that have a legal

6     -- in the metadata, have a legal phase.  They call that

7     their key number system.  It doesn't have a key number.

8     And key numbers aren't obvious from any of the bulk

9     memo.  Not even every bulk memo had such a thing.

14:01:37   10          A small amount of the 25,000 -- it's in

11     our brief.  I want to say a thousand, I just don't want

12     to get caught by saying I am diminishing it overly much.

13     I just don't -- but those memos don't actually have a

14     time in any obvious way.  Most of them, with anything,

14:01:55   15     that would be the key number system, not that ROSS would

16     have received.

17          So it's a false statement to say that

18     these memos contain reference to key number systems.  In

19     the metadata itself -- not even when you read the memo,

14:02:10   20     in the metadata, there is a reference to an area of law.

21     For now they want to call that a key number system.  I

22     think that is a fair question if the Court does not --

23     the Court is -- whether that is actually the key number

24     system and my guys considered the key number system and

14:02:27   25     whether they actually had anything to do with that at

1    all, I think that is a question for the jury.

2              So we can talk until we're blue in the

3    face about whether or not you can grant summary

4    judgement.  Of course you can in the right case.

14:02:42    5              THE COURT:  So talk about the interplay

6    from the observer.  Isn't this fundamentally the

7    judgement call about how much they look alike?  We are

8    not talking about computer code here.  Mr. Simmons makes

9    a fair point.

14:02:52    10              Isn't that a factual determination where

11    when it's close the jury makes it, when it's clear to

12    the naked eye of the judge, the judge can make it?

13              MR. PARKER:  Oh, yeah.  Listen, I'm

14    saying our expert -- neither expert is a legal expert in

14:03:08    15    any way, shape or form.  You can tell whether something

16    is a trivial -- when it says Rule 54(b) and the headnote

17    says a motion under Rule 54.  Or if the Court says in a

18    12(b)(6) motion, and the headnote says in a motion to

19    dismiss.  You are better equipped to tell me if that is

14:03:33    20    similar or a trivial variation than Dr. Krein is and

21    certainly Dr. Frederiksen-Cross, who didn't look at it

22    at that level.

23              So it is unavoidable that you're going to

24    look at it if you want to, right?  And I think you're

14:03:51    25    given the opportunity to do that, frankly, under the

```
 1      case law.  We just want you equipped with the right
 2      things to do so.
 3                      THE COURT:  Fair.
 4                      Now, Ms. Frederiksen-Cross, your expert,
 5      describes 2,830 of the headnotes.  Is that a concession
 6      on substantial similarity?
 7                      MR. PARKER:  No.
 8                      THE COURT:  Why shouldn't I treat it that
 9      way?
10                      MR. PARKER:  Because you have to look at
11      the actual words used and what portion was used.  Again,
12      we are going back to -- she's just mentioned how many
13      words are similar.  So the example on page 2 of -- in
14      their brief but on page 2, if you did that comparison,
15      there are more words that are dissimilar than are
16      similar.  But the words that were actually made into the
17      question also appear in the judicial text.  It is not an
18      admission of anything.  And it is a substantial
19      similarity of why.  And I think that's -- what portion
20      of the headnote, like where, what are we talking about?
21                      She doesn't get you to that.  And then
22      what was actually copied, she doesn't get you there
23      either.
24                      THE COURT:  All right.  Mr. Simmons.
25                      MR. SIMMONS:  So on the question of how
```

1    close they have to be, I commend to the Court Castle

2    Rock, which is one of the cases I mentioned.  That is

3    the Seinfeld Aptitude Test case.  There wasn't even

4    side-by-side comparison there.  Those are a TV show and

14:05:26    5    a quiz book that had only 643 fragments, is the way that

6    the court describes what was copying, and says that's

7    more than de minimus and found and affirmed substantial

8    similarity by the district court, finding it on summary

9    judgment.  So you don't have to do a whole lot of work

14:05:44    10    to make this happen.

11                Secondly, you have to really be careful

12    about when we are talking about actual copying or we're

13    talking about substantial similarity.  Actual copying,

14    as I said, we don't do any of the filtration analysis.

14:05:58    15    I'll come back to that --

16                THE COURT:  We had that last time and I

17    haven't heard Mr. Parker to dispute that we can look at

18    the whole thing of actual copying, substantial

19    similarity is where we filter.

14:06:03    20                MR. SIMMONS:  Correct.  And so in the

21    substantial similarity step, we said here is what was

22    copied; they're supposed to say what they think was

23    unprotectable, and then we respond.  That's happened

24    multiple times.  Ms. Frederiksen-Cross, they chose to

14:06:19    25    have an exert come up and do that analysis.

                          Do I agree with how she did it?  No.

That is their expert.  But she leaves on the table

thousands of headnotes even using the analysis they

chose to use.  That's why it's relevant for summary

judgement, because even if we accept their version of

the facts, then we still win.

                          Even if you thought, though, it is an

expert, I'm concerned about that, what you can do is

look at the chart of what she did and look for yourself

at how similar and different things are, and you can do

that comparison that way too.  I'm happy to win in any

way you want to, to do it, as long as I win.

                          THE COURT:  And you don't have a problem

with taking the 1,161 from Canter, do I subtract those

from the 2,830 and Frederiksen-Cross?

                          MR. SIMMONS:  So those were already out.

So --

                          THE COURT:  If there is any disagreement,

I want to know about it.  But the 1,161 is a subset of

5,367, but it's not a subset of the 2,830?

                          MR. SIMMONS:  Right.  So 2,830 is here is

Frederiksen-Cross's analysis where I walked her through

and said, okay, well, if we accept it, how does this

work out --

                          THE COURT:  So the 1,161 had already

1    been --

2                    MR. SIMMONS:  It is a response to our

3    Krein Appendix B.  So their version is

4    Frederiksen-Cross, I then said, okay, at her deposition,

14:07:38    5    walk we me through your analysis --

6                    THE COURT:  Took her on her own terms on

7    the --

8                    MR. SIMMONS:  Correct.  And that gets you

9    to a thousand.

14:07:45    10                    During the Daubert point -- remember

11    Frederiksen-Cross had essentially a sur-rebuttal,

12    Your Honor permitted it but let us have a supplement in

13    response to it.  The supplemental Dr. Krein report

14    contains Appendix B, which as I said, is I think the

14:08:03    15    best way of looking at this because it has the judicial

16    opinions, the headnotes, and quotes, and the

17    categorization.  The Canter declaration at summary

18    judgement then responds to that, and that's where the

19    thousand is coming out of.

14:08:12    20                    THE COURT:  The thousand is coming out

21    of --

22                    MR. SIMMONS:  Appendix B.

23                    THE COURT:  I thought Appendix B was the

24    2,830.

14:08:36    25                    MR. SIMMONS:  No.

```
 1                 THE COURT:  The Appendix B is the 5,367?

 2                 MR. SIMMONS:  Appendix B is Jonathan

 3   Krein using all of the --

 4                 THE COURT:  Is that D.I. 678-21?

 5                 MR. SIMMONS:  That's 690-6 through 11.

 6                 THE COURT:  690-6 through 11.

 7                 MR. SIMMONS:  That's Jonathan Krein.

 8   Frederiksen-Cross, which is the standalone, is 678-21.

 9   The 5,000 is what happens if you subtract out -- it is

10   taking our headnotes, they then said here are the ones

11   we think are unprotectable, and that leaves you with

12   5,367.

13                 THE COURT:  That is D.I. 678-27.

14                 MR. SIMMONS:  Correct.

15                 THE COURT:  But the 690-6 to 11 is the --

16   the Krein Appendix B has the same --

17                 MR. SIMMONS:  It's got everything,

18   everything that you could possibly need, and then

19   sortables that you can find it on.  So that to me is the

20   easiest because it gives you the full -- and then you

21   can find judicial opinions and see everything.  The

22   Krein -- I'm sorry, the 5,000 or the 2,000 are our

23   attempts to say don't take my word for it, let's use

24   their numbers, and we can still win.  Because I didn't

25   want to come in and tell Your Honor just do it my way
```

1    because you might think that's somehow creating a fact

2    issue.

3                THE COURT:  D.I. 696-11 is a spreadsheet.

4    You may have logged a digital copy of this, but can you

14:10:14   5    get your paralegal just to follow up with a thumb drive

6    or some kind of link to the large file because the

7    capability of sorting and searching may prove useful.

8                MR. SIMMONS:  Sure.  Absolutely.  I think

9    it is a spreadsheet, like a normal Excel, so you should

14:10:32   10   be able to just load it.

11               THE COURT:  Right.  That looks like it's

12   text, like a PDF.  I'm saying if it is in an Excel form,

13   it would be sortable, categorizable, subtractable, et

14   cetera, in ways that the PDF is not.

14:10:46   15              MR. SIMMONS:  We will get that to you.

16               THE COURT:  Okay.

17               MR. PARKER:  We are going to put all the

18   cards on the table and we should.  Their motion starts

19   with we admitted because we didn't provide things to you

14:11:05   20   because under the virtual identity we didn't make any

21   admission at all.

22               THE COURT:  Right.

23               MR. PARKER:  Right.  And so they start

24   with that premise.  We say, you have to do a

14:11:15   25   side-by-side.

                    Now, the -- Krein does not have all the

5,000 because we didn't -- Krein was responding to our

filtration, which was 16,000.  And I'm just telling you

now, by the time we finish talking about what numbers

should be subtracted from another number, I don't even

know what we're moving on.

                    If the Court wants to do this, then let's

just put our money where our mouth is.  We'll give you

the quote, we'll give you the headnote, we will give you

the judicial opinion, and the Court can go to town.

                    THE COURT:  Right.  I already have that

in 678-21.

                    MR. PARKER:  No, you don't have

everything.  I'm saying put it in one place.  Krein's

supplemental B doesn't have everything, Barbara

Frederiksen-Cross doesn't have everything.  We just put

it all in one place.  We will agree what the words are

and we'll do it.  We'll eliminate the 86 headnotes.

Because they were sitting there in the 5,000.  Right?

We'll eliminate -- there may be an argument about

whether any or some of these headnotes even are subject

to copyright.  Because you can't keep extending

copyright on a work even if it sits in a compilation.

                    Rather than -- I literally don't know

which things are now in play.  And we sit here and say

1    subtract this from that and look over here for some of

2    it, but it doesn't have it all but look --

3            THE COURT:  The Court is going to do a

4    side-by-side.  And the Court is going to do a

14:12:49   5    side-by-side involving, you know, headnote and opinion

6    -- now, it sounds like that is -- I thought I looked at

7    that in D.I. 678-21.

8            MR. PARKER:  I will check.  I am almost

9    certain that is not true.  I am going to literally say

14:13:06  10    almost certain, but I believe that is not so.

11            THE COURT:  All right.

12            MR. PARKER:  It won't have the

13    judicial --

14            THE COURT:  At the next break, let's have

14:13:14  15    the paralegals check both of these and see what you

16    agree has all three and what doesn't.  And if you -- I

17    get your argument that the Court ought to be checking

18    these things.  I thought I just saw a document that

19    purported to be one of the smaller of the spreadsheets

14:13:33  20    that had the three columns of all of these things where

21    the Court can just go and like, yes, this looks like the

22    judicial opinion; and no, this is not more than -- you

23    know, the bulk memo is worse than the headnote.

24            MR. PARKER:  Understood.

14:13:47  25            THE COURT:  But apparent to the naked

```
 1    eye.  And the Court will make sure it has that, but I

 2    think the first thing to do is for the paralegals to get

 3    on the same page about what is in each of those three

 4    attachments.  Because I thought I was just looking --

 5              MR. PARKER:  And if you may -- I am

 6    3,000 miles from home.  I would prefer if we were

 7    allowed to just meet and confer outside of the school

 8    and submit an e-mail to whomever you direct.  And we can

 9    say -- and if we have an argument, which I think we

10    might, we will deal with it.

11              MS. CENDALI:  Yes.  Your Honor, may I be

12    heard briefly on this?

13              THE COURT:  Yes.

14              MS. CENDALI:  It's been extremely

15    prejudicial for us the way they keep changing the sands.

16    We're here now, everything has been submitted.  They had

17    optimal opportunity to do everything.  The document

18    speaks for itself.  There shouldn't be a supplemental

19    e-mail.  People can talk during the next break and the

20    document is what it is.  We're just --

21              THE COURT:  I hope you guys can meet and

22    confer.  I'll make the next break a prolonged one, if

23    needed, so that you can agree at least here is what we

24    all agree that this D.I. -- attachment to this D.I.

25    number is.  And if it has the relevant categories that
```

14:13:59 (line 5)
14:14:18 (line 10)
14:14:27 (line 15)
14:14:45 (line 20)
14:14:56 (line 25)

1    Mr. Parker is asking about, that may be sufficient.

2              I understand his point that some of these

3    don't.  And if the Court were to go to such a thing,

4    there is this question about whether ROSS should have

14:15:12    5    raised this earlier, submitted something else.  But the

6    Court is in a position, I believe, to at least do a

7    comparison on the subset of what looked to me like the

8    2830 with the three columns.

9              MS. CENDALI:  Yes.  That's what we

14:15:28    10    believe.  We believe that Your Honor has everything it

11    needs.

12              But I just wanted in the -- one more time

13    because I feel like, as we talk about this, something is

14    lost.  I want to go back to our conversation about Feist

14:15:39    15    and the fact that the Court said that even a directory

16    that contains absolutely no protectable written

17    expression, only facts, meets the constitutional minimum

18    for copyright protection and features an original

19    selection and arrangement.  Your Honor is obviously free

14:15:57    20    to also look to see for some of these headnotes, you

21    know, to what extent do they track the judicial opinion

22    or not and that's fine.  But the point is, all of the

23    headnotes, 20,000 plus, which you heard Mr. Parker admit

24    were copied, all of them are protectable because it

14:16:16    25    doesn't matter --

1          THE COURT:  I understand.  But your

2     briefing it and Mr. Simmons are taking the both/and

3     approach.  I have to decide on compilation and I have to

4     decide on the individual works.

14:16:27    5          MS. CENDALI:  Yes.  We're saying that, I

6     guess, there's two paths --

7          THE COURT:  Yes.

8          MS. CENDALI:  But the point is that the

9     -- that was the selection and arrangement.  I just

14:16:37   10     wanted to --

11          THE COURT:  I understand your argument.

12     It's been made.  I think this is now sufficiently clear

13     to the Court --

14          MS. CENDALI:  Thank you.

14:16:43   15          THE COURT:  -- what the positions are,

16     what the arguments are.  And I will certainly give you

17     guys some time to meet and confer, but we just have to

18     be sure about what it is that I'm looking at and what it

19     is that I have the ability to do this comparison as a

14:16:57   20     factual matter.

21          This is not computer code.  I am a judge.

22     I read headnotes.  I can tell when headnotes are close

23     to judicial opinions and what, if anything, they are

24     adding or what they are selecting and arranging.

14:17:09   25          MR. PARKER:  I did not make an admission

1    on the copying, I just --

2                    THE COURT:  I understand you have not

3    made a concession on that, you're not making an

4    admission on copying.

14:17:18    5                    There is still the issue, I have to

6    decide what to do with Frederiksen-Cross, but your

7    position on that is very clear.

8                    Question 6:  Record citations showing

9    either there is no disputed material fact or any

14:17:31    10   genuinely disputed material fact about actual copying

11   for each of the categories of headnotes including each

12   step.  So I want to know about the steps about going

13   from Westlaw to being copied by LegalEase and then

14   having been placed by LegalEase into the bulk memos, and

14:17:46    15   then the use of the bulk memos by ROSS.

16                    (Brief discussion held off the record.)

17                    (Brief recess taken.)

18                    THE COURT:  Topic 6, Mr. Simmons, record

19   citations.

14:22:34    20                    MR. SIMMONS:  As the Court's prior

21   summary judgement opinion explained, there are two ways

22   of proving actual copying.  One is through direct

23   evidence, such as LegalEase's admissions in its

24   deposition that it copied Westlaw.  Those include 678-6

14:22:47    25   at 34 through 13.  We also have Morae Global, which is

1    the subcontractor, in 678-4 and 195-14 through 19.  And

2    there is also documentary evidence such as 678-84, which

3    is an e-mail exchange between the two of them.

4                  Another way to prove actual copying is

14:23:11   5    proof of access and similarities probative of copying.

6    That's at page 8 of your prior opinion.  There is no

7    question on access.  LegalEase admitted in its

8    deposition that it had Westlaw credentials.  That's at

9    D.I. 678-8 at 93:21 through 24.  And Morae Global had

14:23:30   10   them too.  That's 678-6 at 88 through 1922.  So access

11   done.

12                  All we have to do in that situation is

13   talk about probative similarities.  Earlier I had

14   informed the Court about the Skidmore vs. Led Zeppelin

14:23:46   15   case.  The citation for that is 952 F.3d 1051, 1064.

16   And the quote says there that for purposes of probative

17   similarity, such similarity may be based on the overlap

18   of unprotectible as well as protectable elements.  So

19   the teaching of that case is that filtration doesn't

14:24:07   20   happen at the actual copying stage.

21                  So there's a couple of ways the Court can

22   do this.  All the Court needs to do is look at, again my

23   favor, Appendix B to the Krein declaration.  That's D.I.

24   690-6 through 11.  That has all of the headnotes and the

14:24:23   25   questions.  If they look similar such that you think

```
 1   copying occurred, actual copying is established.  There

 2   are numerous similarities there.

 3                 And faced with that, what ROSS would have

 4   to have done is said, no, no, no, this was independently

 5   created, and that's not an argument that they made.  All

 6   of the arguments in this case are about

 7   unprotectability, not independent creation.

 8                 THE COURT:  So you can do this from

 9   similarity and eyeball it.

10                 MR. SIMMONS:  Yep.

11                 THE COURT:  But in terms of direct

12   evidence, the alleged copying by LegalEase -- okay,

13   we've got access.  It doesn't sound like that's

14   disputed.  I thought it wasn't disputed last time and I

15   so found.

16                 But how about what we have direct

17   evidence of as the placement of the copied material,

18   above memos, which Mr. Parker keeps arguing, look, we

19   instructed them, don't use this, write it on your own,

20   et cetera.  There are all these instructions.  You

21   pointed to --

22                 MR. SIMMONS:  The best practices guide.

23                 THE COURT:  I think it was more than the

24   best practices guide --

25                 (Simultaneous speakers.)
```

```
 1              THE COURT:  -- at pages 4, 8, and 13.

 2              MR. SIMMONS:  Let me walk you through the

 3    best practices guide for ROSS Intelligence, which is

 4    D.I. 678-36.  I have it, which is what I'm going to read

 5    from.

 6              (Discussion held off the record.)

 7              MR. SIMMONS:  This is the document that

 8    LegalEase created to train it and the Morae Global

 9    contractors.  Here is how you make a bulk memo.

10              So Mr. Parker this morning said that

11    there is a reference in this just saying the headnotes

12    are proprietary, which is true, but they also -- the

13    memo also says an easy way of framing questions is to

14    rely on the headnotes.  Here are the steps in the best

15    practices guide that LegalEase used.

16              THE COURT:  Who drafted the best

17    practices guide?

18              MR. SIMMONS:  LegalEase.  So this is the

19    people who are creating the bulk memos saying this is

20    how you do it.

21              Page 4, Westlaw.  Do a headnote search.

22    "Click on the key numbers.  You will be assigned a

23    number which is available under the key numbers."

24              Now, there is a picture of Westlaw at the

25    top of the page.
```

1                 "Here, the key number assigned is 1 and

2      the topic is abandoned and lost property."  And then it

3      has a picture of the key number system from the Westlaw

4      platform.

14:26:48    5                 "2, click on a key number topic.  The

6      best practice is to begin from the top, subtopic number

7      1, and follow the pattern."  And it shows abandoned and

8      lost property and all of the key number citations under

9      that form the Westlaw platform.

14:26:59    10                 "3, click on number 4, evidence and

11      questions for jury," which is one of the key numbers

12      under that.

13                 "4, got this."  Which then gives you all

14      the cases that go with that key number.

14:27:11    15                 THE COURT:  So this is your proof of the

16      second of the third, three steps I asked about.

17                 MR. SIMMONS:  Yes.

18                 THE COURT:  How about the third step, the

19      use of bulk memos by ROSS?

14:27:20    20                 MR. SIMMONS:  Sure.  And I'll just note,

21      by the way, the punch line on this is that step 7 is

22      take headnote and make question.  So that's the answer

23      on that.  And there is other evidence on that too.

24                 In terms of ROSS's use, this is an area

14:27:32    25      where the experts are actually oddly in agreement.  So

        1    Mr. Krein's rebuttal report at paragraph 34, that's our

        2    expert, and Dr. Branting's opening report at paragraph

        3    31 through paragraph 38 described the following process:

        4              Step 1:  An individual at ROSS copies and

14:27:52  5    pastes the contents of the memorandum into their portal

        6    -- that's what my friend on the other side mentioned

        7    earlier -- which would create a copy of the bulk memo in

        8    ROSS's web database.

        9              So bulk memo is like a thing that you get

14:28:08 10    sent over -- let's put it in the database, someone at

       11    ROSS is putting that into the database -- that question

       12    all the other material.

       13              Step 2:  An individual at ROSS would

       14    assess whether the answers to the questions accurately

14:28:19 15    represent the relevance rating, which would require the

       16    user to access the copy of the bulk memo on ROSS's

       17    database and create a new copy in the random access

       18    memory of the computer.

       19              Because they are confirming that the

14:28:31 20    database is correctly copying the question.

       21              Step 3:  The data goes through a mapping

       22    process where they verify the passage -- and I'm -- can

       23    correct to the judicial opinions that they already had.

       24              And then Step 4:  A set of question and

14:28:45 25    the answer pairs that were to be used for training are

1    downloaded into the CSV file -- that my friend on the

2    other side mentioned earlier, which is just a

3    spreadsheet.  And so what that spreadsheet has in it is

4    the list of all the questions and all the judicial

14:28:59    5    passages -- the great quote material that's there.

6                    And so that was their process for every

7    single bulk memo.  There is no question that that

8    involves copying of the memo questions which, as we say,

9    are based on the headnotes.

14:29:13    10              THE COURT:  I understand what you allege

11   ROSS has taken from the headnotes.  But clarify, what

12   are you alleging they have taken from the key number

13   system.

14              MR. SIMMONS:  So the key numbers were

14:29:25    15   also contained in the bulk memos, both in the --

16              THE COURT:  Just metadata were in the

17   files, but not in the text that was being crawled over.

18              MR. SIMMONS:  So the number name was not.

19   But remember, the question and the great quote have a

14:29:39    20   relationship.  And their expert, Dr. Branting, at, I

21   believe it's paragraph 11 of his rebuttal report, if

22   memory serves -- pardon if I'm incorrect -- actually

23   talks about the fact that they're learning -- that

24   they're teaching their AI about the relationship between

14:29:54    25   the headnote and the case great passage.  So yes, it's

```
 1    in the metadata, the file names, but it's also just the

 2    nature of how the bulk memos are created is including

 3    all of this different material.

 4                THE COURT:  One moment.

 5                (Brief pause.)

 6                THE COURT:  All right.  So this may be a

 7    little repetitive of some things that Ms. Cendali

 8    touched on, but try to distill for me, what is the

 9    protected aspect of the key number system that you

10    allege that ROSS took?  What is the protected aspect of

11    creativity or protectable elements of the headnotes that

12    you allege were taken?  Because I am trying to

13    understand the gist of the claim.

14                MR. SIMMONS:  So there is protection at

15    multiple levels.  The fundamental legal question is what

16    did we add?  So anything we added, anything we did is

17    protectable.

18                For the key number system, we chose the

19    names in the key number system, the organization in

20    which they appear, the subsets and everything else.  It

21    is essentially its own work.  It's itself -- it's

22    something that you can actually see in the Westlaw

23    system and say, oh, there's all these key numbers in

24    there.  The headnotes, as Ms. Cendali said before the

25    break, we claim them at the selection arrangement level
```

1    because we chose what to make a headnote.  But we also

2    claim the text that we wrote where we are taking

3    material and summarizing it, even if there is something

4    that looks similar to the judicial opinions -- you know,

5    in many of the cases we're doing some kind of

6    manipulation that makes it more than trivially

7    different.

8              In addition, as anyone who uses Westlaw

9    electronically knows, all of the headnotes are linked to

10   the passages of the text.  So we have chosen that, not

11   only to make a headnote, but to make a headnote that

12   goes to a specific part of the opinion.  It could have

13   been earlier, later, not had a headnote at all, and

14   that is critically important because that paring of our

15   headnote with the judicial text is what becomes the

16   question in great quote in the bulk memos.

17             THE COURT:  Mr. Parker.

18             MR. PARKER:  Oh, my turn.  I didn't think

19   that was going to go that fast.  I am going to take a

20   little bit longer.  And I am going to give you the D.I.

21   cites after.  Page 19.

22             I think we're all good about the best

23   practices guide.  You can look at it yourself.  But

24   also, there was no quote when it says, "take headnote,

25   make question."

1          THE COURT:  Right.

2              MR PARKER:  As I said to the Court

3      before, "Do not copy headnotes verbatim because

4      headnotes are generally not in the form that was

14:33:41    5      expected for the questions."  That is actually a

6      deposition study.  Best practices guide comes, was not

7      copy headnotes.  There's another document, it's

8      Exhibit 59 from LegalEase.  LegalEase directed attorneys

9      to "not to stick to headnotes or frame questions.

14:34:02   10     Rather, use them as a stepping stone."

11             And I said this earlier, each quote was

12     to represent four rankings.  This apparent link to

13     passages -- I am now on page 20.  You can look at the

14     bulk memos.  There is no apparent link there and they

14:34:29   15     don't claim there is a link in metadata.  It is a

16     question and an answer, and then a good top question and

17     an irrelevant question.  And Jimoh Ovbiagele's

18     declaration tells you why we are not the training just

19     on great questions.  You can't do that with AI.  He

14:34:48   20     explains that.  But it would be no good to have 25,000

21     great questions out of a world of how many cases -- I

22     have it written down.  Millions and millions of cases in

23     this world, to have 25,000 great answers, that doesn't

24     -- you can't train AI.

14:35:08   25             THE COURT:  So --

1           MR. PARKER:  Go on.  I can stop.

2           THE COURT:  You're not disputing access.

3           MR. PARKER:  No.

4           THE COURT:  That is conceded.

14:35:20    5           Do you dispute that LegalEase actually

6       copied the headnotes at the first step?

7           MR. PARKER:  If you talk about a --

8       femoral copy.  In other words, you open up a Westlaw,

9       you are going to see those things.

14:35:36    10          THE COURT:  Right.

11          MR. PARKER:  You just are.  The question,

12      though, I think is twofold.  One is, are you using the

13      headnotes to find things like the utility --

14          THE COURT:  But do you concede that, say,

14:35:51    15      the 2830, or whatever, headnotes were copied by

16      LegalEase into the bulk memos?

17          MR. PARKER:  No.

18          THE COURT:  That they were copied from

19      the screen onto something else in the process of

14:36:02    20      creating the bulk memos.

21          MR. PARKER:  No.  I'm not going to --

22      that is not in the evidence at all.

23          THE COURT:  How about the use of the bulk

24      memos by ROSS?  You concede that ROSS used all the bulk

14:36:13    25      memos to train in its AI.

1               MR. PARKER:  No, that is not true,

2       either.

3               THE COURT:  Okay.

4               MR. PARKER:  No, not even a little bit.

14:36:18   5   They discarded some.  They didn't match up, or they

6       didn't think they were -- it's in our papers.

7               THE COURT:  They discarded some of them.

8               MR. PARKER:  Yeah.

9               THE COURT:  Do you concede they used the

14:36:24  10   bulk of them?

11              THE COURT:  Do you concede they used the

12      bulk of them?

13              MR. PARKER:  They used 80 percent.

14              THE COURT:  80 percent of them, and they

14:36:31  15   kept the other 20 percent aside?

16              MR. PARKER:  Yes.

17              THE COURT:  Do we have a way of lining up

18      which 80 percent with individual headnotes?

19              MR. PARKER:  No.

14:36:39  20              THE COURT:  Okay.  The 80 percent was

21      randomly sampled?

22              MR. PARKER:  Yes.

23              THE COURT:  So statically, if there were

24      thousands, the chance that none of those thousands would

14:36:51  25   show up in the 80 percent, you can do the math.

 1                    MR. PARKER:  Right.  So, you know, the

 2      statement was that we were trying to teach the

 3      relationship between a headnote and a great quote.  That

 4      is just not true.

14:37:04      5                    First, that assumes we copied headnotes

 6      verbatim.

 7                    THE COURT:  Okay.

 8                    MR. PARKER:  That assumes that the

 9      headnotes are not just judicial opinions.

14:37:12     10                    THE COURT:  So you conceded that there

11      was a femoral on the screen copied, but nothing from

12      there --

13                    MR. PARKER:  Right.

14                    THE COURT:  -- yet?

14:37:16     15                    You do?

16                    But you do not concede that it made it

17      from the screen into the bulk memo.

18                    MR. PARKER:  Correct.

19                    THE COURT:  Right.  So that is where the

14:37:23     20      dispute is, and then there is a dispute about the

21      placement -- you did the copying at the first stage.

22      You dispute that it was placed in the bulk memos.  You

23      say -- you concede that 80 percent of the bulk memos

24      were used in the training but you can't say which

14:37:37     25      80 percent.

1       MR. PARKER:  No.  No one can.

2       THE COURT:  But yes, you concede

3   80 percent were used?

4       MR. PARKER:  Of course.  It's in our

14:37:45    5   papers.  No question.

6       THE COURT:  Yes.  All right.

7       MR. PARKER:  Let's go to the headnote --

8   I mean, to the key number system in the bulk memo.

9       So this Court can look at the bulk memo;

14:37:56   10   we have given you an example.  There is no key number

11   referenced; there's no synopsis.  There's no Westlaw

12   content that is -- you can look it, it's not there.  It

13   is a question and an answer.

14       Of the memos:  1,534 contained a legal

14:38:15   15   copy as a file name.  24,000 or 23,000 and something odd

16   have not been.  So the legal topic.

17       THE COURT:  Were the file names or the

18   meta data being used or called or recognized by this AI?

19       MR. PARKER:  No.

14:38:33   20       THE COURT:  No, they were not.

21       MR. PARKER:  And I will tell you how I

22   note that.  There's reference to the classified project,

23   which they claim is an infringement.  We received --

24   ROSS sent to -- I mean.  Sorry.  LegalEase sent to ROSS

14:38:47   25   91 topics, the highest level topics in the key number

1    system.

2                    ROSS reduced it to 38 of its own topics

3    because they were trying to figure out if their error

4    would work, if you could take civil procedure cases and

14:39:08    5    label them as civil procedure cases, not in a key number

6    way, but just say this is a civil procedure case.  They

7    abandoned them.

8                    There is no evidence at all that their

9    legal search engine had any kind of classification

14:39:16    10    process at all, and, in fact, they say it doesn't,

11    that's it; that is the close of the evidence.

12                    We say with evidence it didn't happen

13    that way, and they still want to maintain that somehow

14    this classified project came through, and it just

14:39:32    15    didn't.

16                    THE COURT:  One other question about the

17    80 percent, 20 percent.

18                    MR. PARKER:  Yes.

19                    THE COURT:  You say the 20 percent were

14:39:37    20    set aside for cross-checking.

21                    MR. PARKER:  Yes.

22                    THE COURT:  So they were used at a later

23    stage in the cross-checking.

24                    MR. PARKER:  They were used for training

14:39:46    25    and validation of whether or not the featurization was

1    occurring properly, but in that way, they were used.

2                    THE COURT:  So all hundred percent were

3    used, but 80 percent were used --

4                    MR. PARKER:  No.

14:39:58    5                    THE COURT:  -- upfront and 20 percent

6    later.

7                    MR. PARKER:  No.  There were memos

8    discarded.  I don't know how many; no one knows how

9    many.  It's not in the record.  80 percent of what

14:40:05    10    remained after things were discarded were then used to

11    train 20 percent to use to validate.

12                    THE COURT:  So a hundred percent of what

13    was not discarded was used:  80 percent upfront;

14    20 percent later?

14:40:19    15                    MR. PARKER:  Correct.

16                    THE COURT:  Who talks about what was

17    discarded in the record, and where would we find

18    anything out about it?

19                    MR. PARKER:  Sure.  I don't think that

14:40:26    20    you're going to -- let me see this.

21                    MR. PARKER:  Page 22.  The -- okay.  Late

22    declaration as well as the markets declaration.

23                    ROSS received 500 judicial opinions, and

24    we have already talked about that where ROSS says, we

14:40:59    25    don't want all of this stuff.

1                    Next:  ROSS then extracted the question

2      and answers.  They featureised.  They tore apart any

3      relationship between the questions and the great quotes

4      or any other quotes because they featureised things in a

14:41:17    5      way that they are just talking about world

6      relationships.

7                    I have talked about featurization and I

8      think we've had enough conversation about that, and none

9      of that is disputed.

14:41:39    10                    I think that's -- I think that may cover

11      it.  Do you have any questions?

12                    THE COURT:  No, not at all.  Not for you.

13      I am going to go back to Mr. Simmons now.  Thank you.

14                    Mr. Simmons, what do I do about this

14:41:58    15      unknown numbers of things that were discarded?

16                    MR. SIMMONS:  So it doesn't matter

17      because the copying -- the copying occurred before you

18      even get into the training.  So we can talk about the

19      training.

14:42:08    20                    THE COURT:  On the vicarious, but on the

21      direct liability.

22                    MR. SIMMONS:  No, on direct liability.

23                    As soon as -- all of the memos end up in

24      the CSV file.  All of the memos are in the database.

14:42:19    25                    THE COURT:  Did all of them go to ROSS?

1          MR. SIMMONS:  Yes.  All the -- all the

2     25,000 we've been talking about go over the transom, end

3     up on ROSS's database, end up in the CSV file.

4          THE COURT:  Okay.  Mr. Parker, do you

14:42:34    5     agree?

6          MR. PARKER:  I do.  I just don't agree

7     there is a copyright violation by stating the facts.

8          MR. SIMMONS:  Okay.  The debate you are

9     having is then at the stage of, okay, we got them, what

14:42:41   10     are we doing with them on the system itself, the

11     training of it exact - itself?

12          As Mr. Parker indicated, 80 percent were

13     used to train upfront, 20 percent were used for

14     validation.  So they are all, again, being copied into

14:42:58   15     it, but it doesn't really matter because at this point,

16     all of those questions are already in the ROSS system,

17     they have already been copied over.  So I went on direct

18     infringement at that point.  I don't need to go the

19     extra step and say, and then here are the specific ones

14:43:13   20     that went into the training of the ROSS platform.

21          Even if I did, however, the fact that we

22     have the memos there in the system and the direct

23     evidence that they were used should be enough to get a

24     finding of actual copy.

14:43:28   25          Again, we don't have to prove every

1    single thing; we have to prove more than di minimus use,

2    which we have done.

3                Just a couple of points I had.  One was

4    there was a lot of discussion of what ROSS knew or what

14:43:40    5    people were told.  None of that matters for direct

6    infringement.  This is strict liability.  So knowledge

7    and we didn't want doesn't matter.  LegalEase did it;

8    they're liable.  And ROSS is secondarily directly liable

9    for that result.

14:43:55    10                THE COURT:  There is -- we will talk

11    about infringement later.  That's not -- there's

12    liability, but there is a possible defense over there.

13                MR. SIMMONS:  Maybe -- I mean,

14    infringement, although, the copyright notice means that

14:44:06    15    they don't get one.

16                But in addition to that, the record is

17    replete with examples of ROSS actually wanting them to

18    use Westlaw.  Yes, there is sort of this wink and a nod

19    of don't use it, na, na, na, na.  But you see them

14:44:19    20    giving them Westlaw material over and over again.

21    There's this best practices guide that says, take the

22    headnote and make that into a question.  The idea that

23    people weren't using Westlaw is questionable.

24                And then, just finally, on the key number

14:44:35    25    system.  Again, the metadata and file names copied over,

1    so I don't have to remove the training of it, but in it,

2    I will direct the Court to D.I. -- I think it's the

3    Miranda Means, first declaration, Exhibit 23, which is

4    the Klein report, that talks about how the raking

14:44:57    5    algorithm at Paragraph 11 learns relevancy from the

6    relationship between the questions and answers.

7                    And then at paragraph 14, it talks about

8    how the key numbers were used to make sure they were

9    getting full coverage of all the issues of law.

14:45:13    10                    Because, as you can imagine, it is a

11    search platform.  So the reason you want to make sure

12    you are covering all the things, is, if I know a whole

13    lot about the maritime law and you ask me something

14    about the copyright law, AI might not know anything.  So

14:45:29    15    you want to make sure you are getting full coverage of

16    all the issues.  That's how the key numbers go used in

17    the system.

18                    THE COURT:  Mr. Parker.

19                    MR. PARKER:  There is not a lick of

14:45:40    20    evidence that supports any statement that the key

21    numbers were adjusted into the system.  There isn't.  Of

22    the 25,000 memos, there are legal topics on 1,500.

23    There is literally no evidence that ROSS received a

24    single key number except when they received the 500

14:46:00    25    judicial opinions, and they said, "We don't want it."

1           And the only other is that ROSS received

2       91 topics, and reduced it to 38 of their own topics and

3       then discarded the other.

4           There is no evidence at all that in the

14:46:17    5       training data there were key numbers or the source code

6       has anything in it.  Again, we not only have affirmative

7       statement of that, our expert tried to reverse-engineer

8       to find stuff.  They have access to the source code.

9       They could have come and told you, we found it.  They

14:46:41    10      are just speculating.

11          I think that may be it.  There is one

12      other thing that I wanted to tell you that's on -- I

13      know.  I think I want to be careful about this copying

14      idea.  All right.  Because I think it's two different

14:47:05    15      things.

16          LegalEase's copying, meaning the femoral

17      copy, and that is one set of things.

18              THE COURT:  That's conceded.

19              MR. PARKER:  There is another about what

14:47:22    20      ROSS received from LegalEase.  LegalEase does not admit

21      to copying -- and I'm referencing -- does not admit to

22      copying headnotes to make them into questions.  I have

23      given you that --

24              THE COURT:  Right.  That's where the

14:47:36    25      Court then will have to decide whether to infer or just

1    actual copy.

2                   MR. PARKER:  Yes.  I am just leery about

3    just saying LegalEase copied, and then that sort of ends

4    at a bunch of queries.

14:47:49    5                   THE COURT:  But you also don't dispute

6    what Mr. Simmons says, that the actual copying stage,

7    protectable and unprotectable, too.  It is the

8    substantial similarity, I felt they are only

9    protectable.

14:48:01    10                  MR. PARKER:  Yes and no.  I mean, I think

11    it's careful -- you have to be careful, if the words of

12    the judicial opinion are the same words in a headnote,

13    then you don't know whether the headnote was actually

14    copied, even if you don't filter.

14:48:13    15                  I'm not saying -- we are not arguing

16    whether it's protectable or not.  I'm just saying how

17    you can't infer that LegalEase went to the headnote

18    instead of just the judicial opinion.

19                   THE COURT:  But the argument, based on

14:48:29    20    the Frederiksen-Cross chart reads, when the level of

21    similarity of the bulk memo is more similar to the

22    headnote than is -- the original judicial opinion, the

23    logical inference is this was copied.

24                   MR. PARKER:  If they use the same words.

14:48:47    25                  THE COURT:  Yes.

1          MR. PARKER:  Right?

2               I mean, that's -- the danger is we can't

3     just say the headnote is dissimilar to the judicial

4     opinion, therefore the headnote must have been copied.

14:48:59  5               There are instances where the headnote

6     and the judicial opinion and the question -- I don't

7     even know where they got the question from, and there

8     would be great dissimilarities.  There are those

9     instances.

14:49:11  10               So that's why Barb is making some

11     admission by saying, you know, this doesn't add up, to

12     me.  I can't find the similarity; it doesn't answer the

13     question.  Because literally, the questions are like,

14     who knew?  Who knew?

14:49:28  15               THE COURT:  The Court will examine the

16     chart and make the side-by-side comparisons.

17               THE COURT:  I am going to take a recess

18     now until 3:30.  I hope that the parties can get the

19     paralegals together and agree upon which sharks have the

14:49:45  20     relevant three columns in them, because there seems to

21     be disagreement about what I thought I saw with my own

22     eyes, and maybe we are looking at different documents

23     and different D.I.'s, but let's get on the same page

24     about that.

14:50:00  25               We'll come back at 3:30, and we'll cover

1     Topics -- Question 7.  We will cover a few miscellaneous

2     issues kicking around, and we will cover some trial

3     management.  And then I will confer and figure out, you

4     know, are we going to reconvene tomorrow?  What

14:50:18     5     follow-up issues there are if we do reconvene tomorrow.

6                    MR. SIMMONS:  Your Honor, if I can just

7     -- before you leave, I had mentioned Exhibit 23.  That

8     is actually the Branting declaration, that's their

9     expert.  You can see the system we were discussing

14:50:33     10     earlier.

11                    THE COURT:  In terms of the metadata.

12                    MR. SIMMONS:  In terms of use of the key

13     numbers to confirm that they were getting full coverage

14     of the practices.

14:50:41     15                    THE COURT:  That they were getting full

16     coverage.

17                    MR. SIMMONS:  Yes.

18                    THE COURT:  All right.  We'll recess

19     until 3:30.

14:50:43     20                    THE DEPUTY CLERK:  All rise.

21                    (Recess.)

22                    THE COURT:  Before we proceed to question

23     7, was there anything specifically about the comparison

24     notes on which charts included which column and the

16:34:03     25     like?

```
 1                    MS. CHANG:  Good afternoon, Your Honor.

 2         Yungmoon Chang on behalf of plaintiffs.

 3                    So at the Court's direction attorneys

 4         conferred during break and I'm happy to report that ROSS

16:34:13    5         agrees that two of the exhibits that were cited on the

 6         record do contain the information requested by the

 7         Court.  Specifically docket 678,21.  This was the

 8         exhibit that my colleague Mr. Simmons referenced that he

 9         had examined Ms. Barbara Frederiksen-Cross during

16:34:34   10         deposition.

11                    THE COURT:  Ms. Frederiksen-Cross 2830

12         headnotes, correct?

13                    MS. CHANG:  That's correct, Your Honor.

14                    THE COURT:  And that is different from

16:34:45   15         the various exhibit Bs on or exhibit Ds.

16                    MS. CHANG:  Correct, Your Honor, however,

17         the parties do also agree that appendix B to the

18         supplemental Krine report also contains the requested

19         information which is the judicial opinion, the headnote

16:35:00   20         and the memo question.  So that's docket entry 690-6

21         through 11.  That's that large 6-piece file.

22                    THE COURT:  Yes, that is the 6 pages of

23         the spreadsheet.

24                    And what's the number of headnotes in

16:35:16   25         that one?  Is the entire universe of the 25,000?
```

1          MS. CHANG:  That's correct, Your Honor.

2          So what we're happy to do for the Court,

3    if the Court would like, is to provide native Excel

4    versions of those spreadsheets.

16:35:32   5          THE COURT:  I want you guys meet, confer,

6    agree this is the same as those items that are already

7    in the record.  It's just in a native Excel format

8    rather than a pdf or paper format.  And the parties can

9    get the paralegals together and submit that.  That would

16:35:49  10    assist given the volume of headnotes here.

11          MS. CHANG:  We are happy to do that,

12    Your Honor.  Thank you.

13          THE COURT:  So who's handling question 7?

14          MR. SIMMONS:  Me again, Your Honor.

16:35:59  15          THE COURT:  Mr. Simmons.

16          MR. SIMMONS:  Your Honor, may I begin.

17          THE COURT:  Yes.

18          MR. SIMMONS:  Rule 54 B is entirely

19    consistent with the law of the case doctrine.  There is

16:36:25  20    no question that under Rule 54 B the Court has the power

21    to revisit its prior rulings.

22          As Your Honor is aware the rule itself

23    says that any order or decision that adjudicates few

24    than all the claims does not an exempt in the action as

16:36:38  25    any of the claims can be revisited at any time before

1    judgment on the claims.

2                     What the law of the case doctrine does is

3    the Supreme Court in Christianson versus Colt Industries

4    explained, is provide a rule of practice for when a

16:36:54    5    Court exercises its discretion that would promote

6    finality and efficiency.  That's 486 U.S. 800 at 8916.

7                     In re: Pharmacy Benefit Managers

8    antitrust litigation, the Third Circuit emphasized the

9    importance of maintaining consistency and avoiding

16:37:12    10    reconsideration of matters once decided during the

11    course of a single continuing lawsuit.  That's 582 F3d

12    432 at 439.

13                     Now, this applies to both conclusions of

14    law and findings of factual findings as noted in

16:37:30    15    Kagerise versus Susquehanna Township School District.

16    That's 325 F.supp 3d 564 at 589.

17                     Thus, for example, this Court previously

18    concluded that loss actual copying at a prior opinion

19    and that copyrighting the com piliation extends to the

16:37:50    20    copy writable pieces of that compilation.  That's the

21    opinion at 5.

22                     Given that the parties proceeded to trial

23    and briefed summary judgement, with those holdings in

24    mind it would be the epiphysis of finality to reconsider

16:38:01    25    those now.

1              That being said, it is not to say the

2     Court can't reconsider things in its prior ruling.  The

3     Third Circuit in Pharmacy Benefit articulated when rules

4     could be reconsidered under that rule of practice.

16:38:15    5              The two most clear examples are Ruten

6     Kristen which afforded them as extraordinary

7     circumstances.  Those are decisions clearly erroneous

8     from where they would manifest injustice.  That's at

9     816.

16:38:29    10             But the Third Circuit also recognizes

11    when new evidence is available or a law has been

12    announced.  That's Pharmacy Benefit at 582 F3d at 439.

13             And, finally, the trial judge, and I'm

14    quoting here, is not precluded from clarifying or

16:38:46    15    correcting an earlier ambiguous ruling or reconsidering

16    an issue when it appears a previous ruling even if

17    unambiguous might lead to an unjust result.  That's

18    again Pharmacy Benefit 439.

19             So here the Court shouldn't change the

16:39:01    20    issues that were conclusively decided but where the

21    Court left things open or was otherwise thinking that it

22    would be a better course to change them, you still have

23    the power to reconsider.  It's just a question of how do

24    you exercise your discretion to do so.

16:39:15    25             THE COURT:  All right.  So that makes

1   more sense that you recognize ultimately it's a matter

2   of discretion and there's guidance as to that

3   discretion.  I was a little puzzled by the way ou

4   phrased it in your reply brief at pages 7 and 8.

16:39:29   5   Protectabiliy, actual copying of the table, whereas you

6   asked for summary judgment on issues that decided unfair

7   use, issues that I decided to leave open.

8              So is your only response or your main

9   response that on the stuff I left open you can ask me to

16:39:44   10   reconsider, but the stuff that I took off the table I

11   have discretion on but you say the guidance is I

12   shouldn't likely go back on the way that I decided it

13   earlier.

14              MR. SIMMONS:  So the answer is you have

16:39:58   15   the power to do whatever Your Honor would like to do.

16   In terms of how to exercise that discretion consistent

17   with the law of the case doctrine what we would say is

18   for the issues that you conclusively decided, in other

19   words, essentially granted summary judgment on, which

16:40:09   20   were just those narrow issues, that we think should be

21   done.  That should be law of the case.  But as of things

22   where you said well, we're going to go to trial, I think

23   we'll see what the contours are as we get closer, fair

24   use being a great example of that, those should still be

16:40:26   25   on the table because you never conclusively decided as a

1    matter of law or a matter of fact those issues you

2    didn't grant summary judgment on here.

3                    THE COURT:  Thank you.

4                    Mr. Parker.

16:40:37    5                    MR. PARKER:  I feel doubly at a loss here

6    for this reason, two cases were just cited.  I don't see

7    those cases in the reply brief, which raises this other

8    argument that it's raised in the reply brief.  It's

9    waived.  There is a Third Circuit case 379 Fed --

16:41:04    10                    THE COURT:  The first time in the reply

11    brief is not proper --

12                    MR. PARKER:  Correct.  I sent to you an

13    unpublished opinion only because that one is where the

14    Court -- the Third Circuit reversed saying you can't

16:41:17    15    consider an argument already raised.  Now I feel at a

16    loss here myself because I think I just heard two new

17    cases --

18                    THE COURT:  Mutually.  Is there a

19    procedure impediment to my revising any part of my

16:41:32    20    prior --

21                    MR. PARKER:  No.  No.  No.  Rule 54(b)

22    says you may -- your decision may be revised at any time

23    before entry of judgment.

24                    THE COURT:  That's how I read it.

16:41:40    25                    MR. PARKER:  Runyan, Williams vs. Runyan,

1   says, "Although it is often said that the law of the

2   case doctrine does not limit upon the trial court from

3   reconsidering the appellate decisions, this Court has

4   considered to" -- "credential consideration.  The Court

16:41:54   5   must explain the reason behind its decision" -- you did

6   it -- "the Court must take appropriate steps so the

7   parties are not prejudiced in reliance."

8          There are other Third Circuit cases that

9   say the same.  I have to also say this:  I find this a

16:42:10   10   bizarre moment because the original ruling of this Court

11   was to deny summary judgment.  I have no idea what it

12   means to be open or closed.

13          You made a decision on summary judgment.

14   To me, that would have meant, back in September 2023,

16:42:25   15   you can't reopen.  I am not making the argument you

16   can't reopen.  I'm just saying, if you really believed

17   you can't reopen, then there is no reason to stop in

18   August of 2024.  You have to go back to September 2023.

19          And there is nothing that says open and

16:42:41   20   close and denial of summary judgment.  I don't

21   understand that.  That fancy -- that is a pretty fancy

22   argument to weave through what happened.

23          And so I'm done.  I just think if you're

24   going to do this, then we're going back to

16:42:56   25   September 2023, and I will be -- that it was better off

1    then than it was.

2                    THE COURT:  Got it.  All right.  I don't

3    see that we need any back-and-forth on this.

4                    MR. SIMMONS:  No, Your Honor.

16:43:08    5                    THE COURT:  Okay.  Couple more questions.

6    First of all, we've talked in shorthand about this being

7    kind of like liability versus defenses and damages, but

8    my understanding is -- now I didn't ask you to move on

9    and I know you did move on tortious interference, but

16:43:33    10    that is a claim that is still open, and presumably would

11    need to be tried.

12                    Mr. Parker, is that your understanding?

13                    MR. PARKER:  You told us not to move on

14    tortious interference.  And, yes, that would still need

16:43:45    15    to be tried.

16                    MS. CENDALI:  Yes, and we discussed that

17    Thursday Zoom pretrial or whatever, that hearing, that

18    the tortious interference would still need to be tried.

19                    THE COURT:  Okay.  So that's the first

16:43:57    20    thing I wanted to clarify.

21                    Second, Ms. Cendali, innocent

22    infringement.  Does it matter that the bulk memos didn't

23    bear Westlaw's copyright notice?

24                    MS. CENDALI:  It -- my partner, Ms. Chang

16:44:13    25    will cover that.  Thank you, Your Honor.

                    MS. CHANG:  Your Honor, the question is

whether it matters that the bulk memos for the copyright

notice or not.  And the answer to that is, no, according

to the plain language of the statute.

16:44:34            So directing the Court to 17 U.S. Code

Section 401(d), what the section specifically states is

that, "If a notice of copyright in the form and position

specified by this section appears on the published copy

or copies to which a defendant...had access..."

16:44:51            Here, it is undisputed that defendants --

eventually, the defendant was able to obtain limited

access to Westlaw.  And there are documents showing that

there is no dispute of fact they, in fact, had printouts

from Westlaw bearing the copyright notice.

16:45:08            I would also direct --

                    THE COURT:  But there is this issue that

they had printouts of the 500 opinions, but the

headnotes and the key numbers are being claimed

separately and those are the items claimed to have been

16:45:23   infringed.

                    MS. CHANG:  And to clarify, Your Honor,

what the statute requires is that the work itself bear a

copyright notice.  The statute doesn't say anything

about having the constituent elements -- so involved in

16:45:36   that second step of copyright infringement -- the

1    statute does not require that the constituent elements

2    that are being excused of copying, that every single one

3    of those bear a copyright notice.

4                    Indeed, that requirement would run afoul

16:45:50    5    of what the plain language of what the statue really

6    says.

7                    And, Your Honor, I'd also direct the

8    Court, there are statements in ROSS's opposition where

9    they admit that Westlaw does bear a copyright notice and

16:46:03    10    that every printout from Westlaw bears a copyright

11    notice.

12                    Additionally, Your Honor, it's not just

13    the cases that they had that -- that had that copyright

14    notice, there were actually search result printouts that

16:46:15    15    bore the copyright notice, and those were circulated

16    internally.  I don't want to reference any of the names

17    for confidentiality reasons, but this is laid out in our

18    reply brief on page -- I believe it's 18 and 19.

19                    THE COURT:  Okay.  Does Mr. Parker or

16:46:41    20    anyone else want to respond to Ms. Chang's factual or

21    legal?

22                    MR. PARKER:  So much of their argument is

23    based on activities that occurred after the bulk memo

24    project and are not identified as infringing.  Receiving

16:47:01    25    something in the mail which you say, I don't want this,

```
 1    is actually -- I don't --

 2                    THE COURT:  The receipt of the 500

 3    opinions, that was before the bulk memo project,

 4    correct?

 5                    MR. PARKER:  It was at the end of the

 6    bulk -- I actually don't know that -- the timeline.  It

 7    was at some point in the process.  But, again, they

 8    weren't used and they were returned.  I don't know how

 9    you -- receiving and saying, I didn't want this and I

10    don't want this.

11                    Also, the copyright is -- and it

12    repeated -- I think it ends, the copyright does not

13    cover government works.  So my clients believe they're

14    receiving judicial opinions.

15                    That is not evidence that it is a

16    copyright because the copyright doesn't extend to those

17    judicial opinions.

18                    THE COURT:  Right.  The tricky thing

19    about Westlaw is at the bottom of the page it says

20    copyright, but this has no claim to who has covered the

21    works.

22                    MR. PARKER:  Exactly.

23                    THE COURT:  Ms. Chang, do you want to say

24    anything further?

25                    MS. CHANG:  I would just like to clarify
```

16:47:11 (line 5)
16:47:26 (line 10)
16:47:45 (line 15)
16:47:52 (line 20)
16:48:07 (line 25)

1    this for the Court.  The appropriate inquiry for

2    innocent infringement isn't about whether the defendant

3    actually received the notice.  The plain language of the

4    statute is clear.  It's whether the published work

16:48:26    5    itself had a copyright notice.  That's not disputed

6    here, Your Honor.

7                THE COURT:  Okay.  Anything further on

8    that, Mr. Parker?

9                MR. PARKER:  No.

16:48:33    10                THE COURT:  Very good.

11                Let's talk about the key numbering system

12    in the fair use analysis.  I don't know is Ms. Cendali

13    wants to speak to this.

14                There is a whole lot of briefing, and the

16:48:45    15    focus of both sides is primarily on the headnotes.  Is

16    there anything unique about the way the key numbers were

17    used that bears on the fair use analysis?

18                MS. CENDALI:  The fair use analysis is --

19    we were not intending to in any way limit or say that

16:49:12    20    fair use should have some special lesser or greater with

21    regard to the headnotes.  The West Key Number System is

22    a key part of our copyright, which as you heard

23    Mr. Simmons describe was what was walked through to get

24    the headnotes, to get the questionnaire and some

16:49:35    25    pairings, but also to get coverage of the -- to make

1    sure that ROSS was replicating us in getting full

2    coverage.

3              That is the -- one of the hearts of our

4    work that people know of us for, the West Key Number

16:49:52    5    System.  So therefore, when you look at the different

6    fair use factors, all the different arguments with

7    regard to the West Key Number System, are even stronger,

8    the least bit strong, especially when you talk about the

9    nature of the work that is a incredibly innovative,

16:50:14    10    ever-changing taxonomy.

11              And that is -- that's what I want to back

12    to something that's a big factor too.  Part of the

13    reason Factor Two is, which in our view, is that we win,

14    is that the nature of the work is why they copied it.

16:50:28    15    In other words, you know, sometimes people copy for

16    other reasons and the nature of the work isn't as

17    important because -- because, you know, it's kind of the

18    tail wagging the dog.

19              But here, the nature of the work is why

16:50:42    20    they copied it, because they wanted those pairs, they

21    wanted to take advantage of the West Key Number System,

22    and those pairs populate those relationships.

23              THE COURT:  Got it.

24              Mr. Parker, would you like to respond?

16:50:54    25              MR. PARKER:  You know I do.

1           So first, I'm not even sure that there is

2      an infringement claim on the key numbering system at all

3      as to ROSS.  We can just start there.  They don't appear

4      in the memos, they don't appear in the metadata.  When

16:51:18   5      they keep talking about coverage.  In Krein, they have

6      5,000 --

7           THE COURT:  The key numbers themselves

8      don't, but the phrases associated with key numbers,

9      don't they show up in the metadata.

16:51:31  10           MR. PARKER:  No.  I mean, here is the

11     difficult part, one of the key numbers is civil

12     procedure.  I mean, we use that.  You can't help but use

13     it.  Another is criminal law, another is administrative

14     law.  To say that you can't use those terms because they

16:51:47  15     are the key number system...

16           THE COURT:  Got it.

17           Now, Mr. Simmons was saying, Well, the

18     key number system structured the way they did their

19     searches to make sure they covered all the subparts and

16:51:59  20     the subquestions.

21           MR. PARKER:  I got you.  There are 5,473

22     headnotes associated with key numbers that they claim

23     infringe.  That's another 21,000.  Once you get rid of

24     all the -- it's 5,473 key numbers associated with those

16:52:18  25     things.  In total, there are 100,000 key numbers.

1    That's it.  I mean, far from trying to replicate, you

2    can't replicate by having less than 5 percent of the

3    entire key number system.

4              And if you look, they're all in the Krein

16:52:37    5    exhibit, and -- that the reference is to our ROSS motion

6    at page -- I think I put 7.  It doesn't come close to

7    covering the 140-some-odd topics.  It does not come

8    close to drilling down into any one particular topic.

9              So it is -- it is -- and, again, when you

16:53:06    10    look at output, there is no key number system.  None.

11    And the cases aren't organized by what type of case they

12    are.  There is no evidence that when you did a query

13    somehow these cases were organized in some fashion that

14    would even come close to replicating the key number

16:53:31    15    system.  Just nothing.

16              So from a fair use analysis, even if you

17    assume that somehow there were 5,473 key -- key numbers

18    somehow associated -- which our clients didn't see,

19    didn't have.  You can look at the questions and the

16:53:49    20    memos, and I would challenge anybody to say, find me the

21    headnote that this is associated with.  Because also,

22    the headnotes and the key numbers, they get really

23    finely grated down.  I mean, it's not just three

24    numbers, it's, you know, one with a key, and then 5-875.

16:54:13    25              No one is going to know how to work

1    backward in time without having the actual headnote.

2    There is no evidence we had the actual number.  So

3    that's what's confounding to me a little bit about

4    this --

16:54:21    5    THE COURT:  No, I get it.  If I were

6    Ms. Cendali, I would respond, the test isn't that you

7    would be able to reverse engineer something, the

8    question is are you learning something about the

9    relationship between the headnote and the text that it

16:54:37    10    refers to, or the question and the answer.

11    MR. PARKER:  I think they are two

12    different things.  The first is to respond that we are

13    trying to replicate the entire key number system, and

14    that is literally impossible given the facts of the

16:54:49    15    case.

16    THE COURT:  It's not.  Okay.

17    MR. PARKER:  The second piece is, we did

18    not use the key number system.  That's not our output.

19    We don't use the materials at all.  So even if somehow

16:55:00    20    you want to say we tried to figure out a way -- I don't

21    know how you do that when you don't have everything to

22    relate back to -- you don't have a coherent structure.

23    That is all ripped out in the featurization.

24    These aren't just extra strange words,

16:55:21    25    but -- when they're asking what the question and answer

1    is, again, we're going back to some idea that there was

2    a link, and there is literally no link.  And by the time

3    you're done, the link is completely eliminated between

4    answer and question, which then confounds how is that a

5    key number system, and if the key number system would

6    help you in any way.

7                     That's the argument.  And we're talking

8    fair use so you do look at the final result and you

9    said, Okay, I don't see anything here.

10                    THE COURT:  Okay.

11                    MS. CENDALI:  May I respond?

12                    THE COURT:  Yes.

13                    MS. CENDALI:  Two points.  My friend

14   mentions that, Oh, well, we use criminal law or

15   something like that.  The 25,000 memos are far more in

16   detail than just criminal law and civil procedure, all

17   of which copy and all of which came from the key number

18   system.

19                    You heard Mr. Simmons say that's what

20   they did, they walked through the West Key Number

21   System.

22                    But the question on fair use isn't

23   infringement, what was copied, but what was the purpose

24   of it.  And I go to their own expert, Mr. Branting, at

25   Exhibit 23 of the first Means declaration.

                    And what he said in paragraph 14 is, "The

purpose of developing a large training set was to ensure

that the ranking algorithm is trained on better and

worse answers to a full range of representative" --

question mark twice -- "questions in different areas of

law are often expressed using different language so this

diversity of language and expression can be achieved by

developing questions for diverse cases, as done by

ROSS."

                    When you read Exhibit 23, he admits that

the West Key Number System that was being used is part

of the training.  And I think that -- I'm getting a

little bit concerned about, again, losing the forest for

the trees, like Mr. Parker mentioned, again, oh, well,

featurization.  That is, like -- means nothing.  What

matters is what the purpose was for the copying.

                    You can't blind the Court by science.

And if it meant nothing, then the whole purpose of why

they trained, it's inconsistent.  The whole point is

they wanted these pairs.  They said they wanted these

pairs.  That's the whole purpose of the training.

                    So if they're really standing here

saying, "Well, he just took everything apart, it meant

nothing," that's not consistent with their experts said,

what their fact witnesses said, or what they said their

1    purpose was.  This wasn't a situation of learning about

2    language.  This was trying to figure out how to answer

3    legal questions by copying Westlaw's editors.

4                THE COURT:  Anything further?

16:58:22    5                MR. PARKER:  Yes, briefly.

6                I think there are -- let's just start

7    with purpose, because it's a bit confounding.  We

8    certainly needed to know what the language of the law

9    was.  We needed to know the good, the bad, and the

16:58:45    10    indifferent.  So every memo did not just simply match a

11    great question to a great answer.

12                And the paragraph 14 that was just read

13    establishes just that.  We needed to have bad answers

14    and good answers; and none of these answers were mapped.

16:59:02    15    Why did we go to a legal vendor to create memos?

16    Because we needed legal memos to create.  We did not ask

17    them -- we are going back -- just to use Westlaw, we

18    asked, Can you use Lexis, Westlaw, or in some reputable

19    source.

16:59:19    20                So the purpose here -- and this is the

21    key because the purpose was not to suck in the entire

22    key number system, because that didn't happen.  It just

23    didn't happen.

24                The purpose was to get a question, to get

16:59:36    25    judicial quotes, some of which were good -- I mean some

1    of which were great, but the vast majority were not

2    great.  Of the 150,000 different quotes, 125,000 were

3    not great quotes.  So there's not -- it wasn't mapping.

4    And, again, when you look a lot what they received

17:00:02    5    then -- I mean, you can look at the topics and see that

6    they're by no means extensive; 5,000 out of a hundred

7    thousand topics is by no means extensive.  It is not

8    replicating Westlaw.  It truly is not.

9                THE COURT:  Okay.  Thank you.

17:00:18    10                So I have one more question about citing

11    sealed documents.  We have a sealed joint pretrial

12    order.  It attaches a list of uncontested facts, D.I.

13    619-1.

14                Can the parties get together and provide

17:00:41    15    a redacted version of that?  You know, I am not

16    intending to go and quote the names -- you've been

17    careful during this hearing to avoid naming particular

18    lawyers, particular vendors, et cetera.  It's not that

19    kind of thing I want to cite it for.  But there's a

17:00:58    20    number of facts, the uncontested facts, just to help lay

21    out the story, explain to you and the public and the

22    Court of Appeals and everybody else what was going on.

23                Can the parties both work together to

24    provide a -- something such that the bulk of these items

17:01:14    25    is visible and only portions are redacted, or otherwise

```
 1    discuss with me how I might use some of these

 2    uncontested facts in my summary judgment?

 3              MR. PARKER:  We are going to opt for Door

 4    Number 1, at least on this side of the table, and

 5    discuss either redact or completely unconfidentialize

 6    certain of the claims, but we can work together.

 7              MS. CENDALI:  We are obviously happy to

 8    do that, Your Honor, but sometimes what judges do --

 9    just for you to think about, is sometimes they'll issue

10    an opinion to the parties --

11              THE COURT:  And offer the opportunity for

12    redaction.  And so, look, that is an option.  I don't

13    think I'm even going to need to go there in a step.  I

14    think it will simplify things if you guys could try --

15              And I -- I've got an obligation to look

16    out for the First Amendment right as that with regards

17    to the public --

18              MS. CENDALI:  And I can't dispute that.

19              THE COURT:  Right.  So why don't you two

20    work together, come back to me, you know, ten days, with

21    a proposed, here is the stuff in here that we really

22    think needs to remain under seal.  There will be a

23    version of it filed under seal, there will be a redacted

24    version that's public.

25              I'll see -- it isn't likely that I can
```

17:01:32 (line 5)
17:01:47 (line 10)
17:02:04 (line 15)
17:02:14 (line 20)
17:02:27 (line 25)

1    write the whole opinion using the redacted version.  If

2    there are portions otherwise then I would provide the

3    usual, here is a version released under seal, you guys

4    have 14 days to propose redactions to it.  I am trying

17:02:43    5    to move the case along so I think that would be helpful

6    if you could work on that.

7                    MS. CENDALI:  And that's fine,

8    Your Honor.

9                    And to be clear, we were erring on the

17:02:51    10    side of caution in not naming names, but I think that

11    our particular view is there's -- the movers and shakers

12    name names.  I think that they are already in the

13    complaint and public knowledge, and I think that would

14    be fine in the judicial opinion.

17:03:10    15                    THE COURT:  Okay.  If you guys can agree

16    upon that.  I mean, I tend to agree.  The bulk of this

17    stuff can be figured out from the complaint.  I have no

18    reason -- I avoid dragging in or sharing people in the

19    opinions, it's just distracting.  There ought to be a

17:03:27    20    way to do this that allows me to tell the basics of the

21    story that I need to in order to set stage.

22                    Okay.  Logistics of trial.  We will hold

23    the May 12th week as firm.  The only problem with the

24    week of May 5th sounds like the unavailability of your

17:03:48    25    expert.  So my hope is that we can schedule a pretrial

1    conference.  The dates leading up to the trial that

2    involve, you know, a Zoom conference going over jury

3    instructions and motions in limine and things, and then

4    some kind of in-person meeting sometime during the week

17:04:09    5    of May 5th to hammer out the last-minute things that

6    happen.

7              So I ask that you -- let's get some dates

8    on the calendar for these things and hold them in your

9    busy schedules.  It sounded like March was busy but we

17:04:23    10    were all able to find some time in early April before we

11    get into the Easter/Passover week for pretrial

12    conference, and then hold another date a few business

13    days before the trial actually starts for something in

14    person in Delaware.

17:04:40    15              So propose some dates, propose a schedule

16    that -- of what that will look like.  Obviously, this is

17    all on the assumption there is a trial.  But it's better

18    to be prepared because your schedules and mine fill up

19    so early, get so busy, better to put markers down now.

17:05:00    20              Unless I grant summary judgment to ROSS,

21    we are going to have a trial on something and let's talk

22    about making that trial manageable for a jury.  Again,

23    just looking down the road, it is not going to be in the

24    opinion, but it is the kind of thing to start thinking

17:05:16    25    about because I am going to try to hustle this opinion

1    out in January in plenty of time for the parties to gear

2    up.  And if they decide they want to proceed to trial,

3    they have that right to do, and we will do it on this

4    schedule.

17:05:31    5         I am not going to grant continuances or

6    delays.  We will try it May 12th.

7         Thomson Reuters is asking me to grant

8    summary judgment on copyright direct infringement on the

9    premise that a subset of the total headnotes in the case

17:05:44    10    clears the administrative threshold.  So what I want to

11    know is, if I did that, what will the trial look like?

12         Is Thomson Reuters going to be seeking

13    damages on a compilation copyright theory instead of on

14    an individual headnote basis?  We had a little bit of

17:05:58    15    discussion on damages models here.  Is that right?

16         Are we going to be getting into per

17    headnote?  You know, I heard something different from

18    Mr. Parker than I heard from Thomson Reuters.

19         And does either side think the jury is

17:06:15    20    going to still need to make determinations on individual

21    headnotes for damages purposes?  So we're going to have

22    some, okay, there's partial summary judgment on some

23    liability, but there is going to be, in essence, further

24    liability determinations both on tortious interference

17:06:29    25    and on whatever headnotes were not resolved as a matter

1    of law in the summary judgment opinion.

2              And if we do that, are we going to batch

3    the headnotes in some way?  I have not gone and looked

4    at the Docket D.I. 690, these sheets 6 to 11.  Batching

17:06:46    5    them those ways, batching them in other ways.

6              I would like to hear from someone on the

7    Thomson Reuters team what your approach is to these

8    questions, and then let me hear from someone on ROSS's

9    team and maybe we can figure out what is agreed upon and

17:07:03    10    what you guys need to meet and confer about and where

11    you affirmatively disagree about at this point in time.

12              MS. CENDALI:  Your Honor, to suggest it

13    maybe would be easier for us to do that because I don't

14    think any of us have really come to full terms on this

17:07:20    15    until we see Your Honor's opinion, and maybe it makes

16    sense for once we see the opinion to kind of work out a

17    plan with ourselves and with you as to how to do that.

18              THE COURT:  All right.  You have a big

19    trial in March but you would think that if I got you an

17:07:40    20    opinion in January that there been plenty of time for

21    both sides to meet, confer, hammer out a schedule in

22    February such that we would look ahead 3 months to May.

23              MS. CENDALI:  Absolutely.  It's in

24    everyone's interest.

17:07:54    25              THE COURT:  Mr. Parker.

1          MR. PARKER:  Agreed.  My head exploded

2     when you asked those questions.

3          THE COURT:  All right.

4          MS. CENDALI:  I join in Mr. Parker's

17:08:09    5     statement.

6          THE COURT:  All right.  Well, that makes

7     sense.  Let's take a recess of 5 to 10 minutes.  I need

8     to confer a little bit and think about what additional

9     items I have, whether we need to reconvene tomorrow or

17:08:32   10     not.  So let's recess.

11          MS. CENDALI:  For what it's worth,

12     Your Honor, as you think, obviously we cleared these

13     days to be here with you, but Mr. Parker and I did agree

14     on one thing which is since none of us live in

17:08:48   15     Philadelphia, if we're able to get things done today, we

16     would prefer it.

17          THE COURT:  You would both prefer that,

18     even if I if need to hold open the possibility that

19     oops, let's do a zoom or something else tomorrow for

17:09:01   20     some loose ends.

21          MS. CENDALI:  Well, we will do whatever

22     you would like, but clearly we could do that or whatever

23     Your Honor would like.  That's our preference.

24          THE COURT:  Very good.  Let me consider

17:09:12   25     what we can do.

                    (Brief Recess.)

                    THE COURT:  We can let you go home.  I'm

sure there are going to be some -- you are going to get

me some of the spreadsheets in electronic, native, Excel

17:10:51   format.  There are going to be some documents when there

was a reference to such and such, what does that D.I.

translate into.  A lot of that can be done by e-mail.

If there's a need to do some of it by zoom we can.  But

I think we should just wrap it here and the Court will

17:11:11   get hard at work.

                    Because I think the sooner I can get you

an opinion -- and as I said I don't think it's realistic

to get the whole thing out in December, but I think I

can get you something in January, not at the very end of

17:11:25   January, I am going to shoot for the middle of January,

in time such that I will expect you to come back with

some concrete proposals in early February about what the

next steps are.

                    But I also am going to need from you --

17:11:43   what were the other action items?  Excel, can we get

those in 7 to 10 days?

                    MS. CENDALI:  You should -- in the best

senior partner's statements you should get that by

tomorrow, Your Honor.

17:12:02                    MR. PARKER:  Best seated partner

1    statement Crinesha will be the one who approves or not.

2                    THE COURT:  That's great.  You guys are

3    going to agree upon some dates that we are going to hold

4    for a Zoom pretrial conference in April and in-person --

17:12:20    5    the 2 days -- what would that be May 8th, 9th, something

6    like to before the trial itself starts because I find it

7    is helpful to wrap up as many loose ends so that when

8    we're picking the jury and all that we hit the ground

9    running.

17:12:39    10                    So I would hold -- are the 8th and the

11    9th the Thursday and Friday of the week before trial?

12                    MR. SIMMONS:  Yes, Your Honor.

13                    THE COURT:  Okay.  So let's hold both of

14    those on the calendar.  We could consider there is the

17:12:52    15    possibility of doing jury selection on the 9th.  There

16    is the possibility -- if they're held on people's

17    calendars we can -- we will have some estimates after

18    the opinion comes out, is there a trial.  If there's a

19    trial what issues are on the table for the trial.  What

17:13:08    20    is the proposal of how many trial dates are required?

21                    We will at that point engineer how is

22    this going to work, how is it going to sequence, how is

23    it going to fit into the ability of the experts,

24    et cetera.  All right.  Very good.

17:13:19    25                    By the way, I want to commend you all.

1    You have been very well prepared.  There's a lot of

2    paper.  There's a lot of filings in this case.  You

3    marshaled them very well.  There's been a big team

4    effort.  I think we see of course the glory that Mr.

17:13:36    5    Parker and Ms. Cindali have the lead roles here but all

6    the lawyers, the paralegals, the secretaries, the Court

7    expresses its gratitude to you all for a job well done.

8    And whatever happens here it's not going to be because a

9    lack of preparation, it's going to be because you teed

17:13:55    10   up the best arguments on both sides here to help the

11   Court.

12           And you very wisely you have avoided the

13   trap.  So let me say this in the presence of the

14   clients.  There are clients who think they want their

17:14:08    15   lawyers to be pit bulls and fight every last footnote

16   and every last thing and I will tell you that your

17   lawyers have done you a great service by not squandering

18   the credibility on side issues and tertiary things

19   because that is penny wise pound foolish approach.  And

17:14:27    20   the amounts that you are paying your lawyers for their

21   services have been well-spent in terms of good

22   disconcerting judgment and strategy, tactics on what to

23   focus on and the Court is grateful for it.

24           And with that said we will adjourn.  And

17:14:42    25   as I said I ask the parties to work together, split the

1    if cost, get the Court a transcript.  It will be

2    important for us to get going.

3                   MS. CENDALI:  Thank you, Your Honor.

4    Thank you for so much time today.

5                   C E R T I F I C A T E

6

7        I certify that the foregoing is a correct

8    transcript from the record of proceedings in the

9    above-entitled matter.

10

11

12                   /s/ Kim L. Haley, CSR, CRR, RPR
                     12/6/2024

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 204:12

## 0

**02116** [1] - 2:7

## 1

**1** [10] - 9:1, 10:18, 11:1, 76:15, 90:19, 93:25, 155:1, 155:7, 156:4, 195:4
**1,000** [3] - 114:5, 118:13, 119:14
**1,161** [6] - 118:24, 119:16, 136:16, 142:14, 142:19, 142:25
**1,500** [1] - 170:22
**1,534** [1] - 164:14
**1,623** [1] - 136:2
**10** [7] - 21:13, 21:17, 73:15, 95:3, 95:5, 200:7, 201:21
**10-page** [1] - 91:9
**100,000** [1] - 188:25
**1001** [1] - 2:22
**10022** [1] - 2:5
**1051** [1] - 152:15
**1064** [1] - 152:15
**1068** [1] - 67:7
**1079** [1] - 67:8
**10:00** [1] - 1:12
**11** [12] - 95:3, 95:5, 116:4, 116:23, 144:5, 144:6, 144:15, 152:24, 157:21, 170:5, 175:21, 199:4
**1148** [1] - 72:5
**1153** [1] - 72:5
**11th** [2] - 5:14, 7:16
**12** [1] - 21:24
**12(b)(6** [1] - 139:18
**12.10** [1] - 137:6
**12/6/2024** [1] - 204:12
**1201** [1] - 1:18
**1219** [1] - 70:5
**1226** [1] - 70:6
**125,000** [1] - 194:2
**1288** [1] - 121:6
**129** [1] - 24:15
**12th** [9] - 4:23, 6:8, 6:9, 6:11, 6:24, 7:3, 7:18, 196:23, 198:6
**13** [7] - 42:2, 56:8, 89:4, 94:11, 105:20, 151:25, 154:1

**130** [1] - 24:15
**1305** [1] - 121:6
**1306** [1] - 121:7
**1313** [1] - 2:15
**132** [1] - 131:15
**1339** [1] - 83:8
**1347** [1] - 1:19
**1360** [1] - 83:8
**1366** [1] - 131:17
**14** [9] - 41:2, 89:4, 105:21, 114:11, 114:15, 170:7, 192:1, 193:12, 196:4
**140-some-odd** [1] - 189:7
**14th** [1] - 5:15
**15** [2] - 40:23, 73:18
**150** [1] - 131:15
**150,000** [2] - 22:22, 194:2
**15th** [1] - 6:4
**16** [8] - 16:18, 21:12, 28:8, 29:3, 42:3, 51:23, 56:9, 137:12
**16,000** [2] - 109:18, 146:3
**167:2** [1] - 56:8
**168:20** [1] - 56:9
**17** [2] - 121:1, 183:5
**17th** [2] - 5:15, 7:17
**18** [2] - 55:3, 184:18
**180** [1] - 55:25
**19** [5] - 55:3, 55:20, 152:1, 159:21, 184:18
**19106** [1] - 1:11
**1922** [1] - 152:10
**1927** [1] - 118:16
**1940s** [1] - 134:10
**1944** [1] - 76:22
**195-14** [1] - 152:1
**19801** [1] - 2:15
**19899** [1] - 1:19

## 2

**2** [21] - 10:19, 18:22, 25:16, 33:6, 38:19, 39:11, 40:22, 62:25, 71:4, 71:24, 73:2, 73:5, 80:15, 80:22, 93:25, 121:22, 140:13, 140:14, 155:5, 156:13, 202:5
**2,000** [1] - 144:22
**2,830** [11] - 97:25, 109:9, 115:7, 115:8, 136:2, 136:14, 140:5, 142:15, 142:20, 142:21,

143:24
**20** [10] - 30:22, 39:5, 160:13, 162:15, 165:17, 165:19, 166:5, 166:11, 166:14, 168:13
**20,000** [2] - 15:12, 149:23
**20-613** [1] - 1:3
**20-cv-613** [1] - 3:7
**20-year** [1] - 92:11
**200** [1] - 2:7
**20004** [1] - 2:23
**2010** [1] - 41:11
**2011** [1] - 121:21
**2015** [1] - 17:7
**2021** [1] - 17:8
**2023** [3] - 181:14, 181:18, 181:25
**2024** [2] - 1:11, 181:18
**2049** [1] - 2:9
**207** [1] - 131:6
**21** [3] - 35:3, 89:8, 115:8
**21,000** [5] - 90:11, 90:18, 113:3, 114:3, 188:23
**21st** [1] - 6:1
**22** [5] - 76:16, 77:12, 89:8, 132:9, 166:21
**225** [1] - 67:7
**23** [6] - 37:24, 89:8, 170:3, 174:7, 191:25, 192:10
**23,000** [1] - 164:15
**24** [4] - 21:17, 89:8, 132:9, 152:9
**24,000** [1] - 164:15
**24th** [1] - 7:10
**25** [4] - 21:17, 56:11, 89:8, 105:18
**25,000** [16] - 22:18, 22:20, 38:25, 84:19, 84:20, 84:24, 90:10, 90:11, 138:10, 160:20, 160:23, 168:2, 170:22, 175:25, 191:15
**259** [1] - 130:3
**26** [1] - 89:8
**262** [1] - 121:17
**269** [1] - 121:17
**26TH** [1] - 2:20
**27** [2] - 24:8, 32:20
**273** [1] - 121:17
**277** [1] - 130:3
**278** [1] - 130:15
**28** [6] - 41:11, 56:4, 89:18, 90:19, 128:13
**2830** [5] - 126:20,

127:24, 149:8, 161:15, 175:11
**28th** [1] - 5:6
**29** [5] - 32:18, 37:19, 41:11, 121:24, 131:5
**29th** [1] - 7:10
**2d** [1] - 130:25

## 3

**3** [8] - 2:20, 62:18, 63:13, 93:25, 155:10, 156:21, 199:22
**3,000** [1] - 148:6
**30(b)(6** [2] - 40:24, 56:8
**300** [1] - 125:4
**31** [3] - 11:16, 37:22, 156:3
**325** [1] - 177:16
**33** [1] - 128:11
**34** [2] - 151:25, 156:1
**348** [1] - 69:2
**35** [1] - 46:17
**37** [1] - 31:9
**379** [1] - 180:9
**38** [3] - 156:3, 165:2, 171:2
**394** [1] - 130:25
**3:30** [3] - 173:18, 173:25, 174:19
**3d** [1] - 177:16

## 4

**4** [10] - 22:21, 41:2, 94:1, 94:8, 94:13, 154:1, 154:21, 155:10, 155:13, 156:24
**4,000** [5] - 117:24, 118:5, 118:13, 118:24, 119:14
**4,534** [1] - 98:23
**401(d** [1] - 183:6
**408** [1] - 130:25
**410(c)** [1] - 121:1
**432** [1] - 177:12
**439** [3] - 177:12, 178:12, 178:18
**44** [1] - 70:19
**447** [1] - 86:8
**464** [2] - 131:5, 131:16
**47** [1] - 31:5
**482** [1] - 131:19
**486** [1] - 177:6
**489** [1] - 54:13
**49** [1] - 39:25
**4th** [1] - 5:7

## 5

**5** [8] - 1:11, 22:22, 108:23, 127:7, 129:12, 177:21, 189:2, 200:7
**5,000** [19] - 34:13, 97:10, 97:13, 106:13, 106:15, 108:10, 108:20, 114:5, 115:3, 118:8, 118:13, 128:14, 129:8, 144:9, 144:22, 146:2, 146:19, 188:6, 194:6
**5,367** [8] - 97:6, 109:11, 115:4, 119:5, 119:16, 142:20, 144:1, 144:12
**5,473** [3] - 188:21, 188:24, 189:17
**5,695** [1] - 98:16
**5-875** [1] - 189:24
**5-year-old** [3] - 73:18, 91:8, 91:9
**500** [5] - 34:13, 166:23, 170:24, 183:17, 185:2
**504(b** [1] - 123:12
**51** [1] - 20:24
**52** [1] - 121:25
**521** [1] - 83:14
**524** [1] - 83:14
**530** [1] - 11:15
**531** [1] - 13:9
**532** [1] - 13:9
**54** [5] - 21:12, 100:2, 139:17, 176:18, 176:20
**54(b** [2] - 139:12, 180:21
**547** [1] - 11:9
**56** [2] - 21:10, 131:6
**564** [1] - 177:16
**569** [1] - 43:14
**57** [1] - 40:14
**576** [1] - 96:18
**5764** [1] - 96:2
**582** [2] - 177:11, 178:12
**583** [1] - 96:18
**589** [1] - 177:16
**59** [1] - 160:8
**590** [1] - 43:14
**5th** [3] - 6:12, 196:24, 197:5

**6**

**6** [11] - 4:14, 4:15, 4:16, 22:21, 95:4, 116:4, 116:22, 151:8, 151:18, 175:22, 199:4
**6-piece** [1] - 175:21
**601** [2] - 1:10, 2:5
**602** [1] - 96:1
**61** [1] - 70:19
**612** [1] - 97:4
**617** [1] - 97:8
**619-1** [1] - 194:13
**63** [1] - 35:4
**643** [1] - 141:5
**645** [1] - 131:5
**67** [1] - 70:19
**678** [3] - 10:16, 10:18, 20:24
**678,21** [1] - 175:7
**678-21** [8] - 97:22, 126:20, 127:23, 136:15, 144:4, 144:8, 146:12, 147:7
**678-27** [7] - 97:9, 115:3, 115:6, 126:17, 126:22, 128:1, 144:13
**678-36** [2] - 94:7, 154:4
**678-4** [1] - 152:1
**678-6** [2] - 151:24, 152:10
**678-7** [1] - 82:14
**678-8** [1] - 152:9
**678-84** [1] - 152:2
**67821** [1] - 115:7
**679** [3] - 10:17, 10:19, 69:18
**689** [2] - 121:24, 131:4
**690** [4] - 95:2, 116:4, 116:22, 199:4
**690-6** [6] - 95:3, 144:5, 144:6, 144:15, 152:24, 175:20
**696-11** [1] - 145:3
**6th** [1] - 2:14

**7**

**7** [9] - 95:3, 95:4, 155:21, 174:1, 174:23, 176:13, 179:4, 189:6, 201:21
**70** [1] - 40:11
**71** [2] - 36:1, 131:16
**717** [3] - 117:14, 118:8, 119:9
**718** [2] - 10:16, 10:19

**725** [1] - 83:14
**74** [1] - 21:19
**750** [1] - 83:8
**7563043** [1] - 121:22
**76** [1] - 137:8
**769** [1] - 86:9
**78** [1] - 40:9
**785** [2] - 96:17, 111:7
**79** [1] - 56:12
**796** [1] - 72:5
**799** [1] - 70:5

**8**

**8** [8] - 41:2, 89:19, 94:10, 95:3, 95:4, 152:6, 154:1, 179:4
**80** [15] - 30:18, 30:20, 162:13, 162:14, 162:18, 162:20, 162:25, 163:23, 163:25, 164:3, 165:17, 166:3, 166:9, 166:13, 168:12
**800** [1] - 177:6
**816** [1] - 178:9
**853** [1] - 131:21
**855** [1] - 21:19
**86** [3] - 106:15, 106:17, 146:18
**863** [1] - 130:25
**88** [2] - 56:12, 152:10
**883** [1] - 55:25
**8916** [1] - 177:6
**8th** [3] - 6:3, 202:5, 202:10

**9**

**9** [4] - 21:13, 40:23, 95:3, 95:5
**90067** [1] - 2:10
**91** [2] - 164:25, 171:2
**910** [1] - 131:19
**928** [1] - 130:3
**93:21** [1] - 152:9
**94111** [1] - 2:20
**952** [1] - 152:15
**959** [1] - 121:6
**980** [1] - 131:21
**996** [1] - 131:17
**9th** [4] - 6:18, 6:23, 202:5, 202:11, 202:15

**A**

**A10** [1] - 121:21
**abandoned** [3] -

155:2, 155:7, 165:7
**ability** [3] - 42:8, 150:19, 202:23
**able** [7] - 34:25, 79:6, 145:10, 183:11, 190:7, 197:10, 200:15
**above-entitled** [1] - 204:9
**absolutely** [4] - 11:14, 68:24, 149:16, 199:23
**Absolutely** [1] - 145:8
**abuse** [1] - 43:21
**accept** [3] - 98:11, 142:5, 142:23
**accepted** [1] - 76:9
**accepts** [1] - 7:19
**access** [17] - 12:14, 12:17, 20:4, 20:25, 21:5, 21:11, 24:16, 88:4, 152:5, 152:7, 152:10, 153:13, 156:16, 156:17, 161:2, 171:8, 183:12
**access..** [1] - 183:9
**accesses** [1] - 55:15
**accessible** [1] - 9:24
**accessing** [1] - 12:10
**according** [1] - 183:3
**accordingly** [1] - 11:20
**accrue** [2] - 107:3, 107:6
**accrues** [1] - 106:25
**accurately** [2] - 63:19, 156:14
**accuse** [1] - 90:11
**accused** [2] - 90:17, 114:6
**accusing** [1] - 90:12
**achieved** [1] - 192:7
**acknowledge** [1] - 27:20
**acknowledgment** [1] - 49:12
**act** [2] - 67:10, 96:9
**acting** [2] - 25:16, 25:18
**ACTION** [1] - 1:3
**action** [8] - 106:24, 107:1, 107:2, 107:4, 107:6, 107:7, 176:24, 201:20
**actionable** [1] - 38:11
**actively** [1] - 40:6
**activities** [1] - 184:23
**actual** [41] - 20:2, 28:25, 31:20, 34:11, 34:18, 101:4,

101:23, 101:24, 108:17, 109:22, 109:23, 120:6, 120:10, 120:15, 120:17, 120:20, 120:22, 123:16, 123:17, 123:19, 123:21, 124:15, 126:1, 128:3, 133:4, 140:11, 141:12, 141:13, 141:18, 151:10, 151:22, 152:4, 152:20, 153:1, 168:24, 172:1, 172:6, 177:18, 179:5, 190:1, 190:2
**Actual** [1] - 120:12
**Acuff** [2] - 22:4, 56:23
**Acuff-Rose** [1] - 56:23
**add** [3] - 127:17, 158:16, 173:11
**added** [2] - 70:23, 158:16
**addiction** [1] - 95:15
**adding** [3] - 84:1, 127:4, 150:24
**addition** [4] - 92:9, 106:10, 159:8, 169:16
**additional** [5] - 77:23, 96:25, 127:4, 128:2, 200:8
**additionally** [1] - 184:12
**address** [2] - 66:23, 76:15
**adds** [4] - 29:23, 40:9, 40:10, 69:7
**adjourn** [2] - 93:21, 203:24
**adjournment** [1] - 8:22
**adjudicates** [1] - 176:23
**adjusted** [3] - 24:20, 170:21
**administrative** [2] - 188:13, 198:10
**admission** [9] - 107:22, 109:21, 109:22, 109:23, 140:18, 145:21, 150:25, 151:4, 173:11
**admissions** [1] - 151:23
**admit** [5] - 45:13, 149:23, 171:20, 171:21, 184:9

**admits** [1] - 192:10
**admitted** [12] - 13:15, 15:16, 40:17, 40:18, 41:20, 42:14, 45:11, 55:6, 132:7, 145:19, 152:7
**admittedly** [1] - 15:5
**ads** [1] - 13:24
**advantage** [1] - 187:21
**advertising** [1] - 18:12
**affect** [1] - 58:14
**affirmatively** [1] - 199:11
**affirmed** [5] - 76:23, 130:4, 131:2, 131:11, 141:7
**afforded** [2] - 91:13, 178:6
**afield** [1] - 88:5
**afoul** [1] - 184:4
**afternoon** [2] - 93:23, 175:1
**afterwards** [1] - 18:17
**Ages** [1] - 29:21
**aggregate** [2] - 43:13, 111:25
**aggressive** [1] - 107:22
**ago** [1] - 43:3
**agree** [23] - 28:4, 51:16, 68:3, 71:17, 72:10, 109:13, 118:25, 120:21, 122:15, 142:1, 146:17, 147:16, 148:23, 148:24, 168:5, 168:6, 173:19, 175:17, 176:6, 196:15, 196:16, 200:13, 202:3
**agreed** [4] - 9:19, 9:21, 199:9, 200:1
**agreed-upon** [1] - 9:21
**agreement** [2] - 21:20, 155:25
**agrees** [2] - 133:5, 175:5
**ahead** [4] - 25:12, 31:15, 123:10, 199:22
**AI** [29] - 14:20, 14:23, 15:1, 15:24, 16:13, 30:9, 30:14, 32:2, 37:23, 41:9, 44:15, 48:9, 49:9, 49:18, 50:5, 51:6, 55:5, 56:2, 56:10, 61:6,

85:11, 86:1, 157:24, 160:19, 160:24, 161:25, 164:18, 170:14
**aided** [1] - 1:25
**al** [1] - 3:8
**Alfred** [1] - 76:18
**algorithm** [4] - 14:20, 37:24, 170:5, 192:3
**algorithmic** [1] - 110:18
**algorithmically** [1] - 115:11
**algorithms** [3] - 14:23, 41:7, 41:10
**align** [1] - 17:1
**alike** [1] - 139:7
**allay** [1] - 102:16
**allegation** [1] - 23:3
**allege** [3] - 157:10, 158:10, 158:12
**alleged** [1] - 153:12
**alleging** [1] - 157:12
**Allen** [1] - 76:21
**allow** [2] - 87:9, 112:20
**allowed** [1] - 148:7
**allows** [5] - 30:4, 81:15, 105:13, 128:4, 196:20
**alluding** [1] - 58:19
**ALLYN** [1] - 2:9
**almost** [7] - 61:21, 78:17, 107:13, 115:13, 117:20, 147:8, 147:10
**alone** [6] - 13:4, 14:21, 34:17, 43:6, 78:10, 86:25
**altering** [1] - 22:9
**ambiguous** [1] - 178:15
**ambit** [1] - 67:7
**amenable** [2] - 19:22, 99:20
**Amendment** [3] - 59:17, 59:23, 195:16
**American** [2] - 105:17, 137:16
**amount** [10] - 46:20, 55:22, 73:20, 90:22, 91:18, 92:6, 93:7, 96:20, 128:11, 138:10
**amounts** [1] - 203:20
**ample** [1] - 71:23
**analysis** [32] - 15:3, 15:8, 15:10, 16:21, 22:15, 27:13, 28:9, 34:2, 38:3, 44:20,

46:8, 47:22, 52:9, 68:19, 71:1, 80:22, 81:5, 97:19, 97:25, 98:13, 106:9, 107:17, 135:13, 141:14, 141:25, 142:3, 142:22, 143:5, 186:12, 186:17, 186:18, 189:16
**analyst** [1] - 133:15
**analyze** [1] - 82:8
**analyzed** [1] - 82:8
**Ancient** [1] - 93:1
**Anderson** [1] - 4:7
**ANDERSON** [1] - 2:13
**ANGELES** [1] - 2:10
**announced** [1] - 178:12
**another's** [1] - 11:20
**answer** [49] - 14:2, 15:7, 15:13, 16:1, 16:18, 26:12, 31:7, 31:8, 31:25, 32:12, 33:4, 33:14, 33:17, 33:18, 33:19, 37:21, 37:22, 38:4, 38:5, 41:13, 58:18, 64:10, 64:20, 66:25, 71:6, 71:14, 72:9, 72:11, 73:7, 74:3, 85:14, 85:15, 88:23, 102:22, 114:16, 114:22, 155:22, 156:25, 160:16, 164:13, 173:12, 179:14, 183:3, 190:10, 190:25, 191:4, 193:2, 193:11
**answered** [2] - 38:1, 40:21
**answers** [16] - 16:24, 17:14, 32:2, 33:7, 67:19, 85:8, 85:20, 88:21, 156:14, 160:23, 167:2, 170:6, 192:4, 193:13, 193:14
**anticipated** [1] - 45:19
**antitrust** [5] - 44:17, 44:22, 45:17, 50:8, 177:8
**anyway** [4] - 25:13, 25:20, 48:22, 110:20
**apart** [4] - 79:7, 88:21, 167:2, 192:23
**API** [2] - 26:23, 61:19
**APIs** [1] - 47:20
**apologize** [1] - 60:8
**apparent** [3] - 147:25,

160:12, 160:14
**appeals** [1] - 17:19
**Appeals** [2] - 10:2, 194:22
**appear** [5] - 89:3, 140:17, 158:20, 188:3, 188:4
**appearances** [1] - 3:10
**APPEARANCES** [2] - 1:15, 2:1
**appellate** [2] - 131:22, 181:3
**Appendix** [22] - 95:2, 116:5, 116:7, 116:19, 117:1, 117:13, 118:9, 119:12, 122:12, 126:16, 127:12, 128:1, 136:9, 136:15, 143:3, 143:14, 143:22, 143:23, 144:1, 144:2, 144:16, 152:23
**appendix** [2] - 116:20, 175:17
**Apple** [1] - 83:13
**applicable** [2] - 38:15
**applied** [1] - 130:4
**applies** [1] - 177:13
**apply** [6] - 20:11, 28:24, 74:3, 128:19, 130:14, 132:14
**applying** [1] - 77:9
**apportionments** [1] - 123:13
**apposite** [1] - 80:19
**approach** [6] - 48:21, 52:20, 52:21, 150:3, 199:7, 203:19
**appropriate** [8] - 54:2, 99:5, 129:13, 129:24, 130:15, 132:16, 181:6, 186:1
**appropriated** [1] - 137:19
**approves** [1] - 202:1
**April** [5] - 6:3, 6:8, 6:9, 197:10, 202:4
**Aptitude** [1] - 141:3
**Architecture** [1] - 95:25
**area** [4] - 60:14, 134:18, 138:20, 155:24
**areas** [2] - 125:24, 192:5
**argue** [3] - 64:6, 105:1, 124:2

**argued** [2] - 58:21, 83:5
**arguing** [10] - 17:3, 26:25, 57:10, 57:21, 59:11, 61:4, 64:2, 74:12, 153:18, 172:15
**argument** [38] - 5:12, 19:11, 25:24, 26:1, 26:2, 26:14, 26:15, 26:18, 28:17, 34:3, 41:8, 49:7, 51:22, 57:9, 61:5, 67:3, 69:19, 74:8, 75:17, 88:16, 88:17, 91:4, 104:24, 135:3, 135:4, 137:2, 146:20, 147:17, 148:9, 150:11, 153:5, 172:19, 180:8, 180:15, 181:15, 181:22, 184:22, 191:7
**arguments** [11] - 20:19, 67:25, 77:21, 130:6, 130:10, 130:19, 131:8, 150:16, 153:6, 187:6, 203:10
**Arnold** [1] - 134:10
**arranged** [1] - 14:16
**arrangement** [8] - 64:17, 69:2, 94:20, 95:18, 96:7, 149:19, 150:9, 158:25
**arranging** [1] - 150:24
**arrived** [1] - 24:21
**Arroyo** [1] - 37:14
**ARSHT** [1] - 1:16
**Art** [1] - 76:23
**articulated** [1] - 178:3
**artificial** [1] - 84:9
**artwork** [2] - 13:19, 16:10
**aside** [5] - 5:14, 30:23, 48:11, 162:15, 165:20
**aspect** [4] - 24:21, 138:1, 158:9, 158:10
**aspects** [3] - 32:4, 46:13, 137:18
**assault** [1] - 27:14
**assess** [2] - 19:15, 156:14
**assessed** [2] - 45:1, 45:4
**assessing** [1] - 72:6
**assessments** [1] - 72:20
**assigned** [2] - 154:22,

155:1
**assist** [1] - 176:10
**associated** [6] - 95:10, 188:8, 188:22, 188:24, 189:18, 189:21
**Association** [1] - 105:17
**association** [1] - 137:16
**assume** [3] - 34:9, 49:17, 189:17
**assumes** [3] - 62:1, 163:5, 163:8
**assuming** [1] - 34:8
**assumption** [1] - 197:17
**attaches** [1] - 194:12
**attachment** [1] - 148:24
**attachments** [3] - 95:4, 95:5, 148:4
**attempt** [3] - 23:12, 24:10, 24:11
**attempts** [1] - 144:23
**attention** [1] - 108:4
**attorney** [16] - 15:8, 15:11, 15:15, 44:2, 54:8, 82:21, 84:16, 86:2, 94:21, 95:18, 98:2, 98:7, 98:20, 118:23, 119:1, 132:2
**attorneys** [3] - 90:3, 160:8, 175:3
**August** [1] - 181:18
**author** [8] - 29:23, 67:22, 69:6, 69:8, 69:12, 91:4, 91:13, 93:12
**author's** [1] - 91:11
**authority** [1] - 16:2
**Authors** [1] - 17:4
**availability** [1] - 132:6
**available** [6] - 4:25, 6:23, 100:3, 115:2, 154:23, 178:11
**AVENUE** [1] - 2:22
**Avenue** [1] - 2:5
**average** [3] - 22:22, 33:17, 33:19
**aviation** [1] - 104:15
**avoid** [2] - 194:17, 196:18
**avoided** [2] - 42:16, 203:12
**avoiding** [1] - 177:9
**aware** [2] - 64:13, 176:22

## B

**back-and-forth** [1] - 182:3
**backward** [1] - 190:1
**backwards** [2] - 103:11, 114:23
**bad** [34] - 11:2, 11:5, 11:24, 11:25, 12:23, 12:25, 13:6, 17:5, 17:12, 18:6, 18:7, 18:25, 20:10, 20:16, 20:17, 21:8, 23:9, 25:13, 25:24, 26:1, 34:17, 35:5, 35:25, 36:15, 80:10, 85:24, 87:18, 87:19, 87:21, 87:25, 88:5, 193:9, 193:13
**balance** [1] - 10:1
**balancing** [1] - 52:1
**Banion** [1] - 121:16
**Bank** [2] - 129:25, 137:12
**bank** [1] - 121:16
**Barb** [3] - 110:16, 110:23, 173:10
**Barbara** [3] - 115:9, 146:15, 175:9
**barrier** [1] - 113:11
**barriers** [1] - 5:2
**based** [24] - 12:25, 19:23, 32:18, 33:10, 41:8, 41:23, 54:7, 60:1, 63:24, 67:9, 67:15, 87:22, 95:13, 99:8, 101:1, 101:3, 123:19, 123:22, 126:11, 138:2, 152:17, 157:9, 172:19, 184:23
**basics** [1] - 196:20
**basis** [3] - 103:5, 117:21, 198:14
**batch** [4] - 105:8, 106:3, 106:18, 199:2
**batches** [1] - 106:1
**batching** [2] - 199:4, 199:5
**Batlin** [1] - 69:11
**beach** [1] - 72:19
**bear** [5] - 48:25, 182:23, 183:22, 184:3, 184:9
**bearing** [2] - 11:18, 183:14
**bears** [5] - 36:15, 39:23, 48:20, 184:10, 186:17
**beautiful** [1] - 73:14

**became** [4] - 43:10, 43:16, 43:21, 58:22
**become** [3] - 31:3, 43:13, 90:22
**becomes** [2] - 78:13, 159:15
**BEFORE** [1] - 1:13
**began** [2] - 31:1, 31:5
**begin** [4] - 10:22, 50:22, 155:6, 176:16
**beginning** [3] - 7:16, 26:18, 28:2
**begins** [1] - 26:12
**behalf** [3] - 3:12, 4:7, 175:2
**behavior** [1] - 12:22
**behind** [4] - 3:16, 81:11, 88:2, 181:5
**being..** [1] - 4:16
**believes** [1] - 97:2
**belittling** [1] - 56:25
**Bell** [1] - 76:18
**BELUSKO** [1] - 2:9
**Benefit** [4] - 177:7, 178:3, 178:12, 178:18
**benefit** [3] - 43:18, 118:23, 119:1
**benefits** [2] - 12:6, 98:21
**BERRY** [4] - 2:22, 35:13, 35:18, 35:21
**Berry** [2] - 4:9, 69:3
**best** [30] - 9:7, 20:15, 54:22, 56:13, 56:14, 56:16, 80:7, 80:12, 85:1, 88:18, 94:6, 94:9, 106:22, 121:5, 129:3, 129:5, 129:6, 143:15, 153:22, 153:24, 154:3, 154:14, 154:16, 155:6, 159:22, 160:6, 169:21, 201:22, 201:25, 203:10
**Best** [6] - 88:10, 89:9, 89:10, 89:14, 89:22, 89:25
**better** [9] - 18:13, 18:14, 60:11, 139:19, 178:22, 181:25, 192:3, 197:17, 197:19
**between** [19] - 10:1, 31:20, 33:3, 37:25, 74:25, 79:17, 88:22, 95:21, 109:5, 122:24, 126:8, 132:17, 152:3,

157:24, 163:3, 167:3, 170:6, 190:9, 191:3
**beyond** [1] - 19:8
**BIBAS** [1] - 1:13
**Bibas** [1] - 3:5
**big** [7] - 5:9, 18:1, 22:14, 134:18, 187:12, 199:18, 203:3
**bind** [1] - 53:7
**BINDU** [1] - 2:14
**bit** [14] - 35:11, 37:1, 59:7, 86:5, 103:16, 114:13, 159:20, 162:4, 187:8, 190:3, 192:13, 193:7, 198:14, 200:8
**bits** [1] - 104:23
**bizarre** [1] - 181:10
**black** [1] - 72:18
**blind** [1] - 192:17
**blue** [1] - 139:2
**BLUMENFELD** [1] - 1:18
**Boissin** [1] - 121:16
**book** [15] - 29:7, 29:8, 29:20, 41:16, 73:18, 78:16, 83:22, 104:20, 125:9, 129:3, 129:4, 129:5, 134:24, 141:5
**bore** [1] - 184:15
**borrowing** [1] - 11:20
**BOSTON** [1] - 2:7
**both/and** [1] - 150:2
**bottom** [3] - 73:5, 77:12, 185:19
**bound** [1] - 125:24
**bounds** [2] - 34:5, 111:4
**BOX** [1] - 1:19
**box** [2] - 76:8, 83:16
**boxes** [2] - 74:9, 74:11
**boxing** [1] - 66:18
**branting** [1] - 191:24
**Branting** [4] - 24:3, 37:23, 157:20, 174:8
**Branting's** [1] - 156:2
**break** [9] - 60:13, 88:21, 94:7, 123:17, 147:14, 148:19, 148:22, 158:25, 175:4
**breathing** [1] - 59:18
**bridge** [1] - 136:20
**brief** [41] - 16:18, 21:5, 21:13, 21:17, 21:24, 28:9, 29:3, 29:4, 29:5, 34:4, 35:4,

36:17, 36:18, 37:20, 40:22, 41:2, 41:11, 42:3, 51:24, 55:4, 55:20, 58:25, 89:7, 89:19, 98:5, 105:19, 106:22, 121:12, 122:4, 132:8, 132:20, 132:22, 138:11, 140:14, 179:4, 180:7, 180:8, 180:11, 184:18
**Brief** [11] - 8:23, 37:22, 62:16, 81:18, 83:3, 126:14, 127:1, 151:16, 151:17, 158:5, 201:1
**briefed** [5] - 8:7, 8:8, 103:2, 123:10, 177:23
**briefing** [8] - 64:1, 98:4, 99:22, 103:4, 120:1, 125:22, 150:2, 186:14
**briefly** [5] - 36:19, 36:22, 37:9, 148:12, 193:5
**briefs** [3] - 73:25, 99:7, 102:23
**bring** [7] - 13:23, 54:15, 107:1, 107:4, 107:7, 108:3, 108:4
**bringing** [1] - 57:13
**brings** [1] - 114:9
**broad** [1] - 79:23
**Brocade** [1] - 121:21
**brow** [2] - 73:24, 86:25
**Bs** [1] - 175:15
**bucket** [3] - 81:11, 81:14, 81:16
**Buffalo** [1] - 21:22
**built** [3] - 15:14, 18:15, 22:16
**bulk** [43] - 13:15, 41:22, 56:5, 101:13, 123:20, 124:2, 135:17, 135:18, 138:8, 138:9, 147:23, 151:14, 151:15, 154:9, 154:19, 155:19, 156:7, 156:9, 156:16, 157:7, 157:15, 158:2, 159:16, 160:14, 161:16, 161:20, 161:23, 161:24, 162:10, 162:12, 163:17, 163:22, 163:23, 164:8,

164:9, 172:21, 182:22, 183:2, 184:23, 185:3, 185:6, 194:24, 196:16
**bulls** [1] - 203:15
**bunch** [9] - 23:22, 24:24, 61:8, 74:17, 75:19, 84:20, 113:14, 172:4
**burden** [31] - 13:3, 36:25, 39:23, 39:25, 43:8, 44:10, 48:20, 48:25, 49:3, 49:24, 50:13, 50:19, 54:21, 56:17, 88:9, 97:14, 102:3, 108:18, 119:21, 119:22, 120:24, 120:25, 121:19, 122:1, 123:11, 123:13, 124:14, 124:15, 127:18, 133:21
**burdens** [1] - 124:19
**burdensome** [1] - 126:10
**business** [5] - 51:1, 59:25, 62:11, 130:13, 197:12
**businesses** [1] - 44:4
**busy** [3] - 197:9, 197:19
**but-for** [1] - 126:2
**but..** [1] - 37:2
**BY** [16] - 1:17, 1:18, 2:3, 2:3, 2:4, 2:4, 2:6, 2:8, 2:9, 2:13, 2:14, 2:18, 2:19, 2:19, 2:21, 2:22
**Byrne** [1] - 1:10

## C

**CA** [2] - 2:10, 2:20
**calculate** [1] - 101:2
**calculation** [1] - 123:21
**Caldwell** [1] - 55:11
**calendar** [3] - 7:7, 197:8, 202:14
**calendars** [1] - 202:17
**Campbell** [9] - 17:23, 17:24, 18:22, 22:4, 43:11, 43:14, 47:1, 56:23, 87:21
**cannot** [7] - 13:3, 15:1, 25:15, 33:8, 39:25, 44:10, 106:8
**CANTER** [1] - 2:19
**Canter** [10] - 117:13,

117:24, 118:7, 119:8, 119:16, 123:2, 136:12, 136:16, 142:14, 143:17
**Canterbury** [1] - 63:14
**capability** [1] - 145:7
**capable** [1] - 100:24
**capital** [1] - 35:19
**car** [1] - 72:20
**car-kind-of-case** [1] - 72:20
**card** [1] - 38:9
**cards** [1] - 145:18
**care** [1] - 37:11
**careful** [7] - 60:21, 74:2, 141:11, 171:13, 172:11, 194:17
**carefully** [1] - 104:7
**cares** [1] - 61:13
**Carol** [1] - 131:11
**carried** [1] - 50:19
**case** [133] - 11:23, 12:7, 12:8, 12:12, 13:17, 13:18, 18:2, 18:24, 19:2, 19:3, 19:5, 19:6, 23:5, 26:21, 29:22, 34:1, 37:11, 37:15, 37:21, 38:12, 38:13, 40:1, 43:20, 44:8, 44:25, 45:6, 47:2, 47:16, 57:9, 57:10, 58:20, 59:1, 59:5, 59:6, 59:11, 60:22, 61:16, 66:25, 67:1, 67:4, 67:14, 68:4, 68:15, 69:15, 70:21, 72:4, 72:20, 73:22, 73:23, 74:4, 74:6, 74:15, 75:5, 76:5, 76:9, 76:22, 81:6, 81:7, 81:8, 81:9, 81:15, 81:20, 81:23, 82:4, 82:8, 83:19, 85:12, 86:8, 86:18, 86:21, 87:7, 87:20, 94:12, 94:13, 95:8, 96:17, 97:6, 98:22, 100:8, 103:21, 103:22, 104:7, 104:8, 104:15, 104:19, 105:13, 105:14, 108:22, 109:2, 109:3, 110:18, 111:7, 113:10, 114:6, 123:15, 126:9, 126:18, 128:10, 128:16,

128:19, 128:20, 129:16, 130:16, 132:15, 134:9, 134:17, 134:23, 136:24, 137:23, 139:4, 140:1, 141:3, 152:15, 152:19, 153:6, 157:25, 165:6, 176:19, 177:2, 179:17, 179:21, 180:9, 181:2, 189:11, 190:15, 196:5, 198:9, 203:2
**Case** [1] - 3:6
**cases** [78] - 7:15, 15:3, 16:4, 16:5, 16:19, 18:17, 27:15, 27:22, 27:24, 28:8, 28:9, 29:2, 29:17, 38:14, 38:25, 42:21, 45:1, 48:1, 51:11, 51:23, 56:23, 59:5, 60:22, 65:10, 65:19, 69:17, 70:9, 71:21, 74:17, 75:12, 76:17, 78:14, 79:6, 80:18, 80:24, 81:3, 82:8, 82:12, 83:5, 83:9, 87:8, 87:19, 88:5, 101:8, 105:16, 105:17, 106:15, 108:23, 109:1, 111:4, 111:11, 117:2, 121:4, 121:15, 131:7, 133:6, 133:20, 134:1, 137:11, 141:2, 155:14, 159:5, 160:21, 160:22, 165:4, 165:5, 180:6, 180:7, 180:17, 181:8, 184:13, 189:11, 189:13, 192:8
**Castle** [2] - 131:11, 141:1
**categories** [10] - 14:16, 63:22, 95:13, 95:20, 99:1, 123:1, 123:5, 133:16, 148:25, 151:11
**categorizable** [1] - 145:13
**categorization** [3] - 64:13, 68:17, 143:17
**categorized** [2] - 67:5, 95:1
**categorizes** [1] - 95:12

**categorizing** [1] - 122:23
**category** [1] - 96:10
**caught** [1] - 138:12
**caused** [3] - 40:2, 42:17, 45:21
**causes** [1] - 126:2
**caution** [1] - 196:10
**cautioning** [1] - 129:2
**CCC** [1] - 70:15
**cede** [2] - 71:7, 71:13
**CENDALI** [63] - 2:3, 3:24, 5:8, 5:16, 5:25, 6:14, 6:18, 6:21, 6:25, 7:19, 9:4, 10:4, 10:8, 10:21, 10:24, 11:14, 16:3, 16:17, 17:14, 18:10, 18:23, 19:13, 19:25, 20:21, 21:3, 35:2, 36:21, 37:8, 39:16, 44:21, 53:25, 54:24, 55:3, 55:14, 57:7, 57:23, 58:16, 59:21, 60:6, 60:17, 71:14, 72:15, 148:11, 148:14, 149:9, 150:5, 150:8, 150:14, 182:16, 182:24, 186:18, 191:11, 191:13, 195:7, 195:18, 196:7, 199:12, 199:23, 200:4, 200:11, 200:21, 201:22, 204:3
**Cendali** [25] - 3:14, 3:22, 3:25, 9:3, 15:20, 38:18, 39:11, 48:5, 50:4, 53:22, 62:24, 68:22, 69:18, 71:6, 71:8, 71:13, 83:2, 86:8, 94:17, 130:17, 158:7, 158:24, 182:21, 186:12, 190:6
**Cendali's** [2] - 63:4, 87:10
**center** [1] - 35:7
**Central** [1] - 70:3
**Centre** [1] - 3:7
**CENTRE** [1] - 1:3
**CENTURY** [1] - 2:9
**CEO** [1] - 36:8
**certain** [7] - 31:2, 92:13, 101:18, 111:24, 147:9, 147:10, 195:6
**certainly** [7] - 25:17, 76:8, 99:19, 103:13, 139:21, 150:16,

193:8
**certificate** [1] - 121:18
**certify** [1] - 204:7
**cetera** [8] - 4:4, 16:20, 19:7, 118:16, 145:14, 153:20, 194:18, 202:24
**challenge** [3] - 112:3, 112:7, 189:20
**challenged** [1] - 84:21
**chance** [4] - 114:21, 117:12, 117:18, 162:24
**Chang** [4] - 3:16, 175:2, 182:24, 185:23
**CHANG** [9] - 2:8, 175:1, 175:13, 175:16, 176:1, 176:11, 183:1, 183:21, 185:25
**Chang's** [1] - 184:20
**change** [10] - 5:21, 7:4, 17:17, 62:9, 72:25, 75:13, 106:8, 124:9, 178:19, 178:22
**changed** [1] - 95:14
**changes** [3] - 29:23, 96:6, 122:11
**changing** [2] - 148:15, 187:10
**character** [2] - 9:2, 22:9
**characters** [1] - 68:6
**charge** [1] - 44:4
**chart** [11] - 109:15, 109:16, 109:18, 110:5, 113:24, 116:3, 119:4, 119:24, 142:9, 172:20, 173:16
**charts** [7] - 115:18, 116:1, 119:6, 127:3, 127:4, 174:24
**cheaper** [1] - 25:2
**cheat** [1] - 10:13
**check** [4] - 14:10, 115:21, 147:8, 147:15
**checking** [3] - 147:17, 165:20, 165:23
**chided** [1] - 57:9
**child** [1] - 56:14
**chime** [1] - 63:1
**choice** [3] - 22:17, 69:23, 82:24
**choices** [3] - 63:9, 70:1, 132:6
**choose** [2] - 45:8,

45:10
**chose** [5] - 20:12, 141:24, 142:4, 158:18, 159:1
**chosen** [1] - 159:10
**Christianson** [1] - 177:3
**Cindali** [1] - 203:5
**circle** [2] - 62:24, 64:19
**Circuit** [47] - 5:11, 12:22, 14:4, 42:12, 42:16, 52:20, 53:7, 58:21, 64:12, 66:9, 66:13, 66:17, 67:4, 67:13, 69:3, 70:3, 70:15, 72:5, 74:13, 74:16, 76:8, 76:23, 77:7, 81:20, 82:9, 83:15, 86:9, 87:20, 96:1, 105:14, 120:11, 121:7, 121:17, 121:24, 130:1, 130:3, 131:2, 131:10, 131:18, 131:20, 134:17, 177:8, 178:3, 178:10, 180:9, 180:14, 181:8
**circuit** [5] - 64:12, 77:1, 83:6, 83:9, 121:4
**Circuit's** [7] - 17:3, 63:13, 63:22, 64:22, 66:15, 74:9, 82:7
**circulated** [1] - 184:15
**circumstance** [1] - 137:5
**circumstances** [2] - 129:12, 178:7
**citation** [6] - 65:22, 82:14, 85:6, 94:8, 128:2, 152:15
**citations** [8] - 8:11, 20:16, 94:6, 120:3, 129:15, 151:8, 151:19, 155:8
**cite** [19] - 10:6, 29:17, 34:5, 36:2, 52:18, 54:21, 55:19, 74:6, 74:16, 76:17, 76:22, 79:2, 81:8, 87:9, 105:16, 111:4, 128:17, 194:19
**cited** [18] - 17:22, 20:2, 37:15, 48:5, 58:25, 62:12, 67:1, 69:11, 74:17, 81:10, 81:22, 86:21, 105:19, 117:2,

118:10, 137:11, 175:5, 180:6

**cites** [6] - 23:23, 30:24, 86:19, 89:2, 89:20, 159:21

**citing** [3] - 16:19, 65:10, 194:10

**Citing** [1] - 128:9

Civil [1] - 3:6

**CIVIL** [1] - 1:3

civil [6] - 104:14, 165:4, 165:5, 165:6, 188:11, 191:16

**claim** [22] - 11:19, 27:19, 33:24, 34:10, 42:4, 64:5, 64:8, 64:11, 80:3, 100:3, 106:13, 109:11, 109:12, 158:13, 158:25, 159:2, 160:15, 164:23, 182:10, 185:20, 188:2, 188:22

**claimed** [3] - 111:12, 183:18, 183:19

**claims** [4] - 176:24, 176:25, 177:1, 195:6

**CLARENDON** [1] - 2:7

**clarify** [4] - 157:11, 182:20, 183:21, 185:25

**clarifying** [1] - 178:14

**classic** [3] - 59:20, 70:8, 133:7

**classification** [1] - 165:9

**classified** [2] - 164:22, 165:14

**clear** [25] - 13:17, 19:14, 19:16, 19:20, 37:13, 58:18, 59:2, 63:21, 64:20, 64:24, 65:5, 66:25, 73:8, 86:7, 87:24, 88:2, 120:5, 133:13, 135:24, 139:11, 150:12, 151:7, 178:5, 186:4, 196:9

**clear-cut** [1] - 13:17

**cleared** [1] - 200:12

**clearly** [7] - 42:22, 42:23, 69:25, 102:22, 103:5, 178:7, 200:22

**clears** [1] - 198:10

**CLERK** [3] - 3:1, 8:24, 174:20

**clever** [1] - 37:13

**click** [3] - 154:22, 155:5, 155:10

**clients** [6] - 5:9, 43:19, 185:13, 189:18, 203:14

**clips** [1] - 60:23

**close** [17] - 24:5, 115:12, 115:17, 120:7, 132:16, 134:3, 134:6, 135:5, 139:11, 141:1, 150:22, 165:11, 181:20, 189:6, 189:8, 189:14

**closed** [2] - 118:3, 181:12

**closely** [1] - 17:21

**closer** [3] - 7:14, 33:9, 179:23

**cloth** [1] - 68:6

**Code** [1] - 183:5

**code** [15] - 24:17, 24:24, 25:6, 27:23, 31:18, 31:19, 31:20, 38:12, 51:17, 61:20, 139:8, 150:21, 171:5, 171:8

**cofounders** [2] - 40:18, 41:21

**cognizable** [1] - 46:23

**coherent** [1] - 190:22

**Coleridge** [1] - 92:25

**colleague** [1] - 175:8

**colleagues** [1] - 4:8

**collecting** [1] - 133:11

**collet** [1] - 83:9

**color** [2] - 92:13, 92:15

**colors** [1] - 29:14

**Colt** [1] - 177:3

**column** [8] - 95:11, 109:10, 109:12, 115:18, 128:2, 174:24

**columns** [5] - 126:24, 127:4, 147:20, 149:8, 173:20

**com** [1] - 177:19

**combination** [2] - 76:5, 83:24

**combines** [1] - 69:6

**ComicMix** [1] - 54:13

**coming** [4] - 101:12, 118:6, 143:19, 143:20

**command** [1] - 94:8

**commenced** [1] - 14:21

**Commencing** [1] - 1:12

**commend** [3] - 44:24, 141:1, 202:25

**comment** [2] - 10:14, 18:19

**commentary** [2] - 11:18, 63:4

**commercial** [8] - 11:8, 11:10, 13:22, 19:2, 19:3, 19:5, 19:6, 19:18

**commerciality** [9] - 11:2, 11:5, 11:7, 11:13, 11:17, 11:22, 13:6, 17:5, 20:12

**common** [3] - 25:14, 69:5, 134:24

**comp** [1] - 41:7

**companies** [3] - 27:23, 56:1, 56:9

**Company** [1] - 76:18

**comparable** [1] - 41:25

**compare** [1] - 111:11

**compared** [1] - 130:23

**comparing** [2] - 14:16, 97:20

**comparison** [18] - 105:15, 105:18, 105:20, 105:22, 109:2, 110:9, 110:14, 110:19, 115:1, 137:13, 137:17, 137:19, 140:14, 141:4, 142:11, 149:7, 150:19, 174:23

**comparisons** [1] - 173:16

**compendium** [1] - 64:3

**compete** [7] - 11:11, 15:15, 39:24, 51:2, 53:10, 53:13, 62:5

**competed** [1] - 14:11

**competes** [1] - 14:6

**competing** [5] - 25:8, 27:1, 27:3, 27:8, 43:23

**competition** [1] - 53:17

**competitive** [3] - 12:10, 46:2, 59:25

**competitors** [1] - 71:18

**compilation** [51] - 62:18, 63:7, 63:12, 63:23, 64:3, 64:4, 64:16, 64:21, 65:7, 66:8, 66:10, 68:16, 74:4, 74:11, 75:5, 75:6, 75:12, 75:18, 75:24, 76:1, 76:3,

77:16, 77:18, 78:5, 78:14, 78:21, 79:22, 81:21, 81:23, 82:5, 91:25, 92:4, 92:5, 92:16, 99:13, 99:23, 103:16, 103:23, 103:25, 104:22, 104:25, 105:2, 105:3, 113:4, 128:23, 128:24, 146:23, 150:3, 177:20, 198:13

**compilations** [9] - 63:17, 64:23, 64:24, 64:25, 65:1, 65:11, 74:18, 103:19, 104:4

**compile** [4] - 92:8

**complaint** [2] - 196:13, 196:17

**complete** [1] - 56:16

**completely** [7] - 24:6, 64:25, 88:22, 94:22, 114:23, 191:3, 195:5

**complex** [1] - 133:6

**Compulife** [1] - 121:5

**computer** [6] - 1:25, 133:8, 133:10, 139:8, 150:21, 156:18

**computer-aided** [1] - 1:25

**concealment** [1] - 25:22

**concede** [7] - 161:14, 161:24, 162:9, 162:11, 163:16, 163:23, 164:2

**conceded** [4] - 84:6, 161:4, 163:10, 171:18

**concedes** [1] - 82:16

**conceivably** [2] - 48:15, 48:16

**conceived** [1] - 19:24

**concept** [6] - 42:20, 45:12, 66:14, 67:23, 69:25, 86:23

**concerned** [2] - 142:8, 192:13

**concerning** [1] - 17:23

**concerns** [2] - 102:15, 102:17

**concession** [2] - 140:5, 151:3

**concluded** [1] - 177:18

**concludes** [1] - 28:12

**conclusion** [4] - 28:16, 48:2, 91:12, 124:8

**conclusions** [1] - 177:13

**conclusively** [3] - 178:20, 179:18, 179:25

**concrete** [1] - 201:17

**condensed** [1] - 95:17

**condensing** [1] - 96:6

**condone** [1] - 12:21

**conduct** [2] - 12:1, 25:25

**confer** [9] - 5:18, 148:7, 148:22, 150:17, 174:3, 176:5, 199:10, 199:21, 200:8

**conference** [6] - 68:22, 94:18, 197:1, 197:2, 197:12, 202:4

**conferences** [1] - 96:19

**conferred** [1] - 175:4

**confidentiality** [2] - 9:8, 184:17

**confirm** [2] - 126:23, 174:13

**confirmed** [1] - 123:17

**confirming** [1] - 156:19

**conflate** [1] - 52:10

**conflict** [2] - 5:22, 5:23

**conflicts** [2] - 5:5, 6:6

**conforms** [1] - 107:25

**confounding** [2] - 190:3, 193:7

**confounds** [1] - 191:4

**confronting** [1] - 19:9

**connected** [3] - 85:13, 94:12, 128:23

**connections** [1] - 39:14

**Connectix** [1] - 22:3

**connectors** [1] - 26:4

**conservative** [1] - 109:20

**consider** [4] - 46:20, 180:15, 200:24, 202:14

**consideration** [3] - 11:1, 17:12, 181:4

**considerations** [2] - 58:7, 59:18

**considered** [8] - 59:2, 72:6, 103:24, 130:5, 130:9, 130:19, 138:24, 181:4

**considering** [2] - 15:21, 19:11

**considers** [2] - 98:12,

106:9
**consistency** [1] - 177:9
**consistent** [4] - 70:13, 176:19, 179:16, 192:24
**constituent** [4] - 63:8, 100:4, 183:24, 184:1
**constitute** [1] - 94:21
**constitutes** [2] - 11:25, 43:7
**Constitution** [1] - 39:21
**constitutional** [3] - 43:24, 68:25, 149:17
**constrained** [7] - 79:7, 79:8, 79:22, 81:9, 81:10, 82:18, 83:12
**constraints** [2] - 79:1, 81:5
**Construction** [1] - 63:14
**construed** [1] - 73:16
**consult** [1] - 71:5
**consumers** [1] - 18:15
**contact** [1] - 11:24
**contain** [2] - 138:18, 175:6
**contained** [3] - 28:25, 157:15, 164:14
**contains** [5] - 54:3, 68:24, 143:14, 149:16, 175:18
**content** [19] - 13:7, 13:14, 14:14, 14:19, 14:22, 14:25, 25:2, 37:18, 41:6, 41:9, 42:9, 42:10, 43:22, 54:4, 54:5, 56:10, 60:1, 72:2, 164:12
**Content** [1] - 71:15
**contents** [2] - 78:17, 156:5
**context** [8] - 18:20, 18:21, 19:8, 22:13, 37:6, 67:12, 67:24, 128:18
**continuances** [1] - 198:5
**continue** [4] - 44:1, 51:7, 103:15, 106:11
**CONTINUED** [1] - 2:1
**continues** [3] - 46:18, 107:1, 107:9
**continuing** [2] - 86:22, 177:11
**contours** [1] - 179:23
**contract** [4] - 13:24, 25:17, 88:4, 90:3
**contractors** [1] -

154:9
**contradict** [1] - 91:1
**contradicting** [1] - 36:9
**contrary** [2] - 90:5, 95:24
**contribute** [1] - 69:12
**contribution** [1] - 92:7
**control** [3] - 26:17, 28:16, 95:24
**conversation** [3] - 68:23, 149:14, 167:8
**convert** [1] - 85:4
**converted** [2] - 30:11, 94:11
**convincing** [1] - 12:16
**copied** [41] - 44:3, 84:3, 84:24, 100:16, 102:1, 102:6, 119:23, 120:8, 121:8, 121:11, 124:1, 127:18, 128:11, 130:10, 130:14, 132:4, 132:17, 134:25, 135:25, 137:12, 140:22, 141:22, 149:24, 151:13, 151:24, 153:17, 161:6, 161:15, 161:18, 163:5, 163:11, 168:14, 168:17, 169:25, 172:3, 172:14, 172:23, 173:4, 187:14, 187:20, 191:23
**copies** [4] - 56:5, 118:18, 156:4, 183:9
**copy** [27] - 21:13, 39:7, 43:22, 46:16, 90:1, 90:4, 90:15, 96:19, 107:12, 109:22, 120:12, 130:20, 145:4, 156:7, 156:16, 156:17, 160:3, 160:7, 161:8, 164:15, 168:24, 171:17, 172:1, 177:20, 183:8, 187:15, 191:17
**copying** [64] - 12:23, 13:14, 15:10, 15:12, 37:12, 38:9, 43:6, 48:6, 48:7, 86:4, 96:21, 99:10, 100:4, 100:6, 102:5, 108:13, 108:14, 108:15, 109:23,

118:19, 120:5, 120:6, 120:10, 120:16, 120:17, 120:20, 120:22, 125:10, 128:9, 133:4, 135:22, 136:20, 136:23, 137:24, 141:6, 141:12, 141:13, 141:18, 151:1, 151:4, 151:10, 151:22, 152:4, 152:5, 152:20, 153:1, 153:12, 156:20, 157:8, 163:21, 167:17, 171:13, 171:16, 171:21, 171:22, 172:6, 177:18, 179:5, 184:2, 192:16, 193:3
**copyright** [82] - 14:8, 26:19, 27:18, 28:19, 29:10, 30:2, 43:14, 46:11, 46:23, 47:7, 47:12, 47:15, 47:17, 48:3, 51:3, 51:4, 51:5, 62:18, 62:21, 64:9, 65:7, 65:8, 66:6, 66:11, 67:7, 67:10, 70:21, 71:3, 72:8, 73:17, 73:22, 74:3, 75:16, 77:8, 78:7, 79:10, 79:12, 79:23, 80:3, 80:9, 80:11, 82:5, 82:6, 83:11, 86:13, 87:1, 87:2, 93:4, 99:16, 100:3, 111:1, 113:16, 119:23, 130:2, 134:5, 146:22, 146:23, 149:18, 168:7, 169:14, 170:14, 182:23, 183:2, 183:7, 183:14, 183:23, 183:25, 184:3, 184:9, 184:10, 184:13, 184:15, 185:11, 185:12, 185:16, 185:20, 186:5, 186:22, 198:8, 198:13
**Copyright** [1] - 121:8
**copyrightability** [2] - 83:7, 86:15
**copyrightable** [5] - 67:11, 67:17, 78:12, 106:11, 118:16

**copyrighted** [26] - 26:16, 26:17, 27:12, 28:1, 28:10, 28:13, 28:21, 29:1, 39:13, 46:17, 53:11, 53:19, 61:14, 61:15, 61:22, 62:2, 62:5, 62:6, 63:7, 63:10, 71:4, 77:2, 78:13, 102:11
**copyrighting** [1] - 177:19
**copyrights** [7] - 46:14, 47:5, 47:6, 47:13, 47:23, 64:11, 91:6
**corny** [1] - 45:22
**CORPORATION** [1] - 1:4
**correct** [24] - 30:22, 43:8, 77:11, 77:17, 82:3, 85:16, 85:21, 93:3, 95:22, 119:17, 132:23, 141:20, 143:8, 144:14, 156:23, 163:18, 166:15, 175:12, 175:13, 175:16, 176:1, 180:12, 185:4, 204:7
**Correct** [1] - 115:10
**correcting** [1] - 178:15
**correctly** [2] - 130:1, 156:20
**correlation** [2] - 111:23, 137:12
**corresponded** [1] - 38:24
**CORROON** [1] - 2:13
**cost** [2] - 7:22, 204:1
**counsel** [8] - 3:9, 3:14, 6:13, 7:5, 7:13, 7:21, 55:6, 57:13
**counter** [1] - 61:5
**COUNTERCLAIMAN T** [2] - 2:14, 2:19
**Counterclaimant** [1] - 1:8
**counterclaims** [1] - 44:18
**Counterdefendants** [1] - 1:5
**COUNTERDEFENDA NTS** [2] - 1:17, 2:3
**country** [3] - 6:16, 17:19, 131:1
**couple** [10] - 8:18, 29:24, 30:7, 83:4, 100:23, 105:11, 123:10, 152:21, 169:3, 182:5
**course** [17] - 6:2,

12:18, 27:17, 31:25, 45:15, 48:6, 51:14, 60:25, 75:3, 131:22, 135:20, 139:4, 164:4, 177:11, 178:22, 203:4
**court** [12] - 8:18, 53:14, 67:4, 76:9, 96:17, 130:1, 130:4, 137:17, 137:19, 141:6, 141:8, 181:2
**Court** [131] - 1:22, 3:3, 4:25, 7:23, 8:10, 10:2, 10:8, 11:8, 11:16, 11:25, 12:4, 12:24, 14:10, 17:15, 17:16, 17:22, 18:19, 23:25, 25:9, 28:12, 28:20, 39:18, 42:21, 44:24, 46:7, 46:9, 47:21, 48:23, 49:15, 49:23, 52:14, 52:19, 57:9, 57:14, 57:24, 58:8, 59:7, 66:17, 68:19, 73:11, 80:1, 80:5, 80:16, 81:13, 83:8, 86:21, 87:21, 90:9, 94:8, 99:5, 103:9, 107:16, 107:23, 108:7, 108:20, 109:13, 109:18, 109:19, 110:12, 110:13, 113:23, 113:24, 114:9, 120:20, 121:18, 122:12, 122:19, 122:21, 123:8, 126:25, 127:3, 129:2, 130:7, 130:9, 130:18, 130:24, 131:13, 132:13, 133:2, 135:8, 136:8, 138:22, 138:23, 139:17, 141:1, 146:7, 146:10, 147:3, 147:4, 147:17, 147:21, 148:1, 149:3, 149:6, 149:15, 150:13, 152:14, 152:21, 152:22, 160:2, 164:9, 170:2, 171:25, 173:15, 175:7, 176:2, 176:3, 176:20, 177:3, 177:5, 177:17, 178:2, 178:19, 178:21, 180:14, 181:3, 181:4, 181:6, 181:10, 183:5,

184:8, 186:1, 192:17, 194:22, 201:9, 203:6, 203:11, 203:23, 204:1

**COURT** [329] - 1:1, 3:1, 3:2, 3:20, 4:3, 4:12, 4:16, 4:18, 5:13, 5:23, 6:2, 6:9, 6:17, 6:19, 6:22, 7:1, 7:11, 7:20, 8:21, 8:25, 9:13, 10:7, 10:18, 10:23, 11:12, 15:19, 16:16, 17:2, 18:9, 18:21, 18:24, 19:21, 20:15, 21:1, 21:25, 22:5, 23:1, 23:16, 25:21, 26:21, 28:4, 29:4, 30:7, 30:17, 30:20, 30:25, 31:11, 31:15, 32:12, 32:18, 32:21, 34:21, 35:8, 35:16, 36:16, 36:24, 37:3, 38:16, 39:9, 44:11, 46:5, 46:25, 48:20, 49:7, 49:14, 50:4, 51:19, 51:22, 52:14, 52:19, 52:23, 53:6, 53:14, 53:21, 54:20, 55:2, 55:12, 56:18, 57:18, 58:12, 59:17, 60:2, 60:12, 60:18, 61:3, 62:15, 62:17, 63:25, 65:2, 65:12, 66:16, 66:21, 67:20, 68:13, 71:2, 72:9, 73:7, 74:7, 74:12, 74:20, 74:22, 75:17, 77:5, 77:7, 77:14, 77:20, 78:3, 78:15, 79:16, 81:17, 81:19, 82:1, 82:25, 84:18, 85:14, 85:17, 85:22, 86:24, 87:2, 87:5, 87:13, 88:6, 88:12, 88:15, 88:24, 89:5, 89:13, 91:16, 92:2, 92:5, 92:17, 92:24, 93:17, 93:19, 93:23, 95:4, 99:6, 100:17, 101:15, 102:8, 102:14, 103:7, 104:1, 105:5, 106:12, 106:17, 107:20, 109:6, 110:11, 111:15, 112:6, 112:24, 113:11, 114:7, 114:18, 114:20, 115:4, 115:6, 115:8,

115:11, 115:18, 115:22, 116:12, 116:17, 116:20, 116:22, 117:4, 117:9, 118:5, 118:14, 119:3, 119:8, 119:15, 119:18, 120:4, 122:18, 123:24, 124:23, 125:13, 126:13, 126:19, 127:2, 127:8, 127:22, 128:7, 128:15, 129:11, 132:19, 134:1, 135:10, 136:1, 136:14, 136:25, 139:5, 140:3, 140:8, 140:24, 141:16, 142:13, 142:18, 142:25, 143:6, 143:20, 143:23, 144:1, 144:4, 144:6, 144:13, 144:15, 145:3, 145:11, 145:16, 145:22, 146:11, 147:3, 147:11, 147:14, 147:25, 148:13, 148:21, 150:1, 150:7, 150:11, 150:15, 151:2, 151:18, 153:8, 153:11, 153:23, 154:1, 154:16, 155:15, 155:18, 157:10, 157:16, 158:4, 158:6, 159:17, 160:1, 160:25, 161:2, 161:4, 161:10, 161:14, 161:18, 161:23, 162:3, 162:7, 162:9, 162:11, 162:14, 162:17, 162:20, 162:23, 163:7, 163:10, 163:14, 163:19, 164:2, 164:6, 164:17, 164:20, 165:16, 165:19, 165:22, 166:2, 166:5, 166:12, 166:16, 167:12, 167:20, 167:25, 168:4, 169:10, 170:18, 171:18, 171:24, 172:5, 172:19, 172:25, 173:15, 173:17, 174:11,

174:15, 174:18, 174:22, 175:11, 175:14, 175:22, 176:5, 176:13, 176:15, 176:17, 178:25, 180:3, 180:10, 180:18, 180:24, 182:2, 182:5, 182:19, 183:16, 184:19, 185:2, 185:18, 185:23, 186:7, 186:10, 187:23, 188:7, 188:16, 190:5, 190:16, 191:10, 191:12, 193:4, 194:9, 195:11, 195:19, 196:15, 199:18, 199:25, 200:3, 200:6, 200:17, 200:24, 201:2, 202:2, 202:13

**Court's** [5] - 17:7, 17:8, 108:4, 151:20, 175:3

**court's** [2] - 63:16, 67:9

**Courthouse** [1] - 1:10

**courtroom** [2] - 9:6, 60:12

**Courts** [1] - 44:23

**courts** [16] - 17:18, 17:19, 28:15, 52:8, 52:17, 64:14, 72:6, 80:20, 80:25, 129:17, 130:5, 131:2, 131:23, 133:6, 134:11, 134:14

**cover** [6] - 167:10, 173:25, 174:1, 174:2, 182:25, 185:13

**coverage** [7] - 170:9, 170:15, 174:13, 174:16, 186:25, 187:2, 188:5

**covered** [2] - 185:20, 188:19

**covering** [2] - 170:12, 189:7

**crate** [1] - 112:3

**crawled** [1] - 157:17

**crazy** [1] - 9:25

**create** [17] - 13:15, 16:10, 36:4, 40:25, 41:24, 43:22, 44:6, 51:17, 72:1, 85:2, 86:16, 90:6, 113:24,

156:7, 156:17, 193:15, 193:16

**created** [15] - 25:5, 42:13, 62:19, 71:15, 72:7, 89:11, 89:23, 91:25, 95:9, 124:2, 135:21, 138:2, 153:5, 154:8, 158:2

**creating** [7] - 13:21, 43:25, 132:4, 135:17, 145:1, 154:19, 161:20

**creation** [2] - 22:8, 153:7

**creative** [21] - 14:8, 63:6, 63:12, 63:24, 64:7, 67:18, 68:18, 69:4, 73:2, 73:20, 74:11, 75:6, 75:8, 79:11, 82:10, 87:8, 92:7, 92:8, 92:20, 93:6, 104:8

**creativity** [12] - 43:16, 69:21, 70:5, 71:23, 77:23, 77:25, 79:15, 82:20, 86:11, 86:15, 132:3, 158:11

**creators** [1] - 14:9

**credential** [1] - 181:4

**credentials** [2] - 12:17, 152:8

**credibility** [2] - 126:11, 203:18

**credible** [1] - 126:12

**Crew** [1] - 18:22

**criminal** [4] - 104:14, 188:13, 191:14, 191:16

**Crinesha** [1] - 202:1

**CRINESHA** [1] - 2:22

**Crinessa** [1] - 4:9

**critical** [2] - 11:18, 59:13

**critically** [1] - 159:14

**criticism** [2] - 59:16

**cross** [7] - 92:14, 119:13, 126:11, 131:1, 136:20, 165:20, 165:23

**Cross** [17] - 97:18, 97:19, 110:16, 115:9, 136:2, 139:21, 140:4, 141:24, 142:15, 143:4, 143:11, 144:8, 146:16, 151:6, 172:20, 175:9, 175:11

**Cross's** [1] - 142:22

**cross-checking** [2] -

165:20, 165:23

**cross-examination** [1] - 126:11

**cross-list** [1] - 119:13

**cross-reference** [1] - 92:14

**CROWELL** [1] - 2:18

**CRR** [2] - 1:22, 204:12

**crucial** [1] - 63:17

**crunch** [1] - 80:20

**CSR** [1] - 204:12

**CSV** [5] - 30:16, 157:1, 167:24, 168:3

**CTR** [1] - 2:20

**curettage** [1] - 134:22

**current** [1] - 42:9

**customary** [2] - 42:17, 55:16

**customers** [2] - 40:13, 112:22

**cut** [2] - 13:17, 61:9

## D

**D.C** [1] - 51:15

**D.I** [29] - 8:11, 23:24, 36:2, 69:18, 89:17, 94:8, 95:3, 97:8, 115:3, 115:7, 116:8, 116:11, 117:2, 126:16, 127:23, 144:4, 144:13, 145:3, 147:7, 148:24, 152:9, 152:23, 154:4, 159:20, 170:2, 194:12, 199:4, 201:6

**D.I.'s** [1] - 173:23

**Dale** [1] - 3:14

**DALE** [1] - 2:3

**damage** [1] - 113:17

**damages** [49] - 6:21, 6:22, 96:22, 99:22, 100:10, 100:17, 100:21, 100:22, 100:23, 101:1, 101:2, 101:4, 101:6, 101:10, 101:22, 101:23, 101:24, 102:5, 102:10, 102:18, 102:25, 103:3, 111:5, 111:9, 112:9, 112:14, 112:16, 112:20, 113:6, 113:13, 113:19, 123:8, 123:16, 123:18, 123:19, 123:21, 124:4, 124:15, 124:16, 125:15,

125:23, 126:1, 126:3, 126:8, 182:7, 198:13, 198:15, 198:21

**danger** [3] - 46:3, 92:18, 173:2

**Data** [6] - 29:16, 29:19, 70:3, 86:7, 86:18, 87:12

**data** [23] - 16:25, 24:21, 24:22, 31:22, 35:5, 35:7, 41:6, 41:23, 42:5, 42:11, 43:1, 45:12, 47:11, 48:10, 49:18, 49:19, 51:6, 55:17, 55:22, 72:5, 156:21, 164:18, 171:5

**database** [7] - 156:8, 156:10, 156:11, 156:17, 156:20, 167:24, 168:3

**date** [4] - 35:9, 35:20, 35:21, 197:12

**dates** [6] - 7:9, 197:1, 197:7, 197:15, 202:3, 202:20

**Daubert** [2] - 102:19, 143:10

**DAVID** [1] - 2:13

**David** [1] - 4:7

**Davis** [1] - 42:15

**days** [10] - 19:19, 24:16, 114:11, 114:15, 195:20, 196:4, 197:13, 200:13, 201:21, 202:5

**DC** [1] - 2:23

**de** [10] - 99:9, 100:6, 123:25, 124:24, 125:6, 125:11, 125:14, 128:9, 136:23, 141:7

**DE** [2] - 1:19, 2:15

**deal** [6] - 10:9, 54:25, 66:25, 100:9, 134:12, 148:10

**dealing** [1] - 12:3

**death** [1] - 13:24

**debate** [6] - 70:24, 80:14, 125:6, 125:9, 126:7, 168:8

**debated** [2] - 123:1, 135:1

**debt** [1] - 40:10

**decades** [1] - 43:15

**deceit** [1] - 12:13

**December** [2] - 1:11, 201:13

**decide** [20] - 17:9, 20:7, 58:10, 83:11, 92:10, 94:22, 94:25, 102:4, 106:3, 122:14, 126:10, 132:21, 133:17, 134:15, 135:8, 150:3, 150:4, 151:6, 171:25, 198:2

**decided** [11] - 25:20, 62:9, 71:19, 80:6, 177:10, 178:20, 179:6, 179:7, 179:12, 179:18, 179:25

**decides** [4] - 96:9, 122:17, 124:17, 126:3

**deciding** [1] - 99:1

**decision** [10] - 17:4, 17:9, 44:24, 63:13, 128:12, 134:18, 176:23, 180:22, 181:5, 181:13

**decisions** [4] - 54:7, 131:22, 178:7, 181:3

**declaration** [48] - 10:15, 10:16, 10:17, 10:19, 21:10, 21:12, 21:19, 22:25, 24:2, 31:12, 33:1, 35:4, 36:1, 37:24, 56:3, 56:7, 56:11, 69:18, 98:3, 98:4, 98:6, 98:12, 98:20, 98:22, 117:13, 117:24, 118:7, 118:10, 118:23, 119:1, 119:9, 122:13, 122:22, 123:2, 132:5, 136:7, 136:10, 136:13, 136:16, 143:17, 152:23, 160:18, 166:22, 170:3, 174:8, 191:25

**Declaration** [9] - 8:12, 20:23, 40:9, 40:11, 40:14, 40:22, 42:2, 89:18

**declarations** [1] - 90:24

**deductions** [1] - 124:15

**deduped** [1] - 98:15

**defective** [1] - 60:3

**Defendant** [1] - 1:7

**defendant** [4] - 4:5, 4:7, 12:5, 12:8, 54:14, 121:8,

137:10, 183:11, 186:2

**DEFENDANT** [2] - 2:13, 2:18

**defendant's** [5] - 121:19, 130:6, 130:9, 130:19, 131:7

**defendant...had** [1] - 183:9

**defendants** [1] - 183:10

**defense** [2] - 54:14, 169:12

**defenses** [2] - 132:1, 182:7

**defined** [1] - 44:19

**definition** [2] - 44:22, 50:17

**degree** [3] - 11:4, 25:14, 59:4

**Delaware** [2] - 3:6, 197:14

**DELAWARE** [1] - 1:1

**delays** [1] - 198:6

**deletes** [1] - 120:6

**deliberately** [1] - 85:18

**demand** [1] - 46:21

**Demand** [1] - 56:3

**denial** [1] - 181:20

**denied** [2] - 12:9, 18:4

**deny** [3] - 103:4, 115:12, 181:11

**denying** [1] - 49:9

**dependent** [2] - 52:24, 113:6

**depicting** [1] - 76:24

**deposed** [3] - 36:7, 97:19, 98:10

**deposition** [10] - 31:9, 56:8, 65:22, 82:15, 132:8, 143:4, 151:24, 152:8, 160:6, 175:10

**depositions** [1] - 15:6

**deprived** [1] - 41:14

**deputy** [2] - 60:13, 83:1

**DEPUTY** [3] - 3:1, 8:24, 174:20

**Der** [1] - 35:13

**derivative** [26] - 28:13, 28:14, 28:16, 29:19, 45:3, 45:24, 62:19, 63:12, 64:6, 64:8, 64:19, 66:11, 66:24, 67:5, 67:11, 67:18, 67:19, 67:20, 68:17, 74:11, 76:19, 76:25, 77:2, 77:8, 79:8,

79:21

**derivative-work** [1] - 66:24

**derivatives** [1] - 42:9

**derive** [1] - 51:10

**derived** [1] - 67:23

**derives** [1] - 67:6

**describe** [1] - 186:23

**described** [2] - 31:9, 156:3

**describes** [2] - 140:5, 141:6

**descriptions** [1] - 95:25

**deserve** [1] - 79:18

**designation** [1] - 3:6

**designed** [2] - 13:21, 85:18

**designs** [1] - 137:14

**desire** [4] - 79:3, 79:5, 81:13

**desk** [1] - 85:6

**destroy** [2] - 41:22, 56:5

**destroyed** [1] - 62:13

**detail** [4] - 55:4, 71:17, 102:1, 191:16

**details** [1] - 100:24

**detectable** [1] - 77:15

**determination** [5] - 82:19, 96:22, 100:12, 134:16, 139:10

**determinations** [3] - 111:3, 198:20, 198:24

**determinative** [1] - 58:6

**determine** [3] - 61:14, 91:5, 100:21

**determining** [1] - 115:16

**develop** [1] - 45:19

**developed** [2] - 29:8, 40:12

**developing** [2] - 192:2, 192:8

**Development** [1] - 96:1

**di** [2] - 125:10, 169:1

**dice** [1] - 100:14

**difference** [6] - 44:10, 50:18, 59:10, 79:17, 109:5, 137:20

**differences** [2] - 122:24, 131:8

**different** [62] - 19:2, 19:4, 22:9, 24:8, 25:14, 27:4, 29:14, 32:1, 44:23, 45:17,

49:13, 49:25, 52:4, 52:6, 59:12, 65:24, 66:1, 66:2, 67:2, 70:25, 71:21, 72:24, 74:18, 76:5, 76:14, 80:22, 81:2, 81:4, 82:9, 82:16, 84:14, 85:9, 88:13, 90:8, 92:11, 92:12, 95:13, 97:23, 100:23, 105:12, 108:11, 122:8, 127:11, 129:4, 132:11, 132:12, 132:13, 142:10, 158:3, 159:7, 171:14, 173:22, 173:23, 175:14, 187:5, 187:6, 190:12, 192:5, 192:6, 194:2, 198:17

**differently** [5] - 20:18, 71:18, 71:22, 72:24, 84:7

**difficult** [3] - 91:4, 93:6, 188:11

**difficulty** [1] - 7:3

**digital** [1] - 145:4

**diminished** [1] - 41:4

**diminishes** [1] - 11:20

**diminishing** [1] - 138:12

**diminution** [2] - 42:18, 112:22

**direct** [23] - 8:17, 36:6, 36:10, 88:4, 99:7, 101:15, 102:5, 103:5, 124:20, 133:25, 148:8, 151:22, 153:11, 153:16, 167:21, 167:22, 168:17, 168:22, 169:5, 170:2, 183:15, 184:7, 198:8

**directed** [3] - 36:12, 89:10, 160:8

**directing** [1] - 183:5

**direction** [1] - 175:3

**directions** [1] - 85:7

**directly** [8] - 12:20, 14:11, 15:23, 37:21, 46:22, 84:25, 102:22, 169:8

**directory** [2] - 68:24, 149:15

**disagree** [4] - 36:19, 118:21, 133:22, 199:11

**disagreed** [1] - 132:22

disagreement [2] - 142:18, 173:21
discarded [8] - 162:5, 162:7, 166:8, 166:10, 166:13, 166:17, 167:15, 171:3
discarding [1] - 39:5
disclosed [1] - 98:10
disclosing [1] - 18:14
disconcerting [1] - 203:22
discounts [1] - 40:13
discourage [1] - 17:25
discouragement [1] - 123:11
discover [1] - 65:18
discovery [1] - 134:20
discrete [2] - 34:12
discretion [6] - 177:5, 178:24, 179:2, 179:3, 179:11, 179:16
discuss [3] - 77:17, 195:1, 195:5
discussed [12] - 61:12, 70:4, 94:7, 94:17, 98:15, 100:9, 103:3, 117:14, 132:7, 132:8, 136:18, 182:16
discusses [1] - 82:15
discussing [5] - 23:6, 25:22, 118:9, 132:5, 174:9
discussion [5] - 57:8, 102:25, 151:16, 169:4, 198:15
Discussion [3] - 8:20, 53:2, 154:6
discussions [1] - 94:12
disfavored [1] - 134:4
disgorge [1] - 113:5
disgorgement [7] - 101:23, 101:24, 111:20, 112:10, 112:24, 113:1, 124:16
dismiss [3] - 7:15, 134:14, 139:19
dispute [22] - 11:8, 11:12, 20:1, 23:19, 23:20, 24:9, 32:7, 36:9, 63:17, 86:25, 94:15, 122:15, 132:1, 134:23, 141:17, 161:5, 163:20, 163:22, 172:5, 183:13,

195:18
disputed [10] - 20:6, 62:20, 129:22, 135:7, 151:9, 151:10, 153:14, 167:9, 186:5
disputes [1] - 129:21
disputing [3] - 77:14, 95:22, 161:2
dissimilar [2] - 140:15, 173:3
dissimilarities [1] - 173:8
distances [1] - 61:7
distill [1] - 158:8
distinguish [1] - 18:6
distinguished [1] - 51:23
distinguishes [2] - 65:9, 87:17
distracting [1] - 196:19
district [6] - 17:18, 96:17, 130:1, 130:4, 131:23, 141:8
DISTRICT [2] - 1:1, 1:1
District [4] - 3:6, 76:22, 130:17, 177:15
diverse [1] - 192:8
diversity [1] - 192:7
division [1] - 4:10
DNE [1] - 26:24
docket [3] - 10:14, 175:7, 175:20
Docket [5] - 10:16, 10:17, 11:9, 199:4
doctrine [4] - 176:19, 177:2, 179:17, 181:2
doctrines [2] - 130:11, 130:22
document [8] - 77:9, 89:23, 97:22, 147:18, 148:17, 148:20, 154:7, 160:7
documentary [1] - 152:2
documents [4] - 173:22, 183:12, 194:11, 201:5
dog [1] - 187:18
dollar [2] - 48:18, 93:7
dollars [1] - 46:23
domain [4] - 69:6, 76:19, 76:24, 77:10
domino [1] - 58:23
done [27] - 27:17, 30:2, 54:18, 65:23, 66:1, 73:13, 74:5, 82:17, 106:9,

108:19, 110:17, 113:22, 113:25, 114:14, 120:22, 137:17, 152:11, 153:4, 169:2, 179:21, 181:23, 191:3, 192:8, 200:15, 201:7, 203:7, 203:17
Door [1] - 195:3
doubly [1] - 180:5
doubt [1] - 118:23
down [12] - 3:3, 19:7, 64:1, 83:1, 85:10, 103:6, 112:20, 160:22, 189:8, 189:23, 197:19, 197:23
downloaded [1] - 157:1
downstream [2] - 57:19, 58:7
Dr [20] - 24:3, 24:9, 24:15, 31:9, 37:23, 54:13, 54:20, 65:20, 95:2, 98:25, 105:8, 114:1, 123:2, 132:7, 139:20, 139:21, 143:13, 156:2, 157:20
drafted [1] - 154:16
dragging [1] - 196:18
draw [1] - 69:5
drilling [1] - 189:8
drive [1] - 145:5
drop [1] - 111:16
drug [1] - 93:1
drug-induced [1] - 93:1
Ds [1] - 175:15
duck [3] - 37:17, 37:18
duplication [1] - 98:16
during [8] - 7:8, 143:10, 148:19, 175:4, 175:9, 177:10, 194:17, 197:4
dynamics [2] - 96:16, 100:8

## E

e-mail [7] - 34:21, 35:8, 36:2, 148:8, 148:19, 152:3, 201:7
e-mails [1] - 20:2
earliest [1] - 134:9
early [3] - 197:10, 197:19, 201:17
easier [4] - 8:14,

124:20, 135:23, 199:13
easiest [1] - 144:20
easily [1] - 135:8
EAST [1] - 2:9
Easter/Passover [1] - 197:11
Eastern [1] - 76:22
easy [2] - 120:19, 154:13
Edge [1] - 21:20
editor [1] - 95:18
editorial [3] - 15:11, 69:17, 70:5
editors [13] - 15:9, 15:11, 15:15, 38:3, 44:2, 54:8, 72:25, 82:21, 84:16, 86:2, 94:21, 132:3, 193:3
educational [1] - 81:21
effect [6] - 39:12, 40:3, 42:23, 46:16, 49:8, 58:23
effective [1] - 14:7
efficiency [1] - 177:6
effort [9] - 78:25, 79:12, 79:13, 79:18, 91:18, 92:6, 93:7, 105:8, 203:4
eggs [2] - 87:10, 87:16
Eight [1] - 70:3
either [20] - 16:13, 16:25, 19:22, 25:23, 29:1, 33:9, 57:5, 59:22, 64:16, 66:7, 68:5, 83:16, 89:14, 104:16, 108:5, 140:23, 151:9, 162:2, 195:5, 198:19
electronic [1] - 201:4
electronically [1] - 159:9
element [2] - 39:19, 71:24
elements [10] - 69:6, 97:15, 100:3, 100:4, 110:4, 120:14, 152:18, 158:11, 183:24, 184:1
Eleventh [10] - 63:13, 63:22, 64:12, 64:22, 66:9, 74:9, 74:13, 74:16, 76:8, 121:7
elicited [1] - 26:1
eliminate [2] - 146:18, 146:20
eliminated [1] - 191:3
ELLIS [1] - 2:2
Ellis [1] - 3:15

Ellison [1] - 92:22
EMBARCADERO [1] - 2:20
emphasize [1] - 55:8
emphasized [1] - 177:8
emphasizes [1] - 11:16
employee [2] - 12:17, 35:14
employment [1] - 78:11
enabling [1] - 14:9
encourage [1] - 12:22
end [20] - 5:24, 5:25, 15:24, 23:20, 26:14, 28:3, 28:5, 29:9, 30:6, 44:19, 60:25, 68:3, 72:13, 86:5, 98:21, 167:23, 168:2, 168:3, 185:5, 201:14
ended [1] - 28:21
ends [4] - 172:3, 185:12, 200:20, 202:7
energy [1] - 73:21
engine [4] - 24:12, 31:19, 47:6, 165:9
engineer [4] - 24:3, 171:7, 190:7, 202:21
engineering [4] - 38:13, 96:16, 100:8, 111:6
ensure [1] - 192:2
enter [3] - 3:9, 48:12, 62:14
ENTERPRISE [1] - 1:3
Enterprise [1] - 3:7
Entertainment [1] - 131:11
entire [7] - 114:16, 116:14, 137:15, 175:25, 189:3, 190:13, 193:21
entirely [2] - 61:12, 176:18
entirety [2] - 90:22, 113:2
entitled [7] - 63:9, 69:8, 70:1, 70:21, 73:3, 118:2, 204:9
entry [2] - 175:20, 180:23
enumerated [1] - 56:9
epiphysis [1] - 177:24
equals [1] - 112:22
equipped [2] - 139:19, 140:1
ER [1] - 35:18

**Eric** [1] - 95:25
**ERIC** [1] - 2:4
**erring** [1] - 196:9
**erroneous** [1] - 178:7
**error** [1] - 165:3
**especially** [1] - 187:8
**ESQUIRE** [14] - 1:17, 1:18, 2:3, 2:3, 2:4, 2:6, 2:8, 2:9, 2:13, 2:14, 2:19, 2:19, 2:21, 2:22
**essence** [1] - 198:23
**essentially** [6] - 26:15, 82:16, 90:15, 143:11, 158:21, 179:19
**establish** [2] - 112:3, 112:18
**established** [2] - 131:25, 153:1
**establishes** [1] - 193:13
**estimates** [2] - 124:5, 202:17
**et** [9] - 3:8, 4:4, 16:20, 19:7, 118:16, 145:13, 153:20, 194:18, 202:24
**etcetera** [1] - 57:1
**Ets** [1] - 67:3
**ETS** [1] - 82:1
**Ets-Hokin** [1] - 67:3
**evaluated** [2] - 79:19, 94:2
**evaluation** [2] - 31:10, 59:20
**evaluations** [1] - 70:17
**eventually** [2] - 40:21, 183:11
**ever-changing** [1] - 187:10
**evidence** [52] - 20:17, 20:21, 34:2, 34:7, 34:16, 36:5, 36:7, 38:22, 38:25, 39:1, 39:5, 40:2, 48:10, 48:13, 49:4, 49:20, 49:21, 50:1, 50:2, 50:11, 50:16, 54:17, 54:22, 54:23, 55:19, 56:13, 56:15, 62:7, 62:11, 88:18, 88:20, 90:23, 96:4, 120:6, 151:23, 152:2, 153:12, 153:17, 155:10, 155:23, 161:22, 165:8, 165:11, 165:12, 168:23, 170:20,

170:23, 171:4, 178:11, 185:15, 189:12, 190:2
**evidences** [1] - 56:7
**evident** [1] - 91:17
**exact** [1] - 168:11
**exactly** [7] - 19:13, 20:21, 24:1, 32:20, 81:1, 110:17, 185:22
**Exactly** [1] - 66:20
**examination** [1] - 126:11
**examine** [3] - 43:9, 57:25, 173:15
**examined** [1] - 175:9
**example** [20] - 21:8, 23:25, 33:15, 37:14, 40:18, 70:8, 87:10, 106:14, 106:22, 108:13, 113:2, 127:20, 129:25, 133:7, 134:23, 137:24, 140:13, 164:10, 177:17, 179:24
**examples** [4] - 24:25, 108:12, 169:17, 178:5
**Excel** [6] - 145:9, 145:12, 176:3, 176:7, 201:4, 201:20
**except** [5] - 4:14, 51:10, 100:17, 101:15, 170:24
**exceptional** [1] - 137:5
**exchange** [1] - 152:3
**excluded** [1] - 49:15
**excluding** [1] - 97:10
**exclusive** [6] - 41:5, 47:11, 47:13, 62:3, 63:23, 77:24
**exclusively** [1] - 75:18
**exclusivity** [4] - 41:14, 41:15, 41:19
**excused** [1] - 184:2
**executives** [2] - 12:15, 21:6
**exempt** [1] - 176:24
**exercise** [2] - 178:24, 179:16
**exercises** [1] - 177:5
**exert** [1] - 141:25
**Exhibit** [21] - 8:12, 20:24, 21:10, 21:12, 21:19, 35:4, 36:1, 40:14, 40:22, 42:2, 56:4, 56:8, 56:11, 89:18, 127:15, 160:8, 170:3, 174:7,

191:25, 192:10
**exhibit** [5] - 127:12, 175:8, 175:15, 189:5
**exhibits** [2] - 10:15, 175:5
**exist** [3] - 106:18, 118:15, 118:18
**existing** [1] - 45:18
**exists** [4] - 20:11, 46:4, 54:17, 55:6
**expect** [1] - 201:16
**expectation** [1] - 72:2
**expected** [1] - 160:5
**expense** [1] - 44:5
**expenses** [1] - 123:13
**expensive** [1] - 18:1
**expert** [32] - 6:17, 6:19, 6:20, 6:22, 24:9, 37:23, 49:12, 65:20, 71:16, 71:22, 82:14, 88:19, 97:18, 98:7, 98:9, 111:3, 124:5, 132:7, 132:20, 133:2, 139:14, 140:4, 142:2, 142:8, 156:2, 157:20, 171:7, 174:9, 191:24, 196:25
**expertise** [1] - 70:18
**experts** [14] - 6:15, 40:15, 45:13, 59:22, 124:22, 126:8, 132:24, 133:5, 133:7, 133:14, 135:1, 155:25, 192:24, 202:23
**explain** [4] - 38:7, 55:4, 181:5, 194:21
**explained** [4] - 43:11, 67:4, 151:21, 177:4
**explaining** [2] - 98:7, 119:1
**explains** [2] - 52:3, 160:20
**explanation** [1] - 90:21
**explicitly** [1] - 70:4
**exploded** [1] - 200:1
**exploitable** [1] - 55:25
**exploited** [1] - 12:5
**express** [1] - 130:12
**expressed** [1] - 192:6
**expresses** [1] - 203:7
**expression** [14] - 22:10, 24:5, 24:7, 24:13, 31:24, 63:19, 64:15, 68:25, 79:8, 79:13, 79:14, 80:12, 149:17, 192:7

**expressly** [2] - 12:9, 46:1
**extend** [1] - 185:16
**extending** [1] - 146:22
**extends** [1] - 177:19
**extensive** [2] - 194:6, 194:7
**extent** [6] - 8:10, 10:11, 11:22, 22:11, 96:21, 149:21
**extra** [2] - 168:19, 190:24
**extracted** [1] - 167:1
**extraordinary** [1] - 178:6
**extrapolate** [7] - 94:14, 96:4, 99:4, 105:14, 108:10, 111:10, 123:6
**extrapolated** [1] - 94:3
**extreme** [2] - 68:3, 79:9
**extremely** [4] - 64:24, 68:21, 134:3, 148:14
**eye** [2] - 139:12, 148:1
**eyeball** [1] - 153:9
**eyes** [1] - 173:22

**F**

**F.2d** [4] - 70:5, 72:5, 83:14, 131:17
**F.3d** [16] - 67:7, 70:19, 83:8, 86:8, 121:6, 121:17, 121:24, 130:3, 131:5, 131:6, 131:15, 131:16, 131:19, 131:21, 152:15
**F.3rd** [1] - 96:2
**F.7** [2] - 96:17, 111:7
**F.supp** [1] - 177:16
**F3d** [3] - 55:25, 177:11, 178:12
**fabric** [2] - 109:2, 137:14
**Fabrics** [1] - 105:21
**face** [1] - 139:3
**faced** [1] - 153:3
**fact** [33] - 12:12, 15:17, 36:13, 46:9, 55:23, 56:4, 59:14, 62:11, 64:12, 65:17, 66:1, 72:11, 80:6, 84:6, 99:18, 105:1, 120:24, 122:7, 125:24, 133:17, 134:3, 135:7, 145:1, 149:15, 151:9, 151:10, 157:23,

165:10, 168:21, 180:1, 183:13, 192:25
**factfinders** [1] - 110:25
**Factor** [40] - 11:1, 12:2, 27:5, 27:12, 36:20, 39:18, 39:20, 44:6, 44:8, 44:9, 46:4, 46:8, 48:7, 52:1, 52:2, 52:7, 52:9, 52:12, 52:13, 52:23, 53:18, 57:6, 57:11, 57:14, 57:15, 57:16, 57:17, 57:19, 57:20, 57:21, 57:22, 58:4, 58:5, 62:4, 71:4, 71:24, 73:5, 187:13
**factor** [20] - 9:1, 10:25, 19:17, 23:17, 39:12, 46:15, 46:24, 52:24, 58:9, 59:2, 62:25, 63:22, 72:6, 73:1, 73:24, 80:15, 80:16, 80:22, 91:23, 187:12
**factors** [8] - 11:21, 17:4, 57:24, 57:25, 58:9, 58:24, 187:6
**facts** [28] - 4:17, 4:18, 4:19, 9:19, 13:17, 15:14, 19:23, 20:1, 20:5, 20:6, 20:8, 34:11, 41:8, 41:18, 72:15, 87:24, 129:22, 132:14, 134:20, 142:6, 149:17, 168:7, 190:14, 194:12, 194:20, 195:2
**factual** [16] - 14:15, 19:8, 37:4, 38:21, 64:24, 64:25, 66:8, 66:10, 68:16, 72:12, 122:14, 134:6, 139:10, 150:20, 177:14, 184:20
**factually** [1] - 133:16
**failed** [1] - 28:17
**fair** [67] - 9:1, 10:25, 11:6, 12:2, 12:24, 13:1, 13:9, 14:5, 25:9, 26:18, 27:19, 28:2, 28:17, 28:19, 30:4, 34:4, 34:8, 34:9, 35:3, 36:25, 37:3, 39:12, 39:19, 43:12, 44:20, 44:23, 44:25, 45:25, 47:18, 47:22, 47:24, 51:11,

54:13, 57:3, 58:10, 59:6, 61:13, 61:16, 61:25, 62:1, 62:25, 63:4, 71:12, 76:16, 86:6, 87:4, 89:7, 89:19, 92:17, 110:11, 114:18, 130:11, 138:22, 139:9, 140:3, 179:23, 186:12, 186:17, 186:18, 186:20, 187:6, 189:16, 191:8, 191:22

**fairness** [1] - 11:19
**faith** [34] - 11:2, 11:5, 11:24, 11:25, 12:2, 12:23, 12:25, 13:6, 17:5, 17:10, 17:12, 18:6, 18:7, 18:25, 19:21, 20:11, 20:16, 20:17, 21:8, 25:10, 25:13, 25:18, 25:24, 26:1, 34:17, 35:25, 36:15, 87:18, 87:19, 87:21, 87:25, 88:5
**falls** [2] - 51:18, 81:12
**false** [3] - 20:4, 21:21, 138:17
**Falwell** [1] - 47:1
**familiar** [2] - 96:16, 111:6
**fancy** [2] - 181:21
**far** [5] - 4:10, 61:5, 88:5, 189:1, 191:15
**fares** [1] - 133:23
**fashion** [1] - 189:13
**fast** [1] - 159:19
**faster** [1] - 34:25
**fault** [1] - 60:9
**favor** [7] - 73:5, 91:22, 96:21, 137:4, 137:8, 137:10, 152:23
**favorable** [1] - 54:15
**favorably** [1] - 86:21
**feature** [1] - 33:2
**featureised** [2] - 167:2, 167:4
**features** [6] - 24:22, 31:6, 31:9, 33:13, 69:1, 149:18
**featurization** [4] - 165:25, 167:7, 190:23, 192:15
**featurize** [1] - 31:5
**featurizing** [1] - 23:19
**February** [3] - 5:7, 199:22, 201:17
**Fed** [1] - 180:9
**federal** [2] - 83:6, 83:9

**fees** [2] - 123:22, 124:6
**Feist** [21] - 65:2, 65:3, 65:6, 68:2, 68:4, 68:21, 68:23, 69:2, 70:13, 70:14, 73:24, 74:23, 75:4, 75:19, 86:7, 86:9, 86:10, 86:19, 94:19, 149:14
**felt** [1] - 172:8
**femoral** [3] - 161:8, 163:11, 171:16
**Fer** [1] - 130:21
**few** [7] - 15:20, 91:3, 127:11, 132:19, 174:1, 176:23, 197:12
**fiction** [1] - 134:25
**fifth** [3] - 23:7, 23:13, 90:16
**fight** [1] - 203:15
**figure** [7] - 32:3, 124:24, 165:3, 174:3, 190:20, 193:2, 199:9
**figured** [1] - 196:17
**figures** [1] - 48:18
**file** [9] - 145:6, 157:1, 158:1, 164:15, 164:17, 167:24, 168:3, 169:25, 175:21
**filed** [1] - 195:23
**files** [1] - 157:17
**filings** [1] - 203:2
**fill** [1] - 197:18
**filled** [2] - 12:13, 80:5
**filter** [6] - 106:19, 136:12, 136:13, 136:15, 141:19, 172:14
**filtered** [2] - 97:23, 130:22
**filtration** [11] - 98:25, 109:19, 120:1, 120:16, 120:23, 121:12, 127:14, 136:6, 141:14, 146:3, 152:19
**final** [6] - 13:2, 24:11, 28:22, 35:25, 191:8
**finality** [2] - 177:6, 177:24
**finally** [5] - 36:14, 98:2, 110:15, 169:24, 178:13
**financial** [2] - 72:2, 101:14
**finder** [1] - 133:17
**findings** [5] - 94:2,

94:14, 113:14, 177:14
**fine** [5] - 71:6, 123:5, 149:22, 196:7, 196:14
**finely** [1] - 189:23
**finish** [1] - 146:4
**firm** [7] - 12:16, 20:24, 21:1, 21:3, 21:11, 71:4, 196:23
**firms** [2] - 40:19, 40:20
**First** [8] - 13:13, 59:17, 59:23, 80:15, 120:3, 121:24, 131:2, 195:16
**first** [49] - 5:4, 8:4, 9:1, 10:14, 10:25, 20:23, 21:10, 21:19, 22:10, 23:17, 37:24, 38:8, 40:4, 40:9, 40:10, 40:22, 42:2, 54:1, 54:25, 56:3, 56:7, 63:2, 63:16, 64:10, 64:18, 71:19, 81:5, 89:3, 104:4, 105:12, 105:24, 106:2, 107:3, 107:6, 114:25, 125:20, 127:12, 148:2, 161:6, 163:5, 163:21, 170:3, 180:10, 182:6, 182:19, 188:1, 190:12, 191:25
**fit** [3] - 89:22, 128:23, 202:23
**five** [8] - 8:21, 33:24, 95:13, 95:18, 112:19, 113:2, 113:4, 113:21
**five-minute** [1] - 8:21
**flag** [1] - 62:24
**flash** [1] - 92:24
**flat** [3] - 60:9, 60:11, 60:14
**flatter** [1] - 60:14
**FLOOR** [2] - 2:14, 2:20
**Florida** [1] - 5:20
**flowed** [1] - 93:2
**Flynn** [1] - 3:12
**FLYNN** [2] - 1:17, 3:11
**focus** [7] - 15:22, 15:24, 46:9, 102:5, 186:15, 203:23
**focused** [1] - 44:22
**focuses** [1] - 46:16
**folks** [2] - 9:6, 41:10
**follow** [9] - 8:4, 9:14,

30:7, 51:20, 74:13, 79:4, 145:5, 155:7, 174:5
**follow-up** [5] - 8:4, 9:14, 30:7, 51:20, 174:5
**followed** [1] - 17:20
**following** [2] - 37:2, 156:3
**follows** [1] - 61:1
**foolish** [1] - 203:19
**footnote** [3] - 63:13, 137:8, 203:15
**FOR** [5] - 1:1, 1:16, 2:2, 2:13, 2:18
**forced** [1] - 49:11
**Ford** [2] - 104:19, 104:20
**foreclose** [1] - 19:11
**foregoing** [1] - 204:7
**forest** [1] - 192:13
**forgive** [2] - 20:22, 45:14
**forgoing** [1] - 46:23
**form** [6] - 41:17, 139:15, 145:12, 155:9, 160:4, 183:7
**format** [4] - 7:25, 176:7, 176:8, 201:5
**Formula** [1] - 83:14
**formulate** [1] - 108:16
**formulated** [1] - 113:6
**forth** [2] - 8:2, 182:3
**forward** [4] - 5:17, 54:15, 54:19, 121:20
**fought** [1] - 47:24
**founded** [1] - 14:21
**Four** [21] - 27:5, 27:12, 39:18, 39:20, 44:6, 44:9, 46:4, 46:8, 48:7, 52:1, 52:7, 52:9, 52:13, 52:23, 53:18, 57:6, 57:14, 57:16, 57:19, 58:5, 62:4
**four** [3] - 33:24, 95:17, 160:12
**Four's** [1] - 57:20
**Four-Factor** [1] - 52:1
**fourth** [2] - 39:12, 46:15
**Fox** [7] - 42:20, 44:25, 55:23, 59:5, 60:21, 60:22, 80:24
**fraction** [2] - 23:6, 23:10
**fragments** [1] - 141:5
**frame** [2] - 94:9, 160:9
**framework** [1] - 17:2
**framing** [1] - 154:13

**FRANCISCO** [1] - 2:20
**Franklin** [1] - 34:9
**frankly** [1] - 139:25
**Frederiksen** [18] - 97:18, 97:19, 110:16, 115:9, 136:2, 139:21, 140:4, 141:24, 142:15, 142:22, 143:4, 143:11, 144:8, 146:16, 151:6, 172:20, 175:9, 175:11
**Frederiksen-Cross** [17] - 97:18, 97:19, 110:16, 115:9, 136:2, 139:21, 140:4, 141:24, 142:15, 143:4, 143:11, 144:8, 146:16, 151:6, 172:20, 175:9, 175:11
**Frederiksen-Cross's** [1] - 142:22
**free** [4] - 38:9, 42:16, 43:22, 149:19
**frequently** [1] - 44:23
**Friday** [1] - 202:11
**friend** [6] - 55:8, 122:5, 125:3, 156:6, 157:1, 191:13
**friends** [3] - 57:10, 109:7, 126:5
**front** [3] - 78:15, 116:11, 134:15
**fruit** [1] - 79:19
**full** [10] - 22:24, 121:12, 144:20, 170:9, 170:15, 174:13, 174:15, 187:1, 192:4, 199:14
**fun** [1] - 57:1
**fundamental** [1] - 158:15
**fundamentally** [2] - 72:12, 139:6

## G

**game** [4] - 25:7, 50:23, 130:20, 130:21
**Game** [1] - 50:25
**games** [12] - 25:5, 25:7, 25:8, 26:5, 27:3, 27:24, 50:25, 51:1, 51:18, 109:4, 109:5
**gander** [1] - 42:1
**Gap** [1] - 42:15

**GCW(Sic** [1] - 131:18
**gear** [1] - 198:1
**Gee** [1] - 17:24
**geese** [1] - 87:13
**Geiger** [1] - 134:17
**general** [4] - 9:11, 12:14, 51:3, 57:3
**generality** [1] - 10:1
**generally** [4] - 9:8, 9:15, 9:24, 160:4
**generate** [1] - 33:13
**generated** [2] - 33:6, 33:15
**generations** [1] - 44:2
**genuine** [3] - 61:6, 129:21, 132:1
**genuinely** [2] - 58:15, 151:10
**Georgia** [1] - 67:16
**Gerald** [2] - 104:19, 104:20
**gerunds** [1] - 31:4
**giant** [1] - 43:20
**Gifts** [1] - 69:4
**Gillman** [1] - 131:6
**gist** [1] - 158:13
**Giuliano** [1] - 3:19
**given** [10] - 108:8, 113:18, 132:13, 132:16, 139:25, 164:10, 171:23, 176:10, 177:22, 190:14
**Global** [3] - 151:25, 152:9, 154:8
**glory** [1] - 203:4
**GMBh** [1] - 3:7
**GMBH** [1] - 1:3
**goals** [1] - 11:10
**gold** [2] - 43:16, 87:16
**Goldberg** [1] - 37:16
**golden** [3] - 45:23, 46:3, 87:10
**goodness** [1] - 25:3
**Google** [29] - 17:4, 17:9, 17:13, 17:15, 18:8, 18:17, 19:2, 19:9, 25:15, 25:16, 25:22, 26:20, 26:22, 27:22, 28:23, 28:24, 28:25, 36:13, 46:12, 47:18, 51:12, 51:14, 58:3, 61:18, 83:6, 86:22
**goose** [2] - 45:23, 46:4
**Goose** [1] - 42:1
**goose's** [1] - 87:10
**govern** [1] - 89:11
**governed** [1] - 89:23

**government** [1] - 185:13
**Government** [1] - 70:9
**grant** [7] - 137:2, 137:7, 139:3, 180:2, 197:20, 198:5, 198:7
**granted** [4] - 111:1, 130:2, 130:24, 179:19
**granting** [5] - 44:17, 109:15, 113:18, 113:21, 137:4
**grants** [1] - 131:3
**grated** [1] - 189:23
**grateful** [1] - 203:23
**gratitude** [1] - 203:7
**great** [27] - 22:20, 45:23, 80:7, 84:19, 85:9, 85:11, 85:12, 90:13, 90:18, 157:5, 157:19, 157:25, 159:16, 160:19, 160:21, 160:23, 163:3, 167:3, 173:8, 179:24, 193:11, 194:1, 194:2, 194:3, 202:2, 203:17
**greater** [2] - 91:9, 186:20
**greatest** [2] - 39:20, 93:4
**Greene** [1] - 76:21
**Gregory** [1] - 121:24
**grenades** [1] - 111:14
**ground** [1] - 202:8
**Group** [1] - 131:12
**groups** [2] - 94:3, 95:1
**guess** [6] - 10:10, 60:20, 102:16, 106:20, 136:15, 150:6
**guidance** [3] - 128:17, 179:2, 179:11
**Guide** [6] - 88:10, 89:9, 89:10, 89:15, 89:22, 89:25
**guide** [14] - 85:1, 85:5, 88:12, 89:10, 94:6, 94:9, 153:22, 153:24, 154:3, 154:15, 154:17, 159:23, 160:6, 169:21
**Guido** [1] - 95:25
**Guild** [1] - 17:4
**guy** [1] - 29:23
**guys** [12] - 9:18, 34:14, 48:21, 138:24, 148:21, 150:17, 176:5,

195:14, 196:3, 196:15, 199:10, 202:2

**H**

**H-E-I-J-D-E-N** [1] - 35:19
**hair** [2] - 92:13, 92:15
**Haley** [2] - 1:22, 204:12
**hammer** [2] - 197:5, 199:21
**hand** [3] - 72:13, 95:11, 111:13
**handful** [1] - 54:22
**handle** [1] - 4:1
**handling** [1] - 176:13
**happy** [8] - 38:7, 110:5, 113:25, 142:11, 175:4, 176:2, 176:11, 195:7
**hard** [10] - 9:10, 13:16, 59:14, 64:6, 72:22, 73:12, 93:10, 93:13, 93:14, 201:10
**harm** [21] - 40:3, 40:4, 41:3, 41:17, 42:7, 42:11, 42:15, 43:7, 45:21, 46:13, 46:14, 46:22, 47:4, 49:6, 50:20, 53:18, 54:2, 55:14, 55:18, 59:9, 123:19
**harmed** [1] - 47:10
**harmful** [1] - 45:21
**Harper** [17] - 10:25, 12:1, 12:4, 12:7, 17:17, 39:17, 41:17, 43:11, 43:14, 44:6, 80:19, 104:18, 125:3, 128:9, 128:10, 128:12, 129:3
**Harrison** [3] - 4:9, 4:14, 4:19
**HARRISON** [1] - 2:21
**Harry** [1] - 59:6
**hat** [1] - 21:15
**haystack** [1] - 43:20
**haze** [1] - 93:2
**head** [4] - 59:25, 69:22, 200:1
**header** [1] - 125:18
**headnote** [75] - 15:13, 22:23, 23:2, 23:4, 23:14, 24:12, 38:24, 64:8, 69:23, 69:24, 75:20, 77:25, 80:1, 80:4, 84:15, 84:25,

85:3, 85:4, 85:13, 94:1, 94:10, 94:22, 95:12, 95:21, 104:6, 104:9, 106:11, 106:23, 106:24, 107:9, 107:13, 107:25, 108:2, 108:5, 109:25, 111:24, 116:13, 122:8, 127:19, 127:24, 128:18, 128:19, 136:11, 138:2, 139:16, 139:18, 140:20, 146:9, 147:5, 147:23, 154:21, 155:22, 157:25, 159:1, 159:11, 159:13, 159:15, 159:24, 163:3, 164:7, 169:22, 172:12, 172:13, 172:17, 172:22, 173:3, 173:4, 173:5, 175:19, 189:21, 190:1, 190:9, 198:14, 198:17
**headnoted** [2] - 22:17, 71:20
**headnotes** [152] - 23:6, 23:12, 34:12, 34:18, 47:7, 62:20, 63:8, 64:4, 64:5, 65:13, 67:15, 68:9, 69:21, 70:8, 71:19, 71:20, 71:21, 72:17, 74:2, 74:25, 75:1, 75:10, 75:23, 76:13, 79:4, 79:6, 84:12, 84:13, 84:17, 84:19, 90:1, 90:4, 90:6, 90:10, 90:11, 90:12, 90:17, 90:18, 90:19, 94:3, 94:14, 94:15, 94:18, 95:1, 95:8, 95:23, 97:2, 97:5, 97:7, 97:9, 97:11, 97:15, 97:21, 97:23, 97:25, 98:14, 98:16, 98:23, 99:4, 99:8, 99:9, 99:12, 99:15, 99:16, 100:15, 100:18, 101:3, 101:11, 101:18, 101:25, 104:10, 106:5, 106:15, 109:9, 109:24, 110:17, 111:19, 112:1, 112:8, 112:19, 113:2, 113:4, 113:7,

113:14, 114:4, 114:5, 115:3, 115:13, 117:25, 118:15, 118:25, 122:9, 123:18, 125:2, 127:19, 128:13, 128:22, 128:25, 129:8, 132:12, 132:17, 135:6, 135:20, 135:23, 136:19, 138:2, 140:5, 142:3, 143:16, 144:10, 146:18, 146:21, 149:20, 149:23, 150:22, 151:11, 152:24, 154:11, 154:14, 157:9, 157:11, 158:11, 158:24, 159:9, 160:3, 160:4, 160:7, 160:9, 161:6, 161:13, 161:15, 162:18, 163:5, 163:9, 171:22, 175:12, 175:24, 176:10, 183:18, 186:15, 186:21, 186:24, 188:22, 189:22, 198:9, 198:21, 198:25, 199:3
**hear** [12] - 14:16, 22:1, 46:19, 53:22, 66:21, 79:24, 105:5, 105:7, 105:21, 138:4, 199:6, 199:8
**heard** [10] - 80:8, 114:9, 141:17, 148:12, 149:23, 180:16, 186:22, 191:19, 198:17, 198:18
**HEARING** [1] - 1:4
**hearing** [6] - 7:23, 7:25, 127:14, 136:7, 182:17, 194:17
**heart** [8] - 104:3, 104:5, 104:25, 105:3, 128:10, 128:14, 137:1
**hearts** [1] - 187:3
**heavily** [1] - 80:17
**height** [2] - 92:14
**Heijden** [1] - 35:14
**held** [9] - 11:25, 14:4, 42:16, 70:16, 86:9, 130:1, 151:16, 154:6, 202:16
**help** [12] - 8:8, 8:10,

8:17, 14:23, 32:3, 89:20, 128:10, 133:11, 188:12, 191:6, 194:20, 203:10

**helpful** [5] - 10:20, 50:21, 115:23, 196:5, 202:7

**helps** [1] - 77:19

**HERCULES** [1] - 2:14

**hereby** [1] - 60:10

**hiding** [3] - 18:8, 19:3, 19:6

**higher** [1] - 9:25

**highest** [2] - 16:12, 164:25

**hill** [1] - 129:25

**hire** [1] - 44:1

**hiring** [1] - 12:18

**historical** [1] - 20:6

**history** [2] - 67:12, 121:3

**hit** [2] - 112:11, 202:8

**Hokin** [1] - 67:3

**hold** [11] - 7:18, 18:2, 34:23, 52:25, 196:22, 197:8, 197:12, 200:18, 202:3, 202:10, 202:13

**holder** [2] - 30:1, 72:8

**holders** [1] - 47:12

**holders'** [1] - 14:6

**Holding** [1] - 105:19

**holding** [3] - 4:22, 6:11, 130:19

**holdings** [1] - 177:23

**holds** [1] - 62:19

**Holy** [2] - 121:23, 131:3

**home** [2] - 148:6, 201:2

**Honor** [80] - 3:11, 3:24, 4:6, 5:8, 5:17, 6:15, 6:25, 7:19, 9:4, 10:11, 10:21, 11:15, 15:1, 17:15, 17:22, 18:12, 19:14, 19:16, 20:8, 37:8, 39:16, 45:7, 53:25, 58:17, 60:17, 60:19, 63:5, 64:18, 68:20, 68:23, 69:10, 81:22, 82:4, 83:18, 94:5, 94:17, 94:23, 96:8, 96:15, 97:1, 98:12, 100:13, 102:17, 114:22, 125:25, 127:6, 129:17, 133:20, 136:11, 136:21,

143:12, 144:25, 148:11, 149:10, 149:19, 174:6, 175:1, 175:13, 175:16, 176:1, 176:12, 176:14, 176:16, 176:22, 179:15, 182:4, 182:25, 183:1, 183:21, 184:7, 184:12, 186:6, 195:8, 196:8, 199:12, 200:12, 200:23, 201:24, 202:12, 204:3

**Honor's** [4] - 10:13, 10:24, 63:11, 199:15

**HONORABLE** [1] - 1:13

**hope** [4] - 40:20, 148:21, 173:18, 196:25

**horseshoes** [1] - 111:13

**hours** [2] - 91:19, 93:8

**housekeeping** [2] - 9:5, 10:10

**huge** [2] - 43:17, 50:1

**human** [3] - 25:1, 84:14, 92:1

**hundred** [4] - 30:21, 166:2, 166:12, 194:6

**hustle** [1] - 197:25

**Hustler** [2] - 46:25, 72:4

**hyperlinked** [1] - 115:25

---

**I**

---

**I'll..** [1] - 127:5

**idea** [10] - 19:1, 80:7, 82:19, 87:22, 90:14, 130:21, 169:22, 171:14, 181:11, 191:1

**identical** [9] - 13:13, 106:6, 107:9, 107:14, 107:18, 109:3, 115:13, 137:14

**identified** [3] - 84:16, 118:20, 184:24

**identify** [1] - 108:25

**identity** [1] - 145:20

**ignored** [1] - 12:5

**III** [1] - 2:18

**illustrate** [1] - 16:7

**image** [1] - 87:13

**imaginative** [3] - 69:7,

69:8, 72:7

**imagine** [2] - 134:23, 170:10

**immediate** [1] - 28:6

**impact** [3] - 13:20, 39:21, 62:8

**impacted** [6] - 48:11, 48:13, 48:16, 48:17, 49:21, 51:8

**impaired** [1] - 55:15

**impatient** [1] - 57:15

**impeded** [1] - 42:8

**impedes** [1] - 14:7

**impediment** [1] - 180:19

**implications** [1] - 62:21

**importance** [2] - 11:17, 177:9

**important** [14] - 3:4, 8:19, 9:23, 11:15, 15:4, 39:19, 41:19, 44:7, 45:24, 58:16, 87:7, 159:14, 187:17, 204:2

**impose** [2] - 79:1, 79:2

**impossible** [2] - 23:8, 190:14

**improperly** [1] - 137:18

**IN** [1] - 1:1

**in-person** [2] - 197:4, 202:4

**inappropriate** [2] - 98:6, 103:4

**Inc** [1] - 3:8

**INC** [1] - 1:7

**incentive** [1] - 43:24

**incentives** [1] - 39:21

**incentivize** [1] - 14:8

**incidental** [1] - 40:7

**include** [2] - 133:2, 151:24

**included** [1] - 174:24

**includes** [1] - 28:8

**including** [5] - 57:25, 59:5, 69:22, 151:11, 158:2

**income** [1] - 51:10

**inconsistent** [2] - 57:21, 192:19

**incorrect** [2] - 37:5, 157:22

**incredibly** [2] - 19:18, 187:9

**indeed** [2] - 70:8, 184:4

**independent** [4] - 58:7, 111:18, 112:9,

153:7

**independently** [3] - 79:20, 79:21, 153:4

**index** [1] - 78:17

**indicate** [1] - 111:11

**indicated** [3] - 71:16, 72:21, 168:12

**indicates** [1] - 56:3

**indicating** [1] - 41:1

**indifferent** [1] - 193:10

**indirectly** [1] - 12:19

**indisputably** [1] - 97:14

**individual** [13] - 75:20, 76:2, 76:3, 81:24, 94:3, 99:16, 102:11, 150:4, 156:4, 156:13, 162:18, 198:14, 198:20

**individually** [3] - 77:15, 94:2, 109:14

**induced** [1] - 93:1

**Industries** [1] - 177:3

**infer** [4] - 20:19, 99:18, 171:25, 172:17

**inference** [2] - 54:15, 172:23

**influence** [2] - 57:20, 125:15

**inform** [1] - 128:12

**Information** [1] - 70:16

**information** [3] - 126:24, 175:6, 175:19

**informed** [1] - 152:14

**infringe** [2] - 102:22, 188:23

**infringed** [9] - 101:19, 101:20, 102:12, 103:24, 111:13, 112:1, 112:18, 113:8, 183:20

**infringement** [40] - 4:4, 27:19, 27:20, 33:25, 34:10, 34:11, 71:3, 79:25, 99:7, 99:12, 99:14, 99:15, 101:16, 101:17, 103:5, 111:1, 112:4, 112:8, 113:20, 121:14, 123:15, 124:10, 124:12, 124:14, 124:21, 130:2, 133:25, 136:17, 137:4, 164:23, 168:18, 169:6, 169:11,

169:14, 182:22, 183:25, 186:2, 188:2, 191:23, 198:8

**infringements** [2] - 43:12, 112:22

**infringing** [5] - 85:15, 99:11, 124:2, 124:3, 184:24

**injure** [1] - 62:6

**injury** [1] - 50:20

**injustice** [1] - 178:8

**innocent** [2] - 182:21, 186:2

**innovative** [1] - 187:9

**input** [2] - 30:9, 30:14

**inquiry** [2] - 19:23, 186:1

**inroad** [1] - 43:14

**insight** [2] - 92:25, 104:9

**instance** [1] - 108:13

**instances** [5] - 43:12, 109:24, 110:25, 173:5, 173:9

**Instead** [1] - 130:5

**instead** [6] - 22:8, 31:2, 39:25, 40:21, 172:18, 198:13

**instruct** [1] - 126:1

**instructed** [2] - 90:3, 153:19

**instructions** [3] - 90:5, 153:20, 197:3

**insufficiency** [1] - 102:4

**intelligence** [1] - 84:9

**Intelligence** [2] - 3:8, 154:3

**INTELLIGENCE** [1] - 1:7

**intended** [3] - 39:22, 40:16, 46:2

**intending** [2] - 186:19, 194:16

**intensive** [2] - 86:16, 87:11

**intent** [1] - 40:25

**interacting** [1] - 35:24

**Interactive** [1] - 130:18

**interest** [1] - 199:24

**interesting** [2] - 86:20, 134:8

**interface** [1] - 26:23

**interference** [4] - 182:9, 182:14, 182:18, 198:24

**intermediate** [4] - 15:22, 26:13, 26:23, 38:8

**intermediated** [1] - 25:2
**internally** [1] - 184:16
**interplay** [2] - 132:23, 139:5
**interpretation** [1] - 20:7
**interpretations** [1] - 129:23
**interrupt** [1] - 16:17
**interruption** [2] - 130:7, 131:13
**Intervest** [1] - 63:14
**introduce** [1] - 88:14
**intuitive** [1] - 61:9
**invested** [2] - 72:1, 72:8
**investment** [1] - 43:16
**Investments** [1] - 131:19
**Invisible** [1] - 92:22
**invitations** [1] - 5:10
**invoicing** [1] - 121:16
**involve** [2] - 125:16, 197:2
**involved** [8] - 70:18, 77:23, 110:18, 132:4, 133:3, 133:5, 133:7, 183:24
**involves** [1] - 157:8
**involving** [3] - 63:17, 88:5, 147:5
**IP** [2] - 59:20, 126:9
**irrelevant** [5] - 23:5, 35:7, 120:17, 132:21, 160:17
**irrespective** [1] - 77:9
**irresponsibly** [1] - 27:2
**isolated** [1] - 43:12
**isolation** [2] - 78:18, 83:21
**Issue** [1] - 76:15
**issue** [23] - 3:22, 7:7, 7:10, 19:10, 46:11, 47:23, 52:2, 56:19, 59:23, 82:18, 94:22, 95:19, 111:21, 122:17, 122:19, 130:13, 135:7, 137:24, 145:2, 151:5, 178:16, 183:16, 195:9
**issued** [1] - 97:5
**issues** [23] - 6:14, 7:21, 8:7, 9:8, 9:12, 14:15, 51:4, 60:3, 60:7, 76:14, 129:20, 170:9, 170:16, 174:2, 174:5,

178:20, 179:6, 179:7, 179:18, 179:20, 180:1, 202:19, 203:18
**items** [5] - 176:6, 183:19, 194:24, 200:9, 201:20
**itself** [17] - 19:9, 67:6, 69:22, 80:12, 81:6, 118:2, 127:21, 135:9, 138:19, 148:18, 158:21, 168:10, 168:11, 176:22, 183:22, 186:5, 202:6

## J

**JACK** [1] - 1:18
**JACOB** [1] - 2:19
**jail** [1] - 38:9
**James** [1] - 1:10
**January** [6] - 5:5, 198:1, 199:20, 201:14, 201:15
**Jeanpierre** [1] - 3:18
**JEREMY** [1] - 2:4
**Jersey** [1] - 130:17
**Jimoh** [2] - 22:25, 160:17
**Joachim** [1] - 4:8
**JOACHIM** [1] - 2:19
**job** [2] - 80:11, 203:7
**join** [1] - 200:4
**joined** [1] - 4:8
**joint** [1] - 194:11
**Jonathan** [3] - 118:9, 144:2, 144:7
**Josh** [1] - 3:15
**JOSHUA** [1] - 2:3
**Joshua** [1] - 4:1
**Judge** [2] - 3:5, 14:5
**judge** [10] - 80:3, 109:1, 111:2, 129:13, 133:10, 133:18, 139:12, 150:21, 178:13
**judgement** [30] - 100:1, 100:11, 108:23, 109:15, 111:2, 113:12, 113:18, 113:21, 117:20, 118:22, 129:14, 129:20, 129:23, 130:2, 130:15, 131:3, 131:10, 131:25, 132:16, 134:4, 134:13, 137:3, 137:4, 137:7, 139:4,

139:7, 142:5, 143:18, 151:21, 177:23
**judges** [2] - 43:19, 195:8
**judgment** [35] - 7:15, 15:11, 19:22, 44:17, 63:20, 69:20, 70:4, 70:18, 72:19, 94:20, 96:21, 98:21, 99:19, 100:2, 100:7, 100:16, 102:18, 103:12, 130:25, 132:3, 141:9, 177:1, 179:6, 179:19, 180:2, 180:23, 181:11, 181:13, 181:20, 195:2, 197:20, 198:8, 198:22, 199:1, 203:22
**judgments** [2] - 18:16, 54:8
**judicial** [69] - 22:23, 32:10, 32:15, 34:13, 64:9, 67:15, 79:4, 84:5, 84:6, 84:10, 84:16, 95:9, 95:12, 95:14, 95:16, 95:21, 96:8, 97:4, 97:20, 97:24, 106:6, 106:23, 107:2, 107:12, 107:25, 108:6, 108:17, 109:25, 110:1, 116:9, 116:16, 117:3, 117:7, 117:22, 118:18, 122:7, 127:16, 127:21, 135:5, 135:6, 136:10, 138:3, 140:17, 143:15, 144:21, 146:10, 147:13, 147:22, 149:21, 150:23, 156:23, 157:4, 159:4, 159:15, 163:9, 166:23, 170:25, 172:12, 172:18, 172:22, 173:3, 173:6, 175:19, 185:14, 185:17, 193:25, 196:14
**Judy** [1] - 55:10
**jump** [1] - 106:21
**jurors** [2] - 124:11, 132:25
**jury** [31] - 5:19, 6:1, 20:6, 99:18, 100:10,

100:12, 100:17, 100:20, 102:3, 108:15, 108:21, 110:13, 112:4, 124:8, 124:17, 125:25, 126:1, 126:3, 126:7, 126:10, 129:15, 129:19, 133:18, 139:1, 139:11, 155:11, 197:2, 197:22, 198:19, 202:8, 202:15
**just..** [1] - 32:24

## K

**Kagerise** [1] - 177:15
**Kahn** [1] - 59:1
**Kanter** [1] - 98:4
**Katharine** [1] - 3:18
**Katzman** [1] - 81:22
**Kay** [1] - 69:3
**KCAL** [1] - 87:20
**keep** [8] - 23:10, 43:24, 60:5, 74:25, 132:5, 146:22, 148:15, 188:5
**keeping** [1] - 21:15
**keeps** [2] - 67:10, 153:18
**Keith** [1] - 4:9
**KEITH** [1] - 2:21
**kept** [5] - 57:10, 57:13, 77:21, 162:15
**key** [88] - 24:12, 34:13, 59:3, 64:2, 65:14, 65:15, 65:25, 66:3, 66:6, 68:10, 69:22, 75:2, 75:11, 78:4, 78:10, 78:16, 83:17, 85:3, 99:8, 104:11, 104:12, 113:3, 120:19, 135:11, 135:12, 135:18, 135:24, 138:7, 138:8, 138:15, 138:18, 138:21, 138:23, 138:24, 154:22, 154:23, 155:1, 155:3, 155:5, 155:8, 155:11, 155:14, 157:12, 157:14, 158:9, 158:18, 158:19, 158:23, 164:8, 164:10, 164:25, 165:5, 169:24, 170:8, 170:16, 170:20, 170:24,

171:5, 174:12, 183:18, 186:11, 186:16, 186:22, 188:2, 188:7, 188:8, 188:11, 188:15, 188:18, 188:22, 188:24, 188:25, 189:3, 189:10, 189:14, 189:17, 189:22, 189:24, 190:13, 190:18, 191:5, 191:17, 193:21, 193:22
**Key** [8] - 63:8, 65:17, 186:21, 187:4, 187:7, 187:21, 191:20, 192:11
**kicking** [2] - 52:3, 174:2
**kill** [1] - 46:21
**killing** [2] - 45:23, 46:3
**Kim** [2] - 1:22, 204:12
**Kim_Haley@paed. uscourts.gov** [1] - 1:23
**kind** [23] - 9:10, 15:7, 24:7, 27:20, 32:22, 41:7, 42:11, 42:14, 46:22, 59:10, 72:20, 91:21, 111:23, 134:22, 145:6, 159:5, 165:9, 182:7, 187:17, 194:19, 197:4, 197:24, 199:16
**kindly** [1] - 71:15
**kinds** [3] - 65:1, 69:20, 96:4
**KING** [1] - 2:4
**Kirkland** [1] - 3:15
**KIRKLAND** [1] - 2:2
**Klein** [1] - 170:4
**Knitwear** [1] - 131:6
**knowingly** [1] - 12:5
**knowledge** [2] - 169:6, 196:13
**knows** [5] - 68:21, 79:17, 80:16, 159:9, 166:8
**Koons** [1] - 12:23
**Krein** [30] - 24:9, 24:15, 56:12, 105:24, 105:25, 106:1, 106:4, 114:1, 116:4, 116:7, 122:12, 122:22, 127:12, 127:15, 136:7, 136:9, 136:14, 137:23, 139:20, 143:3,

143:13, 144:3, 144:7, 144:16, 144:22, 146:1, 146:2, 152:23, 188:5, 189:4
**Krein's** [8] - 98:25, 105:8, 110:20, 116:19, 118:9, 123:2, 146:14, 156:1
**Krine** [1] - 175:18
**Kristen** [1] - 178:6
**Kron** [1] - 95:2
**Kwitny** [1] - 80:23

## L

**LA** [1] - 87:20
**label** [1] - 165:5
**labeled** [1] - 85:9
**labor** [8] - 4:10, 72:1, 72:8, 78:11, 86:7, 86:16, 87:11, 87:14
**lack** [2] - 20:13, 203:9
**lacked** [1] - 15:3
**lacks** [1] - 36:3
**laid** [1] - 184:17
**land** [3] - 17:18, 19:15, 102:25
**language** [11] - 33:12, 79:25, 80:2, 183:4, 184:5, 186:3, 192:6, 192:7, 193:2, 193:8
**large** [9] - 8:13, 27:13, 56:10, 57:5, 105:4, 111:16, 145:6, 175:21, 192:2
**larger** [1] - 11:22
**Larson** [1] - 3:18
**last** [18] - 5:4, 35:16, 38:18, 53:24, 60:18, 87:18, 88:6, 88:8, 116:3, 123:7, 127:9, 128:8, 137:25, 141:16, 153:14, 197:5, 203:15, 203:16
**last-minute** [1] - 197:5
**late** [2] - 114:2, 166:21
**Laughter** [1] - 87:15
**law** [56] - 12:15, 12:16, 12:21, 14:24, 15:6, 15:18, 17:18, 19:14, 20:4, 20:24, 21:1, 21:3, 21:9, 21:11, 37:13, 40:18, 40:20, 43:21, 45:25, 55:4, 58:10, 58:19, 64:24, 66:15, 70:14, 72:22, 76:12, 77:1, 78:20, 80:9, 82:7, 91:14,

104:14, 129:16, 132:14, 138:20, 140:1, 170:9, 170:13, 170:14, 176:19, 177:2, 177:14, 178:11, 179:17, 179:21, 180:1, 181:1, 188:13, 188:14, 191:14, 191:16, 192:6, 193:8, 199:1
**laws** [1] - 51:24
**lawsuit** [1] - 177:11
**lawyers** [7] - 43:18, 79:5, 194:18, 203:6, 203:15, 203:17, 203:20
**lay** [4] - 132:24, 133:2, 133:10, 194:20
**layers** [1] - 105:9
**lead** [3] - 3:22, 178:17, 203:5
**leading** [1] - 197:1
**learn** [2] - 14:24, 85:11
**learned** [2] - 37:25, 43:3
**learning** [4] - 41:25, 157:23, 190:8, 193:1
**learns** [2] - 86:2, 170:5
**least** [5] - 5:16, 6:15, 77:1, 87:16, 101:19, 108:14, 115:12, 116:15, 136:17, 148:23, 149:6, 187:8, 195:4
**leave** [4] - 81:11, 129:15, 174:7, 179:7
**leaves** [3] - 118:24, 142:2, 144:11
**leaving** [1] - 59:18
**lectern** [3] - 60:7, 60:8, 60:14
**lecterns** [1] - 60:9
**lecture** [1] - 60:3
**lectures** [1] - 60:4
**Led** [2] - 120:11, 152:14
**leery** [1] - 172:2
**left** [6] - 97:6, 98:22, 119:14, 136:17, 178:21, 179:9
**legal** [43] - 14:2, 14:15, 15:3, 15:25, 16:24, 20:7, 22:15, 25:2, 31:19, 34:1, 36:4, 37:20, 41:6, 41:7, 42:1, 42:13, 43:8, 43:17, 43:18,

44:14, 49:10, 49:19, 54:7, 55:7, 65:24, 91:12, 99:1, 122:3, 129:23, 132:11, 133:23, 138:5, 138:6, 139:14, 158:15, 164:14, 164:16, 165:9, 170:22, 184:21, 193:3, 193:15, 193:16
**LegalEase** [33] - 12:19, 35:15, 35:23, 36:2, 36:3, 36:6, 36:7, 36:8, 36:12, 41:21, 55:21, 56:4, 85:2, 89:11, 89:23, 108:16, 151:13, 151:14, 152:7, 153:12, 154:8, 154:15, 154:18, 160:8, 161:5, 161:16, 164:24, 169:7, 171:20, 172:3, 172:17
**LegalEase's** [4] - 21:2, 101:12, 151:23, 171:14
**legally** [4] - 54:25, 72:10, 94:16, 122:15
**legislative** [2] - 67:12, 121:3
**legitimate** [1] - 9:16
**length** [2] - 33:17, 33:19
**lengths** [1] - 61:8
**less** [9] - 13:10, 32:4, 44:4, 52:9, 53:10, 53:17, 86:15, 90:18, 189:2
**lesser** [2] - 85:20, 186:20
**Letterese** [2] - 16:20, 29:8
**Leval** [1] - 14:5
**level** [11] - 10:1, 16:12, 30:19, 63:18, 79:15, 91:5, 129:19, 139:22, 158:25, 164:25, 172:20
**levels** [4] - 46:3, 65:9, 65:16, 158:15
**lexical** [1] - 33:15
**Lexicon** [1] - 59:6
**Lexington** [1] - 2:5
**LEXIS** [2] - 36:13, 71:18
**Lexis** [1] - 193:18
**liability** [8] - 113:13, 167:21, 167:22,

169:6, 169:12, 182:7, 198:23, 198:24
**liable** [3] - 96:20, 169:8
**license** [18] - 12:9, 18:1, 18:2, 18:3, 25:11, 42:8, 42:19, 51:12, 51:13, 54:4, 54:8, 56:10, 61:19, 61:21, 67:21, 67:22, 87:23, 101:7
**licensed** [1] - 61:22
**licensing** [4] - 54:12, 56:6, 59:24
**lick** [1] - 170:19
**life** [2] - 19:18, 130:12
**lifetime** [1] - 92:22
**light** [2] - 10:13, 71:25
**Lighter** [1] - 82:13
**lighter** [2] - 65:20, 132:7
**likely** [6] - 5:24, 13:11, 53:10, 53:17, 179:12, 195:25
**Likewise** [1] - 69:3
**likewise** [1] - 9:17
**limine** [1] - 197:3
**liminized** [1] - 31:2
**limit** [2] - 181:2, 186:19
**limited** [5] - 38:17, 39:2, 71:12, 102:19, 183:11
**line** [6] - 63:6, 71:9, 73:6, 103:6, 125:8, 155:21
**linear** [2] - 111:18, 112:15
**lining** [1] - 162:17
**link** [8] - 52:16, 145:6, 160:12, 160:14, 160:15, 191:2, 191:3
**linked** [2] - 52:14, 159:9
**linking** [2] - 62:25, 69:25
**Lipton** [1] - 131:15
**list** [9] - 58:1, 78:16, 78:19, 93:15, 97:2, 118:21, 119:13, 157:4, 194:12
**listed** [2] - 85:24, 92:1
**listen** [5] - 36:19, 57:8, 81:1, 126:10, 139:13
**Listen** [1] - 50:2
**litany** [1] - 47:4
**literally** [4] - 48:14, 48:15, 48:25, 50:24, 79:25, 80:2, 81:14,

146:24, 147:9, 170:23, 173:13, 190:14, 191:2
**litigate** [1] - 80:8
**litigation** [1] - 177:8
**litmus** [1] - 58:22
**Litmus** [1] - 19:20
**Live** [1] - 18:22
**live** [2] - 200:14
**LLC** [1] - 105:19
**LLP** [3] - 1:17, 2:13, 2:18
**load** [1] - 145:10
**loaded** [1] - 30:15
**locate** [2] - 23:4, 79:6
**located** [1] - 24:17
**logged** [1] - 145:4
**logic** [2] - 53:9, 53:12
**logical** [1] - 172:23
**logically** [1] - 57:21
**logistical** [1] - 7:21
**logistics** [2] - 4:21, 196:22
**look** [80] - 16:3, 16:4, 16:5, 16:11, 16:22, 16:23, 16:25, 17:21, 18:20, 24:25, 28:3, 28:4, 29:2, 30:12, 43:9, 43:19, 51:3, 54:2, 56:22, 56:23, 58:8, 60:13, 60:25, 61:14, 69:15, 76:2, 78:15, 79:12, 81:5, 81:7, 81:9, 83:20, 84:1, 86:11, 88:24, 94:23, 94:24, 96:3, 97:17, 101:23, 103:10, 104:9, 111:22, 115:24, 122:12, 127:3, 133:24, 135:8, 136:9, 139:7, 139:21, 139:24, 140:10, 141:17, 142:9, 147:1, 147:2, 149:20, 152:22, 152:25, 153:18, 159:23, 160:13, 164:9, 164:12, 187:5, 189:4, 189:10, 189:19, 191:8, 194:4, 194:5, 195:12, 195:15, 197:16, 198:11, 199:22
**Look** [2] - 42:22, 51:22
**looked** [6] - 16:11, 66:13, 126:19, 147:6, 149:7, 199:3

**looking** [20] - 25:6, 27:25, 39:3, 61:7, 64:15, 67:12, 73:1, 96:23, 109:4, 111:2, 114:24, 120:13, 122:11, 123:10, 126:20, 143:15, 148:4, 150:18, 173:22, 197:23
**looks** [10] - 24:1, 26:22, 80:11, 81:1, 103:12, 126:21, 127:20, 145:11, 147:21, 159:4
**loom** [2] - 11:22, 57:5
**loose** [2] - 200:20, 202:7
**Lori** [2] - 69:17, 79:2
**LOS** [1] - 2:10
**lose** [4] - 82:24, 83:12, 83:23, 112:11
**losing** [2] - 43:4, 192:13
**loss** [9] - 41:14, 42:17, 46:18, 46:21, 78:22, 123:20, 177:18, 180:5, 180:16
**lost** [4] - 26:9, 149:14, 155:2, 155:8
**louder** [1] - 83:2
**Love** [1] - 80:23
**LOVERRO** [1] - 2:4
**low** [1] - 68:21
**lowercase** [1] - 35:19
**lunch** [1] - 93:20
**Lunch** [1] - 93:22

**M**

**MA** [1] - 2:7
**machine** [1] - 41:24
**Maclean** [1] - 70:16
**madam** [1] - 3:3
**magazine** [1] - 16:7
**Magazine** [1] - 72:4
**mail** [8] - 34:21, 35:8, 36:2, 148:8, 148:19, 152:3, 184:25, 201:7
**mails** [1] - 20:2
**main** [1] - 179:8
**maintain** [1] - 165:13
**maintaining** [1] - 177:9
**major** [1] - 43:13
**majority** [3] - 103:23, 104:2, 194:1
**Malinowski** [2] - 55:21, 56:2
**man** [1] - 21:14
**Man** [1] - 92:22

**manageable** [1] - 197:22
**management** [1] - 174:3
**manager** [1] - 69:17
**Managers** [1] - 177:7
**manicured** [1] - 104:7
**manifest** [2] - 91:18, 178:8
**manipulation** [1] - 159:6
**manufacturer** [1] - 50:24
**manuscript** [4] - 12:5, 80:20, 80:21, 129:6
**map** [1] - 23:12
**mapped** [4] - 23:14, 23:15, 37:20, 193:14
**mapping** [4] - 23:21, 33:22, 156:21, 194:3
**marble** [2] - 72:18, 73:12
**March** [14] - 5:14, 5:20, 5:24, 7:4, 7:8, 7:9, 7:10, 7:12, 7:16, 7:17, 197:9, 199:19
**marching** [1] - 135:21
**marine** [1] - 65:19
**Mariner** [1] - 93:1
**maritime** [1] - 170:13
**mark** [1] - 192:5
**mark's** [1] - 31:9
**markers** [1] - 197:19
**Market** [1] - 1:10
**market** [63] - 13:23, 14:1, 14:6, 27:2, 39:13, 39:24, 40:3, 40:4, 40:9, 41:3, 42:7, 42:9, 42:10, 42:11, 42:23, 43:7, 44:14, 44:15, 44:22, 45:2, 45:12, 45:14, 45:16, 45:18, 45:19, 45:21, 46:16, 48:9, 48:12, 48:14, 48:19, 49:8, 49:9, 49:18, 49:19, 49:20, 49:21, 49:22, 50:1, 50:2, 50:5, 50:6, 50:12, 51:7, 51:9, 53:11, 53:18, 54:23, 55:6, 55:12, 55:18, 55:25, 56:24, 58:14, 59:8, 61:2, 61:12, 61:16, 62:6, 62:8, 62:14
**MARKET** [2] - 1:18, 2:15
**marketed** [1] - 13:22
**marketing** [4] - 13:24, 40:6, 40:12, 59:24

**marketplace** [1] - 53:13
**markets** [10] - 44:13, 44:18, 45:1, 45:3, 50:15, 54:12, 54:16, 55:5, 166:22
**marks** [1] - 24:2
**Marks** [1] - 24:3
**Marks'** [1] - 33:1
**marshaled** [1] - 203:3
**mash** [1] - 76:4
**mask** [1] - 37:10
**masks** [1] - 22:11
**mass** [1] - 131:5
**match** [2] - 162:5, 193:10
**matches** [1] - 63:12
**matching** [1] - 23:20
**material** [33] - 8:1, 9:19, 15:23, 26:16, 26:17, 26:19, 28:1, 28:13, 28:21, 29:1, 61:2, 63:8, 70:21, 70:22, 96:20, 102:7, 108:18, 110:4, 129:22, 130:10, 130:14, 130:20, 130:23, 132:4, 133:11, 151:9, 151:10, 153:17, 156:12, 157:5, 158:3, 159:3, 169:20
**materials** [18] - 26:8, 27:12, 28:10, 28:16, 29:8, 44:15, 47:8, 49:9, 50:6, 53:11, 61:14, 61:15, 61:22, 62:2, 62:5, 70:10, 90:16, 190:19
**math** [1] - 162:25
**mathematically** [1] - 32:4
**Mattel** [1] - 81:6
**matter** [32] - 15:18, 16:21, 18:7, 38:21, 44:20, 50:5, 58:10, 59:8, 68:8, 71:2, 71:3, 71:15, 75:13, 99:1, 104:16, 104:17, 120:15, 128:10, 128:14, 133:23, 137:15, 149:25, 150:20, 167:16, 168:15, 169:7, 179:1, 180:1, 182:22, 198:25, 204:9
**mattered** [1] - 44:19
**matters** [6] - 56:20, 68:15, 169:5,

177:10, 183:2, 192:16
**MCA** [2] - 86:19, 86:20
**MCAT** [1] - 137:18
**mean** [27] - 8:9, 23:1, 30:6, 48:22, 52:10, 54:24, 67:24, 90:20, 99:17, 99:21, 102:9, 113:12, 113:17, 114:4, 127:2, 164:8, 164:24, 169:13, 172:10, 173:2, 188:10, 188:12, 189:1, 189:23, 193:25, 194:5, 196:16
**meaning** [5] - 21:13, 22:10, 29:14, 57:3, 171:16
**Means** [16] - 3:15, 10:19, 20:23, 21:10, 21:12, 21:19, 36:1, 37:24, 40:9, 40:10, 40:22, 42:2, 56:7, 56:11, 170:3, 191:25
**means** [12] - 10:14, 10:16, 10:18, 40:14, 56:3, 80:21, 100:24, 169:14, 181:12, 192:15, 194:6, 194:7
**MEANS** [1] - 2:6
**meant** [4] - 64:23, 181:14, 192:18, 192:23
**measure** [1] - 93:12
**measured** [1] - 33:2
**mechanical** [1] - 110:19
**mechanics** [1] - 130:22
**median** [1] - 111:25
**Medical** [2] - 105:17, 137:16
**meet** [12] - 5:18, 13:3, 39:25, 43:7, 44:10, 100:2, 148:7, 148:21, 150:17, 176:5, 199:10, 199:21
**meeting** [1] - 197:4
**meets** [2] - 68:25, 149:17
**meld** [1] - 91:17
**memo** [28] - 106:23, 107:5, 107:11, 109:10, 123:21, 124:2, 127:24, 132:17, 135:18, 138:9, 138:19, 147:23, 154:9,

154:13, 156:7, 156:9, 156:16, 157:7, 157:8, 163:17, 164:8, 164:9, 172:21, 175:20, 184:23, 185:3, 193:10
**memorandum** [1] - 156:5
**memory** [2] - 156:18, 157:22
**memos** [53] - 13:15, 22:18, 22:19, 22:21, 24:20, 30:9, 30:15, 31:20, 31:21, 31:22, 32:9, 32:10, 36:4, 41:22, 56:5, 84:20, 84:24, 89:12, 89:24, 90:11, 101:13, 135:17, 138:5, 138:13, 138:18, 151:14, 151:15, 153:18, 154:19, 155:19, 157:15, 158:2, 159:16, 160:14, 161:16, 161:20, 161:24, 161:25, 163:22, 163:23, 164:14, 166:7, 167:23, 167:24, 168:22, 170:22, 182:22, 183:2, 188:4, 189:20, 191:15, 193:15, 193:16
**mention** [1] - 21:4
**mentioned** [14] - 21:14, 32:25, 50:15, 78:24, 116:4, 123:16, 125:4, 134:17, 140:12, 141:2, 156:6, 157:2, 174:7, 192:14
**mentions** [1] - 191:14
**merely** [4] - 12:8, 69:13, 78:4, 138:1
**merger** [3] - 130:11, 130:21, 133:23
**message** [1] - 22:10
**met** [1] - 49:3
**meta** [1] - 164:18
**metadata** [10] - 138:6, 138:19, 138:20, 157:16, 158:1, 160:15, 169:25, 174:11, 188:4, 188:9
**methodology** [1] - 115:16
**metric** [1] - 93:6
**metrics** [1] - 93:5

**MGA** [2] - 81:6
**MGM** [2] - 16:20, 29:11
**Michael** [1] - 3:12
**MICHAEL** [1] - 1:17
**middle** [1] - 201:15
**might** [10] - 13:20, 34:25, 72:24, 103:6, 125:18, 145:1, 148:10, 170:14, 178:17, 195:1
**migrate** [1] - 125:17
**miles** [1] - 148:6
**Millennium** [1] - 42:12
**million** [3] - 90:19, 128:13
**millions** [2] - 160:22
**mind** [4] - 31:14, 62:9, 109:17, 177:24
**mindful** [1] - 9:12
**mine** [1] - 197:18
**mini** [1] - 124:10
**minimum** [5] - 69:1, 79:14, 118:19, 118:20, 149:17
**minimus** [12] - 99:9, 100:6, 123:25, 124:24, 125:6, 125:10, 125:11, 125:14, 128:9, 136:23, 141:7, 169:1
**minor** [1] - 43:12
**minute** [2] - 8:21, 197:5
**minutes** [4] - 8:1, 8:19, 73:18, 200:7
**Miranda** [2] - 3:15, 170:3
**MIRANDA** [1] - 2:6
**misappropriation** [2] - 108:19, 110:4
**miscategorized** [1] - 123:3
**miscellaneous** [1] - 174:1
**misquoted** [1] - 37:5
**missing** [1] - 23:10
**mix** [2] - 32:22, 76:10
**model** [17] - 41:25, 100:22, 100:23, 101:1, 101:6, 101:10, 101:19, 102:10, 112:20, 112:21, 113:6, 123:8, 123:18, 123:19, 125:15, 125:16, 126:3
**models** [4] - 103:3, 111:23, 112:14, 198:15

**modes** [1] - 81:4
**modify** [1] - 112:20
**moment** [10] - 7:18, 34:24, 62:15, 81:17, 82:25, 101:16, 126:13, 127:2, 158:4, 181:10
**Monastery** [2] - 121:23, 131:4
**money** [8] - 42:25, 43:1, 43:3, 43:4, 55:22, 61:25, 124:7, 146:8
**months** [1] - 199:22
**Moore** [1] - 4:7
**MOORE** [2] - 2:13, 4:6
**moot** [1] - 18:1
**Morae** [3] - 151:25, 152:9, 154:8
**moreover** [4] - 17:21, 39:4, 41:18, 137:23
**MORING** [1] - 2:18
**morning** [5] - 3:2, 3:11, 3:20, 4:6, 154:10
**Morris** [1] - 3:12
**MORRIS** [1] - 1:16
**most** [20] - 3:4, 8:19, 16:4, 16:5, 23:14, 34:11, 34:13, 38:25, 39:19, 48:15, 58:17, 64:14, 73:14, 74:2, 99:17, 116:5, 116:25, 136:15, 138:14, 178:5
**motion** [9] - 102:18, 102:20, 102:21, 105:18, 139:17, 139:18, 145:18, 189:5
**motions** [2] - 134:14, 197:3
**motive** [1] - 90:14
**motives** [1] - 12:24
**mouth** [1] - 146:8
**move** [16] - 5:21, 36:20, 38:19, 60:10, 60:15, 62:17, 70:25, 75:9, 94:1, 106:1, 121:13, 136:23, 182:8, 182:9, 182:13, 196:5
**moved** [6] - 5:6, 24:23, 102:17, 127:15, 131:24, 134:11
**movers** [1] - 196:11
**moving** [10] - 16:18, 21:17, 21:24, 40:22, 41:2, 41:11, 42:3,

55:4, 55:20, 146:6
**Moving** [1] - 37:22
**MR** [262] - 3:11, 4:6, 4:13, 4:17, 6:7, 7:9, 22:2, 22:6, 23:3, 23:18, 25:23, 27:4, 28:7, 29:5, 30:11, 30:18, 30:22, 31:1, 31:13, 31:16, 32:17, 32:20, 32:23, 34:23, 35:3, 35:10, 35:20, 35:22, 36:23, 36:25, 38:20, 46:7, 47:3, 48:23, 49:11, 49:15, 50:9, 51:21, 52:5, 52:16, 52:21, 52:25, 53:3, 53:9, 53:15, 60:19, 61:11, 63:3, 64:10, 65:4, 65:15, 66:20, 66:23, 68:11, 68:14, 71:7, 73:10, 74:10, 74:15, 74:21, 74:24, 75:22, 77:6, 77:11, 77:17, 78:1, 78:6, 78:21, 79:20, 81:20, 82:3, 83:4, 84:23, 85:16, 85:21, 85:23, 87:1, 87:3, 87:6, 87:16, 88:8, 88:10, 88:13, 88:16, 89:1, 89:6, 89:16, 91:24, 92:3, 92:10, 92:18, 93:3, 93:18, 94:5, 95:7, 99:24, 100:20, 101:21, 102:13, 102:16, 103:15, 104:3, 105:11, 106:14, 106:20, 107:21, 109:17, 110:15, 112:2, 112:16, 113:1, 113:15, 114:12, 114:19, 114:22, 115:5, 115:7, 115:10, 115:15, 115:20, 116:1, 116:15, 116:18, 116:21, 116:24, 117:5, 117:10, 118:7, 118:17, 119:6, 119:10, 119:17, 119:19, 120:9, 122:21, 124:1, 125:1, 125:20, 126:15, 127:6, 127:10, 127:11, 128:6, 128:8, 128:16, 129:17, 130:8, 131:14, 133:1, 134:8,

135:12, 136:4, 136:18, 137:1, 139:13, 140:7, 140:10, 140:25, 141:20, 142:16, 142:21, 143:2, 143:8, 143:22, 143:25, 144:2, 144:5, 144:7, 144:14, 144:17, 145:8, 145:15, 145:17, 145:23, 146:13, 147:8, 147:12, 147:24, 148:5, 150:25, 151:20, 153:10, 153:22, 154:2, 154:7, 154:18, 155:17, 155:20, 157:14, 157:18, 158:14, 159:18, 160:2, 161:1, 161:3, 161:7, 161:11, 161:17, 161:21, 162:1, 162:4, 162:8, 162:13, 162:16, 162:19, 162:22, 163:1, 163:8, 163:13, 163:18, 164:1, 164:4, 164:7, 164:19, 164:21, 165:18, 165:21, 165:24, 166:4, 166:7, 166:15, 166:19, 166:21, 167:16, 167:22, 168:1, 168:6, 168:8, 169:13, 170:19, 171:19, 172:2, 172:10, 172:24, 173:1, 174:6, 174:12, 174:17, 176:14, 176:16, 176:18, 179:14, 180:5, 180:12, 180:21, 180:25, 182:4, 182:13, 184:22, 185:5, 185:22, 186:9, 187:25, 188:10, 188:21, 190:11, 190:17, 193:5, 195:3, 200:1, 201:25, 202:12
**MS** [72] - 3:24, 5:8, 5:16, 5:25, 6:14, 6:18, 6:21, 6:25, 7:19, 9:4, 10:4, 10:8, 10:21, 10:24, 11:14, 16:3, 16:17, 17:14, 18:10, 18:23, 19:13,

19:25, 20:21, 21:3, 35:2, 35:13, 35:18, 35:21, 36:21, 37:8, 39:16, 44:21, 53:25, 54:24, 55:3, 55:14, 57:7, 57:23, 58:16, 59:21, 60:6, 60:17, 71:14, 72:15, 148:11, 148:14, 149:9, 150:5, 150:8, 150:14, 175:1, 175:13, 175:16, 176:1, 176:11, 182:16, 182:24, 183:1, 183:21, 185:25, 186:18, 191:11, 191:13, 195:7, 196:7, 199:12, 199:23, 200:4, 200:11, 200:21, 201:22, 204:3
**muddy** [1] - 75:25
**multiple** [8] - 45:1, 64:11, 65:9, 75:3, 95:19, 100:14, 141:24, 158:15
**multiplied** [1] - 43:13
**Murphy** [2] - 42:12, 48:4
**music** [1] - 137:15
**must** [7] - 46:19, 67:6, 94:1, 173:4, 181:5, 181:6
**mutually** [2] - 63:22, 180:18
**Mystery** [1] - 29:20

**N**

**naked** [2] - 139:12, 147:25
**name** [7] - 9:9, 21:3, 35:17, 115:24, 157:18, 164:15, 196:12
**named** [1] - 135:17
**names** [7] - 9:9, 12:14, 75:19, 158:1, 158:19, 164:17, 169:25, 184:16, 194:16, 196:10, 196:12
**naming** [3] - 12:14, 194:17, 196:10
**narrow** [3] - 16:12, 16:24, 179:20
**Nation** [2] - 39:17, 41:16
**Nations** [1] - 131:16

**native** [3] - 176:3, 176:7, 201:4
**natural** [1] - 33:12
**nature** [12] - 65:18, 71:4, 71:10, 86:10, 87:3, 131:15, 133:9, 158:2, 187:9, 187:14, 187:16, 187:19
**navigate** [1] - 9:7
**near** [1] - 118:19
**nearly** [1] - 23:9
**neatly** [1] - 52:3
**necessarily** [1] - 19:10
**necessary** [1] - 115:23
**need** [49] - 5:12, 9:10, 9:14, 9:20, 9:25, 10:3, 10:5, 21:16, 28:4, 28:5, 35:11, 43:19, 45:9, 60:4, 65:25, 66:18, 67:21, 67:22, 70:23, 77:2, 79:5, 84:6, 87:23, 103:1, 108:15, 112:1, 113:23, 114:14, 116:10, 117:10, 125:18, 127:17, 132:14, 133:11, 144:18, 168:18, 182:3, 182:11, 182:14, 182:18, 195:13, 196:21, 198:20, 199:10, 200:7, 200:9, 200:18, 201:8, 201:19
**needed** [10] - 8:5, 15:5, 22:24, 37:20, 37:22, 148:23, 193:8, 193:9, 193:13, 193:16
**needing** [1] - 38:14
**needle** [1] - 43:20
**needs** [12] - 8:18, 11:5, 59:2, 62:19, 69:12, 113:25, 122:20, 136:11, 136:21, 149:11, 152:22, 195:22
**negative** [1] - 49:5
**negotiating** [3] - 25:11, 25:17, 25:19
**Network** [1] - 42:20
**never** [10] - 6:1, 30:2, 47:3, 48:11, 62:10, 80:8, 105:25, 114:5, 125:11, 179:25
**new** [15] - 14:8, 19:18, 22:7, 22:8, 22:10, 22:12, 25:5, 25:7,

37:12, 55:6, 58:15, 84:12, 156:17, 178:11, 180:16
**New** [4] - 2:5, 70:3, 130:17
**Newman** [1] - 121:6
**News** [7] - 42:20, 44:25, 55:23, 59:5, 60:22, 87:20
**news** [1] - 59:15
**newspaper** [1] - 81:9
**next** [15] - 4:22, 24:19, 32:13, 60:15, 71:1, 78:24, 105:22, 108:22, 119:19, 127:15, 147:14, 148:19, 148:22, 167:1, 201:18
**Nexus** [1] - 21:16
**NICHOLS** [1] - 1:16
**Nichols** [1] - 3:12
**Nimmer** [2] - 58:25, 137:5
**Ninth** [11] - 5:11, 53:7, 58:21, 67:4, 67:13, 72:4, 83:15, 86:9, 87:20, 120:11, 131:20
**Nixon** [1] - 41:16
**NO** [1] - 1:3
**non** [2] - 51:24, 112:4
**non-infringement** [1] - 112:4
**non-transformative** [1] - 51:24
**none** [12] - 43:1, 59:22, 103:2, 110:9, 110:10, 113:4, 162:24, 167:8, 169:5, 189:10, 193:14, 200:14
**nonexclusive** [1] - 58:1
**normal** [1] - 145:9
**normally** [1] - 124:6
**NORTH** [1] - 1:18
**note** [5] - 34:4, 70:12, 105:1, 155:20, 164:22
**notebook** [1] - 60:4
**noted** [6] - 17:15, 41:15, 69:4, 83:18, 98:5, 177:14
**notes** [3] - 122:20, 137:8, 174:24
**nothing** [23] - 36:9, 38:6, 38:8, 47:11, 48:14, 48:15, 48:24, 48:25, 49:23, 50:3, 54:18, 57:17, 74:21,

88:19, 90:25, 108:5, 163:11, 181:19, 189:15, 192:15, 192:18, 192:24
**notice** [14] - 114:8, 169:14, 182:23, 183:3, 183:7, 183:14, 183:23, 184:3, 184:9, 184:11, 184:14, 184:15, 186:3, 186:5
**noticed** [1] - 127:23
**notify** [1] - 7:5
**notorious** [1] - 25:25
**noun** [1] - 31:6
**novel** [2] - 68:5, 91:9
**novels** [2] - 92:21
**Novelty** [1] - 131:19
**Number** [14] - 4:14, 4:15, 10:18, 10:19, 63:9, 65:17, 76:15, 186:21, 187:4, 187:7, 187:21, 191:20, 192:11, 195:4
**number** [87] - 4:16, 4:25, 8:7, 24:12, 33:3, 33:5, 33:13, 33:16, 33:18, 34:12, 62:20, 64:2, 65:25, 66:3, 66:7, 69:22, 78:4, 78:11, 83:17, 85:4, 85:14, 85:23, 89:17, 93:8, 99:8, 101:20, 102:11, 104:11, 104:12, 105:4, 111:16, 112:1, 112:21, 113:7, 116:8, 117:12, 118:5, 118:8, 132:12, 135:11, 135:12, 135:18, 135:24, 138:7, 138:15, 138:18, 138:21, 138:23, 138:24, 146:5, 148:25, 154:23, 155:1, 155:3, 155:5, 155:6, 155:8, 155:10, 155:14, 157:12, 157:18, 158:9, 158:18, 158:19, 164:8, 164:10, 164:25, 165:5, 169:24, 170:24, 175:24, 188:15, 188:18, 189:3, 189:10, 189:14, 190:2, 190:13,

190:18, 191:5, 191:17, 193:22, 194:20
**numbering** [3] - 68:10, 186:11, 188:2
**numbers** [48] - 8:11, 23:22, 24:22, 24:24, 24:25, 31:17, 31:24, 33:6, 33:8, 34:13, 65:14, 65:15, 75:2, 75:11, 75:19, 78:16, 101:12, 103:20, 106:2, 113:4, 126:18, 138:8, 144:24, 146:4, 154:22, 154:23, 155:11, 157:14, 158:23, 167:15, 170:8, 170:16, 170:21, 171:5, 174:13, 183:18, 186:16, 188:7, 188:8, 188:11, 188:22, 188:24, 188:25, 189:17, 189:22, 189:24
**numerical** [1] - 135:19
**numerous** [4] - 56:9, 130:12, 131:22, 153:2
**NW** [1] - 2:22

# O

**o'clock** [1] - 93:21
**object** [1] - 22:7
**objection** [1] - 114:8
**objective** [2] - 19:21, 19:22
**objects** [1] - 76:24
**obligation** [2] - 108:12, 195:15
**observer** [2] - 133:11, 139:6
**observers** [1] - 132:24
**obtain** [4] - 39:6, 54:6, 55:22, 183:11
**obtained** [1] - 41:5
**obvious** [3] - 137:12, 138:8, 138:14
**obviously** [6] - 7:14, 10:5, 149:19, 195:7, 197:16, 200:12
**occur** [1] - 33:11
**occurred** [4] - 20:1, 153:1, 167:17, 184:23
**occurring** [1] - 166:1
**occurs** [1] - 69:8
**octopus** [2] - 73:14,

91:8
**odd** [2] - 40:1, 164:15
**oddly** [1] - 155:25
**OF** [1] - 1:1
**offer** [4] - 10:12, 40:12, 58:15, 195:11
**offers** [1] - 22:8
**Official** [1] - 1:22
**offset** [1] - 13:5
**often** [6] - 58:1, 60:6, 63:19, 125:8, 181:1, 192:6
**Oliver** [4] - 10:17, 10:19, 79:2, 132:5
**Oliver's** [1] - 69:17
**omission** [1] - 97:13
**once** [10] - 24:21, 68:11, 68:15, 82:23, 112:11, 122:1, 124:5, 177:10, 188:23, 199:16
**one** [112] - 6:14, 6:15, 7:6, 9:16, 11:10, 14:3, 19:15, 21:6, 23:7, 23:13, 24:7, 32:9, 33:2, 33:6, 33:20, 35:25, 37:12, 39:14, 40:18, 41:20, 44:11, 44:13, 45:4, 45:19, 47:8, 49:19, 51:9, 58:1, 59:4, 59:12, 60:14, 60:15, 68:3, 72:12, 72:17, 72:23, 73:13, 75:6, 81:6, 81:10, 81:17, 83:5, 83:13, 84:24, 85:10, 85:14, 85:19, 85:23, 86:18, 87:23, 90:16, 92:22, 93:21, 95:13, 96:18, 97:1, 99:2, 99:6, 101:6, 102:17, 103:2, 108:13, 109:9, 109:12, 110:6, 110:8, 111:8, 111:21, 112:5, 114:13, 116:3, 116:12, 116:25, 117:6, 118:12, 121:5, 123:1, 125:11, 125:23, 128:8, 128:18, 128:25, 129:9, 141:2, 146:14, 146:17, 147:19, 148:22, 149:12, 151:22, 155:11, 158:4, 161:12, 164:1, 165:16, 166:8, 169:3,

169:15, 171:11, 171:17, 175:25, 180:13, 184:2, 187:3, 188:11, 189:8, 189:24, 189:25, 194:10, 200:14, 202:1
**One** [12] - 12:2, 17:14, 44:9, 52:2, 52:8, 52:12, 57:11, 57:16, 57:17, 57:20, 57:21, 57:22
**one-fifth** [3] - 23:7, 23:13, 90:16
**ones** [10] - 39:6, 85:18, 85:20, 85:24, 97:12, 118:14, 119:11, 144:10, 168:19
**Ooh** [1] - 26:9
**oops** [1] - 200:19
**open** [9] - 25:25, 161:8, 178:21, 179:7, 179:9, 181:12, 181:19, 182:10, 200:18
**opening** [5] - 24:16, 132:8, 132:20, 132:22, 156:2
**openly** [1] - 25:16
**OPENS** [1] - 3:1
**operates** [1] - 84:9
**opining** [1] - 122:23
**opinion** [73] - 10:4, 14:5, 17:22, 20:10, 44:16, 44:20, 49:16, 57:16, 63:15, 64:9, 64:18, 64:22, 65:5, 68:20, 69:11, 69:24, 70:13, 79:4, 81:22, 84:5, 84:6, 84:16, 95:12, 95:21, 107:13, 108:6, 108:17, 109:25, 110:1, 115:17, 115:24, 115:25, 116:14, 116:16, 117:3, 117:8, 117:22, 118:16, 118:18, 120:11, 122:7, 127:21, 128:3, 128:4, 132:24, 136:10, 146:10, 147:5, 147:22, 149:21, 151:21, 152:6, 159:12, 172:12, 172:18, 172:22, 173:4, 173:6, 175:19, 177:18,

177:21, 180:13, 195:10, 196:1, 196:14, 197:24, 197:25, 199:1, 199:15, 199:16, 199:20, 201:12, 202:18
**opinions** [30] - 9:23, 34:14, 53:7, 67:16, 72:23, 82:15, 95:10, 96:8, 97:4, 97:20, 97:24, 106:7, 116:9, 127:16, 135:5, 135:6, 138:3, 143:16, 144:21, 150:23, 156:23, 159:4, 163:9, 166:23, 170:25, 183:17, 185:3, 185:14, 185:17, 196:19
**opportunity** [10] - 17:17, 42:18, 105:25, 114:9, 117:16, 127:13, 127:17, 139:25, 148:17, 195:11
**opposition** [9] - 34:4, 56:12, 76:16, 77:12, 89:6, 89:19, 98:3, 111:5, 184:8
**opt** [1] - 195:3
**optimal** [1] - 148:17
**option** [1] - 195:12
**options** [1] - 60:16
**Oracle** [9] - 17:9, 25:17, 46:12, 51:15, 58:3, 61:18, 83:6, 86:22
**oral** [1] - 57:8
**orally** [1] - 8:9
**order** [13] - 32:15, 37:2, 57:24, 95:14, 97:4, 97:8, 103:23, 105:6, 108:8, 122:16, 176:23, 194:12, 196:21
**ordered** [1] - 117:21
**orders** [1] - 113:24
**ordinary** [1] - 63:10
**organization** [5] - 59:15, 77:22, 77:24, 95:23, 158:19
**organize** [4] - 5:9, 65:25, 77:19, 78:14
**organized** [3] - 93:24, 189:11, 189:13
**organizing** [2] - 75:3, 104:13
**original** [34] - 11:19,

14:7, 14:11, 22:8, 24:5, 24:20, 40:5, 46:21, 53:19, 62:6, 63:6, 64:7, 64:9, 64:15, 66:11, 67:22, 68:18, 69:1, 69:25, 70:22, 71:11, 72:7, 75:6, 75:8, 79:14, 81:1, 81:2, 100:5, 135:14, 136:6, 137:18, 149:18, 172:22, 181:10
**originality** [2] - 74:23, 82:21
**otherwise** [5] - 80:4, 91:14, 178:21, 194:25, 196:2
**ou** [1] - 179:3
**ought** [3] - 109:13, 147:17, 196:19
**ourselves** [3] - 45:13, 51:14, 199:17
**outcome** [1] - 58:6
**Outfitters** [1] - 131:21
**outline** [1] - 65:23
**output** [4] - 15:25, 90:24, 189:10, 190:18
**outside** [2] - 111:3, 148:7
**outweighed** [1] - 59:9
**Ovbiagele** [2] - 22:25, 35:5
**Ovbiagele's** [2] - 33:1, 160:17
**overall** [5] - 13:14, 15:25, 16:4, 16:21, 16:22
**overemphasized** [1] - 15:1
**overlap** [2] - 118:20, 152:17
**overlooked** [1] - 131:9
**overly** [2] - 107:22, 138:12
**overrule** [1] - 17:17
**overt** [1] - 45:8
**overtly** [1] - 46:1
**overwhelming** [2] - 40:2, 137:7
**overwhelmingly** [1] - 137:14
**own** [24] - 12:6, 14:22, 37:16, 37:23, 41:5, 41:9, 43:23, 56:2, 69:14, 71:16, 71:22, 72:23, 96:13, 96:23, 132:6, 132:12, 143:6, 153:19, 158:21, 165:2,

171:2, 173:21, 191:24
**owner** [3] - 83:11, 119:23, 121:8
**ownership** [1] - 100:3

**P**

**P.O** [1] - 1:19
**PA** [1] - 1:11
**pace** [1] - 134:11
**page** [35] - 16:18, 28:8, 29:3, 30:12, 30:13, 30:24, 35:2, 35:3, 37:19, 46:17, 51:23, 76:16, 77:12, 77:13, 89:2, 89:8, 89:19, 94:8, 94:10, 94:11, 105:18, 105:20, 140:13, 140:14, 148:3, 152:6, 154:21, 154:25, 159:21, 160:13, 166:21, 173:23, 184:18, 185:19, 189:6
**pages** [6] - 55:3, 89:4, 132:9, 154:1, 175:22, 179:4
**paid** [3] - 55:21, 61:23, 123:22
**paintings** [1] - 76:19
**pairings** [1] - 186:25
**pairs** [10] - 15:4, 15:13, 37:22, 37:25, 41:13, 156:25, 187:20, 187:22, 192:20, 192:21
**PALAPURA** [1] - 2:14
**Pan** [1] - 105:21
**pander** [1] - 73:10
**paper** [2] - 176:8, 203:2
**papers** [4] - 8:10, 29:23, 162:6, 164:5
**Paragraph** [1] - 170:5
**paragraph** [8] - 16:19, 156:1, 156:2, 156:3, 157:21, 170:7, 192:1, 193:12
**paragraphs** [1] - 24:15
**paralegal** [1] - 145:5
**paralegals** [5] - 147:15, 148:2, 173:19, 176:9, 203:6
**parameters** [3] - 32:19, 32:20, 32:21
**Paramount** [2] - 16:19, 29:6
**pardon** [1] - 157:22

**paring** [1] - 159:14
**PARK** [1] - 2:9
**Parker** [42] - 4:8, 4:11, 4:12, 20:18, 22:1, 36:24, 37:4, 38:17, 44:12, 46:6, 56:19, 58:12, 60:18, 66:21, 73:9, 84:18, 86:6, 88:7, 88:9, 89:17, 102:14, 103:14, 127:9, 141:17, 149:1, 149:23, 153:18, 154:10, 159:17, 168:4, 168:12, 170:18, 180:4, 182:12, 184:19, 186:8, 187:24, 192:14, 198:18, 199:25, 200:13, 203:5
**PARKER** [158] - 2:18, 4:13, 4:17, 6:7, 7:9, 22:2, 22:6, 23:3, 23:18, 25:23, 27:4, 28:7, 29:5, 30:11, 30:18, 30:22, 31:1, 31:13, 31:16, 32:17, 32:20, 32:23, 34:23, 35:3, 35:10, 35:20, 35:22, 36:23, 36:25, 38:20, 46:7, 47:3, 48:23, 49:11, 49:15, 50:9, 51:21, 52:5, 52:16, 52:21, 52:25, 53:3, 53:9, 53:15, 60:19, 61:11, 73:10, 74:10, 74:15, 74:21, 74:24, 75:22, 77:6, 77:11, 77:17, 78:1, 78:6, 78:21, 79:20, 88:10, 88:13, 88:16, 89:1, 89:6, 89:16, 91:24, 92:3, 92:10, 92:18, 93:3, 93:18, 103:15, 104:3, 105:11, 106:14, 106:20, 107:21, 109:17, 110:15, 112:2, 112:16, 113:1, 113:15, 114:12, 114:19, 127:11, 128:6, 128:8, 128:16, 137:1, 139:13, 140:7, 140:10, 145:17, 145:23, 146:13, 147:8, 147:12, 147:24, 148:5, 150:25, 159:18, 160:2, 161:1, 161:3, 161:7,

161:11, 161:17, 161:21, 162:1, 162:4, 162:8, 162:13, 162:16, 162:19, 162:22, 163:1, 163:8, 163:13, 163:18, 164:1, 164:4, 164:7, 164:19, 164:21, 165:18, 165:21, 165:24, 166:4, 166:7, 166:15, 166:19, 166:21, 168:6, 170:19, 171:19, 172:2, 172:10, 172:24, 173:1, 180:5, 180:12, 180:21, 180:25, 182:13, 184:22, 185:5, 185:22, 186:9, 187:25, 188:10, 188:21, 190:11, 190:17, 193:5, 195:3, 200:1, 201:25
**parker's** [3] - 7:7, 57:19, 122:19
**Parker's** [1] - 200:4
**parodied** [1] - 19:1
**parody** [8] - 18:22, 18:24, 46:21, 56:23, 57:2, 59:11, 59:12, 59:19
**parsing** [1] - 137:16
**Part** [1] - 104:1
**part** [23] - 12:1, 15:12, 32:1, 41:16, 45:25, 52:24, 55:21, 62:20, 75:23, 77:16, 77:18, 104:1, 104:15, 104:16, 104:17, 107:22, 109:21, 159:12, 180:19, 186:22, 187:12, 188:11, 192:11
**partial** [1] - 198:22
**particle** [1] - 103:18
**particular** [12] - 17:23, 46:2, 61:15, 81:14, 81:16, 82:22, 104:3, 104:7, 189:8, 194:17, 194:18, 196:11
**particularly** [2] - 55:5, 126:9
**parties** [14] - 5:5, 93:24, 94:15, 123:10, 173:18, 175:17, 176:8, 177:22, 181:7,

194:14, 194:23, 195:10, 198:1, 203:25
**parties'** [3] - 5:2, 13:10, 14:20
**partner** [3] - 4:1, 182:24, 201:25
**partner's** [1] - 201:23
**parts** [4] - 80:7, 135:13, 135:16, 136:24
**passage** [5] - 116:17, 116:18, 128:3, 156:22, 157:25
**passages** [4] - 37:21, 157:5, 159:10, 160:13
**Passover** [2] - 6:5, 6:9
**password** - 88:2
**password-protected** [1] - 88:2
**past** [4] - 31:4, 107:9, 121:14, 125:5
**paste** [1] - 90:2
**pastes** [1] - 156:5
**path** [1] - 5:17
**paths** [1] - 150:6
**Patri** [1] - 104:4
**pattern** [1] - 155:7
**pause** [6] - 62:16, 81:18, 83:3, 126:14, 127:1, 158:5
**Pause** [1] - 16:15
**pay** [6] - 42:22, 42:24, 55:24, 101:8, 124:6
**paying** [3] - 42:17, 55:16, 203:20
**payment** [1] - 127:25
**PC** [1] - 26:5
**PDF** [2] - 145:12, 145:14
**pdf** [1] - 176:8
**Peaks** [1] - 131:16
**pearls** [1] - 80:20
**pending** [1] - 102:19
**pendulums** [1] - 103:17
**PENNSYLVANIA** [1] - 2:22
**Pennsylvania** [1] - 76:22
**penny** [1] - 203:19
**people** [20] - 15:17, 17:25, 18:3, 47:7, 50:24, 58:21, 66:5, 70:10, 74:1, 92:20, 92:21, 93:9, 125:17, 135:1, 154:19, 169:5, 169:23, 187:4, 187:15,

196:18
**People** [1] - 148:19
**people's** [2] - 44:3, 202:16
**per** [2] - 71:21, 198:16
**percent** [30] - 30:18, 30:20, 30:22, 39:5, 90:19, 128:25, 137:13, 162:13, 162:14, 162:15, 162:18, 162:20, 162:25, 163:23, 163:25, 164:3, 165:17, 165:19, 166:2, 166:3, 166:5, 166:9, 166:11, 166:12, 166:13, 166:14, 168:12, 168:13, 189:2
**perhaps** [3] - 7:5, 50:19, 87:11
**period** [4] - 92:11, 92:23, 99:9, 99:13
**permission** [1] - 19:7
**permitted** [1] - 143:12
**person** [16] - 3:4, 6:23, 8:19, 19:1, 51:9, 67:23, 84:14, 106:25, 107:3, 107:6, 197:4, 197:14, 202:4
**person's** [1] - 9:9
**perspective** [7] - 65:6, 97:17, 98:25, 101:14, 101:22
**persuade** [1] - 53:8
**persuaded** [1] - 56:20
**Peter** [4] - 16:19, 29:7, 105:21, 134:16
**pharmacy** [1] - 177:7
**Pharmacy** [3] - 178:3, 178:12, 178:18
**phase** [1] - 138:6
**Philadelphia** [2] - 1:11, 200:15
**philosophy** [1] - 130:13
**phone** [2] - 47:19, 75:19
**photo** [2] - 28:18, 29:13
**photocopying** [1] - 37:12
**phrased** [1] - 179:4
**phrases** [1] - 188:8
**physics** [1] - 103:17
**pick** [2] - 73:11, 80:7
**picking** [3] - 39:5, 85:19, 202:8
**picture** [3] - 56:16,

154:24, 155:3
**piece** [3] - 113:16, 128:5, 190:17
**pieces** [4] - 15:2, 54:23, 104:23, 177:20
**pilfering** [2] - 87:9, 87:19
**piliation** [1] - 177:19
**pin** [1] - 64:1
**pit** [1] - 203:15
**pitched** [1] - 99:21
**place** [8] - 60:5, 61:10, 88:14, 89:3, 113:23, 120:23, 146:14, 146:17
**placed** [3] - 84:18, 151:14, 163:22
**placement** [1] - 153:17, 163:21
**places** [3] - 74:18, 76:17, 80:25
**plain** [3] - 183:4, 184:5, 186:3
**PLAINTIFF** [2] - 1:17, 2:3
**plaintiff** [3] - 14:22, 137:5, 137:9
**plaintiff's** [4] - 7:12, 14:3, 46:8, 105:20
**Plaintiffs** [1] - 1:4
**plaintiffs** [12] - 3:9, 3:13, 3:21, 5:17, 13:8, 40:1, 41:4, 41:8, 44:1, 50:15, 61:24, 175:2
**plaintiffs'** [2] - 42:8, 43:24
**plan** [2] - 40:12, 199:17
**planned** [1] - 48:12
**platform** [17] - 14:1, 15:14, 27:13, 40:17, 42:14, 46:10, 46:13, 54:2, 54:3, 54:7, 56:2, 65:24, 124:3, 155:4, 155:9, 168:20, 170:11
**platforms** [2] - 43:23, 132:11
**plausibly** [1] - 55:24
**play** [4] - 29:11, 68:8, 114:3, 146:25
**played** [2] - 25:7, 137:15
**playing** [1] - 50:24
**plays** [1] - 17:11
**PLAZA** [1] - 2:14
**plenty** [3] - 59:18, 198:1, 199:20

**plot** [1] - 68:6
**plus** [1] - 149:23
**podium** [2] - 71:8, 71:13
**point** [37] - 9:18, 16:21, 18:11, 35:25, 37:3, 37:12, 38:2, 50:10, 54:11, 57:19, 73:1, 83:25, 86:12, 86:15, 92:17, 99:25, 101:4, 105:6, 110:11, 118:3, 119:13, 119:19, 120:4, 122:19, 123:1, 135:15, 139:9, 143:10, 149:2, 149:22, 150:8, 168:15, 168:18, 185:7, 192:19, 199:11, 202:21
**pointed** [3] - 36:18, 132:10, 153:21
**points** [8] - 19:15, 38:17, 53:23, 58:16, 106:12, 132:3, 169:3, 191:13
**policy** [1] - 58:1
**pops** [1] - 84:15
**populate** [1] - 187:22
**portal** [1] - 156:5
**Porter** [1] - 134:10
**portfolios** [1] - 56:10
**portion** [5] - 104:11, 107:10, 109:25, 140:11, 140:19
**portions** [2] - 194:25, 196:2
**posed** [1] - 114:16
**posing** [1] - 21:18
**posit** [1] - 113:3
**position** [8] - 64:1, 66:16, 91:17, 132:20, 133:23, 149:6, 151:7, 183:7
**positions** [1] - 150:15
**possibility** [7] - 7:6, 7:16, 33:10, 62:13, 200:18, 202:15, 202:16
**possible** [5] - 4:23, 44:13, 77:23, 103:9, 169:12
**possibly** [5] - 30:16, 50:18, 116:6, 126:6, 144:18
**post** [3] - 17:13, 41:7, 86:7
**post-comp** [1] - 41:7
**post-Google** [1] -

17:13

**potential** [13] - 4:21, 10:13, 39:13, 39:20, 42:10, 45:3, 45:16, 46:18, 48:9, 49:2, 49:6, 55:5, 55:12

**POTTER** [1] - 2:13

**Potter** [2] - 4:7, 59:6

**pound** [1] - 203:19

**power** [3] - 176:20, 178:23, 179:15

**practice** [3] - 155:6, 177:4, 178:4

**practices** [12] - 85:1, 94:6, 94:9, 153:22, 153:24, 154:3, 154:15, 154:17, 159:23, 160:6, 169:21, 174:14

**Practices** [6] - 88:10, 89:9, 89:10, 89:14, 89:22, 89:25

**practitioner** [3] - 12:18, 21:18, 21:22

**pre** [2] - 86:19, 118:16

**pre-1927** [1] - 106:18

**pre-Feist** [1] - 86:19

**precarious** [1] - 101:17

**precisely** [2] - 8:14, 32:14

**precluded** [1] - 178:14

**predates** [1] - 118:18

**prefer** [3] - 148:6, 200:16, 200:17

**preference** [1] - 200:23

**preferred** [1] - 85:19

**prejudice** [2] - 117:19, 118:2

**prejudiced** [1] - 181:7

**prejudicial** [1] - 148:15

**premise** [3] - 59:12, 145:24, 198:9

**premised** [1] - 113:8

**prep** [1] - 5:12

**preparation** [1] - 203:9

**prepare** [2] - 89:11, 89:24

**prepared** [4] - 1:24, 7:25, 197:18, 203:1

**prerogative** [1] - 91:11

**presence** [1] - 203:13

**present** [2] - 56:16, 102:3

**presentations** [1] - 39:10

**presented** [4] - 41:3,

57:12, 102:23, 129:20

**presumably** [1] - 182:10

**presumption** [2] - 121:1, 121:19

**presupposes** [2] - 12:2, 30:3

**pretend** [1] - 12:15

**pretending** [1] - 12:17

**pretrial** [8] - 68:22, 94:18, 96:19, 182:17, 194:11, 196:25, 197:11, 202:4

**Pretty** [2] - 18:22, 56:25

**pretty** [2] - 61:4, 181:21

**prevent** [2] - 56:5, 57:2

**previous** [2] - 39:14, 178:16

**previously** [3] - 48:1, 118:20, 177:17

**price** [2] - 42:17, 55:16

**primarily** [2] - 12:23, 186:15

**primary** [2] - 40:2, 45:2

**principal** [3] - 35:23, 36:8, 36:11

**principle** [3] - 42:1, 45:22, 57:4

**principles** [1] - 66:12

**printout** [1] - 184:10

**printouts** [3] - 183:13, 183:17, 184:14

**probative** [4] - 120:12, 152:5, 152:13, 152:16

**problem** [7] - 26:25, 50:10, 54:10, 56:15, 93:16, 142:13, 196:23

**procedural** [2] - 114:8, 118:2

**procedurally** [3] - 114:14, 117:18, 136:1

**procedure** [7] - 104:14, 165:4, 165:5, 165:6, 180:19, 188:12, 191:16

**proceed** [5] - 39:15, 81:19, 127:7, 174:22, 198:2

**proceeded** [1] -

177:22

**proceeding** [1] - 63:20

**proceedings** [2] - 16:15, 204:8

**Proceedings** [1] - 1:24

**process** [9] - 70:5, 78:25, 135:22, 156:3, 156:22, 157:6, 161:19, 165:10, 185:17

**prodigy** [1] - 11:1

**produce** [2] - 80:21, 85:12

**produced** [2] - 85:2, 97:21

**producing** [1] - 19:4, 101:13

**product** [1] - 13:21

**Productions** [1] - 131:5

**professional** [1] - 70:18

**profit** [2] - 12:24, 14:9

**profit-making** [1] - 12:24

**profits** [4] - 101:23, 101:24, 111:20, 123:20

**program** [1] - 133:10

**programming** [1] - 29:19

**programs** [1] - 133:8

**progress** [1] - 93:25

**project** [7] - 15:25, 123:21, 124:2, 164:22, 165:14, 184:24, 185:3

**prolonged** [1] - 148:22

**promise** [1] - 60:11

**promised** [1] - 82:13

**promote** [2] - 39:22, 177:5

**proof** [3] - 54:21, 152:5, 155:15

**proper** [1] - 180:11

**properly** [1] - 166:1

**property** [2] - 155:2, 155:8

**proposal** [1] - 202:20

**proposals** [1] - 201:17

**propose** [3] - 196:4, 197:15

**proposed** [1] - 195:21

**proposition** [4] - 38:10, 67:2, 69:12, 83:10

**proprietary** [2] - 90:1, 154:12

**propriety** [1] - 12:1

**protectability** [3] - 94:23, 94:25, 96:11

**protectabiliy** [1] - 179:5

**protectable** [30] - 63:18, 68:25, 70:7, 70:10, 70:17, 70:25, 75:21, 84:2, 94:16, 94:19, 96:10, 98:8, 98:24, 99:2, 99:4, 100:15, 110:3, 119:2, 119:25, 120:13, 122:16, 130:14, 149:16, 149:24, 152:18, 158:11, 158:17, 172:7, 172:9, 172:16

**protected** [11] - 63:7, 65:16, 71:9, 72:13, 75:20, 78:5, 78:7, 81:25, 88:2, 158:9, 158:10

**protection** [29] - 62:22, 63:10, 65:8, 68:12, 69:1, 69:9, 70:1, 70:22, 73:3, 73:17, 73:22, 74:3, 74:6, 74:19, 75:9, 75:18, 77:3, 79:10, 82:24, 83:12, 83:24, 86:17, 91:5, 91:10, 91:12, 93:13, 121:14, 149:18, 158:14

**protections** [2] - 79:23, 93:4

**protects** [1] - 53:18

**prove** [12] - 49:4, 93:14, 107:11, 123:12, 124:14, 124:15, 124:19, 126:1, 145:7, 152:4, 168:25, 169:1

**proved** [1] - 123:23

**provide** [9] - 8:11, 56:16, 90:14, 145:19, 176:3, 177:4, 194:14, 194:24, 196:2

**provided** [5] - 23:22, 23:25, 24:17, 24:25, 43:17

**providing** [2] - 7:22, 108:12

**province** [3] - 110:22, 110:24, 110:25

**proving** [2] - 39:23, 151:22

**proximity** [1] - 33:11

**propriety** — repeated

**Public** [2] - 67:16, 77:10

**public** [10] - 9:24, 10:2, 58:1, 69:5, 76:19, 76:24, 194:21, 195:17, 195:24, 196:13

**Publication(Sic** [1] - 131:17

**published** [2] - 183:8, 186:4

**Publishing** [2] - 70:3, 131:12

**PUBLISHING** [1] - 1:3

**pull** [3] - 122:25, 123:4, 126:22

**punch** [1] - 63:5, 71:9, 155:21

**pure** [2] - 59:21, 113:13

**purported** [1] - 147:19

**purpose** [38] - 9:1, 13:8, 13:14, 14:1, 14:3, 14:8, 14:14, 14:19, 14:23, 16:4, 16:6, 16:8, 16:12, 16:21, 16:23, 16:24, 22:9, 23:7, 25:1, 26:13, 29:10, 37:10, 37:11, 40:8, 45:25, 51:17, 61:25, 191:23, 192:2, 192:16, 192:18, 192:21, 193:1, 193:7, 193:20, 193:21, 193:24

**purposely** [1] - 52:11

**purposes** [12] - 12:10, 13:10, 13:13, 16:9, 17:1, 34:7, 56:11, 68:15, 98:11, 120:15, 152:16, 198:21

**pursuit** [1] - 81:7

**pushed** [1] - 31:22

**put** [24] - 6:10, 22:13, 39:6, 47:23, 59:15, 68:9, 73:4, 80:1, 83:25, 92:12, 97:9, 98:7, 110:5, 113:24, 117:4, 118:24, 121:11, 145:17, 146:8, 146:14, 146:16, 156:10, 189:6, 197:19

**putting** [3] - 60:10, 119:1, 156:11

**puzzled** [1] - 179:3

## Q

**QER** [1] - 33:2
**quantum** [1] - 103:17
**queries** [1] - 172:4
**query** [1] - 189:12
**question-and-answer** [3] - 15:13, 37:22, 41:13
**questionable** [1] - 169:23
**questionnaire** [1] - 186:24
**Questions** [1] - 93:25
**questions** [51] - 3:25, 4:2, 4:14, 8:5, 14:2, 15:7, 15:20, 16:24, 23:20, 30:8, 37:20, 37:21, 38:1, 81:24, 82:4, 88:21, 90:4, 90:6, 94:10, 95:9, 97:21, 97:24, 103:6, 103:8, 114:16, 118:19, 132:17, 132:19, 152:25, 154:13, 155:11, 156:14, 157:4, 157:8, 160:5, 160:9, 160:19, 160:21, 167:3, 167:11, 168:16, 170:6, 171:22, 173:13, 182:5, 189:19, 192:5, 192:8, 193:3, 199:8, 200:2
**quick** [1] - 54:1
**quickly** [1] - 30:12
**quintessential** [1] - 126:7
**quintessentially** [1] - 125:24
**quite** [4] - 90:4, 90:8, 103:7, 134:11
**quiz** [1] - 141:5
**quotations** [4] - 32:15, 84:21, 97:3
**quote** [33] - 21:21, 22:3, 23:5, 23:14, 27:9, 35:5, 37:19, 41:24, 46:12, 67:6, 68:24, 69:4, 79:25, 85:9, 85:11, 85:12, 89:25, 94:12, 96:21, 97:1, 122:4, 134:9, 146:9, 152:16, 157:5, 157:19, 159:16, 159:24, 160:11, 163:3, 194:16
**quoted** [2] - 116:15,

129:3
**quotes** [21] - 22:20, 22:21, 22:23, 23:7, 23:13, 23:19, 32:11, 33:22, 33:25, 38:23, 76:20, 80:5, 88:18, 90:18, 135:7, 143:16, 167:3, 167:4, 193:25, 194:2, 194:3
**quoting** [6] - 22:3, 54:13, 86:8, 117:22, 122:5, 178:14

## R

**R&D** [1] - 44:5
**rack** [1] - 75:12
**racking** [1] - 75:3
**radar** [1] - 103:13
**radically** [1] - 43:23
**raise** [1] - 136:2
**raised** [7] - 38:18, 59:22, 107:11, 125:21, 149:5, 180:8, 180:15
**raises** [2] - 137:24, 180:7
**raising** [1] - 136:6
**raking** [1] - 170:4
**Ralph** [1] - 92:22
**random** [2] - 30:19, 156:17
**randomly** [2] - 39:5, 162:21
**range** [3] - 22:24, 137:14, 192:4
**ranked** [1] - 32:15
**ranking** [1] - 192:3
**rankings** [1] - 160:12
**rare** [1] - 110:25
**rarely** [1] - 137:8
**rate** [1] - 26:10
**Rather** [1] - 146:24
**rather** [5] - 8:11, 12:9, 129:14, 160:10, 176:8
**rating** [1] - 156:15
**Rayon(sic** [1] - 131:4
**Rd** [1] - 137:14
**re** [2] - 11:16, 177:7
**re-emphasizes** [1] - 11:16
**reach** [4] - 18:3, 102:24, 123:9, 124:8
**reached** [1] - 12:8
**reaching** [1] - 17:25
**read** [20] - 8:9, 17:7, 17:8, 20:17, 20:18, 25:15, 46:8, 46:12,

63:25, 69:16, 73:25, 107:10, 111:7, 129:7, 138:19, 150:22, 154:4, 180:24, 192:10, 193:12
**reading** [1] - 67:10
**reads** [1] - 172:20
**real** [2] - 7:3, 33:8
**realistic** [1] - 201:12
**realize** [2] - 39:14, 58:17
**really** [28] - 18:25, 19:20, 20:7, 27:6, 37:14, 38:6, 45:22, 58:6, 68:14, 73:23, 80:10, 86:16, 87:6, 87:11, 93:9, 93:13, 104:4, 105:3, 137:2, 141:11, 168:15, 181:16, 184:5, 189:22, 192:22, 195:21, 199:14
**reason** [20] - 9:16, 19:9, 28:3, 32:1, 39:20, 51:16, 70:17, 70:23, 84:12, 84:17, 103:11, 118:12, 133:8, 134:21, 170:11, 180:6, 181:5, 181:17, 187:13, 196:18
**reasonable** [2] - 45:19, 91:17
**reasonably** [2] - 45:18, 69:14
**reasoning** [1] - 66:9
**reasons** [2] - 49:10, 184:17, 187:16
**rebuttal** [6] - 37:4, 116:7, 117:1, 143:11, 156:1, 157:21
**receipt** [1] - 185:2
**received** [11] - 34:18, 74:18, 138:16, 164:23, 166:23, 170:23, 170:24, 171:1, 171:20, 186:3, 194:4
**receiving** [4] - 21:12, 184:24, 185:9, 185:14
**recently** [1] - 54:9
**recess** [9] - 8:23, 93:20, 93:22, 151:17, 173:17, 174:18, 174:21, 200:7, 200:10
**Recess** [1] - 201:1

**recode** [1] - 72:22
**recognizable** [1] - 42:11
**recognize** [2] - 42:5, 179:1
**recognized** [3] - 41:17, 64:18, 164:18
**recognizes** [2] - 47:18, 178:10
**recommend** [1] - 123:8
**reconsider** [4] - 177:24, 178:2, 178:23, 179:10
**reconsideration** [1] - 177:10
**reconsidered** [1] - 178:4
**reconsidering** [2] - 178:15, 181:3
**reconvene** [4] - 93:21, 174:4, 174:5, 200:9
**record** [23] - 8:13, 8:20, 12:13, 20:15, 23:23, 53:2, 88:25, 90:7, 109:9, 115:2, 116:11, 118:3, 151:8, 151:16, 151:18, 154:6, 166:9, 166:17, 169:16, 175:6, 176:7, 204:8
**records** [1] - 10:12
**redact** [1] - 195:5
**redacted** [4] - 194:15, 194:25, 195:23, 196:1
**redaction** [1] - 195:12
**redactions** [2] - 9:25, 196:4
**ReDigi** [1] - 14:4
**redo** [1] - 117:18
**reduced** [3] - 125:16, 165:2, 171:2
**reference** [10] - 9:22, 89:9, 92:14, 138:18, 138:20, 154:11, 164:22, 184:16, 189:5, 201:6
**referenced** [3] - 89:18, 164:11, 175:8
**referencing** [1] - 171:21
**referred** [1] - 112:25
**referring** [3] - 34:21, 77:21, 119:12
**refers** [1] - 190:10
**reflected** [2] - 15:12, 33:14
**reflects** [2] - 95:17,

110:1
**refused** [2] - 51:12
**regard** [8] - 51:16, 54:12, 55:4, 55:16, 55:18, 65:10, 186:21, 187:7
**regardless** [1] - 91:13
**regards** [1] - 195:16
**regulate** [1] - 91:14
**rejected** [1] - 87:23
**rejecting** [1] - 131:7
**relate** [5] - 24:8, 32:3, 75:11, 90:13, 190:22
**related** [3] - 10:10, 52:11, 90:25
**relates** [1] - 128:5
**relation** [2] - 33:21
**relationship** [11] - 37:25, 88:22, 111:18, 112:15, 113:2, 126:10, 157:20, 157:24, 163:3, 167:3, 170:6, 190:9
**relationships** [2] - 167:6, 187:22
**released** [1] - 196:3
**relevance** [1] - 156:15
**relevancy** [1] - 170:5
**relevant** [13] - 14:24, 15:6, 39:24, 43:20, 45:5, 54:15, 57:5, 87:4, 90:16, 96:22, 142:4, 148:25, 173:20
**reliably** [1] - 63:19
**reliance** [1] - 181:7
**relied** [1] - 82:4
**religious** [1] - 76:24
**rely** [4] - 9:20, 110:20, 110:23, 154:14
**relying** [2] - 17:3, 17:12
**remain** [1] - 195:22
**remained** [2] - 130:23, 166:10
**remains** [1] - 17:17
**remarkably** [1] - 70:13
**remarks** [1] - 18:5
**remember** [10] - 6:4, 6:5, 45:14, 45:15, 116:2, 122:5, 134:10, 136:5, 143:10, 157:19
**remind** [2] - 7:24, 31:11
**remote** [1] - 13:20
**remove** [6] - 25:1, 104:8, 106:8, 119:14, 170:1
**removed** [2] - 23:21,

31:3

**removing** [1] - 31:2
**reopen** [3] - 181:15, 181:16, 181:17
**reordering** [1] - 96:5
**repeated** [1] - 185:12
**repeatedly** [1] - 15:6
**repeating** [1] - 67:2
**repetitive** [1] - 158:7
**replace** [2] - 40:16, 41:1
**replacement** [2] - 13:16, 40:25
**replete** [1] - 169:17
**replicate** [3] - 189:1, 189:2, 190:13
**replicating** [3] - 187:1, 189:14, 194:8
**reply** [13] - 28:9, 29:4, 29:5, 51:23, 98:5, 105:19, 105:20, 122:6, 179:4, 180:7, 180:8, 180:10, 184:18
**report** [17] - 5:18, 24:16, 55:21, 56:12, 95:2, 100:1, 114:2, 116:8, 116:19, 123:2, 143:13, 156:1, 156:2, 157:21, 170:4, 175:4, 175:18
**reporter** [4] - 8:18, 53:14, 130:7, 131:13
**Reporter** [2] - 1:22, 3:3
**reports** [1] - 88:19
**represent** [3] - 90:18, 156:15, 160:12
**representation** [2] - 20:4, 21:21
**representative** [1] - 192:4
**representatives** [1] - 3:17
**represented** [3] - 33:7, 33:16, 90:5
**reprinted** [1] - 29:21
**reprocess** [1] - 72:23
**reproductions** [1] - 76:19
**reputable** [2] - 36:4, 193:18
**request** [2] - 79:3, 97:11
**requested** [2] - 175:6, 175:18
**require** [5] - 113:13, 113:15, 113:17, 156:15, 184:1

---

**required** [9] - 26:23, 56:4, 65:21, 72:19, 87:25, 92:6, 110:7, 126:2, 202:20
**requirement** [3] - 55:7, 55:10, 184:4
**requires** [6] - 11:1, 100:2, 105:14, 110:13, 125:5, 183:22
**requiring** [2] - 54:14, 129:19
**rereading** [1] - 63:15
**research** [11] - 15:25, 25:2, 41:6, 42:13, 43:17, 44:14, 50:6, 54:7, 56:1, 65:24, 132:11
**researchers'** [1] - 14:2
**resemblance** [1] - 137:6
**reserve** [1] - 19:10
**resolve** [1] - 129:13
**resolved** [2] - 63:20, 198:25
**Resource** [1] - 67:16
**respectfully** [1] - 12:25
**respective** [1] - 14:20
**respond** [16] - 37:7, 38:17, 38:20, 105:25, 114:2, 114:21, 117:13, 117:16, 127:13, 137:22, 141:23, 184:20, 187:24, 190:6, 190:12, 191:11
**responded** [1] - 106:4
**responding** [1] - 146:2
**responds** [1] - 143:18
**response** [10] - 36:18, 50:15, 97:7, 117:14, 127:14, 136:3, 143:2, 143:13, 179:8, 179:9
**responsibility** [1] - 110:12
**responsiveness** [1] - 32:16
**rest** [2] - 80:24, 133:24
**restarted** [1] - 58:5
**restricted** [3] - 86:12, 87:19, 133:9
**result** [14] - 20:14, 28:3, 28:5, 28:22, 29:9, 30:6, 39:7, 60:25, 69:9, 169:9, 178:17, 184:14,

---

191:8
**resulted** [3] - 31:16, 62:5, 124:4
**results** [4] - 32:6, 39:7, 88:17
**return** [2] - 6:17, 72:3
**returned** [5] - 38:23, 39:1, 39:8, 88:17, 185:8
**Reuters** [13] - 3:7, 3:18, 8:3, 14:13, 14:18, 59:14, 94:19, 95:17, 131:24, 198:7, 198:12, 198:18, 199:7
**REUTERS** [1] - 1:3
**Reuters'** [2] - 62:19, 132:2
**Reuters's** [1] - 69:17
**revenue** [4] - 42:18, 46:19, 111:17, 125:16
**revenues** [1] - 123:12
**reverse** [4] - 24:2, 38:13, 171:7, 190:7
**reverse-engineer** [1] - 171:7
**reversed** [2] - 83:7, 180:14
**reversing** [1] - 122:16
**review** [1] - 109:13
**reviewing** [1] - 127:23
**revised** [1] - 180:22
**revising** [1] - 180:19
**revisit** [3] - 7:1, 7:14, 176:21
**revisited** [1] - 176:25
**rich** [1] - 65:7
**rid** [2] - 67:25, 188:23
**right-hand** [1] - 95:11
**rights** [3] - 12:6, 14:6, 45:24
**ripped** [1] - 190:23
**rise** [2] - 8:24, 174:20
**risk** [1] - 27:12
**road** [1] - 197:23
**robust** [2] - 116:5, 116:25
**Rock** [2] - 131:11, 141:2
**Rogers** [1] - 12:23
**role** [1] - 17:11
**roles** [1] - 203:5
**room** [3] - 3:4, 8:19, 59:19
**Rose** [1] - 56:23
**ROSS** [102] - 1:7, 8:4, 11:12, 12:9, 12:13, 12:19, 13:3, 13:7, 13:19, 13:25, 14:13,

---

14:18, 14:21, 14:25, 15:2, 15:13, 15:23, 18:10, 18:11, 18:13, 22:15, 22:24, 24:21, 30:9, 32:7, 32:14, 35:5, 35:23, 36:5, 36:10, 38:23, 39:23, 40:2, 40:5, 40:7, 40:9, 40:12, 40:16, 40:17, 40:19, 40:21, 41:1, 41:4, 41:19, 41:21, 41:22, 42:7, 42:24, 43:7, 43:9, 44:10, 54:10, 54:18, 55:21, 55:24, 56:4, 62:10, 62:12, 62:13, 65:10, 67:1, 97:1, 97:6, 98:3, 99:3, 123:20, 131:25, 136:1, 138:15, 149:4, 151:15, 153:3, 154:3, 155:19, 156:4, 156:11, 156:13, 157:11, 158:10, 161:24, 164:24, 165:2, 166:23, 166:24, 167:1, 167:25, 168:16, 168:20, 169:4, 169:8, 169:17, 170:23, 171:1, 171:20, 175:4, 187:1, 188:3, 189:5, 192:9, 197:20
**Ross** [4] - 3:8, 39:25, 42:4, 42:13
**ROSS'** [3] - 11:24, 13:14, 14:1
**ROSS's** [28] - 11:9, 15:8, 15:14, 21:1, 21:3, 21:6, 35:3, 37:24, 40:15, 40:18, 40:24, 41:25, 43:6, 65:20, 96:13, 96:23, 97:18, 132:6, 132:19, 133:21, 135:3, 135:4, 155:24, 156:8, 156:16, 168:3, 184:8, 199:8
**roughly** [1] - 97:10
**round** [1] - 98:4
**routinely** [1] - 129:18
**Row** [10] - 11:1, 12:1, 39:17, 80:19, 104:18, 125:3, 128:9, 128:10, 128:12, 129:3
**royalty** [1] - 42:17

---

**RPR** [2] - 1:22, 204:12
**RTVI** [1] - 44:25
**Rube** [1] - 37:16
**Rule** [6] - 100:2, 139:16, 139:17, 176:18, 176:20, 180:21
**rule** [3] - 176:22, 177:4, 178:4
**rules** [2] - 37:2, 178:3
**ruling** [4] - 178:2, 178:15, 178:16, 181:10
**rulings** [1] - 176:21
**run** [5] - 31:1, 91:19, 109:24, 111:9, 184:4
**running** [1] - 202:9
**Runyan** [2] - 180:25
**Ruten** [1] - 178:5

---

**S**

**sake** [1] - 61:20
**sale** [1] - 43:4
**sales** [1] - 101:5
**sampled** [2] - 30:20, 162:21
**samuel** [1] - 92:25
**SAN** [1] - 2:20
**sands** [1] - 148:15
**Santa** [1] - 130:21
**sappy** [1] - 57:1
**SAT** [1] - 82:1
**satisfactory** [1] - 126:21
**satisfied** [2] - 39:9, 49:24
**satisfy** [1] - 48:7
**save** [2] - 27:10, 113:22
**savings** [1] - 10:13
**saw** [2] - 147:18, 173:21
**scene** [1] - 41:10
**schedule** [4] - 196:25, 197:15, 198:4, 199:21
**schedules** [5] - 5:3, 5:18, 7:4, 197:9, 197:18
**scheduling** [1] - 4:21
**school** [1] - 148:7
**School** [1] - 177:15
**science** [1] - 192:17
**scientific** [1] - 29:22
**scope** [1] - 34:10
**scopes** [1] - 91:7
**screen** [3] - 161:19, 163:11, 163:17
**sculpture** [3] - 73:14,

73:16, 91:7
**sculptures** [2] - 73:11, 73:12
**seal** [3] - 195:22, 195:23, 196:3
**sealed** [3] - 9:19, 194:11
**search** [12] - 14:20, 24:11, 31:19, 32:13, 41:9, 47:5, 61:6, 88:17, 154:21, 165:9, 170:11, 184:14
**searches** [1] - 188:19
**searching** [1] - 145:7
**seated** [1] - 201:25
**second** [19] - 5:14, 7:11, 10:16, 14:13, 26:10, 41:3, 54:6, 54:11, 60:11, 60:15, 63:21, 80:17, 96:11, 101:19, 125:23, 155:16, 182:21, 183:25, 190:17
**Second** [9] - 12:22, 14:4, 17:3, 42:15, 70:15, 96:1, 121:17, 131:10, 134:17
**secondarily** [1] - 169:8
**secondary** [2] - 14:6, 39:24
**secondly** [2] - 77:4, 141:11
**secret** [1] - 88:1
**secretaries** [1] - 203:6
**Section** [2] - 137:6, 183:6
**section** [3] - 127:25, 183:6, 183:8
**see** [34] - 9:6, 21:5, 25:13, 33:20, 44:13, 51:2, 60:13, 78:16, 89:1, 102:3, 104:15, 107:19, 109:4, 111:7, 117:4, 128:4, 144:21, 147:15, 149:20, 158:22, 161:9, 166:20, 169:19, 174:9, 179:23, 180:6, 182:3, 189:18, 191:9, 194:5, 195:25, 199:15, 199:16, 203:4
**seek** [4] - 55:8, 124:16, 135:24
**seeking** [2] - 99:22, 198:12
**seem** [6] - 57:2, 60:3,

91:16, 91:22, 111:23, 118:25
**Sega** [15] - 25:5, 25:6, 25:11, 26:19, 26:22, 27:3, 27:22, 28:23, 38:9, 50:23, 51:12, 51:16, 53:4
**Sega/Sony** [1] - 50:23
**Segrets** [1] - 131:6
**Seinfeld** [1] - 141:3
**selected** [2] - 14:15, 85:8
**selecting** [1] - 150:24
**selection** [12] - 64:17, 69:2, 74:2, 80:13, 94:20, 95:18, 96:6, 149:19, 150:9, 158:25, 202:15
**selections** [1] - 128:5
**sell** [3] - 48:21, 51:7, 62:9
**selling** [4] - 25:8, 55:9, 55:10, 56:6
**Seltzer** [1] - 58:20
**semantic** [1] - 32:22
**sender** [1] - 35:17
**senior** [1] - 201:23
**sense** [10] - 44:5, 51:3, 91:7, 103:24, 104:21, 105:23, 129:1, 179:1, 199:16, 200:7
**sent** [4] - 156:10, 164:24, 180:12
**sentence** [4] - 33:19, 83:23, 125:7, 125:9
**sentences** [4] - 33:18, 83:22, 125:2, 125:10
**separate** [4] - 31:6, 64:25, 79:7, 103:8
**separately** [2] - 76:14, 183:19
**separating** [1] - 64:14
**September** [3] - 181:14, 181:18, 181:25
**sequence** [3] - 77:22, 77:24, 202:22
**series** [2] - 31:16, 31:23
**serves** [2] - 78:17, 157:22
**service** [4] - 12:11, 21:13, 101:5, 203:17
**services** [1] - 203:21
**Services** [2] - 70:16, 81:21
**set** [13] - 5:13, 7:25, 15:15, 30:22, 33:6, 81:24, 129:19,

130:11, 156:24, 165:20, 171:17, 192:2, 196:21
**sets** [1] - 98:14
**setting** [1] - 48:11
**settle** [1] - 7:15
**Seuss** [2] - 54:13, 54:20
**seven** [1] - 8:1
**Seventh** [1] - 131:18
**shakers** [1] - 196:11
**shall** [1] - 57:25
**shape** [1] - 139:15
**share** [2] - 12:16, 13:23
**shared** [1] - 33:3
**sharing** [2] - 21:20, 196:18
**sharks** [1] - 173:19
**sharp** [1] - 93:21
**sheet** [1] - 10:13
**sheets** [1] - 199:4
**shelf** [1] - 60:11
**shifts** [1] - 121:9
**shoot** [1] - 201:15
**short** [1] - 51:18
**shorthand** [1] - 182:6
**shortly** [1] - 87:20
**shot** [2] - 117:23
**show** [15] - 24:11, 34:3, 94:10, 99:12, 99:15, 100:6, 108:12, 108:14, 108:18, 111:16, 120:7, 126:2, 141:4, 162:25, 188:9
**showed** [1] - 122:6
**showing** [7] - 10:1, 10:2, 13:4, 127:18, 133:15, 151:8, 183:12
**shown** [1] - 127:20
**shows** [4] - 43:1, 55:24, 56:6, 155:7
**shred** [8] - 38:22, 38:24, 39:1, 39:4, 48:10, 48:13, 62:7, 88:18
**shrines** [1] - 76:24
**shuffle** [1] - 5:1
**sic]** [1] - 36:20
**side** [60] - 7:25, 24:23, 31:23, 49:1, 55:8, 89:14, 105:15, 105:18, 105:20, 105:22, 107:9, 109:7, 110:9, 110:14, 111:12, 114:15, 115:1, 115:19, 116:13,

119:4, 122:5, 125:3, 126:5, 137:13, 137:17, 137:19, 141:4, 145:25, 147:4, 147:5, 156:6, 157:2, 173:16, 195:4, 196:10, 198:19, 203:18
**sets** [1] - 98:14
**side's** [1] - 12:6
**side-by-side** [21] - 105:15, 105:18, 105:20, 105:22, 107:17, 109:2, 110:9, 110:14, 114:15, 115:1, 115:19, 116:13, 119:4, 137:13, 137:17, 137:19, 141:4, 145:25, 147:4, 147:5, 173:16
**sidebar** [1] - 9:14
**sidebars** [1] - 9:15
**sides** [6] - 7:22, 36:7, 93:20, 186:15, 199:21, 203:10
**sides'** [1] - 59:22
**sign** [1] - 21:9
**significant** [3] - 13:5, 125:6, 131:9
**similar** [17] - 13:10, 97:24, 110:21, 122:13, 122:14, 127:20, 129:18, 130:24, 133:19, 133:24, 139:20, 140:13, 140:16, 142:10, 152:25, 159:4, 172:21
**similarities** [3] - 152:5, 152:13, 153:2
**similarity** [29] - 63:18, 108:24, 119:21, 120:12, 120:22, 120:24, 122:2, 122:23, 129:14, 132:21, 133:5, 133:14, 134:2, 134:13, 134:19, 135:11, 137:9, 140:6, 140:19, 141:8, 141:13, 141:19, 141:21, 152:17, 153:9, 172:8, 172:21, 173:12
**Simmons** [24] - 3:15, 4:1, 42:21, 62:23, 63:2, 71:16, 72:10, 74:7, 94:4, 106:12, 112:25, 114:20,

139:8, 140:24, 150:2, 151:18, 167:13, 167:14, 172:6, 175:8, 176:15, 186:23, 188:17, 191:19
**SIMMONS** [102] - 2:3, 63:3, 64:10, 65:4, 65:15, 66:20, 66:23, 68:11, 68:14, 71:7, 81:20, 82:3, 83:4, 84:23, 85:16, 85:21, 85:23, 87:1, 87:3, 87:6, 87:16, 88:8, 94:5, 95:7, 99:24, 100:20, 101:21, 102:13, 102:16, 114:22, 115:5, 115:7, 115:10, 115:15, 115:20, 116:1, 116:15, 116:18, 116:21, 116:24, 117:5, 117:10, 118:7, 118:17, 119:6, 119:10, 119:17, 119:19, 120:9, 122:21, 124:1, 125:1, 125:20, 126:15, 127:6, 127:10, 129:17, 130:8, 133:1, 134:8, 136:4, 136:18, 140:25, 141:20, 142:16, 142:21, 143:2, 143:8, 143:22, 143:25, 144:2, 144:5, 144:7, 144:14, 144:17, 145:8, 145:15, 151:20, 153:10, 153:22, 154:2, 154:7, 154:18, 155:17, 155:20, 157:14, 157:18, 158:14, 167:16, 167:22, 168:1, 168:8, 169:13, 174:6, 174:12, 174:17, 176:14, 176:16, 176:18, 179:14, 182:4, 202:12
**sIMMONS** [2] - 131:14, 135:12
**Simone** [1] - 96:1
**simple** [1] - 61:10
**simplify** [2] - 73:4, 195:14
**simply** [4] - 11:7,

44:10, 92:7, 193:10
**Simultaneous** [1] - 153:25
**single** [19] - 39:19, 74:6, 77:15, 78:8, 81:15, 83:18, 95:5, 95:12, 105:13, 110:6, 116:6, 135:18, 136:19, 136:21, 157:7, 169:1, 170:24, 177:11, 184:2
**Sintalva** [1] - 81:8
**sit** [3] - 3:2, 112:4, 146:25
**sits** [1] - 146:23
**sitting** [2] - 50:10, 146:19
**situation** [5] - 6:10, 45:7, 117:15, 152:12, 193:1
**six** [2] - 95:5, 120:18
**skeptical** [1] - 17:16
**skepticism** [1] - 17:10
**Skidmore** [2] - 120:10, 152:14
**skill** [1] - 73:13
**Skyy** [1] - 67:3
**slice** [4] - 45:20, 96:11, 96:24, 100:13
**slides** [1] - 60:8
**slightly** [3] - 16:23, 52:6, 98:19
**small** [9] - 18:2, 23:6, 90:20, 90:22, 96:19, 106:8, 106:18, 138:10
**smaller** [1] - 147:19
**so..** [1] - 30:15
**society** [1] - 45:24
**Society** [2] - 121:23, 131:3
**software** [3] - 29:19, 96:17, 97:18
**Software** [1] - 121:6
**solely** [1] - 21:22
**solo** [2] - 12:18, 21:18
**someone** [19] - 13:20, 20:3, 30:4, 32:8, 32:13, 42:22, 47:16, 68:5, 80:1, 81:15, 84:7, 84:11, 87:9, 91:18, 101:7, 107:12, 156:10, 199:6, 199:8
**someplace** [1] - 49:6
**sometime** [1] - 197:4
**sometimes** [7] - 5:20, 7:14, 9:8, 78:15, 187:15, 195:8, 195:9

**somewhere** [2] - 105:7, 109:8
**song** [2] - 56:25, 137:15
**Sons** [1] - 69:11
**Sony** [10] - 22:3, 26:3, 26:4, 26:18, 26:22, 27:3, 27:22, 28:23, 51:14, 53:5
**soon** [1] - 167:23
**sooner** [1] - 201:11
**Sorry** [1] - 164:24
**sorry** [8] - 36:24, 53:15, 101:24, 103:21, 108:3, 130:8, 131:14, 144:22
**sort** [9] - 60:24, 61:1, 67:19, 69:24, 104:20, 134:18, 135:24, 169:18, 172:3
**sortable** [1] - 145:13
**sortables** [1] - 144:19
**sorting** [1] - 145:7
**sound** [2] - 7:2, 153:13
**sounded** [1] - 197:9
**sounds** [3] - 51:25, 147:6, 196:24
**source** [17] - 24:16, 24:24, 25:6, 27:23, 31:18, 31:19, 31:20, 36:3, 36:4, 46:20, 47:8, 51:17, 61:20, 171:5, 171:8, 193:19
**sp** [1] - 81:8
**space** [4] - 27:1, 33:8, 33:9, 35:18
**spark** [2] - 69:7, 69:8
**speakers** [1] - 153:25
**speaks** [1] - 148:18
**special** [2] - 130:4, 186:20
**specific** [10] - 9:9, 9:25, 10:12, 14:22, 36:18, 101:3, 117:2, 129:15, 159:12, 168:19
**specifically** [10] - 13:21, 20:3, 24:18, 41:12, 101:25, 117:14, 132:10, 174:23, 175:7, 183:6
**specifics** [1] - 8:16
**specified** [1] - 183:8
**spectrum** [8] - 61:3, 68:2, 68:3, 68:8, 68:9, 71:10, 72:11, 72:14

**speculating** [1] - 171:10
**speech** [1] - 59:13
**spell** [1] - 35:16
**spend** [1] - 91:8
**spent** [2] - 73:15, 203:21
**Spirits** [1] - 67:3
**spit** [1] - 32:14
**spitting** [1] - 61:10
**split** [2] - 7:22, 203:25
**splitting** [1] - 3:21
**sponte** [1] - 114:10
**spreadsheet** [10] - 95:6, 95:7, 97:22, 105:9, 126:17, 145:3, 145:9, 157:3, 175:23
**spreadsheets** [4] - 101:13, 147:19, 176:4, 201:4
**spring** [1] - 69:5
**squandering** [1] - 203:17
**SQUIRE** [1] - 2:4
**stack** [1] - 75:12
**stacking** [1] - 75:2
**stage** [11] - 125:19, 133:4, 134:14, 137:20, 137:21, 152:20, 163:21, 165:23, 168:9, 172:6, 196:21
**stand** [3] - 58:13, 83:10, 102:21
**standalone** [1] - 144:8
**standard** [3] - 43:8, 43:17, 130:5
**standards** [1] - 68:21
**standing** [2] - 78:10, 192:22
**stands** [1] - 38:10
**Star** [2] - 29:6, 29:7
**start** [20] - 3:25, 4:20, 22:2, 28:5, 52:12, 58:4, 60:20, 64:21, 69:19, 87:9, 88:13, 92:19, 105:11, 105:12, 114:25, 145:23, 188:3, 193:6, 197:24
**started** [2] - 51:15, 83:20
**starting** [2] - 8:25, 130:25
**starts** [4] - 6:5, 145:18, 197:13, 202:6
**statement** [7] - 63:16, 138:17, 163:2,

170:20, 171:7, 200:5, 202:1
**statements** [3] - 106:5, 184:8, 201:23
**STATES** [1] - 1:1
**states** [1] - 183:6
**statically** [1] - 162:23
**stating** [2] - 11:17, 168:7
**Station** [1] - 50:25
**statistically** [1] - 23:8
**statue** [1] - 184:5
**statute** [8] - 45:15, 121:1, 123:11, 183:4, 183:22, 183:23, 184:1, 186:4
**statutory** [4] - 46:15, 102:9, 124:16
**steam** [1] - 14:21
**Steinberg** [1] - 4:9
**STEINBERG** [1] - 2:19
**stenographically** [1] - 1:24
**Step** [3] - 156:13, 156:21, 156:24
**step** [17] - 15:23, 24:19, 27:25, 71:1, 78:24, 85:7, 120:17, 141:21, 151:12, 155:18, 155:21, 156:4, 161:6, 168:19, 183:25, 195:13
**step-to-step** [1] - 85:7
**Stephanos** [1] - 3:5
**STEPHANOS** [1] - 1:13
**stepping** [1] - 160:10
**steps** [5] - 151:12, 154:14, 155:16, 181:6, 201:18
**stick** [2] - 57:22, 160:9
**still** [33] - 8:8, 19:17, 20:11, 25:6, 25:9, 26:25, 28:25, 47:8, 54:18, 71:9, 74:2, 86:17, 92:3, 92:5, 92:15, 96:20, 98:22, 100:18, 110:3, 111:2, 111:25, 114:14, 142:6, 144:24, 151:5, 165:13, 178:22, 179:24, 182:10, 182:14, 182:18, 198:20
**stipulations** [1] - 9:19
**stolen** [1] - 88:1
**stone** [1] - 160:10
**stop** [6] - 38:15,

40:20, 59:13, 59:16, 161:1, 181:17
**stopped** [1] - 31:3
**stopping** [1] - 31:3
**story** [5] - 29:6, 46:19, 130:13, 194:21, 196:21
**strange** [1] - 190:24
**strategy** [1] - 203:22
**Street** [1] - 1:10
**STREET** [3] - 1:18, 2:7, 2:15
**strength** [1] - 62:21
**stress** [1] - 84:19
**strict** [1] - 169:6
**strike** [2] - 98:13, 119:16
**stripped** [1] - 31:24
**strong** [1] - 187:8
**stronger** [1] - 187:7
**strongly** [1] - 72:13
**struck** [1] - 63:15
**structural** [1] - 96:16
**structure** [3] - 77:21, 77:23, 190:23
**structured** [1] - 188:18
**stuck** [1] - 47:14
**student** [1] - 20:5
**students** [5] - 12:16, 21:10, 79:17, 79:18
**study** [1] - 160:6
**stuff** [13] - 34:19, 35:6, 41:24, 61:8, 81:12, 85:23, 125:17, 166:25, 171:8, 179:9, 179:10, 195:21, 196:17
**style** [1] - 11:19
**sua** [1] - 114:10
**subcontractor** [1] - 152:1
**subfactor** [2] - 12:25, 13:2
**subfactors** [2] - 11:2, 11:6
**subject** [11] - 7:4, 33:25, 73:17, 77:3, 78:12, 79:9, 79:23, 86:18, 93:4, 93:16, 146:21
**submission** [2] - 97:7, 97:8
**submissions** [4] - 96:13, 96:24, 99:3, 136:5
**submit** [6] - 12:21, 97:2, 107:8, 108:7, 148:8, 176:9
**submitted** [8] - 40:1,

97:6, 98:3, 107:16, 107:23, 127:14, 148:16, 149:5

**submitting** [1] - 107:23

**subparts** [1] - 188:19

**subquestions** [1] - 188:20

**subscriber** [1] - 125:16

**subscribers** [3] - 40:6, 112:11, 112:13

**Subscription** [1] - 111:17

**subscriptions** [1] - 111:17

**subsequent** [1] - 102:24

**subset** [8] - 97:6, 98:1, 99:8, 119:4, 142:19, 142:20, 149:7, 198:9

**subsets** [1] - 158:20

**subsidiary** [1] - 45:9

**substance** [1] - 11:18

**substantial** [23] - 63:18, 72:1, 72:8, 108:24, 119:21, 122:2, 122:23, 129:14, 132:21, 133:5, 133:14, 134:2, 134:13, 134:19, 135:11, 137:9, 140:6, 140:18, 141:7, 141:13, 141:18, 141:21, 172:8

**substantially** [4] - 110:21, 129:18, 130:24, 133:19

**substantive** [3] - 95:15, 96:6, 120:23

**substitute** [5] - 13:15, 13:22, 14:7, 15:16, 42:13

**substituted** [4] - 13:12, 16:13, 40:5, 40:19

**substitution** [2] - 13:17, 59:22

**substraction** [1] - 95:15

**subtopic** [1] - 155:6

**subtract** [4] - 118:12, 142:14, 144:9, 147:1

**subtractable** [1] - 145:13

**subtracted** [2] - 98:17, 146:5

**subtractions** [1] -

106:10

**suck** [1] - 193:21

**suddenly** [2] - 83:23, 129:9

**suffered** [1] - 123:20

**suffice** [1] - 55:13

**sufficient** [3] - 96:7, 126:25, 149:1

**sufficiently** [1] - 150:12

**suggest** [1] - 199:12

**suggested** [2] - 24:14, 125:11

**suggesting** [1] - 93:8

**suited** [1] - 94:14

**sum** [1] - 81:4

**summarizing** [1] - 159:3

**summary** [52] - 7:15, 19:22, 44:17, 63:20, 98:21, 99:19, 99:25, 100:11, 100:16, 102:18, 103:12, 108:23, 109:15, 111:1, 113:12, 113:18, 113:21, 117:20, 118:22, 129:14, 129:20, 129:23, 130:2, 130:15, 130:24, 131:3, 131:10, 131:24, 132:15, 133:23, 134:3, 134:13, 137:2, 137:4, 137:7, 139:3, 141:8, 142:4, 143:17, 151:21, 177:23, 179:6, 179:19, 180:2, 181:11, 181:13, 181:20, 195:2, 197:20, 198:8, 198:22, 199:1

**summations** [1] - 14:14

**super** [2] - 103:23, 104:2

**supercedes** [1] - 22:7

**supersede** [2] - 95:24, 122:9

**Supp** [1] - 130:25

**supplement** [1] - 143:12

**supplemental** [10] - 95:2, 116:19, 123:2, 136:7, 136:9, 137:23, 143:13, 146:15, 148:18, 175:18

**support** [2] - 44:3,

91:4

**supported** [1] - 90:7

**supports** [1] - 170:20

**supposed** [4] - 5:25, 57:11, 124:24, 141:22

**Supreme** [11] - 11:25, 12:4, 17:7, 17:8, 39:18, 52:19, 57:14, 66:17, 83:7, 86:21, 177:3

**sur** [1] - 143:11

**sur-rebuttal** [1] - 143:11

**surface** [1] - 60:14

**survive** [2] - 51:4, 51:6

**suspect** [2] - 102:14, 126:15

**Susquehanna** [1] - 177:15

**sweat** [2] - 73:24, 86:25

**switch** [3] - 40:6, 40:8, 112:13

**symposium** [1] - 5:9

**synopses** [2] - 34:19, 47:7

**synopsis** [1] - 164:11

**syntactic** [1] - 32:22

**syntheses** [1] - 14:15

**syrupy** [1] - 57:1

**system** [53] - 25:8, 26:7, 26:24, 43:18, 62:20, 64:2, 65:25, 66:3, 66:7, 68:10, 69:22, 83:17, 84:14, 86:17, 99:8, 104:12, 135:11, 135:12, 135:18, 135:25, 138:7, 138:15, 138:21, 138:24, 155:3, 157:13, 158:9, 158:18, 158:19, 158:23, 164:8, 165:1, 168:10, 168:16, 168:22, 169:25, 170:17, 170:21, 174:9, 186:11, 188:2, 188:18, 189:3, 189:10, 189:15, 190:13, 190:18, 191:5, 191:18, 193:22

**System** [8] - 63:9, 65:17, 186:21, 187:5, 187:7, 187:21, 191:21, 192:11

**system..** [1] - 188:15

**systems** [1] - 138:18

**T**

**table** [11] - 3:14, 78:17, 98:23, 124:21, 142:2, 145:18, 179:5, 179:10, 179:25, 195:4, 202:19

**tactics** [1] - 203:22

**tail** [1] - 187:18

**tailored** [1] - 112:17

**talks** [7] - 37:17, 68:12, 94:9, 157:23, 166:16, 170:4, 170:7

**Tanksley** [1] - 134:2

**tarnishing** [1] - 56:24

**taught** [1] - 79:16

**taxonomy** [2] - 78:19, 187:10

**Taylor** [2] - 69:4, 92:25

**TBIs** [1] - 55:23

**TD** [2] - 129:25, 137:12

**teach** [1] - 163:2

**teaching** [2] - 152:19, 157:24

**team** [4] - 60:7, 199:7, 199:9, 203:3

**technical** [1] - 124:5

**technology** [1] - 37:10

**teed** [1] - 203:9

**teeny** [1] - 43:20

**teeth** [1] - 68:21

**ten** [3] - 32:10, 32:15, 195:20

**tend** [1] - 196:16

**tense** [1] - 31:4

**Terau** [1] - 58:20

**term** [1] - 23:15

**terms** [22] - 8:13, 12:11, 21:13, 25:12, 25:19, 27:1, 34:6, 65:16, 82:12, 82:13, 82:18, 83:17, 122:4, 143:6, 153:11, 155:24, 174:11, 174:12, 179:16, 188:14, 199:14, 203:21

**terrible** [1] - 33:23

**Terry** [3] - 35:14, 35:22, 36:11

**tertiary** [1] - 203:18

**test** [8] - 19:20, 52:1, 58:22, 82:3, 82:11, 122:3, 190:6

**Test** [1] - 141:3

**testified** [4] - 36:9, 40:15, 41:21, 65:22

**testimony** [6] - 95:22, 98:7, 122:10, 132:2, 132:20, 134:22

**Testing** [1] - 81:21

**Tetris** [3] - 109:3, 130:18, 130:20

**Texas** [1] - 105:19

**text** [26] - 64:16, 67:10, 69:22, 84:5, 84:6, 84:10, 95:14, 95:16, 106:23, 106:24, 107:2, 107:12, 107:25, 116:16, 128:5, 135:24, 136:10, 140:17, 145:12, 157:17, 159:2, 159:10, 159:15, 190:9

**textonomy** [3] - 63:11, 83:19, 135:15

**thankful** [1] - 39:9

**THE** [337] - 1:1, 1:1, 1:13, 1:16, 2:2, 2:13, 2:18, 3:1, 3:2, 3:20, 4:3, 4:12, 4:16, 4:18, 5:13, 5:23, 6:2, 6:9, 6:17, 6:19, 6:22, 7:1, 7:11, 7:20, 8:21, 8:24, 8:25, 9:13, 10:7, 10:18, 10:23, 11:12, 15:19, 16:16, 17:2, 18:9, 18:21, 18:24, 19:21, 20:15, 21:1, 21:25, 22:5, 23:1, 23:16, 25:21, 26:21, 28:4, 29:4, 30:7, 30:17, 30:20, 30:25, 31:11, 31:15, 32:12, 32:18, 32:21, 34:21, 35:8, 35:16, 36:16, 36:24, 37:3, 38:16, 39:9, 44:11, 46:5, 46:25, 48:20, 49:7, 49:14, 50:4, 51:19, 51:22, 52:14, 52:19, 52:23, 53:6, 53:14, 53:21, 54:20, 55:2, 55:12, 56:18, 57:18, 58:12, 59:17, 60:2, 60:12, 60:18, 61:3, 62:15, 62:17, 63:25, 65:2, 65:12, 66:16, 66:21, 67:20, 68:13, 71:2, 72:9, 73:7, 74:7, 74:12, 74:20, 74:22, 75:17, 77:5, 77:7, 77:14,

77:20, 78:3, 78:15, 79:16, 81:17, 81:19, 82:1, 82:25, 84:18, 85:14, 85:17, 85:22, 86:24, 87:2, 87:5, 87:13, 88:6, 88:12, 88:15, 88:24, 89:5, 89:13, 91:16, 92:2, 92:5, 92:17, 92:24, 93:17, 93:19, 93:23, 95:4, 99:6, 100:17, 101:15, 102:8, 102:14, 103:7, 104:1, 105:5, 106:12, 106:17, 107:20, 109:6, 110:11, 111:15, 112:6, 112:24, 113:11, 114:7, 114:18, 114:20, 115:4, 115:6, 115:8, 115:11, 115:18, 115:22, 116:12, 116:17, 116:20, 116:22, 117:4, 117:9, 118:5, 118:14, 119:3, 119:8, 119:15, 119:18, 120:4, 122:18, 123:24, 124:23, 125:13, 126:13, 126:19, 127:2, 127:8, 127:22, 128:7, 128:15, 129:11, 132:19, 134:1, 135:10, 136:1, 136:14, 136:25, 139:5, 140:3, 140:8, 140:24, 141:16, 142:13, 142:18, 142:25, 143:6, 143:20, 143:23, 144:1, 144:4, 144:6, 144:13, 144:15, 145:3, 145:11, 145:16, 145:22, 146:11, 147:3, 147:11, 147:14, 147:25, 148:13, 148:21, 150:1, 150:7, 150:11, 150:15, 151:2, 151:18, 153:8, 153:11, 153:23, 154:1, 154:16, 155:15, 155:18, 157:10, 157:16, 158:4, 158:6, 159:17, 160:1, 160:25, 161:2,

161:4, 161:10, 161:14, 161:18, 161:23, 162:3, 162:7, 162:9, 162:11, 162:14, 162:17, 162:20, 162:23, 163:7, 163:10, 163:14, 163:19, 164:2, 164:6, 164:17, 164:20, 165:16, 165:19, 165:22, 166:2, 166:5, 166:12, 166:16, 167:12, 167:20, 167:25, 168:4, 169:10, 170:18, 171:18, 171:24, 172:5, 172:19, 172:25, 173:15, 173:17, 174:11, 174:15, 174:18, 174:20, 174:22, 175:11, 175:14, 175:22, 176:5, 176:13, 176:15, 176:17, 178:25, 180:3, 180:10, 180:18, 180:24, 182:2, 182:5, 182:19, 183:16, 184:19, 185:2, 185:18, 185:23, 186:7, 186:10, 187:23, 188:7, 188:16, 190:5, 190:16, 191:10, 191:12, 193:4, 194:9, 195:11, 195:19, 196:15, 199:18, 199:25, 200:3, 200:6, 200:17, 200:24, 201:2, 202:2, 202:13
**themselves** [7] - 31:21, 42:5, 64:5, 75:20, 95:24, 122:9, 188:7
**theory** [11] - 53:16, 53:20, 99:16, 99:23, 101:16, 111:15, 111:20, 112:9, 112:10, 112:14, 198:13
**therefore** [6] - 16:14, 73:2, 77:3, 93:13, 173:4, 187:5
**they've** [1] - 113:18
**thick** [3] - 70:24, 75:14, 93:13

**thickness** [3] - 68:2, 68:7, 73:21
**thin** [10] - 65:6, 66:6, 68:12, 70:24, 73:21, 74:5, 74:18, 75:13, 76:1, 81:21
**thinking** [4] - 67:21, 91:10, 178:21, 197:24
**thinks** [1] - 110:21
**thinner** [1] - 73:17
**thinness** [2] - 68:2, 68:7
**Third** [21] - 29:17, 42:12, 52:20, 66:13, 66:14, 66:17, 69:3, 76:23, 77:7, 81:20, 82:7, 82:9, 105:14, 130:1, 130:3, 177:8, 178:3, 178:10, 180:9, 180:14, 181:8
**third** [7] - 7:12, 14:18, 42:7, 77:5, 96:12, 155:16, 155:18
**Thomas** [1] - 35:13
**THOMSON** [1] - 1:3
**Thomson** [16] - 3:7, 3:18, 8:3, 14:13, 14:18, 59:14, 62:19, 69:17, 94:19, 95:17, 131:24, 132:2, 198:7, 198:12, 198:18, 199:7
**thousand** [9] - 91:19, 98:19, 118:11, 136:19, 138:11, 143:9, 143:19, 143:20, 194:7
**thousands** [5] - 125:2, 125:10, 142:3, 162:24
**three** [19] - 5:19, 7:25, 11:2, 11:6, 17:4, 40:2, 54:1, 74:10, 95:16, 96:13, 96:24, 133:3, 147:16, 147:20, 148:3, 149:8, 155:16, 173:20, 189:23
**Three** [1] - 44:9
**three-week** [1] - 5:19
**threshold** [6] - 52:2, 111:19, 112:12, 123:24, 125:5, 198:10
**thresholds** [1] - 135:19
**throughout** [2] - 5:10, 17:19
**thumb** [1] - 145:5

**thunder** [1] - 27:10
**Thursday** [2] - 182:17, 202:11
**tied** [2] - 22:23, 23:1
**timeline** [1] - 185:6
**TMTV** [1] - 131:5
**today** [2] - 200:15, 204:4
**together** [14] - 84:1, 92:12, 104:13, 110:5, 113:24, 117:4, 133:12, 173:19, 176:9, 194:14, 194:23, 195:6, 195:20, 203:25
**tolerate** [5] - 25:7, 26:4, 26:6, 26:7, 50:24
**tomorrow** [5] - 174:4, 174:5, 200:9, 200:19, 201:24
**took** [14] - 28:10, 30:15, 30:18, 48:22, 84:4, 98:14, 104:14, 104:18, 104:19, 125:8, 143:6, 158:10, 179:10, 192:23
**tool** [2] - 15:25, 61:6
**tools** [2] - 44:14, 50:6
**top** [4] - 85:10, 154:25, 155:6, 160:16
**topic** [8] - 8:2, 62:18, 151:18, 155:2, 155:5, 164:16, 189:8
**Topic** [3] - 9:1, 38:19, 39:11
**topical** [1] - 23:4
**topics** [12] - 8:1, 54:1, 67:24, 164:25, 165:2, 170:22, 171:2, 189:7, 194:5, 194:7
**Topics** [1] - 174:1
**tore** [1] - 167:2
**tortious** [4] - 182:9, 182:14, 182:18, 198:24
**total** [2] - 188:25, 198:9
**touch** [3] - 24:23, 31:18, 31:20
**touched** [1] - 158:8
**tough** [1] - 91:6
**touting** [1] - 40:10
**town** [1] - 146:10
**Township** [1] - 177:15
**track** [1] - 149:21

**traditionally** [1] - 134:4
**train** [13] - 15:1, 15:24, 23:7, 26:9, 31:18, 37:18, 44:2, 78:22, 154:8, 160:24, 161:25, 166:11, 168:13
**trained** [5] - 41:9, 41:12, 88:20, 192:3, 192:19
**training** [40] - 14:19, 14:23, 15:14, 16:13, 16:25, 24:21, 24:22, 30:23, 31:22, 41:6, 41:23, 42:5, 42:11, 42:25, 44:15, 45:12, 47:11, 48:9, 49:9, 49:18, 50:5, 50:6, 51:6, 55:5, 55:22, 56:11, 85:18, 156:25, 160:18, 163:24, 165:24, 167:18, 167:19, 168:11, 168:20, 170:1, 171:5, 192:2, 192:12, 192:21
**transcript** [5] - 7:22, 56:8, 82:15, 204:1, 204:8
**transcription** [1] - 1:25
**Transfiguration** [2] - 121:23, 131:4
**transform** [1] - 30:5
**transformation** [1] - 48:8
**transformative** [27] - 13:4, 13:5, 13:11, 14:12, 15:18, 16:14, 22:12, 25:3, 25:4, 26:4, 28:22, 28:25, 29:12, 29:15, 29:18, 29:25, 47:14, 48:2, 51:24, 52:8, 52:24, 53:10, 53:17, 58:14, 58:23, 59:8, 60:24
**transformativeness** [12] - 11:3, 11:4, 13:3, 15:21, 17:5, 20:13, 56:20, 57:4, 57:12, 58:22, 59:4, 61:4
**transformatives** [1] - 19:19
**transformed** [1] - 24:6
**translate** [2] - 73:21, 201:7
**translated** [1] - 46:22
**transom** [1] - 168:2

**trap** [1] - 203:13
**treat** [1] - 140:8
**trees** [2] - 37:9, 192:14
**Trek** [2] - 29:7
**trial** [40] - 4:22, 5:12, 5:19, 6:24, 7:4, 7:13, 7:16, 7:17, 99:19, 103:9, 103:10, 112:4, 113:12, 113:15, 113:19, 113:20, 117:21, 123:23, 124:8, 124:10, 174:2, 177:22, 178:13, 179:22, 181:2, 196:22, 197:1, 197:13, 197:17, 197:21, 197:22, 198:2, 198:11, 199:19, 202:6, 202:11, 202:18, 202:19, 202:20
**trickily** [1] - 70:25
**tricky** [1] - 185:18
**tried** [11] - 12:14, 24:3, 61:19, 61:21, 136:12, 171:7, 182:11, 182:15, 182:18, 190:20
**trivial** [9] - 69:13, 81:7, 91:20, 96:7, 96:9, 97:12, 106:13, 139:16, 139:20
**triviality** [1] - 106:7
**trivially** [4] - 82:9, 97:3, 109:12, 159:6
**trope** [3] - 134:24, 135:2
**true** [12] - 11:19, 24:4, 30:13, 51:11, 75:4, 75:5, 80:9, 131:1, 147:9, 154:12, 162:1, 163:4
**truly** [1] - 194:8
**truncated** [1] - 122:6
**truncating** [1] - 122:16
**try** [8] - 8:15, 10:11, 34:3, 36:21, 158:8, 195:14, 197:25, 198:6
**trying** [18] - 18:5, 21:9, 21:10, 37:9, 39:7, 65:21, 80:11, 85:11, 87:8, 100:19, 103:9, 158:12, 163:2, 165:3, 189:1, 190:13, 193:2, 196:4
**Tuesday** [2] - 5:6
**TUNNELL** [1] - 1:16

**turn** [6] - 56:22, 83:1, 101:25, 123:14, 123:18, 159:18
**turned** [2] - 19:7, 120:1
**turning** [3] - 10:24, 52:1, 94:13
**turns** [1] - 119:24
**TV** [1] - 141:4
**twice** [1] - 192:5
**Twin** [1] - 131:16
**two** [40] - 3:17, 17:14, 24:16, 27:4, 44:13, 54:6, 54:24, 63:14, 76:5, 76:14, 76:17, 78:18, 91:23, 95:14, 98:14, 109:4, 109:5, 110:3, 111:22, 114:14, 115:18, 116:2, 117:12, 120:9, 126:8, 128:4, 129:18, 135:1, 150:6, 151:21, 152:3, 171:14, 175:5, 178:5, 180:6, 180:16, 190:11, 191:13, 195:19
**Two** [6] - 36:20, 44:9, 58:4, 58:16, 123:16, 187:13
**twofold** [1] - 161:12
**type** [10] - 18:6, 18:7, 32:1, 37:16, 40:4, 41:3, 62:18, 91:12, 107:15, 189:11
**typed** [1] - 32:10
**types** [4] - 32:8, 32:13, 40:3, 85:9
**typical** [1] - 44:25

## U

**U.S** [3] - 1:10, 177:6, 183:5
**U.S.C** [1] - 121:1
**ultimate** [2] - 16:6, 26:25
**ultimately** [2] - 122:18, 179:1
**unambiguous** [1] - 178:17
**unavailability** [1] - 196:24
**unavoidable** [1] - 139:23
**unbeknownst** [2] - 54:9, 59:25
**unclear** [1] - 64:22
**unconfidentialize** [1] - 195:5

**uncontested** [3] - 194:12, 194:20, 195:2
**under** [34] - 10:25, 11:15, 13:8, 21:15, 21:21, 27:12, 27:14, 46:23, 55:23, 57:6, 59:1, 67:16, 78:7, 94:19, 97:24, 99:13, 99:22, 100:2, 120:10, 123:11, 129:12, 130:11, 130:21, 139:17, 139:25, 145:20, 154:23, 155:8, 155:12, 176:20, 178:4, 195:22, 195:23, 196:3
**underlying** [4] - 76:25, 77:9, 77:25, 78:1
**undermine** [1] - 43:24
**underneath** [1] - 78:14
**understandable** [2] - 10:5, 66:5
**understood** [1] - 147:24
**undertelling** [1] - 19:6
**undeterred** [1] - 12:11
**undisputable** [1] - 20:16
**undisputed** [12] - 4:17, 4:19, 11:24, 19:23, 20:16, 34:14, 34:17, 36:5, 36:6, 72:16, 132:14, 183:10
**Undisputed** [1] - 4:18
**undoubtedly** [2] - 11:10, 39:18
**unfair** [1] - 179:6
**Unicolor** [1] - 137:3
**Unicolors** [2] - 131:20, 137:13
**unique** [1] - 186:16
**UNITED** [1] - 1:1
**universe** [1] - 175:25
**unjust** [1] - 178:17
**unknown** [1] - 167:15
**unless** [4] - 36:17, 47:14, 54:19, 197:20
**unlike** [1] - 18:10
**unlimited** [1] - 132:6
**unprotectability** [2] - 131:7, 153:7
**unprotectable** [12] - 97:15, 98:18, 120:14, 121:9, 121:13, 130:11, 130:21, 130:22,

133:21, 141:23, 144:11, 172:7
**unprotectible** [1] - 152:18
**unpublished** [4] - 80:19, 80:21, 129:6, 180:13
**unrebutted** [1] - 132:2
**unrelated** [1] - 90:17
**unsubscribed** [1] - 40:13
**unusual** [2] - 12:13, 45:7
**up** [50] - 3:21, 7:13, 7:17, 8:4, 9:14, 15:15, 21:9, 28:21, 30:7, 43:4, 51:20, 56:24, 57:13, 58:13, 60:4, 62:25, 68:5, 73:11, 75:25, 76:4, 76:11, 82:7, 84:11, 86:6, 91:19, 98:16, 99:4, 112:14, 114:10, 119:20, 123:23, 126:22, 135:16, 141:25, 145:5, 161:8, 162:5, 162:17, 162:25, 167:23, 168:3, 173:11, 174:5, 188:9, 197:1, 197:18, 198:2, 202:7, 203:10
**upfront** [3] - 166:5, 166:13, 168:13
**Urban** [1] - 131:21
**useful** [7] - 9:11, 10:5, 34:20, 67:20, 67:23, 81:14, 145:7
**user** [1] - 156:16
**users** [1] - 40:25
**uses** [4] - 11:9, 58:14, 127:21, 159:8
**usual** [1] - 196:3
**usurped** [1] - 48:19
**utility** [1] - 161:13
**utilizing** [1] - 1:25

## V

**valid** [1] - 121:3
**validate** [1] - 166:11
**validation** [3] - 30:23, 165:25, 168:14
**validity** [2] - 121:2, 121:19
**valuable** [2] - 84:3, 84:17
**value** [16] - 39:13, 41:4, 42:4, 42:6,

43:1, 46:17, 56:7, 61:20, 61:21, 62:2, 84:12, 85:19, 86:3, 102:6, 104:12, 111:24
**Van** [1] - 35:13
**VAN** [1] - 35:18
**vanish** [1] - 11:21
**vanishingly** [2] - 90:20, 90:21
**variables** [1] - 108:11
**variation** [2] - 69:13, 139:20
**variations** [1] - 96:8
**variety** [1] - 83:9
**various** [3] - 3:25, 105:9, 132:3, 175:15
**vary** [1] - 97:3
**varying** [2] - 109:12, 117:22
**vast** [1] - 194:1
**VEC** [1] - 33:6
**vector** [2] - 33:8, 33:9
**vehicles** [1] - 70:17
**vendor** [2] - 15:2, 193:15
**vendors** [1] - 194:18
**verb** [1] - 31:7
**verbatim** [8] - 97:2, 97:3, 97:12, 115:14, 118:18, 118:19, 160:3, 163:6
**verify** [1] - 156:22
**version** [7] - 142:5, 143:3, 194:15, 195:23, 195:24, 196:1, 196:3
**versions** [1] - 176:4
**versus** [27] - 18:13, 29:16, 46:12, 46:25, 54:13, 55:23, 56:11, 56:23, 63:14, 67:3, 67:16, 69:4, 70:3, 70:16, 83:14, 86:19, 96:1, 96:16, 120:10, 121:6, 121:21, 121:24, 130:18, 134:10, 177:3, 177:15, 182:7
**vicarious** [1] - 167:20
**victory** [1] - 59:6
**video** [2] - 51:1, 130:20
**view** [8] - 20:11, 44:18, 78:4, 86:15, 110:21, 131:23, 187:13, 196:11
**viewed** [1] - 76:10
**views** [1] - 53:24
**violated** [1] - 12:10

**violation** [3] - 28:19, 47:15, 168:7
**virtual** [3] - 107:18, 108:25, 145:20
**virtually** [2] - 106:5, 107:8
**visible** [2] - 3:4, 194:25
**vitality** [1] - 86:22
**volume** [4] - 43:5, 83:2, 112:9, 176:10
**vs** [21] - 3:8, 17:4, 17:9, 22:4, 39:17, 42:12, 42:15, 80:23, 81:6, 81:21, 129:25, 131:4, 131:5, 131:6, 131:11, 131:15, 131:16, 131:19, 131:21, 152:14, 180:25

**W**

**wade** [1] - 100:10
**wagging** [1] - 187:18
**wait** [2] - 27:10, 77:5
**waived** [1] - 180:9
**Walk** [1] - 135:10
**walk** [2] - 143:5, 154:2
**walked** [4] - 97:19, 142:22, 186:23, 191:20
**walks** [1] - 37:17
**Wall** [5] - 29:16, 29:19, 86:7, 86:18, 87:12
**wants** [6] - 10:8, 115:3, 127:3, 129:9, 146:7, 186:13
**Warhol** [17] - 11:15, 13:8, 13:9, 16:5, 19:18, 28:11, 28:18, 29:13, 39:25, 57:9, 57:11, 57:13, 57:17, 59:1, 59:3
**WARRINGTON** [1] - 2:18
**Warrington** [1] - 4:8
**WASHINGTON** [1] - 2:23
**wave** [1] - 103:18
**waybills** [1] - 72:17
**ways** [19] - 54:6, 66:2, 72:24, 75:4, 75:14, 82:17, 92:11, 92:12, 94:24, 96:25, 100:14, 105:12, 130:12, 145:14, 151:21, 152:21, 199:5
**weave** [1] - 181:22

**web** [1] - 156:8
**website** [1] - 88:3
**week** [18] - 4:22, 5:4, 5:10, 5:11, 5:14, 5:19, 6:3, 6:11, 6:12, 6:24, 7:18, 92:21, 196:23, 196:24, 197:4, 197:11, 202:11
**weeks** [2] - 5:1, 7:12
**weigh** [4] - 11:6, 58:9, 80:16, 91:22
**weighed** [2] - 11:5, 59:3
**weighs** [1] - 13:8
**weight** [2] - 17:13, 19:17
**welcome** [1] - 63:3
**well-organized** [1] - 93:24
**well-spent** [1] - 203:21
**well-suited** [1] - 94:14
**WEST** [1] - 1:3
**West** [18] - 43:16, 61:24, 63:8, 65:17, 69:21, 70:3, 70:5, 72:17, 72:25, 78:16, 88:4, 122:7, 186:21, 187:4, 187:7, 187:21, 191:20, 192:11
**Westlaw** [90] - 11:11, 12:10, 12:15, 13:7, 13:14, 13:16, 13:22, 13:23, 13:24, 13:25, 14:14, 14:19, 14:22, 14:25, 15:16, 15:17, 18:13, 21:16, 21:20, 24:23, 26:6, 26:7, 27:8, 27:13, 33:23, 34:2, 36:3, 36:6, 36:10, 36:12, 39:8, 40:5, 40:6, 40:10, 40:13, 40:16, 40:19, 40:20, 41:1, 41:5, 42:8, 42:10, 43:16, 43:22, 46:10, 48:21, 54:2, 54:3, 54:9, 62:20, 63:6, 66:1, 69:16, 70:20, 71:15, 72:2, 88:2, 90:23, 90:25, 101:2, 112:13, 121:21, 123:20, 123:22, 124:13, 129:9, 151:13, 151:24, 152:8, 154:21, 154:24, 155:3, 155:9, 158:22,

159:8, 161:8, 164:11, 169:18, 169:20, 169:23, 183:12, 183:14, 184:9, 184:10, 185:19, 193:17, 193:18, 194:8
**Westlaw's** [6] - 12:11, 15:8, 15:11, 15:15, 182:23, 193:3
**whereas** [2] - 84:20, 179:5
**whichever** [1] - 16:1
**Whitehead** [3] - 35:14, 35:22, 36:11
**whole** [32] - 15:14, 19:1, 38:1, 38:2, 40:8, 46:19, 61:8, 64:3, 64:4, 66:14, 67:25, 68:6, 78:19, 81:24, 84:20, 86:1, 96:9, 99:13, 104:12, 113:14, 115:24, 118:20, 135:15, 141:9, 141:18, 170:12, 186:14, 192:18, 192:19, 192:21, 196:1, 201:13
**wholesale** [1] - 34:1
**wholly** [2] - 98:6, 99:5
**widely** [1] - 34:5
**widespread** [2] - 43:10, 43:21
**Williams** [1] - 180:25
**willing** [3] - 42:22, 42:24, 55:24
**WILMINGTON** [1] - 1:19, 2:15
**Wilson** [2] - 86:20
**win** [9] - 19:17, 54:19, 100:16, 136:13, 142:6, 142:11, 142:12, 144:24, 187:13
**Wind** [1] - 29:11
**wind** [1] - 56:24
**winds** [2] - 7:13, 7:17
**wink** [1] - 169:18
**wise** [1] - 203:19
**wisely** [1] - 203:12
**wish** [2] - 47:13, 81:11
**witnesses** [3] - 40:15, 40:24, 192:25
**Woman** [2] - 18:22, 56:25
**wondering** [2] - 4:23, 119:20
**word** [20] - 28:14, 31:7, 33:6, 33:11,

33:17, 38:19, 53:24, 60:18, 61:7, 83:23, 88:6, 88:9, 107:24, 127:9, 144:23
**Word2** [1] - 33:5
**wording** [1] - 132:13
**words** [45] - 22:11, 22:14, 22:16, 23:20, 24:7, 29:24, 31:6, 31:8, 31:21, 32:3, 33:3, 33:7, 33:16, 75:1, 76:25, 77:19, 78:8, 78:18, 79:4, 83:18, 83:19, 83:21, 104:18, 104:20, 106:6, 108:6, 108:17, 110:1, 125:4, 127:21, 128:21, 140:11, 140:13, 140:15, 140:16, 146:17, 161:8, 172:11, 172:12, 172:24, 179:19, 187:15, 190:24
**works** [26] - 14:9, 48:3, 53:19, 62:6, 64:6, 64:7, 67:11, 67:19, 69:5, 76:2, 76:4, 76:25, 78:13, 91:18, 98:9, 102:11, 104:13, 111:12, 129:18, 131:8, 134:15, 135:12, 150:4, 185:13, 185:21
**world** [14] - 18:14, 44:23, 65:7, 65:8, 67:18, 73:14, 92:1, 103:25, 104:25, 126:2, 160:21, 160:23, 167:5
**Worldwide** [1] - 29:20
**worries** [1] - 21:15
**worse** [4] - 41:18, 85:25, 147:23, 192:4
**worst** [2] - 80:13, 85:18
**worth** [1] - 200:11
**wrap** [3] - 52:7, 201:9, 202:7
**writable** [1] - 177:20
**write** [6] - 20:9, 71:21, 92:21, 153:19, 196:1
**writes** [1] - 73:18
**writing** [1] - 91:8
**written** [4] - 27:13, 68:25, 149:16, 160:22
**wrote** [5] - 69:10,

84:7, 92:22, 92:25, 159:2

**X**

**Xio** [1] - 130:18

**Y**

**year** [3] - 4:22, 6:5, 66:2
**years** [1] - 73:15
**Years** [1] - 14:20
**York** [2] - 2:5
**yourself** [4] - 30:1, 72:24, 142:9, 159:23
**Yungmoon** [2] - 3:16, 175:2
**YUNGMOON** [1] - 2:8

**Z**

**Zeppelin** [2] - 120:11, 152:14
**zero** [1] - 49:4
**Zoom** [3] - 182:17, 197:2, 202:4
**zoom** [2] - 200:19, 201:8