# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | C.A. No. 20-613-SB |
| | ) ) | **JURY TRIAL DEMANDED** |
| Plaintiffs/Counterdefendants, | ) ) | |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) ) | |
| Defendant/Counterclaimant. | | |

## ROSS INTELLIGENCE INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR CERTIFICATION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(B) AND FOR STAY PENDING APPEAL

OF COUNSEL:

Warrington S. Parker III
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Keith J. Harrison
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Andy LeGolvan
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square
Suite 900
Palo Alto, CA 94306
Tel: (213) 620-7755

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendant/Counterclaimant ROSS Intelligence, Inc.*

Mark S. Davies
Anna B. Naydonov
Kufere Laing
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Tel: (202) 626-3600

Taylor Moore-Willis
Rosie Norwood-Kelly
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 819-8200

Dated: March 18, 2025
12120324 / 20516.00001

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

QUESTIONS PRESENTED ..................................................................................... 6

ARGUMENT ............................................................................................................. 7

   I.   The Court should certify for interlocutory appeal the copyrightability and fair use questions. ................................................................................... 7

       A.   The copyrightability and fair use questions are controlling questions of law. ................................................................................ 8

       B.   There are substantial grounds for a difference of opinion as to whether the Westlaw headnotes are original and whether using .076% of the headnotes to train an AI legal search engine was transformative or otherwise fair ........................................................ 9

          1.   The conflicting summary judgment opinions show substantial grounds for a difference of opinion as to the originality of Westlaw headnotes ............................................. 9

          2.   The conflicting summary judgment opinions show substantial grounds for a difference of opinion as to the fair use of Westlaw headnotes. ................................................. 11

       C.   An immediate appeal will materially advance this litigation. 17

   II.   The Court should grant a stay pending appeal ................................... 20

CONCLUSION ....................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&M Records, Inc. v. Napster Inc.*,
239 F.3d 1004 (9th Cir. 2001) ............................................................. 15, 16

*A.S. ex rel. Miller v. SmithKline Beecham Corp.*,
1:13-cv-2382, 2013 WL 6506570 (M.D. Pa. Dec. 12, 2013) ........................ 20

*Ahrenholz v. Bd. of Trustees of Univ. of Ill.*,
219 F.3d 674 (7th Cir. 2000) (Posner, J.) ....................................................... 8

*Am. Geophysical Union v. Texaco Inc.*,
802 F. Supp. 1 (S.D.N.Y. 1992) (Leval, J.) ............................................. 12, 17

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ........................................................................................ 16

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) (Leval, J.) .................................................. 13, 14

*Bradburn Parent Tchr. Store, Inc. v. 3M*,
02-7676, 2005 WL 1819969 (E.D. Pa. Aug. 2, 2005) .................................. 20

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ............................................................................... 14, 16

*Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust*,
No. 17-1323, 2022 WL 548123 (D. Del. Feb. 11, 2022) ......................... 9, 21

*Consumer Fin. Prot. Bureau v. Navient Corp.*,
522 F. Supp. 3d 107 (M.D. Pa. 2021) .......................................................... 21

*Dietz v. Bouldin*,
579 U.S. 40 (2016) ......................................................................................... 21

*Ethicon LLC v. Intuitive Surgical, Inc.*,
No. 17-871, 2019 WL 1276029 (D. Del. Mar. 20, 2019) ............................. 21

*Feist v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ............................................................................... 10, 11

*Ford Motor Credit Co. v. S. E. Barnhart & Sons, Inc.*,
  664 F.2d 377 (3d Cir. 1981) .................................................................. 7

*Gen. Dynamics Corp. v. Am. Tel. and Tel. Co.*,
  658 F. Supp. 417 (N.D. Ill. 1987) ................................................... 20

*Google LLC v. Oracle Am., Inc.*,
  593 U.S. 1 (2021) ............................................................... *passim*

*Hadjipateras v. Pacifica, S.A.*,
  290 F.2d 697 (5th Cir. 1961) .......................................................... 18

*Harper & Row v. Nation Enters.*,
  471 U.S. 539 (1985) ...................................................................... 10

*In re Broadstripe, LLC*,
  No. 09-10006, 2009 WL 774401 (D. Del. Mar. 26, 2009) ........................... 19

*In re: Domestic Drywall Antitrust Litig.*,
  13-md-2437, 2016 WL 2941114 (E.D. Pa. May 20, 2016) .......................... 20

*In re Moon Group Inc.*,
  No. 21-11140, 2023 WL 3848338 (D. Del. June 6, 2023) ........................... 20

*Katz v. Carte Blanche Corp.*,
  496 F.2d 747 (3d Cir. 1974) ...................................................... 8, 9, 18

*Knipe v. SmithKline Beecham*,
  583 F. Supp. 2d 553 (E.D. Pa. 2008) .............................................. 19

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936) ...................................................................... 21

*Link v. Mercedes-Benz*,
  550 F.2d 860 (3d Cir. 1977) ........................................................ 8, 9

*Matthew Bender & Co. v. West Publ'g Co.*,
  158 F.3d 674 (2d Cir. 1998) ...................................................... 10, 11

*Pub. Int. Rsch. Grp. v. Hercules, Inc.*,
  850 F. Supp. 1549 (D. N.J. 1993) ................................................... 20

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ........................................................ 9

*Silverstein v. Penguin Putnam, Inc.*,
  522 F. Supp. 2d 579, 591 (S.D.N.Y. 2007) ...................................... 12

iii

*Sony Comput. Ent., Inc. v. Connectix Corp.,*
    203 F.3d 596 (9th Cir. 2000) ................................................................. 15, 16

*Stewart v. Abend,*
    495 U.S. 207 (1990) ................................................................................. 13

*Sundeman v. Seajay Soc'y,*
    142 F.3d 194 (4th Cir. 1998) .................................................................. 15

*Thomson Reuters Enter. Centre GMBH v. ROSS Intelligence Inc.,*
    No. 1:20-cv-613, 2025 WL 458520 (D. Del. Feb. 11, 2025) ................ *passim*

*Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.,*
    694 F. Supp. 3d 467 (D. Del. 2023) ..................................................... *passim*

*TikTok Inc. v. Garland,*
    145 S. Ct. 57 (2025) ................................................................................. 7

## STATUTES AND RULES

17 U.S.C. § 107 .............................................................................................. 12

28 U.S.C. § 1292(b) ................................................................................. *passim*

## MISCELLANEOUS

Andrew Arruda, *The world's first AI legal assistant,* YouTube (Dec. 21, 2016),
    https://tinyurl.com/nzbkm7hb ................................................................. 4

*Artificial Intelligence and Copyright* 88 Fed. Reg. 59,942 (Aug. 30, 2023) ..... 17

Chat GPT is Eating the World, *Adding Cohere lawsuit, updated Map of all 30*
    *copyright suits v. AI*, https://tinyurl.com/rvb5hawy ................................. 8

Christopher Lehane, Public Comment on behalf of OpenAI,
    https://tinyurl.com/58m6cfxw ................................................................ 17

*Copyright Registration Guidance: Works Containing Material Generated by*
    *Artificial Intelligence*, 88 Fed. Reg. 16190 (March 16, 2023) ................ 17

*Discretionary Appeals of District Court Interlocutory Orders: A Guided Tour*
    *Through Section 1292(b) of the Judicial Code*, 69 Yale L.J. 333 (1959) .... 18

Harlan F. Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4
    (1936) ...................................................................................................... 7

*Kadrey v. Meta Platforms, Inc.*,
 Plaintiffs' Motion for Partial Summary Judgment, No. 3:23-cv-03417 (N.D. Cal. Mar. 10, 2025) .......................................................................................... 7

Kate Knibbs, Every AI Copyright Lawsuit in the US, Visualized, WIRED
 https://tinyurl.com/r7zpmynf ....................................................................... 7

Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ............ 13

*Public Comment Invited on Artificial Intelligence Action Plan*, The White House, https://tinyurl.com/ynyccsn2 (Feb. 25, 2025) .................................. 17

ROSS, ROSS partners with OpenAI for the launch of its API,
 https://tinyurl.com/4yta2xs2 (June 11, 2020) ............................................... 1

Statement of the Honorable John J. Parker, Legislative History of the Judicial Code Amendments, 1958: P.L. 85-554 ......................................... 18

Tal Roded and Peter Slattery, *What drives progress in AI? Trends in Data*, FutureTech (March 19, 2024), https://tinyurl.com/38t55r8x ................... 17

Will Baude, *The 2023 Scalia Lecture: Beyond Textualism*, 46 Harv. J. L. & Pub. Pol'y 1331 (2023) ............................................................................. 18

# INTRODUCTION

This copyright case presents urgent questions governing the innovation at the heart of America's preeminence—at least for now—in artificial intelligence systems. Nearly 10 years ago, ROSS Intelligence foresaw the power of using foundational AI platforms to build an AI legal search engine that could help bring justice to many.[1] But based on theories of copyright law that understate the importance of originality and overstate the scope of copyright protection, this lawsuit has ended the developer's efforts. The evident and predictable result is a pronounced chill on AI innovation, as copyright law is used to stop fair learning based on factual statements.

Appellate review of these questions cannot wait. As the Court has recognized, copyright issues are pivotal to the upcoming trial. *Thomson Reuters Enter. Centre GMBH v. ROSS Intelligence Inc.*, No. 1:20-cv-613, 2025 WL 458520, at *1, *5 (D. Del. Feb. 11, 2025) (continuing the scheduled trial as it reconsidered copyright issues) ("*Thomson Reuters II*"). And though *Thomson Reuters II* determined that a jury no longer needed to consider originality and fair use, weighty issues remain: (1) whether and to what extent 2,830 headnotes are covered by valid copyright registrations, (2) whether 19,544 of the questions in the Bulk Memos infringe on Thomson Reuters's copyrighted headnotes, (3) whether Ross engaged in any infringing act with respect to the Key Number System and 500 judicial opinions containing Thomson Reuters's editorial decisions, and (4) any damages.

But it could all be for naught. *Thomson Reuters II* rests on infirm ground. And if the Third Circuit reverses, the jury's efforts were wasted. Or even worse, the parties, the Court, and another jury will have to do it all again. Another continuance is warranted to allow for appellate review as it will promote judicial economy and

---

[1] ROSS, ROSS partners with OpenAI for the launch of its API, https://tinyurl.com/4yta2xs2 (June 11, 2020).

efficiency.

Accordingly, pursuant to 28 U.S.C. § 1292(b), ROSS respectfully moves to certify for interlocutory appeal this Court's February 11, 2025, order granting Thomson Reuter's renewed motions for partial summary judgment on copyrightability and fair use, D.I. 770, and for a stay of proceedings pending the Third Circuit's review.

Section 1292(b) provides that a district court may certify an order for interlocutory appeal when it finds "that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b)(2).

ROSS requests certification on two questions: (1) whether the Westlaw headnotes fail the Copyright Act's originality requirement because the notes lack "creative spark" and (2) whether ROSS's use of .076% of Westlaw's headnotes to help train an AI search engine is transformative or otherwise a fair use of the headnotes. The issues presented are controlling questions of law.

There are substantial grounds for differences of opinion on each question. Look no further than this Court's two conflicting opinions. *Compare Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*, 694 F. Supp. 3d 467, 478, 487 (D. Del. 2023) *(Thomson Reuters I), with Thomson Reuters II*, 2025 WL 458520. In *Thomson Reuters I*, the Court concluded that originality and fair use were jury questions. 694 F. Supp. 3d at 478, 487. Yet without any new developments in the relevant law or change in material facts, the Court had a "belated insight" that inspired a "change of heart," and granted summary judgment to Thomson Reuters on both originality and fair use. *Thomson Reuters II*, 2025 WL 458520, at *3, *4, *10. The express doctrinal conflict presented by these two decisions reveal a simple truth: technological advances breed unresolved questions in copyright law. *See, e.g., Google*

2

*LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021).

An immediate appeal will materially advance the litigation. This is fundamentally a copyright case, as Count I of the Complaint confirms. Even though *Thomson Reuters II* resolves originality and fair use as a matter of law, it leaves open many factual questions pertaining to tens-of-thousands of headnotes along with the tortious interference claims that *Thomson Reuters I* sent to a jury. But if the Third Circuit disagrees with *Thomson Reuters II*, there are two outcomes: (1) the copyright issues never needed to go to a jury because either the headnotes are not original, or ROSS's use is fair; or (2) *Thomson Reuters I* had it right—a jury ought to determine originality and fair use. In both events, there is one effect—all the efforts and resources that went into the trial are wasted. And maybe jurors, counsel, and the Court will have to do it all again. The Judicial Conference urged Congress to enact Section 1292(b) so that courts would have the freedom to avoid such gambles.

For similar reasons, if the Court grants ROSS's motion for certification, it should also stay district court proceedings while the appellate court considers and resolves the certified questions.

STATEMENT OF FACTS

This motion assumes the Court's familiarity with the record. In brief, in 1887 the American Digest System provided a method for indexing law. This method was based on preexisting casebooks and digests. In 1908, West Publishing Corporation introduced the West Key Number System. Over 75% of the topics in Westlaw's system are the same topics as in the American Digest. The points of law are included in "headnotes" with "key numbers." The first rule for creating headnotes is "follow[ing] the court's language" "insofar as possible" to achieve "[a]ccuracy." *See* D.I. 684, Sealed Renewed ROSS Opening Brief in Support of Summary Judgment on Copyright Infringement ("ROSS CI"), at *6. Westlaw made its collection of public caselaw with headnotes available in books, and, in 1998, on westlaw.com. *See* D.I. 677, Sealed

3

Renewed ROSS Opening Brief in Support of Summary Judgment on Fair Use ("ROSS OB") at *11–*12. Today, Westlaw's system includes over 28 million headnotes and more than 100,000 points of law in 14 million judicial opinions. Ross OB at *30–*31.

Given this vast trove of public judicial opinions and the difficulty of accessing all this law, ROSS Intelligence Inc. ("ROSS") set out to use artificial intelligence technology in a legal search engine. *See* ROSS OB at *4. Since 2014, the goal of ROSS's co-founders was, and is, to reduce the cost of legal research and increase the accessibility of the law. *See* Andrew Arruda, *The world's first AI legal assistant*, YouTube (Dec. 21, 2016), https://tinyurl.com/nzbkm7hb. ROSS has access to a repository of judicial opinions called Casemaker. ROSS needed data to train the AI system to select the relevant legal material that was responsive to a user's question. ROSS's innovation included using memos with 25,000 question and answer pairs, each rated according to how effectively the answer addresses the question. ROSS OB at *3. The memos discussed a tiny percentage (.076%) of the millions of Westlaw headnotes.

The ROSS artificial intelligence legal search engine works as follows. The question and answer pairs are placed into .csv files. D.I. 680-1, Obviagele Decl. ¶ 15. The .csv files are prepared to act as training data by "tokenizing" the text (breaking down the text into smaller units such as words), then "lemmatizing" the text (changing all the text to the same grammatical form), and then reducing the tokenized and lemmatized data to mathematical equations. The tokenized and lemmatized data is then put through a process called featurization that applies various mathematical and statistical algorithms to generate numerical "features." These features quantify the similarity between specific attributes of the question and answer texts, and are then used in subsequent AI training. Thus, the system learns to weigh each feature based on its ability to predict whether a text is answer to a given question.

4

Each question-answer pair is represented by more than two dozen features. The AI system then randomly chooses 80% of the data for training and uses the remaining 20% for later validation. *Thomson Reuters II*, 2025 WL 458520, at *12 (quoting Official Transcript of Renewed Summary Judgment Hearing D.I. 769, at *30 (10:48:35), *162 (14:36:24). Training is then performed using a machine-learning tool called LambdaMART. This tool first combines and generates hundreds of thousands of composite features, then automatically adjusts their weights based on the ratings in the training data to create a model. This model is subsequently used by ROSS's legal search engine to rank how effectively caselaw passages answer a question.

The result is ROSS's AI legal search engine. A user asks a question. The AI system, now trained to take the question, searches across the millions of judicial opinions from Casemaker, and then provides the user a list of passages from relevant judicial opinions. The user is not provided with any Westlaw headnotes or other Westlaw content. The AI system does not use the Key Number System in any way. And each use of the search system teaches the engine additional relevant information about the dataset, as the original training becomes less important over time.

## STATEMENT OF PROCEDURE

Thomson Reuters, who purchased West Publishing in 1996, filed a complaint against ROSS alleging copyright infringement and tortious interference with contract. D.I. 1. ROSS counterclaimed requesting declaratory judgments on copyright invalidity, non-infringement, and no tortious interference with contract. D.I. 21. Both parties moved for summary judgment on copyrightability, fair use, and tortious interference with contract.

The Court issued two conflicting orders. In 2023, the Court denied both parties' motions for summary judgment on copyright infringement, the fair use defense, and on two tortious interference claims. The Court determined that one of Thomson Reuters's interference claims were preempted by the Copyright Act and granted

ROSS summary judgment. *See Thomson Reuters I*, 694 F. Supp. 3d at 478, 479, 482, 486–87. About a year and a half later, the Court continued the scheduled trial and then "revise[d] [its] 2023 summary judgment opinion and order." *Thomson Reuters II*, 2025 WL 458520, at *1. This time around, it granted "summary judgment for Thomson Reuters on whether the headnotes and the Key Number System are original," rejected "Ross's possible defenses" to copyright infringement, and concluded that "Thomson Reuters prevails" on fair use as to ROSS's direct infringement. *Id.* at *4, *6, and *7.

Trial is scheduled for May 12, 2025. ROSS now files this motion for interlocutory appeal.

## QUESTIONS PRESENTED

1. Westlaw headnotes excerpt legal points from public-domain judicial opinions, tracking the language of the opinion as much as possible. Do the headnotes fail the Copyright Act's originality requirement because the notes lack "creative spark"?

2. ROSS used .076% of the publicly-available Westlaw headnotes as an intermediary step in training its AI legal search system to recognize language patterns and then provide an advanced, inexpensive, and different way to access millions of public judicial opinions. Is ROSS's use transformative or otherwise fair use of the headnotes?

## ARGUMENT

Just two months ago, the U.S. Supreme Court moved expeditiously to resolve a dispute that "involve[d] new technologies with transformative capabilities." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 62 (2025). There, the relevant technology involved an advanced proprietary recommendation algorithm developed and maintained in China. Here, the relevant technology involved an advanced proprietary recommendation algorithm developed and maintained in the United States. While *TikTok* involved a unique statute, at issue here is proper application of copyright law, a common law doctrine that "performs its function adequately only when it is suited to the way of life of people." Harlan F. Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 11 (1936). But the role of the appellate courts in both settings is fundamental to resolving disputes central to the future of the United States. This copyright lawsuit has shut down the very innovation that the United States must encourage. Indeed, the Court's latest summary judgment ruling on copyrightability is already having dramatic influence over other copyright litigation matters involving AI. *See*, *e.g.*, *Kadrey v. Meta Platforms, Inc.*, Plaintiffs' Motion for Partial Summary Judgment, No. 3:23-cv-03417 (N.D. Cal. Mar. 10, 2025), D.I. 472, at *18, *28.[2] The Third Circuit's views on these issues are needed as soon as possible.

## I. The Court should certify for interlocutory appeal the copyrightability and fair use questions.

Section 1292(b) "is designed to allow for early appeal of a legal ruling when resolution of the issue may provide more efficient disposition of the litigation." *Ford Motor Credit Co. v. S. E. Barnhart & Sons, Inc.*, 664 F.2d 377, 380 (3d Cir. 1981). The question of how copyright law applies to the use of works by an artificial intelligence

---

[2] *See also* Kate Knibbs, Every AI Copyright Lawsuit in the US, Visualized, WIRED https://tinyurl.com/r7zpmynf ("The outcome [of Ross Intelligence v. Thomson Reuters] could make, break, or reshape the information ecosystem and the entire AI industry-and in doing so, impact just about every across the internet.").

system is one of the most, if not the most, fundamental legal question of today.[3] The Court's expressly conflicting rulings on copyrightability and fair use demonstrate the questions are substantial. Because this case readily satisfies the criteria set out in Section 1292(b), the petition for interlocutory appeal should be granted.

## A.    The copyrightability and fair use questions are controlling questions of law.

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974). "These orders [are] definitive, effective, and in a posture capable of affirmance and reversal." *Link v. Mercedes-Benz*, 550 F.2d 860, 863 (3d Cir. 1977). In short, a "controlling" question is "a pure question of law, something the court of appeals [can] decide quickly and cleanly without having to study the record." *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000) (Posner, J.).

The proposed questions are prototypical examples of a controlling question of law under Section 1292(b). "Copyright validity is a question of law, not fact." *Thomson Reuters, II*, 2025 WL 458520, at *2. And as explained in *Thomson Reuters II*, though fair use can be "a mixed question of law in fact," here the "undisputed facts … push this case squarely into the legal realm." 2025 WL 458520, at *7.

Further, the order at issue is "in a posture capable of affirmance and reversal." *Link*, 550 F.2d at 863. The Court has provided a definitive ruling of law on two issues that are "suitable for determination by an appellate court without a trial record." *Ahrenholz*, 219 F.3d at 677. ROSS does not ask the Third Circuit to "hunt[] through the record complied in the summary judgment proceeding to see whether there may be a genuine issue of material fact lurking there." *Ahrenholz*, 219 F.3d at 677. The

---

[3] See Chat GPT is Eating the World, *Adding Cohere lawsuit, updated Map of all 30 copyright suits v. AI*, https://tinyurl.com/rvb5hawy.

Third Circuit's resulting opinion will not be "advice on speculative matters." *Link*, 550 F.2d at 863. To the contrary, if this motion is granted the Third Circuit could resolve these fundamental copyright questions quickly and cleanly.

> **B.  There are substantial grounds for a difference of opinion as to whether the Westlaw headnotes are original and whether using .076% of the headnotes to train an AI legal search engine was transformative or otherwise fair.**

"[W]hen novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). "Certainly," there is substantial ground for difference of opinion when it takes "two district court opinions to arrive at a decision." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974). And where, as here, the same Court "revise[s]" its own prior opinion that was "wrong," *Thomson Reuters II*, 2025 WL 458520, at *1, there must be a "genuine doubt" as to the correct answer. *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust*, No. 17-1323, 2022 WL 548123, at *2 (D. Del. Feb. 11, 2022) ("*CFPB*") (cleaned up); *see also Katz*, 496 F.2d at 751–52 (discussing the district court's two opinions that come out in opposite ways on the controlling question of law). The substantive differences on copyrightability and fair use reflected in the Court's two opinions establishes substantial grounds for differences in opinion on those novel issues.

> **1.  The conflicting summary judgment opinions show substantial grounds for a difference of opinion as to the originality of Westlaw headnotes.**

The Court's summary judgment orders reach different holdings on the question of the originality of the individual headnotes. In *Thomson Reuters I*, the Court holds that a jury would need to decide whether the headnotes are original enough for copyright protection. 694 F. Supp. 3d at 478. In *Thomson Reuters II*, the Court ruled that "each headnote is an individual, copyrightable work" and that "all headnotes,

even any that quote judicial opinions verbatim, have original value as individual works." 2025 WL 458520, at *3. Both opinions are wrong.

The Second Circuit has explained why the Westlaw headnotes lack originality and thus the Court should have granted ROSS's partial summary judgment on copyrightability. For the "editor of judicial opinions for legal research, faithfulness to the public-domain original is the dominant editorial value, so that the creative is the enemy of the true." *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 674, 676–67, 688 (2d Cir. 1998) ("West's overall decision to add attorney information, subsequent history, and additional citation information exhibits little, if any, creative insight"); *see also Harper & Row v. Nation Enters.*, 471 U.S. 539, at 556–57, 563 (1985) (noting that others could copy bare historical facts from President Ford's autobiography and disallowing the copying of "subjective descriptions and portraits of public figures"). There is nothing for a jury to do here.

In *Thomson Reuters II*, the Court held that certain headnotes meet the minimal threshold for originality because "a headnote can introduce creativity by distilling, synthesizing, or explaining part of an opinion, and thus be copyrightable." 2025 WL 458520, at *3. But, as the Court also notes, "[o]riginality is central to copyright," and the "Constitution limits copyright protection to original works." *Id*. The Supreme Court has emphasized that "originality, not sweat of the brow, is the touchstone of copyright protection." *Feist v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359–60 (1991).

Nevertheless, the Court stated that "even a headnote taken verbatim from an opinion is a carefully chosen fraction of the whole." *Thomson Reuters II*, 2025 WL 458520, at *3. To illustrate, the Court noted that "identifying which words matter and chiseling away the surrounding mass expresses the editor's idea about what the important point of law from the opinion is." *Id*. Thus, "all headnotes, even any that quote judicial opinions verbatim, have original value as individual works," the Court

10

concluded. *Id.* But that is wrong under *Feist* in two respects. First, *Feist* made it clear: "No matter how original the format, however, the facts themselves do not become original through association." 499 U.S. at 349 (citations omitted). Second, *Feist* disavowed crediting the arranger's labor; the sculptor analogy, however, conflates labor with originality.

Although ROSS did not use the Key Number System, the Court also erred in its copyrightability rulings in that context. In the Court's first opinion, the Court concluded that the ultimate question of whether the Key Number System is original should go to the jury. *Thomson Reuters I*, 694 F. Supp. 3d at 477. In its second opinion, the Court went further, granting summary judgment for Thomson Reuters as to the originality of the Key Number System. *Thomson Reuters II*, 2025 WL 458520, at *3– *4. Both opinions are, again, wrong. The act of deciding or choosing a "particular" way "to organize legal topics by level of granularity"—as the Court suggests—does not create a presumption of creativity. *Id.* at 8.  Creativity is not inherently attributed to a compilation where the selection is based on "structural characteristics and attributed [] [writings] based on historical evidence." *Silverstein v. Penguin Putnam, Inc.*, 522 F. Supp. 2d 579, 591 (S.D.N.Y. 2007).

At a minimum, the three possible answers to the question of whether the headnotes are sufficiently original present a "substantial ground for difference of opinion." 28 U.S.C. § 1292(b)(2).

**2. The conflicting summary judgment opinions show substantial grounds for a difference of opinion as to the fair use of Westlaw headnotes.**

"Generally speaking, the decisions of the Supreme Court on fair use have not formulated a clear framework or standard governing future cases." *Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 30 (S.D.N.Y. 1992) (Leval, J.) (certifying the fair use question after finding it inapplicable). The doctrine's ambiguities reflect its judge-

11

made origins that Congress has codified into statute as enumerated, but not exhaustive, factors: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

None of these factors displace the doctrine's "equitable" roots. *Google*, 593 U.S. at 18. The "statutory provision that embodies the doctrine indicates, rather than dictates," the necessary "judicial balancing" that must occur while also considering "relevant circumstances, including significant changes in technology." *Id.* at 18, 19 (cleaned up). Indeed, the Supreme Court has repeatedly cautioned courts "to avoid rigid application of the copyright statute when … it would stifle the very creativity which that law is designed to foster." *Id.* at 18 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). Fair use is "clear" on only one point—the "concept is flexible," "courts must apply it in light of the sometimes conflicting aims of copyright law, and [] its application may very well vary depending upon context." *Id.* at 20.

This is the first Court to answer the important fair use question that this case presents: Is it transformative or otherwise fair to use texts that are modeled after, or recite, publicly available judicial opinions to train an AI legal search engine that produces "highly relevant quotations from judicial opinions in response to natural language questions"? *Thomson Reuters I*, 649 F. Supp. 3d at 483.

**a.** *Thomson Reuters I* and *II* share a controversial premise: the "first and fourth factors weigh most heavily in the analysis." *Thomson Reuters II*, 2025 WL 458520, at *7 (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015) (Leval, J.)); *see also Thomson Reuters I*, 694 F. Supp. 3d at 482. The Third Circuit has never endorsed this rule. And for good reason. The "provision's list of factors is not exhaustive (note the words 'include' and including'), that the examples it sets forth do not exclude other examples (note the words 'such as'), and that some factors may

prove more important in some contexts than in others." *Google*, 593 U.S. at 19. A unilateral rule that the first and fourth factors are always weighed most heavily mandates the very thing that fair use rejects—"rigid application" that ignores "relevant circumstances." *Id.* at 18, 20. In so doing, the fair use factors are reduced to a "score card that promises victory." *Id.* at 19 (quoting Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110 (1990)). *Thomson Reuters I* and *II* begin on the wrong foot.

In turn, neither decision adequately engages a critical, and undisputed, fact: ROSS used .076% of Westlaw headnotes. In *Google*, for example, the "quantitative amount copied" (.4%) and its "basic purpose" ("programmers had already learned to work" with the system) plays a central role in the fair use analysis. *Google*, 593 U.S. at 33, 34. But not in *Thomson Reuters I* or *II*. In the latter opinion, the Court deemphasized the fact that ROSS used "only a small percentage of the total headnotes owned by Westlaw" and instead focused on the fact that ROSS "did not make West headnotes available to the public." *Thomson Reuters II*, 2025 WL 458520, at *9. Though the Court ultimately concluded the "amount and substantiality of the portion used" favored ROSS's fair use, the disregard of ROSS's de minimis copying threw the Court's balancing into disarray as it significantly downplayed the impact courts afford to users who barely copy the protected work. *Id.*; *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) (fair use factors "are to be explored, and the results weighed together, in light of the purposes of copyright," they are not to "be treated in isolation, one from another").

**b.** Perhaps *Thomson Reuters II* ignored *Google*'s proportionality discussion because it concluded that ROSS's AI legal search engine was not transformative—but this is another ground for substantial difference of opinion. Consider *Thomson Reuters I*, which largely tracks the "flexible" fair use standard that the Supreme Court set forth in *Google*. *See* 593 U.S. at 20. In *Thomson Reuters I*, the Court

recognized that under "*Sega* and *Sony*," the translation of "human language into something understandable by a computer as a step in the process of trying to develop a 'wholly new,' albeit competing product" "is transformative intermediate copying." 649 F. Supp. 3d at 483. Because ROSS's AI legal search engine "communicates something new" and "expands" the "utility" of legal search models, it is "transformative" and "serves a different purpose than Westlaw" in a new market that may greatly benefit the public. *Id.* at 482, 486; *see also Authors Guild*, 804 F.3d at 207 ("[A]n author's derivative works do not include an exclusive right to supply information … about her works."). Put together, the "purpose and character" of ROSS's "use" is transformative, and its copying minimally harms the market for Westlaw and its "derivatives," but may benefit the public. *Id.* at 483, 486. Its use is fair.

*Thomson Reuters II* charts a different path. There, the Court determined that ROSS "stands to profit from exploitation of the copyrighted material" and "meant to compete with Westlaw," so its uses are commercial—not transformative. *Thomson Reuters II*, 2025 WL 458520, at *7, *10. The "intermediate copying" cases are immaterial, the Court continued, even though ROSS does "computer programming" because it did not copy "computer code whose underlying ideas can be reached only by copying their expression." *Id.* at *8. ROSS's commercial uses harm the "market for the original" and "potential derivative ones" with minimal "public benefit, the Court further reasoned. *Id.* at 10. Ultimately, the Court distinguished *Google* on the understanding that there "is nothing that Thomson Reuters created that ROSS could not have created for itself … without infringing on Thomson Reuters's copyrights." *Id.*

*Thomson Reuters II* is wrong. Commerciality requires more than profit motives and possibilities—it also requires "repeated and exploitative copying of copyrighted works." *A&M Records, Inc. v. Napster Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001); *see*

*also Sundeman v. Seajay Soc'y*, 142 F.3d 194, 204 (4th Cir. 1998) (distinguishing "commercial" motives from "exploitative" motives). And where, as here, the copied material includes unprotected elements, whether protected materials were copied to provide access to public information is critical. *See Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000).

With these considerations in mind, ROSS's willingness to compete with Westlaw does not outweigh its transformative AI technology. ROSS distributes excerpts from noncopyrightable judicial opinions that are not only free to the public—they are funded by the public. Its users do not "get for free something they would ordinarily have to buy." *Napster Inc.*, 239 F.3d at 1015. Relatedly, the fact that ROSS copied judicial text—not source code—is irrelevant. *See Thomson Reuters II*, 2025 WL 458520, at *8. As *Sony* made clear, intermediate "copying" occurs when "none of the [] copyrighted material [is] copied into, or appear[s] in, [the] final product." *Sony*, 203 F.3d at 600. Again, ROSS "did not make West headnotes available to the public," *Thomson Reuters II*, 2025 WL 458520, at *9, instead it sought to "gain[] access to the unprotected" elements of the 28 million headnotes that largely track the judicial language in the 14 million uncopyrightable opinions housed on Westlaw that lawyers have accessed for over a century. *Id*. Thus*,* ROSS is no different from the programmers in *Google*, whose copying was fair because they "had already learned to work with [the relevant] system." 593 U.S. at 34. The distinction between code and prose, in this context, is one without a difference.

**c.** Then, there's the unique character of an AI legal search engine. Undoubtedly an AI legal search engine that provides relevant excerpts of judicial opinions is of a "different character" than manually sorting through millions of headnotes that, in turn, point users to scores of relevant opinions. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 529 (2023). *Thomson Reuters II* does not consider this distinction at all. And that is a significant oversight. As a matter of first

15

principles, the goal of copyright is "to promote the progress of science and the arts, without diminishing the incentive to create." *Id.* Surely, ROSS's use of AI is a scientific progression that favors transformativeness and not "commercialism." *Campbell*, 510 U.S. at 579. Indeed, this is a far cry from *Warhol*, where the dispute arose from a "stylized derivative[]" of a photograph. 598 U.S. at 535. To reiterate, ROSS used Westlaw's headnotes to facilitate access to judicial opinions that belong to the public. The headnotes serve a "utilitarian," not an "artistic" "function" where "copyright's protection" is weaker. *Id* at 27. Westlaw's licenses provide no incentive to create; in fact, ROSS and Westlaw do not compete on creativity. They compete on their abilities to facilitate public access to the law—a public benefit. *See Google*, 593 U.S. at 35 (Courts "must take into account the public benefits the copying will likely produce.").

**d.** The gulf between *Thomson Reuters I* and *II*—despite evaluating the same facts and considering the same law—reflects substantial differences of opinion, the dearth of precedent, and the need for legal guidance. That is why the Copyright Office recently solicited public comments on "fair use," *Artificial Intelligence and Copyright* 88 Fed. Reg. 59,942, 59,496 (Aug. 30, 2023), pursuant to an "agency-wide initiative to delve into" the law's application "to the use of copyrighted works in AI training and the resulting treatment of outputs," *Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence*, 88 Fed. Reg. 16190, 16191 (March 16, 2023). Just weeks ago, the White House followed up on the Copyright Office's efforts and invited public comment on its "AI Action Plan." *Public Comment Invited on Artificial Intelligence Action Plan*, The White House, https://tinyurl.com/ynyccsn2 (Feb. 25, 2025).

As comments continue to come in, the intersections of AI, fair use, and national security are on full display. *See, e.g.*, Christopher Lehane, Public Comment on behalf of OpenAI, at *10–11, https://tinyurl.com/58m6cfxw. That is because AI models need

data. *See* Tal Roded and Peter Slattery, *What drives progress in AI? Trends in Data*, FutureTech (March 19, 2024), https://tinyurl.com/38t55r8x. The national security issues that arise from data usage persist regardless of whether the AI model is generative or non-generative. *Cf. Thomson Reuters II*, 2025 WL 458520, at *8 (noting "for readers that only non-generative AI is before" the Court).  At the moment, fair use is suspended in the balance, and there are substantial grounds for differing opinions as to its future. The Third Circuit should weigh in now. *See also Am. Geo. Union*, 802 F. Supp. at 29 (the "public interest" supports "prompt appellate review" when a "fair use issue" presents questions that impact industry and the public).

### C.    An immediate appeal will materially advance this litigation.

Section 1292(b) must be applied consistently with the "policies favoring interlocutory appeal," one of which is "the avoidance of possibly wasted trial time and litigation expense." *Katz*, 496 F.2d at 756. Immediate appeal here is consistent with the "typical example" that Section 1292's draftsmen considered: eliminating the possibility that a "circuit court of appeals" will reverse a district court's determination that a theory of legal liability or an affirmative defense is "not applicable" and then proceeds through a long trial that results in damages. Statement of the Honorable John J. Parker, Legislative History of the Judicial Code Amendments, 1958: P.L. 85-554; and, P.L. 85-791; and, P.L. 85-919; and, P.L. 85-920, at *8 (1958) ("Statement of Judge Parker"); *see also Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 702 (5th Cir. 1961) (Section 1292(b) "was a judge-sought, judge-made, and judge-sponsored enactment."); Will Baude, *The 2023 Scalia Lecture: Beyond Textualism*, 46 Harv. J. L. & Pub. Pol'y 1331, 1334 (2023) ("careful and clear" use of legislative history aligns with textualism). If the court of appeals reverses the trial court's ruling on liability or that the affirmative defense does not apply, it must also vacate the damages that the jury awarded, and ultimately the district court's "work [was] for nothing." Statement of Judge Parker at *8; *see also Katz*, 496 F.2d at 754; Note, *Discretionary*

*Appeals of District Court Interlocutory Orders: A Guided Tour Through Section 1292(b) of the Judicial Code*, 69 Yale L.J. 333, 334 (1959) ("When the order requires reversal on final appeal, all intervening lower-court proceedings are wasted.").

Immediate appellate review here would "materially advance the litigation." 28 U.S.C. § 1292(b). To make things plain, following *Thomson Reuters II*, a jury will be asked to resolve the following copyright issues: (1) whether and to what extent 2,830 headnotes are covered by valid copyright registrations, (2) whether 19,544 of the questions in the Bulk Memos infringe on Thomson Reuters's copyrighted headnotes, (3) whether Ross engaged in any infringing act with respect to the Key Number System and 500 judicial opinions containing Thomson Reuters's editorial decisions, and (4) any damages. True, the Court has "slogged through" 2,830 headnotes and "closely" "studied the case materials," but the jury will be forced to do nearly 10 times the work, with the same level of meticulousness, and with the added complication of group collaboration. *Thomson Reuters II*, 2025 WL 458520, at *1, *5. Presumably, the Court recognized the burdens that the copyright issues impose when it continued the scheduled trial as it reconsidered the copyright issues. *Id.*, at *1.

If the Third Circuit vacates and reverses because the headnotes are not original or ROSS's use is fair as a matter of law, then all that work is for naught: voir dire, jury selection, listening to days of testimony, playing close attention to the charge, reviewing the exhibits, hours (maybe days) of deliberation, and calculating damages. The work effectively doubles if the Third Circuit vacates and remands because it concludes *Thomson Reuters I* was correct—perhaps, originality and fair use are jury questions after all. And this says nothing of the emotional toll: the time away from work and family. Before jurors take on these important tasks, the Court should be certain of the necessity.

The fact that the tortious interference with contract issues remain does not counsel against immediate appellate review. Make no mistake, copyright

18

infringement is the "gravamen" this case. *In re Broadstripe, LLC*, No. 09-10006, 2009 WL 774401, at \*2 (D. Del. Mar. 26, 2009); *see also* Thomson Reuters Complaint, at \*13–\*14 ("Count I: Copyright Infringement") (D.I. 1). And if it turns out that the headnotes are not original, or ROSS's use is fair, the tortious interference trial is far simpler than a trial involving copyright too. *See Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 600 (E.D. Pa. 2008) (litigation is materially advanced when complex issues are eliminated from trial).

Moreover, the downsides of two trials scaffold when considering the tortious interference claims. That is because Thomson Reuters does not present an independent profit disgorgement theory for its tortious interference claim. *See* James Malackowski Expert Report at 44, 58. So if the Third Circuit concludes that ROSS did not violate the Copyright Act, but a jury finds that ROSS tortiously interfered with Thomson Reuters's contract with LegalEase, on remand the jury may have to recalculate the damages award. In other words, Thomson Reuters's profit disgorgement damages theory is "fully intertwined" with the merits of its Copyright Act claims. *In re Moon Group Inc.*, No. 21-11140, 2023 WL 3848338, at \*7 (D. Del. June 6, 2023).

In sum, scores of courts have concluded that an interlocutory appeal materially advances the ultimate termination of litigation in similar procedural postures. There can be no dispute that courts should avoid taking the risk that a case "will have to be retried, resulting in a waste of resources." *Id.*; *see also Pub. Int. Rsch. Grp. v. Hercules, Inc.*, 850 F. Supp. 1549, 1557–58 (D. N.J. 1993) (concluding that certification may materially advance the litigation based on the possibility of a second trial); *Gen. Dynamics Corp. v. Am. Tel. and Tel. Co.*, 658 F. Supp. 417, 419 (N.D. Ill. 1987) (same); *In re: Domestic Drywall Antitrust Litig.*, 13-md-2437, 2016 WL 2941114, at \*4–5 (E.D. Pa. May 20, 2016) (same); *A.S. ex rel. Miller v. SmithKline Beecham Corp.*, 1:13-cv-2382, 2013 WL 6506570, at \*3 (M.D. Pa. Dec. 12, 2013) (same).

## II.    The Court should grant a stay pending appeal.

If the Court grants ROSS's motion for certification, the Court should stay further proceedings as the appellate process answers the important questions. A decision to stay litigation lies within the Court's discretion and represents an exercise of its "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). Although a grant of certification under Section 1292(b) does not automatically stay the trial court proceedings, "courts have routinely granted a stay where they have certified an order for interlocutory appeal." *Consumer Fin. Prot. Bureau v. Navient Corp.*, 522 F. Supp. 3d 107, 120 (M.D. Pa. 2021) (collecting cases); *see also CFPB*, 2022 WL 548123, at *4.

A stay here makes sense. As explained, an immediate appeal materially advances the ultimate termination of litigation because it potentially eliminates the need for a copyright trial and lessens the probability of two trials—staying the trial court proceedings is thus consistent with the conclusion that certification is warranted. And though the Court has set a trial date, the litigation is "at an efficient stopping point" now that discovery has concluded. *Ethicon LLC v. Intuitive Surgical, Inc.*, No. 17-871, 2019 WL 1276029 at *2 (D. Del. Mar. 20, 2019). Finally, a stay will not prejudice Thomson Reuters, a delay in trial is not "severe" and if it turns out that ROSS infringed, Thomson Reuters will receive damages. *Id.* at *3.

## CONCLUSION

For the foregoing reasons, this Court should grant the motion for certification for interlocutory appeal under 28 U.S.C. § 1292(b) and issue an accompanying stay pending appeal.

OF COUNSEL:

Warrington S. Parker III
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Keith J. Harrison
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Andy LeGolvan
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square
Suite 900
Palo Alto, CA 94306
Tel: (213) 620-7755

Mark S. Davies
Anna B. Naydonov
Kufere Laing
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Tel: (202) 626-3600

Taylor Moore-Willis
Rosie Norwood-Kelly
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 819-8200

Dated: March 18, 2025
12120324 / 20516.00001

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com

*Attorneys for*
*Defendant/Counterclaimant ROSS*
*Intelligence, Inc.*